# U.S. District Court
## Eastern District of Oklahoma (Muskogee)
## CIVIL DOCKET FOR CASE #: 6:09–cv–00105–JHP

| | |
|---|---|
| Barrett v. USA | Date Filed: 03/16/2009 |
| Assigned to: District Judge James H. Payne | Date Terminated: 08/16/2012 |
| Case in other court: ED/OK, 6:04–cr–115 | Jury Demand: None |
| Cause: 28:2255 Motion to Vacate / Correct Illegal Sentence | Nature of Suit: 535 Death Penalty – Habeas Corpus |
| | Jurisdiction: U.S. Government Defendant |

**Petitioner**

**Kenneth Eugene Barrett**                  represented by   **David B. Autry**
1021 NW 16th St
Oklahoma City, OK 73106
405–521–9600
Fax: 405–521–9669
Email: dbautry44@hotmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joan M. Fisher**
Federal Public Defender – Sacramento, CA
801 "I" St, Third Floor
Sacramento, CA 95814
916–498–6666
Fax: 916–498–5706
Email: joan.fisher@fd.org
*ATTORNEY TO BE NOTICED*

**Tivon Schardl**
Federal Public Defender – Sacramento, CA
801 "I" St, Third Floor
Sacramento, CA 95814
916–498–6666
Fax: 916–498–6656
Email: tim.schardl@fd.org
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**USA**                  represented by   **Christopher J. Wilson**
US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401
918–684–5100
Fax: 918–684–5150

Email: Chris.Wilson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Kahan**
US Department of Justice – Capital Case
Unit
1331 F St NW
Rm 345
Washington, DC 20530
202−305−8910
Fax: 202−353−9779
Email: jeffrey.kahan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheldon J. Sperling**
US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401
918−684−5100
Fax: 918−684−5150
*TERMINATED: 11/24/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/10/2009 | 4 | | MOTION to File Exhibits Under Seal and for a Protective Order by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 5 | | ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for a Protective Order (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 6 | | MOTION to Reconsider (Re: 5 Order Ruling on Motion to Seal Exhibits and for Protective Order) by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 7 | | AMENDED ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for Protective Order (Re: 5 Order, 6 Motion to Reconsider) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 1 | | MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett; Responses due by 6/16/2009 (With attachments – **EXHIBITS 1−36; 59−60**)(EXHIBITS 37−58 NOT USED)(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 3 | | EXHIBITS IN SUPPORT OF MOTION **Nos. 61−70, 71−80, 81−99, 100−118** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 8 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 119, 120, 121, 122,** |

| | | | |
|---|---|---|---|
| | | | **123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134 and 135** (Re: 1 MOTION to Vacate and 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 9 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 10 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 11 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 12 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 13 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 137, 138, 139, 140, 141, 142 and 143** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 14 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 144A, 144B, 145 and 146** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 15 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 16 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 17 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 18 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 19 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 147B2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 20 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 21 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| 03/16/2009 | 22 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
|---|---|---|---|
| 03/16/2009 | 23 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 24 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 25 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 26 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147F** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 27 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147G** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 28 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 148, 149, 150, 151, 152, 153, 154, 155, 156, 157 and 158** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 29 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 159, 160, 161, 162, 163, 164 and 165** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 30 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 166, 167, 168, 169, 170, 171, 172, 173, 174 and 175** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 31 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 32 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 33 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 34 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 35 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| | | | |
|---|---|---|---|
| 03/16/2009 | 36 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 37 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 178, 179 and 180** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 38 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 39 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 40 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 41 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 42 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 182, 183, 184 and 185** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 43 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 186, 187, 188, 189, 190, 191, 192, 193, 194 and 195** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/17/2009 | 2 | | CORRECTED MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett (corrected to include verification) (Re: 1 Motion to Vacate); Responses due by 6/16/2009(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/18/2009 | 44 | | NOTICE to Government to Respond by **6/16/2009** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) Modified on 3/19/2009 to change response date to 6/16/09 (cjt, Deputy Clerk). (Entered: 03/18/2009) |
| 03/19/2009 | | | NOTICE of Docket Entry Modification; Error: Wrong date of 3/16/09 given in text; Correction: Correcting response date to 6/16/09 (Re: 44 Notice to Respond) (cjt, Deputy Clerk) (Entered: 03/19/2009) |
| 05/29/2009 | 45 | | MOTION to Disqualify Judge by Kenneth Eugene Barrett Responses due by 6/15/2009 Replies due by 6/24/2009.(Schardl, Tivon) (Entered: 05/29/2009) |
| 06/03/2009 | 46 | | ATTORNEY APPEARANCE by Christopher J. Wilson on behalf of USA (Wilson, Christopher) (Entered: 06/03/2009) |
| 06/11/2009 | 47 | | First MOTION for Extension of Time to Respond to Motion (Re: 45 MOTION to Disqualify Judge ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/11/2009 | 48 | | First MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION |

| | | | |
|---|---|---|---|
| | | | to Vacate Order/Judgment, 1 MOTION to Vacate Order/Judgment ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/12/2009 | 49 | | MINUTE ORDER by District Judge James H. Payne granting Application for Extension of Time to Respond to Petitioner's Motoin to Disqualify and Recuse United States District Judge James H. Payne from Further Participation in this Matter ( 47 Motion for Extension of Time to Respond to Motion). Accordingly, the respondent has until 7/15/09 within which to file its response to petitioner's motion (Re: 45 MOTION to Disqualify Judge ).(law, Deputy Clerk) (Entered: 06/12/2009) |
| 06/12/2009 | 50 | | MINUTE ORDER by District Judge James H. Payne granting in part and denying in part Application for Extension of Time to Respond to Petitioner's 28 U.S.C. Section 2255 Motion ( 48 Motion for Extension of Time to Respond to Motion ). Respondent has an additional 3 months or until 9/16/09 within which to file its response to petitioner's 28 U.S.C. Section 2255 Motion. (law, Deputy Clerk) (Entered: 06/12/2009) |
| 07/13/2009 | 51 | | RESPONSE in Opposition to Motion (Re: 45 MOTION to Disqualify Judge ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 07/13/2009) |
| 07/24/2009 | 52 | | First MOTION to unseal documents in cr−04−115 by USA Responses due by 8/10/2009 Replies due by 8/19/2009.(Wilson, Christopher) (Entered: 07/24/2009) |
| 08/14/2009 | 53 | | MOTION to File Response to Government's Motion to Unseal Out of Time by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/14/2009 | 54 | | MOTION to File Out of Time *PROPOSED ORDER* by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/17/2009 | 55 | | ORDER by District Judge James H. Payne: striking 54 Petitioner's Proposed Order which was filed in error (cjt, Deputy Clerk) (Entered: 08/17/2009) |
| 08/19/2009 | 56 | | MINUTE ORDER by District Judge James H. Payne: Directing Petitioner to supplement 53 MOTION to File Response to Government's Motion to Unseal Out of Time by 5:00 p.m. today, 8/19/09, to include a statement as to whether either Christopher J. Wilson or Jeffrey B. Kahan, counsel for respondent, USA objects to the motion. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 57 | | SUPPLEMENT (Re: 56 Minute Order,,, 53 MOTION to File Response to Government's Motion to Unseal Out of Time ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 08/19/2009) |
| 08/19/2009 | 58 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/19/2009) |
| 08/19/2009 | 59 | | MINUTE ORDER by District Judge James H. Payne: Striking 58 Petitioner's Response in Opposition to the Government's Motion to Unseal (Re: 52 Government's MOTION to Unseal Documents). (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 60 | | |

| Date | Doc | | Description |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53 ) is hereby granted. The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2255 Motion (Doc. # 2) and that the Government's Motion to Unseal (Doc. # 52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion. To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their current response deadlines on the § 2255 Motion. Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52 ) and the Government shall be given until September 2, 2009, to Reply. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/26/2009 | 61 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/26/2009) |
| 08/28/2009 | 62 | | REPLY to Response to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 08/28/2009) |
| 09/04/2009 | 63 | | Second MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment ) by USA Responses due by 9/21/2009(Wilson, Christopher) (Entered: 09/04/2009) |
| 09/04/2009 | 64 | | MINUTE ORDER by District Judge James H. Payne: granting 63 Respondent's Motion for Extension of Time to Respond to Motion; Response due by 10/16/2009 (Re: 1 MOTION to Vacate Order/Judgment, 2 Corrected MOTION to Vacate Order/Judgment ) (cjt, Deputy Clerk) (Entered: 09/04/2009) |
| 09/04/2009 | 65 | | RESPONSE to Motion (Re: 63 Second MOTION for Extension to Respond to 2255 Motion) by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 9/8/2009 to change text and change link (dma, Deputy Clerk). (Entered: 09/04/2009) |
| 09/11/2009 | 66 | | ORDER by District Judge James H. Payne: denying 45 Petitioner's Motion to Disqualify and Recuse (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/11/2009 | 67 | | ORDER by District Judge James H. Payne: Granting in part, denying in part and taking under advisement in part 52 Government's MOTION to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings filed Cr−04−115 (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/22/2009 | 68 | | NOTICE of Intention Not to Abandon Claims and REQUEST for Protective Order (Re: 67 Order) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) Modified on 9/23/2009 change text (dma, Deputy Clerk). (Entered: 09/22/2009) |
| 09/23/2009 | 69 | | ORDER by District Judge James H. Payne (Re: 67 Order, 68 Petitioner's NOTICE of Intent Not to Abandon Claims and REQUEST for Protective Order) (cjt, Deputy Clerk) (Entered: 09/23/2009) |
| 09/25/2009 | 70 | | |

| | | | |
|---|---|---|---|
| | | | Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* by Kenneth Eugene Barrett Responses due by 10/13/2009 (With attachments – **EXHIBITS 1–10**)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 71 | | EXHIBIT(S) **11 through 50** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 72 | | EXHIBIT(S) **51 through 118** (Re: 70 Amended MOTION to Vacate Order/Judgment *, Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/28/2009 | 73 | | OBJECTION to Petitioner's Proposed Protective Order (Re: 68 MOTION for Protective Order) by USA (Wilson, Christopher) Modified on 9/29/2009 to change text (dma, Deputy Clerk). (Entered: 09/28/2009) |
| 09/29/2009 | 74 | | ORDER by District Judge James H. Payne: Show Cause Hearing and Scheduling Conference are set for 10/6/2009 at 02:00 PM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 70 Amended MOTION for Collateral Relief, to Vacate, Set Aside or Correct Sentence and for a New Trial) (cjt, Deputy Clerk) (Entered: 09/29/2009) |
| 09/30/2009 | 75 | | RESPONSE (Re: 69 Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 09/30/2009) |
| 10/02/2009 | 76 | | MOTION to Vacate Order/Judgment *Order Filed September 29, 2009*, MOTION to Continue Hearing(s) *On Order to Show Cause* (Re: 74 Order,, Setting/Resetting Hearing(s), Setting/Resetting Hearing(s),, ) by Kenneth Eugene Barrett Responses due by 10/19/2009 (With attachments)(Schardl, Tivon) (Entered: 10/02/2009) |
| 10/02/2009 | 77 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's emergency motion (Dkt 76 ) to vacate show cause order is denied. The court hereby waives the presence of petitioner's counsel, Tivon Schardl, at the hearing scheduled October 6, 2009, at 2:00 p.m. Lead counsel, David Autry, is required to attend; however, arrangements will be made for lead counsel to speak with co–counsel Tivon Schardl via telephone, if necessary. In addition, the parties should be aware the court intends to conduct a status and scheduling conference to receive the parties' observations and comments as to the time frame necessary for disposition of this matter. (cjt, Deputy Clerk) (Entered: 10/02/2009) |
| 10/05/2009 | 78 | | MOTION to Continue Hearing(s), MOTION to Recuse, MOTION to Reconsider, MOTION for Leave to Appear *y* (Re: 77 Minute Order,,, Ruling on Motion to Vacate Order/Judgment,,, Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 10/20/2009(Schardl, Tivon) (Entered: 10/05/2009) |
| 10/05/2009 | 79 | | MINUTE ORDER by District Judge James H. Payne: denying 78 Petitioner's Motion to Reconsider; denying 78 Petitioner's Motion to Continue Hearing; finding as moot 78 Motion for Leave to Appear by Telephone pursuant to |

| | | | |
|---|---|---|---|
| | | | Minute Order 77 entered on 10/2/09. 78 Petioner's Motion to Recuse was previously denied by Order 66 entered on 9/11/09. (cjt, Deputy Clerk) (Entered: 10/05/2009) |
| 10/06/2009 | 80 | | MINUTES of Proceedings – held before District Judge James H. Payne: Show Cause/Scheduling Hearing held on 10/6/2009 (Court Reporter: K.Sidwell) (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 81 | | SCHEDULING ORDER by District Judge James H. Payne: Amended Motion to Vacate due 11/6/2009; Brief in Support due 1/5/2010; Response due 3/8/2010; Reply due 3/23/2010 (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 82 | | PROTECTIVE ORDER by District Judge James H. Payne: granting 68 Petitioner's Motion for Protective Order; granting 52 Government's Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/08/2009 | 83 | | ***Remark: Pursuant to 82 Protective Order entered on 10/7/2009, copies of sealed Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, 274, 301 and the sealed letter dated 2/28/2005, all filed in Case No. CR–04–115–JHP, were personally delivered to Asst. United States Attorney Christopher Wilson on 10/8/2009. (cjt, Deputy Clerk) (Entered: 10/08/2009) |
| 10/09/2009 | 84 | | STATUS REPORT by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 10/09/2009) |
| 10/15/2009 | 85 | | TRANSCRIPT of Proceedings (Unredacted) of Show cause/Scheduling Hearing held on 10/6/09 before District Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–42). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 80 Minutes of Scheduling Conference, Striking/Terminating Deadline(s)/Hearing(s) ) (kns, Court Reporter) (Entered: 10/15/2009) |
| 10/16/2009 | 86 | | MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* by Kenneth Eugene Barrett Responses due by 11/2/2009(Schardl, Tivon) (Entered: 10/16/2009) |
| 10/20/2009 | 87 | | ORDER by District Judge James H. Payne ; denying 86 Motion to Stay (lsa, Chambers) (Entered: 10/20/2009) |
| 10/28/2009 | 88 | | Unopposed MOTION to Extend Deadline(s) *Established by Order filed October 7, 2009* by Kenneth Eugene Barrett Responses due by 11/12/2009 (With attachments)(Schardl, Tivon) (Entered: 10/28/2009) |
| 11/02/2009 | 89 | | SUPPLEMENT to Unopposed Motion to Continue Filing Schedule 88 by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 11/3/2009 to edit text (cjt, Deputy Clerk). (Entered: 11/02/2009) |
| 11/03/2009 | 90 | | ORDER EXTENDING FILING SCHEDULE by District Judge James H. Payne: granting 88 Petitioner's Unopposed Motion to Continue Filing Schedule (cjt, Deputy Clerk) (Entered: 11/03/2009) |

| | | | |
|---|---|---|---|
| 11/04/2009 | 91 | | ORDER from Circuit Court (Re: 86 MOTION to Stay Proceedings Pending Disposition of Mandamus Action 87 Order Denying Motion to Stay) (cjt, Deputy Clerk) (Entered: 11/04/2009) |
| 12/03/2009 | 92 | | MINUTE ORDER by District Judge James H. Payne: Show Cause Hearing is set for 12/15/2009 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne for David Autry to show cause why he has failed to comply with this Court's prior orders regarding submission of CJA vouchers. Only David Autry's appearance is required at this hearing. (cjt, Deputy Clerk) (Entered: 12/03/2009) |
| 12/04/2009 | 93 | | ATTORNEY APPEARANCE by Joan Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified on 12/7/2009 to change text (dma, Deputy Clerk). (Entered: 12/04/2009) |
| 12/04/2009 | 94 | | NOTICE Petitioner's Notice Regarding Amended Petition by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 12/04/2009) |
| 12/04/2009 | 95 | | Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* by Kenneth Eugene Barrett Responses due by 12/18/2009(Fisher, Joan) (Entered: 12/04/2009) |
| 12/14/2009 | 96 | | ORDER from Circuit Court (Re: 87 Order, Ruling on Motion to Stay, 86 MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* ) (With attachments)(law, Deputy Clerk) (Entered: 12/14/2009) |
| 12/15/2009 | 97 | | SEALED MINUTES of Show Cause Hearing (cjt, Deputy Clerk) (Entered: 12/15/2009) |
| 01/08/2010 | 98 | | MOTION to Extend Deadline(s) *for submission of cja voucher* by Kenneth Eugene Barrett Responses due by 1/22/2010(Autry, David) (Entered: 01/08/2010) |
| 01/08/2010 | 99 | | MINUTE ORDER by District Judge James H. Payne: granting 98 Motion to Extend Time for Submittal of CJA Voucher by Petitioner's counsel, David Autry, until 1/11/2010. (cjt, Deputy Clerk) (Entered: 01/08/2010) |
| 01/11/2010 | 100 | | NOTICE of Submission of Matter for In Camera Review by USA (Wilson, Christopher) (Entered: 01/11/2010) |
| 01/11/2010 | 101 | | SEALED LETTER (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/12/2010 | 102 | | PROTECTIVE ORDER by District Judge James H. Payne (Re: 101 Sealed Letter) (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/13/2010 | 103 | | Unopposed MOTION to Extend Deadline(s) *to File Brief in Support of Amended Petition and Subsequent Briefing* by Kenneth Eugene Barrett Responses due by 1/27/2010 (With attachments)(Schardl, Tivon) (Entered: 01/13/2010) |
| 01/15/2010 | 104 | | MINUTE ORDER by District Judge James H. Payne: For good cause shown, 103 Petitioner's Motion for Extension of Time to File Brief in Support of Amended Motion to Vacate is granted. Petitioner shall be given until 2/18/2010 to file his brief. No further extensions of time shall be granted. Respondent's answer shall be due 4/19/2010 and Petitioner's reply will be due 5/4/2010. (Re: 95 Amended MOTION to Vacate, Set Aside, or Correct a Sentence under 28 |

| | | | |
|---|---|---|---|
| | | | U.S.C. sec. 2255) (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 01/15/2010 | 105 | | MINUTE ORDER by District Judge James H. Payne: It is hereby ordered that Petitioner Kenneth Eugene Barrett's CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT–APPOINTED COUNSEL comes before the Court by David B. Autry. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original application and supporting documents. (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 02/02/2010 | 106 | | MINUTE ORDER by District Judge James H. Payne (Attachments: # 1 1/29/2010 E–Mail) (cjt, Deputy Clerk) (Entered: 02/02/2010) |
| 02/11/2010 | 107 | | Third MOTION to Extend Deadline(s) *Due to Newly Disclosed Evidence* by Kenneth Eugene Barrett Responses due by 2/25/2010 (With attachments)(Schardl, Tivon) (Entered: 02/11/2010) |
| 02/12/2010 | 108 | | MINUTE ORDER by District Judge James H. Payne: Motion Hearing and Status Conference are set for 3/1/2010 at 09:30 AM before District Judge James H. Payne (Re: 107 Petitioner's Third MOTION to Continue Briefing Schedule). Counsel are required to be present at this hearing. Petitioner does not need to be present. (cjt, Deputy Clerk) (Entered: 02/12/2010) |
| 02/18/2010 | 109 | | MOTION Leave to File Oversized Brief in Support of Amended Motion to Vacate, MOTION for Leave to File Brief in Support of Second Amended Motion to Vacate by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 110 | | Unopposed MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 3/4/2010(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 111 | | Amended MOTION for Leave to Exceed Page Limitation by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 112 | | MINUTE ORDER by District Judge James H. Payne: denying 111 Petitioner's Amended Motion for Leave to File Oversized Brief, with written order to follow (finding as moot 109 Petitioner's Motion for Leave to File Oversized Brief) (cjt, Deputy Clerk) (Entered: 02/18/2010) |
| 02/18/2010 | 113 | | MOTION to Reconsider *Order Denying Leave to File Oversized Brief* (Re: 112 Minute Order,, Ruling on Motion for Miscellaneous Relief,, Ruling on Motion for Leave to File Document(s), Ruling on Motion for Leave to File Document(s), Ruling on Motion to Exceed Page Limitation, ) by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 114 | | REDACTED EXHIBITS **119, 120, 121, 122** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 115 | | REDACTED EXHIBITS **125, 126, 128, 129, 130, 132, 133, 134, 137, 138** (Re: |

| | | | |
|---|---|---|---|
| | | | 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 116 | | REDACTED EXHIBITS **148, 149, 150, 151, 152, 153, 154** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 117 | | REDACTED EXHIBITS **123, 124, 127, 131, 135** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 118 | | REDACTED EXHIBITS **155, 156** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 119 | | REDACTED EXHIBITS **157, 158** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 120 | | REDACTED EXHIBITS **163, 164** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 121 | | REDACTED EXHIBIT **161** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 122 | | REDACTED EXHIBIT **162** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 123 | | REDACTED EXHIBITS **165, 166** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 124 | | REDACTED EXHIBIT **159 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 125 | | REDACTED EXHIBITS **167, 168, 169** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 126 | | REDACTED EXHIBIT **159 Part b** (Re: 95 Amended MOTION to Vacate |

| | | | |
|---|---|---|---|
| | | | Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 127 | | REDACTED EXHIBITS **170, 171** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 128 | | REDACTED EXHIBIT **160 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 129 | | REDACTED EXHIBIT **160 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 130 | | REDACTED EXHIBITS **172, 173** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 131 | | REDACTED EXHIBIT **177 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 132 | | REDACTED EXHIBITS **174, 175, 176, 178** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 133 | | REDACTED EXHIBIT **177 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 134 | | REDACTED EXHIBIT **177 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 135 | | REDACTED EXHIBITS **179, 180, 181a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 136 | | REDACTED EXHIBIT **181 Part B1** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 137 | | REDACTED EXHIBITS **182, 183** (Re: 95 Amended MOTION to Vacate |

| | | | |
|---|---|---|---|
| | | | Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 138 | | REDACTED EXHIBIT **181 Part B2** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 139 | | REDACTED EXHIBIT **196 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 140 | | REDACTED EXHIBITS **184, 185, 186, 187, 188** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 141 | | REDACTED EXHIBIT **196 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 142 | | REDACTED EXHIBIT **196 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 143 | | REDACTED EXHIBIT **196 Part d** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 144 | | REDACTED EXHIBITS **189, 190, 191, 192, 193, 194, 195** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 145 | | REDACTED EXHIBITS **197, 198, 199, 200, 203, 204, and 205** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/18/2010) |
| 02/26/2010 | 146 | | ORDER by District Judge James H. Payne: granting 113 petitioner's Motion to Reconsider; Petitioner's brief due 3/1/10 at 4:30 p.m.; Status Conference RESET for 3/31/2010 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne; (granting in part 107 Motion to Continue Briefing Schedule; striking 1 Motion to Vacate Order/Judgment; striking 2 Corrected Motion to Vacate Order/Judgment; striking 70 Amended Motion to Vacate Order/Judgment) (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 02/26/2010 | 147 | | ORDER by District Judge James H. Payne: Re: 110 petitioner's Unopposed MOTION to File Exhibits Under Seal; Petitioner's response due 3/12/10 (cjt, |

| | | | |
|---|---|---|---|
| | | | Deputy Clerk) (Entered: 02/26/2010) |
| 03/01/2010 | 148 | | STIPULATION *and Order [Proposed] Modified Protective Order* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 149 | | BRIEF in Support of Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 150 | | MOTION for Evidentiary Hearing (Re: 95 Amended MOTION to Vacate) by Kenneth Eugene Barrett; Responses due by 3/15/2010(Schardl, Tivon) Modified on 3/2/2010 to change text and link (dma, Deputy Clerk). (Entered: 03/01/2010) |
| 03/01/2010 | 151 | | MOTION Expand the Record (Re: 149 Brief in Support of Motion ) by Kenneth Eugene Barrett Responses due by 3/15/2010(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/03/2010 | 152 | | Joint MOTION to Modify Protective Order by all parties Responses due by 3/17/2010(Wilson, Christopher) (Entered: 03/03/2010) |
| 03/05/2010 | 153 | | RESPONSE in Opposition to Motion (Re: 150 MOTION for Hearing ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/05/2010 | 154 | | RESPONSE in Opposition to Motion (Re: 151 MOTION Expand the Record ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/12/2010 | 155 | | RESPONSE by Kenneth Eugene Barrett (Re: 147 Order) (Fisher, Joan) (Entered: 03/12/2010) |
| 03/25/2010 | 156 | | MINUTE ORDER by District Judge James H. Payne: **TIME CHANGE ONLY** – Status Conference RESET for 3/31/2010 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne. (cjt, Deputy Clerk) (Entered: 03/25/2010) |
| 03/29/2010 | 157 | | ORDER by District Judge James H. Payne: denying 150 Petitioner's Motion for Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/29/2010 | 158 | | MOTION to be Excused from the Status Conference set on March 31, 2010 by USA Responses due by 4/12/2010(Wilson, Christopher) (Entered: 03/29/2010) |
| 03/29/2010 | 159 | | MINUTE ORDER by District Judge James H. Payne: granting 158 Government's Motion to be Excused from Attendance of Status Conference. The Court further grants Government's request for substitute counsel, Douglas Horn, to appear in lieu of Christopher Wilson for this hearing only. (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/30/2010 | 160 | | MINUTE ORDER by District Judge James H. Payne: The Court directs that Courtroom 1, Room 230, be sealed on 3/31/2010 at 9:00 a.m. for the portion of the Status Hearing pertaining to the Protective Order. The Clerk is directed to post this Minute Order on the Court's bulletin board for public viewing located on the 2nd floor of the United States Courthouse. (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 161 | | ORDER (Re: Exhibits) by District Judge James H. Payne: granting 110 |

| | | | |
|---|---|---|---|
| | | | Petitioner's Motion to File Exhibits under Seal; granting 151 Petitioner's Motion to Expand the Record (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 162 | | SEALED EXHIBIT **201** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 163 | | SEALED EXHIBIT **202** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/31/2010 | 164 | | SEALED MINUTES of Proceedings – held before District Judge James H. Payne: Motion/Status Hearing held on 3/31/2010 (Re: 152 Joint MOTION to Modify Protective Order ) (Court Reporter: B.Neil) (cjt, Deputy Clerk) (cjt, Deputy Clerk). (Entered: 04/01/2010) |
| 03/31/2010 | 165 | | MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 03/31/2010 | 166 | | CORRECTED MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010, Reply due by 7/1/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 04/05/2010 | 167 | | SEALED REPORT TO COURT by USA (Re: 152 Joint Motion to Modify Protective Order) (cjt, Deputy Clerk) (Entered: 04/05/2010) |
| 04/08/2010 | 168 | | SEALED ORDER by Judge James H. Payne Re: 152 Joint Motion to Modify Protective Order (cjt, Deputy Clerk) (Entered: 04/08/2010) |
| 04/14/2010 | 169 | | SEALED STATUS REPORT by Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 4/20/2010 to add corrected attachment (cjt, Deputy Clerk). (Entered: 04/15/2010) |
| 05/12/2010 | 170 | | Unopposed MOTION for Leave to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief by USA Responses due by 5/26/2010(Wilson, Christopher) (Entered: 05/12/2010) |
| 05/13/2010 | 171 | | ORDER by District Judge James H. Payne: granting 170 Respondent's Unopposed Motion to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief (cjt, Deputy Clerk) (Entered: 05/13/2010) |
| 05/14/2010 | 172 | | TRANSCRIPT of Proceedings (Unredacted) of Status Hearing held on 3–31–2010 before District Judge James H. Payne (Court Reporter: Brian P. Neil) (Pages: 1–46). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s) ) (bpn, Court Reporter) (Entered: 05/14/2010) |
| 05/14/2010 | 173 | | TRANSCRIPT ORDER FORM for Status and Scheduling Conference conducted on 3/31/10 (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s), 172 Transcript of Proceedings – |

| | | | |
|---|---|---|---|
| | | | Unredacted) by Kenneth Eugene Barrett (law, Deputy Clerk) (Entered: 05/17/2010) |
| 05/17/2010 | 174 | | Redacted RESPONSE in Opposition to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 05/17/2010) |
| 05/17/2010 | 175 | | SEALED RESPONSE (Re: 174 RESPONSE to Motion; 95 Amended MOTION to Vacate, Set Aside or Correct a Sentence) by USA (dma, Deputy Clerk) (Entered: 05/17/2010) |
| 06/30/2010 | 176 | | Unopposed MOTION for Leave to Exceed Page Limitation *For Reply Brief* by Kenneth Eugene Barrett Responses due by 7/14/2010(Schardl, Tivon) (Entered: 06/30/2010) |
| 06/30/2010 | 177 | | MINUTE ORDER by District Judge James H. Payne: granting 176 Petitioner's Unopposed Motion for Leave to File Oversized Brief (cjt, Deputy Clerk) (Entered: 06/30/2010) |
| 07/01/2010 | 178 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 07/01/2010) |
| 07/23/2010 | 179 | | NOTICE of Filing of Signed Declaration of Toby Barrett (Re: 178 Reply to Response to Motion ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 07/23/2010) |
| 08/13/2010 | 180 | | REPORT AND RECOMMENDATION ON REQUEST FOR EXCESS COMPENSATION by Magistrate Judge Steven P. Shreder (Re: 105 Minute Order Referring CJA 30 Voucher) Objections to RRdue by 8/27/2010(eje, Deputy Clerk) (Entered: 08/13/2010) |
| 09/03/2010 | 181 | | SEALED ORDER by District Judge James H. Payne: Re: 180 Report and Recommendation) (cjt, Deputy Clerk) (Entered: 09/03/2010) |
| 09/03/2010 | | | CJA 30: Authorization to Pay David B. Autry on behalf of Kenneth Eugene Barrett. (JHP 9/3/10)(smg, Deputy Clerk) (Entered: 09/14/2010) |
| 02/07/2011 | 182 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 2/22/2011 (With attachments)(Fisher, Joan) (Entered: 02/07/2011) |
| 02/08/2011 | 183 | | MINUTE ORDER by District Judge James H. Payne: granting 182 Petitioner's Unopposed Motion to Seal. Petitioner is given leave to file the following documents under seal: Petitioners Motion to Vacate or Modify Protective Order and Request for Hearing; Brief in Support of Motion to Vacate or Modify Protective Order and Request for Hearing; Petitioners Motion for Leave to Conduct Discovery; and Petitioners Brief in Support of Motion to Conduct Discovery. (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 184 | | SEALED MOTION to Vacate or Modify Protective Orders and Request for Hearing by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 185 | | |

| | | | |
|---|---|---|---|
| | | | SEALED BRIEF in Support of 184 Petitioner's Sealed Motion to Vacate and/or Modify Protective Order and Request for Hearing (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 186 | | SEALED MOTION for Leave to Conduct Discovery by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 187 | | SEALED BRIEF in Support of 186 Sealed Motion to Conduct Discovery (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/17/2011 | 188 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 186 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 189 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 184 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 190 | | MINUTE ORDER by District Judge James H. Payne: granting 188 and 189 Government's Motions for Extension of Time to Respond to Motions; Responses due by 3/8/2011 Re: 184 Petitioner's SEALED MOTION to Vacate or Modify Protective Orders and 186 Petitioner's SEALED MOTION for Leave to Conduct Discovery (cjt, Deputy Clerk) (Entered: 02/17/2011) |
| 03/04/2011 | 191 | | Unopposed MOTION to Seal Document by USA Responses due by 3/18/2011(Kahan, Jeffrey) (Entered: 03/04/2011) |
| 03/04/2011 | 192 | | MINUTE ORDER by District Judge James H. Payne: granting 191 Respondent's Motion to File Sealed Oppositions to Sealed Motions (cjt, Deputy Clerk) (Entered: 03/04/2011) |
| 03/08/2011 | 193 | | SEALED RESPONSE in Opposition (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/08/2011 | 194 | | SEALED RESPONSE in Oposition (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/18/2011 | 195 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 4/1/2011 (With attachments)(Fisher, Joan) (Entered: 03/18/2011) |
| 03/18/2011 | 196 | | MINUTE ORDER by District Judge James H. Payne: granting 195 Petitioner's Motion to Seal Replies to documents 193 and 194 (cjt, Deputy Clerk) (Entered: 03/18/2011) |
| 03/21/2011 | 197 | | SEALED REPLY to Response (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/21/2011 | 198 | | SEALED REPLY to Response (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/16/2012 | 199 | | NOTICE of Filing of Declaration of Paul D. Gordon (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 03/16/2012) |

| | | | |
|---|---|---|---|
| 03/16/2012 | 200 | | NOTICE of Filing of Declaration of Leonard Post (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 03/16/2012) |
| 03/16/2012 | 201 | | MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett Responses due by 3/30/2012 (With attachments)(Fisher, Joan) (Entered: 03/16/2012) |
| 03/19/2012 | 202 | | CERTIFICATE of Service (Re: 199 Notice (Other) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/19/2012 | 203 | | CERTIFICATE of Service (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/29/2012 | 204 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 201 Motion to Supplement) by USA; Responses due by 4/12/2012 (With attachments)(Wilson, Christopher) Modified on 3/30/2012 (cjt, Deputy Clerk). (Entered: 03/29/2012) |
| 03/30/2012 | 205 | | MINUTE ORDER by District Judge James H. Payne: granting 204 Motion for Extension of Time to Respond to Motion; Response deadline extended to 4/30/2012 (Re: 201 MOTION to Supplement) (cjt, Deputy Clerk) (Entered: 03/30/2012) |
| 04/27/2012 | 206 | | RESPONSE in Opposition to Motion (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by USA ;(Wilson, Christopher) (Entered: 04/27/2012) |
| 05/07/2012 | 207 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255*, 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/07/2012) |
| 06/18/2012 | 208 | | MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY by Kenneth Eugene Barrett. Responses due by 7/2/2012(Fisher, Joan) (Entered: 06/18/2012) |
| 06/18/2012 | 209 | | BRIEF in Support of Motion (Re: 208 MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/18/2012) |
| 06/20/2012 | 210 | | ORDER by District Judge James H. Payne denying 201 Motion for Leave to Supplement Pending Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence Under 28 U.S.C. Section 2255 (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/20/2012 | 211 | | MINUTE ORDER by District Judge James H. Payne denying 208 Motion to Preserve Testimony of Judge John Garrett, Retired, Without Further Delay (dma, Deputy Clerk) (Entered: 06/20/2012) |

| | | | |
|---|---|---|---|
| 06/28/2012 | 212 | | MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* (Re: 210 Ruling on Motion to Supplement ) by Kenneth Eugene Barrett. Responses due by 7/12/2012(Fisher, Joan) (Entered: 06/28/2012) |
| 07/10/2012 | 213 | | RESPONSE in Opposition to Motion (Re: 212 MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* ) by USA ;(Wilson, Christopher) (Entered: 07/10/2012) |
| 08/16/2012 | 214 | 21 | OPINION AND ORDER by District Judge James H. Payne: denying 95 Amended Motion to Vacate; denying 184 Sealed Motion; denying 186 Sealed Motion; denying 212 Motion to Reconsider (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 215 | 212 | SEALED ORDER by District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 216 | 215 | JUDGMENT by District Judge James H. Payne entering judgment in favor of USA against Kenneth Eugene Barrett (terminates case) (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 09/13/2012 | 217 | | MOTION to Alter Order/Judgment *and Brief in Support* (Re: 216 Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider ) by Kenneth Eugene Barrett. Responses due by 9/27/2012 (With attachments)(Fisher, Joan) (Entered: 09/13/2012) |
| 09/27/2012 | 218 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA. Responses due by 10/11/2012(Wilson, Christopher) (Entered: 09/27/2012) |
| 09/27/2012 | 219 | | ORDER by District Judge James H. Payne: granting 218 Motion for Extension of Time to Respond to Motion; Responses due by 10/29/2012 (Re: 217 MOTION to Alter or Amend Judgment) (cjt, Deputy Clerk) (Entered: 09/27/2012) |
| 10/29/2012 | 220 | | RESPONSE in Opposition to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 10/29/2012) |
| 10/30/2012 | 221 | 216 | OPINION AND ORDER by District Judge James H. Payne: denying 217 Petitioner's Motion to Alter or Amend Judgment (cjt, Deputy Clerk) (Entered: 10/30/2012) |
| 12/26/2012 | 222 | 218 | NOTICE OF APPEAL to Circuit Court (Re: 216 Judgment, 221 Ruling on Motion to Alter Order/Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider, 215 Sealed Order ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 12/26/2012) |
| 12/27/2012 | 223 | 221 | Transmission of Notice of Appeal and Docket Sheet to Circuit Court with copy of 222 Notice of Appeal, 216 Judgment, 221 Ruling, 214 Ruling and 215 Sealed Order. Preliminary Record transmitted to 10th Circuit Court of Appeals electronically. (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/27/2012) |

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,                )
                                       )
        Petitioner/Defendant,        )
                                       )
vs.                                    )        Case No. 09-CIV-105-JHP
                                       )
UNITED STATES OF AMERICA,              )
                                       )
        Respondent/Plaintiff.        )

**OPINION AND ORDER**

This is a proceeding initiated by the above-named petitioner by filing a Motion for

Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial. The motion

to vacate conviction and sentence is brought pursuant to 28 U.S.C. § 2255. The government

has filed a response by and through the United States Department of Justice and the United

States Attorney for the Eastern District of Oklahoma. On July 1, 2010, the petitioner filed

his reply.

Petitioner has expanded the record in this case to voluminous proportions. He has

filed multiple amendments to the motion and exhibits in support thereof. Additionally, on

March 16, 2012, three years after the statute of limitations expired herein, the petitioner

sought leave to supplement his motion filing in excess of 500 more pages of pleadings. On

June 20, 2012 this court denied the petitioner's motion to supplement. *See*, Doc. # 210. This

court has, however, reviewed the relevant trial court records associated with Case No. CR-

04-115-JHP, including pleadings, pretrial and trial transcripts as well as all of the pleadings

and exhibits filed by the petitioner and the government herein. The records reflect the petitioner was named in a three-count indictment on November 9, 2004 and a three-count superseding indictment on February 9, 2005. The superseding indictment charged the petitioner with Count I: using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j); Count II: using and carrying a firearm during and in relation to a crime of violence and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j); and Count III, intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). On February 15, 2005, the government gave notice of its intention to seek the death penalty on all three counts of the superseding indictment.[1]

On September 12-16, 2005, the court conducted individual juror death qualification proceedings. Thereafter, on September 26, 2005, the jury trial was commenced. Following presentation of evidence during the first stage of trial, on November 4, 2005, the jury returned verdicts finding the defendant guilty on all three counts. On November 9, 2005, the second stage of trial commenced. On November 17, 2005, the jury returned verdicts of Life in prison without the possibility of release on Counts I and II and a death sentence on Count

---

[1]Doc. Nos. 59 and 60 filed in Case No. 04-CR-115-JHP. All further references to documents filed in the criminal case shall be referred to as "Cr. Doc." References to documents contained in the civil case shall be referred to as "Doc." All page number references to documents contained within the civil case are to the page numbers assigned by CM/ECF as opposed to the page number printed at the bottom of the documents.

III.  On December 19, 2005, the defendant was sentenced in accordance with the jury

verdicts.  The court ordered the sentences to run consecutively.  Additionally, the defendant

was ordered to pay a special assessment of $100 on each count for a total assessment of

$300.

Following his conviction, the defendant filed a direct appeal.  The following issues

were raised on appeal:

1.  The district court committed error in denying the motion to suppress because the warrant: a) did not satisfy Oklahoma standards for a nighttime warrant; b) did not satisfy Oklahoma standards regarding executing officers; c) did not comply with Fed.R.Crim.P. 41; and, d) should have been suppressed on double jeopardy grounds.

2.  The indictment was insufficient for failure to set forth elements of predicate offenses; improperly charged multiple crimes; and improperly joined defenses.

3.  The district court erred in admitting improper victim impact evidence.

4.  Juror misconduct occurring during the trial resulted in the deprivation of the defendant's Fifth, Sixth, and Eighth Amendment rights.

5.  The government violated *Batson*.

6.  The federal death penalty scheme is unconstitutional and violated the defendant's rights to due process, 6th Amendment right to a jury trial; and the 8th Amendment prohibition against cruel and unusual punishment.

7.  The "intent to kill" aggravating factor was unconstitutional.

8.  There was insufficient evidence of an intent to kill.

9.  The government failed to timely disclose the names of its witnesses.

10.  The district court erred in failing to dismiss the indictment based on double jeopardy, collateral estoppel and the statute of limitations.

11. The district court erred in failing to follow the "Petite policy."

12. Cumulative errors occurring at trial deprived the defendant of a fair trial.

After considering each of these issues, the Tenth Circuit Court of Appeals affirmed the defendant's conviction. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 128 S.Ct. 1646, 170 L.Ed.2d 359 (2008).[2]

## I.  Procedural History of this Action

On March 19, 2008, two days after the United States Supreme Court denied *certiorari* from his direct appeal, the defendant filed a Motion for Appointment of Counsel to Pursue Post-Conviction Remedies, and Memorandum of Law in Support in the underlying criminal action, which this court construed as a Motion for Substitution of Counsel.[3]  Thereafter, on March 27, 2008, this court appointed David B. Autry as lead counsel and the Federal Defender for the Eastern District of California, Capital Habeas Unit as co-counsel for the purpose of "pursuing any and all available post-conviction remedies, including the investigation, preparation and prosecution of a motion for post-conviction relief pursuant to 28 U.S.C. § 2255."[4]  The order of appointment directed the Court Clerk to note the substitution of these attorneys as counsel of record upon the filing of their entries of appearance.  The order also directed Mr. Autry to obtain a complete copy of the record below and on appeal within fifteen (15) days of appointment.  In the event any delays were

---

[2]Certiorari was denied on March 17, 2008.

[3]Cr. Doc. 370.

[4]Cr. Doc. 371, at p. 1.

encountered, counsel were directed to make the court aware of those delays. Further, Mr. Autry was instructed to submit his proposed litigation budget to the assigned magistrate judge within twenty (20) days after appointment.

On April 2 and 3, 2008, counsel filed their entries of appearance[5] and the clerk entered a minute order showing the substitution of counsel of record had occurred.[6] On April 16, 2008, Mr. Autry filed *ex parte* his proposed preliminary litigation budget which the magistrate judge, by minute order on April 22, 2008, recommended be approved. The magistrate judge further recommended that the court's sealed order dated March 27, 2008 should govern the payment for costs and attorneys' fees.[7] This court formally adopted the magistrate judge's recommendation by written order on July 3, 2008.[8]

On February 9, 2009, the petitioner's counsel filed an Emergency Motion requesting this court to toll the statute of limitations.[9] On February 11, 2009, a hearing was held on the petitioner's motion. Although the parties were given additional time to submit authorities to the court in support of their motion, the court intimated that it was not comfortable tolling the statute, because of the implications if a reviewing court later held that the statute of limitations should not have been tolled, and advised counsel they should be prepared to

---

[5]*See*, Cr. Docs. 372 and 373, respectively.

[6]Cr. Doc. 374.

[7]Cr. Doc. 376.

[8]Cr. Doc. 377.

[9]Cr. Doc. 382.

5

timely file their motion to vacate.  On February 27, 2009, the court entered a written order denying the petitioner's request to toll the statute of limitations.[10]

On March 16, 2009, the defendant/petitioner filed a "Motion for Collateral Relief"[11] which requested this court to vacate his convictions and sentences.   This motion was not, however,  signed under penalty of perjury by the movant or any person authorized to sign on his behalf as required by Rule 2 of the Rules Governing § 2255 Motions.

Thereafter, on March 17, 2009, the petitioner filed a pleading entitled "Defendant's Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial."[12]  This document contained a "modified" version of the declaration required by Rule 2 of the Rules Governing Section 2255 Motions.   This motion referenced the exhibits previously filed on March 16, 2009.  In this motion, the petitioner  raised seventeen (17) grounds for relief.  Specifically, the petitioner asserted the following errors entitled him to release from custody: (1) actions of the trial court in the appointment and compensation of counsel violated his rights to due process, effective assistance of counsel, cross-examination of witnesses and equal protection of the laws, statutes, and administrative guidelines for the appointment and compensation of counsel; (2) ineffective assistance of trial counsel; (3) denial of his constitutional rights of due process and equal protection of the laws and his right

---

[10]Cr. Doc. 397.

[11]Doc. 1.  *See also*, Cr. Doc. 403.  This Motion was 377 typewritten pages, excluding the table of contents and authorities.  Additionally, approximately 172 exhibits (in excess of 350 additional pages) were attached to said motion.  *See*, Doc. Nos. 1, 3, and  8 thru 43 (Exhibit. Nos. 1-36, 59-60, 71-135, 136A, 136B, 136C, 136D, 137-143, 144A, 144B, 145-146, 147A1, 147A2, 147A3, 147B1, 147B2, 147B3, 147C1, 147C2, 147D, 147E1, 147E2, 147F, 147G, 148-175, 176A, 176B, 176C1, 176C2, 177A, 177B, 178-180, 181A, 181B, 181C, 181D, and 182-195).

[12]Doc. 2.

6

to expert and investigative assistance under 18 U.S.C. § 3006A; (4) the use of false information in obtaining the no-knock warrant for his arrest, which was invalid, deprived the petitioner of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and appellate counsel was ineffective for failing to raise this issue on appeal; (5) the government's suppression of exculpatory evidence and knowing use of perjured testimony deprived the petitioner of his Fifth Amendment right to due process, his Sixth Amendment right to counsel and confrontation, and his Eighth Amendment right to a fair and reliable sentencing process; (6) violations of Fifth, Sixth and Eighth Amendment rights when court restricted use of the petitioner's statements to law enforcement at the time of his arrest; (7) the restraint of the petitioner during trial by the marshal violated his Fifth, Sixth and Eighth Amendment rights; (8) the petitioner was tried while incompetent in violation of the Fifth, Sixth and Eighth Amendments to the United States Constitution; (9) failure of the trial court to instruct on a lesser included homicide offense violated his Fifth, Sixth and Eighth Amendment rights and appellate counsel was ineffective for failing to raise this issue on direct appeal; (10) failure to instruct the jury that they could consider residual doubt as a mitigating factor violated the petitioner's Fifth, Sixth and Eighth Amendment rights; (11) improper excusal of a juror based upon her opinions about the death penalty violated his Fifth, Sixth and Eighth Amendment rights; (12) not requiring the jury to find that death was an appropriate punishment beyond a reasonable doubt violated the petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights; (13) the petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated due to the effects of drugs

7

he was given in jail and his removal from the courtroom during the second stage of trial; (14) the federal death penalty, as administered, is disproportionately and unconstitutionally applied according to the race of the victim thereby depriving him of due process, equal protection and the right to be free from cruel and unusual punishment; (15) errors in the indictment deprived the petitioner of his Fifth, Sixth, Eighth and Fourteenth Amendment rights; (16) juror misconduct deprived him of his Fifth, Sixth, Eighth and Fourteenth Amendment rights; and (17) the cumulative effect of the aforementioned errors warrant vacating his sentence.[13]

On March 18, 2009, the court ordered the government to respond to the petitioner's allegations by June 16, 2009.[14]  On May 29, 2009, the petitioner filed a Motion to Disqualify and Recuse the undersigned judge from further participation in this matter.[15]  On June 11, 2009, the government filed two motions requesting an extension of time to respond.  In the first motion for extension of time, the government sought an extension of thirty (30) days to respond to the disqualification motion.[16]  The second motion for extension of time requested an additional six months to respond to the amended motion to vacate.[17]  Neither motion was

---

[13]Throughout his Amended Motion to Vacate and Brief in Support the petitioner asserts violations of his Fourteenth Amendment rights.  The Fourteenth Amendment does not, however, apply to actions of the federal government.  *See*, *San Francisco Arts and Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 542, 107 S.Ct. 2971, 2984, 97 L.Ed.2d 527 (1987), n. 21.  As a result, even though this opinion refers to each claim as brought by petitioner, this court will not specifically comment on the Fourteenth Amendment as it addresses each of the issues herein.

[14]Doc. 44.

[15]Doc. 45.

[16]Doc. 47.

[17]Doc. 48.

opposed by the petitioner.  Subsequent thereto, this court entered minute orders granting the government until July 15, 2009 to respond to the disqualification motion and until September 16, 2009 to respond to the amended motion to vacate.[18]

On July 13, 2009, the government filed a response opposing the petitioner's motion to disqualify and on July 24, 2009 the government filed a motion to unseal certain proceedings in the underlying criminal case.[19]

On August 14, 2009, the petitioner filed a motion to file his response to the government's motion to unseal certain documents out of time.[20]  On August 19, 2009, this court entered a minute order directing the petitioner to supplement his motion by 5:00 p.m., to include a statement regarding whether the government objected to the motion.  On August 19, 2009, the petitioner filed a Supplement to the Motion to File Response to Pleading Out of Time.[21]  Later that day, the court entered the following minute order:

> Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53) is hereby granted.  The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2555 Motion (Doc. #2) and that the Government's Motion to Unseal (Doc. #52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion.  To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their

---

[18]Docs. 49 and 50, respectively.

[19]Docs. 51 and 52, respectively.

[20]Doc. 53.

[21]Doc. 57 and 58, respectively.

9

current response deadlines on the § 2255 Motion.  Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52) and the Government shall be given until September 2, 2009, to Reply.

Doc. 60.

On August 26, 2009, the petitioner filed a Response opposing the government's motion to unseal claiming that the government had failed to establish "good cause" or "materiality;" the petitioner had not waived his attorney-client privilege; his protections under the work-product doctrine; and/or confidentiality of his mental health records. Additionally, the petitioner objected to the court ruling on the government's motion to unseal documents prior to ruling on the disqualification motion.[22]  On August 28, 2009, the government filed a reply thereto.[23]  On September 4, 2009, the government requested an additional month to file their response to the amended motion to vacate.[24]  This motion was not opposed by the petitioner and the government was given until October 16, 2009 to file their response.

On September 11, 2009, in a twenty-two page order, this court denied the petitioner's motion to recuse and/or disqualify.[25]  Additionally, on the same day, the court entered a fifteen page order ruling on the government's motion to unseal, or to gain full access to motions, orders, reports and proceedings which had occurred in the underlying criminal

---

[22] Doc. 61.

[23] Docs. 62.

[24] Doc. 63.

[25] Doc. 66.

case.[26]  To the extent the petitioner claimed that some of the requested items were protected by various privileges, the court gave the petitioner until September 22, 2009, to advise the court whether he was abandoning any of his claims in order to preserve those privileges.  On September 22, 2009, the petitioner filed a Notice of Intention not to abandon claims and a request for a protective order.[27]  Since the proposed protective order submitted by the petitioner implied that some of the documents sought to be governed by the protective order might have been previously disclosed, the court entered an order on September 23, 2009 requiring the petitioner to advise the court by September 30, 2009, if the particular documents identified in the September 11, 2009 order had previously been disclosed by either the Petitioner or his counsel.[28]

On September 25, 2009, the petitioner filed an Amended Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial.[29]  In this amended motion the petitioner raised nineteen (19) grounds for relief.  In addition to the grounds previously raised, the petitioner added a claim that his execution would violate the Eighth Amendment due to his "chronic and severe mental illness and organic brain impairments" and a separate claim of ineffective assistance of appellate counsel.  The petitioner also claims he should be allowed to conduct discovery "to fully develop and identify the facts supporting his

---

[26]Doc. 67.

[27]Doc. 68.

[28]Doc. 69.

[29]Doc. 70.

[motion]" and "an evidentiary hearing to resolve any factual disputes" and "to establish the facts he alleges."[30]

On September 28, 2009, the respondent filed an Objection to the petitioner's proposed protective order.[31]   On September 29, 2009, this court entered an order setting the matter for a show cause hearing for the court to ascertain why an amendment should be allowed so long after the filing of the motion and the amended motion and a scheduling conference.[32]

On September 30, 2009, the petitioner filed a Memorandum in Response to the court's order regarding waiver of privileges and again sought a protective order concerning release of any documents.[33]   Thereafter, on October 2, 2009, the petitioner filed an Emergency Motion to Vacate Show Cause Order or Continue Hearing Date.[34]   By minute order on the same date, this court denied the petitioner's motion to vacate but waived the presence of co-counsel.   The  parties were also advised that the court intended to conduct a status and scheduling conference at the same time.   On October 5, 2009, the petitioner filed an "Objection to and Motion to Reconsider the Order filed on October 2, 2009, Motion to Continue Hearing, and Motion for Counsel to Appear by Telephone."[35]   On October 5, 2009,

---

[30]Doc. 95, at pp. 400-401.

[31]Doc. 73.

[32]Doc. 74.

[33]Doc. 75.

[34]Doc. 76.

[35]Doc. 78.

the court denied, by minute order, the petitioner's Motion to Reconsider and Motion to Continue Hearing, as well as other miscellaneous findings related to said filing.[36]

On October 6, 2009, after hearing comments of counsel, the court gave the petitioner until November 6, 2009, to refile his amended Motion to Vacate in compliance with the Rules Governing § 2255 Proceedings and until January 5, 2010 to file a Brief in Support.[37] These deadlines were subsequently extended.

On October 13, 2009, the petitioner filed a Writ of Mandamus in the Tenth Circuit Court of Appeals seeking "either the recusal of the district judge who presided over his federal criminal trial and now is hearing his 28 U.S.C. § 2255 motion to vacate, set aside, or correct his sentence, or, in the alternative, an evidentiary hearing before a different district judge on the facts underlying his recusal motion."[38] On October 16, 2009, the petitioner filed a Motion to Stay these proceedings pending disposition of the mandamus action by the circuit court.[39] On October 20, 2009, this court denied the petitioner's motion to stay.[40]

On December 3, 2009, this court entered a minute order setting a Show Cause Hearing for December 15, 2009 "for David Autry to show cause why he has failed to comply with this court's prior orders regarding submission of CJA vouchers."[41] Thereafter, on December

---

[36]Doc. 79.

[37]*See*, Doc. 81.

[38]Doc. 96.

[39]Doc. 86.

[40]Doc. 87.  On December 14, 2009, the Tenth Circuit denied the writ.  *See*, Doc. 96.

[41]Doc. 92.

13

4, 2009, the petitioner filed a Notice basically objecting to this court's handling of this matter and stating he was filing his amended motion as ordered by the court despite his disagreement with the court's order.[42]  Additionally, on December 4, 2009, the petitioner filed his amended Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody, pursuant to 28 U.S.C. § 2255.[43]  Thereafter, on March 1, 2010, the petitioner filed his Brief in Support.[44]

On January 11, 2010, the government submitted a letter for *in camera* review to the court to determine whether the government should disclose the information contained therein to the petitioner.  After reviewing the letter, the court entered a protective order finding that the government should disclose the subject-matter of said letter to counsel for the petitioner but preventing the information to be revealed to the petitioner or any person other than counsel of record for the petitioner and/or persons working for counsel for the petitioner in connection with these proceedings without prior approval and order.[45]

On February 18, 2010, the petitioner filed an Unopposed Motion to File Exhibits under Seal.[46]  On February 26, 2010, this court entered an Order giving the petitioner until March 12, 2010 to advise the court how the records consisting of approximately 1,274 pages

---

[42]Doc. 94.

[43]Doc. 95.

[44]Doc. 149.

[45]Doc. 102.

[46]Doc. 110.

were relevant to the issues contained within the motion.[47]   Following the petitioner's response, on March 30, 2010, the court granted the petitioner's motion to file his exhibits under seal.[48]

On March 1, 2010, the petitioner filed a Brief in support of his Motion, a Motion for Evidentiary Hearing, and Motion to Expand the Record.[49]   On March 3, 2010, the parties filed a joint motion to Modify the Protective Order entered on January 11, 2010.[50]  Following a hearing on said Motion, the court orally amended the protective order.[51]   After receiving additional information from counsel for the government, the court denied the joint motion to Modify the Protective Order and the oral amendment made to the protective order was withdrawn.[52]

On May 17, 2010, the government filed their Response in Opposition to Petitioner's Motion to Vacate.[53]   On June 30, 2010, the petitioner requested leave to file an oversized

---

[47]Doc. 147.

[48]Doc. 161.

[49]Doc. Nos. 149, 150 and 151, respectively.  Since no answer had been filed to the Motion to Vacate, on March 29, 2010, this court denied the petitioner's Motion for Evidentiary Hearing.  Doc. 157.  On March 30, 2010, this court granted the petitioner's Motion to Expand the Record in order that the court could consider previously filed exhibits in support of the petitioner's motion without requiring the refiling of said exhibits and directed the court clerk to file two additional exhibits which had not previously been filed by the petitioner.  Doc. 161.

[50]Doc. 152.

[51]*See*, Doc. 164.

[52]Doc. 168.

[53]Doc. 175.

brief in Reply to the Government's Response which was granted.[54]   On July 1, 2010, the petitioner filed his Reply.[55]

On February 8, 2011, the petitioner filed two additional motions.  Specifically, the petitioner filed a Motion for Leave to Conduct Discovery and Brief in Support thereof.[56]  The petitioner also filed a Motion to Modify Protective Orders and a Request for Hearing and Brief in Support thereof.[57]  Based upon the findings made in this opinion, this court denies the petitioner's Motion for Leave to Conduct Discovery and Motion to Modify Protective Order.  Petitioner has not established that any relevant information could be obtained by pursuing discovery herein.

---

[54]Doc. Nos. 176 and 177, respectively.

[55]Doc. 178.

[56]Doc. Nos. 186 and 187, respectively.

[57]Doc. Nos. 184 and 185, respectively.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" or the "Act") delineates the circumstances under which a federal court may vacate a sentence.  Title 28, section 2255 provides, in pertinent part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).  A prisoner seeking post-conviction relief under this statute must allege as a basis for relief:  (1) lack of jurisdiction by the court entering judgment; (2)  an error of constitutional magnitude; (3) a sentence imposed outside the statutory limits; or (4) an error of law or fact where the claimed error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice."  *United States v. Addonizio*, 442 U.S. 178, 185, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979).

## TIMELINESS OF § 2255 PROCEEDINGS

Under the AEDPA, there is a one-year limitations period for filing a motion to vacate a federal criminal conviction which begins to run from the date on which a prisoner's conviction becomes final.  28 U.S.C. § 2255(f)(1).[58]  In this case, the petitioner's conviction became final on March 17, 2008, the date the United States Supreme Court denied *certiorari*

---

[58]There are a couple of other events which may extend the limitations period, but those events are not relevant to the facts of this case.

17

review of his direct appeal.  As a result, his one-year limitations period began to run on March 17, 2008.  As indicated previously, Petitioner had a verified motion to vacate on file on March 17, 2009.  On September 25, 2009, Petitioner filed a amended motion (Doc. 70) which arguably contained some new claims.

Fed.R.Civ.P. 15 allows a party to amend or supplement a pleading, subject to certain restrictions.  Rule 15(c)(2) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."  In considering the effect of Rule 15(c) on a § 2255 motion to vacate, the Tenth Circuit has held an untimely amendment to a § 2255 motion

> which, by way of additional facts, clarifies or amplifies a claim or theory in the [original motion] may, in the District Court's discretion, relate back to the date of [the original motion] if and only if the [original motion] was timely filed and the proposed amendment does not seek to add a new claim or to insert a new theory into the case.

*United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000)(citing *United States v. Thomas*, 221 F.3d 430, 431 (3rd Cir. 2000).

### GENERAL PRINCIPLES GOVERNING § 2255 ACTIONS

Section 2255 is not a substitute for an appeal and is not available to test the legality of matters which should have been challenged on appeal.  *United States v. Khan*, 835 F.2d 749, 753 (10th Cir. 1987), *cert. denied*, *Ali-Khan v. United States*, 487 U.S. 1222, 108 S.Ct. 2881, 101 L.Ed.2d 915 (1988).  As a result, "failure to raise an issue either at trial or on direct appeal imposes a procedural bar to habeas review." *United States v. Cervini*, 379 F.3d

18

987, 990 (10th Cir. 2004) (quoting *United States v. Barajas-Diaz*, 313 F.3d 1242, 1245 (10th Cir. 2002).  Failure to raise an issue on direct appeal bars the movant/defendant from raising such an issue in a § 2255 Motion to Vacate Sentence unless he can show "both good cause for failing to raise the issue earlier, and that the court's failure to consider the claim would result in actual prejudice to his defense, . . ."  *Id.*  Since a writ of habeas corpus is an equitable remedy, a court may consider the merits of the procedurally barred claim if the defendant alternatively demonstrates "that 'failure to consider the federal claims will result in a fundamental miscarriage of justice.'" *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).

In *United States v. Galloway*, 56 F.3d 1239, 1242 (10th Cir. 1995), the Tenth Circuit held claims of constitutionally ineffective counsel should be brought on collateral review. Consequently, no procedural bar will apply to ineffective assistance of counsel claims which could have been brought on direct appeal but are raised in post-conviction proceedings.[59]  A habeas petitioner may also raise substantive claims which were not presented on direct appeal if he can establish cause for his procedural default by showing he received ineffective assistance of counsel on appeal.

A court considering a claim of ineffective assistance of appellate counsel for failure to raise an issue is required to look to the merits of the omitted issue.  Where the omitted

---

[59]While the petitioner complains about this court leaving Mr. Hilfiger on as counsel for purposes of appeal, the United States Supreme Court has specifically recognized that "[a]ppellate counsel often need trial counsel's assistance in becoming familiar with a lengthy record on a short deadline, . . ." *Massaro v. United States*, 538 U.S. 500, 506, 123 S.Ct. 1690, 1695, 155 L.Ed.2d 714 (2003) (allowing defendant to raise claim of ineffective assistance of counsel on motion to vacate, even though he could have, but did not raise claim on direct appeal).

issues are meritless, counsel's failure to raise it on appeal does not constitute constitutionally ineffective assistance of counsel.  *Hooks v. Ward*, 184 F.3d 1206, 1221 (10th Cir. 1999).  *See also*, *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000).  Additionally, where claims have been raised and rejected on direct appeal, they can not be relitigated in a § 2255 motion.  *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994).

## NECESSITY FOR AN EVIDENTIARY HEARING

"If [a § 2255] motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted . . . to determine whether an evidentiary hearing is warranted."  Rule 8, Rules Governing Section 2255 Proceedings for the United States District Courts.  In this case, as previously indicated, the Petitioner has expanded the record to voluminous proportions.  Without counting the one amendment that this court required to bring the motion in compliance with the federal rules governing these proceedings, he has filed multiple amendments to the motion and exhibits in support thereof.  In addition, the extensive record in the criminal proceedings, including pleadings, pretrial and trial transcripts have been placed before and reviewed by this court.

Where the "record conclusively demonstrates that a defendant is entitled to no relief on his § 2255 motion to vacate, a full evidentiary hearing is not required."  *Menzer v. United States*, 200 F.3d 1000, 1006 (7th Cir. 2000).  *Accord*, *United States v. Marrs*, 856 F.2d 1471, 1472 (10th Cir. 1988).  Additionally, no hearing is required where petitioner's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact."  *Engelen v. United States*, 68 F.3d

238, 240 (8th Cir. 1995). Conclusory allegations contained within affidavits will not require a hearing. *Eskridge v. United States*, 443 F.2d 440, 443 (10th Cir. 1971). In an unpublished opinion, the Tenth Circuit stated that "[t]he district court is not required to hold an evidentiary hearing when a 2255 claim of ineffective assistance is based merely on conclusory allegations unsupported by specific facts." *United States v. Scott*, 7 F.3d 1046, 1993 WL 389463, *2 (10th Cir. 1993)(citing *Eskridge, supra.*)

## **STATEMENT OF THE FACTS**

While the record in this case appears voluminous, other than being a death penalty proceeding this was not a complex case. Because the defendant was tried twice in state court on state charges before being indicted in federal court,[60] the underlying facts of the criminal case were well known at the time the indictment was filed herein. On appeal the Tenth Circuit accurately set forth the facts as relayed to the jury in this case. *See*, *United States v. Barrett*, 496 F.3d 1079, 1082-1086 (10th Cir. 2007). Therefore, this court will not reiterate them herein. The court would note, however, that during the federal criminal trial, the government presented forty-one (41) witnesses during the guilt phase of trial; the defendant put on nine (9) witnesses and then the government called two (2) rebuttal witnesses. Thereafter, during the penalty phase of trial, the government presented eleven (11) witnesses; the defendant called fourteen (14) witnesses and then the government put on five (5) rebuttal witnesses.

---

[60]*See*, *United States v. Barrett*, 496 F.3d 1079, 1086 (10th Cir. 2007).

21

## PETITIONER'S CLAIMS FOR RELIEF

**I.  FUNDING CHALLENGES**[61]

In Grounds 1 and 3, the petitioner claims he was deprived of his due process and equal protection rights when the trial court did not simply rubber stamp his budget requests.  The Sixth Amendment to the United States Constitution provides, in pertinent part: "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . . have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  *See also*, *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).  Rule 44(a) of the Federal Rules of Criminal Procedure grants a criminal defendant "who is unable to obtain counsel" the right to have counsel assigned to represent said defendant at every stage of the proceedings.  *United States v. Reilley*, 948 F.2d 648, 650 (10th Cir. 1991).  An indigent defendant does not, however, have the right to choose appointed counsel.  *United States v. Nichols*, 841 F.2d 1485, 1504 (10th Cir. 1988).

Title 18 U.S.C. § 3005 governs appointment of counsel in capital cases.  It provides, in pertinent part, as follows:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon defendant's request, assign 2 such counsel, *of whom at least 1 shall be learned in the law applicable to capital cases*, and who shall have free access to the accused at all reasonable hours.  In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization, or,

---

[61]To the extent that any information contained within this section would not generally be released under the provisions of 18 U.S.C. § 3006A, this court finds that the challenges made by the petitioner herein require disclosure of such information.

if no such organization exists in the district, of the Administrative Office of the United States Courts. . . . . . (italics added).

Despite the petitioner's conclusory allegations, there is no authority which indicates a court must approve all costs requested in a particular case or that the costs in every federal death penalty case will be identical. What may be necessary in a given case clearly depends upon the facts of that case, including the going rates for counsel in the area where the case is tried, the amount of investigation that has already been completed and the complexity of the issues involved. An indigent criminal defendant is, however, entitled to "the minimum assistance necessary to assure him 'a fair opportunity to present his defense' and 'to participate meaningfully in [the] judicial proceeding.'" *Medina v. California*, 505 U.S. 437, 445, 112 S.Ct. 2572, 2577, 120 L.Ed.2d 353 (1992). This does not mean that indigent defendants are entitled to all of the assistance that their wealthier counterparts might buy; they are only entitled to the "basic and integral tools" needed to present an adequate defense. *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53 (1985) (citing *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974)). Courts consider three factors in determining the minimum assistance required:

(1) the effect on [the petitioner's] private interest in the accuracy of the trial if the requested service is not provided; (2) the burden on the government's interest if the service is provided; and (3) the probable value of the additional service and the risk of error in the proceeding if such assistance is not offered.

*Moore v. Reynolds*, 153 F.3d 1086, 1112 (1998). *See also*, *Rojem v. Gibson*, 245 F.3d 1130, 1139 (10th Cir. 2001) (because petitioner did not show necessity, the district did not abuse its discretion in denying funding for an investigator or experts); *Moore v. Johnson*, 225 F.3d

23

43

495, 503 (5th Cir. 2000) (finding defendant does not lack 'an adequate opportunity to present [his] claims fairly' where he was denied a jury consultant since "[communicating] with the jury is a quintessential responsibility of counsel.")

As indicated in a previous order entered by this court on September 11, 2009, as Chief Judge, this court considered the recommendation of the Federal Public Defender and then decided to appoint John David Echols as lead counsel and Roger Hilfiger as co-counsel. *See*, Doc. 66, at pp. 17-18 regarding the reasons for this decision.[62]  On November 29, 2004, Mr. Echols filed his first Ex Parte Motion for an order concerning the funding of defense.[63]  In this motion, counsel advised the court he was requesting the court to approve expenditures between $55,000 and $82,000, exclusive of attorney fees.[64]

On November 30, 2004, this case was reassigned to the undersigned judge.[65]  On December 1, 2004, this court entered an order setting the matter for a budget conference before Magistrate Judge Steven P. Shreder.[66]  On December 8, 2004, co-counsel filed a motion requesting to be excused from the budget hearing before the magistrate judge due to

---

[62]This court respectfully disagrees with the Federal Defender for the Western District of Oklahoma's opinion that there were only two or three attorneys in the entire state of Oklahoma who were qualified to serve as lead counsel in a federal capital case, *see* Petitioner's Exhibit 54.  Additionally, to imply, as the Federal Defender does, that to be qualified to serve as lead counsel in a federal death penalty trial an attorney has to have agreed to serve and been approved "by a selection committee and the United States District Judges as qualified to serve as counsel in capital habeas cases initiated pursuant [to] Title 28, United States Code, Section 2254" is ludicrous.

[63]Cr. Doc. 16.

[64]This motion indicated that "[t]his is the first federal death penalty case for both of Mr. Barrett's appointed counsel . . . ."  This statement was, however, untrue.  Mr. Hilfiger, in addition to having previously been the United States Attorney for the Eastern District of Oklahoma, had previously been retained and actually tried a federal capital case in the Eastern District of Oklahoma in which the jury decided not to impose the death penalty against his client.  *See*, *United States v. James Norwood Hutching, et al.*, Case No. CR-92-32-FHS (E.D. Okla.).

[65]Cr. Doc. 17.

[66]Cr. Doc. 19.

a family member's prior scheduled surgery and this motion was granted on December 8, 2004.[67]  Additionally, on December 8, 2004 a scheduling conference was held.

On December 9, 2004, a budget conference/hearing was held before Magistrate Judge Shreder.  At that hearing, Mr. Echols discussed the reasons behind his various requests for expert assistance and the magistrate judge requested that Echols put together a proposed litigation budget.  Mr. Echols was told that his C.J.A. vouchers needed to be fairly specific in order for the court to ascertain that the requests were reasonable and necessary.[68]  On December 29, 2004, Mr. Echols filed his second Ex Parte Motion for Authorization to purchase a partial transcript of Mr. Barrett's 2004 State Court Jury Trial and third Ex Parte Motion for Approval of "Pre-Authorization" Budget.[69]  In the second motion, counsel requested $9,000-11,000.00 to purchase the second state court trial transcript, "excluding *voir dire*, opening statements, and closing statements, but including the testimony of all state's witnesses, the *in camera* testimony of Stephen Smith, hearings held during the course of the trial and the jury instruction conference."  Cr. Doc. 23, at pp. 2-3.  The third motion requested the court approve a "pre-authorization budget of $72,000.00."  Cr. Doc. 24, at pp. 3-5.  Despite the petitioner's allegations that this court failed to promptly act upon his requested litigation budget,[70] footnotes to some of the items requested in the various motions

---

[67]Cr. Doc. 20 and 21, respectively.

[68]Cr. Doc. 310, at pp. 40-42.

[69]Cr. Doc. 23 and 24, respectively.

[70]*See*, Doc. 95, at p. 10.

25

indicated the approval of the items could be deferred until after rulings on jurisdictional motions. *Id.* On December 30, 2004, counsel filed a fourth "Ex Parte Motion for Authorization for Counsel to Travel to Washington, D.C., For Conference with the Attorney General's Representatives Concerning Authorization for Seeking the Death Penalty in this Case."[71] On the same day, this court entered a minute order granting counsel's request to travel to Washington, D.C.[72] Thereafter, counsel filed several motions in the case, which were, on January 14, 2005, referred to the magistrate judge for hearing.[73]

On January 19, 2005, United States Magistrate Judge Steven P. Shreder entered a detailed order advising counsel what was expected in terms of approval of a "Pre-Authorization" Budget.[74] At that time, counsel was advised to submit a proposed litigation budget covering the period from February 1, 2005, through June 30, 2005, setting forth:

> *separately and with specificity* the time each of the appointed attorneys anticipates spending on: (i) review of the record; (ii) investigation of claims; (iii) client interviews; (iv) consultation with experts and investigators; (v) legal research; (vi) preparation of pleadings; (vii) attendance at court proceedings; and, (viii) any other compensable activities undertaken in this matter.[75]

Additionally, counsel were directed to

> set forth *separately and with specificity* any expert witness counsel seeks to hire. A request shall: (i) identify the proposed expert and describe his credentials and experience; (ii) describe the subject matter to be covered by the

---

[71]Cr. Doc. 25.

[72]Cr. Doc. 26.

[73]See, Cr. Doc. Nos. 28, 29, 33, 34.

[74]Cr. Doc. 38.

[75]*Id.*, at pp. 1-2, ¶s 1 and 2.

expert; (iii) address why the expert is need, (sic) *i.e.*, explain both the facts indicating that further analysis is justified and the reason an expert witness is needed to interpret those facts; (iv) discuss the stage of the proceedings at which the expert is needed; and, (v) provide a specific time budget identifying the expert's billing rate and amount of time the expert anticipates spending on each portion of the investigation or analysis.[76]

Further, counsel were told to set forth

*separately and with specificity* any investigator counsel seeks to hire. A request shall include a specification of the factual issues counsel intends to investigate, the facts suggesting that such an investigation is warranted, and an estimated time budget for each task. The time budget should be broken down into discrete portions of the investigation, so the Court may assess the reasonableness of each request. In the case of a request to hire a special purpose investigator, counsel shall identify the proposed investigator and describe his credentials and experience.[77]

Thereafter, on January 31, 2005, a fifth Ex Parte Motion concerning funding was filed. For the first time, defense counsel sought the court's approval of an overall budget of $407,875.00.[78] The motion further indicated if additional funds became necessary, counsel would supplement their budget request. This motion did not, however, comply with the order entered on January 19, 2005. As a result, on February 1, 2005, counsel was advised to submit a proposed defense budget in compliance with the court's earlier order.[79] At that time, counsel was advised that

---

[76]*Id.*, at p. 2, ¶ 3.

[77]*Id.*, at pp. 2-3, ¶ 4.

[78]Cr. Doc. 46. It should be noted that the "conclusion" paragraph of this motion indicated counsel was requesting approval of a budget of $406,350.00, but paragraph 6 of the motion indicated the total request, including attorney fees was $407,875.00.

[79]Cr. Doc. 47.

[t]he proposed defense budget *may not* simply project an arbitrary number of hours per week for a particular period, but must instead set forth the time each attorney anticipates spending on each of the listed activities, and describe in detail what each attorney anticipates doing with such time.[80]

On February 7, 2005, in response to this order, counsel submitted their sixth and seventh Ex Parte Motions regarding the Budget. The sixth motion requested court approval of $138,125.00 for various experts and miscellaneous and unforeseen expenses.[81] The seventh motion requested approval of $141,250.00 for lead counsel consisting of 1,130 hours at the rate of $125.00 per hour and $101,250.00 for co-counsel consisting of 810 hours at the rate of $125.00 per hour, for a grand total of $242,500.00 in attorney fees.[82] Thereafter, on February 11, 2005, an eighth Ex Parte Motion was filed requesting the court enter an order allowing transcription of the testimony of Clint Johnson and Juan Beal from a hearing held before the magistrate judge on January 26, 2005.[83]

After reviewing defense counsel's ex parte motions, on February 22, 2005, this court, instead of entering an order, sent a letter to defense counsel Echols asking counsel to address several questions which the court had in regard to the preliminary budget requests. Specifically, the court was interested in ascertaining the amount of compensation necessary to provide "fair compensation" in light of the fact Mr. Echols had previously defended Barrett in two state court proceedings arising out of the same factual scenario. As a result,

---

[80]*Id.*

[81]Cr. Doc. 50.

[82]Cr. Doc. 51.

[83]Cr. Doc. 57.

the court asked Echols to disclose the amounts paid for representation of the defendant in each of the two previous state trials, including the number of hours which were billed to the Oklahoma Indigent Defense System and the amounts paid for experts and investigators in each of those trials.[84]

Instead of responding directly to the court's inquiries, Mr. Echols advised this court that his budget was "in line with the time and fees expended in other federal capital prosecutions."[85] Additionally, counsel indicated the proposed budget had taken into account "the fact that [he] was not starting from zero, and that a great deal of the work already performed can serve as a foundation for further efforts."[86] Counsel further advised this court that

> The Oklahoma Indigent Defense System pays contract "lead" counsel in a capital case $60 per "out of court" hour, and $80 per "in court" hour. The contracts also specify that the maximum payment for lead counsel is $20,000, although this amount can be exceeded if the OIDS Board of Directors makes a finding, as it did in Mr. Barrett's case, that a given case is an exceptional one.
>
> I received approximately $72,229.00 for the first state court trial, although the bulk of this amount was not paid until the summer of 2003 because OIDS was literally out of money. I do not have available a complete breakdown of the "in court" vs. "out of court" hours for the first $29,214.00 of this sum, but for the balance of $43,015.00, the breakdown was 455.25 out of court hours and 196.25 in court hours. From January 1, 2003, through sentencing in the second trial, I billed and received $59,105.00, representing 720.75 out of court hours and 198.25 in court hours.[87]

---

[84] *See*, Sealed letter dated February 22, 2005.

[85] *See*, Sealed letter dated February 28, 2005.

[86] *Id.*

[87] *Id.*, at pp. 1-2.

29

Additionally, counsel advised this court that approximately $39,000 was expended on experts during the first trial even though several of these experts later refused to testify without payment of additional sums of money.  None of these individuals testified at trial.  During the second trial, additional sums of approximately $9,000 were paid for experts.  While counsel admitted the legal issues between the two state trials were similar, he indicated that he would be "in large part 'writing the book as we go'" and, therefore, the legal issues in the federal case would be substantially more demanding.[88]

Thereafter, this court entered an order authorizing a total of 1160 hours for attorneys at a rate of $125.00 per hour.  Additionally, the court approved a budget for investigative, experts and other services in the sum of $37,125.00 to 39,125.00.  While this order denied counsel's request for a copy of the second state court trial transcript, the court indicated it would reconsider the issue if defense counsel still felt like they needed the transcript and if it was relevant to the federal charges.  Finally, the court advised counsel they needed to advise the court in advance of incurring fees or costs not authorized by the budget that they were going to exceed said budget.[89]

On October 31, 2005, defense counsel filed a Motion to Modify the Order Approving the Budget of March 18, 2005.[90]  On November 4, 2005, this court entered a minute order

---

[88]*Id.*, at pp. 2-4.  It should be noted that Mr. Echols was the only attorney of record in the state court case.  *See*, Sequoyah County Court Records.

[89]Cr. Doc. 97.

[90]Cr. Doc. 232.

approving the modification of the budget as requested.[91]  At that time, the court indicated the total budget was not to exceed $192,007.00.

Further, despite counsel's innuendos that this court paid Mr. Hilfiger more money than Mr. Echols for nefarious reasons and as a way to develop a local capital defense panel, two observations are in order.  First, at the time of initial appointment of Mr. Echols and Mr. Hilfiger, the maximum hourly rate allowed for capital defense counsel was $125.00 per hour. 18 U.S.C. 3006A(d)(1).  At the time Mr. Echols withdrew, the maximum hourly rate allowed for capital defense counsel had been raised by Judicial Conference to $160.00 per hour.  *Id. See also*, CJA Memo from Administrative Office of the United States Courts dated January 28, 2005.  Second, the Criminal Justice Act does not require that the court pay counsel a specific hourly rate.  Rather, it sets the **maximum hourly rate** which can be authorized by a court.  *See*, 18 U.S.C. § 3006A(d)(1).  In light of Mr. Hilfiger assuming the role of lead counsel, this court raised his compensation to $150.00 per hour.  Additionally, when new counsel was appointed, this court encouraged counsel to submit an amended budget request solely because, unlike Mr. Echols, they were unfamiliar with the intimate details surrounding the previous state court trials.[92]

A review of the CJA vouchers approved in this case indicates trial counsel for Mr. Barrett were paid a total of $168,484.97, which does not include $3,903.17 paid by this court for the work done by the attorney who was appointed following the jury verdict to represent

---

[91]Cr. Doc. 244.

[92]Cr. Doc. 133.

Barrett at sentencing and who ultimately filed Barrett's notice of appeal and designation of record. Additionally, this court approved payment of $5,844.50 for state court transcripts and $11,067.50 for expert services obtained by the petitioner's counsel, for a total payment in relation to the trial itself of $185,396.97. An additional $24,585.43 was paid for transcripts related to the petitioner's appeal.

Furthermore, the record makes it clear that the budget was not carved in stone but was an estimate of what might reasonably be required. Until counsel has conducted some investigation and spoken with potential witnesses, it is not possible to ascertain the reasonableness of funding requests. Thus court, in carrying out its administrative functions in this case, attempted to get counsel to focus on exactly what would be needed in the way of experts in order to ensure that the requests were reasonable and necessary to provide fair compensation. Additionally, since the underlying incident had been the focus of two prior state court trials, counsel should have been able to utilize the factual investigations completed in the earlier cases to a large extent to reduce the overall amount of investigation necessary to defend the federal case. Once the court approved a budget, however, counsel were not prevented from approaching the court with additional facts and/or information to support a request for increasing any of the budgeted amounts and the court, on several occasions, encouraged defense counsel to submit supplemental budget requests if they felt they needed additional funding.[93]

---

[93]*See*, Doc. 321, Transcript of Sealed Telephone conference held on May 5, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115 (court advised Mr. Hilfiger that it was granting Mr. Echols Motion to Withdraw and advised counsel he would be given an opportunity to inform the court of the effect of this decision on the trial schedule, the budget and anything else to do with the case); Doc. 318, Transcript of Sealed Ex Parte Budget Hearing held on October 3, 2005 in *United*

While the petitioner claims this court "expressed an interest in appointing less-qualified attorneys to represent [him],"[94] the record establishes the court followed the requirements of 18 U.S.C. § 3005 by considering the recommendation of the Federal Public Defender and appointing John Echols as lead counsel and appointing Roger Hilfiger as co-counsel. The court considered both of these counsel to be "learned in the law applicable to capital cases," in that Mr. Echols had previously tried state capital cases and Mr. Hilfiger had previously tried a federal capital case. While the court did not seek the Federal Public Defender's recommendation regarding who to appoint as co-counsel upon the withdrawal of Mr. Echols, the petitioner has failed to establish that the purpose of the statute, *i.e.*, to ensure the high-quality representation necessary in capital cases, was not fulfilled since Mr. Hilfiger was clearly "learned in the law applicable to capital cases" and Mr. Smith was a well-respected attorney who was admitted to practice in this court on April 3, 1992. Additionally, both Mr. Hilfiger and Mr. Smith were active members of the CJA defense panel for the Eastern District of Oklahoma.

Simply because counsel did not use the entire budget as originally approved by this court for experts,[95] the petitioner can not, despite his many statements to the contrary,

---

*States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP (court advised defense counsel that after granting Mr. Echols Motion to Withdraw the court had indicated that an amended budget request would be considered but no amended budget was ever filed. Counsel were again encouraged to advise the court of any supplemental budget requests they might have; but counsel advised the court that they felt the budget was sufficient for everything including all of the experts that they needed). *See also*, Doc. No. 128, Order regarding funding issues filed on May 5, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

[94]Doc. 95, at p. 9.

[95]Counsel modified his request on October 31, 2005, seeking an additional $7882.00, which this court approved. Cr. Doc. 244.

establish that this court violated his constitutional rights by denying him expert and/or investigative funds.  On March 18, 2005, in approving counsel's budget, this court did indicate it would not pay for the transcript of a hearing held on January 26, 2005.  Counsel did not, however, submit a CJA 24 form to the court requesting authorization and/or payment of transcripts.  Also, counsel never asked this court to reconsider their motion for a copy of the transcript of January 26, 2005, or provided the court with any additional facts or law to support the request.  Finally, the petitioner has not shown that denial of this transcript deprived him of the necessary tools to mount a defense or to participate meaningfully in the judicial proceedings.  *Medina v. California*, *supra*.

The petitioner continually claims that he was not provided routine services provided to "similarly situated defendants."  Yet, the petitioner does not identify one service he was not able to obtain which prejudiced his case.  Furthermore, the court approved almost all of the vouchers submitted by defense counsel.  The only vouchers which were not approved as submitted were the first two vouchers submitted by Mr. Echols.  As previously indicated in this case, an adjustment of time was made to those vouchers, in part, because of "striking similarities between the substance of pleadings" filed in Petitioner's criminal case and the substance of pleadings filed in a state court case in which Mr. Echols was involved.[96] Furthermore, the petitioner does not identify even one federal death penalty case which contains the same factual scenario as his case, *i.e.* two prior state criminal trials were held relating to the incident which formed the basis for the federal charges prior to the federal

_____

[96]*See*, Cr. Doc. 106.

court trial.   Moreover, while this court did not approve separate payment for a jury consultant, the petitioner also complains because Mr. Hilfiger actually obtained the services of a private jury consultant and this court "expressed no concern or objection to Mr. Hilfiger's unauthorized retention" of this jury consultant.[97]   Counsel was free to obtain any services he desired and he had no duty to request reimbursement for any of the services he obtained.   Based upon the facts of this case, this court finds the petitioner has not shown that this court's administrative decisions regarding appointment of counsel or funding issues deprived him of his constitutional rights.[98]

Additionally, since a district court's attorney fee determination is not an appealable order, *United States v. French*, 556 F.3d 1091 (10th Cir. 2009), and because the budget approved by the court was not exhausted, this court finds appellate counsel was not ineffective in failing to challenge the administrative decisions of this court on appeal.

## II.   SUPPRESSION OF EXCULPATORY EVIDENCE

In his fifth ground for relief, the petitioner asserts he was deprived of his Fifth Amendment right to Due Process, his Sixth Amendment rights to counsel and confrontation, and his Eighth Amendment right to a fair and reliable capital sentencing process because the government suppressed exculpatory evidence, knowingly used perjured testimony and failed to correct false testimony.   Additionally, the petitioner claims newly discovered evidence

---

[97]Doc. 95, at pp. 24-25.

[98]Petitioner also claims this court engaged in improper *ex parte* communications with the government to bolster his argument that the court was biased against him and treated him unfairly.  This allegation was previously addressed by this court in the order ruling on the petitioner's Motion to Disqualify and Recuse, Doc. 66 at pp. 6-16, and will not be re-addressed herein.

entitles him to relief from his convictions and sentences.  The government argues they did not violate any disclosure requirements.  Further, the government asserts none of their actions amounted to prejudicial misconduct.  In reply, the petitioner claims evidence known to or in the possession of state or local law enforcement is imputed to the federal government.

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment. . . . "  373 U.S. at 87, 83 S.Ct. at 1196-1197.  There are three essential elements to a *Brady* claim: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued."  *Banks v. Dretke,* 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Thus, in order to establish a *Brady* violation, a habeas petitioner must prove the prosecution suppressed evidence, the evidence was favorable to petitioner, and the evidence was material.  *United States v. DeLuna*, 10 F.3d 1529, 1534 (10th Cir. 1993).  To show the evidence was 'material,' there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995).  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United*

36

*States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). *See also*, *Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir. 2009). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, S.Ct. at 1566.

> A *Brady* claim fails if the existence of favorable evidence is merely suspected. That the evidence exists must be established by the defendant. *See United States v. Lopez*, 372 F.3d 1207 1209-11 (10th Cir. 2004) (because defendant failed to establish that government had promised leniency to prosecution witnesses, there could be no *Brady* violation in government's failure to turn over documentation of such promises); *United States v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006) (defendant failed to establish existence of any document withheld by government, so "his *Brady* claim fails to get off the ground.").

*United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009).

"[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, U.S. at 437, S.Ct. at 1567. While courts have refused to draw a distinction between different agencies under the same government,[99] the Tenth Circuit has held where "there is no indication that the investigation was a joint effort between the state and federal government," materials possessed by the state government will not be imputed to the federal government. *United States v. Beers*, 189 F.3d 1297, 1303 (10th Cir. 1999). Other circuits have adopted this same approach by defining the "prosecution team" as "the prosecutor or anyone over whom he has authority." *Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002).

---

[99] *See, United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979).

. . . . knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor's office on the case in question would inappropriately require us to adopt "a monolithic view of government" that would "condemn the prosecution of criminal cases to a state of paralysis." *United States v. Gambino*, 835 F.Supp. 74, 95 (E.D.N.Y. 1993), *aff'd*, 59 F.3d 353 (2d Cir. 1995), *cert. denied*, 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996). Thus, in *United States v. Locascio*, 6 F.3d 924 (2d Cir.1993) ("*Locascio*"), cert. denied, 511 U.S. 1070, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994), we refused to impute to the AUSAs prosecuting that action knowledge of reports prepared by FBI agents who were "uninvolved in the investigation or trial of the defendants-appellants." *Id.* at 949 ("We will not infer the prosecutors' knowledge simply because some other government agents knew about" the evidence.). In *United States v. Quinn*, 445 F.2d 940 (2d Cir.), *cert. denied*, 404 U.S. 850, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971), we refused to impute the knowledge of a Florida prosecutor to an AUSA in New York, rejecting as "completely untenable [the] position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor.' " *Id.* at 944.

*United States v. Avellino*, 136 F.3d 249, 255 -256 (2nd Cir. 1998). *See also*, *Johnston v. Love*, 940 F.Supp. 738, 768-71 (E.D.Pa. 1996), *aff'd*, 128 F.3d 1576 (3rd Cir. 1997), *cert. denied*, 522 U.S. 972, 118 S.Ct. 425, 139 L.Ed.2d 326 (1997) (refused to impute to the state attorney the federal prosecutor's knowledge of a witness immunity agreement because the federal prosecutor was not an agent for the State, did not consult or obtain the consent of the State, and did not bind the State when he entered into the immunity agreement with the witness). Where, however, state and federal governments pool their investigative energies to prosecute the defendants, courts have imputed information possessed by state investigators to the federal prosecutor. *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979) and *United States v. Risha*, 445 F.3d 298 (3rd Cir. 2006).

In *Risha*, the Third Circuit held that a "case-by-case analysis" should be used when considering a federal prosecutor's constructive knowledge of information that was known by state agents.  Courts addressing the issue of cross-jurisdiction have looked at:

> 1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; 2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and 3) whether the entity charged with constructive possession has 'ready access' to the evidence."

*Id.*, at 304.  *See also*, *United States v. Reyeros*, 537 F.3d 270 (3rd Cir. 2008) (while Columbian government which acted at request of federal government and participated in a Columbian extradition proceeding, they did not function as agents of the United States government or act under its control).

In addition to invoking the due process protections of *Brady*, the petitioner asks this court to construe his suppression claims as newly discovered evidence under FED.R.CRIM.P. 33.  The government, citing *United States v. Evans*, 224 F.3d 670, 674 (7th Cir. 2000), argues Rule 33 is meant to correct "factual injustice" as opposed to legal errors and that the petitioner's request for relief under Rule 33 is untimely.  In his reply, the petitioner, citing *United States v. Hernandez*, 94 F.3d 606 (10th Cir. 1996), asserts the Tenth Circuit has recognized the viability of newly discovered evidence issues in § 2255 proceedings and, therefore, *Evans* is not applicable herein.  There is no question that newly discovered evidence issues can be raised in § 2255 proceedings.  *Hernandez* did not, however, contain any indication that the newly discovered evidence claims raised therein were or were not timely raised.  In fact, the § 2255 proceeding was initially brought while the appeal was

pending.   Furthermore, Rule 33 of the Federal Rules of Criminal Procedure has been amended since the *Hernandez* case was decided to change the time for filing a motion for new trial from "within two years after final judgment"[100] to "within 3 years after the verdict or finding of guilt."[101]

In this case, the petitioner was found guilty on November 4, 2005.  The first § 2255 filing was not made until March 16, 2009, well after the expiration of time to seek relief under Rule 33 of the Federal Rules of Criminal Procedure.  As a result, this court finds the petitioner's request for relief under Rule 33 is untimely.

Petitioner claims the government suppressed exculpatory evidence about six civilian witnesses, three law enforcement witnesses, and one trial prosecutor.  In considering this claim, it is important to keep in mind that the United States government was not initially involved in seeking or obtaining the search warrant in this case.  Rather, this case was initiated solely by officers employed by the office of the District Attorney for the Twenty-Seventh (27th) Prosecutorial District Drug Task Force for the State of Oklahoma.[102]  During the motion to suppress hearing in this case, Darren Lane from the Drug Enforcement

---

[100]18 U.S.C. (1996), FED.R.CRIM.P. 33.

[101]FED.R.CRIM.P. 33.

[102]Petitioner's Exhibit No. 194, at p. 1 and Government's Exhibit No. 4, at p. 2 ¶ 5 and p. 3 ¶ 16.  *See also, United States v. Barrett*, 496 F.3d at 1082 and  Cr.Doc. 105, at p. 2 which indicates:

> Clint Johnson, an Oklahoma drug task force agent, secured a state court warrant to search the Defendant's home for drugs.  Agent Johnson had information that the Defendant had threatened "to kill the first cop through the door," and that there were guns around the house, so he sought the assistance of the Oklahoma Highway Patrol with entering and securing the Defendant's home.  The federal drug task force of the Drug Enforcement Agency also was notified because Agent Johnson anticipated there would be a methamphetamine lab to clean up at the scene, although the federal agents were not expected to participate in the raid itself.

40

Administration was designated as "case agent."[103]   At trial, the government designated

Special Agent Darren Lane with the Drug Enforcement Agency (DEA) and Special Agent

Ben Rosser with the Oklahoma Bureau of Investigation.[104]   Finally, it appears that as early

as March 24, 2004, the federal prosecutors were having difficulties communicating and/or

obtaining cooperation from the District 27 District Attorney's Office Drug Task Force.[105]

### *Claims involving Civilian Witnesses*

**A.  Charles Sanders**

Initially, the petitioner attacks the use of the confidential informant, Charles Sanders,

alleging the government did not fully disclose Sander's complete criminal history and that

the government suppressed deals it made with Sanders in exchange for his testimony.

Despite the petitioner's assertions, the trial transcript establishes that the defense counsel was

aware of  the state court charges which could be used to impeach Mr. Sanders at the time of

trial.[106]   Additionally, Sanders admitted to the jury his extensive history of drug abuse.

Assuming for purposes of argument that Sanders had additional state criminal convictions,

---

[103]Tr. of Hearing on Motions held on January 26, 2005, at p. 3.

[104]J.T.Tr. Vol. 1, at p. 3.  *See also*, J.T.Tr. Vol. 4, at p. 423.

[105]*See*, Government's Exhibit No. 4, at p. 4.

[106]Compare, J.T. Vol. 11, at pp. 2491-2494 and 2524-2534 with Government Exhibit 6 and with Petitioner's Exhibit Nos. 157-162, and 164-165.  Petitioner's Exhibit Nos. 157, 158, and 159 contain court pleadings in felony case numbers CF-97-9, CF-97-75, and CF-98-128, respectively but none of these exhibits contain a judgment and sentence rendered in the case, so they could not have been used to impeach Sanders at the time of trial.  *See*, F.R.E. 609.  Petitioner's Exhibit No. 163 contains court pleadings in a felony case number CF-2001-314 but it also does not contain a judgment and sentence.  Petitioner's Exhibit No. 166 contains court pleadings in a misdemeanor case which was ultimately dismissed costs to state on December 8, 2008.  Petitioner's Exhibit No. 167 contains court pleadings in another misdemeanor case but does not contain a judgment and sentence.  Petitioner's Exhibit No. 175 contains court pleadings in a felony case number CF-97-140, but again it does not appear that any judgment and sentence was ever filed in this case.  Absent a conviction, counsel simply would not have been able to use these exhibits to impeach Sanders.

there is no evidence to suggest the federal government was even aware of those convictions.

The government generally does not have a duty under *Brady* to seek out information that is

not in its possession, including a witness's criminal history. *United States v. Jones*, 34 F.3d

596, 599 (8th Cir. 1994) (holding "the prosecutor has no duty to undertake a fishing

expedition in other jurisdictions in an effort to find impeaching evidence").  Further, in light

of Sanders extensive criminal history which was relayed to the jury, this court would find the

petitioner has failed to show any additional criminal records concerning Sanders were

material or that this court's confidence in the outcome of the trial is undermined by additional

criminal history of this particular witness.

Furthermore, the trial transcript establishes that Sanders advised the jury of the

agreement which he had with the federal government in the following colloquy with the

federal prosecutor:

> Q: And I advised you of any assistance that I would provide to yourself in
> relation - - for your cooperation, testimony in this case, haven't I?
>
> A: Yes, sir.
>
> Q: What did I tell you I would do in your behalf?
>
> A: You tell - - you didn't make me no promises.  You told me that you would
> talk to the prosecution upon completion.  That - - no, you haven't guaranteed
> me nothing.
>
> Q: In relation to talking to the prosecutors, the conviction you're serving now
> in Sequoyah County; is that correct?
>
> A: Yes, sir.

Q: Did I advise you that I talked to the prosecutors in Sequoyah County and tell them of your cooperation?

A: Yes, sir.

Q: And since then you also had an application to revoke a misdemeanor sentence in Tulsa County, didn't you?

A: Yes, sir.

Q: And in fact, I called the District Attorney's Office in Tulsa County and advised them that you were cooperating in this case as well, didn't I?

A: Yes, sir.

Q: Beyond doing that, contacting the D.A.'s Office in Sequoyah County and the D.A.'s Office in Tulsa County and advising them that I anticipate you're going to cooperate, have I told you any promises in regards to what would happen to any sentence that you may be facing or any time you may be serving?

A: Have you advised me of what now?

Q: Have I told you anything about what would happen to any sentence you have?

A: No.

Q: Has any promise been made in regards to your early release or anything that might happen in Tulsa County at all?

A: No, sir.

J.T. Vol. 11, at pp. 2494-2496. Despite Barrett's claims to the contrary, he has failed to show

that any benefits Sanders received were inconsistent with what he told the jury. While some

notation on a uncertified copy of a document purportedly filed in the District Court of

Muskogee, Wagoner, Cherokee and Sequoyah Counties in which someone other than the

43

judge who signed the Order wrote "*per plea agreement with the feds, banish from Sequoyah County,"[107] this hearsay statement does not convince this court that any more was done in Sander's criminal cases than what was disclosed to the jury.  Barrett's allegations are purely speculative as to the actual reasons Sander's state cases were handled the way they were.  He has not presented any affidavits from state prosecutors or any other person which establish an agreement different from what Sanders testified to.  As a result, this court finds the petitioner has failed to establish a *Brady* violation in relation to Sanders.

## B.  Travis Crawford

Next, under the guise of a *Brady* claim, the petitioner asserts Travis Crawford lied on the stand and that he has since recanted his trial testimony.  Petitioner first relies on the hearsay accounts provided by his investigator and Crawford's parents of Crawford's purportedly unsworn statements.[108]  This court will not consider hearsay accounts of unsworn recantations.  *See*, *United States v. Pearson*, 203 F.3d 1243, 1275 (10th Cir. 2000) ("Sworn trial testimony is generally not refuted by unsworn repudiation of that testimony.")  *See also*, *Herrera v. Collins*, 506 U.S. 390, 417, 113 S.Ct. 853, 869, 122 L.Ed.2d 203 (1993) (federal habeas case noting that affidavits containing hearsay are "particularly suspect").

Petitioner also relies on Crawford's own declaration in which Crawford states, in pertinent part:

---

[107]*See*, Petitioner's Exhibit No. 160, at p. 88.  Copies of this same pleading appear at Petitioner's Exhibit Nos. 161, at p. 45; 162, at p. 61; 164, at p. 28; and 165, at p. 55.

[108]*See*, Petitioner's Exhibit Nos. 31, 91 and 92.

I testified falsely at Kenny's trial.  At the time I testified, I was living in so many places and was so strung out, I did whatever I was told to keep out of trouble.  I did methamphetamine all the time, every day.  When I testified against Kenny, I was high on speed; . . . .

When Mr. Littlefield interviewed me about Kenny, I was terrified of losing my freedom and said whatever I thought Mr. Littlefield wanted me to say.  Mr. Littlefield asked me if Kenny said he (Kenny) "was going down in a blaze of glory," and before I could answer, Mr. Littlefield told me all the bad things that would happen to me if I "lied."  I was so scared I said, "yes" that Kenny had said he would go down in a blaze of glory if the cops came.  I was panicking because I was afraid.  Mr. Littlefield said he knew things about me. I was so scared.

I never heard Kenny say he was going down in a blaze of glory. . . .

Petitioner's Exhibit No. 45, at p. 2.

Since the recantation is really just a ploy to obtain a new trial under Rule 33 and the petitioner's initial request for a new trial was not filed until four and a half months after the limitations set out in Rule 33 had expired,[109] this court finds this information was not timely filed.  However, even if the declaration had been timely filed, this court finds it is extremely suspicious in light of Crawford's actual trial testimony; the fact Crawford is Barrett's cousin; and because Crawford was persuaded by a defense investigator to recant in the presence of his mother and father.  At trial, Crawford testified, in pertinent part, as follows:

Q: . . . .What happened as that vehicle drove down the road in a westerly direction?

A: I seen my cousin going to the gate.

Q: When you say your cousin, who?

A: Kenneth.

---

[109]It should be noted that Crawford's declaration was not signed until June 3, 2009 and was not filed in this court until September 25, 2009, six months after the limitations had expired.

Q: Okay.  And where was the gate located?

A: Kind of the west side, right there by the road.

Q: Okay.  And when your - - and when did Kenneth Barrett go to the gate in relation to the white vehicle passing?  Was it before it got to there, or after it passed on by?

A: After it passed by, about past my mom's house.  It was right in about there, I guess.

Q: That's where the vehicle was?

A: Yeah.

Q: Okay.  And when Mr. Barrett went to the gate, what did he do?  What'd (sic) you see him doing?

A: I thought he'd closed the gate, but they said it was already closed.

Q: Okay.  You think he was closing the gate?

A: Yeah.

Q: Okay.  What did you do?

A: I just talked to him.

Q: Did you holler or go down there?

A: I walked down there to him, talked to him.

Q: Okay.  And what did Mr. Barrett say when you got down there, about that vehicle – the vehicle that went past?

A: That he knew those was laws.

Q: Did he say anything else?  What did you say when he said he knew that they were the law?

A: Yeah. I knew there was a warrant out for him. I said those probably right there – they're going to come back and serve that warrant.

Q: What did he say?

A: He said D.G.F.

Q: What do you mean by D.G.F.?

A: He just – I guess he was just tired of it all, said he didn't –

Q: What's D.G.F. mean?

A: Don't give a fuck.

Q: After Mr. Barrett said D.G.F., what did he say then?

A: He said he was going out in a blaze of glory. But he said that a thousand times, not just then.

J.T. Vol. III, at pp. 465-466. The prosecutor did not lead Crawford in any way to say what he said. Additionally, the prosecutor did not specifically ask Crawford if "Kenny said he (Kenny) 'was going down in a blaze of glory.'" Instead, the prosecutor asked what had been said and Crawford volunteered that Barrett said "he was going out in a blaze of glory." Crawford further stated Barrett had said this a thousand times. On cross-examination, Crawford indicated he had heard a million people, in the "dope world" say "I'm going out in a blaze of glory."[110] Finally, Crawford admitted that he had used a lot of dope over a period of approximately fifteen years and that his mind was "not sharp like it always has been."[111] Consequently, this court does not believe the recantation which was not made until

[110]J.T.Tr. Vol. 3, at p. 480.

[111]*Id.*, at pp. 457 and 468.

47

more than three years after Barrett's trial and after Barrett had already been sentenced to death.

Barrett also claims the government withheld evidence that Crawford spent two months in a military brig and had once cooperated with local law enforcement. He has not, however, established that the United States Attorney's office knew this information. *Brady* requires disclosure only of evidence within the actual or constructive possession of the prosecution and its investigative team. *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999). In this case, the warrants executed on September 24, 1999 were not federal search warrants. The only involvement by the federal government in this matter was to assist in the execution of the search warrant after state agents had been involved in a fatal shooting at the location which was to be searched. *See*, Government's Exhibit No. 4. The investigative team for purposes of the federal charges was the United States Drug Enforcement Agency (DEA) and this court finds no evidence to suggest that either the DEA or the United States Attorney was aware of Crawford's involvement with local law enforcement. Similarly, there is no evidence to establish that the prosecution team knew that Crawford spent time in a military brig almost twenty years before this trial for an unknown reason that may or may not have reflected on his credibility. *Brady* does not require a prosecutor to seek out and disclose exculpatory or impeaching material not in the government's possession. *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002); *United States v. Jones*, *supra*. Furthermore, based upon the fact Crawford testified to his extensive drug use;[112] admitted on cross-examination

---

[112]*Id.*

his arrests for child support violations and hot checks after testifying on direct examination that he had never been arrested;[113] admitted that his drug use affected his memory;[114] and admitted that six years had passed since the events about which he was testifying and that he had never provided a written statement to law enforcement,[115] this court finds this "newly discovered evidence" would not have had a material effect on the verdict.

Next, Barrett claims the government knew or should have known that Crawford was a drug addict at the time he was interviewed by the prosecution and at the time he testified at trial and therefore, they had an obligation under *Brady* to disclose this information to the defense. As previously stated, Crawford testified at trial about his extensive drug use; so despite the petitioner's allegations, defense counsel was aware that he was a drug addict. Further, Barrett claims, in light of Crawford's affidavit which indicates he "was high on speed" when he testified at trial,[116] the prosecution had an obligation to correct Crawford's allegedly false trial testimony that he had been off drugs for nine months prior to his testimony.[117] Petitioner does not, however, present any evidence that the government actually knew Crawford was using drugs at the time of his testimony. Conclusory or "purely speculative" allegations are insufficient to establish a *Brady* claim. *Murphy v. Johnson*, 205 F.3d. 809, 814 (5th Cir. 2000). If, as the petitioner alleges, it should have been obvious that

---

[113]*Id.*, at pp. 456 and 467-468.

[114]*Id.*, at pp. 468 and 472.

[115]*Id.*, at pp. 481-482.

[116]Petitioner's Exhibit No. 45, at p. 2.

[117]J.T.Tr. Vol. 3, at p. 457.

49

Crawford was on drugs at the time of his testimony, there is no merit to this *Brady* claim because the defense would or should have known that he was on drugs.

Finally, the petitioner claims the government should have disclosed that threats were made to Crawford to secure favorable trial testimony. Again, the petitioner does not present any evidence that Crawford was actually threatened. Based on one statement in Crawford's affidavit in which Crawford says: ". . . Mr. Littlefield told me all the bad things that would happen to me if I 'lied,'"[118] the petitioner speculates that Crawford was threatened. While the prosecution may have encouraged Crawford to be honest, that does not establish that threats were made to Crawford to encourage him to testify untruthfully. Further, when asked at trial whether he had "been threatened with any sort of prosecution if you don't come up here and testify," Crawford stated: "No sir. I was just subpoenaed to be here. That's why I'm here doing this."[119] After reviewing all of the allegations against Travis Crawford, this court finds the petitioner has failed to establish that Travis Crawford testified falsely at trial. As a result, the petitioner has not shown that the prosecutor knew or should have known of any falsity in Crawford's testimony, a fact fatal to his *Brady* claim.

## C. Cindy Crawford

Petitioner claims Cindy Crawford was coached and threatened by the prosecutor; that she was, contrary to her testimony, an active drug user and that she was either high or "coming down" from a high when she was interviewed by the government and when she

---

[118]Petitioner's Exhibit 45, at p. 2.

[119]J.T.Tr. Vol. 3, at p. 470.

testified at trial; that she suffered mental impairments which affected her ability to accurately recall and relate past occurrences, and which caused her to embellish and exaggerate; that she had regularly worked as an informant in the past and had received breaks on a Sequoyah County drug case; at the time of her testimony she was in violation of deferred sentence in Sequoyah County and that case was resolved in her favor after her testimony.  Again, this court will not consider hearsay accounts of unsworn recantations.  *See*, *United States v. Pearson*, 203 F.3d 1243, 1275 (10th Cir. 2000).

Petitioner also claims the government withheld evidence that Ms. Crawford was mentally ill and an active user of methamphetamine at the time of trial.  In support of this claim, the petitioner attaches medical records of Ms. Crawford.[120]  Petitioner does not, however, present any evidence which tends to establish the government knew, prior to cross-examination by defense counsel during the second stage of trial, that Ms. Crawford had been diagnosed with post-traumatic stress disorder.  Similarly, the petitioner does not present any evidence which establishes that the government knew Ms. Crawford was using drugs at the time of her testimony.  Conclusory allegations that evidence was known by the prosecution does not state a claim for relief.  As previously indicated, *Brady* does not require a prosecutor to seek out and disclose exculpatory or impeaching material not in the government's possession.  *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002).

Further, the petitioner claims "it was well known in the community that [Ms. Crawford] acted on a regular basis as a snitch for local law enforcement" and that the

[120]Petitioner's Exhibit 144.

Government "or its agents" had to know this, yet they failed to disclose this information.[121]

This claim fails on two levels. First, if it was "well known" within the community, defense counsel could have easily discovered the information. "There is no *Brady* violation "where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' or where the evidence is available . . . from another source," because in such cases there is really nothing for the government to disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). Specifically, in this case, two of the three declarations submitted by the petitioner to establish the knowledge within the community, were provided by the petitioner's cousin, who indicates her brother is married to Ms. Crawford,[122] and the petitioner's uncle, the father of Travis Crawford.[123] Travis Crawford's parents lived in close proximity to the petitioner's house.[124] On the other hand, while these three declarant's claim Ms. Crawford was a police informant, Barrett fails to show that Ms. Crawford had, prior to her testimony in 2005, actually provided any documented assistance to law enforcement in exchange for favorable treatment. Even assuming the petitioner's allegations that Ms. Crawford had worked for local law enforcement is true, "it is unrealistic to expect the federal prosecutors to know all information possessed by state officials affecting a federal case,

---

[121]Petitioner supports this statement with three declarations. *See*, Petitioner's Exhibit No. 83, at p. 2 ("It is common knowledge in the community that Cindy Crawford has worked as a "snitch" for local law enforcement for a long time to get others in trouble and to avoid getting in trouble herself."); Petitioner's Exhibit No. 88, at 2 ("It is common knowledge in the community that Cindy Crawford has worked as an informant for the police for an extensive period of time. . . . ."); and Petitioner's Exhibit No. 92, at p. 1 ("I am aware that Cindy has worked as an informant for the local police around here . . . . . .").

[122]*See*, Petitioner's Exhibit No. 83, at p. 2.

[123]*See*, Petitioner's Exhibit No. 92, at p. 1.

[124]J.T.Tr., Vol. 3, at pp. 451-456.

especially when the information results from an unrelated state investigation." *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999). Therefore, this court finds no *Brady* violation occurred in relation to this information.

Additionally, the petitioner alleges that "Cindy Crawford continues to milk benefits from her work as an informant, and her testimony against Mr. Barrett, up to the present day." Doc. 95, at p. 289. In support of this flowery statement, the petitioner alleges Crawford was charged in Sequoyah County on June 18, 2008 with first degree burglary and conspiracy and on December 15, 2008, more than three years after the petitioner's trial herein, received a two year deferred sentence on the first degree burglary charge and dismissal of the conspiracy charge. Barrett's conclusory allegations that the federal government has exerted and/or continues to exert influence in Ms. Crawford's state court proceedings are meritless. This statement, like many others contained within the petitioner's pleadings, is purely speculative. Again, speculative allegations are insufficient to state a *Brady* claim. *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000).

**D. Brandie Zane Price**

Next, the petitioner asserts the government or its agents knew or had reason to know that Ms. Price was involved in drug use and drug dealing at the time of her trial testimony despite her testimony, on October 26, 2005, that she had not been using illegal narcotics since 1999.[125] In support of this assertion, the petitioner submits court records from the

---

[125]At trial, Ms. Price was asked, "Since 1999 have you been using illegal narcotics?" She replied, "No, sir." J.T.Tr. Vol. 15, at p. 3488.

Eastern District of Oklahoma Case No. CR-07-016-RAW in which the grand jury returned an indictment on March 14, 2007 which alleged that "Beginning prior to approximately May, 2006, the exact date being unknown to the Grand Jury, and continuing until on or about February 20, 2007," Price and others were involved in a drug conspiracy.[126]  Subsequent to being indicted, Price pled guilty to a superseding Information to the crime of Possession of Methamphetamine with Intent to Distribute a mixture or substance containing a detectable amount of methamphetamine in excess of 500 grams.  The Information alleged the crime occurred "[f]rom approximately May, 2006 to on or about February 20, 2007."  Ultimately, Price received a sixty (60) month sentence in that case.  Barrett claims Ms. Price "received a substantial downward departure or variance from the advisory Guideline range based *on her cooperation and testimony against Mr. Barrett at his federal trial*."  *See*, Doc. 95, at pp. 290-291.  Further, Barrett "alleges that the Government or its agents knew full well (or had reason to know) at the time of Brandie Price's testimony against [him] that she was involved in drug use and drug dealing."  *Id*., at p. 291.

Again, these claims are clearly speculative and this court fails to see how the government could or should have known about drug activity which was not alleged to have begun until more than six months after Price's testimony.  Further, even if the government subsequently considered Price's previous testimony in Barrett's case in requesting a downward departure, this does not establish that the government had any agreement with Ms. Price prior to her testimony in his case.  As the government points out, "Barrett provides no

---

[126]Petitioner's Exhibit No. 174.

theory as to how the government might have induced Price's cooperation by promising leniency in a prosecution it had not undertaken for a crime the witness had not yet committed." Doc. 175, at p. 193. As a result, this court finds the petitioner has failed to state a *Brady* claim in relation to the testimony of Ms. Price.

### E. Karen Real

As to the final civilian witness, the petitioner asserts the government misled the jury with respect to the assistance it was going to give Real in exchange for her testimony and that the government failed to disclose numerous state cases which were dismissed against Real, which could have been used to impeach her. The government argues Barrett has failed "to show that the benefit received by Real was not the one described by the witness in open court." Additionally, in regard to Barrett's claim regarding state cases, the government argues this portion of Barrett's claim is untimely because it was not raised until March 1, 2010, and without merit since Barrett has failed "to establish that the government possessed any material information about Real's state prosecutions."

a. Statute of Limitations

In reviewing the petitioner's Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and For a New Trial filed herein on March 17, 2009, it is clear the only issue raised at that time regarding Ms. Real was

> . . . that the Government misled the jury with respect to the assistance it was going to give Real. The Government surely knew all along that it would ask that Real's sentence be reduced to time served based on her cooperation

against Mr. Barrett, an eventuality which in fact occurred.  The Government has a continuing duty to disclose exculpatory evidence under *Brady*.  This Government's true intentions were never disclosed to the defense or told to the jury.  Additionally, the tremendous break Real received on her sentence is newly discovered evidence adversely impacting her credibility and the Government's lack of forthrightness at trial.  Evidence of Real's deal could not have been discovered with the exercise of due diligence before or during trial, because it post-dated Mr. Barrett's trial.  Yet again, the Government's conduct in soft-peddling the assistance it was going to give Real in exchange for her testimony constituted a violation of *Giglio v. United States*, 405 U.S. 150 (1972) and *Napue v. Illinois*, 360 U.S. 264 (1959).

Doc. 2, at p. 297.

As the government claims, the petitioner did not timely raise a *Brady* violation occurred because of failure to disclose to defense Real's criminal record, including pending state criminal cases.  Since this claim was not raised until the filing of the petitioner's brief in support of his Amended Motion to Vacate, Set Aside, or Correct a Sentence By a Person in Federal Custody which was filed herein on December 4, 2009, *see*, Doc. 95, at p. 293, this court finds it is barred by the statute of limitations.[127]

b.  Sufficiency of claim regarding government assistance in exchange for Real's testimony

At trial, Ms. Real testified she had been convicted of "Conspiracy to manufacture, maintaining a house and a gun charge" and was serving a fourteen (14) year sentence in federal prison.  Thereafter, the following colloquy occurred between the prosecutor and Ms. Real:

Q: And we visited previously to your being here, have we not?

---

[127]All of the state court cases which the petitioner claims should have been disclosed were dismissed by the State of Oklahoma prior to Real's testimony in this case.  Furthermore, none of those cases resulted in a conviction.

56

A: Yes, sir.

Q: And did I indicate anything that I would do for you or attempt to do for you in relation to your cooperating with the Government in this case?

A: No, sir.

Q: Did I talk about anything I'd say to the Court?

A: Well, you just mentioned that, you know, you could tell the Judge, you know, what I did. And then it would be up to the Judge.

Q: Okay. Any relief from your sentence - - you're aware it's not going to come from me, its got to come for (sic) the court?

A: Yes. The court.

J.T.Tr., Vol. 13, at pp. 3080-3081. Ms. Real further advised the jury that she started using methamphetamine in 1994 or 1995, and she continued doing so until her arrest in 2000. *Id*., at p. 3081.

Ms. Real testified in the petitioner's trial on October 24 and 25, 2005. *See*, J.T.Tr., Vol. 13, pp. 3079-3092 and Vol. 14, 3098-3135. On March 1, 2006, the government filed a Motion for Reduction of Sentence for Defendant Karen Jean Real Pursuant to Rule 35, in Case No. CR-00-21-FHS. *See*, Petitioner's Exhibit No. 68 and Respondent's Exhibit No. 9. The government's motion advised the court that a complaint had been filed against Barrett in September 2004. The government indicated, in preparation for the Indictment, Ms. Real was writted to the Eastern District of Oklahoma from a federal correctional institution and asked about her associations with Barrett. The government further advised the court when Ms. Real was told there was a possibility that she would be used as a witness against Barrett,

57

she "expressed a willingness to testify without hesitation or reluctance."  Additionally, the

government indicated:

> While Ms. Real's testimony was delayed for a substantial period of time, Ms. Real presented the information at the earliest possible opportunity for her to assist the government.  The government first presented this matter to a grand jury in November 2004.  Ms. Real, at approximately that time, was first approached by the government regarding the knowledge she had involving Kenneth Eugene Barrett.  At that time, Ms. Real spoke freely and continued to do so during the duration of her assistance to the government.
>
> While ultimately multiple civilian witnesses spoke of Barrett's drug dealing activities, his use of firearms, and his threats to law enforcement, Ms. Real was the first to do so.  Her willingness to provide truthful testimony regarding Barrett's activities made it easier for the subsequent witnesses to come forward.  She was the first and cooperated willingly and courageously. Her assistance was substantial and created an environment in which others could cooperate as well.  She is clearly deserving of a reduction in her sentence in consideration of her efforts.

*Id.*  Thereafter, on April 25, 2006, the Honorable Frank H. Seay entered an order reducing

Ms. Real's sentence to time served, with the original terms of supervised release being left

in effect.  *See*, Petitioner's Exhibit No. 68 and Respondent's Exhibit No. 10.

Although Ms. Real did not advise the jury of the technical procedure that the

government would use to inform the judge of her assistance, (*i.e.*, filing of a Rule 35 Motion)

she clearly advised the jury that she anticipated that the government would make known to

the judge what she had done and then it would be up to the judge to decide what to do.

Based on the record in Ms. Real's case, this appears to be exactly what the government did.

Petitioner, or at least the petitioner's counsel, clearly knew or should have known of the

technical procedure for "informing a judge of a defendant's assistance."  Thus, this court

finds petitioner has failed to establish a *Brady* violation as it relates to Karen Real.

**F. Randy Turman**

Petitioner states

[t]he Government or its agents obviously knew that Turman was committing perjury when he stated he no longer had a pending felony case in Sequoyah County, but they let him give false testimony anyway. It is equally clear the Government knew, despite Turman's denials, that he had worked or was working as a snitch. Otherwise, there was no reason for his case to lie dormant for two years. The Government let Turman get away with another blatant falsehood when he stated the Government had nothing to hang over his head. Clearly, his testimony was motivated by the fact he had a still pending felony case.

Doc. 95, at p. 294.

The testimony to which the petitioner refers, however, was elicited at trial by defense counsel. First, defense counsel asked: "So, you're real familiar with cooking dope; aren't you?" Turman responded: "Yes, sir, I've been arrested for cooking dope." Defense counsel then indicated they were "going to talk about that in a second."[128] A few questions later, the following colloquy occurred:

Q: . . . . you have manufactured dope within a thousand feet of a school; haven't you.

A: No, sir.

Q: You have manufactured dope in the presence of a minor child under the age of 12, haven't you?

A: No, sir.

Q: And, sir, you have manufactured dope while possessing a firearm?

A: Yes, sir.

---

[128]J.T.Tr. Vol. 4, at p. 433.

Q: In fact, you manufactured methamphetamine while possessing a firearm, an AK-47, that had the serial numbers obliterated; didn't you?

A: No, sir.

Q: Well, you've been charged with all those crimes; haven't you?

A: I have been charged with alternating a serial number on a firearm, it was a SKS where it was dropped and hit on a nine, and it looked like that it was tried to be changed, but it hadn't.

Q: And on that case, you're currently out on bond on another $100,000; aren't you?

A: No, 120,000.

Q: And the status of that case is what?

A: There's - - there's nothing, no status. I've done been to court, and it's done been taken care of.

Q: It's over with?

A: As far as I know.

Q: Have you looked at the records?

A: No, sir.

Q: Do you want to look at them?

A: I don't know what good it would do me.

Q: I've got them right here. I've looked at them. You want to look at them?

A: I probably wouldn't understand them.

Q: It's not over with - -

A: The last time I went to court on that was two years ago, and I have never been - - made another court date. That was when Kelly Karnes was fired from the sheriff's department. He brought in bogus charges on me - -

J.T.Tr. Vol. 3, pp. 434-436.

. . . . *Brady* obviously does not apply to information that is not wholly within the control of the prosecution. There is no *Brady* violation "where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' or where the evidence is available . . . from another source," because in such cases there is really nothing for the government to disclose.

*Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (citations omitted).

Despite the petitioner's allegations, the record establishes the falsity of the allegations regarding Turman. The government did not elicit the testimony and, therefore, they could not have "let him give false testimony" nor did they "let [him] get away with another blatant falsehood when he stated the Government had nothing to hang over his head." Defense counsel was clearly aware of the essential facts surrounding Turman's pending criminal case and he took advantage of that information to cross-exam Turman. Furthermore, the petitioner's allegations that Turman "had worked or was working as a snitch" is another example of defense counsel's speculation which has no basis in fact. There is simply no merit to the petitioner's claim. As a result, this court finds the petitioner has failed to establish a *Brady* violation as it relates to Randy Turman.

**G.  Failure to disclose unknown witness**

Barrett next asserts the government

. . . . had spoken with, and knew the identity of, a witness who when questioned failed to corroborate information to which Charles "Monk" Sanders

would eventually testify in the penalty phase of Mr. Barrett's trial. (Tr. 9/13/05 H'rg at 14, 17.) [The Assistant United States Attorney] advised the court that he attempted to corroborate Sanders's claim that he (Sanders) was in a woman's house when he overheard her speaking on the telephone. Sanders, as he later testified, claimed he could recognize Mr. Barrett's voice over the phone, and that he heard the voice say they had to identify the C.I. and get rid of him. [The Assistant United States Attorney] told the court he had spoken with the woman himself, and she did not corroborate Sanders, although [the assistant] claimed he subjectively believed the woman's denial was motivated by fear.

Doc. 95, at p. 295.

Other than to cite to a transcript from a sealed hearing held on September 13, 2005, at pages 14 and 17, the petitioner does not cite the actual statements made by the government which establish that the government failed to disclose the identity of a person who purportedly "failed to corroborate Charles Sanders." A review of that transcript convinces this court that this claim is without merit. The entire colloquy between the court and prosecutors concerned witnesses to events that occurred at the petitioner's residence "during the months leading up to this particular incident." Tr. of September 13, 2005, at p. 9. The prosecutor advised the court he expected "them to testify that Mr. Barrett knew there was an arrest warrant outstanding, he expected law enforcement to come to his residence at some point in time and advised that - - words to the effect of I'm going to shoot when they come." *Id.*, at pp. 9-10. The court then engaged in the following colloquy with the prosecutors:

THE COURT: Haven't you in effect disclosed to counsel then essentially who they are by telling them what the testimony is?

MR. LITTLEFIELD: No, no, because - -

MR. SPERLING: Well, what the testimony is - -

62

MR. LITTLEFIELD: We have told them what the testimony - -

THE COURT: Once you have told them what the testimony is, if they talk with their client about it, isn't he going to be able to determine roughly who we are talking about?

MR. LITTLEFIELD: I don't believe so.

MR. SPERLING: Mike, hold on.  Excuse me just a second.

> (OFF THE RECORD DISCUSSION BETWEEN MR. SPERLING AND MR. LITTLEFIELD)

MR. LITTLEFIELD: If - - Your Honor asks about does that notice them, the defense, as to who it is and my response would be yes and no.  Yes, because the defense could go back through his recollection of who he might have said that to and have an access to the names.  No, because it is my belief that the defendant said that to many, many more people than those that we have found.  I have learned of one person, for example, who - - through witnesses, who would have been a participant in a conversation with Mr. Barrett in which statements of this nature would have been made.  I talked to that person.  That person refused to acknowledge it, I think in large measure because of the fear.

*Id.*, at pp. 11-12.  Simply because some other person did not acknowledge hearing petitioner make similar statements to what Sanders heard, does not establish that the person was even a participant to the conversation which Sanders described.  Sanders never claimed to know who Barrett was speaking to when he heard the statements he testified about.  Moreover, Sanders never testified he was in a woman's house when he overheard Barrett say "they had to identify the C.I. and get rid of him."  Rather, Sanders testified he was in jail when he overheard Barrett talking to someone on the telephone and Barrett made these comments to the person he was talking to.  See, J.T.Tr. Vol. 22, at pp. 4587-4588.

63

Shortly after being advised that the petitioner may have made threatening statements, the court advised counsel it was interested in hearing evidence to support the government's allegations that the witnesses' were in danger. *Id.*, at p. 13. At that point, the following colloquy occurred:[129]

> MR. SPERLING: I think that our brief with regard to the defendant being reasonably believed to be dangerous, that if convicted he faces substantial sentences, that there may well be media coverage. . . I need not belabor that. I want to focus on, C, exactly why the Court should delay the production of certain witnesses in this case. We have identified each of these witnesses, Your Honor. Two of them are in prison; one in federal, one in state. Others live in and around Sequoyah County, which is the home county of the defendant. It is - - there is common knowledge, Your Honor, that guns and drugs go hand in hand and particularly in Sequoyah County, methamphetamine distributors are often armed. The defendant is a hero to certain drug traffickers, as at Doss Gann's residence. He was a federal defendant and was prosecuted here. In fact, Mr. Littlefield was the prosecutor in that case and Doss had a picture of the defendant on the wall with the inscription hero after the time of this incident, this shooting. Randy Turman and Brandie Price have explicitly expressed concern about intimidation, threats, and safety of family members. The confidential informant that has been identified in our pleading, Your Honor, stated such. He was at the house of defendant's associate and overheard the defendant speaking on the phone saying we have got to find out who the C.I. is and take care of him. Mr. Littlefield has spoken directly with that confidential informant, who is identified in our pleading by name.
>
> THE COURT: What is the time frame of that?
>
> MR. LITTLEFIELD: It was after the arrest, while Mr. Barrett was - - and I don't know - -
>
> THE COURT: In '99?

---

[129]Since the petitioner asserts evidence of his allegation is found on page 14 and 17 of the transcript of the September 13, 2005 hearing at pages 14 and 17, the court has included the entire colloquy between the court and the government beginning on page 13 to page 18.

MR. LITTLEFIELD: It would have been in the time frame of '99, early 2000 is my best guess. I didn't ask specifically because I - - but the informant was at someone's residence, a phone call was made, the informant was next to the person who was the recipient of the phone call, recognized Mr. Barrett's voice over the telephone and heard Mr. Barrett tell this associate that we need to find out who the confidential informant is and take care of him.

THE COURT: Okay. You may proceed.

MR. SPERLING: All right. I think the pleading speaks for itself with regard to Cindy Crawford and Randy Turman, but we would point out in particular that Randy Turman has explicitly stated to counsel that he seriously fears Jerry Graham, who is a very dangerous man, recently released from prison and believed involved in Sequoyah County drug activity. This is according to District Attorney Investigator Clint Johnson. Jerry Graham is a neighbor of Randy Turman's and several law enforcement officers, as we noted in our pleading, who are familiar with Jerry Graham advised that he is believed to have killed in the past.

There is another matter, another man by the name of Randy Weaver. We have set forth the substance of what we expect that he will testify to. Brandie Price is also an associate of the defendant, whom we have identified in our pleading as saying that as an associate of the defendant that the defendant told her the cops were going to come, bullets would fly and she should either grab a gun or stay low and that the defendant intended to kill as many of them as he could. She is often in Sequoyah County, although her marital relationship is on and off with a husband and when it's on they live in Van Buren or Fort Smith. She is often then with her mother or grandmother in Sequoyah County and is the object of substantial concern. And then there is Charles Sanders. He is the confidential informant. Early in this proceeding there were allegations by predecessor defense counsel that the C.I. was really fiction. He is not, he is real. We have identified him in this pleading. He knew that the defendant cooked meth. He had been there, smelled the odor of meth at the defendant's residence, had seen cooking items at the defendant's residence, knew that the defendant cooked crank at his residence at a time approximate to the charged murder, and this informant, Mr. Sanders, said that the defendant expected cops to come and said he was going to kill the first one through the door. There was other - - there were other allegations about interaction between the informant and the defendant and sometime after the defendant's arrest, the informant was at the residence of a female associate of Barrett's when Barrett called and that's when Barrett advised the female that

65

they needed to identify the informant and, quote, "take care of him," end quote.

　　　　There is also Travis Crawford and Travis Crawford is - - you know, this statement about taking care of someone - - I mean, I must admit that sometimes perception is reality and the Court needs to deal with reality rather than someone's unreal fears, but I don't believe in the context of this case that these concerns are unrealistic. Travis Crawford was in Kenneth Barrett's yard on the afternoon of the charged murder when there was an apparent drive-by by an unmarked police vehicle. Travis Crawford apparently was told by the defendant that the defendant recognized the Bronco as a cop car, expressed that he didn't give an explicitive (sic), that the law was coming in, and said that he was going to go out in a blaze of glory. As we have - -

THE COURT: When did that witness testify?

MR. LITTLEFIELD: He has not yet testified. Part of our concern too here is, Your Honor, these are not witnesses that have previously testified in state court. So does the defendant have some idea as to whom he interacted with at or about that time? Yes. Does he know about these specific people by name? No.

*Id.*, at pp. 13-18. As can be seen from the transcript of the proceedings, Barrett's claim that the government suppressed the identity of a witness who would have refuted Charles Sanders is a figment of defense counsel's imagination. There is simply no evidence in this record, to establish that some undisclosed witness was in a position to contradict Sanders claim that he had been threatened *after* the murder. The fact the government might have learned of a person who, "according to witnesses," would have been a participant in a conversation with Barrett in which statements concerning the confidential informant were made does not establish that the person the government interviewed was the actual person who was talking to Barrett when the confidential informant overheard Barrett speaking. As a result, this court finds the petitioner has failed to establish that a *Brady* violation occurred.

66

### *Claims involving credibility of Law Enforcement Personnel*

Petitioner next asserts the government suppressed exculpatory evidence favorable to the defense about four law enforcement officials involved in his case, *i.e.* Clint Johnson, Vickie Lyons, Assistant United States Attorney Mike Littlefield, and Sequoyah County Sheriff Johnny Philpott. Many of the allegations have no basis, involve post-trial misconduct about which the government could not have known at the time of trial, and/or concern matters which are clearly not relevant. This court will, however, attempt to address these allegations.

## A.  Clint Johnson

First, the petitioner claims "[t]he Government or its agents knew that Johnson, just like his alleged snitch, Sanders, is untrustworthy and was subject to impeachment in a variety of areas." Doc. 95, at p. 297. Petitioner further asserts "[a]t the time of Mr. Barrett's trial and shortly thereafter, Johnson was under official investigation for embezzlement of funds, illegal drug use, perjury, and gross misuse of his official office." *Id*. In support of most of these allegations, the petitioner relies on a "defense attorney's suggestions" during cross-examination in a criminal case against that defense attorney's client, Richard Gray. All of the documents which the petitioner submits in support of these allegations are blatant hearsay. Further, while the petitioner claims "[o]n November 23, 2005, Sheridan[130] noted

---

[130]Jeff Sheridan appears to have been an employee of Richard Gray, the District Attorney for Cherokee and Sequoyah Counties. Mr. Gray was indicted, following an Oklahoma multi-county grand jury investigation, in October, 2006 for embezzling money seized as evidence from drug investigations. While the charges were ultimately dismissed against Mr. Gray, no charges were ever filed against Mr. Johnson and the petitioner's statement that the charges against Gray were dismissed at the conclusion of the prosecution's case "based on defense counsel's scathing impeachment of Clint Johnson," is nothing more than speculation.

Johnson's possible involvement, as either a target or witness, in a Multi-County Grand Jury criminal investigation," the petitioner does not submit any evidence that establishes Johnson was personally involved in any criminal activity or that an official investigation into Johnson's activities was being undertaken at the time of the petitioner's trial.[131]   The government, on the other hand, submitted an affidavit from Joel-lyn McCormick which indicates Ms. McCormick was responsible for prosecuting Mr. Gray's case and during her preparations for the trial in Mr. Gray's case, she investigated allegations of misconduct leveled against Mr. Johnson.  Ms. McCormick states, in reference to Petitioner's allegations that Mr. Johnson was writing hot checks in September 2005:

> . . . . I directed Attorney General Investigator Fred Ellis to verify an allegation that Mr. Johnson had written checks to a merchant on insufficient funds in September 2005.  As I understood the situation, the merchant had not perceived any fraudulent intent on Johnson's part.  However, I recall that an investigator from the District 27 District Attorney's Office contacted the merchant and urged him to turn the checks over to the DA's office for prosecution.

Respondent's Exhibit No. 2.  Additionally, Ms. McCormick indicates she became aware of an audit of confidential informant funds used by Clint Johnson's former employer, the

---

[131]Petitioner's Exhibit No. 181b  indicates, at p. 117,  that "During 2005, Johnson encountered several problems with operational procedures at the Drug Task Force.  One of the Assistant District Attorney's (A.D.A.) for the district had stolen "Crank" from a house during one of JOHNSON'S search warrants.  This A.D.A. was JANET BICKEL (phonetic).  JOHNSON told the District Attorney, RICHARD GRAY what had happened.  Nothing was done about the incident.  There were also other problems within the District Attorney's office and JOHNSON ended up having to testify before the Multi-County Grand Jury in Oklahoma City, Oklahoma.  JOHNSON told the truth to the Jury and several indictments were handed down against co-workers."  The interview in which this statement appears was conducted in late February, 2006.  Furthermore, it does not establish that Clint Johnson was personally involved in any criminal activities.  Finally, the A.D.A. Janet Bickel ultimately pled guilty "on September 8, 2006 in exchange for a five (5) year deferred sentence in Wagoner County District Court Case No. CF-2006-037 for offering false evidence in violation of 21 O.S. 453 and for Possession of Controlled Dangerous Substance in violation of 63 O.S. 2-402, and in Oklahoma County District Court Case No. CF-2006-597 for Perjury in violation of 21 O.S. 491." *State ex rel. Oklahoma Bar Ass'n v. Phillips*, 175 P.3d 353, 353-354 (Okla. 2007).

District 27 Drug Task Force.  However,  Ms. McCormick states:  "The audit did not find Clint Johnson had misappropriated confidential informant funds."  *Id*.

Finally, assuming the petitioner's allegations that the District Attorney's office had some "concern" over Johnson's inability to account for funds allegedly used for drug buys as early as November, 2005, the government's disclosure obligations under *Brady* do not extend to merely subjective assessments by the prosecutor of a witness's veracity.  *United States v. Torrez-Ortega*, 184 F.3d 1128, 1137 (10th Cir. 1999).  Moreover, mere suspicions of misconduct would not have been admissible to impeach Johnson's credibility.  *See*, Fed.R.Evid. 608 and 609.  Furthermore, this court finds that any evidence of a internal investigation within the state District Attorney's office was not in the actual or constructive possession of the federal government.  This finding is based upon the facts of this particular case, to-wit:  (1) the state District Attorney's office was not acting on behalf of the federal government or under its control; (2) the federal government apparently conducted its own investigation, interviewing and calling witnesses not previously called by the state prosecutor; (3)  a Federal Bureau of Investigation (FBI) visual information specialist spent two complete days at the scene, taking over 200 photographs to develop a model of the crime scene;[132] (4) the DEA performed drug analysis on physical evidence which was seized;[133] and

---

[132]J.T.Tr., Vol. 2, at pp. 241-300.

[133]J.T.Tr., Vol. 12, at pp. 2770-2820 and Vol. 13, at pp. 2827-2835, 2889-2920, 2929-3013*; 3016-3057.  See also*, Respondent's Exhibit No. 4, at p. 2 ¶s 5, 7, 10, 12, 13 and p. 3, at ¶s 15 and 16.

(5) as early as March 24, 2004, the federal government was having trouble in obtaining cooperation from the state District Attorney's office.[134]

Petitioner also claims Johnson mismanaged his personal finances, declared bankruptcy and gave materially false testimony regarding his knowledge of Charles Sanders's criminal activity before September 24, 1999. While the petitioner speculates because of Johnson's bankruptcy filings he "mismanaged his personal finances," the petitioner submits no evidence establishing how or when Johnson mismanaged his personal finances. Furthermore, in relation to Johnson's public bankruptcy filings, there was "really nothing for the government to disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). Additionally, the petitioner has not shown that disclosure of Johnson's bankruptcies which occurred more than four years prior to the petitioner's trial would have had any affect on the verdict in the petitioner's case. *See*, *United States v. Smith*, 534 F.3d 1211, 1222 (10th Cir. 2008). Finally, the petitioner claims "Johnson's testimony was false on a material matter" in relation to the confidential informant (Charles Sanders). *See*, Doc. 95, at pp. 301-303. Other than citing to the transcript from the hearing on the petitioner's motion to suppress in federal court, the petitioner does not provide **any** factual information which establishes that Johnson testified falsely. Rather, this entire allegation is once again premised upon conjecture and speculation. As a result, this court finds no *Brady* violation occurred in relation to Clint Johnson.

---

[134]Respondent's Exhibit No. 4, at p. 4.

**B. Vickie Lyons**[135]

> Petitioner makes the following allegations against Ms. Lyons:

> Agent Vickie Lyons of the Oklahoma State Bureau of Investigation, another critical witness in the Government's case against Mr. Barrett, colluded with and protected Johnson. . . . .Likewise, the credibility of Vickie Lyons would have suffered greatly had the jury learned of her participation in her boyfriend Clint Johnson's numerous illegal activities.

Doc. 95, at p. 297. Petitioner also states ". . . . Johnson lived with another critical prosecution witness in Mr. Barrett's case, Vickie Lyons of the OSBI." *Id.*, at p. 300. Petitioner submits absolutely no evidence of these allegations. Rather, the petitioner relies upon suggestions made by Richard Gray's defense lawyer, Clark Brewster, in questioning Mr. Johnson. Mr. Johnson, however, denied under oath that he had ever lived with Ms. Lyons. Petitioner's Exhibit No. 181A, at p. 73. This allegation is without any merit. Therefore, this court finds the petitioner has failed to establish a *Brady* violation as it relates to Vickie Lyons.

**C. Johnny Philpot**

Next, the petitioner claims the government suppressed evidence that Johnny Philpott visited his property and inspected his weapons less than a month before the murder. In support of this allegation, the petitioner submits a declaration containing hearsay statements attributed to Johnny Philpott. According to Barrett, this evidence would have allowed him to attack the validity of the no-knock nighttime warrant and would have discredited the snitch

---

[135] Although the petitioner refers to "Vickie Lyons", the court is unsure of the true spelling of Ms. Lyons first name. At the hearing on the motion to suppress, it was spelled "Vicky." *See*, Tr. of hearing on Motions held on January 26, 2005, at p. 48. *See also*, Petitioner's Exhibit No. 181A, at p. 75. During trial, it was spelled "Vicki." *See*, J.T.Tr., Vol. 9, at p. 1849.

71

witnesses and undermined the government's proof of intent to kill any law enforcement officers entering his property. Doc. 95, at pp. 307-310. The government, however, submits a declaration from Philpott in which Philpott personally states, in part:

> 1. I was the Sheriff of Sequoyah County, Oklahoma from November 12, 1996 to December 31, 2008.
>
> 2. On July 29, 1998, I responded with some of my deputies, Shelton Fair (#826), Larry Lane (#824) and Walter Ross, Undersheriff (#821), to the home of Kenneth Eugene Barrett. On that occasion, I spoke with Mr. Barrett, and some of my deputies inspected some rifles of Mr. Barrett's. Though Mr. Barrett had an outstanding Sequoyah County misdemeanor warrant at that time, I did not arrest him or cause him to be arrested.
>
> 3. Prior to Mr. Barrett's arrest in connection with the shooting death of David "Rocky" Eales, the July 29, 1998 incident described in paragraph 2, above was the last occasion on which I visited Mr. Barrett's home in Mr. Barrett's presence.

Doc. 175, Government's Exhibit 1.[136]

If, despite Philpott's declaration, Philpott was at Barrett's residence less than a month before the police raid and inspected Barrett's guns, this evidence would have been readily available to defense counsel from Barrett himself. As a result, the petitioner has failed to establish a *Brady* violation in regard to Johnny Philpott.

## D.  Michael Littlefield

Finally, and perhaps most disturbing to this court, are the petitioner's allegations that the prosecution suppressed evidence that Assistant United States Attorney Michael Littlefield

---

[136]This exhibit contains another paragraph which says declarant is attaching a copy of the radio log from July 29, 1998 as Exhibit A; however, no such log is attached to the exhibit. It should be noted that Philpott's declaration is consistent with the testimony given by Philpott at Petitioner's trial. *See*, J.T.Tr., Vol. 8, at p. 1789-1790 and Vol. 22, at p. 4562.

was abusing his children around the time of this trial and disclosure of this exculpatory evidence would have demonstrated that this prosecutor likely threatened and intimidated witnesses to provide false testimony. Petitioner supplies no competent evidence of these allegations and it appears from exhibits filed under seal that the information submitted by the petitioner did not occur until approximately one and a half (1½) years after the petitioner's federal trial. Based upon the sensitivity of the information and the fact that release of this information would undermine previous state court proceedings, this court is entering a separate order under seal which more fully addresses this claim in light of the sensitive nature of the information. For purposes of this order, however, this court finds that the petitioner has failed to establish a *Brady* violation as it relates to Michael Littlefield.

After having reviewed all of the petitioner's *Brady* claims and thoroughly examining the exhibits cited in support thereof, this court finds the petitioner has failed to establish any *Brady* violations actually occurred in the petitioner's trial. Accordingly, this claim is denied.

### III.  VALIDITY OF SEARCH WARRANT

Petitioner argues, in his fourth ground for relief, that his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments were violated by the use of false information in obtaining the search warrant and, as a result, the search warrant was invalid.  The government asserts the petitioner can not raise a Fourth Amendment search and seizure claim on collateral review because he had a full and fair opportunity to litigate this claim.  In reply, the petitioner argues the suppression of exculpatory evidence regarding the affiant's honesty as a law enforcement officer shows that he was denied a full and fair opportunity to litigate the search and seizure warrant.

In *United States v. Cook*, 997 F.2d 1312, 1317 (10th Cir. 1993), the Tenth Circuit held "that Fourth Amendment violations are not reviewable in a § 2255 motion when the federal petitioner has had a full and fair opportunity to litigate the Fourth Amendment claim at trial and present issues on direct appeal."  (citations omitted).  In this case, it is clear that the petitioner had a full and fair opportunity to litigate his Fourth Amendment claims.  First, on January 12, 2005, the defendant filed a motion to suppress.[137]  On January 26, 2005, the magistrate judge held a hearing on the motion to suppress.  Thereafter, on April 1, 2005, the magistrate judge recommended that the motion to suppress be denied.[138]  On April 17, 2005, the defendant filed objections to the magistrate's report and recommendation regarding the motion to suppress and on April 26, 2005, the government filed a response to the defendant's

---

[137]Cr. Doc. 33.  *See also*, Cr. Doc. Nos. 33, 43, 56 and 63.

[138]Cr. Doc. 105.

objections.[139]   On May 5, 2005, this court adopted and affirmed the magistrate's recommendation.[140]

Shortly after the trial began, Charles Sanders testified he was Johnson's confidential informant and Barrett's attorneys orally re-urged their motion to suppress claiming it was based on a faulty affidavit.[141]   Thereafter, defense counsel filed a written motion re-urging their motion to suppress.[142]   This court entered a seven page written order denying the defendant's motion specifically finding:

> Having heard both the testimony of Clint Johnson and Charles Sanders in this trial, as well as the testimony of numerous other witnesses regarding the activities occurring at the defendant's residence during the time period in which Johnson was receiving information from Sanders, this Court finds there is absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful.  Specially, because the affiant accepted as true what he was told by Sanders, and had found him to be reliable in the past, the Court finds the affidavit was properly supported.  Furthermore, based upon the totality of testimony presented herein, this Court finds the defendant has not even established that the information provided in 1999 by the informant was untruthful or unreliable.  As such, the affiant's affidavit concerning that information could not have been made with deliberate or reckless disregard for the truth.  Accordingly, the defendant's motion to suppress is hereby overruled.

Cr. Doc. No. 253.

On appeal, the petitioner argued the district court erred in denying the motion to suppress, although the exact argument raised in his motion to vacate  was not presented on

---

[139]Cr. Doc. 117 and 122, respectively.

[140]Cr. Doc. 124.

[141]J.T.Tr., Vol. 12, at pp. 2667-2680.

[142]Cr. Doc. 228.  *See also*, Cr. Doc. No. 231, Government's Response to Defendant's Request to Reurge Defendant's Motion to suppress the Drug Search Warrant.

appeal.  *See*, *United States v. Barrett*, 496 F.3d 1079, 1088-1091 (10th Cir. 2007).   In rejecting the petitioner's argument, the Tenth Circuit held "there was no violation of Oklahoma state law, let alone a federal constitutional violation that would justify suppression of the evidence seized from Barrett's residence." *Id.*, at 1090.

Since this court has previously found that the government did not suppress any exculpatory evidence about the affiant's honesty as a law enforcement officer, this court finds the petitioner had a full and fair opportunity to litigate his Fourth Amendment issues at trial.  Further, since his allegations concerning the affiant's honesty are nothing more than unfounded scandalous attacks on the affiant, this court finds appellate counsel was not ineffective in failing to raise these unfounded allegations on appeal.  Accordingly, this claim is denied.

## IV.  EVIDENTIARY ISSUES

Barrett's sixth ground for relief asserts his rights under the Fifth, Sixth, and Eighth Amendments were violated because of the trial court's restrictions on the use of statements he purportedly made at the time of his arrest and improper restrictions on the jury's consideration of the state-court verdict.  To overcome any procedural default, the petitioner asserts appellate counsel was ineffective in failing to raise the issue on appeal. The government argues the petitioner first raised his claim that the court improperly excluded evidence of his state court trial in a brief filed herein on March 1, 2010, well after the statute of limitations had expired.  As a result, the government asserts this portion of his claim is time barred.  Additionally, the government claims the petitioner has inadequately pled this

claim by failing to identify the judicial ruling which he is attacking and that the petitioner is procedurally barred from raising the claim because of his failure to raise the issue on appeal. The petitioner did not submit any reply to the government's response on this issue.

## A. Statute of Limitations

As previously indicated, the one-year limitations period ended on March 17, 2009. In reviewing the Motion filed herein on March 17, 2009, it is clear the only issue raised at that time regarding the restriction of the jury's consideration of the state-court verdict dealt with the court's exclusion of evidence during the penalty phase of the trial. *See*, Doc. 2 at pp. 323-327. As the government argues, the petitioner did not timely claim that this court erred in excluding, in the first stage of trial, evidence regarding the prior state court trials and verdict. Since this claim was not raised until the filing of the petitioner's brief in support of his Amended Motion to Vacate which was filed herein on March 1, 2010, *see*, Doc. 149 at p. 179, this court finds it is barred by the statute of limitations.

## B. Sufficiency of claim

While the petitioner claims his counsel sought to admit a "number of statements made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper Eales,"[143] the petitioner identifies only one statement which he claims was erroneously excluded at trial. He does not, however, provide any citations to the ruling which purportedly excluded this statement or establish why the ruling was flawed in light of the facts and circumstances known at the time of the ruling. It is not this court's job to develop

---

[143]Doc. 149, at p. 176.

the petitioner's claims where they are devoid of factual support. *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)) and *Hilliard v. United States*, 345 F.2d 252, 255 (10th Cir. 1965). Rather, it is the petitioner's responsibility to identify the specific rulings which he claims were erroneous and articulate why they were wrong. While the petitioner does provide legal authority for the proposition that statements of remorse may be considered as mitigating evidence, he does not pinpoint what the court's ruling that he is challenging was or explain why the specific ruling was erroneous.[144] Judges are not required to search for the proverbial needle in a haystack in order to ferret out facts to support allegations contained in a motion to vacate. Since the petitioner has not specifically identified the ruling which was erroneous, this court finds the petitioner has failed to establish that any error was made or that appellate counsel was ineffective in failing to raise the issue on appeal. Accordingly, this claim is denied.

## V.  USE OF STUN BELT

In his seventh ground for relief, the petitioner argues his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were violated because the trial court permitted the marshal to "place visible restraints on [him] during the trial. . . ." Doc. 95, at p. 326. In support of this assertion, the petitioner states "[t]he stun belt created a visible bulge in Mr. Barrett's clothing that was observable by the jury. (Exhibit 80.)"[145] *Id.*,

---

[144]Both Petitioner's mother and father were all allowed to testify during the second stage of trial that the defendant knew he made the wrong decision, that he would do things differently if he could, and that he was sorry it happened. *See*, Cr.Doc. 353, at pp. 5089 and 5114-5115.

[145]Exhibit 80 is a declaration by the petitioner's mother, Doris Barrett.

78

at p. 327.  No such statement, however, is contained in Petitioner's Exhibit 80.  In fact, no mention whatsoever is made in Exhibit 80 about the stun belt.  Rather, Exhibit 29[146] indicates trial counsel told appellate counsel that he did not believe the stun belt was visible to the jury.

The government argues the petitioner has procedurally defaulted this issue for failing to raise it on direct appeal.  To overcome the procedural default, the petitioner claims both trial and appellate counsel were ineffective for failing to preserve this issue or raise it on appeal.

In *Deck v. Missouri*, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2007), the United States Supreme Court held on review of a trial conducted by the State of Missouri that the Constitution forbids

> the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion that they are justified by a state interest specific to a particular trial.  Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Id.,* 544 U.S., at 629, 125 S.Ct., at 2012.  Visible shackling has been deemed inherently prejudicial because 1) it undermines the presumption of innocence and the related fairness of the factfinding process; 2) it can interfere with a defendant's "ability to communicate" with his lawyer; and 3) it could undermine the dignity of the judicial process.  *Id*., 544 U.S., at 630-631, 125 S.Ct., at 2013.  In *United States v. Wardell*, 591 F.3d 1279, 1293-1294 (10th Cir. 2009), the Tenth Circuit recognized that "requiring a defendant in a criminal trial to wear

---

[146]Exhibit 29 is a declaration by appellate counsel, Mark Henricksen.

79

a *visible* stun belt, like restraining him with visible shackles, may erode a defendant's constitutional presumption of innocence." (Emphasis added)

Criminal defendants do not, however, enjoy an unqualified right to appear before a jury without restraints. Courts retain the discretion to take measures to maintain order and security within the courtroom. *United States v. Hack*, 782 F.2d 862, 867 (10th Cir. 1986). Where compelling reasons exist to justify the use of physical restraints, the general presumption against their use will "yield to the competing interests of courtroom participants for the safe conduct and orderly progress of the trial." *Id.* Furthermore, prejudice should not be presumed from the use of a stun belt, where there is no evidence that any juror actually observed it. *United States v. McKissick*, 204 F.3d 1282, 1299 (10th Cir. 2000).

In this case, the United States Marshal made a request of the court to authorize the use of a stun belt during the trial to ensure the security of the courtroom. Prior to reaching any decision on the matter, the court entered a sealed minute order ordering the parties to submit briefs on the issue and set the matter for an evidentiary hearing.[147] Following the entry of the sealed minute order, the government filed under seal a Brief in Support of the United States Marshal's request.[148] Attached to said brief was an affidavit by John W. Loyd, United States Marshal for the Eastern District of Oklahoma. In his affidavit, Mr. Loyd indicated "[t]he belt will not be visible to the jury and will not impede the defendant's normal physical

---

[147]Cr. Doc. 166. As indicated in the sealed minute order, the court decided to seal the minute order and all subsequent pleadings and court hearings on the stun belt issue in an effort to prevent any prejudicial inferences to be drawn against the defendant.

[148]Cr. Doc. 175.

movements during trial." Cr. Doc. 175.  Further, in advising the court of the advantages of using a stun belt over using leg irons, Marshal Loyd stated that "[s]tun belts are worn under a defendant's clothing and not visible to the jury." *Id*.

On August 30, 2005, the court conducted an evidentiary hearing at which Louisia Murrow, Supervisory Deputy Marshal for the Eastern District of Oklahoma, testified regarding why the United States Marshal's service considered Barrett an escape risk.  Ms. Murrow testified that she had personally observed Barrett while he was in the marshal's holding cell attempting to tamper with his handcuffs.   Specifically, Ms. Morrow testified:

> He was  twisting them and pulling on them and he even went so far as to walk out of the camera vision and turn his back and face the wall so that I could not fully see what he was doing.  You know, I could see the back of his arms moving and stuff and I could - - when he was seated in the cell block, I could watch him twisting his hands and attempting to tamper with the handcuffs.

Cr. Doc. 330, Tr. of  Sealed Criminal Pretrial Hearing held on August 31, 2005, at pp. 10-11. Ms. Morrow indicated that the behavior of the defendant in the holding cell was very extraordinary.  *Id.*, at p. 14.   Additionally,  Ms. Morrow testified the defendant had continuously been in custody since approximately September 24, 1999; that defendant, prior to coming into the custody of the United States Marshal, had been incarcerated in the maximum security portion of the Oklahoma State Penitentiary where the defendant had been on lockdown for 23 hours per day; and that other deputy marshals had reported to her that they felt the defendant was "checking out the exits more than a normal prisoner would do." *Id*., at pp. 11- 15.  Finally, Ms. Morrow testified the charges pending against the defendant

indicated that the defendant had a propensity of violence. *Id.*, at pp. 53-54.  The government

also admitted as Government Exhibit 1 a copy of the policy of the United States Marshal

Service regarding the use of stun belts which indicated that, if used, the device was to be

concealed from the general public.[149]  *Id.*, at p. 19.  Additional testimony indicated that the

use of the stun belt had never prevented a defendant from consulting with his attorney or

participating in his defense.  *Id.*, at pp. 21-22.

The defendant then called his stepmother, Doris Barrett, to rebut the government's

testimony. Ms. Barrett testified that no restraints had been used on the defendant during state

trial proceedings which occurred prior to defendant's indictment in federal court and that she

never saw any type of threatening gesture by the defendant or any attempt or gesture by the

defendant to escape.  *Id*., at pp. 75-80.  Following the testimony, the court took the matter

under advisement and on September 6, 2005, in a sealed order the court made specific

findings of fact and conclusions of law  regarding why the court felt the use of the stun belt

was appropriate in this case.[150]

Furthermore, this court observed the petitioner during his criminal trial.  The stun belt

did not inhibit the petitioner's communications with his counsel.  Petitioner continually took

notes and freely communicated with both of his counsel during his trial.  The stun belt was

not visible to the jury.  The defendant was brought into the courtroom and seated at the

---

[149]The government also had Ms. Murrow put the stun belt around her waist to demonstrate for the court what such a device would look like if worn by the defendant under his clothes.

[150]Cr. Doc. 178.  In his Reply brief, the petitioner argues this order does not comply with *Deck* because there were no findings that the defendant "was dangerous, an escape risk, threatening or likely to cause any security problems."  Reply at p. 153.  The court's order, however, clearly establishes that the court allowed the use of the stun belt because of specific security concerns present in this particular case.  *See*, Cr. Doc. 178, at pp. 16-18.

defense table prior to the jury being escorted into the courtroom and the defendant remained seated and was not escorted out of the courtroom until the jury had left the courtroom.  It is highly unlikely, based upon the way the jurors entered and existed the courtroom and the seating position of the defendant at the defense table, that any juror would have taken particular notice of petitioner's waist.[151]  To the extent, however, that even one juror might have observed a bulge around the petitioner's waist, they could not have known what caused the bulge.  In light of medical advances today, numerous medical devices could be placed on a person's waist and even if the jury observed a bulge around petitioner's waist, it is mere speculation to assume the jury would know that petitioner was wearing a stun belt for security reasons.  Additionally, when the petitioner jumped out of his seat during the trial and demanded that the United States Attorney "get off his family," the United States deputy marshal in charge of the stun belt did not deploy the stun belt.  As a result, this court finds there is no evidence in the record that any member of  the jury in this case knew that the defendant was wearing a stun belt.  Accordingly, based upon the record herein, this court finds this claim has no absolutely no merit and counsel were not ineffective for failing to raise this issue on appeal.

---

[151]It should also be noted that had the defendant been required to wear full restraints, which is standard practice in the Eastern District of Oklahoma when the United States Marshal brings a defendants from the secure holding facility down the public hallway into the courtroom, (*see*, Cr. Doc. 178, at p. 11) it is highly more likely, based upon the configuration and acoustics of the federal courthouse, that the jury would have become aware of those security measures.  Specifically, the courthouse floor is marble; defendants are required to walk past the outside of the jury assembly room every time the court takes a recess, both on the way out of court and on the way back into court; and the clanking of the waist chains can be heard throughout the entire second floor of the courthouse where the courtroom and jury assembly room are located.

## VI.  COMPETENCY TO STAND TRIAL

In his eighth ground for relief, the petitioner asserts he was tried while incompetent in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. The issue of a defendant's competency to stand trial centers on whether he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding- and whether he has a  rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).  "To prevail on a substantive due process competency claim, a petitioner must demonstrate by clear and convincing evidence a real, substantial, and legitimate doubt regarding his competence to stand trial."  *Walker v. Gibson*, 228 F.3d 1217, 1229 (10th Cir. 2000) (*overruled on other grounds*).

> The Constitution forbids trial of one who, for whatever reason, is unfit to assist in his own defense because our adversarial system of justice depends on vigorous defenses.  The Constitution does not necessarily forbid trial of the mentally ill.  'Not every manifestation of mental illness demonstrates incompetence to stand trial; rather the evidence must indicate a present inability to assist counsel or understand the charges.'  *United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir. 1984); *Galowski v. Berge*, 78 F.3d 1176, 1182 (7th Cir. 1996); *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995) ('[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial.').

*Eddmonds v. Peters*, 93 F.3d 1307, 1314 (7th Cir. 1996), *cert. denied*, 520 U.S. 1172, 117 S.Ct. 1441, 137 L.Ed.2d 548 (1997).

Since capacity to assist in one's defense is the main concern, where fitness is challenged post-trial "[e]vidence of a defendant's behavior and demeanor at trial are relevant

84

104

to the ultimate decision of competency to stand trial." *Id.* (citing *United States v. Prince*, 938 F.2d 1092, 1094 (10th Cir. 1991)).  To show entitlement to a hearing on a substantive competency claim, Petitioner must present "'clear and convincing evidence creating a real, substantial and legitimate doubt [about] his competence to stand trial.'  This standard of proof is high; and 'the facts must positively, unequivocally, and clearly generate the legitimate doubt.'"  *United States v. Battle*, 419 F.3d 1292, 1299 (11th Cir. 2005).

To support his substantive due process claim that he was tried while incompetent, the petitioner relies almost exclusively upon the declarations of two experts who examined him more than three years after his criminal trial.  Neither of these experts, however, appear to have consulted with former counsel, the psychologist who examined Petitioner at the time of trial or any of the other people who interacted on a daily basis with Petitioner during his federal trial such as federal marshals or Muskogee County Jail employees.[152]

The records in this case, however, contradict the findings by these experts.  Specifically, on August 31, 2005, this court held a pretrial hearing for the purpose of deciding whether the defendant would be required to wear a stun belt during the trial.  At said hearing, the petitioner's step-mother, Doris Barrett, testified that she had been in contact with the defendant.  When asked: "Did Kenny Barrett express to you that he realizes what is going

---

[152]The affidavit of Myla H. Young, Ph.D. indicates she did not even review any records from the Muskogee County Jail, the Oklahoma Department of Corrections or any other institutional records related to Mr. Barrett's incarceration from approximately 1999 to date nor did she talk with his any of his custodians either before or during his trial.  *See*, Petitioner's Exhibit 89 at ¶ 20.  The affidavit of George W. Woods, Jr., M.D. reveals that he looked at institutional records including "*available* academic, medical and custodial records."  Petitioner's Exhibit 117, at ¶ 14 (italics added).  His affidavit does not, however, indicate that he spoke with any of the persons who interacted on a daily basis with the petitioner during the trial herein.

on in this case?", she responded: "Yes, sir."  She also indicated the defendant knew that his case was before the jury.[153]

Furthermore, this court's observations during the trial, as well as affidavits of the petitioner's trial counsel and the petitioner's own actions and comments during his trial, clearly indicate the defendant was competent during his trial.  As discussed previously herein, this court observed the defendant taking notes and freely communicating with both of his trial attorneys.  Additionally, during second stage closing arguments when the prosecutor[154] began to discuss testimony that his family members had given as mitigation, the defendant leapt from his chair and said:

> Get off my family, Sperling.  This is about murder, not my family.  You didn't mention the fact that I made two statements to OSBI Internal Affairs that you wouldn't let this jury hear, would you?  I've heard enough of him talking about my family.  Take me out of the courtroom.  Take me out.

Cr. Doc. 355, at p. 5421.[155]

Following this outburst, the defendant was, at his request, removed from the courtroom.[156]  After the prosecutor had completed his closing remarks, even though defense counsel indicated the defendant did not desire to return to the courtroom, the court had Mr.

---

[153]Cr. Doc. 333, at p. 88.

[154]Mr. Sperling gave the second closing argument for the government.  *See*, Cr. Doc. 355, at pp. 5418- 5421.

[155]This statement alone demonstrates the petitioner had a fairly sophisticated understanding of the proceedings.  Further, the decision to leave the courtroom may be reflective of the defendant's anger and frustration with the judicial process, but they were not incoherent.

[156]*Id.*, at pp. 5430-5434 for a discussion of the court and counsel's observations regarding the defendant's behavior.  *See also*, p. 5438 in which the court advised the parties that "the marshal has also brought to my attention that the defendant has said if you force me to come to the court, I can give you some problems."

Barrett brought to court outside the presence of the jury and the following colloquy between

the court and Mr. Barrett occurred:

> THE COURT: Let the record reflect counsel for the Government is present and the Defendant is present with counsel.  Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings.  I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?
>
> MR. BARRETT: Yes, Your Honor.
>
> THE COURT: Do you have any questions of the Court about that?
>
> MR. BARRETT: No, sir.
>
> THE COURT: Any questions of your attorneys?
>
> MR. BARRETT: No, sir.
>
> THE COURT: I'll ask the marshal to return - - (interrupted)
>
> MR. HILFIGER: One more.  Does that include the verdict?
>
> MR. BARRETT: Yes, Your Honor.
>
> THE COURT: Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.
>
> MR. BARRETT: Yes, sir.

*Id*., at pp. 5438-5439.

Additionally, both trial counsel submitted declarations regarding their actual

interactions with Petitioner during the trial.  Mr. Hilfiger stated, in relevant part:

> Mr. Barrett manifested a clear understanding of the trial proceedings.  He was very involved in his defense.  Mr. Barrett discussed witnesses, individual questions, and lines or areas of questions for certain witnesses.  Because of the two prior State

court trials, Mr. Barrett also was able to identify inconsistencies between the evidence in the federal and state trials. Mr. Barrett wrote contemporaneous notes of the testimony and used those notes in later discussions with Mr. Smith and myself concerning testimony already covered. Mr. Barrett appeared very attentive during the trial and he avoided unnecessarily interrupting his attorneys in court by writing messages, rather than by addressing us orally.[157]

In view of my interaction with Mr. Barrett, I harbored no doubts concerning his mental competence to stand trial and was unaware of any symptom that suggested he suffered from a significant mental health condition.

I cannot recall ever discussing with Mr. Echols any concern by him about Mr. Barrett's mental competence to stand trial, and I was never made aware of, by any conversations, or reports in the defense file, that Mr. Echols ever harbored a concern about Mr. Barrett suffering from a significant mental health condition. Similarly, none of the materials in the defense file raised a concern in my mind that Mr. Barrett was incompetent or suffered from a significant mental health condition unrelated to his use of drugs.

Both Bret Smith and I, jointly and individually, met with several of Mr. Barrett's relatives, including (but not limited to) his mother Gelene Dotson, his father Ernest Barrett, his step-mother Doris Barrett, his brother Steven Barrett, his uncle Roger Barrett, and his son Toby Barrett. None of them reported to me that Mr. Barrett had suffered significant head injuries or had exhibited any symptoms of mental illness that led me to question the defendant's competence to stand trial. In fact, none of the defendant's relatives provided me with any information that led me to believe Mr. Barrett had suffered from a significant mental health condition.

. . . . Mr. Smith and I met with Jeanne Russell, at her office in Tulsa. Mr. Smith had more direct contacts with Dr. Russell

---

[157]Ms. Barrett's testimony at the pretrial hearing held on August 31, 2005, establishes that the petitioner was also active in similar ways in his two state trial proceedings. *See*, Cr. Doc. 333, at pp. 82-83 and 87.

concerning her contacts with Mr. Barrett, but she never indicated to me that she had any concern about Mr. Barrett's mental competence to stand trial or suggested anything to me that indicated she believed that Mr. Barrett suffered from a significant mental health condition.

Government's Exhibit 12, at ¶s 5, 7, 8, 9 and 10, respectively (footnote added).

Mr. Smith stated, in pertinent part:

Mr. Barrett impressed me as among the most cooperative criminal defense clients I have ever had. He clearly understood the proceedings, and assisted Mr. Hilfiger and me in selecting witnesses, in suggesting questions, and in identifying inconsistencies between the evidence in the federal and state trials. He was very involved in his defense. He took notes and avoided unnecessarily interrupting his attorneys in court by writing messages, rather than by addressing us orally.

On occasion, I met with Mr. Barrett outside the presence of Mr. Hilfiger. Mr. Barrett would attend those meetings prepared with lists of points he wanted communicated to me and to Mr. Hilfiger.

Mr. Barrett believed he was being unfairly targeted by the government, but I did not find him to be unduly paranoid under the circumstances. During our initial meeting, which occurred soon after my appointment to the case, he was suspicious of my identity. But over the course of our initial few meetings, I found it easy to build a rapport with him. I did not observe him looking over his shoulder to see if anyone was listening to him or engaging in other behaviors that would have demonstrated irrational suspicion of his surroundings or an abnormal degree of paranoia.

In view of my interaction with Mr. Barrett, I harbored no doubts concerning his mental competence to stand trial and was unaware of any symptom that suggested he suffered from a significant mental health condition.

> I met with several of Mr. Barrett's relatives, including (but not limited to) his mother Gelene Dotson, his step-mother Doris Barrett, and his uncle Roger Barrett.  No one, including the family members I interviewed, reported to me that Mr. Barrett had suffered significant head injuries or had exhibited any symptoms of mental illness that led me to question the defendant's competence to stand trial.  In fact, none of the defendant's relatives provided me with any information that led me to believe Mr. Barrett suffered from a significant mental health condition.
>
> . . . . I met with Jeanne Russell, at her office, in the presence of Mr. Hilfiger.  Dr. Russell never indicated to us that she had any concern about Mr. Barrett's mental competence to stand trial or suggested anything to me that indicated she believed that Mr. Barrett suffered from a significant mental health condition.

*Id.*, Exhibit 11 at ¶s 3, 4, 5, 6, 7, and 8, respectively.  *See also*, Doc. 310, at p. 36 in which Mr. Echols indicated the petitioner

> is far from retarded.  He is very bright, not educated, but he is very bright.  He will tell me things during the trial - - he recalls something being said in court.  I will check ranscripts (sic) or computer files and all of this other stuff and low and behold it will turn out to be right almost all of the time.

Additionally, tests conducted by a psychologist named Faust Bianco, during the state court proceedings, indicated Mr. Barrett did not have any "personality disorders or any indication of any brain disfunction. (sic)."  *Id.*

In light of this record, the petitioner's proffer of Dr. George W. Woods' opinion (based upon his evaluation of Mr. Barrett more than three years after trial) that "Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial.,"[158] does not "'positively, unequivocally and clearly generate a real, substantial and legitimate doubt

---

[158]Doc. 72, Exhibit 117, at ¶ 81.

concerning [Barrett's] mental capacity.'" *Foster v. Ward*, 182 F.3d 1177, 1191 (10th Cir.

1999) (citing *Nguyen v. Reynolds*, 131 F.3d 1340, 1346 (10th Cir. 1997)).  *See also*, *Walker,*

*supra* at 1229-1230 (holding several post-conviction affidavits, prepared over seven years

after trial, regarding defendant's competence at time of trial were of little significance in light

of other evidence).  Therefore, this court finds the petitioner has failed to establish by clear

and convincing evidence that he was incompetent at the time of trial.[159]  Accordingly, this

claim is denied.

## VII.  JURY INSTRUCTIONS

Barrett raises challenges to his jury instructions as three separate claims arguing that

his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated by failure

of this court to: 1) instruct on a lesser included homicide offense; 2) instruct the jury they

could consider residual doubt as a mitigating factor; and 3) require the jury to find that death

was an appropriate punishment beyond a reasonable doubt.  Further, the petitioner asserts his

rights to effective appellate counsel were violated due to appellate counsel's failure to raise

the first and third issues on appeal.  The government claims petitioner has procedurally

defaulted the first and second claims and that he can not relitigate the third claim because it

was raised on direct appeal.

As a general rule, improper jury instructions do not form the basis for federal habeas

corpus relief.  *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368

---

[159]*See also*, Cr. Doc. 237, Sealed Psychological Evaluation/Risk Assessment prepared by J. Randall Price on October 25, 2005, and the videotape of the interview of the petitioner conducted by Dr. Price and Cr. Doc. 265, Sealed Notice with disk of telephone calls from the Muskogee County Jail made by the petitioner between October, 2005 and November, 2005.

(1973). In *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), the Supreme Court indicated a federal inmate attempting to establish prejudice from an allegedly erroneous jury instruction has a heavy burden and must show that the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."

## A.  Lesser included offense

In *United States v. Keeble*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973), the Supreme Court stated: "[I]t is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *See also*, *Beck v. Alabama*, 447 U.S. 625, 635, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) (holding that the verdict of death may not be constitutionally imposed after a jury verdict of guilt of a capital offense where jury was not permitted to consider a verdict of guilt of a lesser included offense).  In *Schmuck v. United States*, 489 U.S. 705, 716, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the Supreme Court adopted the "elements approach" in determining when a lesser offense has been established by the evidence at trial.  "Under this test, one offense is  not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense."  *Id*.  Before a lesser offense will be deemed a "subset" of the greater offense, "the lesser [offense] must be such that it is impossible to commit the greater without first having committed the lesser."  *Id*., U.S. at 719, S.Ct. at 1452 (quoting *Giles v. United States*, 144 F.2d 860, 861 (9th Cir. 1944).  Thereafter, in *United States v. Chanthadara*, 230

F.3d 1237 (10th Cir. 2000), the Tenth Circuit Court set forth a four-part test for determining whether a lesser included offense instruction is warranted stating:

> [A] lesser included offense instruction is to be given when [1] there is a proper request for one; [2] the lesser included offense consists of some, but not all, the elements of the offense charged; [3] proof of the element or elements differentiating the lesser and greater offenses is a matter in dispute; and [4] a jury could rationally convict on the lesser offense and acquit on the greater offense.

*Id.*, at 1257. Courts need not instruct on lesser offenses in capital cases when such offenses are not lesser included offenses of the charged crime. *Hopkins v. Reeves*, 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998). Accordingly, no instruction is to be given, when the lesser offense requires an element not required for the greater offense. *Schmuck*, *supra*, U.S. at 716, S.Ct. at 1450.

In this case, both parties requested this court to instruct on voluntary manslaughter. The reason this request was made was due to the fact that the petitioner was charged with First Degree Murder in state court but was convicted of First Degree Manslaughter. Here, however, Barrett was charged, in Count 1, with using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j), and, in Count 2, with using and carrying a firearm during and in relation to a crime of violence and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). While Petitioner recognizes that Counts 1 and 2 were "felony murder" counts, he nonetheless argues heat of passion would have negated the malice

aforethought element. In *Chanthadara*, *supra*, the Court indicated that to prove the malice aforethought element of first-degree felony murder, the prosecution need only show commission of the specified felony. *Id.*, at 1258. As a result, the Court held second degree murder was not a lesser included offense of felony murder under § 1111(a). *Id.* Furthermore, since felony-murder does not necessarily entail a sudden quarrel or heat of passion, voluntary manslaughter is not a lesser included offense of felony murder. *United States v. Miguel*, 338 F.3d 995, 1005-1006 (9th Cir. 2003). Finally, it is important to remember that the petitioner was sentenced to life without the possibility of release on Counts 1 and 2. As a result, this court finds no violation of the principles enunciated in *Beck* occurred in relation to these two counts. *See also*, *Trujillo v. Sullivan*, 815 F.2d 597 (10th Cir. 1987) (finding that failure to give lesser included offense instructions was not constitutionally erroneous and therefore could not be reviewed on habeas where death penalty was sought but not imposed), *cert. denied*, 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987). Thus, appellate counsel was not ineffective for failing to raise this issue in relation to Counts 1 and 2.

As to Count 3 of the superseding indictment, Barrett was charged with Intentionally Killing, During the Commission of a Drug Trafficking Crime, a State Law Enforcement Officer, Engaged in the Performance of His Official Duties, in violation of 21 U.S. § 848(e)(1)(B). Barrett's intent was an essential element of Count 3. *United States v. Barrett*, 496 F.3d at 1112. Therefore, to convict Barrett of Count 3, "the government had to prove,

as it did with respect to Count 2, that Barrett intentionally killed Eales." *Id.* (citations omitted).

In enacting § 848(e), Congress clearly chose to omit any grades of homicide lesser than intentional killing committed in furtherance of a felony drug crime. An examination of federal homicide offenses contained within Title 18 confirms that other federal homicide statutes such as voluntary manslaughter[160] and second degree murder[161] cannot serve as lesser included offenses because those offenses can only be prosecuted in federal court when committed within the maritime or territorial jurisdiction of the United States. Whereas, a killing under § 848(e)(1)(B) does not have to occur within federal territorial jurisdiction. The federal jurisdictional nexus of § 848(e)(1)(B) is met if the defendant is engaged in certain, enumerated federal drug crimes. *United States v. Beckford*, 966 F.Supp. 1415, 1418 (E.D.Va. 1997). Further, since there are no common law federal crimes, this court cannot imply lesser included homicide offenses to § 848(e)(1)(B). *Id.* Accordingly, this court finds voluntary manslaughter is not a lesser included offense of 21 U.S.C. § 848(e)(1)(B). As a result, appellate counsel was not ineffective in failing to raise this issue in relation to Count 3.

## B.  Residual doubt

In his tenth ground for relief, the petitioner argues this court erred in not instructing the jury that they could consider residual doubt as a mitigating factor. Specifically, the

---

[160]18 U.S.C. § 1111.

[161]18 U.S.C. § 1112.

95

petitioner argues he should have been allowed to introduce evidence and the court should have instructed the jury that it was appropriate for them to consider as a mitigating factor that "a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings." Doc. 149, at p. 199. The government argues the petitioner has procedurally defaulted this claim by failing to raise it on appeal.

Petitioner does not provide any legal authority for his argument that his constitutional rights were violated by this court not instructing the jury regarding doubts of a prior state court jury on completely different charges. Rather, the cases cited by the petitioner stand for the proposition that ". . . the Eighth Amendment to the United States Constitution does not require an instruction on "residual doubt" at the penalty phase. *Franklin v. Lynaugh*, 487 U.S. 164, 172-75, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)." *United States v. Honken*, 378 F.Supp.2d 1040, 1041 (N.D. Iowa 2004); and *United States v. Davis*, 132 F.Supp.2d 455, 458 (E.D. La. 2001). The Tenth Circuit in *Sallahdin v. Gibson*, 275 F.3d 1211 (10th Cir. 2002) did not hold that a defendant has a constitutional right to an instruction regarding "residual doubts." Instead, it recognized where the first stage defense was "actual innocence," a residual doubt theory might have been a reasonable strategy for defense counsel to adopt. *Id*., at 1240 n. 10. While the petitioner now argues the court erred in not allowing him to argue "residual doubt" to the jury by advising the jurors, during the penalty phase of trial, that the state court jury did not believe the defendant had intentionally killed Trooper Eales, the petitioner never claimed he was actually innocent. Further, the issue of "residual doubt"

was initially raised in this case not because of the federal jury having doubts over its own verdict, but this court's concern that the parties wanted to utilize the state court verdict based upon different charges to which the United States was not a party, to nullify the federal court jurors sworn duty to consider the facts presented to them in reaching a verdict, during the first stage of trial, regarding whether the actions of the defendant were intentional or, during the second stage of trial, entailed any of the statutory aggravating factors alleged in the case.[162]    The court clearly advised the parties, during pretrial proceedings, of its understanding of mitigating factors stating:

> . . . as to the mitigating factors, which are defined in 189 (sic) U.S.C. Section 3592, evidence is relevant if it tends logically to prove or disprove some fact or circumstance that could reasonably serve as a basis for a sentence less than death.  Under the statute, such evidence may include factors in the defendant's background, record, or character, or any other circumstance of the offense.  This Court does not find that evidence of prior proceedings against the defendant relates to the defendant's background, record, character, or offense in any way that could mitigate against the imposition of a death sentence.  Such evidence is not relevant and Defendant shall therefore refrain from any mention of prior proceedings against this defendant in the sentencing stage of this trial.
>
> Defendant may, however, introduce his prior conviction and the resulting 30-year sentence as a mitigating factor.  Due process and the Eighth Amendment mandate that when a defendant is not eligible for parole, and the government uses future dangerousness as an aggravating factor, the jury must be informed that if it does not sentence the defendant to death, he will spend the rest of his life in prison.  The Court stresses that the defendant's use of this evidence is relevant and admissible solely on this point.  The defendant may not use this evidence to raise residual doubts about the defendant's guilt or any - - or for any other purpose, because it does not relate to any aspect of the defendant's background, record, character or any other circumstance of the offense charged herein, and is, therefore, not relevant.

---

[162]*See*, Cr.Doc. 314, Tr. of September 26, 2005, at pp. 9-10.  *See also*, Cr.Doc. 317, Tr. of September 20, 2005, at pp. 4-5.

Cr. Doc. 314, *supra* at pp. 10-11.  Thereafter, during the sentencing phase of trial, the court

instructed the jury as follows regarding mitigating circumstances:

> You have found the defendant guilty of three capital crimes.  Your consideration of guilt or innocence has, therefore, been completed.  You must now determine an appropriate punishment.  In considering the appropriate punishment to impose, you are not to revisit the issue of guilt or innocence. All twelve jurors are bound by your verdict in the first portion of this case.
> Additionally, you are instructed that you must not speculate about the reasons for the jury's verdict or sentences in the Sequoyah County District Court case.  Only the charges and the evidence presented in this court are relevant to the task now before you.  The sentences in the Sequoyah County District Court case may, therefore, only be considered with regard to their mitigating effect, if any, on the defendant's sentence for the charges at issue in this federal court case.
> You must consider **any** mitigating circumstances you find to exist. Mitigating circumstances are facts about the defendant's character, background, or record, or the circumstances of the particular offenses, or other similar relevant factors, that may call for a penalty less than death.  However, any lingering doubt that you may have about the defendant's guilt is **not** a mitigating circumstance and cannot be considered by you in determining the appropriate punishment.

Cr. Doc. 257, Instruction No. 19 (bold in original).

In *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), the

Supreme Court said:

> Our edict that, in a capital case, " 'the sentencer . . .[may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense,'" *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting *Lockett*, 438 U.S., at 604, 98 S.Ct., at 2964), in no way mandates reconsideration by capital juries, in the sentencing phase, of their "residual doubts" over a defendant's guilt.  Such lingering doubts are not over any aspect of petitioner's "character," "record," or a "circumstance of the offense." This Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor.

*Id.*, U.S. at 174, S.Ct. at 2327. In her concurring opinion, Justice O'Connor made this point even clearer saying:

> Our cases do not support the proposition that a defendant who has been found to be guilty of a capital crime beyond a reasonable doubt has a constitutional right to reconsideration by the sentencing body of lingering doubts about his guilt. . . . as the plurality points out, we have approved capital sentencing procedures that preclude consideration by the sentencing body of 'residual doubts' about guilt.
>
> Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner's claim because 'residual doubt' about guilt is not a mitigating circumstance. . . . 'Residual doubt' is not a fact about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.' . . . Nothing in our cases mandates the imposition of this heightened burden of proof at capital sentencing.

*Id.*, U.S. at 187-188, S.Ct. at 2334-2335 (citations omitted). Thereafter, in *Oregon v. Guzek*, 546 U.S. 517, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006), the Court reaffirmed *Franklin* finding no constitutional right to introduce residual doubt evidence at sentencing.

In this case, the defendant was not prevented from advising the jury that he had already been convicted by a state court jury. In fact, during the penalty phase of trial, the defendant elicited testimony from Maudeen Vann, the First Deputy Court Clerk in Sequoyah County, Oklahoma, that the defendant was originally charged by information in the District Court of Sequoyah County with one count of first degree murder and three counts of shooting with intent to kill. The information was subsequently amended to include one count of first degree murder, one count of shooting with intent to kill, and two counts of discharging a

firearm with intent to kill.[163] Additionally, Ms. Vann went on to advise the jury of the state court jury verdict, telling them that the state court verdict form indicated that the defendant was found guilty by the state court jury on Count I of Manslaughter in the First Degree; on Count Two he was found guilty of the crime of Assault and Battery with a Dangerous Weapon; and on the two counts of discharging a firearm with intent to kill, he was found not guilty.[164] Finally, Ms. Vann advised the jury of the sentence imposed on the two state court charges for which Mr. Barrett was convicted[165] and a copy of the state court judgment was admitted into evidence.[166] While the petitioner claims counsel should have pointed out that the evidence of the prior conviction established the death was not caused in the manner in which the government claimed, the petitioner was not prohibited from introducing any evidence relating to the manner in which the death occurred and the petitioner does not now identify any evidence relating to the manner of the victim's death which was improperly excluded at trial. Furthermore, the jury was actually advised in detail of the outcome of the prior state court proceedings.

Petitioner argues, however, that his jury should have been instructed it could consider "residual doubt" as a mitigating factor. Since there is no constitutional right to such an instruction and the petitioner does not identify a statutory provision requiring such an

---

[163]J.T. Tr., Vol. 24 at pp. 4715-4721. *See also*, Defendant's Trial Exhibit Nos. 230 and 231.

[164]J.T.Tr., Vol. 24 at pp. 4722-4724.

[165]*Id*., at pp. 4724-4725.

[166]*See*, Govt. Exhibit 331. *See also*, J.T.Tr., Vol. 24, at pp. 4726-4738 and Defendant's Trial Exhibit Nos. 230-235.

instruction, the petitioner has failed to establish that the court's instruction regarding mitigating circumstances violated due process.  Thus, he is not entitled to relief on this issue and neither trial or appellate counsel were ineffective in failing to raise this issue.

## C.  Jury not required to find appropriateness of death penalty beyond a reasonable doubt

Petitioner claims, in his twelfth ground for relief, that the court's instructions violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the jury was not instructed that they had to find that death was an appropriate punishment beyond a reasonable doubt.  The government asserts the petitioner raised this issue on appeal and is, therefore, barred from relitigating this issue.  In reply, the petitioner claims the issue "was not raised or adequately resolved on appeal."  Doc. 178, at p. 179.

Although the petitioner claims appellate counsel did not properly raise the issue on appeal, a review of the Tenth Circuit decision leaves no doubt that the issue was addressed on appeal.  In fact, in reaching its decision regarding the constitutionality of 21 U.S.C. § 848's scheme for weighing of aggravating and mitigating factors, the court cites the same Supreme Court cases which Petitioner now attempts to utilize to support his expanded constitutionality argument saying:

> Barrett, effectively seeking to extend the Supreme Court's decision in *Ring*, argues that § 848 violated the Sixth Amendment because it does not require the jury to apply the reasonable doubt standard in weighing the aggravating and mitigating factors. According to Barrett, "[t]here is simply no functional difference between 'finding' and 'weighing,'" and thus "[t]he determination of whether aggravating circumstances outweigh mitigating

circumstances is a factual determination which could lead to an increase to the ultimate penalty-death."

*United States v. Barrett*, 496 F.3d 1079, 1107 (10th Cir. 2007). Although the court indicated appellate counsel had not made as broad an argument on appeal as he had in the district court,[167] the court analyzed the issue in full and held a reasonable doubt standard is not required in the weighing process. *See also, United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008). Accordingly, the petitioner is barred from relitigating this issue and appellate counsel was not ineffective for failing, as the petitioner alleges, to raise this claim.

## VIII.  REMOVAL FROM COURTROOM

In his thirteenth ground for relief, the petitioner argues his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution were violated when he was removed from the courtroom in the presence of the jury and that counsel were ineffective in not raising this issue on appeal. The government argues the petitioner procedurally defaulted this claim by not raising it on direct appeal. The government further asserts that because the claim lacks merit, appellate counsel were not ineffective for failing to raise the claim on appeal. Finally, the government argues that two of the subclaims raised are barred by the statute of limitations. Petitioner does not address the government's arguments in his Reply brief.

---

[167]*Id.*, n. 12.

The record is clear that the petitioner did not raise this issue on appeal.  Since the petitioner claims, however, appellate counsel were ineffective for failing to raise it on appeal, this court will proceed to the merits of the claim.

As indicated above, during the government's final penalty stage closing argument, the defendant got up from his chair and told the marshals to take him out of the courtroom. With the court's permission, the deputy United States Marshals walked the defendant out of the courtroom and the prosecutor completed his argument.[168]

Following completion of the government's argument, but prior to the jury leaving the courtroom, the court called counsel to the bench and had a hearing outside the presence of the jury in which the court asked if the defense had any requested instructions in regard to the defendant's outburst.  Counsel requested a recess to consider the issue further and the court granted that request.[169]  After a short recess, but still outside the presence of the jury, the court inquired of counsel if they had any requested instructions.  When both sides indicated they had none, the court advised the parties it was inclined to give the following instruction:

> Members of the jury: You are instructed that neither the Defendant's conduct nor his statements during closing argument are evidence in this case and you should not consider them when rendering your verdict herein.

Cr. Doc. 355, J.T.Tr. Vol. 27, at p. 5435.  Counsel indicated they did not care whether the court gave this instruction or not because it "highlights it to an extent, but then it also, you

---

[168]Cr. Doc. 355, J.T.Tr. Vol. 27, at p. 5421.

[169]Cr. Doc. 355, at pp. 5426-5429.

103

know, cautions the jury." *Id.* Then, the court inquired as to whether the defendant needed to be brought to the courtroom for the court to inquire as to whether or not he wanted to be present during the remainder of the proceedings. Even though defense counsel advised the court that the defendant had specifically told them he did not want to be present, the court advised counsel he was going to have the marshal bring the defendant to the courtroom in minimum restraints outside the presence of the jury.[170] Defense counsel requested a chance to speak with their client before he was brought to the courtroom and so another short recess was taken. Thereafter, the defendant was brought into the courtroom, outside the presence of the jury, and the following colloquy occurred:

> THE COURT: Let the record reflect counsel for the Government is present and the Defendant is present with counsel. Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings. I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?
>
> MR. BARRETT: Yes, Your Honor.
>
> THE COURT: Do you have any questions of the Court about that?
>
> MR. BARRETT: No, sir.
>
> THE COURT: I'll ask the marshal to return - - (Interrupted)
>
> MR. HILFIGER: One more. Does that include the verdict?
>
> MR. BARRETT: Yes, Your Honor.
>
> THE COURT: Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

---

[170]Minimum restraints were allowed because the marshal advised the court that the defendant had said if he was forced to come to court, he could give them problems. *Id.*, at p. 5438.

MR. BARRETT: Yes, sir.

Cr. Doc. 355, J.T.Tr. Vol. 27, at pp. 5438-5439.  The court took a short recess for the defendant to be removed from the courtroom.  Thereafter, the jury was brought back into the courtroom and the court gave the cautionary instruction discussed above and the concluding instructions to the jury.  The jury then was placed in charge of the bailiff and taken to the jury room to begin their deliberations.  *Id.*, at pp. 5440-5444.

Petitioner now argues that he was not competent to waive his presence at trial and that this court violated his constitutional rights by:

> (a) removing him from the courtroom without just cause, warning or hearing; (b) forcing Mr. Barrett to unnecessarily wear additional restraints; (c) failing to advise Mr. Barrett of his constitutional right to be present at trial; (d) failing to determine whether Mr. Barrett was competent to knowingly and voluntarily waive his constitutional right to be present at trial; (d) failing to determine whether Mr. Barrett had in fact knowingly and voluntarily waived that right; and (e) failing to give the jury a curative instruction.

Doc. 149, at p. 240.  Additionally, the petitioner asserts that trial counsel acted unreasonably

> (a) by failing to consult mental health or other medical experts regarding Mr. Barrett's condition, including his competence to make a valid waiver; (b) by failing to raise a doubt about Mr. Barrett's competence; (c) by failing to seek a hearing on his competence and/or the effects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (d) by failing to object to the additional restraints; (e) by failing to object to the choice the court gave Mr. Barrett (be present in unlawful restraints or absent); (f) by failing to advise him of the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court and Mr. Barrett's absence.

*Id.*, at pp. 240-241.

While the petitioner argues he has a fundamental right to be present at all stages of trial, the court did not, as the petitioner argues, remove the defendant without warning because of the defendant's outburst.   Rather, the defendant voluntarily requested to be removed from the proceedings and the court simply complied with his request.

Rule 43(c) of the Rules of Criminal Procedure provides, in pertinent part:

**(c) Waiving Continued Presence.**

(1) **In General.**  A defendant who was initially present at trial, . . . . waives the right to be present under the following circumstances:

(A) when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial; . . . . . .

(2) **Waiver's Effect.**  If the defendant waives the right to be present, the trial may proceed to completion, including the verdict's return and sentencing, during the defendant's absence.

Petitioner cites no authority to support his argument that when a defendant asks to be removed from the courtroom that he first must be advised that he has a constitutional right to be present before the court acquiesces to the request.  The plain language of Rule 43(c) of the Federal Rules of Criminal Procedure allows a defendant to voluntarily absent himself after the trial has begun without being advised that he has a obligation or constitutional right to remain.  Furthermore, while the petitioner argues *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), prevents his removal from the courtroom without a warning by the judge that he would be removed if he continued to exhibit disruptive behavior, the

106

defendant was not removed from the courtroom based upon his behavior. Rather, he was removed from the courtroom only after he personally requested to be taken from the courtroom. By simply acquiescing in his request, this court avoided drawing unnecessary attention to the situation. As soon as the prosecutor completed his closing argument, which was no more than 5 or 10 minutes after the defendant voluntarily absented himself from the courtroom, the jury left the courtroom.[171] Immediately thereafter, outside the presence of the jury, the court addressed the issue with counsel. After conferring with counsel and giving defense counsel an opportunity to consult with their client, the court had the defendant brought back into the courtroom, outside the presence of the jury, to ensure that the defendant's continued absence was voluntary and that the defendant was aware that he had a right to be present. The court also advised the defendant he could return to the courtroom at anytime if he chose to do so. *See, United States v. Sealander*, 91 F.3d 160, *15 (10th Cir. 1996) (court recognized a distinction between forcible removal and voluntary removal from proceedings). There is nothing in this record which indicates the defendant would have chosen to remain in the courtroom if the court had stopped the proceedings and addressed the defendant before he was allowed to leave the courtroom.

Further, this court is not aware of any authority which has held that a trial court must advise a defendant of his right to remain in the courtroom before allowing the defendant to leave. To the contrary, in a case where the defendant failed to return to court following a

---

[171]According to the courtroom deputy's log notes, the government's final closing argument took approximately 42 minutes (1:37:21 to 2:19:01), including the defendant's statements and removal, and the transcript of this portion of the trial consists of 25 pages. Less than six pages of this portion of the transcript occurred after the defendant left the courtroom.

107

lunch break and was, thereafter, convicted in absentia, the Supreme Court in rejecting the

defendant's argument that "his mere voluntary absence from his trial cannot be construed as

an effective waiver," the Supreme Court held:

> It is wholly incredible to suggest that petitioner, who was at liberty on bail, had
> attended the opening session of his trial, and had a duty to be present at the
> trial, entertained any doubts about his right to be present at every stage of his
> trial.  It seems equally incredible to us, as it did the Court of Appeals, 'that a
> defendant who flees from a courtroom in the midst of a trial-where judge, jury,
> witnesses and lawyers are present and ready to continue-would not know that
> as a consequence the trial could continue in his absence.'

*Taylor v. United States*, 414 U.S. 17, 20, 94 S.Ct. 194, 196, 38 L.Ed.2d 174 (1973) (internal

citations omitted).  *See also*, *United States v. Newman*, 733 F.2d 1395, 1401 (10th Cir. 1984).

While the defendant in this case was clearly not at liberty on bail, it is ludicrous to suggest

that the defendant could demand to leave the courtroom during the prosecutor's closing

argument but not recognize that the court would continue the trial in his absence.  Rule

43(c)(1)(A) permitted the defendant to waive his right to be present by requesting the court's

permission to leave the courtroom without the court informing the defendant of his

constitutional right to be present.  Further, the coherent statements by the defendant at the

time of his request to leave the courtroom establish that he was fully aware of what he was

doing.  Therefore, this court finds the petitioner was not deprived of any constitutional rights

when he was allowed to leave the courtroom.

Petitioner does not provide any authority to support his argument that the court

violated his rights by allowing additional restraints upon him prior to returning him to the

courtroom outside of the jury's presence.  As previously indicated, courts retain the

discretion to take measures to maintain order and security in the courtroom. *United States v. Wardell*, 591 F.3d 1279 (10th Cir. 2009), citing *Deck v. Missouri*, 544 U.S. 622, 632, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005) and *United States v. Hack*, 782 F.2d 862, 867 (10th Cir. 1986). Here, the record reflects the defendant had indicated he could cause trouble if he was returned to the courtroom.[172] Thus, the additional restraints were appropriate to maintain order and security in the courtroom. Further, these additional restraints could not have been observed by the jury as the defendant was brought into the courtroom outside of their presence. As a result, this court finds the defendant's constitutional rights were not violated by the use of additional restraints.

To the extent this court has previously found the petitioner was competent to stand trial, the petitioner's arguments to the contrary will not be further addressed. Additionally, since the record is clear that defense counsel consulted with their client and thereafter, the court made specific inquiries of the defendant regarding his not returning to the courtroom, after which a cautionary instruction was given to the jury regarding the incident, this court finds the petitioner's remaining arguments are frivolous.

After having considered the merits of the arguments herein, this court finds appellate counsel was not ineffective for failing to raise these issues on appeal. *See*, *Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995) ("An appellate advocate may deliver deficient performance and prejudice a defendant by omitting a 'dead-bang winner.'") (quoting *United States v. Cook*, 45 F.3d 388, 394-95 (10th Cir. 1995). Having failed to establish appellant

---

[172]*See* Cr. Doc. 355, J.T.Tr. Vol. 27, at p. 5438.

counsel rendered ineffective assistance of counsel on this issue, the petitioner is procedurally barred from raising this issue herein.

## IX.  CONSTITUTIONALITY OF FEDERAL DEATH PENALTY

Petitioner asserts in his fourteenth ground for relief that he was denied due process, equal protection, the right to be free from cruel and unusual punishment and the effective assistance of counsel because the federal death penalty, as administered, is "disproportionately and unconstitutionally applied according to the race of the victim, and trial and appellate counsel made no objection based on this fact."  Doc. 95, at p. 368. Petitioner bases his argument on a memorandum regarding "DOJ report on the Federal Death Penalty System" from Professor David Baldus to The Honorable Russell D. Feingold[173] and data compiled by Lauren Cohen Bell, Ph.D., in the death penalty case of Rejon Taylor.[174]

While recognizing that a racially disproportionate pattern of capital charging is insufficient to demonstrate purposeful discrimination on the basis of race, the petitioner argues it is sufficient to warrant discovery and an evidentiary hearing.  This court finds, however, that the petitioner's allegations are mere conclusory allegations based upon statistical data of questionable reliability.  Furthermore, the petitioner does not provide any authority for his theory that a defendant can establish an equal protection racial bias claim based upon the race of the victim as opposed to the race of the defendant.

---

[173]*See*, Petitioner's Exhibit 115.

[174]*See*, Petitioner's Exhibit 112.  This exhibit indicates the *curriculum vitae* of Dr. Cohen is attached to the exhibit.  It is not, however, attached to this exhibit.  Additionally, the data used by Dr. Cohen involved cases from 1989 to August 2008 and there is no way to extract the information from the relevant time frame herein.  The defendant in this case was tried in 2005.

In order to prevail on a selective prosecution claim, a defendant must show that the decision to prosecute had both a discriminatory purpose, *Whitus v. Georgia*, 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967), and a discriminatory effect on him, *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985).  *See also*, *United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 1487, 134 L.Ed.2d 687 (1996).  Thus, the defendant must establish that "decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987) (emphasis in original).  A discriminatory effect will be shown by establishing that "similarly situated individuals of a different race were not prosecuted."

*United States v. Armstrong*, *supra*.

> If the defendant seeks to obtain discovery to prove a claim for selective prosecution, he or she must first establish a 'colorable' claim of selective prosecution.  In addition, the 'evidence [must be] specific to [the defendant's] own case that would support an inference that racial considerations played a part' in the prosecutor's decision to seek the death penalty.

*United States v. Cooper*, 91 F.Supp.2d 90, 115 (D.D.C. 2000) (citations omitted).

Just like the defendant in *McCleskey*, the petitioner offers no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence and the statistics he offers without more are insufficient to support an inference that the decisionmakers in his case acted with a discriminatory purpose.  In fact, the statistics offered by the petitioner are less specific than those offered in *McCleskey*.  For instance, the data used in the Baldus study which was considered in *McCleskey* was subjected "to an extensive analysis, taking account of 230 variables that could have explained the disparities

on nonracial grounds." In this case, the declaration of Lauren Cohen Bell indicates that she considered no variables which could have explained the discrepancies. Rather, she concludes solely on the numbers that ". . . it is my opinion to a reasonable degree of certainty that this correlation of more severe sentencing outcomes and white victims is unlikely to disappear even in the presence of other potentially explanatory variables." Petitioner's Exhibit No. 112, Doc. 72-61, at p. 7.[175] The other exhibits which the petitioner submits are similarly insufficient to establish a discriminatory intent by the federal prosecutors. The memorandum from David C. Baldus dated June 11, 2001 states, in part:

> Without data on the comparative culpability of the offenders (and the race of the victims) in the cases affected by these post-authorization pleas (sic) bargaining decisions, *one has no idea the extent to which similarly situated defendants were in fact treated comparably.*
>
> \* \* \* \* \*
>
> No one with an understanding of the system suggests that it is driven by such a conscious and blatant animus against minority defendants or defendants whose victims are white.
>
> The concern about racial unfairness in the system is whether defendants with similar levels of criminal culpability and deathworthiness are treated comparably or differently because of their race or the race of their victims. *The reasons for differential treatment by U.S. Attorneys - and by agents of the FBI, the DEA and other are (sic) federal law enforcement agencies - are almost certainly nonconscious.* (italics added)

---

[175]The government asserts that the statistics relied upon by Dr. Bell and those generated by David Baldus are not reliable under the principles enunciated in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) because petitioner has failed to show that the calculations have been tested, subjected to peer review, and/or published.

Petitioner's Exhibit No. 115, Doc. 72-64, at pp. 6-7.  One of the declarations of Kevin

McNally[176] was prepared for use in the case of Rejon Taylor and contains references to

information "captured in a report previously filed with the Court."  However, no such report

has previously been filed with this court.[177]  The second declaration of Kevin McNally[178]

contains statistics relating to filing of federal death penalty cases.  After detailing those

statistics, McNally states that he is attaching three graphs depicting the information;[179]

however, once again, the information referenced is not attached.  "Statistics at most may

show only a likelihood that a particular factor entered into some decisions." *McCleskey*, U.S.

at 308, S.Ct. at 1776.

Even if shown to be reliable under *Daubert*, petitioner's own exhibits do not establish

a discriminatory intent to prosecute solely for racial reasons.  The petitioner has not shown

either the prosecutor in his case or the jury[180] acted with a discriminatory intent or purpose

in deciding to seek and ultimately imposing the death penalty.  All things considered,

petitioner's proffer regarding selective prosecution contains nothing more than conclusory

---

[176]Petitioner's Exhibit No. 113, Doc. 72-62.

[177]This declaration also states that Lauren Cohen Bell's analysis is attached; however, it is not attached to the declaration.  Finally, the declaration indicates the declarant "can testify about facts and circumstances of other cases involving the murder of government informant or witness which resulted in life sentence" and it refers to another declaration filed of record.  No such document has been filed in this case.

[178]Petitioner's Exhibit No. 116, Doc. 72-65.

[179]Petitioner's Exhibit No. 116, Doc. 72-65, at p. 4  ¶ 9.

[180]As part of their verdict, all twelve jurors signed a certification which stated:
> By signing below, each juror certifies that consideration of race, color, religious beliefs, national origin, or gender of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same decision regarding the appropriate sentence for the offense in question regardless of the race, color, religious beliefs, national origin, or gender of the defendant or the victim.

Cr.Doc. 258.

113

allegations.  Conclusory allegations are insufficient to state a claim under § 2255, and do not

support a request for discovery.

> To earn the right to an evidentiary hearing, a movant is required to allege specific facts which, if true, would entitle him to relief.  *See Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997); Rule 4(b) of the Rules Governing Section 2255 Proceedings.  The Rules Governing Section 2255 do not authorize fishing expeditions, and "'conclusory allegations unsupported by specifics' . . . will not entitle one to discovery or a hearing."  *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977)).

*United States v. Zuno-Arce,* 25 F.Supp.2d 1087, 1118 (C.D.Cal. 1998).  *See also*, *United*

*States v. Rollow*, 357 Fed.Appx. 966 (10th Cir. 2009) and *United States v. Scott*, 7 F.3d 1046

(10th Cir. 1993) (citing *Eskridge v. United States*, 443 F.2d 440, 443 (10th Cir. 1971)).

Systemic statistics alone-that is, discriminatory intent in a particular prosecution can

not conclusively be inferred from system-wide findings suggestive of racially disparate

impact. *United States v. Bin Laden*, 126 F.Supp.2d 256, 260 (S.D.N.Y. 2000).  Furthermore,

as previously stated, in order to prove discriminatory effect, petitioner must show that

similarly situated individuals of a different race were treated differently.  Statistics, in the

context of capital sentencing, about the general operation of a death penalty scheme are

insufficient to support conclusory allegations of a discriminatory purpose.  In this case,  the

petitioner's conclusory allegations do not establish either a discriminatory intent or a

discriminatory effect.  Accordingly, this court finds the petitioner has failed to establish that

the federal death penalty act as administered is unconstitutional.

Moreover, trial counsel did ask this court to declare the federal death penalty statute unconstitutional.[181]  In his motion, trial counsel specifically stated that "[th]e federal death penalty scheme, . . . . . results in arbitrary classifications based upon the race, sex and economic class of the victim and of the accused. . . . ."  Cr. Doc. 78, at p. 3.  Rather than focus on statistics dealing with an equal protection argument, however, counsel chose to use statistics to support his due process claim.  In addressing this portion of defendant's motion, the United States Magistrate Judge stated the following:

> The specific arguments made here by the Defendant would appear to arise under the Due Process Clause of the Fifth Amendment, not under the Eighth Amendment, but they lack merit nevertheless.  First, the federal death penalty is not unconstitutional simply because it may be erroneously imposed.  *See, e.g., Herrera v. Collins*, 506 U.S. 390, 399 (1993) ("But we have also observed that '[d]ue process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.'  To conclude otherwise would all but paralyze our system for enforcement of the criminal law."), *quoting Patterson v. New York*, 432 U.S. 197, 208 (1977).  *See also United States v. Church*, 217 F.Supp.2d 700, 702 (W.D.Va. 2002) ("The Supreme Court's decision in *Herrera* thus forecloses the argument that the inherent fallibility of the criminal justice system supports a due process attack on the death penalty.").  In any event, the statistical evidence cited by the Defendant is irrelevant, as it is founded upon studies of state death penalty cases.  *See United States v. Denis*, 246 F.Supp.2d 1250, 1253 (S.D.Fla. 2002), *aff'd by* 107 Fed.Appx. 182 (11th Cir. May 13, 2004), *cert. denied*, 125 S.Ct. 640 (2004) ("[T]he use of statistics that apply to *state* death penalty cases *cannot* support a conclusion of that possibility in *federal* cases.  This use of statistics is inappropriate, not only because they can be easily manipulated, but because they relate to cases from states with different capital sentencing schemes.")[emphasis in original]; *United States v. Taylor*, 302 F.Supp.2d 901, 908 (N.D.Ill. 2003)("[T]he issue . . . is not the reliability of state death penalty prosecutions but rather federal capital prosecutions.").  *See also United States v. Quinones*, 313 F.3d 49 (2nd Cir. 2002), *cert. denied*, 540 U.S. 1051 (2003) (reversing a lower court decision accepting state

---

[181]*See* Cr. Doc. 78.

statistical evidence as proof that the FDPA violates substantive due process). To the extent there is relevant statistical evidence, *i.e.*, evidence based upon studies of the federal death penalty scheme, such evidence suggests that the federal death penalty is not imposed arbitrarily, capriciously or unreliably. *See Taylor*, 302 F.Supp.2d, at 908 ("This Court follows other courts in finding that based on these statistics regarding the federal death penalty system, that the 'federal experience with death penalty cases certainly does not support an argument that the federal court system is likely to convict the truly innocent.'"), *quoting Church*, 217 F.Supp.2d, at 702; *Denis*, 246 F.Supp.2d, at 1253 ("Therefore, this Court agrees with the holding of [*Church*]").

Cr.Doc. 147, at pp. 3-5 (footnote omitted). On July 18, 2005, this court adopted the Magistrate's Report and Recommendation.[182]

While petitioner now has the advantage of hindsight and can see that an attack based on the principles of due process was not effective, he chooses to change tactics and challenge the Federal Death Penalty Act on equal protection grounds.[183] Since, however, no legal authority exists to suggest that a defendant can establish an equal protection racial bias claim based upon the race of the victim, as opposed to the race of the defendant, and statistics alone do not establish a discriminatory purpose, this court finds the petitioner has failed to establish that the absence of this specific claim, at trial or on appeal, deprived him of his Sixth Amendment right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

---

[182]Cr.Doc. 153.

[183]As indicated previously, the heading of the petitioner's Ground Fourteen claims a denial of due process of law as well as a deprivation of equal protection of the law. His argument, however, focuses exclusively on the racial discrepancies that he perceives exist within the administration of the Federal Death Penalty Act.

116

## X.  SUFFICIENCY OF INDICTMENT

In his fifteenth ground for relief, the petitioner claims his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated because the indictment "made no mention of the federal death penalty or any of the additional non-statutory aggravating factors relied upon by the Government during the penalty phase."  Doc. 149, at pp. 251-252.  Thus, the petitioner asserts "[t]he indictment (and the death penalty statute) under which petitioner was tried and sentenced denied petitioner his right to notice in the charging document of the aggravating circumstances which would make him eligible to be sentenced to death."  *Id.*, at p. 252.  To support this argument, the petitioner relies upon *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed. 2d 311 (1999).  The government asserts petitioner has defaulted this claim by failing to properly raise it before this court or on appeal.  Alternatively, the government asserts that the petitioner was properly charged by superseding indictment.

### A.  Procedural Default

As previously indicated, failure to raise a claim either at trial or on direct appeal prevents a party from raising the issue in a § 2255 proceeding.  The two recognized exceptions to this rule are 1) the defendant can show good cause for failing to raise the issue earlier and that failure to consider the issue would result in actual prejudice to his defense, *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) ; and 2) if "failure to consider the claim would result in a fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 l.Ed.2d 640 (1991).

117

Petitioner attempts to overcome his default by claiming ineffective assistance of appellate counsel.  Where ineffective assistance of counsel is raised as cause for excusing procedural default, the court is required to look at the merits of the omitted issue.  *Hain v. Gibson*, 287 F.3d 1224, 1231 (10th Cir. 2002).

## B.  Sufficiency of superseding indictment

Petitioner fails to provide any legal authority for the proposition that non-statutory aggravating factors must be proven to a grand jury and alleged in the indictment.  A review of the superseding indictment[184] reveals that the statutory aggravating factors, which made the defendant "death-eligible," were, despite the petitioner's assertions to the contrary, alleged in the superseding indictment. The government concedes the superseding indictment did not include allegations of any non-statutory aggravating factors, but asserts the superseding indictment was consistent with prevailing Supreme Court authority and, therefore, was sufficient.

The Indictment Clause of the Fifth Amendment provides, in pertinent part, that [n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury." U.S. Const. amend.V.  Its purpose is to limit a defendant's jeopardy "to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960).  In addition, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be

---

[184]Cr. Doc. 52.

118

informed of the nature and cause of the accusation. U.S.Const. amend. VI. Together, these provisions of the constitution afford a defendant the right to notice of the charges against him in a sufficiently detailed manner that he is able to prevent double jeopardy following conviction or acquittal.

> . . . .an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.

*Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974).

In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 2365, 147 L.Ed.2d 435 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.*, U.S. at 490, S.Ct. at 2362-2363. Thereafter, in *Ring v. Arizona*, 536 U.S. 584, 609, 122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002), the Court held that facts necessary to render a defendant eligible for a death sentence "operate as 'the functional equivalent of an element of a greater offense.'" While the Supreme Court has not specifically extended *Ring* to require grand jury findings of eligibility factors pursuant to the Indictment Clause of the Fifth Amendment, circuit courts examining the issue have consistently held that the eligibility factors – at least one threshold intent factor under § 3591(a)(2) or § 848(n)(1) and at least one statutory aggravating factor under § 3592(c) or § 848(2) to (12) – must be charged in the indictment and found by the grand jury. *See*, *e.g.*, *United States v. Purkey*, 428 F.3d 738, 749 (8th Cir. 2005), *cert. denied*,

119

549 U.S. 975, 127 S.Ct. 433, 166 L.Ed.2d 307 (2006); *United States v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004), *cert. denied*, 543 U.S. 1005, 125 S.Ct. 623, 160 L.Ed.2d 466 (2004); and *United States v. Higgs*, 353 F.3d 281, 295-307 (4th Cir. 2003), *cert. denied*, 543 U.S. 999, 125 S.Ct. 627, 160 L.Ed.2d 456 (2004).

> 'There is no requirement that the indictment allege *all* of the factors that might be weighed by the jury when deciding whether to impose a death sentence.' *Higgs*, 353 F.3d at 299. Non-statutory aggravating factors do not increase the maximum punishment to which a defendant is subject. They are neither sufficient nor necessary under the FDPA for a sentence of death. Their purpose is merely to aid the sentencer 'in selecting the appropriate sentence from the available options,' *id*. at 298, "'on the basis of the character of the [defendant] and the circumstances of the crime,'" *id*. (quoting *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994)).

*United States v. Purkey*, *supra*. *See also*, *United States v. Fields*, 516 F.3d 923, 944 (10th Cir. 2008) ("non-statutory aggravators play no role in the eligibility determination under the FDPA, but are relevant only in the weighing process at the ensuing sentence-selection stage.").

Since non-statutory aggravating factors do not increase the maximum punishment a defendant is subjected to, neither the Indictment Clause nor the Sixth Amendment require that they be alleged in an indictment  The weighing process contained within 18 U.S.C. § 3593(e) is simply a method for the jury to give individualized consideration regarding "whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." *United States v. Purkey*, 428 F.3d, at 750.

A review of the superseding indictment shows it set forth the elements of the offenses charged and the functional equivalents sufficient to apprise Barrett of the charges against

him.  *See also*, *United States v. Barrett*, 496 F.3d 1079, 1091-1095 (10th Cir. 2007)

(discussing sufficiency of indictment issues which appellate counsel raised).  In particular,

the superseding indictment provided him with notice of the intent factor and the statutory

aggravating factors upon which the government, during the penalty phase, ultimately relied.

Therefore, this court finds the superseding indictment was legally sufficient and appellate

counsel was not ineffective in failing to argue that the superseding indictment was

insufficient because it did not allege the non-statutory aggravating factors.  As a result, this

court finds the petitioner is procedurally barred from raising this claim.

## XI.  JURY ISSUES

Petitioner asserts in his eleventh proposition that his Fifth, Sixth, and Eighth

Amendment constitutional rights were violated when the court improperly excused Juror 62

for cause.   In his sixteenth proposition, the petitioner claims he was deprived of his Fifth,

Sixth, Eighth and Fourteenth Amendment constitutional rights because of "juror

misconduct." The government argues each of these claims have been procedurally defaulted.

## A.  Juror excused for cause

Petitioner claims Juror 62 was excused "solely because of her conscientious scruples

against the death penalty. . . ."  Doc. 95, at p. 345.  Respondent argues the petitioner

defaulted this claim by not raising it on direct appeal.  Further, the respondent asserts the

petitioner cannot establish that his attorneys were ineffective for failing to raise the issue on

appeal and, as a result, the petitioner has failed to establish cause to excuse his default.

There can be no doubt that this claim relies on facts contained within the trial court record.[185] As a result, the petitioner should have raised this claim on direct appeal. Since the petitioner did not raise the claim on direct appeal, the claim is procedurally defaulted. To overcome this default, the petitioner once again claims appellate counsel were ineffective for failing to raise the issue. After a review of the transcript, this court finds that Juror 62 was properly removed for cause under the principles enunciated in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

In *Witherspoon*, the Supreme Court indicated prospective jurors must be "willing to consider all of the penalties provided by state law" and that a prospective juror can "not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." *Id.*, 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21. In capital cases, not all prospective jurors who oppose the death penalty are subject to removal for cause. Rather, "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986). In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court indicated a prospective juror may be excluded for cause when "the juror's views would 'prevent or substantially impair the

---

[185]*See* Cr. Doc. 333, Tr. of Individual Juror Qualification for Purposes of Stage One Proceedings held on Sept. 14, 2005, at pp. 819-829.

performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.*,

469 U.S. at 424, 105 S.Ct. at 852; *see also Uttecht v. Brown*, 551 U.S. 1, 127 S.Ct. 2218,

2224, 167 L.Ed.2d 1014 (2007).

> [I]t is not necessary that prospective jurors would vote automatically against the death penalty or that their opinions on capital punishment would prevent them from rendering an impartial verdict.   If a prospective juror conscientiously disapproves of the death penalty, that juror can be eliminated if any of that person's jury duties would be "substantially impaired."

*Coleman v. Brown*, 802 F.2d 1227, 1231 (10th Cir. 1986).

Potential Juror 62 was extensively questioned by this court regarding her ability to

follow the court's instructions and impartially consider both potential sentencing options in

this case.  Initially, when asked by the court if she had an opinion about the death penalty the

following colloquy occurred:

> Juror:  I don't - - I could not do it.  I could not say anybody to be sentenced to death.
>
> Court: When you say you could not do it, do you mean you couldn't be the one that carried out the execution, or - -
>
> Juror: I couldn't even say that they deserve it, no.  I don't believe in it.
>
> Court: Okay.  Let me - - this question - - it's part question and part information to you.  But you heard me give you a little bit of the background of this case, and there's two parts of it, the guilt stage and the sentencing stage.  So, as to the sentencing, you realize that in this case you may be asked at some point to consider whether to impose a sentence of life in prison without the possibility of release or the death penalty?  Those two things are in play in this case.  Do you understand that?
>
> Juror: I do now.  I didn't then, but I do now.
>
> Court: They're both - -

Juror: Now that you say it again, yes.

Court: And you understand that as a juror, if you are selected as a juror in this case, you would have to follow the law and render a verdict within the law? Do you know that?

Juror: Yes, I do.

Court: I mentioned - - or I think I mentioned, or I intended to mention, issues about moral, religious, philosophical or personal opinions. I said something about that, that I'd ask you a question about that.

Juror: Yes.

Court: There are really two questions. And the first of those is: Do you have any moral, religious, philosophical, or personal opinions which would prevent you from considering the imposition of a life sentence without the possibility of release?

Juror: I could do that. I mean, I could do that.

Court: Okay. Well, then, the second question, then: Do you have any moral, religious, philosophical, or personal opinions which would prevent you from considering the imposition of a death sentence?

Juror: Yes, I do.

Cr. Doc. 333, Tr. of Individual Juror Qualification for Purposes of Stage One Proceedings, at pp. 820 - 821.[186] Following this colloquy, the court gave defense counsel an opportunity to rehabilitate the juror. The juror advised counsel that she had held these views about the death penalty all of her adult life. *Id.*, at p. 823. Further questioning by defense counsel did not change this juror's responses. Rather, this colloquy occurred:

---

[186]For ease of reading, in quoting from this portion of the transcript, the court has inserted the person speaking instead of simply using the "Q" and "A" contained in the transcript.

124

Mr. Smith: You understand, ma'am, that in a case like this, because [the death penalty] is an ultimate punishment, you have to be able to consider the facts as they come, not only from the Government but from the defendant, if he chose to put any forward, as to why his life might be spared. And that what you would have to be eligible to do is to listen to the evidence that the Government would put on in a punishment phase, as to those aggravating reasons, those reasons why this particular murder is so heinous that, in fact, this should result in the imposition of a death sentence. It is those factors that you must be able to listen to, hold them to a high standard of proof, but listen to them and give them due consideration. Is that what you would be able to do or not be able to do?

Juror: Well, I don't know if I understand your question, but I could listen to that and see whether he needs to either have the death penalty or go to prison for life without parole.

Mr. Smith: Yes, ma'am. And that is what is required, is for your ability to be able to engage in this weighing process. That is, to listen to the factors that the Government may present in aggravation, the reasons that they say the death penalty is warranted. Those can be balanced. The defendant can offer, if he chooses to, reasons why the death penalty is not an appropriate sanction, that, in fact, "I should be able to live and shouldn't have death." But it's that weighing process that you would have to be able to engage in. Do you think you could do that?

Juror: Well, I'm not for sure what you're asking me. Do I think that I could give him the death penalty, if I thought the reasons were enough to do so?

Mr. Smith: Could you consider the Government's evidence as they presented it in support of the death penalty?

Juror: As long as I didn't say that he had to go - - had to be put to death, leave it to somebody else's decision what to do with him. I could say he probably needed to or should, but I could not say that he - - myself, that he needs the death penalty.

Mr. Smith: Can you ever imagine a situation so heinous, a murder so heinous, when after having considered the Government's evidence, that you could find for the death penalty?

Juror: No.

125

Mr. Smith: Not under any circumstances?

Juror: I don't think I could do it under any circumstances.  I've never been asked to, but I don't think I could do it.

*Id.*, at pp. 823-825.

When the prosecutor attempted to follow-up, the juror became less sure of herself and began equivocating with the following colloquy occurring:

Mr. Sperling: . . . . . In this case, if the law permitted it and the evidence justified it, could you sign your name to a jury verdict form knowing that the result of that verdict would be the death by execution of another human being, the defendant in this case?

Juror: If I thought the crime deserved it, I probably could sign a paper saying that he should get the death penalty, but I couldn't say to do it.  I could not sign a paper that says the death penalty for him.

* * * * *

Mr. Sperling: Do you understand that in this case it's not just a jury recommendation but it is a jury finding, and the judge would not change that recommendation.  That would be the penalty that would be imposed.  Do you understand that, ma'am?

Juror: I could not do that, huh-uh.

*Id.*, at pp. 825-826.  Thereafter, on further questioning by the court, Juror 62 equivocally stated she would "consider " the death penalty since that was her "duty" as juror. *Id*., at pp. 826-829.  When asked by the prosecutor about her ambiguous responses, the juror made it clear that she was only responding the way she thought she should respond as opposed to what she really believed.  For instance, the prosecutor asked ". . . can you ever envision a situation in which you would sign your name to a death verdict?", and the juror stated: "If

126

the judge told me that that was my options, either the death or - - the death penalty and - - I would do that, yes. That would be my duty. I'm here, and that would be what I'm here for. But I couldn't live with it, but I would do that, yes." *Id.*, at p. 830. A few questions later, when asked "If [the judge] simply says, "This is your choice," at the end of the day, are you capable of returning a death verdict for this defendant?" The juror said "I don't know whether I could or not" and that as a matter of "[personal] conviction, I would never do it." *Id.*, at pp. 830-831. Further, the juror indicated there were limited circumstances in which she could ever consider the death penalty. *Id.*, at pp. 832. Additionally, when asked if she could live with herself if she were to sign a death verdict for a defendant she said no she could not sign it. *Id.*, at p. 834.

The court then made one last attempt to determine whether the juror's views would prevent or substantially impair the performance of her duties as a juror by asking the following:

> . . . if I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions - - and I want to repeat those - - if they are, tell me - - your personal opinions about the death penalty, are they so strong that you would not be able to follow the instructions?

The juror responded as follows:

> Well, I have to say it again, it's my duty to do this or not to do this, but if you told me that that was one or the other, and I thought he deserved the death penalty, I would have to - - I think I could sign the death penalty, if I listened to the information and that it was bad enough, I - - and you told me that this was my duty and that this - - I probably could sign the death penalty.

127

*Id.*, pp. 835-836.  When asked if she could likewise consider the possible imposition of life imprisonment without the possibility of release, the juror simply said she "certainly could." *Id.*, at p. 836.

Prior to voir dire qualification, this potential juror completed a juror questionnaire in which she was asked certain questions which were relevant to this court's ultimate decision. Specifically, the juror was asked: "Do you have any political, social or philosophical beliefs that may affect your service as a juror?  Yes ☐ No ☐ If yes, please explain:" This juror placed an "X" in the box next to "Yes" and responded, "Couldn't use or Recommend Death Penalty."  She was also asked a couple of questions about her views and opinions regarding the death penalty, to-wit:

1.   Please describe your feelings about the death penalty in your own words.  Additionally, how strong are they and how long have you had them?"  and she responded,  "I couldn't sentence any one to die - as long as I can remember."

2.   Regarding the death penalty, which of the following statements most accurately represents the way you feel?  (You may check one or more than one of the choices):

☐      A.  If a person is convicted of murder and the death penalty is requested, I will always vote to impose it, regardless of the facts and the law in the case.

☐      B.  I am strongly in favor of the death penalty, and would have a difficult time voting against it, regardless of the facts and the law in the case.

☐      C.  I generally favor the death penalty, but I would base a decision to impose it on the facts and the law in the case.

☐      D.  I am generally opposed to the death penalty, but I believe I can put aside my feelings against

128

□ the death penalty and impose it if it is called for by the facts and law in the case.

□ E. I am strongly opposed to the death penalty, and I will have a difficult time voting to impose it, regardless of the facts and the law in the case.

□ F. I am personally, morally, or religiously opposed to the death penalty, and would never vote to impose it, regardless of the facts and the law in the case.

□ G. I have no opinion either for or against the death penalty, and I could base a decision to impose it based on the facts and the law in the case.

Juror 62 responded to this question by marking the boxes next to both paragraphs "E" and "F." Finally, based upon the juror's questionnaire, the court was aware that this particular juror was 70 years old.

When requested by the prosecutor to excuse Juror 62 for cause, this court considered the juror's demeanor, in addition to her remarks both in the courtroom and on her juror questionnaire, in ruling that the juror was "substantially impaired" and was thus, not qualified to serve as a juror. Since appellate courts are required to give deference to a trial court's assessment of a juror's demeanor,[187] this court finds the petitioner has failed to establish that this issue would have been a "dead-bang winner"[188] if it had been raised on appeal. As a result, counsel was not ineffective for failing to raise this issue on appeal. Accordingly, this

---

[187] *Uttecht v. Brown*, 551 U.S. at 7, 127 S.Ct. at 2223, citing *Wainwright v. Witt*, 469 U.S. at 424-26, 105 S.Ct. at 852-853.

[188] Only omission of a "dead bang winner" can result in a finding of ineffective assistance of counsel on appeal. *U.S. v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009) citing *U.S. v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995).

court finds the petitioner defaulted this claim and has not established cause to excuse the default.

## B.  Juror misconduct

Petitioner does not identify any facts which establish that any misconduct occurred. Rather, the petitioner relies solely on the fact that the jury was not sequestered during the trial to leap to his conclusory allegations that the jurors engaged in "improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Barrett and the case;" that the jurors gave "false or misleading responses on voir dire" and held "improper biases which infected [their] deliberations;" that the jury was improperly exposed to the prejudicial opinions of third parties and had "improper communications with third parties, and/or the trial judge;" and that the jurors improperly prejudged the guilt/innocence and penalty phases of Mr. Barrett's trial.  Doc. 95 at p. 376.  Petitioner does not identify even one matter which was improperly considered by the jury.  He does not identify any publicity which occurred during the trial of this matter, let alone publicity that might have had an influence on the jury.  He does not identify any juror who gave a false or misleading response on voir dire.  He does not identify any juror who improperly communicated with third parties or the judge during the trial proceedings held in this case. Finally, he does not articulate how the jurors improperly prejudged the guilt/innocence and/or penalty phases of his trial.

The government asserts this claim has been procedurally defaulted because it was not raised on appeal.[189] To overcome the default, the petitioner claims appellate counsel were ineffective for failing to raise the issue on appeal.

Rule 2(b)(2) of the Rules Governing Section 2255 Proceedings requires a motion to vacate to "state the facts supporting each ground." Conclusory allegations are insufficient to support a §2255 claim. *See*, *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994). To the extent the underlying claim lacks any specificity, as does the claim of ineffectiveness, the petitioner has failed to establish constitutionally-cognizable error on the part of counsel nor can he show legal cause for his default. Furthermore, despite the government's argument that the petitioner failed to raise the issue on appeal, this court finds the petitioner raised the issue of juror misconduct on appeal actually identifying two particular instances of alleged misconduct and they were rejected by the appellate court. *See*, *United States v. Barrett*, 496 F.3d 1079, 1101-1102 (10th Cir. 2007). Accordingly, this court finds this error is frivolous and denies relief thereon.

## XII. CONSTITUTIONALITY OF PETITIONER'S EXECUTION

---

[189]The Government classifies the issue raised by Petitioner as being "failure to sequester the jury." While Petitioner may be attempting to assert a claim that it was error not to sequester the jury, he provides no legal authority nor is this court aware of any legal authority that makes it mandatory that the jury be sequestered. Furthermore, his claim is more appropriately classified as a claim of "juror misconduct." In fact, the heading of this claim in both the Motion to Vacate (Doc. 95) and the Brief in Support (Doc. 149) is "Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's rights . . . ." Petitioner then lists, without identifying any particular jurors or identifying any specific facts to support the allegation, what the misconduct consisted of as indicated above. Only after generically listing the alleged juror misconduct without any particular facts to establish what actually occurred in his case, does Petitioner state "[t]he jury was not sequestered in such a way to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties. . . ." *See*, Doc. 95 at p. 376. *See also*, Doc. 149 at p. 253.

131

Petitioner claims in his seventeenth ground for relief that executing him would violate the Eighth Amendment because he has "chronic and severe mental illness and organic brain impairments." Doc. 95, at p. 379. Basically, the petitioner argues this court should expand the Eighth Amendment to include not only the mentally retarded and underage offenders, but to also include "mentally ill individuals." *Id.* The government argues 1) the claim is not ripe and 2) the claim is untimely. Even if the court were to consider the claim, the government argues because the claim lacks any basis in existing law, it would require the legally impossible, *i.e.* the retroactive application of a new rule of law. In his reply, the petitioner asserts this claim arises "under the need to continuously review the Eighth Amendment's 'evolving standards of decency' which in this case extend to Mr. Barrett a 'status' based on 'categorical rules' that define Eighth amendment standards . . . ." Doc. 178, at p. 208.

The ripeness doctrine was developed to ensure that courts decide only existing, substantial controversies, not hypothetical questions or possibilities. *In re Cassim*, 594 F.3d 432 (6th Cir. 2010). In the context of a competency to be executed claim, the courts have held that the claim does not become ripe until the execution is imminent. *Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).

In *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), the Supreme Court held the Eighth Amendment prohibits a state from executing an insane inmate. Thereafter, in *Stewart v. Martinez-Villareal*, 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998), the Supreme Court held a competency to be executed claim which had been initially raised in a federal habeas petition but dismissed without prejudice as

premature, was not a "second or successive" petition, when the claim became ripe for review by the state obtaining a warrant for execution. The problem with treating the petitioner's claim as a competency to be executed claim and dismissing it as premature, however, is that the petitioner does not allege that he is incompetent.[190] Rather, he alleges he is "mentally ill." Neither the Supreme Court nor the Tenth Circuit Court of Appeals have ever held that execution of a mentally ill person is cruel and unusual punishment. Further, in *Stewart*, the Supreme Court indicated in a footnote that the "second or successive" rules might apply if the *Ford* claim was not raised in the initial habeas petition. *Id.*, U.S. at 645, S.Ct. at 1622.

Petitioner first raised this claim in his Amended Motion to Vacate filed on September 25, 2009. Doc. 70, at p. 413. Based upon the facts of this case, this court finds the claim was not timely filed. Further, the petitioner has totally failed to support his argument with any legal authority. In fact, existing Supreme Court precedent is directly contrary to the petitioner's argument. *Ford v. Wainwright*, *supra*. Since there is no basis for the petitioner's claim, neither trial or appellate counsel were ineffective in failing to raise this claim. Accordingly, the claim is denied.

## XIII.  INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's second ground for relief alleges he was denied effective assistance of counsel as guaranteed by 18 U.S.C. §§ 3005 and 3006 and the Sixth Amendment to the United States Constitution. Petitioner claims the following acts and/or omissions of trial

---

[190]In a separate ground for relief, Petitioner alleged he was incompetent to stand trial. In this particular claim, however, Petitioner alleges only that he has "chronic and severe mental illness and organic brain impairments." Doc. 95, at p. 379.

counsel fell below professional norms of capital defense practice: 1) conflict of trial counsel; 2) unreasonable omissions in relation to rearguing motion to suppress; 3) failure to investigate and present evidence of the petitioner's alleged diminished capacity; 4) failure to challenge the petitioner's competence; 5) failure to adequately investigate government's "snitch" witnesses; 6) failure to timely object to allegedly improper hearsay evidence of other bad acts; 7) failure to engage the services of an independent crime scene reconstruction expert; 8) failure to engage a expert on police tactics; 9) failure to impeach law enforcement witnesses with prior inconsistent statements from the state trials; 10) trial counsel unreasonably failed to call Toby Barrett, the petitioner's son, and Alvin Hahn, the petitioner's neighbor; 11) trial counsel unreasonably failed to introduce evidence concerning Barrett's lack of knowledge regarding outstanding warrant; 12) trial counsel unreasonably failed to contest the admission of the testimony of James Horn; 13) trial counsel failed to seek appropriate jury instructions during the first stage of trial; 14) trial counsel failed to make proper objections at trial to preserve issues for appeal, including alleged instances of prosecutorial misconduct; and 15) trial counsel failed to investigate, develop and present appropriate mitigation evidence during the second stage of trial.

In his eighteenth ground for relief, the petitioner asserts he was denied effective assistance of appellate counsel. Specifically, he claims appellate counsel unreasonably: 1) failed to raise the due process violation resulting from the court's *ex parte* communications with the government; 2) failed to raise the *Franks v. Delaware* issue; 3) failed to argue government's inappropriate use of hearsay evidence; 4) failed to challenge jury's exposure

to Horn's testimony; 5) failed to challenge improper prosecutorial conduct; 6) failed to challenge court's restrictions on use of Barrett's statements; 7) failed to appeal use of stun belt during trial; 8) failed to appeal denial of jury instructions on lesser included offenses; 9) failed to appeal denial of residual doubt instruction; 10) failure to challenge court's dismissal of juror 62; 11) failure to appeal lack of a jury instruction requiring proof beyond a reasonable doubt as a weighing factor necessary to impose a death sentence; 12) failed to challenge the removal of the petitioner from the courtroom; 13) failed to raise an issue regarding the allegedly unconstitutional racial bias in the administration of the death penalty; and 14) failed to raise allegedly unconstitutional deficiencies in the indictment.

Many of the allegations have previously been addressed in this opinion. To the extent this court has found no error in the substantive allegations, the court will not readdress counsel's performance, *i.e.* arguments relating to motion to suppress; competency; challenges to jury instructions; restriction on use of Barrett's statements; failure to challenge removal of juror 62; failure to challenge removal of defendant from courtroom; failure to challenge *ex parte* communication with court; failure to challenge the constitutionality of the federal death penalty act; and failure to challenge the sufficiency of the indictment, since the Petitioner could not have suffered prejudice. Where, however, additional allegations have been made, this court has attempted to address each of those allegations.

### *Legal Principles applicable to claims of ineffective assistance of counsel*

Petitioner's claim of ineffective assistance of counsel is governed by the familiar two-part test announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104

135

S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the Court indicated that the defendant must establish that the representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms. In order to establish that counsel's performance was deficient, the petitioner must establish counsel made errors so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*, 466 U.S. at 687, 104 S.Ct. at 2064. It is important to remember that the focus of the first prong is "not what is prudent or appropriate, but only what is constitutionally compelled." *Breechen v. Reynolds*, 41 F.3d 1343, 1365 (10th Cir. 1994). "For counsel's performance to be constitutionally ineffective, it must have been 'completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.'" *Le v. Mullin*, 311 F.3d 1002, 1025 (10th Cir. 2002) (citing *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997) (quoting *Hatch v. Oklahoma*, 58 F.3d 1447, 1459 (10th Cir. 1995), *overruled on other grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n. 1 (10th Cir. 2001)).

Second, the defendant must establish that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. "Prejudice" in this context means "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* In other words, the petitioner must prove that "there is a 'reasonable probability' that the outcome would have been different had those errors not occurred." *United States v. Haddock*, 12 F.3d 950, 955 (10th Cir. 1993) (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2068).

Courts may address the performance and prejudice components in any order and need not address both if a defendant fails to make a sufficient showing of one. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. Failure to establish either prong of the *Strickland* standard will result in a denial of the petitioner's Sixth Amendment claims. *Id.*, 466 U.S. at 696, 104 S.Ct. at 2069-2070.

In order to establish prejudice in the guilt stage, the defendant has to show "there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.,* 466 U.S. at 694, 104 S.Ct. at 2068. While at the penalty stage of a capital case, the defendant must show "there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* In other words, deficient performance is prejudicial only where it is clear that "but for trial counsel's errors, there is a reasonable probability that the ultimate result would have been different," *Washington v. Johnson*, 90 F.3d 945, 953 (5th Cir. 1996), *cert. denied,* 520 U.S. 1122, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997); so that, the "confidence in the reliability of the verdict is undermined." *Id.*

The United States Supreme Court has indicated that every effort must be made by a reviewing court to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 1065. In addition, the Court indicated the conduct of counsel is "strongly presumed" to have been within the wide

137

range of reasonable professional assistance. *Id.* Further, the Court acknowledged that there are numerous ways to provide effective assistance in a particular case and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.*, 466 U.S. at 690, 104 S.Ct. at 2066. As a result, in deciding ineffective assistance of counsel claims, this court is required to "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct." *Id.*

Prevailing norms of practice can be used as guides in determining what is reasonable, however, it must be remembered that they are only guides. *Id.*, 466 U.S. at 689, 104 S.Ct. at 2065. As the Supreme Court has indicated, "'American Bar Association standards and the like' are 'only guides to what reasonableness means, not its definition.'" *Bobby v. Van Hook*, — U.S. —, 130 S.Ct. 13, 17, 175 L.Ed.2d 255 (2009).

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

*Strickland*, 466 U.S. at 688-689, 104 S.Ct. at 2065 (citation omitted). "[T]he Federal Constitution imposes one general requirement: that counsel make objectively reasonable

138

choices." *Bobby v. Van Hook*, 130 S.Ct. at 17 (2009)(citing *Roe v. Flores-Ortega*, 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000).

As will become obvious during the balance of this opinion, the petitioner spends a substantial portion of time in his motion and brief in support thereof complaining about defense counsel's failure to investigate. In considering whether counsel should have conducted more investigation, it is important to remember that the underlying facts of this case were the subject of two prior state court trials which were conducted before an indictment was ever filed in this case. Thus, a substantial amount of investigation had been undertaken during the state trial proceedings, including compilation of Mr. Barrett's medical, educational and mental health records, prior to the initiation of the federal proceedings.[191] Additionally, counsel had the benefit of having access to the prior state court trial transcripts and, therefore, substantially more information regarding what many of the government's witnesses were going to testify to than is generally available in a criminal trial.

## A.  *Ineffectiveness of Trial Counsel*

Since Petitioner has challenged the effectiveness of trial counsel during both stages of trial, this court will consider each stage of trial separately.

### **Petitioner's Challenge to Conviction**

Because the petitioner alleges the omissions and/or errors of his trial attorney deprived him of due process, this court will examine each of these errors for violations of constitutional significance. If any of the errors alleged by the petitioner did, in fact, deprive

---

[191]Respondent's Exhibit No. 12. *See also*, Doc. 310.

the petitioner of his constitutional right to a fair trial, the court must decide if the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

1.  Counsel acted under an "actual conflict" of interest

Petitioner claims that this "court's stated desire to minimize costs associated with Mr. Barrett's defense and to appoint local counsel to this case for the purpose of establishing their credentials for appointment in future capital cases, . . . . created an actual conflict between the financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough investigation and a vigorous defense." Doc. 95, at p. 34.  An "actual conflict" for, Sixth Amendment purposes, "is a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172, 122 S.Ct. 1237, 1244, 152 L.Ed.2d 291 (2002), n. 5.  In *United States v. Alvarez*, 137 F.3d 1249, 1252 (10th Cir. 1998), the Court said,

> [a]n actual conflict of interests results if counsel was forced to make choices advancing other interests to the detriment of his client. *See Stoia v. United States*, 22 F.3d 766, 771 (7th Cir. 1994).  Without a showing of inconsistent interests, any alleged conflict remains hypothetical, and does not constitute ineffective assistance. *See Thomas*, 818 F.2d at 481.  Indeed, '[t]o demonstrate an actual conflict of interest, the petitioner must be able to point to specific instances in the record which suggest an impairment or compromise of his interests for the benefit of another party.' *Danner*, 820 F.2d at 1169.

Although the petitioner attempts to create an actual conflict of interest from innuendos, speculation and suggestions, he does not allege any facts to support his conclusory allegations of conflict.  Conclusory allegations contained within affidavits do not

require a hearing.  *Strong v. Johnson*, 495 F.3d 134, 139-40 (4th Cir. 2007).  Many of the statements made in support of this artificially created conflict are not supported by the actual court record.  Specifically, the orders in this case establish, at best, a desire to ensure that the funds requested were reasonably necessary and that the court did not authorize the hiring of experts who would later refuse to testify without additional funds, as was apparently done in state court.[192]  Counsel was advised on several occasions to provide some specificity in regard to their proposed budget.[193]   It became apparent very early in the budgeting of this case that Mr. Echols was attempting to be compensated for items that were improper.  For instance, at the budget hearing when advised that the court generally paid one-half of the allowable hourly rate for travel expenses and treated the rest as overhead, Mr. Echols made the following comments:

> Mr. Echols: "Sometimes I - - my secretary acts more as a - - sort of an assistant.  She goes with me to court.  I'm a sole propractitioner, (sic) so when I'm in court, she is with me and my office has a voice mail system.  Sometimes she travels with me and we will do things like she will read to me and this kind of thing.  We will actually have some meaningful discussion.  Do I note that separately, if that's appropriate?

> The Court: If you can do that, if you can show that you are working while you are driving, well, you can get the whole hourly rate, but most of the time it's just strictly windshield time and you don't get the full hourly rate for that.  It is hard to give somebody the full hourly rate for driving.

> Mr. Echols: I couldn't agree more.  That seems reasonable.  One of the things I thought about, I have read these - - we have got all of these records that have got to be put back together.  If I had Jan do it, is that something she

---

[192]*See*, Cr. Doc. 310, at p. 32.

[193]*See*, Doc. Nos. 38 and 47.

141

could charge like 25 bucks an hour for or do you just want to stay away from that?

The Court: The thing is, when you are talking about anything other than attorney time, it has to be your actual costs.

Mr. Echols: Okay.

The Court: So we can't just - - like, say, we normally bill somebody $25.00 an hour for legal assistant time, it has to be some - - it has to approximate what you actually spent on her doing that.

Mr. Echols: We will just leave that alone because we live together. We don't need to - - we don't need to go into that then.

*Id*., at pp. 42-44.  Additionally, in reducing the number of hours which the Magistrate Judge recommended Mr. Echols be paid in regard to one of only two CJA vouchers submitted by Mr. Echols, the Magistrate Judge found duplication of effort and that there were "striking similarities between the substance of pleadings" which Mr. Echols had previously filed in another death penalty case.  Doc. 106, at pp. 3-4.  Surely due process does not demand that the court pay for work which is not performed in the specific case that is before the court.

Furthermore, as previously indicated herein, the court on numerous occasions urged defense counsel to submit additional budget requests if they felt the budget needed to be increased.  Despite the record, the petitioner asserts because defense counsel never sought to amend the budget,[194] he has shown that defense counsel "were not exercising independent professional judgment on what was in their client's interests."  Doc. 149, at p. 25.  Such

---

[194]As previously indicated herein, on October 31, 2005, defense counsel did seek a modification of the budget which was granted by this court.  *See*, Cr. Doc. Nos. 232 and 244, respectively.

142

conclusory allegations simply do not establish a conflict of interest.  Accordingly, this claim

is denied.

## 2.  Failure to Investigate Evidence tending to show Diminished Capacity to Form Intent

Petitioner asserts trial counsel failed to fully investigate and present evidence, during

the first stage of trial, that he suffered from mental illnesses that would have negated the

government's showing of intent.  First, the petitioner claims counsel unreasonably failed to

investigate and call eyewitnesses Toby Barrett and Alvin Hahn who would have rebutted the

government's theory as to how the shooting occurred.[195]  Petitioner also claims counsel failed

to investigate and/or call witnesses to establish that the actions of the Tact Team were

reckless and unprofessional.[196]  Finally, the petitioner asserts trial counsel failed to obtain a

proper mental health examination or to obtain testimony from readily available witnesses

regarding Mr. Barrett's mental and emotional state.  Other than his two sentence statement

about failing to call Toby Barrett, Alvin Hahn and some unknown witness about the actions

of the Tact Team, the gist of this allegation against counsel revolves around the petitioner's

mental health claims.

As the Supreme Court has indicated "counsel has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations

---

[195]Doc. 95, at p. 48.  Petitioner does not elaborate on this statement as it relates to his allegation of ineffective assistance of counsel for failing to investigate evidence of diminished capacity.  Rather, he later states that Toby Barrett and Alvin Hahn would have "corroborated several law enforcement witnesses, and showed that at the critical moment, Mr. Barrett likely could not see any emergency lights or other indications that the vehicle heading toward his house and young son contained law enforcement officers." *Id.*, at p. 57.

[196]Petitioner also does not elaborate on this statement as it relates to a failure to investigate evidence of diminished capacity. *See*, Doc. 95, at p. 48.

143

unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. "A reasonable investigation is not, however, the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998). To be effective, counsel is not required to "pursue every path until it bears fruit or until all hope withers." *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999). *See also*, *Lovett v. Florida.*, 627 F.2d 706, 708 (5th Cir. 1980). ". . . *Strickland's* approach toward investigation 'reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources.' How a lawyer spends his inherently limited time and resources is also entitled to great deference by the court." *Chandler v. United States*, 218 F.3d 1305, 1318 (11th Cir. 2000), n. 22 (citation omitted). Counsel's actions are usually based, quite properly, upon information supplied by the defendant. *Strickland*, *supra*, 466 U.S. at 691, 104 S.Ct. at 2066.

Again, it is important to remember that this is not a case where **no** investigation was undertaken. Rather, the record reflects counsel had the work product of Mr. Echols, who had undertaken substantial investigation for use in two prior state court trials involving the same incident, as well as investigative materials assembled by the Oklahoma Indigent Defense

System (OIDS).[197]  Additionally, counsel was aware of the actual testimony in the prior two state court trials because he obtained copies of the transcripts from those trials.

Petitioner has failed to establish that counsel had any reason to suspect that the diagnoses proffered in the § 2255 Motion might have been available.  As this court has previously discussed, there was no indication that the petitioner was incompetent at the time of trial.  Petitioner acknowledges that defense counsel consulted with a psychologist, Dr. Jeanne Russell, who "reprise[d] the risk assessment she had done in preparation for a second stage proceeding in state court."  Doc. 95, at pp. 48-49.  What the petitioner fails to acknowledge, however, is that defense counsel employed Dr. Russell for "mitigation and assistance on mental health questions."  *See*, CJA Voucher 060224000004 approved for payment by this court on February 24, 2006.  Furthermore, the documentation supporting this voucher indicates that defense counsel consulted with Dr. Russell "because she was consulted during the State trials as the mitigation expert.  She had accumulated a large amount of information on Kenneth Barrett, . . . ."  *Id.*  Dr. Russell revised her risk assessment concerning Mr. Barrett for use in the federal trial and discussed this information with defense counsel.  *Id.*  Also, on October 11, 2005, Dr. Russell visited Mr. Barrett in the Muskogee County Jail.[198]  Petitioner does not, however, provide any indication that Dr. Russell reported

---

[197]Respondent Exhibit No. 12, at ¶ 4.  Although Petitioner submits a declaration from an OIDS investigator which claims his investigative file was never picked up by Mr. Hilfiger or his staff (Petitioner's Exhibit No. 111), to the extent that OIDS delivered boxes of materials that they had from the state cases to Mr. Hilfiger's office, Petitioner has failed to show that counsel should have contacted Steve Leedy to obtain additional materials or that counsel's failure to do so was unreasonable.

[198]Respondent's Exhibit No. 5 reflects that Anita Russell/Norene Gay - psychologist - visited with Mr. Barrett on October 12, 2005.  Dr. Russell's billing statement indicates she interviewed Mr. Barrett on October 11, 2005.  *See*, supporting documentation accompanying CJA Voucher 060224000004.

145

anything to counsel that should have led a reasonably competent attorney to suspect neurological and/or psychiatric impairments so profound they would have negated the government's evidence of intent as it related to Count 3.[199] Furthermore, none of the declarations submitted by lay witnesses[200] herein establish that counsel should have questioned the petitioner's capacity to form intent at the time of the crime involved herein. As a result, this court finds the petitioner has failed to establish that counsel's investigation of his mental health was unreasonable.

### 3. Failure to Adequately Investigate Government's Civilian Witnesses

Petitioner claims he received ineffective assistance of counsel because his attorneys did not adequately investigate the seven government civilian witnesses. Petitioner asserts that, upon learning the identities of these witnesses, counsel should have moved for a continuance of the trial. Additionally, the petitioner argues his trial counsel should have identified and presented evidence to contradict the civilian witnesses testimony and to establish that the witnesses had poor reputations for truthfulness within the community. The government argues that the petitioner has failed to show that his attorneys' conduct was unreasonable or prejudicial.

While the petitioner surmises this court would have granted a continuance if requested, since no motion was ever filed it is impossible to guess what might have happened. Further, to engage in speculation over what might have occurred would involve

---

[199]This court's discussion of lesser included offenses in relation to the felony murder counts addresses why this evidence would not have been important in relation to Counts 1 and 2.

[200]*See*, Petitioner's Exhibit Nos. 74, 78, 81, 86, 93, 96-99, 101 and 103.

the very type of hindsight that the Supreme Court has specifically cautioned against. *See*, *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.   Pursuant to 18 U.S.C. § 3432, the government was not required to provide the names of any of its witnesses until three days before trial.   Additionally, the statute authorized the government to delay furnishing the names of its witnesses "if the court [found] by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person." *Id*.  While this court never ruled on the government's motion to delay disclosure of these witnesses' names, the government's disclosure of the names was, in fact, timely. *Barrett*, 496 F.3d at 1116-17.

Further, the petitioner cannot show that the timing of the disclosures prevented him from  developing substantial evidence to impeach these witnesses.  All of these witnesses were relatives and/or friends of Barrett.  Moreover, Barrett was obviously familiar with the people and incidents about which they testified.   Each of these witnesses testified to extremely limited events and/or aspects of their relationships with Barrett.  Trial counsel believed they could effectively impeach the witnesses with the evidence they had[201] and based upon what this court observed, defense counsel did, in fact effectively, if not perfectly, cross-examine these witnesses.  Specifically, counsel highlighted the fact that most of these witnesses had extensive criminal records and apparent motives for bias, because they stood to benefit from their testimony.  Counsel also called one witness, Ron Baldwin, to counter Brandie Price's testimony that she had entered Barrett's property thru the ditch in July when they went to Barrett's house.  This witness admitted, however, that he might have been with

---

[201]Respondent's Exhibit No. 12, at ¶ 14.

Brandie Price in July when he provided her with methamphetamine and that he had been using drugs heavily during that period of time.[202]  Counsel's decision not to search for additional character witnesses to establish that the government's witnesses did not have a character for truthfulness within the community was reasonable under the facts of this particular case.  The character flaws and questionable memories of these seven witnesses, due to their extensive use of drugs, was readily apparent following their cross-examination.[203]

Additionally, the omission of the character witnesses now identified, most of whom were related to the defendant or were drug associates of the defendant around the time the crimes were committed, would not have changed the jury's perception of the credibility of these seven witnesses.  Based upon the declarations submitted, however, some of these "newly discovered" witnesses could have been more detrimental and/or prejudicial to the defendant. For instance, one of the witnesses acknowledges that the reason he was at defendant's residence was to obtain drugs.[204]  Since the government was required to prove beyond a reasonable doubt that the Defendant was, in Count 1, engaged in drug trafficking crimes, calling this witness could have aided the government's case.  Moreover, unlike the government's witnesses, the witnesses now identified do not even corroborate each other on

---

[202]Cr. Doc. 346, J.T.Tr. Vol. 18, at pp. 4116-4140.

[203]*See*, testimony of: 1) Randy Turman, Cr. Doc. 324 and 325, J.T.Tr. Vol. 2, at pp. 363-392 and Vol. 3, at pp. 396-449; 2) Travis Crawford, Cr. Doc. 325, J.T.Tr. Vol. 3, at pp. 450-480; 3) Randall Weaver, Cr. Doc. 336, J.T.Tr. Vol. 8, at pp. 1834-1849; 4) Charles Sanders, Cr. Doc. 339, 340 and 342, J.T.Tr. Vol. 11, at pp. 2488-2541; Vol. 12, at pp. 2579-2652; and Vol. 22, at pp. 4586-4590; 5) Cindy Crawford, Cr. 341 and 342, J.T.Tr. Vol. 13, at pp. 3058-3076 and Vol. 22, at pp. 4575-4585; 6) Karen Real, Cr. Doc. 341 and 342, J.T.Tr. Vol. 13, at pp. 3079-3092 and Vol. 14, at pp. 3098-3135; and 7) Brandie Price, Cr. Doc. 343, J.T.Tr. Vol. 15, at pp. 3485-3511.

[204]*See*, Petitioner's Exhibit No. 90.

facts that the petitioner claims are relevant to establish that the government's witnesses were lying at trial. *Compare*, Petitioner's Exhibit No. 95 (Declarant claims Sanders "was never in Kenny's house because Kenny would never have let him in."), with Petitioner's Exhibit No. 13 (Declarant claims she was at defendant's residence on two or three occasions when Sanders was present.).

Further, while some of these declarant's now claim Barrett never made statements about wanting to kill cops or going out in a blaze of glory,[205] five of the government's witnesses offered testimony about Barrett's hostility towards police and/or these specific type of statements being made by Barrett.[206]   Additionally, at least one of the witnesses the petitioner claims should have been called, would have corroborated at least three of the government's  witnesses regarding the extensive drug use and distribution occurring at the petitioner's house.[207]

Furthermore, much of the evidence which the petitioner now proffers would not have been admissible during his trial to impeach these witnesses. In particular, collateral evidence to establish specific acts of misconduct by government witnesses, including acts of dishonesty and drug use, would not have been admissible to attack the witnesses' character

---

[205]*See*, Petitioner's Exhibit Nos. 95, 90, 77, and 37.

[206]*See*, trial testimony of:  1) Randy Turman (Cr. Doc. 325, J.T.Tr. Vol. 3, at p. 401 and 412); 2) Travis Crawford (Cr. Doc. 325, J.T.Tr. Vol. 3, at p. 466); 3) Charles Sanders (Cr. Doc. 339, J.T.Tr. Vol. 11, 2515); 4) Cindy Crawford (Cr. Doc. 341, J.T.Tr. Vol. 13, at pp. 3068-3069); and 5) Brandie Price (Cr. Doc. 343, J.T.Tr. Vol. 15, at pp. 3492-93).

[207]*See*, Petitioner's Exhibit No. 90 (Declarant claims to have done drugs at the petitioner's residence shortly before police raid and says many people were coming and going during the 33 hours he was at the petitioner's residence).

for truthfulness.  *See*, Fed.R.Evid. 608(b) and *Palmer v. City of Monticello*, 31 F.3d 1499, 1507 n. 11 (10th Cir. 1994).

Finally, it should be noted that although the petitioner obtained, almost five years after trial, declarations to establish that there were witnesses which might have been able to contradict testimony given at trial, the petitioner does not allege that he provided trial counsel with these specific witnesses' names or that he provided counsel with information regarding how to contact these witnesses during his trial and that counsel refused to issue subpoenas to them.  Thus, this court finds the petitioner has failed to establish ineffective assistance of counsel in regard to the investigation of the civilian witnesses.  Moreover, even if counsel did not adequately investigate these witnesses, the petitioner has failed to establish prejudice.

4.  Failure to make appropriate and timely objections to improper hearsay evidence of other bad acts

Next, the petitioner asserts his counsel failed to timely object to admission of evidence regarding statements made by the petitioner which were introduced  to establish hostility toward law enforcement and intent to engage them in violence if they came upon his property.  To the extent trial counsel did interpose objections under Federal Rule of Evidence 404(b), the petitioner claims his appellate attorneys were ineffective for failing to pursue the matters on appeal.  The government argues the petitioner failed to timely raise these arguments and therefore, the statute of limitations bars this court's consideration of the same.  In his reply, the petitioner alleges because this particular claim is raised only as it relates to testimony offered by the government's civilian witnesses it relates back to his claim of

150

ineffectiveness of counsel in dealing with informant testimony. To support this position, the petitioner cites *Mayle v. Felix*, 545 U.S. 644, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005).

In *Mayle*, the court refused to allow relation back where the original petition raised a confrontation clause claim regarding the admission in his murder trial of videotaped testimony of a witness for the prosecution and his amended petition sought to challenge the admission of inculpatory statements he made during pretrial police interrogation under the privilege against self-incrimination. Although both claims involved the admission of out-of-court statements during the prosecution's case in chief, the Court held the second ground for relief arose out of facts different in both time and type from those set forth in the original pleading.

Here, while both claims deal with ineffectiveness of counsel in dealing with the government's civilian witnesses, the petitioner made no attempt in his amended petition to tie these two claims together. Even though the petitioner claims he raised the 404(b) issue timely by alluding to it in his first claim alleging that this court's actions violated his constitutional rights,[208] the petitioner never made any allegations that trial counsel were ineffective for failing to object to the testimony given at trial. To the extent the allegations that counsel were ineffective for failing to investigate these witnesses occurred prior to trial and the failure to object to some of these witnesses' testimony occurred during the trial, this court finds the allegations arise out of different facts in time than those alleged in the original

---

[208] *See*, Doc. 2, at p. 38.

151

and/or first amended motion.[209]  *See*, *United States v. Hernandez*, 436 F.3d 851, 858 (8th Cir. 2006) (holding where original claim referred to admission of evidence and amended claim referred to trial testimony and cross-examination of witnesses, the claims were not similar enough to satisfy the "time and type" test nor did they arise out of the same set of operative facts).

Even if this court were to consider this claim, however, the petitioner would not prevail because counsel were not ineffective for failing to object to statements made by the petitioner or to statements which were intrinsic to the crime charged.  *See*, Fed.R.Evid. 801(d)(2)(A) (a statement is not hearsay if it is offered against a party and is the party's own statement) and Fed.R.Evid. 404(b) (evidence of prior drug transactions can be admissible to prove intent in drug prosecutions).  The statements which the petitioner now claims counsel should have objected to were statements made by the petitioner.[210]  While the petitioner argues his attorney should have objected to these statements because they were inadmissable under Fed.R.Evid. 404(b), this court finds each of the statements challenged were intrinsic evidence of the crimes charged.  *See*, *United States v. Viefhaus*, 168 F.3d 392, 398 (10th Cir. 1999) (quoting *United States v. O'Brien*, 131 F.3d 1428, 1432 (10th Cir. 1997) "It is well settled that Rule 404(b) does not apply to other act evidence that is intrinsic to the crime

---

[209]Despite the similarities in the "dump-it-all-in" approach which has been taken in this case with *pro se* filings, this is not a case in which the original and amended timely filed motions were filed by a *pro se* litigant and the subsequent amendment was filed after the statute of limitations expired.  Rather, all of the pleadings filed by the petitioner herein were filed by counsel who were presented to this court as "extremely well-qualified" in federal habeas litigation.  In the opinion of this court, many of the documents have not been submitted in a good faith attempt to direct the court to the legitimate issues in this case, but rather as a way to slow the disposition process.

[210]*See*, Doc. 95, at pp. 122-124.

charged, and that other act evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined."). Petitioner's statements regarding hostility toward law enforcement and/or what he intended to do if law enforcement came onto his property were all intrinsic evidence of the petitioner's express intent. Finally, whether the time frames of these statements, once challenged on cross-examination, were accurate was a question for the jury. Accordingly, this court finds counsel was not ineffective for failing to make objections which would not have been sustained. Similarly, appellate counsel was not ineffective in failing to raise this issue on appeal.

5.  Failure to engage a crime scene reconstruction expert

Petitioner claims trial counsel were ineffective in failing to obtain the services of a crime scene expert, in particular Edward Hueske of Denton, Texas, to counter the testimony of Iris Dalley, who had appeared as a witness in Petitioner's two state court trials.[211] Petitioner argues that Dalley's analysis was critical to the jury's consideration of the issue of intent since the only other evidence was "the often conflicting accounts and compromised memories of the tactical team members who testified." Doc. 95, at p. 138. Ms. Dalley's presentation was not, however, critical or necessary for the jury to determine what had happened in this case nor did it ultimately assist the government, as the petitioner claims, in proving intent.

---

[211] Instead of hiring Hueske, defense counsel employed the services of an investigator who helped counsel in preparing questions to challenge the ballistics testimony. *See*, CJA Voucher 060208000004.

Specifically, despite the petitioner's allegations, the record establishes that defense counsel were prepared to meet Dalley's testimony.  The transcript reveals defense counsel specifically asked some of the very questions which the petitioner's expert now uses to show the inadequacy of Dalley's reconstruction analysis.  Dalley was unable to determine the position of the shooter or the position of the victim's vehicle for any of the trajectories.[212] Additionally, as the government's brief points out, trial counsel "effectively elicited [Dalley's] concession that she could not exclude the possibility that Barrett had fired every shot from inside his house, thus confirming the viability of the defense theory."  Doc. 175, at p. 71.  Furthermore, notwithstanding the petitioner's assertions to the contrary,[213] Dalley never testified Barrett was firing from the porch.  Rather, as previously indicated, she consistently denied knowing the exact position of the shooter and the victim's vehicle.  Moreover, Dalley only reached two significant conclusions: 1) the defendant could not have fired all of the shots from a prone position and 2) the wounds to Eales's flank and elbow were sustained after he exited his Bronco.[214]

As is amply demonstrated by this case, virtually every cross-examination can be reviewed in hindsight and criticized for failure to ask additional questions and no two criminal defense attorneys will defend a particular client in the same way.  *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.  However, as previously stated, this court must make every

---

[212]*See*, Cr. Doc. 342, J.T.Tr. Vol. 14, at p. 3175 and 3226.

[213]Doc. 95, at p. 128.

[214]*See*, Cr. Doc. 342, J.T.Tr. Vol. 14, at pp. 3228-3229, 3247, 3254-3255 and 3259.

154

effort to eliminate the distorting effects of hindsight. *Id.*, 466 U.S. at 689, 104 S.Ct. 2052. Considering the totality of defense counsel's cross-examination of Ms. Dalley, the questioning constituted adversarial testing and maintained the viability of the defense theory, that Barrett was not shooting from the porch and, therefore, may have had trouble actually observing who was entering his property such that he may not have known that he was shooting at a law enforcement officer. The relevant inquiry under *Strickland* is not what defense counsel could have done, "but rather whether the choices made by defense counsel were reasonable" under the facts of the specific case before the court. *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Furthermore, the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel. To the extent defense counsel had the benefit of knowing exactly what Ms. Dalley's testimony would be, since she had previously testified in Petitioner's prior state court trials, this court finds the Petitioner has failed to establish that counsel's strategic decision to allow the testimony and then use it to further his client's defense was not unreasonable. Therefore, this court finds the petitioner has failed to establish that counsel provided ineffective assistance of counsel by not hiring Mr. Hueske.

6.  Failure of trial counsel to present independent expert on police tactics

Petitioner also attacks counsel's failure to secure the testimony of an "independent" expert to establish that the raid on his house was "rife with tactical errors and poor planning"

155

and that these errors contributed to Trooper Eales's death.[215]   Again, the petitioner claims counsel should have hired a specific expert, George Kirkham.

Instead of hiring Kirkham, counsel relied upon the testimony of Chuck Choney, a former FBI agent, who had previously criticized the Tact Team's operation. Petitioner claims counsel could not have made a reasonable decision to forego the testimony of Kirkham since counsel never consulted with him. Trial counsel was not, however, required to try this case in the same way Echols would have tried the case.[216]   Decisions regarding what witnesses to call at trial are a matter of trial strategy. *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008). The fact counsel called Choney to discuss the tactics was a reasonable trial strategy. Choney's reluctance to testify for the defense and his association with the victim added to his credibility. Whereas, a retained expert could have been impeached on the basis of his receiving payment from the defense for his testimony.

Further, Choney actually provided numerous criticisms of the Tact Team operation.[217] While Kirkham might have provided more or different criticisms of the operation, the petitioner has failed to establish that his testimony would have altered the outcome of the trial. As a result, this court finds the petitioner has failed to establish that counsel provided

---

[215]Doc. 95, at p. 139.

[216]The record reflects that Choney was actually perceived by former counsel as "the most honest and upright appearing and sounding and testifying witness you would ever want to see. He used to run the swat team for the FBI in Oklahoma City. He has worked all around the country. He is now on the Indian Gaming Commission in Washington. Just a super guy. Credentials, you know, perfect." Cr. Doc. 310, at p. 13.

[217]*See*, Cr. Doc. 345, J.T.Tr. Vol. 17, at pp. 3906-3909, 3919 and 3974-3975.

ineffective assistance of counsel for failing to retain Mr. Kirkham, because no prejudice has been shown.

7.  Failure to impeach law enforcement witnesses with prior inconsistent statements

Petitioner claims his trial counsel provided ineffective assistance of counsel by failing to adequately impeach the testimony of the Tact Team members regarding the circumstances of the shooting.  While the petitioner cites to some of the state court trial transcripts to establish differences in the witnesses' testimony between the state trials and the federal trial, despite submitting more than 3500 pages of exhibits herein, the petitioner has not provided this court with a copy of the pages of the state court transcripts which they have referenced.[218]  It is well-established that "counsel's decisions regarding how to best cross-examine witnesses presumptively arise from sound trial strategy." *Delozier v. Sirmons*, 531 F.3d 1306, 1326 (10th Cir. 2008).  "In hindsight, there are a few, if any, cross-examinations that could not be improved upon.  If that were the standard of constitutional effectiveness, few would be the counsel whose performance would past (sic) muster." *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996).

Petitioner has failed to establish that the strategy employed in this case was not sound. Specifically, a review of the cross-examination by counsel of the law enforcement witnesses establishes that counsel emphasized the areas which were of importance to the defense. Specifically, counsel demonstrated that the model created by the prosecution's witness did

---

[218]During the trial herein, this court attempted to obtain copies of the state court transcripts from the Sequoyah County Court Clerk's office.  At that time, the court was advised that the transcripts had never been filed in the Sequoyah County District Court.  *See*, Cr. Doc. 336, J.T.Tr. Vol. 8, at p. 1637.

not accurately reflect the house and furnishings as it existed in 1999, including the fact that heavy coverings were over the windows of the defendant's house (allowing counsel to argue it would have been hard for Barrett to see who was coming onto his property); nor did it contain all of the vegetation which existed on the defendant's property at the time of the raid.[219]

While the petitioner complains defense counsel did not impeach Johnson with his earlier state court testimony "that he was thirty seconds behind the tactical team and saw red and blue police lights at the intersection after turning onto the dirt road,"[220] it would have been counter-productive for defense counsel to have pointed this discrepancy out to the jury since Johnson testified on cross-examination during the federal trial that he was told to give the tact team a two minute headstart, which he did, and all he could see when he approached the residence was taillights on a vehicle turning into the residence.[221]  Additionally, Barrett claims trial counsel should have impeached Johnson's testimony by eliciting evidence regarding his initial statement to Investigator Jones.[222]  Counsel did, however, examine Johnson's statement to Jones, adducing Johnson's admission that he might not have told her about the lights.[223]  Even if inconsistencies occurred between Johnson's testimony regarding lighting, defense counsel made the most important point by establishing that Johnson had

[219]*See*, Cr. Doc. 324, J.T.Tr. Vol. 2, at pp. 277-294, 298-300.

[220]Doc. 95, at p. 145.

[221]Cr. Doc. 324, J.T.Tr. Vol. 2, at pp. 343-344 and 349.

[222]Doc. 95, at pp. 145-146.

[223]Cr. Doc. 324, J.T.Tr. Vol. 2, at pp. 361-362.

absolutely no idea what lights were on at the time the shooting occurred because he was, at least two minutes behind the tact team and, therefore, he had no way of observing whether the lights were activated at the time of the shooting.[224]

Petitioner also claims counsel failed to challenge Trooper Poe's testimony that "he initially observed emergency lights when he saw the first Bronco come into view from the east" with prior testimony that "he first became aware of seeing emergency lights *after* he heard shooting break out." Doc. 95, at p. 145. During the federal trial Poe testified as soon as he got out of his car and started toward the fencepost, he heard gunfire. After Poe ascertained he was not the target of the shooting, he came up from behind the fencepost and looked toward the house. At that point he saw Hamilton's Bronco come into view from the east and it appeared the Bronco was taking gunfire.[225] On cross-examination, however, Poe explained that he didn't remember seeing emergency lights from the time he left his car until he reached his assigned position by the post.[226] Thus, the testimony was not inconsistent and counsel was not ineffective for not impeaching Poe with his prior testimony.

Petitioner also complains because counsel did not elicit testimony from Trooper Poe that "he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house." Doc. 95, at p. 146. The testimony at the federal trial, however, made it clear that from the time Trooper Poe exited his vehicle, he was focused

---

[224]Cr. Doc. 324, J.T.Tr. Vol. 2, at p. 351 (shooting was over when he arrived and Trooper Eales was being carried to Bronco).

[225]Cr. Doc. 329, J.T.Tr. Vol. 7, at pp. 1411-1413.

[226]Cr. Doc. 329, J.T.Tr. Vol. 7, at p. 1444.

159

upon his own safety as well as the two other troopers who were closest to him. As a result, he took cover and did not really see anything at that point.[227] Thus, it was not unreasonable for defense counsel to rely on his testimony that other than hearing gunfire, he couldn't see anything.

Petitioner attacks counsel's failure to impeach Trooper Greninger's testimony with what he claims was "conflicting evidence between the second state trial and the federal trial regarding what lighting he observed." *Id.*, at p. 145. Petitioner states that Greninger testified in the federal trial that:

> Trooper Manion activated his emergency lights as he turned into the driveway before entering the property. He noticed also that Trooper Hash had his emergency lights on, but did not know when they were engaged. He was not completely sure Trooper Hise's emergency lights were on. Trooper Pettingill did not activate his lights.

Doc. 95, at p. 145. Petitioner indicates this testimony conflicts with Greninger's testimony in the second state trial that "he turned on his emergency lights after turning left to approach Mr. Barrett's residence, and recalled seeing Trooper Hise's emergency lights on." *Id.* The inconsistencies between these two accounts are insignificant and they certainly do not impeach the evidence that the emergency lights on Greninger's vehicle were activated shortly after the car turned from the roadway in front of Barrett's house. Additionally, defense counsel elicited from Greninger an admission that he did not recall precisely where his car was when the emergency lights on his vehicle were turned on and he did not know when

---

[227]Cr. Doc. 329, J.T.Tr. Vol. 7, at p. 1410.

160

Hash's lights were activated.[228]  Since Greninger admitted upon cross-examination that his memory was not clear, there was no need for counsel to use the prior slightly inconsistent statement as to who in the vehicle activated the lights and when.  As a result of Greninger's admission in the federal trial, counsel could argue that the lights were not on when Barrett first observed the vehicles coming onto his property.  Additionally, to the extent Greninger readily admitted that his memory of the events was imperfect, there would not be much value in trying to refresh the witness's memory about facts that could have been more damaging to the defense.  Thus, the omission was neither unreasonable nor prejudicial.

Petitioner attacks trial counsel saying he failed to impeach Trooper Hamilton's testimony regarding where his vehicle first began receiving gunfire.  During the federal trial, Hamilton testified that his vehicle was initially hit by gunfire "[s]hortly *after* we came out of the ditch."[229]  This appears to be consistent with the statement Petitioner attributes to Hamilton from the state court trial,  "that the shooting started as his vehicle was coming out of the ditch."  Doc. 95, at p. 147.  Further, since Hamilton's recollection supported the defense theory that the lead vehicle was closer to the house when the shooting began, counsel could reasonably have relied on Hamilton's testimony instead of exploring this issue with Greninger as Petitioner claims he should have done.

Petitioner also complains because trial counsel did not contrast Trooper Poe and Trooper Greninger's testimony about guns in the defendant's house with the fact that neither

---

[228]Cr. Doc. 326, J.T.Vol. 4, at p. 771.

[229]Cr. Doc. 325, J.T.Vol. 3, at p. 537.

161

testified to seeing any guns in the state trial. Petitioner does not cite to any portion of the state court transcript and, therefore, it is impossible to know if they were even asked about guns in the prior trials. Accordingly, this court finds the petitioner has not shown that the prior testimony was inconsistent with the testimony offered in federal court.

After thoroughly reviewing counsel's cross-examination, this court finds the petitioner has failed to establish that counsel's cross-examination was unreasonable or prejudicial. Therefore, the petitioner has failed to establish ineffective assistance of counsel.

8.  Failure to elicit testimony of son and neighbor

Petitioner next faults trial counsel for failing to call as defense witnesses his son, Toby Barrett, and his neighbor, Alvin Hahn. Petitioner claims these two witnesses could have undermined evidence that emergency lighting had been turned on prior to the initial shots being fired. Toby Barrett is the only one of these two witnesses who actually observed the police enter Barrett's property.[230] The government argues neither of these witnesses would have meaningfully undermined the prosecution's case, and counsel's omission of their testimony was not prejudicial ineffectiveness.

As previously indicated, decisions regarding which witnesses to call are matters of trial strategy. Again, based on the prior trials, there can be no question that defense counsel

---

[230]While the petitioner implies counsel did nothing to contradict testimony regarding Barrett's knowledge that the people attacking his property were law enforcement, the record establishes the falsity of this claim. In particular, Gelene Dotson, the defendant's mother, testified that she heard a loud noise followed by some gunshots and she glanced out her kitchen window and saw headlights in her driveway. She further testified that she did not see any flashing lights nor any kind of lights on that vehicle she would consider "emergency lights." Also, she indicated she saw a lot of people milling about, answered her phone and then observed a patrol car come through the gate. The patrol car she observed did not have any lights on, but as it pulled closer to the defendant's residence "it turned it (sic) lights on." Cr.Doc. 346, J.T.Tr. Vol. 18, at pp. 4142-4145. Additionally, Loyd Cobb, an investigator for the defense, testified that you would not have been able to see the three police cars coming through the ditch if you were inside the cabin. *Id.*, at pp. 4145-4154.

was aware of the prior testimony of Toby Barrett. Moreover, both Toby Barrett and Alvin

Hahn were originally listed as witnesses for the defendant. In order to demonstrate prejudice

for failure to call a witness, the petitioner must prove that the witness's testimony would have

produced a different result. *Patel v. United States*, 19 F.3d 1231, 1237 (7th Cir. 1994).

In reviewing the declarations of Toby Barrett and Alvin Hahn submitted by the

petitioner, it becomes clear that neither of these witnesses' testimony would have changed

the outcome of the first stage of trial. Specifically, as the petitioner acknowledges,

> a primary contention of the defense in the first stage of trial was that when Mr.
> Barrett fired on the Ford Bronco driven by Buddy Hamilton, he was unaware
> that it was a police vehicle, and was unaware that several police vehicles had
> driven onto his property. It was undisputed that the lead vehicle driven by
> Hamilton, which the evidence showed struck Mr. Barrett's porch, had no
> emergency lights engaged and appeared to be a civilian vehicle.

Doc. 95, at pp. 149-150.

Petitioner states that Toby Barrett testified in the first state trial that "when the

shooting occurred, there were no police vehicles with emergency lights on at all that were

visible." Doc. 95, at p. 152. Petitioner goes on to state that Toby's declaration is consistent

with his state court testimony. *Id*. The declaration indicates the following in regard to what

Toby Barrett actually observed:

> Just before they raided the place, the first thing I saw were taillights that
> went past the driveway and then a flash of light—maybe like the interior light
> of a car when somebody opened a door to get out. Then an SUV and a Crown
> Vic went up my great grandma's driveway and then the Bronco turned toward
> the house and I yelled "Dad." I don't recall how many times I yelled it. It all
> happened so fast. I thought I saw dad come onto the porch for just a second,
> and then the Bronco was just coming over the ditch made a boom, like it

163

bottomed out, if that's where the sound came from. I looked at the porch again and my dad was already gone.

The Bronco's headlights were coming toward me at first. I know for sure that nothing hit the Bronco until it came to a stop in front of the house, because that's when the windshield exploded and a cop knocked me down and wouldn't let me look toward the house. There may well have been shots before that—again it happened so fast and I was so scared, but my dad wasn't on the porch and I know for sure that nothing hit the Bronco before it came to a stop.

* * * * *

The first police lights I seen was on the police car that crashed through the gate when the shooting was over. I'm sure of that. There was no vehicle near me. The cop who knocked me down must have come over Grandma's fence.

Petitioner's Exhibit No. 96.

Based upon Toby's relationship to the petitioner, there is no question that his testimony would have been susceptible to impeachment for bias. Further, Toby Barrett concedes that he had limited recall of what actually happened because it occurred so fast. However, if as Toby claims he could identify the "Crown Vic" coming onto the property, this testimony would have allowed the prosecutor to argue that the defendant, who was somewhat closer to the vehicles, should also have been able to identify the same vehicle. According to the testimony at trial, the "Crown Vic" observed by Toby had to be the marked police unit driven by Hash with the overhead light bar. Thus, the prosecution could easily have argued, based on Toby's testimony, that the defendant had to have observed the light bar regardless of whether the emergency lights were activated or not.

Even though Toby Barrett might have testified that the defendant didn't fire until the lead Bronco had stopped in front of the house, this testimony would have been undermined

by his testimony that he was not sure when the shooting actually began and, therefore, it could have occurred, as the officers testified, before the Bronco stopped.  Furthermore, to the extent no witness was able to place the defendant on the front porch during the shooting, Toby's testimony would have allowed the government to argue the defendant was on the front porch when the shooting began.

Additionally, defense counsel have submitted declarations in which they both claim that the petitioner "wanted to minimize the amount of testimony elicited from his relatives, particularly his son, . . . though he understood that decision could work to his detriment."[231] To counter these declarations, the petitioner submits declarations from family members who claim trial counsel never told them that Barrett didn't want them involved in case and/or that Barrett never told them he didn't want them involved.  *See*, Petitioner's Exhibit Nos. 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, and 220.  These declarations are full of hearsay.  What the petitioner does not do, however, is submit his own declaration to refute counsel's declaration.  Whether or not defense counsel advised Barrett's family of his conversations with Barrett and/or whether Barrett advised his family of his conversations with trial counsel are not the issue.  Finally, to imply, as the petitioner does, that Toby Barrett's testimony was the difference between the more favorable results in the state court trials and the federal trial is nothing more than speculation and second-guessing in hindsight as to what might have been.

---

[231] *See*, Respondent's Exhibit Nos. 11 and 12.

While many of the facts between the two cases were the same, the state cases did not involve the same charges or all of the same witnesses as the federal case. Rather, in state court the petitioner was charged with murder and the evidence dealt solely with the raid and shooting which occurred during the raid. Whereas, in the federal case, Count 1 focused on the petitioner's using and carrying a firearm in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death; Count 2 focused on the petitioner's using and carrying a firearm in relation to a crime of violence and possessing a firearm in furtherance of such crime of violence, resulting in death; and Count 3 focused on intentional killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties. Thus, the jury heard much more evidence about the drug activities and/or associations with drug abusers which was occurring at Barrett's residence in the days and months shortly before the shooting. Further, the prosecutor would have been able to ask specific questions of Toby Barrett regarding the drug activities which were occurring on Barrett's property and, in light of the evidence which was seized from the travel trailer in which Toby supposedly lived, it would have been hard for him to deny knowing anything about those activities. As a result, this court finds defense counsel's decision not to call Toby Barrett was not unreasonable or prejudicial.

Petitioner also complains because trial counsel did not call Alvin Hahn to testify about what he saw approximately fifteen seconds after the shooting stopped. While the petitioner

166

claims Mr. Hahn would say "he saw only one vehicle with its police lights on,"[232] Mr. Hahn's declarations actually says "there was at least one vehicle with its police lights on."[233]  Mr. Hahn does not identify where that vehicle was located and certainly this statement does not preclude there having been several vehicles with emergency lighting on.  Furthermore, Mr. Hahn does not claim to have had an unobstructed view of the property such that he could have seen all of the vehicles.  Finally, to the extent Mr. Hahn could not testify about the lighting prior to the initiation of the shooting, it is unlikely his testimony would have altered the outcome of the jury's verdict.  As a result, this court finds counsel was not ineffective in failing to call Mr. Hahn as a witness nor was the petitioner prejudiced thereby.

9.  Failure of counsel to develop evidence that Barrett was not aware that there was an active felony arrest warrant outstanding

Petitioner asserts counsel provided ineffective assistance by not presenting evidence that he was unaware that the state court had issued a warrant for his arrest.  The government argues the petitioner failed to timely raise this argument and therefore, the statute of limitations bars this court's consideration of the same.

A review of the pleadings herein, convinces this court that the petitioner first raised this issue on September 25, 2009[234] and this court finds the allegations arise out of different facts in time than those alleged in the original and/or first amended motion.  Thus, the claim is barred by the statute of limitations.

---

[232]Doc. 95, at p. 153.

[233]Petitioner's Exhibit No. 75.

[234]*See*, Doc. 70, at pp. 173-174.

167

10. Failure of counsel to contest James Horn's testimony

Petitioner also complains trial counsel were ineffective for failing to prepare for James Horn's testimony and to interpose a *Daubert*[235] challenge to the testimony prior to trial. Additionally, the petitioner asserts trial counsel were ineffective for failing to obtain an adequate curative instruction and/or to seek a mistrial after they successfully moved to strike Horn's testimony. Finally, the petitioner argues his appellate attorneys were ineffective for failing to argue that the jury's exposure to Horn constituted plain error. The government contends trial counsel's successful motion to strike Horn's testimony moots his various complaints about counsel's alleged failures to prepare for the witness. Additionally, the government argues the jury's exposure to Horn's testimony was not a valid basis for mistrial or an appellate claim of plain error.

Despite the petitioner's assertions regarding counsel's lack of preparation, it is clear counsel was prepared for Horn's testimony because he had been allowed to testify in both of the prior state trials.[236] After hearing Horn's testimony, including some of the cross-examination questions posed by defense counsel, the court became concerned that while Horn might have expertise concerning traumatic events, he was not being called to discuss the specific facts in the defendant's case. Thereafter, defense counsel moved to strike the testimony.[237] Since defense counsel had not completed their cross-examination, the court

---

[235]*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[236]Cr. Doc. 327, J.T.Tr. Vol. 5, at p. 942.

[237]Cr. Doc. 327, J.T.Tr. Vol. 5, at p. 938.

took the issue under advisement and allowed defense counsel an opportunity to complete their cross-examination.[238] After defense counsel obtained the admission of Horn that he was not there to discuss any specific individual comments which the Tact Team members had made to him, defense counsel renewed their motion to strike Horn's testimony.[239] The court gave the government an opportunity to rehabilitate the witness but after defense counsel pointed out that Horn could not express an opinion about any of the individuals involved, the court made the following findings:

> Based upon the testimony before the Court, there is no way to challenge Mr. Horn's theories in an objective sense. While Mr. Horn clearly has had real life experiences far in excess of an average person dealing with the issues he discussed, this Court is not convinced that his testimony has been subjected to or been scientifically tested in such a manner to make the evidence reliable under *Daubert*. The Court would note, however, based upon defense counsel's questioning, that the subject of Mr. Horn's testimony aimes (sic) to have been the subject of peer review and publication. Furthermore, it would appear that defense counsel made a strategic decision to allow the testimony and then challenge it before the jury in an effort to discredit the value of the testimony. Defense counsel did an admirable job in his cross examination of Mr. Horn. Generally, a trial court's focus should not be on the methodology employed in reaching those conclusions. That's by <u>Butler (sic) versus A.O. Smith</u>, 391 F.3d 1114, at 1121, 10th Cir. 2005.
>
> This Court doesn't know what methodology was used, nor what conclusions Mr. Horn reached, if any, based upon the actual facts involved in this case. Furthermore, as indicated earlier, this Court does not believe Mr. Horn's testimony will assist the tryer (sic) of fact in determining the issues herein. At best, Mr. Horn's testimony is simply an attempt by the government to bolster the credibility of its witnesses for memory lapses of those witnesses at issue. Additionally, my review of Mr. Horn's testimony leaves me with a definite conviction that Rule 702 only authorizes testimony by an expert in the form of an opinion, if, (1), the testimony is based on sufficient facts or data;

---

[238]Cr. Doc. 327, J.T.Tr. Vol. 5, at p. 949.

[239]Cr. Doc. 327, J.T.Tr. Vol. 5, at p. 958.

(2), the testimony is the product of reliable principles and methods; and (3), the witness has applied the principles and methods reliably to the facts of this case, and I emphasize the facts of this case. Mr. Horn did not testify regarding any opinions based on the underlying facts or data of this case or the individual responses of the officers involved. He did not offer an opinion regarding the specific facts of this case or identify any reliable principles or methods which he actually applied to the facts of this case. Rather, his testimony indicated that his focus was on helping the officers cope with the traumatic experience, not critiquing the differences in their memories or whether the differences were explained by the traumatic event they experienced.

Therefore, this Court finds Mr. Horn's testimony is neither reliable, nor will it assist the tryer (sic) of fact in determining an issue of fact in this case pursuant to Rules 702 and 1046 (sic) of the Federal Rules of Evidence. It should not have been admitted herein. Accordingly, I'm going to strike the testimony and admonish the jury to disregard it.

Cr. Doc. 336, J.T.Tr. Vol. 8, at pp. 1634-1636.

Later that day, the court advised the jury that it had struck Horn's testimony and

instructed the jury as follows:

Ladies and gentlemen of the jury, when we started this trial I gave you some preliminary instructions to guide you in your participation in this trial. As I advised you at that time, it is my duty to determine the law applicable to this case and it is your duty to accept and follow my instructions regardless of whether or not you agree with the law. As a matter of law, I have determined that the testimony which you heard on Monday afternoon and Tuesday morning of James Horn should not have been admitted into this trial. You should not speculate about the reasons for my ruling on this issue; it is based solely on my interpretation of the law applicable in this case. Therefore, I instruct you that you should disregard Mr. Horn's testimony in its entirety and not consider it for any purpose in making your decision when reaching a verdict in this case.

*Id*., at pp. 1739-1740.

Federal courts are to

presume that jurors will follow clear instructions to disregard evidence 'unless there is an overwhelming probability that the jury will be unable to follow the

court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant.' *United States v. Cabellero*, 377 F.3d 1235, 1243 (10th Cir. 2002) (quoting *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)).

*United States v. Lamy*, 521 F.3d 1257, 1266 (10th Cir. 2008).

A careful review of Horn's testimony establishes that the testimony was potentially as helpful to the defendant as to the government in that defense counsel's cross-examination focused on the unreliability of witness testimony six years after the event providing opportunities for defense counsel to argue there was reasonable doubt about what occurred during the raid on Barrett's property.[240] Because the testimony was potentially helpful to the defendant and because the jury was admonished to disregard the testimony in its entirety, this court finds the petitioner has failed to establish that defense counsel's strategy was unreasonable or that he was prejudiced by the jury hearing the testimony or trial counsel's failure to move for a mistrial following the court's striking of the testimony in its entirety. As a result, the petitioner's claim of ineffective assistance of counsel must fail. Furthermore, since the petitioner was not prejudiced by trial counsel's actions, appellate counsel was not ineffective in failing to raise this issue on appeal.

11. Trial counsel's failure to make "proper objections"

Next, the petitioner claims trial counsel were ineffective for omitting objections which resulted in the appellate court reviewing many of his appellate claims for "plain error." Doc. 95, at pp. 178-180. Barrett has not, however, established that he was prejudiced by the

---

[240]*See*, Cr. Doc. 326, J.T.Tr. Vol. 4, at pp. 863-889 and 891-917; and Cr. Doc. 327, J.T.Tr. Vol. 5, at pp. 950-957 and 972-975.

failure of trial counsel to object to any of the items which the Tenth Circuit reviewed for plain error.

Specifically, Barrett first argues trial counsel was ineffective for failing to object to "the prosecution's violation of Oklahoma state law requirements for nighttime search warrants." *Id.* In considering the merits of this claim, the Tenth Circuit found "there was no error on the part of the district court, let alone plain error." *United States v. Barrett*, 496 F.3d 1079, 1089 (10th Cir. 2007). Thus, the petitioner can not establish prejudice.

Second, Barrett claims trial counsel was ineffective for failing to object to "the improper execution of search warrants by federal officers" and "the violation of Fed.R.Crim.P. 41, because no federal judge or magistrate authorized the search warrant executed on Mr. Barrett's home." Doc. 95 at p. 178. In rejecting Barrett's challenge to the execution of the search warrants, the Tenth Circuit found it was permissible under Oklahoma law for the federal law enforcement officers mentioned in the search warrant to be involved in the execution of the warrant. *Barrett*, 496 F.3d, at p. 1090. Additionally, the Tenth Circuit found the warrant was not federal in character. *Id.*, at p. 1091. Therefore, the warrant was not subject to the requirements of Fed.R.Crim.P. 41. As a result, even if trial counsel had objected to federal officers being involved in the execution of the warrant, Barrett would not have prevailed on this claim.

Barrett also argues trial counsel was ineffective in failing to raise various objections to the indictment. Doc. 95 at p. 178. Again, although the Circuit Court reviewed Barrett's challenges to the indictment for plain error, the court made clear that there was no error in

172

the indictment. *See, e.g., Barrett*, 496 F.3d at 1093 (". . . Counts 1 and 2 of the superseding indictment clearly gave Barrett fair notice of the charges he had to defend against, and likewise were sufficient to enable him to assert a double jeopardy defense . . ."); *id.* at 1094 ("As for Barrett's second sufficiency-related argument, it is unnecessary for a criminal defendant charged with a § 924(c) offense to be separately charged with and convicted of the underlying offense."); and *id.* at 1094-95 (rejecting *Ring*[241] claim because it did not apply to defendant's indictment). Additionally, in rejecting the defendant's multiplicity argument, the Tenth Circuit applied the same test to the indictment that would it would have utilized under *de novo* review, *i.e.*, the test established in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The Tenth Circuit also rejected "Barrett's misjoinder arguments as wholly lacking in merit." Finally, a previously indicated herein, the superseding indictment was legally sufficient. As a result, this court finds trial counsel was not ineffective in failing to make futile objections to the indictment.

Further, Barrett challenges trial counsel's failure to object to the victim impact evidence. In reviewing this claim on appeal, the Tenth Circuit found:

> . . . . the victim impact testimony now objected to by Barrett was relevant and properly admitted by the district court to show Eales' uniqueness as an individual human being. . . . . . we conclude there was no error, let alone plain error, arising from the admission of this victim impact testimony.
>
>            \* \* \* \* \*
>
> . . . it is clear that the district court did not violate the Federal Rules of Evidence in admitting the challenged testimony from Kelli Eales.

---

[241]*Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

173

*Barrett*, 496 F.3d, at pp. 1099-1100.  Additionally, as to the admission of four photographs of Trooper Eales, the Circuit Court held ". . . we are not persuaded that the district court committed any error, let alone plain error, in admitting these four photographs.  *Id.*, at p. 1101.  Given the Tenth Circuit's consideration of Barrett's challenges to the victim impact evidence, it is clear that a different result would not have been reached even if trial counsel had interposed objections to the victim impact evidence.  As a result, Barrett was not prejudiced by trial counsel's lack of objections to this evidence.

Petitioner next challenges trial counsel's failure to object to "the prosecutor's use of racially motivated strikes in violation of *Batson*."[242]  While the petitioner states "defense counsel failed to present reasons why the government's purported race-neutral reasons for peremptory strikes were false and pretextual,"[243] the petitioner presents no argument to support this conclusory statement.  Further, the petitioner's *Batson* claim would have been rejected even if counsel had  made contemporaneous objections to the government's peremptory strikes.  *See*, *Barrett*, 496 F.3d, at 1105-1106.  Thus, trial counsel was not ineffective for failing to raise a frivolous objection.

Petitioner also alleges trial counsel was ineffective for failing to challenge the constitutionality of the federal death penalty statutes.  While the Tenth Circuit referred to the plain error standard in rejecting the challenges on appeal, it is clear that the same result would have been reached if the court had reviewed the claims *de novo*.  Specifically, the

---

[242]*Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

[243]Doc. 95, at p. 179.

petitioner's challenge to the federal death penalty statute's use of non-statutory factors in aggravation was foreclosed by prior Tenth Circuit precedent, to-wit: *United States v. McCullough*, 457 F.3d 1150, 1162 (10th Cir. 2006). Similarly, the petitioner's challenge regarding proportionality review was governed by prior Supreme Court precedent, to-wit: *Pulley v. Harris*, 465 U.S. 37, 43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Furthermore, even if trial counsel had argued that the court's use of "a relaxed standard for the admissibility of evidence" violated *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), it is clear this challenge would have not been successful. *See*, *Barrett*, 496 F.3d, at 1109-1110 ("Although the Court in *Woodson* emphasized that it is constitutionally problematic for a jury in the sentencing phase of a capital case to be provided "unguided and unchecked . . . discretion," 428 U.S. at 302, 96 S.Ct. 2978, the sentencing phase evidentiary standard employed by the FDPA clearly does not afford the jury any such unbridled discretion.") Finally, the petitioner would have faired no better if trial counsel had challenged the "impermissibly vague aggravating factors,"[244] since the Tenth Circuit held ". . .it is clear that § 848's general allowance of non-statutory aggravating factors is constitutionally permissible," *Barrett*, 496 F.3d, at 1110, and the petitioner makes no attempt in his motion to vacate to address any particular non-statutory aggravating factor alleged in his case. Furthermore, the petitioner still does not attempt "to explain how this alleged deficiency in § 848's sentencing scheme prejudiced him." *See*, *id*. Therefore, this court finds trial counsel was not ineffective for failing to raise these arguments.

---

[244]Doc. 95, at p. 179.

Next, the petitioner has asserted that counsel was ineffective for failing to challenge "the improper double counting of Mr. Barrett's alleged intent to kill as both a special circumstance and an aggravating factor." Doc. 95, at p. 179. In rejecting this claim on appeal, the Tenth Circuit held ". . Barrett has failed to establish any error, let alone plain error, resulting from the manner in which the jury was instructed to utilize the mental culpability aggravating factor in determining the appropriate sentence with respect to Count 3." *Barrett*, 496 F.3d, at 1111. As a result, this court finds counsel was not ineffective in failing to raise this objection.

Finally, the petitioner asserts trial counsel was ineffective for failing to object to "the Government's improper failure to give timely discovery of the names of seven prosecution witnesses called to establish Mr. Barrett's intent to kill." Doc. 95 at p. 179. To the extent that the trial in Barrett's case did not commence until the jury voir dire began, *see*, *Barrett*, 496 F.3d, at 1115-1117, the government was not required, pursuant to 18 U.S.C. § 3432, to turn over the names of its witnesses until three days prior to Monday, September 26, 2005. The government disclosed these witnesses on September 19, 2005 or a full week before Petitioner's trial actually began. As a result, this court finds counsel was not ineffective in failing to raise this objection.

## Petitioner's Challenge to Second Stage of Trial

Petitioner claims that trial counsel acted ineffectively in failing to present mitigating evidence regarding his dysfunctional childhood and that he suffered from bipolar syndrome and organic brain damage. Petitioner claims "trial counsel had a duty to retain a mitigation

176

specialist to assist in preparation for the penalty phase" of trial and that trial counsel failed to consult with experts and/or counter the government's case. Doc. 95 at p. 186.

In support of this allegation, the petitioner has submitted declarations from three attorneys who have opined as to the effectiveness of representation provided by trial counsel.[245] Each of these declarations are laden with hearsay and contain no citations to the record of what actually occurred in this case. The first affidavit is from John Echols regarding what he felt should have been done after he voluntarily requested permission to withdraw from the case. *See*, Petitioner's Exhibit No. 34. Despite Mr. Hilfiger's extensive federal criminal trial experience as well as prior experience trying a federal death penalty case in the Eastern District of Oklahoma, Mr. Echols states "Mr. Hilfiger was not qualified" to act as first chair in a federal capital case. Further, it is interesting that Echols, who the Federal Public Defender represented as being qualified to try this case, claims several additional things needed to be done to adequately prepare for the second stage of a capital case. However, based upon his own statements these things were not done for either of the two prior state court capital trials which he was responsible for trying.

Mark Hendricksen states:

> It was apparent to me after reviewing the trial transcript, the other transcripts in association with the federal trial, and the investigation that was conducted by Messrs. Hilfiger and Smith that nothing close to a complete second stage investigation was ever conducted. There was effectively no second stage investigator for Mr. Barrett.

---

[245]Petitioner also cites to exhibits which have no discernable relevance to the allegations regarding ineffective assistance of trial counsel during the second stage of trial. *See*, Petitioner's Exhibit Nos. 50 and 51.

177

Petitioner's Exhibit No. 29, at p. 1.

Finally, Julia O'Connell submits a declaration containing her "suspicions" and "impressions" regarding trial counsel as opposed to factual information. Further, without any knowledge as to what information counsel actually possessed or even when the trial was scheduled to start, she states "there was no time for an adequate second stage investigation." Petitioner's Exhibit No. 67.

Despite the petitioner's allegations that trial counsel did not secure the services of a mitigation specialist, the record in this case establishes that counsel did, in fact, retain a mitigation specialist.[246] This specialist, Dr. Jeanne Russell and another psychologist met with the petitioner in the jail[247] and Dr. Russell updated her information about the defendant and was prepared to talk about prison life and future dangerous.[248] Petitioner, however, did not want to present a case in mitigation that centered on sympathy for him or dwell on his family even though he was apprised by counsel that this could work to his disadvantage. *See*, Government's Exhibit Nos. 11 and 12. Additionally, as previously discussed herein, defense counsel met with several of the petitioner's relatives and none of them provided any information that led counsel to believe the petitioner suffered from a significant mental health condition. *Id.* Petitioner was cooperative, helpful and communicative with counsel. He was well behaved in trial and had a clear understanding of the proceedings. *Id.* While the

---

[246]*See*, CJA Voucher No. 06022A000004.

[247]*See*, Government Exhibit No. 5.

[248]*Id. See also*, letter from Roger Hilfiger attached to the CJA Voucher.

178

petitioner has produced documents and declarations establishing that his family is genetically predisposed to mental illness, he has not shown that this information was ever shared with trial counsel or that there were any documents in the files delivered to trial counsel that would have suggested a need to investigate the possibility of mental illness.  Trial counsel have no memory of having received the report from Bill Sharp which the petitioner now claims should have informed trial counsel of the need to investigate the petitioner's mental health.  *Id*.  Petitioner has not presented any evidence to show counsel were ever provided this specific information.  In fact, although OIDS had boxes of files delivered to Mr. Hilfiger, according to the declaration by Steve Leedy, at least one box of OIDS' files remained in his office.[249]  Since counsel did not know of facts that should have alerted them to the need to conduct a mental health examination, their failure to investigate this issue further can not be considered deficient.  *See*, *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003).

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.

*Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066.  Thus, competent counsel would choose to omit investigation of areas which they had no basis to suggest would be fruitful and focus on areas they knew would be important at trial.

Even assuming Petitioner's allegations that trial counsel provided ineffective assistance in the second stage were true, this court finds the petitioner has failed to establish

---

[249]Petitioner's Exhibit No. 111.

179

prejudice.  Specifically, defense counsel presented testimony during the second stage to establish that the defendant was a valuable member of his family and community who had been treated unfairly by the government.  Defense counsel made a strategic decision not to focus on Barrett's history of drug abuse because they felt it would not be well received by the jury.  *See*, Government's Exhibit Nos. 11 and 12.

As a result, counsel presented evidence that the defendant had already been punished for the death of Trooper Eales and the shooting of Trooper Hamilton and that the defendant had no prior felony convictions.[250]  Additionally, counsel presented evidence from the defendant's case manager[251] at the Oklahoma Department of Corrections to establish that the defendant was being treated differently than other inmates with the same security level based on a decision from top management.  According to the testimony, as a result of the administrative notice, the defendant would not be able to receive the normal good time credits allowed other inmates and he would be locked down at the Oklahoma State Penitentiary (a maximum security prison) twenty-three hours a day.[252]  The evidence also established the defendant had not engaged in any acts of misconduct while in prison and that he was considered moderately likely to succeed if provided with substance abuse treatment.[253]

---

[250]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4715-4782.

[251]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4794-4877.

[252]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4823-4827.

[253]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4828 and 4840-4843.

180

Counsel also presented evidence from several of the defendant's friends and relatives that gave the jury some insight into his upbringing.  Basically, Kathy Trotter, the defendant's cousin, testified that she grew up with the defendant.  While she moved away from the community when she was a senior in high school, Ms. Trotter testified she moved back and had been a process server for sixteen years and, therefore, she was very familiar with what happened in her community.  Ms. Trotter testified she never knew of any violent actions on the part of the defendant, prior to September 1999, other than rumors about his marriage to Abby Stites.  Ms. Trotter also testified that everyone in the defendant's family grew up around and always had guns.[254]

The defendant's brother, Steven Barrett, testified that the defendant is seven (7) years older than him and that they have another brother, Richard, who is two (2) years younger than the defendant.  He also testified that his parents were divorced when he was approximately two years old and moved to Sallisaw when he was four years old.  Further, he testified that the defendant was not a violent person; rather, he was just anti-social and preferred to be by himself.  Steven admitted that the defendant had smoked marijuana when he was younger; but he was not aware of the defendant using any other drugs.[255]

Roger Crawford, the defendant's uncle and neighbor, testified that the defendant was a good neighbor who could always be counted upon if his uncle ever needed anything.  Crawford testified he never felt threatened by the defendant and that he had been over to the

---

[254]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4783-4793.

[255]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5030-5051.

defendant's when the defendant overhauled an engine for him.  He indicated Barrett was a good hardworking mechanic and a good framer, carpenter.  While Crawford said he might have suspected the defendant used drugs, he had no personal knowledge that the defendant had ever used drugs.  Finally, Crawford testified that Barrett was "a good person," who had a good relationship with his son.[256]

Craig and Clyde Edgmon also indicated the defendant was a good neighbor and that they had never known him to be violent or make any kind of threats to anyone.  Further, they testified Barrett was a good mechanic and that he did a lot of mechanical work for them  for small sums of money and/or for free.[257]

The defendant's mother, Gelene Dotson, advised the jury that she lived in Illinois and New Jersey with her husband and three sons until she left her husband, Ernie Barrett, and moved back with her sons to Oklahoma.  She testified the defendant was 12 years old when she moved back to Oklahoma and that he went to school in Sallisaw.  She indicated the defendant was an average boy, but he was always hyper.  She also testified Barrett moved back to Indiana and lived with his dad for a year when he was in the 9th grade and then he came back to Oklahoma and lived with her.  When the defendant was 16 he quit school, after a disagreement with the superintendent over the length of his hair.  Once he quit school, Dotson indicated that the defendant went to work at Blue Ribbon Downs caring for horses for about a year.  After he turned 18, the defendant left home to work pipeline and oil rigs

---

[256]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5052-5070.

[257]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4920-4927 and 4929-4939.

in Western Oklahoma. While working pipelines in Idaho, the defendant came back to Sallisaw around 1980 and married Abby Stites. Dotson testified the defendant had a stormy relationship with his wife indicating, however, that there arguments were verbal not physical. After about 13 years of marriage, the defendant and his wife got a divorce. At the time of the divorce, Dotson stated the defendant worked out of town all week and would come and stay at her house with her on the weekends. Shortly thereafter, in about 1994, the defendant began building his cabin next door to her house. Dotson denied ever seeing the defendant use drugs. The defendant ate his meals and took showers at Dotson's house. Dotson also told the jury that the defendant seemed calmer since the incident and that he knew he had made a wrong decision on the night of the shooting and if he could he would do it differently. Finally, Dotson advised the jury that although she had disagreements with the defendant over the years, he never touched her physically and she never feared that he would.[258]

Abby Stites, the defendant's ex-wife and mother of his son Toby, testified that she was married to the defendant for 14 years. During the marriage, Stites admitted that the couple often engaged in mutual physical combat. Stites indicated, however, weapons were never used. Stites further testified that she often observed the defendant boasting of a willingness to use violence, but she had never seen him act on those threats. Finally, Stites mentioned the fact that she had participated in an effort to have Barrett committed to a

---

[258]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5071-5105.

183

hospital in 1986, because she felt like he needed "mental help."[259] Following her divorce

from the defendant, she testified they shared joint custody of their son.[260]

Ernest Barrett, the defendant's father, also testified conceding that he did not have a

close relationship with his son until after this incident. Mr. Barrett testified that he visits with

his son by phone, letter and that he had visited him every other week when he was in the

county jail. Further, Mr. Barrett stated that he never knew the defendant to be violent

towards anyone. Moreover, Mr. Barrett advised the jury that the defendant was sorry for

what had happened and that the defendant never really intentionally shot anybody; rather, all

he ever saw was a headlight.[261] Finally, Doris Barrett, the defendant's step-mother testified.

She claimed that she had developed a very close relationship with the defendant following

the shooting incident. She testified she cared for the defendant like her own son; that she was

very concerned about him; and she intended to maintain her relationship with him.[262]

Trial counsel tried to persuade the defendant to testify during the second stage, but

despite not having been in the courtroom to hear the evidence prior counsel John Echols,

through the defendant's step-mother, convinced the defendant that he should not testify. *See*,

computer disk of telephone calls from Muskogee County Jail attached to Cr. Doc. 265. In

this court's opinion, this decision had a negative effect on the jury who had witnessed the

---

[259]Although Stites claimed the defendant needed "mental help," records introduced by the defendant from the Oklahoma Department of Corrections indicated the defendant was inpatient at Eastern State Hospital for drug treatment in 1987. *See also*, Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4830-4831.

[260]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4877-4920.

[261]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5105-5119.

[262]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5119-5125.

defendant display absolutely no remorse by jumping out of his seat and verbally attacking the prosecutor during closing arguments and then requesting to be removed from the courtroom.    While the defense case was not ultimately successful, this court agrees with the government that, it was clearly persuasive.  After hearing the evidence and observing the defendant's own conduct, the jury unanimously found that the defendant was not likely to commit future acts of violence. Cr. Doc. 258.  Furthermore, the jury unanimously found the following mitigating factors: 1) the defendant, at the time of the incident, had no prior felony convictions; 2) the defendant was a father; 3) the defendant was a loved son and stepson; and 4) the defendant's death will impact his child, family and friends.  *Id.*  A majority of the jurors also found the defendant was a good neighbor and friend.  *Id.*  Additionally, five jurors found that the defendant had accepted responsibility for Eales's death from his prior conviction and that he had been punished and convicted for that death.  *Id.*  Finally, two jurors found as mitigating factors that the defendant did not constitute a future danger to society.  *Id.*

To the extent the petitioner now argues his counsel should have presented evidence that he was mentally ill and came from a dysfunctional family, he simply can not show that such evidence would have led to a more favorable outcome.  Many of the records contained within the petitioner's medical records could have been used by the government to totally negate the jury's findings that the petitioner was a loved son and stepson, a good neighbor and friend, or a person whose death would have an impact on his family and friends.  While the petitioner may have obtained a diagnosis of bipolar syndrome, post-traumatic stress

185

disorder and organic brain damage in 2009, the medical records which he has submitted establish that medical professionals who saw him much closer to the murder observed that the petitioner was a dangerous and assaultive drug addict. For instance, on October 8, 1986, Abby Barrett, the Petitioner's ex-wife, executed a sworn statement in which she stated, in part:

> Kenny Barrett has sexually abused me, he has threatened to kill me, he has threatened to kill himself. He has came and kidnapped my son, . . . . He has come in my house sliced up all my furniture, before he took everything and burned it in the front yard. Kenny is a very dangerous person to himself and others. He is abusing drugs, . . . .

Government Exhibit No. 13. The medical document prepared by the staff at Eastern State Hospital that same day describes the petitioner has having no neurological impairment and the petitioner denies he has had any head injuries. Government Exhibit No. 15. Another document indicates the petitioner did not follow thru with his psychiatric regimen following a prior suicide attempt and that the petitioner had a history of drug abuse. Government Exhibit No. 16. The discharge summary nine days later, indicates, in part:

> Patient and his ex-wife are not getting along; ex-wife reports he sexually and physically assaulted her, not knowing if charges would be filed or not, and the mother of the patient petitioned for a commitment for treatment of the patient. . . . . Patient has been abusing different kinds of drugs since the age of 16, and admitted taking marijuana and downers.

> \* \* \* \* \*

> PROGNOSIS: Guarded, because of the unpredictability of his behavior, depending on the circumstances and depending on whether or not he is taking drugs at the time.

Government's Exhibit No. 16.

186

A report explaining the denial of a social security claim decided a few months after the petitioner's stay at Eastern State hospital summarized the petitioner's medical records as far back as 1980, concluding that the petitioner showed "no signs of a severe mental illness" and was able most of the time "to think clearly and carry out normal activities." Government's Exhibit No. 20.

In January of 1995, the petitioner was brought to the emergency room of the Sequoyah Memorial Hospital in an agitated state by his mother.  He was treated with Haldol and received a provisional bi-polar diagnosis.  Government's Exhibit 19.  Three days later, however, the petitioner was discharged with a final diagnosis of organic effective disorder, polysubstance abuse, amphetamine dependence, urine drug screen positive for cannabis and marital conflicts.  Government's Exhibit 18.  According to the medical records, the petitioner reported "that he got into an argument with his wife and he was afraid that he was going to lose his temper and so he decided that he would leave home for a little while, come here and cool himself down."  *Id.*  Additionally, the treating doctor indicated that the petitioner

> did not appear anxious or depressed. . . .Petitioner reported that he was feeling calm, denying any suicidal/homicidal ideations, denying any auditory or visual hallucinations.  Thought process was not paranoid or delusional.  Patient's memory was intact in all three spheres.  He had good attention and concentration span. . . . .

*Id.*  Finally, at the time of the murder, a blood test established that the petitioner had used amphetamines and marijuana.  Government's Exhibit No. 17.

As the government points out, "Barrett's records demonstrate that his entire mental health history was inextricably tied to his use of illegal drugs."  Doc. 175, at p. 149.  As

187

previously indicated, the petitioner's trial counsel did not believe the jury would be sympathetic to the petitioner's drug use[263] and the petitioner has failed to establish that the introduction of this evidence would not have been more negative than positive. To the extent that this evidence would have shown the petitioner was drug-dependent and violent towards his own family, this evidence would have strengthened the government's argument that he was a future danger to society.

Moreover, while the petitioner goes to great links to establish that many of his relatives suffered hardships or the effects of mental illness, he fails to establish any nexus between the suffering of his relatives and any viable theory of mitigation. Evidence that the petitioner had suffered a dysfunctional upbringing at the hands of mentally ill relatives could have also convinced the jury not only that the petitioner was a future danger but also that his family was too dysfunctional to have cared about him.

Finally, if the petitioner had introduced the evidence now offered, the government would have been able to introduce evidence from their mental health expert, which trial counsel was aware of, that would have portrayed the petitioner as a psychopath. *See*, Cr. Doc. 238. Thus, this court finds the omitted evidence could only have been submitted as an alternative theory to the mitigation case actually developed by trial counsel. Accordingly, this court finds the attack on trial counsel's strategy is based entirely upon the benefits of hindsight and, therefore, is inappropriate. Petitioner has completely failed to establish he was prejudiced by the omission of evidence regarding his alleged mental illness.

---

[263]Government's Exhibit Nos. 11 and 12.

Furthermore, if the defendant had called an expert to testify about his alleged mental deficiencies, the government would have countered that testimony with their own expert. *See*, Cr. Doc. 237.  Just from the portion of the psychological report submitted to defense counsel, they had to have been concerned about Dr. Price potentially testifying that the defendant was a psychopath. *See*, Cr. Doc. 238.  Moreover, since Dr. Russell had conducted and updated her risk assessment of the defendant, counsel made a tactical decision after consulting with Dr. Russell "that a mitigation expert would be more detrimental than advantageous"[264] to the defendant.

## B. *Ineffectiveness of Appellate Counsel*

Having found no merit to the allegations of ineffective assistance of trial counsel, this court finds no merit to those same claims raised as ineffective assistance of appellate counsel for failure to raise those issues on appeal.  Accordingly, this claim is denied.

## XIV.  CUMULATIVE EFFECT OF ERRORS

Petitioner alleges in his nineteenth ground for relief that the cumulative effect of the errors involved in his case "violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness" and, therefore, his conviction and sentence must be vacated.  In considering cumulative error, the Tenth Circuit has indicated a reviewing court should conduct the same inquiry as for individual errors – were the defendant's substantial rights affected; with the focus being on "the underlying fairness of the trial." *United States*

---

[264]*See*, letter of Roger Hilfiger attached to CJA voucher # 060224000004.

*v. Woods*, 207 F.3d 1222, 1237 (10th Cir. 2000).  Having reviewed the entire record in this case, this court finds the petitioner ultimately received a fundamentally fair trial.  Simply because the federal jury's sentence was different from the previous state court trials on different charges does not establish that Petitioner was denied a fair trial.  Accordingly, this claim is also denied.

## XV.  EVIDENTIARY HEARING

In his request for relief (Doc. 95 at pp. 400-401), the petitioner requests leave to conduct discovery and asks for an evidentiary hearing to resolve any factual disputes.  As the disposition of the petitioner's Motion does not require reference to any materials beyond those that are available and currently before the court, this court finds that: 1) the petitioner has failed to establish good cause to conduct discovery herein; and, 2) an evidentiary hearing is not necessary to resolve the issues raised in the petitioner's Motion to Vacate. Accordingly, the petitioner's request for an evidentiary hearing is denied.

## CONCLUSION

For the reasons stated herein, the petitioner's Motion to Vacate, Set Aside, or Correct a Sentence, pursuant to 28 U.S.C. § 2255, is hereby denied.  Furthermore, this court finds the petitioner has failed to make a "substantial showing" of the denial of any constitutional rights. 28 U.S. § 2253(c)(2).  Therefore, pursuant to Rule 11 of the Rules Governing Section 2255 Proceedings, this court hereby declines to issue a certificate of appealability.

Finally, based upon the findings herein, this court hereby denies petitioner's motion to vacate or modify protective orders and request for hearing (Doc. 184), petitioner's motion

for leave to conduct discovery (Doc. 186), and petitioner's motion for reconsideration of

court's order of June 20, 2012 (Doc. 212).

**It is so ordered on this  16th  day of August, 2012.**

James H. Payne
United States District Judge
Eastern District of Oklahoma

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,               )
                                      )
              Petitioner,             )
                                      )
v.                                    )          Case No. 09-CV-105-JHP
                                      )
UNITED STATES OF AMERICA,             )
                                      )
              Respondent.             )

## JUDGMENT

This matter came before the Court for consideration of defendant's motion to vacate, set aside, or correct sentence, pursuant to 28 U.S.C. § 2255. The issues having been duly considered and a decision having been rendered in accordance with the Order filed simultaneously herewith,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is entered for respondent, United States of America, and against petitioner, Kenneth Eugene Barrett, on his challenge to the legality of his sentence.

IT IS SO ORDERED this 16th day of August, 2012.

_____
James H. Payne
United States District Judge
Eastern District of Oklahoma

215

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,          )
                                 )
                Petitioner/Defendant,  )
                                 )
vs.                              )          Case No. 09-CIV-105-JHP
                                 )
UNITED STATES OF AMERICA,        )
                                 )
                Respondent/Plaintiff.  )

## OPINION AND ORDER

This matter comes before the court on the petitioner's motion to alter or amend judgment (Doc. # 217) filed on September 13, 2012. The government filed its response opposing said motion on October 29, 2012 (Doc. # 220). The government urges this court to deny the motion for two reasons: 1) the first two claims in the petitioner's motion constitute a second or successive petition for relief; and 2) the petitioner has failed to identify any error meriting reconsideration.

Petitioner's motion indicates it is brought pursuant to Fed.R.Civ.P. 59(e)[1] and it is styled "Motion to Alter or Amend Judgment" which is the terminology utilized in Fed.R.Civ.P. 59(e). In reality, the petitioner is requesting this court to "reconsider" its opinion regarding judicial bias, failure to grant an evidentiary hearing, and the denial of a certificate of appealability. To be entitled to relief under Rule 59(e), Petitioner must demonstrate that there has been an intervening change in the controlling law or that there is

---

[1]*See*, Doc. # 217, at p. 6.

new evidence previously unavailable or that there is the need to correct clear error. *See Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Upon careful review of the petitioner's motion and record in this matter, the court finds no basis for reconsidering the Opinion and Order denying the amended § 2255 motion. Contrary to the petitioner's allegations, the court carefully considered the trial record and the petitioner's legal arguments in denying his amended motion to vacate. Nothing provided by the petitioner in his motion to alter or amend judgment persuades the Court that the rulings were clearly erroneous or that there is a need to prevent manifest injustice. Finding no clear error or any other reason to alter or amend the judgment, the Court finds Petitioner's Rule 59(e) motion to alter or amend judgment should be denied.

Insofar as Petitioner also requests reconsideration of the denial of a certificate of appealability, the Court finds that request should be denied. Other than claiming that the length of the court's opinion and the nature of the penalty imposed establishes that the issues are "certainly debatable," the petitioner makes no attempt to establish a "substantial showing of the denial of a constitutional right," *i.e.*, he has not shown that "reasonable jurists would find [this court's] assessment of the constitutional claim debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

**ACCORDINGLY, IT IS HEREBY ORDERED** that the petitioner's motion to alter or amend judgment (Doc. # 217) is denied.

DATED THIS 30th day of October, 2012.

James H. Payne
United States District Judge
Eastern District of Oklahoma

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | | |
|---|---|---|---|
| KENNETH EUGENE BARRETT, | ) | | |
| | ) | | |
| Movant/Defendant, | ) | | |
| | ) | | |
| v. | ) | Case Nos. | CIV-09-105-JHP |
| | ) | | CR-04-115-JHP |
| UNITED STATES OF AMERICA, | ) | | (underlying criminal |
| | ) | | case) |
| Respondent/Plaintiff. | ) | | |

**NOTICE OF APPEAL**

Movant/Defendant, Kenneth Eugene Barrett, hereby appeals to the United States Court of Appeals for the Tenth Circuit from the Judgment and Opinion and Order entered on August 16, 2012 (Docs. 214, 215, 216) denying his motions to vacate, set aside, and correct sentence pursuant to 28 U.S.C. § 2255 (Docs. 1, 2, 95), and the Opinion and Order entered on October 30, 2012 denying Mr. Barrett's motion to alter order and judgment filed pursuant to Fed.R.Civ.P. 59(e). (Docs. 217, 221) Counsel are appointed under the Criminal Justice Act.

Dated this 26th day of December, 2012

Respectfully submitted,

/s/ _David B. Autry_
DAVID B. AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone: (405) 521-9600

DANIEL J. BRODERICK, Cal. Bar No. 89424
Federal Defender

by /s/ _Joan M. Fisher_
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender

TIVON SCHARDL FL Bar No. 73016
801 I Street, Third Floor
Sacramento, CA 95814
Telephone: (916) 498-5700

Lawyers for Kenneth Eugene Barrett

2

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 26th day of December, 2012, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with service to be made electronically on the following ECF registrants: Jeffrey B. Kahan, United States Department of Justice, jeffrey.kahan@usdoj.gov, and Christopher J. Wilson, Assistant United States Attorney, Chris.Wilson@usdoj.gov.  To the undersigned's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ David Autry

220

# UNITED STATES DISTRICT COURT
for the
## EASTERN DISTRICT OF OKLAHOMA
TRANSMITTAL SHEET
(Notice of Appellate Action)

| | | |
|---|---|---|
| (12/26/2012) | Notice of Appeal | **Style of case: Kenneth Eugene Barrett v. United States of America** |
| ( ) | Amended NOA | |
| ( ) | Cross Appeal | **District Court Case No: 09-CV-105-JHP** |
| ( ) | Interlocutory Appeal | |
| ( ) | Update Item | **Tenth Circuit Case No:** |

**Part 1**

**Notice of appeal is enclosed to all parties (except to appellant in civil cases); NOA, docket entries, district court order and CJA 20 (if applicable) are enclosed 10 10CCA.**

1.  District Judge: James H. Payne

2.  Official Court Reporter(s): Ken Sidwell, Brian Neil

3.  Fees:
    USA: ( ) Fees waived
    $455.00 filing fee: ( ) Paid   ( ) Due
    Pauper Status: (X) IFP GRANTED
    ( ) IFP DENIED
    ( ) IFP PENDING

4.  State habeas cases: **CPC STATUS    ( ) DENIED**
    **ORIGINAL FILE SENT:**

5.  Transcript:
    ( ) ordered          ( ) not ordered
    ( ) not required     ( ) no in-court hearing
    ( ) CJA pending      ( ) CJA furnished
    ( ) pur. order furn. ( ) docket stmt. furn.

---

**PART 2**            **TRANSMITTAL OF RECORD TO COURT OF APPEALS**
**ORIGINAL RECORD**            **SUPPLEMENT TO RECORD-SUPPLEMENT #**

| | |
|---|---|
| Pleadings: Vols. | Pleadings: Vols. |
| Transcript: Vols. | Transcript: Vols. |
| Exhibits: Vols. | Exhibits: Vols. |
| Depositions: Vols. | Depositions: Vols. |
| State Crt. Record: Vols. | State Crt. Record: Vols. |
| Sealed: Vols. | Sealed: Vols. |
| No. of Boxes: | No. of Boxes: |

---

/s/ Jeanne Brown
Signature Clerk or Deputy Clerk      Phone(918)684-7920          Date:   December 27, 2012

cc: All parties notified through CM/ECF

221