# U.S. District Court
## Eastern District of Oklahoma (Muskogee)
## CIVIL DOCKET FOR CASE #: 6:09–cv–00105–JHP

Barrett v. USA
Assigned to: District Judge James H. Payne
Case in other court:   10th Circuit, 12–07086
             ED/OK, 6:04–cr–115
Cause: 28:2255 Motion to Vacate / Correct Illegal Sentence

Date Filed: 03/16/2009
Date Terminated: 08/16/2012
Jury Demand: None
Nature of Suit: 535 Death Penalty –
Habeas Corpus
Jurisdiction: U.S. Government Defendant

**Petitioner**

**Kenneth Eugene Barrett**　　　represented by　**David B. Autry**
1021 NW 16th St
Oklahoma City, OK 73106
405–521–9600
Fax: 405–521–9669
Email: dbautry44@hotmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joan M. Fisher**
Federal Public Defender – Sacramento,
CA
801 "I" St, Third Floor
Sacramento, CA 95814
916–498–6666
Fax: 916–498–5706
Email: joan.fisher@fd.org
*ATTORNEY TO BE NOTICED*

**Tivon Schardl**
Federal Public Defender – Sacramento,
CA
801 "I" St, Third Floor
Sacramento, CA 95814
916–498–6666
Fax: 916–498–6656
Email: tim.schardl@fd.org
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**USA**　　　represented by　**Christopher J. Wilson**
US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401

918−684−5100
Fax: 918−684−5150
Email: Chris.Wilson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Kahan**
US Department of Justice – Capital Case
Unit
1331 F St NW
Rm 345
Washington, DC 20530
202−305−8910
Fax: 202−353−9779
Email: jeffrey.kahan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheldon J. Sperling**
US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401
918−684−5100
Fax: 918−684−5150
*TERMINATED: 11/24/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/10/2009 | 4 | 1312 | MOTION to File Exhibits Under Seal and for a Protective Order by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 5 | 1317 | ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for a Protective Order (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 6 | 1319 | MOTION to Reconsider (Re: 5 Order Ruling on Motion to Seal Exhibits and for Protective Order) by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 7 | 1322 | AMENDED ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for Protective Order (Re: 5 Order, 6 Motion to Reconsider) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 1 | 22 | MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett; Responses due by 6/16/2009 (With attachments – **EXHIBITS 1−36; 59−60**)(EXHIBITS 37−58 NOT USED)(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 3 | 958 | |

| | | | |
|---|---|---|---|
| | | | EXHIBITS IN SUPPORT OF MOTION **Nos. 61–70, 71–80, 81–99, 100–118** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 8 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134 and 135** (Re: 1 MOTION to Vacate and 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 9 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 10 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 11 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 12 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 13 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 137, 138, 139, 140, 141, 142 and 143** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 14 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 144A, 144B, 145 and 146** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 15 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 16 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 17 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 18 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 19 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 147B2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 20 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) |

| | | | |
|---|---|---|---|
| | | | (Entered: 03/18/2009) |
| 03/16/2009 | 21 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 22 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 23 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 24 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 25 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 26 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147F** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 27 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147G** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 28 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 148, 149, 150, 151, 152, 153, 154, 155, 156, 157 and 158** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 29 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 159, 160, 161, 162, 163, 164 and 165** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 30 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 166, 167, 168, 169, 170, 171, 172, 173, 174 and 175** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 31 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 32 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 33 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 34 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| | | | |
|---|---|---|---|
| 03/16/2009 | 35 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 36 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 37 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 178, 179 and 180** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 38 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 39 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 40 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 41 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 42 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 182, 183, 184 and 185** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 43 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 186, 187, 188, 189, 190, 191, 192, 193, 194 and 195** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/17/2009 | 2 | 561 | CORRECTED MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett (corrected to include verification) (Re: 1 Motion to Vacate); Responses due by 6/16/2009(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/18/2009 | 44 | | NOTICE to Government to Respond by **6/16/2009** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) Modified on 3/19/2009 to change response date to 6/16/09 (cjt, Deputy Clerk). (Entered: 03/18/2009) |
| 03/19/2009 | | | NOTICE of Docket Entry Modification; Error: Wrong date of 3/16/09 given in text; Correction: Correcting response date to 6/16/09 (Re: 44 Notice to Respond) (cjt, Deputy Clerk) (Entered: 03/19/2009) |
| 05/29/2009 | 45 | 1324 | MOTION to Disqualify Judge by Kenneth Eugene Barrett Responses due by 6/15/2009 Replies due by 6/24/2009.(Schardl, Tivon) (Entered: 05/29/2009) |
| 06/03/2009 | 46 | | ATTORNEY APPEARANCE by Christopher J. Wilson on behalf of USA (Wilson, Christopher) (Entered: 06/03/2009) |
| 06/11/2009 | 47 | | |

| | | | |
|---|---|---|---|
| | | | First MOTION for Extension of Time to Respond to Motion (Re: 45 MOTION to Disqualify Judge ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/11/2009 | 48 | | First MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment, 1 MOTION to Vacate Order/Judgment ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/12/2009 | 49 | | MINUTE ORDER by District Judge James H. Payne granting Application for Extension of Time to Respond to Petitioner's Motoin to Disqualify and Recuse United States District Judge James H. Payne from Further Participation in this Matter ( 47 Motion for Extension of Time to Respond to Motion). Accordingly, the respondent has until 7/15/09 within which to file its response to petitioner's motion (Re: 45 MOTION to Disqualify Judge ).(law, Deputy Clerk) (Entered: 06/12/2009) |
| 06/12/2009 | 50 | | MINUTE ORDER by District Judge James H. Payne granting in part and denying in part Application for Extension of Time to Respond to Petitioner's 28 U.S.C. Section 2255 Motion ( 48 Motion for Extension of Time to Respond to Motion ). Respondent has an additional 3 months or until 9/16/09 within which to file its response to petitioner's 28 U.S.C. Section 2255 Motion. (law, Deputy Clerk) (Entered: 06/12/2009) |
| 07/13/2009 | 51 | 1355 | RESPONSE in Opposition to Motion (Re: 45 MOTION to Disqualify Judge ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 07/13/2009) |
| 07/24/2009 | 52 | 1373 | First MOTION to unseal documents in cr–04–115 by USA Responses due by 8/10/2009 Replies due by 8/19/2009.(Wilson, Christopher) (Entered: 07/24/2009) |
| 08/14/2009 | 53 | | MOTION to File Response to Government's Motion to Unseal Out of Time by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/14/2009 | 54 | | MOTION to File Out of Time *PROPOSED ORDER* by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/17/2009 | 55 | | ORDER by District Judge James H. Payne: striking 54 Petitioner's Proposed Order which was filed in error (cjt, Deputy Clerk) (Entered: 08/17/2009) |
| 08/19/2009 | 56 | | MINUTE ORDER by District Judge James H. Payne: Directing Petitioner to supplement 53 MOTION to File Response to Government's Motion to Unseal Out of Time by 5:00 p.m. today, 8/19/09, to include a statement as to whether either Christopher J. Wilson or Jeffrey B. Kahan, counsel for respondent, USA objects to the motion. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 57 | 1379 | SUPPLEMENT (Re: 56 Minute Order,,, 53 MOTION to File Response to Government's Motion to Unseal Out of Time ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 08/19/2009) |
| 08/19/2009 | 58 | 1381 | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/19/2009) |

| | | | |
|---|---|---|---|
| 08/19/2009 | 59 | 1399 | MINUTE ORDER by District Judge James H. Payne: Striking 58 Petitioner's Response in Opposition to the Government's Motion to Unseal (Re: 52 Government's MOTION to Unseal Documents). (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 60 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53 ) is hereby granted. The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2255 Motion (Doc. # 2) and that the Government's Motion to Unseal (Doc. # 52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion. To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their current response deadlines on the § 2255 Motion. Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52 ) and the Government shall be given until September 2, 2009, to Reply. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/26/2009 | 61 | 1400 | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/26/2009) |
| 08/28/2009 | 62 | 1420 | REPLY to Response to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 08/28/2009) |
| 09/04/2009 | 63 | | Second MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment ) by USA Responses due by 9/21/2009(Wilson, Christopher) (Entered: 09/04/2009) |
| 09/04/2009 | 64 | | MINUTE ORDER by District Judge James H. Payne: granting 63 Respondent's Motion for Extension of Time to Respond to Motion; Response due by 10/16/2009 (Re: 1 MOTION to Vacate Order/Judgment, 2 Corrected MOTION to Vacate Order/Judgment ) (cjt, Deputy Clerk) (Entered: 09/04/2009) |
| 09/04/2009 | 65 | | RESPONSE to Motion (Re: 63 Second MOTION for Extension to Respond to 2255 Motion) by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 9/8/2009 to change text and change link (dma, Deputy Clerk). (Entered: 09/04/2009) |
| 09/11/2009 | 66 | 1433 | ORDER by District Judge James H. Payne: denying 45 Petitioner's Motion to Disqualify and Recuse (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/11/2009 | 67 | 1455 | ORDER by District Judge James H. Payne: Granting in part, denying in part and taking under advisement in part 52 Government's MOTION to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings filed Cr–04–115 (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/22/2009 | 68 | 1470 | NOTICE of Intention Not to Abandon Claims and REQUEST for Protective Order (Re: 67 Order) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) Modified on 9/23/2009 change text (dma, |

| | | | |
|---|---|---|---|
| | | | Deputy Clerk). (Entered: 09/22/2009) |
| 09/23/2009 | 69 | 1477 | ORDER by District Judge James H. Payne (Re: 67 Order, 68 Petitioner's NOTICE of Intent Not to Abandon Claims and REQUEST for Protective Order) (cjt, Deputy Clerk) (Entered: 09/23/2009) |
| 09/25/2009 | 70 | 1479 | Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* by Kenneth Eugene Barrett Responses due by 10/13/2009 (With attachments – **EXHIBITS 1–10**)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 71 | | EXHIBIT(S) **11 through 50** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 72 | | EXHIBIT(S) **51 through 118** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/28/2009 | 73 | | OBJECTION to Petitioner's Proposed Protective Order (Re: 68 MOTION for Protective Order) by USA (Wilson, Christopher) Modified on 9/29/2009 to change text (dma, Deputy Clerk). (Entered: 09/28/2009) |
| 09/29/2009 | 74 | | ORDER by District Judge James H. Payne: Show Cause Hearing and Scheduling Conference are set for 10/6/2009 at 02:00 PM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 70 Amended MOTION for Collateral Relief, to Vacate, Set Aside or Correct Sentence and for a New Trial) (cjt, Deputy Clerk) (Entered: 09/29/2009) |
| 09/30/2009 | 75 | | RESPONSE (Re: 69 Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 09/30/2009) |
| 10/02/2009 | 76 | | MOTION to Vacate Order/Judgment *Order Filed September 29, 2009*, MOTION to Continue Hearing(s) *On Order to Show Cause* (Re: 74 Order,, Setting/Resetting Hearing(s), Setting/Resetting Hearing(s),, ) by Kenneth Eugene Barrett Responses due by 10/19/2009 (With attachments)(Schardl, Tivon) (Entered: 10/02/2009) |
| 10/02/2009 | 77 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's emergency motion (Dkt 76 ) to vacate show cause order is denied. The court hereby waives the presence of petitioner's counsel, Tivon Schardl, at the hearing scheduled October 6, 2009, at 2:00 p.m. Lead counsel, David Autry, is required to attend; however, arrangements will be made for lead counsel to speak with co–counsel Tivon Schardl via telephone, if necessary. In addition, the parties should be aware the court intends to conduct a status and scheduling conference to receive the parties' observations and comments as to the time frame necessary for disposition of this matter. (cjt, Deputy Clerk) (Entered: 10/02/2009) |
| 10/05/2009 | 78 | | MOTION to Continue Hearing(s), MOTION to Recuse, MOTION to Reconsider, MOTION for Leave to Appear *y* (Re: 77 Minute Order,,, Ruling on Motion to Vacate Order/Judgment,,, Ruling on Motion to Continue |

| | | | |
|---|---|---|---|
| | | | Hearing(s), Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 10/20/2009(Schardl, Tivon) (Entered: 10/05/2009) |
| 10/05/2009 | 79 | | MINUTE ORDER by District Judge James H. Payne: denying 78 Petitioner's Motion to Reconsider; denying 78 Petitioner's Motion to Continue Hearing; finding as moot 78 Motion for Leave to Appear by Telephone pursuant to Minute Order 77 entered on 10/2/09. 78 Petioner's Motion to Recuse was previously denied by Order 66 entered on 9/11/09. (cjt, Deputy Clerk) (Entered: 10/05/2009) |
| 10/06/2009 | 80 | | MINUTES of Proceedings – held before District Judge James H. Payne: Show Cause/Scheduling Hearing held on 10/6/2009 (Court Reporter: K.Sidwell) (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 81 | | SCHEDULING ORDER by District Judge James H. Payne: Amended Motion to Vacate due 11/6/2009; Brief in Support due 1/5/2010; Response due 3/8/2010; Reply due 3/23/2010 (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 82 | | PROTECTIVE ORDER by District Judge James H. Payne: granting 68 Petitioner's Motion for Protective Order; granting 52 Government's Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/08/2009 | 83 | | ***Remark: Pursuant to 82 Protective Order entered on 10/7/2009, copies of sealed Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, 274, 301 and the sealed letter dated 2/28/2005, all filed in Case No. CR–04–115–JHP, were personally delivered to Asst. United States Attorney Christopher Wilson on 10/8/2009. (cjt, Deputy Clerk) (Entered: 10/08/2009) |
| 10/09/2009 | 84 | | STATUS REPORT by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 10/09/2009) |
| 10/15/2009 | 85 | | TRANSCRIPT of Proceedings (Unredacted) of Show cause/Scheduling Hearing held on 10/6/09 before District Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–42). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 80 Minutes of Scheduling Conference, Striking/Terminating Deadline(s)/Hearing(s) ) (kns, Court Reporter) (Entered: 10/15/2009) |
| 10/16/2009 | 86 | | MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* by Kenneth Eugene Barrett Responses due by 11/2/2009(Schardl, Tivon) (Entered: 10/16/2009) |
| 10/20/2009 | 87 | 1952 | ORDER by District Judge James H. Payne ; denying 86 Motion to Stay (lsa, Chambers) (Entered: 10/20/2009) |
| 10/28/2009 | 88 | | Unopposed MOTION to Extend Deadline(s) *Established by Order filed October 7, 2009* by Kenneth Eugene Barrett Responses due by 11/12/2009 (With attachments)(Schardl, Tivon) (Entered: 10/28/2009) |

| 11/02/2009 | 89 | | SUPPLEMENT to Unopposed Motion to Continue Filing Schedule 88 by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 11/3/2009 to edit text (cjt, Deputy Clerk). (Entered: 11/02/2009) |
|---|---|---|---|
| 11/03/2009 | 90 | | ORDER EXTENDING FILING SCHEDULE by District Judge James H. Payne: granting 88 Petitioner's Unopposed Motion to Continue Filing Schedule (cjt, Deputy Clerk) (Entered: 11/03/2009) |
| 11/04/2009 | 91 | | ORDER from Circuit Court (Re: 86 MOTION to Stay Proceedings Pending Disposition of Mandamus Action 87 Order Denying Motion to Stay) (cjt, Deputy Clerk) (Entered: 11/04/2009) |
| 12/03/2009 | 92 | | MINUTE ORDER by District Judge James H. Payne: Show Cause Hearing is set for 12/15/2009 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne for David Autry to show cause why he has failed to comply with this Court's prior orders regarding submission of CJA vouchers. Only David Autry's appearance is required at this hearing. (cjt, Deputy Clerk) (Entered: 12/03/2009) |
| 12/04/2009 | 93 | | ATTORNEY APPEARANCE by Joan Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified on 12/7/2009 to change text (dma, Deputy Clerk). (Entered: 12/04/2009) |
| 12/04/2009 | 94 | | NOTICE Petitioner's Notice Regarding Amended Petition by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 12/04/2009) |
| 12/04/2009 | 95 | | Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* by Kenneth Eugene Barrett Responses due by 12/18/2009(Fisher, Joan) (Entered: 12/04/2009) |
| 12/14/2009 | 96 | | ORDER from Circuit Court (Re: 87 Order, Ruling on Motion to Stay, 86 MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* ) (With attachments)(law, Deputy Clerk) (Entered: 12/14/2009) |
| 12/15/2009 | 97 | | SEALED MINUTES of Show Cause Hearing (cjt, Deputy Clerk) (Entered: 12/15/2009) |
| 01/08/2010 | 98 | | MOTION to Extend Deadline(s) *for submission of cja voucher* by Kenneth Eugene Barrett Responses due by 1/22/2010(Autry, David) (Entered: 01/08/2010) |
| 01/08/2010 | 99 | | MINUTE ORDER by District Judge James H. Payne: granting 98 Motion to Extend Time for Submittal of CJA Voucher by Petitioner's counsel, David Autry, until 1/11/2010. (cjt, Deputy Clerk) (Entered: 01/08/2010) |
| 01/11/2010 | 100 | | NOTICE of Submission of Matter for In Camera Review by USA (Wilson, Christopher) (Entered: 01/11/2010) |
| 01/11/2010 | 101 | | SEALED LETTER (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/12/2010 | 102 | | PROTECTIVE ORDER by District Judge James H. Payne (Re: 101 Sealed Letter) (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/13/2010 | 103 | | Unopposed MOTION to Extend Deadline(s) *to File Brief in Support of Amended Petition and Subsequent Briefing* by Kenneth Eugene Barrett Responses due by 1/27/2010 (With attachments)(Schardl, Tivon) (Entered: |

| | | | |
|---|---|---|---|
| | | | 01/13/2010) |
| 01/15/2010 | 104 | | MINUTE ORDER by District Judge James H. Payne: For good cause shown, 103 Petitioner's Motion for Extension of Time to File Brief in Support of Amended Motion to Vacate is granted. Petitioner shall be given until 2/18/2010 to file his brief. No further extensions of time shall be granted. Respondent's answer shall be due 4/19/2010 and Petitioner's reply will be due 5/4/2010. (Re: 95 Amended MOTION to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255) (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 01/15/2010 | 105 | | MINUTE ORDER by District Judge James H. Payne: It is hereby ordered that Petitioner Kenneth Eugene Barrett's CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT–APPOINTED COUNSEL comes before the Court by David B. Autry. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original application and supporting documents. (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 02/02/2010 | 106 | | MINUTE ORDER by District Judge James H. Payne (Attachments: # 1 1/29/2010 E–Mail) (cjt, Deputy Clerk) (Entered: 02/02/2010) |
| 02/11/2010 | 107 | | Third MOTION to Extend Deadline(s) *Due to Newly Disclosed Evidence* by Kenneth Eugene Barrett Responses due by 2/25/2010 (With attachments)(Schardl, Tivon) (Entered: 02/11/2010) |
| 02/12/2010 | 108 | | MINUTE ORDER by District Judge James H. Payne: Motion Hearing and Status Conference are set for 3/1/2010 at 09:30 AM before District Judge James H. Payne (Re: 107 Petitioner's Third MOTION to Continue Briefing Schedule). Counsel are required to be present at this hearing. Petitioner does not need to be present. (cjt, Deputy Clerk) (Entered: 02/12/2010) |
| 02/18/2010 | 109 | | MOTION Leave to File Oversized Brief in Support of Amended Motion to Vacate, MOTION for Leave to File Brief in Support of Second Amended Motion to Vacate by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 110 | | Unopposed MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 3/4/2010(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 111 | | Amended MOTION for Leave to Exceed Page Limitation by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 112 | | MINUTE ORDER by District Judge James H. Payne: denying 111 Petitioner's Amended Motion for Leave to File Oversized Brief, with written order to follow (finding as moot 109 Petitioner's Motion for Leave to File Oversized Brief) (cjt, Deputy Clerk) (Entered: 02/18/2010) |
| 02/18/2010 | 113 | | MOTION to Reconsider *Order Denying Leave to File Oversized Brief* (Re: 112 Minute Order,, Ruling on Motion for Miscellaneous Relief,, Ruling on Motion for Leave to File Document(s), Ruling on Motion for Leave to File Document(s), Ruling on Motion to Exceed Page Limitation, ) by Kenneth |

| Date | Doc # | | Description |
|---|---|---|---|
| | | | Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 114 | | REDACTED EXHIBITS **119, 120, 121, 122** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 115 | | REDACTED EXHIBITS **125, 126, 128, 129, 130, 132, 133, 134, 137, 138** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 116 | | REDACTED EXHIBITS **148, 149, 150, 151, 152, 153, 154** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 117 | | REDACTED EXHIBITS **123, 124, 127, 131, 135** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 118 | | REDACTED EXHIBITS **155, 156** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 119 | | REDACTED EXHIBITS **157, 158** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 120 | | REDACTED EXHIBITS **163, 164** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 121 | | REDACTED EXHIBIT **161** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 122 | | REDACTED EXHIBIT **162** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 123 | | REDACTED EXHIBITS **165, 166** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 124 | | REDACTED EXHIBIT **159 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: |

| | | | |
|---|---|---|---|
| | | | 02/18/2010) |
| 02/18/2010 | 125 | | REDACTED EXHIBITS **167, 168, 169** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 126 | | REDACTED EXHIBIT **159 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 127 | | REDACTED EXHIBITS **170, 171** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 128 | | REDACTED EXHIBIT **160 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 129 | | REDACTED EXHIBIT **160 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 130 | | REDACTED EXHIBITS **172, 173** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 131 | | REDACTED EXHIBIT **177 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 132 | | REDACTED EXHIBITS **174, 175, 176, 178** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 133 | | REDACTED EXHIBIT **177 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 134 | | REDACTED EXHIBIT **177 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 135 | | REDACTED EXHIBITS **179, 180, 181a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |

| 02/18/2010 | 136 | | REDACTED EXHIBIT **181 Part B1** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
|---|---|---|---|
| 02/18/2010 | 137 | | REDACTED EXHIBITS **182, 183** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 138 | | REDACTED EXHIBIT **181 Part B2** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 139 | | REDACTED EXHIBIT **196 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 140 | | REDACTED EXHIBITS **184, 185, 186, 187, 188** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 141 | | REDACTED EXHIBIT **196 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 142 | | REDACTED EXHIBIT **196 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 143 | | REDACTED EXHIBIT **196 Part d** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 144 | | REDACTED EXHIBITS **189, 190, 191, 192, 193, 194, 195** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 145 | | REDACTED EXHIBITS **197, 198, 199, 200, 203, 204, and 205** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/18/2010) |
| 02/26/2010 | 146 | | ORDER by District Judge James H. Payne: granting 113 petitioner's Motion to Reconsider; Petitioner's brief due 3/1/10 at 4:30 p.m.; Status Conference RESET for 3/31/2010 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne; (granting in part 107 Motion to Continue Briefing Schedule; striking |

| | | | |
|---|---|---|---|
| | | | 1 Motion to Vacate Order/Judgment; striking 2 Corrected Motion to Vacate Order/Judgment; striking 70 Amended Motion to Vacate Order/Judgment) (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 02/26/2010 | 147 | | ORDER by District Judge James H. Payne: Re: 110 petitioner's Unopposed MOTION to File Exhibits Under Seal; Petitioner's response due 3/12/10 (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 03/01/2010 | 148 | | STIPULATION *and Order [Proposed] Modified Protective Order* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 149 | | BRIEF in Support of Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 150 | | MOTION for Evidentiary Hearing (Re: 95 Amended MOTION to Vacate) by Kenneth Eugene Barrett; Responses due by 3/15/2010(Schardl, Tivon) Modified on 3/2/2010 to change text and link (dma, Deputy Clerk). (Entered: 03/01/2010) |
| 03/01/2010 | 151 | | MOTION Expand the Record (Re: 149 Brief in Support of Motion ) by Kenneth Eugene Barrett Responses due by 3/15/2010(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/03/2010 | 152 | | Joint MOTION to Modify Protective Order by all parties Responses due by 3/17/2010(Wilson, Christopher) (Entered: 03/03/2010) |
| 03/05/2010 | 153 | | RESPONSE in Opposition to Motion (Re: 150 MOTION for Hearing ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/05/2010 | 154 | | RESPONSE in Opposition to Motion (Re: 151 MOTION Expand the Record ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/12/2010 | 155 | | RESPONSE by Kenneth Eugene Barrett (Re: 147 Order) (Fisher, Joan) (Entered: 03/12/2010) |
| 03/25/2010 | 156 | | MINUTE ORDER by District Judge James H. Payne: **TIME CHANGE ONLY** – Status Conference RESET for 3/31/2010 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne. (cjt, Deputy Clerk) (Entered: 03/25/2010) |
| 03/29/2010 | 157 | | ORDER by District Judge James H. Payne: denying 150 Petitioner's Motion for Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/29/2010 | 158 | | MOTION to be Excused from the Status Conference set on March 31, 2010 by USA Responses due by 4/12/2010(Wilson, Christopher) (Entered: 03/29/2010) |
| 03/29/2010 | 159 | | MINUTE ORDER by District Judge James H. Payne: granting 158 Government's Motion to be Excused from Attendance of Status Conference. The Court further grants Government's request for substitute counsel, Douglas Horn, to appear in lieu of Christopher Wilson for this hearing only. (cjt, Deputy Clerk) (Entered: 03/29/2010) |

| 03/30/2010 | 160 | | MINUTE ORDER by District Judge James H. Payne: The Court directs that Courtroom 1, Room 230, be sealed on 3/31/2010 at 9:00 a.m. for the portion of the Status Hearing pertaining to the Protective Order. The Clerk is directed to post this Minute Order on the Court's bulletin board for public viewing located on the 2nd floor of the United States Courthouse. (cjt, Deputy Clerk) (Entered: 03/30/2010) |
|---|---|---|---|
| 03/30/2010 | 161 | | ORDER (Re: Exhibits) by District Judge James H. Payne: granting 110 Petitioner's Motion to File Exhibits under Seal; granting 151 Petitioner's Motion to Expand the Record (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 162 | | SEALED EXHIBIT **201** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 163 | | SEALED EXHIBIT **202** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/31/2010 | 164 | | SEALED MINUTES of Proceedings – held before District Judge James H. Payne: Motion/Status Hearing held on 3/31/2010 (Re: 152 Joint MOTION to Modify Protective Order ) (Court Reporter: B.Neil) (cjt, Deputy Clerk) (cjt, Deputy Clerk). (Entered: 04/01/2010) |
| 03/31/2010 | 165 | | MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 03/31/2010 | 166 | | CORRECTED MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010, Reply due by 7/1/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 04/05/2010 | 167 | | SEALED REPORT TO COURT by USA (Re: 152 Joint Motion to Modify Protective Order) (cjt, Deputy Clerk) (Entered: 04/05/2010) |
| 04/08/2010 | 168 | | SEALED ORDER by Judge James H. Payne Re: 152 Joint Motion to Modify Protective Order (cjt, Deputy Clerk) (Entered: 04/08/2010) |
| 04/14/2010 | 169 | | SEALED STATUS REPORT by Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 4/20/2010 to add corrected attachment (cjt, Deputy Clerk). (Entered: 04/15/2010) |
| 05/12/2010 | 170 | | Unopposed MOTION for Leave to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief by USA Responses due by 5/26/2010(Wilson, Christopher) (Entered: 05/12/2010) |
| 05/13/2010 | 171 | | ORDER by District Judge James H. Payne: granting 170 Respondent's Unopposed Motion to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief (cjt, Deputy Clerk) (Entered: 05/13/2010) |
| 05/14/2010 | 172 | | TRANSCRIPT of Proceedings (Unredacted) of Status Hearing held on 3–31–2010 before District Judge James H. Payne (Court Reporter: Brian P. Neil) (Pages: 1–46). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without |

| | | | |
|---|---|---|---|
| | | | redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s) ) (bpn, Court Reporter) (Entered: 05/14/2010) |
| 05/14/2010 | 173 | | TRANSCRIPT ORDER FORM for Status and Scheduling Conference conducted on 3/31/10 (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s), 172 Transcript of Proceedings – Unredacted) by Kenneth Eugene Barrett (law, Deputy Clerk) (Entered: 05/17/2010) |
| 05/17/2010 | 174 | | Redacted RESPONSE in Opposition to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 05/17/2010) |
| 05/17/2010 | 175 | | SEALED RESPONSE (Re: 174 RESPONSE to Motion; 95 Amended MOTION to Vacate, Set Aside or Correct a Sentence) by USA (dma, Deputy Clerk) (Entered: 05/17/2010) |
| 06/30/2010 | 176 | | Unopposed MOTION for Leave to Exceed Page Limitation *For Reply Brief* by Kenneth Eugene Barrett Responses due by 7/14/2010(Schardl, Tivon) (Entered: 06/30/2010) |
| 06/30/2010 | 177 | | MINUTE ORDER by District Judge James H. Payne: granting 176 Petitioner's Unopposed Motion for Leave to File Oversized Brief (cjt, Deputy Clerk) (Entered: 06/30/2010) |
| 07/01/2010 | 178 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 07/01/2010) |
| 07/23/2010 | 179 | | NOTICE of Filing of Signed Declaration of Toby Barrett (Re: 178 Reply to Response to Motion ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 07/23/2010) |
| 08/13/2010 | 180 | | REPORT AND RECOMMENDATION ON REQUEST FOR EXCESS COMPENSATION by Magistrate Judge Steven P. Shreder (Re: 105 Minute Order Referring CJA 30 Voucher) Objections to RRdue by 8/27/2010(eje, Deputy Clerk) (Entered: 08/13/2010) |
| 09/03/2010 | 181 | | SEALED ORDER by District Judge James H. Payne: Re: 180 Report and Recommendation) (cjt, Deputy Clerk) (Entered: 09/03/2010) |
| 09/03/2010 | | | CJA 30: Authorization to Pay David B. Autry on behalf of Kenneth Eugene Barrett. (JHP 9/3/10)(smg, Deputy Clerk) (Entered: 09/14/2010) |
| 02/07/2011 | 182 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 2/22/2011 (With attachments)(Fisher, Joan) (Entered: 02/07/2011) |
| 02/08/2011 | 183 | | MINUTE ORDER by District Judge James H. Payne: granting 182 Petitioner's Unopposed Motion to Seal. Petitioner is given leave to file the following documents under seal: Petitioners Motion to Vacate or Modify |

| | | | |
|---|---|---|---|
| | | | Protective Order and Request for Hearing; Brief in Support of Motion to Vacate or Modify Protective Order and Request for Hearing; Petitioners Motion for Leave to Conduct Discovery; and Petitioners Brief in Support of Motion to Conduct Discovery. (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 184 | | SEALED MOTION to Vacate or Modify Protective Orders and Request for Hearing by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 185 | | SEALED BRIEF in Support of 184 Petitioner's Sealed Motion to Vacate and/or Modify Protective Order and Request for Hearing (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 186 | | SEALED MOTION for Leave to Conduct Discovery by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 187 | | SEALED BRIEF in Support of 186 Sealed Motion to Conduct Discovery (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/17/2011 | 188 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 186 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 189 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 184 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 190 | | MINUTE ORDER by District Judge James H. Payne: granting 188 and 189 Government's Motions for Extension of Time to Respond to Motions; Responses due by 3/8/2011 Re: 184 Petitioner's SEALED MOTION to Vacate or Modify Protective Orders and 186 Petitioner's SEALED MOTION for Leave to Conduct Discovery (cjt, Deputy Clerk) (Entered: 02/17/2011) |
| 03/04/2011 | 191 | | Unopposed MOTION to Seal Document by USA Responses due by 3/18/2011(Kahan, Jeffrey) (Entered: 03/04/2011) |
| 03/04/2011 | 192 | | MINUTE ORDER by District Judge James H. Payne: granting 191 Respondent's Motion to File Sealed Oppositions to Sealed Motions (cjt, Deputy Clerk) (Entered: 03/04/2011) |
| 03/08/2011 | 193 | | SEALED RESPONSE in Opposition (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/08/2011 | 194 | | SEALED RESPONSE in Oposition (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/18/2011 | 195 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 4/1/2011 (With attachments)(Fisher, Joan) (Entered: 03/18/2011) |
| 03/18/2011 | 196 | | MINUTE ORDER by District Judge James H. Payne: granting 195 Petitioner's Motion to Seal Replies to documents 193 and 194 (cjt, Deputy Clerk) (Entered: 03/18/2011) |
| 03/21/2011 | 197 | | |

| | | | |
|---|---|---|---|
| | | | SEALED REPLY to Response (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/21/2011 | 198 | | SEALED REPLY to Response (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/16/2012 | 199 | | NOTICE of Filing of Declaration of Paul D. Gordon (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) Modified to reflect DVDs for Exhibits 2, 3 and 4 stored in file cabinet in vault on 2nd floor Court Clerk's Office (cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/16/2012 | 200 | | NOTICE of Filing of Declaration of Leonard Post (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 03/16/2012) |
| 03/16/2012 | 201 | | MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett Responses due by 3/30/2012 (With attachments)(Fisher, Joan) Modified to reflect CDs of Appendix A and Appendix B stored in file cabinet in vault on 2nd floor Court Clerk's Office(cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/19/2012 | 202 | | CERTIFICATE of Service (Re: 199 Notice (Other) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/19/2012 | 203 | | CERTIFICATE of Service (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/29/2012 | 204 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 201 Motion to Supplement) by USA; Responses due by 4/12/2012 (With attachments)(Wilson, Christopher) Modified on 3/30/2012 (cjt, Deputy Clerk). (Entered: 03/29/2012) |
| 03/30/2012 | 205 | | MINUTE ORDER by District Judge James H. Payne: granting 204 Motion for Extension of Time to Respond to Motion; Response deadline extended to 4/30/2012 (Re: 201 MOTION to Supplement) (cjt, Deputy Clerk) (Entered: 03/30/2012) |
| 04/27/2012 | 206 | | RESPONSE in Opposition to Motion (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by USA ;(Wilson, Christopher) (Entered: 04/27/2012) |
| 05/07/2012 | 207 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255,* 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/07/2012) |
| 06/18/2012 | 208 | | |

| | | | |
|---|---|---|---|
| | | | MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY by Kenneth Eugene Barrett. Responses due by 7/2/2012(Fisher, Joan) (Entered: 06/18/2012) |
| 06/18/2012 | 209 | | BRIEF in Support of Motion (Re: 208 MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/18/2012) |
| 06/20/2012 | 210 | | ORDER by District Judge James H. Payne denying 201 Motion for Leave to Supplement Pending Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence Under 28 U.S.C. Section 2255 (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/20/2012 | 211 | | MINUTE ORDER by District Judge James H. Payne denying 208 Motion to Preserve Testimony of Judge John Garrett, Retired, Without Further Delay (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/28/2012 | 212 | | MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* (Re: 210 Ruling on Motion to Supplement ) by Kenneth Eugene Barrett. Responses due by 7/12/2012(Fisher, Joan) (Entered: 06/28/2012) |
| 07/10/2012 | 213 | | RESPONSE in Opposition to Motion (Re: 212 MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* ) by USA ;(Wilson, Christopher) (Entered: 07/10/2012) |
| 08/16/2012 | 214 | | OPINION AND ORDER by District Judge James H. Payne: denying 95 Amended Motion to Vacate; denying 184 Sealed Motion; denying 186 Sealed Motion; denying 212 Motion to Reconsider (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 215 | | SEALED ORDER by District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 216 | | JUDGMENT by District Judge James H. Payne entering judgment in favor of USA against Kenneth Eugene Barrett (terminates case) (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 09/13/2012 | 217 | | MOTION to Alter Order/Judgment *and Brief in Support* (Re: 216 Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider ) by Kenneth Eugene Barrett. Responses due by 9/27/2012 (With attachments)(Fisher, Joan) (Entered: 09/13/2012) |
| 09/27/2012 | 218 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA. Responses due by 10/11/2012(Wilson, Christopher) (Entered: 09/27/2012) |
| 09/27/2012 | 219 | | ORDER by District Judge James H. Payne: granting 218 Motion for Extension of Time to Respond to Motion; Responses due by 10/29/2012 (Re: 217 MOTION to Alter or Amend Judgment) (cjt, Deputy Clerk) (Entered: 09/27/2012) |
| 10/29/2012 | 220 | | RESPONSE in Opposition to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA ; (With |

| | | | |
|---|---|---|---|
| | | | attachments)(Wilson, Christopher) (Entered: 10/29/2012) |
| 10/30/2012 | 221 | | OPINION AND ORDER by District Judge James H. Payne: denying 217 Petitioner's Motion to Alter or Amend Judgment (cjt, Deputy Clerk) (Entered: 10/30/2012) |
| 12/26/2012 | 222 | | NOTICE OF APPEAL to Circuit Court (Re: 216 Judgment, 221 Ruling on Motion to Alter Order/Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider, 215 Sealed Order ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 12/26/2012) |
| 12/27/2012 | 223 | | Transmission of Notice of Appeal and Docket Sheet to Circuit Court with copy of 222 Notice of Appeal, 216 Judgment, 221 Ruling, 214 Ruling and 215 Sealed Order. Preliminary Record transmitted to 10th Circuit Court of Appeals electronically. (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/27/2012) |
| 12/27/2012 | 224 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 12–7086 (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/28/2012) |
| 01/10/2013 | 225 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/10/2013) |
| 01/10/2013 | 226 | | DESIGNATION of Record on Appeal (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 01/10/2013) |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**DEFENDANT'S MOTION FOR COLLATERAL RELIEF**

---

**TABLE OF CONTENTS**

I.    Preliminary Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Statement Regarding Form  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Grounds for Disqualifying Trial Judge  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    Events Leading to the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.    The Alleged Offense and the Bench Warrant  . . . . . . . . . . . . . . . . . . . . 8

        2.    The Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        3.    September 24, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.    Three Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.    State Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.    Federal Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.  Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Claim 1.    Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel  . . . . . 17

    Claim 2.    Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. § 3006A and the Sixth Amendment to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        A.    Unreasonable Acts and Omissions Affecting the First and Second Stages of Trial  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

            Overview of First-Stage Ineffective Assistance . . . . . . . . . . . . . . 44

Evidence of Constitutionally Deficient Representation . . . . . . . . 48

1.      Failure to professionally re-urge the motion to suppress under *Franks v. Delaware,* 438 U.S. 154 (1978).  . . . . . . 48

Ineffective Assistance of Appellate Counsel . . . . . . . . . . . . . . . . 60

2.      Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

3.      Due to the unreasonable failure of Mr. Barrett's trial counsel to retain expert assistance, Mr. Barrett was tried while incompetent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

4.      But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder. . . . . . . . . 76

        a.      Travis Crawford . . . . . . . . . . . . . . . . . . . . . . . . . 78

        b.      Cindy Crawford . . . . . . . . . . . . . . . . . . . . . . . . . 86

        c.      Charles "Monk" Sanders . . . . . . . . . . . . . . . . . . . 94

                1.      Failure to adequately investigate and prepare to cross-examine Sanders about his previous convictions, charges against him that were dismissed, and the favorable treatment he often secured to escape punishment. . . . . . . . . . . . . . . . . . . . . . . . 94

                2.      Counsel was professionally unreasonable for failing to investigate and produce witnesses who could have impeached specific claims made by Sanders, and Sanders's credibility as a whole.  . . . . . . 113

        d.      Randy Weaver . . . . . . . . . . . . . . . . . . . . . . . . . 119

e.      Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . . 121

f.      Karen Real  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

g.      Randy Turman  . . . . . . . . . . . . . . . . . . . . . . . . . . 123

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

5.      Due to trial counsel's unreasonable failure to engage the
        services of an independent crime scene reconstruction
        expert, the jury considered and relied upon unscientific,
        unreliable evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

6.      The outcome of the trial is unreliable due to trial
        counsel's unreasonably failure to present an independent
        expert to demonstrate that the raid on Mr. Barrett's house
        was rife with tactical errors and poor planning, and that
        these failures in the "rules of engagement" contributed to
        Trooper Eales's death . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

7.      Mr. Barrett's trial counsel unreasonably failed to impeach
        law enforcement witnesses with prior inconsistent
        statements from the state trials . . . . . . . . . . . . . . . . . . . . 144

8.      Counsel was professionally unreasonable for failing to
        introduce readily available evidence that would have
        impeached the Government's claim that aside from
        Trooper Hamilton's vehicle, the other police vehicles that
        entered Mr. Barrett's property had emergency lights on.
        This evidence would have raised significant doubts about
        the Government's claim that Mr. Barrett "knew" he was
        firing on police officers. . . . . . . . . . . . . . . . . . . . . . . . . . 149

        a.      Toby Barrett  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

        b.      Alvin Hahn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

9.      Trial counsel was professionally unreasonable for failing to
        investigate, develop and introduce evidence that, contrary
        to the Government's argument, Mr. Barrett was unaware he
        was subject to an active felony arrest warrant at the time of
        the shooting incident, was not "hiding out" on his property
        in anticipation of a police raid, and was not prepared to
        meet any police presence with violence.  . . . . . . . . . . . . 154

10.  Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.  . . . . . . . . . . . . . . . . . . . . . . . . 160

11.  The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions  . . . . . . . . . . . . . . . . . . . . . . . . . . 175

12.  Trial counsel were ineffective for failing to adequately preserve the record, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

13.  Counsel was professionally unreasonable for failing to object to numerous instances of prosecutorial misconduct in closing argument in both stages of trial.  . . . . . . . . . . . . 180

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

B.  Unreasonable Acts and Omissions Affecting the Second Stage of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

1.  Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

2.  Prejudice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

a.  The family, social, and medical background of Kenny Barrett  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Family History of Mental Illness  . . . . . . . . . . . . . . . . . . 191

Maternal Family Mental Illness . . . . . . . . . . . . . . . . . . . 191

Paternal Family Mental Illness . . . . . . . . . . . . . . . . . . . . 193

Maternal Family History  . . . . . . . . . . . . . . . . . . . . . . . . 195

Paternal Family History . . . . . . . . . . . . . . . . . . . . . . . . . 198

Family of Origin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Infancy and Childhood Development  . . . . . . . . . . . . . . 207

Onset of Mental Illness  . . . . . . . . . . . . . . . . . . . . . . . . 216

b.    Kenny Barrett's mental illness and organic
brain dysfunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

c.    The prosecution's exploitation of trial counsel's
deficient performance  . . . . . . . . . . . . . . . . . . . . . . . . . 231

3.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

Claim 3.    Mr. Barrett was Denied his Rights to Due Process and Equal Protection of
the Laws, and his Right to Expert and Investigative Assistance under 18
U.S.C. § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Claim 4.    Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and
Fourteenth Amendments to the United States Constitution Were
Violated by the Use of False Information in Obtaining the
No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search
Warrant Obtained by Clint Johnson Was Invalid under *Franks v.
Delaware,* 438 U.S. 154 (1978).  Appellate Counsel Was
Ineffective for Failing to Raise the Issue on Direct Appeal . . . . . . . . . . 247

Claim 5.    Mr. Barrett was Denied his Fifth Amendment Right to Due Process,
his Sixth Amendment Rights to Counsel and Confrontation, and his
Eighth Amendment Right to a Fair and Reliable Capital Sentencing
Process Due to the Government's Suppression of Exculpatory
Evidence, Knowing use of Perjured Testimony, and Failures to
Correct False Testimony; Mr. Barrett is Entitled to Relief
from his Conviction and Sentence Based on Newly
Discovered Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

A.    Suppressed Exculpatory Evidence, Evidence of Knowing use of
Perjured Testimony, and Newly Discovered Evidence  . . . . . . . 257

1.    Evidence regarding informant witnesses Charles
"Monk" Sanders, Travis Crawford, Cindy Crawford,
Brandie Zane Price, Karen Real and Randy Turman
entitles Mr. Barrett to relief from his convictions and
sentences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

a.    Charles "Monk" Sanders . . . . . . . . . . . . . . . . . 257

        b.       Travis Crawford . . . . . . . . . . . . . . . . . . . . . . . . . 262

        c.       Cindy Crawford . . . . . . . . . . . . . . . . . . . . . . . . . 267

        d.       Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . . 273

        e.       Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

        f.       Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . . 277

    2.      The Government failed to reveal exculpatory evidence of a witness who failed to corroborate Charles Sanders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278

B.      The Judgements of Conviction and Sentence Should be Vacated Based on the Suppression and New Discovery of Evidence Undermining the Credibility of Key Law Enforcement Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

    1.      Evidence of Clint Johnson's illicit activities . . . . . . . . . 280

    2.      David Michael Littlefield's illicit activities . . . . . . . . . . 286

    3.      John Philpot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290

C.      Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

D.      Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses . . . . . . . . . . . . . . . . . . . . . . 297

Claim 6.      Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements . . . . . . . . . . . . . . . . . . . . . . . 303

Claim 8.      Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution . . . . 310

Claim 9.      Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense. Direct Appeal Counsel Was Ineffective for Failing to Raise this Issue. . . . . . . 314

Claim 10.    Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

Claim 11.    Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option. Appellate Counsel Was Ineffective for Failing to Raise this Issue on Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Claim 12.    The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

Claim 13.    Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 336

Claim 14.    Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact. . . . . . . . . . . . . . . . . . . . . . . . 348

Claim 15.    Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 351

Claim 17    Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case . . . . . . . . . . . . 354

IV.    Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 355

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Adams v. Texas, 448 U.S. 38 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19

Ake v. Oklahoma, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Alcorta v. Texas, 355 U.S. 28 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

Apprendi v. New Jersey, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333, 334

Banks v. Dretke, 540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Bates v. Bell, 402 F.3d 635 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Batson v. Kentucky, 476 U.S. 76 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Beck v. Alabama, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315, 318

Bouchillon v. Collins, 907 F.2d 589 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 311

Bowen v. Maynard, 799 F.3d 593 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Brecht v. Abrahamson, supra, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brooks v. Tennessee, 406 U.S. 605 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Bush v. Gore, 531 U.S. 98 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Carey v. Duckworth, 738 F.2d 875 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Carter v. Bowersox, 265 F.3d 705 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Cooper v. Oklahoma, 517 U.S. 348 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Crane v. Kentucky, 476 U.S. 683 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Crivens v. Roth, 172 F.3d 991 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264, 266, 271

Crowe v. Sanders, 864 F.2d 430 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Cuyler v. Sullivan, 446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Darden v. Wainwright, 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297, 302

Davis v. Polk, 2007 WL 2898711 (W.D.N.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . passim

Deck v. Missouri, 544 U.S. 622 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Delaware v. Van Arsdale, 475 U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297, 302

Driscoll v. Delo, 71 F.3d 701 (8th  Cir. 1995),
*cert. denied,* 519 U.S. 910 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 139

Drope v. Missouri, 420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Duckett v. Mullin, 306 F.3d 982 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 300

Dunn v. Roberts, 963 F.2d 308 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Dusky v. United States, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314

Eagle v. Linahan, 279 F.3d 1283 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Eddings v. Oklahoma, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

Eddmonds v. Peters, 93 F.3d 1307 (7th Cir. 1996),
cert. denied, 520 U.S. 1172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Estelle v. McGuire, 502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Estelle v. Williams, 425 U.S. 501 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Evitts v. Lucey, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Felde v. Butler, 817 F.2d 281 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Ferguson v. Georgia, 365 U.S. 570 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fero v. Kerby, 39 F.3d 1462 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254, 290

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Freeman v. Class, 95 F.3d 639 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 175

Geders v. United States, 466 U.S. 648 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Gilbert v. Mullen, 302 F.3d 1166 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

Giles v. Maryland, 386 U.S. 66 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262, 257

Godfrey v. Georgia, 446 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 330

Godinez v. Moran, 509 U.S. 389 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 346

Gordon v. Kelly, 2000 WL 145144 (6th Cir. Feb. 1, 2000) . . . . . . . . . . . . . . . . . . . . . . . . 301

Gravely v. Mills, 87 F.3d 779 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Gray v. Mississippi, 481 U.S. 648 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Greer v. Miller, 483 U.S. 756 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966),
*cert. denied*, 396 U.S. 865 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 292

Hall v. Washington, 106 F.3d 742 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Hamilton v. Alabama, 368 U.S. 52 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Herring v. New York, 422 U.S. 853 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 175

High v. Head, 209 F.3d 1257 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Hodge v. Hurley, 426 F.3d 368 (6th Cir.  2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Hogan v. Gibson, 197 F.3d 1297 (10th Cir. 2000),
*cert. denied,* 121 S.Ct. 332 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

Holbrook v. Flynn, 475 U.S. 560 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Holloway v. Arkansas, 435 U.S. 475 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Horton v. Massie, 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished) . . . . . . . . . . . . . . 128

Hull v. Kyler, 190 F.3d 88 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 343

Illinois v. Allen, 397 U.S. 337 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308, 343, 344

Iimbler v. Pachtman, 424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Jaffee v. Redmond, 518 U.S. 1 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Jones v. Polk, 401 F.3d 257 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305, 306

Keeble v. United States, 412 U.S. 205 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 316

Kimmelman v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . 47, 137, 165

Kyles v. Whitley, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253, 254

Lankford v. Idaho, 500 U.S. 110 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 300

Liles v. Saffle, 945 F.2d 333 (10th Cir. 1991),
cert. denied, 502 U.S. 1066 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302, 304, 307

Marchu v. United States, 926 F.3d 50 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Martin v. Grosshans, 424 F.3d 588 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

McCracken v. Gibson, 268 F.3d 970 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Medina v. California, 505 U.S. 437 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 311

Mickens v. Taylor, 535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Miller v. Pate, 386 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257, 279, 286

Mitchell v. Gibson, 262 F.3d 1036 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Mooney v. Hollohan, 294 U.S. 103 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257, 279

Moore v. Illinois, 408 U.S. 786 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Mullaney v. Wilbur, 421 U.S. 684 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 319

In re Murchison, 349 U.S. 133 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Murray v. Carrier, 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Napue v. Illinois, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

Nuckols v. Gibson, 233 F.3d 1261 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Odle v. Woodford, 238 F.3d 1084 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Pate v. Robinson, 383 U.S. 375 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Patton v. Mullin, 425 F.3d 788 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Paxton v. Ward, 199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 299, 302

Peltier v. Booker, 348 F.3d 888 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Polk County v. Dodson, 454 U.S. 312 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Powell v. Alabama, 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Reynolds v. Norris, 86 F.3d 796 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

Reynoso v. Giurbino, 462 F.3d 1099 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Riggins v. Nevada, 504 U.S. 127 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ring v. Arizona, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333, 334, 351

Rock v. Arkansas, 483 U.S. 44 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Rompilla v. Beard, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

Schmuck v. United States, 489 U.S. 705 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Scott v. Mullin, 303 F.3d 1222 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 291

Skipper v. South Carolina, 476 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304, 307

Smith v. Gibson, 197 F.3d 454 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Smith v. Roberts, 115 F.3d 818 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Snowden v. Singleterry, 135 F.3d 732 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Steidl v. Fermon, 494 F.3d 623 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Strickler v. Green, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253, 290

Sullivan v. Louisiana, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

Taylor v. Kentucky, 436 U.S. 478 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Thomas v. Goldsmith, 979 F.2d 746 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Tuggle v. Netherland, 526 U.S. 10 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Tumey v. Ohio, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Turrentine v. Mullin, 390 F.3d 1181 (10th Cir. 2004),
*cert. denied*, 545 U.S. 1106 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

United States v. Abeyta, 27 F.3d 470 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 316

United States v. Antone, 603 F.3d 566 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

United States v. Bagley, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254, 290

United States v. Barnette, 211 F.3d 803 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 236

United States v. Barrett, 469 F.3d 1079 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 178

United States v. Bodkins, 2005 WL 1118158 (W.D. Va. May 11, 2005) . . . . . . . . . . . . . . . 322

United States v. Bridwell, 583 F.2d 1135 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

United States v. Burbage, 365 F.3d 1174 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Calisto, 838 F.2d 711 (3rd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 316

United States v. Davis, 132 F. Supp. 2d 455 (E.D. La. Feb. 2, 2001) . . . . . . . . . . . . . . . . . . . 322

United States v. Deleon, 979 F.2d 761 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. ex rel. Gregory Madef, 223 F. Supp. 2d 968
(N.D. Ill. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

United States v. Hernandez, 94 F.3d 606 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

United States v. Honken, 378 F. Supp. 2d 1040 (N.D. Iowa 2004) . . . . . . . . . . . . . . . . . . . . . 322

United States v. Humphrey, 208 F.3d 1190 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 176

United States v. Joe, 8 F.3d 1488 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

United States v. Johns, 851 F.2d 1311 (9th Cir. 1988),
cert. denied, 505 U.S. 1226 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Johnson, 130 F.3d 1420 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Johnson, 520 U.S. 461 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Kennedy, 131 F.3d 1371 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Libby, 429 F. Supp. 2d 1 (D. D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Lofton, 776 F.2d 918 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 319

United States  v. McIntosh, 124 F.3d 1330 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Novaton, 271 F.3d 968 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 345

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Osorio, 929 F.2d 753 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Pritchard, 745 F.2d 1112 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Quintanilla, 193 F.3d 1139 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 253, 255

United States v. Ramsey, 323 F. Supp. 2d 27 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 174

United States v. Rich, 580 F.2d 929 (9th Cir.),
cert. denied, 439 U.S. 935 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

United States v. Rosales-Rodriguez, 289 F.3d 1106 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 344

United States v. Sands, 899 F.2d 912 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

United States v. Scafe, 822 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 317

United States v. Serawop, 410 F.3d 656 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

United States v. Sinclair, 109 F.3d 1527 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

United States v. Sloan, 776 F.2d 926 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

United States v. Smith, 543 F.3d 1211 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Soundingsides, 820 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . 70, 317

United States v. Thomas, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266
(D.Md. January 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

United States v. Visinaiz, 428 F.3d 1300 (10th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

United States v. Warner, 23 F.3d 287 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Viereck, v. United States, 318 U.S. 236 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Village of Willowbrook v. Olech, 528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Wainwright v. Witt, 469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Washington v. Hofbrauer, 228 F.3d 689 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 181

Williamson v. Ward, 110  F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Witherspoon v. Illinois, 391 U.S. 510 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Wood v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 18

Woodson v. North Carolina, 428 U.S. 280 (1976)  . . . . . . . . . . . . . . . . . . . . . . . . . . 178, 179, 335

## STATE CASES

Dunkle v. State, 139 P.3d 228 (Okl. Cr. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140, 141

## DOCKETED CASES

In re Clint Johnson, No. 01-72501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

Crawford v. Mattox, Sequoyah County Case No. P-03-458 . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Michael Mackey, et al. v. Cindy Crawford, Sequoyah County Case No. PO-03-390 . . . . . . . . . 90

State of Oklahoma v. Richard Loy Gray, Jr. Cherokee County Case No. CF-2007-28 . . . 283, 284

United States v. McAdams, et al., No. CR-07-16-RAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

## FEDERAL STATUTES

21 U.S.C. §§ 848(q)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 42, 236

18 U.S.C. § 3432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

18 U.S.C. § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 293, 294, 351

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 334

18 U.S.C. § 3599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 33

18 U.S.C. § 4241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

28 U.S.C. §§ 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Fed. R. Civ.P. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Fed. R  Crim.P. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Fed. R. Crim.P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

Fed. R. Crim.P. 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 276

Fed. R. Crim.P. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Fed. R. Evid. 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

Fed. R. Evid. 608 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Evid. 615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Fed. R. Evid 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:04-CR-00115-JHP-SPS |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR COLLATERAL RELIEF

COMES NOW defendant KENNETH EUGENE BARRETT, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence. Through counsel, Mr. Barrett states the following grounds for granting this motion:

I.      **Preliminary Matters**

A.      **Statement Regarding Form**

In accordance with Rule 2 of the Rules Governing Section 2255 Cases, this Motion sets forth only the facts and claims entitling Mr. Barrett to relief. It does not contain legal argument or citation. Mr. Barrett will shortly file a separate motion seeking permission and a schedule by which to file a Memorandum in Support of the Motion.

References to prior proceedings are as follows:

- References to the consecutively paginated trial transcripts:  R. *xxx*;

- References to hearing transcripts not consecutively paginated with the

trial transcripts:  Tr. [date] Hr'g;

- References to documents filed with the court such as pleadings, motions,

and orders cite the docket number:  Doc. *xxx*

- References to the two state trials:  1st St. Tr. Tx at *xxx*, and 2nd St. Tr.

Tx at *xxx*;

- References to the exhibits to this Motion are by the name of the exhibit;

- All other references are self-explanatory or based on the Blue Book.

**B.      Grounds for Disqualifying Trial Judge**

In Claim 1 and elsewhere in this Motion, Mr. Barrett relies upon evidence of the

trial judge's on- and off-the-record actions in relation to Mr. Barrett's defense, including *ex parte*

communications with prosecutors.  The evidence that must be considered in evaluating this

Motion disqualifies the trial judge from making any rulings affecting the process for adjudicating

this Motion or the merits of any claims stated herein.  28 U.S.C. §§ 455(a), (b)(1), (b)(3),

(b)(5)(iv); *Marchu v. United States*, 926 F.3d 50, 59 (1st Cir. 1991) (specific allegations about

off-the-record actions of trial judge required that § 2255 motion be heard by different judge).

Therefore, this Motion requests that the trial judge recuse himself without making any further

rulings in the case.

Mr. Barrett will make a separate motion to recuse.  However, the principle that no

person can be a judge in his own case, *In re Murchison*, 349 U.S. 133, 136 (1955), is sufficiently

well established and invoked by the facts presented herein that recusal should not await a formal

motion.  It would be a violation of due process for the trial judge to make any rulings regarding this motion.  *Aetna Life Insurance Company v. Lavoie*, 475 U.S. 813 (1986).

**C.     Introduction**

Kenneth Eugene Barrett was acquitted of the murder for which he now sits on death row.  After an Oklahoma jury convicted him of manslaughter, the Government presided over an unfair trial in this court in order to obtain a death sentence in response to anger over the result of the state proceedings.  The trial in this court could fairly be described as a travesty.

In order to improve their chances of obtaining the desired result, the Government loaded the dice with seven drug-addict informants who were nowhere to be found during the five years Mr. Barrett's state case was pending, but who materialized at the last minute to provide the Government much needed "evidence" of intent.  A number of these noxious characters dutifully marched to the witness stand to recite "statements" from Mr. Barrett that he intended to kill any law enforcement officer who stepped on his property.  Some of these witnesses also sought to portray Mr. Barrett as a drug manufacturer, even though no drug lab was found on his property when it was searched after Oklahoma Highway Patrol Trooper David "Rocky" Eales was tragically killed.

In handling these witnesses, the Government used a carrot and stick approach.  To get them to toe the mark, the Government employed intimidation and threats with at least two of them, Travis and Cindy Crawford.  This strong-arm tactic was headed up by disgraced former Assistant United States Attorney David Michael Littlefield, who was charged in 2007 with beating his children, and whose license to practice law is currently in peril based on charges filed by the Oklahoma Bar Association as a result of his child abuse case.

The carrot was undisclosed deals only vaguely hinted at during trial, or concealed altogether, and only consummated at or after the conclusion of Mr. Barrett's trial. The big winner in the snitch sweepstakes was Charles "Monk" Sanders, an eighteen-time (at least) convicted felon who was the alleged "C.I." for corrupt Drug Task Force officer Clint Johnson's search warrant for Mr. Barrett's residence, which set this entire tragedy in train. Sanders, who was permitted by Seqouyah County officials to run riot despite an almost unending series of convictions, saw any future jail time evaporate, had "split sentences" he never should have received in numerous felony cases reduced to straight *unsupervised* probation, and was even excused from paying any costs or fines in his cases, all courtesy of the Government and state prosecutors after he testified at Mr. Barrett's trial.

Others were also rewarded for their testimony. Karen Real, serving a fourteen year federal sentence in a drug manufacturing and firearms case, saw her sentence reduced to time served on the Government's Rule 35 motion shortly after Mr. Barrett was convicted and sentenced to death. Brandie Zane Price, a convicted felon who was depicted as having been delivered from her drug addiction at the time she testified against Mr. Barrett, was later charged in the Eastern District with being a member of a wide-ranging drug conspiracy. In the indictment filed against her and others, Price was charged with having started her participation in the drug conspiracy just a few short weeks after Mr. Barrett was formally sentenced. Randy Turman, a methamphetamine manufacturer who had a pending six-count drug case hanging over his head at the time he testified against Mr. Barrett, falsely testified on cross-examination that his case had "done been taken care of," when in fact it had not. The Government surely knew Turman was lying, but sat silently by and allowed him to perjure himself, in derogation of its duty to correct

false testimony.  In 2007, after being inactive for years, Turman's case was dismissed by Sequoyah County prosecutors "in the interests of justice."

The Government knew it still had a shaky edifice on its hands.  With sufficient time and a competent defense investigation, it would take but a few prods for the whole ramshackle thing to come crashing down.  In order to prevent investigation by the defense, the Government contrived to keep the identity of these witnesses secret for as long as possible to forestall any effective defense investigation.  As the general jury qualification process in Mr. Barrett's trial began, the Government filed a spurious sealed motion to delay identifying the names and addresses of the snitch witnesses.  An improper *ex parte* hearing was conducted by the court on the motion.  As the court quickly realized, the Government had zero evidence for its request; none of these witnesses were in the least bit of danger.  Outside the presence of defense counsel, their Government adversaries were allowed to speak for them on the question of whether the trial and already begun, thus precluding the informants from testifying under the applicable notice statute, and what steps the Government proposed so the defense would eventually have "access" to these witnesses.  The court recognized a lengthy continuance would likely be necessary to permit proper time for defense preparation.  In passing, AUSA Littlefield let slip he was aware of a witness who would contradict Charles Sanders.

When the hearing was eventually unsealed and defense counsel were allowed to "participate," neither the court nor the Government informed the defense of what had gone on behind closed doors.  What had occurred was misrepresented to defense counsel.  There was no reason to keep what had transpired at the hearing secret, since there was no basis for the Government's motion to begin with.  Defense counsel were led down the primrose path, hastily agreeing to an arrangement whereby they would be allowed, under Government supervision, to

Def's § 2255 Mot.                                       5                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

interview the informant witnesses.  However, except in one instance, these witnesses refused to speak to the defense.  Having agreed to what the Government presented as a fait accompli, the ability of defense counsel to investigate and impeach these witnesses, and to marshal independent evidence contradicting them, went up in smoke.  Mr. Barrett shows in this motion that with a competent investigation, the credibility of the Government's key witnesses would have been destroyed.

The Government's tactics of secrecy, obfuscation and misdirection, exemplified by what occurred at the *ex parte* hearing, typified the prosecutors' conduct of the entire case.  Mr. Barrett shows in this motion that the Government routinely violated its duties to disclose exculpatory evidence, and also sponsored or knowingly allowed materially false testimony.

Well before the *ex parte* hearing, Mr. Barrett found the sledding rough in his efforts to receive what every criminal defendant in this country is entitled to as a matter of fundamental constitutional right: a fair trial.  Mr. Barrett had to contend not only with prosecutors who were determined to press every fair and unfair advantage at their disposal, but the court as well.

From the inception of the case the court demonstrated concerns with and an interest in matters inconsistent with providing Mr. Barrett competent representation.  Tulsa attorney John Echols successfully represented Mr. Barrett in state court.  He was obviously the best choice to defend Mr. Barrett against the late-coming federal charges.  The court only appointed Mr. Echols as a means of saving money, and rejected the Federal Defenders' recommendations of qualified co-counsel in order to give less-qualified local counsel experience needed to form the basis for a local panel of capital attorneys.  The court's furtherance of these

interests virtually forced Mr. Echols off the case, including by withholding compensation for the budgeting investigation the court required Echols to undertake.

After Mr. Echols threw up his hands in frustration and withdrew from the case, more compliant counsel saw it to its predictable end.  Mr. Barrett demonstrates in this motion that trial counsel, due to a combination of interference from the court and their own unprofessional errors and omissions, rendered ineffective assistance in the guilt/innocence stage of trial.  Counsel failed to consult any experts, or even question the purported "expertise" of Government witnesses whose qualifications and methods the court recognized as lacking.

Trial counsel, in part deceived by the court and Government following *ex parte* communications, failed to seek a continuance to investigate the seven secret informants.  Mr. Barrett shows here that even moderate investigation would have shown these witnesses were unworthy of belief.

Counsel's ineffectiveness, again for the same combination of reasons, continued into the penalty phase.  Because counsel were underfunded and failed to properly prepare, the prosecution was able to portray Mr. Barrett as nothing more than a mean, common criminal from an ordinary, unremarkable background, who had simply decided to embark on the path that led him to the courtroom.  Defense counsel did virtually nothing to counter the prosecution's depiction of their client, putting on a superficial and misleading mitigation case that both played right into the Government's hands and failed utterly to reveal Mr. Barrett's true character, history and background.

Mr. Barrett was and is nothing like the prosecution argued.  A competent mitigation investigation would have shown the truth about him.  Severe mental illness has plagued Mr. Barrett's family for generations.  As shown in this motion, Kenneth Barrett has

Def's § 2255 Mot.  7  *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

struggled with severe organic, psychiatric, psychological and intellectual impairments his whole life. This evidence would have been relevant not only in the penalty phase, but in the first stage of trial as well.

Far from being a "bad person" who came from an ordinary background and simply chose to walk a twisted road, Kenneth Barrett is the product of a woefully dysfunctional marriage, a union that was rife with alcohol and other substance abuse, mental dysfunction, chaos, emotional and at times physical abuse, and infidelity. Kenneth Barrett's upbringing was anything but normal. As he struggled from birth with his genetic inheritance, he was forced to grow up in the maelstrom of chaos and neglect created by his parents. The psychological and emotional abuse his parents visited on each other as their doomed-from-the-start marriage unraveled was, from the beginning of his life, visited on him.

The numerous constitutional errors that marred Mr. Barrett's trial require that he be granted relief from his convictions and sentences.

## II.    Statement of the Case

### 1..    Events Leading to the Offense

#### 1.    The Alleged Offense and the Bench Warrant

In March 1997, Mr. Barrett was charged with unlawful delivery of a controlled substance arising from the alleged sale of $25 of methamphetamine to an undercover agent. In the court proceedings for this case, Attorney Bill Ed Rogers represented Mr. Barrett until September 11, 1998, when Mr. Rogers filed a motion to withdraw from the case. The court docket reflects that Mr. Barrett asked the Court for an appointed attorney on December 14, 1998; however, there is no indication that the court appointed an attorney for him. There was no other activity in the case until January 19, 1999, when the docket stated that "subp's issued."

On January 28, 1999, a bench warrant was issued for Mr. Barrett for "failing to appear for jury trial" on January 27, 1999. Mr. Barrett's bail bondsmen, Martin Daggs, testified that he eventually became aware of the bench warrant but never saw a need to notify Mr. Barrett about the warrant. Mr. Daggs stated that he knew where Mr. Barrett lived and he could find him if he wanted to.

### 2.   The Search Warrant

Eight months after the issuance of the bench warrant, Clint Johnson, the supervising agent and field supervisor for the District Twenty-Seven Drug Task Force (Task Force) prepared an affidavit for a search warrant for Mr. Barrett's residence. The affidavit asserted that a confidential informant had seen Mr. Barrett sell drugs on one occasion between September 15 and 18, 1999; that he had seen Mr. Barrett engage in other drug transactions at his house; that he had overheard Mr. Barrett say "'if the cops try to raid me they will regret it because I'm going to kill the first cop through the door'"; that Mr. Barrett had guns in his house; and that Mr. Barrett sold drugs at night because he believed search warrants could not be served at night. (At trial the confidential informant was identified as Charles "Monk" Sanders. Sanders testified and on cross-examination denied having seen, heard, done, and said the specific things attributed to him in Johnson's affidavit.)

On September 20, 1999, a District Court Clerk signed the requested search warrant which authorized law enforcement officers to conduct the search at any time of the day or night and to enter Mr. Barrett's residence without the normally required knocking and announcing their presence. Inexplicably, there did not appear to have been any discussion about simply paying a visit to Mr. Barrett, despite the fact that law enforcement had visited Mr. Barrett in the recent past and even inspected his weapons without any violence.

In any event, Johnson considered the search warrant to be "high risk" in nature and contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance in serving the warrant. Johnson met with Tact Team members to discuss the execution of the warrant. It was determined that the Tact Team would enter and secure the area first, and that the Task Force would then perform the actual search of Barrett's residence. The Tact Team decided that, because the front gate to Barrett's property was locked, three of the Tact Team vehicles, two Ford Broncos and a marked highway patrol unit, would enter Barrett's property by first driving north on a private driveway that lay to the east of Barrett's property, and then driving west across the land and through a ditch onto Barrett's property.

### 3.        September 24, 1999

Until late in the night of September 23 and after midnight on the September 24, Mr. Barrett and his son Toby had worked in their garage on a Camaro Mr. Barrett had promised to Toby if he returned to high school.  After they finished up around 12:30 A.M., Toby cleaned up the garage and was walking to his trailer.  At that time, the five Tact Team vehicles headed towards Mr. Barrett's residence.  What happened next was the subject of conflicting accounts by the law enforcement officers involved.

The lead Tact Team vehicle, a white Ford Bronco, drove eastward on the gravel road that passed in front of Mr. Barrett's residence.  The driver, Trooper John "Buddy" Hamilton, observed Toby as he entered the private driveway to the east of Barrett's residence, but continued with the execution of the no-knock warrant.  Hamilton then turned his vehicle westward towards Mr. Barrett's house and entered a deep ditch that lay between Mr. Barrett's cabin and the property to the east, and drove straight towards the house.

Toby screamed, "Dad," as the unmarked Bronco continued toward the porch.

Mr. Barrett was eating a bowl of cereal when he heard Toby yell.  He went to the doorway and saw the high-beam bright headlights coming towards his cabin from the ditch on the side of his house.  Mr. Barrett ran inside, grabbed a gun and shoved it in his waistband and went to the window.  As Mr. Barrett approached the window, he was shot in the lower portion of his body.  Mr. Barrett  grabbed his Colt Sporter rifle, which was loaded with two full and one partially full magazine of ammunition, and started firing out the doorway.

The lead Bronco hit the porch of the cabin.  As it had been approaching, the second and third vehicles entered the property.  They stopped slightly behind Hamilton's vehicle. Meanwhile, Troopers Gene Hise and Robert Darst, who arrived at the scene in the fourth Tact Team vehicle, climbed over the locked front gate, entered the yard in front of Mr. Barrett's house, and yelled at Toby to get on the ground.  Trooper Darst eventually took custody of Toby Barrett and determined he was unarmed.

The shooting lasted less than thirty seconds.  At some point, Hamilton's passenger, Trooper David "Rocky" Eales, opened the front passenger door, got out of the vehicle, and began moving towards the rear of the vehicle. Before he arrived at the rear of the vehicle, Trooper Eales was struck by three bullets or bullet fragments.

Meanwhile, Hamilton threw a diversionary device out of the driver's side window of his vehicle, causing a noticeable flash and loud bang. The flash and bang created a stoppage of gunfire, during which Hamilton got out of the driver's side of his vehicle. Hamilton then moved towards the rear of his vehicle. As he did so, he was shot in the back of the left shoulder. When he reached the back of the vehicle, Hamilton observed Eales face down on the ground, with Trooper Ricky Manion attempting to assist him.

At some point in the melee, Manion shot Mr. Barrett in the lower body. Hamilton approached and entered the house, told Mr. Barrett to get up, and Mr. Barrett responded that he could not because he had been shot. Hamilton, with the assistance of Troopers Manion and Steve Hash, dragged Mr. Barrett out of the house and into the front yard and beat him. Mr. Barrett had been shot four times.

After unsuccessfully attempting to provide first aid to Trooper Eales, Tact Team members transported him to a local hospital, where he was pronounced dead. A search of Mr. Barrett's property, including his house and outbuildings, failed to yield methamphetamine. The government seized items that it contended were related to the production and use of methamphetamine, including coffee filters, pseudoephedrine, ephedrine tablets, red phosphorus, and iodine.

**B.      Three Trials**

**1.      State Trials**

Mr. Barrett was tried in Oklahoma State court, twice, as set out more fully in the Procedural History. The state court jury rejected the first-degree murder charge and instead found Mr. Barrett guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Mr. Barrett guilty of the lesser-included offense of assault and battery with a dangerous weapon.  The jury acquitted Mr. Barrett on the two counts of discharge of a firearm with intent to kill.  Mr. Barrett did not appeal his convictions or sentences.

**2.      Federal Trial**

Mr. Barrett's federal trial was markedly different from his state trials. In the first phase, most notably different was the testimony of seven informants, who did not testify in either

of the state trials. The identity of these snitches was not made known to the defense until days before the trial was about to start. These snitches came forward with statements that Mr. Barrett allegedly made about "going down in a blaze of glory" and the like.

At the sentencing phase of Mr. Barrett's trial, the government presented testimony with respect to victim impact and future dangerousness. In the category of future dangerousness, the government presented the following witnesses:

1. Stanley Philpot, a Sequoyah County reserve deputy sheriff, who testified about an incident in which he stopped Mr. Barrett in his truck and informed him of the outstanding felony warrant for his arrest. Stanley followed Mr. Barrett home, at which time Mr. Barrett allegedly stood on the porch holding a gun. Stanley called for back up but neither Mr. Barrett nor the gun could be found.

2. Johnny Philpot, former Sequoyah County Sheriff, who testified that he was called as back up for the above incident.

3. Cindy Crawford, who testified that Mr. Barrett allegedly held a gun to her leg because she refused to sleep with him and said that he would "fucking kill her" if she came back to his place.

4. Charles "Monk" Sanders, who testified that he overheard Mr. Barrett on the phone in jail while they were both incarcerated. Sanders said he heard Mr. Barrett say that they needed to find the person who got him arrested so they could "kill that son of a bitch."

52

5.    Larry Lane, a Sequoyah County Sheriff's Deputy, who stated that Mr.

Barrett ran a police check point and he pursued him until he ran off the

road and ran away on foot.

6.    Shannon Smith, a former Sequoyah County Sheriff's Deputy, who was

present at the checkpoint. Smith testified that Mr. Barrett pulled off so fast

that two police officers had to jump out of the way. Smith also testified

that on a different occasion he saw Mr. Barrett slapping his wife. Smith

said that he told Mr. Barrett to stop and Mr. Barrett allegedly told Smith

"he was going to get his gun and kill him."

With respect to victim impact, the government presented the following witnesses:

1.    William DeWeese, Rocky Eales' best friend from the Marine Corps, who

testified that Trooper Eales was an outstanding person, an outstanding

marine and like a brother to him.

2.    Nancy Eales Stalcup, Rocky Eales' sister, who testified that Trooper Eales

was a wonderful person and a wonderful brother. Ms. Stalcup stated that

Trooper Eales' death had a deteriorating effect on her health for which she

had to receive medical care.

3.    Bobbie Eales, Rocky Eales' mother, who testified about her son and read a

five-page written statement into the record that described her loss and

pain.

4.    Gene Hise, an Oklahoma State Highway Patrolman and good friend of

Rocky Eales, who testified about informing Kelli Eales of Rocky's death

and his loss and Post-Traumatic Stress Disorder since Trooper Eales' death.

5.   Kelli Eales, Trooper Eales' wife, who testified about her husband's death and the loss she has suffered. Mrs. Eales also read into the record statements her children had writ The mitigation stage of the sentencing hearing lasted less than three days.  There was no testimony regarding Mr. Barrett's mental health.

Mr. Barrett's counsel presented the following witnesses in mitigation:

1.   Maudeen Vann, First Deputy County Clerk, Sequoyah, Oklahoma, who testified as to the verdict in the state trial, the 30-year sentence Mr. Barrett received and was serving and the fact that he had no prior felony record.

2.   Kathy Trotter, Mr. Barrett's cousin, who briefly testified that everyone in the family grew up with guns and used guns. She also testified that she was a process server and familiar with the legal community and had no knowledge of Mr. Barrett's involvement in violent activities other than some instances of domestic violence.

3.   Jimmy Wilson, a case manager at the Oklahoma Department of Corrections, who testified as to the actual time Mr. Barrett would serve on his state sentence, the type of facility in which he would serve his sentence, his restrictions and his possibility of parole.

4.   Abby Stites, Mr. Barrett's former wife, who testified about their troubled marriage and that it was not all Mr. Barrett's fault; she was equally to blame

5.   Craig Edgmon, Mr. Barrett's neighbor, who testified that Mr. Barrett was a good mechanic and worked on his car, truck and farm equipment.

6.     Clyde Edgmon, Mr. Barrett's neighbor and Craig Edgmon's father, who also testified that Mr. Barrett was a good mechanic who charged a fair price and sometimes did work for no charge. Mr. Edgmon also testified that law enforcement (John Owens and Sandy Gerdner) came by his house when Mr. Barrett was working on Mr. Edgmon's truck and talked to Mr. Barrett for some time. This was a very friendly exchange that took place three to six months before the raid.

7.     Robert Gude, a former jailer at the Sequoyah County Jail, who testified about the conditions at the Sequoyah County Jail and Mr. Barrett's behavior at the jail.

8.     Courtney Burke, an assistant administrator at the Sequoyah County Jail, who testified regarding Mr. Barrett's behavior while housed at the jail.

9.     Martin Daggs, a bail bondsman in Sequoyah County who had bonded Mr. Barrett out of jail on the 1997 drug case. Daggs testified that he was aware of the bench warrant but never did anything to make Mr. Barrett aware of the bench warrant because a judgment of forfeiture had never been ordered.

10.    Steve Barrett, Mr. Barrett's brother, who testified superficially about his and Mr. Barrett's childhood.

11.    Roger Crawford, Mr. Barrett's uncle and neighbor, who testified that Mr. Barrett was a good father, a good son, a good neighbor and good mechanic.

12.     Gelene Dotson, Mr. Barrett's mother, who testified superficially about Mr.

Barrett's childhood, his marriage and his adult life.

13.     Ernest Barrett, Mr. Barrett's father, who testified superficially about Mr.

Barrett's youth.

14.     Doris Barrett, Mr. Barrett's stepmother, who testified that Mr. Barrett was

like a son to her.

**III.     Claims for Relief**

> **Claim 1.     Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments

made elsewhere in this Motion and the exhibits thereto.

Actions of the trial court denied Mr. Barrett a fair trial under conditions required

or routinely provided to similarly situated defendants pursuant to 18 U.S.C. §§ 3005, 3006A, and

3599, the Judicial Conference's Guidelines for implementation of the Criminal Justice Act,

prevailing professional norms of criminal defense practice, and the Fifth, Sixth, Eighth, and

Fourteenth Amendments to the United States Constitution.[1]

---

[1] As stated *supra* in § I.B, this claim and others presented in this Motion rely upon witness accounts of the trial judge's on- and off-the-record interference with Mr. Barrett's defense. Mr. Barrett respectfully submits that the law requires the trial judge to disqualify himself from ruling on this motion, and from any decisions respecting the process for ruling on this motion. 28 U.S.C. §§ 455(a), (b)(1), (b)(3), (b)(5)(iv); *In re Murchison*, 349 U.S. 133, 136 (1955); *Marchu v. United States*, 926 F.3d 50, 59 (1st Cir. 1991). Mr. Barrett objects to the trial judge making any rulings in respect of this motion.

Judicial interference with defense counsel carrying out their constitutional function as opponents of the Government violates the Sixth Amendment, without a showing of prejudice. *Geders v. United States*, 466 U.S. 648 (1976) (trial court's order prohibiting defense counsel from consulting with defendant during recess between direct and cross-examination); *Herring v. New York*, 422 U.S. 853 (1975) (order barring defense counsel from summing up in bench trial); *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972) (rule requiring defendant to testify before any other witnesses denied defendant benefit of counsel's advice and guidance); *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961) (denial of counsel at arraignment where defenses had to be raised); *Ferguson v. Georgia*, 365 U.S. 570 (1961) (where state rule made defendant incompetent to give sworn testimony Constitution required that counsel be permitted to guide unsworn statement). While Mr. Barrett need not show prejudice from the court's actions described in this Claim, he can make that showing and does so in Claims 2, 3, 5, and 14, *infra*.

The trial court's stated interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and its communications with counsel created a conflict between the court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense. *Woods v. Georgia*, 450 U.S. 261 (1981).

The evidence presented herein demonstrates that the trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases. The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as "a 'class of one,' . . . intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). *See also*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

Def's § 2255 Mot.        18        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The trial judge's conduct towards Mr. Barrett's interests and his counsel violated the Code of Judicial Conduct and was not impartial. "No matter what the evidence against (a defendant), he had the right to have an impartial judge." *Tumey v. Ohio*, 273 U.S. 510, 535 (1927). Partiality on the part of a judge in a civil appeal violates due process. *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813 (1985). The Supreme Court has "emphasized the special importance of fair procedure" in death penalty cases, including giving adequate notice to the defense of the judge's plans. *Lankford v. Idaho*, 500 U.S. 110, 125 (1991), quoting and citing, *Gardner v. Florida*, 430 U.S. 349, 357 (1977).

Federal law provides that the court shall consider the recommendations of the Federal Defender when appointing counsel. 18 U.S.C. § 3005. Pursuant to the Judicial Conference's *Guidelines for the Administration of the Criminal Justice Act and Related Statutes* ("CJA Guidelines") the Federal Defender and the court should take into account "the facts and circumstances of the case to determine the qualifications which may be required to provide effective representation." (CJA Guidelines, ¶ 6.01(B)(1)). Courts are encouraged to appoint counsel who "are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation." (CJA Guidelines ¶ 6.01.)

Judge Payne initially expressed a desire to appoint the Federal Defender to represent Mr. Barrett. When the Federal Defender informed Judge Payne that the only attorney in his office qualified to handle a capital case was already appointed to such a case, Judge Payne indicated that he anticipated the assistant federal defender who normally worked in the Eastern District would be responsible. The Federal Defender explained that the attorney was not

qualified and his office could not provide competent representation to two capital defendants at the same time.

Two Federal Defenders and an assistant federal defender recommended that the court appoint John D. Echols and Robert Nigh of Tulsa, based on their past capital defense experience and, in Mr. Echols's case, his demonstrated commitment to Mr. Barrett's defense. (Decl. Julia O'Connell; Decl. John D. Echols).  Judge Payne indicated he preferred to have the Federal Defender appointed so the court would not have to authorize funds for Mr. Barrett's representation.  (Decl. Julia O'Connell).

During discussions with these attorneys, the trial judge expressed an interest in considering factors that are not recognized by the Judicial Conference or national indigent defense organizations as indicative of an attorney's qualifications to provide effective representation.  Judge Payne expressed an interest in appointing less-qualified attorneys to represent Mr. Barrett as a means of giving local attorneys experience so that a local panel could be formed for representation in capital cases.  (Decl. Julia O'Connell; Decl. John D. Echols).  To this end, the trial judge rejected the recommendation of Robert Nigh and appointed Roger Hilfiger, based in part on Mr. Hilfiger's past experience as United States Attorney for the Eastern District of Oklahoma.  *Id.*

The CJA Guidelines provide that courts budgeting federal death penalty cases should ask counsel for the "best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) likely to be needed through the guilt and penalty phases of the trial." (CJA Guidelines, ¶ 6.02F(3)(C)(ii)).  The Judicial Conference's guidelines also provide that these "[c]ase budgets should be submitted *ex parte* and filed and maintained under seal."  *(Id.* at ¶ 6.02(F)).  The trial court in this case required a high degree of specificity, and

Def's § 2255 Mot.  20  *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

threatened to reverse the prior order Judge White entered authorizing *ex parte* submissions if counsel did not disclose "a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case)."  Letter from Hon. James H. Payne to John David Echols dated 2/22/05 ("Payne Letter to Echols").

Judge Payne expressed a desire that the case rapidly proceed to trial.  (Decl. John Echols).  On January 7, 2005, the court admonished Mr. Barrett's attorneys for failing to mention the need for a continuance during a status conference earlier in the day.  Doc. 31.  The court said, "Counsel is reminded this is a death penalty case, which should be given the highest priority by counsel." *Ibid.*

On January 31, 2005, Mr. Barrett's counsel filed a detailed, 10-page, budget proposal.  (Doc. 46.)

Like the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the Judicial Conference's guidelines recognize the importance of prompt authorization of funds so that delay will not result in a denial of effective representation.  The CJA Guidelines encourage courts "to employ[] an *ex parte* pretrial conference in order to facilitate reaching agreement on a litigation budget at the earliest opportunity," ¶ 6.02(F)(3), and encourage courts to "act upon requests for services where prompt authorization is necessary for adequate representation."  (¶ 6.02(F)(5)).  The trial court in this case did not hold such a conference.

On February 7, 2005, Mr. Barrett's counsel filed amended, more detailed budget proposals.  Docs. 50, 51.  On February 22, 2005, the court sent lead counsel a two-page single-spaced letter listing six categories of questions and concerns the court had about Mr. Echols, but

Def's § 2255 Mot.                           21                           *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

not about Mr. Hilfiger's representation.  (Payne Letter to Echols).  Throughout the letter, Judge

Payne expressed concern that Mr. Echols was being paid to represent Mr. Barrett in a third trial,

and expressed the view that no further investigation should need to be done after the previous

trials.  *Ibid.*  Mr. Echols responded by letter on February 28, 2005.  (Letter from John David

Echols to Hon. James H. Payne dated 2/28/05).

As noted *supra*, the statutes and guidelines related to case budgeting in federal

death penalty cases state a preference for *ex parte*, sealed proceedings in order to protect defense

confidentiality.  The trial court in this case expressly considered using Mr. Barrett's budget

submissions to aid the prosecution.  In his letter to Mr. Echols, Judge Payne stated that lifting the

order on *ex parte* budgeting "might actually help resolve this case more expeditiously by

allowing the government an earlier opportunity to object to the admissibility [of Mr. Barrett's

experts] and perhaps allow the court to rule on the admissibility issues prior to expenditure of

funds for experts which might not be allowed to testify at trial."  (Payne Letter to Echols at 2).

Mr. Echols objected that this proposal would infringe on Mr. Barrett's Sixth Amendment rights,

and it was not implemented.

On February 28, 2005, Mr. Echols  informed the court that delays in authorization

of a budget for any defense preparation was endangering counsel's ability to prepare for trial on

the court's schedule.  (Echols letter to Payne at 5).  The court did not rule on the defense's budget

proposal until March 18, 2005.  Doc. 97.  At that point, discovery was scheduled to close on May

11, 2005, and trial was scheduled to start on July 11, 2005.  (Scheduling Order filed 12/11/04

(Doc. 22)).

Richard Burr, an attorney retained by the Office of the Defender Services of the

Administrative Office of the United States Courts, served as an advisor to Mr. Barrett's counsel,

Def's § 2255 Mot.                  22                  *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

John Echols, through the auspices of the Federal Death Penalty Resource Counsel project ("FDPRC").  (Decl. Richard Burr; Decl. John D. Echols).[2]  As Mr. Burr stated to the court at the time, the FDPRC collects "data on the initiation and prosecution of federal capital cases, and on the defense services provided in such cases."  (Decl. Richard Burr re attorney compensation dated 4/4/05 and filed as Exh. B to Doc. 107).  Mr. Barrett's counsel relied upon the data collected by the FDPRC in making his funds requests.  (Echols letter to Payne).

The trial court's funding decisions were based on the judge's subjective view of what was "'reasonably necessary' to provide fair compensation and to provide the defense with necessary tools for a fair trial."  (Order filed 3/18/05 at 2.)  However, the court's reasoning in denying specific requests was inconsistent with the Sixth Amendment role of counsel in exercising independent professional judgment and providing an adversarial testing of the prosecution's case.  *Polk County v. Dodson*, 454 U.S. 312, 320-22 (1981).

The trial court had before it declarations of independent expert counsel regarding the prevailing professional norms of capital defense practice in federal death penalty cases, including courts' decisions validating these norms through the allocation of funds to similarly situated defendants.  (*See* Decl. Richard H. Burr).  The trial court's order evidences no consideration of these norms or practice, whether adversarial and judicial.  The trial judge's order evidences no consideration for the specific needs of counsel as expressed in their funds requests.  The trial judge's limitations on funds were not based on any evidence of or expressed concern for fiscal limitations.

---

[2]  Mr. Burr offered his assistance to Roger Hilfiger, but Mr. Hilfiger did not seek any assistance.  (Decl. Richard Burr).

Def's § 2255 Mot.                23                *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

As expert counsel advised the court at the time,

in the GUIDE TO JUDICIARY POLICIES AND PROCEDURES, Vol, VII, "Appointment of Counsel in Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), Courts are encouraged in the course of case budgeting to secure counsel's "best preliminary estimate that can be made of all services," including the services of counsel.

[]      It is clear that the reason the attorney services were not included in the pre-authorization and circuit review provisions of 21 U.S.C. §§ 848(q)(9) and (10)(B) is that attorney services, to be meaningful, must be provided as the professional judgment of the attorney dictates and cannot, therefore, be subject to pre-authorization without significantly interfering with, even paralyzing, the process of representation.

For this reason, the inclusion of attorney services in the case budgeting guidelines of the GUIDE TO JUDICIARY POLICIES AND PROCEDURES is intended, *not* to interject the courts into case management, but to require *counsel* to assess the representation needs of the case in order to give the courts a way of projecting what counsel believes to be reasonable expenditures of time.  If the expenditure of attorney time thereafter begins to depart in substantial ways from these projections, the budgeting of attorney time provides a basis for the court to question the attorney about the necessity of his or her efforts.  This is the way in which the federal courts have uniformly approached the matter of budgeting attorney time in capital cases - with due deference to the exercise of attorney judgment, but with a basis for questioning certain expenditures of time.

(Decl. Richard H. Burr dated 4/4/05, filed as Exh. A to Doc. 107).

Investigation is a core function of defense counsel.  ABA Standards for Criminal Justice, Standard 4-4.1 (requiring "prompt investigation").  The relevant guidelines to administration of the Criminal Justice Act provide that "upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court should authorize the defendant's attorneys to obtain such services."  The trial court authorized funds for Mr. Barrett's representation on a far more narrow basis.

Indeed, the trial court's funding order went beyond the simple approval or denial or funds.  Mr. Barrett's trial counsel requested funds to investigate and develop evidence for the

defense.  (Doc. 51; Echols letter to Payne).  The trial court refused to permit trial counsel to expend funds in investigation based on their independent professional judgment.  (Order filed 3/18/05 at 2 n.2.)  The court stated that it would not approve payment of vouchers for investigative services unless counsel filed "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial."  *Ibid.*  This threat was contrary to the CJA Guidelines which provide in relevant part: "Courts, in examining the case budget, may reconsider amounts authorized for services prior to the budget's approval; however, *courts shall not rescind prior authorization where work has already been performed*."  (CJA Guidelines, ¶ 6.02(F)(5) [emphasis added]).

The trial judge's conditioning of funds on his subjective evaluation of the significance of the facts counsel sought to investigate barred or chilled investigation into factual matters trial counsel deemed necessary through their exercise of independent professional judgment.  If Mr. Barrett had been represented by private counsel or an independent indigent defense office, the investigation of his case would not have been limited to factual issues that had "significance" to the person paying counsel.

As set forth more fully in Claim 3, *infra*, the court reduced the compensation rate of Mr. Barrett's investigator from the private investigator rate of $50.00 per hour to the rate charged by a state-subsidized agency for its salaried investigators.  Order filed 5/5/05 at 3 n.1.  In the court's initial order reducing the rate, the court did not disclose the state agency's rate as the basis for the reduction.  *(See* Order filed 3/18/05 at 2.)  This limitation meant that for Mr. Barrett's investigator, compared to his other cases, he lost $20.00 for every hour spent working on Mr. Barrett's case.

Def's § 2255 Mot.                                   25                         *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Burr compared this Court's March 18, 2005 order reducing resources for Mr. Barrett's defense with the data collected by the FDPRC. Mr. Burr informed the trial court:

> The number of hours needed for fact investigation of course varies from case to case. The number of hours requested here, however, is below the average for federal cases in which the death penalty has been authorized. The average number of hours approved for fact investigation in authorized cases is closer to 500 hours. The 100 hours approved by the Court is certainly enough to get a fact investigator started, but since it is far less than counsel has estimated is needed, approving only 100 hours now means that counsel in the near future will likely have to submit another request for approval of additional hours.

(Decl. Richard H. Burr re Non-Attorney Costs, dated 4/4/05, filed as Exh. C to Doc. 107). The court treated this statement as an "illustration" that Mr. Barrett's counsel "have the attitude that the budget in this matter is unlimited . . . ." (Order filed 5/5/05 (Doc. 128) at 3 & n.1.)

The trial court did not merely deny funds to Mr. Barrett's defense, it interjected into the funding denial a false impression of the evidence that would be admitted at trial. The court denied 75 percent of the time and one hundred percent of the in-court assistance trial counsel requested from a ballistics and crime scene reconstruction expert. (*Compare* Doc. 50 at 7 *with* Order filed 3/18/05 at 3). At the same time, the court said, "Counsel should be aware that this Court has, [*sic*] never allowed crime scene reconstruction to be introduced in trial." (Order filed 3/18/05 at 3). Trial counsel did not consult a crime scene reconstruction expert. (Tr. 10/3/05 Hr'g at 8). The court's ruling gave counsel an unwarranted impression of the need to consult with a crime scene reconstruction expert and left counsel with no ability to bring such an expert to court to testify or assist in cross-examination. Contrary to the impression given by the court's March 18 order, the court permitted the Government to present and place heavy reliance upon crime scene reconstruction evidence. (*See* R. 3154-3484).

As set forth more fully in Claim 3, *infra*, the trial court denied in full or in majority all Mr. Barrett's requests for expert and investigative services.  The court stated no basis for any denial or reduction related to the facts or circumstances of the case.  Based on the FDPRC's data regarding other capital cases, the court's ruling against Mr. Barrett was unique.  Mr. Burr informed the court at the time that Mr. Barrett's request for a mitigation specialist was "well below average," and "no federal court ha[d] failed to provide expenses for mitigation specialists' work." (Decl. Richard H. Burr dated 4/4/05, Exh. C to Doc. 107).  Where this court denied funds for experts to travel as part of their work on Mr. Barrett's defense, Mr Burr found that "[t]ravel expenses - lodging, meals, and transportation - are always provided, as are any other expenses incidental to the expert's ability to provide services." *Id.*  Where this court permitted Mr. Barrett's counsel to retain only one mental health expert, regardless of the circumstances, the FDPRC found, the "standard practice in federal capital cases is to provide the services of more than one mental health expert." *Id.*

The trial court paradoxically relied upon the experienced judgment of trial counsel as grounds for denying requests they made based on their considered professional judgment.  For example, the court denied counsel's request for a jury consultant on the ground that trial counsel had extensive experience picking juries.  (Order filed 3/18/05 at 3.)  This ruling was influenced by the trial judge's personal choice of trial counsel.  The trial judge personally selected  Roger Hilfiger to represent Mr. Barrett against the recommendations of experienced defense counsel.  (Decl. Julia O'Connell).  The trial judge then relied upon his own subjective view of Mr. Hilfiger's experience, not as a defense lawyer, but as the former United States Attorney as a reason for denying counsel's request for a jury consultant.  (Order filed 3/18/05 at 3.)  However, as set forth *infra* this ruling did not bind Mr. Hilfiger as it would have bound Mr. Echols.

The trial judge hampered trial counsel's ability to prepare a defense by at first denying, then delaying, authorization for counsel to obtain the prior testimony of prosecution witnesses.  (Order filed 3/18/05 at 4.)  The court's reasoning is contrary to the purpose of the right to counsel.  Where the Supreme Court has held that the purpose of defense counsel is opposing the prosecution, the trial judge initially denied access to the second state trial transcripts on the ground that "the government has indicated they do not need the prior transcripts to try this case. If counsel for the government are able to try this case without prior state court trial transcripts, defense counsel should be able to do the same." *Id.* at 5.  Just as the right to cross-examine witnesses depends upon the availability of counsel, so too does the right depend upon the court not denying counsel access to readily available sources of cross-examination.  *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

Initially, the court would not permit the second state trial transcripts to be obtained "unless convinced the testimony of said [prior] witness is critical to the issue of the defendant's intent as it relates to the elements of the offenses charged herein."  (Order filed 3/18/05 at 6.)  The court later rescinded this limitation and permitted counsel to obtain the transcripts they had been seeking since January 2005.  *(See* Doc. 23.)  Although some transcripts were obtained, the delay caused by the trial judge prevented preparation of transcripts before each witness who testified previously testified in federal court.  The delay also impeded or prevented defense counsel's preparation for cross-examination.  *See* Claim 2A, *infra*.

The trial court also limited the ability of defense counsel to prepare for and conduct cross-examinations by denying access to transcripts of witnesses' testimony in earlier federal hearings.  (Order filed 3/18/05 at 6.)  This ruling was especially arbitrary and unfair in that the court could have provided Mr. Barrett's counsel these transcripts without making it part

of the budget.  The Criminal Justice Act specifically provides that court reporters may be paid separately for preparing transcripts in cases of indigency.

Congress, the Judicial Conference, and every professional association concerned with criminal defense practice have expressed the view that cases involving the death penalty require higher degrees of skill and greater preparation than other criminal cases.  The trial judge in this case compared the budget for Mr. Barrett's case only to unidentified budgets in non-capital criminal cases.  *(See generally* Orders filed 3/18/05 and 5/5/05.)

The court's rejection of Mr. Echols's proposed budget was part of a pattern of interference with, or indifference to, Mr. Barrett's legal representation.  As stated *supra*, the trial judge initially wanted to appoint two local attorneys to represent Mr. Barrett so that the capital experience of the local bar would be increased.  (Decl. Julia O'Connell).  In his letter to Mr. Echols in February 2005, Judge Payne indicated he had appointed Mr. Echols, at least in part, because Echols and the Public Defender left him with the understanding that "there would be a substantial savings in the amount of time that would be required for [Echols] to represent the defendant."  (Payne letter to Echols).

As stated *supra*, the trial court required Mr. Echols, as lead counsel, to submit very detailed and specific budget requests.  On April 1, 2005, the Magistrate Judge recommended denying Mr. Echols any compensation for time spent preparing those budgets.  The CJA Guidelines specifically provide that time spent on case budgeting in *capital* cases is compensable.  Mr. Burr submitted a declaration to the Court regarding the extraordinary nature of the ruling against Mr. Echols's voucher:

> In every federal capital case with which the members of our project are familiar - which is virtually all such cases since the inception of the Federal Death Penalty Resource Counsel project in 1992 - defense counsel have been compensated for

their work in seeking funding for the services of defense investigators and experts. We know of no other case in which the court has refused to compensate counsel for such work.  The reason for this is that, in seeking funding for these services, counsel is required to plan the defense investigation and litigation, determine the specific need for investigation and expert assistance, identify appropriate, competent investigators and experts, and contact a number of investigators and experts to discuss the merits of the case and the need for their services and to determine whether those investigators and experts are actually appropriate and available.  All of these efforts are in direct service to the client.  Unlike the preparation of defense counsel's CJA 30 vouchers, through which counsel is compensated - and for which courts usually do not compensate counsel, the work of counsel in seeking finds [*sic*] for investigation and expert assistance is of no financial benefit to counsel.  Its sole purpose if [*sic*] to assist the client in his or her defense.

(Decl. Richard H. Burr re Compensation for Budgeting, dated 4/14/05, filed as Exh. to Doc. 118).  The trial court denied Mr. Echols compensation, because lawyers in the Eastern District in *non-capital* cases were not compensated for budgeting.  (Order filed 5/5/05 at 4.)

Mr. Echols's budget submissions were based in part on advice and data regarding other federal death penalty cases that Mr. Echols received from Federal Death Penalty Resource Counsel.  Only Mr. Echols sought the advice of these experts; Mr. Hilfiger did not.  (Decl. Richard Burr; Decl. John D. Echols).  Although compensation for consultation with expert counsel is specifically authorized by the Criminal Justice Act and 18 U.S.C. § 3599(f), the Magistrate Judge recommended denying payment for Mr. Echols's consultations, and Judge Payne upheld this ruling. (Order filed 5/5/05.)

On April 4 and 6, 2005, Mr. Echols filed motions seeking reconsideration of the March 18 budget order and April 1 report and recommendation regarding vouchers.  These filings sought a budget conference as provided in the CJA Guidelines and included four declarations from Federal Death Penalty Resource Counsel, Richard Burr, some of which are

quoted herein, regarding the CJA Guidelines and statements that the restrictions imposed by the court were unique in all the previously litigated federal death penalty cases.

On April 6, 2005, Mr. Echols also moved to withdraw as counsel for Mr. Barrett citing five circumstances that prevented him from providing effective representation: (1) the trial was less than four months away; (2) no final budget had been approved that was adequate to prepare a defense; (3) the denial of compensation for budgeting and expert consultation placed an unreasonable burden on counsel; (4) Mr. Hilfiger had not done any significant work on the case; (5) the requirements of the March 18 order impaired counsel's exercise of independent professional judgment. Doc. 113. Mr. Hilfiger had urged Mr. Echols not to file the motion. (Decl Richard Burr; Decl. John D. Echols). However, during a hearing on the motion, Mr. Hilfiger did not join in Mr. Echols's concerns about the budget order. (Decl. John D. Echols).

Mr. Echols stated as one ground for his motion to withdraw: "The relationship between the undersigned and co-counsel, Roger Hilfiger, is cordial, but we have not been able to work effectively together, and virtually all of the work performed on pleadings, budgeting and other issues has been performed by Mr. Echols." (Doc. 113 at ¶ 4.) In granting Mr. Echols's motion, the trial judge attributed to Mr. Echols the assertion that "he is unable to work with co-counsel Mr. Hilfiger," and omitted the information about Mr. Hilfiger's lack of work. (Order filed 5/5/05 at 5.) The court instead focused on Mr. Hilfiger being "more familiar with practice before this Court than Mr. Echols." *Ibid.*

In granting Mr. Echols's motion to withdraw the court expressed displeasure with the amount of information Mr. Echols provided in his budget submissions. (Order filed 5/5/05 at 2-3.) The court permitted Mr. Echols to withdraw in part because his budget proposals had not "'set forth separately and with specificity the time each of the appointed attorneys anticipates

Def's § 2255 Mot.  31  *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

spending' on each of several categories." *Ibid.* (quoting Order filed 1/29/05 (Doc. 38)).  The record shows Mr. Echols filed lengthy budget requests describing the specific needs of the defense and, most, but not all the time, describing with particularity the experts he sought to hire and the work they would perform.  (Docs. 50, 51.)  Mr. Echols also sent Judge Payne a six page single-spaced letter detailing the amounts he and others were paid for Mr. Barrett's defense in state court, and what matters were not completely investigated there.

Judge Payne did not hold Mr. Hilfiger to the same standards as Mr. Echols. During the trial the court became concerned that Mr. Hilfiger and Mr. Smith would exceed the budget authorized on March 18, 2005.  (Tr. 10/3/05 Hr'g.)  In that event, Judge Payne said, "I think the safest thing to do maybe on the attorney's fees for October would be for y'all to analyze that and get me an amended budget just to -- I mean, just make your best guestimate."  (Tr. 10/3/05 Hr'g at 8.)

In his letter to Mr. Echols, Judge Payne expressed his concern that Mr. Echols not be unduly compensated for work if his prior representation of Mr. Barrett made further labors unnecessary.  The court had limited Mr. Echols's rate of compensation to $125.00 per hour.  On May 17, 2005, the day Mr. Hilfiger was made lead counsel, Judge Payne raised his compensation rate to $150.00 per hour.  (Tr. 10/3/05 Hr'g at 3.)

The concerns Mr. Echols expressed in his motion to withdraw about the lack of work Mr. Hilfiger committed to the case proved to be well-founded, although the court was again unconcerned.  On May 23, 2005, Mr. Barrett filed a motion seeking appointment of new counsel based, in part, on the assertion that the case loads of appointed counsel interfered with their ability to devote sufficient time to his defense.  (Doc. 135.)  Mr. Barrett's counsel did not file a response to the motion.  There was no hearing on the motion.

On May 24, 2005, the court denied Mr. Barrett's motion to replace counsel. Doc. 137. The denial was based in part on the "finding" that "[c]ounsel has a copy of the first state court trial transcript . . . ." (Order filed 5/24/05 (Doc. 137) at 2 n.2.) The denial was based in part on the court's belief that appointed counsel "will have adequate time to prepare for this particular case." *Id.* at 2. Subsequent events suggest there was no basis for these two statements in the May 24 order.

On May 26, 2005, trial counsel Hilfiger filed a motion to continue the trial date. Doc. 138. Counsel averred as one ground for the continuance that Mr. Hilfiger had "been presented with ten storage boxes of materials, discovery, motions and other paperwork from defendant's two State jury trials, including transcripts of the first State jury trial; and all of such material needs to be reviewed to determine its value for defensive purposes, in this new action." (Doc. 138 at 1.) Mr. Hilfiger was not specific about when he received the materials, but the evidence indicates it was between May 17, 2005, the day Mr. Hilfiger was made lead counsel, and May 26, the date of his assertion. Regardless of the specific date, the record reveals no basis for the court's statement that Hilfiger possessed the record on May 24, and shows that whatever Mr. Hilfiger "possessed" on that date, he had not reviewed it during the six months that had elapsed since his appointment in November 2004.

Mr. Hilfiger's statement about not having reviewed the records from the state-court proceedings, including discovery and transcripts, indicates that he had not made a sufficient inquiry into the facts of the case to support the position he took on the budget during the May 5, 2005, hearing. On May 17, 2005, the court directed Mr. Hilfiger to file by May 27, 2005, any supplemental budget request he deemed necessary. (Tr. 10/3/05 Hr'g at 3.) Assuming the trial court had learned on or before May 17, 2005, that Mr. Hilfiger had not become familiar with the

previous litigation over the previous six months, it was unreasonable for the court to give Mr. Hilfiger only 10 days to request supplemental resources.

In February 2005, Mr. Hilfiger informed Mr. Echols, and Mr. Echols informed the court, that Mr. Hilfiger believed he would need to spend 160 hours assembling and reviewing the files and records related to the case. (Doc. 50 at 4; Echols letter to Payne at 1 n.1.)  On March 18, 2005, the court reduced to 80 hours the compensable time for Mr. Hilfiger – then second-chair – to complete these tasks. (Doc. 97 at 2.)  In any event, it was impossible for Mr. Hilfiger to have completed these tasks between May 17 and May 27, and Mr. Hilfiger did not file an amended budget.

As noted *supra*, in January, when Mr. Echols was lead counsel, the court chastised Mr. Barrett's defense for failing to devote sufficient attention to the case that it could stay on schedule. (Doc. 31.)  The court admonished counsel to give the case the "highest priority." *Ibid.*  In May, when Mr. Hilfiger acknowledged that he had not reviewed the records from the prior state court proceedings, and after Mr. Echols and the lawyers' vouchers revealed the paucity of Mr. Hilfiger's work on the case, the trial court expressed no concern about Mr. Hilfiger's priorities, and simply granted the continuance. (Tr. 6/6/05 Hr'g; Doc. 142.)  In September, Mr. Smith revealed that Mr. Hilfiger had not assembled the files and records related to the mitigation investigation that had been done in state court. (Tr. 9/9/05 Hr'g at 43.)  Again, the court was not concerned with new counsel's priorities.

Mr. Hilfiger himself had informed Mr. Echols and the court that it would take him as second-chair 300 hours to prepare for trial, *not* including court hearings, legal research and preparation of pleadings and briefs. (Doc. 51 at 4.)  On October 3, 2005, with the trial underway, Mr. Hilfiger informed the court that he had worked approximately 300 hours on the case,

Def's § 2255 Mot.            34            *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

*including* legal research and writing and preparation for and in all court proceedings. (Tr. 10/3/05 Hr'g at 5.) Whereas the court had expressed a great deal of skepticism about Mr. Echols's requests for compensable hours, Mr. Hilfiger's statements prompted no expressions of concern.

In other respects, the record does not support the inference that Judge Payne's treatment of Mr. Echols was based either on fiscal concerns or concern for Mr. Barrett's representation. The trial court denied Mr. Echols's request for a jury consultant on the ground that, "Each of defense counsel come before this Court with combined practical experiences on in excess of sixty years in selecting criminal juries, including Mr. Hilfiger's experiences as United States Attorney for the Eastern District of Oklahoma." (Doc. 97 at 3.) If counsel's allegedly vast experience supported their professional judgment in selecting the jury, as the court conjectured, there was no reason for the court to reject the same professionals' judgment that they required the assistance of a jury consultant.

As noted already, after he was elevated to lead counsel, Mr. Hilfiger filed no supplemental budget request. On September 9, 2005, Mr. Hilfiger informed the court that he would be relying upon a private jury consultant. (Tr. 9/9/05 Hr'g at 10.) Mr. Hilfiger casually stated, "I'll assume Angie Cole will be coming in with us the next two weeks. She's going to set at the counsel table with us during the selection." *Ibid.* The court recognized Ms. Cole's name and identified her as a jury consultant. *Ibid.* Despite the earlier denial of funds based on Mr. Hilfiger's particular experience, and the fact that the court was paying Mr. Hilfiger more than it had paid Mr. Echols, Judge Payne expressed no concern or objection to Mr. Hilfiger's unauthorized retention of an expert for two weeks of trial. *Ibid.* If Mr. Hilfiger had been able to obtain a jury consultant without funds from the court, he did not inform Mr. Echols of the fact.

Def's § 2255 Mot.                           35                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

In summary, Judge Payne had only reluctantly appointed John Echols to represent Mr. Barrett, and then based in significant part, at least, on the belief that Mr. Echols would be able to try the case cheaply and quickly. Judge Payne personally chose Roger Hilfiger to represent Mr. Barrett for reasons that had nothing to do with the circumstances of Mr. Barrett's case, but for the purpose of using Mr. Barrett to develop a local capital defense panel. During Mr. Echols's tenure, Judge Payne imposed requirements and restrictions on budgeting and investigation that experts concluded were unheard of in federal death penalty trials, and that intruded upon the constitutionally protected independence of counsel. At one point, Judge Payne threatened to use counsel's budget proposals as a mechanism for finding defense experts' testimony inadmissible at trial. When Mr. Echols left the case due to these restrictions, and Mr. Hilfiger sought no additional resources, Judge Payne's conduct towards defense counsel changed. Judge Payne permitted Mr. Hilfiger to show a lack of diligence and inattention to budget matters. Under these conditions, Mr. Barrett did not receive independent, reasonably funded, reasonably prepared, representation.

The trial judge also violated Mr. Barrett's right to due process, and the Code of Judicial Conduct, by conducting *ex parte* communications with the prosecutors. During an *ex parte* hearing held September 13, 2005, the judge solicited the views of the United States Attorney regarding such matters as (a) when the trial started for purposes of 18 U.S.C. § 3432, (b) whether the defense should be entitled to a continuance based on delayed disclosure of witnesses, and (c) whether the disclosures posed a problem under Rule 404(b) of the Federal Rules of Evidence. (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 22-23.) Although the hearing was held for the purpose of disclosing information supposedly related to dangers to witnesses, the trial court

Def's § 2255 Mot.                                    36                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

solicited the prosecutor's views on these other matters which did not involve discussion of any information that could not be disclosed to the defense.

Also during the *ex parte* portion of the hearing Assistant United States Attorney Michael Littlefield revealed that he knew the identity of a witness who failed to corroborate statements by informant, Charles Sanders.  (Tr. 9/13/05 Hr'g at 14, 17.)

The court's conduct during the *ex parte* portion of the September 9, 2005 proceedings, and its conduct in relation to those proceedings thereafter, violated Rule 2.9 of Canon 2 of the Code of Judicial Conduct.

After the *ex parte* portion of the hearing, and at the beginning of the hearing with defense counsel present, the court did not disclose the discussion regarding the meaning of § 3432, the discussion of the continuance, AUSA Littlefield's revelation about a witness, or the discussion of Rule 404(b).  (Tr. 9/13/05 Hr'g at 25-27.)  During the *ex parte* conversation, the judge revealed to the prosecutors that he had researched the § 3432 issue and found support for the proposition that the trial had started the previous day.  (Tr. 9/13/05 Hr'g at 4-5.)  The court permitted the prosecutor to represent, outside the presence of the defense, that the Government "and defense counsel have been operating under the inference that the trial begins on or after the 26th [of September]."  *Id.* at 7.

Once defense counsel was present, the judge did not reveal the findings of his research in relation to § 3432, though they were potentially helpful to the defense.  The court made no effort to confirm the prosecutor's representations, or familiarize itself with the defense attorneys' views on § 3432.

During the *ex parte* conference, the judge said the following regarding a possible continuance:

Well, I – of course, the notice of who the witnesses are – the term ambush you are familiar with and I guess what concerns me is when these names are revealed with three days [*sic*] notice that we are going to have a request for a continuance.  It would be difficult – if they are as important to the government's case as you say they may be, it looks like we are setting this case up for a long continuance.

(Tr. 9/13/05 Hr'g at 12.)  Then the prosecutors conferred off the record.  (At the conclusion of the *ex parte* conference the court said he would see the prosecutors "down stairs" indicating the conference occurred in chambers.)  During the hearing with defense counsel present, the judge did not share his views regarding possible ambush and defense potentially needing a long continuance.

The trial judge's statements showed the court was aware that the seven informant witnesses were very important to the Government's case.  Nevertheless, during the portion of the hearing with defense counsel present, and in subsequent related proceedings on September 14, 2005, the court did not bring up the female witness who failed to corroborate confidential informant Charles "Monk" Sanders, either to ask whether the witness had been identified to the defense or to notify the defense that the court had been informed of the existence of a witness who could impeach Sanders.

The judge misrepresented the content of the *ex parte* conference to defense counsel.  When the *ex parte* hearing concluded the judge and prosecutor were discussing Rule 404(b), with the court saying "there is 404(b) material obviously in the proposed motion, it appears to me."  (Tr. 9/13/05 Hr'g at 22.)  The prosecutor agreed "[i]t appears to be implicit." *Ibid.*  Then the prosecutor offered a rationale for not "provid[ing] reasonable notice in advance of trial," (Fed. R. Evid. 404(b)), and the judge said he would "take this matter under advisement" before calling the conference to an end.  *Id.* at 23.

At the beginning of the hearing with defense counsel present, the judge did not reveal these discussions.  The prosecutor sought guidance from the court regarding "where we were when we stopped" the *ex parte* conference.  (Tr. 9/13/05 Hr'g at 26.)  The court said they had been discussing "security issues."  *Ibid.*  The court said, "it sounded like there had been some discussion with defense counsel.  And that's about as much as the Court knows."  *Ibid*.  The transcript shows the court drastically understated the true scope of the *ex parte* communications.  Once they were thus misstated, the prosecutor said, "I'm willing for the matter to be unsealed."  *Ibid.*  Mr. Barrett's trial counsel were entitled to rely upon the court's representations.  The combination of the court's omissions and the prosecutor's sudden willingness for the hearing to be unsealed suggested to defense counsel the transcript need not be requested or reviewed.[3]

During the *ex parte* portion of the hearing, the judge made statements suggesting skepticism about the Government's position.  The court specifically and repeatedly emphasized that the Government had no evidence of any overt act by any person that would suggest the witnesses were in danger.  *Id.* at 20.  The court did not inform the defense that the government had failed to produce evidence of an actual danger to its witnesses.  Without disclosing the weakness of the Government's position, the court permitted defense counsel to agree (a) to further delays in learning the identities and contact information for the witnesses, and (b) to be limited in its access to Government witnesses to the extent that they would only be interviewed in the presence of Government representatives.  *(Id.* at 27.)

The court had another opportunity to inform defense counsel of what transpired during the September 9 *ex parte* hearing.  On September 14, 2005, after jury selection

---

[3] Of course, whether it was unsealed during the trial was irrelevant insofar as Judge Payne had denied counsel any funds for obtaining pretrial hearing transcripts.  (Doc. 97.)

Def's § 2255 Mot.                                    39                     *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

proceedings ended, the court raised the issue of the unidentified witnesses.  The United States Attorney informed the court that the Government and Mr. Barrett's counsel had reached an agreement that the witnesses' names, contact information, criminal histories and (allegedly) promises made to them would be revealed the following Monday.  (R. 840.)  The United States Attorney further advised the court that the defense would, possibly, have access to some of the witnesses at the prosecutor's office.  (R. 841.)  Mr. Hilfiger stated that he had no objection to the arrangement, "based on what we talked about yesterday."  *Ibid.*  The court then stated that this would make a "clear record" and the parties' "announcement . . . resolves everything that is under seal."  (R. 843.)

It is a violation of due process for the Government to attempt to restrict defense access to witnesses, for example, by telling the witnesses they should only agree to defense interviews if the Government is present.  *See Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969).  It is unprofessional conduct for a prosecutor to condition a witness's interview with defense counsel on the prosecutor being present.  (ABA Standard 3-3.1(c) (commentary)).  The trial court permitted defense counsel for Mr. Barrett to agree to such restrictions (Tr. 9/13/05 Hr'g at 27; R. 841-42), without revealing to the defense the weaknesses in the Government's motion for a protective order that the court had freely discussed with the prosecutors.

The trial judge's withholding of his views about a continuance was particularly prejudicial.  Mr. Hilfiger has consistently and repeatedly stated that he agreed to the delays and other restrictions on his access to information about the witnesses because he believed Judge Payne would not grant a continuance of the trial.  (Decl. Mark Henricksen).  Judge Payne's views, as freely expressed to the prosecutors, would have given Mr. Hilfiger a completely

different view of the situation.  If Judge Payne had revealed his research regarding § 3432, the issue would not have been reviewed for plain error on appeal.  If Judge Payne had revealed his views on a continuance, Mr. Hilfiger likely would have requested one, and again the matter would have been reviewed differently on appeal.  If Judge Payne had revealed his views on the weakness of the Government's motion for a protective order, Mr. Hilfiger would have had further grounds for a continuance and grounds for objecting to restrictions the Government placed on access to witnesses.  Mr. Hilfiger also would have had grounds for a continuance if Judge Payne had revealed that Mr. Littlefield knew the identity of an impeachment witness who had not been disclosed in discovery, as the court's earlier orders required.

The trial judge's conduct in soliciting *ex parte* the prosecutor's views on the court's private concerns while at the same time failing to accurately disclose those communications to the defense violated Mr. Barrett's right to due process of law.  The disparate conduct of the court between the prosecution and defense is evidence of bias.  In a capital case, courts may not consider information the defense has no opportunity to hear or explain.

For the foregoing reasons, the trial judge should recuse himself from this case.  Thereafter, this Court should grant the relief sought herein.

To the extent the matters raised in this Claim could have been raised on direct appeal, appellate counsel were ineffective.  As stated *supra*, Judge Payne specifically selected Mr. Hilfiger for this case, and Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter.  Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal.  To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in this Claim could not be adequately litigated on appeal, because they required consideration of extra-record evidence.  (Decl. Mark Henricksen).  To the extent, Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.  (ABA Guidelines, *supra*, Guideline 10.15.1.)

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal.  (Decl. Mark Henricksen).  However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal.  *Id.*  Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards.  At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised herein had been raised on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 2.     Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. § 3006A and the Sixth Amendment to the United States Constitution**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

This claim is governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny.  The acts and omissions described herein fell

below prevailing professional norms of capital defense practice. Absent these acts and omissions, whether considered individually or collectively, there is a reasonable probability that Mr. Barrett would not have been convicted of the charged offenses, or that he would have received a sentence less than death.

### A.    Unreasonable Acts and Omissions Affecting the First and Second Stages of Trial

The judgments of conviction and the sentence imposed on Mr. Barrett were obtained in violation of his Sixth Amendment right to effective assistance of counsel. As set forth in Claim 1, *supra*, the trial court interfered with the constitutionally protected independence of trial counsel. Numerous acts and omissions of Mr. Barrett's appointed counsel fell below the standards set forth in prevailing professional norms. *See generally, Rompilla v. Beard,* 545 U.S. 374 (2005)(result of second stage trial held unreliable due to counsel's failure to investigate prosecution evidence and provide material to relevant experts); *Wiggins v. Smith,* 539 U.S. 510 (2003)(result of second stage trial held unreliable due to failure of defense counsel to conduct thorough independent investigation for defense evidence); *Williams v. Taylor,* 529 U.S. 362 (2000)(result of second stage trial held unreliable due to defense counsel's failure to obtain documentary and testimonial evidence favorable to defense); *Kimmelman v. Morrison,* 477 U.S. 365 (1986)(deficient performance in first stage found where defense counsel failed to seek discovery and file appropriate motions); *Strickland v. Washington,* 466 U.S. 668 (1984)(test for violation of Sixth Amendment in both stages of capital trial is (a) whether counsel's conduct fell below prevailing professional norms; (b) whether there was a reasonable probability of more favorable result).

The trial court's stated desire to minimize costs associated with Mr. Barrett's defense and to appoint local counsel to this case for the purpose of establishing their credentials for appointment in future capital cases, *see* Claim 1, *supra*, created an actual conflict between the financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough investigation and a vigorous defense. *See Wood v. Georgia,* 450 U.S. 261 (1981). This conflict adversely affected counsel's performance in that they failed to obtain the services of numerous experts, failed to devote time to preparing for and conducting the trial that counsel himself had considered necessary prior to the court's rulings, and failed to use other resources as expected under prevailing professional norms. *See generally, Mickens v. Taylor,* 535 U.S. 162 (2002); *Cuyler v. Sullivan,* 446 U.S. 335 (1980); *Holloway v. Arkansas,* 435 U.S. 475 (1978). *See also* Claim 3, *infra.*

The facts supporting this claim include the following, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

### Overview of First-Stage Ineffective Assistance

Multiple acts and omissions of trial counsel fell below prevailing professional norms of capital defense practice, and, either individually or in combination with each other, undermine confidence in the guilty verdicts returned by the jury. These include:

1. Trial counsel failed to professionally re-urge the motion to suppress the fruits of the search of Mr. Barrett's residence and property based on *Franks v. Delaware,* 438 U.S. 154, 156 (1978), after it was discovered, during the cross-examination of Charles "Monk" Sanders, that he was the confidential informant who provided the alleged probable cause for the no-knock warrant. Sanders testified on cross-examination that he did not provide District 27

Def's § 2255 Mot.                    44                    *U.S. v. Barrett,* 6:04-CR-115-JHP-SPS

Drug Task Force agent Clint Johnson the information which formed the basis for probable cause. In fact, based on Sanders's testimony on cross-examination in the first stage of trial, any information he could allegedly provide did not support the averments made by Johnson in the affidavit for the search warrant.  To the extent the issue was developed on the trial record, direct appeal counsel was ineffective for failing to raise the *Franks* issue.

2.      Trial counsel failed to professionally and properly investigate and develop evidence showing that Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.  This evidence (a) would have supported one or more defense theory instructions, (b) would have supported instructions on lesser-included offenses, and (c) would have effectively countered the Government's arguments on intent in both stages of trial.

3.      Trial counsel unreasonably failed to investigate Mr. Barrett's history of bipolar disorder and treatment with psychotropic medications, and the affects of Mr. Barrett not taking prescribed medications during trial.  Consequently, Mr. Barrett was tried while incompetent, and was denied his right to a contemporaneous determination of competence.

4.      By acceding to an eleventh hour arrangement to "interview" the informant witnesses during trial, and by failing to move for a continuance, trial counsel was not able to effectively investigate and challenge the testimony of these witnesses.  In any event, no professionally reasonable investigation into the backgrounds of these witnesses and their testimony was undertaken in whatever little time was available.  Had a continuance been secured, and a professionally reasonable investigation been otherwise undertaken, the credibility of these witnesses and their testimony could have been effectively attacked.

5.      Trial counsel was professionally unreasonable in failing to develop and introduce independent expert testimony to challenge the crime scene reconstruction testimony of Iris Dalley.

6.      Trial counsel was professionally unreasonable for failing to hire an independent expert on SWAT tactics, instead of relying on a hostile, pro-prosecution witness who could do the defense case little, if any good.

7.      Counsel was professionally unreasonable for failing to utilize the transcripts from the second state trial to impeach the police witnesses.  Counsel was also ineffective for eliciting damaging hearsay testimony from Clint Johnson, and failing to correct this error with facts that would expose Johnson's answers as false.

8.      Trial counsel unprofessionally failed to develop available evidence and testimony that would have impeached the testimony of Government witnesses and the government's theory that because of the lighting on the police vehicles, Mr. Barrett "knew" that law enforcement, rather than civilian trespassers, had entered his property at the time he fired his weapon.

9.      Trial counsel unprofessionally failed to develop available evidence to counteract the Government's claim that Mr. Barrett knew he had an active warrant for his arrest on a state drug charge, rather than just a pending case.  This evidence would have undermined the Government's theory that Mr. Barrett was hiding from the law because he "knew" he had an active warrant, and was lying in wait for the police.  Likewise, trial counsel was professionally unreasonable for failing to develop available evidence that Mr. Barrett had been reluctant to leave his property for several years preceding his state drug case.  This would have countered the Government's argument that Mr. Barrett "holed up" on his property because he "knew" he had

an active warrant, and was making "preparations" to meet any police presence with force. Similarly, trial counsel unprofessionally failed to develop and present available evidence that Sequoyah County Sheriff John Philpot had been to Mr. Barrett's property a mere four weeks or so before the raid, and inspected Mr. Barrett's weapons without incident. This evidence would have supported the motion to suppress and shown that a no-knock warrant and an armed raid on Mr. Barrett's property in the middle of the night by numerous law enforcement officers was completely unnecessary and unfounded. Additionally, this evidence could have been used to effectively impeach Government witnesses and the Government's theory of the case.

10.     Trial counsel was professionally unreasonable for failing to object to the expert witness testimony of Jim Horn, which the court struck *sua sponte* because it did not meet the standards for admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 595 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150-51 (1999). To the extent this issue was framed by the record, direct appeal counsel was ineffective for failing to raise it.

11.     Trial counsel was professionally unreasonable in failing to object to certain matters that were raised on direct appeal, but were reviewed under the onerous plain error standard due to trial counsel's failure to object.

12.     Trial counsel unreasonably failed to seek appropriate jury instructions at both stages of trial including instructions on the theory of the defense, lesser included offenses, the questionably reliability of testimony from drug addicts and informants, and residual doubts about the manner in which the shooting occurred. If these instructions had been given, there is a reasonable probability the jury would have understood how to reach more favorable verdicts.

13.     Trial counsel was professionally unreasonable for failing to object to prosecutorial misconduct in closing arguments in both stages of trial.

**Evidence of Constitutionally Deficient Representation**

1.     **Failure to professionally re-urge the motion to suppress under** *Franks v. Delaware,* **438 U.S. 154 (1978)**.

Trial counsel was professionally unreasonable for failing to adequately re-urge the motion to suppress under *Franks v. Delaware, supra* following the first stage testimony of Charles "Monk" Sanders.  Counsel's failure in this regard undermines confidence in the jury's first stage verdicts.  Because it was shown during Sanders's cross-examination that the material averments made in the search warrant affidavit to secure a no-knock warrant were false, or were made in reckless disregard for the truth, all evidence seized in the search of Mr. Barrett's cabin and property was subject to suppression.  The failure to competently argue the *Franks* motion obviously undermines confidence in the outcome of the first stage of trial.  Because the search warrant was defective under *Franks,* the drug-related and firearms evidence which formed the basis for each of the three counts of conviction would have evaporated, leaving nothing upon which the jury could have returned guilty verdicts.

The information used to secure the no-knock search warrant in this case was based on information supplied to Clint Johnson, the affiant on the warrant, by an alleged confidential informant (C.I.)  The C.I. did not testify at Mr. Barrett's two state trials.  At the conclusion of the second state trial, Clint Johnson wrote the alleged informant's name on a piece of paper, and placed it in an envelope, which was sealed in the state court file.  (Tr. 1/ 26/05 Hr'g. at 88-89).  It was only when Sanders testified in the first stage of Mr. Barrett's federal trial that it was

revealed, for the first time, that Sanders was the alleged informant who supplied the information providing probable cause. (R. 2521).

In pertinent part, the affidavit for the no-knock, nighttime search warrant state the following:

On September 18, 1999 this affiant was contacted by a confidential informant (CI) who advised that, within the past seventy-two (72) hours, they were in the above-described residence and observed a male that is known to the CI as Kenny Barrett present a quantity of white powder substance and represent it as being "methamphetamine."

The CI went on to state that while in the above described residence they observed Kenny Barrett divide and exchange a portion of the white powder substance for a quantity of money. The CI stated that they had been in the above-described residence on previous occasions and observed Kenny Barrett make "drug transactions." The CI further stated that while in the above-described residence they overheard Kenny Barrett state "if the cops try to raid me they will regret it because I'm going to kill the first cop through the door."

The C.I. also stated that while in the residence they [*sic*] observed several pistols lying around the residence and also Kenny Barrett had a pistol on his person.

This affiant is familiar with Kenny Barrett due to a pending investigation for the past six (6) months and is familiar that [sic] Kenny Barrett has an outstanding felony arrest warrant out of Sequoyah County, Oklahoma for failure to appear for a jury trial and unlawful delivery of CDS case number CF-97-86.

This affiant has learned from the CI that Kenny Barrett is maintaining his "drug transactions" in the night time hours due to the cover of darkness and that law enforcement personnel are less frequent [sic] at night.

The CI further stated that Kenny Barrett, due to Kenny Barrett's belief that law enforcement personnel cannot execute search warrants during the night, sell's [sic] controlled dangerous substances at nighttime and keeps large quantities of meth-amphetamine in his residence at nighttime in order to be undetected by law enforcement personnel.

This affiant asks that this search warrant be directed for day or night service due to the facts stated herein.

> This affiant received information from the informant on at least five (5) occasions. Each time that this informant has provided information, the information proved to be true and accurate and resulted in the confiscation of illegal substances.

Affidavit for search warrant signed by Clint Johnson and warrant signed by Sequoyah County Judge Dennis Sprouse on September 20, 1999.

On cross-examination in Mr. Barrett's federal trial, Sanders largely disavowed the information that was contained in the search warrant affidavit, and which allegedly supplied probable cause for the no-knock search. Sanders's testimony on cross-examination demonstrates that the search warrant affidavit was knowingly based on false information, or that this "information" was supplied to the Sequoyah County District Court with reckless disregard for the truth. Without the false information allegedly supplied by Sanders, there was clearly insufficient evidence to establish probable cause, let alone probable cause for a no-knock warrant. In contrast to the representations made in the search warrant affidavit, Sanders testified to the following on cross-examination:

1.     That he never saw Mr. Barrett manufacture methamphetamine on his property, or attempt to do so, and that he never told Clint Johnson anything to indicate that Mr. Barrett was manufacturing or attempting to manufacture methamphetamine (R. 2596-97, 2609);

2.     That when he first met with Johnson after having been to Mr. Barrett's residence in July, 1999, he gave Johnson no information regarding drugs on Mr. Barrett's property. He did not see any drugs on Mr. Barrett's property, and did not even do drugs with him on any occasion he was supposedly at Mr. Barrett's residence in July, 1999 (R. 2597-98);

3.      In September, 1999[4], Sanders, at Johnson's direction, allegedly went to Mr. Barrett's residence to exchange a set of car keys.  Based on when Sanders alleged this trip occurred, it was just days before the raid in the early morning hours of September 24, 1999.  A "day or two" after being at Mr. Barrett's, Sanders testified he was not asked by Clint Johnson whether he saw any drug activity at Mr. Barrett's on September 19 or 20.  Sanders testified that if Johnson had asked him about drug activity at Mr. Barrett's on September 19 or September 20, he "probably" would have told him that he saw no drug activity.  Sanders then testified, "I didn't see him doing nothing."  (R. 2608-2610);

4(a).    After allegedly being at Mr. Barrett's in mid-September, 1999, Sanders testified that Johnson directed him to again go back to Mr. Barrett's property.  Sanders testified that he told Johnson what he observed on this supposed trip to Mr. Barrett's.  According to Sanders, the pretext for going to Mr. Barrett's on this last occasion was to ask Mr. Barrett about the title to an automobile.  Sanders claimed to have been accompanied by his nephew.  Sanders thought that either he or his nephew asked Mr. Barrett if he had any drugs available.  Mr. Barrett apparently had no methamphetamine.  The only drugs supposedly seen by Sanders was a joint of marijuana, which he, his nephew, and Mr. Barrett smoked in Mr. Barrett's cabin.  (R. 2618-22);

4(b).    Sanders allegedly reported to Clint Johnson in the last meeting that he had seen guns at Mr. Barrett's.  He had also reported to Johnson seeing firearms at Mr. Barrett's residence when he allegedly visited in August, 1999.  To the extent Johnson in his affidavit presented this information as a new development to justify altering the existing bench warrant to

---

[4] Sanders placed the date of this alleged trip to Mr. Barrett's cabin as September 19 or 20, 1999.  The state search warrant was issued on September 20, 1999.  Of course, the precise dates of Sanders's alleged trips to Mr. Barrett's property are unclear.  *E.g.,* R. 2518-21, 2609.

Def's § 2255 Mot.                              51                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

a no-knock warrant, Johnson mislead the court.  Authorities had long been aware that like many rural dwellers, Mr. Barrett had firearms on his property.  In any event, the search warrant affidavit was directed at drug activity only, not the possession of weapons.  (R. 2623);

5.      Sanders's gave conflicting accounts of alleged visits to Mr. Barrett's shack which, together, show he did not observe any drug transactions there.  On direct examination, Sanders testified that in August 1999 he went to Mr. Barrett's home with a person identified only as "Ronny," and saw Mr. Barrett hand something to "Ronny."  Sanders testified that the alleged trip was for the purpose of buying drugs.  At the close of cross-examination, defense counsel walked Sanders through the information Sanders had given to Clint Johnson, according to Sanders's testimony on cross-examination.  Sanders agreed that when he was supposedly at Mr. Barrett's in July 1999 (a) he did not see any drugs, (b) did not see any manufacturing or attempted manufacturing of methamphetamine, and (c) did not do any drugs with Mr. Barrett.  Therefore, Sanders testified, based on his alleged July trips to Mr. Barrett's property, Sanders told Johnson *nothing* about Mr. Barrett engaging in drug activities.  Sanders also testified that when he supposedly went to Mr. Barrett's place in August 1999, with his sister and "Ronny," he saw no drugs, and told Johnson he saw no drugs or any evidence of drug manufacturing.  Sanders admitted he did not go into Mr. Barrett's house with "Ronny" (he waited in the car), and never testified he saw Mr. Barrett go outside.  How he saw any alleged drug transaction is therefore a mystery.  (R. 2599-2601, 2625-28).

Sanders agreed with defense counsel that he saw no drug manufacturing or other drug activity at Mr. Barrett's in September 1999, other than smoking a "joint" on what he claimed was his last trip to the property before the raid.  Aside from smoking a joint with Mr. Barrett on this occasion, the only drug activity he witnessed or participated in at Mr. Barrett's

Def's § 2255 Mot.                        52                     *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

residence was when he and Movant, who was also a methamphetamine user, shot methamphetamine together. (R. 2625-28).

Sanders's cross-examination testimony also belied Johnson's claims (a) that Sanders informed him that Mr. Barrett conducted drug transactions at night because there were fewer police around, and (b) that Mr. Barrett kept a "large quantity" of drugs in his house at night because he believed the police could not conduct a nighttime search. Of course, no "large quantity" of drugs were found when Mr. Barrett's residence and property were searched by the authorities.

After Sanders was cross-examined, AUSA Littlefield asked to take a "bathroom break." (R. 2630). The real purpose of the break was for Littlefield to talk to Sanders about his testimony. Sanders admitted Littlefield talked to him during the break. At first, he denied anything was discussed except how much longer he would be on the stand. In the next breath, he then admitted that Littlefield "may have" asked him whether he was confused about dates. Sanders did not "think" Littlefied asked him about the substance of his testimony on cross-examination. (R. 2239-40, 2642).

After speaking to Sanders during the break, Littlefield sought to repair the damage inflicted by Sanders's remarkably inconsistent testimony by having Sanders contradict, within a matter of a few minutes of the cross-examination having ended, certain aspects of the testimony he gave when questioned by defense counsel. Sanders's abrupt about-face on re-direct alone demonstrates that this is a witness who cannot be believed about anything, and demonstrates that he was anything but the "reliable" confidential informant Clint Johnson claimed him to be in the search warrant affidavit.

On re-direct, and in contrast to his testimony on cross-examination, Sanders stated that when he went to exchange car keys at Mr. Barrett's residence three to four days before Trooper Eales's was killed, Mr. Barrett sold drugs to Geniece Thomas.[5]   He also claimed he went to Mr. Barrett's residence with Thomas on more than two occasions to buy drugs.   He also claimed that he saw drug activity practically every time he supposedly went to Mr. Barrett's property, and that he would have reported any such drug activity to his alleged "handler," Clint Johnson.   Changing up his testimony from cross-examination, Sanders then claimed that on his last alleged trip to Mr. Barrett's, he saw a substance in Mr. Barrett's cabin that he believed to be methamphetamine.   Again in contrast to his testimony on cross-examination, Sanders claimed he may have even been at Mr. Barrett's after the last supposed trip he testified about on cross, and that he could not remember how many times, during the summer of 1999 and into September 1999, he had been to Mr. Barrett's property.   (R. 2531-38).

On re-cross, Sanders contradicted himself in the same breath about whether he shot methamphetamine daily, gave conflicting answers as to whether there was a drug transaction at Mr. Barrett's when he supposedly went there with Geniece Thomas the first time, and again contradicted his testimony on cross-examination by stating that when he allegedly went to Mr. Barrett's with his nephew, he saw methamphetamine in addition to marijuana.   (R. 2642-48).

After Sanders testified, defense counsel re-urged the motion to suppress, but did so in a manner that did not comport with prevailing professional norms.   (R. 2677-80).   Defense

---

[5]   "Geniece" is the way Ms. Thomas's name is spelled in the transcript.   Her name is actually Janesse Thomas.   What she has to say about Mr. Sanders's account of their alleged trips to buy drugs at Mr. Barrett's residence is addressed in the portion of this claim relating to counsel's failure to investigate and effectively impeach the informant witnesses.   (*See also* Decl. Janesse Thomas.)

counsel argued orally that the motion to suppress was being re-urged because, based on Sanders's testimony on cross-examination, the warrant was based on "faulty" information. Clint Johnson, who had been questioned about the search warrant affidavit during the hearing on the motion to suppress, related certain information contained in the affidavit that Sanders specifically denied giving. Specifically, page 2 of the search warrant affidavit stated that the C.I. (Sanders) had advised Johnson within the last 72 hours he had been at Mr. Barrett's residence and observed Mr. Barrett present a quantity of white powder, which Mr. Barrett represented was methamphetamine. On cross-examination, Sanders stated there had been no discussion about what Sanders thought was methamphetamine in Mr. Barrett's kitchen. According to Sanders's testimony on cross-examination, there had been no representation that this substance was methamphetamine, and no presentation of the white powder to Sanders. The search warrant affidavit went on to state that the C.I. (Sanders) observed Mr. Barrett divide and exchange a portion of white powder for a quantity of money. Sanders testified on cross-examination that this did not happen. Defense counsel pointed out they were confronted with all this by the answers Sanders gave on cross-examination; there had been no opportunity to interview Sanders before he testified.

AUSA Littlefield responded that Clint Johnson had testified at the hearing on the motion to suppress, had testified under oath what he had been told by the C.I., and what facts had formed the basis for the search warrant affidavit. (R. 2679.)

The court instructed defense counsel to put the motion in writing, and for the Government to respond in writing. The court stated that it would either hold a hearing, if such was deemed necessary, or would rule on the pleadings. (R. 2679.) As pointed out by the Government in its response to the renewed suppression motion:

Def's § 2255 Mot.                           55                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

> The entire basis of defendant's Motion to Reurge the Motion to Suppressarises from "testimony" of Charles Sanders which was elicited on cross-examination. Specifically, Barrett relies upon the statement attributed to Sanders in the affidavit that he assumed a powder to be methamphetamine. Sanders purportedly testified that he did not advise Clint Johnson that Barrett represented such powder as methamphetamine to him purportedly denied telling Clint Johnson that he had observed Barrett divide and exchange a portion of white powder for quantity of money. [sic]  Barrett's Motion to Reurge ignores substantial portions of Sanders' testimony on direct and redirect examination.

(Doc.  231 at 1).

The court ruled on the renewed motion to suppress by written order, without conducting an evidentiary hearing.  (Doc. 253.)  In its ruling, the court noted that in the original motion to suppress, there was no *Franks* allegation, a rather irrelevant observation because the basis for the *Franks* claim occurred during trial.  Rather, it had been alleged that the C.I. did not really exist.  The court summarized at length aspects of Sanders's testimony, and concluded that, in light of the testimony of Johnson and Sanders, *as well as other witnesses to activities at Mr. Barrett's residence*, there was "absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful."  Because Johnson accepted as true what he was told by Sanders, and because Johnson had found Sanders to have given reliable information in the past, "the affidavit was properly supported."  Based on the totality of the testimony, it was concluded that Mr. Barrett had "not even established that the information provided in 1999 by the informant was untruthful or unreliable."  Thus, the court concluded, facts recited in the affidavit "could not have been made with deliberate or reckless disregard for the truth."  Doc. 253 at 7.

Had defense counsel forcefully and properly re-urged the motion to suppress based on *Franks v. Delaware, supra,* the motion by all rights should and would have been

sustained.  Moreover, as shown below, the court's order is seriously flawed.  Trial counsel urged

only one (or at best two) grounds in support of the renewed motion to suppress based on *Franks.*

These revolved around Sanders's assumption that a powder he observed at Mr. Barrett's

residence was methamphetamine; Sanders's testimony on cross-examination that Mr. Barrett did

not represent the powder to be methamphetamine; and the fact Sanders did not tell Johnson he

saw Mr. Barrett divide and exchange a portion of the white powder for money.

The one or two areas of impeachment cited by the defense simply scratched the

surface.  Based solely on the cross-examination of Sanders (as well as other factors that could

have been used to impeach Sanders, but were not, as is discussed in another subpart of this claim

for relief and Claim 5, *infra*), the defense could have argued much more, and would have been

entitled to an evidentiary hearing and suppression of the evidence.  Aside from what was stated

in the re-urged, counsel could have argued the following:

(1) that Sanders had never seen drug manufacturing or attempted drug

manufacturing at Mr. Barrett's residence at any time, which conflicted with the averment

in the affidavit that Mr. Barrett kept a "large quantity" of drugs at this house;

(2) that Sanders witnessed no drug activities of any kind on Mr. Barrett's property

in July 1999, which also conflicts with Johnson's claims that Sanders said Mr. Barrett

kept a large quantity of drugs and engaged in repeated drug sales at night;

(3) that Johnson was recklessly indifferent to the truth in that he did not ask

Sanders whether he observed drug activity at Mr. Barrett's residence in mid-September

1999 when he supposedly was there with his girlfriend Ms. Thomas to exchange a set of

car keys; if Johnson had asked, Sanders would have contradicted the affidavit because he

"probably" would have told Johnson he witnessed no drug activity, because "I didn't see him doing nothing";

(4) that Johnson knew Sanders had not reliably brought back evidence of methamphetamine activity as shown by Sanders's testimony that after Johnson told him to go back to Mr. Barrett's in September 1999 – after Sanders had supposedly been there just a short time before – Sanders or his "nephew" asked if Mr. Barrett had any drugs

available, but there was no methamphetamine, and the three of them simply smoked marijuana;

(5) that Sanders further testified to Johnson's indifference when, summarizing what he supposedly knew, Sanders repeated he witnessed no drug activity at Mr. Barrett's in July 1999, and told Johnson nothing about any drug activity at Mr. Barrett's during that month;

(6) that, consistent with the court's order, there was no drug activity witnessed in August, 1999; and that, other than smoking a joint with Mr. Barrett and his "nephew," Sanders witnessed no drug activity at Mr. Barrett's in September, 1999.

Again, Sanders's claim that he had seen guns in Mr. Barrett's residence provided no probable cause for a drug search warrant, which is what Johnson secured.  Nor did Sanders's claim that Mr. Barrett had threatened law enforcement provide probable cause for a drug search warrant.

Counsel also unreasonably failed to argue evidence of Johnson's reckless disregard for the truth.  Sanders testified he was in regular contact with Johnson and continued to use drugs steadily.  Sanders acknowledged in his testimony that his drug use seriously impaired

Def's § 2255 Mot.                              58                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

his ability to recall and relate information accurately.  Sanders testified that Johnson, in effect, made a point of not asking Sanders about his own drug use or, on occasion, what he saw or failed to see at Mr. Barrett's residence.  This demonstrated Johnson could not rely reasonably on Sanders for anything.  Counsel also unreasonably failed to argue that Sanders would radically change his testimony depending simply on which lawyer was asking him questions.  Johnson surely would have seen the same tendency in Sanders to say whatever pleased the authority figure asking him questions.  Based on his supposed repeated and close contact with Sanders, Johnson had to be well aware of this fact.

In sum, Sanders not only disavowed the statements Clint Johnson attributed to him, Sanders repeatedly asserted that Johnson *had not asked* about Sanders's own drug use – which would impair his perceptions and his truthfulness – or what Sanders supposedly observed. This testimony would have shown that Johnson made material false statements in the affidavit for search warrant both about the informant's alleged observations and Johnson's own grounds for trusting the informant.  These false statements negate *the entirety of the warrant affidavit*.  At a minimum, it is clear, based on Sanders's testimony on cross-examination, that Johnson recklessly disregarded the truth in reciting the "facts" supporting "probable cause" for the search warrant.  *United States v. Deleon,* 979 F.2d 761 (9th Cir. 1992); *United States v. Calisto,* 838 F.2d 711 (3rd Cir. 1988); *United States v. Pritchard,* 745 F.2d 1112 (7th Cir. 1984)(*Franks* violations established, including instances of affiant reporting information informants never supplied).

In its order denying the renewed motion to suppress, the court did not recite all the facts bearing on the use of false statements by Johnson, or Johnson's reckless disregard for the truth.  Had these matters been urged, there is a reasonable probability that the outcome of the

Def's § 2255 Mot.                    59                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

renewed suppression motion would have been different.  At a minimum, had all the evidence from Sanders's cross-examination been marshaled, the defense surely would have been entitled to the evidentiary hearing under *Franks* that was denied when the court simply ruled on the pleadings.  *United States v. Johns,* 851 F.2d 1311 (9th Cir. 1988), *cert. denied,* 505 U.S. 1226 (1992).

In its order, the court seemed to rely on the testimony of other informant witnesses to buttress the credibility of Sanders and Johnson.  Not only could counsel, had they conducted a reasonable investigation (or had the time to conduct a reasonable investigation), have impeached many of these other witnesses (see below), the court could not properly rely on years-after-the-fact testimony to find that the search warrant affidavit, founded solely on information from Charles "Monk" Sanders, was based on the truth, rather than outright fabrication or a reckless disregard of the truth.

### Ineffective Assistance of Appellate Counsel

The question of the As set forth *supra*, the *Franks* issue, and counsel's failure to effectively argue it, was at least partially framed by the record.[6]  The issue was not raised on direct appeal.  Because the issue was obviously meritorious, even with the record that was made, there could be no reasonable strategic basis for omitting it.  The failure to raise this issue was professionally unreasonable.  Because it was shown above that the *Franks* issue, in conjunction with a claim of ineffective assistance of trial counsel for failing to competently argue it, would have made a difference in the outcome of the appeal, Mr. Barrett was prejudiced.  Had the issue

---

[6]  *Brady* evidence suppressed by the Government, and/or newly discovered evidence, places the *Franks* issue in a much stronger light than even existed on the trial record.  This is addressed in a separate claim for relief.

been raised, there is a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Eagle v. Linahan,* 279 F.3d 1283, 1301-06, 1308 (11th Cir. 2002)(counsel ineffective on appeal for failing to raise error apparent on the record); *Carter v. Bowersox,* 265 F.3d 705, 709-10, 716 (8th Cir. 2001)(direct appeal counsel ineffective for failing to raise issue apparent on the record, even though not preserved or adequately preserved, under plain error standard).   While an action under 28 U.S.C. section 2255 is not intended as a second direct appeal, and issues framed by the trial record and which could been, but were not, raised on direct appeal, are ordinarily considered procedurally barred *United States v. Warner,* 23 F.3d 287, 291 (10th Cir. 1994), cause for excusing waiver exists where appellate counsel provides ineffective assistance. *Murray v. Carrier,* 477 U.S. 478 (1986).

> **2.      Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense**

The Government's theory of the case was that Mr. Barrett anticipated a police raid, prepared for it, and intended to use deadly force if the police came to his property.  The prosecution argued that when Mr. Barrett began firing his weapon, he was well aware that the police, rather than trespassers, had arrived.  This argument was highly relevant to count 3 of the superseding indictment, which charged that Mr. Barrett intentionally killed a state law enforcement officer in the performance of his official duties.  (Doc. 52.)  This is the count of conviction for which Mr. Barrett received the death penalty.  (Docs. 258, 285.)

In the first stage of trial, the jury was instructed that among the essential elements of the offense charged in count 3 was that Mr. Barrett intentionally killed the victim, knowing or

having reason to know that the victim was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties. (Doc. 240; R. 4262-64, 4266-67.)

Mr. Barrett shows below that trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from eyewitnesses Toby Barrett and Alvin Hahn that would have rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting. In addition to these failings, a proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the Government's portrait of Mr. Barrett was wholly inaccurate. Rather than the intentional and remorseless killer one who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the Government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals. The testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case as to both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses.

Defense counsel's consultation with a mental health professional in preparation for Mr. Barrett's trial was limited to retaining Dr. Jeanne Russell of Tulsa, Oklahoma, to reprise the risk assessment she had done in preparation for a second stage proceeding in state court. Due to counsel's failure to conduct a proper investigation, counsel never had Mr. Barrett evaluated with the full range of psychiatric and neuropsychological testing that would have shown him to

be the antithesis of the Government's picture.[7]  Professional norms of criminal practice,

particularly in capital cases, tell attorneys that they should secure expert assistance.  Counsel's

failures to have Mr. Barrett evaluated in connection with first-stage intent or mental state issues,

in light of the defense arguments made at trial respecting how the shooting occurred, constitute

deficient performance.  *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510

(2003).

The results of an accurate and reliable mental health evaluation demonstrate that

trial counsel's failings were prejudicial.  George W. Woods, Jr., M.D., a Board Certified

psychiatrist who specializes in psychiatry and neuropsychiatry, performed a clinical and forensic

evaluation of Mr. Barrett in February 2009, and concluded to a reasonable degree of medical

certainty, *inter alia*, Mr. Barrett's mental functioning was impaired at the time of the offense by

psychiatric illness and significant brain damage, which prevented him from knowing or

deliberating on the nature of his responses to the police incursion before he acted.  Dr. Woods

concluded that at the time of charged offenses, Mr. Barrett suffered from several major brain

disorders including Bipolar Disorder, Post Traumatic Stress Disorder and damage to his brain in

the areas that are necessary to exercise judgment and reasoning.  Among the most significant

functional effects of Mr. Barrett's disorders are a heightened state of fear of imminent

annihilation coupled with an inability to understand or regulate his reactions – including

overreactions – to perceived threats.  Thus, when the events unfolded at the time of the offense,

---

[7] Claims 1 and 3 show that Mr. Barrett had constitutional and statutory rights to expert
assistance to refute the testimony of Government witnesses.

Mr. Barrett could not and did not know right from wrong, and acted with the distorted perception that his response was necessary to keep intruders from killing him.  (Decl. of George Woods.)

Dr. Woods's evaluation was based on reliable information that was reasonably available to trial counsel through timely investigation.  This information included social and medical history documents, as well as witness accounts, which documented Mr. Barrett's personal as well as family history of mental illness.  The data Dr. Woods relied on, and which was available to trial counsel, also included a neuropsychological evaluation performed by Dr. Myla Young.

Dr. Young has a wealth of experience, has published in peer reviewed journals, and has lectured and instructed other professionals in her field on a frequent basis.  (Appendix to decl. of Myla Young, curriculum vitae.)  She administered sixteen hours of neuropsychological testing to Mr. Barrett over a period of three days, and reviewed his relevant educational, medical and mental health records.  (Decl. of Myla Young at 7-24.)

Dr. Young's testing determined that Mr. Barrett has significant brain damage and resulting brain dysfunction.  This damage primarily involves the prefrontal and temporal cortices of the brain.  Proper functioning of these areas of the brain is necessary "for the brain to effectively communicate information and function effectively."  The severity of Mr. Barrett's brain dysfunction has a negative impact on each and every aspect of Mr. Barrett's daily functioning.

Most especially, Mr. Barrett's organic impairments would negatively impact his abilities to "organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment."  (Decl. of Myla Young at 24.)  Mr. Barrett's disabilities are further exacerbated under "conditions of complexity and/or

highly stressful situations." (Decl. of Myla Young at 24.) Mr. Barrett is a "concrete thinker," whose executive function, which controls the ability to think, organize, problem solve, and change actions based on the information he receives, is severely compromised. (Decl. of Myla Young at 11, 13.) Because of the significant impairments to Mr. Barrett's temporal cortex, he has difficulty processing visual information and is abnormally subject to feelings of fear and paranoia, with consequent tendencies to impulsiveness and aggressive outbursts. (Decl. of Myla Young at 13.) Mr. Barrett's ability to actively process and comprehend information, including visual information, in the "here and now," or as it unfolds, is severely compromised. (Decl. of Myla Young at 14, 15, 19.) In lay terms, Mr. Barrett acts or reacts before he is able to accurately perceive and process what is going on around him, a dysfunction that is especially heightened, as noted, in stressful situations. (Decl. of Myla Young at 14, 24.) Mr. Barrett has moderate to significant impairments in his ability to visually scan and accurately recognize information. (Decl. of Myla Young at 20.) The "fluency" with which Mr. Barrett interprets visual information, and the manner in which he processes such information, is also significantly impaired. (Decl. of Myla Young at 21, 23.)

As Dr. Woods explained, the accuracy and reliability of Dr. Young's neuropsychological tests results are medically unassailable:

> [N]europsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results. The successful manipulation of test data to exaggerate measures of neurological impairment in a manner that eluded detection by imbedded validity scales would have required Mr. Barrett to have specific knowledge and mastery of neuroanatomy and test construction.

Based on his consideration of these and other psychiatric data, Dr. Woods

concluded:

[¶]     Mr. Barrett meets diagnostic criteria in the DSM-IV-TR? for Bipolar
Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic,
severe, 309.81.  He also has clinically measured diffuse brain damage, particularly
in the prefrontal, temporal, and limbic system cortices, with the most cognitively
significant impairment located in the orbitofrontal and dorsolateral regions of the
prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive
functioning and behavior that is severely compromised by overlapping symptoms
of depression and mania – diagnostic of Bipolar and secondary to PTSD – and
impairments in higher cortical regions necessary for inhibition, reasoning and
judgment.

[¶]     Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be
categorized on Axis III. "Executive functioning" is a term addressed by many but
coalesced by Lezak to discriminate cognitive functions from the "how" or
"whether" of human behaviors (Lezak 1983).

***

[¶]     Ample anecdotal and congruent documentary evidence confirm that Mr.
Barrett's mental disorders and defects pre-existed the date of the commitment
offense and his trial.

(Decl. George W. Woods, Jr., M.D. at ¶¶ 66-68.)

The concurrent findings of Dr. Young and Dr. Woods show that,

[¶]     Mr. Barrett's functioning at the time of the offense was compromised by
multiple neurological and neuropsychiatric symptoms . . . .

* * *

[¶]     He was suffering from both acute and chronic symptoms of his Post
Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these
disorders, both disorders of mood, were amplified by a disinhibited, disjunctured,
debilitated brain that limited Mr. Barrett's understanding of both the legal
proceedings and the fear, suspicion, racing thoughts, and poor adaptive function
from which he was suffering.

[¶]     Mr. Barrett's chronic PTSD became acutely activated by the event leading
to his arrest. As previously noted, Mr. Barrett had multiple individual stressors
which qualified for a stressor that was life threatening. Over the course of his life,

Def's § 2255 Mot.                              66                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]   He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]   Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregultion primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]   Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of

emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]   Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]   Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]   Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]      My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Decl. George W. Woods, Jr., M.D. at ¶¶ 69-78.)

Mr. Barrett's trial counsel were ineffective for failing to utilize whatever resources they had to discover these facts about their client's organic brain impairments. Prevailing professional norms called upon trial counsel to investigate their client's medical history prior to trial so that counsel could make informed decisions about what strategies to pursue.  They were certainly on notice that Mr. Barrett had mental problems, based on existing mental health records from Eastern State Hospital, Sequoyah Memorial Hospital, Wagoner Community Hospital, and the Bill Willis mental health facility in Sallisaw, as well as the preliminary results of the mental health investigation conducted by predecessor counsel in the state court proceedings.  Yet trial counsel did not retain an expert prior to trial who could advise them regarding mental state defenses that would be available at either stage.

If counsel had undertaken reasonable steps to investigate, prepare and present evidence regarding Mr. Barrett's severe organic deficits, the first stage defense of lack of intent, the argument that Mr. Barrett was unaware that the police were on his property, and was simply reacting in the moment in a fearful and panicked state to a perceived threat by criminal trespassers would have been strengthened immeasurably.  Due to Mr. Barrett's inability to correctly process information, especially visual information, it could have been argued that even

if, as the police witnesses claimed, some of the automobiles which converged on Mr. Barrett's property had their emergency lights engaged, Mr. Barrett did not recognize this and instead simply reacted by firing on the vehicle which all witnesses agreed looked like an ordinary automobile.  At a minimum, this evidence would have been critical in contesting the intent element of count 3 which, as noted, required Mr. Barrett to have a specific intent to kill someone who was known to him to be a law enforcement officer engaged in official duties.

The exculpatory nature of expert testimony regarding Mr. Barrett's numerous and severe psychiatric, psychological and organic impairments could have been buttressed by reasonably available testimony from lay witnesses about Mr. Barrett's mental state.  In addition to providing contemporaneous, real world accounts of Mr. Barrett's impaired mental functioning, the testimony of such witnesses would have confirmed that Mr. Barrett's disabilities pre-dated the charged offenses and thus clearly impaired his mental state at the time in question.  Family witnesses interviewed in connection with the current proceedings describe an individual who had been mentally and emotionally troubled from childhood on; who was subject to inexplicable and wild mood swings; who was paranoid, suspicious and overly vigilant; who had suffered from deep and prolonged episodes of depression; who reacted without thinking or correctly perceiving what was going on around him; who handled stress poorly and who reacted under stress; and who retreated to a safe place when he felt threatened.  (See, e.g., Decls. of Abby Stites, Toby Barrett, Sylvia Gelene Dotson, Mark Dotson, Ruth Harris, Kathy Trotter, Ernest Barrett, Steve Barrett, Ada Blount, Nona Reich, and Carolyn Joseph.)  None of these witnesses, if they were interviewed at all by trial counsel, was questioned about Mr. Barrett's mental state, either with respect to the first or the second stage of trial.

The accurate picture of Mr. Barrett and his mental state, and how it bore on his intent, was further evidenced by reasonably available records of Mr. Barrett's previous hospitalizations, which counsel could have obtained, but unreasonably failed to do so.  In 1986, Mr. Barrett was at Eastern State Hospital in Vinita after shooting himself in a suicide attempt. Among other things, he was diagnosed with bipolar disorder.  In 1995, he was again hospitalized because he was "losing [his] mind."  On this occasion, Mr. Barrett was diagnosed with an acute psychotic reaction.  Mr. Barrett had also received mental health treatment, as noted, at Wagoner Community Hospital and the Bill Willis facility in Sallisaw.  *(See* Eastern State Hospital Records, Wagoner Community Hospital records, and Bill Willis Mental Health Center records.) As discussed in detail in Mr. Barrett's claim that he was denied effective assistance of counsel in the penalty phase of trial, his family history, on both his mother's and father's side, is replete with serious mental illness, suicide and suicide attempts.  (Decl. of George Woods.)

Not only would all of this evidence have been critical in attacking the intent element of count 3, it also would have established the basis for a defense of not guilty by reason of insanity, as well as an instruction on lesser included offenses, at least with respect to count 3.[8]

Tenth Circuit Pattern Instruction 2.54 outlines the elements of voluntary manslaughter under 18 U.S.C. section 1112(a), para. 2.  Voluntary manslaughter is murder without malice, upon a sudden quarrel (which does not apply here) or heat of passion.  Homicide is voluntary manslaughter where a defendant, in a sudden heat of passion and without malice, intentionally kills the victim, or acts recklessly with extreme disregard for human life.  Heat of

---

[8] As argued in Claim 9, Mr. Barrett was denied his due process rights under the Fifth Amendment when the court failed to give a defense theory instruction, and denied requests from both the government and the defense for a manslaughter instruction.

passion is defined as passion, fear or rage in which the defendant loses normal self-control, as a result of a circumstance or circumstances that provoke such a passion in an ordinary person, but which do not justify the use of deadly force. *United States v. Scafe*, 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides*, 820 F.2d 1232, 1242 (10th Cir. 1987).

The mental state required for voluntary manslaughter would apply to all three of the counts charged against Mr. Barrett, because it negates malice altogether. E.g., *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975); *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985)("a defendant in a federal murder case who has sufficiently raised a heat of passion defense [is] entitled to instructions informing the jury of the theory of defense and the Government's duty to prove beyond a reasonable doubt the absence of a heat of passion in order to obtain a murder conviction."); *United States v. Serawop*, 410 F.3d 656. 660-70 (10th Cir. 2005)(citing Lofton's holding that in order to establish malice, the prosecution must prove the absence of a heat of passion beyond a reasonable doubt when it is an issue in the case).

Expert and lay testimony would have raised the issue that Mr. Barrett, even if he had been able to know the difference between right and wrong (which he could not) when confronted with a strange vehicle barreling onto his property and striking his porch, would not have been aware of a police presence, but simply reacted out of a passion, fear or rage in which whatever self-control he possessed was lost, due to the circumstance of the middle-of-the-night intrusion onto his property of automobiles he could not discern as police vehicles.

In sum, trial counsel, had they acted, or been permitted to act, in a manner consistent with prevailing professional norms, would have investigated and presented evidence from Toby Barrett and Alvin Hahn that corroborated several law enforcement witnesses, and showed that at the critical moment, Mr. Barrett likely could not see any emergency lights or other

indications that the vehicle heading toward his house and young son contained law enforcement officers.  Trial counsel also would have investigated Mr. Barrett's background and medical history and, through consultation with appropriate experts, found extensive evidence of organic brain dysfunction, bipolar disorder and PTSD.  Had this evidence been produced, there is a reasonable probability that the outcome of the first stage of trial would have been different.  This evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to count 3, and would have supported either outright acquittal or a finding that, at most, Mr. Barrett was guilty of was voluntary manslaughter.

### 3.    Due to the unreasonable failure of Mr. Barrett's trial counsel to retain expert assistance, Mr. Barrett was tried while incompetent

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, compulsory process, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, a trial free of materially false and misleading evidence, to confront and cross examine witnesses, and to a jury trial as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution, by virtue of trial counsel's prejudicial failure wholly or adequately to investigate Mr. Barrett's mental state and functioning before and during trial, and further failure to invoke adequate procedures, and obtain the assistance of experts, necessary evidence and/or any other reasonable and constitutionally requisite means by which to evaluate, assess and diagnose Mr. Barrett's

underlying mental diseases and defects, and accurately and reliably determine his mental competency to stand trial.

As a corollary to a defendant's due process right not to be tried or sentenced while he is mentally incompetent (see, e.g., *Medina v. California*, 505 U.S. 437, 453, 112 S.Ct. 2572 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173, 95 S.Ct. 896 (1975); *Pate v. Robinson*, 383 U.S. 375, 386, 86 S.Ct. 836 (1966)), "judges must depend to some extent on counsel to bring [competence] issues into focus." (*Drope v. Missouri*, 420 U.S. 162, 176-77 (1975).) Whenever information that is made known to the trial court raises a doubt that a defendant is mentally competent to stand trial, the minimal guarantees of federal and state due process require the suspension of criminal proceedings until the defendant's competency can be determined on the basis of an adequate, thorough and reliable mental health evaluation. *(Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997).) Defense counsel are therefore constitutionally obligated to vindicate this rudimentary trial right by bringing evidence suggesting incompetence to the attention of the court. (Id.; Bouchillon v. Collins, 907 F.2d 589, 595 (5th Cir. 1990).)

Trial counsel failed to investigate Mr. Barrett's mental health as it related to competency, to guilt-innocence phase defenses, and to punishment phase mitigation, and they failed to raise and preserve numerous legal issues involved, all to his prejudice. Counsel unreasonably failed wholly or adequately to complete the investigation of Mr. Barrett's social history and background, and failed to consult with qualified mental health experts, including a neuropsychologist, despite the existence of readily available evidence of which counsel were or should have been aware including, but not limited to Mr. Barrett's history of psychiatric diagnoses and treatments, and his family history of mental illness. "It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has

notice of the client's history of mental problems." (*Williamson v. Ward*, 110 F.3d, at 1518-19 (quoting *Bouchillon v. Collins*, 907 F.2d, at 595).)

As a result of counsel's unreasonable failing, no one working on Mr. Barrett's behalf obtained requisite social history data, nor did any competent mental health professional conduct any of testing and other evaluation necessary to perform a reliable assessment of Mr. Barrett's competency including, but not limited to medically indicated neurological and neuropsychological testing, which was necessary to determine the existence, nature and severity of Mr. Barrett's brain damage and mental illnesses.

If counsel had conducted a professionally adequate investigation, including retaining competent mental health professionals, they would have learned that Mr. Barrett suffered from a life-long history of impaired functioning that was medically indicative of a neuropsychiatric condition, which included organic brain damage associated with, or superimposed on, a chronic major mental illness, Bipolar Disorder and Post Traumatic Stress Disorder (PTSD).   Access to, consideration of and reliance on the results of the neuropsychological testing that was medically and forensically indicated would have enabled any competent expert to inform counsel that the functional impairments associated with the neurologically damaged areas of Mr. Barrett's brain were consistent impairment of the domains necessary for trial competence, such as executive functioning; and that Mr. Barrett would not be able to track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise his legal rights.

Any reasonably diligent counsel informed of such information would have been obligated to request a hearing to determine Mr. Barrett's competency.  (See, e.g., *Williamson v. Ward*, 110 F.3d 1514-17 (counsel ineffective for not raising a competency claim where defendant

had been diagnosed with and treated for mental illness); see, also, *Barnett v. Hargett*, 174 F.3d 1128, 1135-36 (10th Cir. 1999) (defendant's history of mental illness and counsel's belief that defendant was presently incompetent among the factors supporting a bona fide doubt as to competency); ABA Standards, Mental Health, Standard 7-4.2 ("Defense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence").)

To establish the prejudice of counsel's failure to seek a timely competency hearing, Mr. Barrett must show only a reasonable probability that he was incompetent at the time of his trial. *(Hull v. Kyler*, 190 F.3d 88, 105 (3d Cir. 1999) (citing *Eddmonds v. Peters*, 93 F.3d 1307, 1317 (7th Cir. 1996), cert. denied, 520 U.S. 1172 (1997); and *Felde v. Butler*, 817 F.2d 281, 282 (5th Cir. 1987)); see also *Williamson*, supra, 110 F.3d at 1519 (same).).  "[T]he evidence of Mr. [Barrett's] mental state which we have recited at length throughout this [petition] establishes a reasonable probability that he was not competent to stand trial." *(Williamson*, 110 F.3d,  at 1519.)  The documentary evidence submitted in support of Mr. Barrett's petition demonstrates that consistent the results of testing, employing reliable neuropsychological instruments for assessing brain impairment, have measured Mr. Barrett in the impaired range on the critical indicators of brain damage to his frontal lobes and executive functioning.  Mr. Barrett's previous, psychiatric  diagnosis of Bipolar Disorder, made by independent, state clinicians, is supported by the observations of lay witnesses over the course of his life.  The medical indications in his social history and life-time functioning, which meet diagnostic criteria for PTSD, are also documented by reliable sources.  Moreover, the congruence of all the clinical data, including social history, testing and reported symptoms demonstrates that Mr. Barrett is not malingering or exaggerating his condition.

Def's § 2255 Mot.                                     75                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Barrett's brain damage, coupled with his disruptive psychotic illness, left him unable to appreciate the nature of his actions at the time of the offenses for which he was tried and convicted; and unable rationally to understand the proceedings or to assist in his defense during the period in which he was tried.  As Dr. George Woods, Jr. concluded, "Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial."  (Decl. of George Woods, M.D., at  81.)

Rather, Mr. Barrett's ability to understand and track the judicial proceedings was substantially impaired by the confluence of his psychiatric disorders and measured brain damage. The fragments of police bullets in Mr. Barrett's body caused him continuing pain, and provoked an immunological reaction, all of which served as "built-in reminders" of his life-threatening trauma.  The ongoing distortion and distraction of Mr. Barrett's PTSD were compounded by the racing thoughts symptomatic of the disabling "manic form" of Bipolar Disorder.  (See *Williamson v. Ward*, 110 F.3d, at 1519; Decl. of George Woods, Jr., M.D., at  80.)  These disabling impacts on Mr. Barrett's mental state were, in turn, exponentially increased by the effect of his brain damage that left Mr. Barrett being "unable to get unstuck." (Decl. of George Woods, Jr., M.D., at  80.)  This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Id. at  59, 80.)

In light of this record, it is clear that trial counsel's "lack of investigation created a substantial risk that [their] client's due process rights were violated by standing trial while incompetent, and therefore undermines . . . confidence in the reliability of the adversarial testing process." (*Williamson v. Ward*, 110 F.3d, at 1519.)  Accordingly, Mr. Barrett should be granted a new trial.  (Id.)

**4.**      **But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.**

Claim 1 discussed the improper ex parte hearing held between the Court and the Government on the prosecution's sealed motion to delay disclosing the identities of their seven informant witnesses.  During this hearing, the court criticized the Government for failing to raise the issue sooner.  The court also found the Government's justification for throwing a veil of secrecy over these witnesses unconvincing, because literally no evidence was produced that any of them had been threatened or were in any sort of danger.  The Government merely represented that these witnesses, all of whom had criminal records, had an undefined and inchoate "fear" that they "may" be in danger if they testified.  The court made the obvious point that it envisioned a long continuance to allow the defense sufficient time to investigate these witnesses and prepare for their testimony.  (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 20, 22-23, 27.)

None of this was revealed to the defense when they were finally allowed to participate in the hearing.  Instead, counsel unreasonably blundered into an "arrangement" with the Government to "interview" these witnesses – in the presence of the Government yet – to find out what they were going to say.  (Tr. 9/13/05 Hr'g at 27; R. 840-43.)  There were no reports of anything the witnesses told the Government, presumably because Government counsel – particularly AUSA Mike Littlefield – interviewed them alone so as to claim attorney work-product as a shield to discovery.

The defense was literally flying blind.  The "arrangement," doomed as it was from the start to be anything approaching an adequate substitute for a competent investigation, backfired when all but one of the witnesses refused to be interviewed by the defense.  The

Def's § 2255 Mot.                                      77                       *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

obvious and reasonable path of moving for a continuance, which the court itself knew was the proper course, was not taken. As a result, the defense was woefully unprepared to effectively cross-examine these witnesses, and failed to conduct whatever real investigation could have been accomplished in the little time that remained before the snitches hit the stand. Had a continuance been asked for, it would have been granted, based on the court's own remarks during the *ex parte* hearing. Because a continuance was not requested, and because trial counsel otherwise failed to conduct an adequate investigation, a wealth of evidence that would have destroyed the credibility of the informant witnesses was never heard by the jury.[9]

A wealth of evidence was available to impeach the Government's key witnesses. As set forth in Claim 5, *infa*, the Government suppressed material impeachment evidence related to these witnesses and engaged in improper delay tactics to prevent trial counsel discovering the evidence independently. Whether due to the Government, and/or the trial court's misconduct, or trial counsel's unreasonable failure to seek a continuance, there is a reasonable probability that jurors would have rejected the seven snitches if they had heard the following evidence attacking their testimony.

### a. Travis Crawford[10]

---

[9] Direct appeal attorney Mark Henricksen, who was assisted by lead trial counsel Roger Hilfiger on the appeal, questioned Mr. Hilfiger about why he did not seek a continuance. Mr. Hilfiger did not dismiss the merits of moving for a continuance, but instead stated that he simply did not think one would be granted, even though he recognized the importance of the seven snitches to the Government's case. Decl. of Mark Henricksen. Of course, the court's comments at the improper *ex parte* hearing, of which Mr. Hilfiger was never made aware during trial, indicate otherwise.

[10] Mr. Barrett is in possession of newly discovered evidence that eviscerates the credibility of Travis Crawford's trial testimony. Mr. Crawford recently recanted his testimony against Mr. Barrett. (Claim 5A, B)

Travis Crawford, Mr. Barrett's maternal first cousin (R. 450-51), testified in the first stage of trial that the day before the police raid, he noticed a white SUV drive down the road in front of Mr. Barrett's cabin. Mr. Crawford testified he saw Mr. Barrett go to his front gate at the time the SUV passed. Crawford claimed to have walked over to Mr. Barrett's property from his parents' house. Mr. Barrett allegedly told him that he (Mr. Barrett) knew that the people in the white SUV were the police. Mr. Barrett expressed the opinion that they were probably going to come back to serve a warrant. With respect to the potential service of the warrant, Mr. Barrett said, "D.G.F." which, according to Travis Crawford, means "Don't Give a Fuck." Crawford testified Mr. Barrett told him that he was "going out in a blaze of glory," as he had supposedly said on numerous previous occasions. (R. 462-66.) Travis Crawford testified that while he had been a methamphetamine user for 15 years, he had been "clean" for nine months.[11] (R. 457.)

On cross-examination, Mr. Crawford stated he had been arrested previously for failure to pay $11,000.00 in back child support. He was also arrested on hot check charges many years before. He admitted to having used a lot of drugs. His alleged "past" drug use affected his memory, distorted his perception, and his mind was not as sharp as it had been before he became a methamphetamine addict. (R 467-68, 472.)

Mr. Crawford had never been interviewed by the defense before his testimony. He acknowledged on cross-examination that he had an appointment to talk to defense counsel the preceding Friday, but claimed he did not show up because he was working and would have been

---

[11] This is in marked contrast with what Mr. Crawford revealed recently to a defense investigator. Mr. Crawford stated that he was a heavy methamphetamine user at the time he was interviewed by the Government, had taken drugs before his testimony, and was under the influence of drugs at the time he testified against Mr. Barrett. This is discussed in Mr. Barrett's *Brady/*newly discovered evidence claim.

fired from his job if he absented himself for the interview.  He claimed he was not told by the prosecution that defense counsel had made themselves available on the previous Saturday and Sunday to interview him.  (R. 468-69.)  Sequoyah County Sheriff John Philpot had been by his residence to let him know that Mr. Barrett's lawyers might want to talk to him.  (R 469.)  Mr. Crawford admitted he had never provided a written statement to law enforcement or the Government prosecutors relating what his testimony would be.  (R. 481.)

When asked why he was coming forward with this information six years after the fact, Mr. Crawford said it was because he had been subpoenaed; he himself wanted to know why he had been contacted by the Government.  He denied being threatened with charges or other dire consequences if he failed to cooperate with the prosecution.[12]  (R. 470.)  Before being approached to testify in the federal trial, he had never talked to anyone about what he supposedly knew of the circumstances surrounding the shooting of Trooper Eales.  Despite the admitted problems with his memory, Mr. Crawford claimed he remembered the years-old events to which he testified.  He could not recall how many times he had spoken to Sheriff Philpot about what he knew, and also stated, at one point, that he had not had any conversations with government agents other than Sheriff Philpot. (R. 481-82.)

On re-direct examination, AUSA Littlefield reminded Mr. Crawford that he had talked to Littlefield about testifying, and Crawford then stated that before Littlefield interviewed him, he had spoken to no law enforcement agents about Mr. Barrett.  "Correcting" his earlier testimony about his contacts with Sheriff Philpot, Mr. Crawford stated either Littlefield, Sheriff Philpot, or Lance and Judy Bergman got a message to him that he needed to be in court.  If

---

[12] Crawford stated recently he had been threatened by Littlefield, which ensured his cooperation.  *See Brady/*newly discovered evidence claim.

Sheriff Philpot was the individual who contacted him for this purpose, this would be the only contact he had with the Sheriff about the case.  (R 487-88.)

On cross-examination, Mr. Crawford basically repeated the claims he made on direct about his conversation with Mr. Barrett on the late afternoon or evening of  September 23rd regarding the white SUV that had driven past Mr. Barrett's property.  He assumed the occupants of the vehicle were "the laws" instead of Kevin Adams, who owned a white Bronco and lived approximately a mile from Mr. Barrett, even though the vehicle he saw was unmarked, had no antennas like those on law enforcement vehicles, had no spotlights, and Mr. Crawford was not able to see the vehicle's license tag. (R 478-79.)  Retreating somewhat from his testimony on direct examination, Mr. Crawford said that when he went to speak to Mr. Barrett that evening, he did not tell Mr. Barrett that the "laws" had just driven by, and were probably coming to get him, although he might have commented to Mr. Barrett that the people who had driven by in the white SUV were law enforcement officers.  Ultimately, Crawford testified on re-direct examination that when the white SUV drove past and he went to talk to Mr. Barrett, he did not recall whether or he or Mr. Barrett commented that the occupants of the vehicle were law enforcement, but it "seem[ed]" this subject was discussed.  Travis Crawford stuck to his claim that Mr. Barrett said that he was "going out in a blaze of glory."  (R 479-80, 484.)  Mr. Crawford believed that when he went over to talk to Mr. Barrett, the front gate to the property was open, and then "guessed" that Mr. Barrett locked the gate. (R. 48-81.)

During his testimony, Mr. Crawford never mentioned – and was never asked – about his testifying as an informant or snitch in any other case.[13]  Had counsel asked about this,

---

[13]  *See* Mr. Barrett's *Brady* claim.

and had Crawford been truthful, it would have been revealed to the jury that Crawford had acted as a police informant in the past and had given testimony against others in order to escape prosecution, a fact that surely would have adversely affected his credibility.

Because trial counsel was professionally unreasonable in failing to move for a continuance, and otherwise failed to conduct a proper investigation, the jury failed to hear from witnesses who could have testified that Crawford was dishonest and not to be believed about anything, particularly with regard to the events on the evening of September 23, 1999.

Rick Lunsford is a local Sallisaw resident who could have been located and interviewed if any sort of competent defense investigation into Mr. Crawford had been conducted. Mr. Lunsford, along with several other people, were at Mr. Barrett's residence on the afternoon of September 23rd, at the time Mr. Barrett was approached by Travis Crawford about the white SUV that had driven past the property. Mr. Lunsford had arrived at Mr. Barrett's around noon on September 22nd, and stayed until around 9:00 p.m. on September 23rd. Mr. Lunsford went to Mr. Barrett's to drop off a Chevy truck he was selling to him. Mr. Lunsford told investigators currently working for Mr. Barrett that on the late afternoon of September 23rd, Mr. Barrett and others were standing near the fence to Mr. Barrett's property. Travis Crawford walked over from his parents house, which was located a couple of residences down the road, and stood at the fence line. Mr. Crawford asked Mr. Barrett whether he had seen the white SUV that had driven by toward the dead-end, but had not yet driven back. Crawford stated he believed the individuals in the SUV were law enforcement officers. Mr. Barrett did not take Crawford seriously, because he did not trust Crawford. Mr. Barrett was more nervous about Mr. Crawford than he was of law enforcement. Travis Crawford was regarded as a "flake," and it was well known that he had acted as a police snitch in the past. (Decl. of Rick Lunsford.)

After Crawford left, Mr. Barrett told the others who were present that if they wanted to leave because of the SUV, they should do so. Mr. Barrett was concerned about the others getting in trouble if in fact the SUV contained law enforcement officers, because everyone there was using drugs. Toby Barrett and Mr. Lunsford stayed, and the others left. Toby Barrett locked the gate to the driveway, and Mr. Barrett, Toby Barrett and Mr. Lunsford went to either Mr. Barrett's cabin or his garage. Mr. Lunsford left Mr. Barrett's property around 9:00 p.m. to see his family. (Decl. of Rick Lunsford.)

Mr. Lunsford states that during the time Crawford came to Mr. Barrett's to talk about the white SUV, before that occurrence, and after that time until Lunsford left later that night, Mr. Barrett *never* said that he would shoot or kill the first law enforcement officer who came on his property, or that if the police came on his property and tried to arrest him, he would "go out in a blaze of glory." Mr. Barrett never said this or anything like it either on September 23, 1999, or at any other time Mr. Lunsford was around Mr. Barrett. Such a statement would be out of character for Mr. Barrett, because he was not a violent or threatening person. (Decl. of Rick Lunsford.)

Had any investigation been conducted by trial counsel, and had Lunsford been contacted, he could also have opined on Travis Crawford's truthfulness, and Crawford's reputation for honesty in the community. (Fed.R.Evid. 608(a).) In Lunsford's opinion, Travis Crawford is a completely dishonest person; nothing he says can be believed. Mr. Crawford was not only a heavy drug user, but also dealt drugs. Mr. Crawford would sell bad dope to people and "rip them off." Travis Crawford would basically do and say anything to get his hands on drugs, or to get out of trouble. Travis Crawford was known in the community for his dishonesty and untrustworthiness. (Decl. of Rick Lunsford.) Even if Mr. Lunsford would have been

Def's § 2255 Mot.            83            *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

prevented from giving "extrinsic evidence" regarding his knowledge of specific dishonest and bad acts on Crawford's part, they could have been inquired into during Crawford's cross-examination, because they were probative of his truthfulness or untruthfulness.  Fed.R.Evid. 608(b).

Mr. Lunsford was never contacted by any representatives of Mr. Barrett in connection with the federal trial.  Had he been contacted, he would have been willing to testify to the matters described above.  (Decl. of Rick Lunsford.)

Brandy Hill is Travis Crawford's niece.  Ms. Hill told investigators currently working on Mr. Barrett's behalf that she, like Rick Lunsford, was present at Mr. Barrett's on the afternoon and evening of September 23, 1999.  She was present when Travis Crawford came to the fence of Mr. Barrett's property to tell Mr. Barrett about the white SUV that had driven by. Crawford stated he believed police were in the vehicle, or that his father, Roger Crawford, believed it was a police vehicle.  Crawford said his father saw the white SUV drive down the road toward the dead-end, but it had not come back.  After relaying this information, Crawford walked back home.  Shortly after this, Ms. Hill's husband Sean Hill arrived at Mr. Barrett's, and she went home.  (Decl. of Brandy Hill.)

During and after the time Crawford spoke to Mr. Barrett and the others who were there, there was no talk by Mr. Barrett about killing or shooting the police or "going out in a blaze of glory."  After Travis Crawford expressed his suspicions about the white SUV, Mr. Barrett did not react with threats, or in a heated manner. He behaved as if it were normal that the police had driven by.  According to Ms. Hill, the police drove by Mr. Barrett's property all the time, sometimes up to three times a week, from 1996 to 1999.  (Decl. of Brandy Hill.)

According to Ms. Hill, and in contrast to Travis Crawford's claim at trial that he had been offered nothing by the Government in exchange for his testimony, Crawford told her that both he and his wife, Cindy Crawford, had been paid for their testimony against Mr. Barrett. Again in contrast to Crawford's claim that he had been off drugs for a period of months before his testimony, Crawford told Ms. Hill he did two "hits" of dope immediately before testifying, and was under the influence of drugs when he testified. (Decl. of Brandy Hill. *See also,* Mr. Barrett's *Brady* and newly discovered evidence claim.)

Ms. Hill was never interviewed by Mr. Barrett's federal lawyers, or any investigator working for them. She was an easily discoverable, readily available witness. Had she been contacted, she would have given them the information related above, and would have agreed to testify as a defense witness for Mr. Barrett. (Decl. of Brandy Hill.)

Toby Barrett was obviously a readily available witness. He testified for the prosecution in the two state-court trials. He was present at his father's residence on the evening of September 23, 1999. On that evening, Mr. Barrett asked Toby to close the gate to the driveway. Because the gate was usually kept locked in the evenings (certainly a routine occurrence in rural areas), this was nothing out of the ordinary. On September 23rd, Mr. Barrett said nothing to Toby Barrett, or in Toby Barrett's presence, about the police, let alone that he believed they were coming to arrest him and that he would "go out in a blaze of glory." While trial counsel spoke briefly to Toby Barrett several times, he never discussed with Toby any testimony he could give. Had he been asked, Toby Barrett would have testified to these facts, as well as others which are discussed elsewhere in this motion. (Decl. of Toby Barrett.)

Trial counsel could have, but did not, discuss with Mr. Barrett's and Mr. Crawford's aunt, Carolyn Joseph, her knowledge of Travis Crawford's honesty and trustworthiness.  Although trial counsel interviewed Ms. Joseph briefly, she was never questioned about the credibility of either Travis Crawford or Cindy Crawford.  (Decl. of Carolyn Joseph.)

According to Ms. Joseph, Travis Crawford, contrary to his claim of being "clean" of drugs for several months preceding his testimony, was a heavy drug user at the time of Mr. Barrett's trial.  It is her personal belief that Crawford is not an honest or trustworthy person.  Nor does Mr. Crawford have a reputation for honesty in the community at large.  (Fed.R.Evid. 608(a).) (Decl. of Carolyn Joseph.)

Every time Mr. Crawford would come to her house, something turned up missing or stolen.  Travis Crawford would steal from Ms. Joseph in order to get money to buy drugs.  Crawford was the type of person who would say one thing and then do the opposite, so long as it was to his advantage.  Ms. Joseph once paid Crawford $400.00 in advance to build a well house on her property.  Crawford simply pocketed the money and never built the well house.  Crawford never repaid the money he took for a job he never did.  The materials that had been purchased for construction of the well house were later stolen.  Travis Crawford and/or his wife Cindy were the only people who could have stolen the materials.  Crawford once stole four rolls of barbed wire from Ms. Joseph's property, and later admitted the theft to her.  Crawford even went so far as to steal from the property of her late son, DeWitt Joseph, who had been killed in an automobile accident.  Decl. of Carolyn Joseph.

Even if Ms. Joseph could not give "extraneous evidence" of the specific bad acts of Crawford that reflected his dishonesty, trial counsel, using the information gained from her, could have cross-examined him about these dishonest acts. (Fed.R.Evid. 608(b).) Coupled with testimony from Ms. Joseph regarding her opinion that Crawford is a dishonest person, and is regarded as dishonest in the community, any denials offered by Crawford to the specific acts of dishonesty he committed against his own aunt would have rung hollow and marked him as a witness of dreadful credibility.

### b.      Cindy Crawford[14]

Cindy Crawford testified for the Government in both stages of trial. Like her husband, she never talked to defense counsel before her testimony but denied that she had simply refused to meet with them. (R. 3063, 3069.)

In the first stage, she testified she had done drugs at Mr. Barrett's house, although she did not know who supplied the drugs. Cindy Crawford testified Mr. Barrett told her he had a misdemeanor warrant out for his arrest, and that he stayed on his property because he did not want to get in trouble. He knew there was a chance the police could come to his house; that was why he had guns for protection. According to Cindy Crawford, Mr. Barrett told her that if the police (or anyone else, for that matter), invaded his property, he would "go out in a blaze of glory." (R. 3063-69.)

---

[14] Movant is also in possession of newly discovered evidence demonstrating that Cindy Crawford was pressured and threatened by former AUSA Mike Littlefield into testifying against Mr. Barrett, that she was coached in her testimony, and that she embellished her second stage testimony. Movant is also now in possession of Cindy Crawford's medical records, which show that she suffers from post-traumatic stress disorder and other maladies impacting her credibility, and which support her recent statement to defense investigators that she embellished her penalty phase testimony against Mr. Barrett and was susceptible to pressure from the prosecutor and law enforcement. *See* Mr. Barrett's *Brady/*newly discovered evidence claim.

On cross-examination in the first stage of trial, Cindy Crawford stated she started using methamphetamine at age 18. She used the drug for nine years, and would either snort it or shoot it. She stated or implied on direct examination that she was currently drug and alcohol free. (R. 3161.) While on a "meth run," the longest she had stayed up was five days. While using methamphetamine, she would often stay up for three to four days at a time. (R. 3070-71.)

Cindy Crawford admitted her drug use had caused her to lose a sense of time. To her, time was just a blur that played tricks on her mind. (R. 3073.) She really did not know when Mr. Barrett had made the alleged statement about having an outstanding misdemeanor warrant. Defense counsel, in his questioning, stated that any misdemeanor warrant for Mr. Barrett would have been long before 1999. (R. 3072.) While she had done drugs at Mr. Barrett's residence, she was not testifying that Mr. Barrett had ever given her drugs. (R. 3072.) With respect to Mr. Barrett's statement about taking on the police and "going out in a blaze of glory," Cindy Crawford stated this was typical "doper talk" that she had often heard from many drug users. (R. 3075.)

In the penalty phase of trial, Cindy Crawford claimed Mr. Barrett once became angry with her because she would not have sex with him. He ran from his home when she was leaving with his brother Richie Barrett, put the barrel of a rifle against her leg, and threatened to kill her. (R. 4577-79.)

As with the other informant or "snitch" witnesses, trial counsel relied strictly on cross-examination in a weak effort to impeach Cindy Crawford. Had trial counsel moved for a continuance and obtained the time to investigate Crawford, or conducted a reasonable investigation in the time allowed, a wealth of evidence could have been developed which would have shown her to be a witness who jurors would have found not worthy of belief.

During the first stage of trial, Cindy Crawford was never questioned on whether she suffered from any mental problems.  In her second stage testimony, she volunteered that she suffered from PTSD, but it was of course too late to use the information to cast doubt on what she told the jury in the first stage.  A reasonable investigation would have uncovered evidence regarding her mental condition, which, along with her drug use, could have impeached her ability to recall and relate, and her overall credibility.  Medical records for Cindy Crawford confirm that she suffers from PTSD, is subject to bouts of anxiety, and has panic attacks.  Medical records of Cindy Crawford, filed under seal.

Although Crawford testified on direct examination that she was on a five year deferred sentence for misdemeanor marijuana possession (R. 3061), and had a previous misdemeanor marijuana conviction in 1999, counsel failed to explore whether her testimony was motivated by a fear that if she declined to cooperate with the Government, she might face acceleration of her current deferred sentence to either a suspended sentence, which would constitute a felony conviction under Oklahoma law, or could face jail or prison time.  Counsel, who evidently did not search Cindy Crawford's court files, failed to ask her about the fact that she could have been charged with a felony rather than a misdemeanor for her second marijuana possession case, and whether the fact she had not been charged with a felony was due to her regularly acting as a police informant, as other witnesses could have attested.  (Files in Sequoyah County Case Nos. CF-99-645 and CF-04-63.)

Counsel failed to question Cindy Crawford about the fact that her two misdemeanor marijuana cases were originally charged as felonies.  Because counsel made no court record search, he neglected to confront her with the fact that a bench warrant had been issued for her arrest for failure to appear on July 19, 2005, just shortly before Mr. Barrett's trial

commenced.  Counsel also neglected to question her about the fact that on March 20, 2005, the Sequoyah County District Attorney's Office had filed an application to accelerate her deferred sentence because she had failed to pay certain required fees.  Significantly, the bench warrant and the application to accelerate were hanging over Cindy Crawford's head at the time she testified against Mr. Barrett.  It was not until April 24, 2006, after Mr. Barrett's trial concluded, that the application to accelerate and the bench warrant were withdrawn because she had finally complied with the terms of her probation.  (Files in Sequoyah County Case Nos. CF-99-645 and CF-0463.)  The circumstances surrounding Crawford's Sequoyah County cases could have been used to show she had a powerful motive to testify for the Government in exchange for help in keeping her deferred sentence.  *E.g., Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003)(counsel ineffective in part for failing to impeach immunized witness with fact he was on a deferred sentence and had a motive to help the prosecution in order to help himself).

Due to a failure to investigate Cindy Crawford's court history, the jury was denied other valuable impeachment evidence.  The court file in the domestic case of *Crawford v. Mattox,* Sequoyah County Case No. P-03-458, contains a letter from Larry and Brandy Sell, the grandparents of one of Crawford's children, to District Judge John Garrett.  The letter states that Cindy Crawford has problems with depression, and threatened to "do something with her baby," which she would be able to "get away with" because she had been in the Harbor View mental hospital.  The letter also states that drugs had become "all consuming" for Cindy Crawford.  This would not only demonstrate a history of mental illness, but would show that Cindy Crawford was such a despicable and unbelievable character that she had actually threatened harm to her own child, while contemplating the use of her mental illness as an excuse or defense.  (File in Sequoyah County Case No. P-03-458.)

Again because no investigation of Cindy Crawford's court records was made, counsel failed to confront her with the numerous acts of dishonesty which served as the basis for a victim protective order in *Michael Mackey, et al. v. Cindy Crawford,* Sequoyah County Case No. PO-03-390. The application for protective order states the plaintiffs had been harassed with false accusations by Crawford, threats to cause problems for Mr. Mackey's children, acts of stalking, and burglary of the Mackey home and storage shed. (File, Sequoyah County Case No. PO-03-390.) Again, even if extraneous evidence of these misdeeds reflecting Cindy Crawford's lack of honesty could not have been introduced, Crawford certainly could have been cross-examined about them. (Fed.R.Evid. 608(b).)

Aside from court records which would have severely impeached Cindy Crawford's credibility, counsel failed to investigate and produce numerous available witnesses who could have testified to her complete dishonesty and lack of believability, as well as her history as a police informant.

Roger Crawford testified briefly as a second stage witness for Mr. Barrett. In preparation for his second stage testimony, he was only interviewed for a matter of minutes. Unfortunately, trial counsel neglected to interview him regarding information he had on the credibility of Cindy Crawford. Had Roger Crawford been properly interviewed, he could have testified in both stages of trial that in his personal opinion, Cindy Crawford was completely dishonest and untrustworthy, and that her reputation in the community for honesty was extremely poor. Roger Crawford could have testified that at the time of her testimony at Mr. Barrett's trial, Cindy Crawford was a heavy drug user, contrary to what she tried to claim to the jury. Roger Crawford also would have testified that it was well known in the community that Cindy Crawford, far from being a disinterested witness, had regularly acted as a police informant to

escape prosecution and punishment for her own criminal activities.  Roger Crawford would have testified that Cindy Crawford had filed false reports about family members with the Oklahoma Department of Human Services, and also had made false accusations when seeking victim protective orders.  Mr. Crawford was in an excellent position to offer an opinion on Cindy Crawford's dishonesty and her reputation in the community for dishonesty.  He is Cindy Crawford's father in law, and has known her for years.  (Decl. of Roger Crawford.)

Mike Mackey is another witness counsel easily could have discovered by searching court files related to Cindy Crawford.  Mr. Mackey is one of several individuals who filed for a protective order against Cindy Crawford.  He has also known her for years.  He was never contacted or interviewed by Mr. Barrett's trial lawyers, or any investigator working on their behalf.  Had he been contacted, he could have testified that in his opinion, Cindy Crawford is thoroughly dishonest and untrustworthy.  Her reputation for honesty in the community is abysmal.  Mr. Mackey goes so far as to state that Cindy Crawford is the "most wickedly evil" person he has ever had the misfortune to run across.  Ms. Crawford made false reports to state DHS regarding him and his mentally handicapped son, and lied to get a victim protective order against him.  Mr. Mackey is also aware that Cindy Crawford has made false claims to the authorities about other family members.  According to Mr. Mackey, Cindy Crawford has repeatedly broken into his home and stolen from him in order to get money or property to buy drugs.  Like Roger Crawford, Mr. Mackey is aware that Cindy Crawford has long worked as a snitch for the local police, and "works the system" to escape responsibility for her own actions, while getting other people into trouble.  Decl. of Mike Mackey.

Again, even if extrinsic evidence of Crawford's bad and dishonest acts could not have been introduced through Mackey's first stage testimony, they could have been inquired into

during cross-examination of Crawford.  (Fed.R.Evid. 608(b).)  Extrinsic evidence of these acts of criminality could have been introduced in the penalty phase, since Crawford made a return appearance to the witness stand, and the rules of evidence are relaxed in the penalty phase of a capital case.  (18 U.S.C. § 3593(c).)

Brandy Hill is another witness who, with a competent investigation, could have given testimony regarding Cindy Crawford's honesty.  As noted in the discussion of Travis Crawford, Ms. Hill was never contacted before or during Mr. Barrett's trial.  Ms. Hill has known Cindy Crawford for many years.  In her opinion, Cindy Crawford is completely dishonest and untrustworthy.  Ms. Crawford's reputation for honesty in the community is extremely poor.  Ms. Hill describes Cindy Crawford as manipulative.  Cindy Crawford has stolen from Ms. Hill and her family on numerous occasions in order to get money to buy drugs.  Like other witnesses who could have testified to Cindy Crawford's dreadful lack of honesty, Ms. Hill is aware that Cindy Crawford has long acted as a local police informant and has lied against others to obtain something of advantage for herself.  (Decl. of Brandy Hill.)

Similar testimony could have been offered by Sean Hill.  Mr. Hill, though available at the time of trial, was never contacted by anyone working on Mr. Barrett's defense.  He states that Cindy Crawford's reputation in the community is that "she's dishonest, evil and worthless." (Decl. of Sean Hill.)

Carolyn Joseph has known Cindy Crawford for years.  As with Travis Crawford, Ms. Joseph was not interviewed regarding her knowledge of Cindy Crawford's honesty, or any other information which would have served to impeach Ms. Crawford.  Ms. Joseph could have testified that Cindy Crawford was a heavy drug user, and that, in her opinion, Ms. Crawford's drug use affected her mentally.  According to Ms. Joseph, Cindy Crawford has the mind and attitude of a

twelve year old child.  In Ms. Joseph's personal opinion, Cindy Crawford is "so deceitful and dishonest that it is pitiful."  Ms. Crawford's reputation in the community for honesty is, to put it mildly,  poor.  No one Ms. Joseph knows would trust or believe anything Cindy Crawford said. Cindy Crawford has stolen from Ms. Joseph on several occasions and has conned money out of her.  (Decl. of Carolyn Joseph.)

Still another witness who could have testified regarding Cindy Crawford's bedrock lack of honesty is Gwendolyn Crawford, Travis Crawford's sister.  Ms. Crawford, as with the other individuals who could have been, but were not, contacted to testify on Mr. Barrett's behalf, has known Cindy Crawford for years.  In her opinion, Cindy Crawford is thoroughly and totally dishonest.  Cindy Crawford is well known in the community for her dishonesty.  Echoing several of the other witnesses who know Cindy Crawford well, her reputation for honesty in the community is bottom-of-the-barrel.  Gwendolyn Crawford is also aware that Cindy Crawford has acted as a police snitch for years and does not hesitate to falsely accuse others if it means getting something for herself.  (Decl of Gwendolyn Crawford.)

Cindy Crawford's penalty phase testimony that Mr. Barrett had put a rifle barrel to a leg and threatened to kill her, allegedly because she would not have sex with him, could have been conclusively impeached if trial counsel had interviewed Mr. Barrett's brother, Richie Barrett. Crawford testified this incident occurred when she was leaving Mr. Barrett's property with Richie Barrett.  Richie Barrett was interviewed by a defense investigator in connection with the current action.  Richie Barrett states unequivocally that Cindy Barrett fabricated this story out of whole cloth, and that the incident never occurred.  (Decl. of Richard Barrett.)

### c.  Charles "Monk" Sanders

    **1.**      **Failure to adequately investigate and prepare to cross-examine Sanders about his previous convictions, charges against him that were dismissed, and the favorable treatment he often secured to escape punishment.**

As noted *supra*, but unknown to the jury, Charles Sanders, the alleged C.I. on the Clint Johnson search warrant, was a professional informant.  He gave wildly conflicting trial testimony regarding alleged drug activities at Mr. Barrett's residence in the Summer of 1999.  He also testified that at some undetermined time, Mr. Barrett allegedly made statements that he would shoot the first law enforcement officer who came on his property.  (R. 2515.)  In the penalty phase of trial, the Government once more sponsored Sanders to testify that Mr. Barrett, while incarcerated, supposedly contacted a third party about doing harm to Sanders.  (R. 4587.)  In an off-hand manner, Sanders testified, under questioning by AUSA Littlefield, that the most the Government was going to do for him in exchange for his testimony was to talk to prosecutors in Sequoyah and Tulsa Counties, informing them of Sanders's cooperation in the case against Mr. Barrett.  (R. 2494.)

Trial counsel's unreasonably failed to investigate and challenge Sanders from a myriad of angles the informant's history made readily available.  Not only did counsel fail to capitalize on the entirety of Sanders's cross-examination testimony when the motion to suppress was re-urged, but counsel failed to effectively impeach him, both on cross-examination and with independent evidence.

While trial counsel cross-examined Sanders on some, but by no means all, of his prior convictions, counsel failed to conduct a search of court records, not only to demonstrate that Sanders lied about the number and nature of his previous convictions, but that he had received amazing deal after amazing deal for his work as an informant, including after he

supposedly gave information to Clint Johnson about Mr. Barrett. In that sense, assuming he really was the C.I. on the Johnson search warrant, Sanders had *already received and was continuing to receive favor from the authorities based on his "work" against Mr. Barrett.* Had counsel effectively cross-examined Sanders about his prior record, he could have easily exposed Sanders's lies that Clint Johnson only helped with "some" of his cases, had not gotten out of "a lot" of trouble, and that he was not both working as an informant and free to commit whatever crimes he wanted to. (R. 2535-37.)

The beginning of cross-examination revealed no court searches were conducted on Sanders's previous convictions. Counsel stated that he had looked at Sanders's D.O.C. "sheet." This obviously referred to the Oklahoma Department of Corrections website, which would merely list, without any elaboration at all, the case numbers in which Sanders had been convicted, and the offenses for which he was convicted. Counsel confronted Sanders with the fact that he had far more than the four priors Sanders's acknowledged on direct examination, a patent lie that prosecutor Littlefield had an obligation to correct, but did not. (R. 2524.) *See* Claim 5, *infra*.

Counsel superficially asked[15] Sanders about the following prior convictions: (1) an Arkansas conviction in 1986 for distribution of drugs, for which Sanders received a sentence of four years confinement, and six years probation; (2) a 1989 conviction in Sequoyah County for uttering a forged instrument, for which Sanders allegedly received one year in the county jail, and time on probation; (3) a 1990 sexual battery conviction and drug possession conviction in Sequoyah County, for which he received three years incarceration and seven years suspended; (4)

---

[15] R. 2524-36.

a 1992 Sequoyah County conviction for drug possession, in which Sanders received a sentence of three years in prison and seven years suspended (Sanders claimed this was "the same" case as his 1990 Sequoyah County conviction, even though the conviction was in a different case number); 5) a Muskogee County conviction in Case No. CF-93-131 for illegal possession of a weapon, bringing drugs or alcohol into a jail, and escape (Sanders acknowledged the escape conviction, but said he had not been convicted of the other charges); (6) a 1995 conviction in Arkansas for possession of drugs, concealing stolen property, and forgery; (7) a Sequoyah County conviction in Case No. CF-98-346, for which Sanders received five years incarceration and twenty years suspended; (8) a conviction in Sequoyah County Case No. CF-98-363, for uttering a forged instrument, for which Sanders received five years incarceration and twenty years suspended; (9) a conviction in Sequoyah County Case No. CF-99-562 for concealing stolen property, for which Sanders received five years incarceration twenty years suspended (a condition of probation in these last three cases was that Sanders successfully complete a Department of Corrections drug program, which Sanders claimed he had not yet been able to get into); (10) a conviction in Sequoyah County Case No. CF-03-124 for two counts of running a roadblock; and (11) a conviction in Sequoyah County Case No. CF-04-19 for two counts of concealing stolen property, second degree burglary, and second degree arson, for which Sanders received a deal similar to that in the other Sequoyah County cases.

Sanders agreed that after this many convictions, he received, on his current sentences, a very favorable deal (to say the least), requiring him at most to do five years in prison, which would equate to service of only two and one-half years, even if he was not able to enter the Department of Corrections drug program, which, upon completion, would put him back

on the streets immediately. Sanders admitted that his mentor, Clint Johnson, had helped him with "some," but by no means all, of his prior cases. (R. 2534-35.)

Had counsel conducted even minimal research into Sanders's court records, far more about the witness's's abysmal criminal history and the virtual "get out of jail free" cards he received repeatedly would have been revealed to the jury. The following readily available records, among others, would have marked Sanders as a career informant who would say and do anything to continue to have access to drugs and escape incarceration:

(1) Counsel failed to point out that in Sequoyah County Case No. CF-92-91, in which Sanders was convicted of felony drug possession in count 5, the state had charged him with having previously been convicted in Sebastian County, Arkansas, with delivery of marijuana and amphetamines in Case No. 86-604-B. Sanders was also charged in this Sequoyah County case with the misdemeanors of attempting to elude the police, possession of drug paraphernalia, driving under the influence, and possession of marijuana.

The allegation of the "after former" would have set Sanders's exposure, under then existing Oklahoma law, at ten years to life on the felony drug charge. (21 O.S. 1991, section 51.) He also could have been charged with felony possession of marijuana, rather than a misdemeanor, because of his prior Arkansas drug conviction. (63 O.S. section 2-402 (2).) Instead, he initially was sentenced to 10 years imprisonment on the felony drug charge, and one year in the county jail on the marijuana possession charge. An amended judgment and sentence cut Sanders's prison time on the felony drug charge from ten to three years, with the balance suspended, with the misdemeanor attempting to elude and possession of paraphernalia charges dismissed, and a one year concurrent sentence on the DUI charge. (File in Sequoyah County Case No. CF-92-91.)

(2)      In Sequoyah County Case No. CF-97-9, Sanders was charged with three crimes of dishonesty: Concealing stolen property, and two counts of uttering a forged instrument. Although Sanders could have been charged with two or more "after formers," which would have set his exposure at twenty years to life under Oklahoma law, he was not.  (21 O.S. 1991, section 51.)  Instead, the concealing stolen property felony charge was dismissed, and the two uttering charges were reduced to misdemeanors, for which he received one year suspended sentences, to run concurrently.  *(See* File in Sequoyah County Case No. CF-97-9.)

On October 2, 1998, an application to revoke Sanders's misdemeanor suspended sentences was filed because Sanders had violated the terms of his probation by committing second degree burglary and larceny from a house as charged in Sequoyah County Case No. CF-98-128, and also because he failed to pay the restitution he promised when he received his misdemeanor suspended sentences.

On October 7, 1998, Sanders failed to appear for a court hearing, and a bench warrant was issued for his arrest.  No disposition is shown for the revocation action.  The last entry in the docket on this case notes that on December 9, 1999, a waiver of preliminary hearing in Sequoyah County Case No. CF-99-562 was filed.  As discussed below, the application to revoke in this case was later "passed" for ninety days, and would be dismissed altogether upon payment of restitution.  If restitution were not paid, Sanders would receive one year in the county jail.  As matters developed, and as is discussed below, Sanders was required to pay no restitution.

Although these records indicated Sanders was receiving favorable treatment from the Sequoyah County District Attorney at the time he was working for Clint Johnson to gather

"evidence" against Mr. Barrett, and Mr. Barrett's trial counsel demonstrated a desire to impeach Sanders on those grounds, trial counsel failed to present these records to the jury.

(3)     In Sequoyah County Case No. CF-97-75, Sanders was charged with the felony crime of running a roadblock, and misdemeanors for attempting to elude, having an open container, and reckless driving.  Although prior felony conviction enhancements could have been filed to increase the range of punishment on the running a roadblock felony charge, they were not.  On October 16, 1997, this case was dismissed outright on motion of the state, based on what is reflected on OSCN.  The court case file itself apparently shows no disposition.  Sanders was questioned on none of this by defense counsel.  (File in Sequoyah County Case No. CF-97-75.)

(4)     In Sequoyah County Case No. CF-97-140, Sanders was charged with concealing stolen property and felony possession of methamphetamine.  It was alleged on page two of the information that he had three prior felony convictions, all out of Sequoyah County, in Case Nos. CF-89-396 (uttering a forged instrument); CF-92-91 (drug possession); and CF-90144 (sexual battery).  Again, Sanders was facing up to life in prison upon conviction.  (21 O.S. section 51.)  Instead, again on October 16, 1997, all charges were dismissed on motion of the state, according to OSCN.  The court file itself shows no case disposition.  Counsel did not cross-examine Sanders on this gift from the state prosecutors.

(5)     In Sequoyah County Case No. CF-98-22, Sanders was charged with concealing stolen property, grand larceny, unlawful use of a police radio, and *providing false information to a police officer*.  Despite his many prior convictions, Sanders received an illegal deferred sentence, which was later accelerated.  (22 O.S. 1991, section 991c (prohibiting

defendant with even one prior felony conviction from receiving a deferred sentence).[16]  Counsel was professionally unreasonable for failing to question Sanders about how he managed to get a deferred sentence from Sequoyah County authorities when, due to his record, the deferment was absolutely barred by law.  (Record from court clerk's office on case; other parts of file have been lost or destroyed.)

(6)     In Sequoyah County Case No. CF-98-128, Sanders was charged with the felonies of second degree burglary and larceny from a house.  The three "after-formers" alleged in Sequoyah County Case No. CF-97-140 (Sequoyah County Case Nos. CRF-89-396, CRF-92-91 and CRF-90-144) were alleged, setting Sanders's exposure at twenty years to life.  An amended information alleging the same charges and same "after-formers" was filed on July 7, 1998.  Miraculously, the state dismissed the after former conviction allegations, and Sanders received patently illegal five year deferred sentences, running concurrently, with costs waived by the District Attorney's office.  The sentences were also ordered to run concurrently with a conviction

Sanders obtained in Creek County.  CF-98-128 was case was later dismissed with costs, as is discussed below.  (File in Sequoyah County Case No. CF-98-128.)

It was unreasonable for Mr. Barrett's trail counsel not to discover and use on cross-examination records showing that Sanders, who faced the prospect of life in prison on this offense alone, received illegal deferred sentences, and that even those illegally lenient sentences eventually were lifted.

---

[16]  This statute was later amended by 22 O.S. section 991c (F) to permit convicted felons to receive a deferred sentence, but only on motion and waiver by the State.

(7)   In Sequoyah County Case No. CF-98-346, Sanders was charged with possession of methamphetamine (a felony) and misdemeanor possession of drug paraphernalia. Again, he was charged after having been previously convicted of the same three Sequoyah County felonies discussed above. Sanders was yet again facing twenty to life. Per a plea agreement reached with the state, Sanders received a twenty year suspended sentence. The misdemeanor charge was dismissed. At the time he entered his plea, due to his record of prior felony convictions, Sanders was not eligible for a suspended sentence under Oklahoma law as it then existed. (22 O.S. 1991, section 51; 22 O.S. 1991, section 991c.)[17]

Although Mr. Barrett's trial counsel briefly alluded to this case, and the sentence Sanders received, counsel failed to point out the following impeaching facts: (a) on May 3, 2001, the state filed an application to revoke Sanders's suspended sentence because he had been arrested for larceny of merchandise from a retailer and possession of drug paraphernalia in Sequoyah County Case No. CF-01-314, and also failed to report to his probation officer, as he told the court he would do when he received his suspended sentence; (b) on August 23, 2001, the court ordered Sanders's sentence revoked in full, with Sanders ordered to complete the "Last Stop" program in the department of corrections, upon successful completion of which the balance of the sentence would again be suspended; (c) coming to Sanders's aid yet again, the Sequoyah County District Attorney's Office moved on February 22, 2002, to amend the revocation to allow Sanders to attend either the "Last Stop" program, or an equivalent program, and requested that the sentence in this case be ordered to run concurrently with the sentence in

---

[17]   Again, as with the statute governing deferred, the law was later amended to permit defendants, such as Sanders, with two or more prior felony convictions to received suspended sentences, but only on motion and waiver by the State.

Sequoyah County Case No. CF-98-363; (d) a *nunc pro tunc* orders granting these requests were entered by the court on March 5 and March 28, 2002; (e) on March 12, 2004, the District Attorney filed a second application to revoke Sanders's suspended sentence, because he had committed a new offense, burglary in the second degree, as alleged in Sequoyah County Case No. CF-04-19; (f) an amended second application to revoke Sanders's suspended sentence was filed on June 17, 2004, based on the amended information filed in Case No. CF-04-19, which alleged, in addition to second degree burglary, that Sanders had also committed the offenses of second degree arson, concealing stolen property, and felon in possession of a firearm; (g) on November 17, 2004, instead of revoking the entirety of the suspended sentence, the court, pursuant to Sanders's agreement with the state, revoked only five years of the suspended sentence, with the entirety of the sentence to again be suspended if Sanders successfully completed the "Key to Life" program in the Department of Corrections; (h) incredibly, the partial revocation in this case was ordered to run concurrently with the suspended in whole or in part sentences in Sequoyah County Case Nos. CF-98-363, CF-99-562, CF-04-19, and CF-03-124.

Sanders was not questioned about the fact he faced revocation of the entire twenty year sentence based on his various probation violations, with consecutive time in his other active Sequoyah County cases. Nor was it brought to the jury's attention that absent the various deals he received, Sanders was once more facing the potential of life in prison on this offense of conviction due to his record of previous felony convictions. Counsel also failed to point out Sanders's statutory ineligibility for any suspended sentence due to his prior felony convictions, absent a motion and waiver from the State. (File in Sequoyah County Case No. 98-346.)

(8)    In Sequoyah County Case No. CF-98-363, Sanders was charged, yet again, with uttering a forged instrument. The same previous felony convictions noted in the cases

above were alleged on page 2 of the information, meaning Sanders was facing twenty to life. On December 9, 1999, the allegation of prior convictions was dismissed and Sanders received a twenty years suspended sentence that he was not eligible to receive under then-existing Oklahoma law. This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-99-562 and CF-98-346.

Again in this case, an application to revoke was filed on May 3, 2001, for failure to report, and based on Sanders's arrest for felony larceny of merchandise from a retailer and possession of drug paraphernalia, a misdemeanor, as charged in Sequoyah County Case No. CF-01-314. Again, an order revoking was entered by the state court on August 23, 2001, with the sentence ordered revoked in full, but to be suspended in its entirety if Sanders successfully completed the "Last Stop" program in the Department of Corrections. Sanders was allowed to self-surrender to the county jail instead of being immediately placed in custody.

As described in connection with Case No. CF-98-346, a motion to amend the order revoking was filed. A *nunc pro tunc* order amending the previous revocation order, and directing Sanders's sentence to be served concurrently with the sentence in Sequoyah County Case No. CF-98-346, was entered. A second motion to revoke based on the same allegations of new offenses filed in CF-98-346, were also filed in connection with this case. On April 17, 2004, the court entered a second order revoking Sander's suspended sentence. As with Case No. CF-98-346, only five years of the twenty-year suspended sentence was revoked, and the sentence would again be suspended in its entirety if Sanders successfully completed the in-house "Key to Life" program or its equivalent. This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-98-346, CF-99-562, CF-04-19, and CF-03-124.

Counsel failed to cross-examine Sanders about the fact he faced a sentence of up to life imprisonment on this conviction absent the deal he received, and, having received probation, could have had his sentence revoked in full, with consecutive time on all his other active cases, absent the tremendous break he received from the prosecutors. (File in Sequoyah County Case No. CF-98-363.)

(9)     In Sequoyah County Case No. CF-99-562, Sanders was charged with still more crimes of dishonesty. Some, but not all of the charges in this case, were mentioned briefly by defense counsel on cross-examination. Sanders was charged with three counts of concealing stolen property, one count of uttering a forged instrument, misdemeanor possession of marijuana (which could have been charged as a felony due to Sanders's prior drug convictions), and possession of a sawed-off shotgun. Instead of trotting out the usual three "after-formers" charged in some of the cases discussed above, Sanders was charged with committing the instant offenses after previous conviction of five felonies. In addition to the same three prior Sequoyah County felony that were usually alleged on page 2, it was also charged that Sanders had felony convictions in Muskogee County Case No. CF-93-772 for escape from custody, and Muskogee County Case No. CF-93-131 for carrying a weapon into the jail. Yet again, Sanders faced twenty to life.

Based on yet another deal-of-a-lifetime, Sanders received a twenty year suspended sentence on count 1. In an extraordinary gift from prosecutors, and at an extraordinary cost to public safety, counts 2, 3, 4, 5 and 6 were dismissed outright. Consequently, Sanders, a convicted felon many times over, was allowed to walk around with a sawed-off shotgun, with no repercussion whatsoever.

This case was "wrapped up" on the same guilty plea forms with Sequoyah County Case Nos. CF-98-363, CF-98-346, CF-98-128, and CF-97-9.  As noted, Sanders received a twenty year suspended sentence on the felony conviction in CF-98-363; Case No. CF-98-128 was dismissed with costs Sanders was later relieved of paying; and the long-moribund revocation action in CF-97-9 was passed for ninety days to allow payment of restitution, which, in the end, Sanders was never required to pay, thus making hollow the threat of a year in jail for failure to satisfy restitution.

The same application and amended applications to revoke, and the same or similar *nunc pro tunc* orders discussed above in Sanders's other cases, were filed in this case.  As with the other cases discussed above, Sander's suspended sentence in this case was first revoked for only five years.  He would revert to full probationary status upon completion of a Department of Corrections drug program.  The initial revocation order for up to five years and the rest were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-03-124 and CF-04-19.

Trial counsel failed to question Sanders about the fact he was facing up to life in prison in this case; that five of the six charges lodged against him were dismissed; and that, without the largesse of the state prosecutors, he could have (and should have, based on his horrific record) faced revocation of all the suspended sentences he was serving, to be served consecutively.  As with the other cases discussed above, counsel failed to point out that Sanders was either ineligible for a suspended sentence, or had to receive a special dispensation from the prosecution to get one.  (File in Sequoyah County Case No. CF-99-562.)

(10)    In Sequoyah County Case No. CF-01-314, Sanders was charged with another felony crime of dishonesty, larceny of merchandise from a retailer.  He was also charged

with a misdemeanor for possession of drug paraphernalia.  The state alleged in page two of the information that Sanders committed the felony larceny after having been convicted of six felonies (Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363 and CF-99-562).  With two or more "after-formers," Sanders faced a minimum of twenty years, and a maximum of life on the felony charge.

Initially, on August 23, 2001, this case was dismissed upon the payment of costs.  On October 19, 2002, the case was "combined" with other cases, with a result similar to those discussed above.

Mr. Barrett's trial counsel unreasonably failed to reference this case at all during cross-examination, and thereby failed to inform the jury that from the time Sanders became Clint Johnson's confidential informant he received the most extraordinary lenient treatment which left him free to roam the streets committing crime after crime.  (File in Sequoyah County Case No. CF-01-314.)

(11)   In Sequoyah County Case No. CF-03-124, Sanders was charged in a seven count information with: 1) feloniously pointing a firearm; 2) being a felon in possession of a firearm; 3) felony running a roadblock; 4) felony running a roadblock; 5) attempting to elude (misdemeanor); 6) reckless driving (misdemeanor); 7) and resisting an officer (misdemeanor).  Sanders was charged with the felony offenses in this case after having been convicted of six felonies Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363, and CF-99-562.  With the allegation of two or more "after-formers," Sanders was staring at his usual 20 to life term.

Sanders, as with all his other Sequoyah County convictions, entered into wildly generous plea agreement with the state.  As reflected by the judgment and sentence in this case,

Def's § 2255 Mot.                              107                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

filed on November 17, 2004, counts 1 and 2 were dismissed. The allegation of "after-formers" carried no real sting. The misdemeanor charges were dismissed. On the felony running a roadblock charges in counts 3 and 4, Sanders was "punished" with sentences of twenty-five years, running concurrently, all to be suspended except for the first five years (also running concurrently), with the entirety of the sentences to be suspended upon completion of the "Key to Life" program, or another similar program. These sentences were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19. (File in Sequoyah County Case No. CF-03-124.)

Mr. Barrett's trial counsel unreasonably failed to impeach Sanders with this highly prejudicial evidence. The jury could not help but notice that Sanders was given the lightest treatment for conduct very similar to acts the Government attributed to Mr. Barrett. The jury also would have been impressed to learn that charges had been dismissed in this case, that Sanders again escaped 20 years to life due to prosecutors' intervention, that despite his repeated crimes Sanders never drew consecutive sentences, and that, as reflected by his other cases, prosecutors for years gave Sanders a license to commit whatever crime he wished in Sequoyah County, with only the most minor of consequences.

(12) In Sequoyah County Case No. CF-04-19, Sanders was originally charged with second degree burglary, after former conviction of six felonies Sequoyah County Case Nos. CRF-89-396, CRF-90, 144, CRF-92-91, CF-98-346, CF-98-363, and CF-99-562. The case was amended to charge additional counts of second degree arson, concealing stolen property, and felonious possession of a firearm.

On November 17, 2004, per a plea agreement with the state, and with the "page two" still intact, Sanders was sentenced on each of counts 1, 2, and 3 to twenty-five years

imprisonment, with all but the first five years suspended, and with the balance of the sentences suspended in full upon completion of the Department of Corrections in-house drug program. Count 4, in which Sanders was charged with being a felon in possession of a firearm, was dismissed. The sentences in this case were ordered to run concurrently to one another and concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562, and CF-03-124. (File in Sequoyah County Case No. CF-04-19.)

Counsel was professionally unreasonable in failing to cross-examine Sanders on the fact that he faced twenty to life absent a deal from the state prosecutors, that he received concurrent probation time rather than consecutive prison time, and that the firearm charge against him was dismissed.

(13)   In Cherokee County Case No. CF-98-111, Sanders was (and still is) charged with no fewer than six counts of uttering a forged instrument, after former conviction of felonies. Amended and second amended informations were filed on June 1, 1998 and August 20, 1998, respectively. Although he promised to appear at all court dates after being released on bond, he incurred a failure to appear. A bench warrant was issued on May 15, 1998. Sanders had a second failure to appear on March 24, 2000. On May 3, 2001, he was ordered released to a bondsman. The case is still pending today. The last docket entry, for November 25, 2008, shows that Sanders could not make it to court as scheduled because of eye surgery. (File in Cherokee County Case No. CF-98-111.)

Counsel was professionally unreasonable for failing to cross-examine Sanders about this pending case, the existence of which could have been discovered easily. Because this case was still pending without disposition during Mr. Barrett's trial, seven years after it had been

filed, Sanders's bias and motive in appearing as a Government witness in the hopes that he could resolve this case favorably – as he had all of his other cases – was apparent.

(14)   In Muskogee County Case Nos. CF-93-131 and CF-93-772 Sanders was convicted of escape and carrying a weapon into a jail, respectively.  Sanders attempted to claim that these were the same case, when they clearly were not.  Counsel was professionally unreasonable in failing to demonstrate that Sanders lied and that he in fact had separate Muskogee County convictions.  (Files in Muskogee County Case Nos. CF-93-131 and CF-93-772.)

(16)   In Tulsa County Case No. CF-94-1503, Sanders was charged with uttering a forged instrument.  This case was dismissed years later, on September 18, 2001.  Costs were assessed against the state.  Counsel was professionally unreasonable for failing to cross-examine Sanders regarding the disposition of this case, in which he once again avoided a conviction and prison time.  (File in Tulsa County Case No. CF-94-1503.)

(17)   In Tulsa County Case No. CM-03-6603, Sanders was charged with obtaining merchandise by false pretenses, a crime of dishonesty upon which he could have been cross-examined, but was not.  Sanders received a one year suspended sentence, fines and costs.  Although he surely promised to do so, Sanders failed to appear before the Tulsa County cost administrator as directed on March 24, 2004.  A bench warrant was issued for his arrest on April 12, 2004.  An application to revoke his suspended sentence was filed on April 14, 2004.  Another bench warrant for Sanders's arrest was issued on May 20, 2004.  On October 6, 2005, Sanders was sentenced to thirty-six days in jail, at a rate of $15.00 per day, to work off what was owed.  Not only the fact of Sanders's conviction for this crime of dishonesty, but his failure to follow through on promises to fulfill the terms of his suspended sentence, could have been inquired into

on cross-examination to show him to be a completely untrustworthy individual, who will say one thing to receive something of advantage to himself, but whose word is utterly worthless.  (File in Tulsa County Case No. CM-03-6603.)

(18)     In Tulsa County Case No. CM-04-1187, Sanders was charged with drug possession and possession of drug paraphernalia.  On April 5, 2004, he incurred a failure to appear, despite a promise as a condition of his bond to make all court appearances.  During Mr. Barrett's trial, Sanders appeared, in custody, on September 28, 2005.  He entered a not guilty plea, and the case was set for the jury sounding docket on October 13, 2005.  On that date, again during Mr. Barrett's trial, and around the time he appeared as a first stage witness, the case was passed to November 17, 2005.  On November 17, the last day of Mr. Barrett's trial, the case was passed to February 2, 2006, because Sanders was "in federal custody."  On December 9, 2005, Sanders appeared in custody, entered a guilty plea, and was rewarded with sentences of one year in the county jail on each count, with the jail time suspended.  (File in Tulsa County Case No. CM-04-1187.)

Mr. Barrett's trial counsel unreasonably failed to discover the facts and cross-examine Sanders over the fact that this case kept getting passed until Sanders performed for the Government at Mr. Barrett's trial, the obvious implication being that any deals he would receive in that case were contingent solely on how much he pleased the Government.

(19)     In Sequoyah County Case No. CM-00-389, Sanders was charged with attempting to elude an officer, affixing an improper license plate to his vehicle, and eluding arrest.  On June 30, 2000, Sanders entered into a plea bargain which called for count 1 (attempted eluding) to be dismissed, fines and costs on count 2 (improperly affixing a license plate), and a one year suspended sentence and a fine on count 3 (eluding arrest).  On March 7, 2001, a bench

warrant was issued for Sanders's arrest for failure to satisfy terms of probation he promised the court he would fulfill at the time he entered his plea.  Counsel was professionally unreasonable for failing to cross-examine Sanders on this act of dishonesty.  (File in Sequoyah County Case No. CM-00-389.)

(20)     In Sequoyah County Case No. CM-03-365, Sanders was arrested, among other charges, for possession of marijuana.  He also attempted to resist arrest.  Counsel was professionally unreasonable for failing to cross-examine Sanders about the fact that with his prior drug convictions, he could have been, but was not, charged with felony possession of marijuana rather than a misdemeanor.  (File in Sequoyah County Case No. CM-03-365.)

In sum, counsel was professionally unreasonable for failing to move for a continuance so Sanders could be cross-examined effectively about his litany of prior convictions; his deals, which could only have resulted from his working continuously as a snitch; the charges and cases against him which had been dismissed; the fact that he was facing up to life in prison on many charges, but got virtually nothing by way of punishment; his acts of dishonesty in connection with various charges and his obligation to appear in court and adhere to the conditions of his probation, and the like.

Counsel even failed to discover all of Sanders's prior convictions.  Counsel stated that by his count, Sanders had ten previous convictions, or nine, if Sanders's dispute with one of them was credited.  (R. 2524-36.)  In truth, after the dismissed cases and charges against Sanders are set aside, Sanders had no fewer than eighteen prior felony convictions, if the various counts of conviction are totaled.  The better part of a day or more could have been spent cross-examining Sanders about his criminal record and the wonderful deals he got time after time, even while he continued to commit crimes with impunity.  Instead, counsel merely scratched the

surface, cross-examining Sanders generally (and inaccurately) about the number of previous felony convictions, what they were for, and that he received little jail or prison time. Counsel neglected altogether to cross-examine Sanders about his misdemeanor cases involving dishonesty, and did not even draw the jury's attention to the fact that many of Sanders's convictions, for both felonies and misdemeanors, involved acts of dishonesty.

Had an effective cross-examination on Sanders's record been conducted, his credibility would have been completely destroyed in the eyes of any rational jury. Impeachment of Sanders also would have undercut the credibility of Clint Johnson and other Sequoyah County law enforcement officials, not to mention the Government then relying upon him to seek a death sentence. These omissions alone, or in conjunction with counsel's other failures to investigate the informant witnesses and prosecution evidence, undermines confidence in the verdict. If trial counsel had presented the available evidence, the jury would have had an entirely different and more truthful view of the case, including that the raid on Mr. Barrett's house was conducted on the word of someone whom the Sequoyah County District Attorney knew was a lifelong liar, drug addict, and opportunistic snitch.

2. **Counsel was professionally unreasonable for failing to investigate and produce witnesses who could have impeached specific claims made by Sanders, and Sanders's credibility as a whole.**

Even in the absence of moving for and securing a reasonable continuance to investigate the snitch witnesses, it is plain that counsel failed to perform an adequate

Def's § 2255 Mot. 113 *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

investigation into readily available evidence and witnesses that would have impeached Sanders's credibility and shown him to be completely unworthy of belief about anything and everything. Instead of locating available witnesses to impeach Sanders, counsel relied on cross-examination alone, which was plainly inadequate.

As noted, Sanders was somewhat "confused" over the dates he supposedly visited Mr. Barrett's property. Based on one reasonable interpretation of the dates Sanders claimed to have been at Mr. Barrett's residence, and as argued by AUSA Littlefield to the jury, Sanders was at Mr. Barrett's on the afternoon of September 23, 2009, just hours before the early morning police raid on Mr. Barrett's property. Littlefield told the jury Sanders was present around 5:00 p.m. to 6:00 p.m. on September 23rd, around the time the gate to Mr. Barrett's driveway was locked. (R. 4299.)

Had counsel conducted a reasonable investigation, or sought the time to conduct one, they could have produced Rick Lunsford as a witness to rebut this claim. As noted in the discussion of Travis Crawford's testimony, Mr. Lunsford arrived at Mr. Barrett's around noon on September 22, 1999, and stayed until approximately 9:00 p.m. on September 23rd. Lunsford states that Sanders was never at Mr. Barrett's property on either September 22 or September 23, 1999. Of course, Mr. Lunsford was never contacted by defense counsel. Had he been contacted,

he would have been willing to testify that Sanders was never on Mr. Barrett's property on the afternoon and early evening of September 23rd. (Decl. of Rick Lunsford.)

Likewise, trial counsel failed to contact and interview another witness who could have refuted Sanders's claim to have been in Mr. Barrett's house, where he supposedly saw methamphetamine and a drug sale, according to his direct testimony, in September, 1999. Sean

Hill would have testified that Sanders was never in Mr. Barrett's house because Mr. Barrett would not let him in.  Mr. Barrett and his real friends stayed as far away from Sanders as possible because it was well known he was a chronic liar and a police snitch.  (Decl. of Sean Hill.)

As noted, Brandy Hill was present at Mr. Barrett's on the afternoon of September 23, 1999.  She could have identified the people who were present during that time.  Charles Sanders was not among them.  Ms. Hill was never contacted by defense counsel.  (Decl. of Brandy Hill.)

Critically, Sanders testified that two to three days before the shooting, he went to Mr. Barrett's with his then-girlfriend, Geniece [sic] Thomas.[18]  He gave conflicting testimony as to whether Mr. Barrett sold drugs to either him or Ms. Thomas, on this or any other occasion.  When questioned by the prosecutor, Sanders claimed that Mr. Barrett sold Ms. Thomas drugs.  Questioned by defense counsel, Sanders stated that there was no drug deal when he supposedly went to Mr. Barrett's two to three days before the police raid, and that he merely went there, with Ms. Thomas, to exchange a set of car keys.

Trial counsel never contacted Ms. Thomas.  She was an available witness.  Had counsel located and interviewed her, she would have testified that Sanders was lying.  Ms. Thomas would have testified that she was not at Mr. Barrett's with Sanders a few days before the shooting.  She also would have testified that on the occasions she did go to Mr. Barrett's she never went with Sanders.  Moreover, Ms. Thomas could have testified that on the occasions she went to Mr. Barrett's, she never bought drugs from him.  On any occasion she was at Mr. Barrett's when Sanders was on the property, she never witnessed or had any knowledge of any

_____

[18]  Her true name is Janesse Thomas.

drug transactions between Mr. Barrett and Sanders. Mr. Barrett would not have sold drugs or engaged in drug activities with Sanders because Mr. Barrett neither liked nor trusted Sanders, who was a well-known snitch. (Decl. of Janesse Thomas.)

Counsel unreasonably failed to investigate and produce some of the witnesses discussed immediately above, and others, who could have testified that Sanders is a pathological liar whose word was worthless. Not only did these witnesses have personal opinions that Sanders was dishonest and completely untrustworthy, but they were well aware that Sanders's reputation for truth and veracity in the community was horrendous. These witnesses also could have armed counsel with information to cross-examine Sanders, in the first stage of trial, about various bad acts and acts of dishonesty. Since Sanders also appeared as a penalty phase witness for the Government, and because the rules of evidence are relaxed in the second stage of a capital trial, these witnesses could have given specific testimony on specific bad acts of Sanders and actions which reflected negatively on his credibility.

Rick Lunsford could have testified that he knows Sanders, and had done drugs with him in the past. Sanders was a heavy drug user, who also dealt drugs. In Mr. Lunsford's opinion, Sanders is a totally dishonest person. Mr. Lunsford would not believe anything Sanders said. Sanders was even dishonest in his drug dealings. Sanders often sold bad dope to people and ripped them off. Of course, he never seemed to get in trouble for his drug dealings. Mr. Lunsford is aware that Sanders once kidnaped a woman, Sally Davis. Not only does Mr. Lunsford have a personal opinion that Sanders is wholly dishonest, but he has a well known, and richly deserved, reputation for dishonesty in the community. Mr. Lunsford, as noted in the discussion regarding Travis Crawford, also could have testified that Mr. Barrett never threatened

harm to the police, and never said he would go out in a "blaze of glory" or anything like that. (Decl. of Rick Lunsford.)

Janesse Thomas, Mr. Sanders one-time girlfriend, could have testified that in her personal opinion, Sanders is completely dishonest and would say and do anything as long as he believed he would obtain something of advantage to himself. Sanders's reputation for honesty in the community is horrible. Ms. Thomas could also have given testimony showing that Sanders resented Mr. Barrett and had a motive to lie against him. On one occasion, when Thomas was still Sanders's girlfriend, she tried to get away from him and called Mr. Barrett and another friend for help. Thomas left Sanders, and was picked up by Mr. Barrett. Sanders and his mother, Evelyn Sanders, followed Mr. Barrett and Thomas. Sanders was angry and was trying to persuade Ms. Thomas to come back with him and his mother. Instead, Mr. Barrett was able to get Ms. Thomas away from Sanders. (Decl. of Janesse Thomas.) Based on these events, jurors would have found Sanders had a personal motive to lie about Mr. Barrett, apart from or in addition to his interest in currying favor with law enforcement.

Sean Hill could have testified that in his personal opinion, Charles Sanders is a liar who had no credibility whatever. Sanders's reputation in the community for truth and veracity is abysmal; Sanders is known as a thief, a liar and a snitch. It was known in the wider community that Sanders lies about others in order to get favorable treatment from law enforcement. When Mr. Hill heard that the Government sponsored Sanders as a witness at Mr. Barrett's trial, he could not believe the prosecutors would rely on Sanders because of his lengthy arrest record. In his penalty phase testimony, Sanders claimed that Mr. Barrett had made statements to the effect that the informant against him should be found and harmed. Mr. Hill could have given testimony from which the jury could infer that Sanders was attributing to Mr.

Barrett actions that routinely occurred.  Mr. Hill would have informed the jury that when Sanders is in jail, it is known that he is routinely beaten up by other inmates because he is a liar.  (Decl.of Sean Hill.)

Sally Davis Johnson, a one-time girlfriend of Sanders, was available as a witness, but was never contacted by the defense.  She last had contact with Sanders in 2004, before Mr. Barrett's trial.  In her personal opinion, Sanders is completely unbelievable and untrustworthy. Sanders is extremely dishonest even when sober, but when he is on drugs, he is "100 times more dishonest."  Ms. Johnson could never believe anything Sanders said on any subject.  (Decl. of Sally Davis Johnson.)

Ms. Johnson could have provided defense counsel with information about specific bad acts of dishonesty and violence that could have been used to impeach Sanders in the first stage of trial, even if she could not have given "extraneous evidence" on these matters in the first stage.  Ms. Johnson could have testified to these acts, however, in the penalty phase.  This evidence would have put the lie to the prosecution's portrayal of Sanders as simply a non-violent doper who was himself the innocent victim of planned violence by others.

On one occasion, Sanders used lies and fraud to get Ms. Johnson to go with him. Sanders showed up at her house and said he needed to talk to her.  She told him she could talk to him briefly, but had to get back to school.  She left with Sanders in his car.  Against her will, Sanders kidnaped her and took her to Vian, Oklahoma, where she was held for eight days.  She was beaten on a daily basis by Sanders, and was even stabbed.  During this ordeal, Sanders lied to her repeatedly, telling her he would take her home when her bruises healed.  Instead, Sanders simply kept beating her.  When she tried to escape, Sanders threw a knife at her, and stabbed her in the foot.  Sanders also used a knife to cut her from her neck to her chin.  After five days of

Def's § 2255 Mot.                                    118                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

being held by Sanders, he turned himself in to the police on an outstanding charge.  At this point,

Sanders turned Ms. Johnson over to his mother, Evelyn Sanders, who confined her for another

two to three days.  The police finally rescued Ms. Johnson.  Evelyn Sanders tried to cover up Ms.

Johnson's many bruises with make-up.  A police report was made by Ms. Davis about what

Sanders did to her.  (Decl. of Sally Davis Johnson.)[19]

Ms. Johnson could have told defense counsel, had she been contacted, about an

act of threatened violence committed by Sanders.  Sanders once threatened Ms. Johnson's

mother, Linda Davis, because Ms. Davis would not tell Sanders where Ms. Johnson was.

Sanders stated that unless Ms. Davis gave him the information he wanted, he would find Ms.

Johnson and cut her tongue out.  (Decl. of Sally Davis Johnson.)

Ms. Johnson, had she been contacted by defense counsel, also could have

informed the defense about other specific acts of dishonesty committed by Sanders.  Sanders

once took her along on a stealing spree, during which Sanders stole from virtually everyone he

knew in order to get money to buy drugs.  The police were informed about this by Ms. Johnson.

Sanders had also stolen from Ms. Johnson and her family in order to get money to buy drugs.

Sanders was so pathetically dishonest he once stole  Ms. Johnson's children's toys in order to

pawn them for drug money.  (Decl. of Sally Davis Johnson.)

Finally, one of Sanders's own relatives could have testified, had he been contacted

by the defense, that Charles "Monk" Sanders is a completely untrustworthy and unbelievable

individual.  Billy Poindexter is Sanders's uncle, and has known Sanders his entire life.

According to Mr. Poindexter, "you can believe him [Sanders] about as far as you can throw a

---

[19]  Evidently, based on the search of Sanders's court records, he was never charged in this incident because he was working as a police snitch.

pick-up truck." Sanders, who has been in trouble his whole life, is unbelievable in everything he says. Mr. Poindexter would not believe his nephew about anything. Mr. Poindexter is aware that when Sanders testified at Mr. Barrett's trial, Sanders was doing so in order to get out of his own troubles with the law. Mr. Poindexter is also aware that after testifying against Mr. Barrett, Sanders served no jail time for anything he was in trouble for. Mr. Poindexter states also that he is aware that Sanders's reputation in the community for truthfulness is awful. Had Mr. Poindexter been contacted by Mr. Barrett's trial lawyers, he would have testified. (Decl. of Billy Poindexter.)

Additionally, had trial counsel moved for a continuance, they could have developed all the evidence detailed above respecting Sanders's credibility to mount a withering attack on the search warrant under *Franks*. This evidence would demonstrate conclusively that *no one, including Clint Johnson*, could have used Sanders as a "reliable" confidential informant.[20]

### d.    Randy Weaver

Randall Weaver testified in the first stage of Mr. Barrett's trial. He stated that in 1999, he was using methamphetamine, and had been to Mr. Barrett's place three or four times in the spring and summer of that year. Using the death of Trooper Eales as a benchmark, Weaver stated he had been to Mr. Barrett's earlier in 1999 year looking at cars. On that occasion, Weaver and Mr. Barrett used methamphetamine together. Weaver went to Mr. Barrett because he was a good mechanic. Whenever he went to Mr. Barrett's property, the gate was open; Mr. Barrett did not come out with a gun on the occasions Weaver went to the property. Weaver testified he

---

[20] *See also,* Mr. Barrett's *Brady/*newly discovered evidence claim respecting the complete lack of credibility of both Sanders and Johnson.

bought $20.00 of methamphetamine from Mr. Barrett.  Weaver claimed Mr. Barrett told him that he (Mr. Barrett) had missed a court date, and that he thought a warrant had been issued.  (R. 1835-39.)

Weaver, who was interviewed by Bret Smith and defense investigator Loyd Cobb in AUSA Mike Littlefield's presence, testified he had first been approached about Mr. Barrett's federal case by Littlefield, who came to his tattoo shop in Arkansas.  Weaver had previously done time on an Arkansas cocaine charge.  When Littlefield came to see him at the tattoo shop, he asked whether Weaver had ever sold ammunition to Mr. Barrett, and informed Weaver that it was against federal law for Weaver to possess ammunition because of his previous conviction. Weaver told Littlefield he never sold ammunition to Mr. Barrett.  Littlefield's statement to Mr. Weaver about the sale of ammunition might be construed as a subtle threat, but Weaver felt he had nothing to worry about because he had done nothing wrong.  (R. 1835-39.)

Questioned by defense counsel, Weaver testified that in a rural area like he and Mr. Barrett lived in, people don't drive up without warning in the middle of the night.  If a gate is closed, people should not go onto somebody else's property.  It makes no sense to do such a thing.  (R. 1840-45.)

Although he was interviewed briefly by the defense, defense counsel and the defense investigator failed to ask Weaver whether, when Mr. Barrett supposedly discussed his court case, or at any other time during the Spring and Summer of 1999, he ever said words to the effect that he would blast the first policeman who came onto his property, would "go out in a blaze of glory," or had in any way, at any time, threatened the police.  Had he been asked these questions at trial, Weaver would have testified that Mr. Barrett never made such statements to

him or anyone else in his presence.  In fact, Mr. Barrett never indicated to Weaver that he would ever do violence to anyone.  (Decl. of David Autry.)

### e.      Brandie Zane Price

Brandie Price testified she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period.  (R. 3485-86.)  Price testified that a week to ten days before the shooting incident, Mr. Barrett mentioned that he had an outstanding warrant and that the police were going to come get him.  Mr. Barrett supposedly stated that if the police arrived, those present should either grab a gun or hit the floor, because he "was going to take as many of them bastards out as he could."  (R. 3492-93.)

Price stated that she usually went to Mr. Barrett's house with Ronny Baldwin,[21] who would drive her vehicle through the ditch area the police went through when they raided Mr. Barrett's house.  (R. 3502-06.)  Defense counsel cross-examined Price about statements she made to the authorities in 2000, where she stated that Mr. Barrett had a MAC-10 and a Mini-14 at his residence, which were unlike the weapons she described on cross-examination.  She also stated in 2000 that she went to Mr. Barrett's with a lady named Jaime Crow, which she denied doing in her testimony.  (R. 3509-11.)

Price's claim that Ronny Baldwin or she usually approached Mr. Barrett's residence from the east through the ditch in her Mazda or Mitsubishi automobile could have been easily refuted by the testimony of Sean and Brandy Hill.  Had they been contacted, they would

---

[21]  Ronny Baldwin testified for the defense.  He stated he could never recollect going to Mr. Barrett's house with her at any time, and that he never would have driven her car through the depressed area to the east of Mr. Barrett's cabin.  Baldwin could not have gone to Mr. Barrett's in August and September as she claimed, because he was jailed on August 4, 1999, and remained in jail through the entire month of September, 1999.  (R. 4117-23, 4182-83.)

have testified that it would have been impossible for this low-slung vehicle, no matter how slowly it was going, to navigate the ditch successfully. The undercarriage would have been severely damaged in the attempt. (Decls. of Sean Hill and Brandy Hill.)

Counsel also failed to call any witnesses who could testify to their personal opinions regarding Price's honesty, or her reputation for honesty in the community. Sean Hill was an available witness never contacted by the police. If he had been interviewed and prepared to testify, he could have told the jury that Price was known in the community as a thoroughly dishonest person who would do or say anything to obtain drugs. (Decl. of Sean Hill. *See also* Claim 5, *infra*.) Moreover, the witnesses who were never investigated who could have impeached claims by Monk Sanders, Travis Crawford and Cindy Crawford that Mr. Barrett made threatening statements against law enforcement could have been used to indirectly discredit Price, since her story was simply too pat and conveniently lined up with what Sanders and the Crawfords said on the witness stand.

### f.      Karen Real

Karen Real, like all the other informant witnesses except Randy Weaver, refused to talk to the defense. (R. 3076-77.) At the time she testified against Mr. Barrett, she was serving a fourteen year federal sentence on drug charges and a firearms charge. (*See* Claim 5, *infra*.) Real had been to Mr. Barrett's on several occasions. She claimed he usually kept his gate locked, and that when people arrived on his property, he would grab a gun before he determined who they were. (R. 3085-86.) Real did drugs with Mr. Barrett, and testified that he sold drugs and kept syringes in his house. (R. 3087-88, 3099, 3091, 3102-03.) According to Real, Mr. Barrett stated he would shoot the police if they came on his property. (R. 3106.)

Counsel relied strictly on cross-examination in an attempt to impeach Karen Real. No witnesses who knew her in the community were called to testify regarding her honesty. As with Brandie Price, Sean Hill could have testified that Real's word was not to be believed. According to Mr. Hill, Real is a "pretty messed up" person. Although Real's federal conviction was brought out, counsel never asked her if she had provided information against her co-defendants in an effort to secure leniency. Mr. Hill states that she informed on her boyfriend and co-defendant, Doss Gann, in an attempt to get favorable treatment. Karen Real is the type of person who would do and say anything to get out of trouble. (Decl. of Sean Hill.) Again, witnesses who could have been called to impeach the claims of the Crawfords and Sanders that Mr. Barrett threatened violence against the authorities if they came on his property could have been used to indirectly impeach Real's virtually identical claim.

### g.     Randy Turman

At trial, Randy Turman claimed Mr. Barrett taught him how to cook methamphetamine. (R. 193.) At the time he testified, Turman had pending state charges for manufacturing methamphetamine. (R. 193.) He was at liberty on a $120,000.00 bond. Turman admitted that he had cooked methamphetamine once a week for five years, and to possessing a firearm while doing so. When asked about these charges, Turman said "it's done been taken care of." (R. 445-46.) The witness had taken numerous drugs over an extended period of time, and was once up for four days on a "meth run." (R. 430-31.) Turman claimed there was nothing going on in his case. He had gone to court, and as far as he knew, the charges had been resolved. (R. 434-35.) Turman testified he had no deals in exchange for his testimony, that he had not been given immunity from punishment, that he never worked as an informant or paid informant. He declined to talk to the defense because he figured he would be questioned in court, and that

would suffice.  Asked if one of the charges currently lodged against him was for altering the serial number on an SKS, he stated that charge had been dropped.  (R. 434-35, 439-44.)  Turman stated he was simply in court to tell the truth.  (R. 445.)

Turman claimed he met Mr. Barrett three or four months before Trooper Eales was shot.  (R. 364-65.)  He "hung out" at Mr. Barrett's and would use methamphetamine there.  (R. 366.)  He stated he witnessed Mr. Barrett cooking methamphetamine in his cabin.  (R. 377.)  He identified Government's Exhibit 65, a photograph taken in Mr. Barrett's shop of mineral spirits, toluene, and paint thinner.  Turman stated Mr. Barrett would use these ingredients to cook meth.  (R. 383-84.)  Tubing used to manufacture methamphetamine was kept in Mr. Barrett's cabin.  (R. 384-85.)  Glassware used in the manufacturing process was kept in a water trough.  (R. 385-86.)  Turman explained how Mr. Barrett supposedly "powdered" methamphetamine in his shop and how a hose was attached to a gas tank during the cooking process.  (R. 387-91.)  Turman testified, though, that he never actually saw Mr. Barrett cooking meth, and that he never really discussed the manufacturing process with Mr. Barrett, even though he claimed Mr. Barrett was the person who taught him how to cook meth.  (R. 389-91.)

Turman testified he recognized items that were in Mr. Barrett's house during the summer of 1999, including a tool box and hose, and explained how Mr. Barrett could used these items to make dope.  (Government's Exhibit 63, R. 396-97.)  Turman testified Mr. Barrett would lock the gate to his driveway to restrict access to his property, and identified the "warning sign" that had been placed there.  (Government's Exhibit 104.)  The witness claimed Mr. Barrett never

left his property because there was a warrant out for his arrest, and that he was afraid the police would come to his house.  (R. 397-401, 416.)

Mr. Barrett kept several weapons in his home, including a .233 Colt Sporter rifle; a .22 pistol; a Smith and Wesson 9mm pistol; and a double-barreled 12-gauge shotgun, which Turman said he sold Mr. Barrett.  (R. 401, 404-11.)

Turman admitted he went to Mr. Barrett's house to paint a car on one occasion, and that the enamel reducer and mineral spirits in the cabinet to Mr. Barrett's shop were used to paint vehicles.  (R. 437-39.)

Thus, Turman was a critical witness on the underlying drug charges in the superseding indictment, as well as on the question of Mr. Barrett's intent.  Turman was especially important on the drug charges, since the search of Mr. Barrett's home and property yielded no working methamphetamine lab and virtually no drugs.  It was therefore of paramount importance that Turman be effectively impeached.  This, trial counsel failed to take reasonable steps to do.

Trial counsel was professionally unreasonable for failing to research Turman's court file on the charge that had "done been taken care of."  The pending felony drug and firearms charges were still open when Turman testified.  Contrary to Turman's testimony, the possession of a firearm with an altered serial number charge had not been dismissed.  The only way these charges could have been "taken care of" is if Turman were acting as a police informant, and was going to get some sort of deal in exchange for his informant work and his testimony against Mr. Barrett.

In Sequoyah County Case No. CF-02-477, filed on September 10, 2002, Turman was charged in a six count information with manufacturing methamphetamine; possession of methamphetamine with intent to distribute, possession of precursor material; another count of possession of precursor material; possession of a firearm while committing a felony; and

possession of a firearm with an altered serial number. The charges were based on evidence recovered during the execution of a search warrant. Turman posted an appearance bond on September 20, 2002. A preliminary hearing was set for April 17, 2003. The preliminary hearing was re-set for June 12, 2003, and apparently re-set again on later dates, since preliminary hearing was ultimately waived on November 3, 2003. According to documents in the Sequoyah County Court file, the case literally fell off the map until May 9, 2007, when the District Attorney's Office filed a motion to dismiss "in the best interests of justice." The motion to dismiss was granted by written order the same day it was filed. (File in Sequoyah County Case No. CF-02-477.)

Counsel was professionally unreasonable for failing to expose Turman's bald-faced lie about his case having been "taken care of," and one of the firearms charges having been dismissed, when the case was still active and literally nothing had happened on it in two years. Not only would Turman have been exposed as a perjurer, but the curious chronology of his Sequoyah County felony case could have been used to support counsel's claim on cross-examination, which Turman denied, that he was a police snitch, had made an undisclosed deal with the Government for his testimony against Mr. Barrett, and was going to be rewarded in the end (as he was) depending on whether he pleased the Government with his testimony.

Counsel was also professionally unreasonable, as with the other informant witnesses discussed above, in failing to develop and introduce evidence regarding Turman's overall lack of honesty. Sean Hill could have testified that Randy Turman is "as low as you get," and that he was known in the community as a thief who would "testify against anyone to save his own skin." (Decl. of Sean Hill.)

## Conclusion

There was one major difference between Mr. Barrett's state prosecution, which ended in a conviction of manslaughter, and his federal case, which resulted in the death penalty: the testimony of the seven snitches, who were nowhere to be found in 2002 and 2004, when Mr. Barrett was tried in state court.  Their testimony was vital to the Government's case for intent in both stages of trial, and to establishing the underlying drug charges.  Despite the obvious importance of these witnesses, as the trial court itself stated on September 13, 2005, Mr. Barrett's trial counsel failed to move for a continuance, and took virtually no steps to investigate and impeach these witnesses.  Because of the critical importance of these witnesses, who could have been devastated had proper investigative steps been taken, the failures of trial counsel were unquestionably prejudicial.  There is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that but for counsel's indefensible errors and omissions, the result of the guilt stage of trial would have been different.  At a minimum, these failings also had a prejudicial effect on the punishment stage.  *Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Strickland v. Washington,* 466 U.S. 668 (1984).

This case is analogous to *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002), where, in the context of a *Brady* claim, a capital conviction was vacated because exculpatory evidence which could have been used to impeach witnesses was not disclosed.  The concealed evidence, there and in Mr. Barrett's case would have shown that witnesses had motive to lie and had colluded in their stories.  *See also Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2002) (counsel ineffective in part for failing to impeach immunized witness).  *See also, e.g., Reynoso v. Giurbino,* 462 F.3d 1099, 1114, 1120 (9th Cir. 2006) and *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995), *cert. denied,* 519 U.S. 910 (1996)(counsel ineffective for failing to impeach); *Horton v. Massie,* 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished)(counsel ineffective for failing

to call defendant's young daughter in murder case to support claim that while defendant was present, she did not participate; the prosecution's key witness told inconsistent stories, and prosecutor emphasized defendant's version was uncorroborated; counsel was also ineffective for failing to investigate and present evidence that the prosecution's chief witnesses were collaborating with each other and had a motive to lie).

> **5.**      **Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence.**

Trial counsel was professionally unreasonable for failing to hire an independent crime analyst or reconstruction expert in order to rebut the testimony of OSBI agent Iris Dalley. Mr. Barrett's counsel sought $17,000.00 for an expert to conduct a crime scene reconstruction, in anticipation that the Government would rely on Iris Dalley, who appeared as a witness at Mr. Barrett's two state trials. Counsel sought authorization to hire Edward Hueske of Denton, Texas. Mr. Hueske had consulted with the defense during Mr. Barrett's state trials. The court authorized $4,000.00 for a crime scene reconstructionist. After Mr. Echols left the case, trial counsel Roger Hilfiger informed the court that it had not used available funds to hire a crime scene reconstructionist, but instead used the funds for an investigator. Loyd Cobb, the investigator hired by trial counsel, testified that he went to Mr. Barrett's property and took photographs, at least some of which were introduced into evidence. *See* Claim 1, *supra*, and 3, *infra.*

As stated in Claims 1 and 3, Mr. Barrett had a constitutional and statutory right to expert assistance to rebut the Government's witness. Prevailing professional norms of criminal defense practice advise attorneys to obtain expert assistance. Mr. Barrett's trial counsel acted unreasonably by failing to secure any benefit from the exercise of Mr. Barrett's statutory and

constitutional rights to expert assistance. Counsel's failure to investigate the benefits of expert advice was deficient performance. *Rompilla v. Beard,* 545 U.S. 374 (2005)(ineffective assistance to fail to investigate evidence the defense knew prosecutors intended to use); *Wiggins v. Smith,* 539 U.S. 510 (2003)(counsel could not have made a reasonable decision to forego further investigation because they lacked sufficient information).

Iris Dalley was a key witness for the Government. Her crime scene reconstruction testimony was used by the prosecution to argue that Mr. Barrett had been standing on the porch when he fired his .223 Sporter rifle, and therefore would have seen the several police vehicles with emergency lights engaged which had descended on his property. The defense contended that Mr. Barrett fired from inside his house and would only have seen the lead vehicle, driven by Buddy Hamilton, which did not have any emergency lights engaged, and thus could not be identified as a police vehicle. Dalley's crime scene reconstruction testimony, complete with a PowerPoint presentation and animations, which were shown to the jury but not introduced as exhibits, was used to support the prosecution's theory.

Trial counsel's unreasonable omission was prejudicial. Had counsel engaged the services of the independent expert authorized for Mr. Barrett's defense, it could have been shown that Dalley's analysis was amateurish, unscientific, seriously flawed, and did not comport with the necessary protocols for conducting a legitimate and reliable reconstruction. In connection with the current proceedings, counsel asked Mr. Hueske to review Ms. Dalley's testimony, the exhibits introduced in the case, her PowerPoint presentation, her animations, and other materials upon which she relied. Mr. Hueske, a nationally known expert whose credentials, training and experience far outstrip Dalley's meager qualifications, has concluded that Dalley's testimony was not worthy of belief. (Report and curriculum vitae of Edward Hueske.)

Def's § 2255 Mot.                                   130                          *U.S. v. Barrett,* 6:04-CR-115-JHP-SPS

In his report, Mr. Hueske first shows that Dalley's use of inappropriate terminology reflects her poor understanding of the fundamentals of crime scene analysis, if not an intention to confuse, rather than inform, the jury. "Ms. Dalley repeatedly uses terminology that is inappropriate both with regard to vehicular descriptions and firearms components." For example, Dalley, in her testimony, refers to the "front quarter panel" of the Ford Bronco driven by Buddy Hamilton, and in which David Eales was a passenger, when she is trying to reference the front fender. Instead of referring to the "driver's side" and "passenger's side" of the vehicle as points of orientation, she used the confusing terms "left" and "right." Dalley used the term "sidewall," which obviously refers to the portion of a tire, when she is attempting to describe an inner body panel on the Ford Bronco. Dalley consistently and improperly used the term "projectile" to refer to anything that may have caused an impact, rather than using correct terms for a bullet, a bullet fragment, or other constituent parts of a bullet. (Hueske report at 2.)

Dalley exhibited a fundamental misunderstanding of "bullet fragmentation upon impact with glass[.]" In reality, fragmentation of a bullet begins when it impacts a surface such as glass. If trial counsel had secured Mr. Hueske's services, the jury would have known that Dalley erroneously stated that a bullet would only fragment after perforating or passing through glass. Dalley admitted she was not a firearms examiner, stating that she seeks the assistance of such experts when she has a "ballistics" question. While it could be argued that one need not be a firearms expert to conduct a crime scene reconstruction, "a basic understanding of firearms and ammunition components is essential to being able to recognize what one is viewing at a shooting scene." Mr. Hueske notes Dalley testified there "might" be some caliber similar to a .233 rifle that "could have made" some of the bullet holes in the Bronco. When asked by defense counsel for examples, Dalley could not come up with any. (Hueske report at 2-3.)

If he had been called to testify, Mr. Hueske would have exposed to the jury that Dalley's use of "inappropriate terminology and ambiguous statements" made understanding her testimony difficult. Dalley's shortcomings in these areas likely reflect her lack of expertise with firearms and vehicles. (Hueske report at 3.) Hueske's analysis shows that Dalley lacked sufficient knowledge of ballistics, vehicle construction, and the necessity of using consistent, accurate terms of reference when reconstructing a scene to render reliable, credible opinions about a shooting scene involving a vehicle.

Mr. Hueske states there are numerous more serious flaws in Dalley's attempt at a crime scene reconstruction in this case, and with her trial testimony. Mr. Hueske's bottom line conclusion is that Dalley "did not follow widely accepted protocol used in shooting incident reconstruction. ... Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation." (Hueske report at 3, 6.)

Mr. Hueske would have exposed the following failings to the jury:

1)      Standard, accepted crime scene reconstruction protocol requires a determination of the length, width and height of any vehicle involved in a shooting. Dalley neglected to determine the dimensions of the Ford Bronco in aid of any trajectory analysis. There is also an unresolved question as to how wide the passenger door was open when shots were fired. No measurements were taken. Instead, Dalley illogically explained that because the passenger door was curved, it could not be measured. (Hueske report at 3.)

2)      Before trajectory rods are used, proper protocol demands an examination of the margins, interior surface, and surrounding area for trace evidence. Placing trajectory rods

in bullet holes, as Dalley did, invariably alters them.  Dalley was specifically asked whether she saw gunshot residue around any bullet holes, and state she saw none.  (R. 3399.)  Hueske report at 3.

3)   To legitimately evaluate the area around a bullet hole for trace evidence, close inspection with a magnifying lens, or a lift for later analysis, should be done.  Bullet holes should also be examined for blood, tissue, hair, fibers or other forms of trace evidence.  Dalley failed to do this.  Hueske report at 3.

4)   The caliber of a bullet creating a bullet hole can be determined with an acceptable degree of confidence, when bullet holes are "symmetrical and devoid of any distortion."  In such instances, accepted, standard protocol requires the length and width of the bullet holes to be measured with a pair of dial calipers.  The width of the hole can be "related to the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates."  Dalley could not determine the caliber of any bullets striking the Bronco (and thus could not say whether any of them were created by "friendly fire") (R. 3298.)  Based on some of the photographs taken of the bullet holes in the Bronco, it appears they could have been measured to determine caliber with the appropriate instrument.  (Hueske report at 3.)

5)   Dalley's heavy reliance on trajectory rods to determine the trajectories of the fired rounds failed to follow protocols and was based on unwarranted assumptions.  Correct placement of trajectory rods to properly determine trajectories "requires an understanding of bullet penetration/perforation in a variety of substrates."  This is especially true with bullets that fragment or tend to fragment, like rounds fired from a .233 rifle.  Equally important is knowing when the calculation of trajectories, rather than the use of trajectory rods to determine them, is called for.  Trajectory rods such as Dalley utilized are a reliable tool for determining bullet

trajectories where there is "a secondary impact that has not resulted from initial impact deflection and/or fragmentation." However, Dalley attempted to determine bullet trajectories "utilizing fragment impacts into secondary targets based on the presumption" that the bullet core, or a large part of the bullet core, "travels in a straight path." This assumption is unwarranted, and skews the analysis. Mr. Hueske would have explained that Dalley was making contradictory claims, as when she testified (correctly) that the "exact path" of each bullet could not be determined, and also testified (incorrectly) that her trajectory patterns, as she described them, were "accurate." (R. 3446. Hueske report at 4.)

6)      Dalley relied upon fallacious reasoning to say that bullets would pass through an intervening target such as the passenger door of the Bronco "undeterred," or straight through. Dalley testified repeatedly that bullets going through the "partially open" Bronco door would go "straight through," and that bullet core fragments would do the same. Where, as in this case, bullets fragment on impact, the path or trajectory is unpredictable. Dalley conjured a number of scenarios to make her theory that the bullet trajectories were unaffected by intervening targets (and thus her trajectory analysis as a whole) "fit" the evidence. Dalley posited that the passenger door of the Ford Bronco moved to various different positions "to account for the incongruity of different trajectories through it." (R. 3314) Although this type of movement cannot be excluded, it is a speculative endeavor to make the evidence correspond with the theory being propounded. The more likely explanation is that bullet deflections or fragmentations account for the variations in bullet trajectories through the vehicle door. Deflections occur

frequently when bullets strike objects with irregular surfaces, as opposed to those which strike flat surfaces. (Hueske report at 4.)

7)      Dalley lacked basic equipment and measurements necessary to make her diagrams and animations reliable.  When trying to ascertain the trajectories of bullet holes in vehicles and other inanimate objects, trajectory rods placed through the bullet holes are referenced by two linear and two angular coordinates.  This is indispensable to establishing "reproducible data for creating diagrams and animations" that *accurately*, within the limits of uncertainty, represent the true bullet trajectories.  Mr. Hueske finds it "amazing" that Dalley *did not* determine any of the angles because she "did not have the necessary equipment." ( R. 3275) All that would be required to perform this essential task is a "$30 zero base protractor and a $5 plumb bob."  Because Dalley failed to take such measurements, and because she could not determine the "exact paths" of the bullets using trajectory rods alone, "it is unclear how the diagrams and animation she produced can be perceived as having any reliability." Again, the chief reason for getting such linear and angular measurements "is to be able to accurately create diagrams and animations, such as the ones Ms. Dalley prepared in this incident." (Hueske report at 5.)

8)      Dalley failed to ascertain bullet impact angles "relative to a common point of reference (plumb line) [as] is the accepted standard" for reliable reconstruction.  (Hueske report at 5.)  In her testimony, Dalley generally described the terrain of the shooting scene as "hilly," but did not establish the exact grade of the terrain, or consider the potential impact the grade might have had on what she perceived to be the trajectories of the bullets hitting the Ford Bronco.

9)      Where holes are of questionable origin, and may or may not be bullet holes, the proper procedure requires on-site chemical testing for the presence of copper or lead to

confirm that the holes or perforations were produced by a bullet rather than something else. Although Dalley testified that she had some knowledge of this kind of testing, she did not testify that she actually conducted it.  (Hueske report at 5.)

10)     Dalley testified she had "no means of sequencing any of the shots" at the scene.  This was not accurate. Analysis to determine the sequence of shots is not always possible, but it can sometimes be accomplished "through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets [or] fragments[,]" such as glass, fibers, hair, paint and other substances.  Thus, Dalley had the means of attempting to sequence the shots, but she either was not aware of the techniques used in that process or, she chose not to employ those methods either at the scene or later.  (Hueske report at 5.)

11)     Critically, Mr. Hueske could have shown that Ms. Dalley failed to employ well known methods that could have shed light on the location of Hamilton's Bronco when specific shots struck it.  In any incident involving a moving vehicle, any legitimate reconstruction or re-enactment would include actually placing the Bronco in various positions to determine the likelihood of each shot coming from one or more particular positions.  It was particularly important here to determine the angle of fire after the Bronco came to a stop.  However, the Bronco itself was not placed in a variety of positions to determine the trajectories of the shots fired at or into it.  Dalley testified that before she arrived at the scene, the Bronco had been moved.  However, she also testified there were tire impressions and a fluid deposit in the dirt in

front of Mr. Barrett's residence.  These markings could have been used to re-position the Bronco to where it came to rest before being moved.  (Hueske report at 5.)

12)     Dalley employed a fundamentally flawed approach when she attempted to establish the trajectory of bullets that passed through the window glass, blinds and curtain or towel hanging over the front window of Mr. Barrett's cabin.  She testified that the results of her trajectory analysis for these objects were reliable.  (R. 3389.)  First, the accepted method for reliably determining trajectories is to set up a tripod and place a laser on the tripod.  Dalley had someone assisting her hold a trajectory rod by hand.  Second, Dalley failed to take measurements of the hole locations.  (Hueske report at 5.)

13)     Dalley's method of "placing a hand-held laser into bullet holes in the Bronco window glass is equally flawed since it presumes no deflection resulted from either the impacts or the fragmentation."  *Ibid.*

14)     Dalley overstated her ability to reach a warranted conclusion regarding the critical issue of Mr. Barrett's position in relation to the Bronco.  When attempting to determine the distance of fire on the bullet holes in the cabin window, Dalley testified she did not "see" any evidence of gunshot residue on the window.  Because of this, she opined that the distance had to be greater than three feet from the glass, since the literature states that the absence of gunshot residue at the edges of a bullet hole indicates shots were fired from greater than three feet away from impact. This general rule varies greatly depending on the weapon used, and also depends on the type of ammunition used.  To correctly evaluate the maximum muzzle to target distance, the weapon in question should be fired into glass like that at the scene, and the same type of ammunition should be used.  (Hueske report at 6.)

15)     In a shooting incident like this, a metal detector should be used to detect the presence of bullets or bullet fragments.  Dalley did not attempt to locate any bullets or fragments in the soil.  (Hueske report at 6.)

16)     In reaching her conclusion that David Eales was struck in the right arm after he exited the Bronco, Dalley ignored the elementary dictum in forensic science that "absence of evidence is not evidence of absence."  Dalley testified that since she found no tissue in the Bronco, and tissue appeared to be missing based on the appearance (to her) of the wound, Trooper Eales must have been outside when he was struck.  However, Dalley's testimony fails to establish that she looked for any tissue outside the Bronco. It would have been easy to try to confirm Dalley's conclusion by spraying luminol on the ground in the area around the Bronco.  There is nothing to show this was done.  An honest forensic scientist would say the fact that evidence is not found (and Dalley apparently took no steps to find it) cannot be used to "conclude anything other than that no evidence was found."  (Hueske report at 6.)  Dalley's conclusion in this regard was critical to the prosecution's theory because the Government argued that at the time Trooper Eales was shot, he was outside the Bronco and the type of equipment he was wearing would have made it obvious to Mr. Barrett that he was a law enforcement officer.

In sum, if trial counsel had obtained the services of a qualified forensic examiner, they could have challenged the admissibility of Dalley's testimony under Rule 702 of the Federal Rules of Evidence and under *Daubert v. Merrrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993) and *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999).  Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction.  She failed to take many steps that should have been taken, and failed to utilize the appropriate methodology.  Due to these numerous failures, her conclusions, aimed at

strengthening the Government's case, were scientifically unreliable.  At a minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, was outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis.

Under Fed.R.Evid. 702, the trial court is charged with being the "gatekeeper" where expert testimony is concerned, ensuring only that reliable evidence comes before the jury. Among the factors used to determine the reliability of scientific or other expert evidence are: 1) whether the theory can be and has been tested; 2) whether the theory has been subjected to peer review and publication; 3) if relevant, the known or potential rate of error; 4) the existence and maintenance of standards controlling its operation; and 5) whether it has achieved general acceptance in the relevant community.  *Daubert* 509 at 593-94.  While crime scene reconstruction evidence (including an analysis of trajectory patterns) is generally accepted in the overall field of forensic science, Mr. Hueske's report demonstrates that Dalley's methodology, and thus her conclusions, fell well outside the range of accepted protocol and were thus unreliable.  Dalley just made it up as she went along in service of her goal of assisting the Government to obtain convictions.  Had defense counsel hired an independent expert to advise them, a powerful motion to exclude Dalley's testimony altogether could have been presented. Dalley's testimony and analysis was little better, if at all, than the "expert" testimony of James Horn, which the court found so bereft of reliability and relevance that it was stricken because it failed to comply with *Daubert* and *Kumho Tire*.

Because Dalley's analysis was an important part of the Government's case, it was inexcusable for counsel to fail to hire an independent expert such as Mr. Hueske to evaluate her methods and conclusions and to testify for the defense.  Had all the flaws in Dally's testimony

been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle. If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired, and was thus unaware that the vehicle coming directly at his house was a police vehicle, especially due to the fact the Ford Bronco driven by Trooper Hamilton had no emergency lights engaged.

All this is especially critical on the issue of intent with respect to count 3 of the superseding indictment, the intent elements of counts 1 and 2, and the intent elements in the penalty phase.

To obtain a conviction on count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed a law enforcement officer in the performance of his official duties, that he knew or had reason to know he was shooting at a law enforcement officer, and that the shooting was precipitated by this knowledge. Absent Dalley's testimony, all the Government had to rely on were the often conflicting accounts and compromised memories of the tactical team members who testified. Thus, the prejudice under *Strickland* flowing from counsel's failure to effectively contest Dalley's testimony with expert assistance is readily apparent. *Snowden v. Singleterry,* 135 F.3d 732, 738 (11th Cir. 1998)(counsel unreasonable and ineffective for failing to object to improper expert testimony); *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995)(counsel professionally unreasonable and ineffective for failing to impeach serology evidence).

It is not just Mr. Barrett's current lawyers who say Ms. Dalley, far from being an objective scientific witness, is a partisan advocate who dresses up her personal opinions in the

guise of "science."  The Oklahoma Court of Criminal Appeals has chastised her, recently

reversing a first degree murder conviction due to Dalley''s unreliable, unscientific testimony,

including the improper use of computer animations.  *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl.

Cr. 2006).  In that case, the defendant's murder conviction was reversed in large part because Iris

Dalley's conclusions and computer-generated animations were not based on objective scientific

findings, but simply restated the prosecution's theory of the case under a "scientific" gloss.

Based on Mr. Hueske's report, Dalley did the same thing in Mr. Barrett's case.  She used

improper methodologies and techniques to "package" evidence already heard by the jury,

offering conclusions based on an incompetent and unscientific evaluation of the evidence.

In addition to trial counsel's other failings with respect to Dalley's testimony,

counsel were professionally unreasonable for failing to investigate Dalley's track record of giving

scientifically groundless testimony.  Although the *Dunkle* case was decided in 2006, after Mr.

Barrett's trial concluded in 2005, the case was tried some years before, the appellate briefs had

been filed at the time of Mr. Barrett's trial, and Dalley's reputation was well known in the

criminal defense community.

> **6.      The outcome of the trial is unreliable due to trial counsel's unreasonably failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death**

The methods used by the Oklahoma Highway Patrol tactical team were highly

questionable.  Based on all the circumstances surrounding the mission, it was ill-conceived and

should have been aborted.  Instead, even though the element of surprise – the motivation behind

the plan to begin with – had been totally lost because the "drive-by" vehicle was spotted the

afternoon before the raid; Toby Barrett was in the yard when the police arrived and yelled a

warning; the lights were on in Mr. Barrett's house, meaning he was still awake; and ultimately the lead, unmarked vehicle, with no police lights on, actually ran into Mr. Barrett's house, plan went forward, with tragic results for Trooper Eales.

Mr. Barrett's trial counsel unreasonably failed to secure the testimony of an independent expert to show that the raid was plagued by numerous tactical errors that contributed to Trooper Eales's death.  Prior to trial, Mr. Echols sought authorization to retain an independent expert on tact-team methods and procedures.  (Doc. 50.)  The court authorized some funds for this evidence.  (Doc. 97.)  However, Mr. Barrett's trial counsel never contacted the expert Mr. Echols wanted to retain.  Trial counsel's omission was not an informed tactical decision.

During the trial, Mr. Barrett's counsel informed the court that a law enforcement witness, Chuck Choney, who testified for the prosecution in state court and had provided favorable evidence on cross-examination, was reluctant to be subpoenaed as a defense witness and provide evidence favorable to the defense.  (Tr. 10/03/05 Hr'g at 6-7.)  Trial counsel told the court they were "in the process of trying to get this swat [sic] team expert to testify."  *Id.* at 6.

Trial counsel knew or should have known that it was necessary to retain another expert to assist the defense because of Mr. Choney's affinity with law enforcement.  Mr. Echols had known this, and requested authorization to retain another, independent, expert.  (Doc. 50 at 5.)  During a hearing on March 22, 2005, Mr. Echols stated, in Mr. Hilfiger's presence, "we'd like to be able to call Mr. Choney.  But he said he's an ex-FBI agent, and he'd rather be drawn and quartered than appear in court as a defense witness in Mr. Barrett's case."  (Tr. 3/22/05 Hr'g at 14-15.)

Trial counsel did not attempt to contact Mr. Choney until approximately mid-September, 2005.  Trial counsel made unsuccessful efforts to speak with Mr. Choney by

telephone on September 13, 2005, and were told Mr. Choney would not be available until September 22 or 23.  Thus, at the time trial started, Mr. Barrett's counsel conducted no investigation into what evidence could be presented from an independent expert authorized by the court, and fell back on a witness counsel knew would not cooperate.  If trial counsel had enforced Mr. Barrett's constitutional and statutory rights to expert assistance, the evidence would have shown that Trooper Hamilton's errors in conceiving the raid and carrying it out meant, among other things, a) that Mr. Barrett did not have visual evidence that the lead Bronco was a law enforcement vehicle, and had no signs of law enforcement until after the shooting; b) that the lead vehicle lacked necessary cover from a sniper; c) that the lead Bronco advanced onto the property from a tactically disadvantageous position; d) that the team lost the element of surprise; e) that the situation was dangerous for non-tactical personnel; f) that the presence of observers made a violent altercation more likely, though unnecessary; g) that the lead Bronco's approach and the  position of other vehicles unnecessarily exposed Trooper Eales to both friendly fire and hostile fire.

Instead of forcefully bringing these points to the jury's attention, the defense relied on the extremely reluctant Mr. Choney, who only appeared because he was compelled to by subpoena.  He turned out to be a Government witness rather than a defense witness.  He did offer some criticisms of the manner in which the raid was conceived and executed, such as the inclusion of the caravan of local dignitaries and law enforcement onlookers, and the failure of the tactical team to independently verify the reliability of the information provided by the alleged confidential informant.  However, the Government easily turned Mr. Choney into a prosecution witness on cross-examination.  In his opinion, while hindsight might suggest other alternatives to

the action taken, there was no compelling need to have aborted the mission. His bottom line was devastating to the defense: the tactical team did nothing wrong.

The Tenth Circuit dealt with an analogous situation, in the context of a capital defendant's sentencing stage representation, in *Hooper v. Mullin,* 314 F.3d 1162, 1167-71 (10th Cir. 2002). In *Hooper,* the second stage strategy was to present evidence that the defendant suffered from brain damage and was cognitively impaired. Hooper had once attended anger management counseling. His psychologist wrote a report opining, among other things, that the defendant's cognitive functioning was largely adequate, but he had difficulty controlling his temper. Counsel then hired a forensic psychologist to review the other psychologist's report. Based on the review, the second expert stated there may be evidence of mild brain damage, and it was possible the defendant suffered from serious psychological problems. These conclusions could not be reached, however, unless the defendant were examined personally. At the eleventh hour, defense counsel subpoenaed the second psychologist to testify. He was extremely hostile to the defense because he had warned counsel he could reach no conclusions without examining the defendant himself. He had warned counsel before being subpoenaed that his testimony would likely be more aggravating than mitigating. He testified that he could reach no conclusion because he had not examined the accused, and that any tentative indications of possible brain damage could not be confirmed. The prosecution then called the anger management counselor in rebuttal, who testified that while the defendant suffered from a mild learning disability, he had no brain damage or other special problems. The Tenth Circuit found counsel's strategy unreasonable, and that the defendant was prejudiced.

So it was with Mr. Choney. He was contacted late in the day by defense counsel. He was strongly aligned with law enforcement. He made it clear that he did not want to testify

for the defense. He appeared only when compelled by a subpoena. Whatever little mileage the defense got out of his testimony was quickly reversed during the prosecution's cross-examination. On the whole, Mr. Choney's testimony supported the Government's case, and exonerated the tactical team of any serious errors. As in *Hooper,* defense counsel knew Choney would be a most reluctant, if not to say hostile, witness, but he was thrown into the breach anyway, with the predictable negative consequences to Mr. Barrett.

Counsel's failure to retain an independent expert and reliance upon a witness who would not even talk to them, was plainly unreasonable and prejudicial. *Strickland v. Washington,* 466 U.S. 668 (1984). As evidenced by the arguments of both the defense and prosecution at the close of the first stage, questions about how the raid was conceived and carried out were critical issues. If trial counsel had presented the numerous deficiencies pointed out here, there is a reasonable probability the jury would have rejected either murder or the death penalty.

> **7. Mr. Barrett's trial counsel unreasonably failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials**

Claims 1 and 3 discuss the court's interference with proper defense preparation with respect to authorizing payment for the transcripts of the testimony from the second state trial at public expense. The court initially denied the request, adding the proviso that the matter could be reconsidered upon a specific showing that the testimony requested went to Mr. Barrett's intent. Eventually, the court permitted the record of the testimony to be provided at public expense, but far too late for counsel to be adequately prepared. Trial counsel also unreasonably failed to make use of impeachment material that was available to them, and/or elicited damaging testimony on cross-examination, even where that testimony was beyond the scope of direct.

There were numerous delays occasioned in acquiring the transcripts, and they continued through Mr. Barrett's federal trial. At a June 6, 2005 status conference, a few short months before trial was to begin, the court was informed that based on counsel's communications with the court reporter, it was anticipated that the transcripts would be ready by July 11, 2005. (Tr. 6/6/05 Hr'g at 4-5.) This proved a pipe dream. At another status conference on July 15, 2005, the court was informed that the state court reporter had completed five of the nine volumes of testimony. At the pretrial hearing on August 31, 2005, it was revealed that little if any progress had been made; five volumes of testimony had still not been completed. (Tr. 8/31/05 Hr'g at 38-39.) The transcripts continued to trickle in during trial.

A combination of the court's rulings on the transcript issue, the delay in producing the transcripts, and counsel's unreasonable preparation with the transcripts they had resulted in counsel failing to effectively impeach the tactical team members and Clint Johnson on several critical points with their testimony from the second state trial.

As already stated herein, a key factual dispute was whether Mr. Barrett would have known the police were on his property because the emergency lights on some of the vehicles were engaged. Because of the delay in producing the transcripts, counsel's failure to prepare in the time available, or both, crucial opportunities for impeachment in this area were lost.

At the federal trial, Trooper Poe stated he became aware that emergency lighting was being used when he saw Trooper Hamilton's vehicle come into view from the east, implying that emergency lights were engaged before any shots were fired, and thus supporting the Government's theory. (R. 1412.) However, at the second state trial, he testified that he first became aware of seeing emergency lights *after* he heard shooting break out. (2nd St. Tr. Tx. at

747.) Trooper Greninger gave conflicting evidence between the second state trial and the federal trial regarding what lighting he observed. In state court, he testified he turned on his emergency lights after turning left to approach Mr. Barrett's residence, and recalled seeing Trooper Hise's emergency lights on. (2nd St. Tr. TX at 448, 461.) At the federal trial, he testified Trooper Manion activated his emergency lights as he turned into the driveway before entering the property. He noticed also that Trooper Hash had his emergency lights on, but did not know when they were engaged. He was not completely sure Trooper Hise's emergency lights were on. Trooper Pettingill did not activate his lights. (R. 732, 760, 770, 773, 822.)

Most significantly, Clint Johnson testified initially in the second state trial that he was thirty seconds behind the tactical team and saw red and blue police lights at the intersection after turning onto the dirt road. He was impeached with a prior statement in which he said he only saw taillights, not emergency lights. Johnson made no mention in his statement about arriving thirty seconds after the tactical team and seeing any red and blue emergency lights. (2nd St. Tr. TX at 25, 49, 51.) In the federal trial, Johnson said nothing on direct examination about any lighting. Trial counsel was caught flat-footed on cross-examination, when he opened the area up and Johnson, in contrast to the statement he was impeached with in state court, testified that he saw emergency lighting on the patrol vehicle and the second Ford Bronco. (R. 358, 361.) Counsel failed to impeach Johnson as counsel did in the second state trial. Arguably, not even a transcript would have been required to undermine Johnson on this point, because he was impeached in state court with a previous statement, not previous testimony.

The issue of whether Mr. Barrett or the police opened fire first was obviously critical. At the second state trial, Trooper Poe testified he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house. He heard shots as

he exited his vehicle by the fence, and the gunfire was over by the time he was at the fence. (2nd St. Tr. TX at 757, 766.) None of this was brought out on cross-examination at Mr. Barrett's federal trial.

The issue of where Trooper Hamilton's Bronco was when it first received fire was a focal point of the debate over Mr. Barrett's knowledge and intent. Although Trooper Greninger professed a failed memory at the federal trial, and could only say that the shooting began somewhere between the ditch and where Hamilton's Bronco came to a stop (R. 736), he testified at the state trial (albeit with an addled memory), that while he had no real idea when the shooting started, Hamilton's vehicle was ahead of his and had cleared the ditch; he became aware of the shooting between the time his vehicle cleared the ditch and came to a stop halfway between the ditch and Hamilton's Bronco. In his first statement to investigators following the incident, he recalled hearing gunfire as Hamilton's vehicle approach the front of the house at the time he recalled hearing gunfire, which would indicate Hamilton had already gone through the ditch and was near the house when the gunfire started, supporting Mr. Barrett's defense argument that he only fired when Hamilton's Bronco was almost literally in front of his house, with its headlights obstructing Mr. Barrett's view. (2nd St. Tr. TX 450, 504.) Mr. Barrett's trial counsel unreasonably failed to refresh Greninger's memory with his helpful state court testimony, and to introduce that prior recorded recollection, or inconsistent statement.

Trooper Hamilton testified in state court that the shooting started as his vehicle was coming out of the ditch, and after he noticed Toby Barrett in the yard and began driving toward him. (2nd St. Tr. Tx 330.) This was helpful to the defense argument that Mr. Barrett only started firing when the Bronco was close to his house and was in fact headed toward his son, a dangerous situation any father would react to. In federal court, Hamilton stated the gunfire began

earlier.  Instead of gunfire starting as he was coming out of the ditch, Hamilton stated gunfire began shortly after he initially hit the ditch.   In contrast to his testimony in state court, Hamilton stated his vehicle began receiving fire at head level in the middle of the windshield.  (R. 534, 603, 674.)  Counsel failed to effectively contrast Hamilton's testimonies on this point.

Defense counsel failed to exploit other differences between the state and federal trial testimony.  At the state trial, neither Troopers Poe nor Greninger testified to seeing any guns in Mr. Barrett's house.  In federal court, Trooper Poe said he saw an AR 15 and a shotgun in the back room off the entryway.  Greninger testified the rifle he found in his home was the one used to fire on the officers.  (R. 1426, 1427, 748-49.)

Perhaps Mr. Barrett's trial counsel's most grievous error appeared during cross-examination of Clint Johnson.  On direct examination, no details regarding any belief Johnson had that serving the warrant was "high risk" were explored.  On cross-examination, Mr. Barrett's counsel asked an open-ended question, and received a barrage of hearsay damaging to Mr. Barrett.  When counsel opened the door, Johnson marched through it, in the most prejudicial manner imaginable.  Johnson stated he believed this was a "high risk" operation because Mr. Barrett had threatened to kill police officers and that he was making methamphetamine at his residence, which also creates hazards to law enforcement trying to take down a meth lab. Buttressing the testimony not only of the despicable Charles Sanders, but five of the seven informant witness, Johnson stated not only that several people had reported to the sheriff's office that Mr. Barrett was constantly firing weapons across the road, but that they had received several tips from different people within the last six months that Mr. Barrett was going to kill law enforcement officers.  This damaging answer, given only because counsel opened the door, just

hung in the air.  Counsel undermined the defense's own (meager) efforts to attack the credibility

of the informant witnesses due to these "prior reports" from "several" sources.[22]

Counsel's failures to impeach were professionally unreasonable, and not

motivated by any legitimate strategy.  Indeed it was contrary to the strategy evidenced in

counsel's closing argument where Mr. Hilfiger sought to sow doubt about the accuracy of various

officers' accounts of the raid.  Counsel's elicitation of damaging evidence from Johnson was

highly prejudicial under the *Strickland* test, because it tended to invest credibility – however

spurious it might have been, and however false Johnson's testimony was – that they otherwise

lacked.

**8.      Counsel was professionally unreasonable for failing to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on.  This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers.**

**a.      Toby Barrett**

The primary contention of the defense in the first stage of trial was that when Mr.

Barrett fired on the Ford Bronco driven by Buddy Hamilton, he was unaware that it was a police

vehicle, and was unaware that several police vehicles had driven onto his property.  It was

undisputed that the lead vehicle driven by Hamilton, which the evidence showed struck Mr.

Barrett's porch, had no emergency lights engaged and appeared to be a civilian vehicle.

---

[22] Johnson's testimony was surely false.  None of these "known sources" reporting threats by Mr. Barrett to kill law enforcement officers were presented at the state trials.  Surely, if several individuals were reporting this, they would have testified in 2002 and 2004.  Counsel failed to point out that Johnson had given no such testimony previously.  Indeed, the informant witnesses were purely last-minute creatures of the federal trial.

Although no defense theory instructions were given, the defense argued that because Hamilton's car was unmarked, Mr. Barrett reasonably believed he was shooting at trespassers who had zoomed into his yard and struck his house with their vehicle, and reacted by shooting from inside his house.

The prosecution relied upon testimony from members of the tactical team to argue that but for Hamilton's vehicle and the "sniper" vehicle initially parked outside the locked gate to the property, the other police vehicles on or near the property had emergency lights of one sort or another engaged, making it obvious to Mr. Barrett that he was shooting at the police. The prosecution contended Mr. Barrett fired some of the shots after he emerged from his home, and could easily observe that the police were on his property.

Among the omissions of counsel that were inconsistent with prevailing professional norms was counsel's failure to call Toby Barrett to rebut the law enforcement officers' accounts of the raid. Mr. Barrett had a right, protected by the Fifth, Sixth and Eighth Amendments to the United States Constitution, to present evidence inconsistent with the prosecution's theory of how the raid was conducted.

Prevailing professional norms of capital defense practice required Mr. Barrett's trial counsel to investigate, develop, and present witness testimony that could have called into question the manner in which law enforcement officers conducted the raid. (ABA Guideline 10.7 – Investigation and Commentary (specifically noting duty to interview eyewitnesses).)

Trial counsel were aware, or should have been aware, that there were conflicting accounts of the raid, even among law enforcement officers. Toby Barrett was the only witness to the beginning of the raid other than law enforcement officers. Toby Barrett testified in two prior state-court trials. Toby Barrett was prepared for his testimony in those cases and was willing and

able to be prepared by trial counsel to testify in the federal trial. (Decl. Toby Barrett. *See also* 1st State Tr. Tx at 1781.) Obviously, each of the state-court trials ended in a result more favorable to Mr. Barrett than the result of the federal trial.

During the federal trial, the Government made much of the sign on Mr. Barrett's gate. Toby Barrett would have testified, as he did when called by the prosecution in the first state-court trial, that the sign was only meant to convey "No trespassing or something. He had one something to that effect, sir." (1st St. Tr. Tx at 1787.)

Toby Barrett also testified as a prosecution witness in state court that the gate on which the sign was posted was open at the time the Bronco drove by earlier in the day. (1st St. Trial Tx at 1822.) Toby Barrett's account of being in the front yard with his friend Bubba Thompson at the time of the drive-by is consistent with the testimony of Trooper Greninger, who saw two people in the yard at the time. (R. 724.) However, Trooper Hamilton testified in federal court that the gate was locked at the time of the drive-by, and this was offered as a justification for driving onto the property. (R. 518.)

In other respects, Toby Barrett's testimony is consistent with Trooper Hamilton's for example, in confirming that Hamilton had his headlights on but no lights signaling that he was law enforcement. (1st St. Trial Tx at 1796-97; R. 524-26, 598.) However, Trooper Greninger testified that the vehicles' lights were turned on at the commencement of the raid. Officer Steve Hash could not verify Greninger's account. (R. 1036-37.)

Toby Barrett testified in state court that when the shooting occurred, there were no police vehicles with emergency lights on at all that were visible. (1st St. Trial Tx at 1796.) The first police lights he saw were on the vehicle that crashed through the gate, but this was after the shooting was over. (Decl. of Toby Barrett.) He denied telling the police he saw flashing lights.

(1st St. Trial Tx at 1809.)  Toby Barrett saw Hamilton's vehicle speed into the yard, he called out "Dad!"  (1st St. Trial Tx at 1790, 1795.)  Toby Barrett never saw his father out on the front porch, shooting.  He never really saw his father at all, except for perhaps a split second, after which Mr. Barrett went back inside the house. (1st St. Trial Tx 1794, 1795, 1796.)  He never saw who was firing a weapon.  (1st St. Trial Tx at 1807.)  The entire incident happened very quickly.  (Decl. of Toby Barrett.)  The declaration Toby Barrett recently provided to investigators currently working for his father is consistent with his state trial testimony.  (Decl. of Toby Barrett.)

Mr. Barrett's federal trial counsel had every reason to trust the reliability of Toby Barrett's account.  The prosecution in state court deemed Toby Barrett a reliable witness regarding the sequence of events leading up to and during the raid.  His testimony was consistent with the state jury's verdict.

Toby Barrett's testimony would have provided the jury reasonable doubt regarding the federal prosecutor's argument regarding the raid, and in particular, his argument that Mr. Barrett intentionally killed Trooper Eales knowing he was part of a law enforcement raid.  Toby Barrett would have contradicted the prosecutor's assertion that the sign on Mr. Barrett's gate was evidence of intent.  (*See* R. 4297, 4305.)  Toby Barrett's testimony that his father only knew a SUV was speeding onto the property, and had only a split second's view of the Bronco before he went inside; that the Bronco's headlights were shining on the porch; and that no police lights were visible as the shooting occurred, would have contradicted the prosecutor's argument that Mr. Barrett had the opportunity to observe the scene, see police lights, and form the intent to kill before the shooting started.  (*See* R. 4299-4302.)

Toby Barrett's location when the lead Bronco pulled up was important to trial counsel's closing argument.  (R. 4316-17.)  Instead of being able to draw the jury's attention to

Def's § 2255 Mot.                    153                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Toby's testimony regarding his location when the Bronco pulled in, and point to a specific location on an exhibit, as the state trial prosecutor had done, trial counsel could only argue "Toby Barrett was some place out in here." (R 4317.)

Even though Toby Barrett had testified at his father's state trials, counsel in the federal case made no effort to interview him or prepare him to testify. In his recent declaration, Toby Barrett states, "I went up to Mr. Hilfiger in court more than once and asked him if he was going to want me to testify at the trial. He said yes each time, but he never called me. He never asked me about the incident, my father's mental problems, my home life or about me or my mom." (Decl. of Toby Barrett.)

**b.      Alvin Hahn**

Alvin Hahn was a neighbor of Mr. Barrett's. On the night of the shooting, he was asleep and was awakened by gunfire. When Mr. Hahn looked outside about fifteen seconds after the shooting stopped, he saw only one vehicle with its police lights on. (Decl. of Alvin Hahn.)

Mr. Hahn's account is consistent with Toby Barrett's, and would have corroborated Toby Barrett's testimony that *after* the shooting, there was only one police vehicle with its emergency lights on, namely the vehicle that crashed through the gate. Just as it was professionally unreasonable to fail to call Toby Barrett as a witness, counsel had no legitimate reason for neglecting to call Alvin Hahn, who could have supported the defense theory that the police descended on Mr. Barrett's property with nothing to indicate they were law enforcement, and that Mr. Barrett had every reason to believe he was being invaded by trespassers.

Because the testimony of Toby Barrett and Alvin Hahn would have conflicted sharply with the accounts of the Government's witnesses, and supported the defense claim that Mr. Barrett had no idea he was shooting at the police, Mr. Barrett was prejudiced. Viewed

individually, and especially collectively, with all the evidence defense counsel failed to prepare and produce in the first stage of trial to counter the Government's case, there is a reasonable likelihood of a different result had Toby Barrett and Alvin Hahn been called as witnesses. *Strickland v. Washington,* 466 U.S. 668 (1984).

> **9.      Trial counsel was professionally unreasonable for failing to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence.**

The Government made much of the "fact" that Mr. Barrett was well aware there was a warrant out for him for failing to appear in a minor felony drug case. *See* file, Sequoyah County Case No. CF-97-80, *State of Oklahoma v. Kenneth Eugene Barrett.* According to the Government, Mr. Barrett anticipated the police were going to arrest him at any time on this warrant, and was therefore making preparations to repel the police with deadly force. This theory was founded on the testimony of informant witnesses Charles Sanders, Travis Crawford, Cindy Crawford, Brandie Price and Karen Real, who, as noted, testified that Mr. Barrett told them about the warrant, and stated he would kill the first policeman who came on his property and would "go out in a blaze of glory." The Government argued that the killing of Trooper Eales was the fulfillment of Mr. Barrett's "plan."

Trial counsel did virtually nothing to rebut this claim other than rely on cross-examination. Had counsel been paying sufficient attention to certain testimony that was introduced at the hearing on Mr. Barrett's motion to suppress (Tr. 1/ 26/05 Hr'g at 25-45), testimony of Bernell Edwards, Deputy Sequoyah County Court Clerk, and had they conducted

anything approaching a reasonable, professional investigation, the Government's theory would have evaporated, the snitches would have been further impeached, and the Government's case for intent would have suffered mightily.

The Government called Ms. Edwards at the motion to suppress hearing to testify regarding the contents of the court file in CF-97-80. Ms. Edwards stated that according to the file, Mr. Barrett had a trial date of January 25, 1999, at which he failed to appear. A bench warrant was issued on January 27, 1999. When a defendant is not represented by an attorney, the practice of the court clerk's office is to mail a notice regarding the missed court appearance to the defendant. (Tr. 1/26/05 at 25, 29; File in Sequoyah County Case No. CF-97-80.)

On cross-examination by Mr. Echols, it was pointed out there was nothing in the file to indicate that, in accordance with Oklahoma law, the bench warrant was issued on the motion of the District Attorney. (Tr. 1/26/05 at 36.) The docket sheet showed that at one time, Mr. Barrett was represented by attorney Bill Ed Rogers. Mr. Rogers filed a motion to withdraw on September 11, 1998, but there was no docket entry showing that he had actually been allowed to withdraw. (Tr. 1/26/05 at 37-38.) Mr. Barrett applied for court appointed counsel on December 14, 1998. Nothing in the court file indicated that Mr. Barrett's bail bondsman was given notice of the bench warrant. There was nothing in the court file showing that based on Mr. Barrett's failure to appear, a bond forfeiture action was instituted, which would have necessitated the bondsman to bring Mr. Barrett in so the bondsman would not be liable for the entire amount of the bond. There was nothing in the court file to show that Mr. Barrett had actually received notice that he failed to appear, and that a bench warrant had been issued for his arrest. The letter sent by the court clerk's office was simply sent in the regular mail; the letter was not certified,

with a return receipt requested.  (Tr. 1/ 26/05 at 39-43, 45.)  For all the court file suggested, Mr. Barrett was totally unaware there was a warrant out for his arrest.

Without question, it was professionally unreasonable for counsel to fail to call Ms. Edwards, or another representative of the court clerk's office, to sponsor the court file to demonstrate there was *no official record indicating Mr. Barrett would have been aware a warrant had been issued for his arrest.*  The evidence was already in the record.  Only gross neglect can explain this glaring failure to review the file in the case that started the entire tragic chain of events.  *Rompilla v. Beard*, *supra*.

Mr. Rogers, the last attorney to represent Mr. Barrett in this case, whose motion to withdraw was never granted, certainly never informed Mr. Barrett that he had an outstanding warrant.  Mr. Rogers is now deceased.  In connection with this 2255 motion, his widow, Mary Rogers, was contacted by a defense investigator.  Mr. Barrett's current representatives have obtained a copy of Mr. Rogers's file in the case.  Mrs. Rogers states there is nothing in her late husband's file to show that Mr. Rogers ever informed Mr. Barrett he had missed a court date, and that a warrant had been issued for his arrest.  Even if Mr. Rogers had been informed a bench warrant had been issued, he would not have informed Mr. Barrett, because Mr. Rogers was upset over the manner in which Mr. Barrett had terminated his services.  (Decl. of Leonard Post; Bill Ed Rogers's attorney file.)

In addition, the file of Bill Ed Rogers shows that Mr. Barrett was offered a plea in which he faced no jail time.  This fact alone, or in conjunction with other set forth herein, would have convinced jurors that the State had unnecessarily sought the no-knock warrant.  This fact, combined with the evidence of errors made in the planning and execution of the raid, and the abundant impeachment evidence undermining the Government's eleventh-hour informants,

would have given jurors more than reasonable doubt about Mr. Barrett's intent, and certainly the death penalty.

Trial counsel considered it important that Mr. Barrett had not received notice of the bench warrant. But, inexplicably, the defense waited until the second stage of trial to call Mr. Barrett's bail bondsman, Martin Daggs. He explained that he had never informed Mr. Barrett of the bench warrant. The bond was never forfeited. Mr. Daggs testified that if he needed to get hold of Mr. Barrett to surrender him on a warrant or bring him to court, he knew where to find him. There was no sound, strategic reason for deferring Mr. Daggs's testimony to the penalty phase, when he could have and should have been called in the first stage in aid of refuting the Government's theory of the case.

Had Mr. Barrett's trial counsel conducted a reasonable investigation there were other readily available witnesses who could have testified that Mr. Barrett was unconcerned with the police, had been staying on his property rather than venturing out into the larger community for years *preceding* any warrant, and *had in fact been visited by the police within a few weeks of the shooting incident without incident and without being taken into custody.* Evidence was also readily available that would have demonstrated that had Mr. Barrett and his family been contacted and told he had an outstanding warrant, he would have turned himself in or allowed his family to do so.[23]

Janice Sanders, a relative of Mr. Barrett's, lived near his property. Approximately three weeks or so before the shooting incident, she called the police because Mr. Barrett was

---

[23] *See also* Mr. Barrett's *Brady/*newly discovered evidence claim. Former Sequoyah County Sheriff Philpot has admitted to a defense investigator, consistent with the statements of Janice Sanders and Sylvia Gelene Dotson, that he was on Mr. Barrett's property, without incident, within a month of Trooper Eales being killed.

firing a gun into the air.  Five officers, including Sequoyah County Sheriff John Philpot, responded to Mr. Barrett's residence.  The sheriff inspected Mr. Barrett's rifle to determine whether it was empty, and gave it back to him.  There was no confrontation with the authorities, and Mr. Barrett was not taken into custody on the "outstanding warrant" or for any other reason.[24] (Decl. of Janice Sanders.)  Although Ms. Sanders was interviewed by defense counsel, she was not called as a witness.  When she was contacted by Mr. Hilfiger and a man who was likely Bret Smith, this gentleman asked Mr. Hilfiger if he was going to call Ms. Sanders as a witness.  To his surprise, Mr. Hilfiger said "no."  (Decl. of Janice Sanders.)[25]

Mr. Barrett's mother, Sylvia Gelene Dotson, who lived next door, was called as a defense witness in the first stage of trial, but she was not asked about the police coming to her son's residence shortly before the shooting incident, or how long Mr. Barrett had kept close to his property.  Had she been asked, she would have testified that Mr. Barrett was not capable of living on his own, and thus stayed close to his relatives in the community for support.  He had been doing this long before the "warrant" was issued.  Ms. Dotson was stunned at the midnight raid on Mr. Barrett's house.  Had the police simply contacted Mr. Barrett's family, they would have

---

[24]  During Mr. Barrett's state case, Mr. Philpot was deposed by John Echols regarding his previous contacts with Mr. Barrett.  In late 1998, Sheriff Philpot and others, including Deputy Sheldon Fair, went to Mr. Barrett's residence over a complaint that he was firing weapons, something he did not infrequently.  Decl. of Janice Sanders. On this occasion, Sheriff Philpot arrived after the other officers.  When the sheriff arrived, the officers who were already there were inspecting Mr. Barrett's weapons and running the serial numbers.  One of the weapons being inspected appeared to be an SKS.  Sheriff Philpot informed Mr. Barrett that he had an outstanding misdemeanor warrant.  Mr. Barrett said he would appear and take care of the matter. Sheriff Philpot did not take Mr. Barrett in on the warrant.  Mr. Barrett never threatened any of the officers, and his weapons were returned to him after they were inspected.  Philpot Deposition.

[25]  In addition to impeaching the Government's theory of the case, testimony from Ms. Sanders and Ms. Dotson would have been important to the motion to suppress, showing there was no cause for a no-knock, nighttime warrant.

brought him in.  Even if the police had come out to simply arrest Mr. Barrett in a non-confrontational way, there would have been no problem.  Moreover, shortly before the raid, and consistent with what Janice Sanders says, the police had been to Mr. Barrett's property to inspect his weapons.  There had been no violence and no problem.  (Decl. of Sylvia Gelene Dotson.)

Ruth Harris, Mr. Barrett's aunt, also states that had the authorities simply let the family know that Mr. Barrett had an outstanding warrant, it could have been arranged without any difficulty for Mr. Barrett to surrender peacefully.  (Decl. of Ruth Harris.)

Another of Mr. Barrett's aunts, Phyllis Crawford, lived just down the road.  On one occasion when Mr. Barrett felt he was wanted for something by the police, far from threatening violence or bragging that he would "go out in a blaze of glory," Mr. Barrett came to her in tears, asking what he should do.  Ms. Crawford told if the police really wanted them, he should simply go with them.  Instead of issuing threats, this advice seemed entirely reasonable to Mr. Barrett, and calmed him down.  (Decl. of Phyllis Crawford.)

Sean Hill, who was available to testify but never contacted by the defense, states that far from "hiding out" from a warrant, Mr. Barrett had really never left his property for years.  Police drove by Mr. Barrett's property all the time.  When Tom Sanders would call in noise complaints against Mr. Barrett, the police would drive by, and there was no reaction from Mr. Barrett.  Mr. Barrett was used to the regular police patrols and police presence in the area.  His attitude was, he was there if the police wanted him.  Mr. Hill also could have testified that the sign on Mr. Barrett's gate (Government Exhibit 104) which the prosecution made much of had been placed there on September 22, 1999, because the night before drug addicts had climbed over the fence and woken Mr. Barrett up.  (Decl. of Sean Hill.)

Brandy Hill could have given similar testimony. She states that from 1996 to the time of the shooting incident, police drove by Mr. Barrett's place on a frequent basis, sometimes up to three times a week. Mr. Barrett was used to the police presence and was not bothered by it. (Decl. of Brandy Hill.)

Had counsel conducted a proper investigation and presented this evidence, there is a reasonable probability that the outcome would have been different, since it directly countered the prosecution's theory of the case. Compared to this evidence, the self-serving testimony of the seven snitches would have been found clearly wanting in credibility. *Strickland v. Washington,* 466 U.S. 668 (1984); *Cargle v. Mullin,* 317 F.3d 1196, 1120-26 (10th Cir. 2003) (defense counsel ineffective for failing to conduct a reasonable investigation, which would have uncovered witnesses who could countered testimony of prosecution witnesses and supported defense claim of non-involvement in the homicides); *Williamson v. Ward,* 110 F.3d 1508, 1514 (10th Cir. 1997) (duty all lines of defense strictly observed in capital cases; counsel ineffective for, among other things, failure to present evidence showing third party had confessed).

> **10.** **Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony. Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.**

Mr. Barrett's trial counsel unreasonably failed to challenge the Government's use of irrelevant and prejudicial testimony of James H. Horn, a so-called expert in the area of "traumatic stress" (R. 849.) Trial counsel allowed the jury to hear Horn's testimony over a period of two days, failed to timely move to strike that testimony, and when the court did finally strike the testimony, failed to obtain an adequate curative instruction, or to move for a mistrial.

The Government was clearly concerned about the discrepancies in the testimony of its fact witnesses, both as compared to other witnesses, and with regard to their testimony in the previous state court trials.  (R. 925, 934, 1630-31.)  Consequently, it again called a witness who had previously testified at the state court trials, former FBI agent James Horn.  Horn testified to his credentials, including a B.S. in Psychology – although he admitted he was not a psychologist (R. 843, 909) –  and a Masters of Forensic Science degree from George Washington University in Washington D.C.  (R. 843.)  Horn also stated he was board certified through the American Academy of Experts in Traumatic Stress in "Emergency Crisis Response" and "Traumatic Stress."  (R. 848.)   He informed the jury, in some detail, about his service as a decorated Marine Corps infantry officer, having served two terms in Vietnam before joining the FBI.  (R. 843-45.)  Horn had worked with the FBI's behavioral unit as a criminal profiler, and then as program manager of the FBI critical incident program.  (R. 845-848.)

Horn's testimony revealed a strong affiliation with law enforcement and allowed him to present himself as having extraordinary first-hand knowledge of traumatic events. Even during the process of stating his credentials before being offered as an expert, Horn spoke of having been exposed to rocket attacks by the Viet Cong, engaging in combat with the North Vietnamese,  and working for the FBI on "critical incidents" such as Hurricanes Andrew and Hugo, the Oklahoma City Bombing and the assassination attempt on Ronald Reagan, as well as being a member of the first FBI SWAT team (R. 844-847.)[26]

---

[26]During the two state court trials, Horn similarly claimed involvement in the FBI's first SWAT team (Trial # 1, 2120), the aftermath of the Oklahoma City Bombing (Trial # 1, 2122; Trial # 2, 1436, 1441); wartime experience in Vietnam (Trial # 1, 2135; Trial # 2, 1436-37, 1445, 1451, 1459-60); the incident at Wounded Knee (Trial # 2, 1437-39, 1460); as part of an anti-terrorist squad at the Lake Placid Winter Olympics (Trial # 2, 1438); and in connection with a fatal sky-jacking (Trial # 2, 1439).

Def's § 2255 Mot.                                  162                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Horn was accepted by the court as an "expert witness in the area of traumatic stress" without objection from the defense (R. 849), nor any request for a *Daubert* hearing.[27] Horn then testified in very general terms about the impact of trauma on an individual's ability to relate and recall the incidents and circumstances in question.  While unable to comment on the specifics of any of the lay witnesses' testimony (R. 881), Horn narrated the impact of "personal feeling[s] of mortality and vulnerability" that trauma creates (R. 850), and particularly how there is "an extreme aggravation by the loss and injury to fellow police and fellow agents ... the worst thing that happens to a law enforcement officer in the line of duty is the death of a partner in the line of duty. So we can expect to see in those circumstances the worst, the most serious impact in effects on the colleagues who survive." (R. 851.)  In explaining his views about the impact of trauma on recollection, Horn referred repeatedly to his FBI days and cited to specific cases he had been involved in or had simply heard of, giving names and locations.  (R. 852-4, 858, 859, 860.)  However, he offered no particular opinion concerning the members of the SWAT team in this case, even though he had actually been involved in debriefing them in group "counseling sessions," where he had offered them "peer support" (R. 905, 874-79), and claimed that he had the officers sign confidentiality agreements concerning the debriefing.  Horn stated correctly that "confidentiality doesn't extend to the courtroom, privilege does." (R. 880.)  However, counsel simply acquiesced to Horn not testifying about the specifics of what had been said in the debriefing, apparently out of concern that Horn should not run the risk of creating a conflict for himself.  (R. 881.)

---

[27]*See Daubert v. Merrell Dow Pharmaceuticals, Inc.*,  509 U.S. 579 (1993).

After testimony from Horn running to some forty printed pages (R. 849-889), including his narrating what an FBI "psychiatrist" had said on the soundtrack of a training video (R. 856), the court finally intervened *sua sponte*, noting that: "I don't have a clue why the government called this witness ... I don't know what his expertise is ... I don't think a foundation has been laid ... it could be a *Daubert* issue ...".  (R. 890.)

Nonetheless, Horn's testimony continued without challenge from defense counsel, who elicited details of how law enforcement officers should be treated after a traumatic incident, and Horn establishing that his work was not "interested in critiquing and facts, but in helping them resolve their emotional response to these incidents." (R. 897-98.)   As his testimony continued, it became apparent that Horn was unfamiliar with various concepts relevant to the area of memory and trauma, such as acute traumatic disassociation (R. 908-10),[28] confabulation (R. 906),[29] and contamination of memory through contact with others.  (R. 900-901.)[30]  In fact, Horn made it plain that he was not interested in the current research in the field, just in dealing with individual cases.  (R. 883.)

Before recessing for the day, the court again expressed concern about Horn giving expert testimony, citing to Rule 702 and the fact that Horn "hasn't talked about any principles or

---

[28]*See, e.g.,* Vermetten, Dorahy and Spiegel, *Traumatic Dissocation: Neurobiology and Treatment* p. 83, American Psychiatric Publishing 2007.

[29]Horn defined confabulation as "it means to make it up," whereas confabulation is the formation of false memories, perceptions or beliefs as a result of neurological or psychological dysfunction.  Helen Phillips, *Mind Fiction: Why your brain tells tall tales,* 2572 New Scientist, 7th October 2006.

[30]Contamination of eyewitness testimony by subsequent input is a phenomenon that has been confirmed by clinical studies. Anthony Esgate, *An Introduction to Applied Cognitive Psychology*, 51 Psychology Press 2004.

methods that he has used to reach any conclusion and he hasn't applied any of the principles or methods reliably to any facts of this case because he really hasn't talked about the facts in this case." (R. 918.)  The following morning, having expressed further concern, the court indicated that it was contemplating striking Horn's testimony, since it was not likely to aid the jury in resolving any factual dispute, but rather consisted merely of talking "in generalities." (R. 923-27.)  Only after the court had questioned the government at length about the relevance and usefulness of Horn's testimony (R. 923-940) did the defense finally make the half-hearted statement: "I think the Court should consider striking his testimony" (R. 940).  When given a further opportunity to ask that the testimony to be stricken, the defense still failed to affirmatively request that remedy. (R. 948.)   The court then permitted further cross-examination of the witness before the jury (R. 949-958) at the end of which the defense finally moved to strike.  However, the Government was then permitted to take the witness on redirect.  (R. 966-975.)

Eventually, the Court gave counsel a further opportunity to argue the issue (R.1628-1632) and then struck the testimony (R. 1636), giving an instruction to disregard:

> Members of the jury, if you will listen, I'm going to give an instruction.  I started to say a special instruction.  It's not special, it's just – it's just a – (Pause) Not a special instruction, but just an instruction in regard to some testimony you have heard from Mr. Horn.  So if you would listen to this interim instruction:  Ladies and gentlemen of the jury, when we started this trial I gave you some preliminary instructions to guide you in your participation in this trial.  As I advised you at that time, it is my duty to determine the law applicable to this case and it is your duty to accept and follow my instructions regardless of whether or not you agree with the law.  As a matter of law, I have determined that the testimony which you heard on Monday afternoon and Tuesday morning of James Horn should not have been admitted into this trial.  You should not speculate about the reasons for my ruling on this issue; it is based solely on my interpretation of the law applicable in this case.  Therefore, I instruct you that you should disregard Mr. Horn's testimony in its entirety and not consider it for any purpose in making your decision when reaching a verdict in this case.

(R. 1740.)

Nothing in the record indicates that defense counsel urged any amendment to the instruction, even though the trial court gave them that opportunity.  (R. 1636-37.)  And, inexplicably, in spite of the trial court's concern about Horn's testimony, and willingness to strike it, defense counsel made no motion for a mistrial.

Horn's testimony, as the court readily saw, was inadmissible under Fed.R.Evid. 702. The fact was equally clear on the basis of the two state trial transcripts.  As noted in the above discussion concerning counsel's failure to challenge the testimony of Iris Dalley, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 599, charged trial judges with the "gatekeeper" function of excluding unreliable expert testimony and ensuring that the proposed testimony will assist the trier of fact in understanding or determining a fact in issue. To do so, first, the trial court must ensure that the evidence is reliable. *Id. at 592*.  Second, the court must ensure that the evidence will assist the trier of fact and is thus relevant. *Id. Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999) further held that the principles enunciated in *Daubert* applied to all expert testimony, not merely scientific evidence.

Counsel were ineffective for failing initially to challenge Horn's qualifications and the admissibility of his testimony.  Counsel had ample opportunity to prepare for Horn's testimony and consider whether to challenge it, because Horn was listed in the Government's witness list  and had testified at the two previous state court trials.  Counsel do not appear to have bothered to ascertain what Horn's qualifications were.   During a budgeting hearing on the morning before Horn testified, Mr. Hilfiger stated he believed Horn was a psychologist. (Tr. 10/3005 at p. 7.)   However, although Horn had a degree in psychology and had acquired practical experience as an FBI agent, he frankly stated that he was not a psychologist (R. 909) or

psychiatrist (R. 907), was not focused on research, or with accuracy of recollections,  but with the counseling of individuals.  (R. 883, 903-904.)

Horn did state, however, that he was Board Certified in two areas, "Emergency Crisis Response" and "Traumatic Stress", through the "American Academy of Experts in Traumatic Stress" [AAETS] (R. 848.)   Had defense counsel spent even a few minutes researching those qualifications, they would have discovered that the AAETS is an organization in which membership can be bought over the internet (at present, for as little as $60), and that its "Board Certification" credential simply requires a "comprehensive application and examination, along with supporting documentation ... utilized in concert to validate a member's experience in working with survivors of traumatic events, knowledge of the literature and level of education."[31] Indeed, it is an organization through which one can become "Certified in Acute Traumatic Stress Management" merely by completing an application and taking an examination based on a book, "Comprehensive Acute Traumatic Stress Management," which is purchased through the AAETS itself.[32]   When contacted for information about Board Certification in Traumatic Stress, the AAETS provides a link to "The National Center for Crisis Management," which produces a form indicating that Board Certification may be obtained for $350.00, a resume/vita and copies of relevant licenses and certificates, with no mention of any examination, and with the applicant self-certifying as to completion of "relevant course work concerning the specific speciality area" and to other ill-defined criteria.[33]   For example, 30% of the necessary points required for Board

---

[31]*See* http://www.aaets.org/diplomate.htm (last accessed March 2, 2009)

[32]*See* http://www.aaets.org/catsm.htm (last accessed March 2, 2009)

[33]*See* http://www.nc-cm.org/APPLICATION%20FOR%20SPECIALTIES.cwk.pdf (last accessed March 9, 2009).  The National Center for Crisis Management offers no fewer than

Def's § 2255 Mot.                    167                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Certification can be acquired by being "Author/Co-author of an article, paper and/or presentation related to the specific specialty area," but the Board Certification application does not even demand a copy of the article or paper in question.

Further, when being cross-examined about an article by psychiatrist Park Dietz, Horn was asked whether he was a "master's level educated expert in this field," to which he replied "In emergency response, yes, emergency crises response." (R. 908).[34]  This was clearly untrue: his master's was in forensic science, but counsel did not correct that false impression.

Defense counsel did not even talk to Horn in advance of his testimony (R. 863), but cross-examined him by asking questions to which they did not know the answers he would give.  R. 863-866, 887.   For example, they attempted to question him about an article by Dave Grossman on "Critical Incident Amnesia," asserting that Horn "knows Dr. Grossman," only to have Horn state moments later that he knew nothing about Grossman. R. 885-888.[35]  The defense also continued to reinforce Horn's credentials, for example bringing out his role as state director of the Oklahoma Chapter of Concerns of Police Survivors (R. 866), his award from the

---

fourteen different Board Certifications, in Forensic Traumatology, Emergency Crisis Response, Motor Vehicle Trauma, Disability Trauma, Pain Management, Illness Trauma, University Crisis Response, Bereavement Trauma, Domestic Violence, Sexual Abuse, Rape Trauma, Stress Management, School Crisis Response and as a "Crisis Chaplain".

[34]The article appears to have been J.M. Rivard, P. Dietz, D. Martell and M. Widawski, *Acute Dissociative Responses in Law Enforcement Officer involved in Critical Shooting Incidents: the clinical and forensic implications*, 47 Journal of Forensic Sciences, Issue No. 5 (2002).

[35]The article in question was not introduced into evidence.  It was, presumably, Lt. Col. Dave Grossman & Bruce K. Siddle, *Critical Incident Amnesia and the Implication of Memory Loss During Extreme Survival Stress Situations*, 31 The Firearms Instructor: The Official Journal of the International Association of Law Enforcement Firearms Instructors (Aug. 2001).  *See* http://www.traumaregister.co.uk/Articles/critical_incident_amnesia.htm  (last accessed March 6, 2009).

"Concerns of Police Survivors" group (R. 867), the number of presentations he had supposedly

given (R. 868), the fact that he had already testified twice concerning this incident (R. 869), and

his supposed involvement in research.  R. 883-84.   While bolstering Horn's seeming credentials,

the defense failed altogether to attack the "board certifications" he had acquired through a

diploma mill.

Defense counsel were also ineffective for failing to challenge the essential

shortcoming of Horn's testimony:  that it was not helpful to the trier of fact.[36] Ultimately Horn

was, as the court put it, nothing more than "a forensic person who deals with traumatic

experiences that police officers have." (R. 935.)   Horn did not hold himself out as a psychiatrist

(R. 907), or a psychologist. (R. 909.)   Horn himself emphasized that his work involved helping

people cope with the stress of unexpected trauma, not with any issue concerning factual

debriefing.  He did not even really purport to be giving his opinions as an expert, seeming

confused when asked whether he was expressing an expert opinion: "Pardon? ... if I am testifying

as an expert witness, I guess what I'm saying are expert answers."  (R. 957.)

Defense counsel appear to have had no real strategy concerning Horn's testimony.

They conceded admissibility, but then had second thoughts when the court ruled the testimony

inadmissible and suggested moving to strike it.  Counsel indicated that they had foregone their

opportunity to present their own witness to rebut the matters to which he testified, intending

simply to "develop out of him what we could find useful and move on down the road and not

---

[36]The suggestion that counsel made a legitimate strategic decision not to challenge Horn
but to adopt whatever aspects of his testimony were useful, (R. 959) is belied by their obvious
lack of preparation.   The unopposed admission of his testimony, and counsel's eventual need to
have it stricken were "the result of inattention, not reasoned strategic judgment." *Rompilla v.
Beard*, 545 U.S. 374, 395-96 (2005)(internal citation omitted)(counsel ineffective for failure to
review readily available court file concerning previous conviction).

have an expert come up and tell the other side of the stories *per se.*"  (R. 959.)  Given Horn's

lifelong work with law enforcement, and the nebulous nature of his expertise, this "decision" was

uninformed and unreasonable under prevailing professional standards.[37]  It is hard to ascertain

whether defense counsel actually viewed Horn as a witness for or against their client, but their

sheer unpreparedness resulted in a "cross-examination" that was faltering, and characterized by

the witness denying knowledge of the authorities that counsel was seeking to have discussed,

resulting in an entirely unsuccessful examination on the part of the defense.

The court had authorized limited funds for trial counsel to retain a psychologist to

assist in preparing to deal with Mr. Barrett's and the law enforcement officers' responses to the

raid.  (Doc. 97.)  However, the court permitted Mr. Barrett to be assisted by only one mental

health expert and only at below-market rates of compensation, and only for a number of hours far

below the norm for federal capital trials, although the expert had to cover many disparate issues.

*See* Claims 1, *supra*, and 3, *infra.*  Mr. Hilfiger, whom the court personally selected to represent

Mr. Barrett as part of a plan to develop a panel for future capital cases (Decl. of Julia O'Connell),

declined to join his former lead counsel in requesting additional funds from the court.  (Decl. of

John Echols.)  Mr. Hilfiger stated that he relied upon Jeanne Russell, Ed.D., to provide him

questions for his cross-examination of Horn.  (Tr. 10/3/05 Hr'g at 7.)  Trial counsel did not

contact Dr. Russell until mid-August, and did not possess the second state trial transcripts until

late September, 2005, at the earliest.

---

[37]This quixotic attempt to get mileage out of a witness so favorable to the prosecution was mirrored in the October 3 Budget Hearing, where counsel revealed that they were contemplating compelling the testimony of a "SWAT team expert" they knew to be actively opposed to testifying for them.  *Id.* at 6.  See claim of unreasonable performance regarding Chuck Choney.

Def's § 2255 Mot.          170          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Dr. Russell, in her communications to trial counsel, questioned what role Horn was to play in the trial, and admitted difficulty in framing questions for him. A particular concern for her was whether Horn was a mental health expert who might be prevented from testifying for reasons of confidentiality and privilege, and the fact that Horn was assuming dual roles by providing counseling and then testifying as an expert regarding the same subject matter. Defense counsel seemed to accept without question that Horn could not testify about what the officers had actually said in the debriefing sessions (R. 938), apparently believing that information was somehow privileged. Similarly, counsel did not pursue discovery of any notes or records of the various debriefing sessions. (R. 939.) While the federal courts are authorized to define new privileges, and the "recognition of a privilege based on a confidential relationship should be determined on a case-by-case basis," *Jaffee v. Redmond*, 518 U.S. 1, 5-7 (1996)(recognizing privilege in communications with licensed social worker), no "traumatic stress debriefing" privilege has yet emerged, and counsel did not raise or argue Mr. Barrett's right to effective representation through full discovery and cross-examination informed by knowledge of what was said at the debriefings.[38] Thus, their ineffective performance in accepting at face value Horn's claim of confidentiality spilled over into their cross-examination of the tactical team officers.

Not only did counsel lack information from the debriefings with which to cross-examine, but they also overlooked the critical fact that the group sessions were, in effect, a pre-

---

[38]Strong policy arguments would militate against allowing law enforcement to conceal such debriefings on privilege grounds. To do so would create the temptation to hold debriefings in every controversial case in order to chill defense counsel's ability to cross-examine effectively about the possibility of contamination of witnesses. Moreover, since the officers in this case effectively waived any privilege by testifying as to the facts of the incident, shielding them from inquiry into earlier and possibly inconsistent statements would be decidedly unfair.

emptive violation of FED. R. EVID. 615:  an untrammeled opportunity for the officers to learn in advance what other officers would say and, consciously or unconsciously, adopt other officers' perspectives on the incident.  Defense counsel also did not question the narrative technique adopted by some of the officers, of speaking in the present tense - a recognized therapeutic technique in trauma counseling - when describing what they said had taken place.[39]  This not only suggested an unusual degree of synchronicity in the officer's testimony, but rendered it more powerful than a normal past-tense narrative.

Regardless of the court's instruction, Horn's testimony should not have been admitted and was highly prejudicial.  It was the court that recognized Horn had nothing legitimate to offer, hence the fact that his testimony was stricken.  This testimony must have had a tremendous impact on the jury, and the court's instruction to disregard it was an exercise in futility.  Horn painted a powerful picture of law enforcement officers as a valiant brotherhood, referring to "one of our FBI heroes" (R. 855), to the powerful impact of losing a colleague (R. 851) and to the close relationship of SWAT team members: "it's very akin to the relationship I still have to this day with the Marines with whom I served in Vietnam because there is a bond when you face life-threatening situations that is formed, that is probably like no other bond." R. 861-62.  Not only did this testimony improperly bolster the prosecution witnesses,[40] suggesting that the inaccuracies in their testimony were of little moment, given the trauma experienced by the grieving band of law enforcement agents, it also amounted to victim impact testimony that

---

[39]*See* David H. Barlow, *Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-Step Treatment Manual*, 71 Guilford Press 2001.

[40]The Court itself acknowledged this facet of the testimony when ruling that it would strike the testimony: "At best, Mr. Horn's testimony is simply an attempt by the government to bolster the credibility of its witnesses for memory lapses of those witnesses at issue." R. 1635.

should never have come in at the guilt phase.[41]  Moreover, it sought to explain the fact that officers might "recall" significant facts long after an incident which they had not previously mentioned, without beginning to explore the question of whether those recovered "memories" were reliable recollections.  (R. 858-59.)

Horn's connection with the FBI alone would have been perceived by the jury as lending weight to what he said.  Another court, in holding that the testimony of a member of the FBI's Behavioral Analysis Unit failed to satisfy *Daubert*, noted: "In light of ... the considerable authority and even mystique in which these experts are cloaked due to their status within the FBI, it is essential to establish the reliability of such expert testimony."  *United States v. Thomas*, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266 at * 90-94 (D.Md. January 13, 2006)(criticizing unreliability, lack of proven methodology and circular reasoning of agent's testimony).

This was not a case where an isolated and fleeting reference to an improper matter would have been easily cured.  It is normally presumed "that a jury will follow an instruction to disregard inadmissible evidence *unless* there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987)(internal quotation marks and citations omitted)(emphasis added);  *Patton v. Mullin*, 425 F.3d 788, 800 (10th Cir. 2005)(single reference to defendant as an "ex-con" cured by instruction to disregard). The probability that the court's instruction prevented the jury from considering Horn's testimony in the ways stated herein is overwhelmingly small.  Horn's testimony stretched out over two days, and the supposedly curative instruction given by the court was late in coming.

---

[41]  It is noteworthy that victim impact was one of the aggravators ultimately found by the jury in deciding to sentence Mr. Barrett to death.

Horn's testimony concluded on October 4, 2005, but the jury was not instructed to disregard it until three days later, on October 7, 2005. This delay can only have allowed the evidence to sink into the jury's consciousness. By contrast, in *United States v. Joe*, 8 F.3d 1488, 1498 (10th Cir. 1993) an erroneous reference to the defendant's prior incarceration was a "single isolated occurrence in the context of a larger explanation and the trial judge gave an immediate curative instruction"; consequently reversal was not required. Moreover, the low-key nature of the instruction, which downplayed even its own importance, can have done little to erase the jury's recall of Horn's testimony. "It's not special ... Not a special instruction, but just an instruction in regard to some testimony that you have heard from Mr. Horn." (R. 1739.) The trial court also missed an opportunity to drive home the importance of the instruction, by failing to emphasize that the evidence was simply inadmissible as a matter of controlling law, but rather stating that the ruling "is based solely on my interpretation of the law applicable in this case." (R. 1740.)

Notably, this was a case where the prosecution evidence had previously failed to convince two state court juries to convict Mr. Barrett of either first or second degree murder. It can therefore be readily concluded that the evidence was otherwise "not overwhelming" and that the impact of Horn's testimony on the jury requires a new trial. *See United States v. Sands*, 899 F.2d 912 (10th Cir. 1990)(new trial warranted where it cannot be said with reasonable certainty that the improper reference "had but very slight effect on the verdict of the jury").

Given the history of this case, especially with two prior trials that had not resulted in a murder conviction, let alone a death sentence, defense counsel had nothing to lose on their client's behalf by moving for a mistrial. The trial court had properly identified the shortcomings of Horn's testimony, and made clear its readiness to strike that testimony. The court had

recognized the appropriateness of giving an instruction to disregard, although the instruction actually given was inadequate.  Defense counsel could and should have argued that the jury's exposure to Horn's evidence had irredeemably tainted Mr. Barrett's right to a fair trial.  There was no downside to a motion for mistrial and therefore no strategic reasons for failing to make the motion.  Counsel's failure to move for a mistrial clearly demonstrated deficient performance.

In a similar situation, where counsel only realized during the testimony of a government witness that his client's statement had been given after he had already involved his rights, a trial court suppressed the statement.  However, only a cautionary instruction was given and counsel did not move for a mistrial.  *United States v. Ramsey*, 323 F.Supp.2d 27, 33  (D.D.C. 2004).  Counsel's performance was held to be deficient in the circumstances of that case, where "any reasonable defense lawyer would have jumped at the chance to start the trial afresh." *Id*. at 37.  Given Mr. Barrett's counsel's lack of preparedness, their failure to even attempt to obtain a mistrial defies explanation.  *See also Martin v. Grosshans*, 424 F.3d 588, 591-92 (7th Cir. 2005)(trial counsel ineffective for failing to move for mistrial after prosecutor's inflammatory closing argument); *Freeman v. Class*, 95 F.3d 639 (8th Cir. 1996)(counsel ineffective for failing to move for mistrial after repeated references to defendant's exercise of right to remain silent); *Crowe v. Sanders*, 864 F.2d 430 (6th Cir. 1989)(counsel ineffective for failing to seek mistrial after court gave improper parole instructions).

To the extent the issue could have been fully resolved on the record, direct appeal counsel for Mr. Barrett unreasonably failed to raise the issue of the ineffective assistance provided by trial counsel with regard to Mr. Horn's testimony, and their failure to mitigate or correct that error through a stronger instruction or a mistrial.  However, as indicated here, there is

extra-record evidence in trial counsel's files showing that they did not conduct a timely or thorough investigation of Horn's qualifications, the limitations of his testimony, their own expert's ability to provide questions on cross-examination, or the general admissibility of his testimony under federal law.

The fact that trial counsel failed to preserve error initially by moving to exclude the testimony of Mr. Horn, and only asked for his testimony to be stricken after the court's *sua sponte* expressions of concern, did not waive these issues.  Appellate counsel could and should have raised the issue as falling under the plain error doctrine, since trial counsel had failed to raise them in a timely fashion.  *United States v. Johnson*, 520 U.S. 461, 467 (1997);  *United States v. Olano*, 507 U.S. 725, 732 (1993).   "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings."  *United States v. Burbage,* 365 F.3d 1174, 1180 (10th Cir. 2004).  The trial court itself had identified the existence of error, but had not remedied it with a more appropriate instruction or a mistrial.  Mr. Barrett's right to a fair trial and, ultimately, a fair sentencing proceeding were thus affected and, particularly given the highly questionable nature of Mr. Horn's testimony, the integrity of these proceedings was unquestionably tainted.

> **11.     The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions**

Trial counsel's role in representing a criminal defendant is giving the jury a way to find reasonable doubt.  In this respect, closing argument is an indispensable aspect of the defense function.  *Herring v. New York*, 422 U.S. 853 (1975); *Gardner v. Florida*, 430 U.S. 349,

360 (1977).  However, the defense lawyer also must request jury instructions that frame the issues and enable the jury to give effect to the defense's theories.  Absent such an instruction, defense evidence may not be given appropriate effect.

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would have given the jury a way to give effect to the defense evidence and argument.  The instructions trial counsel unreasonably failed to seek include an instruction on informant witness credibility, an instruction on drug-addict witness credibility, an instruction on self-defense, an instruction on Oklahoma's "make-my-day" law, instructions on the theory of the defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses.  These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution in this case from the two previous state-court prosecutions.  Some of these witnesses acknowledge at trial, or have acknowledged since the trial, that they were involved in illegal activities before, during, and after their testimony or the events about which they testified.  These activities included illegal drug possession, use, and/or distribution, various civil violations, making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, be informed about, and seek from the trial court, such orders as may be available to assist in the presentation of the defense.

Courts have long given instructions that inform the jury that the testimony of an informant "'must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.'"  *See, e.g., United States v. Humphrey*, 208 F.3d 1190, 1206 (10th Cir. 2000).  *See also United States v. Bridwell*, 583 F.2d 1135, 1142 n.6 (10th Cir. 1978).

Although trial counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel unreasonably failed to seek a jury instruction to the same effect.

The informant witnesses also confessed to being drug addicts, either at the time of their testimony, or at the time they allegedly perceived the "events" they described in their testimony. Karen Real Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, and Brandi Price were all drug addicts at relevant times.

Courts have long instructed juries that the

testimony of someone who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.

[¶] You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

(Fifth Circuit Pattern Jury Instr. 1.16 (2001).)

"Criminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support." *United States v. Visinaiz*, 428 F.3d 1300, 1308 (10th Cir.2005) (citations omitted). The defense theories were (a) that at the point in time when Mr. Barrett fired his weapon he had no indication that the vehicle speeding toward him contained law enforcement officer (R 4314), and (b) Mr. Barrett was not engaged in the drug manufacture or distribution when the raid took place. As evidenced by the state-court verdicts, the inconsistent testimony of the law enforcement percipient witnesses in federal court, and the jury's verdict in this case, there was evidence and legal support for a theory-of-defense instruction.

**12.    Trial counsel were ineffective for failing to adequately preserve the record, resulting in numerous meritorious**

Def's § 2255 Mot.                    178                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

217

**claims on direct appeal being evaluated under the
onerous plain error standard.**

Trial counsel were professionally unreasonable for failing to make proper objections in order to preserve the record for appeal.  As a consequence, Mr. Barrett was denied his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment.

As demonstrated by the direct appeal decision in this case, *United States v. Barrett,* 469 F.3d 1079 (10th Cir. 2007), Mr. Barrett's trial counsel failed to timely preserve complete objections to: 1) the prosecution's violation of Oklahoma state law requirements for nighttime search warrants (*id.* at 1089-90): 2) the improper execution of search warrants by federal officers (*id.* at 1090); 3) the violation of Fed.R.Crim.P. 41, because no federal judge or magistrate authorized the search warrant executed on Mr. Barrett's home (*id.* at 1090-91); 4) the insufficiency of Mr. Barrett's federal indictment (*id.* at 1090-91); 5) the improper multiplicity of various counts of Mr. Barrett's federal indictment for the same alleged criminal conduct (*id.* at 1095-96); 6) the misjoinder of offenses in violation of Fed.R.Crim.P. 8 (*id.* At 1096-97); 7) the improper admission of victim impact evidence (*id.* at 1097-1101; 8) the prosecutor's use of racially motivated strikes in violation of *Batson v. Kentucky,* 476 U.S. 76 (1986), in that defense counsel failed to present reasons why the government's purported race-neutral reasons for peremptory strikes were false and pretextual, and also failed to inquire into the Government's justifications for the strikes (*id.* at 1105-06); 9) the federal death penalty statute's improper allowance of non-statutory factors in aggravation (*id.* at 1108); 10) the lack of constitutionally required proportionality review (*id.* at 1108-09); 11) the violation of *Woodson v. North Carolina,*

428 U.S. 280 (1976) occasioned by the court's use of a relaxed standard for the admissibility of evidence (*id.* at 1109-10); 12) the federal death penalty statute's improper allowance of impermissibly vague aggravating factors ( *id.* At 1110); 13) the improper double counting of Mr. Barrett's alleged intent to kill as both a special circumstance and an aggravating factor (*id.* at 1110-11); and 14) the government's improper failure to timely provide the names of seven prosecution witnesses called to establish Mr. Barrett's intent to kill. *(Id.* at 1115-17.)

Trial counsel's failure to make full and timely objections to each of these errors constituted ineffective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668 (1984). The American Bar Association ("ABA") guidelines provide a guide in determining what constitutes reasonable performance in capital cases. *Wiggins v. Smith,* 539 U.S. 510, 524 (2003). Under the ABA guidelines, trial counsel have a duty to "consider all legal claims potentially available" and "thoroughly investigate the basis for each potential claim." (ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES, COMMENTARY TO STANDARD 10.8), 31 *Hofstra L.Rev.* 913, 1028 (2003). Trial counsel must bear in mind "the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted or otherwise forfeited." *Id.* Once counsel has made a decision that a clam should be made, counsel has the duty to "present the claim as forcefully as possible" and "ensure that a full record is made of all legal proceedings in connection with the claim." *Id.* at 1028-29.

Each of the claims discussed above had merit. Mr. Barrett would have suffered no adverse consequences had trial counsel made timely and complete objections on any or all of these grounds. Accordingly, trial counsel's failure to preserve Mr. Barrett's objections on each of these grounds fell far below the standards expected of competent counsel in capital cases.

Each of the objections discussed above raised a question of law, or mixed questions of law and fact, subject to de novo review. *See, e.g., United States v. Smith,* 543 F.3d 1211, 1226 (10th Cir. 2008) ("When considering a *Batson* claim, we review de novo whether the proffered explanations were race-neutral"); *United States v. Johnson,* 130 F.3d 1420 (10th Cir. 1997) ("misjoinder under Rule 8 is a question of law subject to de novo review"); *United States v. McIntosh,* 124 F.3d 1330, 1336 (10th Cir. 1997) ("We review claims of multiplicity de novo). However, based upon trial counsel's failure to make complete and timely objections, the Court of Appeals reviewed each of these claims for plain error. Had counsel made appropriate objections, Mr. Barrett would have obtained relief from his convictions and sentence of death based on each of these errors under the appropriate de novo standard of review.

The constitutional violations set forth above warrant the granting of 2255 relief without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abramson,* 507 U.S. 619, 638 n. 9 (1993). Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the jury's determinations of guilt and punishment, rendering them fundamentally unfair and resulting in a miscarriage of justice.

**13.     Counsel was professionally unreasonable for failing to object to numerous instances of prosecutorial misconduct in closing argument in both stages of trial.**

Claim 5, section C details repeated instances of prosecutorial misconduct in questioning witnesses and in closing arguments in both the guilt/innocence and the sentencing phase. The specific instances will not be repeated but are incorporated herein by specific reference. Faced with arguments that could in no sense be termed appropriate, counsel failed

altogether to object. The failure to object to clear prosecutorial misconduct can never be termed a reasonable strategy. Especially in light of the numerous, serious constitutional errors which plagued Mr. Barrett's trial, this omission by counsel was prejudicial. In this case, the prosecution basically did whatever it pleased. That abuse of the process continued unabated in closing arguments, to Mr. Barrett's clear detriment. *E.g., Hodge v. Hurley,* 426 F.3d 368, 386-89 (6th Cir. 2005); *Washington v. Hofbrauer,* 228 F.3d 689, 703, 709 (6th Cir. 2000); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996)(finding counsel ineffective for failing to object to misconduct in closing arguments).

## Conclusion

The unprofessional and prejudicial errors of counsel permeated the first stage of trial. From the failure to properly attack the search warrant, to the failure to impeach witnesses; to the failure to produce witnesses who could eviscerate the credibility of the Government's witnesses and otherwise support Mr. Barrett's defense; to the failure to properly secure and utilize expert witnesses; to failure to object to improper experts called by the Government; to the failure to investigate, be prepared, and demand the time to be prepared, no rational observer could be left with any other conclusion than that counsel ineffectively represented Mr. Barrett in the guilt/innocence phase of trial. While several instances of ineffectiveness, standing alone, are sufficient to warrant vacating Mr. Barrett's convictions, taken together, the conclusion that counsel was ineffective in the first stage of trial is inescapable. *E.g., United States v. ex rel. Gregory Madef,* 223 F.Supp.2d 968, 973 (N.D. Ill. 2002) (viewing evidence that formed basis for ineffective claim in the aggregate, and not individually).

Accordingly, Mr. Barrett is entitled to relief from each of the three counts of conviction.

### B.      Unreasonable Acts and Omissions Affecting the Second Stage of Trial

Mr. Barrett had a constitutionally protected right to have his trial counsel investigate, develop and present, and have the jury give effect to, mitigation evidence related to his background and character and the circumstances of the offense. *Williams v. Taylor*, 529 U.S. 362, 393 (2000). Trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"). *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004).

Acts and omissions of counsel require a new trial when there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant. In a capital case, this standard is met if "there is a reasonable probability that at least one juror would have struck a different balance" at the second stage of trial. *Wiggins*, 539 U.S. at 537. In sum, the Sixth Amendment is violated in a capital sentencing proceeding where defense counsel fails to take necessary steps to provide the jury with information that can help them understand the defendant and offer an explanation for his conduct. *Smith v. Mullin*, 379 F.3d at 929, 943.

"Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance." *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).

### 1.      *Deficient Performance*

Trial counsel were impeded in their efforts to develop mitigation evidence by the trial court's refusal to authorize funds for retaining the necessary resources.  As stated in Claim 1, *supra*, the trial court denied Mr. Barrett resources regularly afforded similarly situated capital defendants, and which were deemed necessary in the independent professional judgment of his trial counsel.  *(See also* Docs. 50, 51, 57, 97, 128; Decl. John Echols; Decl. Richard Burr.)

Mr. Barrett's trial counsel had a duty to retain a mitigation specialist to assist in preparation for the penalty phase.  (ABA Guideline 4.1(A)(2).)  Trial counsel were on notice that the work done by a person previously hired in state court was incomplete, and that the work was done by a novice who refused to produce a summary of her findings for counsel.  (Letter from John Echols to Honorable James H. Payne dated 2/2/8/2005; Decl. John Echols.)  However, trial counsel were aware, or should have been aware, that the preliminary investigation showed there was evidence of mental disorders and other mitigating factors.

The attorneys who represented Mr. Barrett at trial did not obtain the files of the mitigation investigator who worked on the case before the first state trial, although the files were readily available.  (Decl. Steve Leedy; Decl. John Echols).  Nor did Mr. Barrett's trial attorneys timely confer with the prior attorneys who had worked on second-stage issues in order to develop or implement a plan of investigation or for trial.  (Decl. Frank Gordon; Decl. John Echols).  The available files included records showing that Mr. Barrett had been raised in a chaotic household by neglectful, alcoholic parents, a father who was only present when not out drinking and carousing, that Mr. Barrett attempted suicide as a young man, and had been diagnosed with a major medical disorder.

On March 18, 2005, less than six months before the start of trial, the court authorized Mr. Barrett's counsel to retain Inquisitor, Inc., to perform the function of a mitigation

specialist. (Doc. 97). The delay was contrary to ABA Guidelines which call for assembly of the defense team "[a]s soon as possible after designation" of lead counsel. (ABA Guideline 10.4(C).) Trial counsel first sought funds for this task on January 31, 2005, then again on February 7, 2005. (Docs. 46 and 50). Although counsel's professional judgment and that of the mitigation consultant they sought to retain dictated that the investigation would require $20,000 in labor and $5,000 in travel expenses, the court arbitrarily cut this figure in half without any allowance for travel expenses. (Doc. 97). *See* Claim 1, *supra*, and 3, *infra*.

The denial of travel funds – which were essential in this case – may have been due in part to counsel erroneously informing the court that Mr. Barrett had "not lived in numerous locales." (Doc. 50). Had counsel asked Mr. Barrett or his family, they could have told counsel that Mr. Barrett was born and lived as a child in Illinois, lived as a child in New Jersey, and Indiana, and lived and worked as an adult in Arkansas, western Oklahoma, Texas, and Idaho. Even with this misinformation, the trial court's denial of travel funds obviously impaired the prospects for an investigation in that the mitigation investigator resided in Tennessee and even the most minimal investigation would require travel to Oklahoma.

Mr. Barrett's trial counsel had a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." (ABA Guideline 10.11(A).) Reasonably competent counsel would speak with "[w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . ., would rebut or explain evidence presented by the prosecutor, would present positive aspects of the

client's life, or would otherwise support a sentence less than death." (ABA Guideline 10.11(F)(1).)

Mr. Barrett's trial counsel knew or should have known that Mr. Barrett's family lived nearby and were ready to be interviewed or re-interviewed. However, neither of the attorneys who tried the case, nor an investigator working for them, conducted detailed interviews of family and friends regarding Mr. Barrett's life history. (*See*, *e.g.*, Decl. Brandie Hill; Decl. Carolyn Joseph; Decl. Issac Barrett; Decl. Doris Barrett; Decl. Ernest Barrett; Decl. Gwen Crawford; Decl. Kathy Trotter; Decl. Janice Sanders (partial interview by trial counsel); Decl. Paul Lunsford; Decl. Shawn Hill; Decl. Toby Barrett).

On May 17, 2005, the court appointed Roger Hilfiger Mr. Barrett's lead counsel in place of John Echols. The court also appointed Bret A. Smith. Mr. Hilfger had only worked on one prior federal death penalty case. Mr. Smith had no capital experience, yet Mr. Hilfiger gave him primary responsibility for the penalty trial. Contrary to 18 U.S.C. § 3005, and § 3599, and Judicial Conference guidelines, Mr. Smith was appointed without consultation with the Federal Defender. As stated in Claim 1, *supra*, the trial judge chose counsel for Mr. Barrett based on the judge's desire to give inexperienced local attorneys capital experience so that they could form a capital panel in the Eastern District.

On May 17, 2005, the trial court gave Mr. Barrett's counsel until May 27, 2005 to amend the budget that had been reduced by order filed March 18, 2005. The budget submitted for Mr. Barrett's defense had been prepared by Mr. Echols, and was informed by his extensive knowledge of the background of the case, including that many investigative and expert tasks had not been completed during the state proceedings, and that only preliminary work had been done

to prepare for a penalty trial.  (Echols letter to Payne; Decl. John Echols; Doc. 113; Decl. Richard Burr).

Mr. Hilfiger did not seek an amendment of the budget.  His failure to do so was unreasonable.  On May 26, 2005, Mr. Hilfiger filed a motion for a continuance based on his having only recently received the files and records related to some of the state court proceedings, including transcripts and discovery.  Mr. Hilfiger stated in his motion that he was not familiar with the materials.  In February 2005, Mr. Hilfiger had informed Mr. Echols that it would take him (Mr. Hilfiger) 160 hours to assemble and review the files related to the case.  On September 9, 2005, Mr. Smith advised the court that as of that date, Mr. Barrett's lawyers had not yet assembled or reviewed the records of the preliminary mitigation investigation that had been done prior to the first state trial.  These statements, and the declarations of John Echols, Frank Gordon, and Steve Leedy, show Mr. Hilfiger failed to undertake a reasonable investigation before concluding that no additional funds were needed to prepare for either stage of trial.

On or about June 30, 2005, trial counsel telephoned then Assistant Federal Defender Julia O'Connell and requested an opportunity to speak with her mitigation investigator.  (Decl. Julia O'Connell).  Trial counsel had not contacted the mitigation specialist whom the court had authorized to work on Mr. Barrett's case.  (Letter from Ron Lax to Tivon Schardl dated 9/24/08).  Nor had trial counsel familiarized himself with the results of an earlier mitigation investigation.  (Decl. Steve Leedy; Decl. John Echols; Decl. Frank Gordon).  Ms. O'Connell recommended that trial counsel contact Richard Burr, Federal Death Penalty Resource Counsel, for assistance.  Trial counsel did not contact him.  (Decl. Richard Burr.)  At that time, the trial was approximately ten weeks away.  As Federal Defender O'Connell explains, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second stage

Def's § 2255 Mot.                                         187                            *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

investigation if it hadn't already been completed, even if Mr. Hilfiger were able to secure the services of a mitigation investigator or investigators.  (Decl. Julia O'Connell).

Mr. Barrett's trial counsel did not secure the services of a mitigation specialist or other trained mitigation investigator.  Although the court authorized trial counsel to retain Inquisitor, Inc., trial counsel failed to contact the agency, and never sent any documents or requested any investigation for Mr. Barrett's case.  (Letter from Ron Lax to Tivon Schardl dated 9/24/08).

As the Supreme Court has held, where there is a failure to investigate, alleged "strategic" decisions are not reasonable.  In all capital cases, prevailing norms of capital defense practice, and empirical research on its results, indicate that "[c]ounsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."  (ABA Guideline 10.10.1; ABA Guidelines, 31 Hofstra L. Rev. 913, 1059, 1065 (2003) (commentary on Guideline 10.11) ("counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial").)

Trial counsel were aware that expert testimony regarding the mind's response to threats such as an unmarked S.U.V. barreling towards one's cabin was important so that the jury could understand Mr. Barrett's reactions.  (Doc. 50.)  Trial counsel were aware that Mr. Barrett "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders." *Ibid.*  Trial counsel were aware that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic

brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting."
*Ibid.*

The court authorized trial counsel "to hire a psychiatrist or a psychologist for up to 40 hours." (Doc. 97.)  This ruling denied Mr. Barrett the expert assistance he was entitled to under the Due Process Clause of the Fifth Amendment.  *See* Claim 3, *infra*.  It also denied Mr. Barrett the resources afforded similarly situated defendants in federal death penalty cases.  (Decl. Richard Burr; Doc. 107).  The court denied Mr. Barrett resources that would exceed the amount of money spent to represent him in state court, (Doc. 128 at 4), even though there was no second stage of trial in state court.

Prevailing professional norms of capital defense practice provide that counsel should obtain the assistance of expert witnesses who will be provided relevant supporting documentation regarding the defendant's medical, scholastic, cultural, economic, and sociological background.  (ABA Guideline 10.11(F)(1).)  The United States Attorney said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation.  (Tr. 9/9/05 Hr'g at 38.)  Mr. Barrett's trial counsel did not retain an expert to assess mental health mitigation and did not conduct a background investigation that would have supported a reliable opinion.

In mid-August 2005, Mr. Barrett's counsel contacted Jeanne Russell, Ed.D., regarding the risk assessment that had been contemplated in January and authorized in March, 2005.  The scope of Dr. Russell's inquiry was limited, and did not encompass many mitigating factors previously identified by trial counsel and routinely pursued in capital cases.  Dr. Russell did nothing more for Mr. Barrett's federal counsel than update the report she had prepared in

2003 in anticipation of the second state trial.  Indeed, trial counsel represented to the court that the defense did not have to produce a report from Dr. Russell pursuant to Federal Rule of Criminal Procedure 12.2 because Dr. Russell would not testify regarding Mr. Barrett's mental condition.  (Tr. 9/9/05 Hr'g at 41).

By September 9, 2005, Mr. Barrett's trial counsel had not obtained records from any state court investigation for a penalty phase.  (Tr. 9/9/05 Hr'g at 43).  Mr. Smith said he had contacted "Mr. Echols[] because we have been able to find very little on mitigation" from the past trials.  *Ibid.*  Mr. Smith told the court Dr. Russell's testimony would not involve an examination of Mr. Barrett.  *Id.* at 41.  Dr. Russell had "examined" Mr. Barrett, however.  At that time, Mr. Smith believed that Dr. Russell only had "reviewed records and what have you."  (Tr. 9/9/05 Hr'g at 41).  The court generously described the defense's preparation as "still work in progress."  *Id.* at 42.

On October 3, 2005, trial counsel disclosed to the court that they had not consulted a psychiatrist or psychologist.  (Tr. 10/3/05 Hr'g at 7).  Mr. Hilfiger informed the court that Dr. Russell would be used as a mitigation expert.  *Ibid.*  However, Mr. Smith had previously informed the court and the Government that Dr. Russell would not be testifying regarding mental health mitigation.  (Tr. 9/9/05 Hr'g at 41).  Mr. Hilfiger apparently meant that Dr. Russell would act as a mitigation investigator.  However, Dr. Russell was not qualified to conduct a mitigation investigation, and she so informed Mr. Smith in August 2005.

### 2.  *Prejudice*

Trial counsel informed the jury that four categories of "mitigation evidence" would be presented:  (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction"; (3) "Kenny Barrett's incarceration; (4)

"Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999." (R. 4704). The cursory description of the evidence that would be presented in the last category (R. 4709-13), was not "an accurate representation of [Mr. Barrett]" (R. 4713), in that it was terribly incomplete; a reflection of counsel's lack of investigation.

If trial counsel had followed the norms of capital defense practice, and pursued the evidence available to them, the jury would have heard truer and radically different testimony regarding Mr. Barrett. Jurors would have learned the following about Mr. Barrett, his background, and character:

**a.      The family, social, and medical background of Kenny Barrett**

**Introduction**

Kenneth Barrett's familial roots began in Sequoyah County, Oklahoma, at the intersection of two epic journeys in American history. The deprivation of Depression era Sallisaw provided the inspiration for the Joad family in *Grapes of Wrath* who came to personify legions of real-life sharecroppers living in the nearly hopeless circumstances of Sallisaw's drought and poverty before they set out for California. The Trail of Tears[42] ended at Sallisaw Creek for those Cherokees who survived starvation, freezing temperature, disease and murder during their forced relocation from their homelands.

---

[42]In 1838, the US government uprooted some 13,000 Cherokee Indians from their land east of the Mississippi River and forced them westward into the Oklahoma territory. The 1,000 mile route they took to Oklahoma is called the Trail of Tears because of the hardships of weather, disease, and starvation that claimed the lives of 4,000 Cherokee. It was a dismal journey that took place in the middle of harsh winter, and forced Indians from their homelands through north Georgia, middle Tennessee, Kentucky, Missouri, and Arkansas, into present day Oklahoma.

Def's § 2255 Mot.                                191                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Kenny 's heritage is a blend of both cultures.  His paternal relatives, the Barretts, were hard-scrabble farmers, who married Cherokee Indians.  His maternal relatives, the Dotsons, were Cherokee ranchers who married non-Indians. (Gelene Dotson, Genealogy Memorandum; Abe Dotson Marriage Certificate; Ida Melton, Death Certificate; Allen Real, Death Certificate) With some success and much tragedy, both families endured the historical forces that shaped their communities.  Some family members grew up in Indian orphanages, some became successful ranchers, educators, doctors, and business people.  Many struggled with profound mental illness and its attendant chaos.

Intergenerational, genetic predisposition to mental illness affected Kenneth Barrett's development, behavior, perceptions, and experiences over the course of his life.  It made him vulnerable to developing major psychiatric illness.  In lay terms, Kenny  was affected by a confluence of the most damaging genetic defects handed down from both the Barrett and the Dotson families.  His mental illness was marked by severe neuropsychological deficits that manifested themselves in extraordinarily compromised cognitive and psychiatric functioning.

**Family History of Mental Illness**

Kenny  meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component.  His family has long struggled with their vulnerability to mental illness.  Multiple generations on both his mother's and father's side include family members who succumbed to depression, bipolar disorder, schizophrenia and addictive diseases. Although members carried genetic-based risk factors, some who were spared the most debilitating symptoms of mental illness were able to pursue successful professional careers as educators, doctors, ranchers, and business people.  Other family members required psychiatric

institutionalization.  This spectrum of impairment included other family members who functioned marginally, but were unable to meet their responsibilities to their families and community.  The nature and severity of Kenny 's mental illness were both indicative of and exacerbated by significant neurological impairments, including pervasive damage to the prefrontal lobe of his brain.

### Maternal Family Mental Illness

Kenny 's mother, maternal aunt, and maternal cousins satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression, anxiety disorders, and developmental disabilities.  Kenny 's mother's family "had to deal with mental illness for a long time." (Decl. Phyllis Crawford.)   Kenny 's mother, Gelene Dotson, has suffered from clinical depression, mood swings and anxiety since her teenage years.   Gelene's sister, Carolyn (Kenny's aunt), also suffers from bipolar mood disorder and requires therapeutic medication with a regimen of mood stabilizers and antidepressants.  (Decl.  Carolyn Joseph; Carolyn Joseph, Medical Records; Carolyn Joseph, Marriage Certificate.)   One of Carolyn's daughters manifests signs of mood-related psychiatric distress and is unable to rear her children. (Decl. Carolyn Joseph.)   Gelene's brother Mark, the youngest child in her family and now a podiatrist, witnessed Gelene and Carolyn struggle "with serious impairments." (Decl. Mark Dotson.)

One of Kenny 's maternal cousins, Gwendolyn Crawford, also has bipolar mood disorder that necessitates ongoing treatment and medication.  (Decl. Gwendolyn Crawford; Gwen Crawford, School Records;  Decl. Brandy Hill; Brandy Hill, Medical Record.)  Gwendolyn's two children both have significant mental impairments.  Her 26 year old son Brandon has a developmental disability and is unable to speak or live independently.  (Decl. Gwendolyn

Crawford; Brandon Smith, Social Security Earned Income Statement; Brandon Smith, Guardianship Proceedings.)  Gwendolyn's daughter Brandy Hill reported that her family "learned first hand about bipolar disorder and depression" and that Brandy herself "battle[d) with depression," experienced episodes of "high euphoria" and underwent treatment for her mood disorder until she could no longer tolerate chemical regimens.  (Decl. Brandy Hill; Brandy Hill Medical Records.)

Travis Crawford, another of Kenny 's first cousins, also receives medication for anxiety and reported a history depression.  (Decl. Travis Crawford; Travis Crawford Medical Records.)  Travis has had "a long struggle with drugs and ha[s) anxiety and panic attacks" and his "mind does not work that well."  (Decl. Travis Crawford.)  Travis understands that "psychological problems run in [his) family" and reports his oldest daughter, now "a grown young woman" has bipolar disorder and one of his sons "seems a little slow and is having a tough time of it."  (Decl. Travis Crawford.)

Gelene's uncle, Warren Dotson, has two daughters who "each have a son who is bipolar, and it is a challenge for a lifetime.  It never goes away."  (Decl. Nona Reich.)

In the maternal family, depression and mood disorders trace back to Kenny 's grandmother's (Hattie Gertrude Dotson) generation.  Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the Twentieth Century.  (Decl. Carolyn Joseph; Hattie Gertrude Dotson, Death Certificate.)  Another relative, Wallace Dotson, was involuntarily hospitalized at the state mental institution on a petition brought by his father, Tom Dotson,[43] who

---

[43]Tom Dotson was the uncle of Kenny's maternal grandfather, Hugh Dotson.  (Hugh Dotson, Death Certificate.)

described Wallace as being "completely out of his mind," suffering from "some kind of spells" and not having slept for "three days and nights." (Wallace Dotson Lunacy Record)

### Paternal Family Mental Illness

Mental disease and its affects on family life were transmitted down at least four generations of Barretts. Kenny 's great great grandfather, as did his great grandfather, his grandfather and finally Kenny himself. (A. J. Barrett, Mental Health Record; A. J Barrett, Eastern State Hospital Record; Decl. Issac Barrett) As Kenny 's cousin, Kathy Trotter, explained: "Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression." (Decl. Kathy Trotter.) Kenny 's great great grandfather, A. J. (Jack) Barrett, was committed to a mental hospital and a Certificate of Lunacy was entered in the local courthouse in Sequoyah County in 1918. (A.J. Barrett, Certificate of Lunacy.) Kenny 's great grandfather, Issac Clifford Barrett, by all accounts a man who was committed to his family and community, overcame tremendous odds and poverty to build a successful ranch ("cow rich"), but ended his life by suicide. (Decl. Issac Barret and Linda Riley; Isaac Clifford Barrett, Death Certificate.)

Issac's oldest son, Andrew Jackson "A.J." Barrett shared in only the tragedy of Issac's life and none of its success. A.J., Kenny 's grandfather, was haunted by suspicion, paranoia, and hostility, which was manifested by violent physical and sexual assaults against his wife and children, which forced one after the next to flee the home in search of safety. A.J. terrorized his wife who hid "in the woods" from him (Decl. Linda Riley.), raped one of his daughters who became pregnant and placed the baby for adoption (Decl. Issac Barrett), and went on drunken rampages through town. His Certificate of Lunacy documents auditory hallucinations, persecutory delusions and paranoid ideation. (A.J. Barrett Certificate of Lunacy.)

His family believed he "was bipolar." (Decl. Linda Riley.)  A.J. was able to work only "sporadically."  His family eked out a "marginal" living, and at one point A.J. was involuntarily committed to the state hospital for one month but returned home to his wife who would not "consider divorce." (A.J. Barrett Eastern State Hospital Records; Decl. Linda Riley; A. J. Barrett, Death Certificate.)

A.J.'s maternal family also faced the tragedy of mental illness.  A.J.'s mother (and Kenny 's great grandmother), Mary Ellen Maxwell, suffered a "mental breakdown," (A.J. Barrett, Eastern State Hospital Records), wandered the ranch at night talking to herself and believed that she was canning goods for the winter when she washed bottles in the middle of the night (Decl. Issac Barrett.)  She "died very confused." (A.J. Barrett, Eastern State Hospital Records; Mary Ellen Barrett, Death Certificate.)  Mary's brother, Howard, was "Looney Tunes" (Decl. Issac Barrett), and Howard's son, Billy Dean who was a disabled veteran with a history of schizophrenia, committed suicide. (Billy Dean Maxwell Death Certificate; Billy Dean Maxwell Mental Health Record.)  Kenny 's great aunt, Elnora Long, is bipolar and requires significant doses of medication. (Decl. Kathy Trotter and Issac Barrett.)  Elnora, who has a complicated lineage, is "very emotionally unstable" and "unpredictable." (Decl. Kathy Trotter.)  Kathy, Kenny 's cousin who experienced an anxiety and depressive episode and was hospitalized, believes Elnora is manic depressive because of her extreme mood swings. (Decl. Kathy Trotter; Kathy Trotter Medical Records.)  Elnora is Ernie and his siblings' maternal half sister whose father was her mother's former son in law's brother.

Kenny  has one paternal aunt (Linda Riley) and three paternal cousins who suffer from depression and bipolar disorder.  His father's sister, Linda Riley, is treated for depression, and both her adult daughters have been diagnosed with bipolar disorder. (Linda Riley Medical

Records.) Linda's seven-year-old grandson has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder.

### Maternal Family History

Kenny 's maternal grandfather, Hugh Dotson, was a direct descendant of Cherokee Native Americans, whose every day life reflected the travails and successes Indians in eastern Oklahoma.  Hugh, who grew up in an Indian orphanage became an adult universally loved by his children and grandchildren and respected in the Sallisaw community.  He spent his formative years living at Dwight Mission,[44] an Indian mission school started by the Presbyterian Church.  Hugh's mother, Minnie Andrews,  placed Hugh and four of his siblings (Christine, John E., Anna, and Eleanor) at Dwight Mission after their father, Abe Dotson, was murdered.  (Decl. Warren Dotson.)  Hugh's mother, a widow with no ability to support her children, placed her two younger children (Lela and Warren) with her husband's relatives.  (Decl. Warren Dotson and Carl Cook; Sequoyah County Times; Minnie Andrews, Death Certificate.)

Circumstances of Abe Dotson's death are unclear, but it is indisputable that he, two of his brothers, and his brother's son were killed by gunfire over a three year period in separate incidents.  Abe, his siblings Mark and Greenberry, and his nephew Bee, were Cherokee,

---

[44]Dwight Presbyterian Mission of the Cherokees was originally founded in 1820 as an Indian mission school in western Arkansas and was named for Timothy Dwight, president of Yale University.  In 1838, as Cherokees were forced into Oklahoma, Dwight Mission was moved at the invitation of the Cherokee chief to its current location 20 miles into then newly organized Indian Territory. Dwight Mission served generations of Native Americans as a mission and training school until public education became available and the school was finally closed in 1948.

and it appears that at least one of the men who shot and killed them did so with impunity.[45] (Oklahoma v. Henry Edwards; The Vian Press; The Sequoyah Times.)

Abe's son, Hugh, and the other Indian children at the mission worked in its fields and stockyards to earn their keep. Hugh impressed the administrators at Dwight Mission with his skill and sense of responsibility. Hugh and his siblings stayed in the community after they left Dwight Mission, farming as sharecroppers and day laborers. They barely survived, and some of his siblings made the long trek to California in hopes of better jobs in the fields.

Hugh married Hattie Gertrude Real in 1939 (Hugh Dotson Marriage Certificate), and they had five children over their life-long marriage, the oldest of whom is Sylvia Gelene Dotson, Kenny 's mother. (Sylvia Gelene Dotson Birth Certificate.) Hugh "barely earned enough to live on." (Decl. Gelene Dotson.) Hugh, Hattie and their growing family lived in " tumble down" houses that "were in pretty bad shape even by standards back then." (Decl. Gelene Dotson.) The family "had no running water, electricity or plumbing and used wood stoves for heating and kerosene for cooking."

World War II intervened, and Hugh served in the U.S. Army. When he returned home he attended classes on the GI bill that were taught by his brother in law, Carl Cook. Hugh "learned how to run a farm, a big farm, not just a home farm," and when Gelene was six, the family moved to the Dwight Mission School where Hugh ran the farm. (Decl. Gelene Dotson.) Gelene " always heard" her family was "part Indian and that [she) was 3/16 Cherokee." (Decl. Gelene Dotson.)

---

[45]Cherokee Census Cards M2799 and 3294.

Dwight Mission provided a house for the family that had electricity and plumbing, and Gelene began her elementary education at the school.  She was her mother's least favorite no matter that she was the most attentive to her mother's needs.  (Decl. Gelene Dotson.)  The school shut down in 1949, but the Presbyterian Church sent Hugh and his family to its Menual School in Albuquerque that served Spanish speaking students from New Mexico.  Hugh "ran the cattle and vegetable farm" and served as "the overseer" to the student farm hands.  (Decl. Gelene Dotson.)  After a year at Menaul Hugh accepted the church's offer for him to run the farm operations at a new orphanage in Farmington, Missouri.  The family stayed in Farmington two years until the orphanage closed and the family moved back to Oklahoma.

Rural Sallisaw offered no jobs, and Hugh and his family moved in with his brother-in-law Carl and sister Christine.  (Decl. Carl Cook.)  Public schools did not conduct classes during cotton season because children had to join parents picking and chopping cotton.  Hugh and his family traveled to western Oklahoma and "chopped cotton in the spring and pulled cotton balls in the fall." (Decl. Gelene Dotson.)  The family returned to Sallisaw when school began in the fall, but left at Christmas to join family in California who had arranged for Hugh to become an irrigation manager on a large farm near Bakersfield.  Gelene loved her life on that farm where they "were not migrant workers, but people who lived there permanently" in the "30 or 40 houses on the farm, all with kids."  (Decl. Gelene Dotson.)  It was "a joyful time" and Gelene "was a happy child," but her mother and father yearned to return to Sallisaw and own their own land.  (Decl. Gelene Dotson.)  Gelene explained that "[l]and is just something very important" to her family and "always has been."  (Decl. Gelene Dotson.)

Hugh and his wife Hattie were dedicated to their dream of owning land.  Hugh "worked seven day weeks, 12 hour-days" and "was tired from too much work but he never

Def's § 2255 Mot.                              199                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

considered working less." (Decl. Gelene Dotson.)  Children in the family "always knew [they] went out there to make enough money to buy [their] own place back home." (Decl. Gelene Dotson.)  When they had saved enough, the family returned to its roots and soon after their youngest child was born in 1961, Hugh bought 40 acres in Sequoyah County. Gelene and her siblings enrolled in local public schools, and Gelene graduated but she never recaptured the joy of her few years in California.  Years later, Hugh gave each of his five children seven of his treasured 40 acres and retained five.  Kenneth Barrett  eventually built his shack for $150.00 on a spit of  his grandfather's land adjacent to his mother's house, on land that Gelene expected she would one day be deeded, and she was.

### Paternal Family History

Like Hugh Dotson, Issac Clifford Barrett, Kenny's paternal grandfather enjoyed a fine reputation in Sequoyah County.  From 1917 to 1943, Issac managed a 20,000-acre ranch owned by a Kansas doctor.  Issac married Mary Ellen Maxwell, who was one of ten children born in Sequoyah County. Issac was known as "a fair man" who, when he learned of a neighbor's falling on hard times, shared the bounty of his own garden.  (Decl. Issac Barrett.)  Issac "had his burdens to carry after he married" Mary.  She had a "mental breakdown" (A.J. Barrett Eastern State Hospital Records), and "walked around the yard talking to herself.  At night, she would wake up, wash jars, and think she was canning." (Decl. Issac Barrett.)  According to Issac Barrett, Mary's brother, Howard Maxwell, was "Loony Tunes" and Howard's son Billy Dean Maxwell was involuntarily committed to the state mental institution four times over a ten year period before he committed suicide by shooting himself in the head.  (Decl. Issac Barrett; Billy Dean Maxwell Death Certificate; Billy Jean Maxwell, Record of Mental Health Proceeding.)  Issac also committed suicide, by "ingesting a remedy for black leg cattle disease" on November

Def's § 2255 Mot.                               200                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

24, 1952.  (Decl. Issac Barrett.)  Family members believed Issac killed himself "because he had a broken heart" after his brother convinced him to sell his cattle and invest all the proceeds in a failed enterprise. "He had nothing left."  (Decl. Issac Barrett.)

Issac's oldest son, Andrew Jackson Barrett (A.J.), is Kenny's paternal grandfather, but "[w)hatever good Issac had in him, and there was plenty of it, did not pass down" to A.J. (Decl.  Issac Barrett.)  A. J. married Ada Mae Hatter, a woman who came to be "very well thought of" and who " was someone who worked extremely hard."  (Decl. Kathy Trotter; A. J. Barrett, Marriage Certificate.)  Ada's mother, Ida Melton, was an Indian (Ida Melton Death Certificate) married to Sam Hatter.  (Sam Hatter Marriage Certificate.)   Ida and Sam divorced, and Ida married A.J.'s brother John.  (Sam Hatter,  Divorce Proceedings; Sam Hatter, Marriage Certificate to Bessie)  Ida and John had one child, Elnora Barrett Long, who was debilitated by her manic depression and anxiety to such a degree that she has recently been put in a nursing home. Ida's marriage to John meant that her son-in-law, A.J., was also her brother-in-law.

A.J. and his wife, Ada Mae "lived a hard life."  (Decl. Issac Barrett.)  Three children "died at or near childbirth; the oldest was two weeks old.  Two are buried in Akins cemetery.  The stillbirth is buried back in the mountains."  (Decl. Issac Barrett.)  The oldest of the five children born to A.J. and Ada Mae who survived is Ernest (Ernie) Barrett, Kenny's father.  Ernie and his the four siblings who survived (Margaret, Issac, Gary and Linda) lived under the shadow of A.J.'s mental illness, alcoholism, and cruelty in a cabin with "a dirt floor and no electricity or running water. [W)ell water was not usable for humans, although it was all right for animals and crops."  (Decl. Issac Barrett.)

A.J.'s education ended at the seventh or eighth grade. He worked sporadically as a laborer "doing public construction work" and "spent eleven months in the service during World War II." [A.J. Barrett, Eastern State Hospital Records.)  Unable to support his family, "[t)he entire family had to work in the fields traveling from one crop to the next."  (Decl. Issac Barrett.) State Hospital records described their economic status as "marginal," and the family "had a tough time getting by."  [A.J. Barrett, Eastern State Hospital Records)

Life for Ernie, Kenny's father, and other children in the family was  dismal.  One of Ernie's "earliest memories is being taken out of school to work in the fields."  Decl. Ernest Barrett .)  Ernie described their grim life:

> As my brothers and sisters got big enough to walk and carry a load, they joined us in the field.  Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell, and picked beans in Moffitt, Oklahoma.  It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sunup to sundown.  It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it.  When cotton season came, we worked or we starved.  When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

(Decl. Ernest Barrett.)

"We had a neighbor who raised purple whole peas for animal feed. My Granny Ida asked her if we could have what she had left on the vines for our cows—we scavenged them and my mom cooked them."  (Decl. Linda Riley.)

A.J. was unable to ameliorate the harshness of poverty and its impact on his family.  His parenting was derailed by mental illness that ultimately led to his being involuntarily institutionalized by court order at the state hospital for one month.  (A.J. Barrett, Eastern State Hospital Records.)  None of his children "wanted him to be at home because of the crazy things

he did." (Decl. Issac Barrett.) He suffered from mood swings that he attempted unsuccessfully to self medicate with copious amounts of alcohol, to which he became addicted. His alcoholism only aggravated his behavior. (A.J. Barrett, Eastern State Hospital Records.) Family members believed his behavior worsened after an automobile accident in 1960, but he "had always been high tempered and jealous." (A.J. Barrett, Eastern State Hospital Records.) His behavior was erratic and unpredictable leaving his children unable to tell "from one day to the next what was going to happen." (Decl. Issac Barrett.) When he was in a "bad mood" he struck out against his children, hitting them with "any dumb thing, belt, club, board, or limb" (Decl. Issac Barrett), but he "was difficult to figure out because he was also a decent guy when he was sober." (Decl. Ernie Barrett.) A.J. spared no one; he raped his daughter who went away to New Orleans to have the baby and placed it for adoption. (Decl. Issac Barrett.)

A.J.'s psychiatric symptoms made it impossible for anyone in the family to appease him, and his sons, including Kenny's father Ernie, tried to "stay out of [his) way." The children left home as soon as they could. (A.J. Barrett, Eastern State Hospital Records.) Family members reported that A.J. had "two different personalities" and "angry spells about three times a week." (A.J. Barrett, Eastern State Hospital Records.) A.J. had "enormous moods swings from being an alright guy to being totally out of control." (Decl. Ernest Barrett.)

A.J.'s mental illness "caused him not to be able to get along with neighbors and especially his employers." (A.J. Barrett, Eastern State Hospital Records.) A.J. thought "people were after him," heard "imaginary voices," was "somewhat confused," and reported "men outside his window that [were) going to kill him." (A.J. Barrett, Eastern State Hospital Records.) A.J. was "unpredictable, irresponsible, irritable, uncooperative and not in complete reality."

(A.J. Barrett, Eastern State Hospital Records.) A physician examining A.J. when he was admitted to the state hospital, reported his findings:

> His memory for past and remote past is poor. He can retain a number of five digits but is unable to repeat them in reverse with any degree of facility. Serial subtraction of eight from one hundred is done with much hesitation and inaccuracy. His general intelligence seems inaverage and dull normal. His reasoning and judgement are limited. His insight is poor.

(A.J. Barrett, Eastern State Hospital Records.)

Ernie and his siblings were powerless to protect themselves or their mother from A.J.'s assaults and terror. A.J.'s wife, Ada Mae, was an old fashioned woman who "would not divorce" him (Decl. Linda Riley; A.J. Barrett, Eastern State Hospital Records), even though "nothing could stop him from attacking" them." (Decl. Ernest Barrett.) Ada "was churchgoing and devout; she did not believe in leaving a marriage no matter how bad it was." (Decl. Ernest Barrett.) Ernie believed his mother "was as good a woman as there is, but she had a hard life between my father being half crazy and always poor." (Decl. Ernest Barrett.) Ernie tried "[a)s the oldest boy in the family," to protect his mother and the other children, but he was "no match" for his father until he was "half grown." (Decl. Ernest Barrett.) Because Ernie tried to "get between" his father mother" when A.J. attacked her, he "got beaten more than the other children." (Decl. Ernest Barrett.)

Ernie developed characteristic responses to the life threatening trauma he witnessed and experienced. He "learned never to cry" when his father hit him and he does not remember "feeling a hell of a lot." (Decl. Ernest Barrett.) High school for Ernie was "different." (Decl. Ernest Barrett .) In a community known for its poverty, Ernie's family stood out as still poorer than most. Other students "made fun of [Ernie) and laughed at [him) because of the way [he) dressed." (Decl. Ernest Barrett.) Ernie responded to the taunts with fighting

"every boy in [his) high school class to hold any respect." (Decl. Ernest Barrett.)  Other students called Ernie "'Loco' because of the way he acted, and he never completely straightened out." [Decl. Issac Barrett.)  Ernie's brother described him as "pretty cruel." (Decl. Issac Barrett.)  He treated his younger siblings "pretty rough," and when he made them  cry, "he thought it was funny." (Decl. Issac Barrett.)  Ernie's brother thought Ernie was "a lot like [his) father," A.J. (Decl. Issac Barrett.)  An aunt who taught Ernie in elementary school described him as "mean child." (Decl. Ruth Harris.)

Ernie left home without graduating from high school and joined the U.S. Marines. He kept memories of his maltreatment and his powerlessness to protect his family at bay by drinking to excess.  He was three months short of 17 the last time he stepped between his father and mother to try and protect her.  His father hit him across the shoulder with a "19-inch metal file that busted [his) shoulder wide open."  He still has a scar from it.  (Decl. Ernest Barrett.) Ernie described that day: " I left home that day just running because I knew that if I stayed at home I would have to kill my father to protect the others.  I was 6'3" and weighed 187 pounds." (Decl. Ernest Barrett.)

### Family of Origin

Ernie Barrett and Gelene Dotson brought to their marriage a strong genetic predisposition to major mental illness, budding alcoholism, and little understanding of the demands of parenting.  They met in high school, dated briefly before Ernie left to join the U.S. Marines,  reunited by accident when both were back in their home town and married July 8, 1960, without much thought.  (Decl. Ernest Barrett and Gelene Dotson; Ernest Barrett Marriage Certificate.) Ernie and Gelene started married life in Joliet, Illinois, at the recommendation of Gelene's relatives who helped Ernie find work at a Kerr Glass manufacturing plant.

Ernie and Gelene's marriage was tumultuous and marked by discord from its beginning.  Although Ernie was very "determined not to live in the kind of poverty [he) knew as a child growing up," he had little notion of family life or fatherhood.  (Decl. Ernest Barrett.) Ernie acknowledges that he "did not give much thought to fatherhood" and "did not think about Gelene or, later on, the boys, other than working and supporting them."  (Decl. Ernest Barrett.)

Ernie "almost immediately started running around with other women" (Decl. Ernest Barrett.) and was gone for days at a time.  He had his "mind set on doing whatever" he wanted, as long as he worked.  (Decl. Ernest Barrett.)  After he finished his shift at the plant, he went to bars and got "into as many brawls as there were" before coming home.  (Decl. Ernest Barrett.) Ernie "did pretty much whatever [he) wanted to. [He) would go out, drink as much as [he) wanted, and chase women," a pattern he maintained until well after his marriage with Gelene ended.   He "drank a fifth at a time."  (Decl. Ernest Barrett.)  Today Ernie is deeply ashamed of his behavior towards his children and wishes he "could take it back and do for [his) children what they needed and be the kind of parent they deserved."  (Decl.  Ernest Barrett.)  At the time he and Gelene started their family, his only measurement of success was being able to work himself  "up from pushing brooms to production manager."  (Decl. Ernest Barrett.)

Gelene was "pretty depressed" and  "miserable" in the marriage.  (Decl. Gelene Dotson.) She was "a heavy drinker with dramatic mood swings."  (Decl. Mark Dotson.)   She had planned on going to college but discovered she was "crazy about Ernie" who " came home kind of like a knight in shining armor."  (Decl. Gelene Dotson.)  She did not realize, until after they married that Ernie "was not the same boy" she knew in high school and that "he had changed, none for the better."  (Decl. Gelene Dotson.)  Looking back, she "never imagined that life with Ernie could be so terrible, not just for [her), but for the children [they) had together."

Ernie's infidelity, unpredictable absences, and lack of concern for her was "humiliating and embarrassing. " (Decl. Gelene Dotson.)  Gelene knew that Ernie chased after "other women," and she and her aunt went from bar to bar  "looking for him – he would be out drinking," but barkeepers would tell her he was not there.  (Decl. Gelene Dotson.)  Throughout their 13-year marriage, Ernie 'had his other women."  There was never a time he did not have other women.  Gelene "drank right from the beginning of the marriage," according to Ernie.  One of Gelene's sisters, Phyllis, who visited Gelene when she was pregnant with Kenneth Barrett reported that "Gelene drank from the moment she woke up until she went to bed."  (Decl. Phyllis Crawford.)

Kenny 's parents separated multiple times, sometimes for extended periods and sometimes more briefly, but always in chaos. Their relationship was acrimonious and rife with recrimination.  Ernie was unrepentant and "would not even talk" to Gelene "about what was going on" with her or the children.  Gelene says that "[I)t drove [her) crazy," and that she "begged, pleaded, threatened, and cried with Ernie."  (Decl. Gelene Dotson.)   They "split up and got back together and threatened to leave each other over and over."  (Decl. Gelene Dotson.)  They " always had a difficult time of it."  (Decl. Gelene Dotson.)

Their son Kenneth Barrett was born to this troubled marriage in Joliet, Illinois, June 29, 1961.  (Kenneth Barrett, Birth Certificate.)  He was followed by his younger brother, Richard, born June 24, 1964 (Decl. Gelene Barrett; Richard Barrett, Birth Certificate.)  Shortly after Richard's birth, Gelene left Ernie for almost three years and returned home to Sallisaw with the boys.  Ernie "felt bad about leaving" his sons but he "could not take Gelene anymore."  (Decl. Ernest Barrett.) Ernie admits that he "was still young and immature" and not " much of a husband" who "just put the boys out of [his) mind as much as [he) could."  (Decl. Ernest Barrett.)

The three-year separation ended when Ernie was not able to "keep the boys out of [his) mind" and he reunited with Gelene in 1967.  (Decl. Ernest Barrett.)  Gelene and the boys returned to Joliet and "moved into the same mobile home" Ernie had been living in with his girlfriend.  (Decl. Ernie Barrett.)  The nature of the marriage did not change after Gelene and the boys returned to Illinois.  Gelene gave birth to their third and last child, Stephen, January 1, 1969.  (Decl. Gelene Dotson; Stephen Barrett, Birth Certificate.)  Gelene and Ernie "both drank as much as [they) could," and Ernie "still stayed away from home."  (Decl. Ernest Barrett.)  Ernie was arrested multiple times for drunk and disorderly conduct, and a judge threatened him with a year's jail sentence.  Ernie contacted a friend in New Jersey who found him a job at a glass plant.  Leaving Joliet allowed him to avoid the inevitable jail sentence he knew would come because he could not stop drinking and fighting.  The family moved, living first in Stanhope and then Lake Hopatcong, but Ernie "kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time."  (Decl.  Ernest Barrett.)

Gelene's humiliation at Ernie's hands continued.  Ernie started "seeing another woman almost as soon as" the family arrived in New Jersey.  (Decl. Gelene Dotson.)  Ernie had promised Gelene that "he wanted to leave Joliet and have a fresh start, straighten himself out, but that's not what happened."  (Decl.  Gelene Dotson.)  Ernie moved out of the home and lived with another woman, but Gelene allowed him to move back home with her and the boys.  Gelene contracted gonorrhea twice from Ernie.  Although Ernie had vowed he would never become violent like his father, he assaulted Gelene and "gave her two black eyes and split [her) lip."  (Decl. Gelene Dotson.)  Gelene "was at the end of her rope" and left Ernie for good in Lake

Hopatcong, returning home to Sallisaw with three young boys in 1972. Ernie and Gelene

divorced June 20, 1973. (Decl. Gelene Dotson; Sylvia Gelene Barrett, Divorce Proceedings.)

### Infancy and Childhood Development

Kenny has long standing neurologic deficits that were apparent early in his

infancy, continued throughout his childhood and adolescence, and affected his behavior and

understanding over the course of his life. Although it is difficult if not impossible to determine

with precision the etiology of his neurological deficits, there is no doubt that they are present and

significant. These deficits can be the result of his mother's ingestion of alcohol or other

neurotoxins during her pregnancy with him, head trauma he sustained during childhood and

young adulthood, ingestion or exposure to neurotoxins at work or home, or a combination of one

or more of these factors.

Gelene was stressed throughout her pregnancy with Kenny, which she describes

as "very difficult." (Decl. Gelene Dotson.) She was in "constant pain," uncomfortable, and

depressed. (Decl. Gelene Dotson.) She described her pregnancy as "battling with Kenny before

he was born." (Decl. Gelene Dotson.) Gelene drank throughout her pregnancy with Kenny,

unaware of alcohol's potentially devastating effect on a developing fetus's brain. (Decl. Gelene

Dotson; Decl. Linda Riley.) Gelene's in laws commented on her early alcoholism and stated she

"was a drunk right out of high school." (Decl. Kathy Trotter.)

Kenny had a difficult infancy and "exhausted" his mother. (Decl. Gelene

Dotson.) His "days and nights were mixed up," and he "was colicky" and unable to be

comforted. (Decl. Gelene Dotson.) He cried and fussed "all the time," making Gelene think all

babies must be like him. After she had her other two children and observed their development,

she "realized something was wrong with Kenny." (Decl. Gelene Dotson.) Gelene received no

help from her husband who acknowledged he "was not around the house much when Kenny was a little baby" but " heard all about how hard it was to sooth him.  He was colicky and cried all the time." (Decl. Ernest Barrett.)  Kenny was born with a large lump on the back of his head.  (Decl. Gelene Dotson.)

Kenny  failed to meet developmental milestones expected of healthy infants.  Gelene faithfully recorded Kenny's progress at three, six, nine, and 12 month intervals in a complimentary baby book she received at the hospital. (Kenneth Barrett, Baby Book Excerpt)  Although it appears that he met most of his three and six month milestones, he lagged in some.

At three months, Kenny  did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand, splash in bath, take stepping movements when held erect," or "open mouth at sight of nipple before lips are touched."  Kenny's mother nursed him.  [Kenneth Barrett, Baby Book excerpt, KEB 501 953)

At nine months, Kenny  did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent," or make stepping movements when feet are touched to floor."  [Kenneth Barrett, Baby Book excerpts)

At one year, Kenny 's delays were more obvious.  His mother noted he "had trouble learning to walk." (Decl. Gelene Dotson.)  He could not "climb stairs, hold and drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching."  (Kenneth Barrett, Baby Book excerpts.)

Kenny early on demonstrated patterns of behavior associated with the prodromal symptom of bipolar mood disorder, which family members described as extreme hyper activity. Gelene recognized that his behavior lacked purpose and reported he "moved around without thinking about what he was doing" and was "very, very active." (Decl. Gelene Dotson.) Gelene described him as "a handful" who "could not be still" and "was more than hyper." (Decl. Gelene Dotson.) An aunt stated he was "always hyperactive, on the go, into everything, and could not sit still." (Decl. Phyllis Crawford.) Ada Blount, Kenny's maternal great aunt, recollected that "Kenny was a hyper little boy who could not sit still." (Decl. Ada Blount.)

Ernie recollected that when Kenny "got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing." (Decl. Ernest Barrett.) Janice Sanders, a maternal cousin, remembered that "Kenny was a hyper little boy, the most hyper child" she had have ever seen. (Decl. Janice Sanders.) She also noticed that Kenny "had strong feelings" (Decl. Janice Sanders), a common symptom of children who develop bipolar mood disorder. Other family members who "used to babysit Kenny and

saw him on and off through his teens and at family reunions" confirmed that he was "very hyperactive." (Decl. Nona Reich.)

Family members recognized "that Kenny was different" and "needed so much more attention as a child than the other children." (Decl. of Phyllis Crawford.) Kenny "was extremely sensitive and cried over every little thing from the time he was small until he was a grown man . . . . He would break down and cry easily." [Phyllis Crawford) His cousin remembered that "back then we called Kenny hyper. He was erratic and temperamental. (Decl. Kathy Trotter.) His mother reported that "any little thing could upset him, but it took a lot to

calm him." (Decl. Gelene Dotson.)  Ernie also recognized that Kenny was "a sensitive little boy...who cried if you hurt his feelings." (Decl. Ernest Barrett.)  When Kenny was a toddler, he had to go to the hospital for several different accidents because "he got into everything.  He had to have his stomach pumped twice when on two separate occasions, he managed to climb to a top cabinet. Once he ate baby aspirins the other time he ate ex-lax." (Decl. Gelene Dotson.) Kenny's mother had to "rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting it open and raising a big knot." (Decl. Gelene Dotson.)

Gelene was overwhelmed by the responsibility of a child with special needs. Already a very emotional person who was alcoholic, she reacted to Kenny 's impairments by punishing him.  Gelene admits that she decided "to be especially hard on Kenney because he went from one thing to the next" and "was never still."  (Decl. Gelene Dotson.)  It "almost drove [her] crazy." (Decl. Gelene Dotson.)  She thought he "was emotional about things that did not matter.  He would cry and scream like there was no tomorrow." (Decl. Gelene Dotson.)

She physically punished him by beating him with a thin belt and degraded him verbally. Ernie remembered that Gelene "used to whip the boys over any little thing and whipped them all the time.  She had a bad habit of saying cruel things not just to me but to the boys, too." (Decl. Ernest Barrett.)  Gelene's niece by marriage "thought Gelene was mean, that she had a mean spirit" and that the way "she would talk to. . .kids was angry." (Decl. Kathy Trotter.) Children were "afraid of her." (Decl. Kathy Trotter.)  Kenny suffered "more verbal abuse from her than her other two children." (Decl. Kathy Trotter.)  Kenny 's neurologic impairments and his chaotic home life took their toll on his school work.  Gelene stated he "had a difficult time in school and was in special classes part of the time." (Decl. Gelene Dotson.)  Kenny  had difficulty almost immediately in school.  He failed reading and arithmetic in the first grade and was barely

able to keep pace with his peers.  He had difficulty learning to read.  (Decl. Gelene Dotson; Kenneth Barrett school records.)

Ernie "hardly had anything to do with [Kenny ) after the divorce, and everyone could see how much it hurt Kenny."  Even when Ernie made a semi- annual trips to town to see his sons, family reported he was insensitive to his children's needs.  He came "by to show off his new Corvette when his children did not have shoes or decent clothes to wear."  (Decls. Issac Barrett and Phyllis Crawford.)  Ernie's sister in law did not think Ernie was "a good husband or father. Ernie did not come around and visit his children the way he should have.  He was absent in their lives.  Ernie has always been for Ernie." (Decl. Ruth Harris.)  Ernie "went his way and let Gelene take care of the kids." (Decl. Ruth Harris.)

Ernie remembered that "Kenny kicked and screamed to stay" with Ernie and "did not want to go with his mother back to Oklahoma."  (Decl. Ernest Barrett.)  Kenny  "wanted to stay" with Ernie, but Ernie felt he "was not set up to take care of him and work." (Decl. Ernest Barrett.)

Gelene's emotional needs took precedence over Kenny .  Her sister recalled that Gelene "had a lot of problems, especially with alcohol and men" and those problems "affected Kenny badly." (Decl. Phyllis Crawford.)  Gelene brought different men into the house when Kenny was entering his teenage years, and "it was very confusing for him." (Decl. Phyllis Crawford.)   Gelene "seldom gave Kenny a kind word" and "screamed at him over anything." (Decl. Phyllis Crawford.)  Gelene once asked Phyllis to intervene and help her get Kenny  out of his room.  Phyllis and her husband went to Gelene's house and talked to Kenny .  Kenny  told them "he could not get his mom's voice out of his head.  The only time Gelene talked to him was

to scream." (Decl. Phyllis Crawford.)  Gelene's "ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and unpredictability.  She had a hard enough time dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood swings." (Decl. Steve Barrett.)  When Gelene "lost control of herself," she whipped the boys, but "there was no real parenting." (Decl. Steve Barrett.)

Gelene was harsher with Kenny , "verbally and physically," than she was with her other two sons.  (Decl. Steve Barrett.)  Gelene used a strap to whip Kenny, and Kenny "hated" it. (Decl. Steve Barrett.)  Kenny had a German shepherd that Ernie had given him, and the dog was very protective of Kenny.  When Gelene "would try to beat" Kenny, he would hide behind the dog and the dog would growl at Gelene  and not let her near him.  (Decl. Steve Barrett The dog was run over by a car.

Steve, Kenny 's youngest brother, lived at home with Kenny, Richard, and his mother, but found refuge and support with the extended family.  Steve, an educator and principal at a junior high school, has given great thought to understanding how he "was able to overcome many of the challenges" he faced and "how those challenges affected Kenny." (Decl. Steve Barrett.)

Steve and Kenny  "were exposed to vastly different environments and experiences" during their formative years due to Steve's much younger age.  (Decl. Steve Barrett.)  Steve  benefitted from the guidance, support, and structure of an extended family that "Kenny never experienced in his developmental period.  Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children." (Decl. Steve Barrett.)

Def's § 2255 Mot.                              214                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

While Gelene's move back to Sallisaw separated 12-year-old Kenneth Barrett from the closeness and love he longed for with his father, the move placed Steve in the middle of a "village. . .in an extended support structure" when he was in the second grade and Kenny was repeating eighth grade." (Decl. Steve Barrett.)  Steve was "literally surrounded by aunts, uncles, cousins, and most importantly" his maternal grandparents, Hugh and Hattie Dotson. Steve believes "another critical factor" is that Ernie. . . abandoned Kenny when Kenny most needed him" but that Steve, at the age of two, had no real relationship with Ernie.  (Decl. Steve Barrett.) Ernie's absence in Steve's childhood and adolescence was "replaced by attentive older men and women relatives who rooted [him) in their love and guidance."  (Decl. Steve Barrett.)

Steve also attributed his success to his academic ability and recognized that "Kenny had great difficulty with his education.  Kenny failed in school."  (Decl. Steve Barrett.) School became the focal point for Steve and provided "the value system" that was absent at home.  Steve developed close relationships with his extended family, and explained "it made all the difference in the world to have that support structure. It was a pivotal part" of his life, and he had "positive experiences and influences that Kenny never had."  (Decl. Steve Barrett.)

Gelene was unable "to have meaningful conversations about day to day problems, to figure out how to solve normal problems that arise in the course of every day life, or to tolerate the routine activity of growing boys."  (Decl. Steve Barrett.)  Steve once found "diary-type notes" of hers that "were very depressive and full of blackness and darkness."  (Decl. Steve Barrett.) Gelene "did not know how to respond to Kenny's special needs as a youngster with profound psychological problems."  (Decl. Steve Barrett.)

Kenny begged his father to allow him to live with him, and Ernie relented and "let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny

completed ninth grade." (Decl. Ernest Barrett.) Kenny resented Ernie's wife Diana and "it got the best" of Ernie, who "lost control when he sassed her" and "hit him pretty hard in the chest. (Diana Barrett, Marriage Certificate.) He went flying slamming against the wall." (Decl. Ernest Barrett.) After his father's assault, Kenny went back to Sallisaw and soon withdrew from school.

Gelene reported that Kenny "never got over" the divorce and believed that it "caused some of Kenny's problems." (Decl. Gelene Dotson.) She knew that "Kenny never adjusted" after the family moved back to Sallisaw when Kenny was in the seventh grade. (Decl. Gelene Dotson.) Kenny "got pretty depressed and lost interest in school." (Decl. Gelene Dotson.) Kenny's youngest brother Steve realized that Kenny "idolized Ernie." (Decl. Steve Barrett.) He could tell "how much Kenny missed [their) dad by the way he acted when Kenny was around him. Kenny made sure to stay in close proximity. . . Ernie was a god to Kenny." (Decl. Steve Barrett.) Extended family members knew that "Kenny never had much of a father," and "never had any guidance." (Decl. Ada Blount.)

Kenny had "a hard time with lessons" and repeated the eighth grade. (Decl. Ernest Barrett.) In the fall of 1976, at the age of 14, Kenny enrolled in eighth grade for the second time at Tommy Spear Junior High in Sallisaw. He was placed in special education classes in English and staff made "some adjustments to the curriculum" for him. [Kenneth Barrett School Records) At the end of the academic year, he showed improvement in two courses (math and social sciences) and decline in one course (science.) It was a very difficult year for Kenny, whose beloved grandmother, Ada Mae, died in 1976. (Ada Mae Barrett, Death Certificate.) Ada Mae "adored" him, and "[w]hen she died . . . Kenny was just 14. It was as if the only adult who ever cherished him had gone." (Decl. Kathy Trotter.) Ada Mae's death was

the hardest on Kenny "because his father had recently deserted him at the age he most needed direction." (Decl. Kathy Trotter.)

Kenny moved from Sallisaw to live with his father in Dunkirk, Indiana, and enrolled in the ninth grade at Jay County High School at the age of 15 in the fall of 1976.  His grades declined in three of the five subjects (general math, comm arts, and life science.) [Kenneth Barrett School Records) Kenny returned to Sallisaw, but "just couldn't make it in school, so he withdrew from school and went to work full time." (Decl. Ernest Barrett.)

When Kenny was 17, Kenny was assaulted and beaten by Sallisaw police officer John Philpot, who hit Kenny so forcefully, it broke Officer Philpot's hand. [FBI memorandum) The assault had long term consequences on Kenny who could not understand the reason for the assault.  Kenny had been arrested for "hot rodding, squealing his tires" when he was "out driving one of his souped-up cars." (Decl. Gelene Dotson.)  The incident only added to Kenny's already burgeoning paranoia. The traumatic impact of the assault on Kenny , then a manic-depressive, brain damaged youth with a low I.Q., directly affected the development of paranoid delusions that would cause him, almost 20 years later, and 12 years after he shot himself in the chest with a

shotgun, to fend off imaginary satellites or dirigibles that he thought were surveilling him.  (Decl. George Woods, M.D.)

**Onset of Mental Illness**

Kenny  entered late adolescence and young adulthood with modest expectations that were obliterated by the onset of major mental illness emanating from and exacerbated by his long standing neurologic deficits.  He battled "terrible mood swings" and periods of depression that lasted for days. He hoped that hard work would make his pain go away. It did not. He had

worked steadily since he left high school, and "his bosses liked him."  He was "a good worker, strong, and able" and was "proud of his work." (Decl. Gelene Dotson.)  By the time Kenny was 18, he worked on pipelines and oil rigs and traveled throughout Oklahoma and other states.

Soon, Kenny met and fell in love with a beautiful young girl, Abby, and they married in 1980 when he was 19 and she was almost 16. (Kenneth Barrett, Marriage Certificate) Their only child, Toby, was born December 1, 1980. [Toby Barrett, Birth Certificate)  Kenny and Abby's marriage was "rocky. . . and they were more unhappy than happy even though they loved each other."  (Decl. Gelene Dotson.)

Kenny "was far too mentally unstable" to live independently, so the young couple lived off and on with Gelene for the first few years of their marriage.  (Decl. Abby Stites.) Kenny 's relationship with his mother was complex, and although she resented his presence, she insisted that he join her when her friends came over and used drugs.  Kenny 's wife, Abby, worried about the effect such goings on would have on her baby, and she desperately wanted to move into their own apartment.  Abby reported that "Gelene made Kenny get up from bed and party with crack and pot." (Decl. Abby Stites.)  Gelene never treated "her other sons the way she treated Kenny." (Decl. Abby Stites.)  She and Kenny had a "terrible relationship." (Decl. Abby Stites.)  Gelene remarried and divorced a local bar owner, and was frequently "depressed" and "intoxicated." (Pulice v. Barrett, Application for Temporary Order; Gelene Dotson, Marriage Certificate to Paul Dudley; Gelene Dudley, Divorce Proceedings.)

Kenny tried "to bury his problems under constant work and activity." (Decl. Steve Barrett.)  Kenny measured his life by how much he could work, but he was too depressed to keep a steady work schedule on his own.  Depressive episodes overtook him, and he would "get real depressed and sleep all the time." (Decl. Abby Stites.)  The only antidote to his

depression was drugs.  His wife knew that "he smoked a lot of pot, but without it he never got motivated. He turned to drugs to make himself feel better." (Decl. Abby Stites.)  He used methamphetamine as an antidepressant and discovered that he could work well under its influence.  Abby observed that Kenny  "would work hard and then sleep all the time. . . .[He) did the drugs to make himself feel better, because otherwise he would just sleep." (Decl. Abby Stites.)

Kenny 's behavior easily fit the pattern of bipolar mood disorder, and his family knew he was "deeply troubled." (Decl. Kathy Trotter.)  His wife thought he was "like a manic depressive, hot one minute and depressed and even immobile the next." (Decl. Abby Stites.) Kenny had "racing thoughts." (Decl. Abby Stites.)  He did things without thinking and "then regretted them" (Decl. Abby Stites.)  Abby knew that Kenny  "did not act the way normal people act" and that he "got swept away in his emotions." (Decl. Abby Stites.)  When Kenny lost control of himself, he hit Abby and later "would come back crying, begging" Abby to take him back. (Decl. Abby Stites.)  He was genuinely "remorseful" and would "be good as he could be—he would go the extra mile,. . . . but he could not keep it up." (Decl. Abby Stites.)

Kenny 's cousin, Brandy recognized Kenny 's bipolar mood disorder created severe problems for his marriage.  Brandy compared Kenny 's behavior to her own behavior and reported that her "mood swings" made it "hard" on her husband because she "used to attack him, kind of the way Kenny and Abby fought." (Decl. Brandy Hill; Brandy Hill, Oklahoma Department Mental Health and Substance Abuse Service.)

Kenny  and Abby separated and reunited frequently; his mood fluctuations and deep depressive episodes made him irritable, agitated, paranoid, and suspicious.  During one of

the separations, he went to his father's home where Ernie found work for him.  Ernie described

his observations of the effect of Kenny's mental impairments on his behavior:

> Kenny had bouts of depression and did things that did not make any sense. Sometimes he would be very down but other times he would be manic, always on the go and upbeat.  Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it.  In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me.  I got him a job with Kerr Glass and he was making real good money.  Kenny had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve.

(Decl. Ernest Barrett.)

Abby knew that Kenny "had mental issues" and tried to persuade him to seek

psychiatric treatment.  (Decl. Abby Stites.)  Abby recognized that she "was the only stable thing

he ever had in his life" and that she "kept him together."  (Decl. Abby Stites.)  She opposed his

drug use but stayed with him in their fitful marriage to try "to keep him from falling off the deep

edge."  (Decl. Abby Stites.)  Kenny's brother reported, "[a]s troubled as Kenny was, he worked

all the time."  (Decl. Steve Barrett.)  Kenny 's use of drugs allowed him to keep working, despite

his serious mental illness.  Kenny increased the amount of drugs he ingested in direct response to

the symptoms of depression he experienced; his goal was very simple.  He needed

methamphetamines in order to work.

Abby lost battle after battle with Kenny's bipolar mood disorder.  In 1986, Kenny

attempted suicide and nearly succeeded in killing himself with a shotgun blast to his chest.

(Kenneth Barrett, Sequoyah Memorial Hospital Records, 1986.)  Kenny's brother Steve was

home at their mother's and witnessed Kenny's suicide attempt:

> In a terrible episode of depression, he tried to kill himself.  I was home with Monty and Podgy in the living room watching Carl Sagan kind of stuff on

television.  Kenny came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenny leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. . . .Kenny was in and out of it, mumbling, making no sense.  Kenny was in ICU in Sparks Medical Center in Fort Smith for 11 days.

(Decl. Steve Barrett.)

Abby convinced Kenny to see a psychiatrist after he survived the shooting, and he briefly took Elavil and Ascendin.  His dramatic mood swings continued to be "like a roller coaster."  (Decl. Abby Stites.)  Elavil was extremely helpful and made a big difference in Kenny, but- he discontinued his treatment.

Kenny continued to decline and was involuntarily committed to Eastern State Hospital October 8, 1986 "as a result of mental disorder or impairment by chronic alcoholism or drug abuse" that created "an immediate likelihood of serious harm to self or others."  (Kenneth Barrett,  Eastern State Hospital Records; Kenneth Barrett, Record of Mental Health Proceeding.) The admitting psychiatrist provisionally diagnosed Kenny with  "depressive neurosis with suicidal potential extremely high."  (Kenneth Barrett Eastern State Hospital Records) The nursing assessment reported that Kenny did "not recognize problems."   (Kenneth Barrett Eastern State Hospital Records) Kenny had a nine year history of polysubstance abuse.  Kenny hand wrote on a printed questionnaire, "I wish I was back home in the woods."   (Kenneth Barrett Eastern State Hospital Records)

On mental status examination, Kenny was noted to be "labile" and to laugh "inappropriately at times."  (Kenneth Barrett  Eastern State Hospital Records)   His insight and judgment were impaired. Staff found Kenny to be "courteous, cooperative."  (Kenneth Barrett Eastern State Hospital Records) Kenny acknowledged that he had "a hot temper."  (Kenneth

Barrett  Eastern State Hospital Records) Kenny's highest level of functioning in the preceding year was "poor." (Kenneth Barrett  Eastern State Hospital Records)   Kenny reported being anxious and depressed.  He was paranoid and blamed his wife and mother for his being hospitalized.  Kenny was discharged early on October 17, 1986 to his cousin.  His discharge summary noted he "wants to return to work."  (Kenneth Barrett  Eastern State Hospital Records)

Kenny was not able to return to work.  Gelene arranged for his second cousins to "pick Kenny up from Eastern State after they had him committed."  (Decl. Nona Reich.)  Nona described Kenny's preoccupation with Abby:

> He stayed with me in Kellyville that first week. It was apparent how much Kenny loved Abby and he could not get his mind off her.  He was very paranoid, being without her. Gelene hoped that by staying with us he would be in a new environment and do better.

(Decl. Nona Reich.)

Kenny  sustained repeated head injuries from his work and from car accidents.  He was preoccupied and distracted by depression and mania and unable to focus his attention.  He applied for disability due to his mental impairments, and was denied but evaluators found him to be "moderately depressed" and periodically unable to "think clearly."  (Kenneth Barrett Social Security Administration Determination of Eligibility) Kenny made repeated trips to the hospital after falling down stairs, sustaining a contusion to his right periorbital region of his head, being involved in a motor vehicle accident, experiencing rib and chest pain, and suffering a rash "all over."  (Kenneth Barrett Sequoyah Memorial Hospital Records)

When Kenny 's marriage ended after 14 years, he "never recovered."  (Decl. Abby Stites; Kenneth Barrett, Divorce Proceedings.)  He and Abby had wanted the marriage to work for the sake of their son, but Abby was unable to tolerate the irritability, agitation, paranoia, and

severe mood swings that came at unpredictable times and derailed their lives.  By the end of their marriage, Abby "felt like (they) were more like brother-sister than wife and husband because (she) was always bailing him out of trouble and taking care of him" and "trying to keep up with his mood swings."  (Decl. Abby Stites.)  Kenny was too impaired to take care of Abby, and she recognized that "he was mentally ill."  (Decl. Abby Stites.)  It pained Abby to leave Kenny because "(t)here were times he could be good. . . .and would try so hard to be good.  (Decl. Abby Stites.)  She also knew that "he could not function without her."  (Decl. Abby Stites.)

After their final separation, Kenny spiraled downward, as Abby had predicted. His multiple impairments made it impossible for him to function independently.  He was hospitalized January 20, 1995, given "10 mg of Haldol IM,"  and diagnosed with bipolar mood disorder after telling hospital staff, "I'm losing my mind."  (Kenneth Barrett, Wagoner Community Hospital) Hospital staff noted he was "extremely agitated."  (Kenneth Barrett, Sequoyah Memorial Hospital) During his three day hospitalization, staff reported he was "very agitated" and not able to sleep "for a few days."  (Kenneth Barrett, Wagoner Community Hospital)  He demonstrated "lack of concentration" and "rapid thought process."  (Kenneth Barrett, Wagoner Community Hospital)

Kenny was discharged to his mother with "outpatient follow-up at the Bill Willis Community Mental Health,"  but he did not follow through. (Kenneth Barrett, Wagoner Community Hospital; Bob Willis Community Mental Health Center; Muskogee County Jail) Kenny "moved back home" and "built a little shack" next door to his mother's trailer.  (Decl. Steve Barrett.)  His brother visited it and observed that the shack was "almost Waldenish in its own way."  (Decl. Steve Barrett.)  The shack was constructed from discarded and used materials, did not have electricity or plumbing and only had "the essential stuff."  (Decl. Steve Barrett;

Decl. Gelene Dotson and Attachment.)   Kenny "ran an electrical cord from (Gelene's) trailer to

his shack for electricity." (Decl. Gelene Dotson.)  Gelene prepared his meals for him, and he ate

at her trailer.   Kenny 's son, Toby, visited often, but knew that his father had "some problems

inside his head" and "always thought he had a chemical imbalance." (Decl. Toby Barrett.)  Even

as a teenager, Toby " knew something was wrong with him because he had mood changes that

were not normal." (Decl. Toby Barrett.)  Toby observed that his "dad could be in the best of

moods one minute, then the worst" who was "a very paranoid and "a very scared person." (Decl.

Toby Barrett.)

Everyone in the family and Kenny 's ex wife knew he could not "live on his own."

(Decl. Gelene Dotson.)  During his and Abby's frequent separations, "Kenny always came home"

to his mother.  (Decl. Gelene Dotson.)  An aunt explained that Kenny's "only security was with

Gelene because he did not have anybody else" to care for him.  (Decl. Ruth Harris.)  Kenny's son

who had to come to terms with his father's mental illness "had to bring things to him" after his

father "stopped leaving his property." (Decl. Toby Barrett.)

Gelene "knew he had serious mental problems" but "hoped if he lived close to

(her) and just worked on his cars and fixed things for people, he might be able to make it."

(Decl. Gelene Dotson.)  He stayed more and more to himself and became more and more

paranoid, but he was not a loner at all because many friends visited him.  (Decl. Rick Lunsford,

Brandy Hill and Sean Hill.)  Kenny told a neighbor, Alvin Hahn, "he thought there were satellites

watching him." (Decl. Alvin Hahn.)

As Kenny 's paranoia increased, so too did his dependency on family.  His friends

knew his paranoia was in full force and was the reason he "hardly left his property for several

years." (Decl. Shawn Hill.)  His aunt Phyllis understood that he "was never able to be

independent as a grown man.  His emotions got in the way of his being able to live too far from

home."  Phyllis described an incident that explained how he relied on family when his emotions

overcame him:

> [A] couple of years before the incident, Kenny had run to my house in tears,
> crying,  "The laws are after me. They're coming! What should I do?" I told him
> we were going to walk out of the house and that he was going to get in the police
> car and that's just what he did. Kenny had been afraid to go to jail because at that
> time the papers had said someone had been beaten to death at the jail.

(Decl. Phyllis Crawford.)

Despite the limitations of his mental impairments, Kenny "would give you the

shirt off his back if you needed it."  (Decl.  Phyllis Crawford.)  He "tried to stay close to home,

always worked hard and took pride in his work."  (Decl.  Phyllis Crawford.)  Kenny's family and

friends uniformly reported that Kenny was not violent or dangerous to them.  His great aunt Ada

stated, "I never felt threatened by Kenny. He did not bother me any, but I worried about him."

(Decl. Ada Blount.)  Janice, his cousin, grew irritated and inpatient with Kenny on more one

occasion for playing his music too loud and called the police to Kenny's, but she loved Kenny

and "was never afraid of him."  (Decl. Janice Sanders.)  Kenny's maternal aunt Ruth found him

to be "sweet person, nice, and respectful" whose drug use "may have hidden his mental illness."

(Decl. Ruth Harris.)  Ruth and her husband, who visited Kenny "to talk about the Bible and how

he could straighten out his life" were never afraid of him" and did not "believe he would

intentionally hurt anyone." (Decl. Ruth Harris.)  Relatives visited and talked with Kenny.  His

second cousin Nona, who "got along wonderfully" with him counseled him about religion. (Decl.

Nona Reich.)  Nona described the last conversation she had with Kenny:

> The last conversation I had with Kenny was in 1995-96 when my husband at the
> time and I visited Gelene.  Kenny came by to visit. It was clear to me that Kenny
> was studying life and thinking deeply, trying to figure things out. I remember he

said, "'Aunt Nona, how do you know there's a God?" I took him to the window and said, "See how beautiful that is." He agreed but asked me "Why can't we see God?" I tried to explain to him that the Bible says we should worship God in spirit and we will see His truth.

(Decl. Nona Reich.)

Friends and family thought at times Kenny would be alright. A friend and neighbor reported that "Kenny had a reputation in the community as an excellent mechanic who was fair." (Decl. Rick Lunsford.) A cousin, Brandy Hill, remembered that "Kenny was very generous, and his auto repair business was getting more solid every day. People would pay him hundreds of dollars in cash to replace an engine or a transmission." (Decl. Brandy Hill.) Despite Kenny's mental illness, his son Toby had "a lot of fond memories of . . . going canoeing, and helping him work on cars." (Decl. Toby Barrett.) Toby was intimate with Kenny's fears but knew that Kenny "was not dangerous," and Toby "was not afraid of him." (Decl. Toby Barrett.) Toby thought that Kenny "did the best he could" and saw that his father "had a tender side to him" that helped "offset the pain of having a dad with mental problems." (Decl. Toby Barrett.)

The family hoped that Kenny could recover. His mother described their observations:

As time went on, he did a little better, built a garage and fixed everything from appliances to cars, trucks, and trailers for friends and neighbors. He stayed more and more to himself, though, and did not like to leave the property. Friends bought him food and went grocery shopping for him. He ate most of his meals at my trailer, and I cooked for him. I hoped and prayed he was going to make it. At least, I believed, with him living right next door, he was safe and I could keep an eye on him. We had our arguments; that's for sure. He was so paranoid and crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

(Decl. Gelene Dotson).

### b.   Kenny Barrett's mental illness and organic brain dysfunction

If trial counsel had followed prevailing norms and provided experts the documented evidence of Mr. Barrett's background and character Mr. Barrett's jury would have heard and considered extensive evidence of mental illness and neurologic impairment.  As explained by Dr. Young:  "The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex."  (Decl. Myla Young at ¶ 28.)

Dr. Young explains that the areas of the brain in which Mr. Barrett experiences dysfunction are important because of their functions:

> The frontal cortex is comprised of three general cortices—motor cortex, premotor cortex, and prefrontal cortex.  The motor cortex provides a mechanism to control execution of movement of limbs, hands, feet and fingers.  The pre-motor cortex selects and carries out the movements to be executed including repetitive movements and actions in response to external cues.   The pre-motor cortex also primarily mediates information that is communicated by the parietal cortex, cingulated cortex, and basal ganglia.  The prefrontal cortex allows the individual to accommodate complexity and accommodate stress, and is responsible for thinking and acting, referred to as "executive functioning."  Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received.   More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation.  Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders.  The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.
>
> [¶]    The temporal cortex encompasses the primary auditory cortex, secondary visual cortex, and structures of the limbic system.  Primary functions of the temporal cortex are both verbal and visual memory and learning, processing speech sounds and speech emotional tones, and interpreting speech sounds, tones

and emotional meaning.  The temporal cortex is also responsible for processing visual information and the ability to recognize facial expressions, and interpret facial emotions.  Significant impact of temporal cortex dysfunction is particularly implicated in amnesia, hyper-religiosity, hypergraphia, fear, paranoia, impulsiveness and aggressive outbursts in addition to the previously described cognitive disabilities.  Brain functioning associated with frontal and temporal cortices has been known, is described and is documented in multiple sources for many years.  Two resources which provide a representative description of frontal and temporal brain functioning are Kolb & Wishaw, 2003 and Grant & Adams, 2009.

(Decl. Myla Young, Ph.D. at ¶¶ 26-27.)

Dr. Young's findings are based on approximately 16 hours of neuropsychological testing including intelligence testing, clinical interview including a history, review of educational records, and reviews of medical and psychiatric treatment.  As explained by George W. Woods, Jr., M.D., a psychiatrist who also examined Mr. Barrett:

> neuropsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results.

(Decl. George W. Woods, Jr., M.D. at ¶ 62.)

The testing data and congruent findings on psychiatric study show Mr. Barrett experiences dysfunction in areas of his brain

> that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing

Def's § 2255 Mot.                              228                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use of hindsight and foresight in the direction of current processing.  Mr. Barrett suffers significantly impaired functioning in all these domains.

(Decl. George W. Woods, Jr., M.D. at ¶ 58.)

In addition to these neuropsychological deficits (and others detailed in Dr.

Young's declaration), Mr. Barrett suffers from severe mental illness:

Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

[¶]      Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).  Lezak emphasized the fluid nature of executive functioning and how dependent the cognitive and emotional aspects of functioning were on the "executive." Baddeley grouped these behaviors into cognitive domains that included problems in planning,organizing behaviors, disinhibition, perseveration, reduced fluency, and initiation (Baddeley 1986).
Baddeley coined the term "dysexecutive syndrome." Each component of executive functioning has added to the array of cognitive processes, which include maintaining a problem-solving set for goal-directed behavior, interference control, flexibility, strategic planning ability, and the ability to anticipate and engage in goal-directed activity (Denckla 1994). The definition of executive function is encompassed by actions fueled by conceptualizations, such as the ability to filter interference, engage in goal-directed behaviors, anticipate the consequences of one's actions, and the adaptive concept of mental flexibility (Luria 1969; Luria 1980; Stuss and Benson 1986; Denckla 1996; Goldberg 2001). The concept of morality, ethical behaviors, self-awareness, and the idea of the frontal lobes as manager and programmer of the human psyche are also included." (Ardila et al, Executive Function, Medlink Neurology, 2009)

(Decl. George W. Woods, Jr. M.D. at ¶¶ 66-67.)

Dr. Woods explains that people with frontal lobe damage, and people with Bipolar Disorder share suffering in significant areas of daily functioning. "Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become incorrect." (Decl. George W. Woods, Jr., M.D. at ¶ 59.)

> Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

(*Id.* at ¶ 60.)

Mr. Barrett's case would have presented the jury with extraordinary evidence to support these diagnoses. Mr. Barrett's personal and family history, as set forth *supra* and as documented in the exhibits to this Motion, is replete with incidence of major mental illness, including Bipolar Disorder. A qualified clinician would have explained the significance of this remarkable history to jurors.

> [¶] Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult. The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

> [¶] The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan

effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

[¶] Mr. Barrett's family history, the consistency of emotional dysregulation beginning early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

(Decl. George W. Woods, Jr. M.D. at ¶¶ 63-65.)

In other words, "Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial." (*Id.* at ¶ 68.)

If trial counsel had informed themselves regarding Mr. Barrett's history, and consulted relevant experts, the jury too would have been informed that

[¶] Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.

* * *

[¶] Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings . . . . He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶] Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶] He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual

Def's § 2255 Mot.                          231                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]     Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]     Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]     Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]     Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]     My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the

environment. The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Decl. George W. Woods, Jr. M.D. at ¶¶ 69-78.)

Courts, including the Supreme Court, have repeatedly held that evidence of mental impairment such as the devastating history Mr. Barrett has experienced, when it is kept from the jury due to counsel's unreasonable omissions, undermines confidence in the verdict. That should be this Court's judgement here.

### c.    The prosecution's exploitation of trial counsel's deficient performance

Not surprisingly, the inaccurate, incomplete and misleading portrayal of Mr. Barrett and his background and character given by the extremely superficial and unprofessional "mitigation case" that was placed before the jury was ripe fodder for ridicule by the prosecutors in closing arguments. Because of trial counsel's abysmal failures to investigate, prepare and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Mr. Barrett was simply a cold, calculating and unrepentant killer who had little if anything going for him in the sentencing balance. (R. 5340-42, 5402, 5404, 5405-09, 5411-13, 5420-22). Because the jury never learned of Mr. Barrett's abusive, neglected, chaotic and troubled upbringing; his lengthy history of severe mental illness; the extensive history of mental illness in his family; his low I.Q.; and, despite it all, his good and positive qualities, the prosecution had a field day depicting Mr. Barrett as a prime candidate for the death penalty.

Going down the list of the few, bare-bones mitigating circumstances that were instructed upon based on the evidence presented, AUSA Littlefield noted the jury had been told Mr. Barrett was simply a "father," which involved no more than a biological process. Left unsaid

Def's § 2255 Mot.                    233                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

was what kind of father he was.  The prosecutor also ridiculed the claim that Mr. Barrett was a loved son and stepson, remarking that what was missing was any feelings Mr. Barrett had for his parents.  It was pointed out that Ernie Barrett had not seen his son for two years before the shooting of trooper Eales, and that his stepmother had only had contact with him after he was in jail.  As to Mr. Barrett's relationship with his mother, Gelene Dotson, the prosecutor pointed out that they had a tumultuous relationship with frequent arguments, fights and threats between them.  Mr. Littlefield remarked that Mr. Barrett's parents cared so much for him that they could not tell the difference between him being "hyper" and being "hyped up" on drugs.  As to Mr. Barrett being a good neighbor and friend, the prosecutor reminded the jurors that all they heard was that he fixed cars cheaply.   Dismissing the mitigating circumstance that Mr. Barrett's execution would have an impact on his child, family and friends, the prosecutor was quick to point out that since Toby Barrett had not testified, there was no evidence that Mr. Barrett's death would have any negative impact on his own child.  Indeed, the only testimony regarding the impact of Mr. Barrett's execution on his family came from his stepmother, Doris Barrett, who would no longer be able to visit Mr. Barrett in prison.  Making short  work of the claim that Mr. Barrett had expressed remorse, Littlefield told the jury that Mr. Barrett only told his mother that he wished things had turned out differently.  This ambiguous statement was used as a springboard for the prosecutor to argue that by this, Mr. Barrett simply meant that he was sorry he had gotten caught and was prevented from "killing more of the bastards."  Finally, the "catch-all" instruction on any other factors the jury might find to be mitigating opened the door for more negative characterizations of Mr. Barrett, whom the prosecutor described as having dropped out of school because he did not want to get a haircut; as a user and seller of methamphetamine; as a wife-beater; and as a man so unconcerned about the safety of his son that he allowed him to remain on

the property knowing full well that a police raid, which was going to be met by lethal force, was imminent.  (R. 5354, 5356).

Since virtually nothing of Mr. Barrett's background, history and upbringing was placed before the jury by trial counsel, AUSA Littlefield was able to portray Kenneth Barrett as simply a bad and unrepentant seed when compared to his brother Steven Barrett, who became a successful educator and who was raised in the same home as Mr. Barrett.  (R. 5358)

Picking up the theme that Mr. Barrett's case in mitigation was pitifully anemic, United States Attorney Sperling reminded the jury that Sequoyah County Court Clerk Maudeen Vann testified that Abby Barrett had filed seven domestic abuse complaints against Kenneth Barrett.  Abby Barrett was portrayed as a pathetic, abused wife, helpless at the hands of a husband who was simply a mean person, a man who had stalked her and threatened to "blow [her] head off."  Kathy Trotter was dismissed as a witness who knew very little about her cousin, Mr. Barrett, since she stated she was ignorant of his drug activities, his penchant for being armed, his domestic violence record, and was unaware of his "threats" to law enforcement, as testified to by the seven snitch witnesses.  Mr. Barrett's "helpfulness," for all the jury knew, was limited to fixing a few cars.  Just as Littlefield had done, Mr. Sperling contrasted Mr. Barrett with his brother Steven, a success story who was raised by the same parents and in the same environment, but chose to take a different path than Kenneth Barrett, the knowing, violent criminal:  "How he [Kenneth Barrett] must envy his hard working, highly achieving brother's success."  Mr. Sperling pointed out that Mr. Barrett had only sporadic contact with his mother until his arrest, hinting that he was a bad and neglectful son.  Ernie Barrett, being the good father that he was, gave Kenneth Barrett several chances to succeed at work, but Kenneth Barrett simply chose to "[blow] them."  Doris Barrett was loyal to her stepson, despite his misbehavior in jail, the implication

being that her loyalty was more a tribute to her than anything positive or redeeming about Mr. Barrett. Whatever Mr. Barrett had done for his family was vague and undetermined, and was in any event far outweighed by the crimes he had committed. If the jurors were tempted to feel any sympathy for Mr. Barrett's family at all, they should remember that Mr. Barrett abandoned his family by his own conduct. Mr. Sperling stated that Mr. Barrett had "victimized" his own family by making them serve as "props" or witnesses on his behalf in the penalty phase. Concluding his remarks on Mr. Barrett's mitigation case, Mr. Sperling told the jury that Mr. Barrett had paid for his membership among "the worst of the worst." Mr. Barrett was simply a murderer who had killed remorselessly, wantonly, and selfishly, a man who was devoid of sympathy or empathy for his victim. (R. 5417-20).

### 3.  Conclusion

The record and extra record evidence establishes that Mr. Barrett's trial counsel first possessed some information about Mr. Barrett's background in late May 2005. By the beginning of July, trial counsel were searching about for a mitigation specialist. In August, trial counsel learned it was essentially too late to develop a social history and mental health diagnoses informed by that history. In September, the month the trial began, trial counsel were again searching about for information they should have had the previous December. The evidence shows trial counsel never contacted the mitigation specialist the trial court authorized, and never obtained all the records of the state-court mitigation investigation. Trial counsel's statements on the record establish that they made no effort to obtain a psychiatric or psychological evaluation of Mr. Barrett, and merely repackaged, at the last possible minute or later, the risk assessment done years earlier at the request of state-court counsel. This evidence more conclusively establishes deficient performance than any previously found in *Rompilla*, *Wiggins*, or *Williams*, *supra*.

The evidence of prejudice is greater, too. Due to trial counsel's inattention, the jury was uninformed of Mr. Barrett's background, the desperate alcoholism of his parents, his father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the psychologically damaging harsher treatment he experienced from his mother, his father's abandonment of the family, moving from place to place due to the parent's inability to sustain a life, and finally landing in Sequoyah County. There Kenny Barrett's head injuries and genetic vulnerability to mental illness overtook him. He developed Bipolar Disorder and exhibited the symptoms of his organic brain damage. Despite the mania and paranoia, the hypervigilence, hyperactivity, and disinhibition, his family, friends, neighbors, bail bondsman, and even the local sheriff, all knew that Mr. Barrett would have gone peacefully into custody if someone he knew had simply asked him to. The overwhelming weight of the evidence from both stages of a competently tried case would have shown the jury that law enforcement made tragic errors in assessing the situation. Just as Trooper Eales should not have been put in danger, Mr. Barrett should not have been sentenced to death.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 3.     Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Expert and Investigative Assistance under 18 U.S.C. § 3006A**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett had a due process right to the assistance of investigators and experts qualified and sufficiently compensated to "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). Other similarly situated defendants in federal death penalty cases received such assistance as the trial court withheld from Mr. Barrett.

Mr. Barrett had a constitutional right to the expert assistance necessary to counter the prosecution's evidence and to develop defense evidence relevant to both stages of trial. *Ake v. Oklahoma*, 470 U.S. 68, 71 (1985); *Tuggle v. Netherland*, 526 U.S. 10 (1995) (*per curiam*); *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000); *Dunn v. Roberts*, 963 F.2d 308 (10th Cir. 1992); *Liles v. Saffle*, 945 F.2d 333 (10th Cir. 1991), *cert. denied*, 502 U.S. 1066 (1992). Mr. Barrett also had a statutory right to such assistance, pursuant to 18 U.S.C. §§ 3006A and 3599(a)(1)(A), 3599(f), and 3599(g). *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985). Congress has provided that, in capital cases, the "defendant shall be allowed, in his defense to make *any proof* that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution." (18 U.S.C. § 3005 [emphasis added]). Mr. Barrett therefore had a right, as secured by statute, the Due Process and Equal Protection Clauses, to the tools necessary to build a defense, including expert assistance, at the same level and to the same extent as provided or otherwise available to similarly situated persons.

The trial court violated Mr. Barrett's constitutional and statutory rights by denying him expert assistance that was lawful, necessary, and appropriate under the circumstances of the case. The types of lawful witnesses to which the trial court denied Mr. Barrett fair access included a psychiatrist, neuropsychologist, psychologist, mitigation specialist, ballistics expert,

independent fact investigator, an independent expert on SWAT team practices, a metallurgist, a drug analyst, crime scene reconstruction expert, and a jury consultant.  The complete or partial denial of these expert and investigative resources was prejudicial both individually and in combination.

In addition to the denial of expert and investigative assistance afforded other capital defendants, the trial court denied Mr. Barrett and his counsel access to transcripts of pretrial hearings, including hearings in which witnesses testified who would later testify at trial. (Order filed 3/18/05 (Doc. 97) at 6-7.)  Mr. Barrett was plainly entitled to those transcripts pursuant to Chapter 2, section 2.27, and Chapter 3, section 3.12(A) of the Guidelines for the Administration of the Criminal Justice Act.  Effective trial counsel, or the trial judge, should have known that it was unnecessary for counsel even to seek reimbursement for transcripts as the court reporter would normally be independently compensated through the Criminal Justice Act. The trial court's decision to reject these Judicial Conference guidelines was arbitrary and capricious.  The error was particularly prejudicial because it denied or delayed Mr. Barrett's trial

counsel access to the trial court's *ex parte* communications with the prosecutors until it was too late.  *See* Claim 1, *supra*.

Mr. Barrett had a history psychiatric treatment, including involuntary hospitalization and forced medication with psychotropic drugs. (Decl. George Woods).  Trial counsel were aware, or should have been aware, of this history. (*See* Doc. 208; Eastern State Hospital Records of Kenneth Barrett; Muskogee County Jail Medical Records of Kenneth Barrett; Decl. Roseann Schaye).  In addition, Mr. Barrett had a history of illicit drug use and of head injuries.  Furthermore he has a multi-generational predisposition to developing serious

Def's § 2255 Mot.                        239                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

mental illness, including the bipolar disorder for which he was medically diagnosed prior to the events in question. These factors, together with his developmental and trauma history indicated the forensic appropriateness of performing a comprehensive neuropsychological evaluation to assess the presence and effects of brain dysfunction which, again, had a medically indicated onset prior to his arrest. (Dec. Roseann Schaye; Dec. Myla Young; Dec. George Woods). Counsel requested the assistance of a neuropsychologist to perform testing, as well as of a medical doctor to explain the significance of this combination of medication, other drugs and injuries, including the significance of any discontinuation of treatment. Nonetheless, the trial court would permit Mr. Barrett's counsel the assistance of a psychiatrist or a psychologist, but not both. (Order filed 3/18/05 (Doc. 97).

In light of the information known or available to Mr. Barrett's trial counsel, prevailing norms of capital defense practice required that they consult with experts whose training and experience were appropriate to addressing Mr. Barrett's history and the needs of the litigation. The appropriate experts included a medical doctor who could diagnose and explain the functional impact of Mr. Barrett's mental disorders, a neuropsychologist who could determine the location, nature and severity of Mr. Barrett's probable brain dysfunction, and a mitigation specialist qualified to gather data in a manner consistent with the clinical protocols of mental health professionals when considering social history and medical information in the course of forming their opinions. (Decl. Richard H. Burr dated 4/4/05 (Exh. C to Doc. 107) at 4, 8). To the extent trial counsel failed to apprise the court of the specific need for psychiatric assistance, or the assistance of any other expert or investigator, their conduct fell below prevailing professional norms. (ABA Guideline 10.4(C)(2)(a), as soon as possible after designation of lead counsel, defense team should include a mitigation specialist, fact investigator,

Def's § 2255 Mot.                          240                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

and a person "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments"; ABA Guideline 10.11(F)(2), counsel have duty to seek appropriate expert assistance). *See also* Claim 2, *supra*.

Trial counsel informed the trial court that the court's refusal to permit more than one mental health professional to assist in Mr. Barrett's defense was contrary to law, the Judicial Council's Guidelines for the administration of the Criminal Justice Act, and the practice of district courts in numerous other federal death penalty cases with similar circumstances. (Docs. 107, 112; Decl. Richard H. Burr). "The standard practice in federal capital trials is to provide the services of more than one mental health expert." (Decl. Richard H. Burr, Exh. C to Doc. 107). Counsel also informed the court that authorization for a single expert at the cut rates permitted by the court made it impossible to retain an expert competent to provide the necessary assistance, and that the court's authorization was inadequate to develop defense evidence or to rebut the prosecution evidence at both stages of trial. (Docs. 107, 112; Decl. Richard Burr).

The court's denial of psychiatric assistance for Mr. Barrett's defense was prejudicial. As stated in the attached declaration of George W. Woods, M.D., a psychiatrist retained at the time of trial would have provided Mr. Barrett with evidence to rebut the prosecution's theory of malice aforethought and intent, and would have provided abundant mitigation evidence. *See* Claim 2, *supra*.

In addition to the outright denial of psychiatric assistance, the trial court arbitrarily denied funding for all expert and investigative resources that were necessary for Mr. Barrett to receive adequate representation. *(Compare* Doc. 51 *with* Order filed 3/18/05 (Doc. 97)). Contrary to Judicial Council Guidelines, and the ABA Guidelines, contrary to the Supreme Court's recognition that death penalty cases entail a higher level of due process, and contrary to

the tendency of experts, investigators and other paraprofessionals to charge more for the more exacting work required by capital cases, the trial court consistently based its funding decision on a comparison to non-capital cases in the Eastern District. (Order filed 5/5/05 (Doc. 128) at 3 n.1, 4, 6.)

Mr. Barrett's counsel demonstrated the need for a psychologist to assist in preparation of the defense. *(See* Order filed 3/18/05 (Doc. 97) at 3.) Counsel sought this expert for purposes similar to those envisioned by the Government in retaining Jim Horn. *(See* Doc. 50 at 5-6.) Counsel informed the court that a psychologist could not be retained for less than $150.00 per hour, and estimated 60 hours would be needed (Doc. 50 at 5-6), but the court limited the defense to 40 hours at $100.00 per hour. This was despite the fact that the court had been informed that this reduced hourly rate was 30-60% below the hourly rate of $150-250 authorized by federal courts for such services in death penalty cases. (Dec. Richard H. Burr, Exh. C to Doc. 107, at 8). The court gave no reason for this restriction and cited no information upon which the court could have found that any competent psychologist would have worked for the approved rate.

Mr. Barrett specifically sought the assistance of a psychologist who had assisted in the preparation for trial, and testified in the penalty trials, of other federal death penalty defendants. (Doc. 107). That psychologist had been compensated in other similar cases at a rate of $270.00 per hour, and counsel advised the court that he could complete his work in 30 hours. *(Id.* at 3-4.) The court denied the request without explanation.

Mr. Barrett sought the assistance of a mental health expert who was competent to diagnose organic brain dysfunction. (Doc. 50 at 8). Counsel justified this request with the findings of prior investigations, including that Mr. Barrett had used drugs known to cause brain

Def's § 2255 Mot.                                    242                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

damage, and that he had suffered significant head injuries during his life. *Ibid.* Except to the

extent the assistance of such an expert was included in the authorization for a psychologist, the

court denied this request without explanation. (Doc. 97 at 3). This summary denial was highly

prejudicial to Mr. Barrett. As the attached declaration of Myla Young, Ph.D., shows, Mr.

Barrett's history of head injury resulted in significant impairments in his functioning. *See* Claim

2, *supra*.

Mr. Barrett's counsel, in consultation with a mitigation specialist, Federal Death

Penalty Resource Counsel, and the Federal Defender, concluded that a mitigation specialist

would require more than 333 hours and $5,000.00 in travel costs. Counsel and the mitigation

specialist based this estimate on the knowledge gained in a preliminary investigation conducted

before Mr. Barrett's first state-court trial. (Docs. 50, 107). A mitigation specialist is an essential

member of the team in a capital case. (ABA Guideline 10.7.) Without explanation, the court

limited the mitigation investigation to 100 hours and no travel.[46] As resource counsel informed

the court at the time,

> The number of hours requested by the defense is well below average. The average
> number of hours worked by mitigation specialists in federal capital cases is 600
> hours. In a number of cases, mitigation specialist services have exceeded 1000
> hours. Investigating a client's life history thoroughly - through gathering and
> reviewing documents and interviewing scores of witnesses who are often difficult
> to find - and working with counsel and other experts to develop the themes of
> mitigation and the way in which mitigation will be presented, is extremely labor
> intensive. The modest number of hours requested by the defense here reflects the
> hope that the mitigation investigation previously conducted, but not completed in
> the state prosecution will be of use in the current investigation. Measured against
> the number of hours authorized for mitigation specialist services in every other

---

[46] The court authorized "100 hours at $150.00 per hour" apparently without realizing that
the mitigation specialist counsel had consulted quoted a rate of $75 per hour. *(See* Doc. 107.)

capital case in which the death penalty has been authorized, the 100 hours
approved by the Court is grossly inadequate.

(Decl. Richard H. Burr (Exh. C to Doc. 107) at 4).

The court's withholding of resources was highly prejudicial.  As shown in the social history presented in Claim 2, section B, and the numerous declarations cited therein, a reasonable mitigation investigation, including travel to the various states in which Mr. Barrett lived as a child and adult, would have produced abundant mitigation evidence.

Mr. Barrett sought 300 hours of investigative assistance at a rate of $50 per hour. (Doc. 50 at 4).  The court permitted only 100 hours of investigation, and limited it to those areas in which counsel could show a particularly acute need.  (Order filed 3/18/05 (Doc. 97) at 2). "The average number of hours approved for fact investigation in authorized cases is closer to 500 hours." (Decl. Richard H. Burr (Exh. C to Doc. 107) at 3).  The Court knew in fact that this rate was considered reasonable by experts in relation to the practice in other federal capital cases. Moreover, despite the preauthorization, the court, contrary to Judicial Conference guidelines, conditioned payment of an investigator on counsel persuading the court with "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial."  (Order filed 3/18/05 (Doc. 97) at 2 n.2).  The court prohibited the investigator from working at market rates, and required him to work at the same rate as state-subsidized investigators working for salary at the Oklahoma Indigent Defense Service ("OIDS") even though state-subsidized investigators were not available to Mr. Barrett. (Order filed 5/5/05 (Doc. 128) at 3 n.1.  *See also* Decl. Steve Leedy).

At a minimum, the restrictions the court placed on investigation chilled inquiry. Compared with his other cases, Mr. Barrett's investigator *lost $20.00 each hour* he worked on

Def's § 2255 Mot.                                   244                         *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Barrett's case.  Moreover, the court's requirements for approving vouchers meant there was no guarantee any specific amount of time would be compensated at all.  The investigator could work many hours on an issue only to find after he submitted a voucher that the facts he had investigated were not, in the court's view, significant to evidence that would be used at trial.

The Government relied extensively upon testimony regarding the trajectory of bullets during the raid on Mr. Barrett's house.  Mr. Barrett's counsel requested the assistance of an expert, Edward E. Hueske, to assist in responding to the Government's evidence, performing up to 80 hours work, billed at a rate of $ 200 per hour, in addition to $ 1,000 for lodging, travel and incidentals.  (Doc. 50 at 7).  While the Government faced no limits on its ability to marshal this type of evidence, the court, again without explanation, authorized less than one fourth the amount Mr. Barrett's counsel and the expert they consulted determined was reasonably necessary to confront the Government's case.  (*Compare* Doc. 50 at 7 *with* Doc. 97 at 3).  Moreover, the court did not authorize any lodging or travel expenses at all whatsoever.

After advising Mr. Barrett's counsel that "this Court has[] never allowed crime scene reconstruction to be introduced in trial" (Doc. 97 at 3), and at the same time denying Mr. Barrett seventy-five percent of the time and one hundred percent of the in-court assistance counsel needed from Mr. Hueske, the Court admitted the Government's crime scene reconstruction evidence without reservation.  As a result of the Court's denial of funds, it was impossible for Mr. Barrett to have an expert present either to challenge the admissibility of the Government's testimony under Federal Rule of Evidence 702, or to assist with cross-examination of the Government's "expert."  To the extent the Court's statement about its past practice regarding crime scene reconstructions misled counsel into foregoing expert assistance, the

Court's interference with the defense went well beyond the mere denial of funds and constituted active interference in the functioning of the defense. *See* Claim 1, *supra*.

The court's denial of funds for ballistics and crime scene reconstruction experts was prejudicial. As set forth in Claim 2, *supra*, if trial counsel had been able to consult with an expert prior to trial, they could have presented evidence to exclude the testimony of Iris Dalley, an "expert" who was central to the Government's theory of how the shooting took place, including whether Mr. Barrett was in a position to see emergency lights when the shooting started. Even if counsel had not succeeded in excluding that testimony entirely pursuant to FED. R. EVID 702 and *Daubert v. Merrell Dow*, 509 U.S. 579 (1993), counsel would have been far better able to rebut it. For example, if counsel had been able to employ adequate expert services, at a minimum, Mr. Barrett would have shown the following:

(a)     Dalley failed to follow standard protocol by omitting the measurement of the objects through which she claimed bullets passed;

(b)     Dalley failed to follow accepted methods by using magnification and/or chemical analysis to detect the presence of gun shot residue, blood, tissue, hair, fibers or other matter around bullet holes;

(c)     Dalley falsely claimed she could not determine the caliber of bullet holes in the Bronco whereas the determination could have been made with standard tools and methods;

(d)     Dalley offered misleading testimony, beyond the scientific bounds of her methodology, when she claimed that the trajectories she identified for bullet fragments were "accurate" while the method she used could not provide an accurate trajectory;

(e)     Dalley selected descriptions of the evidence to fit the Government's theory when she described the trajectories of bullets that passed through the door of the Bronco;

(f)     Dalley's diagrams and animation were not based on accepted methods, and she testified falsely when she claimed she lacked the necessary equipment to create data with which other experts could attempt to reproduce her findings based on those diagrams and that animation;

(g)     Dalley failed to use available, accepted methods (such as a plumb line) to determine the grade of the terrain on which the shooting occurred;

(h)     Dalley failed to employ proper methods of chemical analysis before concluding that holes of questionable origin came from bullets;

(i)     Dalley misrepresented the facts when she claimed there was "no means of sequencing any of the shots," while the truth was that she did not employ the available means to determine whether they would produce reliable results, i.e. Dalley ignored scientific methods that might have invalidated her claims;

(j)     Dalley failed to use accepted methods for determining the trajectory of bullets that struck a moving vehicle, failing to move the Bronco back to the place where it initially came to rest, and ignoring another standard practice that might have invalidated her findings;

Dalley employed scientifically inappropriate methods for making claims about the trajectory of bullets that passed through the window of Mr. Barrett's cabin;

(k)     Dalley overstated her ability to estimate the distance of a firearm from the cabin window based on a rule of thumb, and ignored more reliable methods that might have contradicted her theory;

(l)     Dalley failed to use the standard tool of a metal detector to locate any bullets or fragments in the soil;

(m)     Dalley failed to follow an essential, generally accepted protocol for reconstructing a shooting scene when she did not attempt to collect all the bullets or fragments from the interior of the Bronco;

(n)     Dalley's conclusion regarding the location of Trooper Eales' arm when it was struck was based on her failure to examine the surrounding area for tissue or blood, and her violation of a cornerstone of forensic science.

(Report Edward Hueske).

To the extent the trial court's denial of expert and investigative resources could have been raised on the existing record, appellate counsel was ineffective for failing to raise the claim. Trial counsel Hilfiger, who also was counsel on appeal, had a conflict of interest which prevented him raising this claim, insofar as he failed to make use of the resources the trial court had authorized.

The record and extra-record evidence establishes that the trial court's denial of resources was not harmless and was highly prejudicial. Mr. Barrett could have presented substantial evidence to counter the Government's case at both stages of trial. The trial court's denial of access to this evidence violated Mr. Barrett's right to due process, to confront adverse witnesses, and to effective assistance of counsel.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

<div style="margin-left: 2em;">

**Claim 4.**   **Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Appellate Counsel Was Ineffective for Failing to Raise the Issue on Direct Appeal**. .

</div>

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

As shown in Claim 2, *supra*, in connection with the claim that trial counsel were ineffective for failing to argue all available evidence supporting the renewed motion to suppress, the trial record itself established the Clint Johnson warrant was invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Suppressed *Brady* material and other evidence gathered in

support of this 2255 petition which relates back to the credibility of the informant at the relevant time makes this conclusion even stronger.

Since the warrant was based solely on the word of the confidential informant, Charles Sanders, his reliability was the linchpin of probable cause.  There was no other information from any other source, and no other circumstances cited in the affidavit, that provided probable cause to search Mr. Barrett's residence and property.  The "totality of the circumstances" in this case *was* Sanders.  *Illinois v. Gates,* 462 U.S. 213 (1983) (totality of the circumstances test used to judge validity of search warrants; an informant's veracity, reliability,

and basis of knowledge are all important considerations in determining whether information as a whole is sufficient to supply probable cause).  If Sanders is unreliable, his information is *per se* unreliable.  Because Sanders is the antithesis of a reliable source, Clint Johnson, at the very least, acted with reckless disregard for the truth in utilizing him as a source, and in omitting information from the search warrant affidavit that would have given an accurate picture of Sanders's credibility.

Sanders could not be relied upon to provide reliable information.  No reasonable person could put stock in anything he says.  Sanders is a professional criminal, who had racked up at least eighteen felony convictions at the time he testified against Mr. Barrett, and had surpassed double digits by 1999.  Numerous other felony charges against him were dismissed because of his work as a snitch.  He always had a motive to lie against others to get out of his own scrapes with the law, and has largely been successful, continuing to land on his feet with probationary sentences so he could commit still more crimes in the community, when any sane system of justice would have flushed him ages ago.  His convictions for crimes of dishonesty are legion: repeated instances of forgery, burglary, concealing stolen property, larceny of merchandise from a retailer, and other forms of fraud and theft, not to mention a laundry list of other felonies.  He has a history of promising to appear in court and then failing to appear.  He has a history of promising to adhere to terms of probation and then breaking them by committing still more crimes, after which he is given still more probation.  He is a long term drug addict. Sanders could not give a straight and consistent answer to save his life at Mr. Barrett's trial, which reflects his almost congenital inability to tell the truth.  Yet he was rewarded for his testimony, as he has always been rewarded for informing on others, despite his wretched history

of dishonesty, and despite the fact that he continued to victimize the community as a virtual one man crime wave.   All this was known about Sanders in 1999, and it has only gotten worse.

At the time he signed the affidavit, Clint Johnson was aware of Sanders lack of reliability, and Johnson himself intentionally ignored evidence of Sanders then-current drug usage, crimes of dishonesty, and Sanders inability to see evidence of drug activity at Mr. Barrett's residence during the critical time.   Yet Johnson still relied on this miscreant as a "reliable confidential informant."

In connection with the claim of ineffective assistance of trial counsel for failing to produce witnesses to attack Sanders's honesty, Mr. Barrett has provided declarations from several people in the community, including one of Sanders's uncles, who say without reservation and in the strongest terms possible that Sanders is totally dishonest and unbelievable, and that this is the opinion by acclamation in the community as a whole.  (Decls. of Rick Lunsford, Brandy Hill, Sally Davis Johnson, Janesse Thomas, Sean Hill, and Billy Poindexter.)  Sanders claimed that he and Janesse Thomas bought drugs at Mr. Barrett's a few days before the shooting incident.  Ms. Thomas says this is absolutely false.

Is it to be believed that the community as a whole regards Sanders as thoroughly dishonest and untrustworthy, but that Clint Johnson could realistically think he was a reliable informant, about whom nothing had to be revealed to a reviewing magistrate?  It simply does not wash.  Johnson acted with reckless disregard for the truth, at a minimum, in relying on Sanders for information about Mr. Barrett or anyone else, let alone presenting that information in a search warrant affidavit.

The prosecution suppressed exculpatory evidence regarding Sanders's honesty. As stated in Claims 1 and 2, Mike Littlefield informed the court of a witness who failed to corroborate Sanders. This would have assisted in establishing a *Franks* claim, and in generally impeaching Sanders, but the evidence was never revealed to the defense. The transcript of this hearing was, however, available to direct appeal counsel.

Then there is Clint Johnson himself. The Government suppressed *Brady* evidence that before, during and after Mr. Barrett's trial, Johnson was caught in a web of his own bad acts, deceit and corruption, including abuse of his position of trust; passing hot checks; failing to control his informants and neglecting to properly supervise and document their activities; failure to account for funds and evidence; theft of drug fund money; kickback schemes; dishonesty with his superiors; and likely drug use, as he tooled around in his drug task force car with drug paraphernalia, marijuana and methamphetamine, none of it properly packaged and marked as evidence. Johnson was fired from the District Attorney's Office a little over two weeks after Mr. Barrett was formally sentenced. In sum, Johnson and Sanders were birds of a feather: both liars, both drug addicts, both trading lies for favorable treatment from law enforcement.

With respect to Johnson's request for a no-knock, nighttime warrant, which was predicated on information from the C.I. that Mr. Barrett had threatened law officers, Johnson acted with reckless disregard for the truth by omitting mention of the fact that local law enforcement, including Sheriff John Philpot, had been to Mr. Barrett's residence less than a month before, and encountered no resistance. (Decl. of Rodney Floyd.)

A search warrant must be voided and the fruits suppressed when 1) it is found the affiant knowingly or recklessly included false statements *or omitted material information from the affidavit in support of a search warrant,* and 2) it is concluded that after excising such false

statements and considering such material omissions, the corrected affidavit does not supply probable cause to search. *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978); *United States v. Kennedy,* 131 F.3d 1371, 1376 (10th Cir. 1997).

Here, at a minimum, when the omitted material information about the reliability of the informant is considered, probable cause could not have been found, because Sanders's history, character, actions and reputation would show him and his word to be totally unreliable. Johnson called Sanders "reliable," a deliberately false or reckless statement in itself, and omitted an avalanche of information, detailed above and elsewhere in this motion, that would have proved the exact opposite to any reasonable magistrate. Had Johnson given a true picture of his C.I.'s numerous crimes of dishonesty; his motivation to accuse others of wrongdoing in order to escape punishment for his own acts, for which he received deal after deal instead of the hard prison time he deserved, after which he continued to commit crimes; his violations of the terms of probation; his bond forfeitures and failures to appear; the number of arrests; the number of convictions; his chronic drug use; and his bottom-of-the-barrel reputation in the community for anything even remotely approaching honesty and trustworthiness, no neutral, detached magistrate would find probable cause.

Johnson's failure to mention that less than a month before securing the warrant, Sheriff Philpot and other officers had been to Mr. Barrett's without incident, was material to the request for a no-knock, nighttime search warrant. In failing to mention this crucial fact, Johnson acted with reckless disregard for the truth. Had the magistrate been informed of this, the averment in the affidavit that Mr. Barrett, according to the "reliable" C.I., had "threatened" law enforcement would have been rendered meaningless, and no cause for a no-knock, nighttime

warrant would have been established, even aside from the question whether any warrant should issue at all.

Although defense counsel raised a *Franks* issue, however incompletely, at trial, and there were certainly indications of Sanders's deplorable criminal record and rampant dishonesty in the ever-shifting sands of his testimony, appellate counsel failed to raise the issue on direct appeal, either as a freestanding argument under *Franks*, or one coupled with an ineffective assistance of trial counsel argument.  Especially in light of the fact there were numerous issues raised on appeal that were reviewed under a plain error standard, because there had been no contemporaneous objection or record, it was professionally unreasonable to omit this issue, and to argue that the court erred in failing to conduct an evidentiary hearing.  Mr. Barrett was prejudiced by this omission.  *Strickland v. Washington,* 466 U.S. 668 (1984).  Decl. of Mark Henricksen.  Mr. Barrett is of course requesting an evidentiary hearing on each factual issue raised in this motion, and specifically requests a *Franks*  hearing, or its equivalent.  He has more than made the requisite showing.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 5.**    **Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Conviction and Sentence Based on Newly Discovered Evidence**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

## Introduction

The Government had an affirmative duty to learn about evidence favorable to the defense, whether as to liability or punishment, including, of course, impeachment material, in the possession of law enforcement agencies, and disclose that evidence to Mr. Barrett's counsel. *Banks v. Dretke,* 540 U.S. 668, 696 (2004); *Strickler v. Green,* 527 U.S. 263 (1999); *Kyles v. Whitley,* 514 U.S. 419, 437 (1995); *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Bowen v. Maynard,* 799 F.3d 593, 610 (10th Cir. 1986) (*Brady* obligations extend to impeachment evidence); *Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir. 1984); *United States v. Osorio,* 929 F.2d 753, 761 (1st Cir. 1991); *United States v. Libby,* 429 F. Supp.2d 1, 10-11 (D. D.C. 2006). This duty extended beyond the point in time when any individual witness testified, and has continued to the present day. *Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir. 1997); *United States v. Quintanilla,* 193 F.3d 1139, 1146-49 (10th Cir. 1999)(citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987)); *Steidl v. Fermon,* 494 F.3d 623, 630 (7th Cir. 2007)("For evidence known to the state at the time of trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings"); *High v. Head,* 209 F.3d 1257, 1265 n.8 (11th Cir. 2000). *See also, Banks,* 540 U.S. at 696; *Giglio,* 405 U.S. at 155; *United States v. Kojayan,* 8 F.3d 1315, 1320, 1323-25 (9th Cir. 1993); *Thomas v. Goldsmith,* 979 F.2d 746, 749-50 (9th Cir. 1992)(prosecution has an obligation to turn over exculpatory evidence relevant to habeas proceedings, even if it was not discovered prior to the close of trial); Fed.R.Crim.P. 16 ( c); Fed.R.Civ.P. 26(g)(1). *Cf. Imbler v. Pachtman,* 424 U.S. 409, 427, n. 25

(1976)(under ABA Criminal Justice Standard 3-3.11, commentary, "A prosecutor may not properly refrain from investigation in order to avoid coming into possession of evidence that may weaken the prosecution's case ... The duty of the prosecutor is to acquire all the relevant evidence ...").

This duty also extends to any member of law enforcement acting on behalf of government agencies, whether or not the prosecutor has personal knowledge of the evidence in question, and whether or not the information is in possession of law enforcement agencies and officials outside the prosecuting agency itself. *United States v. Antone,* 603 F.3d 566, 569 (5ᵗʰ Cir. 1979)(facts known to state law enforcement personnel imputed to federal prosecutors when "the two governments ... pooled their investigative energies to a considerable extent.")

To establish a *Brady* violation, a Movant must show: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant either as to guilt or punishment; and (3) that the evidence was material. The good faith or bad faith of the prosecution is irrelevant. Evidence is "material" only if there is a reasonable probability that, had the evidence been disclosed, the outcome of trial would have been different. *Fero v. Kerby,* 39 F.3d 1462, 1472 (10ᵗʰ Cir. 1994), citing *United States v. Bagley,* 473 U.S. 667, 682 (1985). To prevail, a Movant need not show that it is more "probable than not" that had the evidence been disclosed, the outcome would have been different. Rather, the question is whether, considering the cumulative effect of the suppressed evidence, *Kyles,* 514 U.S. at 436, "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Id.*, at 441.

Newly discovered evidence, *i.e.,* evidence which could not have been discovered by the exercise of due diligence before or during trial, may also form the basis for relief under

section 2255.  *E.g., United States v. Hernandez,* 94 F.3d 606 (10th Cir. 1996)(rejecting newly discovered evidence claim raised in initial 2255 petition, which was filed during pendency of direct appeal, on the merits); (Fed. R. Crim. P. 33.)  To warrant relief on a claim of newly discovered evidence, it must be shown: 1) that the evidence was discovered after the trial; 2) that failure to learn of the evidence was not caused by a lack of diligence; 3) the evidence is not merely impeaching in character; 4) the evidence is material to the principal issues involved; and 5) the evidence is of such a nature that, had it been disclosed to the jury, there is a reasonable probability of a different outcome, *i.e.,* acquittal or a lesser sentence.  *Peltier v. Booker,* 348 F.3d 888, 890 (10th Cir. 2003); *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997).

A *Brady* claim may be a subspecies of a newly discovered evidence claim.  *United States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10th Cir. 1999).  Whether the claims made below constitute *Brady* violations, newly discovered evidence, or both, Mr. Barrett is entitled to relief from his convictions and sentences.

The prosecution in Mr. Barrett's case suppressed, before, during and after trial, exculpatory evidence relevant to several key witnesses.  Deals or leniency given to these witnesses in exchange for their testimony in Mr. Barrett's case and, with respect to Charles Sanders, deals he received in other cases because of his supposed work as an informant, were not disclosed.  Threats to witnesses to get them to cooperate with the Government were not disclosed.  Relevant to this were the ongoing criminal activities of former AUSA Mike Littlefield, which came to light in 2007, when he was allowed to enter an *Alford* plea in Muskogee County District Court to charges of physically abusing his own children.  Among other misdeeds, Littlefield suppressed exculpatory evidence regarding one of the seven informant witnesses that was made known to the court during the improper *ex parte* hearing on the

Government's motion to delay disclosure of the identities of its seven informant witnesses, but never disclosed to the defense.  *See* Claim 1.

Some of the evidence discussed below  was relevant not only to the credibility of witnesses, but the propriety of the initial nighttime, no knock search warrant that was secured by Drug Task Force agent Clint Johnson, based on the good word of Charles "Monk" Sanders.  The Government or its agents were aware of numerous impeaching facts regarding acts of dishonesty and criminality of Clint Johnson and his girlfriend, OSBI agent Vickie Lyons, none of which were revealed to the defense.

Most egregious of all, the Government knowingly used perjured testimony from Randy Turman, who claimed that a Sequoyah County felony case had been disposed of and was no longer active when it was in fact open, giving Turman every reason to fashion his testimony to the Government's liking.  The same could also be said for its tactic of implying to the jury that the most it would do for Charles Sanders was "talk to" the prosecutors in Sequoyah and Tulsa Counties about his cases there, to let them know that Sanders had cooperated in the federal case against Mr. Barrett.  At the improper *ex parte* hearing discussed in Claim 1, AUSA Littlefield told the court that he knew the identify of an informant witness who failed to corroborate Charles Sanders.  Thus, it could be said the Government knew Sanders's testimony was false, as was the basis for the search warrant secured by Clint Johnson.  In any event, the Government failed to disclose exculpatory evidence of the witness who failed to corroborate Sanders.  It could also be said that the Government sponsored false testimony from Travis and Cindy Crawford.  Newly discovered evidence reveals that their testimony was the product of threats and intimidation.  *See Giglio v. United States,* 405 U.S. 150 (1972); *Giles v. Maryland,* 386 U.S. 66 (1967); *Miller v. Pate,* 386 U.S. 1 (1967); *Napue v. Illinois,* 360 U.S. 264 (1959); *Mooney v. Holohan,* 294 U.S.

103 (1959).  If the jury's verdict could be affected by false testimony presented by the prosecution – as it surely was here – a new trial is required.

   A.   **Suppressed Exculpatory Evidence, Evidence of Knowing use of Perjured Testimony, and Newly Discovered Evidence**

      1.   **Evidence regarding informant witnesses Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman entitles Mr. Barrett to relief from his convictions and sentences**

         a.   **Charles "Monk" Sanders**

The prosecution suppressed deals given to Charles "Monk" Sanders in Sequoyah and Tulsa Counties in exchange for his testimony, in both stages of trial, against Mr. Barrett.  In examining Sanders at trial, AUSA Littlefield merely stated, and Sanders agreed, that he would speak to the authorities in Sequoyah and Tulsa Counties regarding Sanders's cooperation, implying there were no guarantees anything would be done.  (R. 2495.)  In fact, near the end of Mr. Barrett's trial on November 17, 2005, Sanders got a sweetheart deal on his active Sequoyah County cases, and more favors shortly thereafter, all due to a "plea agreement with feds." Favorable disposition of Sanders's active Tulsa County case was delayed until after Mr. Barrett's trial.  The prosecution cynically attempted to jettison its *Brady* obligations with respect to Sanders's testimony by either failing to reveal deals it knew were in the works, and/or postponing the culmination of those deals until the end of Mr. Barrett's trial or shortly after its conclusion. The Government's ploys in these regards plainly violated the *continuing duty* to disclose *Brady* evidence.

Of course, Sanders's alleged information was the basis upon which the no-knock warrant secured by his alleged handler Clint Johnson was issued.  Sanders's testimony was

critical to the drug charges which underlay the various counts of the superseding indictment, and to the Government's arguments on malice and intent with respect to both stages of trial.

As noted in Mr. Barrett's first stage ineffective assistance of counsel argument respecting trial counsel's failure to impeach Sanders with the number and nature of his previous convictions (Claim 2, section A.4, *supra*), as well as favorable treatment he had received in these and other cases, Sanders had convictions in Sequoyah County Case No. CF-98-346, (for which he originally received a twenty year suspended sentence, of dubious legality due to his numerous prior convictions), for the felony offense of possession of methamphetamine.  Sanders was also charged in this case with a misdemeanor count for possession of drug paraphernalia, which was dismissed pursuant to plea bargain.  Two applications to revoke Sanders's suspended sentence were filed.  Initially, five years of the suspended sentence was ordered revoked, but the balance would again be suspended if Sanders completed a Department of Corrections drug program.  The revocation was ordered to run concurrent with similar dispositions in Case Nos. CF-98-363, CF-99-562, CF-04-19 and CF-03-124.  (File in Sequoyah County Case CF-98-346.)

In CF-98-363, Sanders received another twenty year suspended sentence for uttering a forged instrument, to run concurrently with the sentences in Case Nos. CF-99-562 and CF-98-346.  Similar applications to revoke were filed in this case based on Sanders's failure to abide by the terms and conditions of probation, in part because he committed new offenses. Initially, as with CF-98-346, the court ordered five years of the sentence to be revoked, with the balance to again be suspended in full upon completion of the drug program. The revocation in this case was ordered to run concurrently with similar actions taken in Case Nos. CF-98-346, CF-99-562, CF-03-124, and CF-04-19.  (File in Sequoyah County Case No. CF-98-363.)

In CF-99-562, in which Sanders was initially charged with three counts of concealing stolen property, uttering a forged instrument, felonious possession of a sawed-off shotgun, and a misdemeanor charge of possession of marijuana, he was allowed to plead to a single count of concealing stolen property, with the other counts dismissed. He originally received a twenty year suspended sentence. Again, applications to revoke were filed due to Sanders's commission of new crimes and for otherwise failing to adhere to the terms of his probation. Five years of the sentence was revoked, the balance again to be suspended upon completion of an in-house drug program. The sentence in this case was ordered to run concurrently with similar dispositions in Case Nos. 98-346, 98-363, 03-124 and 04-19. (File in Sequoyah County Case No. CF-99-562.)

In Case No. CF-03-124, Sanders was allowed to plead guilty to two counts of feloniously running a roadblock, with the other charges dismissed. Sanders received concurrent twenty-five year sentences on the two counts of conviction, with all but five years suspended, and with the entirety of the terms to be suspended on successful completion of the drug program. The sentences in this case were ordered to run concurrently with the sentences in Case Nos. In CF-98-346, CF-98-363, CF-99-562 and CF-04-19. (File in Sequoyah County Case No. CF-03-124.)

In Case No. CF-04-19, Sanders was eventually charged in an amended information with second degree burglary, second degree arson, concealing stolen property, and feloniously carrying a firearm. The firearm charge was dismissed pursuant to the plea agreement. On the three remaining counts, Sanders was sentenced to concurrent terms of twenty-five years, with all but the first five years suspended and, yet again, the balance to be suspended upon

completion of the drug program.  The sentences in this case were ordered to run concurrently with the sentences in Case Nos. 98-346, 98-363, 99-562 and 03-124.  (File in Sequoyah County Case No. CF-04-19.)

The Government violated Mr. Barrett's due process rights by failing to disclose that on November 17, 2005 (the final day of Mr. Barrett's trial), and because of his testimony in Mr. Barrett's trial, amended judgments and sentences were entered on behalf of Sanders in all of the above-described cases, with a filing date of November 23, 2005 (well before Mr. Barrett's formal sentencing) ordering that Sanders receive straight suspended sentences across the board. Moreover, in each of the cases discussed above, an order was entered on April 3, 2006, making Sanders's suspended sentences in these cases unsupervised by the Department of Corrections, even though the sentences did not expire until 2030.  This was done, according to the notations on the orders, "***per plea agreement with feds***."  Finally, on December 8, 2008, orders were entered in each of these cases relieving Sanders of the obligation to pay any outstanding fines or costs.  (*See* the above listed Sequoyah County court files (emphasis added).)

Sanders received similar largesse as the result of his testimony against Mr. Barrett in his pending Tulsa County Case, disposition of which, as noted in the ineffective assistance of counsel argument, was delayed until Sanders could perform for the Government in Mr. Barrett's trial.  In Tulsa County Case No. CM-04-1187, Sanders's case was passed from November 13, 2005 until November 17, 2005 (the last day of Mr. Barrett''s trial), and was again passed from November 17 until December 9, 2005.  At that time, instead of facing jail on his misdemeanor drug possession and possession of drug paraphernalia charges, despite his numerous prior convictions, because of his testimony against Mr. Barrett, Sanders received concurrent one year suspended sentences.

During the pendency of this 2255 action, investigators for Mr. Barrett have attempted repeatedly to interview Sanders, but were stymied. Sanders initially told a defense investigator he would meet with him, and had things he wanted to discuss, but dodged all subsequent attempts at an interview. However, when a defense investigator spoke to Sanders's mother, Evelyn Sanders, regarding her son's testimony against Mr. Barrett, she revealed that Sanders had been promised a number of things in exchange for his testimony that he never received. (Decl. of Dale Anderson.) This witness's statement suggests that aside from the leniency he got, Sanders was given other inducements by the Government to testify against Mr. Barrett.

Not only did the prosecution flatly violate *Brady* and its progeny by failing to disclose Sanders's deals in the particular cases discussed above, it wantonly violated its *Brady* obligations by failing to reveal the jaw-dropping favorable treatment Sanders had received in *all his* Sequoyah County and other cases, as detailed in the ineffectiveness of counsel claim. Taken together, this evidence would have destroyed Sanders's credibility, shown his motive to lie, and would have shown, contrary to this court's order, that Clint Johnson – whose nefarious, but never revealed, acts of dishonesty and criminality are discussed below – could not have reasonably relied on "information" from Sanders to establish probable cause for the no-knock search

warrant, which was the poisonous tree from which the later search warrants resulting in the recovery of drug and firearms related evidence grew.

When the prosecution falsely suggested it would merely "talk to" county prosecutors, even though Sanders received deals on the last day of Mr. Barrett's trial in Sequoyah County and shortly thereafter in Tulsa County, and Sanders agreed with this assessment of the

situation, it sponsored materially false testimony.  *Giglio v. United States,* 405 U.S. 150 (1972).

At a minimum, the Government failed in its duty to correct false testimony.  *Giles v. Maryland*,

386 U.S. 66 (1966); *Alcorta v. Texas*, 355 U.S. 28 (1957).

### b.  Travis Crawford

During the investigation conducted for this 2255 motion, Mr. Barrett has

discovered that one of the key witnesses in the first stage of trial, Travis Crawford, lied about

material matters.  Travis Crawford supplied testimony critical to the Government's case for

malice and intent, at least as to count 3 of the superseding indictment.  Crawford's testimony was

also crucial to establishing the intent elements in the punishment phase of trial.  Crawford's

testimony was summarized in the claim regarding ineffective assistance of counsel in the first

stage of trial, and will not be repeated here.

When Crawford was interviewed in the presence of his parents on December 11,

2008 by defense investigator Leonard Post, he recanted his trial testimony.  To summarize, Mr.

Crawford told Mr. Post the following:

Mr. Barrett's habit of not leaving his property had been established several years

before the raid which led to Trooper Eales's death.  At trial, of course, the prosecution contended

that Mr. Barrett rarely left his property only after he supposedly learned there was a warrant for

his arrest on the  Sequoyah County drug charge.  (Decl. of Leonard Post.)

Mr. Crawford stated that he has anxiety and psychological problems, something

he was not cross-examined on at trial.  Although he was a long-time methamphetamine addict, he

told Mr. Post he had been off drugs for four months preceding Mr. Post's interview.  Before

finally getting off drugs, Crawford had been a daily methamphetamine user for years preceding

Mr. Barrett's arrest in this case and during Mr. Barrett's federal trial.  (Decl. of Leonard Post.)

Thus, Crawford's trial testimony to the effect that he was not a drug addict or under the influence of drugs at the time he testified against Mr. Barrett was false.

Mr. Crawford stated that at the time he was interviewed by then-AUSA Mike Littlefield regarding Mr. Barrett, he was "living in so many places and was so strung out" on drugs, that he did whatever he was told by anyone in authority in order to stay out of trouble. Mr. Crawford states that when he was interviewed by Mr. Littlefield, he was high on drugs. Moreover, anybody who had been around drug addicts for any period of time (which surely includes Mr. Littlefield and then-Sequoyah County Sheriff John Philpot, who took Crawford to Muskogee to be interviewed by Littlefield) would have known Crawford was high. Not only was Mr. Crawford under the influence of illicit drugs at the time he was interviewed by Littlefield, but he was also high when he testified in the first stage of Mr. Barrett's trial. Crawford stated that the other informant witnesses who testified against Mr. Barrett were high and strung out on drugs at the time of their testimony. (Decl. of Leonard Post.)

When Sheriff Philpot took Crawford to Muskogee to be interviewed by Mike Littlefield shortly before Mr. Barrett's trial, Crawford felt he "was already arrested" and did not know "if [he] was ever going to come back home." When Littlefield interviewed him at the United States Attorney's office, Mr. Crawford was terrified about losing his freedom. Consequently, he said whatever he thought it was Littlefield wanted him to say. Mr. Littlefield asked Travis Crawford if Kenneth Barrett ever said he (Mr. Barrett) was "going to go down in a blaze of glory" if the police ever came onto his property. Littlefield made it clear to Crawford what the appropriate answer was. Crawford stated that before he could answer, Littlefield threatened him, stating bad things would happen to him if he "lied." Where a witness is pressured to testify, the prosecution has every reason to believe that the product of that coercion

will be false testimony. Mr. Crawford stated he was scared and panicked, and therefore told Littlefield that Mr. Barrett had made this statement. According to Mr. Crawford, the truth was otherwise: *Mr. Barrett never made such a statement, or anything like it, at any time*. (Decl. of Leonard Post.)

Travis Crawford's recantation is corroborated by witnesses who were present at Mr. Barrett's house on September 23, 1999, but were not called to testify at trial. *See* Claim 2, section A.4, *supra*. Rick Lunsford and Brandy Hill are adamant in stating the Mr. Barrett never made such a statement. (Decls. of Rick Lunsford and Brandy Hill.)

Because the Government and its agents knew or had reason to know that Crawford was a drug addict at the time he was interviewed by the prosecution, and at the time he testified at trial, the Government was obligated to disclose this information under *Brady*. Due process and the rules of professional conduct required AUSA Littlefield to correct Travis Crawford's false testimony about being off drugs. The same is true of at least some of the other informant witnesses, whom Mr. Crawford states were high at the time of their testimony. Moreover, the Government plainly violated its *Brady* obligations by failing to reveal Littlefield's threats to induce cooperation and shape Crawford's testimony. *Crivens v. Roth,* 172 F.3d 991, 998-99 (7th Cir. 1999)(prosecution violated *Brady* where police had intimidated key witnesses to

murder of police officer, and failed to disclose material information as to who was seen carrying the murder weapon moments after the shooting).

Mr. Crawford admitted that before he became a witness against Mr. Barrett, he had previously worked as a snitch for local law enforcement, setting up drug buys at the direction of the authorities in exchange for escaping bogus check charges he was facing. Crawford stated

that he testified regarding the controlled drug buys in state court, even though the police had promised him he would not have to do so. Decl. of Leonard Post. Crawford's history as an informant was not testified to at trial, though it was known to the Government or its agents. Crawford's work as a snitch was exculpatory evidence affecting his credibility. By failing to inform the defense of this fact, the Government violated is *Brady* obligations.

In marked contrast to what the Government attempted to portray at Mr. Barrett's trial regarding the "necessity" for a no-knock warrant and the armed raid on Mr. Barrett's property, Travis Crawford stated that only two weeks or so before the raid, Sheriff John Philpot had gone to Mr. Barrett's residence and inspected his firearms without incident. (Decl. of Leonard Post.)

This information is consistent with that given by Janice Sanders and Sylvia Gelene Dotson, who, though never asked by trial counsel, state that Sheriff Philpot and other law enforcement agents were at Mr. Barrett's house mere weeks before the raid. *See* Claim 2. As shown below, ex-Sheriff Philpot recently admitted to a defense investigator that he indeed was at Mr. Barrett's less than a month before the raid, and encountered no violence or threats. Mr. Barrett was not arrested on his outstanding failure to appear warrant. (Decl. of Rodney Floyd.) This exculpatory evidence, of which the Government and/or its agent Mr. Philpot was well aware, was concealed from the defense in violation of *Brady.*

Again in contrast to what Mr. Crawford implied in his testimony, and to what the Government argued at trial, he recently stated that while Mr. Barrett told him he had a pending state drug charge, he was not overly concerned with it. Mr. Barrett never told Crawford he had an outstanding warrant, and was thus laying low and hiding from the law. Crawford simply

assumed that having an active case meant the same thing as having an active arrest warrant. (Decl. of Leonard Post.)

At trial, with the aid of Mr. Crawford's testimony, the Government made much of the sign posted on the gate, construing it as a threat to law enforcement.  Mr. Crawford states that the sign was posted as a warning to anyone coming on the property in order to prevent trespassing and theft.  (Decl. of Leonard Post.)

A defense investigator reduced to writing what Mr. Crawford stated when he was interviewed.  When the investigator presented the writing to Mr. Crawford, he refused to read it or "sign anything," siting the advice of his psychiatrist.  (Decl. Leonard Post.)  However, even in this tale, Mr. Crawford was caught in a contradiction.  (*Id.* at 5.)

However, Mr. Crawford's parents, Roger and Phyllis Crawford, witnessed his recantation.  They have signed declarations attesting to their son's statements to Mr. Post, statements which destroy the credibility of his trial testimony against Mr. Barrett.  (Decls. of Roger and Phyllis Crawford.)  Of course, as noted above, Mr. Post has also executed a declaration detailing Travis Crawford's recantation.  (Decl. of Leonard Post.)

Evidence of Crawford's recantation is newly discovered, and could not have been discovered with the exercise of due diligence before or during trial, because the Government sprung the existence of Crawford and the other informant witnesses (without initially giving their names) after juror qualification had begun, and Crawford refused to be interviewed by the defense.  Crawford's recantation pulls the rug out from under the prosecution's arguments respecting malice and intent in both stages of trial.  Crawford was *the key Government witness* in this respect, because he testified that only hours before the raid, Mr. Barrett talked about the police "drive-by," the "fact" that they were coming back, that he (Mr. Barrett) "[didn't] give a

fuck," and that he (Mr. Barrett) was going to go out in a "blaze of glory."  Crawford's recantation

also undermines the Government theory that Mr. Barrett only stayed close to home, and was thus

lying in wait for a supposedly inevitable police raid, after he supposedly learned that he had a

warrant out for his arrest.

<div align="center">

**c.      Cindy Crawford**

</div>

As outlined in the first stage ineffective assistance of counsel argument (Claim 2,

section A.4, *supra*), Cindy Crawford testified in the guilt/innocence stage of trial regarding drug

activity she witnessed at Mr. Barrett's home, and Mr. Barrett's supposed threats to law

enforcement if his property were raided.  In the penalty phase of trial, Cindy Crawford testified

that on one occasion, Mr. Barrett, after she rebuffed his sexual advances and was leaving his

residence with Richie Barrett, came out of the house, put the barrel of a rifle up to her leg, and

threatened to kill her.

Leonard Post and another defense investigator currently working on Mr. Barrett's

case, Dale Anderson, interviewed Cindy Crawford on January 13, 2009.  Like her husband,

Cindy Crawford refused to *read* a declaration which faithfully recounted what she told Messrs.

Post and Anderson.  (Decl. Leonard Post.)  Mr. Post's and Mr. Anderson's declarations detail

what Cindy Crawford told them, which is summarized as follows.

Cindy Crawford explained how she was contacted by the Government.  According

to her, one to two weeks before she testified in the first stage of Mr. Barrett's trial, Sequoyah

County Sheriff John Philpot came to see her.  Philpot told her she had to go with him.  Although

Ms. Crawford was unsure whether she was under arrest, it was clear to her that she had no choice

but to go with Sheriff Philpot.  She was driven by Mr. Philpot to the United States Attorney's

office in Muskogee, where she was interviewed by Mike Littlefield in Littlefield's office.  (Decls. of Leonard Post and Dale Anderson.)

Armed law enforcement officers were also present during the interview.  They showed Ms. Crawford several firearms which looked similar to ones she had seen in Mr. Barrett's cabin. In order to secure her cooperation and testimony, Mike Littlefield threatened her.  Littlefield told her she need to work with him and testify against Mr. Barrett.  Otherwise, she was going to prison.  Littlefield pointedly reminded her that she was then under a five-year deferred sentence in a drug case.  Littlefield told Ms. Crawford that Mr. Barrett's residence had been under surveillance for six months preceding the raid, and that she had supposedly been observed on his porch acting as a "lookout" while methamphetamine was cooked on the property.[47]  While Ms. Crawford states that she had no pending charges at the time she was interviewed by Littlefield, she had recently lost a child to foster care.  Along with the threat of prosecution, the possibility that she would not get her child back unless she played ball with the Government hung in the air throughout the interview.  (Decls. of Leonard Post and Dale Anderson.)

According to what Ms. Crawford recently told Mr. Barrett's defense investigators, Mike Littlefield not only threatened her, but coached her testimony.  Littlefield told her to make Mr. Barrett appear violent and an imminent threat to those around him.  Again issuing threats, Littlefield told her that she risked a perjury charge if she did not testify in this manner.  Littlefield emphasized that he could make it extremely hard on her if she did not testify against Mr. Barrett. (Decls. of Leonard Post and Dale Anderson.)

---

[47]  Consistent with her first stage trial testimony, Cindy Crawford told Mr. Post and Mr. Anderson that she never saw Mr. Barrett cook methamphetamine on his property.  She had done drugs at Mr. Barrett's residence, but did not know who supplied them.  Ms. Crawford never bought drugs from Mr. Barrett.  Decls. of Leonard Post and Dale Anderson.

Def's § 2255 Mot.            270            *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

In addition to the threats, Ms. Crawford described the interview taking place in an intimidating atmosphere. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside. It was her belief that she was not free to decline to be interviewed, to terminate the interview, or to leave. Mr. Philpot had driven her to Muskogee, and she had no way back other than him. Ms. Crawford expressed the sentiment that she was not going to cross Sheriff Philpot due to his reputation for violence. (Decls. of Leonard Post and Dale Anderson.)

Ms. Crawford was interviewed by the Government separately from her husband, Travis. After both had been interviewed, Travis Crawford told her that Philpot had told him that if he (Travis) said the right things on the witness stand, he would not get into trouble. (Decls. of Leonard Post and Dale Anderson.)

Mike Littlefield and John Philpot discouraged her from talking to Mr. Barrett's lawyers. Both told her that she did not have to talk to the defense. According to Ms. Crawford, the clear implication was that she should not speak to the defense. (Decls. of Leonard Post and Dale Anderson.)

Like her husband Travis Crawford, Cindy Crawford was under the effects or after-effects of heavy methamphetamine use at the time she was interviewed by Mr. Littlefield and law enforcement at Littlefield's office. At the time of the interview in the prosecutor's office, Cindy Crawford was just coming down from a two day methamphetamine high. She also admitted to being in the same condition when she testified against Mr. Barrett, because her heavy drug use was ongoing at the time of his trial. That her drug use affected what she told Mr. Littlefield and testified to at trial is apparent from her recent comment to Mr. Barrett's current investigators: "If

Def's § 2255 Mot.                    271                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

you had ever crashed from a meth high, you would know that you would not be in your right mind." (Decls. of Leonard Post and Dale Anderson.)

Although, on cross-examination in the second stage of trial, Cindy Crawford told defense counsel she suffered from PTSD, her mental condition was not inquired about during her first stage testimony, and was not effectively exploited by counsel in the penalty phase, largely because Crawford refused to be interviewed by trial counsel. (*See* Claim 2) Because Crawford refused to be interviewed, there are facts about the manner in which her mental condition impacts her credibility that were only recently discovered.[48] (Cindy Crawford medical records, filed under seal.) According to what Ms. Crawford told Mr. Post and Mr. Anderson, one of the symptoms of her PTSD is that she overreacts in stressful situations, sometimes to the point of passing out. She admitted that when she is under stress, she may not perceive things correctly. This causes her to exaggerate what is going on around her. Ms. Crawford told Mr. Post and Mr. Anderson that when she testified in the penalty phase about Mr. Barrett allegedly pressing a gun to her leg, her mental condition very well could have caused her to overreact and embellish the incident. At the conclusion of her recent interview with the defense investigators, Cindy Crawford told them that having given this alleged incident more thought, she was positive she had overreacted to it. She emphasized that Mr. Barrett had a history of being nice and helpful to her. (Decls. of Leonard Post and Dale Anderson.)

However, even Ms. Crawford's claim to have overreacted is a fabrication. A readily available witness to the alleged event, Richie Barrett, states that neither the incident

---

[48] Cindy Crawford executed a release authorizing Mr. Barrett's counsel to obtain her medical records.

Crawford described nor anything like it ever happened. (*See* Claim 2; Decl. Richard Barrett; Decl. of Leonard Post.)

Between her first stage and second stage testimony, the prosecution subjected Cindy Crawford to more threats. The Government was upset with her first stage performance on the witness stand because she denied seeing chemicals or equipment for making methamphetamine at Mr. Barrett's cabin or on his property, and because she had not made Mr. Barrett seem threatening or violent. To quote Ms. Crawford, "They [the Government] were very angry. They scared me and threatened me." Again, according to Ms. Crawford, while the Government never told her explicitly that she could lie and fabricate during her testimony, it was implied that she could say whatever she wanted, true or not, so long as it helped the Government's case. (Decls. of Leonard Post and Dale Anderson.)

In several areas, the Government violated its *Brady* duties with respect to Cindy Crawford. Ms. Crawford implied during her first stage testimony that she was off drugs ( R. 3070), but, based on what Ms. Crawford recently told defense investigators, this was incorrect. The Government or its agents, based on its observations of Ms. Crawford, had to know that she was a drug user both at the time she was interviewed by Littlefield and when she gave testimony. If not, this evidence is at a minimum newly discovered. It is also submitted that the Government or its agents were aware of Cindy Crawford's mental problems, but this was only revealed, and not developed well, when she volunteered this information to trial counsel during cross-examination in the penalty phase of trial. The Government's intimidation of and threats to Cindy Crawford, as well as disgraced former AUSA Mike Littlefield's "coaching" of her testimony, were well known, obviously, to Littlefield himself and the law enforcement officers who participated in Crawford's interview at Littlefield's office. The Government's

failure to reveal these facts is a *Brady* violation as well as newly discovered evidence. *Crivens v. Roth,* 172 F.3d 991, 998-99 (7th Cir. 1999). The impeaching evidence related above would have seriously undermined Cindy Crawford's credibility. More seriously, where, as with Cindy Crawford, a witness is threatened and coached, the prosecution is guilty of knowingly sponsoring materially false testimony and/or failing to correct false testimony in violation of Mr. Barrett's right to due process of law. *Giglio*, *supra*; *Giles*, *supra*; *Alcorta*, *supra*.

Additionally, as reflected by the declarations of several available witnesses whom the defense did not call at trial to impeach Cindy Crawford's credibility, it was well known in the community that she acted on a regular basis as a snitch for local law enforcement. This *Brady* information was never revealed, and the Government or its agents had to know about it.

The fact that Crawford received favor from the authorities for acting as a snitch, against Mr. Barrett or others, is demonstrated by the manner in which her conviction in Sequoyah County Case No. CF-04-63 was handled. Crawford was originally charged with felony possession of marijuana, because she had incurred a previous marijuana possession conviction. On April 28, 2005, she entered a no contest plea to a misdemeanor and received a five year deferred sentence. She received a one year deferred sentence on count 2, which charged misdemeanor possession of drug paraphernalia. On March 20, 2005, an application to accelerate Ms. Crawford's deferred sentence was filed because she failed to make a required payment. On July 17, 2005, shortly before Mr. Barrett's trial commenced, a bench warrant was issued for failure to appear. On April 24, 2006, after Mr. Barrett's trial, an application to dismiss the acceleration action was filed because Crawford had finally "paid in full." (File in Sequoyah County Case No. CF-04-63.) Thus, when she testified at Mr. Barrett's trial, an acceleration action for failure to comply with the terms of her deferred sentence was pending, but this

impeaching information, which could have been used to argue that Crawford had a motive to please the prosecutors lest her deferred sentence be accelerated, was not disclosed. *Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003).

The *Brady* violations committed by the Government with respect to Cindy Crawford could also be considered a form of newly discovered evidence that could not have been discovered with the exercise of due diligence. As with all the informant witnesses, her identity was not revealed until the eleventh hour, the Government kept her under tight wraps, and she refused to speak with the defense.

Cindy Crawford continues to milk benefits for her work as an informant, and her testimony against Mr. Barrett, up to the present day. She was charged in Sequoyah County Case No. CF-08-224 with first degree burglary and conspiracy on June 18, 2008, which was amended on July 13, 2008. The first degree burglary charge carried from seven to twenty years. The conspiracy charge carried up to ten years. On December 15, 2008 she received an almost unheard of two year deferred sentence on the first degree burglary charge, with the conspiracy charge dismissed. (File in Sequoyah County Case No. CF-08-224.)

### d.    Brandie Zane Price

Price testified in the first stage of Mr. Barrett's trial. She claimed that she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period. (R. 3485-86.) For various convictions she received in Sequoyah County, she was sentenced to complete the RTP program, a regimented inmate discipline program for females within the Oklahoma Department of Corrections. The balance of her sentences were suspended upon her completion of the program. (R. 3487.) Responding to feeds by prosecutor Littlefield,

Price testified that the program "worked," that she was "absolutely" clean of drugs, and, presumably, any drug related activity. (R. 3488, 3497.)

After Mr. Barrett's trial, Brandie Zane Price and others were charged in the Eastern District in a methamphetamine drug distribution conspiracy. *United States v. McAdams, et al.,* No. CR-07-16-RAW. The indictment alleged that the overall conspiracy began "prior to approximately" May, 2006, and continued to February 20, 2007. Significantly, the indictment alleged that beginning approximately January 1, 2006, until June 22, 2006, Price received from the lead defendant in the case, Joseph Alondo McAdams, one pound of methamphetamine per delivery, receiving one delivery and as many as three deliveries a week. (Doc. 18, CR-07-16-RAW.) Mr. Barrett's trial concluded November 17, 2005, and he was formally sentenced on December 19, 2005, less than two weeks before the same United States Attorney who prosecuted Mr. Barrett later alleged that Price began receiving large quantities of methamphetamine for resale in a widespread drug conspiracy.

Price was later allowed to plead guilty to a superseding information (Doc. 116, CR-07-16-RAW) charging that from May, 2006 to February 20, 2007, she distributed and possessed with intent to distribute in excess of 500 grams of methamphetamine, or a mixture or substance containing methamphetamine. A plea agreement, in which Price agreed to provide all information regarding criminal activities known by her to the Government, and in which the Government, based on its assessment of the value of her cooperation, agreed, if appropriate, to move for a Guidelines downward departure, was entered into. (Doc. 121, CR-07-16-RAW.)

Price was ultimately sentenced to sixty months imprisonment. (Doc. 218, CR-07-16-RAW.) She received a substantial downward departure or variance from the advisory Guideline range based *on her cooperation and testimony against Mr. Barrett at his federal trial.*

Otherwise, the punishment range for the offense of conviction was a mandatory minimum of ten years imprisonment, a maximum of life, and not less than five years supervised release. In the September 7, 2007 edition of the *Fort Smith Times-Record*, under the headline "Drug Offender Receives Break," the news article about Price's sentencing hearing states, "Price's sentence was significantly impacted by her testimony in the government's case against Kenneth Eugene Barrett, U.S. Attorney Sheldon Sperling stated in a news release." News article, Ft. Smith Times Record. Thus, Price received substantial favor not for her cooperation in the drug conspiracy case in which she was charged, but for her testimony against Mr. Barrett, which preceded the drug indictment against her.[49]

Mr. Barrett alleges that the Government or its agents knew full well (or had reason to know) at the time of Brandie Price's testimony against Mr. Barrett that she was involved in drug use and drug dealing. This is clearly exculpatory evidence affecting her credibility that was not disclosed by the Government. Nor, under the Government's continuing duty to disclose exculpatory evidence under *Brady*, has it been disclosed by the Government that in exchange for her testimony against Mr. Barrett, she received a substantial downward departure in her own federal drug case. The deal Price received in her federal drug case based on her testimony against Mr. Barrett is also newly discovered, because it occurred after Mr. Barrett's trial. The Government's knowledge of these facts expose them once again to be the purveyors of false testimony – Ms. Price was not the clean, law-abiding citizen it portrayed her to be.

### e.    Karen Real

---

[49] The various sentencing memoranda and motion for downward departure are sealed. Docs. 198, 200, 204, 205, 206, No. CR-07-16-RAW.

Karen Real was another of the informant witnesses the Government kept under wraps until the eleventh hour, and who refused to talk to the defense. (R. 3076-77.) At the time Real appeared as a Government witness, she was serving a fourteen year federal sentence.[50] During direct examination, AUSA Littlefield asked Real if he ever indicated that he would do anything for her based on her cooperation. Real initially answered "[n]o, sir." Littlefield then asked, "Did I talk about anything I'd say to the court?" Real responded, "Well, you just mentioned that, you know, what I did. And that it would be up to the judge." (R. 3080-81.) On cross-examination, Real testified that while she hoped her testimony against Mr. Barrett could help her with her sentence, she was not really expecting anything. (R. 3134.)

Although the picture painted for the jury was that the Government would inform Real's sentencing judge of her cooperation, and that Real, while hopeful of a break, was not really expecting one, she actually received the largest favor she could have received shortly after Mr. Barrett's trial concluded. On March 1, 2006, the Government did much more than "mention" Ms. Real's testimony, it initiated a new proceeding in her case by filing a motion under Fed.R.Crim.P. 35 for reduction of sentence, based on her cooperation against Mr. Barrett. (Doc. 148 in Case No. 6:00-cr-21-FHS.) On April 25, 2005, the sentencing court reduced Real's

---

[50] In Eastern District Case No. 6:00-cr-21-FHS, Real had been convicted of conspiracy to manufacture, to possess with intent to distribute, and to distribute methamphetamine (count 1); maintaining a place for the purpose of manufacturing, distributing, or using methamphetamine (count 3); and possessing a firearm during a drug trafficking crime (count 5). Real received sentences of 108 months on count 1, 60 months on count 3, running concurrently to count 1; and 60 months on count 5, running consecutively to the concurrent terms on counts 1 and 3. (Doc. 158, Apr. 25, 2006, order reducing sentence on Government's Rule 35 motion)

sentence from 168 months (fourteen years) to time served (six years), and ordered Real's immediate release from custody. (Doc. 158 in Case No. 6:00-cr-21-FHS.)

Mr. Barrett submits that the Government misled the jury with respect to the assistance it was going to give Real. The Government surely knew all along that it would ask that Real's sentence be reduced to time served based on her cooperation against Mr. Barrett, an eventuality which in fact occurred. The Government has a continuing duty to disclose exculpatory evidence under *Brady*. This Government's true intentions were never disclosed to the defense or told to the jury. Additionally, the tremendous break Real received on her sentence is newly discovered evidence adversely impacting her credibility and the Government's lack of forthrightness at trial. Evidence of Real's deal could not have been discovered with the exercise of due diligence before or during trial, because it post-dated Mr. Barrett's trial. Yet again, the Government's conduct in soft-peddling the assistance it was going to give Real in exchange for her testimony constituted a violation of *Giglio v. United States,* 405 U.S. 150 (1972) and *Napue v. Illinois,* 360 U.S. 264 (1959).

### f.      Randy Turman

It was argued in Claim 2 that counsel was ineffective for failing to research Turman's court file in Sequoyah County Case No. CF-02-447, and expose his perjury that this six count felony charge had been "taken care of" or disposed of, but was still pending, with no action in the case for two years preceding Mr. Barrett's trial. Regardless of any duty counsel had to investigate Turman's criminal background, the Government had an overarching duty to refrain from sponsoring perjured testimony, and to disclose exculpatory evidence.

The Government or its agents obviously knew that Turman was committing perjury when he stated he no longer had a pending felony case in Sequoyah County, but they let

him give false testimony anyway.  This is a classic violation of the rules announced in *Giglio,*

*Napue, Mooney,* and *Miller, supra*, and the Government should be held fully accountable for it.

It is equally clear the Government knew, despite Turman's denials, that he had worked or was

working as a snitch.  Otherwise, there was no reason for his case to lie dormant for two years.

The Government let Turman get away with another blatant falsehood when he stated the

Government had nothing to hang over his head.  Clearly, his testimony was motivated by the fact

he had a still pending felony case.  Unless he pleased the prosecutors with his testimony, there is

every reason to believe they would have taken action against him, or seen to it that the Sequoyah

County authorities did.

The Government's conduct in connection with Turman is a *Brady* violation.  The

fact he had an open, unresolved felony case gave him a powerful motive to testify for the

Government, and this fact affected his credibility.

Finally, the fact Turman's case was dismissed "in the interests of justice" in 2007

after lying dormant for years is highly indicative that his testimony against Mr. Barrett was at

least in part a basis for the dismissal.  This constitutes newly discovered evidence.

### 2.  The Government failed to reveal exculpatory evidence of a witness who failed to corroborate Charles Sanders

In Claim 1, *supra*, Mr. Barrett described the *ex parte* hearing held September 13,

2005, during which AUSA Mike Littlefield, in the presence of the United States Attorney,

informed the court that Littlefield had spoken with, and knew the identity of, a witness who when

questioned failed to corroborate to which Charles "Monk" Sanders would eventually testify in

the penalty phase of Mr. Barrett's trial.  (Tr. 9/13/05 H'rg at 14, 17.)  Littlefield advised the court

that he attempted to corroborate Sanders's claim that he (Sanders) was in a woman's house when

he overheard her speaking on the telephone.  Sanders, as he later testified, claimed he could recognize Mr. Barrett's voice over the phone, and that he heard the voice say they had to identify the C.I. and get rid of him.  Littlefield told the court he had spoken with the woman himself, and she did not corroborate Sanders, although Littlefield claimed he subjectively believed the woman's denial was motivated by fear.

The fact that the Government knew the identity of a witness who failed to corroborate Sanders about a key piece of second-stage testimony was not disclosed until after trial when appellate counsel obtained the transcript of the *ex parte* proceeding.  To this day, the Government has failed to identify the witness.  This was clearly *Brady* material, because it was evidence that could have been used not only to impeach Sanders's testimony, but to attack the search warrant under *Franks v. Delaware,* 438 U.S. 154 (1978).

But the situation is worse than that.  Sanders was able to commit crimes with impunity, and the Government knew that.  As long as he was willing to inform on others, Sanders had a "get out of jail free" card.  No reasonable person could believe Sanders about anything.  This is especially true since the prosecution was in possession of evidence that Sanders's sorry word was contradicted by another witness.  Due to Sanders's record of total dishonesty and the fact that he was contradicted by another witness known to the prosecutor, polluting a federal courtroom with Sanders's testimony constituted the knowing use of perjured evidence.  *E.g., Miller v. Pate,* 386 U.S. 1 (1967); *Mooney v. Hollohan,* 294 U.S. 103 (1935).

B.       **The Judgements of Conviction and Sentence Should be Vacated Based on the Suppression and New Discovery of Evidence Undermining the Credibility of Key Law Enforcement Personnel**

The Government suppressed exculpatory evidence that would have shown Clint Johnson and Vickie Lyons to be witnesses of poor credibility.  With respect to evidence showing Johnson had no credibility, the suppressed evidence would have also supported a motion to suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978).  The Government suppressed exculpatory evidence that would have torpedoed not only the warrant, but its seven informant witnesses and overall theory of the case, because Sequoyah County Sheriff John Philpot had been to Mr. Barrett's residence with other officers less than a month before the September 24, 1999 incident without coming to any harm.  Newly discovered evidence of former AUSA Littlefield's criminal activities supports claims by some of the informant witnesses that they were threatened and coerced into giving testimony.

1.       **Evidence of Clint Johnson's illicit activities**

But for Clint Johnson's alleged reliance upon "Monk" Sanders to secure the nighttime, no-knock warrant for Mr. Barrett's residence and property, David "Rocky" Eales's tragic death never would have occurred.  The Government or its agents knew that Johnson, just like his alleged snitch, Sanders, is untrustworthy and was subject to impeachment in a variety of areas.  To the extent the impeachment evidence discussed below was generated after Mr. Barrett's trial, it constitutes newly discovered evidence.  However, the Government was aware of this evidence, or had a duty to become aware of it, and has once again failed to fulfill its *continuing* duty to disclose exculpatory evidence.  The impeachment evidence detailed below not only could have been used to attack the overall testimony of Johnson and Sanders, but could have

been used at either stage of Mr. Barrett's trial to argue that but for the acts of a "dirty cop," Clint Johnson, the entire chain of events leading to Trooper Eales's death never would have occurred.

At the time of Mr. Barrett's trial and shortly thereafter, Johnson was under official investigation for embezzlement of funds, illegal drug use, perjury, and gross misuse of his official office.  Agent Vickie Lyons of the Oklahoma State Bureau of Investigation, another critical witness in the Government's case against Mr. Barrett, colluded with and protected Johnson.  Had the jury known these facts, Johnson's credibility, and the validity of the no-knock search warrant, would have been destroyed.  Likewise, the credibility of Vickie Lyons would have suffered greatly had the jury learned of her participation in her boyfriend Clint Johnson's numerous illegal activities.

Although not known to the defense, at the time of Mr. Barrett's trial, Johnson, Lyons and a number of other state law enforcement officers involved in Movant's case had been involved in a series of crimes involving the misuse of their office.  On November 1, 2005, while Mr. Barrett's trial was ongoing, Cherokee County District Attorney investigators Tommy Morgan and Jeff Lancaster reported to District Attorney Richard Gray that Johnson had passed four bad checks in September, 2005 at Champlain's Truck Stop in Tahlequah. (Memo to Richard Gray from Tommy Morgan and Jeff Lancaster dated November 1, 2005.)  Beginning on November 5, 2005, Assistant District Attorney and Drug Task Force Director Jeff Sheridan kept a detailed log of discussions with Johnson, which led to Johnson's termination and the seizure of his vehicle on January 5, 2006. (Log of events from November 2005 through January 2006 by Jeff Sheridan; Letter from Richard Gray to Clint Johnson dated January 5, 2006.) On January 5, 2006, District Attorney investigators found in Johnson's car various drugs and drug paraphernalia that had never been logged into evidence, which they suspected Johnson had

acquired through seizure or purchase with official funds, and which they suspected Johnson was abusing himself. (Report of Investigation dated January 5, 2006 from Courtney Bates; February 3, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries.)  These items included multiple syringes, a pipe, a spoon with methamphetamine residue, a partially smoked hand-rolled marijuana cigarette, vials of liquid methamphetamine, a baggie containing marijuana, and bottles of Xanex and Darvon. (OSBI Criminalistics Investigation Report dated January 26, 2006.)

As early as November 9, 2005, Sheridan was expressing concern over Johnson's inability to account for funds allegedly used for drug buys by confidential informants and funds seized during drug raids. (Log of events from November 2005 through January 2006 by Jeff Sheridan; Memo dated November 17, 2005 from Donovan Dobbs to Jeff Sheridan; Undated Memo from Jeff Sheridan to Clint Johnson; Undated Memo from Jeff Sheridan to Richard Gray; Memo dated November 21, 2005 from Jeff Sheridan to Clint Johnson; Memo dated December 19, 2005 from Courtney Bates to Jeff Sheridan; Memo dated December 27, 2005 from Jeff Sheridan to Clint Johnson; January 17, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries; February 22, 2006 Letter from Richard Gray to OSBI Special Agent Shawn Ward; Undated Report of Second OSBI Interview of Clint Johnson; Memo dated November 13, 2006 from Misty Brinley to Richard Gray).

Johnson had considerable difficulties managing his finances.  He declared bankruptcy in 2001, and his actions in passing hot checks had further alarmed his supervisors. (*In re Clint Johnson,* No. 01-72501, United States Bankruptcy Court, E.D. Okl.)  In December 2005 and January 2006, Sheridan repeatedly expressed his conviction that Johnson was lying to him.  (Log of events from November, 2005 through January, 2006 by Jeff Sheridan; Undated Memo from Jeff Sheridan to Richard Gray).  On November 23, 2005, Sheridan noted Johnson's

possible involvement, as either a target or witness, in a Multi-County Grand Jury criminal investigation. (Log of events from November, 2005 to January, 2006 by Jeff Sheridan). It is plainly apparent that law enforcement knew, during the course of Mr. Barrett's trial, that Johnson was involved in a course of serious criminal conduct that involved financial dishonesty and the misuse of his office.

In October, 2006, a Multi-County Grand Jury unsealed an indictment against Richard Gray, the District Attorney for Cherokee and Sequoyah Counties, for embezzling money seized as evidence from drug investigations. In June, 2008, Okmulgee County District Judge Michael Claver dismissed the charges against Gray at the conclusion of the prosecution's case, and barred further prosecution, based on defense counsel's scathing impeachment of Clint Johnson, who testified as a prosecution witness.

The transcript of the cross-examination of Clint Johnson, which took place on June 4, 2008, is replete with additional evidence of Johnson's misappropriation of funds. (Transcript of Proceedings in *State of Oklahoma v. Richard Loy Gray, Jr.,* Cherokee County Case No. CF-2007-28, June 4, 2008) (hereinafter "Gray RT"). During the cross-examination of Johnson, Gray's defense counsel suggested that: 1) Johnson had fathered a child out of wedlock with the daughter of former Adair County Sheriff Charles Hartshorne, and that Johnson and Hartshorne were dividing up drug money between themselves (Gray RT 26-27); 2) Johnson lived with another critical prosecution witness in Mr. Barrett's case, Vickie Lyons of the OSBI (*id.* at 74); 3) based on his relationship with Lyons, Johnson knew that the OSBI would do nothing to address official theft of drug money (*id.*); 4) Johnson used Lyons's cell phone and drove her car, and when government officials confronted Johnson about property he had illegally taken, Lyons brought it back (*id.*); 5) Johnson attempted to borrow, and in some cases did borrow, money from

counsel for defendants whose assets Johnson seized (*id.* at 65); 6) Johnson illegally released funds seized from defendants to defense counsel, and then obtained kickbacks from defense counsel for this illegal conduct (*id.* at 66-67); 7) Johnson used drug funds as his own private ATM (*id.* at 64); 8) throughout 2003 and 2004, Johnson took money seized from drug arrests and purchased cashier's checks for his own personal use (*id.* at 68); and 9) Johnson began writing bad checks as early as May, 2003. *Id.* at 54.

None of this information was shared by the Government with Mr. Barrett's lawyers; it is obvious they intentionally concealed it. Mr. Barrett's current counsel first learned of this information in February, 2009, when they obtained a copy of the court reporter's transcript of Johnson's testimony in Richard Gray's trial and defense exhibits in Mr. Gray's case. Mr. Barrett's counsel are currently investigating this newly discovered evidence of prosecutorial misconduct, and will amend this motion to include new details about the breadth and scope of this misconduct as it becomes available to them.

But there is now abundant evidence calling into question Mr. Barrett's conviction. An evidentiary hearing was conducted on Mr. Barrett's motion to suppress on January 26, 2005 (Tr. 1/26/05 Hr'g), Johnson was called by the Government, and testified that the no-knock search warrant he obtained was based on information he received from a confidential informant (later identified as Charles Sanders). Johnson had used this particular informant at least five times, and the informant had "never been wrong." (Tr. 1/ 26/05 Hr'g at 66-67.)

On cross-examination, Johnson acknowledged that during the state court proceedings, he had never revealed the name of the confidential informant, and that defense counsel John Echols (who examined Johnson at the motion hearing) was the only one who had asked for the identity. Johnson admitted writing the name of the C.I. on a piece of paper, which

was placed in a sealed envelope in the state court file. (Tr. 1/ 26/05 Hr'g at 78, 83-90.) However, Johnson stated that he had revealed the name of the C.I. to the United States Attorney's Office.  (Tr. 1/ 26/05 Hr'g at 81.)

Johnson testified that before September, 1999 the C.I. had been involved in criminal activity leading to formal charges.  (Tr. 1/ 26/05 Hr'g at 82-83.)  When counsel asked Johnson whether the informant had been involved in other criminal activity since September 1999, the Government objected on relevance grounds, and the magistrate sustained the objection, holding that only what occurred before the no-knock warrant was issued was relevant.  Counsel responded that he always believed the C.I. was not a real person, but a composite.  (Tr. 1/ 26/05, Hr'g at 83-90.)  In the state proceedings, one of the reasons given for shielding the alleged C.I.'s identity was the claim the C.I. was involved in assisting an ongoing investigation until 2004.  Of course, the claim the C.I.'s identity was being protected for this reason (assuming Sanders was the C.I.) is obviously false.  Sanders, with the patronage of Clint Johnson, was allowed to commit crimes at will in Sequoyah County after 1999 with only minor consequences.  The Government did not want it brought out at the suppression hearing that Johnson's C.I. had continued to commit crimes with impunity and was therefore an unreliable source.  The Government, who had been informed of Sanders's identity, was well aware of the litany of crimes he had committed since 1999, and knew that his identity was not being protected because of an "ongoing investigation." *(E.g., Giglio v. United States,* 405 U.S. 150 (1972).)

Switching tracks, Mr. Echols asked Johnson if the C.I. had participated in drug transactions or drug dealing prior to September 24, 1999.  Johnson replied, "They [meaning drugs] were probably used some, yes, sir."  Asked if the C.I. sold drugs, Johnson stated "Not that

I am aware of." Asked if the C.I. had run a meth lab, Johnson again replied, "Not that I am aware of, no, sir." (Tr. 1/ 26/05 Hr'g at 92.)

Johnson, who was presumably aware of Sanders's extensive criminal history before 1999, gave false testimony on this score. As illustrated in the first stage ineffective assistance of counsel claim, Sanders had a 1986 Arkansas conviction for delivery of cocaine and amphetamines. Information gathered during this 2255 investigation indicates that Sanders also routinely sold drugs, activities Johnson would have known about if he were regularly in contact with Sanders and not recklessly disregarding the truth of his activities. (Decls. of Rick Lunsford and Sean Hill.) Johnson's testimony was false on a material matter and prevented proper development of evidence to challenge the warrant because of the unreliability of the C.I. The prosecution had every reason to be aware of Sanders's criminal conviction in Arkansas for drug delivery, but stood silently by as Johnson gave false testimony. *Miller v. Pate,* 386 U.S. 1 (1967).

The Government was well aware of damning evidence regarding the alleged C.I., Charles Sanders, but used objections to prevent counsel from eliciting this information in order to build a record for a motion to suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978). It was not until trial, when Sanders testified, that only some of his criminal history, but not the many deals and the repeated lenient treatment he had received, was revealed. By then, the *Franks* challenge that was mounted was incompetent, as detailed in Claim 2.

### 2.    David Michael Littlefield's illicit activities

Following Mr. Barrett's conviction

> [United States Attorney Sheldon] Sperling said he is grateful to Mike Littlefield for his work as chief prosecutor in the case; and to Sequoyah County Sheriff

> Johnny Philpot, who was instrumental in identifying key witnesses who could prove Barrett acted with premeditation.

(Tehleqhah *Daily Press*.)  In fact Littlefield himself was responsible for bringing the seven drug-addict informants to support the Government's case, as he stated during the *ex parte* hearing held September 13, 2005, and discussed elsewhere in this Motion.

Former AUSA Littlefield threatened and pressured Travis and Cindy Crawford to provide testimony against Mr. Barrett.  Since Littlefield primarily conducted the interviews of the seven informant witnesses, it is likely that others were threatened as well.  Support for this claim comes from newly discovered evidence of Littlefield's own troubles with the law, and consequent proceedings against him by the Oklahoma Bar Association.

In Muskogee County Case No. CF-07-363, Littlefield was charged with felony child abuse.  On August 3, 2007, Littlefield was permitted to enter an *Alford* plea to count 2 of the Information, charging child abuse by injury in violation of 10 O.S. 2001, section 7115(A).  Based on this plea, Littlefield received a two year unsupervised deferred sentence, and was required to pay court costs.  *See* Complaint, *State of Oklahoma ex rel. Oklahoma Bar Association v. David M. Littlefield,* OBAD #1720, SCBD #5338, filed with the Oklahoma Supreme Court on September 28, 2007.  Littlefield's criminal case file in Muskogee County was expunged even before the Bar Complaint was filed, although his deferred sentence was to run for two years from August 3, 2007.[51]  (Trial Brief of Complainant, p. 2, filed on January 2, 2008, in *State of*

---

[51]  The fact Littlefield's case was expunged long before his two year deferred sentence expired, as noted by the Bar Association's Assistant General Counsel, prevents Mr. Barrett from ascertaining whether Littlefield lied to investigators before entering his plea.  It also prevents Mr. Barrett from ascertaining why Mr. Littlefield received such favorable treatment.

*Oklahoma ex rel. Oklahoma Bar Association v. Littlefield, supra.*)  As of the date of the filing of Mr. Barrett's 2255 motion, the Bar action against Littlefield is still pending.

In the affidavit for search warrant for Littlefield's home, captioned SW-07-34, and filed in the District Court of Muskogee County on April 23, 2007, Jan Ray, a Muskogee County Deputy Sheriff, states in pertinent part that Littlefield had been brutally abusing his minor children for a period of years extending back to the time he was the chief prosecutor on Mr. Barrett's case.  (Affidavit for search warrant, SW-07-34, filed in Muskogee County District Court, April 23, 2007, signed by affiant on April 13, 2007.)

Based on the affidavit, a search warrant was issued on April 13, 2007, and filed in the court record on April 23, 2007.  (Search warrant, SW-07-34.)  Various camera and computer equipment were seized in the search.  (Search warrant return, SW-07-34, filed in the District Court of Muskogee County on April 23, 2007.)

Littlefield did not contest the charges.  He was found guilty on an *Alford* plea, receiving a very generous sentence which has already been dismissed, with the case file expunged.  The Bar Association action against him is still pending.

Littlefield's child abuse charges are relevant to the manner in which he handled the informant witnesses in Mr. Barrett's case.  A bully who apparently had no compunction about using his minor children as punching bags for years to work out his "temper fits" and frustrations would have no problem threatening witnesses with all manner of dire consequences to keep them in line and produce the desired testimony against Mr. Barrett.  This newly discovered evidence regarding Littlefield's own deplorable and shocking criminal conduct against his own children not only corroborates Travis Crawford's and Cindy Crawford's claims they were threatened by Littlefield to secure their testimony, but is also relevant to Mr. Barrett's claim of prosecutorial

misconduct dealing with the manner in which Littlefield handled his informant witnesses in an attempt to prevent defense counsel from having anything close to a reasonable opportunity to investigate the backgrounds of these witnesses and their testimony.

The current defense investigation supports the claim Littlefield routinely sought to intimidate witnesses.   Janice Sanders described her contact with Littlefield:

> Mr. Littlefield came to see me.  Johnny Philpot accompanied him.  Mr. Littlefield got angry with me when I told him that I thought that Kenny's state sentence was fair and that it was un-American to try him again since he had been convicted and sentenced.

(Decl. of Janice Sanders.)

### 3.      John Philpot

The Government argued extensively at trial that a middle-of-the-night, no-knock search warrant had to be issued to search Mr. Barrett's property, and that the authorities had to proceed in the way they did, because Mr. Barrett was dangerous; if he had any warning that police were on his property, he would have shot them.  This was the repeated theme of the Government's case, based on its seven informant witnesses.

The truth is otherwise.  John Philpot, former Sequoyah County Sheriff, recently admitted to a defense investigator that he and other local law enforcement officers were on Mr. Barrett's property less than a month before the raid which led to the death of David Eales, as police reports reflect they had also done the previous year.  There were no shots fired and no violence from Mr. Barrett.  (Decl. of Rodney Floyd.)

This evidence, known to the Government or its agents, was unquestionably exculpatory, in several respects.  Had this fact been known to the defense, the entire edifice of the prosecution's case would have crumbled.  It would have supported an attack on the nighttime,

no-knock warrant, demonstrating there was no probable cause for a warrant of this type.  Because the initial warrant lacked probable cause, the fruits of any subsequent warrant, *i.e.,* drugs and firearms evidence later seized, would have been acquired unlawfully, knocking out the foundations of the three counts in the superseding indictment.  This evidence would have discredited the seven snitches, some of whom claimed that were told by Mr. Barrett that if the police came on his property, he would shoot the first one through the door, and that he hoped the first officer through the door would be John Philpot.  This evidence would have demonstrated that, as the defense argued, Mr. Barrett was unaware the police were raiding his property; he thought he was repelling civilian trespassers.  Even if convictions had been returned, this evidence was relevant to rebutting the intent factors alleged by the Government in the punishment phase.

## Conclusion

Certainly when viewed together, the exculpatory evidence suppressed by the Government, some of which could also be termed newly discovered evidence, the other newly discovered evidence discussed above, and the Government's sponsorship of false testimony would have made the difference between conviction and acquittal at trial.  At a minimum, it would have made a difference in the sentencing stage.

The Government suppressed and has continued to suppress evidence which would have dealt fatal blows to Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Karen Real, Randy Turman, Clint Johnson, Vickie Lyons, and John Philpot.  At least two of the informant witnesses, Travis and Cindy Crawford, testified based on threats from then-AUSA Littlefield, a fact well known, obviously, to Littlefield himself.  The suppressed exculpatory or newly discovered evidence, or both, affecting the credibility of these witnesses,

were known and became known to the Government and its agents.  This evidence  was

unquestionably favorable to Mr. Barrett, and was material in the sense that disclosure of this

evidence would have created a reasonable probability of a different outcome.  *Strickler v.*

*Greene,* 527 U.S. 263, 289 (1999); *United States v. Bagley,* 473 U.S. 667, 682 (1985); *Fero v.*

*Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994).

> Taken together, the suppressed exculpatory evidence addressed above would have

been fatal to the admissibility of all the physical evidence introduced against Mr. Barrett, and

would have left in shreds the prosecution's claims of Mr. Barrett's "intent," as testified to by the

seven informants.  Newly discovered evidence in the form of after-the-fact deals given to various

prosecution witnesses – which Mr. Barrett contends still constitutes *Brady* material, because

these deals were in the works or promised all along, and because the prosecution's duty under

*Brady* is continuing – would have shown the various snitch witnesses to have no credibility

whatever.  *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002)(habeas relief granted in section

2254 case where exculpatory evidence, even if it could only be used for impeachment purposes,

was suppressed); *Mitchell v. Gibson,* 262 F.3d 1036, 1059-60, 1062-63, 1065 (10th Cir.

2001)(vacating death sentence in 2254 case for failure to reveal exculpatory evidence of testing

on physical evidence); *Nuckols v. Gibson,* 233 F.3d 1261 (10th Cir. 2000)(habeas relief granted in

section 2254 case where prosecution failed to disclose material evidence impeaching a key

prosecution witness).

> Travis Crawford's recantation, if known at the time of Mr. Barrett's trial, belies

the prosecution's theory of intent and could have been used to impeach the credibility of other

witnesses' claims that Mr. Barrett had threatened armed confrontation with the police.  Likewise,

had the former AUSA's violent temper and assaultive behavior against his own children been

known at the time of Mr. Barrett's trial, the claims now made by the Crawfords that they were coerced to testify against Mr. Barrett ring true. The newly discovered evidence discussed here goes to the foundation of the case.

Most troubling, of course, is the Government's sponsorship of false evidence from Randy Turman, Charles Sanders and, at the motion to suppress, from Clint Johnson. This evidence clearly affected the outcome of trial. Threats to witnesses Travis and Cindy Crawford is also a form of false evidence; a threatened witness is, *per se*, an unreliable witness. The Government also misled the jury about what it was going to do for Sanders and Karen Real in exchange for their testimony, in violation of *Giglio.*

The misconduct of the prosecutors was repeated and blatant. Mr. Barrett's fundamental constitutional rights were violated. He should be granted relief from his convictions and sentences.

**C.     Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses**

The prosecution violates a defendant's right to due process when it interferes with the defense's access to prosecution witnesses. *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969). It is unprofessional conduct for prosecutors to impede defense counsel's access to prosecution witnesses. (ABA Criminal Justice Standards, Pros. Function § 3-3.1(c) & commentary (3d ed. 1993)("ABA Standards").)  "It is imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights." *United States v. Rich*, 580 F.2d 929, 934 (9th Cir.), *cert. denied*, 439 U.S. 935 (1978). Thus courts cannot tolerate "any governmental conduct that has the purpose or effect of discouraging witnesses from cooperating with the counsel of an accused." *Ibid.*  Thus,

"counsel may not make his or her presence a condition of the interview" between the defense lawyer and a witness. (Commentary on Standard 3-3.1(c).)

The prosecution in Mr. Barrett's case interfered with the defense's access to key prosecution witnesses including Karen Real, Randy Turman, Randall Weaver, Charles "Monk" Sanders, Cindy Crawford, Travis Crawford, and Brandie Price. Prosecutors, through statements and/or actions, communicated to witnesses that they should not speak with defense personnel outside the presence of the prosecutor. (Decl. Roger Crawford; Decl. Leonard Post.) Additionally, the prosecutors intentionally delayed access to the identities of the witnesses in order to prevent meaningful interviews with them, including by preventing interviews with incarcerated witnesses, and to prevent meaningful investigations of their backgrounds and honesty.

Prosecutors intentionally withheld the names and contact information for these witnesses. On February 17, 2005, prosecutor D. Michael Littlefield wrote in a letter to defense counsel that the Government did not intend to reveal the identity of the confidential informant, and added the "situation would change should we determine to utilize this individual as a witness." The Government did not reveal the identities of its seven key witnesses until September 15, 2005. In order to keep the identities secret past the deadline imposed by 18 U.S.C. § 3592, the Government filed a baseless motion for a protective order. The trial court found the Government could have filed its motion to keep the witnesses' names from the defense weeks earlier. (Tr. 9/13/05 Hr'g at 5). The trial court found the Government's motion did not present any evidence to justify withholding the names and other information from the defense. (Tr. 9/13/05 Hr'g at 4). The prosecutor admitted that the Government could have raised its concerns about at least some of the witnesses earlier. *Id.* at 9. Despite the delay the court found

"there is no evidence of any overt activities by anyone on behalf of the defendant to intimidate witnesses that you [the Government] are aware of." *Id.* at 19.[52]

During an *in camera* the hearing on the Government's motion for a protective order, AUSA Littlefield was not candid with the court. The court appeared to recognize that Littlefield was making inconsistent claims. On the one hand he was claiming that the defense attorneys had sufficient notice of the witnesses (a) because they were Mr. Barrett's associates and family members (Tr. 9/13/05 Hr'g at 9-10), and (b) because the Littlefield told defense counsel what the witnesses would testify to. *Ibid.* The court raised the obvious point that if Littlefield had been so forthcoming, there was no need for secrecy because, the disclosed information would be sufficient for Mr. Barrett "to be able to determine roughly who we are talking about." *Id.* at 11. Littlefield said it would not be. This admission strongly suggests Mr. Barrett was not aware of having said the things attributed to him by the witnesses because he had never said them.

At that point the United States Attorney cut Littlefield off and had an off-the-record discussion. Back on the record, Littlefield said that the notice he had provided would be insufficient to identify the witnesses because Mr. Barrett had said these things to so many people, it would be hard for him to remember them all. Littlefield could produce no evidence of this "belief" he had. *Id.* at 12.

Following the *in camera ex parte* hearing, the Government and Judge Payne withheld from defense counsel information that was critical to the defense including: (a) that the court's research indicated that for purposes of § 3532 the trial had started the previous day; (b)

---

[52] The only person the Government could point to who had any known affinity with Mr. Barrett that could conceivably suggest a threat, was a man who posed no threat whatsoever because he was in a federal prison somewhere. *Id.* at 14.

that the court indicated a request for a continuance would be valid based on the importance of the witnesses and what they would say; (c) that the Government had made representations about defense counsel's interpretation of § 3532; (d) that AUSA Littlefield had spoken with a witness who failed to corroborate information from confidential informant Charles Sanders; (e) that the Government's motion for a protective order relied upon information the court deemed irrelevant – *viz.* that the court permitted Mr. Barrett to be restrained by an electric-shock belt and that the court would keep jurors anonymous – and lacked sufficient factual support; (f) that the prosecutors revealed *in camera* information that fell within the notice requirements of Federal Rule of Evidence 404(b).  *See* Claim 1, *supra*.

To the extent Mr. Barrett's trial counsel acquiesced in the prosecutors' plan to delay production of the witnesses' names, contact, information, statements, and the arrangements for interviewing the witnesses, Mr. Barrett was denied his right to effective assistance of counsel. As the prosecutor said, Mr. Barrett's trial counsel had no information about the identities of the witnesses or the content of their testimony.  (Tr. 9/13/05 Hr'g at 6-7).  With the information withheld from them, trial counsel could not have made an informed decision regarding whether delayed disclosure was acceptable, whether the arrangements for interviews were acceptable, and whether trial counsel were ready for trial once the witness names were known.  *Rompilla v. Beard*, 545 U.S. 374, 383-86 (2005) (failure to investigate evidence prosecution intended to rely upon was obviously deficient); *Wiggins v. Smith*, 539 U.S. 510, 533-34 (2003) (failure to investigate could not be justified where trial counsel had inadequate basis for decision); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984) (decisions are reasonable only to extent supported by adequate investigation).

The concerns of any reasonable defense lawyer under the circumstances – including the need for a continuance – were obvious to the trial court. (Tr. 9/13/05 Hr'g at 10, 12.)  The record shows defense counsel acquiesced in the Government's proposal that witnesses be interviewed with Government representatives present.  *Id.* at 27.  In addition to this "decision" being professionally unreasonable, it was to some extent induced by the trial court's failure to disclose weaknesses the Court had identified in the Government's position, weaknesses the court disclosed to prosecutors, but not to the defense.  *See* Claim 1, *supra*.  Neither Mr. Barrett nor his counsel could have made an informed decision about access to the witnesses without the information the trial court possessed but was unwilling to share with the defense.  To the extent Mr. Barrett's trial counsel could have uncovered the same legal arguments the court identified, they failed to act professionally.

Faced with the Government's intentional delay (the confidential informant at least was known to the Government from the start), and the Government's pretextual expression of concern for the witnesses' safety, and ignorant of the Court's views and complicity in extending the delay, Mr. Barrett's trial counsel "agreed" to restrictions on their access to witnesses.  The Government's promise of restricted access was itself illusory.  Mr. Barrett's counsel were unable to conduct any meaningful interviews of the witnesses prior to trial.  The delays also prevented or impeded meaningful investigation of the witnesses.  As shown *supra* in this Claim and Claim 2, an investigation of the Government's key witnesses would have yielded abundant evidence of their dishonesty and incentives to color their testimony to the desires of law enforcement.

If trial counsel had met their ethical and constitutional obligations to Mr. Barrett, there is a reasonable probability the outcome of the case would have been different.  In the absence of the seven snitches' testimony two prior juries refused to convict Mr. Barrett of capital

Def's § 2255 Mot.                                      298                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

murder.  As the trial judge repeatedly asserted in his budget rulings and elsewhere in the record, the main difference between the federal case and state cases was the question of premeditation, or a pre-formed intent to kill.  As the United States Attorney has publicly acknowledged, the seven snitches were key to the Government's ability to convince the jury Mr. Barrett acted with the requisite *mens rea*.  But for the Government's misconduct or trial counsel's deficient performance, the evidence presented herein would have impeached the seven witnesses.  It is reasonably probable that if the witnesses had been impeached with the evidence presented herewith, Mr. Barrett would not have been convicted of capital murder, or would not have been sentenced to death.

**D.      Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses and Closing Argument**

Throughout the penalty phase of Mr. Barrett's trial prosecutors repeatedly and in various ways violated rules of professional conduct regarding the questioning of witnesses.  *(See ABA Standard 3-5.6.)*  These improper questions, together with the prosecutor's "comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

The prosecutor's improper conduct included the following examples:  The prosecutor improperly asked questions for which he lacked a good faith basis, or to which he knew the witness could not give an answer based on personal knowledge, the effect being to imply that the prosecutor had knowledge of the facts.  (R. 4743 (implying existence of records adverse to Mr. Barrett), 4765-66, 4781 (implying Mr. Barrett had been denied custody of his son), 4788-92, 4850, 4852-53, 4859, 4862, 4866, 4869, 4911, 4913, 4925 (bolstering Karen Real

by implying prosecutor's knowledge of her reputation for honesty), 4980, 5006 (falsely suggesting prosecutor had knowledge of Mr. Barrett trying to infect jail worker with communicable disease).)

The prosecutor improperly commented upon Mr. Barrett exercising his trial rights in state court. (R. 4765.) The prosecutor improperly adduced through a witness who lacked personal knowledge whether someone who is sentenced to 20 years' imprisonment will be released earlier by the Department of Corrections. (R. 4765-66.)

The prosecutor asked witnesses whether other witnesses had made false statements although, due to Federal Rule of Evidence 615, the witness being questioned could have had no knowledge of the other witnesses' testimony. (R. 5092.)

The prosecutor repeatedly exceeded the scope of direct examination and asked witnesses questions about the seven informant witnesses the Government presented in federal court, or Abby Stite's charges against Mr. Barrett, although – or because – the prosecutor knew the witnesses lacked personal knowledge of the facts. (R. 4767, 4788-92, 4925, 4926, 5024-26, 5045 (Littlefield acknowledging he asked question knowing witness had no personal knowledge), 5069, 5116.) As the prosecutor's obvious goal was to merely repeat the testimony of witnesses who claimed to observe various facts, regardless of whether the witness testifying had said anything related to the other witnesses' testimony, the questioning lacked any probative value and trial counsel were ineffective for failing to object. The effect of the prosecutor's improper questioning was to repeat the Government's case over and over and over, and make defense witnesses appear ignorant of facts to which their testimony did not relate. Ultimately, the prosecutor's misconduct – enabled by trial counsel's unreasonable failure to object – completely drowned out the defense witnesses' testimony.

Def's § 2255 Mot.                                  300                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

In arguing for death, the prosecutors stooped to conquer.

In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently. Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards." (R. 5356-57.) The Tenth Circuit has condemned similar tactics. *Paxton v. Ward,* 199 F.3d 1197, 1217 (10th Cir. 1999) (prosecutorial misconduct justified sentencing relief where, in connection with unadjudicated homicide introduced in the penalty phase, prosecution objection prevented defendant from showing the charge had been dismissed because he passed a polygraph test, and prosecutor took advantage of the ruling to argue "we don't know why" the case was dismissed, implying dismissal could have stemmed from a technicality).

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer. This was "way over the capital murder line." (R. 5402-03.) Similarly, Sperling later asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?" (R. 5412.) Denigrating Mr. Barrett's fundamental right to a fair trial, Sperling, in the form of a rhetorical question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness." (R. 5408.)

Trotting out a variation on the old Bob Macy[53] "three hots and a cot" argument, which the Tenth Circuit has condemned on more than one occasion, Sperling repeatedly – and falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room." (R. 5412, 5423.) Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. (R. 5412.) Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. (R. 5412.) *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin,* 311 F.3d 1002, 1014-15 (10th Cir. 2002). In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent." (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence." Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?" The prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill." (R. 5412-13.)

---

[53] Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[54], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough." to testify.  R. 5414-15.  *Gordon v. Kelly,* 2000 WL 145144 (6th Cir. Feb. 1, 2000) (unpublished) (pervasive efforts by prosecutor to portray defendant as being feared by witnesses required habeas relief).

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them.  To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. R. 5415.  This falsely implied the victim impact witnesses did not testify in the state trials only because the incompetent, "under-evidenced" state prosecutors did not have sense

---

[54] This was a knowing false statement on the prosecutor's part.  As discussed in Claim 1, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett.  "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

enough to put them on the stand. Sperling was well aware they *could not have testified by law* because the case never got past the first stage.

Shielded by the court's erroneous ruling excluding Mr. Barrett's statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]." R. 5419. The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did. Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone. Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing." The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops." R. 5420-21. There were additional comments on Mr. Barrett's supposed lack of remorse. R. 5419-20, 5421-22. *Paxton v. Ward,* 199 F.3d at 1217.

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life. (R. 5420.) *Cf. Penry v. Lynaugh,* 492 U.S. 302, 319 (1989); *Lockett v. Ohio,* 438 U.S. 586 (1978).

Sperling aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again. (R. 5421-22.) Remarks of this nature have always been deemed improper. *Viereck, v. United States,* 318 U.S. 236, 247-48 (1943); *Cargle v. Mullin,* 317 F.3d 1196, 1223 (10th Cir. 2003). Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warned the jury they would make him a "hero" in prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time." (R. 5423.) This was little better than telling the

Def's § 2255 Mot.                                304                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit. *Bates v. Bell,* 402 F.3d 635, 642 (6th Cir. 2005).

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections. *See* Claim 2. *Darden v. Wainwright,* 477 U.S. 168 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). The error stemming from prosecutorial misconduct cannot be termed harmless, even under the strict due process test of *Darden* and *Donnelly.* This was not a runaway case for the death penalty. The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

Prosecutorial misconduct was not raised on direct appeal. Because the misconduct of the prosecutors in the second stage of trial was so glaring, no reasonable strategy excused the failure to raise the claim. Based on the fact the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different. *Evittts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 6.** **Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth and Fourteenth Amendment of the United States Constitution, to due process, to effective assistance of counsel, to a reliable sentence, to present defense evidence, and to rebut the evidence introduced against him were violated when the trial court unduly restricted defense counsel's opportunity to present significant, relevant and admissible *defense* evidence and facts to the jury, including various statements by Mr. Barrett around the time of his arrest that showed deep remorse for the death of Trooper David Eales, and restricted the jury's consideration of the state-court verdict.

The court's exclusion of this essential evidence during penalty phase proceedings violated Mr. Barrett's right to jury consideration, as a mitigating factor, of important evidence of Mr. Barrett's character, in violation of *Skipper v. South Carolina*, 476 U.S. 1 (1976) and *Lockett v. Ohio*, 438 U.S. 586 (1978).   The exclusion of this evidence also violated Mr. Barrett's Sixth Amendment right to offer evidence in support of his claims.  *Rock v. Arkansas*, 483 U.S. 44 (1987).  The exclusion of this evidence deprived Mr. Barrett "of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986).  These restrictions also denied Mr. Barrett the opportunity to conduct an effective cross-examination of prosecution witnesses, in violation of Mr. Barrett's rights under the Confrontation Clause of the Sixth Amendment.  *Delaware v. Van Arsdale*, 475 U.S. 673, 678 (1986).  Finally, the trial court's rulings on this issue fatally infected the proceedings and violated Mr. Barrett's due process rights.  *Estelle v. McGuire*, 502 U.S. 62, 70 (1991); *Moore v. Illinois*, 408 U.S. 786, 800 (1972).

During the course of Mr. Barrett's trial, trial counsel sought to admit a number of statements made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper Eales.  For example, Mr. Barrett's counsel sought to admit the written statement of

Trooper Glen Smithson, who recorded that on September 29, 1999, Mr. Barrett told him, "The wrong person got killed.  I wished it had been me."  (Police Report dated September 29, 1999.)

However, the prosecutor objected to these statements, and the court incorrectly excluded them.  The Government cynically exploited the court's ruling in closing argument, mocking the notion Mr. Barrett had any remorse at all.  The prosecutor fastened on Mr. Barrett's statement to his mother that he wished things had turned out differently, which AUSA Littlefield stated meant Mr. Barrett had wished he had not gotten caught so he could "kill more of the bastards."  (R. 5356.)  With Mr. Barrett's expressions of remorse excluded, the United State Attorney was able, without fear of contradiction, to call him a "common, cold-blooded murderer."  (R. 5423.)  During closing argument, Mr. Barrett's counsel argued, as a factor in aggravation, that Mr. Barrett expressed remorse for his crimes.  As a result, all of the jurors rejected as a mitigating factor that Mr. Barrett expressed remorse for his crimes.  *U.S. v. Barrett*, 496 F.3d 1079, 1088 (10th Cir. 2007).

By refusing Mr. Barrett's attempts to present evidence of his contemporaneous expressions of remorse, the Court prevented Mr. Barrett from proving the existence of this factor in mitigation.  In fact, Mr. Barrett's expressions of remores were highly relevant and admissible.  Remorse is "an important mitigating factor."  *Jones v. Polk*, 401 F.3d 257, 264 (4th Cir. 2005).  *See also Riggins v. Nevada*, 504 U.S. 127, 144 (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps be determinative of whether the offender lives or dies.")  This is particularly true when, as in this case, the Government "emphasized the lack of remorse in closing argument."  *Jones v. Polk*, 401 F.3d at 264.

"Short of a defendant taking the stand, often the only way to present evidence of remorse is through the hearsay statements of others." *Davis v. Polk*, 2007 WL 2898711, at \*18 (W.D.N.C. 2007).   Accordingly, the use of hearsay rules to prevent the admission of expressions of remorse violates the *Lockett* line of cases, which hold:

> that 'a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could not be part of the sentencing decision at all.

*Jones v. Polk*, 401 F.3d at 263 *quoting Johnson v. Texas*, 509 U.S. 350, 362 (1993) (court erred in excluding as hearsay at penalty phase letter in which capital defendant expressed remorse).

The court's error in excluding this evidence prejudiced Mr. Barrett.  Had Mr. Barrett been allowed to present this evidence, there is a substantial probability that he would not have been sentenced to death.  The court clearly erred in excluding this evidence, because the rules of evidence, with respect to the introduction of both mitigating and aggravating evidence, do not apply in the sentencing stage of a capital case.  21 U.S.C. section 848(j), in effect at the time of Mr. Barrett's trial, that any other information a party may want to submit is not constrained by the rules of evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice.  Because a defendant must be allowed under the Eighth Amendment to introduce any relevant mitigating evidence, it beggars the imagination to believe that expressions of remorse are more prejudicial than probative.  The court excluded highly relevant mitigating evidence of remorse, which opened the door for the Government to prejudicially deride Mr. Barrett as a cold blooded killer who wanted to take out more cops.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced

Def's § 2255 Mot.                        308                   *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the jury's verdict.  *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on Mr. Barrett's conviction and death sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel was ineffective for failing to raise this issue, clearly framed by the record, on direct appeal.  Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded.  *Skipper v. South Carolina,* 476 U.S. 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Lockett v. Ohio,* 438 U.S. 586 (1978).  There could be no reasonable strategy for neglecting to raise this issue.  There is a reasonable probability that had it been raised, the outcome of the appeal would have been different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 7.       Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the U.S. Marshal to place visible restraints on Mr.

Def's § 2255 Mot.                            309                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Barrett during the trial without a finding that Mr. Barrett was or would be a security risk.

Throughout the trial Mr. Barrett was forced to wear a "stun belt" around his waist. The belt left

an unusual bulge that was visible through Mr. Barrett's clothing. The marshals ability to send an

electric shock through the belt intimidated Mr. Barrett and posed a danger to him that impaired

his ability fully to observe and participate in the trial, including communicating with his

attorneys.

The Supreme Court has long held that the use of visible restraints on a defendant

without a particularized finding of necessity violates due process and can impair a defendant's

Sixth Amendment right to effective assistance of counsel, to a presumption of innocence, and to

a fair and reliable capital sentencing proceeding as guaranteed by the Eighth Amendment. *Deck*

*v. Missouri*, 544 U.S. 622, 632 (2005); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle v.*

*Williams*, 425 U.S. 501 (1976); and *Illinois v. Allen*, 397 U.S. 337 (1970).

During a sealed hearing held August 31, 2005, a deputy U.S. Marshal testified that

there were never any problems with Mr. Barrett acting out or showing any signs of being a risk of

danger or escape. The Court opined that the mere fact that a stun belt had been used against

other capital defendants without their lawyers complaining was a ground to permit its use. Mr.

Barrett had been through two previous capital trials related to the same events and during that

time never posed any security risk or risk of escape. In sum, none of the constitutionally required

circumstances existed to justify placing visible and/or intimidating constraints on Mr. Barrett

during trial.

On September 9, 2005, the Court abdicated its role and consigned the question of

whether to place restraints on Mr. Barrett to the discretion of the U.S. Marshal service. This

Def's § 2255 Mot.              310              *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

ruling violated Mr. Barrett's rights under the cases cited *supra*, and his right to a fair and impartial trial judge. *See also* Claim 1.

In an *ex parte* hearing outside the presence of defense counsel, the trial judge stated that "probably any capital case where I was the presiding judge a stun belt would be used just because of the nature of the potential punishment. It just seems that it's a common – almost a common sense call under those circumstances." (Tr/ 9/13/05 ex parte Hr'g at 13.) The Supreme Court requires much more than a "common sense call" before a defendant can be restrained in a threatening manner during a capital trial.

The stun belt created a visible bulge in Mr. Barrett's clothing that was observable by the jury. (Decl. Doris Barrett). In addition, Mr. Barrett was known by the Government and Court to be a victim of violent abuse by Sheriff Johnny Philpot and his deputy. Indeed, the jury found that Mr. Barrett had suffered abuse from Philpot. The Government and Court also were aware that Mr. Barrett had been beaten and threatened by law enforcement officers for his role in the death of David Eales. Under the circumstances it was reasonable for Mr. Barrett to fear that he would be stunned by the marshals on the slightest perceived provocation, and as this issue was raised by trial counsel, the Court was aware that the stun belt would inhibit Mr. Barrett's movements and communications with counsel in court. After all, he was to be restrained even though the marshals admitted he had never caused them any trouble.

Trial counsel informed the court that Mr. Barrett was at special risk from the stun belt due to conductive steel wire in his chest and abdomen area. (Tr. 9/9/05 Hr'g at 27.) (Trial counsel's statement at this hearing reveals that three days before the trial began trial counsel Hilfiger had not reviewed Mr. Barrett's medical records which clearly mention – and in the case of x-rays, depict – the metal wires in Mr. Barrett's chest.) Trial counsel's statements informed

Def's § 2255 Mot.                           311                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the court that Mr. Barrett was especially fearful of the stun belt and the danger it posed to him. This fear was exacerbated by the marshal's failure to conduct or inquire about Mr. Barrett's unique medical circumstances. Since the trial, trial counsel have confirmed that Mr. Barrett felt intimidated wearing the stun belt throughout the trial.

The unjustified use of restraints on Mr. Barrett inhibited his movement and communications with counsel and made him appear dangerous to jurors. The stun belt scared and intimidated Mr. Barrett and chilled his communications, and restricted his ability fully to observe and participate in the proceedings.

To the extent the stun belt was used without sufficient justification, its use was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance. The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt. In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness. Therefore, there is a reasonable probability that Mr. Barrett would have been granted a new trial if the issue had been raised on direct appeal.

To the extent the record was insufficiently developed for this claim to have been raised on direct appeal, trial counsel's performance was deficient. Counsel recognized the serious danger for prejudice and continued to object on September 9, 2005, when the Court gave the marshal discretion to restrain Mr. Barrett without either the prerequisite legal or medical showings of necessity or safety.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

Def's § 2255 Mot.                                   312                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 8.       Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Mr. Barrett was tried, convicted and sentenced to death when he was in fact mentally incompetent to stand trial.

The federal constitutional due process guarantees of a fair trial, at which the accused has a right to be present and rationally participate in the proceedings, prohibit the trial of a defendant who is mentally incompetent. *Medina v. California*, 505 U.S. 437, 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966). It is therefore "well-settled that the 'criminal trial of an incompetent defendant violates due process.'" *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001) (en banc) (quoting *Media v. California*, 505 U.S. at 453).

A defendant is mentally incompetent if, as the result of mental disease or defect, the defendant is unable to comprehend the nature of the proceedings or rationally assist counsel

in conducting the defense.  *Drope v. Missouri*, 420 U.S. at 172; *see* 18 U.S.C. § 4241.  Where a preponderance of the evidence shows that a defendant lacks the requisite understanding or ability to participate in the proceedings, the defendant may not be tried or admitted to punishment.  *Cooper v. Oklahoma*, 517 U.S. 348 (1996); *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990).

The substantive due process violation that resulted from requiring Mr. Barrett to stand trial while he was mentally incompetent may be established by any relevant evidence, including both the evidence available at the time of trial, as well as any evidence developed since then.  *Odle v. Woodford*, 238 F.3d 1084, 1090 (9th Cir. 2001) (determination whether defendant was incompetent in fact required consideration of "old" evidence of mental state evidence at trial and "new" evidence of post-conviction psychiatric evaluations); *Reynolds v. Norris*, 86 F.3d 796,802 (8th Cir. 1996); see, also, *Gilbert v. Mullen*, 302 F.3d 1166, 1178 (10th Cir. 2002) (discussing different burdens of proof for substantive and procedural competency claims).

The factual allegations set forth in more detail in Claims 2 and 13, and incorporated by this reference as though fully set forth; and the supporting documentary and record evidence submitted with and/or incorporated by reference into this petition irrefutably demonstrates that Mr. Barrett was incompetent as a matter of clinical and medical fact at all stages of the trial proceedings.   At the time of his trial, Mr. Barrett had a documented psychiatric history, including medical diagnosis of Bipolar Disorder, a serious mental illness known to produce "bizarre behavior," impair judgment and distort perceptions.  *Williamson v. Ward*, 110 F.3d 1508, 1519 (10th Cir. 1997).  Mr. Barrett was involuntarily committed to psychiatric hospitals on two occasions and forcibly treated with antipsychotic medication.

In the months preceding Mr. Barrett's arrest, he was psychiatrically decompensating, and his disordered thinking became increasingly paranoid and delusional as he became preoccupied with the distorted belief that he was being monitored by some form of unknown aircraft; and withdrew to his rundown shack, unable to venture into the outside world. Mr. Barrett's mental state was further impaired by brain damage, particularly in the areas that are necessary to reason, exercise sound judgment and inhibit overreaction to stress situations. Neuropsychological assessment of Mr. Barrett by Dr. Myla Young has revealed that prior to and throughout Mr. Barrett's trial, he suffered brain dysfunction that seriously disrupted his executive functioning, compromising his ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior; screen out interference and sustain attention; inhibit reflexive responses and return to ongoing activity; efficiently integrate multiple outputs; oversee the selection of verbal and non-verbal processing mechanisms; regulate emotional control; direct motor output; and adequately process and make use of new information.   (Declaration of Myla H. Young, Ph.D., at ¶¶ 36-38;  Declaration of George W. Woods, Jr. M.D., at ¶¶ 57-58.)

George W. Woods, Jr., M.D., a clinical and forensic psychiatrist, has concluded that Mr. Barrett was incompetent at the time of trial, based on Dr. Woods's review of extensive life history and medical data, his clinical evaluation of Mr. Barrett in February 2009, and his consideration of Mr. Barrett's psychiatric diagnosis of Bipolar Disorder and Post Traumatic Stress Disorder (PTSD), as well as the neuropsychological findings of Dr. Young.  In Dr. Woods's expert medical opinion, Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial due to a confluence of his psychiatric disorders (Bipolar Disorder and PTSD) and his neurocognitive dysfunction resulting from his brain damage.  (Decl. of George Woods, Jr., M.D., at ¶ 81.)  The distorting and distracting effects of the PTSD were exacerbated

by "built-in reminders," in the form of bullet fragments that caused Mr. Barrett continual and significant pain, and an immunological reaction he had to the bullet fragments in his body. (*Id.* at ¶ 79.)  In turn, Mr. Barrett's ability to rationally perceive and attend to legal proceedings was significantly compromised by the racing thoughts indicative of the disabling "manic form" of Bipolar Disorder.  (See *Williamson v. Ward*, 110 F.3d, at 1519; Decl. of George Woods, Jr., M.D., at ¶ 80.)  These disabling impacts on Mr. Barrett's mental state were synergistically increased by the effect of his brain damage to produce a "ruminative" thought process, which prevented Mr. Barrett being "unable to get unstuck." (Decl. of George Woods, Jr., M.D., at ¶ 80.) This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Id. at ¶¶ 59, 80.)

As discussed more fully in Claim 13 the trial record reflects the functional impacts of Mr. Barrett's cluster of impairments.  Mr. Barrett could not regulate his verbal output or emotional control after he became agitated by some aspect of the prosecutor's closing argument.  His involuntary remarks were heard by persons in the courtroom, and his reflexive motoric reaction of attempting to stand prompted intervention by the courtroom marshals.  Once contained and redirected, Mr. Barrett was escorted from the courtroom without further incident. Mr. Barrett's uncontrolled behaviors, however, disrupted the proceedings and likely had a deleterious effect on the jury's deliberations.  Mr. Barrett's reflexive, self-harming comments and actions occurred without regard to social context or the damage they threatened to inflict on his case, and demonstrate that he was unable rationally to assist with his defense.  Because such behaviors were the product of Mr. Barrett's mental diseases and defects, he was incompetent to stand trial.

The trial and sentencing of Mr. Barrett while he was actually mentally incompetent constitutes a deprivation of due process necessitating the granting of habeas corpus relief without a further showing of prejudice. *Pate v. Robinson*, 383 U.S., at 386-387; *Dusky v. United States*, 362 U.S. 402 (1960). The error deprived Mr. Barrett of a fair and reliable determination of guilt and penalty. *Pate v. Robinson*, 383 U.S., at 386.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 9.       Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel Was Ineffective for Failing to Raise this Issue.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

In a capital case, where the evidence supports it, a court must instruct the jury on a lesser- included homicide offense. This "third option" between first degree murder and acquittal helps insure the reliability of any death verdict if the defendant is convicted of first degree murder. *Beck v. Alabama,* 447 U.S. 625 (1980). *See also, Turrentine v. Mullin,* 390 F.3d 1181, 1192-94 (10th Cir. 2004), *cert. denied*, 545 U.S. 1106 (2005); *Hogan v. Gibson,* 197 F.3d 1297 (10th Cir. 2000), *cert. denied,* 121 S.Ct. 332 (2000)(finding *Beck* error for failing to instruct on lesser forms of homicide).

Here, both the prosecution and the defense requested the trial court instruct on voluntary manslaughter. (R. 4212, 4213, 4215, 4218-19. 18 U.S.C. section 1112.) The United

States Attorney conceded there was evidence in the record that raised this lesser offense, because testimony indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's actions in firing on the vehicle could be seen as an imperfect form of self-defense or defense of another, reducing the crime to voluntary manslaughter.  Consistent with the reasoning behind *Beck v. Alabama, supra* the prosecutor stated that because this was a capital case, caution dictated a lesser included-offense instruction be given.  The United States Attorney distinguished count 3 from counts 1 and 2 (which in essence charged felony murder), because count 3 had a specific knowledge and intent element.  To be guilty of count 3, Mr. Barrett had to have more than the intent required to commit an underlying felony, which alone would supply the necessary intent for first degree murder in the usual felony murder case.  As suggested by the Government, and as the court ultimately instructed the jury, to be guilty of count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed Trooper Eales, knowing or having reason to know he was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties.  (R. 4215-19,  *See also,* Doc. 240, first stage jury instructions; R. 4262-63, elements of count 3.)  The court declined to instruct on voluntary manslaughter, ruling the case came down to "murder one or nothing."  (R. 4211, 4222.)

The court's ruling violated Mr. Barrett's Fifth Amendment due process rights and his Eighth Amendment rights to a reliable sentencing determination.

This circuit applies a four-part test to determine whether an instruction on a lesser-included offense is warranted: 1) there must be a proper request; 2) the lesser offense consists of some, but not all, of the elements of the greater offense; 3) the element or elements distinguishing the greater and lesser offense are in dispute; and 4) based on the evidence, the jury

could rationally convict the defendant of the lesser offense and acquit him of the greater offense. *United States v. Chanthadara,* 230 F.3d 1237, 1257 (10ᵗʰ Cir. 2000); *United States v. Abeyta,* 27 F.3d 470, 473 (10ᵗʰ Cir. 1994). "In the federal courts, it has long been beyond dispute" that a defendant is entitled to an instruction on a lesser offense if the evidence would permit a rational

jury to find him guilty of the lesser offense and acquit him of the greater. *Keeble v. United States,* 412 U.S. 205, 208 (1974).

All four requirements for an instruction on voluntary manslaughter were met in Mr. Barrett's case.

There was a proper request, not only by Mr. Barrett, but from the Government as well.

The lesser offense consists of some, but not all, of the elements of the greater offense. The elements of voluntary manslaughter are: 1) the defendant killed the victim; 2) the defendant acted unlawfully; 3) while in a sudden quarrel or a heat of passion, and therefore without malice, the defendant either a) intentionally killed the victim, or b) intended to cause serious bodily injury, or c) acted recklessly with extreme disregard for human life. "Intentionally killed" means either 1) a specific purpose to take the life of another human being, or 2) a willingness to act knowing that the death of another human being is practically certain to follow from that conduct. "Heat of passion" is a passion, fear or rage in which the defendant loses normal self-control, as a result of circumstances that provoke such a passion in an ordinary person, but which did not justify the use of deadly force. Voluntary heat of passion manslaughter is "murder without malice." (Tenth Circuit Pattern Jury Instruction 2.54.) *See also, e.g., United*

*States v. Scafe,* 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir. 1987).

The pertinent elements of count 3 of the superseding indictment, which distinguish it from a "straight" felony murder because a specific intent in connection with the homicide is required, as opposed to simply the intent to commit an underlying felony, are the intentional killing of a state law enforcement officer, whom the defendant knew or had reason to know was a law enforcement officer, and who was killed while engaging in *and on account of* the performance of his official duties.  (Doc. 240; R. 4262-63.)

The distinction between the elements of count 3 and voluntary manslaughter is intent.  The elements of voluntary manslaughter are a subset of the greater offense, since it would be impossible to commit the greater offense without first committing the lesser offense, *i.e.,* the intentional killing of another human being.  The lesser offense of voluntary manslaughter contains no element not required for the greater offense charged in count 3; again, the distinction lies in the level and nature of intent.  *Schmuck v. United States,* 489 U.S. 705, 716 (1989).

In Mr. Barrett's case, the element or elements distinguishing the greater and lesser offenses were in dispute.  The crux of the whole case was knowledge and intent.  The Government contended Mr. Barrett intentionally killed Trooper Eales knowing or having reason to know he was a law enforcement officer engaged in the performance of his official duties, and on account of the performance of those duties.  The defense theory was that when Mr. Barrett saw an ordinary, unmarked vehicle he had no idea contained police officers speed toward his house and his son, Toby, he reacted out of fear and fired.  This circumstance, while perhaps not justifying the use of deadly force, would have aroused a "heat of passion" in any ordinary individual.

Finally, based on the evidence, a rational jury could convict Mr. Barrett of the lesser-included offense and acquit him of the greater offense. *This is exactly what happened in state court, where Mr. Barrett was convicted of heat of passion manslaughter based on the same defense theory that was advanced in the federal trial*.

Because all four of the elements for determining when a lesser-included offense must be instructed upon were met in Mr. Barrett's case, the court committed constitutional error, at least with respect to count 3, in failing to charge the jury on the offense of voluntary manslaughter. *Beck v. Alabama,* 447 U.S. 625 (1980).

Mr. Barrett also contends, as was discussed in Claim 2, that a voluntary manslaughter instruction was appropriate as a lesser-included offense for counts 1 and 2. Although these were "straight" felony murder counts, heat of passion negates the element of malice, however it is defined. When one kills in a heat of passion, that act and the mental state underlying it removes the act from being committed in the course or in furtherance of the commission of a felony, which supplies the intent or malice element for felony murder. *Mullaney v. Wilbur,* 421 U.S. 421 U.S. 684, 704 (1975); *United States v. Lofton,* 776 F.2d 918, 920 (10th Cir. 1985).

It is truly inexplicable why this issue was not raised on direct appeal. Although many issues not preserved for review with timely objections or records were raised on appeal, this fully preserved issue, *even conceded by the Government at trial,* was not. Appellate counsel was well aware that Mr. Barrett had been convicted of manslaughter in state court. The factual basis for Mr. Barrett's federal court defense was the same as it was in state court. Under these very clear circumstances, *no* reasonable strategy excuses the failure to raise this issue, as appellate counsel recognizes. Decl. of Mark Henricksen. Had this issue been raised, there is at

the very least a reasonable probability that the outcome of the appeal, particularly (but not exclusively) as to count 3, would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 10.    Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's right to effective assistance of counsel, to due process, and to a reliable capital sentencing proceeding were violated due to the absence of evidence and an instruction permitting the jury to know and give mitigating effect to evidence casting a doubt on the manner in which the murder of Trooper Eales occurred.

On September 26, 2005, the court entered an order that Mr. Barrett could not rely upon the prior proceedings in mitigation because they were not relevant to the circumstances of the offense, (Tr. 9/26/05 Hr'g at 10-11), and could not rely upon residual doubt as a mitigating circumstance. *Id.* at 11. This ruling compounded the trial court's prior rulings impairing the defense's ability to cross-examine prosecution witnesses with testimony given in the second state-court trial.

During the penalty phase conference on jury instructions, the court asked whether either party objected to leaving out a residual doubt instruction. (R. 5288.) Mr. Hilfiger stated that he did not object. (R. 5289.) This omission was professionally unreasonable.

Readily available evidence from long study of how jurors decide whether to impose a death sentence had shown that residual doubts about the defendant's conduct can be powerful factors in deciding to vote for life. Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998); John H. Blume & Sheri Lynn Johnson, *Competent Capital Representation: the Necessity of Knowing and Heeding what Capital Jurors Tell us about Mitigation*, 36 Hofstra L. Rev. 1035, 1044 & n. 35 (2008).

Mr. Barrett's defense counsel were aware that two prior juries had sufficient doubts about his culpability that they either could not reach a unanimous verdict or rejected first-degree murder liability. The principal difference between those trials and the federal trial was the testimony of seven informants, each of whom was impeached on cross-examination. As argued elsewhere in this Motion, if trial counsel had conducted a reasonable investigation, and/or the Government had complied with its constitutional obligation to disclose exculpatory evidence, further impeachment would have been presented. Regardless of those constitutional violations, trial counsel's failure to seek a residual doubt instruction at the penalty phase denied Mr. Barrett his constitutional right to have the jury consider in their sentencing deliberations whatever value there was in the first stage cross-examination of the informants.

Mr. Barrett had a constitutionally protected right to introduce evidence, and have the jury give mitigating effect to evidence, that tended to cast doubt on the Government's theory of the manner in which the crime occurred. The trial ruling excluding such evidence treated the issue as one of guilt or innocence. Professionally diligent counsel would have pointed out that

the evidence of the prior conviction showed that a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings.

Trial counsel were on notice that courts in other federal death penalty cases, as well as state courts, had held that residual doubt is a valid mitigation circumstance. Trial counsel received from Federal Death Penalty Resource Counsel lists of cases that included references to cases in which residual doubt was considered in mitigation, and where the defendant received a sentence less than death.

Capital juries are called upon to express the community's reasoned moral response to the crime. Knowledge that two prior juries had been unconvinced that the crime was committed in a manner consistent with capital murder would have been important to the federal jury's ability to perform this function.

Attorneys acting in a manner consistent with prevailing professional norms would have argued to the court that evidence of the prior jury's conclusion was relevant to the defense evidence presented in the first stage of trial. For example, during some of their cross-examination, trial counsel attempted to show the jury that nearly all the Government's informant witnesses who provided evidence of malice aforethought had not come forth with their claims during the previous six years of investigation and litigation. (R. 481, testimony of Travis Crawford; R. 3128, testimony of Karen Real.) Reasonably diligent defense counsel would have argued that these witnesses' testimony was an insufficiently reliable foundation for a death sentence, and informed the jury that another jury representing the community had concluded, without those witnesses' testimony, that the death of Trooper Eales was not caused in a capitally culpable manner.

Def's § 2255 Mot. 324 *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

To the extent the trial ruling excluding consideration of residual doubts about the manner in which the offense occurred was based upon trial counsel proffering sufficient evidence to call into question the reliability of the Government's evidence, the ruling was based on trial counsel's unreasonable failure to investigate the informant witnesses and/or the Government's misconduct in withholding impeachment evidence and/or limiting defense counsel's access to the witnesses as alleged elsewhere in this motion.

District courts in other federal death penalty cases permitted the use of "residual doubt" evidence in mitigation. *United States v. Davis*, 132 F.Supp. 2d 455 (E.D. La. Feb. 2, 2001); *United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004); *United States v. Bodkins*, 2005 WL 1118158 (W.D. Va. May 11, 2005). Trial counsel knew, or should have known, about these cases. Their existence was discoverable without the need of independent research. Federal Death Penalty Resource Counsel knew of them and would have informed Mr. Barrett's trial counsel about them.

The Tenth Circuit has recognized repeatedly that residual doubt may be an appropriate strategy in the penalty phase of a capital case. *Sallahdin v. Gibson,* 275 F.3d 1211, 1240 n. 10 (10th Cir. 2002)(reasonable strategy for counsel, having argued defendant's innocence in the first stage, to a adopt a "residual doubt" approach in the penalty phase); *McCracken v. Gibson,* 268 F.3d 970, 979 (10th Cir. 2001)(counsel not ineffective in penalty phase; he tried to develop some mitigating evidence and also reasonably relied on a residual doubt argument); *Smith v. Gibson,* 197 F.3d 454, 462 (10th Cir. 1999)(citing *Lockhart v. McCree,* 476 U.S. 162, 181 (1986) and recognizing that residual doubt strategy can be extremely effective in a capital case). The court's preclusion of residual doubt evidence and argument flew in the face not only of authority in other federal death penalty cases, but of the law in this circuit.

Compounding the error, the court gave a bizarre instruction telling the jury residual or lingering doubt about Mr. Barrett's guilt was not a mitigating factor, that it was bound by its first stage verdict, that it could not speculate on the reasons for the verdict in Sequoyah County, and that the sentence in that case could only be considered for any mitigating effect it might have on the sentence in the federal proceedings. (Doc. 257, Instruction No. 19, R. 5320-21.)

For similar reasons, it was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal. (ABA Guideline 10.15.1.) It is at least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have followed its own precedent.

The trial court's refusal to permit Mr. Barrett to rely upon mitigation that other similarly situated defendants were permitted to present was arbitrary and capricious, and violated Mr. Barrett's rights to due process, equal protection of the laws, and to be free from the cruel and unusual imposition of capital punishment.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 11.   Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option. Appellate Counsel Was Ineffective for Failing to Raise this Issue on Direct Appeal.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Def's § 2255 Mot.                              326                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

All that is required for a juror to sit in a capital case is the jurors willingness to consider the range of punishment options.  A juror cannot be forced to commit that he or she will actually vote for the death penalty.  A juror can be personally, religiously or philosophically opposed to capital punishment and still serve, even if considering or voting for the death penalty would do violence to his or her conscience.  So long as a juror's personal views would not prevent or substantially impair him or her from considering all possible punishments and following the court's instructions, the juror is qualified to serve.  Excusing a juror for cause who opposes the death penalty or has conscientious scruples against imposing it, but could nonetheless consider it violates the Fifth, Sixth and Fourteenth Amendments.  *Gray v. Mississippi,* 481 U.S. 648, 668 (1987); *Wainwright v. Witt,* 469 U.S. 412, 424 (1985); *Adams v. Texas,* 448 U.S. 38, 45 (1980); *Witherspoon v. Illinois,* 391 U.S. 510 (1968).

Juror 62 was improperly excused for cause by the court solely because of her conscientious scruples against the death penalty, not because she would be prevented or substantially impaired from considering it, even though it might do violence to her conscience, and even though it might be difficult.

Asked by the court if she had any opinions about the death penalty, Juror 62 responded, "I don't – I could not do it.  I could not say anybody to be sentenced to death."  Asked if she meant by this that she could not personally carry out an execution, the juror stated, "I couldn't even say they deserve it, no.  I don't believe in it."  The juror stated she could impose a life sentence and had no philosophical, religious, moral or other objections to such a sentence, and said, "Yes, I do[]" when asked whether she had such objections that would "prevent [her] from considering the imposition of a death sentence[.]"

Questioned by defense counsel, the juror said that she had held her views on the death penalty her whole adult life.  Defense counsel informed her that in order to be qualified to sit on a capital case, she would have to consider not only evidence in mitigation, but the Government's evidence as to why the death penalty should be imposed and to give that evidence "due consideration."  Asked if she would be able to do this, the juror responded:

> Well, I don't know if I understand your question, but I could listen to that and see whether he needs to either have the death penalty or go to prison for life without parole.

(R. individual jury selection 823-24.)

Again asked, in a slightly different way, whether she could listen to the evidence in aggravation and mitigation, and weigh the evidence, she said she "could probably say he needed to or should," as long as the responsibility lay elsewhere, "but I could not say that he – myself, that he needs the death penalty."  The juror answered "No[]" when asked if she could imagine a murder so heinous that she could "find for the death penalty" after "having considered the Government's evidence[.]" R. individual jury selection 824-25.

Questioned briefly by the Government, the juror was asked if she could sign her name to a death verdict form "knowing that the result of that verdict would be the death by execution of another human being, the defendant in this case[.]" The juror responded that if she thought the crime "deserved it," she "probably could sign a paper saying that he should get the death penalty, but I couldn't say to do it.  I could not sign a paper that says the death penalty for him." Told by the prosecutor that a jury's death verdict was not just a recommendation, and that

the judge could not change the verdict, the juror said, "I could not do that, huh-uh." R. individual

jury selection 825-26.

The court asked additional death-qualification questions of the juror:

Q.     ... If I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions about the death penalty so strong that you would not be able to follow my instructions?

A.     If you told me I had to, I would do it, because that's my duty, but I would probably live with it for the rest of my life. But if you told me I had to do it, and I thought that he actually – the crime was so heinous that he should

       have the death penalty, because I was instructed to do it, and I thought it was, I could do it. I would do it. But I do not – I would live –

Q.     So you understand, I realize that no one, probably, if they were asked, wants to serve on the jury where that's a possibility.

A.     I understand that.

Q.     And – but if you were selected – otherwise selected as a juror, would you be willing to put your, what I know are strong, personal beliefs aside, and fairly consider the imposition of the death penalty?

A.      I would consider it, yes.

Q.     And, of course, when you say "consider it," couched in the – in the history of how you've answered these questions, it prompts me to say: Would you consider it fairly? I mean, in this case, the first thing that would have to happen, before we got to even a sentencing stage, is there would have to be a finding –

A.     Right.

Q.     – that justified – I wouldn't turn the case over to you for sentencing until there had been a conviction for murder that, under the law,  justified either death or imprisonment for life without the possibility of release. So, under those circumstances, then the Government would have to follow through with their obligation and put on aggravating factors. And aggravating factors are those factors that would suggest that death is the appropriate punishment. Then the defendant would have the opportunity to put on

Def's § 2255 Mot.                    329                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

what's called mitigating factors.  And as a juror, you'd be obligated to not exactly balance them, but give serious consideration to whether or not the Government had put on sufficient aggravation, when compared to the mitigation, for you to arrive at a death penalty.  So, do you think you could do that?

A.    I think I could.  It would be very hard for me to do that, but if it was my duty.

Q.    Well, I think when you say it would be – that encourages me, because you say it would be very hard.  I agree.  I don't disagree with that.  It will be very hard.  I mean, the people who end up sitting as jurors in any case, but particularly in this case, it's going to be very hard.

A.    Uh-huh.

Q.    And it should be very hard.

(R. individual jury selection 826-28.)

Before turning the floor over for additional questions by counsel, the court asked the juror if she could consider life without the possibility of release, to which the juror responded, "Definitely.  I could do that." (R. individual jury selection 828-29.)

Defense counsel had no additional questions for Juror 62.  R. individual jury selection 829.  Questioned again by the Government, the juror stated she realized the judge would never tell her what decision to make.  Asked if, considering the two penalty options, she would "take life as the more comfortable out, given [her] feelings about the death penalty[]," the juror said she would "take life, but it wouldn't be comfortable.  I would still take life in prison, yes." R. individual jury selection 829-30.  Asked if she could ever envision a situation in which "[she] would sign [her] name to a death verdict?", the juror responded:

If the judge told me that that was my options, either the death or – the death penalty and – I would do that, yes.  That would be my duty.  I'm here, and that would be what I'm here for.  But I couldn't live with it, but I would do that, yes.

(R. individual jury selection 830.)

The juror again stated she understood the court would not tell her what sentence to impose.  The Government then asked not whether the juror could simply consider both punishment options, but whether she was "capable for returning a death verdict for this defendant[]," to which the juror understandably replied, "I don't know whether I could or not." Again going to the ultimate issue of whether the juror would actually vote to impose the death penalty, given a choice between life and death, the juror was asked if she could "imagine a circumstance in which you would ever impose a death penalty[,]" to which the juror said "No." (R. individual jury selection 830-31.)  Mining the same subject – not merely whether the juror could consider death as a punishment option, but whether she could "ever return a death penalty unless the judge told you, you had to[,]" the juror responded that she probably could, but could not predict her vote in advance:

> I think I would have to hear what he has done and how heinous it was and all of this.  And I have a – something personal in my life, that happened to me, and I could not, you know – had no remorse about it.  So, I don't know how I would react, but I – you know, since this has never – I've never had this or have to think about, I just always thought I could never do this.  But I think that if it was so bad that I think this person should not even be here anymore, I possibly could do that. Now, I can't say that I would – you know – I – I – my mind can always be changed, but it has to be changed to where I understand it.  So, I thought – if he deserved it, I – I probably – I think I probably could, but I – I'm only human.

(R. individual jury selection 831-32.)

Yet again going beyond whether the juror could consider the death penalty, the prosecutor asked her in effect "how bad it would have to be" before she voted for the death penalty, to which the juror responded, "It would have to be pretty bad."  In response to the prosecutor's question regarding what she meant, the juror gave the example of killing or torturing a child, but she "couldn't tell you how bad it would have to be."  (R., individual jury selection 832.)

Unsatisfied still, the prosecutor continued without court interference (or objection) to harangue the juror with whether, and under what precise circumstances, she could actually vote to impose the death penalty. Juror 62 responded reasonably that everything would depend on the facts, but gave every indication that she could consider both penalties, despite her personal views on capital punishment:

Q.    All right.  Other than torture to a child or something – other than torture to a child, can you imagine a circumstance in which you'd return a death verdict?

A.    I never heard anything so heinous that I even had to think about it.  But I would have to give it a lot of thought.  But I'm – I'm just – I cannot lie to you. I would have to say that I would not know until I'm in that situation.

Q.    Okay.  Well, at the end of the day –

A.    Okay.

Q.    – are your feelings such that you would really be substantially impaired in serving as a juror in a case where you might be asked to vote in favor of a death penalty?

A.    Like I say, it depends on what he has done and how bad I think it is And I'd have to weigh all of the things – I cannot say yes nor can I say no.  I would think that – I would think that I am just enough to know that if this is what it is, and I think he deserves it, I probably could sign, yes.  But I'd have to really decide for myself – you know, I'd have to hear it.  I can't say no, I'll just go in here and sign it.  I'd have to see how bad it is.  And it would have to be really bad.[55]

(R., individual jury selection 832-33.)

---

[55] This is certainly a fair point.  The Supreme Court has held repeatedly that the death penalty should be reserved for a relatively small class of first degree murderers among the entire universe of those convicted of first degree murder. *E.g., Godfrey v. Georgia,* 446 U.S. 420 (1980).

Def's § 2255 Mot.                                   332                        *U.S. v. Barrett,* 6:04-CR-115-JHP-SPS

The United States Attorney then had the temerity to tell the juror that he could not "try the case for you today," detailing the facts of the case so as to inquire whether, on those facts, they would be "bad enough" for her to return the death penalty, even though he asked her repeatedly to commit in advance to signing a death verdict. (R. individual jury selection 833-34.) As noted above, this is not the test of qualification to sit on a capital jury. Worn down by repeated questioning on whether she could not just consider both punishment options, but could put her name to a death verdict, the juror, again very reasonably in light of the fact she had heard no evidence, said, "Well, let me just say no, then. Because, you know, I would have to say no right now. I know no other thing except to say no, I could not sign it." (R., individual jury selection 834.)

What else could the juror say to such a question? This is on par with saying, as rational people would, that they could not convict until hearing the evidence. Jurors are frequently told during voir dire that due to the presumption of innocence, if they had to vote on the case "right now," the verdict would have to be not guilty. The same is true of similar questions asked regarding the penalty phase, since the Government shoulders the burden of proof.

Continuing the seemingly endless round-robin, the court again inquired of Juror 62 on whether she could set her personal views aside and follow the court's sentencing instructions:

> Q.     ... But if I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions – and I want to repeat those – if they are, tell me – your personal opinions about the death penalty, are they so strong that you would not be able to follow the instructions?

Def's § 2255 Mot.                                    333                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

A.      Well, I have to say it again, it's my duty to do this or not to do this, but if you told me that that was one or the other, and I thought he deserved the death penalty, I would have to – I think I could sign the death penalty, if I listened to the information and that it was bad enough, I – and you told me that this was my duty and that this – I probably could sign the death penalty.

Q.      And could you, likewise, consider the possible imposition of life imprisonment without the possibility of release?

A.      Certainly could.

(R., individual jury selection 835-36.)

Defense counsel argued the juror was qualified, and had in fact "backed off her initial stance" when questioned by the Government.  (R., individual jury selection 838.) The Government moved to excuse Juror 62 for cause, arguing that she answered "three or four questions in the right direction, under significant pressure."  (Left unsaid, of course, was that any pressure applied to the juror came from Mr. Sperling himself, rather than defense counsel or, for that matter, the court.)  Yet again focusing on the irrelevant inquiry whether the juror could commit ahead of time to voting for death, the Government maintained the juror was "substantially impaired," because a murder would have to be "really heinous" before she would vote for death.  The court agreed with the Government that the juror was "substantially impaired" and excused her for cause, over objection by defense counsel.  (R. individual jury selection 838-40.)

This is a classic case of the cardinal *Witherspoon* error: excusing a juror who, though it would be difficult, could set her personal views aside, follow the law, and consider all punishment options, even if it would be unpleasant and would bother her conscience.  A juror does not have to be "comfortable" with the death penalty to impose it.  Juror 62 said repeatedly

she could consider the death penalty. She simply wouldn't take the Government's bait and commit ahead of time to voting for it, which is not the test.

The excusal of Juror 62 was not raised on direct appeal, even though the error was plainly apparent from the record. There was no reasonable strategic ground for omitting this argument. Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 12.** **The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's death sentence and confinement are unlawful and were obtained in violation of his rights under the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment, and the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment because the jury was not instructed that the reasonable doubt

Def's § 2255 Mot. 335 *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

standard governed the ultimate penalty determination in this case. *Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

Although this Court instructed the jury that it must determine whether the government had proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors. The jury was provided with the following penalty phase instruction regarding the weighing process:

> As to Count Three, you must find first the Defendant was at least 18 years of age at the time he committed the offense; and second, the Government has proven beyond a reasonable doubt the existence of the threshold eligibility factor; and third, the existence of at least one statutory aggravating factor; and fourth, that the threshold eligibility factor plus the statutory aggravating factor or factors which you have found to exist sufficiently outweigh any mitigating factor or factors which you found to exist are [*sic*] in the absence of the mitigating factor or factors alone are sufficient to justify imposition of a sentence of death.

(R. 4502.)

This instruction mirrors the federal death penalty statute, which provides only that no death penalty can be imposed unless the jury first finds that the aggravating factors "sufficiently outweigh" any mitigating factors. *See* 18 U.S.C. § 3593(e).

However, as discussed below, the instruction falls short of the requirements of the United States Constitution, which require that the jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances

that the death penalty is justified and that death is the appropriate penalty to be imposed under all the circumstances.

The Government may not impose a sentence greater than that authorized by the jury's simple verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are also submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 455. The *Apprendi* principles applies to factfindings necessary to put a capital defendant to death. *Ring*, 536 U.S. at 609.

Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase. In order to impose the increased punishment of death, the jury must make additional *factual* findings at the penalty phase. These findings include a finding that the aggravating factors outweigh any mitigating factors.

Under the *Apprendi* holding, because additional factual findings are absolutely required in order to impose an increased punishment, they are sentencing factors that must be proved beyond a reasonable doubt. Under the *Apprendi* rationale, petitioner was entitled to a jury instruction that before a death verdict could be returned, the jury was required to find that the aggravating  factors outweighed the mitigating factors beyond a reasonable doubt.

Moreover, because a death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). This requirement of heightened reliability requires that the jurors making a finding beyond a reasonable doubt that the death penalty is the appropriate punishment for capital defendants.

This Court's failure to provide such an instruction to the jury renders Mr. Barrett's death sentence unconstitutional. To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.

The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function." *Sullivan v. Louisiana,* 508 U.S. 275, 281 (1993). It is, therefore, reversible per se. *Id.* at 281-82.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668. 686 (1984). Their performance fell far below the standards expected of competent counsel in capital cases. Moreover, had counsel requested an appropriate instructions on this issue, there is a substantial probability that Mr. Barrett would not have been sentenced to death. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been grated a new penalty trial.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 13.**     **Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett was denied rights secured by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and rule 43, Federal Rules of Criminal Procedure, when the trial court ordered him removed from the courtroom without a hearing, without a warning, and without just cause.  Mr. Barrett's trial counsel acted unreasonably under the circumstances and Mr. Barrett was prejudiced by their unreasonable acts and omissions.  Mr. Barrett was held before the jury under the effects and influence of a medication regimen, including both the administration of contra indicated drugs and discontinuation of necessary medication, which substantially exacerbated the neuropsychological impairments of his ability to inhibit unconscious responses to stressful situations, and to exercise judgment, reason and self-control; he was not properly prepared for closing arguments, and was forced to make an un-counseled choice between being present in court under the prejudicial condition of unlawful restraints or relinquishing his right to be present for his trial.

The facts in support of this claim, among others to be presented after further investigation, discovery, access to subpoena power, and an evidentiary hearing, include the following:

During the prosecutor's penalty phase closing argument in the jury's presence, Mr. Barrett impulsively made audible remarks and began to rise from his chair so that he could leave the courtroom. The marshals restrained him and asked the judge if Mr. Barrett should be removed. The court said yes. (R. 5421.) Two to three marshals then took Mr. Barrett from the courtroom, and the prosecutor concluded his closing argument. The court sent the jury out. (R. 5429.) The court then held a hearing with counsel but without Mr. Barrett present to discuss whether it should instruct the jury about Mr. Barrett's removal from the court room. (R. 5430.) The court described the incident in the following way:

> Before the recess and during the closing moments of U.S. Attorney Sperling's closing remarks, the Court first heard the Defendant say words to the effect: Sperling, leave my family out of this. He said something other than that I could not detect. And then I saw the Defendant come out of his chair and make what appeared to the Court to be an effort to get up. I can't say that he was attempting to come out across the table but he did attempt to get up and take a step. As a result of that, it was necessary for the U.S. Marshals to restrain him and take him from the courtroom. I will say that once the marshals made contact with the Defendant, he ceased – there ceased to be any struggle and he was removed from the courtroom without further activity in front of the jury.

(R. 5430.)

Mr. Hilfiger stated that the words Mr. Barrett said which the court did not hear were Mr. Barrett asking why the court and Government did not permit the jury to hear about his statements to law enforcement. (R. 5431.) Mr. Hilfiger also corrected the court's description by saying Mr. Barrett

> was not making an aggressive move toward anybody. What he was saying is I want to get out of courtroom [sic]. Take me out of the courtroom. I don't want to

be here.  And then the marshals, you know, asked you if they could take him out.
Before that they were trying to put him back down in the chair.  His move as I saw
at that point was he was saying, you know, take me out of the courtroom.  I want
to get out of here.  It wasn't an aggressive move towards anybody, just he wanted
to get out.

(R. 5432.)

Mr. Hilfiger then stated that Mr. Barrett personally did not want a curative

instruction and did not "want to participate in the court proceeding now."  (R. 5432.)

According to the prosecutor, a deputy marshal "indicated or asked the Court do

you want us to take him out and you [the Court] said yes.  And at about that same time, the

Defendant indicated he also wanted to leave."  (R. 5433.)

The court confirmed that it ordered Mr. Barrett removed from the courtroom, and

added that Mr. Barrett "was removed from the courtroom by two or three deputy marshals."  (R.

5433-34.)

The Government asserted that the court "should make specific inquiry of the

Defendant."  (R. 5434.)

Mr. Hilfiger requested no instructions.  (R. 5434.)  When the court read its

proposed instruction, Mr. Hilfiger stated, "I don't really care one way or the other.  I don't object,

I don't approve."  (R. 5435.)

Mr. Hilfiger and Mr. Smith described that in their past interactions with Mr.

Barrett, they observed him get upset then calm down and discuss matters.  (R. 5436-37.)  They

recommended that his alleged desires regarding presence in court be revisited.  *Ibid.*  However,

when the court offered them the opportunity to revisit the issue with Mr. Barrett before the court

ruled, Mr. Hilfiger declined.  (R. 5437.)  Trial counsel did not have a private conversation with

Mr. Barrett about the incident or his presence; they spoke to him in the presence of a deputy U.S. marshal.  (R. 5437.)

The court ordered Mr. Barrett placed in "minimum restraints."  (R. 5438.)  The court asserted that an unidentified deputy marshal "brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems."  (R. 5438.)

Thereafter, Mr. Barrett's counsel requested to speak with him.  (R. 5438.)

Mr. Barrett was brought into the courtroom, and the following took place:

Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings.  I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?

Mr. Barrett:    Yes, Your Honor.

The Court:    Do you have any questions of the Court about that?

Mr. Barrett:    No, sir.

The Court:    I'll ask the marshal to return – (Interrupted)

Mr. Hilfiger:    One more.  Does that include the verdict?

Mr. Barrett:    Yes, Your Honor.

The Court:    Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

Mr. Barrett:    Yes, sir.

(R. 5439.)

Mr. Barrett was escorted out, and the jury escorted in.  (R. 5439.)

The court read the following instruction to the jury:

> Members of the jury, you are instructed that neither the Defendant's conduct nor
> his statements during closing arguments are evidence in this case and you should
> not consider them in rendering your verdict herein.

(R. 5440.)

Mr. Barrett was absent for the jury instructions, (R. 5440-45), and for the reading of the jury's verdict. (R. 5448-50.)

Prevailing professional norms of criminal defense practice advise counsel to maintain close contact with the defendant in order to develop trust, (1 ABA Standards for Criminal Justice, Criminal Defense Function 4-3.1 and commentary (2nd ed. 1986)), and to "advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome." *(Id.*, Standard 4-5.1.) One reason for this professional norm is "to keep the client from making suicidal choices about the case." (ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.2, commentary (Feb. 1989 ed.)). Mr. Barrett's counsel failed to follow these fundamental practices and, as a result, the jury was given a false impression of Mr. Barrett, and Mr. Barrett was denied his right to be present during trial.

Mr. Barrett's trial counsel unreasonably failed to conduct a thorough investigation of his background, including his mental health problems. *See* Claim 2, *supra*. Nevertheless, Mr. Barrett's counsel knew, or reasonably should have known, (a) that Mr. Barrett had attempted suicide in the past; (b) that Mr. Barrett had been diagnosed with depression and bipolar disorder; (c) that Mr. Barrett had been prescribed medications for these conditions; (d) that Mr. Barrett was not being given medication at the time of trial; (e) that Mr. Barrett was suffering the effects of steroids. Reasonably diligent counsel, informed about their client's condition, would have taken steps to obtain a competent mental health evaluation and judicial determination of the medical

necessity for the drug regimen Mr. Barrett was being administered; the medical appropriateness of discontinuing his psychotropic medications; whether Mr. Barrett had psychiatrically decompensated  since the termination of the medications; and the nature and severity of the functional impact of discontinuing and/or administering any medication on his ability to communicate and cooperate with counsel and on his affect and appearance before the jury.

In the face of a judicial determination that the drug regiment to which Mr. Barrett was subjected was justified by medical necessity, reasonably diligent counsel would have sought a further medical and legal determination of the degree to which the effects of such a regiment interfered with Mr. Barrett's ability to participate in trial proceedings, including any distortion or alteration of his demeanor, affect and presentation in front of the jury; his attitude toward participating in the proceedings; his ability to endure the disclosure and/or discussion of sensitive information; his capacity to understand his rights and make informed decisions regarding the exercise of waiver of such rights; and his ability and willingness to communicate and cooperate with counsel.

In the event the trial court made a judicial determination that Mr. Barrett's medication regimen was justified and that he was competent to proceed with trial, reasonably diligent counsel would have taken all steps necessary to prevent any untoward scenes in front of the jury, for example, by seeking appropriate medications and counseling Mr. Barrett regarding the prosecutor's likely arguments and prepared him for them.  If Mr. Barrett nonetheless acted inappropriately to his potential detriment in front of the jury, reasonably diligent counsel would have renewed the request for a medical evaluation and determination of the necessity for and functional impact of the medication regiment, as well as an assessment of Mr. Barrett's adjudicatory competency.

Mr. Barrett's counsel failed to gather medical records of his medical treatment in jail during the trial and/or failed to provide those records to a competent mental health or other medical expert retained by the defense. Had trial counsel conducted a reasonable inquiry, they would have known that Mr. Barrett had been injected with steroids in jail. If counsel had developed the relationship of trust required in criminal cases, counsel would have been aware that the steroids had a medically predictable effect that contraindicated their use with defendants who were on trial, and impaired Mr. Barrett's ability to control his inability to endure any psychological or emotional distress that might be caused by the prosecutor's arguments.

Mr. Barrett had a right, protected by the Fifth and Eighth Amendments, to have the jury receive a fair, unadulterated view of him, including his reaction to the proceedings. *See Riggins v. Nevada*, 504 U.S. 127, 142, 143-144 (1992) (Kennedy, J., concurring). Due to the actions of jailers and the unreasonable omissions of Mr. Barrett's trial counsel, the jury was permitted to see him under the affects of steroids and without the benefit of medication deemed medically necessary to control the emotional dysregulation caused by his bipolar disorder.

Trial counsel's failings and the trial court's denial of authorization for counsel to obtain necessary and appropriate mental health assistance, including the assistance of a psychiatrist, individually and cumulatively deprived Mr. Barrett of his right not to be tried while his functioning was altered and impaired by the effects of voluntarily or involuntarily administered or discontinued medication, and/or while his functioning was altered and impaired by the effects of a medication regimen that was unjustified by any medical necessity. *See* Claims 1, 2, and 3, *supra*.

Mr. Barrett's periodically altered mental condition, the ineffectiveness of his attorneys, and the unlawful actions of the court and marshals, also resulted in the denial of his

right to be present during the close of the penalty trial.  The Confrontation Clause of the Sixth

Amendment and the Due Process Clause of the Fifth Amendment guaranteed Mr. Barrett the

right to be present during all critical stages of the case.  *Illinois v. Allen*, 397 U.S. 337 (1970).

Under the controlling law,

> a defendant can lose his right to be present at trial if, *after he has been warned* by
> the judge that he will be removed if he continues his disruptive behavior, he
> nevertheless insists on conducting himself in a manner so disorderly, disruptive,
> and disrespectful of the court that his trial cannot be carried on with him in the
> courtroom.

*(Id.*, 397 U.S. at 343 [emphasis added]).  The trial court's order – which the court initially did not

reveal on the record – that marshals remove Mr. Barrett without warning did not comport with

the requirements of law.  (R. 5430, 5433-34.)

Whether the defense sought or objected to an instruction from the court regarding

Mr. Barrett's actions, was the "exclusive province" of counsel.  (ABA Standard 4-5.2(c).)  As

reflected in counsel's statements on the record, Mr. Barrett's counsel unreasonably failed to give

the matter sufficient thought to determine whether an instruction was desirable or not.  (R. 5435.)

Counsel unreasonably failed to consider whether an instruction that the jury should disregard the

marshal's action in removing Mr. Barrett from the courtroom would have mitigated the prejudice

of the jury having witnesses him being forcibly removed.

The willingness of Mr. Barrett's counsel and the trial court to let Mr. Barrett be

absent from court during the prosecutor's closing argument and the court's instructions violated

Mr. Barrett's constitutional rights.  The trial court plainly ignored the requirement that "courts

must indulge every reasonable presumption against the loss of constitutional rights." *Allen*,

*supra*, 397 U.S. at 343, when it (a) ordered that Mr. Barrett be placed in additional restraints

Def's § 2255 Mot.                                    346                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

besides the electric shock device he wore on his back, and (b) permitted him to be absent without informing him that his presence was a constitutional right, and the risks of giving up that right. Mr. Barrett did not knowingly and intelligently waive his right to be present.

Trial counsel's performance was ineffective because they allowed him to absent himself rom the courtroom during critical stages (closing argument, jury instructions) without ensuring that he was making an informed, knowing and intelligent decision.

The error in allowing Mr. Barrett's absence was not harmless. In his absence, factual matters were discussed, namely what he purportedly said and did that caused the marshal to remove him. His presence would have contributed to the fairness of the proceeding because Mr. Barrett could have advised his counsel about the facts. In the context of jury instructions, prejudice has been found wherever defendant and his lawyer were absent when the court instructed the jury, because counsel could have objected to the instruction or suggested an alternate instruction. See, e.g. *United States v. Rosales-Rodriguez,* 289 f. 3d 1106, 1110 (9th Cir. 2002). Here, defense counsel was present, but refused to take a position on the court's proposed jury instruction. "I really don't care one way or the other." (R. 5435.) Had Mr. Barrett been present, he could have consulted with counsel about the proposed jury instruction.

Among the most prejudicial inferences affecting the jury's penalty determination, Mr. Barrett's apparent voluntary withdrawal from the proceedings likely conveyed a misleading sense of indifference to the outcome of the trial, callous disregard for the seriousness of the questions facing the jury, and even lack of remorse. *See Riggins*, 504 U.S., at 144 (Kennedy, J., concur.). Similarly, any jurors who had been focused on the prosecutor before observing the marshals restraining and removing Mr. Barrett may have concluded prejudicially that the

Def's § 2255 Mot.                                    347                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

marshals acted in response to Mr. Barrett's threatening behavior toward someone in the courtroom or an attempt to escape.

These are other examples of the prejudice that ensued from Mr. Barrett's absence:

It matters not that Mr. Barrett's counsel was present when he was absent.

Although the presence of counsel is certainly a relevant factor to be considered in determining whether a defendant's absence was harmless, the right to be present at trial - grounded in the Confrontation Clause and the Due Process Clause - is not a gossamer right inevitably swept away simply because a defendant is represented, in his absence, by counsel. The right to be present is distinct from the right to be represented by counsel. The right to be present would be hollow indeed if it was dependent upon the lack of representation by counsel. Furthermore, such a rule would ignore the fact that a client's active assistance at trial may be key to an attorney's effective representation of his interests.

*United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001) (Opn. by Carnes, J.). Similarly, Mr. Barrett need not demonstrate any particular issue that his counsel failed to raise in his absence. Forcing Mr. Barrett to make such a showing in order to demonstrate prejudicial error from his absence devalues the constitutional right to be present, and ignores the assistance that a defendant can provide to his counsel during trial. If we were to require that a defendant show with specificity how his presence might have changed the course or outcome of a trial, then the right to be present would cease to exist in many cases in which the evidence of guilt is strong. The right to be present at one's own trial is not that weak. *See Riggins,* 504 U.S., at 137. "Efforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different [in the absence of drugging] would be purely speculative."; *United States v. Novaton*, 271 F.3d. At 1000.

Mr. Barrett's trial counsel acted unreasonably (a) by failing to object to the additional restraints; (b) by failing to object to the choice the court gave Mr. Barrett (be present in unlawful restraints or absent); (c) by failing to consult mental health or other medical experts

regarding Mr. Barrett's condition, including his competence to make a valid waiver; (d) by failing to raise a doubt about Mr. Barrett's competence; (e) by failing to seek a hearing on his competence and/or the affects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (f) by failing to advise him about the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court, and Mr. Barrett's absence.

Significantly, one of the prosecutors explicitly conceded that he did not "think he [Mr. Barrett] – *consciously* chose to do what he did in the presence of the jury." (R. 5427 [emphasis added].)  According to Mr. Hilfiger, Mr. Barrett himself said "I couldn't take it anymore." (R. 5437.)

Due to trial counsel's unreasonable omissions, or the court's actions, Mr. Barrett was denied (a) his rights under *Riggins*, *supra*; (b) his right to a hearing on his competence to waive presence, *Pate v. Robinson*, 383 U.S. 375 (1966); *Godinez v. Moran*, 509 U.S. 389 (1993); (c) his right to be present and free of unjustified restraints, *see* Claim 7, *supra*; and (d) his right to a fair and reliable verdict on punishment.

Irrespective of whether Mr. Barrett could have made or did make a valid waiver of his right to be present, trial counsel acted unreasonably by failing to seek an instruction that was necessary to avoid harm to the jury's deliberations.  Trial counsel's statements on the record reflect that counsel considered only whether the court's proposed instruction brought Mr. Barrett's actions to mind, or minimized their effects.  Mr. Hilfiger twice stated that he could not think of an instruction to give the jury.  (R. 5426-28.)  Unable to decide, he said, "I don't care."

Upon due consideration, trial counsel would have recognized that the court's instruction failed to address the scope of the problem.  The court's instructions permitted the jury to consider the actions of the marshals in restraining Mr. Barrett and removing him from the courtroom, presumably, from the jury's perspective, upon the court's orders or with the court's blessing.  Although Mr. Hilfiger was adamant that Mr. Barrett had not made an aggressive move toward anyone, he permitted the jury to consider that marshals and the court were justified in removing Mr. Barrett.  There is no reason why Mr. Hilfiger would not have sought a modification of the instruction that would have communicated truthful information about Mr. Barrett not having made any aggressive moves, Mr. Barrett suffering the effects of poor or absent medical treatment, or an instruction that directed the jury not to consider or draw any inference from Mr. Barrett's absence from the courtroom.

To the extent the facts supporting this claim were apparent on the appellate record, appellate counsel unreasonably failed to raise this issue on appeal.  Had counsel raised the issues presented in this claim it is reasonably probably that the court would have found the numerous violation of federal law were not harmless beyond a reasonable doubt, or constitute plain error.

This Court should find the error substantially influenced the jury's verdict, and vacate the sentence of death imposed on Mr. Barrett in violation of the Constitution and laws of the United States.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 14.      Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

Some twenty years ago, the federal death penalty was reintroduced; since then it has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims. As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level." (Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001.) Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims which were

presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized. During the administration of Attorney General Gonzalez, the difference was even more striking: 41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized.[56] (2007 Decl. of Kevin McNally)

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence. According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases. Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference." (Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001.)

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases. This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008. (2008 Decl. of Kevin McNally.) Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403. She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim.

---

[56] Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzalez.

Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero." (Decl. of Lauren Cohen Bell.)

While some of the statistics above are based in part on periods after Mr. Barrett's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.[57]  Had counsel performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Barrett's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

Mr. Barrett has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act, is the work of a single decision maker, i.e.

---

[57]     Defendant's Motion To Declare The Federal Death Penalty Statute Unconstitutional, (Doc. 78), does not address the disparate application of the statute according to race of the victim.  Appellate counsel did not raise the issue on appeal. *See* Defendant/Appellant's Brief, C.A. No. 06-7005, Proposition VI.  To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused," (Doc. 78 at 3), appellate counsel was ineffective in failing to pursue and develop the issue.

Def's § 2255 Mot.                        353                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the DOJ.  This fact renders the above statistics all the more probative of discrimination.  The Court should grant relief from Mr. Barrett's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

**Claim 15.**     **Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial b y a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, because the indictment in his case made no mention of the federal death penalty and did not charge the aggravating factors required for a capital offense under 18 U.S.C. § 3592(c) or any of the additional non-statutory aggravating factors relied upon by the government during the penalty phase.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

As the Supreme Court has made clear in a line of cases:

> "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

*Ring v. Arizona*, 536 U.S. 584, 600 (2002) *quoting Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999).  In direct contravention of these principles, the Government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the government claimed justified Mr. Barrett's death sentence in the indictment.  This structural defect in Mr. Barrett's capital proceedings requires that his death sentence be vacated.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the death sentence, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel unreasonably failed to raise this issue on direct appeal.  There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 16      Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by misconduct involving the jury. Such misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Barrett and the case, false or misleading responses of jurors on voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, and/or the trial judge, and improperly prejudging the guilt/innocence and penalty phases of Mr. Barrett's trial.

Mr. Barrett's rights to a fair trial and to due process were violated when the jury was not sequestered in such a way as to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The Sixth and Fourteenth Amendments to the United States Constitution require that a defendant be tried by an impartial jury that is free from any extraneous influences that could subvert the fact finding process. Where jurors consult information that was not introduced during the course of the trial or that conflicts with the trial judge's instructions, the jurors become unsworn witnesses against the defendant in violation of the Sixth Amendment. Mr. Barrett had no opportunity to confront the extraneous information to which the jurors were exposed, denying Mr. Barrett her Sixth and Fourteenth Amendment rights to a fair trial and due process.

The introduction of extraneous materials or evidence has consistently been held to mandate a new trial. Mr. Barrett should be granted a new trial which can be conducted free of extraneous and prejudicial influences.

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Barrett's prejudice. Counsel's ineffective assistance resulted in the deprivation of Mr. Barrett's rights under the Sixth, Eighth and Fourteenth Amendments. Relief is appropriate.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 17      Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case**

Mr. Barrett's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, and a reliable determination of guilt and penalty, and fundamental fairness. *Taylor v. Kentucky*, 436 U.S. 478, 487, and n. 15 (1978).

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. In addition, Mr. Barrett re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process. Each of these errors deprived Mr. Barrett of important constitutional rights, including but not limited to his right to due

process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claim presented in this Motion individually justifies reversal , when considered cumulatively, these errors denied Mr. Barrett his constitutional rights.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

## IV.      Prayer for Relief

WHEREFORE, Movant Kenneth Eugene Barrett asks that this Court provide the following relief:

1.   Disqualify itself and have all proceedings regarding this Motion reassigned randomly to another judge;

2.   That Movant be permitted to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

3.   Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States

District Court, identifying all proceedings conducted in Movant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

4. Permit Movant to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

5. Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion, and any defenses thereto raised by the Respondent's Answer;

6. Permit Movant to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and, to allow the amendment to relate back to the date of the filing of this motion;

7. Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Movant's Response to any Affirmative Defenses raised by the Respondent. Because Movant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

8. Permit oral argument as appropriate and required;

9. Vacate Movant's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

10. Grant such further and additional relief as may be just.

DATED:   March 15, 2009

                                    Respectfully submitted,

                                     /s/ David B. Autry
                                    DAVID B. AUTRY, OBA #11600
                                    Attorney at law
                                    1021 N.W. 16th Street
                                    Oklahoma City, Oklahoma 73106-6405
                                    Telephone:  405-521-9600

                                    DANIEL J. BRODERICK
                                    Federal Defender

                                     /s/ Tivon Schardl
                                    TIVON SCHARDL, Fla. Bar No. 73016
                                    Assistant Federal Defender
                                    801 I Street, 3rd Floor
                                    Sacramento, California 95814
                                    Telephone:  916-498-6666

                                    Attorneys for Defendant
                                    KENNETH EUGENE BARRETT

Def's § 2255 Mot.                         360                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

# APPENDIX A

# PROCEDURAL HISTORY

**I.    State Court Proceedings**

1.     On September 24, 1999, Movant was charged by Information in the District Court of Sequoyah County, Oklahoma with one count of first-degree murder and three counts of shooting with intent to kill. The information was subsequently amended to charge Movant with one count of first-degree murder, one count of shooting with intent to kill, and two counts of discharging a firearm with intent to kill. (Case No. CR 99-493, Garrett, J.)

2.     The case proceeded to trial and ended in a hung jury on October 18, 2002.

3.     Movant was re-tried on the same charges in January and February of 2004. The jury rejected the first-degree murder charge and instead found Movant guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Movant guilty of the lesser-included offense of assault and battery with a dangerous weapon.  The jury acquitted Movant on the two counts of discharge of a firearm with intent to kill.

4.     On April 19, 2004, Movant was sentenced to a term of imprisonment of twenty years on the manslaughter conviction and ten years on the assault and battery conviction, with the two terms to run consecutively.

5.     Movant did not appeal his convictions or sentences.

6.     At both state trials, Movant was represented by John David Echols, Esq., and the State was represented by Darrell Dowty, Asst. Dist. Atty.

Def's § 2255 Mot.                  361                  *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

## II.   Federal District Court Proceedings

7.   On September 23, 2004, a criminal Complaint was filed against Movant in the United Stated District Court for the Eastern District of Oklahoma charging him with eight criminal counts, including intentionally killing a state law enforcement officer engaged in the performance of the state law enforcement officer's official duties, in violation of 21 U.S. C. § 848(e)(1).

8.   On November 9, 2004, a federal grand jury returned a three-count Indictment against Movant. Count 1 charged Movant with using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 2 charged Movant with using and carrying a firearm in relation to a crime of violence, i.e., the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties, and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 3 charged Movant with intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). With respect to Count 3, the grand jury made the following "Special Findings": (a) Movant was 18 years of age or older at the time of the offense; (b) Movant intentionally killed a state law enforcement officer, intentionally inflicted serious bodily injury that resulted in the death of a state law enforcement officer,

intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and a state law enforcement officer died as a direct result of the act, or intentionally and specifically engaged in an act of violence, knowing that the act created a great risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and a state law enforcement officer died as a direct result of the act; and (c) Movant, in the commission of the drug trafficking offenses alleged in Count 3, and in escaping apprehension for a violation of said offenses, knowingly created a grave risk of death to one or more persons. (Case No. 6:04-cr-115P, Payne, J.)

9.      On February 9, 2005, the grand jury returned a superseding indictment against Movant. Although the superseding indictment included some amendments, it contained the same three basic counts as the original indictment.

10.     On February 15, 2005, the government filed notice of its intent to seek the death penalty with respect to all three counts with which Movant was charged.

11.     The case proceeded to trial on September 12, 2005. On November 4, 2005, the jury found Movant guilty of all three counts. In response to special interrogatories propounded by the District Court, the jury found beyond a reasonable doubt that Movant committed murder in connection with

Counts 1 and 2 (i.e., that he committed the unlawful killing of Trooper Eales with malice aforethought).

12. On November 9, 2005, the second-stage proceedings began.

13. On November 17, 2005, at the conclusion of all the second-stage evidence, the jury found, in pertinent part, that Movant was at least eighteen years old at the time of the offenses of conviction, and that, with respect to each of the three counts of conviction, he intentionally killed Trooper Eales.

14. As for the statutory aggravating factors, the jury found, with respect to Counts 1 and 2, that Movant killed or attempted to kill more than one person, i.e., Troopers John Hamilton, Jr., and David Eales, in a single criminal episode, and committed the offenses after substantial planning and premeditation to cause the death of a person. (The jury rejected the statutory aggravating factor that Barrett knowingly created a grave risk of death to persons other than Hamilton and Eales.) With respect to Count 3, the jury found that Movant, in the commission of the offense or in escaping apprehension for the offense, knowingly created a grave risk of death to one or more persons in addition to Trooper Eales, and that Movant committed the offense after substantial planning and premeditation. As for the non-statutory aggravating factors, the jury found, with respect to all three counts of conviction, that Movant caused injury, harm, and loss to the victim's family, but rejected the government's assertion that Movant was likely to commit criminal acts of violence in the

future which would be a continuing and serious threat in an institutional correctional setting to the lives or safety of other persons.

15.    As for mitigating factors, some or all of the jurors found the existence of the following factors with respect to all three counts: Barrett had accepted responsibility for the death of Eales from his previous conviction (found by five jurors with respect to each count); Barrett had been convicted and punished for the death of Eales (found by five jurors with respect to each count); Barrett, at the time of the shooting incident, had no prior felony convictions (found by all twelve jurors with respect to each count); Barrett was a father (found by all twelve jurors with respect to each count); Barrett was a loved son and stepson (found by all twelve jurors with respect to each count); Barrett was a good neighbor and friend (found by seven jurors with respect to each count); Barrett's death would impact his child, family and friends (found by all twelve jurors with respect to each count); Barrett would not present a future danger to society by being imprisoned for life without possibility of release as demonstrated by his incarceration since September 24, 1999 (found by two jurors with respect to each count); that other factors in Barrett's childhood, background or character mitigated against imposition of the death sentence (found by one juror with respect to Counts 1 and 2, and by two jurors with respect to Count 3); that Barrett never left his residence during 1999 (found by one juror with respect to each count); and that Sequoyah County Sheriff Johnny Philpot had mistreated Barrett when Barrett was seventeen years old (i.e., Philpot had

an altercation with Barrett during which Philpot broke Barrett's jaw) (found by six jurors with respect to each count). All of the jurors rejected the alleged mitigating factor that Barrett had expressed remorse for his crimes.

16.     Ultimately, the jury found that sentences of life imprisonment without the possibility of release should be imposed with respect to Counts 1 and 2, and that a sentence of death should be imposed with respect to Count 3.

17.     On December 19, 2005, the district court conducted a sentencing proceeding during which it imposed the sentences recommended by the jury. Judgment was entered in the case on December 29, 2005.

18.     Movant filed a timely Notice of Appeal of his convictions and his death sentence to the United States Court of Appeals for the Tenth Circuit on December 28, 2005 (Case No. 06-7005).

19.     Roger Hilfiger, Esq. and Bret Smith, Esq. represented the Movant in these proceedings. The Government was represented by Sheldon Sperling, U.S. Atty. and D. Michael Littlefield, Asst. U.S. Atty.

III.     Federal Court of Appeals Proceedings

20.     In his direct appeal, Movant challenged his convictions and sentence of death by raising the following claims:

   a.     The district court erred by denying Movant's motion to suppress. More specifically, the search warrant did not satisfy the Oklahoma standards for a nighttime warrant; the executing officers failed to meet Oklahoma standards regarding executing officers; the warrant failed to comply with

Fed. R. Crim. P. 41 (warrant was not issued by a federal officer); and the evidence should be suppressed on double jeopardy grounds.

b.  Movant challenged the indictment, more specifically, its sufficiency because it failed to set forth elements of predicate offenses; its multiplicity because all three counts were based on the same conduct, firearms, drugs, and killing of the same person; and misjoinder of offenses.

c.  The district court allowed admission of improper victim impact evidence.

d.  The district court allowed juror misconduct, more specifically, one of the jurors knew a state trooper involved in the case and another trooper had limited contact with a juror.

e.  The government violated *Batson* by failing to exercise its peremptory challenges in a race neutral manner.

f.  Movant challenged the constitutionality of the federal death penalty scheme, more specifically, arguing that the penalty phase process of weighing aggravating and mitigating factors violates the Sixth Amendment; the federal scheme unconstitutionally delegates legislative authority; the statute fails to require proportional review; the statute allows for consideration of impermissibly vague aggravating factors; and the statute does not narrow the class of persons eligible for the death penalty.

g.  Movant challenged the "intent to kill" aggravating factor, more specifically, because that factor is used in the eligibility process then again in the weighing process.

h.  The government did not present sufficient evidence of "intent to kill."

i.     The government failed to produce names and addresses of key witnesses.

k.     The district court erred by failing to dismiss the indictment on double jeopardy grounds.

l.     The government failed to follow the *Petite* policy.

m.     Movant asserted cumulative error.

21.     On July 25, 2007, the Court of Appeals rejected all of the Movant's claims and affirmed the judgment of the District Court. The decision is published at 496 F.3d 1079 (10th Cir. 2007) (Tacha, Briscoe, Murphy).

22.     A timely Petition for Certiorari was filed on October 12, 2007.

23.     The Petition for Certiorari was denied on March 17, 2008 at 128 S.Ct. 1648 (2008).

24.     Mark Henricksen, Esq. and Roger Hilfiger, Esq. represented Movant in these proceedings. The Government was represented by Sheldon Sperling, US Atty. and D. Michael Littlefield, Asst. US Atty.

# APPENDIX B

## INDEX TO EXHIBITS

## NON-SEALED EXHIBITS

### VOLUME I

| | |
|---|---|
| Exhibit 1 | Marriage Certificate for A.J. and Ada Barrett |
| Exhibit 2 | Marriage Certificate for Abe and Minnie Dotson |
| Exhibit 3 | Marriage Certificate for Allen and Ida Real |
| Exhibit 4 | Marriage Certificate for David and Carolyn Joseph |
| Exhibit 5 | Marriage Certificate for Ernest and Sylvia Gelene Barrett |
| Exhibit 6 | Declaration of Rodney Floyd |
| Exhibit 7 | Marriage Certificate for Kenneth and Abigail Barrett |
| Exhibit 8 | Marriage Certificate for Hugh and Hattie Dotson |
| Exhibit  9 | Marriage Certificate for Sam and Ida Hatter |
| Exhibit 10 | Marriage Certificate for Sam and Bessie Hatter |
| Exhibit 11 | Marriage Certificate for Paul and Sylvia Gelene Dudley |
| Exhibit 12 | Divorce File for Ernest and Sylvia Gelene Barrett |
| Exhibit 13 | Declaration of Janesse Thomas |
| Exhibit 14 | Declaration of Dale Anderson |
| Exhibit 15 | Divorce File for Isaac and Marilyn Barrett |
| Exhibit 16 | *State of Oklahoma vs. Abe Dotson*, dated December 14, 1917 and December 15, 1917 (Commitment to Penitentiary) |
| Exhibit 17 | *State of Oklahoma vs. Abe Dotson*, Record of Informations, dated November 12, 1915 (Assault with the Intent to Kill) |

Exhibit 18        *State of Oklahoma vs. Abe Dotson*, Criminal Docket, dated 1915 (Assault with the Intent to Kill)

Exhibit 19        *State of Oklahoma vs. Abe Dotson,* Criminal Docket (Carrying Weapon)

Exhibit 20        *State of Oklahoma vs. Abe Dotson*, Criminal Trial Docket (Drunk in a Public Place)

Exhibit 21        *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Drunk in a Public Place)

Exhibit 22        *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Larcenry)

Exhibit 23        *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Obtaining Money Under False Pretense)

Exhibit 24        Declaration of David Autry

Exhibit 25        *State of Oklahoma vs. Billy Dean Maxwell*, Case Number 1715 (Burglary)

Exhibit 26        *In the Matter of Mental Illness of Billy Dean Maxwell*, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982

Exhibit 27        *In the Matter of the Sanity of A.J. Barrett*, Case Number 141, Lunacy Record, dated August 12, 1918

Exhibit 28        *In the Matter of the Sanity of A.J. Barrett*, Case Number 709, Mental Health Record and Petition for Order of Admission to State Hospital

Exhibit 29        Declaration of Mark Henricksen

Exhibit 30        *Ada Blount vs. Kathleen Blake*, Case Number 13026

Exhibit 31        Declaration of Leonard Post

Exhibit 32        *In the Matter of the Sanity of Wallace Dotson*, Lunacy Record, Case Number 366, dated May 4, 1948

Exhibit 33        *In the Matter of Mental Illness of Kenneth Barrett*, Case Number 481, Record of Mental Health Proceeding

Exhibit 34        Declaration of John Echols

Exhibit 35        Excerpts from Kenneth Barrett's Baby Book

Exhibit 36              Letter from Kenneth Barrett

Exhibit 37-58           Intentionally Left Blank, No Exhibits

Exhibit 59              *State of Oklahoma vs. Henry Edwards* (Manslaughter)

Exhibit 60              *State of Oklahoma vs. Marilyn Crawford*, Case Number 3005, Criminal
                        Docket (Cultivation of Mari)

Exhibit 61              *State of Oklahoma vs. Kenneth Barrett*, Docket Sheet, Case Number
                        CF-97-00086

Exhibit 62              *State of Oklahoma vs. Tom Dotson*, Case Number 3005, Criminal Docket
                        (Disposing of Mortgaged Property)

Exhibit 63              *State of Oklahoma vs. Tom Dotson*, Case Number 2763, Criminal Docket
                        (Manslaughter in the First Degree)

Exhibit 64              Letter from John Echols to Honorable James H. Payne, dated February 28,
                        2005

Exhibit 65              Letter from Honorable James H. Payne to John Echols, dated February 22,
                        2005

Exhibit 66              Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008

Exhibit 67              Declaration of Julia O'Connell

Exhibit 68              *United States of America vs. Karen Real*, Case Number, Case Number
                        CR-00-21-FHS

Exhibit 69              *Barrett Death Sentence Upheld*, Tahlequah Daily Press, dated July 27,
                        2007

Exhibit 70              *Drug Offender Receives Break*, Times Record

Exhibit 71              Letter to the Editor, *She Questions Sheriff's Department*, dated October
                        17, 1999

Exhibit 72              *State of Oklahoma vs. Charles Sanders*, Case Number CF-1998-00022

Exhibit 73              Photographs of Kenneth Barrett's shack

Exhibit 74              Declaration of Ada Blout

Exhibit 75          Declaration of Alvin Hahn

Exhibit 76          Declaration of Billy Poindexter

Exhibit 77          Declaration of Brandy Hill

Exhibit 78          Declaration of Carolyn Joseph

Exhibit 79          Declaration of Dewey Padgett

Exhibit 80          Declaration of Doris Barrett, dated February 10, 2009

Exhibit 81          Declaration of Ernest Barrett

Exhibit 82          Declaration of Frank Gordon

Exhibit 83          Declaration of Gwendolyn Crawford

Exhibit 84          Declaration of Issac Barrett

Exhibit 85          Declaration of Janice Sanders

Exhibit 86          Declaration of Kathy Trotter

Exhibit 87          Declaration of Linda Riley

**VOLUME II**

Exhibit 88          Declaration of Mike Mackey

Exhibit 89          Declaration of Dr. Myla Young

Exhibit 90          Declaration of Paul Rickie Lunsford

Exhibit 91          Declaration of Phyllis Crawford

Exhibit 92          Declaration of Roger Crawford

Exhibit 93          Declaration of Ruth Harris

Exhibit 94          Declaration of Sally Davis Johnson

Exhibit 95          Declaration of Shawn Hill

Exhibit 96          Declaration of Toby Barrett

| | |
|---|---|
| Exhibit 97 | Declaration of Sylvia Gelene Dotson |
| Exhibit 98 | Declaration of Mark Dotson |
| Exhibit 99 | Declaration of Steve Barrett |
| Exhibit 100 | Declaration of Warren Dotson |
| Exhibit 101 | Declaration of Nona Reich |
| Exhibit 102 | Declaration of Carl Cook |
| Exhibit 103 | Declaration of Abby Stites |
| Exhibit 104 | Declaration of Richard Barrett |
| Exhibit 105 | Declaration of Doris Barrett, March 5, 2009 |
| Exhibit 106 | New Articles from Vian American and Sequoyah County Democrat Regarding Abe Dotson |
| Exhibit 107 | Description Narrative, Written by Trooper Glen Smithson, dated September 29, 1999 |
| Exhibit 108 | Excerpt from the Deposition of John Philpot |
| Exhibit 109 | Report by Edward E. Hueske |
| Exhibit 110 | Curriculum Vitae of Edward E. Hueske |
| Exhibit 111 | Declaration of Steve Leedy |
| Exhibit 112 | Declaration of Lauren Cohen Bell |
| Exhibit 113 | 2008 Declaration of Kevin McNally |
| Exhibit 114 | Declaration of Rodney Floyd |
| Exhibit 115 | Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001 |
| Exhibit 116 | 2007 Declaration of Kevin McNally |
| Exhibit 117 | Declaration of Dr. George Woods |

| | | |
|---|---|---|
| Exhibit 118 | Declaration of Roseann Schaye | 413 |

**SEALED EXHIBITS**

Exhibit 119      Birth Certificate of Kenneth Barrett

Exhibit 120      Birth Certificate of Sylvia Gelene Dotson

Exhibit 121      Birth Certificate of Richard Barrett

Exhibit 122      Birth Certificate of Toby Barrett

Exhibit 123      Birth Certificate of Stephen Barrett

Exhibit 124      Death Certificates of Allen M. Real and Allen Cleveland Real

Exhibit 125      Death Certificate of A.J. Barrett

Exhibit 126      Death Certificate of Ada Melton Barrett

Exhibit 127      Death Certificate of Albert Maxwell

Exhibit 128      Death Certificate of Billy Maxwell

Exhibit 129      Death Certificate of Hattie Dotson

Exhibit 130      Death Certificate of Death Certificate of Hugh Dotson

Exhibit 131      Death Certificate of Ida Melton

Exhibit 132      Death Certificate of Isaac Barrett

Exhibit 133      Death Certificate of Mary Barrett

Exhibit 134      Death Certificate of Minnie Andrews

Exhibit 135      Brandon Smith Social Security Records, Itemized Statement of Earnings

Exhibit 136      Educational Records for Kenneth Barrett

Exhibit 137      Educational Records for Gwendolyn Barrett

Exhibit 138      Educational Records for Ernest Barrett

| | |
|---|---|
| Exhibit 139 | Medical Records for Carolyn Joseph |
| Exhibit 140 | Medical Records for Kathy Trotter |
| Exhibit 141 | Medical Records for Brandy Hill |
| Exhibit 142 | Medical Records for Toby Barrett |
| Exhibit 143 | Medical Records for Travis Crawford |
| Exhibit 144 | Medical Records for Cynthia Crawford |
| Exhibit 145 | Medical Records for Linda Riley |
| Exhibit 146 | Medical Records for A.J. Barrett |
| Exhibit 147 | Medical Records for Kenneth Barrett |
| Exhibit 148 | Report of Interview with Kenneth Barrett by the Oklahoma State Bureau of Investigation, dated October 11, 1999 |
| Exhibit 149 | Marriage Certificate for Ernest and Diana Barrett |
| Exhibit 150 | Divorce File for Eugene and Sylvia Gelene Dudley |
| Exhibit 151 | Divorce File for Kenneth and Abigail Barrett |
| Exhibit 152 | *Kimberly Pulice vs. Richard Barrett*, Case Number JFP-2004-17 |
| Exhibit 153 | *In the Matter of Guardianship of Brandon Leroy Smith*, Case Number PG |
| Exhibit 154 | *In re: Sale of Inherited Lands of Lewis Dotson*, Case Number 481 |
| Exhibit 155 | Sylvia Gelene Dotson's Genealogy Memorandum |
| Exhibit 156 | *State of Oklahoma vs. David Littlefield*, Case Number SCBD-5338 |
| Exhibit 157 | *State of Oklahoma vs. Charles Sanders,* Case Number CF-97-9 |
| Exhibit 158 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-97-75 |
| Exhibit 159 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-128 |
| Exhibit 160 | *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-346 |

Exhibit 161          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-363

Exhibit 162          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-99-562

Exhibit 163          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2001-314

Exhibit 164          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2003-124

Exhibit 165          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2004-19

Exhibit 166          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-03-365

Exhibit 167          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-96-0444

Exhibit 168          *State of Oklahoma vs. Charles Sanders*, Case Number  CRF-92-91

Exhibit 169          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-08-224

Exhibit 170          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-2204-613

Exhibit 171          *State of Oklahoma vs. Cindy Crawford Mattox*, Case Number
CM-2001-885

Exhibit 172          *State Oklahoma vs. Brandie Price*, Case Number  CF-99-549

Exhibit 173          *State Oklahoma vs. Brandie Price*, Case Number  CM-00-900

Exhibit 174          *United States of America vs. Brandie Price*, Case Number
CR-07-16-RAW

Exhibit 175          *State Oklahoma vs. Charles Sanders*, Case Number  CF-97-140

Exhibit 176          *Michael Mackey vs. Cindy Crawford*, Case Number  PO-03-390

Exhibit 177          *State Oklahoma vs. Aubrey Jacobs, Joseph Jacobs, James Jacobs, Brandie
Price*, Case Number CF-98-481

Exhibit 178          *State of Oklahoma vs. Travis Crawford*, Case Number  CM-08-655

Exhibit 179          *State of Oklahoma vs. Randy Weaver*, Case Number  CF-00-668

Exhibit 180          Letter from Larry and Brenda Sell to Honorable John Garrett

Exhibit 181          Background Materials on Clint Johnson:  Testimony of Clint Johnson in
*State of Oklahoma vs. Richard Loy Gray* and Exhibits

| Exhibit 182 | Bill Ed Rogers's File |
|---|---|
| Exhibit 183 | *State of Oklahoma vs. Charles Sanders*, Case Numbers CM-08-1525 and CF-98-111 |
| Exhibit 184 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-94-1503 |
| Exhibit 185 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-03-6603 |
| Exhibit 186 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-04- 1187 |
| Exhibit 187 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-00-389 |
| Exhibit 188 | *State of Oklahoma vs. David Littlefield*, Case Number TRC-02-04186 |
| Exhibit 189 | *State of Oklahoma vs. David Littlefield*, Case Number CF-2007-369 |
| Exhibit 190 | *State of Oklahoma vs. Dawn Littlefield*, Case Number TRC-08-00774 |
| Exhibit 191 | *State of Oklahoma vs. Dawn Littlefield*, Case Number CF-2006-244 |
| Exhibit 192 | *Pam Littlefield vs. Mike Littlefield*, Case Number CJ-05-572 |
| Exhibit 193 | *Bank of Oklahoma vs. Jennifer and David Littlefield*, Case Number CJ-03-988 |
| Exhibit 194 | Affidavit for Search Warrant signed by Clint Johnson and Search Warrant, dated September 20, 1999 |
| Exhibit 195 | *State of Oklahoma vs. Randy Turman*, Case Number CF-02-477 |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )    **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 1**

---

7209

# MARRIAGE RECORD

**STATE OF OKLAHOMA, Sequoyah County, ss.**                                   **IN COUNTY COURT**

A. J. Barrett, the undersigned, hereby apply for a Marriage License to be issued to

Mr. A. J. Barrett, aged 21 years

whose residence is Akins, State of Okla.

and Miss Ada May Hatter, aged 18 years

whose residence is Akins, State of Okla.,

and for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering into the marriage relation, nor are they related to each other within the degrees prohibited by law. That I am 21 years of age, and legally competent to take an oath, and that I reside at Akins, County of Sequoyah, State of Oklahoma.

A. J. Barrett

Subscribed and sworn to before me, this 25 day of January, 193_6

By Frances Tinney Deputy                Horace Moore Court Clerk

I, the undersigned, _____ of _____

named in the application as being of the age of _____ years, do hereby consent to _____ marriage to _____

Dated at _____ Oklahoma, this _____ day of _____, 193_

_____
Parent or Guardian

**STATE OF OKLAHOMA, Sequoyah County, ss**

Before me, _____

a _____ in and for said County and State, on the _____ day of _____, 193_

personally appeared _____ to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that _____ executed the same as _____ free and voluntary act and deed for the uses and purposes therein set forth.

Witness my hand and official seal, the day and date above written.

My commission expires _____ 193_

## MARRIAGE LICENSE

**STATE OF OKLAHOMA, Sequoyah County, ss.**                          **IN COUNTY COURT**

To any Person authorized to Perform and Solemnize the Marriage Ceremony—GREETING:

You are hereby authorized to join in marriage Mr. A. J. Barrett

of Akins, County of Sequoyah, State of Okla

aged 21 years, and Miss Ada May Hatter

of Akins, County of Sequoyah, State of Okla

aged 18 years, and of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, this 2nd day of January, 193_6

My credentials are recorded in Ministers' Credentials, book _____, page _____.

By Frances Tinney Deputy.                Horace Moore Court Clerk.

Recorded this 2nd day of January, 193_6

## CERTIFICATE OF MARRIAGE

**STATE OF OKLAHOMA, Sequoyah County, ss.**

I, N. B. Burrow, Minister, Baptist,

of Maple, in Sequoyah County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be married, on the 2nd day of Jan A. D., 193_6, at Akins, in Sequoyah County, State of Oklahoma, in the presence of L. M. Allen

of Akins, Okla, and Georgia Liles

of _____

N. B. Burrow
Baptist Minister Official Designation

Returned and recorded this 22 day of Jan 193_6

Horace Moore Court Clerk

By Frances Tinney Deputy

418

419

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |


**EXHIBIT 2**

1036

# MARRIAGE RECORD

STATE OF OKLAHOMA,
_Sequoyah_ County, ss.                IN COUNTY COURT.

I, _Abe Datson_, the undersigned, hereby apply for a
MARRIAGE LICENSE, to be issued to Mr. _Abe Datson_ _Okla_ aged _28_ years,
whose residence is _Marble City_ State of _Okla_ and
M _iss Minnie Andrew_ aged _18_ years,
whose residence is _Marble City_ State of _Okla_ and
for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places
of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering
into the marriage relation, nor are they related to each other within the degrees prohibited by law. That I am _28_ years of age, and
reside at _Marble City_ County of _Sequoyah_
State of _Okla_ _Abe Datson_ Applicant.
Subscribed and sworn to before me, this _8_ day of _July_ 1911.
_M. D. Jones_ County Judge.
Clerk County Court.

I, the undersigned,_____ of_____
named in the above application as being of the age of_____years, do hereby
consent to_____marriage to_____
Dated at_____, Oklahoma, this_____day
of_____19_____.
_____Parent or Guardian.

STATE OF OKLAHOMA,
_____County, ss.

Before me,_____a
in and for said County and State, on the_____day of_____19____
personally appeared_____
to me known to be the indentical person who executed the within and foregoing instrument, and acknowledged to me that_____
executed the same as_____free and voluntary act and deed for the uses and purposes therein set forth.
WITNESS my hand and official seal, the day and date above written.

My commission expires_____19_____.

## MARRIAGE LICENSE

STATE OF OKLAHOMA,
_Sequoyah_ County, ss.        IN COUNTY COURT.

To any Person Authorized to Perform and Solemnize the Marriage Ceremony—GREETING:
You are hereby authorized to join in marriage Mr. _Abe Datson_
of _Marble City_, County of _Sequoyah_, State of _Oklahoma_, of _Marble City_
aged _28_ years, and Miss _Minnie Andrews_, of _Marble City_
County of _Sequoyah_, State of _Oklahoma_, aged _18_ years.
And of this License you will make due return to my office within thirty days from this date.
Witness my hand and official seal, at_____in said County, this _8_ day of _July_ A. D. 1911
_N. M. Littlejohn_ County Judge.
By _M. D. Jones_ Clerk County Court.
Recorded this _8_ day of _July_ 19_11_ _M. D. Jones, Clerk_

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA,
_Sequoyah_ County, ss.

I, _R L Horn_
NAME
_Justice of the Peace_
OFFICIAL DESIGNATION.        COURT OR CONGREGATION.
of _McKey_ in _Sequoyah_ County, State of Oklahoma, do hereby
certify that I joined in marriage the persons named in and authorized by this License to be married, on the _8_
day of _July_ A. D. 1911, at _R R Horn_ in _McKey_
County, State of Oklahoma, in the presence of _Lafayette Horn_ of _McKey_
and _Jessie Horn_ of _McKey_
_R L Horn_
_Justice of the Peace_
Returned and recorded this _11_ day of _July_ 1911 _M D Jones_
_Clerk County Court_

420

421

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

—————————————————

**EXHIBIT 3**

—————————————————

**This Certifies that**

Allin C. Real

of Quinton I. T.                              and

Ida Goodwin

of Quinton, I. T.

were by me united in

# Matrimony

according to the ordinance of GOD and the

laws of

at Quinton

on the eighteenth day of Feb.

in the year of our Lord 19 07

Witnesses

Frank Bean

Alfred Goodwin

423

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 4**

MARRIAGE LICENSE

STATE OF OKLAHOMA, COUNTY OF ADAIR, ss.                                                IN COUNTY COURT

TO ANY PERSON AUTHORIZED TO PERFORM OR SOLEMNIZE THE MARRIAGE CEREMONY — GREETING:

You are hereby authorized, upon delivery of this marriage license within ten days from the date of its issue to you, to join in marriage

Mr. _David A. Joseph_ , of _Pensacola_

County of _Escambia_ , State of _Florida_ , age _21_ years, and

Miss _Carolyn Watson_ , of _Sallisaw_

County of _Sequoyah_ , State of _Oklahoma_ , age _18_ years; and

by the command of the statute you shall make due return of this license to my office within five days succeeding the performance of the marriage herein authorized.

Issued under my hand and official seal, and recorded in my Marriage Record before delivery, at Stilwell, Oklahoma, this _24th_

day of _Sept_ 19_64_

(SEAL)                                  _Virginia Harper_ Court Clerk

By_____ Deputy

ENDORSEMENT: By this endorsement to the within and foregoing Marriage License, I hereby verify, and truly certify, that the Application for said License was accompanied by proper credentials under the circumstance indicated by the word "filed" opposite one or more of the applicable provisions of Statute indicated below.

_____(1) Physician's and laboratory technician's statements required by Statute, relative to the examination and health of either or both of the parties.

___✓___(2) An order of the County Judge, with memoranda of reasons for the order dispensing with Statutory requirements relative to the examination and health of either or both of the parties.

_____(3) An order of the County Judge with accompanying memoranda of reasons for the order extending the 30 day period following the examination to 90 days or less together with papers complying with the requirements of Number (1) above.

_____(4) Affidavits of Consent to Marriage of parent or guardian, in lieu of personal appearance as provided by House Bill No. 688 of the 1959 Legislative Session.

All the above and foregoing recorded on this _24th_ day of _Sept_ A. D., 19 _64_, and thereafter said License delivered according to Law.

_Virginia Harper_ Court Clerk

By_____ Deputy

CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, COUNTY OF ADAIR, ss.

I, _E. B. Arnold_                    _Co. Judge_            _Adair Co. Court_
(Name)                               (Official Designation)      (Court or Congregation)

of _Stilwell_ in Adair County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized

by this License to be married, on the _24th_ day of _Sept_ , A. D., 19 _64_ at _Stilwell_

in Adair County, State of Oklahoma, in the presence of_____

_Phyllis Crawford_ of _Sallisaw, Okla_

and _Ruth Harris_ of _"          "_

My credentials of authority are recorded in Minister's Credentials     _E. B. Arnold_
(Person Performing Ceremony)

_____Book_____,     _Co. Judge_

at page_____of_____County, Oklahoma.     (Official Designation)

License returned, and Certificate of Marriage recorded subjoining the record of License issued and recorded in Marriage Record Book _20_ at page _31-/_

on this the _24th_ day of _Sept_ , 19 _64_     _Virginia Harper_ Court Clerk

By_____ Deputy

I, Shawna Baird Court Clerk, for Adair County, Oklahoma, hereby certify that the foregoing is a true, correct and full copy of the instrument herewith set out as appears of record in the Court Clerk's Office of Adair County, Oklahoma, this _2nd_ day of _April 2001_

By: _Shawna Baird_
Clerk/Deputy

KEB400570

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 5**

_____

Subscribed and sworn to before me this........................................day of.................................................. Parent or Guardian.

(SEAL)

................................., 19............

By ........................................................... Court Clerk.

........................................................... Deputy.

STATE OF OKLAHOMA, Adair County, ss.   MARRIAGE LICENSE

To any Person Authorized to Perform and Solemnize the Marriage Ceremony—Greeting:   IN COUNTY COURT

You are hereby authorized to join in marriage Mr. *Ernest E. Barrett*

of *Sallisaw* County of *Sequoyah* State of *Oklahoma* aged *21* years,

and M *Sylvia F. Dotson* of *Sallisaw* County of *Sequoyah* State of *Oklahoma* aged *40* years.

And of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at *Stilwell* in said County, this *8th* day of

*July* A. D. 19 *60*   ........................................ Court Clerk.

By ........................................................... Deputy.

Recorded this *8th* day of *July* 19 *60*

........................................................... Court Clerk.

By ........................................................... Deputy.

STATE OF OKLAHOMA, Adair County, ss.   CERTIFICATE OF MARRIAGE

I, *E. B. Arnold* *County Judge* *Adair County Court*
NAME   OFFICIAL DESIGNATION   COURT OR CONGREGATION

of *Stilwell* in *Adair* County, State of Oklahoma, do hereby certify

that I joined in marriage the persons named in and authorized by this License to be married, on the *8th* day of

*July* A. D. 19 *60*, at *Stilwell* in *Adair* County,

State of Oklahoma, in the presence of *Johnny Simmons* of *Sallisaw, Okla*

and *Roy Weeks Stanford* of *Sallisaw, Okla*

My credentials are recorded in Minister's Credentials

Book............ Page............

*E. B. Arnold*

of.......................................................

....................................... County, Oklahoma.   *County Judge*

Returned and recorded this *8th* day of *July* 19 *60*

........................................................... Court Clerk.

By ........................................................... Deputy.

426

427

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 6**

## DECLARATION OF RODNEY FLOYD

I, Rodney Floyd, declare the following:

I am one of the investigators currently working for the defense in Kenneth Eugene Barrett's case.  On February 21, 2008, I interviewed former Sequoyah County Sheriff John Philpot.  Mr. Philpot told me that less than a month before the incident in which Oklahoma State Highway Patrol Trooper David "Rocky" Eales was shot and killed, he and three other law enforcement officers went to Mr. Barrett's residence.  They did not serve an arrest warrant on Mr. Barrett, or take him into custody.  They encountered no violence from Mr. Barrett, and were not harmed or assaulted.

I did not draft this declaration.  The information detailed above is based on what I told one of Mr. Barrett's lawyers, David Autry, based on my investigation.  I have read this declaration carefully, and it accurately states what I told Mr. Autry.

I declare under penalty of perjury that the foregoing 1 page declaration is true and correct.

Executed by me this _11_ day of _____March_____, 2009, in

_Lincoln_____ County, Oklahoma.

_____
Rodney Floyd

428

429

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 7**

---

532

## MARRIAGE RECORD No. 33

SEI No. 108 (1968) MID-WEST - SAPULPA, OKLAHOMA

### APPLICATION FOR MARRIAGE LICENSE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.        IN DISTRICT COURT

We the undersigned, hereby apply for the issuance of a Marriage License and certify as to our ages and places of residence as follows:

Name    Kenneth Eugene Barrett                                         , Age    18
of       Sallisaw                    , County of    Sequoyah    , State of    Oklahoma

Name    Abigail Teague                                                  , Age    16
of       Sallisaw                    , County of    Sequoyah    , State of    Oklahoma

and for the purpose of procuring same, we do solemnly swear that the names, ages and places of residence as set out above are true and correct, as evidenced by documents described in particular as follows;

(First Party)                                              (Second Party)
and that we are not disqualified or incapable under the law of entering into the marriage relation, nor are we related to each other within the degree prohibited by law.

Kenneth Eugene Barrett .......Applicant        Abby Teague .......Applicant

Subscribed and sworn to before me this 28 day of April                 A. D. 19 80

                                                    THEODORE STITES, Court Clerk
                                        By    Pamela Dyer             Deputy

NOTE—In event one or both of the parties to be married are under age, such application shall have been on file in the Court Clerk's office for a period of not less than seventy-two hours, prior to the issuance of the license.

### Consent Affidavit — In Person (1)

I, the undersigned, state that I am the    mother    of    Abigail Teague    named in the above application as being of the age of    16    years, and in the presence of the issuing official, I do hereby consent to    her    marriage to    Kenneth Eugene Barrett

In the presence of        Signed this    28    day of    April    19 80    Wyona Teague    Signature

                        THEODORE STITES, Court Clerk

By    Pamela Dyer             Deputy

### Consent Affidavit — In Person (2)

I, the undersigned, state that I am the                of                named in the above application as being of the age of            years, and in the presence of the issuing official, I do hereby consent to                marriage to

In the presence of        Signed this        day of        , 19        Signature

                        THEODORE STITES, Court Clerk

By                        Deputy

### MARRIAGE LICENSE

NO.
STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.        IN DISTRICT COURT
TO ANY PERSON AUTHORIZED TO PERFORM OR SOLEMNIZE THE MARRIAGE CEREMONY —— GREETINGS:

You are hereby authorized, upon delivery of this marriage license within ten days from the date of its issue to you, to join in marriage

Mr.    Kenneth Eugene Barrett                    of    Sallisaw
County of    Sequoyah    , State of    Oklahoma    , Age    18    years, and
M    Abigail Teague                    of    Sallisaw
County of    Sequoyah    , State of    Oklahoma    , Age    16    years, and

by the command of the statute you shall make due return of this license to my office within five days succeeding the performance of the marriage herein authorized.

Issued under my hand and official seal, and recorded in my Marriage Record before delivery, at, Sallisaw, Oklahoma, this 7th day of May , 1980.

                                                    THEODORE STITES, Court Clerk
                                    By    Pamela Dyer             Deputy

(SEAL)

ENDORSEMENT: By this endorsement to the within and foregoing Marriage License, I hereby verify, and truly certify, that the Application for said License was accompanied by proper credentials under the circumstance indicated by the word "filed" opposite one or more of the applicable provisions of statute indicated below.

Filed (1) Physician's and laboratory technician's statements required by statute, relative to the examination and health of either or both of the parties.

(2) An order of the District Court with memoranda of reasons for this order dispensing with statutory requirements relative to the examination and health of either or both of the parties.

(3) An order of the District Court with accompanying memoranda of reasons for the order, extending the 30 day period following the examination to 90 days or less, together with papers complying with the requirements of number (1) above.

(4) Affidavit of consent to marriage of an underage person by parent or guardian, in lieu of personal appearance as provided by Statute 43 O. S. Supp. 1967, par. 3.

(5) Affidavit of consent to marriage of an underage person by parent or guardian, residing in another county of this State or outside the State and acknowledged as provided by Statute 43 O.S. Supp. 1967, par. 3.

(6) Affidavit of three persons authorizing marriage of underage person when parents are deceased or otherwise incapable of giving consent, 43 O.S. Supp. 1967, par. 3.

Witness my hand and official seal this    28    day of    April    , 19 80

        THEODORE STITES, Court Clerk    By    Pamela Dyer             Deputy

All the above and foregoing recorded on this        day of                A. D., 19    , and thereafter said License delivered according to Law.

By                        Deputy                THEODORE STITES, Court Clerk

### CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.

I,    Jerry Harris                    Ordained Minister
                    (NAME)                (OFFICIAL DESIGNATION)

Deborah Wilson    of    Sallisaw
(COURT OR CONGREGATION)                (TOWN)

In    Sequoyah    , County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be married on the    10th    day of    May    A. D., 19 80 , at    Sallisaw    , in Sequoyah County, State of Oklahoma, in the presence of    Angela Polasek    of    Carolyn Joseph    and    Jeff Real    of    Henry Hodges

My credentials of authority are recorded in Minister's            Jerry Harris
Credentials            Book                        (PERSON PERFORMING CEREMONY)
at page        of        County,
Oklahoma.                                (OFFICIAL DESIGNATION)

License returned, and Certificate of Marriage recorded subjoining the record of License issued and recorded in Marriage Record Book 33 at page

on this the    14th    day of    May    , 19 80

        THEODORE STITES, Court Clerk    By    Noma Edwards             Deputy

431

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 8**

**181**

## MARRIAGE RECORD

THE STAR PRINTERY, INC., BLANK BOOK MANUFACTURERS, MUSKOGEE, OKLAHOMA

STATE OF OKLAHOMA, Sequoyah County, ss.                    IN COUNTY COURT

I, _____, the undersigned, hereby apply for Marriage License, to be issued to

Mr. _Hugh Dotson_____, age _21_

Color ___W.___, residence _McKey_____ County of _Sequoyah_, State of _Okla_

and Miss _Hattie Read_____, age _18_

Color ___W.___, residence _McKey_____ County of _Sequoyah_, State of _Okla_

and for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering into the marriage relation, nor are they related to each other within the degrees prohibited by law. That I am ___21___ years of age, and reside at _McKey_____, County of _Sequoyah_____, State of _Okla_____,

_Hugh Dotson_____, Applicant.

Subscribed and sworn to before me, this ___3___ day of ___July___, A. D. 19_39_.

By_____, Deputy Court Clerk.    _Lillie Rosson_____, Court Clerk.

I, the undersigned, _____ of _____

named in the above application as being of the age of _____ years, do hereby consent to _____

marriage to _____

Dated at _____, Oklahoma, this _____ day of _____, 19____.

_____, Parent or Guardian.

STATE OF OKLAHOMA, Sequoyah County, ss.

BEFORE ME, _____, a _____ in and for said County and State,

on the _____ day of _____, 19___, personally appeared _____

to me known to be the identical person_____ who executed the within and foregoing instrument, and acknowledged to me that _____ executed the same as _____ free and voluntary act and deed for the uses and purposes therein set forth.

WITNESS my hand and official seal, the day and date above written.

My commission expires _____, 19_____.

## MARRIAGE LICENSE

STATE OF OKLAHOMA, Sequoyah County, ss.                    IN COUNTY COURT

To any Person authorized to Perform and Solemnize the Marriage Ceremony—GREETING:

You are hereby authorized to join in marriage Mr. _Hugh Watson_

of _McKey_____, County of _Sequoyah_____, State of _Okla_

aged ___21___ years, and Miss _Hattie Real_

of _McKey_____, County of _Sequoyah_____, State of _Okla_

aged ___18___ years, and of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at Sallisaw, in said County, this ___3___ day of _July_, 19_39_.

By _____, Deputy.    _Lillie Rosson_____, Court Clerk.

Recorded this ___3___ day of _July_ 19_39_.    _Lillie Rosson_____, Court Clerk.

(seal)                    _____, Deputy.

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, Sequoyah County, ss.

I, _Rev Lewis Young_ _Minister of the Gospel_ of _Baptist Church_
   Name              Official Designation        Court or Congregation

of _Vian_____, in _Sequoyah_____ County, State of Oklahoma, do hereby

certify that I joined in marriage the persons named in and authorized by this License to be married, on the ___3rd___ day of

_July_____, A. D., 19_39_, at _Residence_____, in Sequoyah

County, State of Oklahoma, in the presence of _Eugene Masterson_

of _McKey Okla_____, and _Margue Goodman_

of _McKey Okla_____    _Rev Lewis Young_
                           _Vian Okla_, Official Designation.

My credentials are recorded in Ministers' Credentials, book ___1___, page ___23___

Returned and recorded this ___8___ day of _July_____, 19_39_.

_Lillie Rosson_____, Court Clerk.

By _____, Deputy.

432

433

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 9**

2147

# MARRIAGE RECORD

STATE OF OKLAHOMA, SEQUOYAH COUNTY, ss.          IN COUNTY COURT

I, _Sam Hatter_ the undersigned, hereby apply for a MARRIAGE LICENSE to be issued to Mr. _Sam Hatter_ aged _21_ years, whose residence is _Obi_, State of _Okla_, and Miss _Ida Melton_, aged _19_ years, whose residence is _Obi_, State of _Okla_, and for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering into the marriage relation, nor are they related to each other within the degrees prohibited by law. That I am of _21_ years of age, and reside at _Obi_, County of _Sequoyah_, State of _Okla_

_Sam Hatter_ ..........Applicant.

Subscribed and sworn to before me, this _3_ day of _Feby_ 191_9_.

_Joe E. Thornton_ ..........Court Clerk.

By ..........Deputy.

I, the undersigned, ..........of ..........named in the application as being of the age of ..........years, do hereby consent to ..........marriage to ..........

Dated at ..........Oklahoma, this ..........day of ..........191......

..........Parent or Guardian.

STATE OF OKLAHOMA, ..........COUNTY, ss.

Before me, ..........a ..........in and for said County and State, on the ..........day of ..........191...., personally appeared ..........to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that ..........executed the same as ..........free and voluntary act and deed for the uses and purposes therein set forth.

Witness my hand and official seal, the day and date above written.

My commission expires ..........191.....

## MARRIAGE LICENSE

STATE OF OKLAHOMA, SEQUOYAH COUNTY, ss.          IN COUNTY COURT

TO ANY PERSON AUTHORIZED TO PERFORM AND SOLEMNIZE THE MARRIAGE CEREMONY—GREETING:

You are hereby authorized to join in marriage Mr. _Sam Hatter_ of _Obi_ County of _Sequoyah_ State of _Oklahoma_ aged _21_ years, and Miss _Ida Melton_ of _Obi_ County of _Sequoyah_ State of _Oklahoma_, aged _19_ years,

And of this License you will make due return to my office within thirty days from this date. Witness my hand and official seal, this _2_ day of _Feby_ 191_9_.

_Joe E. Thornton_ ..........Court Clerk.

By ..........Deputy.

Recorded this _3rd_ day of _Feby_ 191_9_ _Joe E. Thornton_ Court Clk.

By _Louise Hall_ Deputy

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, SEQUOYAH COUNTY, ss.

I, _N. A. Carlile, County Judge_, of _Sallisaw_ in _Sequoyah_ County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be married, on the _3rd_ day of _February_ A. D. 191_9_, at _Sallisaw_ in _Sequoyah_ County, State of Oklahoma, in the presence of _Wm McCombs_ of _Sallisaw Okla_ and _Mose Sanders_ of _Sallisaw Okla._

_N. A. Carlile_, County Judge of Sequoyah County, Okla.

Returned and recorded this _3rd_ day of _Feby_ 191_9_

_Joe E. Thornton_

434

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 10**

Copy, mil
3/18-55

625

## MARRIAGE RECORD

9644

THE STAR PRINTERY, INC. BLANK BOOK MANUFACTURERS, MUSKOGEE, OKLAHOMA—JO

STATE OF OKLAHOMA, Sequoyah County, ss.                                    IN COUNTY COURT

I, _____, the undersigned, hereby apply for Marriage License, to be issued to

Mr. _Sam Hatter_____ age _41_,

Color __W__, residence _Akins_____ County of _Sequoyah_, State of _Okla___

and Miss _Bessie Reed_____ age _22_

Color __W__, residence _Akins_____ County of _Sequoyah_ State of _Okla___,

and for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places

of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering into

the marriage relation, nor are they related to each other within the degree prohibited by law. That I am____ _41_ ____years of age, and

reside at _Akins_____, County of _Sequoyah_, State of _Okla_____

_Sam Hatter_____, Applicant.

Subscribed and sworn to before me, this____ _26_ day of____ _Oct_ ____, A. D. 19 _40_

By_____, Deputy Court Clerk. _Lillie Rosson_____, Court Clerk.

I, the undersigned, _____ of_____

named in the above application as being of the age of_____years, do hereby consent to_____

marriage to_____

Dated at_____, Oklahoma, this_____day of_____, 19____

_____, Parent or Guardian.

STATE OF OKLAHOMA, Sequoyah County, ss.

BEFORE ME, _____, a _____ In and for said County and State,

on the_____day of_____, 19___, personally appeared _____

to me known to be the identical person____who executed the within and foregoing instrument, and acknowledged to me that_____executed the

same as_____free and voluntary act and deed for the uses and purposes therein set forth.

WITNESS my hand and official seal, the day and date above written.

_____

My commission expires_____, 19____   _____

## MARRIAGE LICENSE

STATE OF OKLAHOMA, Sequoyah County, ss.                                    IN COUNTY COURT

To any Person authorized to Perform and Solemnize the Marriage Ceremony—GREETING:

You are hereby authorized to join in marriage Mr. _Sam Hatter_____

of _Akins_____, County of _Sequoyah_, State of _Okla___

aged____ _41_ ____years, and Miss _Bessie Reed_____

of _Akins_____, County of _Sequoyah_, State of _Okla___

aged____ _22_ ____years, and of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at Sallisaw, in said County, this _26_ day of _Oct_____, 19 _40_

By_____, Deputy.   _Lillie Rosson_____ Court Clerk.

Recorded this____ _26_ day of_____ _Oct_____ 19 _40_

_Lillie Rosson_____ Court Clerk.

(seal)                                                                               Deputy.

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, Sequoyah County, ss.

I, _O. W. White_____, _Minister_____, _Baptist_____
        Name                Official Designation        Court or Congregation

of _Short___ in _Sequoyah_____ County, State of Oklahoma, do hereby

certify that I joined in marriage the persons named in and authorized by this License to be married, on the _27_ day of

_October_____, A. D., 19 _40_, at _Short_____, In Sequoyah

County, State of Oklahoma, in the presence of _Marie Lizie White_

of _Short Okla_____, and _Mrs. Della Reed_

of _Sallisaw R/_____

_O. W. White_
_Baptist Minister_____Official Designation.

My credentials are recorded in Ministers' Credentials, book____ _1_ ____, page____ _46_

Returned and recorded this____ _2_ ____day of____ _November_____, 19 _40_

_Lillie Rosson_____, Court Clerk.

By _Flo Smith_____, Deputy.

(seal)

437

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |


**EXHIBIT 11**

507

MARRIAGE RECORD No. 35

## APPLICATION FOR MARRIAGE LICENSE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.                    IN DISTRICT COURT

We the undersigned, hereby apply for the issuance of a Marriage License and certify as to our ages and places of residence as follows:

Name .....Paul Dudley................................................................., Age .43......

of ........Sallisaw................................, County of ......Sequoyah........, State of ......Oklahoma......

Name .........Sylvia Gelene Barrett............................................, Age .42......

of ........Sallisaw................................, County of ......Sequoyah........, State of ......Oklahoma......

and for the purpose of procuring same, we do solemnly swear that the names, ages and places of residence as set out above are true and correct, as evidenced by documents described in particular as follows:

(First Party) ................................................... (Second Party) ...........................................

and that we are not disqualified or incapable under the law of entering into the marriage relation, nor are we related to each other within the degree prohibited by law.

.........................................,Applicant      ...........................................Applicant

Subscribed and sworn to before me this.....18.. day of ...October....................A. D. 1982.

THEODORE STITES, Court Clerk

By. Pamela Dyer...................................Deputy

NOTE—In event one or both of the parties to be married are under age, such application shall have been on file in the Court Clerk's office for a period of not less than seventy-two hours, prior to the issuance of the license.

### Consent Affidavit — In Person (1)

I, the undersigned, state that I am the ........................ of ........................ named in the above application as being

of the age of ........ .... years, and in the presence of the issuing official, I do hereby consent to ........ ........ ........................ marriage to

....................................................

In the presence of          Signed this ...... day of .......... .. .. ...... , 19 .... ...........................Signature

THEODORE STITES, Court Clerk

By ............................................ Deputy

### Consent Affidavit — In Person (2)

I, the undersigned, state that I am the ...... ... of ........ .. .. ... ........... named in the above application as being

of the age of ........ ..... years, and in the presence of the issuing official, I do hereby consent to ........................ marriage to

....................................................

In the presence of          Signed this ... .. .. .. day of.... .. ... .. ...... , 19 .... ...........................Signature

THEODORE STITES, Court Clerk

By ............................................ Deputy

### MARRIAGE LICENSE

NO........................                              IN DISTRICT COURT

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.

TO ANY PERSON AUTHORIZED TO PERFORM OR SOLEMNIZE THE MARRIAGE CEREMONY ——— GREETINGS:

You are hereby authorized, upon delivery of this marriage license within ten days from the date of its issue to you, to join in marriage

Mr. .....Paul Dudley................................................. of ....Sallisaw......................

County of ........Sequoyah........................, State of ....Oklahoma................, Age ........43..., years, and

M ......Sylvia Gelene Barrett................................. of .....Sallisaw......................

County of ..........Sequoyah..................., State of ....Oklahoma................., Age ....42...... years, and

by the command of the statute you shall make due return of this license to my office within five days succeeding the performance of the marriage herein authorized.

Issued under my hand and official seal, and recorded in my Marriage Record before delivery, at, Sallisaw, Oklahoma, this.....18 day of......Oct....., 19.82.

THEODORE STITES, Court Clerk

(SEAL)                          By. Pamela Dyer..................Deputy

ENDORSEMENT: By this endorsement to the within and foregoing Marriage License, I hereby verify, and truly certify, that the Application for said License was accompanied by proper credentials under the circumstance indicated by the word "filed" opposite one or more of the applicable provisions of Statute indicated below.

....Filed....(1) Physician's and laboratory technician's statements required by statute, relative to the examination and health of either or both of the parties.

............(2) An order of the District Court with memoranda of reasons for the order dispensing with statutory requirements relative to the examination and health of either or both of the parties.

............(3) An order of the District Court with accompanying memoranda of reasons for the order, extending the 30 day period following the examination to 90 days or less, together with papers complying with the requirements of number (1) above.

............(4) Affidavits of consent to marriage of an underage person by parent or guardian, in lieu of personal appearance as provided by Statute 43 O. S. Supp. 1967, par. 3.

............(5) Affidavits of consent to marriage of an underage person by parent or guardian, residing in another county of this State or outside the State and acknowledged as provided by Statute 43 O.S. Supp. 1967, par. 3.

............(6) Affidavit of three persons authorizing marriage of underage person when parents are deceased or otherwise incapable of giving consent. 43 O.S. Supp. 1967, par. 3.

Witness my hand and official seal this ....18......... day of ......October............., 19.82.

THEODORE STITES, Court Clerk      By ........Pamela Dyer................. Deputy

All the above and foregoing recorded on this ............ day of ............................. A. D., 19. .., and thereafter said License delivered according to Law.

By ............................................ Deputy                    THEODORE STITES, Court Clerk

### CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.

I, ........Billy Ray Jackson ............................ . ...........Minister.........................

   (NAME)                                                          (OFFICIAL DESIGNATION)

..........Baptist.................... of ......Sallisaw......................

   (COURT OR CONGREGATION)                                          (TOWN)

In .Sequoyah.......... County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be

married on the ...18th.. day of ...October........, A. D., 19.82, at ...Sallisaw........, in .Sequoyah.... County, State of Oklahoma,

in the presence of .......Bernell Edwards... ..... ........................ of .....Sallisaw..Okla.....................

and .................Kathy Reed................................... of .....Sallisaw..Okla.....................

My credentials of authority are recorded in Minister's

Credentials ................. Book ....2......,          .........Billy Ray Jackson..........

                                                            (PERSON PERFORMING CEREMONY)

at page ......33.. of .....Sequoyah... County,          Minister

Oklahoma.                                                    (OFFICIAL DESIGNATION)

License returned, and Certificate of Marriage recorded subjoining the record of License issued and recorded in Marriage Record Book 34 at page...507....

on this the ....18th... day of ......October.......... , 19..82.

THEODORE STITES, Court Clerk      By. Kathy Reed............................Deputy

438

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 12**

236

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

SYLVIA GELENE BARRETT,

                                   Plaintiff,        )
                                                     )
                                                     )
                                                     )
-vs-                                                 )        No. D-73-50
                                                     )
                                                     )     SEQUOYAH COUNTY, OKLAHOMA
                                                     )        F I L E D
ERNEST BARRETT,                                      )      IN DISTRICT COURT
                                   Defendant.        )
                                                           JUN 20 1973

DECREE OF DIVORCE          THEODORE STILES, Court Clerk

                                                           By _____ Deputy

On this **20th** day of ___**JUNE**___, 1973, the above entitled and numbered cause comes on for trial on its merits.  The plaintiff, Sylvia Gelene Barrett, appears in person and by her attorney, John Robert Montgomery, of Scoufos and Montgomery, and the defendant appears not, having heretofore executed and filed sufficient Waiver of Service of Summons and Entry of Appearance, same having been filed on the ___19 th___ day of ___JUNE___, 1973.

The Court having ordered that the allegations contained in said Petition be taken as confessed, and having examined the files and records in this case and having heard the oral testimony of witnesses sworn and examined in open Court, having fully considered the evidence, and being fully advised in the premises, finds:  That all material facts alleged in plaintiff's Petition are true; that the parties hereto were legally married at Stilwell, Oklahoma, on the 8th day of July, 1960, and have since that time been husband and wife though said parties have been separated since September 12, 1972; and that of said marriage three (3) children have been born, namely:  Kenneth Barrett, age 11, Richard Barrett, age 8, and Stephen Barrett, age 4; that the plaintiff is now and has been for more than six (6) months next preceding the filing of plaintiff's Petition herein a bona fide resident in good faith of the State of Oklahoma, and is now and has been for more than thirty (30) days prior to the filing of plaintiff's Petition an actual resident in good faith of Sequoyah County, Oklahoma; that the plaintiff is entitled to a divorce upon the grounds of adultery in that the defendant has repeatedly engaged in unlawful voluntary sexual intercourse with persons of the opposite sex during the marriage of the parties, as alleged in plaintiff's Petition; that the plaintiff is a fit and proper perso

*237*

page two, Barrett
Decree of Divorce

to be awarded the exclusive care and custody of the minor children, subject to the defendant's right of reasonable visitation, and that the defendant should be required to pay reasonable child support during their minority, or until further order of the Court, in the amount of FIFTY DOLLARS ($50.00) per week, for the care and maintenance of said children; that during said marriage of the parties hereto they have acquired no real property and have acquired certain person property, to wit: One 1973 Pontiac automobile, household furniture and goods, including but not limited to a television, living room suit and living room rug, of which said person property the said 1973 Pontiac automobile should be awarded to the defendant as his sole and separate property and the household furniture and goods, including the television, living room set and living room rug should be awarded to the plaintiff as her sole and separate property.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED BY THE COURT that Sylvia Gelene Barrett, plaintiff herein, be and she is hereby awarded an absolute decree of divorce from the defendant, Ernest Barrett, and the bonds of matrimoney heretofore existing between said parties are hereby dissolved, set aside and held for naught, and both parties are released therefrom; PROVIDED, that this part of the decree does not become absolute and final until six (6) months from the date hereof, during which time the parties are enjoined from marrying any other party.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that the plaintiff be and she is hereby granted the exclusive care and custody of the minor children, Kenneth Barrett, Richard Barrett and Stephen Barrett; and the defendant is granted rights of visitation with said children at reasonable times, and under reasonable conditions; and the defendant is ordered and directed to pay, as reasonable child support, the sum of FIFTY DOLLARS ($50.00) per week, for the care and maintenance of said children during their minority, or until further order of the Court, the initial child support payment to be made on or before the _2nd_ day of _July_, 1973, by cash, cashier's check or money order through the Clerk of the District Court of Sequoyah County, Oklahoma, and like payments on or before the _1st_ day of each week thereafter.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that the defendant be, and he is hereby, awarded the 1973 Pontiac automobile and his

page three, Barrett
Decree of Divorce

personal effects and belongings as his sole and separate property, free and clear of any claims, rights, or interest whatsoever of the plaintiff, and the plaintiff be, and she is hereby, awarded the household furniture and goods, including but not limited to a television, living room suit and living room rug, and her personal effects and belongings and those of the children as her sole and separate property, free and clear of any claims, rights or interest whatsoever of the defendant.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that each of the parties hereto are hereby ordered and directed forthwith to execute and deliver to the other such assignments, bills of sale, deeds or conveyances of record that may be necessary to carry the terms of the division of property into effect, and in the event either of said parties fail to do so within five (5) days from this date, then this decree shall operate as such conveyance.

BILL ED ROGERS
Associate Judge of the District Court

APPROVED:

SYLVIA GELENE BARRETT, Plaintiff

ERNEST BARRETT, Defendant

442

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

SYLVIA GELENE BARRETT,

Plaintiff, )

)

)

)

-vs- )

)

)

)

ERNEST BARRETT, )

Defendant )

No. D-73-50

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT.

JUN 19 1973,

THEODORE STITES, Court Clerk

By

ENTRY OF APPEARANCE AND WAIVER

Comes now the defendant herein, the undersigned, and acknowledges receipt of a copy of the petition filed and on file herein, states that he has read and understands the same, hereby waives the issuance, service, and return of procees upon him in this action, enters a voluntary appearance in this cause, waiving all time and right to plead, answer or appear in this action, and consents that the same may be set down for trial and heard by the Court at any time hereafter without notice to, and in the absence of, this defendant.

ERNEST BARRETT, Defendant

STATE OF WEST VIRGINIA
XXXXXXXXXXXXXXXXXXXXXXXXX )
) SS
COUNTY OF CABELL )

Before me, the undersigned, a Notary Public within and for the State of West Virginia XXXXXXXX, on this 6 day of June 1973, personally appeared the above named defendant, Ernest Barrett, to me known to be the identical person who executed the above and foregoing entry of appearance and waiver, and personally acknowledged to me that he has read, understood and signed the same, and that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

IN WITNESS WHEREOF I have hereunto affixed my signature and official seal the date and date theretofore stated.

NOTARY PUBLIC

My commission expires the 27 day of September , 19 73 .

443

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

SYLVIA GELENE BARRETT,
                                    Plaintiff,    )
                                                  )
                                                  )
                                                  )
-vs-                                              )          No. D-73-50
                                                  )
                                                  )     SEQUOYAH COUNTY, OKLAHOMA
                                                  )          F I L E D
                                                  )        IN DISTRICT COURT
ERNEST BARRETT,                                   )
                                    Defendant  )           MAR 14 1973

                              PETITION            THEODORE STITES, Court Clerk
                                                       By_____Deputy

        The plaintiff, Sylvia Gelene Barrett, for cause of action against the
defendant, Ernest Barrett, alleges and states:

                                        I

        That the plaintiff is now and has been for more than six (6) months next
preceding the filing of the petition herein an actual resident, in good faith, of the
State of Oklahoma, and a resident of Sequoyah County for thirty (30) days at the time
her petition was filed herein.

                                        II

        That the parties hereto were married on or about the 8th day of July,
1960, at Stilwell, Adair County, Oklahoma and have been since that time, and are
at the present time, husband and wife.

                                       III

        That of said marriage aforesaid three (3) children, now minors, have
been born, to wit:  Kenneth Barrett, age 11, Richard Barrett, age 8, and Stephen
Barrett, age 4.

                                       IV

        That as grounds for divorce the plaintiff alleges that the defendant has,
during the marriage of the parties, been guilty of adultery in that the defendant has
repeatedly engaged in unlawful voluntary sexual intercourse with persons of the op-
posite sex, by reason of which the plaintiff is entitled to a decree of divorce from
the defendant.

444

page two, Barrett
Petition

V

That during the marriage of the parties hereto they have acquired no real property and the following personal property, to wit:

One 1973 Pontiac automobile
Household furniture and goods, including but not limited to
a television, living room suit and living room rug.

VI

That the Court should award the said 1973 Pontiac automobile to the defendant as his sole and separate property and should award the household furniture and goods, including the television, living room set and living room rug to the plaintiff as her sole and separate property.

VII

That the defendant is a healthy man regularly and profitably employed with current gross earnings of approximately ONE THOUSAND FIVE HUNDRED DOLLARS ($1,500.00) per month, and that he should be ordered and directed to make regular periodic payments of child support through the office of the Court Clerk of the District Court of Sequoyah County, Oklahoma, for the maintenance and support of the children of the parties hereto, in the amount of SEVENTY FIVE DOLLARS ($75.00) per week.

VIII

That the plaintiff is a fit and proper person to have custody of the minor children of the parties and that custody of said children should be awarded to the plaintiff subject to the right of the defendant to visit with said children at reasonable times and places.

IX

That plaintiff does not have an adequate means of support and the Court should require the defendant to pay her attorney's fee in the reasonable amount of ONE HUNDRED FIFTY DOLLARS ($150.00) and the Court costs herein.

page three, Barrett
Petition

WHEREFORE, premises considered, the plaintiff prays that upon hearing this cause the Court grant and award the plaintiff a decree of divorce from the defendant; custody of the minor children of the parties with reasonable visitation privileges to the defendant; child support; attorney fees in the amount of ONE HUNDRED FIFTY DOLLARS ($150.00); a fair and equitable division and distribution of the property accumulated by the parties by awarding the defendant the 1973 Pontiac automobile and awarding the plaintiff the household furniture and goods, including but not limited to the television, living room rug and living room set; Court costs; and such other and further relief as to which the plaintiff may be entitled and which may be deemed just and proper by the Court.

SYLVIA GELENE BARRETT

By _____
JOHN ROBERT MONTGOMERY
SCOUFOS & MONTGOMERY
Attorneys at Law
P. O. Box 787
Sallisaw, Oklahoma  74955
Attorneys for Plaintiff

STATE OF OKLAHOMA      )
                       )  SS
COUNTY OF SEQUOYAH     )

Sylvia Gelene Barrett, being first duly sworn upon oath says: That she is the plaintiff above named, that she has read the foregoing Petition and knows the contents thereof, and that the facts therein set forth are true.

_____
SYLVIA GELENE BARRETT

Subscribed and sworn to before me this 14th day of March, 1973.

_____
NOTARY PUBLIC

My Commission Expires:

November 1, 1976

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

SYLVIA GELENE BARRETT,
                            Plaintiff,          )
                                                )
                                                )
                                                )
-vs-                                            )          No. _D-73-50_
                                                )
                                                )          SEQUOYAH COUNTY, OKLAHOMA
                                                )          **FILED**
ERNEST BARRETT,                                 )          IN DISTRICT COURT
                            Defendant           )
                                                           MAR 14 1973

AFFIDAVIT FORMA PAUPERIS                THEODORE STITES, Court Clerk
                                                    By _Arlene Day_ Deputy

I, Sylvia Gelene Barrett, petitioner, above named, do solemnly swear

that the cause of action set forth in the petition hereto prefixed is just, and I do

further swear that by reason of my poverty, I am unable to give security for costs.

_Sylvia Gelene Barrett_
SYLVIA GELENE BARRETT

Subscribed and sworn to before me this _14th_ day of March, 1973.

_Sandra Saylor_
NOTARY PUBLIC

My Commission Expires:

_November 1, 1976_

O. K. to file this _14th_ day of _March_,
1973.

_Bill Ed Rogers_
Judge of the District Court

448

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **v.** ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| ) | |
| **KENNETH EUGENE BARRETT,** ) | |
| ) | |
| *Defendant.* ) | |

**EXHIBIT 13**

449

## DECLARATION OF JANESSE THOMAS

I, Janesse Thomas, declare the following:

I know Charles "Monk" Sanders. At one time, over a decade ago, I was Monk Sanders ████friend. I also know Kenny Barrett.

I was at Kenny Barrett's residence perhaps two or three times while Monk Sanders was there. Mr. Sanders and I did not got to Kenny Barrett's place together. I never went to Kenny Barrett's residence to buy drugs with Monk Sanders. I never bought drugs from Kenny Barrett on any occasion I was at his residence. I never witnessed any drug transaction between Kenny Barrett and Monk Sanders. Kenny Barrett did not like or trust Monk Sanders, and did not want him around his property.

I am aware that Monk Sanders testified against Kenny Barrett at Mr. Barrett's federal trial in Muskogee. It is my understanding that Monk Sanders testified that two to three days before the trooper was killed, he and I went to Kenny Barrett's and bought drugs, and that he and I went to Mr. Barrett's property on other occasions in the summer of 1999 to buy drugs. This never happened, so if Mr. Sanders testified to these things, his testimony was false. As I said, I never bought drugs from Kenny Barrett, and I never saw Kenny Barrett sell Monk Sanders any drugs at any time, let alone two to three days before the trooper was killed.

On one occasion while I was Monk Sanders's girlfriend, he was harassing me and I got away from his place. I called Kenny Barrett to come pick me up so I could get away

1

from Mr. Sanders. Mr. Barrett did pick me up, and Monk Sanders and his mother followed us for a while. He was yelling at me that I needed to go back with him, but I didn't. It appeared that Monk was mad at Kenny Barrett for picking me up and getting me away from him.

Based on my contact with Mr. Sanders, it is my personal opinion that he is completely dishonest and untrustworthy. I would not believe a word he said about anything. I am also aware that in the community, Monk Sanders's reputation for honesty and trustworthiness is about as bad as could be. Nobody trusts or believes him.

I was not contacted by any of Kenny Barrett's lawyers or anybody working for them at the time of Kenny Barrett's federal trial. If they had contacted me, I would have given them the information stated above, and would have testified to these things if asked.

I did not write this declaration. I related the above information to one of Mr. Barrett's current lawyers and an investigator working for Kenny Barrett. I have carefully read the contents of this declaration, and it accurately states what I told the lawyer and investigator.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this _12_ day of March, 2009, in ___Sequoyah___ County, Oklahoma.

2

450

Janesse Thomas

3

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

―――――――――――――――――――――

**EXHIBIT 14**

―――――――――――――――――――――

## DECLARATION OF DALE ANDERSON

I, Dale Anderson, declare the following:

I am one of the investigators working on Kenneth Eugene Barrett's case in preparation for filing a motion attacking his convictions and death sentence pursuant to 28 U.S.C. section 2255. During my investigation, I and another investigator, Leonard Post, interviewed Cindy Crawford. Cindy Crawford testified in both stages of Mr. Barrett's trial. During this interview, Cindy Crawford told Mr. Post and me the following:

Cindy stated that she testified as a government witness in Kenny Barrett's federal trial. She acknowledged that her husband, Travis Crawford, also testified against Kenny Barrett. She stated that as of 1999, she had known Kenny Barrett for approximately 4 years.

Cindy Crawford told Mr. Post and I that one to 2 weeks before her initial testimony against Kenny Barrett, John Philpot came to see her. Mr. Philpot told her that she had to leave with him. Cindy Crawford stated that she did not know whether she was under arrest or not, but it was clear to her that she had no choice but to go with Mr. Philpot. She got into Mr. Philpot's car, and he drove her to Muskogee. There, she met AUSA Mike Littlefield and several men wearing guns who appeared to be law enforcement officers. Cindy Crawford stated that the meeting occurred in Mr. Littlefield's office.

1

Cindy Crawford told us that the men wearing guns showed her several firearms that looked similar to ones that belonged to Kenny Barrett. Cindy stated that she was told by Mr. Littlefield that she needed to work with him and testify against Kenny Barrett, or she was going to prison. She stated that Mr. Littlefield reminded her that she was on a 5-year deferred sentence in a drug case. Mr. Littlefield told her that Kenny Barrett's house had been under surveillance for 6 months prior to the shooting of the trooper, and that during this surveillance she was seen acting as a "lookout" on Kenny Barrett's front porch while he cooked methamphetamine on the property. Cindy Crawford stated that she had never seen Kenny Barrett cook methamphetamine at any time.

Cindy Crawford stated to us that at the time of the meeting in Mike Littlefield's office, she had no pending criminal charges, but had lost one of her children to foster care. Cindy stated that during the meeting, the threat that she would not get her child back hung in the air.

Cindy Crawford told us that during the meeting in Mr. Littlefield's office, she was told by Mr. Littlefield there were certain ways she could phrase her testimony. Cindy stated that Littlefield told her that in her testimony, she should make things look as violent and ominous as possible, and there was imminent danger in being around Kenny Barrett. Cindy stated during our interview that Mr. Littlefield discussed with her the possibility that she could be charged with perjury if she did not put this type of spin on her testimony. Mr. Littlefield also told her that they could make it extremely hard on her

2

if she did not testify against Kenny Barrett.

Cindy Crawford stated that when she was at the meeting in Mr. Littlefield's office in Muskogee, she was not told that she was under arrest, but that the atmosphere was intimidating. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside the restroom. She stated that she believed she was not free to leave because Mr. Philpot had driven her to Muskogee, and she had no way back home other than him. Cindy Crawford stated that she was not going to mess with Mr. Philpot because of his reputation for violence.

Cindy Crawford stated that she was interviewed by Mr. Littlefield and the government about Kenny Barrett's federal case separately from her husband, Travis Crawford. Cindy related that she was told by Travis that John Philpot told him that if he (Travis) said the right things on the witness stand, he would not get into trouble. Cindy stated that she was told by Mike Littlefield, and later by John Philpot, that she did not have to talk to or be interviewed by Mr. Barrett's lawyers or anyone working with them if she did not want to. Cindy stated that it was implied she should not speak to the defense.

Cindy Crawford stated that it was her recollection that when she testified at Mr. Barrett's federal trial, neither the prosecution nor the defense asked about her prior offenses. She admitted to Mr. Post and I that she was a heavy drug user at the time she testified against Mr. Barrett.

Cindy Crawford stated during our interview that during the time she knew Kenny

3

Barrett, she never bought drugs from him, but just used drugs with him. She told us that when she was interviewed by Mr. Littlefield in his office, as described above, she was just coming down off a two-day meth high. She stated that the same was true when she testified at Mr. Barrett's trial. Cindy told us that "if you had ever crashed from a meth high, you would know that you would not be in your right mind."

Cindy told us during our interview that she suffered from post-traumatic stress disorder (PTSD) due to things that happened to her when she was growing up. She stated that she overreacts to stressful situations, sometimes to the point of passing out. She told us that when she was growing up, her father was often in a rage, and that her father had molested her and her sister. Because of this experience, when she is stressed she overreacts, and does not always perceive things correctly or exaggerates what is happening or has happened. Cindy Crawford stated that when she testified in the second stage of Mr. Barrett's trial about Kenny Barrett having once pressed a gun against her leg, she may well have been overreacting and embellishing the story, and Kenny Barrett's mood and actions at the time, due to her PTSD. Cindy stated that other than this incident, which she very well could have exaggerated or embellished, Kenny Barrett had always been nice and helpful to her.

Cindy Crawford stated that during her interviews with the government before she testified in the first stage of trial, she had not told them about the incident with Kenny Barrett putting the gun barrel to her leg. According to Cindy, the prosecutor or law

4

enforcement asked her about this incident after her first stage testimony. She stated it is her belief that they must have gotten this information from Kenny Barrett's brother, Richie Barrett.

Cindy Crawford told us that the prosecutors in the federal trial were upset with her when she denied ever seeing chemicals and equipment for making methamphetamine at Kenny Barrett's place. Cindy stated they were also upset when she said she never saw Kenny Barrett cook methamphetamine. She said that the prosecutors were upset with her after her first stage testimony because she was not hurting Kenny Barrett enough. She stated, "They were very angry. They scared me and threatened me." Cindy related that while the government never told her explicitly that it was all right to lie during her testimony, it was implied that she could lie and make things up so long as it helped them and hurt Kenny Barrett.

Cindy Crawford stated that she was aware John Philpot had gone out to Kenny Barrett's property not too long before the shooting of the trooper to check Kenny Barrett's guns, and there had been no problem. Cindy said that from the information she had about this incident, Kenny Barrett and John Philpot acted like they were old buddies.

During the course of this investigation, I attempted on several occasions to interview Charles "Monk" Sanders. I was unsuccessful. On February 12, 2009, I went to the home of Evelyn Sanders, Mr. Sanders's mother. She lives in Oolagah, Oklahoma. Ms. Sanders told me that her son, Charles, had been promised things by the federal

5

prosecutors in exchange for his testimony against Mr. Barrett that he never received.  Mr.

Sanders, Mrs. Sanders and the Sanders family were upset about this.

I declare under penalty of perjury that the foregoing 6 page declaration is true and

correct.

Executed by me this _12_ day of ___March_____ , 2009, in

_Oklahoma_____ County, Oklahoma.

_____
Dale Anderson

6

458

459

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 15**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN - 2 1992

KATHY REED, Court Clerk

By_____ Vb _____Deputy

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY

STATE OF OKLAHOMA

ISSAC C. BARRETT )
                    Plaintiff, )
                              )
vs.                           )     Case No. D92- J
                              )
MARILYN S. BARRETT            )
                    Defendant. )

PETITION FOR DIVORCE

COMES NOW the Plaintiff and for his cause of action against the Defendant alleges and states as follows:

1. That prior to the filing of this Petition, the Plaintiff has been a resident in good faith of the County of Sequoyah and the State of Oklahoma for thirty (30) days and six (6) month respectively;

2. That the parties hereto were legally married on or about the 26th day of July, 1989 in Ft. Smith, Arkansas;

3. That as grounds for divorce, the Plaintiff alleges incompatibility;

4. That of the marriage, no children have been born, nor is the Defendant now pregnant;

5. That during the marriage of the parties, they have acquired certain property which should be equitably and fairly divided by the Court;

6. That during the marriage of the parties, they have incurred certain indebtedness which should be fairly and equitably divided by the Court;

LIAM K. ORENDORFF
ATTORNEY AT LAW
06 N. OAK STREET
LLISAW, OKLAHOMA
74955

460

KEB400196

## VERIFICATION

STATE OF OKLAHOMA    )
                          )   ss:
COUNTY OF SEQUOYAH   )

**ISSAC C. BARRETT**, of full age being first duly sworn upon his oath deposes and states:

That he is the Plaintiff in the above and foregoing instrument; that he has read and understands the contents contained therein and further states that the same are true and correct as he verily believes.

_____
ISSAC C. BARRETT

SUBSCRIBED AND SWORN to before me this _3/st_ day of _December_, 199_1_.

_____
NOTARY PUBLIC

My Commission Expires:

_5/31/95_

KEB400197

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, OKLAHOMA

STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
**FILED**
IN DISTRICT COURT

JAN 29 1992

ISSAC C. BARRETT

Plaintiff, )

vs.

MARILYN S. BARRETT

Defendant. )

KATHY REED, Court Clerk

By_____Deputy

Case No. D92-1

### ENTRY OF APPEARANCE AND WAIVER

COMES NOW the Defendant herein, the undersigned, acknowledges receipt of a copy of the Petition filed and on f: herein, and states that she has read and understands the sar hereby waives the issuance of service and return of process up her in this action, enters a voluntary appearance in this cau waiving all time and right to plead, answer or appear in t action, and consents that the same may be set down for trial heard by the Court at any time hereafter without notice to, in the absence of this Defendant.

The Defendant acknowledges that this Entry of Appearance Waiver has been prepared by the attorney for the Plaintiff fully understands that the attorney for the Plaintiff is un no obligation to protect and/or enforce any of the rights which the Defendant might be entitled, including the right seek the advice of counsel.

I have been presented with a (proposed) DECREE OF DIVC to be presented to the Judge who tries this case. My signat of approval has been endorsed thereon for the benefit of

JAM K. ORENDORFF
ATTORNEY AT LAW
16 N. OAK STREET
.LISAW, OKLAHOMA
74055

KEB400198

BARRETT ENTRY OF APPEARANCE AND WAIVER
Page 2

Court in acknowledgement of the proposed property settlement

these parties.

*Marilyn S. Barrett*

SUBSCRIBED AND SWORN to before me this 31st day of *Decmb* 1991.

*Nelda S. Johnson*
NOTARY PUBLIC

My Commission Expires:

7/32/92

463

KEB400199

#6402.divdec

IN AND FOR THE DISTRICT COURT OF SEQUOYAH COUNTY,

STATE OF OKLAHOMA

ISSAC C. BARRETT

Plaintiff, )

vs. )

MARILYN S. BARRETT )

Defendant. )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB - 3 1992

KATHY REED, Court Clerk
By_____Deputy

Case No. D-92-1

## DECREE OF DIVORCE

ON THIS 3rd day of February, 1992 the above entitled matter comes on for trial; Plaintiff appears in person and with counsel William K. Orendorff, and Defendant appears not; the Court examine the records, heard the evidence and statements of counsel, and base thereon finds:

That Defendant has executed and filed sufficient Entry c Appearance and Waiver; that the Court has jurisdiction over th parties and subject matter of this action;

That prior to the filing of the Petition herein, th Plaintiff had been a resident in good faith of the County o Sequoyah and the State of Oklahoma for thirty (30) days and six (6 months respectively;

That the parties hereto were legally married on or abou the 26th day of July, 1989, in Fort Smith, Arkansas;

That the parties hereto are entitled to a divorce on th grounds of incompatibility;

Law Offices of
Terry Scalfa, P. C.
Attorneys at Law
Corner of Creek & Elm Streets
Sallisaw, Oklahoma 74955
P. O. Box 187

KEB400200

That during the marriage the parties have acquired certain proper which should be equitably divided as specifically set for hereinafter;

That during the marriage, the parties incurred certa indebtedness which should be equitably divided as specifically s forth hereinafter;

That prior to the marriage of the parties, the Defenda acquired certain property which should be awarded to Defendant her separate property as specifically set forth hereinafter;

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Cou as follows:

That the parties are hereby granted a Decree of Divorc from each other on the grounds of incompatibility, and thei marriage relationship is dissolved and both parties release therefrom; provided, neither party shall marry any other person i the State of Oklahoma for six (6) months from the date hereof;

That the Plaintiff is awarded as his sole and separat property, free and clear of any right, title, or interest of th Defendant, the following:

The appliances which are secured for the debt to Arkansas Best Federal Credit Union;

Real Estate situated in Sequoyah County, Oklahoma, to-wit:

E½ NE¼ SW¼ and SE¼ SE¼ NW¼ Section 8, Township 12 North, Range 25, Sequoyah County, Oklahoma; provided, however, that said property is subject to a lien in favor of the Defendant to secure the payment of the sum of $40,000 to the Defendant as hereinafter provided;

The Mobile Home subject to the indebtedness

2

KEB400201

thereunto;

Plaintiff's personal belongings;

That the Defendant shall divest herself of any intere whatsoever in the above described real property once the lienab claim of the Defendant has been fully satisfied.

That the Defendant is awarded as her sole and separa property , free and clear of any right, title or interest of tl Plaintiff, the following:

1990 GMC Pickup

Bedroom Suite

All furniture she owned prior to marriage

Stock Trailer

1983 Olds Cutlass

All real estate located in Crawford County, Arkansas, to wit;

TRACT 1

All that part of the Southeast Quarter of the Southeast Quarter of Section 18, Township 9 North, Range 32 West lying South and East of the Town of Dora, Arkansas, and South and East of the right of way of Interstate Highway 40; ALL that part of the Fractional Northeast Quarter of Section 19, Township 9 north, Range 32 West, lying South and East of the right of way of Interstate Highway 40, South and East of platted Town of Dora, Arkansas, and North of the right of way of Missouri Pacific Railroad EXCEPT a part of the Southeast Quarter of the Northeast Quarter of Section 19, Township 9 North, Range 32 West heretofore deeded for Dora Cemetery and described as follows: Commencing at the 73d mile post on Oklahoma-Arkansas line, setting in the Southwest part of said Quarter, thence North 45 degrees East 7.5 chains for a point of beginning; thence North 63 degrees East 6.44 chains; thence North 3 degrees West 6.22 chains; thence South 79 degrees West 6.5 chains;

3

466

KEB400202

thence South 13 degrees East 4.57 chains to the point of beginning, containing 4.67 acres more or less; and, ALL that part of the West Half of the West Half of the Northwest Quarter of Section 20, Township 9 North, Range 32 West lying North of the right of way of the Missouri Pacific Railroad, being the same property described in that certain deed appearing in Book 237, page 285, Blakemore to Hogan; EXCEPT that part Commencing at the Southwesterly Corner of the Dora Cemetery which is described as an exception in that certain deed wherein Mrs. Glenn A. Blakemore was grantor and Joe Ray Hogan and Juanita Hogan, Husband and Wife, were grantees, recorded in Book 237, page 285, thence North along the Westerly line of said Dora Cemetery to the Southeasterly Corner of the Gene C. Smith property; thence Westerly along the South line of the Gene C. Smith property to the West line of the Southeast Quarter (SE¼) of the Northeast Quarter (NE¼) of Section 19, Township 9 North, Range 32 West; thence South along the Westerly line of said Southeast Quarter (SE¼) of the Northeast Quarter (NE¼) to the Missouri Pacific right-of-way; thence in an Easterly direction to the point of beginning; EXCEPT FURTHER the two-acre tract deeded to MARCIA BARNES by her father and mother, Joe Ray Hogan and Juanita Hogan, during their lifetimes; and SUBJECT TO that certain easement granted to Bob Bordelon by Joe Ray Hogan and Juanita Hogan, which, among other things, runs along the South end of the above-described property and along the South end of the two-acre tract deeded by Joe Ray Hogan and Juanita Hogan to MARCIA BARNES; to which both MARILYN SUE REICHERT and MARCIA BARNES, their heirs, and assigns shall have joint right of use.

TRACT 2

Lots 5 and 6, Block 5, Town of Dora, Arkansas.

TRACT 3

A part of the West Half (W½) of the Northwest Quarter (NW¼) of the Northwest Quarter (NW¼) of Section 20, Township 9 North, Range 32 West, more particularly described as follows: Commencing at the intersection of the East line of the said West Half (W½) of the Northwest Quarter (NW¼) of the Northwest Quarter (NW¼) of

4

KEB400203

said Section 20, with the northerly right-of-way line of the Missouri Pacific Railroad Company, thence north along said East line of the said W½ NW¼ NW¼ aforesaid, a distance of 420 feet to a point; thence West 210 feet; thence South to the northerly right-of-way line of the Missouri Pacific Railroad Company, thence North and East along said Missouri Pacific Railroad Company northerly right-of-way line to the point of beginning, containing two acres, more or less.

That the Plaintiff shall divest himself of any interest whatsoever in the above described real property by executing a Quit Claim Deed to Defendant within ten (10) days from the date of this Decree, however, should Plaintiff fail to do so, then this Decree shall be sufficient to effect the conveyance of Plaintiff's interest in said real property to the Defendant;

That as part of the property division Plaintiff shall pay to the Defendant the sum of forty-thousand ($40,000.00) dollars as soon as he is able to secure sufficient financing and the Defendant is hereby granted a lien on the real estate hereunder awarded to the Plaintiff to secure the payment of said sum which shall be paid to the Defendant within thirty (30) days from the date hereof.

As a further part and parcel of the property settlement agreement, the Plaintiff agrees that he shall pay any and all attorney's fees and costs that may have arisen by virtue of litigation over an easement pertaining to the above described Crawford County property, and shall hold the Defendant harmless therefore.

That the Plaintiff shall pay the following indebtedness:

The debt on the Discover Card;

The note at First National Bank of Sallisaw on the Stock

468

KEB400204

trailer and 1983 Olds Cutlass;

The indebtedness on the Mobile Home, and hold tl Defendant harmless from same.

That the Defendant shall pay the following indebtednes:

The debt to Arkansas Best Federal Credit Union on the 19! GMC Pickup;

The debt to Arkansas Best Federal Credit Union on the household appliances;

The Personal Note to Arkansas Best Federal Credit Union and hold Plaintiff harmless from same.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Cour as a part and parcel of the property settlement agreement betwee the parties, and as a part and parcel of the division an distribution of said property, that the parties hereto shall fil a joint income tax return for the year 1991 and they shall equall divide any refund received therefrom or shall equally pay the ta obligation created thereby.

_____
WILLIAM K. ORENDORFF OBA #11950
Attorney for Plaintiff
P.O. Box 260
Sallisaw, Oklahoma   74955
(918) 775-4436

_____
ASSOCIATE DISTRICT JUDGE

_____
ISSAC C. BARRETT, Plaintiff

_____
MARILYN S. BARRETT, Defendant

6

469

KEB400205

#6402.

IN AND FOR THE DISTRICT COURT OF SEQUOYAH COUNTY,

STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
F I L E D
IN DISTRICT COURT

FEB 1 8 1992

KATHY REED, Court Clerk
By_____Deputy

ISSAC C. BARRETT

                 Plaintiff, )

vs. )

MARILYN S. BARRETT )

                 Defendant. )     Case No. D-92-1

## RELEASE AND SATISFACTION OF JUDGMENT

The undersigned Defendant does hereby acknowledge recei[...] from ISSAC C. BARRETT, Plaintiff in the above-entitled cause, t[...] sum of $40,000.00 dollars, the amount due upon the judgment render[...] in said cause on the 3rd day of February, 1992, which said sum [...] received and accepted in full payment and satisfaction of sa[...] judgment with interest and costs, and in full payment a[...] satisfaction of all fees, liens, and claims in said cause and in a[...] to the proceeds of said judgment, and the undersigned does here[...] release, acquit, and forever discharge the said Plaintiff, of a[...] from all liability to and demand of the undersigned, in respect t[...] said cause and judgment.

This release shall be filed in the Office of the Clerk [...] said Court, and the said Clerk is hereby authorized and directed t[...]

KEB400206

enter said release on the judgment docket of said Court and 1 release the said judgment of record.

Dated this 5TH day of February, 1992.

MARILYN S. BARRETT, Defendant

LAW OFFICES OF HARRY SCOUFOS, P.C
Attorneys at Law
P. O. Box 787
Sallisaw, OK  74955
(918) 775-5546

By: HARRY SCOUFOS  O.B.A.  #8031

2

KEB400207

472

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,    )
               )
        *Plaintiff,*    )
               )
v.                  )        **Case No. 6:04-CR-00115-JHP-SPS**
               )
KENNETH EUGENE BARRETT,    )
               )
        *Defendant.*   )

---

**EXHIBIT 16**

---

MONDAY DECEMBER 10th-Continued.

And after hearing the testimony offered by both the plaintiff and defendant, instructio from the court as to the law governing in this cause the jury retires in care if sworn ba consider its verdict thereafter returning into open court their verdict, as follows, to-w

State of Oklahoma
Sequoyah County.    IN DISTRICT COURT.

The State of Oklahoma
vs.
Bob Burchett, Defendant

We the jury drawn, empaneled and sworn in the above entitled cause do upon our oaths fi the defendant Bob Burchett guilty of burglary in the second degree as charged in the info herein. We fail to agree upon punishment.

S.E.Winfrey,Foreman.

Their verdict is received and the jury is discharged from any further service in this ca and the jury failing to agree as to the punishment the court sets Saturday December 15th 9 o'clock A.M. for sentence.

Saturday December 15th 1917.

The District Court of Sequoyah County, State of Oklahoma met in the court room at Salli Saturday December 15th 1917 at 9 o'clock A.M. pursuant to adjournment of yesterday. Pres presiding the honorable John H.Pitchford, Judge, C?E?Holder Sheriff and Joe E.Thornton,C Court is regularly opened by public proclamation and the following proceedings had to-wit

1850                          State of Oklahoma vs. Bob Burchett
The defendant having on yesterday been tried and convicted of the crime of burglar he is now sentenced to serve a term of three years in the penitentiary ay McAlester, Okla

WEDNESDAY DECEMBER 12th 1917.

The District court met in regular session pursuant to adjournment as of Tuesday December present and presiding Hon. John H.Pitchford, Judge, thereof, C.E.Holder, Sheriff and Joe Clerk.and after court being regularly and duly opened by proclamation the following proce had and entered:

1784                          State of Oklahoma vs. Howard Henson et al.
This case coming on for trial, present in person and by their attorneys Thomas J. Defendants Howard Henson and Robert Tabor ask permission to withdraw their plea of not gu Court grants the permission,and defendant files a general demurrer, Demurrer is by the co led, defendant excepts. Defendant Ed Gant is three times called and answers not and is adjudged in default, the Clerk is ordered to draw a jury to try the cause as to Howard Hen and Robert Tabor and the following named jurors are drawn and sworn to try the cause.

R.Garrison, D.L.Creekmore      Ed Cox          J.B.Shrum
S.E.Harp        Fonce Holland   S.E.Winfrey     A.P.Flowers
                R.H.Thompson    W.J.Webb        W.B.Briley
J.A.Irwin

The hearing of testimony is begun, at the conclusion of which the court instructs the ju as to the law governing in this cause and argument of counsel being waived the jury retir in care of a sworn bailiff to consider its verdict, thereafter returning into open court their verdict as follows to-wit:

State of Oklahoma
Sequoyah County      IN DISTRICT COURT.

The State of Oklahoma          1784
vs.
Howard Henson and Robert Tabor, D

We the jury drawn, empaneled and sworn in the above entitled cause do upon our oaths find the defendants Howard Henson and Robert Tabor not guilty as charged in the informatio herein.                          S.E.Winfrey, Foreman.

Their verdict is received and the jury is discharged from any further service in this case. Defendants are discharged and their bondsmen exonerated.

THURSDAY DECEMBER 13th 1917.

The District Court of Sequoyah County State of Oklahoma met in the Court room at Sallisa Oklahoma Thursday December 13th 1917 at 9 o'clock A.M. pursuant to adjournment of yester present and presiding Hon. John H.Pitchford, Judge, there being also present C.E.Holder Sheriff and Joe E.Thornton, Clerk. Court is regularly opened by public proclamation and the following proceedings had to-wit:

1862                          State of Oklahoma vs. Joe Morgan
Stricken for lack of evidence on motion of the County Attorney.

1866                          State of Oklahoma vs. Bob Tabor and George Tabor.
Continued by agreement.

FRIDAY DECEMBER 14th, 1917.

The District Court of Sequoyah County, Oklahoma met in the court room at Sallisaw, Oklaho Friday December 14th 1917 at 9 o'clock A.M. pursuant to adjournment of yesterday. Present and presiding Hon. John H.Pitchford, Judge, C.E.Holder, Sheriff and Joe E.Thornton, Clerk Court is regularly opened by public proclamation and the following proceedings had to-wi

1660                          State of Oklahoma vs. Lafayette Horn
The court orders the mandate of the Crimnal Court of Appeals spread of record.

1638                          State of Oklahoma vs. Geo.Williams
The Court orders the mandate of the Crimnal Court of Appeals spread of record.

1672                          State of Oklahoma vs. E.L.Lemley
The court orders mandate of the Crimnal Court of appeals spread of record.

1727                          State of Oklahoma vs. Abe Dotson.
The court orders the mandate of the Crimnal Court of Appeals spread of record.

1871

KEB502745

State of Oklahoma vs. Levi Chuculate.
...dent present in court and waives arraignment and pleads guilty as charged.
...ives time for sentence and is by the court sentenced to serve a term of
...in the penitentiary at McAlester, Oklahoma and suspends sentence until
...y of the next term of the District Court.
::::::::::::::::::::::::::::
        SATURDAY DECEMBER 15th, 1917.
::::::::::::::::::::::::::::::

...ct Court of Sequoyah County, State of Oklahoma met in the court room at
Oklahoma Saturday December 15th 1917 at 9 o'clock A.M.  pursuant to adjournment of
...resent and presiding Hon. John H.Pitchford, Judge, C.E.Holder, Sheriff and
...on, Clerk. Court is regularly opened by public proclamation and the following
...had to-wit:
        State of Oklahoma vs. Lafayette R.Horn.
...orders the defendant committed to the penitentiary for the term of 20 years
...ce with the mandate of the supreme court.
        :::::::::::::::::::::::::::::
        State of Oklahoma vs. George Williams
...orders the defendant committed to the penitentiary for the term of five years
...ce with the mandate of the supreme court.
        :::::::::::::::::::::::::
        State of Oklahoma vs. E.L.Lemley
...orders the defendant  committed to the penitentiary for the term of one year
...y the mandate of the supreme court.
        ::::::::::::::::::::::::::::::::::::
        State of Oklahoma vs. Abe Dotson.
...rt orders the defendant committed to the penitentiary  for a term of one year and
...compliance with the mandate of the supreme court.
        ::::::::::::::::::::::::::::::::::::::

474

KEB502746

475

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 17**

1703 INFORMATION.

## RECORD OF INFORMATIONS.

GEO. D. BARNARD CO., ST. LOUIS

THE STATE OF OKLAHOMA
vs.
Abe Dotson, J. H. Stout
C. B. Stout,
                              Defendant

In the _____District_____ Court,

of _____Sequoyah_____ County, Oklahoma.

In the Name and by the Authority of the State of Oklahoma,

Now comes _____J. B. Allen_____ the duly qualified and acting County Attorney, in and for _____Sequoyah_____ County, State of Oklahoma, and gives the _____District_____ Court of _____Sequoyah_____ County, State of Oklahoma, to know and be informed that _____the above named_____ fendants, Abe Dodson, J. H. Stout and C. B. Stout

did, in _____Sequoyah_____ County, and in the State of Oklahoma, on or about the _____Twenty-eighth_____ day of _____June_____ in the year of our Lord One Thousand Nine Hundred and _____fifteen_____ and anterior to the presentment hereof, commit the crime of _____a felony, to wit, to wit; an assault with intent to kill_____ in the manner and form as follows, to-wit: That is to say the said Abe Dodson, J. H. Stout, and C. B. Stout, in the county and state aforesaid and on or about the day and date aforesaid, then and there being did then and there, with certain dangerous and deadly weapons, to-wit: an axe and a hammer, which they, the said Abe Dodson J. H. Stout, and C. B. Stout then and there had and held in their hands intentionally, wrongfully, unlawfully, purposely, wilfully and feloniously, sault, strike, stab, cut, and wound one Henry Hart with force & injury, to cause death, with the felonious intent on the part of them the said Abe Dotson, J. H. Stout and C. B. Stout, him the said Henry Hart then and there wilfully, unlawfully, intentionally, purposely, wrongfully and feloniously to kill and murder, contrary to the form of the statutes, in such cases made and provided, and against the peace and dignity of the State.

                                    J. B. Allen
                                    County Attorney.

STATE OF OKLAHOMA,
_____Sequoyah_____ County. } ss.   I, _____J. B. Allen_____ being duly sworn, on oath state, that I have read the above and foregoing Information and know the contents thereof and that the facts stated therein are true.

                                    J. B. Allen,

Subscribed and sworn to before me, this _____12_____ day of _____Nov_____ 1915

                                    Fred Mershon
                                    Court Clerk.

### ENDORSEMENTS.

No. 1727

THE STATE OF OKLAHOMA
vs.
Abe Dotson. Et al.

INFORMATION.

In the _____District_____ Court of _____Sequoyah_____ County, Oklahoma.

Filed _____Nov 12_____ 1915

Fred Mershon
Court Clerk.

NAMES OF WITNESSES.

Henry Hart, Marble City, Okla.
Henry Sixkiller      "      "      "
Nettie Sixkiller      "      "      "
Susie Sixkiller      "      "      "
Irene Sixkiller      "      "      "
C. M. Gay      Muldrow Okla.
Dr. J. L. Holcomb    Marble City.

I Hereby Certify that the above and foregoing is a full, true, correct and complete copy of the original Information, together with the endorsements thereon, now on file in my office. Dated_____19_____

By_____Deputy.   _____of_____Co., Okla

KEB503078

477

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )  **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| *Defendant.* | ) |

**EXHIBIT 18**

APPEARANCE DOCKET—CRIMINAL                    No. 1227

| TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |

STATE OF OKLAHOMA

vs.

Abe Dotson

Assault with intent to Kill,

| | | | CLERK'S Costs | SHERIFF'S Costs | MISCELLANEOUS | DISBURSEMENTS | CREDITS |
|---|---|---|---|---|---|---|---|

KEB503096

*Infor Rec. on Page, 483,*

17=134

# APPEARANCE DOCKET—CRIMINAL

No. *1227.*

| CLERK'S COSTS | SHERIFF'S COSTS | MISCELLANEOUS | DISBURSEMENTS | CREDITS | TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|---|---|---|---|---|
| | | | | | STATE OF OKLAHOMA vs. Abe Dotson | Assault with intent to kill, | 12/7/15. Jury trial, Guilty as to Abe Dotson. Not guilty as to J.H. & G.B. Stone Abe Dotson, sent to Pen for 1 year & 1 day. |

| | | | | | | CLERK'S COSTS | SHERIFF'S COSTS | MISCELLANEOUS | DISBURSEMENTS | CREDITS |
|---|---|---|---|---|---|---|---|---|---|---|
| To Fil Fran 10, Comp 10, 3 Warrants 30 | | | | | | 50 | | | | |
| " " & Rec Appr Bond | | | | | | 1 10 | | | | |
| To Dock Fee | | | | | | 2 00 | | | | |
| To J P Cost | | | | | | | | 8 30 | | |
| Court Cost | | | | | | | | 10 55 | | |
| To Dock & Notice | | | | | | 10 | | | | |
| To Fil & Rec Infor (Total 2365) | | | | | | 1 10 | | | | |
| To " Prac & " Inst | | | | | | 35 | | | | |
| " " | | | | | | 35 | | | | |
| " " | | | | | | 35 | | | | |
| " " & 5 copies | | | | | | 1 25 | | | | |
| " Fil & Ent Sheriff's Ret | | | | | | 20 | 6 15 | | | |
| " To fil Chal | | | | | | 10 | | | | |
| " " Instruction | | | | | | 10 | | | | |
| To fil Mo for New trial | | | | | | 10 | | | | |
| " " " in arrest of Judgment | | | | | | 10 | | | | |
| " " off | | | | | | 10 | | | | |
| To fil & approving Supersedeas Bond | | | | | | 1 10 | | | | |
| " Taking ack. to same | | | | | | 20 | | | | |
| " Fee Wit Fee | | | | | | | | 19 50 | | |
| To Appr 10 Waive 30, Plea 50, Mo 10 & Order 30 | | | | | | 1 30 | | | | |
| " Swear. Jurors 100, Writ 50, Order 30, Verdict 10 | | | | | | 1 90 | | | | |
| " Appr 10 Order 30, Verdict 10 Order 30 | | | | | | 70 | | | | |
| " " 10, " 30, Mo 10, Order 30, Mo 10, Order 30 | | | | | | 1 20 | | | | |
| " Mo 10, Order 30 | | | | | | 40 | | | | |
| To fil Notice of Appeal | | | | | | 50 | | | | |
| " " ack | | | | | | | | | | |
| " " & Rec Judgment & Sheriff's Ret | | | | | | 1 00 | | | | |

KEB503097

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 19**

# APPEARANCE DOCKET—Criminal

3

| No | TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|---|
| 3. | THE STATE OF OKLAHOMA vs. Abe Dotson | Carrying Weapon | W. L. Curtis County Atty for State J. H. Jarmon for The Defendant |

| 190__ | | | Clerk's Cost Plaintiff | Clerk's Cost Defendant | Sheriff | Miscellaneous | Disbursements | Credits |
|---|---|---|---|---|---|---|---|---|
| 21 | Verifying Complaint | | 25 | | | | | |
| | Issueing Warrant | | 25 | | | | | |
| | Filing Complaint | | 5 | | | | | |
| | " Warrant | | 5 | | | | | |
| | Entering Plea Guilty | | 10 | | | | | |
| | Making Entry | | 10 | | | | | |
| | Approving Stay Bond | | 25 | | | | | |
| | Entering Judgement | | 25 | | | | | |
| | Rendering " | | 25 | | | | | |
| | Continuance | | 10 | | | | | |
| | | | 165 | | | | | |
| | Sheriffs Fees | | | | | | | |
| | Serving Warrant | | | | 50 | | | |
| | Returning " | | | | 50 | | | |

Reported

SEP 30 1936
No funds in Depository
Acco't for this Case
B. L. Seaman, Deputy S. E. &c.

KEB503073

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 20**

# CRIMINAL TRIAL DOCKET.

1691.

GEO. D. BARNARD & CO., PRIN'

| No. | TITLE | ATTORNEY | PRESENT STATUS OF CASE OR PREVIOUS ORDERS |
|---|---|---|---|
| 9. | THE STATE OF OKLAHOMA, vs. Charles Nelson Defendant Charge Selling intoxicating Liquors, | W. L. Curtis County Atty. | Trial in court. |
| 10 | THE STATE OF OKLAHOMA, vs. Abe Dotson Charge Being Drunk in a public, | W. L. Curtis. | Trial in Court, |
| 11 | THE STATE OF OKLAHOMA, vs. W. P. White Charge Disposing mortgaged Property & False pretense and cheats, | | |
| 12, | THE STATE OF OKLAHOMA, vs. C. F. Ivey Charge, Bartering Selling & giving away intoxicating Liquors | | |

483

KEB503080

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |


---

**EXHIBIT 21**

---

## APPEARANCE DOCKET—Criminal

| TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|
| THE STATE OF OKLAHOMA vs. Abe Dotson Defendant | Being Drunk in a public Place | W. L. Curtis County atty for the State |

| | Clerk's Cost Plaintiff | Clerk's Cost Defendant | Sheriff | Miscellaneous | Disbursements | Credits |
|---|---|---|---|---|---|---|
| Affidavit to Complaint | 25 | | | | | |
| Issuing Warrant | 25 | | | | | |
| Filing Complaint 5 Entering Same 10 | 15 | | | | | |
| Entering warrant 10 Filing warrant 5 | 15 | | | | | |
| Docket entry of Same | 10 | | | | | |
| Plaintiffs appearance 10 Defendants appearance 10 | 20 | | | | | |
| Statement of money paid to Justice | 10 | | | | | |
| By whom paid Berry Dotson. | 10 | | | | | |
| Entering plea of Defendant | 10 | | | | | |
| Defendant Stand Committed | 10 | | | | | |
| For rendering Judgment | 25 | | | | | |
| Filing 3 papers | 15 | | | | | |
| For Issuing Order to bring Defend into Court | 25 | | | | | |
| " " Commitment | 25 | | | | | |
| | 3 40 | | | | | |
| Sheriffs Fees | | | | | | |
| one it by leah court cost | 6 10 | | 6 10 | | | 6 10 |
| " " " " Sheriffs cost | | | | | | 2 40 |
| | | | | | | 6 10 |
| | 8 50 | | | | | 8 50 |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 22**

## APPEARANCE DOCKET—Criminal

| No | TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS | |
|---|---|---|---|---|
| 5 | THE STATE OF OKLAHOMA vs. Abe Datson, Defendant. | Larceny. | W. L. Curtis County Atty. For the State, J. H. Jarman for the Defendant. | ✓ |

| | | Clerk's Cost Plaintiff | Clerk's Cost Defendant | Sheriff | Miscellaneous | Disbursements | Credits |
|---|---|---|---|---|---|---|---|
| 22 | Verifying Complaint | 25 | | | | | |
| | Issuing Warrant | 25 | | | | | |
| | Filing Complaint | 5 | | | | | |
| | " Warrant | 5 | | | | | |
| | Entering Plea | 10 | | | | | |
| | Issuing Subpoena | 25 | | | | | |
| | Rendering Judgement | 25 | | | | | |
| | Recording | 25 | | | | | |
| | Swearing Witnesses | 10 | | | | | |
| | Issuing Complaint Commitment | 25 | | | | | |
| | Approving Bond | 25 | | | | | |
| | Making Transcript | 25 | | | | | |
| 2 | Transmitting papers | 25 | | | | | |
| 2 | Certificate | 25 | | | | | |
| | | 2 80 | | | | | |
| | Sheriffs Fees | | | | | | |
| | Serving Warrant | | | 50 | | | |
| | Returning " | | | 50 | | | |

SFD on 1908
No funds in Depository
Account for this Case
R. L. Seaman Deputy Sheriff

KEB503074

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )     **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 23**

---

# APPEARANCE DOCKET—Criminal

| No | TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|---|
| 1 | THE STATE OF OKLAHOMA vs. Abe Dodson Defendant. | Obtaining money under false pretences and threats, Examination. | W. L. Curtis county Atty. for the State and J. H. Jarman & R. E. Jackson for the Defendant. |

190_7_

The defendant brought before the court on the 21st day of Nov 1907

| | | Clerk's Cost Plaintiff | Clerk's Cost Defendant | Sheriff | Miscellaneous | Disbursements | Credits |
|---|---|---|---|---|---|---|---|
| Nov 20 | Making entry on Docket | 10 | | | | | |
| " " | Issuing information, | 25 | | | | | |
| | Issuing writ | 25 | | | | | |
| | Filing Information | 5 | | | | | |
| | " Writ. | 15 | | | | | |
| | Approving Bond before Trial | 25 | | | | | |
| | Swearing to Complaint | 25 | | | | | |
| | Issuing Subpoena | 25 | | | | | |
| | Swearing witness | 10 | | | | | |
| | Approving Bond after Trial | 25 | 25 | | | | |
| | Transcript of Docket 5 folios. | 50 | | | | | |
| | Transmitting Papers to District court | 25 | | | | | |
| | Entering Judgement | 25 | | | | | |
| | To. Continuance | 25 | | | | | |
| | certificate to record, | 25 | | | | | |
| | | 3 30 | | | | | |
| | Sheriffs Fees | | | | | | |
| | Serving Warrant | | | 30 | | | |
| | Returning " | | | 50 | | | |

SEP 30 1996
No funds in Depository
Account for this Case
R. L. _____ Deputy S. E. Okla.

KEB503072

490

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,    )
            )
        *Plaintiff,*    )
            )
v.            )    **Case No. 6:04-CR-00115-JHP-SPS**
            )
KENNETH EUGENE BARRETT,    )
            )
        *Defendant.*    )

---

**EXHIBIT 24**

---

## DECLARATION OF DAVID AUTRY

I, David Autry, declare the following:

I am a lawyer licensed to practice in the State of Oklahoma, the United States Court of Appeals for the Tenth Circuit, the United States District Court for the Western and Eastern Districts of Oklahoma, and the Northern District of Texas.

I am one of Kenneth Eugene Barrett's lawyers in his motion to vacate convictions and sentences pursuant to 28 U.S.C. section 2255. On February 18, 2009, I interviewed Randy Weaver, one of the witnesses who testified for the Government in the first stage of Mr. Barrett's case. Mr. Weaver gave me information that was largely consistent with his trial testimony. During my interview of Mr. Weaver, I asked him whether, in his contact with Mr. Barrett, he ever heard Mr. Barrett state that if the police came on his property, he would "go out in a blaze of glory," or anything else that would indicated he would confront the police with violence if they came on his property. Mr. Weaver informed me that Mr. Barrett never said anything like that to him or in his presence. Mr. Weaver told me that such a statement or statements would be out of character for Mr. Barrett.

I declare under penalty of perjury that the foregoing 1 page declaration is true and correct.

Executed by me this 12th day of March, 2009, in Oklahoma County, Oklahoma.

_____
David Autry

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 25**

Case 6:09-cv-00105-JHP   Document 1-3   Filed 03/16/09   Page 10 of 32

# APPEARANCE DOCKET—CRIMINAL

No. 1715

123

| CLERK'S Costs | SHERIFF'S Costs | MISCELLA-NEOUS | DISBURSE-MENTS | TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|---|---|---|---|
| | | | | STATE OF OKLAHOMA vs. Sam Maxwell, et al | Burglary | 5/3.15 - Court for Sentence. 13/6/15 Continued 5/1/16. Cause Continued. 13-4-16 Cause Cont, 12/3-17 Cause Cont Dismissed |

| | | | | | CLERK'S Costs | SHERIFF'S Costs | MISCELLA-NEOUS | DISBURSE-MENTS | CREDITS |
|---|---|---|---|---|---|---|---|---|---|
| | | | | To fil Tran'r Comp'r War'r Commit'r | 40 | | | | |
| | | | | " Dock fee | 200 | | | | |
| | | | | " J.P. Costs | | | 570 | | |
| | | | | " Const " | | | 2250 | | |
| | | | | " fil & Rec'd Inform | | | | | |
| | | | | Sum 50 Order 30 | 110 | | | | |
| | | | | Sum 50 Sub 30 | 80 | | | | |
| | | | | To fil & Rec'd apr. Bond | 110 | | | | |
| | | | | " to Dock & Notice (Bal 3570) | 40 | | | | |
| | | | | " To fil Pet | 10 | | | | |
| | | | | " Appro & Order 30 | 40 | | | | |
| | | | | To Docket & Notice    3630 | 10 | | | | |
| | | | | " fil Pet | 10 | | | | |
| | | | | To Docket & Notice | 10 | | | | |
| | | | | To fil Pet | 10 | | | | |
| | | | | Appearance 10 Order 30 Cont 20 | 10 | | | | |
| | | | | to Docket & Nat | 60 | | | | |
| | | | | Paid Sam Maxwell | 10 | | | 1870 | |
| | | | | Will Dustman | | | | 1870 | |
| | | | | Report as to Character | | | | | |
| | | | | (Aid Treasurer) | | | | 3740 | |
| | | | | To Dock & dis | 10 | | | | |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

———————————————————————

**EXHIBIT 26**

———————————————————————

SE&I Form B-74 (1949) Superseding SEI Form 1382

IN THE DISTRICT COURT OF ............................................................ COUNTY

STATE OF OKLAHOMA:

In the Matter of Mental Illness of

_Billy Dean Maxwell_ }   No. _MH-82-12_

| Date Filed | | | Date Case Filed ........ Date of Hearing ........ | Items Recorded | | Cost Accruals | | | | Date Paid | | | Voucher No. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mo. | Da. | Yr. | Nature of Instrument | Book | Page | Clerk's Cost | Sheriff's Cost | Miscl. | On Court Order | Mo. | Da. | Yr. | |
| 5 | 6 | 82 | Petition | | | | | | | | | | |
| " | " | " | Order for Hrg. | | | | | | | | | | |
| " | " | " | Notice of Hrg. issued (Vinita) (Craig Co.) | | | | | | | | | | |
| 5 | 11 | 82 | Order of admission ret'd | | | | | | | | | | |
| 5 | 10 | 82 | Minute: Case coming on for 5-3-15 probable cause hearing, defendant appeared in person with attorney, J.Q. Adams, state represented by M Doctors Robbins, Herndon, & Oliver appeared. Witnesses sworn test heard, doctors examination, finding probable cause, Court ordered defendant committed to Eastern State Hospital. gjh | | | | | | | | | | |
| 5 | 13 | 82 | Notice Let (rec. too late) | | | | | | | | | | |
| 5 | 25 | 82 | Pd: J.Q. Adams   v# 2426   $50.00 | | | | | | | | | | |
| " | " | " | Pd: Dr. Fred Oliver   v# 2432   $20.00 | | | | | | | | | | |
| " | " | " | Pd: Dr. Rick Robbins   v# 2433   $20.00 | | | | | | | | | | |
| " | " | " | Pd: Dr. Jim Herndon   v# 2436   $20.00 | | | | | | | | | | |
| | | | MH 90-29 Re: Gary Ledford ✓ | | | | | | | | | | |
| 3 | 21 | 90 | pet. | | | | | | | | | | |
| 3 | 21 | 90 | Motion to Dismiss Order 95-914 | | | | | | | | | | |
| " | " | " | Min - Motion to dismiss of st. is sustained as per order gjh | | | | | | | | | | |
| 3 | 23 | 90 | Licensed mental health professional statement | | | | | | | | | | |

220

RECORD OF MENTAL HEAL FILE PROCEEDING

SE&I Form B-74 (1949) Superseding SEI Form 1382

IN THE DISTRICT COURT OF .............................................. COUNTY

STATE OF OKLAHOMA:

In the Matter of Mental Illness of

Billy Dean Maxwell

No. MH-85-17

| Date Filed | | | Date Case Filed............ Date of Hearing............ | Items Recorded | | Cost Accruals | | | | Date Paid | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Clerk's Cost | Sheriff's Cost | Other Fees | | | | |
| Mo. | Da. | Yr. | Nature of Instrument | Book | Page | | | Miscl. | On Court Order | Mo. | Da. | Yr. |
| 9 | 11 | 85 | petition | | | | | | | | | |
| ✓ | ✓ | ✓ | Order for hearing | | | | | | | | | |
| ✓ | ✓ | ✓ | notice for hearing | | | | | | | | | |
| ✓ | ✓ | ✓ | Order of detention issued | | | | | | | | | |
| 9 | 16 | 85 | Report of supp symptoms | | | | | | | | | |
| ✓ | ✓ | ✓ | certificate of examine | | | | | | | | | |
| ✓ | ✓ | ✓ | issued Order of admission | | | | | | | | | |
| 9 | 17 | 85 | Order of admission filed | | | | | | | | | |
| ✓ | | | Admission Notification | | | | | | | | | |
| 9 | 19 | 85 | Order of Detention filed | | | | | | | | | |
| 9 | 24 | 85 | Pd Dennis M. Sprouse V#2854 | 75 | 00 | | | | | | | |
| — | — | — | Pd Bert N. Curley MD V#2059 | 50 | 00 | | | | | | | |
| — | — | — | Pd Kish Roblin Do V#2060 | 50 | 00 | | | | | | | |
| 1 | 10 | 86 | Discharge from Hospital (letter) | | | | | | | | | |

MH-92-27  Jimmy Wright

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 26 | 92 | Petition | | | | | | | | | |
| ✓ | — | — | Order issued | | | | | | | | | |
| 5 | 27 | 92 | Temp Order filed | | | | | | | | | |
| 5 | 28 | 92 | Notice of Certification | | | | | | | | | |
| ✓ | ✓ | ✓ | Order of admission issued | | | | | | | | | |
| 6 | 29 | 92 | Letter from Eastern of Disehere | | | | | | | | | |
| 6 | 30 | 92 | Appl for Order allowing | | | | | | | | | |
| 7 | 1 | 92 | Order allowing w/Dg att. | | | | | | | | | |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 27**

State Examiner and Inspector's Form. No. 1382.

News-Dispatch Ptg. & Audit Co., Shawnee, O.

| IN THE MATTER OF | STATE OF OKLAHOMA, | In The |
|---|---|---|
| the Sanity of | County of Sequoyah | COUNTY COURT |
| A. J. Barrett | No. 141 | |

## PETITION

Date Filed: Aug. 12 A 1918  Date of Hearing: 19

By Whom: W. R. Barrett

Address: Maple Okla.

## ORDER OF ADMISSION.

Date Issued: 19  Delivered to Sheriff: 19

To: Oklahoma State Hospital

At: Oklahoma

Received at Hospital By Medical Superintendent: 19

## PHYSICIANS.

| Date of Appointment | NAME | Report Filed | Fees Allowed | Expenses | Total Allow- |
|---|---|---|---|---|---|
| 19 | W. T. Hudson | 10 | $ 5.00 | $ | |
| 19 | J. A. Morrow | 10 | $ 5.00 | $ | |

## GUARDIAN AD LITEM.

| Date of Appointm't | NAME | SERVICE RENDERED |
|---|---|---|
| 19 | | |

## PLEADINGS / PROCESS

| Date Filed | NAME | Date Issued | NAME | Date Returned | BY WHOM SERVED | Officer's |
|---|---|---|---|---|---|---|
| | | | | | | |

## MINUTES OF PROCEEDINGS.

KEB503066

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
                                  )
            *Plaintiff,* )
                                  )
v. )         **Case No. 6:04-CR-00115-JHP-SPS**
                                  )
KENNETH EUGENE BARRETT, )
                                  )
          *Defendant.* )

---

**EXHIBIT 28**

---

IN THE MATTER OF

the Sanity of

*A. J. Barrett*

STATE OF OKLAHOMA

County of *Sequoyah*

No. *709*

In the

COUNTY COUR

| PETITION | | ORDER OF ADMISSION | |
|---|---|---|---|

**Date Filed** — **Date of Hearing**

*8-18-* 19 *66*   *8-19-* 19 *66*

By Whom *Ada Mae Barrett*

Address

**ORDER OF ADMISSION**

Date Issued *8-19-* 19 *66*   *8-19-* Delivered to Sheriff 19

To *Eastern* Oklahoma State Hospital

At *Vinita* Oklal

Received at Hospital By Medical Superintendent 19

## PHYSICIANS

| Date of Appointment | NAME | Report Filed | Fees Allowed | Expenses | Total / |
|---|---|---|---|---|---|
| 19 | | 19 | $ | $ | $ |
| 19 | | 19 | $ | $ | $ |

## GUARDIAN AD LITEM

| Date of Appointment | NAME | SERVICE RENDERED |
|---|---|---|
| 19 | | |

| PLEADINGS | | PROCESS | | | | |
|---|---|---|---|---|---|---|
| Date Filed | NAME | Date Issued | NAME | Date Returned | BY WHOM SERVED | Offi |
| | | | | | | |

## MINUTES OF PROCEEDINGS

9-20-66   Discharged with Rest. to Comp.

9-20-66   Cert of Restoration to Comp.

JOURNAL

STATE OF OKLAHOMA,
County of _Sequoyah_ } ss.
In the Matter of the Sanity of
_A. J. Barrett_

IN THE COUNTY COURT OF SAID COUNTY.

No. _709_

PETITION FOR ORDER OF ADMISSION TO STATE HOSPITAL.

To the County Court of Said County, and to the Honorable Judge Thereof:

Your petitioner respectfully alleges that_____he is a resident of_the County of _Sequoyah_____and State of _Okla._____ That _A. J. Barrett_____is an actual bona fide resident of the County of _Sequoyah_____, State of Oklahoma, is a_____male person of about the age of_____49_____years, and is now within the said county and living with _wife_ at or near the town—city of _Sallisaw_

That your petitioner has good reason to, and does believe that the said_____A. J. Barrett_____is an insane person and a proper subject for custody and treatment in a hospital for the insane; that the condition of the said person is such that it is_____necessary that_____he be taken into custody and detained pending final hearing hereof.

That the facts upon which this allegation of insanity is based, and because of which this application for said order is made, are as follows: _Has at different times threatened his wife and children, accusing them of untruths, threatens to kill wife, is beligerant, overbearing accuses wife of out with other men, etc._

Your petitioner further alleges that_____he is informed and verily believes that the following named persons, of full age, whose names and places of residence respectively are as follows, are related to the said insane person, to-wit:

| NAME | RELATIONSHIP | POSTOFFICE | STATE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Your petitioner is the_____wife_____of the said insane person_____or that he is the_____(Relationship)_____of said County and State, and by reason of such fact is authorized to institute this proceeding.
(Official Title)

Further, your petitioner is informed, and believes and upon such information and belief, alleges that the said insane person has estate in his own right of the approximate value, as follows: Real Property $_____, Personal Property $_____, Total Value $_____. Said estate is situated in_____County, State of_____.

Wherefore, your petitioner prays that a date be fixed for a hearing in the above-styled matter; that notice of said hearing be given as required by law; that two reputable physicians be appointed and required to make a personal examination of and investigation into the sanity of the said alleged insane person, and that said physicians make report of their findings, as by law required; and that said_____be brought before the Court and Judge thereof on the date so fixed for the said hearing to be dealt with as provided by law in such cases; and that the Court by proper order make provision for the support and maintenance of the said person.

Form by the Attorney General—State Examiner and Inspector's Form No. 1863.

_Ada Moe Barrett_
Petitioner.

STATE OF OKLAHOMA,
County of _____ } ss.

CERTIFICATE.

It having been made to appear to the Court, that valid personal service cannot be made on the person alleged herein to be insane on account of his incompetency; and upon h_____next of kin, of full age, on account of their non-residence of the county and state, or uncertainty of location, and upon the person with whom he resides on account that such person has no interest in or authority over said alleged insane person; and it is by the Court deemed proper to dispense with such personal service; and _____

it is hereby ordered that a guardian ad litem be appointed, and that service be made upon the person so appointed._____

_____County Judge.

Filed _____19____ _____Court Clerk. By_____Deputy.
Form by the Attorney General—State Examiner and Inspector's Form No. 1370.

STATE OF OKLAHOMA,
County of _Sequoyah_ } ss.
In the Matter of the Sanity of
_A. J. Barrett_

IN THE COUNTY COURT OF SAID COUNTY.

No. _709_

ORDER FOR ADMISSION TO STATE HOSPITAL.

Now, on this _19_ day of _August_, 19_66_ the above entitled matter came on to be heard before the County Court of _Sequoyah_ County, Oklahoma, and it appearing to the satisfaction of the Court that due and legal notice of the hearing of the petition filed herein by _Ada Moe Barrett_____alleging the insanity of _A. J. Barrett_____, and praying an order for h_is_____admission to the State Hospital for the Insane, has been given as required by law and as directed by the Court.

Thereupon, the court proceeded to the hearing and final determination of the said proceeding. After having examined the certificates of the two physicians appointed to examine the said _A. J. Barrett_____and to report to this Court as to h_is_____sanity, and after hearing the evidence of witnesses and being fully advised in the premises, finds that the said _A. J. Barrett_____is insane; and that_____he should be admitted to a State Hospital for the Insane, there to be treated and kept as a _mental_____patient.

It Is Therefore Ordered by the Court that said _A. J. Barrett_____be admitted to the _Eastern_____Oklahoma _State_____Hospital at _Vinita_____, Oklahoma, as a _mental_____patient, there to be detained and kept until legally discharged.

It Is Further Ordered that the sheriff of said county of _Sequoyah_____, be and he is hereby authorized and directed forthwith to transport the said _A. J. Barrett_____, so adjudged to be insane to the said hospital and to deliver h_is_____, together with a certified copy of this order and of the physician's final certificate herein to the medical superintendent of the said hospital, who is hereby authorized and directed to receive, keep and detain the said person until legally discharged.

It Is Further Ordered that the said sheriff shall cause the said medical superintendent to acknowledge hereon the receipt of the above-named insane person, and forthwith to make return hereof showing the manner in which he has executed this order.

Done in open court this the day first above written.

_Roy Frye Sr._
County Judge.

RECEIPT FOR PATIENT.

Receipt is hereby acknowledged of_____the insane person named in the within order, and I hereby certify that at the time_____he was delivered to me there was in attendance with said person_____Sheriff, with _____and _____guards.

Dated at _____this_____day of_____19____.

Medical Superintendent of _____Oklahoma _____Hospital.

SHERIFF'S RETURN

STATE OF OKLAHOMA, COUNTY OF_____ } ss.

Received the within order on the_____day of_____, 19____, at_____o'clock_____M., and in pursuance of the command thereof, executed the same by transporting the within named_____to the_____Oklahoma_____Hospital at_____, Oklahoma, and there delivering h_____on the_____day of_____, 19____, at_____o'clock_____M., into the custody of the Medical Superintendent of said institution, together with a certified copy of this order and of the physician's final certificate.

_____Sheriff

By_____, Deputy—Under-sheriff.

Filed_____, 19____.

SHERIFF'S FEES
EXPENSES—Receipts attached:

Executing order and making return thereof - $ .50
_____miles travel - - - - - - _____

TOTAL FEES - - - - - $_____

Transportation for - - - - - $_____
Hotel and lodging for - - - - - $_____

TOTAL EXPENSE - - - - - $_____

_____Court Clerk.
By_____, Deputy.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 29**

## DECLARATION OF MARK HENRICKSEN

I, Mark Henricksen, declare the following:

I am a lawyer licensed to practice in the State of Oklahoma. I am also licensed to practice in the various federal district courts in Oklahoma, the United States Court of Appeals for the Tenth Circuit, and the United States Supreme Court. I am in private practice in Oklahoma City, Oklahoma.

I was appointed to represent Kenneth Eugene Barrett as lead counsel in his direct appeal to the United States Court of Appeals for the Tenth Circuit. Mr. Barrett's lead trial counsel, Roger Hilfiger, was also appointed on the appeal.

Based on my knowledge of the case and discussions with trial counsel, Bret Smith, Mr. Hilfiger's second chair, was put in charge of the defense penalty phase case, even though he had no experience in capital cases. Mr. Hilfiger did not like his client, Kenny Barrett. It was apparent to me after reviewing the trial transcript, the other transcripts in association with the federal trial, and the investigation that was conducted by Messrs. Hilfiger and Smith that nothing close to a complete second stage investigation was ever conducted. There was effectively no second stage investigator for Mr. Barrett. Mr. Hilfiger and Mr. Barrett never really got along, and Mr. Barrett wanted his former lawyer, John Echols back as his lawyer. Overall, there was a poor attorney/client relationship between Mr. Hilfiger and Mr. Barrett. Based on my dealings with Mr. Hilfiger, he had a blasé attitude toward the case. Mr. Hilfiger gave the distinct impression of wanting to get the case

1

503

behind him because he was with a small law firm and the case was consuming too much of his time.

During my work on Mr. Barrett's direct appeal, I spoke with John Echols, who had represented Mr. Barrett in state court and was originally his lead attorney in the federal prosecution. I reviewed, of course, various budgetary requests Mr. Echols made, and the manner in which the trial court dealt with them. It was evident that Judge Payne wanted remarkably detailed budget requests from Mr. Echols. Mr. Echols, in my opinion, did not have time to jump through the various administrative and budgetary hoops that had been placed in his way by Judge Payne, and work up the trial of the case, which is the reason he withdrew from representing Mr. Barrett. In contrast, it was also evident that Judge Payne was not nearly as exacting when it came to requests made by Mr. Hilfiger, although the budgets that were approved for investigators, experts and the like were extremely limited.

Mr. Echols informed me that the strictures placed on him by Judge Payne made the case virtually impossible to defend in an effective manner. By moving to withdraw, he thought he was going to call the judge's bluff, but Judge Payne rather quickly granted Mr. Echols's motion to withdraw.

When I was appointed to handle Mr. Barrett's direct appeal, Judge Payne told the Federal Defender for the Western District of Oklahoma, Susan Otto, that he wanted either Mr. Hilfiger or Mr. Smith appointed on the appeal also. This was in furtherance of Judge Payne's plan to develop a local capital defense bar in the Eastern District. It is my view that

2

this is also why Bret Smith, with no capital experience, was appointed co-counsel with Mr. Hilfiger for the trial of Mr. Barrett's case after Mr. Echols withdrew. I learned from Susan Otto that Mr. Barrett's case was to be the inaugural or "test case" for this plan.

During my representation of Mr. Barrett, I consulted on several occasions with Dick Burr, federal capital resource counsel. Mr. Burr informed me that he had consulted with Mr. Echols when Mr. Echols was lead counsel, but was not consulted after Mr. Hilfiger and Mr. Smith took over the case.

As anyone who has read the direct appeal opinion in Mr. Barrett's case can see, many of the issues raised were reviewed under the "plain error" standard because of a lack of contemporaneous objections at trial. When I asked Mr. Hilfiger about the failure to object, he said he was trying to "win" the case and did not want to "offend" the jury by making unsuccessful objections. Mr. Hilfiger also did not want to "offend" Judge Payne by making too many objections, which he felt were likely to be overruled, although not necessarily because they lacked merit.

During the trial, it was revealed that Charles "Monk" Sanders was the alleged confidential informant whose information supplied the authorities probable cause for a no-knock search warrant of Mr. Barrett's property, and for Mr. Barrett's arrest. However, during his trial testimony, Mr. Sanders testified that he never told the authorities various things that supplied the basis for the no-knock warrant. A very weak record was made on this. When I inquired of Mr. Hilfiger why he did not strenuously object and forcefully ask

3

to re-open the search warrant issue, he stated that he was afraid of Judge Payne's reaction and did not want to "interrupt" the trial. He believed that he had little chance of success on this point with Judge Payne based on his understanding that the court wanted to get the trial underway.

As to the seven informant or "snitch" witnesses who appeared at Mr. Barrett's trial, and who were sprung on the defense during jury selection, I asked Mr. Hilfiger why he did not move for a continuance in order to investigate these witnesses. I also asked him why he acceded to an arrangement that permitted him to interview the witnesses in the presence of AUSA Mike Littlefield and law enforcement, particularly when the witnesses more or less refused to talk to him, there was no discovery of what these witnesses said to Littlefield, and there was little time to try to counteract their testimony. Mr. Hilfiger told me that he agreed to the arrangement because it meant he would at least get to interview the witnesses himself, even though this did not turn out as planned. He also said that because the trial was ongoing, he did not want to antagonize the judge by asking for a continuance, even after the witnesses more or less refused to talk to him. Mr. Hilfiger believed that since there was some time before the witnesses actually testified, some investigation could be done into them. Of course, no witnesses for the defense who could impugn the credibility of these seven witnesses were called, and the defense relied solely on cross-examination to try to attack their stories. Mr. Hilfiger said that he believed that no continuance was possible due to Judge Payne's desire to stay on schedule, and that this compromise was better than

4

nothing.

Some of the following paragraphs include propositions identified by Mr. Barret's current lawyers. I am not presently in a position to evaluate the merit of each in comparison to the propositions I chose to raise, and therefore cannot say I would have made the same decisions if I had recognized some of these issues at the time. The Tenth Circuit initially permitted the appellant's brief to be 14,000 words. I applied for an oversized brief of 24,000 words. The court ruled that the brief was limited to 20,000 words and that no further amendments to the case management order would be considered prior to submitting the appellant's brief. I had to edit it to reduce the brief to the 20,000 word threshold. Although I agree that the following issues should have been considered, every appeal involves some triage of issues.

I did not raise on direct appeal a search and seizure issue based on "Monk" Sanders' trial testimony that he had not told the police the matters that were included in the affidavit for search warrant to justify a no-knock warrant. I did not raise this issue because I believed it had not been adequately preserved by Mr. Hilfiger. I could have raised this issue, and had no legitimate strategic reason for not raising it, because the issue was, however inadequately, framed by the record. As noted, there were several issues raised on appeal for which no contemporaneous objection or record had been made at trial.

I did not raise issues relating to the lack of defense theory instructions or lesser included instructions because, again, I believed that a less than adequate job had been done

5

by trial counsel in arguing these issues.  Again, I could have raised this issue, since some record was made.  This is particularly true because self-defense was basically the defense raised at trial, and there was testimony in the record to indicate that if anything, Mr. Barrett was guilty of manslaughter or some lesser offense, not first degree murder as framed by the counts in the indictment.  Of course, the jury in the state case acquitted Mr. Barrett of first degree murder and convicted him of manslaughter.

I was aware from my reading of the record that Mr. Barrett wore a "stun belt" under his clothing throughout trial.  The defense objected.  I discussed the stun belt with Mr. Hilfiger, who told me that while he believed the stun belt was not visible, it did detract from Mr. Barrett's communications with counsel in the courtroom.  I did not recognize as a viable issue for appeal the stun belt's affect on Mr. Barrett's communication with counsel, and therefore did not reject it.

I was aware from my reading of the record that an ex parte hearing was conducted between the Government and Judge Payne regarding the Government's motion, which was originally placed under seal, to delay disclosure of the identity of the seven informant witnesses.  During the ex parte hearing, Judge Payne stated that he could see a long continuance coming based on the fact that the identities of these witnesses had not been revealed and the Government wanted to delay disclosure.  Mr. Hilfiger did not move for a continuance.  I did not have a strategic reason for failing to raise issues surrounding this ex parte hearing.  I was disappointed that trial counsel had acquiesced on this issue between the

6

time of the <u>ex parte</u> hearing and the resumption of open court. I interviewed Mr. Hilfiger repeatedly on this point. He consistently said that an application for a continuance was pointless and that he hoped to gain some useful information from this compromise. In my opinion, there was no professional basis for such a judgment. A reasonable lawyer would have demanded a continuance, and funds with which to conduct an investigation.

Although this was a lead argument in Mr. Barrett's appeal, I anticipated that trial counsel had failed to preserve the record.

In fact, the alleged compromise was meaningless in practice, and Mr. Barrett did not receive the benefit of pre-trial investigation or an adequately preserved record of this failure of due process.

I did not draft all of this declaration. The information contained in this declaration is based on what I told one of Mr. Barrett's current lawyers, David Autry, when he interviewed me about the case. I was also interviewed by another of Mr. Barrett's current lawyers, Tim Schardl. The information in this declaration also reflects what I told him. I have carefully reviewed this declaration, and it states accurately what I told these lawyers.

I declare, under penalty of perjury, that the foregoing 7 page declaration is true and correct.

Executed by me this _13_ day of ___March___, 2009, in Oklahoma County, Oklahoma.

Mark Henricksen

7

509

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 30**

*Exhs. § 2255 Motion*                    *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

Ada Blount,                                                    Plaintiff

vs                                                            No.13026

Kathleen E.Blake, et al.                                      Defendants

### ORDER APPOINTING ATTORNEY FOR DEFENDANTS

Now on this _29th_ day of ___December___ ,195_8_, there comes on to be heard the motion of the plaintiff to appoint an attorney of this bar to appear and represent the interests of such of the defendants, Kathleen E.Blake, Ethel J. Bourdon, Henry C. Bourdon, George R.Bourdon, William R. Bourdon, J. H. Brodie, Embra Marie Cloud, Jeanette Cox, Elizabeth Duncan, R.T.Kelleam, George A.Ralph, Sarah Louise Sprague, A.J.Stone, Hazel B.Walter, if living and or if deceased, the unknown heirs, executors, administrators, devisees, trustees and assigns, immeddate and remote of those who are deceased, the successors, assigns and trustees of Limited Oil Company and of Graves Newman Investment Company, both dissolved or defunct Corporations, the heirs, executors, administrators, devisees, trustees and assigns, immediateand remote of Sarah Smith nee McCoy, a Fullblood Cheorkee Indian, enrolled opposite Roll No.20713, deceased and of Jesse L. Harmon, a One-Half Degree Cherokee Indian, enrolled opposite Roll No.17144, deceased, as are in or awaiting induction into the Military service of the United Statse or some allied nation in the above styled cause of action and the plaintiff appearing by his attorney, W.S.Agent, and presenting the motion to the court, being heard and sufficiently advised finds.

That the defendants hereby have been served with notice by publication and have made default in appearance and pleading; that plaintiff has moved for default judgment and that an attorney should be appointed to appear and represent the interests of said defendants in this cause.

IT IS THEREFORE ORDERED AND DECREED THAT _Fred E. Green_ Be and is hereby appointed to appear and represent the interests of said defendants and that said attorney is hereby granted leave to file answer herein for and on behalf of said defendants.

_____
DISTRICT JUDGE

SEQUOYAH COUNTY, OKLAHOMA
F I L E D
IN _____ COURT
DEC 29 1958
At _____ O'Clock _____ M. and Recorded in
Book _____ Page _____
By _____ Court Clerk
Deputy

511

KEB503090

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

Ada Blount,                                         Plaintiff,

vs.                                                NO. 13026

Kathleen E. Blake, Ethel J. Bourdon, Henry
C. Bourdon, George R. Bourdon, William R.
Bourdon, J. H. Brodie, Embra Marie Cloud,
Jeanette Cox, Elizabeth Duncan, R. T. Kelleam,
George A. Ralph, Sarah Louise Sprague, A. J.
Stone, Hazel B. Walter, if living and or if
deceased, the unknown heirs, executors,
administrators, devisees, trustees and assigns,
immediate and remote of those who are deceased,
the successors, assigns and trustees of Limited
Oil Company and of Graves Newman Investment
Company, both dissolved or defunct Corporations,
the heirs, executors, administrators, devisees,
trustees and assigns, immediate and remote of
Sarah Smith nee McCoy, a Fullblood Cherokee Indian,
enrolled opposite Roll No. 20713, deceased,
and of Jesse L. Harmon, a One-Half Degree Cherokee
Indian, enrolled opposite Roll No. 17114, deceased,
the Oklahoma Tax Commission and the Board of County
Commissioners,  County Treasurer and County Assessor
of Sequoyah County, Oklahoma,                    Defendant

SEQUOYAH COUNTY, OKL.....
F I L E D
IN _____

At _____ O'Clock ____ M. and ...
Book _____ Page _____

## JOURNAL ENTRY

This cause coming on to be heard this 29th day of December, ...
pursuant to special assignment on the trial docket and plaintiff
appearing by her attorney, W. S. Agent and the defendants, Board of
County Commissioners, County Treasurer and County Assessor of Sequoya...
County, Oklahoma, appearing by R. F. Campbell, Jr., County Attorney ...
Sequoyah County, and the Oklahoma Tax commission having filed herein
its Disclaimer and the Superintendent of the Five Civilized Tribes
having filed his election not to remove said cause to the Federal
Courts and those defendants who are in or awaiting induction into th...
military service of the United States appearing by the attorney appo...
to represent said defendants and all other defendants appearing not ...
in person or by counsel are adjudged to be in default.

Thereupon, the court examined the pleadings and evidence as ...
the service in this cause, and finds that each and all of the defen...
have been due and legally served with notice of the pendency of thi...
action as prescribed by the laws of the State of Oklahoma, and that ...
service is good and sufficient to give the court jurisdiction to pro...
with the trial of this case.

512

KEB503091

The Court finds after having heard the statements of counsel and examined the pleadings and evidence, all material allegations contained in Plaintiffs petition to be true and that plaintiff is the owner of and in the actual possession of the following described real estate, located in Sequoyah County, Oklahoma, to-wit:

TRACT 1

$S\frac{1}{2}$ NE SE SE of Section 28, Township 12 North, Range 23 East,

TRACT 2

The East 70 yards of the NE NW NE of Section 33, Township 12 North, Range 23 East,

TRACT 3

$E\frac{1}{2}$ $W\frac{1}{2}$ SW NE of Section 33, Township 12 North, Range 23 East,

TRACT 4

$N\frac{1}{2}$ NE NE, & SE NE NE of Section 33, Township 12 North, Range 23 East,

TRACT 5

SE SE NE Section 33, Township 12 North, Range 23 East,

TRACT 6

$S\frac{1}{2}$ SE SE of Section 28, Township 12 North, Range 23 East, and SE NW NE & SW NE NE & $E\frac{1}{2}$ SW NE & $W\frac{1}{2}$ SE NE, & NE SE NE of Section 33, Township 12 North, Range 23 East, and NW SW NW & $W\frac{1}{2}$ NW NW & NE NW NW of Section 34, Township 12 North, Range 23 East,

The court further finds, that Embra Marie Cloud, if living and if deceased, the unknown heirs, executors, administrators, devisees trustees and assigns, immediate and remote of Embra Marie Cloud is claiming some right, title, interest or estate in and to that real estate described as Tract 1, but that in truth and fact said defendant has no interest therein and plaintiff has owned and held the open, notorious and adverse possession of the same for more than 15 consecutive years immediately preceding the filing of this petition, to-wit: Since 1919 and that plaintiff is entitled to a decree quieting her title against said defendant or defendants.

The court further finds, that the defendants, J. H. Brodie, and J. Stone, if living and if deceased the unknown heirs, executors, administrators, devisees, trustees and assigns, immediate and remote of said defendants are claiming some right, title, interest or estate in and to that real estate described as Tract 2, but that in truth and fact said defendants have no interest therein and plaintiff is entitled to a decree from this court quieting his title and possession against each and all of said defendants.

KEB503092

The court further finds that Sarah Smith nee McCoy, a fullblood Cherokee Indian enrolled opposite Roll No. 20713 died intestate on the 15 day of March, 1915 a resident of Sequoyah County, Oklahoma, seized and possessed of that real estate described as Tract 4 and left as his sole and only heir at law, his only child, Joseph E. Harmon, who took and inherited all of said real estate, the wife of said decedent having predeceased him and that thereafter the said Joseph E. Harmon sold and conveyed said real estate and by mesne processes and conveyances plaintiff became the owner thereof.

The court further finds that the defendants., R. T.Kelleam, Kathleen E. Blake, George A. Ralph, Sarah Louise Sprague, Elizabeth Duncan, Ethel J. Bourdon, William R. Bourdon, George R. Bourdon, Henry C. Bourdon, Jeanette Cox and Hazel B. Walter, if living and if deceased the unknown heirs, executors, administrators, devisees, trustees and assigns, immediate and remote of those who are deceased are claiming some right, title, interest or estate in and to that real estate described as Tract 5, but that in truth and fact said defendants have no interest therein and plaintiff is entitled to a decree from this court quieting his title and possession against each and all of said defendants.

The court further finds that the Limited Oil Company is a dissolved or defunct Corporation and that the successors, assigns and trustees of said dissolved or defunct Corporation are claiming some interest in lien upon all of said real estate by virtue of that certain mortgage recorded in Book 162 at page 176 in the office of the County Clerk of Sequoyah County, Oklahoma, but that in truth and fact said mortgage has been paid and the indebtedness satisfied in full and plaintiff is entitled to a decree quieting her title against said defendants.

The court further finds that the Board of County Commissioners, County Treasurer and County Assessor of Sequoyah County, Oklahoma, are claiming some interest in or lien upon all of said real estate for taxes due and unpaid thereupon or for errors or omissions in the proceedings leading to the sale of said real estate for the non payment of taxes that in truth and fact said defendants have no interest therein and is entitled to a decree from this court quieting her title against said defendants and the further order quieting her title against said defendants and the further order enjoining said defendants and successors in office from hereafter claiming any interest in or lien said real estate.

The court further finds that the Oklahoma Tax Commission by its own pleading claims and has no interest in said real estate or any part thereof.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED by the court that plaintiffs title and possession be and is hereby quieted and set at rest in Plaintiff against each and all of the defendants and that said defendants and all persons claiming by, through or under any defendants since the institution of this action be and are hereby enjoined from hereafter claiming or attempting to claim any right, title, interest or estate or equity of redemption in and to said real or any part thereof.

514

KEB503093

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT, that on 14th day of December, 1914, Jesse L. Harmon, a One-Half Degree Cherokee Indian, enrolled opposite Roll No. 17114 died intestate, a resident Sequoyah County, Oklahoma seized and possessed of that real estate described as Tract 4 and left as his sole and only heir at law, his only child, Joseph E. Harmon, who took and inherited all of said real estate, the wife of said decedent having predeceased him and that thereafter the said Joseph E. Harmon sold and conveyed said real estate and by mesne processes and conveyances plaintiff became the owner thereof.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT, that the 14th day of December, 1914, Jesse L. Harmon, a One-Half Degree Cherokee Indian, enrolled opposite Roll No. 17114 died intestate, a resident of Sequoyah County, Oklahoma, seized and possessed of that real estate described as Tract 4 and left as his sole and only heir at law, his only child, Joseph E. Harmon, who took and inherited all of said real estate, the wife of said decedent having predeceased him and that thereafter the said Joseph E. Harmon sold and conveyed said real estate and by mesne processes and conveyances plaintiff became the owner thereof.

DISTRICT JUDGE

515

KEB503094

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 31**

## <u>DECLARATION OF LEONARD POST</u>

I, Leonard Post, declare the following:

I am one of the investigators contracted by the Federal Defender's office for the Eastern District of California to work on Kenneth Eugene Barrett's case in preparation for filing a motion attacking his convictions and death sentence pursuant to 28 U.S.C. section 2255. During my investigation, I interviewed numerous witnesses including Travis and Cindy Crawford, Richard Barrett, and Mary Rogers.

Travis Crawford testified in the first stage of Mr. Barrett's trial. Cindy Crawford testified in both stages of Mr. Barrett's trial. On December 11, 2008, I interviewed Travis Crawford in the presence of his parents, Roger and Phyllis Crawford at their home in the McKey community. At that time, Travis was separated from his wife, Cindy Crawford, and lived with his parents.

I interviewed Cindy Crawford separately in the presence of another investigator, Dale Anderson, on January 13, 2009. The interview with Cindy took place at her mother's trailer.

In the presence of his parents, Travis Crawford told me the following:

Travis Crawford explained that his mother, Phyllis Crawford, is the sister of Kenneth Barrett's mother, Gelene Dotson, which makes him Mr. Barrett's first cousin. He explained that Gelene lives in the trailer on the adjacent property just west of where we sat.

Travis related that he and Mr. Barrett used to hunt and fish together, and were close. Travis stated that before Mr. Barrett was arrested, he was at Mr. Barrett's home practically every day and that Mr. Barrett "would do anything in the world" for him. He stated that Mr. Barrett liked to help people and that in the last few years before his arrest on the murder charge Mr. Barrett rarely left his property. Travis expressed concern about Mr. Barrett's ability to care for

<div align="center">1</div>



himself, stating that Mr. Barrett would eat meals at his mother's house, and sometimes friends would bring him food.

Travis stated that he Travis had a long struggle with drugs and has anxiety and panic attacks. He stated that his "mind does not work that well." For example, he will go out to his truck to get something, and by the time he gets there, he will have forgotten what it was he went to get. Travis stated that when he has problems with anxiety, he gets so nervous that he just does "whatever it is that comes to mind." Travis stated that he was like this as a child, prior to using drugs, and that he is under a doctor's care and is "trying to be healthy." Travis stated that he was a long-term methamphetamine user, and that he believed he would likely die if he used drugs again because his doctor told him that if he ever shot up again, it would likely kill him on the spot. He stated that he was aware that his drug use was the result of the psychological problems from which he suffers and which he does not understand.

He stated that psychological problems run in his family. Of his three children, he stated that his oldest child, now a grown woman suffers from bipolar disorder, that one of his sons seems a little slow and is having a hard time, but that his other son is a straight-A student, and he has "hopes that he will turn out all right."

Travis stated that he had problems in school and joined the United States Army, trying to make a go of it. He stated that he was not able to adapt to Army life and spent two months in the brig because he could not keep up with all the rules and was late to formation. He stated that it made him feel terrible when people he trained with in the Army made fun of him when they marched by the stockade. He stated that he had received "a less than honorable" discharge from the Army.

Travis stated clearly in the presence of his mother and father that he testified falsely in Mr. Barrett's trial. He stated that at the time he testified, he was "living in so many places and was so strung out, that he did whatever he was told in order to keep out of trouble." Travis Crawford stated that for several years before Mr. Barrett was arrested, through the time of Mr. Barrett's state and federal trials, and up until four months before this interview, he had been doing methamphetamine all day, every day. He stated that when he testified against Mr. Barrett, he was high on meth. He also stated that all of the snitches who testified against Mr. Barrett were "on dope" when they testified. Travis stated that he and the other snitches were also high on drugs when the prosecutor, AUSA Mike Littlefield, interviewed them. He stated that anybody who had been around drug addicts would have known that. When John Philpot took him to see Mr. Littlefield, Travis stated that he was sure that Sheriff Philpot knew that Travis knew that Mr. Philpot knew that he was stoned. Travis stated that he felt as though he "was already arrested" and "didn't know if [he] was ever going to come back home."

During the interview, Travis stated that when Mr. Littlefield interviewed him about Mr. Barrett, he was terrified of losing his freedom and said whatever he thought Littlefield wanted him to say. Travis stated that Mr. Littlefield had asked him if Kenneth Barrett had said that he (Mr. Barrett) "was going down in a blaze of glory," and that before he could answer, Mr. Littlefield told him all the bad things that would happen to him if he "lied." Travis stated that he was so scared that he said, "Yes," that Mr. Barrett had stated that he would go down in a blaze of glory if the cops came to his residence. Travis stated that when he gave this answer, he was panicking because he was afraid. Travis stated that Mr. Littlefield told him he knew things about him (Travis). Travis repeated that he was extremely scared during his interview with Mr.

3

Littlefield and said whatever it was Mr. Littlefield indicated he wanted Travis to say. Travis stated to me affirmatively that he never heard Kenneth Barrett state that he was "going down in a blaze of glory" or express any sentiment like that.

Travis stated that he had testified against somebody prior to testifying against Mr. Barrett. On that occasion, Travis stated that he had been arrested for bad checks and was afraid of going to jail. In lieu of prosecution, he stated that he wore a wire and made four or five controlled drug buys. Travis stated that he believed he could have been killed while doing this. Travis stated that he ultimately had to testify against the person he bought the drugs from, even though the police lied to him and told him he would not have to testify.

During the interview, Travis stated that Sheriff John Philpot was at Kenneth Barrett's residence approximately two weeks before the raid that led to the fatal shooting of the trooper, and that when Sheriff Philpot went to Mr. Barrett's residence he had inspected Kenneth Barrett's guns without incident. Travis stated that Mr. Barrett told him the local authorities had a drug case against him (Kenneth Barrett), but it was not serious. Travis Crawford stated that Mr. Barrett never told him anything about an outstanding warrant for Mr. Barrett's arrest. Travis stated that at the time he testified against Mr. Barrett, he thought having a warrant and having a case were the same thing. He stated that he now knows these are two very different things.

During the interview, Travis Crawford stated that Mr. Barrett put a sign on his fence just a couple of days before Trooper Eales was killed. Travis stated that the sign was not directed at the police; "it was directed at anybody." The sign was intended, stated Travis, to scare people away from trespassing on Mr. Barrett's property and stealing his belongings.

When Travis Crawford spoke to me and told me all of the above in the presence of his

4


520

parents, he was separated from his wife, Cindy Crawford. Based on what Travis Crawford told me, a declaration for his signature was prepared, detailing all of the information related above. On February 15, 2009, when I asked Travis to read over the declaration detailing what he had told me, he had reunited with his wife and declined to read the declaration. He stated that he would "not sign anything," and that his psychiatrist had advised him that further involvement in Mr. Barrett's case was detrimental to his health and that his problems with anxiety were the result of his past association with Mr. Barrett, which was contrary to his earlier statement that the onset of his anxiety was in his childhood. It is my belief, based on my extensive investigation of this case that Travis Crawford declined to sign the declaration because he believed that telling the truth would get him in trouble, and that he was being pressured by Cindy Crawford not to cooperate. Family, friends and associates of Travis and Cindy Crawford informed me that Travis and Cindy have reputations in the community as liars and thieves who would say and do anything to stay out of jail and to obtain drugs. Two witnesses, Paul Rickie Lansford, and Brandy Hill were present at the time Mr. Barrett allegedly made the "blaze of glory" statement in Travis Crawford's presence, and they informed me that Mr. Barrett did not make such a statement then, and that they never heard Mr. Barrett make such a statement or express that idea at any time.

As noted above, I interviewed Cindy Crawford separately from Travis Crawford in the presence of another investigator, Dale Anderson. During this interview, Cindy Crawford told Mr. Anderson and me the following:

Cindy stated that she testified as a government witness in Kenneth Barrett's federal trial. She acknowledged that her husband, Travis Crawford, also testified against Mr. Barrett. She stated that as of 1999, she had known Mr. Barrett for approximately four years.

5



Cindy Crawford stated that one to two weeks prior to her initial testimony against Kenneth Barrett, John Philpot came to see her. Mr. Philpot told her that she had to leave with him. Cindy Crawford stated that she did not know whether she was under arrest or not, but it was clear to her that she had no choice but to go with Mr. Philpot. She stated that she got into Mr. Philpot's car and that he drove her to Muskogee. There, she met AUSA Mike Littlefield and "several men wearing guns" who appeared to be law enforcement officers. Cindy Crawford stated that the meeting occurred in Mr. Littlefield's office.

Cindy Crawford stated that the men wearing guns showed her several firearms that looked similar to ones that belonged to Mr. Barrett. Cindy stated that Mr. Littlefield told her that she needed to work with him and testify against Mr. Barrett, or she was going to prison. She stated that Mr. Littlefield reminded her that she was on a five-year deferred sentence in a drug case. Mr. Littlefield told her that Mr. Barrett's house had been under surveillance for 6 months prior to the shooting of the trooper, and that during this surveillance she was seen acting as a "lookout" on Kenneth Barrett's front porch while he cooked methamphetamine on the property. Cindy Crawford stated to us that she had never seen Mr. Barrett cook methamphetamine at any time and that she had never acted as a lookout for Mr. Barrett.

Cindy Crawford stated to us that at the time of the meeting in Mike Littlefield's office, she had no pending criminal charges, but had lost one of her children to foster care. Cindy stated that during the meeting, the threat that she would not get her child back hung in the air.

Cindy Crawford stated that during the meeting in Mr. Littlefield's office, she was told by Mr. Littlefield there were certain ways she could phrase her testimony. Cindy stated that Mr. Littlefield told her that in her testimony, she should make Kenneth Barrett appear as violent as

6



possible and as an imminent threat to those around him. Cindy stated that Mr. Littlefield had discussed with her the possibility that she risked perjury charges if she did not put this type of spin on her testimony. Mr. Littlefield also told her that they could make it extremely hard on her if she refused to testify against Mr. Barrett.

Cindy Crawford stated that when she was at the meeting in Mr. Littlefield's office in Muskogee, she was not told that she was under arrest, but that the atmosphere was intimidating. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside the restroom. She stated that she believed she was not free to leave because Mr. Philpot had driven her to Muskogee, and she had no way back home other than him. Cindy Crawford stated that she was not going to mess with Mr. Philpot because of his reputation for violence.

Cindy Crawford stated that Mr. Littlefield interviewed her about Kenneth Barrett's federal case separately from her husband, Travis Crawford. Cindy stated that Travis told her that John Philpot told him that if Travis said the right things on the witness stand, he would not get into trouble. Cindy stated that Mr. Littlefield, and later John Philpot, told her that she did not have to talk to or be interviewed by Mr. Barrett's lawyers or anyone working with them if she did not want to. Cindy stated that it was implied she should not speak to the defense.

Cindy Crawford stated that it was her recollection that when she testified at Mr. Barrett's federal trial, neither the prosecution nor the defense asked about her prior offenses. She admitted to Mr. Anderson and me that she was a heavy drug user at the time she testified against Mr. Barrett.

Cindy Crawford stated during our interview that during the time she knew Kenneth Barrett, she never bought drugs from him, but just used drugs with him. She stated that when

7

Mr. Littlefield interviewed her in his office, as described above, she was just coming down off a two-day meth high. She stated that the same was true when she testified at Mr. Barrett's trial. Cindy stated, "If you had ever crashed from a meth high, you would know that you would not be in your right mind."

Cindy stated that she suffered from post-traumatic stress disorder (PTSD) due to things that happened to her when she was growing up. She stated that she overreacts to stressful situations, sometimes to the point of passing out. She told us that when she was growing up, her father was often in a rage, and that her father had molested her and her sister. Because of this experience, she stated that when she is stressed she overreacts, and does not always perceive things correctly or exaggerates what is happening or has happened. Cindy Crawford stated that when she testified in the second stage of Mr. Barrett's trial about Mr. Barrett having once pressed a gun against her leg, she may well have been overreacting and embellishing the story, due to her PTSD. As Dale Anderson and I were leaving her residence, she called to us as we opened the door (she was in a leg cast and incapacitated at the time) and stated that on second thought she was sure she had misread the mood of the situation and overreacted. She stated that Kenneth Barrett had a history of being nice and helpful to her.

Cindy Crawford stated that during her interviews with the government before she testified in the first stage of trial, she had not told them about the incident with Kenneth Barrett putting the gun barrel to her leg. According to Cindy, the prosecutor or law enforcement asked her about this incident after her first stage testimony. Cindy stated that the only person who could have told law enforcement about the incident was the only other person present, Richie Barrett. I interviewed Richie Barrett and he stated that neither that specific incident nor anything

8

resembling it ever took place. I asked Richie Barrett if he would be willing to provide that information in a declaration under penalty of perjury and he said that he would.

Cindy Crawford stated that the prosecutors in the federal trial were upset with her when she denied ever seeing chemicals and equipment for making methamphetamine at Kenneth Barrett's house. Cindy stated they were also upset when she said she never saw Mr. Barrett cook methamphetamine. She said that the prosecutors were upset with her after her first stage testimony because she had not made Mr. Barrett seem threatening. She stated, "They were very angry. They scared me and threatened me." Cindy stated that while the government never told her explicitly that it was all right to lie during her testimony, it was implied that she could lie and make things up so long as it helped the government's case and hurt Mr. Barrett.

Cindy Crawford stated that she was aware John Philpot had gone out to Kenneth Barrett's property not too long before the shooting of the trooper to check Mr. Barrett's guns, and there had been no problem. Cindy said that from the information she had about this incident, Mr. Barrett and John Philpot acted like they were old buddies.

Everything that Cindy Crawford stated to Mr. Anderson and me, as reported above, was detailed in a declaration for her signature. After the declaration was prepared, I brought it to Cindy and Travis's house, asked her to review it for accuracy, and to sign the declaration if it was accurate, as she promised she would. Cindy stated that she would not read the declaration. She then asked me to leave. When I continued to talk with Travis, Cindy Crawford called the sheriff's office, or pretended to. Cindy's statements and conduct indicated she would not read the declaration because she did not want to verify the things she stated previously, or risk getting into trouble for telling the truth about her testimony.

9



As part of my assigned work on Kenneth Barrett's case, I also interviewed Mary Rogers. Ms. Rogers identified herself to me as the widow of Bill Ed Rogers, who was an attorney in Sallisaw, Oklahoma, until he passed away. Bill Ed Rogers was appointed to represent Mr. Barrett on a 1997 criminal charge (State v. Barrett, CF-97-00086, one count of Unlawful Delivery of Controlled Drug, filed 3/24/97). I was advised that Mr. Barrett had "fired" Bill Ed Rogers. I had read the docket sheet, which neither reflected that a hearing had ever been held on Mr. Rogers' motion to withdraw, or that another attorney had substituted into the case. [Oklahoma District Court Records, "Case Detail"]

On December 5, 2008, I asked Ms. Rogers if she could locate Mr. Barrett's file. Ms. Rogers told me that after her husband died, she caused his files to be moved to her (their) former residence at 303 Fryar Drive, which is now her son's home. She told me she pulled Mr. Barrett's file from a carton that had a list of the files it contained. She stated that she copied the file in its entirety in the exact order it was in and returned it to the file in the same order. I picked up the copy of the file from her on December 12, 2008. Ms. Rogers stated that she is maintaining the original file with her husband's other business documents.

Ms. Rogers and I reviewed the file and there was no letter indicating that a warrant had been issued for Mr. Barrett's failure to appear. Ms. Rogers informed me that her husband was hurt about the way Mr. Barrett fired him and the untrue and paranoid accusations Mr. Barrett made about Mr. Rogers colluding with the prosecution. She stated that had her husband been told that a warrant had been issued, he would have noted it in the file because he was a good lawyer and he kept good records. Nothing in the file indicated that her husband received such notice.

When last week I asked Ms. Rogers to sign a declaration averring to the facts above, she



told me she would first seek the advice of counsel. Several days later, she advised me that her lawyer advised her not to sign anything. Neither she nor her lawyer had read the two-page declaration, one page of which was the signature page.

I called her lawyer, Michael Daffin, of Sallisaw several times. He did not return my calls. Last Friday, I went by his office and he apologized for not getting back to me and explained that he had been ill. He told me he was awaiting a call and hoped to be having gall bladder surgery in 10 minutes. Still, I asked him to read the declaration. He stated that if the facts were true he would have no problem having his client sign the declaration, but that he would likely not get to it prior to his surgery and recovery period, which put it past our filing date.

I went by his office on the following Wednesday (this week) and he had not yet had his surgery, but was having further testing on Thursday. I asked if I could have Ms Rogers call him. He said, "Sure." I called Ms. Rogers who seemed amenable, but said she could not make the call until Thursday morning when I knew Mr. Daffin had a doctor's appointment. Despite repeated efforts, I was not able to reach either one of them. Mr. Barrett's counsel then directed me to recite in this declaration my efforts to reach Ms. Rogers.

The file clearly indicated that Mr. Rogers had received a no-time offer from the state. In other words, if Mr. Barrett pleaded to the charge, he would not have gone to jail unless he violated the terms of his probation. There is a letter in the file from an assistant district attorney stating that discovery was ready to be picked up by Mr. Rogers. Based on my review of the file, Mr. Rogers did not obtain that discovery. [BILL ED Rodgers case file, CF-97-00086] When I sought it those files from the Sequoyah County clerk's office in January 2009, I was informed that all the files related to that case had been sent to the U.S. Attorney's office.

11



I declare under penalty of perjury that the foregoing 12-page declaration is true and correct.

Executed by me this 13th day of March, 2009, in Sequoya County, Oklahoma.

_____

Leonard Post

12

528

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 32**

# LUNACY RECORD

State Examiner & Inspector's Form No. 1382 — WARDEN COMPANY, OKLAHOMA CITY

IN THE MATTER OF THE SANITY OF

Wallace Dotson

Vian R.2 - McKey)

STATE OF OKLAHOMA

COUNTY OF Sequoyah

No. 266

IN THE COUNTY COURT

| PETITION | | ORDER OF ADMISSION | |
|---|---|---|---|
| DATE FILED | DATE OF HEARING | DATE ISSUED | DELIVERED TO SHERIFF |
| May 4, 1948 | _____, 191___ | _____, 191___   _____, 191___ | |
| By Whom Tom Dotson | | To _____ Oklahoma State Hospital | |
| Address Vian R+2 - Okla | | at _____ Oklahoma | |
| | | Received at Hospital by Medical Superintendent _____, 191___ | |

## PHYSICIANS

| Date of Appointment | NAME | REPORT FILED | FEES ALLOWED | EXPENSES | TOTAL ALLOW |
|---|---|---|---|---|---|
| 5/4 1948 191 | Ja Chul | 191 | $ | $ | $ |
| | | 191 | $ | $ | $ |

## GUARDIAN AD-LITEM

| Date of Appointment | NAME | SERVICE RENDERED |
|---|---|---|
| 191 | | |

| PLEADINGS | | PROCESS | | | | |
|---|---|---|---|---|---|---|
| DATE FILED | NAME | DATE ISSUED | NAME | DATE RETURNED | BY WHOM SERVED | OFFICER'S |
| | Pet Order of Det. Order appt. Report | 5-3-48 | | 5-4-48 | Chas. Hutchus under Sheriff | |

## MINUTES OF PROCEEDINGS

6-4-48  Paroled by Institution

6-8-48  Discharged from records of Eastern State Hospital

KEB502739

# JOURNAL

STATE OF OKLAHOMA, COUNTY OF Sequoyah, ss.                    IN THE COUNTY COURT OF SAID COUNTY

IN THE MATTER OF THE SANITY OF Wallace Dotson                    No. 366

### PETITION FOR ORDER OF ADMISSION TO STATE HOSPITAL

In the County Court of Said County, and to the Honorable Judge Thereof:

Your petitioner respectfully alleges that he is a resident of the County of Sequoyah and State of Oklahoma

That Tom Dotson is an actual bona fide resident of the County of Sequoyah, State of Oklahoma, is a male person about the age of 22 years, and is now within the said County and is living with his father at or near the town—city of Marble City.

That your petitioner has good reason to, and does believe that the said Wallace Dotson is an insane person and a proper subject for custody and treatment in a hospital for the insane; that the condition of the said person is such that it is necessary that he be taken into custody and detained pending final hearing hereof.

That the facts upon which this allegation of insanity is based, and because of which this application for said order is made, are as follows:

has some kind of spells, but now he is completely out of his mind, threw some brick at some members of the family, hasn't been asleep in 3 days and nights

Your petitioner further alleges that he is informed and verily believes that the following named persons, of full age, whose names and places of residence respectfully are as follows, are related to the said insane person, to-wit:

| Name | Relationship | Post Office | State |
|---|---|---|---|
| Tom Dotson & Lucindia Dotson | father & mother | Vian R 2 | Okla |
| D & Charley Dotson | brothers | | |
| Hardy Dotson | | Braggs | |
| Mrs. Mandy Holcomb | sister | Perry | |
| Mrs. Lillie Taylor | | Ft Gibson | |

Your petitioner is the father (Relationship) of the said insane person—or that he is the _____ (Official Title) of said County and State, and by reason of such fact is authorized to institute this proceeding.

Further, your petitioner is informed, and believes and upon such information and belief, alleges that the said insane person has estate in his own right of the approximate value, as follows: Real Property $ none Personal Property $_____, Total Value $_____ Said estate is situated in_____ County, State of_____

WHEREFORE, your petitioner prays that a date be fixed for a hearing in the above-styled matter; that notice of said hearing be given as required by law; that two reputable physicians be appointed and required to make a personal examination of and investigation into the sanity of the said alleged insane person and that said physicians make report of their findings, as by law required; and that said Wallace Dotson be brought before the Court and Judge thereof on the date so fixed for the said hearing to be dealt with as provided by law in such cases; and that the court by proper order make provision for the support and maintenance of the said person.

Form by the Attorney General—State Examiner and Inspector's Form No. 1368.

Tom L Dotson, Petitioner.

Witness to mark
Flo Smith Deputy

### CERTIFICATE

STATE OF OKLAHOMA, COUNTY OF _____ ss.

It having been made to appear to the Court, that valid personal service cannot be made on the person alleged herein to be insane on account of his incompetency; and upon his next of kin, of full age, on account of their non-residence of the said County and State, or uncertainty of location, and upon the person with whom he resides on account that such person has no interest in or authority over said alleged insane person; and it is by the Court deemed proper to dispense with such personal service; and

is hereby ordered that a guardian ad litem be appointed, and that service be made upon the person so appointed.

_____, County Judge.

Filed May 4, 1948                    T B Taylor, Court Clerk.
By Flo Smith, Deputy.

---

Form by the Attorney General. State Examiner & Inspector's Form No. 1370.
STATE OF OKLAHOMA, COUNTY OF Sequoyah, ss.
IN THE MATTER OF THE SANITY OF Wallace Dotson                    IN THE COUNTY COURT OF SAID COUNTY  No. 266

### ORDER FOR ADMISSION TO STATE HOSPITAL.

NOW, on this 4 day of May, 1948, the above-entitled matter came on to be heard before the County Court of Sequoyah County, Oklahoma, and it appearing to the satisfaction of the Court that due and legal notice of the hearing of the petition filed herein by Tom Dotson alleging the insanity of Wallace Dotson and praying an order for his admission to the State Hospital for the Insane, has been given as required by law and as directed by the Court.

THEREUPON, the Court proceeded to the hearing and final determination of the said proceeding. After having examined the certificates of the two physicians appointed to examine the said Wallace Dotson and to report to this Court as to his sanity, and after hearing the evidence of witnesses and being fully advised in the premises, finds that the said Wallace Dotson is insane; and that he should be admitted to a State Hospital for the Insane, there to be treated and kept as Charity patient.

IT IS, THEREFORE, ORDERED by the Court that said Wallace Dotson be admitted to the Eastern Oklahoma State Hospital at Vinita, Oklahoma, as a Charity patient, there to be detained and kept until legally discharged.

IT IS FURTHER ORDERED, That the sheriff of said county of Sequoyah, be and he is hereby authorized and directed forthwith to transport the said Wallace Dotson, so adjudged to be insane, to the said hospital, and to deliver him, together with a certified copy of this order and of the physicians' final certificate herein to the medical superintendent of the said hospital, who is hereby authorized and directed to receive, keep and detain the said person until legally discharged. IT IS FURTHER ORDERED, That the said sheriff shall cause said medical superintendent to acknowledge hereon the receipt of the above-named insane person, and forthwith make return hereof showing the manner in which he has executed this order. Done in open court, this the day first above written.

J T Brockman, County Judge.

### RECEIPT FOR PATIENT.

Receipt is hereby acknowledged of Wallace Dotson, the insane person named in the within order, and I hereby certify that at the time he was delivered to me there was in attendance with said person Chas Hutchen sheriff, with Tom Dotson and _____, guards.
Dated at Vinita this 4 day of May, 1948.

Edward K Witchey M D, Medical Superintendent of _____ Oklahoma Eastern State Hospital

### SHERIFF'S RETURN.

STATE OF OKLAHOMA, COUNTY OF Sequoyah, ss.
Received the within order on the 4 day of May, 1948, at _____ o'clock __ M., and in pursuance of the command thereof, executed the same by transporting the within named Wallace Dotson to the Eastern Oklahoma Hospital at Vinita, Oklahoma, and there delivering him on the 4 day of May, 1948, at 5 o'clock __ M., into the custody of the medical Superintendent of said institution, together with a certified copy of this order and of the physician's final certificate.

Henry Jones, Sheriff.
By Charley Hutchen, Deputy—Under-sheriff.

Filed 5-4-48                    T B Taylor, Court Clerk.
By _____, Deputy.

| SHERIFF'S FEES | |
|---|---|
| Executing order and making return thereof $ | .50 |
| miles travel | 25.00 |
| TOTAL FEES | $25.00 |
| EXPENSES—Receipts attached: | |
| Transportation for | 25.00 |
| Hotel and lodging for | 3.10 |
| TOTAL EXPENSE | $28.10 |

KEB502740

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,     )
                                     )

                *Plaintiff,*    )

                                     )

v.                              )        **Case No. 6:04-CR-00115-JHP-SPS**

                                   )

KENNETH EUGENE BARRETT,    )

                                   )

             *Defendant.*   )

---

**EXHIBIT 33**

---

## RECORD OF MENTAL HEALTH PROCEEDING

SE&I Form B-74 (1949) Superseding SEI Form 1382

IN THE DISTRICT COURT OF ............................................. COUNTY

STATE OF OKLAHOMA:

In the Matter of Mental Illness of

Kenneth Barrett

No. MH-86-29

| Date Filed | | | Date Case Filed ........... Date of Hearing ............ | Items Recorded | | Cost Accruals | | | | Date Paid | | | Voucher No. |
| Mo. | Da. | Yr. | Nature of Instrument | Book | Page | Clerk's Cost | Sheriff's Cost | Miscl. | On Court Order | Mo. | Da. | Yr. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | 9 | 86 | Pet. | | | | | | | | | | |
| | | | Peace Officer's aff. | | | | | | | | | | |
| | | | Professional Statement | | | | | | | | | | |
| | | | Temp Order issued | | | | | | | | | | |
| 10 | 10 | 86 | notice of certification | | | | | | | | | | |
| ✓ | ✓ | ✓ | copy of Drs. progress notes | | | | | | | | | | |
| ✓ | ✓ | ✓ | issue order of admission not to exceed 28 days from initial admission | | | | | | | | | | |
| 10 | 10 | 86 | Admission Notification (ESH) | | | | | | | | | | |
| 10 | 13 | 86 | Temp order ret'd (ESH 10-10-86) | | | | | | | | | | |
| 10 | 10 | 86 | min - coming on for 72 hr hrg., Barrett appeared in person w/atty John Adams, State rep. by Higgins dft. admitted to East St Hosp for period not to exceed 28 days from initial date of admission - cyt 11 302 | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | MH-92-64    In Re: Johnny Johnson ✓ | | | | | | | | | | |
| | | | | | | | | | | | | | |
| 11 | 16 | 92 | Pet | | | | | | | | | | |
| | | | Aff. for detention | | | | | | | | | | |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )   **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 34**

---

**DECLARATION OF JOHN DAVID ECHOLS**

I, John David Echols, declare the following:

I am an attorney licensed to practice in the State of Oklahoma and the various federal district courts in Oklahoma, including the Eastern District.  I am also admitted to practice in the United States Supreme Court and the United States Court of Appeals for the Tenth Circuit.  I am currently a trial attorney with the Oklahoma Indigent Defense System, Capital Trial Division, Sapulpa office.

I represented Kenneth Eugene Barrett in his two state court trials for the shooting death of Oklahoma Highway Patrol trooper Rocky Eales.  Lawyer Jeffrey Standing Bear was second chair counsel in Mr. Barrett's first state trial.  Attorney Jack Gordon was second chair counsel in Mr. Barrett's second state trial.  During the time of Kenny Barrett's state trials, I was assisted by OIDS investigators Steve Leedy, Jack Stringer, and Lisa Cooper.  We also had the assistance of a mitigation investigator, Roseann Schaye, who did preliminary investigative work for a second stage case.  Ms. Schaye's work was suspended prior to the first state trial.

Mr. Barrett's first state trial ended in a hung jury during the guilt/innocence phase.  In his second state trial, Mr. Barrett was acquitted of first degree murder and convicted of first degree manslaughter.  He was also convicted of a lesser included offense, assault and battery with a dangerous weapon (ABDW).  On the remaining two counts of discharging a deadly weapon with intent to kill, Mr. Barrett was acquitted.  Mr. Barrett was sentenced by the jury to 20 years on the manslaughter charge, and 10 years on the ABDW charge.

1

Mr. Barrett was indicted in federal court on charges related to Trooper Eales's death the day before the statute of limitations ran on the underlying drug charges. When Mr. Barrett was indicted, Paul Brunton, the Federal Defender for the Northern and Eastern Districts of Oklahoma, called me about being lead counsel for Mr. Barrett in his federal case. The proposal, as stated to me by Mr. Brunton, was that I would be appointed lead counsel and Rob Nigh of Tulsa was to be appointed second chair. I was to handle the majority of the trial preparation, including preparation of the penalty phase defense, as well as trial work; Mr. Nigh was to assist with motions work and handle administrative matters such as budgeting requests.

Mr. Brunton met with United States District Judge James Payne about appointing Mr. Nigh and me to represent Mr. Barrett. Judge Payne agreed to appoint me, but declined to appoint Mr. Nigh. Mr. Brunton informed me that Judge Payne wanted to develop a local capital defense bar in the Eastern District, and therefore decided to appoint former Eastern District United States Attorney Roger Hilfiger as co-counsel. In it's minute order, the Court first stated that the substitution of Mr. Hilfiger was by agreement with Mr. Brunton. It is my understanding that Mr. Brunton then wrote Judge Payne, asking that the Court minute reflect Mr. Brunton's objection to the substitution of Mr. Hilfiger for Mr. Nigh. Magistrate Judge Shreder then entered an amended minute order specifying that I had been appointed at the request of the Federal Defender, an Mr. Hilfiger had been appointed at the direction of the Court.

I was familiar with Mr. Hilfiger because when he was the United States Attorney

for the Eastern District, he had handled the prosecution of a client of mine in a Savings and Loan matter. That matter was resolved successfully for my client. After Mr. Hilfiger was appointed as co-counsel for Mr. Barrett, I provided Mr. Hilfiger with access to a secure website, which had my state files in Mr. Barrett's case on a computer data base. Those who access the site are identified when they visit the site. I was able to track who visited the site, and during the time I worked on Kenny Barrett's case with Mr. Hilfiger, I saw no indication of him accessing the database containing the state files.

The first time Mr. Hilfiger and I appeared before Judge Payne on Mr. Barrett's case, Judge Payne stated that he wanted the case tried quickly and that this should be no problem, because I had handled Kenny's state case. I explained to Judge Payne at the time that there were significant tasks that needed to be undertaken to prepare the case adequately for another trial. For example, while the preliminary investigation begun by Roseann Schaye had identified certain evidence and avenues of investigation regarding potential mental state guilt and penalty phase defenses, significant additional investigation and expert consultation remained to be done. Similarly, questions regarding the existence and role of a confidential informant in this case had not been resolved to my satisfaction by the conclusion of the state proceedings. The federal authorities' decision to prosecute Mr. Barrett in a capital case therefore made it imperative for me to investigate the practices of the District 27 Drug Task Force including, but not limited to, their cultivation and reliance on purported informants or "snitch" witnesses.

As I informed Judge Payne in my motion for permission to withdraw, during the

3

537

time Mr. Hilfiger and I were appointed to work together, we maintained a cordial relationship. As I also informed Judge Payne, however, I felt Mr. Hilfiger was not doing work on the case that I had expected him to do, and I was left to handle virtually all the substantive tasks, as well as the all the case budgeting. I also stated my concerns about Mr. Hilfiger's lack of work to Richard Burr, who was the representative of the Federal Death Penalty Resource Counsel project assisting with the case. Although I was lead counsel, I was aware that Judge Payne had specifically selected Mr. Hilfiger for the case over Mr. Brunton's recommendation of Rob Nigh.

At the outset, Judge Payne stated that he regarded himself as the guardian of the public purse and that he would not authorize what he regarded as unnecessary expenses. During my representation of Mr. Barrett in federal court, virtually the only budgeting request Judge Payne approved without drastic cuts was for defense counsel to travel to the Justice Department in Washington, D.C. for a meeting to try to persuade the Justice Department to decline a capital prosecution of Mr. Barrett.

Over the course of my federal court representation of Mr. Barrett, I submitted approximately nine budgeting requests for experts, investigators, expenses and the like, all of which were rejected in whole or in substantial part by Judge Payne. As I informed Judge Payne at the time, the budget I submitted was based in part on my knowledge of the tasks that were not completed during the state proceedings, and in part on materials which I received from Federal Death Penalty Resource Counsel, and from my review of materials they made available on their website. These materials, and information I

4

538

subsequently received from Richard Burr, indicated the time I budgeted for attorneys, and the resources I sought, were in line with the time, fees, and personnel relied upon in other federal capital prosecutions.

Prior to my submitting a proposed budget of attorney hours for various categories of work Mr. Hilfiger provided me his projections of the time he would need to spend in each category.  Other than giving me these projections, Mr. Hilfiger did not assist with administrative or substantive case preparation tasks.  This division of labor required me to expend an inordinate amount of time on budgeting requests and administrative matters. In April 2005, the court held that I would not be compensated for any of the time I spent preparing the detailed budgets on which Judge Payne insisted.  This included time spent conferring with experts regarding the needs of the defense.  These conferences were necessary for two reasons.  First, so that the experts could learn what the status of my knowledge of the evidence was, and second, so that I could prepare the budget requests. Mr. Hilfiger did not participate in these conferences, although I had no objection to him being involved in these aspects of preparing Mr. Barrett's defense.

I was basically not being compensated for consulting with Mr. Hilfiger on the few occasions that he was available to me, nor with Federal Death Penalty Resource Counsel. For example, payment vouchers I sent in for legal research would be cut in half.  The judge believed I did not need to do much if any research on federal death penalty law because I was "learned counsel."  The same was true for research I did on search and seizure issues.  Simply stated, my fee requests and budgeting requests were not being

5

approved, or were being approved for far less than the time I devoted to tasks that I and Federal Death Penalty Resource Counsel believed were reasonably necessary to prepare the case for trial.

As I recall, one of my first requests concerned preparation of transcripts of the second state court trial.  Judge Payne  initially opposed our request based in part upon his stated opinion that we could rely upon my memory of the trial.

Based on the capital nature of the case and the involvement of drugs, I wanted to hire an investigator to complete the investigation of mental state issues and law enforcement practices.  The rate I was quoted for private investigative services in the area was Fifty Dollars ($50.00) per hour.  At that rate, I would have been able to engage Dale Eberle, who had formerly participated in the NDOK drug task force, and who was therefore particularly qualified to conduct the drug subculture investigation which we needed to defend the federal case. Judge Payne, however, said he would authorize a maximum of only Thirty Dollars ($30.00) per hour for such services, because that was the rate charged OIDS by an investigator who withdrew for health reasons prior to the first state court trial.

Judge Payne authorized only 100 hours of investigation.  Based on the information I received from consulting with the Federal Death Penalty Resource Counsel, which I shared with Judge Payne, it was my understanding that the hours I requested constituted only 3/5 of the average hours authorized by federal courts for fact investigation in capital cases; and the requested hourly rate of $50 an hour was $15 below the low end of the

range ($65 - $85) nationally authorized for fact investigators in federal capital cases at the time.

I also sought to retain the services of jury consultant Joe Gustaferro. Mr. Gustaferro had recently assisted the attorneys in Terry Nichols' state court trial and those attorneys recommended him highly. Judge Payne, however, would not authorize any payments whatsoever for jury consultation, citing the extensive litigation experience of Mr. Hilfiger and me.

I also requested authorization for 267 hours of the services of a mitigation specialist to be compensated at a rate of $75 per hour, for a total of $20,025; and travel expenses $5,000. Judge Payne approved only 100 hours at $150 per hour, and no travel expenses. I again shared with Judge Payne the information compiled by the Federal Death Penalty Resource Counsel demonstrating that the requested hours were barely a third of those authorized in an average federal death penalty case; and that these substantially limited hours were reasonably necessary to complete the preliminary mitigation investigation that had been initiated in state court. Although Judge Payne inexplicably doubled the requested rate of compensation for the mitigation investigator, this was of no practical assistance to me because, as Judge Payne was also informed by the Federal Death Penalty Counsel, the denial of expense was completely unworkable and apparently unprecedented in federal death penalty litigation.

Judge Payne also made substantial and unworkable reductions in the amounts requested for the services of forensic experts, including a tool mark and illegal drug

7

541

analyst, and a trajectory and crime scene reconstruction expert. Although the requested hourly rate for these experts was well within the range established by national practice at the time of compensating such qualified experts between $125 and $250 per hour, Judge Payne authorized only $100 per hour. Judge Payne also denied most of the requests for the experts' travel and other out-of-pocket expenses. The reduced hourly rate approved by Judge Payne and the lack of expenses again made it unworkable to obtain the services of any expert qualified to perform the requested services.

Judge Payne similarly made unworkable reductions to my request for the services of mental health experts to assess Mr. Barrett's brain dysfunction, future dangerousness and hypervigilant overreaction to perceived threats of annihilation. My request for a total of $24,000 was well under the average authorization for a federal death penalty case at the time ($30,000) and indicated hourly rates of $125-$150 were at the low end or well below the range of hourly rates authorized by federal courts in death penalty cases for the services of a psychologist ($150-250) and psychiatrist ($250-350). Judge Payne nevertheless approved the retention of only one mental health expert for 40 hours of work, limited compensation to a rate of $100 an hour for an expert who was a psychologist or $125 per hour for a psychiatrist, for a total of $4,000-5,000. Based on the data assembled by the Federal Death Penalty Resource Counsel, and provided to Judge Payne, the limitation on the number of experts, hours, rate of compensation, as well as the denial of expenses, were all completely out of line with the standards of practice prevailing in federal death penalty cases, and precluded meaningful investigation of

8

543

mental health issues.

On one occasion, after I submitted the budget requests, Mr. Hilfiger called me and told me to substantially reduce the requests solely because the judge would not approve them. To my knowledge, Mr. Hilfiger's suggestion was not based on any consultation with the Federal Death Penalty Resource Counsel attorneys, or any other experienced capital litigator. Nor did Mr. Hilfiger have sufficient knowledge of the facts, training and experience as a capital lawyer to render an informed, independent opinion regarding the reasonableness of my funding request. Based on my own training and experience, as well as my consultation with attorneys at the offices of the Federal Death Penalty Resource Counsel, I knew that Mr. Hilfiger's suggestion to reduce the budget request was unreasonable. In a conference call among Judge Payne, Mr. Hilfiger and myself to discuss this matter, Mr. Hilfiger did not join me in advocating for the reasonably necessary funding.

Judge Payne also imposed onerous, exacting conditions for budget requests, which required me to set forth in minute detail a description of specific tasks and which lawyer would perform which task, when each task would be completed and the amount of hours required for each specific activity. In consultation with the Federal Death Penalty Resource Counsel, I also informed Judge Payne that the process requiring pre-authorization and circuit-level review of non-attorney services pursuant to 21 U.S.C. §§ 848(q)(9) and (10)(B) is not applicable to attorney services, and that pursuant to the Guide to Judicial Policies and Procedures, Vol. VII, "Appointment of Counsel in

9

Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), case budgeting should be made in light of counsel's "best preliminary estimate that can be made of all services," including services of counsel. Although the level of detailed quantification of tasks and necessary hours demanded by Judge Payne is virtually impossible to predict, Judge Payne required me to submit such detailed budget proposals in advance, including seeking authorization to do legal research. I did my best to comply with these requirements, and obtained pre-approved authorization from the court. When I submitted vouchers, however, my compensation was routinely cut significantly. I was compensated at an effective rate of approximately Sixty Dollars ($60.00) an hour.

As I stated to Judge Payne at the time, delays in the Court's approval (or rejection) of the budgets I had submitted were eating into the time available to prepare for trial. Some of the budget proposals for Mr. Barrett's defense were first raised with Magistrate Judge Shreder in early December 2004. In February, I responded to a letter from Judge Payne with a letter that in many respects repeated things Magistrate Judge Shreder elicited from me months earlier. Prior to the exchange of letters, in the hope that disputes of budgeting of attorney fees would not delay the acquisition of needed experts, I began to submit separate budget requests - one for attorney fees and a second for experts and expenses. This did not resolve either impasse.

As reflected in the then-current data compiled by the Office of Defender Services and made available to Judge Payne by the Federal Death Penalty Resource Counsel, my projection of 2,000 hours of attorney time necessary to represent Mr. Barrett effectively

10

was well *below* the range of 2,400 to 3,000 hours then being expended in death-authorized federal cases. The Federal Death Penalty Resource Counsel also was unaware of any other instance in which a federal judge routinely cut attorney hours by 50% without providing counsel an opportunity to discuss any legitimate concerns the court might have with the amount of requested compensation.

I was therefore prevented from adequately preparing the case because Judge Payne refused to authorize reasonable fees or expenses for expert and investigative assistance. Judge Payne made me disclose how much money I had earned on Mr. Barrett's state case. Judge Payne expressed on more than one occasion that because I had tried the state case and had been on the state case for years, I did not need all the help and assistance I was requesting.

I was appointed lead counsel for Mr. Barrett in the federal case in the Fall of 2004, and we were still litigating budget requests in April, 2005. As of that time, I was not aware of Mr. Hilfiger doing any investigation other than perhaps visiting the scene and taking some photographs. We still were working without experts or investigators, and my attorney fee vouchers were being cut routinely. I discussed these difficulties with Paul Brunton, and also consulted with the federal capital resource center. After extensively reviewing the matter with the Federal Death Penalty Resource Counsel, I concluded that Judge Payne's reduction of attorney's fees, estimate of the hours necessary to represent Mr. Barrett and restrictions on non-attorney funds for investigative and expert services were substantially inconsistent with the standards and practices

11

governing federal court trials in death penalty cases such as Mr. Barrett's.

Judge Payne's ongoing refusal to authorize adequate resources led me to conclude I would not be able to discharge my professional and ethical obligations to prepare Mr. Barrett's case adequately for trial. I therefore presented my concerns as the bases for a motion to allow me to withdraw as counsel, including in the motion a statement from Mr. Barrett that he wanted me to continue as his lawyer. I anticipated that Judge Payne would deny the request and that this would "force the issue" by getting a ruling that could be appealed to the Tenth Circuit. I urged Mr. Hilfiger to join the motion to withdraw in light of my professional judgment, and concurrence of the Federal Death Penalty Resource Counsel, that we were being prevented from representing Mr. Barrett effectively. Mr. Hilfiger declined to join the motion, and urged me not to file it, but he did not offer any reason to challenge my assertion that the trial preparation was being hamstrung by Judge Payne's denial of ancillary investigative and expert services.

Within a short period of time, Judge Payne granted my motion to withdraw, removed me from the case, designated Mr. Hilfiger as lead counsel, and appointed Bret Smith as second chair. In my opinion, Mr. Hilfiger was not qualified under the appropriate ABA Guidelines to act as first chair in a federal capital case. To my knowledge, Bret Smith had no capital experience.

At the time I withdrew from the case, I was unaware of Mr. Hilfiger having performed any significant work on the case, with the exception of a few pleadings, making court appearances, conducting a brief scene visit, and traveling to Washington,

12

D.C. for the D.O.J. meeting, as described above.  At the time I withdrew, Mr. Hilfiger had not contributed significant legal research, nor had he contributed significantly to the major motions and briefs.

Everything in the federal case, during the time I was participating, was an uphill struggle with Judge Payne.  Over and above the funding issues, I was required to file a motion and brief setting out the serial numbers of my computers and accessories before they could be brought into the Courthouse.  I was also, from time to time, chastised by the Court for such things as titling an agreed scheduling motion as a "joint" motion, when it contained a statement that the United States Attorney endorsed and agreed with the motion, but did not bear Mr. Sperling's signature.

At the time I withdrew from the case, I advised Mr. Hilfiger that he needed to immediately undertake extensive investigation and preparation for a possible penalty phase.  I explained to him that the work performed by Roseann Schaye, the mitigation investigator in the state case, was very preliminary in nature and far from complete.  Ms. Schaye's investigation, and preliminary consultation with mental health experts prior to the state court trial had identified, but not developed, several potentially fruitful areas to pursue, including Mr. Barrett's mental illness and prior suicide attempt.  In particular, the expert advice included seeking assessment of neurological damage and conducting an investigation of family mental illness.  Based on these preliminary results, if Mr. Barrett's case had proceeded to a penalty phase in state court, I would have requested the time and funding necessary to investigate Mr. Barrett's cognitive impairments that suggested brain

13

damage, his mother's consumption of alcohol during her pregnancy with Mr. Barrett, and the presence, severity and effect of mental illness on Mr. Barrett's behavior and functioning.

Based on my experience, I knew that it was important that I had built a rapport with Mr. Barrett so that he would trust my judgment regarding the appropriateness of investigating and presenting certain evidence. I am aware that a variety of factors, including depression, a sense of hopelessness and the fear of shame and embarrassment can adversely affect a client's ability to endure the presentation of penalty phase evidence. For this reason, I and other members of the state court trial team made every reasonable effort, including regular visits with Mr. Barrett, to encourage and support his participation in preparing both the guilt and penalty phase of his trial. Mr. Barrett cooperated with all of our requests to be examined by a mental health professional, provided us with potential sources of background information and helped us to locate significant witnesses who knew the details of his upbringing. Because of the attorney-client relationship we established with him and, which in my opinion, any qualified lawyer would endeavor to establish with a capital client, Mr. Barrett did not place any restrictions on the evidence we were permitted to investigate or prepare to present in the event of a penalty phase.

As mentioned above, however, we had not completed the necessary investigation and preparation of a penalty phase presentation by the conclusion of Mr. Barrett's state trials. I therefore stressed to Mr. Hilfiger the importance of completing a mitigation

14

investigation so that he would be able to make informed decisions and able to advise Mr. Barrett of possible defenses.

After I withdrew from the federal case and gave Mr. Hilfiger this report on the status of the prior investigation, he never again consulted me on the legal and factual issues surrounding Mr. Barrett's case.

It was always my belief that investigator Clint Johnson and the District 27 Drug Task Force simply made up a C.I. out of whole cloth. In my opinion Charles "Monk" Sanders was not the alleged confidential informant (C.I.) used to secure the search and arrest warrants that were prepared in advance of the raid on Mr. Barrett's home. Despite our repeated efforts, including extraordinary writs to the Court of Criminal Appeals, the identity of the C.I. was not disclosed during the state trials. Prior to the second state trial, Clint Johnson was ordered by the Court to write the supposed C.I.'s name on a paper that was then placed in an envelope, sealed and placed in the state court file. It is my understanding that the envelope was opened just prior to the federal trial, and that the name of Charles "Monk" Sanders was written on the paper. In my opinion, Mr. Sanders was an informant, but that he did not actually fill the C.I.'s alleged role. In fact, Mr. Monk's federal trial testimony conflicted with the averments made in the affidavits supporting the state arrest and search warrants.

It is also my understanding that during jury selection in Mr. Barrett's federal trial, the government disclosed for the first time its intention to call informant or "snitch" witnesses to testify to certain statements Mr. Barrett purportedly made regarding his

15

549

intention to harm law enforcement officers.  The belated disclosure of such potentially significant witnesses would have further raised my suspicions regarding the reliability and truthfulness of the proffered testimony.  It is my professional judgment that no reasonably competent capital trial attorney would have permitted the government to introduce the testimony of such belatedly identified witnesses without first obtaining, or at least requesting a continuance sufficient to afford the defense full discovery – including, but not limited to any of the witnesses statements, the circumstances under which they allegedly first came to the attention of the prosecution, records of their criminal histories to include pending cases, and any consideration promised or expected in consideration for their testimony – and a reasonable opportunity to investigate the witnesses' background and substance of their alleged statements to the authorities, including the circumstances and context of Mr. Barrett's reported statements.

These matters occurred several years ago, and I have not reviewed either my files or the Court's records, relying only on my best recollection of the events.  I related the information detailed herein to one of Mr. Barrett's current attorneys, David Autry, in interviews with me.  Based on those interviews, this declaration was drafted for my signature.  I have carefully reviewed its contents, and it reflects accurately what I told Mr. Autry.

16

I declare under penalty of perjury that this declaration, consisting of 17-pages, is true and correct to the best of my recollection and belief.

Executed by me this 13th day of May, 2009, in Tulsa County, Oklahoma.

/S/ _____
John David Echols

17

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 35**

---

## am I supposed to do all this

(Mother will check if I do)

### AT ABOUT THREE MONTHS   MORE OR LESS

Lift chest clear of surface when placed face down _____ 6 weeks

Straighten knees when held erect _____ 8 weeks

Hold head erect and steady when held to shoulders _____ ✓

Sit on lap, hold head erect and steady with support of ribs only _____ ✓

Follow flashlight with eyes: vertically _____ horizontally _____ circularly _____

Smile in response to Mother's voice _____ ✓

Observe anyone speaking _____ Inspect hand _____ Laugh aloud _____

Manipulate object placed in hand _____ Splash in bath _____

Make stepping movements when held erect _____

Open mouth at sight of nipple before lips are touched _____

### AROUND SIX MONTHS

Hold head erect when carried _____ ✓

Sit alone on flat surface momentarily _____ ✓

Stand firmly with help when held erect _____ ✓

Roll from back to stomach and vice-versa on flat surface _____ ✓

Reach and grasp for an object when in sitting position _____ ✓

Pick up one-inch cube with fingers _____ ✓

Scoop up ⅛-inch cube _____ Discover feet _____ ✓

Look at object with which am playing _____ ✓

Look at floor for fallen toy when in high-chair or lap _____

Make various vocalizations _____ ✓

Notice difference between familiar persons and strangers _____ ✓

Not much affected by strangers, new scenes or solitude _____ ✓

Crow and coo actively when pleased _____ ✓

Cry and fret when toy is taken _____ ✓

[ 20 ]

### I'M GETTING BIGGER NOW!

### AT ABOUT NINE MONTHS

Sit on floor and handle playthings without losing balance _____ ✓

Crawl on stomach, making some progress _____ ✓

Creep on hands and knees _____ ✓

Bang table with toys or other objects _____ ✓

Knock down block houses in play _____

Oppose thumb and forefinger in picking up one-inch cube _____

Wave "bye-bye" or play "peek-a-boo" instinctively _____

Take bottle in and out of mouth _____ ✓

Respond to animated facial expressions _____

Bowel control _____ Respond when name is called _____ ✓

Express vocal sounds upon recognition of familiar person or object _____

Associate outdoor clothing with being taken out _____

May react to strangers _____

Reach for objects persistently _____

Say "ma-ma" or "da-da" or equivalent _____

Make stepping movements when feet are touched to floor _____ ✓

### ONE YEAR OR THEREABOUTS

Pull self to standing position with help of furniture _____ ✓

Walk with help _____ ✓ Creep actively and rapidly _____ ✓

Comprehend simple verbal commands and commissions _____ ✓

May cooperate in dressing and undressing _____ ✓

May climb steps _____ Hold and drink from cup _____

Pile one block on another when shown _____

Say two or three words indicating want _____

Play "pat-a-cake" or similar demonstrable game _____

Pick up small object with finger and thumb _____ ✓

Show preference for one hand in reaching _____

Make rhythm movements to music _____ ✓

Indicate need of toilet _____

Dear Folks: Don't worry if I don't do ALL of these things at the ages specified. If I do about half of them at the proper time, I'm doing all right.

(signed) _____

[ 21 ]

KEB501953

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 36**

---

*Exhs. § 2255 Motion*                              *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

Rodger?

Maybe I seem hasty to you. But at this time I don't know what I'm doing or going to do. Or should do. With John gone I feel like things are going to take a turn. You need to know that it's nothing against you or Bret. It could have been to other lawyers and I would have done the same. One day I feel one way and the next I feel another. I guess I have no choice now than to let you do your best. Rodger, this case was close to being beat the second time. Everything we need to be it is there. The reason I feel the way I do is because I felt John would finally win it this time. It can be done. I don't want to go back to prison to were I'm screwed around on my levels to were It takes me twice as long to get out. Screw the politics. Just try your hardest to beat this to were I can go home. I have gave 6 years of my life for something that they caused to happen. I've got alot of things that are good for this case. So hopefully now that there is no-other means for me but to beat this we can put this behind us and start over and do this right and win. I'll try my best to act right. I've got so much riding on this. Everything to get my life back in order is waitin. A good job a good woman. I've got two grand kids I've never even seen. After 6 years of this It gets old Rodger. Please understand that.

Thank you   Kenneth Barrett

KEB009690

**INTENTIONALLY LEFT BLANK
EXHIBIT NUMBERS 37-58 NOT USED**

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 59**

SEQUOYAH COUNTY, OKLAHOMA

| No. | STYLE OF CASE | NATURE OF ACTION | ATTORNEYS |
|---|---|---|---|
| 792 | STATE OF OKLAHOMA vs. Henry Edwards | Manslaughter | A.D.P. J.M. McCombs |

| DATE 1925 | FILINGS, PROCEEDINGS AND RETURNS | Clerk's Costs Plaintiff | Clerk's Costs Defendant | Sheriff's Costs | Miscel- laneous | Credits | Disburse- ments |
|---|---|---|---|---|---|---|---|
| 7 16 | To file Transcript Docket fee | 1 00 | | | | | |
| 20 | To Iss Prace & Ins Sum Reg Sum | 35 | | | 1 00 | | |
| 7 | To file & Record Information | 95 | | | | | |
| 12 | To file & Record Verdict | 50 | | | | | |
| | Acquittal 9-11-25 | | | | | | |

Sep 30 1936
No fees in this case
Acct. in record's case
R.L. Swaim, Court Clerk

558

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA


UNITED STATES OF AMERICA,    )
           )
        *Plaintiff,*   )
           )
v.           )    **Case No. 6:04-CR-00115-JHP-SPS**
           )
KENNETH EUGENE BARRETT,    )
           )
        *Defendant.*  )


**EXHIBIT 60**

## CRIMINAL APPEARANCE DOCKET

573

vised 1968)

| STYLE OF CASE | NATURE OF ACTION | ATTORNEYS |
|---|---|---|
| State of Oklahoma | Cultivation of Mari | District Attorney |
| vs. Deborah Everly Marilyn Crawford | | For Defendant |

| | | ITEMS RECORDED | | CLERK'S COSTS | SHERIFF'S COSTS | MISC. FEES | WITNESS FEES | DEPOSIT IN CASE | DISBURSED | BALANCE CASH ON HAND |
|---|---|---|---|---|---|---|---|---|---|---|
| Return Day___ 19___ Answer Day ___'19___ | | Book | Page | | | | | | | |

Inf.
Minute - Defs pres, St. JQ A, deffee of Inf, bond set at
$5000 each, Arraign passed to 6-1-77 at 1:30 P.M.
Bond (D.C.) Everly     4363
Bond (D.C.) Crawford     34364
Minute - def pres St JQ A, def pres w/att John Ayres, P.N.G, Pre. Hrg set
6-17-77 at 10 A.M., bond lowered to $1000
Order dismissing     4-1-77

KEB503076

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:04-CR-00115-JHP-SPS |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## DEFENDANT'S MOTION FOR COLLATERAL RELIEF,

## TO VACATE, SET ASIDE, OR CORRECT SENTENCE,

## AND FOR A NEW TRIAL

---

**TABLE OF CONTENTS**

I.   Preliminary Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Statement Regarding Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.   Grounds for Disqualifying Trial Judge . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.   Events Leading to the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.   The Alleged Offense and the Bench Warrant . . . . . . . . . . . . . . . . . 8

        2.   The Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        3.   September 24, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.   Three Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.   State Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.   Federal Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Claim 1.   Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel . . . . . 17

    Claim 2.   Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. § 3006A and the Sixth Amendment to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        A.   Unreasonable Acts and Omissions Affecting the First and Second Stages of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

            Overview of First-Stage Ineffective Assistance . . . . . . . . . . . . . . 44

Evidence of Constitutionally Deficient Representation . . . . . . . . 48

1.    Failure to professionally re-urge the motion to suppress
      under *Franks v. Delaware,* 438 U.S. 154 (1978).  . . . . . . 48

Ineffective Assistance of Appellate Counsel . . . . . . . . . . . . . . . . 60

2.    Trial counsel unreasonably failed to investigate and
      introduce evidence of eyewitnesses as well as mental
      impairment and illness that would have rebutted the
      prosecution's theory of the case, supported the defense
      theory, and formed the basis for conviction of a lesser
      offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

3.    Due to the unreasonable failure of Mr. Barrett's trial
      counsel to retain expert assistance, Mr. Barrett was tried
      while incompetent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

4.    But for trial counsel's unreasonable omissions it is
      reasonably probable that the jury would have rejected the
      testimony of the Government's eleventh hour "snitch"
      witnesses and, like the two juries before them, refused
      to convict Mr. Barrett of premeditated murder. . . . . . . . . 76

      a.    Travis Crawford . . . . . . . . . . . . . . . . . . . . . . . . . 78

      b.    Cindy Crawford . . . . . . . . . . . . . . . . . . . . . . . . . 86

      c.    Charles "Monk" Sanders . . . . . . . . . . . . . . . . . . 94

            1.    Failure to adequately investigate and
                  prepare to cross-examine Sanders about
                  his previous convictions, charges against
                  him that were dismissed, and the favorable
                  treatment he often secured to escape
                  punishment. . . . . . . . . . . . . . . . . . . . . . . 94

            2.    Counsel was professionally unreasonable
                  for failing to investigate and produce
                  witnesses who could have impeached
                  specific claims made by Sanders, and
                  Sanders's credibility as a whole. . . . . . . 113

      d.    Randy Weaver . . . . . . . . . . . . . . . . . . . . . . . . . 119

      e.      Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . . 121

      f.      Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

      g.     Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . 123

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

5.      Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

6.      The outcome of the trial is unreliable due to trial counsel's unreasonably failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

7.      Mr. Barrett's trial counsel unreasonably failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials . . . . . . . . . . . . . . . . . . . . . 144

8.      Counsel was professionally unreasonable for failing to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on. This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers. . . . . . . . . . . . . . . . . . . . . . . . . . 149

      a.      Toby Barrett . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

      b.      Alvin Hahn . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

9.      Trial counsel was professionally unreasonable for failing to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence. . . . . . . . . . . . . 154

10.   Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.  . . . . . . . . . . . . . . . . . . . . . . . . 160

11.   The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions  . . . . . . . . . . . . . . . . . . . . . . . . . 175

12.   Trial counsel were ineffective for failing to adequately preserve the record, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

13.   Counsel was professionally unreasonable for failing to object to numerous instances of prosecutorial misconduct in closing argument in both stages of trial.  . . . . . . . . . . . . 180

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

B.   Unreasonable Acts and Omissions Affecting the Second Stage of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

1.   Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

2.   Prejudice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

a.   The family, social, and medical background of Kenny Barrett  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Family History of Mental Illness  . . . . . . . . . . . . . . . . . . 191

Maternal Family Mental Illness . . . . . . . . . . . . . . . . . . . 191

Paternal Family Mental Illness . . . . . . . . . . . . . . . . . . . . 193

Maternal Family History  . . . . . . . . . . . . . . . . . . . . . . . . 195

Paternal Family History . . . . . . . . . . . . . . . . . . . . . . . . . 198

Family of Origin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Infancy and Childhood Development  . . . . . . . . . . . . . . 207

Onset of Mental Illness  . . . . . . . . . . . . . . . . . . . . . . . . . 216

b.    Kenny Barrett's mental illness and organic
brain dysfunction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

c.    The prosecution's exploitation of trial counsel's
deficient performance  . . . . . . . . . . . . . . . . . . . . . . . . . . 231

3.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

Claim 3.    Mr. Barrett was Denied his Rights to Due Process and Equal Protection of
the Laws, and his Right to Expert and Investigative Assistance under 18
U.S.C. § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Claim 4.    Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and
Fourteenth Amendments to the United States Constitution Were
Violated by the Use of False Information in Obtaining the
No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search
Warrant Obtained by Clint Johnson Was Invalid under *Franks v.
Delaware,* 438 U.S. 154 (1978).  Appellate Counsel Was
Ineffective for Failing to Raise the Issue on Direct Appeal . . . . . . . . . . 247

Claim 5.    Mr. Barrett was Denied his Fifth Amendment Right to Due Process,
his Sixth Amendment Rights to Counsel and Confrontation, and his
Eighth Amendment Right to a Fair and Reliable Capital Sentencing
Process Due to the Government's Suppression of Exculpatory
Evidence, Knowing use of Perjured Testimony, and Failures to
Correct False Testimony; Mr. Barrett is Entitled to Relief
from his Conviction and Sentence Based on Newly
Discovered Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

A.    Suppressed Exculpatory Evidence, Evidence of Knowing use of
Perjured Testimony, and Newly Discovered Evidence  . . . . . . . 257

1.    Evidence regarding informant witnesses Charles
"Monk" Sanders, Travis Crawford, Cindy Crawford,
Brandie Zane Price, Karen Real and Randy Turman
entitles Mr. Barrett to relief from his convictions and
sentences  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

a.    Charles "Monk" Sanders  . . . . . . . . . . . . . . . . . 257

b.     Travis Crawford . . . . . . . . . . . . . . . . . . . . . . . . . 262

c.     Cindy Crawford . . . . . . . . . . . . . . . . . . . . . . . . . 267

d.     Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . . 273

e.     Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

f.     Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . . 277

2.     The Government failed to reveal exculpatory evidence of a witness who failed to corroborate Charles Sanders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278

B.     The Judgements of Conviction and Sentence Should be Vacated Based on the Suppression and New Discovery of Evidence Undermining the Credibility of Key Law Enforcement Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

1.     Evidence of Clint Johnson's illicit activities . . . . . . . . 280

2.     David Michael Littlefield's illicit activities . . . . . . . . . 286

3.     John Philpot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290

C.     Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

D.     Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses . . . . . . . . . . . . . . . . . . . . . . . 297

Claim 6.     Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements . . . . . . . . . . . . . . . . . . . . . . . 303

Claim 8.     Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution . . . . 310

Claim 9.     Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel Was Ineffective for Failing to Raise this Issue. . . . . . . 314

Claim 10.      Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments
               to the United States Constitution were Violated Due to the Trial
               Court's Refusal to Instruct the Jury that they Could Consider Residual
               Doubts as a Mitigation Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

Claim 11.      Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated
               When the Trial Court Excused for Cause a Juror Who, While  Personally
               Opposed to the Death Penalty, Could Nonetheless Consider it as a
               Punishment Option.  Appellate Counsel Was Ineffective for Failing to
               Raise this Issue on Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Claim 12.      The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights
               under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the
               Jury was Not Required to Find that Death was an Appropriate
               Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process
               Rights were Violated by Appellate Counsel's Unreasonable Failure to
               Raise this Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

Claim 13.      Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth
               Amendments were Violated Due to the Effects of Drugs he was Given
               in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the
               Trial Court's Removal of Mr. Barrett from the Courtroom in the
               Presence of the Jury without Cause or Inquiry, and Mr. Barrett's
               Absence from Critical Stages of the Proceedings without Valid Waiver;
               To the Extent Appellate Counsel Failed to Raise the Issue on Appeal,
               Counsel were Ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 336

Claim 14.      Mr. Barrett Was Denied Due Process of Law, Equal Protection of the
               Law, the Right to Be Free of Cruel and Unusual Punishment, and
               Effective Assistance of Counsel Because the Federal Death Penalty, as
               Administered, Is Disproportionately and Unconstitutionally Applied
               According to the Race of the Victim, and Trial and Appellate Counsel
               Made No Objection Based on this Fact.  . . . . . . . . . . . . . . . . . . . . . . . 348

Claim 15.      Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth
               Amendments were Violated due to the Government's Failure to Include
               Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights
               were Violated by Appellate Counsel's Unreasonable Failure to Raise this
               Issue on Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 351

Claim 17       Mr. Barrett's Conviction and Sentence Must be Vacated Due to the
               Cumulative Prejudicial Effect of the Errors in this Case . . . . . . . . . . . . 354

IV.     Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 355

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Adams v. Texas, 448 U.S. 38 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19

Ake v. Oklahoma, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Alcorta v. Texas, 355 U.S. 28 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

Apprendi v. New Jersey, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333, 334

Banks v. Dretke, 540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Bates v. Bell, 402 F.3d 635 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Batson v. Kentucky, 476 U.S. 76 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Beck v. Alabama, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315, 318

Bouchillon v. Collins, 907 F.2d 589 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 311

Bowen v. Maynard, 799 F.3d 593 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Brecht v. Abrahamson, supra, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brooks v. Tennessee, 406 U.S. 605 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Bush v. Gore, 531 U.S. 98 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Carey v. Duckworth, 738 F.2d 875 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Carter v. Bowersox, 265 F.3d 705 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Cooper v. Oklahoma, 517 U.S. 348 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Crane v. Kentucky, 476 U.S. 683 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Crivens v. Roth, 172 F.3d 991 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264, 266, 271

Crowe v. Sanders, 864 F.2d 430 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Cuyler v. Sullivan, 446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Darden v. Wainwright, 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297, 302

Davis v. Polk, 2007 WL 2898711 (W.D.N.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . passim

Deck v. Missouri, 544 U.S. 622 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Delaware v. Van Arsdale, 475 U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297, 302

Driscoll v. Delo, 71 F.3d 701 (8th  Cir. 1995),
*cert. denied,* 519 U.S. 910 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 139

Drope v. Missouri, 420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Duckett v. Mullin, 306 F.3d 982 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 300

Dunn v. Roberts, 963 F.2d 308 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Dusky v. United States, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314

Eagle v. Linahan, 279 F.3d 1283 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Eddings v. Oklahoma, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

Eddmonds v. Peters, 93 F.3d 1307 (7th Cir. 1996),
cert. denied, 520 U.S. 1172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Estelle v. McGuire, 502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Estelle v. Williams, 425 U.S. 501 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Evitts v. Lucey, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Felde v. Butler, 817 F.2d 281 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Ferguson v. Georgia, 365 U.S. 570 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fero v. Kerby, 39 F.3d 1462 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254, 290

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Freeman v. Class, 95 F.3d 639 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 175

Geders v. United States, 466 U.S. 648 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Gilbert v. Mullen, 302 F.3d 1166 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

Giles v. Maryland, 386 U.S. 66 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262, 257

Godfrey v. Georgia, 446 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 330

Godinez v. Moran, 509 U.S. 389 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 346

Gordon v. Kelly, 2000 WL 145144 (6th Cir. Feb. 1, 2000) . . . . . . . . . . . . . . . . . . . . . . 301

Gravely v. Mills, 87 F.3d 779 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Gray v. Mississippi, 481 U.S. 648 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Greer v. Miller, 483 U.S. 756 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966),
cert. denied, 396 U.S. 865 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 292

Hall v. Washington, 106 F.3d 742 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Hamilton v. Alabama, 368 U.S. 52 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Herring v. New York, 422 U.S. 853 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 175

High v. Head, 209 F.3d 1257 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Hodge v. Hurley, 426 F.3d 368 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Hogan v. Gibson, 197 F.3d 1297 (10th Cir. 2000),
cert. denied, 121 S.Ct. 332 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

Holbrook v. Flynn, 475 U.S. 560 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Holloway v. Arkansas, 435 U.S. 475 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Horton v. Massie, 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished) . . . . . . . . . . . . . . 128

Hull v. Kyler, 190 F.3d 88 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 343

Illinois v. Allen, 397 U.S. 337 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308, 343, 344

Iimbler v. Pachtman, 424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Jaffee v. Redmond, 518 U.S. 1 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Jones v. Polk, 401 F.3d 257 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305, 306

Keeble v. United States, 412 U.S. 205 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 316

Kimmelman v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . 47, 137, 165

Kyles v. Whitley, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253, 254

Lankford v. Idaho, 500 U.S. 110 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 300

Liles v. Saffle, 945 F.2d 333 (10th Cir. 1991),
cert. denied, 502 U.S. 1066 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302, 304, 307

Marchu v. United States, 926 F.3d 50 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Martin v. Grosshans, 424 F.3d 588 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

McCracken v. Gibson, 268 F.3d 970 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Medina v. California, 505 U.S. 437 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 311

Mickens v. Taylor, 535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Miller v. Pate, 386 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257, 279, 286

Mitchell v. Gibson, 262 F.3d 1036 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Mooney v. Hollohan, 294 U.S. 103 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257, 279

Moore v. Illinois, 408 U.S. 786 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Mullaney v. Wilbur, 421 U.S. 684 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 319

In re Murchison, 349 U.S. 133 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Murray v. Carrier, 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Napue v. Illinois, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

Nuckols v. Gibson, 233 F.3d 1261 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Odle v. Woodford, 238 F.3d 1084 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Pate v. Robinson, 383 U.S. 375 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Patton v. Mullin, 425 F.3d 788 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Paxton v. Ward, 199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 299, 302

Peltier v. Booker, 348 F.3d 888 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Polk County v. Dodson, 454 U.S. 312 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Powell v. Alabama, 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Reynolds v. Norris, 86 F.3d 796 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

Reynoso v. Giurbino, 462 F.3d 1099 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Riggins v. Nevada, 504 U.S. 127 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ring v. Arizona, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333, 334, 351

Rock v. Arkansas, 483 U.S. 44 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Rompilla v. Beard, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

Schmuck v. United States, 489 U.S. 705 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Scott v. Mullin, 303 F.3d 1222 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 291

Skipper v. South Carolina, 476 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304, 307

Smith v. Gibson, 197 F.3d 454 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Smith v. Roberts, 115 F.3d 818 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Snowden v. Singleterry, 135 F.3d 732 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Steidl v. Fermon, 494 F.3d 623 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Strickler v. Green, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253, 290

Sullivan v. Louisiana, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

Taylor v. Kentucky, 436 U.S. 478 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Thomas v. Goldsmith, 979 F.2d 746 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Tuggle v. Netherland, 526 U.S. 10 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Tumey v. Ohio, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Turrentine v. Mullin, 390 F.3d 1181 (10th Cir. 2004),
cert. denied, 545 U.S. 1106 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

United States v. Abeyta, 27 F.3d 470 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 316

United States v. Antone, 603 F.3d 566 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

United States v. Bagley, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254, 290

United States v. Barnette, 211 F.3d 803 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

United States v. Barrett, 469 F.3d 1079 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

United States v. Bodkins, 2005 WL 1118158 (W.D. Va. May 11, 2005) . . . . . . . . . . . . . . . . . 322

United States v. Bridwell, 583 F.2d 1135 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

United States v. Burbage, 365 F.3d 1174 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Calisto, 838 F.2d 711 (3rd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 316

United States v. Davis, 132 F. Supp. 2d 455 (E.D. La. Feb. 2, 2001) . . . . . . . . . . . . . . . . . . . 322

United States v. Deleon, 979 F.2d 761 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. ex rel. Gregory Madef, 223 F. Supp. 2d 968
(N.D. Ill. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

United States v. Hernandez, 94 F.3d 606 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

United States v. Honken, 378 F. Supp. 2d 1040 (N.D. Iowa 2004) . . . . . . . . . . . . . . . . . . . . . 322

United States v. Humphrey, 208 F.3d 1190 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 176

United States v. Joe, 8 F.3d 1488 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

United States v. Johns, 851 F.2d 1311 (9th Cir. 1988),
cert. denied, 505 U.S. 1226 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Johnson, 130 F.3d 1420 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Johnson, 520 U.S. 461 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Kennedy, 131 F.3d 1371 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Libby, 429 F. Supp. 2d 1 (D. D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Lofton, 776 F.2d 918 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 319

United States  v. McIntosh, 124 F.3d 1330 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Novaton, 271 F.3d 968 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 345

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Osorio, 929 F.2d 753 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Pritchard, 745 F.2d 1112 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Quintanilla, 193 F.3d 1139 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 253, 255

United States v. Ramsey, 323 F. Supp. 2d 27 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 174

United States v. Rich, 580 F.2d 929 (9th Cir.),
cert. denied, 439 U.S. 935 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

United States v. Rosales-Rodriguez, 289 F.3d 1106 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 344

United States v. Sands, 899 F.2d 912 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

United States v. Scafe, 822 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 70, 317

United States v. Serawop, 410 F.3d 656 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

United States v. Sinclair, 109 F.3d 1527 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

United States v. Sloan, 776 F.2d 926 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

United States v. Smith, 543 F.3d 1211 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Soundingsides, 820 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . 70, 317

United States v. Thomas, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266
(D.Md. January 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

United States v. Visinaiz, 428 F.3d 1300 (10th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

United States v. Warner, 23 F.3d 287 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Viereck, v. United States, 318 U.S. 236 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Village of Willowbrook v. Olech, 528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Wainwright v. Witt, 469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Washington v. Hofbrauer, 228 F.3d 689 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 181

Williamson v. Ward, 110  F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Witherspoon v. Illinois, 391 U.S. 510 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Wood v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 18

Woodson v. North Carolina, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . 178, 179, 335

**STATE CASES**

Dunkle v. State, 139 P.3d 228 (Okl. Cr. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140, 141

**DOCKETED CASES**

In re Clint Johnson, No. 01-72501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

Crawford v. Mattox, Sequoyah County Case No. P-03-458 . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Michael Mackey, et al. v. Cindy Crawford, Sequoyah County Case No. PO-03-390 . . . . . . . . . 90

State of Oklahoma v. Richard Loy Gray, Jr. Cherokee County Case No. CF-2007-28 . . . 283, 284

United States v. McAdams, et al., No. CR-07-16-RAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

**FEDERAL STATUTES**

21 U.S.C. §§ 848(q)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 42, 236

18 U.S.C. § 3432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

18 U.S.C. § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 293, 294, 351

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 334

18 U.S.C. § 3599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 33

18 U.S.C. § 4241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

28 U.S.C. §§ 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Fed. R. Civ.P. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Fed. R  Crim.P. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Fed. R. Crim.P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

Fed. R. Crim.P. 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 276

Fed. R. Crim.P. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Fed. R. Evid. 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

Fed. R. Evid. 608 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Evid. 615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Fed. R. Evid 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## DEFENDANT'S MOTION FOR COLLATERAL RELIEF

---

COMES NOW defendant KENNETH EUGENE BARRETT, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence. Through counsel, Mr. Barrett states the following grounds for granting this motion:

## I. Preliminary Matters

### A. Statement Regarding Form

In accordance with Rule 2 of the Rules Governing Section 2255 Cases, this Motion sets forth only the facts and claims entitling Mr. Barrett to relief. It does not contain legal argument or citation. Mr. Barrett will shortly file a separate motion seeking permission and a schedule by which to file a Memorandum in Support of the Motion.

---

Def's § 2255 Mot.     1     *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

References to prior proceedings are as follows:

- References to the consecutively paginated trial transcripts:  R. *xxx*;

- References to hearing transcripts not consecutively paginated with the trial transcripts:  Tr. [date] Hr'g;

- References to documents filed with the court such as pleadings, motions, and orders cite the docket number:  Doc. *xxx*

- References to the two state trials:  1st St. Tr. Tx at *xxx*, and 2nd St. Tr. Tx at *xxx*;

- References to the exhibits to this Motion are by the name of the exhibit;

- All other references are self-explanatory or based on the Blue Book.

### B.      Grounds for Disqualifying Trial Judge

In Claim 1 and elsewhere in this Motion, Mr. Barrett relies upon evidence of the trial judge's on- and off-the-record actions in relation to Mr. Barrett's defense, including *ex parte* communications with prosecutors.  The evidence that must be considered in evaluating this Motion disqualifies the trial judge from making any rulings affecting the process for adjudicating this Motion or the merits of any claims stated herein.  28 U.S.C. §§ 455(a), (b)(1), (b)(3), (b)(5)(iv); *Marchu v. United States*, 926 F.3d 50, 59 (1st Cir. 1991) (specific allegations about off-the-record actions of trial judge required that § 2255 motion be heard by different judge).  Therefore, this Motion requests that the trial judge recuse himself without making any further rulings in the case.

Mr. Barrett will make a separate motion to recuse.  However, the principle that no person can be a judge in his own case, *In re Murchison*, 349 U.S. 133, 136 (1955), is sufficiently well established and invoked by the facts presented herein that recusal should not await a formal

motion.  It would be a violation of due process for the trial judge to make any rulings regarding this motion.  *Aetna Life Insurance Company v. Lavoie*, 475 U.S. 813 (1986).

**C.      Introduction**

Kenneth Eugene Barrett was acquitted of the murder for which he now sits on death row.  After an Oklahoma jury convicted him of manslaughter, the Government presided over an unfair trial in this court in order to obtain a death sentence in response to anger over the result of the state proceedings.  The trial in this court could fairly be described as a travesty.

In order to improve their chances of obtaining the desired result, the Government loaded the dice with seven drug-addict informants who were nowhere to be found during the five years Mr. Barrett's state case was pending, but who materialized at the last minute to provide the Government much needed "evidence" of intent.  A number of these noxious characters dutifully marched to the witness stand to recite "statements" from Mr. Barrett that he intended to kill any law enforcement officer who stepped on his property.  Some of these witnesses also sought to portray Mr. Barrett as a drug manufacturer, even though no drug lab was found on his property when it was searched after Oklahoma Highway Patrol Trooper David "Rocky" Eales was tragically killed.

In handling these witnesses, the Government used a carrot and stick approach.  To get them to toe the mark, the Government employed intimidation and threats with at least two of them, Travis and Cindy Crawford.  This strong-arm tactic was headed up by disgraced former Assistant United States Attorney David Michael Littlefield, who was charged in 2007 with beating his children, and whose license to practice law is currently in peril based on charges filed by the Oklahoma Bar Association as a result of his child abuse case.

The carrot was undisclosed deals only vaguely hinted at during trial, or concealed altogether, and only consummated at or after the conclusion of Mr. Barrett's trial. The big winner in the snitch sweepstakes was Charles "Monk" Sanders, an eighteen-time (at least) convicted felon who was the alleged "C.I." for corrupt Drug Task Force officer Clint Johnson's search warrant for Mr. Barrett's residence, which set this entire tragedy in train. Sanders, who was permitted by Seqouyah County officials to run riot despite an almost unending series of convictions, saw any future jail time evaporate, had "split sentences" he never should have received in numerous felony cases reduced to straight *unsupervised* probation, and was even excused from paying any costs or fines in his cases, all courtesy of the Government and state prosecutors after he testified at Mr. Barrett's trial.

Others were also rewarded for their testimony. Karen Real, serving a fourteen year federal sentence in a drug manufacturing and firearms case, saw her sentence reduced to time served on the Government's Rule 35 motion shortly after Mr. Barrett was convicted and sentenced to death. Brandie Zane Price, a convicted felon who was depicted as having been delivered from her drug addiction at the time she testified against Mr. Barrett, was later charged in the Eastern District with being a member of a wide-ranging drug conspiracy. In the indictment filed against her and others, Price was charged with having started her participation in the drug conspiracy just a few short weeks after Mr. Barrett was formally sentenced. Randy Turman, a methamphetamine manufacturer who had a pending six-count drug case hanging over his head at the time he testified against Mr. Barrett, falsely testified on cross-examination that his case had "done been taken care of," when in fact it had not. The Government surely knew Turman was lying, but sat silently by and allowed him to perjure himself, in derogation of its duty to correct

Def's § 2255 Mot.                             4                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

false testimony.  In 2007, after being inactive for years, Turman's case was dismissed by Sequoyah County prosecutors "in the interests of justice."

The Government knew it still had a shaky edifice on its hands.  With sufficient time and a competent defense investigation, it would take but a few prods for the whole ramshackle thing to come crashing down.  In order to prevent investigation by the defense, the Government contrived to keep the identity of these witnesses secret for as long as possible to forestall any effective defense investigation.  As the general jury qualification process in Mr. Barrett's trial began, the Government filed a spurious sealed motion to delay identifying the names and addresses of the snitch witnesses.  An improper *ex parte* hearing was conducted by the court on the motion.  As the court quickly realized, the Government had zero evidence for its request; none of these witnesses were in the least bit of danger.  Outside the presence of defense counsel, their Government adversaries were allowed to speak for them on the question of whether the trial and already begun, thus precluding the informants from testifying under the applicable notice statute, and what steps the Government proposed so the defense would eventually have "access" to these witnesses.  The court recognized a lengthy continuance would likely be necessary to permit proper time for defense preparation.  In passing, AUSA Littlefield let slip he was aware of a witness who would contradict Charles Sanders.

When the hearing was eventually unsealed and defense counsel were allowed to "participate," neither the court nor the Government informed the defense of what had gone on behind closed doors.  What had occurred was misrepresented to defense counsel.  There was no reason to keep what had transpired at the hearing secret, since there was no basis for the Government's motion to begin with.  Defense counsel were led down the primrose path, hastily agreeing to an arrangement whereby they would be allowed, under Government supervision, to

interview the informant witnesses. However, except in one instance, these witnesses refused to speak to the defense. Having agreed to what the Government presented as a fait accompli, the ability of defense counsel to investigate and impeach these witnesses, and to marshal independent evidence contradicting them, went up in smoke. Mr. Barrett shows in this motion that with a competent investigation, the credibility of the Government's key witnesses would have been destroyed.

The Government's tactics of secrecy, obfuscation and misdirection, exemplified by what occurred at the *ex parte* hearing, typified the prosecutors' conduct of the entire case. Mr. Barrett shows in this motion that the Government routinely violated its duties to disclose exculpatory evidence, and also sponsored or knowingly allowed materially false testimony.

Well before the *ex parte* hearing, Mr. Barrett found the sledding rough in his efforts to receive what every criminal defendant in this country is entitled to as a matter of fundamental constitutional right: a fair trial. Mr. Barrett had to contend not only with prosecutors who were determined to press every fair and unfair advantage at their disposal, but the court as well.

From the inception of the case the court demonstrated concerns with and an interest in matters inconsistent with providing Mr. Barrett competent representation. Tulsa attorney John Echols successfully represented Mr. Barrett in state court. He was obviously the best choice to defend Mr. Barrett against the late-coming federal charges. The court only appointed Mr. Echols as a means of saving money, and rejected the Federal Defenders' recommendations of qualified co-counsel in order to give less-qualified local counsel experience needed to form the basis for a local panel of capital attorneys. The court's furtherance of these

interests virtually forced Mr. Echols off the case, including by withholding compensation for the budgeting investigation the court required Echols to undertake.

After Mr. Echols threw up his hands in frustration and withdrew from the case, more compliant counsel saw it to its predictable end. Mr. Barrett demonstrates in this motion that trial counsel, due to a combination of interference from the court and their own unprofessional errors and omissions, rendered ineffective assistance in the guilt/innocence stage of trial. Counsel failed to consult any experts, or even question the purported "expertise" of Government witnesses whose qualifications and methods the court recognized as lacking.

Trial counsel, in part deceived by the court and Government following *ex parte* communications, failed to seek a continuance to investigate the seven secret informants. Mr. Barrett shows here that even moderate investigation would have shown these witnesses were unworthy of belief.

Counsel's ineffectiveness, again for the same combination of reasons, continued into the penalty phase. Because counsel were underfunded and failed to properly prepare, the prosecution was able to portray Mr. Barrett as nothing more than a mean, common criminal from an ordinary, unremarkable background, who had simply decided to embark on the path that led him to the courtroom. Defense counsel did virtually nothing to counter the prosecution's depiction of their client, putting on a superficial and misleading mitigation case that both played right into the Government's hands and failed utterly to reveal Mr. Barrett's true character, history and background.

Mr. Barrett was and is nothing like the prosecution argued. A competent mitigation investigation would have shown the truth about him. Severe mental illness has plagued Mr. Barrett's family for generations. As shown in this motion, Kenneth Barrett has

struggled with severe organic, psychiatric, psychological and intellectual impairments his whole life. This evidence would have been relevant not only in the penalty phase, but in the first stage of trial as well.

Far from being a "bad person" who came from an ordinary background and simply chose to walk a twisted road, Kenneth Barrett is the product of a woefully dysfunctional marriage, a union that was rife with alcohol and other substance abuse, mental dysfunction, chaos, emotional and at times physical abuse, and infidelity. Kenneth Barrett's upbringing was anything but normal. As he struggled from birth with his genetic inheritance, he was forced to grow up in the maelstrom of chaos and neglect created by his parents. The psychological and emotional abuse his parents visited on each other as their doomed-from-the-start marriage unraveled was, from the beginning of his life, visited on him.

The numerous constitutional errors that marred Mr. Barrett's trial require that he be granted relief from his convictions and sentences.

## II.   Statement of the Case

### 1..   Events Leading to the Offense

#### 1.   The Alleged Offense and the Bench Warrant

In March 1997, Mr. Barrett was charged with unlawful delivery of a controlled substance arising from the alleged sale of $25 of methamphetamine to an undercover agent. In the court proceedings for this case, Attorney Bill Ed Rogers represented Mr. Barrett until September 11, 1998, when Mr. Rogers filed a motion to withdraw from the case. The court docket reflects that Mr. Barrett asked the Court for an appointed attorney on December 14, 1998; however, there is no indication that the court appointed an attorney for him. There was no other activity in the case until January 19, 1999, when the docket stated that "subp's issued."

On January 28, 1999, a bench warrant was issued for Mr. Barrett for "failing to appear for jury trial" on January 27, 1999. Mr. Barrett's bail bondsmen, Martin Daggs, testified that he eventually became aware of the bench warrant but never saw a need to notify Mr. Barrett about the warrant. Mr. Daggs stated that he knew where Mr. Barrett lived and he could find him if he wanted to.

### 2.     The Search Warrant

Eight months after the issuance of the bench warrant, Clint Johnson, the supervising agent and field supervisor for the District Twenty-Seven Drug Task Force (Task Force) prepared an affidavit for a search warrant for Mr. Barrett's residence.  The affidavit asserted that a confidential informant had seen Mr. Barrett sell drugs on one occasion between September 15 and 18, 1999; that he had seen Mr. Barrett engage in other drug transactions at his house; that he had overheard Mr. Barrett say "'if the cops try to raid me they will regret it because I'm going to kill the first cop through the door'"; that Mr. Barrett had guns in his house; and that Mr. Barrett sold drugs at night because he believed search warrants could not be served at night.  (At trial the confidential informant was identified as Charles "Monk" Sanders.  Sanders testified and on cross-examination denied having seen, heard, done, and said the specific things attributed to him in Johnson's affidavit.)

On September 20, 1999, a District Court Clerk signed the requested search warrant which authorized law enforcement officers to conduct the search at any time of the day or night and to enter Mr. Barrett's residence without the normally required knocking and announcing their presence.  Inexplicably, there did not appear to have been any discussion about simply paying a visit to Mr. Barrett, despite the fact that law enforcement had visited Mr. Barrett in the recent past and even inspected his weapons without any violence.

In any event, Johnson considered the search warrant to be "high risk" in nature and contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance in serving the warrant. Johnson met with Tact Team members to discuss the execution of the warrant. It was determined that the Tact Team would enter and secure the area first, and that the Task Force would then perform the actual search of Barrett's residence. The Tact Team decided that, because the front gate to Barrett's property was locked, three of the Tact Team vehicles, two Ford Broncos and a marked highway patrol unit, would enter Barrett's property by first driving north on a private driveway that lay to the east of Barrett's property, and then driving west across the land and through a ditch onto Barrett's property.

### 3.      September 24, 1999

Until late in the night of September 23 and after midnight on the September 24, Mr. Barrett and his son Toby had worked in their garage on a Camaro Mr. Barrett had promised to Toby if he returned to high school.  After they finished up around 12:30 A.M., Toby cleaned up the garage and was walking to his trailer.  At that time, the five Tact Team vehicles headed towards Mr. Barrett's residence.  What happened next was the subject of conflicting accounts by the law enforcement officers involved.

The lead Tact Team vehicle, a white Ford Bronco, drove eastward on the gravel road that passed in front of Mr. Barrett's residence.  The driver, Trooper John "Buddy" Hamilton, observed Toby as he entered the private driveway to the east of Barrett's residence, but continued with the execution of the no-knock warrant.  Hamilton then turned his vehicle westward towards Mr. Barrett's house and entered a deep ditch that lay between Mr. Barrett's cabin and the property to the east, and drove straight towards the house.

Toby screamed, "Dad," as the unmarked Bronco continued toward the porch.

Mr. Barrett was eating a bowl of cereal when he heard Toby yell.  He went to the doorway and saw the high-beam bright headlights coming towards his cabin from the ditch on the side of his house.  Mr. Barrett ran inside, grabbed a gun and shoved it in his waistband and went to the window.  As Mr. Barrett approached the window, he was shot in the lower portion of his body.  Mr. Barrett  grabbed his Colt Sporter rifle, which was loaded with two full and one partially full magazine of ammunition, and started firing out the doorway.

The lead Bronco hit the porch of the cabin.  As it had been approaching, the second and third vehicles entered the property.  They stopped slightly behind Hamilton's vehicle.  Meanwhile, Troopers Gene Hise and Robert Darst, who arrived at the scene in the fourth Tact Team vehicle, climbed over the locked front gate, entered the yard in front of Mr. Barrett's house, and yelled at Toby to get on the ground.  Trooper Darst eventually took custody of Toby Barrett and determined he was unarmed.

The shooting lasted less than thirty seconds.  At some point, Hamilton's passenger, Trooper David "Rocky" Eales, opened the front passenger door, got out of the vehicle, and began moving towards the rear of the vehicle. Before he arrived at the rear of the vehicle, Trooper Eales was struck by three bullets or bullet fragments.

Meanwhile, Hamilton threw a diversionary device out of the driver's side window of his vehicle, causing a noticeable flash and loud bang. The flash and bang created a stoppage of gunfire, during which Hamilton got out of the driver's side of his vehicle. Hamilton then moved towards the rear of his vehicle. As he did so, he was shot in the back of the left shoulder. When he reached the back of the vehicle, Hamilton observed Eales face down on the ground, with Trooper Ricky Manion attempting to assist him.

Def's § 2255 Mot.                                11                           *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

At some point in the melee, Manion shot Mr. Barrett in the lower body. Hamilton approached and entered the house, told Mr. Barrett to get up, and Mr. Barrett responded that he could not because he had been shot. Hamilton, with the assistance of Troopers Manion and Steve Hash, dragged Mr. Barrett out of the house and into the front yard and beat him. Mr. Barrett had been shot four times.

After unsuccessfully attempting to provide first aid to Trooper Eales, Tact Team members transported him to a local hospital, where he was pronounced dead. A search of Mr. Barrett's property, including his house and outbuildings, failed to yield methamphetamine. The government seized items that it contended were related to the production and use of methamphetamine, including coffee filters, pseudoephedrine, ephedrine tablets, red phosphorus, and iodine.

### B.   Three Trials

#### 1.   State Trials

Mr. Barrett was tried in Oklahoma State court, twice, as set out more fully in the Procedural History. The state court jury rejected the first-degree murder charge and instead found Mr. Barrett guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Mr. Barrett guilty of the lesser-included offense of assault and battery with a dangerous weapon.  The jury acquitted Mr. Barrett on the two counts of discharge of a firearm with intent to kill.  Mr. Barrett did not appeal his convictions or sentences.

#### 2.   Federal Trial

Mr. Barrett's federal trial was markedly different from his state trials. In the first phase, most notably different was the testimony of seven informants, who did not testify in either

of the state trials. The identity of these snitches was not made known to the defense until days before the trial was about to start. These snitches came forward with statements that Mr. Barrett allegedly made about "going down in a blaze of glory" and the like.

At the sentencing phase of Mr. Barrett's trial, the government presented testimony with respect to victim impact and future dangerousness. In the category of future dangerousness, the government presented the following witnesses:

1. Stanley Philpot, a Sequoyah County reserve deputy sheriff, who testified about an incident in which he stopped Mr. Barrett in his truck and informed him of the outstanding felony warrant for his arrest. Stanley followed Mr. Barrett home, at which time Mr. Barrett allegedly stood on the porch holding a gun. Stanley called for back up but neither Mr. Barrett nor the gun could be found.

2. Johnny Philpot, former Sequoyah County Sheriff, who testified that he was called as back up for the above incident.

3. Cindy Crawford, who testified that Mr. Barrett allegedly held a gun to her leg because she refused to sleep with him and said that he would "fucking kill her" if she came back to his place.

4. Charles "Monk" Sanders, who testified that he overheard Mr. Barrett on the phone in jail while they were both incarcerated. Sanders said he heard Mr. Barrett say that they needed to find the person who got him arrested so they could "kill that son of a bitch."

5.  Larry Lane, a Sequoyah County Sheriff's Deputy, who stated that Mr. Barrett ran a police check point and he pursued him until he ran off the road and ran away on foot.

6.  Shannon Smith, a former Sequoyah County Sheriff's Deputy, who was present at the checkpoint. Smith testified that Mr. Barrett pulled off so fast that two police officers had to jump out of the way. Smith also testified that on a different occasion he saw Mr. Barrett slapping his wife. Smith said that he told Mr. Barrett to stop and Mr. Barrett allegedly told Smith "he was going to get his gun and kill him."

With respect to victim impact, the government presented the following witnesses:

1.  William DeWeese, Rocky Eales' best friend from the Marine Corps, who testified that Trooper Eales was an outstanding person, an outstanding marine and like a brother to him.

2.  Nancy Eales Stalcup, Rocky Eales' sister, who testified that Trooper Eales was a wonderful person and a wonderful brother. Ms. Stalcup stated that Trooper Eales' death had a deteriorating effect on her health for which she had to receive medical care.

3.  Bobbie Eales, Rocky Eales' mother, who testified about her son and read a five-page written statement into the record that described her loss and pain.

4.  Gene Hise, an Oklahoma State Highway Patrolman and good friend of Rocky Eales, who testified about informing Kelli Eales of Rocky's death

and his loss and Post-Traumatic Stress Disorder since Trooper Eales' death.

5.    Kelli Eales, Trooper Eales' wife, who testified about her husband's death and the loss she has suffered. Mrs. Eales also read into the record statements her children had writ[ten.]

The mitigation stage of the sentencing hearing lasted less than three days.  There was no testimony regarding Mr. Barrett's mental health.

Mr. Barrett's counsel presented the following witnesses in mitigation:

1.    Maudeen Vann, First Deputy County Clerk, Sequoyah, Oklahoma, who testified as to the verdict in the state trial, the 30-year sentence Mr. Barrett received and was serving and the fact that he had no prior felony record.

2.    Kathy Trotter, Mr. Barrett's cousin, who briefly testified that everyone in the family grew up with guns and used guns. She also testified that she was a process server and familiar with the legal community and had no knowledge of Mr. Barrett's involvement in violent activities other than some instances of domestic violence.

3.    Jimmy Wilson, a case manager at the Oklahoma Department of Corrections, who testified as to the actual time Mr. Barrett would serve on his state sentence, the type of facility in which he would serve his sentence, his restrictions and his possibility of parole.

4.    Abby Stites, Mr. Barrett's former wife, who testified about their troubled marriage and that it was not all Mr. Barrett's fault; she was equally to blame

5.    Craig Edgmon, Mr. Barrett's neighbor, who testified that Mr. Barrett was a good mechanic and worked on his car, truck and farm equipment.

6. Clyde Edgmon, Mr. Barrett's neighbor and Craig Edgmon's father, who also testified that Mr. Barrett was a good mechanic who charged a fair price and sometimes did work for no charge. Mr. Edgmon also testified that law enforcement (John Owens and Sandy Gerdner) came by his house when Mr. Barrett was working on Mr. Edgmon's truck and talked to Mr. Barrett for some time. This was a very friendly exchange that took place three to six months before the raid.

7. Robert Gude, a former jailer at the Sequoyah County Jail, who testified about the conditions at the Sequoyah County Jail and Mr. Barrett's behavior at the jail.

8. Courtney Burke, an assistant administrator at the Sequoyah County Jail, who testified regarding Mr. Barrett's behavior while housed at the jail.

9. Martin Daggs, a bail bondsman in Sequoyah County who had bonded Mr. Barrett out of jail on the 1997 drug case. Daggs testified that he was aware of the bench warrant but never did anything to make Mr. Barrett aware of the bench warrant because a judgment of forfeiture had never been ordered.

10. Steve Barrett, Mr. Barrett's brother, who testified superficially about his and Mr. Barrett's childhood.

11. Roger Crawford, Mr. Barrett's uncle and neighbor, who testified that Mr. Barrett was a good father, a good son, a good neighbor and good mechanic.

12.     Gelene Dotson, Mr. Barrett's mother, who testified superficially about Mr.

Barrett's childhood, his marriage and his adult life.

13.     Ernest Barrett, Mr. Barrett's father, who testified superficially about Mr.

Barrett's youth.

14.     Doris Barrett, Mr. Barrett's stepmother, who testified that Mr. Barrett was

like a son to her.

**III.   Claims for Relief**

> **Claim 1.     Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments

made elsewhere in this Motion and the exhibits thereto.

Actions of the trial court denied Mr. Barrett a fair trial under conditions required

or routinely provided to similarly situated defendants pursuant to 18 U.S.C. §§ 3005, 3006A, and

3599, the Judicial Conference's Guidelines for implementation of the Criminal Justice Act,

prevailing professional norms of criminal defense practice, and the Fifth, Sixth, Eighth, and

Fourteenth Amendments to the United States Constitution.[1]

---

[1] As stated *supra* in § I.B, this claim and others presented in this Motion rely upon witness accounts of the trial judge's on- and off-the-record interference with Mr. Barrett's defense.  Mr. Barrett respectfully submits that the law requires the trial judge to disqualify himself from ruling on this motion, and from any decisions respecting the process for ruling on this motion.  28 U.S.C. §§ 455(a), (b)(1), (b)(3), (b)(5)(iv);  *In re Murchison*, 349 U.S. 133, 136 (1955); *Marchu v. United States*, 926 F.3d 50, 59 (1st Cir. 1991).  Mr. Barrett objects to the trial judge making any rulings in respect of this motion.

Judicial interference with defense counsel carrying out their constitutional function as opponents of the Government violates the Sixth Amendment, without a showing of prejudice. *Geders v. United States*, 466 U.S. 648 (1976) (trial court's order prohibiting defense counsel from consulting with defendant during recess between direct and cross-examination); *Herring v. New York*, 422 U.S. 853 (1975) (order barring defense counsel from summing up in bench trial); *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972) (rule requiring defendant to testify before any other witnesses denied defendant benefit of counsel's advice and guidance); *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961) (denial of counsel at arraignment where defenses had to be raised); *Ferguson v. Georgia*, 365 U.S. 570 (1961) (where state rule made defendant incompetent to give sworn testimony Constitution required that counsel be permitted to guide unsworn statement). While Mr. Barrett need not show prejudice from the court's actions described in this Claim, he can make that showing and does so in Claims 2, 3, 5, and 14, *infra*.

The trial court's stated interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and its communications with counsel created a conflict between the court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense. *Woods v. Georgia*, 450 U.S. 261 (1981).

The evidence presented herein demonstrates that the trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases. The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as "a 'class of one,' . . . intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). *See also*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

The trial judge's conduct towards Mr. Barrett's interests and his counsel violated the Code of Judicial Conduct and was not impartial. "No matter what the evidence against (a defendant), he had the right to have an impartial judge." *Tumey v. Ohio*, 273 U.S. 510, 535 (1927). Partiality on the part of a judge in a civil appeal violates due process. *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813 (1985). The Supreme Court has "emphasized the special importance of fair procedure" in death penalty cases, including giving adequate notice to the defense of the judge's plans. *Lankford v. Idaho*, 500 U.S. 110, 125 (1991), quoting and citing, *Gardner v. Florida*, 430 U.S. 349, 357 (1977).

Federal law provides that the court shall consider the recommendations of the Federal Defender when appointing counsel. 18 U.S.C. § 3005. Pursuant to the Judicial Conference's *Guidelines for the Administration of the Criminal Justice Act and Related Statutes* ("CJA Guidelines") the Federal Defender and the court should take into account "the facts and circumstances of the case to determine the qualifications which may be required to provide effective representation." (CJA Guidelines, ¶ 6.01(B)(1)). Courts are encouraged to appoint counsel who "are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation." (CJA Guidelines ¶ 6.01.)

Judge Payne initially expressed a desire to appoint the Federal Defender to represent Mr. Barrett. When the Federal Defender informed Judge Payne that the only attorney in his office qualified to handle a capital case was already appointed to such a case, Judge Payne indicated that he anticipated the assistant federal defender who normally worked in the Eastern District would be responsible. The Federal Defender explained that the attorney was not

qualified and his office could not provide competent representation to two capital defendants at the same time.

Two Federal Defenders and an assistant federal defender recommended that the court appoint John D. Echols and Robert Nigh of Tulsa, based on their past capital defense experience and, in Mr. Echols's case, his demonstrated commitment to Mr. Barrett's defense. (Decl. Julia O'Connell; Decl. John D. Echols). Judge Payne indicated he preferred to have the Federal Defender appointed so the court would not have to authorize funds for Mr. Barrett's representation. (Decl. Julia O'Connell).

During discussions with these attorneys, the trial judge expressed an interest in considering factors that are not recognized by the Judicial Conference or national indigent defense organizations as indicative of an attorney's qualifications to provide effective representation. Judge Payne expressed an interest in appointing less-qualified attorneys to represent Mr. Barrett as a means of giving local attorneys experience so that a local panel could be formed for representation in capital cases. (Decl. Julia O'Connell; Decl. John D. Echols). To this end, the trial judge rejected the recommendation of Robert Nigh and appointed Roger Hilfiger, based in part on Mr. Hilfiger's past experience as United States Attorney for the Eastern District of Oklahoma. *Id.*

The CJA Guidelines provide that courts budgeting federal death penalty cases should ask counsel for the "best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) likely to be needed through the guilt and penalty phases of the trial." (CJA Guidelines, ¶ 6.02F(3)(C)(ii)). The Judicial Conference's guidelines also provide that these "[c]ase budgets should be submitted *ex parte* and filed and maintained under seal." *(Id.* at ¶ 6.02(F)). The trial court in this case required a high degree of specificity, and

Def's § 2255 Mot.                                   20                          *U.S. v. Barrett,* 6:04-CR-115-JHP-SPS

threatened to reverse the prior order Judge White entered authorizing *ex parte* submissions if counsel did not disclose "a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case)." Letter from Hon. James H. Payne to John David Echols dated 2/22/05 ("Payne Letter to Echols").

Judge Payne expressed a desire that the case rapidly proceed to trial. (Decl. John Echols). On January 7, 2005, the court admonished Mr. Barrett's attorneys for failing to mention the need for a continuance during a status conference earlier in the day. Doc. 31. The court said, "Counsel is reminded this is a death penalty case, which should be given the highest priority by counsel." *Ibid.*

On January 31, 2005, Mr. Barrett's counsel filed a detailed, 10-page, budget proposal. (Doc. 46.)

Like the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the Judicial Conference's guidelines recognize the importance of prompt authorization of funds so that delay will not result in a denial of effective representation. The CJA Guidelines encourage courts "to employ[] an *ex parte* pretrial conference in order to facilitate reaching agreement on a litigation budget at the earliest opportunity," ¶ 6.02(F)(3), and encourage courts to "act upon requests for services where prompt authorization is necessary for adequate representation." (¶ 6.02(F)(5)). The trial court in this case did not hold such a conference.

On February 7, 2005, Mr. Barrett's counsel filed amended, more detailed budget proposals. Docs. 50, 51. On February 22, 2005, the court sent lead counsel a two-page single-spaced letter listing six categories of questions and concerns the court had about Mr. Echols, but

not about Mr. Hilfiger's representation.  (Payne Letter to Echols).  Throughout the letter, Judge

Payne expressed concern that Mr. Echols was being paid to represent Mr. Barrett in a third trial,

and expressed the view that no further investigation should need to be done after the previous

trials.  *Ibid.*  Mr. Echols responded by letter on February 28, 2005.  (Letter from John David

Echols to Hon. James H. Payne dated 2/28/05).

As noted *supra*, the statutes and guidelines related to case budgeting in federal

death penalty cases state a preference for *ex parte*, sealed proceedings in order to protect defense

confidentiality.  The trial court in this case expressly considered using Mr. Barrett's budget

submissions to aid the prosecution.  In his letter to Mr. Echols, Judge Payne stated that lifting the

order on *ex parte* budgeting "might actually help resolve this case more expeditiously by

allowing the government an earlier opportunity to object to the admissibility [of Mr. Barrett's

experts] and perhaps allow the court to rule on the admissibility issues prior to expenditure of

funds for experts which might not be allowed to testify at trial."  (Payne Letter to Echols at 2).

Mr. Echols objected that this proposal would infringe on Mr. Barrett's Sixth Amendment rights,

and it was not implemented.

On February 28, 2005, Mr. Echols  informed the court that delays in authorization

of a budget for any defense preparation was endangering counsel's ability to prepare for trial on

the court's schedule.  (Echols letter to Payne at 5).  The court did not rule on the defense's budget

proposal until March 18, 2005.  Doc. 97.  At that point, discovery was scheduled to close on May

11, 2005, and trial was scheduled to start on July 11, 2005.  (Scheduling Order filed 12/11/04

(Doc. 22)).

Richard Burr, an attorney retained by the Office of the Defender Services of the

Administrative Office of the United States Courts, served as an advisor to Mr. Barrett's counsel,

John Echols, through the auspices of the Federal Death Penalty Resource Counsel project ("FDPRC").  (Decl. Richard Burr; Decl. John D. Echols).[2]  As Mr. Burr stated to the court at the time, the FDPRC collects "data on the initiation and prosecution of federal capital cases, and on the defense services provided in such cases."  (Decl. Richard Burr re attorney compensation dated 4/4/05 and filed as Exh. B to Doc. 107).  Mr. Barrett's counsel relied upon the data collected by the FDPRC in making his funds requests.  (Echols letter to Payne).

The trial court's funding decisions were based on the judge's subjective view of what was "'reasonably necessary' to provide fair compensation and to provide the defense with necessary tools for a fair trial."  (Order filed 3/18/05 at 2.)  However, the court's reasoning in denying specific requests was inconsistent with the Sixth Amendment role of counsel in exercising independent professional judgment and providing an adversarial testing of the prosecution's case.  *Polk County v. Dodson*, 454 U.S. 312, 320-22 (1981).

The trial court had before it declarations of independent expert counsel regarding the prevailing professional norms of capital defense practice in federal death penalty cases, including courts' decisions validating these norms through the allocation of funds to similarly situated defendants.  (*See* Decl. Richard H. Burr).  The trial court's order evidences no consideration of these norms or practice, whether adversarial and judicial.  The trial judge's order evidences no consideration for the specific needs of counsel as expressed in their funds requests.  The trial judge's limitations on funds were not based on any evidence of or expressed concern for fiscal limitations.

---

[2]  Mr. Burr offered his assistance to Roger Hilfiger, but Mr. Hilfiger did not seek any assistance.  (Decl. Richard Burr).

As expert counsel advised the court at the time,

> in the GUIDE TO JUDICIARY POLICIES AND PROCEDURES, Vol, VII, "Appointment of Counsel in Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), Courts are encouraged in the course of case budgeting to secure counsel's "best preliminary estimate that can be made of all services," including the services of counsel.

> []       It is clear that the reason the attorney services were not included in the pre-authorization and circuit review provisions of 21 U.S.C. §§ 848(q)(9) and (10)(B) is that attorney services, to be meaningful, must be provided as the professional judgment of the attorney dictates and cannot, therefore, be subject to pre-authorization without significantly interfering with, even paralyzing, the process of representation.

> For this reason, the inclusion of attorney services in the case budgeting guidelines of the GUIDE TO JUDICIARY POLICIES AND PROCEDURES is intended, *not* to interject the courts into case management, but to require *counsel* to assess the representation needs of the case in order to give the courts a way of projecting what counsel believes to be reasonable expenditures of time.  If the expenditure of attorney time thereafter begins to depart in substantial ways from these projections, the budgeting of attorney time provides a basis for the court to question the attorney about the necessity of his or her efforts.  This is the way in which the federal courts have uniformly approached the matter of budgeting attorney time in capital cases - with due deference to the exercise of attorney judgment, but with a basis for questioning certain expenditures of time.

(Decl. Richard H. Burr dated 4/4/05, filed as Exh. A to Doc. 107).

Investigation is a core function of defense counsel.  ABA Standards for Criminal Justice, Standard 4-4.1 (requiring "prompt investigation").  The relevant guidelines to administration of the Criminal Justice Act provide that "upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court should authorize the defendant's attorneys to obtain such services."  The trial court authorized funds for Mr. Barrett's representation on a far more narrow basis.

Indeed, the trial court's funding order went beyond the simple approval or denial or funds.  Mr. Barrett's trial counsel requested funds to investigate and develop evidence for the

defense.  (Doc. 51; Echols letter to Payne).  The trial court refused to permit trial counsel to expend funds in investigation based on their independent professional judgment.  (Order filed 3/18/05 at 2 n.2.)  The court stated that it would not approve payment of vouchers for investigative services unless counsel filed "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial."  *Ibid.*  This threat was contrary to the CJA Guidelines which provide in relevant part: "Courts, in examining the case budget, may reconsider amounts authorized for services prior to the budget's approval; however, *courts shall not rescind prior authorization where work has already been performed.*"  (CJA Guidelines, ¶ 6.02(F)(5) [emphasis added]).

The trial judge's conditioning of funds on his subjective evaluation of the significance of the facts counsel sought to investigate barred or chilled investigation into factual matters trial counsel deemed necessary through their exercise of independent professional judgment.  If Mr. Barrett had been represented by private counsel or an independent indigent defense office, the investigation of his case would not have been limited to factual issues that had "significance" to the person paying counsel.

As set forth more fully in Claim 3, *infra*, the court reduced the compensation rate of Mr. Barrett's investigator from the private investigator rate of $50.00 per hour to the rate charged by a state-subsidized agency for its salaried investigators.  Order filed 5/5/05 at 3 n.1.  In the court's initial order reducing the rate, the court did not disclose the state agency's rate as the basis for the reduction.  *(See* Order filed 3/18/05 at 2.)  This limitation meant that for Mr. Barrett's investigator, compared to his other cases, he lost $20.00 for every hour spent working on Mr. Barrett's case.

Def's § 2255 Mot.                               25                               *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Burr compared this Court's March 18, 2005 order reducing resources for Mr. Barrett's defense with the data collected by the FDPRC.  Mr. Burr informed the trial court:

> The number of hours needed for fact investigation of course varies from case to case.  The number of hours requested here, however, is below the average for federal cases in which the death penalty has been authorized.  The average number of hours approved for fact investigation in authorized cases is closer to 500 hours.  The 100 hours approved by the Court is certainly enough to get a fact investigator started, but since it is far less than counsel has estimated is needed, approving only 100 hours now means that counsel in the near future will likely have to submit another request for approval of additional hours.

(Decl. Richard H. Burr re Non-Attorney Costs, dated 4/4/05, filed as Exh. C to Doc. 107).  The court treated this statement as an "illustration" that Mr. Barrett's counsel "have the attitude that the budget in this matter is unlimited . . . ."  (Order filed 5/5/05 (Doc. 128) at 3 & n.1.)

The trial court did not merely deny funds to Mr. Barrett's defense, it interjected into the funding denial a false impression of the evidence that would be admitted at trial.  The court denied 75 percent of the time and one hundred percent of the in-court assistance trial counsel requested from a ballistics and crime scene reconstruction expert.  (*Compare* Doc. 50 at 7 *with* Order filed 3/18/05 at 3).  At the same time, the court said, "Counsel should be aware that this Court has, [*sic*] never allowed crime scene reconstruction to be introduced in trial."  (Order filed 3/18/05 at 3).  Trial counsel did not consult a crime scene reconstruction expert.  (Tr. 10/3/05 Hr'g at 8).  The court's ruling gave counsel an unwarranted impression of the need to consult with a crime scene reconstruction expert and left counsel with no ability to bring such an expert to court to testify or assist in cross-examination.  Contrary to the impression given by the court's March 18 order, the court permitted the Government to present and place heavy reliance upon crime scene reconstruction evidence.  (*See* R. 3154-3484).

As set forth more fully in Claim 3, *infra*, the trial court denied in full or in majority all Mr. Barrett's requests for expert and investigative services.  The court stated no basis for any denial or reduction related to the facts or circumstances of the case.  Based on the FDPRC's data regarding other capital cases, the court's ruling against Mr. Barrett was unique.  Mr. Burr informed the court at the time that Mr. Barrett's request for a mitigation specialist was "well below average," and "no federal court ha[d] failed to provide expenses for mitigation specialists' work."  (Decl. Richard H. Burr dated 4/4/05, Exh. C to Doc. 107).  Where this court denied funds for experts to travel as part of their work on Mr. Barrett's defense, Mr Burr found that "[t]ravel expenses - lodging, meals, and transportation - are always provided, as are any other expenses incidental to the expert's ability to provide services."  *Id.*  Where this court permitted Mr. Barrett's counsel to retain only one mental health expert, regardless of the circumstances, the FDPRC found, the "standard practice in federal capital cases is to provide the services of more than one mental health expert."  *Id.*

The trial court paradoxically relied upon the experienced judgment of trial counsel as grounds for denying requests they made based on their considered professional judgment.  For example, the court denied counsel's request for a jury consultant on the ground that trial counsel had extensive experience picking juries.  (Order filed 3/18/05 at 3.)  This ruling was influenced by the trial judge's personal choice of trial counsel.  The trial judge personally selected  Roger Hilfiger to represent Mr. Barrett against the recommendations of experienced defense counsel.  (Decl. Julia O'Connell).  The trial judge then relied upon his own subjective view of Mr. Hilfiger's experience, not as a defense lawyer, but as the former United States Attorney as a reason for denying counsel's request for a jury consultant.  (Order filed 3/18/05 at 3.)  However, as set forth *infra* this ruling did not bind Mr. Hilfiger as it would have bound Mr. Echols.

The trial judge hampered trial counsel's ability to prepare a defense by at first denying, then delaying, authorization for counsel to obtain the prior testimony of prosecution witnesses.  (Order filed 3/18/05 at 4.)  The court's reasoning is contrary to the purpose of the right to counsel.  Where the Supreme Court has held that the purpose of defense counsel is opposing the prosecution, the trial judge initially denied access to the second state trial transcripts on the ground that "the government has indicated they do not need the prior transcripts to try this case. If counsel for the government are able to try this case without prior state court trial transcripts, defense counsel should be able to do the same." *Id.* at 5.  Just as the right to cross-examine witnesses depends upon the availability of counsel, so too does the right depend upon the court not denying counsel access to readily available sources of cross-examination.  *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

Initially, the court would not permit the second state trial transcripts to be obtained "unless convinced the testimony of said [prior] witness is critical to the issue of the defendant's intent as it relates to the elements of the offenses charged herein."  (Order filed 3/18/05 at 6.)  The court later rescinded this limitation and permitted counsel to obtain the transcripts they had been seeking since January 2005.  *(See* Doc. 23.)  Although some transcripts were obtained, the delay caused by the trial judge prevented preparation of transcripts before each witness who testified previously testified in federal court.  The delay also impeded or prevented defense counsel's preparation for cross-examination.  *See* Claim 2A, *infra*.

The trial court also limited the ability of defense counsel to prepare for and conduct cross-examinations by denying access to transcripts of witnesses' testimony in earlier federal hearings.  (Order filed 3/18/05 at 6.)  This ruling was especially arbitrary and unfair in that the court could have provided Mr. Barrett's counsel these transcripts without making it part

of the budget.  The Criminal Justice Act specifically provides that court reporters may be paid separately for preparing transcripts in cases of indigency.

Congress, the Judicial Conference, and every professional association concerned with criminal defense practice have expressed the view that cases involving the death penalty require higher degrees of skill and greater preparation than other criminal cases.  The trial judge in this case compared the budget for Mr. Barrett's case only to unidentified budgets in non-capital criminal cases.  *(See generally* Orders filed 3/18/05 and 5/5/05.)

The court's rejection of Mr. Echols's proposed budget was part of a pattern of interference with, or indifference to, Mr. Barrett's legal representation.  As stated *supra*, the trial judge initially wanted to appoint two local attorneys to represent Mr. Barrett so that the capital experience of the local bar would be increased.  (Decl. Julia O'Connell).  In his letter to Mr. Echols in February 2005, Judge Payne indicated he had appointed Mr. Echols, at least in part, because Echols and the Public Defender left him with the understanding that "there would be a substantial savings in the amount of time that would be required for [Echols] to represent the defendant."  (Payne letter to Echols).

As stated *supra*, the trial court required Mr. Echols, as lead counsel, to submit very detailed and specific budget requests.  On April 1, 2005, the Magistrate Judge recommended denying Mr. Echols any compensation for time spent preparing those budgets.  The CJA Guidelines specifically provide that time spent on case budgeting in *capital* cases is compensable.  Mr. Burr submitted a declaration to the Court regarding the extraordinary nature of the ruling against Mr. Echols's voucher:

> In every federal capital case with which the members of our project are familiar -
> which is virtually all such cases since the inception of the Federal Death Penalty
> Resource Counsel project in 1992 - defense counsel have been compensated for

their work in seeking funding for the services of defense investigators and experts. We know of no other case in which the court has refused to compensate counsel for such work. The reason for this is that, in seeking funding for these services, counsel is required to plan the defense investigation and litigation, determine the specific need for investigation and expert assistance, identify appropriate, competent investigators and experts, and contact a number of investigators and experts to discuss the merits of the case and the need for their services and to determine whether those investigators and experts are actually appropriate and available. All of these efforts are in direct service to the client. Unlike the preparation of defense counsel's CJA 30 vouchers, through which counsel is compensated - and for which courts usually do not compensate counsel, the work of counsel in seeking finds [*sic*] for investigation and expert assistance is of no financial benefit to counsel. Its sole purpose if [*sic*] to assist the client in his or her defense.

(Decl. Richard H. Burr re Compensation for Budgeting, dated 4/14/05, filed as Exh. to Doc. 118). The trial court denied Mr. Echols compensation, because lawyers in the Eastern District in *non-capital* cases were not compensated for budgeting. (Order filed 5/5/05 at 4.)

Mr. Echols's budget submissions were based in part on advice and data regarding other federal death penalty cases that Mr. Echols received from Federal Death Penalty Resource Counsel. Only Mr. Echols sought the advice of these experts; Mr. Hilfiger did not. (Decl. Richard Burr; Decl. John D. Echols). Although compensation for consultation with expert counsel is specifically authorized by the Criminal Justice Act and 18 U.S.C. § 3599(f), the Magistrate Judge recommended denying payment for Mr. Echols's consultations, and Judge Payne upheld this ruling. (Order filed 5/5/05.)

On April 4 and 6, 2005, Mr. Echols filed motions seeking reconsideration of the March 18 budget order and April 1 report and recommendation regarding vouchers. These filings sought a budget conference as provided in the CJA Guidelines and included four declarations from Federal Death Penalty Resource Counsel, Richard Burr, some of which are

Def's § 2255 Mot.                              30                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

quoted herein, regarding the CJA Guidelines and statements that the restrictions imposed by the court were unique in all the previously litigated federal death penalty cases.

On April 6, 2005, Mr. Echols also moved to withdraw as counsel for Mr. Barrett citing five circumstances that prevented him from providing effective representation: (1) the trial was less than four months away; (2) no final budget had been approved that was adequate to prepare a defense; (3) the denial of compensation for budgeting and expert consultation placed an unreasonable burden on counsel; (4) Mr. Hilfiger had not done any significant work on the case; (5) the requirements of the March 18 order impaired counsel's exercise of independent professional judgment. Doc. 113. Mr. Hilfiger had urged Mr. Echols not to file the motion. (Decl Richard Burr; Decl. John D. Echols). However, during a hearing on the motion, Mr. Hilfiger did not join in Mr. Echols's concerns about the budget order. (Decl. John D. Echols).

Mr. Echols stated as one ground for his motion to withdraw: "The relationship between the undersigned and co-counsel, Roger Hilfiger, is cordial, but we have not been able to work effectively together, and virtually all of the work performed on pleadings, budgeting and other issues has been performed by Mr. Echols." (Doc. 113 at ¶ 4.) In granting Mr. Echols's motion, the trial judge attributed to Mr. Echols the assertion that "he is unable to work with co-counsel Mr. Hilfiger," and omitted the information about Mr. Hilfiger's lack of work. (Order filed 5/5/05 at 5.) The court instead focused on Mr. Hilfiger being "more familiar with practice before this Court than Mr. Echols." *Ibid.*

In granting Mr. Echols's motion to withdraw the court expressed displeasure with the amount of information Mr. Echols provided in his budget submissions. (Order filed 5/5/05 at 2-3.) The court permitted Mr. Echols to withdraw in part because his budget proposals had not "'set forth separately and with specificity the time each of the appointed attorneys anticipates

Def's § 2255 Mot.                              31                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

spending' on each of several categories." *Ibid.* (quoting Order filed 1/29/05 (Doc. 38)).  The record shows Mr. Echols filed lengthy budget requests describing the specific needs of the defense and, most, but not all the time, describing with particularity the experts he sought to hire and the work they would perform.  (Docs. 50, 51.)  Mr. Echols also sent Judge Payne a six page single-spaced letter detailing the amounts he and others were paid for Mr. Barrett's defense in state court, and what matters were not completely investigated there.

Judge Payne did not hold Mr. Hilfiger to the same standards as Mr. Echols. During the trial the court became concerned that Mr. Hilfiger and Mr. Smith would exceed the budget authorized on March 18, 2005.  (Tr. 10/3/05 Hr'g.)  In that event, Judge Payne said, "I think the safest thing to do maybe on the attorney's fees for October would be for y'all to analyze that and get me an amended budget just to -- I mean, just make your best guestimate."  (Tr. 10/3/05 Hr'g at 8.)

In his letter to Mr. Echols, Judge Payne expressed his concern that Mr. Echols not be unduly compensated for work if his prior representation of Mr. Barrett made further labors unnecessary.  The court had limited Mr. Echols's rate of compensation to $125.00 per hour.  On May 17, 2005, the day Mr. Hilfiger was made lead counsel, Judge Payne raised his compensation rate to $150.00 per hour.  (Tr. 10/3/05 Hr'g at 3.)

The concerns Mr. Echols expressed in his motion to withdraw about the lack of work Mr. Hilfiger committed to the case proved to be well-founded, although the court was again unconcerned.  On May 23, 2005, Mr. Barrett filed a motion seeking appointment of new counsel based, in part, on the assertion that the case loads of appointed counsel interfered with their ability to devote sufficient time to his defense.  (Doc. 135.)  Mr. Barrett's counsel did not file a response to the motion.  There was no hearing on the motion.

On May 24, 2005, the court denied Mr. Barrett's motion to replace counsel.  Doc. 137.  The denial was based in part on the "finding" that "[c]ounsel has a copy of the first state court trial transcript . . . ."  (Order filed 5/24/05 (Doc. 137) at 2 n.2.)  The denial was based in part on the court's belief that appointed counsel "will have adequate time to prepare for this particular case."  *Id.* at 2.  Subsequent events suggest there was no basis for these two statements in the May 24 order.

On May 26, 2005, trial counsel Hilfiger filed a motion to continue the trial date.  Doc. 138.  Counsel averred as one ground for the continuance that Mr. Hilfiger had "been presented with ten storage boxes of materials, discovery, motions and other paperwork from defendant's two State jury trials, including transcripts of the first State jury trial; and all of such material needs to be reviewed to determine its value for defensive purposes, in this new action."  (Doc. 138 at 1.)  Mr. Hilfiger was not specific about when he received the materials, but the evidence indicates it was between May 17, 2005, the day Mr. Hilfiger was made lead counsel, and May 26, the date of his assertion.  Regardless of the specific date, the record reveals no basis for the court's statement that Hilfiger possessed the record on May 24, and shows that whatever Mr. Hilfiger "possessed" on that date, he had not reviewed it during the six months that had elapsed since his appointment in November 2004.

Mr. Hilfiger's statement about not having reviewed the records from the state-court proceedings, including discovery and transcripts, indicates that he had not made a sufficient inquiry into the facts of the case to support the position he took on the budget during the May 5, 2005, hearing.  On May 17, 2005, the court directed Mr. Hilfiger to file by May 27, 2005, any supplemental budget request he deemed necessary.  (Tr. 10/3/05 Hr'g at 3.)  Assuming the trial court had learned on or before May 17, 2005, that Mr. Hilfiger had not become familiar with the

previous litigation over the previous six months, it was unreasonable for the court to give Mr. Hilfiger only 10 days to request supplemental resources.

In February 2005, Mr. Hilfiger informed Mr. Echols, and Mr. Echols informed the court, that Mr. Hilfiger believed he would need to spend 160 hours assembling and reviewing the files and records related to the case. (Doc. 50 at 4; Echols letter to Payne at 1 n.1.) On March 18, 2005, the court reduced to 80 hours the compensable time for Mr. Hilfiger – then second-chair – to complete these tasks. (Doc. 97 at 2.) In any event, it was impossible for Mr. Hilfiger to have completed these tasks between May 17 and May 27, and Mr. Hilfiger did not file an amended budget.

As noted *supra*, in January, when Mr. Echols was lead counsel, the court chastised Mr. Barrett's defense for failing to devote sufficient attention to the case that it could stay on schedule. (Doc. 31.) The court admonished counsel to give the case the "highest priority." *Ibid.* In May, when Mr. Hilfiger acknowledged that he had not reviewed the records from the prior state court proceedings, and after Mr. Echols and the lawyers' vouchers revealed the paucity of Mr. Hilfiger's work on the case, the trial court expressed no concern about Mr. Hilfiger's priorities, and simply granted the continuance. (Tr. 6/6/05 Hr'g; Doc. 142.) In September, Mr. Smith revealed that Mr. Hilfiger had not assembled the files and records related to the mitigation investigation that had been done in state court. (Tr. 9/9/05 Hr'g at 43.) Again, the court was not concerned with new counsel's priorities.

Mr. Hilfiger himself had informed Mr. Echols and the court that it would take him as second-chair 300 hours to prepare for trial, *not* including court hearings, legal research and preparation of pleadings and briefs. (Doc. 51 at 4.) On October 3, 2005, with the trial underway, Mr. Hilfiger informed the court that he had worked approximately 300 hours on the case,

*including* legal research and writing and preparation for and in all court proceedings.  (Tr. 10/3/05 Hr'g at 5.)  Whereas the court had expressed a great deal of skepticism about Mr. Echols's requests for compensable hours, Mr. Hilfiger's statements prompted no expressions of concern.

In other respects, the record does not support the inference that Judge Payne's treatment of Mr. Echols was based either on fiscal concerns or concern for Mr. Barrett's representation.  The trial court denied Mr. Echols's request for a jury consultant on the ground that, "Each of defense counsel come before this Court with combined practical experiences on in excess of sixty years in selecting criminal juries, including Mr. Hilfiger's experiences as United States Attorney for the Eastern District of Oklahoma."  (Doc. 97 at 3.)  If counsel's allegedly vast experience supported their professional judgment in selecting the jury, as the court conjectured, there was no reason for the court to reject the same professionals' judgment that they required the assistance of a jury consultant.

As noted already, after he was elevated to lead counsel, Mr. Hilfiger filed no supplemental budget request.  On September 9, 2005, Mr. Hilfiger informed the court that he would be relying upon a private jury consultant.  (Tr. 9/9/05 Hr'g at 10.)  Mr. Hilfiger casually stated, "I'll assume Angie Cole will be coming in with us the next two weeks.  She's going to set at the counsel table with us during the selection."  *Ibid.*  The court recognized Ms. Cole's name and identified her as a jury consultant.  *Ibid.*  Despite the earlier denial of funds based on Mr. Hilfiger's particular experience, and the fact that the court was paying Mr. Hilfiger more than it had paid Mr. Echols, Judge Payne expressed no concern or objection to Mr. Hilfiger's unauthorized retention of an expert for two weeks of trial.  *Ibid.*  If Mr. Hilfiger had been able to obtain a jury consultant without funds from the court, he did not inform Mr. Echols of the fact.

In summary, Judge Payne had only reluctantly appointed John Echols to represent Mr. Barrett, and then based in significant part, at least, on the belief that Mr. Echols would be able to try the case cheaply and quickly.  Judge Payne personally chose Roger Hilfiger to represent Mr. Barrett for reasons that had nothing to do with the circumstances of Mr. Barrett's case, but for the purpose of using Mr. Barrett to develop a local capital defense panel.  During Mr. Echols's tenure, Judge Payne imposed requirements and restrictions on budgeting and investigation that experts concluded were unheard of in federal death penalty trials, and that intruded upon the constitutionally protected independence of counsel.  At one point, Judge Payne threatened to use counsel's budget proposals as a mechanism for finding defense experts' testimony inadmissible at trial.  When Mr. Echols left the case due to these restrictions, and Mr. Hilfiger sought no additional resources, Judge Payne's conduct towards defense counsel changed. Judge Payne permitted Mr. Hilfiger to show a lack of diligence and inattention to budget matters. Under these conditions, Mr. Barrett did not receive independent, reasonably funded, reasonably prepared, representation.

The trial judge also violated Mr. Barrett's right to due process, and the Code of Judicial Conduct, by conducting *ex parte* communications with the prosecutors.  During an *ex parte* hearing held September 13, 2005, the judge solicited the views of the United States Attorney regarding such matters as (a) when the trial started for purposes of 18 U.S.C. § 3432, (b) whether the defense should be entitled to a continuance based on delayed disclosure of witnesses, and (c) whether the disclosures posed a problem under Rule 404(b) of the Federal Rules of Evidence.  (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 22-23.)  Although the hearing was held for the purpose of disclosing information supposedly related to dangers to witnesses, the trial court

solicited the prosecutor's views on these other matters which did not involve discussion of any information that could not be disclosed to the defense.

Also during the *ex parte* portion of the hearing Assistant United States Attorney Michael Littlefield revealed that he knew the identity of a witness who failed to corroborate statements by informant, Charles Sanders.  (Tr. 9/13/05 Hr'g at 14, 17.)

The court's conduct during the *ex parte* portion of the September 9, 2005 proceedings, and its conduct in relation to those proceedings thereafter, violated Rule 2.9 of Canon 2 of the Code of Judicial Conduct.

After the *ex parte* portion of the hearing, and at the beginning of the hearing with defense counsel present, the court did not disclose the discussion regarding the meaning of § 3432, the discussion of the continuance, AUSA Littlefield's revelation about a witness, or the discussion of Rule 404(b).  (Tr. 9/13/05 Hr'g at 25-27.)  During the *ex parte* conversation, the judge revealed to the prosecutors that he had researched the § 3432 issue and found support for the proposition that the trial had started the previous day.  (Tr. 9/13/05 Hr'g at 4-5.)  The court permitted the prosecutor to represent, outside the presence of the defense, that the Government "and defense counsel have been operating under the inference that the trial begins on or after the 26th [of September]."  *Id.* at 7.

Once defense counsel was present, the judge did not reveal the findings of his research in relation to § 3432, though they were potentially helpful to the defense.  The court made no effort to confirm the prosecutor's representations, or familiarize itself with the defense attorneys' views on § 3432.

During the *ex parte* conference, the judge said the following regarding a possible continuance:

Def's § 2255 Mot.                    37                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

> Well, I – of course, the notice of who the witnesses are – the term ambush you are familiar with and I guess what concerns me is when these names are revealed with three days [*sic*] notice that we are going to have a request for a continuance. It would be difficult – if they are as important to the government's case as you say they may be, it looks like we are setting this case up for a long continuance.

(Tr. 9/13/05 Hr'g at 12.)  Then the prosecutors conferred off the record.  (At the conclusion of the *ex parte* conference the court said he would see the prosecutors "down stairs" indicating the conference occurred in chambers.)  During the hearing with defense counsel present, the judge did not share his views regarding possible ambush and defense potentially needing a long continuance.

The trial judge's statements showed the court was aware that the seven informant witnesses were very important to the Government's case.  Nevertheless, during the portion of the hearing with defense counsel present, and in subsequent related proceedings on September 14, 2005, the court did not bring up the female witness who failed to corroborate confidential informant Charles "Monk" Sanders, either to ask whether the witness had been identified to the defense or to notify the defense that the court had been informed of the existence of a witness who could impeach Sanders.

The judge misrepresented the content of the *ex parte* conference to defense counsel.  When the *ex parte* hearing concluded the judge and prosecutor were discussing Rule 404(b), with the court saying "there is 404(b) material obviously in the proposed motion, it appears to me."  (Tr. 9/13/05 Hr'g at 22.)  The prosecutor agreed "[i]t appears to be implicit." *Ibid.*  Then the prosecutor offered a rationale for not "provid[ing] reasonable notice in advance of trial," (Fed. R. Evid. 404(b)), and the judge said he would "take this matter under advisement" before calling the conference to an end.  *Id.* at 23.

At the beginning of the hearing with defense counsel present, the judge did not reveal these discussions.  The prosecutor sought guidance from the court regarding "where we were when we stopped" the *ex parte* conference.  (Tr. 9/13/05 Hr'g at 26.)  The court said they had been discussing "security issues."  *Ibid.*  The court said, "it sounded like there had been some discussion with defense counsel.  And that's about as much as the Court knows."  *Ibid.*  The transcript shows the court drastically understated the true scope of the *ex parte* communications.  Once they were thus misstated, the prosecutor said, "I'm willing for the matter to be unsealed."  *Ibid.*  Mr. Barrett's trial counsel were entitled to rely upon the court's representations.  The combination of the court's omissions and the prosecutor's sudden willingness for the hearing to be unsealed suggested to defense counsel the transcript need not be requested or reviewed.[3]

During the *ex parte* portion of the hearing, the judge made statements suggesting skepticism about the Government's position.  The court specifically and repeatedly emphasized that the Government had no evidence of any overt act by any person that would suggest the witnesses were in danger.  *Id.* at 20.  The court did not inform the defense that the government had failed to produce evidence of an actual danger to its witnesses.  Without disclosing the weakness of the Government's position, the court permitted defense counsel to agree (a) to further delays in learning the identities and contact information for the witnesses, and (b) to be limited in its access to Government witnesses to the extent that they would only be interviewed in the presence of Government representatives.  *(Id.* at 27.)

The court had another opportunity to inform defense counsel of what transpired during the September 9 *ex parte* hearing.  On September 14, 2005, after jury selection

---

[3]  Of course, whether it was unsealed during the trial was irrelevant insofar as Judge Payne had denied counsel any funds for obtaining pretrial hearing transcripts.  (Doc. 97.)

proceedings ended, the court raised the issue of the unidentified witnesses.  The United States

Attorney informed the court that the Government and Mr. Barrett's counsel had reached an

agreement that the witnesses' names, contact information, criminal histories and (allegedly)

promises made to them would be revealed the following Monday.  (R. 840.)  The United States

Attorney further advised the court that the defense would, possibly, have access to some of the

witnesses at the prosecutor's office.  (R. 841.)  Mr. Hilfiger stated that he had no objection to the

arrangement, "based on what we talked about yesterday."  *Ibid.*  The court then stated that this

would make a "clear record" and the parties' "announcement . . . resolves everything that is

under seal."  (R. 843.)

It is a violation of due process for the Government to attempt to restrict defense

access to witnesses, for example, by telling the witnesses they should only agree to defense

interviews if the Government is present.  *See Gregory v. United States*, 369 F.2d 185 (D.C. Cir.

1966), *cert. denied*, 396 U.S. 865 (1969).  It is unprofessional conduct for a prosecutor to

condition a witness's interview with defense counsel on the prosecutor being present.  (ABA

Standard 3-3.1(c) (commentary)).  The trial court permitted defense counsel for Mr. Barrett to

agree to such restrictions (Tr. 9/13/05 Hr'g at 27; R. 841-42), without revealing to the defense the

weaknesses in the Government's motion for a protective order that the court had freely discussed

with the prosecutors.

The trial judge's withholding of his views about a continuance was particularly

prejudicial.  Mr. Hilfiger has consistently and repeatedly stated that he agreed to the delays and

other restrictions on his access to information about the witnesses because he believed Judge

Payne would not grant a continuance of the trial.  (Decl. Mark Henricksen).  Judge Payne's

views, as freely expressed to the prosecutors, would have given Mr. Hilfiger a completely

different view of the situation.  If Judge Payne had revealed his research regarding § 3432, the issue would not have been reviewed for plain error on appeal.  If Judge Payne had revealed his views on a continuance, Mr. Hilfiger likely would have requested one, and again the matter would have been reviewed differently on appeal.  If Judge Payne had revealed his views on the weakness of the Government's motion for a protective order, Mr. Hilfiger would have had further grounds for a continuance and grounds for objecting to restrictions the Government placed on access to witnesses.  Mr. Hilfiger also would have had grounds for a continuance if Judge Payne had revealed that Mr. Littlefield knew the identity of an impeachment witness who had not been disclosed in discovery, as the court's earlier orders required.

The trial judge's conduct in soliciting *ex parte* the prosecutor's views on the court's private concerns while at the same time failing to accurately disclose those communications to the defense violated Mr. Barrett's right to due process of law.  The disparate conduct of the court between the prosecution and defense is evidence of bias.  In a capital case, courts may not consider information the defense has no opportunity to hear or explain.

For the foregoing reasons, the trial judge should recuse himself from this case.  Thereafter, this Court should grant the relief sought herein.

To the extent the matters raised in this Claim could have been raised on direct appeal, appellate counsel were ineffective.  As stated *supra*, Judge Payne specifically selected Mr. Hilfiger for this case, and Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter.  Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal.  To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in this Claim could not be adequately litigated on appeal, because they required consideration of extra-record evidence.  (Decl. Mark Henricksen).  To the extent, Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.  (ABA Guidelines, *supra*, Guideline 10.15.1.)

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal.  (Decl. Mark Henricksen).  However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal.  *Id.*  Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards.  At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised herein had been raised on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 2.**　　　**Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. § 3006A and the Sixth Amendment to the United States Constitution**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

This claim is governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny.  The acts and omissions described herein fell

below prevailing professional norms of capital defense practice. Absent these acts and omissions, whether considered individually or collectively, there is a reasonable probability that Mr. Barrett would not have been convicted of the charged offenses, or that he would have received a sentence less than death.

A.      **Unreasonable Acts and Omissions Affecting the First and Second Stages of Trial**

The judgments of conviction and the sentence imposed on Mr. Barrett were obtained in violation of his Sixth Amendment right to effective assistance of counsel. As set forth in Claim 1, *supra*, the trial court interfered with the constitutionally protected independence of trial counsel. Numerous acts and omissions of Mr. Barrett's appointed counsel fell below the standards set forth in prevailing professional norms. *See generally, Rompilla v. Beard,* 545 U.S. 374 (2005)(result of second stage trial held unreliable due to counsel's failure to investigate prosecution evidence and provide material to relevant experts); *Wiggins v. Smith,* 539 U.S. 510 (2003)(result of second stage trial held unreliable due to failure of defense counsel to conduct thorough independent investigation for defense evidence); *Williams v. Taylor,* 529 U.S. 362 (2000)(result of second stage trial held unreliable due to defense counsel's failure to obtain documentary and testimonial evidence favorable to defense); *Kimmelman v. Morrison,* 477 U.S. 365 (1986)(deficient performance in first stage found where defense counsel failed to seek discovery and file appropriate motions); *Strickland v. Washington,* 466 U.S. 668 (1984)(test for violation of Sixth Amendment in both stages of capital trial is (a) whether counsel's conduct fell below prevailing professional norms; (b) whether there was a reasonable probability of more favorable result).

Def's § 2255 Mot.                    43                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The trial court's stated desire to minimize costs associated with Mr. Barrett's defense and to appoint local counsel to this case for the purpose of establishing their credentials for appointment in future capital cases, *see* Claim 1, *supra*, created an actual conflict between the financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough investigation and a vigorous defense. *See Wood v. Georgia,* 450 U.S. 261 (1981). This conflict adversely affected counsel's performance in that they failed to obtain the services of numerous experts, failed to devote time to preparing for and conducting the trial that counsel himself had considered necessary prior to the court's rulings, and failed to use other resources as expected under prevailing professional norms. *See generally, Mickens v. Taylor,* 535 U.S. 162 (2002); *Cuyler v. Sullivan,* 446 U.S. 335 (1980); *Holloway v. Arkansas,* 435 U.S. 475 (1978). *See also* Claim 3, *infra.*

The facts supporting this claim include the following, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

### Overview of First-Stage Ineffective Assistance

Multiple acts and omissions of trial counsel fell below prevailing professional norms of capital defense practice, and, either individually or in combination with each other, undermine confidence in the guilty verdicts returned by the jury. These include:

1.      Trial counsel failed to professionally re-urge the motion to suppress the fruits of the search of Mr. Barrett's residence and property based on *Franks v. Delaware,* 438 U.S. 154, 156 (1978), after it was discovered, during the cross-examination of Charles "Monk" Sanders, that he was the confidential informant who provided the alleged probable cause for the no-knock warrant. Sanders testified on cross-examination that he did not provide District 27

Def's § 2255 Mot.                                  44                        *U.S. v. Barrett,* 6:04-CR-115-JHP-SPS

Drug Task Force agent Clint Johnson the information which formed the basis for probable cause. In fact, based on Sanders's testimony on cross-examination in the first stage of trial, any information he could allegedly provide did not support the averments made by Johnson in the affidavit for the search warrant. To the extent the issue was developed on the trial record, direct appeal counsel was ineffective for failing to raise the *Franks* issue.

2.      Trial counsel failed to professionally and properly investigate and develop evidence showing that Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms. This evidence (a) would have supported one or more defense theory instructions, (b) would have supported instructions on lesser-included offenses, and (c) would have effectively countered the Government's arguments on intent in both stages of trial.

3.      Trial counsel unreasonably failed to investigate Mr. Barrett's history of bipolar disorder and treatment with psychotropic medications, and the affects of Mr. Barrett not taking prescribed medications during trial. Consequently, Mr. Barrett was tried while incompetent, and was denied his right to a contemporaneous determination of competence.

4.      By acceding to an eleventh hour arrangement to "interview" the informant witnesses during trial, and by failing to move for a continuance, trial counsel was not able to effectively investigate and challenge the testimony of these witnesses. In any event, no professionally reasonable investigation into the backgrounds of these witnesses and their testimony was undertaken in whatever little time was available. Had a continuance been secured, and a professionally reasonable investigation been otherwise undertaken, the credibility of these witnesses and their testimony could have been effectively attacked.

5.      Trial counsel was professionally unreasonable in failing to develop and introduce independent expert testimony to challenge the crime scene reconstruction testimony of Iris Dalley.

6.       Trial counsel was professionally unreasonable for failing to hire an independent expert on SWAT tactics, instead of relying on a hostile, pro-prosecution witness who could do the defense case little, if any good.

7.      Counsel was professionally unreasonable for failing to utilize the transcripts from the second state trial to impeach the police witnesses.  Counsel was also ineffective for eliciting damaging hearsay testimony from Clint Johnson, and failing to correct this error with facts that would expose Johnson's answers as false.

8.      Trial counsel unprofessionally failed to develop available evidence and testimony that would have impeached the testimony of Government witnesses and the government's theory that because of the lighting on the police vehicles, Mr. Barrett "knew" that law enforcement, rather than civilian trespassers, had entered his property at the time he fired his weapon.

9.      Trial counsel unprofessionally failed to develop available evidence to counteract the Government's claim that Mr. Barrett knew he had an active warrant for his arrest on a state drug charge, rather than just a pending case.  This evidence would have undermined the Government's theory that Mr. Barrett was hiding from the law because he "knew" he had an active warrant, and was lying in wait for the police.  Likewise, trial counsel was professionally unreasonable for failing to develop available evidence that Mr. Barrett had been reluctant to leave his property for several years preceding his state drug case.  This would have countered the Government's argument that Mr. Barrett "holed up" on his property because he "knew" he had

an active warrant, and was making "preparations" to meet any police presence with force. Similarly, trial counsel unprofessionally failed to develop and present available evidence that Sequoyah County Sheriff John Philpot had been to Mr. Barrett's property a mere four weeks or so before the raid, and inspected Mr. Barrett's weapons without incident. This evidence would have supported the motion to suppress and shown that a no-knock warrant and an armed raid on Mr. Barrett's property in the middle of the night by numerous law enforcement officers was completely unnecessary and unfounded. Additionally, this evidence could have been used to effectively impeach Government witnesses and the Government's theory of the case.

10.   Trial counsel was professionally unreasonable for failing to object to the expert witness testimony of Jim Horn, which the court struck *sua sponte* because it did not meet the standards for admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 595 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150-51 (1999). To the extent this issue was framed by the record, direct appeal counsel was ineffective for failing to raise it.

11.   Trial counsel was professionally unreasonable in failing to object to certain matters that were raised on direct appeal, but were reviewed under the onerous plain error standard due to trial counsel's failure to object.

12.   Trial counsel unreasonably failed to seek appropriate jury instructions at both stages of trial including instructions on the theory of the defense, lesser included offenses, the questionably reliability of testimony from drug addicts and informants, and residual doubts about the manner in which the shooting occurred. If these instructions had been given, there is a reasonable probability the jury would have understood how to reach more favorable verdicts.

13.     Trial counsel was professionally unreasonable for failing to object to prosecutorial misconduct in closing arguments in both stages of trial.

**Evidence of Constitutionally Deficient Representation**

**1.     Failure to professionally re-urge the motion to suppress under *Franks v. Delaware,* 438 U.S. 154 (1978).**

Trial counsel was professionally unreasonable for failing to adequately re-urge the motion to suppress under *Franks v. Delaware, supra* following the first stage testimony of Charles "Monk" Sanders.  Counsel's failure in this regard undermines confidence in the jury's first stage verdicts.  Because it was shown during Sanders's cross-examination that the material averments made in the search warrant affidavit to secure a no-knock warrant were false, or were made in reckless disregard for the truth, all evidence seized in the search of Mr. Barrett's cabin and property was subject to suppression.  The failure to competently argue the *Franks* motion obviously undermines confidence in the outcome of the first stage of trial.  Because the search warrant was defective under *Franks,* the drug-related and firearms evidence which formed the basis for each of the three counts of conviction would have evaporated, leaving nothing upon which the jury could have returned guilty verdicts.

The information used to secure the no-knock search warrant in this case was based on information supplied to Clint Johnson, the affiant on the warrant, by an alleged confidential informant (C.I.)  The C.I. did not testify at Mr. Barrett's two state trials.  At the conclusion of the second state trial, Clint Johnson wrote the alleged informant's name on a piece of paper, and placed it in an envelope, which was sealed in the state court file.  (Tr. 1/ 26/05 Hr'g. at 88-89).  It was only when Sanders testified in the first stage of Mr. Barrett's federal trial that it was

revealed, for the first time, that Sanders was the alleged informant who supplied the information

providing probable cause. (R. 2521).

In pertinent part, the affidavit for the no-knock, nighttime search warrant state the

following:

> On September 18, 1999 this affiant was contacted by a confidential informant (CI) who advised that, within the past seventy-two (72) hours, they were in the above-described residence and observed a male that is known to the CI as Kenny Barrett present a quantity of white powder substance and represent it as being "methamphetamine."

> The CI went on to state that while in the above described residence they observed Kenny Barrett divide and exchange a portion of the white powder substance for a quantity of money. The CI stated that they had been in the above-described residence on previous occasions and observed Kenny Barrett make "drug transactions." The CI further stated that while in the above-described residence they overheard Kenny Barrett state "if the cops try to raid me they will regret it because I'm going to kill the first cop through the door."

> The C.I. also stated that while in the residence they [*sic*] observed several pistols lying around the residence and also Kenny Barrett had a pistol on his person.

> This affiant is familiar with Kenny Barrett due to a pending investigation for the past six (6) months and is familiar that [sic] Kenny Barrett has an outstanding felony arrest warrant out of Sequoyah County, Oklahoma for failure to appear for a jury trial and unlawful delivery of CDS case number CF-97-86.

> This affiant has learned from the CI that Kenny Barrett is maintaining his "drug transactions" in the night time hours due to the cover of darkness and that law enforcement personnel are less frequent [sic] at night.

> The CI further stated that Kenny Barrett, due to Kenny Barrett's belief that law enforcement personnel cannot execute search warrants during the night, sell's [sic] controlled dangerous substances at nighttime and keeps large quantities of meth-amphetamine in his residence at nighttime in order to be undetected by law enforcement personnel.

> This affiant asks that this search warrant be directed for day or night service due to the facts stated herein.

628

> This affiant received information from the informant on at least five (5) occasions. Each time that this informant has provided information, the information proved to be true and accurate and resulted in the confiscation of illegal substances.

Affidavit for search warrant signed by Clint Johnson and warrant signed by Sequoyah County Judge Dennis Sprouse on September 20, 1999.

On cross-examination in Mr. Barrett's federal trial, Sanders largely disavowed the information that was contained in the search warrant affidavit, and which allegedly supplied probable cause for the no-knock search.  Sanders's testimony on cross-examination demonstrates that the search warrant affidavit was knowingly based on false information, or that this "information" was supplied to the Sequoyah County District Court with reckless disregard for the truth.  Without the false information allegedly supplied by Sanders, there was clearly insufficient evidence to establish probable cause, let alone probable cause for a no-knock warrant.  In contrast to the representations made in the search warrant affidavit, Sanders testified to the following on cross-examination:

1.      That he never saw Mr. Barrett manufacture methamphetamine on his property, or attempt to do so, and that he never told Clint Johnson anything to indicate that Mr. Barrett was manufacturing or attempting to manufacture methamphetamine (R. 2596-97, 2609);

2.      That when he first met with Johnson after having been to Mr. Barrett's residence in July, 1999, he gave Johnson no information regarding drugs on Mr. Barrett's property.  He did not see any drugs on Mr. Barrett's property, and did not even do drugs with him on any occasion he was supposedly at Mr. Barrett's residence in July, 1999 (R. 2597-98);

3.      In September, 1999[4], Sanders, at Johnson's direction, allegedly went to Mr. Barrett's residence to exchange a set of car keys.  Based on when Sanders alleged this trip occurred, it was just days before the raid in the early morning hours of September 24, 1999.  A "day or two" after being at Mr. Barrett's, Sanders testified he was not asked by Clint Johnson whether he saw any drug activity at Mr. Barrett's on September 19 or 20.  Sanders testified that if Johnson had asked him about drug activity at Mr. Barrett's on September 19 or September 20, he "probably" would have told him that he saw no drug activity.  Sanders then testified, "I didn't see him doing nothing."  (R. 2608-2610);

4(a).      After allegedly being at Mr. Barrett's in mid-September, 1999, Sanders testified that Johnson directed him to again go back to Mr. Barrett's property.  Sanders testified that he told Johnson what he observed on this supposed trip to Mr. Barrett's.  According to Sanders, the pretext for going to Mr. Barrett's on this last occasion was to ask Mr. Barrett about the title to an automobile.  Sanders claimed to have been accompanied by his nephew.  Sanders thought that either he or his nephew asked Mr. Barrett if he had any drugs available.  Mr. Barrett apparently had no methamphetamine.  The only drugs supposedly seen by Sanders was a joint of marijuana, which he, his nephew, and Mr. Barrett smoked in Mr. Barrett's cabin.  (R. 2618-22);

4(b).      Sanders allegedly reported to Clint Johnson in the last meeting that he had seen guns at Mr. Barrett's.  He had also reported to Johnson seeing firearms at Mr. Barrett's residence when he allegedly visited in August, 1999.  To the extent Johnson in his affidavit presented this information as a new development to justify altering the existing bench warrant to

---

[4] Sanders placed the date of this alleged trip to Mr. Barrett's cabin as September 19 or 20, 1999.  The state search warrant was issued on September 20, 1999.  Of course, the precise dates of Sanders's alleged trips to Mr. Barrett's property are unclear.  *E.g.,* R. 2518-21, 2609.

Def's § 2255 Mot.                              51                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

a no-knock warrant, Johnson mislead the court.  Authorities had long been aware that like many rural dwellers, Mr. Barrett had firearms on his property.  In any event, the search warrant affidavit was directed at drug activity only, not the possession of weapons.  (R. 2623);

5.     Sanders's gave conflicting accounts of alleged visits to Mr. Barrett's shack which, together, show he did not observe any drug transactions there.  On direct examination, Sanders testified that in August 1999 he went to Mr. Barrett's home with a person identified only as "Ronny," and saw Mr. Barrett hand something to "Ronny."  Sanders testified that the alleged trip was for the purpose of buying drugs.  At the close of cross-examination, defense counsel walked Sanders through the information Sanders had given to Clint Johnson, according to Sanders's testimony on cross-examination.  Sanders agreed that when he was supposedly at Mr. Barrett's in July 1999 (a) he did not see any drugs, (b) did not see any manufacturing or attempted manufacturing of methamphetamine, and (c) did not do any drugs with Mr. Barrett.  Therefore, Sanders testified, based on his alleged July trips to Mr. Barrett's property, Sanders told Johnson *nothing* about Mr. Barrett engaging in drug activities.  Sanders also testified that when he supposedly went to Mr. Barrett's place in August 1999, with his sister and "Ronny," he saw no drugs, and told Johnson he saw no drugs or any evidence of drug manufacturing.  Sanders admitted he did not go into Mr. Barrett's house with "Ronny" (he waited in the car), and never testified he saw Mr. Barrett go outside.  How he saw any alleged drug transaction is therefore a mystery.  (R. 2599-2601, 2625-28).

Sanders agreed with defense counsel that he saw no drug manufacturing or other drug activity at Mr. Barrett's in September 1999, other than smoking a "joint" on what he claimed was his last trip to the property before the raid.  Aside from smoking a joint with Mr. Barrett on this occasion, the only drug activity he witnessed or participated in at Mr. Barrett's

Def's § 2255 Mot.                              52                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

residence was when he and Movant, who was also a methamphetamine user, shot methamphetamine together.  (R. 2625-28).

Sanders's cross-examination testimony also belied Johnson's claims (a) that Sanders informed him that Mr. Barrett conducted drug transactions at night because there were fewer police around, and (b) that Mr. Barrett kept a "large quantity" of drugs in his house at night because he believed the police could not conduct a nighttime search.  Of course, no "large quantity" of drugs were found when Mr. Barrett's residence and property were searched by the authorities.

After Sanders was cross-examined, AUSA Littlefield asked to take a "bathroom break."  (R. 2630).  The real purpose of the break was for Littlefield to talk to Sanders about his testimony.  Sanders admitted Littlefield talked to him during the break.  At first, he denied anything was discussed except how much longer he would be on the stand.  In the next breath, he then admitted that Littlefield "may have" asked him whether he was confused about dates. Sanders did not "think" Littlefied asked him about the substance of his testimony on cross-examination.  (R. 2239-40, 2642).

After speaking to Sanders during the break, Littlefield sought to repair the damage inflicted by Sanders's remarkably inconsistent testimony by having Sanders contradict, within a matter of a few minutes of the cross-examination having ended, certain aspects of the testimony he gave when questioned by defense counsel.  Sanders's abrupt about-face on re-direct alone demonstrates that this is a witness who cannot be believed about anything, and demonstrates that he was anything but the "reliable" confidential informant Clint Johnson claimed him to be in the search warrant affidavit.

On re-direct, and in contrast to his testimony on cross-examination, Sanders stated that when he went to exchange car keys at Mr. Barrett's residence three to four days before Trooper Eales's was killed, Mr. Barrett sold drugs to Geniece Thomas.[5]  He also claimed he went to Mr. Barrett's residence with Thomas on more than two occasions to buy drugs.  He also claimed that he saw drug activity practically every time he supposedly went to Mr. Barrett's property, and that he would have reported any such drug activity to his alleged "handler," Clint Johnson.  Changing up his testimony from cross-examination, Sanders then claimed that on his last alleged trip to Mr. Barrett's, he saw a substance in Mr. Barrett's cabin that he believed to be methamphetamine.  Again in contrast to his testimony on cross-examination, Sanders claimed he may have even been at Mr. Barrett's after the last supposed trip he testified about on cross, and that he could not remember how many times, during the summer of 1999 and into September 1999, he had been to Mr. Barrett's property.  (R. 2531-38).

On re-cross, Sanders contradicted himself in the same breath about whether he shot methamphetamine daily, gave conflicting answers as to whether there was a drug transaction at Mr. Barrett's when he supposedly went there with Geniece Thomas the first time, and again contradicted his testimony on cross-examination by stating that when he allegedly went to Mr. Barrett's with his nephew, he saw methamphetamine in addition to marijuana.  (R. 2642-48).

After Sanders testified, defense counsel re-urged the motion to suppress, but did so in a manner that did not comport with prevailing professional norms.  (R. 2677-80).  Defense

---

[5]  "Geniece" is the way Ms. Thomas's name is spelled in the transcript.  Her name is actually Janesse Thomas.  What she has to say about Mr. Sanders's account of their alleged trips to buy drugs at Mr. Barrett's residence is addressed in the portion of this claim relating to counsel's failure to investigate and effectively impeach the informant witnesses.  (*See also* Decl. Janesse Thomas.)

counsel argued orally that the motion to suppress was being re-urged because, based on Sanders's testimony on cross-examination, the warrant was based on "faulty" information. Clint Johnson, who had been questioned about the search warrant affidavit during the hearing on the motion to suppress, related certain information contained in the affidavit that Sanders specifically denied giving. Specifically, page 2 of the search warrant affidavit stated that the C.I. (Sanders) had advised Johnson within the last 72 hours he had been at Mr. Barrett's residence and observed Mr. Barrett present a quantity of white powder, which Mr. Barrett represented was methamphetamine. On cross-examination, Sanders stated there had been no discussion about what Sanders thought was methamphetamine in Mr. Barrett's kitchen. According to Sanders's testimony on cross-examination, there had been no representation that this substance was methamphetamine, and no presentation of the white powder to Sanders. The search warrant affidavit went on to state that the C.I. (Sanders) observed Mr. Barrett divide and exchange a portion of white powder for a quantity of money. Sanders testified on cross-examination that this did not happen. Defense counsel pointed out they were confronted with all this by the answers Sanders gave on cross-examination; there had been no opportunity to interview Sanders before he testified.

AUSA Littlefield responded that Clint Johnson had testified at the hearing on the motion to suppress, had testified under oath what he had been told by the C.I., and what facts had formed the basis for the search warrant affidavit. (R. 2679.)

The court instructed defense counsel to put the motion in writing, and for the Government to respond in writing. The court stated that it would either hold a hearing, if such was deemed necessary, or would rule on the pleadings. (R. 2679.) As pointed out by the Government in its response to the renewed suppression motion:

Def's § 2255 Mot.                        55                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The entire basis of defendant's Motion to Reurge the Motion to Suppress arises from "testimony" of Charles Sanders which was elicited on cross-examination. Specifically, Barrett relies upon the statement attributed to Sanders in the affidavit that he assumed a powder to be methamphetamine. Sanders purportedly testified that he did not advise Clint Johnson that Barrett represented such powder as methamphetamine to him purportedly denied telling Clint Johnson that he had observed Barrett divide and exchange a portion of white powder for quantity of money. [sic]  Barrett's Motion to Reurge ignores substantial portions of Sanders' testimony on direct and redirect examination.

(Doc. 231 at 1).

The court ruled on the renewed motion to suppress by written order, without conducting an evidentiary hearing.  (Doc. 253.)  In its ruling, the court noted that in the original motion to suppress, there was no *Franks* allegation, a rather irrelevant observation because the basis for the *Franks* claim occurred during trial.  Rather, it had been alleged that the C.I. did not really exist.  The court summarized at length aspects of Sanders's testimony, and concluded that, in light of the testimony of Johnson and Sanders, *as well as other witnesses to activities at Mr. Barrett's residence*, there was "absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful."  Because Johnson accepted as true what he was told by Sanders, and because Johnson had found Sanders to have given reliable information in the past, "the affidavit was properly supported."  Based on the totality of the testimony, it was concluded that Mr. Barrett had "not even established that the information provided in 1999 by the informant was untruthful or unreliable."  Thus, the court concluded, facts recited in the affidavit "could not have been made with deliberate or reckless disregard for the truth."  Doc. 253 at 7.

Had defense counsel forcefully and properly re-urged the motion to suppress based on *Franks v. Delaware, supra,* the motion by all rights should and would have been

sustained.  Moreover, as shown below, the court's order is seriously flawed.  Trial counsel urged only one (or at best two) grounds in support of the renewed motion to suppress based on *Franks*. These revolved around Sanders's assumption that a powder he observed at Mr. Barrett's residence was methamphetamine; Sanders's testimony on cross-examination that Mr. Barrett did not represent the powder to be methamphetamine; and the fact Sanders did not tell Johnson he saw Mr. Barrett divide and exchange a portion of the white powder for money.

The one or two areas of impeachment cited by the defense simply scratched the surface.  Based solely on the cross-examination of Sanders (as well as other factors that could have been used to impeach Sanders, but were not, as is discussed in another subpart of this claim for relief and Claim 5, *infra*), the defense could have argued much more, and would have been entitled to an evidentiary hearing and suppression of the evidence.  Aside from what was stated in the re-urged, counsel could have argued the following:

(1) that Sanders had never seen drug manufacturing or attempted drug manufacturing at Mr. Barrett's residence at any time, which conflicted with the averment in the affidavit that Mr. Barrett kept a "large quantity" of drugs at this house;

(2) that Sanders witnessed no drug activities of any kind on Mr. Barrett's property in July 1999, which also conflicts with Johnson's claims that Sanders said Mr. Barrett kept a large quantity of drugs and engaged in repeated drug sales at night;

(3) that Johnson was recklessly indifferent to the truth in that he did not ask Sanders whether he observed drug activity at Mr. Barrett's residence in mid-September 1999 when he supposedly was there with his girlfriend Ms. Thomas to exchange a set of car keys; if Johnson had asked, Sanders would have contradicted the affidavit because he

"probably" would have told Johnson he witnessed no drug activity, because "I didn't see him doing nothing";

(4) that Johnson knew Sanders had not reliably brought back evidence of methamphetamine activity as shown by Sanders's testimony that after Johnson told him to go back to Mr. Barrett's in September 1999 – after Sanders had supposedly been there just a short time before – Sanders or his "nephew" asked if Mr. Barrett had any drugs

available, but there was no methamphetamine, and the three of them simply smoked marijuana;

(5) that Sanders further testified to Johnson's indifference when, summarizing what he supposedly knew, Sanders repeated he witnessed no drug activity at Mr. Barrett's in July 1999, and told Johnson nothing about any drug activity at Mr. Barrett's during that month;

(6)  that, consistent with the court's order, there was no drug activity witnessed in August, 1999; and that, other than smoking a joint with Mr. Barrett and his "nephew," Sanders witnessed no drug activity at Mr. Barrett's in September, 1999.

Again, Sanders's claim that he had seen guns in Mr. Barrett's residence provided no probable cause for a drug search warrant, which is what Johnson secured.  Nor did Sanders's claim that Mr. Barrett had threatened law enforcement provide probable cause for a drug search warrant.

Counsel also unreasonably failed to argue evidence of Johnson's reckless disregard for the truth.  Sanders testified he was in regular contact with Johnson and continued to use drugs steadily.  Sanders acknowledged in his testimony that his drug use seriously impaired

his ability to recall and relate information accurately.  Sanders testified that Johnson, in effect, made a point of not asking Sanders about his own drug use or, on occasion, what he saw or failed to see at Mr. Barrett's residence.  This demonstrated Johnson could not rely reasonably on Sanders for anything.  Counsel also unreasonably failed to argue that Sanders would radically change his testimony depending simply on which lawyer was asking him questions.  Johnson surely would have seen the same tendency in Sanders to say whatever pleased the authority figure asking him questions.  Based on his supposed repeated and close contact with Sanders, Johnson had to be well aware of this fact.

In sum, Sanders not only disavowed the statements Clint Johnson attributed to him, Sanders repeatedly asserted that Johnson *had not asked* about Sanders's own drug use – which would impair his perceptions and his truthfulness – or what Sanders supposedly observed.  This testimony would have shown that Johnson made material false statements in the affidavit for search warrant both about the informant's alleged observations and Johnson's own grounds for trusting the informant.  These false statements negate *the entirety of the warrant affidavit.*  At a minimum, it is clear, based on Sanders's testimony on cross-examination, that Johnson recklessly disregarded the truth in reciting the "facts" supporting "probable cause" for the search warrant.  *United States v. Deleon,* 979 F.2d 761 (9th Cir. 1992); *United States v. Calisto,* 838 F.2d 711 (3rd Cir. 1988); *United States v. Pritchard,* 745 F.2d 1112 (7th Cir. 1984)(*Franks* violations established, including instances of affiant reporting information informants never supplied).

In its order denying the renewed motion to suppress, the court did not recite all the facts bearing on the use of false statements by Johnson, or Johnson's reckless disregard for the truth.  Had these matters been urged, there is a reasonable probability that the outcome of the

renewed suppression motion would have been different.  At a minimum, had all the evidence from Sanders's cross-examination been marshaled, the defense surely would have been entitled to the evidentiary hearing under *Franks* that was denied when the court simply ruled on the pleadings.  *United States v. Johns,* 851 F.2d 1311 (9th Cir. 1988), *cert. denied,* 505 U.S. 1226 (1992).

In its order, the court seemed to rely on the testimony of other informant witnesses to buttress the credibility of Sanders and Johnson.  Not only could counsel, had they conducted a reasonable investigation (or had the time to conduct a reasonable investigation), have impeached many of these other witnesses (see below), the court could not properly rely on years-after-the-fact testimony to find that the search warrant affidavit, founded solely on information from Charles "Monk" Sanders, was based on the truth, rather than outright fabrication or a reckless disregard of the truth.

### Ineffective Assistance of Appellate Counsel

The question of the As set forth *supra*, the *Franks* issue, and counsel's failure to effectively argue it, was at least partially framed by the record.[6]  The issue was not raised on direct appeal.  Because the issue was obviously meritorious, even with the record that was made, there could be no reasonable strategic basis for omitting it.  The failure to raise this issue was professionally unreasonable.  Because it was shown above that the *Franks* issue, in conjunction with a claim of ineffective assistance of trial counsel for failing to competently argue it, would have made a difference in the outcome of the appeal, Mr. Barrett was prejudiced.  Had the issue

---

[6] *Brady* evidence suppressed by the Government, and/or newly discovered evidence, places the *Franks* issue in a much stronger light than even existed on the trial record.  This is addressed in a separate claim for relief.

Def's § 2255 Mot.                              60                     *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

been raised, there is a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Eagle v. Linahan,* 279 F.3d 1283, 1301-06, 1308 (11th Cir. 2002)(counsel ineffective on appeal for failing to raise error apparent on the record); *Carter v. Bowersox,* 265 F.3d 705, 709-10, 716 (8th Cir. 2001)(direct appeal counsel ineffective for failing to raise issue apparent on the record, even though not preserved or adequately preserved, under plain error standard). While an action under 28 U.S.C. section 2255 is not intended as a second direct appeal, and issues framed by the trial record and which could been, but were not, raised on direct appeal, are ordinarily considered procedurally barred *United States v. Warner,* 23 F.3d 287, 291 (10th Cir. 1994), cause for excusing waiver exists where appellate counsel provides ineffective assistance. *Murray v. Carrier,* 477 U.S. 478 (1986).

> **2.      Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense**

The Government's theory of the case was that Mr. Barrett anticipated a police raid, prepared for it, and intended to use deadly force if the police came to his property. The prosecution argued that when Mr. Barrett began firing his weapon, he was well aware that the police, rather than trespassers, had arrived. This argument was highly relevant to count 3 of the superseding indictment, which charged that Mr. Barrett intentionally killed a state law enforcement officer in the performance of his official duties. (Doc. 52.) This is the count of conviction for which Mr. Barrett received the death penalty. (Docs. 258, 285.)

In the first stage of trial, the jury was instructed that among the essential elements of the offense charged in count 3 was that Mr. Barrett intentionally killed the victim, knowing or

having reason to know that the victim was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties. (Doc. 240; R. 4262-64, 4266-67.)

Mr. Barrett shows below that trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from eyewitnesses Toby Barrett and Alvin Hahn that would have rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting. In addition to these failings, a proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the Government's portrait of Mr. Barrett was wholly inaccurate. Rather than the intentional and remorseless killer one who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the Government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals. The testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case as to both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses.

Defense counsel's consultation with a mental health professional in preparation for Mr. Barrett's trial was limited to retaining Dr. Jeanne Russell of Tulsa, Oklahoma, to reprise the risk assessment she had done in preparation for a second stage proceeding in state court. Due to counsel's failure to conduct a proper investigation, counsel never had Mr. Barrett evaluated with the full range of psychiatric and neuropsychological testing that would have shown him to

be the antithesis of the Government's picture.[7]  Professional norms of criminal practice,

particularly in capital cases, tell attorneys that they should secure expert assistance.  Counsel's

failures to have Mr. Barrett evaluated in connection with first-stage intent or mental state issues,

in light of the defense arguments made at trial respecting how the shooting occurred, constitute

deficient performance.  *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510

(2003).

The results of an accurate and reliable mental health evaluation demonstrate that

trial counsel's failings were prejudicial.  George W. Woods, Jr., M.D., a Board Certified

psychiatrist who specializes in psychiatry and neuropsychiatry, performed a clinical and forensic

evaluation of Mr. Barrett in February 2009, and concluded to a reasonable degree of medical

certainty, *inter alia*, Mr. Barrett's mental functioning was impaired at the time of the offense by

psychiatric illness and significant brain damage, which prevented him from knowing or

deliberating on the nature of his responses to the police incursion before he acted.  Dr. Woods

concluded that at the time of charged offenses, Mr. Barrett suffered from several major brain

disorders including Bipolar Disorder, Post Traumatic Stress Disorder and damage to his brain in

the areas that are necessary to exercise judgment and reasoning.  Among the most significant

functional effects of Mr. Barrett's disorders are a heightened state of fear of imminent

annihilation coupled with an inability to understand or regulate his reactions – including

overreactions – to perceived threats.  Thus, when the events unfolded at the time of the offense,

---

[7] Claims 1 and 3 show that Mr. Barrett had constitutional and statutory rights to expert assistance to refute the testimony of Government witnesses.

Mr. Barrett could not and did not know right from wrong, and acted with the distorted perception that his response was necessary to keep intruders from killing him.  (Decl. of George Woods.)

Dr. Woods's evaluation was based on reliable information that was reasonably available to trial counsel through timely investigation.  This information included social and medical history documents, as well as witness accounts, which documented Mr. Barrett's personal as well as family history of mental illness.  The data Dr. Woods relied on, and which was available to trial counsel, also included a neuropsychological evaluation performed by Dr. Myla Young.

Dr. Young has a wealth of experience, has published in peer reviewed journals, and has lectured and instructed other professionals in her field on a frequent basis.  (Appendix to decl. of Myla Young, curriculum vitae.)  She administered sixteen hours of neuropsychological testing to Mr. Barrett over a period of three days, and reviewed his relevant educational, medical and mental health records.  (Decl. of Myla Young at 7-24.)

Dr. Young's testing determined that Mr. Barrett has significant brain damage and resulting brain dysfunction.  This damage primarily involves the prefrontal and temporal cortices of the brain.  Proper functioning of these areas of the brain is necessary "for the brain to effectively communicate information and function effectively."  The severity of Mr. Barrett's brain dysfunction has a negative impact on each and every aspect of Mr. Barrett's daily functioning.

Most especially, Mr. Barrett's organic impairments would negatively impact his abilities to "organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment."  (Decl. of Myla Young at 24.)  Mr. Barrett's disabilities are further exacerbated under "conditions of complexity and/or

Def's § 2255 Mot.                                  64                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

highly stressful situations." (Decl. of Myla Young at 24.) Mr. Barrett is a "concrete thinker,"

whose executive function, which controls the ability to think, organize, problem solve, and

change actions based on the information he receives, is severely compromised. (Decl. of Myla

Young at 11, 13.) Because of the significant impairments to Mr. Barrett's temporal cortex, he

has difficulty processing visual information and is abnormally subject to feelings of fear and

paranoia, with consequent tendencies to impulsiveness and aggressive outbursts. (Decl. of Myla

Young at 13.) Mr. Barrett's ability to actively process and comprehend information, including

visual information, in the "here and now," or as it unfolds, is severely compromised. (Decl. of

Myla Young at 14, 15, 19.) In lay terms, Mr. Barrett acts or reacts before he is able to accurately

perceive and process what is going on around him, a dysfunction that is especially heightened, as

noted, in stressful situations. (Decl. of Myla Young at 14, 24.) Mr. Barrett has moderate to

significant impairments in his ability to visually scan and accurately recognize information.

(Decl. of Myla Young at 20.) The "fluency" with which Mr. Barrett interprets visual

information, and the manner in which he processes such information, is also significantly

impaired. (Decl. of Myla Young at 21, 23.)

As Dr. Woods explained, the accuracy and reliability of Dr. Young's

neuropsychological tests results are medically unassailable:

> [N]europsychological testing offers a reliable method for the delineation of
> cognitive strengths and weaknesses. The clinical batteries administered by Dr.
> Young included methods for validating findings of deficits within individual test
> protocols and across the battery of tests. When administered across a broad variety
> of testing instruments, congruent results further confirm the accuracy and
> reliability of test results. The successful manipulation of test data to exaggerate
> measures of neurological impairment in a manner that eluded detection by
> imbedded validity scales would have required Mr. Barrett to have specific
> knowledge and mastery of neuroanatomy and test construction.

Based on his consideration of these and other psychiatric data, Dr. Woods concluded:

[¶]     Mr. Barrett meets diagnostic criteria in the DSM-IV-TR? for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

[¶]     Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).

\*\*\*

[¶]     Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial.

(Decl. George W. Woods, Jr., M.D. at ¶¶ 66-68.)

The concurrent findings of Dr. Young and Dr. Woods show that,

[¶]     Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms . . . .

\* \* \*

[¶]     He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]     Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life,

he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]     He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]     Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregultion primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]     Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of

emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]     Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]     Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

646

[¶]      My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Decl. George W. Woods, Jr., M.D. at ¶¶ 69-78.)

Mr. Barrett's trial counsel were ineffective for failing to utilize whatever resources they had to discover these facts about their client's organic brain impairments. Prevailing professional norms called upon trial counsel to investigate their client's medical history prior to trial so that counsel could make informed decisions about what strategies to pursue.  They were certainly on notice that Mr. Barrett had mental problems, based on existing mental health records from Eastern State Hospital, Sequoyah Memorial Hospital, Wagoner Community Hospital, and the Bill Willis mental health facility in Sallisaw, as well as the preliminary results of the mental health investigation conducted by predecessor counsel in the state court proceedings.  Yet trial counsel did not retain an expert prior to trial who could advise them regarding mental state defenses that would be available at either stage.

If counsel had undertaken reasonable steps to investigate, prepare and present evidence regarding Mr. Barrett's severe organic deficits, the first stage defense of lack of intent, the argument that Mr. Barrett was unaware that the police were on his property, and was simply reacting in the moment in a fearful and panicked state to a perceived threat by criminal trespassers would have been strengthened immeasurably.  Due to Mr. Barrett's inability to correctly process information, especially visual information, it could have been argued that even

if, as the police witnesses claimed, some of the automobiles which converged on Mr. Barrett's property had their emergency lights engaged, Mr. Barrett did not recognize this and instead simply reacted by firing on the vehicle which all witnesses agreed looked like an ordinary automobile.  At a minimum, this evidence would have been critical in contesting the intent element of count 3 which, as noted, required Mr. Barrett to have a specific intent to kill someone who was known to him to be a law enforcement officer engaged in official duties.

The exculpatory nature of expert testimony regarding Mr. Barrett's numerous and severe psychiatric, psychological and organic impairments could have been buttressed by reasonably available testimony from lay witnesses about Mr. Barrett's mental state.  In addition to providing contemporaneous, real world accounts of Mr. Barrett's impaired mental functioning, the testimony of such witnesses would have confirmed that Mr. Barrett's disabilities pre-dated the charged offenses and thus clearly impaired his mental state at the time in question.  Family witnesses interviewed in connection with the current proceedings describe an individual who had been mentally and emotionally troubled from childhood on; who was subject to inexplicable and wild mood swings; who was paranoid, suspicious and overly vigilant; who had suffered from deep and prolonged episodes of depression; who reacted without thinking or correctly perceiving what was going on around him; who handled stress poorly and who reacted under stress; and who retreated to a safe place when he felt threatened.  (See, e.g., Decls. of Abby Stites, Toby Barrett, Sylvia Gelene Dotson, Mark Dotson, Ruth Harris, Kathy Trotter, Ernest Barrett, Steve Barrett, Ada Blount, Nona Reich, and Carolyn Joseph.)  None of these witnesses, if they were interviewed at all by trial counsel, was questioned about Mr. Barrett's mental state, either with respect to the first or the second stage of trial.

The accurate picture of Mr. Barrett and his mental state, and how it bore on his intent, was further evidenced by reasonably available records of Mr. Barrett's previous hospitalizations, which counsel could have obtained, but unreasonably failed to do so.  In 1986, Mr. Barrett was at Eastern State Hospital in Vinita after shooting himself in a suicide attempt.  Among other things, he was diagnosed with bipolar disorder.  In 1995, he was again hospitalized because he was "losing [his] mind."  On this occasion, Mr. Barrett was diagnosed with an acute psychotic reaction.  Mr. Barrett had also received mental health treatment, as noted, at Wagoner Community Hospital and the Bill Willis facility in Sallisaw.  *(See* Eastern State Hospital Records, Wagoner Community Hospital records, and Bill Willis Mental Health Center records.)  As discussed in detail in Mr. Barrett's claim that he was denied effective assistance of counsel in the penalty phase of trial, his family history, on both his mother's and father's side, is replete with serious mental illness, suicide and suicide attempts.  (Decl. of George Woods.)

Not only would all of this evidence have been critical in attacking the intent element of count 3, it also would have established the basis for a defense of not guilty by reason of insanity, as well as an instruction on lesser included offenses, at least with respect to count 3.[8]

Tenth Circuit Pattern Instruction 2.54 outlines the elements of voluntary manslaughter under 18 U.S.C. section 1112(a), para. 2.  Voluntary manslaughter is murder without malice, upon a sudden quarrel (which does not apply here) or heat of passion.  Homicide is voluntary manslaughter where a defendant, in a sudden heat of passion and without malice, intentionally kills the victim, or acts recklessly with extreme disregard for human life.  Heat of

---

[8] As argued in Claim 9, Mr. Barrett was denied his due process rights under the Fifth Amendment when the court failed to give a defense theory instruction, and denied requests from both the government and the defense for a manslaughter instruction.

passion is defined as passion, fear or rage in which the defendant loses normal self-control, as a result of a circumstance or circumstances that provoke such a passion in an ordinary person, but which do not justify the use of deadly force. *United States v. Scafe*, 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides*, 820 F.2d 1232, 1242 (10th Cir. 1987).

The mental state required for voluntary manslaughter would apply to all three of the counts charged against Mr. Barrett, because it negates malice altogether. E.g., *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975); *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985)("a defendant in a federal murder case who has sufficiently raised a heat of passion defense [is] entitled to instructions informing the jury of the theory of defense and the Government's duty to prove beyond a reasonable doubt the absence of a heat of passion in order to obtain a murder conviction."); *United States v. Serawop*, 410 F.3d 656. 660-70 (10th Cir. 2005)(citing Lofton's holding that in order to establish malice, the prosecution must prove the absence of a heat of passion beyond a reasonable doubt when it is an issue in the case).

Expert and lay testimony would have raised the issue that Mr. Barrett, even if he had been able to know the difference between right and wrong (which he could not) when confronted with a strange vehicle barreling onto his property and striking his porch, would not have been aware of a police presence, but simply reacted out of a passion, fear or rage in which whatever self-control he possessed was lost, due to the circumstance of the middle-of-the-night intrusion onto his property of automobiles he could not discern as police vehicles.

In sum, trial counsel, had they acted, or been permitted to act, in a manner consistent with prevailing professional norms, would have investigated and presented evidence from Toby Barrett and Alvin Hahn that corroborated several law enforcement witnesses, and showed that at the critical moment, Mr. Barrett likely could not see any emergency lights or other

indications that the vehicle heading toward his house and young son contained law enforcement officers. Trial counsel also would have investigated Mr. Barrett's background and medical history and, through consultation with appropriate experts, found extensive evidence of organic brain dysfunction, bipolar disorder and PTSD. Had this evidence been produced, there is a reasonable probability that the outcome of the first stage of trial would have been different. This evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to count 3, and would have supported either outright acquittal or a finding that, at most, Mr. Barrett was guilty of was voluntary manslaughter.

>    **3.     Due to the unreasonable failure of Mr. Barrett's trial counsel to retain expert assistance, Mr. Barrett was tried while incompetent**

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, compulsory process, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, a trial free of materially false and misleading evidence, to confront and cross examine witnesses, and to a jury trial as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution, by virtue of trial counsel's prejudicial failure wholly or adequately to investigate Mr. Barrett's mental state and functioning before and during trial, and further failure to invoke adequate procedures, and obtain the assistance of experts, necessary evidence and/or any other reasonable and constitutionally requisite means by which to evaluate, assess and diagnose Mr. Barrett's

650

underlying mental diseases and defects, and accurately and reliably determine his mental competency to stand trial.

As a corollary to a defendant's due process right not to be tried or sentenced while he is mentally incompetent (see, e.g., *Medina v. California*, 505 U.S. 437, 453, 112 S.Ct. 2572 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173, 95 S.Ct. 896 (1975); *Pate v. Robinson*, 383 U.S. 375, 386, 86 S.Ct. 836 (1966)), "judges must depend to some extent on counsel to bring [competence] issues into focus." (*Drope v. Missouri*, 420 U.S. 162, 176-77 (1975).)  Whenever information that is made known to the trial court raises a doubt that a defendant is mentally competent to stand trial, the minimal guarantees of federal and state due process require the suspension of criminal proceedings until the defendant's competency can be determined on the basis of an adequate, thorough and reliable mental health evaluation.  *(Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997).)  Defense counsel are therefore constitutionally obligated to vindicate this rudimentary trial right by bringing evidence suggesting incompetence to the attention of the court.  (Id.; Bouchillon v. Collins, 907 F.2d 589, 595 (5th Cir. 1990).)

Trial counsel failed to investigate Mr. Barrett's mental health as it related to competency, to guilt-innocence phase defenses, and to punishment phase mitigation, and they failed to raise and preserve numerous legal issues involved, all to his prejudice.  Counsel unreasonably failed wholly or adequately to complete the investigation of Mr. Barrett's social history and background, and failed to consult with qualified mental health experts, including a neuropsychologist, despite the existence of readily available evidence of which counsel were or should have been aware including, but not limited to Mr. Barrett's history of psychiatric diagnoses and treatments, and his family history of mental illness.  "It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has

notice of the client's history of mental problems." (*Williamson v. Ward*, 110 F.3d, at 1518-19

(quoting *Bouchillon v. Collins*, 907 F.2d, at 595).)

As a result of counsel's unreasonable failing, no one working on Mr. Barrett's

behalf obtained requisite social history data, nor did any competent mental health professional

conduct any of testing and other evaluation necessary to perform a reliable assessment of Mr.

Barrett's competency including, but not limited to medically indicated neurological and

neuropsychological testing, which was necessary to determine the existence, nature and severity

of Mr. Barrett's brain damage and mental illnesses.

If counsel had conducted a professionally adequate investigation, including

retaining competent mental health professionals, they would have learned that Mr. Barrett

suffered from a life-long history of impaired functioning that was medically indicative of a

neuropsychiatric condition, which included organic brain damage associated with, or

superimposed on, a chronic major mental illness, Bipolar Disorder and Post Traumatic Stress

Disorder (PTSD).   Access to, consideration of and reliance on the results of the

neuropsychological testing that was medically and forensically indicated would have enabled any

competent expert to inform counsel that the functional impairments associated with the

neurologically damaged areas of Mr. Barrett's brain were consistent impairment of the domains

necessary for trial competence, such as executive functioning; and that Mr. Barrett would not be

able to track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate

new information to the degree minimally necessary to appreciate and exercise his legal rights.

Any reasonably diligent counsel informed of such information would have been

obligated to request a hearing to determine Mr. Barrett's competency.  (See, e.g., *Williamson v.

Ward*, 110 F.3d 1514-17 (counsel ineffective for not raising a competency claim where defendant

had been diagnosed with and treated for mental illness); see, also, *Barnett v. Hargett*, 174 F.3d 1128, 1135-36 (10th Cir. 1999) (defendant's history of mental illness and counsel's belief that defendant was presently incompetent among the factors supporting a bona fide doubt as to competency); ABA Standards, Mental Health, Standard 7-4.2 ("Defense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence").)

To establish the prejudice of counsel's failure to seek a timely competency hearing, Mr. Barrett must show only a reasonable probability that he was incompetent at the time of his trial. *(Hull v. Kyler*, 190 F.3d 88, 105 (3d Cir. 1999) (citing *Eddmonds v. Peters*, 93 F.3d 1307, 1317 (7th Cir. 1996), cert. denied, 520 U.S. 1172 (1997); and *Felde v. Butler*, 817 F.2d 281, 282 (5th Cir. 1987)); see also *Williamson*, supra, 110 F.3d at 1519 (same).). "[T]he evidence of Mr. [Barrett's] mental state which we have recited at length throughout this [petition] establishes a reasonable probability that he was not competent to stand trial." *(Williamson*, 110 F.3d, at 1519.) The documentary evidence submitted in support of Mr. Barrett's petition demonstrates that consistent the results of testing, employing reliable neuropsychological instruments for assessing brain impairment, have measured Mr. Barrett in the impaired range on the critical indicators of brain damage to his frontal lobes and executive functioning. Mr. Barrett's previous, psychiatric diagnosis of Bipolar Disorder, made by independent, state clinicians, is supported by the observations of lay witnesses over the course of his life. The medical indications in his social history and life-time functioning, which meet diagnostic criteria for PTSD, are also documented by reliable sources. Moreover, the congruence of all the clinical data, including social history, testing and reported symptoms demonstrates that Mr. Barrett is not malingering or exaggerating his condition.

Mr. Barrett's brain damage, coupled with his disruptive psychotic illness, left him unable to appreciate the nature of his actions at the time of the offenses for which he was tried and convicted; and unable rationally to understand the proceedings or to assist in his defense during the period in which he was tried.  As Dr. George Woods, Jr. concluded, "Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial."  (Decl. of George Woods, M.D., at 81.)

Rather, Mr. Barrett's ability to understand and track the judicial proceedings was substantially impaired by the confluence of his psychiatric disorders and measured brain damage. The fragments of police bullets in Mr. Barrett's body caused him continuing pain, and provoked an immunological reaction, all of which served as "built-in reminders" of his life-threatening trauma.  The ongoing distortion and distraction of Mr. Barrett's PTSD were compounded by the racing thoughts symptomatic of the disabling "manic form" of Bipolar Disorder.  (See *Williamson v. Ward*, 110 F.3d, at 1519; Decl. of George Woods, Jr., M.D., at 80.)  These disabling impacts on Mr. Barrett's mental state were, in turn, exponentially increased by the effect of his brain damage that left Mr. Barrett being "unable to get unstuck." (Decl. of George Woods, Jr., M.D., at 80.)  This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Id. at 59, 80.)

In light of this record, it is clear that trial counsel's "lack of investigation created a substantial risk that [their] client's due process rights were violated by standing trial while incompetent, and therefore undermines . . . confidence in the reliability of the adversarial testing process."  (*Williamson v. Ward*, 110 F.3d, at 1519.)  Accordingly, Mr. Barrett should be granted a new trial.  (Id.)

**4.    But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.**

Claim 1 discussed the improper ex parte hearing held between the Court and the Government on the prosecution's sealed motion to delay disclosing the identities of their seven informant witnesses. During this hearing, the court criticized the Government for failing to raise the issue sooner. The court also found the Government's justification for throwing a veil of secrecy over these witnesses unconvincing, because literally no evidence was produced that any of them had been threatened or were in any sort of danger. The Government merely represented that these witnesses, all of whom had criminal records, had an undefined and inchoate "fear" that they "may" be in danger if they testified. The court made the obvious point that it envisioned a long continuance to allow the defense sufficient time to investigate these witnesses and prepare for their testimony. (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 20, 22-23, 27.)

None of this was revealed to the defense when they were finally allowed to participate in the hearing. Instead, counsel unreasonably blundered into an "arrangement" with the Government to "interview" these witnesses – in the presence of the Government yet – to find out what they were going to say. (Tr. 9/13/05 Hr'g at 27; R. 840-43.) There were no reports of anything the witnesses told the Government, presumably because Government counsel – particularly AUSA Mike Littlefield – interviewed them alone so as to claim attorney work-product as a shield to discovery.

The defense was literally flying blind. The "arrangement," doomed as it was from the start to be anything approaching an adequate substitute for a competent investigation, backfired when all but one of the witnesses refused to be interviewed by the defense. The

obvious and reasonable path of moving for a continuance, which the court itself knew was the proper course, was not taken. As a result, the defense was woefully unprepared to effectively cross-examine these witnesses, and failed to conduct whatever real investigation could have been accomplished in the little time that remained before the snitches hit the stand. Had a continuance been asked for, it would have been granted, based on the court's own remarks during the *ex parte* hearing. Because a continuance was not requested, and because trial counsel otherwise failed to conduct an adequate investigation, a wealth of evidence that would have destroyed the credibility of the informant witnesses was never heard by the jury.[9]

A wealth of evidence was available to impeach the Government's key witnesses. As set forth in Claim 5, *infa*, the Government suppressed material impeachment evidence related to these witnesses and engaged in improper delay tactics to prevent trial counsel discovering the evidence independently. Whether due to the Government, and/or the trial court's misconduct, or trial counsel's unreasonable failure to seek a continuance, there is a reasonable probability that jurors would have rejected the seven snitches if they had heard the following evidence attacking their testimony.

### a.        Travis Crawford[10]

---

[9]  Direct appeal attorney Mark Henricksen, who was assisted by lead trial counsel Roger Hilfiger on the appeal, questioned Mr. Hilfiger about why he did not seek a continuance. Mr. Hilfiger did not dismiss the merits of moving for a continuance, but instead stated that he simply did not think one would be granted, even though he recognized the importance of the seven snitches to the Government's case. Decl. of Mark Henricksen. Of course, the court's comments at the improper *ex parte* hearing, of which Mr. Hilfiger was never made aware during trial, indicate otherwise.

[10]  Mr. Barrett is in possession of newly discovered evidence that eviscerates the credibility of Travis Crawford's trial testimony. Mr. Crawford recently recanted his testimony against Mr. Barrett. (Claim 5A, B)

Def's § 2255 Mot.                              78                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Travis Crawford, Mr. Barrett's maternal first cousin (R. 450-51), testified in the first stage of trial that the day before the police raid, he noticed a white SUV drive down the road in front of Mr. Barrett's cabin. Mr. Crawford testified he saw Mr. Barrett go to his front gate at the time the SUV passed. Crawford claimed to have walked over to Mr. Barrett's property from his parents' house. Mr. Barrett allegedly told him that he (Mr. Barrett) knew that the people in the white SUV were the police. Mr. Barrett expressed the opinion that they were probably going to come back to serve a warrant. With respect to the potential service of the warrant, Mr. Barrett said, "D.G.F." which, according to Travis Crawford, means "Don't Give a Fuck." Crawford testified Mr. Barrett told him that he was "going out in a blaze of glory," as he had supposedly said on numerous previous occasions. (R. 462-66.) Travis Crawford testified that while he had been a methamphetamine user for 15 years, he had been "clean" for nine months.[11] (R. 457.)

On cross-examination, Mr. Crawford stated he had been arrested previously for failure to pay $11,000.00 in back child support. He was also arrested on hot check charges many years before. He admitted to having used a lot of drugs. His alleged "past" drug use affected his memory, distorted his perception, and his mind was not as sharp as it had been before he became a methamphetamine addict. (R 467-68, 472.)

Mr. Crawford had never been interviewed by the defense before his testimony. He acknowledged on cross-examination that he had an appointment to talk to defense counsel the preceding Friday, but claimed he did not show up because he was working and would have been

---

[11] This is in marked contrast with what Mr. Crawford revealed recently to a defense investigator. Mr. Crawford stated that he was a heavy methamphetamine user at the time he was interviewed by the Government, had taken drugs before his testimony, and was under the influence of drugs at the time he testified against Mr. Barrett. This is discussed in Mr. Barrett's *Brady/*newly discovered evidence claim.

fired from his job if he absented himself for the interview.  He claimed he was not told by the prosecution that defense counsel had made themselves available on the previous Saturday and Sunday to interview him.  (R. 468-69.)  Sequoyah County Sheriff John Philpot had been by his residence to let him know that Mr. Barrett's lawyers might want to talk to him.  (R 469.)  Mr. Crawford admitted he had never provided a written statement to law enforcement or the Government prosecutors relating what his testimony would be.  (R. 481.)

When asked why he was coming forward with this information six years after the fact, Mr. Crawford said it was because he had been subpoenaed; he himself wanted to know why he had been contacted by the Government.  He denied being threatened with charges or other dire consequences if he failed to cooperate with the prosecution.[12]  (R. 470.)  Before being approached to testify in the federal trial, he had never talked to anyone about what he supposedly knew of the circumstances surrounding the shooting of Trooper Eales.  Despite the admitted problems with his memory, Mr. Crawford claimed he remembered the years-old events to which he testified.  He could not recall how many times he had spoken to Sheriff Philpot about what he knew, and also stated, at one point, that he had not had any conversations with government agents other than Sheriff Philpot. (R. 481-82.)

On re-direct examination, AUSA Littlefield reminded Mr. Crawford that he had talked to Littlefield about testifying, and Crawford then stated that before Littlefield interviewed him, he had spoken to no law enforcement agents about Mr. Barrett.  "Correcting" his earlier testimony about his contacts with Sheriff Philpot, Mr. Crawford stated either Littlefield, Sheriff Philpot, or Lance and Judy Bergman got a message to him that he needed to be in court.  If

---

[12]  Crawford stated recently he had been threatened by Littlefield, which ensured his cooperation. *See Brady/*newly discovered evidence claim.

Sheriff Philpot was the individual who contacted him for this purpose, this would be the only contact he had with the Sheriff about the case.  (R 487-88.)

On cross-examination, Mr. Crawford basically repeated the claims he made on direct about his conversation with Mr. Barrett on the late afternoon or evening of  September 23rd regarding the white SUV that had driven past Mr. Barrett's property.  He assumed the occupants of the vehicle were "the laws" instead of Kevin Adams, who owned a white Bronco and lived approximately a mile from Mr. Barrett, even though the vehicle he saw was unmarked, had no antennas like those on law enforcement vehicles, had no spotlights, and Mr. Crawford was not able to see the vehicle's license tag. (R 478-79.)  Retreating somewhat from his testimony on direct examination, Mr. Crawford said that when he went to speak to Mr. Barrett that evening, he did not tell Mr. Barrett that the "laws" had just driven by, and were probably coming to get him, although he might have commented to Mr. Barrett that the people who had driven by in the white SUV were law enforcement officers.  Ultimately, Crawford testified on re-direct examination that when the white SUV drove past and he went to talk to Mr. Barrett, he did not recall whether or he or Mr. Barrett commented that the occupants of the vehicle were law enforcement, but it "seem[ed]" this subject was discussed.  Travis Crawford stuck to his claim that Mr. Barrett said that he was "going out in a blaze of glory."  (R 479-80, 484.)  Mr. Crawford believed that when he went over to talk to Mr. Barrett, the front gate to the property was open, and then "guessed" that Mr. Barrett locked the gate. (R. 48-81.)

During his testimony, Mr. Crawford never mentioned – and was never asked – about his testifying as an informant or snitch in any other case.[13]  Had counsel asked about this,

---

[13]  *See* Mr. Barrett's *Brady* claim.

and had Crawford been truthful, it would have been revealed to the jury that Crawford had acted as a police informant in the past and had given testimony against others in order to escape prosecution, a fact that surely would have adversely affected his credibility.

Because trial counsel was professionally unreasonable in failing to move for a continuance, and otherwise failed to conduct a proper investigation, the jury failed to hear from witnesses who could have testified that Crawford was dishonest and not to be believed about anything, particularly with regard to the events on the evening of September 23, 1999.

Rick Lunsford is a local Sallisaw resident who could have been located and interviewed if any sort of competent defense investigation into Mr. Crawford had been conducted. Mr. Lunsford, along with several other people, were at Mr. Barrett's residence on the afternoon of September 23rd, at the time Mr. Barrett was approached by Travis Crawford about the white SUV that had driven past the property. Mr. Lunsford had arrived at Mr. Barrett's around noon on September 22nd, and stayed until around 9:00 p.m. on September 23rd. Mr. Lunsford went to Mr. Barrett's to drop off a Chevy truck he was selling to him. Mr. Lunsford told investigators currently working for Mr. Barrett that on the late afternoon of September 23rd, Mr. Barrett and others were standing near the fence to Mr. Barrett's property. Travis Crawford walked over from his parents house, which was located a couple of residences down the road, and stood at the fence line. Mr. Crawford asked Mr. Barrett whether he had seen the white SUV that had driven by toward the dead-end, but had not yet driven back. Crawford stated he believed the individuals in the SUV were law enforcement officers. Mr. Barrett did not take Crawford seriously, because he did not trust Crawford. Mr. Barrett was more nervous about Mr. Crawford than he was of law enforcement. Travis Crawford was regarded as a "flake," and it was well known that he had acted as a police snitch in the past. (Decl. of Rick Lunsford.)

After Crawford left, Mr. Barrett told the others who were present that if they wanted to leave because of the SUV, they should do so. Mr. Barrett was concerned about the others getting in trouble if in fact the SUV contained law enforcement officers, because everyone there was using drugs. Toby Barrett and Mr. Lunsford stayed, and the others left. Toby Barrett locked the gate to the driveway, and Mr. Barrett, Toby Barrett and Mr. Lunsford went to either Mr. Barrett's cabin or his garage. Mr. Lunsford left Mr. Barrett's property around 9:00 p.m. to see his family. (Decl. of Rick Lunsford.)

Mr. Lunsford states that during the time Crawford came to Mr. Barrett's to talk about the white SUV, before that occurrence, and after that time until Lunsford left later that night, Mr. Barrett *never* said that he would shoot or kill the first law enforcement officer who came on his property, or that if the police came on his property and tried to arrest him, he would "go out in a blaze of glory." Mr. Barrett never said this or anything like it either on September 23, 1999, or at any other time Mr. Lunsford was around Mr. Barrett. Such a statement would be out of character for Mr. Barrett, because he was not a violent or threatening person. (Decl. of Rick Lunsford.)

Had any investigation been conducted by trial counsel, and had Lunsford been contacted, he could also have opined on Travis Crawford's truthfulness, and Crawford's reputation for honesty in the community. (Fed.R.Evid. 608(a).) In Lunsford's opinion, Travis Crawford is a completely dishonest person; nothing he says can be believed. Mr. Crawford was not only a heavy drug user, but also dealt drugs. Mr. Crawford would sell bad dope to people and "rip them off." Travis Crawford would basically do and say anything to get his hands on drugs, or to get out of trouble. Travis Crawford was known in the community for his dishonesty and untrustworthiness. (Decl. of Rick Lunsford.) Even if Mr. Lunsford would have been

Def's § 2255 Mot.                              83                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

prevented from giving "extrinsic evidence" regarding his knowledge of specific dishonest and bad acts on Crawford's part, they could have been inquired into during Crawford's cross-examination, because they were probative of his truthfulness or untruthfulness.  Fed.R.Evid. 608(b).

Mr. Lunsford was never contacted by any representatives of Mr. Barrett in connection with the federal trial.  Had he been contacted, he would have been willing to testify to the matters described above.  (Decl. of Rick Lunsford.)

Brandy Hill is Travis Crawford's niece.  Ms. Hill told investigators currently working on Mr. Barrett's behalf that she, like Rick Lunsford, was present at Mr. Barrett's on the afternoon and evening of September 23, 1999.  She was present when Travis Crawford came to the fence of Mr. Barrett's property to tell Mr. Barrett about the white SUV that had driven by. Crawford stated he believed police were in the vehicle, or that his father, Roger Crawford, believed it was a police vehicle.  Crawford said his father saw the white SUV drive down the road toward the dead-end, but it had not come back.  After relaying this information, Crawford walked back home.  Shortly after this, Ms. Hill's husband Sean Hill arrived at Mr. Barrett's, and she went home.  (Decl. of Brandy Hill.)

During and after the time Crawford spoke to Mr. Barrett and the others who were there, there was no talk by Mr. Barrett about killing or shooting the police or "going out in a blaze of glory."  After Travis Crawford expressed his suspicions about the white SUV, Mr. Barrett did not react with threats, or in a heated manner. He behaved as if it were normal that the police had driven by.  According to Ms. Hill, the police drove by Mr. Barrett's property all the time, sometimes up to three times a week, from 1996 to 1999.  (Decl. of Brandy Hill.)

According to Ms. Hill, and in contrast to Travis Crawford's claim at trial that he had been offered nothing by the Government in exchange for his testimony, Crawford told her that both he and his wife, Cindy Crawford, had been paid for their testimony against Mr. Barrett. Again in contrast to Crawford's claim that he had been off drugs for a period of months before his testimony, Crawford told Ms. Hill he did two "hits" of dope immediately before testifying, and was under the influence of drugs when he testified.  (Decl. of Brandy Hill.  *See also,* Mr. Barrett's *Brady* and newly discovered evidence claim.)

Ms. Hill was never interviewed by Mr. Barrett's federal lawyers, or any investigator working for them.  She was an easily discoverable, readily available witness.  Had she been contacted, she would have given them the information related above, and would have agreed to testify as a defense witness for Mr. Barrett.  (Decl. of Brandy Hill.)

Toby Barrett was obviously a readily available witness.  He testified for the prosecution in the two state-court trials.  He was present at his father's residence on the evening of September 23, 1999.  On that evening, Mr. Barrett asked Toby to close the gate to the driveway.  Because the gate was usually kept locked in the evenings (certainly a routine occurrence in rural areas), this was nothing out of the ordinary.  On September 23rd, Mr. Barrett said nothing to Toby Barrett, or in Toby Barrett's presence, about the police, let alone that he believed they were coming to arrest him and that he would "go out in a blaze of glory."  While trial counsel spoke briefly to Toby Barrett several times, he never discussed with Toby any testimony he could give.  Had he been asked, Toby Barrett would have testified to these facts, as well as others which are discussed elsewhere in this motion.  (Decl. of Toby Barrett.)

Trial counsel could have, but did not, discuss with Mr. Barrett's and Mr. Crawford's aunt, Carolyn Joseph, her knowledge of Travis Crawford's honesty and trustworthiness. Although trial counsel interviewed Ms. Joseph briefly, she was never questioned about the credibility of either Travis Crawford or Cindy Crawford. (Decl. of Carolyn Joseph.)

According to Ms. Joseph, Travis Crawford, contrary to his claim of being "clean" of drugs for several months preceding his testimony, was a heavy drug user at the time of Mr. Barrett's trial. It is her personal belief that Crawford is not an honest or trustworthy person. Nor does Mr. Crawford have a reputation for honesty in the community at large. (Fed.R.Evid. 608(a).) (Decl. of Carolyn Joseph.)

Every time Mr. Crawford would come to her house, something turned up missing or stolen. Travis Crawford would steal from Ms. Joseph in order to get money to buy drugs. Crawford was the type of person who would say one thing and then do the opposite, so long as it was to his advantage. Ms. Joseph once paid Crawford $400.00 in advance to build a well house on her property. Crawford simply pocketed the money and never built the well house. Crawford never repaid the money he took for a job he never did. The materials that had been purchased for construction of the well house were later stolen. Travis Crawford and/or his wife Cindy were the only people who could have stolen the materials. Crawford once stole four rolls of barbed wire from Ms. Joseph's property, and later admitted the theft to her. Crawford even went so far as to steal from the property of her late son, DeWitt Joseph, who had been killed in an automobile accident. Decl. of Carolyn Joseph.

Def's § 2255 Mot.        86        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Even if Ms. Joseph could not give "extraneous evidence" of the specific bad acts of Crawford that reflected his dishonesty, trial counsel, using the information gained from her, could have cross-examined him about these dishonest acts. (Fed.R.Evid. 608(b).) Coupled with testimony from Ms. Joseph regarding her opinion that Crawford is a dishonest person, and is regarded as dishonest in the community, any denials offered by Crawford to the specific acts of dishonesty he committed against his own aunt would have rung hollow and marked him as a witness of dreadful credibility.

### b.      Cindy Crawford[14]

Cindy Crawford testified for the Government in both stages of trial. Like her husband, she never talked to defense counsel before her testimony but denied that she had simply refused to meet with them. (R. 3063, 3069.)

In the first stage, she testified she had done drugs at Mr. Barrett's house, although she did not know who supplied the drugs. Cindy Crawford testified Mr. Barrett told her he had a misdemeanor warrant out for his arrest, and that he stayed on his property because he did not want to get in trouble. He knew there was a chance the police could come to his house; that was why he had guns for protection. According to Cindy Crawford, Mr. Barrett told her that if the police (or anyone else, for that matter), invaded his property, he would "go out in a blaze of glory." (R. 3063-69.)

---

[14] Movant is also in possession of newly discovered evidence demonstrating that Cindy Crawford was pressured and threatened by former AUSA Mike Littlefield into testifying against Mr. Barrett, that she was coached in her testimony, and that she embellished her second stage testimony. Movant is also now in possession of Cindy Crawford's medical records, which show that she suffers from post-traumatic stress disorder and other maladies impacting her credibility, and which support her recent statement to defense investigators that she embellished her penalty phase testimony against Mr. Barrett and was susceptible to pressure from the prosecutor and law enforcement. *See* Mr. Barrett's *Brady/*newly discovered evidence claim.

On cross-examination in the first stage of trial, Cindy Crawford stated she started using methamphetamine at age 18. She used the drug for nine years, and would either snort it or shoot it. She stated or implied on direct examination that she was currently drug and alcohol free. (R. 3161.) While on a "meth run," the longest she had stayed up was five days. While using methamphetamine, she would often stay up for three to four days at a time. (R. 3070-71.)

Cindy Crawford admitted her drug use had caused her to lose a sense of time. To her, time was just a blur that played tricks on her mind. (R. 3073.) She really did not know when Mr. Barrett had made the alleged statement about having an outstanding misdemeanor warrant. Defense counsel, in his questioning, stated that any misdemeanor warrant for Mr. Barrett would have been long before 1999. (R. 3072.) While she had done drugs at Mr. Barrett's residence, she was not testifying that Mr. Barrett had ever given her drugs. (R. 3072.) With respect to Mr. Barrett's statement about taking on the police and "going out in a blaze of glory," Cindy Crawford stated this was typical "doper talk" that she had often heard from many drug users. (R. 3075.)

In the penalty phase of trial, Cindy Crawford claimed Mr. Barrett once became angry with her because she would not have sex with him. He ran from his home when she was leaving with his brother Richie Barrett, put the barrel of a rifle against her leg, and threatened to kill her. (R. 4577-79.)

As with the other informant or "snitch" witnesses, trial counsel relied strictly on cross-examination in a weak effort to impeach Cindy Crawford. Had trial counsel moved for a continuance and obtained the time to investigate Crawford, or conducted a reasonable investigation in the time allowed, a wealth of evidence could have been developed which would have shown her to be a witness who jurors would have found not worthy of belief.

During the first stage of trial, Cindy Crawford was never questioned on whether she suffered from any mental problems.  In her second stage testimony, she volunteered that she suffered from PTSD, but it was of course too late to use the information to cast doubt on what she told the jury in the first stage.  A reasonable investigation would have uncovered evidence regarding her mental condition, which, along with her drug use, could have impeached her ability to recall and relate, and her overall credibility.  Medical records for Cindy Crawford confirm that she suffers from PTSD, is subject to bouts of anxiety, and has panic attacks.  Medical records of Cindy Crawford, filed under seal.

Although Crawford testified on direct examination that she was on a five year deferred sentence for misdemeanor marijuana possession (R. 3061), and had a previous misdemeanor marijuana conviction in 1999, counsel failed to explore whether her testimony was motivated by a fear that if she declined to cooperate with the Government, she might face acceleration of her current deferred sentence to either a suspended sentence, which would constitute a felony conviction under Oklahoma law, or could face jail or prison time.  Counsel, who evidently did not search Cindy Crawford's court files, failed to ask her about the fact that she could have been charged with a felony rather than a misdemeanor for her second marijuana possession case, and whether the fact she had not been charged with a felony was due to her regularly acting as a police informant, as other witnesses could have attested.  (Files in Sequoyah County Case Nos. CF-99-645 and CF-04-63.)

Counsel failed to question Cindy Crawford about the fact that her two misdemeanor marijuana cases were originally charged as felonies.  Because counsel made no court record search, he neglected to confront her with the fact that a bench warrant had been issued for her arrest for failure to appear on July 19, 2005, just shortly before Mr. Barrett's trial

commenced.  Counsel also neglected to question her about the fact that on March 20, 2005, the Sequoyah County District Attorney's Office had filed an application to accelerate her deferred sentence because she had failed to pay certain required fees.  Significantly, the bench warrant and the application to accelerate were hanging over Cindy Crawford's head at the time she testified against Mr. Barrett.  It was not until April 24, 2006, after Mr. Barrett's trial concluded, that the application to accelerate and the bench warrant were withdrawn because she had finally complied with the terms of her probation.  (Files in Sequoyah County Case Nos. CF-99-645 and CF-0463.)  The circumstances surrounding Crawford's Sequoyah County cases could have been used to show she had a powerful motive to testify for the Government in exchange for help in keeping her deferred sentence.  *E.g., Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003)(counsel ineffective in part for failing to impeach immunized witness with fact he was on a deferred sentence and had a motive to help the prosecution in order to help himself).

Due to a failure to investigate Cindy Crawford's court history, the jury was denied other valuable impeachment evidence.  The court file in the domestic case of *Crawford v. Mattox,* Sequoyah County Case No. P-03-458, contains a letter from Larry and Brandy Sell, the grandparents of one of Crawford's children, to District Judge John Garrett.  The letter states that Cindy Crawford has problems with depression, and threatened to "do something with her baby," which she would be able to "get away with" because she had been in the Harbor View mental hospital.  The letter also states that drugs had become "all consuming" for Cindy Crawford.  This would not only demonstrate a history of mental illness, but would show that Cindy Crawford was such a despicable and unbelievable character that she had actually threatened harm to her own child, while contemplating the use of her mental illness as an excuse or defense.  (File in Sequoyah County Case No. P-03-458.)

Again because no investigation of Cindy Crawford's court records was made, counsel failed to confront her with the numerous acts of dishonesty which served as the basis for a victim protective order in *Michael Mackey, et al. v. Cindy Crawford,* Sequoyah County Case No. PO-03-390. The application for protective order states the plaintiffs had been harassed with false accusations by Crawford, threats to cause problems for Mr. Mackey's children, acts of stalking, and burglary of the Mackey home and storage shed. (File, Sequoyah County Case No. PO-03-390.) Again, even if extraneous evidence of these misdeeds reflecting Cindy Crawford's lack of honesty could not have been introduced, Crawford certainly could have been cross-examined about them. (Fed.R.Evid. 608(b).)

Aside from court records which would have severely impeached Cindy Crawford's credibility, counsel failed to investigate and produce numerous available witnesses who could have testified to her complete dishonesty and lack of believability, as well as her history as a police informant.

Roger Crawford testified briefly as a second stage witness for Mr. Barrett. In preparation for his second stage testimony, he was only interviewed for a matter of minutes. Unfortunately, trial counsel neglected to interview him regarding information he had on the credibility of Cindy Crawford. Had Roger Crawford been properly interviewed, he could have testified in both stages of trial that in his personal opinion, Cindy Crawford was completely dishonest and untrustworthy, and that her reputation in the community for honesty was extremely poor. Roger Crawford could have testified that at the time of her testimony at Mr. Barrett's trial, Cindy Crawford was a heavy drug user, contrary to what she tried to claim to the jury. Roger Crawford also would have testified that it was well known in the community that Cindy Crawford, far from being a disinterested witness, had regularly acted as a police informant to

Def's § 2255 Mot.                    91                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

escape prosecution and punishment for her own criminal activities.  Roger Crawford would have testified that Cindy Crawford had filed false reports about family members with the Oklahoma Department of Human Services, and also had made false accusations when seeking victim protective orders.  Mr. Crawford was in an excellent position to offer an opinion on Cindy Crawford's dishonesty and her reputation in the community for dishonesty.  He is Cindy Crawford's father in law, and has known her for years.  (Decl. of Roger Crawford.)

Mike Mackey is another witness counsel easily could have discovered by searching court files related to Cindy Crawford.  Mr. Mackey is one of several individuals who filed for a protective order against Cindy Crawford.  He has also known her for years.  He was never contacted or interviewed by Mr. Barrett's trial lawyers, or any investigator working on their behalf.  Had he been contacted, he could have testified that in his opinion, Cindy Crawford is thoroughly dishonest and untrustworthy.  Her reputation for honesty in the community is abysmal.  Mr. Mackey goes so far as to state that Cindy Crawford is the "most wickedly evil" person he has ever had the misfortune to run across.  Ms. Crawford made false reports to state DHS regarding him and his mentally handicapped son, and lied to get a victim protective order against him.  Mr. Mackey is also aware that Cindy Crawford has made false claims to the authorities about other family members.  According to Mr. Mackey, Cindy Crawford has repeatedly broken into his home and stolen from him in order to get money or property to buy drugs.  Like Roger Crawford, Mr. Mackey is aware that Cindy Crawford has long worked as a snitch for the local police, and "works the system" to escape responsibility for her own actions, while getting other people into trouble.  Decl. of Mike Mackey.

Again, even if extrinsic evidence of Crawford's bad and dishonest acts could not have been introduced through Mackey's first stage testimony, they could have been inquired into

during cross-examination of Crawford.  (Fed.R.Evid. 608(b).)  Extrinsic evidence of these acts of criminality could have been introduced in the penalty phase, since Crawford made a return appearance to the witness stand, and the rules of evidence are relaxed in the penalty phase of a capital case.  (18 U.S.C. § 3593(c).)

Brandy Hill is another witness who, with a competent investigation, could have given testimony regarding Cindy Crawford's honesty.  As noted in the discussion of Travis Crawford, Ms. Hill was never contacted before or during Mr. Barrett's trial.  Ms. Hill has known Cindy Crawford for many years.  In her opinion, Cindy Crawford is completely dishonest and untrustworthy.  Ms. Crawford's reputation for honesty in the community is extremely poor.  Ms. Hill describes Cindy Crawford as manipulative.  Cindy Crawford has stolen from Ms. Hill and her family on numerous occasions in order to get money to buy drugs.  Like other witnesses who could have testified to Cindy Crawford's dreadful lack of honesty, Ms. Hill is aware that Cindy Crawford has long acted as a local police informant and has lied against others to obtain something of advantage for herself.  (Decl. of Brandy Hill.)

Similar testimony could have been offered by Sean Hill.  Mr. Hill, though available at the time of trial, was never contacted by anyone working on Mr. Barrett's defense.  He states that Cindy Crawford's reputation in the community is that "she's dishonest, evil and worthless." (Decl. of Sean Hill.)

Carolyn Joseph has known Cindy Crawford for years.  As with Travis Crawford, Ms. Joseph was not interviewed regarding her knowledge of Cindy Crawford's honesty, or any other information which would have served to impeach Ms. Crawford.  Ms. Joseph could have testified that Cindy Crawford was a heavy drug user, and that, in her opinion, Ms. Crawford's drug use affected her mentally.  According to Ms. Joseph, Cindy Crawford has the mind and attitude of a

twelve year old child.  In Ms. Joseph's personal opinion, Cindy Crawford is "so deceitful and dishonest that it is pitiful."  Ms. Crawford's reputation in the community for honesty is, to put it mildly,  poor.  No one Ms. Joseph knows would trust or believe anything Cindy Crawford said.  Cindy Crawford has stolen from Ms. Joseph on several occasions and has conned money out of her.  (Decl. of Carolyn Joseph.)

Still another witness who could have testified regarding Cindy Crawford's bedrock lack of honesty is Gwendolyn Crawford, Travis Crawford's sister.  Ms. Crawford, as with the other individuals who could have been, but were not, contacted to testify on Mr. Barrett's behalf, has known Cindy Crawford for years.  In her opinion, Cindy Crawford is thoroughly and totally dishonest.  Cindy Crawford is well known in the community for her dishonesty.  Echoing several of the other witnesses who know Cindy Crawford well, her reputation for honesty in the community is bottom-of-the-barrel.  Gwendolyn Crawford is also aware that Cindy Crawford has acted as a police snitch for years and does not hesitate to falsely accuse others if it means getting something for herself.  (Decl of Gwendolyn Crawford.)

Cindy Crawford's penalty phase testimony that Mr. Barrett had put a rifle barrel to a leg and threatened to kill her, allegedly because she would not have sex with him, could have been conclusively impeached if trial counsel had interviewed Mr. Barrett's brother, Richie Barrett.  Crawford testified this incident occurred when she was leaving Mr. Barrett's property with Richie Barrett.  Richie Barrett was interviewed by a defense investigator in connection with the current action.  Richie Barrett states unequivocally that Cindy Barrett fabricated this story out of whole cloth, and that the incident never occurred.  (Decl. of Richard Barrett.)

### c. Charles "Monk" Sanders

**1.  Failure to adequately investigate and prepare to cross-examine Sanders about his previous convictions, charges against him that were dismissed, and the favorable treatment he often secured to escape punishment.**

As noted *supra*, but unknown to the jury, Charles Sanders, the alleged C.I. on the Clint Johnson search warrant, was a professional informant.  He gave wildly conflicting trial testimony regarding alleged drug activities at Mr. Barrett's residence in the Summer of 1999.  He also testified that at some undetermined time, Mr. Barrett allegedly made statements that he would shoot the first law enforcement officer who came on his property.  (R. 2515.)  In the penalty phase of trial, the Government once more sponsored Sanders to testify that Mr. Barrett, while incarcerated, supposedly contacted a third party about doing harm to Sanders.  (R. 4587.)  In an off-hand manner, Sanders testified, under questioning by AUSA Littlefield, that the most the Government was going to do for him in exchange for his testimony was to talk to prosecutors in Sequoyah and Tulsa Counties, informing them of Sanders's cooperation in the case against Mr. Barrett.  (R. 2494.)

Trial counsel's unreasonably failed to investigate and challenge Sanders from a myriad of angles the informant's history made readily available.  Not only did counsel fail to capitalize on the entirety of Sanders's cross-examination testimony when the motion to suppress was re-urged, but counsel failed to effectively impeach him, both on cross-examination and with independent evidence.

While trial counsel cross-examined Sanders on some, but by no means all, of his prior convictions, counsel failed to conduct a search of court records, not only to demonstrate that Sanders lied about the number and nature of his previous convictions, but that he had received amazing deal after amazing deal for his work as an informant, including after he

supposedly gave information to Clint Johnson about Mr. Barrett. In that sense, assuming he really was the C.I. on the Johnson search warrant, Sanders had *already received and was continuing to receive favor from the authorities based on his "work" against Mr. Barrett.* Had counsel effectively cross-examined Sanders about his prior record, he could have easily exposed Sanders's lies that Clint Johnson only helped with "some" of his cases, had not gotten out of "a lot" of trouble, and that he was not both working as an informant and free to commit whatever crimes he wanted to. (R. 2535-37.)

The beginning of cross-examination revealed no court searches were conducted on Sanders's previous convictions. Counsel stated that he had looked at Sanders's D.O.C. "sheet." This obviously referred to the Oklahoma Department of Corrections website, which would merely list, without any elaboration at all, the case numbers in which Sanders had been convicted, and the offenses for which he was convicted. Counsel confronted Sanders with the fact that he had far more than the four priors Sanders's acknowledged on direct examination, a patent lie that prosecutor Littlefield had an obligation to correct, but did not. (R. 2524.) *See* Claim 5, *infra*.

Counsel superficially asked[15] Sanders about the following prior convictions: (1) an Arkansas conviction in 1986 for distribution of drugs, for which Sanders received a sentence of four years confinement, and six years probation; (2) a 1989 conviction in Sequoyah County for uttering a forged instrument, for which Sanders allegedly received one year in the county jail, and time on probation; (3) a 1990 sexual battery conviction and drug possession conviction in Sequoyah County, for which he received three years incarceration and seven years suspended; (4)

---

[15] R. 2524-36.

a 1992 Sequoyah County conviction for drug possession, in which Sanders received a sentence of three years in prison and seven years suspended (Sanders claimed this was "the same" case as his 1990 Sequoyah County conviction, even though the conviction was in a different case number); 5) a Muskogee County conviction in Case No. CF-93-131 for illegal possession of a weapon, bringing drugs or alcohol into a jail, and escape (Sanders acknowledged the escape conviction, but said he had not been convicted of the other charges); (6) a 1995 conviction in Arkansas for possession of drugs, concealing stolen property, and forgery; (7) a Sequoyah County conviction in Case No. CF-98-346, for which Sanders received five years incarceration and twenty years suspended; (8) a conviction in Sequoyah County Case No. CF-98-363, for uttering a forged instrument, for which Sanders received five years incarceration and twenty years suspended; (9) a conviction in Sequoyah County Case No. CF-99-562 for concealing stolen property, for which Sanders received five years incarceration twenty years suspended (a condition of probation in these last three cases was that Sanders successfully complete a Department of Corrections drug program, which Sanders claimed he had not yet been able to get into); (10) a conviction in Sequoyah County Case No. CF-03-124 for two counts of running a roadblock; and (11) a conviction in Sequoyah County Case No. CF-04-19 for two counts of concealing stolen property, second degree burglary, and second degree arson, for which Sanders received a deal similar to that in the other Sequoyah County cases.

Sanders agreed that after this many convictions, he received, on his current sentences, a very favorable deal (to say the least), requiring him at most to do five years in prison, which would equate to service of only two and one-half years, even if he was not able to enter the Department of Corrections drug program, which, upon completion, would put him back

on the streets immediately.  Sanders admitted that his mentor, Clint Johnson, had helped him with "some," but by no means all, of his prior cases.  (R. 2534-35.)

Had counsel conducted even minimal research into Sanders's court records, far more about the witness's's abysmal criminal history and the virtual "get out of jail free" cards he received  repeatedly would have been revealed to the jury.  The following readily available records, among others, would have marked Sanders as a career informant who would say and do anything to continue to have access to drugs and escape incarceration:

(1)      Counsel failed to point out that in Sequoyah County Case No. CF-92-91, in which Sanders was convicted of felony drug possession in count 5, the state had charged him with having previously been convicted in Sebastian County, Arkansas, with delivery of marijuana and amphetamines in Case No. 86-604-B.  Sanders was also charged in this Sequoyah County case with the misdemeanors of attempting to elude the police, possession of drug paraphernalia, driving under the influence, and possession of marijuana.

The allegation of the "after former" would have set Sanders's exposure, under then existing Oklahoma law, at ten years to life on the felony drug charge.  (21 O.S. 1991, section 51.)  He also could have been charged with felony possession of marijuana, rather than a misdemeanor, because of his prior Arkansas drug conviction.  (63 O.S. section 2-402 (2).)  Instead, he initially was sentenced to 10 years imprisonment on the felony drug charge, and one year in the county jail on the marijuana possession charge.  An amended judgment and sentence cut Sanders's prison time on the felony drug charge from ten to three years, with the balance suspended, with the misdemeanor attempting to elude and possession of paraphernalia charges dismissed, and a one year concurrent sentence on the DUI charge.  (File in Sequoyah County Case No. CF-92-91.)

(2)     In Sequoyah County Case No. CF-97-9, Sanders was charged with three crimes of dishonesty: Concealing stolen property, and two counts of uttering a forged instrument. Although Sanders could have been charged with two or more "after formers," which would have set his exposure at twenty years to life under Oklahoma law, he was not.  (21 O.S. 1991, section 51.)  Instead, the concealing stolen property felony charge was dismissed, and the two uttering charges were reduced to misdemeanors, for which he received one year suspended sentences, to run concurrently.  *(See* File in Sequoyah County Case No. CF-97-9.)

On October 2, 1998, an application to revoke Sanders's misdemeanor suspended sentences was filed because Sanders had violated the terms of his probation by committing second degree burglary and larceny from a house as charged in Sequoyah County Case No. CF-98-128, and also because he failed to pay the restitution he promised when he received his misdemeanor suspended sentences.

On October 7, 1998, Sanders failed to appear for a court hearing, and a bench warrant was issued for his arrest.  No disposition is shown for the revocation action.  The last entry in the docket on this case notes that on December 9, 1999, a waiver of preliminary hearing in Sequoyah County Case No. CF-99-562 was filed.  As discussed below, the application to revoke in this case was later "passed" for ninety days, and would be dismissed altogether upon payment of restitution.  If restitution were not paid, Sanders would receive one year in the county jail.  As matters developed, and as is discussed below, Sanders was required to pay no restitution.

Although these records indicated Sanders was receiving favorable treatment from the Sequoyah County District Attorney at the time he was working for Clint Johnson to gather

"evidence" against Mr. Barrett, and Mr. Barrett's trial counsel demonstrated a desire to impeach Sanders on those grounds, trial counsel failed to present these records to the jury.

(3)     In Sequoyah County Case No. CF-97-75, Sanders was charged with the felony crime of running a roadblock, and misdemeanors for attempting to elude, having an open container, and reckless driving.  Although prior felony conviction enhancements could have been filed to increase the range of punishment on the running a roadblock felony charge, they were not.  On October 16, 1997, this case was dismissed outright on motion of the state, based on what is reflected on OSCN.  The court case file itself apparently shows no disposition.  Sanders was questioned on none of this by defense counsel.  (File in Sequoyah County Case No. CF-97-75.)

(4)     In Sequoyah County Case No. CF-97-140, Sanders was charged with concealing stolen property and felony possession of methamphetamine.  It was alleged on page two of the information that he had three prior felony convictions, all out of Sequoyah County, in Case Nos. CF-89-396 (uttering a forged instrument); CF-92-91 (drug possession); and CF-90144 (sexual battery).  Again, Sanders was facing up to life in prison upon conviction.  (21 O.S. section 51.)  Instead, again on October 16, 1997, all charges were dismissed on motion of the state, according to OSCN.  The court file itself shows no case disposition.  Counsel did not cross-examine Sanders on this gift from the state prosecutors.

(5)     In Sequoyah County Case No. CF-98-22, Sanders was charged with concealing stolen property, grand larceny, unlawful use of a police radio, and *providing false information to a police officer*.  Despite his many prior convictions, Sanders received an illegal deferred sentence, which was later accelerated.  (22 O.S. 1991, section 991c (prohibiting

defendant with even one prior felony conviction from receiving a deferred sentence).[16] Counsel was professionally unreasonable for failing to question Sanders about how he managed to get a deferred sentence from Sequoyah County authorities when, due to his record, the deferment was absolutely barred by law. (Record from court clerk's office on case; other parts of file have been lost or destroyed.)

(6) In Sequoyah County Case No. CF-98-128, Sanders was charged with the felonies of second degree burglary and larceny from a house. The three "after-formers" alleged in Sequoyah County Case No. CF-97-140 (Sequoyah County Case Nos. CRF-89-396, CRF-92-91 and CRF-90-144) were alleged, setting Sanders's exposure at twenty years to life. An amended information alleging the same charges and same "after-formers" was filed on July 7, 1998. Miraculously, the state dismissed the after former conviction allegations, and Sanders received patently illegal five year deferred sentences, running concurrently, with costs waived by the District Attorney's office. The sentences were also ordered to run concurrently with a conviction

Sanders obtained in Creek County. CF-98-128 was case was later dismissed with costs, as is discussed below. (File in Sequoyah County Case No. CF-98-128.)

It was unreasonable for Mr. Barrett's trail counsel not to discover and use on cross-examination records showing that Sanders, who faced the prospect of life in prison on this offense alone, received illegal deferred sentences, and that even those illegally lenient sentences eventually were lifted.

---

[16] This statute was later amended by 22 O.S. section 991c (F) to permit convicted felons to receive a deferred sentence, but only on motion and waiver by the State.

(7)     In Sequoyah County Case No. CF-98-346, Sanders was charged with possession of methamphetamine (a felony) and misdemeanor possession of drug paraphernalia. Again, he was charged after having been previously convicted of the same three Sequoyah County felonies discussed above.  Sanders was yet again facing twenty to life.  Per a plea agreement reached with the state, Sanders received a twenty year suspended sentence.  The misdemeanor charge was dismissed.  At the time he entered his plea, due to his record of prior felony convictions, Sanders was not eligible for a suspended sentence under Oklahoma law as it then existed.  (22 O.S. 1991, section 51; 22 O.S. 1991, section 991c.)[17]

Although Mr. Barrett's trial counsel briefly alluded to this case, and the sentence Sanders received, counsel failed to point out the following impeaching facts: (a) on May 3, 2001, the state filed an application to revoke Sanders's suspended sentence because he had been arrested for larceny of merchandise from a retailer and possession of drug paraphernalia in Sequoyah County Case No. CF-01-314, and also failed to report to his probation officer, as he told the court he would do when he received his suspended sentence; (b) on August 23, 2001, the court ordered Sanders's sentence revoked in full, with Sanders ordered to complete the "Last Stop" program in the department of corrections, upon successful completion of which the balance of the sentence would again be suspended; (c) coming to Sanders's aid yet again, the Sequoyah County District Attorney's Office moved on February 22, 2002, to amend the revocation to allow Sanders to attend either the "Last Stop" program, or an equivalent program, and requested that the sentence in this case be ordered to run concurrently with the sentence in

---

[17]  Again, as with the statute governing deferred, the law was later amended to permit defendants, such as Sanders, with two or more prior felony convictions to received suspended sentences, but only on motion and waiver by the State.

Def's § 2255 Mot.                    102                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Sequoyah County Case No. CF-98-363; (d) a *nunc pro tunc* orders granting these requests were entered by the court on March 5 and March 28, 2002; (e) on March 12, 2004, the District Attorney filed a second application to revoke Sanders's suspended sentence, because he had committed a new offense, burglary in the second degree, as alleged in Sequoyah County Case No. CF-04-19; (f) an amended second application to revoke Sanders's suspended sentence was filed on June 17, 2004, based on the amended information filed in Case No. CF-04-19, which alleged, in addition to second degree burglary, that Sanders had also committed the offenses of second degree arson, concealing stolen property, and felon in possession of a firearm; (g) on November 17, 2004, instead of revoking the entirety of the suspended sentence, the court, pursuant to Sanders's agreement with the state, revoked only five years of the suspended sentence, with the entirety of the sentence to again be suspended if Sanders successfully completed the "Key to Life" program in the Department of Corrections; (h) incredibly, the partial revocation in this case was ordered to run concurrently with the suspended in whole or in part sentences in Sequoyah County Case Nos. CF-98-363, CF-99-562, CF-04-19, and CF-03-124.

Sanders was not questioned about the fact he faced revocation of the entire twenty year sentence based on his various probation violations, with consecutive time in his other active Sequoyah County cases.  Nor was it brought to the jury's attention that absent the various deals he received, Sanders was once more facing the potential of life in prison on this offense of conviction due to his record of previous felony convictions.  Counsel also failed to point out Sanders's statutory ineligibility for any suspended sentence due to his prior felony convictions, absent a motion and waiver from the State.  (File in Sequoyah County Case No. 98-346.)

(8)     In Sequoyah County Case No. CF-98-363, Sanders was charged, yet again, with uttering a forged instrument.  The same previous felony convictions noted in the cases

above were alleged on page 2 of the information, meaning Sanders was facing twenty to life.  On December 9, 1999, the allegation of prior convictions was dismissed and Sanders received a twenty years suspended sentence that he was not eligible to receive under then-existing Oklahoma law.  This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-99-562 and CF-98-346.

Again in this case, an application to revoke was filed on May 3, 2001, for failure to report, and based on Sanders's arrest for felony larceny of merchandise from a retailer and possession of drug paraphernalia, a misdemeanor, as charged in Sequoyah County Case No. CF-01-314.  Again, an order revoking was entered by the state court on August 23, 2001, with the sentence ordered revoked in full, but to be suspended in its entirety if Sanders successfully completed the "Last Stop" program in the Department of Corrections.  Sanders was allowed to self-surrender to the county jail instead of being immediately placed in custody.

As described in connection with Case No. CF-98-346, a motion to amend the order revoking was filed.  A *nunc pro tunc* order amending the previous revocation order, and directing Sanders's sentence to be served concurrently with the sentence in Sequoyah County Case No. CF-98-346, was entered.  A second motion to revoke based on the same allegations of new offenses filed in CF-98-346, were also filed in connection with this case.  On April 17, 2004, the court entered a second order revoking Sander's suspended sentence.  As with Case No. CF-98-346, only five years of the twenty-year suspended sentence was revoked, and the sentence would again be suspended in its entirety if Sanders successfully completed the in-house "Key to Life" program or its equivalent.  This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-98-346, CF-99-562, CF-04-19, and CF-03-124.

Counsel failed to cross-examine Sanders about the fact he faced a sentence of up to life imprisonment on this conviction absent the deal he received, and, having received probation, could have had his sentence revoked in full, with consecutive time on all his other active cases, absent the tremendous break he received from the prosecutors. (File in Sequoyah County Case No. CF-98-363.)

(9)     In Sequoyah County Case No. CF-99-562, Sanders was charged with still more crimes of dishonesty. Some, but not all of the charges in this case, were mentioned briefly by defense counsel on cross-examination. Sanders was charged with three counts of concealing stolen property, one count of uttering a forged instrument, misdemeanor possession of marijuana (which could have been charged as a felony due to Sanders's prior drug convictions), and possession of a sawed-off shotgun. Instead of trotting out the usual three "after-formers" charged in some of the cases discussed above, Sanders was charged with committing the instant offenses after previous conviction of five felonies. In addition to the same three prior Sequoyah County felony that were usually alleged on page 2, it was also charged that Sanders had felony convictions in Muskogee County Case No. CF-93-772 for escape from custody, and Muskogee County Case No. CF-93-131 for carrying a weapon into the jail. Yet again, Sanders faced twenty to life.

Based on yet another deal-of-a-lifetime, Sanders received a twenty year suspended sentence on count 1. In an extraordinary gift from prosecutors, and at an extraordinary cost to public safety, counts 2, 3, 4, 5 and 6 were dismissed outright. Consequently, Sanders, a convicted felon many times over, was allowed to walk around with a sawed-off shotgun, with no repercussion whatsoever.

Def's § 2255 Mot.                    105                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

This case was "wrapped up" on the same guilty plea forms with Sequoyah County Case Nos. CF-98-363, CF-98-346, CF-98-128, and CF-97-9.  As noted, Sanders received a twenty year suspended sentence on the felony conviction in CF-98-363; Case No. CF-98-128 was dismissed with costs Sanders was later relieved of paying; and the long-moribund revocation action in CF-97-9 was passed for ninety days to allow payment of restitution, which, in the end, Sanders was never required to pay, thus making hollow the threat of a year in jail for failure to satisfy restitution.

The same application and amended applications to revoke, and the same or similar *nunc pro tunc* orders discussed above in Sanders's other cases, were filed in this case.  As with the other cases discussed above, Sander's suspended sentence in this case was first revoked for only five years.  He would revert to full probationary status upon completion of a Department of Corrections drug program.  The initial revocation order for up to five years and the rest were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-03-124 and CF-04-19.

Trial counsel failed to question Sanders about the fact he was facing up to life in prison in this case; that five of the six charges lodged against him were dismissed; and that, without the largesse of the state prosecutors, he could have (and should have, based on his horrific record) faced revocation of all the suspended sentences he was serving, to be served consecutively.  As with the other cases discussed above, counsel failed to point out that Sanders was either ineligible for a suspended sentence, or had to receive a special dispensation from the prosecution to get one.  (File in Sequoyah County Case No. CF-99-562.)

(10)    In Sequoyah County Case No. CF-01-314, Sanders was charged with another felony crime of dishonesty, larceny of merchandise from a retailer.  He was also charged

with a misdemeanor for possession of drug paraphernalia.  The state alleged in page two of the information that Sanders committed the felony larceny after having been convicted of six felonies (Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363 and CF-99-562).  With two or more "after-formers," Sanders faced a minimum of twenty years, and a maximum of life on the felony charge.

Initially, on August 23, 2001, this case was dismissed upon the payment of costs.  On October 19, 2002, the case was "combined" with other cases, with a result similar to those discussed above.

Mr. Barrett's trial counsel unreasonably failed to reference this case at all during cross-examination, and thereby failed to inform the jury that from the time Sanders became Clint Johnson's confidential informant he received the most extraordinary lenient treatment which left him free to roam the streets committing crime after crime.  (File in Sequoyah County Case No. CF-01-314.)

(11)    In Sequoyah County Case No. CF-03-124, Sanders was charged in a seven count information with: 1) feloniously pointing a firearm; 2) being a felon in possession of a firearm; 3) felony running a roadblock; 4) felony running a roadblock; 5) attempting to elude (misdemeanor); 6) reckless driving (misdemeanor); 7) and resisting an officer (misdemeanor).  Sanders was charged with the felony offenses in this case after having been convicted of six felonies Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363, and CF-99-562.  With the allegation of two or more "after-formers," Sanders was staring at his usual 20 to life term.

Sanders, as with all his other Sequoyah County convictions, entered into wildly generous plea agreement with the state.  As reflected by the judgment and sentence in this case,

filed on November 17, 2004, counts 1 and 2 were dismissed. The allegation of "after-formers" carried no real sting. The misdemeanor charges were dismissed. On the felony running a roadblock charges in counts 3 and 4, Sanders was "punished" with sentences of twenty-five years, running concurrently, all to be suspended except for the first five years (also running concurrently), with the entirety of the sentences to be suspended upon completion of the "Key to Life" program, or another similar program. These sentences were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19. (File in Sequoyah County Case No. CF-03-124.)

Mr. Barrett's trial counsel unreasonably failed to impeach Sanders with this highly prejudicial evidence. The jury could not help but notice that Sanders was given the lightest treatment for conduct very similar to acts the Government attributed to Mr. Barrett. The jury also would have been impressed to learn that charges had been dismissed in this case, that Sanders again escaped 20 years to life due to prosecutors' intervention, that despite his repeated crimes Sanders never drew consecutive sentences, and that, as reflected by his other cases, prosecutors for years gave Sanders a license to commit whatever crime he wished in Sequoyah County, with only the most minor of consequences.

(12)    In Sequoyah County Case No. CF-04-19, Sanders was originally charged with second degree burglary, after former conviction of six felonies Sequoyah County Case Nos. CRF-89-396, CRF-90, 144, CRF-92-91, CF-98-346, CF-98-363, and CF-99-562. The case was amended to charge additional counts of second degree arson, concealing stolen property, and felonious possession of a firearm.

On November 17, 2004, per a plea agreement with the state, and with the "page two" still intact, Sanders was sentenced on each of counts 1, 2, and 3 to twenty-five years

imprisonment, with all but the first five years suspended, and with the balance of the sentences suspended in full upon completion of the Department of Corrections in-house drug program. Count 4, in which Sanders was charged with being a felon in possession of a firearm, was dismissed. The sentences in this case were ordered to run concurrently to one another and concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562, and CF-03-124. (File in Sequoyah County Case No. CF-04-19.)

Counsel was professionally unreasonable in failing to cross-examine Sanders on the fact that he faced twenty to life absent a deal from the state prosecutors, that he received concurrent probation time rather than consecutive prison time, and that the firearm charge against him was dismissed.

(13)    In Cherokee County Case No. CF-98-111, Sanders was (and still is) charged with no fewer than six counts of uttering a forged instrument, after former conviction of felonies. Amended and second amended informations were filed on June 1, 1998 and August 20, 1998, respectively. Although he promised to appear at all court dates after being released on bond, he incurred a failure to appear. A bench warrant was issued on May 15, 1998. Sanders had a second failure to appear on March 24, 2000. On May 3, 2001, he was ordered released to a bondsman. The case is still pending today. The last docket entry, for November 25, 2008, shows that Sanders could not make it to court as scheduled because of eye surgery. (File in Cherokee County Case No. CF-98-111.)

Counsel was professionally unreasonable for failing to cross-examine Sanders about this pending case, the existence of which could have been discovered easily. Because this case was still pending without disposition during Mr. Barrett's trial, seven years after it had been

filed, Sanders's bias and motive in appearing as a Government witness in the hopes that he could resolve this case favorably – as he had all of his other cases – was apparent.

(14)  In Muskogee County Case Nos. CF-93-131 and CF-93-772 Sanders was convicted of escape and carrying a weapon into a jail, respectively.  Sanders attempted to claim that these were the same case, when they clearly were not.  Counsel was professionally unreasonable in failing to demonstrate that Sanders lied and that he in fact had separate Muskogee County convictions.  (Files in Muskogee County Case Nos. CF-93-131 and CF-93-772.)

(16)  In Tulsa County Case No. CF-94-1503, Sanders was charged with uttering a forged instrument.  This case was dismissed years later, on September 18, 2001.  Costs were assessed against the state.  Counsel was professionally unreasonable for failing to cross-examine Sanders regarding the disposition of this case, in which he once again avoided a conviction and prison time.  (File in Tulsa County Case No. CF-94-1503.)

(17)  In Tulsa County Case No. CM-03-6603, Sanders was charged with obtaining merchandise by false pretenses, a crime of dishonesty upon which he could have been cross-examined, but was not.  Sanders received a one year suspended sentence, fines and costs.  Although he surely promised to do so, Sanders failed to appear before the Tulsa County cost administrator as directed on March 24, 2004.  A bench warrant was issued for his arrest on April 12, 2004.  An application to revoke his suspended sentence was filed on April 14, 2004.  Another bench warrant for Sanders's arrest was issued on May 20, 2004.  On October 6, 2005, Sanders was sentenced to thirty-six days in jail, at a rate of $15.00 per day, to work off what was owed.  Not only the fact of Sanders's conviction for this crime of dishonesty, but his failure to follow through on promises to fulfill the terms of his suspended sentence, could have been inquired into

Def's § 2255 Mot.                                    110                       *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

on cross-examination to show him to be a completely untrustworthy individual, who will say one thing to receive something of advantage to himself, but whose word is utterly worthless.  (File in Tulsa County Case No. CM-03-6603.)

(18)    In Tulsa County Case No. CM-04-1187, Sanders was charged with drug possession and possession of drug paraphernalia.  On April 5, 2004, he incurred a failure to appear, despite a promise as a condition of his bond to make all court appearances.  During Mr. Barrett's trial, Sanders appeared, in custody, on September 28, 2005.  He entered a not guilty plea, and the case was set for the jury sounding docket on October 13, 2005.  On that date, again during Mr. Barrett's trial, and around the time he appeared as a first stage witness, the case was passed to November 17, 2005.  On November 17, the last day of Mr. Barrett's trial, the case was passed to February 2, 2006, because Sanders was "in federal custody."  On December 9, 2005, Sanders appeared in custody, entered a guilty plea, and was rewarded with sentences of one year in the county jail on each count, with the jail time suspended.  (File in Tulsa County Case No. CM-04-1187.)

Mr. Barrett's trial counsel unreasonably failed to discover the facts and cross-examine Sanders over the fact that this case kept getting passed until Sanders performed for the Government at Mr. Barrett's trial, the obvious implication being that any deals he would receive in that case were contingent solely on how much he pleased the Government.

(19)    In Sequoyah County Case No. CM-00-389, Sanders was charged with attempting to elude an officer, affixing an improper license plate to his vehicle, and eluding arrest.  On June 30, 2000, Sanders entered into a plea bargain which called for count 1 (attempted eluding) to be dismissed, fines and costs on count 2 (improperly affixing a license plate), and a one year suspended sentence and a fine on count 3 (eluding arrest).  On March 7, 2001, a bench

warrant was issued for Sanders's arrest for failure to satisfy terms of probation he promised the court he would fulfill at the time he entered his plea.  Counsel was professionally unreasonable for failing to cross-examine Sanders on this act of dishonesty.  (File in Sequoyah County Case No. CM-00-389.)

(20)    In Sequoyah County Case No. CM-03-365, Sanders was arrested, among other charges, for possession of marijuana.  He also attempted to resist arrest.  Counsel was professionally unreasonable for failing to cross-examine Sanders about the fact that with his prior drug convictions, he could have been, but was not, charged with felony possession of marijuana rather than a misdemeanor.  (File in Sequoyah County Case No. CM-03-365.)

In sum, counsel was professionally unreasonable for failing to move for a continuance so Sanders could be cross-examined effectively about his litany of prior convictions; his deals, which could only have resulted from his working continuously as a snitch; the charges and cases against him which had been dismissed; the fact that he was facing up to life in prison on many charges, but got virtually nothing by way of punishment; his acts of dishonesty in connection with various charges and his obligation to appear in court and adhere to the conditions of his probation, and the like.

Counsel even failed to discover all of Sanders's prior convictions.  Counsel stated that by his count, Sanders had ten previous convictions, or nine, if Sanders's dispute with one of them was credited.  (R. 2524-36.)  In truth, after the dismissed cases and charges against Sanders are set aside, Sanders had no fewer than eighteen prior felony convictions, if the various counts of conviction are totaled.  The better part of a day or more could have been spent cross-examining Sanders about his criminal record and the wonderful deals he got time after time, even while he continued to commit crimes with impunity.  Instead, counsel merely scratched the

surface, cross-examining Sanders generally (and inaccurately) about the number of previous

felony convictions, what they were for, and that he received little jail or prison time.  Counsel

neglected altogether to cross-examine Sanders about his misdemeanor cases involving

dishonesty, and did not even draw the jury's attention to the fact that many of Sanders's

convictions, for both felonies and misdemeanors, involved acts of dishonesty.

Had an effective cross-examination on Sanders's record been conducted, his

credibility would have been completely destroyed in the eyes of any rational jury.  Impeachment

of Sanders also would have undercut the credibility of Clint Johnson and other Sequoyah County

law enforcement officials, not to mention the Government then relying upon him to seek a death

sentence.  These omissions alone, or in conjunction with counsel's other failures to investigate

the informant witnesses and prosecution evidence, undermines confidence in the verdict.  If trial

counsel had presented the available evidence, the jury would have had an entirely different and

more truthful view of the case, including that the raid on Mr. Barrett's house was conducted on

the word of someone whom the Sequoyah County District Attorney knew was a lifelong liar,

drug addict, and opportunistic snitch.

> **2.    Counsel was professionally unreasonable for failing to investigate and produce witnesses who could have impeached specific claims made by Sanders, and Sanders's credibility as a whole.**

Even in the absence of moving for and securing a reasonable continuance to

investigate the snitch witnesses, it is plain that counsel failed to perform an adequate

investigation into readily available evidence and witnesses that would have impeached Sanders's

credibility and shown him to be completely unworthy of belief about anything and everything.

Instead of locating available witnesses to impeach Sanders, counsel relied on cross-examination

alone, which was plainly inadequate.

As noted, Sanders was somewhat "confused" over the dates he supposedly visited

Mr. Barrett's property.  Based on one reasonable interpretation of the dates Sanders claimed to

have been at Mr. Barrett's residence, and as argued by AUSA Littlefield to the jury, Sanders was

at Mr. Barrett's on the afternoon of September 23, 2009,  just hours before the early morning

police raid on Mr. Barrett's property.  Littlefield told the jury Sanders was present around 5:00

p.m. to 6:00 p.m. on September 23rd, around the time the gate to Mr. Barrett's driveway was

locked.  (R. 4299.)

Had counsel conducted a reasonable investigation, or sought the time to conduct

one, they could have produced Rick Lunsford as a witness to rebut this claim.  As noted in the

discussion of Travis Crawford's testimony, Mr. Lunsford arrived at Mr. Barrett's around noon on

September 22, 1999, and stayed until approximately 9:00 p.m. on September 23rd.  Lunsford

states that Sanders was never at Mr. Barrett's property on either September 22 or September 23,

1999.  Of course, Mr. Lunsford was never contacted by defense counsel.  Had he been contacted,

he would have been willing to testify that Sanders was never on Mr. Barrett's property on the

afternoon and early evening of September 23rd.  (Decl. of Rick Lunsford.)

Likewise, trial counsel failed to contact and interview another witness who could

have refuted Sanders's claim to have been in Mr. Barrett's house, where he supposedly saw

methamphetamine and a drug sale, according to his direct testimony, in September, 1999.  Sean

Hill would have testified that Sanders was never in Mr. Barrett's house because Mr. Barrett would not let him in. Mr. Barrett and his real friends stayed as far away from Sanders as possible because it was well known he was a chronic liar and a police snitch. (Decl. of Sean Hill.)

As noted, Brandy Hill was present at Mr. Barrett's on the afternoon of September 23, 1999. She could have identified the people who were present during that time. Charles Sanders was not among them. Ms. Hill was never contacted by defense counsel. (Decl. of Brandy Hill.)

Critically, Sanders testified that two to three days before the shooting, he went to Mr. Barrett's with his then-girlfriend, Geniece [sic] Thomas.[18] He gave conflicting testimony as to whether Mr. Barrett sold drugs to either him or Ms. Thomas, on this or any other occasion. When questioned by the prosecutor, Sanders claimed that Mr. Barrett sold Ms. Thomas drugs. Questioned by defense counsel, Sanders stated that there was no drug deal when he supposedly went to Mr. Barrett's two to three days before the police raid, and that he merely went there, with Ms. Thomas, to exchange a set of car keys.

Trial counsel never contacted Ms. Thomas. She was an available witness. Had counsel located and interviewed her, she would have testified that Sanders was lying. Ms. Thomas would have testified that she was not at Mr. Barrett's with Sanders a few days before the shooting. She also would have testified that on the occasions she did go to Mr. Barrett's she never went with Sanders. Moreover, Ms. Thomas could have testified that on the occasions she went to Mr. Barrett's, she never bought drugs from him. On any occasion she was at Mr. Barrett's when Sanders was on the property, she never witnessed or had any knowledge of any

_____

[18] Her true name is Janesse Thomas.

drug transactions between Mr. Barrett and Sanders.  Mr. Barrett would not have sold drugs or engaged in drug activities with Sanders because Mr. Barrett neither liked nor trusted Sanders, who was a well-known snitch.  (Decl. of Janesse Thomas.)

Counsel unreasonably failed to investigate and produce some of the witnesses discussed immediately above, and others, who could have testified that Sanders is a pathological liar whose word was worthless.  Not only did these witnesses have personal opinions that Sanders was dishonest and completely untrustworthy, but they were well aware that Sanders's reputation for truth and veracity in the community was horrendous.  These witnesses also could have armed counsel with information to cross-examine Sanders, in the first stage of trial, about various bad acts and acts of dishonesty.  Since Sanders also appeared as a penalty phase witness for the Government, and because the rules of evidence are relaxed in the second stage of a capital trial, these witnesses could have given specific testimony on specific bad acts of Sanders and actions which reflected negatively on his credibility.

Rick Lunsford could have testified that he knows Sanders, and had done drugs with him in the past.  Sanders was a heavy drug user, who also dealt drugs.  In Mr. Lunsford's opinion, Sanders is a totally dishonest person.  Mr. Lunsford would not believe anything Sanders said.  Sanders was even dishonest in his drug dealings.  Sanders often sold bad dope to people and ripped them off.  Of course, he never seemed to get in trouble for his drug dealings.  Mr. Lunsford is aware that Sanders once kidnaped a woman, Sally Davis.  Not only does Mr. Lunsford have a personal opinion that Sanders is wholly dishonest, but he has a well known, and richly deserved, reputation for dishonesty in the community.  Mr. Lunsford, as noted in the discussion regarding Travis Crawford, also could have testified that Mr. Barrett never threatened

harm to the police, and never said he would go out in a "blaze of glory" or anything like that. (Decl. of Rick Lunsford.)

Janesse Thomas, Mr. Sanders one-time girlfriend, could have testified that in her personal opinion, Sanders is completely dishonest and would say and do anything as long as he believed he would obtain something of advantage to himself. Sanders's reputation for honesty in the community is horrible. Ms. Thomas could also have given testimony showing that Sanders resented Mr. Barrett and had a motive to lie against him. On one occasion, when Thomas was still Sanders's girlfriend, she tried to get away from him and called Mr. Barrett and another friend for help. Thomas left Sanders, and was picked up by Mr. Barrett. Sanders and his mother, Evelyn Sanders, followed Mr. Barrett and Thomas. Sanders was angry and was trying to persuade Ms. Thomas to come back with him and his mother. Instead, Mr. Barrett was able to get Ms. Thomas away from Sanders. (Decl. of Janesse Thomas.) Based on these events, jurors would have found Sanders had a personal motive to lie about Mr. Barrett, apart from or in addition to his interest in currying favor with law enforcement.

Sean Hill could have testified that in his personal opinion, Charles Sanders is a liar who had no credibility whatever. Sanders's reputation in the community for truth and veracity is abysmal; Sanders is known as a thief, a liar and a snitch. It was known in the wider community that Sanders lies about others in order to get favorable treatment from law enforcement. When Mr. Hill heard that the Government sponsored Sanders as a witness at Mr. Barrett's trial, he could not believe the prosecutors would rely on Sanders because of his lengthy arrest record. In his penalty phase testimony, Sanders claimed that Mr. Barrett had made statements to the effect that the informant against him should be found and harmed. Mr. Hill could have given testimony from which the jury could infer that Sanders was attributing to Mr.

Barrett actions that routinely occurred.  Mr. Hill would have informed the jury that when Sanders is in jail, it is known that he is routinely beaten up by other inmates because he is a liar.  (Decl.of Sean Hill.)

Sally Davis Johnson, a one-time girlfriend of Sanders, was available as a witness, but was never contacted by the defense.  She last had contact with Sanders in 2004, before Mr. Barrett's trial.  In her personal opinion, Sanders is completely unbelievable and untrustworthy.  Sanders is extremely dishonest even when sober, but when he is on drugs, he is "100 times more dishonest."  Ms. Johnson could never believe anything Sanders said on any subject.  (Decl. of Sally Davis Johnson.)

Ms. Johnson could have provided defense counsel with information about specific bad acts of dishonesty and violence that could have been used to impeach Sanders in the first stage of trial, even if she could not have given "extraneous evidence" on these matters in the first stage.  Ms. Johnson could have testified to these acts, however, in the penalty phase.  This evidence would have put the lie to the prosecution's portrayal of Sanders as simply a non-violent doper who was himself the innocent victim of planned violence by others.

On one occasion, Sanders used lies and fraud to get Ms. Johnson to go with him.  Sanders showed up at her house and said he needed to talk to her.  She told him she could talk to him briefly, but had to get back to school.  She left with Sanders in his car.  Against her will, Sanders kidnaped her and took her to Vian, Oklahoma, where she was held for eight days.  She was beaten on a daily basis by Sanders, and was even stabbed.  During this ordeal, Sanders lied to her repeatedly, telling her he would take her home when her bruises healed.  Instead, Sanders simply kept beating her.  When she tried to escape, Sanders threw a knife at her, and stabbed her in the foot.  Sanders also used a knife to cut her from her neck to her chin.  After five days of

being held by Sanders, he turned himself in to the police on an outstanding charge.  At this point,

Sanders turned Ms. Johnson over to his mother, Evelyn Sanders, who confined her for another

two to three days.  The police finally rescued Ms. Johnson.  Evelyn Sanders tried to cover up Ms.

Johnson's many bruises with make-up.  A police report was made by Ms. Davis about what

Sanders did to her.  (Decl. of Sally Davis Johnson.)[19]

Ms. Johnson could have told defense counsel, had she been contacted, about an

act of threatened violence committed by Sanders.  Sanders once threatened Ms. Johnson's

mother, Linda Davis, because Ms. Davis would not tell Sanders where Ms. Johnson was.

Sanders stated that unless Ms. Davis gave him the information he wanted, he would find Ms.

Johnson and cut her tongue out.  (Decl. of Sally Davis Johnson.)

Ms. Johnson, had she been contacted by defense counsel, also could have

informed the defense about other specific acts of dishonesty committed by Sanders.  Sanders

once took her along on a stealing spree, during which Sanders stole from virtually everyone he

knew in order to get money to buy drugs.  The police were informed about this by Ms. Johnson.

Sanders had also stolen from Ms. Johnson and her family in order to get money to buy drugs.

Sanders was so pathetically dishonest he once stole  Ms. Johnson's children's toys in order to

pawn them for drug money.  (Decl. of Sally Davis Johnson.)

Finally, one of Sanders's own relatives could have testified, had he been contacted

by the defense, that Charles "Monk" Sanders is a completely untrustworthy and unbelievable

individual.  Billy Poindexter is Sanders's uncle, and has known Sanders his entire life.

According to Mr. Poindexter, "you can believe him [Sanders] about as far as you can throw a

---

[19]  Evidently, based on the search of Sanders's court records, he was never charged in this incident because he was working as a police snitch.

Def's § 2255 Mot.                              119                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

pick-up truck." Sanders, who has been in trouble his whole life, is unbelievable in everything he says. Mr. Poindexter would not believe his nephew about anything. Mr. Poindexter is aware that when Sanders testified at Mr. Barrett's trial, Sanders was doing so in order to get out of his own troubles with the law. Mr. Poindexter is also aware that after testifying against Mr. Barrett, Sanders served no jail time for anything he was in trouble for. Mr. Poindexter states also that he is aware that Sanders's reputation in the community for truthfulness is awful. Had Mr. Poindexter been contacted by Mr. Barrett's trial lawyers, he would have testified. (Decl. of Billy Poindexter.)

Additionally, had trial counsel moved for a continuance, they could have developed all the evidence detailed above respecting Sanders's credibility to mount a withering attack on the search warrant under *Franks*. This evidence would demonstrate conclusively that *no one, including Clint Johnson*, could have used Sanders as a "reliable" confidential informant.[20]

### d.    Randy Weaver

Randall Weaver testified in the first stage of Mr. Barrett's trial. He stated that in 1999, he was using methamphetamine, and had been to Mr. Barrett's place three or four times in the spring and summer of that year. Using the death of Trooper Eales as a benchmark, Weaver stated he had been to Mr. Barrett's earlier in 1999 year looking at cars. On that occasion, Weaver and Mr. Barrett used methamphetamine together. Weaver went to Mr. Barrett because he was a good mechanic. Whenever he went to Mr. Barrett's property, the gate was open; Mr. Barrett did not come out with a gun on the occasions Weaver went to the property. Weaver testified he

---

[20] *See also,* Mr. Barrett's *Brady/*newly discovered evidence claim respecting the complete lack of credibility of both Sanders and Johnson.

bought $20.00 of methamphetamine from Mr. Barrett. Weaver claimed Mr. Barrett told him that

he (Mr. Barrett) had missed a court date, and that he thought a warrant had been issued. (R.

1835-39.)

Weaver, who was interviewed by Bret Smith and defense investigator Loyd Cobb

in AUSA Mike Littlefield's presence, testified he had first been approached about Mr. Barrett's

federal case by Littlefield, who came to his tattoo shop in Arkansas. Weaver had previously

done time on an Arkansas cocaine charge. When Littlefield came to see him at the tattoo shop,

he asked whether Weaver had ever sold ammunition to Mr. Barrett, and informed Weaver that it

was against federal law for Weaver to possess ammunition because of his previous conviction.

Weaver told Littlefield he never sold ammunition to Mr. Barrett. Littlefield's statement to Mr.

Weaver about the sale of ammunition might be construed as a subtle threat, but Weaver felt he

had nothing to worry about because he had done nothing wrong. (R. 1835-39.)

Questioned by defense counsel, Weaver testified that in a rural area like he and

Mr. Barrett lived in, people don't drive up without warning in the middle of the night. If a gate is

closed, people should not go onto somebody else's property. It makes no sense to do such a

thing. (R. 1840-45.)

Although he was interviewed briefly by the defense, defense counsel and the

defense investigator failed to ask Weaver whether, when Mr. Barrett supposedly discussed his

court case, or at any other time during the Spring and Summer of 1999, he ever said words to the

effect that he would blast the first policeman who came onto his property, would "go out in a

blaze of glory," or had in any way, at any time, threatened the police. Had he been asked these

questions at trial, Weaver would have testified that Mr. Barrett never made such statements to

him or anyone else in his presence.  In fact, Mr. Barrett never indicated to Weaver that he would ever do violence to anyone.  (Decl. of David Autry.)

### e.   Brandie Zane Price

Brandie Price testified she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period.  (R. 3485-86.)  Price testified that a week to ten days before the shooting incident, Mr. Barrett mentioned that he had an outstanding warrant and that the police were going to come get him.  Mr. Barrett supposedly stated that if the police arrived, those present should either grab a gun or hit the floor, because he "was going to take as many of them bastards out as he could."  (R. 3492-93.)

Price stated that she usually went to Mr. Barrett's house with Ronny Baldwin,[21] who would drive her vehicle through the ditch area the police went through when they raided Mr. Barrett's house.  (R. 3502-06.)  Defense counsel cross-examined Price about statements she made to the authorities in 2000, where she stated that Mr. Barrett had a MAC-10 and a Mini-14 at his residence, which were unlike the weapons she described on cross-examination.  She also stated in 2000 that she went to Mr. Barrett's with a lady named Jaime Crow, which she denied doing in her testimony.  (R. 3509-11.)

Price's claim that Ronny Baldwin or she usually approached Mr. Barrett's residence from the east through the ditch in her Mazda or Mitsubishi automobile could have been easily refuted by the testimony of Sean and Brandy Hill.  Had they been contacted, they would

---

[21]  Ronny Baldwin testified for the defense.  He stated he could never recollect going to Mr. Barrett's house with her at any time, and that he never would have driven her car through the depressed area to the east of Mr. Barrett's cabin.  Baldwin could not have gone to Mr. Barrett's in August and September as she claimed, because he was jailed on August 4, 1999, and remained in jail through the entire month of September, 1999.  (R. 4117-23, 4182-83.)

have testified that it would have been impossible for this low-slung vehicle, no matter how slowly it was going, to navigate the ditch successfully.  The undercarriage would have been severely damaged in the attempt.  (Decls. of Sean Hill and Brandy Hill.)

Counsel also failed to call any witnesses who could testify to their personal opinions regarding Price's honesty, or her reputation for honesty in the community.  Sean Hill was an available witness never contacted by the police.  If he had been interviewed and prepared to testify, he could have told the jury that Price was known in the community as a thoroughly dishonest person who would do or say anything to obtain drugs.  (Decl. of Sean Hill.  *See also* Claim 5, *infra*.)  Moreover, the witnesses who were never investigated who could have impeached claims by Monk Sanders, Travis Crawford and Cindy Crawford that Mr. Barrett made threatening statements against law enforcement could have been used to indirectly discredit Price, since her story was simply too pat and conveniently lined up with what Sanders and the Crawfords said on the witness stand.

### f.      Karen Real

Karen Real, like all the other informant witnesses except Randy Weaver, refused to talk to the defense.  (R. 3076-77.)  At the time she testified against Mr. Barrett, she was serving a fourteen year federal sentence on drug charges and a firearms charge.  (*See* Claim 5, *infra*.)  Real had been to Mr. Barrett's on several occasions.  She claimed he usually kept his gate locked, and that when people arrived on his property, he would grab a gun before he determined who they were.  (R. 3085-86.)  Real did drugs with Mr. Barrett, and testified that he sold drugs and kept syringes in his house.  (R. 3087-88, 3099, 3091, 3102-03.)  According to Real, Mr. Barrett stated he would shoot the police if they came on his property.  (R. 3106.)

Counsel relied strictly on cross-examination in an attempt to impeach Karen Real. No witnesses who knew her in the community were called to testify regarding her honesty. As with Brandie Price, Sean Hill could have testified that Real's word was not to be believed. According to Mr. Hill, Real is a "pretty messed up" person. Although Real's federal conviction was brought out, counsel never asked her if she had provided information against her co-defendants in an effort to secure leniency. Mr. Hill states that she informed on her boyfriend and co-defendant, Doss Gann, in an attempt to get favorable treatment. Karen Real is the type of person who would do and say anything to get out of trouble. (Decl. of Sean Hill.) Again, witnesses who could have been called to impeach the claims of the Crawfords and Sanders that Mr. Barrett threatened violence against the authorities if they came on his property could have been used to indirectly impeach Real's virtually identical claim.

### g.    Randy Turman

At trial, Randy Turman claimed Mr. Barrett taught him how to cook methamphetamine. (R. 193.) At the time he testified, Turman had pending state charges for manufacturing methamphetamine. (R. 193.) He was at liberty on a $120,000.00 bond. Turman admitted that he had cooked methamphetamine once a week for five years, and to possessing a firearm while doing so. When asked about these charges, Turman said "it's done been taken care of." (R. 445-46.) The witness had taken numerous drugs over an extended period of time, and was once up for four days on a "meth run." (R. 430-31.) Turman claimed there was nothing going on in his case. He had gone to court, and as far as he knew, the charges had been resolved. (R. 434-35.) Turman testified he had no deals in exchange for his testimony, that he had not been given immunity from punishment, that he never worked as an informant or paid informant. He declined to talk to the defense because he figured he would be questioned in court, and that

Def's § 2255 Mot.                              124                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

would suffice.  Asked if one of the charges currently lodged against him was for altering the serial number on an SKS, he stated that charge had been dropped.  (R. 434-35, 439-44.)  Turman stated he was simply in court to tell the truth.  (R. 445.)

Turman claimed he met Mr. Barrett three or four months before Trooper Eales was shot.  (R. 364-65.)  He "hung out" at Mr. Barrett's and would use methamphetamine there.  (R. 366.)  He stated he witnessed Mr. Barrett cooking methamphetamine in his cabin.  (R. 377.)  He identified Government's Exhibit 65, a photograph taken in Mr. Barrett's shop of mineral spirits, toluene, and paint thinner.  Turman stated Mr. Barrett would use these ingredients to cook meth.  (R. 383-84.)  Tubing used to manufacture methamphetamine was kept in Mr. Barrett's cabin.  (R. 384-85.)  Glassware used in the manufacturing process was kept in a water trough.  (R. 385-86.)  Turman explained how Mr. Barrett supposedly "powdered" methamphetamine in his shop and how a hose was attached to a gas tank during the cooking process.  (R. 387-91.)  Turman testified, though, that he never actually saw Mr. Barrett cooking meth, and that he never really discussed the manufacturing process with Mr. Barrett, even though he claimed Mr. Barrett was the person who taught him how to cook meth.  (R. 389-91.)

Turman testified he recognized items that were in Mr. Barrett's house during the summer of 1999, including a tool box and hose, and explained how Mr. Barrett could used these items to make dope.  (Government's Exhibit 63, R. 396-97.)  Turman testified Mr. Barrett would lock the gate to his driveway to restrict access to his property, and identified the "warning sign" that had been placed there.  (Government's Exhibit 104.)  The witness claimed Mr. Barrett never

left his property because there was a warrant out for his arrest, and that he was afraid the police would come to his house.  (R. 397-401, 416.)

Mr. Barrett kept several weapons in his home, including a .233 Colt Sporter rifle; a .22 pistol; a Smith and Wesson 9mm pistol; and a double-barreled 12-gauge shotgun, which Turman said he sold Mr. Barrett.  (R. 401, 404-11.)

Turman admitted he went to Mr. Barrett's house to paint a car on one occasion, and that the enamel reducer and mineral spirits in the cabinet to Mr. Barrett's shop were used to paint vehicles.  (R. 437-39.)

Thus, Turman was a critical witness on the underlying drug charges in the superseding indictment, as well as on the question of Mr. Barrett's intent.  Turman was especially important on the drug charges, since the search of Mr. Barrett's home and property yielded no working methamphetamine lab and virtually no drugs.  It was therefore of paramount importance that Turman be effectively impeached.  This, trial counsel failed to take reasonable steps to do.

Trial counsel was professionally unreasonable for failing to research Turman's court file on the charge that had "done been taken care of."  The pending felony drug and firearms charges were still open when Turman testified.  Contrary to Turman's testimony, the possession of a firearm with an altered serial number charge had not been dismissed.  The only way these charges could have been "taken care of" is if Turman were acting as a police informant, and was going to get some sort of deal in exchange for his informant work and his testimony against Mr. Barrett.

In Sequoyah County Case No. CF-02-477, filed on September 10, 2002, Turman was charged in a six count information with manufacturing methamphetamine; possession of methamphetamine with intent to distribute, possession of precursor material; another count of possession of precursor material; possession of a firearm while committing a felony; and

possession of a firearm with an altered serial number. The charges were based on evidence recovered during the execution of a search warrant. Turman posted an appearance bond on September 20, 2002. A preliminary hearing was set for April 17, 2003. The preliminary hearing was re-set for June 12, 2003, and apparently re-set again on later dates, since preliminary hearing was ultimately waived on November 3, 2003. According to documents in the Sequoyah County Court file, the case literally fell off the map until May 9, 2007, when the District Attorney's Office filed a motion to dismiss "in the best interests of justice." The motion to dismiss was granted by written order the same day it was filed. (File in Sequoyah County Case No. CF-02-477.)

Counsel was professionally unreasonable for failing to expose Turman's bald-faced lie about his case having been "taken care of," and one of the firearms charges having been dismissed, when the case was still active and literally nothing had happened on it in two years. Not only would Turman have been exposed as a perjurer, but the curious chronology of his Sequoyah County felony case could have been used to support counsel's claim on cross-examination, which Turman denied, that he was a police snitch, had made an undisclosed deal with the Government for his testimony against Mr. Barrett, and was going to be rewarded in the end (as he was) depending on whether he pleased the Government with his testimony.

Counsel was also professionally unreasonable, as with the other informant witnesses discussed above, in failing to develop and introduce evidence regarding Turman's overall lack of honesty. Sean Hill could have testified that Randy Turman is "as low as you get," and that he was known in the community as a thief who would "testify against anyone to save his own skin." (Decl. of Sean Hill.)

## Conclusion

There was one major difference between Mr. Barrett's state prosecution, which ended in a conviction of manslaughter, and his federal case, which resulted in the death penalty: the testimony of the seven snitches, who were nowhere to be found in 2002 and 2004, when Mr. Barrett was tried in state court.  Their testimony was vital to the Government's case for intent in both stages of trial, and to establishing the underlying drug charges.  Despite the obvious importance of these witnesses, as the trial court itself stated on September 13, 2005, Mr. Barrett's trial counsel failed to move for a continuance, and took virtually no steps to investigate and impeach these witnesses.  Because of the critical importance of these witnesses, who could have been devastated had proper investigative steps been taken, the failures of trial counsel were unquestionably prejudicial.  There is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that but for counsel's indefensible errors and omissions, the result of the guilt stage of trial would have been different.  At a minimum, these failings also had a prejudicial effect on the punishment stage.  *Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Strickland v. Washington,* 466 U.S. 668 (1984).

This case is analogous to *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002), where, in the context of a *Brady* claim, a capital conviction was vacated because exculpatory evidence which could have been used to impeach witnesses was not disclosed.  The concealed evidence, there and in Mr. Barrett's case would have shown that witnesses had motive to lie and had colluded in their stories.  *See also Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2002) (counsel ineffective in part for failing to impeach immunized witness).  *See also, e.g., Reynoso v. Giurbino,* 462 F.3d 1099, 1114, 1120 (9th Cir. 2006) and *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995), *cert. denied,* 519 U.S. 910 (1996)(counsel ineffective for failing to impeach); *Horton v. Massie,* 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished)(counsel ineffective for failing

to call defendant's young daughter in murder case to support claim that while defendant was present, she did not participate; the prosecution's key witness told inconsistent stories, and prosecutor emphasized defendant's version was uncorroborated; counsel was also ineffective for failing to investigate and present evidence that the prosecution's chief witnesses were collaborating with each other and had a motive to lie).

> **5.      Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence.**

Trial counsel was professionally unreasonable for failing to hire an independent crime analyst or reconstruction expert in order to rebut the testimony of OSBI agent Iris Dalley. Mr. Barrett's counsel sought $17,000.00 for an expert to conduct a crime scene reconstruction, in anticipation that the Government would rely on Iris Dalley, who appeared as a witness at Mr. Barrett's two state trials. Counsel sought authorization to hire Edward Hueske of Denton, Texas. Mr. Hueske had consulted with the defense during Mr. Barrett's state trials. The court authorized $4,000.00 for a crime scene reconstructionist. After Mr. Echols left the case, trial counsel Roger Hilfiger informed the court that it had not used available funds to hire a crime scene reconstructionist, but instead used the funds for an investigator. Loyd Cobb, the investigator hired by trial counsel, testified that he went to Mr. Barrett's property and took photographs, at least some of which were introduced into evidence. *See* Claim 1, *supra*, and 3, *infra.*

As stated in Claims 1 and 3, Mr. Barrett had a constitutional and statutory right to expert assistance to rebut the Government's witness. Prevailing professional norms of criminal defense practice advise attorneys to obtain expert assistance. Mr. Barrett's trial counsel acted unreasonably by failing to secure any benefit from the exercise of Mr. Barrett's statutory and

constitutional rights to expert assistance.  Counsel's failure to investigate the benefits of expert advice was deficient performance.  *Rompilla v. Beard,* 545 U.S. 374 (2005)(ineffective assistance to fail to investigate evidence the defense knew prosecutors intended to use); *Wiggins v. Smith,* 539 U.S. 510 (2003)(counsel could not have made a reasonable decision to forego further investigation because they lacked sufficient information).

Iris Dalley was a key witness for the Government.  Her crime scene reconstruction testimony was used by the prosecution to argue that Mr. Barrett had been standing on the porch when he fired his .223 Sporter rifle, and therefore would have seen the several police vehicles with emergency lights engaged which had descended on his property.  The defense contended that Mr. Barrett fired from inside his house and would only have seen the lead vehicle, driven by Buddy Hamilton, which did not have any emergency lights engaged, and thus could not be identified as a police vehicle.  Dalley's crime scene reconstruction testimony, complete with a PowerPoint presentation and animations, which were shown to the jury but not introduced as exhibits, was used to support the prosecution's theory.

Trial counsel's unreasonable omission was prejudicial.  Had counsel engaged the services of the independent expert authorized for Mr. Barrett's defense, it could have been shown that Dalley's analysis was amateurish, unscientific, seriously flawed, and did not comport with the necessary protocols for conducting a legitimate and reliable reconstruction.  In connection with the current proceedings, counsel asked Mr. Hueske to review Ms. Dalley's testimony, the exhibits introduced in the case, her PowerPoint presentation, her animations, and other materials upon which she relied.  Mr. Hueske, a nationally known expert whose credentials, training and experience far outstrip Dalley's meager qualifications, has concluded that Dalley's testimony was not worthy of belief.  (Report and curriculum vitae of Edward Hueske.)

Def's § 2255 Mot. 130 *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

In his report, Mr. Hueske first shows that Dalley's use of inappropriate terminology reflects her poor understanding of the fundamentals of crime scene analysis, if not an intention to confuse, rather than inform, the jury. "Ms. Dalley repeatedly uses terminology that is inappropriate both with regard to vehicular descriptions and firearms components." For example, Dalley, in her testimony, refers to the "front quarter panel" of the Ford Bronco driven by Buddy Hamilton, and in which David Eales was a passenger, when she is trying to reference the front fender. Instead of referring to the "driver's side" and "passenger's side" of the vehicle as points of orientation, she used the confusing terms "left" and "right." Dalley used the term "sidewall," which obviously refers to the portion of a tire, when she is attempting to describe an inner body panel on the Ford Bronco. Dalley consistently and improperly used the term "projectile" to refer to anything that may have caused an impact, rather than using correct terms for a bullet, a bullet fragment, or other constituent parts of a bullet. (Hueske report at 2.)

Dalley exhibited a fundamental misunderstanding of "bullet fragmentation upon impact with glass[.]" In reality, fragmentation of a bullet begins when it impacts a surface such as glass. If trial counsel had secured Mr. Hueske's services, the jury would have known that Dalley erroneously stated that a bullet would only fragment after perforating or passing through glass. Dalley admitted she was not a firearms examiner, stating that she seeks the assistance of such experts when she has a "ballistics" question. While it could be argued that one need not be a firearms expert to conduct a crime scene reconstruction, "a basic understanding of firearms and ammunition components is essential to being able to recognize what one is viewing at a shooting scene." Mr. Hueske notes Dalley testified there "might" be some caliber similar to a .233 rifle that "could have made" some of the bullet holes in the Bronco. When asked by defense counsel for examples, Dalley could not come up with any. (Hueske report at 2-3.)

If he had been called to testify, Mr. Hueske would have exposed to the jury that Dalley's use of "inappropriate terminology and ambiguous statements" made understanding her testimony difficult. Dalley's shortcomings in these areas likely reflect her lack of expertise with firearms and vehicles. (Hueske report at 3.) Hueske's analysis shows that Dalley lacked sufficient knowledge of ballistics, vehicle construction, and the necessity of using consistent, accurate terms of reference when reconstructing a scene to render reliable, credible opinions about a shooting scene involving a vehicle.

Mr. Hueske states there are numerous more serious flaws in Dalley's attempt at a crime scene reconstruction in this case, and with her trial testimony. Mr. Hueske's bottom line conclusion is that Dalley "did not follow widely accepted protocol used in shooting incident reconstruction. ... Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation." (Hueske report at 3, 6.)

Mr. Hueske would have exposed the following failings to the jury:

1)      Standard, accepted crime scene reconstruction protocol requires a determination of the length, width and height of any vehicle involved in a shooting. Dalley neglected to determine the dimensions of the Ford Bronco in aid of any trajectory analysis. There is also an unresolved question as to how wide the passenger door was open when shots were fired. No measurements were taken. Instead, Dalley illogically explained that because the passenger door was curved, it could not be measured. (Hueske report at 3.)

2)      Before trajectory rods are used, proper protocol demands an examination of the margins, interior surface, and surrounding area for trace evidence. Placing trajectory rods

in bullet holes, as Dalley did, invariably alters them.  Dalley was specifically asked whether she saw gunshot residue around any bullet holes, and state she saw none.  (R. 3399.)  Hueske report at 3.

3)      To legitimately evaluate the area around a bullet hole for trace evidence, close inspection with a magnifying lens, or a lift for later analysis, should be done.  Bullet holes should also be examined for blood, tissue, hair, fibers or other forms of trace evidence.  Dalley failed to do this.  Hueske report at 3.

4)      The caliber of a bullet creating a bullet hole can be determined with an acceptable degree of confidence, when bullet holes are "symmetrical and devoid of any distortion."  In such instances, accepted, standard protocol requires the length and width of the bullet holes to be measured with a pair of dial calipers.  The width of the hole can be "related to the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates."  Dalley could not determine the caliber of any bullets striking the Bronco (and thus could not say whether any of them were created by "friendly fire") (R. 3298.)  Based on some of the photographs taken of the bullet holes in the Bronco, it appears they could have been measured to determine caliber with the appropriate instrument.  (Hueske report at 3.)

5)      Dalley's heavy reliance on trajectory rods to determine the trajectories of the fired rounds failed to follow protocols and was based on unwarranted assumptions.  Correct placement of trajectory rods to properly determine trajectories "requires an understanding of bullet penetration/perforation in a variety of substrates."  This is especially true with bullets that fragment or tend to fragment, like rounds fired from a .233 rifle.  Equally important is knowing when the calculation of trajectories, rather than the use of trajectory rods to determine them, is called for.  Trajectory rods such as Dalley utilized are a reliable tool for determining bullet

trajectories where there is "a secondary impact that has not resulted from initial impact deflection and/or fragmentation." However, Dalley attempted to determine bullet trajectories "utilizing fragment impacts into secondary targets based on the presumption" that the bullet core, or a large part of the bullet core, "travels in a straight path." This assumption is unwarranted, and skews the analysis. Mr. Hueske would have explained that Dalley was making contradictory claims, as when she testified (correctly) that the "exact path" of each bullet could not be determined, and also testified (incorrectly) that her trajectory patterns, as she described them, were "accurate." (R. 3446. Hueske report at 4.)

6)      Dalley relied upon fallacious reasoning to say that bullets would pass through an intervening target such as the passenger door of the Bronco "undeterred," or straight through. Dalley testified repeatedly that bullets going through the "partially open" Bronco door would go "straight through," and that bullet core fragments would do the same. Where, as in this case, bullets fragment on impact, the path or trajectory is unpredictable. Dalley conjured a number of scenarios to make her theory that the bullet trajectories were unaffected by intervening targets (and thus her trajectory analysis as a whole) "fit" the evidence. Dalley posited that the passenger door of the Ford Bronco moved to various different positions "to account for the incongruity of different trajectories through it." (R. 3314) Although this type of movement cannot be excluded, it is a speculative endeavor to make the evidence correspond with the theory being propounded. The more likely explanation is that bullet deflections or fragmentations account for the variations in bullet trajectories through the vehicle door. Deflections occur

frequently when bullets strike objects with irregular surfaces, as opposed to those which strike flat surfaces. (Hueske report at 4.)

Def's § 2255 Mot.                              134                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

7)      Dalley lacked basic equipment and measurements necessary to make her diagrams and animations reliable.  When trying to ascertain the trajectories of bullet holes in vehicles and other inanimate objects, trajectory rods placed through the bullet holes are referenced by two linear and two angular coordinates.  This is indispensable to establishing "reproducible data for creating diagrams and animations" that *accurately*, within the limits of uncertainty, represent the true bullet trajectories.  Mr. Hueske finds it "amazing" that Dalley *did not* determine any of the angles because she "did not have the necessary equipment."  ( R. 3275) All that would be required to perform this essential task is a "$30 zero base protractor and a $5 plumb bob."  Because Dalley failed to take such measurements, and because she could not determine the "exact paths" of the bullets using trajectory rods alone, "it is unclear how the diagrams and animation she produced can be perceived as having any reliability." Again, the chief reason for getting such linear and angular measurements "is to be able to accurately create diagrams and animations, such as the ones Ms. Dalley prepared in this incident."  (Hueske report at 5.)

8)      Dalley failed to ascertain bullet impact angles "relative to a common point of reference (plumb line) [as] is the accepted standard" for reliable reconstruction.  (Hueske report at 5.)  In her testimony, Dalley generally described the terrain of the shooting scene as "hilly," but did not establish the exact grade of the terrain, or consider the potential impact the grade might have had on what she perceived to be the trajectories of the bullets hitting the Ford Bronco.

9)      Where holes are of questionable origin, and may or may not be bullet holes, the proper procedure requires on-site chemical testing for the presence of copper or lead to

confirm that the holes or perforations were produced by a bullet rather than something else. Although Dalley testified that she had some knowledge of this kind of testing, she did not testify that she actually conducted it.  (Hueske report at 5.)

10)     Dalley testified she had "no means of sequencing any of the shots" at the scene.  This was not accurate. Analysis to determine the sequence of shots is not always possible, but it can sometimes be accomplished "through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets [or] fragments[,]" such as glass, fibers, hair, paint and other substances.  Thus, Dalley had the means of attempting to sequence the shots, but she either was not aware of the techniques used in that process or, she chose not to employ those methods either at the scene or later.  (Hueske report at 5.)

11)     Critically, Mr. Hueske could have shown that Ms. Dalley failed to employ well known methods that could have shed light on the location of Hamilton's Bronco when specific shots struck it.  In any incident involving a moving vehicle, any legitimate reconstruction or re-enactment would include actually placing the Bronco in various positions to determine the likelihood of each shot coming from one or more particular positions.  It was particularly important here to determine the angle of fire after the Bronco came to a stop.  However, the Bronco itself was not placed in a variety of positions to determine the trajectories of the shots fired at or into it.  Dalley testified that before she arrived at the scene, the Bronco had been moved.  However, she also testified there were tire impressions and a fluid deposit in the dirt in front of Mr. Barrett's residence.  These markings could have been used to re-position the Bronco to where it came to rest before being moved.  (Hueske report at 5.)

12)     Dalley employed a fundamentally flawed approach when she attempted to establish the trajectory of bullets that passed through the window glass, blinds and curtain or towel hanging over the front window of Mr. Barrett's cabin.  She testified that the results of her trajectory analysis for these objects were reliable.  (R. 3389.)  First, the accepted method for reliably determining trajectories is to set up a tripod and place a laser on the tripod.  Dalley had someone assisting her hold a trajectory rod by hand.  Second, Dalley failed to take measurements of the hole locations.  (Hueske report at 5.)

13)     Dalley's method of "placing a hand-held laser into bullet holes in the Bronco window glass is equally flawed since it presumes no deflection resulted from either the impacts or the fragmentation."  *Ibid.*

14)     Dalley overstated her ability to reach a warranted conclusion regarding the critical issue of Mr. Barrett's position in relation to the Bronco.  When attempting to determine the distance of fire on the bullet holes in the cabin window, Dalley testified she did not "see" any evidence of gunshot residue on the window.  Because of this, she opined that the distance had to be greater than three feet from the glass, since the literature states that the absence of gunshot residue at the edges of a bullet hole indicates shots were fired from greater than three feet away from impact. This general rule varies greatly depending on the weapon used, and also depends on the type of ammunition used.  To correctly evaluate the maximum muzzle to target distance, the weapon in question should be fired into glass like that at the scene, and the same type of ammunition should be used.  (Hueske report at 6.)

15) In a shooting incident like this, a metal detector should be used to detect the presence of bullets or bullet fragments. Dalley did not attempt to locate any bullets or fragments in the soil. (Hueske report at 6.)

16) In reaching her conclusion that David Eales was struck in the right arm after he exited the Bronco, Dalley ignored the elementary dictum in forensic science that "absence of evidence is not evidence of absence." Dalley testified that since she found no tissue in the Bronco, and tissue appeared to be missing based on the appearance (to her) of the wound, Trooper Eales must have been outside when he was struck. However, Dalley's testimony fails to establish that she looked for any tissue outside the Bronco. It would have been easy to try to confirm Dalley's conclusion by spraying luminol on the ground in the area around the Bronco. There is nothing to show this was done. An honest forensic scientist would say the fact that evidence is not found (and Dalley apparently took no steps to find it) cannot be used to "conclude anything other than that no evidence was found." (Hueske report at 6.) Dalley's conclusion in this regard was critical to the prosecution's theory because the Government argued that at the time Trooper Eales was shot, he was outside the Bronco and the type of equipment he was wearing would have made it obvious to Mr. Barrett that he was a law enforcement officer.

In sum, if trial counsel had obtained the services of a qualified forensic examiner, they could have challenged the admissibility of Dalley's testimony under Rule 702 of the Federal Rules of Evidence and under *Daubert v. Merrrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993) and *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999). Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction. She failed to take many steps that should have been taken, and failed to utilize the appropriate methodology. Due to these numerous failures, her conclusions, aimed at

strengthening the Government's case, were scientifically unreliable. At a minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, was outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis.

Under Fed.R.Evid. 702, the trial court is charged with being the "gatekeeper" where expert testimony is concerned, ensuring only that reliable evidence comes before the jury. Among the factors used to determine the reliability of scientific or other expert evidence are: 1) whether the theory can be and has been tested; 2) whether the theory has been subjected to peer review and publication; 3) if relevant, the known or potential rate of error; 4) the existence and maintenance of standards controlling its operation; and 5) whether it has achieved general acceptance in the relevant community. *Daubert* 509 at 593-94. While crime scene reconstruction evidence (including an analysis of trajectory patterns) is generally accepted in the overall field of forensic science, Mr. Hueske's report demonstrates that Dalley's methodology, and thus her conclusions, fell well outside the range of accepted protocol and were thus unreliable. Dalley just made it up as she went along in service of her goal of assisting the Government to obtain convictions. Had defense counsel hired an independent expert to advise them, a powerful motion to exclude Dalley's testimony altogether could have been presented. Dalley's testimony and analysis was little better, if at all, than the "expert" testimony of James Horn, which the court found so bereft of reliability and relevance that it was stricken because it failed to comply with *Daubert* and *Kumho Tire*.

Because Dalley's analysis was an important part of the Government's case, it was inexcusable for counsel to fail to hire an independent expert such as Mr. Hueske to evaluate her methods and conclusions and to testify for the defense. Had all the flaws in Dally's testimony

been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle. If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired, and was thus unaware that the vehicle coming directly at his house was a police vehicle, especially due to the fact the Ford Bronco driven by Trooper Hamilton had no emergency lights engaged.

All this is especially critical on the issue of intent with respect to count 3 of the superseding indictment, the intent elements of counts 1 and 2, and the intent elements in the penalty phase.

To obtain a conviction on count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed a law enforcement officer in the performance of his official duties, that he knew or had reason to know he was shooting at a law enforcement officer, and that the shooting was precipitated by this knowledge. Absent Dalley's testimony, all the Government had to rely on were the often conflicting accounts and compromised memories of the tactical team members who testified. Thus, the prejudice under *Strickland* flowing from counsel's failure to effectively contest Dalley's testimony with expert assistance is readily apparent. *Snowden v. Singleterry,* 135 F.3d 732, 738 (11th Cir. 1998)(counsel unreasonable and ineffective for failing to object to improper expert testimony); *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995)(counsel professionally unreasonable and ineffective for failing to impeach serology evidence).

It is not just Mr. Barrett's current lawyers who say Ms. Dalley, far from being an objective scientific witness, is a partisan advocate who dresses up her personal opinions in the

guise of "science."  The Oklahoma Court of Criminal Appeals has chastised her, recently

reversing a first degree murder conviction due to Dalley''s unreliable, unscientific testimony,

including the improper use of computer animations.  *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl.

Cr. 2006).  In that case, the defendant's murder conviction was reversed in large part because Iris

Dalley's conclusions and computer-generated animations were not based on objective scientific

findings, but simply restated the prosecution's theory of the case under a "scientific" gloss.

Based on Mr. Hueske's report, Dalley did the same thing in Mr. Barrett's case.  She used

improper methodologies and techniques to "package" evidence already heard by the jury,

offering conclusions based on an incompetent and unscientific evaluation of the evidence.

In addition to trial counsel's other failings with respect to Dalley's testimony,

counsel were professionally unreasonable for failing to investigate Dalley's track record of giving

scientifically groundless testimony.  Although the *Dunkle* case was decided in 2006, after Mr.

Barrett's trial concluded in 2005, the case was tried some years before, the appellate briefs had

been filed at the time of Mr. Barrett's trial, and Dalley's reputation was well known in the

criminal defense community.

> **6.    The outcome of the trial is unreliable due to trial counsel's
> unreasonably failure to present an independent expert to
> demonstrate that the raid on Mr. Barrett's house was rife with
> tactical errors and poor planning, and that these failures in the
> "rules of engagement" contributed to Trooper Eales's death**

The methods used by the Oklahoma Highway Patrol tactical team were highly

questionable.  Based on all the circumstances surrounding the mission, it was ill-conceived and

should have been aborted.  Instead, even though the element of surprise – the motivation behind

the plan to begin with – had been totally lost because the "drive-by" vehicle was spotted the

afternoon before the raid; Toby Barrett was in the yard when the police arrived and yelled a

warning; the lights were on in Mr. Barrett's house, meaning he was still awake; and ultimately the lead, unmarked vehicle, with no police lights on, actually ran into Mr. Barrett's house, plan went forward, with tragic results for Trooper Eales.

Mr. Barrett's trial counsel unreasonably failed to secure the testimony of an independent expert to show that the raid was plagued by numerous tactical errors that contributed to Trooper Eales's death. Prior to trial, Mr. Echols sought authorization to retain an independent expert on tact-team methods and procedures. (Doc. 50.) The court authorized some funds for this evidence. (Doc. 97.) However, Mr. Barrett's trial counsel never contacted the expert Mr. Echols wanted to retain. Trial counsel's omission was not an informed tactical decision.

During the trial, Mr. Barrett's counsel informed the court that a law enforcement witness, Chuck Choney, who testified for the prosecution in state court and had provided favorable evidence on cross-examination, was reluctant to be subpoenaed as a defense witness and provide evidence favorable to the defense. (Tr. 10/03/05 Hr'g at 6-7.) Trial counsel told the court they were "in the process of trying to get this swat [sic] team expert to testify." *Id.* at 6.

Trial counsel knew or should have known that it was necessary to retain another expert to assist the defense because of Mr. Choney's affinity with law enforcement. Mr. Echols had known this, and requested authorization to retain another, independent, expert. (Doc. 50 at 5.) During a hearing on March 22, 2005, Mr. Echols stated, in Mr. Hilfiger's presence, "we'd like to be able to call Mr. Choney. But he said he's an ex-FBI agent, and he'd rather be drawn and quartered than appear in court as a defense witness in Mr. Barrett's case." (Tr. 3/22/05 Hr'g at 14-15.)

Trial counsel did not attempt to contact Mr. Choney until approximately mid-September, 2005. Trial counsel made unsuccessful efforts to speak with Mr. Choney by

Def's § 2255 Mot.                             142                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

telephone on September 13, 2005, and were told Mr. Choney would not be available until September 22 or 23. Thus, at the time trial started, Mr. Barrett's counsel conducted no investigation into what evidence could be presented from an independent expert authorized by the court, and fell back on a witness counsel knew would not cooperate. If trial counsel had enforced Mr. Barrett's constitutional and statutory rights to expert assistance, the evidence would have shown that Trooper Hamilton's errors in conceiving the raid and carrying it out meant, among other things, a) that Mr. Barrett did not have visual evidence that the lead Bronco was a law enforcement vehicle, and had no signs of law enforcement until after the shooting; b) that the lead vehicle lacked necessary cover from a sniper; c) that the lead Bronco advanced onto the property from a tactically disadvantageous position; d) that the team lost the element of surprise; e) that the situation was dangerous for non-tactical personnel; f) that the presence of observers made a violent altercation more likely, though unnecessary; g) that the lead Bronco's approach and the position of other vehicles unnecessarily exposed Trooper Eales to both friendly fire and hostile fire.

Instead of forcefully bringing these points to the jury's attention, the defense relied on the extremely reluctant Mr. Choney, who only appeared because he was compelled to by subpoena. He turned out to be a Government witness rather than a defense witness. He did offer some criticisms of the manner in which the raid was conceived and executed, such as the inclusion of the caravan of local dignitaries and law enforcement onlookers, and the failure of the tactical team to independently verify the reliability of the information provided by the alleged confidential informant. However, the Government easily turned Mr. Choney into a prosecution witness on cross-examination. In his opinion, while hindsight might suggest other alternatives to

Def's § 2255 Mot.                                    143                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the action taken, there was no compelling need to have aborted the mission.  His bottom line was devastating to the defense: the tactical team did nothing wrong.

The Tenth Circuit dealt with an analogous situation, in the context of a capital defendant's sentencing stage representation, in *Hooper v. Mullin,* 314 F.3d 1162, 1167-71 (10th Cir. 2002).  In *Hooper,* the second stage strategy was to present evidence that the defendant suffered from brain damage and was cognitively impaired.  Hooper had once attended anger management counseling.  His psychologist wrote a report opining, among other things, that the defendant's cognitive functioning was largely adequate, but he had difficulty controlling his temper.  Counsel then hired a forensic psychologist to review the other psychologist's report.  Based on the review, the second expert stated there may be evidence of mild brain damage, and it was possible the defendant suffered from serious psychological problems.  These conclusions could not be reached, however, unless the defendant were examined personally.  At the eleventh hour, defense counsel subpoenaed the second psychologist to testify.  He was extremely hostile to the defense because he had warned counsel he could reach no conclusions without examining the defendant himself.  He had warned counsel before being subpoenaed that his testimony would likely be more aggravating than mitigating.  He testified that he could reach no conclusion because he had not examined the accused, and that any tentative indications of possible brain damage could not be confirmed.  The prosecution then called the anger management counselor in rebuttal, who testified that while the defendant suffered from a mild learning disability, he had no brain damage or other special problems.  The Tenth Circuit found counsel's strategy unreasonable, and that the defendant was prejudiced.

So it was with Mr. Choney.  He was contacted late in the day by defense counsel. He was strongly aligned with law enforcement.  He made it clear that he did not want to testify

for the defense. He appeared only when compelled by a subpoena. Whatever little mileage the defense got out of his testimony was quickly reversed during the prosecution's cross-examination. On the whole, Mr. Choney's testimony supported the Government's case, and exonerated the tactical team of any serious errors. As in *Hooper,* defense counsel knew Choney would be a most reluctant, if not to say hostile, witness, but he was thrown into the breach anyway, with the predictable negative consequences to Mr. Barrett.

Counsel's failure to retain an independent expert and reliance upon a witness who would not even talk to them, was plainly unreasonable and prejudicial. *Strickland v. Washington,* 466 U.S. 668 (1984). As evidenced by the arguments of both the defense and prosecution at the close of the first stage, questions about how the raid was conceived and carried out were critical issues. If trial counsel had presented the numerous deficiencies pointed out here, there is a reasonable probability the jury would have rejected either murder or the death penalty.

> **7.      Mr. Barrett's trial counsel unreasonably failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials**

Claims 1 and 3 discuss the court's interference with proper defense preparation with respect to authorizing payment for the transcripts of the testimony from the second state trial at public expense. The court initially denied the request, adding the proviso that the matter could be reconsidered upon a specific showing that the testimony requested went to Mr. Barrett's intent. Eventually, the court permitted the record of the testimony to be provided at public expense, but far too late for counsel to be adequately prepared. Trial counsel also unreasonably failed to make use of impeachment material that was available to them, and/or elicited damaging testimony on cross-examination, even where that testimony was beyond the scope of direct.

There were numerous delays occasioned in acquiring the transcripts, and they continued through Mr. Barrett's federal trial. At a June 6, 2005 status conference, a few short months before trial was to begin, the court was informed that based on counsel's communications with the court reporter, it was anticipated that the transcripts would be ready by July 11, 2005. (Tr. 6/6/05 Hr'g at 4-5.) This proved a pipe dream. At another status conference on July 15, 2005, the court was informed that the state court reporter had completed five of the nine volumes of testimony. At the pretrial hearing on August 31, 2005, it was revealed that little if any progress had been made; five volumes of testimony had still not been completed. (Tr. 8/31/05 Hr'g at 38-39.) The transcripts continued to trickle in during trial.

A combination of the court's rulings on the transcript issue, the delay in producing the transcripts, and counsel's unreasonable preparation with the transcripts they had resulted in counsel failing to effectively impeach the tactical team members and Clint Johnson on several critical points with their testimony from the second state trial.

As already stated herein, a key factual dispute was whether Mr. Barrett would have known the police were on his property because the emergency lights on some of the vehicles were engaged. Because of the delay in producing the transcripts, counsel's failure to prepare in the time available, or both, crucial opportunities for impeachment in this area were lost.

At the federal trial, Trooper Poe stated he became aware that emergency lighting was being used when he saw Trooper Hamilton's vehicle come into view from the east, implying that emergency lights were engaged before any shots were fired, and thus supporting the Government's theory. (R. 1412.) However, at the second state trial, he testified that he first became aware of seeing emergency lights *after* he heard shooting break out. (2nd St. Tr. Tx. at

747.)  Trooper Greninger gave conflicting evidence between the second state trial and the federal trial regarding what lighting he observed.  In state court, he testified he turned on his emergency lights after turning left to approach Mr. Barrett's residence, and recalled seeing Trooper Hise's emergency lights on.  (2nd St. Tr. TX at 448, 461.)  At the federal trial, he testified Trooper Manion activated his emergency lights as he turned into the driveway before entering the property.  He noticed also that Trooper Hash had his emergency lights on, but did not know when they were engaged.  He was not completely sure Trooper Hise's emergency lights were on.  Trooper Pettingill did not activate his lights.  (R. 732, 760, 770, 773, 822.)

Most significantly, Clint Johnson testified initially in the second state trial that he was thirty seconds behind the tactical team and saw red and blue police lights at the intersection after turning onto the dirt road.  He was impeached with a prior statement in which he said he only saw taillights, not emergency lights.  Johnson made no mention in his statement about arriving thirty seconds after the tactical team and seeing any red and blue emergency lights.  (2nd St. Tr. TX at 25, 49, 51.)  In the federal trial, Johnson said nothing on direct examination about any lighting.  Trial counsel was caught flat-footed on cross-examination, when he opened the area up and Johnson, in contrast to the statement he was impeached with in state court, testified that he saw emergency lighting on the patrol vehicle and the second Ford Bronco.  (R. 358, 361.)  Counsel failed to impeach Johnson as counsel did in the second state trial.  Arguably, not even a transcript would have been required to undermine Johnson on this point, because he was impeached in state court with a previous statement, not previous testimony.

The issue of whether Mr. Barrett or the police opened fire first was obviously critical.  At the second state trial, Trooper Poe testified he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house.  He heard shots as

he exited his vehicle by the fence, and the gunfire was over by the time he was at the fence.  (2nd St. Tr. TX at 757, 766.)  None of this was brought out on cross-examination at Mr. Barrett's federal trial.

The issue of where Trooper Hamilton's Bronco was when it first received fire was a focal point of the debate over Mr. Barrett's knowledge and intent.  Although Trooper Greninger professed a failed memory at the federal trial, and could only say that the shooting began somewhere between the ditch and where Hamilton's Bronco came to a stop (R. 736), he testified at the state trial (albeit with an addled memory), that while he had no real idea when the shooting started, Hamilton's vehicle was ahead of his and had cleared the ditch; he became aware of the shooting between the time his vehicle cleared the ditch and came to a stop halfway between the ditch and Hamilton's Bronco.  In his first statement to investigators following the incident, he recalled hearing gunfire as Hamilton's vehicle approach the front of the house at the time he recalled hearing gunfire, which would indicate Hamilton had already gone through the ditch and was near the house when the gunfire started, supporting Mr. Barrett's defense argument that he only fired when Hamilton's Bronco was almost literally in front of his house, with its headlights obstructing Mr. Barrett's view.  (2nd St. Tr. TX 450, 504.)  Mr. Barrett's trial counsel unreasonably failed to refresh Greninger's memory with his helpful state court testimony, and to introduce that prior recorded recollection, or inconsistent statement.

Trooper Hamilton testified in state court that the shooting started as his vehicle was coming out of the ditch, and after he noticed Toby Barrett in the yard and began driving toward him.  (2nd St. Tr. Tx 330.)  This was helpful to the defense argument that Mr. Barrett only started firing when the Bronco was close to his house and was in fact headed toward his son, a dangerous situation any father would react to.  In federal court, Hamilton stated the gunfire began

earlier.  Instead of gunfire starting as he was coming out of the ditch, Hamilton stated gunfire began shortly after he initially hit the ditch.   In contrast to his testimony in state court, Hamilton stated his vehicle began receiving fire at head level in the middle of the windshield.  (R. 534, 603, 674.)  Counsel failed to effectively contrast Hamilton's testimonies on this point.

Defense counsel failed to exploit other differences between the state and federal trial testimony.  At the state trial, neither Troopers Poe nor Greninger testified to seeing any guns in Mr. Barrett's house.  In federal court, Trooper Poe said he saw an AR 15 and a shotgun in the back room off the entryway.  Greninger testified the rifle he found in his home was the one used to fire on the officers.  (R. 1426, 1427, 748-49.)

Perhaps Mr. Barrett's trial counsel's most grievous error appeared during cross-examination of Clint Johnson.  On direct examination, no details regarding any belief Johnson had that serving the warrant was "high risk" were explored.  On cross-examination, Mr. Barrett's counsel asked an open-ended question, and received a barrage of hearsay damaging to Mr. Barrett.  When counsel opened the door, Johnson marched through it, in the most prejudicial manner imaginable.  Johnson stated he believed this was a "high risk" operation because Mr. Barrett had threatened to kill police officers and that he was making methamphetamine at his residence, which also creates hazards to law enforcement trying to take down a meth lab. Buttressing the testimony not only of the despicable Charles Sanders, but five of the seven informant witness, Johnson stated not only that several people had reported to the sheriff's office that Mr. Barrett was constantly firing weapons across the road, but that they had received several tips from different people within the last six months that Mr. Barrett was going to kill law enforcement officers.  This damaging answer, given only because counsel opened the door, just

hung in the air. Counsel undermined the defense's own (meager) efforts to attack the credibility of the informant witnesses due to these "prior reports" from "several" sources.[22]

Counsel's failures to impeach were professionally unreasonable, and not motivated by any legitimate strategy. Indeed it was contrary to the strategy evidenced in counsel's closing argument where Mr. Hilfiger sought to sow doubt about the accuracy of various officers' accounts of the raid. Counsel's elicitation of damaging evidence from Johnson was highly prejudicial under the *Strickland* test, because it tended to invest credibility – however spurious it might have been, and however false Johnson's testimony was – that they otherwise lacked.

> **8. Counsel was professionally unreasonable for failing to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on. This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers.**

> **a. Toby Barrett**

The primary contention of the defense in the first stage of trial was that when Mr. Barrett fired on the Ford Bronco driven by Buddy Hamilton, he was unaware that it was a police vehicle, and was unaware that several police vehicles had driven onto his property. It was undisputed that the lead vehicle driven by Hamilton, which the evidence showed struck Mr. Barrett's porch, had no emergency lights engaged and appeared to be a civilian vehicle.

---

[22] Johnson's testimony was surely false. None of these "known sources" reporting threats by Mr. Barrett to kill law enforcement officers were presented at the state trials. Surely, if several individuals were reporting this, they would have testified in 2002 and 2004. Counsel failed to point out that Johnson had given no such testimony previously. Indeed, the informant witnesses were purely last-minute creatures of the federal trial.

Although no defense theory instructions were given, the defense argued that because Hamilton's car was unmarked, Mr. Barrett reasonably believed he was shooting at trespassers who had zoomed into his yard and struck his house with their vehicle, and reacted by shooting from inside his house.

The prosecution relied upon testimony from members of the tactical team to argue that but for Hamilton's vehicle and the "sniper" vehicle initially parked outside the locked gate to the property, the other police vehicles on or near the property had emergency lights of one sort or another engaged, making it obvious to Mr. Barrett that he was shooting at the police. The prosecution contended Mr. Barrett fired some of the shots after he emerged from his home, and could easily observe that the police were on his property.

Among the omissions of counsel that were inconsistent with prevailing professional norms was counsel's failure to call Toby Barrett to rebut the law enforcement officers' accounts of the raid. Mr. Barrett had a right, protected by the Fifth, Sixth and Eighth Amendments to the United States Constitution, to present evidence inconsistent with the prosecution's theory of how the raid was conducted.

Prevailing professional norms of capital defense practice required Mr. Barrett's trial counsel to investigate, develop, and present witness testimony that could have called into question the manner in which law enforcement officers conducted the raid. (ABA Guideline 10.7 – Investigation and Commentary (specifically noting duty to interview eyewitnesses).)

Trial counsel were aware, or should have been aware, that there were conflicting accounts of the raid, even among law enforcement officers. Toby Barrett was the only witness to the beginning of the raid other than law enforcement officers. Toby Barrett testified in two prior state-court trials. Toby Barrett was prepared for his testimony in those cases and was willing and

able to be prepared by trial counsel to testify in the federal trial. (Decl. Toby Barrett. *See also* 1st State Tr. Tx at 1781.) Obviously, each of the state-court trials ended in a result more favorable to Mr. Barrett than the result of the federal trial.

During the federal trial, the Government made much of the sign on Mr. Barrett's gate. Toby Barrett would have testified, as he did when called by the prosecution in the first state-court trial, that the sign was only meant to convey "No trespassing or something. He had one something to that effect, sir." (1st St. Tr. Tx at 1787.)

Toby Barrett also testified as a prosecution witness in state court that the gate on which the sign was posted was open at the time the Bronco drove by earlier in the day. (1st St. Trial Tx at 1822.) Toby Barrett's account of being in the front yard with his friend Bubba Thompson at the time of the drive-by is consistent with the testimony of Trooper Greninger, who saw two people in the yard at the time. (R. 724.) However, Trooper Hamilton testified in federal court that the gate was locked at the time of the drive-by, and this was offered as a justification for driving onto the property. (R. 518.)

In other respects, Toby Barrett's testimony is consistent with Trooper Hamilton's for example, in confirming that Hamilton had his headlights on but no lights signaling that he was law enforcement. (1st St. Trial Tx at 1796-97; R. 524-26, 598.) However, Trooper Greninger testified that the vehicles' lights were turned on at the commencement of the raid. Officer Steve Hash could not verify Greninger's account. (R. 1036-37.)

Toby Barrett testified in state court that when the shooting occurred, there were no police vehicles with emergency lights on at all that were visible. (1st St. Trial Tx at 1796.) The first police lights he saw were on the vehicle that crashed through the gate, but this was after the shooting was over. (Decl. of Toby Barrett.) He denied telling the police he saw flashing lights.

(1st St. Trial Tx at 1809.)  Toby Barrett saw Hamilton's vehicle speed into the yard, he called out "Dad!"  (1st St. Trial Tx at 1790, 1795.)  Toby Barrett never saw his father out on the front porch, shooting.  He never really saw his father at all, except for perhaps a split second, after which Mr. Barrett went back inside the house. (1st St. Trial Tx 1794, 1795, 1796.)  He never saw who was firing a weapon.  (1st St. Trial Tx at 1807.)  The entire incident happened very quickly.  (Decl. of Toby Barrett.)  The declaration Toby Barrett recently provided to investigators currently working for his father is consistent with his state trial testimony.  (Decl. of Toby Barrett.)

Mr. Barrett's federal trial counsel had every reason to trust the reliability of Toby Barrett's account.  The prosecution in state court deemed Toby Barrett a reliable witness regarding the sequence of events leading up to and during the raid.  His testimony was consistent with the state jury's verdict.

Toby Barrett's testimony would have provided the jury reasonable doubt regarding the federal prosecutor's argument regarding the raid, and in particular, his argument that Mr. Barrett intentionally killed Trooper Eales knowing he was part of a law enforcement raid.  Toby Barrett would have contradicted the prosecutor's assertion that the sign on Mr. Barrett's gate was evidence of intent.  (*See* R. 4297, 4305.)  Toby Barrett's testimony that his father only knew a SUV was speeding onto the property, and had only a split second's view of the Bronco before he went inside; that the Bronco's headlights were shining on the porch; and that no police lights were visible as the shooting occurred, would have contradicted the prosecutor's argument that Mr. Barrett had the opportunity to observe the scene, see police lights, and form the intent to kill before the shooting started.  (*See* R. 4299-4302.)

Toby Barrett's location when the lead Bronco pulled up was important to trial counsel's closing argument.  (R. 4316-17.)  Instead of being able to draw the jury's attention to

Toby's testimony regarding his location when the Bronco pulled in, and point to a specific location on an exhibit, as the state trial prosecutor had done, trial counsel could only argue "Toby Barrett was some place out in here." (R 4317.)

Even though Toby Barrett had testified at his father's state trials, counsel in the federal case made no effort to interview him or prepare him to testify. In his recent declaration, Toby Barrett states, "I went up to Mr. Hilfiger in court more than once and asked him if he was going to want me to testify at the trial. He said yes each time, but he never called me. He never asked me about the incident, my father's mental problems, my home life or about me or my mom." (Decl. of Toby Barrett.)

### b. Alvin Hahn

Alvin Hahn was a neighbor of Mr. Barrett's. On the night of the shooting, he was asleep and was awakened by gunfire. When Mr. Hahn looked outside about fifteen seconds after the shooting stopped, he saw only one vehicle with its police lights on. (Decl. of Alvin Hahn.)

Mr. Hahn's account is consistent with Toby Barrett's, and would have corroborated Toby Barrett's testimony that *after* the shooting, there was only one police vehicle with its emergency lights on, namely the vehicle that crashed through the gate. Just as it was professionally unreasonable to fail to call Toby Barrett as a witness, counsel had no legitimate reason for neglecting to call Alvin Hahn, who could have supported the defense theory that the police descended on Mr. Barrett's property with nothing to indicate they were law enforcement, and that Mr. Barrett had every reason to believe he was being invaded by trespassers.

Because the testimony of Toby Barrett and Alvin Hahn would have conflicted sharply with the accounts of the Government's witnesses, and supported the defense claim that Mr. Barrett had no idea he was shooting at the police, Mr. Barrett was prejudiced. Viewed

individually, and especially collectively, with all the evidence defense counsel failed to prepare and produce in the first stage of trial to counter the Government's case, there is a reasonable likelihood of a different result had Toby Barrett and Alvin Hahn been called as witnesses. *Strickland v. Washington,* 466 U.S. 668 (1984).

> **9.      Trial counsel was professionally unreasonable for failing to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence.**

The Government made much of the "fact" that Mr. Barrett was well aware there was a warrant out for him for failing to appear in a minor felony drug case. *See* file, Sequoyah County Case No. CF-97-80, *State of Oklahoma v. Kenneth Eugene Barrett.* According to the Government, Mr. Barrett anticipated the police were going to arrest him at any time on this warrant, and was therefore making preparations to repel the police with deadly force. This theory was founded on the testimony of informant witnesses Charles Sanders, Travis Crawford, Cindy Crawford, Brandie Price and Karen Real, who, as noted, testified that Mr. Barrett told them about the warrant, and stated he would kill the first policeman who came on his property and would "go out in a blaze of glory." The Government argued that the killing of Trooper Eales was the fulfillment of Mr. Barrett's "plan."

Trial counsel did virtually nothing to rebut this claim other than rely on cross-examination. Had counsel been paying sufficient attention to certain testimony that was introduced at the hearing on Mr. Barrett's motion to suppress (Tr. 1/ 26/05 Hr'g at 25-45), testimony of Bernell Edwards, Deputy Sequoyah County Court Clerk, and had they conducted

anything approaching a reasonable, professional investigation, the Government's theory would have evaporated, the snitches would have been further impeached, and the Government's case for intent would have suffered mightily.

The Government called Ms. Edwards at the motion to suppress hearing to testify regarding the contents of the court file in CF-97-80. Ms. Edwards stated that according to the file, Mr. Barrett had a trial date of January 25, 1999, at which he failed to appear. A bench warrant was issued on January 27, 1999. When a defendant is not represented by an attorney, the practice of the court clerk's office is to mail a notice regarding the missed court appearance to the defendant. (Tr. 1/ 26/05 at 25, 29; File in Sequoyah County Case No. CF-97-80.)

On cross-examination by Mr. Echols, it was pointed out there was nothing in the file to indicate that, in accordance with Oklahoma law, the bench warrant was issued on the motion of the District Attorney. (Tr. 1/ 26/ 05 at 36.) The docket sheet showed that at one time, Mr. Barrett was represented by attorney Bill Ed Rogers. Mr. Rogers filed a motion to withdraw on September 11, 1998, but there was no docket entry showing that he had actually been allowed to withdraw. (Tr. 1/ 26/05 at 37-38.) Mr. Barrett applied for court appointed counsel on December 14, 1998. Nothing in the court file indicated that Mr. Barrett's bail bondsman was given notice of the bench warrant. There was nothing in the court file showing that based on Mr. Barrett's failure to appear, a bond forfeiture action was instituted, which would have necessitated the bondsman to bring Mr. Barrett in so the bondsman would not be liable for the entire amount of the bond. There was nothing in the court file to show that Mr. Barrett had actually received notice that he failed to appear, and that a bench warrant had been issued for his arrest. The letter sent by the court clerk's office was simply sent in the regular mail; the letter was not certified,

with a return receipt requested.  (Tr. 1/ 26/05 at 39-43, 45.)  For all the court file suggested, Mr. Barrett was totally unaware there was a warrant out for his arrest.

Without question, it was professionally unreasonable for counsel to fail to call Ms. Edwards, or another representative of the court clerk's office, to sponsor the court file to demonstrate there was *no official record indicating Mr. Barrett would have been aware a warrant had been issued for his arrest.*  The evidence was already in the record.  Only gross neglect can explain this glaring failure to review the file in the case that started the entire tragic chain of events.  *Rompilla v. Beard*, *supra*.

Mr. Rogers, the last attorney to represent Mr. Barrett in this case, whose motion to withdraw was never granted, certainly never informed Mr. Barrett that he had an outstanding warrant.  Mr. Rogers is now deceased.  In connection with this 2255 motion, his widow, Mary Rogers, was contacted by a defense investigator.  Mr. Barrett's current representatives have obtained a copy of Mr. Rogers's file in the case.  Mrs. Rogers states there is nothing in her late husband's file to show that Mr. Rogers ever informed Mr. Barrett he had missed a court date, and that a warrant had been issued for his arrest.  Even if Mr. Rogers had been informed a bench warrant had been issued, he would not have informed Mr. Barrett, because Mr. Rogers was upset over the manner in which Mr. Barrett had terminated his services.  (Decl. of Leonard Post; Bill Ed Rogers's attorney file.)

In addition, the file of Bill Ed Rogers shows that Mr. Barrett was offered a plea in which he faced no jail time.  This fact alone, or in conjunction with other set forth herein, would have convinced jurors that the State had unnecessarily sought the no-knock warrant.  This fact, combined with the evidence of errors made in the planning and execution of the raid, and the abundant impeachment evidence undermining the Government's eleventh-hour informants,

would have given jurors more than reasonable doubt about Mr. Barrett's intent, and certainly the death penalty.

Trial counsel considered it important that Mr. Barrett had not received notice of the bench warrant. But, inexplicably, the defense waited until the second stage of trial to call Mr. Barrett's bail bondsman, Martin Daggs. He explained that he had never informed Mr. Barrett of the bench warrant. The bond was never forfeited. Mr. Daggs testified that if he needed to get hold of Mr. Barrett to surrender him on a warrant or bring him to court, he knew where to find him. There was no sound, strategic reason for deferring Mr. Daggs's testimony to the penalty phase, when he could have and should have been called in the first stage in aid of refuting the Government's theory of the case.

Had Mr. Barrett's trial counsel conducted a reasonable investigation there were other readily available witnesses who could have testified that Mr. Barrett was unconcerned with the police, had been staying on his property rather than venturing out into the larger community for years *preceding* any warrant, and *had in fact been visited by the police within a few weeks of the shooting incident without incident and without being taken into custody.* Evidence was also readily available that would have demonstrated that had Mr. Barrett and his family been contacted and told he had an outstanding warrant, he would have turned himself in or allowed his family to do so.[23]

Janice Sanders, a relative of Mr. Barrett's, lived near his property. Approximately three weeks or so before the shooting incident, she called the police because Mr. Barrett was

---

[23] *See also* Mr. Barrett's *Brady/*newly discovered evidence claim. Former Sequoyah County Sheriff Philpot has admitted to a defense investigator, consistent with the statements of Janice Sanders and Sylvia Gelene Dotson, that he was on Mr. Barrett's property, without incident, within a month of Trooper Eales being killed.

firing a gun into the air.  Five officers, including Sequoyah County Sheriff John Philpot, responded to Mr. Barrett's residence.  The sheriff inspected Mr. Barrett's rifle to determine whether it was empty, and gave it back to him.  There was no confrontation with the authorities, and Mr. Barrett was not taken into custody on the "outstanding warrant" or for any other reason.[24] (Decl. of Janice Sanders.)  Although Ms. Sanders was interviewed by defense counsel, she was not called as a witness.  When she was contacted by Mr. Hilfiger and a man who was likely Bret Smith, this gentleman asked Mr. Hilfiger if he was going to call Ms. Sanders as a witness.  To his surprise, Mr. Hilfiger said "no."  (Decl. of Janice Sanders.)[25]

Mr. Barrett's mother, Sylvia Gelene Dotson, who lived next door, was called as a defense witness in the first stage of trial, but she was not asked about the police coming to her son's residence shortly before the shooting incident, or how long Mr. Barrett had kept close to his property.  Had she been asked, she would have testified that Mr. Barrett was not capable of living on his own, and thus stayed close to his relatives in the community for support.  He had been doing this long before the "warrant" was issued.  Ms. Dotson was stunned at the midnight raid on Mr. Barrett's house.  Had the police simply contacted Mr. Barrett's family, they would have

---

[24]  During Mr. Barrett's state case, Mr. Philpot was deposed by John Echols regarding his previous contacts with Mr. Barrett.  In late 1998, Sheriff Philpot and others, including Deputy Sheldon Fair, went to Mr. Barrett's residence over a complaint that he was firing weapons, something he did not infrequently.  Decl. of Janice Sanders. On this occasion, Sheriff Philpot arrived after the other officers.  When the sheriff arrived, the officers who were already there were inspecting Mr. Barrett's weapons and running the serial numbers.  One of the weapons being inspected appeared to be an SKS.  Sheriff Philpot informed Mr. Barrett that he had an outstanding misdemeanor warrant.  Mr. Barrett said he would appear and take care of the matter. Sheriff Philpot did not take Mr. Barrett in on the warrant.  Mr. Barrett never threatened any of the officers, and his weapons were returned to him after they were inspected.  Philpot Deposition.

[25]  In addition to impeaching the Government's theory of the case, testimony from Ms. Sanders and Ms. Dotson would have been important to the motion to suppress, showing there was no cause for a no-knock, nighttime warrant.

brought him in.  Even if the police had come out to simply arrest Mr. Barrett in a non-confrontational way, there would have been no problem.  Moreover, shortly before the raid, and consistent with what Janice Sanders says, the police had been to Mr. Barrett's property to inspect his weapons.  There had been no violence and no problem.  (Decl. of Sylvia Gelene Dotson.)

Ruth Harris, Mr. Barrett's aunt, also states that had the authorities simply let the family know that Mr. Barrett had an outstanding warrant, it could have been arranged without any difficulty for Mr. Barrett to surrender peacefully.  (Decl. of Ruth Harris.)

Another of Mr. Barrett's aunts, Phyllis Crawford, lived just down the road.  On one occasion when Mr. Barrett felt he was wanted for something by the police, far from threatening violence or bragging that he would "go out in a blaze of glory," Mr. Barrett came to her in tears, asking what he should do.  Ms. Crawford told if the police really wanted them, he should simply go with them.  Instead of issuing threats, this advice seemed entirely reasonable to Mr. Barrett, and calmed him down.  (Decl. of Phyllis Crawford.)

Sean Hill, who was available to testify but never contacted by the defense, states that far from "hiding out" from a warrant, Mr. Barrett had really never left his property for years.  Police drove by Mr. Barrett's property all the time.  When Tom Sanders would call in noise complaints against Mr. Barrett, the police would drive by, and there was no reaction from Mr. Barrett.  Mr. Barrett was used to the regular police patrols and police presence in the area.  His attitude was, he was there if the police wanted him.  Mr. Hill also could have testified that the sign on Mr. Barrett's gate (Government Exhibit 104) which the prosecution made much of had been placed there on September 22, 1999, because the night before drug addicts had climbed over the fence and woken Mr. Barrett up.  (Decl. of Sean Hill.)

Def's § 2255 Mot.                              160                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Brandy Hill could have given similar testimony.  She states that from 1996 to the time of the shooting incident, police drove by Mr. Barrett's place on a frequent basis, sometimes up to three times a week.  Mr. Barrett was used to the police presence and was not bothered by it. (Decl. of Brandy Hill.)

Had counsel conducted a proper investigation and presented this evidence, there is a reasonable probability that the outcome would have been different, since it directly countered the prosecution's theory of the case.  Compared to this evidence, the self-serving testimony of the seven snitches would have been found clearly wanting in credibility.  *Strickland v. Washington,* 466 U.S. 668 (1984); *Cargle v. Mullin,* 317 F.3d 1196, 1120-26 (10th Cir. 2003) (defense counsel ineffective for failing to conduct a reasonable investigation, which would have uncovered witnesses who could countered testimony of prosecution witnesses and supported defense claim of non-involvement in the homicides); *Williamson v. Ward,* 110 F.3d 1508, 1514 (10th Cir. 1997) (duty all lines of defense strictly observed in capital cases; counsel ineffective for, among other things, failure to present evidence showing third party had confessed).

**10.      Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.**

Mr. Barrett's trial counsel unreasonably failed to challenge the Government's use of  irrelevant and prejudicial testimony of James H. Horn, a so-called expert in the area of "traumatic stress"  (R. 849.)  Trial counsel allowed the jury to hear Horn's testimony over a period of two days, failed to timely move to strike that testimony, and when the court did finally strike the testimony, failed to obtain an adequate curative instruction, or to move for a mistrial.

739

The Government was clearly concerned about the discrepancies in the testimony of its fact witnesses, both as compared to other witnesses, and with regard to their testimony in the previous state court trials. (R. 925, 934, 1630-31.) Consequently, it again called a witness who had previously testified at the state court trials, former FBI agent James Horn. Horn testified to his credentials, including a B.S. in Psychology – although he admitted he was not a psychologist (R. 843, 909) – and a Masters of Forensic Science degree from George Washington University in Washington D.C. (R. 843.) Horn also stated he was board certified through the American Academy of Experts in Traumatic Stress in "Emergency Crisis Response" and "Traumatic Stress." (R. 848.) He informed the jury, in some detail, about his service as a decorated Marine Corps infantry officer, having served two terms in Vietnam before joining the FBI. (R. 843-45.) Horn had worked with the FBI's behavioral unit as a criminal profiler, and then as program manager of the FBI critical incident program. (R. 845-848.)

Horn's testimony revealed a strong affiliation with law enforcement and allowed him to present himself as having extraordinary first-hand knowledge of traumatic events. Even during the process of stating his credentials before being offered as an expert, Horn spoke of having been exposed to rocket attacks by the Viet Cong, engaging in combat with the North Vietnamese, and working for the FBI on "critical incidents" such as Hurricanes Andrew and Hugo, the Oklahoma City Bombing and the assassination attempt on Ronald Reagan, as well as being a member of the first FBI SWAT team (R. 844-847.)[26]

---

[26]During the two state court trials, Horn similarly claimed involvement in the FBI's first SWAT team (Trial # 1, 2120), the aftermath of the Oklahoma City Bombing (Trial # 1, 2122; Trial # 2, 1436, 1441); wartime experience in Vietnam (Trial # 1, 2135; Trial # 2, 1436-37, 1445, 1451, 1459-60); the incident at Wounded Knee (Trial # 2, 1437-39, 1460); as part of an anti-terrorist squad at the Lake Placid Winter Olympics (Trial # 2, 1438); and in connection with a fatal sky-jacking (Trial # 2, 1439).

Def's § 2255 Mot.                                  162                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Horn was accepted by the court as an "expert witness in the area of traumatic stress" without objection from the defense (R. 849), nor any request for a *Daubert* hearing.[27] Horn then testified in very general terms about the impact of trauma on an individual's ability to relate and recall the incidents and circumstances in question.   While unable to comment on the specifics of any of the lay witnesses' testimony (R. 881), Horn narrated the impact of "personal feeling[s] of mortality and vulnerability" that trauma creates (R. 850), and particularly how there is "an extreme aggravation by the loss and injury to fellow police and fellow agents ... the worst thing that happens to a law enforcement officer in the line of duty is the death of a partner in the line of duty. So we can expect to see in those circumstances the worst, the most serious impact in effects on the colleagues who survive." (R. 851.)  In explaining his views about the impact of trauma on recollection, Horn referred repeatedly to his FBI days and cited to specific cases he had been involved in or had simply heard of, giving names and locations.  (R. 852-4, 858, 859, 860.)  However, he offered no particular opinion concerning the members of the SWAT team in this case, even though he had actually been involved in debriefing them in group "counseling sessions," where he had offered them "peer support" (R. 905, 874-79), and claimed that he had the officers sign confidentiality agreements concerning the debriefing.  Horn stated correctly that "confidentiality doesn't extend to the courtroom, privilege does." (R. 880.)  However, counsel simply acquiesced to Horn not testifying about the specifics of what had been said in the debriefing, apparently out of concern that Horn should not run the risk of creating a conflict for himself.  (R. 881.)

---

[27]*See Daubert v. Merrell Dow Pharmaceuticals, Inc.*,  509 U.S. 579 (1993).

After testimony from Horn running to some forty printed pages (R. 849-889), including his narrating what an FBI "psychiatrist" had said on the soundtrack of a training video (R. 856), the court finally intervened *sua sponte*, noting that: "I don't have a clue why the government called this witness ... I don't know what his expertise is ... I don't think a foundation has been laid ... it could be a *Daubert* issue ...".  (R. 890.)

Nonetheless, Horn's testimony continued without challenge from defense counsel, who elicited details of how law enforcement officers should be treated after a traumatic incident, and Horn establishing that his work was not "interested in critiquing and facts, but in helping them resolve their emotional response to these incidents." (R. 897-98.)   As his testimony continued, it became apparent that Horn was unfamiliar with various concepts relevant to the area of memory and trauma, such as acute traumatic disassociation (R. 908-10),[28] confabulation (R. 906),[29] and contamination of memory through contact with others.  (R. 900-901.)[30]  In fact, Horn made it plain that he was not interested in the current research in the field, just in dealing with individual cases.  (R. 883.)

Before recessing for the day, the court again expressed concern about Horn giving expert testimony, citing to Rule 702 and the fact that Horn "hasn't talked about any principles or

---

[28]*See, e.g.,* Vermetten, Dorahy and Spiegel, *Traumatic Dissocation: Neurobiology and Treatment* p. 83, American Psychiatric Publishing 2007.

[29]Horn defined confabulation as "it means to make it up," whereas confabulation is the formation of false memories, perceptions or beliefs as a result of neurological or psychological dysfunction.  Helen Phillips, *Mind Fiction: Why your brain tells tall tales,* 2572 New Scientist, 7th October 2006.

[30]Contamination of eyewitness testimony by subsequent input is a phenomenon that has been confirmed by clinical studies. Anthony Esgate, *An Introduction to Applied Cognitive Psychology*, 51 Psychology Press 2004.

Def's § 2255 Mot.         164         *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

methods that he has used to reach any conclusion and he hasn't applied any of the principles or methods reliably to any facts of this case because he really hasn't talked about the facts in this case." (R. 918.)  The following morning, having expressed further concern, the court indicated that it was contemplating striking Horn's testimony, since it was not likely to aid the jury in resolving any factual dispute, but rather consisted merely of talking "in generalities." (R. 923-27.)  Only after the court had questioned the government at length about the relevance and usefulness of Horn's testimony (R. 923-940) did the defense finally make the half-hearted statement: "I think the Court should consider striking his testimony" (R. 940).  When given a further opportunity to ask that the testimony to be stricken, the defense still failed to affirmatively request that remedy. (R. 948.)   The court then permitted further cross-examination of the witness before the jury (R. 949-958) at the end of which the defense finally moved to strike.  However, the Government was then permitted to take the witness on redirect.  (R. 966-975.)

Eventually, the Court gave counsel a further opportunity to argue the issue (R.1628-1632) and then struck the testimony (R. 1636), giving an instruction to disregard:

> Members of the jury, if you will listen, I'm going to give an instruction.  I started to say a special instruction.  It's not special, it's just – it's just a – (Pause) Not a special instruction, but just an instruction in regard to some testimony you have heard from Mr. Horn.  So if you would listen to this interim instruction:  Ladies and gentlemen of the jury, when we started this trial I gave you some preliminary instructions to guide you in your participation in this trial.  As I advised you at that time, it is my duty to determine the law applicable to this case and it is your duty to accept and follow my instructions regardless of whether or not you agree with the law.  As a matter of law, I have determined that the testimony which you heard on Monday afternoon and Tuesday morning of James Horn should not have been admitted into this trial.  You should not speculate about the reasons for my ruling on this issue; it is based solely on my interpretation of the law applicable in this case.  Therefore, I instruct you that you should disregard Mr. Horn's testimony in its entirety and not consider it for any purpose in making your decision when reaching a verdict in this case.

(R. 1740.)

Def's § 2255 Mot.                                   165                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Nothing in the record indicates that defense counsel urged any amendment to the instruction, even though the trial court gave them that opportunity. (R. 1636-37.) And, inexplicably, in spite of the trial court's concern about Horn's testimony, and willingness to strike it, defense counsel made no motion for a mistrial.

Horn's testimony, as the court readily saw, was inadmissible under Fed.R.Evid. 702. The fact was equally clear on the basis of the two state trial transcripts. As noted in the above discussion concerning counsel's failure to challenge the testimony of Iris Dalley, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 599, charged trial judges with the "gatekeeper" function of excluding unreliable expert testimony and ensuring that the proposed testimony will assist the trier of fact in understanding or determining a fact in issue. To do so, first, the trial court must ensure that the evidence is reliable. *Id. at 592.* Second, the court must ensure that the evidence will assist the trier of fact and is thus relevant. *Id. Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999) further held that the principles enunciated in *Daubert* applied to all expert testimony, not merely scientific evidence.

Counsel were ineffective for failing initially to challenge Horn's qualifications and the admissibility of his testimony. Counsel had ample opportunity to prepare for Horn's testimony and consider whether to challenge it, because Horn was listed in the Government's witness list and had testified at the two previous state court trials. Counsel do not appear to have bothered to ascertain what Horn's qualifications were. During a budgeting hearing on the morning before Horn testified, Mr. Hilfiger stated he believed Horn was a psychologist. (Tr. 10/3005 at p. 7.) However, although Horn had a degree in psychology and had acquired practical experience as an FBI agent, he frankly stated that he was not a psychologist (R. 909) or

Def's § 2255 Mot.                              166                    *U.S. v. Barrett,* 6:04-CR-115-JHP-SPS

psychiatrist (R. 907), was not focused on research, or with accuracy of recollections, but with the counseling of individuals. (R. 883, 903-904.)

Horn did state, however, that he was Board Certified in two areas, "Emergency Crisis Response" and "Traumatic Stress", through the "American Academy of Experts in Traumatic Stress" [AAETS] (R. 848.) Had defense counsel spent even a few minutes researching those qualifications, they would have discovered that the AAETS is an organization in which membership can be bought over the internet (at present, for as little as $60), and that its "Board Certification" credential simply requires a "comprehensive application and examination, along with supporting documentation ... utilized in concert to validate a member's experience in working with survivors of traumatic events, knowledge of the literature and level of education."[31] Indeed, it is an organization through which one can become "Certified in Acute Traumatic Stress Management" merely by completing an application and taking an examination based on a book, "Comprehensive Acute Traumatic Stress Management," which is purchased through the AAETS itself.[32] When contacted for information about Board Certification in Traumatic Stress, the AAETS provides a link to "The National Center for Crisis Management," which produces a form indicating that Board Certification may be obtained for $350.00, a resume/vita and copies of relevant licenses and certificates, with no mention of any examination, and with the applicant self-certifying as to completion of "relevant course work concerning the specific speciality area" and to other ill-defined criteria.[33] For example, 30% of the necessary points required for Board

---

[31]*See* http://www.aaets.org/diplomate.htm (last accessed March 2, 2009)

[32]*See* http://www.aaets.org/catsm.htm (last accessed March 2, 2009)

[33]*See* http://www.nc-cm.org/APPLICATION%20FOR%20SPECIALTIES.cwk.pdf (last accessed March 9, 2009). The National Center for Crisis Management offers no fewer than

Certification can be acquired by being "Author/Co-author of an article, paper and/or presentation related to the specific specialty area," but the Board Certification application does not even demand a copy of the article or paper in question.

Further, when being cross-examined about an article by psychiatrist Park Dietz, Horn was asked whether he was a "master's level educated expert in this field," to which he replied "In emergency response, yes, emergency crises response." (R. 908).[34]  This was clearly untrue: his master's was in forensic science, but counsel did not correct that false impression.

Defense counsel did not even talk to Horn in advance of his testimony (R. 863), but cross-examined him by asking questions to which they did not know the answers he would give.  R. 863-866, 887.   For example, they attempted to question him about an article by Dave Grossman on "Critical Incident Amnesia," asserting that Horn "knows Dr. Grossman," only to have Horn state moments later that he knew nothing about Grossman. R. 885-888.[35]  The defense also continued to reinforce Horn's credentials, for example bringing out his role as state director of the Oklahoma Chapter of Concerns of Police Survivors (R. 866), his award from the

---

fourteen different Board Certifications, in Forensic Traumatology, Emergency Crisis Response, Motor Vehicle Trauma, Disability Trauma, Pain Management, Illness Trauma, University Crisis Response, Bereavement Trauma, Domestic Violence, Sexual Abuse, Rape Trauma, Stress Management, School Crisis Response and as a "Crisis Chaplain".

[34]The article appears to have been J.M. Rivard, P. Dietz, D. Martell and M. Widawski, *Acute Dissociative Responses in Law Enforcement Officer involved in Critical Shooting Incidents: the clinical and forensic implications*, 47 Journal of Forensic Sciences, Issue No. 5 (2002).

[35]The article in question was not introduced into evidence.  It was, presumably, Lt. Col. Dave Grossman & Bruce K. Siddle, *Critical Incident Amnesia and the Implication of Memory Loss During Extreme Survival Stress Situations*, 31 The Firearms Instructor: The Official Journal of the International Association of Law Enforcement Firearms Instructors (Aug. 2001).  *See* http://www.traumaregister.co.uk/Articles/critical_incident_amnesia.htm  (last accessed March 6, 2009).

"Concerns of Police Survivors" group (R. 867), the number of presentations he had supposedly given (R. 868), the fact that he had already testified twice concerning this incident (R. 869), and his supposed involvement in research.  R. 883-84.   While bolstering Horn's seeming credentials, the defense failed altogether to attack the "board certifications" he had acquired through a diploma mill.

Defense counsel were also ineffective for failing to challenge the essential shortcoming of Horn's testimony:  that it was not helpful to the trier of fact.[36] Ultimately Horn was, as the court put it, nothing more than "a forensic person who deals with traumatic experiences that police officers have." (R. 935.)   Horn did not hold himself out as a psychiatrist (R. 907), or a psychologist. (R. 909.)   Horn himself emphasized that his work involved helping people cope with the stress of unexpected trauma, not with any issue concerning factual debriefing.  He did not even really purport to be giving his opinions as an expert, seeming confused when asked whether he was expressing an expert opinion: "Pardon? ... if I am testifying as an expert witness, I guess what I'm saying are expert answers."  (R. 957.)

Defense counsel appear to have had no real strategy concerning Horn's testimony. They conceded admissibility, but then had second thoughts when the court ruled the testimony inadmissible and suggested moving to strike it.  Counsel indicated that they had foregone their opportunity to present their own witness to rebut the matters to which he testified, intending simply to "develop out of him what we could find useful and move on down the road and not

---

[36]The suggestion that counsel made a legitimate strategic decision not to challenge Horn but to adopt whatever aspects of his testimony were useful, (R. 959) is belied by their obvious lack of preparation.   The unopposed admission of his testimony, and counsel's eventual need to have it stricken were "the result of inattention, not reasoned strategic judgment." *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005)(internal citation omitted)(counsel ineffective for failure to review readily available court file concerning previous conviction).

have an expert come up and tell the other side of the stories *per se.*" (R. 959.)  Given Horn's

lifelong work with law enforcement, and the nebulous nature of his expertise, this "decision" was

uninformed and unreasonable under prevailing professional standards.[37]  It is hard to ascertain

whether defense counsel actually viewed Horn as a witness for or against their client, but their

sheer unpreparedness resulted in a "cross-examination" that was faltering, and characterized by

the witness denying knowledge of the authorities that counsel was seeking to have discussed,

resulting in an entirely unsuccessful examination on the part of the defense.

The court had authorized limited funds for trial counsel to retain a psychologist to

assist in preparing to deal with Mr. Barrett's and the law enforcement officers' responses to the

raid.  (Doc. 97.)  However, the court permitted Mr. Barrett to be assisted by only one mental

health expert and only at below-market rates of compensation, and only for a number of hours far

below the norm for federal capital trials, although the expert had to cover many disparate issues.

*See* Claims 1, *supra*, and 3, *infra.*  Mr. Hilfiger, whom the court personally selected to represent

Mr. Barrett as part of a plan to develop a panel for future capital cases (Decl. of Julia O'Connell),

declined to join his former lead counsel in requesting additional funds from the court.  (Decl. of

John Echols.)  Mr. Hilfiger stated that he relied upon Jeanne Russell, Ed.D., to provide him

questions for his cross-examination of Horn.  (Tr. 10/3/05 Hr'g at 7.)  Trial counsel did not

contact Dr. Russell until mid-August, and did not possess the second state trial transcripts until

late September, 2005, at the earliest.

---

[37]This quixotic attempt to get mileage out of a witness so favorable to the prosecution was mirrored in the October 3 Budget Hearing, where counsel revealed that they were contemplating compelling the testimony of a "SWAT team expert" they knew to be actively opposed to testifying for them.  *Id.* at 6.  See claim of unreasonable performance regarding Chuck Choney.

Dr. Russell, in her communications to trial counsel, questioned what role Horn was to play in the trial, and admitted difficulty in framing questions for him. A particular concern for her was whether Horn was a mental health expert who might be prevented from testifying for reasons of confidentiality and privilege, and the fact that Horn was assuming dual roles by providing counseling and then testifying as an expert regarding the same subject matter. Defense counsel seemed to accept without question that Horn could not testify about what the officers had actually said in the debriefing sessions (R. 938), apparently believing that information was somehow privileged. Similarly, counsel did not pursue discovery of any notes or records of the various debriefing sessions. (R. 939.) While the federal courts are authorized to define new privileges, and the "recognition of a privilege based on a confidential relationship should be determined on a case-by-case basis," *Jaffee v. Redmond*, 518 U.S. 1, 5-7 (1996)(recognizing privilege in communications with licensed social worker), no "traumatic stress debriefing" privilege has yet emerged, and counsel did not raise or argue Mr. Barrett's right to effective representation through full discovery and cross-examination informed by knowledge of what was said at the debriefings.[38] Thus, their ineffective performance in accepting at face value Horn's claim of confidentiality spilled over into their cross-examination of the tactical team officers.

Not only did counsel lack information from the debriefings with which to cross-examine, but they also overlooked the critical fact that the group sessions were, in effect, a pre-

---

[38]Strong policy arguments would militate against allowing law enforcement to conceal such debriefings on privilege grounds. To do so would create the temptation to hold debriefings in every controversial case in order to chill defense counsel's ability to cross-examine effectively about the possibility of contamination of witnesses. Moreover, since the officers in this case effectively waived any privilege by testifying as to the facts of the incident, shielding them from inquiry into earlier and possibly inconsistent statements would be decidedly unfair.

emptive violation of FED. R. EVID. 615:  an untrammeled opportunity for the officers to learn in advance what other officers would say and, consciously or unconsciously, adopt other officers' perspectives on the incident.  Defense counsel also did not question the narrative technique adopted by some of the officers, of speaking in the present tense - a recognized therapeutic technique in trauma counseling - when describing what they said had taken place.[39]  This not only suggested an unusual degree of synchronicity in the officer's testimony, but rendered it more powerful than a normal past-tense narrative.

Regardless of the court's instruction, Horn's testimony should not have been admitted and was highly prejudicial.  It was the court that recognized Horn had nothing legitimate to offer, hence the fact that his testimony was stricken.  This testimony must have had a tremendous impact on the jury, and the court's instruction to disregard it was an exercise in futility.  Horn painted a powerful picture of law enforcement officers as a valiant brotherhood, referring to "one of our FBI heroes" (R. 855), to the powerful impact of losing a colleague (R. 851) and to the close relationship of SWAT team members: "it's very akin to the relationship I still have to this day with the Marines with whom I served in Vietnam because there is a bond when you face life-threatening situations that is formed, that is probably like no other bond." R. 861-62.  Not only did this testimony improperly bolster the prosecution witnesses,[40] suggesting that the inaccuracies in their testimony were of little moment, given the trauma experienced by the grieving band of law enforcement agents, it also amounted to victim impact testimony that

---

[39]*See* David H. Barlow, *Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-Step Treatment Manual*, 71 Guilford Press 2001.

[40]The Court itself acknowledged this facet of the testimony when ruling that it would strike the testimony: "At best, Mr. Horn's testimony is simply an attempt by the government to bolster the credibility of its witnesses for memory lapses of those witnesses at issue." R. 1635.

Def's § 2255 Mot.                                        172                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

should never have come in at the guilt phase.[41] Moreover, it sought to explain the fact that officers might "recall" significant facts long after an incident which they had not previously mentioned, without beginning to explore the question of whether those recovered "memories" were reliable recollections. (R. 858-59.)

Horn's connection with the FBI alone would have been perceived by the jury as lending weight to what he said. Another court, in holding that the testimony of a member of the FBI's Behavioral Analysis Unit failed to satisfy *Daubert*, noted: "In light of ... the considerable authority and even mystique in which these experts are cloaked due to their status within the FBI, it is essential to establish the reliability of such expert testimony." *United States v. Thomas*, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266 at * 90-94 (D.Md. January 13, 2006)(criticizing unreliability, lack of proven methodology and circular reasoning of agent's testimony).

This was not a case where an isolated and fleeting reference to an improper matter would have been easily cured. It is normally presumed "that a jury will follow an instruction to disregard inadmissible evidence *unless* there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987)(internal quotation marks and citations omitted)(emphasis added); *Patton v. Mullin*, 425 F.3d 788, 800 (10th Cir. 2005)(single reference to defendant as an "ex-con" cured by instruction to disregard). The probability that the court's instruction prevented the jury from considering Horn's testimony in the ways stated herein is overwhelmingly small. Horn's testimony stretched out over two days, and the supposedly curative instruction given by the court was late in coming.

---

[41] It is noteworthy that victim impact was one of the aggravators ultimately found by the jury in deciding to sentence Mr. Barrett to death.

Horn's testimony concluded on October 4, 2005, but the jury was not instructed to disregard it until three days later, on October 7, 2005. This delay can only have allowed the evidence to sink into the jury's consciousness. By contrast, in *United States v. Joe*, 8 F.3d 1488, 1498 (10th Cir. 1993) an erroneous reference to the defendant's prior incarceration was a "single isolated occurrence in the context of a larger explanation and the trial judge gave an immediate curative instruction"; consequently reversal was not required. Moreover, the low-key nature of the instruction, which downplayed even its own importance, can have done little to erase the jury's recall of Horn's testimony. "It's not special ... Not a special instruction, but just an instruction in regard to some testimony that you have heard from Mr. Horn." (R. 1739.) The trial court also missed an opportunity to drive home the importance of the instruction, by failing to emphasize that the evidence was simply inadmissible as a matter of controlling law, but rather stating that the ruling "is based solely on my interpretation of the law applicable in this case." (R. 1740.)

Notably, this was a case where the prosecution evidence had previously failed to convince two state court juries to convict Mr. Barrett of either first or second degree murder. It can therefore be readily concluded that the evidence was otherwise "not overwhelming" and that the impact of Horn's testimony on the jury requires a new trial. *See United States v. Sands*, 899 F.2d 912 (10th Cir. 1990)(new trial warranted where it cannot be said with reasonable certainty that the improper reference "had but very slight effect on the verdict of the jury").

Given the history of this case, especially with two prior trials that had not resulted in a murder conviction, let alone a death sentence, defense counsel had nothing to lose on their client's behalf by moving for a mistrial. The trial court had properly identified the shortcomings of Horn's testimony, and made clear its readiness to strike that testimony. The court had

Def's § 2255 Mot.                    174                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

recognized the appropriateness of giving an instruction to disregard, although the instruction actually given was inadequate. Defense counsel could and should have argued that the jury's exposure to Horn's evidence had irredeemably tainted Mr. Barrett's right to a fair trial. There was no downside to a motion for mistrial and therefore no strategic reasons for failing to make the motion. Counsel's failure to move for a mistrial clearly demonstrated deficient performance.

In a similar situation, where counsel only realized during the testimony of a government witness that his client's statement had been given after he had already involved his rights, a trial court suppressed the statement. However, only a cautionary instruction was given and counsel did not move for a mistrial. *United States v. Ramsey*, 323 F.Supp.2d 27, 33 (D.D.C. 2004). Counsel's performance was held to be deficient in the circumstances of that case, where "any reasonable defense lawyer would have jumped at the chance to start the trial afresh." *Id*. at 37. Given Mr. Barrett's counsel's lack of preparedness, their failure to even attempt to obtain a mistrial defies explanation. *See also Martin v. Grosshans*, 424 F.3d 588, 591-92 (7th Cir. 2005)(trial counsel ineffective for failing to move for mistrial after prosecutor's inflammatory closing argument); *Freeman v. Class*, 95 F.3d 639 (8th Cir. 1996)(counsel ineffective for failing to move for mistrial after repeated references to defendant's exercise of right to remain silent); *Crowe v. Sanders*, 864 F.2d 430 (6th Cir. 1989)(counsel ineffective for failing to seek mistrial after court gave improper parole instructions).

To the extent the issue could have been fully resolved on the record, direct appeal counsel for Mr. Barrett unreasonably failed to raise the issue of the ineffective assistance provided by trial counsel with regard to Mr. Horn's testimony, and their failure to mitigate or correct that error through a stronger instruction or a mistrial. However, as indicated here, there is

extra-record evidence in trial counsel's files showing that they did not conduct a timely or thorough investigation of Horn's qualifications, the limitations of his testimony, their own expert's ability to provide questions on cross-examination, or the general admissibility of his testimony under federal law.

The fact that trial counsel failed to preserve error initially by moving to exclude the testimony of Mr. Horn, and only asked for his testimony to be stricken after the court's *sua sponte* expressions of concern, did not waive these issues. Appellate counsel could and should have raised the issue as falling under the plain error doctrine, since trial counsel had failed to raise them in a timely fashion. *United States v. Johnson*, 520 U.S. 461, 467 (1997); *United States v. Olano*, 507 U.S. 725, 732 (1993). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Burbage,* 365 F.3d 1174, 1180 (10th Cir. 2004). The trial court itself had identified the existence of error, but had not remedied it with a more appropriate instruction or a mistrial. Mr. Barrett's right to a fair trial and, ultimately, a fair sentencing proceeding were thus affected and, particularly given the highly questionable nature of Mr. Horn's testimony, the integrity of these proceedings was unquestionably tainted.

**11.    The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions**

Trial counsel's role in representing a criminal defendant is giving the jury a way to find reasonable doubt. In this respect, closing argument is an indispensable aspect of the defense function. *Herring v. New York*, 422 U.S. 853 (1975); *Gardner v. Florida*, 430 U.S. 349,

360 (1977). However, the defense lawyer also must request jury instructions that frame the issues and enable the jury to give effect to the defense's theories. Absent such an instruction, defense evidence may not be given appropriate effect.

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would have given the jury a way to give effect to the defense evidence and argument. The instructions trial counsel unreasonably failed to seek include an instruction on informant witness credibility, an instruction on drug-addict witness credibility, an instruction on self-defense, an instruction on Oklahoma's "make-my-day" law, instructions on the theory of the defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses. These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution in this case from the two previous state-court prosecutions. Some of these witnesses acknowledge at trial, or have acknowledged since the trial, that they were involved in illegal activities before, during, and after their testimony or the events about which they testified. These activities included illegal drug possession, use, and/or distribution, various civil violations, making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, be informed about, and seek from the trial court, such orders as may be available to assist in the presentation of the defense.

Courts have long given instructions that inform the jury that the testimony of an informant "'must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.'" *See, e.g., United States v. Humphrey*, 208 F.3d 1190, 1206 (10th Cir. 2000). *See also United States v. Bridwell*, 583 F.2d 1135, 1142 n.6 (10th Cir. 1978).

Although trial counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel unreasonably failed to seek a jury instruction to the same effect.

The informant witnesses also confessed to being drug addicts, either at the time of their testimony, or at the time they allegedly perceived the "events" they described in their testimony. Karen Real Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, and Brandi Price were all drug addicts at relevant times.

Courts have long instructed juries that the

testimony of someone who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.

[¶] You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

(Fifth Circuit Pattern Jury Instr. 1.16 (2001).)

"Criminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support." *United States v. Visinaiz*, 428 F.3d 1300, 1308 (10th Cir.2005) (citations omitted). The defense theories were (a) that at the point in time when Mr. Barrett fired his weapon he had no indication that the vehicle speeding toward him contained law enforcement officer (R 4314), and (b) Mr. Barrett was not engaged in the drug manufacture or distribution when the raid took place. As evidenced by the state-court verdicts, the inconsistent testimony of the law enforcement percipient witnesses in federal court, and the jury's verdict in this case, there was evidence and legal support for a theory-of-defense instruction.

**12.    Trial counsel were ineffective for failing to adequately preserve the record, resulting in numerous meritorious**

**claims on direct appeal being evaluated under the
onerous plain error standard.**

Trial counsel were professionally unreasonable for failing to make proper objections in order to preserve the record for appeal.  As a consequence, Mr. Barrett was denied his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment.

As demonstrated by the direct appeal decision in this case, *United States v. Barrett,* 469 F.3d 1079 (10th Cir. 2007), Mr. Barrett's trial counsel failed to timely preserve complete objections to: 1) the prosecution's violation of Oklahoma state law requirements for nighttime search warrants (*id.* at 1089-90): 2) the improper execution of search warrants by federal officers (*id.* at 1090); 3) the violation of Fed.R.Crim.P. 41, because no federal judge or magistrate authorized the search warrant executed on Mr. Barrett's home (*id.* at 1090-91); 4) the insufficiency of Mr. Barrett's federal indictment (*id.* at 1090-91); 5) the improper multiplicity of various counts of Mr. Barrett's federal indictment for the same alleged criminal conduct (*id.* at 1095-96); 6) the misjoinder of offenses in violation of Fed.R.Crim.P. 8 (*id.* At 1096-97); 7) the improper admission of victim impact evidence (*id.* at 1097-1101; 8) the prosecutor's use of racially motivated strikes in violation of *Batson v. Kentucky,* 476 U.S. 76 (1986), in that defense counsel failed to present reasons why the government's purported race-neutral reasons for peremptory strikes were false and pretextual, and also failed to inquire into the Government's justifications for the strikes (*id.* at 1105-06); 9) the federal death penalty statute's improper allowance of non-statutory factors in aggravation (*id.* at 1108); 10) the lack of constitutionally required proportionality review (*id.* at 1108-09); 11) the violation of *Woodson v. North Carolina,*

428 U.S. 280 (1976) occasioned by the court's use of a relaxed standard for the admissibility of evidence (*id.* at 1109-10); 12) the federal death penalty statute's improper allowance of impermissibly vague aggravating factors ( *id.* At 1110); 13) the improper double counting of Mr. Barrett's alleged intent to kill as both a special circumstance and an aggravating factor (*id.* at 1110-11); and 14) the government's improper failure to timely provide the names of seven prosecution witnesses called to establish Mr. Barrett's intent to kill.  *(Id.* at 1115-17.)

Trial counsel's failure to make full and timely objections to each of these errors constituted ineffective assistance of counsel.  *Strickland v. Washington,* 466 U.S. 668 (1984). The American Bar Association ("ABA") guidelines provide a guide in determining what constitutes reasonable performance in capital cases.  *Wiggins v. Smith,* 539 U.S. 510, 524 (2003). Under the ABA guidelines, trial counsel have a duty to "consider all legal claims potentially available" and "thoroughly investigate the basis for each potential claim."  (ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES, COMMENTARY TO STANDARD 10.8), 31 *Hofstra L.Rev.* 913, 1028 (2003).  Trial counsel must bear in mind "the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted or otherwise forfeited."  *Id.*   Once counsel has made a decision that a clam should be made, counsel has the duty to "present the claim as forcefully as possible" and "ensure that a full record is made of all legal proceedings in connection with the claim."  *Id.* at 1028-29.

Each of the claims discussed above had merit.  Mr. Barrett would have suffered no adverse consequences had trial counsel made timely and complete objections on any or all of these grounds.  Accordingly, trial counsel's failure to preserve Mr. Barrett's objections on each of these grounds fell far below the standards expected of competent counsel in capital cases.

Each of the objections discussed above raised a question of law, or mixed questions of law and fact, subject to de novo review. *See, e.g., United States v. Smith,* 543 F.3d 1211, 1226 (10th Cir. 2008) ("When considering a *Batson* claim, we review de novo whether the proffered explanations were race-neutral"); *United States v. Johnson,* 130 F.3d 1420 (10th Cir. 1997) ("misjoinder under Rule 8 is a question of law subject to de novo review"); *United States v. McIntosh,* 124 F.3d 1330, 1336 (10th Cir. 1997) ("We review claims of multiplicity de novo). However, based upon trial counsel's failure to make complete and timely objections, the Court of Appeals reviewed each of these claims for plain error. Had counsel made appropriate objections, Mr. Barrett would have obtained relief from his convictions and sentence of death based on each of these errors under the appropriate de novo standard of review.

The constitutional violations set forth above warrant the granting of 2255 relief without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abramson,* 507 U.S. 619, 638 n. 9 (1993). Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the jury's determinations of guilt and punishment, rendering them fundamentally unfair and resulting in a miscarriage of justice.

**13.     Counsel was professionally unreasonable for failing to object to numerous instances of prosecutorial misconduct in closing argument in both stages of trial.**

Claim 5, section C details repeated instances of prosecutorial misconduct in questioning witnesses and in closing arguments in both the guilt/innocence and the sentencing phase. The specific instances will not be repeated but are incorporated herein by specific reference. Faced with arguments that could in no sense be termed appropriate, counsel failed

altogether to object. The failure to object to clear prosecutorial misconduct can never be termed a reasonable strategy. Especially in light of the numerous, serious constitutional errors which plagued Mr. Barrett's trial, this omission by counsel was prejudicial. In this case, the prosecution basically did whatever it pleased. That abuse of the process continued unabated in closing arguments, to Mr. Barrett's clear detriment. *E.g., Hodge v. Hurley,* 426 F.3d 368, 386-89 (6th Cir. 2005); *Washington v. Hofbrauer,* 228 F.3d 689, 703, 709 (6th Cir. 2000); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996)(finding counsel ineffective for failing to object to misconduct in closing arguments).

## Conclusion

The unprofessional and prejudicial errors of counsel permeated the first stage of trial. From the failure to properly attack the search warrant, to the failure to impeach witnesses; to the failure to produce witnesses who could eviscerate the credibility of the Government's witnesses and otherwise support Mr. Barrett's defense; to the failure to properly secure and utilize expert witnesses; to failure to object to improper experts called by the Government; to the failure to investigate, be prepared, and demand the time to be prepared, no rational observer could be left with any other conclusion than that counsel ineffectively represented Mr. Barrett in the guilt/innocence phase of trial. While several instances of ineffectiveness, standing alone, are sufficient to warrant vacating Mr. Barrett's convictions, taken together, the conclusion that counsel was ineffective in the first stage of trial is inescapable. *E.g., United States v. ex rel. Gregory Madef,* 223 F.Supp.2d 968, 973 (N.D. Ill. 2002) (viewing evidence that formed basis for ineffective claim in the aggregate, and not individually).

Accordingly, Mr. Barrett is entitled to relief from each of the three counts of conviction.

### B.   Unreasonable Acts and Omissions Affecting the Second Stage of Trial

Mr. Barrett had a constitutionally protected right to have his trial counsel investigate, develop and present, and have the jury give effect to, mitigation evidence related to his background and character and the circumstances of the offense.  *Williams v. Taylor*, 529 U.S. 362, 393 (2000).  Trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines").  *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004).

Acts and omissions of counsel require a new trial when there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant. In a capital case, this standard is met if "there is a reasonable probability that at least one juror would have struck a different balance" at the second stage of trial.  *Wiggins*, 539 U.S. at 537.  In sum, the Sixth Amendment is violated in a capital sentencing proceeding where defense counsel fails to take necessary steps to provide the jury with information that can help them understand the defendant and offer an explanation for his conduct.  *Smith v. Mullin*, 379 F.3d at 929, 943.

"Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance."  *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).

### 1.   *Deficient Performance*

Trial counsel were impeded in their efforts to develop mitigation evidence by the trial court's refusal to authorize funds for retaining the necessary resources.  As stated in Claim 1, *supra*, the trial court denied Mr. Barrett resources regularly afforded similarly situated capital defendants, and which were deemed necessary in the independent professional judgment of his trial counsel.  *(See also* Docs. 50, 51, 57, 97, 128; Decl. John Echols; Decl. Richard Burr.)

Mr. Barrett's trial counsel had a duty to retain a mitigation specialist to assist in preparation for the penalty phase.  (ABA Guideline 4.1(A)(2).)  Trial counsel were on notice that the work done by a person previously hired in state court was incomplete, and that the work was done by a novice who refused to produce a summary of her findings for counsel.  (Letter from John Echols to Honorable James H. Payne dated 2/2/8/2005; Decl. John Echols.)  However, trial counsel were aware, or should have been aware, that the preliminary investigation showed there was evidence of mental disorders and other mitigating factors.

The attorneys who represented Mr. Barrett at trial did not obtain the files of the mitigation investigator who worked on the case before the first state trial, although the files were readily available.  (Decl. Steve Leedy; Decl. John Echols).  Nor did Mr. Barrett's trial attorneys timely confer with the prior attorneys who had worked on second-stage issues in order to develop or implement a plan of investigation or for trial.  (Decl. Frank Gordon; Decl. John Echols).  The available files included records showing that Mr. Barrett had been raised in a chaotic household by neglectful, alcoholic parents, a father who was only present when not out drinking and carousing, that Mr. Barrett attempted suicide as a young man, and had been diagnosed with a major medical disorder.

On March 18, 2005, less than six months before the start of trial, the court authorized Mr. Barrett's counsel to retain Inquisitor, Inc., to perform the function of a mitigation

specialist. (Doc. 97). The delay was contrary to ABA Guidelines which call for assembly of the defense team "[a]s soon as possible after designation" of lead counsel. (ABA Guideline 10.4(C).) Trial counsel first sought funds for this task on January 31, 2005, then again on February 7, 2005. (Docs. 46 and 50). Although counsel's professional judgment and that of the mitigation consultant they sought to retain dictated that the investigation would require $20,000 in labor and $5,000 in travel expenses, the court arbitrarily cut this figure in half without any allowance for travel expenses. (Doc. 97). *See* Claim 1, *supra*, and 3, *infra*.

The denial of travel funds – which were essential in this case – may have been due in part to counsel erroneously informing the court that Mr. Barrett had "not lived in numerous locales." (Doc. 50). Had counsel asked Mr. Barrett or his family, they could have told counsel that Mr. Barrett was born and lived as a child in Illinois, lived as a child in New Jersey, and Indiana, and lived and worked as an adult in Arkansas, western Oklahoma, Texas, and Idaho. Even with this misinformation, the trial court's denial of travel funds obviously impaired the prospects for an investigation in that the mitigation investigator resided in Tennessee and even the most minimal investigation would require travel to Oklahoma.

Mr. Barrett's trial counsel had a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." (ABA Guideline 10.11(A).) Reasonably competent counsel would speak with "[w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . ., would rebut or explain evidence presented by the prosecutor, would present positive aspects of the

client's life, or would otherwise support a sentence less than death." (ABA Guideline 10.11(F)(1).)

Mr. Barrett's trial counsel knew or should have known that Mr. Barrett's family lived nearby and were ready to be interviewed or re-interviewed.  However, neither of the attorneys who tried the case, nor an investigator working for them, conducted detailed interviews of family and friends regarding Mr. Barrett's life history.  (*See*, *e.g.*, Decl. Brandie Hill; Decl. Carolyn Joseph; Decl. Issac Barrett; Decl. Doris Barrett; Decl. Ernest Barrett; Decl. Gwen Crawford; Decl. Kathy Trotter; Decl. Janice Sanders (partial interview by trial counsel); Decl. Paul Lunsford; Decl. Shawn Hill; Decl. Toby Barrett).

On May 17, 2005, the court appointed Roger Hilfiger Mr. Barrett's lead counsel in place of John Echols.  The court also appointed Bret A. Smith.  Mr. Hilfger had only worked on one prior federal death penalty case.  Mr. Smith had no capital experience, yet Mr. Hilfiger gave him primary responsibility for the penalty trial.  Contrary to 18 U.S.C. § 3005, and § 3599, and Judicial Conference guidelines, Mr. Smith was appointed without consultation with the Federal Defender.  As stated in Claim 1, *supra*, the trial judge chose counsel for Mr. Barrett based on the judge's desire to give inexperienced local attorneys capital experience so that they could form a capital panel in the Eastern District.

On May 17, 2005, the trial court gave Mr. Barrett's counsel until May 27, 2005 to amend the budget that had been reduced by order filed March 18, 2005.  The budget submitted for Mr. Barrett's defense had been prepared by Mr. Echols, and was informed by his extensive knowledge of the background of the case, including that many investigative and expert tasks had not been completed during the state proceedings, and that only preliminary work had been done

to prepare for a penalty trial. (Echols letter to Payne; Decl. John Echols; Doc. 113; Decl. Richard Burr).

Mr. Hilfiger did not seek an amendment of the budget. His failure to do so was unreasonable. On May 26, 2005, Mr. Hilfiger filed a motion for a continuance based on his having only recently received the files and records related to some of the state court proceedings, including transcripts and discovery. Mr. Hilfiger stated in his motion that he was not familiar with the materials. In February 2005, Mr. Hilfiger had informed Mr. Echols that it would take him (Mr. Hilfiger) 160 hours to assemble and review the files related to the case. On September 9, 2005, Mr. Smith advised the court that as of that date, Mr. Barrett's lawyers had not yet assembled or reviewed the records of the preliminary mitigation investigation that had been done prior to the first state trial. These statements, and the declarations of John Echols, Frank Gordon, and Steve Leedy, show Mr. Hilfiger failed to undertake a reasonable investigation before concluding that no additional funds were needed to prepare for either stage of trial.

On or about June 30, 2005, trial counsel telephoned then Assistant Federal Defender Julia O'Connell and requested an opportunity to speak with her mitigation investigator. (Decl. Julia O'Connell). Trial counsel had not contacted the mitigation specialist whom the court had authorized to work on Mr. Barrett's case. (Letter from Ron Lax to Tivon Schardl dated 9/24/08). Nor had trial counsel familiarized himself with the results of an earlier mitigation investigation. (Decl. Steve Leedy; Decl. John Echols; Decl. Frank Gordon). Ms. O'Connell recommended that trial counsel contact Richard Burr, Federal Death Penalty Resource Counsel, for assistance. Trial counsel did not contact him. (Decl. Richard Burr.) At that time, the trial was approximately ten weeks away. As Federal Defender O'Connell explains, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second stage

investigation if it hadn't already been completed, even if Mr. Hilfiger were able to secure the services of a mitigation investigator or investigators.  (Decl. Julia O'Connell).

Mr. Barrett's trial counsel did not secure the services of a mitigation specialist or other trained mitigation investigator.  Although the court authorized trial counsel to retain Inquisitor, Inc., trial counsel failed to contact the agency, and never sent any documents or requested any investigation for Mr. Barrett's case.  (Letter from Ron Lax to Tivon Schardl dated 9/24/08).

As the Supreme Court has held, where there is a failure to investigate, alleged "strategic" decisions are not reasonable.  In all capital cases, prevailing norms of capital defense practice, and empirical research on its results, indicate that "[c]ounsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."  (ABA Guideline 10.10.1; ABA Guidelines, 31 Hofstra L. Rev. 913, 1059, 1065 (2003) (commentary on Guideline 10.11) ("counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial").)

Trial counsel were aware that expert testimony regarding the mind's response to threats such as an unmarked S.U.V. barreling towards one's cabin was important so that the jury could understand Mr. Barrett's reactions.  (Doc. 50.)  Trial counsel were aware that Mr. Barrett "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders."  *Ibid.*  Trial counsel were aware that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic

brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting."
*Ibid.*

The court authorized trial counsel "to hire a psychiatrist or a psychologist for up to 40 hours." (Doc. 97.) This ruling denied Mr. Barrett the expert assistance he was entitled to under the Due Process Clause of the Fifth Amendment. *See* Claim 3, *infra*. It also denied Mr. Barrett the resources afforded similarly situated defendants in federal death penalty cases. (Decl. Richard Burr; Doc. 107). The court denied Mr. Barrett resources that would exceed the amount of money spent to represent him in state court, (Doc. 128 at 4), even though there was no second stage of trial in state court.

Prevailing professional norms of capital defense practice provide that counsel should obtain the assistance of expert witnesses who will be provided relevant supporting documentation regarding the defendant's medical, scholastic, cultural, economic, and sociological background. (ABA Guideline 10.11(F)(1).) The United States Attorney said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation. (Tr. 9/9/05 Hr'g at 38.) Mr. Barrett's trial counsel did not retain an expert to assess mental health mitigation and did not conduct a background investigation that would have supported a reliable opinion.

In mid-August 2005, Mr. Barrett's counsel contacted Jeanne Russell, Ed.D., regarding the risk assessment that had been contemplated in January and authorized in March, 2005. The scope of Dr. Russell's inquiry was limited, and did not encompass many mitigating factors previously identified by trial counsel and routinely pursued in capital cases. Dr. Russell did nothing more for Mr. Barrett's federal counsel than update the report she had prepared in

2003 in anticipation of the second state trial. Indeed, trial counsel represented to the court that the defense did not have to produce a report from Dr. Russell pursuant to Federal Rule of Criminal Procedure 12.2 because Dr. Russell would not testify regarding Mr. Barrett's mental condition. (Tr. 9/9/05 Hr'g at 41).

By September 9, 2005, Mr. Barrett's trial counsel had not obtained records from any state court investigation for a penalty phase. (Tr. 9/9/05 Hr'g at 43). Mr. Smith said he had contacted "Mr. Echols[] because we have been able to find very little on mitigation" from the past trials. *Ibid.* Mr. Smith told the court Dr. Russell's testimony would not involve an examination of Mr. Barrett. *Id.* at 41. Dr. Russell had "examined" Mr. Barrett, however. At that time, Mr. Smith believed that Dr. Russell only had "reviewed records and what have you." (Tr. 9/9/05 Hr'g at 41). The court generously described the defense's preparation as "still work in progress." *Id.* at 42.

On October 3, 2005, trial counsel disclosed to the court that they had not consulted a psychiatrist or psychologist. (Tr. 10/3/05 Hr'g at 7). Mr. Hilfiger informed the court that Dr. Russell would be used as a mitigation expert. *Ibid.* However, Mr. Smith had previously informed the court and the Government that Dr. Russell would not be testifying regarding mental health mitigation. (Tr. 9/9/05 Hr'g at 41). Mr. Hilfiger apparently meant that Dr. Russell would act as a mitigation investigator. However, Dr. Russell was not qualified to conduct a mitigation investigation, and she so informed Mr. Smith in August 2005.

### 2.    *Prejudice*

Trial counsel informed the jury that four categories of "mitigation evidence" would be presented: (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction"; (3) "Kenny Barrett's incarceration; (4)

"Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999." (R. 4704). The cursory description of the evidence that would be presented in the last category (R. 4709-13), was not "an accurate representation of [Mr. Barrett]" (R. 4713), in that it was terribly incomplete; a reflection of counsel's lack of investigation.

If trial counsel had followed the norms of capital defense practice, and pursued the evidence available to them, the jury would have heard truer and radically different testimony regarding Mr. Barrett. Jurors would have learned the following about Mr. Barrett, his background, and character:

**a.      The family, social, and medical background of
Kenny Barrett**

**<u>Introduction</u>**

Kenneth Barrett's familial roots began in Sequoyah County, Oklahoma, at the intersection of two epic journeys in American history. The deprivation of Depression era Sallisaw provided the inspiration for the Joad family in *Grapes of Wrath* who came to personify legions of real-life sharecroppers living in the nearly hopeless circumstances of Sallisaw's drought and poverty before they set out for California. The Trail of Tears[42] ended at Sallisaw Creek for those Cherokees who survived starvation, freezing temperature, disease and murder during their forced relocation from their homelands.

---

[42]In 1838, the US government uprooted some 13,000 Cherokee Indians from their land east of the Mississippi River and forced them westward into the Oklahoma territory. The 1,000 mile route they took to Oklahoma is called the Trail of Tears because of the hardships of weather, disease, and starvation that claimed the lives of 4,000 Cherokee. It was a dismal journey that took place in the middle of harsh winter, and forced Indians from their homelands through north Georgia, middle Tennessee, Kentucky, Missouri, and Arkansas, into present day Oklahoma.

Def's § 2255 Mot.                              191                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Kenny 's heritage is a blend of both cultures.  His paternal relatives, the Barretts, were hard-scrabble farmers, who married Cherokee Indians.  His maternal relatives, the Dotsons, were Cherokee ranchers who married non-Indians. (Gelene Dotson, Genealogy Memorandum; Abe Dotson Marriage Certificate; Ida Melton, Death Certificate; Allen Real, Death Certificate) With some success and much tragedy, both families endured the historical forces that shaped their communities.  Some family members grew up in Indian orphanages, some became successful ranchers, educators, doctors, and business people.  Many struggled with profound mental illness and its attendant chaos.

Intergenerational, genetic predisposition to mental illness affected Kenneth Barrett's development, behavior, perceptions, and experiences over the course of his life.  It made him vulnerable to developing major psychiatric illness.  In lay terms, Kenny  was affected by a confluence of the most damaging genetic defects handed down from both the Barrett and the Dotson families.  His mental illness was marked by severe neuropsychological deficits that manifested themselves in extraordinarily compromised cognitive and psychiatric functioning.

**Family History of Mental Illness**

Kenny  meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component.  His family has long struggled with their vulnerability to mental illness.  Multiple generations on both his mother's and father's side include family members who succumbed to depression, bipolar disorder, schizophrenia and addictive diseases. Although members carried genetic-based risk factors, some who were spared the most debilitating symptoms of mental illness were able to pursue successful professional careers as educators, doctors, ranchers, and business people.  Other family members required psychiatric

Def's § 2255 Mot.                     192                     *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

institutionalization.  This spectrum of impairment included other family members who functioned marginally, but were unable to meet their responsibilities to their families and community.  The nature and severity of Kenny 's mental illness were both indicative of and exacerbated by significant neurological impairments, including pervasive damage to the prefrontal lobe of his brain.

<div align="center">**Maternal Family Mental Illness**</div>

Kenny 's mother, maternal aunt, and maternal cousins satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression, anxiety disorders, and developmental disabilities.  Kenny 's mother's family "had to deal with mental illness for a long time." (Decl. Phyllis Crawford.)   Kenny 's mother, Gelene Dotson, has suffered from clinical depression, mood swings and anxiety since her teenage years.   Gelene's sister, Carolyn (Kenny's aunt), also suffers from bipolar mood disorder and requires therapeutic medication with a regimen of mood stabilizers and antidepressants.  (Decl.  Carolyn Joseph; Carolyn Joseph, Medical Records; Carolyn Joseph, Marriage Certificate.)   One of Carolyn's daughters manifests signs of mood-related psychiatric distress and is unable to rear her children. (Decl. Carolyn Joseph.)   Gelene's brother Mark, the youngest child in her family and now a podiatrist, witnessed Gelene and Carolyn struggle "with serious impairments." (Decl. Mark Dotson.)

One of Kenny 's maternal cousins, Gwendolyn Crawford, also has bipolar mood disorder that necessitates ongoing treatment and medication.  (Decl. Gwendolyn Crawford; Gwen Crawford, School Records;  Decl. Brandy Hill; Brandy Hill, Medical Record.)  Gwendolyn's two children both have significant mental impairments.  Her 26 year old son Brandon has a developmental disability and is unable to speak or live independently.  (Decl. Gwendolyn

Crawford; Brandon Smith, Social Security Earned Income Statement; Brandon Smith, Guardianship Proceedings.)  Gwendolyn's daughter Brandy Hill reported that her family "learned first hand about bipolar disorder and depression" and that Brandy herself "battle[d) with depression," experienced episodes of "high euphoria" and underwent treatment for her mood disorder until she could no longer tolerate chemical regimens.  (Decl. Brandy Hill; Brandy Hill Medical Records.)

Travis Crawford, another of Kenny 's first cousins, also receives medication for anxiety and reported a history depression.  (Decl. Travis Crawford; Travis Crawford Medical Records.)  Travis has had "a long struggle with drugs and ha[s) anxiety and panic attacks" and his "mind does not work that well."  (Decl. Travis Crawford.)  Travis understands that "psychological problems run in [his) family" and reports his oldest daughter, now "a grown young woman" has bipolar disorder and one of his sons "seems a little slow and is having a tough time of it."  (Decl. Travis Crawford.)

Gelene's uncle, Warren Dotson, has two daughters who "each have a son who is bipolar, and it is a challenge for a lifetime.  It never goes away."  (Decl. Nona Reich.)

In the maternal family, depression and mood disorders trace back to Kenny 's grandmother's (Hattie Gertrude Dotson) generation.  Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the Twentieth Century.  (Decl. Carolyn Joseph; Hattie Gertrude Dotson, Death Certificate.)  Another relative, Wallace Dotson, was involuntarily hospitalized at the state mental institution on a petition brought by his father, Tom Dotson,[43] who

---

[43]Tom Dotson was the uncle of Kenny's maternal grandfather, Hugh Dotson.  (Hugh Dotson, Death Certificate.)

Def's § 2255 Mot.                         194                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

described Wallace as being "completely out of his mind," suffering from "some kind of spells" and not having slept for "three days and nights." (Wallace Dotson Lunacy Record)

**Paternal Family Mental Illness**

Mental disease and its affects on family life were transmitted down at least four generations of Barretts. Kenny 's great great grandfather, as did his great grandfather, his grandfather and finally Kenny himself. (A. J. Barrett, Mental Health Record; A. J Barrett, Eastern State Hospital Record; Decl. Issac Barrett) As Kenny 's cousin, Kathy Trotter, explained: "Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression." (Decl. Kathy Trotter.) Kenny 's great great grandfather, A. J. (Jack) Barrett, was committed to a mental hospital and a Certificate of Lunacy was entered in the local courthouse in Sequoyah County in 1918. (A.J. Barrett, Certificate of Lunacy.) Kenny 's great grandfather, Issac Clifford Barrett, by all accounts a man who was committed to his family and community, overcame tremendous odds and poverty to build a successful ranch ("cow rich"), but ended his life by suicide. (Decl. Issac Barret and Linda Riley; Isaac Clifford Barrett, Death Certificate.)

Issac's oldest son, Andrew Jackson "A.J." Barrett shared in only the tragedy of Issac's life and none of its success. A.J., Kenny 's grandfather, was haunted by suspicion, paranoia, and hostility, which was manifested by violent physical and sexual assaults against his wife and children, which forced one after the next to flee the home in search of safety. A.J. terrorized his wife who hid "in the woods" from him (Decl. Linda Riley.), raped one of his daughters who became pregnant and placed the baby for adoption (Decl. Issac Barrett), and went on drunken rampages through town. His Certificate of Lunacy documents auditory hallucinations, persecutory delusions and paranoid ideation. (A.J. Barrett Certificate of Lunacy.)

His family believed he "was bipolar." (Decl. Linda Riley.)  A.J. was able to work only "sporadically."  His family eked out a "marginal" living, and at one point A.J. was involuntarily committed to the state hospital for one month but returned home to his wife who would not "consider divorce." (A.J. Barrett Eastern State Hospital Records; Decl. Linda Riley; A. J. Barrett, Death Certificate.)

A.J.'s maternal family also faced the tragedy of mental illness.  A.J.'s mother (and Kenny 's great grandmother), Mary Ellen Maxwell, suffered a "mental breakdown," (A.J. Barrett, Eastern State Hospital Records), wandered the ranch at night talking to herself and believed that she was canning goods for the winter when she washed bottles in the middle of the night (Decl. Issac Barrett.)  She "died very confused." (A.J. Barrett, Eastern State Hospital Records; Mary Ellen Barrett, Death Certificate.)  Mary's brother, Howard, was "Looney Tunes" (Decl. Issac Barrett), and Howard's son, Billy Dean who was a disabled veteran with a history of schizophrenia, committed suicide. (Billy Dean Maxwell Death Certificate; Billy Dean Maxwell Mental Health Record.)  Kenny 's great aunt, Elnora Long, is bipolar and requires significant doses of medication. (Decl.  Kathy Trotter and Issac Barrett.)  Elnora, who has a complicated lineage, is "very emotionally unstable" and "unpredictable." (Decl. Kathy Trotter.)  Kathy, Kenny 's cousin who experienced an anxiety and depressive episode and was hospitalized, believes Elnora is manic depressive because of her extreme mood swings.  (Decl. Kathy Trotter; Kathy Trotter Medical Records.)  Elnora is Ernie and his siblings' maternal half sister whose father was her mother's former son in law's brother.

Kenny  has one paternal aunt (Linda Riley) and three paternal cousins who suffer from depression and bipolar disorder.  His father's sister, Linda Riley, is treated for depression, and both her adult daughters have been diagnosed with bipolar disorder. (Linda Riley Medical

Records.) Linda's seven-year-old grandson has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder.

### Maternal Family History

Kenny 's maternal grandfather, Hugh Dotson, was a direct descendant of Cherokee Native Americans, whose every day life reflected the travails and successes Indians in eastern Oklahoma.  Hugh, who grew up in an Indian orphanage became an adult universally loved by his children and grandchildren and respected in the Sallisaw community.  He spent his formative years living at Dwight Mission,[44] an Indian mission school started by the Presbyterian Church.  Hugh's mother, Minnie Andrews,  placed Hugh and four of his siblings (Christine, John E., Anna, and Eleanor) at Dwight Mission after their father, Abe Dotson, was murdered.  (Decl. Warren Dotson.)  Hugh's mother, a widow with no ability to support her children, placed her two younger children (Lela and Warren) with her husband's relatives.  (Decl. Warren Dotson and Carl Cook; Sequoyah County Times; Minnie Andrews, Death Certificate.)

Circumstances of Abe Dotson's death are unclear, but it is indisputable that he, two of his brothers, and his brother's son were killed by gunfire over a three year period in separate incidents.  Abe, his siblings Mark and Greenberry, and his nephew Bee, were Cherokee,

---

[44]Dwight Presbyterian Mission of the Cherokees was originally founded in 1820 as an Indian mission school in western Arkansas and was named for Timothy Dwight, president of Yale University.  In 1838, as Cherokees were forced into Oklahoma, Dwight Mission was moved at the invitation of the Cherokee chief to its current location 20 miles into then newly organized Indian Territory. Dwight Mission served generations of Native Americans as a mission and training school until public education became available and the school was finally closed in 1948.

and it appears that at least one of the men who shot and killed them did so with impunity.[45] (Oklahoma v. Henry Edwards; The Vian Press; The Sequoyah Times.)

Abe's son, Hugh, and the other Indian children at the mission worked in its fields and stockyards to earn their keep.  Hugh impressed the administrators at Dwight Mission with his skill and sense of responsibility.  Hugh and his siblings stayed in the community after they left Dwight Mission, farming as sharecroppers and day laborers.  They barely survived, and some of his siblings made the long trek to California in hopes of better jobs in the fields.

Hugh married Hattie Gertrude Real in 1939 (Hugh Dotson Marriage Certificate), and they had five children over their life-long marriage, the oldest of whom is Sylvia Gelene Dotson, Kenny 's mother.  (Sylvia Gelene Dotson Birth Certificate.)  Hugh "barely earned enough to live on." (Decl. Gelene Dotson.)  Hugh, Hattie and their growing family lived in " tumble down" houses that "were in pretty bad shape even by standards back then."  (Decl. Gelene Dotson.)  The family "had no running water, electricity or plumbing and used wood stoves for heating and kerosene for cooking."

World War II intervened, and Hugh served in the U.S. Army.  When he returned home he attended classes on the GI bill that were taught by his brother in law, Carl Cook.  Hugh "learned how to run a farm, a big farm, not just a home farm," and when Gelene was six, the family moved to the Dwight Mission School where Hugh ran the farm.  (Decl. Gelene Dotson.)  Gelene " always heard" her family was "part Indian and that [she) was 3/16 Cherokee."  (Decl. Gelene Dotson.)

---

[45]Cherokee Census Cards M2799 and 3294.

Dwight Mission provided a house for the family that had electricity and plumbing, and Gelene began her elementary education at the school.  She was her mother's least favorite no matter that she was the most attentive to her mother's needs.  (Decl. Gelene Dotson.)  The school shut down in 1949, but the Presbyterian Church sent Hugh and his family to its Menual School in Albuquerque that served Spanish speaking students from New Mexico.  Hugh "ran the cattle and vegetable farm" and served as "the overseer" to the student farm hands.  (Decl. Gelene Dotson.)  After a year at Menaul Hugh accepted the church's offer for him to run the farm operations at a new orphanage in Farmington, Missouri.  The family stayed in Farmington two years until the orphanage closed and the family moved back to Oklahoma.

Rural Sallisaw offered no jobs, and Hugh and his family moved in with his brother-in-law Carl and sister Christine.  (Decl. Carl Cook.)  Public schools did not conduct classes during cotton season because children had to join parents picking and chopping cotton.  Hugh and his family traveled to western Oklahoma and "chopped cotton in the spring and pulled cotton balls in the fall." (Decl. Gelene Dotson.)  The family returned to Sallisaw when school began in the fall, but left at Christmas to join family in California who had arranged for Hugh to become an irrigation manager on a large farm near Bakersfield.  Gelene loved her life on that farm where they "were not migrant workers, but people who lived there permanently" in the "30 or 40 houses on the farm, all with kids."  (Decl. Gelene Dotson.)  It was "a joyful time" and Gelene "was a happy child," but her mother and father yearned to return to Sallisaw and own their own land.  (Decl. Gelene Dotson.)  Gelene explained that "[l)and is just something very important" to her family and "always has been."  (Decl. Gelene Dotson.)

Hugh and his wife Hattie were dedicated to their dream of owning land.  Hugh "worked seven day weeks, 12 hour-days" and "was tired from too much work but he never

Def's § 2255 Mot.                              199                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

considered working less." (Decl. Gelene Dotson.)  Children in the family "always knew [they] went out there to make enough money to buy [their) own place back home." (Decl. Gelene Dotson.)   When they had saved enough, the family returned to its roots and soon after their youngest child was born in 1961, Hugh bought 40 acres in Sequoyah County. Gelene and her siblings enrolled in local public schools, and Gelene graduated but she never recaptured the joy of her few years in California.  Years later, Hugh gave each of his five children seven of his treasured 40 acres and retained five.  Kenneth Barrett  eventually built his shack for $150.00 on a spit of  his grandfather's land adjacent to his mother's house, on land that Gelene expected she would one day be deeded, and she was.

### Paternal Family History

Like Hugh Dotson, Issac Clifford Barrett, Kenny's paternal grandfather enjoyed a fine reputation in Sequoyah County.  From 1917 to 1943, Issac managed a 20,000-acre ranch owned by a Kansas doctor.  Issac married Mary Ellen Maxwell, who was one of ten children born in Sequoyah County. Issac was known as "a fair man" who, when he learned of a neighbor's falling on hard times, shared the bounty of his own garden.  (Decl. Issac Barrett.)  Issac "had his burdens to carry after he married" Mary.  She had a "mental breakdown" (A.J. Barrett Eastern State Hospital Records), and "walked around the yard talking to herself.  At night, she would wake up, wash jars, and think she was canning." (Decl. Issac Barrett.)  According to Issac Barrett, Mary's brother, Howard Maxwell, was "Loony Tunes" and Howard's son Billy Dean Maxwell was involuntarily committed to the state mental institution four times over a ten year period before he committed suicide by shooting himself in the head.  (Decl. Issac Barrett; Billy Dean Maxwell Death Certificate; Billy Jean Maxwell, Record of Mental Health Proceeding.) Issac also committed suicide, by "ingesting a remedy for black leg cattle disease" on November

24, 1952.  (Decl. Issac Barrett.)  Family members believed Issac killed himself "because he had a broken heart" after his brother convinced him to sell his cattle and invest all the proceeds in a failed enterprise. "He had nothing left."  (Decl. Issac Barrett.)

Issac's oldest son, Andrew Jackson Barrett (A.J.), is Kenny's paternal grandfather, but "[w]hatever good Issac had in him, and there was plenty of it, did not pass down" to A.J. (Decl.  Issac Barrett.)  A. J. married Ada Mae Hatter, a woman who came to be "very well thought of" and who " was someone who worked extremely hard."  (Decl. Kathy Trotter; A. J. Barrett, Marriage Certificate.)  Ada's mother, Ida Melton, was an Indian (Ida Melton Death Certificate) married to Sam Hatter.  (Sam Hatter Marriage Certificate.)   Ida and Sam divorced, and Ida married A.J.'s brother John.  (Sam Hatter,  Divorce Proceedings; Sam Hatter, Marriage Certificate to Bessie)  Ida and John had one child, Elnora Barrett Long, who was debilitated by

her manic depression and anxiety to such a degree that she has recently been put in a nursing home. Ida's marriage to John meant that her son-in-law, A.J., was also her brother-in-law.

A.J. and his wife, Ada Mae "lived a hard life."  (Decl. Issac Barrett.)  Three children "died at or near childbirth; the oldest was two weeks old.  Two are buried in Akins cemetery.  The stillbirth is buried back in the mountains."  (Decl. Issac Barrett.)  The oldest of the five children born to A.J. and Ada Mae who survived is Ernest (Ernie) Barrett, Kenny's father.  Ernie and his the four siblings who survived (Margaret, Issac, Gary and Linda) lived under the shadow of A.J.'s mental illness, alcoholism, and cruelty in a cabin with "a dirt floor and no electricity or running water. [W]ell water was not usable for humans, although it was all right for animals and crops."  (Decl. Issac Barrett.)

A.J.'s education ended at the seventh or eighth grade. He worked sporadically as a laborer "doing public construction work" and "spent eleven months in the service during World War II."  [A.J. Barrett, Eastern State Hospital Records.)  Unable to support his family, "[t)he entire family had to work in the fields traveling from one crop to the next."  (Decl. Issac Barrett.) State Hospital records described their economic status as "marginal," and the family "had a tough time getting by."  [A.J. Barrett, Eastern State Hospital Records)

Life for Ernie, Kenny's father, and other children in the family was  dismal.  One of Ernie's "earliest memories is being taken out of school to work in the fields."  Decl. Ernest Barrett .)  Ernie described their grim life:

> As my brothers and sisters got big enough to walk and carry a load, they joined us in the field.  Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell, and picked beans in Moffitt, Oklahoma.  It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sunup to sundown.  It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it.  When cotton season came, we worked or we starved.  When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

(Decl. Ernest Barrett.)

"We had a neighbor who raised purple whole peas for animal feed. My Granny Ida asked her if we could have what she had left on the vines for our cows—we scavenged them and my mom cooked them." (Decl. Linda Riley.)

A.J. was unable to ameliorate the harshness of poverty and its impact on his family.  His parenting was derailed by mental illness that ultimately led to his being involuntarily institutionalized by court order at the state hospital for one month.  (A.J. Barrett, Eastern State Hospital Records.)  None of his children "wanted him to be at home because of the crazy things

he did." (Decl. Issac Barrett.) He suffered from mood swings that he attempted unsuccessfully to self medicate with copious amounts of alcohol, to which he became addicted. His alcoholism only aggravated his behavior. (A.J. Barrett, Eastern State Hospital Records.) Family members believed his behavior worsened after an automobile accident in 1960, but he "had always been high tempered and jealous." (A.J. Barrett, Eastern State Hospital Records.) His behavior was erratic and unpredictable leaving his children unable to tell "from one day to the next what was going to happen." (Decl. Issac Barrett.) When he was in a "bad mood" he struck out against his children, hitting them with "any dumb thing, belt, club, board, or limb" (Decl. Issac Barrett), but he "was difficult to figure out because he was also a decent guy when he was sober." (Decl. Ernie Barrett.) A.J. spared no one; he raped his daughter who went away to New Orleans to have the baby and placed it for adoption. (Decl. Issac Barrett.)

A.J.'s psychiatric symptoms made it impossible for anyone in the family to appease him, and his sons, including Kenny's father Ernie, tried to "stay out of [his) way." The children left home as soon as they could. (A.J. Barrett, Eastern State Hospital Records.) Family members reported that A.J. had "two different personalities" and "angry spells about three times a week." (A.J. Barrett, Eastern State Hospital Records.) A.J. had "enormous moods swings from being an alright guy to being totally out of control." (Decl. Ernest Barrett.)

A.J.'s mental illness "caused him not to be able to get along with neighbors and especially his employers." (A.J. Barrett, Eastern State Hospital Records.) A.J. thought "people were after him," heard "imaginary voices," was "somewhat confused," and reported "men outside his window that [were) going to kill him." (A.J. Barrett, Eastern State Hospital Records.) A.J. was "unpredictable, irresponsible, irritable, uncooperative and not in complete reality."

(A.J. Barrett, Eastern State Hospital Records.)  A physician examining A.J. when he was admitted to the state hospital, reported his findings:

> His memory for past and remote past is poor.  He can retain a number of five digits but is unable to repeat them in reverse with any degree of facility.  Serial subtraction of eight from one hundred is done with much hesitation and inaccuracy.  His general intelligence seems inaverage and dull normal.  His reasoning and judgement are limited.  His insight is poor.

(A.J. Barrett, Eastern State Hospital Records.)

Ernie and his siblings were powerless to protect themselves or their mother from A.J.'s assaults and terror.  A.J.'s wife, Ada Mae, was an old fashioned woman who "would not divorce" him (Decl. Linda Riley; A.J. Barrett, Eastern State Hospital Records), even though "nothing could stop him from attacking" them."  (Decl. Ernest Barrett.)  Ada "was churchgoing and devout; she did not believe in leaving a marriage no matter how bad it was."  (Decl. Ernest Barrett.)  Ernie believed his mother "was as good a woman as there is, but she had a hard life between my father being half crazy and always poor."  (Decl. Ernest Barrett.)  Ernie tried "[a)s the oldest boy in the family," to protect his mother and the other children, but he was "no match" for his father until he was "half grown."  (Decl. Ernest Barrett.)  Because Ernie tried to "get between" his father mother" when A.J. attacked her, he "got beaten more than the other children."  (Decl. Ernest Barrett.)

Ernie developed characteristic responses to the life threatening trauma he witnessed and experienced.  He "learned never to cry" when his father hit him and he does not remember "feeling a hell of a lot."  (Decl. Ernest Barrett.)  High school for Ernie was "different."  (Decl. Ernest Barrett .)  In a community known for its poverty, Ernie's family stood out as still poorer than most.  Other students "made fun of [Ernie) and laughed at [him) because of the way [he) dressed."  (Decl. Ernest Barrett.)  Ernie responded to the taunts with fighting

"every boy in [his) high school class to hold any respect."  (Decl. Ernest Barrett.)  Other students called Ernie "'Loco' because of the way he acted, and he never completely straightened out." [Decl.  Issac Barrett.)  Ernie's brother described him as "pretty cruel."  (Decl. Issac Barrett.)  He treated his younger siblings "pretty rough," and when he made them  cry, "he thought it was funny."  (Decl. Issac Barrett.)  Ernie's brother thought Ernie was "a lot like [his) father," A.J. (Decl. Issac Barrett.)  An aunt who taught Ernie in elementary school described him as "mean child."  (Decl. Ruth Harris.)

Ernie left home without graduating from high school and joined the U.S. Marines. He kept memories of his maltreatment and his powerlessness to protect his family at bay by drinking to excess.  He was three months short of 17 the last time he stepped between his father and mother to try and protect her.  His father hit him across the shoulder with a "19-inch metal file that busted [his) shoulder wide open."  He still has a scar from it.  (Decl. Ernest Barrett.) Ernie described that day: " I left home that day just running because I knew that if I stayed at home I would have to kill my father to protect the others.  I was 6'3" and weighed 187 pounds." (Decl. Ernest Barrett.)

## Family of Origin

Ernie Barrett and Gelene Dotson brought to their marriage a strong genetic predisposition to major mental illness, budding alcoholism, and little understanding of the demands of parenting.  They met in high school, dated briefly before Ernie left to join the U.S. Marines,  reunited by accident when both were back in their home town and married July 8, 1960, without much thought.  (Decl. Ernest Barrett and Gelene Dotson; Ernest Barrett Marriage Certificate.) Ernie and Gelene started married life in Joliet, Illinois, at the recommendation of Gelene's relatives who helped Ernie find work at a Kerr Glass manufacturing plant.

Def's § 2255 Mot.                              205                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Ernie and Gelene's marriage was tumultuous and marked by discord from its beginning.  Although Ernie was very "determined not to live in the kind of poverty [he) knew as a child growing up," he had little notion of family life or fatherhood.  (Decl. Ernest Barrett.)  Ernie acknowledges that he "did not give much thought to fatherhood" and "did not think about Gelene or, later on, the boys, other than working and supporting them."  (Decl. Ernest Barrett.)

Ernie "almost immediately started running around with other women" (Decl. Ernest Barrett.) and was gone for days at a time.  He had his "mind set on doing whatever" he wanted, as long as he worked.  (Decl. Ernest Barrett.)  After he finished his shift at the plant, he went to bars and got "into as many brawls as there were" before coming home.  (Decl. Ernest Barrett.) Ernie "did pretty much whatever [he) wanted to. [He) would go out, drink as much as [he) wanted, and chase women," a pattern he maintained until well after his marriage with Gelene ended.   He "drank a fifth at a time."  (Decl. Ernest Barrett.)  Today Ernie is deeply ashamed of his behavior towards his children and wishes he "could take it back and do for [his) children what they needed and be the kind of parent they deserved."  (Decl.  Ernest Barrett.)  At the time he and Gelene started their family, his only measurement of success was being able to work himself  "up from pushing brooms to production manager."  (Decl. Ernest Barrett.)

Gelene was "pretty depressed" and  "miserable" in the marriage.  (Decl. Gelene Dotson.) She was "a heavy drinker with dramatic mood swings."  (Decl. Mark Dotson.)   She had planned on going to college but discovered she was "crazy about Ernie" who " came home kind of like a knight in shining armor."  (Decl. Gelene Dotson.)  She did not realize, until after they married that Ernie "was not the same boy" she knew in high school and that "he had changed, none for the better."  (Decl. Gelene Dotson.)  Looking back, she "never imagined that life with Ernie could be so terrible, not just for [her), but for the children [they) had together."

Ernie's infidelity, unpredictable absences, and lack of concern for her was "humiliating and embarrassing. " (Decl. Gelene Dotson.)  Gelene knew that Ernie chased after "other women," and she and her aunt went from bar to bar  "looking for him – he would be out drinking," but barkeepers would tell her he was not there.  (Decl. Gelene Dotson.)  Throughout their 13-year marriage, Ernie 'had his other women."  There was never a time he did not have other women.  Gelene "drank right from the beginning of the marriage," according to Ernie.  One of Gelene's sisters, Phyllis, who visited Gelene when she was pregnant with Kenneth Barrett reported that "Gelene drank from the moment she woke up until she went to bed."  (Decl. Phyllis Crawford.)

Kenny 's parents separated multiple times, sometimes for extended periods and sometimes more briefly, but always in chaos. Their relationship was acrimonious and rife with recrimination.  Ernie was unrepentant and "would not even talk" to Gelene "about what was going on" with her or the children.  Gelene says that "[I]t drove [her) crazy," and that she "begged, pleaded, threatened, and cried with Ernie." (Decl. Gelene Dotson.)   They "split up and got back together and threatened to leave each other over and over."  (Decl. Gelene Dotson.) They " always had a difficult time of it." (Decl. Gelene Dotson.)

Their son Kenneth Barrett was born to this troubled marriage in Joliet, Illinois, June 29, 1961.  (Kenneth Barrett, Birth Certificate.)  He was followed by his younger brother, Richard, born June 24, 1964 (Decl. Gelene Barrett; Richard Barrett, Birth Certificate.)  Shortly after Richard's birth, Gelene left Ernie for almost three years and returned home to Sallisaw with the boys.  Ernie "felt bad about leaving" his sons but he "could not take Gelene anymore." (Decl. Ernest Barrett.) Ernie admits that he "was still young and immature" and not " much of a husband" who "just put the boys out of [his) mind as much as [he) could." (Decl. Ernest Barrett.)

The three-year separation ended when Ernie was not able to "keep the boys out of [his) mind" and he reunited with Gelene in 1967. (Decl. Ernest Barrett.) Gelene and the boys returned to Joliet and "moved into the same mobile home" Ernie had been living in with his girlfriend. (Decl. Ernie Barrett.) The nature of the marriage did not change after Gelene and the boys returned to Illinois. Gelene gave birth to their third and last child, Stephen, January 1, 1969. (Decl. Gelene Dotson; Stephen Barrett, Birth Certificate.) Gelene and Ernie "both drank as much as [they) could," and Ernie "still stayed away from home." (Decl. Ernest Barrett.) Ernie was arrested multiple times for drunk and disorderly conduct, and a judge threatened him with a year's jail sentence. Ernie contacted a friend in New Jersey who found him a job at a glass plant. Leaving Joliet allowed him to avoid the inevitable jail sentence he knew would come because he could not stop drinking and fighting. The family moved, living first in Stanhope and then Lake Hopatcong, but Ernie "kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time." (Decl. Ernest Barrett.)

Gelene's humiliation at Ernie's hands continued. Ernie started "seeing another woman almost as soon as" the family arrived in New Jersey. (Decl. Gelene Dotson.) Ernie had promised Gelene that "he wanted to leave Joliet and have a fresh start, straighten himself out, but that's not what happened." (Decl. Gelene Dotson.) Ernie moved out of the home and lived with another woman, but Gelene allowed him to move back home with her and the boys. Gelene contracted gonorrhea twice from Ernie. Although Ernie had vowed he would never become violent like his father, he assaulted Gelene and "gave her two black eyes and split [her) lip." (Decl. Gelene Dotson.) Gelene "was at the end of her rope" and left Ernie for good in Lake

Hopatcong, returning home to Sallisaw with three young boys in 1972.  Ernie and Gelene

divorced June 20, 1973.  (Decl. Gelene Dotson; Sylvia Gelene Barrett, Divorce Proceedings.)

### Infancy and Childhood Development

Kenny  has long standing neurologic deficits that were apparent early in his

infancy, continued throughout his childhood and adolescence, and affected his behavior and

understanding over the course of his life.  Although it is difficult if not impossible to determine

with precision the etiology of his neurological deficits, there is no doubt that they are present and

significant.  These deficits can be the result of his mother's ingestion of alcohol or other

neurotoxins during her pregnancy with him, head trauma he sustained during childhood and

young adulthood, ingestion or exposure to neurotoxins at work or home, or a combination of one

or more of these factors.

Gelene was stressed throughout her pregnancy with Kenny, which she describes

as "very difficult."  (Decl. Gelene Dotson.)  She was in "constant pain," uncomfortable, and

depressed. (Decl. Gelene Dotson.)  She described her pregnancy as "battling with Kenny before

he was born."  (Decl. Gelene Dotson.)  Gelene drank throughout her pregnancy with Kenny,

unaware of alcohol's potentially devastating effect on a developing fetus's brain.  (Decl. Gelene

Dotson; Decl. Linda Riley.)  Gelene's in laws commented on her early alcoholism and stated she

"was a drunk right out of high school."  (Decl. Kathy Trotter.)

Kenny  had a difficult infancy and "exhausted" his mother.  (Decl. Gelene

Dotson.)  His "days and nights were mixed up," and he "was colicky" and unable to be

comforted.  (Decl. Gelene Dotson.)  He cried and fussed "all the time," making Gelene think all

babies must be like him.  After she had her other two children and observed their development,

she "realized something was wrong with Kenny."  (Decl. Gelene Dotson.)  Gelene received no

help from her husband who acknowledged he "was not around the house much when Kenny was a little baby" but " heard all about how hard it was to sooth him.  He was colicky and cried all the time." (Decl. Ernest Barrett.)  Kenny was born with a large lump on the back of his head.  (Decl. Gelene Dotson.)

Kenny  failed to meet developmental milestones expected of healthy infants. Gelene faithfully recorded Kenny's progress at three, six, nine, and 12 month intervals in a complimentary baby book she received at the hospital. (Kenneth Barrett, Baby Book Excerpt) Although it appears that he met most of his three and six month milestones, he lagged in some.

At three months, Kenny  did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand, splash in bath, take stepping movements when held erect," or "open mouth at sight of nipple before lips are touched."  Kenny's mother nursed him. [Kenneth Barrett, Baby Book excerpt, KEB 501 953)

At nine months, Kenny  did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent," or make stepping movements when feet are touched to floor."  [Kenneth Barrett, Baby Book excerpts)

At one year, Kenny 's delays were more obvious.  His mother noted he "had trouble learning to walk." (Decl. Gelene Dotson.)  He could not "climb stairs, hold and drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching."  (Kenneth Barrett, Baby Book excerpts.)

Kenny  early on demonstrated patterns of behavior associated with the prodromal symptom of bipolar mood disorder, which family members described as extreme hyper activity. Gelene recognized that his behavior lacked purpose and reported he "moved around without thinking about what he was doing" and was "very, very active." (Decl. Gelene Dotson.)  Gelene described him as "a handful" who "could not be still" and "was more than hyper." (Decl. Gelene Dotson.)  An aunt stated he was "always hyperactive, on the go, into everything, and could not sit still." (Decl. Phyllis Crawford.)  Ada Blount, Kenny's maternal great aunt, recollected that "Kenny was a hyper little boy who could not sit still." (Decl. Ada Blount.)

Ernie recollected that when Kenny "got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing." (Decl. Ernest Barrett.)  Janice Sanders, a maternal cousin, remembered that "Kenny was a hyper little boy, the most hyper child" she had have ever seen.  (Decl. Janice Sanders.)  She also noticed that Kenny "had strong feelings" (Decl. Janice Sanders), a common symptom of children who develop bipolar mood disorder.  Other family members who "used to babysit Kenny and

saw him on and off through his teens and at family reunions" confirmed that he was "very hyperactive." (Decl. Nona Reich.)

Family members recognized "that Kenny was different" and "needed so much more attention as a child than the other children." (Decl. of Phyllis Crawford.)  Kenny "was extremely sensitive and cried over every little thing from the time he was small until he was a grown man . . . .  He would break down and cry easily." [Phyllis Crawford) His cousin remembered that "back then we called Kenny hyper.  He was erratic and temperamental.  (Decl. Kathy Trotter.)  His mother reported that "any little thing could upset him, but it took a lot to

calm him." (Decl. Gelene Dotson.) Ernie also recognized that Kenny was "a sensitive little boy...who cried if you hurt his feelings." (Decl. Ernest Barrett.) When Kenny was a toddler, he had to go to the hospital for several different accidents because "he got into everything. He had to have his stomach pumped twice when on two separate occasions, he managed to climb to a top cabinet. Once he ate baby aspirins the other time he ate ex-lax." (Decl. Gelene Dotson.) Kenny's mother had to "rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting it open and raising a big knot." (Decl. Gelene Dotson.)

Gelene was overwhelmed by the responsibility of a child with special needs. Already a very emotional person who was alcoholic, she reacted to Kenny's impairments by punishing him. Gelene admits that she decided "to be especially hard on Kenney because he went from one thing to the next" and "was never still." (Decl. Gelene Dotson.) It "almost drove [her] crazy." (Decl. Gelene Dotson.) She thought he "was emotional about things that did not matter. He would cry and scream like there was no tomorrow." (Decl. Gelene Dotson.)

She physically punished him by beating him with a thin belt and degraded him verbally. Ernie remembered that Gelene "used to whip the boys over any little thing and whipped them all the time. She had a bad habit of saying cruel things not just to me but to the boys, too." (Decl. Ernest Barrett.) Gelene's niece by marriage "thought Gelene was mean, that she had a mean spirit" and that the way "she would talk to. . .kids was angry." (Decl. Kathy Trotter.) Children were "afraid of her." (Decl. Kathy Trotter.) Kenny suffered "more verbal abuse from her than her other two children." (Decl. Kathy Trotter.) Kenny's neurologic impairments and his chaotic home life took their toll on his school work. Gelene stated he "had a difficult time in school and was in special classes part of the time." (Decl. Gelene Dotson.) Kenny had difficulty almost immediately in school. He failed reading and arithmetic in the first grade and was barely

able to keep pace with his peers.  He had difficulty learning to read.  (Decl. Gelene Dotson;

Kenneth Barrett school records.)

Ernie "hardly had anything to do with [Kenny ) after the divorce, and everyone

could see how much it hurt Kenny."  Even when Ernie made a semi- annual trips to town to see

his sons, family reported he was insensitive to his children's needs.  He came "by to show off his

new Corvette when his children did not have shoes or decent clothes to wear."  (Decls. Issac

Barrett and Phyllis Crawford.)  Ernie's sister in law did not think Ernie was "a good husband or

father. Ernie did not come around and visit his children the way he should have.  He was absent

in their lives.  Ernie has always been for Ernie."  (Decl. Ruth Harris.)  Ernie "went his way and

let Gelene take care of the kids."  (Decl. Ruth Harris.)

Ernie remembered that "Kenny kicked and screamed to stay" with Ernie and "did

not want to go with his mother back to Oklahoma."   (Decl. Ernest Barrett.)  Kenny  "wanted to

stay" with Ernie, but Ernie felt he "was not set up to take care of him and work."  (Decl. Ernest

Barrett.)


Gelene's emotional needs took precedence over Kenny .  Her sister recalled that

Gelene "had a lot of problems, especially with alcohol and men" and those problems "affected

Kenny badly."  (Decl. Phyllis Crawford.)  Gelene brought different men into the house when

Kenny was entering his teenage years, and "it was very confusing for him."  (Decl. Phyllis

Crawford.)   Gelene "seldom gave Kenny a kind word" and "screamed at him over anything."

(Decl. Phyllis Crawford.)  Gelene once asked Phyllis to intervene and help her get Kenny  out of

his room.  Phyllis and her husband went to Gelene's house and talked to Kenny .  Kenny  told

them "he could not get his mom's voice out of his head.  The only time Gelene talked to him was

to scream." (Decl. Phyllis Crawford.)  Gelene's "ability to parent was very limited, not just by

alcoholism, but by her extreme mood swings and unpredictability.  She had a hard enough time

dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood

swings." (Decl. Steve Barrett.)  When Gelene "lost control of herself," she whipped the boys,

but "there was no real parenting." (Decl. Steve Barrett.)

Gelene was harsher with Kenny , "verbally and physically," than she was with her

other two sons. (Decl. Steve Barrett.)  Gelene used a strap to whip Kenny, and Kenny "hated" it.

(Decl. Steve Barrett.)  Kenny had a German shepherd that Ernie had given him, and the dog was

very protective of Kenny.  When Gelene "would try to beat" Kenny, he would hide behind the

dog and the dog would growl at Gelene  and not let her near him. (Decl. Steve Barrett The dog

was run over by a car.

Steve, Kenny 's youngest brother, lived at home with Kenny, Richard, and his

mother, but found refuge and support with the extended family.  Steve, an educator and principal

at a junior high school, has given great thought to understanding how he "was able to overcome

many of the challenges" he faced and "how those challenges affected Kenny." (Decl. Steve

Barrett.)

Steve and Kenny  "were exposed to vastly different environments and

experiences" during their formative years due to Steve's much younger age. (Decl. Steve

Barrett.)  Steve  benefitted from the guidance, support, and structure of an extended family that

"Kenny never experienced in his developmental period.  Kenny's developmental period was

filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic

and who put their own needs and wants ahead of their children." (Decl. Steve Barrett.)

Def's § 2255 Mot.            214            *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

While Gelene's move back to Sallisaw separated 12-year-old Kenneth Barrett from the closeness and love he longed for with his father, the move placed Steve in the middle of a "village. . .in an extended support structure" when he was in the second grade and Kenny was repeating eighth grade." (Decl. Steve Barrett.)  Steve was "literally surrounded by aunts, uncles, cousins, and most importantly" his maternal grandparents, Hugh and Hattie Dotson. Steve believes "another critical factor" is that Ernie. . . abandoned Kenny when Kenny most needed him" but that Steve, at the age of two, had no real relationship with Ernie.  (Decl. Steve Barrett.) Ernie's absence in Steve's childhood and adolescence was "replaced by attentive older men and women relatives who rooted [him) in their love and guidance."  (Decl. Steve Barrett.)

Steve also attributed his success to his academic ability and recognized that "Kenny had great difficulty with his education.  Kenny failed in school."  (Decl. Steve Barrett.) School became the focal point for Steve and provided "the value system" that was absent at home.  Steve developed close relationships with his extended family, and explained "it made all the difference in the world to have that support structure. It was a pivotal part" of his life, and he had "positive experiences and influences that Kenny never had."  (Decl. Steve Barrett.)

Gelene was unable "to have meaningful conversations about day to day problems, to figure out how to solve normal problems that arise in the course of every day life, or to tolerate the routine activity of growing boys."  (Decl. Steve Barrett.)  Steve once found "diary-type notes" of hers that "were very depressive and full of blackness and darkness."  (Decl. Steve Barrett.) Gelene "did not know how to respond to Kenny's special needs as a youngster with profound psychological problems."  (Decl. Steve Barrett.)

Kenny begged his father to allow him to live with him, and Ernie relented and "let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny

completed ninth grade." (Decl. Ernest Barrett.) Kenny resented Ernie's wife Diana and "it got

the best" of Ernie, who "lost control when he sassed her" and "hit him pretty hard in the chest.

(Diana Barrett, Marriage Certificate.) He went flying slamming against the wall." (Decl. Ernest

Barrett.) After his father's assault, Kenny went back to Sallisaw and soon withdrew from school.

Gelene reported that Kenny "never got over" the divorce and believed that it

"caused some of Kenny's problems." (Decl. Gelene Dotson.) She knew that "Kenny never

adjusted" after the family moved back to Sallisaw when Kenny was in the seventh grade. (Decl.

Gelene Dotson.) Kenny "got pretty depressed and lost interest in school." (Decl. Gelene

Dotson.) Kenny's youngest brother Steve realized that Kenny "idolized Ernie." (Decl. Steve

Barrett.) He could tell "how much Kenny missed [their] dad by the way he acted when Kenny

was around him. Kenny made sure to stay in close proximity. . . Ernie was a god to Kenny."

(Decl. Steve Barrett.) Extended family members knew that "Kenny never had much of a father,"

and "never had any guidance." (Decl. Ada Blount.)

Kenny had "a hard time with lessons" and repeated the eighth grade. (Decl.

Ernest Barrett.) In the fall of 1976, at the age of 14, Kenny enrolled in eighth grade for the

second time at Tommy Spear Junior High in Sallisaw. He was placed in special education

classes in English and staff made "some adjustments to the curriculum" for him. [Kenneth

Barrett School Records) At the end of the academic year, he showed improvement in two courses

(math and social sciences) and decline in one course (science.) It was a very difficult year for

Kenny, whose beloved grandmother, Ada Mae, died in 1976. (Ada Mae Barrett, Death

Certificate.) Ada Mae "adored" him, and "[w]hen she died . . . Kenny was just 14. It was as if

the only adult who ever cherished him had gone." (Decl. Kathy Trotter.) Ada Mae's death was

the hardest on Kenny "because his father had recently deserted him at the age he most needed direction." (Decl. Kathy Trotter.)

Kenny moved from Sallisaw to live with his father in Dunkirk, Indiana, and enrolled in the ninth grade at Jay County High School at the age of 15 in the fall of 1976. His grades declined in three of the five subjects (general math, comm arts, and life science.) [Kenneth Barrett School Records) Kenny returned to Sallisaw, but "just couldn't make it in school, so he withdrew from school and went to work full time." (Decl. Ernest Barrett.)

When Kenny was 17, Kenny was assaulted and beaten by Sallisaw police officer John Philpot, who hit Kenny so forcefully, it broke Officer Philpot's hand. [FBI memorandum) The assault had long term consequences on Kenny who could not understand the reason for the assault. Kenny had been arrested for "hot rodding, squealing his tires" when he was "out driving one of his souped-up cars." (Decl. Gelene Dotson.) The incident only added to Kenny's already burgeoning paranoia. The traumatic impact of the assault on Kenny , then a manic-depressive, brain damaged youth with a low I.Q., directly affected the development of paranoid delusions that would cause him, almost 20 years later, and 12 years after he shot himself in the chest with a

shotgun, to fend off imaginary satellites or dirigibles that he thought were surveilling him. (Decl. George Woods, M.D.)

## Onset of Mental Illness

Kenny entered late adolescence and young adulthood with modest expectations that were obliterated by the onset of major mental illness emanating from and exacerbated by his long standing neurologic deficits. He battled "terrible mood swings" and periods of depression that lasted for days. He hoped that hard work would make his pain go away. It did not. He had

worked steadily since he left high school, and "his bosses liked him."  He was "a good worker, strong, and able" and was "proud of his work."  (Decl. Gelene Dotson.)  By the time Kenny was 18, he worked on pipelines and oil rigs and traveled throughout Oklahoma and other states.

Soon, Kenny  met and fell in love with a beautiful young girl, Abby, and they married in 1980 when he was 19 and she was almost 16. (Kenneth Barrett, Marriage Certificate) Their only child, Toby, was born December 1, 1980. [Toby Barrett, Birth Certificate)  Kenny and Abby's marriage was "rocky. . . and they were more unhappy than happy even though they loved each other."  (Decl. Gelene Dotson.)

Kenny  "was far too mentally unstable" to live independently, so the young couple lived off and on with Gelene for the first few years of their marriage.  (Decl. Abby Stites.) Kenny 's relationship with his mother was complex, and although she resented his presence, she insisted that he join her when her friends came over and used drugs.  Kenny 's wife, Abby, worried about the effect such goings on would have on her baby, and she desperately wanted to move into their own apartment.  Abby reported that "Gelene made Kenny get up from bed and party with crack and pot."  (Decl. Abby Stites.)  Gelene never treated "her other sons the way she treated Kenny."  (Decl. Abby Stites.)  She and Kenny had a "terrible relationship."  (Decl. Abby Stites.)  Gelene remarried and divorced a local bar owner, and was frequently "depressed" and "intoxicated." (Pulice v. Barrett, Application for Temporary Order; Gelene Dotson, Marriage Certificate to Paul Dudley; Gelene Dudley, Divorce Proceedings.)

Kenny  tried "to bury his problems under constant work and activity."  (Decl. Steve Barrett.)  Kenny  measured his life by how much he could work, but he was too depressed to keep a steady work schedule on his own.  Depressive episodes overtook him, and he would "get real depressed and sleep all the time."  (Decl. Abby Stites.)  The only antidote to his

depression was drugs.  His wife knew that "he smoked a lot of pot, but without it he never got motivated. He turned to drugs to make himself feel better." (Decl. Abby Stites.)  He used methamphetamine as an antidepressant and discovered that he could work well under its influence.  Abby observed that Kenny  "would work hard and then sleep all the time. . . .[He) did the drugs to make himself feel better, because otherwise he would just sleep." (Decl. Abby Stites.)

Kenny 's behavior easily fit the pattern of bipolar mood disorder, and his family knew he was "deeply troubled." (Decl. Kathy Trotter.)  His wife thought he was "like a manic depressive, hot one minute and depressed and even immobile the next." (Decl. Abby Stites.) Kenny had "racing thoughts." (Decl. Abby Stites.)  He did things without thinking and "then regretted them" (Decl. Abby Stites.)  Abby knew that Kenny  "did not act the way normal people act" and that he "got swept away in his emotions." (Decl. Abby Stites.)  When Kenny lost control of himself, he hit Abby and later "would come back crying, begging" Abby to take him back. (Decl. Abby Stites.)  He was genuinely "remorseful" and would "be good as he could be—he would go the extra mile,. . . . but he could not keep it up." (Decl. Abby Stites.)

Kenny 's cousin, Brandy recognized Kenny 's bipolar mood disorder created severe problems for his marriage.  Brandy compared Kenny 's behavior to her own behavior and reported that her "mood swings" made it "hard" on her husband because she "used to attack him, kind of the way Kenny and Abby fought." (Decl. Brandy Hill; Brandy Hill, Oklahoma Department Mental Health and Substance Abuse Service.)

Kenny  and Abby separated and reunited frequently; his mood fluctuations and deep depressive episodes made him irritable, agitated, paranoid, and suspicious.  During one of

the separations, he went to his father's home where Ernie found work for him.  Ernie described

his observations of the effect of Kenny's mental impairments on his behavior:

> Kenny had bouts of depression and did things that did not make any sense.
> Sometimes he would be very down but other times he would be manic, always on
> the go and upbeat.  Kenny cried a lot when he and Abby were separated. He
> bawled like a baby when he talked about it.  In 1986, when Kenny was separated
> from Abby and was very depressed, he stayed with Doris and me.  I got him a job
> with Kerr Glass and he was making real good money.  Kenny had a truck. He
> worked about three months and then left in the middle of a shift, just walked away
> from a $200,000 machine that he left running. Soon after that, he tried to kill
> himself by shooting himself in the chest with a shotgun I had lent his youngest
> brother Steve.

(Decl. Ernest Barrett.)

Abby knew that Kenny "had mental issues" and tried to persuade him to seek

psychiatric treatment.  (Decl. Abby Stites.)  Abby recognized that she "was the only stable thing

he ever had in his life" and that she "kept him together."  (Decl. Abby Stites.)  She opposed his

drug use but stayed with him in their fitful marriage to try "to keep him from falling off the deep

edge."  (Decl. Abby Stites.)  Kenny's brother reported, "[a)s troubled as Kenny was, he worked

all the time."  (Decl. Steve Barrett.)  Kenny 's use of drugs allowed him to keep working, despite

his serious mental illness.  Kenny increased the amount of drugs he ingested in direct response to

the symptoms of depression he experienced; his goal was very simple.  He needed

methamphetamines in order to work.

Abby lost battle after battle with Kenny's bipolar mood disorder.  In 1986, Kenny

attempted suicide and nearly succeeded in killing himself with a shotgun blast to his chest.

(Kenneth Barrett, Sequoyah Memorial Hospital Records, 1986.)  Kenny's brother Steve was

home at their mother's and witnessed Kenny's suicide attempt:

> In a terrible episode of depression, he tried to kill himself.  I was home with
> Monty and Podgy in the living room watching Carl Sagan kind of stuff on

television.  Kenny came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenny leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. . . .Kenny was in and out of it, mumbling, making no sense.  Kenny was in ICU in Sparks Medical Center in Fort Smith for 11 days.

(Decl. Steve Barrett.)

Abby convinced Kenny to see a psychiatrist after he survived the shooting, and he briefly took Elavil and Ascendin.  His dramatic mood swings continued to be "like a roller coaster."  (Decl. Abby Stites.)  Elavil was extremely helpful and made a big difference in Kenny, but- he discontinued his treatment.

Kenny continued to decline and was involuntarily committed to Eastern State Hospital October 8, 1986 "as a result of mental disorder or impairment by chronic alcoholism or drug abuse" that created "an immediate likelihood of serious harm to self or others."  (Kenneth Barrett,  Eastern State Hospital Records; Kenneth Barrett, Record of Mental Health Proceeding.) The admitting psychiatrist provisionally diagnosed Kenny with  "depressive neurosis with suicidal potential extremely high."  (Kenneth Barrett Eastern State Hospital Records) The nursing assessment reported that Kenny did "not recognize problems."   (Kenneth Barrett Eastern State Hospital Records) Kenny had a nine year history of polysubstance abuse.  Kenny hand wrote on a printed questionnaire, "I wish I was back home in the woods."   (Kenneth Barrett Eastern State Hospital Records)

On mental status examination, Kenny was noted to be "labile" and to laugh "inappropriately at times."  (Kenneth Barrett  Eastern State Hospital Records)   His insight and judgment were impaired. Staff found Kenny to be "courteous, cooperative."  (Kenneth Barrett Eastern State Hospital Records) Kenny acknowledged that he had "a hot temper."  (Kenneth

Barrett  Eastern State Hospital Records) Kenny's highest level of functioning in the preceding year was "poor." (Kenneth Barrett  Eastern State Hospital Records)    Kenny reported being anxious and depressed.  He was paranoid and blamed his wife and mother for his being hospitalized.  Kenny was discharged early on October 17, 1986 to his cousin.  His discharge summary noted he "wants to return to work." (Kenneth Barrett  Eastern State Hospital Records)

Kenny was not able to return to work.  Gelene arranged for his second cousins to "pick Kenny up from Eastern State after they had him committed."  (Decl. Nona Reich.)  Nona described Kenny's preoccupation with Abby:

> He stayed with me in Kellyville that first week. It was apparent how much Kenny loved Abby and he could not get his mind off her.  He was very paranoid, being without her. Gelene hoped that by staying with us he would be in a new environment and do better.

(Decl. Nona Reich.)

Kenny  sustained repeated head injuries from his work and from car accidents.  He was preoccupied and distracted by depression and mania and unable to focus his attention.  He applied for disability due to his mental impairments, and was denied but evaluators found him to be "moderately depressed" and periodically unable to "think clearly." (Kenneth Barrett Social Security Administration Determination of Eligibility) Kenny made repeated trips to the hospital after falling down stairs, sustaining a contusion to his right periorbital region of his head, being involved in a motor vehicle accident, experiencing rib and chest pain, and suffering a rash "all over." (Kenneth Barrett Sequoyah Memorial Hospital Records)

When Kenny 's marriage ended after 14 years, he "never recovered." (Decl. Abby Stites; Kenneth Barrett, Divorce Proceedings.)  He and Abby had wanted the marriage to work for the sake of their son, but Abby was unable to tolerate the irritability, agitation, paranoia, and

severe mood swings that came at unpredictable times and derailed their lives.  By the end of their marriage, Abby "felt like (they) were more like brother-sister than wife and husband because (she) was always bailing him out of trouble and taking care of him" and "trying to keep up with his mood swings."  (Decl. Abby Stites.)  Kenny was too impaired to take care of Abby, and she recognized that "he was mentally ill."  (Decl. Abby Stites.)  It pained Abby to leave Kenny because "(t)here were times he could be good. . . .and would try so hard to be good.  (Decl. Abby Stites.)  She also knew that "he could not function without her."  (Decl. Abby Stites.)

After their final separation, Kenny spiraled downward, as Abby had predicted. His multiple impairments made it impossible for him to function independently.  He was hospitalized January 20, 1995, given "10 mg of Haldol IM,"  and diagnosed with bipolar mood disorder after telling hospital staff, "I'm losing my mind."  (Kenneth Barrett, Wagoner Community Hospital) Hospital staff noted he was "extremely agitated."  (Kenneth Barrett, Sequoyah Memorial Hospital) During his three day hospitalization, staff reported he was "very agitated" and not able to sleep "for a few days."  (Kenneth Barrett, Wagoner Community Hospital)  He demonstrated "lack of concentration" and "rapid thought process."  (Kenneth Barrett, Wagoner Community Hospital)

Kenny was discharged to his mother with "outpatient follow-up at the Bill Willis Community Mental Health,"  but he did not follow through. (Kenneth Barrett, Wagoner Community Hospital; Bob Willis Community Mental Health Center; Muskogee County Jail) Kenny "moved back home" and "built a little shack" next door to his mother's trailer.  (Decl. Steve Barrett.)  His brother visited it and observed that the shack was "almost Waldenish in its own way."  (Decl. Steve Barrett.)  The shack was constructed from discarded and used materials, did not have electricity or plumbing and only had "the essential stuff."  (Decl. Steve Barrett;

Decl. Gelene Dotson and Attachment.)   Kenny "ran an electrical cord from (Gelene's) trailer to his shack for electricity." (Decl. Gelene Dotson.)  Gelene prepared his meals for him, and he ate at her trailer.   Kenny 's son, Toby, visited often, but knew that his father had "some problems inside his head" and "always thought he had a chemical imbalance." (Decl. Toby Barrett.)  Even as a teenager, Toby " knew something was wrong with him because he had mood changes that were not normal." (Decl. Toby Barrett.)  Toby observed that his "dad could be in the best of moods one minute, then the worst" who was "a very paranoid and "a very scared person." (Decl. Toby Barrett.)

Everyone in the family and Kenny 's ex wife knew he could not "live on his own." (Decl. Gelene Dotson.)  During his and Abby's frequent separations, "Kenny always came home" to his mother.  (Decl. Gelene Dotson.)  An aunt explained that Kenny's "only security was with Gelene because he did not have anybody else" to care for him.  (Decl. Ruth Harris.)  Kenny's son who had to come to terms with his father's mental illness "had to bring things to him" after his father "stopped leaving his property." (Decl. Toby Barrett.)

Gelene "knew he had serious mental problems" but "hoped if he lived close to (her) and just worked on his cars and fixed things for people, he might be able to make it." (Decl. Gelene Dotson.)  He stayed more and more to himself and became more and more paranoid, but he was not a loner at all because many friends visited him.  (Decl. Rick Lunsford, Brandy Hill and Sean Hill.)  Kenny told a neighbor, Alvin Hahn, "he thought there were satellites watching him." (Decl. Alvin Hahn.)

As Kenny 's paranoia increased, so too did his dependency on family.  His friends knew his paranoia was in full force and was the reason he "hardly left his property for several years." (Decl. Shawn Hill.)  His aunt Phyllis understood that he "was never able to be

independent as a grown man.  His emotions got in the way of his being able to live too far from

home."  Phyllis described an incident that explained how he relied on family when his emotions

overcame him:

> [A] couple of years before the incident, Kenny had run to my house in tears,
> crying,  "The laws are after me. They're coming! What should I do?" I told him
> we were going to walk out of the house and that he was going to get in the police
> car and that's just what he did. Kenny had been afraid to go to jail because at that
> time the papers had said someone had been beaten to death at the jail.

(Decl. Phyllis Crawford.)

Despite the limitations of his mental impairments, Kenny "would give you the

shirt off his back if you needed it."  (Decl.  Phyllis Crawford.)  He "tried to stay close to home,

always worked hard and took pride in his work."  (Decl.  Phyllis Crawford.)  Kenny's family and

friends uniformly reported that Kenny was not violent or dangerous to them.  His great aunt Ada

stated, "I never felt threatened by Kenny. He did not bother me any, but I worried about him."

(Decl. Ada Blount.)  Janice, his cousin, grew irritated and inpatient with Kenny on more one

occasion for playing his music too loud and called the police to Kenny's, but she loved Kenny

and "was never afraid of him."  (Decl. Janice Sanders.)  Kenny's maternal aunt Ruth found him

to be "sweet person, nice, and respectful" whose drug use "may have hidden his mental illness."

(Decl. Ruth Harris.)  Ruth and her husband, who visited Kenny "to talk about the Bible and how

he could straighten out his life" were never afraid of him" and did not "believe he would

intentionally hurt anyone."  (Decl. Ruth Harris.)  Relatives visited and talked with Kenny.  His

second cousin Nona, who "got along wonderfully" with him counseled him about religion. (Decl.

Nona Reich.)  Nona described the last conversation she had with Kenny:

> The last conversation I had with Kenny was in 1995-96 when my husband at the
> time and I visited Gelene.  Kenny came by to visit. It was clear to me that Kenny
> was studying life and thinking deeply, trying to figure things out. I remember he

said, "'Aunt Nona, how do you know there's a God?" I took him to the window and said, "See how beautiful that is." He agreed but asked me "Why can't we see God?" I tried to explain to him that the Bible says we should worship God in spirit and we will see His truth.

(Decl. Nona Reich.)

Friends and family thought at times Kenny would be alright. A friend and neighbor reported that "Kenny had a reputation in the community as an excellent mechanic who was fair." (Decl. Rick Lunsford.) A cousin, Brandy Hill, remembered that "Kenny was very generous, and his auto repair business was getting more solid every day. People would pay him hundreds of dollars in cash to replace an engine or a transmission." (Decl. Brandy Hill.) Despite Kenny's mental illness, his son Toby had "a lot of fond memories of . . . going canoeing, and helping him work on cars." (Decl. Toby Barrett.) Toby was intimate with Kenny's fears but knew that Kenny "was not dangerous," and Toby "was not afraid of him." (Decl. Toby Barrett.) Toby thought that Kenny "did the best he could" and saw that his father "had a tender side to him" that helped "offset the pain of having a dad with mental problems." (Decl. Toby Barrett.)

The family hoped that Kenny could recover. His mother described their observations:

> As time went on, he did a little better, built a garage and fixed everything from appliances to cars, trucks, and trailers for friends and neighbors. He stayed more and more to himself, though, and did not like to leave the property. Friends bought him food and went grocery shopping for him. He ate most of his meals at my trailer, and I cooked for him. I hoped and prayed he was going to make it. At least, I believed, with him living right next door, he was safe and I could keep an eye on him. We had our arguments; that's for sure. He was so paranoid and crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

(Decl. Gelene Dotson).

### b.      Kenny Barrett's mental illness and organic brain dysfunction

If trial counsel had followed prevailing norms and provided experts the documented evidence of Mr. Barrett's background and character Mr. Barrett's jury would have heard and considered extensive evidence of mental illness and neurologic impairment.  As explained by Dr. Young:  "The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex." (Decl. Myla Young at ¶ 28.)

Dr. Young explains that the areas of the brain in which Mr. Barrett experiences dysfunction are important because of their functions:

> The frontal cortex is comprised of three general cortices—motor cortex, premotor cortex, and prefrontal cortex.  The motor cortex provides a mechanism to control execution of movement of limbs, hands, feet and fingers.  The pre-motor cortex selects and carries out the movements to be executed including repetitive movements and actions in response to external cues.   The pre-motor cortex also primarily mediates information that is communicated by the parietal cortex, cingulated cortex, and basal ganglia.  The prefrontal cortex allows the individual to accommodate complexity and accommodate stress, and is responsible for thinking and acting, referred to as "executive functioning."  Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received.   More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation.  Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders.  The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.
>
> [¶]     The temporal cortex encompasses the primary auditory cortex, secondary visual cortex, and structures of the limbic system.  Primary functions of the temporal cortex are both verbal and visual memory and learning, processing speech sounds and speech emotional tones, and interpreting speech sounds, tones

and emotional meaning.  The temporal cortex is also responsible for processing visual information and the ability to recognize facial expressions, and interpret facial emotions.  Significant impact of temporal cortex dysfunction is particularly implicated in amnesia, hyper-religiosity, hypergraphia, fear, paranoia, impulsiveness and aggressive outbursts in addition to the previously described cognitive disabilities.  Brain functioning associated with frontal and temporal cortices has been known, is described and is documented in multiple sources for many years.  Two resources which provide a representative description of frontal and temporal brain functioning are Kolb & Wishaw, 2003 and Grant & Adams, 2009.

(Decl. Myla Young, Ph.D. at ¶¶ 26-27.)

Dr. Young's findings are based on approximately 16 hours of neuropsychological testing including intelligence testing, clinical interview including a history, review of educational records, and reviews of medical and psychiatric treatment.  As explained by George W. Woods, Jr., M.D., a psychiatrist who also examined Mr. Barrett:

neuropsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results.

(Decl. George W. Woods, Jr., M.D. at ¶ 62.)

The testing data and congruent findings on psychiatric study show Mr. Barrett experiences dysfunction in areas of his brain

that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing

the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use of hindsight and foresight in the direction of current processing. Mr. Barrett suffers significantly impaired functioning in all these domains.

(Decl. George W. Woods, Jr., M.D. at ¶ 58.)

In addition to these neuropsychological deficits (and others detailed in Dr.

Young's declaration), Mr. Barrett suffers from severe mental illness:

Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81. He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex. Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

[¶]      Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983). Lezak emphasized the fluid nature of executive functioning and how dependent the cognitive and emotional aspects of functioning were on the "executive." Baddeley grouped these behaviors into cognitive domains that included problems in planning,organizing behaviors, disinhibition, perseveration, reduced fluency, and initiation (Baddeley 1986). Baddeley coined the term "dysexecutive syndrome." Each component of executive functioning has added to the array of cognitive processes, which include maintaining a problem-solving set for goal-directed behavior, interference control, flexibility, strategic planning ability, and the ability to anticipate and engage in goal-directed activity (Denckla 1994). The definition of executive function is encompassed by actions fueled by conceptualizations, such as the ability to filter interference, engage in goal-directed behaviors, anticipate the consequences of one's actions, and the adaptive concept of mental flexibility (Luria 1969; Luria 1980; Stuss and Benson 1986; Denckla 1996; Goldberg 2001). The concept of morality, ethical behaviors, self-awareness, and the idea of the frontal lobes as manager and programmer of the human psyche are also included." (Ardila et al, Executive Function, Medlink Neurology, 2009)

(Decl. George W. Woods, Jr. M.D. at ¶¶ 66-67.)

Dr. Woods explains that people with frontal lobe damage, and people with Bipolar Disorder share suffering in significant areas of daily functioning. "Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become incorrect." (Decl. George W. Woods, Jr., M.D. at ¶ 59.)

> Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

(*Id.* at ¶ 60.)

Mr. Barrett's case would have presented the jury with extraordinary evidence to support these diagnoses. Mr. Barrett's personal and family history, as set forth *supra* and as documented in the exhibits to this Motion, is replete with incidence of major mental illness, including Bipolar Disorder. A qualified clinician would have explained the significance of this remarkable history to jurors.

> [¶]     Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult. The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

> [¶]     The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan

effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

[¶]     Mr. Barrett's family history, the consistency of emotional dysregulation beginning early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

(Decl. George W. Woods, Jr. M.D. at ¶¶ 63-65.)

In other words, "Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial." (*Id.* at ¶ 68.)

If trial counsel had informed themselves regarding Mr. Barrett's history, and consulted relevant experts, the jury too would have been informed that

[¶]     Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.

* * *

[¶]     Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings . . . . He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]     Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]     He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual

disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]     Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]     Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]     Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]     Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]     My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the

environment. The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Decl. George W. Woods, Jr. M.D. at ¶¶ 69-78.)

Courts, including the Supreme Court, have repeatedly held that evidence of mental impairment such as the devastating history Mr. Barrett has experienced, when it is kept from the jury due to counsel's unreasonable omissions, undermines confidence in the verdict. That should be this Court's judgement here.

### c.    The prosecution's exploitation of trial counsel's deficient performance

Not surprisingly, the inaccurate, incomplete and misleading  portrayal of Mr. Barrett and his background and character given by the extremely superficial and unprofessional "mitigation case" that was placed before the jury was ripe fodder for ridicule by the prosecutors in closing arguments. Because of trial counsel's abysmal failures to investigate, prepare and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Mr. Barrett was simply a cold, calculating and unrepentant killer who had little if anything going for him in the sentencing balance. (R. 5340-42, 5402, 5404, 5405-09, 5411-13, 5420-22). Because the jury never learned of Mr. Barrett's abusive, neglected, chaotic and troubled upbringing; his lengthy history of severe mental illness; the extensive history of mental illness in his family; his low I.Q.; and, despite it all, his good and positive qualities, the prosecution had a field day depicting Mr. Barrett as a prime candidate for the death penalty.

Going down the list of the few, bare-bones mitigating circumstances that were instructed upon based on the evidence presented, AUSA Littlefield noted the jury had been told Mr. Barrett was simply a "father," which involved no more than a biological process. Left unsaid

Def's § 2255 Mot.                      233                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

was what kind of father he was.  The prosecutor also ridiculed the claim that Mr. Barrett was a loved son and stepson, remarking that what was missing was any feelings Mr. Barrett had for his parents.  It was pointed out that Ernie Barrett had not seen his son for two years before the shooting of trooper Eales, and that his stepmother had only had contact with him after he was in jail.  As to Mr. Barrett's relationship with his mother, Gelene Dotson, the prosecutor pointed out that they had a tumultuous relationship with frequent arguments, fights and threats between them.  Mr. Littlefield remarked that Mr. Barrett's parents cared so much for him that they could not tell the difference between him being "hyper" and being "hyped up" on drugs.  As to Mr. Barrett being a good neighbor and friend, the prosecutor reminded the jurors that all they heard was that he fixed cars cheaply.   Dismissing the mitigating circumstance that Mr. Barrett's execution would have an impact on his child, family and friends, the prosecutor was quick to point out that since Toby Barrett had not testified, there was no evidence that Mr. Barrett's death would have any negative impact on his own child.  Indeed, the only testimony regarding the impact of Mr. Barrett's execution on his family came from his stepmother, Doris Barrett, who would no longer be able to visit Mr. Barrett in prison.  Making short  work of the claim that Mr. Barrett had expressed remorse, Littlefield told the jury that Mr. Barrett only told his mother that he wished things had turned out differently.  This ambiguous statement was used as a springboard for the prosecutor to argue that by this, Mr. Barrett simply meant that he was sorry he had gotten caught and was prevented from "killing more of the bastards."  Finally, the "catch-all" instruction on any other factors the jury might find to be mitigating opened the door for more negative characterizations of Mr. Barrett, whom the prosecutor described as having dropped out of school because he did not want to get a haircut; as a user and seller of methamphetamine; as a wife-beater; and as a man so unconcerned about the safety of his son that he allowed him to remain on

the property knowing full well that a police raid, which was going to be met by lethal force, was imminent.  (R. 5354, 5356).

Since virtually nothing of Mr. Barrett's background, history and upbringing was placed before the jury by trial counsel, AUSA Littlefield was able to portray Kenneth Barrett as simply a bad and unrepentant seed when compared to his brother Steven Barrett, who became a successful educator and who was raised in the same home as Mr. Barrett.  (R. 5358)

Picking up the theme that Mr. Barrett's case in mitigation was pitifully anemic, United States Attorney Sperling reminded the jury that Sequoyah County Court Clerk Maudeen Vann testified that Abby Barrett had filed seven domestic abuse complaints against Kenneth Barrett.  Abby Barrett was portrayed as a pathetic, abused wife, helpless at the hands of a husband who was simply a mean person, a man who had stalked her and threatened to "blow [her] head off."  Kathy Trotter was dismissed as a witness who knew very little about her cousin, Mr. Barrett, since she stated she was ignorant of his drug activities, his penchant for being armed, his domestic violence record, and was unaware of his "threats" to law enforcement, as testified to by the seven snitch witnesses.  Mr. Barrett's "helpfulness," for all the jury knew, was limited to fixing a few cars.  Just as Littlefield had done, Mr. Sperling contrasted Mr. Barrett with his brother Steven, a success story who was raised by the same parents and in the same environment, but chose to take a different path than Kenneth Barrett, the knowing, violent criminal:  "How he [Kenneth Barrett] must envy his hard working, highly achieving brother's success."  Mr. Sperling pointed out that Mr. Barrett had only sporadic contact with his mother until his arrest, hinting that he was a bad and neglectful son.  Ernie Barrett, being the good father that he was, gave Kenneth Barrett several chances to succeed at work, but Kenneth Barrett simply chose to "[blow] them."  Doris Barrett was loyal to her stepson, despite his misbehavior in jail, the implication

being that her loyalty was more a tribute to her than anything positive or redeeming about Mr. Barrett. Whatever Mr. Barrett had done for his family was vague and undetermined, and was in any event far outweighed by the crimes he had committed. If the jurors were tempted to feel any sympathy for Mr. Barrett's family at all, they should remember that Mr. Barrett abandoned his family by his own conduct. Mr. Sperling stated that Mr. Barrett had "victimized" his own family by making them serve as "props" or witnesses on his behalf in the penalty phase. Concluding his remarks on Mr. Barrett's mitigation case, Mr. Sperling told the jury that Mr. Barrett had paid for his membership among "the worst of the worst." Mr. Barrett was simply a murderer who had killed remorselessly, wantonly, and selfishly, a man who was devoid of sympathy or empathy for his victim. (R. 5417-20).

### 3.      Conclusion

The record and extra record evidence establishes that Mr. Barrett's trial counsel first possessed some information about Mr. Barrett's background in late May 2005. By the beginning of July, trial counsel were searching about for a mitigation specialist. In August, trial counsel learned it was essentially too late to develop a social history and mental health diagnoses informed by that history. In September, the month the trial began, trial counsel were again searching about for information they should have had the previous December. The evidence shows trial counsel never contacted the mitigation specialist the trial court authorized, and never obtained all the records of the state-court mitigation investigation. Trial counsel's statements on the record establish that they made no effort to obtain a psychiatric or psychological evaluation of Mr. Barrett, and merely repackaged, at the last possible minute or later, the risk assessment done years earlier at the request of state-court counsel. This evidence more conclusively establishes deficient performance than any previously found in *Rompilla*, *Wiggins*, or *Williams*, *supra*.

The evidence of prejudice is greater, too.  Due to trial counsel's inattention, the jury was uninformed of Mr. Barrett's background, the desperate alcoholism of his parents, his father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the psychologically damaging harsher treatment he experienced from his mother, his father's abandonment of the family, moving from place to place due to the parent's inability to sustain a life, and finally landing in Sequoyah County.  There Kenny Barrett's head injuries and genetic vulnerability to mental illness overtook him.  He developed Bipolar Disorder and exhibited the symptoms of his organic brain damage.  Despite the mania and paranoia, the hypervigilence, hyperactivity, and disinhibition, his family, friends, neighbors, bail bondsman, and even the local sheriff, all knew that Mr. Barrett would have gone peacefully into custody if someone he knew had simply asked him to.  The overwhelming weight of the evidence from both stages of a competently tried case would have shown the jury that law enforcement made tragic errors in assessing the situation.  Just as Trooper Eales should not have been put in danger, Mr. Barrett should not have been sentenced to death.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 3.**         **Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Expert and Investigative Assistance under 18 U.S.C. § 3006A**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett had a due process right to the assistance of investigators and experts qualified and sufficiently compensated to "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). Other similarly situated defendants in federal death penalty cases received such assistance as the trial court withheld from Mr. Barrett.

Mr. Barrett had a constitutional right to the expert assistance necessary to counter the prosecution's evidence and to develop defense evidence relevant to both stages of trial. *Ake v. Oklahoma*, 470 U.S. 68, 71 (1985); *Tuggle v. Netherland*, 526 U.S. 10 (1995) (*per curiam*); *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000); *Dunn v. Roberts*, 963 F.2d 308 (10th Cir. 1992); *Liles v. Saffle*, 945 F.2d 333 (10th Cir. 1991), *cert. denied*, 502 U.S. 1066 (1992). Mr. Barrett also had a statutory right to such assistance, pursuant to 18 U.S.C. §§ 3006A and 3599(a)(1)(A), 3599(f), and 3599(g). *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985). Congress has provided that, in capital cases, the "defendant shall be allowed, in his defense to make *any proof* that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution." (18 U.S.C. § 3005 [emphasis added]). Mr. Barrett therefore had a right, as secured by statute, the Due Process and Equal Protection Clauses, to the tools necessary to build a defense, including expert assistance, at the same level and to the same extent as provided or otherwise available to similarly situated persons.

The trial court violated Mr. Barrett's constitutional and statutory rights by denying him expert assistance that was lawful, necessary, and appropriate under the circumstances of the case. The types of lawful witnesses to which the trial court denied Mr. Barrett fair access included a psychiatrist, neuropsychologist, psychologist, mitigation specialist, ballistics expert,

independent fact investigator, an independent expert on SWAT team practices, a metallurgist, a drug analyst, crime scene reconstruction expert, and a jury consultant. The complete or partial denial of these expert and investigative resources was prejudicial both individually and in combination.

In addition to the denial of expert and investigative assistance afforded other capital defendants, the trial court denied Mr. Barrett and his counsel access to transcripts of pretrial hearings, including hearings in which witnesses testified who would later testify at trial. (Order filed 3/18/05 (Doc. 97) at 6-7.) Mr. Barrett was plainly entitled to those transcripts pursuant to Chapter 2, section 2.27, and Chapter 3, section 3.12(A) of the Guidelines for the Administration of the Criminal Justice Act. Effective trial counsel, or the trial judge, should have known that it was unnecessary for counsel even to seek reimbursement for transcripts as the court reporter would normally be independently compensated through the Criminal Justice Act. The trial court's decision to reject these Judicial Conference guidelines was arbitrary and capricious. The error was particularly prejudicial because it denied or delayed Mr. Barrett's trial

counsel access to the trial court's *ex parte* communications with the prosecutors until it was too late. *See* Claim 1, *supra*.

Mr. Barrett had a history psychiatric treatment, including involuntary hospitalization and forced medication with psychotropic drugs. (Decl. George Woods). Trial counsel were aware, or should have been aware, of this history. (*See* Doc. 208; Eastern State Hospital Records of Kenneth Barrett; Muskogee County Jail Medical Records of Kenneth Barrett; Decl. Roseann Schaye). In addition, Mr. Barrett had a history of illicit drug use and of head injuries. Furthermore he has a multi-generational predisposition to developing serious

mental illness, including the bipolar disorder for which he was medically diagnosed prior to the events in question. These factors, together with his developmental and trauma history indicated the forensic appropriateness of performing a comprehensive neuropsychological evaluation to assess the presence and effects of brain dysfunction which, again, had a medically indicated onset prior to his arrest. (Dec. Roseann Schaye; Dec. Myla Young; Dec. George Woods). Counsel requested the assistance of a neuropsychologist to perform testing, as well as of a medical doctor to explain the significance of this combination of medication, other drugs and injuries, including the significance of any discontinuation of treatment. Nonetheless, the trial court would permit Mr. Barrett's counsel the assistance of a psychiatrist or a psychologist, but not both. (Order filed 3/18/05 (Doc. 97).

In light of the information known or available to Mr. Barrett's trial counsel, prevailing norms of capital defense practice required that they consult with experts whose training and experience were appropriate to addressing Mr. Barrett's history and the needs of the litigation. The appropriate experts included a medical doctor who could diagnose and explain the functional impact of Mr. Barrett's mental disorders, a neuropsychologist who could determine the location, nature and severity of Mr. Barrett's probable brain dysfunction, and a mitigation specialist qualified to gather data in a manner consistent with the clinical protocols of mental health professionals when considering social history and medical information in the course of forming their opinions. (Decl. Richard H. Burr dated 4/4/05 (Exh. C to Doc. 107) at 4, 8). To the extent trial counsel failed to apprise the court of the specific need for psychiatric assistance, or the assistance of any other expert or investigator, their conduct fell below prevailing professional norms. (ABA Guideline 10.4(C)(2)(a), as soon as possible after designation of lead counsel, defense team should include a mitigation specialist, fact investigator,

Def's § 2255 Mot.                         240                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

and a person "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments"; ABA Guideline 10.11(F)(2), counsel have duty to seek appropriate expert assistance). *See also* Claim 2, *supra*.

Trial counsel informed the trial court that the court's refusal to permit more than one mental health professional to assist in Mr. Barrett's defense was contrary to law, the Judicial Council's Guidelines for the administration of the Criminal Justice Act, and the practice of district courts in numerous other federal death penalty cases with similar circumstances. (Docs. 107, 112; Decl. Richard H. Burr). "The standard practice in federal capital trials is to provide the services of more than one mental health expert." (Decl. Richard H. Burr, Exh. C to Doc. 107). Counsel also informed the court that authorization for a single expert at the cut rates permitted by the court made it impossible to retain an expert competent to provide the necessary assistance, and that the court's authorization was inadequate to develop defense evidence or to rebut the prosecution evidence at both stages of trial. (Docs. 107, 112; Decl. Richard Burr).

The court's denial of psychiatric assistance for Mr. Barrett's defense was prejudicial. As stated in the attached declaration of George W. Woods, M.D., a psychiatrist retained at the time of trial would have provided Mr. Barrett with evidence to rebut the prosecution's theory of malice aforethought and intent, and would have provided abundant mitigation evidence. *See* Claim 2, *supra*.

In addition to the outright denial of psychiatric assistance, the trial court arbitrarily denied funding for all expert and investigative resources that were necessary for Mr. Barrett to receive adequate representation. *(Compare* Doc. 51 *with* Order filed 3/18/05 (Doc. 97)). Contrary to Judicial Council Guidelines, and the ABA Guidelines, contrary to the Supreme Court's recognition that death penalty cases entail a higher level of due process, and contrary to

the tendency of experts, investigators and other paraprofessionals to charge more for the more exacting work required by capital cases, the trial court consistently based its funding decision on a comparison to non-capital cases in the Eastern District. (Order filed 5/5/05 (Doc. 128) at 3 n.1, 4, 6.)

Mr. Barrett's counsel demonstrated the need for a psychologist to assist in preparation of the defense. *(See* Order filed 3/18/05 (Doc. 97) at 3.) Counsel sought this expert for purposes similar to those envisioned by the Government in retaining Jim Horn. *(See* Doc. 50 at 5-6.) Counsel informed the court that a psychologist could not be retained for less than $150.00 per hour, and estimated 60 hours would be needed (Doc. 50 at 5-6), but the court limited the defense to 40 hours at $100.00 per hour. This was despite the fact that the court had been informed that this reduced hourly rate was 30-60% below the hourly rate of $150-250 authorized by federal courts for such services in death penalty cases. (Dec. Richard H. Burr, Exh. C to Doc. 107, at 8). The court gave no reason for this restriction and cited no information upon which the court could have found that any competent psychologist would have worked for the approved rate.

Mr. Barrett specifically sought the assistance of a psychologist who had assisted in the preparation for trial, and testified in the penalty trials, of other federal death penalty defendants. (Doc. 107). That psychologist had been compensated in other similar cases at a rate of $270.00 per hour, and counsel advised the court that he could complete his work in 30 hours. *(Id.* at 3-4.) The court denied the request without explanation.

Mr. Barrett sought the assistance of a mental health expert who was competent to diagnose organic brain dysfunction. (Doc. 50 at 8). Counsel justified this request with the findings of prior investigations, including that Mr. Barrett had used drugs known to cause brain

damage, and that he had suffered significant head injuries during his life. *Ibid.* Except to the extent the assistance of such an expert was included in the authorization for a psychologist, the court denied this request without explanation. (Doc. 97 at 3). This summary denial was highly prejudicial to Mr. Barrett. As the attached declaration of Myla Young, Ph.D., shows, Mr. Barrett's history of head injury resulted in significant impairments in his functioning. *See* Claim 2, *supra*.

Mr. Barrett's counsel, in consultation with a mitigation specialist, Federal Death Penalty Resource Counsel, and the Federal Defender, concluded that a mitigation specialist would require more than 333 hours and $5,000.00 in travel costs. Counsel and the mitigation specialist based this estimate on the knowledge gained in a preliminary investigation conducted before Mr. Barrett's first state-court trial. (Docs. 50, 107). A mitigation specialist is an essential member of the team in a capital case. (ABA Guideline 10.7.) Without explanation, the court limited the mitigation investigation to 100 hours and no travel.[46] As resource counsel informed the court at the time,

> The number of hours requested by the defense is well below average. The average number of hours worked by mitigation specialists in federal capital cases is 600 hours. In a number of cases, mitigation specialist services have exceeded 1000 hours. Investigating a client's life history thoroughly - through gathering and reviewing documents and interviewing scores of witnesses who are often difficult to find - and working with counsel and other experts to develop the themes of mitigation and the way in which mitigation will be presented, is extremely labor intensive. The modest number of hours requested by the defense here reflects the hope that the mitigation investigation previously conducted, but not completed in the state prosecution will be of use in the current investigation. Measured against the number of hours authorized for mitigation specialist services in every other

---

[46] The court authorized "100 hours at $150.00 per hour" apparently without realizing that the mitigation specialist counsel had consulted quoted a rate of $75 per hour. *(See* Doc. 107.)

capital case in which the death penalty has been authorized, the 100 hours approved by the Court is grossly inadequate.

(Decl. Richard H. Burr (Exh. C to Doc. 107) at 4).

The court's withholding of resources was highly prejudicial. As shown in the social history presented in Claim 2, section B, and the numerous declarations cited therein, a reasonable mitigation investigation, including travel to the various states in which Mr. Barrett lived as a child and adult, would have produced abundant mitigation evidence.

Mr. Barrett sought 300 hours of investigative assistance at a rate of $50 per hour. (Doc. 50 at 4). The court permitted only 100 hours of investigation, and limited it to those areas in which counsel could show a particularly acute need. (Order filed 3/18/05 (Doc. 97) at 2). "The average number of hours approved for fact investigation in authorized cases is closer to 500 hours." (Decl. Richard H. Burr (Exh. C to Doc. 107) at 3). The Court knew in fact that this rate was considered reasonable by experts in relation to the practice in other federal capital cases. Moreover, despite the preauthorization, the court, contrary to Judicial Conference guidelines, conditioned payment of an investigator on counsel persuading the court with "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial." (Order filed 3/18/05 (Doc. 97) at 2 n.2). The court prohibited the investigator from working at market rates, and required him to work at the same rate as state-subsidized investigators working for salary at the Oklahoma Indigent Defense Service ("OIDS") even though state-subsidized investigators were not available to Mr. Barrett. (Order filed 5/5/05 (Doc. 128) at 3 n.1. *See also* Decl. Steve Leedy).

At a minimum, the restrictions the court placed on investigation chilled inquiry. Compared with his other cases, Mr. Barrett's investigator *lost $20.00 each hour* he worked on

Mr. Barrett's case.  Moreover, the court's requirements for approving vouchers meant there was no guarantee any specific amount of time would be compensated at all.  The investigator could work many hours on an issue only to find after he submitted a voucher that the facts he had investigated were not, in the court's view, significant to evidence that would be used at trial.

The Government relied extensively upon testimony regarding the trajectory of bullets during the raid on Mr. Barrett's house.  Mr. Barrett's counsel requested the assistance of an expert, Edward E. Hueske, to assist in responding to the Government's evidence, performing up to 80 hours work, billed at a rate of $ 200 per hour, in addition to $ 1,000 for lodging, travel and incidentals.  (Doc. 50 at 7).  While the Government faced no limits on its ability to marshal this type of evidence, the court, again without explanation, authorized less than one fourth the amount Mr. Barrett's counsel and the expert they consulted determined was reasonably necessary to confront the Government's case.  (*Compare* Doc. 50 at 7 *with* Doc. 97 at 3).  Moreover, the court did not authorize any lodging or travel expenses at all whatsoever.

After advising Mr. Barrett's counsel that "this Court has[] never allowed crime scene reconstruction to be introduced in trial" (Doc. 97 at 3), and at the same time denying Mr. Barrett seventy-five percent of the time and one hundred percent of the in-court assistance counsel needed from Mr. Hueske, the Court admitted the Government's crime scene reconstruction evidence without reservation.  As a result of the Court's denial of funds, it was impossible for Mr. Barrett to have an expert present either to challenge the admissibility of the Government's testimony under Federal Rule of Evidence 702, or to assist with cross-examination of the Government's "expert."  To the extent the Court's statement about its past practice regarding crime scene reconstructions misled counsel into foregoing expert assistance, the

Court's interference with the defense went well beyond the mere denial of funds and constituted active interference in the functioning of the defense.  *See* Claim 1, *supra*.

The court's denial of funds for ballistics and crime scene reconstruction experts was prejudicial.  As set forth in Claim 2, *supra*, if trial counsel had been able to consult with an expert prior to trial, they could have presented evidence to exclude the testimony of Iris Dalley, an "expert" who was central to the Government's theory of how the shooting took place, including whether Mr. Barrett was in a position to see emergency lights when the shooting started.  Even if counsel had not succeeded in excluding that testimony entirely pursuant to FED. R. EVID 702 and *Daubert v. Merrell Dow*, 509 U.S. 579 (1993), counsel would have been far better able to rebut it.  For example, if counsel had been able to employ adequate expert services, at a minimum, Mr. Barrett would have shown the following:

>    (a)   Dalley failed to follow standard protocol by omitting the measurement of the objects through which she claimed bullets passed;
>
>    (b)   Dalley failed to follow accepted methods by using magnification and/or chemical analysis to detect the presence of gun shot residue, blood, tissue, hair, fibers or other matter around bullet holes;
>
>    (c)   Dalley falsely claimed she could not determine the caliber of bullet holes in the Bronco whereas the determination could have been made with standard tools and methods;
>
>    (d)   Dalley offered misleading testimony, beyond the scientific bounds of her methodology, when she claimed that the trajectories she identified for bullet fragments were "accurate" while the method she used could not provide an accurate trajectory;

824

(e)     Dalley selected descriptions of the evidence to fit the Government's theory when she described the trajectories of bullets that passed through the door of the Bronco;

(f)     Dalley's diagrams and animation were not based on accepted methods, and she testified falsely when she claimed she lacked the necessary equipment to create data with which other experts could attempt to reproduce her findings based on those diagrams and that animation;

(g)     Dalley failed to use available, accepted methods (such as a plumb line) to determine the grade of the terrain on which the shooting occurred;

(h)     Dalley failed to employ proper methods of chemical analysis before concluding that holes of questionable origin came from bullets;

(i)     Dalley misrepresented the facts when she claimed there was "no means of sequencing any of the shots," while the truth was that she did not employ the available means to determine whether they would produce reliable results, i.e. Dalley ignored scientific methods that might have invalidated her claims;

(j)     Dalley failed to use accepted methods for determining the trajectory of bullets that struck a moving vehicle, failing to move the Bronco back to the place where it initially came to rest, and ignoring another standard practice that might have invalidated her findings;

Dalley employed scientifically inappropriate methods for making claims about the trajectory of bullets that passed through the window of Mr. Barrett's cabin;

(k)　　Dalley overstated her ability to estimate the distance of a firearm from the cabin window based on a rule of thumb, and ignored more reliable methods that might have contradicted her theory;

(l)　　Dalley failed to use the standard tool of a metal detector to locate any bullets or fragments in the soil;

(m)　　Dalley failed to follow an essential, generally accepted protocol for reconstructing a shooting scene when she did not attempt to collect all the bullets or fragments from the interior of the Bronco;

(n)　　Dalley's conclusion regarding the location of Trooper Eales' arm when it was struck was based on her failure to examine the surrounding area for tissue or blood, and her violation of a cornerstone of forensic science.

(Report Edward Hueske).

To the extent the trial court's denial of expert and investigative resources could have been raised on the existing record, appellate counsel was ineffective for failing to raise the claim. Trial counsel Hilfiger, who also was counsel on appeal, had a conflict of interest which prevented him raising this claim, insofar as he failed to make use of the resources the trial court had authorized.

The record and extra-record evidence establishes that the trial court's denial of resources was not harmless and was highly prejudicial. Mr. Barrett could have presented substantial evidence to counter the Government's case at both stages of trial. The trial court's denial of access to this evidence violated Mr. Barrett's right to due process, to confront adverse witnesses, and to effective assistance of counsel.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 4.** **Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Appellate Counsel Was Ineffective for Failing to Raise the Issue on Direct Appeal**. .

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

As shown in Claim 2, *supra*, in connection with the claim that trial counsel were ineffective for failing to argue all available evidence supporting the renewed motion to suppress, the trial record itself established the Clint Johnson warrant was invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Suppressed *Brady* material and other evidence gathered in

support of this 2255 petition which relates back to the credibility of the informant at the relevant time makes this conclusion even stronger.

Since the warrant was based solely on the word of the confidential informant, Charles Sanders, his reliability was the linchpin of probable cause.  There was no other information from any other source, and no other circumstances cited in the affidavit, that provided probable cause to search Mr. Barrett's residence and property.  The "totality of the circumstances" in this case *was* Sanders. *Illinois v. Gates,* 462 U.S. 213 (1983) (totality of the circumstances test used to judge validity of search warrants; an informant's veracity, reliability,

and basis of knowledge are all important considerations in determining whether information as a whole is sufficient to supply probable cause). If Sanders is unreliable, his information is *per se* unreliable. Because Sanders is the antithesis of a reliable source, Clint Johnson, at the very least, acted with reckless disregard for the truth in utilizing him as a source, and in omitting information from the search warrant affidavit that would have given an accurate picture of Sanders's credibility.

Sanders could not be relied upon to provide reliable information. No reasonable person could put stock in anything he says. Sanders is a professional criminal, who had racked up at least eighteen felony convictions at the time he testified against Mr. Barrett, and had surpassed double digits by 1999. Numerous other felony charges against him were dismissed because of his work as a snitch. He always had a motive to lie against others to get out of his own scrapes with the law, and has largely been successful, continuing to land on his feet with probationary sentences so he could commit still more crimes in the community, when any sane system of justice would have flushed him ages ago. His convictions for crimes of dishonesty are legion: repeated instances of forgery, burglary, concealing stolen property, larceny of merchandise from a retailer, and other forms of fraud and theft, not to mention a laundry list of other felonies. He has a history of promising to appear in court and then failing to appear. He has a history of promising to adhere to terms of probation and then breaking them by committing still more crimes, after which he is given still more probation. He is a long term drug addict. Sanders could not give a straight and consistent answer to save his life at Mr. Barrett's trial, which reflects his almost congenital inability to tell the truth. Yet he was rewarded for his testimony, as he has always been rewarded for informing on others, despite his wretched history

of dishonesty, and despite the fact that he continued to victimize the community as a virtual one man crime wave.   All this was known about Sanders in 1999, and it has only gotten worse.

At the time he signed the affidavit, Clint Johnson was aware of Sanders lack of reliability, and Johnson himself intentionally ignored evidence of Sanders then-current drug usage, crimes of dishonesty, and Sanders inability to see evidence of drug activity at Mr. Barrett's residence during the critical time.   Yet Johnson still relied on this miscreant as a "reliable confidential informant."

In connection with the claim of ineffective assistance of trial counsel for failing to produce witnesses to attack Sanders's honesty, Mr. Barrett has provided declarations from several people in the community, including one of Sanders's uncles, who say without reservation and in the strongest terms possible that Sanders is totally dishonest and unbelievable, and that this is the opinion by acclamation in the community as a whole.  (Decls. of Rick Lunsford, Brandy Hill, Sally Davis Johnson, Janesse Thomas, Sean Hill, and Billy Poindexter.)  Sanders claimed that he and Janesse Thomas bought drugs at Mr. Barrett's a few days before the shooting incident.  Ms. Thomas says this is absolutely false.

Is it to be believed that the community as a whole regards Sanders as thoroughly dishonest and untrustworthy, but that Clint Johnson could realistically think he was a reliable informant, about whom nothing had to be revealed to a reviewing magistrate?  It simply does not wash.  Johnson acted with reckless disregard for the truth, at a minimum, in relying on Sanders for information about Mr. Barrett or anyone else, let alone presenting that information in a search warrant affidavit.

The prosecution suppressed exculpatory evidence regarding Sanders's honesty. As stated in Claims 1 and 2, Mike Littlefield informed the court of a witness who failed to corroborate Sanders. This would have assisted in establishing a *Franks* claim, and in generally impeaching Sanders, but the evidence was never revealed to the defense. The transcript of this hearing was, however, available to direct appeal counsel.

Then there is Clint Johnson himself. The Government suppressed *Brady* evidence that before, during and after Mr. Barrett's trial, Johnson was caught in a web of his own bad acts, deceit and corruption, including abuse of his position of trust; passing hot checks; failing to control his informants and neglecting to properly supervise and document their activities; failure to account for funds and evidence; theft of drug fund money; kickback schemes; dishonesty with his superiors; and likely drug use, as he tooled around in his drug task force car with drug paraphernalia, marijuana and methamphetamine, none of it properly packaged and marked as evidence. Johnson was fired from the District Attorney's Office a little over two weeks after Mr. Barrett was formally sentenced. In sum, Johnson and Sanders were birds of a feather: both liars, both drug addicts, both trading lies for favorable treatment from law enforcement.

With respect to Johnson's request for a no-knock, nighttime warrant, which was predicated on information from the C.I. that Mr. Barrett had threatened law officers, Johnson acted with reckless disregard for the truth by omitting mention of the fact that local law enforcement, including Sheriff John Philpot, had been to Mr. Barrett's residence less than a month before, and encountered no resistance. (Decl. of Rodney Floyd.)

A search warrant must be voided and the fruits suppressed when 1) it is found the affiant knowingly or recklessly included false statements *or omitted material information from the affidavit in support of a search warrant,* and 2) it is concluded that after excising such false

statements and considering such material omissions, the corrected affidavit does not supply probable cause to search. *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978); *United States v. Kennedy,* 131 F.3d 1371, 1376 (10th Cir. 1997).

Here, at a minimum, when the omitted material information about the reliability of the informant is considered, probable cause could not have been found, because Sanders's history, character, actions and reputation would show him and his word to be totally unreliable. Johnson called Sanders "reliable," a deliberately false or reckless statement in itself, and omitted an avalanche of information, detailed above and elsewhere in this motion, that would have proved the exact opposite to any reasonable magistrate. Had Johnson given a true picture of his C.I.'s numerous crimes of dishonesty; his motivation to accuse others of wrongdoing in order to escape punishment for his own acts, for which he received deal after deal instead of the hard prison time he deserved, after which he continued to commit crimes; his violations of the terms of probation; his bond forfeitures and failures to appear; the number of arrests; the number of convictions; his chronic drug use; and his bottom-of-the-barrel reputation in the community for anything even remotely approaching honesty and trustworthiness, no neutral, detached magistrate would find probable cause.

Johnson's failure to mention that less than a month before securing the warrant, Sheriff Philpot and other officers had been to Mr. Barrett's without incident, was material to the request for a no-knock, nighttime search warrant. In failing to mention this crucial fact, Johnson acted with reckless disregard for the truth. Had the magistrate been informed of this, the averment in the affidavit that Mr. Barrett, according to the "reliable" C.I., had "threatened" law enforcement would have been rendered meaningless, and no cause for a no-knock, nighttime

warrant would have been established, even aside from the question whether any warrant should issue at all.

Although defense counsel raised a *Franks* issue, however incompletely, at trial, and there were certainly indications of Sanders's deplorable criminal record and rampant dishonesty in the ever-shifting sands of his testimony, appellate counsel failed to raise the issue on direct appeal, either as a freestanding argument under *Franks*, or one coupled with an ineffective assistance of trial counsel argument. Especially in light of the fact there were numerous issues raised on appeal that were reviewed under a plain error standard, because there had been no contemporaneous objection or record, it was professionally unreasonable to omit this issue, and to argue that the court erred in failing to conduct an evidentiary hearing. Mr. Barrett was prejudiced by this omission. *Strickland v. Washington,* 466 U.S. 668 (1984). Decl. of Mark Henricksen. Mr. Barrett is of course requesting an evidentiary hearing on each factual issue raised in this motion, and specifically requests a *Franks* hearing, or its equivalent. He has more than made the requisite showing.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 5.**     **Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Conviction and Sentence Based on Newly Discovered Evidence**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

**Introduction**

The Government had an affirmative duty to learn about evidence favorable to the defense, whether as to liability or punishment, including, of course, impeachment material, in the possession of law enforcement agencies, and disclose that evidence to Mr. Barrett's counsel. *Banks v. Dretke,* 540 U.S. 668, 696 (2004); *Strickler v. Green,* 527 U.S. 263 (1999); *Kyles v. Whitley,* 514 U.S. 419, 437 (1995); *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Bowen v. Maynard,* 799 F.3d 593, 610 (10th Cir. 1986) (*Brady* obligations extend to impeachment evidence); *Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir. 1984); *United States v. Osorio,* 929 F.2d 753, 761 (1st Cir. 1991); *United States v. Libby,* 429 F. Supp.2d 1, 10-11 (D. D.C. 2006). This duty extended beyond the point in time when any individual witness testified, and has continued to the present day.  *Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir. 1997); *United States v. Quintanilla,* 193 F.3d 1139, 1146-49 (10th Cir. 1999)(citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987)); *Steidl v. Fermon,* 494 F.3d 623, 630 (7th Cir. 2007)("For evidence known to the state at the time of trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings"); *High v. Head,* 209 F.3d 1257, 1265 n.8 (11th Cir. 2000).  *See also, Banks,* 540 U.S. at 696; *Giglio,* 405 U.S. at 155; *United States v. Kojayan,* 8 F.3d 1315, 1320, 1323-25 (9th Cir. 1993); *Thomas v. Goldsmith,* 979 F.2d 746, 749-50 (9th Cir. 1992)(prosecution has an obligation to turn over exculpatory evidence relevant to habeas proceedings, even if it was not discovered prior to the close of trial); Fed.R.Crim.P. 16 ( c); Fed.R.Civ.P. 26(g)(1).  *Cf.  Imbler v. Pachtman,* 424 U.S. 409, 427, n. 25

(1976)(under ABA Criminal Justice Standard 3-3.11, commentary, "A prosecutor may not properly refrain from investigation in order to avoid coming into possession of evidence that may weaken the prosecution's case ... The duty of the prosecutor is to acquire all the relevant evidence ...").

This duty also extends to any member of law enforcement acting on behalf of government agencies, whether or not the prosecutor has personal knowledge of the evidence in question, and whether or not the information is in possession of law enforcement agencies and officials outside the prosecuting agency itself.  *United States v. Antone,* 603 F.3d 566, 569 (5th Cir. 1979)(facts known to state law enforcement personnel imputed to federal prosecutors when "the two governments ... pooled their investigative energies to a considerable extent.")

To establish a *Brady* violation, a Movant must show: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant either as to guilt or punishment; and (3) that the evidence was material.  The good faith or bad faith of the prosecution is irrelevant.  Evidence is "material" only if there is a reasonable probability that, had the evidence been disclosed, the outcome of trial would have been different.  *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994), citing *United States v. Bagley,* 473 U.S. 667, 682 (1985).  To prevail, a Movant need not show that it is more "probable than not" that had the evidence been disclosed, the outcome would have been different.  Rather, the question is whether, considering the cumulative effect of the suppressed evidence, *Kyles,* 514 U.S. at 436, "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable."  *Id.*, at 441.

Newly discovered evidence, *i.e.,* evidence which could not have been discovered by the exercise of due diligence before or during trial, may also form the basis for relief under

section 2255. *E.g., United States v. Hernandez,* 94 F.3d 606 (10th Cir. 1996)(rejecting newly discovered evidence claim raised in initial 2255 petition, which was filed during pendency of direct appeal, on the merits); (Fed. R. Crim. P. 33.)  To warrant relief on a claim of newly discovered evidence, it must be shown: 1) that the evidence was discovered after the trial; 2) that failure to learn of the evidence was not caused by a lack of diligence; 3) the evidence is not merely impeaching in character; 4) the evidence is material to the principal issues involved; and 5) the evidence is of such a nature that, had it been disclosed to the jury, there is a reasonable probability of a different outcome, *i.e.,* acquittal or a lesser sentence.  *Peltier v. Booker,* 348 F.3d 888, 890 (10th Cir. 2003); *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997).

A *Brady* claim may be a subspecies of a newly discovered evidence claim.  *United States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10th Cir. 1999).  Whether the claims made below constitute *Brady* violations, newly discovered evidence, or both, Mr. Barrett is entitled to relief from his convictions and sentences.

The prosecution in Mr. Barrett's case suppressed, before, during and after trial, exculpatory evidence relevant to several key witnesses.  Deals or leniency given to these witnesses in exchange for their testimony in Mr. Barrett's case and, with respect to Charles Sanders, deals he received in other cases because of his supposed work as an informant, were not disclosed.  Threats to witnesses to get them to cooperate with the Government were not disclosed.  Relevant to this were the ongoing criminal activities of former AUSA Mike Littlefield, which came to light in 2007, when he was allowed to enter an *Alford* plea in Muskogee County District Court to charges of physically abusing his own children.  Among other misdeeds, Littlefield suppressed exculpatory evidence regarding one of the seven informant witnesses that was made known to the court during the improper *ex parte* hearing on the

Government's motion to delay disclosure of the identities of its seven informant witnesses, but never disclosed to the defense.  *See* Claim 1.

Some of the evidence discussed below  was relevant not only to the credibility of witnesses, but the propriety of the initial nighttime, no knock search warrant that was secured by Drug Task Force agent Clint Johnson, based on the good word of Charles "Monk" Sanders.  The Government or its agents were aware of numerous impeaching facts regarding acts of dishonesty and criminality of Clint Johnson and his girlfriend, OSBI agent Vickie Lyons, none of which were revealed to the defense.

Most egregious of all, the Government knowingly used perjured testimony from Randy Turman, who claimed that a Sequoyah County felony case had been disposed of and was no longer active when it was in fact open, giving Turman every reason to fashion his testimony to the Government's liking.  The same could also be said for its tactic of implying to the jury that the most it would do for Charles Sanders was "talk to" the prosecutors in Sequoyah and Tulsa Counties about his cases there, to let them know that Sanders had cooperated in the federal case against Mr. Barrett.  At the improper *ex parte* hearing discussed in Claim 1, AUSA Littlefield told the court that he knew the identify of an informant witness who failed to corroborate Charles Sanders.  Thus, it could be said the Government knew Sanders's testimony was false, as was the basis for the search warrant secured by Clint Johnson.  In any event, the Government failed to disclose exculpatory evidence of the witness who failed to corroborate Sanders.  It could also be said that the Government sponsored false testimony from Travis and Cindy Crawford.  Newly discovered evidence reveals that their testimony was the product of threats and intimidation.  *See Giglio v. United States,* 405 U.S. 150 (1972); *Giles v. Maryland,* 386 U.S. 66 (1967); *Miller v. Pate,* 386 U.S. 1 (1967); *Napue v. Illinois,* 360 U.S. 264 (1959); *Mooney v. Holohan,* 294 U.S.

103 (1959).  If the jury's verdict could be affected by false testimony presented by the prosecution – as it surely was here – a new trial is required.

> **A.**   **Suppressed Exculpatory Evidence, Evidence of Knowing use of Perjured Testimony, and Newly Discovered Evidence**
>
> **1.**   **Evidence regarding informant witnesses Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman entitles Mr. Barrett to relief from his convictions and sentences**
>
> **a.**   **Charles "Monk" Sanders**

The prosecution suppressed deals given to Charles "Monk" Sanders in Sequoyah and Tulsa Counties in exchange for his testimony, in both stages of trial, against Mr. Barrett.  In examining Sanders at trial, AUSA Littlefield merely stated, and Sanders agreed, that he would speak to the authorities in Sequoyah and Tulsa Counties regarding Sanders's cooperation, implying there were no guarantees anything would be done.  (R. 2495.)  In fact, near the end of Mr. Barrett's trial on November 17, 2005, Sanders got a sweetheart deal on his active Sequoyah County cases, and more favors shortly thereafter, all due to a "plea agreement with feds." Favorable disposition of Sanders's active Tulsa County case was delayed until after Mr. Barrett's trial.  The prosecution cynically attempted to jettison its *Brady* obligations with respect to Sanders's testimony by either failing to reveal deals it knew were in the works, and/or postponing the culmination of those deals until the end of Mr. Barrett's trial or shortly after its conclusion. The Government's ploys in these regards plainly violated the *continuing duty* to disclose *Brady* evidence.

Of course, Sanders's alleged information was the basis upon which the no-knock warrant secured by his alleged handler Clint Johnson was issued.  Sanders's testimony was

critical to the drug charges which underlay the various counts of the superseding indictment, and to the Government's arguments on malice and intent with respect to both stages of trial.

As noted in Mr. Barrett's first stage ineffective assistance of counsel argument respecting trial counsel's failure to impeach Sanders with the number and nature of his previous convictions (Claim 2, section A.4, *supra*), as well as favorable treatment he had received in these and other cases, Sanders had convictions in Sequoyah County Case No. CF-98-346, (for which he originally received a twenty year suspended sentence, of dubious legality due to his numerous prior convictions), for the felony offense of possession of methamphetamine. Sanders was also charged in this case with a misdemeanor count for possession of drug paraphernalia, which was dismissed pursuant to plea bargain. Two applications to revoke Sanders's suspended sentence were filed. Initially, five years of the suspended sentence was ordered revoked, but the balance would again be suspended if Sanders completed a Department of Corrections drug program. The revocation was ordered to run concurrent with similar dispositions in Case Nos. CF-98-363, CF-99-562, CF-04-19 and CF-03-124. (File in Sequoyah County Case CF-98-346.)

In CF-98-363, Sanders received another twenty year suspended sentence for uttering a forged instrument, to run concurrently with the sentences in Case Nos. CF-99-562 and CF-98-346. Similar applications to revoke were filed in this case based on Sanders's failure to abide by the terms and conditions of probation, in part because he committed new offenses. Initially, as with CF-98-346, the court ordered five years of the sentence to be revoked, with the balance to again be suspended in full upon completion of the drug program. The revocation in this case was ordered to run concurrently with similar actions taken in Case Nos. CF-98-346, CF-99-562, CF-03-124, and CF-04-19. (File in Sequoyah County Case No. CF-98-363.)

In CF-99-562, in which Sanders was initially charged with three counts of concealing stolen property, uttering a forged instrument, felonious possession of a sawed-off shotgun, and a misdemeanor charge of possession of marijuana, he was allowed to plead to a single count of concealing stolen property, with the other counts dismissed. He originally received a twenty year suspended sentence. Again, applications to revoke were filed due to Sanders's commission of new crimes and for otherwise failing to adhere to the terms of his probation. Five years of the sentence was revoked, the balance again to be suspended upon completion of an in-house drug program. The sentence in this case was ordered to run concurrently with similar dispositions in Case Nos. 98-346, 98-363, 03-124 and 04-19. (File in Sequoyah County Case No. CF-99-562.)

In Case No. CF-03-124, Sanders was allowed to plead guilty to two counts of feloniously running a roadblock, with the other charges dismissed. Sanders received concurrent twenty-five year sentences on the two counts of conviction, with all but five years suspended, and with the entirety of the terms to be suspended on successful completion of the drug program. The sentences in this case were ordered to run concurrently with the sentences in Case Nos. In CF-98-346, CF-98-363, CF-99-562 and CF-04-19. (File in Sequoyah County Case No. CF-03-124.)

In Case No. CF-04-19, Sanders was eventually charged in an amended information with second degree burglary, second degree arson, concealing stolen property, and feloniously carrying a firearm. The firearm charge was dismissed pursuant to the plea agreement. On the three remaining counts, Sanders was sentenced to concurrent terms of twenty-five years, with all but the first five years suspended and, yet again, the balance to be suspended upon

Def's § 2255 Mot.                              261                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

completion of the drug program.  The sentences in this case were ordered to run concurrently with the sentences in Case Nos. 98-346, 98-363, 99-562 and 03-124.  (File in Sequoyah County Case No. CF-04-19.)

The Government violated Mr. Barrett's due process rights by failing to disclose that on November 17, 2005 (the final day of Mr. Barrett's trial), and because of his testimony in Mr. Barrett's trial, amended judgments and sentences were entered on behalf of Sanders in all of the above-described cases, with a filing date of November 23, 2005 (well before Mr. Barrett's formal sentencing) ordering that Sanders receive straight suspended sentences across the board. Moreover, in each of the cases discussed above, an order was entered on April 3, 2006, making Sanders's suspended sentences in these cases unsupervised by the Department of Corrections, even though the sentences did not expire until 2030.  This was done, according to the notations on the orders, "***per plea agreement with feds***."  Finally, on December 8, 2008, orders were entered in each of these cases relieving Sanders of the obligation to pay any outstanding fines or costs.  (*See* the above listed Sequoyah County court files (emphasis added).)

Sanders received similar largesse as the result of his testimony against Mr. Barrett in his pending Tulsa County Case, disposition of which, as noted in the ineffective assistance of counsel argument, was delayed until Sanders could perform for the Government in Mr. Barrett's trial.  In Tulsa County Case No. CM-04-1187, Sanders's case was passed from November 13, 2005 until November 17, 2005 (the last day of Mr. Barrett''s trial), and was again passed from November 17 until December 9, 2005.  At that time, instead of facing jail on his misdemeanor drug possession and possession of drug paraphernalia charges, despite his numerous prior convictions, because of his testimony against Mr. Barrett, Sanders received concurrent one year suspended sentences.

During the pendency of this 2255 action, investigators for Mr. Barrett have attempted repeatedly to interview Sanders, but were stymied.  Sanders initially told a defense investigator he would meet with him, and had things he wanted to discuss, but dodged all subsequent attempts at an interview.  However, when a defense investigator spoke to Sanders's mother, Evelyn Sanders, regarding her son's testimony against Mr. Barrett, she revealed that Sanders had been promised a number of things in exchange for his testimony that he never received.  (Decl. of Dale Anderson.)  This witness's statement suggests that aside from the leniency he got, Sanders was given other inducements by the Government to testify against Mr. Barrett.

Not only did the prosecution flatly violate *Brady* and its progeny by failing to disclose Sanders's deals in the particular cases discussed above, it wantonly violated its *Brady* obligations by failing to reveal the jaw-dropping favorable treatment Sanders had received in *all his* Sequoyah County and other cases, as detailed in the ineffectiveness of counsel claim.  Taken together, this evidence would have destroyed Sanders's credibility, shown his motive to lie, and would have shown, contrary to this court's order, that Clint Johnson – whose nefarious, but never revealed, acts of dishonesty and criminality are discussed below – could not have reasonably relied on "information" from Sanders to establish probable cause for the no-knock search warrant, which was the poisonous tree from which the later search warrants resulting in the recovery of drug and firearms related evidence grew.

When the prosecution falsely suggested it would merely "talk to" county prosecutors, even though Sanders received deals on the last day of Mr. Barrett's trial in Sequoyah County and shortly thereafter in Tulsa County, and Sanders agreed with this assessment of the

situation, it sponsored materially false testimony. *Giglio v. United States,* 405 U.S. 150 (1972). At a minimum, the Government failed in its duty to correct false testimony. *Giles v. Maryland*, 386 U.S. 66 (1966); *Alcorta v. Texas*, 355 U.S. 28 (1957).

### b. Travis Crawford

During the investigation conducted for this 2255 motion, Mr. Barrett has discovered that one of the key witnesses in the first stage of trial, Travis Crawford, lied about material matters. Travis Crawford supplied testimony critical to the Government's case for malice and intent, at least as to count 3 of the superseding indictment. Crawford's testimony was also crucial to establishing the intent elements in the punishment phase of trial. Crawford's testimony was summarized in the claim regarding ineffective assistance of counsel in the first stage of trial, and will not be repeated here.

When Crawford was interviewed in the presence of his parents on December 11, 2008 by defense investigator Leonard Post, he recanted his trial testimony. To summarize, Mr. Crawford told Mr. Post the following:

Mr. Barrett's habit of not leaving his property had been established several years before the raid which led to Trooper Eales's death. At trial, of course, the prosecution contended that Mr. Barrett rarely left his property only after he supposedly learned there was a warrant for his arrest on the Sequoyah County drug charge. (Decl. of Leonard Post.)

Mr. Crawford stated that he has anxiety and psychological problems, something he was not cross-examined on at trial. Although he was a long-time methamphetamine addict, he told Mr. Post he had been off drugs for four months preceding Mr. Post's interview. Before finally getting off drugs, Crawford had been a daily methamphetamine user for years preceding Mr. Barrett's arrest in this case and during Mr. Barrett's federal trial. (Decl. of Leonard Post.)

Def's § 2255 Mot.                          264                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Thus, Crawford's trial testimony to the effect that he was not a drug addict or under the influence of drugs at the time he testified against Mr. Barrett was false.

Mr. Crawford stated that at the time he was interviewed by then-AUSA Mike Littlefield regarding Mr. Barrett, he was "living in so many places and was so strung out" on drugs, that he did whatever he was told by anyone in authority in order to stay out of trouble. Mr. Crawford states that when he was interviewed by Mr. Littlefield, he was high on drugs. Moreover, anybody who had been around drug addicts for any period of time (which surely includes Mr. Littlefield and then-Sequoyah County Sheriff John Philpot, who took Crawford to Muskogee to be interviewed by Littlefield) would have known Crawford was high. Not only was Mr. Crawford under the influence of illicit drugs at the time he was interviewed by Littlefield, but he was also high when he testified in the first stage of Mr. Barrett's trial. Crawford stated that the other informant witnesses who testified against Mr. Barrett were high and strung out on drugs at the time of their testimony. (Decl. of Leonard Post.)

When Sheriff Philpot took Crawford to Muskogee to be interviewed by Mike Littlefield shortly before Mr. Barrett's trial, Crawford felt he "was already arrested" and did not know "if [he] was ever going to come back home." When Littlefield interviewed him at the United States Attorney's office, Mr. Crawford was terrified about losing his freedom. Consequently, he said whatever he thought it was Littlefield wanted him to say. Mr. Littlefield asked Travis Crawford if Kenneth Barrett ever said he (Mr. Barrett) was "going to go down in a blaze of glory" if the police ever came onto his property. Littlefield made it clear to Crawford what the appropriate answer was. Crawford stated that before he could answer, Littlefield threatened him, stating bad things would happen to him if he "lied." Where a witness is pressured to testify, the prosecution has every reason to believe that the product of that coercion

Def's § 2255 Mot.                      265                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

will be false testimony.  Mr. Crawford stated he was scared and panicked, and therefore told Littlefield that Mr. Barrett had made this statement.  According to Mr. Crawford, the truth was otherwise: *Mr. Barrett never made such a statement, or anything like it, at any time*.  (Decl. of Leonard Post.)

Travis Crawford's recantation is corroborated by witnesses who were present at Mr. Barrett's house on September 23, 1999, but were not called to testify at trial.  *See* Claim 2, section A.4, *supra*.  Rick Lunsford and Brandy Hill are adamant in stating the Mr. Barrett never made such a statement.  (Decls. of Rick Lunsford and Brandy Hill.)

Because the Government and its agents knew or had reason to know that Crawford was a drug addict at the time he was interviewed by the prosecution, and at the time he testified at trial, the Government was obligated to disclose this information under *Brady*.  Due process and the rules of professional conduct required AUSA Littlefield to correct Travis Crawford's false testimony about being off drugs.  The same is true of at least some of the other informant witnesses, whom Mr. Crawford states were high at the time of their testimony.  Moreover, the Government plainly violated its *Brady* obligations by failing to reveal Littlefield's threats to induce cooperation and shape Crawford's testimony.  *Crivens v. Roth,* 172 F.3d 991, 998-99 (7th Cir. 1999)(prosecution violated *Brady* where police had intimidated key witnesses to

murder of police officer, and failed to disclose material information as to who was seen carrying the murder weapon moments after the shooting).

Mr. Crawford admitted that before he became a witness against Mr. Barrett, he had previously worked as a snitch for local law enforcement, setting up drug buys at the direction of the authorities in exchange for escaping bogus check charges he was facing.  Crawford stated

that he testified regarding the controlled drug buys in state court, even though the police had promised him he would not have to do so. Decl. of Leonard Post. Crawford's history as an informant was not testified to at trial, though it was known to the Government or its agents. Crawford's work as a snitch was exculpatory evidence affecting his credibility. By failing to inform the defense of this fact, the Government violated is *Brady* obligations.

In marked contrast to what the Government attempted to portray at Mr. Barrett's trial regarding the "necessity" for a no-knock warrant and the armed raid on Mr. Barrett's property, Travis Crawford stated that only two weeks or so before the raid, Sheriff John Philpot had gone to Mr. Barrett's residence and inspected his firearms without incident. (Decl. of Leonard Post.)

This information is consistent with that given by Janice Sanders and Sylvia Gelene Dotson, who, though never asked by trial counsel, state that Sheriff Philpot and other law enforcement agents were at Mr. Barrett's house mere weeks before the raid. *See* Claim 2. As shown below, ex-Sheriff Philpot recently admitted to a defense investigator that he indeed was at Mr. Barrett's less than a month before the raid, and encountered no violence or threats. Mr. Barrett was not arrested on his outstanding failure to appear warrant. (Decl. of Rodney Floyd.) This exculpatory evidence, of which the Government and/or its agent Mr. Philpot was well aware, was concealed from the defense in violation of *Brady.*

Again in contrast to what Mr. Crawford implied in his testimony, and to what the Government argued at trial, he recently stated that while Mr. Barrett told him he had a pending state drug charge, he was not overly concerned with it. Mr. Barrett never told Crawford he had an outstanding warrant, and was thus laying low and hiding from the law. Crawford simply

assumed that having an active case meant the same thing as having an active arrest warrant. (Decl. of Leonard Post.)

At trial, with the aid of Mr. Crawford's testimony, the Government made much of the sign posted on the gate, construing it as a threat to law enforcement. Mr. Crawford states that the sign was posted as a warning to anyone coming on the property in order to prevent trespassing and theft. (Decl. of Leonard Post.)

A defense investigator reduced to writing what Mr. Crawford stated when he was interviewed. When the investigator presented the writing to Mr. Crawford, he refused to read it or "sign anything," siting the advice of his psychiatrist. (Decl. Leonard Post.) However, even in this tale, Mr. Crawford was caught in a contradiction. (*Id.* at 5.)

However, Mr. Crawford's parents, Roger and Phyllis Crawford, witnessed his recantation. They have signed declarations attesting to their son's statements to Mr. Post, statements which destroy the credibility of his trial testimony against Mr. Barrett. (Decls. of Roger and Phyllis Crawford.) Of course, as noted above, Mr. Post has also executed a declaration detailing Travis Crawford's recantation. (Decl. of Leonard Post.)

Evidence of Crawford's recantation is newly discovered, and could not have been discovered with the exercise of due diligence before or during trial, because the Government sprung the existence of Crawford and the other informant witnesses (without initially giving their names) after juror qualification had begun, and Crawford refused to be interviewed by the defense. Crawford's recantation pulls the rug out from under the prosecution's arguments respecting malice and intent in both stages of trial. Crawford was *the key Government witness* in this respect, because he testified that only hours before the raid, Mr. Barrett talked about the police "drive-by," the "fact" that they were coming back, that he (Mr. Barrett) "[didn't] give a

fuck," and that he (Mr. Barrett) was going to go out in a "blaze of glory."  Crawford's recantation

also undermines the Government theory that Mr. Barrett only stayed close to home, and was thus

lying in wait for a supposedly inevitable police raid, after he supposedly learned that he had a

warrant out for his arrest.

<div style="text-align:center">

**c.      Cindy Crawford**

</div>

As outlined in the first stage ineffective assistance of counsel argument (Claim 2,

section A.4, *supra*), Cindy Crawford testified in the guilt/innocence stage of trial regarding drug

activity she witnessed at Mr. Barrett's home, and Mr. Barrett's supposed threats to law

enforcement if his property were raided.  In the penalty phase of trial, Cindy Crawford testified

that on one occasion, Mr. Barrett, after she rebuffed his sexual advances and was leaving his

residence with Richie Barrett, came out of the house, put the barrel of a rifle up to her leg, and

threatened to kill her.

Leonard Post and another defense investigator currently working on Mr. Barrett's

case, Dale Anderson, interviewed Cindy Crawford on January 13, 2009.  Like her husband,

Cindy Crawford refused to *read* a declaration which faithfully recounted what she told Messrs.

Post and Anderson.  (Decl. Leonard Post.)  Mr. Post's and Mr. Anderson's declarations detail

what Cindy Crawford told them, which is summarized as follows.

Cindy Crawford explained how she was contacted by the Government.  According

to her, one to two weeks before she testified in the first stage of Mr. Barrett's trial, Sequoyah

County Sheriff John Philpot came to see her.  Philpot told her she had to go with him.  Although

Ms. Crawford was unsure whether she was under arrest, it was clear to her that she had no choice

but to go with Sheriff Philpot.  She was driven by Mr. Philpot to the United States Attorney's

office in Muskogee, where she was interviewed by Mike Littlefield in Littlefield's office. (Decls. of Leonard Post and Dale Anderson.)

Armed law enforcement officers were also present during the interview. They showed Ms. Crawford several firearms which looked similar to ones she had seen in Mr. Barrett's cabin. In order to secure her cooperation and testimony, Mike Littlefield threatened her. Littlefield told her she need to work with him and testify against Mr. Barrett. Otherwise, she was going to prison. Littlefield pointedly reminded her that she was then under a five-year deferred sentence in a drug case. Littlefield told Ms. Crawford that Mr. Barrett's residence had been under surveillance for six months preceding the raid, and that she had supposedly been observed on his porch acting as a "lookout" while methamphetamine was cooked on the property.[47] While Ms. Crawford states that she had no pending charges at the time she was interviewed by Littlefield, she had recently lost a child to foster care. Along with the threat of prosecution, the possibility that she would not get her child back unless she played ball with the Government hung in the air throughout the interview. (Decls. of Leonard Post and Dale Anderson.)

According to what Ms. Crawford recently told Mr. Barrett's defense investigators, Mike Littlefield not only threatened her, but coached her testimony. Littlefield told her to make Mr. Barrett appear violent and an imminent threat to those around him. Again issuing threats, Littlefield told her that she risked a perjury charge if she did not testify in this manner. Littlefield emphasized that he could make it extremely hard on her if she did not testify against Mr. Barrett. (Decls. of Leonard Post and Dale Anderson.)

---

[47] Consistent with her first stage trial testimony, Cindy Crawford told Mr. Post and Mr. Anderson that she never saw Mr. Barrett cook methamphetamine on his property. She had done drugs at Mr. Barrett's residence, but did not know who supplied them. Ms. Crawford never bought drugs from Mr. Barrett. Decls. of Leonard Post and Dale Anderson.

In addition to the threats, Ms. Crawford described the interview taking place in an intimidating atmosphere. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside. It was her belief that she was not free to decline to be interviewed, to terminate the interview, or to leave. Mr. Philpot had driven her to Muskogee, and she had no way back other than him. Ms. Crawford expressed the sentiment that she was not going to cross Sheriff Philpot due to his reputation for violence. (Decls. of Leonard Post and Dale Anderson.)

Ms. Crawford was interviewed by the Government separately from her husband, Travis. After both had been interviewed, Travis Crawford told her that Philpot had told him that if he (Travis) said the right things on the witness stand, he would not get into trouble. (Decls. of Leonard Post and Dale Anderson.)

Mike Littlefield and John Philpot discouraged her from talking to Mr. Barrett's lawyers. Both told her that she did not have to talk to the defense. According to Ms. Crawford, the clear implication was that she should not speak to the defense. (Decls. of Leonard Post and Dale Anderson.)

Like her husband Travis Crawford, Cindy Crawford was under the effects or after-effects of heavy methamphetamine use at the time she was interviewed by Mr. Littlefield and law enforcement at Littlefield's office. At the time of the interview in the prosecutor's office, Cindy Crawford was just coming down from a two day methamphetamine high. She also admitted to being in the same condition when she testified against Mr. Barrett, because her heavy drug use was ongoing at the time of his trial. That her drug use affected what she told Mr. Littlefield and testified to at trial is apparent from her recent comment to Mr. Barrett's current investigators: "If

you had ever crashed from a meth high, you would know that you would not be in your right mind." (Decls. of Leonard Post and Dale Anderson.)

Although, on cross-examination in the second stage of trial, Cindy Crawford told defense counsel she suffered from PTSD, her mental condition was not inquired about during her first stage testimony, and was not effectively exploited by counsel in the penalty phase, largely because Crawford refused to be interviewed by trial counsel. (*See* Claim 2) Because Crawford refused to be interviewed, there are facts about the manner in which her mental condition impacts her credibility that were only recently discovered.[48] (Cindy Crawford medical records, filed under seal.) According to what Ms. Crawford told Mr. Post and Mr. Anderson, one of the symptoms of her PTSD is that she overreacts in stressful situations, sometimes to the point of passing out. She admitted that when she is under stress, she may not perceive things correctly. This causes her to exaggerate what is going on around her. Ms. Crawford told Mr. Post and Mr. Anderson that when she testified in the penalty phase about Mr. Barrett allegedly pressing a gun to her leg, her mental condition very well could have caused her to overreact and embellish the incident. At the conclusion of her recent interview with the defense investigators, Cindy Crawford told them that having given this alleged incident more thought, she was positive she had overreacted to it. She emphasized that Mr. Barrett had a history of being nice and helpful to her. (Decls. of Leonard Post and Dale Anderson.)

However, even Ms. Crawford's claim to have overreacted is a fabrication. A readily available witness to the alleged event, Richie Barrett, states that neither the incident

---

[48] Cindy Crawford executed a release authorizing Mr. Barrett's counsel to obtain her medical records.

Crawford described nor anything like it ever happened.  (*See* Claim 2; Decl. Richard Barrett; Decl. of Leonard Post.)

Between her first stage and second stage testimony, the prosecution subjected Cindy Crawford to more threats.  The Government was upset with her first stage performance on the witness stand because she denied seeing chemicals or equipment for making methamphetamine at Mr. Barrett's cabin or on his property, and because she had not made Mr. Barrett seem threatening or violent.  To quote Ms. Crawford, "They [the Government] were very angry.  They scared me and threatened me."  Again, according to Ms. Crawford, while the Government never told her explicitly that she could lie and fabricate during her testimony, it was implied that she could say whatever she wanted, true or not, so long as it helped the Government's case.  (Decls. of Leonard Post and Dale Anderson.)

In several areas, the Government violated its *Brady* duties with respect to Cindy Crawford.  Ms. Crawford implied during her first stage testimony that she was off drugs ( R. 3070), but, based on what Ms. Crawford recently told defense investigators, this was incorrect.  The Government or its agents, based on its observations of Ms. Crawford, had to know that she was a drug user both at the time she was interviewed by Littlefield and when she gave testimony.  If not, this evidence is at a minimum newly discovered.  It is also submitted that the Government or its agents were aware of Cindy Crawford's mental problems, but this was only revealed, and not developed well, when she volunteered this information to trial counsel during cross-examination in the penalty phase of trial.  The Government's intimidation of and threats to Cindy Crawford, as well as disgraced former AUSA Mike Littlefield's "coaching" of her testimony, were well known, obviously, to Littlefield himself and the law enforcement officers who participated in Crawford's interview at Littlefield's office.  The Government's

failure to reveal these facts is a *Brady* violation as well as newly discovered evidence. *Crivens v. Roth,* 172 F.3d 991, 998-99 (7th Cir. 1999). The impeaching evidence related above would have seriously undermined Cindy Crawford's credibility. More seriously, where, as with Cindy Crawford, a witness is threatened and coached, the prosecution is guilty of knowingly sponsoring materially false testimony and/or failing to correct false testimony in violation of Mr. Barrett's right to due process of law. *Giglio*, *supra*; *Giles*, *supra*; *Alcorta*, *supra*.

Additionally, as reflected by the declarations of several available witnesses whom the defense did not call at trial to impeach Cindy Crawford's credibility, it was well known in the community that she acted on a regular basis as a snitch for local law enforcement. This *Brady* information was never revealed, and the Government or its agents had to know about it.

The fact that Crawford received favor from the authorities for acting as a snitch, against Mr. Barrett or others, is demonstrated by the manner in which her conviction in Sequoyah County Case No. CF-04-63 was handled. Crawford was originally charged with felony possession of marijuana, because she had incurred a previous marijuana possession conviction. On April 28, 2005, she entered a no contest plea to a misdemeanor and received a five year deferred sentence. She received a one year deferred sentence on count 2, which charged misdemeanor possession of drug paraphernalia. On March 20, 2005, an application to accelerate Ms. Crawford's deferred sentence was filed because she failed to make a required payment. On July 17, 2005, shortly before Mr. Barrett's trial commenced, a bench warrant was issued for failure to appear. On April 24, 2006, after Mr. Barrett's trial, an application to dismiss the acceleration action was filed because Crawford had finally "paid in full." (File in Sequoyah County Case No. CF-04-63.) Thus, when she testified at Mr. Barrett's trial, an acceleration action for failure to comply with the terms of her deferred sentence was pending, but this

impeaching information, which could have been used to argue that Crawford had a motive to please the prosecutors lest her deferred sentence be accelerated, was not disclosed. *Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003).

The *Brady* violations committed by the Government with respect to Cindy Crawford could also be considered a form of newly discovered evidence that could not have been discovered with the exercise of due diligence. As with all the informant witnesses, her identity was not revealed until the eleventh hour, the Government kept her under tight wraps, and she refused to speak with the defense.

Cindy Crawford continues to milk benefits for her work as an informant, and her testimony against Mr. Barrett, up to the present day. She was charged in Sequoyah County Case No. CF-08-224 with first degree burglary and conspiracy on June 18, 2008, which was amended on July 13, 2008. The first degree burglary charge carried from seven to twenty years. The conspiracy charge carried up to ten years. On December 15, 2008 she received an almost unheard of two year deferred sentence on the first degree burglary charge, with the conspiracy charge dismissed. (File in Sequoyah County Case No. CF-08-224.)

### d.      Brandie Zane Price

Price testified in the first stage of Mr. Barrett's trial. She claimed that she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period. (R. 3485-86.) For various convictions she received in Sequoyah County, she was sentenced to complete the RTP program, a regimented inmate discipline program for females within the Oklahoma Department of Corrections. The balance of her sentences were suspended upon her completion of the program. (R. 3487.) Responding to feeds by prosecutor Littlefield,

Def's § 2255 Mot.                            275                   *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Price testified that the program "worked," that she was "absolutely" clean of drugs, and, presumably, any drug related activity.  (R. 3488, 3497.)

After Mr. Barrett's trial, Brandie Zane Price and others were charged in the Eastern District in a methamphetamine drug distribution conspiracy.  *United States v. McAdams, et al.,* No. CR-07-16-RAW.  The indictment alleged that the overall conspiracy began "prior to approximately" May, 2006, and continued to February 20, 2007.  Significantly, the indictment alleged that beginning approximately January 1, 2006, until June 22, 2006, Price received from the lead defendant in the case, Joseph Alondo McAdams, one pound of methamphetamine per delivery, receiving one delivery and as many as three deliveries a week.  (Doc. 18, CR-07-16-RAW.)  Mr. Barrett's trial concluded November 17, 2005, and he was formally sentenced on December 19, 2005, less than two weeks before the same United States Attorney who prosecuted Mr. Barrett later alleged that Price began receiving large quantities of methamphetamine for resale in a widespread drug conspiracy.

Price was later allowed to plead guilty to a superseding information (Doc. 116, CR-07-16-RAW) charging that from May, 2006 to February 20, 2007, she distributed and possessed with intent to distribute in excess of 500 grams of methamphetamine, or a mixture or substance containing methamphetamine.  A plea agreement, in which Price agreed to provide all information regarding criminal activities known by her to the Government, and in which the Government, based on its assessment of the value of her cooperation, agreed, if appropriate, to move for a Guidelines downward departure, was entered into.  (Doc. 121, CR-07-16-RAW.)

Price was ultimately sentenced to sixty months imprisonment.  (Doc. 218, CR-07-16-RAW.)  She received a substantial downward departure or variance from the advisory Guideline range based *on her cooperation and testimony against Mr. Barrett at his federal trial.*

Def's § 2255 Mot.                           276                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Otherwise, the punishment range for the offense of conviction was a mandatory minimum of ten years imprisonment, a maximum of life, and not less than five years supervised release.  In the September 7, 2007 edition of the *Fort Smith Times-Record*, under the headline "Drug Offender Receives Break," the news article about Price's sentencing hearing states, "Price's sentence was significantly impacted by her testimony in the government's case against Kenneth Eugene Barrett, U.S. Attorney Sheldon Sperling stated in a news release."  News article, Ft. Smith Times Record.   Thus,  Price received substantial favor not for her cooperation in the drug conspiracy case in which she was charged, but for her testimony against Mr. Barrett, which preceded the drug indictment against her.[49]

Mr. Barrett alleges that the Government or its agents knew full well (or had reason to know) at the time of Brandie Price's testimony against Mr. Barrett that she was involved in drug use and drug dealing.  This is clearly exculpatory evidence affecting her credibility that was not disclosed by the Government.  Nor, under the Government's continuing duty to disclose exculpatory evidence under *Brady*, has it been disclosed by the Government that in exchange for her testimony against Mr. Barrett, she received a substantial downward departure in her own federal drug case.  The deal Price received in her federal drug case based on her testimony against Mr. Barrett is also newly discovered, because it occurred after Mr. Barrett's trial.  The Government's knowledge of these facts expose them once again to be the purveyors of false testimony – Ms. Price was not the clean, law-abiding citizen it portrayed her to be.

### e.     Karen Real

---

[49]  The various sentencing memoranda and motion for downward departure are sealed. Docs. 198, 200, 204, 205, 206, No. CR-07-16-RAW.

Karen Real was another of the informant witnesses the Government kept under wraps until the eleventh hour, and who refused to talk to the defense. (R. 3076-77.) At the time Real appeared as a Government witness, she was serving a fourteen year federal sentence.[50] During direct examination, AUSA Littlefield asked Real if he ever indicated that he would do anything for her based on her cooperation. Real initially answered "[n]o, sir." Littlefield then asked, "Did I talk about anything I'd say to the court?" Real responded, "Well, you just mentioned that, you know, what I did. And that it would be up to the judge." (R. 3080-81.) On cross-examination, Real testified that while she hoped her testimony against Mr. Barrett could help her with her sentence, she was not really expecting anything. (R. 3134.)

Although the picture painted for the jury was that the Government would inform Real's sentencing judge of her cooperation, and that Real, while hopeful of a break, was not really expecting one, she actually received the largest favor she could have received shortly after Mr. Barrett's trial concluded. On March 1, 2006, the Government did much more than "mention" Ms. Real's testimony, it initiated a new proceeding in her case by filing a motion under Fed.R.Crim.P. 35 for reduction of sentence, based on her cooperation against Mr. Barrett. (Doc. 148 in Case No. 6:00-cr-21-FHS.) On April 25, 2005, the sentencing court reduced Real's

---

[50] In Eastern District Case No. 6:00-cr-21-FHS, Real had been convicted of conspiracy to manufacture, to possess with intent to distribute, and to distribute methamphetamine (count 1); maintaining a place for the purpose of manufacturing, distributing, or using methamphetamine (count 3); and possessing a firearm during a drug trafficking crime (count 5). Real received sentences of 108 months on count 1, 60 months on count 3, running concurrently to count 1; and 60 months on count 5, running consecutively to the concurrent terms on counts 1 and 3. (Doc. 158, Apr. 25, 2006, order reducing sentence on Government's Rule 35 motion)

sentence from 168 months (fourteen years) to time served (six years), and ordered Real's immediate release from custody.  (Doc. 158 in Case No. 6:00-cr-21-FHS.)

Mr. Barrett submits that the Government misled the jury with respect to the assistance it was going to give Real.  The Government surely knew all along that it would ask that Real's sentence be reduced to time served based on her cooperation against Mr. Barrett, an eventuality which in fact occurred.  The Government has a continuing duty to disclose exculpatory evidence under *Brady*.  This Government's true intentions were never disclosed to the defense or told to the jury.  Additionally, the tremendous break Real received on her sentence is newly discovered evidence adversely impacting her credibility and the Government's lack of forthrightness at trial.  Evidence of Real's deal could not have been discovered with the exercise of due diligence before or during trial, because it post-dated Mr. Barrett's trial.  Yet again, the Government's conduct in soft-peddling the assistance it was going to give Real in exchange for her testimony constituted a violation of *Giglio v. United States,* 405 U.S. 150 (1972) and *Napue v. Illinois,* 360 U.S. 264 (1959).

### f.      Randy Turman

It was argued in Claim 2 that counsel was ineffective for failing to research Turman's court file in Sequoyah County Case No. CF-02-447, and expose his perjury that this six count felony charge had been "taken care of" or disposed of, but was still pending, with no action in the case for two years preceding Mr. Barrett's trial.  Regardless of any duty counsel had to investigate Turman's criminal background, the Government had an overarching duty to refrain from sponsoring perjured testimony, and to disclose exculpatory evidence.

The Government or its agents obviously knew that Turman was committing perjury when he stated he no longer had a pending felony case in Sequoyah County, but they let

him give false testimony anyway.  This is a classic violation of the rules announced in *Giglio, Napue, Mooney,* and *Miller, supra*, and the Government should be held fully accountable for it. It is equally clear the Government knew, despite Turman's denials, that he had worked or was working as a snitch.  Otherwise, there was no reason for his case to lie dormant for two years. The Government let Turman get away with another blatant falsehood when he stated the Government had nothing to hang over his head.  Clearly, his testimony was motivated by the fact he had a still pending felony case.  Unless he pleased the prosecutors with his testimony, there is every reason to believe they would have taken action against him, or seen to it that the Sequoyah County authorities did.

The Government's conduct in connection with Turman is a *Brady* violation.  The fact he had an open, unresolved felony case gave him a powerful motive to testify for the Government, and this fact affected his credibility.

Finally, the fact Turman's case was dismissed "in the interests of justice" in 2007 after lying dormant for years is highly indicative that his testimony against Mr. Barrett was at least in part a basis for the dismissal.  This constitutes newly discovered evidence.

> **2.      The Government failed to reveal exculpatory evidence
> of a witness who failed to corroborate Charles Sanders**

In Claim 1, *supra*, Mr. Barrett described the *ex parte* hearing held September 13, 2005, during which AUSA Mike Littlefield, in the presence of the United States Attorney, informed the court that Littlefield had spoken with, and knew the identity of, a witness who when questioned failed to corroborate to which Charles "Monk" Sanders would eventually testify in the penalty phase of Mr. Barrett's trial.  (Tr. 9/13/05 H'rg at 14, 17.)  Littlefield advised the court that he attempted to corroborate Sanders's claim that he (Sanders) was in a woman's house when

he overheard her speaking on the telephone.  Sanders, as he later testified, claimed he could recognize Mr. Barrett's voice over the phone, and that he heard the voice say they had to identify the C.I. and get rid of him.  Littlefield told the court he had spoken with the woman himself, and she did not corroborate Sanders, although Littlefield claimed he subjectively believed the woman's denial was motivated by fear.

The fact that the Government knew the identity of a witness who failed to corroborate Sanders about a key piece of second-stage testimony was not disclosed until after trial when appellate counsel obtained the transcript of the *ex parte* proceeding.  To this day, the Government has failed to identify the witness.  This was clearly *Brady* material, because it was evidence that could have been used not only to impeach Sanders's testimony, but to attack the search warrant under *Franks v. Delaware,* 438 U.S. 154 (1978).

But the situation is worse than that.  Sanders was able to commit crimes with impunity, and the Government knew that.  As long as he was willing to inform on others, Sanders had a "get out of jail free" card.  No reasonable person could believe Sanders about anything.  This is especially true since the prosecution was in possession of evidence that Sanders's sorry word was contradicted by another witness.  Due to Sanders's record of total dishonesty and the fact that he was contradicted by another witness known to the prosecutor, polluting a federal courtroom with Sanders's testimony constituted the knowing use of perjured evidence.  *E.g., Miller v. Pate,* 386 U.S. 1 (1967); *Mooney v. Hollohan,* 294 U.S. 103 (1935).

**B.      The Judgements of Conviction and Sentence Should be
         Vacated Based on the Suppression and New Discovery of
         Evidence Undermining the Credibility of Key Law
         Enforcement Personnel**

The Government suppressed exculpatory evidence that would have shown Clint Johnson and Vickie Lyons to be witnesses of poor credibility.  With respect to evidence showing Johnson had no credibility, the suppressed evidence would have also supported a motion to suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978).  The Government suppressed exculpatory evidence that would have torpedoed not only the warrant, but its seven informant witnesses and overall theory of the case, because Sequoyah County Sheriff John Philpot had been to Mr. Barrett's residence with other officers less than a month before the September 24, 1999 incident without coming to any harm.  Newly discovered evidence of former AUSA Littlefield's criminal activities supports claims by some of the informant witnesses that they were threatened and coerced into giving testimony.

**1.      Evidence of Clint Johnson's illicit activities**

But for Clint Johnson's alleged reliance upon "Monk" Sanders to secure the nighttime, no-knock warrant for Mr. Barrett's residence and property, David "Rocky" Eales's tragic death never would have occurred.  The Government or its agents knew that Johnson, just like his alleged snitch, Sanders, is untrustworthy and was subject to impeachment in a variety of areas.  To the extent the impeachment evidence discussed below was generated after Mr. Barrett's trial, it constitutes newly discovered evidence.  However, the Government was aware of this evidence, or had a duty to become aware of it, and has once again failed to fulfill its *continuing* duty to disclose exculpatory evidence.  The impeachment evidence detailed below not only could have been used to attack the overall testimony of Johnson and Sanders, but could have

been used at either stage of Mr. Barrett's trial to argue that but for the acts of a "dirty cop," Clint Johnson, the entire chain of events leading to Trooper Eales's death never would have occurred.

At the time of Mr. Barrett's trial and shortly thereafter, Johnson was under official investigation for embezzlement of funds, illegal drug use, perjury, and gross misuse of his official office.  Agent Vickie Lyons of the Oklahoma State Bureau of Investigation, another critical witness in the Government's case against Mr. Barrett, colluded with and protected Johnson.  Had the jury known these facts, Johnson's credibility, and the validity of the no-knock search warrant, would have been destroyed.  Likewise, the credibility of Vickie Lyons would have suffered greatly had the jury learned of her participation in her boyfriend Clint Johnson's numerous illegal activities.

Although not known to the defense, at the time of Mr. Barrett's trial, Johnson, Lyons and a number of other state law enforcement officers involved in Movant's case had been involved in a series of crimes involving the misuse of their office.  On November 1, 2005, while Mr. Barrett's trial was ongoing, Cherokee County District Attorney investigators Tommy Morgan and Jeff Lancaster reported to District Attorney Richard Gray that Johnson had passed four bad checks in September, 2005 at Champlain's Truck Stop in Tahlequah. (Memo to Richard Gray from Tommy Morgan and Jeff Lancaster dated November 1, 2005.)  Beginning on November 5, 2005, Assistant District Attorney and Drug Task Force Director Jeff Sheridan kept a detailed log of discussions with Johnson, which led to Johnson's termination and the seizure of his vehicle on January 5, 2006. (Log of events from November 2005 through January 2006 by Jeff Sheridan; Letter from Richard Gray to Clint Johnson dated January 5, 2006.) On January 5, 2006, District Attorney investigators found in Johnson's car various drugs and drug paraphernalia that had never been logged into evidence, which they suspected Johnson had

acquired through seizure or purchase with official funds, and which they suspected Johnson was abusing himself. (Report of Investigation dated January 5, 2006 from Courtney Bates; February 3, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries.)  These items included multiple syringes, a pipe, a spoon with methamphetamine residue, a partially smoked hand-rolled marijuana cigarette, vials of liquid methamphetamine, a baggie containing marijuana, and bottles of Xanex and Darvon. (OSBI Criminalistics Investigation Report dated January 26, 2006.)

As early as November 9, 2005, Sheridan was expressing concern over Johnson's inability to account for funds allegedly used for drug buys by confidential informants and funds seized during drug raids. (Log of events from November 2005 through January 2006 by Jeff Sheridan; Memo dated November 17, 2005 from Donovan Dobbs to Jeff Sheridan; Undated Memo from Jeff Sheridan to Clint Johnson; Undated Memo from Jeff Sheridan to Richard Gray; Memo dated November 21, 2005 from Jeff Sheridan to Clint Johnson; Memo dated December 19, 2005 from Courtney Bates to Jeff Sheridan; Memo dated December 27, 2005 from Jeff Sheridan to Clint Johnson; January 17, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries; February 22, 2006 Letter from Richard Gray to OSBI Special Agent Shawn Ward; Undated Report of Second OSBI Interview of Clint Johnson; Memo dated November 13, 2006 from Misty Brinley to Richard Gray).

Johnson had considerable difficulties managing his finances.  He declared bankruptcy in 2001, and his actions in passing hot checks had further alarmed his supervisors. (*In re Clint Johnson,* No. 01-72501, United States Bankruptcy Court, E.D. Okl.)  In December 2005 and January 2006, Sheridan repeatedly expressed his conviction that Johnson was lying to him.  (Log of events from November, 2005 through January, 2006 by Jeff Sheridan; Undated Memo from Jeff Sheridan to Richard Gray).  On November 23, 2005, Sheridan noted Johnson's

possible involvement, as either a target or witness, in a Multi-County Grand Jury criminal investigation. (Log of events from November, 2005 to January, 2006 by Jeff Sheridan). It is plainly apparent that law enforcement knew, during the course of Mr. Barrett's trial, that Johnson was involved in a course of serious criminal conduct that involved financial dishonesty and the misuse of his office.

In October, 2006, a Multi-County Grand Jury unsealed an indictment against Richard Gray, the District Attorney for Cherokee and Sequoyah Counties, for embezzling money seized as evidence from drug investigations. In June, 2008, Okmulgee County District Judge Michael Claver dismissed the charges against Gray at the conclusion of the prosecution's case, and barred further prosecution, based on defense counsel's scathing impeachment of Clint Johnson, who testified as a prosecution witness.

The transcript of the cross-examination of Clint Johnson, which took place on June 4, 2008, is replete with additional evidence of Johnson's misappropriation of funds. (Transcript of Proceedings in *State of Oklahoma v. Richard Loy Gray, Jr.,* Cherokee County Case No. CF-2007-28, June 4, 2008) (hereinafter "Gray RT"). During the cross-examination of Johnson, Gray's defense counsel suggested that: 1) Johnson had fathered a child out of wedlock with the daughter of former Adair County Sheriff Charles Hartshorne, and that Johnson and Hartshorne were dividing up drug money between themselves (Gray RT 26-27); 2) Johnson lived with another critical prosecution witness in Mr. Barrett's case, Vickie Lyons of the OSBI (*id.* at 74); 3) based on his relationship with Lyons, Johnson knew that the OSBI would do nothing to address official theft of drug money (*id.*); 4) Johnson used Lyons's cell phone and drove her car, and when government officials confronted Johnson about property he had illegally taken, Lyons brought it back (*id.*); 5) Johnson attempted to borrow, and in some cases did borrow, money from

Def's § 2255 Mot.                    285              *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

counsel for defendants whose assets Johnson seized (*id.* at 65); 6) Johnson illegally released funds seized from defendants to defense counsel, and then obtained kickbacks from defense counsel for this illegal conduct (*id.* at 66-67); 7) Johnson used drug funds as his own private ATM (*id.* at 64); 8) throughout 2003 and 2004, Johnson took money seized from drug arrests and purchased cashier's checks for his own personal use (*id.* at 68); and 9) Johnson began writing bad checks as early as May, 2003.  *Id.* at 54.

None of this information was shared by the Government with Mr. Barrett's lawyers; it is obvious they intentionally concealed it.  Mr. Barrett's current counsel first learned of this information in February, 2009, when they obtained a copy of the court reporter's transcript of Johnson's testimony in Richard Gray's trial and defense exhibits in Mr. Gray's case.  Mr. Barrett's counsel are currently investigating this newly discovered evidence of prosecutorial misconduct, and will amend this motion to include new details about the breadth and scope of this misconduct as it becomes available to them.

But there is now abundant evidence calling into question Mr. Barrett's conviction. An evidentiary hearing was conducted on Mr. Barrett's motion to suppress on January 26, 2005 (Tr. 1/26/05 Hr'g), Johnson was called by the Government, and testified that the no-knock search warrant he obtained was based on information he received from a confidential informant (later identified as Charles Sanders).  Johnson had used this particular informant at least five times, and the informant had "never been wrong."  (Tr. 1/ 26/05 Hr'g at 66-67.)

On cross-examination, Johnson acknowledged that during the state court proceedings, he had never revealed the name of the confidential informant, and that defense counsel John Echols (who examined Johnson at the motion hearing) was the only one who had asked for the identity.  Johnson admitted writing the name of the C.I. on a piece of paper, which

was placed in a sealed envelope in the state court file. (Tr. 1/ 26/05 Hr'g at 78, 83-90.)

However, Johnson stated that he had revealed the name of the C.I. to the United States

Attorney's Office.  (Tr. 1/ 26/05 Hr'g at 81.)

Johnson testified that before September, 1999 the C.I. had been involved in

criminal activity leading to formal charges.  (Tr. 1/ 26/05 Hr'g at 82-83.)  When counsel asked

Johnson whether the informant had been involved in other criminal activity since September

1999, the Government objected on relevance grounds, and the magistrate sustained the objection,

holding that only what occurred before the no-knock warrant was issued was relevant.  Counsel

responded that he always believed the C.I. was not a real person, but a composite.  (Tr. 1/ 26/05,

Hr'g at 83-90.)  In the state proceedings, one of the reasons given for shielding the alleged C.I.'s

identity was the claim the C.I. was involved in assisting an ongoing investigation until 2004.  Of

course, the claim the C.I.'s identity was being protected for this reason (assuming Sanders was

the C.I.) is obviously false.  Sanders, with the patronage of Clint Johnson, was allowed to

commit crimes at will in Sequoyah County after 1999 with only minor consequences.  The

Government did not want it brought out at the suppression hearing that Johnson's C.I. had

continued to commit crimes with impunity and was therefore an unreliable source.  The

Government, who had been informed of Sanders's identity, was well aware of the litany of

crimes he had committed since 1999, and knew that his identity was not being protected because

of an "ongoing investigation." *(E.g., Giglio v. United States,* 405 U.S. 150 (1972).)

Switching tracks, Mr. Echols asked Johnson if the C.I. had participated in drug

transactions or drug dealing prior to September 24, 1999.  Johnson replied, "They [meaning

drugs] were probably used some, yes, sir."  Asked if the C.I. sold drugs, Johnson stated "Not that

I am aware of."  Asked if the C.I. had run a meth lab, Johnson again replied, "Not that I am aware of, no, sir."  (Tr. 1/ 26/05 Hr'g at  92.)

Johnson, who was presumably aware of Sanders's extensive criminal history before 1999, gave false testimony on this score.  As illustrated in the first stage ineffective assistance of counsel claim, Sanders had a 1986 Arkansas conviction for delivery of cocaine and amphetamines.  Information gathered during this 2255 investigation indicates that Sanders also routinely sold drugs, activities Johnson would have known about if he were regularly in contact with Sanders and not recklessly disregarding the truth of his activities.  (Decls. of Rick Lunsford and Sean Hill.)  Johnson's testimony was false on a material matter and prevented proper development of evidence to challenge the warrant because of the unreliability of the C.I.  The prosecution had every reason to be aware of Sanders's criminal conviction in Arkansas for drug delivery, but stood silently by as Johnson gave false testimony.  *Miller v. Pate,* 386 U.S. 1 (1967).

The Government was well aware of damning evidence regarding the alleged C.I., Charles Sanders, but used objections to prevent counsel from eliciting this information in order to build a record for a motion to suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978).  It was not until trial, when Sanders testified, that only some of his criminal history, but not the many deals and the repeated lenient treatment he had received, was revealed.  By then, the *Franks* challenge that was mounted was incompetent, as detailed in Claim 2.

### 2.    David Michael Littlefield's illicit activities

Following Mr. Barrett's conviction

[United States Attorney Sheldon] Sperling said he is grateful to Mike Littlefield
for his work as chief prosecutor in the case; and to Sequoyah County Sheriff

Johnny Philpot, who was instrumental in identifying key witnesses who could prove Barrett acted with premeditation.

(Tehleqhah *Daily Press*.)  In fact Littlefield himself was responsible for bringing the seven drug-addict informants to support the Government's case, as he stated during the *ex parte* hearing held September 13, 2005, and discussed elsewhere in this Motion.

Former AUSA Littlefield threatened and pressured Travis and Cindy Crawford to provide testimony against Mr. Barrett.  Since Littlefield primarily conducted the interviews of the seven informant witnesses, it is likely that others were threatened as well.  Support for this claim comes from newly discovered evidence of Littlefield's own troubles with the law, and consequent proceedings against him by the Oklahoma Bar Association.

In Muskogee County Case No. CF-07-363, Littlefield was charged with felony child abuse.  On August 3, 2007, Littlefield was permitted to enter an *Alford* plea to count 2 of the Information, charging child abuse by injury in violation of 10 O.S. 2001, section 7115(A).  Based on this plea, Littlefield received a two year unsupervised deferred sentence, and was required to pay court costs.  *See* Complaint, *State of Oklahoma ex rel. Oklahoma Bar Association v. David M. Littlefield,* OBAD #1720, SCBD #5338, filed with the Oklahoma Supreme Court on September 28, 2007.  Littlefield's criminal case file in Muskogee County was expunged even before the Bar Complaint was filed, although his deferred sentence was to run for two years from August 3, 2007.[51]  (Trial Brief of Complainant, p. 2, filed on January 2, 2008, in *State of*

---

[51]  The fact Littlefield's case was expunged long before his two year deferred sentence expired, as noted by the Bar Association's Assistant General Counsel, prevents Mr. Barrett from ascertaining whether Littlefield lied to investigators before entering his plea.  It also prevents Mr. Barrett from ascertaining why Mr. Littlefield received such favorable treatment.

*Oklahoma ex rel. Oklahoma Bar Association v. Littlefield, supra.*)  As of the date of the filing of Mr. Barrett's 2255 motion, the Bar action against Littlefield is still pending.

In the affidavit for search warrant for Littlefield's home, captioned SW-07-34, and filed in the District Court of Muskogee County on April 23, 2007, Jan Ray, a Muskogee County Deputy Sheriff, states in pertinent part that Littlefield had been brutally abusing his minor children for a period of years extending back to the time he was the chief prosecutor on Mr. Barrett's case.  (Affidavit for search warrant, SW-07-34, filed in Muskogee County District Court, April 23, 2007, signed by affiant on April 13, 2007.)

Based on the affidavit, a search warrant was issued on April 13, 2007, and filed in the court record on April 23, 2007.  (Search warrant, SW-07-34.)  Various camera and computer equipment were seized in the search.  (Search warrant return, SW-07-34, filed in the District Court of Muskogee County on April 23, 2007.)

Littlefield did not contest the charges.  He was found guilty on an *Alford* plea, receiving a very generous sentence which has already been dismissed, with the case file expunged.  The Bar Association action against him is still pending.

Littlefield's child abuse charges are relevant to the manner in which he handled the informant witnesses in Mr. Barrett's case.  A bully who apparently had no compunction about using his minor children as punching bags for years to work out his "temper fits" and frustrations would have no problem threatening witnesses with all manner of dire consequences to keep them in line and produce the desired testimony against Mr. Barrett.  This newly discovered evidence regarding Littlefield's own deplorable and shocking criminal conduct against his own children not only corroborates Travis Crawford's and Cindy Crawford's claims they were threatened by Littlefield to secure their testimony, but is also relevant to Mr. Barrett's claim of prosecutorial

misconduct dealing with the manner in which Littlefield handled his informant witnesses in an attempt to prevent defense counsel from having anything close to a reasonable opportunity to investigate the backgrounds of these witnesses and their testimony.

The current defense investigation supports the claim Littlefield routinely sought to intimidate witnesses.   Janice Sanders described her contact with Littlefield:

> Mr. Littlefield came to see me.  Johnny Philpot accompanied him.  Mr. Littlefield got angry with me when I told him that I thought that Kenny's state sentence was fair and that it was un-American to try him again since he had been convicted and sentenced.

(Decl. of Janice Sanders.)

### 3.     John Philpot

The Government argued extensively at trial that a middle-of-the-night, no-knock search warrant had to be issued to search Mr. Barrett's property, and that the authorities had to proceed in the way they did, because Mr. Barrett was dangerous; if he had any warning that police were on his property, he would have shot them.  This was the repeated theme of the Government's case, based on its seven informant witnesses.

The truth is otherwise.  John Philpot, former Sequoyah County Sheriff, recently admitted to a defense investigator that he and other local law enforcement officers were on Mr. Barrett's property less than a month before the raid which led to the death of David Eales, as police reports reflect they had also done the previous year.  There were no shots fired and no violence from Mr. Barrett.  (Decl. of Rodney Floyd.)

This evidence, known to the Government or its agents, was unquestionably exculpatory, in several respects.  Had this fact been known to the defense, the entire edifice of the prosecution's case would have crumbled.  It would have supported an attack on the nighttime,

no-knock warrant, demonstrating there was no probable cause for a warrant of this type. Because the initial warrant lacked probable cause, the fruits of any subsequent warrant, *i.e.,* drugs and firearms evidence later seized, would have been acquired unlawfully, knocking out the foundations of the three counts in the superseding indictment. This evidence would have discredited the seven snitches, some of whom claimed that were told by Mr. Barrett that if the police came on his property, he would shoot the first one through the door, and that he hoped the first officer through the door would be John Philpot. This evidence would have demonstrated that, as the defense argued, Mr. Barrett was unaware the police were raiding his property; he thought he was repelling civilian trespassers. Even if convictions had been returned, this evidence was relevant to rebutting the intent factors alleged by the Government in the punishment phase.

## Conclusion

Certainly when viewed together, the exculpatory evidence suppressed by the Government, some of which could also be termed newly discovered evidence, the other newly discovered evidence discussed above, and the Government's sponsorship of false testimony would have made the difference between conviction and acquittal at trial. At a minimum, it would have made a difference in the sentencing stage.

The Government suppressed and has continued to suppress evidence which would have dealt fatal blows to Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Karen Real, Randy Turman, Clint Johnson, Vickie Lyons, and John Philpot. At least two of the informant witnesses, Travis and Cindy Crawford, testified based on threats from then-AUSA Littlefield, a fact well known, obviously, to Littlefield himself. The suppressed exculpatory or newly discovered evidence, or both, affecting the credibility of these witnesses,

were known and became known to the Government and its agents.  This evidence  was unquestionably favorable to Mr. Barrett, and was material in the sense that disclosure of this evidence would have created a reasonable probability of a different outcome.  *Strickler v. Greene,* 527 U.S. 263, 289 (1999); *United States v. Bagley,* 473 U.S. 667, 682 (1985); *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994).

Taken together, the suppressed exculpatory evidence addressed above would have been fatal to the admissibility of all the physical evidence introduced against Mr. Barrett, and would have left in shreds the prosecution's claims of Mr. Barrett's "intent," as testified to by the seven informants.  Newly discovered evidence in the form of after-the-fact deals given to various prosecution witnesses – which Mr. Barrett contends still constitutes *Brady* material, because these deals were in the works or promised all along, and because the prosecution's duty under *Brady* is continuing – would have shown the various snitch witnesses to have no credibility whatever.  *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002)(habeas relief granted in section 2254 case where exculpatory evidence, even if it could only be used for impeachment purposes, was suppressed); *Mitchell v. Gibson,* 262 F.3d 1036, 1059-60, 1062-63, 1065 (10th Cir. 2001)(vacating death sentence in 2254 case for failure to reveal exculpatory evidence of testing on physical evidence); *Nuckols v. Gibson,* 233 F.3d 1261 (10th Cir. 2000)(habeas relief granted in section 2254 case where prosecution failed to disclose material evidence impeaching a key prosecution witness).

Travis Crawford's recantation, if known at the time of Mr. Barrett's trial, belies the prosecution's theory of intent and could have been used to impeach the credibility of other witnesses' claims that Mr. Barrett had threatened armed confrontation with the police.  Likewise, had the former AUSA's violent temper and assaultive behavior against his own children been

known at the time of Mr. Barrett's trial, the claims now made by the Crawfords that they were coerced to testify against Mr. Barrett ring true.  The newly discovered evidence discussed here goes to the foundation of the case.

Most troubling, of course, is the Government's sponsorship of false evidence from Randy Turman, Charles Sanders and, at the motion to suppress, from Clint Johnson.  This evidence clearly affected the outcome of trial.  Threats to witnesses Travis and Cindy Crawford is also a form of false evidence; a threatened witness is, *per se*, an unreliable witness.  The Government also misled the jury about what it was going to do for Sanders and Karen Real in exchange for their testimony, in violation of *Giglio.*

The misconduct of the prosecutors was repeated and blatant.  Mr. Barrett's fundamental constitutional rights were violated.  He should be granted relief from his convictions and sentences.

**C.  Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses**

The prosecution violates a defendant's right to due process when it interferes with the defense's access to prosecution witnesses.  *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969).  It is unprofessional conduct for prosecutors to impede defense counsel's access to prosecution witnesses.  (ABA Criminal Justice Standards, Pros. Function § 3-3.1(c) & commentary (3d ed. 1993)("ABA Standards").)  "It is imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights."  *United States v. Rich*, 580 F.2d 929, 934 (9th Cir.), *cert. denied*, 439 U.S. 935 (1978).  Thus courts cannot tolerate "any governmental conduct that has the purpose or effect of discouraging witnesses from cooperating with the counsel of an accused."  *Ibid.*  Thus,

"counsel may not make his or her presence a condition of the interview" between the defense lawyer and a witness.  (Commentary on Standard 3-3.1(c).)

The prosecution in Mr. Barrett's case interfered with the defense's access to key prosecution witnesses including Karen Real, Randy Turman, Randall Weaver, Charles "Monk" Sanders, Cindy Crawford, Travis Crawford, and Brandie Price.  Prosecutors, through statements and/or actions, communicated to witnesses that they should not speak with defense personnel outside the presence of the prosecutor.  (Decl. Roger Crawford; Decl. Leonard Post.) Additionally, the prosecutors intentionally delayed access to the identities of the witnesses in order to prevent meaningful interviews with them, including by preventing interviews with incarcerated witnesses, and to prevent meaningful investigations of their backgrounds and honesty.

Prosecutors intentionally withheld the names and contact information for these witnesses.  On February 17, 2005, prosecutor D. Michael Littlefield wrote in a letter to defense counsel that the Government did not intend to reveal the identity of the confidential informant, and added the "situation would change should we determine to utilize this individual as a witness."  The Government did not reveal the identities of its seven key witnesses until September 15, 2005.  In order to keep the identities secret past the deadline imposed by 18 U.S.C. § 3592, the Government filed a baseless motion for a protective order.  The trial court found the Government could have filed its motion to keep the witnesses' names from the defense weeks earlier.  (Tr. 9/13/05 Hr'g at 5).  The trial court found the Government's motion did not present any evidence to justify withholding the names and other information from the defense. (Tr. 9/13/05 Hr'g at 4).  The prosecutor admitted that the Government could have raised its concerns about at least some of the witnesses earlier.  *Id.* at 9.  Despite the delay the court found

"there is no evidence of any overt activities by anyone on behalf of the defendant to intimidate witnesses that you [the Government] are aware of." *Id.* at 19.[52]

During an *in camera* the hearing on the Government's motion for a protective order, AUSA Littlefield was not candid with the court. The court appeared to recognize that Littlefield was making inconsistent claims. On the one hand he was claiming that the defense attorneys had sufficient notice of the witnesses (a) because they were Mr. Barrett's associates and family members (Tr. 9/13/05 Hr'g at 9-10), and (b) because the Littlefield told defense counsel what the witnesses would testify to. *Ibid.* The court raised the obvious point that if Littlefield had been so forthcoming, there was no need for secrecy because, the disclosed information would be sufficient for Mr. Barrett "to be able to determine roughly who we are talking about." *Id.* at 11. Littlefield said it would not be. This admission strongly suggests Mr. Barrett was not aware of having said the things attributed to him by the witnesses because he had never said them.

At that point the United States Attorney cut Littlefield off and had an off-the-record discussion. Back on the record, Littlefield said that the notice he had provided would be insufficient to identify the witnesses because Mr. Barrett had said these things to so many people, it would be hard for him to remember them all. Littlefield could produce no evidence of this "belief" he had. *Id.* at 12.

Following the *in camera ex parte* hearing, the Government and Judge Payne withheld from defense counsel information that was critical to the defense including: (a) that the court's research indicated that for purposes of § 3532 the trial had started the previous day; (b)

---

[52] The only person the Government could point to who had any known affinity with Mr. Barrett that could conceivably suggest a threat, was a man who posed no threat whatsoever because he was in a federal prison somewhere. *Id.* at 14.

that the court indicated a request for a continuance would be valid based on the importance of the witnesses and what they would say; (c) that the Government had made representations about defense counsel's interpretation of § 3532; (d) that AUSA Littlefield had spoken with a witness who failed to corroborate information from confidential informant Charles Sanders; (e) that the Government's motion for a protective order relied upon information the court deemed irrelevant – *viz.* that the court permitted Mr. Barrett to be restrained by an electric-shock belt and that the court would keep jurors anonymous – and lacked sufficient factual support; (f) that the prosecutors revealed *in camera* information that fell within the notice requirements of Federal Rule of Evidence 404(b).  *See* Claim 1, *supra*.

To the extent Mr. Barrett's trial counsel acquiesced in the prosecutors' plan to delay production of the witnesses' names, contact, information, statements, and the arrangements for interviewing the witnesses, Mr. Barrett was denied his right to effective assistance of counsel. As the prosecutor said, Mr. Barrett's trial counsel had no information about the identities of the witnesses or the content of their testimony.  (Tr. 9/13/05 Hr'g at 6-7).  With the information withheld from them, trial counsel could not have made an informed decision regarding whether delayed disclosure was acceptable, whether the arrangements for interviews were acceptable, and whether trial counsel were ready for trial once the witness names were known.  *Rompilla v. Beard*, 545 U.S. 374, 383-86 (2005) (failure to investigate evidence prosecution intended to rely upon was obviously deficient); *Wiggins v. Smith*, 539 U.S. 510, 533-34 (2003) (failure to investigate could not be justified where trial counsel had inadequate basis for decision); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984) (decisions are reasonable only to extent supported by adequate investigation).

The concerns of any reasonable defense lawyer under the circumstances – including the need for a continuance – were obvious to the trial court. (Tr. 9/13/05 Hr'g at 10, 12.) The record shows defense counsel acquiesced in the Government's proposal that witnesses be interviewed with Government representatives present. *Id.* at 27. In addition to this "decision" being professionally unreasonable, it was to some extent induced by the trial court's failure to disclose weaknesses the Court had identified in the Government's position, weaknesses the court disclosed to prosecutors, but not to the defense. *See* Claim 1, *supra*. Neither Mr. Barrett nor his counsel could have made an informed decision about access to the witnesses without the information the trial court possessed but was unwilling to share with the defense. To the extent Mr. Barrett's trial counsel could have uncovered the same legal arguments the court identified, they failed to act professionally.

Faced with the Government's intentional delay (the confidential informant at least was known to the Government from the start), and the Government's pretextual expression of concern for the witnesses' safety, and ignorant of the Court's views and complicity in extending the delay, Mr. Barrett's trial counsel "agreed" to restrictions on their access to witnesses. The Government's promise of restricted access was itself illusory. Mr. Barrett's counsel were unable to conduct any meaningful interviews of the witnesses prior to trial. The delays also prevented or impeded meaningful investigation of the witnesses. As shown *supra* in this Claim and Claim 2, an investigation of the Government's key witnesses would have yielded abundant evidence of their dishonesty and incentives to color their testimony to the desires of law enforcement.

If trial counsel had met their ethical and constitutional obligations to Mr. Barrett, there is a reasonable probability the outcome of the case would have been different. In the absence of the seven snitches' testimony two prior juries refused to convict Mr. Barrett of capital

murder. As the trial judge repeatedly asserted in his budget rulings and elsewhere in the record, the main difference between the federal case and state cases was the question of premeditation, or a pre-formed intent to kill. As the United States Attorney has publicly acknowledged, the seven snitches were key to the Government's ability to convince the jury Mr. Barrett acted with the requisite *mens rea*. But for the Government's misconduct or trial counsel's deficient performance, the evidence presented herein would have impeached the seven witnesses. It is reasonably probable that if the witnesses had been impeached with the evidence presented herewith, Mr. Barrett would not have been convicted of capital murder, or would not have been sentenced to death.

### D. Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses and Closing Argument

Throughout the penalty phase of Mr. Barrett's trial prosecutors repeatedly and in various ways violated rules of professional conduct regarding the questioning of witnesses. *(See ABA Standard 3-5.6.)* These improper questions, together with the prosecutor's "comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

The prosecutor's improper conduct included the following examples: The prosecutor improperly asked questions for which he lacked a good faith basis, or to which he knew the witness could not give an answer based on personal knowledge, the effect being to imply that the prosecutor had knowledge of the facts. (R. 4743 (implying existence of records adverse to Mr. Barrett), 4765-66, 4781 (implying Mr. Barrett had been denied custody of his son), 4788-92, 4850, 4852-53, 4859, 4862, 4866, 4869, 4911, 4913, 4925 (bolstering Karen Real

by implying prosecutor's knowledge of her reputation for honesty), 4980, 5006 (falsely suggesting prosecutor had knowledge of Mr. Barrett trying to infect jail worker with communicable disease).)

The prosecutor improperly commented upon Mr. Barrett exercising his trial rights in state court. (R. 4765.) The prosecutor improperly adduced through a witness who lacked personal knowledge whether someone who is sentenced to 20 years' imprisonment will be released earlier by the Department of Corrections. (R. 4765-66.)

The prosecutor asked witnesses whether other witnesses had made false statements although, due to Federal Rule of Evidence 615, the witness being questioned could have had no knowledge of the other witnesses' testimony. (R. 5092.)

The prosecutor repeatedly exceeded the scope of direct examination and asked witnesses questions about the seven informant witnesses the Government presented in federal court, or Abby Stite's charges against Mr. Barrett, although – or because – the prosecutor knew the witnesses lacked personal knowledge of the facts. (R. 4767, 4788-92, 4925, 4926, 5024-26, 5045 (Littlefield acknowledging he asked question knowing witness had no personal knowledge), 5069, 5116.) As the prosecutor's obvious goal was to merely repeat the testimony of witnesses who claimed to observe various facts, regardless of whether the witness testifying had said anything related to the other witnesses' testimony, the questioning lacked any probative value and trial counsel were ineffective for failing to object. The effect of the prosecutor's improper questioning was to repeat the Government's case over and over and over, and make defense witnesses appear ignorant of facts to which their testimony did not relate. Ultimately, the prosecutor's misconduct – enabled by trial counsel's unreasonable failure to object – completely drowned out the defense witnesses' testimony.

In arguing for death, the prosecutors stooped to conquer.

In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently.  Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards."  (R. 5356-57.)  The Tenth Circuit has condemned similar tactics. *Paxton v. Ward,* 199 F.3d 1197, 1217 (10th Cir. 1999) (prosecutorial misconduct justified sentencing relief where, in connection with unadjudicated homicide introduced in the penalty phase, prosecution objection prevented defendant from showing the charge had been dismissed because he passed a polygraph test, and prosecutor took advantage of the ruling to argue "we don't know why" the case was dismissed, implying dismissal could have stemmed from a technicality).

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer.  This was "way over the capital murder line."  (R. 5402-03.)  Similarly, Sperling later asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?"  (R. 5412.) Denigrating Mr. Barrett's fundamental right to a fair trial,  Sperling, in the form of a rhetorical question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness."  (R. 5408.)

Trotting out a variation on the old Bob Macy[53] "three hots and a cot" argument, which the Tenth Circuit has condemned on more than one occasion, Sperling repeatedly – and falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room." (R. 5412, 5423.) Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. (R. 5412.) Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. (R. 5412.) *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin,* 311 F.3d 1002, 1014-15 (10th Cir. 2002). In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent." (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence." Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?" The prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill." (R. 5412-13.)

---

[53] Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[54], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough." to testify. R. 5414-15. *Gordon v. Kelly,* 2000 WL 145144 (6ᵗʰ Cir. Feb. 1, 2000) (unpublished) (pervasive efforts by prosecutor to portray defendant as being feared by witnesses required habeas relief).

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them. To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. R. 5415. This falsely implied the victim impact witnesses did not testify in the state trials only because the incompetent, "under-evidenced" state prosecutors did not have sense

---

[54] This was a knowing false statement on the prosecutor's part. As discussed in Claim 1, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett. "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

enough to put them on the stand. Sperling was well aware they *could not have testified by law* because the case never got past the first stage.

Shielded by the court's erroneous ruling excluding Mr. Barrett's statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]." R. 5419. The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did. Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone. Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing." The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops." R. 5420-21. There were additional comments on Mr. Barrett's supposed lack of remorse. R. 5419-20, 5421-22. *Paxton v. Ward,* 199 F.3d at 1217.

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life. (R. 5420.) *Cf. Penry v. Lynaugh,* 492 U.S. 302, 319 (1989); *Lockett v. Ohio,* 438 U.S. 586 (1978).

Sperling aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again. (R. 5421-22.) Remarks of this nature have always been deemed improper. *Viereck, v. United States,* 318 U.S. 236, 247-48 (1943); *Cargle v. Mullin,* 317 F.3d 1196, 1223 (10th Cir. 2003). Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warned the jury they would make him a "hero" in prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time." (R. 5423.) This was little better than telling the

Def's § 2255 Mot.        304        *U.S. v. Barrett,* 6:04-CR-115-JHP-SPS

jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit. *Bates v. Bell,* 402 F.3d 635, 642 (6th Cir. 2005).

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections. *See* Claim 2. *Darden v. Wainwright,* 477 U.S. 168 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). The error stemming from prosecutorial misconduct cannot be termed harmless, even under the strict due process test of *Darden* and *Donnelly.* This was not a runaway case for the death penalty. The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

Prosecutorial misconduct was not raised on direct appeal. Because the misconduct of the prosecutors in the second stage of trial was so glaring, no reasonable strategy excused the failure to raise the claim. Based on the fact the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different. *Evittts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 6.     Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth and Fourteenth Amendment of the United States Constitution, to due process, to effective assistance of counsel, to a reliable sentence, to present defense evidence, and to rebut the evidence introduced against him were violated when the trial court unduly restricted defense counsel's opportunity to present significant, relevant and admissible *defense* evidence and facts to the jury, including various statements by Mr. Barrett around the time of his arrest that showed deep remorse for the death of Trooper David Eales, and restricted the jury's consideration of the state-court verdict.

The court's exclusion of this essential evidence during penalty phase proceedings violated Mr. Barrett's right to jury consideration, as a mitigating factor, of important evidence of Mr. Barrett's character, in violation of *Skipper v. South Carolina*, 476 U.S. 1 (1976) and *Lockett v. Ohio*, 438 U.S. 586 (1978).   The exclusion of this evidence also violated Mr. Barrett's Sixth Amendment right to offer evidence in support of his claims.  *Rock v. Arkansas*, 483 U.S. 44 (1987).  The exclusion of this evidence deprived Mr. Barrett "of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986).  These restrictions also denied Mr. Barrett the opportunity to conduct an effective cross-examination of prosecution witnesses, in violation of Mr. Barrett's rights under the Confrontation Clause of the Sixth Amendment.  *Delaware v. Van Arsdale*, 475 U.S. 673, 678 (1986).  Finally, the trial court's rulings on this issue fatally infected the proceedings and violated Mr. Barrett's due process rights.  *Estelle v. McGuire*, 502 U.S. 62, 70 (1991); *Moore v. Illinois*, 408 U.S. 786, 800 (1972).

During the course of Mr. Barrett's trial, trial counsel sought to admit a number of statements made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper Eales.  For example, Mr. Barrett's counsel sought to admit the written statement of

884

Trooper Glen Smithson, who recorded that on September 29, 1999, Mr. Barrett told him, "The wrong person got killed. I wished it had been me." (Police Report dated September 29, 1999.)

However, the prosecutor objected to these statements, and the court incorrectly excluded them. The Government cynically exploited the court's ruling in closing argument, mocking the notion Mr. Barrett had any remorse at all. The prosecutor fastened on Mr. Barrett's statement to his mother that he wished things had turned out differently, which AUSA Littlefield stated meant Mr. Barrett had wished he had not gotten caught so he could "kill more of the bastards." (R. 5356.) With Mr. Barrett's expressions of remorse excluded, the United State Attorney was able, without fear of contradiction, to call him a "common, cold-blooded murderer." (R. 5423.) During closing argument, Mr. Barrett's counsel argued, as a factor in aggravation, that Mr. Barrett expressed remorse for his crimes. As a result, all of the jurors rejected as a mitigating factor that Mr. Barrett expressed remorse for his crimes. *U.S. v. Barrett*, 496 F.3d 1079, 1088 (10th Cir. 2007).

By refusing Mr. Barrett's attempts to present evidence of his contemporaneous expressions of remorse, the Court prevented Mr. Barrett from proving the existence of this factor in mitigation. In fact, Mr. Barrett's expressions of remores were highly relevant and admissible. Remorse is "an important mitigating factor." *Jones v. Polk*, 401 F.3d 257, 264 (4th Cir. 2005). *See also Riggins v. Nevada*, 504 U.S. 127, 144 (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps be determinative of whether the offender lives or dies.") This is particularly true when, as in this case, the Government "emphasized the lack of remorse in closing argument." *Jones v. Polk*, 401 F.3d at 264.

"Short of a defendant taking the stand, often the only way to present evidence of remorse is through the hearsay statements of others." *Davis v. Polk*, 2007 WL 2898711, at \*18 (W.D.N.C. 2007).   Accordingly, the use of hearsay rules to prevent the admission of expressions of remorse violates the *Lockett* line of cases, which hold:

> that 'a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could not be part of the sentencing decision at all.

*Jones v. Polk*, 401 F.3d at 263 *quoting Johnson v. Texas*, 509 U.S. 350, 362 (1993) (court erred in excluding as hearsay at penalty phase letter in which capital defendant expressed remorse).

The court's error in excluding this evidence prejudiced Mr. Barrett.  Had Mr. Barrett been allowed to present this evidence, there is a substantial probability that he would not have been sentenced to death.  The court clearly erred in excluding this evidence, because the rules of evidence, with respect to the introduction of both mitigating and aggravating evidence, do not apply in the sentencing stage of a capital case.  21 U.S.C. section 848(j), in effect at the time of Mr. Barrett's trial, that any other information a party may want to submit is not constrained by the rules of evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice.  Because a defendant must be allowed under the Eighth Amendment to introduce any relevant mitigating evidence, it beggars the imagination to believe that expressions of remorse are more prejudicial than probative.  The court excluded highly relevant mitigating evidence of remorse, which opened the door for the Government to prejudicially deride Mr. Barrett as a cold blooded killer who wanted to take out more cops.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced

the jury's verdict.  *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on Mr. Barrett's conviction and death sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel was ineffective for failing to raise this issue, clearly framed by the record, on direct appeal.  Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded.  *Skipper v. South Carolina,* 476 U.S. 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Lockett v. Ohio,* 438 U.S. 586 (1978).  There could be no reasonable strategy for neglecting to raise this issue.  There is a reasonable probability that had it been raised, the outcome of the appeal would have been different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 7.**     **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the U.S. Marshal to place visible restraints on Mr.

Def's § 2255 Mot.                          309                     *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Barrett during the trial without a finding that Mr. Barrett was or would be a security risk. Throughout the trial Mr. Barrett was forced to wear a "stun belt" around his waist. The belt left an unusual bulge that was visible through Mr. Barrett's clothing. The marshals ability to send an electric shock through the belt intimidated Mr. Barrett and posed a danger to him that impaired his ability fully to observe and participate in the trial, including communicating with his attorneys.

The Supreme Court has long held that the use of visible restraints on a defendant without a particularized finding of necessity violates due process and can impair a defendant's Sixth Amendment right to effective assistance of counsel, to a presumption of innocence, and to a fair and reliable capital sentencing proceeding as guaranteed by the Eighth Amendment. *Deck v. Missouri*, 544 U.S. 622, 632 (2005); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle v. Williams*, 425 U.S. 501 (1976); and *Illinois v. Allen*, 397 U.S. 337 (1970).

During a sealed hearing held August 31, 2005, a deputy U.S. Marshal testified that there were never any problems with Mr. Barrett acting out or showing any signs of being a risk of danger or escape. The Court opined that the mere fact that a stun belt had been used against other capital defendants without their lawyers complaining was a ground to permit its use. Mr. Barrett had been through two previous capital trials related to the same events and during that time never posed any security risk or risk of escape. In sum, none of the constitutionally required circumstances existed to justify placing visible and/or intimidating constraints on Mr. Barrett during trial.

On September 9, 2005, the Court abdicated its role and consigned the question of whether to place restraints on Mr. Barrett to the discretion of the U.S. Marshal service. This

Def's § 2255 Mot.                              310                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

ruling violated Mr. Barrett's rights under the cases cited *supra*, and his right to a fair and impartial trial judge.  *See also* Claim 1.

In an *ex parte* hearing outside the presence of defense counsel, the trial judge stated that "probably any capital case where I was the presiding judge a stun belt would be used just because of the nature of the potential punishment.  It just seems that it's a common – almost a common sense call under those circumstances." (Tr/ 9/13/05 ex parte Hr'g at 13.)  The Supreme Court requires much more than a "common sense call" before a defendant can be restrained in a threatening manner during a capital trial.

The stun belt created a visible bulge in Mr. Barrett's clothing that was observable by the jury.  (Decl. Doris Barrett). In addition, Mr. Barrett was known by the Government and Court to be a victim of violent abuse by Sheriff Johnny Philpot and his deputy.  Indeed, the jury found that Mr. Barrett had suffered abuse from Philpot.  The Government and Court also were aware that Mr. Barrett had been beaten and threatened by law enforcement officers for his role in the death of David Eales.  Under the circumstances it was reasonable for Mr. Barrett to fear that he would be stunned by the marshals on the slightest perceived provocation, and as this issue was raised by trial counsel, the Court was aware that the stun belt would inhibit Mr. Barrett's movements and communications with counsel in court.  After all, he was to be restrained even though the marshals admitted he had never caused them any trouble.

Trial counsel informed the court that Mr. Barrett was at special risk from the stun belt due to conductive steel wire in his chest and abdomen area.  (Tr. 9/9/05 Hr'g at 27.)  (Trial counsel's statement at this hearing reveals that three days before the trial began trial counsel Hilfiger had not reviewed Mr. Barrett's medical records which clearly mention – and in the case of x-rays, depict – the metal wires in Mr. Barrett's chest.)  Trial counsel's statements informed

the court that Mr. Barrett was especially fearful of the stun belt and the danger it posed to him. This fear was exacerbated by the marshal's failure to conduct or inquire about Mr. Barrett's unique medical circumstances.  Since the trial, trial counsel have confirmed that Mr. Barrett felt intimidated wearing the stun belt throughout the trial.

The unjustified use of restraints on Mr. Barrett inhibited his movement and communications with counsel and made him appear dangerous to jurors.  The stun belt scared and intimidated Mr. Barrett and chilled his communications, and restricted his ability fully to observe and participate in the proceedings.

To the extent the stun belt was used without sufficient justification, its use was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance.  The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt.  In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness.  Therefore, there is a reasonable probability that Mr. Barrett would have been granted a new trial if the issue had been raised on direct appeal.

To the extent the record was insufficiently developed for this claim to have been raised on direct appeal, trial counsel's performance was deficient.  Counsel recognized the serious danger for prejudice and continued to object on September 9, 2005, when the Court gave the marshal discretion to restrain Mr. Barrett without either the prerequisite legal or medical showings of necessity or safety.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 8.     Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Mr. Barrett was tried, convicted and sentenced to death when he was in fact mentally incompetent to stand trial.

The federal constitutional due process guarantees of a fair trial, at which the accused has a right to be present and rationally participate in the proceedings, prohibit the trial of a defendant who is mentally incompetent. *Medina v. California*, 505 U.S. 437, 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966). It is therefore "well-settled that the 'criminal trial of an incompetent defendant violates due process.'" *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001) (en banc) (quoting *Media v. California*, 505 U.S. at 453).

A defendant is mentally incompetent if, as the result of mental disease or defect, the defendant is unable to comprehend the nature of the proceedings or rationally assist counsel

in conducting the defense. *Drope v. Missouri*, 420 U.S. at 172; *see* 18 U.S.C. § 4241. Where a preponderance of the evidence shows that a defendant lacks the requisite understanding or ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper v. Oklahoma*, 517 U.S. 348 (1996); *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990).

The substantive due process violation that resulted from requiring Mr. Barrett to stand trial while he was mentally incompetent may be established by any relevant evidence, including both the evidence available at the time of trial, as well as any evidence developed since then. *Odle v. Woodford*, 238 F.3d 1084, 1090 (9th Cir. 2001) (determination whether defendant was incompetent in fact required consideration of "old" evidence of mental state evidence at trial and "new" evidence of post-conviction psychiatric evaluations); *Reynolds v. Norris*, 86 F.3d 796,802 (8th Cir. 1996); see, also, *Gilbert v. Mullen*, 302 F.3d 1166, 1178 (10th Cir. 2002) (discussing different burdens of proof for substantive and procedural competency claims).

The factual allegations set forth in more detail in Claims 2 and 13, and incorporated by this reference as though fully set forth; and the supporting documentary and record evidence submitted with and/or incorporated by reference into this petition irrefutably demonstrates that Mr. Barrett was incompetent as a matter of clinical and medical fact at all stages of the trial proceedings. At the time of his trial, Mr. Barrett had a documented psychiatric history, including medical diagnosis of Bipolar Disorder, a serious mental illness known to produce "bizarre behavior," impair judgment and distort perceptions. *Williamson v. Ward*, 110 F.3d 1508, 1519 (10th Cir. 1997). Mr. Barrett was involuntarily committed to psychiatric hospitals on two occasions and forcibly treated with antipsychotic medication.

In the months preceding Mr. Barrett's arrest, he was psychiatrically decompensating, and his disordered thinking became increasingly paranoid and delusional as he became preoccupied with the distorted belief that he was being monitored by some form of unknown aircraft; and withdrew to his rundown shack, unable to venture into the outside world. Mr. Barrett's mental state was further impaired by brain damage, particularly in the areas that are necessary to reason, exercise sound judgment and inhibit overreaction to stress situations. Neuropsychological assessment of Mr. Barrett by Dr. Myla Young has revealed that prior to and throughout Mr. Barrett's trial, he suffered brain dysfunction that seriously disrupted his executive functioning, compromising his ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior; screen out interference and sustain attention; inhibit reflexive responses and return to ongoing activity; efficiently integrate multiple outputs; oversee the selection of verbal and non-verbal processing mechanisms; regulate emotional control; direct motor output; and adequately process and make use of new information.   (Declaration of Myla H. Young, Ph.D., at ¶¶ 36-38;  Declaration of George W. Woods, Jr. M.D., at ¶¶ 57-58.)

George W. Woods, Jr., M.D., a clinical and forensic psychiatrist, has concluded that Mr. Barrett was incompetent at the time of trial, based on Dr. Woods's review of extensive life history and medical data, his clinical evaluation of Mr. Barrett in February 2009, and his consideration of Mr. Barrett's psychiatric diagnosis of Bipolar Disorder and Post Traumatic Stress Disorder (PTSD), as well as the neuropsychological findings of Dr. Young.  In Dr. Woods's expert medical opinion, Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial due to a confluence of his psychiatric disorders (Bipolar Disorder and PTSD) and his neurocognitive dysfunction resulting from his brain damage.  (Decl. of George Woods, Jr., M.D., at ¶ 81.)  The distorting and distracting effects of the PTSD were exacerbated

by "built-in reminders," in the form of bullet fragments that caused Mr. Barrett continual and significant pain, and an immunological reaction he had to the bullet fragments in his body. (*Id.* at ¶ 79.) In turn, Mr. Barrett's ability to rationally perceive and attend to legal proceedings was significantly compromised by the racing thoughts indicative of the disabling "manic form" of Bipolar Disorder. (See *Williamson v. Ward*, 110 F.3d, at 1519; Decl. of George Woods, Jr., M.D., at ¶ 80.) These disabling impacts on Mr. Barrett's mental state were synergistically increased by the effect of his brain damage to produce a "ruminative" thought process, which prevented Mr. Barrett being "unable to get unstuck." (Decl. of George Woods, Jr., M.D., at ¶ 80.) This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Id. at ¶¶ 59, 80.)

As discussed more fully in Claim 13 the trial record reflects the functional impacts of Mr. Barrett's cluster of impairments. Mr. Barrett could not regulate his verbal output or emotional control after he became agitated by some aspect of the prosecutor's closing argument. His involuntary remarks were heard by persons in the courtroom, and his reflexive motoric reaction of attempting to stand prompted intervention by the courtroom marshals. Once contained and redirected, Mr. Barrett was escorted from the courtroom without further incident. Mr. Barrett's uncontrolled behaviors, however, disrupted the proceedings and likely had a deleterious effect on the jury's deliberations. Mr. Barrett's reflexive, self-harming comments and actions occurred without regard to social context or the damage they threatened to inflict on his case, and demonstrate that he was unable rationally to assist with his defense. Because such behaviors were the product of Mr. Barrett's mental diseases and defects, he was incompetent to stand trial.

The trial and sentencing of Mr. Barrett while he was actually mentally incompetent constitutes a deprivation of due process necessitating the granting of habeas corpus relief without a further showing of prejudice. *Pate v. Robinson*, 383 U.S., at 386-387; *Dusky v. United States*, 362 U.S. 402 (1960). The error deprived Mr. Barrett of a fair and reliable determination of guilt and penalty. *Pate v. Robinson*, 383 U.S., at 386.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 9.** **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense. Direct Appeal Counsel Was Ineffective for Failing to Raise this Issue.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

In a capital case, where the evidence supports it, a court must instruct the jury on a lesser- included homicide offense. This "third option" between first degree murder and acquittal helps insure the reliability of any death verdict if the defendant is convicted of first degree murder. *Beck v. Alabama,* 447 U.S. 625 (1980). *See also, Turrentine v. Mullin,* 390 F.3d 1181, 1192-94 (10th Cir. 2004), *cert. denied*, 545 U.S. 1106 (2005); *Hogan v. Gibson,* 197 F.3d 1297 (10th Cir. 2000), *cert. denied,* 121 S.Ct. 332 (2000)(finding *Beck* error for failing to instruct on lesser forms of homicide).

Here, both the prosecution and the defense requested the trial court instruct on voluntary manslaughter. (R. 4212, 4213, 4215, 4218-19. 18 U.S.C. section 1112.) The United

States Attorney conceded there was evidence in the record that raised this lesser offense, because testimony indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's actions in firing on the vehicle could be seen as an imperfect form of self-defense or defense of another, reducing the crime to voluntary manslaughter.  Consistent with the reasoning behind *Beck v. Alabama, supra* the prosecutor stated that because this was a capital case, caution dictated a lesser included-offense instruction be given.  The United States Attorney distinguished count 3 from counts 1 and 2 (which in essence charged felony murder), because count 3 had a specific knowledge and intent element.  To be guilty of count 3, Mr. Barrett had to have more than the intent required to commit an underlying felony, which alone would supply the necessary intent for first degree murder in the usual felony murder case.  As suggested by the Government, and as the court ultimately instructed the jury, to be guilty of count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed Trooper Eales, knowing or having reason to know he was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties.  (R. 4215-19, *See also,* Doc. 240, first stage jury instructions; R. 4262-63, elements of count 3.)  The court declined to instruct on voluntary manslaughter, ruling the case came down to "murder one or nothing."  (R. 4211, 4222.)

The court's ruling violated Mr. Barrett's Fifth Amendment due process rights and his Eighth Amendment rights to a reliable sentencing determination.

This circuit applies a four-part test to determine whether an instruction on a lesser-included offense is warranted: 1) there must be a proper request; 2) the lesser offense consists of some, but not all, of the elements of the greater offense; 3) the element or elements distinguishing the greater and lesser offense are in dispute; and 4) based on the evidence, the jury

could rationally convict the defendant of the lesser offense and acquit him of the greater offense. *United States v. Chanthadara,* 230 F.3d 1237, 1257 (10th Cir. 2000); *United States v. Abeyta,* 27 F.3d 470, 473 (10th Cir. 1994). "In the federal courts, it has long been beyond dispute" that a defendant is entitled to an instruction on a lesser offense if the evidence would permit a rational

jury to find him guilty of the lesser offense and acquit him of the greater. *Keeble v. United States,* 412 U.S. 205, 208 (1974).

All four requirements for an instruction on voluntary manslaughter were met in Mr. Barrett's case.

There was a proper request, not only by Mr. Barrett, but from the Government as well.

The lesser offense consists of some, but not all, of the elements of the greater offense. The elements of voluntary manslaughter are: 1) the defendant killed the victim; 2) the defendant acted unlawfully; 3) while in a sudden quarrel or a heat of passion, and therefore without malice, the defendant either a) intentionally killed the victim, or b) intended to cause serious bodily injury, or c) acted recklessly with extreme disregard for human life. "Intentionally killed" means either 1) a specific purpose to take the life of another human being, or 2) a willingness to act knowing that the death of another human being is practically certain to follow from that conduct. "Heat of passion" is a passion, fear or rage in which the defendant loses normal self-control, as a result of circumstances that provoke such a passion in an ordinary person, but which did not justify the use of deadly force. Voluntary heat of passion manslaughter is "murder without malice." (Tenth Circuit Pattern Jury Instruction 2.54.) *See also, e.g., United*

*States v. Scafe,* 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir. 1987).

The pertinent elements of count 3 of the superseding indictment, which distinguish it from a "straight" felony murder because a specific intent in connection with the homicide is required, as opposed to simply the intent to commit an underlying felony, are the intentional killing of a state law enforcement officer, whom the defendant knew or had reason to know was a law enforcement officer, and who was killed while engaging in *and on account of* the performance of his official duties. (Doc. 240; R. 4262-63.)

The distinction between the elements of count 3 and voluntary manslaughter is intent. The elements of voluntary manslaughter are a subset of the greater offense, since it would be impossible to commit the greater offense without first committing the lesser offense, *i.e.,* the intentional killing of another human being. The lesser offense of voluntary manslaughter contains no element not required for the greater offense charged in count 3; again, the distinction lies in the level and nature of intent. *Schmuck v. United States,* 489 U.S. 705, 716 (1989).

In Mr. Barrett's case, the element or elements distinguishing the greater and lesser offenses were in dispute. The crux of the whole case was knowledge and intent. The Government contended Mr. Barrett intentionally killed Trooper Eales knowing or having reason to know he was a law enforcement officer engaged in the performance of his official duties, and on account of the performance of those duties. The defense theory was that when Mr. Barrett saw an ordinary, unmarked vehicle he had no idea contained police officers speed toward his house and his son, Toby, he reacted out of fear and fired. This circumstance, while perhaps not justifying the use of deadly force, would have aroused a "heat of passion" in any ordinary individual.

Finally, based on the evidence, a rational jury could convict Mr. Barrett of the lesser-included offense and acquit him of the greater offense. *This is exactly what happened in state court, where Mr. Barrett was convicted of heat of passion manslaughter based on the same defense theory that was advanced in the federal trial*.

Because all four of the elements for determining when a lesser-included offense must be instructed upon were met in Mr. Barrett's case, the court committed constitutional error, at least with respect to count 3, in failing to charge the jury on the offense of voluntary manslaughter. *Beck v. Alabama,* 447 U.S. 625 (1980).

Mr. Barrett also contends, as was discussed in Claim 2, that a voluntary manslaughter instruction was appropriate as a lesser-included offense for counts 1 and 2. Although these were "straight" felony murder counts, heat of passion negates the element of malice, however it is defined. When one kills in a heat of passion, that act and the mental state underlying it removes the act from being committed in the course or in furtherance of the commission of a felony, which supplies the intent or malice element for felony murder. *Mullaney v. Wilbur,* 421 U.S. 421 U.S. 684, 704 (1975); *United States v. Lofton,* 776 F.2d 918, 920 (10th Cir. 1985).

It is truly inexplicable why this issue was not raised on direct appeal. Although many issues not preserved for review with timely objections or records were raised on appeal, this fully preserved issue, *even conceded by the Government at trial,* was not. Appellate counsel was well aware that Mr. Barrett had been convicted of manslaughter in state court. The factual basis for Mr. Barrett's federal court defense was the same as it was in state court. Under these very clear circumstances, *no* reasonable strategy excuses the failure to raise this issue, as appellate counsel recognizes. Decl. of Mark Henricksen. Had this issue been raised, there is at

the very least a reasonable probability that the outcome of the appeal, particularly (but not exclusively) as to count 3, would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 10.      Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's right to effective assistance of counsel, to due process, and to a reliable capital sentencing proceeding were violated due to the absence of evidence and an instruction permitting the jury to know and give mitigating effect to evidence casting a doubt on the manner in which the murder of Trooper Eales occurred.

On September 26, 2005, the court entered an order that Mr. Barrett could not rely upon the prior proceedings in mitigation because they were not relevant to the circumstances of the offense, (Tr. 9/26/05 Hr'g at 10-11), and could not rely upon residual doubt as a mitigating circumstance. *Id.* at 11. This ruling compounded the trial court's prior rulings impairing the defense's ability to cross-examine prosecution witnesses with testimony given in the second state-court trial.

During the penalty phase conference on jury instructions, the court asked whether either party objected to leaving out a residual doubt instruction.  (R. 5288.)  Mr. Hilfiger stated that he did not object.  (R. 5289.)  This omission was professionally unreasonable.

Readily available evidence from long study of how jurors decide whether to impose a death sentence had shown that residual doubts about the defendant's conduct can be powerful factors in deciding to vote for life.  Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998); John H. Blume & Sheri Lynn Johnson, *Competent Capital Representation: the Necessity of Knowing and Heeding what Capital Jurors Tell us about Mitigation*, 36 Hofstra L. Rev. 1035, 1044 & n. 35 (2008).

Mr. Barrett's defense counsel were aware that two prior juries had sufficient doubts about his culpability that they either could not reach a unanimous verdict or rejected first-degree murder liability.  The principal difference between those trials and the federal trial was the testimony of seven informants, each of whom was impeached on cross-examination.  As argued elsewhere in this Motion, if trial counsel had conducted a reasonable investigation, and/or the Government had complied with its constitutional obligation to disclose exculpatory evidence, further impeachment would have been presented.  Regardless of those constitutional violations, trial counsel's failure to seek a residual doubt instruction at the penalty phase denied Mr. Barrett his constitutional right to have the jury consider in their sentencing deliberations whatever value there was in the first stage cross-examination of the informants.

Mr. Barrett had a constitutionally protected right to introduce evidence, and have the jury give mitigating effect to evidence, that tended to cast doubt on the Government's theory of the manner in which the crime occurred.  The trial ruling excluding such evidence treated the issue as one of guilt or innocence.  Professionally diligent counsel would have pointed out that

the evidence of the prior conviction showed that a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings.

Trial counsel were on notice that courts in other federal death penalty cases, as well as state courts, had held that residual doubt is a valid mitigation circumstance. Trial counsel received from Federal Death Penalty Resource Counsel lists of cases that included references to cases in which residual doubt was considered in mitigation, and where the defendant received a sentence less than death.

Capital juries are called upon to express the community's reasoned moral response to the crime. Knowledge that two prior juries had been unconvinced that the crime was committed in a manner consistent with capital murder would have been important to the federal jury's ability to perform this function.

Attorneys acting in a manner consistent with prevailing professional norms would have argued to the court that evidence of the prior jury's conclusion was relevant to the defense evidence presented in the first stage of trial. For example, during some of their cross-examination, trial counsel attempted to show the jury that nearly all the Government's informant witnesses who provided evidence of malice aforethought had not come forth with their claims during the previous six years of investigation and litigation. (R. 481, testimony of Travis Crawford; R. 3128, testimony of Karen Real.) Reasonably diligent defense counsel would have argued that these witnesses' testimony was an insufficiently reliable foundation for a death sentence, and informed the jury that another jury representing the community had concluded, without those witnesses' testimony, that the death of Trooper Eales was not caused in a capitally culpable manner.

Def's § 2255 Mot.                    324                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

To the extent the trial ruling excluding consideration of residual doubts about the manner in which the offense occurred was based upon trial counsel proffering sufficient evidence to call into question the reliability of the Government's evidence, the ruling was based on trial counsel's unreasonable failure to investigate the informant witnesses and/or the Government's misconduct in withholding impeachment evidence and/or limiting defense counsel's access to the witnesses as alleged elsewhere in this motion.

District courts in other federal death penalty cases permitted the use of "residual doubt" evidence in mitigation. *United States v. Davis*, 132 F.Supp. 2d 455 (E.D. La. Feb. 2, 2001); *United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004); *United States v. Bodkins*, 2005 WL 1118158 (W.D. Va. May 11, 2005). Trial counsel knew, or should have known, about these cases. Their existence was discoverable without the need of independent research. Federal Death Penalty Resource Counsel knew of them and would have informed Mr. Barrett's trial counsel about them.

The Tenth Circuit has recognized repeatedly that residual doubt may be an appropriate strategy in the penalty phase of a capital case. *Sallahdin v. Gibson,* 275 F.3d 1211, 1240 n. 10 (10th Cir. 2002)(reasonable strategy for counsel, having argued defendant's innocence in the first stage, to a adopt a "residual doubt" approach in the penalty phase); *McCracken v. Gibson,* 268 F.3d 970, 979 (10th Cir. 2001)(counsel not ineffective in penalty phase; he tried to develop some mitigating evidence and also reasonably relied on a residual doubt argument); *Smith v. Gibson,* 197 F.3d 454, 462 (10th Cir. 1999)(citing *Lockhart v. McCree,* 476 U.S. 162, 181 (1986) and recognizing that residual doubt strategy can be extremely effective in a capital case). The court's preclusion of residual doubt evidence and argument flew in the face not only of authority in other federal death penalty cases, but of the law in this circuit.

Compounding the error, the court gave a bizarre instruction telling the jury residual or lingering doubt about Mr. Barrett's guilt was not a mitigating factor, that it was bound by its first stage verdict, that it could not speculate on the reasons for the verdict in Sequoyah County, and that the sentence in that case could only be considered for any mitigating effect it might have on the sentence in the federal proceedings.  (Doc. 257, Instruction No. 19, R. 5320-21.)

For similar reasons, it was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal.  (ABA Guideline 10.15.1.)  It is at least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have followed its own precedent.

The trial court's refusal to permit Mr. Barrett to rely upon mitigation that other similarly situated defendants were permitted to present was arbitrary and capricious, and violated Mr. Barrett's rights to due process, equal protection of the laws, and to be free from the cruel and unusual imposition of capital punishment.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 11.** **Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While  Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option.  Appellate Counsel Was Ineffective for Failing to Raise this Issue on Direct Appeal.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

All that is required for a juror to sit in a capital case is the jurors willingness to consider the range of punishment options. A juror cannot be forced to commit that he or she will actually vote for the death penalty. A juror can be personally, religiously or philosophically opposed to capital punishment and still serve, even if considering or voting for the death penalty would do violence to his or her conscience. So long as a juror's personal views would not prevent or substantially impair him or her from considering all possible punishments and following the court's instructions, the juror is qualified to serve. Excusing a juror for cause who opposes the death penalty or has conscientious scruples against imposing it, but could nonetheless consider it violates the Fifth, Sixth and Fourteenth Amendments. *Gray v. Mississippi,* 481 U.S. 648, 668 (1987); *Wainwright v. Witt,* 469 U.S. 412, 424 (1985); *Adams v. Texas,* 448 U.S. 38, 45 (1980); *Witherspoon v. Illinois,* 391 U.S. 510 (1968).

Juror 62 was improperly excused for cause by the court solely because of her conscientious scruples against the death penalty, not because she would be prevented or substantially impaired from considering it, even though it might do violence to her conscience, and even though it might be difficult.

Asked by the court if she had any opinions about the death penalty, Juror 62 responded, "I don't – I could not do it. I could not say anybody to be sentenced to death." Asked if she meant by this that she could not personally carry out an execution, the juror stated, "I couldn't even say they deserve it, no. I don't believe in it." The juror stated she could impose a life sentence and had no philosophical, religious, moral or other objections to such a sentence, and said, "Yes, I do[]" when asked whether she had such objections that would "prevent [her] from considering the imposition of a death sentence[.]"

Def's § 2255 Mot.                              327                         *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Questioned by defense counsel, the juror said that she had held her views on the death penalty her whole adult life.  Defense counsel informed her that in order to be qualified to sit on a capital case, she would have to consider not only evidence in mitigation, but the Government's evidence as to why the death penalty should be imposed and to give that evidence "due consideration."  Asked if she would be able to do this, the juror responded:

> Well, I don't know if I understand your question, but I could listen to that and see whether he needs to either have the death penalty or go to prison for life without parole.

(R. individual jury selection 823-24.)

Again asked, in a slightly different way, whether she could listen to the evidence in aggravation and mitigation, and weigh the evidence, she said she "could probably say he needed to or should," as long as the responsibility lay elsewhere, "but I could not say that he – myself, that he needs the death penalty."  The juror answered "No[]" when asked if she could imagine a murder so heinous that she could "find for the death penalty" after "having considered the Government's evidence[.]" R. individual jury selection 824-25.

Questioned briefly by the Government, the juror was asked if she could sign her name to a death verdict form "knowing that the result of that verdict would be the death by execution of another human being, the defendant in this case[.]" The juror responded that if she thought the crime "deserved it," she "probably could sign a paper saying that he should get the death penalty, but I couldn't say to do it.  I could not sign a paper that says the death penalty for him." Told by the prosecutor that a jury's death verdict was not just a recommendation, and that

the judge could not change the verdict, the juror said, "I could not do that, huh-uh."  R. individual

jury selection 825-26.

        The court asked additional death-qualification questions of the juror:

Q.      ... If I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions about the death penalty so strong that you would not be able to follow my instructions?

A.      If you told me I had to, I would do it, because that's my duty, but I would probably live with it for the rest of my life.  But if you told me I had to do it, and I thought that he actually – the crime was so heinous that he should

have the death penalty, because I was instructed to do it, and I thought it was, I could do it.  I would do it.  But I do not – I would live –

Q.      So you understand, I realize that no one, probably, if they were asked, wants to serve on the jury where that's a possibility.

A.      I understand that.

Q.      And – but if you were selected – otherwise selected as a juror, would you be willing to put your, what I know are strong, personal beliefs aside, and fairly consider the imposition of the death penalty?

A.      I would consider it, yes.

Q.      And, of course, when you say "consider it," couched in the –  in the history of how you've answered these questions, it prompts me to say: Would you consider it fairly?  I mean, in this case, the first thing that would have to happen, before we got to even a sentencing stage, is there would have to be a finding –

A.      Right.

Q.      – that justified – I wouldn't turn the case over to you for sentencing until there had been a conviction for murder that, under the law,  justified either death or imprisonment for life without the possibility of release.  So, under those circumstances, then the Government would have to follow through with their obligation and put on aggravating factors.  And aggravating factors are those factors that would suggest that death is the appropriate punishment.  Then the defendant would have the opportunity to put on

Def's § 2255 Mot.               329             *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

what's called mitigating factors. And as a juror, you'd be obligated to not exactly balance them, but give serious consideration to whether or not the Government had put on sufficient aggravation, when compared to the mitigation, for you to arrive at a death penalty. So, do you think you could do that?

A.    I think I could. It would be very hard for me to do that, but if it was my duty.

Q.    Well, I think when you say it would be – that encourages me, because you say it would be very hard. I agree. I don't disagree with that. It will be very hard. I mean, the people who end up sitting as jurors in any case, but particularly in this case, it's going to be very hard.

A.    Uh-huh.

Q.    And it should be very hard.

(R. individual jury selection 826-28.)

Before turning the floor over for additional questions by counsel, the court asked the juror if she could consider life without the possibility of release, to which the juror responded, "Definitely. I could do that." (R. individual jury selection 828-29.)

Defense counsel had no additional questions for Juror 62. R. individual jury selection 829. Questioned again by the Government, the juror stated she realized the judge would never tell her what decision to make. Asked if, considering the two penalty options, she would "take life as the more comfortable out, given [her] feelings about the death penalty[]," the juror said she would "take life, but it wouldn't be comfortable. I would still take life in prison, yes." R. individual jury selection 829-30. Asked if she could ever envision a situation in which "[she] would sign [her] name to a death verdict?", the juror responded:

If the judge told me that that was my options, either the death or – the death penalty and – I would do that, yes. That would be my duty. I'm here, and that would be what I'm here for. But I couldn't live with it, but I would do that, yes.

(R. individual jury selection 830.)

The juror again stated she understood the court would not tell her what sentence to impose.  The Government then asked not whether the juror could simply consider both punishment options, but whether she was "capable for returning a death verdict for this defendant[]," to which the juror understandably replied, "I don't know whether I could or not." Again going to the ultimate issue of whether the juror would actually vote to impose the death penalty, given a choice between life and death, the juror was asked if she could "imagine a circumstance in which you would ever impose a death penalty[,]" to which the juror said "No." (R. individual jury selection 830-31.)  Mining the same subject – not merely whether the juror could consider death as a punishment option, but whether she could "ever return a death penalty unless the judge told you, you had to[,]" the juror responded that she probably could, but could not predict her vote in advance:

> I think I would have to hear what he has done and how heinous it was and all of this.  And I have a – something personal in my life, that happened to me, and I could not, you know – had no remorse about it.  So, I don't know how I would react, but I – you know, since this has never – I've never had this or have to think about, I just always thought I could never do this.  But I think that if it was so bad that I think this person should not even be here anymore, I possibly could do that. Now, I can't say that I would – you know – I – I – my mind can always be changed, but it has to be changed to where I understand it.  So, I thought – if he deserved it, I – I probably – I think I probably could, but I – I'm only human.

(R. individual jury selection 831-32.)

Yet again going beyond whether the juror could consider the death penalty, the prosecutor asked her in effect "how bad it would have to be" before she voted for the death penalty, to which the juror responded, "It would have to be pretty bad."  In response to the prosecutor's question regarding what she meant, the juror gave the example of killing or torturing a child, but she "couldn't tell you how bad it would have to be."  (R., individual jury selection 832.)

Unsatisfied still, the prosecutor continued without court interference (or objection) to harangue the juror with whether, and under what precise circumstances, she could actually vote to impose the death penalty. Juror 62 responded reasonably that everything would depend on the facts, but gave every indication that she could consider both penalties, despite her personal views on capital punishment:

> Q.      All right. Other than torture to a child or something – other than torture to a child, can you imagine a circumstance in which you'd return a death verdict?
>
> A.      I never heard anything so heinous that I even had to think about it. But I would have to give it a lot of thought. But I'm – I'm just – I cannot lie to you. I would have to say that I would not know until I'm in that situation.
>
> Q.      Okay. Well, at the end of the day –
>
> A.      Okay.
>
> Q.      – are your feelings such that you would really be substantially impaired in serving as a juror in a case where you might be asked to vote in favor of a death penalty?
>
> A.      Like I say, it depends on what he has done and how bad I think it is And I'd have to weigh all of the things – I cannot say yes nor can I say no. I would think that – I would think that I am just enough to know that if this is what it is, and I think he deserves it, I probably could sign, yes. But I'd have to really decide for myself – you know, I'd have to hear it. I can't say no, I'll just go in here and sign it. I'd have to see how bad it is. And it would have to be really bad.[55]

(R., individual jury selection 832-33.)

---

[55] This is certainly a fair point. The Supreme Court has held repeatedly that the death penalty should be reserved for a relatively small class of first degree murderers among the entire universe of those convicted of first degree murder. *E.g., Godfrey v. Georgia,* 446 U.S. 420 (1980).

The United States Attorney then had the temerity to tell the juror that he could not "try the case for you today," detailing the facts of the case so as to inquire whether, on those facts, they would be "bad enough" for her to return the death penalty, even though he asked her repeatedly to commit in advance to signing a death verdict. (R. individual jury selection 833-34.) As noted above, this is not the test of qualification to sit on a capital jury. Worn down by repeated questioning on whether she could not just consider both punishment options, but could put her name to a death verdict, the juror, again very reasonably in light of the fact she had heard no evidence, said, "Well, let me just say no, then. Because, you know, I would have to say no right now. I know no other thing except to say no, I could not sign it." (R., individual jury selection 834.)

What else could the juror say to such a question? This is on par with saying, as rational people would, that they could not convict until hearing the evidence. Jurors are frequently told during voir dire that due to the presumption of innocence, if they had to vote on the case "right now," the verdict would have to be not guilty. The same is true of similar questions asked regarding the penalty phase, since the Government shoulders the burden of proof.

Continuing the seemingly endless round-robin, the court again inquired of Juror 62 on whether she could set her personal views aside and follow the court's sentencing instructions:

> Q.   ... But if I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions – and I want to repeat those – if they are, tell me – your personal opinions about the death penalty, are they so strong that you would not be able to follow the instructions?

Def's § 2255 Mot.                    333                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

A.      Well, I have to say it again, it's my duty to do this or not to do this, but if you told me that that was one or the other, and I thought he deserved the death penalty, I would have to – I think I could sign the death penalty, if I listened to the information and that it was bad enough, I – and you told me that this was my duty and that this – I probably could sign the death penalty.

Q.      And could you, likewise, consider the possible imposition of life imprisonment without the possibility of release?

A.      Certainly could.

(R., individual jury selection 835-36.)

Defense counsel argued the juror was qualified, and had in fact "backed off her initial stance" when questioned by the Government.  (R., individual jury selection 838.) The Government moved to excuse Juror 62 for cause, arguing that she answered "three or four questions in the right direction, under significant pressure."  (Left unsaid, of course, was that any pressure applied to the juror came from Mr. Sperling himself, rather than defense counsel or, for that matter, the court.)  Yet again focusing on the irrelevant inquiry whether the juror could commit ahead of time to voting for death, the Government maintained the juror was "substantially impaired," because a murder would have to be "really heinous" before she would vote for death.  The court agreed with the Government that the juror was "substantially impaired" and excused her for cause, over objection by defense counsel.  (R. individual jury selection 838-40.)

This is a classic case of the cardinal *Witherspoon* error: excusing a juror who, though it would be difficult, could set her personal views aside, follow the law, and consider all punishment options, even if it would be unpleasant and would bother her conscience.  A juror does not have to be "comfortable" with the death penalty to impose it.  Juror 62 said repeatedly

she could consider the death penalty. She simply wouldn't take the Government's bait and commit ahead of time to voting for it, which is not the test.

The excusal of Juror 62 was not raised on direct appeal, even though the error was plainly apparent from the record. There was no reasonable strategic ground for omitting this argument. Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 12.** **The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's death sentence and confinement are unlawful and were obtained in violation of his rights under the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment, and the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment because the jury was not instructed that the reasonable doubt

Def's § 2255 Mot.                                        335                          *U.S. v. Barrett,* 6:04-CR-115-JHP-SPS

standard governed the ultimate penalty determination in this case. *Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

Although this Court instructed the jury that it must determine whether the government had proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors. The jury was provided with the following penalty phase instruction regarding the weighing process:

> As to Count Three, you must find first the Defendant was at least 18 years of age at the time he committed the offense; and second, the Government has proven beyond a reasonable doubt the existence of the threshold eligibility factor; and third, the existence of at least one statutory aggravating factor; and fourth, that the threshold eligibility factor plus the statutory aggravating factor or factors which you have found to exist sufficiently outweigh any mitigating factor or factors which you found to exist are [*sic*] in the absence of the mitigating factor or factors alone are sufficient to justify imposition of a sentence of death.

(R. 4502.)

This instruction mirrors the federal death penalty statute, which provides only that no death penalty can be imposed unless the jury first finds that the aggravating factors "sufficiently outweigh" any mitigating factors. *See* 18 U.S.C. § 3593(e).

However, as discussed below, the instruction falls short of the requirements of the United States Constitution, which require that the jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances

that the death penalty is justified and that death is the appropriate penalty to be imposed under all the circumstances.

The Government may not impose a sentence greater than that authorized by the jury's simple verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are also submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 455. The *Apprendi* principles applies to factfindings necessary to put a capital defendant to death. *Ring*, 536 U.S. at 609.

Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase. In order to impose the increased punishment of death, the jury must make additional *factual* findings at the penalty phase. These findings include a finding that the aggravating factors outweigh any mitigating factors.

Under the *Apprendi* holding, because additional factual findings are absolutely required in order to impose an increased punishment, they are sentencing factors that must be proved beyond a reasonable doubt. Under the *Apprendi* rationale, petitioner was entitled to a jury instruction that before a death verdict could be returned, the jury was required to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt.

Moreover, because a death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). This requirement of heightened reliability requires that the jurors making a finding beyond a reasonable doubt that the death penalty is the appropriate punishment for capital defendants.

This Court's failure to provide such an instruction to the jury renders Mr. Barrett's death sentence unconstitutional. To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.

The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function." *Sullivan v. Louisiana,* 508 U.S. 275, 281 (1993). It is, therefore, reversible per se. *Id.* at 281-82.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668. 686 (1984). Their performance fell far below the standards expected of competent counsel in capital cases. Moreover, had counsel requested an appropriate instructions on this issue, there is a substantial probability that Mr. Barrett would not have been sentenced to death. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been grated a new penalty trial.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 13.    Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett was denied rights secured by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and rule 43, Federal Rules of Criminal Procedure, when the trial court ordered him removed from the courtroom without a hearing, without a warning, and without just cause.  Mr. Barrett's trial counsel acted unreasonably under the circumstances and Mr. Barrett was prejudiced by their unreasonable acts and omissions.  Mr. Barrett was held before the jury under the effects and influence of a medication regimen, including both the administration of contra indicated drugs and discontinuation of necessary medication, which substantially exacerbated the neuropsychological impairments of his ability to inhibit unconscious responses to stressful situations, and to exercise judgment, reason and self-control; he was not properly prepared for closing arguments, and was forced to make an un-counseled choice between being present in court under the prejudicial condition of unlawful restraints or relinquishing his right to be present for his trial.

The facts in support of this claim, among others to be presented after further investigation, discovery, access to subpoena power, and an evidentiary hearing, include the following:

During the prosecutor's penalty phase closing argument in the jury's presence, Mr. Barrett impulsively made audible remarks and began to rise from his chair so that he could leave the courtroom. The marshals restrained him and asked the judge if Mr. Barrett should be removed. The court said yes. (R. 5421.) Two to three marshals then took Mr. Barrett from the courtroom, and the prosecutor concluded his closing argument. The court sent the jury out. (R. 5429.) The court then held a hearing with counsel but without Mr. Barrett present to discuss whether it should instruct the jury about Mr. Barrett's removal from the court room. (R. 5430.) The court described the incident in the following way:

> Before the recess and during the closing moments of U.S. Attorney Sperling's closing remarks, the Court first heard the Defendant say words to the effect: Sperling, leave my family out of this. He said something other than that I could not detect. And then I saw the Defendant come out of his chair and make what appeared to the Court to be an effort to get up. I can't say that he was attempting to come out across the table but he did attempt to get up and take a step. As a result of that, it was necessary for the U.S. Marshals to restrain him and take him from the courtroom. I will say that once the marshals made contact with the Defendant, he ceased – there ceased to be any struggle and he was removed from the courtroom without further activity in front of the jury.

(R. 5430.)

Mr. Hilfiger stated that the words Mr. Barrett said which the court did not hear were Mr. Barrett asking why the court and Government did not permit the jury to hear about his statements to law enforcement. (R. 5431.) Mr. Hilfiger also corrected the court's description by saying Mr. Barrett

> was not making an aggressive move toward anybody. What he was saying is I want to get out of courtroom [sic]. Take me out of the courtroom. I don't want to

be here.  And then the marshals, you know, asked you if they could take him out.
Before that they were trying to put him back down in the chair.  His move as I saw
at that point was he was saying, you know, take me out of the courtroom.  I want
to get out of here.  It wasn't an aggressive move towards anybody, just he wanted
to get out.

(R. 5432.)

Mr. Hilfiger then stated that Mr. Barrett personally did not want a curative

instruction and did not "want to participate in the court proceeding now."  (R. 5432.)

According to the prosecutor, a deputy marshal "indicated or asked the Court do

you want us to take him out and you [the Court] said yes.  And at about that same time, the

Defendant indicated he also wanted to leave."  (R. 5433.)

The court confirmed that it ordered Mr. Barrett removed from the courtroom, and

added that Mr. Barrett "was removed from the courtroom by two or three deputy marshals."  (R.

5433-34.)

The Government asserted that the court "should make specific inquiry of the

Defendant."  (R. 5434.)

Mr. Hilfiger requested no instructions.  (R. 5434.)  When the court read its

proposed instruction, Mr. Hilfiger stated, "I don't really care one way or the other.  I don't object,

I don't approve."  (R. 5435.)

Mr. Hilfiger and Mr. Smith described that in their past interactions with Mr.

Barrett, they observed him get upset then calm down and discuss matters.  (R. 5436-37.)  They

recommended that his alleged desires regarding presence in court be revisited.  *Ibid.*  However,

when the court offered them the opportunity to revisit the issue with Mr. Barrett before the court

ruled, Mr. Hilfiger declined.  (R. 5437.)  Trial counsel did not have a private conversation with

Def's § 2255 Mot.                                    341                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Barrett about the incident or his presence; they spoke to him in the presence of a deputy U.S. marshal.  (R. 5437.)

The court ordered Mr. Barrett placed in "minimum restraints."  (R. 5438.)  The court asserted that an unidentified deputy marshal "brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems."  (R. 5438.)

Thereafter, Mr. Barrett's counsel requested to speak with him.  (R. 5438.)

Mr. Barrett was brought into the courtroom, and the following took place:

Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings.  I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?

Mr. Barrett:   Yes, Your Honor.

The Court:   Do you have any questions of the Court about that?

Mr. Barrett:   No, sir.

The Court:   I'll ask the marshal to return – (Interrupted)

Mr. Hilfiger:   One more.  Does that include the verdict?

Mr. Barrett:   Yes, Your Honor.

The Court:   Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

Mr. Barrett:   Yes, sir.

(R. 5439.)

Mr. Barrett was escorted out, and the jury escorted in.  (R. 5439.)

The court read the following instruction to the jury:

920

> Members of the jury, you are instructed that neither the Defendant's conduct nor his statements during closing arguments are evidence in this case and you should not consider them in rendering your verdict herein.

(R. 5440.)

Mr. Barrett was absent for the jury instructions, (R. 5440-45), and for the reading of the jury's verdict.  (R. 5448-50.)

Prevailing professional norms of criminal defense practice advise counsel to maintain close contact with the defendant in order to develop trust, (1 ABA Standards for Criminal Justice, Criminal Defense Function 4-3.1 and commentary (2nd ed. 1986)), and to "advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome." *(Id.*, Standard 4-5.1.)  One reason for this professional norm is "to keep the client from making suicidal choices about the case."  (ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.2, commentary (Feb. 1989 ed.)).  Mr. Barrett's counsel failed to follow these fundamental practices and, as a result, the jury was given a false impression of Mr. Barrett, and Mr. Barrett was denied his right to be present during trial.

Mr. Barrett's trial counsel unreasonably failed to conduct a thorough investigation of his background, including his mental health problems.  *See* Claim 2, *supra*.  Nevertheless, Mr. Barrett's counsel knew, or reasonably should have known, (a) that Mr. Barrett had attempted suicide in the past; (b) that Mr. Barrett had been diagnosed with depression and bipolar disorder; (c) that Mr. Barrett had been prescribed medications for these conditions; (d) that Mr. Barrett was not being given medication at the time of trial; (e) that Mr. Barrett was suffering the effects of steroids.  Reasonably diligent counsel, informed about their client's condition, would have taken steps to obtain a competent mental health evaluation and judicial determination of the medical

necessity for the drug regimen Mr. Barrett was being administered; the medical appropriateness of discontinuing his psychotropic medications; whether Mr. Barrett had psychiatrically decompensated  since the termination of the medications; and the nature and severity of the functional impact of discontinuing and/or administering any medication on his ability to communicate and cooperate with counsel and on his affect and appearance before the jury.

In the face of a judicial determination that the drug regiment to which Mr. Barrett was subjected was justified by medical necessity, reasonably diligent counsel would have sought a further medical and legal determination of the degree to which the effects of such a regiment interfered with Mr. Barrett's ability to participate in trial proceedings, including any distortion or alteration of his demeanor, affect and presentation in front of the jury; his attitude toward participating in the proceedings; his ability to endure the disclosure and/or discussion of sensitive information; his capacity to understand his rights and make informed decisions regarding the exercise of waiver of such rights; and his ability and willingness to communicate and cooperate with counsel.

In the event the trial court made a judicial determination that Mr. Barrett's medication regimen was justified and that he was competent to proceed with trial, reasonably diligent counsel would have taken all steps necessary to prevent any untoward scenes in front of the jury, for example, by seeking appropriate medications and counseling Mr. Barrett regarding the prosecutor's likely arguments and prepared him for them.  If Mr. Barrett nonetheless acted inappropriately to his potential detriment in front of the jury, reasonably diligent counsel would have renewed the request for a medical evaluation and determination of the necessity for and functional impact of the medication regiment, as well as an assessment of Mr. Barrett's adjudicatory competency.

Def's § 2255 Mot. 344 *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Barrett's counsel failed to gather medical records of his medical treatment in jail during the trial and/or failed to provide those records to a competent mental health or other medical expert retained by the defense.  Had trial counsel conducted a reasonable inquiry, they would have known that Mr. Barrett had been injected with steroids in jail.  If counsel had developed the relationship of trust required in criminal cases, counsel would have been aware that the steroids had a medically predictable effect that contraindicated their use with defendants who were on trial, and impaired Mr. Barrett's ability to control his inability to endure any psychological or emotional distress that might be caused by the prosecutor's arguments.

Mr. Barrett had a right, protected by the Fifth and Eighth Amendments, to have the jury receive a fair, unadulterated view of him, including his reaction to the proceedings.  *See Riggins v. Nevada*, 504 U.S. 127, 142, 143-144 (1992) (Kennedy, J., concurring).  Due to the actions of jailers and the unreasonable omissions of Mr. Barrett's trial counsel, the jury was permitted to see him under the affects of steroids and without the benefit of medication deemed medically necessary to control the emotional dysregulation caused by his bipolar disorder.

Trial counsel's failings and the trial court's denial of authorization for counsel to obtain necessary and appropriate mental health assistance, including the assistance of a psychiatrist, individually and cumulatively deprived Mr. Barrett of his right not to be tried while his functioning was altered and impaired by the effects of voluntarily or involuntarily administered or discontinued medication, and/or while his functioning was altered and impaired by the effects of a medication regimen that was unjustified by any medical necessity.  *See* Claims 1, 2, and 3, *supra*.

Mr. Barrett's periodically altered mental condition, the ineffectiveness of his attorneys, and the unlawful actions of the court and marshals, also resulted in the denial of his

right to be present during the close of the penalty trial. The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment guaranteed Mr. Barrett the right to be present during all critical stages of the case. *Illinois v. Allen*, 397 U.S. 337 (1970). Under the controlling law,

> a defendant can lose his right to be present at trial if, *after he has been warned* by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.

*(Id.*, 397 U.S. at 343 [emphasis added]). The trial court's order – which the court initially did not reveal on the record – that marshals remove Mr. Barrett without warning did not comport with the requirements of law. (R. 5430, 5433-34.)

Whether the defense sought or objected to an instruction from the court regarding Mr. Barrett's actions, was the "exclusive province" of counsel. (ABA Standard 4-5.2(c).) As reflected in counsel's statements on the record, Mr. Barrett's counsel unreasonably failed to give the matter sufficient thought to determine whether an instruction was desirable or not. (R. 5435.) Counsel unreasonably failed to consider whether an instruction that the jury should disregard the

marshal's action in removing Mr. Barrett from the courtroom would have mitigated the prejudice of the jury having witnesses him being forcibly removed.

The willingness of Mr. Barrett's counsel and the trial court to let Mr. Barrett be absent from court during the prosecutor's closing argument and the court's instructions violated Mr. Barrett's constitutional rights. The trial court plainly ignored the requirement that "courts must indulge every reasonable presumption against the loss of constitutional rights." *Allen*, *supra*, 397 U.S. at 343, when it (a) ordered that Mr. Barrett be placed in additional restraints

besides the electric shock device he wore on his back, and (b) permitted him to be absent without informing him that his presence was a constitutional right, and the risks of giving up that right. Mr. Barrett did not knowingly and intelligently waive his right to be present.

Trial counsel's performance was ineffective because they allowed him to absent himself rom the courtroom during critical stages (closing argument, jury instructions) without ensuring that he was making an informed, knowing and intelligent decision.

The error in allowing Mr. Barrett's absence was not harmless. In his absence, factual matters were discussed, namely what he purportedly said and did that caused the marshal to remove him. His presence would have contributed to the fairness of the proceeding because Mr. Barrett could have advised his counsel about the facts. In the context of jury instructions, prejudice has been found wherever defendant and his lawyer were absent when the court instructed the jury, because counsel could have objected to the instruction or suggested an alternate instruction. See, e.g. *United States v. Rosales-Rodriguez,* 289 f. 3d 1106, 1110 (9th Cir. 2002). Here, defense counsel was present, but refused to take a position on the court's proposed jury instruction. "I really don't care one way or the other." (R. 5435.) Had Mr. Barrett been present, he could have consulted with counsel about the proposed jury instruction.

Among the most prejudicial inferences affecting the jury's penalty determination, Mr. Barrett's apparent voluntary withdrawal from the proceedings likely conveyed a misleading sense of indifference to the outcome of the trial, callous disregard for the seriousness of the questions facing the jury, and even lack of remorse. *See Riggins*, 504 U.S., at 144 (Kennedy, J., concur.). Similarly, any jurors who had been focused on the prosecutor before observing the marshals restraining and removing Mr. Barrett may have concluded prejudicially that the

marshals acted in response to Mr. Barrett's threatening behavior toward someone in the courtroom or an attempt to escape.

These are other examples of the prejudice that ensued from Mr. Barrett's absence:

It matters not that Mr. Barrett's counsel was present when he was absent.

> Although the presence of counsel is certainly a relevant factor to be considered in determining whether a defendant's absence was harmless, the right to be present at trial - grounded in the Confrontation Clause and the Due Process Clause - is not a gossamer right inevitably swept away simply because a defendant is represented, in his absence, by counsel. The right to be present is distinct from the right to be represented by counsel. The right to be present would be hollow indeed if it was dependent upon the lack of representation by counsel. Furthermore, such a rule would ignore the fact that a client's active assistance at trial may be key to an attorney's effective representation of his interests.

*United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001) (Opn. by Carnes, J.).  Similarly, Mr. Barrett need not demonstrate any particular issue that his counsel failed to raise in his absence.  Forcing Mr. Barrett to make such a showing in order to demonstrate prejudicial error from his absence devalues the constitutional right to be present, and ignores the assistance that a defendant can provide to his counsel during trial.  If we were to require that a defendant show with specificity how his presence might have changed the course or outcome of a trial, then the right to be present would cease to exist in many cases in which the evidence of guilt is strong. The right to be present at one's own trial is not that weak.  *See Riggins,* 504 U.S., at 137. "Efforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different [in the absence of drugging] would be purely speculative."; *United States v. Novaton*, 271 F.3d. At 1000.

Mr. Barrett's trial counsel acted unreasonably (a) by failing to object to the additional restraints; (b) by failing to object to the choice the court gave Mr. Barrett (be present in unlawful restraints or absent); (c) by failing to consult mental health or other medical experts

regarding Mr. Barrett's condition, including his competence to make a valid waiver; (d) by failing to raise a doubt about Mr. Barrett's competence; (e) by failing to seek a hearing on his competence and/or the affects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (f) by failing to advise him about the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court, and Mr. Barrett's absence.

Significantly, one of the prosecutors explicitly conceded that he did not "think he [Mr. Barrett] – *consciously* chose to do what he did in the presence of the jury." (R. 5427 [emphasis added].)  According to Mr. Hilfiger, Mr. Barrett himself said "I couldn't take it anymore." (R. 5437.)

Due to trial counsel's unreasonable omissions, or the court's actions, Mr. Barrett was denied (a) his rights under *Riggins*, *supra*; (b) his right to a hearing on his competence to waive presence, *Pate v. Robinson*, 383 U.S. 375 (1966); *Godinez v. Moran*, 509 U.S. 389 (1993); (c) his right to be present and free of unjustified restraints, *see* Claim 7, *supra*; and (d) his right to a fair and reliable verdict on punishment.

Irrespective of whether Mr. Barrett could have made or did make a valid waiver of his right to be present, trial counsel acted unreasonably by failing to seek an instruction that was necessary to avoid harm to the jury's deliberations.  Trial counsel's statements on the record reflect that counsel considered only whether the court's proposed instruction brought Mr. Barrett's actions to mind, or minimized their effects.  Mr. Hilfiger twice stated that he could not think of an instruction to give the jury.  (R. 5426-28.)  Unable to decide, he said, "I don't care."

Upon due consideration, trial counsel would have recognized that the court's instruction failed to address the scope of the problem. The court's instructions permitted the jury to consider the actions of the marshals in restraining Mr. Barrett and removing him from the courtroom, presumably, from the jury's perspective, upon the court's orders or with the court's blessing. Although Mr. Hilfiger was adamant that Mr. Barrett had not made an aggressive move toward anyone, he permitted the jury to consider that marshals and the court were justified in removing Mr. Barrett. There is no reason why Mr. Hilfiger would not have sought a modification of the instruction that would have communicated truthful information about Mr. Barrett not having made any aggressive moves, Mr. Barrett suffering the effects of poor or absent medical treatment, or an instruction that directed the jury not to consider or draw any inference from Mr. Barrett's absence from the courtroom.

To the extent the facts supporting this claim were apparent on the appellate record, appellate counsel unreasonably failed to raise this issue on appeal. Had counsel raised the issues presented in this claim it is reasonably probably that the court would have found the numerous violation of federal law were not harmless beyond a reasonable doubt, or constitute plain error.

This Court should find the error substantially influenced the jury's verdict, and vacate the sentence of death imposed on Mr. Barrett in violation of the Constitution and laws of the United States.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 14.   Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

Some twenty years ago, the federal death penalty was reintroduced; since then it has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims. As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level." (Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001.) Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims which were

presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized.  During the administration of Attorney General Gonzalez, the difference was even more striking: 41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized.[56]  (2007 Decl. of Kevin McNally)

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence.  According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases.  Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference."  (Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001.)

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases.  This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008.  (2008 Decl. of Kevin McNally.)  Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403.  She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim.

---

[56]      Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzalez.

Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero." (Decl. of Lauren Cohen Bell.)

While some of the statistics above are based in part on periods after Mr. Barrett's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.[57]  Had counsel performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Barrett's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

Mr. Barrett has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act, is the work of a single decision maker, i.e.

---

[57]  Defendant's Motion To Declare The Federal Death Penalty Statute Unconstitutional, (Doc. 78), does not address the disparate application of the statute according to race of the victim.  Appellate counsel did not raise the issue on appeal. *See* Defendant/Appellant's Brief, C.A. No. 06-7005, Proposition VI.  To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused," (Doc. 78 at 3), appellate counsel was ineffective in failing to pursue and develop the issue.

Def's § 2255 Mot.          353          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the DOJ.  This fact renders the above statistics all the more probative of discrimination.  The Court should grant relief from Mr. Barrett's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

> **Claim 15.**    **Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial b y a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, because the indictment in his case made no mention of the federal death penalty and did not charge the aggravating factors required for a capital offense under 18 U.S.C. § 3592(c) or any of the additional non-statutory aggravating factors relied upon by the government during the penalty phase.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

As the Supreme Court has made clear in a line of cases:

"[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

*Ring v. Arizona*, 536 U.S. 584, 600 (2002) *quoting Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999).  In direct contravention of these principles, the Government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the government claimed justified Mr. Barrett's death sentence in the indictment.  This structural defect in Mr. Barrett's capital proceedings requires that his death sentence be vacated.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the death sentence, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel unreasonably failed to raise this issue on direct appeal.  There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 16      Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by misconduct involving the jury. Such misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Barrett and the case, false or misleading responses of jurors on voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, and/or the trial judge, and improperly prejudging the guilt/innocence and penalty phases of Mr. Barrett's trial.

Mr. Barrett's rights to a fair trial and to due process were violated when the jury was not sequestered in such a way as to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The Sixth and Fourteenth Amendments to the United States Constitution require that a defendant be tried by an impartial jury that is free from any extraneous influences that could subvert the fact finding process. Where jurors consult information that was not introduced during the course of the trial or that conflicts with the trial judge's instructions, the jurors become unsworn witnesses against the defendant in violation of the Sixth Amendment. Mr. Barrett had no opportunity to confront the extraneous information to which the jurors were exposed, denying Mr. Barrett her Sixth and Fourteenth Amendment rights to a fair trial and due process.

The introduction of extraneous materials or evidence has consistently been held to mandate a new trial. Mr. Barrett should be granted a new trial which can be conducted free of extraneous and prejudicial influences.

Def's § 2255 Mot.                                356                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Barrett's prejudice.  Counsel's ineffective assistance resulted in the deprivation of Mr. Barrett's rights under the Sixth, Eighth and Fourteenth Amendments.  Relief is appropriate.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 17      Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case**

Mr. Barrett's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, and a reliable determination of guilt and penalty, and fundamental fairness.  *Taylor v. Kentucky*, 436 U.S. 478, 487, and n. 15 (1978).

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.  In addition, Mr. Barrett re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process.  Each of these errors deprived Mr. Barrett of important constitutional rights, including but not limited to his right to due

process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claim presented in this Motion individually justifies reversal , when considered cumulatively, these errors denied Mr. Barrett his constitutional rights.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

## IV.    Prayer for Relief

WHEREFORE, Movant Kenneth Eugene Barrett asks that this Court provide the following relief:

1. Disqualify itself and have all proceedings regarding this Motion reassigned randomly to another judge;

2. That Movant be permitted to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

3. Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States

District Court, identifying all proceedings conducted in Movant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

4. Permit Movant to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

5. Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion, and any defenses thereto raised by the Respondent's Answer;

6. Permit Movant to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and, to allow the amendment to relate back to the date of the filing of this motion;

7. Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Movant's Response to any Affirmative Defenses raised by the Respondent. Because Movant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

8. Permit oral argument as appropriate and required;

9. Vacate Movant's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

10. Grant such further and additional relief as may be just.

DATED:  March 15, 2009

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

## APPENDIX A

## PROCEDURAL HISTORY

I.     **State Court Proceedings**

1.     On September 24, 1999, Movant was charged by Information in the District Court of Sequoyah County, Oklahoma with one count of first-degree murder and three counts of shooting with intent to kill. The information was subsequently amended to charge Movant with one count of first-degree murder, one count of shooting with intent to kill, and two counts of discharging a firearm with intent to kill. (Case No. CR 99-493, Garrett, J.)

2.     The case proceeded to trial and ended in a hung jury on October 18, 2002.

3.     Movant was re-tried on the same charges in January and February of 2004. The jury rejected the first-degree murder charge and instead found Movant guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Movant guilty of the lesser-included offense of assault and battery with a dangerous weapon.  The jury acquitted Movant on the two counts of discharge of a firearm with intent to kill.

4.     On April 19, 2004, Movant was sentenced to a term of imprisonment of twenty years on the manslaughter conviction and ten years on the assault and battery conviction, with the two terms to run consecutively.

5.     Movant did not appeal his convictions or sentences.

6.     At both state trials, Movant was represented by John David Echols, Esq., and the State was represented by Darrell Dowty, Asst. Dist. Atty.

II.     **Federal District Court Proceedings**

7.      On September 23, 2004, a criminal Complaint was filed against Movant in the United Stated District Court for the Eastern District of Oklahoma charging him with eight criminal counts, including intentionally killing a state law enforcement officer engaged in the performance of the state law enforcement officer's official duties, in violation of 21 U.S.C. § 848(e)(1).

8.      On November 9, 2004, a federal grand jury returned a three-count Indictment against Movant. Count 1 charged Movant with using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 2 charged Movant with using and carrying a firearm in relation to a crime of violence, i.e., the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties, and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 3 charged Movant with intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). With respect to Count 3, the grand jury made the following "Special Findings": (a) Movant was 18 years of age or older at the time of the offense; (b) Movant intentionally killed a state law enforcement officer, intentionally inflicted serious bodily injury that resulted in the death of a state law enforcement officer,

940

intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and a state law enforcement officer died as a direct result of the act, or intentionally and specifically engaged in an act of violence, knowing that the act created a great risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and a state law enforcement officer died as a direct result of the act; and (c) Movant, in the commission of the drug trafficking offenses alleged in Count 3, and in escaping apprehension for a violation of said offenses, knowingly created a grave risk of death to one or more persons. (Case No. 6:04-cr-115P, Payne, J.)

9.    On February 9, 2005, the grand jury returned a superseding indictment against Movant. Although the superseding indictment included some amendments, it contained the same three basic counts as the original indictment.

10.   On February 15, 2005, the government filed notice of its intent to seek the death penalty with respect to all three counts with which Movant was charged.

11.   The case proceeded to trial on September 12, 2005. On November 4, 2005, the jury found Movant guilty of all three counts. In response to special interrogatories propounded by the District Court, the jury found beyond a reasonable doubt that Movant committed murder in connection with

Counts 1 and 2 (i.e., that he committed the unlawful killing of Trooper Eales with malice aforethought).

12. On November 9, 2005, the second-stage proceedings began.

13. On November 17, 2005, at the conclusion of all the second-stage evidence, the jury found, in pertinent part, that Movant was at least eighteen years old at the time of the offenses of conviction, and that, with respect to each of the three counts of conviction, he intentionally killed Trooper Eales.

14. As for the statutory aggravating factors, the jury found, with respect to Counts 1 and 2, that Movant killed or attempted to kill more than one person, i.e., Troopers John Hamilton, Jr., and David Eales, in a single criminal episode, and committed the offenses after substantial planning and premeditation to cause the death of a person. (The jury rejected the statutory aggravating factor that Barrett knowingly created a grave risk of death to persons other than Hamilton and Eales.) With respect to Count 3, the jury found that Movant, in the commission of the offense or in escaping apprehension for the offense, knowingly created a grave risk of death to one or more persons in addition to Trooper Eales, and that Movant committed the offense after substantial planning and premeditation. As for the non-statutory aggravating factors, the jury found, with respect to all three counts of conviction, that Movant caused injury, harm, and loss to the victim's family, but rejected the government's assertion that Movant was likely to commit criminal acts of violence in the

Def's § 2255 Mot.      364      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

future which would be a continuing and serious threat in an institutional correctional setting to the lives or safety of other persons.

15.   As for mitigating factors, some or all of the jurors found the existence of the following factors with respect to all three counts: Barrett had accepted responsibility for the death of Eales from his previous conviction (found by five jurors with respect to each count); Barrett had been convicted and punished for the death of Eales (found by five jurors with respect to each count); Barrett, at the time of the shooting incident, had no prior felony convictions (found by all twelve jurors with respect to each count); Barrett was a father (found by all twelve jurors with respect to each count); Barrett was a loved son and stepson (found by all twelve jurors with respect to each count); Barrett was a good neighbor and friend (found by seven jurors with respect to each count); Barrett's death would impact his child, family and friends (found by all twelve jurors with respect to each count); Barrett would not present a future danger to society by being imprisoned for life without possibility of release as demonstrated by his incarceration since September 24, 1999 (found by two jurors with respect to each count); that other factors in Barrett's childhood, background or character mitigated against imposition of the death sentence (found by one juror with respect to Counts 1 and 2, and by two jurors with respect to Count 3); that Barrett never left his residence during 1999 (found by one juror with respect to each count); and that Sequoyah County Sheriff Johnny Philpot had mistreated Barrett when Barrett was seventeen years old (i.e., Philpot had

an altercation with Barrett during which Philpot broke Barrett's jaw)

(found by six jurors with respect to each count). All of the jurors rejected

the alleged mitigating factor that Barrett had expressed remorse for his

crimes.

16.    Ultimately, the jury found that sentences of life imprisonment without the

possibility of release should be imposed with respect to Counts 1 and 2,

and that a sentence of death should be imposed with respect to Count 3.

17.    On December 19, 2005, the district court conducted a sentencing

proceeding during which it imposed the sentences recommended by the

jury. Judgment was entered in the case on December 29, 2005.

18.    Movant filed a timely Notice of Appeal of his convictions and his death

sentence to the United States Court of Appeals for the Tenth Circuit on

December 28, 2005 (Case No. 06-7005).

19.    Roger Hilfiger, Esq. and Bret Smith, Esq. represented the Movant in these

proceedings. The Government was represented by Sheldon Sperling, U.S.

Atty. and D. Michael Littlefield, Asst. U.S. Atty.

III.   Federal Court of Appeals Proceedings

20.    In his direct appeal, Movant challenged his convictions and sentence of death by

raising the following claims:

a.    The district court erred by denying Movant's motion to suppress. More

specifically, the search warrant did not satisfy the Oklahoma standards for

a nighttime warrant; the executing officers failed to meet Oklahoma

standards regarding executing officers; the warrant failed to comply with

Fed. R. Crim. P. 41 (warrant was not issued by a federal officer); and the evidence should be suppressed on double jeopardy grounds.

b.    Movant challenged the indictment, more specifically, its sufficiency because it failed to set forth elements of predicate offenses; its multiplicity because all three counts were based on the same conduct, firearms, drugs, and killing of the same person; and misjoinder of offenses.

c.    The district court allowed admission of improper victim impact evidence.

d.    The district court allowed juror misconduct, more specifically, one of the jurors knew a state trooper involved in the case and another trooper had limited contact with a juror.

e.    The government violated *Batson* by failing to exercise its peremptory challenges in a race neutral manner.

f.    Movant challenged the constitutionality of the federal death penalty scheme, more specifically, arguing that the penalty phase process of weighing aggravating and mitigating factors violates the Sixth Amendment; the federal scheme unconstitutionally delegates legislative authority; the statute fails to require proportional review; the statute allows for consideration of impermissibly vague aggravating factors; and the statute does not narrow the class of persons eligible for the death penalty.

g.    Movant challenged the "intent to kill" aggravating factor, more specifically, because that factor is used in the eligibility process then again in the weighing process.

h.    The government did not present sufficient evidence of "intent to kill."

Def's § 2255 Mot.                              367                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

      i.      The government failed to produce names and addresses of key witnesses.

      k.      The district court erred by failing to dismiss the indictment on double jeopardy grounds.

      l.      The government failed to follow the *Petite* policy.

      m.      Movant asserted cumulative error.

21. On July 25, 2007, the Court of Appeals rejected all of the Movant's claims and affirmed the judgment of the District Court. The decision is published at 496 F.3d 1079 (10th Cir. 2007) (Tacha, Briscoe, Murphy).

22. A timely Petition for Certiorari was filed on October 12, 2007.

23. The Petition for Certiorari was denied on March 17, 2008 at 128 S.Ct. 1648 (2008).

24. Mark Henricksen, Esq. and Roger Hilfiger, Esq. represented Movant in these proceedings. The Government was represented by Sheldon Sperling, US Atty. and D. Michael Littlefield, Asst. US Atty.

## APPENDIX B

## INDEX TO EXHIBITS

## NON-SEALED EXHIBITS

<u>**VOLUME I**</u>

Exhibit 1            Marriage Certificate for A.J. and Ada Barrett

Exhibit 2            Marriage Certificate for Abe and Minnie Dotson

Exhibit 3            Marriage Certificate for Allen and Ida Real

Exhibit 4            Marriage Certificate for David and Carolyn Joseph

Exhibit 5            Marriage Certificate for Ernest and Sylvia Gelene
                     Barrett

Exhibit 6            Declaration of Rodney Floyd

Exhibit 7            Marriage Certificate for Kenneth and Abigail Barrett

Exhibit 8            Marriage Certificate for Hugh and Hattie Dotson

Exhibit  9           Marriage Certificate for Sam and Ida Hatter

Exhibit 10           Marriage Certificate for Sam and Bessie Hatter

Exhibit 11           Marriage Certificate for Paul and Sylvia Gelene Dudley

Exhibit 12           Divorce File for Ernest and Sylvia Gelene Barrett

Exhibit 13           Declaration of Janesse Thomas

Exhibit 14           Declaration of Dale Anderson

Exhibit 15           Divorce File for Isaac and Marilyn Barrett

Exhibit 16           *State of Oklahoma vs. Abe Dotson*, dated December 14, 1917 and
                     December 15, 1917 (Commitment to Penitentiary)

Exhibit 17           *State of Oklahoma vs. Abe Dotson*, Record of Informations, dated
                     November 12, 1915 (Assault with the Intent to Kill)

Exhibit 18     *State of Oklahoma vs. Abe Dotson*, Criminal Docket, dated 1915 (Assault with the Intent to Kill)

Exhibit 19     *State of Oklahoma vs. Abe Dotson,* Criminal Docket (Carrying Weapon)

Exhibit 20     *State of Oklahoma vs. Abe Dotson*, Criminal Trial Docket (Drunk in a Public Place)

Exhibit 21     *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Drunk in a Public Place)

Exhibit 22     *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Larcenry)

Exhibit 23     *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Obtaining Money Under False Pretense)

Exhibit 24     Declaration of David Autry

Exhibit 25     *State of Oklahoma vs. Billy Dean Maxwell*, Case Number 1715 (Burglary)

Exhibit 26     *In the Matter of Mental Illness of Billy Dean Maxwell*, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982

Exhibit 27     *In the Matter of the Sanity of A.J. Barrett*, Case Number 141, Lunacy Record, dated August 12, 1918

Exhibit 28     *In the Matter of the Sanity of A.J. Barrett*, Case Number 709, Mental Health Record and Petition for Order of Admission to State Hospital

Exhibit 29     Declaration of Mark Henricksen

Exhibit 30     *Ada Blount vs. Kathleen Blake*, Case Number 13026

Exhibit 31     Declaration of Leonard Post

Exhibit 32     *In the Matter of the Sanity of Wallace Dotson*, Lunacy Record, Case Number 366, dated May 4, 1948

Exhibit 33     *In the Matter of Mental Illness of Kenneth Barrett*, Case Number 481, Record of Mental Health Proceeding

Exhibit 34     Declaration of John Echols

Exhibit 35     Excerpts from Kenneth Barrett's Baby Book

Exhibit 36                    Letter from Kenneth Barrett

Exhibit 37-58                 Intentionally Left Blank, No Exhibits

Exhibit 59                    *State of Oklahoma vs. Henry Edwards* (Manslaughter)

Exhibit 60                    *State of Oklahoma vs. Marilyn Crawford*, Case Number 3005, Criminal
                              Docket (Cultivation of Mari)

Exhibit 61                    *State of Oklahoma vs. Kenneth Barrett*, Docket Sheet, Case Number
                              CF-97-00086

Exhibit 62                    *State of Oklahoma vs. Tom Dotson*, Case Number 3005, Criminal Docket
                              (Disposing of Mortgaged Property)

Exhibit 63                    *State of Oklahoma vs. Tom Dotson*, Case Number 2763, Criminal Docket
                              (Manslaughter in the First Degree)

Exhibit 64                    Letter from John Echols to Honorable James H. Payne, dated February 28,
                              2005

Exhibit 65                    Letter from Honorable James H. Payne to John Echols, dated February 22,
                              2005

Exhibit 66                    Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008

Exhibit 67                    Declaration of Julia O'Connell

Exhibit 68                    *United States of America vs. Karen Real*, Case Number, Case Number
                              CR-00-21-FHS

Exhibit 69                    *Barrett Death Sentence Upheld*, Tahlequah Daily Press, dated July 27,
                              2007

Exhibit 70                    *Drug Offender Receives Break*, Times Record

Exhibit 71                    Letter to the Editor, *She Questions Sheriff's Department*, dated October
                              17, 1999

Exhibit 72                    *State of Oklahoma vs. Charles Sanders*, Case Number CF-1998-00022

Exhibit 73                    Photographs of Kenneth Barrett's shack

Exhibit 74                    Declaration of Ada Blout

Exhibit 75          Declaration of Alvin Hahn

Exhibit 76          Declaration of Billy Poindexter

Exhibit 77          Declaration of Brandy Hill

Exhibit 78          Declaration of Carolyn Joseph

Exhibit 79          Declaration of Dewey Padgett

Exhibit 80          Declaration of Doris Barrett, dated February 10, 2009

Exhibit 81          Declaration of Ernest Barrett

Exhibit 82          Declaration of Frank Gordon

Exhibit 83          Declaration of Gwendolyn Crawford

Exhibit 84          Declaration of Issac Barrett

Exhibit 85          Declaration of Janice Sanders

Exhibit 86          Declaration of Kathy Trotter

Exhibit 87          Declaration of Linda Riley

## **VOLUME II**

Exhibit 88          Declaration of Mike Mackey

Exhibit 89          Declaration of Dr. Myla Young

Exhibit 90          Declaration of Paul Rickie Lunsford

Exhibit 91          Declaration of Phyllis Crawford

Exhibit 92          Declaration of Roger Crawford

Exhibit 93          Declaration of Ruth Harris

Exhibit 94          Declaration of Sally Davis Johnson

Exhibit 95          Declaration of Shawn Hill

Exhibit 96          Declaration of Toby Barrett

Exhibit 97            Declaration of Sylvia Gelene Dotson

Exhibit 98            Declaration of Mark Dotson

Exhibit 99            Declaration of Steve Barrett

Exhibit 100           Declaration of Warren Dotson

Exhibit 101           Declaration of Nona Reich

Exhibit 102           Declaration of Carl Cook

Exhibit 103           Declaration of Abby Stites

Exhibit 104           Declaration of Richard Barrett

Exhibit 105           Declaration of Doris Barrett, March 5, 2009

Exhibit 106           New Articles from Vian American and Sequoyah County Democrat
                      Regarding Abe Dotson

Exhibit 107           Description Narrative, Written by Trooper Glen Smithson, dated
                      September 29, 1999

Exhibit 108           Excerpt from the Deposition of John Philpot

Exhibit 109           Report by Edward E. Hueske

Exhibit 110           Curriculum Vitae of Edward E. Hueske

Exhibit 111           Declaration of Steve Leedy

Exhibit 112           Declaration of Lauren Cohen Bell

Exhibit 113           2008 Declaration of Kevin McNally

Exhibit 114           Declaration of Rodney Floyd

Exhibit 115           Memo Regarding DOJ Report on the Federal Death Penalty System, dated
                      June 11, 2001

Exhibit 116           2007 Declaration of Kevin McNally

Exhibit 117           Declaration of Dr. George Woods

Exhibit 118         Declaration of Roseann Schaye

**SEALED EXHIBITS**

Exhibit 119         Birth Certificate of Kenneth Barrett

Exhibit 120         Birth Certificate of Sylvia Gelene Dotson

Exhibit 121         Birth Certificate of Richard Barrett

Exhibit 122         Birth Certificate of Toby Barrett

Exhibit 123         Birth Certificate of Stephen Barrett

Exhibit 124         Death Certificates of Allen M. Real and Allen
                    Cleveland Real

Exhibit 125         Death Certificate of A.J. Barrett

Exhibit 126         Death Certificate of Ada Melton Barrett

Exhibit 127         Death Certificate of Albert Maxwell

Exhibit 128         Death Certificate of Billy Maxwell

Exhibit 129         Death Certificate of Hattie Dotson

Exhibit 130         Death Certificate of Death Certificate of Hugh Dotson

Exhibit 131         Death Certificate of Ida Melton

Exhibit 132         Death Certificate of Isaac Barrett

Exhibit 133         Death Certificate of Mary Barrett

Exhibit 134         Death Certificate of Minnie Andrews

Exhibit 135         Brandon Smith Social Security Records, Itemized Statement of Earnings

Exhibit 136         Educational Records for Kenneth Barrett

Exhibit 137         Educational Records for Gwendolyn Barrett

Exhibit 138         Educational Records for Ernest Barrett

Def's § 2255 Mot.                        374                   *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Exhibit 139          Medical Records for Carolyn Joseph

Exhibit 140          Medical Records for Kathy Trotter

Exhibit 141          Medical Records for Brandy Hill

Exhibit 142          Medical Records for Toby Barrett

Exhibit 143          Medical Records for Travis Crawford

Exhibit 144          Medical Records for Cynthia Crawford

Exhibit 145          Medical Records for Linda Riley

Exhibit 146          Medical Records for A.J. Barrett

Exhibit 147          Medical Records for Kenneth Barrett

Exhibit 148          Report of Interview with Kenneth Barrett by the Oklahoma State Bureau of Investigation, dated October 11, 1999

Exhibit 149          Marriage Certificate for Ernest and Diana Barrett

Exhibit 150          Divorce File for Eugene and Sylvia Gelene Dudley

Exhibit 151          Divorce File for Kenneth and Abigail Barrett

Exhibit 152          *Kimberly Pulice vs. Richard Barrett*, Case Number JFP-2004-17

Exhibit 153          *In the Matter of Guardianship of Brandon Leroy Smith*, Case Number PG

Exhibit 154          *In re: Sale of Inherited Lands of Lewis Dotson*, Case Number 481

Exhibit 155          Sylvia Gelene Dotson's Genealogy Memorandum

Exhibit 156          *State of Oklahoma vs. David Littlefield*, Case Number SCBD-5338

Exhibit 157          *State of Oklahoma vs. Charles Sanders,* Case Number CF-97-9

Exhibit 158          *State of Oklahoma vs. Charles Sanders*, Case Number CF-97-75

Exhibit 159          *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-128

Exhibit 160          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-346

Exhibit 161          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-363

Exhibit 162          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-99-562

Exhibit 163          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2001-314

Exhibit 164          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2003-124

Exhibit 165          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2004-19

Exhibit 166          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-03-365

Exhibit 167          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-96-0444

Exhibit 168          *State of Oklahoma vs. Charles Sanders*, Case Number  CRF-92-91

Exhibit 169          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-08-224

Exhibit 170          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-2204-613

Exhibit 171          *State of Oklahoma vs. Cindy Crawford Mattox*, Case Number
                     CM-2001-885

Exhibit 172          *State Oklahoma vs. Brandie Price*, Case Number  CF-99-549

Exhibit 173          *State Oklahoma vs. Brandie Price*, Case Number  CM-00-900

Exhibit 174          *United States of America vs. Brandie Price*, Case Number
                     CR-07-16-RAW

Exhibit 175          *State Oklahoma vs. Charles Sanders*, Case Number  CF-97-140

Exhibit 176          *Michael Mackey vs. Cindy Crawford*, Case Number  PO-03-390

Exhibit 177          *State Oklahoma vs. Aubrey Jacobs, Joseph Jacobs, James Jacobs, Brandie
                     Price*, Case Number CF-98-481

Exhibit 178          *State of Oklahoma vs. Travis Crawford*, Case Number  CM-08-655

Exhibit 179          *State of Oklahoma vs. Randy Weaver*, Case Number  CF-00-668

Exhibit 180          Letter from Larry and Brenda Sell to Honorable John Garrett

Exhibit 181          Background Materials on Clint Johnson:  Testimony of Clint Johnson in
                     *State of Oklahoma vs. Richard Loy Gray* and Exhibits

Exhibit 182          Bill Ed Rogers's File

Exhibit 183          *State of Oklahoma vs. Charles Sanders*, Case Numbers CM-08-1525 and CF-98-111

Exhibit 184          *State of Oklahoma vs. Charles Sanders*, Case Number CF-94-1503

Exhibit 185          *State of Oklahoma vs. Charles Sanders*, Case Number CM-03-6603

Exhibit 186          *State of Oklahoma vs. Charles Sanders*, Case Number CM-04- 1187

Exhibit 187          *State of Oklahoma vs. Charles Sanders*, Case Number CM-00-389

Exhibit 188          *State of Oklahoma vs. David Littlefield*, Case Number TRC-02-04186

Exhibit 189          *State of Oklahoma vs. David Littlefield*, Case Number CF-2007-369

Exhibit 190          *State of Oklahoma vs. Dawn Littlefield*, Case Number TRC-08-00774

Exhibit 191          *State of Oklahoma vs. Dawn Littlefield*, Case Number CF-2006-244

Exhibit 192          *Pam Littlefield vs. Mike Littlefield*, Case Number CJ-05-572

Exhibit 193          *Bank of Oklahoma vs. Jennifer and David Littlefield*, Case Number CJ-03-988

Exhibit 194          Affidavit for Search Warrant signed by Clint Johnson and Search Warrant, dated September 20, 1999

Exhibit 195          *State of Oklahoma vs. Randy Turman*, Case Number CF-02-477

## VERIFICATION UNDER PENALTY OF PERJURY

My name is Tivon Schardl.  I am an attorney licensed to practice law by the State of Florida, and I am a member in good standing of the bar of the United States District Court for the Eastern District of Oklahoma.  I am a supervising assistant federal defender in the Capital Habeas Unit of the Federal Defender Office for the Eastern District of California.  In 2008, I was appointed post-conviction counsel for Kenneth Eugene Barrett with David Autry as lead counsel.

I am authorized by Kenneth Eugene Barrett to file the foregoing motion to vacate, set aside, or correct the sentence, and for a new trial made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.  I am filing the motion on Mr. Barrett's behalf. Mr. Barrett is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing motion for collateral relief, to vacate, set aside, and correct the conviction and death sentence is made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.  I declare that the contents of the foregoing Motion are true except for those matters based upon information and belief, and I believe the latter matters to be true.  The sources of my information include, but are not limited to, official court records, various documents prepared during investigation of this Motion, and items in the possession of other lawyers, investigators and/or experts connected with the preparation of this Motion.  I make this verification pursuant to Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings because these matters are more within my knowledge than Mr. Barrett's knowledge.

Def's § 2255 Mot.                            378                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

I declare, under penalty of perjury, that the foregoing is true and correct.

/s/  Tivon Schardl
Tivon Schardl

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## EXHIBIT 61

---

# ON DEMAND COURT RECORDS

## CASE DETAIL

| County: | Sequoyah - **County Last Updated: 03/13/2009 08:00** |
|---|---|
| Case: | CF-97-00086<br>STATE OF OKLAHOMA vs. BARRETT, KENNETH EUGENE |
| Date Filed: | 03/24/1997 |
| Amount Owed: | $0.00 (as of 03/13/2009 08:00) |

## OFFENSE

UNLAWFUL DELIVERY OF CONTROLLED DRUG

| Parties | |
|---|---|
| Defendant | BARRETT, KENNETH EUGENE - VIAN OK |
| Attorney | ECHOLS, JOHN DAVID - TULSA OK |
| DA | DISTRICT ATTORNEY OF SEQ. CO - SALLISAW OK |
| Officer | BLOUNT, LARRY - SALLISAW OK |
| Judge | PAYTON, JEFF |
| Agency | SALLISAW POLICE DEPT. - SALLISAW OK |

| Case Entries | | |
|---|---|---|
| **Date:** | **Case Entries** | **Amount** |
| 03/24/1997 | PRE COMPUTER | |
| 08/04/1997 | FILE IS READY FOR INSPECTION | |
| 08/27/1997 | CM: DMS DEF. APPEARS W/ATTY ROGERS, STATE REP. BY BARNES, CASE SET THIS DATE FOR PREL; WITNESSES SWORN, TESTIMONY HEARD, DEF. BOUND OVER FOR TRIAL, DCA SET FOR OCT 9, AT 1:30 P.M. BEFORE JCG. 27-84 | |
| 10/09/1997 | CM: JCG STATE APPEARS BY S BARNES, DEF WITH ATTY B. ROGERS. DEF ENTERS PLEA NOT GUILTY. SET FOR NEXT JURY DOCKET. 27-148 | |
| 10/16/1997 | TRANSCRIPT OF PROCEEDINGS PRELIMINARY HEARING HAD ON THE 27TH DAY OF AUGUST 1997 BEFORE JUDGE SPROUSE-1 ORIGINAL | |
| 06/12/1998 | LETTER FROM EASTERN STATE HOSPITAL (FILED IN WRONG CASE SHOULD BE FILED IN CF-98-86 ST VS. PAUL E. WARFORD) | |
| 09/02/1998 | LETTER FROM DA TO ATTY K.BARRETT | |
| 09/02/1998 | MOTION TO PRODUCE | |
| 09/03/1998 | SUBPOENA ISSUED BACK TO DA | |
| 09/08/1998 | MOTION FOR EX PARTE HEARING | |
| 09/11/1998 | MOTION TO WITHDRAW | |
| 09/14/1998 | ORDER FOR HEARING 9/24 AT 9AM. | |
| 12/14/1998 | APP FOR COURT APPT ATTY | $40.00 |
| 01/19/1999 | SUBP'S ISSUED-5 ST | |
| 01/27/1999 | CM: AJH; DEFENDANT FAILED TO APPEAR FOR JURY TRIAL. BENCH WARRANT. 29-17 | |
| 01/28/1999 | B/W ISSUED | $50.00 |

| | | |
|---|---|---|
| | (Entry with fee only) | $5.00 |
| 09/27/1999 | BW FILED | |
| 02/24/2000 | SUBPOENA'S ISSUED (5) ST | |
| 02/25/2000 | LETTER FROM DA TO ATTY | |
| 03/01/2000 | ENTRY OF APPEARANCE -ECHOLS | |
| 03/01/2000 | OBJECTION TO 22 O.S. | |
| 03/06/2000 | MOTION TO CONTINUE TRIAL SETTING | |
| 09/18/2000 | ORDER FOR HEARING, JURY TRIAL | |
| 04/29/2004 | NOTICE OF APPOINTMENT OF SPECIAL VOLUNTEER ASSISTANT DISTRICT ATTORNEY | |
| 05/17/2004 | ENTRY OF APPEARANCE | |
| 05/24/2004 | MOTION FOR ORDER PROHIBITING THE APPEARANCE OF PURPORTED SPECIAL PROSECUTORD AND OR SPECIAL ASSISTANT DISTRICT ATTORNEY | |
| 06/24/2004 | MOTION FOR OARDER PROHIBITING THE APPEARANCE OF PURPORTE SPECIAL PROSECUTORS AND OR SPECIAL ASSISTANT DISTRICT ATTORNEY | |
| 02/03/2005 | COURT MINUTE-ORDER | |
| 02/14/2005 | ENTRY OF APPEARANCE | |
| 02/14/2005 | ENTRY OF APPEARANCE | |
| 02/22/2007 | CM: JP DISMISSED AS MOOT. 39-112 | |
| 03/16/2007 | DISMISSING COSTS | $-20.00 |
| | (Entry with fee only) | $-5.00 |
| **Total:** | | **$40.00** |

| Date: | Time: | Calendar Events: |
|---|---|---|
| 01/28/1999 | | Date Action: ISSUE BENCH WARRANT FAIL TO APPEAR Completed : 09/27/1999 |
| 02/03/2005 | 11:00A | Date Action: DISPOSITION DOCKET |
| 08/18/2005 | 11:00A | Date Action: DISPOSITION DOCKET |
| 08/10/2006 | 1:30P | Date Action: DISPOSITION DOCKET |
| 02/22/2007 | 1:30P | Date Action: PAYTON HEARING CRIMINAL |
| 02/22/2007 | | Date Action: ST DISMISSED/SETTLED |

| Date: | Receipts: | Amount: |
|---|---|---|
| 12/14/1998 | R1-011914 BARRETT, KENNETH EUGENE | $40.00 |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |


**EXHIBIT 62**

286

# CRIMINAL APPEARANCE DOCKET

### SEQUOYAH COUNTY, OKLAHOMA

The News-Dispatch Printing & Audit Co., Shawnee, Okla.

| No. | STYLE OF CASE | NATURE OF ACTION | ATTORNEYS |
|---|---|---|---|
| 300 5 | STATE OF OKLAHOMA vs Tom Dotson | Disposing of Mortgaged Property | Ed. J. Armstrong |

| DATE 1938 | FILINGS, PROCEEDINGS AND RETURNS | CLERK'S COSTS PLAINTIFF | CLERK'S COSTS DEFENDANT | SHERIFF'S COSTS | MISCEL-LANEOUS | CREDITS | DISBURSEMENTS |
|---|---|---|---|---|---|---|---|
| Sept 8 | Docket Fee | 2 00 | | | | | |
| " " | To file Transcript | 10 | | | 1 85 | | |
| " " | To file & record Bond | 1 10 | | | | | |
| " " | To file & record Information | 1 10 | | | | | |
| Oct 27 | case continued for the term – Book 2 page 341 | | | | | | |
| 11-21-41 | case Dismissed B.2. P. 362 | | | | | | |

KEB503071

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 63**

The News-Dispatch Printing & Audit Co., Shawnee, Okla.

| NO. | STYLE OF CASE | NATURE OF ACTION | ATTORNEYS |
|---|---|---|---|
| 2763 | STATE OF OKLAHOMA vs Tom Dotson & Hooley Dotson | Man- slaughter 1st degree | J. Fred Green |

| DATE 1933 | FILINGS, PROCEEDINGS AND RETURNS | CLERK'S COSTS PLAINTIFF | CLERK'S COSTS DEFENDANT | SHERIFF'S COSTS | MISCEL-LANEOUS | CREDITS | DISBURSE-MENTS |
|---|---|---|---|---|---|---|---|
| Dec 8 | Docket fee | 3 00 | | | | | |
| " " | To file transcript | 10 | | | | | |
| " " | " " record Information | 1 10 | | | | | |
| Feb. 22 | Issue alias Warrant Hooley Dotson | 50 | | | | | |
| " 28 | " file Warrant & enter sheriffs ret. | 20 | | 9 00 | | | |
| Mar. 26 | " " Motion to set aside plea of Guilty — | 10 | | | | | |
| " " | " " & record appearance Bond — | 1 10 | | | | | |

KEB503068

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 64**

---

*John David Echols*                                                    *Attorney at Law*

---

SUBMITTED *EX PARTE* AND UNDER SEAL

*VÍA HAND DELIVERY TO THE CLERK*                Monday, February 28, 2005

Honorable James H. Payne
Chief Judge
Eastern District of Oklahoma
101 N. 5ᵗʰ Street
Muskogee, OK  74401

                                        In Re:  US v. Barrett
                                                EDOK Case No. CR-04-115-P

Your Honor:

        Thank you for your letter of February 22, 2005.  For mutual convenience, I am responding to your inquires in the order in which they appear in your letter.

1.      Savings due to prior representation.

        The budget which I submitted was based in part on materials which I received from Federal Death Penalty Resource Counsel, and from review of materials on the FDPRC website, capdefnet.org.  These materials indicate that the time I "budgeted" for attorneys is in line with the time and fees expended in other federal capital prosecutions.[1]

        In my view, the principal advantage from my prior representation of Mr. Barrett is not that I can represent him more cheaply, but that I can represent him more effectively.  Having said that, I do believe that another attorney without my case-specific experience would need to expend a great deal of additional time and effort absorbing the unique history of the case as it played out in state court.

        I found it very difficult to predict the time, particularly to break it down into categories as I was ordered to do.  It may well be that my estimates are overly pessimistic.  However, from my perspective, I believe that the proposed budget for attorney time does take into account the fact that I am not starting from zero, and that a great deal of the work already performed can serve as a foundation for further efforts.  I also know that whatever the budgeted amounts, the Court will have an opportunity to review the actual time expended prior to approval.[2]

2.      Fair compensation.

        The Oklahoma Indigent Defense System pays contract "lead" counsel in a capital case $60 per "out of court" hour, and $80 per "in court" hour.  The contracts also specify that the maximum payment for lead counsel is $20,000, although this amount can be exceeded if the

---

[1]     In addition, in my experience it is generally more expensive in time and effort to move a case quickly on all fronts, than to allow the case to proceed in a more linear way.

[2]     The entries for Mr. Hilfiger were based on projections he provided.  As noted in our Sixth and Seventh *Ex Parte* motions, I broke the attorney budget out from the experts budget so that consideration of attorney fees would not delay presentation of the experts portion to the Circuit Court of Appeals.

---

**Bank of America Bldg., Suite 2112**                        **Voice: 918.299.3802**
**P.O. Box 701196**                                          **Fax:  918.299.9765**
**Tulsa, OK 74170-1196**                                     **defender@pianosa.com**

966

KEB013596

Honorable James H. Payne
February 28, 2005
Page 2 of 6

OIDS Board of Directors makes a finding, as it did in Mr. Barrett's case, that a given case is an exceptional one.

I received approximately $72,229.00 for the first state court trial, although the bulk of this was not paid until the summer of 2003 because OIDS was literally out of money. I do not have available a complete breakdown of the "in court" vs. "out of court" hours for the first $29,214.00 of this sum, but for the balance of $43,015.00, the breakdown was 455.25 out of court hours and 196.25 in court hours. From January 1, 2003, through sentencing in the second trial, I billed and received $59,105.00, representing 720.75 out of court hours and 198.25 in court hours.

In both trials, I bore the expenses of my own secretary, and staying in Sallisaw. I also believe that the time which I recorded and submitted to OIDS was at least 20% low, particularly through the first trial.

In the first trial, OIDS hired or provided the following to assist me:[3]

- an outside investigator, Jim Allison. Mr. Allison was paid approximately $10,000. However, he became seriously ill before the first trial and was not able to participate fully, and OIDS agreed to assign two of its "in house" investigators, Steve Leedy and Jack Stringer to assist me as the case developed to trial.

- an outside mitigation investigator, Roseanne Schaye. Ms. Schaye received approximately $20,000 for her services, but she abruptly resigned prior to the first trial because she was not given an additional unlimited budget authorization. She then refused to submit a summary of her findings and/or tasks remaining unless OIDS paid her an additional $4 or $5,000 fee. Steve Leedy, listed above, retrieved the documents she had accumulated and assumed her responsibilities.

- a SWAT team tactics expert, Monroe Earl Simpson. Mr. Simpson received approximately $5,000 for his services. He was available to testify, but we elected not to present any defense witnesses. I was also very disappointed in the quality of his work, and did not request the use his services for the second trial.

- a psychologist, Faust Bianco. Mr. Bianco charged $150 per hour for testing and evaluating Mr. Barrett. I believe his compensation was under $4,000 for the first case. Mr. Bianco and Ms. Schaye disagreed completely concerning Mr. Barrett's mental well being. OIDS in house psychologist Kathy Lafortune, who is also an attorney, was then involved in the case and was prepared to testify in any second stage proceeding.

- a forensics expert, Ron Singer. Mr. Singer was retained with a $5,000 budget, but because the case took so long to bring to trial, he was compelled to withdraw before he devoted any specific time to the case. OIDS then provided the use of two of its in house

---

[3] I do not have available the hourly billing records for the outside experts, but I believe these estimates based on my recollection are reasonably accurate. The OIDS in house employees are salaried and did not submit time records through me. Also, this reflects only the OIDS staff members who were specifically assigned significant duties for the defense. Throughout the two trials, many other OIDS lawyers and employees consulted with us whenever we requested.

**Bank of America Bldg., Suite 2112**
**P.O. Box 701196**
**Tulsa, OK 74170-1196**

**Voice: 918.299.3802**
**Fax:  918.299.9765**
**defender@pianosa.com**

KEB013597

Honorable James H. Payne
February 28, 2005
Page 3 of 6

forensics experts, Laura Schile for scientific issues, and Lisa Cooper for issues relating to weapons, trajectory analysis and the like. Ms. Cooper sat with me at counsel table throughout both trials.

- a jury consultant, Ernest Harper. Mr. Harper was an in house OIDS employee who specialized in the use of a computer database as an aid to jury selection. Mr. Harper worked with us for approximately two weeks, and returned to other duties after *voir dire*.

In the second trial, and at our specific request, OIDS agreed to assign the same "in house" personnel to the case.[4] In addition, OIDS contracted with Ed Hueske, in place of Mr. Singer, and Jeannie Russell, in place of Mr. Bianco. Mr. Hueske was paid approximately $4,000 for forensic testing and consultation, and he was present and ready to testify concerning weapons related issues if needed. Ms. Russell tested Mr. Barrett, consulted with me, and was prepared to testify in a second stage proceeding. She worked principally with my second chair, Jack Gordon, Jr.. I do not have a clear recollection of her total billings, but I believe they were less than $5,000.

3.    Legal research.

You are correct that we reviewed many similar legal issues in the state court trials. However, I believe that the dynamics of the state court cases differ considerably from this federal case. Judge Garrett preferred to discuss anticipated legal issues informally with the prosecution and defense. For example, in discussing issues relating to jury selection and search and seizure, he would "telegraph" his anticipated ruling based on his understanding of the law. Knowing his position in advance, on issues for which he indicated he would rule against us, we concentrated on being certain that a proper record was made to preserve the issue for any prospective appeal. While this required significant preparation, it was not what I would term "thoroughly" researched.

This was true in relation to death penalty issues as well. His position was known, based upon our discussions and his own experience in capital trials. Moreover, Judge Garrett had ruled that, in the event of a first stage verdict of guilty as charged, there would be at least a two week delay before the beginning of any second stage proceeding.[5] We deferred finalizing our position on these issues until and unless that became necessary. For example, although we prepared drafts, we never presented finalized second stage proposed instructions to Judge Garrett in either trial.

In just the past week, the FDPRC counsel have provided me with two resent opinions from other federal district courts which total almost 300 pages in length. Both opinions, *U.S. v. Sampson*[6] and *U.S. v. Johnson*,[7] emphasize the limited amount of clear precedent concerning

---

[4] Steve Leedy, Jack Stringer, Kathy Lafortune, Laura Schile, and Lisa Cooper. By the time of the second trial, Mr. Harper was no longer with OIDS, and he was replaced in the jury selection role by another OIDS employee, Angie Cole.

[5] This hiatus between first and second stages is, in my opinion, a sound concept, even if second stage legal issues are resolved prior to the first stage.

[6] District Judge Mark L. Wolf, USDC Massachusetts, Cr. No. 01-10384-MLW, issued August 26, 2004.

[7] Chief Judge Mark W. Bennett, USDC Northern District of Iowa, No. CR 01-3046-MWB, issued on February 18, 2005.

Bank of America Bldg., Suite 2112
P.O. Box 701196
Tulsa, OK 74170-1196

Voice: 918.299.3802
Fax:  918.299.9765
defender@pianosa.com

968
KEB013598

Honorable James H. Payne
February 28, 2005
Page 4 of 6

federal death penalty law, and the subtle distinctions between §848 provisions and the balance of federal death penalty law. We will be in large part "writing the book as we go," and in my view this is a more demanding task than locating and following [or objecting to] clear precedent. Add in possible *Apprendi*, *Blakely* and *Booker* issues, and I believe we will need to do far more than merely "update" the previous research.

4.      The use of an investigator.

When I first approached the budgeting issue, I basically thought as you have suggested. However, by the time of my first conference with Magistrate Shreder, I had begun to realize that we are not receiving the same level of cooperation from the United States Attorneys Office that we did from the state court prosecutors.[8] I also became increasingly aware that the government hopes to hang the "drug king pin" label on Mr. Barrett even though the search after his arrest revealed little other than a modest amount of precursors and trace amounts of methamphetamine.

Judge Garrett indicated early on that he considered drug abuse testimony to be troubling because of its potential for prejudicial impact. While drugs were referred to frequently, the only "druggie" whom the state called to testify, was Steven Carl Smith, who got no further than a hearing outside the presence of the jury, in which he admitted that he had committed perjury during that very hearing. Judge Garrett ordered him arrested for perjury and the state then withdrew its notice of intention to call him.[9]

The drug culture in southeastern Oklahoma is both elusive and ingrained. Throughout both state court trials we received rumors of all sorts concerning organized criminal activities and political corruption. Those rumors continue, and a thorough fact investigation could conceivably turn up evidence that Mr. Barrett was targeted not for drug activities, but in retaliation for his having angered local criminal interests.

In my opinion, we will need to be more informed generally about the drug evidence. As soon as we succeed in learning the identity of the government's intended witnesses, we will need to be thoroughly informed about those individuals and their relationship to organized criminal activities and law enforcement agencies.

With respect to the relative costs of fact investigators vs. mitigation investigators [with fact investigators less expensive], I based my opinion on my prior experiences along with anecdotal information from other attorneys. When I sought mitigation services before the first trial, most of the recognized mitigation specialists received fees in the $100 to $150 per hour range. Ms. Schaye was a "beginner" with little experience, but a good resume. She agreed to work for OIDS for $70 per hour, but as I indicated above, she was just beginning in the business and agreed to a lower than usual rate.

---

[8]      The state court prosecutors made all of their witnesses and evidence available to us at our request. In contrast, the government has refused virtually every informal discovery request, and has simply refused to reply to our request that they be responsible for summoning the law enforcement witnesses to hearings or trial.

[9]      In a typical miscarriage of justice, Mr. Smith plead guilty and was placed on an illegal suspended sentence with the concurrence of the prosecutors and the Drug Task Force. This for a man who had admitted committing perjury in a capital case!

Bank of America Bldg., Suite 2112                                    Voice:  918.299.3802
P.O. Box 701196                                                           Fax:  918.299.9765
Tulsa, OK 74170-1196                                              defender@pianosa.com

KEB013599

Honorable James H. Payne
February 28, 2005
Page 5 of 6

I also note that Inquisitor, Inc., the agency which I have requested, charges only $75 per hour, which is lower than I anticipated, but still higher than the rate of $50 per hour requested for Mr. Eberle. There is still a differential, but it is smaller than I anticipated.

5.    The existence of a clear plan for the defense.

I believe that my previous comments address this issue for the most part. Also, while I do think that we have a clear idea of the foundation of Mr. Barrett's first and second stage defenses, I continue to disagree that this knowledge allows me to predict, "how much time [I] plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case."

I also note that in both trials, the state court prosecutors endeavored to present a complete picture to the juries. They basically called all available witnesses. I do not expect the government to simply retry the case that has twice failed to convince a jury that Mr. Barrett intended to kill anyone. They will, in my opinion try a bare bones case that barely, if at all, touches on the statutory elements. It will therefore fall to us to give the jury the complete truth, a task which will take more time and effort than relying on cross-examination.

6.    Ex-parte proceedings.

With respect to particular experts who will be either interacting with the government [such as receiving evidence for independent testing] or certainly testifying at trial, I agree that disclosure of the name of that person *after they have been approved* will not damage Mr. Barrett. However, the disclosure of the justification advanced for each individual expert would necessarily disclose privileged attorney client information. Moreover, I think that if an expert of one sort or the other is approved, and the name and general purpose of the expert is revealed to the government, then the Court could entertain any government objection before the requested funds have been entirely expended.[10]

Generally, exposing Mr. Barrett's attorneys' plans and strategies infringes on his Sixth Amendment rights, and could irreparably harm his defense. I believe also that this is the reason the government has not objected to *ex parte* proceedings concerning the funding of his defense.

7.    Finally, I would like to respectfully express something of my own views about this process.

I am frankly concerned that Mr. Barrett cannot wait much longer to engage the requested experts if we are to be expected to meet the Court's present schedule. Recognizing your responsibility to protect the public purse, it may be that we are simply attempting to meet a schedule which is unrealistic.[11]

---

[10]    With respect to psychological or physiological experts, even the identity of the approved expert should not be revealed until we determine to give notice under Rule 12.2.

[11]    I won't expand upon this point here, because the government is not privy to this correspondence. However, Mr. Littlefield has expressed similar concerns, particularly concerning the transcript of the second trial.

**Bank of America Bldg., Suite 2112**
**P.O. Box 701196**
**Tulsa, OK 74170-1196**

**Voice: 918.299.3802**
**Fax:  918.299.9765**
**defender@pianosa.com**

970

KEB013600

Honorable James H. Payne
February 28, 2005
Page 6 of 6

I am also concerned that Your Honor may view these budgets and budgeted amounts as being set in stone, or a ceiling above which Mr. Barrett's defense should or may not go. This cuts both ways, and it may be that I have subconsciously over estimated some items out of concern that Your Honor will not take kindly to "upward departures." Then again, I have also been instructed that I am to make this case my "highest priority," which I am endeavoring to do.

I was literally sickened when informed by a reporter that the September 23, 2004, Complaint had been filed on the day the statue of limitations ran for drug offenses. From our perspective, this case should never have been filed, and zero dollars should have been needed for this defense. Nevertheless, there is a small constituency to which the government responds that insists on a third trial, and then possibly a fourth or even a fifth if this one doesn't turn out as they wish. Based on what we know now, our sincere efforts to convince the government not to file [Petite Policy] and not to seek the death penalty [Authorization by the Justice Department] amounted to a fool's errand. We anticipate that the government will continue to present one public face to the Court and the defense, while seeking every fair *and unfair* advantage.

I appreciate the opportunity to respond to your concerns. My strong preference would be that we continue to communicate our concerns to one another, and that, on Mr. Barrett's behalf, we be granted the flexibility to alter and amend our plan as the case progresses to trial.

Sincerely,

John David Echols

JDE:am
cc: Roger Hilfiger

**Bank of America Bldg., Suite 2112**
**P.O. Box 701196**
**Tulsa, OK  74170-1196**

**Voice: 918.299.3802**
**Fax:  918.299.9765**
**defender@pianosa.com**

971
KEB013601

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 65**

---



# UNITED  STATES  DISTRICT  COURT
### EASTERN  AND  NORTHERN  DISTRICTS  OF  OKLAHOMA

February  22,  2005

Chambers  of
JAMES  HARDY  PAYNE
Chief  Judge
Eastern  District  of  Oklahoma

!OI  N.  5th  Street,  Muskogee,  OK  74401
P.O.  Box  2459,  Muskogee,  OK  74402
(918)  684-7940  (phone)
(918)  684-7941  (fax)

Mr.  John  David  Echols
Attorney  at  Law
P.O.  Box  701196
Tulsa,  OK  74170-1196

> Re:     *United  States  of America*   v. *Kenneth  Eugene  Barrett*
> Case  No.  CR-04-115-P

Dear  Mr.  Echols:

I have  reviewed  a copy  of the  eight  ex parte  budget  requests  you have  submitted  in the  above  referenced  case. After  reviewing  your  preliminary  litigation  budget,  I have  several  questions  I would  like  you to address  prior to any  action  being  taken  in this  matter.

First,  while  I recognize  this  is a death  penalty  case,  the total  number  of hours  you estimate  will  be expended is more  than  four  times  the number  of hours  billed  in the most  complex  criminal  case that  has come  before this  court  to date.  Because  you have  defended  Mr.  Barrett  in two  earlier  state  prosecutions  based  on the underlying  facts of this  indictment,  it was  my understanding  from  both  you and the Public  Defender  there would  be a substantial  savings  in the amount  of time  that  would  be required  for you to represent  the defendant.  Specifically,  what,  if any,  savings  do you foresee  because  of the previous  trials?  Further,  how are those  savings  reflected  in the proposed  budget  now before  the court?

Second,  the statute  requires  that  I establish  the amount  of compensation  necessary  to provide  "fair compensation."   In order  to determine  the amount  of compensation  that  would  be fair in this  particular  case, I am requesting  that  you advise  me of the amounts  paid  for you to represent  Mr.  Barrett  in each  of the two previous  state  trials,  including  the number  of hours  that  was  billed  to the Oklahoma  Indigent  Defense  System for each  of those  trials.  Additionally,  I would  like  to know  the amounts  paid  for experts  and investigators in each  of the state  trials  and how many  hours  work  was  required  by each  expert  and investigator?

Third,  the number  of hours  you have  requested  for legal  research  on items  such  as search  and seizure,  jury selection,  and the death  penalty  appear  to be issues  that  undoubtedly  would  have  been  researched  thoroughly prior  to the state  court  trials.  Can you explain  why you would  need  to do anything  other  than  update  your previous  research?  From  what  I understand  of this  case,  the facts  are the same.  The only  difference  is the federal  criminal  statute  which  your  client  is now  charged  with  violating.  Why do you need  anything  other than  updating  your  previous  research?

KEB010540

Mr. John David Echols
February 22, 2005
Page Two

Fourth, other than service of subpoenas, for what purpose do you anticipate using an investigator? Can you not use the documents which you obtained through the state court investigators? Also, you have indicated a fact investigator will charge less than a mitigation investigator. In addition, please explain why you anticipate a higher per hourly rate for the mitigation investigator vs. the fact investigator.

It appears the Magistrate Judge has, on at least two occasions, advised you that your budget request should be specific enough for this court to determine what legal services you intend to provide. While Judge White entered an order, prior to my assignment of this case, authorizing all motions and pleadings to be filed ex parte and under seal, this court is prepared to modify that order if counsel does not disclose sufficient information to justify the budget submitted. See 18 US.c. ~ 3006A(d)(4)(D). To the extent you have dealt with what I believe to be the essential facts of this case in two state prosecutions, I assume you have developed a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case).

Finally, regarding your Sixth Motion for Funding of Expert, 21 US.C. ~ 848(q)(9) provides "[n]o ex parte proceeding, communication, or request may be considered pursuant to this section unless a proper showing is made concerning the need for confidentiality." As I understand the history of this matter, you have litigated the central facts of this case in two state court proceedings, using many of the experts you are now requesting authority to engage. What, if anything, is unique about the federal case that would prevent disclosure of your intent to rehire the same individuals (e.g., would such revelation divulge attorney/client privilege or work product)? See 18 US.C. _ (d)(4)(D). It appears this information might actually help resolve this case more expeditiously by allowing the government an earlier opportunity to object to the admissibility and perhaps allowing the court to rule on the admissibility issues prior to expenditure offunds for experts which might not be allowed to testify at trial.

I request you give this inquiry your earliest possible attention.

Sincerely,

James H. Payne

cc:     Mr. Roger Hilfiger
        Attorney at Law
        P.O. Box 791
        Muskogee, OK 74402

KEB010541

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 66**



INVESTIGATIVE SERVICES

364 SOUTH FRONT STREET
MEMPHIS, TN 38103
PHONE (901) 526-6576
FAX (901) 523-9281

September 24, 2008

Mr. Tivon Schardl
Asst. Federal Defender
Office of the Federal Defender
Eastern District of California
801 I Street, 3rd Floor
Sacramento, CA  95814

              Re:  *United States vs. Kenneth Eugene Barrett*
                    CR 04-115-JHP

Dear Mr. Schardl:

After our conversation this past Friday and receipt of your letter dated September 18, 2008, we have checked our records and have no record that we ever conducted any investigative work on behalf of Kenneth Barrett. I have spoken with Glori Shettles, one of our mitigation specialists, and she recalls receiving a telephone call from an Assistant Federal Defender in Oklahoma informing her that the Assistant Federal Defender was going to recommend Ms. Shettles' services to John Echols. I also recall having a brief conversation with Mr. Echols where he also expressed a desire to use our services; however, we heard nothing further from him.

I am sorry, but at this point we have no records in our office regarding Kenneth Barrett. If I can be of further service, please do not hesitate to contact me.

Sincerely,

Ronald L. Lax

RLL:nb

976

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:04-CR-00115-JHP-SPS |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Defendant. | ) | |

## EXHIBIT 67

## DECLARATION OF JULIA O'CONNELL

I, Julia O'Connell, declare the following:

I am currently the Federal Defender for the Northern and Eastern Districts of Oklahoma. I am licensed to practice law in the State of Oklahoma, the various federal district courts in Oklahoma, and the United States Court of Appeals for the Tenth Circuit.

I am familiar with issues surrounding the appointment of counsel for Kenneth Eugene Barrett in his federal capital trial in the Eastern District of Oklahoma. At the time Mr. Barrett was charged, I was an Assistant Federal Defender. Paul Brunton was the Federal Defender for the Northern and Eastern Districts. When Mr. Barrett was initially charged, we received notice that the Court intended to appoint our office to represent him. Mr. Brunton and I met with Judge Payne regarding Mr. Barrett's representation, because we did not feel our office could effectively represent Mr. Barrett, due to the fact that our office was very small and we were already appointed in another death penalty case that we were preparing for trial. *United States v. Edward Leon Fields,* No. CR-03-73-RAW. The *Fields* case was taxing our office resources and I was the only trial lawyer in the office with death penalty trial experience. We explained to Judge Payne that we did not feel it was feasible for our office to effectively represent Mr. Barrett because I was already representing Mr. Fields in his pending capital case.

Mr. Brunton and I asked that John Echols— who represented Mr. Barrett throughout his state court prosecution and had already effectively tried the case (twice)—

1

and Rob Nigh of Tulsa-- who had federal death penalty experience in the Timothy McVeigh case-- be appointed to represent Mr. Barrett. Both Mr. Echols and Mr. Nigh are highly qualified capital attorneys. Based on discussions Mr. Brunton and I had with these two lawyers, we knew they were willing to represent Mr. Barrett. We asked Mr. Echols and Mr. Nigh if they would accept appointment in the Barrett case because we knew that the government would likely seek the death penalty against Mr. Barrett, and we knew our office could not accept the case because of the other pending capital case. Thus, we wanted to get commitments from well-qualified lawyers who were willing to be appointed for Barrett's federal capital trial, so that we could assist the Court by recommending attorneys we felt the judge could rely on to try the case effectively as an alternative to the Federal Public Defender.

Judge Payne initially indicated that he wanted our office appointed, but Mr. Brunton told him that I was the only attorney in the office with capital trial experience and that I could not effectively handle two capital trials scheduled so closely to one another. This led to a discussion of the statutory requirement to appoint "learned counsel" as first chair. Judge Payne or his staff had evidently researched the issue, and the Judge explained that he felt "learned counsel" was not defined in the materials he had reviewed. Judge Payne further explained that it seemed that the federal death penalty cases that were being filed in Oklahoma were being prosecuted in the Eastern District, and he expressed the idea that if counsel from the Eastern District were appointed, that

2

lawyer or lawyers could then take other death penalty cases filed in the Eastern District in the future.

My recollection is that Judge Payne did not appoint Mr. Nigh to represent Mr. Barrett. Instead, he appointed John Echols and Roger Hilfiger, the former United States Attorney for the Eastern District, as Mr. Barrett's lawyers. Mr. Echols eventually withdrew from the case. Judge Payne elevated Roger Hilfiger to first chair and appointed Bret Smith second chair. To my knowledge, Mr. Smith had no capital experience.

On June 21, 2005, I forwarded copies of orders the district court had issued in *United States v. Fell,* No. 2:01-CR-12-01 from the District of Vermont regarding fact-specific voir dire in capital cases to Mr. Hilfiger. I sent these orders to him hoping it would impress upon him the importance of mitigation in a capital case, because I suspected that the Barrett trial attorneys were not fully versed on how to investigate and utilize mitigation evidence. At the time I sent the e-mail, neither of the Barrett attorneys had consulted with me regarding the case.

Mr. Hilfiger called my office on June 30, 2005. I was away from the office, so he left me a voice message, asking if my mitigation specialist was going to be in Muskogee in the future and whether she would be willing to meet with him to discuss mitigation. Although I do not remember the exact wording of his message, I remember that it alarmed me. I got the distinct impression that Mr. Hilfiger did not know what was expected from a defense lawyer during the punishment phase of a federal capital trial.

3

The message led me to believe Mr. Hilfiger thought "mitigation" merely entailed a short meeting with my mitigation specialist (who was in no way involved in or familiar with his client's case) within a few weeks of commencement of trial. I suspected that Mr. Hilfiger did not understand the nature, value or extent of adequate, effective death penalty mitigation. I was taken aback by Mr. Hilfiger's inquiry, because Mr. Barrett's trial was imminent, and there was not sufficient time to do an adequate mitigation investigation. At a minimum, in my opinion, it would take a mitigation investigator or investigators at least six months to conduct an adequate penalty phase investigation.

I responded by e-mail on July 3, 2005, when I returned to the office and received his message. My e-mails to Mr. Hilfiger are attached to this declaration. In my July 3 e-mail response to Mr. Hilfiger, I gave him contact information for Dick Burr, one of the federal capital resource attorneys. I gave him Mr. Burr's contact information because I knew Mr. Burr to be an extremely competent lawyer in the area of death penalty cases, and knew that he was willing to help every lawyer who sought his assistance. I do not know whether Mr. Hilfiger ever contacted Mr. Burr or any other capital resource counsel regarding a mitigation specialist. In any event, as mentioned above, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second stage investigation if it hadn't been substantially completed on June 30, even if Mr. Hilfiger had been able to secure the services of a mitigation investigator or investigators at that late date.

4

I declare under penalty of perjury that the foregoing declaration is true and correct.

Executed by me this 28 day of February , 2009, in
Tulsa County, Oklahoma.

Julia O'Connell

982

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**EXHIBIT 68**

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,                 )
                                          )
   *Plaintiff,*            )
                                          )
v.                                        )  Case No. CR-00-21-S
                                          )
THOMAS DOSS GANN,                         )
RALPH DOUGLAS GANN,                       )
KAREN JEAN REAL and                       )
IRENE MARIE GANN also known               )
as Irene Baker,                           )
                                          )
   *Defendants.*           )

## MOTION FOR REDUCTION OF SENTENCE
## FOR DEFENDANT KAREN JEAN REAL
## PURSUANT TO RULE 35

COMES NOW the plaintiff, the United States of America, by and through Sheldon J.

Sperling, United States Attorney for the Eastern District of Oklahoma, and D. Michael

Littlefield, Assistant United States Attorney for the Eastern District of Oklahoma, and moves this

Honorable Court for a reduction of the sentence of Karen Jean Real pursuant to Rule 35(b),

Federal Rules of Criminal Procedure, for the following reasons:

Rule 35(b)(2) states, in pertinent part, upon the government's motion:

> made more than one year after sentencing, the court may reduce the
> sentence if the defendant's substantial assistance involved (C)
> information, the usefulness of which could not reasonably have
> been anticipated by the defendant until more than one year after
> sentencing and which was promptly provided to the government
> after its usefulness was reasonably apparent to the defendant.

Karen Real testified on behalf of the government in the case of *United States v. Kenneth Eugene Barrett*, and her testimony, in the estimation of the undersigned, constituted substantial assistance warranting a reduction of sentence.

The government filed a complaint alleging capital murder against Kenneth Eugene Barrett in September 2004. In preparation for the Indictment, the undersigned caused Karen Jean Real to be writted to the Eastern District of Oklahoma from the Federal Correctional Institution in which she was incarcerated. The undersigned was aware that Ms. Real had common associations with Barrett. It was hoped that Ms. Real had information that would be of assistance in the prosecution of Kenneth Eugene Barrett and that she would be willing to provide that information. Upon Ms. Real's return to the Eastern District of Oklahoma, the undersigned met with her and learned that Ms. Real had, in fact, associated directly with Mr. Barrett for a substantial period of time during the calendar years of 1997 and 1998. Ms. Real was willing to speak truthfully and freely about information relating to Barrett, his drug dealing activities, and his involvement with firearms. Ms. Real spoke freely, openly, and in the opinion of the undersigned, truthfully. The undersigned advised Ms. Real that there was the possibility that she would be utilized as a witness in the ultimate trial against Kenneth Eugene Barrett. She expressed a willingness to testify without hesitation or reluctance.

One of the strategies utilized by the government in the Barrett prosecution was to establish Barrett's substantial drug distribution activities as well as his extensive involvement with firearms and his willingness to utilize those firearms in the advancement of his drug distribution activities, including the utilization of those firearms against law enforcement officials. Ms. Real testified regarding Mr. Barrett's providing her with methamphetamine as well

2

as his commercial methamphetamine business operations of which she was aware. Ms. Real further testified freely at his trial regarding the firearms that Barrett had in his residence. Her testimony revealed that Barrett always carried firearms with him in relation to his drug distribution activities. Ms. Real further testified that any time a vehicle with which Barrett was unfamiliar would approach his residence, he would retrieve a firearm.

Ms. Real met on more than one occasion in preparation for trial testimony with the undersigned. During those pretrial meetings, Ms. Real was fully cooperative, answering all questions to the best of her ability, and suggesting areas about which she might be able to testify which could potentially be beneficial to the government. Especially impressive to the undersigned, Ms. Real freely advised when she was unaware of information in response to specific questions asked of her. While Ms. Real spoke freely about matters of which she was familiar and aware, it was clear that Ms. Real restricted herself to only those items about which she absolutely certain. She never "guessed" in an effort to enhance her testimony, even though it might enure to her benefit. Ms. Real was uncertain as to the exact dates of her involvement with Barrett and her observations of his commercial drug operations. She limited the time frames about which she was able to testify to periods of which she was certain, even though she knew there was the possibility that the Court could rule those time periods to be too remote to allow her testimony even though such would limit her ability to assist the government to her personal disadvantage. The undersigned has no doubt that Ms. Real's testimony was truthful and was limited to subject matters about which she was certain.

While Ms. Real's testimony was delayed for a substantial period of time, Ms. Real presented the information at the earliest possible opportunity for her to assist the government.

3

The government first presented this matter to a grand jury in November 2004. Ms. Real, at approximately that time, was first approached by the government regarding the knowledge she had involving Kenneth Eugene Barrett. At that time, Ms. Real spoke freely and continued to do so during the duration of her assistance to the government.

While ultimately multiple civilian witnesses spoke of Barrett's drug dealing activities, his use of firearms, and his threats to law enforcement, Ms. Real was the first to do so. Her willingness to provide truthful testimony regarding Barrett's activities made it easier for the subsequent witnesses to come forward . She was the first and cooperated willingly and courageously. Her assistance was substantial and created an environment in which others could cooperate as well. She is clearly deserving of a reduction in her sentence in consideration of her efforts.

Respectfully submitted,

SHELDON J. SPERLING
United States Attorney

D. MICHAEL LITTLEFIELD, OBA # 5461
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK 74401
(918) 684-5100

## CERTIFICATE OF MAILING

I hereby certify that on this 1st day of March, 2006, a true and correct copy of the foregoing was mailed, with proper postage fully prepaid thereon, to: Michael Abel, Attorney for Karen Real, One West Third Street, Suite 1225, Tulsa, OK 74103-3532.

DML:ljh

4

987

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,    )
              )
    Plaintiff,     )
              )
v.            )  No. CR-00-21-FHS
              )
KAREN JEAN REAL,     )
              )
    Defendant.    )

**ORDER**

The government has moved the court pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure for an order reducing the sentence of incarceration previously imposed upon Defendant for the following convictions: (1) conspiracy to manufacture, possess with intent to distribute and distribute methamphetamine in violation of 21 U.S.C. § 846 (Count One), (2) maintaining a place for the purpose of manufacturing, distributing and using methamphetamine in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2 (Count Three), and (3) possessing a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c) (Count Five). Having considered the government's motion, the court concludes a reduction of Defendant's sentence of incarceration is warranted under the facts and circumstances as outlined in the government's motion.

Defendant was originally sentenced to a term of 108 months of incarceration on Count One, a concurrent term of 60 months of incarceration on Count Three, and a consecutive term of 60 months of incarceration on Count Five. The total sentence imposed was 168 months (fourteen years) of incarceration. Defendant has been in federal custody since March 2000 - some six years into her fourteen-year sentence. The government's motion under Rule 35 is

1

988

based upon Defendant's cooperation and testimony during the investigation and subsequent trial of Kenneth Barrett. During the course of the prosecution of Kenneth Barrett, Defendant provided the government with significant information about Kenneth Barrett – information relevant to his drug dealing activities and his involvement with firearms. In the court's opinion, substantial assistance was provided by Defendant in the government's successful federal court prosecution of Kenneth Barrett. Under these circumstances, the court finds Defendant is entitled to some sentencing relief for her substantial assistance provided to the federal authorities.

Turning to the extent of the reduction, the court finds that after having considered the factors enumerated under the policy statement of United States Sentencing Guideline § 5K1.1, a reduction in Defendant's sentence to time served on each of the three counts of conviction is warranted. Consequently, it is ordered that Defendant's sentence be reduced to time served on each of Counts One, Three, and Five, and that Defendant be released from custody forthwith. The original terms of supervised release imposed in this case shall remain in effect.

**IT IS SO ORDERED** this 25th day of April, 2006.

Frank H. Seay
United States District Judge
Eastern District of Oklahoma

2

989

AO 245C (Rev. 12/03) Amended Judgment in a Criminal Case Case 6:00-cr-00021-FHS Document 160 Filed in USDC ED/OK on 05/11/2006 (NOTE: Identify Changes with Asterisks (*))
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern _____ District of _____ Oklahoma

| UNITED STATES OF AMERICA | AMENDED JUDGMENT IN A CRIMINAL CASE |
|---|---|
| V. | |
| KAREN JEAN REAL | Case Number: CR-00-00021-003-S |
| | USM Number: 03760-063 |

**FILED**

**MAY 11 2006**

~~WILLIAM B. GUTHRIE~~
Clerk, U.S. District Court

By: _____
Deputy Clerk

Date of Original Judgment: **February 27, 2001**
(Or Date of Last Amended Judgment)

Michael A. Abel
Defendant's Attorney

## Reason for Amendment:

☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))
■ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))
☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))
☐ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)

☐ Modification of Supervision Conditions (18 U.S.C. §§ 3563(c) or 3583(e))
☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))
☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))
☐ Direct Motion to District Court Pursuant ☐ 28 U.S.C. § 2255 or ☐ 18 U.S.C. § 3559(c)(7)
☐ Modification of Restitution Order (18 U.S.C. § 3664)

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____
☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.
■ was found guilty on count(s) **1, 3, and 5 of the Superceding Indictment.**
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21:846 | Conspiracy to Manufacture, Possess w/ Intent to Distribute, and Distribution of Methamphetamine. | March 2, 2000 | 1 |
| 21:856(a)(1) & 18:2 | Maintaining a Place for the Purpose of Manufacturing, Distributing and Using Methamphetamine. | March 2000 | 3 |
| 18:924(c) & 2 | Possession of a Firearm During and in Relation to a Drug Trafficking Offense. | January 12, 1999 | 5 |

The defendant is sentenced as provided in pages 2 _____ **through 6** _____ of this judgment. The sentence is imposed pursuant to the provisions of 18 U.S.C. § 3553(a).

☐ The defendant has been found not guilty on count(s) _____
■ Count(s) **6 and 7 of the Superseding Indictment** ☐ is ■ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

April 25, 2006
Date of Imposition of Judgment

_____
Signature of Judge

FRANK H. SEAY, U.S. DISTRICT JUDGE
Name and Title of Judge

EOD: **5/11/06**
Date

Judgment — Page <u>  2  </u> of <u>  6  </u>

DEFENDANT:        KAREN JEAN REAL
CASE NUMBER:      CR-00-00021-003-S

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of :

* <u>Time Served on each of Counts One, Three and Five, and that the defendant be released from custody forthwith.</u>

☐   The court makes the following recommendations to the Bureau of Prisons:

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

   ☐   at _____   ☐   a.m.   ☐   p.m.   on _____ .

   ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐   before 2 p.m. on _____ .

   ☐   as notified by the United States Marshal.

   ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

a _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

Case 6:09-cv-00105-JHP   Document 3   Filed 03/16/09   Page 35 of 42

AO 245C (Rev. 12/03) Amended Judgment in a Criminal Case 160     Filed in USDC ED/OK on 05/11/2006     Page 3 of 6
        Sheet 3 — Supervised Release                                                    (NOTE: Identify Changes with Asterisks (*))

Judgment—Page __3__ of __6__

DEFENDANT:       KAREN JEAN REAL
CASE NUMBER:     CR-00-00021-003-S

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of
 5 years on each of Counts One and Three, and a term of 3 years on Count Five.  Said terms of supervised release shall run concurrently.

        The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of
     future substance abuse. (Check, if applicable.)

■   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☐   The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a
     student, as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

        If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

        The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record, personal history, or characteristics and shall permit the probation officer to make such notifications and confirm the defendant's compliance with such notification requirement; and

14)  the defendant shall submit to urinalysis testing as directed by the probation officer.

AO 245C   (Rev. 12/03) Amended Judgment in a Criminal Case
Sheet 3C — Supervised Release                                           (NOTE: Identify Changes with Asterisks (*))

Judgment—Page   4   of   6

DEFENDANT:        KAREN JEAN REAL
CASE NUMBER:      CR-00-00021-003-S

## SPECIAL CONDITIONS OF SUPERVISION

(1)     The defendant shall participate in a program approved by the United States Probation Office for the treatment of narcotic addiction, drug dependency, or alcohol dependency, which will include testing to determine if she has reverted to the use of drugs or alcohol.  If it is determined by the Probation Officer that the defendant is in need of a residential drug/alcohol treatment program, the defendant shall participate in such treatment as directed by the Probation Officer and remain in the treatment facility until discharged.

AO 245C (Rev. 12/03) Amended Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___5___ of ____6____

DEFENDANT:       KAREN JEAN REAL
CASE NUMBER:     CR-00-00021-003-S

## CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $ 300.00 | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| TOTALS | $ | $ | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for    ☐ fine    ☐ restitution.

☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245C     (Rev. 12/03) Amended Judgment in a Criminal Case
            Sheet 6 — Schedule of Payments                                    (NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___6___ of ___6___

DEFENDANT:        KAREN JEAN REAL
CASE NUMBER:      CR-00-00021-003-S

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A   ☐   Lump sum payment of $ _____ due immediately, balance due

        ☐   not later than _____ , or
        ☐   in accordance with  ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B   ■   Payment to begin immediately (may be combined with   ☐ C,     ☐ D, or   ■ F below); or

C   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
        _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
        _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
        term of supervision; or

E   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
        imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ■   Special instructions regarding the payment of criminal monetary penalties:

        A special assessment of $100 on each of Counts One, Three and Five, for a total of $300, is due immediately and shall be made
        payable to the U.S. Court Clerk for the Eastern District of Oklahoma, P.O. Box 607, Muskogee, OK 74402.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due
during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Joint and Several Amount, and
    corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

———————————————————————

**EXHIBIT 69**

———————————————————————

Hugh Downs Reports:
Artery cleaning breakthrough from Nobel Prize Winner.
Drops high blood pressure by as much as 60 points. **Bottom Line**



Sat, Feb 28 2009

**TAHLEQUAH DAILY PRESS Online NEWS**

Currently
**27**
H: 31 L: 19
Click for more weather

travelocity
Choose
from over

**Resources**

Print this story

E-mail this story

Post to del.icio.us

Discuss this story

**Ads by Google**

Oklahoma Teacher Jobs

Rug Cleaning Oklahoma

Florist Enid Oklahoma

Flowers Moore Oklahoma

Published July 27, 2007 09:45 am - MUSKOGEE – Sheldon J. Sperling, U.S. attorney for the Eastern District of Oklahoma, Thursday today that the U.S. Court of Appeals, Tenth Circuit, has unanimously affirmed the conviction and death sentence of Kenneth Eugene Barrett, 47, Sallisaw.

# Barrett death sentence upheld

**Press staff reports**

MUSKOGEE – Sheldon J. Sperling, U.S. attorney for the Eastern District of Oklahoma, Thursday today that the U.S. Court of Appeals, Tenth Circuit, has unanimously affirmed the conviction and death sentence of Kenneth Eugene Barrett, 47, Sallisaw.

"Barrett was sentenced on Nov. 18, 2005, to death for intentionally killing a state law enforcement officer engaged in the performance of his duty," Sperling said in a press release.

Barrett was also sentenced to life imprisonment without possibility of release for both using or carrying a firearm during and in relationship to a drug trafficking crime with death resulting and using or carrying a firearm during and in relationship to a federal crime of violence, with death resulting.

**I need affordable auto insurance.**
My age is:
- 16-19 years old
- 20-24 years old
- 25-29 years old
- 30-34 years old
- 35-39 years old
- 40-49 years old
- 50+ years old

**Go »**

I have had my driver's license for:
- 1-5 years
- 11-15 years
- 21-25 years
- 6-10 years
- 16-20 years

RateMarketplace

"Out of a dark, murderous tragedy, we see today a bright ray of judicial light," said Sperling. "The appellate road is long and challenging. We will continue the battle to uphold courageous jury and judicial decisions in this epic case.

"I am so thankful for a discerning judge, jury, and appellate panel. It's clearly affirmed. There is no open season on law enforcement in the Eastern District of Oklahoma.

Sperling said he is grateful to Mike Littlefield for his work as chief prosecutor in the case; and to Sequoyah County Sheriff Johnny Philpot, who was instrumental in identifying key witnesses who could prove Barrett acted with premeditation.

"The Oklahoma State Bureau of Investigation, Drug Enforcement Administration, Bureau of Alcohol, Tobacco, Firearms, and Explosives, The Sequoyah County Sheriff's Office, and other agents and investigators worked together to investigate this case and see justice done so far," said Sperling.

Barrett was sentenced in 2005 for killing Oklahoma Highway Patrol Trooper David "Rocky" Eales, 49, by shooting him in the arm and chest outside Barrett's home. Eales and other law enforcement officials were conducting a raid on Barrett's home near Vian when the shooting occurred.

Barrett's lawyers have argued Barrett was defending his home and son against people he could not see in the dark; and that to prove the suspect intentionally killed a law enforcement officer, prosecutors had to prove Barrett knew the person he was shooting was a law enforcement officer, according to briefs filed in Barrett's original appeal.

Prosecutors argued that several witnesses testified Barrett "expected law enforcement officers to come upon his premises and that he intended to kill as many of them as he could rather than allowing himself to be taken into custody."

Barrett's first state trial ended in a hung jury; and during his second state trial, jurors found Barrett guilty of manslaughter in the death of Eales and felony assault and battery with a firearm for wounding another trooper.

BARDELL & BARDELL Insurance Agency
Tahlequah, OK 918-456-6129 Click here for more info
Serving All of Oklahoma

**monster**
Coast to Coast. Around the Corner.
**Find your perfect car.**
Select A Make   Search

IT'S W
TO S
BEF
YOU
CONSUMER

**Find a business:**
Business name or type...
HyperLocal
**Location:**
Tahlequah, OK
SEARCH
Maps, Menus, Store hours, Coupons, and more...

**Popular business directory searches**

---

**Premium Jobs**

**Help Wanted:**
Oaks Mission- Now accepting Applications for High School Secretary. Position open until filled. Send resumes to: Wyma...>MORE

**Help Wanted:**
Restaurant Of The Cherokees now taking applications for full and part time help. No Phone Calls Please!...>MORE

**Help Wanted:**
The Salvation Army Heart O' Hills Camp and Conference Center is hiring for the summer season. We have part-time kitchen ...>MORE

**Help Wanted:**
Wanted: Front Office Medical Help plus cleaning. Call 458-9888...>MORE

**Help Wanted:**
Part-time Caregiver needed. $8.00 hour. (918)456-6290...>MORE

**Help Wanted:**
CNA/ CHHA Immediate openings in Tahlequah Area. Call 351-8652...>MORE

**Help Wanted:**
The City of Tahlequah is accepting applications for a Part-time Computer Tech in the Managerial Department. Application...>MORE

See all ads
**Premium cars**

**SELL YOUR AUTO HERE**
CONTACT BRENDA OR HANNAH TO PLACE YOUR AUTO FOR SALE HERE! 918-456-8833 extension 10 or 11...>MORE

**Used Car For Sale:**
1998 Pontiac Sunfire, standard shift, good condition, good mileage. $2500 OBO 456-2707...>MORE

See all ads
**Premium Homes**

**House For Rent:**

997

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 70**

**Drug Offender Receives Break**

*By Wanda Freeman*

TIMES RECORD • WFREEMAN@SWTIMES.COM

One of two Oklahoma residents sentenced Wednesday for federal drug offenses received a sentence break because she cooperated in another case, the prosecutor announced.

Brandie Zane Price, 28, and Leslie Barnard Johnson, 40, both of Muldrow, were sentenced in connection with a methamphetamine possession case prosecuted in U.S. District Court for the Eastern District of Oklahoma in Muskogee.

Each pleaded guilty in April to one count of possession of more than 500 grams of a mixture or substance containing a detectable quantity of methamphetamine with intent to distribute.

The offenses took place between May 2006 and February 2007 in Sequoyah County. The Sequoyah County Sheriff's Office, the Fort Smith Police Department, the Cherokee Nation Marshal Service and the federal Bureau of Alcohol Tobacco, Firearms and Explosives investigated the case.

The offense is punishable by 10 years to life in prison and/or a fine of up to $4 million, plus at least five years of supervised release to follow the prison term, according to plea agreements on record with the court.

Price was sentenced to 60 months in prison plus 36 months of supervised release and ordered to pay a $100 special assessment.

Johnson was sentenced to 70 months in prison plus 36 months of supervised release and ordered to pay $100 special assessment.

Price's sentence was "significantly impacted" by her testimony in the government's case against Kenneth Eugene Barrett, U.S. Attorney Sheldon J. Sperling stated in a news release.

"In this case, the court's sentence reaffirmed a very important principle. Truthful cooperation with law enforcement officers should be encouraged and rewarded," Sperling commented.

Barrett was sentenced to death in December 2005 for the September 1999 killing of Oklahoma State Trooper David "Rocky" Eales during a raid on his rural McKey home. The 10th U.S. Circuit Court of Appeals affirmed his conviction and sentence July 25.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 71**

---

# OPINION

...ah County

Sunday, October 17, 1999
Page A-3

...OYAH COUNTY TIMES
USPS No. 490-840
...NDEPENDENT Democratic NEWSpaper
...MAYO          FLORENCE B. MAYO
...S                    1904-1986

...tten and edited to merit your confidence
N. Oak. St., Sallisaw, Okla. 74955-4637
-Mail address: info@seqcotimes.com
...ne (918) 775-4433   Fax (918) 775-3023
Published each Thursday and Sunday
By Cookson-Hills Publishers, Inc.

JIM MAYO, Publisher
ALLY MAXWELL, Managing Editor
.MIKE ERWIN, Sports Editor
DRIDGE STIMMEL, County Reporter
...Y MAYO, Educational Services Director
.ANNA NUTTER, Advertising Manager
T TYLER, Advertising Representative
...MSTRONG, Classified Advertising Representative
.GAYLA EAKLE, Advertising Design
...CHARD MAYO, Production Manager

MEMBER OF:
...KLAHOMA PRESS ASSOCIATION
INTERNATIONAL SOCIETY OF
WEEKLY NEWSPAPER EDITORS
...IONAL NEWSPAPER ASSOCIATION

SUBSCRIPTION RATES:
...r Area ..................................$18.00 Per Year
...us In Okla. ..........................$35.00 Per Year
...nt To Oklahoma ...................$35.00 Per Year
...oma and Adjacent States ......$45.00 Per Year

...Is Postage Paid At Sallisaw, Oklahoma 74955
: Send address changes to Sequoyah County Times,
...Oak Street, Sallisaw, Oklahoma 74955-4637



THE CITY OF SEMINOLE, ONCE KNOWN AS TIDMORE, IN 1926 EXPERIENCED ONE OF THE GREATEST BOOMS IN THE STATE'S HISTORY WHEN OIL WAS DISCOVERED NEARBY! THE ROCK ISLAND RAILROAD'S INCOME FROM SEMINOLE IN 6 MONTHS, MORE THAN $1,000,000, WAS SAID TO BE EXCEEDED ONLY BY CHICAGO.

A SAUK AND FOX INDIAN, JIM THORPE OF SHAWNEE, WON BOTH THE DECATHLON AND THE PENTATHLON IN THE 1912 OLYMPICS IN SWEDEN AND CAME BACK TO LEAD LITTLE CARLISLE INDIAN SCHOOL TO FOOTBALL VICTORIES OVER HARVARD AND ARMY. HE WAS VOTED THE ALL STAR ALL AMERICA ATHLETE FOR THE FIRST HALF OF THE 20TH CENTURY!

WHIRL WIND, CHEYENNE HEAD CHIEF AND ONE TIME CUSTER FOE, WHOSE DEATH FROM A HEART ATTACK REVEALED THAT HE HAD WILLED HIS PIPE AND HIS WIFE AND FOUR CHILDREN TO U.S. DEPUTY MARSHAL CHRIS MADSEN. AND THEY BROUGHT THE PIPE WITH THEM TO THE MADSEN HOME, THEN IN EL RENO, AND ALL MOVED IN!

EL RENO    SHAWNEE    SEMINOLE

## Letters to the Editor

### Cherokee Water Claim

...when someone (former mayor of Sallisaw, included) ...rokee Nation claims all the water that falls from the ...n enough to run him out of town; or laugh him out. ...hanged! I don't presume the Cherokees have at any ...lade such grandiose claims on Mother Nature, and in ...oma, so you know there must be money involved – ...eler, money for the Tribe, money for the politicians, ...collection – 40 cents added to your monthly water ...or that, we are a bunch of guilt-ridden taxpayers! ...ses undertaken by the Tribe have been well term ...xpenses of personal (bad) habits, I guess 40 cents off ...Is would fit very closely into that category. Let's see, ...beauty of the Cherokee Casino, in Roland, for ...tine little smoke shops dotting the landscape as we ...nute; and now that we taxpayers have established ...lies that have conveniently filled with their rainfall ...the sound of change tumbling through the slot ...I ChaChing! ChaChing!....time again. It seems as ...Peoples and taxpayers we are subsidizing our own ...legislated by the Federal Government! I'd be better ...ashioned way of duking it out. ...) be in touch with my Congressman, as this is our ...s to me current Tribal events make Oklahoma look ...it just visually, but economically and in terms of ...w businesses, and those existing ones, adjusting to ...rce under federal, state and now Cherokee Tribal ...y, I think it's time to look matters squarely in the ...t within a nation, withdraw some of these recent ...by the Tribes, and have the courage to say, "Now,

...proud heritage, what they're becoming now is a ...ckpockets! Let your representatives know how ...n of owning water that falls from the sky, sounds to

Mary Ann Cosner
Gans

### ...obacco Money Wisely

...mmunity hospital, I know the cost of the insurance ...loyees – all of them. I don't smoke and neither do ...s, yet over the years I have seen the cost of health ...eadily increase to cover the costs associated with

...) some relief from this unnecessary burden. ...) Attorney General signed on to a multi-state ...bacco companies to cover the billions of dollars ...year to cover tobacco-related health costs. The, ...ll pay these steadily increasing costs through higher ...l higher taxes. ...ettlement provides Oklahoma with a unique ...ss the settlement money is used for tobacco ...lf find itself right back in the financial hole created ...caring for the current generation of teen smokers

### She Questions Sheriff's Department

Dear Editor:

Everyone has been saddened by the death of the state trooper, especially the McKey community. There are many questions being asked as to how this could have happened. One of these questions is why did the local sheriff's department allow the gun and drug situation to escalate to that point. It should be known that the sheriff's department was contacted many times over the last three years and nothing was done. There were times they would drive by and simply turn around and leave. Sometimes they would not even respond to calls that were made. If the sheriff's department had done what they are paid to do this man's family would not be mourning him now.

Meredith Lawson
Sallisaw

### Comments on Cherokee Pay Raise

Dear Editor:

I worked along with my family in the past Cherokee Tribal election to try to get a chief for the Cherokee Nation who is above the rest in character and morals. While he didn't get elected, I was happy to see a few tribal councilors elected that I thought had integrity.

When I found out last week that the tribal councilors were going to vote themselves a big pay raise, I was sickened. If they feel that $16,800 a year is not enough let them resign and give the job to someone that would be thrilled with the present salary. I thought Cherokee Nation was hurting financially. We are either broke or we have money and if we have money, why not spread it around to the average Indian person just trying daily to survive.

Remember elected officials, you were voted in and you can get voted out. I'm sure all tribal members were watching you vote on Oct. 11.

Suzanne Garrett
Bunch

### Favors Cockfighting

Dear Editor:

Cockfighting and goose killing. Our elected officials, who congregate at 23rd and Lincoln Boulevard in Oklahoma City, have in the past made decisions concerning industry that have killed "the goose that laid the golden egg." Now the pressure is on the legislature to make another decision concerning an Oklahoma industry. Oklahoma is one of only three states that allow cockfighting. Do we follow the 47 states that have outlawed the sport or do we capitalize on being one of only three?

Cockfighting has been going on not just for years or decades, but for centuries. The fowl have been bred for this so long that fighting is part of their nature. Those who breed and keep game fowl take excellent care of them. By the way, this promotes Oklahoma agriculture. The purse money at many cockfights exceeds the purses at our racetracks and attracts many fans. People come from all over the world and bring their stock to participate. Motels fill to capacity and restaurants flourish in areas of our state that need the revenue generated by the sport. Why not take advantage of an opportunity that enhances the economy of some of our financially stressed counties?

What is right about allowing the populated metropolitan areas of the state to determine what is right for less populated areas where

### A Response to Peters' Comments

Dear Editor,

I was some amused by the news report of the Oct. 2 Sequoyah County Republican meeting, wherein Grand Republican Booh-Bah Joe F. Peters, Sr., did "welcome with delight into our fold the Mayo brothers."

Obviously, Joe hallucinated and thought he was present at the end of the world. Once more, Tailgunner Joe wrote like he rides--backward--in the airplane.

I'll not honor his gas attack with reiteration or dissection of my Kansas City Southern column, since any Sequoyah Countian with half an education knows what I said and what I meant. If Tailgunner Joe couldn't understand it he should enroll in night classes and, hopefully, come up to speed with the rest of the world. I would have thought they taught reading comprehension at the U.S. Air Force Academy, but maybe Joe was out tailgunning back then, too.

In today's political discussion (that's what Tailgunner Joe is trying to make of this), charges and claims can be cast with little or no regard for the truth, meaning or intent.

Tailgunner Joe is an excellent imitation of his mentor, the late U.S. Senator Joseph R. (Tailgunner Joe) McCarthy. They both cast the illusion they are "on to something," when actually they have nothing more than bad gas.

Take a Rolaid, Joe, turn around and ride with both eyes looking forward. Who knows, it might even help you shoot straight.

Dick Mayo
Sallisaw

### Thanks for Helping Tori Mills

Dear Editor:

This is to thank all that helped with the fundraiser for Tori Mills.

Thank you for your donations of food, money and time. The bake sale at the Grapes of Wrath was a great success.

This is a great community, thanks again.

Friends of Tori Mills

### Appreciate Help

Dear Editor,

First of all we want to thank our wonderful Lord and Savior for sparing our son's (Chad Sutton) life.

Special thanks to Police Chief Randy Reed, all the officers and entire staff at the Fort Smith Police Department.

Our heartfelt thanks to the many, many people who came and stood by our side. For all the visits, flowers, cards, phone calls, prayers and every act of kindness shown to us during Chad's hospital stay.

To Dr. Anderson, ambulance drivers, all the nurses and staff at Sparks Regional Medical Center.

We can never thank you enough. We love and appreciate each and every one of you.

God bless you all and keep you safe from harm.

Officer Chad Sutton and Family
Doug, Viola (Bobbie) and Dena

### Children And Divorce

Dear Editor:

People wake up! What are we doing to our children? Has anyone

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |


**EXHIBIT 72**

Court file missing

Printed: 03/10/09                    SEQUOYAH COUNTY FELONY DOCKET                    Page: 1
                                       VICKI BEATY, COURT CLERK

| Case No. | TITLE OF CAUSE | NATURE OF CHARGE | ATTORNEYS |
|---|---|---|---|
| CF-1998-00022 | STATE OF OKLAHOMA VS. CHARLES EDMOND (MONK) SANDERS | COUNT 1. KNOWINGLY CONCEALING STOLEN PROPERTY COUNT 2. UNLAWFUL USE OF POLICE RADIO COUNT 3. GRAND LARCENY COUNT 4. FALSE INFORMATION TO POLICE OFFICER | |

Judge:                          Case Information:
                                    Comments: CO-DEF=J BROWN=22A,

| Date | Entries | Book | Page | Fees | Cat. |
|---|---|---|---|---|---|
| 01-23-1998 | INFORMATION | | | | |
| 01-23-1998 | AFFIDAVIT | | | | |
| 01-23-1998 | WARRANT ISSUED-BOND $10000 | | | | |
| 01-29-1998 | MOTION TO DISMISS AND ORDER-WARRANT RECALLED PER JUDGE | | | | |
| 02-27-1998 | WARRANT CANCELLED | | | | |
| 06-11-1998 | CM: AJH;  DEFENDANT ENTERS PLEA OF NOT GUILTY. SET FOR PLEA 6-26-98, AT 11AM. BEFORE JUDGE NELSON.  28-64 | | | | |
| 12-08-1999 | ORDER ACCELERATAING DEFERRED SENTENCE | | | | |

                                                            Total Fees
                                                      Total Unassigned

                                        Amount Due:        $0.00

1003

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 73**











**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 74**

**Declaration of Ada Blount**

I, Ada Blount, declare as follows:

I am Kenneth Barrett's maternal great aunt. My sister is Gelene Dotson's mother. I live with my daughter, Janice Sanders.

Kenny was a hyper little boy who could not sit still. He grew up and built a shack next to his mother's place and tried to make a living fixing cars. I never felt threatened by Kenny. He did not bother me any, but I worried about him because I thought drugs made him do things he wouldn't do otherwise. He was living by himself and got mad at himself sometimes. Once he shot himself.

Kenny never had much of a father, never had any guidance. We all still love him very much.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 1 page declaration is true and correct.

Executed by me this _27_ day of _Feb._ 2009, in _Sq._ County, Oklahoma.

_Ada Blount_

Ada Blount

1

1009

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

### EXHIBIT 75

---

## Declaration of Alvin Hahn

I, Alvin Hahn, declare the following:

I am a neighbor of Kenneth Barrett and am also related to him by marriage. My wife's mother, Janice Sanders, is Ada Blount's daughter.

Kenny and I were more like neighbors than friends or bosom buddies. I went by Kenny's no more than once a month. I never saw Monk Sanders at Kenny's and I never saw Kenny make or sell drugs.

Kenny was paranoid. Kenny told me he thought there were satellites watching him. Kenny never spoke about killing cops or killing anyone, or committing suicide by cops. Kenny never told me there was a warrant out for his arrest. I never saw Kenny do anything violent.

On the night of the incident, I had been sleeping and was awakened by gunfire. I remember the sound of different guns, but I cannot remember which came first or even whether I was awakened by the first shots because I had grown somewhat used to Kenny shooting at night. By the time I looked outside, about 15 seconds after the shooting stopped, there was at least one vehicle with its police lights on.

An investigator working on Kenny's case recently asked me about Kenny and the night of the raid. Then the investigator came back to me with the information I gave him in this declaration. I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that this 2-page declaration is true and correct. Executed by me this 27 day of Feb. 2009, in Sea               AH

Page 1 of 2

County, Oklahoma.

_Alvin Hahn_ (signature)

Alvin Hahn

1012

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 76**

---

## DECLARATION OF BILLY POINDEXTER

I, Billy Poindexter, declare the following:

I am the uncle of Charles "Monk" Sanders. I have known Monk Sanders his entire life. He has been in trouble his whole life and you can believe him about as far as you could throw a pick-up truck. In other words, my nephew Monk Sanders is unbelievable in everything he says. I would not believe him about anything. I am aware that when my nephew Monk Sanders testified against Kenny Barrett at Mr. Barrett's federal trial, he was doing so in order to get out of his own troubles with the law. After my nephew Monk Sanders testified against Kenny Barrett, he served no jail or prison time on anything he was in trouble for.

Not only is it my personal opinion that Monk Sanders is a completely untruthful person, but I am aware that in the community, Monk Sanders' reputation for honesty and truthfulness is extremely poor.

I was not contacted by any lawyers representing Kenny Barrett on his federal case, or any investigator working for Mr. Barrett on his federal case at the time it went to trial. Had I been contacted, I would have provided the above information and would have been willing to testify for Mr. Barrett regarding my nephew Monk Sanders' lack of honesty and truthfulness.

An investigator currently working on Kenny Barrett's case asked me to provide this declaration. I did not write this declaration myself, but I have read it carefully, and it

1

says what I told the investigator during our meeting.

I declare under penalty of perjury that the foregoing one page declaration is true and correct.

Executed by me this _1_ day of _March_, 2009, in _Sequoyah_ County, Oklahoma.

_Billy Poindexter_
Billy Poindexter

2

1015

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 77**

## DECLARATION OF BRANDY HILL

I, Brandy Hill, declare the following:

I am Kenneth Barrett's maternal second cousin. My grandmother, Phyllis Crawford, is a sister of Gelene Dotson, Kenny's mother. My mother is Gwen Crawford, and her mother is Phyllis Crawford. I am married to Shawn Hill, and we live with our two children in Sallisaw, Oklahoma. My youngest baby's middle name is Kenny, named after Kenny Barrett.

My family has learned first hand about bipolar disorder and depression. My mother has bipolar disorder, and I battle with depression. I was treated at Bill Willis several years ago where they prescribed anti depressants for me, but I stopped taking them. I am afraid of being a guinea pig. I had a problem with drugs, but have been clean for years. I was arrested for using methamphetamine and received a five- year suspended sentence. I completed drug court.

My mood swings make it hard on my husband. I used to attack him, kind of the way Kenny and Abby fought. Kenny told me to stop beating on Shawn because it was embarrassing. On more than one occasion, I took all of Shawn's belongings, piled them outside, and burnt them. This parallels Kenny's behavior toward Abby, both to lesser and greater degrees. My husband understands now that my mood swings control me more than I control them. He and my mother encourage me to get treatment, and I am considering it.

My husband lived with Kenny from June through October 1998. Kenny was very generous, and his auto repair business was getting more solid every day. People would pay him hundreds of dollars in cash to replace an engine or a transmission. Kenny also bought and sold cars. He might buy one and flip it the same day.

I have known Travis Crawford and Cindy Crawford for years. Travis is my uncle on my

1


1017

mother's side.  Cindy is his wife.  I know that Travis and Cindy testified against Kenny when he was on trial in Muskogee for the killing of an Oklahoma Highway Patrol Trooper.

I was at Kenny's on September 23 when Travis came over to tell Kenny about the white vehicle that had gone by that Travis thought was cops. Rick was there, as was Toby, Kenny and Bubba Thompson, little Debbie Thompson's son. Most of us were by the garage on the side right next to Gelene's fence.  Travis said Grandpa said he had seen a white SUV go past the house down to the bottoms, which is a dead end, and that it had not come out.  Travis said that either he or Roger thought they were likely cops; I'm not sure which one.  Travis did not come onto the property at that time, but just kind of leaned over the fence and then went back home.  Shawn was just pulling up at the time and I left with him soon after.

There was no talk about killing police or going down in a blaze of glory.  Kenny did not act as if it were anything but normal that the police had come by. The police drove by all the time, sometimes three times a week, from around 1996 to 1999.

Cindy Crawford is completely dishonest and totally untrustworthy.  In my opinion, she has no conscience whatsoever.  I am also aware that she has a very bad reputation for honesty in the community.  She is extremely manipulative.

Cindy has stolen from me and my family several times.  She would steal to get money for drugs.

Cindy intentionally hurts other people with her lies and by trying to get them in trouble for things they never did.  The only reason she would have testified against Kenny would be to get something for herself.

My uncle Travis told me he and Cindy were paid for their testimony against Kenny.

2

1018

Uncle Travis also told me that he did two shots of dope immediately before his testimony and was under the influence of drugs when he testified.

I am aware that Cindy has long acted as a police informant, and has gotten out of trouble because of it. For example, she was enrolled in drug court, but did not have to attend their sessions. Most times when a person fails to abide by the conditions of drug court, they are terminated from the program and charged. Cindy told me this didn't happen to her and she didn't have to attend drug court because "they lost her paperwork."

Around 2001 or 2002, Shawn and I were brought into ADA Robbie Cowan's office. We were asked to roll on Chip Teague, Boss Green and Diane Wynn and to tell whatever they knew about these individuals and the drug trade. We declined. Shortly after that, Cowan was out of office.

At the time of Kenny's trial in Muskogee no one working for his case talked to me about my family or what I knew about Travis and Cindy's honesty. When an investigator working on Kenny's case asked me about these things recently, I told him the information in this declaration. I did not write this declaration myself, but I have read it carefully, and it says what I told the investigator during our meeting.

I declare under penalty of perjury that the foregoing 3-page declaration is true and correct.

Executed by me this 27 day of Feb. , 2009, in

Sequoyah County, Oklahoma.

Brandy Hill
Brandy Hill

3

1019

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |


**EXHIBIT 78**

## DECLARATION OF CAROLYN JOSEPH

I, Carolyn Joseph, declare the following:

I am the maternal aunt of Kenneth Eugene Barrett. Kenny's mother, Gelene, is my oldest sister. I am the youngest of three daughters and am 17 years older than my only brother Mark Dotson. I live in Fort Smith, Arkansas, where I moved about a year ago to be closer to my sister Ruth. Ruth and I are Jehovah's Witnesses, and it's comforting to be close to her.

I used to live on family land but moved into town after my son Dewitt was killed in an automobile accident on November 25, 1997, when he was only 30 years old. I could not live there any more because of the memories. Dewitt was Mark Dotson's best friend. Dewitt had a Masters degree in chemistry. I depended on him so much; he came home on weekends. I am only now beginning to come to terms with losing him. He was a mannerly boy, just a really good son. I work at a small hospital, Booneville Community Hospital where I am the only lab tech on weekends, the only shifts I work. I went back to school at 47 to become a lab technician. I am now 62. Prior to being a lab tech, I was a bookkeeper for Doug Stites and later for Ed Stites. Mike Stites who is married to Abby, Kenny's ex wife, is Ed Stites's nephew. It is a small community around Sallisaw, so we all know each other.

We have had serious mental health problems in my family. I have bipolar disorder and have bouts of depression, sometimes severe. I take Welbutrin for it every day. At one time, I had it really bad. I try now to live for the little things and not to think about the big things. I have seen a psychologist for my condition for years. Ingram Goodwin, who was the son of my mother's sister (a Real until she married), killed his wife and then himself. His wife had just finished medical school. My daughter Stephanie has mental health issues. She is divorced. She is a nice

1

girl, but used to be flighty.  Like Kenny, she was hyper when she was little.  She is outgoing, but is very, very moody. Living with her is awful.

My daddy was not a falling down drunk and could hide how much he drank.  My mother thought he had quit drinking, and that Daddy was doing well near the end of his life.  My mother was surprised when I showed her where Daddy had been stashing vodka bottles in the barn.

I do not want to run Gelene down, because she has had a hard life, working and raising three boys alone, but she was more a drunk who would drink to being sloppy, which Daddy would not do. I think she did it because of the stress she was under.  When I got divorced after my mother passed away, Gelene wanted me to move in with her and I did for a while. She has a big heart, but she does have a drinking problem.

When I was thirteen, my mother and I went to Joliet to help Gelene when Kenny was supposed to be born, but we ended up staying five weeks, because Kenny was born a month late. I paid Gelene and Ernie a visit again when I was 17.  Gelene was drinking up a storm. She was drinking beer and was stinky drunk and unhappy.  Kenny was four. Ernie was dating a woman named Jerry and Ernie ran around all the time. He was a good-looking guy and it went to his head. Ernie was hardly around their home.

Kenny was more than a hyper child. I think he had ADD or something; you could not pin that boy down. He was the most hyper kid I have ever seen. I remember when he was little, he was so loving. He would climb up on you and put his arm around your neck and say, "I love you." He was the sweetest little boy, and then he would change to being loud and kicking for no reason I could see.

Most of the time Kenny was in a high mood, then he would fly off the handle all at once.

1022

Kenny had low self-esteem.  He would duck his little head a lot and act like he was not as good as those around him.  His mother put him down a lot rather than build him up and make him feel good about himself. I do not think you should condemn a child and Kenny had a lot of that. Gelene got worse toward him when he was 11 or 12, around the time of the divorce.

We all felt for Kenny.  Maybe we should have stepped in and done something about it. Kenny did not have much of a chance.  Gelene always took out on him the frustrations she had about Ernie.  Kenny was defenseless.  The damage gets done and there's not much to do about it. A child should not have to be raised like that.  It was easier for Steve because Gelene treated him better than Kenny.  She babied him when he was little, spoiled him rotten, even in high school. She took him and gave him whatever he wanted.  Richie has his problems, too.  He can be downright mean.

Kenny's divorce was hard on him and his wife, Abby.  Abby dearly loved Kenny. Abby has told me more than once she loved him.  Abby explains it as just one of those things that did not work out because Kenny would be so emotional. Kenny moved back home after he and Abby divorced, and I could never figure out why Kenny lived next door to his mother.  They did not get along.  Kenny would have done anything for Gelene, but they argued all the time. She fussed at him constantly over any little thing. It seemed like Gelene and Kenny were a whole lot alike. They argued a lot.

The whole tragedy would never have happened if Ruth had been Kenny's mother.  Ruth is a fortress.  If I have problems, I turn to her.  She's the reason I moved to Fort Smith.  I call her twice a day.  If Ruth had been Kenny's mother from infancy, he would have been taught what was correct.  What a difference that would have made for him.

3

I have never known Kenny to hurt anybody. He gets emotional, but as far as hurting anybody, he is not a dangerous person. My car broke down when I was living on the Dotson property in the little brick house. Kenny came over. He was so mannerly and he fixed my car. He never treated me disrespectfully. He could not have been nicer to me when I did see him, but I worried about him.

Kenny was going downhill, and because I have experience with bipolar disorder I recognized some symptoms in Kenny. I thought if he stopped using drugs, he could improve. Gelene and I met with Kenny in my kitchen to talk about how to get him help. We called the sheriff, asking for help but received none. I am sure that Kenny hallucinated and believed that he was constantly under surveillance. I called the authorities because I thought they could get Kenny off the drugs, that they would get him help. I wanted them to get him in a drug program. I did not want them to hurt him. They would not do anything to help. I made my last call to OSBI just days before the raid on Kenny's property, but I never got past a dispatcher.

I was not the only one to call the law enforcement. Janice Sanders often called the sheriff on Kenny with noise complaints. Janice is one of Kenny's cousins and lived across the road from Kenny. My mother's sister had married Coy Blount whose daughter, Janice, married Tom Sanders. One particular time, that got blown out of proportion at the trial, was when Kenny got miffed that Janice had called the police on him for either shooting his gun in the air or for playing the radio too loud. Kenny had yelled across his property a threat to burn down Janice's house. Neither Janice nor I thought for a moment that Kenny would carry out his threat. He was not vindictive or mean or violent. He was just mad at Janice for calling the police on him. He was just shooting off his mouth. Janice testified about this incident at the trial.

4

1024

Kenny's trial attorney only met me for a few minutes. He asked me about Kenny threatening to burn down Janice's house. I confirmed that I heard the threat, and the attorney did not ask me any other questions so he never learned that no one believed it for a second. He never gave me a chance to tell him. The attorney just told me my testimony would not be required. The attorney never asked whether Kenny had attempted to carry out the threat or whether anyone believed that he would. My answer would have been no. Kenny never had done anything to anyone. The attorney did not ask anything about what Kenny was like as a person, what kind of life he had growing up, or what kind of mental illness runs in our family. I would have answered any questions the attorneys asked and I would have answered them truthfully.

My daughter, Meredith Broomfield, wrote a letter to the *Sequoyah Times* about our family's pleas for help. At first, they would not publish it, but she insisted they do and they finally agreed if she came down to the paper and signed it.

I know Travis Crawford and Cindy Crawford. Travis is my nephew, and he was married to Cindy. Kenny's attorneys in the federal trial never asked me about Travis or Cindy. If they had asked me about them, I could have testified about Travis and Cindy's honesty, not just my opinion, but their reputations.

Cindy Crawford was a heavy drug user, and I could see that her drug use affected her mentally. She seemed to have the mind and attitude of a 12 year old. Cindy is so deceitful and dishonest that it is pitiful. No one I know trusts Cindy or believes anything she says. This is not only my personal opinion. Her reputation for honesty in the community is poor.

It is also my opinion that Travis Crawford, who was also a heavy drug user during the time of Kenny's federal case, is not an honest person. Travis does not have a reputation in this

5

community as an honest person.

Every time Cindy or Travis Crawford came to my home, something turned up missing. They would steal to get money to buy drugs. Travis and Cindy were people who would say one thing and do the other. I once paid Travis $400.00 to build a well house on my property. The materials were delivered. The well house never got built, and the materials were stolen. The only people who could have stolen the materials were Travis and Cindy. No one ever paid me back the money I gave to Travis to build the well house.

On several occasions, Travis asked me for help when he and Cindy were out of money, then he'd steal things from my home and property. Travis once stole four rolls of barbed wire from my barn. The police were notified, and Travis later admitted to me that he had stolen the barbed wire. After my son DeWitt Joseph was killed in an automobile accident some years ago, Travis stole things from his property.

I have not seen or associated with Travis and Cindy Crawford since they testified at Kenny's trial. The things I'm telling about here happened before Kenny's federal trial.

Two investigators who said they were working on Kenny's federal case asked me to talk to them and one of them came back to me with this declaration, and asked me if it says what I told them. I did not write this declaration myself, but I have read it carefully, and it says what I told the investigators during our meetings.

I declare, under penalty of perjury, as provided in the laws of the United States of America, and the State of Oklahoma, that the foregoing 7-page declaration is true and correct.

6

Executed by me this _15th_ day of _February_ , 2009, in _Sebastian_ County, Arkansas.

_Carolyn Joseph_

Carolyn Joseph

7

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 79**

**DECLARATION OF DEWEY PADGETT**

I, Dewey Padgett, declare the following:

I have been a Sallisaw town barber for fifty years. I see all kinds in my business and I hear most things about everything that goes on in this town. My place of business, Padgett's Barber Shop, at 202 N Oak Street, is just down the block from the courthouse where the police, sheriff's and highway patrol have their offices.

I was Kenny Barrett's barber for many years. Kenny was always respectful to me and my other customers. When I heard about what happened up at Kenny's, of course my first thoughts were for Rocky Eales and his family. Soon the talk around town was that there was no reason for the police to do Kenny like they did. Most people think that he had a right to protect his son and his property and that there were other ways to arrest Kenny that would not have put anyone in danger.

Of course, that wasn't Rocky's fault, and as I said we all feel for him and his family. There are those in the community who think that he had a right to defend himself, but most of us felt that it was fair that Kenny got some punishment. We felt that the manslaughter conviction in state court was punishment enough. We felt that trying him again after there was a verdict was pretty much un-American and against everything we were taught in school about justice and double jeopardy.

Παγε 1 οφ 2

1029

Again, I say, and the vast majority of my customers feel this way, that the police didn't have to do Kenny the way they did because they could have arrested him peaceably any time they wanted. And then to do him again like they did in the courts—people don't like that.

Of course, I have some customers who would disagree, but that's how I and most of the town feel.

An Investigator working on Kenny Barrett's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told him and how I feel.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this 2⋲ day of _Zele._____, 2009, in

___So⟨⟨__ County, Oklahoma.

_____
Dewey Padgett

1030

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 80**

_____


## DECLARATION OF DORIS BARRETT

I, Doris Barrett, declare the following:

I am married to Ernie Barrett, Kenneth Eugene Barrett's father. I am Ernie Barrett's third wife. Kenny Barrett is my stepson. I was married to Ernie Barrett before and at the time of Kenny's state trials in Sequoyah County, and during his federal trial in the Eastern District of Oklahoma. I followed Kenny's case closely, both in state and federal court. Before and during the state trials, I had frequent contact with Kenny's lawyers and investigators.

I went to every hearing and every day of both state trials and the federal trial, except I missed just one state hearing that was held in Stilwell.

I had some contact with Kenny's lead federal lawyer, Roger Hilfiger, before and during Kenny's trial, but we never discussed Kenny's family life or history. Mostly, he just outlined the day for me, told me who was going to testify that day. In fact, he only told my husband Ernie and me that we were going to testify on the day we testified in the penalty phase of Kenny's trial. He did not even tell Ernie or me what questions he was going to ask us. No investigator or investigators working for the defense in Kenny's federal case spoke with us.

I did have quite a few conversations with Mr. Hilfiger's co-counsel, Bret Smith, during Kenny's federal trial. Mr. Smith was very upset with what he considered to be Mr. Hilfiger's incompetency and lack of effort and interest on Kenny's behalf. From where I

1

1032

sat in court I could see Mr. Smith become upset at Mr. Hilfiger's failure to object to inadmissible evidence, and at Mr. Hilfiger failing to object to the prosecutor, Mr. Sperling, referring to Kenny as "the murderer" even before the case had been submitted to the jury in the first part of the trial.  Many times there would be people on the stand and Brett would say Mr. Hilfiger needed to object and Mr. Hilfiger would say, "no." Mr. Smith had a real problem with a lot about what Mr. Hilfiger did. At times, Mr. Smith complained to me in private about Mr. Hilfiger's failure to object or do other things to represent Kenny properly. While Mr. Smith and I spoke many, many times, neither he nor Mr. Hilfiger spoke to me about or interviewed me about Kenny's family life or history.

An investigator working on Kenny's case asked me to provide this declaration.  I did not write the declaration myself, but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 2 page declaration is true and correct.

Executed by me this _10_ day of _February_, 2009, in _Creek_ County, Oklahoma.

_Doris Barrett_
Doris Barrett

2

1033

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 81**

Exhs. § 2255 Motion                                             *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

## Declaration of Ernest Eugene Barrett

I, ERNEST EUGENE BARRETT, declare as follows:

I am the father of Kenneth Edward Barrett, the oldest of three sons born to me and Gelene Dotson Barrett during our marriage.  At the time I married Gelene, even before we had children, I almost immediately started running around with other women. When Gelene and I started having children, I did not give much thought to fatherhood and I was mostly an absent father. Today, these many years later, I wish I could take it back and do for my children what they needed and be the kind of parent they deserved.  At the time, though, I had my mind set on doing whatever I wanted as long as I was working.

I always worked and was determined not to live in the kind of poverty I knew as a child growing up.  I went into the glass business and worked myself up from pushing brooms to production superintendent. When I retired, I was earning about $76,000 a year and had a good life.  It was a far cry from the way I lived as a youngster.

I grew up dirt poor, in a log cabin with a dirt floor, no running water and an outhouse in Akins, Oklahoma, outside of Sallisaw. We had a wood stove for heat and a wood cook stove. We all worked and barely scratched out a living for my mother, father, two brothers and two sisters.  I was the oldest child who survived and was born August 8, 1938.  Three other babies were born, but they died. The next oldest who survived, Margaret, was born December 26, 1941.  She died from cancer in 1995.  After Margaret, there was Ike, born May 31,1944, Linda, born May 30, 1946, and then came Gary, who was born January 23, 1948.

1

1035

One of my earliest memories is being taken out of school to work in the fields alongside my parents.  As my brothers and sisters got big enough to walk and carry a load, they joined us in the field.  Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell, and picked beans in Moffitt, Oklahoma.  It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sun up to sundown.  It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it.  When cotton season came, we worked or we starved.  When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

In those days, school was a luxury that came only after work was done. I went to school when I could during the times when my family came back to Akins from working cotton and other crops.  I went to school off and on through the eighth grade in Akins and then started high school.  High school was different for me than for most of the other students. I met Gelene in high school before I had to quit after finishing the eleventh grade.   We sort of dated twice, but I did not have any money to date and my family lived a good 12 miles from town in the country.   I made the football team but had to quit because I could not get to after school practices.  We lived far out in the country and no one could pick me up and drive me back and forth.  Lots of students came from poor families, but my family had it even tougher.  Other students made fun of me and laughed at me because of the way I dressed.  I wore my shoes and clothes until they wore out,

2

and then we had to patch them and keep wearing them. I figure I had to fight every boy in my high school class to hold any respect.

My family had some pretty serious mental problems that folks whispered about back in those days. My father, A.J. (Andrew Jackson), had enormous moods swings from being an alright guy to being totally out of control where nothing could stop him from attacking us. He was sent to the mental hospital in Vinita for a month and was in and out of jail in Sequoyah County for public drunkenness. My father's father, Isaac Clifford Barrett, managed a big ranch until he committed suicide by taking cow black leg medicine. My brother Ike and my sister Linda also have mental problems.

As the oldest boy in the family, I tried to protect my mother and the other children, but I was no match for my father until I was half grown. My father beat my mother and us children with his fists and with anything he could get his hands on. I tried to get between him and my mother when he attacked her. I got beaten more than the other children and learned never to cry when my father hit me. I figure I have a very high pain threshold because I do not remember feeling a hell of a lot. Gary was the only child to hit my father back and that happened when Gary got bigger than Dad. My father was 5'11" and weighed 185. Gary was 5'11" and weighed 270. Gary's nickname was Hoss.

I was three months short of 17 the last time I stepped between my father and mother to try and protect her. My father hit me across the shoulder with a 19-inch metal file that busted my shoulder wide open. My shoulder still has a scar. I left home that day just running because I knew that if I stayed at home I

3

would have to kill my father to protect the others.  I was 6'3" and weighed 187 pounds.   My mother stayed with him all those years and put up with his abuse but I could not.  My mother, Ada, was churchgoing and devout; she did not believe in leaving a marriage no matter how bad it was.  Plus, my father was difficult to figure out because he was also a decent guy when he was sober.   He worked on a pipeline for two or three weeks and then come home, went on a bender, and just went crazy.  There was no stopping him.  He died at the age of 52, sitting on the back porch with a cup of coffee in his hand.  He just laid his head back and died. The coffee didn't spill.

When I left home, I knew what hard work was and was not afraid of it. I moved to Tulsa, where I got a room in a house and got a job in the Hartley Cabinet Shop in May 1955.  In March 1957, I lost my job because of a recession and had to return home for two months.  I joined the Marines and got my first lesson in drinking and chasing women.  I was in such good physical shape that basic training was a walk in the park for me.  I had been tossing hay bales since I was 12.  I got an honorable discharge in 1960 and met up with my family in Clinton, Oklahoma, where they were picking cotton.

After I came home, I saw Gelene in Sallisaw; she was back home for a visit and had been living with her aunt and uncle in Joliet, Illinois. They had helped her get a job at Walgreens.  I had been planning to apply for a job with Oklahoma Highway Patrol, a civil service job, when I ran into her. She had dark brown hair and dark brown eyes and because I didn't just fall off a cabbage wagon I knew she had had a lot of experience with men. I was swept away by

4

how beautiful she was.  Gelene called her aunt and uncle in Joliet, and they talked me into coming to Joliet.  They told me I could make a lot of money at Kerr glass, and they could get me a job.

When we got married, I was a physical supernatural.  I could work eight hours, go to a bar, get into as many brawls as there were, come home, sleep and go back to work.  I was strong as a bull and would fight anybody that wanted to fight. I did not beat them up so that they couldn't work.  Once I knocked them down I did not kick them in the head or anything.

I did pretty much whatever I wanted to and did not think about Gelene or, later on, the boys, other than working and supporting them.  I would go out, drink as much as I wanted, and chase women.  I kept that up for years until I met Doris, my third wife in 1985.  I tried to keep my drinking away from the house and in bars.  I was a Canadian Club (whiskey) straight with a water chaser drinker and drank a fifth at a time. Marriage brought out the worst in Gelene.  She drank right from the beginning of the marriage and straight through when she was pregnant.  She was miserable and complained constantly about how unhappy she was.  She got mad over any little thing and had foul moods.  When she got pregnant, she was miserable.  Her bickering was constant.  I stayed away from home as much as I could, working 16 hours shifts.  I'd rather work a straight 16 hours than listen to her.  I was a trouble-shooter at the plant and could memorize machinery blueprints.  At the end of seven years, I was a supervisor, spurred on by never wanting to be as poor as I was growing up.  I preferred staying at the plant rather than facing Gelene and her drinking.

5

I was not around the house much when Kenny was a little baby but I heard all about how hard it was to sooth him.  He was colicky and cried all the time.  When he got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing. I cannot sit around either, but I am not as bad off as Kenny was.  Even though he was a handful, he was a beautiful little boy.

When the boys got older, I took the boys with me when I hunted and fished. I liked taking Kenny with me hunting.  Sometimes his little legs would give out and I had to carry him on my shoulders.  Boy, he loved that.  Kenny was fearless, but that he was a sensitive little boy too who cried if you hurt his feelings.

When I went home, I would never know which Gelene I would get, what condition she would be in.  I did not want to turn into my father and beat my wife and children.  One time Gelene cut up the front of my shirt with a knife when I was wearing it. I slapped her twice and messed up her nose pretty good, gave her two black eyes and split her lip open. It was around 1963 or 1964.

I discovered women when I was in the Marines and I just thought I had to be with different women until I finally met up with Doris in 1985.  When I was married to Gelene I stayed away from home every few months for a night or two with other women.   Once, in 1966, I moved in with a woman for a couple of years and left Gelene and the two boys.  Gelene was always running back to Sallisaw where she was her daddy's number-one girl.

6

I felt bad about leaving my two boys, Kenny and Richie, but I could not take Gelene anymore. I was still young and immature myself so I wasn't much of a husband either. I just put the boys out of my mind as much as I could. After a couple of years I could not keep the boys out of my mind and I went back with Gelene in 1967. We moved in to the same mobile home I had been living in with my girlfriend. Even though we were back together, neither Gelene nor I had changed any. We both drank as much as we could, and I still stayed away from home. I was arrested time after time and went before the same judge for drunk and disorderly conduct and fighting. The judge told me if he ever saw me again, he was going to jail me for a year. It was my nature and I was out of control when it came to fighting and drinking.

I called a friend in New Jersey and he knew where I could get a job. I left Kerr Glass and moved my family to New Jersey. My new job was at a plant in Wharton, New Jersey, and we lived in Stanhope first and then pretty soon moved to Lake Hopatcong. I kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time.

Gelene left me for good in Lake Hopatcong. She was at the end of her rope, but I did not much care. She used to whip the boys over any little thing and whipped them all the time. She had a bad habit of saying cruel things not just to me but to the boys, too. Kenny was always upsetting her because he could not sit still and was always into everything. He loved my tools and he was always getting into them. I would find them all over the yard and in the woods. It made

7

me pretty mad. Kenny always had a mechanical aptitude that was out of this world.

When Gelene left me, Kenny wanted to stay with me but I was not set up to take care of him and work. Besides, Gelene would not hear of it. Kenny kicked and screamed to stay with me. He was10 or 11 years old and did not want to go with his mother back to Oklahoma. The day Gelene left, she took my paycheck, two of my friends' paychecks that I had won in a draw poker game, which she returned to their wives, and left me with forty-seven cents. I stayed single for five years before I married my second wife and then for six years before I married Doris. I was married to Diane Kay Wilson from 1977-1979, and we lived in Dunkirk, Indiana. I paid Gelene child support, $150.00 per child until each reached 18 and also gave Gelene extra money for the children's school clothes every fall. I also paid their medical, dental and life insurance but Gelene told the children I never gave her any money. Years later, I showed Kenny canceled checks to prove I had paid because he did not believe me. I came back to Sallisaw at least once a year for a week to spend time with the boys.

Kenny always wanted to live with me. I let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny completed ninth grade. Kenny resented my wife Diane and it got the best of me. I lost control when he sassed her, and I hit him pretty hard in the chest. He went flying slamming against the wall. One time I overheard Kenny and some boys talking about running from a fight. I told Kenny, "That's not the way to live your life. If you want, I'll teach you how to fight." Kenny did not show any interest in learning to

8

fight or any interest in fighting.  Kenny was not much of a fighter. Now his brother Steve, he was different.   He would have taken your lights out.  Kenny went back to Sallisaw after that summer and soon quit school for good.  He had a hard time with lessons but could do anything with his hands.

Diane and I moved to Sand Springs, Oklahoma, around 1979.  I was still drinking, but no longer getting drunk or getting into fights at bars. I worked and made a decent living.  We got Kenny a job and made a down payment on a Camero for him.  Kenny did alright for two or three months but he could not stay away from Sallisaw.  Kenny quit his job and went home.  I had to take the Camero back when Kenny could not meet the payments.  It hurt Kenny that I took the car back.  Diane and I divorced and I lived by myself a while until Doris moved in with me in Sand Springs around 1985.  Doris and I married in Fort Smith, Arkansas, on December 28, 1990.

Kenny had bouts of depression and did things that did not make any sense.  Sometimes he would be very down but other times he would be manic, always on the go and upbeat.  Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it.  In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me.  I got him a job with Kerr Glass and he was making real good money.  Kenny had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve.  Kenny worked hard when he worked, but he never

9

seemed to be able to live on his own. He lived with his wife and lots of times they lived with Gelene, he lived with me, or he lived right next to Gelene. He was not an independent person and had to be close to home.

My father died in 1969, and my mother died in 1977. She was as good a woman as there is, but she had a hard life between my father being half crazy and always poor. I believe in calling a spade a spade, and I would never call myself a good father. I still kick myself over the way I lived my life and the way I treated my children, I can't help but ask myself if I had been a good father or if I had stayed with Gelene if Kenny would be where he is. I've tried to make it up to him by standing by him since all this trouble. I went to both state trials every day. I had just started a new job when the federal trial happened so I could only go to that once or twice a week.

Kenny's trial attorney, Mr. Hilfiger, only interviewed me a few minutes before I testified. I did not know what kind of information could help my son, so I just answered questions the best I could.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator when we talked.

I declare, under penalty of perjury, that the foregoing ten (10) page declaration is true and correct.

Executed by me this _10th_ day of 2009, in _Creek_ County, Oklahoma.

Ernest Eugene Barrett

10

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 82**

---

## DECLARATION OF JACK GORDON

I, Jack Gordon, declare the following:

I am a lawyer admitted to practice in the courts of the State of Oklahoma, the various federal district courts in Oklahoma, the United States Court of Appeals for the Tenth Circuit, and the United States Supreme Court.

I was second chair counsel to attorney John David Echols in Kenneth Eugene Barrett's second trial in state court. I was primarily responsible for the second stage of trial, which never occurred, because Mr. Barrett was acquitted of first degree murder and was convicted of manslaughter.

Our second stage psychological expert witness was Dr. Jeanne Russell of Tulsa, Oklahoma. I had prepared her testimony and the testimony of other witnesses based on the investigation and reports that were generated by the investigators working with us on the state case, including Roseann Schaye, who had acted as a mitigation investigator for Mr. Echols before Mr. Barrett's first state trial.

I am aware that after Mr. Barrett's second state trial, he was charged in federal court. I am also aware that Mr. Echols, for a time, represented Mr. Barrett in federal court, but withdrew before the trial. I am aware that Roger Hilfiger and Bret Smith of Muskogee represented Mr. Barrett in his federal trial.

I was never contacted by either Mr. Hilfiger or Mr. Smith regarding the work I did on Mr. Barrett's state case for the penalty phase. Nor did either Mr. Hilfiger or Mr.

1

Smith, or anyone working for them, retrieve my file in Mr. Barrett's case.

I did not write this declaration. The above information was related to one of Mr. Barrett's current counsel. I have read carefully the contents of this declaration, and it accurately reflects what I told one of Mr. Barrett's current lawyers.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this _2_ day of March, 2009, in _Rogers_ County, Oklahoma.

Jack Gordon

-2-

1047

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 83**

## DECLARATION OF GWENDOLYN CRAWFORD

I, Gwendolyn Crawford, declare the following:

I am Kenneth Barrett's maternal cousin.  My mother, Phyllis Crawford, is Kenny's mother's sister.

My family has struggled with mental illness a lot.  I have bipolar disorder and am treated for it.  For a long time, my family had no idea what to make of my moodiness. When I was a child, I paid a terrible price because family and friends thought I could control my mood swings. I used to smoke a lot of marijuana, before I figured out that it was the exact wrong treatment for what ails me.  I am taking prescription drugs now, and it has allowed me to control my moods much, much better.

Both my children have mental problems.  My 24-year-old son Brandon cannot speak and is clearly developmentally challenged. He is a dear boy, warm and responsive.  My daughter, Brandie Hill, also has depression, and is possibly bipolar, but she is fearful of treatment.  Her husband, Shawn Hill and I encourage her to get treatment, and we are hopeful she will make the right decision some day.

For a while, I lived in a trailer just below Kenny's shack on the other side of the ditch that OHP came though when they raided Kenny's.  Sometimes Shawn and Brandy lived with me there, too.  It would have been impossible for a Mazda to go through the two-foot deep ditch without bottoming out and destroying her transmission and oil pan as Brandie Price had testified.

−1−

1049

I know Kenny, and he would not talk about killing police or going down in a blaze of glory.  That would not have been Kenny.

I have known Cindy Crawford for years.  She is married to my brother, Travis Crawford.

It is my personal opinion that Cindy Crawford is a totally dishonest person.  I am also aware that her reputation in the community for honesty and truthfulness is extremely poor.  I would describe Cindy Crawford as one of the biggest manipulators I have ever seen.  She can turn the "water works" on and off to get what she wants, and can also be charming when she needs to be to get something of advantage to herself.  Cindy Crawford has broken into my house and stolen from me on numerous occasions in order to get money to buy drugs.  She is basically a compulsive thief and a liar.  Cindy Crawford has made false referrals to the Oklahoma Department of Human Services regarding my family.  It is common knowledge in the community that Cindy Crawford has worked as a "snitch" for local law enforcement for a long time to get others in trouble and to avoid getting in trouble herself.

My problems with Cindy Crawford reached the point where I actually took a shot at her, and had to go to court over it.  The court case was resolved with me being put on probation.  When I was in court to resolve my case, a lady came up to me and asked if I needed her to testify for me because Cindy Crawford, on the previous day, had beaten this lady's daughter severely with a beer bottle.

–2–

1050

I love my brother Travis very much, but there was no helping him when he was around Cindy and taking drugs.  Travis told me that before he testified in Kenny Barrett's trial, he did two hits of methamphetamine, and was under the influence of the drug when he testified.

I was aware that Kenny was on trial in 2005.  No defense attorney or investigator ever spoke to me about my immediate family or Kenny regarding Kenny's case until last month.  Until recently, no one working on Kenny's case asked me about Cindy Crawford's honesty, either.  If someone had asked me to testify about the things in this declaration, I would have done so.

After investigators working on Kenny's case asked me about my family and Cindy, one of them came back and showed me this declaration.  I did not write the declaration myself but I have read it carefully and it says what I told the investigators during our meetings.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.

Executed by me this __27__ day of __February__ 2009, in __Sequoyah__ County, Oklahoma.

_Gwendolyn Crawford_
Gwendolyn Crawford

—3—

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 84**

**Declaration of Issac Barrett**

I, Issac Barrett, declare the following:

I am Kenneth Barrett's uncle on his father's side of the family. Ernie Barrett, Kenny's father, is my brother.

My wife, Oleta, and I lived on a nice little ranch in Akins, Oklahoma, on land that was inherited by various members of my family. We have a few horses, a few head of cattle, a good dog, and six cats that are self-taught copperhead killers. We also have cougars, coyotes, and bear around here, and we have to keep an eye out for them. I used to hunt but don't care about it anymore. Oleta and I feed deer and wild turkeys all winter, always at the same time of day. If we're late, the deer make a sound and let us know it. Our property is surrounded by woods, and lots of people would think it is pretty idyllic. My grandfather owned 1/3 of this land by himself and 2/3 of this land, twenty acres, with my Uncle John. They died intestate as did my parents. Uncle John's only child Elnora Long, my half-aunt and half cousin, got John's ten acres, which I bought from her. The remaining 20 acres was divided among my grandfather's and Uncle John's grandchildren. We each got 11/144. I bought out most of my family and paid better than the appraised value, and traded for the rest or acquired it by quiet title. Before I bought it, it had lain dormant from 1962-1980; no one lived on it or worked it.

We are able to enjoy life now because we worked hard for it; Barretts are hard working people. Busted my leg twice and my collarbone once. I drive a construction truck for a small outfit now. Before that, I was a production supervisor for 10 years at an open pit, strip surface mine, in Huntington, Arkansas. My job at the mine eventually became a union job. I spent two years in college at West Arkansas College. When I was

–1–

1053

growing up, I worked on ranches.  When I was 15 or 16, I broke horses for $15.00 a horse.  I rode a horse every day for six weeks, and if the horse got broken in, I got paid.

From 1917 to 1943, my grandfather and namesake, Isaac Clifford Barrett, managed a 20,000-acre ranch owned by a Kansas doctor, B.B. Ralph. The ranch has since been carved up some, but much of it is a hunting preserve.

My family goes back a ways around here, and we heard interesting stories about them.  My grandfather Isaac married Mary Ellen Maxwell whose mother was Mattie Newby. Mattie married William Maxwell.  Mattie and William had nine other children besides my grandmother Mary: Hazel, Opal, Ivy Harold, Howard, Jim, a boy named Ann, Sam and Albert.  Isaac didn't like to ride in cars. He used a wagon and a team of mules. He was a walker most of all. He didn't have much to say. He chewed tobacco. We called him Papa. We always had a big garden.

Isaac was a fair man.  When I was three or four Isaac told me, "I'm going to take Mr. Rogers some green beans, radishes and new potatoes—he's been sick, bad off— he's our neighbor; we need to share with him." "Please let me go!" I asked. At first he said no because the grass was so high and he was carrying two large buckets. I begged him, "Please!" Isaac agreed and said, "All right, but you have to keep up with me," and I did.  Coming home, we passed a pear orchard and I asked if we could pick one. He said, "No, they're not our pears."  I tried to argue with him and pointed out that he just gave Mr. Rogers all that food, but he explained, "That's because we have plenty—that doesn't entitle us to these pears." That's the way he was.

Isaac sure had his burdens to carry after he married into Mary Maxell's family. She walked around the yard talking to herself.  At night, she would wake up, wash jars,

1054 B

and think she was canning.  Mary's brother, Howard Maxwell, who worked for Douglas Aircraft in Tulsa, was Loony Tunes and his son Dean Maxwell put a gun to his head and pulled the trigger about 10 to15 years ago.  Dean is buried in Akins Cemetery.

Papa (Isaac) committed suicide by ingesting a remedy for black leg cattle disease.  My mother told me he killed himself because he had a broken heart.  The range was open in Isaac's day. Isaac eventually assembled a small herd, and was cow rich.  His son Wilson, they called him Barney, hounded him to sell the herd and invest the money.  Finally, Isaac gave in. He sold the herd and never saw the money again after giving it to his son.  Took away Isaac's way of life.  He had nothing left.  He killed himself November 24, 1952, and is buried in Akins cemetery.  My grandmother died a little more than ten years later, on December 25, 1963.

Whatever good Isaac had in him, and there was plenty of it, did not pass down to his son, A.J., who was my father.  A. J. married my mother, Ada Mae Hatter.  I loved my father because he was my father, but as a person he was the sorriest man I ever met in my life.  I was born in Marble City, Oklahoma, and then my family moved to Akins, Oklahoma. Both are in Sequoyah County.  We lived a hard life. I had three other brothers who died at or near childbirth; the oldest was two weeks old. Two are buried in Akins cemetery. The stillbirth is buried back in the mountains.

The cabin we lived in had no electricity or running water. Our well water was not usable for humans, although it was all right for animals and crops. We had to haul our water.  My parents got electricity in 1957. Six years later, they got water and a drain. The entire family had to work in the fields traveling from one crop to the next.  We worked strawberry crops, and one time we went to California to pick potatoes.

–3–

1055

My father was an abusive alcoholic and a bully who only cared about himself.  He mortgaged cattle that he didn't own and left it to us kids, every one of us, to pay the debt off by picking cotton and green beans. His mom and dad once bought him a pair of shoes—we were so poor—he didn't like them so he threw them in the fireplace. He would destroy his own stuff. His attitude was always, "I'm bigger than you—the hell with you." My brother Ernie is a lot like my father.

If my father was in a bad mood, he hit me or the other kids with any damn thing, belt, club, board, or limb.  He hit all of us and my mother. I never knew from one day to the next what was going to happen.  He was drunk for two weeks at a time. I could never bring my friends around. Sometimes he was away, working pipeline or the lime quarry. Nobody wanted him to be at home because of the crazy things he did.  He raped and impregnated one of my sisters, Margaret.  He beat her bad if she came home from a date late, and once she said, "Beat me some more, I don't care; you've done everything else." I didn't know what she meant at the time, but now I do. My sister went to New Orleans, had the baby, and gave it up for adoption. My father went to Vinita to the state mental hospital but came back after a month.  He was constantly messing around with other women, and rumors flew around that he fathered another child.

When I turned 14, I had had enough of him beating my mother and us kids.  The next time he hit my mother, I hit him back with a fireplace poker that opened a five-inch gash.  I knocked him out cold. When he came to, I said, "You touch my mother again and I'll kill you." I think he knew I would.  He never hit her again when I was around, but he hit her plenty when I wasn't there, busting her eardrum one time when he slapped her. As I got older, I just stayed away from him.

1056

Some of my family had some pretty serious problems as they grew up.  Kids in school called my brother Ernie "Loco" because of the way he acted, and he never completely straightened out.  Ernie was pretty cruel and treated us kids pretty rough.  When he made us cry, he thought it was funny.  He would destroy what little things we might have.  My sister Linda is not mentally stable and has treatment by a psychiatrist.  My other sister Margaret left home, moved to Bloomington, Illinois, married Morris Cochran and had three boys with him (Kurt, Kent, and Kelly).  She died from cancer in 1995.  My brother Gary seems to be doing pretty well, but he struggles with a dark side he keeps hidden pretty well.

Ernie married Gelene, and I felt sorry for her.  Ernie was Mr. Playboy and good for that one thing only--to use and to walk on women. He botched his marriage. He was always flashing dollars, but  he didn't mind taking money from others, even our poor mother. In the Marine Corps, he got in trouble and was going to go to jail unless Mama sent him $1,000. She borrowed it. We picked cotton to pay it back. In 1969 when dad died, mama had to send Ernie money so he could come home for the funeral, but he always acted like Mr. Big.

My mother knew there was something wrong in the head with Ernie, but she covered up as best she could. Ernie would roll dad if he was drunk and passed out and dad had any money.  Once when Ernie came to visit after his divorce from Gelene, Ernie was driving a new Corvette and he passed his children on the street. I was riding with him.  The children were wearing worn, ragged clothes. I said, "Let's stop; there's your kids." He refused to stop and said, "All they want out of me is money." I think Kenny was 15 or 16 then. It was right pitiful.  The less Ernie wanted Kenny, the more Kenny

1057

worshipped him.

Gelene had something wrong with her, too. I would come over and some new boyfriend would just be getting out of bed—you never had any idea who was going to be there in the morning. My mother used to keep Kenny and Richie. When Gelene was at Mama's she did not drink, but when she had money, Mama would not see her again until she drank it up. Gelene was a drunk when she was in high school. I met a man who said that when Gelene worked in Walgreens in Joliet right after high school, before she met Ernie, she would get drunk with him, strip for him, and sleep with him. Gelene had two extremes—alcoholic and Jehovah's Witness—and she was definitely in the alcoholic mode when she begat Kenny.

Gelene's dad, Hugh Dotson, was a strange duck. He could not sit down and talk, like he was paranoid, looking around all the time.

There was a pattern in my family that went right down the line—the two suicides and Kenny's attempted suicide—mental illnesses of one kind or another that showed itself in so many ways. The dots connect. Look at Ernie, our father, grandfather and great grandfather. Ellie Long, who is my grandmother's daughter, but is so close to our age we called her "Sis," has serious mental problems. She's a nut out. Where I'm going with this is that I think Kenny was a very paranoid person. Something was wrong with him even when he was a little one. As he got older, Kenny's moods were all over the place.

I was aware that my nephew Kenny Barrett was tried in federal court in 2005. Before or during his trial, no lawyer or investigator working on Kenny's case contacted me. Had I been contacted, I would have provided the information in this declaration and would have testified if asked to do so.

–6–

1058

—7—

An investigator currently working on Kenny's case asked me to tell him about my family. I did not write the declaration myself but I have read it carefully and it says what I told the investigator when he asked me.

I declare, under penalty of perjury, that the foregoing 7-page declaration is true and correct.

Executed by me this 2 day of March, 2009, in Sequoyah County, Oklahoma.

Issac C. Barrett

1059

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 85**

---

**<u>Declaration of Janice Sanders</u>**

I, Janice Sanders, declare as follows:

I am Kenneth Barrett's maternal cousin and neighbor.  I presently live with my mother, Ada Blount, who is Gelene Dotson's mother's sister.  My husband Tom Sanders  is Monk Sanders's uncle. My husband and I are presently separated. He lives just down the road from us in the house we used to live in together.

Kenny was a hyper little boy, the most hyper child I have ever seen. Kenny could not sit still, no matter what. Kenny also had strong feelings.

I love Kenny and was never afraid of him.  That did not stop me from calling the police on Kenny on several occasions for playing the radio too loud or because I thought a bullet had accidently whizzed by my mother one afternoon when Kenny was firing his gun and she was outside. That call to the sheriff brought five law enforcement vehicles to Kenny's place and resulted in John Philpot inspecting Kenny's rifle to see if it was legal. I watched them there from across the road.  I saw the police drive onto Kenny's property and saw him hand the rifle to John Philpot, the Sheriff.  John looked at the rifle and gave it back, and the police left.

Carolyn Joseph told me that Kenny once threatened to burn my house down because of my calling the police on him, but neither of us took it seriously, not for a minute.  Once when I was walking by his property Kenny threatened my dog, if it ever came on to his property. I never did take it seriously. Kenny would never hurt anyone or anything.

In fact, one of Kenny's dogs once attacked a poodle I owned and Kenny put his own dog down for doing it although he loved that dog, and he couldn't have been more

1061

apologetic. The vet fixed my dog up fine, but Kenny often asked about the dog and never stopped saying how sorry he was that it happened. About two weeks before the raid, Kenny drove up to everybody's property in the area and told them that he had lost a gun while riding in a pasture on his four-wheeler. He was warning folks to keep their children out of that pasture until he found his gun so that they would not pick it up and accidentally hurt themselves.

About a week before the incident, and about two weeks after Johnny Philpot had come by and visited Kenny on his porch, I drove over to Kenny's house. The gate was open. I asked Kenny if I could give him a Bible. He took it and he could not have been any sweeter. I told him we cared about him.

I was awake at the time of the raid on September 24, 1999, and living with my husband. I had awakened to go to the bathroom and had just gone back to bed when the shooting started. I did not see any police lights when I got out of bed, although from the way my house is situated, unless I went to the kitchen or the front door I could not have seen the road. I did not go to the kitchen when I went to the bathroom.

When the first rounds were fired, I assumed it was Kenny, because Kenny often fired into the air at night. Kenny did not fire what sounded like semi-automatic or automatic weaponry when he fired into the night or when he fired during the day. It was always one or more distinctly separate shots. Soon, I no longer thought it was Kenny because of the large number of rounds fired and the rapid firing. I had no idea what was going on outside, who was shooting, and then it stopped as suddenly as it had begun. It all happened so fast. My mother called me after the shooting had stopped for a minute or two and said she saw police lights.

<div align="center">Page 2 of 4</div>



I have always wondered if there were really a warrant out for Kenny's arrest, as I learned later after the raid. Why didn't they arrest Kenny then, when John Philpot came out a few weeks earlier or when they had his weapons and there were five police cars on his property?

At the state trial, the prosecution subpoenaed me and made me read aloud the words on the sign that Kenny had on the gate. This upset me, both because the sign was meaningless and because I had never read the sign before they showed it to me.

Mr. Littlefield came to see me. Johnny Philpot accompanied him. Mr. Littlefield got angry with me when I told him that I thought that Kenny's state sentence was fair and that it was un-American to try him again since he had been convicted and sentenced. Mr. Littlefield said, "You want him living next door to you again?" And I said, "Why not?" I told him that I thought the state sentence was fair and that I wasn't afraid of Kenny. Mr. Littlefield was very hateful to me.

Mr. Hilfiger came to my house with a heavyset younger man whose name I do not know. I told him everything I am stating in this declaration except the part about Kenny being hyper. Mr. Hilfiger did not ask anything about Kenny's childhood or background. The man with Mr. Hilfiger said, "Aren't you going to put her on the stand?" He was referring to me. Mr. Hilfiger said, "No." The man with Mr. Hilfiger acted like he could not understand why Mr. Hilfiger felt that way.

I recently told an investigator working on Kenny's case the information I am saying in this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that this 4-page declaration is true and

Page 3 of 4

1063

correct.

Executed by me this _27_ day of _Feb_ 2009, in _Sequoyah_ County,

Oklahoma.

Janice Sanders

Janice Sanders

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 86**

**Declaration of Kathy Trotter**

I, Kathy Trotter, declare as follows:

I am Kenneth Barrett's paternal first cousin. My parents are Ike and Ruth Barrett. Ernie Barrett is my uncle.

I grew up in Fort Smith from the second grade through the seventh, when we moved to Alma, Arkansas, where I spent my eighth and ninth grades. I moved to Sallisaw in my sophomore year where I stayed with my father. My parents divorced in 1977. I stayed in Sallisaw until the middle of my senior year in high school when I went back to Arkansas to live with my mother because I found my dad too demanding and controlling. I drove back to Sallisaw every weekend to see my friends. My brother Glenn, who is four years younger than I am spent 20 years in the U.S. Navy, married a Japanese woman and moved to Japan upon his retirement.

You cannot pick your family, so I have learned to live with mine. Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression. My aunt Linda, who is my father's sister, is mentally ill, as are Ernie Barrett and Elnora Long. My dad calls Elnora, "Sis" because they are about the same age, even though she is his grandmother's daughter. I call her Ellie. She is very emotionally unstable. All the children loved her, but she flip-flops and her moods are unpredictable. She will say she loves you on one extreme and that you are dirt on the other. She is prone

K.T.

to snap, start shaking really badly, and whatever is on her mind comes flying out of her mouth. She is manic-depressive.

I have also had mental health issues. In 1985, I was an inpatient at Harbor View in Fort Smith for one week for a chemical imbalance, anxiety and depression. Two years ago, I weaned myself off medication I was prescribed in 2006 by Dr. Tom Coburn of Muskogee.

Kenny had a tough time coming up with the parents he had. His mother Gelene used to drop Kenny and his two brothers off at the home of their grandmother, Ada Mae Barrett so she could party with my Aunt Linda Riley. My parents told me Gelene was a drunk right out of high school and I never saw a reason to doubt that. I always thought Gelene was mean, that she had a mean spirit. The way she would talk to us kids was angry. I was afraid of her. Maybe because Kenny was older, Kenny did suffer more verbal abuse from her than her other two children.

Back then we called Kenny hyper. He was erratic and temperamental. He did not have a family that loved him or cared for him, and it was apparent to me that Kenny was deeply troubled. He would do irrational things, like ride bikes down a dangerously steep, extremely bumpy hill. He could be very kind and generous and he could be very agitated and mischievous. I had to be a tough girl to hang with him, but it was something I wanted to do. I love Kenny; I care about him

Kenny's grandmother, Ada Mae, adored him. When she died in 1976 Kenny was just 14. It was as if the only adult who ever cherished him had gone. The family split apart when she died, but for Kenny it was worse because his father had recently deserted him at the age he most needed direction. Ada Mae was very well thought of, and was someone who worked extremely hard. My father is a lot like she was.

Mr. Smith, one of Kenny's lawyer's, spoke to me a few minutes before I testified. When I was on the witness stand, he did not ask me any of the questions that he asked me when we spoke beforehand. He never asked me about our family's history of mental health issues, either before I testified or on the witness stand. I thought my testimony was pointless.

I gave this information to a man who recently came to talk to me and said he was an investigator working on Kenny's case. He asked me if I would read this declaration to see if it says what I told him when we talked, and if I would sign it as part of Kenny's case. I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct. Executed by me this 24th day of February, 2009, in Sequoyah County, Oklahoma.

Kathy Trotter

1068

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 87**

## Declaration of Linda Riley

I, Linda Riley, declare the following:

My husband, Fred Riley is a former barber who receives disability for PTSD, a consequence of his service in Viet Nam during the war. I have twin daughters, Stephanie and Jennifer, both of whom struggle with bipolar disorder. Stephanie's seven-year-old son, Ben Thomas, has been diagnosed with Asperger's Syndrome. Jennifer's' disorder was discovered when she was training in the military during the first Gulf War, and she now receives disability from the U.S. Air Force.

Growing up was difficult because of what we had to go through. My mother was Ada Mae Hatter Barrett, who was born September 10, 1919. My father was A.J. Barrett, and he was a drunk. We all had a lot of resentment toward mom for staying with him. We loved her and respected her, but there was a part that didn't because of what we had to go through growing up with the humiliation and the shame. Wearing old clothes, clothes with holes, starting high school and not having the clothes we needed. I got along a lot better with my mom in her later years. All those bad feelings about my mom were very strong until my daddy died. After he died, I was getting more mature, I looked back, and I saw how incredible she was. She fixed her own sewing machine, cooked from scratch, and raised five children. She had two breach babies at home by herself. Women didn't have the choices to leave back then that they have now. They had nowhere to go and no one to help them.

My father had plenty of rage in him. Dad worked for St. Clair Lime in Marble City driving a truck, but his drinking caused him to lose his job. Mom started to work in

Page 1 of 8

1070

1951 when my brother Gary and I were little. We stayed with Granny Bell and Papa (Isaac Clifford) when she worked.  She did not work long at first but went back to work when I was 12.  She worked in the Sallisaw hospital laundry from 1958 until her death, March 24, 1976.  She was a hard working woman.  My dad did not want her to work, but we would have starved without her income.  Granny Ida knew a lady who had a field of purple hull peas. The lady said my mom could have what was left for our cattle, but we picked them and that's what we ate for two whole weeks, that and cornbread. That was in 1958.

My mother was a very unhappily married woman. Although she loved my father, she nagged him. When he had had enough, he went to town and got a bottle of whiskey. My mom did not like my grandparents and had great resentment towards her mother-in law, Granny Bell (Mary Ellen Barrett) and her sister-in law, Esther Marie Barrett Floyd.

My grandparents had plenty of nice things, and my mom thought they should have shared more with her.  My grandparents were wonderful to me, and I was Aunt Esther's favorite.  She told me so. Aunt Esther tried to give me her 10-acre pasture in 1991, but I had two daughters starting college and besides I could never live in Akins again because of the shame of growing up there.

I am not like my brothers.  I moved away from the family right after Mom died. I did not want to be like them, fighting all the time, with no loyalty or kindness for each other. My sister Margaret felt the same way and moved to Bloomington, Illinois. I worked as a machine operator at Planter's Peanuts for some 21 years and before that I worked for two years at McDonnell Douglas in Tulsa.

1071

We think my dad was bipolar. My mom sent him to the insane asylum in Vinita. This is the same place where my father's granddad, whose name was also Andrew Jackson Barrett. died. My dad's granddad is buried at Maple Cemetery and has a military stone.

My dad used to puncture the tires on my mom's car and would threaten to cut her throat. On the other hand, when I was pregnant with Craig, my daddy said he would buy me two pantsuits if I had a boy. When Craig was born, he took his money from digging graves and we went shopping together. He kept his promise. He was so proud.

I was not afraid of my father. One time, my mother had been hiding from him in the woods all day and I found her. Daddy had cut the phone lines, which he often did. He could be meaner after a drunk than when he was drinking. I went to the house and called him a son of a bitch and told him I was going to the neighbor's to call the sheriff. Dad said if I walked off that hill, he would shoot me. I walked out and was going down the hill when I saw the gravel skip near my feet before I heard the shot, but I kept going. I called E.W. Floyd, Pretty Boy's brother, the sheriff. He arrested my father, but Mom had him out by sundown. It made me resent her and that's when I decided she was on her own.

The last time I saw my dad alive, I had driven down from Broken Arrow to see my mother. I walked into the kitchen and I could see from Mama's face that Daddy had slapped her and daddy had messed up the house like he did when he went berserk. I confronted Dad, and he told me to get my ass in my truck and go back where I came from. Mama gave me a look and I knew if would be best for her if I left. That was the

1072

last time I saw him alive. The next time I saw him he was on the slab and I said, "I love you daddy, but you were one mean drunk old son of a bitch."

Daddy was a cruel person at times. My sister Margaret told me in 1994 that my dad had raped my mother's younger sister, Wanda, when she was 13-years old, soon after Mama and Daddy were married. When Mama asked him why, he said because he wanted to be the first one. Granny Ida later took Wanda to Rocky Point, Oklahoma, to have a clothes-hanger abortion, so there's no telling how many times he abused Wanda. We never knew why our girl cousins couldn't come to our house, but now that questioned is answered.

I went to family therapy by myself more than once. I take Welbutrin, which is prescribed by my family doctor. I felt like I needed something. I didn't think I was depressed, but my family did. I married Fred Riley on September 30, 1980, in Poteau, Oklahoma; he is my fifth husband. I did not have children with Fred or with two of my other husbands. I married Jimmy Holden in March 1976 in Fort Smith and divorced him the same year. I married Bill Harris April 7, 1979 in Fort Smith and divorced him a few months later. I married Pat Sherrard in Inola, and divorced him in Sallisaw.

Ernie and Gelene had a volatile marriage. They got married on a dare.

They were wild. Gelene always drank. There is no doubt in my mind she drank all through her pregnancy with Kenny. To be fair, we had no knowledge back then of how bad alcohol could be for the fetus. In 1968, Richard, my first ex husband, took Craig when he was a baby and me to visit them. Gelene would get out of control. One night we drove into Chicago. We went to a supper club, ate, and had a good time until Gelene got

Page 4 of 8

up on the table and started dancing. She was famous for that. She wanted attention; she was a doll, but she did not have to do that. When Gelene had Stevie, the marriage was over. It was a funny marriage – they both loved the children, loved to party and they were both wild. Whatever their marriage was, it worked for them sometimes. Ernie loved them all. He is very complex.

In 1964, when Gelene left Ernie for the first time, she brought the two babies back to Oklahoma. It was the winter and she moved in with my mom and dad.

Mom worked and daddy would go squirrel hunting every day. Gelene would stay in bed all day with Richie, every day. She did not get out of bed until my mother had dinner on the table. Kenny was three and a half. He would cry when my mother went to work. My mother showed Kenny so much love and tenderness. Kenny would just wander around in the cold house alone without a wood fire to warm the place. Gelene did not change Richie's diapers.

Gelene was depressed. She did not drink around my parents. She ignored Kenny. He was neglected. I would come out there and find him with a cold fried egg in his hand. I would take him to my apartment and run the tub – he was filthy. He would play with the Ivory soap like it was a boat. I got him a haircut. Kenny had nothing to eat. Gelene would not even get out of bed to feed him. I would come and he would have a box of Rice Krispies in his hand. Mom took Kenny to see Dr. Bob Mitchell because Kenny was so frail and wouldn't eat anything but those Rice Krispies. They discovered then that he had a heart murmur and Dr. Mitchell had mom put Kenny on beer to help him gain weight, but that didn't last long because my daddy would drink the beer, so Kenny

remained frail and thin.

Kenny never had a chance. I remember when they were living with my parents, I found Kenny standing on one of the chairs, looking out the window. "What you doing bubby?" I asked. "My daddy's going to come get me," he said. "He has a fast car." It was that way forever. Sometimes I would find him sitting next to his mom's bed waiting for her to wake up. I feel like I abandoned him when I moved away around this time to Broken Arrow.

Gelene, Kenny and Richie stayed at my parent's house for five months. At first, Gelene felt safe at my parents. She could not go to her own people. Hugh was a strange man. Then one day A.J. told Gelene he was going into town to get condoms and that when he came home he was going to have sex with her. Gelene moved Kenny and Richie to Aunt Ruth's before A.J. got back. At that time, my mother did not believe Gelene, but when Mama was on her deathbed, she begged for Gelene to come. Mama told Gelene that she was so sorry she hadn't believed her. There is no telling what Kenny saw and heard back then, when he was wandering around alone at mom and dad's house.

Kenny was the cutest boy. He had the sweetest smile. He loved everybody. He didn't have anybody looking out for him after my mom died. Steve was whining and crying. Richie was tattling. Kenny was just yelled at by Gelene. Kenny's whole life she screamed at him. He once told his Aunt Phyllis that he would lay awake nights because he couldn't get her voice out of his head. Kenny just wanted to be left alone by her, to avoid her, but she never gave him a break. He didn't have a moment's peace; she was incessantly nagging and screaming at him. He had to have taken himself somewhere else

Page 6 of 8

emotionally and mentally to endure this.

Gelene would do anything in the world for anyone. Nothing is any trouble for her. What would be an inconvenience for others is not for her. She is a Jekyll and Hyde – you never know who you're going to get. To her Kenny was always trouble, like she took Ernie out on him. He was always doing something wrong, could never do anything right. He was left to watch his brothers all the time while she partied. She wanted them not to love their daddy. She would tell them stuff you don't tell your kids, like when her child support was late.

When Gelene was in a Jehovah's Witness mode, one Christmas she brought the children out to my mother's, and would not allow the children to receive the gifts we had bought them. Jehovah's Witnesses do not celebrate Christmas in the manner of most other Christian faiths. I took her into another room and I told her in no uncertain terms she was not going to take Christmas away from the children or my mother. If she refused, I would have taken her down like a dog. Gelene left, and the children got their presents.

I love Kenny; I did not go to the trial but I was always praying for him.

After I spoke with an investigator working on Kenny's case, he asked me if I would provide the information I gave him to the court. I did not write out this declaration myself but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 8-page declaration is true and correct.

Executed by me this 28 day of February 2009, in

Page 7 of 8

_Sebastian_ County, Arkansas.

Linda Riley

1077

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 88**

## DECLARATION OF MIKE MACKEY

I, Mike Mackey, declare the following:

I have known Cindy Crawford for several years.  It is my understanding that she testified against Kenneth Eugene Barrett at his federal trial in Muskogee for the murder of an Oklahoma Highway Patrol Trooper.

Before or during Mr. Barrett's federal trial, I was not contacted by any attorneys or investigators working on his behalf.  Had I been contacted, I would have given them the following information about the honesty of Cindy Crawford, and would have been willing to testify.

To put it bluntly, Cindy Crawford is the most wickedly evil person I have ever run across.  She will do or say anything to get other people in trouble, if she can get something out of it and if she thinks she will benefit.  She is totally dishonest, and lies constantly.  This is not only my personal belief, but I am also aware that her reputation for honesty in the community is horrible.  In the past, Cindy Crawford has made false referrals to the Oklahoma Department of Human Services regarding me and my step son, who is mentally handicapped, and has also used false information in an effort to get victim protective orders.  For example, I once saw her walking down the road while I was driving by.  I did not stop and speak to her, and did nothing to her.  Within days of this non-incident, she sought a victim protective order against me.  She has made false claims of wrongdoing against other members of her family.  Cindy Crawford has broken into my

1

home on numerous occasions and stolen things in order to buy drugs. It is common knowledge in the community that Cindy Crawford has worked as an informant for the police for an extensive period of time and has managed to stay out of trouble herself because of this. She "works the system" in order to get whatever she can that will benefit her.

An investigator working on Kenny Barrett's case asked me to provide this declaration. I did not write the declaration myself, but I have read it carefully and it says what I told the investigator during our meeting.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this ___1___ day of __March__, 2009, in __Sequoyah___ County, Oklahoma.

_Milal U. Mackey_

2

1080

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 89**

**DECLARATION OF MYLA H. YOUNG, Ph.D.**

I, Myla H. Young, declare as follows:

1. I am a clinical psychologist licensed to practice in the State of California, specializing in neuropsychology and neuropsychological assessments. I am Board Certified in Neuropsychology by the American Board of Professional Neuropsychology (ABN). I am a member in good standing of the American Psychological Association and its subspecialty divisions in Clinical Neuropsychology and Forensic Psychology; the National Academy of Neuropsychology; the International Neuropsychological Society; and the Society of Personality Assessment.

2. I am currently in private practice and conduct neuropsychological evaluations of criminal offenders, medical patients, psychiatric patients, and medical-legal patients. I have conducted neuropsychological evaluations of children, adolescents, and adults. I am an instructor of continuing education courses in the Neuropsychological Evaluation of Criminal Offenders and Introduction to Neuropsychology at the University of California, Berkeley, and at Alliant University.

3. I hold a doctorate in Clinical Psychology from Alliant University, formally known as the California School of Professional Psychology in San Francisco, California. I received my Masters Degree in Experimental Psychology from Towson State University in Baltimore, Maryland, in 1977. I earned my Bachelor of Arts Degree in 1975 with a major in Psychology from the University of Guam.

4. From 1984 to 1985, I completed a pre-doctoral internship at Garfield Geropsychiatric Hospital in Oakland, California. During this internship, I performed neuropsychological and psychological evaluations of geriatric patients who were hospitalized for medical, neurological, or psychiatric disorders.

5. I completed a pre-doctoral internship at the McAuley Neuropsychiatric Institute at St. Mary's Hospital in San Francisco, California, from 1985 to 1987. While at St. Mary's Hospital I conducted neuropsychological and psychological evaluations of children, adolescents, and adults

1

who were hospitalized for psychiatric treatment, and provided treatment to these same individuals. I also conducted neuropsychological evaluations of adults who were hospitalized for medical treatment or who were recovering from neurosurgery, neurological and other medical disorders.

6. In 1989, I completed a post-doctoral fellowship in neuropsychology at San Francisco General Hospital/University of California, San Francisco. During this time I conducted neuropsychological and psychological evaluations of patients hospitalized for medical, neurological, and psychiatric disorders. I conducted neuropsychological and psychological evaluations of children and adolescents who had been referred to the Child and Adolescent Sexual Abuse Resource Center. In addition, I participated in research that evaluated the neuropsychological, neurophysiological (evoked potential), and psychological functioning of men and women who tested positive and negative for the human immunodeficiency virus (HIV).

7. From 1990 to 2005, I was employed by the California Department of Mental Health at the Correctional Medical Facility, a California State Prison, in Vacaville, California. During this period I served as a staff psychologist, providing neuropsychological and psychological assessments of individuals who had been admitted for acute and sub-acute psychiatric treatment while confined in the California Department of Corrections. I was part of an interdisciplinary treatment team and served as the clinical coordinator responsible for the development, implementation, and evaluation of a behavioral milieu treatment program. I provided staff training in neuropsychological assessment and behavioral treatment and psycho-diagnostic evaluation, and supervised pre-licensed Ph.D. candidates. I also trained and supervised pre-doctoral psychology interns and conducted seminars in neuropsychological and personality assessment of children at Oakes Children's Center in San Francisco, California. I trained and supervised pre- and post-doctoral psychology interns and conducted seminars in neuropsychological and personality assessment of children, adolescents and adults at the McAuley Institute of St. Mary's Hospital in San Francisco, California.

8. From 1995 to 2000, I served as the Program Consultant for Psychology for the California Department of Mental Health facility located within the Correctional Medical Facility at

2

Vacaville, California, and served from 2000 to 2005 as the Senior Supervising Psychologist in the same prison's psychiatric treatment program. In these positions, I was the psychology consultant to the Executive Director, Medical Director, and Program Directors, was responsible for research and program evaluation, provided clinical supervision and consultation, and provided direct inmate/patient care. I was also the principal investigator for research, program evaluation, and treatment outcome measurement. I developed, accomplished accreditation of, and served as the director for an American Psychological Association accredited psychology intern training program, provided seminars in neuropsychological assessment, and provided individual and group supervision to psychology pre-doctoral interns and post-doctoral fellows.

9. From January 1990 to June 2004, I served on the Adjunct Faculty at Alliant International University/California School of Professional Psychology where I taught courses on neuropsychological assessment. I was the dissertation chairperson for several doctoral students and served on the dissertation committees of numerous other doctoral students. The students pursued varied and wide-ranging areas of investigation involving both children and adults, psychotic and non-psychotic individuals, and persons confined in penal institutions as well as persons not so confined. I am the primary author of several studies which have appeared in peer-reviewed publications involving the prison population and the secondary author of several additional peer-reviewed publications.

10. I have been the principal presenter at several professional conferences including: Asilomar Forensic Mental Health Conference; Patton State Hospital Forensic Mental Health Conference; California Psychological Association; American Correctional Mental Health Services Association; Behavioral Health Institute Conference; and the International Organization of Psychophysiology. I have been qualified as an expert witness in criminal cases in state and federal criminal courts in California, Nevada, Washington and Hawaii and in civil cases in California state courts. Further description of my education and professional experiences is included as Addendum A.

3

11.     I was asked by the current post-conviction attorneys for Kenneth Barrett to complete a neuropsychological evaluation of Mr. Barrett to determine if he experiences brain damage and, if brain damage exists, the nature, severity and functional impact of that brain damage.

### A.     Introduction: Brain Functioning and Neuropsychological Assessment

12.     The science of clinical neuropsychology studies the relationship between the brain and behavior.  Because the brain is the human organ that drives behavior, any injury or insult has the potential to adversely affect a person's actions, thought processes, cognitive abilities and psychological functioning.  Conversely, observable behavioral deficits, including failure to meet developmental milestones and impaired scholastic, occupational and/or social functioning may suggest compromised brain anatomy or neurophysiology.  Consequently, historical, academic, vocational, medical/psychiatric, family, and social history information may provide reasons to suspect brain dysfunction or damage and make a comprehensive neuropsychological evaluation appropriate and/or medically indicated.

13.     A competent evaluation of neuropsychological functioning requires administration of a full battery of standardized neuropsychological tests, review of information from documents that are available, interviews or reports of interviews of those who have knowledge of the individual's history, and interviews with the individual being evaluated.  Focus of information sought includes family, medical, psychiatric, and social histories, circumstances of prenatal development, circumstances of childhood and adolescent development, educational, work, offense information, and description of current functioning.

14.     A comprehensive neuropsychological testing battery also includes measures of different aspects of brain functioning, including general mental ability (intelligence), sensory perception, motor functions, attention and concentration, verbal and visual memory and learning, expressive and receptive language, psychomotor and executive functioning (abilities to think, organize, reason, plan, inhibit impulses, think and act flexibility).  Based on knowledge of brain anatomy, brain functioning, and neurological disorders, instruments used in a neuropsychological evaluation are developed to identify and measure cognitive deficits caused by brain dysfunction,

4

1085

and, if impairment is demonstrated, to provide an indication of the potential cognitive and behavioral consequences of disrupted brain functioning for the individual.

15.     Neuropsychological testing is guided by understanding of the phylogenetic structure of brain structures and brain connecting systems. One such developmental understanding was proposed by Ivan Yakovlev in 1967 and is supported and relied upon by contemporary neuroscientists in understanding brain function and dysfunction.

16.     Yakovlev described the brain as organized in three separate but related systems, with three primary connecting systems. There is a primitive nuclear core of the brain, the allocortex, which includes the brain stem, reticular activating system, pons, medulla and cranial nerves, and functions to maintain consciousness, metabolism, respiration, and circulation and to filter stimuli received from the environment. The middle system, the neocortex, includes limbic system structures including the hypothalamus, hippocampus, thalamus, basal ganglia and amygdala, serves primary functions of motivation, memory, arousal, emotion and mood. The outer layer, the isocortex, includes the sensory and motor cortices, corpus callosum, cerebrum (occipital, parietal, temporal, and frontal lobes) and cerebellum. Orbitofrontal-paralimbic, hippocampal-paralimbic and subcortical-limbic connection circuits provide a "flow" of information throughout the brain (Yakovlev & Lacours, 1964/1967; Bear, Connors & Paradiso, 2001).

17.     In addition to knowledge of the phylogenetic development of the brain, neuroscientists have known for many years that the normal brain develops in a predictable and unchangeable sequence. Brain regions responsible for arousal, filtering information, auditory, visual, and tactile/kinesthetic abilities develop first; brain regions responsible for analyzing and integrating information sequentially develop next; and brain regions responsible for simultaneously analyzing and integrating information develop last, with the brain continuing to develop through adolescence and into young adulthood.

18.     In early childhood, the primary portions of the brain that function for motor, sensory, attention filtering, visual dimension and color, and analyzing language sounds undergo the greatest maturation. In middle childhood, the secondary portions of the brain that function to develop abilities for reading, writing, spelling, arithmetic and other secondary language

1086

academic skills undergo the greatest maturation. In adolescence and into young adulthood, the tertiary portions of the cerebrum, particularly the temporal and frontal cortices undergo the greatest maturation (Luria, 1966/1973/1986).

19.     As the brain develops, those brain regions that are maturing the most are also those brain regions that are most vulnerable to brain damage, identified as the "vulnerability hypothesis." Consequently, the child who experiences brain trauma between the ages of approximately 8 – 12 years is most vulnerable to subsequent severe leaning disabilities. The adolescent who experiences brain injury between the ages of 12 and 16 years is most vulnerable to subsequently impaired executive functions. Additionally, brain insult(s) as a child interferes with further development of all other brain systems and structures (Pfefferhan, 1994; Gied, 1999; Sowell, 2000/2001/2003; Adelman, 2002; Casey, 2000/2005; Durston, 2001; Gogtay, 2004).

## B. Risk Factors and Indications of Neuropsychological Dysfunction

20.     Social and medical history data obtained in interviews with Mr. Barrett and contained in records that reportedly were available at the time of his trial indicated the existence of several risk factors and potential etiologies for congenital and/or acquired brain dysfunction. The pertinent information I reviewed included excerpts of academic records from Tommie Spear Junior High School, Sallisaw, Oklahoma and Jan County High School, Portland Indiana; Universal Cumulative Record, Plainfield Community Consolidated School District, Plainfield, Illinois; medical records from Sequoyah Memorial Hospital, Sallisaw, Oklahoma, St. Francis Hospital, Tulsa, Oklahoma, Wagoner Community Hospital, Wagoner, Oklahoma, and Bill Willis Community Mental Health Center, Sallisaw, Oklahoma; and a Disability Determination Unit Record, Sallisaw, Oklahoma. I also reviewed psychological evaluation test data obtained by Faust Bianco, Ph.D., Tulsa, Oklahoma, in August 2000 and psychological evaluation test data and a report prepared by Bill Sharp, Ph.D., Norman, Oklahoma, in October 2002. These data suggested potential insults to Mr. Barrett's brain functioning resulting from head trauma(s), both in childhood and as an adult; possible prenatal insult and brain development abnormality; and adolescent and adult abuse of alcohol and other drugs. Documented symptoms of possible

6

psychiatric disorders were also indicative of neurological brain substrate abnormality and consequent brain dysfunction.

21.    Mr. Barrett's history of potential head trauma(s) include a childhood injury, at age eight or nine years when he was struck in the head with some type of "steel ball" on the school yard. Mr. Barrett's description of the incident ("I just remember waking up and them picking me up") suggests loss of consciousness as a result of this incident, and as an adult, Mr. Barrett has a skull indentation which he attributes to this childhood injury. At the approximate age of 22, Mr. Barrett also may have suffered a head injury, with consequent loss of consciousness, in a motorcycle accident. He was treated at Sequoyah Memorial Hospital, Sallisaw, Oklahoma, and the Emergency Room Records describe "treatment for MVA," right periorbital area pain, edema, and possible head trauma. Immediately following his arrest in 1999 for his current commitment offense, Mr. Barrett was treated at St. Francis Hospital, Tulsa, Oklahoma, for multiple gunshot wounds and "bruising to the left eye and superficial abrasions to forehead...superficial blunt head trauma").

22.    Head traumas may cause damage to the cellular units of the brain (neurons), which transmit and store information. The blood vessels transmitting oxygen and nutrients through the brain are also damaged. Multiple small, and/or single large bleeds (hematomas) within the brain can occur. The brain swells, pressing against the rigid bony skull, causing further damage to the brain. Extensive research describing the damaging effects of head trauma as a child and head trauma as an adult is currently known and was well established in 1999. Two sources which provide a representative description of this historical and current research are found in Kolb & Wishaw (2003) and Silver, McAllister, & Yudofsky (2005).

23.    Mr. Barrett also may have been exposed to dysgenic disorder as the result of teratogenic effects of substance use by his mother during her pregnancy with him, as well as secondary to his mother's psychopharmacological treatment for depression during her pregnancy. These factors are known to be associated with brain development abnormality, brain dysfunction and abnormal development of the fetal brain (Rasansen, 1999; Steissguth 1990; Tizabi, 1997; Cornelius, 2001; DiPietro; 2002, Ernst; 2001; Huizink, 2004; Weizman, 2002). Mr. Barrett reports childhood

7

1088

exposure to alcohol beginning at age seven, when his father provided alcohol to him and his brother, resulting in his severe intoxication and subsequent emesis. He indicates that he then consumed alcohol and other drugs "on a regular basis" beginning at approximately the age of 14 years, with particularly severe drug abuse between the ages of 16 and 18. Drug use was then reportedly intermittent until age 32 when it again became severe until the time of the offense for which he was incarcerated. The research describing the damaging neurocognitive effects of alcohol and drug abuse is currently known, and was well known in 1999. Two resources which provide a representative description of this past and current research include Tapert (1999) and Heimer (2003), as well as Kolb & Wishaw, 2003 and Adams, 2009.

24.     Medical records dating from several years before Mr. Barrett's arrest documented his hospitalization for a suicide attempt, as well as medically indicated need for psychopharmacological treatment with antidepressant and with antipsychotic medications. Brain abnormalities and consequent neuropsychological impairments associated with major psychiatric disorders have been known for more than a decade. There is substantial research describing the neurological bases of psychiatric disorders, particularly the neurological bases of depression, bipolar, and psychotic disorders, and there is substantial research describing the neuropsychological patterns of impairment associated with these psychiatric disorders (Heaton, 1998; McIntosh, 2005; Savitz, 2008) to site a few sources of this extensive literature.

25.     This information about Mr. Barrett's history indicated the appropriateness of conducting a comprehensive neuropsychological assessment both in 1999 and currently.

### C. Nature and Circumstances of the Neuropsychological Evaluation

26.     I conducted approximately 16 hours of neuropsychological evaluation of Kenneth Barrett over the course of three days on February 9 - 11, 2009. Mr. Barrett is a 47 year old White male. The evaluation was conducted at the United States Penitentiary, Terra Haute, Indiana in a confidential room without distraction or interruption. The examination room was reasonably quiet, reasonably private and with adequate ventilation and climate control. Mr. Barrett was not physically restrained during the evaluation and the evaluation proceeded uninterrupted. Multiple breaks in testing were taken, and Mr. Barrett was provided drink and snack. Mr. Barrett's

clinical presentation, which I observed during the evaluation, was consistent with the results of neuropsychological testing.

27.     Mr. Barrett completed 9 years of formal education, and school records for his 8th and 9th grade school experiences, as well as cumulative record from his 1st and 2nd grades were available at the time of this evaluation.  It is unclear from these school records, but Mr. Barrett reports that he repeated the 8th grade of school and that he participated in special education for learning disability.  He has attempted to complete a General Education Degree (GED) at several points in time, but has not been able to pass the required test.  Mr. Barrett indicated that he is currently studying to take the GED examination again.  He reports that he has taken several "pre-tests," but has not been able to successfully pass these pre-examinations.

28.     From the results of testing measures and from my own observations, Mr. Barrett fully cooperated with the evaluation, gave his best effort on all tests, and made no attempt to manipulate, fake or exaggerate his neurological dysfunction.  Specific evaluation of Mr. Barrett's effort on and attitude toward the assessment was obtained through administration of tests that were specifically developed to determine the validity of the individual's effort on and attitude towards testing, including the 15 Item Test, the Test of Malingering Memory (TOMM), Green's Word Memory Test (WMT) and the Forced Choice Subtest of the California Verbal Learning Test (CVLT-II).     These tests have demonstrated validity and reliability in distinguishing between individuals who are known to be attempting to manipulate their test ability and those who are not, with as high as 93% accuracy (Lee, 1992; Millis, 1995; Rees, 1998) for some of these tests.  Mr. Barrett's abilities on these tests indicate that he was expending his best efforts in this evaluation and was not attempting to feign or exaggerate any deficits in his abilities.

29.     Mr. Barrett's attitude towards and effort on testing was also evaluated considering the expected consistency of his test ability within each test, across different measures of the same test, and across different neuropsychological tests that are known to be measuring the same brain region and functions.  Mr. Barrett's attitude and effort on testing were further evaluated considering events in his personal history, what is known about potential brain damage

9

associated with those events of his personal history, and the consistency of Mr. Barrett's history, his brain function/dysfunction, and his neuropsychological testing abilities/disabilities.

30.     In addition to these validity testing measures, my own clinical observations of Mr. Barrett confirmed that he was cooperating and putting forth exceptional effort on testing. He worked consistently, attempted all tasks that were requested of him and persisted until tasks were completed or terminated. He was intent on completing the tasks asked of him and was particularly intent on trying to accomplish tasks that were difficult for him. On several occasions Mr. Barrett asked me if he could re-attempt a previously administered test which was difficult for him. These observations were consistent indications that Mr. Barrett was marshalling all of his resources to complete neuropsychological testing and was putting forth an earnest effort to perform well.

31.     Consideration of all of these elements indicates that Mr. Barrett was putting forth substantial effort to complete neuropsychological testing, was cooperating with testing, and was not attempting to manipulate his abilities. This evaluation is considered to be a valid measure of Mr. Barrett's neuropsychological profile, and can be relied upon in establishing conclusions about his brain functioning.

32.     Although he reported a history of what he identified as migraine headache, Mr. Barrett reported that he was not experiencing headache nor was he experiencing any other unusual pain on the days of testing. On each day of testing he indicated that his sleep and eating were no different from his usual patterns. He indicated that he did not require glasses and was able to see all information that was presented to him. He was not experiencing any peripheral numbness in his hands or fingers. Mr. Barrett reported a history of tinnitus, but indicated that he was not experiencing tinnitus on the days of testing, and that he was able to hear all information that was given to him. Although he reported several serious medical disorders (Hepitis A, Hepitis C, prostate disorder, persisting staph infection and consequent eczema, and chronic ulcers) he indicated that he was not experiencing any unusual pain or discomfort on days of testing. Mr. Barrett reported that although he has been prescribed both antidepressant and antipsychotic medications in the past that he was not currently prescribed and was not currently taking any

10

1091

psychotropic medications.  Although he has a history of past suicide attempt and psychiatric treatment, Mr. Barrett reported that his mood was reasonably stable, that he was not experiencing perceptual alternations such as hallucination, was not experiencing other psychotic symptoms and did not experience suicidal ideation or plan.

33.    Mr. Barrett reported that he was taking an anti-inflammatory medication but did not know the name or dosage, and that he was taking Prilosec for treatment of ulcers.  He reported that he had not experienced any additional medical disorders of note since his incarceration at United States Penitentiary, Terra Haute, Indiana (USP Terra Haute, Indiana) for this offense. Mr. Barrett has an extensive past drug use history.  Although he acknowledged availability of drugs in incarcerations facilities, he reported that he had not used any drug or alcohol since his incarceration at USP Terra Haute, Indiana.  Mr. Barrett has a history of prior tobacco use.  He indicated, however, that his last tobacco use was in 2005.

34.    Kenneth Barrett expressed his willingness to participate in this evaluation.  He was advised of, understood and agreed to limits to his confidentiality.   Although testing conditions were quite adequate, functional manifestation of Mr. Barrett's neuropsychological deficits made evaluation challenging at times.  He presented as mildly hypomanic.  His speech was rapid, he often started to respond to a question before the question was completed, at times was tangential, and often arbitrarily changed the focus of his discussion without warning indicating likely racing thought ("sometimes I just think too fast").  When attempting to provide information, Mr. Barrett often exhibited circumstantial speech, describing extensive, often irrelevant details.   He responded to all requests, but often "talked around" the topic, rather than providing a direct response.  He was not able to provide a simple "yes" or "no" response to questions that clearly called for only such a response.  Although he provided many details, Mr. Barrett's thinking often was overly concrete and he often did not appear to fully understand testing instructions, often requiring test instructions to be presented several times, and in several different ways.  Mr. Barrett appeared to be somewhat aware of his presentation, at times acknowledging that he sometimes "talked too much" and at times apologized for beginning to answer a question or provide a response before I had completed my question.  Mr. Barrett responded positively to

11

appropriate clinical interventions, however, further assuring that all information obtained is valid and reliable.

35.    All neuropsychological tests administered have appropriate and documented standardization, reliability and validity.  All tests administered are often used and are generally accepted in the neuropsychology community.  In addition to the previously described validity tests (15 Item Test, Test of Malingering Memory (TOMM), Green Word Memory Test, CVLT II Forced Choice Subtest), the neuropsychological tests administered to Mr. Barrett included the following instruments:  Wechsler Adult Scale of Intelligence Test (WAIS IV); Wide Range Achievement Test – Third Edition (WRAT-III); Smell Identification Test, Reitan-Klove Sensory Perception Examination, Finger Tapping Test, Grooved Pegboard, Seashore Rhythm, Speech Perception Test, California Verbal Learning Test (CVLT-II), Wechsler Memory Test (WMS IV), Rey Complex Figure Test; Executive Functioning Test (EFT), Wisconsin Card Sorting Test, and Short Category Test (SCT).  Attempt was made to administer the Paced Auditory Serial Addition Test (PASAT).  Mr. Barrett was quite cooperative with his attempts to complete this test, but he was simply unable to understand the instructions.  Instructions were provided in the standardized format.  Instructions were then also repeated several times, paraphrased several different ways, and demonstrated with examples.  The PASAT was discontinued after the third trial.  The administered neuropsychological battery consists of the most sensitive and reliable standardized tests currently available for measuring neuropsychological functioning that are also compatible with the testing conditions at USP Terra Haute, Indiana.  All of these tests – or their predecessor editions – the methodology, and the research on which I based my conclusions were available and accepted in the neuropsychological community, and valid at the time of Mr. Barrett's arrest and trial in 1999.

### D.        Results of Testing

36.    Overview:  For Mr. Barrett, understanding of his brain dysfunction is particularly dependent on understanding the functions associated with the frontal cortex, temporal cortex, and interconnecting systems between these brain cortices.  The frontal cortex is comprised of three general cortices—motor cortex, premotor cortex, and prefrontal cortex.  The motor cortex

12

provides a mechanism to control execution of movement of limbs, hands, feet and fingers. The pre-motor cortex selects and carries out the movements to be executed including repetitive movements and actions in response to external cues. The pre-motor cortex also primarily mediates information that is communicated by the parietal cortex, cingulated cortex, and basal ganglia. The prefrontal cortex allows the individual to accommodate complexity and accommodate stress, and is responsible for thinking and acting, referred to as "executive functioning." Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received. More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation. Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders. The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

37. The temporal cortex encompasses the primary auditory cortex, secondary visual cortex, and structures of the limbic system. Primary functions of the temporal cortex are both verbal and visual memory and learning, processing speech sounds and speech emotional tones, and interpreting speech sounds, tones and emotional meaning. The temporal cortex is also responsible for processing visual information and the ability to recognize facial expressions, and interpret facial emotions. Significant impact of temporal cortex dysfunction is particularly implicated in amnesia, hyper-religiosity, hypergraphia, fear, paranoia, impulsiveness and aggressive outbursts in addition to the previously described cognitive disabilities. Brain functioning associated with frontal and temporal cortices has been known, is described and is documented in multiple sources for many years. Two resources which provide a representative description of frontal and temporal brain functioning are Kolb & Wishaw, 2003 and Grant & Adams, 2009.

1094

38. The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex. The impairment of cognitive functioning produced by these deficits is manifested in a pattern of ability and disability indicating that although Mr. Barrett is generally able to reasonably access and provide information that is long-standing and that he has rehearsed and learned, his ability to actively attend to, take in, and learn and recall new information is significantly impaired. While his previously learned information remains reasonably stable and accessible, Mr. Barrett's ability to actively process and comprehend new information in the "here and now" is significantly compromised. Indicative of extensive dysfunction in Mr. Barrett's prefrontal cortex regions, his test performance was significantly impaired on executive functioning tasks which primarily required cognitive flexibility, particularly the ability to flexibly inhibit and change his thinking and actions in response to requirements of the task or situation (perseveration). Also typical of individuals with significant prefrontal cortex impairment, Mr. Barrett exhibited multiple instances of confabulation, where he unknowingly provided information that had no real relationship to the problem at hand. He presented that information in a self-assured way, seemingly not recognizing the errors—at time even absurdity —in his thinking. Mr. Barrett was not purposefully "making up" information but, as is typical in prefrontal cortex damage, he reported information that was inaccurate, at times illogical.

39. <u>Intellectual Functioning:</u> Mr. Barrett's general mental ability was evaluated using the most recent revision of the Wechsler Adult Intelligence Scale (WAIS IV), which was published in January 2009. WAIS-IV consists of 15 subtests, 10 of which are required. Four Composite Indexes are developed (Verbal Comprehension Index (Vocabulary, Similarities, Information); Perceptual Reasoning Index (Block Design, Matrix Reasoning, Visual Puzzles); Working Memory Index (Digit Span Arithmetic Letter-Number Sequencing); and Processing Speed Index (Symbol Search, Coding).

40. Mr. Barrett's abilities on this test demonstrate overall intellectual functioning in the low average range. His full scale intelligence quotient (FSIQ) is 84 (95% Confidence Index = 80 –

88), placing him in the 14th %ile. His acquired knowledge, verbal reasoning, and attention to verbal material is in the average range (VCI = 95, 37th %ile) (95% Confidence Index = 90 – 101). His fluid reasoning, spatial processing, attentiveness to detail, and visual-motor integration is in the low average – average range (Perceptual Reasoning Index = 92, 30th %ile) (95% Confidence Index = 86 – 99). His ability to actively receive, organize and recall information (Working Memory Index) was, however, significantly lower and in the borderline - low average range (WMI = 83, 13th %ile) (95% Confidence Index = 77 – 91). His ability to attend and concentrate, recall information, and reproduce the information that he recalls (Processing Speed Index) was even lower and in the borderline range (PS = 76, 5th %ile) (95% Confidence Index = 70 – 87).

41.    Significantly lower abilities to actively receive, attend and concentrate, organize, recall and reproduce information as measured on the WAIS-IV Working Memory and Processing Speed indexes, are particularly relevant to understanding Mr. Barrett's brain dysfunction, including the pronounced disparity between his ability to access his stable fund of knowledge and his significant inability to appreciate and make sense of new information.

42.    Compromised prefrontal, temporal, and connecting systems (Orbitofrontal Paralimbic Connection; Hippocampal Paralimbic Connection; Frontal Subcortical Connection) relaying information from the frontal cortex to all other brain regions is particularly indicated. This pattern of brain function and dysfunction provides explanation as to why Mr. Barrett's overall intellectual quotient can be in the low average range even in the face of significant current brain dysfunction. This pattern also explains why at some point in time his overall intellectual quotient may have been measured as higher.

43.    Sensory and Motor Functioning: Mr. Barrett's sensory functioning was evaluated using the Smell Identification Test (SIT) and the Reitan-Klove Sensory-Perceptual Examination (SPE). His olfactory sensory abilities on the SIT were in the normal range (4 errors, 49th %). His abilities to accurately receive bilateral simultaneous auditory, visual, and tactile stimulation were normal. His tactile-finger recognition was normal. Mr. Barrett's finger-tip number writing perception, however, was significantly bilaterally impaired. He had 10 errors for his right hand

(T = 34, mild-moderate impairment) and 8 errors for his left hand (T = 32, mild-moderate impairment). Whereas other sensory-perceptual abilities in this examination represent simple sensory perception, finger-tip number writing perception is more complex. This ability requires more concentrated attention and more communication of information from the sensory strip in the posterior area of the frontal cortex through the frontal-hippocampal-limbic connection to and from the parietal cortex. This sensory perceptual ability also requires more complex communication across the corpus callosum to and from the right and left brain hemispheres. Dysfunction of the sensory cortex and communication of the sensory cortex to other brain regions is indicated for Mr. Barrett.

44.    Mr. Barrett's motor coordination and repetition were evaluated using the Finger Tapping and Grooved Pegboard tests. He experienced mild-moderate bilateral impairment on both of these measures (Finger Tapping Right T-34; L T=32; Grooved Pegboard Right SS = -1; Left SS = -1). Dysfunction within the frontal motor cortex and communication of information from the frontal motor cortex to other brain regions is indicated.

45.    <u>Attention and Concentration</u>:   Mr. Barrett's attention and concentration were evaluated using Seashore Rhythm and Speech Sounds Perception tests. As has been previously described, Mr. Barrett was not able to comprehend and carry out instructions to complete the Paced Auditory Serial Addition Test (PASAT) and this test was discontinued after the third trial.

46.    There are multiple indications that Mr. Barrett experiences impaired attention and concentration. During testing he frequently had to be re-directed to the task at hand and when he was not able to sustain his attention, frequent breaks on tests which had multiple subtests were needed.   Additionally, his abilities on several neuropsychological tests which are strongly weighted to the ability to attend and concentrate (WAIS IV Digit Span, Letter-Number Sequencing, Symbol Search, Coding; Executive Functioning Trail Making Tests) were particularly impaired. Attention and concentration is primarily mediated by the prefrontal cortex, subcortical reticular activating system, and communication between these two brain regions through the frontal-subcortical connecting system, indicating dysfunction of these brain structures and connections for Mr. Barrett.

16

47.   Memory and Learning:   Multiple aspects of Mr. Barrett's memory and learning were evaluated assessing his ability to learn and recall information that was presented both verbally and visually and—in both of these modalities—assessing his immediate, delayed, free recall, interference, recognition and forced choice recall of information.   Memory and learning were evaluated using the California Verbal Learning Test (CVLT II), Wechsler Memory Scale (WMS IV), memory trials of the Rey Complex Figure Test (Rey), and Working Memory Index of the WAIS IV.   Mr. Barrett's abilities across these measures of memory and learning portray a distinct pattern of memory function and dysfunction.   On several measures his memory was within or above the normal range (Rey Complex Figure Immediate Recall T = 59, 82%; Rey Complex Figure Delayed Recall T = 59, 82%; Rey Recognition T = 51, 54%; WMS IV Auditory Memory = 95, 37th %ile; Immediate Memory = 108, 70th %ile; Delayed Memory = 100, 50th%; On CVLT II, his standard scores ranged from normal to mild-moderate impairment = +1.5 to -1.5).   On other measures of memory and learning, however, his ability was significantly impaired.   Mr. Barrett's ability to actively receive, organize and recall information (WAIS IV working memory) and his ability to concentrate, recall and reproduce information (WAIS IV processing speed) were within the borderline-low average range.   On the Wechsler Memory Scale (WMS IV) his Visual Working Memory (VWMI) was in the extremely low to borderline range (VWMI = 70, 2nd %ile), his delayed recall of word pairs was in the borderline range (WMS IV Paired Associates Delay = SS 8, 25th %ile ), his ability to store, manipulate, and ignore irrelevant or competing information was in the mildly impaired range  (Spatial Addition = SS 6, 9th%ile), and his ability to keep a mental image of a design in mind and to recall the relative spatial position of this information was in the moderately impaired range (Symbol Span SS = 4, 2nd%ile ).   Also of note, Mr. Barrett had a significant number of repetition errors indicating perseverative thinking (CVLT repetition errors = -1, mild impairment).   This same impairment of his ability to flexibly shift his thinking and acting was demonstrated across multiple tests of executive functioning, as described below.   Memory and learning is primarily mediated by the limbic system hippocampus, temporal cortex, prefrontal cortex and connecting systems among

17

1098

these brain structures (Frontal-subcortical connecting system; Orbitofrontal Connecting System; Frontal-hippocampal Connecting System).

48.     Language:    Mr. Barrett's secondary language was evaluated using the Wide Range Achievement Test (WRAT3).  This test measures academic achievement in three areas:  Reading Word Recognition, Spelling, and Arithmetic Skills.  Mr. Barrett's abilities on the WRAT3 placed him in the 25th percentile in reading recognition (high school equivalent), but in the 5th percentile (6th grade equivalent) in spelling, and the 7th percentile in arithmetic (7th grade equivalent).

49.     Executive Functioning:   As previously described, executive functioning is an umbrella construct, which encompasses abilities to think, reason, problem solve, make reasoned decisions, anticipate consequences of decisions and actions, and modify actions in response to information received from the environment.  Executive functioning includes abilities to initiate, monitor and change actions depending on needs of the situation.  Executive functioning also includes abilities to inhibit thinking and actions, understand and develop ways to accommodate complex situations, and inhibit thinking and actions as required by the situation.  Executive functioning is mediated by the frontal cortex, predominantly by the prefrontal cortex, and through connections from the frontal cortex to all other brain regions.  Intact executive functions are necessary for managing a wide range of experiences in daily living.  Accommodating stressful situations, understanding complex constructs and situations, being able to plan and deliberate potential ways of solving a problem or situation, being able to describe why actions are selected or not selected for action, anticipating the consequences of those decisions, and changing decisions and actions based on understanding of the problem or situation are all examples of executive functioning abilities.  Adequate executive functioning is demanded when a situation or problem is complex and/or stressful and requires the ability to understand, as well as to act thoughtfully. More specifically, executive functioning requires the individual to incorporate feedback concerning the effect of each piece of information and then consider how the new information affects subsequent actions or choices or requires the individual to modify his thinking and actions or change a course of action as needed by the problem or situation.  The executive

18

functioning process is dynamic in that it requires continuous attention to, evaluation of, and incorporation of new information and inhibits thinking and actions as needed to solve the problem or situation (Delis, Kaplan & Kramer, 2001; Gioia, Isquith, Guy & Kenworthy, 1996/1998/2000). Mr. Barrett was significantly impaired across multiple tests of executive functioning, with his impairment ranging from mild to severe.

50. The frontal cortex is the largest brain structure in the human brain, comprising 20-25% of all brain tissue. The frontal cortex is divided into four regions--motor, mesial, dorsolateral and orbitofrontal. Each of these regions mediates executive functioning, but each of these regions also is predominantly responsible for different aspects of executive functioning. For example, the motor region primarily regulates motor coordination and integration and repetition of motor abilities. The mesial region primarily regulates emotion, motivation, drive, spontaneity, motor aspects of speech, and the ability to monitor actions. The dorsolateral lateral region primarily regulates organization, initiation, planning, flexible thinking, problem solving, the ability to categorize and organize information and memory, and—in combination with the mesial region— the ability to monitor and change actions. The orbitofrontal region primarily regulates judgment, insight into deficits, irritability and emotional lability, olfaction, disinhibition, and control of actions. The orbitofrontal region also plays a particularly interactive role with the limbic system, assessing and altering emotional responsivity and inhibition of thought and actions. Knowledge of executive functioning and the role of executive functioning has been known by neuroscientists for many years, since and prior to 1996 (Benson, 1996; Casey, 1997; Constantine, 2004; Frank, 2006; Hinson, 2003; Janowsky, 1989; Kritchevsky, 1989; Lyketsos, 2004; Nagahama, 2005).

51. Mr. Barrett's executive functioning was evaluated using tests that make up the Executive Functioning Test (EFT) (Trail Making Tests, Verbal Fluency Tests, Design Fluency Tests, Color-Word Interference Tests, Sorting Tests, Twenty Questions, and Tower Test), Wisconsin Card Sorting Test (WCST), and Short Category Test (SCT). Across EFT subtests, Mr. Barrett was able to accurately complete some tasks. He was, however, significantly impaired in his abilities on other tasks of executive functioning, with his impairment ranging from mild to

1100

severe. A distinct pattern in the nature of Mr. Barrett's impairment on EFT measures was apparent.

52. With the exception of his ability to complete the Twenty Questions subtest of the EFT, Mr. Barrett had some significant impairment on each of the EFT subtests. Trail Making Test is a series of four individual tests which primarily evaluate visual-scanning, attention, motor and the ability to flexibly switch thinking and actions. Mr. Barrett's ability to quickly scan the task was moderately impaired (SS = 4); his ability to sequentially process numbers was in the borderline range (SS = 8); his ability to sequentially process letters was mildly impaired (SS = 7) and his ability to flexibly shift his thinking and actions was mildly impaired (SS = 7). Of particular note, Mr. Barrett made multiple errors of several types on Trail Making. He had a significant number of errors where he was not able to effectively scan information, focusing on the relevant and ignoring the irrelevant (Omission Errors = 13%th, mild impairment); he had a significant number of errors correctly moving information in the expected order (Sequencing Errors = 16th ile – below average); and he had a significant number of errors where he could not order numbers and letters of the alphabet while sequentially and flexibly switching from number to letter (Set Loss Errors = 22% - below average). Overall, the number of errors that Mr. Barrett had on Trail Making Tests was impaired (SS = 7, mild impairment).

53. Verbal Fluency Tests evaluate the ability to initiate and report verbal information, and this was a relative strength for Mr. Barrett. He was successfully able to retrieve and report letters and words and he was able to switch his verbal descriptions (Letter Fluency SS = 8; Category Fluency = 10; Category Switching SS = 10). Mr. Barrett again, however, had a significant number of errors in this process (Switching Accuracy SS = 5, mild impairment; Percent Switching Accuracy SS = 4, moderate impairment).

54. On tests which evaluate fluency of visual information, Mr. Barrett's abilities were similar to his fluency with verbal information. Design Fluency was a relative strength for him (Filled Stimuli SS = 12; Empty Stimuli SS = 10; Design Switching SS = 10). Mr. Barrett's accuracy in carrying out these tasks was, however, significantly impaired (Percent Switching Accuracy SS = 8, borderline impairment).

20

55.    A similar pattern of ability/disability was demonstrated on EFT tests of the ability to name colors and words and his ability to withhold the familiar while reporting the accurate but less familiar (Color-Word Interference Tests (Color Naming SS = 10, average range; Word naming = SS 7, mild impairment; Inhibition = SS = 9, average range; Inhibition Switching SS = 10, average range).  Again, despite his ability to simultaneously process this information was significantly impaired (Inhibition Errors = SS 6, mild impairment; Inhibition/Switching Errors SS = 7, mild impairment).

56.    On tests of concept formation and conceptual knowledge (Sorting Tests) Mr. Barrett was successfully able to develop concepts (Free Sorting SS = 8 and 9, below average - average range).  His ability to transfer his skills to understand and describe concepts presented to him, however, was significantly impaired (Recognition Description SS = 3, moderate-severe impairment).

57.    Mr. Barrett's ability to view a problem and, using his hands, to manipulate objects (Tower Test) was within the normal range (SS = 11, average range).   In the process, however, Mr. Barrett's ability to accomplish this task while inhibiting his thinking and action was severely impaired.  Mr. Barrett reports substantial work history as an automobile mechanic.  He reports with pride that he could approach a difficult automobile mechanical problem and fix it but he could not explain *how* he went about fixing the problem, *why* he did what he did to fix the problem, or to *replicate* the process at another time on another vehicle.  Completing the EFT Tower Test is somewhat similar to completing an automotive repair project.  Completion of the Tower Test has two simple rules…move one piece at a time and always put a small object on top of a larger object.  Mr. Barrett was not able to inhibit his responding and he broke the "rule" a significant number of times ((Move Accuracy Ratio SS = 3-severe, moderate impairment; Rule Violations SS = 7, mild impairment).   Persistent errors on tests of executive functioning, as well as on tests of memory and learning, represent significant perseverative thinking and acting (tendency to rigidly repeat the same thought and action even though the situation or problem has changed) and tendency towards confabulation (the recitation of inaccurate often absurd experiences to unknowingly fill in gaps of memory) for Mr. Barrett.

21

58. The entire frontal cortex system is required to complete these tests on the EFT. The pattern of Mr. Barrett's success and failures across the tests, however, indicate that the greatest prefrontal cortex impairment for him is within the dorsolateral and orbitofrontal regions, with relative sparing of structures within the mesial prefrontal system.

59. The Wisconsin Card Sorting Test (WCST) is one of the oldest, most researched, and most utilized tests of executive functioning available to neuropsychologists (Buros, 2009). It requires the individual to place cards with different symbols, numbers of symbols printed in various colors in piles under four key cards according to a pattern that the individual must deduce from the examiner's feedback to the individual's decisions for placement of the cards. Although the entire frontal cortex system is involved in successfully completing this test, current neuroimaging research demonstrates particular involvement of the dorsolateral prefrontal region (Nagahama, Okina, Suzuki, Nabatame & Matsuda, 2005). Mr. Barrett's ability to complete the WCST is significantly impaired, with Mr. Barrett experiencing impairment on 67% of the WCST measures, with impairment severity ranging from mild to severe. The total number of errors made by Mr. Barrett on the WCST places him equal to or below the 1st %ile. The number of perseverative errors made by Mr. Barrett was impaired (Perseverative Errors = 42nd%ile); and the number of nonperseverative errors was severely impaired ≤1st %ile).

60. One of several abilities measured by the WCS is the ability to develop a simple concept and then to carry out that simple concept. Mr. Barrett experienced significant difficulty developing the concept required by this test (Conceptual Level Responses = ≤ 1st %). Of particular concern, Mr. Barrett frequently repeated out loud the "rule" he was using to solve this problem. Nevertheless, he was unable to carry out the "rule" he had stated (Categories Completed = 0). When impaired, his impairment was consistently in the severe range. Current research demonstrates a significant relationship between ability/inability to grasp and to consistently carry out the demands of the WCST and daily functioning such as driving an automobile or successfully returning to work after a closed head trauma (Macklin, Horner, Harvey, & Stevens, 2005).

61. Again, the WCS requires the entire prefrontal system to successfully complete. Dorsolateral and orbitolateral prefrontal regions are, however, primarily involved in completing this test (Nagahama, Okina, Suziki, Nambatome, & Matsuda, 2006).

62. Category Test is another well-known and respected measure of functioning of the prefrontal cortex. Category Test was developed by Halstead in 1979, and one of the first standardizations of the Category Test was in 1985 (Reitan & Wolfson,). The Short Category Test (SCT, 1989) is a current revision of the Category Test. Using stimuli from the original Category Test, the SCT was developed as an instrument that could be more easily transported, more easily administered, and requires less time to accomplish the same goal. SCT and Category Test are significantly related (discriminate validity = .93) and reliable (reliability co-efficient = .81). SCT also has good sensitivity, correctly classifying 83% of individuals who do/do not experience brain damage. This indicates that these two tests are measuring the same construct and same brain region. Category Test and SCT are highly related (.93 to .80), providing confidence in substituting SCT for the longer, more demanding Category Test. (Buros, 2009).

63. Similar to the WCST, the Category Test assesses an individual's ability to solve problems which require abstract concept formation, use abstract principles, and understand complex information. Whereas neuroimaging has demonstrated the WCST to be primarily mediated by the dorsolateral region of the frontal cortex, the Category Test appears to be primarily mediated by the posterior frontal cortex, anterior parietal cortex, and connecting systems between these brain regions.

64. Like his abilities on the WCST, Mr. Barrett's abilities on the SCT were also severely impaired. SCT requires the individual to develop a concept to solve a problem, carry out the actions needed to accomplish the concept they developed, and flexibly change their thinking and acting in response to information that is actively provided to the individual by the neuropsychologist who is administering the test. The test requires that the neuropsychologist to verbally respond to each choice as being "right" or "wrong" while the test is actively being taken. The objective is for the individual to be able to develop a concept, try the concept out, and if their concept is accurate ("right") continue applying the concept, but if the concept is

23

inaccurate ("wrong") to change the concept and try out a different concept. Out of 100 possible responses, Mr. Barrett was wrong 64% of the time, making 64 errors. The measured significant impairment on this test means that I had to say to Mr. Barrett 64 times that he was "wrong."

65. Mr. Barrett was not able to learn from the information he was being provided and his abilities on this test were severely impaired (T = <24, <1st%ile). Again, Mr. Barrett often stated the concept or "rule" he had developed, but then did not carry out that rule that he had just stated. The SCT assesses an individual's capacity for abstract reasoning and complex concept formation, as well as the individual's ability to flexibly change their thinking and actions considering information that they are provided. SCT is a measure of functioning of the entire prefrontal cortex system, evaluating abilities that are similar to those measured by the WCST.

66. In summary, Mr. Barrett's abilities and disabilities on neuropsychological testing portray the picture of an individual who, despite reasonably adequate general mental ability, nevertheless experiences significant brain damage and consequent brain dysfunction primarily of prefrontal and temporal cortices, which are necessary for the brain to effectively communicate information and function effectively. The nature and severity of brain dysfunction would negatively impact all aspects of Mr. Barrett's daily functioning, and would particularly impair his abilities to organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment. His disabilities would be further exacerbated under conditions of complexity and/or highly stressful situations.

67. I hold each one of the observations, findings, and conclusions I have reached above to a reasonable degree of scientific certainty and would have advised trial counsel and testified in accordance with them if called as a witness during Mr. Barrett's trial.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States and the State of California on March 5, 2009.

Myla H. Young, Ph.D.

24

Addendum A

Myla H. Young, Ph.D., ABN

25

MYLA H. YOUNG, Ph.D., ABPN
Diplomate – American Board of Professional Neuropsychology
PSY 11916

RESUME

*Office:*
1475 North Broadway # 335
Walnut Creek, CA 94596

*Mailing:*
1630 North Main Street #357
Walnut Creek, CA 94596

(925) 952-4350
925  945-8991 (FAX)
mylayoung@sbcglobal.net

LICENSE-Psychology

California        August, 1990          PSY 11916

CERTIFICATION

Board Certification in Neuropsychology – American Board of
     Professional Neuropsychology (ABPN)

Certification in Hare Psychopathy Checklist-#99-20
     Robert Hare, Ph.D.

EDUCATION

Ph.D.              Alliant International University
                   (Formerly California School of Professional
                   Psychology)
                     San Francisco, California
                     Doctor of Philosophy/Clinical Psychology
                     January, 1988

M.A.               Towson State University
                     Baltimore, Maryland
                     Master of Arts/Experimental Psychology
                     June, 1977

B.A.               University of Guam
                     Agana, Guam
                     Bachelor of Arts/Psychology
                     June, 1975

1

## POST-DOCTORAL FELLOWSHIP

University of California/San Francisco General Hospital
San Francisco, California

January 1988 - January 1990

## PRE-DOCTORAL INTERNSHIPS

McAuley Neuropsychiatric Institute of St. Mary's Hospital
San Francisco, California

July 1985 - July 1987

Garfield Geropsychiatric Hospital
Oakland, California

October 1984 - July 1985

## PROFESSIONAL WORK EXPERIENCE - Current

| | |
|---|---|
| Private Practice | Neuropsychological Assessment Child, Adolescent and Adult Forensic, Medical, Psychiatric, Medico-Legal, Educational |

March 1992 - Present

| | |
|---|---|
| Continuing Education Faculty | Alliant International University Neuropsychological Evaluation of Criminal Offenders |

2000 - Present

| | |
|---|---|
| Continuing Education Faculty | University of California-Berkeley Neuropsychological Evaluation of Criminal Offenders Introduction to Neuropsychological Assessment |

2005 - Present

2

**PROFESSIONAL WORK EXPERIENCE - Prior**

Senior              California Department of Mental Health
Supervising         Correctional Medical Facility
Psychologist        Vacaville, California

                    Psychology Consultant to Executive Director,
                      Medical Director and Program Directors
                     Principal Investigator for Research Project
                     Program Evaluation, Program Development,
                       Treatment Outcome Measurement
                     Director-American Psychological Association
                      (APA) Psychology Intern Training Program
                     Director-Psychology Fellowship Training
                       Program
                      Standards of Practice/Quality Assurance
                      -Psychology Service
                      Staff Selection/Evaluation - Psychology
                       Service
                      Clinical Supervision and Consultation -
                      Psychology Service

             Staff Psychologist - January 1990 - June 1995
             Program Consultant - June 1995 - January 2000
             Senior Psychologist - January 2000 - July 2005


Adjunct             Alliant University - Berkeley/Alameda
Faculty                 Instructor: Neuropsychological Assessment
                                    Cognitive Bases of Behavior

                    Dissertation Chairperson:
                            -Neuropsychological Assessment of
                                Psychotic and Non-Psychotic
                                Inmate/Patients
                            -Neuropsychiatric Description of
                                Children in Day Treatment
                            -HIV/AIDS-Affected Children:  A
                             Study Utilizing the Rorschach To
                                Identify Depression
                            -Self Mutilation:  Analysis of
                                a Psychiatric Forensic
                                Population
                             -Relationships of Rorschach and
                                MMPI2 to the PCL-R among
                                Mentally Ill Felons

3

Dissertation Committee:
-Development of Special
    Aggression Content Scales for
    Rorschach Test Administration
    within a Prison Population
-Neuropsychological and Cognitive
    Correlates of Academic
    Achievement in a Child
    Psychiatric Sample
-Emotional Descriptors of
    Adolescents Who Have
    Committed Homicide
-Rorschach Responses/Piagetian
    Cognitive Development in Eight
    to Twelve Year Old Children
-Understanding Malingering:
    Theory and Treatment

1990 - 2005

Training,                Oaks Children's Center
Assessment,                San Francisco, California
Consultation             Training and Supervision of Pre-Doctoral
                             Psychology Intern
                         Seminars in Neuropsychological and
                          Personality Assessment of Children
                                 1992 - 1995

Training,                McAuley Institute of St. Mary's Hospital
Assessment,                San Francisco, California
Consultation             Training and Supervision of Pre/Post-
                          Doctoral Psychology Interns/Fellows
                           Seminars in Neuropsychological Assessment
                              Of Children, Adolescents, Adults

1992 - 1995

Research                 University of California-San Francisco
Training                  NIDA Research Grant:  Longitudinal
                          Study of HIV Related Cognitive
                          Impairment in Groups of Gay Men and IV
                          Drug Users

1988 - 1990

4

| | |
|---|---|
| Child &<br>Family<br>Counselor | Florida United Methodist Children's Home<br>  Enterprise, Florida<br>Child & Family Counselor at a Residential<br>  Treatment Facility for Children/Adolescents<br>Individual and Group Counseling<br>Parent Education<br>Court Liaison<br>Consultation to Residential Group Home<br>Consultation to Children in Foster Care<br><br>  1978 - 1980 |
| Adjunct<br>Faculty | University of Central Florida<br>Valencia Community College<br>Seminole Community College<br>Lake-Sumter Community College<br>  Orlando, Florida<br>    General Psychology<br>    Developmental Psychology<br>    Child & Adolescent Psychology<br>    Research Methods<br>    Learning Theory and Animal Behavioral<br>      Training Laboratory<br><br>  1980 - 1984 |

**RESEARCH EXPERIENCE**

| | |
|---|---|
| Principal<br>Investigator | California Department of Mental Health<br>  Correctional Medical Facility-Vacaville<br>  Prospective description of demographic,<br>  neuropsychological and emotional<br>  functioning in psychiatrically hospitalized<br>  males<br><br>  1994 - 2005 (Project Completed) |
| Principal<br>Investigator | California Department of Mental Health<br>  Correctional Medical Facility-Vacaville<br>    Multimethod description of inmates<br>    referred for psychiatric treatment from<br>    Pelican Bay State Prison<br><br>  1994 - 1997 (Project Completed) |

5

| | |
|---|---|
| Principal Investigator | California Department of Mental Health Correctional Medical Facility-Vacaville Development and Evaluation of a Behavioral Milieu Program in a Forensic Psychiatric Treatment Program |
| | 1990 - 1993 (Project Completed) |
| Participant | Spine Institute of San Francisco - Medtronic Spinal Cord Stimulator Project Principal Investigator: J. Schofferman, M.D. |
| | 1996 - 1998 (Project Completed) |
| Post Doctoral Research Assistant | University of California-San Francisco Psychiatric Aspects of AIDS Dementia in Gay Men and IV Drug Abusers Principal Investigators: Alicia Boccellari, Ph.D. J. Dilley, M.D. |
| | 1988 - 1990 (Project Completed) |
| Post Doctoral Research Assistant | McAuley Neuropsychiatric Institute of St. Mary's Hospital Longitudinal Study of Infant Attachment Principal Investigators: H. Massey, M.D. J. Afterman, M.D. |
| | 1988 -1990 (Project Completed) |
| Doctoral Dissertation | Neuropsychological and Piagetian Cognitive Development: A comparison of children's responses to the Luria-Nebraska Neuropsychological Battery-Children's Revision, Piagetian Tasks, and the WISC-R |
| Master's Thesis | Piagetian Moral Development: A comparison of children's responses to Piagetian Moral Intentionally stories presented in both verbal and videotaped versions |
| Graduate Research Assistant | Towson State University Piagetian Cognitive Development Behavioral Treatment |

6

1112

**PROFESSIONAL PRESENTATIONS**

Contra Costa Department of Defense Seminar Martinez, California. *When juvenile offenders become adult offenders: A prospective look* (July, 2006)

California Psychological Association Conference San Jose, California. *The sexual offender in prison psychiatric treatment: A multimethod description* (April, 2003)

Forensic Mental Health Association of California Conference Asilomar, California. *The sexual offender in prison psychiatric treatment: A multimethod description* (March, 2003)

International Organization of Psychophysiology Montreal, Canada *Profiles of Violent Mentally Ill Incarcerated Males: Neuropsychology and Psychophysiology* (August, 2002)

California Psychological Association Conference Pasadena, California *Research in Prison Psychiatric Treatment* (May, 2002)

American Correctional Health Services Association Conference Costa Mesa, California *Profiles in Violence* (September, 2001)

Forensic Mental Health Association of California Conference Asilomar, California *Profiles in Violence* (March, 2001)

Behavioral Health Institute Conference – Los Angeles, CA. *Latinos is Forensic Psychiatric Treatment* (September, 2000)

Forensic Social Work Conference – Palm Springs, California *The Violent Psychopath in Treatment* (May, 2000)

Forensic Mental Health Association of California Conference Asilomar, California *Danger to Self and Danger to Others: A description of Inmates Who Harm Themselves or Harm Others* (March, 2000)

California Psychological Association Conference, San Jose, California
*Neuropsychological and Psychological Evaluations in A Forensic Psychiatric Setting* (March, 2000)

7

Forensic Mental Health Association of California Conference Asilomar, California *The Violent Psychopath in Psychiatric Treatment* (March, 1999)

Patton State Hospital Mental Health Conference, Patton, California *The Violent Psychopath in Psychiatric Treatment* (September, 1999)

Patton State Hospital Mental Health Conference, Patton, California *Psychopathy in a Forensic Psychiatric Population*(September, 1998)

Forensic Mental Health Association of California Conference Asilomar, California *A Multimethod Approach to Understanding Psychopathy* (March, 1998)

Patton State Hospital Mental Health Conference, Patton, California *Violence in the Community and Assaut in Prison: A Multimethod Approach*(September, 1997)

Forensic Mental Health Association of California Conference Asilomar, California *Patterns of Violence: Demographic, neurocognitive, diagnostic, and emotional descriptions of inmates with high and low violence histories.* (April, 1997)

California Department of Corrections-Pelican Bay-Pelican Bay, California *Description of Inmate/Patient Populations Demographic, Cognitive, Neuropsychological, and Psychological Correlates with Violence* (July, 1996)

California Department of Corrections-Preston School for Boys – Ione, California *Demographic, Cognitive, Neuropsychological, and Psychological Correlates with Age of Offense* (July, 1996)

California Department of Corrections-Director's Cabinet Meeting – Sacramento, California *Description of Inmate/Patient Population* (July, 1996)

California Department of Corrections-Northern Regional Warden's Meeting – Folsom State Prison *Description of Inmate/Patient Population* (July, 1996)

8

California Department of Corrections-Warden's Meeting - CMF Vacaville, California *Description of Inmate/Patient Population* (June, 1996)

Patton State Hospital Forensic Mental Health Conference. *Development of a Forensic Psychiatric Treatment Program Based on Empirical Description of the Population* (October, 1995)

Patton State Hospital Forensic Mental Health Conference. *Opening Address – The Changing Face of Forensic Mental Health: The Challenge Described* (October, 1994)

## PUBLICATIONS

Young, M. H., Justice, J., & Erdberg, P. (2008). *The Rorschach Test in a prison population.* (Manuscript in press).

Young, M. H., Justice, J., & Erdberg P. (2008). *Sex offenders in prison psychiatric treatment: A biopsychosocial description.* International Journal of Offender Therapy and Comparative Criminology. (in press).

Young, M. H., Justice J., & Erdberg, P. (2007). *A comparison of rape and molest offenders in prison psychiatric treatment.* (Manuscript in review).

Schofferman, J. & Young, M. H. (2007). *Previously unrecognized cognitive and psychological disorders in patients with chronic neck pain due to whiplash and other forms of cervical trauma.* Pain Medicine, (Manuscript in revision).

Young, M. H., Justice, J., & Erdberg, P. (2006). Risk of harm: Inmates who harm themselves while in prison psychiatric treatment. *Journal of Forensic Sciences, 51*(1), 154-162.

Young, M. H., & Justice, J. (2003). Risk Factors for assault while in Prison Psychiatric Treatment. *Journal of Forensic Sciences, 49*(1), 141-149.

Justice, J. & Young, M. H. (2002). *Managing violence in a Supermax facility: A discussion of research findings and their application to reducing violence in supermax*

9

*institutions and beyond.* In D. Neal (ed.) Supermax Prisons (pp. 99 – 118). Lanham, MD. American Correctional Association.

Young, M. H., Siemsen, R., & Roman, T. (2000).  Neuropsychological and personality assessment in a forensic psychiatric setting. *California Psychological Association Convention Abstracts.*

Young, M.H., Justice, J., & Erdberg, P. (2000).  A multi-method description of psychopathy among forensic psychiatric inmates. In C. Gacono(Ed.) *The Clinical Forensic Assessment of Psychopathy:  A Practitioner's Guide* (pp. 313-332).  Mahwah, New Jersey, Erlbaum.

Young, M.H., Justice, J., & Erdberg, P. (1999).  Risk factors for violence among incarcerated male psychiatric patients:  A multimethod approach. *Assessment, 6,* 243-258.

Young, M. H. & Justice, J. (1997). Neuropsychological functioning of inmates referred for psychiatric treatment.  *Archives of Clinical Neuropsychology, 13,* 303 – 318.

Dilley, J., Boccellari, A., Davis, A., Young, M., & Bacchetti, P.  (1989).  Relationships between neuropsychological and immune variables in HIV positive asymptomatic men. *IV International Conference on AIDS. Montreal, Canada.*

Dilley, J., Boccellari, A., Davis, A., Young, M. & Bacchetti, P.  (1989).  Relationships between neuro_psychological and immune variables in HIV positive asymptomatic men.  *Abstract and oral presentation. American Psychiatric Association, May 11, 1989. San Francisco, CA.*

Young, M.H.  (1977).  Visual Modality as a Preferred Mode presentation for Piagetian Moral Intentionally. *Monographs of Lida Lee Tall Learning Research Center.* Towson State University

10

PROFESSIONAL AWARDS

| | |
|---|---|
| University of Guam | Graduation - Magna Cum Laude<br>June, 1975 |
| Towson State University | Graduation - Magna Cum Laude<br>June, 1978 |
| California School of Professional Psychology | Superior Accomplishment Award<br>Dissertation<br>June, 1988 |
| State of California | Superior Accomplishment Award |
| Department of Mental Health Correctional Medical Facility | Exceptional Job Performance<br>April, 1993 |
| State of California Department of Mental Health Correctional Medical | Superior Accomplishment Award<br>Exceptional Job Performance<br>April, 1995 |
| State of California Award Department of Mental Health Correctional Medical Facility | Outstanding Accomplishment<br>Exceptional Job Performance<br>September, 1999 |

PROFESSIONAL ASSOCIATIONS

-American Board of Professional Neuropsychology (ABPN)
-American Psychological Association (APA)
    Division 40:  Clinical Neuropsychology
    Division 42:  Forensic Psychology
-California Psychological Association (CPA)
-National Academy of Neuropsychology (NAN)
-International Neuropsychological Society (INS)
-Society for Personality Assessment (SPA)

April, 2008

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 90**

## DELCARATION OF PAUL RICKIE LUNSFORD

I, Paul Rickie Lunsford, declare the following:

I am a friend of Kenneth Barrett and had known him seven or eight years at the time the police raided his shack in 1999. I am married and have two children with my current wife and two other children by a former runner up to Miss California. I grew up in California in the Bakersfield area and lived in many place in Central California and in the Mammoth Lakes area, which is how I got my Oklahoma nickname, "California Rick."

I am a former baker and cake decorator, a trade I practiced both here in Oklahoma and in California. I baked the cakes for the grand openings of the Wal-Mart super centers in Fort Smith, Arkansas. One of the cakes was an exact replica of the store, about twelve feet long and five-feet high. Every shopper got a piece of the store. I decorated Kenny's birthday cake every year. If I ever needed him, he was always there. There are a lot of people, but few characters and Kenny's a character. Kenny was trustworthy.

I first met Kenny when I brought him my 1992 Ford Escort, a hatchback, to him to repair. I cannot recall what was wrong with it or what Kenny charged, but Kenny had a reputation in the community as an excellent mechanic who was fair. At the time, I lived about a half-mile down the road from Kenny. Kenny and I developed a friendship. Some time prior to the raid, I set up a listening device in Kenny's garage, a security monitor so that Kenny could hear in the house if someone broke in. There were never any other listening devices on the grounds. Kenny set up the motion sensor light at the back door of the house himself. These devices were not to detect police; they were like anyone's burglar alarm.

1

1119

I was at Kenny's house from noon on September 22, 1999 through 9:00 P.M. on September 23, 1999. On 9/22/08, at about noon, I went by Kenny's to drop off a truck I was selling to Kenny. The truck was a 1964 Chevy Custom Cab. I sold it for $1500, some cash, a stereo, and a 30-30. I remained at Kenny's for the next 33 hours. I parked the truck in front of the garage.

Kenny and I stayed up for the next 33 hours; we were doing methamphetamine. During this time, there were a lot of people coming and going to Kenny's. Monk Sanders never came by during that 33-hour period. However, others, including Travis Crawford, came by to do drugs, which he often did. In the late afternoon, on September 23, 2008, Kenny, a few others, and I were standing near the fence to Kenny's property. Travis came over from his parents' place and asked Kenny if he had seen the white SUV with tinted windows that went by, which was of particular note because it had gone down a dead end road and not yet returned. Travis said he thought they were police.

Kenny did not trust Travis at all; Travis made him nervous. Travis was pretending to watch Kenny's back, but Kenny knew better. Kenny was not nervous about the police. He was nervous about Travis. Travis is a real flaky person who was a police informant. Kenny shrugged Travis off and Travis went back to his house. Once Travis had left, Kenny told us that anyone who wanted to leave could. Kenny said, "Hey, you guys might want to leave because the car that drove by was cops." Kenny was concerned the police would come by his place and that we would all get in trouble because we were all holding drugs. Kenny opened the gate to let out anyone out who wanted to go. There were three or four of us. The others left, but I remained with Kenny. Kenny re-locked the

2

1120

gate and we went back to the house or the garage without our seeing the SUV again.

Kenny never said anything about going down in a blaze of glory. Kenny would not say that or want that. That was not who Kenny was.

Kenny had a case pending at the time. I knew about the case because once Kenny had borrowed my phone to call his lawyer. I knew Kenny had a case, but I never heard that there was a warrant out for Kenny.

I left about three hours before they raided Kenny's place. Toby, Kenny's son, was the only one still there besides Kenny. Toby was living there at the time.

I knew Travis Crawford and Cindy Crawford. They acted as if they would do anything if their freedom were threatened and therefore their ability to get dope.

I have never been interviewed before or during Kenny's trial by an investigator or defense attorney working on Kenny's behalf.

An investigator working on Kenny's case asked me about Kenny, our friendship, what I knew about the raid, and Travis and Cindy Crawford. After I told him what I knew, he asked if I would give a written statement. He showed me this declaration and asked me to read it carefully. I have and it says what I told the investigator during our meetings. If I had been asked to testify about the same things at Kenny's trial this declaration is what I would have said.

I declare, under penalty of perjury, that the foregoing 3 page declaration is true and correct.

Executed by me this _26 Feb_ day of 2009, in _Sequoyah_ County, Oklahoma.

<div align="center">3</div>

Paul Rickie Lunsford

4

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 91**

---

Exhs. § 2255 Motion                    *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

## Declaration of Phyllis Crawford

I, Phyllis Crawford, declare the following:

I am Kenneth Barrett's maternal aunt; Gelene Dotson, who is Kenny's mother, is my sister. I live with my husband, Roger. My son, Travis Crawford, has lived here on and off for many years. Our home is adjacent to Gelene's home and in front of Mark Dotson's home. I can see Kenny's old shack from my home. My family grew up on this land, and many of us still live around here.

We are a close knit family and, like all families, have our quarrels and disputes, but we try hard to help each other out. We feel guilty that we did not do more for Kenny. We did not do anything to get him the kind of mental health treatment he needed, even though our family has had to deal with mental illness for a long time.

Neither Gelene nor Ernie was ready to be a parent. I lived with Gelene and Ernie in Joliet for a few months when Roger was in the service at Ford Ord. Gelene was four months pregnant with Kenny. Even at that time, Gelene drank from the moment she woke up until she went to bed. When Ernie came home from work, Gelene immediately started in on him. Often, he would turn around and leave. I had intended on staying longer, but I could not stand it.

We knew that Kenny was different because he needed so much more attention as a child than the other children. He was extremely sensitive and cried over every little thing from the time he was small until he was a grown man. He was always hyperactive, on the go, into everything, and could not sit still. He would break down and cry easily.

Kenny had a very difficult relationship with both his parents, but he loved them dearly. Gelene never gave Kenny a kind word, and she screamed at him over anything.

Page 1 of 4

1124

When Kenny was about 11, Gelene called me because Kenny was crying and would not come out of his room.  My husband Roger and I went over to their house and talked to Kenny.  Kenny told us that he could not get his mom's voice out of his head.  The only time Gelene talked to him was to scream.  That is so sad.

Gelene had a lot of problems, especially with alcohol and men, that affected Kenny badly. Gelene had different men in the house all the time right when Kenny was entering his teenage years, and it was very confusing for him.

Gelene was and is a bona fide alcoholic, although she denies it.  Gelene, who is three years older than I am, started drinking in high school.  She used to beat me up with her fists.  Now, Gelene drinks beer from the time she gets up until she goes to bed.  She screams all the time, and I can hear it in my house after it's gone through her walls and across our yards.  She cannot control her emotions.  Gelene takes after our father, who was also a heavy drinker who generally wanted to fight when he was inebriated.  My dad's relatives were drinkers as well.

Ernie, Kenny's father, was also a drinker.  He hardly had anything to do with him after the divorce, and everyone could see how much it hurt Kenny.  Ernie used to come to town once a year, and I remember him coming by to show off his new Corvette when his children did not have shoes or decent clothes to wear.

Kenny was never able to be independent as a grown man.  His emotions got in the way of his being able to live too far from home.  As an example, a couple of years before the incident, Kenny had run to my house in tears, crying, "The laws are after me. They're coming! What should I do?"  I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been

<div align="center">Page 2 of 4</div>

afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail. I have never been afraid of Kenny.

Kenny tried to stay close to home, always worked hard and took pride in his work. He would give you the shirt off his back if you needed it. Kenny was crazy about Abby, his wife. They married young and had a little boy in no time. After Kenny married, he and his wife lived off and on with his mother, and after his divorce he moved back home, building a little shack next door to this mother's. His suicide attempt tells it all. A friend and I witnessed it right from my front window. I almost passed out. Kenny pulled his truck into his mother's driveway, went in her house and got Steve's gun, came outside and shot himself. We rushed over to him, and heard him mumbling and not making any sense. An ambulance came and took him to the hospital where he stayed almost two weeks.

We have learned a lot about depression and mental illness as our children grew up. It runs in our family. I have depression and I get treated for it. My daughter Gwen is bipolar, and her son has a rare disorder that makes him unable to talk or mature; he is like a little child. My son Travis also has to have psychiatric treatment for anxiety and panic attacks and lives with me and my husband.

This whole tragedy with the police officer did not have to happen. Instead of raiding Kenny's house in the middle of the night, all they had to do was come to me and I would have walked over to his house and told him that he had to come with me and be arrested and he would have come.

I know that my son Travis testified in the federal trial against Kenny. I was here in December 2008 when an investigator working on Kenny's case listened to what Travis



had to say about his testimony. My husband, Roger, was here and listened to the conversation, too. I have read the part of Roger's declaration where he talks about what Travis told the investigator, and I agree that is what Travis told him.

This declaration I am giving includes what I told the investigator when he asked me about Kenny, our family, Kenny's upbringing, and his interview with Travis. I did not write the declaration myself, but it says what I told the investigator.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this _22_ day of _Feb_ 2009, in _Sequnyah_ County, Oklahoma.

Phyllis Crawford

Page 4 of 4

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 92**

---

## DECLARATION OF ROGER CRAWFORD

I, Roger Crawford, declare the following:

I am Kenny Barrett's uncle by marriage. I am married to Phyllis, who is the sister of Gelene Dotson, Kenny's mother. We live next door to Gelene, and Kenny lived next to Gelene on the other side of her house.

My son is Travis Crawford. He is married to Cindy Crawford. I have known Cindy for years. I don't like to talk bad about anyone, but Cindy is a very dishonest person, and has been dishonest and untrustworthy for as long as I have known her. Cindy basically lies about anything and everything, especially if it means she can get something for herself. It is not only my personal opinion that Cindy is very dishonest, but I know that she has that reputation in the community. Cindy has gotten victim protective orders against people that were based on false information, and has even falsely informed on her own family members through the state Department of Human Services.

I am aware that Cindy has worked as an informant for the local police around here to avoid getting into trouble herself for things she has done. When Cindy testified against Kenny Barrett at his federal trial, I believe she was in some type of trouble, as she has been afterwards, but never had to serve a day in jail. My son Travis was also in legal trouble at the time he testified against Kenny Barrett, but he never had to do any jail time, either. I believe that is also true of the other informant witnesses who testified against Kenny.

At the time of Kenny's federal trial, his lawyers did not ask me about my

Page 1 of 6

RC

knowledge of Cindy Crawford's dishonesty and reputation for dishonesty. Had they asked, I would have told them the things I said above and would have testified to her dishonesty.

An investigator named Leonard Post interviewed my son Travis on December 11, 2008 at my residence. My wife Phyllis and I were present when Mr. Post interviewed Travis. I recall that Travis told Mr. Post the following during the interview:

Travis told Mr. Post that he is Kenneth Barrett's first cousin on his mother's side of the family.

Travis related to Mr. Post that he and Kenny Barrett used to hunt and fish together, and were close. Travis said he was at Kenny's home practically every day. Travis told Mr. Post that Kenny was very generous to him, and would do anything in the world for him. Travis told Mr. Post that Kenny Barrett liked to help people and rarely left his property. Kenny would eat meals at his mother's house, and sometimes friends would bring him food.

Travis told Mr. Post that he had had a long struggle with drugs and has anxiety and panic attacks. He told Mr. Post that his mind does not work that well. Travis gave the example of going out to his truck to get something, and by the time he gets there, he will have forgotten what it was he was going to get. Travis told Mr. Post that when he gets problems with anxiety, he gets so nervous that he just does whatever it is that comes to mind. Travis told Mr. Post that he was like this as a child as well. As Travis told Mr. Post, and as I know, he is under a doctor's care and is trying to be healthy. Travis told

Page 2 of 6

*RC*

Mr. Post that he was a long term methamphetamine user, and he thinks he would die if he used drugs again. As I am also aware, and as Travis told Mr. Post, Travis was told by his doctor that if he ever shot up drugs again, it would likely kill him.

Travis told Mr. Post that he is aware that his drug use was caused by psychological problems that he has and that he does not understand. Travis told Mr. Post that psychological problems run in his mother's side of the family, something I am also aware of. Travis told Mr. Post that he has three children (our grandchildren), one daughter and two sons. Travis talked about how his oldest child is a grown woman who suffers from bipolar disorder. Travis stated to Mr. Post that in his opinion, one of his sons seems a little slow and is having a hard time. Travis said that his other son, however, is a straight-A student, and Travis hopes that he will turn out alright.

Travis told Mr. Post that he had problems in school and joined the United States Army, trying to straighten himself out. Travis said that he was not able to handle Army life and spent two months in the brig. Travis said he just couldn't keep up with all the rules and was late to formation. It made him feel terrible when people he trained with in the Army made fun of him when they marched by the stockade. Travis told Mr. Post that he got a less than honorable discharge from the Army.

Also when Travis was talking to Mr. Post in front of me and his mother, Travis said that he testified falsely in Kenny Barrett's trial. Travis told Mr. Post that at the time he testified, he was living in so many places and was so strung out, that he did whatever he was told in order to keep out of trouble. Travis told Mr. Post that for several years

Page 3 of 6

*RC*

before Kenny was arrested for shooting the trooper, through Kenny's two state trials and federal trial, and up until about four months before Mr. Post came to talk to him, he had been doing methamphetamine all day, every day. Travis told Mr. Post that when he testified against Kenny Barrett, he was high on meth. He also told Mr. Post that all of the snitches who testified against Kenny Barrett were on dope and high when they testified. Travis stated that he and the other snitches were also high on drugs when they were interviewed by prosecutor Mike Littlefield. Travis told Mr. Post that anybody who had been around drug addicts would have known that. Travis told Mr. Post that when John Philpot took him to see Mike Littlefield, he was sure Mr. Philpot knew he (Travis) was stoned. Travis told Mr. Post that at the time he was interviewed by Mike Littlefield, he felt as though he was already under arrest, and "didn't know if he was ever going to come back home."

Travis told Mr. Post that when Mr. Littlefield interviewed him about Kenny Barrett, he was scared to death of losing his freedom and said whatever he thought Littlefield wanted him to say. Travis said that when Mr. Littlefield asked him if Kenny Barrett said that he (Kenny) "was going down in a blaze of glory," before Travis could answer, Mike Littlefield told him all the bad things that would happen to him if he "lied." Travis told Mr. Post that he was so scared that he said, "yes," that Kenny Barrett would go down in a blaze of glory if the cops came to his residence. Travis said that when he gave this answer, he was panicking because he was afraid. Travis told Mr. Post that Mr. Littlefield told him he knew things about him. Travis repeated that he was extremely

<div align="center">Page 4 of 6</div>



scared during his interview with Mr. Littlefield and said whatever it was Mr. Littlefield indicated he wanted Travis to say. Travis told Mr. Post that he never heard Kenny Barrett state that he was "going down in a blaze of glory" or anything like that.

Travis admitted to Mr. Post that he had testified against somebody before he testified in Kenny's case. That time, Travis said that he had been arrested for bad checks and was afraid of going to jail. Travis said the prosecution at the time of that case let him work for them so he would not get charged in the check case. Travis told Mr. Post that he wore a wire and made four or five drug buys. Travis said to Mr. Post that he believes he could have been killed while working for the police. Travis related that he had to testify against the person he bought drugs from, even though the police lied to him and told him he would not have to testify.

Travis stated to Mr. Post that he was aware John Philpot was at Kenny's residence just two weeks before the raid that led to the trooper getting killed. Travis said that when Mr. Philpot went to Kenny's place two weeks before the raid, Mr. Philpot had inspected Kenny's guns without any problem. Travis told Mr. Post that Kenny told him the local police had a drug case against him (Kenny), but it was not serious. Travis said to Mr. Post that Kenny Barrett never told him anything about an outstanding warrant for Kenny's arrest. Travis said to Mr. Post that at the time he testified against Kenny, he thought having a warrant and having a case were the same thing, but he now knows they are two different things.

Mr. Post asked Travis about the sign Kenny put on his fence. Travis told Mr. Post

Page 5 of 6

*RC*

that Kenny put a sign on his fence just a couple of days before the police raided Kenny's property and Trooper Eales was killed. Travis told Mr. Post the sign was not directed at the police, but it was meant for anybody. According to what Travis told Mr. Post, the sign was to scare people away from trespassing on Kenny's property and stealing his stuff.

As I said before, I was interviewed by investigators working on Kenny's case, and my wife and I were present when Travis was interviewed. After the interviews, I was shown this declaration and was asked if it is accurate about what I told the investigators and what I heard Travis tell Mr. Post. I have read this declaration carefully and it says what I told the investigators and what I heard Travis say.

I declare, under penalty of perjury, that the foregoing 6-page declaration is true and correct.

Executed by me this _22_ day of _FEBRUARY_ , 2009, in _SEQUAYAH_ County, Oklahoma.

_____
Roger Crawford



1134

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 93**

---

## Declaration of Ruth Harris

I, Ruth Harris, declare as follows:

I am Kenneth Barrett's maternal aunt. Kenny's mother, Gelene, is my oldest sister, followed by Phyllis, then me, and then Carolyn. All the girls in the family are about two years apart. Our brother Mark is the youngest child in the family.

My husband, Jerry Harris, and I have been married for 45 years and have two grown children, both doing well. Our daughter Michelle and her husband run two family businesses, a cleaning business and an equipment rental business. Their two boys, Javan, 24, and Alex, 19, are in good health. Our son, Faron, manages a furniture store in Tulsa and has two children, Dallas, 16, and Mandy, 11. Faron was not as fortunate as Michelle in his relationships. He has been married three times. He was hurt badly by his first two wives, both of whom began associating with people outside our religion.

Jerry and I are deeply religious and are Jehovah's Witnesses. We raised our children in the faith, and they are raising their children in the congregation. Jerry and I protected our family from being around those who are not Jehovah's Witnesses so we were not around our sisters and their families very much when our children were growing up. Bad associations spoil useful habits. If we are around people who are cursing and doing bad, it influences us. Peer pressure can make children do bad things, and I tried to keep my children from that.

We made a conscious decision to be around people who are true to the Bible and have the same moral standards as we do. Jehovah's Witnesses all believe the same exact

–1–

1136

RH

way whether we are from Fort Smith or anywhere in the world. We share the same doctrine that the only answers are in God's Kingdom and that Jesus is King. We pay taxes, and we respect the government, but we do not vote because our allegiance is to God's Kingdom. The Bible teaches us that the only true government is the Kingdom of God. As Jehovah's Witnesses, we love everyone and do not hate the person doing wrong. We avoid talking about the bad side of people, but I make an exception for Kenny's father.

Ernie Barrett was not a good husband or father. Ernie did not come around and visit his children the way he should have. He was absent in their lives. I know he regrets that now. Ernie has always been for Ernie. My aunt Mary Real taught Ernie at Marble City Elementary School and said Ernie was a mean child. I do not feel good when I say bad things about people. I hope Ernie is a better person than he used to be because he was not a good father—he went his way and let Gelene take care of the kids.

My family also had problems that they have had to deal with. My father had a drinking problem and was high-strung and quick tempered, but he tried to be a good father and he lived up to his responsibilities. My sister Carolyn has depression, and one of her daughters also has depression. Phyllis's son, Travis, is doing very poorly mentally, which is made worse by his use of drugs.

Gelene moved back to Oklahoma with the boys when Kenny was around nine. Kenny took the divorce very hard and probably blamed himself for it as children commonly do. We planned for Kenny to live with me and my family to help him adjust

–2–

1137

A dL

better. It did not work out. He wouldn't come home with us; he wanted to go with his dad. Gelene did not have a husband to help her raise her children the way Jerry helped me. She had to raise three bronchy boys alone. She was strapped financially. She drank the way she did because that was her way of dealing with adversity. She did not set any boundaries for the boys who were allowed to do whatever they wanted

Kenny was a sweet boy as a child, but I knew there was something emotionally wrong with him. He was hyper, never sitting still, moving all the time. He was more hyper than any child I ever saw. He had a short attention span. He needed a lot of structure and support, but he did not receive any. The boys got to running around with other kids who were bad associations.

As an adult, Kenny was a sweet person, nice, and respectful. I am prejudiced because I love him. Kenny loved Abby, who was really sweet, and their son was a doll. I believe that Kenny had a family substance abuse problem that may have hidden his mental illness. After he and Abby divorced, we tried to help him. His only security was with Gelene because he did not have anybody else. My husband went to see Kenny to talk about the Bible and how he could straighten out his life. We were never afraid of him and do not believe he would intentionally hurt anyone.

This entire tragedy could have been avoided if the police had let the family know they needed to arrest Kenny. Kenny is a very kind person who does not want to bring harm to others. We attended Kenny' two state trials every day and his federal trial twice because we cared for him.

–3–

1138

R H

After speaking with an investigator working on Kenny's case, I have made this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 4 page declaration is true and correct.

Executed by me this _15_ day of 2009, in ___LeFlore___ County, Oklahoma.

_____Ruth Harris_____

Ruth Harris

–4–

1139

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 94**

## DECLARATION OF SALLY DAVIS Johnson

I, Sally Davis, declare the following:

I knew Monk Sanders for a period of several years, and last saw him in 2004. I lived with him for a period of one year. I lost track of him when he went to prison for arson and robbery of a Chinese restaurant.

On one occasion, Monk Sanders used fraud and lies to get me to go somewhere with him. During our relationship, he came to my house one day and said he needed to talk to me. I told him I could talk to him, but not for long, because I had to get back to school. At his request, I left with him in his car. After I got in his car, he drove me to Vian, Oklahoma and kidnapped and held me against my will for 8 days. During this period of time, he stabbed me and beat me on a daily basis. He kept lying to me, telling me he would take me home when my bruises healed, but since he kept beating me, the bruises would not heal. At one point when I tried to escape, Monk Sanders threw a knife at me and stabbed me in the foot. At another point, Monk Sanders cut me from my neck to my chin. This wound bled very profusely. After 5 days of being kidnapped by Monk Sanders, he finally turned himself in on another charge. I was held against my will by his mother, Evelyn Sanders, for another 2 or 3 days. At the end of this, the police finally came and got me. Evelyn Sanders tried to cover up my bruises with make-up. A police report was made regarding this incident.

Monk Sanders is an extremely dishonest person even when he is sober, but he is

1

100 times more dishonest when he is on drugs. I could never believe anything he said about any subject. He is extremely untrustworthy, and took me along on a stealing spree where he stole from practically everyone he knew in order to get money for drugs. I informed the police about this, because I wanted out of it. Monk Sanders has stolen from me before and also stole from my family in order to get drugs. He even once stole my children's toys and pawned them for drug money.

On one occasion, Monk Sanders has threatened my mother Linda Davis because she would not tell him where I was. He told her that if she did not reveal where I was, when he found me he was going to cut my tongue out.

I know Kenny Barrett. My ex-husband and I would occasionally hang out with Kenny Barrett and his wife. I never knew Monk Sanders to have any association with Kenny Barrett.

I was never contacted or interviewed by any lawyers representing Kenny Barrett during his federal trial. Had I been contacted, I would have given them the above information and would have testified if asked to do so.

An investigator working on Mr. Barrett's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully, and it says what I told the investigator during our meetings.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

1142

Executed by me this __l__ day of __March__, 2009, in

__Sequoyah__ County, Oklahoma.

Sally Davis Johnson

3

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 95**

---

## Declaration of Shawn Hill

I, Shawn Hill, declare the following:

I am related to Kenneth Barrett by marriage. My wife, Brandy Hill, is the granddaughter of Phyllis Crawford, who is Kenny's mother's sister. My wife's mother is Gwen Crawford who is Phyllis Crawford's daughter. I am a contractor and work every day to support my wife and our two children.

My wife and I both had drug problems, which we have handled and dealt with successfully. I served eighteen months, with the remainder of a 20-year prison sentence suspended upon completion of a drug program, for possession of methamphetamine.

I know Kenny pretty well. I lived with him from June through October 1998. My wife and I also lived off and on with Gwen, my wife's mother, in a trailer just below Kenny's shack on the other side of the ditch that OHP came though. It would be impossible for a Mazda to go through the two-foot deep ditch, as Brandy Price testified at trial, without tearing out its undercarriage and making the Mazda inoperable. You don't need to know much about cars to know that.

Kenny hardly left his property for several years, long before his arrest for selling any drugs. Kenny did not talk about killing police or going down in a "blaze of glory." He was not the kind of person to say something like that. The police drove by his place all the time, and they knew he would not shoot at them. Tom Sanders would sometimes call the cops over noise disturbances, and the police would drive by. Kenny was used to it. He acted as if "I'm here if you want me." What I mean by that is that his attitude was not threatening; I mean he wasn't hiding.

1

The sign on Kenny's gate was put there on the 9/22/99 because meth fiends had climbed across his fence the night before and awakened him. It had nothing to do with the police.

I was out at Kenny's frequently and know some of the people who testified against him in his federal trial.

Brandie Price is known in the community as a dope whore who would do or say anything to obtain drugs.

Monk Sanders has a reputation in this community as a thief, a liar, and a snitch. He was never in Kenny's house because Kenny would never have let him in. We all stayed far away from Monk. I could not believe they let him on the witness stand because he had been arrested so many times. He is well known as someone who lies to get favorable treatment. When Monk is in jail, he gets beaten up by other inmates for the lies he tells. Monk was addicted to pain killers.

Cindy Crawford's reputation around here is that she's dishonest, evil and worthless.

Karen Real is pretty messed up. Kenny and Karen were life-long friends. She stayed for a while in Kenny's house. She has been arrested numerous times and she informed on her boyfriend Doss Gann in exchange for favorable treatment. Some people will take what they got coming and some will do anything to get out of it. She is known to be the latter.

Randy Thurman is as low as you get. He is known around here as a thief who will testify against anyone to save his own skin.

In 2001 or 2002, my wife Brandy and I were brought into ADA Robbie Cowan's office and asked to roll on Chip Teague, Boss Green and Diane Wynn. They wanted us to say whatever we knew about these individuals and the drug trade. We declined. Ten days later, Cowan was no longer a D.A. He had resigned.

2



I recently gave this information to a man who told me he was an investigator working on Kenny's case. I did not write the declaration myself. When the investigator came back and asked me if I would provide this declaration for Kenny's case, I read it carefully. It says what I told the investigator during our meeting.

Had I been asked to testify at Kenny's trial about what is in this declaration, I would have.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.

Executed by me this _26_ day of _February_ 2009, in _Sequoyah_ County, Oklahoma.

Shawn Hill

3

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 96**

---

**Declaration of Toby Barrett**

I, Toby Barrett, declare the following:

Kenneth Barrett is my father, and Abby Stites is my mother. I am their only child.

I was born and raised around Sallisaw. I went to Brushy Elementary School and Central High in Sallisaw. My mother had me held back in the first grade because she was not satisfied with my progress. I stayed in school throughout the 11th grade, when I withdrew. It was hard for me to focus my attention on school.

When I was 12 or 13 my parents separated for good. I lived mostly with my mom, but lived with my dad and Gelene, my grandmother, for most of a year when my parents first split up. Gelene drank beer like most of us drink water, but she drinks more moderately now. I moved back in with my dad when I was 18 for several months before the incident. He wanted me to return to school. We were working on the Camaro the night of the raid so that I could use it to go back to school. The raid changed everything, but I finally obtained a diploma from a Christian school.

Now I work on an offshore oilrig for two weeks at a time, two weeks on and two weeks off. I make pretty good money, which is important because I do not want to go in debt since I have two sons to raise. When I'm home in Sallisaw, I stay to myself mostly and with my girlfriend who just moved here, other than spending time with my sons, Toby Joe who is six and Ty Lee who is four. Their mom married a fellow who treats the boys well, so I get along with him. The boys spend more time with their stepfather than with me, which is all right because I am not a jealous person. I just want what is best for my boys.

Page 1 of 4

1149

and it is nothing he would have hid from me.

Just before they raided the place, the first thing I saw were taillights that went past the driveway and then a flash of light—maybe like the interior light of a car when somebody opened a door to get out. Then an SUV and a Crown Vic went up my great grandma's driveway and then the Bronco turned toward the house and I yelled "Dad." I don't recall how many times I yelled it. It all happened so fast. I thought I saw dad come onto the porch for just a second, and then the Bronco was just coming over the ditch made a boom, like it bottomed out, if that's where the sound came from. I looked at the porch again and my dad was already gone.

The Bronco's headlights were coming toward me at first. I know for sure that nothing hit the Bronco until it came to a stop in front of the house, because that's when the windshield exploded and a cop knocked me down and wouldn't let me look toward the house. There may well have been shots before that—again it happened so fast and I was so scared, but my dad wasn't on the porch and I know for sure that nothing hit the Bronco before it came to a stop.

If my dad went to the roll top desk to get his handgun when he saw the headlights coming, which he said he did, for sure they could have seen his silhouette through the curtain. If he went into that room, they would have seen his silhouette.

The first police lights I seen was on the police car that crashed through the gate when the shooting was over. I'm sure of that. There was no vehicle near me. The cop who knocked me down must have come over Grandma's fence.

I spoke to Mr. Hilfiger once, I'm not sure where, and asked him if he was going to

want me to testify at the trial.  He said he was weighing whether it would be helpful for my dad or not, but that he expected I would. He never asked me about my father's mental problems, my home life or about me or my mom. I never spoke to him again.

I have been interviewed by an investigator who told me he is working on my dad's case.  Later he asked me if I would give him a declaration of what I told him.  He showed me this declaration and I have read it carefully.  It says what I said to the investigator.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this __23__ day of __Feb.__ 2009, in _____Seg._____ County, Oklahoma.

Toby Barrett

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:04-CR-00115-JHP-SPS |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Defendant. | ) | |

**EXHIBIT 97**

Exhs. § 2255 Motion                                        *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

## DECLARATION OF SYLVIA GELENE DOTSON

I, SYLVIA GELENE DOTSON, declare the following:

I am Kenneth Eugene Barrett's mother. He is the first of three children born to me and his father, Ernest Eugene Barrett, during our marriage. To understand Kenny you have to know something about my family, how he fit into it, and how he came to live in his little shack on our family's property.

Family and hard work meant everything to my parents whose families go back generations in this part of Oklahoma. My parents and their parents always helped out each other and their children by finding jobs that let them feed their families in tough economic times, working together, and working land near each other. Through the years, my family has lived through wars, droughts, and lean economic times. We have worked our way back and forth across this country, all the way to California and up to Joliet. We had to deal with real poverty even when we worked from sunup to sundown. We dealt with mental illness and suicides, and more than our share of problems with alcohol and drugs, but we survived it as a family.

My father, Hugh Dotson, was one of six children (Hugh, Eleanor, Warren, Lela, John E. and Christine) whose great grandparents were from around Sallisaw, Oklahoma. Dad's wiife, Hattie Gertrude Real, who is my mother, was born in 1921 in rural Vian, Oklahoma. The Reals worked a piece of property north of the Dotsons. Hattie parents, Alan Real and Ida Goodwin Real, were my maternal grandparents. They were farmers like everyone else. They grew anything they could—mainly peanuts and cotton. No one had running water or

1

1153

electricity until the later1940s.  They knew the value and the cost of hard labor because nothing was easy or taken for granted in those days.

Dad's younger brother, Warren, is 90 or so and lives in Kellyville, outside of Tulsa, about two and a half hours from Sallisaw.  His children are Nona, who lives with him; Linda Rogers who lives in Sapulpa; Judy who lives in Kellyville; and Karen who lives in Bunch, Oklahoma.  One of Dad's sisters, Christine Cook, lived in Sallisaw.  Dad's sister, Eleanor, married Gene Masterson, and they moved off to Joliet, Illinois, had two children, Nelda, who died recently, and Jim, who lives in Antioch, California.  Lela, another one of Dad's sisters, lived in Wichita, Kansas. The Joliet connection ended up being pretty important in my life because that's where Kenny's dad, Ernie, and I lived after we married.

Back when Dad married my mother, he did odd jobs and barely earned enough to live on.  I was born in 1940 in an old tumble down house in Vian. We moved out of that house before my sister Phyllis was born in 1942 to a house owned by my Grandpa Alan Real. That house is now gone but the land is still in the family and my cousin Mike lives on it. Not too long passed before we moved to what was known as the Granny Golden Place before my next sister Ruth was born, then back to that old tumbledown house. After that, we moved less than a mile away to another house where my youngest sister Carolyn was born. All the houses were in pretty bad shape even by standards back then. We had no running water, electricity or plumbing and used wood stoves for heating and kerosene for cooking.  All that moving made Dad all the more set on owning his own land, but it took a good many more years for him to be in a position to buy

2

1154

40 acres. At the time, I just figured this was the way life was. I did not have aspirations back then.

After Dad got out of the army, he went to classes in agriculture on the G.I. Bill in Sallisaw. Uncle Carl Cook, who was married to Dad's sister Christine, taught agriculture there. It was night classes, not college, more like a technical school. Dad learned how to run a farm, a big farm, not just a home farm. When I was six, the family moved to the Dwight Mission School, an Indian school run by the Presbyterians. I always heard we were part Indian and think that I am 3/16 Cherokee.

Dad ran Dwight Mission's farm. The school provided a house for our family that had electricity and plumbing. There was no kindergarten in those days and I went to first and 2nd grade at Dwight Mission, and then they shut the school down. They sent Dad, who took us along, to the Menaul School in Albuquerque, New Mexico. It was a high school. Dad ran the cattle and vegetable farm. The kids that went to the school were the farm hands and Dad was the overseer. I spent third grade in Albuquerque, and then we moved to Missouri when I was nine.

The fellow who had been the superintendent of Dwight Mission stayed in contact with my dad. When the Presbyterian Church started an orphanage in Farmington, Missouri, and purchased another farm, the superintendent asked Dad to run it. I loved Missouri. We had good neighbors and kids to play with. We had pigs and went sledding in the snow on the hills above the farm. I had started the sixth grade when the superintendent lost his job and we had to move back to

3



1155

Oklahoma where we lived for two or three months with Uncle Carl and Aunt Christine. There was no work around there. I was eleven years old and wanted to go to school in Blunt, Oklahoma, but the school was closed when we first got there because a lot of families chopped cotton in the spring and pulled cotton balls in the fall. Most of the country schools shut down because kids joined their parents in working in the fields and traveling to where the cotton needed tending.

My Uncle Jim and Aunt Rosy Newton, Rosy Real Newton, Mom's sister, had a place here in Oklahoma but they had to go to California part of every year to make money working on a ranch. I don't know why they called it a ranch, because they raised crops, but they called them ranches. We ended up going to California with them when Christmas vacation came. We moved to Shafter, just outside of Bakersfield, California, in 1952. Aunt Valerie, my paternal grandmother's sister, was married to Monroe Bell, and they lived in Weedpatch, California. Their son-in-law was the accountant for Pelletier Farms, which owned a big farm, and he helped Dad get hired as an irrigator. I was almost 12.

In 1952, I attended a school in Maricopa that was flattened by an earthquake so classes in the seventh, eighth and half the ninth grades were held in a Quonset hut. I made many friends. There were 30 or 40 houses on the farm, all with kids. We were not migrant workers, but people who lived there permanently. We went from one person's house to another. The children were welcomed wherever they went. We played Kick the Can and other children's games. It was a joyful time, and I was a happy child. My mother, Hattie, was unhappy about a whole lot of things, but she was happy when we lived at the

4

California farm.

My mother's unhappiness seemed mainly to be about the family not owning their own place. She was not happy after they returned to Oklahoma until she and Dad were finally able to get their own place.  Land is just something very important to us and always has been.  Out in California, Dad worked seven day weeks, 12 hour-days, and got two weeks vacation during which we came back home to Oklahoma.  He was tired from too much work but he never considered working less. He didn't take us to California to stay.  Oklahoma was home, and we always knew we went out there to make enough money to buy our own place back home.

After my brother, Mark, the youngest child, was born in 1961, Dad finally saved enough to buy 40 acres.  By that time, I had left home and was already married to Ernie. Much later, Dad gave each of his five kids 8 acres. He had lived to see his dream come true.  Kenny was living on that land when the shooting happened.

Dad was strict with his children and was not one to show favors, but Mom favored Carolyn until Mark was born.  Mom did things for Mark and his kids that she did not do for the rest of her children.  I always felt it took something away from me and my children.

I was about to turn 15 in April 1955 when, in January, we picked up stakes. I didn't want to leave. I had friends on the farm and at Maricopa High School.  I was interested in my friends more than anything else.  I was really good at English, but I didn't know enough to be interested in it. When we moved

5

1157

back to Oklahoma Dad rented a place for us to live.  I rode a school bus to Sallisaw High School, and a man with a station wagon picked up my sisters Phyllis, Carolyn and Ruth and drove them to McKey Grade School.  In high school, I was in FHA (Future Homemakers of America), but had to drop out because Dad could not pick me up.  I had to ride home on the school bus. I took a class in dramatics and the teacher said I was a natural born actress, but I couldn't be in the junior or senior plays because Dad would not come and get me. Dad wanted me to play basketball. In Maricopa, I played volleyball and I was good. We didn't lose one match. But the girls at Sallisaw High had been playing basketball since the sixth or seventh grade and I was getting too late a start to catch up to them. I regret I didn't play basketball.  I had a couple of boyfriends, but nothing serious.  I even dated Ernie a couple of times.

I really planned on going to college after I graduated from Sallisaw High School in 1958. I made arrangements to go to Connors College, but I didn't know what I wanted to do. Dad's sister Eleanor (Masterson) asked me to spend the summer in Joliet and helped me get a job as a waitress at Walgreen's, which had full-service restaurants back then. I still planned on going to school. I was making new friends. My teachers in high school pressed me to be an English teacher. I thought about that. I read and still do read mysteries all the time, like Jane Withers and the Hardy Boys. I was always interested in them. I am presently a member of the Mystery Guide Book Club. Back then, though, I just didn't have the initiative to go to college.  One of my customers at Walgreens was an air force recruiter and I thought about going in that direction.

6

1158

Right when I was trying to figure out what to do with my life, I came home to Sallisaw on vacation and ran into Ernie again. He was just back from the Marines. I was crazy about Ernie and remembered him from high school where he was ahead of me. Ernie left high school, served in the Marines and came home kind of like a knight in shining armor. He was a handsome fellow. I was so taken by him that I didn't realize he was not the same boy I knew in high school and that he had changed, none for the better. We were not the same people we were back in high school, but I never imagined that life with Ernie could be so terrible, not just for me, but for the children we had together.

My cousins were pushing me to marry him, telling me what beautiful children we would have. I thought it would be the real American dream. My mom and dad had worked together and stayed together to get the things they wanted, to own their own land, and to raise their children among family. I married Ernie on July 8, 1960, and Kenny was born in Joliet on June 29, 1961. We had a very difficult marriage right from the start but we were young and neither one of us really understood what lay ahead. I try not to think about those years.

Ernie did not want a family or a wife, much less children. He left me for other women right after we married. I think he had a lot of problems that made him have to have all those women to make himself feel like a man. When I was pregnant with Kenny, he left me one night and did not come back for days. He did this all the time I was pregnant with Kenny. Whenever he took off like that, my Aunt Eleanor would come by and bring me food, because he left me no money and he would have the pickup. I was pretty miserable then, and Eleanor

7

tried to keep me company.  We would have a few beers, talk, and plan what to do next.  Eleanor and I would go looking for him—he would be out drinking.  We would go to bars and they would tell me he wasn't there.  It was a constant thing.  Once I even went to a woman's apartment looking for Ernie—the woman said he wasn't there, but I heard his voice. It was humiliating and embarrassing and hurt a lot.  I was alone, pregnant, and really depressed. I wish we had known then what we know now about how having just a little beer can affect your baby—none of us would have had a drop. I couldn't believe what I had gotten myself into and wondered if there would ever be a way out of it.

I started battling with Kenny before he was born.  My pregnancy with Kenny was very difficult.  I was in constant pain above my pelvis.  He moved all the time and kicked me all the time. I could never get comfortable.

Kenny was born with a lump on top of his head, larger than a knot, which went away in a about two or three years. His days and nights were mixed up when he was a baby.  He did not sleep at night and slept in the daytime.  I was exhausted by it.  Kenny was a very difficult baby and child.  He was colicky and nothing could comfort him, not even breastfeeding him, which I did for six months.  He cried and fussed all the time. At first I thought all babies must be like this, but after I had my other two sons I realized something was wrong with Kenny.  He was very, very active and moved around without thinking about what he was doing. Still, by the time he was one he did not walk and this worried me.  But by the time he was 18 months, he was walking all right.

When he was a toddler, he had to go to the hospital for several different

1160

accidents. He got into everything.  He had to have his stomach pumped two different times after he managed to climb to a top cabinet. Once he ate baby aspirins and the other time he ate ex-lax.  I also had to rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting his head open and raising a big knot. He could not be still.  Any little thing could upset him, but it took a lot to calm him. I know that babies falling and hitting their heads is not so uncommon, but Kenny had far more than his share of accidents no matter how hard I tried to protect him. This was not true with my other boys. Kenny had the measles once and ran a fever so high it scared me. I took him to the doctor and he was so concerned he prescribed a fever reducer. My other two boys got the measles' vaccine, which didn't exist before Kenny caught them.

My second son, Richard Andrew, was born June 24, 1964, in Joliet, almost three years to the day after Kenny. Soon after Richie was born, Ernie and I separated for three years.  Kenny, Richie, and I lived with another woman who had two boys of her own for a while but we had to move back to Sallisaw for two years. I could not support two boys on my own. Kenny really loved his dad and missed him a lot when we were separated.  I always wondered if that separation caused some of Kenny's problems because he never got over it. That's one reason Ernie convinced me to go back to him.  My third son, Steve was born in January 1969 in Joliet, Illinois.  Ernie still had his other women, though. There was never a time he did not have other women.

Kenny was a handful, and I did not get any help from my husband with the

9

1161

children. Kenny had a difficult time in school and was in Special Ed classes part of the time.  He failed reading and arithmetic in the first grade and had a hard time keeping up with the other kids.  It was very difficult for him to read. In the second grade, when they taught phonics he never grasped it.  He never did well in school and he finally gave up. I didn't know what I could do.

Ernie would not even talk to me about what was going on with me, the kids and him.  It drove me crazy.  I tried to talk to him about it because it is not in my nature to be a passive person. I begged, pleaded, threatened, and cried with Ernie about his women.  Ernie would just tell me it was none of my business and to shut up.  We split up and got back together and threatened to leave each other over and over. We always had a difficult time of it.  Ernie did not drink at home but drank at bars away from home and could not hold his liquor. I was very depressed at times.

We left Joliet and moved to New Jersey to try and find a place where we could start our lives over.  He said he wanted to have a fresh start, straighten himself out, but that's not what happened. Even having a job at Thatcher Glass where he worked didn't help. He started seeing another woman almost as soon as we got there. He moved out on me and the kids and lived with her, but I let him move back in.  Ernie would leave and move in with other women or not come home for days on end. He gave me gonorrhea twice. We got into some pretty bad fights because I couldn't stand his not coming home nights anymore, and he gave me two black eyes and split my lip. There were terrible scenes with us screaming at each other, Kenny and his brothers crying and scared and not

10

knowing how to make us stop fighting, and then the time he hit me.

I liked Hopatcong, New Jersey; I liked the people and I liked the country; I wish I could have afforded to stay, but I finally left Ernie, told him I was leaving for good. I'm the one who left that time; all the other times it was him. He asked me to stay. He said his behavior didn't have anything to do with his love for me or the kids. He said, "Someday I'll get too old to do this and we'll have a good life." I agreed to stay, but I wanted to move into my own room and he would have to leave me alone—I mean not have sex with me anymore. He said no, that it wasn't going to be that way.

Dad had always insisted I stick it out, but now he said he wanted me to come home. Daddy paid for the ticket. My parents did not hate Ernie—they just didn't like the way he did me.  Ernie went from one woman to the next before he finally settled down with Doris, his wife now.

I don't even hate Ernie; I just have no use for him, not so much for what he did to me but for what he didn't do for the kids.  He was always talking about how big he was and telling the boys "'you ain't never going to be as big as me."

I came home to Oklahoma in 1972, and Ernie and I divorced June 20, 1973. I dated and had a few boyfriends before I married Paul Dudley in 1982, when Stephen was 12.  Paul and I owned a bar together but he did not know how to be a husband.  He was violent and attacked me, beating me black and blue.  I divorced him after three years but we were in the process of getting back together when he was murdered in Las Vegas.  I took my maiden name back.

When Kenny and his brothers were growing up, I had my hands full with

11

1163

three boys and basically no husband.  A woman is not cut out for discipline, and it is not a good role for a woman to play.  I whooped my kids with a belt or a switch, the same way I was raised. Spare the rod, spoil the child. Ernie did not beat the kids because his dad beat him and Ernie hated it.  I had to make up for the discipline Ernie would not give the boys.  I had to be especially hard on Kenny because he went from one thing to the next, was never still, and almost drove me crazy.  He was more than hyper.  He was emotional about things that did not matter.  He would cry and scream like there was no tomorrow.

Kenny never adjusted after we moved back to Sallisaw for good.  He really missed his dad, but his dad did not show him any affection.  His dad came every year or so to see the boys but used it as a time to show off a new car for a few minutes rather than spend any real time with the boys, although once or twice he would take them hunting, which is the only way he ever related to the boys. Kenny got pretty depressed and lost interest in school. He had to repeat the eighth grade.  He went to live with Ernie and Ernie's new wife in Dunkirk, Indiana, but that didn't work out and he came back to Sallisaw as soon as he finished ninth grade.  I told him he had to work, and he got a job at the local racetrack. When school started up again he went for a few days and then just quit and went to work full time.

When he was 16 or 17, Kenny was beaten up by police officer John Philpot who broke his own hand while breaking my boy's face after Kenny was arrested for squealing his tires. The FBI investigated the whole thing. Kenny always loved working on cars. They were his pride and joy.  He was out driving

12

one of his souped-up cars and got arrested, taken to jail, and beaten all over his face. His nose was bloodied, and his jaw and collarbone broken. A highway patrolman held my son's head back by the hair while John Philpot beat him. An assistant district attorney said he just stepped out of the room and missed what happened. Everyone in law enforcement interviewed by the FBI gave a different story. You should have seen the pictures of his face, made you so mad and want to cry at the same time. I think they would have brought a case, but Kenny wanted the FBI to drop it he was so afraid. It was a big thing in Kenny's life and really traumatized and terrified him.

Kenny always worked hard and his bosses liked him.  He was a good worker, strong, and able. By the time Kenny was 18, he was working on pipelines and oilrigs and traveling all over, not just in Oklahoma but to other states.  He was a builder and could frame and put up apartments.  He was proud of his work.

Kenny met and fell in love with Abby Stites, a wonderful girl.  I love her like a daughter to this day.  Kenny was 19 and Abby was 16 when they married in 1980.  Kenny and Abby's marriage was always rocky, though, and they were more unhappy than happy even though they loved each other. They were too young and Kenny was far too mentally unstable. Their son, Toby, was born December 1, 1980. Toby, Kenny and Abby lived with me a lot of the time when Toby was little.

Kenny had terrible mood swings and periods of depression that lasted for days.  He withdrew—anything upset him—and he was paranoid about

13

 

everything.  Abby tried to stay with him, but he needed help for his mental problems and she could not figure out what to do for him.  She begged him to go to doctors, and he tried it a time or two, but he went downhill further and further.

He tried to kill himself in January 1986 in my front yard.  He came right into the house, got Steve's shotgun, went back to the front yard by his truck and shot himself.  We all ran out of the house and thought we had lost him for sure.  He almost died in the hospital but he survived and returned home after losing a lung and suffering other internal damage.  Abby had him committed to a psychiatric hospital in early October 1986 to try and get him help, and for a while he did better, but he could never hold on to happiness.  Abby and Kenny wanted the marriage to work for the sake of their son, but Abby finally ended the marriage in the fall of 1995.  Kenny never recovered.

Kenny was not able to live on his own.  When he and Abby would separate, Kenny always came home to me. After he and Abby broke up for good, he moved back home. He was a lost soul. Nothing in his life ever mattered but Abby and Toby. Sometimes I could see how hard he was trying to hold it together for them, but he couldn't do it. He just couldn't do it no matter how hard he tried. It was so sad, so he came home to me.

He asked his grandfather and got his blessings to build a place to live on a piece of land next to my house. This was on the part of a few acres he still owned that I knew he planned to give me, which he did before he died.

With $150.00 and whatever scraps he could find, he built himself a little shack. He was so proud. He showed it off to everybody, but it was nothing much,

14

1166

pretty bare, three tiny rooms and an attic space for sleeping. It had no water, or toilet, or electricity. He put a porch on it though.

He ran an electrical cord from my trailer to his shack for electricity, and he ate his meals and showered at my trailer.  He became more and more reluctant to leave our family's property and he became more and more paranoid, although plenty of friends visited him so you could never call him a loner.

I knew he had serious mental problems but I hoped if he lived close to me and just worked on his cars and fixed things for people, he might be able to make it.  My family has seen a lot of mental illness, alcoholism and suicide so I know what depression does to people.  Sometimes, Kenny was manic and thought everything was wonderful, but he became frustrated and irritable over any little thing and was depressed and withdrawn at times.  His moods changed from one extreme to the other.  We knew he was mentally disturbed and suffering.

As time went on, he did a little better, built a garage—more like a storage shed—and fixed cars and pickup trucks for friends and neighbors. Cars were his only other love besides Abby and Toby.

Friends brought him food and went grocery shopping for him.  He ate most of his meals at my trailer, and I cooked for him.  I hoped and prayed he was going to make it.  At least, I believed, with him living right next door he was safe and I could keep an eye on him.  We had our arguments; that's for sure.  He was so paranoid and crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

15

1167

The night of the shooting, I got home after working a 12-hour shift, saw Kenny and Toby working on a car by the garage, and was too tired even to say hello. I knew Kenny and Toby were already over and ate, because there had been food in the icebox for them and it was gone. I was sound asleep when I woke up to gunshots. At first, I thought it was Kenny shooting skunks, and then there was so much shooting and then it stopped like it never happened.  I looked out the window and all I could see was a cloud of dust and a lot of people yelling, and the phone rang—it was Phyllis, my sister across the way, who wanted to know what was happening because she was scared to go out and she was wondering where Travis, her son, was—because he had been home just before. I told her I hadn't seen him. I walked back to my room and I saw a black and white police car in my driveway without any lights and then a black and white police car coming through Kenny's gate with just its headlights on. One thing I know is they did not have their red and blue lights on.

I never believed there would come a time when the police would come in the middle of the night to arrest him.  If they had told me or my other family members or even Kenny, we would have brought him to the jail or the police could have come out and taken him to the jail without any trouble at all. They had come on his property before and sat on his porch talking to him and inspected his rifles, which were legal, and Kenny never gave them any trouble. If fact, John Philpot had been out to talk to him just a few weeks before this all happened.

Mr. Hilfiger and Mr. Smith, Kenny's lawyers, never talked to me about my

16

family's history in Oklahoma, how much our land meant to us, how we always worked for what we had, and how some of our people, including Kenny, had mental problems.  Our people go back for generations in these parts and we are close to each other even though we have our misunderstandings from time to time.  I know my family would have answered any questions they had about Kenny, his life, and his problems, but the lawyers only talked to us in a hurried way. They came to my house once, more to see where Kenny lived than to talk to me. They didn't ask me anything except about what I saw the night they came for Kenny. The day I came to testify, they didn't tell me what they wanted me to talk about in court or what they would be asking me except if I loved Kenny and would miss him if he was executed,

An investigator working on Kenny's case now asked me to give the information in this declaration.  I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meetings. I have looked at copies of five photographs the investigator showed me that he said would be attached to my declaration. They are pictures of the shack next to my place that Kenny built. The shack looks like it looked around 1999. I have put my initials on the copies he showed me. The investigator also showed me copies of two pages from a baby book that I had given him. The stuff not checked is stuff Kenny could not do when he was supposed to and it really worried me. Funny the things you can remember like how he couldn't follow the light when I shined a flashlight at his eyes and moved it. I have initialed the pages the investigator showed me.

17

1169

I declare, under penalty of perjury, that the foregoing 18-page declaration is true and correct.  Executed by me this ___9___ day of March 2009, in ___Sequoyah___ County, Oklahoma.

Sylvia Gelene Dotson

18

## am I supposed to do all this ? ?

(Mother will check if I do)

### AT ABOUT THREE MONTHS    MORE OR LESS

Lift chest clear of surface when placed face down_____

Straighten knees when held erect_____

Hold head erect and steady when held to shoulders_____

Sit on lap, hold head erect and steady with support of ribs only_____

Follow flashlight with eyes: vertically_____ horizontally_____ circularly_____

Smile in response to Mother's voice_____

Observe anyone speaking_____ Inspect hand_____ Laugh aloud_____

Manipulate object placed in hand_____ Splash in bath_____

Make stepping movements when held erect_____

Open mouth at sight of nipple before lips are touched_____

### AROUND SIX MONTHS

Hold head erect when carried_____

Sit alone on flat surface momentarily_____

Stand firmly with help when held erect_____

Roll from back to stomach and vice-versa on flat surface_____

Reach and grasp for an object when in sitting position_____

Pick up one-inch cube with fingers_____

Scoop up 1/8-inch cube_____ Discover feet_____

Look at object with which am playing_____

Look at floor for fallen toy when in high-chair or lap_____

Make various vocalizations_____

Notice difference between familiar persons and strangers_____

Not much affected by strangers, new scenes or solitude_____

Crow and coo actively when pleased_____

Cry and fret when toy is taken_____

[ 20 ]

## I'M GETTING BIGGER NOW!

### AT ABOUT NINE MONTHS

Sit on floor and handle playthings without losing balance_____

Crawl on stomach, making some progress_____

Creep on hands and knees_____

Bang table with toys or other objects_____

Knock down block houses in play_____

Oppose thumb and forefinger in picking up one-inch cube_____

Wave "bye-bye" or play "peek-a-boo" instinctively_____

Take bottle in and out of mouth_____

Respond to animated facial expressions_____

Bowel control_____ Respond when name is called_____

Express vocal sounds upon recognition of familiar person or object_____

Associate outdoor clothing with being taken out_____

May react to strangers_____

Reach for objects persistently_____

Say "ma-ma" or "da-da" or equivalent_____

Make stepping movements when feet are touched to floor_____

### ONE YEAR OR THEREABOUTS

Pull self to standing position with help of furniture_____

Walk with help_____ Creep actively and rapidly_____

Comprehend simple verbal commands and commissions_____

May cooperate in dressing and undressing_____

May climb steps_____ Hold and drink from cup_____

Pile one block on another when shown_____

Say two or three words indicating want_____

Play "pat-a-cake" or similar demonstrable game_____

Pick up small object with finger and thumb_____

Show preference for one hand in reaching_____

Make rhythm movements to music_____

Indicate need of toilet_____

Dear Folks: Don't worry if I don't do ALL of these things at the ages specified. If I do about half of them at the proper time, I'm doing all right.

(signed)_____

[ 21 ]

1171

KEB501953

















**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 98**

## <u>DECLARATION OF MARK DOTSON</u>

I, Mark Dotson, declare the following:

I am Kenneth Barrett's maternal uncle. Kenny's mother, Gelene Dotson, is my sister; I am 23 years younger than she is. I am a podiatrist with a private practice in Fort Smith, Arkansas. My wife, who is a dentist, and I have three wonderful children who are doing well. My daughter is 20 years old and in college, and my two boys, who are 16 and 11, attend public schools. Our home is in Vian, Oklahoma, on land passed down by my parents.

I recognize that we are fortunate to have healthy children who enjoy and appreciate their lives, do well in school, and are not disadvantaged by problems that affect my extended family. My wife and I have not had to deal with depression, alcoholism, and attention deficits that have affected many members of the Dotson family. My children do not appear to have been bitten by the Dotson bug.

Two of my sisters, Ruth and Phyllis, have been relatively mentally healthy, but two of them, Gelene and Carolyn, have struggled with serious impairments. Gelene, Kenny's mother, is a heavy drinker with dramatic mood swings. Some days she is pleasant, and some days she is rough. She is so unpredictable and unpleasant that I try to keep my distance from her. Kenny was very hyper as a kid. He was not a normal child. Kenny often stayed to himself. Most of us went to the movies or out to eat, but as far as I can recall I do not remember his ever doing those things.

All three of Gelene's sons had problems. Richie is not quite right mentally and no longer works. He is odd. Steve was extremely hyper, the most hyper child I have ever

*MitD*

Page 1 of 4

seen. Grandpa used to say, "If there was a knob they would turn it." I thought Steve was retarded, but he turned out not to be and is now a principal. A difference between Kenny and Steve was that Kenny would get things and tear them up, which Steve would not.

Kenny had difficulty figuring out social situations. I used to watch the Andy Griffith show; I still enjoy it. A running gag of the show is that Andy pretends that Barney was a good deputy, although Andy knew that Barney was really bumbling and afraid. It would make me laugh, but it would frustrate and confuse Kenny that Barney believed he was good when he was incompetent. Kenny could not see the humor.

Gelene was constantly bickering with Kenny, which must have been humiliating for him. He stayed away from the house a lot just to stay away from Gelene. My dad said sometimes when Gelene would get going he would put a hand over her mouth to shut her up. She was the worst with Kenny.

Kenny's home life was his mother drinking a lot and having men in and out. Gelene clashed with Kenny and took her frustrations with life and with Ernie out on Kenny. She put him down over insignificant things. Gelene was always lit up from alcohol. When she got going and her face got red, you had better watch out. It was extremely unpleasant, especially because she always targeted Kenny. Kenny was the best shade tree mechanic you can find, but you would never know it from Gelene.

Phyllis's children also suffered with ADD. My nephew, Travis Crawford who is Phyllis's son, had attention deficit disorder as a child that was not treated. He is nervous to an extreme. He was raised in an extremely lenient home that set no boundaries. This did not serve Travis well and nourished his problems. As a kid, we got a kick out of

*MKW*

he had a better family life and got the help he needed, I can't help but believe things would not have turned out this way. A year before the incident, Ruth went over to speak to Kenny and tried to tell him that his lifestyle needed changing.

A lot of us had backed off from Kenny, but not Ruth.  I wish now that I had talked to him.  I and my family let him down.  The truth is our family's failure to help Kenny begins at the core of Gelene.  What I mean by that is he either lived next door to Gelene or with her, and Gelene being who she was made us want to stay away.  It is not a very good excuse for the family not stepping in to help Kenny, but there you have it.

I gave this information to a man who recently came to talk to me and said he was an investigator working on Kenny's case.  He asked me if I would read this declaration to see if it was an accurate account of what I told him, and if it was if I would sign it as part of Kenny's case.  I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 4 page declaration is true and correct.

Executed by me this _8th_ day of March 2009, in ____Sequahaw____ County, Oklahoma.

<div align="right">

Mark Dotson

</div>

1178

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 99**

## Declaration of Steve Barrett

I, Steve Barrett, declare the following:

I am Kenneth Barrett's youngest brother; I was born on January 1, 1969, when Kenny was seven years old. Because of the seven-year gap in our ages, we were exposed to vastly different environments and experiences during our formative years that help explain how I was able to overcome many of the challenges I faced and how those challenges affected Kenny.

The biggest factor missing in Kenny's life that was present in mine is I benefitted from the guidance, support, and structure of an extended family that Kenny never experienced in his developmental period. Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children. Even though I love my parents very much and recognize they did not understand the damage they did to their children, I have had to come to terms with the impact of alcoholism, mental illness, and family instability on my own life.

The primary difference in our upbringing is that I was raised by a village and lived in an extended support structure, something Kenny never had. My mother moved to the country to live on family land amidst her relatives when I was an adolescent. We moved in to the same trailer in which my mother now lives, where I was literally surrounded by aunts, uncles, cousins, and most importantly for me, my maternal grandparents, Hugh and Hattie Dotson.

Another critical factor is that our father walked out and abandoned Kenny when Kenny most needed him. Kenny idolized Ernie, while I barely knew him. My parents

1

divorced when I was two, and my two brothers and I stayed with our mother. I could tell when Ernie visited how much Kenny missed him, that Kenny was enamored. Kenny made sure to stay in close proximity, while I would wander off. Ernie was a god to Kenny. I have no recollections of being close to my father in childhood, although as a teenager and young adult I was able to develop a relationship with him, long after Kenny had become an adult. My father's absence in my childhood and adolescence was replaced by attentive older men and women relatives who rooted me in their love and guidance.

Finally, while I was able to succeed academically, Kenny had great difficulty with his education. Kenny failed in school, but I was one of those lucky students who was always good at school and a decent athlete. High school athletes in my small town were just about the only ones who got noticed. We got sort of pampered treatment.

School became the focal point for me. In some ways, it replaced the value system that I never got at home. I would often stay at friends' houses to avoid the high stress environment at home. My mother's ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and unpredictability. She had a hard enough time dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood swings.

One of my first memories of Kenny doing something bizarre, was when I was about five years old. Gelene whipped Kenny for something. Kenny had built these intricate scale models of cars—Mustangs and Chevelles—that were perfect. Kenny became so upset he smashed them all.

Gelene whipped us boys with a strap, but I was able to stay out of trouble pretty much. Kenny was constantly on the go, though, and Mom was pretty harsh with him,

2

verbally and physically. Kenny hated being whipped. We had a German shepherd that Ernie had given Kenny. The dog was very protective of Kenny and when Mom would try to beat him, Kenny would hide behind the dog and the dog would growl at Mom and not let her near him. The dog was run over by a car.

Mom did not have regular discipline or rules for the house; she went from one extreme to the next. When she lost control of herself, she whipped us, but there was no real parenting. Sometimes she came into my room after she had been drinking, when she thought I was sleeping, and she would cry about things she had and had not done. She went in and out of being a Jehovah's Witness, but we did not regularly attend church. We never discussed education, how we were doing in school, or how to prepare for the future. We mostly just raised ourselves as best we could.

After we moved to the country, I often ate breakfast with Hattie and Hugh, my maternal grandparents. They were real grandparents. Friends and relatives took an active part in my and each others' lives. Janice and Tom Sanders taught me how to play cards. I hung out with my cousins Rodger, Jr. (Podgy), Travis and my Uncle Mark. It made all the difference in the world to have that support structure. It was a pivotal part of my life. I had positive experiences and influences that Kenny never had. Aunt Phyllis gave me girlfriend advice. Phyllis and Rodger were instrumental in helping me. Uncle Mark was like an older brother who showed me how to do stuff, who spent time with me. I fed cows and hunted and fished with Podgy and Jeff Sanders on the Real property, which was just north of the Dotson section. I went with Podgy Travis, Mark, and Hugh to get alfalfa for winter animal feed. I loved the outdoors.

My own family was always dysfunctional. My mother was never able to have

3

1182

meaningful conversations about day-to-day problems, to figure out how to solve normal problems that arise in the course of everyday life, or to tolerate the routine activity of growing boys.  She did everything to the extreme, whether it was drinking excessively or becoming a devout member of a religious group.  I once found some diary-type notes of hers when I was young; her notes were very depressive and full of blackness and darkness.  If I were to find the same kind of writing today, I would know to get that person professional mental health treatment.

Life wore my mother down. She certainly did not know how to respond to Kenny's special needs as a youngster with profound psychological problems.  She was not able to meet my fairly normal needs.  In my junior and senior years in high school, I started in every (varsity) football game and she only came to two.  I ran track in 40 or 50 meets, in conference championships, and she saw me one time.

It seems like much of my childhood was a real blur. It was weird in some ways; I was an observer. I saw things that children should not see.  My mom always drank and had men around, but when she married her second husband, Paul Dudley, her life spiraled totally out of control, and I witnessed it.  Paul was an amazing alcoholic, who was around from about 1982-1986.  I remember Mom having a gun put to her head by Paul, when he was drunker than Cotton Brown, until she talked him down. I remember mom in the kitchen drunk with a knife in her hand, threatening to stab Paul who ended up leaving her.

Kenny left home and tried to make it on his own, but he never succeeded.  He married young, had a son, and worked hard, trying to bury his problems under constant work and activity. Sometimes Kenny and I worked together. We once packed stalls at the racetrack; it was hard labor. We had a great time. We loved it. We kicked some butt, the

4

1183

amount of work we accomplished. I have a genuine fondness for Kenny. Kenny and I were close; we understood each other. We were pedal to the metal kinds of kids.

As troubled as Kenny was, he worked all the time. In a terrible episode of depression, he tried to kill himself. I was home with Monty and Podgy in the living room watching Carl Sagan kind of stuff on television. Kenny came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenny leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. Phyllis came over and was so freaked out she rolled in the grass. Paul wanted to drive Kenny to the hospital, but Phyllis' friend was there—a nurse—and she would not let him. She covered Kenny with a blanket and said not to give him any liquids. Kenny was in and out of it, mumbling, making no sense. Kenny was in ICU in Sparks Medical Center in Fort Smith for 11 days.

After Kenny and his wife divorced, he moved back home, next door to Mom and built a little shack. I visited it once when Kenny was constructing it. Kenny was showing me how he was building it. I was intrigued even though I have an inherent belief in quality. The shack was almost Waldenish in its own way. Kenny lived life with great determination; he got it down to the essential stuff.

While I benefitted from coming along later in mother's life when she was surrounded by family, I still had to overcome considerable problems. I had a rough go from ages 17 to 19. I was involved with drugs, including crank, marijuana and psilocybin. I had a job at the local racetrack and had been using crank for several

5

consecutive days when I overdosed and was hospitalized at Sallisaw General for two days. It was the turning point in my life.

My grandfather Hugh Dotson let me borrow his beat up car in which I could see the road through the floor and I went to the old Liberty Grade School that was by then an adult school, a general educational college of sorts, where I studied algebra. Right after that I moved away from Sallisaw in an attempt to escape the constant family drama. I moved in with my dad and his wife, Doris, and worked at Kerr Glass, where my father worked. They provided stability at that point in my life. Education was a lifesaver for me. I went to Tulsa Junior College for 18 months, while still living with my father. Ernie paid my tuition, which was about $1100 a year. I went on to Oklahoma University where I received a B.A. and a Masters in Education, majoring in physical sciences.

I have a career in education that has allowed me to help youngsters like Kenny who have multiple impediments to learning. I have taught chemistry, physics, and physical science and have coached football. I also have served as a sergeant in the National Guard for 11 years but had to withdraw when it interfered significantly with my coaching responsibilities. As an NCO I was randomly drug tested, which was a deterrent to using drugs. I am currently a principal in a junior high school, where I routinely see students in all stages of crises, many from stressful homes with alcoholic, mentally ill, and abusive parents. In our district, we consider these children emotionally disturbed (E.D.), which is a catchall phrase for distressed students who may develop prolonged or chronic mental illness the way Kenny did. We take care not to label students unless they have prolonged or chronic mental issues. I see such a parallel with some of my students and Kenny. They are students from low socio-economic backgrounds in high stress

6

get it before the jury for their consideration.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 8-page declaration is true and correct. Executed by me this ___5TH___ day of March, 2009, in

_Cleveland_ County, Oklahoma.

Steve Barrett

8

1186

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 100**

## DECLARATION OF WARREN DOTSON

I, Warren Dotson, declare as follows:

I am Hugh Dotson's youngest brother, which makes me Gelene Dotson's uncle and Kenneth Barrett's maternal great uncle. An investigator for Kenny asked me to tell him about myself and the family. He wrote this declaration of what I told him. I have read it carefully and it says what I told the investigator during our meeting.

I am an ordained evangelical minister in the First Baptist Church in Kellyville, but I do not believe in denominations. I was saved when I was 34 years old.

I live with my daughter Nona in Kellyville, Oklahoma, about 25 miles outside of Tulsa, in a house my wife and moved into in 1965. Another daughter, Linda Rogers, lives several miles away. Linda is my only daughter to have married just once. She married Rodger Dan Rogers. The family refers to him as "Rodger Dan the Mountain Man," because" Dan is something of a recluse who likes to hunt and trap. My family is very fond of Dan. Nona has been married five times, but is single now, and after my wife died two years ago, Nona moved in with me. I have four daughters, who are all good women, but too often pick the wrong men to marry.

I have been married twice. My first marriage was to Lela Warren whose father was a U.S. Marshall. The Dotsons and Morgans are mentioned in a book, "The Outlaws of Cooks and Hill." Lela divorced me around 1939 or 1940, when I

–1–

sheriff had come to the house looking for stolen bridles, that Dad knew nothing about them and none was found. Dad later found them hidden in his barn and turned them in to the Feds. Mama always thought he was killed over the bridles and that he knew more about those bridles than he told.

Dad's death left Mama with six children to raise alone. She gave four of them to Dwight Mission School to raise: Hugh, Elnora who later married Gene Masterson, John E. who later married Jackie Morgan, and then Christine who married Carl Cook. Mama kept me and my sister Lela, but she was not able to keep us long. I was only four years old and Lela was two. Mama had to give me to her sister, Francis Stites who was married to Andrew Payne. They lived in Muskogee. When I was fourteen, I went out on my own. Lela was first given to welfare people and then to Uncle George Dotson, my dad's brother who was married to Nancy Kennedy. Lela was married at 15 to Jack Combs and then later to Thomas McClendon.

I was never mad at my mother. What choice did she have? If I had to forgive her, that would be a wrong way of thinking. It hurts to lose your family. I remember crying when I saw her so many years later because she was a stranger.

I have worked my whole life. I was a welder and a factory repairman and learned never to stay at a job for more than a few years. If I found a company that would pay me more, I went there. If management insulted me, I would move on even if it was for less money. I worked as a helper for four years in Muskogee

–3–

WH

for seventy-five cents an hour. I then hired on as an acetylene welder and later worked welding gas and steam lines. I also have done heavy maintenance work that involved welding. I went where I could make better—nobody paid overtime.

My brother Hugh was a shy man who liked to hunt and fish. I was at Hugh's bedside when he died. Hugh worked all his life so he could buy land and have something to leave to his children. They live on land he left them.

Kenny, Hugh's grandson, lived out there on Hugh's land. Kenny was a good worker, too, and was never disrespectful. My daughters took care of him after he got out of the mental hospital.

The law did not have to go to Kenny's place in the middle of the night to arrest him. Our people live all around Kenny's place and know that he was not dangerous. It breaks my heart what happened out there that night.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this ___6___ day of March 2009, in ___Creek___ County, Oklahoma.

Warren Dotson

—4—

1190

## IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |


## EXHIBIT 101

## DECLARATION OF NONA REICH

I, Nona Reich, declare as follows:

I am Kenneth Barrett's maternal second cousin.  My father, Warren Dotson, and Kenny's maternal grandfather, Hugh Dotson, were brothers.  Kenny's mother, Gelene Dotson, is my paternal aunt.

Marriages are easy to get into; they can get you a lot screwed up and they are hard to straighten out. I have been married five times, some more successful than others, but probably my best marriage was to my second husband.  I first married when I was only 16. I divorced two years later because my husband did not want children.  I had my only two children, both sons, with my second husband, and we were married for 13 years.  My youngest son, Marty, has had a difficult time with life and spent 11 years in prison for crimes related to methamphetamine. He has been out of prison two years but life as an ex convict is hard. I was married to my third husband seven years.  My fourth husband was in the penitentiary when I married him in 1988; he was an alcoholic. Our marriage lasted two years.  My fifth marriage lasted seven years.  I have been single since 1999.  When the preacher's wife wanted to introduce me to a man recently, I told her I was not interested. I must have stupid written across my forehead. Even if a man had "God sent me to you" tattooed on his forehead, I would question it.  My greatest regret is not staying with my second husband and making our marriage work.

Gelene and Ernie had a terrible marriage and she got no affection from him. Gelene was hard on Kenny. Something about him reminded her of Ernie and she took it

-1-

said, "See how beautiful that is." He agreed but asked me "Why can't we see God?" I tried to explain to him that the Bible says that if we worship God in spirit that we will see His truth. I explained God was just like the wind. We can see the leaves blowing in the wind but we cannot see the wind. God is the same thing as the wind in those leaves. Kenny told me that no one had ever explained it that way to him before, in a way that he could understand it. He thanked me.

I feel bad about what has happened. I have beaten myself up a hundred thousand times for letting Kenny down at a time when he was asking for help, wondering what I could have done, knowing that I should have done more. My only excuse is that my mother was dying at the time. I feel like the whole family failed him. I know I have. I feel it in my heart. I really do love Kenny. The pity of all this is I know Kenny and he was not a violent person, troubled but not violent.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.

Executed by me this ___5___ day of March 2009, in ____Creek____ County, Oklahoma.

*Nona Reich*

Nona Reich

–3–

1193 R

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 102**

Exhs. § 2255 Motion                                        *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

## Declaration of Carl Cook

I, Carl Cook, declare the following:

I married into the Dotson family on December 31, 1939, when Christine Dotson became my bride.  We were married 61 years before her death March 31, 2001.  Christine was Hugh Dotson's sister, and Hugh was Gelene Dotson's father, so that makes me Gelene Dotson's uncle and Kenny Barrett's great uncle.  Through the years, I learned the Dotson family history.

The Dotson family history was passed down through the generations orally.  I was naturally interested in history so I paid attention to it.  I am telling it now because an investigator who is working for the attorneys on Kenneth Barrett's behalf asked me to tell what I knew of the family history.  I should start with something of my own history, however, as it explains how I came to meet and marry Christine.

I was born on October 8, 1918 in Sequoyah County, Oklahoma. My mother was a Latimer, and my father was a Cook. One of my mother's ancestors was a colonel in the Revolutionary War.  Some of her family fought for the Confederacy in the Civil War. After the Civil War, they were allotted land. My father, Lewis Cook, died in 1928. He was gassed in World War I, got TB and went to Arizona to recuperate where he died. I followed the military tradition of my family and served in World War II.  I fought under General Patton in Czechoslovakia and liberated several concentration camps.  The most horrible thing I ever saw was a flat car piled high with dead bodies.  I was saved by Jesus in Le Havre, France, during the war, and credit Jesus with my long life.  I do not look down on people who are not saved but I cannot help but feel sorry for those who have not found salvation.

1

The Dotson family history also goes back to the Civil War. The Dotsons moved from North Carolina to Arkansas, south of Huntsville, in 1835. Their old grandma at that time claimed to have been a friend of Davey Crockett's. They loaned the town, now Huntsville, the money to incorporate. According to family lore, the Dotsons were moneyed slaveholders. The head of the Dotson clan and his two sons fought for the Confederacy, leaving the youngest boy at home with his mother. Towards the end of the war, a gang of scalawags showed up at the Dotsons to rob the defenseless woman. She had buried the family savings but told the scalawags she was penniless. They hung her two different times, but still she denied having any money. Then they drug her behind a horse through the creek and her son begged her to tell them where the money was hidden. She relented and they took the entire Dotson fortune.

The Dotsons came to Oklahoma in 1900—I imagine they were poor. They moved to Marble City. It was wild territory back then, "still Indian." The area was riddled with bank robbers and it was a profession many took to. Even I had an uncle who did 10 years for bank robbery—Monroe Cook, from Muldrow. The Dotsons were tenant farmers. Christine and Hugh's dad, Abe, was killed in 1925. He was shot by a man in a fight over a woman they both Minnie seeing even though both of the men were married.

Abe's wife, Minnie, could not raise her six children alone. There was no welfare back then. Minnie put four of her children, including Hugh and Christine, in the Dwight Mission School, a Presbyterian School established by missionaries in 1820 in Indian Territory. I think the school went up to the eighth grade. People at the school told Minnie not to visit her children once she left them at the Mission because it would make them want to come home. The four children were Hugh, Christine, John E. and Eleanor.

2

Mattie kept the other two children: Warren and a girl. Minnie never came around to the school. It turned the children against Minnie because they felt in the back of their minds that Mattie deserted them.

Eventually all the siblings connected up. I liked all of them. John E was an alcoholic, and Hugh drank quite a bit when he was young. Hugh raised his four kids; one of them, Gelene, is Kenny's mother. They were dirt poor and had to work in the fields all the way out to California and back. Hugh had a fairly close family, and we visited quite a bit. Hugh loved to tease and so did I. We got along good. You could depend on what he said. He told the truth, quite an attribute; now you don't know what people are thinking.

When Hugh first brought his family back, they bought a farm as I recall, but the farm didn't support the family. Hugh had some cattle like everybody did. People farmed everywhere then. Most of it was arable, even the mountains. Someone told me that it was a fact that there was more corn raised in Sequoyah County in 1920 than in any county in the United States, although I have never checked it out. Hugh was forced by finances to get a job as a laborer in a creosote plant in Sallisaw. He kept that job until they closed the plant in the early 1990s.

I think what got Kenny, what affected him more than anything, was their mother. I don't think Gelene knew how to raise a child. And as far as I know, Ernie wasn't a father. I blame him for a lot of it. I know Gelene was a drinker. It is hard on children not to have a father, but when their mother is a drinker too, it takes a toll on them.

After I told the investigator working on Kenny's case about my family, he came back to me with this declaration. I have read this declaration over carefully and it says what I told the investigator during our meetings. I would have testified to these things in

*ac*

3

1197

Kenny's trial if anyone had asked me to,

I declare, under penalty of perjury, that this 4-page declaration is true and correct.

Executed by me this __7__ day of March 2009, in _Sequoyah_ County, Oklahoma.

_Carl Cook_

**Carl Cook**

4

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 103**

---

## DECLARATION OF ABBY STITES

I, Abby Stites, declare the following:

I was nine days short of 16 when I married Kenneth Barrett and was two months pregnant with my only child, Toby. Kenny was only 18 and married me because he felt sorry for me. My father did not speak to me throughout my pregnancy. I was one of ten, seven girls and three boys. My mom had her first baby when she was sixteen, so there was not much my mother could say.

Gelene was not a good mother to Kenny; when she wasn't working, she was partying. Kenny and I stayed with Gelene after Toby was born. I had my new baby, and Gelene brought in people from work and everyone was partying with crack and pot. Gelene made Kenny get up from bed and party with them. She was always bringing men home when the children were still living with her. Stevie was still a child. She wasn't there for her kids. She was always running around. She didn't know what her kids were doing.

Gelene was always cussing Kenny and had a terrible relationship with him. I never saw Gelene treat her other sons the way she treated Kenny. Gelene had a good side to her, even if she did not show it to Kenny much. She did not have to take me in when I was pregnant. It was just that her morals and mine were different.

Ernie, Kenny's father, was not much of a father or husband, either. He gave Kenny things and then took them back. Ernie was always running around. After the divorce, Ernie would come by the children's house to show off his new Corvette and the kids did not even have shoes, several family members told me. Ernie was for Ernie. I



think he paid Gelene some child support for all three kids but he made a lot of money. He was a big deal in the glass company where he worked.

I learned in my marriage to Kenny that Kenny had mental problems. He would do bad things and then have remorse. He did things on impulse and then regretted them. During one of his remorseful periods, I convinced him to go to Willis mental health facility in Sallisaw, and Mike Fry had him picked up by the sheriff and taken to Eastern State Hospital in Vinita, Oklahoma, an inpatient facility. They could have kept him a month and it might have done him some good, but Gelene came and got him out after two weeks when Kenny asked her to.

Kenny was like a manic depressive, hot one minute and depressed and even immobile the next. He would work hard and then sleep all the time. I don't know if he was doing drugs then, but I think he did the drugs to make himself feel better, because otherwise he would just sleep. Kenny did not act the way normal people act. Kenny took good care of his own stuff, but then he would destroy it too when he just got swept away in his emotions. He went out with other women and then came home, expecting me to forgive him. Kenny would hit me, and I hit back.

I always thought he was mentally ill. The whole 14 years we were together, I was always trying to help Kenny. I felt like we were more like brother-sister than wife and husband because I was always bailing him out of trouble and taking care of him. He was never able to take care of me. I spent 14 years trying to keep up with his mood swings. There were times he could be good, but every time I got a new car he would tear it up; every time I got new furniture he would tear it up. He would get very upset over any little

thing, but then he would try so hard to be good.  He would mow the lawn and take care of things and fix things and it would last for two months.  Then he would start running around with women and be gone for two months.

I got the stay-away orders, not to just keep him from trying to come back, but to keep me from going back.  He would come back crying, begging me to take him back, so remorseful.  He could be good as he could be—he would go the extra mile, trim the tree if it meant my taking him back, but he could not keep it up.  This was from the beginning of our marriage.  He came home one time and accused me of having an affair with somebody I worked with, and cracked my nose and left bruises on me.  I had to call the police and go to the emergency room.  Kenny came back, crying, very sincere, and could not believe he had done all that.  He went out of his way to make up, to be good-hearted. I knew he had mental issues.

He was always doing crazy things on motorcycles. He never wore a helmet. Once when Toby was about eighteen-months-old we were living in Elk City, Oklahoma, where Kenny worked oilrigs. I was watching him dirt biking in a field and he didn't see the barbed-wire fence. He went smack over it and landed on his head, He was unconscious for a while. It really scared me. He had a bunch of cuts and scratches, too.

Kenny was a hard worker but it would not last long. He would get real depressed and sleep all the time.  He smoked a lot of pot, but without it he never got motivated.  He turned to drugs to make himself feel better.

I was the only stable thing he ever had in his life.  I kept him together. Without me, he could not function.  I did not care for his drugs when he started into that, but I

Page 3 of  4



1202

tried to keep him from falling off the deep end.  Kenny needed more than I could give.  I have two sisters like Kenny; that's why I tried to help him.

Mr. Hilfiger and Mr. Smith were interested in my stay-away orders and in my marriage, but not in the underlying issues of Kenny's mental health, at least not from anything they ever talked to me about.  They did not ask me anything about his family history either.  Even though I wasn't happy about testifying at the trial, I did, and I would have testified about the things in this declaration if they had asked me about it.

I recently gave this information to a man who told me he was an investigator working on Kenny's case.  I did not write the declaration myself.  When the investigator came back and asked me if I would provide this declaration for Kenny's case, I read it carefully.  It says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this __9__ day of March 2009, in ___Sag.___ County, Arkansas.

_Abby Stites_
Abby Stites

1203

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,     )

                        )

            *Plaintiff,*   )

                        )

v.                      )       **Case No. 6:04-CR-00115-JHP-SPS**

                        )

KENNETH EUGENE BARRETT,    )

                        )

          *Defendant.*  )

---

**EXHIBIT 104**

---

**Declaration of Richard Barrett**

I, Richard (Richie) Barrett, declare the following:

Kenneth (Kenny) Barrett is my older brother by a few days short of three years.

An investigator who told me that he works for lawyers representing Kenny recently asked me if I had seen my brother and Cindy Crawford in any kind of altercation. Cindy Crawford is married to our cousin Travis Crawford.

I told the investigator that I had once seen Kenny dress Cindy down. Cindy was sitting in a car at the time on my brother's property and Kenny was standing next to it. I heard him say something like, "Who the fuck do you think you are?"

The investigator then asked me if anything else took place. I had no idea what he was getting at. Then he asked me if I ever saw my brother point a gun, a shotgun or any weapon at Cindy Crawford.

I told him that I never saw my brother point any kind of weapon at her.

He then asked me if I had ever seen Kenny put a gun, shotgun or any weapon against her leg. I told him that I had never seen anything like that, that I had never seen Kenny put a gun, shotgun or anyway weapon against her leg or any part of her body, and that anybody who said that I saw that is a flat out liar.

The investigator who asked me these questions asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed by me this ____9____ day of March, 2009, in _Sequoyah_ County, Oklahoma.

_Richard Barrett_
Richard Barrett

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 105**

---

## **Declaration of Doris Barrett**

I, Doris Barrett, declare the following:

I am married to Ernie Barrett, Kenneth Eugene Barrett's father. I was married to Ernie Barrett before and at the time of Kenny's state trials in Sequoyah County, and during his federal trial in the Eastern District of Oklahoma. I followed Kenny's case closely, in both state and federal court. I went to every hearing and every day of both state trials and the federal trial, except I missed just one state hearing that was held in Stilwell.

In Kenny's federal trial, I noticed a bulge around Kenny's waist. It was there every day. I asked Kenny's lawyer what it was. He told me it was a shock belt, there to shock Kenny if he tried to escape or hurt someone. If it was obvious to me, it must have been obvious to others.

Kenny wore nothing like that in the state trials.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself, but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 1-page declaration is true and correct.

Executed by me this 5th day of March 2009, in Creek County, Oklahoma.

_Doris Barrett_
Doris Barrett

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 106**

# Sequoyah County Democrat

QUOYAH COUNTY DEMOCRAT VOL. XIX. NO. 23     SALLISAW, OKLAHOMA, JULY 10, 1925.     STAR-GAZETTE, VOL. 31. NO. 23

## THE OFFICIAL COUNTY PAPER—THE PAPER THAT IS READ

# SEQUOYAH COUNTY LEADS AT TAHLEQUAH NORMAL

## Enrollment Records Show This County Far Ahead

Through the courtesy of J. H. Dodson, superintendent of the Roland schools and now instructor at the summer term at Northeastern State Teachers College at Tahlequah, we are able to give below a list of one hundred twenty-two students and training in their chosen sections. The list is an extended and we are advised that Sequoyah county heads the honor list in attendance this year. This speaks well in favor of the county and discloses a work on the part of those in the teaching profession to increase their knowledge and better equip themselves to place Sequoyah county in higher rank in every department. Prof. Dodson also enclosed some interesting notes relative to the progress of the Sequoyah county colony, which will be of interest to our readers.

Following is the list of names:

Acton, Joyce Akins, Edmund Armstrong, Lola Aston, Thee Brodie, Birdie Barnes, Pearl Barnes, Bessick, J. F. K. Bass, Glena Bange, Jean Lackard, J. V. Downing, Ver-Brackett, Mrs. Lyda Bradley, le Bradman, Thelma Briscoe, Hazel Brown, Leonard Bumpers, Fannie Bell, Theodore Casey, Nettye Con-Thelma Deese, A. W. Dodson, Mrs. L. Dodson, Maurine Dodson, J. H. Dodson, Mrs. Kate Dorcas, Lola Dorris, R. E. Downing, Winnie Estep, Dorothy Eichling, Ida Eppler, Max Mason, Jewell Frye, Clara Folsom, Fox, Harriett Frye, Fray Fulton, Fulton, Lola Garretson, Norma Gaston, J. W. Gilbert, Mrs. Flora Gilbert, Ida Gilbert, Stratton Goins, Hammett, Leta Harden, G. S. Heston, Mrs. G. S. Harmon, Squire, E. R. Haskins, Ruby Walton, Watkins, Marie Watkins, Son-Wilson, Mrs. Margaret Wilson, Mandie Wofford, Jettie Wood, Floye Kine, Elizabeth Ratcliff, Harrie, M. M. Black, Otal Wilson, J. Dison, Mae Pinkerton, Pearl Pin-Sula King, Mrs. B. R. Has-Margaret Hastings, Esse Helms, Max Hill, Max Holcomb, John Hol-Ferrin Holcomb, R. L. Howell, B. Howell, James Humphrey, Humphrey, Lucille Jones, Edith Eula Keck, S. S. Kirk, Ku-Kuykendall, Mrs. Byrda Kuyken-Ora Lea, Lee J. Lewis, Mrs. Lee Mattie Lillard, Mayme Lin-Vaness Mays, Ben F. Mills, Mrs. Mills, Ruth Mize, Winnie Mize, Vida Nichols, B. F. Oliver, Ed-Oliver, Edna Pattycord, Edith Ora Lee Pinner, Gertie Reed, Noel Ross, Elvis Rowland, Othel, Mrs. Mary Scott, Guy R. Sharp, Wade H. Shumate, Anderson, Pansy Stewart, J. Tyler, Margie Thompson, Ruth, J. H. Walkup, Mrs. J. H. Minnie Walker.

### Normal Notes

W. Gilbert principal of Liberty, Sallisaw, was elected president graduating class of the Junior.

Held serum is being given to all its who wish to take it. Many taking advantage of this opportunity.

Many of the Sequoyah county teachers are spending the week and taking the picnic.

The daughter of Mr. Floyd who is instructor in Sallisaw city schools, contracted a case of ing cough and was taken by her to Tulsa, Oklahoma, to the of Mrs. Tompkins' mother.

Humphrey of Akins was president of Sequoyah county's who are in attendance at N. S. T. C. and Floyd O. Temp-Sallisaw, secretary.

Sequoyah county stayed in for the both boys and girls basketball being defeated in the finals by Cherokee boys and girls.

of the Sequoyah county teachers to receive their life certificate at the close of the summer term view their degree.

## Abe Dotson, Well Known Marble City Farmer, Shot to Death

### TWO NEWSPAPER BOYS ARE PROUD FATHERS

Cas A. Carr, formerly connected with The Democrat but associated with the Johnson Credit company since last November is the proud father this week of a fine seven pound baby girl who arrived last Sunday. The mother and babe are doing fine and Cas wears a smile that will not come off. On Monday, July sixth, Fred Green became the proud and adoring father of a nine pound baby boy. He (Fred) joined The Democrat staff on that same date that the boy arrived but has found it hard to get his mind on lered upon his work. The mother and boy are both making splendid progress.

### JIM TAYLOR RENAMED COUNTY COMMISSIONER CHAIRMAN

When the new board of county commissioners qualified last Monday morning and proceeded to organize, J. A. (Jim) Taylor from district number three was unanimously chosen as chairman to succeed himself. He has served for two years past in this important position and the honor bestowed upon him Monday is well deserved, for no man in the county perhaps knows county affairs and the county's business as thoroughly as does Mr. Taylor. J. A. Wofford, able and qualified Commissioner from district one has served for two years past also and rendered splendid service. His work was well enough thought of by his people that he was returned to office following a most bitter fight and in a district thought by many to be Republican in politics. R. L. Horn, who replaces W. E. McConnell in district two, is the third member of the new Board and returns to official duties following a lapse of several years. He comes well equipped to render excellent service, by reason of his previous service on the Board and his wide knowledge of road affairs and county business generally. The new Board is indeed an able one and the county may expect big doings during the next two years.

The newly organized Board got down to business immediately and cleared the decks for action. Much important road and bridge work faces the three members and they expect to map out and carry into effect an extensive program. The estimates of the various county offices are to be examined also, preparatory to final accountability by the county examiner board. Many road overseers and seekers for official place were here on Monday also, presenting their claims and applications for reappointment. The Board met again on Tuesday to complete the work started on Monday and to consider any unfinished business that might be presented.

### FRED MERSHON ASSUMES DUTIES AS SUPT. OF SCHOOLS

Monday of this week witnessed assumption of the duties of County Superintendent of Schools by Fred Mershon, elected last November by the voters of Sequoyah county. He took over the reins of office from Lee J. Lewis who retires to enter school work in Muskogee county. Mr. Mershon is not a novice in school work and comes to this office with a wealth of knowledge and experience gained in earlier years in this part of Oklahoma. He is oftimes referred to as "the father of Sequoyah county schools" and has done more perhaps to establish and build up the school system in this county than any other man. He held the office a number of years ago, but retired from official life during 1923 and 1925 and engaged in the oil business at Eldorado, Arkansas, for a longer period. Everyone is invited and urged to attend the nightly meetings.

### MRS. CALLIE LEATHERS IS SERIOUSLY ILL

Friends of Mrs. Callie Leathers are greatly worried the past week because of the serious illness which she has been suffering since Thursday, July 8, when she became suddenly stricken immediately following the noon meal and as she had started back to her duties in the county treasurer's office. It was at first thought that the attack was acute indigestion, but this idea was soon dispelled and it became apparent that the illness came from a serious ailment at the base of the brain. She has been unconscious since the day of the attack and close family friends fear for her recovery. Attending physicians are keeping close vigil, and a trained nurse was called into service on Monday of this week. Relatives of the family have arrived throughout the week, to render whatever assistance and that it was possible to give. As we go to press the belief prevails that the chances of recovery are remote.

### OAK STREET TO BE OPENED AT ONCE

The city commissioners in session Tuesday evening, passed the necessary resolution ordering the opening of Oak street north across the Missouri-Pacific tracks. The news will be most welcome to those citizens who live north of the tracks and who have hoped for years that a good street might be opened to traffic. This has been impossible heretofore because of title to the land, and complications arising out of the original plat made and the way the streets and the city were laid out. The new street extends north from the First National Bank and Citizens National Bank corners across the track, and past the R. T. Kelleam and George Daniel homes. The street will pass between those two houses and the small alleyway on the east side of the Kelleam home will be closed to traffic. Sidewalks can now be builded and a well graded street can be maintained. Many of the nicest homes in the city are located on the north side and many new homes will be builded in future, with the opening of this important street.

### HINES WINNER IN GOLF TOURNEY

Leland Hines is golf champion of the Sallisaw Country club. He won this title when he defeated Roy Frye, 5 up. Frye was at first the picked winner, but Hines worked himself up from the start and defeated everything on his way. Leslie Hines is winner of class B, and Mrs. J. L. McDaniel is winner of the ladies tilt. Leslie Hines defeated Floyd Green in a close match, 3 up. Mrs. J. L. McDaniel, a champion since the organization of the club won her match easily from the very start, defeating Miss Bass Hall, 7 up in the finals.

### CHRISTIAN CHURCH TO OPEN BIG REVIVAL

Announcement was made this week by officials of the Christian church that a big revival meeting would open next Sunday, July twelfth in their church, led by Evangelist Harrison Lewis of Muskogee. This revival follows closely the recent revival of the Nazarene church. A good choir is being organized to conduct the musical service. Evangelist Lewis delivered a sermon here quite recently and impressed his hearers as being a most effective speaker, and arrangements were started at once to open a big revival meeting. He is a noted evangelist and comes very highly recommended. The meeting will be conducted for two weeks at least, and possibly for a longer period.

### COTTONWOOD

The revival meeting is getting better all the time. Houston Martin, Wade Vaughan, Hanna Turner and Jeff Shackelford were converted Saturday night.

Son Wolf and Faner Hibbs were married Wednesday night.

### BIG PIE SUPPER TO CLOSE CHAUTAUQUA

The chautauqua course has occupied the time of everyone this week, with both afternoon and night programs each day. The course ends tonight (Friday) with a splendid number—"The Musical Moores," featuring Baby Harold Charter. The Friday evening program also includes Karl Waadman, cartoonist. The week of varied entertainment started off on Monday with Woods quartet and full singers and continued each afternoon and night with good attendance and close attention. Many complimentary remarks have been heard from those who listened to each number. The humorous lecture on Tuesday evening by Denton C. Crowl was particularly appreciated, picturing as it did the everyday problems of life and pointing the way to a solving of those problems. The ticket sales were far from what was expected and fell far short. The guarantors whose names were affixed to the contract were forced to make good the deficit.

Tonight a big pie supper and popularity contest is to be had. The doors will be thrown open free to everyone who wishes to come. The regular program will be given as usual and immediately following, the pie supper and contest for the most popular young lady and handsomest young man, will be carried on. This big pie supper is being arranged to help clear the big deficit and everyone should respond and should bring with them one or more friends. The program is well worth attending, and following the big fun will start.

### WALTER HAMPTON TO OPEN MODERN GARAGE

Walter Hampton this week closed a deal for the purchase of the large brick building immediately east of the Bonham hotel, occupied recently by the L. C. Corley garage, and is working out plans for the opening of a modern garage and filling station. His plans contemplate tearing out the present front and building a drive-in filling station. He has been connected with the Reager-Frye Motor Co. for several years past and is an experienced mechanic and garage man. The location is a splendid one and has been used for years past as a garage and auto sales room. The present occupants have made no definite plans as to a new location, and will probably not vacate the present room until next month.

### FRED GREEN OF AKINS JOINS DEMOCRAT STAFF

Fred Green, superintendent of the Akins schools this week joined the working staff of The Democrat and assumed his new duties on Monday. He served as superintendent of the Akins schools last year and had contracted to teach the summer term starting this month, but obtained a substitute when acceptance was made of the offer to enter the newspaper game. He is new in newspaper work but is entering with the intention of making it his life's work. Enjoying a wide acquaintance in the eastern part of the county, and also in the teaching fraternity, and being a graduate of Sallisaw high school equips him admirably for entrance into newspaper work in Sequoyah county. The Democrat force welcomes him and believes that the public generally will feel that a wise choice has been made. He will take over the advertising and news features of the paper just as quickly as experience can equip him for that work.

### RAYMOND DRAKE NARROWLY ESCAPES SERIOUS ILLNESS

Raymond Drake, popular and efficient clerk of the district court is slowly recovering from a ten day attack of fever which for a time threatened to become serious. Attending physicians felt that for days he was on verge of an attack of typhoid fever, but by careful treatment and watchful care, the attack was avoided. He was confined to his bed for more than one week but is now able to be back.

### MANY ATTEND I.O.O.F. HOMECOMING AT CHECOTAH

Several Sallisaw members and their families attended the annual Odd Fellow homecoming held at the Orphanage at Checotah last Monday July 6. More than 1600 members of the order from over the state were in attendance at the affair. A great picnic and program was held in the afternoon.

Those who attended the affair from Sallisaw were: Mr. and Mrs. Chas. W. Anderson, Mr. and Mrs. J. H. Thompson and family, Mr. and Mrs. E. S. Spears and family, Mr. and Mrs. Aulda Rosson and family, Mrs. Tucker and son John, Carnell Leach, Looney McCoy and Mr. and Mrs. William A. Timmerman.

### ROSS TAYLOR MAKES FIRST DONATION IN ORPHAN DRIVE

Ross Taylor, member of Carnie Welch post here and a sick and disabled world war veteran has the honor of being the first person in Sequoyah county to donate to the big Legion Endowment Fund drive which starts today (Friday). He is in the Government hospital at Little Rock, Arkansas, and on Tuesday of this week mailed his check to County Chairman Harry Pitchford for $10 with the wish that he could give more. He has been a government patient for three years past, suffering from illness and disability receive while doing service in France and his magnanimity and big hearted desire to do his bit in this greatest drive since the war convinced, proves beyond question that the effort will succeed and that it is worthy. Ross has a wife and three small kiddies who live here in Sallisaw and who depend entirely upon his limited hospital pay for a livelihood, but he saved out a sufficient amount in start off the big drive and show his fine spirit in putting Sequoyah county over the top in the fund drive. He spent three weeks here this spring with his family and had laid his plans to be here and assist in every possible way when the drive started, but last month became so ill that he was forced to return to the hospital. If this donation by one of Sallisaw's sick and disabled vets is a criterion, then the quota for Sequoyah county will go over in great shape—and possibly will be doubled.

### POOL HALL APPLIED FOR AT MOFFETT

County Judge W. S. Moore on Wednesday of this week held a public hearing in the district court room in connection with the recent application made by L. N. Cantrell and J. W. Pressley for a permit to open a pool and billiard hall in the town of Moffett. The hearing was largely attended by citizens of Moffett who came here to testify, and offer personal views as to the advisability of granting such a permit. The Oklahoma laws vest the county judge of each county with authority to grant permits of this character. No pool or billiard halls have been permitted to run in Sequoyah county since soon after statehood and opposition has been voiced each time that individuals have taken steps to secure such a permit. The applicants in this case were represented before the county court by Judge Thos. J. Watts who presented the reasons for believing that a pool and billiard hall would not prove offensive or a nuisance. Fifteen or more citizens were questioned closely by Judge Moore concerning the effect that a pool hall would have upon the town from every conceivable angle. The application by Messrs. Cantrell and Pressley was made soon after the closing of the pool and billiard rooms in Fort Smith last month. Judge Moore continued the hearing until Wednesday, July 15, at which time additions from citizens examined and questioned concerning the advisability of granting such a permit.

Mr. and Mrs. L. T. Newton and daughter, Betty, returned home first part of the week...

## Killed at Home of John Wallace, a Near Neighbor

Sequoyah county's long list of homicides was made larger on Wednesday of this week, when Abe Dotson well known farmer and stockman of Marble City was shot and killed five miles northwest of that town by Henry Edwards, aged 24, at the home of John Wallace, farmer.

The killing occurred about 9:00 a.m. and within one hour and a half thereafter, Sheriff John E. Johnston and County Attorney Harry Pitchford were at the scene making full investigation and securing statements from those who knew any details whatever as to causes surrounding the case.

From the meagre information at hand, it seems that Abe Dotson, Tom Dotson, Henry Edwards, Merl Edwards and John Wallace live in the same immediate community, and that Wednesday morning Abe Dotson and the Edwards boys went to the Wallace home to get some barber work done. While there a minor quarrel ensued which was thought nothing of and in which no one took any exception. When Dotson and the Edwards boys started away from the house, it is said that Dotson drew a butcher knife and started after Henry Edwards. Edwards ran back into the Wallace house, grabbed a double barreled 12 gauge shotgun, turned in the doorway and called to Dotson to halt. Dotson took a step forward at the gate and Edwards fired, the shot striking Dotson in the right shoulder and breast. He fell and rolled four or five steps from the gate, and according to one eye witness, Edwards fired another shot which struck Dotson in the left ear and temple. Mrs. Wallace witnessed the tragedy, her husband was at the barn back of the house. Dotson lived fifteen or twenty minutes but was unconscious and could make no statement. The Edwards boys, who are cousins, left soon after the tragedy and rode to the home of Deputy Campbell Bellar, who lives near Sycamore school house, and surrendered. Ben Crawford, deputy sheriff at Marble City, happened to be in the vicinity of the killing and rode up to the Wallace home very shortly after the killing and shortly after the departure of the Edwards boys. He heard the shots that were fired and which killed Dotson. Deputy Bellar brought Henry Edwards to Sallisaw at once, and placed him in the custody of Sheriff Johnston. Merl Edwards, the cousin who witnessed the tragedy, accompanied them to Sallisaw. All of the parties made statements to Sheriff Johnston and County Attorney Pitchford. Edwards was lodged in jail pending his preliminary hearing which will be held probably next week.

Tom Dotson, a brother of Abe Dotson has some personal difficulties with John Wallace at whose home the tragedy occurred, last Saturday and was brought to Sallisaw and placed under arrest yesterday. It is not believed however that this trouble had any connection whatever with Wednesday's killing. None of the parties were drinking, as was at first reported and all were in good humor and good spirits apparently. The quarrel and the killing occurred so suddenly that it hardly seemed possible.

Abe Dotson was a brother of Berry Dotson who was killed by Constable Nicholson at Ramona, Oklahoma, about two years ago. He was also an uncle of Mack Dotson who was killed on the streets of Marble City on March 9, 1923 by Jeff Kirk. He was the third member of the family to "die with his boots on" within a period of two years. See Dotson, a son of Berry Dotson and nephew of Abe Dotson, is a fugitive from justice at this time and has been wanted for more than a year upon bank robbing charges. He is thought to be in hiding in the Cookson country and by henry.

Case 6:09-cv-00105-JHP   Document 3-4   Filed 03/16/09   Page 24 of 125

# The Vian American

VOLUME 1      VIAN, SEQUOYAH COUNTY, OKLAHOMA, JULY 10, 1928.      NUMBER 3

## OB TOWRY KILLED BY TRUCK

Driver Fails to Observe Crossing Stop Law and Throws Five Men Off.

The entire community was shocked and grieved last Friday morning when the news was wired from Sand springs that R. L. Towry, brother of N. H. Towry of this city had been thrown from a truck and instantly killed while going to work that morning.

Mr. Towry with six other men were on a truck going out to work and in attempting to make a railroad crossing on a sharp curve, going at high speed, the driver failed to obey the crossing stop law and as the crossing was a rough one, the truck was partly overturned to the extent that five of the men were thrown off. Mr. Towry struck the rail or a tie in such a manner as to crush the skull, from which he died instantly. One other occupant suffered a broken leg and the other three men escaped with slight bruises.

The driver of the truck, whose name we failed to get, was arrested immediately after the accident on a charge of man-laughter and was confined in the Tulsa jail.

Mr. and Mrs. E. S. Towry of Sallisaw, accompanied by D. E. Towry of Stilwell and H. N. Towry of Vian, left immediately upon receipt of the tragic news, going by auto to Sand Springs, where funeral services were held and the body interred in the City cemetery on Saturday, July 4th.

The deceased was 51 years of age and was well known to a large number of our citizens, having resided and engaged in business here several years ago, and established here, as well as at other places where he has lived, a reputation for honesty, reliability and good citizenship. He is the first death among the children of his family, and leaves to mourn his death the mother, Mrs. O. C. Towry and five brothers and three sisters, viz: Brothers— J. J. and D. O. Towry of Stilwell, J. W. Towry of Sulphur, H. N. Towry of Vian and E. S. Towry of Sallisaw. Sisters— Mrs. J. R. Plunkett of Charleston, Arkansas; Mrs. Ed Craven of Scanton, Arkansas and Mrs. Jas Stephens of Okmulgee, Oklahoma.

The American wishes to join the many friends of this estimable family in their expressions of sympathy.

George McCoy of Muskogee was in town Wednesday of this week looking after business matters.

## ACCIDENT AT GANS WELL

Monday morning about eleven o'clock the boys working at test well Gans. Gans let the bull wheel get away which caused same to explode and tear down the rig, destroy several hundred feet of the cable and tear up many parts of the machinery.

Three who were at the scene at the time say it was wonder that no one was hurt.

The rig fell to the ground and was practically demolished.

Contractor Robert Dooley has already begun the erection of the new rig and will be back at work in record time we understand.

## CHEERS FOR H. B. 4

The Tulsa World rejoices that the referendum on H. B. No. 4 lost.

The opinion of the attorney-general that presidential electors are state officials puts an end to the demagogic attempt to refer H. B. 4 to a vote of the people. If it had been so referred, even a reasonable campaign of education would have resulted in the overwhelming adoption for the late legislature enacted no more constructive beneficial law. Factional politics and demagogic pretense done instituted the attempt to make of that law something injurious to the public and its interests.

It may be the matter will ...
...provides for the election of a chief executive by the states and not by the people directly.

As a matter of absolute fact, there are but two elective officials in the entire scheme of government that are not state officials. These are the president and vice-president. The remainder of elected officials are state officers, selected by the states for the purpose of constituting the proper state representation in the conduct of the federal government.

## FISHING ON THE ILLINOIS

C. M. Gay, George Barker and Chas. O. Frye spent the 4th on the Illinois river fishing.

By special arrangements they met a party from Tulsa composed of county and district officers of that place and Messrs. Gay and Barker furnished the fish for the crowd.

Sunday, Messrs. Gay and Barker joined a Vian crowd and had a great fish fry which was enjoyed by all.

## ABE DOTSON KILLED
### BY HENRY EDWARDS

Home of John Wallace Scene of Tragedy Wednesday Morning.

A wire was received at the sheriff's office Wednesday morning calling Sheriff John E. Johnston to Marble City with the information that Henry Edwards had shot and killed Abe Dotson, both of that place.

Within an hour Sheriff Johnston and County Attorney Pitchford went at the home of John Wallace, the scene of the killing, which had occurred about 9:30 o'clock, and Edwards was placed under arrest.

The full details of the tragedy could not be ascertained at the time we go to press with this issue more than that Edwards had fired two loads of "B. B." shot into Dotson using a double-barrel shotgun, one load entering the body through the right shoulder and the other going into the head and the left ear.

It seems that Ben Crawford, deputy sheriff at Marble City was within 300 yards of the Wallace home at the time of the shooting and met Edwards and another boy coming that way, but did not know of the tragedy until he arrived at the Wallace gate where he found Dotson dying.

Dotson was forty-five years of age and is survived by his wife and five children. His body was removed at once, being about four mile northwest of Marble City.

Edwards was taken to Sallisaw and lodged in the county jail to await a preliminary.

## MARKETING EXPERT VISITS SEQUOYAH COUNTY

On Wednesday of this week J. Robt. Wiley of the Chamber of Commerce of Tulsa county and who is employed by this body to assist in the marketing of eggs from the Eastern Oklahoma counties and who is an expert along this line, spent the day here working with our county agent in explaining the plan of marketing the eggs, and while here put on some demonstrations in this work with some of our poultry men of the county, explaining to them the methods employed by the government in classing and grading eggs and under which eggs are being marketed at this time.

For some time Oklahoma eggs have been penalized by being dumped on the Eastern market on account of not being properly classed and graded, by which this state, being one of the leading states in poultry production has lost and is losing at this time, millions of dollars each year on this account.

Mr. Wiley explained, while putting on the demonstration that the government grades of eggs were divided in three classes as follows: Extras, Standards and Trades, with the following qualifications that is required under each grade.

Extras must weigh at least 24 ounces to the dozen, be fresh, clean strong and infertile. Standards— Clear, strong, fresh, can be fertile if properly handled and must be uniform. Trades— includes culls, must be fresh, dark yolks, cracks can go in this class if not leaking, and must not show any sign of blood rings or clots.

While in the county, Mr. Wiley stressed the importance of pushing the work of exalting the rooster campaign, which has been started in this and other parts of the state so that more infertile eggs can be produced. The demand is such for this high class of eggs that is impossible, at this time, to get the supply of eggs to fill the demand, which is coming in at this time, for eggs of this class.

While in Sallisaw, the egg market was investigated, and found that some of the produce men were still...

## RIDE 'IM, COWBOY

take until they take advantage of this opportunity being afforded them in this egg marketing deal.

While here Mr. Wiley was well pleased with the poultry development he found, on his short stay in the county, and assured our County Agent he would be glad to return to this county and assist him in developing the poultry, as it should be, not only from a quality and production standpoint, but go into the marketing game and assist in the sale of eggs and poultry so that this line of farming can be placed on a more profitable basis here.

## TWO DAYS' OUTING

A two days' outing on the Illinois river was enjoyed July 4th and 5th by several families of Vian consisting of A. D. Benher and family, Ed Whiteside and family, W. P. Davis and wife, Irwin Lay and family, Gould Moore and family, C. C. Howard and family, S. A. Fee and family and were later joined by R. W. Armstrong and family, W. T. Wilson and family.

Everyone had a most wonderful time both days, the light showers of rain not affecting the pleasure of the trip any and the few mosquito bites helped each one to realize they were out on the river in a camp and not at home in a comfortable bed.

Sunday morning several of the party decided they would return home for Sunday School, but as the time drew near some one suggested that they hold Sunday School on the creek, which they did with everyone taking part.

Some of the more thoughtful took with them their Sunday School quarterlies and in one big class the lesson for the day was read and studied by all.

C. M. Gay and George Barker furnished breakfast for a great fish fry which was held at the noon hour Sunday with about ten visitors from Tulsa joining in with the Vian party.

## O. G. & E. APPLIES FOR REDUCTION IN POWER RATE

Household Appliances Would Be Installed Where New Rate Would Be Effective

Oklahoma City, July 3.—Application for permission to apply a reduced rate on current for electrical heating and power appliances was filed today with the state corporation commission by the Oklahoma Gas & Electric company. The new rate affects sixty-two Oklahoma towns, and if granted would become effective as of July 1.

The application was filed with B. P. Stockwell, gas and electric engineer for the commission. Stockwell said he would submit it with his recommendations to the commission within the next few days.

The rate would be 3.15 cents net per kilowatt hour for all current over eight kilowatts used in a household during a month, according to the application. While the primary rate for the first four kilowatts in a month varies in the different towns it averages about ten cents a kilowatt.

A charge of 7.2 cents per kilowatt would be made for the next four kilowatts used and the flat rate of 3.15 cents would apply for all additional current.

Current for all household purposes would be supplied through one meter instead of the rate would be allowed in both cloths in which appliance having a capacity of at least three kilowatt hours per month have been installed. Electric refrigerating machines, range water heaters and all motor driven appliances of less than one horsepower are included in this classification. Stockwell...

Ed Lee of near Gore was in Sallisaw Monday of this week where he was looking after the interest of a road which he and his neighbors want made a state highway. Ed is a very public spirited man.

## REAGOR FRYE MOTOR COMPANY, NEW FIRM AT SALLISAW, OKLA.

We wish to call the attention of readers of teh American to announcement advertisement of Reagor-Frye Motor Company of Sallisaw. This new firm succeeds Max Reagor as authorized dealers of Ford products in Sallisaw. The new firm will rebuild the interior of the present plant, enlarging the floor space and add additional equipment to the garage department, that will equal any Ford agency in cities the size of Sallisaw. The owners of the plant at Sallisaw are well known to Vian people. Chas. O. Frye, the new member was formerly active head of the Sequoyah County Democrat, a newspaper at Sallisaw, during the past ten years. He is a splendid business man and will have charge of the plant, while Mr. Reagor will head the sales and service department. He is considered one of the best automobile dealers in Oklahoma and is one of the oldest dealers in point of service in the state, having been the Ford dealer at Sallisaw during the past fifteen years.

## TAKES OATH OF OFFICE

Monday of this week was a very busy day at the county seat because some changes were made in the county officials on that date. Those that were elected at the last general election on last November and had not taken their oath of office did so on that date. Those who took their places as officers to act for the welfare of all concerned were:

County Superintendent—Fred Merchan.

Commissioners—Bud Horn, District No. ...; ... Taylor, District No. ...; ... ford, District No. 3.

## Advertisement

## Our Motto:

# "Safety First"

# Men and Money
## Make This Bank Secure

There are two ways of measuring the strength and standing of a bank. In the first place money resources—capital and surplus—give it financial strength.

In the second place—and perhaps even more important—are the men, the officers and directors. They give the bank character, determine and execute its policies.

This is a strong bank, a helpful bank because...



An animated tornado on four legs, 1,200 pounds of living dynamite is the "outlaw" break, scores of which will provide the chief thrills of the Chicago Roundup and World's Championship Rodeo, to be held for nine days beginning August 18...

# The Vian American

VOLUME I     VIAN, SEQUOYAH COUNTY, OKLAHOMA, JULY 10, 1923.     NUMBER 3

## OG TOWRY KILLED BY TRUCK

### Driver Fails to Observe Crossing Stop Law and Throws Five Men Off.

The entire community was shocked and grieved last Friday morning when the news was wired from Sulphur Springs that R. L. Towry, brother of N. H. Towry of this city had been drawn from a truck and instantly killed while going to work that morning.

Mr. Towry with six other men were on a truck going out to work and in attempting to make a railroad crossing on a sharp curve, going at high speed, the driver failed to obey the crossing stop law and as the crossing was a rough one, the truck was partly overturned to the extent that five of the men were thrown off. Mr. Towry struck the rail or a tie in such a manner as to crush the skull, from which he died instantly. One other occupant suffered a broken leg and the other three men escaped with slight bruises.

The driver of the truck, whose name we failed to get, was arrested immediately after the accident on a charge of manslaughter and was confined in the Tulsa jail.

Mr. and Mrs. E. S. Towry of Sallisaw, accompanied by D. E. Towry of Stilwell and H. N. Towry of Vian, left immediately upon receipt of the tragic news, going by auto to Sand Springs, where for and on the were held and the body interred in the city cemetery on Saturday, July 4th.

The deceased was 51 years of age and was well known to a large number of our citizens, having resided and engaged in business here several years ago, had established here, as well as at other places where he has lived, a reputation for honesty, reliability and good citizenship. He is the first death among the children of his family, and leaves to mourn his death the mother, Mrs. G. C. Towry and five brothers and three sisters, viz: Brothers—J. J. and D. E. Towry of Stilwell, J. W. Towry of Sulphur, H. N. Towry of Vian and E. S. Towry of Sallisaw. Sisters—Mrs. J. R. Plunkett of Charleston, Arkansas; Mrs. Ed Cravens of Scranton, Arkansas and Mrs. Joe Stephens of Okmulgee, Oklahoma.

The American wishes to join the many friends of this estimable family in their expressions of sympathy.

George McCoy of Muskogee was in town Wednesday of this week looking after business matters.

## ACCIDENT AT GANS WELL

Monday morning about eleven o'clock two boys working at test well near Gans got the bar wheel got away which caused same to explode and tear down the rig, destroy several hundred feet of the cable and tear up many parts of the machinery. Those who were at the scene at the time say it was a wonder that no one was hurt.

The rig fell to the ground and was practically demolished.

Contractor Robert Dooley has already begun the erection of the rig and will be back at work in second time we understand.

## CHEERS FOR H. B. 4

The Tulsa World rejoices that the referendum on H. B. No. 4 lost.

The opinion of the attorney-general that presidential electors are state officials puts an end to the demagogic attempt to refer H. B. 4 to a vote of the people. If it had been referred, even a reasonable campaign of education would have resulted in its overwhelming adoption for the legislature enacted no more constructive beneficial law. Factional politics and demagogue practices have bottomed the attempt to make of that law something ulterior to the public and its interests.

It may be that the matter will be an influence to remove the taint in the electoral college, which exists for the purpose of electing a chief executive of the union composed of various states. And very specifically the constitution provides for the election of a chief executive by the states and not by the people directly.

As a matter of absolute fact, there are but two elective officials in the entire scheme of government that are not state officials. These are the president and vice-president. The remainder of elected officials are state officers, selected by the states for the purpose of constituting the proper state representation in the conduct of the federal government.

## FISHING ON THE ILLINOIS

C. M. Gay, George Barker and Chas. O. Frye spent the 4th on the Illinois river fishing.

By special arrangements they met a party from Tulsa composed of county and district officers of that place and Messrs. Gay and Barker furnished the fish for the crowd.

Sunday, Messrs. Gay and Barker joined a Vian crowd and had a great fish fry which was enjoyed by all.

## ABE DOTSON KILLED BY HENRY EDWARDS

### Home of John Wallace Scene of Tragedy Wednesday Morning.

A wire was received at the sheriff's office Wednesday morning calling Sheriff John E. Johnston to Marble City with the information that Henry Edwards had shot and killed Abe Dotson, both of that place.

Within an hour Sheriff Johnston and County Attorney Pitchford were at the home of John Wallace, the scene of the killing, which had occurred about 9:00 o'clock, and Edwards was placed under arrest.

The full details of the tragedy could not be ascertained at the time we go to press with this issue more than that Edwards had fired two loads of "B. B." shot into Dotson using a double-barrel shotgun, one load entering the body through the right shoulder and the other going into the head and the left ear.

It seems that Ben Crawford, deputy sheriff at Marble City was within 300 yards of the Wallace home at the time of the shooting and met Edwards and another boy coming that way, but did not know of the tragedy until he arrived at the Wallace gate where he found Dotson dying.

Dotson was forty-five years of age and is survived by his wife and five children. His body was removed to their home about four miles southwest of Marble City.

Edwards was taken to Sallisaw and lodged in the county jail to await a preliminary.

## MARKETING EXPERT VISITS SEQUOYAH COUNTY

On Wednesday of this week J. Robt. Wiley of the Chamber of Commerce of Tulsa county and who is employed by this body to assist in the marketing of eggs from the Eastern Oklahoma counties and who is an expert along this line, spent the day here working with our county agent in explaining the plan of marketing the eggs, and while here put on some demonstrations in this work with some of our poultry men of the vicinity, explaining to them the methods employed by the government in classing and grading eggs and under which eggs are being marketed at this time.

For some time Oklahoma egg have been penalized by being dumped on the Eastern market on account of not being properly classed and graded, by which this state, being one of the leading states in poultry production has lost and is losing at this time, millions of dollars each year on this account.

Mr. Wiley explained, while putting on the demonstration that the government grades of eggs were divided into three classes as follows: Extras, Standards and Trades, with the following qualifications that is required under each grade.

Extras must weigh at least 24 ounces to the dozen, be fresh, clean, strong and infertile. Standards—Clear, strong, fresh, can be fertile if properly handled and must be uniform. Trades—includes culls, must be fresh, dark yolks, cracks can go in this class if not leaking, and must not show any signs of blood rings or clots.

While in the county, Mr. Wiley stressed the importance of pushing the work of swatting the rooster campaign, which has been started in this and other parts of the state so that more infertile eggs can be produced. The demand is such for this high class of eggs that is impossible, at this time, to get the supply of eggs to fill the demand which is coming at this time, for eggs of this class.

While in Sallisaw, the egg market was investigated, and found that some of the produce men were out of the egg market on account of not

take until they take advantage of this opportunity being afforded them in this egg marketing deal.

While here Mr. Wiley was well pleased with the poultry development he found, on his short stay in the county, and assured our County Agent he would be glad to return to this county and assist him in developing the poultry, as it should be, not only from a quality and production standpoint, but go into the marketing game and assist in the sale of eggs and poultry so that this line of farming can be placed on a more profitable basis here.

## TWO DAYS' OUTING

A two days' outing on the Illinois river was enjoyed July 4th and 5th by several families of Vian consisting of A. D. Bonher and family, Ed Whiteside and family, W. P. Davis and wife, Irwin Lay and family, Gould Moore and family, C. C. Howard and family, S. A. Foe and family, and were later joined by R. W. Armstrong and family, W. T. Wilson and family.

Everyone had a most wonderful time both days, the light showers of rain not affecting the pleasure of the trip; one bit and the few mosquito bites belped each one to realize they were out on the river in a camp and not at home in a comfortable bed.

Sunday morning several of the party decided they would return home for Sunday School, but as the time drew near some one suggested that they hold Sunday School on the creek, which they did with everyone taking part.

Some of the more thoughtful took with them their Sunday School quarterlies and in one big class the lesson for the day was read and studied by all.

C. M. Gay and George Barker furnished the fish for a great fish fry which was held at the noon hour Sunday with about ten visitors from Tulsa joining in with the Vian party.

## O. G. & E. APPLIES FOR REDUCTION IN POWER RATE

### Household Appliances Would Be Installed Where New Tore Would Be Effective

Oklahoma City, July 3.—Application for permission to apply a reduced rate on current for electrical heating and power appliances was filed today with the state corporation commission by the Oklahoma Gas & Electric company. The new rate affects sixty-two Oklahoma towns, and if granted would become effective as of July 1.

The application was filed with B. P. Stockwell, gas and electric engineer for the commission. Stockwell said he would submit it with his recommendations to the commission within the next few days.

The rate would be 3.15 cents per kilowatt hour for all current over eight kilowatts used in a household during a month, according to the application. While the primary rate for the first four kilowatts in a month varies in the different towns it averages about ten cents a kilowatt.

A charge of 5.2 cents per kilowatt would be made for the next four kilowatts used and the flat rate of 3.15 cents would apply for all additional current.

Current for all household purposes would be supplied through one meter instead of the two would be allowed in households in which appliances having a capacity of at least three kilowatts in per month have been installed. Electric refrigerating machines, range water heaters and all motor driven appliances of less than one horsepower are included in this classification. Stockwell

Ed Lee of near Gore was in Sallisaw Monday of this week where he was looking after the interest of a road which he and his neighbors want made a state highway. Ed is a very public spirited man.

## REAGER FRYE MOTOR COMPANY NEW FIRM AT SALLISAW, OKLA.

We wish to call the attention of readers of the American to announcement advertisement of Reager-Frye Motor Company of Sallisaw. This new firm succeeds Max Reager as authorized dealers of Ford products in Sallisaw. The new firm will rebuild the interior of the present plant, enlarging the floor space and add additional equipment to the garage department, that will equal any Ford agency in cities the size of Sallisaw. The owners of the plant at Sallisaw are well known to Vian people. Chas. O. Frye, the new member was formerly active head of the Sequoyah County Democrat, a newspaper at Sallisaw, during the past ten years. He is a splendid business man and will have charge of the plant, while Mr. Reager will have the sales and service department. He is considered one of the best automobile dealers in Oklahoma and is one of the oldest dealers in point of service in the state, having been the Ford dealer at Sallisaw during the past fifteen years.

## TAKES OATH OF OFFICE

Monday of this week was a very busy day at the county seat because some changes were made in the county officials on that date. Those that were elected at the last general election on last November and had not taken their oath of office did so on that date. Those who took their places as officers to act for the welfare of all concerned were:

County Superintendent—Fred Morrison.
Commissioners—Bud Horn, District No. 2; A. Taylor, District No. 3; J. A. Ford, District No. 1.

As a matter of cold fact, there is a large abundance of parking space about seven miles from the place you intend to stop.

## Our Motto:

# "Safety First"

## Men and Money
### Make This Bank Secure

There are two ways of measuring the strength and standing of a bank. In the first place money resources—capital and surplus—give it financial strength.

In the second place—and perhaps even more important—are the men, the officers and directors. They give the bank character, determine and execute its policies.

This is a strong bank, a helpful bank because



### RIDE 'IM, COWBOY

(Copyright by N. E. Dubberley)

An animated tornado on four feet, 1,200 pounds of living dynamite—such is the "outlaw" bronk, scores of which will provide the chief thrills of the Chicago Roundup and World's Championship Rodeo, to be held for nine days beginning August 18. Wild and daring, coolest when facing almost certain injury—such is the buckaroo, standard type of the men who will fight it out with the "bad" horses in the Chicago contests.

Broncho busting calls forth all the courage that is traditional on the western ranges and a great part of the $80,000 in prizes appropriated by the Chicago Association of Commerce, under whose auspices the rodeo will be presented, will go to the men who will fight to stay for a few seconds on the hurricane decks of the "sunfishing," "skygrazing," squealing, fighting cayuses. When the courage of the buckaroo clashes with the lawless spirit of the broncho, the ride is always a sensational finish. Tex Austin, famous broncho

1211

KEB401084

SEQUOYAH COUNTY DEMOCRAT

FRIDAY, JULY 10, 1925

FRIDAY, JULY 10, 92



## oyah County Democrat

Published every Friday at Sallisaw, Oklahoma
RAY O. WEEMS, Editor and Publisher

### A Democratic Newspaper

the postoffice at Vian, Sequoyah county, Oklahoma, under ... 2nd, 1897, as second class matter.

second class matter, August 21st, 1914, at the postoffice at ..., under the act of March 3rd, 1897.

... $1.50 ... One year out of county ... $2.00

### GUBERNATORIAL POSSIBILITIES

... has one year to elapse before the state primary, talk is ... grocery and in the columns of the state press as to who ... for Governor, and this talk and press comment has brought ...

### CAREFUL DRIVING

... of one of the new laws which became effective last week ...

## WOUNDED PRISONER BELIEVED TO BE FUGITIVE

The belief prevails with Sheriff John E. Johnston and his force of deputies that F. T. Daley who was wounded last week in a gun battle near Gans with Robert Russell, special agent for the K. C. S. railroad, may be a fugitive from justice. His every move in the gun fight indicated such. When caught, he was wearing a shoulder scabbard but no pistol was found. Careful search this week of the ground immediately surrounding the spot where he was caught disclosed the buried gun and also a complete burglars kit, which he is supposed to have buried when he found that escape was impossible. The sheriff's force is making close search of all records and reward cards, to find whether any trace of him can be found. He is being treated in the county jail by the county physician and making recovery steadily. He denies his guilt emphatically, but officers doubt his innocence.

## BROTHER OF E. S. TOWRY DIES AT SAND SPRINGS

E. S. Towry of this city, accompanied by Mrs. Towry, D. B. Towry of Stilwell and H. N. Towry of Vian, were called to Sand Springs last Friday following receipt of a message that R. L. Towry, a brother, had been instantly killed in a serious auto accident on that day. The party made the trip overland, returning Sunday.

The brother had started several miles out of town on a loaded truck to his work, and the driver carelessly drove his truck close up to a grade crossing and attempted to stop suddenly. The truck swayed and tipped enough to throw several workmen off, injuring several and killing Towry almost instantly. The driver was arrested later, charged with reckless driving and manslaughter and is now in the Tulsa jail.

The deceased was buried Saturday, July fourth, in the city cemetery at Sand Springs. He resided in Sallisaw a short while many years back.

## PRESBYTERIAN CHURCH

A. E. Arnfield, pastor

Sunday school 9:45. Our closing assembly will be utilized as a Junior church service. All children are urged to bring a lead pencil with them. We will have a "pencil" talk for the little folks. The regular preaching service will commence at 11 o'clock. Subject "The Unfinished Task." No night service.

### COMMISSIONERS PROCEEDINGS

July 6, 1925

The board of county commissioners met pursuant to recess with all members present and transacted the following business, to-wit:

3015 Claimant Harry D. Pitchford; traveling expenses; claimed $15.25; allowed. Fund Gen.

3016 Claimant J. T. Botting; mileage to county charge; claimed $1.50; allowed. Fund Gen.

3017 Claimant Lee J. Lewis; stamps; claimed $6.00; allowed. Fund Gen.

3019 Claimant American Natl. Bank; juror fees; claimed $9.80; allowed. Fund Gen.

3020 Claimant H. D. Pitchford; traveling expenses; claimed $28.00; allowed. Fund Gen.

3021 Claimant Amer. Natl. Bank; juror fees; claimed $3.00; allowed. Fund Gen.

3022 Claimant C. M. Guy; salary for 3 1-2 days; claimed $25.00; allowed.

3023 Claimant C. M. Guy; boarding prisoners; claimed $39.00; disallowed.

3024 Claimant Bart Redman; salary; claimed $14.58; allowed. Fund Gen.

3025 Claimant Lee Jackson; salary; claimed $11.67; allowed. Fund Gen.

3026 Claimant Lee Blair; salary; claimed $14.58; allowed. Fund Gen.

3027 Claimant Geo. W. Ritter; salary; claimed $14.58; allowed. Fund Gen.

3028 Claimant Geo. W. Ritter; mileage; claimed $15.20; disallowed.

3029 Claimant J. S. Colclough; for blacksmith work; claimed $6.60; allowed. Fund Gen.

3030 Claimant J. S. Colclough; for blacksmith work; claimed $1.50; allowed. Fund Gen.

3031 Claimant First Natl. Bank; juror fees; claimed $11.80; allowed. Fund Gen.

3032 Claimant J. E. Newman; for dragging road; claimed $4.00; allowed. Fund Gen.

3033 Claimant Elmer Blaylock; for supplies; claimed $30.50; allowed. Fund Gen.

3034 Claimant First Natl. Bank; juror fees; claimed $7.00; allowed

3035 Claimant Gum Bros.; refund; claimed $58.42; allowed. Fund Gen.

3036 Claimant Lee J. Lewis; stamps; claimed $6.50; allowed. Fund Gen.

3037 Claimant First Natl. Bank; juror fees; claimed $1.90; allowed. Fund Gen.

3038 Claimant Amer. Natl. Bank; juror fees; claimed $33.90; allowed. Fund Gen.

3039 Claimant Pierce Pet. Corp.; gas and oil; claimed $49.10; allowed. Fund Gen.

3040 Claimant J. P. Montgomery; dragging road; claimed $8.00; allowed. Fund Gen.

3041 Claimant Glen S. Allen; for stamps; claimed $5.00; allowed. Fund Gen.

3044 Claimant City Natl. Bank; juror fees; claimed $22.90; allowed. Fund Gen.

3045 Claimant Glen S. Allen; any services; claimed $41.25; allowed. Fund Gen.

3046 Claimant Ross M. Hall; salary for June; claimed $90.00; allowed. Fund Gen.

3045 Claimant M. P. Boydston; for salary for June; claimed $125.00; allowed. Fund Gen.

3048 Claimant C. J. Holland; for dragging road; claimed $10.00; allowed. Fund Gen.

3047 Claimant Earnest Nimmo; damages; claimed $15.00; allowed. Fund Gen.

3046 Claimant H. D. Pitchford; for telephone bill; claimed $2.00; allowed. Fund Gen.

3049 Claimant H. D. Pitchford; for stamps; claimed $5.50; allowed. Fund Gen.

(Continued on back page)

In the District Court in and for the County of Sequoyah, State of Oklahoma

Maxine Wilson, plaintiff, vs. Omar Wilson, defendant.

State of Oklahoma, to, Omar Wilson:

You are hereby notified that Maxine Wilson did on the 30 day of June, A. D. 1925, file in the district court of Sequoyah county, State of Oklahoma, her petition for divorce, upon the grounds of gross neglect of duty, non-support and intolerable treatment; and you must answer the petition of said plaintiff on or before the 15 day of August, A. D. 1925, or said petition will be taken as true and judgment rendered accordingly.

Witness my hand and the seal of said Court on this the 30 day of June, A. D. 1925.

RAYMOND P. DRAKE, Court Clerk

FRYE & FRYE, Attys. for plaintiff.

July 3-10-17-25

## To My Patrons

I am back at my old stand east of First National Bank and am prepared to take care of your flat tires. I vulcanize tubes. Phone 384

### Frank Weaver

## Don't Endure Foot Troubles

Don't let tired, aching feet, callouses, corns, bunions, weak and broken down arches mar your comfort and happiness. Come to our Foot Comfort Department today and let our Foot Comfort Expert show you how quickly and easily you can secure your Foot Comfort through the proper fitting of shoes and Dr. Scholl's Foot Comfort Appliances.

No charge for this service.

Crooked toes?

Dr. Scholl's Toe-Flex corrects bunions by straightening crooked toes. Very comfortable. Soft rubber. 75c each.

Dr. Scholl's Zino-Pads give instant, positive relief. Remove cause — pressure and friction. Thin, antiseptic, safe. 35c per box.

Come in and get a FREE Demonstration.

### McDonald & Matthews
"We Sell Everything"

## SOCIETY
### and Local Happenings

Ben F. Garvin of Hanson ... day visitor to the big celebration ...

ATTEND big free entertainment Chautauqua tent tonight.

... and Mrs. M. C. Loggains ... Miss Alta motored to Gore ... day to spend the day with ...

STOLEN: One Pueblo shop made saddle; number 59; about half worn. Reward of $10 will be paid for return to Waite Devault's store at Marble City. C. H. BRIMMER, Marble City 2

## SUPPORT

The Legion Endowment Drive

IT IS WORTHY

Adv. No. 671

## We are S...

### CADDIES TOURNAMENT AROUSING GREAT INTEREST

A great deal of interest is being aroused by the caddies of the Sallisaw Country Club in their annual tournament now being held at the golf links west of Sallisaw.

### MARBLE CITY CITIZEN DIES

The many friends of John Cole were shocked last Sunday when it became known, that he had been called in death on Saturday, July 4. He had been ill but ten days and many friends did not know that he was seriously ill. He lived about three miles northwest of Marble City, and was one of the most highly respected citizens in that community. He left surviving him a wife, two sons, Lonnie Cole and Wiley Cole of Marble City, and two daughters, Mrs. Maude Stubbs of Pershing and Mrs. Lizzie Burrow who lives in Arizona.

Funeral services were conducted on Sunday the fifth, and the deceased was laid to his final rest in Vian cemetery.

### FINE COTTON PROSPECT

Oklahoma City, July 2—Oklahoma may exceed last year's bumper crop by approximately 15,000 bales this year, according to present indications John A. Whitehurst, president of the Oklahoma state board of agriculture, said today in the first official report for the 1925 cotton season.

More than 1,519,000 bales of cotton will be produced this year in Oklahoma. It was forecast by the division of agriculture. Last year the state produced 1,504,000 bales and in 1923 raised 985,504 bales.

## THE NEW PICTORIAL REVIEW SIMPLIFIED PRINTED PATTERNS

are perforated, notched and cut and ready for use.

## Cherry & Winter

"We Appreciate your Business"

SALLISAW, OKLA.



The man who wakes up famous hasn't been asleep.

A BANK ACCOUNT IS A PACIFYING THING

The experience of those who keep a bank account bears testimony to, this statement.

No man ever regretted anything about his account in a good bank except that the account was not larger. And when a man has an account at a good bank there is an incentive to make it grow, that he otherwise would not have.

"Ask the man who has one."



YOUR BANK CAN HELP YOU

## FIRST NATIONAL BANK IN SALLISAW
1901 — 1925

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 107**

ACCIDENT DESCRIPTION NARRATIVE

| MONTH | DAY | YEAR | 24 HOUR TIME | COUNTY | | | SHEET 1 OF 1 SHEETS |
|---|---|---|---|---|---|---|---|
| 9 | 29 | 99 | 1230 | SEQUOYAH | | REPORT NUMBER | ADMINISTRATIVE |

ON 9-29-99 AT ABOUT 1230 HRS GARY PHILPOT, SALLISAW POLICE CHIEF & MYSELF GLEN SMITHSON WERE AT THE SALLISAW CITY JAIL WATCHING SHERIFF JOHNNY PHILPOT DRESS THE GUN SHOT WOUNDS ON KENNETH BARRET THE SHOOTING SUSPECT OF TROOPER ROCKY EALES, GARY MADE THE STATEMENT TO ME THAT TROOPER EALES AFTER HE WAS KILLED LEFT A LITTLE BOY & A WIFE. I SAID YES HE HAD A LITTLE 2 YR OLD BOY & A SIX YEAR OLD GIRL, & THEY WILL NEVER REMEMBER THEIR DADDY WHEN THEY GROW UP. AT THIS TIME KENNETH BARRET SPOKE UP & SAID AS I RECALL, YEA THE WRONG PERSON GOT KILLED I WISH IT HAD OF BEEN ME. I SAID TO HIM THAT YOU ARE THE ONE THAT PULLED THE TRIGGER & PICKED YOUR TARGET HE SAID YEA BUT THEY SHOT FIRST.

END OF STATEMENT

TROOPER M. SMITH 408

GLEN SMITHSON

TROOP C

MUSKOGEE OK 7(4/0)

ACCIDENT DESCRIPTION NARRATIVE SHOULD CONSIST OF THE FOLLOWING PARTS:
1. SYNOPSIS
2. NOTIFICATION AND ARRIVAL
3. LOCATION DESCRIPTION
4. ARRIVAL AT SCENE
5. DRIVER IDENTIFIER
6. VEHICLE IDENTIFIER
7. PASSENGER STATEMENT(S)
8. WITNESS STATEMENT(S)
9. INVESTIGATION AT SCENE
10. OFFICER'S OPINION/CONCLUSION

DPS 0105-14

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

═══════════════════════════════

**EXHIBIT 108**

═══════════════════════════════

Exhs. § 2255 Motion                                    *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

5

files on our confidential informants and keep track of the money that's paid to them.

Q    How would you, for instance --

A    In the form of a receipt with a -- a signed receipt with a thumb print on it in a confidential file.

Q    Each and every payment would have such a --

A    Yes.

Q    -- receipt?  Without identifying any person by name, do you know whether or not the confidential informant that was the basis for the issuance of the search warrant used to raid Mr. Barrett's home was ever paid money through your office?

A    No.  Whoever it was was not ours, no sheriff's department informant.

Q    Do you have any knowledge of the identity of that person?

A    No, sir, I do not.  I never did.

Q    Has anyone since the time of the trial asked you if you could provide information about a particular individual, whether he be reliable or whatnot, anything of that kind?

A    In reference to this particular informant?

Q    Yes.

A    No.

Q    Now, back in our -- all of the stuff that we've received in this case, there's a reference to a time when one or more people from your office went out to Mr. Barrett's

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1216
00002403
KEB312947

6

home and inspected some weapons.

A     Uh-huh.

Q     Do you recall, generally, a reference to that?

A     I remember one specific incident where I went out.  After the officers had already been there, I arrived there.

Q     Fill me in on that instance.

A     I think the call was he was supposedly shooting out there; and if I remember right, a deputy by the name of Shelton Fare was the first officer there.  And when I got there I think another one had arrived and I don't remember who it was.  They had some firearms they were inspecting when I arrived.  Kenny was in the house and they were running the serial numbers and, in effect, looking at the guns.

Q     And was there a AR15-type weapon that was being looked at then?

A     Not that I remember, no.  I believe the one they had actually looking at when I got there was a -- I think it was an SKS or it looked like it.  I didn't inspect it.  I just saw it.

Q     Did you have any dealing with Mr. Barrett at that time?

A     Yes.  I walked up to the porch and talked to him.

Q     What do you recall about your conversation?

A     Mostly about -- some of it was about shooting.  I guess about shooting.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

00002404
KEB312948

7

Q    You were kind of telling him to calm down, that kind of thing?

A    Did I tell him to calm down?

Q    No, I don't mean calm down. I mean but to tell him to behave himself a little better as a neighbor?

A    Yeah, shooting in general around a residential area. You had to be careful and all of this stuff, and then I called his attention to a misdemeanor warrant that was outstanding on him.

Q    And what did you tell him about the misdemeanor warrant?

A    I told him there was one. And he said he was planning on going in and appearing on that and taking care of it or doing whatever. He promised me that he would.

Q    Did Mr. Barrett threaten you when you were out there?

A    No.

Q    Prior to the time that this search warrant was executed out at his place, did anybody ask you for advice concerning whether or not there might have been a different way of proceeding?

A    In the execution of the warrant?

Q    Yeah. When the task force obtained this no-knock warrant and brought in the tact team, did anybody talk with you about whether it was necessary to bring in the tact team in order to deal with Mr. Barrett?

A    It was discussed at one point before the warrant -- way

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

00002405

KEB312949

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 109**

# Forensic Training & Consulting, LLC

1544 Valley Creek Rd.                                          Ph: 940-383-8668
Denton, Texas 76205                                   E-mail: xprtwit@aol.com

March 10, 2009

David Autry
1021 NW 16th Street
Oklahoma City, OK 73106

**Re** *United States of America vs. Kenneth Barrett* **(FT&C Case # 03-5767) – Review of Testimony by Terrence Higgs and Iris Dalley**

## Introduction

I was requested to review transcripts of trial testimony by Terrence Higgs and Iris Dalley in United States vs. Kenneth Barrett. I was provided both transcripts, along with a directory of court exhibits and 4 CDs containing demonstrative exhibits used by Iris Dalley, videos of the scene and images of the scale model used at trial. This is the report of my findings concerning that review.

## Higgs testimony

My review of the testimony given by Terrence Higgs revealed some issues of minor concern, but nothing of substantive concern in my opinion. The specific issues that I would categorize as being of only minor concern are as follows:

1.  In his testimony concerning the number of shots that might have been fired by the officers' H&K MP5 9mm submachine gun, Mr. Higgs failed to point out that the MP5, according to H&K, should not be loaded to full magazine capacity due to the potential for jamming. Thus, basing the number of shots potentially fired on starting with a fully loaded magazine is unreliable unless it can be confirmed that the OSBI does not follow the H&K recommendation.
2.  In his testimony concerning ejection characteristics for fired casings, Mr. Higgs failed to mention that, from time to time, anomalous ejection paths do result. That means a weapon that typically ejects to the right, all else being equal, may occasionally eject to the left and so on.

In his testimony concerning bullet spin, Mr. Higgs gave a flawed explanation that opined that, for a time, bullet spin overcomes the effects of gravity during its flight. In response to that, I would point to the classic ballistics question: "If a bullet is fired from a weapon held parallel to the ground and at the moment that the bullet exits the muzzle, a similar bullet is dropped to the ground from the same height the gun barrel is above the ground, which bullet would hit the ground first?" The answer, of course, is that they would hit the ground at the same time

since gravity acts on them equally and neither the horizontal velocity nor the spin stabilization of the fired bullet has any effect of the force of gravity.

4. Mr. Higgs testified that he "would expect a ricochet" for bullet impact angles of 60 degrees or less. The reality is more like 20 degrees or less.

5. Mr. Higgs expressed the opinion that many examiners have historically had in regard to the production of photographs as demonstrative exhibits in firearms examinations of fired bullet and cartridge case markings (i.e. photomicrographs). I would point out, however, that many firearms examiners do produce such photographs in court contrary to the old argument that "beauty lies in the eye of the beholder".

As already stated, I consider all these statements to be of only minor concern. The majority of Mr. Higgs' testimony is very credible and forthright. I am unable to assess the validity of any of the actual comparisons of bullets/fragments and cartridge cases on the basis of this verbal testimony alone. To do so would require my access to both the bench notes of Mr. Higgs and the photographs he states he took of his comparisons, at the least, and possibly the evidence itself.

**Dalley testimony**

Based upon my review of the testimony given by Iris Dalley, there are, in my opinion, some minor issues as well as some substantive issues of concern. My specific concerns are as follows:

<u>Minor issues</u>

Ms. Dalley repeatedly uses terminology that is inappropriate both with regard to vehicular descriptions and firearms components. Specifically, these are the terms that were inappropriately used:

1. The term "front quarter panel" is used to refer to the front fender.
2. The terms "left" and "right" are used when "driver side" and "passenger side" are appropriate.
3. The term "side wall", which is a term for part of the anatomy of a tire, is used several times to describe an inner body panel on the Ford Bronco.
4. The term "projectile", typically misused by non-firearms trained individuals, is applied to anything and everything presumably responsible for impacts/perforations rather than the appropriate terms "bullet", "bullet fragment", "bullet jacket", "jacket fragment", "bullet core" and "bullet core fragment".
5. Ms/ Dalley's explanation of bullet fragmentation upon impact with glass is flawed. She states that the bullet impacts the glass, perforating it and then exiting it whereupon it fragments. The reality is fragmentation begins upon impact.
6. Ms. Dalley, by her own admission, is not a firearms examiner, but states she seeks out the assistance of firearms examiners when she has a "ballistics" question. Arguably, one can reconstruct a shooting incident without being a firearms examiner, but a basic understanding of firearms and ammunition components is

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

2

1221

essential to being able to recognize what one is viewing at a shooting scene. This lack of understanding/familiarity was exemplified when she stated that there might be some caliber similar to a 223 that could have made some of the bullet holes in the Bronco but when asked by the defense attorney for an example she could not name one.

The use of inappropriate terminology and ambiguous statements in testimony makes it difficult for anyone to understand, but particularly so for lay individuals. This is no doubt reflective of the fact that Ms. Dalley is not a trained firearms examiner and is also apparently not very well versed in vehicle component terminology. The use of incorrect terminology constitutes only a minor concern in my opinion, however.

<u>Substantive issues</u>

There are, in my opinion, a number of substantive issues with regard to both Ms. Dalley's approach to shooting incident reconstruction in general and this reconstruction in particular. These concerns are as follows:

1. From her various responses to questions from both the prosecution and the defense, it appears that Ms. Dalley did not follow widely accepted protocol used in shooting incident reconstruction. This protocol includes the following:

   a. The dimensions of the Bronco were not determined. Standard protocol involves determining, at a minimum, length, width and height of vehicles involved in shootings. Similarly, there was a question as to how wide one of the Bronco's doors was open for several shots but no measurements were taken and the explanation "the door was curved so it could not be measured" was given.

   b. Prior to inserting trajectory rods into bullet holes (or otherwise altering them), one is well advised to examine the hole margins, interior surfaces and area surrounding them for trace evidence. Ms. Dalley was specifically asked about gunshot residue around some of the bullets holes at the scene but stated "she did not see any" (pg 3399). A legitimate evaluation of areas around bullet holes for trace evidence requires close inspection with a hand lens and/or making a lift for lab testing. Likewise, the presence of blood, tissue, hair, fibers, etc. should be looked for in and around bullet holes.

   c. Whenever bullet holes appear to be symmetrical and devoid of significant distortion, the length and width of the holes should be determined using a pair of dial calipers. The width can be related to the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates. Ms. Dalley testified that she could not determine the caliber of any of the responsible bullets striking the Bronco (pg 3298). Measurement of some of the holes, based upon the photographs included in the materials received, appears to have been something that could have been reliably carried out.

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

3

1222

d.  The proper placement of trajectory rods in bullet holes in order to reliably approximate the responsible bullet trajectories requires an understanding of the characteristics of bullet penetration/perforation in a variety of substrates. This is particularly true with bullets that fragment, such as the 223 bullets in this incident. It is equally important to have sufficient experience to know when calculation of trajectories, rather than use of trajectory rods, is preferable and to know when the use of alternate means are appropriate. For trajectory rods to be a feasible method for reliably representing bullet trajectories, one needs to have a secondary impact that has not resulted from initial impact deflection and/or fragmentation. Ms. Dalley attempted to establish bullet trajectories utilizing fragment impacts into secondary targets based upon the presumption that the core (or a large fragment thereof) travels in a straight path. She correctly testified (pg 3466) that there was no way to determine the "exact path" of each bullet fragment and yet proposes that her trajectories, as represented, are "accurate".

e.  Ms. Dalley repeatedly testified that bullets passing through the "partially open" Bronco door would go "straight through" and that bullet core fragments would do likewise (it is presumed that only fragments were recovered because Ms. Dalley testified that "No, I didn't find any [fragments] consistent with being parts of a single bullet." – pg 3298). One need only recall the "magic bullet" path in the John F. Kennedy assassination to recognize the fallacy of proposing that bullets pass through intermediary target undeterred ("straight through"). The situation for bullets that fragment upon impact is even more unpredictable. In order to attempt to make her theory of bullet trajectories being unimpeded by intermediary targets fit the evidence, Ms. Dalley proposed that the door moved to various positions to account for the incongruity of the different trajectories through it (pg 3314). While such movement cannot be excluded, it is more likely that bullet deflections/fragmentation account for the trajectory variations in the door. When bullets impact surfaces with irregular contours (i.e. other than flat surfaces) deflection can and does occur with frequency.

f.  Bullet holes in vehicles and other inanimate objects and the trajectory rods placed in those bullet holes are generally referenced by two sets of coordinates (2 linear and 2 angular) in order to establish reproducible data for creating diagrams, animations, etc. that accurately represent the true trajectories (within the limits of measuring uncertainty). Ms. Dalley stated, rather amazingly, that she did not determine any of the angles because she "did not have the necessary equipment" (pg 3275). All that is required is a $30 zero base protractor and a $5 plumb bob. The primary reason for obtaining such linear and angular measurements is to be able to accurately create diagrams and animations, such as the ones Ms. Dalley prepared in this incident. Given her testimony that she took no such measurements and that she could not establish "exact paths" using

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

4

1223

trajectory rods alone, it is unclear how the diagrams and animation she produced can be perceived as having any reliability.

g.  Ms. Dalley testified that the terrain at the shooting scene could be described as "hilly" but apparently did nothing to establish the exact grade or assess the potential impact any such grade might have on the perceived trajectories of bullets striking the Bronco. At the very least, determining bullet impact angles relative to a common point of reference (plumb line) is the accepted standard.

h.  When there are holes of questionable origin, proper procedure calls for on-scene chemical testing for the presence of copper and lead to confirm that they were produced by bullets. Ms. Dalley testified to having knowledge of that type testing but did not testify that she, in fact, conducted any of it.

i.  Ms. Dalley testified that she had "no means of sequencing any of the shots" at the scene. The sequencing of shots, while certainly not always possible, can sometimes be accomplished through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets/fragments (glass, fibers, hair, paint, etc.). There was no testimony that would indicate that any of this type examination/testing was ever done, either on-scene or off-scene.

j.  In an incident involving a moving vehicle, as with the Bronco in this case, a reenactment would include physically placing the Bronco in various positions and making a determination (typically projecting a laser beam from each bullet hole of interest, where possible) as to the feasibility of the each shot coming a particular position or positions. Of particular importance in this incident are the shots that occurred after the Bronco came to a stop. While Ms. Dalley testified that the Bronco had been moved to another position prior to her arrival, she also testified that there were tire impressions and a fluid deposit in the soil in front of the cabin that could have been used to reestablish the position before moving.

2.  Ms. Dalley's approach to establishing the trajectory of bullet holes through the cabin window glass, blinds and curtain ("towel") and the Bronco windows was inappropriate. She testified that her results were unreliable for the cabin window part of her analysis (pg 3389).

a.  She had someone hold the trajectory rod rather than set up a tripod and place the laser on the tripod.

b.  She took no measurements of the hole locations.

Her methodology, as she testified to it, of placing a hand-held laser into bullet holes in the Bronco window glass is equally flawed since it presumes no deflection resulted from either the impacts or the fragmentation.

3.  Ms. Dalley testified that she concluded that, not "seeing" any evidence of gunshot residue on the cabin window that was shot through, that the distance of the muzzle would have been "greater than 3 feet" from the glass because that distance has been reported in forensic literature. That testimony was an apparent reference to a general rule of thumb that varies considerably from weapon to weapon and is also dependent upon the particular ammunition used. The correct evaluation of maximum muzzle to target distance would require test firing into glass like that at

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

5

the scene using the incident weapon and ammunition like that used to produce the bullet holes in question.

4. Ms. Dalley testified that she did not attempt to locate any bullets/fragments in the soil. A metal detector should have been used to attempt to locate any bullets/fragments in the soil.

5. Ms. Dalley testified that she did not attempt to collect all of the bullets/fragments inside the Bronco. According to generally accepted protocol in shooting incident reconstruction, all shots need to be accounted for when possible. The location and recovery of bullets/fragments is an essential aspect of that endeavor.

6. Ms. Dalley testified that she concluded that the bullet wound to Trooper Eales' right arm had to take place after he exited the Bronco because of "the absence of tissue inside the Bronco" and the fact that tissue appeared to be missing in the area of the arm wound. She did not, however, testify to finding any tissue outside the Bronco. She did not indicate that she ever attempted to locate tissue outside the Bronco. One way to test for it would have involved spraying luminol on the ground in the area around the Bronco. That apparently was not done. Furthermore, one of the cornerstones of forensic science is "Absence of evidence is not evidence of absence." That refers to the fact that not finding evidence cannot be used to conclude anything other than that no evidence was found. That statement is attributed to one of Ms. Dalley's own colleagues, well-known bloodstain pattern analyst Herbert Leon MacDonnel of Corning, New York.

In summary, Ms. Dalley's testimony indicates that she did not follow accepted protocol in the evaluations she conducted at the shooting scene. Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation. In order to confirm this apparent failure to follow appropriate protocol, it would be necessary to have access to Ms. Dalley's field notes, photographs and other supporting documents in this matter.

These opinions are based upon my 35 years experience as a firearms examiner and shooting reconstruction expert, my independent research in the area of shooting incident reconstruction and specialized training that I have received in firearms, firearms-related issues and shooting incident reconstruction as reflected in my attached curriculum vitae.

Edward E. Hueske
Consulting Forensic Scientist

*Note: The opinions expressed herein are based upon the information that was available at the time of this writing. Should new or different information be forthcoming, the right to modify these opinions accordingly is hereby reserved.*

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

6

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

═══════════════════════════════

**EXHIBIT 110**

═══════════════════════════════

# CURRICULUM VITAE

**Phone: (940) 383-8668**     Edward E. Hueske     **Fax: (940) 383-8668**
**E-mail:** xprtwit@aol.com                        **www.edhueske.com**

Present Positions:

- Director, Forensic Training & Consulting, LLC since 1997
- Lecturer/Criminalistics Program Coordinator, University of North Texas, since 1999

Former Positions:

- Instructor of Chemistry, Blinn College, Brenham, Texas 1970-1974
- Assistant Laboratory Director, Fort Worth Police Department, 1974-1983
- Adjunct Instructor of Chemistry, Weatherford College, Weatherford, Texas 1976-1980
- Adjunct Instructor of Criminal Justice, University of Texas at Arlington, 1980-1983
- Supervising Criminalist, Arizona Department of Public Safety, 1983-1996 (retired)
- Adjunct Instructor of Police Science, Northern Arizona University, 1984-1994
- Firearms Examiner, Tulsa Police Department, Tulsa, Oklahoma 1996-1997
- Adjunct Instructor of Police Science, Tulsa Community College, 1997
- Laboratory Manager, Weckerling Scientific Laboratories, Carrollton, Texas 1997-1998
- Criminalist, Forensic Consultant Services, Fort Worth, Texas, 1998-1999

Formal Education:

- B.S., Chemistry, Sam Houston State University, 1968
- M.A., Chemistry, Sam Houston State University, 1971

Special Courses Attended:

- *DEA Forensic Chemist Seminar,* McLean, Virginia, 1975 (40 hrs)
- *FBI Glass Analysis Course,* Quantico, Virginia, 1976 (40 hrs)
- *Applied Molecular Spectroscopy,* Arizona State University, Tempe, Arizona, 1977 (40 hrs)
- *ATF Arson Residue Analysis Course,* Rockville, Maryland, 1980 (40 hrs)
- *FBI Gunshot Residue Analysis Course,* Quantico, Virginia, 1981 (40 hrs)
- *Ballistics and Handloading Course,* Trinidad State College, Trinidad, Colorado, 1982 (40 hrs)
- *Polarized Light Microscopy,* McCrone Institute, Austin, Texas, 1982 (40 hrs)
- *FBI Instrumental Analysis of Paints and Polymers Course,* Quantico, Virginia, 1983 (40 hrs)
- *FBI Symposium on Footwear and Tire Tread Examination,* Quantico, Virginia, 1984 (40 hrs)
- *X-Ray Fluorescence Class,* Tracor Corporation, Flagstaff, Arizona, 1985 (8 hrs)
- *FBI Specialized Techniques in Firearms Identification Course,* Quantico, Virginia, 1987 (40 hrs)
- *Ruger Police Armorer's Course,* Phoenix Police Academy, Phoenix, Arizona, 1987 (40 hrs)
- *Crime Scene Reconstruction Class,* Dr. Henry Lee, Scottsdale, Arizona, 1988 (8 hrs)
- *AFTE Glock Armorer's Class,* Virginia Beach, Virginia, 1989 (8 hrs)
- *AFTE Remington 1100 Service Class,* Houston, Texas, 1991 (8 hrs)
- *Photomicrography Class,* Leitz Corporation, Phoenix, Arizona, 1991 (8 hrs)
- *Crime Scene Photography,* Flagstaff, Arizona 1992 (8 hrs)
- *Wound Ballistics Class,* Dr. Martin Fackler, Glendale, Arizona, 1992 (8 hrs)
- *Blood Spatter Interpretation and Crime Scene Reconstruction,* Scottsdale, Arizona, 1993 (16 hrs)
- *FBI Footwear and Tire Tread Examination Seminar* (presenter), Quantico, Virginia, 1994 (40 hrs)
- *SWAFS Shooting Reconstruction Class,* Colorado Springs, Colorado, 1995 (8 hrs)
- *SWAFS Lamp Bulb Examination Class,* Colorado Springs, Colorado, 1995 (8 hrs)

1

- *Accident Reconstruction and Low-Speed Crash Evaluation,* Texas A&M University, 1996 (16 hrs)
- *Bloodstain Pattern Analysis in Violent Crimes,* University of North Texas, 2000 (40 hrs)
- *Recovery of Buried Remains,* University of North Texas, 2001 (16 hrs)
- *Bloodstain Pattern Analysis in Crimes of Violence – Pt. II,* University of North Texas, 2002 (40 hrs)
- *Blood Wipes, Swipes & Other Patterns,* IAI Training Seminar, Boston, MA, 2006 (2 hrs)
- *Preparation of Demonstrative Exhibits for Bloodstain Pattern Analysis,* IAI Training Seminar, Boston, MA, 2006 (10 hrs)
- *Microscopical Approach to Trace Evidence in Shootings,* AAFS, Denver, CO, 2009 (8 hrs)

Professional Affiliations:

- Fellow of the American Academy of Forensic Sciences
- Distinguished Member of the Association of Firearm and Tool Mark Examiners
- Emeritus Member of the Southwestern Association of Forensic Scientists
- Emeritus Member of the American Society of Crime Laboratory Directors
- Member of the International Association of Bloodstain Pattern Analysts

Papers Presented :

- "Developing Regional Lab-User Agency Communication," Southern and Southwestern Assns. of Forensic Scientists, Baton Rouge , Louisiana, 1986
- "Mikrosil Casting in Firearms Examinations," Assn. of Firearm and Tool Mark Examiners, Houston, Texas, 1991
- "The Jennifer Wilson Homicide: A Study in Trace Evidence," SW Assn. of Forensic Scientists, Tucson, Arizona, 1991
- "The Use of Videomicroscopy in Footwear Comparisons," Southern and Southwestern Assns. of Forensic Scientists, Shreveport, Louisiana, 1992
- "The Reconstruction of a Double Homicide near Ashfork, Arizona," SW Assn. of Forensic Scientists, South Padre Island, Texas, 1993
- "Gunshot Residue Testing of Blood Stained Garments," SW Assn. of Forensic Scientists, South Padre Island, Texas, 1993
- "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," Southern and Southwestern Assns. of Forensic Scientists, Little Rock, Arkansas, 1994
- "The Application of Videomicroscopy to Footwear Identification," International Symposium on Footwear/Tire Tread Identification, FBI Academy, Quantico, Virginia, 1994
- "Footwear/Tire Tread Identification-The Northern Arizona Perspective," International Association for Identification, Phoenix, Arizona, 1994
- "The Application of Videomicroscopy to Footwear Identification," International Association for Identification, Phoenix, Arizona, 1994
- "A Bizarre Homicide," SW Assn. of Forensic Scientists, Houston, Texas, 1995
- "The Portable Scopeman-A Powerful New Crime Scene Tool," SW Assn. of Forensic Scientists, Fort Worth, Texas, 1996
- "Defense Experts- The Good, The Bad, and The Ugly," Texas Criminal Defense Lawyers Assn., El Paso, Texas, 1998
- "Forensic Science for the Prosecution and the Defense," University of Texas Law School, 2000
- "The Defense of Shawn Berry," Louisiana Criminal Defense Lawyers Association, Lafayette, Louisiana, 2000
- "The Defense of Shawn Berry," University of Texas Law School, 2000
- "Private Forensic Labs – The Good, The Bad and The Ugly," International Conference of the American Society for Industrial Security, 2001
- "Bloodstain Pattern Interpretation," Oklahoma City University Law School, 2002
- "Crime Scene Deconstruction-Reconstruction," Oklahoma City University Law School, 2002
- "Re-Examination of Physical Evidence – A Defense Perspective," American Academy of Forensic Science Annual Conference, Dallas, Texas, 2004
- "Shooting Incident Reconstruction," 8th Annual Public Defender Retreat, Las Vegas, NV, 2008

2

Specialized Forensic Classes Taught:

(List of classes taught from 1984-1998 is available upon request)

- *Shooting Reconstruction,* El Paso Police Department, 1999 (40 hrs)
- *Shooting Reconstruction,* Prince William County Police Training Center, Nokesville, Va.,1999 (40 hrs)
- *Shooting Reconstruction,* Florida Dept. of Law Enforcement, Pensacola, Fla., 1999 (24 hrs)
- *Shooting Reconstruction,* Salt Lake Co. Sheriff's Training Center, Salt Lake City, Ut., 1999 (24 hrs)
- *Shooting Reconstruction,* Tri-County Police Training Center, Fergus Falls, Minn., 1999 (24 hrs)
- *Clandestine Drug Lab Investigation,* Tarrant Co. (TX) Drug Task Force, Cleburne, Tx., 1999 (24 hrs)
- *Blood Spatter Interpretation,* Arlington Police Training Center, Arlington, Texas, 1999 (24 hrs)
- *Advanced Homicide Investigation,* Turkish National Police, Ankara, Turkey, 1999 (40 hrs)
- *Advanced Homicide Investigation,* Turkish National Police, Istanbul, Turkey, 1999 (40 hrs)
- *Shooting Reconstruction,* Gastonia Police Training Center, Gastonia, N.C., 1999 (24 hrs)
- *Shooting Reconstruction,* Tallahassee Police Department, Tallahassee, Florida, 1999 (24 hrs)
- *Shooting Reconstruction,* Tri-Cities Police Academy, Richardson, Texas, 1999 (24 hrs)
- *Shooting Reconstruction,* West Palm Beach Co. Sheriff, West Palm Beach, FL, 2000 (24 hrs)
- *Crime Scene Investigation,* Office of the Attorney General , Guatemala City, Guatemala, 2000 (40 hrs)
- *Officer –Involved Shooting Incidents,* University of North Texas, Denton, Texas, 2000 (16 hrs)
- *Advanced Shooting Reconstruction,* University of North Texas, Denton, Texas, 2000 (24 hrs)
- *Shooting Reconstruction,* Las Vegas Metro Police Department, Las Vegas, Nevada, 2000 (24 hrs)
- *Advanced Shooting Reconstruction,* West Palm Beach Police Department, Florida, 2000 (24 hrs)
- *Shooting Reconstruction,* East Texas Police Academy, Kilgore, Texas 2000 (24 hrs)
- *Shooting Reconstruction/Adv. Shooting Reconstruction,* NYPD, New York City, New York, 2000 (48 hrs)
- *Shooting Reconstruction,* Grossmont College, San Diego, California, 2000 (24 hrs)
- *Advanced Crime Scene Investigation/Reconstruction,* University of North Texas, Denton, Texas, 2000 (40hrs)
- *Shooting Reconstruction,* Suffolk County Crime Lab, Hauppauge, New York, 2000 (40 hrs)
- *Shooting Reconstruction,* Missouri State Police Academy, Columbia, Missouri, 2001 (24 hrs)
- *Shooting Reconstruction,* Bannock County Sheriff's Office, Pocatello, Idaho, 2001 (40 hrs)
- *Shooting Reconstruction,* Syracuse Police Department, Syracuse, New York, 2001 (40 hrs)
- *Shooting Reconstruction,* Federal Bureau of Investigation, Dallas, Texas 2001 (40 hrs)
- *Shooting Reconstruction,* Washington Metropolitan Police, Washington, D.C., 2001 (24 hrs)
- *Shooting Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2001 (24 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Northwestern University, Chicago, 2001 (40 hrs)
- *Footwear/Tire Tread Evidence,* Metropolitan Police Department, Washington, D.C., 2001 (24 hrs)
- *Officer-Involved Shootings,* Baton Rouge Police Department, Baton Rouge, Louisiana, 2001 (16 hrs)
- *Officer-Involved Shootings,* East Texas Police Academy, Kilgore, Texas, 2001 (16 hrs)
- *Bio-Terrorism,* Kimberly-Clark Corporation, Dallas, Texas, 2001 (4 hrs)
- *Advanced Shooting Reconstruction,* East Texas Police Academy, Kilgore, Texas, 2001 (24 hrs)
- *Shooting Reconstruction,* Santa Barbara County Sheriff's Office, Santa Barbara, California, 2002 (24 hrs)
- *Bio-Terrorism,* Solutions 2000, Austin, Texas, 2002 (8 hrs)
- *Gunpowder and Primer Residues,* University of North Texas, Denton, Texas, 2002 (40 hrs)
- *Advanced Shooting Reconstruction,* University of North Texas, Denton, Texas, 2002 (24 hrs)
- *Shooting Reconstruction,* Metropolitan Police Department, Washington, D.C., 2002 (total of 72 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Northwestern University, Chicago, 2002 (40 hrs)
- *Shooting Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2002 (24 hrs)
- *Shooting Reconstruction,* Federal Bureau of Investigation, Dallas, Texas 2002 (40 hrs)
- *Shooting Reconstruction,* El Paso Police Department, El Paso, Texas 2002 (40 hrs)
- *Tool Mark Comparison,* Centre of Forensic Science, Toronto, Ontario, Canada, 2002 (40 hrs)
- *Shooting Reconstruction,* Sioux Falls Police Department, Sioux Falls, South Dakota, 2002 (40 hrs)

3

Specialized Classes Taught (continued):

- *Footwear/Tire Tread Evidence,* East Texas Police Academy, Kilgore, Texas, 2002 (24 hours)
- *Crime Scene Analysis/Reconstruction,* East Texas Police Academy, Kilgore, Texas, 2002 (24 hours)
- *Shooting Incident Analysis/Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2003 (48 hours)
- *Shooting Incident Reconstruction,* St. Louis County Police Academy, St. Louis, MO, 2003 (24 hours)
- *Crime Scene Analysis/Reconstruction,* NYPD, New York, New York, 2003 (24 hours)
- *Bloodstain Pattern Analysis in Crimes of Violence,* NYPD, New York, New York, 2003 (24 Hours)
- *Advanced Trajectory Analysis,* Special Investigations Unit, Mississauga, Ontario, Canada, 2003 (24 hours)
- *The Abuse and Sexual Assault of Children,* East Texas Police Academy, Kilgore Texas, 2003 (16 hours)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2003 (40 hours)
- *Gunpowder & Primer Residues in Distance Determination,* Denton County Sheriff's Training Center, Denton, Texas, 2003 (40 hours)
- *The Analysis/Reconstruction of Crimes of Violence,* UNT Police Academy, Denton, Texas, 2003 (24 hours)
- *Advanced Trajectory Analysis,* UNT Police Academy, Denton, Texas, 2003 (24 hours)
- *Shooting Incident Reconstruction,* Charlotte-Mecklenburg Regional Police Training Center, Charlotte, NC, 2003, (40 hours)
- *Shooting Incident Reconstruction,* Nashville Metro Police Academy, Nashville, Tennessee, 2003 (40 hours)
- *The Investigation of Officer-Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2003 (40 hours)
- *Gunpowder & Primer Residues in Distance Determination,* San Diego Police Department, San Diego, CA, 2003 (40 hours)
- *Crime Scene Analysis/Reconstruction,* Florida Public Defenders Association, Ft. Lauderdale, FL, 2003 (16 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* St. Louis Cty. P.A., St. Louis, MO, 2004 (40 hrs)
- *The Investigation of Officer Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2004 (24 hours)
- *Gunpowder & Primer Residues in Distance Determination,* NYPD New York, New York, 2004 (40 hours)
- *Crime Scene Photography,* St. Louis County Police Academy, St. Louis, MO, 2004 (24 hours)
- *Advanced Trajectory Analysis,* St. Louis County Police Academy, St. Louis, MO, 2004 (24 hours)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2004 (40 hours)
- *Shooting Reconstruction Techniques,* Texas Rangers Annual Conference, Cypress, Texas, 2004 (4 hours)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2004 (40 hours)
- *Forensic Photography,* East Texas Police Academy, Kilgore, Texas, 2004 (24 hours)
- *Crime Scene Analysis/Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2004 (24 hours)
- *The Investigation of Officer Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2004 (24 hours)
- *Shooting Reconstruction/Officer-Involved Shootings,* Sioux Falls Police Dept. , Sioux Falls, SD, 2004 (40 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Lewis & Clark Co. S.O., Helena, MT, 2004 (40 hrs)
- *Analysis/Reconstruction of Violent Crimes,* St. Louis Co. Reg. Police Academy, St. Louis, MO, 2005 (40 hrs)
- *Investigating Officer-Involved Shootings,* Natick Police Department, Natick, MA, 2005 (16 hrs)
- *Advanced Shooting Incident Reconstruction,* Suffolk Co. Crime Lab, Hauppague, NY, 2005 (24 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2005 (40 hours)
- *Sexually-Related Violent Crime,* Texas Rangers Annual Conference, Spring, Texas, 2005 (4 hrs)
- *Introduction to Shooting Reconstruction,* Texas DPS Training Academy, Austin, Texas, 2005 (24 hrs)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2005 (40 hours)
- *Introduction to Shooting Reconstruction,* Minneapolis Police Dept., Minneapolis, WI, 2005 (40 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Mississippi State Crime Lab, Jackson, MS 2005 (40 hrs)
- *Processing Violent Crime Scenes,* Federal Bureau of Investigation, Dallas, Texas, 2005 (8 hours)

4

- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Texas DPS Training Academy, Austin, Texas, 2005 (40 hrs)
- *Introduction to Shooting Reconstruction,* Charlottesville PD, Charlottesville, Virginia, 2005 (24 hrs)
- *Homicide Investigation,* Texas DPS Training Academy, Austin, Texas, 2005 (8 hours)
- *Introduction to Shooting Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2006 (24 hrs)
- *Advanced Shooting Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2006 (24 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings ,*St. Louis Co. Police Academy, St. Louis, MO, 2006 (40 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Austin Police Academy, Austin, TX, 2006 (40 hrs)
- *Footwear/Tire Tread Evidence, ,* Austin Police Academy, Austin, TX, 2006 (24 hrs)
- *The Analysis & Reconstruction of Violent Crimes,* Austin Police Academy, Austin, TX, 2006 (24 hrs)
- *Introduction to Bloodstain Pattern Analysis,* Dallas Police Academy, Dallas, TX, 2006 (24 hrs)
- *Advanced Shooting Reconstruction,* East Texas Police Academy, Kilgore, TX, 2006 (24 hrs)
- *Special Topics in Shooting Reconstruction,* Texas Rangers In-Service Training Conference, Austin, TX, 2006 (4 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2006 (40 hours)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Garland PD, Garland, TX, 2007 (40 hrs)
- *Special Topics in Shooting Reconstruction,* NYPD, Jamaica, Queens, NY, 2007 (24 hours)
- *The Analysis & Reconstruction of Violent Crimes,* NYPD, Jamaica, Queens, NY, 2007 (24 hours)
- *Shooting Incident Reconstruction,* Madison PD, Madison, WI, 2007 (24 hrs)
- *Shooting Incident Reconstruction,* Chatauqua County Sheriff's Office, Mayville, NY, 2007 (40 hrs)
- *Shooting Incident Reconstruction,* Texas DPS Training Academy, Austin, TX, 2007 (40 hours)
- *Advanced Shooting Reconstruction,* Texas DPS Training Academy, Austin, TX, 2007 (40 hours)
- *Shooting Reconstruction/Officer-Involved Shootings ,*St. Louis Co. Police Academy, St. Louis, MO, 2007 (40 hrs)
- *Advanced Shooting Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2007 (24 hrs)
- *Fracture Match Identification,* St. Louis Co. Police Academy, St. Louis, MO, 2007 (16 hrs)
- *Advanced Shooting Incident Reconstruction,* Vancouver P.D., Vancouver, WA, 2008 (40 hrs)
- *Advanced Shooting Incident Reconstruction,* Texas Tech Univ. Inst. of Forensic Sci., 2008 (24 hrs)
- *Crime Scene Analysis & Reconstruction,* East Texas Police Academy, Kilgore TX, 2008 (24 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2008 (40 hours)
- *Introduction to Crime Scene photography, ,* East Texas Police Academy, Kilgore TX, 2008 (16 hrs)
- *Shooting Incident Reconstruction,* New Hampshire State Police, Concord, NH, 2008 (40 hrs)
- *Advanced Shooting Incident Reconstruction, ,* New Hampshire State Police, Concord, NH, 2008 (24 hrs)
- *Shooting Incident Reconstruction,* Clackamus Co. Sheriff's Office, Oregon City OR, 2008 (40 hrs)
- *Crime Scene Analysis & Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2008 (24 hrs)
- *Fracture Match Identification,* St. Louis Co. Police Academy, St. Louis, MO, 2008 (16 hrs)
- *Shooting Incident Reconstruction,* Texas DPS Training Academy, Austin, TX, 2008 (24 hrs)
- *Advanced Shooting Reconstruction,* Texas DPS Training Academy, Austin, TX, 2008 (24 hrs)
- *Officer-Involved Shooting Investigation,* Minneapolis Police Dept., Minneapolis, MN, 2008 (24 hrs)

Academic classes:

I am a full time faculty member of the department of criminal justice at the University of North Texas and regularly teach the following undergraduate classes and coordinate the criminalistics certificate program at the university:

- CJUS 3330 – Introduction to Criminalistics
- CJUS 4360 – Criminal Investigation
- CJUS 4370 – Advanced Criminalistics I

5

- CJUS 4380 – Advanced Criminalistics II
- CJUS 4390 – Crime Scene Investigation

Additionally, I teach the following graduate classes on a rotating basis, each year:

- CJUS 5800 – Crime Scene Reconstruction
- CJUS 5800 – Bloodstain Pattern Analysis
- CJUS 5800 – Shooting Incident Reconstruction
- CJUS 5900 – Directed Studies (graduate research projects conducted under my supervision)

Publications:

- "Reaction of Azobenzene with Triphenylphosphine," co-authored with R.E. Humphrey, *Journal of Organic Chemistry*, 1971
- "A Procedure for the Isolation and Identification of LSD in a Single Dosage Unit (The Microdot Tablet)," *Microgram*, 1976
- "A Comparison of Decomposition Products from Selected Burned Materials with Common Arson Accelerants," co-authored with R.W. Clodfelter, *Journal of Forensic Sciences*, 1977
- "An Examination of Selected Automobile Rubber Bumper Guards," co-authored with R.W. Clodfelter, *Journal of Forensic Sciences*, 1977
- "Techniques for Extraction of Spermatozoa from Stained Clothing: A Critical Review," *Journal of Forensic Sciences*, 1977
- "Tannic Acid as a Field Test for Caffeine," *Microgram*, 1982
- "Toy Store Bomb Paraphernalia," *AFTE Journal*, 1984
- "Forensic Aspects of Shotshell Buffers," *AFTE Journal*, 1984
- "Enhancement of Footwear Impressions on Glass," co-authored with R.A. Erfert, *SWAFS Journal*, 1985
- "Stripping of Lead Bullets in a Browning High Power Pistol," *AFTE Journal*, 1988
- "The Browning of Firearms Serial Numbering System," *AFTE Journal*, 1988
- "An Anti-Splashback Lid for Water Traps," *AFTE Journal*, 1988
- "A Preliminary Report on the Application of Fiber-Optic Videomicroscopy to Firearm and Tool Mark Examination," *AFTE Journal*, 1990
- "Class Characteristics of Mossberg C-Lect-Choke Barrels with Factory Porting," *AFTE Journal*, 1990
- "The Examination of Goodyear Neolite Cowboy Walking Boot Heels," *SWAFS Journal*, 1992
- "The Application of Fiber-Optic Videomicroscopy to Firearm and Tool Mark Examination- A Further Look," *AFTE Journal*, 1993
- "Calculation of Trajectory Angles Using an Inexpensive Angle Gauge," *AFTE Journal*, 1993
- "Gunshot Residue Testing of Blood Stained Garments," *AFTE Journal*, 1993
- "Gunshot Residue Testing of Blood Stained Garments," *SWAFS Journal*, 1994
- "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," co-authored with B.M. Courtney, *SWAFS Journal*, 1994
- "The Portable Scopeman- A Powerful New Crime Scene Tool," *SWAFS Journal*, 1996
- "Some Observations on Blood Back-Spatter," *SWAFS Journal*, 1997
- "A New and Economical Forensic Light Source for Crime Scene and Laboratory Use," *SWAFS Journal*, 2003
- "Recognition and Documentation of Bullet Ricochet Characteristics and Predicting Directionalities," *SWAFS Journal*, 2003
- "A Compact Laser Protractor and its Use in Shooting Reconstruction," *SWAFS Journal*, 2004
- "Estimation of Caliber for Distorted Bullets," *SWAFS Journal*, 2004
- "Determination of Lateral Angles for Bullet Holes in Windshields," *SWAFS Journal*, 2005
- "Making Knife Blade Test Impressions," *SWAFS Journal*, 2007
- "A Simplistic Approach to Demonstrative Evidence in Complex Shootings", *SWAFS Journal*, 2008
- "Pseudo-HVIS: An Empirical Study", *SWAFS Journal*, publication pending
- "A Comparison of Some Selected 00 Buckshot Pellet Patterns", *AFTE Journal*, publication pending
- "Some Thoughts on Accreditation, Certification and Bad Behavior in Crime Labs", *SWAFS Journal*, publication pending

6

Books Contributed To/Written:

- Mozyani, A. and Noziglia, C., "The Forensic Laboratory Handbook" (chapter on Firearm/Tool Mark identification), Humana Press: New Jersey, 2005 (revised 2009)
- Hueske, E.E., "The Analysis and Reconstruction of Shooting Incidents", CRC Press/Taylor & Francis: Boca Raton, 2006
- Hueske, E.E., "Fingerprints and Firearms", Essentials of Forensic Science Series, Facts on File: New York, 2009

Training Videos Written/Produced (Through the Law Enforcement Training Network of Carrollton, Texas, 2002-03):

- "Bloodstain Pattern Analysis I"
- "Bloodstain Pattern Analysis II"
- "Blood Spatter in Shooting Incidents"
- "Bloodstain Evidence Documentation"
- "The Proper Use of Trajectory Rods"
- "Bullet Ricochet Phenomena I"
- "Bullet Ricochet Phenomena II"
- "Finding Invisible Footwear Impressions at Crime Scenes"
- "Photographing & Casting Impression Evidence"
- "Tire Tread Evidence Deductions"
- "Producing Test or Elimination Impressions"
- "The Use of Gunshot Residue in Distance Determinations"
- "Cartridge Case Ejection Pattern Testing"

Professional Offices Held:

Association of Firearm and Tool Mark Examiners:

- Reviewer for *AFTE Journal*, 1989-present

Southwestern Association of Forensic Scientists:

- Program Chairman, 1984
- Member, Board of Directors, 1986-1988
- Chair of Professional Development, 1988-1990
- *SWAFS Journal* Editor, 1988-1992
- President, 1993-1994
- Chairman, Board of Directors, 1994-1995
- Fall Meeting Workshop Chair, 1993

American Society of Crime Lab Directors:

- Member, Board of Directors, 1986-1989
- Chair, Publication Committee, 1986-1987
- Chair, Membership Committee, 1987-1989
- Laboratory Accreditation Inspector, 1987-1995
- Laboratory Accreditation Board Member, 1996
- Forensic Science Operations and Program Committee, 1988-1991
- Member, Management Committee, 1992-1994
- Chair, Crime Scene Investigation Standards Committee, 1996

7

Advisory Board Membership

- 2004 served as a member of the NYPD Laboratory Accreditation Advisory Board
- 2006-2007 served as a member of the Crime Laboratory Review Board for the Houston Police Department

Awards/Honors:

- "Distinguished Member Award," AFTE, 1988
- "James Zotter Award," SW Assn. of Forensic Scientists, 1991, ("For Outstanding Dedication and Contributions to the SW Association of Forensic Scientists and Forensic Science.")
- "Best Technical Paper," Southern and SW Assns. of Forensic Scientists, 1992, "The Use of Videomicroscopy in Footwear Comparisons"
- "Best Technical Paper," SW Assn. of Forensic Scientists, 1993, "The Reconstruction of a Double Homicide near Ashfork, Arizona"
- "Best Technical Paper," Southern and SW Associations of Forensic Scientists Joint Conference, 1994, "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," co-authored with Max Courtney
- Awarded Emeritus status in the American Society of Crime Laboratory Directors, 1996
- Awarded Emeritus status in the Southwestern Association of Forensic Scientists, 1996
- Co-recipient of the annual MLK Award for Community service in 2007 for work done on the Houston Crime Lab project
- Co-recipient of award for "Top 10 Books for Youth" for 2009 for "Fingerprints & Firearms"

8

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 111**

---

03/12/2009 THU 14:46 FAX 918 248 5026 OIDS CTT ⊠002/004

## DECLARATION OF STEVE LEEDY

I, Steve Leedy, declare as follows:

I am an investigator with the Capital Trial Division of the Oklahoma Indigent Defense System, Sapulpa office. I was one of the investigators assigned to assist John Echols and other defense counsel in the state trials of Kenneth Eugene Barrett. I was assisted by investigator Jack Stringer, also of this office. Before Mr. Barrett's first state trial, Mr. Echols had an "outside" mitigation investigator named Roseann Schaye. It is my understanding that she did mitigation work-up, and exhausted the funds that had been made available to her by OIDS. Ms. Schaye requested additional funding to continue her investigation, but it was not approved. I retrieved her work product, which included life history documents such as school, medical, psychiatric, employment, birth, marriage, and divorce records.

Mr. Stringer and I are former law enforcement officers. I'm not a mitigation expert. Before and during Mr. Barrett's first and second state trials, his attorneys and Mr. Stringer and I investigated guilt/innocence issues. I am generally aware that a proper mitigation investigations entails compiling a complete social and background history on the defendant and his family. I reviewed documents and reports in the file Ms. Schaye provided. I conducted some interviews for the purpose of mitigation.

I am familiar with the fact that John Echols, who was lead counsel for Mr. Barrett in his state case, was appointed to represent him in federal court.

1

1236

At some point, Mr. Echols withdrew. At the OIDS Sapulpa office, we possessed the investigative file that had been compiled with respect to Mr. Barrett's state case. This included, among other things, reports of interviews I did, reports of interviews Mr. Stringer conducted, the reports that had been done by mitigation investigator Roseann Schaye, as wells as records she retrieved, including from Eastern State Hospital, the Bill Willis Community Health Center, and Wagoner Community Hospital concerning Mr. Barrett. I had learned that Roger Hilfiger became lead counsel. During the time Mr. Hilfiger represented Mr. Barrett in federal court, I don't recall being contacted by him. The OIDS investigative file I referred to above remained at the OIDS office, and was not picked up by either Mr. Hilfiger or his staff who worked on Mr. Barrett's federal case. This file was retrieved in I believe 2008 by David Autry, one of Mr. Barrett's current lawyers.

OIDS Capital trial investigators are salaried employees and as a part of our employment do not work on federal trial cases and did not work on Mr. Barrett's 2005 federal trial. I don't recall statements from individuals to the effect that Mr. Barrett had stated repeatedly, or even stated, that he would "go out in a blaze of glory" if the police tried to raid his property. If that statement was made we would have confronted such witnesses at Mr. Barrett's state trial, and a thorough investigation into the records, character, background and reputations of each such witness.

2

1237

The information detailed in the preceding paragraph was related by me to one of Mr. Barrett's current attorneys and an investigator currently working on Mr. Barrett's federal case. I have carefully reviewed the contents of this declaration.

I declare under penalty of perjury that the foregoing declaration is to the best of my recollection true and correct.

Executed by me this _12_ day of March, 2009, in ___*Creek*_____ County, Oklahoma.

Steve Needy

3

1238

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,   )
           )
       *Plaintiff,*   )
           )
v.           )     **Case No. 6:04-CR-00115-JHP-SPS**
           )
KENNETH EUGENE BARRETT,   )
           )
      *Defendant.*   )

---

**EXHIBIT 112**

---

Declaration of LAUREN COHEN BELL, Ph.D., regarding sentencing dynamics in federal death penalty cases.

1. I am currently Associate Professor of Political Science and Associate Dean of the College at Randolph-Macon College in Ashland, Virginia, where I have been a faculty member since September 1999. Among the subjects I teach are public policy, judicial process, constitutional law, and research methodology.

2. In my research, I regularly perform quantitative analysis of data and rely on the Statistical Package for the Social Sciences (SPSS) to organize and analyze such data. The use of quantitative analysis in social science and the use of SPSS in particular is an integral part of the research methodology course I teach. I have authored or coauthored a total of 21 books, book chapters, and peer-reviewed articles and have presented nearly 30 academic papers at scholarly meetings. I am a member of the editorial board of *Justice System Journal* and a regular manuscript reviewer for *American Politics Research,* Routledge Publishers, *Journal of Politics*, Congressional Quarterly Press, Longman Publishers, Cambridge University Press, *Law and Society Review, American Journal of Political Science, Justice System Journal, Judicature, Political Studies Quarterly,* and *PS: Political Science and Politics.*

3. Between August 2006 and August 2007, I served as one of four United States Supreme Court Fellows. I was posted at the U.S. Sentencing Commission where I worked closely with the Office of Research and Data on the design and implementation of the Commission's 2007 study of the effect of minor offenses on the calculation of offenders' criminal history scores.

4. I hold Masters and Ph.D. degrees in political science from the University of Oklahoma's Carl Albert Congressional Research and Studies Center. A copy of my *curriculum vitae* is attached.

5. I have been asked to conduct an analysis of federal capital prosecutions focusing on the dynamics of death sentencing in cases involving white victims in comparison with the dynamics of death sentencing in cases not involving white victims.

6. In order to conduct these analyses, I was provided with data maintained by Kevin McNally on behalf of the Federal Death Penalty Resource Counsel Project. I used SPSS to create a database of 403 cases authorized and completed as capital prosecutions by the U.S. Department of Justice between 1989 and August 2008. For purposes of analyzing sentencing dynamics, I excluded from the analysis six cases: one in which the charged offense was treason and there were no identified victims; and five in which there were mass numbers of victims. (These were large-scale terrorist attacks: the Oklahoma City bombing, the September 11 attack, and the bombing of two U.S. embassies in Africa.) The cases were excluded because where there is either no victim or where there are mass casualties it is not possible to isolate a white victim effect on sentencing. This is consistent with the way other researchers have addressed issues of race and gender in sentencing. This left 397 authorized capital prosecutions for analysis.

7. I used statistical procedures generally applied in the analysis of quantitative data to assess whether the death penalty was imposed differently in cases involving defendants who killed white victims as opposed to victims of other races: descriptive statistics provide a "snapshot" of the characteristics of the data; crosstabulations show how two variables interact with one another; and chi-square analysis provides an indicator of whether an

2

observed relationship occurs by chance or because of a systematic interaction between the two variables.

8. My analysis, as reflected in the charts below, demonstrates that defendants who kill white victims receive the death penalty at a substantially higher rate than defendants whose victims are not white and that this correlation between white victims and death sentencing is highly statistically significant, systematic, and not the result of chance.

9. The data used in the analysis have the following characteristics:

| Condition of Interest | Number of Cases | |
|---|---|---|
| All Authorized Cases | 403 | |
| Authorized Cases Involving Victim | 402 (see paragraph 6, above) | |
| Authorized Cases Excluding Mass Killings | 397 (see paragraph 6, above) | |
| Death Penalty Imposed | 60 | |
| Death Penalty Not Imposed | 337 | |
| White Victim (WV) | 146 | |
| No WV | 251 | |
| Sentencing Trial Completed | 182 | |
| Sentencing Trial Involving WV | | 75 |
| Sentencing Trial, No WV | | 107 |
| Death Penalty Imposed, WV | | 37 |
| Death Penalty Imposed, No WV | | 23 |

10. The results of the chi-square analysis for cases involving a white victim are as follows: Table 1 summarizes the analysis of death sentences among the set of 397 authorized federal capital cases. As explained in paragraph 6, this includes all but six authorized prosecutions. Table 1 indicates that defendants in cases involving a white victim were

3

sentenced to death 25.3 percent of the time (in 37 of 146 cases). Defendants in cases not involving a white victim were sentenced to death 9.2 percent of the time (in 23 of 251) cases. Thus, a defendant charged with killing a white victim was nearly three times (2.75) more likely to be sentenced to death than a defendant charged with killing a victim who was not white. These results are statistically significant at the p<.001 level, indicating that the probability that this relationship has been observed by chance is essentially zero.

**Table 1: Relationship between the Presence of White Victim (WV) and the Imposition of a Death Sentence – All Authorized Cases Except Mass Casualties (N=397)**

| Data Source | Condition (N) | Percent (Formula) |
|---|---|---|
| Set of All Cases (N =146) with White Victim | Death-Sentenced (37) | 25.3 (37 of 146) |
| | Non-Death Sentenced (109) | 74.7 (109 of 146) |
| Set of All Cases (N=251) with no White Victim | Death-Sentenced (23) | 9.2 (23 of 251) |
| | Non-Death-Sentenced (228) | 90.8 (228 of 251) |
| Set of All Cases (N=60) Involving a Death Sentence | Cases with White Victim (37) | 61.7 (37 of 60) |
| | Cases with no White Victim (23) | 38.3 (23 of 60) |
| Set of All Cases (N=337) Not Involving a Death Sentence | Cases with White Victim (109) | 32.3 (109 of 337) |
| | Cases with no WV (228) | 67.7 (228 of 337) |

11. Table 2 looks at the smaller set of authorized capital cases that proceeded through to a capital sentencing trial. It indicates that among those for whom life or death decisions were made by judges or juries, defendants in cases involving a white victim received a death sentence 49.3 percent of the time (in 37 of 75 cases). Defendants in cases where there was no white victim were sentenced to death 21.5 percent of the time (in 23 of 107

4

cases). A defendant in a federal capital trial thus was almost two-and-one-third (2.29) more likely to be sentenced to death in a case involving a white victim than a defendant in a case in which there was no white victim. These results are also statistically significant at the $p<.001$ level, indicating the probability that this relationship has been observed by chance is essentially zero.

**Table 2: Relationship between the Presence of White Victim (WV) and the Imposition of a Death Sentence – Sentencing Trial Cases Only (N=182)**

| Data Source | Condition (N) | Percent (Formula) |
|---|---|---|
| Set of All Cases (N =75) with White Victim | Death-Sentenced (37) | 49.3 (37 of 75) |
| | Non-Death Sentenced (38) | 50.7 (38 of 75) |
| Set of All Cases (N=107) with no White Victim | Death-Sentenced (23) | 21.5 (23 of 107) |
| | Non-Death-Sentenced (84) | 78.5 (84 of 107) |
| Set of All Cases (N=60) Involving a Death Sentence | Cases with White Victim (37) | 61.7 (37 of 60) |
| | Cases with no White Victim (23) | 38.3 (23 of 60) |
| Set of All Cases (N=122) Not Involving a Death Sentence | Cases with White Victim (38) | 31.1 (38 of 122) |
| | Cases with no WV (84) | 68.9 (84 of 122) |

12. After reviewing the results of these analyses, it is clear that there is a robust correlation between the presence of a white victim and the imposition of a death sentence. Social scientists consider a result to be robust when changing the assumptions undergirding an analysis would be unlikely to affect its results, which is the case here. Cases in which there is white victim represent 36.7 percent of all authorized prosecutions (146 of 397) and 41.2 percent of authorized prosecutions completing a penalty phase trial (75 of 182);

5

however they represent 61.7 percent of death sentences (37 of 60). These results are highly statistically significant. The generally accepted standard for statistical significance in political science research is $p<.05$, meaning the probability that the results occurred by chance is less than five percent. In the case of these analyses, the findings are statistically significant at a higher level of $p<.001$, meaning the probability they occurred by chance is less than one-tenth of one percent, or one in one thousand. Given the robust quality of these findings, it is my opinion to a reasonable degree of scientific certainty that this correlation of more severe sentencing outcomes and white victims is unlikely to disappear even in the presence of other potentially explanatory variables.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 3rd day of October, 2008.

Lauren Cohen Bell

Appendix: SPSS Output Used to Generate the Foregoing Analysis

**Case Processing Summary**

| | Cases | | | | | |
|---|---|---|---|---|---|---|
| | Valid | | Missing | | Total | |
| | N | Percent | N | Percent | N | Percent |
| Death Penalty Imposed * race2 | 397 | 100.0% | 0 | .0% | 397 | 100.0% |

**Death Penalty Imposed * race2 Crosstabulation**

| | | | White Victim | | |
|---|---|---|---|---|---|
| | | | No | Yes | Total |
| Death Penalty Imposed | No | Count | 228 | 109 | 337 |
| | | % within Death Penalty Imposed | 67.7% | 32.3% | 100.0% |
| | | % within race2 | 90.8% | 74.7% | 84.9% |
| | Yes | Count | 23 | 37 | 60 |
| | | % within Death Penalty Imposed | 38.3% | 61.7% | 100.0% |
| | | % within race2 | 9.2% | 25.3% | 15.1% |
| Total | | Count | 251 | 146 | 397 |
| | | % within Death Penalty Imposed | 63.2% | 36.8% | 100.0% |
| | | % within race2 | 100.0% | 100.0% | 100.0% |

**Chi-Square Tests**

| | Value | df | Asymp. Sig. (2-sided) | Exact Sig. (2-sided) | Exact Sig. (1-sided) |
|---|---|---|---|---|---|
| Pearson Chi-Square | 18.834[b] | 1 | .000 | | |
| Continuity Correction[a] | 17.594 | 1 | .000 | | |
| Likelihood Ratio | 18.134 | 1 | .000 | | |
| Fisher's Exact Test | | | | .000 | .000 |
| Linear-by-Linear Association | 18.787 | 1 | .000 | | |
| N of Valid Cases | 397 | | | | |

a. Computed only for a 2x2 table

b. 0 cells (.0%) have expected count less than 5. Minimum expected count is 22.07.

7

**Case Processing Summary**

| | Cases | | | | | |
|---|---|---|---|---|---|---|
| | Valid | | Missing | | Total | |
| | N | Percent | N | Percent | N | Percent |
| Death Penalty Imposed * race2 | 182 | 100.0% | 0 | .0% | 182 | 100.0% |

**Death Penalty Imposed * race2 Crosstabulation**

| | | | White Victim | | |
|---|---|---|---|---|---|
| | | | No | Yes | Total |
| Death Penalty Imposed | No | Count | 84 | 38 | 122 |
| | | % within Death Penalty Imposed | 68.9% | 31.1% | 100.0% |
| | | % within race2 | 78.5% | 50.7% | 67.0% |
| | Yes | Count | 23 | 37 | 60 |
| | | % within Death Penalty Imposed | 38.3% | 61.7% | 100.0% |
| | | % within race2 | 21.5% | 49.3% | 33.0% |
| Total | | Count | 107 | 75 | 182 |
| | | % within Death Penalty Imposed | 58.8% | 41.2% | 100.0% |
| | | % within race2 | 100.0% | 100.0% | 100.0% |

**Chi-Square Tests**

| | Value | df | Asymp. Sig. (2-sided) | Exact Sig. (2-sided) | Exact Sig. (1-sided) |
|---|---|---|---|---|---|
| Pearson Chi-Square | 15.463[b] | 1 | .000 | | |
| Continuity Correction[a] | 14.229 | 1 | .000 | | |
| Likelihood Ratio | 15.422 | 1 | .000 | | |
| Fisher's Exact Test | | | | .000 | .000 |
| Linear-by-Linear Association | 15.378 | 1 | .000 | | |
| N of Valid Cases | 182 | | | | |

a. Computed only for a 2x2 table

b. 0 cells (.0%) have expected count less than 5. Minimum expected count is 24.73.

8

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,    )
                )
         *Plaintiff,*    )
                )
v.                )        **Case No. 6:04-CR-00115-JHP-SPS**
                )
KENNETH EUGENE BARRETT,    )
                )
        *Defendant.*    )

---

## EXHIBIT 113

---

## DECLARATION OF KEVIN McNALLY REGARDING TESTIMONY
## IN *UNITED STATES V. TAYLOR* (E.D. TN No. 1:04-CR-00160-1)

1. I currently serve as the Director of the Federal Death Penalty Resource Counsel Project [FDPRC]. I have served as a Resource Counsel since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Office of Defender Services of the Administrative Office of the United States Courts. We assist court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.[1]

2. My responsibilities as Federal Death Penalty Resource Counsel include the monitoring of federal capital prosecutions throughout the United States in order to help ensure the delivery of adequate defense services to indigent capital defendants in such cases. This effort, in turn, includes the collection of data on a wide variety of topics regarding federal capital cases, including decisions by the Attorney General to seek or not seek the death penalty and decisions by juries or judges whether to impose the death penalty. This includes the factual scenario, allegations and evidence, the number of homicide victims, the race or ethnic background of the defendant and the victim(s) and the statutory and non-statutory aggravating and mitigating circumstances alleged and found by the jury.

3. In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information regarding Department of Justice allegations in these

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in the report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMEN-DATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ..." *Id.* at 50.

cases. I accomplish this by reviewing dockets and downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, by reviewing transcripts, reviewing media accounts of trials, reviewing DOJ press releases and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. I have been asked by appointed counsel for Rejon Taylor to testify before the jury regarding the federal death penalty and issues of race and fairness, including statistics regarding the race of the defendant and victim, the facts and circumstances, the allegations of statutory and non-statutory aggravating circumstances, the jury findings and the results in other federal death penalty cases.

5. Since 1988, the Attorney General has authorized a capital prosecution against 403 defendants as to whom the capital prosecution has been completed, to the extent that a decision imposing or rejecting the death penalty has been made by the Attorney General and/or a jury or a judge. FDPRC has determined the race and gender of the defendants and victims as to each of these 403 "authorized" capital defendants. Additionally, FDPRC has determined the number of homicide victims attributable to each defendant. This information is captured in a report previously filed with the Court [Docket Entry 701, Exhibit B], along with the defendant's name, the district and the indictment number. FDPRC has obtained and reviewed the Notice of Intent to seek the Death Penalty and the jury findings regarding aggravating and mitigating circumstances in these cases.

- 2 -

6. Each of these 403 defendants is categorized in the report by a descriptive name relating to the disposition of the case. The categories, which FDPRC uses in our database, are as follows: "Acquittal," "Authorization withdrawn," "Awaiting resentencing or retrial," "Clemency," "Death Row," "Death Sen Vac & AW," "Dismissal after notice by judge," "Executed," "Guilty plea," "Incompetent after authorization," "Innocent," "Killed or died after authorization," "Lesser included conviction" and "Life sentence."

7. "Acquittal" means that the jury found the defendant not guilty of the capital charge.

8. "Authorization withdrawn" means that the Attorney General withdrew the request for the death penalty either before or during trial.

9. "Awaiting resentencing or retrial" means that the defendant received a sentence of death, but an appellate court has ordered a retrial or resentencing which has not yet occurred.

10. "Clemency" means that the President granted clemency to an individual who was sentenced to death.

11. "Death Row" means that a person is under a sentence of death and is awaiting appellate or post-conviction review.

12. "Death Sentence Vacated and Authorization Withdrawn" (Death Sen Vac & AW) means that a death sentence was reversed by an appellate court and the Attorney General withdrew the request for the death penalty.

13. "Dismissal after notice by Judge" means that a Judge has declined to permit the government to seek the death penalty, due to a legal reason.

14. "Executed" means that the sentence of death was carried out.

15. "Guilty plea" means that a plea agreement involving a non-death sentence (usually life)

- 3 -

was approved by the Attorney General and accepted by the Court, either before or during trial.

16. "Incompetent after authorization" means that the Court found the defendant incompetent, after the Attorney General authorized a capital prosecution.

17. "Innocent" means that the government moved to dismiss the capital count and either prosecuted another individual or the prosecutor admitted he/she was unable to prove the capital charge.

18. "Killed or died after authorization" means that the individual was killed or committed suicide after the Attorney General had authorized a capital prosecution before or during a trial.

19. "Lesser included conviction" means that the jury did not find a statutorily required aggravating circumstance or the required mental state threshold.

20. "Life sentence" means that the jury, or in two cases a judge, sentenced the defendant to life in prison.

21. 110 of the 403 individuals reached a plea agreement with the government that was accepted by the Court. The Attorney General withdrew the request for the death penalty as to an additional 57 individuals for various reasons.

22. 188 of the 403 individuals were tried by a jury or judge.

23. The numerical distribution of these cases is as follows:

| | |
|---|---|
| Acquittals | 13 |
| Authorization withdrawn | 48 |
| Authorization withdrawn at trial | 9 |
| Death sentence | 61 |
| Dismissal of notice by judge | 24 |
| Guilty pleas | 110 |
| Incompetent | 2 |
| Innocent | 3 |
| Killed/Died | 3 |
| Lesser included | 3 |

– 4 –

1252

| | |
|---|---|
| Life sentence | <u>127</u> |
| **Total** | **403** |

24. One defendant of the 403 "authorized" defendants described above was charged with espionage and there was no homicide victim.

25. Five of the 403 defendants were accused of acts of mass murder/terrorism/bombing and were tried by a jury. These individuals were Timothy McVeigh and Terry Nichols (the Oklahoma City bombing), Mohamed Rashed Al'Owhali and Khalfan Khamis Mohamed (the African Embassy bombings) and Zacarias Moussaoui (convicted of participation in the September 11, 2001 attack on the World Trade Center in New York).

26. In cases with multiple murders, if one homicide victim is white, the case is coded as involving a white victim.

27. In the attached report, "M" means male, "F" means female, "W" means white, "H" means Hispanic, "B" means African-American, "A" means Asian, "NA" means Native American, "I" means Indian and "O" means other.

28. I provided the attached data set to Lauren Cohen Bell, Ph.D., and requested that she provide an expert opinion as to whether the race of the victim(s), in particular white victims, in federal capital cases has a statistically significant effect on the death sentencing rate. Her analysis is attached. It indicates that defendants who kill a white victim or victim(s) are nearly three times as likely than other capital defendants to be sentenced to death, that the race of the victim is "highly statistically significant" and that the likelihood that this occurs by chance is "essentially zero."

29. I am able to testify regarding the facts and circumstances of the following cases: *United States v. Anthony Jones* (D. MD CR No. WMN-96-0458); *United States v. Terry Lynn Nichols* (D. CO No. 96-CR-68-M); *United States v. Khalfan Khamis Mohamed and Mohamed Rashed Daoul*

- 5 -

*Al'Owhali* (S.D. NY No. S6 98 CR 1023); *United States v. Mariano Martinez* (C.D. CA No. 99-83-(A)-DT); *United States v. William and Rudy Sablan* (D. CO No. 00-CR-531); *United States v. Zacarias Moussaoui* (E.D. VA No. 01-CR-455); *United States v. Michael* O'Driscoll (M.D. PA No. 4-CR-01-277); *United States v. Barry Byron Mills, Tyler Davis Bingham, Wayne Bridgewater and Henry Michael Houston* (C.D. CA No. 02-00938-GHK); *United States v. Kenneth McGriff* (E.D. NY No. 04-966 (ERK)) and *United States v. Ellis Mosher* (E.D. TX No. 1:06 CR 00101-TH). I would testify that each of these individuals were sentenced by a jury to life in prison without release and that all are housed at ADX Florence, the so-called federal "Supermax" prison. This information was obtained from the Bureau of Prisons website. http://www.bop.gov/iloc2/LocateInmate.jsp (last viewed on October 3, 2008).

30. *United States v. Anthony Jones* (D. MD CR No. WMN-96-0458) involved multiple (six) killings: one in '94, four in '96, one in '97. Authorization was granted to seek the death penalty for three murders, including an allegation that Jones ordered his step-brother killed from jail because he feared he was about to become a government witness. Jones also ordered the murder, by the victim's own bodyguards, of a rival Baltimore drug dealer who had earlier attempted to arrange the murder of Mr. Jones. Numerous other homicides, attributed to Jones, were alleged in aggravation. Murder for hire was alleged as an aggravating circumstance. Jones was convicted in 1998, sentenced to life without release. Eight co-conspirators were involved in multiple murders but did not face the death penalty. Jones was sent to the "Control Unit" at "super-max," ADX in Florence, Colorado, where he is under severe communication restrictions for 10 years. The defendants and victims were black.

31. *United States v. Terry Lynn Nichols* (D. CO No. 96-CR-68-M) involved Timothy McVeigh's co-defendant in the Oklahoma City bombing case. He was sentenced in 1998 to life imprisonment in federal court and faced the death penalty in state court where he was also sentenced to life in prison. McVeigh was executed.

32. *United States v. Khalfan Khamis Mohamed and Mohamed Rashed Daoul Al'Owhali* (S.D. NY No. S6 98 CR 1023) involved foreign national accomplices of Usama bin Ladin, the organizer of two bombings of American embassies in Africa. The August 7, 1998 bombings in Kenya and Tanzania killed 224 people, including 12 Americans. More than 5,000 people were injured. Al-'Owhali is a Saudi citizen who was arrested in Nairobi after the bombing. Mohamed and Al'Owhali are members of al-Qaida, an international terrorist organization, led by bin Laden, who has repeatedly issued various "fatwahs" against the United States. A co-defendant stabbed a jail guard in the eye and caused brain damage during an escape attempt.

33. *United States v. Mariano Martinez* (C.D. CA No. 99-83-(A)-DT) involved defendants in one of three related multiple murder Mexican Mafia prosecutions. "Chuy" Martinez, 41, was a "drug kingpin," the head of a narcotics organization. There were a total of four murders and 13 conspiracies to commit murder charged. Three men, one a drug dealer and two innocent bystanders, all Hispanic, were killed in a Monticello autobody shop. Martinez orchestrated the killings using a walkie-talkie. Max Torvisco, once Martinez's right hand man, obtained a plea agreement. He admitted ordering 140 murders. Wiretaps show Martinez ordering numerous murders.

34. *United States v. William and Rudy Sablan* (D. CO No. 00-CR-531) involved an inmate killing - an evisceration stabbing of cellmate (in their cell). The aftermath of the murder was recorded on videotape. The letter "S" was written on the cell wall in the victim's blood and his organs

- 7 -

removed and held up for the guards to see. The defendants are foreign nationals, Pacific Islanders, "Chmorran", from Saipan. The victim is Hispanic. The defendants, cousins, were doing federal time for a hostage-taking in Guam. William had a 20 year history of violent crime.

35. *United States v. Zacarias Moussaoui* (E.D. VA No. 01-CR-455) involved a foreign national and co-conspirator in the September 11, 2001 terrorist attack on the World Trade Center and Pentagon which killed over 3,000 and resulted in four airline crashes in New York, Pennsyvlania and Washington, D.C. Moussaoui is French of Moroccan descent and is a member of al-Qaida. He was in jail on September 11 after suspicious actions at a Minnesota flight school. There were victims of many nationalities and races.

36. *United States v. Michael* O'Driscoll (M.D. PA No. 4-CR-01-277) the stabbing and killing of an inmate at USP - Allenwood in 1997. There were half a dozen correctional officers who witnessed the end of the stabbing. Both the defendant and victim are white.

37. *United States v. Barry Byron Mills, Tyler Davis Bingham, Wayne Bridgewater and Henry Michael Houston* (C.D. CA No. 02-00938-GHK) were charged in a racketeering indictment of 40 members and associates of the Aryan Brotherhood [AB] for a string of murders and violent attacks allegedly designed to expand the power of the white racist prison gang, which was founded at San Quentin state prison in 1964. Authorities say the gang has about 100 members. In 1980, the federal faction of the AB formed a three-man "Commission" to oversee AB members in federal prisons, and, in 1993, the Federal Commission formed a "Council" to oversee the day-to-day activities of the federal faction. 17 murders were alleged. Multiple (at least six) murders occurred since 1996. Twenty-seven defendants initially were eligible for the death penalty. Mills and Bingham made all major decisions involving the criminal activities of the federal faction. Mills was

also charged with personally committing one murder and involvement in numerous murders. AB members who were selected to face the death penalty were: McIntosh, Knorr, Sahakian, McElhiney, Littrell, Bridgewater, Terflinger, Schwyhart, Houston, Griffin, Chance, Stinson, Mills and Bingham. Mills and Bingham were sentenced to life in prison in 2006, as were Bridgewater and Houston at a separate trial in 2007. The Attorney General dropped the remaining capital prosecutions against the Aryan Brotherhood.

38. *United States v. Kenneth McGriff* (E.D. NY No. 04-966 (ERK)) involved Kenneth "Supreme" McGriff, the leader of a notorious Queens-based drug gang, "The Supreme Team," that operated in the 1980's. He went to prison after pleading to a Continuing Criminal Enterprise and receiving a 12-year sentence. Upon his release, he resumed drug trafficking. McGriff and co-defendants were charged with two VICAR murders that took place in 2001. All involved are African-American.

39. *United States v. Ellis Mosher* (E.D. TX No. 1:06 CR 00101-TH) involved a 1998 inmate killing at Beaumont FCI.

40. I am also able to testify as to the facts and circumstances of other cases involving the murder of a government informant or witness which have resulted in a life sentence after trial. I previously listed these cases in a declaration filed of record [DE 701, Ex. A, paragraph 7]. Descriptions of the facts and circumstances of these cases have also been previously filed of record [DE 701, Ex. C].

41. I am able to produce the Notice of Intent to Seek the Death Penalty (which contains the Government's allegation of statutory and non-statutory aggravating circumstances) and the jury

– 9 –

findings of statutory and non-statutory aggravating circumstances and statutory and non-statutory mitigating circumstances in all these cases.

42. I am able to testify as to the race of all of these capital defendants and their victims, the number and nature of aggravating and mitigating circumstances and the number of homicide victims in all of these cases.

43. Rejon Taylor's date of birth is September 15, 1984 and the date of the capital offense is August 6, 2003. Therefore, Mr. Taylor was 18 years old at the time of the homicide. If the capital crime had occurred 11 months earlier, Mr. Taylor would not have been eligible for the death penalty. 18 U.S.C. §3591(a). *See Roper v. Simmons,* 543 U.S. 551 (2005).

44. No federal capital defendant who was 18 at the time of the capital offense has been sentenced to death for a single homicide.

45. No federal capital defendant has been sentenced to death in a prosecution involving a struggle for a gun leading to a shooting or a factual scenario similar to that.

46. The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project and is accurate to the best of my knowledge, ability and belief.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of October, 2008.

Kevin McNally
Federal Death Penalty Resource Counsel

- 10 -

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## EXHIBIT 114

---

Exhs. § 2255 Motion                                 *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

# DECLARATION OF RODNEY FLOYD

I, Rodney Floyd, declare the following:

I am one of the investigators currently working for the defense in Kenneth Eugene Barrett's case. On February 21, 2008, I interviewed former Sequoyah County Sheriff John Philpot. Mr. Philpot told me that less than a month before the incident in which Oklahoma State Highway Patrol Trooper David "Rocky" Eales was shot and killed, he and three other law enforcement officers went to Mr. Barrett's residence. They did not serve an arrest warrant on Mr. Barrett, or take him into custody. They encountered no violence from Mr. Barrett, and were not harmed or assaulted.

I did not draft this declaration. The information detailed above is based on what I told one of Mr. Barrett's lawyers, David Autry, based on my investigation. I have read this declaration carefully, and it accurately states what I told Mr. Autry.

I declare under penalty of perjury that the foregoing 1 page declaration is true and correct.

Executed by me this 11 day of March, 2009, in Lincoln County, Oklahoma.

Rodney Floyd

1260

# EXHIBIT 115

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 115**

June 11, 2001

To:     The Honorable Russell D. Feingold, Committee on the Judiciary, U. S. Senate, 716 Hart
        Senate Office Building, Washington D.C. 20510-4904

From:   David C. Baldus, Joseph B. Tye Distinguished Professor of Law, College of Law,
        University of Iowa

Re:     DOJ report on the Federal Death Penalty System (June 6, 2001)

        I have read U.S. Department of Justice, <u>The Federal Death Penalty System:</u>

<u>Supplementary Data, Analysis and Revised Protocols for Capital Case Review</u> (June 6, 2001) ("the

report"), which supplements the DOJ report of September 12, 2000.  The following comments

explain why in the face of the findings and data in the DOJ September 2000 report, the latest DOJ

report utterly fails to convince me that there is no significant risk of racial unfairness and

geographic arbitrariness in the administration of the federal death penalty.  I believe there is still

the just as much reason to be concerned about these issues as there was when the September 2000

report was issued.

        1.  <u>The report completely overlooks the evidence of race-of-victim discrimination</u>
<u>documented in the September 12, 2000 report.</u>

        A main theme of the latest report (p. 10) is that the death penalty authorization rate is

higher for whites (.38) than it is for blacks (.25) and Hispanics (.20).  These are the same figures

that appeared in the September 2000 report.  The latest report's emphasis on these statistics

appears to suggest that white defendants are actually treated more punitively than minority

defendants.

        A more plausible explanation for the higher authorization rates for the white defendants is

plainly documented in the September report – (1) white defendants are more likely to have killed

whites[1] and (2) the U.S. Attorney charging and DOJ authorization rates are much higher in white-

victim cases than they are in minority-victim cases.  For example, data in the September 2000

---

[1] For the cases for which both race-of-defendant and race-of-victim data are available, 92% (109/119) of the white

<div align="right">1</div>

report indicate that the Attorney General (AG) authorization rate for capital prosecutions is .37 (61/167) in white-victim cases and .21(81/383) in minority-victim cases -- a 16 percentage point difference that is statistically significant at the .001 level.  The more punitive treatment of *white-victim cases* is a plausible alternative explanation for the higher authorization rates in *white-defendant cases* that the new DOJ report does not even recognize, let alone dispel.

The September 2000 report also documents race-of-victim disparities in the actual imposition of death sentences in the federal system.  Among all death-eligible offenders, those data indicate that the death-sentencing rate from 1995 to 2000 is twice as high in white victim cases as it is in minority victim cases.  Nationwide, the rates are .05 (10/198) for the white-victim cases versus .02 (10/446) for the minority-victim cases; in the eleven states in which death sentences were actually imposed, the rate in the white-victim cases was .17 (10/59) versus .08 (10/119) in the minority-victim cases -- a nine percentage-point difference.[2]

These are the same kinds of race-of-victim disparities documented in *McCleskey v. Kemp*[3].  The latest report simply ignores the data on race-of-victim disparities in the charging and authorization process, *and* in the actual imposition of federal death sentences.

---

defendant cases involved a white victim.

[2] The race-of-victim disparity nationwide is significant at the .06 level while the disparity in the states in which death sentences have been imposed is significant at the .09 level.   The states in which death sentences were imposed between 1995 and 2000 are Arkansas, Georgia, Illinois, Kansas, Louisiana, Missouri, North Carolina, Oklahoma, Pennsylvania, Texas, and Virginia.

      Of particular relevance are the race-of-victim disparities in case involving black defendants. Nationwide, in black defendant/*white victim* cases, the death-sentencing rate was .11 (6/55) while in the black defendant/*minority victim* cases, the rate was .03 (7/253), an 8 percentage-point difference significant at the .01 level.  In the eleven death-sentencing states, the death-sentencing rate in the black defendant/*white victim* cases was .24 (6/25) while in the black defendant/*minority victim* cases, the rate was .07 (7/95), a 17 percentage-point difference significant at the .02 level.

[3] 481 U.S. 279 (1987).

2.  The report confounds the issue of "regional disparities" in the administration of the federal death penalty with the issue of racial disparities in the distribution of death eligible cases.

The report argues that we should not expect the proportions of black, white, and Hispanic offenders among death-eligible cases that are *accepted* for federal prosecution to correspond to "the racial and ethnic proportions in the general population." (p.13)  Perhaps, but that is not the question.  The real issue in this regard is the racial composition of the pool of death-eligible cases that are *not accepted* for federal prosecution.  The report offers no data on that question.  As a result, we do not know to what extent the death-eligible cases that were prosecuted in federal court are representative of all homicides that could have been charged as federal capital crimes, in the districts that are discussed in the report (pp.14-18) and in the country as a whole.

More importantly, the report seeks to equate its arguments concerning geographic disparities in the *racial distribution of death-eligible cases* with an explanation for clearly documented geographic and regional disparities in the *administration of the death penalty.* (Pp. 17-18)  This is extremely misleading.  The patterns that need to be studied are differences between regions in the rates at which death sentences are (a) *sought* by United State's Attorneys, (b) *approved* by the Attorney General, and (c) *imposed* by juries.

The September 2000 report clearly shows that in practice the federal death sentencing system is largely a Southern program. Twelve of the 19 men on federal death row as of September were sentenced in the South, including 6 from Texas and 4 from Virginia.  The new report focuses on *regional differences* in the *racial composition of the pools* of potential capital cases that the districts have generated (p. 17).  This has nothing to do with regional disparities in the rates at which death eligible defendants in the system are capitally charged and sentenced to death.

3.  The report presents no data or other compelling reasons to dispel concerns about the exercise of discretion by U.S. Attorneys in the post-authorization stage of the process.

3

One the most striking findings of the September 2000 report is that in the period after the AG has approved a capital prosecution, 48% of white defendants avoid the risk of a death penalty by entering a plea agreement to a non-capital charge, while the rates that blacks and Hispanics enter such agreements are 25% and 28% respectively. (p.19)  The department is obviously concerned about this issue because it plans to limit the power of U.S. Attorneys to enter such agreements without AG approval. (p. 22)

The report seeks to dispel concerns created by these data by pointing out first that it  "takes two to make a plea agreement" and the data do not reflect racial differences in the rates at which the government offered post-authorization plea agreements.  This argument raises an empirical question about the 62 cases (as of the September 2000 report) in which a post-authorization plea agreement was *not* reached.  Was a plea bargain offered by the prosecution in these cases and rejected by the defense, or was none offered?  It would have been easy for the DOJ to ask its own prosecutors whether they offered plea agreements in these cases.  Apparently, it was not done.

The report further argues that even if differential acceptance rates by white and minority defendants did not explain the race disparities in the post-authorization guilty pleas, the September 2000 report's findings on this issue "would not be suggestive of bias by the U.S. Attorney's offices." (p. 20) The argument is that the detection of discrimination by U.S. Attorneys must rest on an analysis of  "what happens in the process as a whole" and that decisions taken "at the final plea stage are uninformative as possible indications of bias by the U.S. Attorney offices." (p.20) Certainly it is important to view the system as a whole, but prior research demonstrates that race disparities may operate at discrete stages in a decision making process that overall appears to be evenhanded. There is serious cause for worry here, and the report makes no attempt to address it.[4]

---

[4] The report's argument also overlooks the fact that many of the post-authorization plea agreements are made in cases in which the U.S. Attorney's initial recommendation to waive the death penalty was overruled by the AG, a circumstance that needs to be factored into any analysis of the post-authorization decisions.

4

The claim that no differential treatment exists in the post-authorization plea stage is a mere assertion with no evidence whatever to support it.  Without data on the comparative culpability of the offenders (and the race of the victims) in the cases affected by these post-authorization pleas bargaining decisions, one has no idea the extent to which similarly situated defendants were in fact treated comparably.

4.  <u>The report provides no compelling reason for the DOJ's failure to authorize a comprehensive state of the art study of fairness in the administration of the federal death penalty system.</u>

The report notes a meeting of  "researchers and practitioners on January 10, 2001" in Washington D.C. to consider the feasibility of conducting a comprehensive empirical study and evaluation of fairness in the administration of the federal system. (p.11)  I was one of the researchers at that meeting.

The report correctly states that there was general agreement at the January meeting that the conduct of such a study would entail a "multi-year research initiative."  Two years would be the likely time line.  In the meantime, half a year has passed since that meeting, and nine months since the release of the initial report, and neither the NIJ nor any other agency of the Department of Justice has taken any visible step to begin to make such a study possible.  Quite the opposite. Attorney General Ashcroft's testimony last week suggested that he believes that the idea should be abandoned.

The report also states that "discussion" at the January 10 meeting "indicated," that such a study "could not be expected to yield definitive answers concerning the reasons for disparities in federal death penalty cases."  This was certainly not the consensus of the researchers at the January 10 meeting.  On the contrary, the consensus was that such a study would provide the best possible evidence on the question.  Certainly the results of such a study would yield far more definitive answers to the issue of racial fairness in the system than the arguments presented in the department's latest report.

*5*

The new report offers no reason at all why such a study should not be conducted even if it would require up to two years to complete. It also offers no reason why the DOJ appears unwilling to identify by defendant name and docket number the more than 700 death-eligible cases that make up the database for its latest study. With this information independent researchers could collect data on the cases in the DOJ database and conduct the kind of study that would provide the best evidence available on the question of fairness in the federal death sentencing system.

5. <u>The report misconceives the nature of race discrimination in the administration of the federal death penalty.</u>

A main theme of the report is that the core issue of racial fairness is whether U.S. Attorneys are consciously engaged in "favoritism towards White defendants." (p. 11) In other words, are their decisions based on "invidious" racial reasons (p.12) or motivated by "bias" (p. 20) or a "particular desire to secure the death penalty for minority defendants." (p. 17) This states the issue far too crudely. No one with an understanding of the system suggests that it is driven by such a conscious and blatant animus against minority defendants or defendants whose victims are white.

The concern about racial unfairness in the system is whether defendants with similar levels of criminal culpability and deathworthiness are treated comparably or differently because of their race or the race of their victims. The reasons for differential treatment by U.S. Attorneys - and by agents of the FBI, the DEA and other are federal law enforcement agencies - are almost certainly nonconscious. More importantly, the reasons for the differential treatment of similarly situated offenders on the basis of their race or the race of the victim are irrelevant. It is the fact that differential treatment cannot be explained by legitimate case characteristics that makes it morally and legally objectionable, when it exists. Without a systematic study based on full information concerning the criminal culpability and the race of the victims of all of the death eligible offenders,

6

we will remain in the dark about whether unexplained differential treatment based on the race of the defendant and victim exists in the federal death penalty system, and if so, what causes it.

7

8

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

========

**EXHIBIT 116**

========

**DECLARATION OF KEVIN McNALLY REGARDING THE GENDER AND
RACE OF VICTIMS IN FEDERAL CAPITAL PROSECUTIONS SINCE 2000**

1. I currently serve as the Director of the Federal Death Penalty Resource Counsel Project [FDPRC], assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts. I have served as Resource Counsel since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Office of Defender Services of the Administrative Office of the United States Courts.

2. The responsibilities of the FDPRC include the monitoring of federal capital prosecutions throughout the United States, in order to ensure the delivery of cost-effective and adequate defense services to indigent capital defendants in such cases.[1] This includes the collection of data on the utilization of the federal death penalty, both as to prosecutions brought under the 1988 so-called "Drug Kingpin" death penalty statute, 21 U.S.C. § 848(e) *et seq.,* and those brought pursuant to the "Federal Death Penalty Act of 1994." 18 U.S.C. §3591 *et seq.*

3. In order to carry out our responsibilities, the FDPRC maintains a comprehensive list of all federal death penalty prosecutions and information regarding each defendant. FDPRC accomplish this by reviewing dockets and downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy whenever possible against any

---

[1]In May 1998, the role of the Federal Death Penalty Resource Counsel Project was described, at pp. 28-30, in a report prepared by a Judicial Conference Subcommittee on Federal Death Penalty Cases. That report (commonly called the Spencer Committee Report) "urge[d] the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project . . . which has become essential to the delivery of high quality, cost-effective representation in death penalty cases . . . ." *See "*Federal Death Penalty Cases:  Recommendations Concerning the Cost and Quality of Defense Representation," (May 1998), at p. 50. The Report is available online at  http://www.uscourts.gov/dpenalty/. The Report's recommendations were later adopted by the Judicial Conference of the United States.

1

available United States government information regarding federal capital prosecutions and/or with defense counsel in those cases. The Project's information regarding practices in federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. Attorney General Gonzales reviewed 409 potential capital defendants. In those cases, there were 19 prosecutions involving white female victims. Of those 19 cases, 10 defendants (53%) were "authorized" or selected by the Attorney General to face the death penalty. Of those 409 defendants, there were 67 cases involving white male victims. Of those 67 cases, 19 defendants (28%), were chosen to face the death penalty. Of those 409 defendants, there were 323 cases involving non-white victims. Of those 323 cases, 52 defendants (16%) were authorized to face the death penalty.

5. Attorney General Ashcroft reviewed 626 potential capital defendants. However, three cases involved no homicide victims, as espionage or large scale drug trafficking was alleged. Of those 623 cases, there were 59 cases involving white female victims. Of those 59, 34 (58%) defendants were selected for a death penalty prosecution. Of those 623 cases, there were 105 prosecutions involving white male victims. Of those 105 prosecutions, 18 defendants (17%) were authorized. Of those 623 cases, there were 459 prosecutions involving non-white victims. Of those 459 prosecutions, 86 defendants (19%) were chosen to face the death penalty.

6. Eighty-seven defendants "authorized" to face the death penalty by Attorney General Ashcroft have completed trial. Of those 87 defendants, 25 prosecutions involved white female homicide victims. 15 of those 25 (60%) white female victim prosecutions have resulted in a death sentence. 30% (3 of 10) white male victims cases have resulted in a death sentence. 51 non-white victim prosecutions have completed trial. Five (10%) of these 51 non-white victims have resulted in a death sentence.

7. Thirty-one defendants "authorized" to face the death penalty by Attorney General Gonzales have

2

completed trial. Of those, 5 prosecutions involved white female victims. Juries have sentenced 4 of those 5 defendants to death. Seven prosecutions have involved white male victims. Two (29%) of those 7 defendants have been sentenced to a death sentence. 19 non-white victim cases have completed trial. Three (16%) of those 19 defendants have been sentenced to death.

8. The totals for Attorney General Ashcroft and Attorney General Gonzales are as follows:

| Gonzales authorized - 81 | | Gonzales not authorized - 328 | |
|---|---|---|---|
| 52 | Black, Hispanic and other victims | 271 | Black, Hispanic and other victims |
| 19 | White male victims | 48 | White male victims |
| 10 | White female victims | 9 | White female victims |

| Ashcroft Authorized - 139 | | Ashcroft not authorized - 487 | |
|---|---|---|---|
| 86 | Black, Hispanic and other victims | 373 | Black, Hispanic and other victims |
| 18 | White male victims | 87 | White male victims |
| 34 | White female victims | 25 | White female victims |
| 1 | No victim | 2 | No victim |

9. I attach three graphs depicting this information.

10. The victim gender data has not been available before.

11. The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project and is accurate to the best of my knowledge, ability and belief.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 5th day of December, 2007.

 /s/ Kevin McNally
Kevin McNally

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 117**

---

**DECLARATION OF GEORGE W. WOODS, JR., M.D.**

I, George W. Woods, M.D., declare as follows:

1.      I am a licensed physician specializing in psychiatry and neuropsychiatry. I currently maintain a private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations.

2.      I am a Fellow of the American Psychiatric Association, and a member of the California Psychiatric Association and the Northern California Psychiatric Association. I am also a member of the American Neuropsychiatric Association, the American Psychological Association, the American Society of Addiction Medicine and the Black Psychiatrists of America.

3.      I am Secretary General-Elect of the International Academy of Law and Mental Health, where I am a member of the Scientific and Executive Committees.  I also serve on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York.

4.      I received my bachelor's degree from Westminster College in Salt Lake City, Utah, in 1969; and was awarded my medical degree from the University of Utah in 1977.  I then completed a rotating medical internship at Alameda County Medical Center (Highland Hospital), in Oakland, California, which included internal medicine, surgery, orthopedic surgery, Emergency Medicine, and Obstetrics/Gynecology.  In 1981, I completed my psychiatric residency at the Pacific Medical Center in San Francisco, California, where I served as Chief Resident my senior year.  During my psychiatric residency, I pursued specialized neurological

1

1276

electives at Kaiser Permanente Hospital, Oakland, California.  These electives consisted of extended, three month clerkships, in which I was assigned to the Neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

5.       In 1982, I then participated in a National Institute of Mental Health/American Psychiatric Association Fellowship, during which I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital. This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units.  The focus of my Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology, however, is an extremely valuable approach to the study of psychopharmacology in general.  The medical/psychiatric/neurological/pharmacological training and experience I gained during this period proved relevant to other patient populations, particularly forensic populations, who experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population.  Following the completion of my Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency.  In that capacity, I conducted home visits with elderly patients who manifested psychiatric symptoms.  Medical examinations and neurological intervention were frequently required.

6.       From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, a long-term psychiatric facility, dedicated to treating severely ill patients. Many of these patients came from state hospitals with atypical presentations and the diagnosis of

2

1277

mental retardation. Atypical presentation of psychiatric symptoms is common among forensic populations as well, particularly in areas that may lack community mental health services and or widespread availability of intensive treatment.  Many of these patients Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

7.      From 1989 to 1994, I served as Clinical Director of the New Beginnings Chemical Dependency Program, an inpatient substance abuse detoxification and rehabilitation center housed at Doctors Hospital in Pinole, California.  In 1994, I was appointed as Senior Consulting Addictionologist by Doctors Hospital, and oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units.  During my tenure, New Beginnings evolved into program that treated patients with what are called co-occurring disorders, meaning persons who have multiple psychiatric disorders – which is the norm, rather than unusual. Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

8.      The clinical facilities at Doctors Hospital afforded access to a Single Photon Emission Computerized Tomography (SPECT), which was utilized to determine brain function. My neuroimaging experience also includes the study of Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET).  From 1990 through 1995, I also served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital Sleep Disorders Center.  The assessment of sleep disorders, the evaluation of disorders in the architecture of sleep, is a seminal component of diagnosing medical illness and

1278

psychiatric disorders, and formulating appropriate pharmacological interventions. Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder.  Disruption of sleep can be found in almost all psychiatric disorders. Impairment of normal sleep patterns is also often a contributing cause of and exacerbated by substance abuse.

9.      In 1991, I was retained by Neurocare Corporation, a treatment facility in Concord, California, specializing in head-injury and neurological disorders, to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments.  The facility was a multidisciplinary environment in which the treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers.  Treating physicians required an intimate knowledge of brain/behavior relationships in order to avoid misdiagnosis of atypical symptom presentations.

10.     In 1992, I received my board certification in psychiatry by the American Board of Psychiatry and Neurology.  I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship.

11.     In 1998, at the request of Kenyan and Tanzanian Medical Societies, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that

4

predated the bombings.

12.    I am currently an Adjunct Professor on the faculty of Morehouse School of Medicine, Department of Psychiatry, in Atlanta, Georgia, where I teach courses in Clinical Aspects of Forensic Psychiatry to third and fourth year residents.  I am also on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento, California.

13.    My clinical private practice is based in Oakland, California.  I have been qualified and testified as an expert in numerous civil and criminal cases in state and federal courts.

14.    At the request of counsel currently representing Kenneth Barrett, I have performed a neuropsychiatric evaluation to determine whether Mr. Barrett suffers from any mental disease or defect and, if so, what functional impact his condition may have had before, during and after the commission of his current commitment offense.   In order to complete this assessment, I evaluated Mr. Barrett, including conducting a structured clinical interview, at the federal prison in Terre Haute, Indiana, over the course of two full days on February 17 and 18, 2009.  I also reviewed and considered the declaration of neuropsychologist, Myla Young, PhD; Mr. Barrett's institutional records, to include available academic, medical and custodial records; declarations and/or medical and social records of various family members, including his father, Ernie Barrett; his mother, Gelene Dotson; and his former wife, Abby Stites.  These are the types of data customarily relied upon by qualified mental health professionals to perform an accurate and reliable neuropsychiatric assessment.

**Clinical Presentation**

15.    Clinical observation of Mr. Barrett over the course of lengthy interviews revealed

5

1280

signs of significant neurologically impaired cognitive and psychosocial functioning, including severe depression, mania, psychotic ambivalence, adhedonia, sleep disturbance, suicidality, hypervigilance, avoidant behavior, withdrawal, constricted emotional range, and inability to sustain lasting relationships secondary to his severe mental illness.

16. Kenneth Barrett presented as an appropriately groomed White male who appeared to be his stated age of 47 years. His movements were fluid, although his gait was somewhat halting. Mr. Barrett noted he had difficulty with his legs since he had been shot multiple times during the police action that resulted in his arrest and conviction.

17. Speech was spontaneous and coherent, although he repeated questions often, even after the questions had been answered. He evidenced pressured speech. His ability to utilize complex words or grammatical structures was limited.

18. Mr. Barrett's thought form was extremely concrete, and his ability to abstract limited. There was no evidence of prosody or alexithymia, poverty of thought. On the contrary, Mr. Barrett had significant flight of ideas. He was paranoid and guarded, particularly in discussing the painful memories of separation from his father and the inattention of his mother, due to her own mental illness, during his formative years. His thinking was also grandiose, manifesting cognitive disinhibition, reflecting neurodevelopmental and/or acquired brain dysfunction. There was no evidence of perceptual disorders, hallucinations, or delusions.

19. He was most animated and fluent in describing his attempts to redress perceived injustices (e.g., disrespect and unfair enforcement of rules by prison staff; the misappropriation of his property after his arrest). His description of his responses in such situations indicated a significant lack of inhibition and age-appropriate defenses and coping skills.

6

1281

20.     Mr. Barrett's mood was elevated. His affect was often inappropriate to the content of our examination. The affective content of his presentation was incongruent with self-description of his life and current situation.  Mr. Barrett is invested in appearing to be a high-functioning individual, without significant past or present impairment, and who is in control of his life.

21.     Insight and judgment were impaired by his severe mood disorder and executive functioning deficits. His conceptual dysfunction also limited his ability to develop a larger picture, further impinging his insight and judgment.

**Background and Developmental Impact**

22.     Kenneth Barrett was born on June 29, 1961, in Joliet, Illinois.  He is the oldest of three sons born to Ernie Barrett and Gelene Barrett (nee Dotson).  Both father's and mother's sides of Mr. Barrett's family were burdened by multi-generational neurological impairments and affective mood disorders, as well as patterns of substance abuse and parental neglect consistent with an affective-laden family.  Mr. Barrett's young parents were apparently ill-equipped cognitively, emotionally or financially to rear children.  Mr. Barrett's developmental years were characterized by parental neglect, lack of appropriate boundaries, domestic discord, inter-parental violence and physical abuse.  These factors likely potentiated Mr. Barrett's genetic predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning.

23.     Significant risk factors for, and the symptomatic presentation of multiple types of mental disorders and neurologic impairments existed in both the maternal and paternal lines of Mr. Barrett's antecedents.  In particular, Mr. Barrett has high genetic loading (risk) for bipolar

1282

disorder and other affective disorders. He has multiple multigenerational and first-degree relatives with confirmed diagnoses of such mental illness. Mr. Barrett's extensive family history of bipolar and associated neuropsychiatric disorders is rare, and presents a clinical profile which, consistent with research protocols of the National Institute of Mental Health's collaborative Genetic Linkage Study of Schizophrenia and Bipolar Disorder, identifies his family as likely genetically predisposed to develop the disorders.

24. Mr. Barrett's mother, Gelene Dotson, his maternal aunt, Carolyn Joseph, and maternal cousin, Gwendolyn Crawford, satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression and anxiety disorders. Gwendolyn's daughter, Brandy Hill, suffers with major depression punctuated by episodes of "high euphoria," and is noncompliant with her prescribed medication regimen. Gwendolyn's 26-year-old son, Brandon, suffers from developmental disabilities that prevent him from speaking or being able to live independently. Another of Mr. Barrett's first cousins, Travis Crawford, is being treated for anxiety, has a history of depression, and experiences significant cognitive impairment. Mr. Crawford's oldest daughter has been diagnosed with bipolar disorder, and one of his sons exhibits significantly impaired neurocognitive functioning. At least two other of Mr. Barrett's cousins each has a son who suffers from diagnosed bipolar disorder.

25. Medical indications of the incidence of major mood disorders, and related impairments in functioning, can be found in Mr. Barrett's maternal family back to at least the generation of his grandmother, Hattie Gertrude Dotson. Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the twentieth century. Wallace Dotson, a first cousin of Mr. Barrett's maternal grandfather, was involuntarily committed to a state psychiatric hospital by

8

his father, Tom Dotson.  The record of admission documents the senior Dotson's description of his son as being "completely out of his mind," suffering from "some kind of spells" and not having slept for "three days and nights," a neurovegetative sign of mood disorders.

26.   Mr. Barrett's paternal family presents a comparable degree of genetic loading for major mood disorders and associated neurocognitive substrates.  At least one paternal aunt, Linda Riley, suffers from depression, and both of her adult daughters have been diagnosed with bipolar disorder.  One of Ms. Riley's grandsons has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder.  Another paternal aunt, Elnora Long, currently meets diagnostic criteria for bipolar disorders and requires treatment with high doses of medication.

27.   The paternal pedigree, neuropsychiatrically indicative of mental illness in Mr. Barrett's family extends back at least four generations.  A Certificate of Lunacy for Mr. Barrett's great-great-grandfather, A.J. (Jack) Barrett, documents his 1918 commitment to a psychiatric hospital in Sequoyah County.  Mr. Barrett's great grandfather, Isaac Clifford Barrett, despite achieving prominence in his social and professional community, manifested a loss of pleasure, called anhedonia, eventually committing suicide.  His oldest son, Mr. Barrett's grandfather, Andrew Jackson Barrett, manifested severe mood imbalances and disordered thinking, which resulted in violent physical and sexual assaults against his wife and children, including the forcible rapes and consequent impregnations of one of his daughters and his 13-year-old sister-in-law; and rampages in public while under the influence of alcohol.  His occupational functioning was severely impaired.  Psychiatric symptoms documented in his Certificate of Lunacy, contemporaneously with his commitment to a state psychiatric hospital, include auditory hallucinations, persecutory delusions and paranoid ideation, which were, in turn, exacerbated by

9

neuropsychological deficits that impaired his intellectual functioning, judgment and reasoning. He suffered severe mood swings, and attempted to self-medicate his psychiatric distress with excessive amounts of alcohol.  When he was sober, his family described him as "a decent guy." When he consumed alcohol, as he did on frequent occasions, he became unpredictable and violent.

28.     A.J. Barrett's disinhibition, affective dysregulation and violent behaviors, including assaults against his wife, traumatized his own son, Ernie Barrett (Kenneth Barrett's father), and impaired Ernie's neurodevelopment and cognitive functioning.  As an adolescent, Ernie Barrett exhibited signs of traumatic stress, becoming emotionally constricted, exhibiting psychic numbing and replicating his father's aggressive behaviors against his own siblings and classmates.   As an adult, Ernie Barrett exhibited a neuropsychiatrically diagnostic symptom cluster of bipolar-related behaviors, including hypersexuality, grandiosity and substance abuse.

29.     Howard Maxwell, the brother of one of Mr. Barrett's paternal great grandmothers, Mary Ellen Maxwell, was colloquially described as exhibiting psychiatric symptoms, and his son, Billy Dean, had a history of Schizophrenia, and also committed suicide.

30.     Kenneth Barrett's own genetically based potential for developing a mental illness was significantly increased by the circumstances of his upbringing, especially his parents' chemical dependency. Mood disorders have an incidence in the United States of approximately 8 percent of the population. When there is a genetic loading of mood disorders in a family, the incidence increases exponentially.

31.     Early onset BD appears to have strong polygenetic inheritances, with strong expression in the children of affected parents, and has a higher incidence than reported in the

offspring of parents with other types of mood or affective disorders. Children with one parent with BD have a 25% incident of inheriting BD; for children whose parents both have BD, the incidence rises to 50% to 75%. (Faust et al, *Diagnosis and Management of Childhood Bipolar Disorder in the Primary Care Setting*, Primary Pediatrics, November 2006, page 802.)

32.     Based on the research regarding the genetics of schizophrenia and bipolar disorder, it is medically reasonable to conclude that the prevalence and severity of substance dependency in Mr. Barrett's family is largely genetically determined.  His parents' dependency and their different, unpredictable behaviors while intoxicated, further compromised Mr. Barrett's ability to perceive and incorporate a sense of appropriate boundaries, and develop an adequate perception of social cues and interpersonal interactions.  Ernie Barrett was frequently physically absent for days at a time as a result of extramarital affairs, and Gelene Barrett was rendered emotionally distant and neglectful by her intoxication.  These behaviors left Mr. Barrett's parents ill equipped to develop the primary attachments or provide the basic physical and emotional nurturing necessary for a young child's normal, healthy neurocognitive development.

33.     *From Neurons to Neighborhoods*, a study of early childhood development by the National Research Council and the Institute of Medicine, documented sensory stimulation, and social interactions as conditions that affect the developing brain. They also determined that chronic stress is detrimental to the normal development of the brain. (Shonkoff and Phillips, *From Neurons to Neighborhoods: The Science of Early Childhood Development*, National Academy of Science Press, 2001, page 199.)

34.     Parental neglect of the type suffered by Mr. Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the

11

longest term and most pernicious effects of all such early traumatic experiences.

35.     The brain is only starting to grow, mature, and differentiate at the time of birth. Within the newborn brain there are certain structures that develop only if stimulated, and there are other structures that atrophy if not stimulated.  The newborn child's interpersonal and environmental experiences determine the rate and quality of development for domains that regulate definition of person and comprehension of one's place in his or her environment.  The absence of necessary caretaking or experiences that promote attachment between parent and child can alter both the structure and function of the child's developing brain. Mr. Barrett's reactivity rather than responsiveness is directly related to the lack of parental training of appropriate coping mechanism, in addition to his genetically-derived mood disorder.

36.     Emotional development can be seen as the literal acquisition of emotions. Children must develop the capacity to recognize and use emotions appropriately. Children must also become successful in a complex maturation process that entails learning to become emotionally responsive rather than emotionally reactive to internal experiences of emotion.  In addition, children must learn to use their emotional repertoire to handle the inherent anxiety and stresses that are universal to the human condition. Emotional maturity can be understood as the acquisition of coping defenses in infancy and childhood. (Sadock and Sadock, Comprehensive Textbook of Psychiatry, Eight Edition, Lippincott, Wilkins, and Williams, 2005, page 3029.)

37.     Mr. Barrett was also exposed to neurological insults to his fragile central nervous system *in utero* due to his mother's alcohol use, and during his formative years from his mother's unpredictable beatings and his parents frequent domestic disputes, that were known to end in violence.  E.g., Mr. Barrett's mother describes the "pretty bad fights" she and her husband had

12

whenever she confronted him about his infidelity, and reports that "he gave [her] two black eyes and split [her] lip."

38.     As a child, Mr. Barrett exhibited signs of impaired neurological growth, failing to meet developmental milestones expected of healthy infants.   During his first year, Mr. Barrett exhibited increasing delays in areas associated with creating interpersonal relations and emotional development.  Among other delays, at age three months, he did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand"; at nine months, he did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent"; at one year, Mr. Barrett's mother noticed that he "had trouble learning to walk," and could not  "drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching."

39.     Mr. Barrett failed reading in the first grade, was required to repeat the eighth grade and was eventually referred to special education classes before he dropped out of school in the ninth grade.  By pre-adolescence his hyperactivity, irritability, isolation, and impaired academic functioning introduced the prodromal symptoms associated with major mood disorder. He became more hyperactive, intrusive, and emotional labile, extremely sensitive, and a tendency to emotionally decompensate without apparent provocation.

40.     Initial presentation of childhood or adolescent bipolar disorder typically involves moodiness, frequent or aggressive oppositional behavior, anger that does not resolve in 15

13

minutes, sadness and easy crying, inattention, and impulsiveness.  When the illness begins before or soon after puberty, it is often characterized by a pattern of continuous rapid-cycling, irritable or mixed symptoms that may co-occur with disruptive behavior disorders such as ADHD or CDs (conduct disorders), or may have symptoms of these disorders as presenting features. (Faust et al, Diagnosis and management of childhood bipolar disorder in the primary care setting, Primary Pediatrics, November 2006, page 801.)

41.    As he approached adolescence and continuing through young adulthood, Mr. Barrett experienced potential neurological insults outside his home that posed further risks of cognitive impairment and traumatogenic sequelae.  In a playground accident that occurred when Mr. Barrett was eight or nine, he was struck in the head by what he describes as a "steel ball," with indicated loss of consciousness.  He recalls only "waking up" as he was being lifted off the ground after being struck.   At age 17, Mr. Barrett reportedly suffered an assault by one or more police officers.  Mr. Barrett reportedly declined to pursue an investigation of the officers' actions, but his mother reports that while one officer restrained Mr. Barrett, another one beat him around the face, head and neck, inflicting injuries that included a broken jaw and collar bone, facial contusions and a bloodied nose.  When he was approximately 22, and again at age 23, Mr. Barrett was involved in motorcycle accidents, again with apparent loss of consciousness.  Mr. Barrett, witness accounts and medical records confirm that at the age of 24, he apparently attempted suicide by shooting himself in the chest with a shotgun; and Mr. Barrett reports that he has made several other unsuccessful attempts to take his life by driving his car or motorcycle off the road at high speeds.   In connection with Mr. Barrett's arrest for the commitment offense, he suffered several gunshot wounds to his legs, facial contusions and abrasions, and superficial

14

blunt trauma to his head.

42.     Mr. Barrett reports that his regular use of alcohol, tobacco and other drugs, including marijuana, started around the age of eleven or twelve, a period when the development of his frontal lobes, the seat of neurological executive functioning, is first beginning.

43.     Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received. More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation.  Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders.  The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.( Young declaration, page 13)

44.     In an environment in which "mom drank, grandpa drank," Mr. Barrett had easy access to alcohol and soon began drinking "more regular."  In the seventh grade he regularly abused marijuana on a weekly or bi-weekly basis, and increased to more frequent use as he gained greater access to the drug once his use became more widely known among peers, and other users were willing "to turn [him] on."  From late adolescence through early adulthood he reports episodic use of Valium, Lithium, LSD, PCP, psilocybin mushrooms, methamphetamine, cocaine, Quaaludes and Placidyl; and frequent abuse of barbiturates.  By his 30's, Mr. Barrett primarily abused cocaine, methamphetamine and Tuenol.  Mr. Barrett's chemical dependency

15

history is consistent with the high incidence of substance use secondary to the increased neurovegetative symptoms of eating and sleep disorders, adhedonia and mania found in bipolar disorder. Mr. Barrett's combination of traumatic stress and bipolar disorder predisposed him to chemical dependency. PTSD and bipolar disorder each have a co-occurring incidence with chemical dependence greater than 40% in the clinical literature.

45.     Mr. Barrett was unable to acquire the skills and means necessary to live independently, and manifested significantly impaired social, relational and occupational functioning throughout his adulthood.  He married at the age of 19, and his son, the couple's only child, was born shortly afterward.  The union was severely strained by the effects of Mr. Barrett's mental instability, which was apparent to lay observers.  Mr. Barrett experienced periods of severe depression, in which he exhibited signs of catatonia, followed by mania and racing thoughts.  Mr. Barrett was unable to maintain a consistent work schedule, and the couple frequently had to live with Mr. Barrett's mother, Gelene Dotson.

46.     Mr. Barrett's former wife reports that during the periods they lived with Ms. Dotson, the effects of Mr. Barrett's attempts to ameliorate symptoms by self-medicating with illicit drugs were exacerbated by his mother's habit of making him "get up from bed and party with crack and pot."

47.     Mr. Barrett and his wife experienced frequent separations followed by unsuccessful attempts at reconciliation.  Mr. Barrett was unable to live independently and resided with his mother or father when living apart from his wife.  Mr. Barrett's efforts at pursuing gainful employment were defeated by feelings of irritability, agitation and dysthymia, and impulsive, unconsidered abandonment of his job.

48.     Mr. Barrett reported to me that he would become so paranoid over time when interacting with others, he would be forced to leave successful attempts at working, often leaving at the point he was experiencing his direst moment. He left Fort Smith, Arkansas, working with his father, overwhelmed with racing thoughts and paranoid ideation

49.     Mr. Barrett's documented suicide attempt in 1986 was followed by psychiatric intervention and treatment with Elavil and Ascendin, antidepressants well known to exacerbate mania. Many antidepressants force a neurological "switch" to occur in bipolar disorder, inducing mania.

50.     Mr. Barrett's bipolar disorder's pattern can best be described as a "mixed phase" disorder, with depressive mood and affect combined with racing thoughts, irritability, paranoia, and disinhibition. Treated most often with antidepressants due to his depressive presentation, the medication regimen had the potential to increase Mr. Barrett's symptomatology, rather than ameliorate it.

51.     Mr. Barrett was medication noncompliant and his condition deteriorated, necessitating involuntary commitment to Eastern State Hospital in October 1986.  At admission, he presented as emotionally labile with impaired insight and judgment, and was provisionally diagnosed as suffering "depressive neurosis with suicidal potential extremely high."   Upon discharge, Mr. Barrett was again unable to live independently, and stayed with relatives.  The results of a Social Security Administration determination of eligibility found that Mr. Barrett was "moderately depressed" and periodically unable to "think clearly."  He required frequent admissions to hospital emergency rooms after reportedly falling down stairs, sustaining a contusion to his right periorbital region of his head; being involved in a motor vehicle accident,

17

in which he experienced rib and chest pain; and suffering a rash "all over."  Mr. Barrett's disclosure, during clinical evaluation, of described suicide attempts using motor vehicles indicates that documented motorcycle and automobile accidents may have been unsuccessful suicide attempts, increasing the psychologically traumatic component of such incidents in addition to creating a risk of further neurological insults.

52.   Following a final separation from his wife after being unable to live independently in Fort Smith, Arkansas, Mr. Barrett psychiatrically decompensated and was hospitalized in January 1995.  He reported to hospital staff that he was "losing [his] mind," and noted to be extremely agitated, sleep-deprived, unable to concentrate and experiencing racing thoughts.  He was diagnosed with bipolar mood disorder and started on a regimen of 10mg. of Haldol, to be injected intramuscularly ("IM").  The requirement of intramuscular administration of psychotropic medication indicates that Mr. Barrett lacked the insight to recognize his medical predicament and that involuntary treatment with neuroleptics was medically necessary. However, Mr. Barrett's symptoms also called for mood stabilizing and cognitive enhancing medication, and Haldol, although an excellent antipsychotic, does neither. Again, Mr. Barrett's symptoms, although identified, were not appropriately or adequately treated, leaving him to become increasingly paranoid and cognitively impaired.

53.   When he was discharged from the psychiatric hospital, Mr. Barrett returned to his mother's property, where he constructed what family members describe as a small "shack," with approximately $150 worth of building supplies and scraps of materials.  The structure lacked running water, a toilet or electricity.  Mr. Barrett's mother allowed him to run an electrical cord from her house trailer to his shack, to use her bathroom and shower, and eventually to eat in her

kitchen.  Mr. Barrett's family and former wife recognized that he could never "live on his own," and his mother allowed him to remain on her property, where he earned a marginal income repairing cars for friends and neighbors.

54.     In the years and months preceding the commitment offense, Mr. Barrett expressed increasingly paranoid thoughts, experienced intolerable irritation at perceived surveillance and harassment by law enforcement authorities and felt threatened by illicit drug users and dealers, some of whom he suspected of being police informants.  He disclosed to others his belief that he was being monitored by satellites and became increasingly withdrawn until he stopped leaving his mother's property.  He relied on others to shop and run errands in the nearby town for him. At other times, he believed the unidentified aircraft "hovering" over his property were "dirigibles," similar to "the ones the U.N. uses," and reinforced with "steel plates on their bottoms."  He described shooting at one and causing it to flee.

55.     In the weeks or days before the commitment offense, Mr. Barrett reportedly displayed a sign on the roadway leading onto his mother's property that warned:  "Keep out.  I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot."  There was some dispute whether the message was directed at law enforcement, drug dealers or both.

56.     Mr. Barrett's description of the events leading to his arrest indicates that he did not leave his shack before he was shot by the police.  Responding to the sound of his son's voice calling his name, Mr. Barrett rushed to the front porch and observed an unidentified Ford Bronco driving toward his son.  Mr. Barrett retrieved a handgun from inside the shack and placed it in the waistband of his trousers, and began to return to the porch to investigate.  He was struck by a bullet he believes was fired through a window of the shack as the Bronco "hit the front of the

house." Mr. Barrett says "I didn't know what was going on except someone was there to kill me." At the sight of the Bronco striking his residence, Mr. Barrett "went to firing." The next recollection he has is of a law enforcement officer ordering him to stand up. Mr. Barrett has no memory of having fallen, but he does recall he could not stand up due to bullet injuries to his legs.

**Neuropsychological Assessment**

57.    The neuropsychological assessment performed by Dr. Myla Young measured impairments in cognitive performance associated with significant dysfunction in the dorsolateral and orbital portions of the prefrontal lobes of Mr. Barrett's brain. The measured deficits compromise Mr. Barrett's ability to inhibit cognitive and emotional stimuli, and seriously disrupt executive function including planning (the ability to inhibit short-term goals for long-term objectives), and engaging in reasoned, purposeful, self-regulating goal-directed behavior. The frontal lobes are also responsible for the integration of motoric and cognitive functioning, including mediation of impulses from the regions of the amygdala and hippocampus. The amygdala is associated with primordial "fight/flight" responses, as wells as the positive/negative emotional responses of happiness and sadness. When the amygdala sends an impulse, it is modulated by the orbital frontal lobe before activating striatal responses. Frontal lobe integration of working memory with limbic impulses enables the brain to contextualize new information, including external stimuli, and make an appropriate response selection.

58.    The prefrontal cortex, the area of most severe damage for Mr. Barrett, is the site of executive functions. As Dr. Young has indicated, the processes grouped under the label of executive functions can be thought of as multiple processing modules collected together to direct

20

cognitive activity, including mental functions associated with the ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior.  These modules perform functions related to overseeing the use of other cognitive processes.  As noted by Dr. Young, this array of brain functions include those that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use of hindsight and foresight in the direction of current processing.  Mr. Barrett suffers significantly impaired functioning in all these domains.

59.     In addition to having problems with focusing and sustained attention, manic patients have difficulties shifting attention. Manic patients resemble patients with frontal lobe

21

damage on attentional shifting task such as the Wisconsin Card Sorting Test.  Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become incorrect. (Goldberg et al, Cognitive Dysfunction in Bipolar Disorder, American Psychiatric Publishing, 2009, page 29)

60.     Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

**Malingering**

61.     The Diagnostic and Statistical Manual of the American Psychiatric Association, Fourth Edition, Text-Revised (DSM-IV-TR™) explains that "[t]he essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as . . . evading criminal prosecution, or obtaining drugs."  Mr. Barrett does not "produce" or exaggerate symptoms, rather he minimizes the severity of his symptoms and attempts to present as high functioning, despite acknowledgement of signs of his mental illness.  There is no marked discrepancy between Mr. Barrett's acknowledged symptoms and the objective findings (Malingering criterion #2). Reliable, congruent clinical evidence – including lay witness observations predating Mr. Barrett's arrest, prior psychiatric diagnoses and treatment, and objective neuropsychological testing results – shows that he meets diagnostic criteria for mental illness and suffers cognitive deficits.

22

62.     In particular, neuropsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results.  The successful manipulation of test data to exaggerate measures of neurological impairment in a manner that eluded detection by imbedded validity scales would have required Mr. Barrett to have specific knowledge and mastery of neuroanatomy and test construction.

**Etiology and Onset**

63.     Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult.  The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

64.     The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

65.     Mr. Barrett's family history, the consistency of emotional dysregulation beginning

23

early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

**Clinical Impressions**

66.     Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

67.     Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).  Lezak emphasized the fluid nature of executive functioning and how dependent the cognitive and emotional aspects of functioning were on the "executive." Baddeley grouped these behaviors into cognitive domains that included problems in planning,organizing behaviors, disinhibition, perseveration, reduced fluency, and initiation (Baddeley 1986). Baddeley coined the term "dysexecutive syndrome." Each component of executive functioning has added to the array of cognitive processes, which include maintaining a problem-solving set for goal-directed

1299

behavior, interference control, flexibility, strategic planning ability, and the ability to anticipate and engage in goal-directed activity (Denckla 1994). The definition of executive function is encompassed by actions fueled by conceptualizations, such as the ability to filter interference, engage in goal-directed behaviors, anticipate the consequences of one's actions, and the adaptive concept of mental flexibility (Luria 1969; Luria 1980; Stuss and Benson 1986; Denckla 1996; Goldberg 2001). The concept of morality, ethical behaviors, self-awareness, and the idea of the frontal lobes as manager and programmer of the human psyche are also included." (Ardila et al, Executive Function, Medlink Neurology, 2009)

68.    Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial.

**Medicolegal Findings**

69.     Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms, none of which was addressed, either legally or psychiatrically. First, Mr. Barrett was suffering profound neurocognitive deficits that impaired his ability to rationally assist his attorney in the preparation of his defense.

70.     Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings, rendering him unable to rationally assist his attorneys. He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

25

71. Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

72. He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

73. Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

74. Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

75. Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

76. Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He

26

was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

77.     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

78.     My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions

27

before they occurred.

79.     Mr. Barrett's reactivated Post Traumatic Stress Disorder had built-in reminders, namely the bullet fragments that continued to cause him significant pain and the reactive immunological reaction he has had to the bullet fragments in his body. Consequently, it is clinically consistent that his constellation of PTSD symptoms would continue through his trial and, to some extent, exist today.

80.     He described symptoms of racing thoughts during his trial, which prevented him from being able to effectively track the proceedings. Mr. Barrett's thoughts were also ruminative, and he was "unable to get unstuck." He would get his mind on an issue during the trial, and not be able to move to other aspects of the trial.

81.     Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial. His triad of neuropsychiatric impairments, his PTSD, Bipolar Disorder, and Dysexecutive Syndrome; were not bound, as they are today, in a structured environment without the overwhelming stress Mr. Barrett was facing at the time of trial.

82.     I hold the foregoing opinions to a reasonable degree of medical certainty, and if called as a witness, I would and could testify truthfully to the information set forth above.

I declare under the penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct and was executed on March 14, 2009.

/s/ George W. Woods
George W. Woods, Jr., M.D.

28

1303

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 118**

DECLARATION OF ROSEANN SCHAYE

I, ROSEANN SCHAYE, declare under penalty of perjury as follows:

1.   I am a Licensed Professional Counselor and maintain a private practice in Tucson, Arizona.  I received my undergraduate degree, Bachelor of Arts, with a major in sociology in 1978 at the University of Arizona and my Masters in Education also from the University of Arizona in 1981.

2.   In July of 2000, I was self-employed as a Mitigation Specialist providing assistance to court-appointed and retained counsel in capital trials and post conviction proceedings.  In that capacity I routinely investigated and developed evidence relevant to the questions to be decided in the penalty phase of capital cases.  As of July 2000, I had extensive experience in assisting capital defense counsel in formulating and implementing a mitigation investigation consistent with the standards of professional practice prevailing at that time.  I had an understanding of the presumptive scope of the investigation that was necessary to discharge defense counsel's obligation to obtain all reasonably available mitigation evidence necessary for the preparation and presentation of a penalty phase defense.  Based on my training and practical experience, I was also aware of the tasks, hours and expenses that were reasonably necessary to develop the evidence required for a professionally adequate presentation of penalty phase mitigation evidence, including investigation of the client's social and medical history, and the consideration and presentation of potential mental health evidence and mitigation themes.

3.  Based on my training and experience, I knew that the timely investigation and preparation of a potential penalty phase defense had to commence in conjunction with the preparation of the guilt phase.  Development of an effective penalty phase presentation

required counsel to have a coherent theory of the case as a whole, and that strategic and tactical decisions made in the guilt phase be informed by counsel's awareness of the evidence that would be presented in mitigation in the event the case proceeded to a penalty phase, or second stage. It was my experience, and that of other qualified mitigation specialists, that preparation of an effective case in mitigation required a command of the guilt phase evidence, including the circumstances of the crime; and that timely investigation of mitigation evidence, such as a client's mental state, could reveal the basis for a guilt phase defense.

4. In July 2000, I was retained by counsel for Kenneth Barrett to conduct an investigation of potential mitigating factors that would be relevant to guilt phase as well as the penalty phase of his trial, in the event the case proceeded to a second stage. The organizing focus of my investigation was the development of information necessary to produce a social and medical history documenting the significant events and factors that shaped Mr. Barrett's development, functioning and behavior over the course of his life, including at the time of the charged offense. The preparation of a social history is recognized by capital litigators as a prerequisite to identifying potential stand-alone mitigation based on a client's frailties and privations, as well as an essential component of a reliable and accurate evaluation of the client's mitigating mental states. In conducting my investigation of Mr. Barrett's social history and other potentially mitigating factors, I followed the professional standards recognized by the American Bar Association for the function of defense counsel in capital cases, as well as observing protocols followed by competent mental health and medical professionals who would be relying on the data I collected to reach their expert opinions.

2

5. As of December 2001, I had performed the following tasks:

a) Completed one non-confidential interview with Mr. Barrett and two confidential interviews to obtain his perception of his social history, including a history of possible mental impairments and history of childhood mistreatment.

b) Conducted many witness interviews, including with members of Mr. Barrett's biological family who had personal knowledge of the parental abuse of Mr. Barrett, his parents' very frequent separations and regular abandonment by his father, his family's very frequent moves, and poverty of the family when the father left.

c) Identified and begun to obtain medical, educational, social service and employment records for Mr. Barrett, and those family members who I had interviewed who had a significant role in his life. The relevant records were necessary both to determine and document family patterns of behavior, as well as to determine genetic predisposition to medical and psychiatric disorders, including chemical dependencies.

6. My preliminary investigation revealed a constellation of factors that likely had affected Mr. Barrett's development, functioning and behavior; and reasonably indicated the need for further, in-depth investigation that was likely to uncover and document:

a) The nature and extent of physical and psychological trauma Mr. Barrett experienced during his childhood at the hands of his parents and, later, other adults;

3

b) The long term consequences of the trauma, including psychiatric symptoms and disease;

c) His family's substantial, multi-generational history of mental impairments including a significant prevalence of neurological impairments, mood disorders and chemical dependency;

d) Mr. Barrett's probable inability to perceive the world around him accurately or to inhibit his trauma-related behavior as a result of brain damage in addition to cognitive deprivation and familial cultural factors.

7. The standard of care in capital cases in state and federal cases required that a thorough investigation be conducted in Mr. Barrett's case to develop a reliable social and medical history for him. The contents of records obtained as a result of my preliminary investigation indicated that no such comprehensive history has been conducted on Mr. Barrett's behalf for any purpose. Developing a social history is the crucial first step in determining the range of mitigation evidence that counsel can offer at penalty phase. A social history also serves the purpose of allowing counsel to rebut, defeat, or mitigate evidence offered by the prosecution as aggravation. Finally, the completion of a competent and confidential mental health evaluation by psychiatrists, neurologists, psychologists, or social workers to reliably determine the presence, severity and effect of mental disorders that affected Mr. Barrett's behavior during the course of his life required them to be provided with reliable and independently documented data about Mr. Barrett's social history.

8. It was also crucial to determine the psychiatric and medical history of Mr. Barrett's biological family, including that of his parents' and grandparents' generations in

4

order to determine and document the existence of a genetic vulnerability to the development of the types of mental disorders that became apparent during the course of the preliminary investigation. It was therefore important to gather appropriate institutional records about other family members who had mental disabilities or histories, which may have affected Mr. Barrett' behavior or functioning. Based on the voluminous social records I initially obtained or identified for Mr. Barrett and his family members, it was evident that the completion of an adequate social history would require the defense to obtain additional records, including:

    a)    All school records, including transcripts, health records, standardized testing, attendance, special education testing and/or classes, disciplinary action for every school attended;

    b)    Employment records, including applications, attendance, job assignments and performance evaluations, medical and psychological evaluations, relocations, pay records, Social Security tax records;

    c)    Family and individual social service records, including Food Stamps, AFDC, WIC, welfare, counseling records, referrals, and medical and mental health treatment. Again, these records are necessary both to determine family patterns of behavior, as well as to determine genetic predisposition to medical and psychiatric disease, including chemical dependency;

    d)    Medical records, including private physicians, clinics and hospitals;

    e)    Youth agency and juvenile criminal justice records, including defense counsel's files, pre-trial intervention, community service records, juvenile

5

detention records, and all related medical, educational and intelligence evaluations, treatment plans, field and progress notes, referrals and court files;

f)      Adult criminal records, including police, sheriff and FBI records, jail records including psychological, educational and medical evaluations and notes, daily progress notes, disciplinary reports, work assignments, classification reports, religious reports and visitation logs; all court records; all public defender and prosecution files;

g)      Psychological and psychiatric records, including community mental health clinics, private doctors and counselors, hospitals and substance abuse facilities, to include intake evaluations, treatment interventions, medication logs, physician and nurse progress notes, referrals, and discharge reports.

h)      All military records for significant family members of Mr. Barrett.

There were also potentially significant witnesses who resided in Norman and Oklahoma City, Oklahoma; and the State of Iowa, who needed to be interviewed.

9.      Based on my discussions with Mr. Barrett's attorney, my experience investigating numerous cases at the stage in the legal proceedings that Mr. Barrett's case was at that time, and my consultations with an experienced mitigation expert, it was my professional judgment that the investigation into mitigation for Mr. Barrett's penalty proceeding was still inadequate and incomplete.  In my opinion, a competent and reliable investigation of mitigation evidence to be presented at the penalty phase in Mr. Barrett's case would have required an additional minimum of eight to ten months.

10.     The preliminary results of my investigation also made it evident to me that once the social history investigation had been completed, a clinical assessment, including

6

neuropsychological evaluation would have to be conducted. Based on my interviews with Mr. Barrett, it was my opinion that he would have cooperated fully with the indicated evaluation. Throughout the course of my interviews with him, he remained willing to disclose and discuss uncomfortable, sensitive information and cooperated fully in describing experiences that were clearly painful for him to share with me. I explained my purpose in delving into such stressful memories of his life and upbringing, and Mr. Barrett did not in any way restrict the scope of my inquiries or indicate that he would object to the use of any information in the preparation of his mitigation case.

11. I was not authorized by Mr. Barrett's counsel to perform the additional tasks described above, and my involvement in Mr. Barrett's case was terminated in December 2001.

I declare under penalty of perjury that the foregoing is true and correct.


 /s/ Roseann Schaye
Roseann Schaye

7

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

### DEFENDANT'S MOTION
### TO FILE EXHIBITS UNDER SEAL
### AND FOR A PROTECTIVE ORDER

COMES NOW defendant KENNETH EUGENE BARRETT, by and through his undersigned counsel, and respectfully requests that this Court enter attached proposed order directing the Clerk to file under seal certain exhibits that will accompany his motion for post-conviction relief.  Mr. Barrett states the following as good cause for entering the proposed order:

1.      Exhibits to Mr. Barrett's motion under 28 U.S.C. § 2255 will include medical and educational records of witnesses.  Information contained in these documents is considered private and confidential under federal law, including, the Health Insurance Portability And Accountability Act ("HIPAA") which protects the privacy of medical records.  Mr. Barrett's counsel obtained these records through HIPAA-compliant releases.  In order to protect the witnesses from breaches of their privacy unrelated to the litigation in this case, the records should be maintained under seal.

2.      Exhibits to Mr. Barrett's § 2255 motion will include birth and death certificates that are considered confidential under Oklahoma law.  Mr. Barrett's counsel obtained these documents with appropriate releases.  However, in order not to frustrate the purposes of

Oklahoma law – including the prevention of fraud through such practices as identity theft – these records should be kept under seal.

3.     On March 10, 2009, undersigned counsel contacted United States Attorney Sheldon Sperling by e-mail in order to confer regarding this motion.  As of this filing, undersigned counsel is not aware of the Government's position regarding this motion.

WHEREFORE, Mr. BARRETT respectfully requests the Court enter the attached proposed protective order.

DATED:   March 10, 2009

<div style="margin-left:50%">

Respectfully submitted,

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

 /s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

</div>

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**[PROPOSED] PROTECTIVE ORDER
SEALING EXHIBITS**

On March 10, 2009, counsel for Defendant filed a motion requesting that certain exhibits to be filed with his motion for post-conviction relief be maintained under seal and subject to a protective order.  Mr. Barrett has identified these exhibits as medical records, educational records, and birth certificates of witnesses, as well as death certificates.  Such documents are considered privileged and confidential under the laws of the United States and the State of Oklahoma.  Therefore, GOOD CAUSE appearing, Defendant's motion to file exhibits under seal is GRANTED.  The following provisions shall apply to exhibits Defendant identifies as private and confidential:

1.      Mr. Barrett's counsel shall segregate exhibits he identifies as subject to federal or state privacy laws.  The volumes of paper documents, and/or the computer disk(s), containing these exhibits shall be separate from other exhibits, and shall clearly be labeled "Private and Confidential."

2.      The Clerk of this Court is directed to maintain under seal the documents identified

in Paragraph 1, *supra*.

3. The Government shall keep sealed and confidential all of the materials described in Paragraph 1, *supra*. None of these materials, and no information contained therein or derived therefrom, shall be revealed to any person other than counsel for the United States and persons working under their direct supervision in connection with these proceedings without prior authorization of the Court ordered on motion pursuant to fifteen days' notice filed under seal and served on counsel for Mr. Barrett. Except with such prior authorization, none of the materials and no information contained therein or derived directly or indirectly therefrom shall be used in any way or for any purpose except in connection with the litigation of the claims presented in any motion for post-conviction relief Mr. Barrett may have pending before this Court.

4. At the conclusion of the post-conviction proceedings, the United States shall file with this Court and serve upon counsel for Mr. Barrett a list of the names of all persons to whom any of the materials described in Paragraph 1, *supra*, or any information contained therein or derived directly or indirectly therefrom has been disclosed by counsel for the United States pursuant to or in violation of Paragraph 3, *supra*. Prior to any retrial or prosecution of Mr. Barrett by the United States or State of Oklahoma, his counsel shall be notified of the names of all persons acting for or assisting the United States or State of Oklahoma in any way in such matter.

5. This order shall continue in effect after the conclusion of these post-conviction proceedings. The court will maintain continuing jurisdiction over this matter for the purpose of enforcing the provisions of this order and imposing appropriate sanctions for any violation.

////

////

IT IS SO ORDERED.

DATED:   ____, 2009

_____
HON. JAMES H. PAYNE
CHIEF JUDGE
UNITED STATES DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-CR-115-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Defendant. | ) | |

## **ORDER**

This matter comes on for hearing on Defendant's Motion to File Exhibits Under Seal and for a Protective Order (Doc. 398) to seal certain exhibits which will accompany his motion for post-conviction relief.  Defendant's Motion to File Exhibits containing personal data identifiers or other confidential information under seal is hereby granted.  Counsel for the defendant shall strictly comply with L.Cv.R. 5.3 in redacting personal data identifiers or other confidential information from all pleadings and/or exhibits filed with the Court and shall file an unredacted copy of all documents with the Court and file a reference list under seal.

It is further ordered that counsel for the defendant shall provide counsel for the government an unredacted copy of all documents filed under seal.  Counsel for the government shall take the necessary steps to ensure that the sealed and confidential materials are not disclosed to any person other than counsel for the United States and/or persons working under their direct supervision in connection with any post-conviction proceeding

subsequently filed in this Court.   Once these filings have occurred, counsel for the government will be allowed to request relief from this order if they believe any of the documents and/or exhibits should not remain under seal.

Accordingly, it is the Order of this Court that the Motion to File Exhibits under Seal and for a Protective Order (Doc. 398) is hereby granted.  It is further ordered, upon receipt of any post-conviction motion by the defendant and the opening of a new civil action in this Court, the Court Clerk is hereby directed to file a copy of Defendant's Motion and this Order in the new civil case.

It is so ordered this _11th_ day of March, 2009.

James H. Payne
United States District Judge
Eastern District of Oklahoma

1318

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

### DEFENDANT'S MOTION FOR RECONSIDERATION OF THE ORDER FILED MARCH 11, 2009 (Doc. 399)

COMES NOW defendant KENNETH EUGENE BARRETT, by and through his undersigned counsel, and respectfully requests that this Court reconsider the order filed March 11, 2009, to the extent that it denied Mr. Barrett the relief he requested while stating that Mr. Barrett's motion was granted. Mr. Barrett states the following as good cause for reconsideration:

1.      On March 10, 2009, Mr. Barrett filed a motion seeking to have certain exhibits filed and maintained under seal, and subject to a protective order. Doc. 398. Mr. Barrett explained that the exhibits in question contained information that is considered private and confidential under federal and state laws. Mr. Barrett's counsel did *not* explain, however, that he was, by seeking leave to file entire exhibits under seal, in effect, seeking to file using the first alternative method set forth in Local Civil Rule 5.3. The local rule provides that

> a party wishing to file a document containing the personal data identifiers or other confidential information listed above may:
>
> •      File an unredacted version of the document under seal, which shall be retained by the court as part of the record; **or**
>
> •      File a reference list under seal. * * *

Def.'s Mot. File Exhibits Under Seal                                             *U.S. v. Barrett*, CR-04-115-JHP-SPS

L.Cv.R. 5.3 (emphasis in original).  Due to counsel's omission, the Court "granted" Mr. Barrett's motion while also requiring him to comply with **both** alternative methods for protecting privacy.  Mr. Barrett's counsel apologize for not being more specific regarding the purpose of their motion, and for the inconvenience this omission has caused.

2.     As noted, the Local Rule provides that a party may file documents either under seal or in redacted form with a reference list.  Mr. Barrett intends to file a large number of exhibits which contain personal identifying information.  Moreover, some of the exhibits are many pages long.  Under the circumstances, identifying and redacting each personal identifier then creating a detailed reference list creates an extreme burden.  The provision for alternative methods in Local Civil Rule 5.3 (which is duplicated in Local Criminal Rule 49.3), reflects a determination by this Court that the goals of the local rule and relevant privacy statutes can be accomplished if the exhibits containing private matter are segregated and filed under seal without the undue burden of redactions, and without the added complication of having two sets of exhibits, one redacted, the other not redacted.  Mr. Barrett submits there is no reason for the Court to require the use of both methods in his case.

3.     On March 10, 2009, after Mr. Barrett's motion was filed, undersigned counsel conferred by e-mail with United States Attorney Sheldon Sperling regarding the motion filed that day.  Undersigned counsel explained to Mr. Sperling the concern about the volume of material that would have to be redacted.  Mr. Sperling stated that the Government did not oppose Mr. Barrett's motion.

WHEREFORE, Mr. BARRETT respectfully requests the Court reconsider and modify its order filed March 11, 2009, to provide that pursuant to the Local Rules Mr. Barrett, like all other litigants before this Court, may file exhibits containing personal data identifiers

under seal in unredacted form.

DATED:   March 11, 2009

Respectfully submitted,

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-CR-115-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED ORDER**

This matter comes on for hearing on Defendant's Motion to File Exhibits Under Seal and for a Protective Order (Doc. 398) to seal certain exhibits which will accompany his motion for post-conviction relief. Defendant's Motion to File Exhibits containing personal data identifiers or other confidential information under seal is hereby granted. Counsel for the defendant shall strictly comply with L.Cv.R. 5.3 in redacting personal data identifiers or other confidential information from all pleadings and/or exhibits filed with the Court and shall file an unredacted copy of all documents under seal with the Court or file a reference list under seal.

It is further ordered that counsel for the defendant shall provide counsel for the government an unredacted copy of all documents filed under seal. Counsel for the government shall take the necessary steps to ensure that the sealed and confidential materials are not disclosed to any person other than counsel for the United States and/or persons working under their direct supervision in connection with any post-conviction proceeding

subsequently filed in this Court.   Once these filings have occurred, counsel for the government will be allowed to request relief from this order if they believe any of the documents and/or exhibits should not remain under seal.

Accordingly, it is the Order of this Court that the Motion to File Exhibits under Seal and for a Protective Order (Doc. 398) is hereby granted.  It is further ordered, upon receipt of any post-conviction motion by the defendant and the opening of a new civil action in this Court, the Court Clerk is hereby directed to file a copy of Defendant's Motion and this Order in the new civil case.

It is so ordered this __11th__ day of March, 2009.

James H. Payne
United States District Judge
Eastern District of Oklahoma

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**


KENNETH EUGENE BARRETT,        )
                               )
                   *Movant,*   )
                               )
                               )   **Case No. 6:09-cv-00105-JHP**
v.                             )
                               )
UNITED STATES OF AMERICA,      )
                               )
                   *Respondent.*  )


**MOTION TO DISQUALIFY AND RECUSE UNITED STATES DISTRICT JUDGE
JAMES H. PAYNE FROM FURTHER PARTICIPATION IN THIS MATTER**

**TABLE OF CONTENTS**

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     APPLICABLE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      Constitutional Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      Statutory Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

                1.      28 U.S.C. § 455(a):  the appearance of bias . . . . . . . . . . . . . . . . . . . . . . . 3

                2.      28 U.S.C. § 455(b): actual bias &disqualifying knowledge
                        or association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        C.      The law requires heightened need for reliability in death penalty cases . . . . . . . 5

III.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      Judge Payne's Conduct Provides Reason to Believe he Harbors Bias or
                Prejudice against Mr. Barrett or in Favor of the Government, and Would
                Cause Any Fully Informed Person to Question his Impartiality in this Matter . . . 6

                1.      Judge Payne's ex parte communications with prosecutors and
                        the necessity of adjudicating claims based on those communications
                        constitute grounds for disqualification and recusal . . . . . . . . . . . . . . . . . 6

                2.      Judge Payne's administrative decisions and the necessity of
                        adjudicating claims involving those decisions constitute grounds for
                        disqualification and recusal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                3.      Judge Payne's independent investigation of facts underlying the
                        denial of Mr. Barrett's motion for tolling constitutes grounds for
                        disqualification and recusal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                4.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        B.      Recusal is Required Under 28 U.S.C. § 455(b) Due to Judge Payne's Status
                as a Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.     REQUEST FOR EVIDENTIARY HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

V.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

Aetna Life Insurance v. Lavoie, 475 U.S. 813 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Bracy v. Schomig, 286 F.3d 406 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

Brokaw v. Mercer County, 235 F.3d 1000, 1025 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 4

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Lankford v. Idaho, 500 U.S. 110 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Liteky v. United States, 510 U.S. 540 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Mayberry v. Pennsylvania, 400 U.S. 455 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

In re Murchison, 349 U.S. 133 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 13, 21

Murchu v. United States, 926 F.2d 50 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Nichols v. Alley, 71 F.3d 347 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Spaziano v. Florida, 468 U.S. 447 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Taylor v. Hayes, 418 U.S. 488 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21

Tumey v. Ohio, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Cooley, 1 F.3d 985 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Gonzalez, 150 F.3d 1246 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Greenspan, 26 F.3d 1001 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 3

Ward v. Village of Monroe, 409 U.S. 57 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Woods v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Woodson v. North Carolina, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**FEDERAL STATUTES**

18 U.S.C. § 3432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 10, 11

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

18 U.S.C. § 3599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28 U.S.C. § 144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 26

28 U.S.C. § 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17

**MISCELLANEOUS**

ABA Model Code of Judicial Conduct, Canon 2, Rule 2.9(C) . . . . . . . . . . . . . . . . . . . . . . . . 17

Elizabeth G. Thornburg, *The Curious Appellate Judge: Ethical Limits on
Independent Research*, 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

iii

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA


KENNETH EUGENE BARRETT,            )
                                   )
                     *Movant,*     )
                                   )
                                   )     **Case No. 6:09-cv-00105-JHP**
v.                                 )
                                   )
UNITED STATES OF AMERICA,          )
                                   )
                  *Respondent.*    )


**MOTION TO DISQUALIFY AND RECUSE UNITED STATES DISTRICT JUDGE
JAMES H. PAYNE FROM FURTHER PARTICIPATION IN THIS MATTER**

COMES NOW Kenneth Eugene Barrett, by and through his undersigned counsel, and,

pursuant to 28 U.S.C. § 455, and the Fifth, Sixth, Eighth and Fourteenth Amendments to the

United States Constitution, moves for an order disqualifying and recusing Hon. James H. Payne

from further participation in this case. The grounds for this motion and supporting legal authority

are set forth as follows:

## I.  INTRODUCTION

On March 16, 2009, Mr. Barrett filed a motion pursuant to 28 U.S.C. § 2255 for collateral

relief, including vacating, setting aside and/or correcting his sentence.  Docs. 1 & 2 ("Motion to

Vacate").  Among the grounds set forth in his motion, Mr. Barrett asserts that the trial court,

presided over by Judge James H. Payne, directly violated his constitutional and statutory rights in

ways that include violations of rules of judicial conduct.  In addition, Mr. Barrett contends that

Judge Payne is a material witness to many of the facts and circumstances that comprise the basis

1

of various other claims set forth by Mr. Barrett, including Mr. Barrett's claims of prosecutorial misconduct and his claims of ineffective assistance of counsel. Accordingly, Judge Payne is either the subject of or a potential material witness to facts that must be considered in evaluating Mr. Barrett's claims and, as such, Judge Payne is disqualified, and must recuse himself, from making any rulings in these proceedings.

Additionally, prior to the filing of his Section 2255 Motion, Mr. Barrett filed a Motion for Equitable Tolling in Case No. 6:04-CR-00115, requesting that the trial court toll the time period for the filing of the Motion to Vacate. In considering that motion, Judge Payne violated the canons of judicial ethics by conducting an independent investigation on the internet of information he later relied upon to deny relief without giving Mr. Barrett prior notice or an opportunity to be heard.

Whether these acts are considered individually or collectively, any reasonable person fully informed of the law and facts, at a minimum, would question Judge Payne's impartiality.

## II.  APPLICABLE LAW

A.      **Constitutional Authority**

The fair trial guarantees of the Due Process Clause of the Fifth Amendment encompass a litigant's right to have "a neutral and detached judge" preside over judicial proceedings. *Ward v. Village of Monroe,* 409 U.S. 57, 62 (1972). In *In re Murchison,* 349 U.S. 133 (1959), the Supreme Court has stated:

> A fair trial in a fair tribunal is a basic requirement of due process.
> Fairness of course requires an absence of actual bias. But our
> system of law has always endeavored to prevent even the
> probability of unfairness. . . . Such a stringent rule may sometimes
> bar trial by judges who have no actual bias and who would do their

2

1329

> very best to weigh the scales of justice equally between contending
> parties. But to perform its high function in the best way "justice
> must satisfy the appearance of justice."

*Id.* at 136 (citations omitted).

So important is this constitutional guarantee that its denial is not subject to the harmless

error rule. *See, e.g., Tumey v. Ohio,* 273 U.S. 510 (1927); *Bracy v. Schomig,* 286 F.3d 406, 414

(7th Cir. 2002) ("There is no harmless error analysis relevant to the issue of judicial bias.").

**B.      Statutory Authority**

*1.       28 U.S.C. § 455(a):  the appearance of bias*

Section 455(a) is broader than 28 U.S.C. § 144 and Section 455(b), providing that

disqualification of a United States judge is warranted not only when there is actual bias or

prejudice but also when "the impartiality of the judge might reasonably be questioned."  The goal

of Section 455(a) is to avoid even the appearance of partiality.  *See Nichols v. Alley,* 71 F.3d 347,

351 (10th Cir. 1995).  "The test in this circuit is 'whether a reasonable person, knowing all the

relevant facts, would harbor doubts about the judge's impartiality.'" *United States v. Cooley,* 1

F.3d 985, 993 (10th Cir. 1993) (citations omitted); *see also United States v. Greenspan,* 26 F.3d

1001, 1005 (10th Cir. 1994) (the statute imposes on the trial judge "a continuing duty to ask

himself what a reasonable person, knowing all the relevant facts, would think about his

impartiality").

Whether recusal is required is determined by an objective standard that considers what a

reasonable person might believe.  As summarized by the Supreme Court:

> [W]hat matters is not the reality of bias or prejudice but its
> appearance. Quite simply and quite universally, recusal was

3

1330

required [pursuant to § 455(a)] whenever impartiality might be questioned.

*Liteky v. United States,* 510 U.S. 540, 548 (1994).

### 2.   28 U.S.C. § 455(b): actual bias &disqualifying knowledge or association

Section 455 (b)(1) of the Judicial Code provides:

(b) [A judge] shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . .

The first clause of Section 455(b)(1) parallels 28 U.S.C. § 144, and the standard for recusal is similar:  whether a reasonable person would be convinced that the judge was biased. *See Brokaw v. Mercer County,* 235 F 3d 1000, 1025 (7th Cir. 2000).  Recusal under this statute "is required only if actual bias or prejudice is proved by compelling evidence." *Id.*  However, the section is proposed in the disjunctive, requiring disqualification if either bias or personal knowledge of disputed facts exists.

Section 455 (b)(1) is distinct from Section 144 in that its provisions are applicable to all justices, judges and magistrates and places the obligation to identify the existence of these grounds upon the judge, rather than requiring recusal only in response to a party affidavit as in Section 144.  *See Liteky,* 510 U.S. at 548.

A judge must also disqualify himself in the event he has been or will be a witness in the case in controversy.  Section 455(b)(3) provides that a judge shall disqualify himself "[w]here he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the

4

particular case in controversy."  Along similar lines, Section 455(b)(5)(iv) states that a judge should disqualify himself when he "[i]s to the judge's knowledge likely to be a material witness in the proceeding."

**C.      The law requires heightened need for reliability in death penalty cases**

Death penalty cases are significantly different from ordinary felony cases because the "finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnifies the "need for reliability" and, accordingly, the need for reliable fact-determination procedures.  *Woodson v. North Carolina,* 428 U.S. 280, 305(1976); *see also Gardner v. Florida*, 430 U.S. 349, 357-58 (1977) ("From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action.  It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."); *Spaziano v. Florida,* 468 U.S. 447, 468  (1984) (Stevens, J., concurring in part and dissenting in part) ("because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment and hence must be accompanied by unique safeguards").  The judge's role under federal law literally gives the power of life and death.  Recusal issues are treated differently in capital cases.  *See, e.g., Bracy v. Schomig,* 286 F.3d 406, 418 (7th Cir. 2002) ("In evaluating [the trial judge's] rulings at the penalty phase of this proceeding, we are again mindful that death is indeed different.")

### III.  ARGUMENT

This motion presents several grounds for Judge James H. Payne being disqualified from this case.  The grounds include that Judge Payne has demonstrated bias, or the appearance of

bias, against Mr. Barrett or in favor of the Government in several ways, and that Judge Payne is a material witness to events that occurred off the record and that are at issue in Mr. Barrett's claims. These circumstances are individually or collectively sufficient to disqualify Judge Payne and require him to recuse himself without taking further action in this case.

**A.      Judge Payne's Conduct Provides Reason to Believe he Harbors Bias or Prejudice against Mr. Barrett or in Favor of the Government, and Would Cause Any Fully Informed Person to Question his Impartiality in this Matter**

> *1.       Judge Payne's* ex parte *communications with prosecutors and the necessity of adjudicating claims based on those communications constitute grounds for disqualification and recusal*

Claim 1 of Mr. Barrett's Motion to Vacate (Doc. 2) raises allegations about the conduct of the trial judge James H. Payne both in his judicial and administrative capacities. Doc. 2 at 17-42. Mr. Barrett hereby incorporates by specific reference the averments made on pages 17 through 42 of his Motion to Vacate and all exhibits cited therein. The relevant allegations are based on witnesses' accounts of statements Judge Payne made off the record, and documents and transcripts that are part of the record. The constitutional and statutory violations alleged in Claim 1 stem from Judge Payne's administrative and *ex parte* conduct, not his judicial rulings.

Evidence obtained by Mr. Barrett's post-conviction counsel gave rise to the following allegations that are relevant to the instant Motion:

(a) that on September 13, 2005, Judge Payne engaged in improper *ex parte* communications with prosecutors which included giving prosecutors the benefit of (1) the court's independent legal research into the application of 18 U.S.C. § 3432 to Mr. Barrett's case, (2) the court's view that the Government's motion for a protective order

6

1333

lacked merit, (3) knowledge that the court would find merit in a defense request for a continuance, and (4) advance notice of a potential violation of Federal Rule of Evidence 404(b);

(b) that during the *ex parte* conference on September 13, 2005, prosecutors informed Judge Payne that they were aware of a witness who when questioned would not corroborate claims of the Government's trial witness Charles "Monk" Sanders (Tr. 9/13/05 Hr'g at 14, 17);

(c) that later on September 13, 2005, Judge Payne, in describing the content of his *ex parte* conversation with prosecutors to Mr. Barrett's counsel, misrepresented the conversation by omitting information important to the defense;

(d) that Judge Payne concealed the full extent of his *ex parte* communications with prosecutors – including his statements that the Government lacked grounds for keeping information from the defense – with the knowledge that the Government wanted to delay revealing that information for as long as possible and that the Government wanted to obtain concessions from the defense before revealing the information;

(e) that Judge Payne continued to conceal the full extent of his *ex parte* communications with prosecutors after he observed Mr. Barrett's counsel forego the pursuit of remedies such as a continuance that Judge Payne anticipated would be needed by the defense;

(f) that Judge Payne concealed from the defense the existence of the impeachment witness described to him during the *ex parte* conference even after Sanders testified to the claims the witness could not corroborate.

7

1334

Claim 5 of Mr. Barrett's Motion to Vacate asserts that his constitutional and statutory rights were violated by the suppression of evidence that could have been used to impeach prosecution witnesses, including Monk Sanders.  Mr. Barrett hereby incorporates by specific reference the allegations of Claim 5 and all exhibits cited therein.  Judge Payne's failure to disclose the content of prosecutors' *ex parte* communications with him makes him complicit in the suppression of evidence.

The American Bar Association's Model Code of Judicial Conduct ("Model Rules") provides the following:

> A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter, except as follows:
>
> [¶] When circumstances require it, ex parte communication for scheduling, administrative, or emergency purposes, which does not address substantive matters, is permitted, provided:
>
>> (a) the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication; and
>>
>> (b) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication, and gives the parties an opportunity to respond.

Canon 2, Rule 2.9.  Judge Payne's conduct on September 13, 2005 violated this rule.

Judge Payne called the *ex parte* hearing for the purpose of addressing the Government's motion for a protective order.  Tr. 9/13/2005 Hr'g at 2.  It appears from the transcript that the *ex*

8

1335

*parte* communications took place in Judge Payne's chambers.[1]  The Government's motion sought approval for prosecutors previously redacting from the Government's witness list the names and contact information of seven witnesses.  While it may be that Judge Payne believed the *ex parte* conference was necessary for "emergency purposes," ABA Model Rule 2.9, what transpired during the hearing shows Judge Payne saw no emergency, and, in any event, that he permitted the discussion to include matters of substance about which he did not inform the defense and to which he gave Mr. Barrett no opportunity to respond.

At the beginning of the hearing, Judge Payne informed the prosecutors that he saw no merit in the written motion where the Government had relied upon the court's prior orders that Mr. Barrett be restrained with an electric shock belt and that the jury be anonymous.  Tr. 9/13/05 Hr'g at 3-4.  He stated that these rulings were not based upon concerns about Mr. Barrett being dangerous.  *Id.* at 4.  Towards the end to the hearing, after he gave prosecutors an opportunity to present additional factual support for the Government's motion, Judge Payne specifically and repeatedly emphasized that the Government had no evidence of any overt act by any person that would suggest the witnesses were in danger.  *Id.* at 20.  The transcript thus gives no indication that Judge Payne might have granted the Government's motion.

The transcript also shows Judge Payne "address[ed] substantive matters" beyond the immediate purpose of the Government's motion.  Model Rule 2.9.  At the end of the *ex parte* conference Judge Payne said "there is 404(b) material obviously in the proposed motion, it appears to me," Tr. 9/13/05 Hr'g at 22, referring to Federal Rule of Evidence 404(b), which

---

[1] At the conclusion of the *ex parte* conference, Judge Payne stated that they would "proceed with jury selection," and "I'll see you downstairs."  Tr. 9/13/2005 Hr'g at 23.

would have required the Government to "provide reasonable notice in advance of trial."  The prosecutor agreed that Rule 404(b) matter "appears to be implicit" in the information provided in the motion for a protective order.  *Ibid.*  Then the prosecutor offered a rationale for not providing notice, and Judge Payne said he would "take this matter under advisement" before calling the conference to an end.  *Id.* at 23.  But that was not the only substantive matter addressed in the *ex parte* hearing.

During the *ex parte* hearing, Judge Payne invited the prosecutors to proffer additional grounds for a protective order beyond the matter set forth in the written motion.  Tr. 9/13/05 Hr'g at 13, 19 (Judge Payne:  "what evidence amy I going to be furnished to demonstrate that these people are in danger").  Assistant United States Attorney Michael Littlefield attempted to persuade Judge Payne that Mr. Barrett posed a danger to witnesses by telling about an interview he conducted with a female witness.  Littlefield told Judge Payne that Sanders, the confidential informant, had been in a woman's apartment when she received a telephone call.  Sanders claimed that although the woman held the receiver he could hear the voice on the other end and recognized it as Mr. Barrett's voice calling from the jail.  Sanders claimed Mr. Barrett said something to the woman about finding the identity of the confidential informant and doing harm to him.  Littlefield told Judge Payne he interviewed the woman Sanders named, and she did not confirm his story, but, Littlefield added, he believed she was afraid.  Tr. 9/13/05 Hr'g at 14, 17.

At the conclusion of this presentation Judge Payne summed up the prosecution's evidence as follows:

> . . . what you are telling me is nothing  –  you have no evidence of
> anyone being threatened that is on your witness list now. You are
> saying if we list them, we are afraid they will be threatened?

10

Tr. 9/13/05 Hr'g at 19.

Based on his statements during the *ex parte* hearing, Judge Payne believed at the time, that cases interpreting 18 U.S.C. § 3432 gave Mr. Barrett the legal right to be informed of the Government's witnesses. Tr. 9/13/05 Hr'g at 4-5. Judge Payne's statements also indicated he saw no merit in the Government's motion for an order permitting those witnesses' identities to be retained under seal. *Id.* at 4-5, 7, 13 & 19-20. Judge Payne learned from the prosecutors' *ex parte* communications that they believed the Government would "gain a procedural, substantive, or tactical advantage," Model Rule 2.9, if the motion for a protective order were not simply denied, and the Government was permitted to pursue negotiations for concessions from the defense in exchange for disclosure. Judge Payne also permitted the Government the tactical advantage of making *ex parte* representations regarding the defense attorneys' alleged view of the law. Tr. 9/13/05 Hr'g at 7. At the conclusion of the *ex parte* hearing, Judge Payne failed "promptly to notify all other parties of the substance of the ex parte communication," Model Rule 2.9, and consequently failed to give Mr. Barrett an opportunity to respond.

Following the *ex parte* conference, the court held further proceedings with defense counsel present. At the beginning of these proceedings the prosecutor sought guidance from the Judge Payne regarding "where we were when we stopped" the *ex parte* conference. Tr. 9/13/05 Hr'g at 26. Judge Payne said they had been discussing "security issues." *Ibid.* He said, "it sounded like there had been some discussion with defense counsel. And that's about as much as the Court knows."[2] *Ibid.* The Court did not describe the discussion of § 3432, the prosecutor's

---

[2] Immediately after this misleading characterization of the *ex parte* conference, and on the basis of that characterization, the prosecutor withdrew opposition to having the transcript remain under seal. Tr. 9/13/05 Hr'g at 26.

representations regarding the defense attorney's view of the law, the court's rejection of the written grounds in the Government's motion, the prosecutors' factual proffer, including the information about Monk Sanders, or the discussion of Rule 404(b).

Most importantly, Judge Payne did not reveal his understanding that the Government's witnesses were so important that the defense would likely request, and be entitled to, a continuance. Rather than ensure that the Government gained no procedural, substantive, or tactical advantage from the *ex parte* communication, Judge Payne permitted the defense to agree to concessions from the Government – including further delay – before gaining access to information about the witnesses.

On September 14, 2005, after jury selection proceedings ended, the court raised the issue of the unidentified witnesses. The United States Attorney informed the court that the Government and Mr. Barrett's counsel had reached an agreement that the witnesses' names, contact information, criminal histories and (allegedly) promises made to them would be revealed the following Monday. R. 840. The United States Attorney further advised the court that the defense would, possibly, have access to some of the witnesses at the prosecutor's office. R. 841. defense counsel Roger Hilfiger stated that he had no objection to the arrangement, "based on what we talked about yesterday." *Ibid.* The court then stated that this would make a "clear record" and the parties' "announcement . . . resolves everything that is under seal." R. 843.

The record thus shows that Judge Payne's violation of Model Rule 2.9 on September 13 and 14, 2005, provided the prosecution with advantages and Mr. Barrett with disadvantages, and that Judge Payne was aware of these trade-offs when he concealed the full extent of his *ex parte* conference. Any reasonable person informed of these circumstances would question Judge

12

Payne's impartiality as regards Mr. Barrett's position in this case.  On the basis of this record, Judge Payne is disqualified from presiding in this case, and he must recuse himself.

At a minimum, Judge Payne is disqualified from adjudicating Claims 1 and 5 of Mr. Barrett's Motion to Vacate due to his own conduct being at issue.  Proceeding after the *ex parte* hearing without giving Mr. Barrett notice of the court's intentions or the bases for its (in)action with respect to the Government's motion violated Mr. Barrett's right to due process.  *Cf. Lankford v. Idaho*, 500 U.S. 110 (1991).  This is not a question of the correctness of a ruling that might be reversed by a higher court, but whether Judge Payne engaged in conduct that could subject him to disciplinary proceedings and public obloquy.  Any reasonable person fully informed of these circumstances would doubt that Judge Payne, or any other judge, could impartially adjudicate the propriety of his own conduct.  *In re Murchison*, *supra*, 349 U.S. at 136. It would violate Mr. Barrett's right to due process in these proceedings for Judge Payne to continue to decide matters in this case.  *Aetna Life Ins. v. Lavoie*, 475 U.S. 813, 825 (1986).

> **2.      *Judge Payne's administrative decisions and the necessity of adjudicating claims involving those decisions constitute grounds for disqualification and recusal***

A judge is required to recuse himself "[w]here he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy." 28 U.S.C. § 455(b)(3).  Several claims in Mr. Barrett's Motion to Vacate raise constitutional and statutory violations stemming in whole or in part from decisions Judge Payne made in an administrative capacity under the Criminal Justice Act.  Judge Payne's prior administrative decisions express opinions prejudging the merits of the relevant claims.

13

Claim 1 asserts in relevant part that Judge Payne's administrative decisions to deny Mr. Barrett's counsel access to investigative and expert assistance encroached upon the constitutionally and statutorily protected independence of defense counsel. Claim 2 asserts in relevant part that Mr. Barrett's trial counsel were ineffective in various ways including lack of preparation and a failure to secure expert and investigative assistance. Claim 3 asserts in relevant part that Mr. Barrett was denied his constitutional and statutory right to expert and investigative assistance due to the budgeting decisions Judge Payne made prior to trial. Mr. Barrett hereby incorporates by specific reference the averments made on pages 17 through 247 of his Motion to Vacate (Doc. 2) and all exhibits cited therein.

Judge Payne's opinions expressed in his administration of funds under the Criminal Justice Act cannot be separated from the issues that must be decided in Mr. Barrett's claims. For example, in Claims 2 and 3 Mr. Barrett alleges the outcome of the trial is unreliable because his trial counsel unreasonably failed to challenge the "expert" testimony of Iris Dalley and her "reconstruction" of the crime scene. Judge Payne denied Mr. Barrett's counsel access to funds necessary to have a crime scene reconstruction expert assist in challenging Dalley's testimony. Although Judge Payne would permit counsel to consult with an expert on a limited basis, he denied counsel's request for funds to have a defense expert travel to Oklahoma where he could observe the Government's expert's testimony and advise counsel about its shortcomings. In denying these funds, Judge Payne advised Mr. Barrett's counsel that he had never permitted a crime scene reconstruction expert to testify. Order filed 3/18/05 at 3 in Case No. 04-cr-115-JHP. He later permitted the Government to present such testimony. R. 3154-3484.

14

Section 455(b)(3), on its face, applies to actions a judge carried out in something other than a judicial capacity. Judge Payne's decisions regarding assistance to the defense were administrative, not judicial. As the Court of Appeals for the Tenth Circuit has said, "the court essentially acts in an administrative, not a judicial, capacity when approving voucher requests and related motions for trial assistance." *United States v. Gonzalez*, 150 F.3d 1246, 1255 (10th Cir. 1998). While "grounds for a later appeal might be created by the denial of funds for expert witnesses, investigators, or other services relating to an adequate defense," the court involved in creating that record "at most is acting in a quasi-judicial capacity in the CJA process." *Ibid*.

In the course of his administrative duties Judge Payne expressed distrust of John Echols, Mr. Barrett's former counsel, whose requests for investigative and expert assistance are now at issue. In Claims 1, 2, and 3, Mr. Barrett asserts that Mr. Echols made reasonable requests for expert assistance and other resources. Judge Payne's responses to those requests included implicit and explicit attacks on Mr. Echols. Judge Payne's letter to Mr. Echols dated February 22, 2005, implies that Mr. Echols was seeking to enrich himself through his representation of Mr. Barrett. Exh. 65 to Mot. to Vacate. Judge Payne's order in response to Mr. Echols motion to withdraw accuses Mr. Echols of violating court orders requiring detailed descriptions of tasks for budget requests. Order in Case No. 04-cr-115-JHP filed 5/5/05 at 4. Judge Payne did not impose the same requirements on Roger Hilfiger, whose representation of Mr. Barrett is the subject of Claim 2. Judge Payne personally nominated Mr. Hilfiger to represent Mr. Barrett over the recommendations of two Federal Defenders who recommended another attorney. Exhs. 34 & 67 to Mot. to Vacate.

15

Mr. Barrett alleges, *inter alia*, that Mr. Hilfiger unreasonably failed to secure the assistance of experts and other forms of evidence.  Mr. Barrett's pleadings demonstrate prejudice in part through the opinions of witnesses whose expertise parallels that of the experts Mr. Echols tried to retain.  Judge Payne's prior rulings on Mr. Echols's budget requests create a source of bias.  Judge Payne, through his budget rulings, communicated to trial counsel that he believed Mr. Echols's requests were unreasonable.  In that respect Judge Payne has prejudged issues that arise in Mr. Barrett's claims.

Under analogous circumstances where a relationship of distrust or animosity developed between counsel and the court, the Supreme Court has required judges to recuse themselves.  In *Taylor v. Hayes*, 418 U.S. 488, 503 (1974), the Court concluded that the case of an attorney accused of contempt had to be heard by a different judge than the one who initially brought the charges because the record showed the judge had "an unfavorable personal attitude toward petitioner, his ability, and his motives."  418 U.S. at 501.  Similarly, in *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971), the Court held that the trial judge should have recused himself and permitted another judge to decide the issue of contempt because, during the course of the dispute between the contempt and the court, "marked personal feelings were present on both sides."  400 U.S. at 464.  Judge Payne's statements on the record reflect both marked dissatisfaction with Mr. Echols as an attorney and marked personal regard for Mr. Hilfiger.

In sum, Judge Payne's administration of the Criminal Justice Act, his interpretation of the Judicial Conference's CJA Guidelines, and his expressed attitude towards Mr. Barrett's various counsel reflect prejudgment of the issues presented in Claims 1, 2, and 3.  Judge Payne, in his administrative decisions, expressed the opinion that it was not necessary for trial counsel to

16

conduct the investigation and preparation for trial that Mr. Barrett asserts in Claim 2 was reasonably necessary under the circumstances and the prevailing norms of capital defense practice. Any reasonable person fully apprised of the circumstances would question Judge Payne's impartiality in adjudicating the affects of his own administrative decisions, particularly where those decisions expressly prejudged the question whether certain areas of investigation or expert assistance were necessary. It would be a violation of Mr. Barrett's due process rights for Judge Payne to adjudicate the affects of his own administrative decisions.

3.      ***Judge Payne's independent investigation of facts
underlying the denial of Mr. Barrett's motion for tolling
constitutes grounds for disqualification and recusal***

"A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed." ABA Model Code of Judicial Conduct, Canon 2, Rule 2.9(C). The ABA Model Rules appropriately place the prohibition on independent judicial investigation within the context of other *ex parte* communications due to the judge collecting "evidence" from third-party sources without providing notice or an opportunity to be heard to the parties that may be affected by the judge's investigation.[3] "The prohibition against a judge investigating the facts in a matter extends to information available in all mediums, including electronic." *Id.*, commentary. Judge Payne exhibited bias or the appearance of bias against Mr. Barrett when he violated Model Rule 2.9(C) and relied upon "facts" he independently collected as a basis for denying Mr. Barrett's motion to toll time without giving Mr. Barrett prior notice or an opportunity to be heard.

---

[3] *See* Elizabeth G. Thornburg, *The Curious Appellate Judge: Ethical Limits on Independent Research*, 28 Rev. Litig. 131(Fall 2008).

17

On February 9, 2009, Mr. Barrett filed a motion to toll the time limits imposed in 28 U.S.C. § 2255. Doc. No. 382 in Case No. CR-04-115-JHP. Mr. Barrett's motion was based primarily on the inability of his appointed counsel to perform the work necessary to complete the motion due to a medical condition. *Ibid.* The Government responded that "Defendant's counsel cites unique and extraordinary circumstances which justify the time relief requested herein." Doc. No. 390 in Case No. CR-04-115-JHP. Although Mr. Barrett tentatively reported that the Government opposed the motion, in its response, the Government withdrew its initial opposition to granting Mr. Barrett any relief, and conceded that the circumstances presented in the motion satisfied the higher courts' criteria for tolling. *Ibid.*

The court's order filed February 27, 2009, denied Mr. Barrett's motion *in toto*. The order shows that Judge Payne searched the Web site for the Federal Defender Office for the Eastern District of California ("FDO") in order to gather information he would use to adjudicate the motion. Order filed 2/27/2009 in Case No. CR-04-115-JHP at 1-2. Judge Payne expressly and primarily relied upon the Web site's list of attorneys working both in the Sacramento and Fresno branches of the FDO to "find[] the Defendant has failed to establish that counsel can not timely file a completed motion to vacate within the current statute of limitations period." *Id.* at 3.

The record shows Judge Payne gave neither party notice that he was conducting his own independent investigation. The record also shows Judge Payne gave Mr. Barrett no opportunity to be heard regarding the "evidence" he believed he had developed as a basis for denying the motion. The record shows Judge Payne gave no consideration to whether any of the attorneys listed on the FDO Web site were qualified to represent Mr. Barrett as required by 18 U.S.C. § 3599. Evidence would lead a reasonable person to conclude that Judge Payne consciously

18

omitted from his order any mention of the qualifications for appointment to a case such as Mr. Barrett's because to do so would undermine reliance upon the information Judge Payne gleaned from the FDO Web site.

Judge Payne's February 27 Order misstated the circumstances under which Assistant Federal Defender Tivon Schardl was appointed to represent Mr. Barrett, and did so in such a way as to make the findings of his independent investigation seem more pertinent than could be justified under the true circumstances. As Judge Payne stated, "this Court appointed David B. Autry as lead counsel and the Federal Defender for the Eastern District of California, Capital Habeas Unit as co-counsel." Order at 1. The Court appointed the Capital Habeas Unit, and more specifically appointed "David B. Autry and Assistant Federal Public Defender, Eastern District of California Tivon Schardl" as counsel for Mr. Barrett (Minute Order filed 4/3/2008 (Doc. 374) in Case No. CR-04-115-JHP). Although the Court did not appoint the entire FDO from the Eastern District of California to this case from the Eastern District of Oklahoma, the February 27 Order cited the fruits of Judge Payne's independent investigation to imply that the Federal Defender had accepted appointment to Mr. Barrett's case without specifying the Capital Habeas Unit or Mr. Schardl.

Judge Payne specifically relied upon the FDO Web site's identification of 37 attorneys at branches in Sacramento and Fresno, Order at 1-2, although he knew or reasonably should have known that only a fraction of those attorneys worked in the Capital Habeas Unit ("CHU") in Sacramento. Indeed, the Web site specifies that the CHU is in Sacramento.

Judge Payne acknowledged, "It should be noted that this Court had the assistance of the Federal Public Defender of the Northern and Eastern District of Oklahoma's assistance in

19

1346

locating a Federal Public Defender's office willing to accept appointment in this matter."  Order

at 2 n.1.  Judge Payne's note omits some of the circumstances surrounding the appointment of

counsel.  In response to a request, Mr. Schardl wrote Federal Defender Julia O'Connell on March

26, 2008 that "the Federal Defender for the Eastern District of California, has authorized me to

inform you that our *Capital Habeas Unit* is able to represent Mr. Barrett."  Letter from Tivon

Schardl to Julia O'Connell dated 3/26/2008 (emphasis added).  The letter goes on to specify Mr.

Schardl's qualifications for appointment.  Following the submission of that letter, and with no

other contact between Mr. Schardl and the court, Judge Payne specifically substituted David

Autry and Mr. Schardl as counsel for Mr. Barrett.  Thus, it was disingenuous for Judge Payne to

represent in the February 27 Order that "the Federal Defender in the Eastern District of

California" had "accept[ed] appointment to this case," Order at 2, such that any of the 37

attorneys working in the FDO were available to represent Mr. Barrett.

Judge Payne's indisputable violation of Rule 2.9(C) in search of a factual basis to deny

Mr. Barrett's motion constitutes sufficient grounds for disqualification.  However, the February

27 Order contains additional evidence of bias, or the appearance of bias, against Mr. Barrett.

Judge Payne cited as the second ground for denying Mr. Barrett relief that "according to the

Motion, the Government opposes tolling the statute of limitations."  Feb. 27 Order at 2.  Judge

Payne omitted the fact that *after* Mr. Barrett filed his motion the Government filed a response in

which it did not oppose relief.  The third ground Judge Payne cited for denying relief was "the

Government's response contain[ing] numerous citations to cases in which the courts have found

equitable tolling was not appropriate."  *Ibid.*  Judge Payne omitted the Government's statement

that the circumstances presented in Mr. Barrett's motion fit within cases where the courts found

<div align="center">20</div>

tolling *was* appropriate.  Together Judge Payne's independent search for a factual basis upon which to deny the motion and his selective references to the motion and response – including only things negative to Mr. Barrett and omitting the statement of both parties' counsel in his favor – reflect a bias, or the appearance of bias, against Mr. Barrett's pursuit of relief.

Any reasonable person fully informed of Rule 2.9(C), and Judge Payne's conduct would question Judge Payne's impartiality in this matter.  Judge Payne sought *ex parte* information regarding the matter pending before him and relied upon that information to deny Mr. Barrett relief without giving Mr. Barrett prior notice or an opportunity to be heard.  He also presented a distorted picture of the facts that would make the information he obtained appear more persuasive than it would have been if the circumstances had been described accurately and completely.  Therefore, Judge Payne is disqualified from presiding over this case and must recuse himself.  28 U.S.C. §§ 455(a) & (b)(1) (disqualification required where judge has "personal knowledge of disputed evidentiary facts concerning the proceeding").

### 4.   *Conclusion*

The foregoing evidence is sufficient to establish that Judge Payne is biased against Mr. Barrett (or in favor of the Government), or that he has prejudged aspects of Mr. Barrett's claims. While Judge Payne may in fact not be biased against Mr. Barrett, due process requires recusal where there is a sufficient appearance of bias.  *Taylor*, 418 U.S. at 501 (citing and quoting *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964)), and *In re Murchison*, 349 U.S. 133, 136 (1955).  The circumstances of this case more than meet that test.

**B.**     **Recusal is Required Under 28 U.S.C. § 455(b) Due to Judge Payne's Status as a Witness**

A judge is disqualified from proceedings and must recuse himself where the judge "is to the judge's knowledge likely to be a material witness of the proceeding," 28 U.S.C. § 455(b)(5)(iv), or where the judge has "personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1).  Claim 1 of Mr. Barrett's Motion to Vacate asserts in relevant part that Judge Payne applied his own standards rather than those set forth in the Judicial Conference's *Guidelines for the Administration of the Criminal Justice Act and Related Statutes* ("CJA Guidelines") when choosing counsel to appoint to represent Mr. Barrett. Claims 1, 2, and 3 also assert in relevant part that Judge Payne's selection of Roger Hilfiger to represent Mr. Barrett, and Judge Payne's rejection of John Echols's resourceful approach to the case in favor of Mr. Hilfiger's less expensive approach to the case was prejudicial to Mr. Barrett.

The grounds upon which Judge Payne rejected the recommendations of two Federal Defenders in order to appoint Mr. Hilfiger, and some of the grounds upon which Judge Payne rejected Mr. Echols's requests for funds are not part of the trial record.  Mr. Barrett relies upon the declarations of witnesses to Judge Payne's statements including those of former Federal Defender Paul Brunton, current Federal Defender Julia O'Connell, and John Echols.  To the extent the Government disputes those statements, Judge Payne is likely to be a material witness and his personal knowledge – gained in an administrative rather than judicial capacity – is likely to be in dispute.

Title 18 U.S.C. § 3005 provides that in a capital case the court shall "assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases . . .. In

22

1349

assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization." Pursuant to the Judicial Conference's *Guidelines for the Administration of the Criminal Justice Act and Related Statutes* ("CJA Guidelines") the Federal Defender and the court should take into account "the facts and circumstances of the case to determine the qualifications which may be required to provide effective representation." CJA Guidelines ¶ 6.01 (B)(1).  Courts are encouraged to appoint counsel who "are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation." *Id.*

In this case, Judge Payne expressed a desire to appoint the Federal Defender to represent Mr. Barrett in his federal trial proceedings. When the Federal Defender's office received notice that Judge Payne intended to appoint it to represent Mr. Barrett, the office informed Judge Payne that it could not adequately represent Mr. Barrett because of its limited resources and current involvement in a death penalty case.  Exh. 67 to Mot. to Vacate (Decl. Julia O'Connell).  Two Federal Defenders and an Assistant Federal Defender recommended that Judge Payne appoint John D. Echols – who effectively represented Mr. Barrett in his two state court trials – and Robert Nigh – a Tulsa attorney with significant federal death penalty experience.  *Id.*; Exh. 34 to Mot. to Vacate (Decl. John D. Echols).  The Federal Defender Office made this recommendation because it believed that these two attorneys were qualified to try the case effectively as an alternative to the Federal Public Defender.  Exh. 67.

Judge Payne initially appointed John Echols to the case.  In appointing Echols, Judge Payne stated that "he wanted the case tried quickly and that this should be no problem because [Echols] had handled Kenny's state case."  Exh. 34. Judge Payne, however, declined to appoint

23

Robert Nigh and instead appointed Roger Hilfiger, the former United States Attorney for the Eastern District of Oklahoma. Exhs. 67 & 34.[4] Judge Payne's rationale for this appointment was not based on factors recognized by the Judicial Conference or national indigent defense organizations as indicative of an attorney's qualifications to provide effective representation. Rather, Judge Payne stated that it seemed that the federal death penalty cases that were being filed in Oklahoma were being prosecuted in the Eastern District and because of that, "if counsel from the Eastern District were appointed, that lawyer or lawyers could then take other death penalty cases filed in the Eastern District in the future." Exh. 67. Judge Payne thus admitted that he intended to appoint less qualified counsel in Mr. Barrett's case as a means of giving local attorneys experience so that a local panel could be formed to provide representation in capital cases. Exhs. 34 & 67. This admission created a conflict between the court's interests, counsel's interests and Mr. Barrett's interests in a vigorous, independent defense. *See generally Woods v. Georgia,* 450 U.S. 261 (1981).

The situation deteriorated further when Judge Payne effectively forced Mr. Echols off the case (discussed *supra*) and elevated Roger Hilfiger to first chair. At that point, Judge Payne appointed Bret Smith to second chair. Mr. Smith had no capital experience whatsoever.

---

[4] In its minute order, the Court first stated that the substitution of Mr. Hilfiger for Mr. Nigh was by agreement with the Federal Defender. When the Federal Defender wrote to Judge Payne asking that the Court's order reflect the Federal Defender's objection to the substitution, Magistrate Judge Shreder entered an amended minute order specifying that Mr. Echols had been appointed at the request of the Federal Defender and Mr. Hilfiger had been appointed at the direction of the Court. (Decl. John D. Echols, Filed as Exh. 34 to Mot. to Vacate).

24

As stated *supra*, the information Judge Payne obtained and the opinions he expressed regarding the appointment, provisioning, and performance of Mr. Barrett's counsel occurred when Judge Payne was acting in an administrative rather than a judicial capacity.

In order to determine whether the process by which Judge Payne appointed counsel was appropriate, the conduct of Judge Payne is at issue.  Accordingly, further factual inquiry before a different factfinder is necessary to resolve this claim, for reasons of both actual bias and the appearance of impropriety.  *Murchu v. United States,* 926 F. 2d 50, 57, 59 (1st Cir. 1991) (remanding to different district court judge because "further factual inquiry is necessary to resolve this claim [of alleged judicial misconduct], and that, to avoid any appearance of impropriety, the matter should be decided by another factfinder").

## IV.  REQUEST FOR EVIDENTIARY HEARING

Should Judge Payne not disqualify himself on the grounds of actual bias, prejudice, appearance of partiality or because he is a material witness, Mr. Barrett requests that an evidentiary hearing on this Motion be conducted before another judge.  Because Judge Payne is a material witness to some of the factual matter alleged in this Motion, due process requires that at least the Motion to Recuse or Disqualify be referred to another judge for a hearing.  *Murchu v. United States,* 926 F. 2d 50, 57 (1st Cir. 1991).

## V.  CONCLUSION

WHEREFORE, for the foregoing reasons, Mr. Barrett respectfully seeks an order disqualifying and recusing Judge James H. Payne from any further participation in this matter, and requests this Court to enter such further order as is necessary to cause another Judge to be assigned to hear all issues that remain to be decided and for such other relief as this Court deems

25

1352

just and proper.  Should Judge Payne not disqualify himself, Mr. Barrett requests that an

evidentiary hearing on this Motion be conducted before another judge.

DATED:      May 28, 2009

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA# 11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: 405-521-9600


DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Movant
KENNETH EUGENE BARRETT

## CERTIFICATE OF GOOD FAITH

I hereby certify, pursuant to 28 U.S.C. § 144, that the foregoing motion and the supporting affidavit of Mr. Barrett have been submitted in good faith.


/s/ Tivon Schardl
TIVON SCHARDL

DATED:      May 28, 2009

1353

## CERTIFICATE OF SERVICE

This will certify that, on today's date, this motion was served upon the United States by filing via ECF.

/s/ Tivon Schardl
TIVON SCHARDL

DATED:      May 28, 2009

1354

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT       )
      )
      *Petitioner*,       )
      )
v.       )       Case No. CV-09-00105-JHP
      )
UNITED STATES OF AMERICA       )
      )
      *Respondent.*       )

**RESPONSE TO PETITIONER'S MOTION TO DISQUALIFY
AND RECUSE UNITED STATES DISTRICT COURT JUDGE JAMES H. PAYNE
FROM FURTHER PARTICIPATION IN THIS MATTER**

Now comes the United States of America and files this response in opposition to Barrett's Motion to Disqualify the Honorable James H. Payne.

The evidence of purported prejudice and bias identified by Barrett does not remotely rise to a level that would justify, much less require, the Court's recusal from adjudicating Barrett's motion under 28 U.S.C. § 2255 ("§ 2255 Motion").

Barrett advances three bases for disqualification: (1) that the Court improperly engaged in *ex parte* communications with the prosecution and failed to properly disclose those communications to the defense; (2) that the Court made rulings under the Criminal Justice Act and cannot impartially adjudicate the propriety of its own decisions; and (3) that the Court improperly denied a request for additional time to file the § 2255 Motion based on an independent investigation of facts. (Mot. to Disqual. and Recuse, filed May 29, 2009, at 6-25) None of the grounds relied upon are timely presented or would lead a reasonable person to question the impartiality of this Court.

A. <u>The Motion is Untimely</u>

A party alleging judicial bias should move for recusal, and "must do so in a timely fashion." *United States v. Nickl*, 427 F.3d 1286, 1297 (10th Cir. 2005) (citing *United States. v. Kimball*, 73 F.3d 269, 273 (10th Cir.1995)). The Tenth Circuit has not specifically defined timeliness within the

meaning of § 455, but requires a party to act promptly once it knows of the facts on which it relies in its motion. *Willner v. Univ. of Kan.*, 848 F.2d 1023, 1028-29 (10th Cir.1988), *cert. denied*, 488 U.S. 1031 (1989); *see also Levy v. Levitt*, 3 Fed.Appx. 944, 951 (10th Cir. 2001) (unpublished) (applying timeliness rule under § 455(b)) (copy of opinion attached as Appendix A).

Barrett contends that each of his stated grounds for recusal are "individually or collectively sufficient" to merit recusal (Mot. at 6), but he has never previously sought disqualification of the judge despite long-term access to the records upon which he bases his arguments. Barrett's first sub-claim, that the court supposedly engaged in improper *ex parte* communications with the prosecution, is premised on a transcript that has been available to the defense since 2006, as it was quoted in the defendant's opening brief to the Tenth Circuit. Defendant/Appellant's Brief at 65-66, *United States v. Barrett*, 496 F.3d 1079, 1116-17 (10th Cir. 2007) (No. 06-7005.) (available at 2006 WL 3099220); *see also* Dckt. in ED OK case 6:04-cr-115-JHP, entry # 319 (reflecting receipt of sealed transcript on April 24, 2006).) Barrett's second sub-claim, that the Court's rulings and remarks under the Criminal Justice Act demonstrate bias, have been known to him since before trial. And his third sub-claim, that the Court improperly denied a request for equitable tolling, is based entirely on an Order filed February 27, 2009.

Despite the availability of the underlying facts giving rise to the Motion – which Barrett claims would lead any reasonable person to question the Court's impartiality – he did not address the issues for years, as to the first two sub-claims and for months as to the third. Barrett's lack of prompt attention to his recusal request should bar its consideration. *Willner*, 848 F.2d at 1028-29. At a minimum, Barrett's belated identification of these issues undermines his argument that the facts patently demonstrate prejudice on the part of this Court.

B.  The Motion Lacks Merit

None of Barrett's stated grounds satisfy the applicable standards for recusal. A court must recuse itself if "sufficient factual grounds exist to cause a reasonable, objective person, knowing all

2

the relevant facts, to question the judge's impartiality." *United States v. Erickson*, 561 F.3d 1150, 1169 (10th Cir. 2009); *United States v. Pearson*, 203 F.3d 1243, 1277 (10th Cir. 2000).  As the Supreme Court has noted, "[n]ot *all* unfavorable disposition towards an individual (or his case)" amounts to bias or prejudice.  *Liteky v. United States*, 510 U.S. 540, 550 (1994) (emphasis in original).  Bias and prejudice "connote a . . . disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess."  *Id.*  An opinion or view held by a judge based on information received in earlier proceedings is "not subject to deprecatory characterization as 'bias' or 'prejudice.'"  *Id.* at 551.  A judge bears ". . . as much obligation . . . not to recuse when there is no occasion for him to do so as there is for him to do so when there is."  *United States v. Burger*, 964 F.2d 1065, 1070 (10th Cir. 1992) (internal quotes omitted).  Denials of recusal requests are reviewed for abuse of discretion and upheld "unless . . . arbitrary, capricious, whimsical, or manifestly unreasonable." *Higganbotham v. Okla. ex rel. Okla. Transp. Comm'n*, 328 F.3d 638, 645 (10th Cir. 2003); *see United States v. Mendoza*, 468 F.3d 1256, 1262 (10th Cir. 2006).

        1. <u>Allegedly Improper Ex Parte Contact</u>

        Barrett relies on non-binding guidelines to advance his claim that this Court improperly engaged in *ex parte* communications with the government and failed to make necessary disclosures to the defense.  Specifically, Barrett complains that this Court's conduct during and after a September 13, 2005 ex parte hearing "violated" the American Bar Association's Model Code of Judicial Conduct Canon 2, Rule 2.9, because it was held despite the lack of an emergency, involved matters of substance and did not result in full disclosure to the defense.  Barrett further argues that the lack of disclosure placed him at an unfair disadvantage in obtaining witness information, but ignores the fact that the Tenth Circuit already found that he timely received the requisite disclosure. *See United States v. Barrett*, 496 F.3d 1079, 1116-17 (10th Cir.2007).

Barrett fails to demonstrate that the Court was bound by, or even aware of, the ABA's rule. The ABA's Model Code created no "legally enforceable duties." *Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003). Indeed, the Judicial Conference's own Code of Conduct for United States Judges is merely "aspirational." *In re Charge of Judicial Misconduct*, 91 F.3d 1416, 1417-18 (10th Cir. 1996). "The fact that a judge's conduct violates the [Judicial Conference's] Canons . . . does not necessarily mean that it constitutes judicial misconduct." *Id.* at 1418.

The Judicial Conference's Canon applicable to the Court at the time of trial, unlike the ABA rule cited by Barrett, provided only the most general direction concerning *ex parte* communications, and did not dictate full disclosure:

> A judge should accord to every person who is legally interested in a proceeding, or the person's lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* communications on the merits, or procedures affecting the merits, of a pending or impending proceeding.

Code of Conduct for United States Judges, Canon 3A(4) (2000).

Barrett makes no attempt to argue that this Court ran afoul of the Judicial Conference's aspirational Canon, nor could he do so successfully. He does not, and cannot, show that this Court's *ex parte* hearing was not authorized by law, given that it concerned discussions about potential threats to witnesses whose identities were to be disclosed under 18 U.S.C. § 3432. Indeed, "where the government fears that disclosing a list of its witnesses would pose a threat to their safety, *ex parte* communications between the court and the government may be appropriate in determining whether or not the list should be provided." *United States v. Napue*, 834 F.2d 1311, 1318 (7th Cir. 1987); *see also United States v. Lee*, 374 F.3d 637, 652 (8th Cir. 2004) (noting in dicta that Fed. R. Crim. P. 16(d) authorizes *ex parte* communications in the context of § 3432). Accordingly, there is no basis upon which to conclude that this Court's actions would subject it to any "disciplinary proceedings or public obloquy," as Barrett claims. (Mot. at 13)

Barrett also fails in arguing that this Court, by failing to disclose information about the *ex parte* hearing, led the defense to forgo a meritorious continuance request under § 3432. Section 3432, requiring disclosure of witnesses at least three days ahead of a death penalty trial, was unquestionably honored in this case. *United States v. Barrett*, 496 F.3d at 1116-17 (10th Cir. 2007). Accordingly, Barrett's argument that the Court somehow misled him into relinquishing a continuance amounts to a complaint that he was deprived of a basis for seeking an unfair advantage and a needless delay. The record, moreover, undermines two of Barrett's fundamental factual claims: that during the *ex parte* hearing the Court indicated it would deny a government motion to seal witness identities that the Court failed to disclose a rejection of the Government's motion to seal witness identities and also implied a belief that the government's duty to disclose witnesses had already attached under § 3432. (Mot. at 9 & 11.) In fact, the Court began the hearing by noting it had reached no conclusion about the commencement of trial for § 3432 purposes and ended the hearing with an extended discussion about the safety of witnesses before advising that it would take the matter of record sealing under advisement. (Tr. 9/13/05 Hr'g at 4-5, 20-23.) The Court did not hide any fact or finding from the defense, nor did it deny the defense any procedural or substantive right under the law.

Given all the relevant facts, no objective person would have a reason to question the objectivity of the Court.

2. CJA Voucher Request Rulings

Barrett also fails in his argument that this Court's pre-trial rulings under the Criminal Justice Act ("CJA") were tantamount to non-judicial employment requiring recusal under 28 U.S.C. § 455(b)(3).[1] He likewise fails to show that the Court's comments in denying various CJA requests

---

[1]Section 455(b)(3) requires recusal whenever a judge "has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy."

demonstrate prejudgment of the various claims in his § 2255 Motion.

Barrett's argument equating CJA rulings with non-judicial employment under § 455(b)(3) finds no basis in the law.  If accepted, his theory would necessarily preclude any judge who granted or denied a CJA voucher from subsequent involvement in a criminal case.  Barrett provides no authority for his outlandish conclusion, nor could he do so.  His principal authority, *United States v. Gonzales*, does not arise in the context of a recusal motion, but rather in litigation over media access to CJA records.  In restricting media access, the *Gonzales* court announces that the *granting* of voucher requests is "purely administrative."  *United States v. Gonzales*, 150 F.3d 1246, 1255 (10th Cir. 1998).  But the court did note an exception: "grounds for a later appeal might be created by the denial of funds for expert witnesses, investigators, or other services relating to an adequate defense. In that latter sense, perhaps, the court at most is acting in a quasi-judicial capacity in the CJA process."  *Id.*

At no point did *Gonzalez* consider, much less announce, that the granting or denying of CJA requests amounted to conflicting employment under § 455(b)(3).  Such a conclusion would fly in the face of the CJA's text, which requires that ". . . the court shall make determinations relating to reimbursement of expenses." 18 U.S.C. § 3006A(d)(1). CJA determinations may be administrative in nature, but they still must be made by a judge.  Thus, the Eighth Circuit – rejecting Barrett's theory – held that a judge was not disqualified under § 455(b) "from handling the contempt claim of an attorney simply because he reviewed the voucher claims of said attorney for an indigent client under the CJA."  *In re Snyder*, 734 F.2d 334, 343 (8th Cir. 1984), *reversed on other grounds*, 472 U.S. 634 (1985).  In fact, the liberal construction of § 455(b)(3) urged by Barrett is at odds with the Tenth Circuit's "strict" interpretation of the statute. *United States v. Gipson*, 835 F.2d 1323, 1326 (10th Cir. 1988).

The denial of CJA voucher requests about which Barrett complains fell outside the letter and spirit of § 455(b)(3). If, in the course of those rulings, this Court expressed unflattering views of

a former defense attorney or that attorney's theory of the case, those statements do not require recusal:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.

*Liteky v. United States*, 510 U.S. 540, 555 (1994).  Barrett does not identify any remark that indicates this Court is incapable of fair judgment in this matter.  To the extent Barrett further complains that this Court's decisions about the appointment of counsel should disqualify it from hearing a § 2255 Motion which challenges those decisions, his position finds no support in the law. *See* 28 U.S.C. § 2255, ¶ 1 ("A prisoner in custody under sentence of a court established by Act of Congress ... may move the court which imposed the sentence to vacate, set aside or correct the sentence."); *see United States v. Erickson*, 561 F.3d 1150, 1169 (10th Cir. 2009) (noting that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion"); *United States v. DeClerck*, 252 Fed.Appx. 220, 222-23 (unpublished) (noting the wisdom of permitting the trial court to consider any subsequent motion under § 2255).

The facts at issue would not cause an objective person reason to question the objectivity of this Court.

### 3. Court's Knowledge of Current Counsel

In his final bid to demonstrate judicial bias, Barrett again relies upon an inapplicable ABA judicial Canon, this time arguing that the guideline should have precluded this Court from an independent "investigation" of defense counsel in determining whether to extend equitable tolling to the filing of his § 2255 Motion.  As discussed above, neither the Judicial Conference's Code of Conduct for United States Judges, nor the ABA model code, were binding on this Court's rulings

1361

or actions. Significantly, the Judicial Conference's "aspirational" Code of Conduct, unlike the ABA's model code, contains no ban on independent investigation.

Regardless of any limitations on this Court's authority to independently explore facts, its "investigation," had little bearing on the denial of equitable tolling in this case. A fair reading of the challenged Order demonstrates that the Court denied the request for additional time on the basis of its conclusion that the defense, as led by Mr. Autry, "should be fairly close to completing any motion they intend to file," given the amount of time already available to Barrett in this matter. (Ord. 2/27/09 at 3.) As a preface to its ruling, the Court did note certain facts about the size of co-counsel's office. Those facts were found on a public website maintained by co-counsel's employer. To the extent the Court later alluded to those facts in its ruling, it did so only in pointing out that Mr. Schardl could have sought the assistance of his colleagues before seeking to delay the filing of the § 2255 Motion. (Ord. 2/27/09 at 3.) Neither the facts gleaned from the website, nor the conclusions drawn from them, were critical to the Court's Order. No aspect of that order demonstrates misconduct or prejudice.

Barrett's subsidiary complaints about the Court's Order also fail to evince prejudice. Barrett argues that the Order inaccurately suggested that co-counsel could have sought the assistance of any attorney in his office, rather than just those employed in its habeas unit. If the Order, in that regard, somewhat overstates the number of attorneys available to assist Mr. Schardl, it does not undermine the still-undisputed finding that co-counsel could have sought *some* colleague's help before requesting delay of the § 2255 Motion. The Order, according to Barrett, also misinterpreted the government's response concerning the request for delay. Even if the Court did err, those errors do not amount to a demonstration of bias. *See F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1145 (9th Cir. 2001)

The irony here is that rather than demonstrating bias against the defendant, the Court's Order protects him from potentially forfeiting his rights under § 2255. While Barrett expends a great deal

8

of energy criticizing the Order as an attack on his defense, the ruling appears aimed at precluding a jurisdictional bar to the § 2255 Motion.  Indeed, the Order goes so far as to identify a method by which Barrett could satisfy the jurisdictional limitation, but still file a subsequent and improved motion, as Barrett has since done.  (Ord. 2/27/09 at 4 n.4.)

In short, the allegations advanced by Barrett, taken as true, wholly fail to establish bias or prejudice within the meaning of 28 U.S.C. §§ 144 and 455.  The United States therefore respectfully asks the Court to deny Barrett's Motion to Disqualify and Recuse United States District Court Judge James H. Payne from Further Participation in this Matter.

Respectfully submitted,

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma


s/        Christopher J. Wilson
          CHRISTOPHER J. WILSON, OBA # 13801
          Assistant United States Attorney
          United States Attorney's Office
          1200 West Okmulgee
          Muskogee, OK 74401
          (918) 684-5100
          Fax (918) 684-5150


s/        Jeffrey B. Kahan
          JEFFREY B. KAHAN, PA Bar #93199
          Trial Attorney
          U.S. Department of Justice
          1331 F Street, N.W.; Rm. 345
          Washington, D.C. 20530
          Tel: (202) 305-8910

## CERTIFICATE OF SERVICE

I, hereby certify that on 14th day of July, 2009, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry, Attorney for Petitioner
Tivon Schardl, Attorney for Petitioner

s/      Christopher  J. Wilson
Assistant United States Attorney

1364

3 Fed.Appx. 944                                                                    Page 1
3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)), 2001 DJCAR 1141
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)))**

**C**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,
Tenth Circuit.
Robert J. LEVY and John M. Levy, Plaintiffs-Appellees,
v.
Edward M. LEVITT, Defendant-Appellant.
**No. 98-1360.**

Feb. 26, 2001.

Former partners and joint venturers sued other partner and joint venturer for contribution pursuant to their partnership and joint venture agreements. The district court granted plaintiffs' motion for summary judgment with respect to their breach of contract and capital contribution claims and denied summary judgment for defendant. Defendant appealed. The Court of Appeals, McKay, Circuit Judge, held that: (1) under Colorado law, plaintiffs could recover on breach of contract claim, though they failed to include a specific claim for a partnership accounting; (2) defendant was estopped from arguing that dissolution occurred beyond the period of limitations; (3) defendant had not been released; (4) plaintiffs were not limited to paying defendant's capital contributions and then buying out his interest; (5) district court did not deny defendant due process when it ordered the parties to submit simultaneous briefs consolidating all outstanding motions for summary judgment; and (6) recusal of district judge was not required.

Affirmed.

West Headnotes

**[1] Joint Adventures 224 ☞5(1)**

224 Joint Adventures
    224k3 Mutual Rights, Duties, and Liabilities of Parties
        224k5 Actions Between Parties
        224k5(1) k. In General. Most Cited Cases

**Partnership 289 ☞108**

289 Partnership
    289III Mutual Rights, Duties, and Liabilities of Partners
        289III(C) Actions Between Partners
            289k102 Grounds of Action and Form of Remedy
                289k108 k. Previous Accounting or Settlement. Most Cited Cases
Under Colorado law, partners and joint venturers could recover on breach of contract claim against another partner and joint venturer, though plaintiffs failed to include a specific claim for a partnership accounting, where the partnership was dissolved, and all partnership business had concluded, before plaintiffs brought suit, and where the joint venture existed for the sole purpose of managing the investment in a single piece of real property.

**[2] Limitation of Actions 241 ☞13**

241 Limitation of Actions
    241I Statutes of Limitation
        241I(A) Nature, Validity, and Construction in General
            241k13 k. Estoppel to Rely on Limitation. Most Cited Cases
Under Colorado law, partner and joint venturer was estopped from arguing that dissolution occurred, for limitations purposes, on June 9, 1988, when he de-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)), 2001 DJCAR 1141
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)))**

clared to the other partners and joint venturers that "It's over," where he claimed partnership losses on his 1988, 1989, and 1990 tax returns, and on February 9, 1990, he signed a "Consent and Ratification" regarding the sale of the building owned by the joint venture in which he declared four separate times that he was a partner and a joint venturer.

**[3] Partnership 289 🗝11**

289 Partnership
    289I The Relation
        289I(A) Creation and Requisites
            289k4 Community of Interest in Profits and Losses
                289k11 k. Sharing Profits, But Not Losses. Most Cited Cases
Under Colorado law, an individual cannot acquire the benefits of partnership without simultaneously assuming its corresponding liabilities.

**[4] Release 331 🗝5**

331 Release
    331I Requisites and Validity
        331k5 k. Agreements to Release. Most Cited Cases
Where partner and joint venturer had full opportunity to sign a proposed release submitted by the other partners and joint venturers and refused to do so, his negotiations with the others over a mutual release in return for ratification of sale of joint venture asset did not constitute an implied release of his obligations on the notes to both the lenders and to the other partners and joint venturers.

**[5] Joint Adventures 224 🗝4(1)**

224 Joint Adventures
    224k3 Mutual Rights, Duties, and Liabilities of Parties
        224k4 In General
            224k4(1) k. In General. Most Cited Cases

**Partnership 289 🗝72**

289 Partnership
    289III Mutual Rights, Duties, and Liabilities of Partners
        289III(A) Firm Property and Business
            289k72 k. Capital of Firm. Most Cited Cases
Under Colorado law, partners and joint venturers had the right to collect from the other partner and joint venturer the capital contributions that latter failed to provide, rather than pursuing the remedy provided in the partnership and joint venture agreements, which allowed them to pay the other's capital contributions and then buy out his interest. West's C.R.S.A. § 7-60-118(1)(a).

**[6] Constitutional Law 92 🗝4011**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(E) Civil Actions and Proceedings
            92k4007 Judgment or Other Determination
                92k4011 k. Summary Judgment. Most Cited Cases
    (Formerly 92k315)

**Federal Civil Procedure 170A 🗝2535**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2535 k. Presentation of Case in General. Most Cited Cases
District court did not deny defendant due process when it ordered the parties to submit simultaneous briefs consolidating all outstanding motions for summary judgment, on theory this prevented defendant from presenting rebuttal evidence, where the parties had submitted nine separate briefs detailing various motions for summary judgment, which were followed by the opposing parties' respective responses; the court's order was an appropriate attempt to manage its caseload. Fed.Rules

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)), 2001 DJCAR 1141
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)))**

Civ.Proc.Rule 56, 28 U.S.C.A.; U.S.Dist.Ct.Rules D.Colo., Rule 7.1(H).

**[7] Judges 227 ⬦49(1)**

227 Judges
  227IV Disqualification to Act
    227k49 Bias and Prejudice
      227k49(1) k. In General. Most Cited Cases

That the district judge was impatient with the parties' numerous briefs and unheeding to defendant's pleas for exoneration from liability did not rise to the level of judicial bias or prejudice, warranting recusal. 28 U.S.C.A. § 455(b).

**[8] Judges 227 ⬦51(2)**

227 Judges
  227IV Disqualification to Act
    227k51 Objections to Judge, and Proceedings Thereon
      227k51(2) k. Time of Making Objection. Most Cited Cases

A claim of judicial bias stemming from over nine years of judicial administration was not timely. 28 U.S.C.A. § 455(b)(1).

**[9] Federal Courts 170B ⬦698.1**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(G) Record
      170Bk698 Defects and Objections
        170Bk698.1 k. In General. Most Cited Cases

Court of Appeals would decline to review defendant's challenge to the district court's award of attorney fees, where defendant failed to provide the court with the documents he referenced in his one-sentence justification.

***946** Before SEYMOUR, McKAY, and LUCERO, Circuit Judges.

ORDER AND JUDGMENT [FN*]

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir.R. 36.3.

McKAY, Circuit Judge.

I. Background

**1** In this diversity action under Colorado law, Plaintiffs sue Defendant for contribution pursuant to their partnership and joint venture agreements. In 1983, the parties formed Tri L Partners (Tri L), an equally-owned partnership, and Tejon-Kiowa Associates (Tejon-Kiowa), a joint venture owned by Tri L and the parties individually. Tejon-Kiowa was formed to acquire and develop certain real estate-the Giddings Building-in Colorado Springs, Colorado. In order to fund the purchase of the building, Plaintiffs and Defendant obtained two separate loans for which they were liable individually, as joint venturers of Tejon-Kiowa, and as general partners of Tri L.

The partnership and joint venture soon began losing money. In July 1987, Defendant stopped making payments to fund the ongoing deficiencies of the joint venture and partnership. However, Plaintiffs continued to make payments on Defendant's behalf, as allowed under the partnership and joint venture agreements. These payments were initially classified as capital payments made by Defendant with offsetting loans from Plaintiffs to Defendant; later they were reclassified as loans from Plaintiffs to Defendant.

Despite his nonpayment, Defendant continued to serve for several months as managing partner of the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)), 2001 DJCAR 1141
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)))**

partnership. In addition, Defendant made payments on a junior debt against the Giddings Building, received monthly reports on the partnership and joint venture, and claimed partnership deductions on his federal income tax returns for 1987-89. Defendant states that he told Plaintiffs "It's over" on June 9, 1988; nevertheless, he continued to indicate a willingness to pay the sums he owed and even stated an interest in purchasing Plaintiffs' shares in the partnership.

On January 4, 1990, Tejon-Kiowa sold the Giddings Building and gave the proceeds to Tejon-Kiowa's creditors. Plaintiffs then personally paid the balance of Tejon-Kiowa's debts, including Defendant's share of the loss. Defendant endorsed a Consent and Ratification approving the Giddings Building Deed and was **\*947** released from liability to the banks on the two notes. Defendant specifically referred to himself in the Consent as a partner of Tri L and joint venturer of Tejon-Kiowa. Plaintiffs and Defendant also discussed signing a mutual release of all parties from the obligations incurred under payment of the bank notes in exchange for Defendant's endorsement of the Consent and Ratification; however, Defendant found Plaintiffs' release draft unsatisfactory and refused to sign it.

Plaintiffs, by letter of October 24, 1990, demanded that Defendant pay the money he owed or they would dissolve the partnership and joint venture. When they received no substantive response, Plaintiffs dissolved Tejon-Kiowa and terminated Tri L on December 31, 1990, pursuant to the provisions of their respective agreements. On August 22, 1991, Plaintiffs filed suit against Defendant for amounts owed under the partnership and joint venture agreements.

**\*\*2** Nearly a decade of litigation followed, during which the parties filed nine separate motions for summary judgment and Defendant asserted more than twenty different defenses to liability. The dis-

trict court repeatedly attempted to resolve or simplify the issues presented. On November 5, 1993, the court struck the parties' previous briefs and required both parties to submit simultaneous briefs in support of their existing summary judgment motions. Important to this appeal, Defendant moved for summary judgment as to the date in which the partnership and joint venture were dissolved and his release from liability to Plaintiffs. Plaintiffs moved for summary judgment on their claims for breach of contract and capital contribution and against all of Defendant's defenses, including the dissolution date and release. On January 19, 1995, the court granted Plaintiffs' motion for summary judgment with respect to their breach of contract and capital contribution claims and denied summary judgment for Defendant on his numerous defenses. On August 12, 1998, the court entered judgment against Defendant for Plaintiffs' attorney fees and costs.

On appeal, Defendant asserts that the district court erred in granting summary judgment on Plaintiffs' breach of contract, dissolution date, and contribution claims. In addition, Defendant alleges violations of due process and requests that we set aside Plaintiffs' award of attorney fees.

We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). When applying this standard, we view the evidence and draw inferences therefrom in the light most favorable to the non-moving party. *See id.*

II. Partnership Accounting, Dissolution

[1] Defendant first claims that the district court

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)), 2001 DJCAR 1141
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)))**

erred in entering summary judgment in favor of Plaintiffs on their breach of contract claim. Defendant contends that Plaintiffs' action must be dismissed because Plaintiffs failed to include a specific claim for a partnership accounting, as required by *Boner v. L.C. Fulenwider, Inc.,* 32 Colo.App. 440, 513 P.2d 730, 732 (Colo.Ct.App.1973). The *Boner* court declared the general rule that individual members of a partnership "cannot maintain an action for damages against another member unless there has been an accounting." *Id.* However, Colorado courts have **\*948** enumerated several exceptions to the *Boner* rule. The Colorado Supreme Court has held that "where a partnership has been dissolved, or where its business has been concluded, or where a partnership exists for a single venture or special purpose ... the rule does not apply." *Morris v. Redak,* 124 Colo. 27, 234 P.2d 908, 914 (Colo.1951).

**\*\*3** In the instant case, although the parties dispute the exact date of dissolution, both concur that the partnership was dissolved before Plaintiffs brought suit. In addition, prior to this litigation all partnership business had concluded with the dissolution and sale of the partnership's property. Finally, the partnership and joint venture existed for only one purpose: to manage the investment in a single piece of real property. Thus, by any of these three exceptions, Plaintiffs were not required to make a specific claim for accounting under Colorado law.[FN1]

> FN1. We further note that some years after this suit was instigated, Colorado adopted § 405 of the Uniform Partnership Act, which allows a partner to maintain actions against other partners without an accounting to enforce the partner's rights under the partnership agreement. *See* COLO.REV.STAT. § 7-64-405 (2000).

Defendant next claims that a genuine issue of material fact existed as to the exact date of dissolution of the Tri L partnership. He asserts that his declaration to the Plaintiffs that "It's over" acted to dissolve the partnership on June 9, 1988, as opposed to December 31, 1990, the date in which Plaintiffs formally acted to dissolve both the joint venture and the partnership. The earlier dissolution date was essential to Defendant's statute of limitations defense.[FN2]

> FN2. The Colorado Court of Appeals has recently ruled that a two-year catch-all statute of limitations applied to a withdrawing partner's action for partnership accounting because the amount due from accounting was not capable of ascertainment by reference to partnership agreement or by simple computation derived from agreement. *See Tafoya v. Perkins,* 932 P.2d 836, 838 (Colo.Ct.App.1996). The district court had held that the applicable time frame for Plaintiffs to bring suit in this action under Colorado law was six years. *See* Order of May 27, 1993 (App. at 51-57).

[2] The district court found that Defendant claimed partnership losses on his 1988, 1989, and 1990 tax returns.[FN3] In addition, on February 9, 1990, Defendant signed a "Consent and Ratification" regarding the sale of the Giddings Building in which he declared four separate times that he was a partner of Tri L and a joint venturer of Tejon-Kiowa. The district court cited *In re S & D Foods, Inc.,* 144 B.R. 121, 159 (Bankr.D.Colo.1992), for the proposition that a party is estopped from denying the existence of a partnership where he has held himself out as a partner by executing documents in behalf of the partnership. The court further noted that under Colorado law, a party holds himself out as a partner if he claims partnership losses on his tax returns. *See Roberts v. Roberts,* 113 Colo. 128, 155 P.2d 155, 157 (Colo.1945). Thus, the court held, Defendant was estopped from arguing that dissolution occurred on June 9, 1988.

> FN3. As Defendant points out, the court

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)), 2001 DJCAR 1141
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)))**

erred in making this finding. It should have determined that such losses were claimed in 1987, 1988, and 1989. Since Defendant endorsed the Consent and Ratification as a partner in 1990, the error was harmless.

[3] On appeal, Defendant contends that *Roberts* is inapposite because, in contrast to the defendant in *Roberts,* he does not deny the existence of a partnership, only that his status as a partner was changed through dissolution. However, Defendant asserts a distinction without a meaningful difference. While *Roberts***\*949** dealt specifically with an individual denying the existence of a partnership, its principle is equally applicable to individuals denying their status in an existing partnership. The essential rule of *Roberts* is that an individual cannot acquire the benefits of partnership without simultaneously assuming its corresponding liabilities. Colorado courts have affirmed this rule since at least 1892: "It is well settled that where a person, with his knowledge and consent, has been held out to the person having a claim or to third parties as a partner, liability as a partner is fastened upon him." *Butler v. Hinckley,* 17 Colo. 523, 30 P. 250, 252 (Colo.1892). Defendant cannot deny his status as a partner of Tri L for a period in which he induced the Internal Revenue Service and two banks to believe that he had the right, as a partner, to receive tax refunds and manage partnership property. This inducement of third parties to change position detrimentally in reasonable reliance on the inducing party's actions is the very purpose for estoppel. *Cont'l W. Ins. Co. v. Jim's Hardwood Floor Co., Inc.,* 12 P.3d 824, 829 (Colo.Ct.App.2000).

**\*\*4** Since Defendant was estopped from denying his status as a partner after June 9, 1988, and presented no other evidence refuting Plaintiffs' claim that dissolution occurred on December 31, 1990, the court held that December 31, 1990, was the proper dissolution date. We agree.

III. Release and Contribution

[4] Defendant next claims that the court erred in granting summary judgment against him on his release from liability defense. Defendant maintains that in exchange for ratification of the Giddings Building deed, he was released from liability on the two bank notes as to both the banks and Plaintiffs. Plaintiffs point out that Defendant did not also sign the mutual release on the indebtedness that they proffered to him. Nevertheless, Defendant argues that his negotiations with Plaintiffs over a mutual release in return for the Giddings ratification constituted an implied release of his obligations on the notes to both the banks and to Plaintiffs. However, Defendant fails to substantiate his inventive argument. Defendant had full opportunity to sign Plaintiffs' proposed release and refused to do so. In addition, as the district court held, a release of his indebtedness to the banks did not relieve him of liability to his partners under the partnership and joint venture agreements. Viewing the evidence in the light most favorable to Defendant, there is no triable issue concerning Defendant's release claim.

[5] Defendant next contests the district court's grant of summary judgment on Plaintiffs' contribution claim. The court found that Defendant admitted failing to make capital contribution payments in breach of the partnership and joint venture agreements. In addition, Defendant did not dispute that, pursuant to the terms of the joint venture agreement, Plaintiffs made capital contributions on his behalf until dissolution and termination of the partnership and joint venture. Nevertheless, Defendant argues that Plaintiffs did not follow the contribution procedures described in the partnership and joint venture agreements, which allow Plaintiffs to pay Defendant's capital contributions and then buy out his interest. Defendant claims that he should have been bought out under these procedures instead of held liable for his breach. However, as the district court noted, the joint venture agreement also states that "nothing in the agreement is intended to limit

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)), 2001 DJCAR 1141
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)))**

the rights 'at law or by statute or otherwise' of any party aggrieved by the agreement's breach." App. at 243. The court also **\*950** observed that under Colorado law, a partner "shall contribute toward the losses whether of capital or otherwise sustained by the partnership according to his share in the profits." COLO.REV.STAT. § 7-60-118(1)(a). The court then held that section 118(1)(a) conferred upon Plaintiffs the right to collect the capital contributions that Defendant failed to provide. Defendant presented no genuine issue of material fact for the court to decide. In addition, Defendant identifies no error in the court's reasoning under Colorado law, nor does he present evidence indicating a mandated hierarchy of Plaintiffs' remedies for his breach. Thus, the court did not err in granting Plaintiffs' motion for summary judgment on their contribution claim.

IV. Due Process

**\*\*5** [6] Defendant next claims that the district court denied him due process when it ordered the parties to submit simultaneous briefs consolidating all outstanding motions for summary judgment. Defendant contends that the simultaneous briefing procedure prevented him from presenting rebuttal evidence in accordance with Fed.R.Civ.P. 56, since he had no opportunity to respond to Plaintiff's brief after its submission. However, Defendant misconstrues the purpose and use of the simultaneous briefs. The parties had submitted nine separate briefs detailing various motions for summary judgment, which were followed by the opposing parties' respective responses. This was an unwieldy load. The district court struck the nine summary judgment briefs and ordered each of the parties to submit a single consolidated brief that organized and condensed the arguments that each had already made. The court did not deny Defendant the right to respond to Plaintiffs' arguments; Defendant had already done so, followed by which both parties were required to consolidate their previous briefs.

The court's act was a common and appropriate attempt to manage its caseload in accordance with local rules.[FN4] Defendant was not prejudiced by this unremarkable consolidated briefing procedure.

> FN4. D.C.COLO.L.R. 7.1(H) states: "[B]riefs and Motions shall be concise. A verbose, redundant, ungrammatical, or unintelligible brief or motion may be stricken or returned for revision, and its filing may be grounds for imposing sanctions. Limitations may be imposed on the length of any brief or motion."

Defendant also alleges that he was denied due process because the initial district court judge in charge of this action "had a personal bias or prejudice against both parties within the meaning of 28 U.S.C. § 455(b)(1) such that he should have disqualified himself years ago." (Br. Aplt. at 43). Defendant "constructively infer[s]" this bias by pointing out the number of times that trial dates were rescheduled, the court's order for simultaneous briefing, its rejection of Defendant's arguments, and even the judge's retirement before this case had concluded.

However, the Supreme Court, in discussing § 455(b)(1), has stated that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). In addition,

opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.... Not establishing bias or partiality ... are expressions of impatience, dissatisfaction, annoyance, and even anger, that **\*951** are within the bounds of what imperfect men and women, even

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)), 2001 DJCAR 1141
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)))**

after having been confirmed as federal judges, sometimes display.

*Id.* at 555-56; *see also United States v. Young, 45 F.3d 1405, 1415 (10th Cir.), cert. denied, 515 U.S. 1169, 115 S.Ct. 2633, 132 L.Ed.2d 872 (1995).*

[7][8] At most, Defendant has shown that the district judge was impatient with the parties' numerous briefs and unheeding to Defendant's pleas for exoneration. This did not rise to the level of judicial bias or prejudice under § 455(b). Even if it did, the remedy for judicial prejudice is a motion for recusal that "must be timely filed," and a party must act promptly in filing its motion once it knows of the facts on which it relies. *Willner v. Univ. of Kan., 848 F.2d 1023, 1028-29 (10th Cir.1988), cert. denied, 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989).* Defendant's belated claim of judicial bias stemming from over nine years of judicial administration is certainly not timely.

V. Attorney Fees

**6** [9] Lastly, Defendant argues that the award of attorney fees to Plaintiffs should be set aside. Defendant's one-sentence justification directs this court to peruse three of his previous filings and alleges that Plaintiffs did not prove their entitlement to attorney fees. However, Defendant fails to provide this court with the documents he references. "It is not this court's burden to hunt down the pertinent materials. Rather, it is [Defendant's] responsibility as the appellant to provide us with a proper record on appeal." *Rios v. Bigler, 67 F.3d 1543, 1553 (10th Cir.1995).* We thus decline to review Defendant's challenge to the district court's award of attorney fees. *See Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1182 (10th Cir.1999)* (failure to provide adequate record requires court to disregard challenges to district court's ruling on sanctions).

For the foregoing reasons, the judgment of the dis-trict court is AFFIRMED.

C.A.10 (Colo.),2001.
Levy v. Levitt
3 Fed.Appx. 944, 2001 WL 184230 (C.A.10 (Colo.)), 2001 DJCAR 1141

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Respondent.* | ) | |

**GOVERNMENT'S MOTION TO UNSEAL, OR TO GAIN FULL ACCESS TO**
**MOTIONS, ORDERS, REPORTS AND PROCEEDINGS**

**COMES NOW** the United States of America, by undersigned counsel, respectfully moves

this Court to unseal, or alternatively grant the government access to, all sealed motions, orders,

proceedings, reports or docket entries in the underlying criminal case 04-CR-115-JHP, *United States*

*v. Kenneth Eugene Barrett.*

*Notice Regarding Compliance with Local Rules LCvR 7.1(g) and LCrR 12.1*

Pursuant to Local Rules LCvR 7.1(g) and LCrR 12.1, counsel for the government has

consulted by telephone with opposing counsel, Tivon Schardl, in Sacramento, California, and have

been advised that the Petitioner objects to the government's requested relief.

*Discussion*

The government requires access to the requested materials to adequately respond to Barrett's

motion for relief under 28 U.S.C. § 2255, in which he alleges ineffective assistance of counsel in the

trial and appeal underlying his conviction and final judgment of death. (*See* Doc. 405 (filed in case

no. 04-CR-115-JHP)). By attacking the quality of the representation provided to him by trial and

appellate counsel, Barrett has put privileged communications at issue, thereby waiving the

1

attorney-client privilege. By making allegations about his mental health, and defense counsel's investigation of it, Barrett has placed in issue – and waived any claim of confidentiality about – previously sealed records concerning his psychological state. This Court should, therefore, permit the government access to all currently sealed documents concerning the efforts of defense counsel and the defendant's mental health.

A.  Documents Concerning Defense Counsel's Efforts on Barrett's Behalf

A habeas petitioner's reliance on a claim of ineffective assistance of counsel waives the attorney-client privilege as to all communications with the allegedly inadequate lawyer. *See, e.g., Wharton v. Calderon*, 127 F.3d 1201, 1203 (9th Cir.1997); *Tasby v. United States*, 504 F.2d 332, 336 (8th Cir.1974); *Laughner v. United States*, 373 F.2d 326, 327 (5th Cir.1967); *see United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986) (holding that an attorney may reveal otherwise privileged communications from his client to defend himself against charges of improper conduct without violating either the ethical rules of confidentiality or the attorney-client privilege). As the Fifth Circuit has held, "where . . . the client alleges a breach of duty to him by the attorney, we have not the slightest scruple about deciding that he thereby waives the privilege as to all communications relevant to that issue." *Laughner*, 373 F.2d at 327.

In this case, to facilitate a fair and meaningful review of Barrett's claims of ineffective assistance, the government requires access to the sealed records in the underlying criminal case reflecting on counsel's efforts to represent the defendant. The government must respond to Barrett's allegations that former counsel failed to investigate, challenge and introduce evidence – including evidence of mental illness, police tactics, crime scene reconstruction, and the defendant's life history. (*See* § 2255 Motion, claim 2.) The government is currently hindered in drafting that

response because Barrett's claims are premised, at least in part, on sealed records. For example, in asserting that trial counsel failed to compile or present Barrett's life history, the § 2255 Motion refers to, and reveals excerpts of, sealed documents 50, 97, 107 and 128 (order adopting sealed report and recommendation, Doc. 106) 208. (*See* § 2255 Motion at 184 & 189.)

To appropriately respond to the documents upon which Barrett relies, the government requires access to them and to the other sealed records reflecting on defense counsel's efforts on behalf of the defendant, including (but not necessarily limited to) docket entries 16, 19, 20, 21, 23, 24, 25, 26, 38, 46,47, 50, 51, 57, 97, 102, 106, 107, 113, 116, 118, 123, 128, 129, 133, 207, 232, 244, 261, 262, 274, 275, 287, 293, 301, 302, 310, 316, 318, 321, and Sealed Letter 2/28/05, Sealed Hearing 3/22/05 (transcript filed 2/15/05), Sealed Budget Minutes 10/3/05, and Sealed Hearing 10/20/05.

B.  Documents Concerning Barrett's Mental Health

On September 29, 2005, this Court filed an order (Doc. 216) in response to Barrett's notice of expert evidence of a mental condition (206) and the government's responsive request for authorization to conduct a psychiatric examination on the defendant (Doc. 214). The order granted the government's request for a mental health evaluation. However, to protect Barrett's Fifth and Sixth Amendment rights, the order required that the government's "fire-walled" counsel receive all mental health documents regarding Barrett. (Doc. 206 at 3.) The order prohibited fire-walled counsel from disclosing the mental health records unless Barrett was convicted of a capital crime and confirmed his intent to offer mental health evidence during sentencing proceedings. (Doc. 206 at 6.)

3

Barrett was, of course, convicted of death-eligible offenses but gave notice on November 8, 2005, that he would not present mental health evidence during the penalty phase.  Accordingly, the Court's order prohibits fire-walled counsel from disclosing the records in his possession.  Because Barrett relies substantially upon mental health evidence in his § 2255 motion, and attacks trial counsel's investigation of such information, this Court should lift its order sealing the documents in the custody of fire-walled counsel.  (*See, e.g.*, § 2255 Motion at 61-76, 226-36 & 313-17.)

By placing his mental state at issue, Barrett has waived any claim to the Fifth and Sixth Amendment rights that gave rise to this Court's order sealing the mental health records in the possession of fire-walled counsel.  The Supreme Court has held that a government's use of properly obtained mental health evidence to rebut a "mental status" defense does not violate the Fifth or Sixth Amendments.  *Buchanan v. Kentucky*, 483 U.S. 402, 422-24 (1987).  As the Fifth Circuit has succinctly stated, "a defendant who puts his mental state at issue with psychological evidence may not then use the Fifth Amendment to bar the state from rebutting in kind."  *Schneider v. Lynaugh*, 835 F.2d 570, 575 (5th Cir. 1988); *see United States v Madrid*, 673 F.2d 1114, 1121 (10th Cir. 1982) (permitting admission of evidence from a government mental health examination authorized under Fed. R. Crim. Proc. 12.2).

The mental health evidence in the custody of the fire-walled counsel is not only relevant to rebut claims about Barrett's mental health, it is also highly probative of trial counsel's efforts to investigate those issues.  Barrett's present reliance on evidence of his mental condition should waive any claim of confidentiality with regard to the information in the custody of fire-walled counsel.  Accordingly, the Court should lift the order sealing all the documents in the custody of fire-walled counsel, including (but not necessarily limited to) Documents 208, 210, 237 and 238.

### *Conclusion*

In order for the government to conduct a fair and meaningful review and respond to Barrett's § 2255 claims, the government moves this Court to unseal, or alternatively, to grant the government access to all sealed motions, orders, proceedings, reports or docket entries in the underlying criminal case 04-CR-115-JHP, *United States v. Kenneth Eugene Barrett*, and permission to refer to these materials, as necessary, when answering Barrett's claims.

Respectfully submitted,

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma


s/      Christopher J. Wilson
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
United States Attorney's Office
1200 West Okmulgee
Muskogee, OK 74401
(918) 684-5100
Fax (918) 684-5150


s/      Jeffrey B. Kahan
JEFFREY B. KAHAN, PA Bar #93199
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W.; Rm. 345
Washington, D.C. 20530
Tel: (202) 305-8910

## CERTIFICATE OF SERVICE

I, hereby certify that on 24th day of July, 2009, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry, Attorney for Petitioner
Tivon Schardl, Attorney for Petitioner

<div style="text-align:right">

s/     Christopher  J. Wilson        
Assistant United States Attorney

</div>

6

1378

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,              )
                                     )
          Petitioner,                )
                                     )
v.                                   )          Case No. CV-09-105-JHP
                                     )
UNITED STATES OF AMERICA,            )
                                     )
          Defendant.                 )

### SUPPLEMENT TO MOTION TO FILE RESPONSE TO
### PLEADING OUT OF TIME

On August 19, 2009, the Court directed counsel to file a supplement to Petitioner's

Motion to File Response to Pleading Out of Time (Doc. 53) by 5:00 p.m. CDT on this

date stating whether the Government objects to the motion.  David Autry spoke to AUSA

Chris Wilson regarding this matter.  The United States objects to the motion in light of its

deadline to file a response to Petitioner's 2255 motion.

As stated in the proposed order Mr. Barrett filed with his motion, Mr. Barrett

would expect the Court to grant the Government the same amount of time to reply that it

would have had if Mr. Barrett had timely filed his opposition.  Similarly, if the Court

agrees with the Government's position that the documents it requests are essential to its

preparation of an answer, and finds the Government did not unreasonably delay in

seeking those documents, Mr. Barrett would not object to the Court giving the

1

Government an additional ten days from the current due-date to file its answer.  Such an order would fully cure any delay caused by the delay in filing a response and therefore answer the Government's objection.

Respectfully submitted,

/s/ David Autry
David Autry, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry44@hotmail.com

Daniel J. Broderick
Federal Defender

/s/ Tivon Schardl
Tivon Schardl, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
(916) 498-6666
(916) 498-5710 [fax]
Tim_Schardl@fd.org

Lawyers for Petitioner

### Certificate of Filing and Electronic Service

This is to certify that on this 19th day of August, 2009, I caused the foregoing instrument to filed with the Clerk of the Court using the ECF System for filing.  A copy will be served electronically to Chris J. Wilson, AUSA, United States Attorney's Office, 1200 W. Okmulgee Street, Muskogee, OK 74401.

/s/ David Autry

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,           )
                                  )
          Petitioner,             )
                                  )
v.                                )          Case No. CV-09-00105-JHP
                                  )
UNITED STATES OF AMERICA,         )
                                  )
          Respondent.             )

**PETITIONER'S RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTION TO UNSEAL, OR
TO GAIN FULL ACCESS TO MOTIONS, ORDERS, REPORTS
AND PROCEEDINGS**

**TABLE OF CONTENTS**

1.     The Government has failed to establish "good cause" or "materiality" for its overly
       broad requests.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2.     Petitioner has not waived altogether the attorney-client privilege, his protections
       under the work-product doctrine, and confidentiality in mental health records by
       raising issues relating to ineffective assistance of counsel and his mental health.
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

3.     Mr. Barrett objects to the Court ruling on the Government's motion prior to
       deciding the disqualification of the trial judge.
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## TABLE OF AUTHORITIES

### FEDERAL CASES

Bittaker v. Woodford, 331 F.3d 715 (9th Cir. 2009)(en banc) . . . . . . . . . . . . . 8, 9, 12, 13

Bracy v. Gramley, 520 U.S. 899 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Brown v. Sternes, 304 F.3d 677 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 13

Buchanan v. Kentucky, 483 U.S. 402 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Calderon v. United States District Court (Nicolaus), 98 F.3d 1102
(9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5

Campbell v. Blodgett, 982 F.2d 1356 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . 3

District Attorney's Office v. Osborne, ___ U.S. ___, 129 S. Ct. 2308 (2009) . . . . . . . . . . 3

Frontier Refining, Inc. v. Gorman-Rupp Co., Inc., 136 F.3d 695 (10th Cir. 1998) . . . . . 11

Griffin v. Warden, Maryland Correctional Adjustment Center, 970 F.2d 1355
(4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Harris v. Reed, 894 F.2d 871 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Johnson v. Alabama, 256 F.3d 1156 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 9

Kimmelman v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13

LaFevers v. Gibson, 182 F.3d 705 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 2

Laughner v. United States, 373 F.2d 326 (5th Cir. 1967) . . . . . . . . . . . . . . . . . . . . 11

In re Lott, 424 F.3d 446 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Massaro v. United States, 538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

McGregor v. Gibson, 219 F.3d 1245 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 4

McGregor v. Gibson, 248 F.3d 946 (10th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Moore v. Johnson, 194 F.3d 586 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Schiro v. Landigran, 127 S. Ct. 1933 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Strickler v. Greene, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Tasby v. United States, 504 F.2d 332 (8th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . 10

Townsend v. Sain, 372 U.S. 293 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Ballard, 779 F.2d 287 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Burrows, 872 F.2d 915 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . 13

Wallace v. Ward, 191 F.3d 1235 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Wharton v. Calderon, 127 F.3d 1201 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 8, 10

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 12

**STATE CASES**

Patton v. State, 784 So. 2d 380 (Fla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Petitioner's Response in Opposition to
the Government's Motion to Unseal
    iii    
Barrett v. United States of America
Case No. CV-09-00105-HJP

1384

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**PETITIONER'S RESPONSE IN OPPOSITION**
**TO THE GOVERNMENT'S MOTION TO UNSEAL, OR**
**TO GAIN FULL ACCESS TO MOTIONS, ORDERS, REPORTS**
**AND PROCEEDINGS**

Petitioner, Kenneth Eugene Barrett, submits the following response to the

Government's Motion to Unseal, or Gain Full Access to Motions, Orders, Reports and

Proceedings.[1]  (Doc. #52.)

The Government seeks pre-pleading discovery of documents that are privileged

and confidential, contending it is entitled to this extraordinary remedy so that it may better

respond to Mr. Barrett's claims that he received ineffective assistance of trial and

appellate counsel, and that by raising these issues, Petitioner has waived the attorney-

client privilege.  (Doc. #52 at pp. 1-2.) The Government argues also that by raising issues

concerning his mental health, Mr. Barrett has waived any privilege or claims of

---

[1]  Mr. Barrett has filed a separate request that this Court accept the filing of this motion
out of time.  Doc. # 53, 57.

Petitioner's Response in Opposition to                Barrett v. United States of America
the Government's Motion to Unseal     1     Case No. CV-09-00105-HJP

1385

confidentiality regarding sealed records concerning his mental or psychological state.

(Doc. 52 at p. 2.)

The Government's extraordinary and over-broad requests should be denied.

1.      **The Government has failed to establish "good cause" or "materiality" for its overly broad requests.**

Under Rule 6(a) of the Rules Governing § 2255 Proceedings, the party seeking discovery in § 2255 proceedings must establish "good cause" for its request. In *Bracy v. Gramley,* 520 U.S. 899 (1997), the Supreme Court discussed the contours of the Rule 6(a) "good cause" requirement.[2] The Court held that good cause exists "where specific allegations before the court show reason to believe that the [party] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . ." *Bracy*, 520 U.S. at 908-909. The Court of Appeals for the Tenth Circuit applies the same test.[3] The Government's motion makes no showing of good cause, and cites no cases in which a court has granted discovery prior to the filing of a pleading.

Applying *Bracy*'s test *mutatis mutandis* to a habeas respondent's position, the

---

[2] Although *Bracy* involved discovery in a § 2254 proceeding, the Rule 6(a) "good cause" requirement is identical for both § 2254 and § 2255 proceedings. *See* Rule 6, Rules Governing § 2255 Proceedings, Advisory Committee Notes (1976 Adoption).

[3] *LaFevers v. Gibson*, 182 F.3d 705, 723 (10th Cir. 1999) ("Rule 6(a) of the Rules Governing Section 2254 Cases requires a habeas petitioner to show good cause before he is afforded an opportunity for discovery. Good cause is shown if the petitioner makes a specific allegation that shows reason to believe the petitioner may be able to demonstrate he is entitled to relief.").

Petitioner's Response in Opposition to                                Barrett v. United States of America
the Government's Motion to Unseal                   2                  Case No. CV-09-00105-HJP

Government must (1) place "specific allegations before the court" that are (2) sufficient to "show reason to believe" that (3) the Government needs the requested discovery in order to "fully develop" a defense. This test calls for a greater showing than relevance under Rule 26(b) of the Federal Rules of Civil Procedure. *See Campbell v. Blodgett*, 982 F.2d 1356, 1359 (9th Cir. 1993). As numerous courts have held, the good-cause standard requires the party to have a pre-existing position and show that this position could prevail if supported by the requested discovery. *See Calderon v. United States District Court (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996) (district court committed clear error in granting pre-petition discovery to petitioner because, in part, "prisoner must outline factual allegations in a petition before the district court will be able to determine the propriety of discovery"). The Government cites no cases in which a court granted discovery prior to the filing of an answer in all likelihood because without even filing a pleading in the case, there are no "specific allegations" before the court that could be supported by the requested discovery. *Cf. District Attorney's Office v. Osborne*, ___ U.S. ___, 129 S. Ct. 2308, 2322 (2009) (dicta stating Rule 6 would permit discovery where "habeas claim is viable").

The Government's motion fails because it contains nothing more than the type of "general and conclusory" assertions that do not constitute "good cause," particularly where the information necessary to resolve the issues is part of the existing record. *Wallace v. Ward*, 191 F.3d 1235, 1245 (10th Cir. 1999) (discovery denied where

Petitioner's Response in Opposition to
the Government's Motion to Unseal                3                Barrett v. United States of America
                                                                 Case No. CV-09-00105-HJP

1387

allegations offered to support request were "general and conclusory" and matter could be decided on basis of record).[4]  The Government has made no specific showing that the materials it requests are necessary for it to formulate an answer to Mr. Barrett's § 2255 motion.  Indeed, Rule 5 of the Rules Governing § 2255 Proceedings only requires "the government to supplement its answers with appropriate copies or transcripts or briefs *if for some reason the judge does not already have them under his control.*"  Advisory Committee Notes (1976 Adoption)(emphasis added).  The Court already has access to the relevant documents the Government seeks, and it will perforce consider those documents in deciding whether further fact-development is appropriate.  *See* Rule 8, Rules Governing § 2255 Proceedings ("If the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted."); *cf. McGregor v. Gibson*, 219 F.3d 1245, 1253 (10th Cir. 2000) (habeas petitioner not prejudiced by failure to disclose tape where court reviewed it and found it contained nothing relevant), *reh'g granted and overruled on other grounds*, *McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001).

---

[4] *See also Calderon v. United States District Court (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996) (citing cases for proposition that "courts should not allow prisoners to use federal discovery for fishing expeditions to investigate mere speculation").  The same good-cause standard applies to petitioners and respondents in § 2255 proceedings.  Rule 6(a).  Here, the Government is merely fishing on speculation that the discovery it seeks may contain information it can artfully shape into a defense.

As the court observed in *Calderon v. United States District Court (Nicolaus)*, *supra*, discovery in habeas corpus proceedings is not available prior to the requesting party's filing of an initial pleading because it is the pleading itself that provides a basis for the court to determine whether discovery is needed.  98 F.3d at 1106.  The purpose of an answer to a § 2255 petition is to address legal sufficiency of the allegations made in the petition and any procedural bars.  *See* Rules 5(b), 5(c) & 8(a), Rules Governing § 2255 Proceedings.  It is not necessary for the Government to access the materials it seeks in order to state whether the motion states *prima facie* grounds for relief.  The information the Government needs to make that determination is included in Mr. Barrett's allegations in the § 2255 motion, which include detailed statements of what trial counsel sought and what resources, materials or information the Court denied.  If there are factual disputes to be resolved, that must be done through an evidentiary hearing.  Rule 8(a), Rules Governing § 2255 Proceedings; *see also Townsend v. Sain,* 372 U.S. 293 (1963) ("Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing"); *Schiro v. Landigran,* 127 S.Ct. 1933, 1940 (2007) (an evidentiary hearing is appropriate when it "could enable an applicant to prove the petition's factual allegations which, if true, would entitle the applicant to federal habeas relief").

That the Government has failed the "good cause" requirement is apparent from the justification given for its broad request to have access to sealed documents.  While the Government seeks access to sealed materials that would "reflect[] trial counsel's efforts

Petitioner's Response in Opposition to
the Government's Motion to Unseal                    5                    Barrett v. United States of America
                                                                                       Case No. CV-09-00105-HJP

to represent the defendant[,]" (Doc. 52 at p. 2), the Government has failed to establish the materiality of the information it seeks to obtain.  To the extent the Government is merely attempting to show that trial counsel expended a certain number of hours or resources on Mr. Barrett's case, such a showing is not dispositive of the specific claims alleged in Mr. Barrett's § 2255 motion, and therefore the information the Government seeks is not necessary to test the sufficiency of the allegations.  The question whether the Sixth Amendment was satisfied under *Strickland v. Washington*, 466 U.S. 668 (1984), cannot be resolved in the way the Government proposes:  by looking at the record to determine what counsel contemplated or did.  *See Massaro v. United States*, 538 U.S. 500, 505 (2003) (evaluation of ineffective-assistance claims requires consideration of extra-record evidence); *Kimmelman v. Morrison*, 477 U.S. 365, 386-87 (1986) (rejecting rationalization of trial counsel's conduct based on view of evidence counsel did not have at time of trial).  *See also Wiggins v. Smith,* 539 U.S. 510, 524 (2003) (focus of ineffectiveness claim is the reasonableness of counsel's investigation).

Rule 6(a) does not permit a party to cast such a wide net, as the Government does here, in the mere hope that it might ultimately turn up something relevant and probative.  Rather, *Bracy* requires that the Government narrowly tailor its discovery requests, with reference to the specific allegations contained in its yet to be filed answer.  Absent something more than the speculation that expansive access to these materials is necessary

for the Government to defend itself against the specific allegations raised in the §2255

motion the Government's request should be denied.[5]

Lastly, the Government's claim of need is belied by its delay in seeking the

requested discovery. Mr. Barrett filed his motion for post-conviction relief on March 16,

2009. This Court granted the Government 90 days in which to file an answer. In June

2009, the Court granted the Government an additional 90 days in which to answer.

Although this Court could not have ruled on the Government's discovery motion before

the end of August, a little over three weeks before the answer is due, the Government did

not file its motion until the end of July. Given the scope of work necessary to answer Mr.

Barrett's motion, the Government's delay suggests this discovery is an after-thought and

is unnecessary to answering the allegations.

2.      **Petitioner has not waived altogether the attorney-client privilege, his
        protections under the work-product doctrine, and confidentiality in
        mental health records by raising issues relating to ineffective assistance
        of counsel and his mental health.**

The Government asserts broadly that because Mr. Barrett has raised ineffective

assistance of trial and appellate counsel arguments, and issues relating to his mental

---

[5]Analogously, if this were a defendant making a discovery request relating to a *Brady* claim, the defendant could not simply make a general request for material, since such a request would be overly broad, and would fail to explain what basis there is for believing that there exists within the requested materials information which would support the defendant's *Brady* claim. *See Strickler v. Greene*, 527 U.S. 263, 286-87 & n. 28 (1999) (petitioner was not entitled to discovery to support *Brady* claim he had not yet raised).

Petitioner's Response in Opposition to                                  Barrett v. United States of America
the Government's Motion to Unseal                    7                          Case No. CV-09-00105-HJP

health, he has effectively and completely waived the attorney-client privilege, any confidentiality stemming from the work-product doctrine, and confidentiality in his mental health records. This is inaccurate, and case law following the cases the Government relied upon demonstrate the inaccuracy.

The Government relies primarily upon *Wharton v. Calderon*, 127 F.3d 1201, 1203 (9th Cir. 1997). Mot. Unseal (Doc. #52) at 2. However, as the same court, sitting *en banc*, subsequently held any waiver of the attorney-client privilege and the work-product privilege in connection with ineffective assistance of counsel arguments raised in post-conviction pleadings constitutes an implied, rather than an express, waiver. *Bittaker v. Woodford,* 331 F.3d 715, 719 (9th Cir. 2009)(en banc)("The privilege may be found to have been waived by implication when a party takes a position in litigation that makes it unfair to protect the party's attorney-client communications ... The doctrine of waiver by implication reflects the position that the attorney-client privilege was intended as a shield, and not a sword.")(ellipses in original).

*Bittaker* explains the distinction between an implied and express waiver of privileged information. *Id.* at 719. An express waiver occurs when disclosure of the ostensibly privileged matter is made to a third party who is not bound by the privilege. In such an instance, the Court has "no role in encouraging or forcing the disclosure – [it] merely recognizes the waiver after it has occurred." *Id.* Conversely, a waiver resulting from a claim of ineffective assistance of counsel is considered under the doctrine of

Petitioner's Response in Opposition to
the Government's Motion to Unseal                    8                    Barrett v. United States of America
                                                                          Case No. CV-09-00105-HJP

1392

"implied waiver":

> The doctrine of implied waiver allocates control of the privilege between the judicial system and the party holding the privilege...The court imposing the waiver does not order disclosure of the materials *categorically*; rather the court directs the party holding the privilege to produce the privileged materials if it wishes to go forward with its claims implicating them. The court thus gives the holder of the privilege a choice: If you want to litigate this claim, then you must waive your privilege to the extent necessary to give your opponent a fair opportunity to defend against it.

*Id.* at 720 (emphasis added). *Bittaker* also cautions that the:

> [C]ourt must impose a waiver *no broader than needed* to ensure the fairness of the proceedings before it. Because a waiver is required so as to be fair to the opposing side, the rationale only supports a waiver broad enough to serve that purpose. Courts... that have imposed waivers under the fairness principle have therefore *closely tailored the scope of the waiver* to the needs of the opposing party in litigating the claim in question.

*Id.* (emphasis added), *citing Kerr v. United States District Court*, 426 U.S. 394

(1976)(court should ensure that the "balance between the petitioner's claims of ...

privilege and plaintiffs' asserted need for the documents is correctly struck.")(ellipses in

original). *See also, In re Lott,* 424 F.3d 446, 453 (6th Cir. 2005)("Implied waivers [such

as when a habeas petitioner raises a claim of ineffectiveness] are consistently construed

narrowly"); *Johnson v. Alabama,* 256 F.3d 1156, 1179 (11th Cir. 2001)("the precise

boundaries of the privilege will vary from case to case, and in many instances will require

careful evaluation by the district court); *Mason v. Mitchell,* 293 F.Supp.2d 819, 823-24

(N.D. Ohio 2003)("waiver in habeas cases should be limited to the extent necessary to

litigate a petitioner's ineffective assistance of counsel claims").

Petitioner's Response in Opposition to         Barrett v. United States of America
the Government's Motion to Unseal   9        Case No. CV-09-00105-HJP

1393

Rather than requesting that the Court supervise a "closely tailored" waiver of the privileges, the Government's Motion broadly requests the unsealing of every document currently under seal, cutting the Court out of the process. Contrary to *Bittaker* and the other cases cited above, the Government seeks access to sealed material based on a "categorical" waiver of the privilege because Petitioner has raised ineffective assistance of trial and appellate counsel claims. Should the Court grant the Government's Motion, the scope of the privileges to be waived, including documents, strategies, communications and other work-product that ought to properly remain privileged – because they are unrelated to Petitioner's claims of ineffectiveness – would be disclosed pursuant to the unilateral reckonings of the Government, as well as Petitioner's former counsel.

The cases relied upon by the Government in arguing that because Petitioner has raised ineffective assistance of counsel claims, he has totally waived any attorney-client or work-product privilege, and the Government is entitled to access to "sealed records in the underlying criminal case reflecting on counsel's efforts to represent the defendant," are inapplicable. (Doc. 52 at p. 2) *Wharton v. Calderon,* 127 F.3d 1201, 1203 (9th Cir. 1997), which stated generally that a claim of ineffective assistance of counsel waives the attorney-client privilege, must be read in conjunction with the Ninth Circuit's later *en banc* opinion in *Bittaker,* which addressed the limited *scope* of such an implied waiver; any implied waiver of the privilege is not absolute. *Tasby v. United States,* 504 F.2d 332, 336 (8th Cir. 1974), considered the waiver issue not in the context of a Government

Petitioner's Response in Opposition to
the Government's Motion to Unseal                    10                    Barrett v. United States of America
                                                                          Case No. CV-09-00105-HJP

request for disclosure even before it filed an answer to a §2255 petition, but in an appeal following an evidentiary hearing.  Likewise, *Laughner v. United States,* 373 F.2d 326, 327 (5th Cir. 1967), addressed the privilege issue on appeal following a hearing ("There is not [sic] contention nor any indication in the record that the testimony elicited from the attorney in this case exceeded the scope of that waiver.").  *United States v. Ballard,* 779 F.2d 287, 292 (5th Cir. 1986), addressed the waiver of the attorney client privilege in a context completely unlike that here, namely, where the defendant used an attorney's advice to further the commission of a crime.

With respect to the work product doctrine, the Tenth Circuit has held that "the work product doctrine extends to subsequent litigation." *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.,* 136 F.3d 695, 703 (10th Cir. 1998).  Discovery in §2255 proceedings is governed by the applicable Federal Rules of Civil Procedure.  R.Gov. §2255 Proc. 6(a).  As the Court stated in *Frontier Refining,* 136 F.3d at 704: "Rule 26(b)(3) [of the Federal Rules of Civil Procedure] prevents discovery of an attorney's work product unless (1) the discovering party can demonstrate substantial need for the material and (2) the discovering party is unable to obtain the substantial equivalent of the material by other means without undue hardship."

Thus, the substantial need/undue burden test applies to fact work product.  Opinion work product is, depending on the jurisdiction, either absolutely immune from discovery, or discoverable only upon a showing of compelling need.  *Frontier Refining,* 136 F.3d at

704 n. 12. The Government here seeks materials that relate to opinion work product, i.e., the mental impressions of Mr. Barrett's trial attorneys regarding the witnesses they believed were best for the case. At this point, the Government can neither establish a need for the documents nor an undue burden if the materials it seeks are not disclosed. After the Government files an answer to Mr. Barrett's §2255 motion, the Court will review the motion and answer and "any transcripts and records of prior proceedings ... to determine whether an evidentiary hearing is warranted." R. Gov. §2255 Proc. 8(a). If the Court orders a hearing on Mr. Barrett's claims, the Government will be entitled to see the documents in question subject to an appropriate protective order. *Bittaker*, *supra.*

The Government's contention that Mr. Barrett's § 2255 motion places him in the same position as a defendant presenting evidence of mental illness at trial is similarly specious. Unlike *Buchanan v. Kentucky*, 483 U.S. 402 (1987), and the other cases cited on page 4 of the Government's motion, the issue here is not the existence *vel non* of privileges at trial where a defendant presents evidence of mental illness. The trial is over. Mr. Barrett is arguing that he should be granted a new trial on the basis of evidence that was *not* presented. His position now is more like the position when this Court initially ordered the use of a fire-walled attorney than it is like the position the Government would be in at a trial.

The Government is seeking to use evidence that was not part of the record to establish a defense. This apparent effort to construct a post-hoc rationalization for trial

counsel's conduct is impermissible under the governing law. *See Wiggins v. Smith*, 539 U.S. 510, 526-27 (2002) (rejecting Government's effort to supply post-hoc rationalization for trial counsel's conduct). "Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990), citing *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).[6]

**3.      Mr. Barrett objects to the Court ruling on the Government's motion prior to deciding the disqualification of the trial judge.**

Mr. Barrett has filed a motion to recuse the Honorable James H. Payne. Doc. # 45. In his § 2255 petition, and in the recusal motion, Mr. Barrett objected to Judge Payne making further rulings that effect Mr. Barrett's rights in these proceedings. Mr. Barrett reasserts that objection with regard to the Government's motion to unseal.

---

[6] *Accord United States v. Burrows*, 872 F.2d 915, 918 (9th Cir. 1989) (holding district court committed reversible error by assuming trial counsel made a strategic decision although there was no evidentiary support for the assumption); *Brown v. Sternes*, 304 F.3d 677, 691 (7th Cir. 2002) ("it is not the role of a reviewing court to engage in a *post hoc* rationalization for an attorney's actions . . . or engage in Monday morning quarterbacking"); *Moore v. Johnson*, 194 F.3d 586, 604  (5th Cir. 1999) ("Court is . . . not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all"); *Griffin v. Warden, Maryland Correctional Adjustment Center*, 970 F.2d 1355, 1358 (4th Cir. 1992) (citing *Strickland* and *Kimmelman* for proposition that "courts should not conjure up tactical decisions an attorney could have made, but plainly did not"); *Patton v. State*, 784 So.2d 380, 387 (Fla. 2000) (same as *Burrows*).

Petitioner's Response in Opposition to the Government's Motion to Unseal          13          Barrett v. United States of America Case No. CV-09-00105-HJP

1397

WHEREFORE, Petitioner asks that the Government's Motion (Doc. #52) be

denied.  If the Court does not deny the Government's motion outright, it must, at a

minimum, enter a protective order consistent with that described in *Bittaker*, *supra*.

> Respectfully submitted,
>
> /s/ David Autry
> David Autry, OBA #11600
> 1021 N.W. 16th Street
> Oklahoma City, OK 73106
> (405) 521-9600
> (405) 521-9669 [fax]
> dbautry44@hotmail.com
>
> Daniel J. Broaderick
> Federal Defender
>
> /s/ Tivon Schardl
> Tivon Schardl, Fla. Bar No. 73016
> Assistant Federal Defender
> 801 I Street, 3rd Floor
> Sacramento, CA 95814
> (916) 498-6666
> (916) 498-5710
> Tim_Schardl@fd.org
>
> Lawyers for Petitioner
> Kenneth Eugene Barrett

**Certificate of Electronic Filing and Service**

I hereby certify that on this 19th day of August, 2009, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing.  A copy will be served electronically to Chris Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401.

> /s/ David Autry

Petitioner's Response in Opposition to
the Government's Motion to Unseal                    14                    Barrett v. United States of America
Case No. CV-09-00105-HJP

## Eastern District of Oklahoma

**Notice of Electronic Filing**

The following transaction was entered on 8/19/2009 at 4:54 PM CDT and filed on 8/19/2009

**Case Name:**       Barrett v. USA

**Case Number:**     6:09−cv−105

**Filer:**

**Document Number:** 59(No document attached)

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: Striking [58] Petitioner's Response in Opposition to the Government's Motion to Unseal (Re: [52] Government's MOTION to Unseal Documents). (cjt, Deputy Clerk)**

**6:09−cv−105 Notice has been electronically mailed to:**

Sheldon J. Sperling  sheldon.sperling@usdoj.gov, bonnie.london@usdoj.gov, usaoke.criminal@usdoj.gov

Christopher J. Wilson  Chris.Wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry  dbautry44@hotmail.com

Tivon Schardl  tim.schardl@fd.org, dianna.rosenberg@fd.org, hermida.diaz@fd.org, kathryn.nguyen@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan  jeffrey.kahan@usdoj.gov

**6:09−cv−105 Notice has not been electronically mailed to:**

1399

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**PETITIONER'S RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTION TO UNSEAL, OR
TO GAIN FULL ACCESS TO MOTIONS, ORDERS, REPORTS
AND PROCEEDINGS**

**TABLE OF CONTENTS**

1.     The Honorable James H. Payne cannot and should not rule on the Government's Motion until the Mr. Barrett's motion to recuse the Honorable James H. Payne is finally resolved . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2.     The Government has failed to establish "good cause" or "materiality" for its overly broad requests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3.     Petitioner has not waived altogether the attorney-client privilege, his protections under the work-product doctrine, and confidentiality in mental health records by raising issues relating to ineffective assistance of counsel and his mental health. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4.     Conclusion:  the motion should be denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1401

## TABLE OF AUTHORITIES

### FEDERAL CASES

Bittaker v. Woodford, 331 F.3d 715 (9th Cir. 2009)(en banc) . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Bracy v. Gramley, 520 U.S. 899 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Bracy v. Schomig, 286 F.3d 406 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Brown v. Sternes, 304 F.3d 677 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Buchanan v. Kentucky, 483 U.S. 402 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Calderon v. United States District Court (Nicolaus), 98 F.3d 1102 (9th Cir. 1996) . . . . . . . 4, 5, 6

Campbell v. Blodgett, 982 F.2d 1356 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

District Attorney's Office v. Osborne, ___ U.S. ___, 129 S. Ct. 2308 (2009) . . . . . . . . . . . . . . 4

Frontier Refining, Inc. v. Gorman-Rupp Co., Inc., 136 F.3d 695 (10th Cir. 1998) . . . . . . . . . . 12

Frontier Refining, 136 F.3d at 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Griffin v. Warden, Maryland Correctional Adjustment Center, 970 F.2d 1355
(4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Harris v. Reed, 894 F.2d 871 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Johnson v. Alabama, 256 F.3d 1156 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Kimmelman v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

LaFevers v. Gibson, 182 F.3d 705 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Laughner v. United States, 373 F.2d 326 (5th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

In re Lott, 424 F.3d 446 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Massaro v. United States, 538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

McGregor v. Gibson, 219 F.3d 1245 (10th Cir. 2000), *reh'g granted and*
    *overruled on other grounds*, *McGregor v. Gibson*,
    248 F.3d 946 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Moore v. Johnson, 194 F.3d 586 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Schiro v. Landigran, 127 S. Ct. 1933 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Strickler v. Greene, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Tasby v. United States, 504 F.2d 332 (8th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . 11

Townsend v. Sain, 372 U.S. 293 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Tumey v. Ohio, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Ballard, 779 F.2d 287 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Burrows, 872 F.2d 915 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . 14

Wallace v. Ward, 191 F.3d 1235 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Wharton v. Calderon, 127 F.3d 1201 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 9

Wharton v. Calderon, 127 F.3d 1201 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 11

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

## STATE CASES

Patton v. State, 784 So. 2d 380 (Fla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## FEDERAL STATUTES

28 U.S.C.A. §455(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Crim. P. 12.2 - . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1403

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**PETITIONER'S RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTION TO UNSEAL, OR
TO GAIN FULL ACCESS TO MOTIONS, ORDERS, REPORTS
AND PROCEEDINGS**

Petitioner, Kenneth Eugene Barrett, submits the following response to the

Government's Motion to Unseal, or Gain Full Access to Motions, Orders, Reports and

Proceedings.[1]  (Doc. #52.)

The Government seeks pre-pleading discovery of documents that are privileged

and confidential, contending it is entitled to this extraordinary remedy so that it may better

respond to Mr. Barrett's claims that he received ineffective assistance of trial and

appellate counsel, and that by raising these issues, Petitioner has waived the attorney-

client privilege.  (Doc. #52 at pp. 1-2.) The Government argues also that by raising issues

concerning his mental health, Mr. Barrett has waived any privilege or claims of

---

[1] Mr. Barrett has filed a separate request that this Court accept the filing of this motion out of time.  Doc. # 53, 57.

Petitioner's Response in Opposition to                                                    Barrett v. United States of America
the Government's Motion to Unseal                  1                          Case No. CV-09-00105-HJP

1404

confidentiality regarding sealed records concerning his mental or psychological state.

(Doc. 52 at p. 2.)

The Government's extraordinary and over-broad requests should be denied.

1.      **The Honorable James H. Payne cannot and should not rule on the Government's Motion until the Mr. Barrett's motion to recuse the Honorable James H. Payne is finally resolved.**

Mr. Barrett has filed a motion to recuse court the In his § 2255 petition [Doc. # 45], and in the recusal motion, Mr. Barrett objected to Judge Payne making further rulings that affect Mr. Barrett's rights in these proceedings.  Mr. Barrett reasserts that objection with regard to the Government's motion to unseal.  28 U.S.C.A. §455(a) provides that "[a]ny justice, judge , magistrate, or referee in bankruptcy of the United States *shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned.  28 U.S.C.A. §455(a)."  This court cannot act on any other pending motion until such time as the Motion for Recusal has been finally resolved.  To do otherwise is to compel Mr. Barrett to undergo unconstitutional proceedings in the absence of a fair and impartial judge in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution. *See, e.g., Tumey v. Ohio,* 273 U.S. 510 (1927); *Bracy v. Schomig,* 286 F.3d 406, 414 (7th Cir. 2002).  To rule on this motion or any other pending motion prior to resolution of the recusal motion is an abuse of discretion and will waste precious judicial resources on litigation and rulings which will ultimately be rendered null and void.

**2.      The Government has failed to establish "good cause" or "materiality" for its overly broad requests.**

Under Rule 6(a) of the Rules Governing § 2255 Proceedings, the party seeking discovery in § 2255 proceedings must establish "good cause" for its request.  In *Bracy v. Gramley,* 520 U.S. 899 (1997), the Supreme Court discussed the contours of the Rule 6(a) "good cause" requirement.[2]  The Court held that good cause exists "where specific allegations before the court show reason to believe that the [party] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . ."  *Bracy*, 520 U.S. at 908-909.  The Court of Appeals for the Tenth Circuit applies the same test.[3]  The Government's motion makes no showing of good cause, and cites no cases in which a court has granted discovery prior to the filing of a pleading.

Applying *Bracy*'s test *mutatis mutandis* to a habeas respondent's position, the Government must (1) place "specific allegations before the court" that are (2) sufficient to "show reason to believe" that (3) the Government needs the requested discovery in order to "fully develop" a defense.  This test calls for a greater showing than relevance under

---

[2]  Although *Bracy* involved discovery in a § 2254 proceeding, the Rule 6(a) "good cause" requirement is identical for both § 2254 and § 2255 proceedings.  *See* Rule 6, Rules Governing § 2255 Proceedings, Advisory Committee Notes (1976 Adoption).

[3]  *LaFevers v. Gibson*, 182 F.3d 705, 723 (10th Cir. 1999) ("Rule 6(a) of the Rules Governing Section 2254 Cases requires a habeas petitioner to show good cause before he is afforded an opportunity for discovery. Good cause is shown if the petitioner makes a specific allegation that shows reason to believe the petitioner may be able to demonstrate he is entitled to relief.").

Rule 26(b) of the Federal Rules of Civil Procedure. *See Campbell v. Blodgett*, 982 F.2d 1356, 1359 (9th Cir. 1993). As numerous courts have held, the good-cause standard requires the party to have a pre-existing position and show that this position could prevail if supported by the requested discovery. *See Calderon v. United States District Court (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996) (district court committed clear error in granting pre-petition discovery to petitioner because, in part, "prisoner must outline factual allegations in a petition before the district court will be able to determine the propriety of discovery"). The Government cites no cases in which a court granted discovery prior to the filing of an answer in all likelihood because without even filing a pleading in the case, there are no "specific allegations" before the court that could be supported by the requested discovery. *Cf. District Attorney's Office v. Osborne*, ___ U.S. ___, 129 S. Ct. 2308, 2322 (2009) (dicta stating Rule 6 would permit discovery where "habeas claim is viable").

The Government's motion fails because it contains nothing more than the type of "general and conclusory" assertions that do not constitute "good cause," particularly where the information necessary to resolve the issues is part of the existing record. *Wallace v. Ward*, 191 F.3d 1235, 1245 (10th Cir. 1999) (discovery denied where allegations offered to support request were "general and conclusory" and matter could be

Petitioner's Response in Opposition to
the Government's Motion to Unseal                    4                    Barrett v. United States of America
Case No. CV-09-00105-HJP

1407

decided on basis of record).[4]  The Government has made no specific showing that the materials it requests are necessary for it to formulate an answer to Mr. Barrett's § 2255 motion.  Indeed, Rule 5 of the Rules Governing § 2255 Proceedings only requires "the government to supplement its answers with appropriate copies or transcripts or briefs *if for some reason the judge does not already have them under his control.*"  Advisory Committee Notes (1976 Adoption)(emphasis added).  The Court already has access to the relevant documents the Government seeks, and it will perforce consider those documents in deciding whether further fact-development is appropriate.  *See* Rule 8, Rules Governing § 2255 Proceedings ("If the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted."); *cf. McGregor v. Gibson*, 219 F.3d 1245, 1253 (10th Cir. 2000) (habeas petitioner not prejudiced by failure to disclose tape where court reviewed it and found it contained nothing relevant), *reh'g granted and overruled on other grounds*, *McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001).

As the court observed in *Calderon v. United States District Court (Nicolaus)*,

---

[4]  *See also Calderon v. United States District Court (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996) (citing cases for proposition that "courts should not allow prisoners to use federal discovery for fishing expeditions to investigate mere speculation").  The same good-cause standard applies to petitioners and respondents in § 2255 proceedings.  Rule 6(a).  Here, the Government is merely fishing on speculation that the discovery it seeks may contain information it can artfully shape into a defense.

Petitioner's Response in Opposition to
the Government's Motion to Unseal                    5                    Barrett v. United States of America
                                                                                                     Case No. CV-09-00105-HJP

*supra,* discovery in habeas corpus proceedings is not available prior to the requesting party's filing of an initial pleading because it is the pleading itself that provides a basis for the court to determine whether discovery is needed. 98 F.3d at 1106. The purpose of an answer to a § 2255 petition is to address legal sufficiency of the allegations made in the petition and any procedural bars. *See* Rules 5(b), 5(c) & 8(a), Rules Governing § 2255 Proceedings. It is not necessary for the Government to access the materials it seeks in order to state whether the motion states *prima facie* grounds for relief. The information the Government needs to make that determination is included in Mr. Barrett's allegations in the § 2255 motion, which include detailed statements of what trial counsel sought and what resources, materials or information the Court denied. If there are factual disputes to be resolved, that must be done through an evidentiary hearing. Rule 8(a), Rules Governing § 2255 Proceedings; *see also Townsend v. Sain,* 372 U.S. 293 (1963) ("Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing"); *Schiro v. Landigran,* 127 S.Ct. 1933, 1940 (2007) (an evidentiary hearing is appropriate when it "could enable an applicant to prove the petition's factual allegations which, if true, would entitle the applicant to federal habeas relief").

That the Government has failed the "good cause" requirement is apparent from the justification given for its broad request to have access to sealed documents. While the Government seeks access to sealed materials that would "reflect[] trial counsel's efforts to represent the defendant[,]" (Doc. 52 at p. 2), the Government has failed to establish the

Petitioner's Response in Opposition to
the Government's Motion to Unseal                              6                              Barrett v. United States of America
Case No. CV-09-00105-HJP

materiality of the information it seeks to obtain.  To the extent the Government is merely

attempting to show that trial counsel expended a certain number of hours or resources on

Mr. Barrett's case, such a showing is not dispositive of the specific claims alleged in Mr.

Barrett's § 2255 motion, and therefore the information the Government seeks is not

necessary to test the sufficiency of the allegations.  The question whether the Sixth

Amendment was satisfied under *Strickland v. Washington*, 466 U.S. 668 (1984), cannot

be resolved in the way the Government proposes:  by looking at the record to determine

what counsel contemplated or did.  *See Massaro v. United States*, 538 U.S. 500, 505

(2003) (evaluation of ineffective-assistance claims requires consideration of extra-record

evidence); *Kimmelman v. Morrison*, 477 U.S. 365, 386-87 (1986) (rejecting

rationalization of trial counsel's conduct based on view of evidence counsel did not have

at time of trial).  *See also Wiggins v. Smith,* 539 U.S. 510, 524 (2003) (focus of

ineffectiveness claim is the reasonableness of counsel's investigation).

Rule 6(a) does not permit a party to cast such a wide net, as the Government does

here, in the mere hope that it might ultimately turn up something relevant and probative.

Rather, *Bracy* requires that the Government narrowly tailor its discovery requests, with

reference to the specific allegations contained in its yet to be filed answer.  Absent

something more than the speculation that expansive access to these materials is necessary

for the Government to defend itself against the specific allegations raised in the §2255

motion the Government's request should be denied.[5]

Lastly, the Government's claim of need is belied by its delay in seeking the requested discovery.  Mr. Barrett filed his motion for post-conviction relief on March 16, 2009.  This Court granted the Government 90 days in which to file an answer.  In June 2009, the Court granted the Government an additional 90 days in which to answer.  Although this Court could not have ruled on the Government's discovery motion before the end of August, a little over three weeks before the answer is due, the Government did not file its motion until the end of July. Given the scope of work necessary to answer Mr. Barrett's motion, the Government's delay suggests this discovery is an after-thought and is unnecessary to answering the allegations.

3.      **Petitioner has not waived altogether the attorney-client privilege, his protections under the work-product doctrine, and confidentiality in mental health records by raising issues relating to ineffective assistance of counsel and his mental health.**

The Government asserts broadly that because Mr. Barrett has raised ineffective assistance of trial and appellate counsel arguments, and issues relating to his mental health, he has effectively and completely waived the attorney-client privilege, any

---

[5]Analogously, if this were a defendant making a discovery request relating to a *Brady* claim, the defendant could not simply make a general request for material, since such a request would be overly broad, and would fail to explain what basis there is for believing that there exists within the requested materials information which would support the defendant's *Brady* claim.  *See Strickler v. Greene*, 527 U.S. 263, 286-87 & n. 28 (1999) (petitioner was not entitled to discovery to support *Brady* claim he had not yet raised).

Petitioner's Response in Opposition to
the Government's Motion to Unseal                    8                    Barrett v. United States of America
                                                                                     Case No. CV-09-00105-HJP

confidentiality stemming from the work-product doctrine, and confidentiality in his mental health records. This is inaccurate, and case law following the cases the Government relied upon demonstrate the inaccuracy.

The Government relies primarily upon *Wharton v. Calderon*, 127 F.3d 1201, 1203 (9th Cir. 1997). Mot. Unseal (Doc. #52) at 2. However, the same court, sitting *en banc*, subsequently held any waiver of the attorney-client privilege and the work-product privilege in connection with ineffective assistance of counsel arguments raised in post-conviction pleadings constitutes an implied, rather than an express, waiver. *Bittaker v. Woodford,* 331 F.3d 715, 719 (9th Cir. 2009)(en banc)("The privilege may be found to have been waived by implication when a party takes a position in litigation that makes it unfair to protect the party's attorney-client communications ... The doctrine of waiver by implication reflects the position that the attorney-client privilege was intended as a shield, and not a sword.")(ellipses in original).

*Bittaker* explains the distinction between an implied and express waiver of privileged information. *Id.* at 719. An express waiver occurs when disclosure of the ostensibly privileged matter is made to a third party who is not bound by the privilege. In such an instance, the Court has "no role in encouraging or forcing the disclosure – [it] merely recognizes the waiver after it has occurred." *Id.* Conversely, a waiver resulting from a claim of ineffective assistance of counsel is considered under the doctrine of "implied waiver":

1412

> The doctrine of implied waiver allocates control of the privilege between the judicial system and the party holding the privilege...The court imposing the waiver does not order disclosure of the materials *categorically*; rather the court directs the party holding the privilege to produce the privileged materials if it wishes to go forward with its claims implicating them.  The court thus gives the holder of the privilege a choice: If you want to litigate this claim, then you must waive your privilege to the extent necessary to give your opponent a fair opportunity to defend against it.

*Id.* at 720 (emphasis added).  *Bittaker* also cautions that the:

> [C]ourt must impose a waiver *no broader than needed* to ensure the fairness of the proceedings before it.  Because a waiver is required so as to be fair to the opposing side, the rationale only supports a waiver broad enough to serve that purpose.  Courts . . . that have imposed waivers under the fairness principle have therefore *closely tailored the scope of the waiver* to the needs of the opposing party in litigating the claim in question.

*Id.* (emphasis added), *citing Kerr v. United States District Court*, 426 U.S. 394 (1976)(court should ensure that the "balance between the petitioner's claims of ... privilege and plaintiffs' asserted need for the documents is correctly struck.")(ellipses in original).  *See also, In re Lott,* 424 F.3d 446, 453 (6th Cir. 2005)("Implied waivers [such as when a habeas petitioner raises a claim of ineffectiveness] are consistently construed narrowly"); *Johnson v. Alabama,* 256 F.3d 1156, 1179 (11th Cir. 2001)("the precise boundaries of the privilege will vary from case to case, and in many instances will require careful evaluation by the district court); *Mason v. Mitchell,* 293 F.Supp.2d 819, 823-24 (N.D. Ohio 2003)("waiver in habeas cases should be limited to the extent necessary to litigate a petitioner's ineffective assistance of counsel claims").

Rather than requesting that the Court supervise a "closely tailored" waiver of the

privileges, the Government's Motion broadly requests the unsealing of every document currently under seal, cutting the Court out of the process.  Contrary to *Bittaker* and the other cases cited above, the Government seeks access to sealed material based on a "categorical" waiver of the privilege because Petitioner has raised ineffective assistance of trial and appellate counsel claims.  Should the Court grant the Government's Motion, the scope of the privileges to be waived, including documents, strategies, communications and other work-product that ought to properly remain privileged – because they are unrelated to Petitioner's claims of ineffectiveness – would be disclosed pursuant to the unilateral reckonings of the Government, as well as Petitioner's former counsel.

The cases relied upon by the Government in arguing that because Petitioner has raised ineffective assistance of counsel claims, he has totally waived any attorney-client or work-product privilege, and the Government is entitled to access to "sealed records in the underlying criminal case reflecting on counsel's efforts to represent the defendant," are inapplicable.  (Doc. 52 at p. 2)  *Wharton v. Calderon,* 127 F.3d 1201, 1203 (9th Cir. 1997), which stated generally that a claim of ineffective assistance of counsel waives the attorney-client privilege, must be read in conjunction with the Ninth Circuit's later *en banc* opinion in *Bittaker,* which addressed the limited *scope* of such an implied waiver; any implied waiver of the privilege is not absolute.  *Tasby v. United States,* 504 F.2d 332, 336 (8th Cir. 1974), considered the waiver issue not in the context of a Government request for disclosure even before it filed an answer to a §2255 petition, but in an appeal

Petitioner's Response in Opposition to
the Government's Motion to Unseal                11                Barrett v. United States of America
                                                                Case No. CV-09-00105-HJP

following an evidentiary hearing. Likewise, *Laughner v. United States,* 373 F.2d 326, 327 (5th Cir. 1967), addressed the privilege issue on appeal following a hearing ("There is not [sic] contention nor any indication in the record that the testimony elicited from the attorney in this case exceeded the scope of that waiver."). *United States v. Ballard,* 779 F.2d 287, 292 (5th Cir. 1986), addressed the waiver of the attorney client privilege in a context completely unlike that here, namely, where the defendant used an attorney's advice to further the commission of a crime.

With respect to the work product doctrine, the Tenth Circuit has held that "the work product doctrine extends to subsequent litigation." *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.,* 136 F.3d 695, 703 (10th Cir. 1998). Discovery in § 2255 proceedings is governed by the applicable Federal Rules of Civil Procedure. R. Gov. § 2255 Proc. 6(a). As the Court stated in *Frontier Refining,* 136 F.3d at 704: "Rule 26(b)(3) [of the Federal Rules of Civil Procedure] prevents discovery of an attorney's work product unless (1) the discovering party can demonstrate substantial need for the material and (2) the discovering party is unable to obtain the substantial equivalent of the material by other means without undue hardship."

Thus, the substantial need/undue burden test applies to fact work product. Opinion work product is, depending on the jurisdiction, either absolutely immune from discovery, or discoverable only upon a showing of compelling need. *Frontier Refining,* 136 F.3d at 704 n. 12. The Government here seeks materials that relate to opinion work product, i.e.,

the mental impressions of Mr. Barrett's trial attorneys regarding the witnesses they believed were best for the case.  At this point, the Government can neither establish a need for the documents nor an undue burden if the materials it seeks are not disclosed. After the Government files an answer to Mr. Barrett's §2255 motion, the Court will review the motion and answer and "any transcripts and records of prior proceedings ... to determine whether an evidentiary hearing is warranted."  R. Gov. § 2255 Proc. 8(a).  If the Court orders a hearing on Mr. Barrett's claims, the Government will be entitled to see the documents in question subject to an appropriate protective order.  *Bittaker*, *supra*.

The Government's contention that Mr. Barrett's § 2255 motion places him in the same position as a defendant presenting evidence of mental illness at trial is similarly specious.  Unlike *Buchanan v. Kentucky*, 483 U.S. 402 (1987), and the other cases cited on page 4 of the Government's motion, the issue here is not the existence *vel non* of privileges at trial where a defendant presents evidence of mental illness.  The trial is over. Mr. Barrett is arguing that he should be granted a new trial on the basis of evidence that was *not* presented.  His position now is more like the position when this Court initially ordered the use of a fire-walled attorney than it is like the position the Government would be in at a trial.  Just as it would be appropriate to impose a protective order to sequester and embargo privileged and protected information, *Bittaker*, *supra*, it is appropriate the information already sequestered and embargoed through the use of a firewall remain so.

The Government is seeking to use evidence that was not part of the record to

Petitioner's Response in Opposition to
the Government's Motion to Unseal                13                Barrett v. United States of America
Case No. CV-09-00105-HJP

establish a defense. This apparent effort to construct a post-hoc rationalization for trial counsel's conduct is impermissible under the governing law. *See Wiggins v. Smith*, 539 U.S. 510, 526-27 (2002) (rejecting Government's effort to supply post-hoc rationalization for trial counsel's conduct). "Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990), citing *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).[6]

No mental health evidence of any sort, from either party, was offered at trial. The thrust of the claim here is that defense counsel were ineffective for failing to investigate and develop in both stages of trial the mental health evidence which has been developed in these post-conviction proceedings. Because defense counsel at trial did not proffer mental health evidence – indeed, the record shows they argued their potential evidence did not fall within the scope of Fed. R. Crim. P. 12.2 – the evidence in the possession of the fire-walled attorney the Government now seeks is admissible neither to counter the

---

[6] *Accord United States v. Burrows*, 872 F.2d 915, 918 (9th Cir. 1989) (holding district court committed reversible error by assuming trial counsel made a strategic decision although there was no evidentiary support for the assumption); *Brown v. Sternes*, 304 F.3d 677, 691 (7th Cir. 2002) ("it is not the role of a reviewing court to engage in a *post hoc* rationalization for an attorney's actions . . . or engage in Monday morning quarterbacking"); *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999) ("Court is . . . not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all"); *Griffin v. Warden, Maryland Correctional Adjustment Center*, 970 F.2d 1355, 1358 (4th Cir. 1992) (citing *Strickland* and *Kimmelman* for proposition that "courts should not conjure up tactical decisions an attorney could have made, but plainly did not"); *Patton v. State*, 784 So.2d 380, 387 (Fla. 2000) (same as *Burrows*).

Petitioner's Response in Opposition to
the Government's Motion to Unseal                                    14                     Barrett v. United States of America
                                                                                                 Case No. CV-09-00105-HJP

evidence of deficient performance, nor on the issue of prejudice. *Wiggins*, *supra*, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.").

**4.      Conclusion:  the motion should be denied.**

For the foregoing reasons Petitioner asks that the Government's Motion (Doc. #52) be denied.  If the Court does not deny the Government's motion outright, it must, at a minimum, enter a protective order consistent with that described in *Bittaker*, *supra*.

Respectfully submitted,

/s/ David Autry
David Autry, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry44@hotmail.com

Daniel J. Broaderick
Federal Defender

/s/ Tivon Schardl
Tivon Schardl, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
(916) 498-6666
(916) 498-5710
Tim_Schardl@fd.org

Lawyers for Petitioner
Kenneth Eugene Barrett

Petitioner's Response in Opposition to
the Government's Motion to Unseal                    15                    Barrett v. United States of America
                                                                          Case No. CV-09-00105-HJP

1418

**Certificate of Electronic Filing and Service**

I hereby certify that on this 26th day of August, 2009, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing. A copy will be served electronically to Chris Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401.

/s/ David Autry

1419

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT    )
    )
        *Petitioner*,     )
    )
**v.**    )     **Case No. CV-09-105-JHP**
    )
UNITED STATES OF AMERICA    )
    )
        *Respondent*.    )
    )

## GOVERNMENT'S REPLY BRIEF IN SUPPORT OF MOTION TO UNSEAL, OR TO GAIN <u>FULL ACCESS TO MOTIONS, ORDERS, REPORTS AND PROCEEDINGS</u>

**COMES NOW** the United States of America, by undersigned counsel, and respectfully replies to Petitioner, Kenneth Eugene Barrett's, Response in Opposition (Doc. 61) to the Government's Motion to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings (Doc. 52) (hereinafter "Motion").

As noted in its Motion, the government requires access to the requested sealed materials to adequately respond to Barrett's motion for relief under 28 U.S.C. § 2255 (hereinafter "§ 2255 Motion"). Barrett opposes the government's request on a number of grounds, none of which find support in the law or facts.

1.    <u>The Court Should Deny the Motion to Recuse and Grant this Motion</u>

Barrett claims that this Court is disabled by the asserted need to recuse itself and, therefore, should not rule on the government's Motion. As set forth in the government's Response to Petitioner's Motion to Disqualify and Recuse United States District Court Judge James H. Payne from Further Participation in this Matter (Doc. 51), Barrett's claim that this Court should recuse itself lacks merit. Because Barrett's Motion to Disqualify should fail, the Court's rulings on the

instant Motion are not threatened by any likelihood that they will be vacated in view of some subsequent finding that the Court should have recused itself. Still, for the sake of clarity, the government urges this Court to deny the Motion to Disqualify immediately.

2.      The Government has Established Good Cause for its Disclosure Requests

Barrett argues that the government's Motion seeks premature discovery for which it has not established good cause under Rule 6 of the Rules Governing § 2255 Proceedings. He bases his argument concerning the lack of good cause on a contention that the government does not require the requested documents to determine whether he has stated a *prima facie* case for relief in his § 2255 Motion. Barrett also claims that the government cannot justify its request for the sealed documents based on its intent to show that trial counsel's actions were reasonable in light of the information available to them. Finally, Barrett argues that the government's delay in seeking these documents undermines any showing that they were requested in good faith. (Resp. 3-8.) None of Barrett's arguments find any support in the law or in common sense.

Under Rule 5(a) of the Rules Governing § 2255 Proceedings, the government is presently required to file an answer that "must address the allegations in the motion." Contrary to Barrett's position, the government's obligation is not limited to determining whether the § 2255 Motion states a *prima facie* case for relief. Barrett provides no authority for that assertion because none exists. Indeed, the Court's Order requiring an Answer to the § 2255 Motion stated as follows:

> You are requested to file a response by June 16, 2009, setting forth your position, together with applicable authorities, affidavits or other documents deemed necessary.
> Failure to file a response in compliance with our Local Civil Rule 7.1(c) will constitute waiver of objection by the party not complying, and such failure to comply will constitute a confession of the matters raised by such pleadings.

(Doc. 44.)  Thus, the Court anticipates far more of the Answer than a determination of whether Barrett has stated a prima facie claim, and the government intends to comply with the Court's mandate by substantively refuting the § 2255 claims.

In his § 2255 Motion, Barrett has directly placed at issue his mental health, his trial attorneys' investigative efforts, and this Court's willingness to fund defense resources.  To justify his claims, Barrett repeatedly refers to, and relies upon, documents to which he alone has access. (*See, e.g.*, § 2255 Mot. at 21 (citing Doc. 46, 50, 51),[1] 22 (citing Doc. 97), 23 (citing Doc. 107), 24 (citing Doc. 107), 25 (citing Doc. 51), 26 (citing Docs. 50, 107, 128; Tr. 10/3/05 Hr'g), 27 (citing Doc. 107), 28 (citing Doc. 23), 30 (citing Doc. 118), 31 (citing Doc. 113), 32 (citing Doc. 38, 50, 51; Tr. 10/3/05 Hr'g), 33 (citing Tr. 10/3/05 Hr'g) 34 (citing Doc. 50, 51, 97), 35 (citing Doc. 97; Tr. 10/3/05 Hr'g), 39 (citing Doc. 97), 142 (citing Doc. 50, 97; Tr. 3/22/05 Hr'g), 166 (citing Tr. 10/3/05 Hr'g), 170 (citing Doc. 97; Tr. 10/3/05 Hr'g), 184 (citing Docs. 50, 51, 57, 97, 128),185 (citing Doc. 46, 50, 97), 187 (citing Doc. 113), 188 (citing Doc. 188), 189 (citing Doc. 97, 107, 128), 190 (citing Tr. 10/3/05 Hr'g), 239 (citing Doc. 97), 240 (citing Doc. 97, 107), 241 (citing Doc. 51, 97, 107), 242 (citing Doc. 50, 97, 107, 128), 243 (citing Doc. 50, 97, 107), 244 (citing Doc. 50, 97, 107, 128), 245 (citing Doc. 50, 97), 276 (citing Doc. 116).  Indeed, with rare exceptions, virtually every document citation in Barrett's § 2255 Motion refers to a sealed record.  Clearly, in Barrett's view, the cited documents are highly probative of the issues in controversy.  Fundamental fairness requires that the government should have access to those documents in order to effectively respond to the allegations in Barrett's § 2255 Motion.

---

[1]The document numbers in this citation refer to the docket in Case Number CR-04-115-JHP.

The government has, of course, requested access to sealed documents that Barrett did not cite in his § 2255 Motion as it believes that they all have potential bearing on the issues at hand. In regard to the claims that trial counsel performed an ineffective investigation (*see, e.g.*, § 2255 Mot. at 61-72, 77-129 ), the government must show that the attorneys conducted a reasonable one. *Strickland v. Washington*, 466 U.S. 668, 691 (1984). The duty to investigate depends upon the facts known to the attorney. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). It appears from Barrett's reliance on the sealed documents, most of which are requests or orders for funding, that they do indeed reflect upon the facts known to trial counsel and are, therefore, probative of the lawyers' actions. As to the claims that this Court improperly deprived the defense of necessary experts (*see, e.g.*, § 2255 Mot. at 17-42 & 237-49), Barrett must show that his attorneys adequately demonstrated the need for the requested resources. *See Liles v. Saffle*, 945 F.2d 333, 336 (10th Cir.1991); *see Allen v. Mullin*, 368 F.3d 1220, 1236 (10th Cir.2004). Presumably, any attempt to make that showing occurred in sealed funding requests, rendering their contents central to the resolution of Barrett's claims. Finally, in challenging his competence to stand trial, and his attorney's alleged failures to challenge his competence, Barrett has placed at issue the mental health information available to the Court and counsel, and presently in the custody of the government's fire-walled team. (*See, e.g.*, § 2255 Mot. 72-76, 313-17.)

Barrett cannot succeed in his argument that the government's Motion amounts to a premature request for discovery pursuant to Rule 6 of the Rules of Government § 2255 Proceedings. That rule permits discovery, with leave of court, under the Federal Rules of Criminal and Civil Procedure. *See* Fed. R. Crim. Pro. 16; Fed. R. Civ. Pro. 26 to 37. Those provisions, in turn, regulate how parties to federal actions obtain information from one another. *Id.* But in its current Motion, the

4

government seeks, not discovery from Barrett, but an exercise of this Court's discretion to unseal documents under Federal Rule of Criminal Procedure 49.1(d), applicable to this matter by way of Rule 12 of the Rules Governing § 2255 Proceedings.  Accordingly, Barrett's attempt to invoke Rule 6 is of no moment.

Barrett, likewise, fails in his attempt to invoke the substantive protections of discovery law. In an utterly conclusory fashion he asserts that the government's request to unseal is "over broad." While the government's request does not fall within the rules of discovery, any application of discovery principles, such as the overbreadth doctrine, undermines Barrett's argument.  In discovery, the party objecting to overbreadth has the burden of demonstrating it.  *In re Urethane Antitrust Litigation*, 237 F.R.D. 454, 458 (D.Kan. 2006) (citing *McCoo v. Denny's, Inc.*, 192 F.R.D. 675, 694 (D.Kan. 2000).  Barrett makes no effort to show that any document requested by the government falls outside the realm of reasonableness.  The government obviously cannot show the particular relevance of any individual sealed document, since it has no access to them, but believes that all the requested documents concern defense counsel's state of mind, as relevant to the § 2255 claims of ineffective assistance of counsel; Barrett's mental health, as relevant to the § 2255 claims of incompetence and mental health related ineffective assistance of counsel; or the court's reasoning in rejecting requests under 18 U.S.C. § 3006A, as relevant to the § 2255 claims that the Court underfunded the defense.  Given that Barrett makes no effort to contradict that assumption, this Court should disregard his overbreadth argument.

Barrett's contention that the government unduly delayed its request for the documents leaving it virtually no time to make use of them is irrelevant.  The date upon which the government sought these documents in no way affects the merits of its arguments in favor of obtaining them.

5

Moreover, much of the delay in discovering this issue stems from Barrett's failure to make use of citations that would have highlighted it. At no time during the initial review of the § 2255 Motion did counsel for the government have cause for concern that it lacked access to every document relied upon by Barrett. Once the issue came to light, discovery of the true scope of the issue required repeated electronic searches of the trial docket and § 2255 Motion. Given the length of § 2255 Motion, even that tedious method has likely failed to identify every instance in which Barrett relied on a document that he alone had access to.

3.      Barrett Waived the Protections of the Attorney-Client Privilege by Claiming Ineffective Assistance of Counsel

Barrett argues that his § 2255 claims of ineffective assistance of counsel merely implied a waiver of the attorney-client privilege, which this Court should narrowly construe. He further contends that the government's request, if granted, would result in an unnecessarily broad waiver of his right to the protection of privilege. He additionally claims that the government's Motion necessarily contemplates work-product that remains protected, notwithstanding any waiver of attorney-client privilege. Finally, he argues that his reliance on mental health evidence in this proceeding does not waive his interest in the privacy of the psychological reports prepared in anticipation of his trial. (Resp. 8-15.) Barrett's arguments all lack merit.

However broadly construed, Barrett's claims of ineffective assistance of counsel waived the attorney-client privilege. Indeed, Barrett's own authority leaves no ambiguity about that fact:

> It has long been the rule in the federal courts that, where a habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer. *See, e.g., Wharton v. Calderon*, 127 F.3d 1201, 1203 (9th Cir.1997); *Tasby v. United States*, 504 F.2d 332, 336 (8th Cir.1974); *Laughner v. United States*, 373 F.2d 326, 327 (5th Cir.1967).

6

*Bittaker v. Woodford*, 331 F.3d 715, 716 (9th Cir. 2003). Barrett expends some energy trifling over the procedural posture of the cases cited by the government (and by the Ninth Circuit's *Bittaker* opinion) in a vain attempt to distinguish his own case from those matters. (*See* Resp. at 10-12.) The fact remains, however, that the federal courts recognize that a defendant cannot simultaneously claim attorney-client privilege and ineffective assistance of counsel. *Id.* Obviously, *Bittaker* does not undermine that rule and stands, instead, for the limited proposition that courts may impose protective orders when permitting the disclosure of documents that would be privileged absent a claim of ineffective assistance. *Id.* at 728.

Barrett unsuccessfully attempts to extend *Bittaker's* reach. He argues that the government's unconditional request for documents somehow offends *Bittaker* by threatening to strip the defendant of the Court's protection over any remaining claim he may have to privilege. Thus, Barrett implies that *Bittaker* places an onus on the government to moderate its requests on pain of having them denied. *Bittaker* stands for no such thing – it merely provides discretion to the courts of the Ninth Circuit to issue protective orders meant to guard whatever remains of a defendant's attorney-client privilege following the assertion of an ineffective assistance of counsel claim. Accordingly, while the government does not seek to protect any remaining vestige of Barrett's privilege, its Motion contains no fatal flaw. Indeed, the government could not reasonably be expected to seek appropriate protections for Barrett's privilege since it remains unaware of the precise content of the documents it has requested and could only speculate as to how, or even if, to limit disclosure or usage of those records. Furthermore, the government's Motion did not baldly ask this Court to unseal documents, thereby exposing them to public view, but requested in the alternative a simple grant of access and permission to rely on the records. (*See* Mot. at 5.)

7

Barrett likewise fails in his contention that the work-product privilege protects the requested documents even if the attorney-client privilege does not. Barrett correctly observes that the work-product privilege separately protects documents. *See United States v. Nobles*, 422 U.S. 225, 238 (1975). But he fails to show how the work-product protection survives his constructive waiver of the attorney-client privilege. Indeed, Barrett's own authority, *Bittaker*, undermines his argument. *See Alvarez v. Woodford*, 81 Fed. Appx. 119, **1 (9th Cir. 2003) ("As to the work product doctrine, we explained in *Bittaker* that the same concerns that dictate waiver of the attorney-client privilege by a habeas petitioner raising an ineffectiveness claim also dictate the waiver of the work product protection.") (citing 331 F.3d at 722 n.6)(Attached hereto and marked as Attachment One).

Finally, Barrett cannot succeed in arguing that, because he intends in this proceeding to rely on new mental health evidence, he retains a protected interest in the mental health reports prepared in anticipation of trial. Barrett's argument presumes that to prevail on collateral review he need do nothing more than produce evidence helpful to the defense that he could have presented at trial. His burdens under § 2255 are, however, far heavier. For instance, to show that his attorneys provided ineffective assistance in failing to challenge his competence (*see* § 2255 Mot. at 72-76.), he must show that a reasonable attorney would have been on notice of a need to assess competence. *See Foster v. Ward*, 182 F.3d 1177, 1186 (10th Cir. 1999). To prevail on even the bare claim that he was incompetent to stand trial (*see* § 2255 Mot. at 313-17.), he "must demonstrate by clear and convincing evidence a real, substantial, and legitimate doubt regarding his competence to stand trial." *Walker v. Gibson*, 228 F.3d 1217, 1229 (10th Cir. 2000), *abrogated on other grounds in Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001). On collateral review, the courts do not assess a defendant's newly proffered competence evidence in a vacuum, but consider the totality of the

mental health record to determine whether the petitioner has carried his burden of clear and convincing evidence. *See Walker*, 228 F.3d at 1229-31. Accordingly, the mental health evaluations prepared at the time of trial are entirely relevant to the issues raised in the § 2255 Motion. Barrett cannot shield them from view simply because he would prefer to rely on other evidence.

<div align="center">CONCLUSION</div>

In view of its manifest need for access to sealed documents, and the failure of Barrett's arguments to the contrary, the government respectfully urges this Court to grant its Motion to Unseal, or alternatively, to grant the government access to all sealed motions, orders, proceedings, reports or docket entries in the underlying Criminal Case 04-CR-115-JHP, *United States v. Kenneth Eugene Barrett*, and permission to refer to these materials, as necessary, when answering Barrett's claims.

Dated: August 28, 2009.

Respectfully submitted,

SHELDON SPERLING
United States Attorney


s/      Christopher J. Wilson
        CHRISTOPHER J. WILSON, OBA # 13801
        Assistant United States Attorney
        United States Attorney's Office
        1200 West Okmulgee
        Muskogee, OK 74401
        (918) 684-5100
        Fax (918) 684-5150


s/      Jeffrey B. Kahan
        JEFFREY B. KAHAN, PA Bar #93199
        Trial Attorney
        U.S. Department of Justice

<div align="center">9</div>

1331 F Street, N.W.; Rm. 345
Washington, D.C. 20530
Tel: (202) 305-8910


**CERTIFICATE OF SERVICE**


I, hereby certify that on 28th day of August, 2009, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry, Attorney for Petitioner
Tivon Schardl, Attorney for Petitioner


s/      Christopher  J. Wilson
        Assistant United States Attorney

1429

81 Fed.Appx. 119, 2003 WL 22682463 (C.A.9 (Cal.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 81 Fed.Appx. 119, 2003 WL 22682463 (C.A.9 (Cal.)))**

**H**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Ninth Circuit Rule 36-3. (Find CTA9 Rule 36-3)

United States Court of Appeals,
Ninth Circuit.
Manuel Machado ALVAREZ, Petitioner-Appellant,
v.
Jeanne S. WOODFORD, Warden, California State Prison at San Quentin, Respondent-Appellee.
**No. 03-99000.**
**D.C. No. CV-97-01895-GEB-JFM.**

Argued and Submitted Oct. 6, 2003.
Decided Nov. 12, 2003.

California death row inmate filed habeas corpus petition, alleging ineffective assistance of counsel. The United States District Court for the Eastern District of California, Garland E. Burrell, J., following report and recommendation of magistrate judge, ordered petitioner to produce certain ordinarily privileged documents to the government in order for the government to defend against ineffective assistance of counsel claims. Petitioner appealed. The Court of Appeals held that: (1) petitioner was properly ordered to produce certain ordinarily privileged documents, and (2) Court of Appeals had jurisdiction to hear interlocutory order.

Affirmed.

West Headnotes

**[1] Habeas Corpus 197 ⚷688**

197 Habeas Corpus

197III Jurisdiction, Proceedings, and Relief
197III(C) Proceedings
197III(C)1 In General
197k688 k. Discovery and Disclosure; Physical or Mental Examination. Most Cited Cases
Magistrate judge properly ordered habeas corpus petitioner to produce certain documents, which would ordinarily be privileged under the attorney-client privilege, to the government in order for government to defend against petitioner's ineffective assistance of counsel claims. U.S.C.A. Const.Amend. 6.

**[2] Habeas Corpus 197 ⚷814**

197 Habeas Corpus
197III Jurisdiction, Proceedings, and Relief
197III(D) Review
197III(D)1 In General
197k814 k. Decisions Reviewable. Most Cited Cases
Court of Appeals had jurisdiction to hear habeas corpus petitioner's appeal from federal district court's interlocutory order requiring petitioner to produce certain ordinarily privileged documents in order for government to defend against petitioner's ineffective assistance of counsel claims; order was not a final judgment, but fit within "[that small class] of orders which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."

**[3] Habeas Corpus 197 ⚷688**

197 Habeas Corpus
197III Jurisdiction, Proceedings, and Relief
197III(C) Proceedings
197III(C)1 In General
197k688 k. Discovery and Disclosure;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT ONE

81 Fed.Appx. 119, 2003 WL 22682463 (C.A.9 (Cal.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 81 Fed.Appx. 119, 2003 WL 22682463 (C.A.9 (Cal.)))**

Physical or Mental Examination. Most Cited Cases
Magistrate judge properly ordered habeas corpus petitioner to produce certain documents, which would ordinarily be subject to work-product protection, to the government in order for government to defend against petitioner's ineffective assistance of counsel claims.

**\*120** Appeal from the United States District Court for the Eastern District of California; Garland E. Burrell, District Judge, Presiding.Connie Alvarez, AFP, Jennifer M. Corey, Sacramento, CA, for Petitioner-Appellant.

Brett Morgan, Lauara W. Simpton, AGCA-Office of the California Attorney General, Sacramento, CA, for Respondent-Appellee.

Before SCHROEDER, Chief Judge, THOMAS, and CLIFTON, Circuit Judges.

MEMORANDUM FN*

> FN* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

**\*\*1** [1] This is an interlocutory appeal by California death row inmate and habeas corpus petitioner Manuel Machado Alvarez. The magistrate judge ordered Alvarez to produce certain ordinarily privileged documents to the government in order for the government to defend against Alvarez's ineffective assistance of counsel claims. The district court denied reconsideration of the magistrate judge's order, and it is from this denial that Alvarez now appeals.

[2] The government challenges our jurisdiction. The district court's order is not a final judgment, but it fits within "[that small class] of orders which

finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); Bittaker v. Woodford, 331 F.3d 715, 717-18 (9th Cir.2003)* (en banc). We have jurisdiction to hear this appeal.

On the merits of this appeal, our decision is controlled by our en banc decision in *Bittaker.* A habeas petitioner cannot raise a claim of ineffectiveness against his trial counsel while at the same time asserting that documents relevant to that claim are protected by the attorney-client privilege. *Id.* at 716. Here, the Magistrate Judge gave careful consideration to each document at issue, such that "only those documents or portions of documents relating to the [claim asserted by the client]" would be disclosed. *Id.* at 720 (*quoting United States v. Amlani, 169 F.3d 1189, 1196 (9th Cir.1999)*).

[3] As to the work product doctrine, we explained in *Bittaker* that the same concerns that dictate waiver of the attorney-client privilege by a habeas petitioner raising an ineffectiveness claim also dictate the waiver of the work product protection. *Id.* at 722 n. 6. The same logic forecloses Alvarez's argument that the documents are protected by the psychotherapist-patient privilege. To allow Alvarez to at once claim that his mental state was not properly investigated and presented by counsel and also claim that the government is barred from accessing information about his mental state is simply inequitable. *See id.*

AFFIRMED.

C.A.9 (Cal.),2003.
Alvarez v. Woodford
81 Fed.Appx. 119, 2003 WL 22682463 (C.A.9 (Cal.))

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

81 Fed.Appx. 119, 2003 WL 22682463 (C.A.9 (Cal.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 81 Fed.Appx. 119, 2003 WL 22682463 (C.A.9 (Cal.)))**

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 09-CIV-105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**<u>ORDER</u>**

This post-conviction federal death penalty case, in which a motion under 28 U.S.C. § 2255 has been filed, comes before the Court on Petitioner's Motion to Disqualify and Recuse the undersigned judge from further participation in this matter (Doc. 45). The pending motion is brought pursuant to 28 U.S.C. §§ 144 and 455 and alleges that the actions and/or rulings of the undersigned judge during the pendency of the federal death penalty case and immediately prior to the filing of the § 2255 motion indicate a judicial bias which should disqualify said judge from presiding over this post-conviction proceeding. Petitioner asserts three grounds for disqualification of the undersigned judge: (1) violations of rules of judicial conduct; (2) judge will be a material witness to many of the facts and circumstances that comprise the basis of his motion to vacate; and (3) violations of canons of judicial ethics by conducting independent investigation on the internet during the course of ruling on Petitioner's motion to toll the statute of limitations in this matter. On July 13, 2009, the Government filed its Response to Petitioner's Motion to Disqualify (Doc. 51), in which it

urges this Court to deny the Motion because "[n]one of the grounds relied upon are timely presented or would lead a reasonable person to question the impartiality of this Court." Petitioner did not file a Reply.

A.  Request to disqualify pursuant to 28 U.S.C. § 144

Title 28 U.S.C. § 144 provides as follows:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

In a § 144 motion, a court is not called upon to decide the truth of any allegations of bias.  The only question before the Court under this section is whether a "party" has filed a "timely and sufficient affidavit" and a "certificate of counsel of record stating that it is made in good faith." *United States v. Battle*, 235 F.Supp.2d 1301, 1340 (N.D. Ga. 2001).  Not one, but two declarations[1] are attached to the motion as well as a certificate of counsel that the motion is made in good faith.  Neither of the declarations, however, were made or filed by a "party" as required by § 144.  Furthermore, "conclusions, rumors, beliefs and opinions are not sufficient to form a basis for disqualification." *United States v. Burger*, 964 F.2d 1065,

---

[1] Pursuant to 28 U.S.C. § 1746, unsworn declarations signed under penalty of perjury are permitted whenever any law requires a sworn affidavit.

1070 (10th Cir. 1992).  Finally, "[t]he doctrine of incorporation by reference has no place in a § 144 affidavit."  *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987).

Although Petitioner's Motion to Disqualify indicates it is incorporating "by specific reference the averments made on pages 17 through 42 of his Motion to Vacate and all exhibits cited therein"[2] and "all allegations of Claim 5 and all exhibits cited therein"[3] and "the averments made on pages 17 through 247 of his Motion to Vacate (Doc. 2) and all exhibits cited therein,"[4] the Court is aware that the voluminous § 2255 motion (397 pages plus 195 multi-page exhibits) contains numerous allegations that the trial court violated Petitioner's due process rights during the course of the trial proceedings.  *See*, Doc. No. 2 at pp. 2-3; 17-43; 238-249; 305-308; 309-311; 345.  Despite the fact Petitioner's Motion to Disqualify states that his motion "stems from [this Court's] administrative and *ex parte* conduct, not his judicial rulings,"[5] most of the allegations of bias center around the Court's decisions (1) regarding appointment of counsel; (2) relating to the approval of an initial budget, (3) relating to the treatment of, at most, two CJA[6] vouchers submitted by John Echols, who subsequently requested leave to withdraw from this case; and (4) other rulings made during the course of the proceedings.  The Petitioner/Defendant did not personally sign

---

[2]*See*, Doc. 45 at p. 6.

[3]*Id.*, at p. 8.

[4]*Id.*, at p. 14.

[5]*See*, Doc. 45 at p. 6.

[6]CJA refers to the Criminal Justice Act, 18 U.S.C. § 3006A.

a verification with respect to the § 2255 motion; rather, it was signed by his attorney on his

behalf and it recites, in pertinent part, the following:

> I am authorized by Kenneth Eugene Barrett to file the foregoing motion to vacate, set aside, or correct the sentence, and for a new trial made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure. I am filing the motion on Mr. Barrett's behalf. . . .
> . . . . . I declare that the contents of the foregoing Motion are true except for those matters based upon information and belief, and I believe the latter matters to be true. . . . . I make this verification pursuant to Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings because these matters are more within my knowledge than Mr. Barrett's knowledge.
> I declare, under penalty of perjury, that the foregoing is true and correct.

> /s/ Tivon Schardl

*Id.*, at p. 396-397.

To the extent that § 144 is explicit that only one affidavit is allowed, this Court finds

neither the declarations attached to the Motion to Disqualify or to the Motion to Vacate are

sufficient to satisfy the statutory requirements of a single affidavit by a "party."  Further,

adverse rulings of the court are not legal grounds, under § 144, for disqualification.  *Martin*

*v. United States*, 285 F.2d 150, 151 (10th Cir. 1960).  Because a sufficient affidavit has not

been filed by a "party" stating facts showing bias against the Petitioner as required by § 144,

Petitioner's Motion to Disqualify based on 28 U.S.C. § 144 is denied.

B.  Request to disqualify pursuant to 28 U.S.C. § 455

Title 28 U.S.C. § 455 provides, in relevant part:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

* * * * * *

(3) Where he has served in a governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy; . . . . . . .

28 U.S.C. § 455. Additionally, a judge shall disqualify if he knows it is likely that he will be a material witness in the proceeding. 28 U.S.C. § 455(5)(iv).

In *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994), the United States Supreme Court made it clear that judicial rulings almost never constitute a valid basis for a bias or partiality motion and opinions formed by the judge on the basis of events occurring in the course of judicial proceedings do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Rather, "[a] judge's ordinary efforts at courtroom administration" are immune from attack for judicial bias or partiality. *Id.*, U.S. at 556. A court called upon to consider a request to disqualify under § 455 must decide "whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *United States v. Burger*, *supra*. Under this section, the court does not have to presume the factual allegations are true nor is the judge limited to the facts presented by the challenging party. *Hinman v. Rogers*, *supra.* The court may consider all the circumstances, both public and non-public to rebut an inference of partiality. *Id.* See also, *State of Idaho v.*

5

1437

*Freeman*, 507 F.Supp. 706 (D.C. Ida. 1981) in which the court stated when considering a claim of bias under § 455:

> Hidden facts indicating partiality may at any time come into public view and therefore are legitimate elements of an appearance test; and hidden facts tending to rebut an inference of partiality are presumably in the judge's power to reveal once public suspicion of his partiality in a given instance has been aroused.

*Id.*, at 721.

In addition to the general grounds asserted for disqualification of the undersigned judge, Petitioner asserts three specific actions taken in this case which he claims are "individually or collectively sufficient" to require this Court to recuse. First, Petitioner alleges the Court engaged in improper *ex parte* communications with the prosecutors. Second, Petitioner asserts administrative decisions made by the Court in approving a budget can not be separated from the claims raised in his § 2255 motion. Finally, Petitioner argues the Court's ruling denying his request to toll the statute of limitations was improper and, therefore, when added to the first two claims of judicial misconduct establish the court's bias or lack of impartiality. The Court will consider each of these allegations individually.

1. *Allegations of ex parte communications*

Petitioner claims that the Court's conduct during and after a September 13, 2005 *ex parte* hearing "violated" the American Bar Association's Model Code of Judicial Conduct (hereinafter "Model Code") Canon 2, Rule 2.9 because it was held despite the lack of an emergency, involved matters of substance and did not result in full disclosure to the defense.

1438

The Government argues a court is not bound by the Model Code and that Petitioner has failed to establish that the challenged *ex parte* hearing was not authorized by law.

On September 9, 2005, the Government filed a Sealed Motion for Delaying the Production of Witness Names.[7]   This motion requested permission to delay the disclosure of the names and addresses of certain witnesses until the Friday prior to their scheduled testimony. *Id.*, at p. 1.  The motion asserted the Court could, pursuant to 18 U.S.C. § 3432, "make a finding by a preponderance of the evidence that the list of veniremen and witnesses need not be provided to the defendant in a capital case where the life or safety of any person may be jeopardized." *Id.*, at pp. 1-2.  Despite the fact the defendant was in custody, the Government's motion alleged, in pertinent part:

> Defendant's actions which underlay (sic) the crimes for which he is charged, were lethally violent.  He intentionally shot and killed one officer and wounded another.  He also created substantial risk of injury to additional officers as well as citizens in the immediate area, including his own son.  He displayed little regard to his own safety as well.
>
> Various of defendant's know (sic) associates in the drug business likewise have displayed violent tendencies and are commonly associated with firearms.  In communications with some of these associates, Barrett threatened potential witnesses.  He was heard to advise one person that the informant for his search warrant need (sic) to be "taken care of."  He advised other persons that he intended or expected to be involved in a shoot-out with law enforcement officers.  He willingly pursued that course of action despite his admitted expectation that he may die doing so.
>
> On several occasions before September 24, 1999,k (sic) defendant threatened or committed acts of violence towards law enforcement officers. On one occasion, defendant ran a roadblock with a vehicle and nearly hit two law enforcement officers.  On another occasion, an officer approached defendant's residence.  Defendant, confronted the officer, holding a firearm in a ready

---

[7]Doc. 186 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.  This document was unsealed by minute order entered on May 30, 2006.

7

position. Defendant also threatened to burn the residences of his neighbors and threatened to shoot their animals. Defendant's violent tendencies were so substantial that the sheriff of Sequoyah County had directed his officers not to answer calls at defendant's residence without backup. Defendant's known threats of violence were the basis for the no-knock search warrant herein and the decision to call the Oklahoma Highway Patrol tactical team for service of the warrant.

*Id.*, at p. 5. The government's motion also implied that the Court's actions deciding to utilize an anonymous jury selection process as well as authorizing the use by the United States Marshal of a stun belt on the defendant during the trial proceedings, added support to the government's "articulable concern that defendant poses a current and credible threat to others." *Id.*, at p. 3.

Based solely upon the government's allegations that Petitioner/Defendant had suggested that the informant on the search warrant needed "to be taken care of," the Court was obligated to hold an *ex parte* hearing to ascertain the basis for the government's safety concerns and to determine whether the government could prove "by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person." 18 U.S.C. § 3432. *See also, United States v. Napue*, 834 F.2d 1311, 1318 (10th Cir. 1988) (recognizing *ex parte* hearing between the court and the government is appropriate to determine whether or not the government will be required to provide a witness list where government has raised concerns regarding disclosure). Although *ex parte* hearings should be avoided whenever possible, *id.*, one must question how a court would ever be able to consider a government claim that disclosure of a witness's identity would jeopardize that witness's life without holding an *ex parte* hearing.

8

A reading of the entire *ex parte* hearing reveals that the Court had not prejudged anything. At most, the transcript reveals the Court's frustration that the Government was just now disclosing a problem that the Court felt should have been addressed much sooner in the course of the proceedings. Specifically, the Court began the proceedings by noting that the Government's motion was filed late the day before, after the Court had just finished a full day of juror death qualification proceedings, by inquiring:

> . . . . why this motion was not filed much, much earlier. We have had at least two, maybe three pretrials. Every time the Court has inquired about the status of discovery, I have been told it's moving along fine without problem. This issue is a - - my research suggests it is of utmost importance for several reasons. One, as pointed out by the government's motion, they are concerned about the safety of potential witnesses.

*See*, Vol. I of Transcript of Hearing held on 9/13/05 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP, at p. 3.[8] The Court did, however, ask the government to address when the trial started in light of its filing a list of witnesses on the prior Friday. The Court emphasized, however, that it was

---

[8]In preparing this Order, the Court became aware that the transcript contained within the Court files for September 13, 2005, only contained the first sealed hearing held on that day. The cover page for that transcript identified the transcript as "Transcript of Sealed Hearing on Government's Motion Before the Honorable James H. Payne United States District Judge, September 13, 2005." This transcript was filed on April 25, 2006 in *Unites States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

When the court reporter was asked to provide the Court with a copy of the transcript for the second sealed hearing held on September 13, 2005, the Court was advised that the two sealed hearings held on September 13, 2005 were contained in two separate volumes, labeled on the cover pages as "Transcript of Hearing on Government's Motion for Order Delaying the Production of Witness Names and Request for Protective Order Before the Honorable James H. Payne United States District Judge September 13, 2005 Volume I of II" and "Transcript of Hearing on Government's Motion for Order Delaying the Production of Witness Names and Request for Protective Order Before the Honorable James H. Payne United States District Judge September 13, 2005 Volume II of II." Volume I of II appears to be identical to the transcript filed with the Court Clerk on April 25, 2006 with the exception of the cover page. Volume II of II was apparently never filed with the Court Clerk. Accordingly, in order to ensure the entire transcript of both of the sealed hearings held on September 13, 2005 are on file in this case, the Court hereby directs the Court Clerk to file these two transcripts in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP simultaneously with the filing of this Order. Finally, the Court would note that the minutes for September 13, 2005 indicate the Court unsealed these hearings by agreement of counsel at the conclusion of the second hearing.

. . . . . concerned, at the very least, about the government's requirements to put on a preponderance of the evidence to demonstrate the concerns outlined in the motion for order delaying the production of witness names. I would advise the government that it's - - the Court has some concerns as to why this did not happen at a time when it could have been addressed more leisurely and comfortably. We are now here a few minutes before nine with the jurors coming in with only a few minutes to address this issue. So, I'm interested, first, in knowing from the government when does the trial start. I'm not so interested in excuses why it hasn't been done before, although that troubles me that we couldn't - - because if we had only had one pretrial, I would understand it, but I have had status conferences and pretrials. You could have filed this under seal weeks ago. As I say, I'm - - I don't want to waste time about what we could have done. I want to address where you think we are now and what evidence you have to support the delay in producing the names of these witnesses.

*Id.*, at pp. 5-6.

After the government advised the Court that it had been in contact with defense counsel regarding it's witness list and the names of those persons deleted from the filed list, the Court indicated it was reassured that there had been discussions with defense counsel. The Court did, however, advise the government it was still concerned if the government failed in establishing by a preponderance of the evidence that revealing these witnesses' names would put their lives in jeopardy, what problems would arise with those witnesses' testimony. *Id.*, at p. 7. At that point, the government advised the Court that all counsel had been "operating under the inference that the trial begins on or after the 26th." *Id.* Furthermore, government counsel advised the Court that defense counsel was aware of "essence of the testimony of the witnesses"; that the witnesses were "all associates of Mr. Barrett's, associates or family." The government then proceeded to argue the merits of their motion. *Id.*, at pp. 12-20. After hearing the government's evidence, the Court said ". . . what you are telling me is nothing - -

10

you have no evidence of anyone being threatened that is on your witness list now.  You are saying if we list them, we are afraid they will be threatened?" *Id.*, at p. 21.  Additionally, the Court asked why the government had not addressed whether the witnesses could be protected if their names were revealed.  *Id.*, at p. 22.  After hearing the government's response, the Court indicated it would take the matter under advisement since it needed to proceed with juror qualification proceedings.  *Id.* at p. 24. Once in the courtroom, the Court indicated it was "continuing with the individual juror qualification for purposes of Stage I proceedings."  Tr. of Individual Juror Qualification for Purposes of Stage One Proceedings held on September 13, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP, at p. 252. Before starting, however, the Court gave both sides an opportunity to address any issues they felt the Court needed to address.  At that time, the following record was made:

> MR. SPERLING:  Briefly, Your Honor.  As we have noted, we have informed defense counsel of the nature of the proceeding that was the subject of the hearing this morning.  We're working in the direction of an agreement by which we will make witnesses available to defense counsel and/or their investigator.  I anticipate that that will be done next week.  And we have talked very candidly, I think, without - - although we have not specific names, we've talked very candidly about the substance of testimony.  We have also indicated to both Mr. Hilfiger and Mr. Smith that we will make a proffer - -

> THE COURT: Well, let me - - before we proceed with much further discussion of that matter, that was a sealed hearing.  Is that what you're speaking of?

> MR. SPERLING: Yes, Your Honor.

> THE COURT: And, of course, we're not - - this is a public proceeding, although there's no one in the courtroom that I detect.  The sound system is on.  And I think that further discussion of that matter should be - - I'm obviously interested in hearing about it, but I think it should be a sealed proceeding.

<div align="center">11</div>

MR. SPERLING: I appreciate your caution, Your Honor.

THE COURT: I'll make time for that during the day.

*Id.*, at pp. 252-253. After this colloquy, the jury panel entered the courtroom and the Court

continued with death qualification of the jury. At the end of the day's proceedings, the Court

took a five minute recess, sealed the courtroom and proceeded to deal with the issues raised

at the beginning of the day. *Id.*, at p. 535. Specifically, the following record was made:

> THE COURT: Let the record reflect the Court is in session again in U.S.A. versus Kenneth Eugene Barrett, CR-04-115. The record should reflect that the defendant is present with counsel and the Government's counsel is present.
>
> It came to the Court - - this Court's attention Monday morning, just before the Court started the hearing on selection of jurors, or doing what we refer to as the death penalty qualification, that the Government had filed a motion requesting that their motion be filed under seal. I looked at the motion and granted the motion, the motion to file under seal, and later in the day, started examining the actual motion, and then into the evening yesterday, examining it, and decided, after looking at it, that it was necessary to set the matter for a sealed hearing first thing this morning, at which time the U.S. Attorney appeared and made a presentation on what was entitled Government's Motion for Order Delaying the Production of Witness' Names. That hearing was concluded. Then, as we started to begin the hearing for qualification of death qualified jurors, it was my understanding the U.S. Attorney desired to make an announcement, and at that point, I stopped the proceeding because I was concerned about the sealed issue.
>
> And, so, I want to make inquiry of the Government at this time, if you desire to proceed with this matter in the presence of defense counsel, and do you desire that this matter continue to be sealed?
>
> MR. SPERLING: I think we can proceed with defense counsel. I think where we were at - - and I'm doing my best, Your Honor, to recall where we were when we stopped - - when I - - I'm not sure exactly what thought I was - -
>
> THE COURT: I'll tell you where I was, is I was - - because of the nature of the pleading, I was concerned about security issues. And, so, that's why I thought it appropriate to stop and wait to hold this hearing at a time when we

12

had more time to think about it. And the nature of the announcement you were about to make, it sounded like there had been some discussion with defense counsel. And that's about as much as the Court knows.

MR. SPERLING: Okay. I'm willing for the matter to be unsealed. And here is where we are, Your Honor. I would really like to give this some additional thought, because we want to expeditiously identify the witnesses to defense counsel. We have attendant causes for concern. And, you know, I'm just thinking a bit aloud now, but I would want the Court's standard admonition with regard to contacting witnesses. We are working in the direction of either making the witnesses available in our office, or providing information such that the investigator for the defense can contact them and locate them. I'd really like to give this some thought this evening, before we come up with an explicit plan, but I think in one way or another, we're prepared, in the very near future, to do one of those two things.

THE COURT: From the defense?

MR. HILFIGER: Well, I don't have much more to say about - - I mean, we have talked about it, and they've made some offer, and I think that that's a workable solution.[9]

Vol. II of Tr. of Hearing held on September 13, 2005 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP, pp. 26-28.

The next day, before the Court could issue a formal ruling on the government's motion, the parties announced to the Court that they had reached an agreement regarding these witnesses. Specifically, after indicating that it looked like the Court would complete the death qualification process by the end of the week, the following colloquy occurred:

THE COURT: . . . . . Let me - - the motion that we discussed at the end of yesterday, that was filed under seal, is it necessary to seal the courtroom in regard to that matter?

---

[9]At this point in the proceedings, defense counsel raised other matters of concern with the Court and no further discussion of disclosure of witnesses was held.

13

MR. SPERLING: It is not, and we have an announcement with regard to - - Your Honor, I believe we have reached an agreement whereby on Monday, we will give to the defense the names of these seven, their places of abode, criminal history, and any deals or promises that may have been made in exchange for their prospective testimony. We have also - - we are also working in the direction of making them available in our office next Thursday or Friday.

There are two incarcerated witnesses - - and I have also discussed this with counsel - - I don't know why we can't commit to telling them, you know, when they're here, they'll be brought here by writ, and then making them available in that manner.

THE COURT: Mr. Hilfiger, any comment?

MR. HILFIGER: That's what I understand, and at this time, we don't have any objection to that. That should be sufficient time, based on what we talked about yesterday, on the jurors that we sort of - -

THE COURT: I mean, Monday may be the last day. I think that if everything goes well, if we have a decent - - I think we had 52 total, and - - I don't want to get overly optimistic, but, I mean, if we - - in the next two days, we'll have to pause, and I'll give you both an opportunity to give me your assessment. We do have jurors coming next week, if we think we need them, but if we have a reasonable number the next two days, we may be satisfied with what we have by the end of the week. But I would think, at the very most, Monday would be sufficient.

MR. HILFIGER: That's what I was sort of thinking, about being able to talk to the witnesses next Thursday.

THE COURT: So, it's my understanding that the Government is disclosing - - this will be the last of the witness disclosures; is that correct?

MR. SPERLING: I believe so, Your Honor.

THE COURT: Okay. And that's what the defense understands?

MR. HILFIGER: That's what I understand, yes.

THE COURT: The Court, unless I hear different, has sealed the original pleading. Unless there is an application otherwise, that will remain sealed. I don't know of any reason why it should or shouldn't but until I receive an

14

application, it will remain sealed.  But as I understand it, the witnesses' names will be turned over to the defendant on Monday?

MR. SPERLING: Yes, Your Honor.

(PAUSE)

THE COURT: The clerk has brought to my attention, in regard to the matters filed under seal that has to do with an application for a writ - - unless you file some - - and I'll ask the U.S. Attorney to advise the Court and the clerk by the close of business tomorrow, as to whether that should remain sealed, unless you know now.

MR. SPERLING: Until Monday, we would ask at this time that that remain under seal until Monday.  We can work with the Marshall (sic) service. I presume that the fact that it is under seal would not obviate our talking with them.

THE COURT: No.

MR. SPERLING: We can still talk with them, in order to give them that notice.

THE COURT: I'm just trying to clear up the record, to see if it should be - - if the announcement you've made today resolves everything that is under seal.

MR. SPERLING: I think it does, but we need to wait until Monday.  We want to have an opportunity to talk with the witnesses and to encourage them to show up here.

THE COURT: Well, I'll leave it unexecuted.  If you will notify the Court and the clerk by the end of the close of business on Monday.

Tr. of Individual Juror Qualification for Purposes of Stage One Proceedings held on September 14, 2005 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP, at pp. 840-843.

15

Other than citing to Model Rule 2.9, Petitioner has not cited any authority to establish that the Court could not hold an *ex parte* hearing on the government's motion.  Furthermore, in light of the fact that the names of these witnesses were disclosed to defense counsel on September 19, 2005, and the actual selection of jurors did not commence until September 26, 2005,[10] any actions taken by this Court in relation to the *ex parte* hearing did not prejudice the defendant's rights under § 3432 in any way.  Simply looking at what occurred as it unfolded, the Court was focused on the immediate legal proceedings (*i.e.*, death qualification of the jurors) before ruling upon the issues contained in the government's motion to delay disclosure of witnesses.  Once an announcement was made that counsel had discussed those issues and had reached an agreed resolution, there was nothing left for the Court to decide.  Therefore, this Court finds no reasonable person would harbor doubts about the judge's impartiality in light of the facts of this particular case.

### 2.  *Budget and CJA Voucher Rulings*

Next, Petitioner alleges the Court's administrative decisions "express opinions prejudging the merits of the relevant claims" and therefore, pursuant to 28 U.S.C. § 455(b)(3), the Court is required to recuse.  Specifically, Petitioner argues this Court's opinions "expressed in [its] administration of funds under the Criminal Justice Act cannot be separated from the issues that must be decided in Mr. Barrett's claims."  Doc. 45, at p. 14.  In support of this allegation, Petitioner incorporates two declarations, one from John Echols and one

---

[10]*See*, *United States v. Barrett*, 496 F.3d 1079, 1116-17 (10th Cir. 2007).

from Julia O'Connell.[11]  The gist of these two declarations is that the Court did not strictly follow the recommendations of the Federal Public Defender in the appointment of counsel in this case and did not automatically approve all claims submitted by defense counsel.  Initially, the Court attempted to appoint the Federal Public Defender for the Northern and Eastern Districts of Oklahoma but the Federal Public Defender felt his office could not accept the case due to their prior obligations to represent a capital eligible defendant in *United States v. Edward Leon Fields*, Case No. CR-03-73-RAW, also pending in the Eastern District of Oklahoma.  *See*, Doc. 1, Exhibit 67 -  Declaration of Julia O'Connell, at p. 1.  The Federal Public Defender recommended the appointment of John Echols and Rob Nigh[12] of Tulsa.  *Id.* After considering the recommendation of the Federal Public Defender as required by 18 U.S.C. § 3005, the Court appointed Mr. John Echols as lead counsel and Mr. Roger Hilfiger as co-counsel.  Mr. Echols had represented Mr. Barrett in two state court trials arising from the same set of facts as those underlying the federal indictment.  *Id.*  Mr. Echols did not, however, have any federal capital trial experience.[13]  On the other hand, Mr. Hilfiger had served as United States Attorney for the Eastern District of Oklahoma, had previously tried a federal capital case in the Eastern District of Oklahoma in which the jury decided against

---

[11]These declarations are labeled Exhibit 34 and 67.  When referring to these Exhibits, the Court will refer to them as Doc. 1, Exh. 34 or 67.  Any page references to these two exhibits will refer to the page numbers at the bottom of the exhibits' pages as opposed to the page number given by the CM/ECF system on the top of these pages.

[12]It should be pointed out that Mr. Nigh had a conflict of interest and when asked to accept appointment in this proceeding declined because of his conflict.

[13]*See* Doc. 310, Tr. of Sealed Budget Hearing on December 9, 2004 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP, at p. 3.

imposing the death penalty against his client, and had an office in Muskogee (the location of the United States District Court for the Eastern District of Oklahoma).[14]

Additionally, Petitioner argues, "in the course of his administrative decisions, [this Court] expressed distrust of John Echols, Mr. Barrett's former counsel, whose request for investigative and expert assistance are now at issue."[15]   Doc. 45, at p. 15.   What Petitioner fails to acknowledge is that after Mr. Echols was allowed to withdraw at his request,[16] this Court repeatedly encouraged defense counsel to submit supplemental budget requests if they felt they needed additional funding.[17]   The budget was not carved in stone but as the definition implies was an estimate of what might reasonably be required.   Additionally, the record is

_____

[14]*Id.*, at pp. 3-4.   *See also*, *United States v. James Norwood Hutching, et al.*, Case No. CR-92-32-FHS (E.D.Okla.).

[15]It should be noted that Mr. Echols filed only two CJA vouchers in Petitioner's criminal case.   The first voucher covered fees and expenses from October 20, 2004 thru January 31, 2005, CJA Voucher No. 0505060000012.   The second voucher covered fees and expenses from February 1, 2005 thru February 28, 2005, CJA Voucher No. 05056000014.   Mr. Echols was allowed to withdraw on May 5, 2005.   The trial did not begin until September 26, 2005.   Prior to approving payment on these vouchers as well as two CJA vouchers submitted by Mr. Hilfiger, this Court referred all four vouchers to the magistrate judge.   In a very thorough report and recommendation, the magistrate judge found an adjustment of time claimed by the attorneys was necessary due, in part, because of "striking similarities between the substance of pleadings" filed in Petitioner's criminal case and the substance of pleadings filed in a state court case in which Mr. Echols was involved.   *See*, Doc. 106 filed in *United States v. Kenneth Eugene Barrett,* Case No. CR-04-115-JHP, at p. 3.   On May 5, 2005, this Court entered an order affirming the magistrate's report and recommendation regarding defense counsel's CJA vouchers, as well as ruling upon several other *ex parte* defense motions.   Doc. 128 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.   See also, Doc. 38, Sealed Order Regarding Ex Parte Motion for approval of "Pre-Authorization" Budget for the Defense signed by Magistrate Judge Steven P. Shreder and filed on January 19, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP detailing procedures to follow in submitting a proposed litigation budget and in submission of vouchers.

[16]Doc. 113, Tenth Ex Parte Motion Concerning the Funding of Mr. Barrett's Defense filed on April 6, 2005 and Doc. 128, Order filed May 5, 2005.   Both of these documents were filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

[17]*See*, Doc. 321, Transcript of Sealed Telephone conference held on May 5, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115 (Court advised Mr. Hilfiger that it was granting Mr. Echols Motion to Withdraw and advised counsel he would be given an opportunity to inform the Court of the effect of this decision on the trial schedule, the budget and anything else to do with the case); Doc. 318, Transcript of Sealed Ex Parte Budget Hearing held on October 3, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP (Court advised defense counsel that after granting Mr. Echols Motion to Withdraw the Court had indicated that an amended budget request would be considered but no amended budget was ever filed.   Counsel were again encouraged to advise the Court of any supplemental budget requests they might have; but counsel advised the Court that they felt the budget was sufficient for everything including all of the experts that they needed).   *See also*, Doc. No. 128, Order regarding funding issues filed on May 5, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

clear that the Court encouraged defense counsel on numerous occasions to file amended budget requests and/or to advise the Court if it needed to amend its budget as the case proceeded.  Furthermore, the defendant clearly did not seek recusal in a timely fashion as it relates to his allegations that the Court showed "distrust of Mr. Echols" and, therefore, this Court finds this allegation to be untimely.  *See*, *United States v. Nickl*, 427 F.3d 1286, 1297 (10th Cir. 2005) (citing *United States v. Kimball*, 73 F.3d 269, 273 (10th Cir. 1995)( Party seeking recusal must do so in a timely fashion.)

Petitioner does not cite and this Court has not found any cases to establish that a judge who makes administrative budget decisions during the course of criminal proceedings is "serv[ing] in a governmental employment" capacity "as counsel, adviser or material witness" as those terms are used in 28 U.S.C. § 455((b)(3).  To the extent the record establishes that counsel did not use the entire budget approved by this Court, Petitioner has failed to establish that this Court, in approving an initial litigation budget[18] and in ruling on the two CJA vouchers submitted by John Echols, demonstrated an opinion on the merits of the claims contained in his Motion to Vacate.  It is not unheard of for a district court judge to appoint a licensed attorney to represent a criminal defendant and then during the course of ruling on an ineffective assistance of counsel claim in a subsequent § 2255 action for that same judge to find that counsel appointed by the court rendered ineffective assistance of counsel.  Until the Court considers each of the allegations in a § 2255 case, along with the evidence presented to support those allegations, the Court has no way of prejudging the claims.  Simply not

---

[18]Doc. 97 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

following the recommendation of the Federal Public Defender does not establish that the Court has already decided any of the issues in this case.

3. *Court's decision regarding tolling of statute of limitations*

Finally, Petitioner argues this Court conducted "independent investigation" to use as a basis for denying Petitioner's motion to toll the statute of limitations.  In support of this allegation, Petitioner cites Canon 2, Rule 2.9(C) of the Model Code for the proposition that independent investigation of facts by a judge is improper.  The full text of the Rule relied upon states: "A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed."  *Id.* Without citing any authority to establish that the Model Code is binding on this Court, Petitioner argues this Court's judicial finding that it had appointed the Federal Public Defender's Office for the Eastern District of California, and thereafter, relying upon the information contained on the public website of the Federal Public Defender's office[19] establishes bias or creates the appearance of bias toward Petitioner.  As acknowledged by the government, the information which this Court took "judicial notice" of had no bearing on this Court's ultimate legal conclusion that there was no legitimate basis to authorize tolling of the statute of limitations in light of the specific facts considered by the Court.  This was not a case where lead counsel died and no one else knew anything about the case.  Rather, this is a case

---

[19]Without trying to address all of the trivial points raised regarding the specific language of this Court's Order filed on February 27, 2009 (Doc. 397), this Court would note that 18 U.S.C. § 3005 authorizes a district court to appoint "Federal Public Defender organizations" as opposed to individual attorneys within such an organization and this Court's written appointment order clearly envisioned that a Federal Public Defender organization was being appointed herein.  *See*, Doc. 371, filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

1452

where **lead counsel**, David Autry, had absolutely no medical concerns or other issues which were brought to the attention of this Court. Furthermore, lead counsel was aware for several months prior to requesting the Court toll the statute of limitations that he might need to take a more active role in preparation of petitioner's pleadings. Finally, whether or not the government felt tolling was appropriate, this Court had to make a legal decision regarding this issue. While petitioner and/or defense counsel may disagree with the legal decision made by this Court, the Supreme Court has made it clear that judicial rulings rarely constitute a valid basis for bias or partiality motions. *Liteky*, *supra*. *See also*, *Martin v. United States*, *supra*. Despite Petitioner's allegations, Petitioner has failed to establish that this Court's "impartiality might reasonably be questioned" or that this Court has any "personal knowledge of disputed evidentiary facts concerning the proceeding."

For the reasons set forth herein, this Court finds Petitioner has failed to establish, based upon the allegations in his Motion to Disqualify, either that a reasonable person knowing all of the facts would question this Court's impartiality, 28 U.S.C. § 455(a)) that this Court has a personal bias or prejudice against Petitioner or "personal knowledge of disputed evidentiary facts concerning this proceeding," 28 U.S.C. § 455(b)(1); or that this Court "has served in governmental employment and in such capacity participated as counsel, advisor or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case or controversy." 28 U.S.C. § 455(b)(3). Additionally, this Court does not anticipate being a witness in any proceedings in this case. 28 U.S.C. § 455 (5)(iv).

Accordingly, Petitioner's Motion to Disqualify based on 28 U.S.C. § 455 (Doc. 45) is hereby denied.

## **CONCLUSION**

For the reasons stated herein, it is the Order of this Court that Petitioner's Motion to Disqualify (Doc. 45) is hereby denied.

It is so ordered on this _11th_ of September, 2009.

James H. Payne
United States District Judge
Eastern District of Oklahoma

1454

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,     )
         )
         Petitioner,   )
         )
vs.         )    Case No. 09-CIV-105-JHP
         )
UNITED STATES OF AMERICA,    )
         )
         Respondent.  )

**ORDER**

This post-conviction death penalty matter comes before the Court on the Government's Motion to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings (Doc. 52) in the underlying criminal case of *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.  The Government contends it can not fully respond to Petitioner's Motion to Vacate regarding petitioner's allegations of ineffective assistance of counsel without access to these documents.  Further, by attacking the quality of the representation provided to him by trial and appellate counsel, the Government argues Petitioner has waived the attorney-client privilege and has waived any claims of confidentiality regarding his psychological records.  Petitioner objects claiming "[t]he Government seeks pre-pleading *discovery* of documents that are privileged and confidential . . ." (Italics added).  Doc. 61, at p. 1.  As the Government's Reply correctly notes, Petitioner has raised the issues to be addressed in this matter based upon sealed court documents in his

underlying criminal case and this Court has the authority to order any document filed with the Court to be unsealed.  *See*, Fed.R.Cr.P. 49(d).

The Government seeks to unseal basically two types of pleadings.[1]  First, the majority of the documents the Government seeks to unseal are related to CJA budgetary matters, including *ex parte* hearings held on budget matters.  Second, the Government seeks to have this Court unseal the Petitioner's Psychological Report/Forensic Evaluation conducted by the Government's expert pursuant to F.R.Cr.P. 12.2.

As a general rule, all criminal judicial proceedings are to be open to the public.  *See*, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) ("*Press- Enterprise II*"); *Press-Enterprise  Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) ("*Press-Enterprise I*"); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 67 L.Ed.2d 973 (1980); *see also* Samuel B. Sokol, Comment, *Trying Dependency Cases in Public: A First Amendment Inquiry*, 45 UCLA L.Rev. 881, 884-901 (1998).  Further, "(c)ourts have long recognized a common-law right of access to judicial records."  *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007) (citing *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 599, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)) and *United States v. Hickey*, 767 F.2d 705, 708 (10th Cir. 1985).

---

[1]The Government also requests to unseal a "Sealed Hearing 10/20/05."  A review of the docket sheet and Vol 11 of 27 of the Transcript of Proceedings held on October 20, 2005 establish that the courtroom was sealed following presentation of evidence to the jury and a hearing was held outside the presence of the jury.  The transcript of this hearing, however, was not sealed.  *See*, Doc. 339 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

> It is the policy of this Court that sealed documents . . . . . are disfavored. Sealed documents . . . . may be approved by the Court only upon a showing that a legally protected interest of a party, non-party or witness outweighs the compelling public interest in disclosure of records.

LCvR 79.1. *See also*, LCrR 1.2 which makes the Local Rules of Civil Procedure applicable to criminal cases.

## I.  Matters related to Assistance of Counsel and/or Due Process

The Criminal Justice Act, hereinafter referred to as the "CJA", provides for disclosure of attorney fees subject to certain enumerated considerations.  18 U.S.C. § 3006A(d)(4)(A). Subparagraph (C) governs disclosure after the trial has been completed and provides as follows:

> **(C) Trial completed.—**
>
> **(i) In general.**— If a request for payment is not submitted until after the completion of the trial and subject to consideration of the defendant's interests as set forth in subparagraph (D), the court shall make available to the public an unredacted copy of the expense voucher.
>
> **(ii) Protection of the rights of the defendant.**— If the court determines that defendant's interests as set forth in subparagraph (D) require a limited disclosure, the court shall disclose amounts as provided in subparagraph (B).
>
> **(D) Considerations.**— The interests referred to in subparagraphs (B) and (C) are—
>
>> **(i)** to protect any person's 5th amendment right against self-incrimination;
>>
>> **(ii)** to protect the defendant's 6th amendment rights to effective assistance of counsel;
>>
>> **(iii)** the defendant's attorney-client privilege;

3

> **(iv)** the work product privilege of the defendant's counsel;
>
> **(v)** the safety of any person; and
>
> **(vi)** any other interest that justice may require, except that the amount of the fees shall not be considered a reason justifying any limited disclosure under section 3006A(d)(4) of title 18, United States Code.
>
> **(E) Notice.**— The court shall provide reasonable notice of disclosure to the counsel of the defendant prior to approval of the payments in order to allow the counsel to request redaction based on the considerations set forth in subparagraph (D). *Upon completion of the trial, the court shall release unredacted copies of the vouchers provided by defense counsel to justify the expenses to the court. If there is an appeal, the court shall not release unredacted copies of the vouchers provided by defense counsel to justify the expenses to the court until such time as the appeals process is completed, unless the court determines that none of the defendant's interests set forth in subparagraph (D) will be compromised.*

*Id.* (Italics added).

In an effort to deny the government access to the CJA budgetary matters which, according to the above-quoted statute, are generally open to the public following completion of the appeals process, Petitioner argues the government is requesting to conduct "discovery" pursuant to Rule 6(a) of the Rules Governing § 2255 Proceedings and that these "discovery requests" are overly broad. In an attempt to further distort the real issues herein, Petitioner's counsel cites *Calderon v. United States District Court*, 98 F.3d 1102, 1106 (9th Cir. 1996), for the proposition that "courts should not allow prisoners to use federal discovery for fishing expeditions to investigate mere speculation." Counsel then suggests the Government is merely on a fishing expedition. The Court in *Calderon*, however, was addressing whether a prisoner should be allowed "pre-petition discovery." In this case, Petitioner has already

4

filed his motion to vacate[2] and the Government has been ordered by this Court to file a response to the allegations made in Petitioner's motion.  While the Federal Rules of Civil Procedure no longer contain a separate list of the available discovery methods,[3] the rules specifically contemplate that "discovery" is accomplished by one or more of the following methods: (1) depositions upon oral examination or written questions;[4] (2) written interrogatories;[5] (3) production of documents or things or permission to enter upon land or other property, for inspection and other purposes;[6] (4) physical and mental examinations;[7] and (5) requests for admission.[8]

The Government is not asking to conduct "discovery."  Rather, the Government seeks disclosure of this Court's files, records, transcripts, and/or correspondence relating to the judgment which is being challenged herein in order to respond to allegations which have been made by the Petitioner.  While it may be true that "the Court already has access to the relevant documents the Government seeks," the Court should not have to decide whether or not to conduct an evidentiary hearing solely based upon its own review of those documents

---

[2]Petitioner's Motion to Vacate pursuant to 28 U.S.C. §2255 is analogous to the §2254 Petition for Writ of Habeas Corpus which the petitioner in *Calderon* sought discovery prior to filing.

[3]Fed.R.Civ.P. 26(a)(5) was removed in 2007.

[4]Fed.R.Civ.P. 30 and 31.

[5]Fed.R.Civ.P. 33.

[6]Fed.R.Civ.P. 34 or 45 (a)((1)(C).

[7]Fed.R.Civ.P. 35.

[8]Fed.R.Civ.P. 36.

without the Government ever having an opportunity to direct the Court to the portions of those documents which it feels bolsters its arguments and/or positions.

Further, by raising claims of ineffective assistance of counsel in a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255, a defendant waives his attorney-client privilege. *In re Lott*, 424 F.3d 446, 453-54 (6th Cir. 2005); *Bittaker v. Woodford*, 331 F.3d 715, 716 (9th Cir. 2003); *Johnson v. Alabama*, 256 F.3d 1156, 1178 (11th Cir. 2001); *Tasby v. United States*, 504 F.2d 332, 336 (8th Cir. 1974); *Laugner v. United States*, 373 F.2d 326, 327 n.1 (5th Cir. 1967). As the court in *Bittaker* explained:

> The rule that a litigant waives the attorney-client privilege by putting the lawyer's performance at issue during the course of the litigation dates back to at least *Hunt v. Blackburn*, 128 U.S. 464, 9 S.Ct. 125, 32 L.Ed. 488 (1888), where the Court stated: "When Mrs. Blackburn entered upon a line of defence which involved what transpired between herself and Mr. Weatherford [her lawyer], and respecting which she testified, she waived her right to object to his giving his own account of the matter." *Id*. at 470-71, 9 S.Ct. 125. The Court thought this proposition so self-evident it felt no need to support it with either citation to authority or further analysis. In the intervening years, courts and commentators have come to identify this simple rule as the fairness principle. (citations omitted) The principle is often expressed in terms of preventing a party from using the privilege as both a shield and a sword. (citations omitted)

*Bittaker*, *supra* at 718 - 719. The court in *Bittaker*, however, recognized a distinction between an express waiver and an implied waiver. "An express waiver occurs when a party discloses privileged information to a third party who is not bound by the privilege, or otherwise shows disregard for the privilege by making the information public." *Id.*, at 719.

> . . . . [T]he doctrine of implied waiver allocates control of the privilege between the judicial system and the party holding the privilege. (citation omitted) The court imposing the waiver does not order disclosure of the materials

categorically; rather, the court directs the party holding the privilege to produce the privileged materials *if* it wishes to go forward with its claims implicating them. The court thus gives the holder of the privilege a choice: If you want to litigate this claim, then you must waive your privilege to the extent necessary to give your opponent a fair opportunity to defend against it.

*Id.*, at 720.

In relation to the CJA documents, Petitioner's argument is that he has not totally waived his attorney-client privilege and his protections under the work-product doctrine.[9] "The attorney-client privilege exists to protect confidential communications between client and lawyer for the purpose of securing legal advice." *In re Grand Jury Matter No. 91-01386*, 969 F.2d 995, 997 (11th Cir. 1992). The protection is designed to

encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

*Upjohn Co. v. U.S.*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). A review of the CJA documents and/or transcripts, however, reveals no communications between any attorneys and the petitioner. Accordingly, this Court finds disclosure of the requested CJA matters would not violate Petitioner's attorney-client privilege.

The work product privilege, on the other hand, is "distinct from and broader than the attorney-client privilege." *United States v. Nobles*, 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). "At its core, the work-product doctrine shelters the mental

---

[9] Petitioner's counsel has not made any attempt to identify which documents and/or portions thereof should be covered by attorney client privilege as opposed to work product privilege.

1461

processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *Id.*, U.S. at 238.  Like the attorney-client privilege, the privilege is not absolute but may be waived. *Id.*

Some of the items which the government requests to unseal clearly contain the mental impressions, conclusions, opinions or legal theories of trial counsel.  For instance, in the *ex parte* motions concerning the funding of the defense,[10] defense counsel identified areas in which counsel felt investigative and/or expert services might be necessary and in the sealed budget hearing held on December 9, 2004, the magistrate judge allowed defense counsel to explain the legal reasoning behind various budgetary requests.[11]  Similarly, the transcripts of other *ex parte* budget hearings included discussions with the Court about what counsel anticipated might arise in the criminal case.[12]  Additionally, the sealed letter of 2/28/05 from defense counsel contains opinions of counsel among other information and Doc. 301 contains information from counsel to support the CJA voucher submitted for investigative services.

Other items which the government specifically requested be unsealed contain no such work product information.  For instance, Doc. 19 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115[13] is nothing more than an order granting an *ex parte* conference

---

[10]Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, and 274 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

[11]Doc. No. 310 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

[12]Doc. Nos. 316, 318, and 321 and the transcript filed on 2/15/06 of an *ex parte* budget hearing held on 3/22/05 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

[13]The references to documents on pages 8-11 of this order all refer to documents which were filed in this underlying criminal case.

concerning the defense budget; Doc. 20 is simply a request from co-counsel, Roger Hilfiger, to be excused from that budget conference; and Doc. 21 is a minute order granting Mr. Hilfiger's request. Additionally, Doc. 26 is a minute order granting "defendant's sealed *ex parte* motion[14] for authorization to travel to Washington, D.C., for a conference with the Attorney General's Representative concerning authorization for seeking the death penalty in this case." Similarly, Doc. 38 is an order by the magistrate judge advising defense counsel of the procedures and/or rules which must be followed by counsel, including the submission of a proposed litigation budget, in seeking interim payment of attorneys' fees and reimbursement of costs. Doc. 47 is an order by the magistrate judge directing defense counsel to "submit a proposed defense budget that *strictly complies*" with Doc. 38. Doc. 97 is the order of this Court approving an initial litigation budget. Doc. 102 is a two sentence order by the Court authorizing defense counsel to purchase certain state court transcripts; Doc. 106 is the Sealed Report and Recommendation of the magistrate judge regarding approval of four interim CJA vouchers; and Doc. 123 is a short minute order by the magistrate judge concerning payment of interim compensation. Doc. 128 is an order affirming the magistrate's report and recommendation regarding four interim defense counsel CJA vouchers, as well as ruling on other *ex parte* defense motions. Doc. 129 is a minute order which contains no privileged information. Doc. 133 is an order appointing Bret Smith as co-counsel, setting the maximum hourly compensation rates and advising counsel of the necessity to comply with the guidelines for interim payment of attorney fees and reimbursement of costs set forth in previous court

---

[14]Doc. 25.

1463

orders, *i.e.* Doc. Nos. 38, 97, and 128. Doc. No. 207 is a minute order setting an *ex parte* budget hearing and Doc. 244 is a minute order granting the defendant's motion to modify the budget[15] and indicating the total budget authorized. Doc. Nos. 261 and 262 are minute orders by the magistrate judge recommending payment of interim CJA vouchers. Similarly, Doc. No. 275 is a minute order approving a defense request regarding the litigation budget.[16] Doc. No. 287 is an order by the magistrate judge requiring counsel to submit a verified statement from the investigator regarding his requested fees; Doc. No. 293 is the report and recommendation of the magistrate judge regarding payment of those investigative services and Doc. No. 302 is the Order of this Court adopting that magistrate's report and recommendation. In light of the contents of the items referred to in this paragraph and the Court's conclusion that no attorney client or work product privilege is contained in any of these items, the Court hereby orders the Court Clerk to unseal Doc. Nos. 19, 20, 21, 26, 38, 47, 97, 102, 106, 123, 128, 129, 133, 207, 244, 261, 262, 275, 287, 293, and 302 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

While there may have been justifiable reasons for sealing the other documents and/or transcripts discussed herein in the criminal case during pre-trial and/or trial proceedings (and to a lesser extent during post-trial proceedings), this Court finds based upon the specific allegations contained with Petitioner's Motion to Vacate, it would be patently unfair to allow Petitioner to make allegations which might be substantiated and/or refuted in part by sealed

---

[15]Doc. 232.

[16]Doc. 274.

court documents, pleadings and/or transcripts without allowing the government an opportunity to review those matters. Accordingly, as to Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, 274, 301, 310, 316, 318, 321, a sealed letter dated 2/28/05 and the transcript filed on 2/15/06 of an *ex parte* budget hearing held on 3/22/05 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP, this Court finds Petitioner has impliedly waived his attorney client and/or work product privileges but this waiver is limited to claims of ineffective assistance of counsel claims as raised in the § 2255 motion. The claims of ineffective assistance of counsel include numerous claims of failure to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness among other allegations. *See*, Doc. 2 filed herein.

Because Petitioner may choose to preserve the confidentiality of these privileges, this Court will give Petitioner until September 22, 2009, to advise the Court whether he wishes to abandon any of his claims in order to preserve his privileges. In the event Petitioner decides to pursue all claims of ineffective assistance of counsel, this Court will order all of these items disclosed to counsel for the Government subject to an appropriate protective order.

## II. Matters relating to Mental Health

Finally, the government seeks disclosure of Doc. Nos. 208, 210, 237 and 238 in *Untied States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP which they assert are mental health evidence in the custody of the fire-walled counsel. On September 23, 2005, the Defendant filed Doc. 208, Notice of Expert Evidence of a Mental Condition Pursuant to F.R.Cr.P. 12.2. Copies were served upon counsel for the government. Later that day, after the

1465

Court had reviewed the document, this Court *sua sponte* entered a minute order[17] sealing the

pleading to protect the privacy interests of the defendant.  The Court's minute order was not

intended to prevent government counsel access to Doc. 208.  Further, that minute order  is not

and has never been sealed.

Rule 12.2 of the Federal Rules of Criminal Procedure requires a defendant to give notice

if he intends to offer expert evidence of a mental condition.   In pertinent part, that rule

provides:

> **(b) Notice of Expert Evidence of a Mental Condition.**
>
> If a defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on either (1) the issue of guilt or (2) the issue of punishment in a capital case, the defendant must — within the time provided for filing a pretrial motion or at any later time the court sets — notify an attorney for the government in writing of this intention and file a copy of the notice with the clerk. . . . . .
>
> **(c) Mental Examination.**
>
> **(1) Authority to Order an Examination; Procedures.**
>
> \* \* \* \* \* \*
>
> **(B)** If the defendant provides notice under Rule 12.2(a), the court must, upon the government's motion, order the defendant to be examined under 18 U.S.C. § 4242.  If the defendant provides notice under Rule 12.2(b) the court may, upon the government's motion, order the defendant to be examined under procedures ordered by the court.
>
> **(2) Disclosing Results and Reports of Capital Sentencing Examination.**

---

[17]Doc. 210.

The results and reports of any examination conducted solely under Rule 12.2(c)(1) after notice under Rule 12.2(b)(2) must be sealed and *must not be disclosed to any attorney for the government or the defendant unless* the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition.

*Id.* (Italics added).

The records herein reveal on September 23, 2005, the defendant gave notice of expert evidence of a mental condition pursuant to Rule 12.2 of the F.R.Cr.P.  *See*, Doc. 208. Thereafter the Government filed a Motion for Psychiatric Examination, Doc. 214, and the Court granted that motion, Doc. 216.  Pursuant to the Order entered by this Court, a Sealed Psychological Evaluation/Risk Assessment was prepared by J. Randall Price, Ph.D., ABPP, ABPN.  The entire report was provided to a fire-walled Assistant United States Attorney in the Northern District of Oklahoma.  Once the fire-walled attorney received the evaluation, he filed the sealed report with the court (Doc. 237) and extracted approximately one and a half paragraphs detailing part of the conclusions of the government's expert and provided that excerpt to all counsel.  *See*, Doc. 238.

The Government now requests this Court to unseal the entire forensic report arguing that the mental health evidence in the custody of the fire-walled attorney "is not only relevant to rebut claims of Barrett's mental health, it is also highly probative of trial counsel's efforts to investigate those issues.  Barrett's present reliance on evidence of his mental condition should waive any claim of confidentiality with regard to the information in the custody of fire-

walled counsel." Doc. 52, at p. 4. Petitioner objects because no mental health evidence was offered at trial.

Although Petitioner has impliedly waived, by challenging the adequacy of counsel's investigation of mental health and/or mitigation issues, his attorney client and/or work product privileges regarding exactly what investigation was undertaken by trial counsel, this Court finds because Petitioner did not introduce evidence of his mental condition at trial, Rule 12.2(c)(2) prevents the disclosure of the evaluation conducted by the government. Accordingly, this Court denies the Government's Request to Unseal Doc. 237.

## <u>CONCLUSION</u>

For the reasons stated herein, it is hereby ordered that the Government's Motion to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings is:

1) GRANTED as to Doc. Nos. 19, 20, 21, 26, 38, 47, 97, 102, 106, 123, 128, 129, 133, 207, 244, 261, 262, 275, 287, 293, and 302 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP;

2) TAKEN UNDER ADVISEMENT as to Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, 274, 301, 310, 316, 318, 321, a sealed letter dated 2/28/05, and the transcript filed on 2/15/06 of an *ex parte* budget hearing held on 3/22/05 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP, pending Petitioner's advising this Court whether he wishes to abandon any of his claims in order to preserve his privileges; and

3) DENIED as to Doc. No. 237.

It is further ordered that Petitioner shall have until September 22, 2009, to advise the Court whether he wishes to abandon any of his claims.  In the event Petitioner chooses to not abandon any claims, Petitioner's counsel shall submit a proposed protective order regarding the pleadings addressed in paragraph 2 above which have not been unsealed by this Order.

It is so ordered on this  11th  day of September, 2009.

James H. Payne
United States District Judge
Eastern District of Oklahoma

1469

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

### NOTICE OF INTENT NOT TO ABANDON CLAIMS
### AND
### REQUEST FOR  PROTECTIVE ORDER

COMES NOW Petitioner, Kenneth Eugene Barrett, by and through his undersigned counsel, and, pursuant to this Court's Order of September 11, 2009 (Doc. No. 67) gives his NOTICE that he does not intend to abandon any claims raised in these Section 2255 proceedings.

Pursuant to this Court's Order (Doc. No. 67) and *Bittaker v. Woodford*, 331 F.3d 715 (9th Cir.) (*en banc*), *cert. denied*, 540 U.S. 1013 (2003), Mr. Barrett respectfully requests that this Court enter a protective order regarding the documents as to which this Court took under advisement the Government's motion, to wit:  Docket Nos. 16, 23, 24, 25, 46, 50 51, 57, 107, 113, 116 118, 232, 274, 301, 310, 316, 321, a sealed letter dated 2/28/05, and the transcript filed on 2/15/06 of an *ex parte* budget hearing held on 3/22/05 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

Mr. Barrett respectfully submits that the following provisions should be made in the protective order, and gives notice of filing a proposed order containing these provisions:

1470

1.      **Scope:**  The following provisions apply to the documents filed under Docket Numbers 16, 23, 24, 25, 46, 50 51, 57, 107, 113, 116, 118, 232, 274, 301, 310, 316, and 321; to the sealed letter dated 2/28/05; and to the transcript filed on 2/15/06 of an *ex parte* budget hearing held on 3/22/05, all in *United States v. Kenneth Eugene Barrett*, E.D. Case No. CR-04-115-JHP.

2.      **Directions to Clerk:**  The documents identified in Paragraph 1, *supra*, shall remain under seal in the record of Case No. CR-04-115-JPH.  However, the Clerk of this Court shall immediately provide copies of these documents to counsel of record for the United States. Each document shall be clearly marked "SEALED."

3.      **Sequestration:**  None of the documents identified in Paragraph 1, and no information contained therein or derived therefrom, shall be revealed to any person other than counsel of record for the United States and persons working under their direct supervision in connection with these Section 2255 proceedings, unless Mr. Barrett or his counsel previously made the information public.

4.      **Embargo:**  Disclosure of the contents of the documents and the documents themselves may not be made to any other persons or agencies, including any law enforcement or prosecutorial personnel or agencies, without a prior order from this Court.  No authorization for disclosure will be made by this Court except on a motion filed under seal and served with fifteen days' notice on counsel for Mr. Barrett.  Except with such prior authorization, none of the documents, and no information contained therein or derived therefrom, shall be used in any way or for any purpose except in connection with the litigation of claims Mr. Barrett presents in these Section 2255 proceedings.

5.      **Enforcement:**  At the conclusion of the post-conviction proceedings, the United

States shall file with this Court, and serve upon counsel for Mr. Barrett, a list of the names of all persons to whom any of the materials described in Paragraph 1, *supra*, or any information contained therein or derived therefrom, has been disclosed by counsel for the United States pursuant to or in violation of Paragraphs 3 or 4, *supra*.  Prior to any retrial or prosecution of Mr. Barrett by the United States or State of Oklahoma, his counsel shall be notified of the names of all persons acting for or assisting the United States or State of Oklahoma in any way in such matter.

6.      **Continuation:**  This Order shall continue in effect after the conclusion of these Section 2255 proceedings and shall apply in the event of a retrial of all or any portion of the Government's criminal case against Mr. Barrett. The court will maintain continuing jurisdiction over this matter for the purpose of enforcing the provisions of this order and imposing appropriate sanctions for any violation.

WHEREFORE, premises considered, Mr. Barrett respectfully requests that an Order granting the requests above, and as set forth in the Proposed Protective Order attached, be entered.

////

////

////

////

////

////

////

/////

DATED:   September 23, 2009

Respectfully submitted,

/s/ David Autry
David Autry, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry44@hotmail.com

Daniel J. Broderick
Federal Defender
/s/ Tivon Schardl
Tivon Schardl, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
(916) 498-6666
(916) 498-5710
Tim_Schardl@fd.org

Lawyers for Petitioner
Kenneth Eugene Barrett

### Certificate of Electronic Filing and Service

I hereby certify that on this 23rd day of September, 2009, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing.  A copy will be served electronically to Chris Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401.

/s/ Tivon Schardl

1473

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                   )
          Petitioner,              )
                                   )
v.                                 )          Case No. CV-09-00105-JHP
                                   )
UNITED STATES OF AMERICA,          )
                                   )
          Respondent.              )

**[PROPOSED] PROTECTIVE ORDER**

On September 11, 2009, this Court entered an order taking under advisement the Government's Motion to Unseal Document Nos. 16, 23, 24, 25, 46, 50 51, 57, 107, 113, 116, 118, 232, 274, 301, 310, 316, 321, a sealed letter dated 2/28/05, and the transcript filed on 2/15/06 of an *ex parte* budget hearing held on 3/22/05 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.  The Court withheld ruling in order to give Petitioner an opportunity either to withdraw claims to which these documents would be relevant or propose a protective order that would give counsel for the Government access to them.  *See Bittaker v. Woodford*, 331 F.3d 715 (9th Cir.) (*en banc*), *cert. denied*, 540 U.S. 1013 (2003).  Counsel for Petitioner has filed a Notice of Intention Not to Abandon any of his Claims and requested a Protective Order be entered regarding the pleadings addressed herein which have not been unsealed by this Court's prior Order.  Doc. No. *.

GOOD CAUSE appearing, Defendant's motion to enter a Protective Order regarding documents identified in this Court's Order of September 11, 2009 (Doc. No. 67)  is GRANTED as follows:

1

1.      **Scope:**  The following provisions apply to the documents filed under Docket Numbers 16, 23, 24, 25, 46, 50 51, 57, 107, 113, 116, 118, 232, 274, 301, 310, 316, and 321; to the sealed letter dated 2/28/05; and to the transcript filed on 2/15/06 of an *ex parte* budget hearing held on 3/22/05, all in *United States v. Kenneth Eugene Barrett*, E.D. Case No. CR-04-115-JHP.

2.      **Directions to Clerk:**  The documents identified in Paragraph 1, *supra*, shall remain under seal in the record of Case No. CR-04-115-JPH.  However, the Clerk of this Court shall immediately provide copies of these documents to counsel of record for the United States. Each document shall be clearly marked "SEALED."

3.      **Sequestration:**  None of the documents identified in Paragraph 1, and no information contained therein or derived therefrom, shall be revealed to any person other than counsel of record for the United States and persons working under their direct supervision in connection with these Section 2255 proceedings, unless Mr. Barrett or his counsel previously made the information public.

4.      **Embargo:**  Disclosure of the contents of the documents and the documents themselves may not be made to any other persons or agencies, including any law enforcement or prosecutorial personnel or agencies, without a prior order from this Court.  No authorization for disclosure will be made by this Court except on a motion filed under seal and served with fifteen days' notice on counsel for Mr. Barrett.  Except with such prior authorization, none of the documents, and no information contained therein or derived therefrom, shall be used in any way or for any purpose except in connection with the litigation of claims Mr. Barrett presents in these Section 2255 proceedings.

5.      **Enforcement:**  At the conclusion of the post-conviction proceedings, the United

States shall file with this Court, and serve upon counsel for Mr. Barrett, a list of the names of all persons to whom any of the materials described in Paragraph 1, *supra*, or any information contained therein or derived therefrom, has been disclosed by counsel for the United States pursuant to or in violation of Paragraphs 3 or 4, *supra*.  Prior to any retrial or prosecution of Mr. Barrett by the United States or State of Oklahoma, his counsel shall be notified of the names of all persons acting for or assisting the United States or State of Oklahoma in any way in such matter.

6.      **Continuation:**  This Order shall continue in effect after the conclusion of these Section 2255 proceedings and shall apply in the event of a retrial of all or any portion of the Government's criminal case against Mr. Barrett. The court will maintain continuing jurisdiction over this matter for the purpose of enforcing the provisions of this order and imposing appropriate sanctions for any violation.

IT IS SO ORDERED.

DATED:   ____, 2009

_____
HON. JAMES H. PAYNE
CHIEF JUDGE
UNITED STATES DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,     )
                             )
        Petitioner,            )
                             )
v.                            )         Case No. CIV-09-105-JHP
                             )
UNITED STATES OF AMERICA,     )
                             )
        Respondent.       )

## ORDER

On September 11, 2009, this Court entered an Order taking under advisement a portion of the Government's Motion to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings. *See*, Doc. No. 67. Following entry of said Order, Petitioner filed a Notice of Intent Not to Abandon Claims and a Request for Protective Order. Doc. No. 68. Additionally, Petitioner submitted a Proposed Protective Order. Doc. No. 68-2.

A review of the proposed order submitted by Petitioner causes this Court some concerns. Specifically, it was this Court's understanding that Petitioner was seeking to maintain his work product privilege and, therefore, would need this Court to enter a protective order to protect such privilege while allowing him to proceed with his claims in this action. The protective order proposed by the Petitioner, however, indicates that the documents covered by the order shall not "be revealed to any person other than counsel of record for the United States and persons working under their direct supervision in connection with these Section 2255 proceedings, *unless Mr. Barrett or his counsel previously made the information public.*" Doc. No. 68-2. (Italics added). "The privilege derived from the work-

product doctrine is not absolute.  Like other qualified privileges, it may be waived." *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.2d.2d 141 (1975).

To the extent Mr. Barrett or his counsel have previously disclosed any information contained within the documents which the Government has requested, the documents would no longer be privileged.  Thus, there would be no reason for this Court to maintain these documents under seal or any reason for this Court to enter a protective order seeking to shield previously waived work-product privileges.  Accordingly, prior to any further ruling on the Government's Motion by this Court, Petitioner is hereby ordered to advise this Court by September 30, 2009, as to each of the documents identified in numbered paragraph 2 on page 14 of this Court's Order of September 11, 2009 (Doc. 67) whether any of the listed documents have previously been disclosed by either the Petitioner or his counsel to any other person or entity.

It is so ordered on this  23rd  day of September, 2009.

James H. Payne
United States District Judge
Eastern District of Oklahoma

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**AMENDED MOTION FOR COLLATERAL RELIEF,**

**TO VACATE, SET ASIDE, OR CORRECT SENTENCE,**

**AND FOR A NEW TRIAL**

---

1479

**TABLE OF CONTENTS**

I.     Preliminary Matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       A.    Statement Regarding Form  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       B.    Grounds for Disqualifying Trial Judge  . . . . . . . . . . . . . . . . . . . . . . . . 2

       C.    Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       A.    Events Leading Up to the Raid on the Barrett Home . . . . . . . . . . . . . . . . . . . 9

             1.    Mr. Barrett's "Failure to Appear" and the Resulting Bench Warrant  . . . . 9

             2.    The Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

             3.    September 24, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       B.    Three Trials  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

             1.    State Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

             2.    Federal Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.   Claims for Relief  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       Claim 1.    Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his
                   Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and
                   his Right to Equal Protection of the Laws, and Federal Statutes and
                   Guidelines for the Appointment and Compensation of Counsel; the Failure
                   of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to
                   Effective Assistance of Appellate Counsel  . . . . . . . . . . . . . . . . . . . . . . . 18

       Claim 2.    Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by
                   18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United
                   States Constitution.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

       A.    Unreasonable Acts and Omissions Affecting the First and Second Stages
             of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

             Overview of First-Stage Ineffective Assistance . . . . . . . . . . . . . . . . . . . . 46

Evidence of Constitutionally Deficient Representation . . . . . . . . . . . . . . 49

1.      Failure to professionally re-urge the motion to suppress under
        *Franks v. Delaware,* 438 U.S. 154 (1978). . . . . . . . . . . . . . . . . 49

2.      Trial counsel unreasonably failed to investigate and introduce
        evidence of eyewitnesses as well as mental impairment and illness
        that would have rebutted the prosecution's theory of the case,
        supported the defense theory, and formed the basis for conviction
        of a lesser offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

3.      Due to the unreasonable failure of Mr. Barrett's trial counsel to
        retain expert assistance, Mr. Barrett was tried while
        incompetent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

4.      But for trial counsel's unreasonable omissions it is reasonably
        probable that the jury would have rejected the testimony of the
        Government's eleventh hour "snitch" witnesses and, like the two
        juries before them, refused to convict Mr. Barrett of premeditated
        murder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

        a.      Travis Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

        b.      Cindy Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

        c.      Charles "Monk" Sanders. . . . . . . . . . . . . . . . . . . . . . . . . 97

                1.      Failure to adequately investigate and prepare to
                cross-examine Sanders about his previous convictions,
                charges against him that were dismissed, and the favorable
                treatment he often secured to escape punishment. . . . . . . 97

                2.      Counsel unreasonably failed to investigate and
                produce witnesses who could have impeached specific
                claims made by Sanders, and Sanders's credibility as
                a whole. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

        d.      Randy Weaver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

        e.      Brandie Zane Price. . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

        f.      Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

        g.      Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

5.  Trial counsel were ineffective in failing to make appropriate and timely objections to improper hearsay evidence of other bad acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

6.  Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence. . . 143

7.  The outcome of the trial is unreliable due to trial counsel's unreasonable failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

8.  Mr. Barrett's trial counsel unreasonably failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

9.  Trial counsel unreasonably failed to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on.  This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

    a.  Toby Barrett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

    b.  Alvin Hahn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

10. Trial counsel unreasonably failed to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence. . . . . . . . . . 172

    a.  Mr. Barrett's "failure to appear". . . . . . . . . . . . . . . . . . 173

    b.  Mr. Barrett's lack of knowledge of the warrant.  . . . . . . 174

    c.  Mr. Barrett's previous cooperation with the law.  . . . . . 177

11.     Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony. . . . . . . . . . . . . . . 181

12.     The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

13.     The outcomes of the trial and appeal are unreliable due to trial counsel's unreasonable failure to preserve a record of error, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard.  . . . . . . . . . . 197

14.     Trial counsel unreasonably failed to object to numerous instances of prosecutorial misconduct in closing argument in the penalty phase of trial.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

Conclusion.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

B.      Unreasonable Acts and Omissions Primarily Affecting the Second Stage of Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

1.      Deficient Performance: trial counsel's unreasonable failure to interview witnesses, gather documentary evidence, consult with experts, counter the Government's case, and argue for a sentences less than death  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

2.      Prejudice:  abundant, readily available evidence that Mr. Barrett is worthy of life; his neglectful upbringing, parental drug abuse and mental illness, his own mental illness and organic brain impairment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

        a.      The family, social, and medical background of Kenny Barrett. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

                Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

                Family History of Mental Illness  . . . . . . . . . . . . . . . . . . 217

                        Maternal Family Mental Illness . . . . . . . . . . . . . 217

                        Paternal Family Mental Illness . . . . . . . . . . . . . 219

Maternal Family History . . . . . . . . . . . . . . . . . . . . . . . . 221

Paternal Family History . . . . . . . . . . . . . . . . . . . . . . . . . 224

Family of Origin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Infancy and Childhood Development . . . . . . . . . . . . . 232

Onset of Mental Illness . . . . . . . . . . . . . . . . . . . . . . . . 241

b.      Kenny Barrett's mental illness and organic brain
        dysfunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 249

c.      The prosecution's exploitation of trial counsel's deficient
        performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

Claim 3.    Mr. Barrett was Denied his Rights to Due Process and Equal Protection of
            the Laws, and his Right to Transcripts, Expert and Investigative Assistance
            under 18 U.S.C. §§ 3005 & 3006A. . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

Claim 4.    Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth
            Amendments to the United States Constitution Were Violated by the Use
            of False Information in Obtaining the No-Knock Warrant for his Arrest.
            The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was
            Invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Appellate
            Counsel Were Ineffective for Failing to Raise the Issue on
            Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

Claim 5.    Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his
            Sixth Amendment Rights to Counsel and Confrontation, and his Eighth
            Amendment Right to a Fair and Reliable Capital Sentencing Process Due
            to the Government's Suppression of Exculpatory Evidence, Knowing use
            of Perjured Testimony, and Failures to Correct False Testimony; Mr.
            Barrett is Entitled to Relief from his Convictions and Sentences Based on
            Newly Discovered Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

A.      Suppressed Exculpatory Evidence, Evidence of Knowing use of Perjured
        Testimony, and Newly Discovered Evidence . . . . . . . . . . . . . . . . . . . 289

1.      Evidence regarding informant witnesses Charles "Monk" Sanders,

Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman entitles Mr. Barrett to relief from his convictions and sentences. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289

    a.    Charles "Monk" Sanders . . . . . . . . . . . . . . . . . . . . . . . . 289

    b.    Travis Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

    c.    Cindy Crawford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299

    d.    Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305

    e.    Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

    f.    Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 310

2.    The Government failed to reveal exculpatory evidence of a witness who failed to corroborate Charles Sanders . . . . . . . . . . . . . . . . 311

B.    The Judgements of Conviction and Sentence Should be Vacated Based on the Suppression and New Discovery of Evidence Undermining the Credibility of Key Law Enforcement Personnel. . . . . . . . . . . . . . . . . . 312

1.    Evidence of Clint Johnson's illicit activities . . . . . . . . . . . . . . 313

2.    David Michael Littlefield's illicit activities . . . . . . . . . . . . . . . 319

3.    John Philpot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

C.    Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses. . . . . . . . . . . . 326

D.    Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 331

Claim 6.    Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements . . . . . . . . . . . . . . . . . . . . . 338

Claim 7.    Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342

Claim 8.    Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution . . . . . . . . . . 345

Claim 9.    Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel Were Ineffective for Failing to Raise this Issue.  . . . . . . . . . . . . . . . . . . 350

Claim 10.    Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Claim 11.    Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While  Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option.  Appellate Counsel Were Ineffective for Failing to Raise this Issue on Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

Claim 12.    The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 368

Claim 13.    Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 372

Claim 14.    Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.  . . . . . . . . . . . . . . . . . . . . . . . . 384

Claim 15.    Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights

were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 387

Claim 16.    Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  . . . . . . . . . . . . . . . . . . 389

Claim 17.    Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment. . . 390

Claim 18.    The Failure of Counsel to Raise or Effectively Argue on Appeal Claims Which Are of Record Violated Mr. Barrett's Due Process Right to Effective Assistance of Appellate Counsel. . . . . . . . . . . . . . . . . . . . . . . 394

         A.    Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 396

              1.    Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government. . . . . . . . . . . . . . . 396

              2.    Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under 438 U.S. 154 (1978). . . . . . . . . . . . . . . 397

              3.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Government's Inappropriate Use of Hearsay Evidence used to Show Propensity or Character. . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

              4.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Jury's Exposure to Phony Expert Jim Horn.  . . . . . . . . . . . . . . . 398

              5.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Restrictions on the Use of Mr. Barrett's Statements.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 400

              6.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Use of a Shock Belt on Mr. Barrett during Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 400

              7.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Denial of a Jury Instruction on Lesser Included Offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 401

              8.    Appellate Counsel Unreasonably Failed to Raise on Appeal the

Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402

9.    Appellate Counsel Unreasonably Failed to Raise on Direct Appeal the Trial Court's Unconstitutional Dismissal of Juror 62. . . . . . . 402

10.   Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Failure to Require Proof Beyond a Reasonable Doubt as to the Weighing Factor Necessary to Impose a Death Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402

11.   Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Removal of Mr. Barrett from the Courtroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 403

12.   Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Racial Bias in the Administration of the Federal Death Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 403

13.   Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment. . . . . . . . . . . . . 404

B.    A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise. . . . . . . . . 405

Claim 19.   Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case. . . . . . . . . . . . 406

IV.   Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 407

APPENDIX A
      PROCEDURAL HISTORY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 410

      I.    State Court Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 410

      II.   Federal District Court Proceedings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 411

APPENDIX B
      INDEX TO EXHIBITS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

      SEALED EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424

VERIFICATION UNDER PENALTY OF PERJURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 429

# TABLE OF AUTHORITIES

## FEDERAL CASES

Adams v. Texas, 448 U.S. 38 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 360

Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

Ake v. Oklahoma, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

Alcorta v. Texas, 355 U.S. 28 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

Apprendi v. New Jersey, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 368, 403

Atkins v. Virginia, 536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 391, 392

Banks v. Dretke, 540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285, 286

Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Bates v. Bell, 402 F.3d 635 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

Batson v. Kentucky, 476 U.S. 76 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198, 199

Beck v. Alabama, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 350, 354

Bland v. Sirmons, 459 F.3d 999 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

Bouchillon v. Collins, 907 F.2d 589 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 74, 75, 347

Bowen v. Maynard, 799 F.3d 593 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

Brecht v. Abrahamson, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brooks v. Tennessee, 406 U.S. 605 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Bush v. Gore, 531 U.S. 98 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Carey v. Duckworth, 738 F.2d 875 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Carter v. Bowersox, 265 F.3d 705 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

Cooper v. Oklahoma, 517 U.S. 348 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

Crane v. Kentucky, 476 U.S. 683 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339

Crivens v. Roth, 172 F.3d 991 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297, 304

Crowe v. Sanders, 864 F.2d 430 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143, 195

Cuyler v. Sullivan, 446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Darden v. Wainwright, 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 332, 337

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . passim

Deck v. Missouri, 544 U.S. 622 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 343

Delaware v. Van Arsdale, 475 U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 332, 337

Draughton v. Dretke, 427 F.3d 286 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155, 172

Driscoll v. Delo, 71 F.3d 701 (8th Cir. 1995),
   *cert. denied,* 519 U.S. 910 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135, 155

Drope v. Missouri, 420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 346, 347

Duckett v. Mullin, 306 F.3d 982 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

Dunn v. Roberts, 963 F.2d 308 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

Dusky v. United States, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 350

Eagle v. Linahan, 279 F.3d 1283 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

Eddings v. Oklahoma, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342, 400

Eddmonds v. Peters, 93 F.3d 1307 (7th Cir. 1996),
   *cert. denied*, 520 U.S. 1172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Estelle v. McGuire, 502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340

Estelle v. Williams, 425 U.S. 501 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 343

Evitts v. Lucey, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Felde v. Butler, 817 F.2d 281 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Ferguson v. Georgia, 365 U.S. 570 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fero v. Kerby, 39 F.3d 1462 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287, 325

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Freeman v. Class, 95 F.3d 639 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143, 195

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 195, 338

Geders v. United States, 466 U.S. 648 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Giglio v. United States, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Gilbert v. Mullen, 302 F.3d 1166 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

Giles v. Maryland, 386 U.S. 66 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294, 289

Godfrey v. Georgia, 446 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 365

Godinez v. Moran, 509 U.S. 389 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 383

Gravely v. Mills, 87 F.3d 779 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199, 201

Gray v. Mississippi, 481 U.S. 648 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 360

Greer v. Miller, 483 U.S. 756 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966),
      *cert. denied*, 396 U.S. 865 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 327

Hall v. Washington, 106 F.3d 742 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

Hamilton v. Alabama, 368 U.S. 52 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Herring v. New York, 422 U.S. 853 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 195

High v. Head, 209 F.3d 1257 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

Hodge v. Hurley, 426 F.3d 368 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

Hogan v. Gibson, 197 F.3d 1297 (10th Cir. 2000),
      *cert. denied,* 121 S.Ct. 332 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 350

Holbrook v. Flynn, 475 U.S. 560 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 343

Holloway v. Arkansas, 435 U.S. 475 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

Huddleston v. United States, 485 U.S. 681 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Hull v. Kyler, 190 F.3d 88 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Illinois v. Allen, 397 U.S. 337 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 343, 380

Illinois v. Gates, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280

Imbler v. Pachtman, 424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

In re Murchison, 349 U.S. 133 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Jaffee v. Redmond, 518 U.S. 1 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Johnson v. Texas, 509 U.S. 350 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341

Jones v. Polk, 401 F.3d 257 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340, 341

Jones v. United States, 526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 388

Keeble v. United States, 412 U.S. 205 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352

Kimmelman v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 141, 158

Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . 49, 153, 185

Kyles v. Whitley, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285, 287

Lankford v. Idaho, 500 U.S. 110 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

Liles v. Saffle, 945 F.2d 333 (10th Cir. 1991),
    cert. denied, 502 U.S. 1066 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 337, 339, 342, 400

Lockhart v. McCree, 476 U.S. 162, 181 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

Malicoat v. Mullin, 426 F.3d 1241 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

Martin v. Grosshans, 424 F.3d 588 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . 143, 155, 194, 199

Mason v. Hanks, 97 F.3d 887 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

Mayes v. Gibson, 210 F.3d 1284 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

McCracken v. Gibson, 268 F.3d 970 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

Medina v. California, 505 U.S. 437 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 346

Mickens v. Taylor, 535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Miller v. Pate, 386 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289, 312, 319

Mitchell v. Gibson, 262 F.3d 1036 (10th Cir.  2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325

Mooney v. Hollohan, 294 U.S. 103 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289, 312

Moore v. Illinois, 408 U.S. 786 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340

Mullaney v. Wilbur, 421 U.S. 421 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 354

Murchu v. United States, 926 F.2d 50 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19

Murray v. Carrier, 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395

Napue v. Illinois, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289, 310

Northrop v. Trippett, 265 F.3d 372 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Nuckols v. Gibson, 233 F.3d 1261 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 326

Odle v. Woodford, 238 F.3d 1084 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

Parker v. Dugger, 498 U.S. 308 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395

Pate v. Robinson, 383 U.S. 375 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 346, 350, 383

Patton v. Mullin, 425 F.3d 788 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Paxton v. Ward, 199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 334, 336

Amended § 2255 Pet.                          xiv                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Peltier v. Booker, 348 F.3d 888 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

Polk County v. Dodson, 454 U.S. 312 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Powell v. Alabama, 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Reynolds v. Norris, 86 F.3d 796 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

Reynoso v. Giurbino, 462 F.3d 1099 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

Riggins v. Nevada, 504 U.S. 127 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340, 379, 381, 382

Ring v. Arizona, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 368, 370, 388

Rock v. Arkansas, 483 U.S. 44 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339

Roe v. Flores-Ortega, 528 U.S. 470 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395

Rojem v. Gibson, 245 F.3d 1130 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

Rompilla v. Beard, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Roper v. Simmons, 543 U.S. 304 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 391, 392

Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

Schmuck v. United States, 489 U.S. 705 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 353

Scott v. Mullin, 303 F.3d 1222 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134, 325

Seidel v. Merkle, 146 F.3d 750 (9th Cir. 1998),
    cert. denied, 525 U.S. 1093 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Skipper v. South Carolina, 476 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339, 342, 400

Smith v. Gibson, 197 F.3d 454 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206, 266

Smith v. Roberts, 115 F.3d 818 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

Snowden v. Singleterry, 135 F.3d 732 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 155, 195

Spears v. Mullin, 343 F.3d 1215 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

Steidl v. Fermon, 494 F.3d 623 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

Steinkuhler v. Meschner, 176 F.3d 441 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 134, 166

Stewart v. Wolfenbarger, 468 F.3d 338 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 171

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Strickler v. Green, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285, 325

Sullivan v. Louisiana, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 372

Tanberg v. Sholtis, 401 F.3d 1151 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

Taylor v. Kentucky, 436 U.S. 478 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 407

Thomas v. Goldsmith, 979 F.2d 746 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

Thornburg v. Mullin, 422 F.3d 1113 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

Tuggle v. Netherland, 526 U.S. 10 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

Tumey v. Ohio, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Turrentine v. Mullin, 390 F.3d 1181 (10th Cir. 2004),
    cert. denied, 545 U.S. 1106 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 350

United States ex rel. Madej v. Schomig, 223 F. Supp. 2d 968 (N.D. Ill. 2002) . . . . . . . . . . . . 205

United States v. Abeyta, 27 F.3d 470 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352

United States v. Antone, 603 F.3d 566 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

United States v. Bagley, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287, 325

United States v. Barnette, 211 F.3d 803 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

United States v. Barrett, 469 F.3d 1079 (10th Cir. 2007) . . . . . . . . . . . . . . . . 198, 340, 405, 418

United States v. Biswell, 700 F.2d 1310 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

United States v. Bridwell, 583 F.2d 1135 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . 196

United States v. Brooks, 161 F.3d 1240 (10th Cir. 1998), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

United States v. Burbage, 365 F.3d 1174 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 399

United States v. Calisto, 838 F.2d 711 (3rd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 352

United States v. Cherry, 433 F.3d 698 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

United States v. Cook, 45 F.3d 388 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395, 396

United States v. Davis, 132 F. Supp. 2d 455 (E.D. La. Feb. 2, 2001) . . . . . . . . . . . . . . . 142, 358

United States v. Deleon, 979 F.2d 761 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Fuller, 938 F. Supp. 731 (D. Kan. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

United States v. Hernandez, 94 F.3d 606 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

United States v. Hogue, 827 F.2d 660 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 136, 137

United States v. Honken, 378 F. Supp. 2d 1040 (N.D. Iowa 2004) . . . . . . . . . . . . . . . . . . . . . . 358

United States v. Humphrey, 208 F.3d 1190 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

United States v. Joe, 8 F.3d 1488 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

United States v. Johns, 851 F.2d 1311 (9th Cir. 1988),
    *cert. denied,* 505 U.S. 1226 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Johnson, 130 F.3d 1420 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

United States v. Johnson, 520 U.S. 461 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 399

United States v. Kennedy, 131 F.3d 1371 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 283

United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

United States v. Libby, 429 F. Supp. 2d 1 (D. D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

United States v. Lofton, 776 F.2d 918 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 354

United States v. McIntosh, 124 F.3d 1330 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

United States v. Morales-Quinones, 812 F.2d 604 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 136

United States v. Novaton, 271 F.3d 968 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 382

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 399

United States v. Osorio, 929 F.2d 753 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

United States v. Pritchard, 745 F.2d 1112 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Quintanilla, 193 F.3d 1139 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 286, 287

United States v. Ramsey, 323 F. Supp. 2d 27 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 194

United States v. Rich, 580 F.2d 929 (9th Cir.), *cert. denied*, 439 U.S. 935 (1978) . . . . . . . . . 327

United States v. Rosales-Rodriguez, 289 F.3d 1106 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 381

United States v. Sands, 899 F.2d 912 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

United States v. Scafe, 822 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 352

United States v. Serawop, 410 F.3d 656. 660-70 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 72

United States v. Sinclair, 109 F.3d 1527 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

United States v. Sloan, 776 F.2d 926 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

United States v. Smith, 543 F.3d 1211 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

United States v. Soundingsides, 820 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . 71, 353

United States v. Temple, 862 F.2d 821 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 136, 142

United States v. Thomas, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266
    (D.Md. January 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

United States v.  Toles, 297 F.3d 959 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 405

United States v. Visinaiz, 428 F.3d 1300 (10th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

United States v. Warner, 23 F.3d 287 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395

Viereck v. United States, 318 U.S. 236 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

Village of Willowbrook v. Olech, 528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Wainwright v. Witt, 469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 360

Washington v. Hofbrauer, 228 F.3d 689 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

Washington v. Smith, 219 F.3d 620 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Witherspoon v. Illinois, 391 U.S. 510 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 360

Wood v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 45

Woods v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Woodson v. North Carolina, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199, 371

## STATE CASES

Davis v. Polk, 2007 WL 2898711 (W.D.N.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341

Dunkle v. State, 139 P.3d 228 (Okl. Cr. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155, 158

Gordon v. Kelly, 2000 WL 145144 (6th Cir. Feb. 1, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

Horton v. Massie, 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished) . . . . . . . . . . . . . 135

United States v. Bodkins, 2005 WL 1118158 (W.D. Va. May 11, 2005) . . . . . . . . . . . . . . . . 358

## DOCKETED CASES

In re Clint Johnson, No. 01-72501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

Crawford v. Mattox, Sequoyah County Case No. P-03-458 . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Michael Mackey, et al. v. Cindy Crawford, Sequoyah County Case No. PO-03-390 . . . . . . . . . 92

State of Oklahoma v. Richard Loy Gray, Jr., Cherokee County Case No. CF-2007-28 . . . . . . 316

United States v. Kenneth Eugene Barrett, Case No. 6:04-CR-00115-JHP-SPS . . . . . . . . . . . . . . 2

United States v. McAdams, et al., No. CR-07-16-RAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306

**FEDERAL STATUTES**

21 U.S.C. § 848(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 412

21 U.S.C. § 848(e)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 412

21 U.S.C. §§ 848(q)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 395, 408, 430

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. §3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18, 44, 267

18 U.S.C. § 3432 (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

18 U.S.C. § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 328, 329

18 U.S.C. § 3592(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94, 388

18 U.S.C. § 3593(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261, 369

18 U.S.C. § 3594 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

18 U.S.C. § 3599(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

18 U.S.C. § 4241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

28 U.S.C. §§ 455(a),þ(b)(1þ, (b)(3), (b)(5)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

18 U.S.C. § 924(c)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 412

18 U.S.C. § 924(c)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 412

Fed.R.Civ.P. 26(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

Fed.R.Crim.P. 16 ( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

Fed. R. Crim. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

Fed.R.Crim.P. 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 309

Fed. R. Crim.P. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198, 417

Fed.R.Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136, 142

Fed. R. Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed.R.Evid. 608(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 87

Fed. R. Evid. 608(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 88, 93, 94

Fed. R. Evid. 615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153, 185, 276

Fed.R.Evid. 803(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

## MISCELLANEOUS

ABA Standards for Criminal Justice, Standard 4-4.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ABA Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases
& Commentary to Guidelines, 31 Hofstra L. Rev. 913 (2003) . . . . . . . . . . . . . . . . . . . . . passim

ABA, *Special Feature: Recommendation and Report on the Death Penalty
and Persons with Mental Disabilities*, 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 392

American Psychiatric Association, *Moratorium on Capital Punishment in
the United States* (approved October 2000), APA Document Reference
No. 200006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 393

Guide to Judiciary Policies and Procedures, Vol, VII, "Appointment of
Counsel in Criminal Cases," Chapter, V.I., §§ 6.02 (F)(3)(c)(i) . . . . . . . . . . . . . . . . . . . . . 25

David H. Barlow, *Clinical Handbook of Psychological Disorders, Third
Edition: A Step-by-Step Treatment Manual*, 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

John H. Blume & Sheri Lynn Johnson, *Competent Capital Representation:
the Necessity of Knowing and Heeding what Capital Jurors Tell us
about Mitigation*, 36 Hofstra L. Rev. 1035, 1044 & n. 35 (2008) . . . . . . . . . . . . . . . . . . . 356

Anthony Esgate, *An Introduction to Applied Cognitive Psychology*, 51 . . . . . . . . . . . . . . . . . 184

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What
Do Jurors Think?* 98 Colum. L. Rev. 1538, 1563 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . 356

Lt. Col. Dave Grossman & Bruce K. Siddle, *Critical Incident Amnesia and the Implication of Memory Loss During Extreme Survival Stress Situations*, 31 . . . . . . . . . . . 188

J.M. Rivard, P. Dietz, D. Martell and M. Widawski, *Acute Dissociative Responses in Law Enforcement Officer involved in Critical Shooting Incidents: the clinical and forensic implications*, 47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

William Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 393

Vermetten, Dorahy and Spiegel, *Traumatic Dissocation: Neurobiology and Treatment* p. 83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA


KENNETH EUGENE BARRETT,    )
    )
    *Petitioner,*    )
    )
v.    )    **Case No. 6:09-cv-00105-JHP**
    )
UNITED STATES OF AMERICA,    )
    )
    *Respondent.*    )


---

**AMENDED MOTION FOR COLLATERAL RELIEF,
TO VACATE, SET ASIDE, OR CORRECT SENTENCE,
AND FOR A NEW TRIAL**

---


COMES NOW defendant KENNETH EUGENE BARRETT, by and through his

undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, Rule

2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court

grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct

the sentence.  Through counsel, Mr. Barrett states the following grounds for granting this

Petition:

I.      **Preliminary Matters.**

    A.      **Statement Regarding Form**.

        In accordance with Rule 2 of the Rules Governing Section 2255 Cases, this

Petition sets forth only the facts and legal authority necessary to "specify all the grounds for relief

available to the moving party." In conformity with the Rule this Petition does not contain all the legal arguments Mr. Barrett could present to support his entitlement to relief, including those arguments, points, and authorities that would respond to any opposition to this Petition. Mr. Barrett will shortly file a separate motion seeking permission and a schedule by which to file a Memorandum in Support of the Petition.

References to prior proceedings are as follows:

- References to the consecutively paginated trial transcripts: R. *xxx*;

- References to hearing transcripts not consecutively paginated with the trial transcripts: Tr. [date] Hr'g at *xxx*;

- References to documents filed with the court such as pleadings, motions, and orders cite the docket number for *United States v. Kenneth Eugene Barrett*, Case No. 6:04-CR-00115-JHP-SPS: Doc. *xxx*

- References to the two state trials: 1st St. Tr. Tx at *xxx*, and 2nd St. Tr. Tx at *xxx*;

- References to the exhibits to this Amended Petitioner: Exhibit *xx* (an index to the exhibits appears in Appendix B);

- All other references are self-explanatory or based on the Blue Book.

B.      **Grounds for Disqualifying Trial Judge**.

In Claim 1 and elsewhere in this Petition, Mr. Barrett relies upon evidence of the trial judge's on- and off-the-record actions in relation to Mr. Barrett's defense, including *ex parte* communications with prosecutors. The evidence that must be considered in evaluating this Petition disqualifies the trial judge from making any rulings affecting the process for adjudicating this Petition or the merits of any claims stated herein. 28 U.S.C. §§ 455(a), (b)(1), (b)(3),

(b)(5)(iv); *Murchu v. United States*, 926 F.2d 50, 57, 59 (1st Cir. 1991) (specific allegations about off-the-record actions of trial judge required that § 2255 motion be heard by different judge). Therefore, this Petition requests that the trial judge recuse himself without making any further rulings in the case.

Mr. Barrett separately has moved to recuse or disqualify the trial judge, and that motion has been denied. It would be a violation of due process for the trial judge to make any rulings regarding this Petition. *Aetna Life Insurance Company v. Lavoie*, 475 U.S. 813 (1986).

**C.     Introduction**.

Kenneth Eugene Barrett would not and did not intentionally kill Trooper David "Rocky" Eales. Mr. Barrett defended himself from an unannounced attack on his home and his teenage son by individuals who failed to announce that they were law enforcement officers. In recognition of these facts – although without the benefit of the evidence presented through this Petition – a jury of Oklahoma citizens acquitted Mr. Barrett of the murder for which he now sits on death row. This Petition shows the Government succeeded in overturning that result through an unfair trial in this Court, a trial characterized by judicial misconduct, ineffective defense representation (a product both of a failure to perform according to prevailing professional norms and judicial interference), the withholding of truthful information that would have impeached the Government's key witnesses, and other forms of misconduct by prosecutors and law enforcement officers. Mr. Barrett is a mentally ill, traumatized man under sentence of death for a death that, though tragic, was not murder.

In order to improve their chances of obtaining the desired result, the Government loaded the dice with seven drug-addict informants who were nowhere to be found during the five years Mr. Barrett's state case was pending, but who materialized at the last minute to provide the

prosecution with much needed and inadmissible "evidence" of intent. A number of these noxious characters dutifully marched to the witness stand to recite "statements" from Mr. Barrett that he threatened to kill any law enforcement officer who stepped on his property. Some of these witnesses also sought to portray Mr. Barrett as a drug manufacturer, even though no drug lab was found on his property when it was searched after Trooper Eales was tragically killed.

In handling these witnesses, the Government used a carrot and stick approach. To get them to toe the mark, the Government employed intimidation and threats with at least two of them, Travis and Cindy Crawford. This strong-arm tactic was headed up by disgraced former Assistant United States Attorney David Michael Littlefield, who was charged in 2007 with beating his children, and whose has been reprimanded by the Oklahoma Supreme Court as a result of his child abuse case.

The carrot was undisclosed deals only vaguely hinted at during trial, or concealed altogether, and only consummated at or after the conclusion of Mr. Barrett's trial. The big winner in the snitch sweepstakes was Charles "Monk" Sanders, an eighteen-time (at least) convicted felon who was the alleged "C.I." for corrupt Drug Task Force officer Clint Johnson's search warrant for Mr. Barrett's residence, which set this entire tragedy in train. Sanders, who was permitted by Seqouyah County officials to run riot despite an almost unending series of convictions, saw any future jail time evaporate, had "split sentences" he never should have received in numerous felony cases reduced to straight *unsupervised* probation, and was even excused from paying any costs or fines in his cases, all courtesy of the Government and state prosecutors after he testified at Mr. Barrett's trial.

Others were also rewarded for their testimony. Karen Real, who, at the time of her testimony was serving a fourteen-year federal sentence in a drug manufacturing and firearms

case, saw her sentence reduced to time served on the Government's Rule 35 motion shortly after Mr. Barrett was convicted and sentenced to death. Brandie Zane Price, a convicted felon who was depicted as having been delivered from her drug addiction at the time she testified against Mr. Barrett, was later charged in the Eastern District with being a member of a wide-ranging drug conspiracy. In the indictment filed against her and others, Price was charged with having started her participation in the drug conspiracy just a few short weeks after Mr. Barrett was formally sentenced. Randy Turman, a methamphetamine manufacturer who had a pending six-count drug case hanging over his head at the time he testified against Mr. Barrett, falsely testified on cross-examination that his case had "done been taken care of," when in fact it had not. The Government surely knew Turman was lying, but sat silently by and allowed him to perjure himself, in derogation of its duty to correct false testimony. In 2007, after being inactive for years, Turman's case was dismissed by Sequoyah County prosecutors "in the interests of justice."

The Government knew it still had a shaky edifice on its hands. With sufficient time and a competent defense investigation, it would take but a few prods for the whole ramshackle thing to come crashing down. In order to prevent or forestall any effective investigation by the defense, the Government contrived to keep the identity of these witnesses secret for as long as possible. As the general jury qualification process in Mr. Barrett's trial began, the Government filed a spurious sealed motion to delay identifying the names and addresses of the snitch witnesses. An improper *ex parte* hearing was conducted by the court on the motion. As the court quickly realized, the Government had zero evidence for its request; none of these witnesses were in the least bit of danger. Outside the presence of defense counsel, their Government adversaries were allowed to speak for them on the question of whether the trial had already begun, thus precluding the informants from testifying under the applicable notice

statute, and what steps the Government proposed so the defense would eventually have "access" to these witnesses. The court recognized a lengthy continuance would likely be necessary to permit proper time for defense preparation. In passing, AUSA Littlefield revealed to the Court, but not defense counsel, that he was aware of a witness who would contradict Charles Sanders.

When the hearing was eventually unsealed and defense counsel were allowed to "participate," neither the court nor the Government informed the defense of what had gone on behind closed doors. What had occurred was misrepresented to defense counsel. There was no reason to keep what had transpired at the hearing secret, since there was no basis for the Government's motion to begin with. Defense counsel were led down the primrose path, hastily agreeing to an arrangement whereby they would be allowed, under Government supervision, to interview the informant witnesses. However, except in one instance, these witnesses refused to speak to the defense. Having agreed to what the Government presented as a fait accompli, the ability of defense counsel to investigate and impeach these witnesses, and to marshal independent evidence contradicting them, went up in smoke. Mr. Barrett shows in this motion that with a competent investigation, the credibility of the Government's key witnesses would have been destroyed.

The Government's tactics of secrecy, obfuscation and misdirection, exemplified by what occurred at the *ex parte* hearing, typified the prosecutors' conduct of the entire case. Mr. Barrett shows in this motion that the Government routinely violated its duties to disclose exculpatory evidence, and also sponsored or knowingly allowed materially false testimony.

Well before the *ex parte* hearing, Mr. Barrett found the sledding rough in his efforts to receive what every criminal defendant in this country is entitled to as a matter of fundamental constitutional right: a fair trial. Mr. Barrett had to contend not only with

prosecutors who were determined to press every fair and unfair advantage at their disposal, but the court as well.

From the inception of the case the court demonstrated concerns with and an interest in matters inconsistent with providing Mr. Barrett competent representation.  Tulsa attorney John Echols successfully represented Mr. Barrett in state court.  He was obviously the best choice to defend Mr. Barrett against the late-coming federal charges.  The court only appointed Mr. Echols as a means of saving money, and rejected the Federal Defenders' recommendations of qualified co-counsel in order to give less-qualified local counsel experience needed to form the basis for a local panel of capital attorneys.  The court's furtherance of these interests virtually forced Mr. Echols off the case, including by withholding compensation for the budgeting investigation the court required Echols to undertake.

After Mr. Echols threw up his hands in frustration and withdrew from the case, more compliant counsel saw it to its predictable end.  Mr. Barrett demonstrates in this motion that trial counsel, due to a combination of interference from the court and their own unprofessional errors and omissions, rendered ineffective assistance in the guilt/innocence stage of trial.  Counsel failed to consult any experts, or even question the purported "expertise" of Government witnesses whose qualifications and methods the court recognized as lacking.

Trial counsel, in part deceived by the court and Government following *ex parte* communications, failed to seek a continuance to investigate the seven secret informants.  Mr. Barrett shows here that even moderate investigation would have shown these witnesses were unworthy of belief.

Counsel's ineffectiveness, again for the same combination of reasons, continued into the penalty phase.  Because counsel were underfunded and failed to properly prepare, the

prosecution was able to portray Mr. Barrett as nothing more than a mean, common criminal from an ordinary, unremarkable background, who had simply decided to embark on the path that led him to the courtroom. Defense counsel did virtually nothing to counter the prosecution's depiction of their client, putting on a superficial and misleading mitigation case that both played right into the Government's hands and failed utterly to reveal Mr. Barrett's true character, history and background.

Mr. Barrett was and is nothing like the prosecution argued. A competent mitigation investigation would have shown the truth about him. Severe mental illness has plagued Mr. Barrett's family for generations. As shown in this motion, Kenneth Barrett has struggled with severe organic, psychiatric, psychological and intellectual impairments his whole life. This evidence would have been relevant not only in the penalty phase, but in the first stage of trial as well.

Far from being a "bad person" who came from an ordinary background and simply chose to walk a twisted road, Kenneth Barrett is the product of a woefully dysfunctional marriage, a union that was rife with alcohol and other substance abuse, mental dysfunction, chaos, emotional and at times physical abuse, and infidelity. Kenneth Barrett's upbringing was anything but normal. As he struggled from birth with his genetic inheritance, he was forced to grow up in the maelstrom of chaos and neglect created by his parents. The psychological and emotional abuse his parents visited on each other as their doomed-from-the-start marriage unraveled was, from the beginning of his life, visited on him.

The numerous constitutional errors that marred Mr. Barrett's trial require that he be granted relief from his convictions and sentences.

## II.     Statement of the Case.

### A.     Events Leading Up to the Raid on the Barrett Home.

#### 1.     Mr. Barrett's "Failure to Appear" and the Resulting Bench Warrant.

In March 1997, Mr. Barrett was charged with unlawful delivery of a controlled substance arising from the alleged sale of $25 of methamphetamine to an undercover agent.  In the court proceedings for this case, Attorney Bill Ed Rogers represented Mr. Barrett until September 11, 1998, when Mr. Rogers filed a motion to withdraw from the case.  There is no record of a ruling on Mr. Rogers' motion.  The court docket reflects that Mr. Barrett asked the Court for an appointed attorney on December 14, 1998; however, there is no indication that the Court ever did so. There was no other activity in the case until January 19, 1999, when the docket stated that "subp's issued."

The court docket indicates that on January 28, 1999, a bench warrant was issued for Mr. Barrett for "failing to appear for jury trial" on January 27, 1999.  This was the only notation in the criminal docket regarding the trial for which Mr. Barrett allegedly failed to appear.  The only other information about this alleged trial date was elicited at the hearing on Mr. Barrett's Motion to Suppress Evidence on January 26, 2005, prior to his federal trial. At that hearing, Sequoyah County Court Clerk Bernell Edwards testified that Mr. Barrett's state trial for the drug case had been scheduled for January 25, 1999.  However, juror records examined by Sequoyah County Court Clerk Vickie Beaty show that no citizens were summoned for jury duty on January 25, 1999 or, indeed, for the entire month of January 1999.  Accordingly, the bench warrant issued for Mr. Barrett's arrest arose from his failure to appear for a trial for which no jurors had ever been summoned.

There was never any evidence that Mr. Barrett was aware of the bench warrant. Mr. Barrett's bail bondsmen, Martin Daggs, testified that he eventually became aware of the bench warrant but never saw a need to notify Mr. Barrett about the warrant. Mr. Daggs stated that he knew where Mr. Barrett lived and he could find him if he wanted to.

### 2.    *The Search Warrant.*

Eight months after the issuance of the bench warrant, Clint Johnson, the supervising agent and field supervisor for the District Twenty-Seven Drug Task Force (Task Force) prepared an affidavit for a search warrant for Mr. Barrett's residence.  The affidavit asserted that a confidential informant had seen Mr. Barrett sell drugs on one occasion between September 15 and 18, 1999; that he had seen Mr. Barrett engage in other drug transactions at his house; that he had overheard Mr. Barrett say "'if the cops try to raid me they will regret it because I'm going to kill the first cop through the door'"; that Mr. Barrett had guns in his house; and that Mr. Barrett sold drugs at night because he believed search warrants could not be served at night.  (At the federal trial in 2005, law enforcement for the first time identified the confidential informant as Charles "Monk" Sanders.  Sanders testified and on cross-examination denied having seen, heard, done, and said the specific things attributed to him in Johnson's affidavit.)

On September 20, 1999, a District Court Judge signed the requested search warrant which authorized law enforcement officers to conduct the search at any time of the day or night and to enter Mr. Barrett's residence without the normally required knocking and announcing their presence.  Inexplicably, there did not appear to have been any discussion about simply paying a visit to Mr. Barrett, despite the fact that law enforcement had visited Mr. Barrett in the recent past and even inspected his weapons without any violence.

In any event, Johnson considered the search warrant to be "high risk" in nature and contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance in serving the warrant. Johnson met with Tact Team members to discuss the execution of the warrant. It was determined that the Tact Team would enter and secure the area first, and that the Task Force and would then perform the actual search of Barrett's residence. The Tact Team and Task Force were accompanied by an entourage of local dignitaries. The Tact Team allegedly decided that, because the front gate to Barrett's property was locked, three of the Tact Team vehicles, two Ford Broncos that were unmarked and had extra antennae removed and a marked highway patrol unit, would enter Barrett's property by first driving north on a private driveway that lay to the east of Barrett's property, and then driving west across the land and through a ditch onto Barrett's property.

**3.** *September 24, 1999.*

Until late in the night of September 23 and after midnight on the September 24, Mr. Barrett and his son Toby had worked in their garage on a Camaro Mr. Barrett had promised to Toby if he returned to high school. After they finished up around 12:30 A.M., Toby cleaned up the garage and was walking to his trailer. At that time, the five Tact Team vehicles headed towards Mr. Barrett's residence. What happened next was the subject of conflicting accounts by the law enforcement officers involved.

The lead Tact Team vehicle, a white Ford Bronco, drove eastward on the gravel road that passed in front of Mr. Barrett's residence. The driver, Trooper John "Buddy" Hamilton, observed Toby as he entered the private drive to the east of Barrett's residence, but continued with the execution of the no-knock warrant. Hamilton then turned his vehicle westward towards

Mr. Barrett's house and entered a deep ditch that lay between Mr. Barrett's cabin and the property to the east, and drove straight towards the house.

Toby screamed, "Dad," as the unmarked Bronco continued toward the porch.

Mr. Barrett was eating a bowl of cereal when he heard Toby yell.  He went to the doorway and saw the high-beam bright headlights coming towards his cabin from the ditch on the side of his house.  Mr. Barrett ran inside, grabbed a gun and shoved it in his waistband and went to the window.  As Mr. Barrett approached the window, he was shot in the lower portion of his body.  Mr. Barrett  grabbed his Colt Sporter rifle, to which were attached two full and one partially full magazines of ammunition, and started firing out the doorway.

The lead Bronco hit the porch of the cabin.  As it had been approaching, the second and third vehicles entered the property.  They stopped slightly behind Hamilton's vehicle. Meanwhile, Troopers Gene Hise and Robert Darst, who arrived at the scene in the fourth Tact Team vehicle, climbed over the locked front gate, entered the yard in front of Mr. Barrett's house, and yelled at Toby to get on the ground.  Trooper Darst eventually took custody of Toby Barrett and determined he was unarmed.

The shooting lasted less than thirty seconds.  At some point, Hamilton's passenger, Trooper David "Rocky" Eales, opened the front passenger door, got out of the vehicle, and began moving towards the rear of the vehicle. Before he arrived at the rear of the vehicle, Trooper Eales was struck by three bullets or bullet fragments.

Meanwhile, Hamilton threw a diversionary device out of the driver's side window of his vehicle, causing a noticeable flash and loud bang. The flash and bang created a stoppage of gunfire, during which Hamilton got out of the driver's side of his vehicle.  Hamilton then moved towards the rear of his vehicle.  As he did so, he was struck by a bullet in the back of the left

Amended § 2255 Pet.                    12                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

shoulder. When he reached the back of the vehicle, Hamilton observed Eales face down on the ground, with Trooper Ricky Manion attempting to assist him.

At some point in the melee, Manion shot Mr. Barrett in the lower body. Hamilton approached and entered the house, told Mr. Barrett to get up, and Mr. Barrett responded that he could not because he had been shot. Hamilton, with the assistance of Troopers Manion and Steve Hash, dragged Mr. Barrett out of the house and into the front yard and beat him. Mr. Barrett had been shot at least four times.

After unsuccessfully attempting to provide first aid to Trooper Eales, Tact Team members transported him to a local hospital, where he was pronounced dead. A search of Mr. Barrett's property, including his house and outbuildings, failed to yield methamphetamine. The government seized items that it contended were related to the production and use of methamphetamine, including coffee filters, pseudoephedrine, ephedrine tablets, red phosphorus, and iodine.

## B.     Three Trials.

### 1.     State Trials.

Mr. Barrett was tried in Oklahoma state court, twice, as set out more fully in the Procedural History (Appendix A hereto). In the first state trial, the jury was deadlocked and could not reach a verdict. The second state court jury rejected the first-degree murder charge and instead found Mr. Barrett guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Mr. Barrett guilty of the lesser-included offense of assault and battery with a dangerous weapon. The jury acquitted Mr. Barrett on the two counts of discharge of a firearm with intent to kill. Mr. Barrett did not appeal his convictions or sentences.

### 2.    Federal Trial.

Mr. Barrett's federal trial was markedly different from his state trials. In the first phase the most notable difference was the testimony of seven informants, who did not testify in either of the state trials. The identity of these snitches was not made known to the defense until after the beginning of jury selection. These snitches came forward with statements that Mr. Barrett allegedly made about "going down in a blaze of glory" and the like.

At the sentencing phase of Mr. Barrett's trial, the government presented testimony with respect to victim impact and future dangerousness. In the category of future dangerousness, the government presented the following witnesses:

1.    Stanley Philpot, a Sequoyah County reserve deputy sheriff, who testified about an incident in which he stopped Mr. Barrett in his truck and informed him of the outstanding felony warrant for his arrest. Stanley followed Mr. Barrett home, at which time Mr. Barrett allegedly stood on the porch holding a gun. Stanley called for back up but neither Mr. Barrett nor the gun could be found.

2.    Johnny Philpot, former Sequoyah County Sheriff, who testified that he was called as back up for the above incident.

3.    Cindy Crawford, who testified that Mr. Barrett allegedly held a gun to her leg because she refused to sleep with him and said that he would "fucking kill her" if she came back to his place.

4.    Charles "Monk" Sanders testified that he was present when a female friend of Mr. Barrett's received a telephone call from Mr. Barrett while he was in jail. According to Sanders's second-stage testimony, he overheard Mr. Barrett,

whose voice he recognized, tell the female friend they needed to find the person who got him arrested so they could "kill that son of a bitch."

5.      Larry Lane, a Sequoyah County Sheriff's Deputy, who stated that Mr. Barrett ran a police check point and he pursued him until he ran off the road and ran away on foot.

6.      Shannon Smith, a former Sequoyah County Sheriff's Deputy, who was present at the checkpoint. Smith testified that Mr. Barrett pulled off so fast that two police officers had to jump out of the way. Smith also testified that on a different occasion he saw Mr. Barrett slapping his wife. Smith said that he told Mr. Barrett to stop and Mr. Barrett allegedly told Smith "he was going to get his gun and kill him."

With respect to victim impact, the government presented the following witnesses:

1.      William DeWeese, Rocky Eales' best friend from the Marine Corps, who testified that Trooper Eales was an outstanding person, an outstanding marine and like a brother to him.

2.      Nancy Eales Stalcup, Rocky Eales' sister, who testified that Trooper Eales was a wonderful person and a wonderful brother. Ms. Stalcup stated that Trooper Eales' death had a deteriorating effect on her health for which she had to receive medical care.

3.      Bobbie Eales, Rocky Eales' mother, who testified about her son and read a five-page written statement into the record that described her loss and pain.

4.      Gene Hise, an Oklahoma State Highway Patrolman and good friend of Rocky Eales, who testified about informing Kelli Eales of Rocky's death and his loss and Post-Traumatic Stress Disorder since Trooper Eales' death.

5.      Kelli Eales, Trooper Eales' wife, who testified about her husband's death and the loss she has suffered.  Mrs. Eales also read into the record statements her children had written about the loss of their father.

The mitigation stage of the sentencing hearing lasted less than three days.  There was no testimony regarding Mr. Barrett's mental health.

Mr. Barrett's counsel presented the following witnesses in mitigation:

1.      Maudeen Vann, First Deputy Court Clerk, Sequoyah County, Oklahoma, who testified as to the verdict in the state trial, the 30-year sentence Mr. Barrett received and was serving and the fact that he had no prior felony record.

2.      Kathy Trotter, Mr. Barrett's cousin, who briefly testified that everyone in the family grew up with guns and used guns. She also testified that she was a process server and familiar with the legal community and had no knowledge of Mr. Barrett's involvement in violent activities other than some instances of domestic violence.

3.      Jimmy Wilson, a case manager at the Oklahoma Department of Corrections, who testified as to the actual time Mr. Barrett would serve on his state sentence, the type of facility in which he would serve his sentence, his restrictions and his possibility of parole.

4.      Abby Stites, Mr. Barrett's former wife, who testified about their troubled marriage and that it was not all Mr. Barrett's fault; she was equally to blame.

5.      Craig Edgmon, Mr. Barrett's neighbor, who testified that Mr. Barrett was a good mechanic and worked on his car, truck and farm equipment.

6.      Clyde Edgmon, Mr. Barrett's neighbor and Craig Edgmon's father, who also testified that Mr. Barrett was a good mechanic who charged a fair price and sometimes did work for no charge. Mr. Edgmon also testified that law enforcement (John Owens and Sandy Gerdner) came by his house when Mr. Barrett was working on Mr. Edgmon's truck and talked to Mr. Barrett for some time.  This was a very friendly exchange that took place three to six months before the raid.

7.      Robert Gude, a former jailer at the Sequoyah County Jail, who testified about the conditions at the Sequoyah County Jail and Mr. Barrett's behavior at the jail.

8.      Courtney Burke, an assistant administrator at the Sequoyah County Jail, who testified regarding Mr. Barrett's behavior while housed at the jail.

9.      Martin Daggs, a bail bondsman in Sequoyah County who had bonded Mr. Barrett out of jail on the 1997 drug case.  Daggs testified that he was aware of the bench warrant but never did anything to make Mr. Barrett aware of the bench warrant because a judgment of forfeiture had never been ordered.

10.     Steve Barrett, Mr. Barrett's brother, who testified superficially about his and Mr. Barrett's childhood.

11.     Roger Crawford, Mr. Barrett's uncle and neighbor, who testified that Mr. Barrett was a good father, a good son, a good neighbor and good mechanic.

12.     Gelene Dotson, Mr. Barrett's mother, who testified superficially about Mr.

Barrett's childhood, his marriage and his adult life.

13.     Ernest Barrett, Mr. Barrett's father, who testified superficially about Mr. Barrett's

youth.

14.     Doris Barrett, Mr. Barrett's stepmother, who testified that Mr. Barrett was

like a son to her.

**III.   Claims for Relief**.

> **Claim 1.       Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments

made elsewhere in this Petition and the exhibits thereto.

Actions of the trial court denied Mr. Barrett a fair trial under conditions required

or routinely provided to similarly situated defendants pursuant to 18 U.S.C. §§ 3005, 3006A, and

3599, the Judicial Conference's Guidelines for implementation of the Criminal Justice Act,

prevailing professional norms of criminal defense practice, and the Fifth, Sixth, Eighth, and

Fourteenth Amendments to the United States Constitution.[1]

---

[1] As stated *supra* in § I.B, this claim and others presented in this Petition rely upon witness accounts of the trial judge's on- and off-the-record interference with Mr. Barrett's defense.  Claim 1 also relies upon evidence that Judge James H. Payne engaged in improper *ex parte* communications with the prosecutors prior to trial, that he mislead Mr. Barrett and his counsel regarding the substance of those communications, and that following the *ex parte* communications, Judge Payne deferred ruling on a Government motion and that he was aware that delay conferred benefits upon the Government.  Mr. Barrett respectfully submits that the law

(continued...)

Judicial interference with defense counsel carrying out their constitutional function as opponents of the Government violates the Sixth Amendment, without a showing of prejudice. *Geders v. United States*, 466 U.S. 648 (1976) (trial court's order prohibiting defense counsel from consulting with defendant during recess between direct and cross-examination); *Herring v. New York*, 422 U.S. 853 (1975) (order barring defense counsel from summing up in bench trial); *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972) (rule requiring defendant to testify before any other witnesses denied defendant benefit of counsel's advice and guidance); *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961) (denial of counsel at arraignment where defenses had to be raised); *Ferguson v. Georgia*, 365 U.S. 570 (1961) (where state rule made defendant incompetent to give sworn testimony Constitution required that counsel be permitted to guide unsworn statement). While Mr. Barrett need not show prejudice from the court's actions described in this Claim, he can make that showing and does so in Claims 2, 3, 5, and 14, *infra*.

The trial court's stated interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and its communications with counsel created a conflict between the court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense. *See Woods v. Georgia*, 450 U.S. 261 (1981).

---

[1](...continued)
requires the trial judge to disqualify himself from ruling on this motion, and from any decisions respecting the process for ruling on this motion. 28 U.S.C. §§ 455(a), (b)(1), (b)(3), (b)(5)(iv); *In re Murchison*, 349 U.S. 133, 136 (1955); *Murchu v. United States*, 926 F.3d 50, 57, 59 (1st Cir. 1991). Mr. Barrett objects to the trial judge making any rulings in respect of this motion.

Since the initial Motion to Vacate was filed, Mr. Barrett has filed a separate motion to disqualify and require the recusal of Judge Payne. That motion was denied on September 11, 2009.

Amended § 2255 Pet.                    19                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

The evidence presented herein demonstrates that the trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases. The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as "a 'class of one,' . . . intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). *See also*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). Imposition of the death penalty through such an arbitrarily skewed process violates the Eighth Amendment's prohibition on cruel and unusual punishment.

The trial judge's conduct towards Mr. Barrett's interests and his counsel violated the Code of Judicial Conduct and was not impartial. "No matter what the evidence against (a defendant), he had the right to have an impartial judge." *Tumey v. Ohio*, 273 U.S. 510, 535 (1927). Partiality on the part of a judge in a civil appeal violates due process. *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813 (1985). The Supreme Court has "emphasized the special importance of fair procedure" in death penalty cases, including giving adequate notice to the defense of the judge's plans. *Lankford v. Idaho*, 500 U.S. 110, 125 (1991), quoting and citing, *Gardner v. Florida*, 430 U.S. 349, 357 (1977). The trial judge's conduct violated Mr. Barrett's rights under the Fifth and Fourteenth Amendments.

Federal law provides that the court shall consider the recommendations of the Federal Defender when appointing counsel. 18 U.S.C. § 3005. Pursuant to the Judicial Conference's *Guidelines for the Administration of the Criminal Justice Act and Related Statutes* ("CJA Guidelines") the Federal Defender and the court should take into account "the facts and circumstances of the case to determine the qualifications which may be required to provide

effective representation." (CJA Guidelines, ¶ 6.01(B)(1)). Courts are encouraged to appoint counsel who "are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation." (CJA Guidelines ¶ 6.01.)

Judge Payne initially expressed a desire to appoint the Federal Defender to represent Mr. Barrett. When the Federal Defender informed Judge Payne that the only attorney in his office qualified to handle a capital case was already appointed to such a case, Judge Payne indicated that he anticipated the assistant federal defender who normally worked in the Eastern District would be responsible. The Federal Defender explained that the attorney was not qualified and his office could not provide competent representation to two capital defendants at the same time. (Exhibit 67.)

Two Federal Defenders and an assistant federal defender recommended that the court appoint John D. Echols and Robert Nigh of Tulsa, based on their past capital defense experience and, in Mr. Echols's case, his demonstrated commitment to Mr. Barrett's defense. (Exhibit 54; Exhibit 67; Exhibit 34). Judge Payne indicated he preferred to have the Federal Defender appointed so the court would not have to authorize funds for Mr. Barrett's representation. (Exhibit 54; Exhibit 67).

During discussions with these attorneys, the trial judge expressed an interest in considering factors that are not recognized by the Judicial Conference or national indigent defense organizations as indicative of an attorney's qualifications to provide effective representation. Judge Payne expressed an interest in appointing less-qualified attorneys to represent Mr. Barrett as a means of giving local attorneys experience so that a local panel could be formed for representation in capital cases. (Exhibit 54; Exhibit 67; Exhibit 34). To this end,

the trial judge rejected the recommendation of Robert Nigh and appointed Roger Hilfiger, based in part on Mr. Hilfiger's past experience as United States Attorney for the Eastern District of Oklahoma. *Id.*

The CJA Guidelines provide that courts budgeting federal death penalty cases should ask counsel for the "best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) likely to be needed through the guilt and penalty phases of the trial." (CJA Guidelines, ¶ 6.02F(3)(C)(ii)). The Judicial Conference's guidelines also provide that these "[c]ase budgets should be submitted *ex parte* and filed and maintained under seal." (*Id.* at ¶ 6.02(F)). The trial court in this case required a high degree of specificity, and threatened to reverse the prior order Judge White entered authorizing *ex parte* submissions if counsel did not disclose "a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case)." (Exhibit 65 – Letter from Hon. James H. Payne to John David Echols dated 2/22/05.)

Judge Payne expressed a desire that the case rapidly proceed to trial. (Exhibit 34.) On January 7, 2005, the court admonished Mr. Barrett's attorneys for failing to mention the need for a continuance during a status conference earlier in the day. Doc. 31. The court said, "Counsel is reminded this is a death penalty case, which should be given the highest priority by counsel." *Ibid.*

On January 31, 2005, Mr. Barrett's counsel filed a detailed, 10-page, budget proposal. (Doc. 46.)

Like the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases,[2] the Judicial Conference's guidelines recognize the importance of prompt authorization of funds so that delay will not result in a denial of effective representation. The CJA Guidelines encourage courts "to employ[] an *ex parte* pretrial conference in order to facilitate reaching agreement on a litigation budget at the earliest opportunity," ¶ 6.02(F)(3), and encourage courts to "act upon requests for services where prompt authorization is necessary for adequate representation." (¶ 6.02(F)(5)). The trial court in this case did not hold such a conference.

On February 7, 2005, Mr. Barrett's counsel filed amended, more detailed budget proposals. (Docs. 50, 51.) On February 22, 2005, the court sent lead counsel a two-page single-spaced letter listing six categories of questions and concerns the court had about Mr. Echols, but not about Mr. Hilfiger's representation. (Exhibit 65). Throughout the letter, Judge Payne expressed concern that Mr. Echols was being paid to represent Mr. Barrett in a third trial, and expressed the view that no further investigation should need to be done after the previous trials. *Ibid.* Mr. Echols responded by letter on February 28, 2005. (Exhibit 64.)

As noted *supra*, the statutes and guidelines related to case budgeting in federal death penalty cases state a preference for *ex parte*, sealed proceedings in order to protect defense confidentiality. The trial court in this case expressly considered using Mr. Barrett's budget submissions to aid the prosecution. In his letter to Mr. Echols, Judge Payne stated that lifting the order on *ex parte* budgeting "might actually help resolve this case more expeditiously by

---

[2] Eric Freedman, AMERICAN BAR ASSOCIATION, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES & COMMENTARY TO GUIDELINES, 31 Hofstra L. Rev. 913 (2005).

allowing the government an earlier opportunity to object to the admissibility [of Mr. Barrett's experts] and perhaps allow the court to rule on the admissibility issues prior to expenditure of funds for experts which might not be allowed to testify at trial." (Exhibit 65 at 2.) Mr. Echols objected that this proposal would infringe on Mr. Barrett's Sixth Amendment rights, and it was not implemented.

On February 28, 2005, Mr. Echols informed the court that delays in authorization of a budget for any defense preparation was endangering counsel's ability to prepare for trial on the court's schedule. (Exhibit 64 at 5.) The court did not rule on the defense's budget proposal until March 18, 2005. (Doc. 97.) At that point, discovery was scheduled to close on May 11, 2005, and trial was scheduled to start on July 11, 2005. (Scheduling Order filed 12/11/04 (Doc. 22).)

Richard Burr, an attorney retained by the Office of the Defender Services of the Administrative Office of the United States Courts, served as an advisor to Mr. Barrett's counsel, John Echols, through the auspices of the Federal Death Penalty Resource Counsel project ("FDPRC"). (Exhibit 118; Exhibit 34.)[3] As Mr. Burr stated to the court at the time, the FDPRC collects "data on the initiation and prosecution of federal capital cases, and on the defense services provided in such cases." (Decl. Richard Burr re attorney compensation dated 4/4/05 and filed as Exh. B to Doc. 107.) Mr. Barrett's counsel relied upon the data collected by the FDPRC in making his funds requests. (Exhibit 64.)

The trial court's funding decisions were based on the judge's subjective view of what was "'reasonably necessary' to provide fair compensation and to provide the defense with

---

[3] Mr. Burr offered his assistance to Roger Hilfiger, but Mr. Hilfiger did not seek any assistance. (Exhibit 29; Exhibit 118.)

necessary tools for a fair trial." (Order filed 3/18/05 at 2.) However, the court's reasoning in denying specific requests was inconsistent with the Sixth Amendment role of counsel in exercising independent professional judgment and providing an adversarial testing of the prosecution's case. *Polk County v. Dodson*, 454 U.S. 312, 320-22 (1981).

The trial court had before it declarations of independent expert counsel regarding the prevailing professional norms of capital defense practice in federal death penalty cases, including courts' decisions validating these norms through the allocation of funds to similarly situated defendants. (Exhibit 118.) The trial court's order evidences no consideration of these norms or practice, whether adversarial or judicial. The trial judge's order evidences no consideration for the specific needs of counsel as expressed in their funds requests. The trial judge's limitations on funds were not based on any evidence of or expressed concern for fiscal limitations.

As expert counsel advised the court at the time,

in the GUIDE TO JUDICIARY POLICIES AND PROCEDURES, Vol, VII, "Appointment of Counsel in Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), Courts are encouraged in the course of case budgeting to secure counsel's "best preliminary estimate that can be made of all services," including the services of counsel.

[] It is clear that the reason the attorney services were not included in the pre-authorization and circuit review provisions of 21 U.S.C. §§ 848(q)(9) and (10)(B) is that attorney services, to be meaningful, must be provided as the professional judgment of the attorney dictates and cannot, therefore, be subject to pre-authorization without significantly interfering with, even paralyzing, the process of representation.

For this reason, the inclusion of attorney services in the case budgeting guidelines of the GUIDE TO JUDICIARY POLICIES AND PROCEDURES is intended, *not* to interject the courts into case management, but to require *counsel* to assess the representation needs of the case in order to give the courts a way of projecting what counsel believes to be reasonable expenditures of time. If the expenditure of attorney time thereafter begins to depart in substantial ways from these

Amended § 2255 Pet.                 25                *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

projections, the budgeting of attorney time provides a basis for the court to question the attorney about the necessity of his or her efforts.  This is the way in which the federal courts have uniformly approached the matter of budgeting attorney time in capital cases - with due deference to the exercise of attorney judgment, but with a basis for questioning certain expenditures of time.

(Decl. Richard H. Burr dated 4/4/05, filed as Exh. A to Doc. 107.)

Investigation is a core function of defense counsel.  ABA Standards for Criminal Justice, Standard 4-4.1 (requiring "prompt investigation").  The relevant guidelines to administration of the Criminal Justice Act provide that "upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court should authorize the defendant's attorneys to obtain such services."  The trial court authorized funds for Mr. Barrett's representation on a far more narrow basis.

Indeed, the trial court's funding order went beyond the simple approval or denial or funds.  Mr. Barrett's trial counsel requested funds to investigate and develop evidence for the defense.  (Doc. 51; Exhibit 64.)  The trial court refused to permit trial counsel to expend funds in investigation based on their independent professional judgment.  (Order filed 3/18/05 at 2 n.2.)  The court stated that it would not approve payment of vouchers for investigative services unless counsel filed "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial."  *Ibid.*  This threat was contrary to the CJA Guidelines which provide in relevant part: "Courts, in examining the case budget, may reconsider amounts authorized for services prior to the budget's approval; however, *courts shall not rescind prior authorization where work has already been performed*."  (CJA Guidelines, ¶ 6.02(F)(5) [emphasis added].)

The trial judge's conditioning of funds on his subjective evaluation of the significance of the facts counsel sought to investigate barred or chilled investigation into factual

matters trial counsel deemed necessary through their exercise of independent professional judgment.  If Mr. Barrett had been represented by private counsel or an independent indigent defense office, the investigation of his case would not have been limited to factual issues that had "significance" to the person paying counsel.

As set forth more fully in Claim 3, *infra*, the court reduced the compensation rate of Mr. Barrett's investigator from the private investigator rate of $50.00 per hour to the rate charged by a state-subsidized agency for its salaried investigators.  (Order filed 5/5/05 at 3 n.1.)  In the court's initial order reducing the rate, the court did not disclose the state agency's rate as the basis for the reduction.  (*See* Order filed 3/18/05 at 2.)  This limitation meant that for Mr. Barrett's investigator, compared to his other cases, he *lost* $20.00 for every hour spent working on Mr. Barrett's case.

Mr. Burr compared this Court's March 18, 2005 order reducing resources for Mr. Barrett's defense with the data collected by the FDPRC.  Mr. Burr informed the trial court:

> The number of hours needed for fact investigation of course varies from case to case.  The number of hours requested here, however, is below the average for federal cases in which the death penalty has been authorized.  The average number of hours approved for fact investigation in authorized cases is closer to 500 hours.  The 100 hours approved by the Court is certainly enough to get a fact investigator started, but since it is far less than counsel has estimated is needed, approving only 100 hours now means that counsel in the near future will likely have to submit another request for approval of additional hours.

(Decl. Richard H. Burr re Non-Attorney Costs, dated 4/4/05, filed as Exh. C to Doc. 107.)  The court treated this statement as an "illustration" that Mr. Barrett's counsel "have the attitude that the budget in this matter is unlimited . . . ."  (Order filed 5/5/05 (Doc. 128) at 3 & n.1.)

The trial court did not merely deny funds to Mr. Barrett's defense, it interjected into the funding denial a false impression of the evidence that would be admitted at trial.  The

Amended § 2255 Pet.                    27            *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

court denied 75 percent of the time and one hundred percent of the in-court assistance trial counsel requested from a ballistics and crime scene reconstruction expert.  (*Compare* Doc. 50 at 7 *with* Order filed 3/18/05 at 3.)  At the same time, the court said, "Counsel should be aware that this Court has, [*sic*] never allowed crime scene reconstruction to be introduced in trial."  (Order filed 3/18/05 at 3.)  Trial counsel did not consult a crime scene reconstruction expert.  (Tr. 10/3/05 Hr'g at 8.)  The court's ruling gave counsel an unwarranted impression of the need to consult with a crime scene reconstruction expert and left counsel with no ability to bring such an expert to court to testify or assist in cross-examination.  Contrary to the impression given by the court's March 18 order, the court permitted the Government to present and place heavy reliance upon crime scene reconstruction evidence.  (*See* R. 3154-3484.)

As set forth more fully in Claim 3, *infra*, the trial court denied in full or in majority all Mr. Barrett's requests for expert and investigative services.  The court stated no basis for any denial or reduction related to the facts or circumstances of the case.  Based on the FDPRC's data regarding other capital cases, the court's ruling against Mr. Barrett was unique.  Mr. Burr informed the court at the time that Mr. Barrett's request for a mitigation specialist was "well below average," and "no federal court ha[d] failed to provide expenses for mitigation specialists' work."  (Decl. Richard H. Burr dated 4/4/05, Exh. C to Doc. 107.)  Where this court denied funds for experts to travel as part of their work on Mr. Barrett's defense, Mr. Burr found that "[t]ravel expenses - lodging, meals, and transportation - are always provided, as are any other expenses incidental to the expert's ability to provide services."  (*Id.*)  Where this court permitted Mr. Barrett's counsel to retain only one mental health expert, regardless of the circumstances, the FDPRC found, the "standard practice in federal capital cases is to provide the

services of more than one mental health expert." *Id.* Trial counsel felt the court's restriction of funds was an impediment to preparing a mitigation investigation. (*See* Exhibit 56.)

The trial court paradoxically relied upon the experienced judgment of trial counsel as grounds for denying requests they made based on their considered professional judgment. For example, the court denied counsel's request for a jury consultant on the ground that trial counsel had extensive experience picking juries. (Order filed 3/18/05 at 3.) This ruling was influenced by the trial judge's personal choice of trial counsel. The trial judge personally selected Roger Hilfiger to represent Mr. Barrett against the recommendations of experienced defense counsel. (Exhibit 54; Exhibit 67.) The trial judge then relied upon his own subjective view of Mr. Hilfiger's experience, not as a defense lawyer, but as the former United States Attorney as a reason for denying counsel's request for a jury consultant. (Order filed 3/18/05 at 3.) However, as set forth *infra* this ruling did not bind Mr. Hilfiger as it would have bound Mr. Echols.

The trial judge hampered trial counsel's ability to prepare a defense by at first denying, then delaying, authorization for counsel to obtain the prior testimony of prosecution witnesses. (Order filed 3/18/05 at 4.) The court's reasoning is contrary to the purpose of the right to counsel. Where the Supreme Court has held that the purpose of defense counsel is opposing the prosecution, the trial judge initially denied access to the second state trial transcripts on the ground that "the government has indicated they do not need the prior transcripts to try this case. If counsel for the government are able to try this case without prior state court trial transcripts, defense counsel should be able to do the same." (*Id.* at 5.) Just as the right to cross-examine witnesses depends upon the availability of counsel, so too does the right depend upon the court not denying counsel access to readily available sources of cross-examination. *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

Initially, the court would not permit the second state trial transcripts to be obtained "unless convinced the testimony of said [prior] witness is critical to the issue of the defendant's intent as it relates to the elements of the offenses charged herein." (Order filed 3/18/05 at 6.) The court later rescinded this limitation and permitted counsel to obtain the transcripts they had been seeking since January 2005. (*See* Doc. 23.) Although some transcripts were obtained, the delay caused by the trial judge prevented preparation of transcripts before each witness who testified previously testified in federal court. The delay also impeded or prevented defense counsel's preparation for cross-examination. *See* Claim 2, Part A, *infra*.

The trial court also limited the ability of defense counsel to prepare for and conduct cross-examinations by denying access to transcripts of witnesses' testimony in earlier federal hearings. (Order filed 3/18/05 at 6.) This ruling was especially arbitrary and unfair in that the court could have provided Mr. Barrett's counsel these transcripts without making it part of the budget. The Criminal Justice Act specifically provides that court reporters may be paid separately for preparing transcripts in cases of indigence.

Congress, the Judicial Conference, and every professional association concerned with criminal defense practice have expressed the view that cases involving the death penalty require higher degrees of skill and greater preparation than other criminal cases. The trial judge in this case compared the budget for Mr. Barrett's case only to unidentified budgets in non-capital criminal cases. (*See generally* Orders filed 3/18/05 and 5/5/05.)

The court's rejection of Mr. Echols's proposed budget was part of a pattern of interference with, or indifference to, Mr. Barrett's legal representation. As stated *supra*, the trial judge initially wanted to appoint two local attorneys to represent Mr. Barrett so that the capital experience of the local bar would be increased. (Exhibit 67.) In his letter to Mr. Echols in

February 2005, Judge Payne indicated he had appointed Mr. Echols, at least in part, because Echols and the Public Defender left him with the understanding that "there would be a substantial savings in the amount of time that would be required for [Echols] to represent the defendant." (Exhibit 65.)

As stated *supra*, the trial court required Mr. Echols, as lead counsel, to submit very detailed and specific budget requests. On April 1, 2005, the Magistrate Judge recommended denying Mr. Echols any compensation for time spent preparing those budgets. The CJA Guidelines specifically provide that time spent on case budgeting in *capital* cases is compensable. Mr. Burr submitted a declaration to the Court regarding the extraordinary nature of the ruling against Mr. Echols's voucher:

> In every federal capital case with which the members of our project are familiar - which is virtually all such cases since the inception of the Federal Death Penalty Resource Counsel project in 1992 - defense counsel have been compensated for their work in seeking funding for the services of defense investigators and experts. We know of no other case in which the court has refused to compensate counsel for such work. The reason for this is that, in seeking funding for these services, counsel is required to plan the defense investigation and litigation, determine the specific need for investigation and expert assistance, identify appropriate, competent investigators and experts, and contact a number of investigators and experts to discuss the merits of the case and the need for their services and to determine whether those investigators and experts are actually appropriate and available. All of these efforts are in direct service to the client. Unlike the preparation of defense counsel's CJA 30 vouchers, through which counsel is compensated - and for which courts usually do not compensate counsel, the work of counsel in seeking finds [sic] for investigation and expert assistance is of no financial benefit to counsel. Its sole purpose if [sic] to assist the client in his or her defense.

(Decl. Richard H. Burr re Compensation for Budgeting, dated 4/14/05, filed as Exh. to Doc. 118.) The trial court denied Mr. Echols compensation, because lawyers in the Eastern District in *non-capital* cases were not compensated for budgeting. (Order filed 5/5/05 at 4.)

Mr. Echols's budget submissions were based in part on advice and data regarding other federal death penalty cases that Mr. Echols received from Federal Death Penalty Resource Counsel.  Only Mr. Echols sought the advice of these experts; Mr. Hilfiger did not.  (Exhibit 118; Exhibit 34.)  Although compensation for consultation with expert counsel is specifically authorized by the Criminal Justice Act and 18 U.S.C. § 3599(f), the Magistrate Judge recommended denying payment for Mr. Echols's consultations, and Judge Payne upheld this ruling.  (Order filed 5/5/05.)

On April 4 and 6, 2005, Mr. Echols filed motions seeking reconsideration of the March 18 budget order and April 1 report and recommendation regarding vouchers.  These filings sought a budget conference as provided in the CJA Guidelines and included four declarations from Federal Death Penalty Resource Counsel, Richard Burr, some of which are quoted herein, regarding the CJA Guidelines and statements that the restrictions imposed by the court were unique in all the previously litigated federal death penalty cases.

On April 6, 2005, Mr. Echols also moved to withdraw as counsel for Mr. Barrett citing five circumstances that prevented him from providing effective representation: (1) the trial was less than four months away; (2) no final budget had been approved that was adequate to prepare a defense; (3) the denial of compensation for budgeting and expert consultation placed an unreasonable burden on counsel; (4) Mr. Hilfiger had not done any significant work on the case; (5) the requirements of the March 18 order impaired counsel's exercise of independent professional judgment.  (Doc. 113.)  Mr. Hilfiger had urged Mr. Echols not to file the motion.  (Exhibit 118; Exhibit 34.)  However, during a hearing on the motion, Mr. Hilfiger did not join in Mr. Echols's concerns about the budget order.  (Exhibit 34.)

Mr. Echols stated as one ground for his motion to withdraw: "The relationship between the undersigned and co-counsel, Roger Hilfiger, is cordial, but we have not been able to work effectively together, and virtually all of the work performed on pleadings, budgeting and other issues has been performed by Mr. Echols." (Doc. 113 at ¶ 4.)  In granting Mr. Echols's motion, the trial judge attributed to Mr. Echols the assertion that "he is unable to work with co-counsel Mr. Hilfiger," and omitted the information about Mr. Hilfiger's lack of work.  (Order filed 5/5/05 at 5.)  The court instead focused on Mr. Hilfiger being "more familiar with practice before this Court than Mr. Echols."  (*Ibid.*)

In granting Mr. Echols's motion to withdraw the court expressed displeasure with the amount of information Mr. Echols provided in his budget submissions.  (Order filed 5/5/05 at 2-3.)  The court permitted Mr. Echols to withdraw in part because his budget proposals had not "'set forth separately and with specificity the time each of the appointed attorneys anticipates spending' on each of several categories."  (*Ibid.* (quoting Order filed 1/29/05 (Doc. 38).)  The record shows Mr. Echols filed lengthy budget requests describing the specific needs of the defense and, most, but not all the time, describing with particularity the experts he sought to hire and the work they would perform.  (Docs. 50, 51.)  Mr. Echols also sent Judge Payne a six page single-spaced letter detailing the amounts he and others were paid for Mr. Barrett's defense in state court, and what matters were not completely investigated there.

Judge Payne did not hold Mr. Hilfiger to the same standards as Mr. Echols.  During the trial the court became concerned that Mr. Hilfiger and Mr. Smith would exceed the budget authorized on March 18, 2005.  (Tr. 10/3/05 Hr'g.)  In that event, Judge Payne said, "I think the safest thing to do maybe on the attorney's fees for October would be for y'all to analyze

that and get me an amended budget just to -- I mean, just make your best guestimate." (Tr. 10/3/05 Hr'g at 8.)

In his letter to Mr. Echols, Judge Payne expressed his concern that Mr. Echols not be unduly compensated for work if his prior representation of Mr. Barrett made further labors unnecessary. The court had limited Mr. Echols's rate of compensation to $125.00 per hour. On May 17, 2005, the day Mr. Hilfiger was made lead counsel, Judge Payne raised his compensation rate to $150.00 per hour. (Tr. 10/3/05 Hr'g at 3.)

The concerns Mr. Echols expressed in his motion to withdraw about the lack of work Mr. Hilfiger committed to the case proved to be well-founded, although the court was again unconcerned. On May 23, 2005, Mr. Barrett filed a motion seeking appointment of new counsel based, in part, on the assertion that the case loads of appointed counsel interfered with their ability to devote sufficient time to his defense. (Doc. 135.) Mr. Barrett's counsel did not file a response to the motion. There was no hearing on the motion.

On May 24, 2005, the court denied Mr. Barrett's motion to replace counsel. (Doc. 137.) The denial was based in part on the "finding" that "[c]ounsel has a copy of the first state court trial transcript . . . ." (Order filed 5/24/05 (Doc. 137) at 2 n.2.) The denial was based in part on the court's belief that appointed counsel "will have adequate time to prepare for this particular case." *Id.* at 2. Subsequent events suggest there was no basis for these two statements in the May 24 order.

On May 26, 2005, trial counsel Hilfiger filed a motion to continue the trial date. (Doc. 138.) Counsel averred as one ground for the continuance that Mr. Hilfiger had "been presented with ten storage boxes of materials, discovery, motions and other paperwork from defendant's two State jury trials, including transcripts of the first State jury trial; and all of such

material needs to be reviewed to determine its value for defensive purposes, in this new action."

(Doc. 138 at 1.)  Mr. Hilfiger was not specific about when he received the materials, but the evidence indicates it was between May 17, 2005, the day Mr. Hilfiger was made lead counsel, and May 26, the date of his assertion.  Regardless of the specific date, the record reveals no basis for the court's statement that Hilfiger possessed the record on May 24, and shows that whatever Mr. Hilfiger "possessed" on that date, he had not reviewed it during the six months that had elapsed since his appointment in November 2004.

Mr. Hilfiger's statement about not having reviewed the records from the state-court proceedings, including discovery and transcripts, indicates that he had not made a sufficient inquiry into the facts of the case to support the position he took on the budget during the May 5, 2005, hearing.  On May 17, 2005, the court directed Mr. Hilfiger to file by May 27, 2005, any supplemental budget request he deemed necessary.  (Tr. 10/3/05 Hr'g at 3.)  Assuming the trial court had learned on or before May 17, 2005, that Mr. Hilfiger had not become familiar with the previous litigation over the previous six months, it was unreasonable for the court to give Mr. Hilfiger only 10 days to request supplemental resources.

In February 2005, Mr. Hilfiger informed Mr. Echols, and Mr. Echols informed the court, that Mr. Hilfiger believed he would need to spend 160 hours assembling and reviewing the files and records related to the case.  (Doc. 50 at 4; Exhibit 64 at 1 n.1.)  On March 18, 2005, the court reduced to 80 hours the compensable time for Mr. Hilfiger – then second-chair – to complete these tasks.  (Doc. 97 at 2.)  In any event, it was impossible for Mr. Hilfiger to have completed these tasks between May 17 and May 27, and Mr. Hilfiger did not file an amended budget.

As noted *supra*, in January, when Mr. Echols was lead counsel, the court chastised Mr. Barrett's defense for failing to devote sufficient attention to the case that it could stay on schedule. (Doc. 31.)  The court admonished counsel to give the case the "highest priority." *Ibid.*  In May, when Mr. Hilfiger acknowledged that he had not reviewed the records from the prior state court proceedings, and after Mr. Echols and the lawyers' vouchers revealed the paucity of Mr. Hilfiger's work on the case, the trial court expressed no concern about Mr. Hilfiger's priorities, and simply granted the continuance. (Tr. 6/6/05 Hr'g; Doc. 142.)  In September, Mr. Smith revealed that Mr. Hilfiger had not assembled the files and records related to the mitigation investigation that had been done in state court. (Tr. 9/9/05 Hr'g at 43.)  Again, the court was not concerned with new counsel's priorities.

Mr. Hilfiger himself had informed Mr. Echols and the court that it would take him as second-chair 300 hours to prepare for trial, *not* including court hearings, legal research and preparation of pleadings and briefs. (Doc. 51 at 4.)  On October 3, 2005, with the trial underway, Mr. Hilfiger informed the court that he had worked approximately 300 hours on the case, *including* legal research and writing and preparation for and in all court proceedings.  (Tr. 10/3/05 Hr'g at 5.)  Whereas the court had expressed a great deal of skepticism about Mr. Echols's requests for compensable hours, Mr. Hilfiger's statements prompted no expressions of concern.

In other respects, the record does not support the inference that Judge Payne's treatment of Mr. Echols was based either on fiscal concerns or concern for Mr. Barrett's representation.  The trial court denied Mr. Echols's request for a jury consultant on the ground that, "Each of defense counsel come before this Court with combined practical experiences on in excess of sixty years in selecting criminal juries, including Mr. Hilfiger's experiences as United

Amended § 2255 Pet.                               36                          *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

States Attorney for the Eastern District of Oklahoma." (Doc. 97 at 3.) If counsel's allegedly vast experience supported their professional judgment in selecting the jury, as the court conjectured, there was no reason for the court to reject the same professionals' judgment that they required the assistance of a jury consultant.

As noted already, after he was elevated to lead counsel, Mr. Hilfiger filed no supplemental budget request. On September 9, 2005, Mr. Hilfiger informed the court that he would be relying upon a private jury consultant. (Tr. 9/9/05 Hr'g at 10.) Mr. Hilfiger casually stated, "I'll assume Angie Cole will be coming in with us the next two weeks. She's going to set [*sic*] at the counsel table with us during the selection." (*Ibid.*) The court recognized Ms. Cole's name and identified her as a jury consultant. (*Ibid.*) Despite the earlier denial of funds based on Mr. Hilfiger's particular experience, and the fact that the court was paying Mr. Hilfiger more than it had paid Mr. Echols, Judge Payne expressed no concern or objection to Mr. Hilfiger's unauthorized retention of an expert for two weeks of trial. (*Ibid.*) If Mr. Hilfiger had been able to obtain a jury consultant without funds from the court, he did not inform Mr. Echols of the fact.

In summary, Judge Payne had only reluctantly appointed John Echols to represent Mr. Barrett, and then based in significant part, at least, on the belief that Mr. Echols would be able to try the case cheaply and quickly. Judge Payne personally chose Roger Hilfiger to represent Mr. Barrett for reasons that had nothing to do with the circumstances of Mr. Barrett's case, but for the purpose of using Mr. Barrett to develop a local capital defense panel. During Mr. Echols's tenure, Judge Payne imposed requirements and restrictions on budgeting and investigation that experts concluded were unheard of in federal death penalty trials, and that intruded upon the constitutionally protected independence of counsel. At one point, Judge Payne threatened to use counsel's budget proposals as a mechanism for finding defense experts'

testimony inadmissible at trial.  When Mr. Echols left the case due to these restrictions, and Mr.

Hilfiger sought no additional resources, Judge Payne's conduct towards defense counsel changed.

Judge Payne permitted, or through his actions encouraged, Mr. Hilfiger to show a lack of

diligence and inattention to the conduct of the case including obtaining resources, investigative,

and expert assistance.  Under these conditions, Mr. Barrett did not receive independent,

reasonably funded, reasonably prepared, representation.

The trial judge also violated Mr. Barrett's right to due process, and the Code of

Judicial Conduct, by conducting *ex parte* communications with the prosecutors.  During an *ex*

*parte* hearing held September 13, 2005, the judge solicited the views of the United States

Attorney regarding such matters as (a) when the trial started for purposes of 18 U.S.C. § 3432,

(b) whether the defense should be entitled to a continuance based on delayed disclosure of

witnesses, and (c) whether the disclosures posed a problem under Rule 404(b) of the Federal

Rules of Evidence.  (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 22-23.)  Although the hearing was held for

the purpose of disclosing information supposedly related to dangers to witnesses, the trial court

solicited the prosecutor's views on these other matters which did not involve discussion of any

information that could not be disclosed to the defense.

Also during the *ex parte* portion of the hearing Assistant United States Attorney

Michael Littlefield revealed that he knew the identity of a witness who failed to corroborate

statements by informant, Charles Sanders.  (Tr. 9/13/05 Hr'g at 14, 17.)

The court's conduct during the *ex parte* portion of the September 13, 2005

proceedings, and its conduct in relation to those proceedings thereafter, violated Rule 2.9 of

Canon 2 of the Code of Judicial Conduct.

After the *ex parte* portion of the hearing, and at the beginning of the hearing with defense counsel present, the court did not disclose the discussion regarding the meaning of § 3432, the discussion of the continuance, AUSA Littlefield's revelation about a witness, or the discussion of Rule 404(b). (Tr. 9/13/05 Hr'g at 25-27.) During the *ex parte* conversation, the judge revealed to the prosecutors that he had researched the § 3432 issue and found support for the proposition that the trial had started the previous day. (Tr. 9/13/05 Hr'g at 4-5.) The court permitted the prosecutor to represent, outside the presence of the defense, that the Government "and defense counsel have been operating under the inference that the trial begins on or after the 26th [of September]." *Id.* at 7.

Once defense counsel was present, the judge did not reveal the findings of his research in relation to § 3432, though they were potentially helpful to the defense. The court made no effort to confirm the prosecutor's representations, or familiarize itself with the defense attorneys' views on § 3432.

During the *ex parte* conference, the judge said the following regarding a possible continuance:

> Well, I – of course, the notice of who the witnesses are – the term ambush you are familiar with and I guess what concerns me is when these names are revealed with three days [*sic*] notice that we are going to have a request for a continuance. It would be difficult – if they are as important to the government's case as you say they may be, it looks like we are setting this case up for a long continuance.

(Tr. 9/13/05 Hr'g at 12.) Then the prosecutors conferred off the record. (At the conclusion of the *ex parte* conference the court said he would see the prosecutors "down stairs" indicating the conference occurred in chambers.) During the hearing with defense counsel present, the judge did not share his views regarding possible ambush and the defense potentially needing a long continuance.

The trial judge's statements showed the court was aware that the seven informant witnesses were very important to the Government's case. Nevertheless, during the portion of the hearing with defense counsel present, and in subsequent related proceedings on September 14, 2005, the court did not bring up the female witness who failed to corroborate confidential informant Charles "Monk" Sanders, either to ask whether the witness had been identified to the defense or to notify the defense that the court had been informed of the existence of a witness who could impeach Sanders.

The judge misrepresented the content of the *ex parte* conference to defense counsel. When the *ex parte* hearing concluded the judge and prosecutor were discussing Rule 404(b), with the court saying "there is 404(b) material obviously in the proposed motion, it appears to me." (Tr. 9/13/05 Hr'g at 22.) The prosecutor agreed "[i]t appears to be implicit." *Ibid.* Then the prosecutor offered a rationale for not "provid[ing] reasonable notice in advance of trial," (Fed. R. Evid. 404(b)), and the judge said he would "take this matter under advisement" before calling the conference to an end. *Id.* at 23.

At the beginning of the hearing with defense counsel present, the judge did not reveal these discussions. The prosecutor sought guidance from the court regarding "where we were when we stopped" the *ex parte* conference. (Tr. 9/13/05 Hr'g at 26.) The court said they had been discussing "security issues." *Ibid.* The court said, "it sounded like there had been some discussion with defense counsel. And that's about as much as the Court knows." *Ibid.* The transcript shows the court drastically understated the true scope of the *ex parte* communications. Once they were thus misstated, the prosecutor said, "I'm willing for the matter to be unsealed." *Ibid.* Mr. Barrett's trial counsel were entitled to rely upon the court's representations. The

combination of the court's omissions and the prosecutor's sudden willingness for the hearing to be unsealed suggested to defense counsel the transcript need not be requested or reviewed.[4]

During the *ex parte* portion of the hearing, the judge made statements suggesting skepticism about the Government's position. The court specifically and repeatedly emphasized that the Government had no evidence of any overt act by any person that would suggest the witnesses were in danger. *Id.* at 20. The court did not inform the defense that the government had failed to produce evidence of an actual danger to its witnesses. Without disclosing the weakness of the Government's position, the court permitted defense counsel to agree (a) to further delays in learning the identities and contact information for the witnesses, and (b) to be limited in its access to Government witnesses to the extent that they would only be interviewed in the presence of Government representatives. (*Id.* at 27.)

The court had another opportunity to inform defense counsel of what transpired during the September 13 *ex parte* hearing. On September 14, 2005, after jury selection proceedings ended, the court raised the issue of the unidentified witnesses. The United States Attorney informed the court that the Government and Mr. Barrett's counsel had reached an agreement that the witnesses' names, contact information, criminal histories and (allegedly) promises made to them would be revealed the following Monday. (R. 840.) The United States Attorney further advised the court that the defense would, possibly, have access to some of the witnesses at the prosecutor's office. (R. 841.) Mr. Hilfiger stated that he had no objection to the arrangement, "based on what we talked about yesterday." *Ibid.* The court then stated that this

---

[4] Of course, whether it was unsealed during the trial was irrelevant insofar as Judge Payne had denied counsel any funds for obtaining pretrial hearing transcripts. (Doc. 97.)

would make a "clear record" and the parties' "announcement . . . resolves everything that is under seal." (R. 843.)

As shown in Claim 2, Parts A.4 and A.5, trial counsel acted unreasonably by failing to object to the delayed disclosures, by failing to seek a reasonable continuance, and by failing to investigate the seven informant witnesses. Evidence available at the time would have provided extensive grounds for impeachment and cross-examination.

It is a violation of due process for the Government to attempt to restrict defense access to witnesses, for example, by telling the witnesses they should only agree to defense interviews if the Government is present. *See Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969). It is unprofessional conduct for a prosecutor to condition a witness's interview with defense counsel on the prosecutor being present. (ABA Standard 3-3.1(c) (commentary)). The trial court permitted defense counsel for Mr. Barrett to agree to such restrictions (Tr. 9/13/05 Hr'g at 27; R. 841-42), without revealing to the defense the weaknesses in the Government's motion for a protective order that the court had freely discussed with the prosecutors.

The trial judge's withholding of his views about a continuance was particularly prejudicial. Mr. Hilfiger has consistently and repeatedly stated that he agreed to the delays and other restrictions on his access to information about the witnesses because he believed Judge Payne would not grant a continuance of the trial. (Exhibit 29.) Judge Payne's views, as freely expressed to the prosecutors, would have given Mr. Hilfiger a completely different view of the situation. If Judge Payne had revealed his research regarding § 3432, the issue would not have been reviewed for plain error on appeal. If Judge Payne had revealed his views on a continuance, Mr. Hilfiger likely would have requested one, and again the matter would have been reviewed

differently on appeal. If Judge Payne had revealed his views on the weakness of the Government's motion for a protective order, Mr. Hilfiger would have had further grounds for a continuance and grounds for objecting to restrictions the Government placed on access to witnesses. Mr. Hilfiger also would have had grounds for a continuance if Judge Payne had revealed that Mr. Littlefield knew the identity of an impeachment witness who had not been disclosed in discovery, as the court's earlier orders required.

The trial judge's conduct in soliciting *ex parte* the prosecutor's views on the court's private concerns while at the same time failing to accurately disclose those communications to the defense violated Mr. Barrett's right to due process of law. The disparate conduct of the court between the prosecution and defense is evidence of bias. In a capital case, courts may not consider information the defense has no opportunity to hear or explain.

For the foregoing reasons, the trial judge should recuse himself from this case. Thereafter, this Court should grant the relief sought herein.

To the extent the matters raised in this Claim could have been raised on direct appeal, appellate counsel were ineffective. As stated *supra*, Judge Payne specifically selected Mr. Hilfiger for this case, and Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter. Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal. To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in this Claim could not be adequately litigated on appeal, because they required consideration of extra-record evidence. (Exhibit 29.) To the extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's

failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.  (ABA Guidelines, *supra*, Guideline 10.15.1.)

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal.  (Exhibit 29.)  However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal.  *Id.* Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards.  At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised herein had been raised on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 2.  Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

This claim is governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny.  The acts and omissions described herein fell below prevailing professional norms of capital defense practice.  Absent these acts and omissions, whether considered individually or collectively, there is a reasonable probability that Mr. Barrett would not have been convicted of the charged offenses, or that he would have received a sentence less than death.

### A.   Unreasonable Acts and Omissions Affecting the First and Second Stages of Trial.

The judgments of conviction and the sentence imposed on Mr. Barrett were obtained in violation of his Sixth Amendment right to effective assistance of counsel. As set forth in Claim 1, *supra*, the trial court interfered with the constitutionally protected independence of trial counsel. Numerous acts and omissions of Mr. Barrett's appointed counsel fell below the standards set forth in prevailing professional norms. *See generally, Rompilla v. Beard,* 545 U.S. 374 (2005)(result of second stage trial held unreliable due to counsel's failure to investigate prosecution evidence and provide material to relevant experts); *Wiggins v. Smith,* 539 U.S. 510 (2003)(result of second stage trial held unreliable due to failure of defense counsel to conduct thorough independent investigation for defense evidence); *Williams v. Taylor,* 529 U.S. 362 (2000)(result of second stage trial held unreliable due to defense counsel's failure to obtain documentary and testimonial evidence favorable to defense); *Kimmelman v. Morrison,* 477 U.S. 365 (1986)(deficient performance in first stage found where defense counsel failed to seek discovery and file appropriate motions); *Strickland v. Washington,* 466 U.S. 668 (1984)(test for violation of Sixth Amendment in both stages of capital trial is (a) whether counsel's conduct fell below prevailing professional norms; (b) whether there was a reasonable probability of more favorable result).

The trial court's stated desire to minimize costs associated with Mr. Barrett's defense and to appoint local counsel to this case for the purpose of establishing their credentials for appointment in future capital cases, *see* Claim 1, *supra*, created an actual conflict between the financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough investigation and a vigorous defense. *See Wood v. Georgia,* 450 U.S. 261 (1981). This conflict

adversely affected counsel's performance in that they failed to obtain the services of numerous experts, failed to devote time to preparing for and conducting the trial that counsel himself had considered necessary prior to the court's rulings, and failed to use other resources as expected under prevailing professional norms. *See generally, Mickens v. Taylor,* 535 U.S. 162 (2002); *Cuyler v. Sullivan,* 446 U.S. 335 (1980); *Holloway v. Arkansas,* 435 U.S. 475 (1978). *See also* Claim 3, *infra.*

The facts supporting this claim include the following, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

**Overview of First-Stage Ineffective Assistance**.

Multiple acts and omissions of trial counsel fell below prevailing professional norms of capital defense practice, and, either individually or in combination with each other, undermine confidence in the guilty verdicts returned by the jury. These include:

1. Trial counsel failed to professionally re-urge the motion to suppress the fruits of the search of Mr. Barrett's residence and property based on *Franks v. Delaware,* 438 U.S. 154, 156 (1978), after it was discovered, during the cross-examination of Charles "Monk" Sanders, that he was the confidential informant who provided the alleged probable cause for the no-knock warrant. Sanders testified on cross-examination that he did not provide District 27 Drug Task Force agent Clint Johnson the information which formed the basis for probable cause. In fact, based on Sanders's testimony on cross-examination in the first stage of trial, any information he could allegedly provide did not support the averments made by Johnson in the affidavit for the search warrant. To the extent the issue was developed on the trial record, direct appeal counsel were ineffective for failing to raise the *Franks* issue.

2. Trial counsel failed to professionally and properly investigate and develop evidence showing that Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms. This evidence (a) would have supported one or more defense theory instructions, (b) would have supported instructions on lesser-included offenses, and (c) would have effectively countered the Government's arguments on intent in both stages of trial.

3. Trial counsel unreasonably failed to investigate Mr. Barrett's history of bipolar disorder and treatment with psychotropic medications, and the effects of Mr. Barrett not taking prescribed medications during trial. Consequently, Mr. Barrett was tried while incompetent, and was denied his right to a contemporaneous determination of competence.

4. By acceding to an eleventh hour arrangement to "interview" the informant witnesses during trial, and by failing to move for a continuance, trial counsel were not able to effectively investigate and challenge the testimony of these witnesses. In any event, no professionally reasonable investigation into the backgrounds of these witnesses and their testimony was undertaken in whatever little time was available. Had a continuance been secured, and a professionally reasonable investigation been otherwise undertaken, the credibility of these witnesses and their testimony could have been effectively attacked.

5. Trial counsel were professionally unreasonable in failing to develop and introduce independent expert testimony to challenge the crime scene reconstruction testimony of Iris Dalley.

6. Trial counsel were professionally unreasonable for failing to hire an independent expert on SWAT tactics, instead of relying on a hostile, pro-prosecution witness who could do the defense case little, if any good.

7.      Counsel were professionally unreasonable for failing to utilize the transcripts from the second state trial to impeach the police witnesses.  Counsel were also ineffective for eliciting damaging hearsay testimony from Clint Johnson, and failing to correct this error with facts that would expose Johnson's answers as false.

8.      Trial counsel unprofessionally failed to develop available evidence and testimony that would have impeached the testimony of Government witnesses and the Government's theory that because of the lighting on the police vehicles, Mr. Barrett "knew" that law enforcement, rather than civilian trespassers, had entered his property at the time he fired his weapon.

9.      Trial counsel unprofessionally failed to develop available evidence to counteract the Government's claim that Mr. Barrett knew he had an active warrant for his arrest on a state drug charge, rather than just a pending case.  This evidence would have undermined the Government's theory that Mr. Barrett was hiding from the law because he "knew" he had an active warrant, and was lying in wait for the police.  Likewise, trial counsel were professionally unreasonable for failing to develop available evidence that Mr. Barrett had been reluctant to leave his property for several years preceding his state drug case.  This would have countered the Government's argument that Mr. Barrett "holed up" on his property because he "knew" he had an active warrant, and was making "preparations" to meet any police presence with force. Similarly, trial counsel unprofessionally failed to develop and present available evidence that Sequoyah County Sheriff John Philpot had been to Mr. Barrett's property a mere four weeks or so before the raid, and inspected Mr. Barrett's weapons without incident.  This evidence would have supported the motion to suppress and shown that a no-knock warrant and an armed raid on Mr. Barrett's property in the middle of the night by numerous law enforcement officers was

completely unnecessary and unfounded.  Additionally, this evidence could have been used to effectively impeach Government witnesses and the Government's theory of the case.

10.     Trial counsel were professionally unreasonable for failing to object to the expert witness testimony of Jim Horn, which the court struck *sua sponte* because it did not meet the standards for admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 595 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150-51 (1999).  To the extent this issue was framed by the record, direct appeal counsel were ineffective for failing to raise it.

11.     Trial counsel were professionally unreasonable in failing to object to certain matters that were raised on direct appeal, but were reviewed under the onerous plain error standard due to trial counsel's failure to object.

12.     Trial counsel unreasonably failed to seek appropriate jury instructions at both stages of trial including instructions on the theory of the defense, lesser included offenses, the questionable reliability of testimony from drug addicts and informants, and residual doubts about the manner in which the shooting occurred.  If these instructions had been given, there is a reasonable probability the jury would have understood how to reach more favorable verdicts.

13.     Trial counsel were professionally unreasonable for failing to object to prosecutorial misconduct in closing arguments in the penalty phase of trial.

**Evidence of Constitutionally Deficient Representation**.

1.      **Failure to professionally re-urge the motion to suppress under *Franks v. Delaware*, 438 U.S. 154 (1978)**.

Trial counsel were professionally unreasonable for failing to adequately re-urge the motion to suppress under *Franks v. Delaware, supra* following the first stage testimony of

Charles "Monk" Sanders. Counsel's failure in this regard undermines confidence in the jury's first stage verdicts. Because it was shown during Sanders's cross-examination that the material averments made in the search warrant affidavit to secure a no-knock warrant were false, or were made in reckless disregard for the truth, all evidence seized in the search of Mr. Barrett's cabin and property was subject to suppression. The failure to competently argue the *Franks* motion obviously undermines confidence in the outcome of the first stage of trial. Because the search warrant was defective under *Franks,* the drug-related and firearms evidence which formed the basis for each of the three counts of conviction would have evaporated, leaving nothing upon which the jury could have returned guilty verdicts.

The information used to secure the no-knock search warrant in this case was based on information supplied to Clint Johnson, the affiant on the warrant, by an alleged confidential informant (C.I.) The C.I. did not testify at Mr. Barrett's two state trials. At the conclusion of the second state trial, Clint Johnson wrote the alleged informant's name on a piece of paper, and placed it in an envelope, which was sealed in the state court file. (Tr. 1/ 26/05 Hr'g. at 88-89). It was only when Sanders testified in the first stage of Mr. Barrett's federal trial that it was revealed, for the first time, that Sanders was the alleged informant who supplied the information providing probable cause. (R. 2521).

In pertinent part, the affidavit for the no-knock, nighttime search warrant states the following:

> On September 18, 1999 this affiant was contacted by a confidential informant (CI) who advised that, within the past seventy-two (72) hours, they [sic] were in the above-described residence and observed a male that is known to the CI as Kenny Barrett present a quantity of white powder substance and represent it as being "methamphetamine."

The CI went on to state that while in the above described residence they [sic] observed Kenny Barrett divide and exchange a portion of the white powder substance for a quantity of money. The CI stated that they [sic] had been in the above-described residence on previous occasions and observed Kenny Barrett make "drug transactions." The CI further stated that while in the above-described residence they [sic] overheard Kenny Barrett state "if the cops try to raid me they will regret it because I'm going to kill the first cop through the door."

The C.I. also stated that while in the residence they [*sic*] observed several pistols lying around the residence and also Kenny Barrett had a pistol on his person.

This affiant is familiar with Kenny Barrett due to a pending investigation for the past six (6) months and is familiar that [*sic*] Kenny Barrett has an outstanding felony arrest warrant out of Sequoyah County, Oklahoma for failure to appear for a jury trial and unlawful delivery of CDS case number CF-97-86.

This affiant has learned from the CI that Kenny Barrett is maintaining his "drug transactions" in the night time hours due to the cover of darkness and that law enforcement personnel are less frequent [sic] at night.

The CI further stated that Kenny Barrett, due to Kenny Barrett's belief that law enforcement personnel cannot execute search warrants during the night, sell's [sic] controlled dangerous substances at nighttime and keeps large quantities of meth-amphetamine in his residence at nighttime in order to be undetected by law enforcement personnel.

This affiant asks that this search warrant be directed for day or night service due to the facts stated herein.

This affiant received information from the informant on at least five (5) occasions. Each time that this informant has provided information, the information proved to be true and accurate and resulted in the confiscation of illegal substances.

(Exhibit 194.)

On cross-examination in Mr. Barrett's federal trial, Sanders largely disavowed the information that was contained in the search warrant affidavit, and which allegedly supplied probable cause for the no-knock search. Sanders's testimony on cross-examination demonstrates that the search warrant affidavit was knowingly based on false information, or that this "information" was supplied to the Sequoyah County District Court with reckless disregard for the

truth.  Without the false information allegedly supplied by Sanders, there was clearly insufficient evidence to establish probable cause, let alone probable cause for a no-knock warrant.  In contrast to the representations made in the search warrant affidavit, Sanders testified to the following on cross-examination:

1. That he never saw Mr. Barrett manufacture methamphetamine on his property, or attempt to do so, and that he never told Clint Johnson anything to indicate that Mr. Barrett was manufacturing or attempting to manufacture methamphetamine (R. 2596-97, 2609);

2. That when he first met with Johnson after having been to Mr. Barrett's residence in July, 1999, he gave Johnson no information regarding drugs on Mr. Barrett's property.  He did not see any drugs on Mr. Barrett's property, and did not even do drugs with him on any occasion he was supposedly at Mr. Barrett's residence in July, 1999 (R. 2597-98);

3. In September, 1999[5], Sanders, at Johnson's direction, allegedly went to Mr. Barrett's residence to exchange a set of car keys.  Based on when Sanders alleged this trip occurred, it was just days before the raid in the early morning hours of September 24, 1999.  A "day or two" after being at Mr. Barrett's, Sanders testified he was not asked by Clint Johnson whether he saw any drug activity at Mr. Barrett's on September 19 or 20.  Sanders testified that if Johnson had asked him about drug activity at Mr. Barrett's on September 19 or September 20, he "probably" would have told him that he saw no drug activity.  Sanders then testified, "I didn't see him doing nothing."  (R. 2608-2610);

---

[5]  Sanders placed the date of this alleged trip to Mr. Barrett's cabin as September 19 or 20, 1999.  The state search warrant was issued on September 20, 1999.  Of course, the precise dates of Sanders's alleged trips to Mr. Barrett's property are unclear.  *E.g.,* R. 2518-21, 2609.

4(a).   After allegedly being at Mr. Barrett's in mid-September, 1999, Sanders testified that Johnson directed him to again go back to Mr. Barrett's property. Sanders testified that he told Johnson what he observed on this supposed trip to Mr. Barrett's. According to Sanders, the pretext for going to Mr. Barrett's on this last occasion was to ask Mr. Barrett about the title to an automobile. Sanders claimed to have been accompanied by his nephew. Sanders thought that either he or his nephew asked Mr. Barrett if he had any drugs available. Mr. Barrett apparently had no methamphetamine. The only drugs supposedly seen by Sanders was a joint of marijuana, which he, his nephew, and Mr. Barrett smoked in Mr. Barrett's cabin. (R. 2618-22);

4(b).   Sanders allegedly reported to Clint Johnson in the last meeting that he had seen guns at Mr. Barrett's. He had also reported to Johnson seeing firearms at Mr. Barrett's residence when he allegedly visited in August, 1999. To the extent Johnson in his affidavit presented this information as a new development to justify altering the existing bench warrant to a no-knock warrant, Johnson misled the court. Authorities had long been aware that like many rural dwellers, Mr. Barrett had firearms on his property. In any event, the search warrant affidavit was directed at drug activity only, not the possession of weapons. (R. 2623);

5.   Sanders's gave conflicting accounts of alleged visits to Mr. Barrett's shack which, together, show he did not observe any drug transactions there. On direct examination, Sanders testified that in August 1999 he went to Mr. Barrett's home with a person identified only as "Ronny," and saw Mr. Barrett hand something to "Ronny." Sanders testified that the alleged trip was for the purpose of buying drugs. At the close of cross-examination, defense counsel walked Sanders through the information Sanders had given to Clint Johnson, according to Sanders's testimony on cross-examination. Sanders agreed that when he was supposedly at Mr. Barrett's in July 1999 (a) he did not see any drugs, (b) did not see any manufacturing or

attempted manufacturing of methamphetamine, and (c) did not do any drugs with Mr. Barrett.

Therefore, Sanders testified that based on his alleged July trips to Mr. Barrett's property he

would have told Johnson *nothing* about Mr. Barrett engaging in drug activities.  Sanders also

testified that when he supposedly went to Mr. Barrett's place in August 1999, with his sister and

"Ronny," he saw no drugs, and told Johnson he saw no drugs or any evidence of drug

manufacturing.  Sanders admitted he did not go into Mr. Barrett's house with "Ronny" (he

waited in the car), and never testified he saw Mr. Barrett go outside.  How he saw any alleged

drug transaction is therefore a mystery.  (R. 2599-2601, 2625-28).

Sanders agreed with defense counsel that he saw no drug manufacturing or other

drug activity at Mr. Barrett's in September 1999, other than smoking a "joint" on what he

claimed was his last trip to the property before the raid.  Aside from smoking a joint with Mr.

Barrett on this occasion, the only drug activity he witnessed or participated in at Mr. Barrett's

residence was when he and Movant, who was also a methamphetamine user, shot

methamphetamine together.  (R. 2625-28).

Sanders's cross-examination testimony also belied Johnson's claims (a) that

Sanders informed him that Mr. Barrett conducted drug transactions at night because there were

fewer police around, and (b) that Mr. Barrett kept a "large quantity" of drugs in his house at night

because he believed the police could not conduct a nighttime search.  Of course, no "large

quantity" of drugs was found when Mr. Barrett's residence and property were searched by the

authorities.

After Sanders was cross-examined, AUSA Littlefield asked to take a "bathroom

break."  (R. 2630).  The real purpose of the break was for Littlefield to talk to Sanders about his

testimony.  Sanders admitted Littlefield talked to him during the break.  At first, he denied

anything was discussed except how much longer he would be on the stand. In the next breath, he then admitted that Littlefield "may have" asked him whether he was confused about dates. Sanders did not "think" Littlefied asked him about the substance of his testimony on cross-examination. (R. 2239-40, 2642).

After speaking to Sanders during the break, Littlefield sought to repair the damage inflicted by Sanders's remarkably inconsistent testimony by having Sanders contradict, within a matter of a few minutes of the cross-examination having ended, certain aspects of the testimony he gave when questioned by defense counsel. Sanders's abrupt about-face on re-direct alone demonstrates that this is a witness who cannot be believed about anything, and demonstrates that he was anything but the "reliable" confidential informant Clint Johnson claimed him to be in the search warrant affidavit.

On re-direct, and in contrast to his testimony on cross-examination, Sanders stated that when he went to exchange car keys at Mr. Barrett's residence three to four days before Trooper Eales's was killed, Mr. Barrett sold drugs to Geniece Thomas.[6] He also claimed he went to Mr. Barrett's residence with Thomas on more than two occasions to buy drugs. He also claimed that he saw drug activity practically every time he supposedly went to Mr. Barrett's property, and that he would have reported any such drug activity to his alleged "handler," Clint Johnson. Changing up his testimony from cross-examination, Sanders then claimed that on his last alleged trip to Mr. Barrett's, he saw a substance in Mr. Barrett's cabin that he believed to be

---

[6] "Geniece" is the way Ms. Thomas's name is spelled in the transcript. Her name is actually Janesse Thomas. What she has to say about Mr. Sanders's account of their alleged trips to buy drugs at Mr. Barrett's residence is addressed in the portion of this claim relating to counsel's failure to investigate and effectively impeach the informant witnesses. (*See also* Exhibit 13.)

methamphetamine.  Again in contrast to his testimony on cross-examination, Sanders claimed he may have even been at Mr. Barrett's after the last supposed trip he testified about on cross, and that he could not remember how many times, during the summer of 1999 and into September 1999, he had been to Mr. Barrett's property.  (R. 2531-38).

On re-cross, Sanders contradicted himself about whether he shot methamphetamine daily, gave conflicting answers as to whether there was a drug transaction at Mr. Barrett's when he supposedly went there with Geniece Thomas the first time, and again contradicted his testimony on cross-examination by stating that when he allegedly went to Mr. Barrett's with his nephew, he saw methamphetamine in addition to marijuana.  (R. 2642-48).

After Sanders testified, defense counsel re-urged the motion to suppress, but did so in a manner that did not comport with prevailing professional norms.  (R. 2677-80).  Defense counsel argued orally that the motion to suppress was being re-urged because, based on Sanders's testimony on cross-examination, the warrant was based on "faulty" information.  Clint Johnson, who had been questioned about the search warrant affidavit during the hearing on the motion to suppress, related certain information contained in the affidavit that Sanders specifically denied giving.  Specifically, page 2 of the search warrant affidavit stated that the C.I. (Sanders) had advised Johnson within the last 72 hours he had been at Mr. Barrett's residence and observed Mr. Barrett present a quantity of white powder, which Mr. Barrett represented was methamphetamine.  On cross-examination, Sanders stated there had been no discussion about what Sanders thought was methamphetamine in Mr. Barrett's kitchen.  According to Sanders's testimony on cross-examination, there had been no representation that this substance was methamphetamine, and no presentation of the white powder to Sanders.  The search warrant affidavit went on to state that the C.I. (Sanders) observed Mr. Barrett divide and exchange a

portion of white powder for a quantity of money.  Sanders testified on cross-examination that this did not happen.  Defense counsel pointed out they were confronted with all this by the answers Sanders gave on cross-examination; there had been no opportunity to interview Sanders before he testified.

AUSA Littlefield responded that Clint Johnson had testified at the hearing on the motion to suppress, had testified under oath what he had been told by the C.I., and what facts had formed the basis for the search warrant affidavit.  (R. 2679.)

The court instructed defense counsel to put the motion in writing, and for the Government to respond in writing.  The court stated that it would either hold a hearing, if such was deemed necessary, or would rule on the pleadings.  (R. 2679.)  As pointed out by the Government in its response to the renewed suppression motion:

> The entire basis of defendant's Motion to Reurge the Motion to Suppress arises from "testimony" of Charles Sanders which was elicited on cross-examination. Specifically, Barrett relies upon the statement attributed to Sanders in the affidavit that he assumed a powder to be methamphetamine. Sanders purportedly testified that he did not advise Clint Johnson that Barrett represented such powder as methamphetamine to him purportedly denied telling Clint Johnson that he had observed Barrett divide and exchange a portion of white powder for quantity of money. [sic]  Barrett's Motion to Reurge ignores substantial portions of Sanders' testimony on direct and redirect examination.

(Doc.  231 at 1).

The court ruled on the renewed motion to suppress by written order, without conducting an evidentiary hearing.  (Doc. 253).  In its ruling, the court noted that in the original motion to suppress, there was no *Franks* allegation, a rather irrelevant observation because the basis for the *Franks* claim occurred during trial.  Instead, it had been alleged that the C.I. did not really exist.  The court summarized at length aspects of Sanders's testimony, and concluded that, in light of the testimony of Johnson and Sanders, *as well as other witnesses to activities at Mr.*

*Barrett's residence*, there was "absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful."  Because Johnson accepted as true what he was told by Sanders, and because Johnson had found Sanders to have given reliable information in the past, "the affidavit was properly supported."  Based on the totality of the testimony, it was concluded that Mr. Barrett had "not even established that the information provided in 1999 by the informant was untruthful or unreliable."  Thus, the court concluded, facts recited in the affidavit "could not have been made with deliberate or reckless disregard for the truth."  (Doc. 253 at 7).

Had defense counsel forcefully and properly re-urged the motion to suppress based on *Franks v. Delaware, supra,* the motion by all rights should and would have been sustained.  Moreover, as shown below, the court's order is seriously flawed.  Trial counsel urged only one (or at best two) grounds in support of the renewed motion to suppress based on *Franks.* These revolved around Sanders's assumption that a powder he observed at Mr. Barrett's residence was methamphetamine; Sanders's testimony on cross-examination that Mr. Barrett did not represent the powder to be methamphetamine; and the fact Sanders did not tell Johnson he saw Mr. Barrett divide and exchange a portion of the white powder for money.  *Northrop v. Trippett,* 265 F.3d 372, 382-85 (6th Cir. 2001)(counsel ineffective for failing to pursue meritorious motion to suppress; here, counsel was ineffective for failing to professionally and thoroughly re-urge a motion to suppress based on Sanders's trial testimony.)

The one or two areas of impeachment cited by the defense simply scratched the surface.  Based solely on the cross-examination of Sanders (as well as other factors that could have been used to impeach Sanders, but were not, as is discussed in another subpart of this claim for relief and Claim 5, *infra*), the defense could have argued much more, and would have been

entitled to an evidentiary hearing and suppression of the evidence.  Aside from what was stated in the re-urged motion to suppress, counsel could have argued the following:

1.     that Sanders had never seen drug manufacturing or attempted drug manufacturing at Mr. Barrett's residence at any time, which conflicted with the averment in the affidavit that Mr. Barrett kept a "large quantity" of drugs at his house;

2.     that Sanders witnessed no drug activities of any kind on Mr. Barrett's property in July 1999, which also conflicts with Johnson's claims that Sanders said Mr. Barrett kept a large quantity of drugs and engaged in repeated drug sales at night;

3.      that Johnson was recklessly indifferent to the truth in that he did not ask Sanders whether he observed drug activity at Mr. Barrett's residence in mid-September 1999 when he supposedly was there with his girlfriend Ms. Thomas to exchange a set of car keys; if Johnson had asked, Sanders would have contradicted the affidavit because he "probably" would have told Johnson he witnessed no drug activity, because "I didn't see him doing nothing";

4.     that Johnson knew Sanders had not informed him of methamphetamine activity as shown when Sanders testified that after Johnson told him to go back to Mr. Barrett's in September 1999 – after Sanders had supposedly been there just a short time before – Sanders or his "nephew" asked if Mr. Barrett had any drugs available, but there was no methamphetamine, and the three of them simply smoked marijuana;

5.      that Sanders further testified to Johnson's indifference when, summarizing what he supposedly knew, Sanders repeated he witnessed no drug activity at Mr. Barrett's in July 1999, and told Johnson nothing about any drug activity at Mr. Barrett's during that month;

6.      that, consistent with the court's order, there was no drug activity witnessed in August, 1999; and that, other than smoking a joint with Mr. Barrett and his "nephew," Sanders witnessed no drug activity at Mr. Barrett's in September, 1999.

Again, Sanders's claim that he had seen guns in Mr. Barrett's residence provided no probable cause for a drug search warrant, which is what Johnson secured. Nor did Sanders's claim that Mr. Barrett had threatened law enforcement provide probable cause for a drug search warrant.

Counsel also unreasonably failed to argue evidence of Johnson's reckless disregard for the truth. Sanders testified he was in regular contact with Johnson and continued to use drugs steadily. Sanders acknowledged in his testimony that his drug use seriously impaired his ability to recall and relate information accurately. Sanders testified that Johnson, in effect, made a point of not asking Sanders about his own drug use or, on occasion, what he saw or failed to see at Mr. Barrett's residence. This demonstrated Johnson could not rely reasonably on Sanders for anything. Counsel also unreasonably failed to argue that Sanders would radically change his testimony depending simply on which lawyer was asking him questions. Johnson surely would have seen the same tendency in Sanders to say whatever pleased the authority figure asking him questions. Based on his supposed repeated and close contact with Sanders, Johnson had to be well aware of this fact.

In sum, Sanders not only disavowed the statements Clint Johnson attributed to him, he repeatedly asserted that Johnson *had not asked* about Sanders's own drug use – which would impair his perceptions and his truthfulness – or what he supposedly observed. This testimony would have shown that Johnson made material false statements in the affidavit for search warrant both about the informant's alleged observations and Johnson's own grounds for trusting the informant. These false statements negate *the entirety of the warrant affidavit*. At a minimum, it is clear, based on Sanders's testimony on cross-examination, that Johnson recklessly disregarded the truth in reciting the "facts" supporting "probable cause" for the search warrant. *United States v. Deleon,* 979 F.2d 761 (9th Cir. 1992); *United States v. Calisto,* 838 F.2d 711 (3rd Cir. 1988); *United States v. Pritchard,* 745 F.2d 1112 (7th Cir. 1984)(*Franks* violations established, including instances of affiant reporting information informants never supplied).

In its order denying the renewed motion to suppress, the court did not recite all the facts bearing on the use of false statements by Johnson, or Johnson's reckless disregard for the truth. Had these matters been urged, there is a reasonable probability that the outcome of the renewed suppression motion would have been different. At a minimum, had all the evidence from Sanders's cross-examination been marshaled, the defense surely would have been entitled to the evidentiary hearing under *Franks* that was denied when the court simply ruled on the pleadings. *United States v. Johns,* 851 F.2d 1311 (9th Cir. 1988), *cert. denied,* 505 U.S. 1226 (1992).

In its order, the court seemed to rely on the testimony of other informant witnesses to buttress the credibility of Sanders and Johnson. Not only could counsel, had they conducted a reasonable investigation (or had the time to conduct a reasonable investigation), have impeached many of these other witnesses (see below), the court could not properly rely on years-after-the-

fact testimony to find that the search warrant affidavit, founded solely on information from Charles "Monk" Sanders, was based on the truth, rather than outright fabrication or a reckless disregard of the truth.

The *Franks* issue, and counsel's failure to effectively argue it, was at least partially framed by the record.[7]  The issue was not raised on direct appeal.  Because the issue was obviously meritorious, even with the record that was made, there could be no reasonable strategic basis for omitting it.  The failure to raise this issue was professionally unreasonable and prejudicial.  *See* Claim 19, *infra*.

**2.      Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense.**

The Government's theory of the case was that Mr. Barrett anticipated a police raid, prepared for it, and intended to use deadly force if the police came to his property.  The prosecution argued that when Mr. Barrett began firing his weapon, he was well aware that the police, rather than trespassers, had arrived.  This argument was highly relevant to count 3 of the superseding indictment, which charged that Mr. Barrett intentionally killed a state law enforcement officer in the performance of his official duties.  (Doc. 52.)  This is the count of conviction for which Mr. Barrett received the death penalty.  (Docs. 258, 285.)

In the first stage of trial, the jury was instructed that among the essential elements of the offense charged in count 3 were that Mr. Barrett intentionally killed the victim, knowing or

---

[7]  *Brady* evidence suppressed by the Government, and/or newly discovered evidence, places the *Franks* issue in a much stronger light than even existed on the trial record.  This is addressed in a separate claim for relief.

having reason to know that the victim was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties. (Doc. 240; R. 4262-64, 4266-67.)

Mr. Barrett shows below that trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from eyewitnesses Toby Barrett and Alvin Hahn that would have rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting. Mr. Barrett also shows that the actions of the Tact Team fell outside professional standards for law enforcement and that one aspect of the team's recklessness was the use of unprofessional procedures that minimized the chances of being recognized as law enforcement. (Exhibit 44.) In addition to these failings, a proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the Government's portrait of Mr. Barrett was wholly inaccurate. Rather than the intentional and remorseless killer who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the Government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals. The testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case as to both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses.

Defense counsel's consultation with a mental health professional in preparation for Mr. Barrett's trial was limited to retaining Dr. Jeanne Russell of Tulsa, Oklahoma, to reprise

the risk assessment she had done in preparation for a second stage proceeding in state court, and to conduct research on memory loss stemming from traumatic events. Due to counsel's failure to conduct a proper investigation, counsel never had Mr. Barrett evaluated with the full range of psychiatric and neuropsychological testing that would have shown him to be the antithesis of the Government's picture.[8] Professional norms of criminal practice, particularly in capital cases, tell attorneys that they should secure expert assistance. ABA Guidelines 10.7, 10.10.1, and 10.11. Counsel's failures to have Mr. Barrett evaluated in connection with first-stage intent or mental state issues, in light of the defense arguments made at trial respecting how the shooting occurred, constitute deficient performance. *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003).

The results of an accurate and reliable mental health evaluation demonstrate that trial counsel's failings were prejudicial. George W. Woods, Jr., M.D., a Board Certified psychiatrist who specializes in psychiatry and neuropsychiatry, performed a clinical and forensic evaluation of Mr. Barrett in February 2009, and concluded to a reasonable degree of medical certainty, *inter alia*, Mr. Barrett's mental functioning was impaired at the time of the offense by psychiatric illness and significant brain damage, which prevented him from knowing or deliberating on the nature of his responses to the police incursion before he acted. Dr. Woods concluded that at the time of the charged offenses, Mr. Barrett suffered from several major brain disorders including Bipolar Disorder, Post Traumatic Stress Disorder and damage to his brain in the areas that are necessary to exercise judgment and reasoning. Among the most significant functional effects of Mr. Barrett's disorders are a heightened state of fear of imminent

---

[8] Claims 1 and 3 show that Mr. Barrett had constitutional and statutory rights to expert assistance to refute the testimony of Government witnesses.

annihilation coupled with an inability to understand or regulate his reactions – including overreactions – to perceived threats.  Thus, when the events unfolded at the time of the offense, Mr. Barrett could not and did not know right from wrong, and acted with the distorted perception that his response was necessary to keep intruders from killing him.  (Exhibit 117.)

Dr. Woods's evaluation was based on reliable information that was reasonably available to trial counsel through timely investigation.  This information included social and medical history documents, the opinions of experts consulted during prior proceedings, as well as witness accounts that documented Mr. Barrett's personal as well as family history of mental illness.  The data Dr. Woods relied on, and which was available to trial counsel, also included a neuropsychological evaluation performed by Dr. Myla Young.

Dr. Young has a wealth of experience, has published in peer reviewed journals, and has lectured and instructed other professionals in her field on a frequent basis.  (Appendix to Exhibit 89, curriculum vitae.)  She administered sixteen hours of neuropsychological testing to Mr. Barrett over a period of three days, and reviewed his relevant educational, medical and mental health records.  (Exhibit 89 at 7-24.)

Dr. Young's testing determined that Mr. Barrett has significant brain damage and resulting brain dysfunction.  This damage primarily involves the prefrontal and temporal cortices of the brain.  Proper functioning of these areas of the brain is necessary "for the brain to effectively communicate information and function effectively."  The severity of Mr. Barrett's brain dysfunction has a negative impact on each and every aspect of Mr. Barrett's daily functioning.

Most especially, Mr. Barrett's organic impairments would negatively impact his abilities to "organize, think, reason, plan, anticipate consequences of actions, and change actions

as needed based on information he receives from the environment." (Exhibit 89 at 24.) Mr. Barrett's disabilities are further exacerbated under "conditions of complexity and/or highly stressful situations." (Exhibit 89 at 24.) Mr. Barrett is a "concrete thinker," whose executive function, which controls the ability to think, organize, problem solve, and change actions based on the information he receives, is severely compromised. (Exhibit 89 at 11, 13.) Because of the significant impairments to Mr. Barrett's temporal cortex, he has difficulty processing visual information and is abnormally subject to feelings of fear and paranoia, with consequent tendencies to impulsiveness and aggressive outbursts. (Exhibit 89 at 13.) Mr. Barrett's ability to actively process and comprehend information is compromised. This includes the ability actively to process visual information, in the "here and now," or as it unfolds. (Exhibit 89 at 14, 15, 19.) In lay terms, Mr. Barrett acts or reacts before he is able to accurately perceive and process what is going on around him, a dysfunction that is especially heightened, as noted, in stressful situations. (Exhibit 89 at 14, 24.) Mr. Barrett has moderate to significant impairments in his ability to visually scan and accurately recognize information. (Exhibit 89 at 20.) The "fluency" with which Mr. Barrett interprets visual information, and the manner in which he processes such information, is also significantly impaired. (Exhibit 89 at 21, 23.)

As Dr. Woods explained, the accuracy and reliability of Dr. Young's neuropsychological tests results are medically unassailable:

> [N]europsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results. The successful manipulation of test data to exaggerate measures of neurological impairment in a manner that eluded detection by imbedded validity scales would have required Mr. Barrett to have specific knowledge and mastery of neuroanatomy and test construction.

Based on his consideration of these and other psychiatric data, Dr. Woods concluded:

[¶]     Mr. Barrett meets diagnostic criteria in the DSM-IV-TR for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

[¶]     Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).

***

[¶]     Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial.

(Exhibit 117 at ¶¶ 66-68.)

The concurrent findings of Dr. Young and Dr. Woods show that,

[¶]     Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms . . . .

* * *

[¶]     He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]     Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life,

he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]     He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]     Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]     Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]     Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]     Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]     My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Exhibit 117 at ¶¶ 69-78.)

Mr. Barrett's trial counsel were ineffective for failing to utilize whatever resources they had to discover these facts about their client's organic brain impairments. Prevailing professional norms called upon trial counsel to investigate their client's medical history prior to trial so that counsel could make informed decisions about what strategies to pursue.  They were certainly on notice that Mr. Barrett had mental problems, based on existing mental health records from Eastern State Hospital, Sequoyah Memorial Hospital, Wagoner Community Hospital, and the Bill Willis mental health facility in Sallisaw, as well as the preliminary results of the mental health investigation conducted by predecessor counsel in the state court proceedings.  Yet trial counsel did not retain an expert prior to trial who could advise them regarding mental state defenses that would be available at either stage.

If counsel had undertaken reasonable steps to investigate, prepare and present evidence regarding Mr. Barrett's severe organic deficits, the first stage defense of lack of intent, and the arguments that Mr. Barrett was unaware that the police were on his property and was simply reacting in the moment in a fearful and panicked state to a perceived threat by criminal trespassers would have been strengthened immeasurably.  Due to Mr. Barrett's inability to correctly process information, especially visual information, it could have been argued that even if, as the police witnesses claimed, some of the automobiles which converged on Mr. Barrett's

property had their emergency lights engaged, Mr. Barrett did not recognize this and instead simply reacted by firing on the vehicle which all witnesses agreed looked like an ordinary automobile. At a minimum, this evidence would have been critical in contesting the intent element of count 3 which, as noted, required Mr. Barrett to have a specific intent to kill someone who was known to him to be a law enforcement officer engaged in official duties.

The exculpatory nature of expert testimony regarding Mr. Barrett's numerous and severe psychiatric, psychological and organic impairments could have been buttressed by reasonably available testimony from lay witnesses about Mr. Barrett's mental state. In addition to providing contemporaneous, real-world accounts of Mr. Barrett's impaired mental functioning, the testimony of such witnesses would have confirmed that Mr. Barrett's disabilities pre-dated the charged offenses and thus clearly impaired his mental state at the time in question. Family witnesses interviewed in connection with the current proceedings describe an individual who had been mentally and emotionally troubled from childhood on; who was subject to inexplicable and wild mood swings; who was paranoid, suspicious and overly vigilant; who had suffered from deep and prolonged episodes of depression; who reacted without thinking or correctly perceiving what was going on around him; who handled stress poorly and who reacted under stress; and who retreated to a safe place when he felt threatened. (See, e.g., Exhibit 103; Exhibit 96; Exhibit 97; Exhibit 98; Exhibit 93; Exhibit 86; Exhibit 81; Exhibit 99; Exhibit 74; 101; Exhibit 79.) None of these witnesses, if they were interviewed at all by trial counsel, was questioned about Mr. Barrett's mental state, either with respect to the first or the second stage of trial.

The accurate picture of Mr. Barrett and his mental state, and how it bore on his intent, was further evidenced by reasonably available records of Mr. Barrett's previous hospitalizations, which counsel could have obtained, but unreasonably failed to do so. In 1986,

Mr. Barrett was at Eastern State Hospital in Vinita after shooting himself in a suicide attempt. Among other things, he was diagnosed with bipolar disorder. In 1995, he was again hospitalized because he was "losing [his] mind." On this occasion, Mr. Barrett was diagnosed with an acute psychotic reaction. Mr. Barrett had also received mental health treatment, as noted, at Wagoner Community Hospital and the Bill Willis facility in Sallisaw. *(See* Exhibit 147.) As discussed in detail in Mr. Barrett's claim that he was denied effective assistance of counsel in the penalty phase of trial, his family history, on both his mother's and father's side, is replete with serious mental illness, suicide and suicide attempts. (Exhibit 117.)

Not only would all of this evidence have been critical in attacking the intent element of count 3, it also would have established the basis for a defense of not guilty by reason of insanity, as well as an instruction on lesser included offenses, at least with respect to count 3.[9]

Tenth Circuit Pattern Instruction 2.54 outlines the elements of voluntary manslaughter under 18 U.S.C. section 1112(a), § 2. Voluntary manslaughter is murder without malice, upon a sudden quarrel (which does not apply here) or heat of passion. Homicide is voluntary manslaughter where a defendant, in a sudden heat of passion and without malice, intentionally kills the victim, or acts recklessly with extreme disregard for human life. Heat of passion is defined as passion, fear or rage in which the defendant loses normal self-control, as a result of a circumstance or circumstances that provoke such a passion in an ordinary person, but which do not justify the use of deadly force. *United States v. Scafe*, 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides*, 820 F.2d 1232, 1242 (10th Cir. 1987).

---

[9] As argued in Claim 9, Mr. Barrett was denied his due process rights under the Fifth Amendment when the court failed to give a defense theory instruction, and denied requests from both the government and the defense for a manslaughter instruction.

The mental state required for voluntary manslaughter would apply to all three of the counts charged against Mr. Barrett, because it negates malice altogether.  E.g., *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975); *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985)("a defendant in a federal murder case who has sufficiently raised a heat of passion defense [is] entitled to instructions informing the jury of the theory of defense and the Government's duty to prove beyond a reasonable doubt the absence of a heat of passion in order to obtain a murder conviction."); *United States v. Serawop*, 410 F.3d 656. 660-70 (10th Cir. 2005)(citing *Lofton*'s holding that in order to establish malice, the prosecution must prove the absence of a heat of passion beyond a reasonable doubt when it is an issue in the case).

Expert and lay testimony would have raised the issue that Mr. Barrett, even if he had been able to know the difference between right and wrong (which he could not) when confronted with a strange vehicle barreling onto his property and striking his porch, would not have been aware of a police presence, but simply reacted out of a passion, fear or rage in which whatever self-control he possessed was lost, due to the circumstance of the middle-of-the-night intrusion onto his property of automobiles he could not discern as police vehicles.

In sum, trial counsel, had they acted, or been permitted to act, in a manner consistent with prevailing professional norms, would have investigated and presented evidence from Toby Barrett and Alvin Hahn that corroborated several law enforcement witnesses, and showed that at the critical moment, Mr. Barrett likely could not see any emergency lights or other indications that the vehicle heading toward his house and young son contained law enforcement officers.  Trial counsel also would have investigated Mr. Barrett's background and medical history and, through consultation with appropriate experts, found extensive evidence of organic brain dysfunction, bipolar disorder and PTSD.  Had this evidence been produced, there is a

reasonable probability that the outcome of the first stage of trial would have been different.  This evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to count 3, and would have supported either outright acquittal or a finding that, at most, Mr. Barrett was guilty of voluntary manslaughter.  *Jennings v. Woodford,* 290 F.3d 1006, 1009, 1015-19 (9th Cir. 2002)(counsel ineffective for failing to investigate and produce mental health evidence which would have aided defense that accused lacked the capacity to form the intent to commit first degree murder; defendant was a long-term methamphetamine addict, had previously attempted suicide and was committed to a mental hospital, otherwise had a history of self-injury, and had been diagnosed as a schizophrenic); *Seidel v. Merkle,* 146 F.3d 750, 756-57 (9th Cir. 1998), *cert. denied,* 525 U.S. 1093 (1999)(counsel ineffective for failing to investigate and produce evidence of defendant's mental problems, including PTSD, which would have served to negate malice and support self-defense claim); *Williamson v. Ward,* 110 F.3d 1508, 1518-21 (10th Cir. 1997)(counsel ineffective for failing to investigate and present evidence of defendant's extensive mental health problems, which would have assisted a claim of incompetency to stand trial and aided in a first stage mental health defense); *Stewart v. Wolfenbarger,* 468 F.3d 338, 357, 361 (6th Cir. 2006)(counsel ineffective for failing to call witnesses in support of defense theory (alibi)).

> **3.      Due to the unreasonable failure of Mr. Barrett's trial counsel to retain expert assistance, Mr. Barrett was tried while incompetent.**

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, compulsory process, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, a trial free of

materially false and misleading evidence, to confront and cross examine witnesses, and to a jury trial as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution, by virtue of trial counsel's prejudicial failure wholly or adequately to investigate Mr. Barrett's mental state and functioning before and during trial, and further failure to invoke adequate procedures, and obtain the assistance of experts, necessary evidence and/or any other reasonable and constitutionally requisite means by which to evaluate, assess and diagnose Mr. Barrett's underlying mental diseases and defects, and accurately and reliably determine his mental competency to stand trial.

As a corollary to a defendant's due process right not to be tried or sentenced while he is mentally incompetent, *see*, *e.g.*, *Medina v. California*, 505 U.S. 437, 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966), "judges must depend to some extent on counsel to bring [competence] issues into focus." *Drope*, 420 U.S. at 176-77. Whenever information that is made known to the trial court raises a doubt that a defendant is mentally competent to stand trial, the minimal guarantees of federal and state due process require the suspension of criminal proceedings until the defendant's competency can be determined on the basis of an adequate, thorough and reliable mental health evaluation. *Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997). Defense counsel are therefore constitutionally obligated to vindicate this rudimentary trial right by bringing evidence suggesting incompetence to the attention of the court. *Id.*; *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990).

Trial counsel failed to investigate Mr. Barrett's mental health as it related to competency, to guilt-innocence phase defenses, and to punishment phase mitigation, and they failed to raise and preserve numerous legal issues involved, all to his prejudice. Counsel

unreasonably failed to complete the investigation of Mr. Barrett's social history and background, and failed to consult with qualified mental health experts, including a neuropsychologist, despite the existence of readily available evidence of which counsel were or should have been aware including, but not limited to Mr. Barrett's history of psychiatric diagnoses and treatments, and his family history of mental illness.  "It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental problems." *Williamson v. Ward*, 110 F.3d, at 1518-19 (quoting *Bouchillon v. Collins*, 907 F.2d, at 595).

As a result of counsel's unreasonable failing, no one working on Mr. Barrett's behalf obtained requisite social history data, nor did any competent mental health professional conduct testing and other evaluation methods necessary to perform a reliable assessment of Mr. Barrett's competency including, but not limited to medically indicated neurological and neuropsychological testing, which was necessary to determine the existence, nature and severity of Mr. Barrett's brain damage and mental illnesses.

If counsel had conducted a professionally adequate investigation, including retaining competent mental health professionals, they would have learned that Mr. Barrett suffered from a life-long history of impaired functioning that was medically indicative of a neuropsychiatric condition, which included organic brain damage associated with, or superimposed on, chronic major mental illnesses, Bipolar Disorder and Post Traumatic Stress Disorder (PTSD).   Access to, consideration of and reliance on the results of the neuropsychological testing that was medically and forensically indicated would have enabled any competent expert to inform counsel that the functional impairments associated with the neurologically damaged areas of Mr. Barrett's brain were consistent with impairment of the

domains necessary for trial competence, such as executive functioning; and that Mr. Barrett would not be able to track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise his legal rights.

Any reasonably diligent counsel informed of such information would have been obligated to request a hearing to determine Mr. Barrett's competency. *See*, *e.g.*, *Williamson v. Ward*, 110 F.3d 1514-17 (counsel ineffective for not raising a competency claim where defendant had been diagnosed with and treated for mental illness); *see also*, *Barnett v. Hargett*, 174 F.3d 1128, 1135-36 (10th Cir. 1999) (defendant's history of mental illness and counsel's belief that defendant was presently incompetent among the factors supporting a bona fide doubt as to competency); ABA Standards, Mental Health, Standard 7-4.2 ("Defense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence").

To establish the prejudice of counsel's failure to seek a timely competency hearing, Mr. Barrett must show only a reasonable probability that he was incompetent at the time of his trial. *Hull v. Kyler*, 190 F.3d 88, 105 (3d Cir. 1999) (citing *Eddmonds v. Peters*, 93 F.3d 1307, 1317 (7th Cir. 1996), *cert. denied*, 520 U.S. 1172 (1997); and *Felde v. Butler*, 817 F.2d 281, 282 (5th Cir. 1987)); *see also Williamson*, *supra*, 110 F.3d at 1519 (same). "[T]he evidence of Mr. [Barrett's] mental state which we have recited at length throughout this [petition] establishes a reasonable probability that he was not competent to stand trial." *Williamson*, *supra*, 110 F.3d, at 1519. The documentary evidence submitted in support of Mr. Barrett's petition demonstrates that he is in the impaired range on the critical indicators of brain damage to his frontal lobes and executive functioning. Mr. Barrett's previous psychiatric diagnosis of Bipolar

Disorder, made by independent state clinicians, is supported by the observations of lay witnesses over the course of his life. The medical indications in his social history and life-time functioning, which meet diagnostic criteria for PTSD, are also documented by reliable sources. Moreover, the congruence of all the clinical data, including social history, testing and reported symptoms demonstrates that Mr. Barrett is not malingering or exaggerating his condition.

Mr. Barrett's brain damage, coupled with his disruptive psychotic illness, left him unable to appreciate the nature of his actions at the time of the offenses for which he was tried and convicted, and left him unable rationally to understand the proceedings or to assist in his defense during the period in which he was tried. As Dr. George Woods, Jr. concluded, "Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial." (Exhibit 117 at 81.)

Rather, Mr. Barrett's ability to understand and track the judicial proceedings was substantially impaired by the confluence of his psychiatric disorders and measured brain damage. The fragments of police bullets in Mr. Barrett's body caused him continuing pain, and provoked an immunological reaction, all of which served as "built-in reminders" of his life-threatening trauma. The ongoing distortion and distraction of Mr. Barrett's PTSD were compounded by the racing thoughts symptomatic of the disabling "manic form" of Bipolar Disorder. *See Williamson v. Ward*, 110 F.3d, at 1519; Exhibit 117 at ¶ 80. These disabling impacts on Mr. Barrett's mental state were, in turn, exponentially increased by the effect of his brain damage that left Mr. Barrett being "unable to get unstuck." (Exhibit 117 at ¶ 80.) This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Exhibit 117 at ¶¶ 59, 80.)

Trial counsel's unreasonable omissions were exacerbated by the court's infliction of an electric shock belt on Mr. Barrett.  (*See* Claim 7, *infra*.)

In light of this record, it is clear that trial counsel's "lack of investigation created a substantial risk that [their] client's due process rights were violated by standing trial while incompetent, and therefore undermines . . . confidence in the reliability of the adversarial testing process."  *Williamson v. Ward*, 110 F.3d, at 1519.  Accordingly, Mr. Barrett should be granted a new trial.  *Ibid.*

> **4.      But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.**

Claim 1 discussed the improper *ex parte* hearing held between the Court and the Government on the prosecution's sealed motion to delay disclosing the identities of their seven informant witnesses.  During this hearing, the Court criticized the Government for failing to raise the issue sooner.  The court also found the Government's justification for throwing a veil of secrecy over these witnesses unconvincing, because literally no evidence was produced that any of them had been threatened or were in any sort of danger.  The Government merely represented that these witnesses, all of whom had criminal records, had an undefined and inchoate "fear" that they "may" be in danger if they testified.  The Court made the obvious point that it envisioned a long continuance to allow the defense sufficient time to investigate these witnesses and prepare for their testimony.  (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 20, 22-23, 27.)

None of this was revealed to the defense when they were finally allowed to participate in the hearing.  Instead, counsel unreasonably blundered into an "arrangement" with the Government to "interview" these witnesses – in the presence of the Government yet – to find

out what they were going to say. (Tr. 9/13/05 Hr'g at 27; R. 840-43.) There were no reports of anything the witnesses told the Government, presumably because Government counsel – particularly AUSA Mike Littlefield – interviewed them alone so as to claim attorney work-product as a shield to discovery.

The defense was literally flying blind. The "arrangement," doomed as it was from the start to be anything approaching an adequate substitute for a competent investigation, backfired when all but one of the witnesses refused to be interviewed by the defense. The obvious and reasonable path of moving for a continuance, which the court itself knew was the proper course, was not taken. As a result, the defense was woefully unprepared to effectively cross-examine these witnesses, and failed to conduct whatever real investigation could have been accomplished in the little time that remained before the snitches hit the stand. Had a continuance been asked for, it would have been granted, based on the court's own remarks during the *ex parte* hearing. Because a continuance was not requested, and because trial counsel otherwise failed to conduct an adequate investigation, a wealth of evidence that would have destroyed the credibility of the informant witnesses was never heard by the jury.[10]

A great deal of evidence was available to impeach the Government's key witnesses. As set forth in Claim 5, *infa*, the Government suppressed material impeachment evidence related to these witnesses and engaged in improper delay tactics to prevent trial counsel

---

[10] Direct appeal attorney Mark Henricksen, who was assisted by lead trial counsel Roger Hilfiger on the appeal, questioned Mr. Hilfiger about why he did not seek a continuance. Mr. Hilfiger did not dismiss the merits of moving for a continuance, but instead stated that he simply did not think one would be granted, even though he recognized the importance of the seven snitches to the Government's case. (Exhibit 29.) Of course, the court's comments at the improper *ex parte* hearing, of which Mr. Hilfiger was never made aware during trial, indicate otherwise.

Amended § 2255 Pet.          79          *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

from discovering the evidence independently. Whether due to the Government, and/or the trial court's misconduct, or trial counsel's unreasonable failure to seek a continuance, there is a reasonable probability that jurors would have rejected the seven snitches if they had heard the following evidence attacking their testimony.

### a.  Travis Crawford.[11]

Travis Crawford, Mr. Barrett's maternal first cousin (R. 450-51), testified in the first stage of trial that the day before the police raid, he noticed a white SUV drive down the road in front of Mr. Barrett's cabin. Mr. Crawford testified he saw Mr. Barrett go to his front gate at the time the SUV passed. Crawford claimed to have walked over to Mr. Barrett's property from his parents' house. Mr. Barrett allegedly told him that he (Mr. Barrett) knew that the people in the white SUV were the police. Mr. Barrett expressed the opinion that they were probably going to come back to serve a warrant. With respect to the potential service of the warrant, Mr. Barrett said, "D.G.F." which, according to Travis Crawford, means "Don't Give a Fuck." Crawford testified Mr. Barrett told him that he was "going out in a blaze of glory," as he had supposedly said on numerous previous occasions. (R. 462-66.) Travis Crawford testified that while he had been a methamphetamine user for 15 years, he had been "clean" for nine months.[12] (R. 457.)

---

[11]  Mr. Barrett is in possession of newly discovered evidence showing that Travis Crawford's trial testimony was false. Mr. Crawford recently recanted his testimony against Mr. Barrett. (*See* Exhibit 45; Exhibit 92; Exhibit 31; *see also* Claim 5 §§ A & B.)

[12]  This is in marked contrast with what Mr. Crawford revealed recently to a defense investigator. Mr. Crawford stated that he was a heavy methamphetamine user at the time he was interviewed by the Government, had taken drugs before his testimony, and was under the influence of drugs at the time he testified against Mr. Barrett. This is discussed in Mr. Barrett's *Brady/*newly discovered evidence claim.

On cross-examination, Mr. Crawford stated he had been arrested previously for failure to pay $11,000.00 in back child support. He was also arrested on hot check charges many years before. He admitted to having used a lot of drugs. His alleged "past" drug use affected his memory, distorted his perception, and his mind was not as sharp as it had been before he became a methamphetamine addict. (R 467-68, 472.)

Mr. Crawford had never been interviewed by the defense before his testimony. He acknowledged on cross-examination that he had an appointment to talk to defense counsel the preceding Friday, but claimed he did not show up because he was working and would have been fired from his job if he absented himself for the interview. He claimed he was not told by the prosecution that defense counsel had made themselves available on the previous Saturday and Sunday to interview him. (R. 468-69.) Sequoyah County Sheriff John Philpot had been by his residence to let him know that Mr. Barrett's lawyers might want to talk to him. (R 469.) Mr. Crawford admitted he had never provided a written statement to law enforcement or the Government prosecutors relating what his testimony would be. (R. 481.)

When asked why he was coming forward with this information six years after the fact, Mr. Crawford said it was because he had been subpoenaed; he himself wanted to know why he had been contacted by the Government. He denied being threatened with charges or other dire consequences if he failed to cooperate with the prosecution.[13] (R. 470.) Before being approached to testify in the federal trial, he had never talked to anyone about what he supposedly knew of the circumstances surrounding the shooting of Trooper Eales. Despite the admitted problems with his memory, Mr. Crawford claimed he remembered the years-old events to which

---

[13] Crawford stated recently he had been threatened by Littlefield, which ensured his cooperation. (See Claim 5 *infra.*)

he testified.  He could not recall how many times he had spoken to Sheriff Philpot about what he knew, and also stated, at one point, that he had not had any conversations with government agents other than Sheriff Philpot. (R. 481-82.)

On re-direct examination, AUSA Littlefield reminded Mr. Crawford that he had talked to Littlefield about testifying, and Crawford then stated that before Littlefield interviewed him, he had spoken to no law enforcement agents about Mr. Barrett.  "Correcting" his earlier testimony about his contacts with Sheriff Philpot, Mr. Crawford stated either Littlefield, Sheriff Philpot, or Lance and Judy Bergman got a message to him that he needed to be in court.  If Sheriff Philpot was the individual who contacted him for this purpose, this would be the only contact he had with the Sheriff about the case.  (R 487-88.)

On cross-examination, Mr. Crawford basically repeated the claims he made on direct about his conversation with Mr. Barrett on the late afternoon or evening of  September 23 regarding the white SUV that had driven past Mr. Barrett's property.  He assumed the occupants of the vehicle were "the laws" instead of Kevin Adams, who owned a white Bronco and lived approximately a mile from Mr. Barrett, even though the vehicle he saw was unmarked, had no antennas like those on law enforcement vehicles, had no spotlights, and Mr. Crawford was not able to see the vehicle's license tag. (R 478-79.)  Retreating somewhat from his testimony on direct examination, Mr. Crawford said that when he went to speak to Mr. Barrett that evening, he did not tell Mr. Barrett that the "laws" had just driven by, and were probably coming to get him, although he might have commented to Mr. Barrett that the people who had driven by in the white SUV were law enforcement officers.  Ultimately, Crawford testified on re-direct examination that when the white SUV drove past and he went to talk to Mr. Barrett, he did not recall whether he or Mr. Barrett commented that the occupants of the vehicle were law enforcement, but it

"seem[ed]" this subject was discussed. Travis Crawford stuck to his claim that Mr. Barrett said that he was "going out in a blaze of glory." (R 479-80, 484.) Mr. Crawford believed that when he went over to talk to Mr. Barrett, the front gate to the property was open, and then "guessed" that Mr. Barrett locked the gate. (R. 48-81.)

During his testimony, Mr. Crawford never mentioned – and was never asked – about his testifying as an informant or snitch in any other case.[14] Had counsel asked about this, and had Crawford been truthful, it would have been revealed to the jury that Crawford had acted as a police informant in the past and had given testimony against others in order to escape prosecution, a fact that surely would have adversely affected his credibility. (Exhibit 45, Exhibit 92.)

Because trial counsel was professionally unreasonable in failing to move for a continuance, and otherwise failed to conduct a proper investigation, the jury failed to hear from witnesses who could have testified that Crawford was dishonest and not to be believed about anything, particularly with regard to the events on the evening of September 23, 1999.

Rick Lunsford is a local Sallisaw resident who could have been located and interviewed if any sort of competent defense investigation into Mr. Crawford had been conducted. Mr. Lunsford, along with several other people, were at Mr. Barrett's residence on the afternoon of September 23, at the time Mr. Barrett was approached by Travis Crawford about the white SUV that had driven past the property. Mr. Lunsford had arrived at Mr. Barrett's around noon on September 22, and stayed until around 9:00 p.m. on September 23. Mr. Lunsford went to Mr. Barrett's to drop off a Chevy truck he was selling to him. Mr. Lunsford told investigators

---

[14] *See* Mr. Barrett's *Brady* claim.

currently working for Mr. Barrett that on the late afternoon of September 23, Mr. Barrett and others were standing near the fence to Mr. Barrett's property.  Travis Crawford walked over from his parents house, which was located a couple of residences down the road, and stood at the fence line.  Mr. Crawford asked Mr. Barrett whether he had seen the white SUV that had driven by toward the dead-end, but had not yet driven back.  Crawford stated he believed the individuals in the SUV were law enforcement officers.  Mr. Barrett did not take Crawford seriously, because he did not trust Crawford.  Mr. Barrett was more nervous about Mr. Crawford than he was of law enforcement.  Mr. Lunsford would have testified that Travis Crawford was regarded as a "real flaky person" and that he was known to have been a police informant in the past.  (Exhibit 90.

After Crawford left, Mr. Barrett told the others who were present that if they wanted to leave because of the SUV, they should do so.  Mr. Barrett was concerned about the others getting in trouble if in fact the SUV contained law enforcement officers, because everyone there was using drugs.  Toby Barrett and Mr. Lunsford stayed, and the others left.  Toby Barrett locked the gate to the driveway, and Mr. Barrett, Toby Barrett and Mr. Lunsford went to either Mr. Barrett's cabin or his garage.  Mr. Lunsford left Mr. Barrett's property around 9:00 p.m. to see his family.  (Exhibit 90.)

Mr. Lunsford states that during the time Crawford came to Mr. Barrett's to talk about the white SUV, before that occurrence, and after that time until Lunsford left later that night, Mr. Barrett *never* said that he would shoot or kill the first law enforcement officer who came on his property, or that if the police came on his property and tried to arrest him, he would "go out in a blaze of glory."  Mr. Barrett never said this or anything like it either on September 23, 1999, or at any other time Mr. Lunsford was around Mr. Barrett.  Such a statement would be out of character for Mr. Barrett, because he was not a violent or threatening person.  (Exhibit 90.)

Had any investigation been conducted by trial counsel, and had Lunsford been contacted, he could also have opined on Travis Crawford's truthfulness, and Crawford's reputation for honesty in the community. (Fed.R.Evid. 608(a).) In Lunsford's opinion, Travis Crawford is a completely dishonest person; nothing he says can be believed. Mr. Crawford was not only a heavy drug user, but also dealt drugs. Mr. Crawford would sell bad dope to people and "rip them off." Travis Crawford would basically do and say anything to get his hands on drugs, or to get out of trouble. Travis Crawford was known in the community for his dishonesty and untrustworthiness. (Exhibit 90.) Independent of Mr. Lunsford's testimony, his knowledge of Travis Crawford's conduct and record would have provided Mr. Barrett's counsel with additional grounds for impeaching Crawford on cross-examination. Fed. R. Evid. 608(b) .

Mr. Lunsford was never contacted by any representatives of Mr. Barrett in connection with the federal trial. Had he been contacted, he would have been willing to testify to the matters described above. (Exhibit 90.)

Brandy Hill is Travis Crawford's niece. Ms. Hill told investigators currently working on Mr. Barrett's behalf that she, like Rick Lunsford, was present at Mr. Barrett's on the afternoon and evening of September 23, 1999. She was present when Travis Crawford came to the fence of Mr. Barrett's property to tell Mr. Barrett about the white SUV that had driven by. Crawford stated he believed police were in the vehicle, or that his father, Roger Crawford, believed it was a police vehicle. Crawford said his father saw the white SUV drive down the road toward the dead-end, but it had not come back. After relaying this information, Crawford walked back home. Shortly after this, Ms. Hill's husband Sean Hill arrived at Mr. Barrett's, and she went home. (Exhibit 77.)

During and after the time Crawford spoke to Mr. Barrett and the others who were there, there was no talk by Mr. Barrett about killing or shooting the police or "going out in a blaze of glory."  After Travis Crawford expressed his suspicions about the white SUV, Mr. Barrett did not react with threats, or in a heated manner. He behaved as if it were normal that the police had driven by.  According to Ms. Hill, the police drove by Mr. Barrett's property all the time, sometimes up to three times a week, from 1996 to 1999.  (Exhibit 77.)

According to Ms. Hill, and in contrast to Travis Crawford's claim at trial that he had been offered nothing by the Government in exchange for his testimony, Crawford told her that both he and his wife, Cindy Crawford, had been paid for their testimony against Mr. Barrett. Again in contrast to Crawford's claim that he had been off drugs for a period of months before his testimony, Crawford told Ms. Hill he did two "hits" of dope immediately before testifying, and was under the influence of drugs when he testified.  (Exhibit 77.)  (*See also,* Mr. Barrett's *Brady* and newly discovered evidence claim.)

Ms. Hill was never interviewed by Mr. Barrett's federal lawyers, or any investigator working for them.  She was an easily discoverable, readily available witness.  Had she been contacted, she would have given them the information related above, and would have agreed to testify as a defense witness for Mr. Barrett.  (Exhibit 77.)

Toby Barrett was obviously a readily available witness.  He testified for the prosecution in the two state-court trials.  He was present at his father's residence on the evening of September 23, 1999.  On that evening, Mr. Barrett asked Toby to close the gate to the driveway.  Because the gate was usually kept locked in the evenings (certainly a routine occurrence in rural areas), this was nothing out of the ordinary.  On September 23, Mr. Barrett said nothing to Toby Barrett, or in Toby Barrett's presence, about the police, let alone that he

believed they were coming to arrest him and that he would "go out in a blaze of glory."  While trial counsel spoke briefly to Toby Barrett several times, he never discussed with Toby any testimony he could give.  Had he been asked, Toby Barrett would have testified to these facts, as well as others which are discussed elsewhere in this motion.  (Exhibit 96.)

Like Rick Lunsford, Brandy Hill and Toby Barrett, Robert "Bubba" Thompson was present at Mr. Barrett's on the afternoon of September 23, 1999.  Although he cannot recall specifically whether he saw Travis Crawford there that afternoon, he is sure that while he was there, Mr. Barrett never made any statements about expecting the police to raid his house, wanting to kill law enforcement officers, or desiring to go out "in a blaze of glory."  (Exhibit 37.)  In fact, Mr. Thompson never heard Mr. Barrett make such statements at any time, even though he was a frequent visitor to Mr. Barrett's property in 1999 because he was close friends with Toby Barrett.  (Exhibit 37.)

Trial counsel could have, but did not, discuss with Mr. Barrett's and Mr. Crawford's aunt, Carolyn Joseph, her knowledge of Travis Crawford's honesty and trustworthiness.  Although trial counsel interviewed Ms. Joseph briefly, she was never questioned about the credibility of either Travis Crawford or Cindy Crawford.  (Exhibit 78.)

According to Ms. Joseph, Travis Crawford, contrary to his claim of being "clean" of drugs for several months preceding his testimony, was a heavy drug user at the time of Mr. Barrett's trial.  It is her personal belief that Crawford is not an honest or trustworthy person.  Nor does Mr. Crawford have a reputation for honesty in the community at large.  Fed.R.Evid. 608(a).  (Exhibit 78.)

Every time Mr. Crawford would come to her house, something turned up missing or stolen.  Travis Crawford would steal from Ms. Joseph in order to get money to buy drugs.

Crawford was the type of person who would say one thing and then do the opposite, so long as it was to his advantage. Ms. Joseph once paid Crawford $400.00 in advance to build a well house on her property. Crawford simply pocketed the money and never built the well house. Crawford never repaid the money he took for a job he never did. The materials that had been purchased for construction of the well house were later stolen. Travis Crawford and/or his wife Cindy were the only people who could have stolen the materials. Crawford once stole four rolls of barbed wire from Ms. Joseph's property, and later admitted the theft to her. Crawford even went so far as to steal from the property of her late son, DeWitt Joseph, who had been killed in an automobile accident. (Exhibit 78.)

Even if Ms. Joseph could not give "extraneous evidence" of the specific bad acts of Crawford that reflected his dishonesty, trial counsel, using the information gained from her, could have cross-examined him about these dishonest acts. (Fed.R.Evid. 608(b).) Coupled with testimony from Ms. Joseph regarding her opinion that Crawford is a dishonest person, and is regarded as dishonest in the community, any denials offered by Crawford to the specific acts of dishonesty he committed against his own aunt would have rung hollow and marked him as a witness of dreadful credibility.

### b. Cindy Crawford.[15]

Cindy Crawford testified for the Government in both stages of trial. Like her husband, she never talked to defense counsel before her testimony but denied that she had simply refused to meet with them. (R. 3063, 3069.)

In the first stage, she testified she had done drugs at Mr. Barrett's house, although she did not know who supplied the drugs. Cindy Crawford testified Mr. Barrett told her he had a misdemeanor warrant out for his arrest, and that he stayed on his property because he did not want to get in trouble. He knew there was a chance the police could come to his house; that was why he had guns for protection. According to Cindy Crawford, Mr. Barrett told her that if the police (or anyone else, for that matter), invaded his property, he would "go out in a blaze of glory." (R. 3063-69.)

On cross-examination in the first stage of trial, Cindy Crawford stated she started using methamphetamine at age 18. She used the drug for nine years, and would either snort it or shoot it. She stated or implied on direct examination that she was currently drug and alcohol free. (R. 3161.) While on a "meth run," the longest she had stayed up was five days. While using methamphetamine, she would often stay up for three to four days at a time. (R. 3070-71.)

Cindy Crawford admitted her drug use had caused her to lose a sense of time. To her, time was just a blur that played tricks on her mind. (R. 3073.) She really did not know

---

[15] Petitioner is also in possession of newly discovered evidence demonstrating that Cindy Crawford was pressured and threatened by former AUSA Mike Littlefield into testifying against Mr. Barrett, that she was coached in her testimony, and that she embellished her second stage testimony. Movant is also now in possession of Cindy Crawford's medical records, which show that she suffers from post-traumatic stress disorder and other maladies impacting her credibility, and which support her recent statement to defense investigators that she embellished her penalty phase testimony against Mr. Barrett and was susceptible to pressure from the prosecutor and law enforcement. *See* Mr. Barrett's *Brady/*newly discovered evidence claim (Claim 5).

when Mr. Barrett had made the alleged statement about having an outstanding misdemeanor warrant. Defense counsel, in his questioning, stated that any misdemeanor warrant for Mr. Barrett would have been long before 1999. (R. 3072.) While she had done drugs at Mr. Barrett's residence, she was not testifying that Mr. Barrett had ever given her drugs. (R. 3072.) With respect to Mr. Barrett's statement about taking on the police and "going out in a blaze of glory," Cindy Crawford stated this was typical "doper talk" that she had often heard from many drug users. (R. 3075.)

In the penalty phase of trial, Cindy Crawford claimed Mr. Barrett once became angry with her because she would not have sex with him. He ran from his home when she was leaving with his brother Richie Barrett, put the barrel of a rifle against her leg, and threatened to kill her. (R. 4577-79.)

As with the other informant or "snitch" witnesses, trial counsel relied strictly on cross-examination to impeach Cindy Crawford. Had trial counsel moved for a continuance and obtained the time to investigate Crawford, or conducted a reasonable investigation in the time allowed, a wealth of evidence could have been developed which would have shown her to be a witness who jurors would have found not worthy of belief.

During the first stage of trial, Cindy Crawford was never questioned on whether she suffered from any mental problems. In her second stage testimony, she volunteered that she suffered from PTSD, but it was of course too late to use the information to cast doubt on what she told the jury in the first stage. A reasonable investigation would have uncovered evidence that she had an impaired mental condition, which, along with her drug use, could have impeached her ability to recall and relate, and shown her to be unstable and amenable to pressure

or influence from law enforcement. Medical records for Cindy Crawford confirm that she suffers from PTSD, is subject to bouts of anxiety, and has panic attacks. (Exhibit 144.)

Although Crawford testified on direct examination that she was on a five year deferred sentence for misdemeanor marijuana possession (R. 3061), and had a previous misdemeanor marijuana conviction in 1999, counsel failed to explore whether her testimony was motivated by a fear that if she declined to cooperate with the Government, she might face acceleration of her current deferred sentence to either a suspended sentence, which would constitute a felony conviction under Oklahoma law, or could face jail or prison time. Counsel, who evidently did not search Cindy Crawford's court files, failed to ask her about the fact that she could have been charged with a felony rather than a misdemeanor for her second marijuana possession case, and whether the fact she had not been charged with a felony was due to her regularly acting as a police informant, as other witnesses could have attested. (Exhibit 204; Exhibit 170.)

Counsel failed to question Cindy Crawford about the fact that her two misdemeanor marijuana cases were originally charged as felonies. Trial counsel neglected to confront her with the fact that a bench warrant had been issued for her arrest for failure to appear on July 19, 2005, just shortly before Mr. Barrett's trial commenced. Counsel also neglected to question her about the fact that on March 20, 2005, the Sequoyah County District Attorney's Office had filed an application to accelerate her deferred sentence because she had failed to pay certain required fees. Significantly, the bench warrant and the application to accelerate were hanging over Cindy Crawford's head at the time she testified against Mr. Barrett. It was not until April 24, 2006, after Mr. Barrett's trial concluded, that the application to accelerate and the bench warrant were withdrawn because she had finally complied with the terms of her probation.

Amended § 2255 Pet.                    91                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

(Exhibit 204; Exhibit 170.)  The circumstances surrounding Crawford's Sequoyah County cases could have been used to show she had a powerful motive to testify for the Government in exchange for help in keeping her deferred sentence.  *E.g., Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003)(counsel ineffective in part for failing to impeach immunized witness with fact he was on a deferred sentence and had a motive to help the prosecution in order to help himself).

Due to a failure to investigate Cindy Crawford's court history, the jury was denied other valuable impeachment evidence.  The court file in the domestic case of *Crawford v. Mattox,* Sequoyah County Case No. P-03-458, contains a letter from Larry and Brandie Sell, the grandparents of one of Crawford's children, to District Judge John Garrett.  The letter states that Cindy Crawford has problems with depression, and threatened to "do something with her baby," which she would be able to "get away with" because she had been in the Harbor View mental hospital.  The letter also states that drugs had become "all consuming" for Cindy Crawford.  This would not only demonstrate a history of mental illness, but would show that Cindy Crawford was such a despicable and unbelievable character that she had actually threatened harm to her own child, while contemplating the use of her mental illness as an excuse or defense.  (File in Sequoyah County Case No. P-03-458.)

Again because no investigation of Cindy Crawford's court records was made, counsel failed to confront her with the numerous acts of dishonesty which served as the basis for a victim protective order in *Michael Mackey, et al. v. Cindy Crawford,* Sequoyah County Case No. PO-03-390.  The application for protective order states the plaintiffs had been harassed with false accusations by Crawford, threats to cause problems for Mr. Mackey's children, acts of stalking, and burglary of the Mackey home and storage shed.  (Exhibit 176.)  Again, even if extraneous evidence of these misdeeds reflecting Cindy Crawford's lack of honesty could not

have been introduced, Crawford certainly could have been cross-examined about them. (Fed.R.Evid. 608(b).)

Aside from court records which would have severely impeached Cindy Crawford's credibility, counsel failed to investigate and produce numerous available witnesses who could have testified to her complete dishonesty and lack of believability, as well as her history as a police informant.

Roger Crawford testified briefly as a second stage witness for Mr. Barrett. In preparation for his second stage testimony, he was only interviewed for a matter of minutes. Unfortunately, trial counsel neglected to interview him regarding information he had on the credibility of Cindy Crawford. Had Roger Crawford been properly interviewed, he could have testified in both stages of trial that Cindy Crawford was dishonest and untrustworthy, and that her reputation in the community for honesty was extremely poor. Roger Crawford could have testified that at the time of her testimony at Mr. Barrett's trial, Cindy Crawford was a heavy drug user, contrary to what she tried to claim to the jury. Roger Crawford also would have testified that it was well known in the community that Cindy Crawford, far from being a disinterested witness, had regularly acted as a police informant to escape prosecution and punishment for her own criminal activities. Roger Crawford would have testified that Cindy Crawford had filed false reports about family members with the Oklahoma Department of Human Services, and also had made false accusations when seeking victim protective orders. Mr. Crawford was in an excellent position to offer an opinion on Cindy Crawford's dishonesty and her reputation in the community for dishonesty. He is Cindy Crawford's father in law, and has known her for years. (Exhibit 92.)

Mike Mackey is another witness counsel easily could have discovered by searching court files related to Cindy Crawford. Mr. Mackey is one of several individuals who filed for a protective order against Cindy Crawford. He has also known her for years. He was never contacted or interviewed by Mr. Barrett's trial lawyers, or any investigator working on their behalf. Had he been contacted, he could have testified that Cindy Crawford is thoroughly dishonest and untrustworthy, and her reputation in the community for honesty is abysmal. Mr. Mackey goes so far as to state that Cindy Crawford is the "most wickedly evil" person he has ever had the misfortune to run across. Ms. Crawford made false reports to state DHS regarding him and his mentally handicapped son, and lied to get a victim protective order against him. Mr. Mackey is also aware that Cindy Crawford has made false claims to the authorities about other family members. According to Mr. Mackey, Cindy Crawford has repeatedly broken into his home and stolen from him in order to get money or property to buy drugs. Like Roger Crawford, Mr. Mackey is aware that Cindy Crawford has long worked as a snitch for the local police, and "works the system" to escape responsibility for her own actions, while getting other people into trouble. (Exhibit 88.)

Again, even if extrinsic evidence of Crawford's bad and dishonest acts could not have been introduced through Mackey's first stage testimony, they could have been inquired into during cross-examination of Crawford. Fed.R.Evid. 608(b). Extrinsic evidence of these acts of criminality could have been introduced in the penalty phase, since Crawford made a return appearance to the witness stand, and the rules of evidence are relaxed in the penalty phase of a capital case. 18 U.S.C. § 3593(c).

Brandy Hill is another witness who, with a competent investigation, could have given testimony regarding Cindy Crawford's lack of honesty. As noted in the discussion of

Travis Crawford, Ms. Hill was never contacted before or during Mr. Barrett's trial. Ms. Hill has known Cindy Crawford for many years. In her opinion, Cindy Crawford is completely dishonest and untrustworthy. Ms. Crawford's reputation for honesty in the community is extremely poor. Ms. Hill describes Cindy Crawford as manipulative. Cindy Crawford has stolen from Ms. Hill and her family on numerous occasions in order to get money to buy drugs. Like other witnesses who could have testified to Cindy Crawford's dreadful lack of honesty, Ms. Hill is aware that Cindy Crawford has long acted as a local police informant and has lied against others to obtain something of advantage for herself. (Exhibit 77.)

Similar testimony could have been offered by Sean Hill. Mr. Hill, though available at the time of trial, was never contacted by anyone working on Mr. Barrett's defense. He states that Cindy Crawford's reputation in the community is that "she's dishonest, evil and worthless." (Exhibit 95.)

Carolyn Joseph has known Cindy Crawford for years. As with Travis Crawford, Ms. Joseph was not interviewed regarding her knowledge of Cindy Crawford's honesty, or any other information which would have served to impeach Ms. Crawford. Ms. Joseph could have testified that Cindy Crawford was a heavy drug user, and that, in her opinion, Ms. Crawford's drug use affected her mentally. According to Ms. Joseph, Cindy Crawford has the mind and attitude of a twelve year old child. In Ms. Joseph's personal opinion, Cindy Crawford is "so deceitful and dishonest that it is pitiful." Ms. Crawford's reputation in the community for honesty is, to put it mildly, poor. No one Ms. Joseph knows would trust or believe anything Cindy Crawford said. Cindy Crawford has stolen from Ms. Joseph on several occasions and has conned money out of her. (Exhibit 78.)

Still another witness who could have testified to Cindy Crawford's bedrock reputation for dishonesty is Gwendolyn Crawford, Travis Crawford's sister. Ms. Crawford, as with the other individuals who could have been, but were not, contacted to testify on Mr. Barrett's behalf, has known Cindy Crawford for years. Gwen Crawford's experience of Cindy informed her opinion that Cindy Crawford is dishonest, and is well known in the community for her dishonesty. Echoing several of the other witnesses who know Cindy Crawford well, her reputation for honesty in the community is bottom-of-the-barrel. Gwendolyn Crawford is also aware that Cindy Crawford has acted as a police snitch for years and does not hesitate to falsely accuse others if it means getting something for herself. (Exhibit 83.)

Cindy Crawford's penalty phase testimony that Mr. Barrett had put a rifle barrel to her leg and threatened to kill her, allegedly because she would not have sex with him, could have been further impeached if trial counsel had interviewed Mr. Barrett's brother, Richie Barrett. Crawford testified this incident occurred when she was leaving Mr. Barrett's property with Richie Barrett. Richie Barrett was interviewed by a defense investigator in connection with the current action. Richie Barrett states unequivocally that Cindy Barrett fabricated this story out of whole cloth, and that the incident never occurred. (Exhibit 104.)

Cindy Crawford's claim that Mr. Barrett had threatened violence to law enforcement officers if they came on his property could have been impeached had defense counsel investigated and produced witnesses Rick Lunsford, Toby Barrett, Brandy Hill, and Robert "Bubba" Thompson, all of whom state that Mr. Barrett never made such statements around them and would not have done so. (Exhibit 90; Exhibit 96; Exhibit 77; Exhibit 37.) This same point could have been made through Government witness Randy Weaver, had counsel simply asked the obvious. (Exhibit 38.)

c.      **Charles "Monk" Sanders.**

1.      **Failure to adequately investigate and prepare to cross-examine Sanders about his previous convictions, charges against him that were dismissed, and the favorable treatment he often secured to escape punishment.**

As noted *supra*, but unknown to the jury, Charles Sanders, the alleged C.I. on the Clint Johnson search warrant, was a professional informant. He gave wildly conflicting trial testimony regarding alleged drug activities at Mr. Barrett's residence in the Summer of 1999. He also testified that at some undetermined time, Mr. Barrett allegedly made statements that he would shoot the first law enforcement officer who came on his property. (R. 2515.) In the penalty phase of trial, the Government once more sponsored Sanders to testify that Mr. Barrett, while incarcerated, supposedly contacted a third party about doing harm to the informant in his case. (R. 4587.) In an off-hand manner, Sanders testified, under questioning by AUSA Littlefield, that the most the Government was going to do for him in exchange for his testimony was to talk to prosecutors in Sequoyah and Tulsa Counties, informing them of Sanders's cooperation in the case against Mr. Barrett. (R. 2494.)

Trial counsel unreasonably failed to investigate and challenge Sanders from a myriad of angles the informant's history made readily available. Trial counsel not only failed to capitalize on the entirety of Sanders's cross-examination testimony when he re-urged the motion to suppress, but counsel failed to impeach him effectively, both on cross-examination and with independent evidence.

While trial counsel cross-examined Sanders on some, but by no means all, of his prior convictions, counsel failed to conduct a search of court records, not only to demonstrate

that Sanders lied about the number and nature of his previous convictions, but that he had received amazing deal after amazing deal for his work as an informant, including after he supposedly gave information to Clint Johnson about Mr. Barrett. In that sense, assuming he really was the C.I. on the Johnson search warrant, Sanders had *already received and was continuing to receive favor from the authorities based on his "work" against Mr. Barrett.* Had counsel effectively cross-examined Sanders about his prior record, he could have easily exposed Sanders's lies including that Clint Johnson only helped with "some" of his cases, that Sanders had not gotten out of "a lot" of trouble, and his denial that he could commit crimes without fear of paying the full consequences as long as he worked as an informant. (R. 2535-37.)

The beginning of cross-examination revealed no court searches were conducted on Sanders's previous convictions. Counsel stated that he had looked at Sanders's D.O.C. "sheet." This obviously referred to the Oklahoma Department of Corrections website, which would merely list, without any elaboration at all, the case numbers in which Sanders had been convicted, and the offenses for which he was convicted. Counsel confronted Sanders with the fact that he had far more than the four priors he acknowledged on direct examination, a patent lie that prosecutor Littlefield had an obligation to correct, but did not. (R. 2524.) *See* Claim 5, *infra*.

Counsel superficially asked[16] Sanders about the following prior convictions: (1) an Arkansas conviction in 1986 for distribution of drugs, for which Sanders received a sentence of four years confinement, and six years probation; (2) a 1989 conviction in Sequoyah County for uttering a forged instrument, for which Sanders allegedly received one year in the county jail, and time on probation; (3) a 1990 sexual battery conviction and drug possession conviction in

---

[16]  R. 2524-36.

Sequoyah County, for which he received three years incarceration and seven years suspended; (4) a 1992 Sequoyah County conviction for drug possession, in which Sanders received a sentence of three years in prison and seven years suspended (Sanders claimed this was "the same" case as his 1990 Sequoyah County conviction, even though the conviction was in a different case number); 5) a Muskogee County conviction in Case No. CF-93-131 for illegal possession of a weapon, bringing drugs or alcohol into a jail, and escape (Sanders acknowledged the escape conviction, but said he had not been convicted of the other charges); (6) a 1995 conviction in Arkansas for possession of drugs, concealing stolen property, and forgery; (7) a Sequoyah County conviction in Case No. CF-98-346, for which Sanders received five years incarceration and twenty years suspended; (8) a conviction in Sequoyah County Case No. CF-98-363, for uttering a forged instrument, for which Sanders received five years incarceration and twenty years suspended; (9) a conviction in Sequoyah County Case No. CF-99-562 for concealing stolen property, for which Sanders received five years incarceration and twenty years suspended (a condition of probation in these last three cases was that Sanders successfully complete a Department of Corrections drug program, which Sanders claimed he had not yet been able to get into); (10) a conviction in Sequoyah County Case No. CF-03-124 for two counts of running a roadblock; and (11) a conviction in Sequoyah County Case No. CF-04-19 for two counts of concealing stolen property, second degree burglary, and second degree arson, for which Sanders received a deal similar to that in the other Sequoyah County cases.

Sanders agreed that after this many convictions, he received, on his current sentences, a very favorable deal (to say the least), requiring him at most to serve five years in prison, which would equate to service of only two and one-half years, even if he was not able to enter the Department of Corrections drug program, which, upon completion, would put him back

on the streets immediately.  Sanders admitted that his mentor, Clint Johnson, had helped him with "some," but by no means all, of his prior cases.  (R. 2534-35.)

Had counsel conducted even minimal research into Sanders's court records, far more about the witness's abysmal criminal history and the virtual "get out of jail free" cards he received  repeatedly would have been revealed to the jury.  The following readily available records, among others, would have marked Sanders as a career informant who would say and do anything to continue to have access to drugs and escape incarceration:

1.      Counsel failed to point out that in Sequoyah County Case No. CF-92-91, in which Sanders was convicted of felony drug possession in count 5, the state had charged him with having previously been convicted in Sebastian County, Arkansas, with delivery of marijuana and amphetamines in Case No. 86-604-B.  Sanders was also charged in this Sequoyah County case with the misdemeanors of attempting to elude the police, possession of drug paraphernalia, driving under the influence, and possession of marijuana.

The allegation of the "after former" would have set Sanders's exposure, under then existing Oklahoma law, at ten years to life on the felony drug charge.  (21 O.S. 1991, section 51.)  He also could have been charged with felony possession of marijuana, rather than a misdemeanor, because of his prior Arkansas drug conviction.  (63 O.S. section 2-402 (2).)  Instead, he initially was sentenced to 10 years imprisonment on the felony drug charge, and one year in the county jail on the marijuana possession charge.  An amended judgment and sentence cut Sanders's prison time on the felony drug charge from ten to three years, with the balance suspended, with the misdemeanor attempting to elude and possession of paraphernalia charges dismissed, and a one year concurrent sentence on the DUI charge.  (Exhibit 168.)

2.      In Sequoyah County Case No. CF-97-9, Sanders was charged with three crimes of dishonesty: concealing stolen property, and two counts of uttering a forged instrument. Although Sanders could have been charged with two or more "after formers," which would have set his exposure at twenty years to life under Oklahoma law, he was not. (21 O.S. 1991, section 51.) Instead, the concealing stolen property felony charge was dismissed, and the two uttering charges were reduced to misdemeanors, for which he received one year suspended sentences, to run concurrently. (Exhibit 157.)

On October 2, 1998, an application to revoke Sanders's misdemeanor suspended sentences was filed because Sanders had violated the terms of his probation by committing second degree burglary and larceny from a house as charged in Sequoyah County Case No. CF-98-128, and also by failing to pay the restitution he promised when he received his misdemeanor suspended sentences.

On October 7, 1998, Sanders failed to appear for a court hearing, and a bench warrant was issued for his arrest. No disposition is shown for the revocation action. The last entry in the docket on this case notes that on December 9, 1999, a waiver of preliminary hearing in Sequoyah County Case No. CF-99-562 was filed. As discussed below, the application to revoke in this case was later "passed" for ninety days, and would be dismissed altogether upon payment of restitution. If restitution were not paid, Sanders would receive one year in the county jail. As matters developed, and as is discussed below, Sanders was required to pay no restitution.

Although these records indicated Sanders was receiving favorable treatment from the Sequoyah County District Attorney at the time he was working for Clint Johnson to gather "evidence" against Mr. Barrett, and Mr. Barrett's trial counsel demonstrated a desire to impeach Sanders on those grounds, trial counsel failed to present these records to the jury.

3.     In Sequoyah County Case No. CF-97-75, Sanders was charged with the felony crime of running a roadblock, and misdemeanors for attempting to elude, having an open container, and reckless driving.  Although prior felony conviction enhancements could have been filed to increase the range of punishment on the running a roadblock felony charge, they were not.  On October 16, 1997, this case was dismissed outright on motion of the state, based on what is reflected on OSCN.  The court case file itself apparently shows no disposition.  Sanders was questioned on none of this by defense counsel.  (Exhibit 158.)

4.     In Sequoyah County Case No. CF-97-140, Sanders was charged with concealing stolen property and felony possession of methamphetamine.  It was alleged on page two of the information that he had three prior felony convictions, all out of Sequoyah County, in Case Nos. CF-89-396 (uttering a forged instrument); CF-92-91 (drug possession); and CF-90-144 (sexual battery).  Again, Sanders was facing up to life in prison upon conviction.  (21 O.S. section 51.)  Instead, again on October 16, 1997, all charges were dismissed on motion of the state, according to OSCN.  The court file itself shows no case disposition.  Counsel did not cross-examine Sanders on this gift from the state prosecutors.

5.     In Sequoyah County Case No. CF-98-22, Sanders was charged with concealing stolen property, grand larceny, unlawful use of a police radio, and *providing false information to a police officer*.  Despite his many prior convictions, Sanders received an illegal deferred sentence, which was later accelerated.  (22 O.S. 1991, section 991c (prohibiting defendant with even one prior felony conviction from receiving a deferred sentence).[17]  Counsel was professionally unreasonable for failing to question Sanders about how he managed to get a

_____

[17]  This statute was later amended by 22 O.S. section 991c (F) to permit convicted felons to receive a deferred sentence, but only on motion and waiver by the State.

deferred sentence from Sequoyah County authorities when, due to his record, the deferment was absolutely barred by law. (Record from court clerk's office on case; other parts of file have been lost or destroyed.)

6.      In Sequoyah County Case No. CF-98-128, Sanders was charged with the felonies of second degree burglary and larceny from a house. The three "after-formers" alleged in Sequoyah County Case No. CF-97-140 (Sequoyah County Case Nos. CRF-89-396, Exhibit 168; and CRF-90-144) were alleged, setting Sanders's exposure at twenty years to life. An amended information alleging the same charges and same "after-formers" was filed on July 7, 1998. Miraculously, the state dismissed the after former conviction allegations, and Sanders received patently illegal five year deferred sentences, running concurrently, with costs waived by the District Attorney's office. The sentences were also ordered to run concurrently with a conviction Sanders obtained in Creek County. Later, CF-98-128 was dismissed with costs, as is discussed below. (Exhibit 159.)

It was unreasonable for Mr. Barrett's trial counsel not to discover and use on cross-examination records showing that Sanders, who faced the prospect of life in prison on this offense alone, received illegal deferred sentences, and that even those illegally lenient sentences eventually were lifted.

7.      In Sequoyah County Case No. CF-98-346, Sanders was charged with possession of methamphetamine (a felony) and misdemeanor possession of drug paraphernalia. Again, he was charged after having been previously convicted of the same three Sequoyah County felonies discussed above. Sanders was yet again facing twenty to life. Per a plea agreement reached with the state, Sanders received a twenty year suspended sentence. The misdemeanor charge was dismissed. At the time he entered his plea, due to his record of prior

Amended § 2255 Pet.                       103                      *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

felony convictions, Sanders was not eligible for a suspended sentence under Oklahoma law as it then existed.  (22 O.S. 1991, § 51; 22 O.S. 1991, § 991c.)[18]

Although Mr. Barrett's trial counsel briefly alluded to this case, and the sentence Sanders received, counsel failed to point out the following impeaching facts: (a) on May 3, 2001, the state filed an application to revoke Sanders's suspended sentence because he had been arrested for larceny of merchandise from a retailer and possession of drug paraphernalia in Sequoyah County Case No. CF-01-314, and also failed to report to his probation officer, as he told the court he would do when he received his suspended sentence; (b) on August 23, 2001, the court ordered Sanders's sentence revoked in full, with Sanders ordered to complete the "Last Stop" program in the Department of Corrections, upon successful completion of which the balance of the sentence would again be suspended; (c) coming to Sanders's aid yet again, the Sequoyah County District Attorney's Office moved on February 22, 2002, to amend the revocation to allow Sanders to attend either the "Last Stop" program, or an equivalent program, and requested that the sentence in this case be ordered to run concurrently with the sentence in Sequoyah County Case No. CF-98-363; (d) *nunc pro tunc* orders granting these requests were entered by the court on March 5 and March 28, 2002; (e) on March 12, 2004, the District Attorney filed a second application to revoke Sanders's suspended sentence, because he had committed a new offense, burglary in the second degree, as alleged in Sequoyah County Case No. CF-04-19; (f) an amended second application to revoke Sanders's suspended sentence was filed on June 17, 2004, based on the amended information filed in Case No. CF-04-19, which

_____

[18]  Again, as with the statute governing deferred sentences, the law was later amended to permit defendants, such as Sanders, with two or more prior felony convictions to received suspended sentences, but only on motion and waiver by the State.

alleged, in addition to second degree burglary, that Sanders had also committed the offenses of second degree arson, concealing stolen property, and felon in possession of a firearm; (g) on November 17, 2004, instead of revoking the entirety of the suspended sentence, the court, pursuant to Sanders's agreement with the state, revoked only five years of the suspended sentence, with the entirety of the sentence to again be suspended if Sanders successfully completed the "Key to Life" program in the Department of Corrections; (h) incredibly, the partial revocation in this case was ordered to run concurrently with the suspended in whole or in part sentences in Sequoyah County Case Nos. CF-98-363, CF-99-562, CF-04-19, and CF-03-124.

Sanders was not questioned about the fact he faced revocation of the entire twenty year sentence based on his various probation violations, with consecutive time in his other active Sequoyah County cases. Nor was it brought to the jury's attention that absent the various deals he received, Sanders was once more facing the potential of life in prison on this offense of conviction due to his record of previous felony convictions. Counsel also failed to point out Sanders's statutory ineligibility for any suspended sentence due to his prior felony convictions, absent a motion and waiver from the State. (Exhibit 160.)

8.     In Sequoyah County Case No. CF-98-363, Sanders was charged, yet again, with uttering a forged instrument. The same previous felony convictions noted in the cases above were alleged on page 2 of the information, meaning Sanders was facing twenty to life. On December 9, 1999, the allegation of prior convictions was dismissed and Sanders received a twenty years suspended sentence that he was not eligible to receive under then-existing Oklahoma law. This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-99-562 and CF-98-346.

Again in this case, an application to revoke was filed on May 3, 2001, for failure to report, and based on Sanders's arrest for felony larceny of merchandise from a retailer and possession of drug paraphernalia, a misdemeanor, as charged in Sequoyah County Case No. CF-01-314.  Again, an order revoking was entered by the state court on August 23, 2001, with the sentence ordered revoked in full, but to be suspended in its entirety if Sanders successfully completed the "Last Stop" program in the Department of Corrections.  Sanders was allowed to self-surrender to the county jail instead of being immediately placed in custody.

As described in connection with Case No. CF-98-346, a motion to amend the order revoking was filed.  A *nunc pro tunc* order amending the previous revocation order, and directing Sanders's sentence to be served concurrently with the sentence in Sequoyah County Case No. CF-98-346, was entered.  A second motion to revoke based on the same allegations of new offenses filed in CF-98-346, was also filed in connection with this case.  On April 17, 2004, the court entered a second order revoking Sander's suspended sentence.  As with Case No. CF-98-346, only five years of the twenty-year suspended sentence was revoked, and the sentence would again be suspended in its entirety if Sanders successfully completed the in-house "Key to Life" program or its equivalent.  This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-98-346, CF-99-562, CF-04-19, and CF-03-124.

Counsel failed to cross-examine Sanders about the fact he faced a sentence of up to life imprisonment on this conviction absent the deal he received, and, having received probation, could have had his sentence revoked in full, with consecutive time on all his other active cases, absent the tremendous break he received from the prosecutors.  (Exhibit 161.)

9.      In Sequoyah County Case No. CF-99-562, Sanders was charged with still more crimes of dishonesty.  Some, but not all of the charges in this case, were mentioned briefly

by defense counsel on cross-examination.  Sanders was charged with three counts of concealing stolen property, one count of uttering a forged instrument, misdemeanor possession of marijuana (which could have been charged as a felony due to Sanders's prior drug convictions), and possession of a sawed-off shotgun.  Instead of trotting out the usual three "after-formers" charged in some of the cases discussed above, Sanders was charged with committing the instant offenses after previous conviction of five felonies.  In addition to the same three prior Sequoyah County felonies that were usually alleged on page 2, it was also charged that Sanders had felony convictions in Muskogee County Case No. CF-93-772 for escape from custody, and Muskogee County Case No. CF-93-131 for carrying a weapon into the jail.  Yet again, Sanders faced twenty years to life.

Based on yet another deal-of-a-lifetime, Sanders received a twenty year suspended sentence on count 1.  In an extraordinary gift from prosecutors, and at an extraordinary cost to public safety, counts 2, 3, 4, 5 and 6 were dismissed outright.  Consequently, Sanders, a convicted felon many times over, was allowed to walk around with a sawed-off shotgun, with no repercussion whatsoever.

This case was "wrapped up" on the same guilty plea forms with Sequoyah County Case Nos. CF-98-363, CF-98-346, CF-98-128, and CF-97-9.  As noted, Sanders received a twenty year suspended sentence on the felony conviction in CF-98-363; Case No. CF-98-128 was dismissed with costs Sanders was later relieved of paying; and the long-moribund revocation action in CF-97-9 was passed for ninety days to allow payment of restitution, which, in the end, Sanders was never required to pay, thus making hollow the threat of a year in jail for failure to satisfy restitution.

The same application and amended applications to revoke, and the same or similar *nunc pro tunc* orders discussed above in Sanders's other cases, were filed in this case. As with the other cases discussed above, Sander's suspended sentence in this case was first revoked for only five years. He would revert to full probationary status upon completion of a Department of Corrections drug program. The initial revocation order for up to five years and the rest were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-03-124 and CF-04-19.

Trial counsel failed to question Sanders about the fact he was facing up to life in prison in this case; that five of the six charges lodged against him were dismissed; and that, without the largesse of the state prosecutors, he could have (and should have, based on his horrific record) faced revocation of all the suspended sentences he was serving, to be served consecutively. As with the other cases discussed above, counsel failed to point out that Sanders was either ineligible for a suspended sentence, or had to receive a special dispensation from the prosecution to get one. (Exhibit 162.)

10.     In Sequoyah County Case No. CF-01-314, Sanders was charged with another felony crime of dishonesty, larceny of merchandise from a retailer. He was also charged with a misdemeanor for possession of drug paraphernalia. The state alleged in page two of the information that Sanders committed the felony of larceny after having been convicted of six felonies (Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-988-345, CF-98-363, and CF-99-562). (Exhibit 163; Exhibit 160; Exhibit 161; Exhibit 162, Exhibit 168.) With two or more "after-formers," Sanders faced a minimum of twenty years, and a maximum of life on the felony charge.

Initially, on August 23, 2001, this case was dismissed upon the payment of costs. On October 19, 2002, the case was "combined" with other cases, with a result similar to those discussed above.

Mr. Barrett's trial counsel unreasonably failed to reference this case at all during cross-examination, and thereby failed to inform the jury that from the time Sanders became Clint Johnson's confidential informant he received the most extraordinary lenient treatment which left him free to roam the streets committing crime after crime. (Exhibit 163.)

11.     In Sequoyah County Case No. CF-03-124, Sanders was charged in a seven count information with: 1) feloniously pointing a firearm; 2) being a felon in possession of a firearm; 3) felony running a roadblock; 4) felony running a roadblock; 5) attempting to elude (misdemeanor); 6) reckless driving (misdemeanor); 7) and resisting an officer (misdemeanor). Sanders was charged with the felony offenses in this case after having been convicted of six felonies in Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363, and CF-99-562. With the allegation of two or more "after-formers," Sanders was staring at his usual 20 to life term.

Sanders, as with all his other Sequoyah County convictions, entered into wildly generous plea agreement with the state. As reflected by the judgment and sentence in this case, filed on November 17, 2004, counts 1 and 2 were dismissed. The allegation of "after-formers" carried no real sting. The misdemeanor charges were dismissed. On the felony running a roadblock charges in counts 3 and 4, Sanders was "punished" with sentences of twenty-five years, running concurrently, all to be suspended except for the first five years (also running concurrently), with the entirety of the sentences to be suspended upon completion of the "Key to Life" program, or another similar program. These sentences were ordered to run concurrently

with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19.  (Exhibit 164.)

Mr. Barrett's trial counsel unreasonably failed to impeach Sanders with this highly impeaching.  The jury could not help but notice that Sanders was given the lightest treatment for conduct very similar to acts the Government attributed to Mr. Barrett.  The jury also would have been impressed to learn that charges had been dismissed in this case, that Sanders again escaped 20 years to life due to prosecutors' intervention, that despite his repeated crimes Sanders never drew consecutive sentences, and that, as reflected by his other cases, prosecutors for years gave Sanders a license to commit whatever crime he wished in Sequoyah County, with only the most minor of consequences.

12.    In Sequoyah County Case No. CF-04-19, Sanders was originally charged with second degree burglary, after former conviction of six felonies in Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CRF-92-91, CF-98-346, CF-98-363, and CF-99-562.   The case was amended to charge additional counts of second degree arson, concealing stolen property, and felonious possession of a firearm.

On November 17, 2004, per a plea agreement with the state, and with the "page two" still intact, Sanders was sentenced on each of counts 1, 2, and 3 to twenty-five years imprisonment, with all but the first five years suspended, and with the balance of the sentences suspended in full upon completion of the Department of Corrections in-house drug program. Count 4, in which Sanders was charged with being a felon in possession of a firearm, was dismissed.  The sentences in this case were ordered to run concurrently to one another and concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562, and CF-03-124.  (Exhibit 165.)

Counsel was professionally unreasonable in failing to cross-examine Sanders on the fact that he faced twenty to life absent a deal from the state prosecutors, that he received concurrent probation time rather than consecutive prison time, and that the firearm charge against him was dismissed.

13.     In Cherokee County Case No. CF-98-111, Sanders was charged with no fewer than six counts of uttering a forged instrument, after former conviction of felonies. Amended and second amended informations were filed on June 1, 1998 and August 20, 1998, respectively.  Although he promised to appear at all court dates after being released on bond, he incurred a failure to appear.  A bench warrant was issued on May 15, 1998.  Sanders had a second failure to appear on March 24, 2000.  On May 3, 2001, he was ordered released to a bondsman.  On July 29, 2009, in keeping with the unbelievable sweetheart deals Sanders has received throughout his appalling and protracted criminal career, the felony charges in this case were dismissed on payment of costs of $229.00, with payment to be made beginning September 1, 2009.  (Exhibit 183; Exhibit 57.)

Counsel were professionally unreasonable for failing to cross-examine Sanders about this case, which was pending at the time of Mr.  Barrett's trial.  Because this case was still pending without disposition during Mr. Barrett's trial, seven years after it had been filed, Sanders's bias and motive in appearing as a Government witness in the hopes that he could resolve this case favorably – as he had all of his other cases – was apparent.

14.     In Muskogee County Case Nos. CF-93-131 and CF-93-772 Sanders was convicted of escape and carrying a weapon into a jail, respectively.  Sanders attempted to claim that these were the same case, when they clearly were not.  Counsel was professionally

Amended § 2255 Pet.                    111            *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

unreasonable in failing to demonstrate that Sanders lied and that he in fact had separate Muskogee County convictions.  (Exhibit 183.)

15.     In Tulsa County Case No. CF-94-1503, Sanders was charged with uttering a forged instrument.  This case was dismissed years later, on September 18, 2001.  Costs were assessed against the state.  Counsel was professionally unreasonable for failing to cross-examine Sanders regarding the disposition of this case, in which he once again avoided a conviction and prison time.  (Exhibit 183.)

16.     In Tulsa County Case No. CM-03-6603, Sanders was charged with obtaining merchandise by false pretenses, a crime of dishonesty upon which he could have been cross-examined, but was not.  Sanders received a one year suspended sentence, fines and costs.  Although he surely promised to do so, Sanders failed to appear before the Tulsa County cost administrator as directed on March 24, 2004.  A bench warrant was issued for his arrest on April 12, 2004.  An application to revoke his suspended sentence was filed on April 14, 2004.  Another bench warrant for Sanders's arrest was issued on May 20, 2004.  On October 6, 2005, Sanders was sentenced to thirty-six days in jail, at a rate of $15.00 per day, to work off what was owed.  Not only the fact of Sanders's conviction for this crime of dishonesty, but his failure to follow through on promises to fulfill the terms of his suspended sentence, could have been inquired into on cross-examination to show him to be a completely untrustworthy individual, who will say one thing to receive something of advantage to himself, but whose word is utterly worthless.  (Exhibit 185.)

17.     In Tulsa County Case No. CM-04-1187, Sanders was charged with drug possession and possession of drug paraphernalia.  On April 5, 2004, he incurred a failure to appear, despite a promise as a condition of his bond to make all court appearances.  During Mr.

Barrett's trial, Sanders appeared, in custody, on September 28, 2005. He entered a not guilty plea, and the case was set for the jury sounding docket on October 13, 2005. On that date, again during Mr. Barrett's trial, and around the time he appeared as a first stage witness, the case was passed to November 17, 2005. On November 17, the last day of Mr. Barrett's trial, the case was passed to February 2, 2006, because Sanders was "in federal custody." On December 9, 2005, Sanders appeared in custody, entered a guilty plea, and was rewarded with sentences of one year in the county jail on each count, with the jail time suspended. (Exhibit 186.)

Mr. Barrett's trial counsel unreasonably failed to cross-examine Sanders over the fact that this case kept getting passed until Sanders performed for the Government at Mr. Barrett's trial, the obvious implication being that any deals he would receive in that case were contingent solely on how much he pleased the Government.

18. In Sequoyah County Case No. CM-00-389, Sanders was charged with attempting to elude an officer, affixing an improper license plate to his vehicle, and eluding arrest. On June 30, 2000, Sanders entered into a plea bargain which called for count 1 (attempted eluding) to be dismissed, fines and costs on count 2 (improperly affixing a license plate), and a one year suspended sentence and a fine on count 3 (eluding arrest). On March 7, 2001, a bench warrant was issued for Sanders's arrest for failure to satisfy terms of probation he promised the court he would fulfill at the time he entered his plea. Counsel was professionally unreasonable for failing to cross-examine Sanders on this act of dishonesty. (Exhibit 187.)

19. In Sequoyah County Case No. CM-03-365, Sanders was arrested, among other charges, for possession of marijuana. He also attempted to resist arrest. Counsel was professionally unreasonable for failing to cross-examine Sanders about the fact that with his prior

drug convictions, he could have been, but was not, charged with felony possession of marijuana rather than a misdemeanor.  (Exhibit 166.)

In sum, counsel was professionally unreasonable for failing to move for a continuance so Sanders could be cross-examined effectively about his litany of prior convictions; his deals, which could only have resulted from his working continuously as a snitch; the charges and cases against him which had been dismissed; the fact that he was facing up to life in prison on many charges, but got virtually nothing by way of punishment; his acts of dishonesty in connection with various charges and his obligation to appear in court and adhere to the conditions of his probation, and the like.

Counsel even failed to discover all of Sanders's prior convictions.  Counsel stated that by his count, Sanders had ten previous convictions, or nine, if Sanders's dispute with one of them was credited.  (R. 2524-36.)  In truth, after the dismissed cases and charges against Sanders are set aside, Sanders had no fewer than eighteen prior felony convictions, if the various counts of conviction are totaled.  The better part of a day or more could have been spent cross-examining Sanders about his criminal record and the wonderful deals he got time after time, even while he continued to commit crimes with impunity.  Instead, counsel merely scratched the surface, cross-examining Sanders generally (and inaccurately) about the number of previous felony convictions, what they were for, and that he received little jail or prison time.  Counsel neglected altogether to cross-examine Sanders about his misdemeanor cases involving dishonesty, and did not even draw the jury's attention to the fact that many of Sanders's convictions, for both felonies and misdemeanors, involved acts of dishonesty.

Had an effective cross-examination on Sanders's record been conducted, his credibility would have been completely destroyed in the eyes of any rational jury.  Impeachment

of Sanders also would have undercut the credibility of Clint Johnson and other Sequoyah County law enforcement officials, not to mention the Government then relying upon him to seek a death sentence.  These omissions alone, or in conjunction with counsel's other failures to investigate the informant witnesses and prosecution evidence, undermines confidence in the verdict.  If trial counsel had presented the available evidence, the jury would have had an entirely different and more truthful view of the case, including that the raid on Mr. Barrett's house was conducted on the word of someone whom the Sequoyah County District Attorney knew was a lifelong liar, drug addict, and opportunistic snitch.

> **2.    Counsel unreasonably failed to investigate and produce witnesses who could have impeached specific claims made by Sanders, and Sanders's credibility as a whole.**

Even in the absence of moving for and securing a reasonable continuance to investigate the snitch witnesses, it is plain that counsel failed to perform an adequate investigation into readily available evidence and witnesses that would have impeached Sanders's credibility and shown him to be completely unworthy of belief about anything and everything.  Instead of locating available witnesses to impeach Sanders, counsel relied on cross-examination alone, which was plainly inadequate.

As noted, Sanders was somewhat "confused" over the dates he supposedly visited Mr. Barrett's property.  Based on one reasonable interpretation of the dates Sanders claimed to have been at Mr. Barrett's residence, and as argued by AUSA Littlefield to the jury, Sanders was at Mr. Barrett's on the afternoon of September 23, 2009,  just hours before the early morning police raid on Mr. Barrett's property.  Littlefield told the jury Sanders was present around 5:00

p.m. to 6:00 p.m. on September 23, around the time the gate to Mr. Barrett's driveway was locked. (R. 4299.)

Had counsel conducted a reasonable investigation, or sought the time to conduct one, they could have produced Rick Lunsford as a witness to rebut this claim. As noted in the discussion of Travis Crawford's testimony, Mr. Lunsford arrived at Mr. Barrett's around noon on September 22, 1999, and stayed until approximately 9:00 p.m. on September 23. Mr. Lunsford states that Sanders was never at Mr. Barrett's property on either September 22 or September 23, 1999. Mr. Barrett's trial counsel did not contact Mr. Lunsford. Had he been contacted, he would have been willing to testify that Sanders was never on Mr. Barrett's property on the afternoon and early evening of September 23rd. (Exhibit 90.)

Likewise, trial counsel failed to contact and interview another witness who could have refuted Sanders's claim to have been in Mr. Barrett's house, where he supposedly saw methamphetamine and a drug sale, according to his direct testimony, in September, 1999. Sean Hill would have testified that Sanders was never in Mr. Barrett's house because Mr. Barrett would not let him in. Mr. Barrett and his real friends stayed as far away from Sanders as possible because it was well known he was a chronic liar and a police snitch. (Exhibit 95.)

As noted, Brandy Hill was present at Mr. Barrett's on the afternoon of September 23, 1999. She could have identified the people who were present during that time. Charles Sanders was not among them. Ms. Hill was never contacted by defense counsel. (Exhibit 77.)

Critically, Sanders testified that two to three days before the shooting, he went to Mr. Barrett's with his then-girlfriend, Geniece [sic] Thomas.[19] He gave conflicting testimony as

_____

[19] Her true name is Janesse Thomas.

to whether Mr. Barrett sold drugs to either him or Ms. Thomas, on this or any other occasion. When questioned by the prosecutor, Sanders claimed that Mr. Barrett sold Ms. Thomas drugs. Questioned by defense counsel, Sanders stated that there was no drug deal when he supposedly went to Mr. Barrett's two to three days before the police raid, and that he merely went there, with Ms. Thomas, to exchange a set of car keys.

Trial counsel never contacted Ms. Thomas. She was an available witness. Had counsel located and interviewed her, she would have testified that Sanders was lying. Ms. Thomas would have testified that she was not at Mr. Barrett's with Sanders a few days before the shooting. She also would have testified that on the occasions she did go to Mr. Barrett's, she never went with Sanders. Moreover, Ms. Thomas could have testified that on the occasions she went to Mr. Barrett's, she never bought drugs from him. On any occasion she was at Mr. Barrett's when Sanders was on the property, she never witnessed or had any knowledge of any drug transactions between Mr. Barrett and Sanders. Mr. Barrett would not have sold drugs or engaged in drug activities with Sanders because Mr. Barrett neither liked nor trusted Sanders, who was a well-known snitch. (Exhibit 13.)

Staff Sergeant Robert "Bubba" Thompson, is an eyewitness whom trial counsel could have called to impeach Sanders's and the Government's claim that Sanders was at Mr. Barrett's on the afternoon of September 23, 1999. Trial counsel never contacted Mr. Thompson, although he was readily available and would have testified had he been asked to do so. In 1999, Mr. Thompson was a good friend of Toby Barrett's, and often visited the Barrett property. He was at Mr. Barrett's on the afternoon of September 23, hanging out with Toby Barrett on the front porch. There were two or three other people visiting with Kenneth Barrett at the time Mr. Thompson was there. Mr. Thompson is sure that Charles "Monk" Sanders was not at Mr.

Barrett's on the afternoon of September 23.  In fact, Mr. Thompson never saw Sanders at Mr.

Barrett's, even though Thompson was a frequent visitor.  Contrary to the claims of Sanders and

some of the other informant witnesses, Mr. Thompson never heard Mr. Barrett state, on

September 23, 1999, or at any other time, that he wanted to kill police, that he would kill any law

enforcement officer who came on his property, or that he wanted to go out "in a blaze of glory."

(Exhibit 37.)

Counsel unreasonably failed to interview and present at trial some of the

witnesses discussed immediately above, and others who could have testified that Sanders is a

pathological liar whose word should not have been relied upon by Clint Johnson or the jury.

These witnesses were known in the community, had experience with Sanders, had formed the

opinion that Sanders was dishonest and completely untrustworthy, and knew that Sanders had a

horrendous reputation in the community for truth and veracity.  These witnesses also could have

armed counsel with information to cross-examine Sanders, in the first stage of trial, about various

bad acts and acts of dishonesty.  Since Sanders also appeared as a penalty phase witness for the

Government, and because the rules of evidence are relaxed in the second stage of a capital trial,

these witnesses could have given specific testimony on specific bad acts of Sanders and actions

which reflected negatively on his credibility.  The impeachment of Sanders, alone or in

conjunction with doubts about the conduct of the Tact Team, would have provided jurors with

reason to vote for a sentence less than death.

Rick Lunsford could have testified that he knows Sanders, and had done drugs

with him in the past.  Sanders was a heavy drug user, who also dealt drugs.  In Mr. Lunsford's

opinion, Sanders is a dishonest person.  Mr. Lunsford would not believe anything Sanders said.

Sanders was even dishonest in his drug dealings.  Sanders often sold bad dope to people and

ripped them off. As reflected in court documents, he never seemed to get in trouble for his drug dealings. Mr. Lunsford is aware that Sanders once kidnaped a woman, Sally Davis. Mr. Lunsford could have testified to his personal opinion that Sanders is wholly dishonest, and his knowledge that Sanders has a richly deserved reputation for dishonesty in the community. Mr. Lunsford, as noted in the discussion regarding Travis Crawford, also could have testified that Mr. Barrett never threatened harm to the police, and never said he would go out in a "blaze of glory" or anything like that. (Exhibit 90.)

Janesse Thomas, Mr. Sanders one-time girlfriend, could have testified to her well informed opinion that Sanders is dishonest and would say and do anything as long as he believed he would obtain something of advantage to himself. Sanders's reputation for honesty in the community is horrible. Ms. Thomas could also have given testimony showing that Sanders resented Mr. Barrett and had a motive to lie against him. On one occasion, when Thomas was still Sanders's girlfriend, she tried to get away from him and called Mr. Barrett and another friend for help. Thomas left Sanders, and was picked up by Mr. Barrett. Sanders and his mother, Evelyn Sanders, followed Mr. Barrett and Thomas. Sanders was angry and was trying to persuade Ms. Thomas to come back with him and his mother. Instead, Mr. Barrett was able to get Ms. Thomas away from Sanders. (Exhibit 13.) Based on these events, jurors would have found Sanders had a personal motive to lie about Mr. Barrett, apart from or in addition to his interest in currying favor with law enforcement.

Sean Hill, another person with experience and knowledge of Sanders, could have testified to his opinion, and the community's judgment, that Charles Sanders is a liar who was accorded no credibility whatever, and was known to trade false allegations about others for favors from law enforcement. When Mr. Hill heard that the Government sponsored Sanders as a

witness at Mr. Barrett's trial, he could not believe the prosecutors would rely on Sanders because of his lengthy arrest record.  In his penalty phase testimony, Sanders claimed that Mr. Barrett had made statements to the effect that the informant against him should be found and harmed.  Mr. Hill could have given testimony from which the jury could infer that Sanders was attributing to Mr. Barrett actions that routinely occurred without any connection to Mr. Barrett.  Mr. Hill would have informed the jury that when Sanders is in jail, he is routinely beaten up by other inmates because he falsely informs on others.  (Exhibit 95.)

Sally Davis Johnson, a one-time girlfriend of Sanders, was available as a witness, but was never contacted by the defense.  She last had contact with Sanders in 2004, before Mr. Barrett's trial.  In her personal opinion, Sanders is untrustworthy.  Sanders is dishonest when sober, but when he is on drugs, he is "100 times more dishonest."  Ms. Johnson could never believe anything Sanders said on any subject.  (Exhibit 94.)

Ms. Johnson could have provided defense counsel with information about specific bad acts of dishonesty and violence that could have been used to impeach Sanders either in the first or second stage of trial.  This evidence would have put the lie to the prosecution's portrayal of Sanders as simply a non-violent doper who was himself the innocent victim of planned violence by others.

On one occasion, Sanders used lies and fraud to get Ms. Johnson to go with him. Sanders showed up at her house and said he needed to talk to her.  She told him she could talk to him briefly, but had to get back to school.  She left with Sanders in his car.  Against her will, Sanders kidnaped her and took her to Vian, Oklahoma, where she was held for eight days.  She was beaten on a daily basis by Sanders, and was even stabbed.  During this ordeal, Sanders lied to her repeatedly, telling her he would take her home when her bruises healed.  Instead, Sanders

Amended § 2255 Pet.                    120                *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

simply kept beating her. When she tried to escape, Sanders threw a knife at her, and stabbed her in the foot. Sanders also used a knife to cut her from her neck to her chin. After five days of being held by Sanders, he turned himself in to the police on an outstanding charge. At this point, Sanders turned Ms. Johnson over to his mother, Evelyn Sanders, who confined her for another two to three days. The police finally rescued Ms. Johnson. Evelyn Sanders tried to cover up Ms. Johnson's many bruises with make-up. A police report was made by Ms. Davis about what Sanders did to her. (Exhibit 94.)[20]

Ms. Johnson could have told defense counsel, had she been contacted, about an act of threatened violence committed by Sanders. Sanders once threatened Ms. Johnson's mother, Linda Davis, because Ms. Davis would not tell Sanders where Ms. Johnson was. Sanders stated that unless Ms. Davis gave him the information he wanted, he would find Ms. Johnson and cut her tongue out. (Exhibit 94.)

Ms. Johnson, had she been contacted by defense counsel, also could have informed the defense about other specific acts of dishonesty committed by Sanders. Sanders once took her along on a stealing spree, during which Sanders stole from virtually everyone he knew in order to get money to buy drugs. The police were informed about this by Ms. Johnson. Sanders had also stolen from Ms. Johnson and her family in order to get money to buy drugs. Sanders was so pathetically dishonest he once stole Ms. Johnson's children's toys in order to pawn them for drug money. (Exhibit 94.)

One of Mr. Sanders's own relatives could have testified, had he been contacted by the defense, that "Monk" is untrustworthy and his claims are considered uniformly unbelievable.

---

[20] Evidently, based on the search of Sanders's court records, he was never charged in this incident because he was working as a police snitch.

Billy Poindexter is Sanders's uncle, and has known Sanders his entire life.  According to Mr.
Poindexter, "you can believe him [Sanders] about as far as you can throw a pick-up truck."  Mr.
Poindexter would have confirmed that Sanders has been in trouble his whole life.  Mr.
Poindexter himself would not believe his nephew about anything.  Mr. Poindexter is aware that
when Sanders testified at Mr. Barrett's trial, Sanders was doing so in order to get out of his own
troubles with the law.  Mr. Poindexter is also aware that after testifying against Mr. Barrett,
Sanders served no jail time for anything he was in trouble for.  Mr. Poindexter would have
testified that Sanders has a low reputation in the community for truthfulness.  (Exhibit 76.)

Additionally, had trial counsel moved for a continuance, they could have
developed all the evidence detailed above respecting Sanders's credibility to mount a withering
attack on the search warrant under *Franks*.  This evidence would demonstrate that *no one,
including Clint Johnson*, could have used Sanders as a "reliable" confidential informant.[21]

### d.    Randy Weaver.

Randall Weaver testified in the first stage of Mr. Barrett's trial.  He stated that in
1999, he was using methamphetamine, and had been to Mr. Barrett's place three or four times in
the Spring and Summer of that year.  Using the death of Trooper Eales as a benchmark, Weaver
stated he had been to Mr. Barrett's earlier in 1999 looking at cars.  On that occasion, Weaver and
Mr. Barrett used methamphetamine together.  Weaver went to Mr. Barrett because he was a good
mechanic.  Whenever he went to Mr. Barrett's property, the gate was open; Mr. Barrett did not
come out with a gun on the occasions Weaver went to the property.  Weaver testified he bought

---

[21] *See also* Claim 5 (Mr. Barrett's *Brady/*newly discovered evidence claim respecting the
complete lack of credibility of both Sanders and Johnson).

$20.00 of methamphetamine from Mr. Barrett. Weaver claimed Mr. Barrett told him that he (Mr. Barrett) had missed a court date, and that he thought a warrant had been issued. (R. 1835-39.)

Weaver, who was interviewed by Bret Smith and defense investigator Loyd Cobb in AUSA Mike Littlefield's presence, testified he had first been approached about Mr. Barrett's federal case by Littlefield, who came to his tattoo shop in Arkansas. Weaver had previously done time on an Arkansas cocaine charge. When Littlefield came to see him at the tattoo shop, he asked whether Weaver had ever sold ammunition to Mr. Barrett, and informed Weaver that it was against federal law for Weaver to possess ammunition because of his previous conviction. Weaver told Littlefield he never sold ammunition to Mr. Barrett. Littlefield's statement to Mr. Weaver about the sale of ammunition might be construed as a subtle threat, but Weaver felt he had nothing to worry about because he had done nothing wrong. (R. 1835-39.)

Questioned by defense counsel, Weaver testified that in a rural area like he and Mr. Barrett lived in, people don't drive up without warning in the middle of the night. If a gate is closed, people should not go onto somebody else's property. It makes no sense to do such a thing. (R. 1840-45.)

Although he was interviewed briefly by the defense, defense counsel and the defense investigator failed to ask Weaver whether, when Mr. Barrett supposedly discussed his court case, or at any other time during the Spring and Summer of 1999, he ever said words to the effect that he would blast the first policeman who came onto his property, would "go out in a blaze of glory," or had in any way, at any time, threatened the police. Had he been asked these questions at trial, Weaver would have testified that Mr. Barrett never made such statements to him or anyone else in his presence. In fact, Mr. Barrett never indicated to Weaver that he would ever do violence to anyone. (Exhibit 24; Exhibit 38.)

e.      **Brandie Zane Price.**

Brandie Price testified she first met Mr. Barrett in August or September, 1999,

and went to his residence four to six times during this period.  (R. 3485-86.)  Price testified that a

week to ten days before the shooting incident, Mr. Barrett mentioned that he had an outstanding

warrant and that the police were going to come get him.  Mr. Barrett supposedly stated that if the

police arrived, those present should either grab a gun or hit the floor, because he "was going to

take as many of them bastards out as he could."  (R. 3492-93.)

Price stated that she usually went to Mr. Barrett's house with Ronny Baldwin,[22]

who would drive her vehicle through the ditch area the police went through when they raided Mr.

Barrett's house.  (R. 3502-06.)  Defense counsel cross-examined Price about statements she

made to the authorities in 2000, where she stated that Mr. Barrett had a MAC-10 and a Mini-14

at his residence, which were unlike the weapons she described on cross-examination.  She also

stated in 2000 that she went to Mr. Barrett's with a lady named Jaime Crow, which she denied

doing in her testimony.  (R. 3509-11.)

Price's claim that Ronny Baldwin or she usually approached Mr. Barrett's

residence from the east through the ditch in her Mazda or Mitsubishi automobile could have been

easily refuted by the testimony of Sean and Brandy Hill.  Had they been contacted, they would

have testified that it would have been impossible for this low-slung vehicle, no matter how

---

[22]  Ronny Baldwin testified for the defense.  He stated he could never recollect going to Mr. Barrett's house with Brandie Price at any time, and that he never would have driven her car through the depressed area to the east of Mr. Barrett's cabin.  Baldwin could not have gone to Mr. Barrett's in August and September as she claimed, because he was jailed on August 4, 1999, and remained in jail through the entire month of September 1999.  (R. 4117-23, 4182-83.)

slowly it was going, to navigate the ditch successfully. The undercarriage would have been severely damaged in the attempt. (Exhibit 95; Exhibit 77.)

Counsel also failed to call any witnesses who could testify to their well-informed opinions regarding Price's honesty, or her reputation for honesty in the community. Sean Hill was an available witness never contacted by the defense. If he had been interviewed and prepared to testify, he could have told the jury that Price was known in the community as a thoroughly dishonest person who would do or say anything to obtain drugs. (Exhibit 95. *See also* Claim 5, *infra*.) Moreover, the witnesses who were never investigated who could have impeached claims by Monk Sanders, Travis Crawford and Cindy Crawford that Mr. Barrett made threatening statements against law enforcement could have been used to indirectly discredit Price, since her story was simply too pat and conveniently lined up with what Sanders and the Crawfords said on the witness stand. (Exhibit 90; Exhibit 77; Exhibit 96; Exhibit 38; Exhibit 37.)

#### f.    Karen Real.

Karen Real, like all the other informant witnesses except Randy Weaver, refused to talk to the defense. (R. 3076-77.) At the time she testified against Mr. Barrett, she was serving a fourteen year federal sentence on drug charges and a firearms charge. (*See* Claim 5, *infra*.) Real had been to Mr. Barrett's on several occasions. She claimed he usually kept his gate locked, and that when people arrived on his property, he would grab a gun before he determined who they were. (R. 3085-86.) Real did drugs with Mr. Barrett, and testified that he sold drugs and kept syringes in his house. (R. 3087-88, 3099, 3091, 3102-03.) According to Real, Mr. Barrett stated he would shoot the police if they came on his property. (R. 3106.)

Counsel relied strictly on cross-examination in an attempt to impeach Karen Real. No witnesses who knew her in the community were called to testify regarding her honesty. As with Brandie Price, Sean Hill could have testified that Real's word was not to be believed. According to Mr. Hill, Real is a "pretty messed up" person. Although Real's federal conviction was brought out, counsel never asked her if she had provided information against her co-defendants in an effort to secure leniency. Mr. Hill states that she informed on her boyfriend and co-defendant, Doss Gann, in an attempt to get favorable treatment. Karen Real is the type of person who would do and say anything to get out of trouble. (Exhibit 95.) Again, witnesses who could have been called to impeach the claims of the Crawfords and Sanders that Mr. Barrett threatened violence against the authorities if they came on his property could have been used to indirectly impeach Real's virtually identical claim. (Exhibit 90; Exhibit 77; Exhibit 96; Exhibit 38; Exhibit 37.)

As with a number of the informant witnesses, trial counsel failed to conduct a search of available state court files to impeach Karen Real. A search of the Sequoyah and Cherokee County Court files would have shown that she had several serious state drug cases that were ultimately dismissed, some shortly before Mr. Barrett's trial. These dismissed charges would have shown Real's bias and motive in testifying against Mr. Barrett. Bias and motive are never "collateral matters" from which a witness can be shielded from cross-examination. Moreover, it is of no significance if some or all of these state charges were dismissed in lieu of Real's federal prosecution. Under the dual sovereign doctrine, Real could have, but for the dismissal of these charges, faced serious prison time in the Oklahoma Department of Corrections. After all, Mr. Barrett was convicted in both state and federal court for a single alleged criminal transaction. There was nothing to guarantee that the state charges against Real

would not be revived if she failed to please the federal prosecutors with her testimony against Mr. Barrett.

In Sequoyah County Case No. CF-97-445A, Real was charged with attempted manufacture of methamphetamine, possession of CDS with intent to distribute, possession of marijuana, two counts of possession of CDS, and two counts of possession of drug paraphernalia. These charges were filed on December 22, 1997. The case was passed, or little action was taken on it, until May 18, 2004, when a motion to dismiss was filed. The motion to dismiss was granted by an order entered on May 24, 2004. (Exhibit 52.)

In Sequoyah County Case No. CF-98-264A, Real was charged with manufacturing methamphetamine, trafficking in methamphetamine, unlawful use of a police radio, possession of CDS, and possession of drug paraphernalia. The charges were filed on July 29, 1998. A bench warrant for failure to appear was issued on June 7, 1999, and was recalled on June 9 or 10, 1999. Nothing happened in the case until May 18, 2004, until a motion to dismiss was filed. The motion was granted on May 24, 2004. (Exhibit 51.)

In Sequoyah County Case No. CF-99-250A, Real was charged with trafficking methamphetamine, possession of marijuana with intent to distribute, unlawful use of a police radio, possession of a firearm in the commission of a felony, and unlawful possession of drug paraphernalia. This case was filed on June 8, 1999, over three months before Trooper Eales was killed. Little or no action was taken on the case before it was dismissed on May 24, 2004, based on a motion filed on May 18, 2004. (Exhibit 49.)

In Sequoyah County Case No. CF-99-251, Real was charged with unlawful possession of CDS. The information was filed June 28, 1999. On February 15, 2001, an order was entered that Real was awaiting sentencing in her federal case and that this state case would

be dismissed after Real was sentenced in federal court.  On September 4, 2001, a motion to dismiss and an order dismissing the case were filed.  The order dismissing was apparently finalized on December 20, 2001.  (Exhibit 50.)

In Cherokee County Case No. CF-99-18,  Real was charged, on January 26, 1999, with trafficking in illegal drugs, manufacture of a controlled dangerous substance, possession of marijuana with intent to distribute, possession of a controlled dangerous substance in the presence of a minor child, and use of a weapon in the commission of a crime.  The case was passed on a number of occasions.  On February 15, 2001, an order was entered that Real was awaiting sentencing in federal court, and that the case would be dismissed after she had received her federal sentence.  On June 4, 2001, a motion to dismiss and an order dismissing were filed. (Exhibit 47.)

In Cherokee County Case No. CM-99-40, Real was charged with the misdemeanor of possession of drug paraphernalia.  The case was filed on January 26, 1999. Little happened on the case until February 15, 2001.  An order was entered noting that Real was pending sentencing in federal court, and that the case would be dismissed after Real received her federal sentence.  On September 4, 2001, a motion to dismiss and an order dismissing the case were entered.  (Exhibit 48.)

In Cherokee County Case No. CF-99-251, Real was charged with possession of CDS.  The charge was filed on June 28, 1999.  On February 15, 2001, an order was entered reflecting that Real was awaiting sentence in federal court, and that the case would be dismissed after she received her federal sentence.  On September 4, 2001, a motion to dismiss the case and an order dismissing the case were entered.  (Exhibit 50.)

Because counsel failed to adequately research Real's criminal record, the jury was left with the false impression that the only trouble she had been in stemmed from the federal prosecution on which she was doing time when she testified against Mr. Barrett.[23]  Based on the dismissed state charges, counsel could have drawn her credibility into serious question by pointing out that she had previously avoided the potential of lengthy sentences in state court, which could well have run consecutively to one another and to her federal sentence, and that to prevent the possible revival of her state cases, it was certainly in her interest to cooperate with the Government in Mr. Barrett's prosecution.  Each of these state cases involved separate criminal transactions, and some were apparently dismissed not necessarily in lieu of federal prosecution, but for other reasons.  It certainly could have been strongly implied on cross-examination that some of these cases were dismissed because Real acted as a police informant.  Mr. Barrett's trial counsel's failure to discover Real's state criminal record was professionally unreasonable, and prejudiced Mr. Barrett because her direct testimony was largely unscathed by cross-examination. Thus, the jury was wrongly left with another largely un-impeached witness who regaled it with tales of Mr. Barrett's "plan" to confront law enforcement with deadly force if his property were ever raided.

### g.    Randy Turman.

At trial, Randy Turman claimed Mr. Barrett taught him how to cook methamphetamine.  (R. 193.)  At the time he testified, Turman had pending state charges for manufacturing methamphetamine.  (R. 193.)  He was at liberty on a $120,000.00 bond.  Turman admitted that he had cooked methamphetamine once a week for five years, and to possessing a

---

[23]  Real was rewarded for her testimony against Mr. Barrett when the Government filed a Rule 35 motion to reduce her 14 year sentence to time served.  See Ground 5.

firearm while doing so.  When asked about these charges, Turman said "it's done been taken care of."  (R. 445-46.)  The witness had taken numerous drugs over an extended period of time, and was once up for four days on a "meth run."  (R. 430-31.)  Turman claimed there was nothing going on in his case.  He had gone to court, and as far as he knew, the charges had been resolved.  (R. 434-35.)  Turman testified he had no deals in exchange for his testimony, that he had not been given immunity from punishment, and that he never worked as an informant or paid informant.  He declined to talk to the defense because he figured he would be questioned in court, and that would suffice.  Asked if one of the charges currently lodged against him was for altering the serial number on an SKS, he stated that charge had been dropped.  (R. 434-35, 439-44.)  Turman stated he was simply in court to tell the truth.  (R. 445.)

Turman claimed he met Mr. Barrett three or four months before Trooper Eales was shot.  (R. 364-65.)  He "hung out" at Mr. Barrett's and would use methamphetamine there.  (R. 366.)  He stated he witnessed Mr. Barrett cooking methamphetamine in his cabin.  (R. 377.)  He identified Government's Exhibit 65, a photograph taken in Mr. Barrett's shop of mineral spirits, toluene, and paint thinner.  Turman stated Mr. Barrett would use these ingredients to cook meth.  (R. 383-84.)  Tubing used to manufacture methamphetamine was kept in Mr. Barrett's cabin.  (R. 384-85.)  Glassware used in the manufacturing process was kept in a water trough.  (R. 385-86.)  Turman explained how Mr. Barrett supposedly "powdered" methamphetamine in his shop and how a hose was attached to a gas tank during the cooking process.  (R. 387-91.)  Turman testified, though, that he never actually saw Mr. Barrett cooking meth, and that he never really discussed the manufacturing process with Mr. Barrett, even though he claimed Mr. Barrett was the person who taught him how to cook meth.  (R. 389-91.)

Turman testified he recognized items that were in Mr. Barrett's house during the summer of 1999, including a tool box and hose, and explained how Mr. Barrett could used these items to make dope.  (Government's Exhibit 63, R. 396-97.)  Turman testified Mr. Barrett would lock the gate to his driveway to restrict access to his property, and identified the "warning sign" that had been placed there.  (Government's Exhibit 104.)  The witness claimed Mr. Barrett never left his property because there was a warrant out for his arrest, and that he was afraid the police would come to his house.  (R. 397-401, 416.)

Mr. Barrett kept several weapons in his home, including a .233 Colt Sporter rifle; a .22 pistol; a Smith and Wesson 9mm pistol; and a double-barreled 12-gauge shotgun, which Turman said he sold Mr. Barrett.  (R. 401, 404-11.)

Turman admitted he went to Mr. Barrett's house to paint a car on one occasion, and that the enamel reducer and mineral spirits in the cabinet to Mr. Barrett's shop were used to paint vehicles.  (R. 437-39.)

Turman testified Mr.  Barrett had expressed concern about law enforcement coming to his property, and allegedly stated there would be a shoot-out if this occurred.  According to Turman, Mr.  Barrett expressed the hope that Sheriff Philpot or Frank Loyd would be the first law enforcement officers through the door.  (R.  412).  Turman also testified that on one occasion, late at night, an individual had come to the gate of Mr.  Barrett's property and said he was running from the law and expected law enforcement to arrive at any time.  Mr.  Barrett's response to this, according to Turman, was to go into his cabin and retrieve his Colt Sporter rifle.  (R. 414-15).

Thus, Turman was a critical witness on the underlying drug charges in the superseding indictment, as well as on the question of Mr. Barrett's intent.  Turman was

especially important on the drug charges, since the search of Mr. Barrett's home and property yielded no working methamphetamine lab and virtually no drugs. It was therefore of paramount importance that Turman be effectively impeached. This, trial counsel failed to take reasonable steps to do.

Trial counsel was professionally unreasonable for failing to research Turman's court file on the charge that had "done been taken care of." The pending felony drug and firearms charges were still open when Turman testified. Contrary to Turman's testimony, the possession of a firearm with an altered serial number charge had not been dismissed. The only way these charges could have been "taken care of" is if Turman were acting as a police informant, and was going to get some sort of deal in exchange for his informant work and his testimony against Mr. Barrett.

In Sequoyah County Case No. CF-02-477, filed on September 10, 2002, Turman was charged in a six count information with manufacturing methamphetamine; possession of methamphetamine with intent to distribute; possession of precursor material; another count of possession of precursor material; possession of a firearm while committing a felony; and possession of a firearm with an altered serial number. The charges were based on evidence recovered during the execution of a search warrant. Turman posted an appearance bond on September 20, 2002. A preliminary hearing was set for April 17, 2003. The preliminary hearing was re-set for June 12, 2003, and apparently re-set again on later dates, since preliminary hearing was ultimately waived on November 3, 2003. According to documents in the Sequoyah County Court file, the case literally fell off the map until May 9, 2007, when the District Attorney's Office filed a motion to dismiss "in the best interests of justice." The motion to dismiss was granted by written order the same day it was filed. (Exhibit 195.)

Counsel were professionally unreasonable for failing to expose Turman's bald-faced lie about his case having been "taken care of," and one of the firearms charges having been dismissed, when the case was still active and literally nothing had happened on it in two years. Not only would Turman have been exposed as a perjurer, but the curious chronology of his Sequoyah County felony case could have been used to support counsel's claim on cross-examination, which Turman denied, that he was a police snitch, had made an undisclosed deal with the Government for his testimony against Mr. Barrett, and was going to be rewarded in the end (as he was) depending on whether he pleased the Government with his testimony. With respect to Turman's testimony regarding Mr. Barrett's supposed comments about law enforcement, counsel were also unreasonable for failing to produce testimony from available witnesses who could have testified, in direct contrast to the informant witnesses, that Mr. Barrett did not and would not threaten violence toward law enforcement. (E.g., Exhibits 37, 77, 90, 96).

Counsel were also professionally unreasonable, as with the other informant witnesses discussed above, in failing to develop and introduce evidence regarding Turman's overall lack of honesty. Sean Hill could have testified that Randy Turman is "as low as you get," and that he was known in the community as a thief who would "testify against anyone to save his own skin." (Exhibit 95.)

### Conclusion.

There was one major difference between Mr. Barrett's state prosecution, which ended in a conviction of manslaughter, and his federal case, which resulted in the death penalty: the testimony of the seven snitches, who were nowhere to be found in 2002 and 2004, when Mr. Barrett was tried in state court. Their testimony was vital to the Government's case for intent in both stages of trial, and to establishing the underlying drug charges. Despite the obvious

importance of these witnesses, as the trial court itself stated on September 13, 2005, Mr. Barrett's trial counsel failed to move for a continuance, and took virtually no steps to investigate and impeach these witnesses. *United States v. Fuller,* 938 F. Supp. 731, 733-34 (D. Kan. 1996) (counsel ineffective for, among other reasons, failing to insist on adequate time to prepare for trial). In Mr. Barrett's case, counsel in effect agreed to a trial by ambush with respect to the seven crucial informant witnesses. Because of the critical importance of these witnesses, who could have been devastated had proper investigative steps been taken, the failures of trial counsel were unquestionably prejudicial. There is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that but for counsel's indefensible errors and omissions, the result of the guilt stage of trial would have been different. At a minimum, these failings also had a prejudicial effect on the punishment stage. *Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Strickland v. Washington,* 466 U.S. 668 (1984).

This case is analogous to *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002), where, in the context of a *Brady* claim, a capital conviction was vacated because exculpatory evidence which could have been used to impeach witnesses was not disclosed. The concealed evidence, there and in Mr. Barrett's case, would have shown that witnesses had motive to lie and had colluded in their stories. *See also Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2002) (counsel ineffective in part for failing to impeach immunized witness); *Steinkuhler v. Meschner,* 176 F.3d 441, 445 (8th Cir. 1999)(counsel ineffective for failing to use available evidence to impeach witnesses). In Mr. Barrett's case, counsel failed adequately to investigate the criminal history of the informant witnesses, particularly Sanders and Turman, and failed to research their court files, which would have produced devastating impeachment and demonstrated that they had motives to lie. *See also, e.g., Reynoso v. Giurbino,* 462 F.3d 1099, 1114, 1120 (9th Cir. 2006)

Amended § 2255 Pet.                    134              *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

and *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995), *cert. denied,* 519 U.S. 910 (1996)(counsel ineffective for failing to impeach); *Horton v. Massie,* 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished)(counsel ineffective for failing to call defendant's young daughter in murder case to support claim that while defendant was present, she did not participate; the prosecution's key witness told inconsistent stories, and prosecutor emphasized defendant's version was uncorroborated; counsel was also ineffective for failing to investigate and present evidence that the prosecution's chief witnesses were collaborating with each other and had a motive to lie).

> **5.      Trial counsel were ineffective in failing to make appropriate and timely objections to improper hearsay evidence of other bad acts.**

Fed.R.Evid. 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

"The Federal Rules of Evidence generally preclude the use of evidence of crimes or wrongs unrelated to the conduct at issue if that evidence is offered to prove a propensity to behave in a particular manner." *Tanberg v. Sholtis,* 401 F.3d 1151, 1168 (10th Cir. 2005).  For evidence of other crimes or bad acts to be admissible under Rule 404(b), four factors must be satisfied: (1) the evidence is offered for a proper purpose; (2) the evidence is relevant; (3) the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) upon request, the district court provides an appropriate limiting instruction.

*United States v. Cherry,* 433 F.3d 698, 700-02 (10th Cir. 2005).  *See also*, *United States v. Brooks,* 161 F.3d 1240, 1243 (10th Cir. 1998), *citing Huddleston v. United States*, 485 U.S. 681, 691-92 (1988).  In offering 404(b) evidence, the Government carries the burden of showing how the proffered evidence is relevant to one or more issues in the case; it must specifically articulate the evidentiary hypotheses by which a fact of consequence may be inferred from the other acts evidence.  *United States v. Biswell,* 700 F.2d 1310, 1317 (10th Cir. 1983).  There must be a clear and logical connection between the alleged earlier offense or misconduct and the case being tried.  *Id.* at 1317-18.

Before prior bad acts evidence is admissible, the trial court must find: (1) the evidence tends to establish intent, knowledge, motive, identity or absence of mistake or accident; (2) must also be related to the charge in that it serves to establish intent, knowledge, motive, identity or absence of mistake or accident; (3) must have real probative value, not just possible worth; and (4) must be close in time to the crime charged.  If the trial court determines that the prior acts are admissible under 404(b), it must still conduct a separate balancing of the probative value of the evidence and its prejudicial impact under Fed.R.Evid. 403.  *United States v. Temple,* 862 F.2d 821, 823-24 (10th Cir. 1988), *relying on United States v. Morales-Quinones,* 812 F.2d 604, 612 (10th Cir. 1987); *United States v. Hogue,* 827 F.2d 660, 663 (10th Cir. 1987).

On September 22, 2005, after the start of the trial, the Government filed a Notice of Intent to Offer Evidence of Other Crimes.  (Doc. 206.)  Aside from evidence regarding narcotics activity at Mr. Barrett's residence preceding the shooting of Trooper Eales, the Government stated it intended to offer testimony from the majority of its informant witnesses (Charles Sanders, Randy Turman, Cindy Crawford, Travis Crawford and Brandie Price) that in the weeks and months preceding the shooting of Trooper Eales, Mr. Barrett had made statements

to the effect that if law enforcement came on his property, he would shoot them.[24]  The

Government argued these alleged statements were relevant to show Mr. Barrett's intent. (Doc.

206 at 1-3.)  The Government's filing failed to give notice that informant witness Karen Real

would offer similar evidence of supposed statements made by Mr. Barrett.  Before Mr. Barrett

could respond, the Government's filing said, "The defendant has not complained of lack of

notice." (Doc. 206 at 4.)

        The Government's Notice was filed nine days after the trial court, during an *ex*

*parte* hearing, advised the prosecutors that the testimony they intended to present from

informants included evidence covered by Rule 404(b).  (Tr. 8/13/05 Hr'g at 22-23.)  The court

permitted the prosecutors to argue outside the presence of Mr. Barrett and his counsel that the

testimony was not within the scope of the rule.  *Ibid.*  Following the conclusion of that

discussion, when defense counsel were present, the trial court described the content of the *ex*

*parte* discussion without revealing that it included the court stating that the testimony described

*in camera* included 404(b) evidence.  *Id.* at 25-27.

        On September 27, 2005, trial counsel for Mr. Barrett filed a response to the

Government's 404(b) Notice, contesting specifically the evidence of Mr. Barrett's alleged

statements, and arguing that the proposed testimony from the informant witnesses was irrelevant

propensity evidence; any marginal relevance or probative value it might possess was outweighed

by the danger of unfair prejudice.  (Doc. 215.)

        On the same day counsel for Mr. Barrett filed their response to the 404(b) Notice,

the court stated it would rule on admissibility as the evidence developed, and directed the

---

[24] Mr. Barrett's argument concerns only the testimony offered by the informant witnesses regarding his alleged statements or actions related to those statements.

Government to approach the bench immediately before it intended to offer such evidence.

Defense counsel were directed to submit an appropriate limiting instruction, should they desire to

do so. (R. 174.) Defense counsel filed a proposed limiting instruction on September 28. (Doc.

218.)

Without objection, informant Randy Turman testified that Mr. Barrett expressed

concerns that the police were going to come to his property; said there would be a shootout if this

happened; that he hoped Sequoyah County Sheriff John Philpot or Frank Loyd would be the first

officers through the door; and that he would "take out" as many officers as he could. (R. 412-

13.) Turman also testified about a supposed late-night incident where a man came to the gate of

Mr. Barrett's property and said he was running from the law and expected the police to arrive. In

response to this, Mr. Barrett supposedly went in his cabin and retrieved his Colt Sporter rifle. (R.

414-15.) This testimony was met with an objection, which was overruled. (R. 414.)

Turman testified that he began going to Mr. Barrett's property three to four

months before the shooting of Trooper Eales. By his vague estimate, he was last there a month

or two before the shooting. (R. 413.) On cross-examination, Turman stated he could not

remember the dates and times on which any of the incidents he testified occurred. All Turman

could really say was that they had to have occurred in the three to four months preceding the

shooting of Trooper Eales that he claimed to have frequented Mr. Barrett's property. (R. 422-

23.)

Without objection, Charles Sanders, on direct examination, stated Mr. Barrett told

him that if the police came to his property, he would shoot the first officer who came through the

door, and that he expected it to be John Philpot. No real time frame was given for this alleged

statement. (R. 2515.) On cross-examination, Sanders testified that in September 1999, Clint

Johnson asked if Mr. Barrett had ever made any statements about doing violence to law enforcement. Sanders stated, "I think the response was that me and Kenny Barrett had a discussion about him killing John Philpot if he came through his door." (R. 2612.) Sanders was initially unable to put any kind of time frame on this statement; the statement was simply made "sometime," and he did not know when the alleged conversation occurred. Drifting toward an attempt at some sort of specificity, Sanders then said that while the conversation could not have occurred in 1998, it would have been before July, 1999. (R. 2612, 2614.)

Responding to a leading question by the prosecutor which set the relevant time frame at a month or two before the shooting of Trooper Eales, Cindy Crawford testified Mr. Barrett said he would "go out in a blaze of glory" if the police raided his property. This statement supposedly occurred in the context of Mr. Barrett remarking that he had a misdemeanor warrant outstanding. Crawford admitted she was a heavy drug user at the time of this alleged conversation, that she lost her sense of time when she was on drugs, and that Mr. Barrett's reference to a misdemeanor warrant could have been made long before 1999. (R. 3068, 3070, 3072-73.) No objection was made to Crawford's testimony regarding Mr. Barrett's alleged statements. (R. 3068.)

Brandie Price, who claimed she went to Mr. Barrett's cabin in August and September 1999, testified that a week to ten days before the shooting of Trooper Eales, Mr. Barrett remarked that he had an outstanding warrant and that if the police came to the property, any visitors to his residence should either grab a gun or hit the floor. Mr. Barrett supposedly stated that he would "take out as many" lawmen as he could. Price admitted that her memory was very foggy during this period of time due to her drug use. (R. 3485-86, 3492-93, 3507,

3509.)  No objection was made to Price's testimony regarding Mr. Barrett's purported statements.

Karen Real testified she periodically visited Mr. Barrett at his cabin from 1997 until, by her estimation, early 1999.  (R. 3082-83.)  She told defense counsel it was possible the last time she had been to Mr. Barrett's property was in late 1998.  (R. 3118-20.)   During this time period, according to Real, Mr. Barrett expressed a negative view of law enforcement.  (R. 3090.)  Initially, a defense objection was sustained when the prosecutor asked Real what Mr. Barrett had specifically said about this subject.  (R. 3090.)  A short time later, without objection, when asked what Mr. Barrett had said about the police in late 1998 or early 1999, Real responded Mr. Barrett said he would shoot law enforcement officers who came on his property.   (R. 3106.)   Like the other informant witnesses, Real had been a heavy drug user.  At the conclusion of Real's testimony, defense counsel moved to strike her testimony because it was remote in time.  The prosecution countered that Real's testimony related to a continuing pattern of behavior on Mr. Barrett's part.  The court overruled the objection.  (R. 3135-36.)

The only witness to give testimony respecting alleged statements by Mr. Barrett threatening violence to law enforcement that was in any sense contemporaneous with the shooting of Trooper Eales came from Travis Crawford.  Crawford testified that on September 23, 1999, the afternoon before the shooting, Mr. Barrett said if the police came on his property he would "go out in a blaze of glory."  (R. 462-66.)  As noted in Mr. Barrett's original petition and this amendment, Crawford has since recanted his testimony.  (*See* Claim 5(A)(b), *infra*.)

Evidence of Mr. Barrett's alleged statements to these witnesses, excluding Travis Crawford, was inadmissible, and wrongly argued and considered by the jury as propensity

evidence in violation of Rule 404(b).  Trial counsel unreasonably failed (a) to seek reasonable pretrial disclosure of these statements, (b) to make appropriate objections to the Government's delay and to the admissibility of the statements, and (c) to seek an appropriate order limiting the jury's consideration of the evidence to Mr. Barrett's alleged state of mind at the time the statements were made.  *See Kimmelman v. Morrison*, 477 U.S. 365, 385 (1985) (counsel's failure to seek suppression of evidence unreasonable where counsel also failed to seek pretrial discovery).

Trial counsel were on notice by September 12, 2005, at the latest, that the Government intended to use informant witnesses, but made no request for notice under Rule 404(b).  To the extent earlier requests for discovery included requests for 404(b) notice, trial counsel unreasonably failed to assert that the Government had staged an ambush (as the trial judge himself thought likely, Tr. 9/13/05 Hr'g at 7, 10-12), failed to seek a continuance to investigate, and failed to object that the Government failed to show good cause for the late disclosures, as required by Rule 404(b).

The statements were hearsay, and pursuant to Fed.R.Evid. 803(3) were admissible only to show the declarant's state of mind at the time the statements allegedly were made.  The alleged statements made weeks, several months, or many months before the offense could not reliably or relevantly evince Mr. Barrett's intent on the night Trooper Eales was fatally shot; they were injected into the trial simply to unfairly prejudice Mr. Barrett.

Moreover, any time frame placed on these alleged statements by the informant witnesses was completely unreliable.  Their memories were vague in the extreme due not only to the passage of time, but because of their own repeated use of mind-altering drugs.  The alleged statements attributed to Mr. Barrett by Turman, Sanders, Cindy Crawford, Brandie Price and

Karen Real *were not* close in time to the offense itself, and had only "possible worth," not real probative value. *Temple,* 862 F.2d at 823-24. Any slight probative value this evidence could arguably be said to possess was clearly outweighed by the danger of unfair prejudice. Fed.R.Evid. 403.

Even assuming for the sake of argument Mr. Barrett made these statements (which he did not), they could not relate to any specific intent to do harm to law enforcement when the Highway Patrol Tact Team invaded his property unannounced in the middle of the night, with the lead vehicle having all the appearance of a civilian automobile. This evidence simply covered Mr. Barrett in a veil of unwarranted suspicion. With respect to Karen Real, no notice was given by the Government in its 404(b) filing that she would attribute any threatening statements to Mr. Barrett. *United States v. Temple, supra.* (defendant was prejudiced by improper admission of other crimes or bad act evidence which did not show a common scheme or plan and was otherwise inadmissible, and commenting that care should be taken to protect the accused as far as possible from being convicted simply because of past conduct rather than the crime for which he is being tried).

Although defense counsel filed a response the Government's 404(b) Notice objecting to the admission of Mr. Barrett's statements to these witnesses, and made, as outlined above, sporadic objections during the testimony of Randy Turman and Karen Real, the remainder of the evidence complained of here passed without a contemporaneous objection, and a contemporaneous request for a limiting instruction. *United States v. Davis,* 766 F.2d 1452, 1458 (10th Cir. 1985)(failure to lodge contemporaneous objections fatal to claim raised on appeal). Because the evidence addressed here was clearly inadmissible, and trial counsel recognized its inadmissibility in their response to the Government's 404(b) Notice, counsel were professionally

unreasonable for failing to make adequate, contemporaneous objections.  Since the testimony of the informant witnesses regarding Mr. Barrett's supposed statements was the centerpiece of the Government's case for intent, the failure to adequately object affected the trial outcome. *Strickland v. Washington,* 466 U.S. 668, 688, 694 (1984); *Martin v. Grosshans,* 424 F.3d 588, 591-92 (7th Cir. 2005); *Freeman v. Class,* 95 F.3d 639 (8th Cir. 1996); *Crowe v. Sanders,* 864 F.2d 430 (6th Cir. 1989)(counsel deemed ineffective for failing to properly object or seek proper curative measures, including moving for a mistrial).

Defense counsel were also professionally unreasonable, to Mr. Barrett's prejudice, for failing to object to Karen Real's other crimes or bad act testimony because no pretrial notice was given as required by Rule 404(b), and for failing to object to the prosecution's 404(b) Notice because it was filed untimely.  Rule 404(b) states that upon request, reasonable notice in advance of trial of other crimes or bad act evidence must be given, absent good cause indicating notice should be excused.  The prosecution did not file its 404(b) Notice until individual jury selection in the case was underway.

To the extent trial counsel did object to the other bad acts evidence addressed here, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.  *See* Claim 18, *infra*.

> **6.      Due to trial counsel's unreasonable failure to engage the
> services of an independent crime scene reconstruction
> expert, the jury considered and relied upon unscientific,
> unreliable evidence.**

Trial counsel was professionally unreasonable for failing to hire an independent crime analyst or reconstruction expert in order to rebut the testimony of OSBI agent Iris Dalley. Mr. Barrett's counsel sought $17,000.00 for an expert to conduct a crime scene reconstruction, in

anticipation that the Government would rely on Iris Dalley, who appeared as a witness at Mr. Barrett's two state trials. Counsel sought authorization to hire Edward Hueske of Denton, Texas. Mr. Hueske had consulted with the defense during Mr. Barrett's state trials. The court authorized $4,000.00 for a crime scene reconstructionist. After Mr. Echols left the case, trial counsel Roger Hilfiger informed the court that het had not used available funds to hire a crime scene reconstructionist, but instead used the funds for an investigator. Loyd Cobb, the investigator hired by trial counsel, testified that he went to Mr. Barrett's property and took photographs, at least some of which were introduced into evidence. *See* Claim 1, *supra*, and 3, *infra.*

As stated in Claims 1 and 3, Mr. Barrett had a constitutional and statutory right to expert assistance to rebut the Government's witness. Prevailing professional norms of criminal defense practice advise attorneys to obtain expert assistance. Mr. Barrett's trial counsel acted unreasonably by failing to secure any benefit from the exercise of Mr. Barrett's statutory and constitutional rights to expert assistance. Counsel's failure to investigate the benefits of expert advice was deficient performance. *Rompilla v. Beard,* 545 U.S. 374 (2005)(ineffective assistance to fail to investigate evidence the defense knew prosecutors intended to use); *Wiggins v. Smith,* 539 U.S. 510 (2003)(counsel could not have made a reasonable decision to forego further investigation because they lacked sufficient information).

Iris Dalley was a key witness for the Government. Her crime scene reconstruction testimony was used by the prosecution to argue that Mr. Barrett had been standing on the porch when he fired his .223 Sporter rifle, and therefore would have seen the several police vehicles with emergency lights engaged which had descended on his property. The defense contended that Mr. Barrett fired from inside his house and would only have seen the lead vehicle, driven by Buddy Hamilton, which did not have any emergency lights engaged, and thus could not be

identified as a police vehicle.  Dalley's crime scene reconstruction testimony, complete with a

PowerPoint presentation and animations, which were shown to the jury but not introduced as

exhibits, was used to support the prosecution's theory.

Trial counsel's unreasonable omission was prejudicial.  Had counsel engaged the

services of the independent expert authorized for Mr. Barrett's defense, it could have been shown

that Dalley's analysis was amateurish, unscientific, seriously flawed, and did not comport with

the necessary protocols for conducting a legitimate and reliable reconstruction.  In connection

with the current proceedings, counsel asked Mr. Hueske to review Ms. Dalley's testimony, the

exhibits introduced in the case, her PowerPoint presentation, her animations, and other materials

upon which she relied.  Mr. Hueske, a nationally known expert whose credentials, training and

experience far outstrip Dalley's meager qualifications, has concluded that Dalley's testimony was

not worthy of belief.  (Exhibit 109; Exhibit 110.)

In his report, Mr. Hueske first shows that Dalley's use of inappropriate

terminology reflects her poor understanding of the fundamentals of crime scene analysis, if not

an intention to confuse, rather than inform, the jury.  "Ms. Dalley repeatedly uses terminology

that is inappropriate both with regard to vehicular descriptions and firearms components."  For

example, Dalley, in her testimony, refers to the "front quarter panel" of the Ford Bronco driven

by Buddy Hamilton, and in which David Eales was a passenger, when she is trying to reference

the front fender.  Instead of referring to the "driver's side" and "passenger's side" of the vehicle

as points of orientation, she used the confusing terms "left" and "right."  Dalley used the term

"sidewall," which obviously refers to the portion of a tire, when she is attempting to describe an

inner body panel on the Ford Bronco.  Dalley consistently and improperly used the term

"projectile" to refer to anything that may have caused an impact, rather than using correct terms for a bullet, a bullet fragment, or other constituent parts of a bullet.  (Exhibit 109 at 2.)

Dalley exhibited a fundamental misunderstanding of "bullet fragmentation upon impact with glass[.]" In reality, fragmentation of a bullet begins when it impacts a surface such as glass.  If trial counsel had secured Mr. Hueske's services, the jury would have known that Dalley erroneously stated that a bullet would only fragment after perforating or passing through glass. Dalley admitted she was not a firearms examiner, stating that she seeks the assistance of such experts when she has a "ballistics" question. While it could be argued that one need not be a firearms expert to conduct a crime scene reconstruction, "a basic understanding of firearms and ammunition components is essential to being able to recognize what one is viewing at a shooting scene."  Mr. Hueske notes Dalley testified there "might" be some caliber similar to a .233 rifle that "could have made" some of the bullet holes in the Bronco.  When asked by defense counsel for examples, Dalley could not come up with any.  (Exhibit 109 at 2-3.)

If he had been called to testify, Mr. Hueske would have exposed to the jury that Dalley's use of "inappropriate terminology and ambiguous statements" made understanding her testimony difficult.  Dalley's shortcomings in these areas likely reflect her lack of expertise with firearms and vehicles.  (Exhibit 109 at 3.)  Hueske's analysis shows that Dalley lacked sufficient knowledge of ballistics, vehicle construction, and the necessity of using consistent, accurate terms of reference when reconstructing a scene to render reliable, credible opinions about a shooting scene involving a vehicle.

Mr. Hueske states there are numerous more serious flaws in Dalley's attempt at a crime scene reconstruction in this case, and with her trial testimony.  Mr. Hueske's bottom line conclusion is that Dalley "did not follow widely accepted protocol used in shooting incident

Amended § 2255 Pet.                    146                *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

reconstruction. ... Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation." (Exhibit 109 at 3, 6.)

Mr. Hueske would have exposed the following failings to the jury:

1.  Standard, accepted crime scene reconstruction protocol requires a determination of the length, width and height of any vehicle involved in a shooting. Dalley neglected to determine the dimensions of the Ford Bronco in aid of any trajectory analysis. There is also an unresolved question as to how wide the passenger door was open when shots were fired. No measurements were taken. Instead, Dalley illogically explained that because the passenger door was curved, it could not be measured. (Exhibit 109 at 3.)

2.  Before trajectory rods are used, proper protocol demands an examination of the margins, interior surface, and surrounding area for trace evidence. Placing trajectory rods in bullet holes, as Dalley did, invariably alters them. Dalley was specifically asked whether she saw gunshot residue around any bullet holes, and stated she saw none. (R. 3399.) (Exhibit 109 at 3.)

3.  To legitimately evaluate the area around a bullet hole for trace evidence, close inspection with a magnifying lens, or a lift for later analysis, should be done. Bullet holes should also be examined for blood, tissue, hair, fibers or other forms of trace evidence. Dalley failed to do this. (Exhibit 109 at 3.)

4.  The caliber of a bullet creating a bullet hole can be determined with an acceptable degree of confidence, when bullet holes are "symmetrical and devoid of any distortion." In such instances, accepted, standard protocol requires the length and width of the bullet holes to be measured with a pair of dial calipers. The width of the hole can be "related to

the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates."

Dalley could not determine the caliber of any bullets striking the Bronco (and thus could not say

whether any of them were created by "friendly fire"). (R. 3298.) Based on some of the

photographs taken of the bullet holes in the Bronco, it appears they could have been measured to

determine caliber with the appropriate instrument. (Exhibit 109 at 3.)

5.      Dalley's heavy reliance on trajectory rods to determine the trajectories of

the fired rounds failed to follow protocols and was based on unwarranted assumptions. Correct

placement of trajectory rods to properly determine trajectories "requires an understanding of

bullet penetration/perforation in a variety of substrates." This is especially true with bullets that

fragment or tend to fragment, like rounds fired from a .233 rifle. Equally important is knowing

when the calculation of trajectories, rather than the use of trajectory rods to determine them, is

called for. Trajectory rods such as Dalley utilized are a reliable tool for determining bullet

trajectories where there is "a secondary impact that has not resulted from initial impact deflection

and/or fragmentation." However, Dalley attempted to determine bullet trajectories "utilizing

fragment impacts into secondary targets based on the presumption" that the bullet core, or a large

part of the bullet core, "travels in a straight path." This assumption is unwarranted, and skews

the analysis. Mr. Hueske would have explained that Dalley was making contradictory claims, as

when she testified (correctly) that the "exact path" of each bullet could not be determined, and

also testified (incorrectly) that her trajectory patterns, as she described them, were "accurate."

(R. 3446; Exhibit 109 at 4.)

6.      Dalley relied upon fallacious reasoning to say that bullets would pass

through an intervening target such as the passenger door of the Bronco "undeterred," or straight

through. Dalley testified repeatedly that bullets going through the "partially open" Bronco door

would go "straight through," and that bullet core fragments would do the same.  Where, as in this case, bullets fragment on impact, the path or trajectory is unpredictable.  Dalley conjured a number of scenarios to make her theory that the bullet trajectories were unaffected by intervening targets (and thus her trajectory analysis as a whole) "fit" the evidence.  Dalley posited that the passenger door of the Ford Bronco moved to various different positions "to account for the incongruity of different trajectories through it." (R. 3314) Although this type of movement cannot be excluded, it is a speculative endeavor to make the evidence correspond with the theory being propounded.  The more likely explanation is that bullet deflections or fragmentations account for the variations in bullet trajectories through the vehicle door.  Deflections occur frequently when bullets strike objects with irregular surfaces, as opposed to those which strike flat surfaces.  (Exhibit 109 at 4.)

7.    Dalley lacked basic equipment and measurements necessary to make her diagrams and animations reliable.  When trying to ascertain the trajectories of bullet holes in vehicles and other inanimate objects, trajectory rods placed through the bullet holes are referenced by two linear and two angular coordinates.  This is indispensable to establishing "reproducible data for creating diagrams and animations" that *accurately*, within the limits of uncertainty, represent the true bullet trajectories.  Mr. Hueske finds it "amazing" that Dalley *did not* determine any of the angles because she "did not have the necessary equipment."  ( R. 3275) All that would be required to perform this essential task is a "$30 zero base protractor and a $5 plumb bob."  Because Dalley failed to take such measurements, and because she could not determine the "exact paths" of the bullets using trajectory rods alone, "it is unclear how the diagrams and animation she produced can be perceived as having any reliability." Again, the chief reason for getting such linear and angular measurements "is to be able to accurately create

diagrams and animations, such as the ones Ms. Dalley prepared in this incident." (Exhibit 109 report at 5.)

8.      Dalley failed to ascertain bullet impact angles "relative to a common point of reference (plumb line) [as] is the accepted standard" for reliable reconstruction. (Exhibit 109 at 5.) In her testimony, Dalley generally described the terrain of the shooting scene as "hilly," but did not establish the exact grade of the terrain, or consider the potential impact the grade might have had on what she perceived to be the trajectories of the bullets hitting the Ford Bronco.

9.      Where holes are of questionable origin, and may or may not be bullet holes, the proper procedure requires on-site chemical testing for the presence of copper or lead to confirm that the holes or perforations were produced by a bullet rather than something else. Although Dalley testified that she had some knowledge of this kind of testing, she did not testify that she actually conducted it. (Exhibit 109 at 5.)

10.      Dalley testified she had "no means of sequencing any of the shots" at the scene. This was not accurate. Analysis to determine the sequence of shots is not always possible, but it can sometimes be accomplished "through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets [or] fragments[,]" such as glass, fibers, hair, paint and other substances. Thus, Dalley had the means of attempting to sequence the shots, but she either was not aware of the techniques used in that process or, she chose not to employ those methods either at the scene or later. (Exhibit 109 at 5.)

11.      Critically, Mr. Hueske could have shown that Ms. Dalley failed to employ well known methods that could have shed light on the location of Hamilton's Bronco when specific shots struck it. In any incident involving a moving vehicle, any legitimate reconstruction or re-enactment would include actually placing the Bronco in various positions to determine the

likelihood of each shot coming from one or more particular positions. It was particularly

important here to determine the angle of fire after the Bronco came to a stop. However, the

Bronco itself was not placed in a variety of positions to determine the trajectories of the shots

fired at or into it. Dalley testified that before she arrived at the scene, the Bronco had been

moved. However, she also testified there were tire impressions and a fluid deposit in the dirt in

front of Mr. Barrett's residence. These markings could have been used to re-position the Bronco

to where it came to rest before being moved. (Exhibit 109 at 5.)

12.     Dalley employed a fundamentally flawed approach when she attempted to

establish the trajectory of bullets that passed through the window glass, blinds and curtain or

towel hanging over the front window of Mr. Barrett's cabin. She testified that the results of her

trajectory analysis for these objects were reliable. (R. 3389.) First, the accepted method for

reliably determining trajectories is to set up a tripod and place a laser on the tripod. Dalley had

someone assisting her hold a trajectory rod by hand. Second, Dalley failed to take measurements

of the hole locations. (Exhibit 109 at 5.)

13.     Dalley's method of "placing a hand-held laser into bullet holes in the

Bronco window glass is equally flawed since it presumes no deflection resulted from either the

impacts or the fragmentation." *Ibid.*

14.     Dalley overstated her ability to reach a warranted conclusion regarding the

critical issue of Mr. Barrett's position in relation to the Bronco. When attempting to determine

the distance of fire on the bullet holes in the cabin window, Dalley testified she did not "see" any

evidence of gunshot residue on the window. Because of this, she opined that the distance had to

be greater than three feet from the glass, since the literature states that the absence of gunshot

residue at the edges of a bullet hole indicates shots were fired from greater than three feet away

from impact. This general rule varies greatly depending on the weapon used, and also depends on the type of ammunition used. To correctly evaluate the maximum muzzle to target distance, the weapon in question should be fired into glass like that at the scene, and the same type of ammunition should be used. (Exhibit 109 at 6.)

15.     In a shooting incident like this, a metal detector should be used to detect the presence of bullets or bullet fragments. Dalley did not attempt to locate any bullets or fragments in the soil. (Exhibit 109 at 6.)

16.     In reaching her conclusion that David Eales was struck in the right arm after he exited the Bronco, Dalley ignored the elementary dictum in forensic science that "absence of evidence is not evidence of absence." Dalley testified that since she found no tissue in the Bronco, and tissue appeared to be missing based on the appearance (to her) of the wound, Trooper Eales must have been outside when he was struck. However, Dalley's testimony fails to establish that she looked for any tissue outside the Bronco. It would have been easy to try to confirm Dalley's conclusion by spraying luminol on the ground in the area around the Bronco. There is nothing to show this was done. An honest forensic scientist would say the fact that evidence is not found (and Dalley apparently took no steps to find it) cannot be used to "conclude anything other than that no evidence was found." (Exhibit 109 at 6.) Dalley's conclusion in this regard was critical to the prosecution's theory because the Government argued that at the time Trooper Eales was shot, he was outside the Bronco and the type of equipment he was wearing would have made it obvious to Mr. Barrett that he was a law enforcement officer.

In sum, if trial counsel had obtained the services of a qualified forensic examiner, they could have challenged the admissibility of Dalley's testimony under Rule 702 of the Federal Rules of Evidence and under *Daubert v. Merrrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589

(1993) and *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999). Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction. She failed to take many steps that should have been taken, and failed to utilize the appropriate methodology. Due to these numerous failures, her conclusions, aimed at strengthening the Government's case, were scientifically unreliable. At a minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, was outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis.

Under Fed.R.Evid. 702, the trial court is charged with being the "gatekeeper" where expert testimony is concerned, ensuring only that reliable evidence comes before the jury. Among the factors used to determine the reliability of scientific or other expert evidence are: 1) whether the theory can be and has been tested; 2) whether the theory has been subjected to peer review and publication; 3) if relevant, the known or potential rate of error; 4) the existence and maintenance of standards controlling its operation; and 5) whether it has achieved general acceptance in the relevant community. *Daubert*, 509 U.S. at 593-94. While crime scene reconstruction evidence (including an analysis of trajectory patterns) is generally accepted in the overall field of forensic science, Mr. Hueske's report demonstrates that Dalley's methodology, and thus her conclusions, fell well outside the range of accepted protocol and were thus unreliable. Had defense counsel hired an independent expert to advise them, a powerful motion to exclude Dalley's testimony altogether could have been presented. Dalley's testimony and analysis was little better, if at all, than the "expert" testimony of James Horn, which the court found so bereft of reliability and relevance that it was stricken because it failed to comply with *Daubert* and *Kumho Tire*.

Because Dalley's analysis was an important part of the Government's case, it was inexcusable for counsel to fail to hire an independent expert such as Mr. Hueske to evaluate her methods and conclusions and to testify for the defense.  Had all the flaws in Dally's testimony been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle.  If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired, and was thus unaware that the vehicle coming directly at his house was a police vehicle, especially due to the fact the Ford Bronco driven by Trooper Hamilton had no emergency lights engaged.

All this is especially critical on the issue of intent with respect to count 3 of the superseding indictment, the intent elements of counts 1 and 2, and the intent elements in the penalty phase.  Even if the trial court had received Dalley's testimony, there is at least a reasonable probability that the outcome of the trial would have been different.  If jurors had been shown the chasm between what counts as a scientifically reliable claim and Dalley's testimony they would have reached any of several conclusions adverse to the prosecution from finding that Dalley just made things up in an effort to assist the prosecution, to finding that her conclusions were entitled to little credence or weight.

To obtain a conviction on count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed a law enforcement officer in the performance of his official duties, that he knew or had reason to know he was shooting at a law enforcement officer, and that the shooting was precipitated by this knowledge.  Absent Dalley's testimony, all the Government had to rely on were the often conflicting accounts and

compromised memories of the tactical team members who testified. Thus, the prejudice under *Strickland* flowing from counsel's failure to effectively contest Dalley's testimony with expert assistance is readily apparent. *See Draughton v. Dretke,* 427 F.3d 286 (5th Cir. 2005) (trial counsel ineffective for failing to present evidence on how fatal shooting occurred, which would have supported defense claims); *Martin v. Grosshans,* 424 F.3d 588, 590-92 (7th Cir. 2005) (counsel ineffective in part for failing to object to the inadmissible testimony of two key prosecution witnesses); *Snowden v. Singleterry,* 135 F.3d 732, 738 (11th Cir. 1998) (counsel unreasonable and ineffective for failing to object to improper expert testimony); *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995) (counsel professionally unreasonable and ineffective for failing to impeach serology evidence).

It is not only Mr. Barrett's current lawyers who say Ms. Dalley is far from being an objective scientific witness, but is a partisan advocate who dresses up her personal opinions in the guise of "science." The Oklahoma Court of Criminal Appeals has chastised Ms. Dalley, recently reversing a first degree murder conviction due to Dalley's unreliable, unscientific testimony, including the improper use of computer animations. *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl. Cr. 2006). In that case, the defendant's murder conviction was reversed in large part because Iris Dalley's conclusions and computer-generated animations were not based on objective scientific findings, but simply restated the prosecution's theory of the case under a "scientific" gloss. Based on Mr. Hueske's report, Dalley did the same thing in Mr. Barrett's case. She used improper methodologies and techniques to "package" evidence already heard by the jury, offering conclusions based on an incompetent and unscientific evaluation of the evidence.

In addition to trial counsel's other failings with respect to Dalley's testimony, counsel were professionally unreasonable for failing to investigate Dalley's track record of giving

scientifically groundless testimony.  Although the *Dunkle* case was decided in 2006, after Mr. Barrett's trial concluded in 2005, the case was tried some years before, the appellate briefs had been filed at the time of Mr. Barrett's trial, and Dalley's reputation was well known in the criminal defense community.

> **7.      The outcome of the trial is unreliable due to trial counsel's unreasonable failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death.**

The jury should have heard that methods used by the Oklahoma Highway Patrol tactical team were contrary to established law enforcement standards and practices.  Based on all the circumstances surrounding the mission, it was ill-conceived and should have been aborted.  Even though every piece of information considered by the Task Force and Tact Team called for a daytime, talk-first approach, with prominent insignia of law enforcement and the use of distance and cover, the officers chose a nighttime, close-contact, force-first approach, with no advanced signs of law enforcement.  The results of this provocative assault were foreseeable and tragic for Trooper Eales who, due to poor planning and execution, was exposed to gunfire on all sides.

Mr. Barrett's trial counsel unreasonably failed to secure the testimony of an independent expert who would have revealed to the jury that the midnight raid was reckless and dangerous, as though calculated to provoke a violent response, and that it was foreseeable that these errors would result in harm to a law enforcement officer.  Prior to trial, Mr. Echols sought authorization to retain an independent expert on tact-team methods and procedures, Dr. George Kirkham.  (Doc. 50.)  The court authorized some funds for this expert.  (Doc. 97.)  However, Mr. Barrett's trial counsel never contacted the expert.

Trial counsel knew or should have known that it was necessary to retain an expert to assist the defense. In the second state trial Chuck Choney, a former FBI agent, testified for the prosecution and, when surprised on cross-examination, provided testimony favorable to Mr. Barrett. However, trial counsel knew that Mr. Choney, because of his affinity with law enforcement, was unhappy about his testimony and was unwilling to provide any further helpful testimony for Mr. Barrett. Based on this knowledge, trial counsel requested authorization to retain another, independent expert, Dr. Kirkham. (Doc. 50 at 5.) During a hearing on March 22, 2005, Mr. Echols stated, in Mr. Hilfiger's presence, "we'd like to be able to call Mr. Choney. But he said he's an ex-FBI agent, and he'd rather be drawn and quartered than appear in court as a defense witness in Mr. Barrett's case." (Tr. 3/22/05 Hr'g at 14-15.)

After the court authorized part of the funds trial counsel sought to retain Dr. Kirkham, trial counsel failed to contact him. Dr. Kirkham received no background materials and had no contact with trial counsel about assisting in Mr. Barrett's defense. (Exhibit 44)

Trial counsel did not attempt to contact Mr. Choney until approximately mid-September, 2005. Trial counsel made unsuccessful efforts to speak with Mr. Choney by telephone on September 13, 2005, and were told Mr. Choney would not be available until September 22 or 23. Thus, at the time trial started, Mr. Barrett's counsel conducted no investigation into what evidence could be presented from an independent expert authorized by the court, and fell back on a witness who counsel knew would take any opportunity to harm Mr. Barrett's case.

Even after the trial started, trial counsel knew Mr. Choney was reluctant to be subpoenaed as a defense witness and provide evidence favorable to the defense. (Tr. 10/03/05 Hr'g at 6-7.) Trial counsel told the court they were "in the process of trying to get this swat [sic]

team expert to testify." *Id.* at 6. Yet counsel made no effort to learn what opinions Dr. Kirkham would have had if he had been informed of the facts of the case. Trial counsel could not have made a reasonable decision to forego Dr. Kirkham's assistance because they had not inquired into what that assistance would mean, and they knew they would get no assistance from Choney. *Wiggins*, *supra*, 539 U.S. at 522; *Kimmelman v. Morrison*, *supra*, 477 U.S. at 385.

If trial counsel had enforced Mr. Barrett's constitutional and statutory rights to expert assistance, Dr. Kirkham would have provided the jury with more than reasonable doubt about Mr. Barrett's alleged intent. Dr. Kirkham would have explained that the jury could assume – against the weight of evidence – that the claims made in Clint Johnson's affidavit were true, and even credit the dubious testimony of the other informants, and still conclude that the raid was uncalled for and conducted in a way that provoked violence and minimized the chances that Mr. Barrett would see that he was being confronted by law enforcement officers. The evidence would have shown the raid was contrary to the standards and practices of law enforcement agencies precisely because it increased the chance that the target would be unable to tell whether those attacking him and his teenage son were law enforcement officers. The Tact Team's errors conceiving the raid and carrying it out meant (a) the first vehicle visible to Mr. Barrett would have no law enforcement markings; (b) the nighttime darkness made it more difficult to identify law enforcement vehicles; (c) there would be no audible indication that law enforcement was involved in the attack; (d) the raid would play into any paranoid fears or legitimate fears of being attacked by drug dealers or other criminals; (e) that the lead vehicle lacked necessary cover from the terrain or a sniper; (f) that the lead Bronco advanced onto the property from a tactically disadvantageous position that drew fire towards Trooper Eales; and (g) that the plan ignored a

variety of tactics deemed by law enforcement experts to be less likely to result in violence. (Exhibit 44 at 3-4.)

Instead of forcefully bringing these points to the jury's attention, the defense relied on the extremely reluctant Mr. Choney, who only appeared because he was compelled to by subpoena. He turned out to be a Government witness rather than a defense witness. He did offer some criticisms of the manner in which the raid was conceived and executed, such as the inclusion of the caravan of local dignitaries and law enforcement onlookers, and the failure of the tactical team to independently verify the reliability of the information provided by the alleged confidential informant. However, the Government easily turned Mr. Choney into a prosecution witness on cross-examination. In his opinion, while hindsight might suggest other alternatives to the action taken, there was no compelling need to have aborted the mission.

The Tenth Circuit dealt with an analogous situation, in the context of a capital defendant's sentencing stage representation, and found constitutionally deficient representation. *Hooper v. Mullin,* 314 F.3d 1162, 1167-71 (10th Cir. 2002). In *Hooper,* the second stage strategy was to present evidence that the defendant suffered from brain damage and was cognitively impaired. Hooper had once attended anger management counseling. His psychologist wrote a report opining, among other things, that the defendant's cognitive functioning was largely adequate, but he had difficulty controlling his temper. Counsel then hired a forensic psychologist to review the other psychologist's report. Based on the review, the second expert stated there may be evidence of mild brain damage, and it was possible the defendant suffered from serious psychological problems. These conclusions could not be reached, however, unless the defendant had been examined personally. At the eleventh hour, defense counsel subpoenaed the second psychologist to testify. He was extremely hostile to the

defense because he had warned counsel he could reach no conclusions without examining the defendant himself.  He had warned counsel before being subpoenaed that his testimony would likely be more aggravating than mitigating.  He testified that he could reach no conclusion because he had not examined the accused, and that any tentative indications of possible brain damage could not be confirmed.  The prosecution then called the anger management counselor in rebuttal, who testified that while the defendant suffered from a mild learning disability, he had no brain damage or other special problems.  The Tenth Circuit found counsel's strategy unreasonable, and that the defendant was prejudiced.

So it was with Mr. Choney.  He was contacted late in the day by defense counsel.  He was strongly aligned with law enforcement.  He made it clear that he did not want to testify for the defense.  He appeared only when compelled by a subpoena.  Whatever little mileage the defense got out of his testimony was quickly reversed during the prosecution's cross-examination.  On the whole, Mr. Choney's testimony supported the Government's case, and exonerated the tactical team of any serious errors.  As in *Hooper,* defense counsel knew Choney would be a most reluctant, if not to say hostile, witness, but he was thrown into the breach anyway, with the predictable negative consequences to Mr. Barrett.

Counsel's failure to retain an independent expert and reliance upon a witness who would not even talk to them, was plainly unreasonable and prejudicial.  *Strickland v. Washington,* 466 U.S. 668 (1984).  As evidenced by the arguments of both the defense and prosecution at the close of the first stage, questions about how the raid was conceived and carried out were critical issues.  If trial counsel had presented the numerous deficiencies pointed out here, there is a reasonable probability the jury would have rejected either murder or the death penalty.  One indication of this probability is the state-court jury's acquittal of Mr. Barrett on

charges of murder.  Had the federal jury known that law enforcement standards and practices counseled against a raid of this type precisely because the failure to give the clearest sign of law enforcement's presence is more likely to provoke an uninformed, violent response, there is a reasonable probability that Mr. Barrett either would not have been convicted of murder, or not have been sentenced to death.

>**8.    Mr. Barrett's trial counsel unreasonably failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials**.

Claims 1 and 3 discuss the court's interference with proper defense preparation with respect to authorizing payment for the transcripts of the testimony from the second state trial at public expense.  The court initially denied the request, adding the proviso that the matter could be reconsidered upon a specific showing that the testimony requested went to Mr. Barrett's intent.  Eventually, the court permitted the record of the testimony to be provided at public expense, but far too late for counsel to be adequately prepared.  Trial counsel also unreasonably failed to make use of impeachment material that was available to them, and/or elicited damaging testimony on cross-examination, even where that testimony was beyond the scope of direct.

There were numerous delays occasioned in acquiring the transcripts, and they continued through Mr. Barrett's federal trial.  At a June 6, 2005 status conference, a few short months before trial was to begin, the court was informed that based on counsel's communications with the court reporter, it was anticipated that the transcripts would be ready by July 11, 2005. (Tr. 6/6/05 Hr'g at 4-5.)  This proved a pipe dream.  At another status conference on July 15, 2005, the court was informed that the state court reporter had completed five of the nine volumes of testimony.  At the pretrial hearing on August 31, 2005, it was revealed that little

if any progress had been made; five volumes of testimony had still not been completed.  (Tr. 8/31/05 Hr'g at 38-39.)  The transcripts continued to trickle in during trial.

A combination of the court's rulings on the transcript issue, the delay in producing the transcripts, and counsel's unreasonable preparation with the transcripts they had resulted in counsel failing to effectively impeach the tactical team members and Clint Johnson on several critical points with their testimony from the second state trial.

As already stated herein, a key factual dispute was whether Mr. Barrett knew the police were on his property because the emergency lights on some of the vehicles were engaged and visible to him prior to the shooting.  Because of the delay in producing the transcripts, counsel's failure to prepare in the time available, or both, Mr. Barrett lost crucial opportunities for the impeachment of key prosecution witnesses in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights, as well as his statutory and rule-based rights to counsel, discovery, and cross-examination.

At the federal trial, Trooper Poe stated he became aware that emergency lighting was being used when he saw Trooper Hamilton's vehicle come into view from the east, implying that emergency lights were engaged before any shots were fired, and thus supporting the Government's theory.  (R. 1412.)  However, at the second state trial, he testified that he first became aware of seeing emergency lights *after* he heard shooting break out.  (2nd St. Tr. Tx. at 747.)  Trooper Greninger gave conflicting evidence between the second state trial and the federal trial regarding what lighting he observed.  In state court, he testified he turned on his emergency lights after turning left to approach Mr. Barrett's residence, and recalled seeing Trooper Hise's emergency lights on.  (2nd St. Tr. Tx at 448, 461.)  At the federal trial, he testified Trooper Manion activated his emergency lights as he turned into the driveway before entering the

property.  He noticed also that Trooper Hash had his emergency lights on, but did not know when they were engaged.  He was not completely sure Trooper Hise's emergency lights were on. Trooper Pettingill did not activate his lights.  (R. 732, 760, 770, 773, 822.)

Most significantly, Clint Johnson testified initially in the second state trial that he was thirty seconds behind the tactical team and saw red and blue police lights at the intersection after turning onto the dirt road.  He was impeached with a prior statement in which he said he only saw taillights, not emergency lights.  Johnson made no mention in his statement about arriving thirty seconds after the tactical team and seeing any red and blue emergency lights.  (2nd St. Tr. Tx at 25, 49, 51.)  In the federal trial, Johnson said nothing on direct examination about any lighting.  Trial counsel was caught flat-footed on cross-examination, when he opened the area up and Johnson, in contrast to the statement he was impeached with in state court, testified that he saw emergency lighting on the patrol vehicle and the second Ford Bronco.  (R. 358, 361.) Counsel failed to impeach Johnson as counsel did in the second state trial.  Arguably, not even a transcript would have been required to undermine Johnson on this point, because he was impeached in state court with a previous statement, not previous testimony.

There obviously was a critical question as to whether Mr. Barrett or the police opened fire first.  At the second state trial, Trooper Poe testified he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house.  He heard shots as he exited his vehicle by the fence, and the gunfire was over by the time he was at the fence.  (2nd St. Tr. Tx at 757, 766.)  None of this was brought out on cross-examination at Mr. Barrett's federal trial.

The issue of where Trooper Hamilton's Bronco was when it first received fire was a focal point of the debate over Mr. Barrett's knowledge and intent.  Although Trooper Greninger

professed a failed memory at the federal trial, and could only say that the shooting began somewhere between the ditch and where Hamilton's Bronco came to a stop (R. 736), he testified at the state trial (albeit with an addled memory), that while he had no real idea when the shooting started, Hamilton's vehicle was ahead of his and had cleared the ditch; he became aware of the shooting between the time his vehicle cleared the ditch and came to a stop halfway between the ditch and Hamilton's Bronco.  In his first statement to investigators following the incident, he recalled hearing gunfire as Hamilton's vehicle approached the front of the house, which would indicate Hamilton had already gone through the ditch and was near the house when the gunfire started.  This statement supported Mr. Barrett's defense argument that he only fired when Hamilton's Bronco was almost literally in front of his house, with its headlights obstructing Mr. Barrett's view.  (2nd St. Tr. Tx 450, 504.)  Mr. Barrett's trial counsel unreasonably failed to refresh Greninger's memory with his helpful state court testimony, and to introduce that prior recorded recollection, or inconsistent statement.

Trooper Hamilton testified in state court that the shooting started as his vehicle was coming out of the ditch, and after he noticed Toby Barrett in the yard and began driving toward him.  (2nd St. Tr. Tx 330.)  This was helpful to the defense argument that Mr. Barrett only started firing when the Bronco was close to his house and was in fact headed toward his son, a dangerous situation to which any father would react.  In federal court, Hamilton stated the gunfire began earlier.  Instead of gunfire starting as he was coming out of the ditch, Hamilton stated gunfire began shortly after he initially hit the ditch.   In contrast to his testimony in state court, Hamilton stated his vehicle began receiving fire at head level in the middle of the windshield.  (R. 534, 603, 674.)  Counsel failed to effectively contrast Hamilton's testimonies on this point.

Defense counsel failed to exploit other differences between the state and federal trial testimony.  At the state trial, neither Troopers Poe nor Greninger testified to seeing any guns in Mr. Barrett's house.  In federal court, Trooper Poe said he saw an AR 15 and a shotgun in the back room off the entryway.  Greninger testified the rifle he found in Mr. Barrett's cabin was the one used to fire on the officers.  (R. 1426, 1427, 748-49.)

Perhaps Mr. Barrett's trial counsel's most grievous error occurred during cross-examination of Clint Johnson.  On direct examination, no details regarding any belief Johnson had that serving the warrant was "high risk" were explored.  On cross-examination, Mr. Barrett's counsel asked an open-ended question, and received a barrage of hearsay damaging to Mr. Barrett.  When counsel opened the door, Johnson marched through it, in the most prejudicial manner imaginable.  Johnson stated he believed this was a "high risk" operation because Mr. Barrett had threatened to kill police officers and that he was making methamphetamine at his residence, which also creates hazards to law enforcement trying to take down a meth lab. Buttressing the testimony not only of the despicable Charles Sanders, but six of the seven informant witness, Johnson stated not only that several people had reported to the sheriff's office that Mr. Barrett was constantly firing weapons across the road, but that they had received several tips from different people within the last six months that Mr. Barrett was going to kill law enforcement officers.[25]  This damaging answer, given only because counsel opened the door, just

---

[25]  As shown elsewhere in this Claim and in Claim 3, trial counsel's blundering cross-examination was most damaging because counsel failed to retain the expert in police tactics whose assistance the Court had authorized in part.  Without an independent source of information about the raid, the Government was able to give jurors the *false* impression that the conduct of the tactical team was appropriate under the circumstances Johnson described.

hung in the air. Counsel undermined the defense's own (meager) efforts to attack the credibility of the informant witnesses due to these "prior reports" from "several" sources.[26]

Counsel's failures to impeach were professionally unreasonable, and not motivated by any legitimate strategy. Indeed it was contrary to the strategy evidenced in counsel's closing argument where Mr. Hilfiger sought to sow doubt about the accuracy of various officers' accounts of the raid. Counsel's elicitation of damaging evidence from Johnson was highly prejudicial under the *Strickland* test, because it tended to invest credibility in the informant witnesses – however spurious it might have been, and however false Johnson's testimony was – that these witnesses otherwise lacked. *Cargle v. Mullin,* 317 F.3d 1196, 1220-22 (10th Cir. 2003)(counsel found ineffective in part for failing to use impeachment evidence that would have shown key witness had a motive to curry favor with prosecution); *Steinkuhler v. Meschner,* 176 F.3d 441, 445 (8th Cir. 1999)(counsel ineffective for failing to use available evidence to impeach witnesses).

Trial counsel's unreasonable failure to investigate what an independent expert would say about the conduct of the tactical team, and their unreasonable failure to impeach Johnson, left the jury with two false impressions: (a) that at the time of the raid Johnson and the tactical team had sources of information other than Monk Sanders; (b) that even if the information they had was true and backed by multiple sources, the raid was reckless and carried

---

[26] Johnson's testimony was surely false. None of these "known sources" reporting threats by Mr. Barrett to kill law enforcement officers were presented at the state trials. Surely, if several individuals were reporting this, they would have testified in 2002 and 2004. Counsel failed to point out that Johnson had given no such testimony previously. Indeed, the informant witnesses were purely last-minute creatures of the federal trial.

out in a way that made it hardest for Mr. Barrett to recognize his attackers as law enforcement officers

> **9.      Trial counsel unreasonably failed to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on.  This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers.**

> **a.      Toby Barrett**.

The primary contention of the defense in the first stage of trial was that when Mr. Barrett fired on the Ford Bronco driven by Buddy Hamilton, he was unaware that it was a police vehicle, and was unaware that several police vehicles had driven onto his property.  It was undisputed that the lead vehicle driven by Hamilton, which the evidence showed struck Mr. Barrett's porch, had no emergency lights engaged and appeared to be a civilian vehicle. Although no defense theory instructions were given, the defense argued that because Hamilton's car was unmarked, Mr. Barrett reasonably believed he was shooting at trespassers who had zoomed into his yard and struck his house with their vehicle, and reacted by shooting from inside his house.

The prosecution relied upon testimony from members of the tactical team to argue that but for Hamilton's vehicle and the "sniper" vehicle initially parked outside the locked gate to the property, the other police vehicles on or near the property had emergency lights of one sort or another engaged, making it obvious to Mr. Barrett that he was shooting at the police.  The prosecution contended Mr. Barrett fired some of the shots after he emerged from his home, and could easily observe that the police were on his property.

Among the omissions of counsel that were inconsistent with prevailing professional norms was counsel's failure to call Toby Barrett to rebut the law enforcement officers' accounts of the raid.  Mr. Barrett had a right, protected by the Fifth, Sixth and Eighth Amendments to the United States Constitution, to present evidence inconsistent with the prosecution's theory of how the raid was conducted.

Prevailing professional norms of capital defense practice required Mr. Barrett's trial counsel to investigate, develop, and present witness testimony that could have called into question the manner in which law enforcement officers conducted the raid.  (ABA Guideline 10.7 – Investigation and Commentary (specifically noting duty to interview eyewitnesses).)

Trial counsel were aware, or should have been aware, that there were conflicting accounts of the raid, even among law enforcement officers.  Toby Barrett was the only witness to the beginning of the raid other than law enforcement officers.  Toby Barrett testified in two prior state-court trials.  Toby Barrett was prepared for his testimony in those cases and was willing and able to be prepared by trial counsel to testify in the federal trial.  (Exhibit 96.  *See also* 1st State Tr. Tx at 1781.)  Obviously, each of the state-court trials ended in a result more favorable to Mr. Barrett than the result of the federal trial.

During the federal trial, the Government made much of the sign on Mr. Barrett's gate.  Toby Barrett would have testified, as he did when called by the prosecution in the first state-court trial, that the sign was only meant to convey "No trespassing or something.  He had one something to that effect, sir."  (1st St. Tr. Tx at 1787.)

Toby Barrett also testified as a prosecution witness in state court that the gate on which the sign was posted was open at the time the Bronco drove by earlier in the day.  (1st St. Tr. Tx at 1822.)  Toby Barrett's account of being in the front yard with his friend Bubba

Thompson at the time of the drive-by is consistent with the testimony of Trooper Greninger, who saw two people in the yard at the time. (R. 724.) However, Trooper Hamilton testified in federal court that the gate was locked at the time of the drive-by, and this was offered as a justification for driving onto the property. (R. 518.)

In other respects, the testimony of Toby Barrett and Trooper Hamilton are consistent with each other. For example, Toby Barrett confirmed that Hamilton had his headlights on but no lights signaling that he was law enforcement. (1st St. Tr. Tx at 1796-97; R. 524-26, 598.) However, Trooper Greninger testified that the vehicles' lights were turned on at the commencement of the raid. Officer Steve Hash could not verify Greninger's account. (R. 1036-37.)

Toby Barrett testified in state court that when the shooting occurred, there were no police vehicles with emergency lights on at all that were visible. (1st St. Tr. Tx at 1796.) The first police lights he saw were on the vehicle that crashed through the gate, but this was after the shooting was over. (Exhibit 96.) He denied telling the police he saw flashing lights. (1st St. Tr. Tx at 1809.) When Toby Barrett saw Hamilton's vehicle speed into the yard, he called out "Dad!" (1st St. Tr. Tx at 1790, 1795.) Toby Barrett never saw his father out on the front porch, shooting. If he saw his father at all it was for perhaps a split second, after which Mr. Barrett went back inside the house. (1st St. Tr. Tx 1794, 1795, 1796.) He never saw who was firing a weapon. (1st St. Tr. Tx at 1807.) The entire incident happened very quickly. (Exhibit 96.) The declaration Toby Barrett recently provided to investigators currently working for his father is consistent with his state trial testimony. (Exhibit 96.)

Mr. Barrett's federal trial counsel had every reason to trust the reliability of Toby Barrett's account. The prosecution in state court deemed Toby Barrett a reliable witness

regarding the sequence of events leading up to and during the raid. His testimony was consistent with the state jury's verdict.

Toby Barrett's testimony would have provided the jury reasonable doubt regarding the federal prosecutor's argument regarding the raid, and in particular, his argument that the bullet that killed Trooper Eales was fired by Mr. Barrett with the intention of killing someone who was part of a law enforcement raid. Toby Barrett would have contradicted the prosecutor's assertion that the sign on Mr. Barrett's gate was evidence of intent. (*See* R. 4297, 4305.) Toby Barrett's testimony that his father only knew a SUV was speeding onto the property, and had only a split second's view of the Bronco before he went inside; that the Bronco's headlights were shining on the porch; and that no police lights were visible as the shooting occurred, would have contradicted the prosecutor's argument that Mr. Barrett had the opportunity to observe the scene, see police lights, and form the intent to kill before the shooting started. (*See* R. 4299-4302.)

Toby Barrett's location when the lead Bronco pulled up would have been important to defense trial counsel's closing argument. (R. 4316-17.) Instead of being able to draw the jury's attention to Toby's testimony regarding his location when the Bronco pulled in, and point to a specific location on an exhibit, as the state trial prosecutor had done, trial counsel could only argue "Toby Barrett was some place out in here." (R 4317.)

Even though Toby Barrett had testified at his father's state trials, counsel in the federal case made no effort to interview him or prepare him to testify. In his recent declaration, Toby Barrett states, "I went up to Mr. Hilfiger in court more than once and asked him if he was going to want me to testify at the trial. He said yes each time, but he never called me. He never

asked me about the incident, my father's mental problems, my home life or about me or my mom."  (Exhibit 96.)

<div align="center">

**b.       Alvin Hahn.**

</div>

Alvin Hahn was a neighbor of Mr. Barrett's.  On the night of the shooting, he was asleep and was awakened by gunfire.  When Mr. Hahn looked outside about fifteen seconds after the shooting stopped, he saw only one vehicle with its police lights on.  (Exhibit 75.)

Mr. Hahn's account is consistent with Toby Barrett's, and would have corroborated Toby Barrett's testimony that *after* the shooting, there was only one police vehicle with its emergency lights on, namely the vehicle that crashed through the gate.  Just as it was professionally unreasonable to fail to call Toby Barrett as a witness, counsel had no legitimate reason for neglecting to call Alvin Hahn, who could have supported the defense theory that the police descended on Mr. Barrett's property with nothing to indicate they were law enforcement, and that Mr. Barrett had every reason to believe he was being invaded by trespassers.

Trial counsel's omissions of these known witnesses were unreasonable and prejudicial.  The testimony of Toby Barrett and Alvin Hahn would have conflicted sharply with the accounts of the Government's witnesses, and provided jurors with evidence that Mr. Barrett did not know, in the few seconds he had to act, that the people attacking his cabin in the middle of the night were law enforcement officers.  Viewed individually, and especially collectively, with all the evidence defense counsel failed to prepare and produce in the first stage of trial to counter the Government's case, there is a reasonable likelihood of a different result had Toby Barrett and Alvin Hahn been called as witnesses.  *Strickland v. Washington,* 466 U.S. 668 (1984); *Stewart v. Wolfenbarger,* 468 F.3d 338, 357, 361 (6th Cir. 2006)(counsel ineffective for failing to call available witnesses who would have supported defense claim, specifically, in that

case, an alibi defense); *Draughton v. Dretke,* 427 F.3d 286 (5th Cir. 2005)(counsel ineffective for failing to produce evidence supporting defense theory and in contrast to prosecution testimony on how shooting occurred); *Cargle v. Mullin,* 317 F.3d 1196, 1120-22 (10th Cir. 2003)(counsel found ineffective, among other reasons, for failing to call available witnesses to contradict testimony of prosecution witnesses, and prosecution's theory as to how homicides were committed).

> **10.   Trial counsel unreasonably failed to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence.**

A key component of the Government's case was its contention that it was a "fact" that Mr. Barrett was well aware there was a warrant out for him for failing to appear in a minor felony drug case. *See* file, Sequoyah County Case No. CF-97-80, *State of Oklahoma v. Kenneth Eugene Barrett.* According to the Government, Mr. Barrett anticipated the police were going to arrest him at any time on this warrant, and he was therefore making preparations to repel the police with deadly force. This theory was founded on the testimony of informant witnesses Charles Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Randy Turman and Karen Real, who, as noted, testified that Mr. Barrett told them about the warrant, and stated he would kill the first policeman who came on his property and would "go out in a blaze of glory." The Government argued that the killing of Trooper Eales was the fulfillment of Mr. Barrett's "plan."

It was imperative that trial counsel rebut this linchpin theory of the Government's case; yet, trial counsel did virtually nothing to rebut this argument other than rely on cross-examination. Had counsel conducted anything approaching a reasonable, professional

Amended § 2255 Pet.                                    172                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

investigation into Mr. Barrett's alleged failure to appear, or had they been paying sufficient attention to certain testimony that was introduced at the hearing on Mr. Barrett's motion to suppress  (Tr. 1/ 26/05 Hr'g at 25-45, testimony of Bernell Edwards, Deputy Sequoyah County Court Clerk), the Government's theory would have evaporated, the snitches would have been further impeached, and the Government's case for intent would have suffered mightily.

### a.      Mr. Barrett's "failure to appear".

Any semblance of a reasonable investigation would have cast doubt on Mr. Barrett's alleged failure to show up for trial and the circumstances surrounding the warrant issued for his arrest.  Had trial counsel conducted a reasonable investigation of the court files related to Mr. Barrett's state court charges, they would have discovered that there was not going to be a trial.  No citizens had been summoned for jury service on the date of Mr. Barrett's scheduled trial, January 25, 1999.  (Exhibit 39.)  In fact, when the Clerk of the Sequoyah County Court checked the court records, she found that no citizens were summoned for jury service in January 1999, and no jurors reported to the court during the entire month of January 1999. (Exhibit 39.) This is curious, as Ms. Edwards specifically testified at the suppression hearing that the trial scheduled for January 25, 1999 was a jury trial. (Tr. 1/ 26/05 at 25.) Accordingly, Mr. Barrett was charged with failing to appear for a trial that never was scheduled. He was not the only party who failed to appear; apparently, the entire jury failed to appear because they were never summoned.

The importance of this fact – and the importance of this fact being pointed out to a jury – goes to the defense theory of the suspect circumstances involving every single detail of the state prosecution of Mr. Barrett. The trial that never was is the first shaky detail in the whole house of cards.  The first cause of the events leading to Trooper Eales death was a warrant issued

for Mr. Barrett's arrest for his failure to appear for a trial that was not going to happen anyway. The State's "investigation" went downhill from there. The rare no-knock warrant was intended to deny Mr. Barrett notice he was going to be arrested. The warrant was based on the statements of a serial felon, informant, and liar, and a law enforcement officer who proved to be a crook himself. Evidence indicated that Mr. Barrett had cooperated with authorities in the past, and had not been violent toward law enforcement officers. The suspicious confidential informant recanted at trial the information he allegedly gave in the search warrant affidavit. The search warrant was executed with a team of "dignitaries." Once the search warrant was executed, no methamphetamine was ever discovered. Each of these facts is consistent with the conclusion that Mr. Barrett was the target of an unjustified raid that was recklessly conceived and implemented in a manner designed to conceal the fact that law enforcement officers were the raiders. In other words, the fact that there was no jury summoned for the day Mr. Barrett was supposed to be tried supports the conclusion of the state-court jury that this was not a case of a man lying in wait for law enforcement officers. Trial counsel's lack of investigation was inexcusable and caused extreme prejudice to Mr. Barrett.

### b.      Mr. Barrett's lack of knowledge of the warrant.

The Government called Ms. Bernell Edwards at the motion to suppress hearing to testify regarding the contents of the court file in CF-97-80. Ms. Edwards stated that according to the file, Mr. Barrett had a trial date of January 25, 1999, at which he failed to appear. A bench warrant was issued for Mr. Barrett on January 27, 1999. When a defendant is not represented by an attorney, the practice of the court clerk's office is to mail a notice regarding the missed court appearance to the defendant. (Tr. 1/ 26/05 at 25, 29; File in Sequoyah County Case No. CF-97-80.)

On cross-examination by Mr. Echols, it was pointed out there was nothing in the file to indicate that, in accordance with Oklahoma law, the bench warrant was issued on the motion of the District Attorney.  (Tr. 1/ 26/ 05 at 36.)  The docket sheet showed that at one time, Mr. Barrett was represented by attorney Bill Ed Rogers.  Mr. Rogers filed a motion to withdraw on September 11, 1998, but there was no docket entry showing that he had actually been allowed to withdraw.  (Tr. 1/ 26/05 at 37-38.)  Mr. Barrett applied for court appointed counsel on December 14, 1998.  Nothing in the court file indicated that Mr. Barrett's bail bondsman was given notice of the bench warrant.  There was nothing in the court file showing that based on Mr. Barrett's failure to appear, a bond forfeiture action was instituted, which would have necessitated the bondsman to bring Mr. Barrett in so the bondsman would not be liable for the entire amount of the bond.  There was nothing in the court file to show that Mr. Barrett had actually received notice that he failed to appear, and that a bench warrant had been issued for his arrest.  The letter sent by the court clerk's office was simply sent in the regular mail; the letter was not certified, with a return receipt requested.  (Tr. 1/ 26/05 at 39-43, 45.)  For all the court file suggested, Mr. Barrett was totally unaware there was a warrant out for his arrest.

Without question, it was professionally unreasonable for counsel to fail to call Ms. Edwards, or another representative of the court clerk's office, to sponsor the court file to demonstrate there was *no official record indicating Mr. Barrett would have been aware a warrant had been issued for his arrest.*  The evidence was already in the record.  Only gross neglect can explain this glaring failure to review the file in the case that started the entire tragic chain of events.  *Rompilla v. Beard*, 545 U.S. 374 (2005).

Mr. Rogers, the last attorney to represent Mr. Barrett in the state-court distribution case, whose motion to withdraw was never granted, certainly never informed Mr. Barrett that he

Amended § 2255 Pet.                                       175                              *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

had an outstanding warrant.  Mr. Rogers is now deceased.  In connection with this Petition, his widow, Mary Rogers, was contacted by a defense investigator.  Mr. Barrett's current representatives have obtained a copy of Mr. Rogers's file in the case.  Mrs. Rogers states there is nothing in her late husband's file to show that Mr. Rogers ever informed Mr. Barrett he had missed a court date, and that a warrant had been issued for his arrest.  Even if Mr. Rogers had been informed a bench warrant had been issued, he would not have informed Mr. Barrett, because Mr. Rogers was upset over the manner in which Mr. Barrett had terminated his services.  (Exhibit 31; Exhibit 182.)

In addition, the file of Bill Ed Rogers shows that Mr. Barrett was offered a plea in which he faced no jail time.  This fact alone, or in conjunction with other facts set forth herein, including that no jury was called for the "trial," would have convinced jurors that the State had unnecessarily sought the no-knock warrant.  This fact, combined with the evidence of errors made in the planning and execution of the raid, and the abundant impeachment evidence undermining the Government's eleventh-hour informants, would have given jurors more than reasonable doubt about Mr. Barrett's intent, and certainly the death penalty.

Trial counsel considered it important that Mr. Barrett had not received notice of the bench warrant.  But, inexplicably, the defense waited until the second stage of trial to call Mr. Barrett's bail bondsman, Martin Daggs.  He explained that he had never informed Mr. Barrett of the bench warrant.  The bond was never forfeited.  Mr. Daggs testified that if he needed to get hold of Mr. Barrett to surrender him on a warrant or bring him to court, he knew where to find him.  There was no sound, strategic reason for deferring Mr. Daggs's testimony to the penalty phase, when he could have and should have been called in the first stage in aid of refuting the Government's theory of the case.

### c.       Mr. Barrett's previous cooperation with the law.

Had Mr. Barrett's trial counsel conducted a reasonable investigation, there were other readily available witnesses who could have testified that Mr. Barrett was unconcerned with the police, had been staying on his property rather than venturing out into the larger community for years *preceding* any warrant, and *had in fact been visited by the police within a few weeks of the shooting incident without incident and without being taken into custody.* Evidence was also readily available that would have demonstrated that had Mr. Barrett and his family been contacted and told he had an outstanding warrant, he would have turned himself in or allowed his family to do so.[27]

Janice Sanders, a relative of Mr. Barrett's, lived near his property. Approximately three weeks or so before the shooting incident, she called the police because Mr. Barrett was firing a gun into the air. Five officers, including Sequoyah County Sheriff John Philpot, responded to Mr. Barrett's residence. The sheriff inspected Mr. Barrett's rifle to determine whether it was empty, and gave it back to him. There was no confrontation with the authorities, and Mr. Barrett was not taken into custody on the "outstanding warrant" or for any other reason.[28]

---

[27] *See also* Claim 5, Mr. Barrett's *Brady/*newly discovered evidence claim. Former Sequoyah County Sheriff Philpot has admitted to a defense investigator, consistent with the statements of Janice Sanders and Sylvia Gelene Dotson, that he was on Mr. Barrett's property, without incident, within a month of Trooper Eales being killed.

[28] During Mr. Barrett's state case, Mr. Philpot was deposed by John Echols regarding his previous contacts with Mr. Barrett. In late 1998, Sheriff Philpot and others, including Deputy Sheldon Fair, went to Mr. Barrett's residence over a complaint that he was firing weapons, something he did not infrequently. (Exhibit 85.) On this occasion, Sheriff Philpot arrived after the other officers. When the sheriff arrived, the officers who were already there were inspecting Mr. Barrett's weapons and running the serial numbers. One of the weapons being inspected appeared to be an SKS. Sheriff Philpot informed Mr. Barrett that he had an outstanding misdemeanor warrant. Mr. Barrett said he would appear and take care of the matter. Sheriff

(continued...)

(Exhibit 85.)  Although Ms. Sanders was interviewed by defense counsel, she was not called as a witness.  When she was contacted by Mr. Hilfiger and a man who was likely Bret Smith, this gentleman asked Mr. Hilfiger if he was going to call Ms. Sanders as a witness.  To his surprise, Mr. Hilfiger said "no."  (Exhibit 85.)[29]

Mr. Barrett's mother, Sylvia Gelene Dotson, who lived next door, was called as a defense witness in the first stage of trial, but she was not asked about the police coming to her son's residence shortly before the shooting incident, or how long Mr. Barrett had kept close to his property.  Had she been asked, she would have testified that Mr. Barrett was not capable of living on his own, and thus stayed close to his relatives in the community for support.  He had been doing this long before the "warrant" was issued.  Ms. Dotson was stunned at the midnight raid on Mr. Barrett's house.  Had the police simply contacted Mr. Barrett's family, they would have brought him in.  Even if the police had come out to simply arrest Mr. Barrett in a non-confrontational way, there would have been no problem.  Moreover, shortly before the raid, and consistent with what Janice Sanders says, the police had been to Mr. Barrett's property to inspect his weapons.  There had been no violence and no problem.  (Exhibit 97.)

Ruth Harris, Mr. Barrett's aunt, also states that had the authorities simply let the family know that Mr. Barrett had an outstanding warrant, it could have been arranged without any difficulty for Mr. Barrett to surrender peacefully.  (Exhibit 93.)

---

[28](...continued)
Philpot did not take Mr. Barrett in on the warrant.  Mr. Barrett never threatened any of the officers, and his weapons were returned to him after they were inspected.  (Exhibit 108.)

[29]  In addition to impeaching the Government's theory of the case, testimony from Ms. Sanders and Ms. Dotson would have been important to the motion to suppress, showing there was no cause for a no-knock, nighttime warrant.

Amended § 2255 Pet.                          178                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Another of Mr. Barrett's aunts, Phyllis Crawford, lived just down the road. On one occasion when Mr. Barrett felt he was wanted for something by the police, far from threatening violence or bragging that he would "go out in a blaze of glory," Mr. Barrett came to her in tears, asking what he should do. Ms. Crawford told him if the police really wanted him, he should simply go with them. Instead of issuing threats, this advice seemed entirely reasonable to Mr. Barrett, and calmed him down. (Exhibit 91.)

Sean Hill, who was available to testify but never contacted by the defense, states that far from "hiding out" from a warrant, Mr. Barrett had really never left his property for years. Police drove by Mr. Barrett's property all the time. When Tom Sanders would call in noise complaints against Mr. Barrett, the police would drive by, and there was no reaction from Mr. Barrett. Mr. Barrett was used to the regular police patrols and police presence in the area. His view was that he was there if the police wanted him. Mr. Hill also could have testified that the sign on Mr. Barrett's gate (Government Exhibit 104) which the prosecution made much of had been placed there on September 22, 1999, because the night before drug addicts had climbed over the fence and woken Mr. Barrett up. (Exhibit 95.)

Brandy Hill could have given similar testimony. She states that from 1996 to the time of the shooting incident, police drove by Mr. Barrett's place on a frequent basis, sometimes up to three times a week. Mr. Barrett was used to the police presence and was not bothered by it. (Exhibit 77.)

Trial counsel also unreasonably failed to call in the first stage one of Mr. Barrett's neighbors, Clyde Edgmon, and bail bondsman Martin Daggs. Both these witnesses were known to trial counsel at some point, as they were called to testify in the second stage of trial. In the penalty phase, Mr. Edgmon testified that approximately six months before the raid, two law

enforcement officers, John Owens and Sandy Gerdner, came by his house when Mr. Barrett was working on a truck for him.  The officers talked to Mr. Barrett for some time.  There were no problems, and Mr. Barrett was friendly with the officers.  Mr. Edgmon, Ms. Hill, and other witnesses contradicted the Government's theory that Mr. Barrett was "hiding out" from the law for months before the raid, priming himself for a violent confrontation.  Mr. Edgmon's testimony also would have cast doubt on the claims of several of the informant witnesses that Mr. Barrett was prepared to "go out in a blaze of glory" and would react violently to any police contact.

Had counsel conducted a proper investigation and presented this evidence, there is a reasonable probability that the outcome would have been different, since it directly countered the prosecution's theory of the case.  Compared to this evidence, the self-serving testimony of the seven snitches would have been found clearly wanting in credibility.  *Strickland v. Washington,* 466 U.S. 668 (1984); *Cargle v. Mullin,* 317 F.3d 1196, 1120-26 (10th Cir. 2003) (defense counsel ineffective for failing to conduct a reasonable investigation, which would have uncovered witnesses who could have countered testimony of prosecution witnesses and supported defense claim of non-involvement in the homicides); *Williamson v. Ward,* 110 F.3d 1508, 1514 (10th Cir. 1997) (duty to investigate all lines of defense strictly observed in capital cases; counsel ineffective for, among other things, failure to present evidence showing third party had confessed).

**11.** **Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony. Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.**

Mr. Barrett's trial counsel unreasonably failed to challenge the Government's use of irrelevant and prejudicial testimony of James H. Horn, a so-called expert in the area of "traumatic stress" (R. 849.) Trial counsel allowed the jury to hear Horn's testimony over a period of two days, failed to timely move to strike that testimony, and when the court did finally strike the testimony, failed to obtain an adequate curative instruction, or to move for a mistrial.

The Government was clearly concerned about the discrepancies in the testimony of its fact witnesses, both as compared to other witnesses, and with regard to their own testimony in the previous state court trials. (R. 925, 934, 1630-31.) Consequently, it again called a witness who had previously testified at the state court trials, former FBI agent James Horn. Horn testified to his credentials, including a B.S. in Psychology – although he admitted he was not a psychologist (R. 843, 909) – and a Masters of Forensic Science degree from George Washington University in Washington D.C. (R. 843.) Horn also stated he was board certified through the American Academy of Experts in Traumatic Stress in "Emergency Crisis Response" and "Traumatic Stress." (R. 848.) He informed the jury, in some detail, about his service as a decorated Marine Corps infantry officer, having served two tours in Vietnam before joining the FBI. (R. 843-45.) Horn had worked with the FBI's behavioral unit as a criminal profiler, and then as program manager of the FBI critical incident program. (R. 845-848.)

Horn's testimony revealed a strong affiliation with law enforcement and allowed him to present himself as having extraordinary first-hand knowledge of traumatic events. Even

during the process of stating his credentials before being offered as an expert, Horn spoke of having been exposed to rocket attacks by the Viet Cong, engaging in combat with the North Vietnamese,  and working for the FBI on "critical incidents" such as Hurricanes Andrew and Hugo, the Oklahoma City Bombing and the assassination attempt on Ronald Reagan, as well as being a member of the first FBI SWAT team (R. 844-847.)[30]

Horn was accepted by the court as an "expert witness in the area of traumatic stress" without objection from the defense (R. 849), nor any request for a *Daubert* hearing.[31] Horn then testified in very general terms about the impact of trauma on an individual's ability to relate and recall the incidents and circumstances in question.   While unable to comment on the specifics of any of the lay witnesses' testimony (R. 881), Horn narrated the impact of "personal feeling[s] of mortality and vulnerability" that trauma creates (R. 850), and particularly how there is "an extreme aggravation by the loss and injury to fellow police and fellow agents ... the worst thing that happens to a law enforcement officer in the line of duty is the death of a partner in the line of duty. So we can expect to see in those circumstances the worst, the most serious impact in effects on the colleagues who survive." (R. 851.)  In explaining his views about the impact of trauma on recollection, Horn referred repeatedly to his FBI days and cited to specific cases he had been involved in or had simply heard of, giving names and locations.  (R. 852-4, 858, 859, 860.)  However, he offered no particular opinion concerning the members of the SWAT team in

---

[30]During the two state court trials, Horn similarly claimed involvement in the FBI's first SWAT team (Trial # 1, 2120), the aftermath of the Oklahoma City Bombing (Trial # 1, 2122; Trial # 2, 1436, 1441); wartime experience in Vietnam (Trial # 1, 2135; Trial # 2, 1436-37, 1445, 1451, 1459-60); the incident at Wounded Knee (Trial # 2, 1437-39, 1460); as part of an anti-terrorist squad at the Lake Placid Winter Olympics (Trial # 2, 1438); and in connection with a fatal sky-jacking (Trial # 2, 1439).

[31]*See Daubert v. Merrell Dow Pharmaceuticals, Inc.*,  509 U.S. 579 (1993).

Amended § 2255 Pet.                    182                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

this case, even though he had actually been involved in debriefing them in group "counseling sessions," where he had offered them "peer support" (R. 905, 874-79), and claimed that he had the officers sign confidentiality agreements concerning the debriefing.  Horn stated correctly that "confidentiality doesn't extend to the courtroom, privilege does."  (R. 880.)   However, counsel simply acquiesced to Horn not testifying about the specifics of what had been said in the debriefing, apparently out of concern that Horn should not run the risk of creating a conflict for himself.  (R. 881.)

After testimony from Horn running to some forty printed pages (R. 849-889), including his narration of what an FBI "psychiatrist" had said on the soundtrack of a training video (R. 856), the court finally intervened *sua sponte*, noting that: "I don't have a clue why the government called this witness ... I don't know what his expertise is ... I don't think a foundation has been laid ... it could be a *Daubert* issue ...".  (R. 890.)

Nonetheless, Horn's testimony continued without challenge from defense counsel, who elicited details of how law enforcement officers should be treated after a traumatic incident, and Horn establishing that his work was not "interested in critiquing and facts, but in helping them resolve their emotional response to these incidents." (R. 897-98.)   As his testimony continued, it became apparent that Horn was unfamiliar with various concepts relevant to the area of memory and trauma, such as acute traumatic disassociation (R. 908-10),[32] confabulation (R. 906),[33] and contamination of memory through contact with others.  (R. 900-901.)[34]  In fact,

---

[32]*See, e.g.,* Vermetten, Dorahy and Spiegel, *Traumatic Dissocation: Neurobiology and Treatment* p. 83, American Psychiatric Publishing 2007.

[33]Horn defined confabulation as "it means to make it up," whereas confabulation is the formation of false memories, perceptions or beliefs as a result of neurological or psychological

(continued...)

Horn made it plain that he was not interested in the current research in the field, just in dealing with individual cases. (R. 883.)

Before recessing for the day, the court again expressed concern about Horn giving expert testimony, citing to Rule 702 and the fact that Horn "hasn't talked about any principles or methods that he has used to reach any conclusion and he hasn't applied any of the principles or methods reliably to any facts of this case because he really hasn't talked about the facts in this case." (R. 918.)  The following morning, having expressed further concern, the court indicated that it was contemplating striking Horn's testimony, since it was not likely to aid the jury in resolving any factual dispute, but rather consisted merely of talking "in generalities." (R. 923-27.)  Only after the court had questioned the government at length about the relevance and usefulness of Horn's testimony (R. 923-940) did the defense finally make the half-hearted statement: "I think the Court should consider striking his testimony" (R. 940).  When given a further opportunity to ask that the testimony to be stricken, the defense still failed to affirmatively request that remedy. (R. 948.)   The court then permitted further cross-examination of the witness before the jury (R. 949-958) at the end of which the defense finally moved to strike.  However, the Government was then permitted to take the witness on redirect. (R. 966-975.)

Eventually, the Court gave counsel a further opportunity to argue the issue (R.1628-1632) and then struck the testimony (R. 1636), giving an instruction to disregard:

---

[33](...continued)
dysfunction.  Helen Phillips, *Mind Fiction: Why your brain tells tall tales,* 2572 New Scientist, 7th October 2006.

[34]Contamination of eyewitness testimony by subsequent input is a phenomenon that has been confirmed by clinical studies. Anthony Esgate, *An Introduction to Applied Cognitive Psychology*, 51 Psychology Press 2004.

Amended § 2255 Pet.                          184                    *Barrett v. U.S.,* No. 6:09-cv-00105-JHP

Members of the jury, if you will listen, I'm going to give an instruction. I started to say a special instruction. It's not special, it's just – it's just a – (Pause) Not a special instruction, but just an instruction in regard to some testimony you have heard from Mr. Horn. So if you would listen to this interim instruction: Ladies and gentlemen of the jury, when we started this trial I gave you some preliminary instructions to guide you in your participation in this trial. As I advised you at that time, it is my duty to determine the law applicable to this case and it is your duty to accept and follow my instructions regardless of whether or not you agree with the law. As a matter of law, I have determined that the testimony which you heard on Monday afternoon and Tuesday morning of James Horn should not have been admitted into this trial. You should not speculate about the reasons for my ruling on this issue; it is based solely on my interpretation of the law applicable in this case. Therefore, I instruct you that you should disregard Mr. Horn's testimony in its entirety and not consider it for any purpose in making your decision when reaching a verdict in this case.

(R. 1740.)

Nothing in the record indicates that defense counsel urged any amendment to the instruction, even though the trial court gave them that opportunity. (R. 1636-37.) Inexplicably, in spite of the trial court's concern about Horn's testimony, and willingness to strike it, defense counsel made no motion for a mistrial.

Horn's testimony, as the court readily saw, was inadmissible under Fed. R. Evid. 702. The fact was equally clear on the basis of the two state trial transcripts. As noted in the above discussion concerning counsel's failure to challenge the testimony of Iris Dalley, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 599, charged trial judges with the "gatekeeper" function of excluding unreliable expert testimony and ensuring that the proposed testimony will assist the trier of fact in understanding or determining a fact in issue. To do so, first, the trial court must ensure that the evidence is reliable. *Id. at 592.* Second, the court must ensure that the evidence will assist the trier of fact and is thus relevant. *Id. Kumho*

Amended § 2255 Pet.                                  185                        *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

*Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999) further held that the principles enunciated in *Daubert* applied to all expert testimony, not merely scientific evidence.

Counsel were ineffective for failing initially to challenge Horn's qualifications and the admissibility of his testimony.  Counsel had ample opportunity to prepare for Horn's testimony and consider whether to challenge it, because Horn was listed in the Government's witness list  and had testified at the two previous state court trials.  Counsel do not appear to have bothered to ascertain what Horn's qualifications were.   During a budgeting hearing on the morning before Horn testified, Mr. Hilfiger stated he believed Horn was a psychologist. (Tr. 10/3005 at p. 7.)   However, although Horn had a degree in psychology and had acquired practical experience as an FBI agent, he frankly stated that he was not a psychologist (R. 909) or psychiatrist (R. 907), was not focused on research, or with accuracy of recollections,  but with the counseling of individuals.  (R. 883, 903-904.)

Horn did state, however, that he was Board Certified in two areas, "Emergency Crisis Response" and "Traumatic Stress", through the "American Academy of Experts in Traumatic Stress" [AAETS] (R. 848.)   Had defense counsel spent even a few minutes researching those qualifications, they would have discovered that the AAETS is an organization in which membership can be bought over the internet (at present, for as little as $60), and that its "Board Certification" credential simply requires a "comprehensive application and examination, along with supporting documentation ... utilized in concert to validate a member's experience in working with survivors of traumatic events, knowledge of the literature and level of education."[35] Indeed, it is an organization through which one can become "Certified in Acute Traumatic Stress

---

[35] *See* http://www.aaets.org/diplomate.htm (last accessed March 2, 2009)

Management" merely by completing an application and taking an examination based on a book,

"Comprehensive Acute Traumatic Stress Management," which is purchased through the AAETS

itself.[36]   When contacted for information about Board Certification in Traumatic Stress, the

AAETS provides a link to "The National Center for Crisis Management," which produces a form

indicating that Board Certification may be obtained for $350.00, a resume/vita and copies of

relevant licenses and certificates, with no mention of any examination, and with the applicant

self-certifying as to completion of "relevant course work concerning the specific speciality area"

and to other ill-defined criteria.[37]   For example, 30% of the necessary points required for Board

Certification can be acquired by being "Author/Co-author of an article, paper and/or presentation

related to the specific specialty area," but the Board Certification application does not even

demand a copy of the article or paper in question.

Further, when being cross-examined about an article by psychiatrist Park Dietz,

Horn was asked whether he was a "master's level educated expert in this field," to which he

replied "In emergency response, yes, emergency crises response." (R. 908).[38]   This was clearly

untrue: his master's was in forensic science, but counsel did not correct that false impression.

---

[36]*See* http://www.aaets.org/catsm.htm (last accessed March 2, 2009)

[37]*See* http://www.nc-cm.org/APPLICATION%20FOR%20SPECIALTIES.cwk.pdf (last accessed March 9, 2009).  The National Center for Crisis Management offers no fewer than fourteen different Board Certifications, in Forensic Traumatology, Emergency Crisis Response, Motor Vehicle Trauma, Disability Trauma, Pain Management, Illness Trauma, University Crisis Response, Bereavement Trauma, Domestic Violence, Sexual Abuse, Rape Trauma, Stress Management, School Crisis Response and as a "Crisis Chaplain".

[38]The article appears to have been J.M. Rivard, P. Dietz, D. Martell and M. Widawski, *Acute Dissociative Responses in Law Enforcement Officer involved in Critical Shooting Incidents: the clinical and forensic implications*, 47 Journal of Forensic Sciences, Issue No. 5 (2002).

Defense counsel did not even talk to Horn in advance of his testimony (R. 863), but cross-examined him by asking questions to which they did not know the answers he would give.  R. 863-866, 887.   For example, they attempted to question him about an article by Dave Grossman on "Critical Incident Amnesia," asserting that Horn "knows Dr. Grossman," only to have Horn state moments later that he knew nothing about Grossman. R. 885-888.[39]  The defense also continued to reinforce Horn's credentials, for example bringing out his role as state director of the Oklahoma Chapter of Concerns of Police Survivors (R. 866), his award from the "Concerns of Police Survivors" group (R. 867), the number of presentations he had supposedly given (R. 868), the fact that he had already testified twice concerning this incident (R. 869), and his supposed involvement in research.  R. 883-84.   While bolstering Horn's seeming credentials, the defense failed altogether to attack the "board certifications" he had acquired through a diploma mill.

Defense counsel were also ineffective for failing to challenge the essential shortcoming of Horn's testimony:  that it was not helpful to the trier of fact.[40] Ultimately Horn was, as the court put it, nothing more than "a forensic person who deals with traumatic

---

[39]The article in question was not introduced into evidence.  It was, presumably, Lt. Col. Dave Grossman & Bruce K. Siddle, *Critical Incident Amnesia and the Implication of Memory Loss During Extreme Survival Stress Situations*, 31 The Firearms Instructor: The Official Journal of the International Association of Law Enforcement Firearms Instructors (Aug. 2001).  *See* http://www.traumaregister.co.uk/Articles/critical_incident_amnesia.htm  (last accessed March 6, 2009).

[40]The suggestion that counsel made a legitimate strategic decision not to challenge Horn but to adopt whatever aspects of his testimony were useful, (R. 959) is belied by their obvious lack of preparation.   The unopposed admission of his testimony, and counsel's eventual need to have it stricken were "the result of inattention, not reasoned strategic judgment." *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005)(internal citation omitted)(counsel ineffective for failure to review readily available court file concerning previous conviction).

experiences that police officers have." (R. 935.)   Horn did not hold himself out as a psychiatrist

(R. 907), or a psychologist. (R. 909.)   Horn himself emphasized that his work involved helping

people cope with the stress of unexpected trauma, not with any issue concerning factual

debriefing.  He did not even really purport to be giving his opinions as an expert, seeming

confused when asked whether he was expressing an expert opinion: "Pardon? ... if I am testifying

as an expert witness, I guess what I'm saying are expert answers."  (R. 957.)

Defense counsel appear to have had no real strategy concerning Horn's testimony.

They conceded admissibility, but then had second thoughts when the court ruled the testimony

inadmissible and suggested moving to strike it.  Counsel indicated that they had foregone their

opportunity to present their own witness to rebut the matters to which he testified, intending

simply to "develop out of him what we could find useful and move on down the road and not

have an expert come up and tell the other side of the stories *per se.*"  (R. 959.)  Given Horn's

lifelong work with law enforcement, and the nebulous nature of his expertise, this "decision" was

uninformed and unreasonable under prevailing professional standards.[41]  It is hard to ascertain

whether defense counsel actually viewed Horn as a witness for or against their client, but their

sheer unpreparedness resulted in a "cross-examination" that was faltering, and characterized by

the witness denying knowledge of the authorities that counsel was seeking to have discussed,

resulting in an entirely unsuccessful examination on the part of the defense.

The court had authorized limited funds for trial counsel to retain a psychologist to

assist in preparing to deal with Mr. Barrett's and the law enforcement officers' responses to the

---

[41]This quixotic attempt to get mileage out of a witness so favorable to the prosecution was mirrored in the October 3 Budget Hearing, where counsel revealed that they were contemplating compelling the testimony of a "SWAT team expert" they knew to be actively opposed to testifying for them.  *Id.* at 6.  See claim of unreasonable performance regarding Chuck Choney.

raid. (Doc. 97.)  However, the court permitted Mr. Barrett to be assisted by only one mental health expert and only at below-market rates of compensation, and only for a number of hours far below the norm for federal capital trials, although the expert had to cover many disparate issues. *See* Claims 1, *supra*, and 3, *infra.*  Mr. Hilfiger, whom the court personally selected to represent Mr. Barrett as part of a plan to develop a panel for future capital cases (Exhibit 67), declined to join his former lead counsel in requesting additional funds from the court. (Exhibit 34.)  Mr. Hilfiger stated that he relied upon Jeanne Russell, Ed.D., to provide him questions for his cross-examination of Horn.  (Tr. 10/3/05 Hr'g at 7.)  Trial counsel did not contact Dr. Russell until mid-August, and did not possess the second state trial transcripts until late September, 2005, at the earliest.

Dr. Russell, in her communications to trial counsel, questioned what role Horn was to play in the trial, and admitted difficulty in framing questions for him.  A particular concern for her was whether Horn was a mental health expert who might be prevented from testifying for reasons of confidentiality and privilege, and the fact that Horn was assuming dual roles by providing counseling and then testifying as an expert regarding the same subject matter. Defense counsel seemed to accept without question that Horn could not testify about what the officers had actually said in the debriefing sessions (R. 938), apparently believing that information was somehow privileged.  Similarly, counsel did not pursue discovery of any notes or records of the various debriefing sessions.  (R. 939.)  While the federal courts are authorized to define new privileges, and the "recognition of a privilege based on a confidential relationship should be determined on a case-by-case basis," *Jaffee v. Redmond*, 518 U.S. 1, 5-7 (1996)(recognizing privilege in communications with licensed social worker), no "traumatic stress debriefing" privilege has yet emerged, and counsel did not raise or argue Mr. Barrett's

Amended § 2255 Pet.  190  *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

right to effective representation through full discovery and cross-examination informed by knowledge of what was said at the debriefings.[42]  Thus, their ineffective performance in accepting at face value Horn's claim of confidentiality spilled over into their cross-examination of the tactical team officers.

Not only did counsel lack information from the debriefings with which to cross-examine, but they also overlooked the critical fact that the group sessions were, in effect, a pre-emptive violation of Fed. R. Evid. 615:  an untrammeled opportunity for the officers to learn in advance what other officers would say and, consciously or unconsciously, adopt other officers' perspectives on the incident.  Defense counsel also did not question the narrative technique adopted by some of the officers, of speaking in the present tense - a recognized therapeutic technique in trauma counseling - when describing what they said had taken place.[43]  This not only suggested an unusual degree of synchronicity in the officer's testimony, but rendered it more powerful than a normal past-tense narrative.

Regardless of the court's instruction, Horn's testimony should not have been admitted and was highly prejudicial.  It was the court that recognized Horn had nothing legitimate to offer, hence the fact that his testimony was stricken.  This testimony must have had a tremendous impact on the jury, and the court's instruction to disregard it was an exercise in

---

[42]Strong policy arguments would militate against allowing law enforcement to conceal such debriefings on privilege grounds.  To do so would create the temptation to hold debriefings in every controversial case in order to chill defense counsel's ability to cross-examine effectively about the possibility of contamination of witnesses.  Moreover, since the officers in this case effectively waived any privilege by testifying as to the facts of the incident, shielding them from inquiry into earlier and possibly inconsistent statements would be decidedly unfair.

[43] *See* David H. Barlow, *Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-Step Treatment Manual*, 71 Guilford Press 2001.

Amended § 2255 Pet.                      191                      *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

futility.  Horn painted a powerful picture of law enforcement officers as a valiant brotherhood, referring to "one of our FBI heroes" (R. 855), to the powerful impact of losing a colleague (R. 851) and to the close relationship of SWAT team members: "it's very akin to the relationship I still have to this day with the Marines with whom I served in Vietnam because there is a bond when you face life-threatening situations that is formed, that is probably like no other bond." R. 861-62.  Not only did this testimony improperly bolster the prosecution witnesses,[44] suggesting that the inaccuracies in their testimony were of little moment, given the trauma experienced by the grieving band of law enforcement agents, it also amounted to victim impact testimony that should never have come in at the guilt phase.[45]  Moreover, it sought to explain the fact that officers might "recall" significant facts long after an incident which they had not previously mentioned, without beginning to explore the question of whether those recovered "memories" were reliable recollections.  (R. 858-59.)

Horn's connection with the FBI alone would have been perceived by the jury as lending weight to what he said.  Another court, in holding that the testimony of a member of the FBI's Behavioral Analysis Unit failed to satisfy *Daubert*, noted: "In light of ... the considerable authority and even mystique in which these experts are cloaked due to their status within the FBI, it is essential to establish the reliability of such expert testimony."  *United States v. Thomas*, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266 at * 90-94 (D.Md. January 13, 2006)(criticizing unreliability, lack of proven methodology and circular reasoning of agent's testimony).

---

[44]  The Court itself acknowledged this facet of the testimony when ruling that it would strike the testimony: "At best, Mr. Horn's testimony is simply an attempt by the government to bolster the credibility of its witnesses for memory lapses of those witnesses at issue." R. 1635.

[45]  It is noteworthy that victim impact was one of the aggravators ultimately found by the jury in deciding to sentence Mr. Barrett to death.

Amended § 2255 Pet.  192  *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

This was not a case where an isolated and fleeting reference to an improper matter would have been easily cured. It is normally presumed "that a jury will follow an instruction to disregard inadmissible evidence *unless* there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987)(internal quotation marks and citations omitted)(emphasis added); *Patton v. Mullin*, 425 F.3d 788, 800 (10th Cir. 2005)(single reference to defendant as an "ex-con" cured by instruction to disregard). The probability that the court's instruction prevented the jury from considering Horn's testimony in the ways stated herein is overwhelmingly small. Horn's testimony stretched out over two days, and the supposedly curative instruction given by the court was late in coming.

Horn's testimony concluded on October 4, 2005, but the jury was not instructed to disregard it until three days later, on October 7, 2005. This delay can only have allowed the evidence to sink into the jury's consciousness. By contrast, in *United States v. Joe*, 8 F.3d 1488, 1498 (10th Cir. 1993) an erroneous reference to the defendant's prior incarceration was a "single isolated occurrence in the context of a larger explanation and the trial judge gave an immediate curative instruction"; consequently reversal was not required. Moreover, the low-key nature of the instruction, which downplayed even its own importance, can have done little to erase the jury's recall of Horn's testimony. "It's not special ... Not a special instruction, but just an instruction in regard to some testimony that you have heard from Mr. Horn." (R. 1739.) The trial court also missed an opportunity to drive home the importance of the instruction, by failing to emphasize that the evidence was simply inadmissible as a matter of controlling law, but rather stating that the ruling "is based solely on my interpretation of the law applicable in this case." (R. 1740.)

Notably, this was a case where the prosecution evidence had previously failed to convince two state court juries to convict Mr. Barrett of either first or second degree murder. It can therefore be readily concluded that the evidence was otherwise "not overwhelming" and that the impact of Horn's testimony on the jury requires a new trial. *See United States v. Sands*, 899 F.2d 912 (10th Cir. 1990)(new trial warranted where it cannot be said with reasonable certainty that the improper reference "had but very slight effect on the verdict of the jury").

Given the history of this case, especially with two prior trials that had not resulted in a murder conviction, let alone a death sentence, defense counsel had nothing to lose on their client's behalf by moving for a mistrial. The trial court had properly identified the shortcomings of Horn's testimony, and made clear its readiness to strike that testimony. The court had recognized the appropriateness of giving an instruction to disregard, although the instruction actually given was inadequate. Defense counsel could and should have argued that the jury's exposure to Horn's evidence had irredeemably tainted Mr. Barrett's right to a fair trial. There was no downside to a motion for mistrial and therefore no strategic reasons for failing to make the motion. Counsel's failure to move for a mistrial clearly demonstrated deficient performance.

In a similar situation, where counsel only realized during the testimony of a government witness that his client's statement had been given after he had already invoked his rights, a trial court suppressed the statement. However, only a cautionary instruction was given and counsel did not move for a mistrial. *United States v. Ramsey*, 323 F.Supp.2d 27, 33 (D.D.C. 2004). Counsel's performance was held to be deficient in the circumstances of that case, where "any reasonable defense lawyer would have jumped at the chance to start the trial afresh." *Id*. at 37. Given Mr. Barrett's counsel's lack of preparedness, their failure to even attempt to obtain a mistrial defies explanation. *See also Martin v. Grosshans*, 424 F.3d 588, 591-92 (7th Cir.

2005)(trial counsel ineffective for failing to move for mistrial after prosecutor's inflammatory closing argument); *Freeman v. Class*, 95 F.3d 639 (8th Cir. 1996)(counsel ineffective for failing to move for mistrial after repeated references to defendant's exercise of right to remain silent); *Crowe v. Sanders*, 864 F.2d 430 (6th Cir. 1989)(counsel ineffective for failing to seek mistrial after court gave improper parole instructions); *Snowden v. Singleterry,* 135 F.3d 732, 738 (11th Cir. 1998)(counsel ineffective for failing to object to bogus "expert" testimony).

To the extent the issue could have been fully resolved on the record, direct appeal counsel for Mr. Barrett unreasonably failed to raise the issue of the ineffective assistance provided by trial counsel with regard to Mr. Horn's testimony, and their failure to mitigate or correct that error through a stronger instruction or a mistrial. *See* Claim 19, *infra*. However, as indicated here, there is extra-record evidence in trial counsel's files showing that they did not conduct a timely or thorough investigation of Horn's qualifications, the limitations of his testimony, their own expert's ability to provide questions on cross-examination, or the general admissibility of his testimony under federal law.

> **12.** **The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions**.

Trial counsel's role in representing a criminal defendant is giving the jury a way to find reasonable doubt. In this respect, closing argument is an indispensable aspect of the defense function. *Herring v. New York*, 422 U.S. 853 (1975); *Gardner v. Florida*, 430 U.S. 349, 360 (1977). However, the defense lawyer also must request jury instructions that frame the issues and enable the jury to give effect to the defense's theories. Absent such an instruction, defense evidence may not be given appropriate effect.

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would have given the jury a way to give effect to the defense evidence and argument.  The instructions trial counsel unreasonably failed to seek include an instruction on informant witness credibility, an instruction on drug-addict witness credibility, an instruction on self-defense, instructions on the theory of the defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses. These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution in this case from the two previous state-court prosecutions.  Some of these witnesses acknowledged at trial, or have acknowledged since the trial, that they were involved in illegal activities before, during, and after their testimony or the events about which they testified.  These activities included illegal drug possession, use, and/or distribution, various civil violations, making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, and be informed about, and seek from the trial court, such orders as may be available to assist in the presentation of the defense.

Courts have long given instructions that inform the jury that the testimony of an informant "'must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.'"  *See*, *e.g.*, *United States v. Humphrey*, 208 F.3d 1190, 1206 (10th Cir. 2000).  *See also United States v. Bridwell*, 583 F.2d 1135, 1142 n.6 (10th Cir. 1978). Although trial counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel unreasonably failed to seek a jury instruction to the same effect.

The informant witnesses also confessed to being drug addicts, either at the time of their testimony, or at the time they allegedly perceived the "events" they described in their

testimony.  Karen Real, Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis

Crawford, Cindy Crawford, and Brandie Price were all drug addicts at relevant times.

> Courts have long instructed juries that the

> testimony of someone who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.

> [¶]  You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

(Fifth Circuit Pattern Jury Instr. 1.16 (2001).)

"Criminal defendants are entitled to jury instructions upon their theory of defense

provided there is evidentiary and legal support." *United States v. Visinaiz*, 428 F.3d 1300, 1308

(10th Cir.2005) (citations omitted).  The defense theories were (a) that at the point in time when

Mr. Barrett fired his weapon he had no indication that the vehicle speeding toward him contained

law enforcement officer (R 4314), and (b) Mr. Barrett was not engaged in drug manufacturing or

distribution when the raid took place.  As evidenced by the state-court verdicts, the inconsistent

testimony of the law enforcement percipient witnesses in federal court, and the jury's verdict in

this case, there was evidence and legal support for a theory-of-defense instruction.

**13.    The outcomes of the trial and appeal are unreliable due to trial counsel's unreasonable failure to preserve a record of error, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard.**

Trial counsel were professionally unreasonable for failing to make proper

objections in order to preserve the record for appeal.  As a consequence, Mr. Barrett was denied

his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the

effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment.

As demonstrated by the direct appeal decision in this case, *United States v. Barrett,* 469 F.3d 1079 (10th Cir. 2007), Mr. Barrett's trial counsel failed to timely preserve complete objections to the following:

1.　the prosecution's violation of Oklahoma state law requirements for nighttime search warrants (*id.* at 1089-90);

2.　the improper execution of search warrants by federal officers (*id.* at 1090);

3.　the violation of Fed. R. Crim.P. 41, because no federal judge or magistrate authorized the search warrant executed on Mr. Barrett's home (*id.* at 1090-91);

4.　the insufficiency of Mr. Barrett's federal indictment (*id.* at 1090-91);

5.　the improper multiplicity of various counts of Mr. Barrett's federal indictment for the same alleged criminal conduct (*id.* at 1095-96);

6.　the misjoinder of offenses in violation of Fed.R.Crim.P. 8 (*id.* at 1096-97);

7.　the improper admission of victim impact evidence (*id.* at 1097-1101);

8.　the prosecutor's use of racially motivated strikes in violation of *Batson v. Kentucky,* 476 U.S. 76 (1986), in that defense counsel failed to present reasons why the government's purported race-neutral reasons for peremptory strikes were false and pretextual, and also failed to inquire into the Government's justifications for the strikes (*id.* at 1105-06);

9.　the federal death penalty statute's improper allowance of non-statutory factors in aggravation (*id.* at 1108);

10.     the lack of constitutionally required proportionality review (*id.* at 1108-09);

11.      the violation of *Woodson v. North Carolina,*  428 U.S. 280 (1976) occasioned by the court's use of a relaxed standard for the admissibility of evidence (*id.* at 1109-10);

12.     the federal death penalty statute's improper allowance of impermissibly vague aggravating factors ( *id.* at 1110);

13.     the improper double counting of Mr. Barrett's alleged intent to kill as both a special circumstance and an aggravating factor (*id.* at 1110-11); and,

14.     the Government's improper failure to give timely discovery of the names of seven prosecution witnesses called to establish Mr. Barrett's intent to kill (*id.* at 1115-17.)

Trial counsel's failure to make full and timely objections to each of these errors constituted ineffective assistance of counsel.  *Strickland v. Washington,* 466 U.S. 668 (1984); *Cf. Martin v. Grosshans,* 424 F.3d 588, 590-92 (7th Cir. 2005); *Cargle v. Mullin,* 317 F.3d 1196, 1220-22 (10th Cir. 2003); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996).  Analogously, in these cases, counsel were found ineffective, in whole or in part, for simply failing to object to prosecutorial misconduct.  In Mr. Barrett's case, trial counsel's failures to lodge appropriate objections and to adequately preserve the record for appeal were numerous, were not a function of legitimate trial strategy, and prejudiced Mr. Barrett because the onerous "plain error" standard was applied to judging myriad meritorious issues.  Under prevailing professional norms, trial counsel had a duty to "consider all legal claims potentially available" and "thoroughly investigate the basis for each potential claim."  ABA Guideline 10.8 and Commentary in 31 Hofstra L. Rev.

at 1028.  10.8, 31 *Hofstra L.Rev.* 913, 1028 (2003).  Trial counsel must bear in mind "the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted or otherwise forfeited." *Id.*   Once counsel has made a decision that a clam should be made, counsel has the duty to "present the claim as forcefully as possible" and "ensure that a full record is made of all legal proceedings in connection with the claim." *Id.* at 1028-29.

Each of the claims discussed above had merit.  Mr. Barrett would have suffered no adverse consequences had trial counsel made timely and complete objections on any or all of these grounds.  Accordingly, trial counsel's failure to preserve Mr. Barrett's objections on each of these grounds fell far below the standards expected of competent counsel in capital cases.

Each of the objections discussed above raised a question of law, or mixed questions of law and fact, subject to de novo review.  *See, e.g., United States v. Smith,* 543 F.3d 1211, 1226 (10th Cir. 2008) ("When considering a *Batson* claim, we review de novo whether the proffered explanations were race-neutral"); *United States v. Johnson,* 130 F.3d 1420 (10th Cir. 1997) ("misjoinder under Rule 8 is a question of law subject to de novo review"); *United States v. McIntosh,* 124 F.3d 1330, 1336 (10th Cir. 1997) ("We review claims of multiplicity de novo").  However, based upon trial counsel's failure to make complete and timely objections, the Court of Appeals reviewed each of these claims for plain error.  Had counsel made appropriate objections, Mr. Barrett would have obtained relief from his convictions and sentence of death based on each of these errors under the appropriate de novo standard of review.

The constitutional violations set forth above warrant the granting of § 2255 relief without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abramson,* 507 U.S. 619, 638 n. 9 (1993).  Furthermore, these

1701

constitutional violations, individually or cumulatively, so infected the integrity of the proceedings that the errors cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the jury's determinations of guilt and punishment, rendering them fundamentally unfair and resulting in a miscarriage of justice.

> **14.     Trial counsel unreasonably failed to object to numerous instances of prosecutorial misconduct in closing argument in the penalty phase of trial.**

Claim 5, section C details repeated instances of prosecutorial misconduct in questioning witnesses and in closing arguments in both the guilt/innocence and the sentencing phase.  The specific instances will not be repeated but are incorporated herein by specific reference.  Faced with arguments that could in no sense be termed appropriate, counsel failed altogether to object.  The failure to object to clear prosecutorial misconduct can never be termed a reasonable strategy.  Especially in light of the numerous, serious constitutional errors which plagued Mr. Barrett's trial, this omission by counsel was prejudicial.  In this case, the prosecution basically did whatever it pleased.  That abuse of the process continued unabated in second stage closing arguments, to Mr. Barrett's clear detriment. *E.g., Hodge v. Hurley,* 426 F.3d 368, 386-89 (6th Cir. 2005); *Washington v. Hofbrauer,* 228 F.3d 689, 703, 709 (6th Cir. 2000); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996)(finding counsel ineffective for failing to object to misconduct in closing arguments).

### Conclusion.

But for trial counsel's numerous unreasonable acts and omissions, each one a contravention of prevailing professional norms, there is at least a reasonable probability that jurors would have reached a different verdict in the first stage of trial.

Counsel late in the case recognized the need to attack the search warrant based on the trial testimony of the C.I., Charles "Monk" Sanders, but unreasonably omitted key facts and argument from their briefing. A competent and thorough re-urging of the motion to suppress based on *Franks v. Delaware*, 438 U.S. 154 (1978), likely would have resulted in the exclusion of much of the Government's case.

When informed that prosecutors sought to conceal seven informant witnesses, and did conceal them until after the start of jury selection, counsel unreasonably acquiesced to a trial by ambush when they acceded to an arrangement that resulted in these crucial prosecution taking the stand with little or no time to investigate their backgrounds, criminal records, or their motives for testifying. As a result, a wealth of impeachment evidence that could have been used to show them to be the incredible, self-serving witnesses they were was not produced. Because counsel unreasonably failed to seek a continuance, or were induced into not seeking a continuance by prosecutorial and judicial misconduct, counsel left relatively unscathed key prosecution witnesses whose credibility would have been shattered. With reasonable investigation the Government's case for intent, particularly with respect to Count 3 of the superseding indictment, would have been damaged beyond repair.

Trial counsel unreasonably failed to object to the seven informants' testimony to prior bad acts under Fed. R. Evid. 404(b). When the Government failed to give notice that Karen Real would offer such testimony, in violation fo Rule 404(b), trial counsel offered no objection. Trial counsel permitted the prosecutors to use the hearsay evidence for an improper, and highly prejudicial purpose, i.e., to show Mr. Barrett's state of mind at a time far removed from his alleged statements and under circumstances that gave the alleged statements little probative value.

Numerous witnesses were available to rebut the Government's claim that Mr. Barrett had "holed up" on his property, readying himself for an attack on law enforcement, because he feared the authorities would arrest him on an outstanding felony warrant. This spurious claim went virtually unchallenged due to a total failure of investigation. The two witnesses the defense did call that would have challenged this theory – Martin Daggs and Clyde Edgmon – inexplicably did not appear until the sentencing phase of trial, even though their testimony was directly relevant to the guilt/innocence stage. Several other witnesses who could have refuted the prosecution's theory were either never contacted or were interviewed only superficially. Likewise, defense counsel failed to produce readily available witnesses who could have contradicted the testimony of law enforcement regarding the lighting used on the police vehicles, and supported the defense argument that Mr. Barrett reasonably believed he and his property were being attacked by lawless intruders.

Mr. Barrett had a well-documented history of mental impairments that were highly relevant to why he stayed close to his property, what he would have perceived at the time of the raid, and on his intent at the time of the shooting, but, due to both limitations on funds for expert witnesses and counsels' failure to investigate and prepare, the jury heard about none of this. Because of counsels' failures, the Government had a clear path to falsely portraying Mr. Barrett as a deliberate killer. Along the same lines, counsel failed altogether to challenge Mr. Barrett's competency to stand trial, though a thorough investigation would have revealed his mental competency to be very much in doubt.

Trial counsel unreasonably failed to use what funds were available to prepare to impeach prosecution "expert," Iris Dalley, and her dubious "reconstruction" of the manner in which the shooting occurred. Due to trial counsel's failure to retain an expert he asked the court

to authorize, no *Daubert* challenge was made to exclude her testimony and conclusions, and the jury never heard that her methodology and testimony were seriously flawed and lacking in a reliable foundation.  In a related fashion, the version of events testified to by the members of the OHP Tactical Team, which dovetailed with Dalley's "expert testimony," was not impeached with readily available previous testimony they had given in the two state trials.  Any failures of memory on their part, or contradictions in their testimony, were allowed to be explained away by James Horn, another "expert" who held forth for the better part of two days without objection, until the court itself struck his testimony because it so plainly failed to meet the test of *Daubert* and *Kumho Tire*.  The court's curative instruction was inadequate; the bell could not be unrung. Horn never should have been allowed to appear, but counsel's failure to object to his obviously inadmissible testimony ensured that Mr. Barrett would be prejudiced.   Whatever headway counsel did make in casting doubt on the testimony of the officers was swept away in the welter of innocent explanations for their inconsistent testimony offered by Horn.

Trial counsel recognized that it was crucial to present expert testimony to show that the raid by law enforcement was contrary to law enforcement policies and procedures, was inadvisable, ill-conceived, poorly planned, and was met by violence from Mr. Barrett only because law enforcement did not make its presence plainly known.  But trial counsel failed to contact the expert the court authorized them to retain for that purpose.  The effort to support this theory came to grief when the defense inexplicably decided to rely on the testimony of Chuck Choney, even though the witness told trial counsel he was hostile to Mr. Barrett and would not testify for the defense.  What few half-hearted criticisms he may have offered for the manner in which the raid was conducted were more than counterbalanced by his defense at almost every turn of the conduct of the OHP Tactical Team, and his ringing conclusion that they did "nothing

wrong." Had counsel engaged the services of a truly independent expert, the jury would have heard an entirely different story. Dr. Kirkham, an independent, nationally recognized authority whom the Court authorized counsel to hire as the defense's SWAT expert, would have testified that the OHP raid on Mr. Barrett's property was a textbook example in almost every respect of *what not to do,* resulting in Mr. Barrett reacting in the belief that criminal trespassers were on his property.

Symptomatic of counsels' ineffectiveness were also the failure to request appropriate instructions; the failure, on many points eventually raised on direct appeal, to adequately preserve the record with timely objections and motions; and the failure to object to prosecutorial misconduct.

Based on the above evidence, the conclusion is inescapable that trial counsel rendered ineffective assistance in the first stage of trial. As the results of the state prosecution demonstrated, this was a very defensible case, even with (or perhaps especially) the eleventh hour addition of the informant witnesses. The deficiencies of counsel argued above were not grounded in sound strategy, but fell outside the wide range of reasonable professional assistance. Mr. Barrett was clearly prejudiced. Whether the Court views the errors of trial counsel individually or in the aggregate, a different outcome was reasonably likely. *Washington v. Smith,* 219 F.3d 620, 634-35 (7th Cir. 2000); *United States ex rel. Madej v. Schomig,* 223 F.Supp.2d 968, 973 (N.D. Ill. 2002).

### B.    Unreasonable Acts and Omissions Primarily Affecting the Second Stage of Trial.

Mr. Barrett had a constitutionally protected right to have his trial counsel investigate, develop and present, and have the jury give effect to, mitigation evidence related to

his background and character and the circumstances of the offense. *Williams v. Taylor*, 529 U.S. 362, 393 (2000). Trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"). *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004).

Acts and omissions of counsel require a new trial when there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant. In a capital case, this standard is met if "there is a reasonable probability that at least one juror would have struck a different balance" at the second stage of trial. *Wiggins*, 539 U.S. at 537. In sum, the Sixth Amendment is violated in a capital sentencing proceeding where defense counsel fails to take necessary steps to provide the jury with information that can help them understand the defendant and offer an explanation for his conduct. *Smith v. Mullin*, 379 F.3d at 929, 943.

"Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance." *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).

> **1.** **Deficient Performance: trial counsel's unreasonable failure to interview witnesses, gather documentary evidence, consult with experts, counter the Government's case, and argue for a sentences less than death**.

Trial counsel were impeded in their efforts to develop mitigation evidence by the trial court's refusal to authorize funds for retaining the necessary resources. As stated in Claim 1,

*supra*, and Claim 3, *infra*, the trial court denied Mr. Barrett resources regularly afforded similarly situated capital defendants, and which were deemed necessary in the independent professional judgment of his trial counsel.  (*See also* Docs. 50, 51, 57, 97, 128; Exhibit 34; Exhibit 118.)

Mr. Barrett's trial counsel had a duty to retain a mitigation specialist to assist in preparation for the penalty phase.  (ABA Guideline 4.1(A)(2).)  Trial counsel were on notice that the work done by a person previously hired in state court was incomplete, and that the work was done by a novice who refused to produce a summary of her findings for counsel.  (Exhibit 64 to Honorable James H. Payne dated 2/2/8/2005; Exhibit 34.)  However, trial counsel were aware, or should have been aware, that the preliminary investigation showed there was evidence of mental disorders and other mitigating factors.  Mental health professionals who were consulted during state proceedings found evidence of paranoia, a mood disorder, Attention Deficit/Hyperactivity Disorder ("ADHD"), and organic brain impairment including deficits in impulse control and processing information, especially under stress.

The attorneys who represented Mr. Barrett at trial did not obtain the files of the mitigation investigator who worked on the case before the first state trial, although the files were readily available.  (Exhibit 111; Exhibit 34.)  Nor did Mr. Barrett's trial attorneys timely confer with the prior attorneys who had worked on second-stage issues in order to develop or implement a plan of investigation or for trial.  (Exhibit 82; Exhibit 34.)  The available files included records showing that Mr. Barrett had been raised in a chaotic household by neglectful, alcoholic parents, a father who was only present when not out drinking and carousing, that Mr. Barrett attempted suicide as a young man, and had been diagnosed with Bipolar Disorder.

On March 18, 2005, less than six months before the start of trial, the court authorized Mr. Barrett's counsel to retain Inquisitor, Inc., to perform the function of a mitigation

specialist.  (Doc. 97.)  The delay was contrary to ABA Guidelines which call for assembly of the defense team "[a]s soon as possible after designation" of lead counsel.  (ABA Guideline 10.4(C).)  Trial counsel first sought funds for this task on January 31, 2005, then again on February 7, 2005.  (Docs. 46 and 50.)  Although counsel's professional judgment and that of the mitigation consultant they sought to retain dictated that the investigation would require $20,000 in labor and $5,000 in travel expenses, the court arbitrarily cut this figure in half without any allowance for travel expenses.  (Doc. 97.)  *See* Claims 1, *supra*, and 3, *infra*.

The denial of travel funds – which were essential in this case – may have been due in part to counsel erroneously informing the court that Mr. Barrett had "not lived in numerous locales."  (Doc. 50.)  Had counsel asked Mr. Barrett or his family, they could have told counsel that Mr. Barrett was born and lived as a child in Illinois, lived as a child in New Jersey and Indiana, and lived and worked as an adult in Arkansas, western Oklahoma, Texas, and Idaho. Even with this misinformation, the trial court's denial of travel funds obviously impaired the prospects for an investigation in that the mitigation investigator resided in Tennessee and even the most minimal investigation would require travel to Oklahoma.

Mr. Barrett's trial counsel had a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation."  (ABA Guideline 10.11(A).)  Reasonably competent counsel would speak with "[w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . ., would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death."  (ABA Guideline 10.11(F)(1).)

1709

Mr. Barrett's trial counsel knew or should have known that Mr. Barrett's family lived nearby and were ready to be interviewed or re-interviewed.  However, neither of the attorneys who tried the case, nor an investigator working for them, conducted detailed interviews of family and friends regarding Mr. Barrett's life history.  (*See*, *e.g.*, Exhibit 77; Exhibit 78; Exhibit 84; Exhibit 80; Exhibit 81; Exhibit 83; Exhibit 86; Exhibit 85; Exhibit 90; Exhibit 95; Exhibit 96; Exhibit 37.)

On May 17, 2005, the court appointed Roger Hilfiger Mr. Barrett's lead counsel in place of John Echols.  The court also appointed Bret A. Smith.  Mr. Hilfger had only worked on one prior federal death penalty case.  Mr. Smith had no capital experience, yet Mr. Hilfiger gave him primary responsibility for the penalty trial.  Contrary to 18 U.S.C. § 3005, and § 3599, and Judicial Conference guidelines, Mr. Smith was appointed without consultation with the Federal Defender.  As stated in Claim 1, *supra*, the trial judge chose counsel for Mr. Barrett based on the judge's desire to give inexperienced local attorneys capital experience so that they could form a capital panel in the Eastern District.

On May 17, 2005, the trial court gave Mr. Barrett's counsel until May 27, 2005 to amend the budget that had been reduced by order filed March 18, 2005.  The budget submitted for Mr. Barrett's defense had been prepared by Mr. Echols, and was informed by his extensive knowledge of the background of the case, including that many investigative and expert tasks had not been completed during the state proceedings, and that only preliminary work had been done to prepare for a penalty trial.  (Exhibit 64; Exhibit 34; Doc. 113; Exhibit 118.)

Mr. Hilfiger did not seek an amendment of the budget.  His failure to do so was unreasonable.  On May 26, 2005, Mr. Hilfiger filed a motion for a continuance based on his having only recently received the files and records related to some of the state court proceedings,

including transcripts and discovery. Mr. Hilfiger stated in his motion that he was not familiar with the materials. In February 2005, Mr. Hilfiger had informed Mr. Echols that it would take him (Mr. Hilfiger) 160 hours to assemble and review the files related to the case. On September 9, 2005, Mr. Smith advised the court that as of that date, Mr. Barrett's lawyers had not yet assembled or reviewed the records of the preliminary mitigation investigation that had been done prior to the first state trial. These statements, and the declarations of John Echols, Jack Gordon, and Steve Leedy (Exhibits 34, 82 and 111), show Mr. Hilfiger failed to undertake a reasonable investigation before concluding that no additional funds were needed to prepare for either stage of trial.

On or about June 30, 2005, trial counsel telephoned then Assistant Federal Defender Julia O'Connell and requested an opportunity to speak with her mitigation investigator. (Exhibit 67.) Trial counsel had not contacted the mitigation specialist whom the court had authorized to work on Mr. Barrett's case. (Exhibit 66.) Nor had trial counsel familiarized himself with the results of an earlier mitigation investigation. (Exhibit 111; Exhibit 34; Exhibit 82.) Ms. O'Connell recommended that trial counsel contact Richard Burr, Federal Death Penalty Resource Counsel, for assistance. Trial counsel did not contact him. (Exhibit 118.) At that time, the trial was approximately ten weeks away. As Federal Defender O'Connell explains, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second-stage investigation if it had not already been completed, even if Mr. Hilfiger were able to secure the services of a mitigation investigator or investigators. (Exhibit 67.)

Mr. Barrett's trial counsel did not secure the services of a mitigation specialist or other trained mitigation investigator. Although the court authorized trial counsel to retain

Inquisitor, Inc., trial counsel failed to contact the agency, and never sent any documents or requested any investigation for Mr. Barrett's case.  (Exhibit 66.)

As the Supreme Court has held, where there is a failure to investigate, alleged "strategic" decisions are not reasonable.  In all capital cases, prevailing norms of capital defense practice, and empirical research on its results, indicate that "[c]ounsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."  (ABA Guideline 10.10.1; ABA Guidelines, 31 Hofstra L. Rev. 913, 1059, 1065 (2003) (commentary on Guideline 10.11) ("counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial").)

Trial counsel were aware that expert testimony regarding the mind's response to threats such as an unmarked S.U.V. barreling towards one's cabin was important so that the jury could understand Mr. Barrett's reactions.  (Doc. 50.)  Trial counsel were aware that Mr. Barrett "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders."  *Ibid.*  Trial counsel were aware that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting." *Ibid.*

The court authorized trial counsel "to hire a psychiatrist or a psychologist for up to 40 hours."  (Doc. 97.)  This ruling denied Mr. Barrett the expert assistance he was entitled to under the Due Process Clause of the Fifth Amendment.  *See* Claim 3, *infra*.  It also denied Mr. Barrett the resources afforded similarly situated defendants in federal death penalty cases.  (Exhibit 118; Doc. 107).  The court denied Mr. Barrett resources that would exceed the amount

of money spent to represent him in state court, (Doc. 128 at 4), even though there was no second stage of trial in state court.

Trial counsel obtained a copy of a preliminary report prepared by a mental health expert, Bill Sharp, Ph.D., prior to the first state trial. (Exhibit 55 at ¶ 16.) Dr. Sharp had identified numerous sources of mitigation, and recommended further testing and treatment. (*Id.* at ¶¶ 9-14.) Federal trial counsel never consulted with Dr. Sharp about his findings or how his diagnoses might be relevant to mitigating circumstances. (*Id.* at ¶ 16.) Dr. Sharp's report put trial counsel on notice that Mr. Barrett suffered from extreme paranoia and long-term memory problems (*id.* at ¶¶ 3, 14), facts that would have indicated a need to spend more time with Mr. Barrett and to rely on other sources for background information. (ABA Guideline 10.7 and commentary, 31 Hofstra L. Rev. at 1023-24.)

Prevailing professional norms of capital defense practice provide that counsel should obtain the assistance of expert witnesses who will be provided relevant supporting documentation regarding the defendant's medical, scholastic, cultural, economic, and sociological background. (ABA Guideline 10.11(F)(1).) The United States Attorney said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation. (Tr. 9/9/05 Hr'g at 38.) Mr. Barrett's trial counsel did not retain an expert to assess mental health mitigation and did not conduct a background investigation that would have supported a reliable opinion. At no time prior to or during the federal trial did Mr. Hilfiger or Mr. Smith either consult with mental health professionals who had consulted with Mr. Echols during the state-court proceedings or obtain their files.

In mid-August 2005, Mr. Barrett's counsel contacted Jeanne Russell, Ed.D., regarding the risk assessment that had been contemplated in January and authorized in March, 2005.  (Exhibit 56.)  Dr. Russell had performed an assessment of Mr. Barrett in preparation for the state trial.  In mid-August 2005, federal trial counsel did not have the report she provided to Mr. Echols in 2003.  (*Id.*)  The scope of Dr. Russell's inquiry was limited, and did not encompass many mitigating factors previously identified by trial counsel and routinely pursued in capital cases.  Dr. Russell did nothing more for Mr. Barrett's federal counsel than update the report she had prepared in 2003 in anticipation of the second state trial, and conduct some research on an unrelated matter.  (*Id.*)  At the time of her report in September 2005 she had conducted no additional interviews.

Dr. Russell was not asked to conduct a mental health evaluation for the purpose of identifying mitigation evidence such as the existence of a serious mental illness or organic brain dysfunction.  (Exhibit 56.)   Indeed, trial counsel represented to the court that the defense did not have to produce a report from Dr. Russell pursuant to Fed. R. Cr. P. 12.2 because Dr. Russell would not testify regarding Mr. Barrett's mental condition.  (Tr. 9/9/05 Hr'g at 41.)

Mr. Smith asked Dr. Russell whether she would conduct a mitigation investigation.  (Exhibit 56.)  She informed him that she was not qualified to take on that assignment, and that it was too late for anyone to conduct the type of thorough background investigation she viewed as the norm in other capital cases with which she had been involved.  (*Id.*)  Mr. Smith indicated that the trial court's refusal to provide the defense with resources impaired their ability to conduct such an investigation.  (*Id.*)

By September 9, 2005, Mr. Barrett's trial counsel had not obtained records from any state court investigation for a penalty phase.  (Tr. 9/9/05 Hr'g at 43.)  Mr. Smith said he had

Amended § 2255 Pet.        213        *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

contacted "Mr. Echols[] because we have been able to find very little on mitigation" from the past trials. *Ibid.* This hardly should have come as a surprise given (a) that Mr. Echols had informed Mr. Hilfiger and the Court that his preparation for a mitigation case was never fully formed during the state trials, (b) that Mr. Echols withdrew from the case in large part because he believed the Court's limitations on time and resources made reasonable preparation for a penalty phase impossible, and (c) that there was no penalty phase in either state trial. Mr. Smith told the court Dr. Russell's testimony would not involve an examination of Mr. Barrett. *Id.* at 41. Dr. Russell had "examined" Mr. Barrett, however. At that time, Mr. Smith believed that Dr. Russell only had "reviewed records and what have you." (Tr. 9/9/05 Hr'g at 41.) The court generously described the defense's preparation as "still work in progress." *Id.* at 42.

By September 15, 2005, when Dr. Russell submitted her "updated" report, she had not had an opportunity to conduct any additional interviews. (Exhibit 56.)

On October 3, 2005, trial counsel disclosed to the court that they had not consulted a psychiatrist or psychologist. (Tr. 10/3/05 Hr'g at 7.) Mr. Hilfiger informed the court that Dr. Russell would be used as a mitigation expert. *Ibid.* However, Mr. Smith had previously informed the court and the Government that Dr. Russell would not be testifying regarding mental health mitigation. (Tr. 9/9/05 Hr'g at 41.) Mr. Hilfiger apparently meant that Dr. Russell would act as a mitigation investigator. However, Dr. Russell was not qualified to conduct a mitigation investigation, and she so informed Mr. Smith in August 2005.

As stated in § A of this Claim, *supra*, trial counsel unreasonably failed to investigate, *inter alia*, (a) the circumstances of the state drugs charges for which trial Mr. Barrett allegedly failed to appear; (b) the Government's evidence of how the raid occurred and the supposed "reconstruction" of the crime scene; (c) whether the conduct of the raid followed law

Amended § 2255 Pet.                    214                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

enforcement protocols for identification and safety; and (d) the unreliability of the Government's eleventh hour informant witnesses. Trial counsel's unreasonable omissions denied the jury a thorough understanding of the events of September 24, 1999, and denied Mr. Barrett a defense applicable to both stages of trial. Their conduct was the essence of deficient performance.

> **2.      Prejudice:  abundant, readily available evidence that Mr. Barrett is worthy of life; his neglectful upbringing, parental drug abuse and mental illness, his own mental illness and organic brain impairment**.

If trial counsel had investigated the readily available evidence presented in ths Claim, the jury would have had a completely different, more accurate, and exculpatory view of events, including Mr. Barrett's character and actions. Jurors informed by this evidence would have understood that Mr. Barrett would not and did not knowingly or intentionally take the life of a law enforcement officer. Having failed to inform themselves of the readily available evidence, trial counsel presented only a superficial penalty case.

Trial counsel informed the jury that four categories of "mitigation evidence" would be presented: (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction"; (3) "Kenny Barrett's incarceration"; (4) "Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999." (R. 4704). The cursory description of the evidence that would be presented in the last category (R. 4709-13), was not "an accurate representation of [Mr. Barrett]" (R. 4713), in that it was terribly incomplete.

If trial counsel had followed the norms of capital defense practice, and pursued the evidence available to them, the jury would have heard truer and radically different testimony

regarding Mr. Barrett.  Jurors would have learned the following about Mr. Barrett, his background, and character:

> **a.    The family, social, and medical background of Kenny Barrett.**

## Introduction

Kenneth Barrett's familial roots began in Sequoyah County, Oklahoma, at the intersection of two epic journeys in American history.  The deprivation of Depression era Sallisaw provided the inspiration for the Joad family in *The Grapes of Wrath* who came to personify legions of real-life sharecroppers living in the nearly hopeless circumstances of Sallisaw's drought and poverty before they set out for California.  The Trail of Tears[46] ended at Sallisaw Creek for those Cherokees who survived starvation, freezing temperature, disease and murder during their forced relocation from their homelands.

Kenny's heritage is a blend of both cultures.  His paternal relatives, the Barretts, were hard-scrabble farmers, who married Cherokee Indians.  His maternal relatives, the Dotsons, were Cherokee ranchers who married non-Indians. (Exhibits 155, 2, 131, 124.)  With some success and much tragedy, both families endured the historical forces that shaped their communities.  Some family members grew up in Indian orphanages, some became successful ranchers, educators, doctors, and business people.  Many struggled with profound mental illness and its attendant chaos.

---

[46]  In 1838, the US government uprooted some 13,000 Cherokee Indians from their land east of the Mississippi River and forced them westward into the Oklahoma territory.  The 1,000 mile route they took to Oklahoma is called the Trail of Tears because of the hardships of weather, disease, and starvation that claimed the lives of 4,000 Cherokee.  It was a dismal journey that took place in the middle of harsh winter, and forced Indians from their homelands through north Georgia, middle Tennessee, Kentucky, Missouri, and Arkansas, into present day Oklahoma.

Amended § 2255 Pet.                         216                *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Intergenerational, genetic predisposition to mental illness affected Kenneth Barrett's development, behavior, perceptions, and experiences over the course of his life. It made him vulnerable to developing major psychiatric illness. In lay terms, Kenny was affected by a confluence of the most damaging genetic defects handed down from both the Barrett and the Dotson families. His mental illness was marked by severe neuropsychological deficits that manifested themselves in extraordinarily compromised cognitive and psychiatric functioning.

## Family History of Mental Illness

Kenny meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component. (Exhibit 117.) Multiple generations on both his mother's and father's side include family members who succumbed to depression, bipolar disorder, schizophrenia and addictive diseases. Although members carried genetic-based risk factors, some who were spared the most debilitating symptoms of mental illness were able to pursue successful professional careers as educators, doctors, ranchers, and business people. Other family members required psychiatric institutionalization. This spectrum of impairment included other family members who functioned marginally, but were unable to meet their responsibilities to their families and community. The nature and severity of Kenny's mental illness were both indicative of and exacerbated by significant neurological impairments, including pervasive damage to the prefrontal lobe of his brain.

## Maternal Family Mental Illness

Kenny's mother, maternal aunt, and maternal cousins satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression, anxiety disorders, and developmental disabilities. Kenny's mother's family "had to deal with mental illness for a long time." (Exhibit 91)  Kenny's mother, Gelene Dotson, has suffered from

clinical depression, mood swings and anxiety since her teenage years.   Gelene's sister, Carolyn

(Kenny's aunt), also suffers from bipolar mood disorder and requires therapeutic medication with

a regimen of mood stabilizers and antidepressants.  (Exhibit 4; Exhibit 78; Exhibit 139; Exhibit

202.)   One of Carolyn's daughters manifests signs of mood-related psychiatric distress and is

unable to rear her children.  (Exhibit 78.)   Gelene's brother Mark, the youngest child in her

family and now a podiatrist, witnessed Gelene and Carolyn struggle "with serious impairments."

(Exhibit 98.)

One of Kenny's maternal cousins, Gwendolyn Crawford, also has bipolar mood

disorder that necessitates ongoing treatment and medication.  (Exhibit 83; Exhibit 137; Exhibit

77; Exhibit 41; Exhibit 201.)  Gwendolyn's two children both have significant mental

impairments.  Her 26 year old son Brandon has a developmental disability and is unable to speak

or live independently.  (Exhibit 83; Exhibit 135; Exhibit 153.)  Gwendolyn's daughter Brandy

Hill reported that her family "learned first hand about bipolar disorder and depression" and that

Brandy herself "battle[d] with depression," experienced episodes of "high euphoria" and

underwent treatment for her mood disorder until she could no longer tolerate chemical regimens.

(Exhibit 77; Exhibit 141.)

Travis Crawford, another of Kenny's first cousins (*see* Exhibit 198), also receives

medication for anxiety and reports a history depression.  (Exhibit 45; Exhibit 92; Exhibit 143.)

Travis has had "a long struggle with drugs and ha[s] anxiety and panic attacks" and his "mind

does not work that well."  (Exhibit 45; Exhibit 92.)  He struggled and did not succeed in the

Army, or in his employment.  (Exhibit 196; Exhibit 203.)  Travis understands that "psychological

problems run in [his]family" and reports his oldest daughter, now "a grown young woman" has

bipolar disorder and one of his sons "seems a little slow and is having a tough time of it."
(Exhibit 45; Exhibit 92.)

Gelene's uncle, Warren Dotson, has two daughters who "each have a son who is bipolar, and it is a challenge for a lifetime.  It never goes away."  (Exhibit 101.)

In the maternal family, depression and mood disorders trace back to Kenny's grandmother's (Hattie Gertrude Dotson) generation.  Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the Twentieth Century.  (Exhibit 78; Exhibit 129.)  Another relative, Wallace Dotson, was involuntarily hospitalized at the state mental institution on a petition brought by his father, Tom Dotson,[47] who described Wallace as being "completely out of his mind," suffering from  "some kind of spells" and not having slept for "three days and nights." (Exhibit 32.)

### Paternal Family Mental Illness

Mental disease and its affects on family life were transmitted down at least four generations of Barretts.  Illness has affected Kenny's great great grandfather, his great grandfather, his grandfather and finally Kenny  himself.  (Exhibit 28; Exhibit 146; Exhibit 84) As Kenny's cousin, Kathy Trotter, explained: "Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression." (Exhibit 86.) Kenny's great great grandfather,  A. J. (Jack) Barrett, was committed to a mental hospital and a Certificate of Lunacy was entered in the local courthouse in Sequoyah County in 1918.  (Exhibit 27.)  Kenny's great grandfather, Issac Clifford Barrett, by all accounts a man who was committed

---

[47]Tom Dotson was the uncle of Kenny's maternal grandfather, Hugh Dotson.  (Exhibit 130.)

to his family and community, overcame tremendous odds and poverty to build a successful ranch ("cow rich"), but ended his life by suicide.  (Exhibit 84, Exhibit 87, Exhibit 132.)

Issac's oldest son, Andrew Jackson "A.J." Barrett shared in only the tragedy of Issac's life and none of its success.  A.J., Kenny's grandfather (*see* Exhibit 1) , was haunted by suspicion, paranoia, and hostility, which was manifested by violent physical and sexual assaults against his wife and children, which forced one after the next to flee the home in search of safety.  A.J. terrorized his wife who hid "in the woods" from him (Exhibit 87), raped one of his daughters who became pregnant and placed the baby for adoption (Exhibit 84), and went on drunken rampages through town.  His Certificate of Lunacy documents auditory hallucinations, persecutory delusions and paranoid ideation.  (Exhibit 27.)  His family believed he "was bipolar." (Exhibit 87.)  A.J. was able to work only "sporadically."  His family eked out a "marginal" living, and at one point A.J. was involuntarily committed to the state hospital for one month but returned home to his wife who would not "consider divorce."  (Exhibit 87; Exhibit 125; Exhibit 146.)

A.J.'s maternal family also faced the tragedy of mental illness.  A.J.'s mother (and Kenny's great grandmother), Mary Ellen Maxwell, suffered a "mental breakdown," (Exhibit 146), wandered the ranch at night talking to herself and believed that she was canning goods for the winter when she washed bottles in the middle of the night (Exhibit 84).  She "died very confused."  (Exhibit 146; Exhibit 133.)  Mary's brother, Howard, was "Looney Tunes" (Exhibit 84), and Howard's son, Billy Dean, who was a disabled veteran with a history of schizophrenia, committed suicide.  (Exhibit 26; Exhibit 128.)  Kenny's great aunt, Elnora Long, is bipolar and requires significant doses of medication.  (Exhibit 84; Exhibit 86.)  Elnora, who has a complicated lineage, is "very emotionally unstable" and "unpredictable."  (Exhibit 86.)  Kathy,

Kenny's cousin who experienced an anxiety and depressive episode and was hospitalized, believes Elnora is manic depressive because of her extreme mood swings. (Exhibit 86; Exhibit 140.) Elnora is Ernie and his siblings' maternal half sister whose father was her mother's former son in law's brother.

Kenny has one paternal aunt (Linda Riley) and three paternal cousins who suffer from depression and bipolar disorder. His father's sister, Linda Riley, is treated for depression, and both her adult daughters have been diagnosed with bipolar disorder. (Exhibit 86; Exhibit 145.) Linda's seven-year-old grandson has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder. (Exhibit 86.)

### Maternal Family History

Kenny's maternal grandfather, Hugh Dotson, was a direct descendant of Cherokee Native Americans, whose everyday life reflected the travails and successes of Indians in eastern Oklahoma. Hugh grew up in an Indian orphanage, and became an adult universally loved by his children and grandchildren and respected in the Sallisaw community. He spent his formative years living at Dwight Mission,[48] an Indian mission school started by the Presbyterian Church. Hugh's mother, Minnie Andrews, placed Hugh and four of his siblings (Christine, John E., Anna, and Eleanor) at Dwight Mission after their father, Abe Dotson, was murdered. (Exhibit 100.) Hugh's mother, a widow with no ability to support her children, placed her two younger

---

[48]Dwight Presbyterian Mission of the Cherokees was originally founded in 1820 as an Indian mission school in western Arkansas and was named for Timothy Dwight, president of Yale University. In 1838, as Cherokees were forced into Oklahoma, Dwight Mission was moved at the invitation of the Cherokee chief to its current location 20 miles into then newly organized Indian Territory. Dwight Mission served generations of Native Americans as a mission and training school until public education became available and the school was finally closed in 1948.

Amended § 2255 Pet.                              221                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

children (Lela and Warren) with her husband's relatives.  (Exhibit 100; Exhibit 102; Exhibit 106; Exhibit 134.)

Circumstances of Abe Dotson's death are unclear, but it is indisputable that he, two of his brothers, and his brother's son were killed by gunfire over a three year period in separate incidents.  Abe, his siblings Mark and Greenberry, and his nephew Bee, were Cherokee, and it appears that at least one of the men who shot and killed them did so with impunity.[49]  (Exhibit 59; Exhibit 106.)  Records also show that Abe got into trouble with alcohol, committed violent offenses and stole.  (Exhibits 16 through 23.)

Abe's son, Hugh, and the other Indian children at the mission worked in its fields and stockyards to earn their keep.  Hugh impressed the administrators at Dwight Mission with his skill and sense of responsibility.  Hugh and his siblings stayed in the community after they left Dwight Mission, farming as sharecroppers and day laborers.  They barely survived, and some of his siblings made the long trek to California in hopes of better jobs in the fields.

Hugh married Hattie Gertrude Real in 1939 (Exhibit 8), and they had five children over their life-long marriage, the oldest of whom is Sylvia Gelene Dotson, Kenny's mother. (Exhibit 120.)  Hugh "barely earned enough to live on."  (Exhibit 97.)  Hugh, Hattie and their growing family lived in "tumble down" houses that "were in pretty bad shape even by standards back then."  (Exhibit 97.)  The family "had no running water, electricity or plumbing and used wood stoves for heating and kerosene for cooking."  (Exhibit 97.)

World War II intervened, and Hugh served in the U.S. Army.  When he returned home he attended classes on the GI bill that were taught by his brother in law, Carl Cook.  Hugh

---

[49]Cherokee Census Cards M2799 and 3294.

"learned how to run a farm, a big farm, not just a home farm," and when Gelene was six, the family moved to the Dwight Mission School where Hugh ran the farm. (Exhibit 97.) Gelene "always heard" her family was "part Indian and that [she] was 3/16 Cherokee." (Exhibit 97.)

Dwight Mission provided a house for the family that had electricity and plumbing, and Gelene began her elementary education at the school. She was her mother's least favorite no matter that she was the most attentive to her mother's needs. (Exhibit 97.) The school shut down in 1949, but the Presbyterian Church sent Hugh and his family to its Menual School in Albuquerque that served Spanish speaking students from New Mexico. Hugh "ran the cattle and vegetable farm" and served as "the overseer" to the student farm hands. (Exhibit 97.) After a year at Menual Hugh accepted the church's offer for him to run the farm operations at a new orphanage in Farmington, Missouri. The family stayed in Farmington two years until the orphanage closed and the family moved back to Oklahoma.

Rural Sallisaw offered no jobs, and Hugh and his family moved in with his brother-in-law Carl and sister Christine. (Exhibit 102.) Public schools did not conduct classes during cotton season because children had to join parents picking and chopping cotton. Hugh and his family traveled to western Oklahoma and "chopped cotton in the spring and pulled cotton balls in the fall." (Exhibit 97.) The family returned to Sallisaw when school began in the fall, but left at Christmas to join family in California who had arranged for Hugh to become an irrigation manager on a large farm near Bakersfield. Gelene loved her life on that farm where they "were not migrant workers, but people who lived there permanently" in the "30 or 40 houses on the farm, all with kids." (Exhibit 97.) It was "a joyful time" and Gelene "was a happy child," but her mother and father yearned to return to Sallisaw and own their own land. (Exhibit 97.)

Gelene explained that "[l]and is just something very important" to her family and "always has been." (Exhibit 97.)

Hugh and his wife Hattie were dedicated to their dream of owning land. Hugh "worked seven day weeks, 12 hour-days" and "was tired from too much work but he never considered working less." (Exhibit 97.) Children in the family "always knew [they] went out there to make enough money to buy [their] own place back home." (Exhibit 97.) When they had saved enough, the family returned to its roots and soon after their youngest child was born in 1961, Hugh bought 40 acres in Sequoyah County. Gelene and her siblings enrolled in local public schools, and Gelene graduated but she never recaptured the joy of her few years in California. Years later, Hugh gave each of his five children seven of his treasured 40 acres and retained five. Kenneth Barrett eventually built his shack for $150.00 on a spit of his grandfather's land adjacent to his mother's house, on land that Gelene expected she would one day be deeded, and she was.

**Paternal Family History**

Like Hugh Dotson, Issac Clifford Barrett, Kenny's paternal grandfather, enjoyed a fine reputation in Sequoyah County. From 1917 to 1943, Issac managed a 20,000-acre ranch owned by a Kansas doctor. Issac married Mary Ellen Maxwell, who was one of ten children born in Sequoyah County. Issac was known as "a fair man" who, when he learned of a neighbor's falling on hard times, shared the bounty of his own garden. (Exhibit 84.) Issac "had his burdens to carry after he married" Mary. She had a "mental breakdown" (Exhibit 146), and "walked around the yard talking to herself. At night, she would wake up, wash jars, and think she was canning." (Exhibit 84.) According to Issac Barrett, Mary's brother, Howard Maxwell, was "Loony Tunes" and Howard's son Billy Dean Maxwell was accused of burglary, and was

involuntarily committed to the state mental institution four times over a ten year period before he committed suicide by shooting himself in the head. (Exhibit 84; Exhibit 25; Exhibit 26; Exhibit 128.) Issac also committed suicide, by "ingesting a remedy for black leg cattle disease" on November 24, 1952. (Exhibit 84.) Family members believed Issac killed himself "because he had a broken heart" after his brother convinced him to sell his cattle and invest all the proceeds in a failed enterprise. "He had nothing left." (Exhibit 84.)

Issac's oldest son, Andrew Jackson Barrett (A.J.), is Kenny's paternal grandfather, but "[w]hatever good Issac had in him, and there was plenty of it, did not pass down" to A.J. (Exhibit 84.) A.J. married Ada Mae Hatter, a woman who came to be "very well thought of" and who " was someone who worked extremely hard." (Exhibit 86; Exhibit 1.) Ada's mother, Ida Melton, was an Indian (Exhibit 131) married to Sam Hatter. (Exhibit 9.) Ida and Sam divorced, and Ida married A.J.'s brother John. (*See* Exhibit 10.) Ida and John had one child, Elnora Barrett Long, who was debilitated by her manic depression and anxiety to such a degree that she has recently been put in a nursing home. Ida's marriage to John meant that her son-in-law, A.J., was also her brother-in-law.

A.J. and his wife, Ada Mae "lived a hard life." (Exhibit 84.) Three children "died at or near childbirth; the oldest was two weeks old. Two are buried in Akins cemetery. The stillbirth is buried back in the mountains." (Exhibit 84.) The oldest of the five children born to A.J. and Ada Mae who survived is Ernest (Ernie) Barrett, Kenny's father. Ernie and his four siblings who survived (Margaret, Issac, Gary and Linda) lived under the shadow of A.J.'s mental illness, alcoholism, and cruelty in a cabin with "a dirt floor and no electricity or running water. [W]ell water was not usable for humans, although it was all right for animals and crops." (Exhibit 84.)

A.J.'s education ended at the seventh or eighth grade. He worked sporadically as a laborer "doing public construction work" and "spent eleven months in the service during World War II." (Exhibit 146.) Unable to support his family, "[t]he entire family had to work in the fields traveling from one crop to the next." (Exhibit 84.) State Hospital records described their economic status as "marginal," and the family "had a tough time getting by." (Exhibit 146.)

Life for Ernie, Kenny's father, and other children in the family was dismal. One of Ernie's "earliest memories is being taken out of school to work in the fields." (Exhibit 81.) Ernie described their grim life:

> As my brothers and sisters got big enough to walk and carry a load, they joined us in the field. Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell [sic], and picked beans in Moffitt [sic], Oklahoma. It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sunup to sundown. It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it. When cotton season came, we worked or we starved. When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

(Exhibit 81.)

"We had a neighbor who raised purple whole peas for animal feed. My Granny Ida asked her if we could have what she had left on the vines for our cows—we scavenged them and my mom cooked them." (Exhibit 87.)

A.J. was unable to ameliorate the harshness of poverty and its impact on his family. His parenting was derailed by mental illness that ultimately led to his being involuntarily institutionalized by court order at the state hospital for one month. (Exhibit 146.) None of his children "wanted him to be at home because of the crazy things he did." (Exhibit 84.) He suffered from mood swings that he attempted unsuccessfully to self medicate with copious

amounts of alcohol, to which he became addicted.  His alcoholism only aggravated his behavior.  (Exhibit 146.)  Family members believed his behavior worsened after an automobile accident in 1960, but he "had always been high tempered and jealous."  (Exhibit 146.)  His behavior was erratic and unpredictable leaving his children unable to tell "from one day to the next what was going to happen."  (Exhibit 84.)  When he was in a "bad mood" he struck out against his children, hitting them with "any dumb thing, belt, club, board, or limb" (Exhibit 84), but he "was difficult to figure out because he was also a decent guy when he was sober."  (Exhibit 81.)   A.J. spared no one; he raped his daughter who went away to New Orleans to have the baby and placed it for adoption.  (Exhibit 84.)

A.J.'s psychiatric symptoms made it impossible for anyone in the family to appease him, and his sons, including Kenny's father Ernie, tried to "stay out of [his] way."  The children left home as soon as they could.  (Exhibit 146.)  Family members reported that A.J. had "two different personalities" and "angry spells about three times a week."  (Exhibit 146.)  A.J. had "enormous moods swings from being an alright guy to being totally out of control."  (Exhibit 81.)

A.J.'s mental illness "caused him not to be able to get along with neighbors and especially his employers."  (Exhibit 146.)   A.J. thought "people were after him," heard "imaginary voices," was "somewhat confused," and reported "men outside his window that [were] going to kill him."  (Exhibit 146.)  A.J. was "unpredictable, irresponsible, irritable, uncooperative and not in complete reality."  (Exhibit 146.)  A physician examining A.J. when he was admitted to the state hospital, reported his findings:

> His memory for past and remote past is poor.  He can retain a number of
> five digits but is unable to repeat them in reverse with any degree of
> facility.  Serial subtraction of eight from one hundred is done with much

hesitation and inaccuracy.  His general intelligence seems inaverage and dull normal.  His reasoning and judgement are limited.  His insight is poor.

(Exhibit 146.)

Ernie and his siblings were powerless to protect themselves or their mother from A.J.'s assaults and terror.  A.J.'s wife, Ada Mae, was an old fashioned woman who "would not divorce" him (Exhibit 87; Exhibit 146), even though "nothing could stop him from attacking them."  (Exhibit 81.)  Ada "was churchgoing and devout; she did not believe in leaving a marriage no matter how bad it was."  (Exhibit 81.)  Ernie believed his mother "was as good a woman as there is, but she had a hard life between my father being half crazy and always poor."  (Exhibit 81.)   Ernie tried "[a]s the oldest boy in the family," to protect his mother and the other children, but he was "no match"  for his father until he was "half grown."  (Exhibit 81.)  Because Ernie tried to "get between" his father and mother when A.J. attacked her, he "got beaten more than the other children."  (Exhibit 81.)

Ernie developed characteristic responses to the life threatening trauma he witnessed and experienced.  He "learned never to cry" when his father hit him and he does not remember "feeling a hell of a lot."  (Exhibit 81.)   High school for Ernie was "different." (Exhibit 81 .)  In a community known for its poverty, Ernie's family stood out as still poorer than most.  Other students "made fun of [Ernie] and laughed at [him] because of the way [he] dressed."  (Exhibit 81.)  Ernie responded to the taunts with fighting "every boy in [his] high school class to hold any respect."  (Exhibit 81.)  Other students called Ernie "'Loco' because of the way he acted, and he never completely straightened out."  (Exhibit 84.)  Ernie's brother described him as "pretty cruel."  (Exhibit 84.)  He treated his younger siblings "pretty rough," and when he made them  cry, "he thought it was funny."  (Exhibit 84.)  Ernie's brother thought

Ernie was "a lot like [his] father," A.J.  (Exhibit 84.)  An aunt who taught Ernie in elementary school described him as "a mean child."  (Exhibit 93.)

Ernie left home without graduating from high school and joined the U.S. Marines. He kept memories of his maltreatment and his powerlessness to protect his family at bay by drinking to excess.  He was three months short of 17 the last time he stepped between his father and mother to try and protect her.  His father hit him across the shoulder with a "19-inch metal file that busted [his] shoulder wide open."  He still has a scar from it.  (Exhibit 81.)  Ernie described that day: " I left home that day just running because I knew that if I stayed at home I would have to kill my father to protect the others.  I was 6'3" and weighed 187 pounds." (Exhibit 81.)

### Family of Origin

Ernie Barrett and Gelene Dotson brought to their marriage a strong genetic predisposition to major mental illness, budding alcoholism, and little understanding of the demands of parenting.  They met in high school, dated briefly before Ernie left to join the U.S. Marines, reunited by accident when both were back in their home town and married July 8, 1960, without much thought.  (Exhibit 91; Exhibit 97; Exhibit 5.)  Ernie and Gelene started married life in Joliet, Illinois, at the recommendation of Gelene's relatives who helped Ernie find work at a Kerr Glass manufacturing plant.

Ernie and Gelene's marriage was tumultuous and marked by discord from its beginning.  Although Ernie was very "determined not to live in the kind of poverty [he] knew as a child growing up," he had little notion of family life or fatherhood.  (Exhibit 81.) Ernie acknowledges that he "did not give much thought to fatherhood" and "did not think about Gelene or, later on, the boys, other than working and supporting them."  (Exhibit 81.)

Ernie "almost immediately started running around with other women" (Exhibit 81) and was gone for days at a time. He had his "mind set on doing whatever" he wanted, as long as he worked. (Exhibit 81.) After he finished his shift at the plant, he went to bars and got "into as many brawls as there were" before coming home. (Exhibit 81.) Ernie "did pretty much whatever [he] wanted to. [He] would go out, drink as much as [he] wanted, and chase women," a pattern he maintained until well after his marriage with Gelene ended. He "drank a fifth at a time." (Exhibit 81.) Today Ernie is deeply ashamed of his behavior towards his children and wishes he "could take it back and do for [his] children what they needed and be the kind of parent they deserved." (Exhibit 81.) At the time he and Gelene started their family, his only measurement of success was being able to work himself "up from pushing brooms to production manager." (Exhibit 81.)

Gelene was "pretty depressed" and "miserable" in the marriage. (Exhibit 97.) She was "a heavy drinker with dramatic mood swings." (Exhibit 98.) She had planned on going to college but discovered she was "crazy about Ernie" who "came home kind of like a knight in shining armor." (Exhibit 97.) She did not realize, until after they married, that Ernie "was not the same boy" she knew in high school and that "he had changed, none for the better." (Exhibit 97.) Looking back, she "never imagined that life with Ernie could be so terrible, not just for [her], but for the children [they] had together."

Ernie's infidelity, unpredictable absences, and lack of concern for her was "humiliating and embarrassing. " (Exhibit 97.) Gelene knew that Ernie chased after "other women," and she and her aunt went from bar to bar "looking for him – he would be out drinking," but barkeepers would tell her he was not there. (Exhibit 97.) Throughout their 13-year marriage, Ernie "had his other women." There was never a time he did not have other

women.  Gelene "drank right from the beginning of the marriage," according to Ernie.  One of Gelene's sisters, Phyllis (*see* Exhibit 197), who visited Gelene when she was pregnant with Kenneth Barrett reported that "Gelene drank from the moment she woke up until she went to bed."  (Exhibit 91.)

Kenny's parents separated multiple times, sometimes for extended periods and sometimes more briefly, but always in chaos. Their relationship was acrimonious and rife with recrimination.  Ernie was unrepentant and "would not even talk" to Gelene "about what was going on" with her or the children.  Gelene says that "[I]t drove [her] crazy," and that she "begged, pleaded, threatened, and cried with Ernie."  (Exhibit 97.)   They "split up and got back together and threatened to leave each other over and over."  (Exhibit 97.) They "always had a difficult time of it."  (Exhibit 97.)

Their son Kenneth Barrett was born to this troubled marriage in Joliet, Illinois, June 29, 1961.  (Exhibit 119.)  He was followed by his younger brother, Richard, born June 24, 1964.  (Exhibit 97; Exhibit 121.)  Shortly after Richard's birth, Gelene left Ernie for almost three years and returned home to Sallisaw with the boys.  Ernie "felt bad about leaving" his sons but he "could not take Gelene anymore."  (Exhibit 81.)  Ernie admits that he "was still young and immature" and not " much of a husband" who "just put the boys out of [his] mind as much as [he] could."  (Exhibit 81.)

The three-year separation ended when Ernie was not able to "keep the boys out of [his] mind" and he reunited with Gelene in 1967.  (Exhibit 81.)  Gelene and the boys returned to Joliet and "moved into the same mobile home" Ernie had been living in with his girlfriend. (Exhibit 81.)  The nature of the marriage did not change after Gelene and the boys returned to Illinois.  Gelene gave birth to their third and last child, Stephen, January 1, 1969.  (Exhibit 97;

Exhibit 123.)  Gelene and Ernie "both drank as much as [they] could," and Ernie "still stayed away from home."  (Exhibit 81.)  Ernie was arrested multiple times for drunk and disorderly conduct, and a judge threatened him with a year's jail sentence.  Ernie contacted a friend in New Jersey who found him a job at a glass plant.  Leaving Joliet allowed him to avoid the inevitable jail sentence he knew would come because he could not stop drinking and fighting.  The family moved, living first in Stanhope and then Lake Hopatcong, but Ernie "kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time." (Exhibit 81.)

Gelene's humiliation at Ernie's hands continued.  Ernie started "seeing another woman almost as soon as" the family arrived in New Jersey.  (Exhibit 97.)  Ernie had promised Gelene that "he wanted to leave Joliet and have a fresh start, straighten himself out, but that's not what happened."  (Exhibit 97.)  Ernie moved out of the home and lived with another woman, but Gelene allowed him to move back home with her and the boys.  Gelene contracted gonorrhea twice from Ernie.  Although Ernie had vowed he would never become violent like his father, he assaulted Gelene and "gave her two black eyes and split [her] lip." (Exhibit 97.)  Gelene "was at the end of her rope" and left Ernie for good in Lake Hopatcong, returning home to Sallisaw with three young boys in 1972.  Ernie and Gelene divorced June 20, 1973.  (Exhibit 97; Exhibit 12.)

**Infancy and Childhood Development**

Kenny  has long standing neurologic deficits that were apparent early in his infancy, continued throughout his childhood and adolescence, and affected his behavior and understanding over the course of his life.  Although it is difficult if not impossible to determine with precision the etiology of his neurological deficits, there is no doubt that they are present and significant.  These deficits can be the result of his mother's ingestion of alcohol or other

Amended § 2255 Pet.                       232                *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

neurotoxins during her pregnancy with him, head trauma he sustained during childhood and young adulthood, ingestion or exposure to neurotoxins at work or home, or a combination of one or more of these factors.

Gelene was stressed throughout her pregnancy with Kenny, which she describes as "very difficult." (Exhibit 97.) She was in "constant pain," uncomfortable, and depressed. (Exhibit 97.) She described her pregnancy as "battling with Kenny before he was born." (Exhibit 97.) Gelene drank throughout her pregnancy with Kenny, unaware of alcohol's potentially devastating effect on a developing fetus's brain. (Exhibit 97; Decl. Linda Riley.) Gelene's in laws commented on her early alcoholism and stated she "was a drunk right out of high school." (Exhibit 86.)

Kenny had a difficult infancy and "exhausted" his mother. (Exhibit 97.) His "days and nights were mixed up," and he "was colicky" and unable to be comforted. (Exhibit 97.) He cried and fussed "all the time," making Gelene think all babies must be like him. After she had her other two children and observed their development, she "realized something was wrong with Kenny." (Exhibit 97.) Gelene received no help from her husband who acknowledged he "was not around the house much when Kenny was a little baby" but " heard all about how hard it was to sooth him. He was colicky and cried all the time." (Exhibit 81.) Kenny was born with a large lump on the back of his head. (Exhibit 97.)

Kenny failed to meet developmental milestones expected of healthy infants. Gelene faithfully recorded Kenny's progress at three, six, nine, and 12 month intervals in a complimentary baby book she received at the hospital. (Exhibit 35.) Although it appears that he met most of his three and six month milestones, he lagged in some.

At three months, Kenny did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand, splash in bath, take stepping movements when held erect," or "open mouth at sight of nipple before lips are touched." Kenny's mother nursed him. (Exhibit 35.)

At nine months, Kenny did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave "bye-bye" or play "peek-a-boo" instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say "ma-ma" or "da-da" or equivalent," or "make stepping movements when feet are touched to floor." (Exhibit 35.)

At one year, Kenny's delays were more obvious. His mother noted he "had trouble learning to walk." (Exhibit 97.) He could not "climb stairs, hold and drink from cup, put one block on another when shown, say two or three words indicating want, play "pat-a-cake," or "show preference for one hand in reaching." (Exhibit 35.)

Kenny early on demonstrated patterns of behavior associated with the prodromal symptom of bipolar mood disorder, which family members described as extreme hyperactivity. Gelene recognized that his behavior lacked purpose and reported he "moved around without thinking about what he was doing" and was "very, very active." (Exhibit 97.) Gelene described him as "a handful" who "could not be still" and "was more than hyper." (Exhibit 97.) An aunt stated he was "always hyperactive, on the go, into everything, and could not sit still." (Exhibit 91.) Ada Blount, Kenny's maternal great aunt, recollected that "Kenny was a hyper little boy who could not sit still." (Exhibit 74.)

Ernie recollected that when Kenny "got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing." (Exhibit 81.)  Janice Sanders, a maternal cousin, remembered that "Kenny was a hyper little boy, the most hyper child" she had have ever seen.  (Exhibit 85.)  She also noticed that Kenny "had strong feelings" (Exhibit 85), a common symptom of children who develop bipolar mood disorder.  Other family members who "used to babysit Kenny and saw him on and off through his teens and at family reunions" confirmed that he was "very hyperactive."  (Exhibit 101.)

Family members recognized "that Kenny was different" and "needed so much more attention as a child than the other children."  (Exhibit 91.)  Kenny "was extremely sensitive and cried over every little thing from the time he was small until he was a grown man . . . .  He would break down and cry easily."  (Exhibit 91.)  His cousin remembered that "back then we called Kenny hyper.  He was erratic and temperamental."  (Exhibit 86.)  His mother reported that "any little thing could upset him, but it took a lot to calm him."  (Exhibit 97.)  Ernie also recognized that Kenny was "a sensitive little boy...who cried if you hurt his feelings."  (Exhibit 81.)  When Kenny was a toddler, he had to go to the hospital for several different accidents because "he got into everything.  He had to have his stomach pumped twice when on two separate occasions, he managed to climb to a top cabinet. Once he ate baby aspirins the other time he ate ex-lax."  (Exhibit 97.)  Kenny's mother had to "rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting it open and raising a big knot."  (Exhibit 97.)

Gelene was overwhelmed by the responsibility of a child with special needs. Already a very emotional person who was alcoholic, she reacted to Kenny's impairments by punishing him.  Gelene admits that she decided "to be especially hard on Kenney because he

went from one thing to the next" and "was never still." (Exhibit 97.) It "almost drove [her] crazy." (Exhibit 97.) She thought he "was emotional about things that did not matter. He would cry and scream like there was no tomorrow." (Exhibit 97.)

She physically punished him by beating him with a thin belt and degraded him verbally. Ernie remembered that Gelene "used to whip the boys over any little thing and whipped them all the time. She had a bad habit of saying cruel things not just to me but to the boys, too." (Exhibit 81.) Gelene's niece by marriage "thought Gelene was mean, that she had a mean spirit" and that the way "she would talk to. . .kids was angry." (Exhibit 86.) Children were "afraid of her." (Exhibit 86.) Kenny suffered "more verbal abuse from her than her other two children." (Exhibit 86.) Kenny's neurologic impairments and his chaotic home life took their toll on his school work. Gelene stated he "had a difficult time in school and was in special classes part of the time." (Exhibit 97.) Kenny had difficulty almost immediately in school. He failed reading and arithmetic in the first grade and was barely able to keep pace with his peers. He had difficulty learning to read. (Exhibit 97; Exhibit 136.)

Ernie "hardly had anything to do with [Kenny] after the divorce, and everyone could see how much it hurt Kenny." Even when Ernie made semi-annual trips to town to see his sons, family reported he was insensitive to his children's needs. He came "by to show off his new Corvette when his children did not have shoes or decent clothes to wear." (Exhibit 84; Exhibit 91.) Ernie's sister in law did not think Ernie was "a good husband or father. Ernie did not come around and visit his children the way he should have. He was absent in their lives. Ernie has always been for Ernie." (Exhibit 93.) Ernie "went his way and let Gelene take care of the kids." (Exhibit 93.)

Ernie remembered that "Kenny kicked and screamed to stay" with Ernie and "did not want to go with his mother back to Oklahoma."  (Exhibit 81.)  Kenny  "wanted to stay" with Ernie, but Ernie felt he "was not set up to take care of him and work."  (Exhibit 81.)

Gelene's emotional needs took precedence over Kenny .  Her sister recalled that Gelene "had a lot of problems, especially with alcohol and men" and those problems "affected Kenny badly."  (Exhibit 91.)  Gelene brought different men into the house when Kenny was entering his teenage years, and "it was very confusing for him."  (Exhibit 91.)  Gelene "seldom gave Kenny a kind word" and "screamed at him over anything."  (Exhibit 91.)  Gelene once asked Phyllis to intervene and help her get Kenny  out of his room.  Phyllis and her husband went to Gelene's house and talked to Kenny.  Kenny told them "he could not get his mom's voice out of his head.  The only time Gelene talked to him was to scream."  (Exhibit 91.)  Gelene's "ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and unpredictability.  She had a hard enough time dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood swings."  (Exhibit 99.)  When Gelene "lost control of herself," she whipped the boys,  but "there was no real parenting."  (Exhibit 99.)

Gelene was harsher with Kenny, "verbally and physically," than she was with her other two sons.  (Exhibit 99.)  Gelene used a strap to whip Kenny, and Kenny "hated" it. (Exhibit 99.)  Kenny had a German shepherd that Ernie had given him, and the dog was very protective of Kenny.  When Gelene "would try to beat" Kenny, he would hide behind the dog and the dog would growl at Gelene and not let her near him.  (Exhibit 99.)  The dog was run over by a car.

Steve, Kenny's youngest brother, lived at home with Kenny, Richard, and his mother, but found refuge and support with the extended family.  Steve, an educator and principal

at a junior high school, has given great thought to understanding how he "was able to overcome many of the challenges" he faced and "how those challenges affected Kenny." (Exhibit 99.)

Steve and Kenny "were exposed to vastly different environments and experiences" during their formative years due to Steve's much younger age. (Exhibit 99.) Steve benefitted from the guidance, support, and structure of an extended family that "Kenny never experienced in his developmental period. Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children." (Exhibit 99.)

While Gelene's move back to Sallisaw separated 12-year-old Kenneth Barrett from the closeness and love he longed for with his father, the move placed Steve in the middle of a "village. . .in an extended support structure" when he was in the second grade and Kenny was repeating eighth grade. (Exhibit 99.) Steve was "literally surrounded by aunts, uncles, cousins, and most importantly" his maternal grandparents, Hugh and Hattie Dotson. Steve believes "another critical factor" is that "Ernie. . . abandoned Kenny when Kenny most needed him" but that Steve, at the age of two, had no real relationship with Ernie. (Exhibit 99.) Ernie's absence in Steve's childhood and adolescence was "replaced by attentive older men and women relatives who rooted [him] in their love and guidance." (Exhibit 99.)

Steve also attributed his success to his academic ability and recognized that "Kenny had great difficulty with his education. Kenny failed in school." (Exhibit 99.) School became the focal point for Steve and provided "the value system" that was absent at home. Steve developed close relationships with his extended family, and explained "it made all the difference in the world to have that support structure. It was a pivotal part" of his life, and he had "positive experiences and influences that Kenny never had." (Exhibit 99.)

Amended § 2255 Pet.                            238                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Gelene was unable "to have meaningful conversations about day to day problems, to figure out how to solve normal problems that arise in the course of everyday life, or to tolerate the routine activity of growing boys." (Exhibit 99.) Steve once found "diary-type notes" of hers that "were very depressive and full of blackness and darkness." (Exhibit 99.) Gelene "did not know how to respond to Kenny's special needs as a youngster with profound psychological problems." (Exhibit 99.)

Kenny begged his father to allow him to live with him, and Ernie relented and "let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny completed ninth grade." (Exhibit 81.) Kenny resented Ernie's wife Diana and "it got the best" of Ernie, who "lost control when he sassed her" and "hit him pretty hard in the chest. He went flying slamming against the wall." (Exhibit 81; Exhibit 149.) After his father's assault, Kenny went back to Sallisaw and soon withdrew from school.

Gelene reported that Kenny "never got over" the divorce and believed that it "caused some of Kenny's problems." (Exhibit 97.) She knew that "Kenny never adjusted" after the family moved back to Sallisaw when Kenny was in the seventh grade. (Exhibit 97.) Kenny "got pretty depressed and lost interest in school." (Exhibit 97.) Kenny's youngest brother Steve realized that Kenny "idolized Ernie." (Exhibit 99.) He could tell "how much Kenny missed [their] dad by the way he acted when Kenny was around him. Kenny made sure to stay in close proximity. . . Ernie was a god to Kenny." (Exhibit 99.) Extended family members knew that "Kenny never had much of a father," and "never had any guidance." (Exhibit 74.)

Kenny had "a hard time with lessons" and repeated the eighth grade. (Exhibit 81.) In the fall of 1976, at the age of 14, Kenny enrolled in eighth grade for the second time at Tommy Spear Junior High in Sallisaw. He was placed in special education classes in English and staff

made "some adjustments to the curriculum" for him.  (Exhibit 136.)  At the end of the academic year, he showed improvement in two courses (math and social sciences) and decline in one course (science).  It was a very difficult year for Kenny, whose beloved grandmother, Ada Mae, died in 1976.  (Exhibit 126.)  Ada Mae "adored" him, and "[w]hen she died . . . Kenny was just 14.  It was as if the only adult who ever cherished him had gone."  (Exhibit 86.)  Ada Mae's death was the hardest on Kenny "because his father had recently deserted him at the age he most needed direction."  (Exhibit 86.)

Kenny moved from Sallisaw to live with his father in Dunkirk, Indiana, and enrolled in the ninth grade at Jay County High School at the age of 15 in the fall of 1976.  His grades declined in three of the five subjects (general math, comm arts, and life science).  (Exhibit 136.)  Kenny returned to Sallisaw, but "just couldn't make it in school, so he withdrew from school and went to work full time."  (Exhibit 81; Exhibit 200.)

When Kenny was 17, he was assaulted and beaten by Sallisaw police officer John Philpot, who hit Kenny so forcefully, it broke Officer Philpot's hand.  The assault had long term consequences on Kenny who could not understand the reason for the assault.  Kenny had been arrested for "hot rodding, squealing his tires" when he was "out driving one of his souped-up cars."  (Exhibit 97.)  The incident only added to Kenny's already burgeoning paranoia.  The traumatic impact of the assault on Kenny – then a youth with manic-depressive illness, brain damage and a low I.Q. – affected the development of paranoid delusions that would cause him, almost 20 years later, and 12 years after he shot himself in the chest with a shotgun, to fend off imaginary satellites or dirigibles that he thought were surveilling him.  (Exhibit 117.)

**Onset of Mental Illness**

Kenny entered late adolescence and young adulthood with modest expectations that were obliterated by the onset of major mental illness emanating from and exacerbated by his long standing neurologic deficits.  He battled "terrible mood swings" and periods of depression that lasted for days.  He hoped that hard work would make his pain go away.  It did not.  He had worked steadily since he left high school, and "his bosses liked him."  He was "a good worker, strong, and able" and was "proud of his work."  (Exhibit 97.)  By the time Kenny was 18, he worked on pipelines and oil rigs and traveled throughout Oklahoma and other states.

Soon, Kenny  met and fell in love with a beautiful young girl, Abby, and they married in 1980 when he was 19 and she was almost 16.  (Exhibit 7.)  Their only child, Toby, was born December 1, 1980.  (Exhibit 122.)  Kenny and Abby's marriage was "rocky. . . and they were more unhappy than happy even though they loved each other."  (Exhibit 97.)

Kenny "was far too mentally unstable" to live independently, so the young couple lived off and on with Gelene for the first few years of their marriage.  (Exhibit 103.)  Kenny's relationship with his mother was complex, and although she resented his presence, she insisted that he join her when her friends came over and used drugs.  Kenny's wife, Abby, worried about the effect such goings on would have on her baby, and she desperately wanted to move into their own apartment.  Abby reported that "Gelene made Kenny get up from bed and party with crack and pot."  (Exhibit 103.)  Gelene never treated "her other sons the way she treated Kenny."  (Exhibit 103.)  She and Kenny had a "terrible relationship."  (Exhibit 103.)  Gelene remarried and divorced a local bar owner, and was frequently "depressed" and "intoxicated." (Exhibit 152; Exhibit 11; Exhibit 150.)

Kenny tried "to bury his problems under constant work and activity." (Exhibit 99.) Kenny measured his life by how much he could work, but he was too depressed to keep a steady work schedule on his own. Depressive episodes overtook him, and he would "get real depressed and sleep all the time." (Exhibit 103.) The only antidote to his depression was drugs. His wife knew that "he smoked a lot of pot, but without it he never got motivated. He turned to drugs to make himself feel better." (Exhibit 103.) He used methamphetamine as an antidepressant and discovered that he could work well under its influence. Abby observed that Kenny "would work hard and then sleep all the time. . . .[He] did the drugs to make himself feel better, because otherwise he would just sleep." (Exhibit 103.)

Kenny's behavior easily fit the pattern of bipolar mood disorder, and his family knew he was "deeply troubled." (Exhibit 86.) His wife thought he was "like a manic depressive, hot one minute and depressed and even immobile the next." (Exhibit 103.) Kenny had "racing thoughts." (Exhibit 103.) He did things without thinking and "then regretted them." (Exhibit 103.) Abby knew that Kenny "did not act the way normal people act" and that he "got swept away in his emotions." (Exhibit 103.) When Kenny lost control of himself, he hit Abby and later "would come back crying, begging" Abby to take him back. (Exhibit 103.) He was genuinely "remorseful" and would "be good as he could be—he would go the extra mile,. . . . but he could not keep it up." (Exhibit 103.)

Kenny's cousin, Brandy, recognized Kenny's bipolar mood disorder created severe problems for his marriage. Brandy compared Kenny's behavior to her own behavior and reported that her "mood swings" made it "hard" on her husband because she "used to attack him, kind of the way Kenny and Abby fought." (Exhibit 77; Exhibit 141.)

Kenny and Abby separated and reunited frequently; his mood fluctuations and deep depressive episodes made him irritable, agitated, paranoid, and suspicious. During one of the separations, he went to his father's home where Ernie found work for him. Ernie described his observations of the effect of Kenny's mental impairments on his behavior:

> Kenny had bouts of depression and did things that did not make any sense. Sometimes he would be very down but other times he would be manic, always on the go and upbeat. Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it. In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me. I got him a job with Kerr Glass and he was making real good money. Kenny had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve.

(Exhibit 81.)

Abby knew that Kenny "had mental issues" and tried to persuade him to seek psychiatric treatment. (Exhibit 103.) Abby recognized that she "was the only stable thing he ever had in his life" and that she "kept him together." (Exhibit 103.) She opposed his drug use but stayed with him in their fitful marriage to try "to keep him from falling off the deep edge." (Exhibit 103.) Kenny's brother reported, "[a]s troubled as Kenny was, he worked all the time." (Exhibit 99.) Kenny's use of drugs allowed him to keep working, despite his serious mental illness. Kenny increased the amount of drugs he ingested in direct response to the symptoms of depression he experienced; his goal was very simple. He needed methamphetamines in order to work.

Abby lost battle after battle with Kenny's bipolar mood disorder. In 1986, Kenny attempted suicide and nearly succeeded in killing himself with a shotgun blast to his chest.

(Exhibit 147.)  Kenny's brother Steve was home at their mother's and witnessed Kenny's suicide

attempt:

> In a terrible episode of depression, he tried to kill himself.  I was home with Monty and Podgy in the living room watching Carl Sagan kind of stuff on television.  Kenny came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenny leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. . . .Kenny was in and out of it, mumbling, making no sense.  Kenny was in ICU in Sparks Medical Center in Fort Smith for 11 days.

(Exhibit 99.)

Abby convinced Kenny to see a psychiatrist after he survived the shooting, and he

briefly took Elavil and Ascendin.  His dramatic mood swings continued to be "like a roller

coaster."  (Exhibit 103.)  Elavil was extremely helpful and made a big difference in Kenny, but

he discontinued his treatment.

Kenny continued to decline and was involuntarily committed to Eastern State

Hospital October 8, 1986 "as a result of mental disorder or impairment by chronic alcoholism or

drug abuse" that created "an immediate likelihood of serious harm to self or others."  (Exhibit

147; Exhibit 33.)  The admitting psychiatrist provisionally diagnosed Kenny with "depressive

neurosis with suicidal potential extremely high."  (Exhibit 147.)  The nursing assessment

reported that Kenny did "not recognize problems."  (Exhibit 147.)  Kenny had a nine year history

of polysubstance abuse.  Kenny hand wrote on a printed questionnaire, "I wish I was back home

in the woods."  (Exhibit 147.)

On the mental status examination, Kenny was noted to be "labile" and to laugh

"inappropriately at times."  (Exhibit 147.)   His insight and judgment were impaired.  Staff found

Kenny to be "courteous, cooperative." (Exhibit 147.) Kenny acknowledged that he had "a hot temper." (Exhibit 147.) Kenny's highest level of functioning in the preceding year was "poor." (Exhibit 147.) Kenny reported being anxious and depressed. He was paranoid and blamed his wife and mother for his being hospitalized. Kenny was discharged early on October 17, 1986 to his cousin. His discharge summary noted he "wants to return to work." (Exhibit 147.)

Kenny was not able to return to work. Gelene arranged for his second cousins to "pick Kenny up from Eastern State after they had him committed." (Exhibit 101.) Nona described Kenny's preoccupation with Abby:

> He stayed with me in Kellyville that first week. It was apparent how much Kenny loved Abby and he could not get his mind off her. He was very paranoid, being without her. Gelene hoped that by staying with us he would be in a new environment and do better.

(Exhibit 101.)

Kenny sustained repeated head injuries from his work and from car accidents. He was preoccupied and distracted by depression and mania and unable to focus his attention. He applied for disability due to his mental impairments, and was denied but evaluators found him to be "moderately depressed" and periodically unable to "think clearly." (Exhibit 147.) Kenny made repeated trips to the hospital after falling down stairs, sustaining a contusion to the right periorbital region of his head, being involved in a motor vehicle accident, experiencing rib and chest pain, and suffering a rash "all over." (Exhibit 147.)

When Kenny's marriage ended after 14 years, he "never recovered." (Exhibit 103; Kenneth Barrett, Divorce Proceedings.) He and Abby had wanted the marriage to work for the sake of their son, but Abby was unable to tolerate the irritability, agitation, paranoia, and severe mood swings that came at unpredictable times and derailed their lives. By the end of their

marriage, Abby "felt like [they] were more like brother-sister than wife and husband because [she] was always bailing him out of trouble and taking care of him" and "trying to keep up with his mood swings." (Exhibit 103.)  Kenny was too impaired to take care of Abby, and she recognized that "he was mentally ill." (Exhibit 103.)  It pained Abby to leave Kenny because "[t]here were times he could be good. . . .and would try so hard to be good." (Exhibit 103.)  She also knew that "he could not function without her." (Exhibit 103.)

After their final separation, Kenny spiraled downward, as Abby had predicted. His multiple impairments made it impossible for him to function independently.  He was hospitalized January 20, 1995, given "10 mg of Haldol IM," and diagnosed with bipolar mood disorder after telling hospital staff, "I'm losing my mind." (Exhibit 147.)  Hospital staff noted he was "extremely agitated." (Exhibit 147.)  During his three day hospitalization, staff reported he was "very agitated" and not able to sleep "for a few days." (Exhibit 147.)  He demonstrated "lack of concentration" and "rapid thought process." (Exhibit 147.)

Kenny was discharged to his mother with "outpatient follow-up at the Bill Willis Community Mental Health," but he did not follow through. (Exhibit 147.)  Kenny "moved back home" and "built a little shack" next door to his mother's trailer. (Exhibit 99.)  His brother visited it and observed that the shack was "almost Waldenish in its own way." (Exhibit 99.)  The shack was constructed from discarded and used materials, did not have electricity or plumbing and only had "the essential stuff." (Exhibit 99; Exhibit 97 and Attachment.)  Kenny "ran an electrical cord from (Gelene's) trailer to his shack for electricity." (Exhibit 97.)  Gelene prepared his meals for him, and he ate at her trailer.  Kenny's son, Toby, visited often, but knew that his father had "some problems inside his head" and "always thought he had a chemical imbalance." (Exhibit 96.)  Even as a teenager, Toby "knew something was wrong with him because he had

mood changes that were not normal." (Exhibit 96.)  Toby observed that his "dad could be in the best of moods one minute, then the worst" and was "a very paranoid" and "a very scared person." (Exhibit 96.)

Everyone in the family and Kenny's ex wife knew he could not "live on his own." (Exhibit 97.)  During his and Abby's frequent separations, "Kenny always came home" to his mother.  (Exhibit 97.)  An aunt explained that Kenny's "only security was with Gelene because he did not have anybody else" to care for him.  (Exhibit 93.)  Kenny's son who had to come to terms with his father's mental illness "had to bring things to him" after his father "stopped leaving his property."  (Exhibit 96.)

Gelene "knew he had serious mental problems" but "hoped if he lived close to [her] and just worked on his cars and fixed things for people, he might be able to make it." (Exhibit 97.)  He stayed more and more to himself and became more and more paranoid, but he was not a loner at all because many friends visited him.  (Exhibit 90; Exhibit 77; Exhibit 95.) Kenny told a neighbor, Alvin Hahn, "he thought there were satellites watching him."  (Exhibit 75.)

As Kenny's paranoia increased, so too did his dependency on family.  His friends knew his paranoia was in full force and was the reason he "hardly left his property for several years."  (Exhibit 95)  His aunt Phyllis understood that he "was never able to be independent as a grown man.  His emotions got in the way of his being able to live too far from home."  Phyllis described an incident that explained how he relied on family when his emotions overcame him:

> [A] couple of years before the incident, Kenny had run to my house in tears, crying, "The laws are after me. They're coming! What should I do?" I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail.

Amended § 2255 Pet.                    247                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

(Exhibit 91.)

Despite the limitations created by his mental impairments, Kenny "would give you the shirt off his back if you needed it." (Exhibit 91.) He "tried to stay close to home, always worked hard and took pride in his work." (Exhibit 91.) Kenny's family and friends uniformly reported that Kenny was not violent or dangerous to them. His great aunt Ada stated, "I never felt threatened by Kenny. He did not bother me any, but I worried about him." (Exhibit 74.) Janice, his cousin, grew irritated and impatient with Kenny on more one occasion for playing his music too loud and called the police to Kenny's, but she loved Kenny and "was never afraid of him." (Exhibit 85.) Kenny's maternal aunt Ruth found him to be "sweet person, nice, and respectful" whose drug use "may have hidden his mental illness." (Exhibit 93.) Ruth and her husband, who visited Kenny "to talk about the Bible and how he could straighten out his life" were "never afraid of him" and did not "believe he would intentionally hurt anyone." (Exhibit 93.) Relatives visited and talked with Kenny. His second cousin Nona, who "got along wonderfully" with him counseled him about religion. (Exhibit 101.) Nona described the last conversation she had with Kenny:

> The last conversation I had with Kenny was in 1995-96 when my husband at the time and I visited Gelene. Kenny came by to visit. It was clear to me that Kenny was studying life and thinking deeply, trying to figure things out. I remember he said, "'Aunt Nona, how do you know there's a God?" I took him to the window and said, "See how beautiful that is." He agreed but asked me "Why can't we see God?" I tried to explain to him that the Bible says we should worship God in spirit and we will see His truth.

(Exhibit 101.)

Friends and family thought at times Kenny would be alright. A friend and neighbor reported that "Kenny had a reputation in the community as an excellent mechanic who was fair." (Exhibit 90.) A cousin, Brandy Hill, remembered that "Kenny was very generous,

and his auto repair business was getting more solid every day. People would pay him hundreds of

dollars in cash to replace an engine or a transmission." (Exhibit 77.) Despite Kenny's mental

illness, his son Toby had "a lot of fond memories of . . . going canoeing, and helping him work

on cars." (Exhibit 96.) Toby was intimate with Kenny's fears but knew that Kenny "was not

dangerous," and Toby "was not afraid of him." (Exhibit 96.) Toby thought that Kenny "did the

best he could" and saw that his father "had a tender side to him" that helped "offset the pain of

having a dad with mental problems." (Exhibit 96.)

The family hoped that Kenny could recover. His mother described their

observations:

> As time went on, he did a little better, built a garage and fixed everything from appliances to cars, trucks, and trailers for friends and neighbors. He stayed more and more to himself, though, and did not like to leave the property. Friends bought him food and went grocery shopping for him. He ate most of his meals at my trailer, and I cooked for him. I hoped and prayed he was going to make it. At least, I believed, with him living right next door, he was safe and I could keep an eye on him. We had our arguments; that's for sure. He was so paranoid and crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

(Exhibit 97.)

### b. Kenny Barrett's mental illness and organic brain dysfunction.

Mr. Barrett's trial counsel had a duty to obtain this information about his family

and his own personal history. This is the story of a unique human being whom jurors never met.

If trial counsel had gathered this readily available information and provided it to a qualified

expert, as prevailing professional norms required, the jury would have understood how Mr.

Barrett's life history, while intrinsically compelling, also has profound implications for a

scientific understanding of his mind and actions. A competent mental health expert would have

seen significant risk factors in Mr. Barrett's background that would have helped explain who he

is and why he would act as he did.

> Both father's and mother's sides of Mr. Barrett's family were burdened by multi-generational neurological impairments and affective mood disorders, as well as patterns of substance abuse and parental neglect consistent with an affective-laden family. Mr. Barrett's young parents were apparently ill-equipped cognitively, emotionally or financially to rear children. Mr. Barrett's developmental years were characterized by parental neglect, lack of appropriate boundaries, domestic discord, inter-parental violence and physical abuse. These factors likely potentiated Mr. Barrett's genetic predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning.

(Exhibit 117 at ¶ 22.)

An expert presented with the available background data would have informed the

jury that Mr. "Barrett's own genetically based potential for developing a mental illness was

significantly increased by the circumstances of his upbringing, especially his parents' chemical

dependency." (Exhibit 117 at ¶ 30.)

> His parents' dependency and their different, unpredictable behaviors while intoxicated, further compromised Mr. Barrett's ability to perceive and incorporate a sense of appropriate boundaries, and develop an adequate perception of social cues and interpersonal interactions. Ernie Barrett was frequently physically absent for days at a time as a result of extramarital affairs, and Gelene Barrett was rendered emotionally distant and neglectful by her intoxication. These behaviors left Mr. Barrett's parents ill equipped to develop the primary attachments or provide the basic physical and emotional nurturing necessary for a young child's normal, healthy neurocognitive development.

(Exhibit 117 at ¶ 32.)

As Dr. Woods explains, research published by the National Academy of Science

documents the impact of such parenting on a child's developing brain:

> *From Neurons to Neighborhoods*, a study of early childhood development by the National Research Council and the Institute of Medicine, documented sensory stimulation, and social interactions as conditions that affect the developing brain.

They also determined that chronic stress is detrimental to the normal development of the brain. ***

[¶]      Parental neglect of the type suffered by Mr. Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the longest term and most pernicious effects of all such early traumatic experiences.

[¶]      The brain is only starting to grow, mature, and differentiate at the time of birth.  Within the newborn brain there are certain structures that develop only if stimulated, and there are other structures that atrophy if not stimulated.  The newborn child's interpersonal and environmental experiences determine the rate and quality of development for domains that regulate definition of person and comprehension of one's place in his or her environment.  The absence of necessary caretaking or experiences that promote attachment between parent and child can alter both the structure and function of the child's developing brain. Mr. Barrett's reactivity rather than responsiveness is directly related to the lack of parental training of appropriate coping mechanism, in addition to his genetically-derived mood disorder.

(Exhibit 117 at ¶¶ 33-35.)

Documents and family history also present experts with data that are important to understanding what chemical and other physical insults touched Mr. Barrett's development.  His mother drank when she was pregnant with him.  Alcohol use during pregnancy is known to be associated with abnormal brain development and brain dysfunction.  (Exhibit 89 at ¶ 23, Exhibit 117 at ¶ 37.)  Mr. Barrett's brain continued to be affected by alcohol and other drugs in adolescence and young adulthood.  His father initiated his drinking at age seven, and drinking and drug use, modeled by his parents, continued from there until it included a vast array of substances and prolonged exposure.  Research informed mental health clinicians that childhood and adolescent intoxication has damaging neurological consequences.  (Exhibit 89 at ¶ 23.)

Mr. Barrett's chemical dependency history is consistent with the high incidence of substance use secondary to the increased neurovegetative symptoms of eating and sleep disorders, adhedonia and mania found in bipolar disorder. Mr. Barrett's combination of traumatic stress and bipolar disorder predisposed him to chemical

dependency. PTSD and bipolar disorder each have a co-occurring incidence with chemical dependence greater than 40% in the clinical literature.

(Exhibit 117 at ¶ 44.)

Jurors would want to know whether there were signs that these sources of trauma and potential impairment had an effect on the young Kenny Barrett.  Records kept contemporaneously, when considered by clinicians, showed evidence of harm.

> As a child, Mr. Barrett exhibited signs of impaired neurological growth, failing to meet developmental milestones expected of healthy infants.   During his first year, Mr. Barrett exhibited increasing delays in areas associated with creating interpersonal relations and emotional development.  Among other delays, at age three months, he did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand"; at nine months, he did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent"; at one year, Mr. Barrett's mother noticed that he "had trouble learning to walk," and could not "drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching."

> [¶]    Mr. Barrett failed reading in the first grade, was required to repeat the eighth grade and was eventually referred to special education classes before he dropped out of school in the ninth grade.  By pre-adolescence his hyperactivity, irritability, isolation, and impaired academic functioning introduced the prodromal symptoms associated with major mood disorder.   He became more hyperactive, intrusive, and emotional labile, extremely sensitive, and a tendency to emotionally decompensate without apparent provocation.

(Exhibit 117 at ¶¶ 38-39.)

The life history information that was available to trial counsel includes evidence of other sources of trauma that placed him at risk for organic brain impairment.  (Exhibit 89 at ¶ 21, Exhibit 171 at ¶ 41.)  He was hit in the head with a steel ball when he was eight or nine years old; at age 17, Johnny Philpot beat Mr. Barrett about the face and head, including a blow that

broke his jaw; in his early twenties, he was involved in motorcycle accidents; at age 24, he shot himself in the chest with a shotgun. *Id.*

If trial counsel had followed prevailing professional norms and had timely retained appropriate mental health experts to assist the defense, Mr. Barrett's jury would have heard extensive evidence of mental illness and impaired brain functions due to organic damage. As explained by Dr. Young: "The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex." (Exhibit 89 at ¶ 28.)

The prefrontal cortex is responsible for executive functioning, which allows an individual to think and reason; solve problems; adapt to circumstances; accurately receive, process and organize information; make rational decisions; and, based on the information that is received, adapt behavior based on experience and make appropriate choices of action.

> More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation. Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders. The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

(Exhibit 89 at ¶ 26.)

Dr. Young's findings are based on approximately 16 hours of neuropsychological testing, including intelligence testing, a clinical interview including the taking of a history, review of educational records, and a review of psychiatric and medical records. (Exhibit 89 at ¶¶

20-26.)  The objective testing and historical study performed by Dr. Young constitutes an

accepted, reliable method for assessing cognitive function.  (Exhibit 89 at ¶ 62.)  Based on the

historical data available at the time of trial and the scientific literature, Dr. Young opines that the

damage to Mr. Barrett's prefrontal cortex likely stems from abnormal prenatal development,

traumatic brain injuries Mr. Barrett suffered, and drug abuse.  (Exhibit 89 at ¶¶ 63-65.)

Like any other person, Mr. Barrett has areas of weakness and areas of strength in

the many brain functions evaluated by a neuropsychological test battery.  However, testing shows

Mr. Barrett is impaired in some areas which means that he functions at a level below the average

person, and sometimes far below.  The testing data and congruent findings on psychiatric study

show Mr. Barrett experiences dysfunction in areas of his brain

that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use of hindsight and foresight in the direction of current processing.  Mr. Barrett suffers significantly impaired functioning in all these domains.

(Exhibit 117 at ¶ 58.)  In less scientific terms, Mr. Barrett has brain damage that makes him less

able than a normal person to process information and formulate a rational response.

Mr. Barrett's temporal cortex is also damaged or otherwise dysfunctional, and in

ways that complement (aggravate) his other impairments, as they relate to culpability in the death

of Trooper Eales.  The temporal cortex controls verbal and visual memory, as well as learning,

interpreting and processing speech and the emotional tones and meaning in speech.  The

temporal cortex is also responsible for processing visual information.  Dysfunction of the

temporal cortex is associated with, among other things, amnesia, fear, paranoia, impulsivity, and

outbursts of aggression.  (Exhibit 89 at ¶¶ 36-77.)

Based on Dr. Young's findings and his own assessment, psychiatrist George W.

Woods, Jr., M.D. concludes that Mr. Barrett experiences dysfunction in the areas of the brain that

are necessary to sound reasoning, judgment and planning.  That is, "Mr. Barrett . . . suffers from

a Dysexecutive Syndrome, which would be categorized on Axis III" of the DSM-IV-TR™.

(Exhibit 117 at ¶ 67.)  In other words, Mr. Barrett's ability to accurately and appropriately

process, retain, integrate and respond to information and events as they unfold is significantly

compromised.  (Exhibit 117 at ¶ 58.)

The areas in which Mr. Barrett experiences impairment make understanding his

functioning a necessary part of understanding him as a unique human being trying to get along in

the world, and for understanding the events of September 24, 1999.  The problems Mr. Barrett

has experienced from organic brain impairments are compounded and exacerbated by severe

psychiatric illness.

> Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder,
> severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe,
> 309.81.  * * *  Mr. Barrett's clinical profile medically indicates cognitive
> functioning and behavior that is severely compromised by overlapping symptoms
> of depression and mania – diagnostic of Bipolar and secondary to PTSD – and
> impairments in higher cortical regions necessary for inhibition, reasoning and
> judgment.

(Exhibit 117 at ¶ 66.)  As Dr. Woods states it, Mr. Barrett's cognitive functioning and behavior

"is severely compromised by overlapping symptoms of depression and mania ... and impairments

in [the] higher cortical regions necessary for inhibition, reasoning and judgment." (Exhibit 117 at ¶ 66.)

The development of Mr. Barrett's bipolar disorder was strongly influenced by his familial predisposition to this and other mental illnesses. As shown in the attached medical records and summarized *supra* in § B.2.a of this Claim, Mr. Barrett comes from a family plagued with bipolar disorder. The onset of his organic brain damage can likely be traced not only to early head trauma, but his mother's drinking while pregnant, and other factors. (Exhibit 117 at ¶¶ 63-65.)

Dr. Woods explains that people with frontal lobe damage, and people with Bipolar Disorder share suffering in significant areas of daily functioning. "Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become [sic] incorrect." (Exhibit 117 at ¶ 59.)

> Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

(*Id.* at ¶ 60.)

Mr. Barrett's case would have presented the jury with extraordinary evidence to support these diagnoses. Mr. Barrett's personal and family history, as set forth *supra* and as documented in the exhibits to this Petition, is replete with incidence of major mental illness, including Bipolar Disorder. A qualified clinician would have explained the significance of this remarkable history to jurors.

[¶]     Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult.  The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

[¶]     The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

[¶]     Mr. Barrett's family history, the consistency of emotional dysregulation beginning early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

(Exhibit 117 at ¶¶ 63-65.)

In other words, "Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial."  (Exhibit 117 at ¶ 68.)

If trial counsel had informed themselves regarding Mr. Barrett's history, and consulted relevant experts, the jury too would have been informed that

[¶]     Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.

* * *

[¶]     Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings . . . . He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder.  The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that

Amended § 2255 Pet.                             257                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]     Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening.  Over the course of his life, he had been beaten multiple times by his caregiver and the police.  He had shot himself in the chest, at close range, almost losing his life.

[¶]     He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid.  Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]     Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]     Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction.  This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]     Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor.  Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]     Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme.  He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce.  Mr. Barrett had become increasingly withdrawn, by everyone's account.  He reported to me that the years from his divorce and the raid on his home were the darkest of his life.  He was self medicating more heavily than ever before.

[¶]     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the

Amended § 2255 Pet.                    258              *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]     My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment. The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Exhibit 117 at ¶¶ 69-78.)

Trial counsel had available to them some resources for obtaining mental health evidence to present in mitigation. If trial counsel had contacted Dr. Bill Sharp, who had done a preliminary evaluation during the state-court proceedings, he would have been able to rely upon the additional social history data and neuropsychological findings. (Exhibit 55 at ¶ 16.) Dr. Sharp concurs in the findings of Dr. Young and Dr. Woods. (*Id.* at ¶ 23.)

Taking [the social history] information into account and Mr. Barrett's assessment by myself, Dr. Young, and Dr. Woods, one could conclude that Mr. Barrett's response to the raid on his property was impulsive and not thought-out. I liken the situation to a person being surprised in the night by an unexpected phone call or alarm clock. In general, someone in those circumstances will experience some disorientation and difficulty understanding events. For someone with Mr. Barrett's mental impairments those experiences would be magnified many times over. For a normally functioning person to understand how Mr. Barrett would have experienced the assault on his property, he would have to think about his own sense of surprise or disorientation and think of that experience multiplied one thousand times over.

(*Id.* at ¶ 24.)

Armed with the available information, trial counsel would have been able to persuade the jury on multiple fronts including (a) doubts about the truthfulness and motivations of the prosecution's informants; (b) doubts about the need for a no-knock warrant (including whether Mr. Barrett could have failed to appear for a trial that was not going to happen); (c) the inappropriate nature of the raid and the tactics that call into doubt whether Mr. Barrett could have seen that his attackers were law enforcement officers; (d) that the Tact Team recklessly approached a man who was hyperreactive, who had been suicidal, who was extremely paranoid, and whose teenage son was threatened; (e) that Mr. Barrett had pre-existing, organically induced impairments in the abilities to solve problems, the ability to engage in goal-directed behavior, the ability to plan strategically, the ability to anticipate the consequences of his actions, the ability to see the "big picture," and the ability to be mentally flexible rather than rigidly persist in an action that new information indicates is inappropriate; (f) that apart from the conditions existing at the time of the offense, Mr. Barrett grew up in an environment of alcoholism, violence, selfishness, abuse, and neglect; (g) that he struggled to overcome the burdens of his background and mental impairments but in doing so fell into drug abuse that exacerbated these problems.

As elaborated in the conclusion to Mr. Barrett's second stage ineffective assistance of counsel arguments, trial counsel had a clearly defined duty to investigate, develop and present this mental health evidence in the penalty phase of trial.  The mental health evidence that could have and should have been presented on Mr. Barrett's behalf was not only powerful evidence in mitigation of punishment, as the Supreme Court has recognized repeatedly, but was also directly relevant to refuting the statutory aggravating circumstances that Mr. Barrett *knowingly* created a grave risk of death to one or more persons in addition to Trooper Eales, and that Mr. Barrett committed the offense *after substantial planning and premeditation.*

The evidence presented here shows both that trial counsel's lack of investigation and expert consultation fell below the objective standards of reasonableness codified in the ABA Standards and Guidelines and in case law, and that there was abundant "undiscovered mitigating evidence [that], taken as a whole, might well have influenced the jury's appraisal of [Mr. Barrett's] culpability." *Rompilla*, *supra*, 545 U.S. at 393, quoting *Wiggins*, *supra*, 539 U.S. at 538, in turn quoting *Williams*, *supra*, 529 U.S. at 398 (internal quotation marks omitted). Had the jury been able to place the evidence related to both phases of trial "on the mitigation side of the scale, there a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. Accordingly, the sentence of death should be vacated. 18 U.S.C. §§ 3593(e), 3594.

> **c.** **The prosecution's exploitation of trial counsel's deficient performance.**

Not surprisingly, the inaccurate, incomplete and misleading portrayal of Mr. Barrett and his background and character given by the extremely superficial and unprofessional "mitigation case" that was placed before the jury was ripe fodder for ridicule by the prosecutors in closing arguments. Because of trial counsel's abysmal failures to investigate, prepare and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Mr. Barrett was simply a cold, calculating and unrepentant killer who had little if anything going for him in the sentencing balance. (R. 5340-42, 5402, 5404, 5405-09, 5411-13, 5420-22). Because the jury never learned of Mr. Barrett's abusive, neglected, chaotic and troubled upbringing; his lengthy history of severe mental illness; the extensive history of mental illness in his family; his low I.Q.; and, despite it all, his good and positive qualities, the prosecution had a field day depicting Mr. Barrett as a prime candidate for the death penalty.

Going down the list of the few, bare-bones mitigating circumstances that were instructed upon based on the evidence presented, AUSA Littlefield noted the jury had been told Mr. Barrett was simply a "father," which involved no more than a biological process. Left unsaid was what kind of father he was. The prosecutor also ridiculed the claim that Mr. Barrett was a loved son and stepson, remarking that what was missing was any feelings Mr. Barrett had for his parents. It was pointed out that Ernie Barrett had not seen his son for two years before the shooting of Trooper Eales, and that his stepmother had only had contact with him after he was in jail. As to Mr. Barrett's relationship with his mother, Gelene Dotson, the prosecutor pointed out that they had a tumultuous relationship with frequent arguments, fights and threats between them. Mr. Littlefield remarked that Mr. Barrett's parents cared so much for him that they could not tell the difference between him being "hyper" and being "hyped up" on drugs. As to Mr. Barrett being a good neighbor and friend, the prosecutor reminded the jurors that all they heard was that he fixed cars cheaply. Dismissing the mitigating circumstance that Mr. Barrett's execution would have an impact on his child, family and friends, the prosecutor was quick to point out that since Toby Barrett had not testified, there was no evidence that Mr. Barrett's death would have any negative impact on his own child. Indeed, the only testimony regarding the impact of Mr. Barrett's execution on his family came from his stepmother, Doris Barrett, who would no longer be able to visit Mr. Barrett in prison. Making short work of the claim that Mr. Barrett had expressed remorse, Littlefield told the jury that Mr. Barrett only told his mother that he wished things had turned out differently. This ambiguous statement was used as a springboard for the prosecutor to argue that by this, Mr. Barrett simply meant that he was sorry he had gotten caught and was prevented from "killing more of the bastards." Finally, the "catch-all" instruction on any other factors the jury might find to be mitigating opened the door for more negative

characterizations of Mr. Barrett, whom the prosecutor described as having dropped out of school because he did not want to get a haircut; as a user and seller of methamphetamine; as a wife-beater; and as a man so unconcerned about the safety of his son that he allowed him to remain on the property knowing full well that a police raid, which was going to be met by lethal force, was imminent.  (R. 5354, 5356.)

Since virtually nothing of Mr. Barrett's background, history and upbringing was placed before the jury by trial counsel, AUSA Littlefield was able to portray Kenneth Barrett as simply a bad and unrepentant seed when compared to his brother Steven Barrett, who became a successful educator and who was raised in the same home as Mr. Barrett.  (R. 5358.)

Picking up the theme that Mr. Barrett's case in mitigation was pitifully anemic, United States Attorney Sperling reminded the jury that Sequoyah County Court Clerk Maudeen Vann testified that Abby Barrett had filed seven domestic abuse complaints against Kenneth Barrett.  Abby Barrett was portrayed as a pathetic, abused wife, helpless at the hands of a husband who was simply a mean person, a man who had stalked her and threatened to "blow [her] head off."  Kathy Trotter was dismissed as a witness who knew very little about her cousin, Mr. Barrett, since she stated she was ignorant of his drug activities, his penchant for being armed, his domestic violence record, and was unaware of his "threats" to law enforcement, as testified to by the seven snitch witnesses.   Mr. Barrett's "helpfulness," for all the jury knew, was limited to fixing a few cars.  Just as Littlefield had done, Mr. Sperling contrasted Mr. Barrett with his brother Steven, a success story who was raised by the same parents and in the same environment, but chose to take a different path than Kenneth Barrett, the knowing, violent criminal:  "How he [Kenneth Barrett] must envy his hard working, highly achieving brother's success."  Mr. Sperling pointed out that Mr. Barrett had only sporadic contact with his mother until his arrest, hinting

that he was a bad and neglectful son. Ernie Barrett, being the good father that he was, gave Kenneth Barrett several chances to succeed at work, but Kenneth Barrett simply chose to "[blow] them." Doris Barrett was loyal to her stepson, despite his misbehavior in jail, the implication being that her loyalty was more a tribute to her than anything positive or redeeming about Mr. Barrett. Whatever Mr. Barrett had done for his family was vague and undetermined, and was in any event far outweighed by the crimes he had committed. If the jurors were tempted to feel any sympathy for Mr. Barrett's family at all, they should remember that Mr. Barrett abandoned his family by his own conduct. Mr. Sperling stated that Mr. Barrett had "victimized" his own family by making them serve as "props" or witnesses on his behalf in the penalty phase. Concluding his remarks on Mr. Barrett's mitigation case, Mr. Sperling told the jury that Mr. Barrett had paid for his membership among "the worst of the worst." Mr. Barrett was simply a murderer who had killed remorselessly, wantonly, and selfishly, a man who was devoid of sympathy or empathy for his victim. (R. 5417-20.)

## Conclusion.

The record and extra record evidence establishes that Mr. Barrett's trial counsel first possessed some information about Mr. Barrett's background in late May 2005. By the beginning of July, trial counsel were searching about for a mitigation specialist. In August, trial counsel learned it was essentially too late to develop a social history and mental health diagnoses informed by that history. In September, the month the trial began, trial counsel were again searching about for information they should have had the previous December. The evidence shows trial counsel never contacted the mitigation specialist the trial court authorized, and never obtained all the records of the state-court mitigation investigation. Trial counsel's statements on the record establish that they made no effort to obtain a psychiatric or psychological evaluation of

Mr. Barrett, and merely repackaged, at the last possible minute or later, the risk assessment done

years earlier at the request of state-court counsel.  This evidence more conclusively establishes

deficient performance than any previously found in *Rompilla*, *Wiggins*, or *Williams*, *supra*.

Prejudice from trial counsel's failures to properly investigate and present available

evidence in mitigation, exacerbated by the trial court's funding restrictions (*see* Claim 3), is

manifest because the Government's case for death was hardly overwhelming.  The jury rejected

the death sentence on Counts 1 and 2.  Even though the death sentence was imposed on Count 3,

the jury rejected the non-statutory aggravating circumstance that Mr. Barrett would constitute a

continuing threat to society.  The statutory aggravating circumstances the jury did find all

revolved around the circumstances of the commission of the offense (which, it should be noted,

would have been viewed in an entirely different way had counsel not rendered ineffective

assistance in the guilt/innocence stage).  Especially where, as here, the case for death was not

overwhelming, prejudice from counsels' unprofessional performance is readily apparent.  *Cargle*

*v. Mullin,* 317 F.3d 1196, 1220-22 (10th Cir. 2003) (while counsel was also found to be

ineffective in the first stage of trial, he was also ineffective in the penalty phase, particularly in

light of the fact that the aggravating circumstances found "over-represented their collective

substance," the evidence in support of a death verdict was not overwhelming, and the

prosecution's penalty phase case did not indicate much additional "moral egregiousness" above

and beyond the *two* murders for which defendant was convicted); *Mayes v. Gibson,* 210 F.3d

1284, 1289 (10th Cir. 2000).  Even where, unlike Mr. Barrett's case, a strong case for death has

been presented, the types of failures on the part of counsel that were present here have led to a

finding of prejudice.  *Williams v. Taylor,* 529 U.S. 362, 390-93 (2000); *Smith v. Mullin,* 379 F.3d

919, 942 (10th Cir. 2004)(prejudice from second stage deficient performance found even though

defendant was convicted of killing his girlfriend and her four children). Surely, had counsel presented the powerful case in mitigation that could have been marshaled, but which Mr. Barrett's jury never heard, at least one juror would have opted not to impose the death penalty. *Smith v. Mullin, supra, relying on Wiggins v. Smith,* 539 U.S. 510, 534-35 (2003).

The evidence of prejudice is greater, too. Due to trial counsel's inattention, the jury was uninformed of Mr. Barrett's background, the desperate alcoholism of his parents, his father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the psychologically damaging harsher treatment he experienced from his mother, his father's abandonment of the family, moving from place to place due to the parents' inability to sustain a life, and finally landing in Sequoyah County. There Kenny Barrett's head injuries and genetic vulnerability to mental illness overtook him. He developed Bipolar Disorder and exhibited the symptoms of his organic brain damage. Despite the mania and paranoia, the hypervigilence, hyperactivity, and disinhibition, his family, friends, neighbors, bail bondsman, and even the local sheriff, all knew that Mr. Barrett would have gone peacefully into custody if someone he knew had simply asked him to. The overwhelming weight of the evidence from both stages of a competently tried case would have shown the jury that law enforcement made tragic errors in assessing the situation. Just as Trooper Eales should not have been put in danger, Mr. Barrett should not have been sentenced to death.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

Amended § 2255 Pet.                                266                        *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

**Claim 3.        Mr. Barrett was Denied his Rights to Due Process and Equal
                 Protection of the Laws, and his Right to Transcripts, Expert and
                 Investigative Assistance under 18 U.S.C. §§ 3005 & 3006A.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett had a due process right to the assistance of investigators and experts qualified and sufficiently compensated to "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). Other similarly situated defendants in federal death penalty cases received such assistance as the trial court withheld from Mr. Barrett.

Mr. Barrett had a constitutional right to the expert assistance necessary to counter the prosecution's evidence and to develop defense evidence relevant to both stages of trial. *Ake v. Oklahoma*, 470 U.S. 68, 71 (1985); *Tuggle v. Netherland*, 526 U.S. 10 (1995) (*per curiam*); *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000); *Dunn v. Roberts*, 963 F.2d 308 (10th Cir. 1992); *Liles v. Saffle*, 945 F.2d 333 (10th Cir. 1991), *cert. denied*, 502 U.S. 1066 (1992). Mr. Barrett also had a statutory right to such assistance, pursuant to 18 U.S.C. §§ 3005, 3006A and 3599(a)(1)(A), 3599(f), and 3599(g). *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985).

Congress has provided that, in capital cases, the "defendant shall be allowed, in his defense to make *any proof* that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution." 18 U.S.C. § 3005 (emphasis added).

Mr. Barrett therefore had a right, as secured by statute, and the Due Process and Equal Protection Clauses, to the tools necessary to build a defense, including expert assistance, at

the same level and to the same extent as provided or otherwise available to the prosecution and similarly situated defendants.

The trial court violated Mr. Barrett's constitutional and statutory rights by denying him expert assistance that was lawful, necessary, and appropriate under the circumstances of the case. The types of lawful witnesses to which the trial court denied Mr. Barrett fair access included a psychiatrist, neuropsychologist, psychologist, mitigation specialist, ballistics expert, independent fact investigator, an independent expert on SWAT team practices, a metallurgist, a drug analyst, crime scene reconstruction expert, and a jury consultant. The complete or partial denial of these expert and investigative resources was prejudicial both individually and in combination.

In addition to the denial of expert and investigative assistance afforded other capital defendants, the trial court denied Mr. Barrett and his counsel access to transcripts of pretrial hearings, including hearings in which witnesses testified who would later testify at trial. (Order filed 3/18/05 (Doc. 97) at 6-7.) Mr. Barrett was plainly entitled to those transcripts pursuant to Chapter 2, section 2.27, and Chapter 3, section 3.12(A) of the Guidelines for the Administration of the Criminal Justice Act. Effective trial counsel, or the trial judge, should have known that it was unnecessary for counsel even to seek reimbursement for transcripts as the court reporter would normally be independently compensated through the Criminal Justice Act. The trial court's decision to reject these Judicial Conference guidelines was arbitrary and capricious. The error was particularly prejudicial because it denied or delayed Mr. Barrett's trial counsel access to the trial court's *ex parte* communications with the prosecutors until it was too late. *See* Claims 1 and 2, *supra*.

Mr. Barrett had a history of psychiatric treatment, including involuntary hospitalization and forced medication with psychotropic drugs. (Exhibit 117; Exhibit 147.) Trial counsel were aware, or should have been aware, of this history. (*See* Doc. 208; Exhibit 147; Muskogee County Jail Medical Records of Kenneth Barrett; Exhibit 118.) In addition, Mr. Barrett had a history of illicit drug use and of head injuries. Furthermore, he has a multi-generational predisposition to developing serious mental illness, including the Bipolar Disorder for which he was medically diagnosed prior to the events in question. These factors, together with his developmental and trauma history, indicated the forensic appropriateness of performing a comprehensive neuropsychological evaluation to assess the presence and effects of brain dysfunction which, again, had a medically indicated onset prior to his arrest. (Exhibit 118; Exhibit 89; Exhibit 117.)

Counsel requested the assistance of a neuropsychologist to perform testing, as well as of a medical doctor to explain the significance of this combination of medication, and other drugs and injuries, including the significance of any discontinuation of treatment. Nonetheless, the trial court would permit Mr. Barrett's counsel the assistance of a psychiatrist or a psychologist, but not both. (Order filed 3/18/05 (Doc. 97).)

In light of the information known or available to Mr. Barrett's trial counsel, prevailing norms of capital defense practice required that they consult with experts whose training and experience were appropriate to addressing Mr. Barrett's history and the needs of the litigation. The appropriate experts included a medical doctor who could diagnose and explain the functional impact of Mr. Barrett's mental disorders, a neuropsychologist who could determine the location, nature and severity of Mr. Barrett's probable brain dysfunction, and a mitigation specialist qualified to gather data in a manner consistent with the clinical protocols of

mental health professionals when considering social history and medical information in the course of forming their opinions.   (Decl. Richard H. Burr dated 4/4/05, filed as Exh. C to Doc. 107, at 4, 8.)  To the extent trial counsel failed to apprise the court of the specific need for psychiatric assistance, or the assistance of any other expert or investigator, their conduct fell below prevailing professional norms.  *See* ABA Guideline 10.4(C)(2)(a) (as soon as possible after designation of lead counsel, defense team should include a mitigation specialist, fact investigator, and a person "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments"); ABA Guideline 10.11(F)(2) (counsel have duty to seek appropriate expert assistance).  *See also* Claim 2, *supra*.

Trial counsel informed the trial court that the court's refusal to permit more than one mental health professional to assist in Mr. Barrett's defense was contrary to law, the Judicial Council's Guidelines for the administration of the Criminal Justice Act, and the practice of district courts in numerous other federal death penalty cases with similar circumstances.  (Docs. 107, 112; Exhibit 53.)  "The standard practice in federal capital trials is to provide the services of more than one mental health expert."  (Decl. Richard H. Burr, filed as Exh. C to Doc. 107.) Counsel also informed the court that authorization for a single expert at the cut rates permitted by the court made it impossible to retain an expert competent to provide the necessary assistance, and that the court's authorization was inadequate to develop defense evidence or to rebut the prosecution evidence at both stages of trial.  (Docs. 107, 112; Exhibit 118.)

The court's denial of psychiatric assistance for Mr. Barrett's defense was prejudicial.  Trial counsel informed Dr. Russell in August 2005 that the court would not fund a thorough investigation for mitigating circumstances.  (Exhibit 56.)  As stated in the attached declaration of George W. Woods, M.D., a psychiatrist retained at the time of trial would have

provided Mr. Barrett with evidence to rebut the prosecution's theory of malice aforethought and intent, and would have provided abundant mitigation evidence. *See* Claim 2, *supra*.

In addition to the outright denial of psychiatric assistance, the trial court arbitrarily denied funding for all expert and investigative resources that were necessary for Mr. Barrett to receive adequate representation. (*Compare* Doc. 51 *with* Order filed 3/18/05 (Doc. 97).) Contrary to Judicial Council Guidelines, and the ABA Guidelines, contrary to the Supreme Court's recognition that death penalty cases demand a higher level of due process, and contrary to the tendency of experts, investigators and other paraprofessionals to charge more for the more exacting work required by capital cases, the trial court consistently based its funding decision on a comparison to non-capital cases in the Eastern District. (Order filed 5/5/05 (Doc. 128) at 3 n.1, 4, 6.)

Mr. Barrett's counsel demonstrated the need for a psychologist to assist in preparation of the defense. (*See* Order filed 3/18/05 (Doc. 97) at 3.) Counsel sought this expert for purposes similar to those envisioned by the Government in retaining Jim Horn. (*See* Doc. 50 at 5-6.) Counsel informed the court that a psychologist could not be retained for less than $150.00 per hour, and estimated 60 hours would be needed (Doc. 50 at 5-6), but the court limited the defense to 40 hours at $100.00 per hour. This was despite the fact that the court had been informed that this reduced hourly rate was 30-60% below the hourly rate of $150-250 authorized by federal courts for such services in death penalty cases. (Exh. C to Doc. 107, at 8.) The court gave no reason for this restriction and cited no information upon which the court could have found that any competent psychologist would have worked for the approved rate.

Mr. Barrett specifically sought the assistance of a psychologist who had assisted in the preparation for trial, and testified in the penalty trials, of other federal death penalty

Amended § 2255 Pet.                    271                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

defendants. (Doc. 107.) That psychologist had been compensated in other similar cases at a rate of $270.00 per hour, and counsel advised the court that he could complete his work in 30 hours. (*Id.* at 3-4.) The court denied the request without explanation.

Mr. Barrett sought the assistance of a mental health expert who was competent to diagnose organic brain dysfunction. (Doc. 50 at 8.) Counsel justified this request with the findings of prior investigations, including that Mr. Barrett had used drugs known to cause brain damage, and that he had suffered significant head injuries during his life. (*Ibid.*) Except to the extent the assistance of such an expert was included in the authorization for a psychologist, the court denied this request without explanation. (Doc. 97 at 3.) This summary denial was highly prejudicial to Mr. Barrett. The only expert on whom trial counsel attempted to rely, Dr. Russell, had not evaluated Mr. Barrett for mental illness or organic brain dysfunction. (Exhibit 56.) As shown in the attached declaration of Myla Young, Ph.D. (Exhibit 89), Mr. Barrett's history of insults to his brain resulted in significant impairments in his functioning. (*See* Claim 2, *supra*.)

Mr. Barrett's counsel, in consultation with a mitigation specialist, Federal Death Penalty Resource Counsel, and the Federal Defender, concluded that a mitigation specialist would require more than 333 hours and $5,000.00 in travel costs. Counsel and the mitigation specialist based this estimate on the knowledge gained in a preliminary investigation conducted before Mr. Barrett's first state-court trial. (Docs. 50, 107.) A mitigation specialist is an essential member of the team in a capital case. (ABA Guideline 10.7.) Without explanation, the court limited the mitigation investigation to 100 hours and no travel.[50] As resource counsel informed the court at the time,

---

[50] The court authorized "100 hours at $150.00 per hour" apparently without realizing that the mitigation specialist counsel had consulted quoted a rate of $75 per hour. (*See* Doc. 107.)

> The number of hours requested by the defense is well below average. The average number of hours worked by mitigation specialists in federal capital cases is 600 hours. In a number of cases, mitigation specialist services have exceeded 1000 hours. Investigating a client's life history thoroughly - through gathering and reviewing documents and interviewing scores of witnesses who are often difficult to find - and working with counsel and other experts to develop the themes of mitigation and the way in which mitigation will be presented, is extremely labor intensive. The modest number of hours requested by the defense here reflects the hope that the mitigation investigation previously conducted, but not completed in the state prosecution will be of use in the current investigation. Measured against the number of hours authorized for mitigation specialist services in every other capital case in which the death penalty has been authorized, the 100 hours approved by the Court is grossly inadequate.

(Exh. C to Doc. 107 at 4.)

The court's withholding of resources was highly prejudicial. Shortly before trial, trial counsel turned to Dr. Jeanne Russell, for whom the court had approved some funds, and asked her to conduct a mitigation investigation. (Exhibit 56.) Dr. Russell was not qualified to perform that role, even if trial counsel had contacted her in time, which he did not. (*Id.*) Trial counsel informed Dr. Russell that the defense's efforts were hampered by the court's refusal to approve resources for a comprehensive mitigation investigation. (*Id.*) As shown in the social history presented in Claim 2, Part B, and the numerous declarations cited therein, a reasonable mitigation investigation, including travel to the various states in which Mr. Barrett lived as a child and adult, would have produced abundant mitigation evidence.

Mr. Barrett sought 300 hours of investigative assistance at a rate of $50 per hour. (Doc. 50 at 4.) The court permitted only 100 hours of investigation, and limited it to those areas in which counsel could show a particularly acute need. (Order filed 3/18/05 (Doc. 97) at 2.) "The average number of hours approved for fact investigation in authorized cases is closer to 500 hours." (Exh. C to Doc. 107 at 3.) The Court was aware that this rate was considered reasonable by experts in relation to the practice in other federal capital cases. Moreover, despite the

Amended § 2255 Pet.                    273                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

preauthorization, the court, contrary to Judicial Conference guidelines, conditioned payment of an investigator on counsel persuading the court with "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial." (Order filed 3/18/05 (Doc. 97) at 2 n.2.) The court prohibited the investigator from working at market rates, and required him to work at the same rate as state-subsidized investigators working for salary at the Oklahoma Indigent Defense System ("OIDS") even though state-subsidized investigators were not available to Mr. Barrett. (Order filed 5/5/05 (Doc. 128) at 3 n.1. *See also* Exhibit 111.)

At a minimum, the restrictions the court placed on investigation chilled inquiry. Compared with his other cases, Mr. Barrett's investigator *lost $20.00 each hour* he worked on Mr. Barrett's case. Moreover, the court's requirements for approving vouchers meant there was no guarantee any specific amount of time would be compensated at all. The investigator could work many hours on an issue only to find after he submitted a voucher that the facts he had investigated were not, in the court's view, significant to evidence that would be used at trial.

The Government relied extensively upon testimony regarding the trajectory of bullets during the raid on Mr. Barrett's house. Mr. Barrett's counsel requested the assistance of an expert, Edward E. Hueske, to assist in responding to the Government's evidence, performing up to 80 hours work, billed at a rate of $200.00 per hour, in addition to $1,000.00 for lodging, travel and incidentals. (Doc. 50 at 7.) While the Government faced no limits on its ability to marshal this type of evidence, the court, again without explanation, authorized less than one fourth the amount Mr. Barrett's counsel and the expert they consulted determined was reasonably necessary to confront the Government's case. (*Compare* Doc. 50 at 7 *with* Doc. 97 at 3 *and with* 18 U.S.C. § 3005). Moreover, the court did not authorize any lodging or travel expenses

whatsoever which would have made it impossible for a defense expert to observe the testimony of the Government's expert and impossible for the defense expert to travel to Oklahoma to testify.

After advising Mr. Barrett's counsel that "this Court has[] never allowed crime scene reconstruction to be introduced in trial" (Doc. 97 at 3), and at the same time denying Mr. Barrett seventy-five percent of the time and one hundred percent of the in-court assistance counsel needed from Mr. Hueske, the Court admitted the Government's crime scene reconstruction evidence without reservation.  As a result of the Court's denial of funds, it was impossible for Mr. Barrett to have an expert present either to challenge the admissibility of the Government's testimony under Federal Rule of Evidence 702, or to assist with cross-examination of the Government's "expert."  To the extent the Court's statement about its past practice regarding crime scene reconstructions misled counsel into foregoing expert assistance, the Court's interference with the defense went well beyond the mere denial of funds and constituted active interference in the functioning of the defense.  *See* Claim 1, *supra*.

The court's denial of funds for ballistics and crime scene reconstruction experts was prejudicial.  As set forth in Claim 2, *supra*, if trial counsel had been able to consult with an expert prior to trial, they could have presented evidence to exclude the testimony of Iris Dalley, an "expert" who was central to the Government's theory of how the shooting took place, including whether Mr. Barrett was in a position to see emergency lights when the shooting started.  Even if counsel had not succeeded in excluding that testimony entirely pursuant to FED. R. EVID 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579 (1993), counsel would have been far better able to rebut it.  For example, if counsel had been able to employ adequate expert services, at a minimum, Mr. Barrett would have shown the following:

Amended § 2255 Pet. 275 *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

(a)     Dalley failed to follow standard protocol by omitting the measurement of the objects through which she claimed bullets passed;

(b)     Dalley failed to follow accepted methods by using magnification and/or chemical analysis to detect the presence of gun shot residue, blood, tissue, hair, fibers or other matter around bullet holes;

(c)     Dalley falsely claimed she could not determine the caliber of bullet holes in the Bronco whereas the determination could have been made with standard tools and methods;

(d)     Dalley offered misleading testimony, beyond the scientific bounds of her methodology, when she claimed that the trajectories she identified for bullet fragments were "accurate" while the method she used could not provide an accurate trajectory;

(e)     Dalley selected descriptions of the evidence to fit the Government's theory when she described the trajectories of bullets that passed through the door of the Bronco;

(f)     Dalley's diagrams and animation were not based on accepted methods, and she testified falsely when she claimed she lacked the necessary equipment to create data with which other experts could attempt to reproduce her findings based on those diagrams and that animation;

(g)     Dalley failed to use available, accepted methods (such as a plumb line) to determine the grade of the terrain on which the shooting occurred;

(h)     Dalley failed to employ proper methods of chemical analysis before concluding that holes of questionable origin came from bullets;

(i)     Dalley misrepresented the facts when she claimed there was "no means of sequencing any of the shots," while the truth was that she did not employ the available

means to determine whether they would produce reliable results, i.e. Dalley ignored scientific methods that might have invalidated her claims;

(j)        Dalley failed to use accepted methods for determining the trajectory of bullets that struck a moving vehicle, failing to move the Bronco back to the place where it initially came to rest, and ignoring another standard practice that might have invalidated her findings; Dalley employed scientifically inappropriate methods for making claims about the trajectory of bullets that passed through the window of Mr. Barrett's cabin;

(k)        Dalley overstated her ability to estimate the distance of a firearm from the cabin window based on a rule of thumb, and ignored more reliable methods that might have contradicted her theory;

(l)        Dalley failed to use the standard tool of a metal detector to locate any bullets or fragments in the soil;

(m)        Dalley failed to follow an essential, generally accepted protocol for reconstructing a shooting scene when she did not attempt to collect all the bullets or fragments from the interior of the Bronco;

(n)        Dalley's conclusion regarding the location of Trooper Eales' arm when it was struck was based on her failure to examine the surrounding area for tissue or blood, and her violation of a cornerstone of forensic science.

(Exhibit 109.)

The trial court denied Mr. Barrett due process, equal protection, and his statutory rights to develop a defense by denying him meaningful access to an expert in law enforcement tactics.  As stated in Claim 2, *supra*, trial counsel sought funds to retain Dr. George Kirkham, a criminologist, sworn law enforcement officer, and expert in police tactics.  (Doc. 50 at 5.)

Amended § 2255 Pet.                      277                      *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Counsel informed the court that Dr. Kirkham charged a flat rate for pretrial review and preparation, and that he would need to travel from his residence in Florida.  (*Ibid.*)  The trial court, without explanation, refused to authorize Dr. Kirkham's rate, arbitrarily limited the defense to 40 hours of services at $100.00 per hour, and denied funds for Dr. Kirkham to travel. (Doc. 97 at 3.)

As stated in Claim 2, *supra*, if trial counsel had been able to retain Dr. Kirkham, or had been diligent in pursuing his services, the jury would have heard that the raid on Mr. Barrett's home (a) violated – indeed, was converse to – established law enforcement standards and procedures in that it relied upon force and aggression before any other methods were explored; (b) was carried out in a way that minimized the chances of Mr. Barrett having visible evidence that his attackers were law enforcement officers and no audible evidence of law enforcement's presence; (c) was carried out in a way that trained law enforcement officers would expect to provoke a violent response from the target; and (d) unnecessarily exposed Troopers Hamilton and Eales to gunfire from the cabin and other law enforcement officers.  Dr. Kirkham would have explained how these things are just as true if the jury credited the testimony of the Government's seven informants, as they were when the second state court jury, without the testimony of those witnesses, acquitted Mr. Barrett of first-degree murder.  (Exhibit 44.)  That is, with expert assistance, Mr. Barrett would have been able to show that he did not have the intent to kill law enforcement officers, or, at a minimum, that there was every reason to doubt the Government's claim that he had such intent.  Jurors at the second stage or trial would have had ample grounds to vote for a sentence less than death if they had known of the errors made in deciding upon, planning, and conducting the ill-fated attack.

To the extent the trial court's denial of expert and investigative resources could have been raised on the existing record, appellate counsel was ineffective for failing to raise the claim. *See* Claim 18, *infra*. Trial counsel Hilfiger, who also was counsel on appeal, had a conflict of interest which prevented him raising this claim, insofar as he failed to make use of the resources the trial court had authorized. *Id.* and Claim 1, *supra*.

The record and extra-record evidence establishes that the trial court's denial of resources was not harmless and was highly prejudicial. Mr. Barrett could have presented substantial evidence to counter the Government's case at both stages of trial. The trial court's denial of access to this evidence violated Mr. Barrett's right to due process, to confront adverse witnesses, and to effective assistance of counsel.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 4.** **Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest. The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under *Franks v. Delaware,* 438 U.S. 154 (1978). Appellate Counsel Were Ineffective for Failing to Raise the Issue on Direct Appeal.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

As shown in Claim 2, *supra*, in connection with the claim that trial counsel were ineffective for failing to argue all available evidence supporting the renewed motion to suppress,

the trial record itself established the Clint Johnson warrant was invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Suppressed *Brady* material and other evidence gathered in support of this 2255 petition which relates back to the credibility of the informant at the relevant time makes this conclusion even stronger.

Since the warrant was based solely on the word of the confidential informant, Charles Sanders, his reliability was the linchpin of probable cause.  There was no other information from any other source, and no other circumstances cited in the affidavit, that provided probable cause to search Mr. Barrett's residence and property.  The "totality of the circumstances" in this case *was* Sanders.  *Illinois v. Gates,* 462 U.S. 213 (1983) (totality of the circumstances test used to judge validity of search warrants; an informant's veracity, reliability, and basis of knowledge are all important considerations in determining whether information as a whole is sufficient to supply probable cause).  If Sanders is unreliable, his information is *per se* unreliable.  Because Sanders is the antithesis of a reliable source, Clint Johnson, at the very least, acted with reckless disregard for the truth in utilizing him as a source, and in omitting information from the search warrant affidavit that would have given an accurate picture of Sanders's credibility.

Sanders could not be relied upon to provide reliable information.  No reasonable person could put stock in anything he says.  Sanders is a professional criminal, who had racked up at least eighteen felony convictions at the time he testified against Mr. Barrett, and had surpassed double digits by 1999.  Numerous other felony charges against him were dismissed because of his work as a snitch.  He always had a motive to lie against others to get out of his own scrapes with the law, and has largely been successful, continuing to land on his feet with probationary sentences so he could commit still more crimes in the community, when any sane

system of justice would have flushed him ages ago.  His convictions for crimes of dishonesty are legion: repeated instances of forgery, burglary, concealing stolen property, larceny of merchandise from a retailer, and other forms of fraud and theft, not to mention a laundry list of other felonies.  He has a history of promising to appear in court and then failing to appear.  He has a history of promising to adhere to terms of probation and then breaking them by committing still more crimes, after which he is given still more probation.  He is a long term drug addict. Sanders could not give a straight and consistent answer to save his life at Mr. Barrett's trial, which reflects his almost congenital inability to tell the truth.  Yet he was rewarded for his testimony, as he has always been rewarded for informing on others, despite his wretched history of dishonesty, and despite the fact that he continued to victimize the community as a virtual one man crime wave.   All this was known about Sanders in 1999, and it has only gotten worse.

At the time he signed the affidavit, Clint Johnson was aware of Sanders's lack of reliability, and Johnson himself intentionally ignored evidence of Sanders's then-current drug usage, crimes of dishonesty, and Sanders's inability to see evidence of drug activity at Mr. Barrett's residence during the critical time.  Yet Johnson still relied on this miscreant as a "reliable confidential informant."

In connection with the claim of ineffective assistance of trial counsel for failing to produce witnesses to attack Sanders's honesty, Mr. Barrett has provided declarations from several people in the community, including one of Sanders's uncles, who say without reservation and in the strongest terms possible that Sanders is totally dishonest and unbelievable, and that this is the opinion by acclamation in the community as a whole.  (Exhibit 90; Exhibit 70; Exhibit 94; Exhibit 76; Exhibit 13; Exhibit 95.)  Sanders claimed that he and Janesse Thomas bought

drugs at Mr. Barrett's a few days before the shooting incident.  Ms. Thomas says this is absolutely false.

Is it to be believed that the community as a whole regards Sanders as thoroughly dishonest and untrustworthy, but that Clint Johnson could realistically think he was a reliable informant, about whom nothing had to be revealed to a reviewing magistrate?  It simply does not wash.  Johnson acted with reckless disregard for the truth, at a minimum, in relying on Sanders for information about Mr. Barrett or anyone else, let alone presenting that information in a search warrant affidavit.

The prosecution suppressed exculpatory evidence regarding Sanders's dishonesty. As stated in Claims 1 and 2, Mike Littlefield informed the court of a witness who failed to corroborate Sanders.  This would have assisted in establishing a *Franks* claim, and in generally impeaching Sanders, but the evidence was never revealed to the defense.  The transcript of this hearing was, however, available to direct appeal counsel.

Then there is Clint Johnson himself.  The Government suppressed *Brady* evidence that before, during and after Mr. Barrett's trial, Johnson was caught in a web of his own bad acts, deceit and corruption,  including abuse of his position of trust; passing hot checks; failing to control his informants and neglecting to properly supervise and document their activities; failure to account for funds and evidence; theft of drug fund money; kickback schemes; dishonesty with his superiors; and likely drug use, as he tooled around in his drug task force car with drug paraphernalia, marijuana and methamphetamine, none of it properly packaged and marked as evidence.  Johnson was fired from the District Attorney's Office a little over two weeks after Mr. Barrett was formally sentenced.  In sum, Johnson and Sanders were birds of a feather:  both liars, both drug addicts, both trading lies for favorable treatment from law enforcement.

With respect to Johnson's request for a no-knock, nighttime warrant, which was predicated on information from the C.I. that Mr. Barrett had threatened law officers, Johnson acted with reckless disregard for the truth by omitting mention of the fact that local law enforcement, including Sheriff John Philpot, had been to Mr. Barrett's residence less than a month before, and encountered no resistance. (Exhibit 6.)

A search warrant must be voided and the fruits suppressed when 1) it is found the affiant knowingly or recklessly included false statements *or omitted material information from the affidavit in support of a search warrant,* and 2) it is concluded that after excising such false statements and considering such material omissions, the corrected affidavit does not supply probable cause to search. *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978); *United States v. Kennedy,* 131 F.3d 1371, 1376 (10th Cir. 1997).

Here, at a minimum, when the omitted material information about the reliability of the informant is considered, probable cause could not have been found, because Sanders's history, character, actions and reputation would show him and his word to be totally unreliable. Johnson called Sanders "reliable," a deliberately false or reckless statement in itself, and omitted an avalanche of information, detailed above and elsewhere in this motion, that would have proved the exact opposite to any reasonable magistrate. Had Johnson given a true picture of his C.I.'s numerous crimes of dishonesty; his motivation to accuse others of wrongdoing in order to escape punishment for his own acts, for which he received deal after deal instead of the hard prison time he deserved, after which he continued to commit crimes; his violations of the terms of probation; his bond forfeitures and failures to appear; the number of arrests; the number of convictions; his chronic drug use; and his bottom-of-the-barrel reputation in the community for

anything even remotely approaching honesty and trustworthiness, no neutral, detached magistrate would find probable cause.

Johnson's failure to mention that less than a month before securing the warrant, Sheriff Philpot and other officers had been to Mr. Barrett's without incident, was material to the request for a no-knock, nighttime search warrant. In failing to mention this crucial fact, Johnson acted with reckless disregard for the truth. Had the magistrate been informed of this, the averment in the affidavit that Mr. Barrett, according to the "reliable" C.I., had "threatened" law enforcement would have been rendered meaningless, and no cause for a no-knock, nighttime warrant would have been established, even aside from the question whether any warrant should issue at all.

Although defense counsel raised a *Franks* issue, however incompletely, at trial, and there were certainly indications of Sanders's deplorable criminal record and rampant dishonesty in the ever-shifting sands of his testimony, appellate counsel failed to raise the issue on direct appeal, either as a freestanding argument under *Franks*, or one coupled with an ineffective assistance of trial counsel argument. (Exhibit 29.) *See* Claim 18, *infra*. Mr. Barrett is of course requesting an evidentiary hearing on each factual issue raised in this motion, and specifically requests a *Franks* hearing, or its equivalent. He has more than made the requisite showing.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 5.**    **Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Convictions and Sentences Based on Newly Discovered Evidence.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

### Introduction

The Government had an affirmative duty to learn about evidence favorable to the defense, whether as to liability or punishment, including, of course, impeachment material, in the possession of law enforcement agencies, and disclose that evidence to Mr. Barrett's counsel. *Banks v. Dretke,* 540 U.S. 668, 696 (2004); *Strickler v. Green,* 527 U.S. 263 (1999); *Kyles v. Whitley,* 514 U.S. 419, 437 (1995); *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Bowen v. Maynard,* 799 F.3d 593, 610 (10th Cir. 1986) (*Brady* obligations extend to impeachment evidence); *Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir. 1984); *United States v. Osorio,* 929 F.2d 753, 761 (1st Cir. 1991); *United States v. Libby,* 429 F. Supp.2d 1, 10-11 (D. D.C. 2006). This duty extended beyond the point in time when any individual witness testified, and has continued to the present day.  *Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir. 1997); *United States v. Quintanilla,* 193 F.3d 1139, 1146-49 (10th Cir. 1999)(citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987)); *Steidl v. Fermon,* 494 F.3d 623, 630 (7th Cir. 2007)("For evidence known to the state at the time of trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings"); *High v. Head,* 209 F.3d 1257, 1265 n.8 (11th Cir. 2000).  *See also, Banks,* 540 U.S. at 696; *Giglio,* 405 U.S. at 155;

*United States v. Kojayan,* 8 F.3d 1315, 1320, 1323-25 (9th Cir. 1993); *Thomas v. Goldsmith,* 979

F.2d 746, 749-50 (9th Cir. 1992)(prosecution has an obligation to turn over exculpatory evidence

relevant to habeas proceedings, even if it was not discovered prior to the close of trial);

Fed.R.Crim.P. 16 ( c); Fed.R.Civ.P. 26(g)(1).  *Cf.  Imbler v. Pachtman,* 424 U.S. 409, 427, n. 25

(1976)(under ABA Criminal Justice Standard 3-3.11, commentary, "A prosecutor may not

properly refrain from investigation in order to avoid coming into possession of evidence that may

weaken the prosecution's case ... The duty of the prosecutor is to acquire all the relevant

evidence ...").

This duty also extends to any member of law enforcement acting on behalf of

government agencies, whether or not the prosecutor has personal knowledge of the evidence in

question, and whether or not the information is in possession of law enforcement agencies and

officials outside the prosecuting agency itself.  *United States v. Antone,* 603 F.3d 566, 569 (5th

Cir. 1979)(facts known to state law enforcement personnel imputed to federal prosecutors when

"the two governments ... pooled their investigative energies to a considerable extent.")

To establish a *Brady* violation, a Movant must show: (1) that the prosecution

suppressed evidence; (2) that the evidence was favorable to the defendant either as to guilt or

punishment; and (3) that the evidence was material.  The good faith or bad faith of the

prosecution is irrelevant.  Evidence is "material" only if there is a reasonable probability that, had

the evidence been disclosed, the outcome of trial would have been different.  *Fero v. Kerby,* 39

F.3d 1462, 1472 (10th Cir. 1994), citing *United States v. Bagley,* 473 U.S. 667, 682 (1985).  To

prevail, a Movant need not show that it is more "probable than not" that had the evidence been

disclosed, the outcome would have been different.  Rather, the question is whether, considering

the cumulative effect of the suppressed evidence, *Kyles*, 514 U.S. at 436, "disclosure of the

suppressed evidence to competent counsel would have made a different result reasonably probable." *Id.*, at 441.

Newly discovered evidence, *i.e.,* evidence which could not have been discovered by the exercise of due diligence before or during trial, may also form the basis for relief under § 2255. *E.g., United States v. Hernandez,* 94 F.3d 606 (10th Cir. 1996)(rejecting newly discovered evidence claim raised in initial 2255 petition, which was filed during pendency of direct appeal, on the merits); (Fed. R. Crim. P. 33.)  To warrant relief on a claim of newly discovered evidence, it must be shown: 1) that the evidence was discovered after the trial; 2) that failure to learn of the evidence was not caused by a lack of diligence; 3) the evidence is not merely impeaching in character; 4) the evidence is material to the principal issues involved; and 5) the evidence is of such a nature that, had it been disclosed to the jury, there is a reasonable probability of a different outcome, *i.e.,* acquittal or a lesser sentence.  *Peltier v. Booker,* 348 F.3d 888, 890 (10th Cir. 2003); *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997).

A *Brady* claim may be a subspecies of a newly discovered evidence claim.  *United States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10th Cir. 1999).  Whether the claims made below constitute *Brady* violations, newly discovered evidence, or both, Mr. Barrett is entitled to relief from his convictions and sentences.

The prosecution in Mr. Barrett's case suppressed, before, during and after trial, exculpatory evidence relevant to several key witnesses.  Deals or leniency given to these witnesses in exchange for their testimony in Mr. Barrett's case and, with respect to Charles Sanders, deals he received in other cases because of his supposed work as an informant, were not disclosed.  Threats to witnesses to get them to cooperate with the Government were not disclosed.  Relevant to this were the ongoing criminal activities of former AUSA Mike

Littlefield, which came to light in 2007, when he was allowed to enter an *Alford* plea in Muskogee County District Court to charges of physically abusing his own children, the relevance of which is explained in Claim 5, Part B.2, *infra*.  Among other misdeeds, Littlefield suppressed exculpatory evidence regarding one of the seven informant witnesses that was made known to the court during the improper *ex parte* hearing on the Government's motion to delay disclosure of the identities of its seven informant witnesses, but never disclosed to the defense.  (*See* Claim 1, *supra*.)

Some of the evidence discussed below was relevant not only to the credibility of witnesses, but the propriety of the initial nighttime, no knock search warrant that was secured by Drug Task Force agent Clint Johnson, based on the good word of Charles "Monk" Sanders.  The Government or its agents were aware of numerous impeaching facts regarding acts of dishonesty and criminality of Clint Johnson and his girlfriend, OSBI agent Vickie Lyons, none of which were revealed to the defense.

Most egregious of all, the Government knowingly used perjured testimony from Randy Turman, who claimed that a Sequoyah County felony case had been disposed of and was no longer active when it was in fact open, giving Turman every reason to fashion his testimony to the Government's liking.  The same could also be said for its tactic of implying to the jury that the most it would do for Charles Sanders was "talk to" the prosecutors in Sequoyah and Tulsa Counties about his cases there, to let them know that Sanders had cooperated in the federal case against Mr. Barrett.  At the improper *ex parte* hearing discussed in Claim 1, AUSA Littlefield told the court that he knew the identify of an informant witness who failed to corroborate Charles Sanders.  Thus, it could be said the Government knew Sanders's testimony was false, as was the basis for the search warrant secured by Clint Johnson.  In any event, the Government failed to

disclose exculpatory evidence of the witness who failed to corroborate Sanders. The

Government also sponsored false testimony from Travis and Cindy Crawford. Newly discovered

evidence reveals that their testimony was the product of threats and intimidation. *See Giglio v.*

*United States,* 405 U.S. 150 (1972); *Giles v. Maryland,* 386 U.S. 66 (1967); *Miller v. Pate,* 386

U.S. 1 (1967); *Napue v. Illinois,* 360 U.S. 264 (1959); *Mooney v. Holohan,* 294 U.S. 103 (1959).

If the jury's verdict could be affected by false testimony presented by the prosecution – as it

surely was here – a new trial is required.

> **A.** **Suppressed Exculpatory Evidence, Evidence of Knowing use of Perjured Testimony, and Newly Discovered Evidence**
>
> **1.** **Evidence regarding informant witnesses Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman entitles Mr. Barrett to relief from his convictions and sentences.**
>
> **a.** **Charles "Monk" Sanders**

The prosecution suppressed deals given to Charles "Monk" Sanders in Sequoyah

and Tulsa Counties in exchange for his testimony, in both stages of trial, against Mr. Barrett. In

examining Sanders at trial, AUSA Littlefield merely stated, and Sanders agreed, that he would

speak to the authorities in Sequoyah and Tulsa Counties regarding Sanders's cooperation,

implying there were no guarantees anything would be done. (R. 2495.) In fact, near the end of

Mr. Barrett's trial on November 17, 2005, Sanders got a sweetheart deal on his active Sequoyah

County cases, and more favors shortly thereafter, all due to a "plea agreement with feds."

Favorable disposition of Sanders's active Tulsa County case was delayed until after Mr. Barrett's

trial. The prosecution cynically attempted to jettison its *Brady* obligations with respect to

Sanders's testimony by either failing to reveal deals it knew were in the works, and/or postponing

the culmination of those deals until the end of Mr. Barrett's trial or shortly after its conclusion. The Government's ploys in these regards plainly violated the *continuing duty* to disclose *Brady* evidence. Moreover, the prosecution violated its *Brady* obligations by failing to disclose to the defense Sanders's complete criminal history, which could have and should have been used for impeachment purposes. It was argued in Claim 2 that trial counsel were ineffective in failing to cross-examine Sanders about all his previous criminal convictions and dismissed cases; counsel unreasonably failed to make a search of Sanders's available court files. Above and beyond that failing, the prosecution was obligated under *Brady* to reveal Sanders's complete criminal history to the defense, since it constituted impeachment evidence. The prosecution failed to do so, papering over Sanders's appalling criminal history on direct examination, and leaving defense counsel to simply scratch the surface based on what counsel was able to glean from the Department of Corrections website.

Of course, Sanders's alleged information was the basis upon which the no-knock warrant was secured.. Sanders's testimony was critical to the drug charges which underlay the various counts of the superseding indictment, and to the Government's arguments on malice and intent with respect to both stages of trial.

As noted in Mr. Barrett's first stage ineffective assistance of counsel argument respecting trial counsel's failure to impeach Sanders with the number and nature of his previous convictions (Claim 2, section A.4, *supra*), as well as favorable treatment he had received in these and other cases, Sanders had convictions in Sequoyah County Case No. CF-98-346, (for which he originally received a twenty year suspended sentence, of dubious legality due to his numerous prior convictions), for the felony offense of possession of methamphetamine. Sanders was also charged in this case with a misdemeanor count for possession of drug paraphernalia, which was

dismissed pursuant to plea bargain.  Two applications to revoke Sanders's suspended sentence were filed.  Initially, five years of the suspended sentence was ordered revoked, but the balance would again be suspended if Sanders completed a Department of Corrections drug program.  The revocation was ordered to run concurrently with similar dispositions Case Nos. CF-98-363, CF-99-562, CF-04-19 and CF-03-124.  Exhibit 160.)

In CF-98-363, Sanders received another twenty year suspended sentence for uttering a forged instrument, to run concurrently with the sentences in Case Nos. CF-99-562 and CF-98-346.  Similar applications to revoke were filed in this case based on Sanders's failure to abide by the terms and conditions of probation, in part because he committed new offenses.  Initially, as with CF-98-346, the court ordered five years of the sentence to be revoked, with the balance to again be suspended in full upon completion of the drug program. The revocation in this case was ordered to run concurrently with similar actions taken in Case Nos. CF-98-346, CF-99-562, CF-03-124, and CF-04-19.  (Exhbit 161.)

In CF-99-562, in which Sanders was initially charged with three counts of concealing stolen property, uttering a forged instrument, felonious possession of a sawed-off shotgun, and a misdemeanor charge of possession of marijuana, he was allowed to plead to a single count of concealing stolen property, with the other counts dismissed.  He originally received a twenty year suspended sentence.  Again, applications to revoke were filed due to Sanders's commission of new crimes and for otherwise failing to adhere to the terms of his probation.  Five years of the sentence was revoked, the balance again to be suspended upon completion of an in-house drug program.  The sentence in this case was ordered to run concurrently with similar dispositions in Case Nos. 98-346, 98-363, 03-124 and 04-19.  (Exhibit 162.)

In Case No. CF-03-124, Sanders was allowed to plead guilty to two counts of feloniously running a roadblock, with the other charges dismissed. Sanders received concurrent twenty-five year sentences on the two counts of conviction, with all but five years suspended, and with the entirety of the terms to be suspended on successful completion of the drug program. The sentences in this case were ordered to run concurrently with the sentences in Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19. (Exhibit 164.)

In Case No. CF-04-19, Sanders was eventually charged in an amended information with second degree burglary, second degree arson, concealing stolen property, and feloniously carrying a firearm. The firearm charge was dismissed pursuant to the plea agreement. On the three remaining counts, Sanders was sentenced to concurrent terms of twenty-five years, with all but the first five years suspended and, yet again, the balance to be suspended upon completion of the drug program. The sentences in this case were ordered to run concurrently with the sentences in Case Nos. 98-346, 98-363, 99-562 and 03-124. (Exhibit 165.)

The Government violated Mr. Barrett's due process rights by failing to disclose that on November 17, 2005 (the final day of Mr. Barrett's trial), and because of his testimony in Mr. Barrett's trial, amended judgments and sentences were entered on behalf of Sanders in all of the above-described cases, with a filing date of November 23, 2005 (well before Mr. Barrett's formal sentencing) ordering that Sanders receive straight suspended sentences across the board. Moreover, in each of the cases discussed above, an order was entered on April 3, 2006, making Sanders's suspended sentences in these cases unsupervised by the Department of Corrections, even though the sentences did not expire until 2030. This was done, according to the notations on the orders, "***per plea agreement with feds***." (Emphasis added). Finally, on December 8, 2008,

orders were entered in each of these cases relieving Sanders of the obligation to pay any outstanding fines or costs.  (*See* the above listed Sequoyah County court files.)

Sanders received similar largesse as the result of his testimony against Mr. Barrett in his pending Tulsa County Case, disposition of which, as noted in the ineffective assistance of counsel argument, was delayed until Sanders could perform for the Government in Mr. Barrett's trial.  In Tulsa County Case No. CM-04-1187, Sanders's case was passed from November 13, 2005 until November 17, 2005 (the last day of Mr. Barrett's trial), and was again passed from November 17 until December 9, 2005.  At that time, instead of facing jail on his misdemeanor drug possession and possession of drug paraphernalia charges, despite his numerous prior convictions, because of his testimony against Mr. Barrett, Sanders received concurrent one year suspended sentences.

During the pendency of this 2255 action, investigators for Mr. Barrett have attempted repeatedly to interview Sanders, but were stymied.  Sanders initially told a defense investigator he would meet with him, and had things he wanted to discuss, but dodged all subsequent attempts at an interview.  However, when a defense investigator spoke to Sanders's mother, Evelyn Sanders, regarding her son's testimony against Mr. Barrett, she revealed that Sanders had been promised a number of things in exchange for his testimony that he never received. (Exhibit 14.)  This witness's statement suggests that aside from the leniency he got, Sanders was given other inducements by the Government to testify against Mr. Barrett.

Not only did the prosecution flatly violate *Brady* and its progeny by failing to disclose Sanders's deals in the particular cases discussed above, it wantonly violated its *Brady* obligations by failing to reveal the jaw-dropping favorable treatment Sanders had received in *all his* Sequoyah County and other cases, as detailed in the ineffectiveness of counsel claim.  Taken

together, this evidence would have destroyed Sanders's credibility, shown his motive to lie, and would have shown, contrary to this court's order, that Clint Johnson – whose nefarious, but never revealed, acts of dishonesty and criminality are discussed below – could not have reasonably relied on "information" from Sanders to establish probable cause for the no-knock search warrant, which was the poisonous tree from which the later search warrants resulting in the recovery of drug and firearms related evidence grew.

When the prosecution falsely suggested it would merely "talk to" county prosecutors, even though Sanders received deals on the last day of Mr. Barrett's trial in Sequoyah County and shortly thereafter in Tulsa County, and Sanders agreed with this assessment of the situation, it sponsored materially false testimony. *Giglio v. United States,* 405 U.S. 150 (1972). At a minimum, the Government failed in its duty to correct false testimony. *Giles v. Maryland*, 386 U.S. 66 (1966); *Alcorta v. Texas*, 355 U.S. 28 (1957).

### b. Travis Crawford.[51]

During the investigation conducted for this 2255 motion, Mr. Barrett has discovered that one of the key witnesses in the first stage of trial, Travis Crawford, lied about material matters. Travis Crawford supplied testimony critical to the Government's case for malice and intent, at least as to count 3 of the superseding indictment. Crawford's testimony was also crucial to establishing the intent elements in the punishment phase of trial. Crawford's testimony was summarized in the claim regarding ineffective assistance of counsel in the first stage of trial, and will not be repeated here.

---

[51] At the time Mr. Barrett filed his original Motion to Vacate, Mr. Crawford had declined to sign a declaration reflecting what he told defense investigator Leonard Post. Mr. Crawford has since signed his declaration to the information he gave a defense investigator prior to Mr. Barrett's initial filing. (*See* Exhibit 91; Exhibit 92; Exhibit 31; and, Exhibit 45.)

When Crawford was interviewed in the presence of his parents on December 11, 2008 by defense investigator Leonard Post, he recanted his trial testimony. To summarize, Mr. Crawford told Mr. Post the following:

Mr. Barrett's habit of not leaving his property had been established several years before the raid which led to Trooper Eales's death. At trial, of course, the prosecution contended that Mr. Barrett rarely left his property only after he supposedly learned there was a warrant for his arrest on the Sequoyah County drug charge. (Exhibit 45.)

Mr. Crawford stated that he has anxiety and psychological problems, something he was not cross-examined on at trial.[52] Although he was a long-time methamphetamine addict, he told Mr. Post he had been off drugs for four months preceding Mr. Post's interview. Before finally getting off drugs, Crawford had been a daily methamphetamine user for years preceding Mr. Barrett's arrest in this case and during Mr. Barrett's federal trial. (Exhibit 45.) Thus, Crawford's trial testimony to the effect that he was not a drug addict or under the influence of drugs at the time he testified against Mr. Barrett was false.

Mr. Crawford stated that at the time he was interviewed by then-AUSA Mike Littlefield regarding Mr. Barrett, he was "living in so many places and was so strung out" on drugs, that he did whatever he was told by anyone in authority in order to stay out of trouble. Mr. Crawford states that when he was interviewed by Mr. Littlefield, he was high on drugs.

---

[52] These problems and his drug abuse also doubtless contributed to the difficulties he had while in the military, which Mr. Crawford alludes to in his declaration, and his spotty employment history. Travis Crawford's military records reflect that he went AWOL four times, and suffered at least one conviction at a court-martial. Mr. Crawford was not honorably discharged. (Sealed military records of Travis Crawford.) He also did not maintain steady employment in the years preceding or following the assault on Mr. Barrett's home. (Exhibit 143.)

Moreover, anybody who had been around drug addicts for any period of time (which surely includes Mr. Littlefield and then-Sequoyah County Sheriff John Philpot, who took Crawford to Muskogee to be interviewed by Littlefield)  would have known Crawford was high.  Not only was Mr. Crawford under the influence of illicit drugs at the time he was interviewed by Littlefield, but he was also high when he testified in the first stage of Mr. Barrett's trial.  Crawford stated that the other informant witnesses who testified against Mr. Barrett were high and strung out on drugs at the time of their testimony.  (Exhibit 45.)

When Sheriff Philpot took Crawford to Muskogee to be interviewed by Mike Littlefield shortly before Mr. Barrett's trial, Crawford felt he "was already arrested" and did not know "if [he] was ever going to come back home."  When Littlefield interviewed him at the United States Attorney's Office, Mr. Crawford was terrified about losing his freedom.  Consequently, he said whatever he thought it was Littlefield wanted him to say.  Mr. Littlefield asked Travis Crawford if Kenneth Barrett ever said he (Mr. Barrett) was "going to go down in a blaze of glory" if the police ever came onto his property.  Littlefield made it clear to Crawford what the appropriate answer was.  Crawford stated that before he could answer, Littlefield threatened him, stating bad things would happen to him if he "lied."  Where a witness is pressured to testify, the prosecution has every reason to believe that the product of that coercion will be false testimony.  Mr. Crawford stated he was scared and panicked, and therefore told Littlefield that Mr. Barrett had made this statement.  According to Mr. Crawford, the truth was otherwise: *Mr. Barrett never made such a statement, or anything like it, at any time*.  (Exhibit 45.)

Travis Crawford's recantation is corroborated by witnesses who were present at Mr. Barrett's house on September 23, 1999, but were not called to testify at trial.  *See* Claim 2,

section A.4, *supra*.  Rick Lunsford and Brandy Hill are adamant in stating the Mr. Barrett never made such a statement.  (Exhibit 90; Exhibit 77.)

Because the Government and its agents knew or had reason to know that Crawford was a drug addict at the time he was interviewed by the prosecution, and at the time he testified at trial, the Government was obligated to disclose this information under *Brady*.  Due process and the rules of professional conduct required AUSA Littlefield to correct Travis Crawford's false testimony about being off drugs.  The same is true of at least some of the other informant witnesses, whom Mr. Crawford states were high at the time of their testimony.  Moreover, the Government plainly violated its *Brady* obligations by failing to reveal Littlefield's threats to induce cooperation and shape Crawford's testimony.  *Crivens v. Roth,* 172 F.3d 991, 998-99 (7th Cir. 1999)(prosecution violated *Brady* where police had intimidated key witnesses to murder of police officer, and failed to disclose material information as to who was seen carrying the murder weapon moments after the shooting).

Mr. Crawford admitted that before he became a witness against Mr. Barrett, he had previously worked as a snitch for local law enforcement, setting up drug buys at the direction of the authorities in exchange for escaping bogus check charges he was facing.  Crawford stated that he testified regarding the controlled drug buys in state court, even though the police had promised him he would not have to do so.  (Exhibit 45.)  Crawford's history as an informant was not testified to at trial, though it was known to the Government or its agents.  Crawford's work as a snitch was exculpatory evidence affecting his credibility.  By failing to inform the defense of this fact, the Government violated is *Brady* obligations.

In marked contrast to what the Government attempted to portray at Mr. Barrett's trial regarding the "necessity" for a no-knock warrant and the armed raid on Mr. Barrett's

Amended § 2255 Pet.                                   297                        *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

property, Travis Crawford stated that only two weeks or so before the raid, Sheriff John Philpot had gone to Mr. Barrett's residence and inspected his firearms without incident.  (Exhibit 45.)

This information is consistent with that given by Janice Sanders and Sylvia Gelene Dotson, who, though never asked by trial counsel, state that Sheriff Philpot and other law enforcement agents were at Mr. Barrett's house mere weeks before the raid.  *See* Claim 2.  As shown below, ex-Sheriff Philpot recently admitted to a defense investigator that he indeed was at Mr. Barrett's less than a month before the raid, and encountered no violence or threats.  Mr. Barrett was not arrested on his outstanding failure to appear warrant.  (Exhibit 6.)  This exculpatory evidence, of which the Government and/or its agent Mr. Philpot was well aware, was concealed from the defense in violation of *Brady.*

Again in contrast to what Mr. Crawford implied in his testimony, and to what the Government argued at trial, he recently stated that while Mr. Barrett told him he had a pending state drug charge, he was not overly concerned with it.  Mr. Barrett never told Crawford he had an outstanding warrant, and was thus laying low and hiding from the law.  Crawford simply assumed that having an active case meant the same thing as having an active arrest warrant. (Exhibit 45.)

At trial, with the aid of Mr. Crawford's testimony, the Government made much of the sign posted on the gate, construing it as a threat to law enforcement.  Mr. Crawford states that the sign was posted as a warning to anyone coming on the property in order to prevent trespassing and theft.  (Exhibit 45.)[53]

---

[53] At the time the original 2255 motion in Mr. Barrett's case was filed, Travis Crawford had declined to sign a declaration reflecting his statements to a defense investigator currently working for Mr. Barrett.  Thus, declarations reflecting what Mr. Crawford said were filed by his

(continued...)

Evidence of Crawford's recantation is newly discovered, and could not have been discovered with the exercise of due diligence before or during trial, because the Government sprung the existence of Crawford and the other informant witnesses (without initially giving their names) after juror qualification had begun, and Crawford refused to be interviewed by the defense. Crawford's recantation pulls the rug out from under the prosecution's arguments respecting malice and intent in both stages of trial. Crawford was *the key Government witness* in this respect, because he testified that only hours before the raid, Mr. Barrett talked about the police "drive-by," the "fact" that they were coming back, that he (Mr. Barrett) "[didn't] give a fuck," and that he (Mr. Barrett) was going to go out in a "blaze of glory." Crawford's recantation also undermines the Government theory that Mr. Barrett only stayed close to home, and was thus lying in wait for a supposedly inevitable police raid, after he supposedly learned that he had a warrant out for his arrest.

### c.      Cindy Crawford.

As outlined in the first stage ineffective assistance of counsel argument (Claim 2, section A.4, *supra*), Cindy Crawford testified in the guilt/innocence stage of trial regarding drug activity she witnessed at Mr. Barrett's home, and Mr. Barrett's supposed threats to law enforcement if his property were raided. In the penalty phase of trial, Cindy Crawford testified that on one occasion, Mr. Barrett, after she rebuffed his sexual advances and was leaving his residence with Richie Barrett, came out of the house, put the barrel of a rifle up to her leg, and threatened to kill her.

---

[53](...continued)
parents, Roger and Phyllis Crawford, and defense investigator Leonard Post. During the continuing investigation following the filing of the 2255 motion, Mr. Crawford has signed his declaration.

Leonard Post and another defense investigator currently working on Mr. Barrett's case, Dale Anderson, interviewed Cindy Crawford on January 13, 2009. Like her husband, Cindy Crawford refused to *read* a declaration which faithfully recounted what she told Messrs. Post and Anderson. (Exhibit 31.) Mr. Post's and Mr. Anderson's declarations detail what Cindy Crawford told them, which is summarized as follows.

Cindy Crawford explained how she was contacted by the Government. According to her, one to two weeks before she testified in the first stage of Mr. Barrett's trial, Sequoyah County Sheriff John Philpot came to see her. Philpot told her she had to go with him. Although Ms. Crawford was unsure whether she was under arrest, it was clear to her that she had no choice but to go with Sheriff Philpot. She was driven by Mr. Philpot to the United States Attorney's office in Muskogee, where she was interviewed by Mike Littlefield in Littlefield's office. (Exhibit 31; Exhibit 14.)

Armed law enforcement officers were also present during the interview. They showed Ms. Crawford several firearms which looked similar to ones she had seen in Mr. Barrett's cabin. In order to secure her cooperation and testimony, Mike Littlefield threatened her. Littlefield told her she need to work with him and testify against Mr. Barrett. Otherwise, she was going to prison. Littlefield pointedly reminded her that she was then under a five-year deferred sentence in a drug case. Littlefield told Ms. Crawford that Mr. Barrett's residence had been under surveillance for six months preceding the raid, and that she had supposedly been observed on his porch acting as a "lookout" while methamphetamine was cooked on the property.[54] While Ms.

---

[54] Consistent with her first stage trial testimony, Cindy Crawford told Mr. Post and Mr. Anderson that she never saw Mr. Barrett cook methamphetamine on his property. She had done drugs at Mr. Barrett's residence, but did not know who supplied them. Ms. Crawford never

(continued...)

Crawford states that she had no pending charges at the time she was interviewed by Littlefield, she had recently lost a child to foster care. Along with the threat of prosecution, the possibility that she would not get her child back unless she played ball with the Government hung in the air throughout the interview. (Exhibit 31; Exhibit 14.)

According to what Ms. Crawford recently told Mr. Barrett's defense investigators, Mike Littlefield not only threatened her, but coached her testimony. Littlefield told her to make Mr. Barrett appear violent and an imminent threat to those around him. Again issuing threats, Littlefield told her that she risked a perjury charge if she did not testify in this manner. Littlefield emphasized that he could make it extremely hard on her if she did not testify against Mr. Barrett. (Exhibit 31; Exhibit 14.)

In addition to the threats, Ms. Crawford described the interview taking place in an intimidating atmosphere. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside. It was her belief that she was not free to decline to be interviewed, to terminate the interview, or to leave. Mr. Philpot had driven her to Muskogee, and she had no way back other than him. Ms. Crawford expressed the sentiment that she was not going to cross Sheriff Philpot due to his reputation for violence. (Exhibit 31; Exhibit 14.)

Ms. Crawford was interviewed by the Government separately from her husband, Travis. After both had been interviewed, Travis Crawford told her that Philpot had told him that if he (Travis) said the right things on the witness stand, he would not get into trouble. (Exhibit 31; Exhibit 14.)

---

[54](...continued)
bought drugs from Mr. Barrett. (Exhibit 31; Exhibit 14.)

1802

Mike Littlefield and John Philpot discouraged her from talking to Mr. Barrett's lawyers. Both told her that she did not have to talk to the defense. According to Ms. Crawford, the clear implication was that she should not speak to the defense. (Exhibit 31; Exhibit 14.)

Like her husband Travis Crawford, Cindy Crawford was under the effects or after-effects of heavy methamphetamine use at the time she was interviewed by Mr. Littlefield and law enforcement at Littlefield's office. At the time of the interview in the prosecutor's office, Cindy Crawford was just coming down from a two day methamphetamine high. She also admitted to being in the same condition when she testified against Mr. Barrett, because her heavy drug use was ongoing at the time of his trial. That her drug use affected what she told Mr. Littlefield and testified to at trial is apparent from her recent comment to Mr. Barrett's current investigators: "If you had ever crashed from a meth high, you would know that you would not be in your right mind." (Exhibit 31; Exhibit 14.)

Although, on cross-examination in the second stage of trial, Cindy Crawford told defense counsel she suffered from PTSD, her mental condition was not inquired about during her first stage testimony, and was not effectively exploited by counsel in the penalty phase, largely because Crawford refused to be interviewed by trial counsel. (*See* Claim 2) Because Crawford refused to be interviewed, there are facts about the manner in which her mental condition impacts her credibility that were only recently discovered.[55] (Exhibit 144.) According to what Ms. Crawford told Mr. Post and Mr. Anderson, one of the symptoms of her PTSD is that she overreacts in stressful situations, sometimes to the point of passing out. She admitted that when she is under stress, she may not perceive things correctly. This causes her to exaggerate what is

---

[55] Cindy Crawford executed a release authorizing Mr. Barrett's counsel to obtain her medical records.

going on around her. Ms. Crawford told Mr. Post and Mr. Anderson that when she testified in the penalty phase about Mr. Barrett allegedly pressing a gun to her leg, her mental condition very well could have caused her to overreact and embellish the incident. At the conclusion of her recent interview with the defense investigators, Cindy Crawford told them that having given this alleged incident more thought, she was positive she had overreacted to it. She emphasized that Mr. Barrett had a history of being nice and helpful to her. (Exhibit 31; Exhibit 14.)

However, even Ms. Crawford's claim to have overreacted is a fabrication. A readily available witness to the alleged event, Richie Barrett, states that neither the incident Crawford described nor anything like it ever happened. (*See* Claim 2; Exhibit 104; Exhibit 31.)

Between her first stage and second stage testimony, the prosecution subjected Cindy Crawford to more threats. The Government was upset with her first stage performance on the witness stand because she denied seeing chemicals or equipment for making methamphetamine at Mr. Barrett's cabin or on his property, and because she had not made Mr. Barrett seem threatening or violent. To quote Ms. Crawford, "They [the Government] were very angry. They scared me and threatened me." Again, according to Ms. Crawford, while the Government never told her explicitly that she could lie and fabricate during her testimony, it was implied that she could say whatever she wanted, true or not, so long as it helped the Government's case. (Exhibit 31; Exhibit 14.)

In several areas, the Government violated its *Brady* duties with respect to Cindy Crawford. Ms. Crawford implied during her first stage testimony that she was off drugs ( R. 3070), but, based on what Ms. Crawford recently told defense investigators, this was incorrect. The Government or its agents, based on its observations of Ms. Crawford, had to know that she was a drug user both at the time she was interviewed by Littlefield and when she

gave testimony.  If not, this evidence is at a minimum newly discovered.  It is also submitted that the Government or its agents were aware of Cindy Crawford's mental problems, but this was only revealed, and not developed well, when she volunteered this information to trial counsel during cross-examination in the penalty phase of trial.  The Government's intimidation of and threats to Cindy Crawford, as well as disgraced former AUSA Mike Littlefield's "coaching" of her testimony, were well known, obviously, to Littlefield himself and the law enforcement officers who participated in Crawford's interview at Littlefield's office.  The Government's failure to reveal these facts is a *Brady* violation as well as newly discovered evidence.  *Crivens v. Roth,* 172 F.3d 991, 998-99 (7th Cir. 1999).  The impeaching evidence related above would have seriously undermined Cindy Crawford's credibility.  More significantly, where, as with Cindy Crawford, a witness is threatened and coached, the prosecution is guilty of knowingly sponsoring materially false testimony and/or failing to correct false testimony in violation of Mr. Barrett's right to due process of law.  *Giglio*, *supra*; *Giles*, *supra*; *Alcorta*, *supra*.

Additionally, as reflected by the declarations of several available witnesses whom the defense did not call at trial to impeach Cindy Crawford's credibility, it was well known in the community that she acted on a regular basis as a snitch for local law enforcement.  This *Brady* information was never revealed, and the Government or its agents had to know about it.

The fact that Crawford received favor from the authorities from acting as a snitch, against Mr. Barrett or others, is demonstrated by the manner in which her conviction in Sequoyah County Case No. CF-2004-613 was handled.  Crawford was originally charged with felony possession of marijuana, because she had incurred a previous marijuana possession conviction.  On April 28, 2005, she entered a no contest plea to a misdemeanor and received a five year deferred sentence.  She received a one year deferred sentence on count 2, which charged

misdemeanor possession of drug paraphernalia. On March 20, 2005, an application to accelerate Ms. Crawford's deferred sentence was filed because she failed to make a required payment. On July 17, 2005, shortly before Mr. Barrett's trial commenced, a bench warrant was issued for failure to appear. On April 24, 2006, after Mr. Barrett's trial, an application to dismiss the acceleration action was filed because Crawford had finally "paid in full." (Exhibit 170.) Thus, when she testified at Mr. Barrett's trial, an acceleration action for failure to comply with the terms of her deferred sentence was pending, but this impeaching information, which could have been used to argue that Crawford had a motive to please the prosecutors lest her deferred sentence be accelerated, was not disclosed. *Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003).

The *Brady* violations committed by the Government with respect to Cindy Crawford could also be considered a form of newly discovered evidence that could not have been discovered with the exercise of due diligence. As with all the informant witnesses, her identity was not revealed until the eleventh hour, the Government kept her under tight wraps, and she refused to speak with the defense.

Cindy Crawford continues to milk benefits from her work as an informant, and her testimony against Mr. Barrett, up to the present day. She was charged in Sequoyah County Case No. CF-08-224 with first degree burglary and conspiracy on June 18, 2008, which was amended on July 13, 2008. The first degree burglary charge carried from seven to twenty years. The conspiracy charge carried up to ten years. On December 15, 2008 she received an almost unheard of two year deferred sentence on the first degree burglary charge, with the conspiracy charge dismissed. (Exhibit 169.)

### d. Brandie Zane Price.

Price testified in the first stage of Mr. Barrett's trial. She claimed that she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period. (R. 3485-86.) For various convictions she received in Sequoyah County, she was sentenced to complete the RTP program, a regimented inmate discipline program for females within the Oklahoma Department of Corrections. The balance of her sentences were suspended upon her completion of the program. (R. 3487.) Responding to feeds by prosecutor Littlefield, Price testified that the program "worked," that she was "absolutely" clean of drugs, and, presumably, was not engaging in any drug related activity. (R. 3488, 3497.)

After Mr. Barrett's trial, Brandie Zane Price and others were charged in the Eastern District in a methamphetamine drug distribution conspiracy. *United States v. McAdams, et al.,* No. CR-07-16-RAW. The indictment alleged that the overall conspiracy began "prior to approximately" May, 2006, and continued to February 20, 2007. Significantly, the indictment alleged that beginning approximately January 1, 2006, until June 22, 2006, Price received from the lead defendant in the case, Joseph Alondo McAdams, one pound of methamphetamine per delivery, receiving between one delivery and as many as three deliveries a week. (Doc. 18, CR-07-16-RAW.) (Exhibit 174.) Mr. Barrett's trial concluded November 17, 2005, and he was formally sentenced on December 19, 2005, less than two weeks before the same United States Attorney who prosecuted Mr. Barrett later alleged that Price began receiving large quantities of methamphetamine for resale in a widespread drug conspiracy.

Price was later allowed to plead guilty to a superseding information (Doc. 116, CR-07-16-RAW.) (Exhibit 174) charging that from May, 2006 to February 20, 2007, she distributed and possessed with intent to distribute in excess of 500 grams of methamphetamine, or a mixture or substance containing methamphetamine. A plea agreement, in which Price

agreed to provide all information regarding criminal activities known by her to the Government,

and in which the Government, based on its assessment of the value of her cooperation, agreed, if

appropriate, to move for a Guidelines downward departure, was entered into. (Doc. 121, CR-07-

16-RAW.) (Exhibit 174.)

Price was ultimately sentenced to sixty months imprisonment. (Doc. 218, CR-07-

16-RAW.) (Exhibit 174.) She received a substantial downward departure or variance from the

advisory Guideline range based *on her cooperation and testimony against Mr. Barrett at his*

*federal trial.* Otherwise, the punishment range for the offense of conviction was a mandatory

minimum of ten years imprisonment, a maximum of life, and not less than five years supervised

release. In the September 7, 2007 edition of the *Fort Smith Times-Record*, under the headline

"Drug Offender Receives Break," the news article about Price's sentencing hearing states,

"Price's sentence was significantly impacted by her testimony in the government's case against

Kenneth Eugene Barrett, U.S. Attorney Sheldon Sperling stated in a news release." (Exhibit 70.)

Thus, Price received substantial favor not for her cooperation in the drug conspiracy case in

which she was charged, but for her testimony against Mr. Barrett, which preceded the drug

indictment against her.[56]

Mr. Barrett alleges that the Government or its agents knew full well (or had reason

to know) at the time of Brandie Price's testimony against Mr. Barrett that she was involved in

drug use and drug dealing. This is clearly exculpatory evidence affecting her credibility that was

not disclosed by the Government. Nor, under the Government's continuing duty to disclose

exculpatory evidence under *Brady*, has it been disclosed by the Government that in exchange for

---

[56] The various sentencing memoranda and motion for downward departure are sealed. Docs. 198, 200, 204, 205, 206, No. CR-07-16-RAW.

her testimony against Mr. Barrett, she received a substantial downward departure in her own federal drug case. The deal Price received in her federal drug case based on her testimony against Mr. Barrett is also newly discovered, because it occurred after Mr. Barrett's trial. The Government's knowledge of these facts expose them once again to be the purveyors of false testimony – Ms. Price was not the clean, law-abiding citizen it portrayed her to be.

### e.   Karen Real.

Karen Real was another of the informant witnesses the Government kept under wraps until the eleventh hour, and who refused to talk to the defense. (R. 3076-77.) At the time Real appeared as a Government witness, she was serving a fourteen year federal sentence.[57] During direct examination, AUSA Littlefield asked Real if he ever indicated that he would do anything for her based on her cooperation. Real initially answered "[n]o, sir." Littlefield then asked, "Did I talk about anything I'd say to the court?" Real responded, "Well, you just mentioned that, you know, what I did. And that it would be up to the judge." (R. 3080-81.) On cross-examination, Real testified that while she hoped her testimony against Mr. Barrett could help her with her sentence, she was not really expecting anything. (R. 3134.)

Although the picture painted for the jury was that the Government would inform Real's sentencing judge of her cooperation, and that Real, while hopeful of a break, was not really expecting one, she actually received the largest favor she could have received shortly after

---

[57] In Eastern District Case No. 6:00-cr-21-FHS, Real had been convicted of conspiracy to manufacture, to possess with intent to distribute, and to distribute methamphetamine (count 1); maintaining a place for the purpose of manufacturing, distributing, or using methamphetamine (count 3); and possessing a firearm during a drug trafficking crime (count 5). Real received sentences of 108 months on count 1, 60 months on count 3, running concurrently to count 1; and 60 months on count 5, running consecutively to the concurrent terms on counts 1 and 3. (Doc. 158, Apr. 25, 2006, order reducing sentence on Government's Rule 35 motion.) (Exhibit 68.)

Mr. Barrett's trial concluded. On March 1, 2006, the Government did much more than "mention" Ms. Real's testimony, it initiated a new proceeding in her case by filing a motion under Fed.R.Crim.P. 35 for reduction of sentence, based on her cooperation against Mr. Barrett. (Doc. 148 in Case No. 6:00-cr-21-FHS.) (Exhibit 68.) On April 25, 2005, the sentencing court reduced Real's sentence from 168 months (fourteen years) to time served (six years), and ordered Real's immediate release from custody. (Doc. 158 in Case No. 6:00-cr-21-FHS.) (Exhibit 68.) The Government also violated its *Brady* obligations by failing to disclose the numerous state cases, discussed in Claim 2(4)(f), that were dismissed against Real, and which could have been used as impeachment evidence. The Government was obligated under *Brady* to disclose to the defense Real's criminal record, and failed to do so. As with the other *Brady* violations discussed here, Mr. Barrett was prejudiced by the Government's "hide the ball" approach. Due to its failure to follow the law, the Government was allowed to portray this witness as far more credible than she really was.

Mr. Barrett submits that the Government misled the jury with respect to the assistance it was going to give Real. The Government surely knew all along that it would ask that Real's sentence be reduced to time served based on her cooperation against Mr. Barrett, an eventuality which in fact occurred. The Government has a continuing duty to disclose exculpatory evidence under *Brady*. The Government's true intentions were never disclosed to the defense or told to the jury. Additionally, the tremendous break Real received on her sentence is newly discovered evidence adversely impacting her credibility and the Government's lack of forthrightness at trial. Evidence of Real's deal could not have been discovered with the exercise of due diligence before or during trial, because it post-dated Mr. Barrett's trial. Yet again, the Government's conduct in soft-peddling the assistance it was going to give Real in exchange for

1810

her testimony constituted a violation of *Giglio v. United States,* 405 U.S. 150 (1972) and *Napue v. Illinois,* 360 U.S. 264 (1959).

### f. Randy Turman.

It was argued in Claim 2 that counsel were ineffective for failing to research Turman's court file in Sequoyah County Case No. CF-02-447 (Exhibit 195), and expose his perjury that this six count felony charge had been "taken care of" or disposed of, but was still pending, with no action in the case for two years preceding Mr. Barrett's trial. Regardless of any duty counsel had to investigate Turman's criminal background, the Government had an overarching duty to refrain from sponsoring perjured testimony, and to disclose exculpatory evidence.

The Government or its agents obviously knew that Turman was committing perjury when he stated he no longer had a pending felony case in Sequoyah County, but they let him give false testimony anyway. This is a classic violation of the rules announced in *Giglio, Napue, Mooney,* and *Miller, supra*, and the Government should be held fully accountable for it. It is equally clear the Government knew, despite Turman's denials, that he had worked or was working as a snitch. Otherwise, there was no reason for his case to lie dormant for two years. The Government let Turman get away with another blatant falsehood when he stated the Government had nothing to hang over his head. Clearly, his testimony was motivated by the fact he had a still pending felony case. Unless he pleased the prosecutors with his testimony, there is every reason to believe they would have taken action against him, or seen to it that the Sequoyah County authorities did.

1811

The Government's conduct in connection with Turman is a *Brady* violation.  The fact he had an open, unresolved felony case gave him a powerful motive to testify for the Government, and this fact affected his credibility.

Finally, the fact Turman's case was dismissed "in the interests of justice" in 2007 after lying dormant for years is highly indicative that his testimony against Mr. Barrett was at least in part a basis for the dismissal.  (Exhibit 195.)  This constitutes newly discovered evidence.

### 2.     The Government failed to reveal exculpatory evidence of a witness who failed to corroborate Charles Sanders.

In Claim 1, *supra*, Mr. Barrett described the *ex parte* hearing held September 13, 2005, during which AUSA Mike Littlefield, in the presence of the United States Attorney, informed the court that Littlefield had spoken with, and knew the identity of, a witness who when questioned failed to corroborate information to which Charles "Monk" Sanders would eventually testify in the penalty phase of Mr. Barrett's trial.  (Tr. 9/13/05 H'rg at 14, 17.)  Littlefield advised the court that he attempted to corroborate Sanders's claim that he (Sanders) was in a woman's house when he overheard her speaking on the telephone.  Sanders, as he later testified, claimed he could recognize Mr. Barrett's voice over the phone, and that he heard the voice say they had to identify the C.I. and get rid of him.  Littlefield told the court he had spoken with the woman himself, and she did not corroborate Sanders, although Littlefield claimed he subjectively believed the woman's denial was motivated by fear.

The fact that the Government knew the identity of a witness who failed to corroborate Sanders about a key piece of second-stage testimony was not disclosed until after trial when appellate counsel obtained the transcript of the *ex parte* proceeding.  To this day, the Government has failed to identify the witness.  This was clearly *Brady* material, because it was

Amended § 2255 Pet.                    311                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

evidence that could have been used not only to impeach Sanders's testimony, but to attack the search warrant under *Franks v. Delaware,* 438 U.S. 154 (1978).

But the situation is worse than that. Sanders was able to commit crimes with impunity, and the Government knew that. As long as he was willing to inform on others, Sanders had a "get out of jail free" card. No reasonable person could believe Sanders about anything. This is especially true since the prosecution was in possession of evidence that Sanders's sorry word was contradicted by another witness. Due to Sanders's record of total dishonesty and the fact that he was contradicted by another witness known to the prosecutor, polluting a federal courtroom with Sanders's testimony constituted the knowing use of perjured evidence. *E.g., Miller v. Pate,* 386 U.S. 1 (1967); *Mooney v. Hollohan,* 294 U.S. 103 (1935).

> **B.      The Judgements of Conviction and Sentence Should be Vacated Based on the Suppression and New Discovery of Evidence Undermining the Credibility of Key Law Enforcement Personnel.**

The Government suppressed exculpatory evidence that would have shown Clint Johnson and Vickie Lyons to be witnesses of poor credibility. With respect to evidence showing Johnson had no credibility, the suppressed evidence would have also supported a motion to suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978). The Government suppressed exculpatory evidence that would have torpedoed not only the warrant, but its seven informant witnesses and overall theory of the case, because Sequoyah County Sheriff John Philpot had been to Mr. Barrett's residence with other officers less than a month before the September 24, 1999 incident without coming to any harm. Newly discovered evidence of former AUSA Littlefield's criminal activities supports claims by some of the informant witnesses that they were threatened and coerced into giving testimony.

### 1.      Evidence of Clint Johnson's illicit activities.

But for Clint Johnson's alleged reliance upon "Monk" Sanders to secure the nighttime, no-knock warrant for Mr. Barrett's residence and property, David "Rocky" Eales's tragic death never would have occurred.  The Government or its agents knew that Johnson, just like his alleged snitch, Sanders, is untrustworthy and was subject to impeachment in a variety of areas.  To the extent the impeachment evidence discussed below was generated after Mr. Barrett's trial, it constitutes newly discovered evidence.  However, the Government was aware of this evidence, or had a duty to become aware of it, and has once again failed to fulfill its *continuing* duty to disclose exculpatory evidence.  The impeachment evidence detailed below not only could have been used to attack the overall testimony of Johnson and Sanders, but could have been used at either stage of Mr. Barrett's trial to argue that but for the acts of a "dirty cop," Clint Johnson, the entire chain of events leading to Trooper Eales's death never would have occurred.

At the time of Mr. Barrett's trial and shortly thereafter, Johnson was under official investigation for embezzlement of funds, illegal drug use, perjury, and gross misuse of his official office.  Agent Vickie Lyons of the Oklahoma State Bureau of Investigation, another critical witness in the Government's case against Mr. Barrett, colluded with and protected Johnson.  Had the jury known these facts, Johnson's credibility, and the validity of the no-knock search warrant, would have been destroyed.  Likewise, the credibility of Vickie Lyons would have suffered greatly had the jury learned of her participation in her boyfriend Clint Johnson's numerous illegal activities.

Although not known to the defense, at the time of Mr. Barrett's trial, Johnson, Lyons and a number of other state law enforcement officers involved in Mr. Barrett's case had been involved in a series of crimes involving the misuse of their office.  On November 1, 2005,

while Mr. Barrett's trial was ongoing, Cherokee County District Attorney investigators Tommy

Morgan and Jeff Lancaster reported to District Attorney Richard Gray that Johnson had passed

four bad checks in September, 2005 at Champlain's Truck Stop in Tahlequah. (Exhibit 181 -

Memo to Richard Gray from Tommy Morgan and Jeff Lancaster dated November 1, 2005.)

Beginning on November 5, 2005, Assistant District Attorney and Drug Task Force Director Jeff

Sheridan kept a detailed log of discussions with Johnson, which led to Johnson's termination and

the seizure of his vehicle on January 5, 2006. (Exhibit 181 - Log of events from November 2005

through January 2006 by Jeff Sheridan; Letter from Richard Gray to Clint Johnson dated January

5, 2006.) On January 5, 2006, District Attorney investigators found in Johnson's car various

drugs and drug paraphernalia that had never been logged into evidence, which they suspected

Johnson had acquired through seizure or purchase with official funds, and which they suspected

Johnson was abusing himself. (Exhibit 181 - Report of Investigation dated January 5, 2006 from

Courtney Bates; February 3, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries.)

These items included multiple syringes, a pipe, a spoon with methamphetamine residue, a

partially smoked hand-rolled marijuana cigarette, vials of liquid methamphetamine, a baggie

containing marijuana, and bottles of Xanex and Darvon. (Exhibit 181 - OSBI Criminalistics

Investigation Report dated January 26, 2006.)

      As early as November 9, 2005, Sheridan was expressing concern over Johnson's

inability to account for funds allegedly used for drug buys by confidential informants and funds

seized during drug raids. (Exhibit 181 - Log of events from November 2005 through January 2006

by Jeff Sheridan; Memo dated November 17, 2005 from Donovan Dobbs to Jeff Sheridan; Undated

Memo from Jeff Sheridan to Clint Johnson; Undated Memo from Jeff Sheridan to Richard Gray;

Memo dated November 21, 2005 from Jeff Sheridan to Clint Johnson; Memo dated December 19,

2005 from Courtney Bates to Jeff Sheridan; Memo dated December 27, 2005 from Jeff Sheridan to Clint Johnson; January 17, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries; February 22, 2006 Letter from Richard Gray to OSBI Special Agent Shawn Ward; Undated Report of Second OSBI Interview of Clint Johnson; Memo dated November 13, 2006 from Misty Brinley to Richard Gray).

Johnson had considerable difficulties managing his finances.  He declared bankruptcy in 2001, and his actions in passing hot checks had further alarmed his supervisors. (Exhibit 181 - *In re Clint Johnson,* No. 01-72501, United States Bankruptcy Court, E.D. Okl.)  In December 2005 and January 2006, Sheridan repeatedly expressed his conviction that Johnson was lying to him.  (Exhibit 181 - Log of events from November, 2005 through January, 2006 by Jeff Sheridan; Undated Memo from Jeff Sheridan to Richard Gray).  On November 23, 2005, Sheridan noted Johnson's possible involvement, as either a target or witness, in a Multi-County Grand Jury criminal investigation.  (Exhibit 181 - Log of events from November, 2005 to January, 2006 by Jeff Sheridan).  It is plainly apparent that law enforcement knew, during the course of Mr. Barrett's trial, that Johnson was involved in a course of serious criminal conduct that involved financial dishonesty and the misuse of his office.

In October, 2006, a Multi-County Grand Jury unsealed an indictment against Richard Gray, the District Attorney for Cherokee and Sequoyah Counties, for embezzling money seized as evidence from drug investigations.  In June, 2008, Okmulgee County District Judge Michael Claver dismissed the charges against Gray at the conclusion of the prosecution's case, and barred further prosecution, based on defense counsel's scathing impeachment of Clint Johnson, who testified as a prosecution witness.

The transcript of the cross-examination of Clint Johnson, which took place on June 4, 2008, is replete with additional evidence of Johnson's misappropriation of funds. (Exhibit 181 - Transcript of Proceedings in *State of Oklahoma v. Richard Loy Gray, Jr.,* Cherokee County Case No. CF-2007-28, June 4, 2008) (hereinafter "Gray RT").  During the cross-examination of Johnson, Gray's defense counsel suggested that: 1) Johnson had fathered a child out of wedlock with the daughter of former Adair County Sheriff Charles Hartshorne, and that Johnson and Hartshorne were dividing up drug money between themselves (Gray RT 26-27); 2) Johnson lived with another critical prosecution witness in Mr. Barrett's case, Vickie Lyons of the OSBI (*id.* at 74); 3) based on his relationship with Lyons, Johnson knew that the OSBI would do nothing to address official theft of drug money (*id.*); 4) Johnson used Lyons's cell phone and drove her car, and when government officials confronted Johnson about property he had illegally taken, Lyons brought it back (*id.*); 5) Johnson attempted to borrow, and in some cases did borrow, money from counsel for defendants whose assets Johnson seized (*id.* at 65); 6) Johnson illegally released funds seized from defendants to defense counsel, and then obtained kickbacks from defense counsel for this illegal conduct (*id.* at 66-67); 7) Johnson used drug funds as his own private ATM (*id.* at 64); 8) throughout 2003 and 2004, Johnson took money seized from drug arrests and purchased cashier's checks for his own personal use (*id.* at 68); and 9) Johnson began writing bad checks as early as May, 2003.  *Id.* at 54.

None of this information was shared by the Government with Mr. Barrett's lawyers; it is obvious they intentionally concealed it.  Mr. Barrett's current counsel first learned of this information in February, 2009, when they obtained a copy of the court reporter's transcript of Johnson's testimony in Richard Gray's trial and defense exhibits in Mr. Gray's case.  Mr. Barrett's counsel are currently investigating this newly discovered evidence of prosecutorial

Amended § 2255 Pet.          316          *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

misconduct, and will amend this motion to include new details about the breadth and scope of this misconduct as it becomes available to them.

But there is now abundant evidence calling into question Mr. Barrett's convictions. At an evidentiary hearing conducted on Mr. Barrett's motion to suppress on January 26, 2005 (Tr. 1/26/05 Hr'g), Johnson was called by the Government, and testified that the no-knock search warrant he obtained was based on information he received from a confidential informant (later identified as Charles Sanders). Johnson had used this particular informant at least five times, and the informant had "never been wrong." (Tr. 1/ 26/05 Hr'g at 66-67.)

On cross-examination, Johnson acknowledged that during the state court proceedings, he had never revealed the name of the confidential informant, and that defense counsel John Echols (who examined Johnson at the motion hearing) was the only one who had asked for the identity. Johnson admitted writing the name of the C.I. on a piece of paper, which was placed in a sealed envelope in the state court file. (Tr. 1/ 26/05 Hr'g at 78, 83-90.) However, Johnson stated that he had revealed the name of the C.I. to the United States Attorney's Office. (Tr. 1/ 26/05 Hr'g at 81.)

Johnson testified that before September, 1999 the C.I. had been involved in criminal activity leading to formal charges. (Tr. 1/ 26/05 Hr'g at 82-83.) When counsel asked Johnson whether the informant had been involved in other criminal activity since September 1999, the Government objected on relevance grounds, and the magistrate sustained the objection, holding that only what occurred before the no-knock warrant was issued was relevant. Counsel responded that he always believed the C.I. was not a real person, but a composite. (Tr. 1/ 26/05, Hr'g at 83-90.) In the state proceedings, one of the reasons given for shielding the alleged C.I.'s identity was the claim the C.I. was involved in assisting an ongoing investigation until 2004. Of

course, the claim the C.I.'s identity was being protected for this reason (assuming Sanders was the C.I.) is obviously false.  Sanders, with the patronage of Clint Johnson, was allowed to commit crimes at will in Sequoyah County after 1999 with only minor consequences.  The Government did not want it brought out at the suppression hearing that Johnson's C.I. had continued to commit crimes with impunity and was therefore an unreliable source.  The Government, which had been informed of Sanders's identity, was well aware of the litany of crimes he had committed since 1999, and knew that his identity was not being protected because of an "ongoing investigation."  *E.g., Giglio v. United States,* 405 U.S. 150 (1972).

Switching tracks, Mr. Echols asked Johnson if the C.I. had participated in drug transactions or drug dealing prior to September 24, 1999.  Johnson replied, "They [meaning drugs] were probably used some, yes, sir."  Asked if the C.I. sold drugs, Johnson stated "Not that I am aware of."  Asked if the C.I. had run a meth lab, Johnson again replied, "Not that I am aware of, no, sir."  (Tr. 1/ 26/05 Hr'g at  92.)

Johnson, who was presumably aware of Sanders's extensive criminal history before 1999, gave false testimony on this score.  As illustrated in the first stage ineffective assistance of counsel claim, Sanders had a 1986 Arkansas conviction for delivery of cocaine and amphetamines.  Information gathered during this 2255 investigation indicates that Sanders also routinely sold drugs, activities Johnson would have known about if he were regularly in contact with Sanders and not recklessly disregarding the truth of his activities.  (Exhibit 90; Exhibit 95.)  Johnson's testimony was false on a material matter and prevented proper development of evidence to challenge the warrant because of the unreliability of the C.I.  The prosecution had every reason to be aware of Sanders's criminal conviction in Arkansas for drug delivery, but stood silently by as Johnson gave false testimony.  *Miller v. Pate,* 386 U.S. 1 (1967).

The Government was well aware of damning evidence regarding the alleged C.I.,

Charles Sanders, but used objections to prevent counsel from eliciting this information in order

to build a record for a motion to suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978).  It

was not until trial, when Sanders testified, that only some of his criminal history, but not the

many deals and the repeated lenient treatment he had received, was revealed.  By then, the

*Franks* challenge that was mounted was incompetent, as detailed in Claim 2.

### 2.        David Michael Littlefield's illicit activities.

Following Mr. Barrett's conviction

> [United States Attorney Sheldon] Sperling said he is grateful to Mike Littlefield
> for his work as chief prosecutor in the case; and to Sequoyah County Sheriff
> Johnny Philpot, who was instrumental in identifying key witnesses who could
> prove Barrett acted with premeditation.

(Exhibit 69 - Tehleqhah *Daily Press*.)  In fact Littlefield himself was responsible for bringing the

seven drug-addict informants to support the Government's case, as he stated during the *ex parte*

hearing held September 13, 2005, and discussed elsewhere in this Petition.

Former AUSA Littlefield threatened and pressured Travis and Cindy Crawford to

provide testimony against Mr. Barrett.  Since Littlefield primarily conducted the interviews of the

seven informant witnesses, it is likely that others were threatened as well.  Support for this claim

comes from newly discovered evidence of Littlefield's own troubles with the law, and

consequent proceedings against him by the Oklahoma Bar Association.

In Muskogee County Case No. CF-07-363, Littlefield was charged with felony

child abuse.  On August 3, 2007, Littlefield was permitted to enter an *Alford* plea to count 2 of

the Information, charging child abuse by injury in violation of 10 O.S. 2001, section 7115(A).

Based on this plea, Littlefield received a two year unsupervised deferred sentence, and was

required to pay court costs.  *See* Complaint, *State of Oklahoma ex rel. Oklahoma Bar Association v. David M. Littlefield,* OBAD #1720, SCBD #5338, filed with the Oklahoma Supreme Court on September 28, 2007.  Littlefield's criminal case file in Muskogee County was expunged even before the Bar Complaint was filed, although his deferred sentence was to run for two years from August 3, 2007.[58]  (Exhibit 156 - Trial Brief of Complainant, p. 2, filed on January 2, 2008, in *State of Oklahoma ex rel. Oklahoma Bar Association v. Littlefield, supra.*)  On September 14, 2009, the Oklahoma Supreme Court determined that, based on the Bar Complaint filed against Littlefield, he should receive a private reprimand by the Court, scheduled to occur on October 22, 2009

.            In the affidavit for search warrant for Littlefield's home*,* captioned SW-07-34, and filed in the District Court of Muskogee County on April 23, 2007, Jan Ray, a Muskogee County Deputy Sheriff, states in pertinent part that Littlefield had been brutally abusing his minor children for a period of years extending back to the time he was the chief prosecutor on Mr. Barrett's case.  (Exhibit 189 - Affidavit for search warrant, SW-07-34, filed in Muskogee County District Court, April 23, 2007, signed by affiant on April 13, 2007.)

Based on the affidavit, a search warrant was issued on April 13, 2007, and filed in the court record on April 23, 2007.  (Exhibit 189 - Search warrant, SW-07-34.)  Various camera and computer equipment were seized in the search.  (Exhibit 189 - Search warrant return, SW-07-34, filed in the District Court of Muskogee County on April 23, 2007.)

---

[58]   The fact Littlefield's case was expunged long before his two year deferred sentence expired, as noted by the Bar Association's Assistant General Counsel, prevents Mr. Barrett from ascertaining whether Littlefield lied to investigators before entering his plea.  It also prevents Mr. Barrett from ascertaining why Mr. Littlefield received such favorable treatment.

Littlefield did not contest the charges.  He was found guilty on an *Alford* plea, receiving a very generous sentence which has already been dismissed, with the case file expunged.

The Bar Association action resulted in a private reprimand.  (Exhibit 53.) Littlefield was found guilty of violations of Rule 8.4(b) of the Oklahoma Rules of Professional Conduct, and Rule 1.3 of the Rules Governing Disciplinary Proceedings.  *Id.*  Thus the Oklahoma Supreme Court found Littlefield's actions reflect adversely on his honesty, trustworthiness, or fitness as a lawyer in other respects.  *Id.*  Just as the Oklahoma Supreme Court found that Littlefield's conduct brought "discredit upon the legal profession," this Court should find that his conduct both in and out of court during Mr. Barrett's trial brings discredit upon the judgment of conviction and sentence of death Littlefield engineered.

Littlefield's child abuse charges are relevant to the manner in which he handled the informant witnesses in Mr. Barrett's case.  A bully who apparently had no compunction about using his minor children as punching bags for years to work out his "temper fits" and frustrations would have no problem threatening witnesses with all manner of dire consequences to keep them in line and produce the desired testimony against Mr. Barrett.  This newly discovered evidence regarding Littlefield's own deplorable and shocking criminal conduct against his own children not only corroborates Travis Crawford's and Cindy Crawford's claims they were threatened by Littlefield to secure their testimony, and Randy Weaver's assertion that Littlefield tried to intimidate him, but also is relevant to Mr. Barrett's claim of prosecutorial misconduct dealing with the manner in which Littlefield handled his informant witnesses in an attempt to prevent defense counsel from having anything close to a reasonable opportunity to investigate the backgrounds of these witnesses and their testimony.

The current defense investigation supports the claim Littlefield routinely sought to intimidate witnesses.   Janice Sanders described her contact with Littlefield:

> Mr. Littlefield came to see me.  Johnny Philpot accompanied him.  Mr. Littlefield got angry with me when I told him that I thought that Kenny's state sentence was fair and that it was un-American to try him again since he had been convicted and sentenced.

(Exhibit 85.)[59]

During the penalty trial Littlefield repeatedly questioned Mr. Barrett's ex-wife, Abby Stites, about instances of violence in their marriage.  Each time Ms. Stites put these events in context – including Mr. Barrett's mental illness and her own violence towards him – Littlefield returned the jury's attention to Mr. Barrett.  It is now clear that Littlefield had his own guilt to

---

[59] Since Mr. Barrett's original Motion to Vacate was filed, there has been continuing investigation into Littlefield's Muskogee County child abuse charges, which have been shrouded in secrecy because the file was apparently improperly expunged even before his 2-year deferred sentence expired.  An investigator working on Mr. Barrett's case interviewed Tim Brown, the current chief of police in Webbers Falls, Oklahoma.  Mr. Brown was formerly a lieutenant in the Muskogee County Sheriff's Department.  He was employed with the Muskogee County Sheriff's Office at the time criminal charges were filed against Littlefield.  He was also a member of the Eastern Oklahoma Regional Child Death Review Board.  According to Mr. Brown, Littlefield threatened the sheriff's investigators working on the child abuse case.  Littlefield also dismissed the charges as "bullshit" (a protestation of innocence belied by his later *Alford* plea), and, adopting a victim role, claimed the Muskogee County Sheriff's Office was "trying to get him."  In addition to committing child abuse, it was alleged by Mike and Dawn Littlefield's daughter that her parents smoked marijuana in front of her and her younger brother.

According to Mr. Brown, the prosecutors assigned to Littlefield's criminal case from the Oklahoma Attorney General's Office were scared that Littlefield's prosecution would "open up a can of worms" because Littlefield, while he was employed with the Muskogee County District Attorney's Office, had prosecuted most of the big drug cases brought in that county.  During the continuing defense investigation into this matter, former DHS child abuse investigator Melissa Todd was also interviewed.  While she declined to discuss Littlefield's criminal case because of confidentiality concerns, she attested to the honesty of Tim Brown.  (Exhibit 43.)

Littlefield's conduct lends additional support to Mr. Barrett's claim that Littlefield threatened the informant witnesses he cultivated for Mr. Barrett's federal prosecution.  It shows that Littlefield behaved as a law unto himself, a pattern of conduct indicating he would have few qualms about concealing *Brady* material and sponsoring false testimony.  Mr. Barrett will continue to seek information from the Government about these matters and amend his claims as the information becomes available to him.

---

project onto Mr. Barrett during this cross-examination.  Although jurors rejected the idea that Mr. Barrett was a future danger, it is likely that Littlefield's harping on the violence in the Barrett marriage had an impact on the jury's assessment of the appropriate punishment.  This Court should not permit a death verdict to stand where it was influenced by the rhetoric of a prosecutor expiating his own sins of abuse on the life of the defendant.

### 3.       John Philpot.

The Government argued extensively at trial that a middle-of-the-night, no-knock search warrant had to be issued to search Mr. Barrett's property, and that the authorities had to proceed in the way they did, because Mr. Barrett was dangerous; if he had any warning that police were on his property, he would have shot them.  This was the repeated theme of the Government's case, based on its seven informant witnesses.

The truth is otherwise.  John Philpot, former Sequoyah County Sheriff, recently admitted to a defense investigator that he and other local law enforcement officers were on Mr. Barrett's property less than a month before the raid which led to the death of David Eales, as police reports reflect they had also done the previous year.  There were no shots fired and no violence from Mr. Barrett.  (Exhibit 6.)

This evidence, known to the Government or its agents, was unquestionably exculpatory, in several respects.  Had this fact been known to the defense, the entire edifice of the prosecution's case would have crumbled.  It would have supported an attack on the nighttime, no-knock warrant, demonstrating there was no probable cause for a warrant of this type.  Because the initial warrant lacked probable cause, the fruits of any subsequent warrant, *i.e.,* drugs and firearms evidence later seized, would have been acquired unlawfully, knocking out the foundations of the three counts in the superseding indictment.  This evidence would have

discredited the seven snitches, some of whom claimed they were told by Mr. Barrett that if the police came on his property, he would shoot the first one through the door, and that he hoped the first officer through the door would be John Philpot.  This evidence would have demonstrated that, as the defense argued, Mr. Barrett was unaware the police were raiding his property; he thought he was repelling civilian trespassers.  Even if convictions had been returned, this evidence was relevant to rebutting the intent factors alleged by the Government in the punishment phase.

<div align="center">**Conclusion.**</div>

Certainly when viewed together, the exculpatory evidence suppressed by the Government, some of which could also be termed newly discovered evidence, the other newly discovered evidence discussed above, and the Government's sponsorship of false testimony would have made the difference between conviction and acquittal at trial.  At a minimum, it would have made a difference in the sentencing stage.

The Government suppressed and has continued to suppress evidence which would have dealt fatal blows to Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Karen Real, Randy Turman, Clint Johnson, Vickie Lyons, and John Philpot.  At least two of the informant witnesses, Travis and Cindy Crawford, testified based on threats from then-AUSA Littlefield, a fact well known, obviously, to Littlefield himself.  The suppressed exculpatory or newly discovered evidence, or both, affecting the credibility of these witnesses, were known and became known to the Government and its agents.  This evidence  was unquestionably favorable to Mr. Barrett, and was material in the sense that disclosure of this evidence would have created a reasonable probability of a different outcome.  *Strickler v.*

*Greene,* 527 U.S. 263, 289 (1999); *United States v. Bagley,* 473 U.S. 667, 682 (1985); *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994).

Taken together, the suppressed exculpatory evidence addressed above would have been fatal to the admissibility of all the physical evidence introduced against Mr. Barrett, and would have left in shreds the prosecution's claims of Mr. Barrett's "intent," as testified to by the seven informants. Newly discovered evidence in the form of after-the-fact deals given to various prosecution witnesses – which Mr. Barrett contends still constitutes *Brady* material, because these deals were in the works or promised all along, and because the prosecution's duty under *Brady* is continuing – would have shown the various snitch witnesses to have no credibility whatever. *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002)(habeas relief granted in § 2254 case where exculpatory evidence, even if it could only be used for impeachment purposes, was suppressed); *Mitchell v. Gibson,* 262 F.3d 1036, 1059-60, 1062-63, 1065 (10th Cir. 2001)(vacating death sentence in 2254 case for failure to reveal exculpatory evidence of testing on physical evidence); *Nuckols v. Gibson,* 233 F.3d 1261 (10th Cir. 2000)(habeas relief granted in § 2254 case where prosecution failed to disclose material evidence impeaching a key prosecution witness).

Travis Crawford's recantation, if known at the time of Mr. Barrett's trial, belies the prosecution's theory of intent and could have been used to impeach the credibility of other witnesses' claims that Mr. Barrett had threatened armed confrontation with the police. Likewise, had the former AUSA's violent temper and assaultive behavior against his own children been known at the time of Mr. Barrett's trial, the claims now made by the Crawfords that they were coerced to testify against Mr. Barrett ring true. The newly discovered evidence discussed here goes to the foundation of the case.

Most troubling, of course, is the Government's sponsorship of false evidence from Randy Turman, Charles Sanders and, at the motion to suppress, from Clint Johnson.  This evidence clearly affected the outcome of trial.  Threats to witnesses Travis and Cindy Crawford is also a form of false evidence; a threatened witness is, *per se*, an unreliable witness.  The Government also misled the jury about what it was going to do for Sanders and Karen Real in exchange for their testimony, in violation of *Giglio.*

The misconduct of the prosecutors was repeated and blatant.  Mr. Barrett's fundamental constitutional rights were violated.  He should be granted relief from his convictions and sentences.

C.   **Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses.**

The prosecution violates a defendant's right to due process when it interferes with the defense's access to prosecution witnesses.  *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969).  It is unprofessional conduct for prosecutors to impede defense counsel's access to prosecution witnesses.  (ABA Criminal Justice Standards, Pros. Function § 3-3.1(c) & commentary (3d ed. 1993)("ABA Standards").)  "It is imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights."  *United States v. Rich*, 580 F.2d 929, 934 (9th Cir.), *cert. denied*, 439 U.S. 935 (1978).  Courts cannot tolerate "any governmental conduct that has the purpose or

effect of discouraging witnesses from cooperating with the counsel of an accused." *Ibid.* Thus, "counsel may not make his or her presence a condition of the interview" between the defense lawyer and a witness. (Commentary on Standard 3-3.1(c).)

The prosecution in Mr. Barrett's case interfered with the defense's access to key prosecution witnesses including Karen Real, Randy Turman, Randall Weaver, Charles "Monk" Sanders, Cindy Crawford, Travis Crawford, and Brandie Price. Prosecutors, through statements and/or actions, communicated to witnesses that they should not speak with defense personnel outside the presence of the prosecutor. (Exhibit 92; Exhibit 31.) For example, Karen Real has told Mr. Barrett's investigator that she was told not to speak with him. (Exhibit 43.) Additionally, the prosecutors intentionally delayed access to the identities of the witnesses in order to prevent meaningful interviews with them, including by preventing interviews with incarcerated witnesses, and to prevent meaningful investigations of their backgrounds and honesty.

Prosecutors intentionally withheld the names and contact information for these witnesses. On February 17, 2005, prosecutor D. Michael Littlefield wrote in a letter to defense counsel that the Government did not intend to reveal the identity of the confidential informant, and added the "situation would change should we determine to utilize this individual as a witness." The Government did not reveal the identities of its seven key witnesses until September 15, 2005. In order to keep the identities secret past the deadline imposed by 18 U.S.C. § 3432, the Government filed a baseless motion for a protective order. The trial court found the Government could have filed its motion to keep the witnesses' names from the defense weeks earlier. (Tr. 9/13/05 Hr'g at 5). The trial court found the Government's motion did not present any evidence to justify withholding the names and other information from the defense.

(Tr. 9/13/05 Hr'g at 4).  The prosecutor admitted that the Government could have raised its concerns about at least some of the witnesses earlier.  *Id.* at 9.  Despite the delay the court found "there is no evidence of any overt activities by anyone on behalf of the defendant to intimidate witnesses that you [the Government] are aware of."  *Id.* at 19.[60]

During an *in camera* hearing on the Government's motion for a protective order, AUSA Littlefield was not candid with the court.  The court appeared to recognize that Littlefield was making inconsistent claims.  On the one hand he was claiming that the defense attorneys had sufficient notice of the witnesses (a) because they were Mr. Barrett's associates and family members (Tr. 9/13/05 Hr'g at 9-10), and (b) because Littlefield told defense counsel what the witnesses would testify to.  *Ibid.*  The court raised the obvious point that if Littlefield had been so forthcoming, there was no need for secrecy because the disclosed information would be sufficient for Mr. Barrett "to be able to determine roughly who we are talking about."  *Id.* at 11.  Littlefield said it would not be.  This admission strongly suggests Mr. Barrett was not aware of having said the things attributed to him by the witnesses because he had never said them.

At that point the United States Attorney cut Littlefield off and had an off-the-record discussion.  Back on the record, Littlefield said that the notice he had provided would be insufficient to identify the witnesses because Mr. Barrett had said these things to so many people, it would be hard for him to remember them all.  Littlefield could produce no evidence of this "belief" he had.  *Id.* at 12.

---

[60] The only person the Government could point to who had any known affinity with Mr. Barrett that could conceivably suggest a threat, was a man who posed no threat whatsoever because he was in a federal prison somewhere.  *Id.* at 14.

Following the *in camera ex parte* hearing, the Government and Judge Payne withheld from defense counsel information that was critical to the defense including: (a) that the court's research indicated that for purposes of § 3532 the trial had started the previous day; (b) that the court indicated a request for a continuance would be valid based on the importance of the witnesses and what they would say; (c) that the Government had made representations about defense counsel's interpretation of § 3532; (d) that AUSA Littlefield had spoken with a witness who failed to corroborate information from confidential informant Charles Sanders; (e) that the Government's motion for a protective order relied upon information the court deemed irrelevant – *viz.* that the court permitted Mr. Barrett to be restrained by an electric-shock belt and that the court would keep jurors anonymous – and lacked sufficient factual support; (f) that the prosecutors revealed *in camera* information that fell within the notice requirements of Federal Rule of Evidence 404(b). *See* Claim 1, *supra*.

To the extent Mr. Barrett's trial counsel acquiesced in the prosecutors' plan to delay production of the witnesses' names, contact information, statements, and the arrangements for interviewing the witnesses, Mr. Barrett was denied his right to effective assistance of counsel. As the prosecutor said, Mr. Barrett's trial counsel had no information about the identities of the witnesses or the content of their testimony. (Tr. 9/13/05 Hr'g at 6-7). With the information withheld from them, trial counsel could not have made an informed decision regarding whether delayed disclosure was acceptable, whether the arrangements for interviews were acceptable, and whether trial counsel were ready for trial once the witness names were known. *Rompilla v. Beard*, 545 U.S. 374, 383-86 (2005) (failure to investigate evidence prosecution intended to rely upon was obviously deficient); *Wiggins v. Smith*, 539 U.S. 510, 533-34 (2003) (failure to investigate could not be justified where trial counsel had inadequate basis for decision);

*Strickland v. Washington*, 466 U.S. 668, 690-91 (1984) (decisions are reasonable only to extent supported by adequate investigation).

The concerns of any reasonable defense lawyer under the circumstances – including the need for a continuance – were obvious to the trial court. (Tr. 9/13/05 Hr'g at 10, 12.) The record shows defense counsel acquiesced in the Government's proposal that witnesses be interviewed with Government representatives present. *Id.* at 27. In addition to this "decision" being professionally unreasonable, it was to some extent induced by the trial court's failure to disclose weaknesses the Court had identified in the Government's position, weaknesses the court disclosed to prosecutors, but not to the defense. *See* Claim 1, *supra*. Neither Mr. Barrett nor his counsel could have made an informed decision about access to the witnesses without the information the trial court possessed but was unwilling to share with the defense. To the extent Mr. Barrett's trial counsel could have uncovered the same legal arguments the court identified, they failed to act professionally.

Faced with the Government's intentional delay (the confidential informant at least was known to the Government from the start), and the Government's pretextual expression of concern for the witnesses' safety, and ignorant of the Court's views and complicity in extending the delay, Mr. Barrett's trial counsel "agreed" to restrictions on their access to witnesses. The Government's promise of restricted access was itself illusory. Mr. Barrett's counsel were unable to conduct any meaningful interviews of the witnesses prior to trial. The delays also prevented or impeded meaningful investigation of the witnesses. As shown *supra* in this Claim and Claim 2, an investigation of the Government's key witnesses would have yielded abundant evidence of their dishonesty and incentives to color their testimony to the desires of law enforcement.

If trial counsel had met their ethical and constitutional obligations to Mr. Barrett, there is a reasonable probability the outcome of the case would have been different. In the absence of the seven snitches' testimony two prior juries refused to convict Mr. Barrett of capital murder. As the trial judge repeatedly asserted in his budget rulings and elsewhere in the record, the main difference between the federal case and state cases was the question of premeditation, or a pre-formed intent to kill. As the United States Attorney has publicly acknowledged, the seven snitches were key to the Government's ability to convince the jury Mr. Barrett acted with the requisite *mens rea*. But for the Government's misconduct or trial counsel's deficient performance, the evidence presented herein would have impeached the seven witnesses. It is reasonably probable that if the witnesses had been impeached with the evidence presented herewith, Mr. Barrett would not have been convicted of capital murder, or would not have been sentenced to death.

> **D.      Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses and Closing Argument**.

Throughout the penalty phase of Mr. Barrett's trial the prosecutors repeatedly and in various ways violated rules of professional conduct regarding the questioning of witnesses. (*See* ABA Standard 3-5.6.) These improper questions, together with the prosecutors' "comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

The prosecutor's improper conduct included the following examples: The prosecutor improperly asked questions for which he lacked a good faith basis, or to which he knew the witness could not give an answer based on personal knowledge, the effect being to imply that the prosecutor had knowledge of the facts. (R. 4743 (implying existence of records adverse to Mr. Barrett), 4765-66, 4781 (implying Mr. Barrett had been denied custody of his son), 4788-92, 4850, 4852-53, 4859, 4862, 4866, 4869, 4911, 4913, 4925 (bolstering Karen Real by implying prosecutor's knowledge of her reputation for honesty), 4980, 5006 (falsely suggesting prosecutor had knowledge of Mr. Barrett trying to infect jail worker with communicable disease).)

The prosecutor improperly commented upon Mr. Barrett exercising his trial rights in state court. (R. 4765.) The prosecutor improperly adduced through a witness who lacked personal knowledge whether someone who is sentenced to 20 years' imprisonment will be released earlier by the Department of Corrections. (R. 4765-66.)

The prosecutor asked witnesses whether other witnesses had made false statements although, due to Federal Rule of Evidence 615, the witness being questioned could have had no knowledge of the other witnesses' testimony. (R. 5092.)

The prosecutor repeatedly exceeded the scope of direct examination and asked witnesses questions about the seven informant witnesses the Government presented in federal court, or Abby Stite's charges against Mr. Barrett, although – or because – the prosecutor knew the witnesses lacked personal knowledge of the facts. (R. 4767, 4788-92, 4925, 4926, 5024-26, 5045 (Littlefield acknowledging he asked question knowing witness had no personal knowledge), 5069, 5116.) As the prosecutor's obvious goal was to merely repeat the testimony of witnesses who claimed to observe various facts, regardless of whether the witness testifying had said

Amended § 2255 Pet.                              332                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

anything related to the other witnesses' testimony, the questioning lacked any probative value and trial counsel were ineffective for failing to object.  The effect of the prosecutor's improper questioning was to repeat the Government's case over and over and over, and make defense witnesses appear ignorant of facts to which their testimony did not relate.  Ultimately, the prosecutor's misconduct – enabled by trial counsel's unreasonable failure to object – completely drowned out the defense witnesses' testimony.

In arguing for death, the prosecutors stooped to conquer.

In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently.  Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards."  (R. 5356-57.)  The Tenth Circuit has condemned similar tactics.  *Paxton v. Ward,* 199 F.3d 1197, 1217 (10th Cir. 1999) (prosecutorial misconduct justified sentencing relief where, in connection with unadjudicated homicide introduced in the penalty phase, prosecution objection prevented defendant from showing the charge had been dismissed because he passed a polygraph test, and prosecutor took advantage of the ruling to argue "we don't know why" the case was dismissed, implying dismissal could have stemmed from a technicality).

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer.  This was "way over the capital murder line."  (R. 5402-03.)  Similarly, Sperling later

asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?" (R. 5412.) Denigrating Mr. Barrett's fundamental right to a fair trial, Sperling, in the form of a rhetorical question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness." (R. 5408.)

Trotting out a variation on the old Bob Macy[61] "three hots and a cot" argument, which the Tenth Circuit has condemned on more than one occasion, Sperling repeatedly – and falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room." (R. 5412, 5423.) Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. (R. 5412.) Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. (R. 5412.) *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin,* 311 F.3d 1002, 1014-15 (10th Cir. 2002). In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent." (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence." Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?" The

---

[61] Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill." (R. 5412-13.)

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[62],  and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough." to testify.  (R. 5414-15.)  *Gordon v. Kelly,* 2000 WL 145144 (6th Cir. Feb. 1, 2000) (unpublished) (pervasive efforts by prosecutor to portray defendant as being feared by witnesses required habeas relief).

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them.  To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. (R. 5415.)  This falsely implied the victim impact witnesses did not testify in the state

---

[62]  This was a knowing false statement on the prosecutor's part.  As discussed in Claim 1, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett.  "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

trials only because the incompetent, "under-evidenced" state prosecutors did not have sense enough to put them on the stand. Sperling was well aware they *could not have testified by law* because the case never got past the first stage. Shielded by the court's erroneous ruling excluding Mr. Barrett's statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]." (R. 5419.) The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did. Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone. Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing." The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops." (R. 5420-21.) There were additional comments on Mr. Barrett's supposed lack of remorse. (R. 5419-20, 5421-22.) *Paxton v. Ward,* 199 F.3d at 1217.

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life. (R. 5420.) *Cf. Penry v. Lynaugh,* 492 U.S. 302, 319 (1989); *Lockett v. Ohio,* 438 U.S. 586 (1978).

Sperling aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again. (R. 5421-22.) Remarks of this nature have always been deemed improper. *Viereck v. United States,* 318 U.S. 236, 247-48 (1943); *Cargle v. Mullin,* 317 F.3d 1196, 1223 (10th Cir. 2003).

It is simply improper for a prosecutor to suggest that a jury has a civic duty to convict or to return a certain punishment. *Thornburg v. Mullin,* 422 F.3d 1113, 1134 (10th Cir.

2005); *Malicoat v. Mullin,* 426 F.3d 1241, 1256 (10th Cir. 2005); *Spears v. Mullin,* 343 F.3d 1215, 1247 (10th Cir. 2003).

Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warning the jury they would make him a "hero" in prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time." (R. 5423.)  This was little better than telling the jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit.  *Bates v. Bell,* 402 F.3d 635, 642 (6th Cir. 2005).

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections.  *See* Claim 2.  *Darden v. Wainwright,* 477 U.S. 168 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974).  The error stemming from prosecutorial misconduct cannot be termed harmless, even under the strict due process test of *Darden* and *Donnelly.*  This was not a runaway case for the death penalty.  The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

"It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 358 (1977)(plurality opinion); *Bland v. Sirmons,* 459 F.3d 999, 1028 (10th Cir. 2006).  The repeated misconduct of the prosecutors prevented the jury from evaluating the second stage evidence fairly, leading to a death verdict based on emotion rather than reason. *Bland,* 459 F.3d at 1024.

Prosecutorial misconduct was not raised on direct appeal. Because the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused the failure to raise the claim. Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different. *Evittts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 6.      Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, to due process, to effective assistance of counsel, to a reliable sentence, to present defense evidence, and to rebut the evidence introduced against him were violated when the trial court unduly restricted defense counsel's opportunity to present significant, relevant and admissible *defense* evidence and facts to the jury, including various statements by Mr. Barrett around the time of his arrest that showed deep remorse for the death of Trooper David Eales, and restricted the jury's consideration of the state-court verdict.

The court's exclusion of this essential evidence during penalty phase proceedings violated Mr. Barrett's right to jury consideration, as a mitigating factor, of important evidence of Mr. Barrett's character, in violation of *Skipper v. South Carolina*, 476 U.S. 1 (1976) and *Lockett v. Ohio*, 438 U.S. 586 (1978). The exclusion of this evidence also violated Mr. Barrett's Sixth Amendment right to offer evidence in support of his claims. *Rock v. Arkansas*, 483 U.S. 44 (1987). The exclusion of this evidence deprived Mr. Barrett "of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986). These restrictions also denied Mr. Barrett the opportunity to conduct an effective cross-examination of prosecution witnesses, in violation of Mr. Barrett's rights under the Confrontation Clause of the Sixth Amendment. *Delaware v. Van Arsdale*, 475 U.S. 673, 678 (1986). Finally, the trial court's rulings on this issue fatally infected the proceedings and violated Mr. Barrett's due process rights. *Estelle v. McGuire*, 502 U.S. 62, 70 (1991); *Moore v. Illinois*, 408 U.S. 786, 800 (1972).

During the course of Mr. Barrett's trial, trial counsel sought to admit a number of statements made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper Eales. For example, Mr. Barrett's counsel sought to admit the written statement of Trooper Glen Smithson, who recorded that on September 29, 1999, Mr. Barrett told him, "The wrong person got killed. I wished it had been me." (Exhibit 107.)

However, the prosecutor objected to these statements, and the court incorrectly excluded them. The Government cynically exploited the court's ruling in closing argument, mocking the notion Mr. Barrett had any remorse at all. The prosecutor fastened on Mr. Barrett's statement to his mother that he wished things had turned out differently, which AUSA Littlefield stated meant Mr. Barrett had wished he had not gotten caught so he could "kill more of the

bastards." (R. 5356.)  During closing argument, the Mr. Barrett's counsel argued, as a factor in mitigation, that Mr. Barrett expressed remorse.  With Mr. Barrett's expressions of remorse excluded, the United States Attorney was able, without fear of contradiction, to call him a "common, cold-blooded murderer." (R. 5423.)  As a result, all of the jurors rejected as a mitigating factor that Mr. Barrett expressed remorse for his crimes.  *United States v. Barrett*, 496 F.3d 1079, 1088 (10th Cir. 2007).

By refusing Mr. Barrett's attempts to present evidence of his contemporaneous expressions of remorse, the Court prevented Mr. Barrett from proving the existence of this factor in mitigation.  In fact, Mr. Barrett's expressions of remorse were highly relevant and admissible.  Remorse is "an important mitigating factor."  *Jones v. Polk*, 401 F.3d 257, 264 (4th Cir. 2005).  *See also Riggins v. Nevada*, 504 U.S. 127, 144 (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps be determinative of whether the offender lives or dies.")  This is particularly true when, as in this case, the Government "emphasized the lack of remorse in closing argument."  *Jones v. Polk*, 401 F.3d at 264.

"Short of a defendant taking the stand, often the only way to present evidence of remorse is through the hearsay statements of others."  *Davis v. Polk*, 2007 WL 2898711, at *18 (W.D.N.C. 2007).   Accordingly, the use of hearsay rules to prevent the admission of expressions of remorse violates the *Lockett* line of cases, which hold:

> that 'a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could not be part of the sentencing decision at all."

*Jones v. Polk*, 401 F.3d at 263 *quoting Johnson v. Texas*, 509 U.S. 350, 362 (1993) (court erred in excluding as hearsay at penalty phase letter in which capital defendant expressed remorse).

The court's error in excluding this evidence prejudiced Mr. Barrett. Had Mr. Barrett been allowed to present this evidence, there is a substantial probability that he would not have been sentenced to death. The court clearly erred in excluding this evidence, because the rules of evidence, with respect to the introduction of both mitigating and aggravating evidence, do not apply in the sentencing stage of a capital case. 21 U.S.C. section 848(j), in effect at the time of Mr. Barrett's trial, states that any other information a party may want to submit is not constrained by the rules of evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice. Because a defendant must be allowed under the Eighth Amendment to introduce any relevant mitigating evidence, it beggars the imagination to believe that expressions of remorse are more prejudicial than probative. The court excluded highly relevant mitigating evidence of remorse, which opened the door for the Government to prejudicially deride Mr. Barrett as a cold blooded killer who wanted to take out more cops.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on Mr. Barrett's conviction and death sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel were ineffective for failing to raise this issue, clearly framed by the record, on direct appeal. Because of the overriding importance of mitigating evidence in

capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded. *Skipper v. South Carolina,* 476 U.S. 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Lockett v. Ohio,* 438 U.S. 586 (1978). There could be no reasonable strategy for neglecting to raise this issue. There is a reasonable probability that had it been raised, the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 7.      Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the U.S. Marshal to place visible restraints on Mr. Barrett during the trial without a finding that Mr. Barrett was or would be a security risk. Throughout the trial Mr. Barrett was forced to wear a "stun belt" around his waist. The belt left an unusual bulge that was visible through Mr. Barrett's clothing. The marshals' ability to send an electric shock through the belt intimidated Mr. Barrett and posed a danger to him that

impaired his ability fully to observe and participate in the trial, including communicating with his attorneys.

The Supreme Court has long held that the use of visible restraints on a defendant without a particularized finding of necessity violates due process and can impair a defendant's Sixth Amendment right to effective assistance of counsel, to a presumption of innocence, and to a fair and reliable capital sentencing proceeding as guaranteed by the Eighth Amendment. *Deck v. Missouri*, 544 U.S. 622, 632 (2005); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle v. Williams*, 425 U.S. 501 (1976); and *Illinois v. Allen*, 397 U.S. 337 (1970).

During a sealed hearing held August 31, 2005, a deputy U.S. Marshal testified that there were never any problems with Mr. Barrett acting out or showing any signs of being a risk of danger or escape. The Court opined that the mere fact that a stun belt had been used against other capital defendants without their lawyers complaining was a ground to permit its use. Mr. Barrett had been through two previous capital trials related to the same events and during that time never posed any security risk or risk of escape. In sum, none of the constitutionally required circumstances existed to justify placing visible and/or intimidating constraints on Mr. Barrett during trial.

On September 9, 2005, the Court abdicated its role and consigned the question of whether to place restraints on Mr. Barrett to the discretion of the U.S. Marshal Service. This ruling violated Mr. Barrett's rights under the cases cited *supra*, and his right to a fair and impartial trial judge. *See also* Claim 1.

In an *ex parte* hearing outside the presence of defense counsel, the trial judge stated that "probably any capital case where I was the presiding judge a stun belt would be used just because of the nature of the potential punishment. It just seems that it's a common – almost

a common sense call under those circumstances." (Tr/ 9/13/05 ex parte Hr'g at 13.) The Supreme Court requires much more than a "common sense call" before a defendant can be restrained in a threatening manner during a capital trial.

The stun belt created a visible bulge in Mr. Barrett's clothing that was observable by the jury. (Exhibit 80). In addition, Mr. Barrett was known by the Government and Court to be a victim of violent abuse by Sheriff Johnny Philpot and his deputy. Indeed, the jury found that Mr. Barrett had suffered abuse from Philpot. The Government and Court also were aware that Mr. Barrett had been beaten and threatened by law enforcement officers for his role in the death of David Eales. Under the circumstances it was reasonable for Mr. Barrett to fear that he would be stunned by the marshals on the slightest perceived provocation, and as this issue was raised by trial counsel, the Court was aware that the stun belt would inhibit Mr. Barrett's movements and communications with counsel in court. After all, he was to be restrained even though the marshals admitted he had never caused them any trouble.

Trial counsel informed the court that Mr. Barrett was at special risk from the stun belt due to conductive steel wire in his chest and abdomen area. (Tr. 9/9/05 Hr'g at 27.) (Trial counsel's statement at this hearing reveals that three days before the trial began trial counsel Hilfiger had not reviewed Mr. Barrett's medical records which clearly mention – and in the case of x-rays, depict – the metal wires in Mr. Barrett's chest.) Trial counsel's statements informed the court that Mr. Barrett was especially fearful of the stun belt and the danger it posed to him. This fear was exacerbated by the marshal's failure to conduct or inquire about Mr. Barrett's unique medical circumstances. Since the trial, trial counsel have confirmed that Mr. Barrett felt intimidated wearing the stun belt throughout the trial. (Exhibit 29.)

The unjustified use of restraints on Mr. Barrett inhibited his movement and communications with counsel and made him appear dangerous to jurors. The stun belt scared and intimidated Mr. Barrett and chilled his communications, and restricted his ability fully to observe and participate in the proceedings.

To the extent the stun belt was used without sufficient justification, its use was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance. The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt. In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness. Therefore, there is a reasonable probability that Mr. Barrett would have been granted a new trial if the issue had been raised on direct appeal. *See* Claim 18, *infra*.

To the extent the record was insufficiently developed for this claim to have been raised on direct appeal, trial counsel's performance was deficient. Counsel recognized the serious danger for prejudice and continued to object on September 9, 2005, when the Court gave the marshal discretion to restrain Mr. Barrett without either the prerequisite legal or medical showings of necessity or safety.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 8.       Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Mr. Barrett was tried, convicted and sentenced to death when he was in fact mentally incompetent to stand trial.

The federal constitutional due process guarantees of a fair trial, at which the accused has a right to be present and rationally participate in the proceedings, prohibit the trial of a defendant who is mentally incompetent. *Medina v. California*, 505 U.S. 437, 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966). It is therefore "well-settled that the 'criminal trial of an incompetent defendant violates due process.'" *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001) (en banc) (quoting *Media v. California*, 505 U.S. at 453).

A defendant is mentally incompetent if, as the result of mental disease or defect, the defendant is unable to comprehend the nature of the proceedings or rationally assist counsel in conducting the defense. *Drope v. Missouri*, 420 U.S. at 172; *see* 18 U.S.C. § 4241. Where a preponderance of the evidence shows that a defendant lacks the requisite understanding or ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper v. Oklahoma*, 517 U.S. 348 (1996); *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990).

The substantive due process violation that resulted from requiring Mr. Barrett to stand trial while he was mentally incompetent may be established by any relevant evidence, including both the evidence available at the time of trial, as well as any evidence developed since then. *Odle v. Woodford*, 238 F.3d 1084, 1090 (9th Cir. 2001) (determination whether defendant was incompetent in fact required consideration of "old" evidence of mental state evidence at trial and "new" evidence of post-conviction psychiatric evaluations); *Reynolds v. Norris*, 86 F.3d 796, 802 (8th Cir. 1996); see, also, *Gilbert v. Mullen*, 302 F.3d 1166, 1178 (10th Cir. 2002) (discussing different burdens of proof for substantive and procedural competency claims).

The factual allegations set forth in more detail in Claims 2 and 13, and incorporated by this reference as though fully set forth; and the supporting documentary and record evidence submitted with and/or incorporated by reference into this petition irrefutably demonstrates that Mr. Barrett was incompetent as a matter of clinical and medical fact at all stages of the trial proceedings. At the time of his trial, Mr. Barrett had a documented psychiatric history, including medical diagnosis of Bipolar Disorder, a serious mental illness known to produce "bizarre behavior," impair judgment and distort perceptions. *Williamson v. Ward*, 110 F.3d 1508, 1519 (10th Cir. 1997). Mr. Barrett was involuntarily committed to psychiatric hospitals on two occasions and forcibly treated with antipsychotic medication.

In the months preceding Mr. Barrett's arrest, he was psychiatrically decompensating, and his disordered thinking became increasingly paranoid and delusional as he became preoccupied with the distorted belief that he was being monitored by some form of unknown aircraft; and withdrew to his rundown shack, unable to venture into the outside world. Mr. Barrett's mental state was further impaired by brain damage, particularly in the areas that are necessary to reason, exercise sound judgment and inhibit overreaction to stress situations.

Neuropsychological assessment of Mr. Barrett by Dr. Myla Young has revealed that prior to and throughout Mr. Barrett's trial, he suffered brain dysfunction that seriously disrupted his executive functioning, compromising his ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior; screen out interference and sustain attention; inhibit reflexive responses and return to ongoing activity; efficiently integrate multiple outputs; oversee the selection of verbal and non-verbal processing mechanisms; regulate emotional control; direct motor output; and adequately process and make use of new information.   (Exhibit 89 at ¶¶ 36-38;  Exhibit 117 at ¶¶ 57-58.)

George W. Woods, Jr., M.D., a clinical and forensic psychiatrist, has concluded that Mr. Barrett was incompetent at the time of trial, based on Dr. Woods's review of extensive life history and medical data, his clinical evaluation of Mr. Barrett in February 2009, and his consideration of Mr. Barrett's psychiatric diagnosis of Bipolar Disorder and Post Traumatic Stress Disorder (PTSD), as well as the neuropsychological findings of Dr. Young.  In Dr. Woods's expert medical opinion, Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial due to a confluence of his psychiatric disorders (Bipolar Disorder and PTSD) and his neurocognitive dysfunction resulting from his brain damage.  (Exhibit 117 at ¶ 81.)  The distorting and distracting effects of the PTSD were exacerbated by "built-in reminders," in the form of bullet fragments that caused Mr. Barrett continual and significant pain, and an immunological reaction he had to the bullet fragments in his body. (Exhibit 117 at ¶ 79.)  In turn, Mr. Barrett's ability to rationally perceive and attend to legal proceedings was significantly compromised by the racing thoughts indicative of the disabling "manic form" of Bipolar Disorder.  (See *Williamson v. Ward*, 110 F.3d, at 1519; Exhibit 117 at ¶ 80.)  These disabling impacts on Mr. Barrett's mental state were synergistically increased by the effect of his brain

Amended § 2255 Pet.     348     *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

damage to produce a "ruminative" thought process, which caused Mr. Barrett to be "unable to get unstuck." (Exhibit 117, at ¶ 80.)  This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings.  (Exhibit 117 at ¶¶ 59, 80.)

As discussed more fully in Claim 13, the trial record reflects the functional impacts of Mr. Barrett's cluster of impairments.  Mr. Barrett could not regulate his verbal output or emotional control after he became agitated by some aspect of the prosecutor's closing argument.  His involuntary remarks were heard by persons in the courtroom, and his reflexive motoric reaction of attempting to stand prompted intervention by the courtroom marshals.  Once contained and redirected, Mr. Barrett was escorted from the courtroom without further incident.  Mr. Barrett's uncontrolled behaviors, however, disrupted the proceedings and likely had a deleterious effect on the jury's deliberations.  Mr. Barrett's reflexive, self-harming comments and actions occurred without regard to social context or the damage they threatened to inflict on his case, and demonstrate that he was unable rationally to assist with his defense.  Because such behaviors were the product of Mr. Barrett's mental diseases and defects, he was incompetent to stand trial.

The trial and sentencing of Mr. Barrett while he was actually mentally incompetent constitutes a deprivation of due process necessitating the granting of habeas corpus relief without a further showing of prejudice.  *Pate v. Robinson*, 383 U.S., at 386-387; *Dusky v. United States*, 362 U.S. 402 (1960).  The error deprived Mr. Barrett of a fair and reliable determination of guilt and penalty.  *Pate v. Robinson*, 383 U.S., at 386.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 9.** **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense. Direct Appeal Counsel Were Ineffective for Failing to Raise this Issue.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

In a capital case, where the evidence supports it, a court must instruct the jury on a lesser- included homicide offense. This "third option" between first degree murder and acquittal helps insure the reliability of any death verdict if the defendant is convicted of first degree murder. *Beck v. Alabama,* 447 U.S. 625 (1980). *See also, Turrentine v. Mullin,* 390 F.3d 1181, 1192-94 (10th Cir. 2004), *cert. denied*, 545 U.S. 1106 (2005); *Hogan v. Gibson,* 197 F.3d 1297 (10th Cir. 2000), *cert. denied,* 121 S.Ct. 332 (2000)(finding *Beck* error for failing to instruct on lesser forms of homicide).

Here, both the prosecution and the defense requested the trial court instruct on voluntary manslaughter. (R. 4212, 4213, 4215, 4218-19. 18 U.S.C. section 1112.) The United States Attorney conceded there was evidence in the record that raised this lesser offense, because testimony indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's actions in firing on the vehicle could be seen as an imperfect form of self-defense or defense of another, reducing the crime to voluntary manslaughter. Consistent with the reasoning behind *Beck v. Alabama, supra* the prosecutor stated that because this was a capital case, caution dictated a lesser included-offense instruction be given. The United States Attorney distinguished count 3 from counts 1 and 2 (which in

essence charged felony murder), because count 3 had a specific knowledge and intent element. To be guilty of count 3, Mr. Barrett had to have more than the intent required to commit an underlying felony, which alone would supply the necessary intent for first degree murder in the usual felony murder case. As suggested by the Government, and as the court ultimately instructed the jury, to be guilty of count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed Trooper Eales, knowing or having reason to know he was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties. (R. 4215-19, *See also,* Doc. 240, first stage jury instructions; R. 4262-63, elements of count 3.) The court declined to instruct on voluntary manslaughter, ruling the case came down to "murder one or nothing." (R. 4211, 4222.)

The court's ruling violated Mr. Barrett's Fifth Amendment due process rights and his Eighth Amendment rights to a reliable sentencing determination.

This circuit applies a four-part test to determine whether an instruction on a lesser-included offense is warranted: 1) there must be a proper request; 2) the lesser offense consists of some, but not all, of the elements of the greater offense; 3) the element or elements distinguishing the greater and lesser offense are in dispute; and 4) based on the evidence, the jury could rationally convict the defendant of the lesser offense and acquit him of the greater offense. *United States v. Chanthadara,* 230 F.3d 1237, 1257 (10th Cir. 2000); *United States v. Abeyta,* 27 F.3d 470, 473 (10th Cir. 1994). "In the federal courts, it has long been beyond dispute" that a defendant is entitled to an instruction on a lesser offense if the evidence would permit a rational jury to find him guilty of the lesser offense and acquit him of the greater. *Keeble v. United States,* 412 U.S. 205, 208 (1974).

All four requirements for an instruction on voluntary manslaughter were met in Mr. Barrett's case.

There was a proper request, not only by Mr. Barrett, but from the Government as well.

The lesser offense consists of some, but not all, of the elements of the greater offense. The elements of voluntary manslaughter are: 1) the defendant killed the victim; 2) the defendant acted unlawfully; 3) while in a sudden quarrel or a heat of passion, and therefore without malice, the defendant either a) intentionally killed the victim, or b) intended to cause serious bodily injury, or c) acted recklessly with extreme disregard for human life. "Intentionally killed" means either 1) a specific purpose to take the life of another human being, or 2) a willingness to act knowing that the death of another human being is practically certain to follow from that conduct. "Heat of passion" is a passion, fear or rage in which the defendant loses normal self-control, as a result of circumstances that provoke such a passion in an ordinary person, but which did not justify the use of deadly force. Voluntary heat of passion manslaughter is "murder without malice." (Tenth Circuit Pattern Jury Instruction 2.54.) *See also, e.g., United States v. Scafe,* 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir. 1987).

The pertinent elements of count 3 of the superseding indictment, which distinguish it from a "straight" felony murder because a specific intent in connection with the homicide is required, as opposed to simply the intent to commit an underlying felony, are the intentional killing of a state law enforcement officer, whom the defendant knew or had reason to know was a law enforcement officer, and who was killed while engaging in *and on account of* the performance of his official duties. (Doc. 240; R. 4262-63.)

The distinction between the elements of count 3 and voluntary manslaughter is intent. The elements of voluntary manslaughter are a subset of the greater offense, since it would be impossible to commit the greater offense without first committing the lesser offense, *i.e.,* the intentional killing of another human being. The lesser offense of voluntary manslaughter contains no element not required for the greater offense charged in count 3; again, the distinction lies in the level and nature of intent. *Schmuck v. United States,* 489 U.S. 705, 716 (1989).

In Mr. Barrett's case, the element or elements distinguishing the greater and lesser offenses were in dispute. The crux of the whole case was knowledge and intent. The Government contended Mr. Barrett intentionally killed Trooper Eales knowing or having reason to know he was a law enforcement officer engaged in the performance of his official duties, and on account of the performance of those duties. The defense theory was that when Mr. Barrett saw an ordinary, unmarked vehicle he had no idea contained police officers speed toward his house and his son, Toby, he reacted out of fear and fired. This circumstance, while perhaps not justifying the use of deadly force, would have aroused a "heat of passion" in any ordinary individual.

Finally, based on the evidence, a rational jury could convict Mr. Barrett of the lesser-included offense and acquit him of the greater offense. *This is exactly what happened in state court, where Mr. Barrett was convicted of heat of passion manslaughter based on the same defense theory that was advanced in the federal trial.*

Because all four of the elements for determining when a lesser-included offense must be instructed upon were met in Mr. Barrett's case, the court committed constitutional error, at least with respect to count 3, in failing to charge the jury on the offense of voluntary manslaughter. *Beck v. Alabama,* 447 U.S. 625 (1980).

Mr. Barrett also contends, as was discussed in Claim 2, that a voluntary manslaughter instruction was appropriate as a lesser-included offense for counts 1 and 2. Although these were "straight" felony murder counts, heat of passion negates the element of malice, however it is defined.  When one kills in a heat of passion, that act and the mental state underlying it removes the act from being committed in the course or in furtherance of the commission of a felony, which supplies the intent or malice element for felony murder. *Mullaney v. Wilbur,* 421 U.S. 421 U.S. 684, 704 (1975); *United States v. Lofton,* 776 F.2d 918, 920 (10th Cir. 1985).

As set forth in Claim 18, *infra*, appellate counsel were ineffective for failing to raise this issue on appeal, particularly insofar as the error was conceded by the Government at trial, appellate counsel were well aware that Mr. Barrett had been convicted of manslaughter in state court, and the factual basis for Mr. Barrett's federal court defense was the same as it was in state court.  (Exhibit 29.)  Had this issue been raised, there is at the very least a reasonable probability that the outcome of the appeal, particularly (but not exclusively) as to count 3, would have been different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 10.** **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett's right to effective assistance of counsel, to due process, and to a reliable capital sentencing proceeding were violated due to the absence of evidence and an instruction permitting the jury to know and give mitigating effect to evidence casting a doubt on the manner in which the murder of Trooper Eales occurred.

On September 26, 2005, the court entered an order that Mr. Barrett could not rely upon the prior proceedings in mitigation because they were not relevant to the circumstances of the offense, (Tr. 9/26/05 Hr'g at 10-11), and could not rely upon residual doubt as a mitigating circumstance. *Id.* at 11.  This ruling compounded the trial court's prior rulings impairing the defense's ability to cross-examine prosecution witnesses with testimony given in the second state-court trial.

During the penalty phase conference on jury instructions, the court asked whether either party objected to leaving out a residual doubt instruction.  (R. 5288.)  Mr. Hilfiger stated that he did not object.  (R. 5289.)  This omission was professionally unreasonable.

Readily available evidence from long study of how jurors decide whether to impose a death sentence had shown that residual doubts about the defendant's conduct can be powerful factors in deciding to vote for life.  Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998); John H. Blume & Sheri Lynn Johnson, *Competent Capital Representation: the Necessity of Knowing and Heeding what Capital Jurors Tell us about Mitigation*, 36 Hofstra L. Rev. 1035, 1044 & n. 35 (2008).

Mr. Barrett's defense counsel were aware that two prior juries had sufficient doubts about his culpability that they either could not reach a unanimous verdict or rejected first-

degree murder liability.  The principal difference between those trials and the federal trial was the

testimony of seven informants, each of whom was impeached, to a limited and ineffective

degree, on cross-examination.  As argued elsewher in this Petition, if trial counsel had

conducted a reasonable investigation, and/or the Government had complied with its

constitutional obligation to disclose exculpatory evidence, further impeachment would have been

presented.  Regardless of those constitutional violations, trial counsel's failure to seek a residual

doubt instruction at the penalty phase denied Mr. Barrett his constitutional right to have the jury

consider in their sentencing deliberations whatever value there was in the first stage cross-

examination of the informants.

Mr. Barrett had a constitutionally protected right to introduce evidence, and have

the jury give mitigating effect to evidence, that tended to cast doubt on the Government's theory

of the manner in which the crime occurred.  The trial ruling excluding such evidence treated the

issue as one of guilt or innocence.  Professionally diligent counsel would have pointed out that

the evidence of the prior conviction showed that a prior jury was convinced that the death of

Trooper Eales was not brought about in the manner which the Government claimed in the federal

proceedings.

Trial counsel were on notice that courts in other federal death penalty cases, as

well as state courts, had held that residual doubt is a valid mitigation circumstance.  Trial counsel

received from Federal Death Penalty Resource Counsel lists of cases that included references to

cases in which residual doubt was considered in mitigation, and where the defendant received a

sentence less than death.

Capital juries are called upon to express the community's reasoned moral

response to the crime.  Knowledge that two prior juries had been unconvinced that the crime was

committed in a manner consistent with capital murder would have been important to the federal jury's ability to perform this function.

Attorneys acting in a manner consistent with prevailing professional norms would have argued to the court that evidence of the prior jury's conclusion was relevant to the defense evidence presented in the first stage of trial.  For example, during some of their cross-examination, trial counsel attempted to show the jury that nearly all the Government's informant witnesses who provided evidence of malice aforethought had not come forth with their claims during the previous six years of investigation and litigation. (R. 481, testimony of Travis Crawford; R. 3128, testimony of Karen Real.)  Reasonably diligent defense counsel would have argued that these witnesses' testimony was an insufficiently reliable foundation for a death sentence, and informed the jury that another jury representing the community had concluded, without those witnesses' testimony, that the death of Trooper Eales was not caused in a capitally culpable manner.

To the extent the trial ruling excluding consideration of residual doubts about the manner in which the offense occurred was based upon trial counsel proffering sufficient evidence to call into question the reliability of the Government's evidence, the ruling was based on trial counsel's unreasonable failure to investigate the informant witnesses and/or the Government's misconduct in withholding impeachment evidence and/or limiting defense counsel's access to the witnesses as alleged elsewhere in this motion.

District courts in other federal death penalty cases permitted the use of "residual doubt" evidence in mitigation.  *United States v. Davis*, 132 F.Supp. 2d 455 (E.D. La. Feb. 2, 2001); *United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004); *United States v. Bodkins*, 2005 WL 1118158 (W.D. Va. May 11, 2005).  Trial counsel knew, or should have

known, about these cases.  Their existence was discoverable without the need of independent research.  Federal Death Penalty Resource Counsel knew of them and would have informed Mr. Barrett's trial counsel about them.

The Tenth Circuit has recognized repeatedly that residual doubt may be an appropriate strategy in the penalty phase of a capital case.  *Sallahdin v. Gibson,* 275 F.3d 1211, 1240 n. 10 (10th Cir. 2002)(reasonable strategy for counsel, having argued defendant's innocence in the first stage, to a adopt a "residual doubt" approach in the penalty phase); *McCracken v. Gibson,* 268 F.3d 970, 979 (10th Cir. 2001)(counsel not ineffective in penalty phase; he tried to develop some mitigating evidence and also reasonably relied on a residual doubt argument); *Smith v. Gibson,* 197 F.3d 454, 462 (10th Cir. 1999)(citing *Lockhart v. McCree,* 476 U.S. 162, 181 (1986) and recognizing that residual doubt strategy can be extremely effective in a capital case).  The court's preclusion of residual doubt evidence and argument flew in the face not only of authority in other federal death penalty cases, but of the law in this circuit.

Compounding the error, the court gave a bizarre instruction telling the jury residual or lingering doubt about Mr. Barrett's guilt was not a mitigating factor, that it was bound by its first stage verdict, that it could not speculate on the reasons for the verdict in Sequoyah County, and that the sentence in that case could only be considered for any mitigating effect it might have on the sentence in the federal proceedings.  (Doc. 257, Instruction No. 19, R. 5320-21.)

For similar reasons, it was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal.  (ABA Guideline 10.15.1.)  It is at least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have followed its own precedent.  *See* Claim 18, *infra*.

The trial court's refusal to permit Mr. Barrett to rely upon mitigation that other similarly situated defendants were permitted to present was arbitrary and capricious, and violated Mr. Barrett's rights to due process, equal protection of the laws, and to be free from the cruel and unusual imposition of capital punishment.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 11. Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option. Appellate Counsel Were Ineffective for Failing to Raise this Issue on Direct Appeal.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

All that is required for a juror to sit in a capital case is the juror's willingness to consider the range of punishment options. A juror cannot be forced to commit that he or she will actually vote for the death penalty. A juror can be personally, religiously or philosophically opposed to capital punishment and still serve, even if considering or voting for the death penalty would do violence to his or her conscience. So long as a juror's personal views would not prevent or substantially impair him or her from considering all possible punishments and

following the court's instructions, the juror is qualified to serve. Excusing a juror for cause who opposes the death penalty or has conscientious scruples against imposing it, but could nonetheless consider it violates the Fifth, Sixth and Fourteenth Amendments. *Gray v. Mississippi,* 481 U.S. 648, 668 (1987); *Wainwright v. Witt,* 469 U.S. 412, 424 (1985); *Adams v. Texas,* 448 U.S. 38, 45 (1980); *Witherspoon v. Illinois,* 391 U.S. 510 (1968).

Juror 62 was improperly excused for cause by the court solely because of her conscientious scruples against the death penalty, not because she would be prevented or substantially impaired from considering it, even though it might do violence to her conscience, and even though it might be difficult.

Asked by the court if she had any opinions about the death penalty, Juror 62 responded, "I don't – I could not do it. I could not say anybody to be sentenced to death." Asked if she meant by this that she could not personally carry out an execution, the juror stated, "I couldn't even say they deserve it, no. I don't believe in it." The juror stated she could impose a life sentence and had no philosophical, religious, moral or other objections to such a sentence, and said, "Yes, I do[]" when asked whether she had such objections that would "prevent [her] from considering the imposition of a death sentence[.]" (R. Individual jury selection, 819-21.)

Questioned by defense counsel, the juror said that she had held her views on the death penalty her whole adult life. Defense counsel informed her that in order to be qualified to sit on a capital case, she would have to consider not only evidence in mitigation, but the Government's evidence as to why the death penalty should be imposed and to give that evidence "due consideration." Asked if she would be able to do this, the juror responded:

> Well, I don't know if I understand your question, but I could listen to that and see whether he needs to either have the death penalty or go to prison for life without parole.

Amended § 2255 Pet.                              360                              *Barrett v. U.S.,* No. 6:09-cv-00105-JHP

(R. individual jury selection 823-24.)

Again asked, in a slightly different way, whether she could listen to the evidence in aggravation and mitigation, and weigh the evidence, she said she "could probably say he needed to or should," as long as the responsibility lay elsewhere, "but I could not say that he – myself, that he needs the death penalty."  The juror answered "No[]" when asked if she could imagine a murder so heinous that she could "find for the death penalty" after "having considered the Government's evidence[.]" (R. individual jury selection 824-25.)

Questioned briefly by the Government, the juror was asked if she could sign her name to a death verdict form "knowing that the result of that verdict would be the death by execution of another human being, the defendant in this case[.]" The juror responded that if she thought the crime "deserved it," she "probably could sign a paper saying that he should get the death penalty, but I couldn't say to do it.  I could not sign a paper that says the death penalty for him."  Told by the prosecutor that a jury's death verdict was not just a recommendation, and that the judge could not change the verdict, the juror said, "I could not do that, huh-uh."  (R. individual jury selection 825-26.)

The court asked additional death-qualification questions of the juror:

Q.      ... If I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions about the death penalty so strong that you would not be able to follow my instructions?

A.      If you told me I had to, I would do it, because that's my duty, but I would probably live with it for the rest of my life.  But if you told me I had to do it, and I thought that he actually – the crime was so heinous that he should have the death penalty, because I was instructed to do it, and I thought it was, I could do it.  I would do it.  But I do not – I would live –

Q.      So you understand, I realize that no one, probably, if they were asked, wants to serve on the jury where that's a possibility.

A.     I understand that.

Q.     And – but if you were selected – otherwise selected as a juror, would you be willing to put your, what I know are strong, personal beliefs aside, and fairly consider the imposition of the death penalty?

A.      I would consider it, yes.

Q.     And, of course, when you say "consider it," couched in the – in the history of how you've answered these questions, it prompts me to say: Would you consider it fairly?  I mean, in this case, the first thing that would have to happen, before we got to even a sentencing stage, is there would have to be a finding –

A.     Right.

Q.     – that justified – I wouldn't turn the case over to you for sentencing until there had been a conviction for murder that, under the law,  justified either death or imprisonment for life without the possibility of release.  So, under those circumstances, then the Government would have to follow through with their obligation and put on aggravating factors.  And aggravating factors are those factors that would suggest that death is the appropriate punishment.  Then the defendant would have the opportunity to put on what's called mitigating factors.  And as a juror, you'd be obligated to not exactly balance them, but give serious consideration to whether or not the Government had put on sufficient aggravation, when compared to the mitigation, for you to arrive at a death penalty.  So, do you think you could do that?

A.     I think I could.  It would be very hard for me to do that, but if it was my duty.

Q.     Well, I think when you say it would be – that encourages me, because you say it would be very hard.  I agree.  I don't disagree with that.  It will be very hard.  I mean, the people who end up sitting as jurors in any case, but particularly in this case, it's going to be very hard.

A.     Uh-huh.

Q.     And it should be very hard.

(R. individual jury selection 826-28.)

Before turning the floor over for additional questions by counsel, the court asked the juror if she could consider life without the possibility of release, to which the juror responded, "Definitely. I could do that." (R. individual jury selection 828-29.)

Defense counsel had no additional questions for Juror 62. (R. individual jury selection 829.) Questioned again by the Government, the juror stated she realized the judge would never tell her what decision to make. Asked if, considering the two penalty options, she would "take life as the more comfortable out, given [her] feelings about the death penalty[]," the juror said she would "take life, but it wouldn't be comfortable. I would still take life in prison, yes." (R. individual jury selection 829-30.) Asked if she could ever envision a situation in which "[she] would sign [her] name to a death verdict?", the juror responded:

> If the judge told me that that was my options, either the death or – the death penalty and – I would do that, yes. That would be my duty. I'm here, and that would be what I'm here for. But I couldn't live with it, but I would do that, yes.

(R. individual jury selection 830.)

The juror again stated she understood the court would not tell her what sentence to impose. The Government then asked not whether the juror could simply consider both punishment options, but whether she was "capable for returning a death verdict for this defendant[]," to which the juror understandably replied, "I don't know whether I could or not." Again going to the ultimate issue of whether the juror would actually vote to impose the death penalty, given a choice between life and death, the juror was asked if she could "imagine a circumstance in which you would ever impose a death penalty[,]" to which the juror said "No." (R. individual jury selection 830-31.) Mining the same subject – not merely whether the juror could consider death as a punishment option, but whether she could "ever return a death penalty

unless the judge told you, you had to[,]"– the juror responded that she probably could, but could not predict her vote in advance:

> I think I would have to hear what he has done and how heinous it was and all of this.  And I have a – something personal in my life, that happened to me, and I could not, you know – had no remorse about it.  So, I don't know how I would react, but I – you know, since this has never – I've never had this or have to think about, I just always thought I could never do this.  But I think that if it was so bad that I think this person should not even be here anymore, I possibly could do that.  Now, I can't say that I would – you know – I – I – my mind can always be changed, but it has to be changed to where I understand it.  So, I thought – if he deserved it, I – I probably – I think I probably could, but I – I'm only human.

(R. individual jury selection 831-32.)

Yet again going beyond whether the juror could consider the death penalty, the prosecutor asked her in effect "how bad it would have to be" before she voted for the death penalty, to which the juror responded, "It would have to be pretty bad."  In response to the prosecutor's question regarding what she meant, the juror gave the example of killing or torturing a child, but she "couldn't tell you how bad it would have to be."  (R., individual jury selection 832.)

Unsatisfied still, the prosecutor continued without court interference (or objection) to harangue the juror with whether, and under what precise circumstances, she could actually vote to impose the death penalty.  Juror 62 responded reasonably that everything would depend on the facts, but gave every indication that she could consider both penalties, despite her personal views on capital punishment:

> Q.    All right.  Other than torture to a child or something – other than torture to a child, can you imagine a circumstance in which you'd return a death verdict?
>
> A.    I never heard anything so heinous that I even had to think about it.  But I would have to give it a lot of thought.  But I'm – I'm just – I cannot lie to you. I would have to say that I would not know until I'm in that situation.

Q.      Okay.  Well, at the end of the day –

A.      Okay.

Q.      – are your feelings such that you would really be substantially impaired in serving as a juror in a case where you might be asked to vote in favor of a death penalty?

A.      Like I say, it depends on what he has done and how bad I think it is.   And I'd have to weigh all of the things – I cannot say yes nor can I say no.  I would think that – I would think that I am just enough to know that if this is what it is, and I think he deserves it, I probably could sign, yes.  But I'd have to really decide for myself – you know, I'd have to hear it.  I can't say no, I'll just go in here and sign it.  I'd have to see how bad it is.  And it would have to be really bad.[63]

(R., individual jury selection 832-33.)

The United States Attorney then had the temerity to tell the juror that he could not "try the case for you today," detailing the facts of the case so as to inquire whether, on those facts, they would be "bad enough" for her to return the death penalty, even though he asked her repeatedly to commit in advance to signing a death verdict.  (R. individual jury selection 833-34.) As noted above, this is not the test of qualification to sit on a capital jury.  Worn down by repeated questioning on whether she could not just consider both punishment options, but could put her name to a death verdict, the juror, again very reasonably in light of the fact she had heard no evidence, said, "Well, let me just say no, then.  Because, you know, I would have to say no right now.  I know no other thing except to say no, I could not sign it."  (R., individual jury selection 834.)

---

[63]  This is certainly a fair point.  The Supreme Court has held repeatedly that the death penalty should be reserved for a relatively small class of first degree murderers among the entire universe of those convicted of first degree murder.  *E.g., Godfrey v. Georgia,* 446 U.S. 420 (1980).

Amended § 2255 Pet.                          365                  *Barrett v. U.S.,* No. 6:09-cv-00105-JHP

What else could the juror say to such a question?  This is on par with saying, as rational people would, that they could not convict until hearing the evidence.  Jurors are frequently told during voir dire that due to the presumption of innocence, if they had to vote on the case "right now," the verdict would have to be not guilty.  The same is true of similar questions asked regarding the penalty phase, since the Government shoulders the burden of proof.

Continuing the seemingly endless round-robin, the court again inquired of Juror 62 on whether she could set her personal views aside and follow the court's sentencing instructions:

> Q.    ... But if I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions – and I want to repeat those – if they are, tell me – your personal opinions about the death penalty, are they so strong that you would not be able to follow the instructions?
>
> A.    Well, I have to say it again, it's my duty to do this or not to do this, but if you told me that that was one or the other, and I thought he deserved the death penalty, I would have to – I think I could sign the death penalty, if I listened to the information and that it was bad enough, I – and you told me that this was my duty and that this – I probably could sign the death penalty.
>
> Q.    And could you, likewise, consider the possible imposition of life imprisonment without the possibility of release?
>
> A.    Certainly could.

(R., individual jury selection 835-36.)

Defense counsel argued the juror was qualified, and had in fact "backed off her initial stance" when questioned by the Government.  (R., individual jury selection 838.) The Government moved to excuse Juror 62 for cause, arguing that she answered "three or four questions in the right direction, under significant pressure."  (Left unsaid, of course, was that any

pressure applied to the juror came from Mr. Sperling himself, rather than defense counsel or, for that matter, the court.) Yet again focusing on the irrelevant inquiry whether the juror could commit ahead of time to voting for death, the Government maintained the juror was "substantially impaired," because a murder would have to be "really heinous" before she would vote for death. The court agreed with the Government that the juror was "substantially impaired" and excused her for cause, over objection by defense counsel. (R. individual jury selection 838-40.)

This is a classic case of the cardinal *Witherspoon* error: excusing a juror who, though it would be difficult, could set her personal views aside, follow the law, and consider all punishment options, even if it would be unpleasant and would bother her conscience. A juror does not have to be "comfortable" with the death penalty to impose it. Juror 62 said repeatedly she could consider the death penalty. She simply wouldn't take the Government's bait and commit ahead of time to voting for it, which is not the test.

The excusal of Juror 62 was not raised on direct appeal, even though the error was plainly apparent from the record. There was no reasonable strategic ground for omitting this argument. Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

1868

**Claim 12.** **The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett's death sentence and confinement are unlawful and were obtained in violation of his rights under the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment, and the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment because the jury was not instructed that the reasonable doubt standard governed the ultimate penalty determination in this case. *Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows. Although this Court instructed the jury that it must determine whether the government had proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors. The jury was provided with the following penalty phase instruction regarding the weighing process:

> As to Count Three, you must find first the Defendant was at least 18 years of age at the time he committed the offense; and second, the Government has proven beyond a reasonable doubt the existence of the threshold eligibility factor; and third, the existence of at least one statutory aggravating factor; and fourth, that the threshold eligibility factor plus the statutory aggravating factor or factors which you have found to exist sufficiently outweigh any mitigating factor or factors which you found to exist are [*sic*] in the absence of the mitigating factor or factors alone are sufficient to justify imposition of a sentence of death.

1869

(R. 4502.)

This instruction mirrors the federal death penalty statute, which provides only that no death penalty can be imposed unless the jury first finds that the aggravating factors "sufficiently outweigh" any mitigating factors. *See* 18 U.S.C. § 3593(e).

However, as discussed below, the instruction falls short of the requirements of the United States Constitution, which require that the jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that the death penalty is justified and that death is the appropriate penalty to be imposed under all the circumstances.

The Government may not impose a sentence greater than that authorized by the jury's simple verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are also submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 455. The *Apprendi* principle applies to factfindings necessary to put a capital defendant to death. *Ring*, 536 U.S. at 609.

Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase. In order to impose the increased punishment of death, the jury must make additional *factual* findings at the penalty phase. These findings include a finding that the aggravating factors outweigh any mitigating factors.

Under the *Apprendi* holding, because additional factual findings are absolutely required in order to impose an increased punishment, they are sentencing factors that must be proved beyond a reasonable doubt. Under the *Apprendi* rationale, Mr. Barrett was entitled to a

jury instruction that before a death verdict could be returned, the jury was required to find that the aggravating  factors outweighed the mitigating factors beyond a reasonable doubt.

Just as the finding of an aggravating circumstance is a "fact" that must be proved beyond a reasonable doubt under *Ring, supra*, the finding that one or more aggravating circumstances outweigh mitigating circumstances is a factual one.  Indeed, under the federal death penalty statutes applicable to Mr. Barrett's trial, the weighing process leads to the *ultimate* factual finding without which the death penalty may not be imposed.  Therefore, the "fact" that the aggravating factors outweigh the evidence in mitigation is *the indispensable factual finding* that "increases the penalty for a crime beyond the prescribed statutory maximum."  *Apprendi,* 530 U.S. at 490.  In other words, while the finding of one or more aggravating circumstances is a necessary precondition to the imposition of the death penalty, it is not sufficient for the death penalty to be imposed.  Before a death sentence can be returned, the jury must find, as a matter of fact, that the aggravating circumstances outweigh the mitigating circumstances.  Because the weighing instruction given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual finding, the weighing process in Mr. Barrett's case was constitutionally invalid.  This conclusion is proved by the Tenth Circuit's holding in *Rojem v. Gibson,* 245 F.3d 1130, 1135-38 (10th Cir. 2001), where the Court vacated an Oklahoma death row inmate's capital sentence because the trial court failed to give a weighing instruction altogether.  If the weighing process is simply "icing on the cake" and does not require both a *necessary and sufficient* factual finding before a death sentence can be rendered, then the absence of a weighing instruction would be of little significance.  If, as in *Rojem*, it is constitutional error to forgo a weighing instruction altogether, then the flawed weighing instruction given in Mr. Barrett's case, which did not properly allocate the burden of proof, is equally erroneous.

By not requiring a standard for the certainty necessary to impose a death verdict, a defendant might be sentenced to death by jurors who believe it is simply more likely than not the defendant should be sentenced to death, rather than by a unanimous finding that death is appropriate beyond a reasonable doubt.  Put another way, the trial court's weighing instruction permitted the jury to make the ultimate factual finding without which a death sentence cannot be returned by a preponderance of the evidence only.  This plainly violates the Supreme Court's *Apprendi* line of cases.

Moreover, because a death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."  *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).  The requirement of heightened reliability compels the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances before the death penalty may be imposed.

This Court's failure to provide such an instruction to the jury renders Mr. Barrett's death sentence unconstitutional.  To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.

The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function."  *Sullivan v. Louisiana,* 508 U.S. 275, 281 (1993).  It is, therefore, reversible per se.  *Id.* at 281-82.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668. 686 (1984).  Their performance fell far below the standards expected

of competent counsel in capital cases.  Moreover, had counsel requested an appropriate instruction on this issue, there is a substantial probability that Mr. Barrett would not have been sentenced to death.  Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial.  *See* Claim 18, *infra*.

These constitutional violations warrant the granting of this Petition without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 13.** **Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett was denied rights secured by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Rule 43, Federal Rules of Criminal Procedure, when the trial court ordered him removed from the courtroom without a hearing, without a warning, and without just cause. Mr. Barrett's trial counsel acted unreasonably under the circumstances and Mr. Barrett was prejudiced by their unreasonable acts and omissions. Mr. Barrett was held before the jury under the effects and influence of a medication regimen, including both the administration of contraindicated drugs and discontinuation of necessary medication, which substantially exacerbated the neuropsychological impairments of his ability to inhibit unconscious responses to stressful situations, and to exercise judgment, reason and self-control; he was not properly prepared for closing arguments, and was forced to make an un-counseled choice between being present in court under the prejudicial condition of unlawful restraints or relinquishing his right to be present for his trial.

The facts in support of this claim, among others to be presented after further investigation, discovery, access to subpoena power, and an evidentiary hearing, include the following:

During the prosecutor's penalty phase closing argument in the jury's presence, Mr. Barrett impulsively made audible remarks and began to rise from his chair so that he could leave the courtroom. The marshals restrained him and asked the judge if Mr. Barrett should be removed. The court said yes. (R. 5421.) Two to three marshals then took Mr. Barrett from the courtroom, and the prosecutor concluded his closing argument. The court sent the jury out. (R. 5429.) The court then held a hearing with counsel but without Mr. Barrett present to discuss whether it should instruct the jury about Mr. Barrett's removal from the court room. (R. 5430.) The court described the incident in the following way:

> Before the recess and during the closing moments of U.S. Attorney Sperling's closing remarks, the Court first heard the Defendant say words to the effect: Sperling, leave my family out of this. He said something other than that I could not detect. And then I saw the Defendant come out of his chair and make what appeared to the Court to be an effort to get up. I can't say that he was attempting to come out across the table but he did attempt to get up and take a step. As a result of that, it was necessary for the U.S. Marshals to restrain him and take him from the courtroom. I will say that once the marshals made contact with the Defendant, he ceased – there ceased to be any struggle and he was removed from the courtroom without further activity in front of the jury.

(R. 5430.)

Mr. Hilfiger stated that the words Mr. Barrett said which the court did not hear were Mr. Barrett asking why the court and Government did not permit the jury to hear about his statements to law enforcement. (R. 5431.) Mr. Hilfiger also corrected the court's description by saying Mr. Barrett

> was not making an aggressive move toward anybody. What he was saying is I want to get out of courtroom [*sic*]. Take me out of the courtroom. I don't want to be here. And then the marshals, you know, asked you if they could take him out. Before that they were trying to put him back down in the chair. His move as I saw at that point was he was saying, you know, take me out of the courtroom. I want to get out of here. It wasn't an aggressive move towards anybody, just he wanted to get out.

(R. 5432.)

Mr. Hilfiger then stated that Mr. Barrett personally did not want a curative instruction and did not "want to participate in the court proceeding now." (R. 5432.)

According to the prosecutor, a deputy marshal "indicated or asked the Court do you want us to take him out and you [the Court] said yes. And at about that same time, the Defendant indicated he also wanted to leave." (R. 5433.)

The court confirmed that it ordered Mr. Barrett removed from the courtroom, and added that Mr. Barrett "was removed from the courtroom by two or three deputy marshals." (R. 5433-34.)

The Government asserted that the court "should make specific inquiry of the Defendant." (R. 5434.)

Mr. Hilfiger requested no instructions. (R. 5434.) When the court read its proposed instruction, Mr. Hilfiger stated, "I don't really care one way or the other. I don't object, I don't approve." (R. 5435.)

Mr. Hilfiger and Mr. Smith described that in their past interactions with Mr. Barrett, they observed him get upset then calm down and discuss matters. (R. 5436-37.) They recommended that his alleged desires regarding presence in court be revisited. *Ibid*. However, when the court offered them the opportunity to revisit the issue with Mr. Barrett before the court ruled, Mr. Hilfiger declined. (R. 5437.) Trial counsel did not have a private conversation with Mr. Barrett about the incident or his presence; they spoke to him in the presence of a deputy U.S. marshal. (R. 5437.)

The court ordered Mr. Barrett placed in "minimum restraints." (R. 5438.) The court asserted that an unidentified deputy marshal "brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems." (R. 5438.)

Thereafter, Mr. Barrett's counsel requested to speak with him. (R. 5438.)

Mr. Barrett was brought into the courtroom, and the following took place:

> Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings. I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?

Amended § 2255 Pet.  375  *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Mr. Barrett:    Yes, Your Honor.

The Court:    Do you have any questions of the Court about that?

Mr. Barrett:    No, sir.

The Court:    I'll ask the marshal to return – (Interrupted)

Mr. Hilfiger:    One more.  Does that include the verdict?

Mr. Barrett:    Yes, Your Honor.

The Court:    Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

Mr. Barrett:    Yes, sir.

(R. 5439.)

Mr. Barrett was escorted out, and the jury escorted in.  (R. 5439.)

The court read the following instruction to the jury:

Members of the jury, you are instructed that neither the Defendant's conduct nor his statements during closing arguments are evidence in this case and you should not consider them in rendering your verdict herein.

(R. 5440.)

Mr. Barrett was absent for the jury instructions, (R. 5440-45), and for the reading of the jury's verdict.  (R. 5448-50.)

Prevailing professional norms of criminal defense practice advise counsel to maintain close contact with the defendant in order to develop trust, (1 ABA Standards for Criminal Justice, Criminal Defense Function 4-3.1 and commentary (2nd ed. 1986)), and to "advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome." *(Id.*, Standard 4-5.1.)  One reason for this professional norm is "to keep the client from making suicidal choices about the case."  (ABA Guidelines for the

Amended § 2255 Pet.                    376                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Appointment and Performance of Counsel in Death Penalty Cases 11.4.2, commentary (Feb. 1989 ed.)).  Mr. Barrett's counsel failed to follow these fundamental practices and, as a result, the jury was given a false impression of Mr. Barrett, and Mr. Barrett was denied his right to be present during trial.

Mr. Barrett's trial counsel unreasonably failed to conduct a thorough investigation of his background, including his mental health problems.  *See* Claim 2, *supra*.  Nevertheless, Mr. Barrett's counsel knew, or reasonably should have known, (a) that Mr. Barrett had attempted suicide in the past; (b) that Mr. Barrett had been diagnosed with depression and bipolar disorder; (c) that Mr. Barrett had been prescribed medications for these conditions; (d) that Mr. Barrett was not being given medication at the time of trial; (e) that Mr. Barrett was suffering the effects of steroids.  Reasonably diligent counsel, informed about their client's condition, would have taken steps to obtain a competent mental health evaluation and judicial determination of the medical necessity for the drug regimen Mr. Barrett was being administered; the medical appropriateness of discontinuing his psychotropic medications; whether Mr. Barrett had psychiatrically decompensated  since the termination of the medications; and the nature and severity of the functional impact of discontinuing and/or administering any medication on his ability to communicate and cooperate with counsel and on his affect and appearance before the jury.

In the face of a judicial determination that the drug regimen to which Mr. Barrett was subjected was justified by medical necessity, reasonably diligent counsel would have sought a further medical and legal determination of the degree to which the effects of such a regimen interfered with Mr. Barrett's ability to participate in trial proceedings, including any distortion or alteration of his demeanor, affect and presentation in front of the jury; his attitude toward participating in the proceedings; his ability to endure the disclosure and/or discussion of sensitive

information; his capacity to understand his rights and make informed decisions regarding the exercise of waiver of such rights; and his ability and willingness to communicate and cooperate with counsel.

In the event the trial court made a judicial determination that Mr. Barrett's medication regimen was justified and that he was competent to proceed with trial, reasonably diligent counsel would have taken all steps necessary to prevent any untoward scenes in front of the jury, for example, by seeking appropriate medications and counseling Mr. Barrett regarding the prosecutor's likely arguments and preparing him for them. If Mr. Barrett nonetheless acted inappropriately to his potential detriment in front of the jury, reasonably diligent counsel would have renewed the request for a medical evaluation and determination of the necessity for and functional impact of the medication regimen, as well as an assessment of Mr. Barrett's adjudicatory competency.

Mr. Barrett's counsel failed to gather medical records of his medical treatment in jail during the trial and/or failed to provide those records to a competent mental health or other medical expert retained by the defense. Had trial counsel conducted a reasonable inquiry, they would have known that Mr. Barrett had been injected with steroids in jail. If counsel had developed the relationship of trust required in criminal cases, counsel would have been aware that the steroids had a medically predictable effect that contraindicated their use with defendants who were on trial, and impaired Mr. Barrett's capacity to control his inability to endure any psychological or emotional distress that might be caused by the prosecutor's arguments.

Mr. Barrett had a right, protected by the Fifth and Eighth Amendments, to have the jury receive a fair, unadulterated view of him, including his reaction to the proceedings. *See Riggins v. Nevada*, 504 U.S. 127, 142, 143-144 (1992) (Kennedy, J., concurring). Due to the

actions of jailers and the unreasonable omissions of Mr. Barrett's trial counsel, the jury was permitted to see him under the effects of steroids and without the benefit of medication deemed medically necessary to control the emotional dysregulation caused by his bipolar disorder.

Trial counsel's failings and the trial court's denial of authorization for counsel to obtain necessary and appropriate mental health assistance, including the assistance of a psychiatrist, individually and cumulatively deprived Mr. Barrett of his right not to be tried while his functioning was altered and impaired by the effects of voluntarily or involuntarily administered or discontinued medication, and/or while his functioning was altered and impaired by the effects of a medication regimen that was unjustified by any medical necessity. *See* Claims 1, 2, and 3, *supra*.

Mr. Barrett's periodically altered mental condition, the ineffectiveness of his attorneys, and the unlawful actions of the court and marshals, also resulted in the denial of his right to be present during the close of the penalty trial. The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment guaranteed Mr. Barrett the right to be present during all critical stages of the case. *Illinois v. Allen*, 397 U.S. 337 (1970). Under the controlling law,

> a defendant can lose his right to be present at trial if, *after he has been warned* by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.

*Id.*, 397 U.S. at 343 (emphasis added). The trial court's order – which the court initially did not reveal on the record – that marshals remove Mr. Barrett without warning did not comport with the requirements of law. (R. 5430, 5433-34.)

1880

Whether the defense sought or objected to an instruction from the court regarding Mr. Barrett's actions was the "exclusive province" of counsel.  (ABA Standard 4-5.2(c).)  As reflected in counsel's statements on the record, Mr. Barrett's counsel unreasonably failed to give the matter sufficient thought to determine whether an instruction was desirable or not.  (R. 5435.) Counsel unreasonably failed to consider whether an instruction that the jury should disregard the marshal's action in removing Mr. Barrett from the courtroom would have mitigated the prejudice of the jury having witnessed him being forcibly removed.

The willingness of Mr. Barrett's counsel and the trial court to let Mr. Barrett be absent from court during the remainder of the prosecutor's argument, the court's instructions, and the reading of the penalty phase verdict violated Mr. Barrett's constitutional rights.  The trial court plainly ignored the requirement that "courts must indulge every reasonable presumption against the loss of constitutional rights[,]" *Allen*, *supra*, 397 U.S. at 343, when it (a) ordered that Mr. Barrett be placed in additional restraints besides the electric shock device he wore on his back, and (b) permitted him to be absent without informing him that his presence was a constitutional right, and the risks of giving up that right.  Mr. Barrett did not knowingly and intelligently waive his right to be present.

Trial counsel's performance was ineffective because they allowed him to absent himself from the courtroom during critical stages (closing argument, jury instructions, and the reading of the penalty phase verdict) without ensuring that he was making an informed, knowing and intelligent decision.

The error in allowing Mr. Barrett's absence was not harmless.  In his absence, factual matters were discussed, namely what he purportedly said and did that caused the marshal to remove him.  His presence would have contributed to the fairness of the proceeding because

Mr. Barrett could have advised his counsel about the facts. In the context of jury instructions, prejudice has been found wherever a defendant and his lawyer were absent when the court instructed the jury, because counsel could have objected to the instruction or suggested an alternate instruction. See, e.g. *United States v. Rosales-Rodriguez,* 289 F.3d 1106, 1110 (9th Cir. 2002). Here, defense counsel was present, but refused to take a position on the court's proposed jury instruction. "I really don't care one way or the other." (R. 5435.) Had Mr. Barrett been present, he could have consulted with counsel about the proposed jury instruction.

Among the most prejudicial inferences affecting the jury's penalty determination, Mr. Barrett's apparent voluntary withdrawal from the proceedings likely conveyed a misleading sense of indifference to the outcome of the trial, callous disregard for the seriousness of the questions facing the jury, and even lack of remorse. *See Riggins*, 504 U.S., at 144 (Kennedy, J., concurring). Similarly, any jurors who had been focused on the prosecutor before observing the marshals restraining and removing Mr. Barrett may have concluded prejudicially that the marshals acted in response to Mr. Barrett's threatening behavior toward someone in the courtroom or an attempt to escape.

These are other examples of the prejudice that ensued from Mr. Barrett's absence:

It matters not that Mr. Barrett's counsel was present when he was absent.

Although the presence of counsel is certainly a relevant factor to be considered in determining whether a defendant's absence was harmless, the right to be present at trial - grounded in the Confrontation Clause and the Due Process Clause - is not a gossamer right inevitably swept away simply because a defendant is represented, in his absence, by counsel. The right to be present is distinct from the right to be represented by counsel. The right to be present would be hollow indeed if it was dependent upon the lack of representation by counsel. Furthermore, such a rule would ignore the fact that a client's active assistance at trial may be key to an attorney's effective representation of his interests.

1882

*United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001) (Opn. by Carnes, J.). Similarly, Mr. Barrett need not demonstrate any particular issue that his counsel failed to raise in his absence. Forcing Mr. Barrett to make such a showing in order to demonstrate prejudicial error from his absence devalues the constitutional right to be present, and ignores the assistance that a defendant can provide to his counsel during trial. If we were to require that a defendant show with specificity how his presence might have changed the course or outcome of a trial, then the right to be present would cease to exist in many cases in which the evidence of guilt is strong. The right to be present at one's own trial is not that weak. *See Riggins,* 504 U.S., at 137. "Efforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different [in the absence of drugging] would be purely speculative." *United States v. Novaton*, 271 F.3d. at 1000.

Mr. Barrett's trial counsel acted unreasonably (a) by failing to object to the additional restraints; (b) by failing to object to the choice the court gave Mr. Barrett (be present in unlawful restraints or absent); (c) by failing to consult mental health or other medical experts regarding Mr. Barrett's condition, including his competence to make a valid waiver; (d) by failing to raise a doubt about Mr. Barrett's competence; (e) by failing to seek a hearing on his competence and/or the effects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (f) by failing to advise him about the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court, and Mr. Barrett's absence.

Significantly, one of the prosecutors explicitly conceded that he did not "think he [Mr. Barrett] – *consciously* chose to do what he did in the presence of the jury." (R. 5427

Amended § 2255 Pet.   382   *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

[emphasis added].)  According to Mr. Hilfiger, Mr. Barrett himself said "I couldn't take it anymore." (R. 5437.)

Due to trial counsel's unreasonable omissions, or the court's actions, Mr. Barrett was denied (a) his rights under *Riggins*, *supra*; (b) his right to a hearing on his competence to waive presence, *Pate v. Robinson*, 383 U.S. 375 (1966); *Godinez v. Moran*, 509 U.S. 389 (1993); (c) his right to be present and free of unjustified restraints, *see* Claim 7, *supra*; and (d) his right to a fair and reliable verdict on punishment.

Irrespective of whether Mr. Barrett could have made or did make a valid waiver of his right to be present, trial counsel acted unreasonably by failing to seek an instruction that was necessary to avoid harm to the jury's deliberations.  Trial counsel's statements on the record reflect that counsel considered only whether the court's proposed instruction brought Mr. Barrett's actions to mind, or minimized their effects.  Mr. Hilfiger twice stated that he could not think of an instruction to give the jury.  (R. 5426-28.)  Unable to decide, he said, "I don't care."

Upon due consideration, trial counsel would have recognized that the court's instruction failed to address the scope of the problem.  The court's instructions permitted the jury to consider the actions of the marshals in restraining Mr. Barrett and removing him from the courtroom, presumably, from the jury's perspective, upon the court's orders or with the court's blessing.  Although Mr. Hilfiger was adamant that Mr. Barrett had not made an aggressive move toward anyone, he permitted the jury to consider that marshals and the court were justified in removing Mr. Barrett.  There is no reason why Mr. Hilfiger would not have sought a modification of the instruction that would have communicated truthful information about Mr. Barrett not having made any aggressive moves, Mr. Barrett suffering the effects of poor or absent

medical treatment, or an instruction that directed the jury not to consider or draw any inference from Mr. Barrett's absence from the courtroom.

To the extent the facts supporting this claim were apparent on the appellate record, appellate counsel unreasonably failed to raise this issue on appeal.  Had counsel raised the issues presented in this claim it is reasonably probable that the court would have found the numerous violations of federal law were not harmless beyond a reasonable doubt, or constituted plain error.  *See* Claim 18, *infra*.

This Court should find the error substantially influenced the jury's verdict, and vacate the sentence of death imposed on Mr. Barrett in violation of the Constitution and laws of the United States.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 14.** **Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

Some twenty years ago, the federal death penalty was reintroduced; since then it has been used as a tool of federal law enforcement with escalating frequency.  Statistics maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and

subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims.  As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level."  (Exhibit 115.)  Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims which were presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized.  During the administration of Attorney General Gonzales, the difference was even more striking: 41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized.[64] (Exhibit 116.)

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence.  According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases.  Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death

---

[64]     Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzales.

sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference." (Exhibit 115.)

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases. This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008. (Exhibit 113.) Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403. She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim. Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero." (Exhibit 112.)

While some of the statistics above are based in part on periods after Mr. Barrett's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.[65] Had counsel

---

[65] Defendant's Motion To Declare The Federal Death Penalty Statute Unconstitutional, (Doc. 78), does not address the disparate application of the statute according to race of the victim. Appellate counsel did not raise the issue on appeal. *See* Defendant/Appellant's Brief, C.A. No. 06-7005, Proposition VI. To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused," (Doc. 78 at 3), appellate counsel were ineffective in failing to pursue and develop the issue. *See* Claim 18, *infra*.

Amended § 2255 Pet.                            386                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Barrett's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

Mr. Barrett has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act is the work of a single decision maker, i.e. the DOJ. This fact renders the above statistics all the more probative of discrimination. The Court should grant relief from Mr. Barrett's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

**Claim 15.** **Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a

fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case made no mention of the federal death penalty and did not charge the aggravating factors other than those required for a capital offense under 18 U.S.C. § 3592(c) or any of the additional non-statutory aggravating factors relied upon by the Government during the penalty phase.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

As the Supreme Court has made clear in a line of cases:

> "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

*Ring v. Arizona*, 536 U.S. 584, 600 (2002) *quoting Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999). In direct contravention of these principles, the Government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the Government claimed justified Mr. Barrett's death sentence in the indictment. This structural defect in Mr. Barrett's capital proceedings requires that his death sentence be vacated.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the death sentence, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel unreasonably failed to raise this issue on direct appeal.  There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 16.** **Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by misconduct involving the jury.  Such misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Barrett and the case, false or misleading responses of jurors on voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, and/or the trial judge, and improperly prejudging the guilt/innocence and penalty phases of Mr. Barrett's trial.

Mr. Barrett's rights to a fair trial and to due process were violated when the jury was not sequestered in such a way as to avoid contact with prejudicial publicity and hostility to

the defendant, and to avoid contact and communications with third parties, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The Sixth and Fourteenth Amendments to the United States Constitution require that a defendant be tried by an impartial jury that is free from any extraneous influences that could subvert the fact finding process. Where jurors consult information that was not introduced during the course of the trial or that conflicts with the trial judge's instructions, the jurors become unsworn witnesses against the defendant in violation of the Sixth Amendment. Mr. Barrett had no opportunity to confront the extraneous information to which the jurors were exposed, denying Mr. Barrett his Sixth and Fourteenth Amendment rights to a fair trial and due process.

The introduction of extraneous materials or evidence has consistently been held to mandate a new trial. Mr. Barrett should be granted a new trial which can be conducted free of extraneous and prejudicial influences.

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Barrett's prejudice. Counsel's ineffective assistance resulted in the deprivation of Mr. Barrett's rights under the Sixth, Eighth and Fourteenth Amendments. Relief is appropriate.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 17.    Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment.**

Throughout his life, Mr. Barrett has struggled with severe mental illness, as well as organic brain disease and neurological and intellectual impairments. The Eighth Amendment's prohibition of the execution of the mentally retarded and underage offenders should be expanded to preclude the execution of severely mentally ill individuals such as Mr. Barrett.  Similar to people with mental retardation and juveniles, the execution of the mentally ill serves no retributive or deterrent function and offends "evolving standards of decency."

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of individuals with mental retardation.  The Court reasoned that a person with mental retardation is both less culpable and less able to be deterred because of his "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318.

In *Roper v. Simmons*, 543 U.S. 304 (2005), the Court held that the execution of juveniles who commit crimes while under age eighteen also violates the Eighth Amendment. Analogous to *Atkins*, the Court reasoned, "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity. . . .  [T]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Id.* at 571-72 (internal quotations omitted).

Although neither *Atkins* nor *Roper* explicitly addresses a categorical exception for persons who are severely mentally ill, the reasoning of the decisions makes necessary an

Amended § 2255 Pet.                    391          *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

expansion of Eighth Amendment protection to the mentally ill. *Atkins'* and *Roper*'s bar on the death penalty for the mentally retarded and underage offenders was levied to remedy those very wrongs inherent in the execution of the mentally ill.

People with mental illness, like Mr. Barrett, share the characteristics that make the execution of mentally retarded and underage individuals inconsistent with the retributive and deterrence functions of the death penalty, such as a diminished capacity for understanding, impulse control, and ability to engage in meaningful cost-benefit analysis. ABA, *Special Feature: Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R 668, 670 (2006).

Moreover, the execution of the mentally ill offends the "evolving standards of decency" protected by the Eighth Amendment. That amendment's analysis is "informed by objective factors," such as the views of professional "organizations with germane expertise." *Atkins*, 536 U.S. at 312, 316 n.21. Here, the leading legal professional organization in the country, the American Bar Association, unequivocally express the view that "[d]efendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law." American Bar Resolution 122A, unanimously passed on August 8, 2006; ABA, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R at 668. In addition, nearly every major mental health association in the United States has published a policy statement addressing the issue of the execution of mentally ill offenders, and all of those organizations advocate either an outright ban on executing *all* mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be

implemented.[66]   Moreover, just as in *Atkins* and *Roper*, where international law and opinion

weighed against the execution of persons with mental retardation, international law and opinion

weigh against the execution of the mentally ill.[67]

Mr. Barrett does not have, and never has had, an intact brain.  (*See* Claim 2, §

B.2.b., *supra*; Exhibit 117; Exhibit 89.)  He suffers from severe mental illness in the form of

Bipolar Disorder, Post Traumatic Stress Disorder and Dysexecutive Syndrome, and his brain is

organically damaged.  Experts who have examined Mr. Barrett have opined that Mr. Barrett's

functioning is compromised by multiple neurological and neuropsychiatric symptoms such that

---

[66]*See* American Psychiatric Association, *Moratorium on Capital Punishment in the United States* (approved October 2000), APA Document Reference No. 200006; American Psychological Association, *Resolution on the Death Penalty in the United States*, National Alliance for the Mentally Ill, *The Criminalization of People with Mental Illness*; National Mental Health Association, *Death Penalty and People with Mental Illness* (approved March 10, 2001). Specifically, the National Mental Health Association (NMHA) found that the fact-finding portion of capital trials "fails to identify who among those convicted and sentenced to death actually has a mental illness." NMHA, *Death Penalty and People with Mental Illness.* Similarly, the American Psychological Association (APA) argued that too many "[p]rocedural problems, such as assessing competency," render capital punishment unfair to the mentally ill. APA, *Resolution on the Death Penalty in the United States*. Such procedural inadequacies fall far short of the "basic requirements of due process," according to the American Psychiatric Association (AMPA). AMPA, *Moratorium on Capital Punishment in the United States*. Thus, the NMHA, APA, and AMPA believe that the criminal justice system routinely executes many mentally ill individuals without realizing that any illness existed and, therefore, without considering that illness as a mitigating factor.  The National Alliance for the Mentally Ill (NAMI) advocates an outright ban on death sentences for individuals with any type of brain disorder. NAMI, *The Criminalization of People with Mental Illness*.

[67]The International Covenant on Civil and Political Rights (ICCPR) specifically forbids the use of the death penalty in an arbitrary manner, International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 (1966), art. 6, and the Human Rights Committee of the United Nations has interpreted the treaty to forbid the execution of persons with severe mental illness. *See* William Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 Criminal Law Forum 95, 100 (1993).  Although the United States issued a reservation to article six, the Human Rights Committee has concluded that the reservation is invalid.  Moreover, customary international law also prohibits the execution of Mr. Barrett.  *Id.*

---

he mis-processes information and cannot understand the difference between right and wrong. (Exhibit 117.) Simply put, Mr. Barrett cannot think the way that other people think; he cannot experience and interact with the world the way other people do; and he cannot act in his own best interest in a rational manner. In light of these circumstances, *Atkins* compels that Mr. Barrett's sentence violates the Eighth Amendment.

Because of both his organic brain disease and severe mental illness, there is no meaningful way to distinguish Mr. Barrett from the people protected by *Atkins*. His execution would violate the Eighth Amendment. The holdings of *Atkins* and *Roper* should be extended to protect Mr. Barrett from a penalty disproportionate to his culpability.

As with mental retardation, Mr. Barrett's status as a person with significant mental illness is non-waivable and should preclude his execution without regard to waiver.

**Claim 18.    The Failure of Counsel to Raise or Effectively Argue on Appeal Claims Which Are of Record Violated Mr. Barrett's Due Process Right to Effective Assistance of Appellate Counsel.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

The Due Process Clause of the Fifth Amendment guarantees to a defendant in a criminal case the effective assistance of counsel on appeal. *Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *United States v. Cook*, 45 F. 3d 388, 392 (10th Cir. 1995). Where a petitioner challenges the outcome of his appeal, the question whether the result should be upheld is resolved based upon the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *Roe v. Flores-Ortega*, 528 U.S. 470 (2000). Here, Petitioner shows his counsel's performance on appeal fell below prevailing professional norms in that counsel either failed to recognize meritorious issues, failed to consult with Mr. Barrett regarding whether to raise meritorious issues or not, or both.

The outcome of the appeal is unreliable; the issues appellate counsel could have raised, either individually or cumulatively, create a reasonable probability that the judgment or sentence would not have been affirmed.

Imposition of a death sentence without meaningful appellate review violates the Eighth Amendment. *Parker v. Dugger*, 498 U.S. 308, 321 (1991). As demonstrated *infra*, the record of this case presented numerous grounds for reversal, and for distinguishing this case from others in which a death sentence was imposed, and likening this case to cases in which a sentence less than death was imposed. To the extent the Court of Appeals prevented appellate counsel from briefing those issues, there was a failure of meaningful appellate review in violation of Mr. Barrett's rights to due process and to be free from arbitrary imposition of the death penalty.

While an action under 28 U.S.C. § 2255 is not intended as a second direct appeal, and issues framed by the trial record are ordinarily considered waived if not raised on direct appeal, *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994), cause for excusing a procedural bar exists where appellate counsel provides ineffective assistance. *Murray v. Carrier*, 477 U.S. 478 (1986). Mr. Barrett can establish cause for any alleged failure to present a previously framed issue on appeal. Appellate counsel in this case unreasonably failed to recognize meritorious issues for appeal. (Exhibit 29.) For the reasons expressed in Claim 1; Claim2, Parts A.1, A.5, A.11; Claim 3; Claim 4; Claim 5, Part D; Claim 6; Claim 7; Claim 9; Claim 10; Claim 11; Claim 12; Claim 13; Claim 14; Claim 15; and Claim 19, there is at least a reasonable probability that the conviction or sentence would have been reversed on appeal if these issues had been raised. The allegations of these claims are incorporated herein by specific reference.

### A. Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel.

#### 1. Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government.

To the extent the matters raised in Claim 1 could have been raised on direct appeal, appellate counsel were ineffective which resulted in a violation of Mr. Barrett's right to Due Process under the Fifth and Fourteenth Amendments. *See Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *United States v. Cook*, 45 F. 3d 388, 392 (10th Cir. 1995). As stated *supra*, Judge Payne specifically selected Roger Hilfiger for this case over the recommendations of the Oklahoma Federal Defenders that he appoint more experienced capital defense counsel. Judge Payne appointed Mr. Hilfiger for the expressed purpose of boosting counsel's experience so that he could receive future capital appointments. Judge Payne refused to compensate prior lead counsel, John Echols, at the highest prevailing rate for capital defense counsel, but immediately raised Mr. Hilfiger's compensation to that level after Mr. Echols withdrew from the case. Judge Payne required Mr. Echols to be painstaking in his accounting for resources, but permitted Mr. Hilfiger to make requests based on his "best guestimate." In sum, Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter. Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal. To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in Claim 1 could not be adequately litigated on appeal, because they required consideration of extra-record evidence. (Exhibit 29.) To the

Amended § 2255 Pet.  396  *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work. (ABA Guidelines, *supra*, Guideline 10.15.1.)

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal. (Exhibit 29.) However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal. (*Id.*) Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards. At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised in Claim 1 had been raised on appeal. The record shows the trial judge interceded on behalf of the prosecution in a way that deceived defense counsel and aided the prosecutors in their effort to delay revealing the names and type of testimony that would be offered from the Government's seven most important witnesses.

> **2. Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under 438 U.S. 154 (1978).**

For the reasons stated in Claim 2, Part A.1, and Claim 4, *supra*, Mr. Barrett had at the time of appeal, a claim based on *Franks v. Delaware*, that was at least partially framed by the record. Appellate counsel did not raise the issue because he felt trial counsel had failed to make an adequate record. (Exhibit 29.) The *Franks* issue, in conjunction with a claim of ineffective assistance of trial counsel for failing to competently argue it, would have made a difference in the outcome of the appeal, Mr. Barrett was prejudiced. Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Eagle v. Linahan,* 279 F.3d 1283, 1301-06, 1308 (11th Cir. 2002) (counsel

ineffective on appeal for failing to raise error apparent on the record); *Carter v. Bowersox,* 265 F.3d 705, 709-10, 716 (8th Cir. 2001) (direct appeal counsel ineffective for failing to raise issue apparent on the record, even though not preserved or adequately preserved, under plain error standard); *Mason v. Hanks,* 97 F.3d 887, 897 (7th Cir. 1996)(direct appeal counsel ineffective for failing to raise issue apparent from the record).

### 3. Appellate Counsel Unreasonably Failed to Raise on Appeal the Government's Inappropriate Use of Hearsay Evidence used to Show Propensity or Character.

In Claim 2, Part A.5, Mr. Barrett demonstrated that improper "propensity" evidence concerning alleged statements made by him to various informant witnesses threatening violence to the police if they showed up on his property was wrongly admitted, and that trial counsel were ineffective for failing to lodge appropriate, timely objections to this evidence.  To the extent trial counsel did preserve this issue by filing a response to the Government's 404(b) Notice (Docs. 206, 215), and by at least lodging some objections to part of this testimony, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.

Because the 404(b) issue was meritorious, even based on the record that was made, no reasonable strategic basis for excluding it exists.  Due to trial counsel's omissions, appellate counsel was forced to raise several issues that were subject to review for clear error. The failure to raise the issue was professionally unreasonable.  Had the issue been raised, a reasonable probability exists that the outcome of the appeal would have been different.

### 4. Appellate Counsel Unreasonably Failed to Raise on Appeal the Jury's Exposure to Phony Expert Jim Horn.

In Claim 2, Part A.11, Mr. Barrett showed that the testimony of Government "expert" Jim Horn was erroneously and prejudicially heard by the jury.  The fact that trial

counsel failed to preserve error initially by moving to exclude the testimony of Mr. Horn, and only asked for his testimony to be stricken after the court's *sua sponte* expressions of concern, did not necessarily waive for appeal the issues of mistrial and a meaningful jury instruction to cure the error in permitting Horn to testify.  Appellate counsel could and should have raised the issue as falling under the plain error doctrine, since trial counsel had failed to raise them in a timely fashion.  *United States v. Johnson*, 520 U.S. 461, 467 (1997);  *United States v. Olano*, 507 U.S. 725, 732 (1993).   "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings."  *United States v. Burbage,* 365 F.3d 1174, 1180 (10th Cir. 2004).

The trial court itself had identified the existence of error, but had not remedied it with a more appropriate instruction or a mistrial.  Mr. Barrett's right to a fair trial and, ultimately, a fair sentencing proceeding were thus affected and, particularly given the highly questionable nature of Mr. Horn's testimony, the integrity of these proceedings was unquestionably tainted.

> **5.     Appellate Counsel Unreasonably Failed to Raise on Appeal the Prosecutors' Use of Improper, Inflammatory Argument in Violation of Mr. Barrett's Due Process Rights**

Prosecutorial misconduct through questions and argument as described Claim 5, Part D was not raised on direct appeal.  The misconduct of the prosecutors in both stages of trial was glaring.  No reasonable strategy excused the failure to raise the claim.  Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.

*Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

**5.**     **Appellate Counsel Unreasonably Failed to Raise on
Appeal the Trial Court's Unconstitutional Restrictions
on the Use of Mr. Barrett's Statements.**

As set forth in Claim 6, *supra*, the trial court placed unconstitutional restrictions
on the introduction and use of Mr. Barrett's statements.  This issue was clearly framed by the
record.  Appellate counsel acted unreasonably in failing to present this issue to the Court of
Appeals.  Because of the overriding importance of mitigating evidence in capital cases, the
Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant
mitigating evidence is excluded.  *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Eddings v.
Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978).  There could be no
reasonable strategy for neglecting to raise this issue.  There is a reasonable probability that had it
been raised, the outcome of the appeal would have been different.

Without considering the mitigating impact Mr. Barrett's statements would have
had, the Court of Appeals could not conduct meaningful review of the death sentence.  The
appellate court's view of the balance of aggravating and mitigating evidence was skewed, as was
the jury's, in favor of death.

**6.**     **Appellate Counsel Unreasonably Failed to Raise on
Appeal the Unconstitutional Use of a Shock Belt on Mr.
Barrett during Trial.**

As set forth in Claim 7, *supra*, the trial court, admittedly without constitutionally
required justification, ordered Mr. Barrett to be fitted with an electric-shock belt during trial.
The shock pack created a large bulge under Mr. Barrett's clothes, induced fear in Mr. Barrett,
distracted him from the trial, and prevented him from sitting normally or concentrating on the
proceedings.

The trial court's lack of justification for the use of this restraint was apparent on the record, as were some of its affects on the trial. To the extent the shock belt was used without sufficient justification, the constitutional violation was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance. Appellate counsel believed the issue required extra-record development. (Exhibit 29.) The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt. In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness. Therefore, there is a reasonable probability that Mr. Barrett would have been granted a new trial if the issue had been raised on direct appeal.

**7.      Appellate Counsel Unreasonably Failed to Raise on
Appeal the Trial Court's Unconstitutional Denial of a
Jury Instruction on Lesser Included Offenses.**

As set forth in Claim 9, *supra*, the trial court unconstitutionally failed to instruct the jury on the lesser included offense of voluntary manslaughter. Appellate counsel asserts he failed to raise this issue because it was not adequately preserved for appeal by co-appellate counsel, Roger Hilfiger. (Exhibit 29.) Counsel's judgment was unreasonable. Although many issues not preserved for review with timely objections or records were raised on appeal, this fully preserved issue, *even conceded by the Government at trial,* was not. Appellate counsel was well aware that Mr. Barrett had been convicted of manslaughter in state court. The factual basis for Mr. Barrett's federal court defense was the same as it was in state court. Under these very clear circumstances, *no* reasonable strategy excuses the failure to raise this issue, as appellate counsel recognizes. (Exhibit 29.) Had this issue been raised, there is at the very least a reasonable

probability that the outcome of the appeal, particularly (but not exclusively) as to Count 3, would have been different.

**8.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred.**

As set forth in Claim 10, *supra*, the trial court violated Mr. Barrett's rights under the Fifth, Sixth, and Eighth Amendments by failing to instruct jurors that they could consider in the second stage doubts regarding the raid.  It was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal.  (ABA Guideline 10.15.1.) It is at least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have followed its own precedent and reversed the death judgment.

**9.      Appellate Counsel Unreasonably Failed to Raise on Direct Appeal the Trial Court's Unconstitutional Dismissal of Juror 62.**

The dismissal of Juror 62, as set out in detail in Claim 11, *surpa*, was not raised on direct appeal, even though the error was plainly apparent from the record.  There was no reasonable strategic ground for omitting this argument.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.

**10.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Failure to Require Proof Beyond a Reasonable Doubt as to the Weighing Factor Necessary to Impose a Death Sentence.**

As set forth in Claim 12, *supra*,  the Court's failure to provide an instruction to the jury regarding the Government's burden to prove beyond a reasonable doubt that the aggravating circumstances outweigh mitigating circumstances renders Mr. Barrett's death sentence unconstitutional.  To the extent that the federal death penalty scheme allows capital

defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.  The "fact" that the aggravating factors outweigh the evidence in mitigation is *the indispensable factual finding* that "increases the penalty for a crime beyond the prescribed statutory maximum." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).  Because the weighing instruction given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual finding, the weighing process in Mr. Barrett's case was constitutionally invalid. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial.

> **11.  Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Removal of Mr. Barrett from the Courtroom.**

As set forth in Claim 13, *supra*, Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated due to the effects of drugs he was given in jail, trial counsel's failure to inquire about the drugs' effects, the trial court's removal of Mr. Barrett from the Courtroom in the presence of the jury without cause or inquiry, and Mr. Barrett's subsequent absence from critical stages of the proceedings without a valid waiver.  To the extent the matters surrounding the forceful removal and denial of presence at all critical proceedings are a matter of record, it was unreasonable for appellate counsel not to raise these issues on appeal.  It is at least reasonably probable that the conviction or sentence would have been reversed and new proceedings ordered if these multiple violations of the Constitution were presented on appeal.

> **12.  Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Racial Bias in the Administration of the Federal Death Penalty.**

As set forth in Claim 14, *supra*, trial counsel filed a Motion To Declare The Federal Death Penalty Statute Unconstitutional (Doc. 78), which addressed the disparate application of the statute but did not argue disparity based on the race of the victim.  Appellate counsel did not raise on appeal the issue of the unconstitututionality of the federal death penalty on the basis of arbitrary and capricious disparities in application of the penalty based on the race of the victim on appeal.  To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused" (Doc. 78 at 3), appellate counsel acted unreasonably in failing to raise the issue.  There is a reasonable probability that the death sentence would have been vacated had the issue been raised.

To the extent the Court of Appeals prevented appellate counsel from raising this issue, the court's review of the death sentence imposed on Mr. Barrett was constitutionally inadequate.  The Court of Appeals failed to consider the disproportionate use of the federal death penalty based on the race of the victim.

### 13.   Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment.

As set forth in Claim 15, *supra*, Mr. Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case made did not charge either the non-statutory aggravating factors relied upon by the government during the penalty phase or the allegation that the aggravating factors outweighed the mitigating factors.  Appellate counsel unreasonably failed to raise this issue on

direct appeal.  There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

**B.      A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise.**

The Court of Appeals reviewed the errors in this case cumulatively.  *United States v. Barrett*, *supra*, 496 F.3d at 1121.  "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'"  *Ibid.*, quoting, *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002).  The review conducted on appeal was deficient due to the unreasonable omissions of appellate counsel, the Court of Appeals' limitations on counsel, or both.

There is a reasonable probability that any two or more of the errors identified herein *supra*, if they had been considered cumulatively on appeal, would hare resulted in reversal.  Several of the errors appellate counsel unreasonably failed to raise, or did raise on appeal, complement each other such that the risk of harm is increased.  For example, the harm from the trial court's withholding from trial counsel the contents of the *ex parte* hearing complements the continuance issue raised on appeal.  As appellate counsel states, without knowing that Judge Payne had said he believed a continuance was likely, failed to seek a continuance because he believed the court would deny the request.  (Exhibit 29.)  Issues related to the seven snitches would have been enhanced if trial and appellate counsel had argued the Government's violation of Fed. R. Evid. 404(b), particularly with regard to failure to disclose that Karen Real would testify to prior bad acts.

Multiple errors in the second stage had greater cumulative impact than their already prejudicial independent impact.  The jury in this case, after being denied the opportunity to convict on manslaughter, were denied consideration of Mr. Barrett's statements, doubts about the raid, and were inflamed by improper argument and seeing Mr. Barrett in an electric shock belt.  These errors, in and of themselves, or combined with the unconstitutional circumstances that removed Mr. Barrett from the courtroom, had a prejudicial influence on the penalty deliberations.

Whether considered individually or cumulatively, appellate counsel's unreasonable failure to raise issues on appeal, and/or the Court of Appeals' failure to consider them, violated Mr. Barrett's rights under the Fifth, Eighth, and Fourteenth Amendments.  The judgments of conviction and sentence should be set aside.

**Claim 19.       Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case.**

Mr. Barrett's convictions and sentences are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness.  *Taylor v. Kentucky*, 436 U.S. 478, 487, and n. 15 (1978).

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.  In addition, Mr. Barrett re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

Amended § 2255 Pet.                                406                          *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process.  Each of these errors deprived Mr. Barrett of important constitutional rights, including but not limited to his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claims presented in this Petition individually justifies reversal, when considered cumulatively, these errors denied Mr. Barrett his constitutional rights.

These constitutional violations warrant the granting of this Petition without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

## IV.    Prayer for Relief.

WHEREFORE, Movant Kenneth Eugene Barrett asks that this Court provide the following relief:

1.    Recuse himself and have all proceedings regarding this Petition reassigned randomly to another judge;

2.   That Petitioner be permitted to file a Memorandum of Law in Support of this Petition in accordance with a briefing schedule established by this Court;

3.   Require Respondent to file an Answer to the Petition in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Petitioner's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

4.   Permit Petitioner to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

5.   Permit Petitioner to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Petition, and refute any defenses thereto raised by the Respondent's Answer;

6.   Permit Petitioner to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Petitioner, and, to allow the amendment to relate back to the date of the filing of his Section 2255 Motion;

7.   Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Petitioner's Response to any Affirmative Defenses raised by the Respondent. Because Petitioner has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

8.      Permit oral argument as appropriate and required;

9.      Vacate Petitioner's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

10.     Grant such further and additional relief as may be just.

DATED:   September 25, 2009

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

**APPENDIX A**

**PROCEDURAL HISTORY**

**I.     State Court Proceedings**

1.      On September 24, 1999, Movant was charged by Information in the District Court

of Sequoyah County, Oklahoma with one count of first-degree murder and three

counts of shooting with intent to kill. The Information was subsequently amended

to charge Movant with one count of first-degree murder, one count of shooting

with intent to kill, and two counts of discharging a firearm with intent to kill.

(Case No. CR 99-493, Garrett, J.)

2.      The case proceeded to trial and ended in a hung jury on October 18, 2002.

3.      Movant was re-tried on the same charges in January and February of 2004.

The jury rejected the first-degree murder charge and instead found Movant

guilty of the lesser-included crime of first-degree manslaughter. The jury

also rejected the shooting with intent to kill charge and instead found

Movant guilty of the lesser-included offense of assault and battery with a

dangerous weapon.  The jury acquitted Movant on the two counts of

discharge of a firearm with intent to kill.

4.      On April 19, 2004, Movant was sentenced to a term of imprisonment of

twenty years on the manslaughter conviction and ten years on the assault

and battery conviction, with the two terms to run consecutively.

5.      Movant did not appeal his convictions or sentences.

6.      At both state trials, Movant was represented by John David Echols, Esq.,

and the State was represented by Darrell Dowty, Asst. Dist. Atty.

Amended § 2255 Pet.                     410                     *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

## II.      Federal District Court Proceedings

7.      On September 23, 2004, a criminal Complaint was filed against Movant in the United Stated District Court for the Eastern District of Oklahoma charging him with eight criminal counts, including intentionally killing a state law enforcement officer engaged in the performance of the state law enforcement officer's official duties, in violation of 21 U.S. C. § 848(e)(1).

8.      On November 9, 2004, a federal grand jury returned a three-count Indictment against Movant. Count 1 charged Movant with using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 2 charged Movant with using and carrying a firearm in relation to a crime of violence, i.e., the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties, and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 3 charged Movant with intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). With respect to Count 3, the grand jury made the following "Special Findings": (a) Movant was 18 years of age or older at the time of the offense; (b) Movant intentionally killed a state law enforcement officer, intentionally inflicted serious bodily injury that resulted in the death of a state law enforcement officer,

intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and a state law enforcement officer died as a direct result of the act, or intentionally and specifically engaged in an act of violence, knowing that the act created a great risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and a state law enforcement officer died as a direct result of the act; and (c) Movant, in the commission of the drug trafficking offenses alleged in Count 3, and in escaping apprehension for a violation of said offenses, knowingly created a grave risk of death to one or more persons. (Case No. 6:04-cr-115P, Payne, J.)

9. On February 9, 2005, the grand jury returned a superseding indictment against Movant. Although the superseding indictment included some amendments, it contained the same three basic counts as the original indictment.

10. On February 15, 2005, the Government filed notice of its intent to seek the death penalty with respect to all three counts with which Movant was charged.

11. The case proceeded to trial on September 12, 2005. On November 4, 2005, the jury found Movant guilty of all three counts. In response to special interrogatories propounded by the District Court, the jury found beyond a reasonable doubt that Movant committed murder in connection with

Counts 1 and 2 (i.e., that he committed the unlawful killing of Trooper Eales with malice aforethought).

12.   On November 9, 2005, the second-stage proceedings began.

13.   On November 17, 2005, at the conclusion of all the second-stage evidence, the jury found, in pertinent part, that Movant was at least eighteen years old at the time of the offenses of conviction, and that, with respect to each of the three counts of conviction, he intentionally killed Trooper Eales.

14.   As for the statutory aggravating factors, the jury found, with respect to Counts 1 and 2, that Movant killed or attempted to kill more than one person, i.e., Troopers John Hamilton, Jr., and David Eales, in a single criminal episode, and committed the offenses after substantial planning and premeditation to cause the death of a person. (The jury rejected the statutory aggravating factor that Barrett knowingly created a grave risk of death to persons other than Hamilton and Eales.) With respect to Count 3, the jury found that Movant, in the commission of the offense or in escaping apprehension for the offense, knowingly created a grave risk of death to one or more persons in addition to Trooper Eales, and that Movant committed the offense after substantial planning and premeditation. As for the non-statutory aggravating factors, the jury found, with respect to all three counts of conviction, that Movant caused injury, harm, and loss to the victim's family, but rejected the Government's assertion that Movant was likely to commit criminal acts of violence in the

future which would be a continuing and serious threat in an institutional correctional setting to the lives or safety of other persons.

15. As for mitigating factors, some or all of the jurors found the existence of the following factors with respect to all three counts: Barrett had accepted responsibility for the death of Eales from his previous conviction (found by five jurors with respect to each count); Barrett had been convicted and punished for the death of Eales (found by five jurors with respect to each count); Barrett, at the time of the shooting incident, had no prior felony convictions (found by all twelve jurors with respect to each count); Barrett was a father (found by all twelve jurors with respect to each count); Barrett was a loved son and stepson (found by all twelve jurors with respect to each count); Barrett was a good neighbor and friend (found by seven jurors with respect to each count); Barrett's death would impact his child, family and friends (found by all twelve jurors with respect to each count); Barrett would not present a future danger to society by being imprisoned for life without possibility of release as demonstrated by his incarceration since September 24, 1999 (found by two jurors with respect to each count); that other factors in Barrett's childhood, background or character mitigated against imposition of the death sentence (found by one juror with respect to Counts 1 and 2, and by two jurors with respect to Count 3); that Barrett never left his residence during 1999 (found by one juror with respect to each count); and that Sequoyah County Sheriff Johnny Philpot had mistreated Barrett when Barrett was seventeen years old (i.e., Philpot had

an altercation with Barrett during which Philpot broke Barrett's jaw)

(found by six jurors with respect to each count). All of the jurors rejected

the alleged mitigating factor that Barrett had expressed remorse for his

crimes.

16.     Ultimately, the jury found that sentences of life imprisonment without the

possibility of release should be imposed with respect to Counts 1 and 2,

and that a sentence of death should be imposed with respect to Count 3.

17.     On December 19, 2005, the district court conducted a sentencing

proceeding during which it imposed the sentences recommended by the

jury. Judgment was entered in the case on December 29, 2005.

18.     Movant filed a timely Notice of Appeal of his convictions and his death

sentence to the United States Court of Appeals for the Tenth Circuit on

December 28, 2005 (Case No. 06-7005).

19.     Roger Hilfiger, Esq. and Bret Smith, Esq. represented the Movant in these

proceedings. The Government was represented by Sheldon Sperling, U.S.

Atty. and D. Michael Littlefield, Asst. U.S. Atty.

## III.    Federal Court of Appeals Proceedings

20.     In his direct appeal, Movant challenged his convictions and sentence of death by

raising the following claims:

a.      The district court erred by denying Movant's motion to suppress. More

specifically, the search warrant did not satisfy the Oklahoma standards for

a nighttime warrant; the executing officers failed to meet Oklahoma

standards regarding executing officers; the warrant failed to comply with

Fed. R. Crim. P. 41 (warrant was not issued by a federal officer); and the evidence should be suppressed on double jeopardy grounds.

b. Movant challenged the indictment, more specifically, its sufficiency because it failed to set forth elements of predicate offenses; its multiplicity because all three counts were based on the same conduct, firearms, drugs, and killing of the same person; and misjoinder of offenses.

c. The district court allowed admission of improper victim impact evidence.

d. The district court allowed juror misconduct, more specifically, one of the jurors knew a state trooper involved in the case and another trooper had limited contact with a juror.

e. The Government violated *Batson* by failing to exercise its peremptory challenges in a race neutral manner.

f. Movant challenged the constitutionality of the federal death penalty scheme, more specifically, arguing that the penalty phase process of weighing aggravating and mitigating factors violates the Sixth Amendment; the federal scheme unconstitutionally delegates legislative authority; the statute fails to require proportionality review; the statute allows for consideration of impermissibly vague aggravating factors; and the statute does not narrow the class of persons eligible for the death penalty.

g. Movant challenged the "intent to kill" aggravating factor, more specifically, because that factor is used in the eligibility process then again in the weighing process.

h.      The Government did not present sufficient evidence of "intent to kill."

i.      The Government failed to produce names and addresses of key witnesses.

k.      The district court erred by failing to dismiss the indictment on double jeopardy grounds.

l.      The Government failed to follow the *Petite* policy.

m.      Movant asserted cumulative error.

21. On July 25, 2007, the Court of Appeals rejected all of the Movant's claims and affirmed the judgment of the District Court. The decision is published at 496 F.3d 1079 (10th Cir. 2007) (Tacha, Briscoe, Murphy).

22. A timely Petition for Certiorari was filed on October 12, 2007.

23. The Petition for Certiorari was denied on March 17, 2008 at 128 S.Ct. 1648 (2008).

24. Mark Henricksen, Esq. and Roger Hilfiger, Esq. represented Movant in these proceedings. The Government was represented by Sheldon Sperling, US Atty. and D. Michael Littlefield, Asst. US Atty.

1918

## APPENDIX B

## INDEX TO EXHIBITS

**NON-SEALED EXHIBITS**

Exhibit 1             Marriage Certificate for A.J. and Ada Barrett

Exhibit 2             Marriage Certificate for Abe and Minnie Dotson

Exhibit 3             Marriage Certificate for Allen and Ida Real

Exhibit 4             Marriage Certificate for David and Carolyn Joseph

Exhibit 5             Marriage Certificate for Ernest and Sylvia Gelene
                      Barrett

Exhibit 6             Declaration of Rodney Floyd

Exhibit 7             Marriage Certificate for Kenneth and Abigail Barrett

Exhibit 8             Marriage Certificate for Hugh and Hattie Dotson

Exhibit  9            Marriage Certificate for Sam and Ida Hatter

Exhibit 10            Marriage Certificate for Sam and Bessie Hatter

Exhibit 11            Marriage Certificate for Paul and Sylvia Gelene Dudley

Exhibit 12            Divorce File for Ernest and Sylvia Gelene Barrett

Exhibit 13            Declaration of Janesse Thomas

Exhibit 14            Declaration of Dale Anderson

Exhibit 15            Divorce File for Isaac and Marilyn Barrett

Exhibit 16            *State of Oklahoma vs. Abe Dotson*, dated December 14, 1917 and
                      December 15, 1917 (Commitment to Penitentiary)

Exhibit 17            *State of Oklahoma vs. Abe Dotson*, Record of Informations, dated
                      November 12, 1915 (Assault with the Intent to Kill)

Exhibit 18            *State of Oklahoma vs. Abe Dotson*, Criminal Docket, dated 1915 (Assault
                      with the Intent to Kill)

Amended § 2255 Pet.                        418                 *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Exhibit 19   *State of Oklahoma vs. Abe Dotson,* Criminal Docket (Carrying Weapon)

Exhibit 20   *State of Oklahoma vs. Abe Dotson*, Criminal Trial Docket (Drunk in a Public Place)

Exhibit 21   *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Drunk in a Public Place)

Exhibit 22   *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Larcenry)

Exhibit 23   *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Obtaining Money Under False Pretense)

Exhibit 24   Declaration of David Autry

Exhibit 25   *State of Oklahoma vs. Billy Dean Maxwell*, Case Number 1715 (Burglary)

Exhibit 26   *In the Matter of Mental Illness of Billy Dean Maxwell*, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982

Exhibit 27   *In the Matter of the Sanity of A.J. Barrett*, Case Number 141, Lunacy Record, dated August 12, 1918

Exhibit 28   *In the Matter of the Sanity of A.J. Barrett*, Case Number 709, Mental Health Record and Petition for Order of Admission to State Hospital

Exhibit 29   Declaration of Mark Henricksen

Exhibit 30   *Ada Blount vs. Kathleen Blake*, Case Number 13026

Exhibit 31   Declaration of Leonard Post

Exhibit 32   *In the Matter of the Sanity of Wallace Dotson*, Lunacy Record, Case Number 366, dated May 4, 1948

Exhibit 33   *In the Matter of Mental Illness of Kenneth Barrett*, Case Number 481, Record of Mental Health Proceeding

Exhibit 34   Declaration of John Echols

Exhibit 35   Excerpts from Kenneth Barrett's Baby Book

Exhibit 36   Letter from Kenneth Barrett

Exhibit 37            Declaration of Robert Thompson

Exhibit 38            Declaration of Randy Weaver

Exhibit 39            Declaration of Vickie Beaty

Exhibit 40            Declaration of Amanda Grizzle

Exhibit 41            Declaration of Ellen Stovall

Exhibit 42            Declaration of Christine Calbert

Exhibit 43            Supplemental Declaration of Leonard Post

Exhibit 44            Report of George Kirkham, Ph.D.

Exhibit 45            Declaration of Travis Crawford

Exhibit 46            *Diana Barrett vs. Ernest Barrett*, Case No. JFD-79-3274

Exhibit 47            *State of Oklahoma vs. Karen Real*, Case No. CF-99-00018, Docket Sheet

Exhibit 48            *State of Oklahoma vs. Karen Real*, Case No. CM-99-00040, Docket Sheet

Exhibit 49            *State of Oklahoma vs. Karen Real*, Case No. CF-99-00250A, Docket Sheet

Exhibit 50            *State of Oklahoma vs. Karen Real*, Case No. CF-99-00251, Docket Sheet

Exhibit 51            *State of Oklahoma vs. Karen Real*, Case No. CF-98-00264A, Docket Sheet

Exhibit 52            *State of Oklahoma vs. Karen Real*, Case No. CF-97-00445A, Docket Sheet

Exhibit 53            *State of Oklahoma vs. David Littlefield*, Case No. OBAD No. 1729 and SCBD No. 5338, Order dated September 14, 2009

Exhibit 54            Declaration of Susan Otto

Exhibit 55            Declaration of Bill Sharp, Ph.D.

Exhibit 56            Declaration of Jeanne Russell, Ed.D.

Exhibits 57           *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-111, Docket Sheet

Exhibit  58           Intentionally Left Blank, No Exhibit.

Amended § 2255 Pet.                    420                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Exhibit 59          *State of Oklahoma vs. Henry Edwards* (Manslaughter)

Exhibit 60          *State of Oklahoma vs. Marilyn Crawford*, Case Number 3005, Criminal Docket (Cultivation of Mari)

Exhibit 61          *State of Oklahoma vs. Kenneth Barrett*, Docket Sheet, Case Number CF-97-00086

Exhibit 62          *State of Oklahoma vs. Tom Dotson*, Case Number 3005, Criminal Docket (Disposing of Mortgaged Property)

Exhibit 63          *State of Oklahoma vs. Tom Dotson*, Case Number 2763, Criminal Docket (Manslaughter in the First Degree)

Exhibit 64          Letter from John Echols to Honorable James H. Payne, dated February 28, 2005

Exhibit 65          Letter from Honorable James H. Payne to John Echols, dated February 22, 2005

Exhibit 66          Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008

Exhibit 67          Declaration of Julia O'Connell

Exhibit 68          *United States of America vs. Karen Real*, Case Number, Case Number CR-00-21-FHS

Exhibit 69          *Barrett Death Sentence Upheld*, Tahlequah Daily Press, dated July 27, 2007

Exhibit 70          *Drug Offender Receives Break*, Times Record

Exhibit 71          Letter to the Editor, *She Questions Sheriff's Department*, dated October 17, 1999

Exhibit 72          *State of Oklahoma vs. Charles Sanders*, Case Number CF-1998-00022

Exhibit 73          Photographs of Kenneth Barrett's shack

Exhibit 74          Declaration of Ada Blout

Exhibit 75          Declaration of Alvin Hahn

Exhibit 76          Declaration of Billy Poindexter

Amended § 2255 Pet.                          421                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Exhibit 77          Declaration of Brandie Hill

Exhibit 78          Declaration of Carolyn Joseph

Exhibit 79          Declaration of Dewey Padgett

Exhibit 80          Declaration of Doris Barrett, dated February 10, 2009

Exhibit 81          Declaration of Ernest Barrett

Exhibit 82          Declaration of Frank Gordon

Exhibit 83          Declaration of Gwendolyn Crawford

Exhibit 84          Declaration of Issac Barrett

Exhibit 85          Declaration of Janice Sanders

Exhibit 86          Declaration of Kathy Trotter

Exhibit 87          Declaration of Linda Riley

Exhibit 88          Declaration of Mike Mackey

Exhibit 89          Declaration of Dr. Myla Young

Exhibit 90          Declaration of Paul Rickie Lunsford

Exhibit 91          Declaration of Phyllis Crawford

Exhibit 92          Declaration of Roger Crawford

Exhibit 93          Declaration of Ruth Harris

Exhibit 94          Declaration of Sally Davis Johnson

Exhibit 95          Declaration of Shawn Hill

Exhibit 96          Declaration of Toby Barrett (resubmitted)

Exhibit 97          Declaration of Sylvia Gelene Dotson

Exhibit 98          Declaration of Mark Dotson

Exhibit 99          Declaration of Steve Barrett (resubmitted)

Exhibit 100          Declaration of Warren Barrett (resubmitted)

Exhibit 101          Declaration of Nona Reich (resubmitted)

Exhibit 102          Declaration of Carl Cook

Exhibit 103          Declaration of Abby Stites

Exhibit 104          Declaration of Richard Barrett

Exhibit 105          Declaration of Doris Barrett, March 5, 2009

Exhibit 106          New Articles from Vian American and Sequoyah County Democrat
                     Regarding Abe Dotson

Exhibit 107          Description Narrative, Written by Trooper Glen Smithson, dated
                     September 29, 1999

Exhibit 108          Excerpt from the Deposition of John Philpot

Exhibit 109          Report by Edward E. Hueske

Exhibit 110          Curriculum Vitae of Edward E. Hueske

Exhibit 111          Declaration of Steve Leedy

Exhibit 112          Declaration of Lauren Cohen Bell

Exhibit 113          2008 Declaration of Kevin McNally

Exhibit 114          Declaration of Rodney Floyd

Exhibit 115          Memo Regarding DOJ Report on the Federal Death Penalty System, dated
                     June 11, 2001

Exhibit 116          2007 Declaration of Kevin McNally

Exhibit 117          Declaration of Dr. George Woods

Exhibit 118          Declaration of Richard H. Burr

**SEALED EXHIBITS**

Exhibit 119          Birth Certificate of Kenneth Barrett

Amended § 2255 Pet.                    423                *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Exhibit 120        Birth Certificate of Sylvia Gelene Dotson

Exhibit 121        Birth Certificate of Richard Barrett

Exhibit 122        Birth Certificate of Toby Barrett

Exhibit 123        Birth Certificate of Stephen Barrett

Exhibit 124        Death Certificates of Allen M. Real and Allen Cleveland Real

Exhibit 125        Death Certificate of A.J. Barrett

Exhibit 126        Death Certificate of Ada Melton Barrett

Exhibit 127        Death Certificate of Albert Maxwell

Exhibit 128        Death Certificate of Billy Maxwell

Exhibit 129        Death Certificate of Hattie Dotson

Exhibit 130        Death Certificate of Hugh Dotson

Exhibit 131        Death Certificate of Ida Melton

Exhibit 132        Death Certificate of Isaac Barrett

Exhibit 133        Death Certificate of Mary Barrett

Exhibit 134        Death Certificate of Minnie Andrews

Exhibit 135        Brandon Smith Social Security Records, Itemized Statement of Earnings

Exhibit 136        Educational Records for Kenneth Barrett

Exhibit 137        Educational Records for Gwendolyn Barrett

Exhibit 138        Educational Records for Ernest Barrett

Exhibit 139        Medical Records for Carolyn Joseph

Exhibit 140        Medical Records for Kathy Trotter

Exhibit 141        Medical Records for Brandie Hill

Exhibit 142        Medical Records for Toby Barrett

Exhibit 143          Medical Records for Travis Crawford

Exhibit 144          Medical Records for Cynthia Crawford

Exhibit 145          Medical Records for Linda Riley

Exhibit 146          Medical Records for A.J. Barrett

Exhibit 147          Medical Records for Kenneth Barrett

Exhibit 148          Report of Interview with Kenneth Barrett by the Oklahoma State Bureau
                     of Investigation, dated October 11, 1999

Exhibit 149          Marriage Certificate for Ernest and Diana Barrett

Exhibit 150          Divorce File for Eugene and Sylvia Gelene Dudley

Exhibit 151          Divorce File for Kenneth and Abigail Barrett

Exhibit 152          *Kimberly Pulice vs. Richard Barrett*, Case Number JFP-2004-17

Exhibit 153          *In the Matter of Guardianship of Brandon Leroy Smith*, Case Number PG

Exhibit 154          *In re: Sale of Inherited Lands of Lewis Dotson*, Case Number 481

Exhibit 155          Sylvia Gelene Dotson's Genealogy Memorandum

Exhibit 156          *State of Oklahoma vs. David Littlefield*, Case Number SCBD-5338

Exhibit 157          *State of Oklahoma vs. Charles Sanders,* Case Number CF-97-9

Exhibit 158          *State of Oklahoma vs. Charles Sanders*, Case Number CF-97-75

Exhibit 159          *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-128

Exhibit 160          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-346

Exhibit 161          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-363

Exhibit 162          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-99-562

Exhibit 163          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2001-314

Exhibit 164          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2003-124

Exhibit 165          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2004-19

Exhibit 166          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-03-365

Exhibit 167          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-96-0444

Exhibit 168          *State of Oklahoma vs. Charles Sanders*, Case Number  CRF-92-91

Exhibit 169          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-08-224

Exhibit 170          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-2004-613

Exhibit 171          *State of Oklahoma vs. Cindy Crawford Mattox*, Case Number  CM-2001-885

Exhibit 172          *State Oklahoma vs. Brandie Price*, Case Number  CF-99-549

Exhibit 173          *State Oklahoma vs. Brandie Price*, Case Number  CM-00-900

Exhibit 174          *United States of America vs. Brandie Price*, Case Number  CR-07-16-RAW

Exhibit 175          *State Oklahoma vs. Charles Sanders*, Case Number  CF-97-140

Exhibit 176          *Michael Mackey vs. Cindy Crawford*, Case Number  PO-03-390

Exhibit 177          *State Oklahoma vs. Aubrey Jacobs, Joseph Jacobs, James Jacobs, Brandie Price*, Case Number CF-98-481

Exhibit 178          *State of Oklahoma vs. Travis Crawford*, Case Number  CM-08-655

Exhibit 179          *State of Oklahoma vs. Randy Weaver*, Case Number  CF-00-668

Exhibit 180          Letter from Larry and Brenda Sell to Honorable John Garrett

Exhibit 181          Background Materials on Clint Johnson:  Testimony of Clint Johnson in *State of Oklahoma vs. Richard Loy Gray* and Exhibits

Exhibit 182          Bill Ed Rogers's File

Exhibit 183          *State of Oklahoma vs. Charles Sanders*, Case Numbers CM-08-1525 and CF-98-111

Exhibit 184          *State of Oklahoma vs. Charles Sanders*, Case Number CF-94-1503

| | |
|---|---|
| Exhibit 185 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-03-6603 |
| Exhibit 186 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-04- 1187 |
| Exhibit 187 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-00-389 |
| Exhibit 188 | *State of Oklahoma vs. David Littlefield*, Case Number TRC-02-04186 |
| Exhibit 189 | *State of Oklahoma vs. David Littlefield*, Case Number CF-2007-369 |
| Exhibit 190 | *State of Oklahoma vs. Dawn Littlefield*, Case Number TRC-08-00774 |
| Exhibit 191 | *State of Oklahoma vs. Dawn Littlefield*, Case Number CF-2006-244 |
| Exhibit 192 | *Pam Littlefield vs. Mike Littlefield*, Case Number CJ-05-572 |
| Exhibit 193 | *Bank of Oklahoma vs. Jennifer and David Littlefield*, Case Number CJ-03-988 |
| Exhibit 194 | Affidavit for Search Warrant signed by Clint Johnson and Search Warrant, dated September 20, 1999 |
| Exhibit 195 | *State of Oklahoma vs. Randy Turman*, Case Number CF-02-477 |
| Exhibit 196 | Military Records for Travis Crawford |
| Exhibit 197 | Birth Certificate of Phyllis Dotson |
| Exhibit 198 | Birth Certificate of Travis Crawford |
| Exhibit 199 | Birth Certificate of Stephen Barrett |
| Exhibit 200 | Educational Records for Kenneth Barrett |
| Exhibit 201 | Medical Records for Gwen Crawford |
| Exhibit 202 | Medical Records for Carolyn Joseph |
| Exhibit 203 | Social Security Records for Travis Crawford |
| Exhibit 204 | *State of Oklahoma vs. Cindy Crawford*, Case Number CF-99-645 |

Amended § 2255 Pet. 427 *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

## VERIFICATION UNDER PENALTY OF PERJURY

My name is Tivon Schardl.  I am an attorney licensed to practice law by the State of Florida, and I am a member in good standing of the bar of the United States District Court for the Eastern District of Oklahoma.  I am a research and writing attorney in the Office of the Federal Defender for the Eastern District of California.  In 2008, I was appointed post-conviction counsel for Kenneth Eugene Barrett with David Autry as lead counsel.

I am authorized by Kenneth Eugene Barrett to file the foregoing amended motion to vacate, set aside, or correct the sentence, and for a new trial made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.  I am filing the amended motion on Mr. Barrett's behalf.  Mr. Barrett is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing amended motion for collateral relief, to vacate, set aside, and correct the conviction and death sentence is made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.  I declare that the contents of the foregoing amended motion are true except for those matters based upon information and belief, and I believe the latter matters to be true.  The sources of my information include, but are not limited to, official court records, various documents obtained or prepared during investigation of this amended motion, and items in the possession of other lawyers, investigators and/or experts connected with the preparation of this amended motion.  I make this verification pursuant to Rule 2(b)(5) of the Rules Governing § 2255 Proceedings because these matters are more within my knowledge than Mr. Barrett's knowledge.

I declare, under penalty of perjury, that the foregoing verification is true and correct.

Executed by me this 25th day of September, 2009, in Sacramento County,

California.

/s/  Tivon Schardl
Tivon Schardl

1931

**Certificate of Electronic Filing and Service**

I hereby certify that on this 25th day of September, 2009, I caused the foregoing AMENDED PETITION to be filed with the Clerk of the Court using the ECF System for filing.  A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

/s/ Tivon Schardl

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 1**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

7209

## MARRIAGE RECORD

STATE OF OKLAHOMA, Sequoyah County, ss.                    IN COUNTY COURT

I, _A. J. Barrett_, the undersigned, hereby apply for a Marriage License to be issued to

Mr. _A. J. Barrett_, aged _21_ years

whose residence is _Akins_, State of _Okla._

and Miss _Ada May Hatter_, aged _18_ years

whose residence is _Akins_, State of _Okla._,

and for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering into the marriage relation, nor are they related to each other within the degrees prohibited by law. That I am _21_ years of age, and legally competent to take an oath, and that I reside at _Akins_, County of _Sequoyah_, State of _Oklahoma_

A. J. Barrett

Subscribed and sworn to before me, this _25_ day of _January_ 193_6_.

By _Frances Tinney_ Deputy       _Horace Moore_ Court Clerk

I, the undersigned, _____ of _____ named in the application as being of the age of _____ years, do hereby consent to _____ marriage to

Dated at _____ Oklahoma, this _____ day of _____, 193__

_____
Parent or Guardian

STATE OF OKLAHOMA, Sequoyah County, ss

Before me, _____

a _____ in and for said County and State, on the _____ day of _____, 193__

personally appeared _____ to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that _____ executed the same as _____ free and voluntary act and deed for the uses and purposes therein set forth.

Witness my hand and official seal, the day and date above written.

My commission expires _____ 193__

## MARRIAGE LICENSE

STATE OF OKLAHOMA, Sequoyah County, ss.                    IN COUNTY COURT

To any Person authorized to Perform and Solemnize the Marriage Ceremony—GREETING:

You are hereby authorized to join in marriage Mr. _A. J. Barrett_

of _Akins_, County of _Sequoyah_, State of _Okla._

aged _21_ years, and Miss _Ada May Hatter_

of _Akins_, County of _Sequoyah_, State of _Okla._

aged _18_ years, and of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, this _2nd_ day of _January_ 193_6_.

My credentials are recorded in Ministers' Credentials, book _____, page _____

By _Frances Tinney_ Deputy.       _Horace Moore_ Court Clerk.

Recorded this _2nd_ day of _January_ 193_6_.

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, Sequoyah County, ss.

I, _N. B. Burrow_ Name, _Minister_ Official Designation, _Baptist_ Court or Congregation,

of _Maple_, in _Sequoyah_ County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be married, on the _2nd_ day of _Jan_ A. D., 193_6_, at _Akins_, in Sequoyah County, State of Oklahoma, in the presence of _D. M. Allen_

of _Akins, Okla_, and _Georgia Liles_

of _____

_N. B. Burrow_
Baptist Minister Official Designation

Returned and recorded this _27_ day of _Jan_ 193_6_.

_Horace Moore_ Court Clerk

By _Frances Tinney_ Deputy

1933

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 2**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

1036

# MARRIAGE RECORD

STATE OF OKLAHOMA,
_Sequoyah_ County. } ss.                IN COUNTY COURT.

I, _Ike Datson_ _____ the undersigned, hereby apply for a
MARRIAGE LICENSE, to be issued to Mr. _Ike Datson_ _____ aged _28_ years,
whose residence is _Marble City_ _____ State of _Okla_ _____ and
M__ _Minnie Andrews_ _____ aged _18_ years,
whose residence is _Marble City_ _____ State of _Okla_ _____ and
for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places
of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering
into the marriage relation, nor are they related to each other within the degrees prohibited by law. That I am _28_ years of age, and
reside at _Marble City_ _____ County of _Sequoyah_
State of _Okla_ _____ _Ike Datson_ _____ Applicant.
Subscribed and sworn to before me, this _8_ day of _July_ 19_11_.
_M. D. Jones_ _____ County Judge.
_____ Clerk County Court.

I, the undersigned, _____ of _____
named in the above application as being of the age of _____ years, do hereby
consent to _____ marriage to _____
Dated at _____, Oklahoma, this _____ day
of _____ 19_____ _____ Parent or Guardian.

STATE OF OKLAHOMA,
_____ County. } ss.

Before me, _____
in and for said County and State, on the _____ day of _____ 19_____
personally appeared _____
to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that _____
executed the same as _____ free and voluntary act and deed for the uses and purposes therein set forth.
WITNESS my hand and official seal, the day and date above written.

_____

My commission expires _____ 19_____

## MARRIAGE LICENSE

STATE OF OKLAHOMA,
_Sequoyah_ County. } ss.             IN COUNTY COURT.

To any Person Authorized to Perform and Solemnize the Marriage Ceremony—GREETING:
You are hereby authorized to join in marriage M_ _Ike Datson_
of _Marble City_, County of _Sequoyah_, State of _Oklahoma_
aged _28_ years, and M__ _Minnie Andrews_, of _Marble City_
County of _Sequoyah_, State of _Oklahoma_ _____ aged _18_ years.
And of this License you will make due return to my office within thirty days from this date.
Witness my hand and official seal, at _____ in said County, this _8_ day of _July_ A. D. 19_11_
_N. N. Littlejohn_ _____ County Judge.
By _M. D. Jones_ _____ Clerk County Court.
Recorded this _8_ day of _July_ 19_11_ _M. D. Jones, Clerk_

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA,
_Sequoyah_ County. } ss.

I, _R. L. Horn_
NAME
_Justice of the Peace_
OFFICIAL DESIGNATION.
of _McKey_ in _Sequoyah_ County, State of Oklahoma, do hereby
COURT OR CONGREGATION.
certify that I joined in marriage the persons named in and authorized by this License to be married, on the _8_
day of _July_ A. D. 19_11_, at _L. R. Horn_ in _McKey_
County, State of Oklahoma, in the presence of _Lafayette Horn_ of _McKey_
and _Janie Horn_ of _McKey_ _R. L. Horn_
_Justice of the Peace_
Returned and recorded this _11_ day of _July_ 19_11_ _M. D. Jones_
_Clerk County Court_

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,     )
                                            )

                  *Movant,*     )

                                            )

v.                                   )        **Case No. 6:09-cv-00105-JHP**

                                          )

UNITED STATES OF AMERICA,     )

                                          )

               *Respondent.*  )

---

**EXHIBIT 3**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

# This Certifies that

*Allen C. Real*
of *Quinton, I.T.* and
*Ida Goodwin*
of *Quinton, I.T.*

were by me united in

# Matrimony

according to the ordinance of GOD and the
laws of
at *Quinton*
on the *eighteenth* day of *Feb.*
in the year of our Lord 19*07*

Witnesses
*Frank Bean*
*Alfred Goodwin*

1937

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 4**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

KEB400570

## MARRIAGE LICENSE

STATE OF OKLAHOMA, COUNTY OF ADAIR, ss.                                   IN COUNTY COURT

TO ANY PERSON AUTHORIZED TO PERFORM OR SOLEMNIZE THE MARRIAGE CEREMONY — GREETING:

You are hereby authorized, upon delivery of this marriage license within ten days from the date of its issue to you, to join in marriage

Mr. _David A Joseph_ , of _Pensacola_

County of _Escambia_ , State of _Florida_ , age _21_ years, and

Miss _Carolyn Watson_ , of _Sallisaw_

County of _Sequoyah_ , State of _Oklahoma_ , age _18_ years; and by the command of the statute you shall make due return of this license to my office within five days succeeding the performance of the marriage herein authorized.

Issued under my hand and official seal, and recorded in my Marriage Record before delivery, at Stilwell, Oklahoma, this _24th_

day of _Sept_ 19_64_

(SEAL)                                                                    _Virginia Harper_ , Court Clerk

By_____ Deputy

ENDORSEMENT: By this endorsement to the within and foregoing Marriage License, I hereby verify, and truly certify, that the Application for said License was accompanied by proper credentials under the circumstance indicated by the word "filed" opposite one or more of the applicable provisions of Statute indicated below.

_____(1) Physician's and laboratory technician's statements required by Statute, relative to the examination and health of either or both of the parties.

___f_____(2) An order of the County Judge, with memoranda of reasons for the order dispensing with Statutory requirements relative to the examination and health of either or both of the parties.

_____(3) An order of the County Judge with accompanying memoranda of reasons for the order extending the 30 day period following the examination to 90 days or less together with papers complying with the requirements of Number (1) above.

_____(4) Affidavits of Consent to Marriage of parent or guardian, in lieu of personal appearance as provided by House Bill No. 688 of the 1959 Legislative Session.

All the above and foregoing recorded on this _24th_ day of _Sept_ A. D., 19_64_, and thereafter said License delivered according to Law.

_Virginia Harper_ , Court Clerk

By_____ Deputy

### CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, COUNTY OF ADAIR, ss.

I, _E. B. Arnold_ , _Co. Judge_ , _Adair Co. Court_
(Name)                    (Official Designation)          (Court or Congregation)

of _Stilwell_ in Adair County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be married, on the _24th_ day of _Sept_ , A. D., 19_64_ at _Stilwell_

in Adair County, State of Oklahoma, in the presence of _Phyllis Crawford_ of _Sallisaw, Okla_

and _Ruth Harris_ of _"    "_

_E. B. Arnold_
(Person Performing Ceremony)

My credentials of authority are recorded in Minister's Credentials

_Co. Judge_

Book_____,                                                          (Official Designation)

at page_____of_____County, Oklahoma.

License returned, and Certificate of Marriage recorded subjoining the record of License issued and recorded in Marriage Record Book _20_ at page _31-1_

on this the _24th_ day of _Sept_ , 19_64_

_Virginia Harper_ , Court Clerk

By_____ Deputy

I, Shawna Baird Court Clerk, for Adair County, Oklahoma, hereby certify that the foregoing is a true, correct and full copy of the instrument herewith set out as appears of record in the Court Clerk's Office of Adair County, Oklahoma, this _2nd_ day of _April 2001_

By: _Shawna Baird_
Clerk/Deputy

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
          )
       *Movant,*    )
          )
v.          )     **Case No. 6:09-cv-00105-JHP**
          )
UNITED STATES OF AMERICA,    )
          )
      *Respondent.*  )

---

**EXHIBIT 5**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Subscribed and sworn to before me this.................................................................................................................................... Parent or Guardian.

(SEAL) ..........................day of........................................

.................................., 19.............

By ................................................................................................ Court Clerk.

.................................................................................................. Deputy.

STATE OF OKLAHOMA, Adair County, ss.     **MARRIAGE   LICENSE**

To any Person Authorized to Perform and Solemnize the Marriage Ceremony—Greeting:     IN COUNTY COURT

You are hereby authorized to join in marriage Mr. _Ernest E. Barrett_

of _Sallisaw_ County of _Sequoyah_ State of _Oklahoma_ aged _21_ years,

and M _Sylvia F. Nelson_ County of _Sequoyah_ State of _Oklahoma_ aged _10_ years,

of _Sallisaw_

And of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at _Stilwell_ in said County, this _8th_ day of

_July_ A. D. 19 _60_ .............................. Court Clerk.

By .......................................... Deputy.

Recorded this _8th_ day of _July_ 19 _60_ .................................. Court Clerk.

By .......................................... Deputy.

STATE OF OKLAHOMA, Adair County, ss.     **CERTIFICATE  OF  MARRIAGE**

I, _E. B. Arnold_ _County Judge_ _Adair County Court_
NAME     OFFICIAL DESIGNATION     COURT OR CONGREGATION

of _Stilwell_ in _Adair_ County, State of Oklahoma, do hereby certify

that I joined in marriage the persons named in and authorized by this License to be married, on the _8th_ day of

_July_ A. D. 19 _60_ at _Stilwell_ in _Adair_ County,

State of Oklahoma, in the presence of _Johnny Simmgrude_ of _Sallisaw Okla_

and _Ira Weeks / Mainford_ of _Sallisaw Okla_

My credentials are recorded in Minister's Credentials

Book........ Page........ _E. B. Arnold,_

of........................................ _County Judge_

.................................... County, Oklahoma.

Returned and recorded this _8th_ day of _July_ 19 _60_ .................................. Court Clerk.

By .......................................... Deputy.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| *Movant,* | ) |
| | ) |
| v. | )     **Case No. 6:09-cv-00105-JHP** |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Respondent.* | ) |

---

**EXHIBIT 6**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF RODNEY FLOYD

I, Rodney Floyd, declare the following:

I am one of the investigators currently working for the defense in Kenneth Eugene Barrett's case. On February 21, 2008, I interviewed former Sequoyah County Sheriff John Philpot. Mr. Philpot told me that less than a month before the incident in which Oklahoma State Highway Patrol Trooper David "Rocky" Eales was shot and killed, he and three other law enforcement officers went to Mr. Barrett's residence. They did not serve an arrest warrant on Mr. Barrett, or take him into custody. They encountered no violence from Mr. Barrett, and were not harmed or assaulted.

I did not draft this declaration. The information detailed above is based on what I told one of Mr. Barrett's lawyers, David Autry, based on my investigation. I have read this declaration carefully, and it accurately states what I told Mr. Autry.

I declare under penalty of perjury that the foregoing 1 page declaration is true and correct.

Executed by me this _11_ day of ___March___, 2009, in

_Lincoln_ County, Oklahoma.

Rodney Floyd

1943

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 7**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

532

## MARRIAGE RECORD No. 33

BEL No. 100 (1966)  MID-WEST - SAPULPA, OKLAHOMA

### APPLICATION FOR MARRIAGE LICENSE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.                    IN DISTRICT COURT

We the undersigned, hereby apply for the issuance of a Marriage License and certify as to our ages and places of residence as follows:

Name    Kenneth Eugene Barrett ................................................, Age    18

of    Sallisaw ................., County of    Sequoyah ........., State of    Oklahoma

Name    Abigail Teague ................................................, Age    16

of    Sallisaw ................., County of    Sequoyah ........., State of    Oklahoma

and for the purpose of procuring same, we do solemnly swear that the names, ages and places of residence as set out above are true and correct, as evidenced by documents described in particular as follows;

(First Party) .....................................................  (Second Party) ...................................................
and that we are not disqualified or incapable under the law of entering into the marriage relation, nor are we related to each other within the degree prohibited by law.

Kenneth Eugene Barrett ....Applicant        Auby Teague ....Applicant

Subscribed and sworn to before me this  28  day of  April ................ A. D. 19  80

                                                           THEODORE STITES, Court Clerk

                                By  Pamela Dyer ........................Deputy

NOTE—In event one or both of the parties to be married are under age, such application shall have been on file in the Court Clerk's office for a period of not less than seventy-two hours, prior to the issuance of the license.

#### Consent Affidavit — In Person (1)

I, the undersigned, state that I am the  mother  of  Abigail Teague  named in the above application as being

of the age of  16  years, and in the presence of the issuing official, I do hereby consent to  her  marriage to

Kenneth Eugene Barrett

In the presence of          Signed this  28  day of  April  19 80   Virginia Teague  Signature

                    THEODORE STITES, Court Clerk

By  Pamela Dyer ........................ Deputy

#### Consent Affidavit — In Person (2)

I, the undersigned, state that I am the ................  of ........................  named in the above application as being

of the age of ............ years, and in the presence of the issuing official, I do hereby consent to ........................ marriage to

.........................................................................................................

In the presence of          Signed this ........ day of........  19 .....  ........................Signature

                    THEODORE STITES, Court Clerk

By ........................ Deputy

### MARRIAGE LICENSE

NO...........................
STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.                    IN DISTRICT COURT

TO ANY PERSON AUTHORIZED TO PERFORM OR SOLEMNIZE THE MARRIAGE CEREMONY —— GREETINGS:

You are hereby authorized, upon delivery of this marriage license within ten days from the date of its issue to you, to join in marriage

Mr.    Kenneth Eugene Barrett ................, of    Sallisaw

County of    Sequoyah ................, State of    Oklahoma ......, Age  18  years, and

M    Abigail Teague ................, of    Sallisaw

County of    Sequoyah ................, State of    Oklahoma ......, Age  16  years, and

by the command of the statute you shall make due return of this license to my office within five days succeeding the performance of the marriage herein authorized.

Issued under my hand and official seal, and recorded in my Marriage Record before delivery, at, Sallisaw, Oklahoma, this  7th  day of  May  19 80.

                                                           THEODORE STITES, Court Clerk

                                By  Pamela Dyer ........................Deputy

(SEAL)

ENDORSEMENT: By this endorsement to the within and foregoing Marriage License, I hereby verify and truly certify, that the Application for said License was accompanied by proper credentials under the circumstance indicated by the word "filed" opposite one or more of the applicable provisions of Statute indicated below.

Filed (1) Physician's and laboratory technician's statements required by statute, relative to the examination and health of either or both of the parties.

(2) An order of the District Court with memoranda of reasons for this order dispensing with statutory requirements relative to the examination and health of either or both of the parties.

(3) An order of the District Court with accompanying memoranda of reasons for the order, extending the 30 day period following the examination to 90 days or less, together with papers complying with the requirements of number (1) above.

(4) Affidavit of consent to marriage of an underage person by parent or guardian, in lieu of personal appearance as provided by Statute 43 O. S. Supp. 1967, par. 3.

(5) Affidavit of consent to marriage of an underage person by parent or guardian, residing in another county of this State or outside the State and acknowledged as provided by Statute 43 O.S. Supp. 1967, par. 3.

(6) Affidavit of three persons authorizing marriage of underage person when parents are deceased or otherwise incapable of giving consent. 43 O.S. Supp. 1967, par. 3.

Witness my hand and official seal this  28  day of  April  19 80.

                    THEODORE STITES, Court Clerk    By  Pamela Dyer ........................ Deputy

All the above and foregoing recorded on this ........ day of ........................ A. D., 19 ..., and thereafter said License delivered according to Law.

By ........................ Deputy                        THEODORE STITES, Court Clerk

### CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.

I,  Jerry Harris ........................  Ordained Minister
                (NAME)                          (OFFICIAL DESIGNATION)

Deborah Watson ........................  of  Sallisaw
        (COURT OR CONGREGATION)                  (TOWN)

In  Sequoyah , County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be

married on the  10th  day of  May  A. D., 19 80, at  Sallisaw , in Sequoyah County, State of Oklahoma, in the

presence of  Angela Polasek ........................  of  Carolyn Joseph

and  Jeff Keal ........................  of  Henry Hodges

My credentials of authority are recorded in Minister's

Credentials ............ Book ........................          Jerry Harris
                                                       (PERSON PERFORMING CEREMONY)

at page ........ of ........................ County,          ........................
Oklahoma.                                                (OFFICIAL DESIGNATION)

License returned, and Certificate of Marriage recorded subjoining the record of License issued and recorded in Marriage Record Book 33 at page ..........

on this the  14  day of  May , 19 80      By  Noma Edwards ........................Deputy

                    THEODORE STITES, Court Clerk

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,          )
                                 )
                     *Movant,*   )
                                 )
v.                               )          **Case No. 6:09-cv-00105-JHP**
                                 )
UNITED STATES OF AMERICA,         )
                                 )
                  *Respondent.*  )

---

**EXHIBIT 8**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

181

920o
1000

## MARRIAGE RECORD

THE STAR PRINTERY, INC., BLANK BOOK MANUFACTURERS, MUSKOGEE, OKLAHOMA

STATE OF OKLAHOMA, Sequoyah County, ss.                    IN COUNTY COURT

I, _____, the undersigned, hereby apply for Marriage License, to be issued to

Mr. _Hugh Dotson_ _____, age _21_

Color _W._, residence _McKey_ _____, County of _Sequoyah_, State of _Okla._

and Miss _Hattie Read_ _____, age _18_,

Color _W._, residence _McKey_ _____, County of _Sequoyah_, State of _Okla._,

and for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering into the marriage relation, nor are they related to each other within the degrees prohibited by law. That I am _21_ years of age, and reside at _McKey_ _____, County of _Sequoyah_, State of _Okla._,

_Hugh Dotson_ _____, Applicant.

Subscribed and sworn to before me, this _3_ day of _July_ A. D. 19 _39_

By _____, Deputy Court Clerk.   _Lillie Rosson_ _____, Court Clerk.

I, the undersigned, _____ of _____

named in the above application as being of the age of _____ years, do hereby consent to _____

marriage to _____

Dated at _____, Oklahoma, this _____ day of _____, 19____

_____, Parent or Guardian.

STATE OF OKLAHOMA, Sequoyah County, ss.

BEFORE ME, _____, a _____ in and for said County and State,

on the _____ day of _____, 19___, personally appeared _____

to me known to be the identical person _____ who executed the within and foregoing instrument, and acknowledged to me that _____ executed the same as _____ free and voluntary act and deed for the uses and purposes therein set forth.

WITNESS my hand and official seal, the day and date above written.

My commission expires _____, 19____.

## MARRIAGE LICENSE

STATE OF OKLAHOMA, Sequoyah County, ss.                    IN COUNTY COURT

To any Person authorized to Perform and Solemnize the Marriage Ceremony—GREETING:

You are hereby authorized to join in marriage Mr. _Hugh Watson_

of _McKey_ _____, County of _Sequoyah_, State of _Okla_

aged _21_ years, and Miss _Hattie Read_

of _McKey_ _____, County of _Sequoyah_, State of _Okla_

aged _18_ years, and of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at Sallisaw, in said County, this _3_ day of _July_, 19 _39_

By _____, Deputy.   _Lillie Rosson_ _____, Court Clerk.

Recorded this _3_ day of _July_ 19 _39_

_Lillie Rosson_ _____, Court Clerk.

(seal)

_____, Deputy.

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, Sequoyah County, ss.

I, _Rev Lewis Young_ _Minister of The Gospel_ of _Baptist Church_
  Name             Official Designation         Court or Congregation

of _Vian_ _____, in _Sequoyah_ _____ County, State of Oklahoma, do hereby

certify that I joined in marriage the persons named in and authorized by this License to be married, on the _3rd_ day of

_July_ A. D. 19 _39_, at _Resident_ _____, in Sequoyah

County, State of Oklahoma, in the presence of _Eugene Masterson_

of _McKey Okla_ _____, and _Margie Goodman_

of _McKey Okla_ _____   _Rev Lewis Young_

                                      _Vian Okla_ _____, Official Designation.

My credentials are recorded in Ministers' Credentials, book _1_, page _23_

Returned and recorded this _X_ day of _July_, 19 _39_

_Lillie Rosson_ _____, Court Clerk.

By _____, Deputy.

1947

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 9**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Subscribed and sworn to before me this.................................................................................................................. Parent or Guardian.

(SEAL) ....................................................day of................................................

................................................, 19..........

By ....................................................... Court Clerk.

....................................................... Deputy.

STATE OF OKLAHOMA, Adair County, ss.

## MARRIAGE LICENSE

To any Person Authorized to Perform and Solemnize the Marriage Ceremony—Greeting:

IN COUNTY COURT

You are hereby authorized to join in marriage Mr. *Ernest E. Barrett*

of *Salina*.................................... County of *Sequoyah* State of *Oklahoma* aged *21* years,

and M *Sylvia A. Nolson*

of *Salina*.................................... County of *Sequoyah* State of *Oklahoma* aged *10* years,

And of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at *Stilwell* in said County, this *8th* day of

............... A. D. 19 *60* ....................................... Court Clerk.

Recorded this *8th* day of .......................

By .......................................

By ....................................... Court Clerk.

....................................... Deputy.

STATE OF OKLAHOMA, Adair County, ss.

## CERTIFICATE OF MARRIAGE

I, *E. B. Arnold*

NAME

*County Judge*

OFFICIAL DESIGNATION

*Adair County Court*

COURT OR CONGREGATION

of *Stilwell* in *Adair* County, State of Oklahoma, do hereby certify

that I joined in marriage the persons named in and authorized by this License to be married, on the *8th* day of

............... A. D. 19 *60* at *Stilwell* in *Adair* County,

State of Oklahoma, in the presence of *Johnny Simmonds* of *Salina Okla*

and *Pykeeks Mannford* of *Salina Okla*

My credentials are recorded in Minister's Credentials

Book........... Page........... *E. B. Arnold*

*County Judge*

of............... County, Oklahoma.

Returned and recorded this *8th* day of ............... 19 *60*

By ....................................... Court Clerk.

....................................... Deputy.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 10**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

Copy. mid
3/18-55

# MARRIAGE RECORD

625

9644

THE STAR PRINTERY, INC. BLANK BOOK MANUFACTURERS, MUSKOGEE, OKLAHOMA—AO

STATE OF OKLAHOMA, Sequoyah County, ss.                    IN COUNTY COURT

I, _____, the undersigned, hereby apply for Marriage License, to be issued to

M. A. *Sam Hatter* _____, age 41,

Color W, residence *Akins* County of *Sequoyah*, State of *Okla*

and Miss *Bessie Reed* _____, age 22,

Color W, residence *Akins* County of *Sequoyah* State of *Okla*,

and for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering into the marriage relation, nor are they related to each other within the degree prohibited by law. That I am 41 years of age, and reside at *Akins*, County of *Sequoyah*, State of *Okla*, Applicant.

*Sam Hatter*, Applicant.

Subscribed and sworn to before me, this 26 day of Oct, A. D. 19 40

By _____, Deputy Court Clerk. *Lillie Rosson*, Court Clerk.

I, the undersigned, _____ of _____

named in the above application as being of the age of _____ years, do hereby consent to _____

marriage to _____

Dated at _____, Oklahoma, this ____ day of _____, 19___

_____, Parent or Guardian.

STATE OF OKLAHOMA, Sequoyah County, ss.

BEFORE ME, _____, a _____ in and for said County and State,

on the ____ day of _____, 19___, personally appeared _____

to me known to be the identical person____ who executed the within and foregoing instrument, and acknowledged to me that _____ executed the same as _____ free and voluntary act and deed for the uses and purposes therein set forth.

WITNESS my hand and official seal, the day and date above written.

My commission expires _____, 19___

## MARRIAGE LICENSE

STATE OF OKLAHOMA, Sequoyah County, ss.                    IN COUNTY COURT

To any Person authorized to Perform and Solemnize the Marriage Ceremony—GREETING:

You are hereby authorized to join in marriage Mr. *Sam Hatter*

of *Akins*, County of *Sequoyah*, State of *Okla*

aged 41 years, and Miss *Bessie Reed*

of *Akins*, County of *Sequoyah*, State of *Okla*

aged 22 years, and of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at Sallisaw, in said County, this 26 day of Oct, 19 40

By _____, Deputy. *Lillie Rosson*, Court Clerk.

Recorded this 26 day of Oct, 19 40

*Lillie Rosson*, Court Clerk.

(seal)                                                            Deputy.

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, Sequoyah County, ss.

I, *O. W. White*, *Minister*, *Baptist*

Name                    Official Designation                    Court or Congregation

of *Short*, in *Sequoyah* County, State of Oklahoma, do hereby

certify that I joined in marriage the persons named in and authorized by this License to be married, on the 27 day of

*October*, A. D., 1940, at *Short*, in Sequoyah

County, State of Oklahoma, in the presence of *Marie Lizie White*

of *Short, Okla*, and *Mrs. Della Reed*

of *Sallisaw R/*

*O. W. White*

*Baptist Minister*, Official Designation.

My credentials are recorded in Ministers' Credentials, book 1, page 46

Returned and recorded this 2 day of November, 1940

*Lillie Rosson*, Court Clerk.

By *Flo Smith*, Deputy.

(seal)

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 09-CIV-105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER

This matter comes on for consideration of Petitioner's Motion to Stay Proceedings

(Doc. 86).   After due consideration thereof, the Motion to Stay Proceedings is denied.

It is so ordered on this 20th day of October, 2009.

_____
James H. Payne
United States District Judge
Eastern District of Oklahoma

# U.S. District Court
# Eastern District of Oklahoma (Muskogee)
# CIVIL DOCKET FOR CASE #: 6:09−cv−00105−JHP

Barrett v. USA

Assigned to: District Judge James H. Payne

Case in other court:  10th Circuit, 12−07086

ED/OK, 6:04−cr−115

Cause: 28:2255 Motion to Vacate / Correct Illegal Sentence

Date Filed: 03/16/2009
Date Terminated: 08/16/2012
Jury Demand: None
Nature of Suit: 535 Death Penalty − Habeas Corpus
Jurisdiction: U.S. Government Defendant

**Petitioner**

**Kenneth Eugene Barrett**　　　　　　represented by　**David B. Autry**
1021 NW 16th St
Oklahoma City, OK 73106
405−521−9600
Fax: 405−521−9669
Email: dbautry44@hotmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joan M. Fisher**
Federal Public Defender − Sacramento, CA
801 "I" St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−5706
Email: joan.fisher@fd.org
*ATTORNEY TO BE NOTICED*

**Tivon Schardl**
Federal Public Defender − Sacramento, CA
801 "I" St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−6656
Email: tim.schardl@fd.org
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**USA**　　　　　　　　　　　represented by　**Christopher J. Wilson**
US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401

1

918−684−5100
Fax: 918−684−5150
Email: Chris.Wilson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Kahan**
US Department of Justice – Capital Case
Unit
1331 F St NW
Rm 345
Washington, DC 20530
202−305−8910
Fax: 202−353−9779
Email: jeffrey.kahan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheldon J. Sperling**
US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401
918−684−5100
Fax: 918−684−5150
*TERMINATED: 11/24/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/10/2009 | 4 | | MOTION to File Exhibits Under Seal and for a Protective Order by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 5 | | ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for a Protective Order (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 6 | | MOTION to Reconsider (Re: 5 Order Ruling on Motion to Seal Exhibits and for Protective Order) by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 7 | | AMENDED ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for Protective Order (Re: 5 Order, 6 Motion to Reconsider) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 1 | | MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett; Responses due by 6/16/2009 (With attachments – **EXHIBITS 1–36; 59–60**)(EXHIBITS 37–58 NOT USED)(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 3 | | |

| | | | |
|---|---|---|---|
| | | | EXHIBITS IN SUPPORT OF MOTION **Nos. 61–70, 71–80, 81–99, 100–118** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 8 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134 and 135** (Re: 1 MOTION to Vacate and 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 9 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 10 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 11 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 12 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 13 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 137, 138, 139, 140, 141, 142 and 143** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 14 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 144A, 144B, 145 and 146** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 15 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 16 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 17 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 18 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 19 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 147B2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 20 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) |

| | | | |
|---|---|---|---|
| | | | (Entered: 03/18/2009) |
| 03/16/2009 | 21 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 22 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 23 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 24 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 25 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 26 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147F** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 27 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147G** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 28 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 148, 149, 150, 151, 152, 153, 154, 155, 156, 157 and 158** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 29 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 159, 160, 161, 162, 163, 164 and 165** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 30 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 166, 167, 168, 169, 170, 171, 172, 173, 174 and 175** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 31 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 32 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 33 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 34 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| | | | |
|---|---|---|---|
| 03/16/2009 | 35 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 36 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 37 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 178, 179 and 180** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 38 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 39 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 40 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 41 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 42 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 182, 183, 184 and 185** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 43 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 186, 187, 188, 189, 190, 191, 192, 193, 194 and 195** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/17/2009 | 2 | | CORRECTED MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett (corrected to include verification) (Re: 1 Motion to Vacate); Responses due by 6/16/2009(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/18/2009 | 44 | | NOTICE to Government to Respond by **6/16/2009** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) Modified on 3/19/2009 to change response date to 6/16/09 (cjt, Deputy Clerk). (Entered: 03/18/2009) |
| 03/19/2009 | | | NOTICE of Docket Entry Modification; Error: Wrong date of 3/16/09 given in text; Correction: Correcting response date to 6/16/09 (Re: 44 Notice to Respond) (cjt, Deputy Clerk) (Entered: 03/19/2009) |
| 05/29/2009 | 45 | | MOTION to Disqualify Judge by Kenneth Eugene Barrett Responses due by 6/15/2009 Replies due by 6/24/2009.(Schardl, Tivon) (Entered: 05/29/2009) |
| 06/03/2009 | 46 | | ATTORNEY APPEARANCE by Christopher J. Wilson on behalf of USA (Wilson, Christopher) (Entered: 06/03/2009) |
| 06/11/2009 | 47 | | |

| | | | |
|---|---|---|---|
| | | | First MOTION for Extension of Time to Respond to Motion (Re: 45 MOTION to Disqualify Judge ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/11/2009 | 48 | | First MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment, 1 MOTION to Vacate Order/Judgment ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/12/2009 | 49 | | MINUTE ORDER by District Judge James H. Payne granting Application for Extension of Time to Respond to Petitioner's Motoin to Disqualify and Recuse United States District Judge James H. Payne from Further Participation in this Matter ( 47 Motion for Extension of Time to Respond to Motion). Accordingly, the respondent has until 7/15/09 within which to file its response to petitioner's motion (Re: 45 MOTION to Disqualify Judge ).(law, Deputy Clerk) (Entered: 06/12/2009) |
| 06/12/2009 | 50 | | MINUTE ORDER by District Judge James H. Payne granting in part and denying in part Application for Extension of Time to Respond to Petitioner's 28 U.S.C. Section 2255 Motion ( 48 Motion for Extension of Time to Respond to Motion ). Respondent has an additional 3 months or until 9/16/09 within which to file its response to petitioner's 28 U.S.C. Section 2255 Motion. (law, Deputy Clerk) (Entered: 06/12/2009) |
| 07/13/2009 | 51 | | RESPONSE in Opposition to Motion (Re: 45 MOTION to Disqualify Judge ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 07/13/2009) |
| 07/24/2009 | 52 | | First MOTION to unseal documents in cr–04–115 by USA Responses due by 8/10/2009 Replies due by 8/19/2009.(Wilson, Christopher) (Entered: 07/24/2009) |
| 08/14/2009 | 53 | | MOTION to File Response to Government's Motion to Unseal Out of Time by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/14/2009 | 54 | | MOTION to File Out of Time *PROPOSED ORDER* by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/17/2009 | 55 | | ORDER by District Judge James H. Payne: striking 54 Petitioner's Proposed Order which was filed in error (cjt, Deputy Clerk) (Entered: 08/17/2009) |
| 08/19/2009 | 56 | | MINUTE ORDER by District Judge James H. Payne: Directing Petitioner to supplement 53 MOTION to File Response to Government's Motion to Unseal Out of Time by 5:00 p.m. today, 8/19/09, to include a statement as to whether either Christopher J. Wilson or Jeffrey B. Kahan, counsel for respondent, USA objects to the motion. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 57 | | SUPPLEMENT (Re: 56 Minute Order,,, 53 MOTION to File Response to Government's Motion to Unseal Out of Time ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 08/19/2009) |
| 08/19/2009 | 58 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/19/2009) |

| | | | |
|---|---|---|---|
| 08/19/2009 | 59 | | MINUTE ORDER by District Judge James H. Payne: Striking 58 Petitioner's Response in Opposition to the Government's Motion to Unseal (Re: 52 Government's MOTION to Unseal Documents). (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 60 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53 ) is hereby granted. The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2255 Motion (Doc. # 2) and that the Government's Motion to Unseal (Doc. # 52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion. To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their current response deadlines on the § 2255 Motion. Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52 ) and the Government shall be given until September 2, 2009, to Reply. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/26/2009 | 61 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/26/2009) |
| 08/28/2009 | 62 | | REPLY to Response to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 08/28/2009) |
| 09/04/2009 | 63 | | Second MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment ) by USA Responses due by 9/21/2009(Wilson, Christopher) (Entered: 09/04/2009) |
| 09/04/2009 | 64 | | MINUTE ORDER by District Judge James H. Payne: granting 63 Respondent's Motion for Extension of Time to Respond to Motion; Response due by 10/16/2009 (Re: 1 MOTION to Vacate Order/Judgment, 2 Corrected MOTION to Vacate Order/Judgment ) (cjt, Deputy Clerk) (Entered: 09/04/2009) |
| 09/04/2009 | 65 | | RESPONSE to Motion (Re: 63 Second MOTION for Extension to Respond to 2255 Motion) by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 9/8/2009 to change text and change link (dma, Deputy Clerk). (Entered: 09/04/2009) |
| 09/11/2009 | 66 | | ORDER by District Judge James H. Payne: denying 45 Petitioner's Motion to Disqualify and Recuse (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/11/2009 | 67 | | ORDER by District Judge James H. Payne: Granting in part, denying in part and taking under advisement in part 52 Government's MOTION to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings filed Cr−04−115 (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/22/2009 | 68 | | NOTICE of Intention Not to Abandon Claims and REQUEST for Protective Order (Re: 67 Order) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) Modified on 9/23/2009 change text (dma, |

| | | | |
|---|---|---|---|
| | | | Deputy Clerk). (Entered: 09/22/2009) |
| 09/23/2009 | 69 | | ORDER by District Judge James H. Payne (Re: 67 Order, 68 Petitioner's NOTICE of Intent Not to Abandon Claims and REQUEST for Protective Order) (cjt, Deputy Clerk) (Entered: 09/23/2009) |
| 09/25/2009 | 70 | | Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* by Kenneth Eugene Barrett Responses due by 10/13/2009 (With attachments – **EXHIBITS 1–10**)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 71 | | EXHIBIT(S) **11 through 50** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 72 | | EXHIBIT(S) **51 through 118** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/28/2009 | 73 | | OBJECTION to Petitioner's Proposed Protective Order (Re: 68 MOTION for Protective Order) by USA (Wilson, Christopher) Modified on 9/29/2009 to change text (dma, Deputy Clerk). (Entered: 09/28/2009) |
| 09/29/2009 | 74 | | ORDER by District Judge James H. Payne: Show Cause Hearing and Scheduling Conference are set for 10/6/2009 at 02:00 PM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 70 Amended MOTION for Collateral Relief, to Vacate, Set Aside or Correct Sentence and for a New Trial) (cjt, Deputy Clerk) (Entered: 09/29/2009) |
| 09/30/2009 | 75 | | RESPONSE (Re: 69 Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 09/30/2009) |
| 10/02/2009 | 76 | | MOTION to Vacate Order/Judgment *Order Filed September 29, 2009*, MOTION to Continue Hearing(s) *On Order to Show Cause* (Re: 74 Order,, Setting/Resetting Hearing(s), Setting/Resetting Hearing(s),, ) by Kenneth Eugene Barrett Responses due by 10/19/2009 (With attachments)(Schardl, Tivon) (Entered: 10/02/2009) |
| 10/02/2009 | 77 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's emergency motion (Dkt 76 ) to vacate show cause order is denied. The court hereby waives the presence of petitioner's counsel, Tivon Schardl, at the hearing scheduled October 6, 2009, at 2:00 p.m. Lead counsel, David Autry, is required to attend; however, arrangements will be made for lead counsel to speak with co–counsel Tivon Schardl via telephone, if necessary. In addition, the parties should be aware the court intends to conduct a status and scheduling conference to receive the parties' observations and comments as to the time frame necessary for disposition of this matter. (cjt, Deputy Clerk) (Entered: 10/02/2009) |
| 10/05/2009 | 78 | | MOTION to Continue Hearing(s), MOTION to Recuse, MOTION to Reconsider, MOTION for Leave to Appear *y* (Re: 77 Minute Order,,, Ruling on Motion to Vacate Order/Judgment,,, Ruling on Motion to Continue |

| | | | |
|---|---|---|---|
| | | | Hearing(s), Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 10/20/2009(Schardl, Tivon) (Entered: 10/05/2009) |
| 10/05/2009 | 79 | | MINUTE ORDER by District Judge James H. Payne: denying 78 Petitioner's Motion to Reconsider; denying 78 Petitioner's Motion to Continue Hearing; finding as moot 78 Motion for Leave to Appear by Telephone pursuant to Minute Order 77 entered on 10/2/09. 78 Petioner's Motion to Recuse was previously denied by Order 66 entered on 9/11/09. (cjt, Deputy Clerk) (Entered: 10/05/2009) |
| 10/06/2009 | 80 | | MINUTES of Proceedings – held before District Judge James H. Payne: Show Cause/Scheduling Hearing held on 10/6/2009 (Court Reporter: K.Sidwell) (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 81 | | SCHEDULING ORDER by District Judge James H. Payne: Amended Motion to Vacate due 11/6/2009; Brief in Support due 1/5/2010; Response due 3/8/2010; Reply due 3/23/2010 (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 82 | | PROTECTIVE ORDER by District Judge James H. Payne: granting 68 Petitioner's Motion for Protective Order; granting 52 Government's Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/08/2009 | 83 | | ***Remark: Pursuant to 82 Protective Order entered on 10/7/2009, copies of sealed Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, 274, 301 and the sealed letter dated 2/28/2005, all filed in Case No. CR–04–115–JHP, were personally delivered to Asst. United States Attorney Christopher Wilson on 10/8/2009. (cjt, Deputy Clerk) (Entered: 10/08/2009) |
| 10/09/2009 | 84 | | STATUS REPORT by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 10/09/2009) |
| 10/15/2009 | 85 | | TRANSCRIPT of Proceedings (Unredacted) of Show cause/Scheduling Hearing held on 10/6/09 before District Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–42). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 80 Minutes of Scheduling Conference, Striking/Terminating Deadline(s)/Hearing(s) ) (kns, Court Reporter) (Entered: 10/15/2009) |
| 10/16/2009 | 86 | | MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* by Kenneth Eugene Barrett Responses due by 11/2/2009(Schardl, Tivon) (Entered: 10/16/2009) |
| 10/20/2009 | 87 | | ORDER by District Judge James H. Payne ; denying 86 Motion to Stay (lsa, Chambers) (Entered: 10/20/2009) |
| 10/28/2009 | 88 | | Unopposed MOTION to Extend Deadline(s) *Established by Order filed October 7, 2009* by Kenneth Eugene Barrett Responses due by 11/12/2009 (With attachments)(Schardl, Tivon) (Entered: 10/28/2009) |

| | | | |
|---|---|---|---|
| 11/02/2009 | 89 | | SUPPLEMENT to Unopposed Motion to Continue Filing Schedule 88 by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 11/3/2009 to edit text (cjt, Deputy Clerk). (Entered: 11/02/2009) |
| 11/03/2009 | 90 | | ORDER EXTENDING FILING SCHEDULE by District Judge James H. Payne: granting 88 Petitioner's Unopposed Motion to Continue Filing Schedule (cjt, Deputy Clerk) (Entered: 11/03/2009) |
| 11/04/2009 | 91 | 22 | ORDER from Circuit Court (Re: 86 MOTION to Stay Proceedings Pending Disposition of Mandamus Action 87 Order Denying Motion to Stay) (cjt, Deputy Clerk) (Entered: 11/04/2009) |
| 12/03/2009 | 92 | | MINUTE ORDER by District Judge James H. Payne: Show Cause Hearing is set for 12/15/2009 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne for David Autry to show cause why he has failed to comply with this Court's prior orders regarding submission of CJA vouchers. Only David Autry's appearance is required at this hearing. (cjt, Deputy Clerk) (Entered: 12/03/2009) |
| 12/04/2009 | 93 | | ATTORNEY APPEARANCE by Joan Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified on 12/7/2009 to change text (dma, Deputy Clerk). (Entered: 12/04/2009) |
| 12/04/2009 | 94 | 24 | NOTICE Petitioner's Notice Regarding Amended Petition by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 12/04/2009) |
| 12/04/2009 | 95 | 51 | Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* by Kenneth Eugene Barrett Responses due by 12/18/2009(Fisher, Joan) (Entered: 12/04/2009) |
| 12/14/2009 | 96 | 454 | ORDER from Circuit Court (Re: 87 Order, Ruling on Motion to Stay, 86 MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* ) (With attachments)(law, Deputy Clerk) (Entered: 12/14/2009) |
| 12/15/2009 | 97 | | SEALED MINUTES of Show Cause Hearing (cjt, Deputy Clerk) (Entered: 12/15/2009) |
| 01/08/2010 | 98 | | MOTION to Extend Deadline(s) *for submission of cja voucher* by Kenneth Eugene Barrett Responses due by 1/22/2010(Autry, David) (Entered: 01/08/2010) |
| 01/08/2010 | 99 | | MINUTE ORDER by District Judge James H. Payne: granting 98 Motion to Extend Time for Submittal of CJA Voucher by Petitioner's counsel, David Autry, until 1/11/2010. (cjt, Deputy Clerk) (Entered: 01/08/2010) |
| 01/11/2010 | 100 | 457 | NOTICE of Submission of Matter for In Camera Review by USA (Wilson, Christopher) (Entered: 01/11/2010) |
| 01/11/2010 | 101 | | SEALED LETTER (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/12/2010 | 102 | 459 | PROTECTIVE ORDER by District Judge James H. Payne (Re: 101 Sealed Letter) (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/13/2010 | 103 | | Unopposed MOTION to Extend Deadline(s) *to File Brief in Support of Amended Petition and Subsequent Briefing* by Kenneth Eugene Barrett Responses due by 1/27/2010 (With attachments)(Schardl, Tivon) (Entered: |

| | | | |
|---|---|---|---|
| | | | 01/13/2010) |
| 01/15/2010 | 104 | | MINUTE ORDER by District Judge James H. Payne: For good cause shown, 103 Petitioner's Motion for Extension of Time to File Brief in Support of Amended Motion to Vacate is granted. Petitioner shall be given until 2/18/2010 to file his brief. No further extensions of time shall be granted. Respondent's answer shall be due 4/19/2010 and Petitioner's reply will be due 5/4/2010. (Re: 95 Amended MOTION to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255) (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 01/15/2010 | 105 | | MINUTE ORDER by District Judge James H. Payne: It is hereby ordered that Petitioner Kenneth Eugene Barrett's CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT–APPOINTED COUNSEL comes before the Court by David B. Autry. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original application and supporting documents. (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 02/02/2010 | 106 | | MINUTE ORDER by District Judge James H. Payne (Attachments: # 1 1/29/2010 E–Mail) (cjt, Deputy Clerk) (Entered: 02/02/2010) |
| 02/11/2010 | 107 | | Third MOTION to Extend Deadline(s) *Due to Newly Disclosed Evidence* by Kenneth Eugene Barrett Responses due by 2/25/2010 (With attachments)(Schardl, Tivon) (Entered: 02/11/2010) |
| 02/12/2010 | 108 | | MINUTE ORDER by District Judge James H. Payne: Motion Hearing and Status Conference are set for 3/1/2010 at 09:30 AM before District Judge James H. Payne (Re: 107 Petitioner's Third MOTION to Continue Briefing Schedule). Counsel are required to be present at this hearing. Petitioner does not need to be present. (cjt, Deputy Clerk) (Entered: 02/12/2010) |
| 02/18/2010 | 109 | | MOTION Leave to File Oversized Brief in Support of Amended Motion to Vacate, MOTION for Leave to File Brief in Support of Second Amended Motion to Vacate by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 110 | | Unopposed MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 3/4/2010(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 111 | | Amended MOTION for Leave to Exceed Page Limitation by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 112 | | MINUTE ORDER by District Judge James H. Payne: denying 111 Petitioner's Amended Motion for Leave to File Oversized Brief, with written order to follow (finding as moot 109 Petitioner's Motion for Leave to File Oversized Brief) (cjt, Deputy Clerk) (Entered: 02/18/2010) |
| 02/18/2010 | 113 | | MOTION to Reconsider *Order Denying Leave to File Oversized Brief* (Re: 112 Minute Order,, Ruling on Motion for Miscellaneous Relief,, Ruling on Motion for Leave to File Document(s), Ruling on Motion for Leave to File Document(s), Ruling on Motion to Exceed Page Limitation, ) by Kenneth |

| | | | |
|---|---|---|---|
| | | | Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 114 | 460 | REDACTED EXHIBITS **119, 120, 121, 122** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 115 | 468 | REDACTED EXHIBITS **125, 126, 128, 129, 130, 132, 133, 134, 137, 138** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 116 | 489 | REDACTED EXHIBITS **148, 149, 150, 151, 152, 153, 154** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 117 | 545 | REDACTED EXHIBITS **123, 124, 127, 131, 135** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 118 | 559 | REDACTED EXHIBITS **155, 156** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 119 | 654 | REDACTED EXHIBITS **157, 158** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 120 | 703 | REDACTED EXHIBITS **163, 164** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 121 | 754 | REDACTED EXHIBIT **161** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 122 | | REDACTED EXHIBIT **162** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 123 | | REDACTED EXHIBITS **165, 166** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 124 | | REDACTED EXHIBIT **159 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: |

| | | | |
|---|---|---|---|
| | | | 02/18/2010) |
| 02/18/2010 | <u>125</u> | | REDACTED EXHIBITS **167, 168, 169** (Re:<u> 95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>126</u> | | REDACTED EXHIBIT **159 Part b** (Re:<u> 95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>127</u> | | REDACTED EXHIBITS **170, 171** (Re:<u> 95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>128</u> | | REDACTED EXHIBIT **160 Part a** (Re:<u> 95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>129</u> | | REDACTED EXHIBIT **160 Part b** (Re:<u> 95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>130</u> | | REDACTED EXHIBITS **172, 173** (Re:<u> 95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>131</u> | | REDACTED EXHIBIT **177 Part a** (Re:<u> 95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>132</u> | | REDACTED EXHIBITS **174, 175, 176, 178** (Re:<u> 95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>133</u> | | REDACTED EXHIBIT **177 Part b** (Re:<u> 95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>134</u> | | REDACTED EXHIBIT **177 Part c** (Re:<u> 95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>135</u> | | REDACTED EXHIBITS **179, 180, 181a** (Re:<u> 95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |

| | | | |
|---|---|---|---|
| 02/18/2010 | 136 | | REDACTED EXHIBIT **181 Part B1** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 137 | | REDACTED EXHIBITS **182, 183** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 138 | | REDACTED EXHIBIT **181 Part B2** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 139 | | REDACTED EXHIBIT **196 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 140 | | REDACTED EXHIBITS **184, 185, 186, 187, 188** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 141 | | REDACTED EXHIBIT **196 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 142 | | REDACTED EXHIBIT **196 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 143 | | REDACTED EXHIBIT **196 Part d** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 144 | | REDACTED EXHIBITS **189, 190, 191, 192, 193, 194, 195** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 145 | | REDACTED EXHIBITS **197, 198, 199, 200, 203, 204, and 205** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/18/2010) |
| 02/26/2010 | 146 | | ORDER by District Judge James H. Payne: granting 113 petitioner's Motion to Reconsider; Petitioner's brief due 3/1/10 at 4:30 p.m.; Status Conference RESET for 3/31/2010 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne; (granting in part 107 Motion to Continue Briefing Schedule; striking |

| | | | |
|---|---|---|---|
| | | | 1 Motion to Vacate Order/Judgment; striking 2 Corrected Motion to Vacate Order/Judgment; striking 70 Amended Motion to Vacate Order/Judgment) (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 02/26/2010 | 147 | | ORDER by District Judge James H. Payne: Re: 110 petitioner's Unopposed MOTION to File Exhibits Under Seal; Petitioner's response due 3/12/10 (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 03/01/2010 | 148 | | STIPULATION *and Order [Proposed] Modified Protective Order* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 149 | | BRIEF in Support of Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 150 | | MOTION for Evidentiary Hearing (Re: 95 Amended MOTION to Vacate) by Kenneth Eugene Barrett; Responses due by 3/15/2010(Schardl, Tivon) Modified on 3/2/2010 to change text and link (dma, Deputy Clerk). (Entered: 03/01/2010) |
| 03/01/2010 | 151 | | MOTION Expand the Record (Re: 149 Brief in Support of Motion ) by Kenneth Eugene Barrett Responses due by 3/15/2010(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/03/2010 | 152 | | Joint MOTION to Modify Protective Order by all parties Responses due by 3/17/2010(Wilson, Christopher) (Entered: 03/03/2010) |
| 03/05/2010 | 153 | | RESPONSE in Opposition to Motion (Re: 150 MOTION for Hearing ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/05/2010 | 154 | | RESPONSE in Opposition to Motion (Re: 151 MOTION Expand the Record ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/12/2010 | 155 | | RESPONSE by Kenneth Eugene Barrett (Re: 147 Order) (Fisher, Joan) (Entered: 03/12/2010) |
| 03/25/2010 | 156 | | MINUTE ORDER by District Judge James H. Payne: **TIME CHANGE ONLY** – Status Conference RESET for 3/31/2010 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne. (cjt, Deputy Clerk) (Entered: 03/25/2010) |
| 03/29/2010 | 157 | | ORDER by District Judge James H. Payne: denying 150 Petitioner's Motion for Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/29/2010 | 158 | | MOTION to be Excused from the Status Conference set on March 31, 2010 by USA Responses due by 4/12/2010(Wilson, Christopher) (Entered: 03/29/2010) |
| 03/29/2010 | 159 | | MINUTE ORDER by District Judge James H. Payne: granting 158 Government's Motion to be Excused from Attendance of Status Conference. The Court further grants Government's request for substitute counsel, Douglas Horn, to appear in lieu of Christopher Wilson for this hearing only. (cjt, Deputy Clerk) (Entered: 03/29/2010) |

| | | | |
|---|---|---|---|
| 03/30/2010 | 160 | | MINUTE ORDER by District Judge James H. Payne: The Court directs that Courtroom 1, Room 230, be sealed on 3/31/2010 at 9:00 a.m. for the portion of the Status Hearing pertaining to the Protective Order. The Clerk is directed to post this Minute Order on the Court's bulletin board for public viewing located on the 2nd floor of the United States Courthouse. (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 161 | | ORDER (Re: Exhibits) by District Judge James H. Payne: granting 110 Petitioner's Motion to File Exhibits under Seal; granting 151 Petitioner's Motion to Expand the Record (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 162 | | SEALED EXHIBIT **201** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 163 | | SEALED EXHIBIT **202** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/31/2010 | 164 | | SEALED MINUTES of Proceedings – held before District Judge James H. Payne: Motion/Status Hearing held on 3/31/2010 (Re: 152 Joint MOTION to Modify Protective Order ) (Court Reporter: B.Neil) (cjt, Deputy Clerk) (cjt, Deputy Clerk). (Entered: 04/01/2010) |
| 03/31/2010 | 165 | | MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 03/31/2010 | 166 | | CORRECTED MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010, Reply due by 7/1/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 04/05/2010 | 167 | | SEALED REPORT TO COURT by USA (Re: 152 Joint Motion to Modify Protective Order) (cjt, Deputy Clerk) (Entered: 04/05/2010) |
| 04/08/2010 | 168 | | SEALED ORDER by Judge James H. Payne Re: 152 Joint Motion to Modify Protective Order (cjt, Deputy Clerk) (Entered: 04/08/2010) |
| 04/14/2010 | 169 | | SEALED STATUS REPORT by Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 4/20/2010 to add corrected attachment (cjt, Deputy Clerk). (Entered: 04/15/2010) |
| 05/12/2010 | 170 | | Unopposed MOTION for Leave to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief by USA Responses due by 5/26/2010(Wilson, Christopher) (Entered: 05/12/2010) |
| 05/13/2010 | 171 | | ORDER by District Judge James H. Payne: granting 170 Respondent's Unopposed Motion to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief (cjt, Deputy Clerk) (Entered: 05/13/2010) |
| 05/14/2010 | 172 | | TRANSCRIPT of Proceedings (Unredacted) of Status Hearing held on 3–31–2010 before District Judge James H. Payne (Court Reporter: Brian P. Neil) (Pages: 1–46). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without |

| | | | |
|---|---|---|---|
| | | | redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s) ) (bpn, Court Reporter) (Entered: 05/14/2010) |
| 05/14/2010 | 173 | | TRANSCRIPT ORDER FORM for Status and Scheduling Conference conducted on 3/31/10 (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s), 172 Transcript of Proceedings – Unredacted) by Kenneth Eugene Barrett (law, Deputy Clerk) (Entered: 05/17/2010) |
| 05/17/2010 | 174 | | Redacted RESPONSE in Opposition to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 05/17/2010) |
| 05/17/2010 | 175 | | SEALED RESPONSE (Re: 174 RESPONSE to Motion; 95 Amended MOTION to Vacate, Set Aside or Correct a Sentence) by USA (dma, Deputy Clerk) (Entered: 05/17/2010) |
| 06/30/2010 | 176 | | Unopposed MOTION for Leave to Exceed Page Limitation *For Reply Brief* by Kenneth Eugene Barrett Responses due by 7/14/2010(Schardl, Tivon) (Entered: 06/30/2010) |
| 06/30/2010 | 177 | | MINUTE ORDER by District Judge James H. Payne: granting 176 Petitioner's Unopposed Motion for Leave to File Oversized Brief (cjt, Deputy Clerk) (Entered: 06/30/2010) |
| 07/01/2010 | 178 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 07/01/2010) |
| 07/23/2010 | 179 | | NOTICE of Filing of Signed Declaration of Toby Barrett (Re: 178 Reply to Response to Motion ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 07/23/2010) |
| 08/13/2010 | 180 | | REPORT AND RECOMMENDATION ON REQUEST FOR EXCESS COMPENSATION by Magistrate Judge Steven P. Shreder (Re: 105 Minute Order Referring CJA 30 Voucher) Objections to RRdue by 8/27/2010(eje, Deputy Clerk) (Entered: 08/13/2010) |
| 09/03/2010 | 181 | | SEALED ORDER by District Judge James H. Payne: Re: 180 Report and Recommendation) (cjt, Deputy Clerk) (Entered: 09/03/2010) |
| 09/03/2010 | | | CJA 30: Authorization to Pay David B. Autry on behalf of Kenneth Eugene Barrett. (JHP 9/3/10)(smg, Deputy Clerk) (Entered: 09/14/2010) |
| 02/07/2011 | 182 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 2/22/2011 (With attachments)(Fisher, Joan) (Entered: 02/07/2011) |
| 02/08/2011 | 183 | | MINUTE ORDER by District Judge James H. Payne: granting 182 Petitioner's Unopposed Motion to Seal. Petitioner is given leave to file the following documents under seal: Petitioners Motion to Vacate or Modify |

| | | | |
|---|---|---|---|
| | | | Protective Order and Request for Hearing; Brief in Support of Motion to Vacate or Modify Protective Order and Request for Hearing; Petitioners Motion for Leave to Conduct Discovery; and Petitioners Brief in Support of Motion to Conduct Discovery. (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 184 | | SEALED MOTION to Vacate or Modify Protective Orders and Request for Hearing by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 185 | | SEALED BRIEF in Support of 184 Petitioner's Sealed Motion to Vacate and/or Modify Protective Order and Request for Hearing (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 186 | | SEALED MOTION for Leave to Conduct Discovery by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 187 | | SEALED BRIEF in Support of 186 Sealed Motion to Conduct Discovery (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/17/2011 | 188 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 186 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 189 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 184 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 190 | | MINUTE ORDER by District Judge James H. Payne: granting 188 and 189 Government's Motions for Extension of Time to Respond to Motions; Responses due by 3/8/2011 Re: 184 Petitioner's SEALED MOTION to Vacate or Modify Protective Orders and 186 Petitioner's SEALED MOTION for Leave to Conduct Discovery (cjt, Deputy Clerk) (Entered: 02/17/2011) |
| 03/04/2011 | 191 | | Unopposed MOTION to Seal Document by USA Responses due by 3/18/2011(Kahan, Jeffrey) (Entered: 03/04/2011) |
| 03/04/2011 | 192 | | MINUTE ORDER by District Judge James H. Payne: granting 191 Respondent's Motion to File Sealed Oppositions to Sealed Motions (cjt, Deputy Clerk) (Entered: 03/04/2011) |
| 03/08/2011 | 193 | | SEALED RESPONSE in Opposition (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/08/2011 | 194 | | SEALED RESPONSE in Oposition (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/18/2011 | 195 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 4/1/2011 (With attachments)(Fisher, Joan) (Entered: 03/18/2011) |
| 03/18/2011 | 196 | | MINUTE ORDER by District Judge James H. Payne: granting 195 Petitioner's Motion to Seal Replies to documents 193 and 194 (cjt, Deputy Clerk) (Entered: 03/18/2011) |
| 03/21/2011 | 197 | | SEALED REPLY to Response (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by Petitioner (cjt, Deputy Clerk) (Entered: |

| | | | |
|---|---|---|---|
| | | | 03/22/2011) |
| 03/21/2011 | 198 | | SEALED REPLY to Response (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/16/2012 | 199 | | NOTICE of Filing of Declaration of Paul D. Gordon (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) Modified to reflect DVDs for Exhibits 2, 3 and 4 stored in file cabinet in vault on 2nd floor Court Clerk's Office (cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/16/2012 | 200 | | NOTICE of Filing of Declaration of Leonard Post (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 03/16/2012) |
| 03/16/2012 | 201 | | MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett Responses due by 3/30/2012 (With attachments)(Fisher, Joan) Modified to reflect CDs of Appendix A and Appendix B stored in file cabinet in vault on 2nd floor Court Clerk's Office(cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/19/2012 | 202 | | CERTIFICATE of Service (Re: 199 Notice (Other) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/19/2012 | 203 | | CERTIFICATE of Service (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/29/2012 | 204 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 201 Motion to Supplement) by USA; Responses due by 4/12/2012 (With attachments)(Wilson, Christopher) Modified on 3/30/2012 (cjt, Deputy Clerk). (Entered: 03/29/2012) |
| 03/30/2012 | 205 | | MINUTE ORDER by District Judge James H. Payne: granting 204 Motion for Extension of Time to Respond to Motion; Response deadline extended to 4/30/2012 (Re: 201 MOTION to Supplement) (cjt, Deputy Clerk) (Entered: 03/30/2012) |
| 04/27/2012 | 206 | | RESPONSE in Opposition to Motion (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by USA ;(Wilson, Christopher) (Entered: 04/27/2012) |
| 05/07/2012 | 207 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255,* 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/07/2012) |
| 06/18/2012 | 208 | | MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY by Kenneth Eugene Barrett. Responses due by 7/2/2012(Fisher, Joan) (Entered: 06/18/2012) |

| | | | |
|---|---|---|---|
| 06/18/2012 | 209 | | BRIEF in Support of Motion (Re: 208 MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/18/2012) |
| 06/20/2012 | 210 | | ORDER by District Judge James H. Payne denying 201 Motion for Leave to Supplement Pending Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence Under 28 U.S.C. Section 2255 (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/20/2012 | 211 | | MINUTE ORDER by District Judge James H. Payne denying 208 Motion to Preserve Testimony of Judge John Garrett, Retired, Without Further Delay (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/28/2012 | 212 | | MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* (Re: 210 Ruling on Motion to Supplement ) by Kenneth Eugene Barrett. Responses due by 7/12/2012(Fisher, Joan) (Entered: 06/28/2012) |
| 07/10/2012 | 213 | | RESPONSE in Opposition to Motion (Re: 212 MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* ) by USA ;(Wilson, Christopher) (Entered: 07/10/2012) |
| 08/16/2012 | 214 | | OPINION AND ORDER by District Judge James H. Payne: denying 95 Amended Motion to Vacate; denying 184 Sealed Motion; denying 186 Sealed Motion; denying 212 Motion to Reconsider (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 215 | | SEALED ORDER by District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 216 | | JUDGMENT by District Judge James H. Payne entering judgment in favor of USA against Kenneth Eugene Barrett (terminates case) (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 09/13/2012 | 217 | | MOTION to Alter Order/Judgment *and Brief in Support* (Re: 216 Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider ) by Kenneth Eugene Barrett. Responses due by 9/27/2012 (With attachments)(Fisher, Joan) (Entered: 09/13/2012) |
| 09/27/2012 | 218 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA. Responses due by 10/11/2012(Wilson, Christopher) (Entered: 09/27/2012) |
| 09/27/2012 | 219 | | ORDER by District Judge James H. Payne: granting 218 Motion for Extension of Time to Respond to Motion; Responses due by 10/29/2012 (Re: 217 MOTION to Alter or Amend Judgment) (cjt, Deputy Clerk) (Entered: 09/27/2012) |
| 10/29/2012 | 220 | | RESPONSE in Opposition to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 10/29/2012) |
| 10/30/2012 | 221 | | OPINION AND ORDER by District Judge James H. Payne: denying 217 Petitioner's Motion to Alter or Amend Judgment (cjt, Deputy Clerk) |

| | | | |
|---|---|---|---|
| | | | (Entered: 10/30/2012) |
| 12/26/2012 | 222 | | NOTICE OF APPEAL to Circuit Court (Re: 216 Judgment, 221 Ruling on Motion to Alter Order/Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider, 215 Sealed Order ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 12/26/2012) |
| 12/27/2012 | 223 | | Transmission of Notice of Appeal and Docket Sheet to Circuit Court with copy of 222 Notice of Appeal, 216 Judgment, 221 Ruling, 214 Ruling and 215 Sealed Order. Preliminary Record transmitted to 10th Circuit Court of Appeals electronically. (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/27/2012) |
| 12/27/2012 | 224 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 12–7086 (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/28/2012) |
| 01/10/2013 | 225 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/10/2013) |
| 01/10/2013 | 226 | | DESIGNATION of Record on Appeal (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 01/10/2013) |

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**November 4, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

In re:

KENNETH EUGENE BARRETT,

Petitioner.

No. 09-7096
(D.C. No. 6:09-CV-00105-JHP)
(E.D. Okla.)

**ORDER**

Before **BRISCOE** and **TYMKOVICH**, Circuit Judges.

Kenneth Eugene Barrett has filed a motion to stay all proceedings in his 28 U.S.C. § 2255 case pending in the district court until this court decides his petition for a writ of mandamus. Mr. Barrett must satisfy the traditional stay factors, which are "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Nken v. Holder*, 129 S. Ct. 1749, 1761 (2009) (reiterating traditional stay standards). "A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 129 S. Ct. at 1760 (quotation omitted). "The party requesting a stay bears the

22

burden of showing that the circumstances justify an exercise of [the court's] discretion." *Id.* at 1761.

We are not convinced that Mr. Barrett has satisfied the required factors or that the circumstances justify an exercise of the court's discretion. The motion for stay is DENIED.

Entered for the Court,

*Elisabeth A. Shumaker*

ELISABETH A. SHUMAKER, Clerk

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>              Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>              Respondent. | 6:09-cv-00105-JHP |

**PETITIONER'S NOTICE REGARDING**
**AMENDED PETITION FILED PURSUANT TO COURT ORDER**

**TABLE OF CONTENTS**

Prefatory Statement ................................................................................................ 1

1.  Relevant Procedural History  .......................................................................... 2

2.  Objections ...................................................................................................... 4

3.  Statement regarding amendment .................................................................... 5

      a.  Mr. Barrett's compliance with the Court's order does not imply
          agreement with it ............................................................................... 5

      b.  The rules being applied to Mr. Barrett are not clear and are not consistently
          applied to others who are similarly situated .......................................... 7

      c.  Mr. Barrett's pleadings met all formal requirements either directly or
          by providing the same information ................................................... 13

Conclusion ............................................................................................... 16

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Davis v. Wechsler*, 263 U.S. 22 (1923) ................................................................ 13

*James v. Kentucky*, 466 U.S. 341 (1984) ............................................................. 13

*Kafo v. United States*, 467 F.3d 1063 (7th Cir. 2006) ..................................... 14, 15

*Lee v. Kemna*, 534 U.S. 362 (2002) .................................................................... 13

*Maggio v. Zeitz*, 333 U.S. 56 (1948) .................................................................... 1

*Mayle v. Felix*, 545 U.S. 644 (2005) ............................................................ 6, 11, 15

*NAACP ex rel. Patterson v. Alabama*, 357 U.S. 449 (1958) ............................... 13

*NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288 (1964) ................................. 13

*Staub v. City of Baxley*, 355 U.S. 313 (1958) ..................................................... 13

*Walker v. City of Birmingham*, 388 U.S. 307 (1967) ............................................ 1

### DOCKETED CASES

*United States v. Kenneth Barrett*, E.D. Ok. Case No. 06-cr-115 .......................... 8

### FEDERAL STATUTES

28 U.S.C. § 2254 ............................................................................................ 8, 10

28 U.S.C. § 2255 ................................................................................................. 5

Fed. R. Civ. P. 8(a) .............................................................................................. 6

Fed. R. Civ. P. 15 ......................................................................................... passim

Fed. R. Crim. P. 33 .............................................................................................. 5

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br><br>Petitioner,<br><br>v.<br><br><br>UNITED STATES OF AMERICA,<br><br><br>Respondent. | 6:09-cv-00105-JHP |

**PETITIONER'S NOTICE REGARDING**
**AMENDED PETITION FILED PURSUANT TO COURT ORDER**

COMES NOW Petitioner, KENNETH EUGENE BARRETT, by and through his undersigned counsel, and submits this statement of understanding regarding the amended motion/petition being filed pursuant to the Order entered October 7, 2009 (Doc. 81) ("October 7 Order"), and objections to the lack of timely notice that preceded that order.

**Prefatory Statement**

Regardless of Mr. Barrett's objections to the manner as in which this Court rendered its October 7 Order set forth hereinbelow, he recognizes that he must follow that order. *Cf. Walker v. City of Birmingham*, 388 U.S. 307, 316 & n.8 (1967); *Maggio v. Zeitz*, 333 U.S. 56, 69 (1948). Mr. Barrett relies upon this Court's findings that Petitioner has "a clean slate going forward," (Tr. 10/6/09 Hr'g at 25), and acknowledges Court's intent to create a clean and clear record. To

1

27

that end, and to avoid the appearance or implication that Mr. Barrett's compliance with the October 7 order suggests his prior pleadings were in any way improper, or that petitioner acquiesces or admits the same, Mr. Barrett submits the following:

**1.      Relevant Procedural History**

The October 7 Order gave Mr. Barrett "thirty (30) days or until November 6, 2009 to file an Amended Motion to Vacate in compliance with the Rules Governing § 2255 Proceedings and sixty (60) days thereafter, or until January 5, 2010, to file a Brief in Support." Doc. 81. The Order issued pursuant to the hearing held the previous day.

On October 28, 2009, Mr. Barrett filed an unopposed motion to extend by 30 days the schedule set forth in the October 7 Order. Doc. 88. On November 3, 2009, this Court granted Mr. Barrett's requested extension, giving Mr. Barrett until December 6, 2009 to file an amended petition. Doc. 90. Mr. Barrett's Brief in Support of the Amended Petition will be filed sixty days hereafter, i.e., on or before February 4, 2010.

On September 29, 2009, this Court entered an order to show cause why the Court should allow Mr. Barrett to amend. Doc. 74 ("September 29 Order"). That Order issued after Mr. Barrett filed his amended petition. *See* Doc. 70. The Order referred in a footnote to the form appended to the Rules Governing § 2255 Proceedings, and to local rules related to pleadings and motions, but did not state that these rules required the filing of an amended petition. Order (Doc. 74) at 2, n.1. The Order also adverted to issues related to Fed. R. Civ. P. 15, but did not make any findings or conclusions of law as to the propriety of Mr. Barrett's amended motion under that rule. *Id.* at 2. In the latter context, the Court directed "[t]o the extent Petitioner waited for more than six months following the filing of his voluminous Motion to file an amendment without

2

seeking prior leave of court, this Court finds Petitioner should show cause why this Court should now allow an amendment to his motion." *Ibid.*

On October 2 and October 5, 2009, Mr. Barrett objected that the September 29 Order denied him meaningful notice and a meaningful opportunity to be heard. Docs. 76 & 78. Mr. Barrett's filings, *inter alia*, set forth grounds for filing an amended pleading without seeking leave of court, grounds for finding his amendment proper, and various objections. Docs. 76 & 78. These motions reflect the understanding of Mr. Barrett's counsel that the purpose of the show cause hearing, as indicated in the quoted, operative sentence of the September 29 Order was to address the propriety of Mr. Barrett's amended motion. *E.g.*, Mot. Vacate Show Cause Order (Doc. 76-0) at 4. Mr. Barrett incorporates herein by specific reference the arguments and averments made in Docs. 76 and 78. This Court summarily overruled those objections. Docs. 77 & 79.

On October 6, 2009, this Court conducted a hearing which began with the Court reading from a prepared statement detailing numerous criticisms of Mr. Barrett's pleadings and his counsel. Tr. 10/6/09 Hr'g at 3-13. Most of those assertions were not contained in the September 29 Order which was ostensibly issued for the purpose of providing notice to Mr. Barrett and his counsel of the issues to which they were to show cause at the hearing. Mr. Barrett again objected to the lack of notice, and to the apparent judgment before trial. Tr. 10/6/09 Hr'g at 14-15.

During the October 6 hearing, the Court qualified its statements regarding potential defects or problems with Mr. Barrett's pleadings, including the initial motion to vacate filed March 16, 2009 (Doc. 1), the corrected motion filed March 17, 2009 (Doc. 2), and the amended motion filed September 25, 2009 (Doc. 75). *E.g.* Tr. 10/6/09 Hr'g at 11. The Court stated that it

<center>3</center>

was not finding Mr. Barrett's pleadings defective in any specific way, (Tr. 10/6/09 Hr'g at 23, 25, 26-27), was not striking Mr. Barrett's pleadings, (Tr. 10/6/09 Hr'g at 27, 29), and reiterated that no potential defect in Mr. Barrett's pleadings would prejudice him, (Tr. 10/2/09 Hr'g at 23, 25, 26, 27, 29).  The Court stated that Mr. Barrett must file an amended petition using the form appended to the Rules Governing § 2255 Proceedings, *(id.* at 11), and repeatedly indicated that the purpose of this hearing was to clarify the issues and the record, *(id.* at 3, 11, 22, 23, 25, 26).

The issue of the form of the pleading was mentioned only as a notation in the footnote to the September 29 Order, and there is no mention in that order of a question regarding the verification of Mr. Barrett's pleadings.  Nevertheless, Mr. Barrett, in his filings on October 2 and 5, 2009, addressed the latter issue as it may have related to the Court's discussion of Fed. R. Civ. P. 15 in the September 29 Order.  Despite the lack of mention in the show cause order, the Court stated during the hearing that it was "extremely concerned" about the form of the verification, (Tr. 10/6/09 Hr'g at 8), a matter of which Mr. Barrett had no inkling, as reflected in the filings of October 2 and 5.  The transcript of the hearing indicates the Court noted that Mr. Barrett's pleading was not on the form prior to the order filed March 18, 2009, which ordered the Government to answer.  Tr. 10/6/09 Hr'g at 4.

**2.      Objections**

To the extent the Court's prepared statements during the October 6 hearing may be considered findings or conclusions of law adverse to Mr. Barrett, they represent the type of hostile judgment preceding trial that violates a person's right to due process of law.  The gravamen of the October 7 Order is a matter the Court indicated, six months after the fact, was of marginal importance.  Mr. Barrett again objects to the lack of timely notice, and respectfully submits any delay is not attributable to him.

4

Mr. Barrett's previous pleadings substantially complied with the Rules Governing § 2255 Proceedings, Fed. R. Civ. P. 15, this Court's Local Rules, and local practice.  As demonstrated *infra*, the October 7 Order imposes a requirement on Mr. Barrett that has not been imposed on any similarly situated capital habeas corpus petitioner in this District for at least the past eleven years.  Mr. Barrett objects to this disparate treatment prejudicing him in any way, and thereby denying him due process and the equal protection of the laws guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

**3.      Statement regarding amendment**

**a.      Mr. Barrett's compliance with the Court's order does not imply agreement with it**

Mr. Barrett is filing an amended petition on the form intended primarily for inmates filing *pro se* because it is his counsel's understanding that the October 7 Order requires him to do so.  By complying with this Order, Mr. Barrett does not suggest or imply that his initial pleading filed March 16, 2009, his corrected pleading filed March 17, 2009, or his amended pleading filed September 25, 2009 failed to substantially conform to the requirements of Rule 2 of the Rules Governing § 2255 Cases.  As discussed in greater detail *infra*, those pleadings constitute valid, effective invocations of 28 U.S.C. § 2255, Fed. R. Crim. P. 33, and the constitutional rights protected by those procedures.

The amended petition being filed pursuant to the October 7 Order is Mr. Barrett's second amended petition.  Mr. Barrett does not file a motion seeking leave to amend, because he understands the October 7 Order obviates such a motion.

The only notice Mr. Barrett or his counsel have regarding the requirements of the October 7 Order is the reference therein to the hearing conducted the previous day.  Neither the

5

October 7 Order nor any other part of the record provides a legal basis for requiring Mr. Barrett to amend, nor does the record or Order identify any specific defects in Mr. Barrett's pleadings such that he is on notice of what specifically his amendment must or must not contain. The Government has filed no objection providing notice that it considers the form or content of any of Mr. Barrett's pleadings deficient in a manner that would require amendment.

As stated by Mr. Barrett's counsel during the October 6 hearing, counsel has had the form re-created in a word processor so that Mr. Barrett's claim could be re-presented as grounds on the form. Mr. Barrett's counsel have provided all the information required by the form. Counsel have eliminated all references to law save those that counsel believe are necessary to state a claim without risk of prejudice to Mr. Barrett. *Cf. Mayle v. Felix*, 545 U.S. 644, 655-56 (2005) (pleading under Rule 2 of Rules Governing § 2254 Cases is "more demanding" than civil notice pleading under Fed. R. Civ. P. 8(a) and requires "that habeas petitioners plead with particularity ...to assist the district court").

Counsel also have eliminated what may be termed "argument" as the form may use that term. Mr. Barrett's counsel have been unable to identify any cases interpreting the term "argument" as used on the form. To the extent the term "argument" is intended to preclude the assertion that the facts support any specific element or elements of a constitutional rule of criminal procedure, the term is overbroad and, when read in conjunction with Rule 2 of the Rules Governing § 2254 Cases and *Felix*, *supra*, violates the Due Process Clause of the Fifth Amendment and Mr. Barrett's right under the First Amendment to plead his claims. In all other respects the term is unconstitutionally vague.

Mr. Barrett does not withdraw or waive any allegation, contention or argument made in his initial § 2255 Motion filed March 16, 2009, his identical-but-for-the-verification corrected

6

motion filed March 17, 2009, or the amendment he filed of right on September 25, 2009.  Mr. Barrett is filing the amended petition on the form because he has been ordered to do so.  Mr. Barrett objected to the Court entering any order until the issue of bias has been resolved.  Although this Court denied disqualification in a separate order filed October 7, 2009 (Doc. 75), that issue is before the Court of Appeals for the Tenth Circuit.  The October 7 Order has not been voided or vacated.  Therefore, Mr. Barrett has no choice but to file an amendment in compliance with the October 7 Order.

However, by filing the amended motion Mr. Barrett does not waive his contention that the Orders filed in September and October 2009 are part of a pattern of disparate treatment which this Court has meted out towards Mr. Barrett.[1]  The October 7 Order applies L.Cv.R. 9.2 in a manner that is unique just as this Court uniquely denied funds for transcripts and expert assistance that had routinely been granted to all other similarly situated defendants in federal death penalty cases.

### b.    The rules being applied to Mr. Barrett are not clear and are not consistently applied to others who are similarly situated

There is a great deal of inconsistency and ambiguity between individual Local Rules and parts of a single Local Rule, between the Local Rules and local practice, and between the Local Rules, local practice, and the Rules Governing § 2255 Proceedings.  Against the background of this ambiguity, or regardless of it, Mr. Barrett substantially complied with Rule 2, the local rules, local practice, and Fed. R. Civ. P 15.

---

[1]  The Court's requirement that Mr. Barrett's counsel incur the expense and delay necessary to refile his amended petition appears to bely the Court's earlier assertions that limits on funding for the defense were based on fiscal concerns and any suggestion made in the order denying equitable tolling that the Court was concerned about delay.

7

Rules 1 and 2 of the Rules Governing § 2255 Proceedings treat a § 2255 motion as a continuation of the criminal case, and find this aspect of § 2255 proceedings distinguishes them from cases brought pursuant to 28 U.S.C. § 2254.[2] *See also* Advisory Committee Notes on same ("motion under § 2255 is a further step in the movant's criminal case and not a separate civil action"). However, this Court, like some other District Courts, treats § 2255 proceedings as civil in nature, and opens a separate civil case following the filing of a § 2255 motion. *See* R. Gov. § 2255 Proc. 3, Advisory Committee Notes ("motion has been considered to be a new civil action in the nature of habeas corpus for filing purposes").

Local Criminal Rule 12.1 sets forth the requirements for motions in criminal cases. It is different than Local Civil Rule 7.1, which sets forth the requirements for motions in civil cases, in ways that are relevant to this Court's criticism of Mr. Barrett's pleadings. This Court found fault with Mr. Barrett's § 2255 motion because it does not state in the title that it is both a motion and brief, *see* L.Cv.R. 7.1(p), and because Mr. Barrett did not seek leave to file a brief over 25 pages in length, as required by L.Cv.R. 7.1(d), *(see* Tr. 10/6/09 Hr'g at 8-9). Mr. Barrett filed his motion in the criminal case, *United States v. Kenneth Barrett*, E.D. Ok. Case No. 06-cr-115, as he was required to do. Local Criminal Rule 12.1 includes neither the page limitation nor the titling requirement of L.Cv.R. 7.1. Although the Local Criminal Rules provide that the Local Civil Rules may apply "when appropriate in a criminal context," L.Cr.R. 1.2, the rules are unclear as to when application of the civil rules is appropriate.[3] The Local Rules do not state

---

[2] This distinction appears in the very names of the rules: where a state prisoner seeks habeas corpus relief the Rules Governing § 2254 *Cases* in the District Courts apply; where a federal prisoner seeks habeas corpus relief the Rules Governing § 2255 *Proceedings* apply.

[3] *See also* R. Gov. § 2255 Proc. 12 ("Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory

(continued...)

8

34

that a § 2255 motion will be converted into a petition initiating a new civil case. *See* Decl. Tivon Schardl appended to Mot. Vacate Show Cause Order (Doc. 76-1).

Mr. Barrett acknowledges that § 2255 motions are addressed under Local Civil Rule 9.2. That rule contains inconsistent provisions and substantial ambiguity. The first sentence of L.Cv.R. 9.2(a) provides that "motions to vacate pursuant to 28 U.S.C. § 2255 . . . shall be on forms provided by the Court Clerk upon request, or from the Court's website at www.oked.uscourts.gov." However, the second sentence of L.Cv.R. 9.2(a), provides, "If the petition is not on the Court-approved form *or does not provide the Court with equivalent information* required by such form, the Court may order the pleading be stricken" (emphasis added). This Court has said it would not strike Mr. Barrett's pleadings, (Tr. 10/6/09 Hr'g at Tr. 10/6/09 Hr'g at 27, 29), and reiterated that no potential defect in Mr. Barrett's pleadings would prejudice him, (Tr. 10/2/09 Hr'g at 23, 25, 26, 27, 29). That ruling is correct and should not be disturbed as a result of the Court ordering Mr. Barrett to amend his petition to present his grounds for relief on the form. The Local Civil Rule's option to provide equivalent information to that required by the form is consistent with Rule 2 of the Rules Governing § 2255, which does not itself require use of the form but provides that a "motion must *substantially follow* either the form appended to these rules or a form prescribed by a local district-court rule" (emphasis added).[4]

---

(...continued)
provisions or these rules, may be applied to a proceeding under these rules").

[4] The Advisory Committee Notes on the 2004 Amendments to Rule 2 note the following:

The language in new Rule 2 (c) has been changed to reflect that a moving party must *substantially follow* the standard form, which is appended to the rules, or a form provided by the court. The current rule, Rule 2 (c), seems to indicate a

(continued...)

9

Local Civil Rule 9.2(a) and (b) provide identical filing requirements for petitions submitted pursuant to 28 U.S.C. §§ 2254 and 2255. Mr. Barrett's counsel have examined the dockets in all capital habeas corpus cases filed in the Eastern District for the eleven (11) years preceding the filing of Mr. Barrett's § 2255 pleading. According to the CM/ECF system, Mr. Barrett's case is the only capital § 2255 proceeding filed in the district in that time. The system identifies capital § 2254 cases and capital § 2255 cases the same way: with code 535. There have been seventeen (17) capital habeas corpus cases filed in the Eastern District since January 1, 1998, although one (1) appears to have been a second or successive petition. Local practice in filing § 2254 petitions in capital cases has consistently been to file them in substantially the same form as Mr. Barrett used in filing his § 2255 petition, i.e. to present claims in the form of a "brief" including both factual averments and, contrary to the instructions on the form, citations to legal authorities and argument. Exh. A (Decl. Tivon Schardl and Appendix thereto).

This practice is consistent with the object and purpose of the drafters of the form who intended it as an "[a]dministrative convenience" that would minimize the number of "lengthy and often illegible petitions, arranged in no logical order" submitted by prison inmates who have no right to counsel. R. Gov. § 2254 Cases 2, Advisory Committee Notes. That the form is primarily intended for use by those proceeding *pro se* is confirmed in the instructions to the form available on this Court's website which cautions those under sentence of death that they are entitled to counsel, implying that they should not file the form on their own behalf.

---

[4] (...continued)
preference for the standard "national" form. Under the amended rule, there is no stated preference. The Committee understood that the current practice in some courts is that if the moving party first files a motion using the national form, that courts may ask the moving party to supplement it with the local form. (emphasis added).

10

The Court has criticized Mr. Barrett's pleadings under two disparate Local Rules, creating *ex post facto* a unique and unmeetable double standard for this case.  On the one hand the Court has criticized Mr. Barrett's pleadings on the ground that they do not conform to L.Cv.R. 7.1 which prescribes the form of civil motions and briefs.  September 29 Order (Doc. 74) at 2, n.1; Tr. 10/6/09 Hr'g at 8-9.  The Court has treated Mr. Barrett's § 2255 motion like any other civil motion, although it was initially filed in a criminal case to which L.Cr.R. 12.1 would apparently apply, and the Court also has treated the motion as a pleading initiating a new civil case.  *Cf. Felix*, *supra*, 545 U.S. at 655-56 (noting petition in habeas case is "original pleading" for purpose of Fed. R. Civ. P. 15).  On the other hand, the Court has criticized Mr. Barrett's pleadings on the ground that they do not conform to L.Cv.R. 9.2 which, the Court has stated, prescribes a *different* and *uniquely* acceptable form for § 2255 motions.  Tr. 10/6/09 Hr'g at 7-8.

In the time since the October 7 Order issued, Mr. Barrett's counsel have investigated local practice in the Eastern District of Oklahoma because the Court's comments during the October 6 hearing indicated that Mr. Barrett's counsel had acted in an atypical manner that they should have anticipated was incorrect.  Tr. 10/6/09 Hr'g at 7:15-18.  Specifically, the Court noted that Mr. Barrett's pleadings sought different forms of relief under different provisions of law, including requesting discovery and an evidentiary hearing, (Tr. 10/6/09 Hr'g at 8, 13), and this apparently is inconsistent with L.Cv.R. 7.1.  Doc. 74 at 2 n. 1.  The Court also noted that Mr. Barrett's pleadings contained citations to cases and "argument" such that they combined a "motion" and "brief."  Tr. 10/6/09 Hr'g at 8-9.  Local Civil Rule 7.1 permits such filings, but requires a motion for leave to file a brief in support of a motion that is longer than 25 pages.  The Court noted that Mr. Barrett's pleadings were over 25 pages in length but Mr. Barrett had not moved for leave to file an extended brief.  Tr. 10/6/09 Hr'g at 9.

<div align="center">11</div>

In each respect, Mr. Barrett's pleadings appear to have conformed to local practice in the Eastern District of Oklahoma, and therefore, to reflect the same understanding of Rule 2 and L.Cv.Rs. 7.1 and 9.2 as counsel in all other capital habeas corpus cases.  It appears that in each and every capital habeas case filed in the past eleven years, ten of which were presided over at either Magistrate or District Court Level by Judge Payne, has been in the form of a "brief" including argument and citations to legal authority, and has been longer than 25 pages.  Many, if not all, capital habeas corpus petitions also sought in their prayers for relief discovery or evidentiary hearings.  The dockets, District Court opinions, Tenth Circuit decisions, and the recollections of counsel show that in none of those cases did the Court raise the issues Judge Payne raises with respect to Mr. Barrett's pleadings, and no similarly situated person was required to amend his petition on the form, or to eliminate law and argument from his pleadings. Exh. A.

The October 7 Order interprets and applies the relevant rules in a new way, and singles out Mr. Barrett for this novel treatment.  However, as this Court said during the hearing, the "clean slate" applies prospectively.  Tr. 10/6/09 Hr'g at 25:22-23.  Any effort to disadvantage Mr. Barrett through this novel procedure would violate his rights to due process and equal protection of the law.  Even where weighty concerns over comity and federalism are factors, the Supreme Court has consistently held that courts may not refuse on the basis of formal defects to entertain clearly asserted claims of constitutional violations, particularly where the rules regarding form are not consistently applied to similarly situated litigants.[5]  Mr. Barrett has

---

[5] *Lee v. Kemna*, 534 U.S. 362 (2002) (rejecting alleged procedural default for attorney's failure to comply with state rule requiring written motion for continuance), *James v. Kentucky*, 466 U.S. 341, 351 (1984) (rejecting alleged default for attorney's failure to follow state-law distinction between admonitions and instructions) ("Where it is
(continued...)

12

38

complied with all applicable rules and local practice in the same manner and to the same extent as other similarly situated persons.

      c.      **Mr. Barrett's pleadings met all formal requirements either directly or by providing the same information**

Mr. Barrett has acknowledged that his counsel mistakenly omitted from his initial § 2255 motion the formal verification language provided for in Rule 2 of the Rules Governing § 2255 Proceedings.  In order to ensure that he suffered no prejudice from this omission, Mr. Barrett's counsel, less than 24 hours later, filed a corrected petition with the verification.  In compliance with L.Cv.R. 9.2, the corrected motion was complete, including, and not modifying, all claims filed the previous day.[6]

---

[5] (...continued)
inescapable that the defendant sought to invoke the substance of his federal right, the asserted state-law defect in form must be more evidence than it is here."); *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 294-301 (1964) (rejecting as "wholly unacceptable" efforts of Alabama to preclude review of merits through application of state procedural rule prescribing form of briefs where "mere stylistic device" "intended presumably as an organizational aid to understanding" "cannot well be regarded as detracting from the brief's full conformity with the rule in question") ("The consideration of constitutional rights may not be thwarted by simple recitation that there has not been observance of a procedural rule with which there has been compliance in both substance and form, in every real sense."); *Staub v. City of Baxley*, 355 U.S. 313 (1958) (rejecting alleged procedural default based on plaintiff's failure to challenge constitutionality of each provision of statute severally); *NAACP ex rel. Patterson v. Alabama*, 357 U.S. 449, 455-58 (1958) (rejecting as inadequate Alabama Supreme Court ruling that petitioners should have sought review through mandamus rather than certiorari where state court had previously held review was appropriate through mandamus) ("Novelty in procedural requirements cannot be permitted to thwart review in this Court applied for by those who, in justified reliance upon prior decisions, seek vindication in state courts of their federal constitutional rights.")  *See also Davis v. Wechsler*, 263 U.S. 22, 25 (1923) (Holmes, J.) ("it is necessary to see that local practice shall not be allowed to put unreasonable obstacles in the way" of enforcement of federal rights).

[6] During the October 6 hearing, the Court appeared to find fault with Petitioner's counsel
(continued...)

Although the initial pleading did not satisfy the formal requirement of a verification, and subsequent events indicate Mr. Barrett's counsel were correct to proceed cautiously and cure this defect, Mr. Barrett's initial § 2255 motion went to extraordinary lengths to satisfy the object and purpose of the verification requirement.

> [T]he verification requirement serves to ensure that a petitioner can provide some evidence beyond conclusory and speculative allegations, even if that evidence is his verified statement alone. Requiring either that the motion be signed under penalty of perjury or be accompanied by an affidavit is thus not a mere technicality of pleading; once a pleading is submitted in this form, the allegations contained therein *become* evidence and permit the district court to evaluate properly the movant's allegations and to determine whether a sufficient threshold showing has been made to warrant further proceedings.

*Kafo v. United States*, 467 F.3d 1063, 1068 (7th Cir. 2006) (footnote omitted).  As with the form referenced in Rule 2, the verification requirement is intended to ensure that a prisoner appearing *pro se* is invoking the remedy of habeas corpus with valid claims.  *Ibid.*  Mr. Barrett, through counsel, provided that assurance, first by substantiating his allegations with abundant evidence, and also by verifying those allegations under penalty of perjury.

Mr. Barrett's initial petition was accompanied by 173 exhibits.  The individual factual averments in the petitions are accompanied by references to an exhibit or exhibits, or contain quotations from or descriptions of an exhibit or exhibits, or are supported by references to or quotations from the existing record.  "There are salutary reasons for requiring strict observance of the affidavit requirement.  Motions to vacate a conviction or sentence ask the district court to grant an extraordinary remedy to one who already has had an opportunity for full process."  *Kafo*, 467 F.3d 1068.  Mr. Barrett filed one of the most, if not the most, meticulously

---

⁶ (...continued)
due to their having not refiled all exhibits with the corrected petition.  Tr. 10/6/09 Hr'g at 9.  Petitioner's counsel conferred with this Court's deputy clerk regarding that issue and was informed that the clerk would not refile the exhibits.

substantiated applications for habeas corpus relief on record in this District, and did so in a good-faith effort to demonstrate the *bona fides* of his claims. And he has made still more efforts to comply with all applicable rules.

The motion/petition filed March 17, 2009, added a verification that complied with Rule 2. The verification unequivocally states that all factual averments in the pleading are true and correct and it makes that declaration under penalty of perjury. The form of the verification differs from the verification in the form appended to Rule 2 only in that the verification contains the explanation – *required by the form itself* – for why the pleading was being signed by someone other than the petitioner himself. For the reasons stated in the filings of October 2, 2009, October 5, 2009, and stated on the record during the hearing held October 6, 2009, the petition filed March 17, 2009, was a correction, not an amendment within the meaning of Fed. R. Civ. P. 15.

To the extent case law applicable to petitioners appearing *pro se* does not apply to this case, *see* Tr. 10/6/09 Hr'g at 6-7, this Court should find that Mr. Barrett substantially complied with Rule 2 of the Rules Governing § 2255 Proceedings by substantiating his claims with 173 exhibits gathered by his counsel. The allegations contained in the amended petition, which Mr. Barrett had a right to file without prior notice or leave of court, Fed. R. Civ. P. 15; *Mayle v. Felix*, *supra*, were substantiated by more than 200 exhibits. Both the corrected motion and the amended motion complied with the verification requirement of Rule 2. Indeed, they exceeded that requirement by not only verifying under penalty of perjury that the allegations of the petition are true, but that the reasons stated for counsel signing in lieu of Mr. Barrett also are true. That is, the verification attached to the corrected and amended motions provided the same or more assurance as required by the form of the verification on the form referenced in Rule 2.

15

42

## Conclusion

Petitioner has proceeded under the good-faith belief, supported by extant law, that his pleadings were filed of right and in compliance with all applicable rules.  This Statement, filed contemporaneously with Mr. Barrett's amendment on the form, should disabuse this Court of any assumptions to the contrary.

DATED:        December 4, 2009.

                                Respectfully submitted,


                                 /s/ David B. Autry
                                DAVID B. AUTRY, OBA #11600
                                Attorney at law
                                1021 N.W. 16th Street
                                Oklahoma City, Oklahoma 73106-6405
                                Telephone:  405-521-9600

                                DANIEL J. BRODERICK
                                Federal Defender

                                 /s/ Tivon Schardl
                                TIVON SCHARDL, Fla. Bar No. 73016
                                Assistant Federal Defender
                                801 I Street, 3rd Floor
                                Sacramento, California 95814
                                Telephone:  916-498-6666

                                 /s/ Joan M. Fisher
                                JOAN M. FISHER, IDA Bar No. 2854
                                Assistant Federal Defender
                                801 I Street, 3rd Floor
                                Sacramento, California 95814
                                Telephone:  916-498-6666

                                Attorneys for Defendant
                                KENNETH EUGENE BARRETT

43

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| | 6:09-cv-00105-JHP |
| Petitioner, | |
| v. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

**DECLARATION OF COUNSEL IN SUPPORT OF
PETITIONER'S NOTICE REGARDING
AMENDED PETITION FILED PURSUANT TO COURT ORDER**

I, Tivon Schardl, declare the following:

1.      I am appointed co-counsel for Kenneth Eugene Barrett in this case.  As part of my responsibilities in the case, following the hearing held October 6, 2009, and in response to comments from the Court made during that hearing, I researched all capital habeas corpus cases filed in the Eastern District of Oklahoma since January 1, 1998.

2.      The purpose of this research was to determine whether I and lead counsel had understood Rule 2 of the Rules Governing § 2255 Proceedings, and the local rules, in a manner that was inconsistent with the understanding of other lawyers in capital cases in the Eastern District.

1

43

3.      I identified all capital habeas corpus cases filed after January 1, 1998 by logging onto the Court's CM/ECF system using the Federal Defender's generic login.  I clicked the "query" button and entered search parameters under the second option on the query page as follows:

In this way, I believed I was querying the CM/ECF database for all cases filed under the same code as Mr. Barrett's case, and therefore for all similarly situated cases.

4.      That query produced a list of seventeen (17) cases, including Mr. Barrett's.  I entered each of those cases into the table appended to this declaration.  Insofar as the issues I was researching involved the application of the local rules, that Mr. Barrett's case was classified the same way as capital habeas cases filed under 28 U.S.C. § 2254, and that L.Cv.R. 9.2 treated §

2

44

2255 and § 2254 cases identically, this list appeared to represent the complete set of relevant cases.

5.     I attempted to learn whether the petitions in the sixteen (16) cases other than Mr. Barrett's were different from his in the following respects: (a) whether the petitions were filed on the form appended to the Rules Governing § 2254 Cases in the District Courts; (b) whether, if not, they contained "argument" and citations to law, i.e. whether they were in the form of a motion/brief; (c) whether, if the petitions were not filed on the form, they were longer than 25 pages; (d) whether the petitions sought various forms of relief including discovery or evidentiary hearings; and, (e) whether, if the answers to (a), (b), (c), or (d) were in the affirmative, the District Court had made an issue of it and requested the petitioners to modify their pleadings accordingly.

6.     In order to answer these questions, I first attempted to form at least an educated guess based upon the documents available through CM/ECF. For nearly all the cases, the petitions and relevant orders, if any, were not available for download. After reviewing the docket entries, and hypothesizing that no capital habeas petitioner on the list had used the form, or been faulted for failing to do so, I decided to conduct a telephone and e-mail survey of counsel in order to test that theory. However, based on a review of the dockets, it appeared that one case, *Braun v. Keating*, Case No. 6:00-cv-00102-JHP-KEW, was a second or successive petition, and I therefore eliminated it from further inquiry.

7.     In ten (10) of the fifteen (15) similarly situated cases, counsel were current or former attorneys from the Capital Habeas Unit of the Federal Public Defender for the Western District of Oklahoma. I spoke with some of these lawyers by telephone and then sent a

3

confirming e-mail regarding the five issues of concern.  Randy Bauman, Vicki Werneke, Kristi Christopher, and Scott Braden, lawyers I have known for many years, confirmed that the CHU had not in the past eleven years filed a petition on the form, had filed in the form of a motion/brief, that the petitions had exceeded 25 pages in length without seeking prior leave, and had sought evidentiary hearings (at least), and there had been no issue made of any of these things.  Mr. Braden reported, however, that in at least one case filed sometime before my survey period, he thought he recalled the Court requesting that a petition be refiled on the form.

8.    In addition to speaking with and/or e-mailing the CHU attorneys, I spoke by telephone with Steve Presson, Chris Eulberg, and Gregory Laird.  These attorneys represented the petitioners in four (4) of the five (5) cases not handled by CHU attorneys.  I asked them the same questions I had asked the CHU attorneys, and received the same responses.

9.    I resolved questions about the remaining case, *Wackerly v. Sirmons*, Case No. 6:01-cv-00567-FHS-KEW, by reviewing the District Court's opinion at 2007 WL 963210, and the opinion on appeal in *Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009).

10.    Based on the records and recollections of counsel, and in some cases counsel's review of the petitions they filed, no capital habeas corpus petitioner in the Eastern District of Oklahoma for the eleven years preceding Mr. Barrett's application for habeas relief, has been required to file on the form, seek leave for filing a petition containing argument in excess of 25 pages, or been faulted for seeking an evidentiary hearing or other process in his prayer for relief. In the majority of cases, the Court denied relief after the parties filed their answer and reply, respectively.  The Court had allowed limited time for filing replies.  Thus, the orderly processing

of capital habeas cases has appeared to rely upon argument being presented in the petitions themselves.

I declare, under penalty of perjury as provided in the laws of the United States of America, that the foregoing five-page declaration is true and correct.

Executed by me this 30th day of November, 2009, in Sacramento County, California.

<div align="right">/s/ Tivon Schardl</div>

**CAPITAL HABEAS CASES FILED IN THE EASTERN DISTRICT OF OKLAHOMA SINCE 1/1/1998**

| | CASE | JHP | FILED DATE & DOC. # | ON FORM | COUNSEL |
|---|---|---|---|---|---|
| 1 | *Battenfield v. Ward*, 6:98-cv-00036-JHP | MJ, DJ (after remand) | 6/15/1998 (Doc. #16); Appendix filed 6/15/1998 (Doc. #17); denied without briefing, argument or hearing of any kind 5/5/1999 (Doc. #28) | No, per counsel, but contained all info req'd by form, contained brief, over 25 pages, appendix included exhibits | Robert Jackson Steve Presson 10-20-09 |
| 2 | *Johnson v. Gibson*, 6:98-cv-00072-FHS-JHP | MJ | 7/16/98 (Doc. # 11); State court appendix filed separately 5/1/98 (Doc. 8); response filed 9/30/98 (Doc. 18); reply filed 11/2/98 (Doc. 22); petition denied 6/29/99 (Doc. 30) | No, per counsel. Separate motions for discovery & record expansion. Denied after reply w/o fact-development. | Randy Bauman, FDP CHU |
| 3 | *Johnson v. Gibson*, 6:98-cv-00331-FHS | MJ | Minute order of 12/1/98 says "all motions to be filed within petition" (Doc. 11); 2/1/99 petition filed (Doc. 12); brief filed separately 2/1/99 (Doc. 14); 3/23/99 response (Doc. 17); 6/30/99 reply (Doc. 24; 12/9/99 order denying (Doc. 30) [10th Cir. reversed and remanded] | No, per FPD CHU attorneys, no CHU case has been filed on form. | Stephen J. Greubel, FPD CHU |
| 4 | *Humphreys v. Gibson*, 6:98-cv-00568-FHS-JHP | | 5/18/1999 (Doc. #11); Order denying filed 3/30/2000 (Doc. #24) after response and reply | No, per counsel, cites cases, 81 pages | Chris Eulberg 405-232-3450 10-21-09 |
| 5 | *Cummings v. Gibson*, 6:99-cv-00447-FHS-KEW | | | | |
| 6 | *Snow v. Gibson*, 6:00-cv-00070-FHS | MJ | 7/31/2000 (Doc. #13); with appendix filed same day (Doc. # 14). | No, per counsel | Vicki Wernecki 10-20-09 |

|  | CASE | JHP | FILED DATE & DOC. # | ON FORM | COUNSEL |
|---|---|---|---|---|---|
| 7 | *Delozier v. Gibson*, 6:00-cv-00102-JHP-KEW | MJ, DJ | 8/31/2000 (Doc. #18), withdrawn and supplemented on 10/10/2000 (Doc. # 23); appendix filed 10/10/2000 (Doc. #24); on 10/20/2003 JHP granted motion to amend with recent authority (Doc. ##48, 49) | No, per docket entries on legal authority | Randy Bauman 10-20-09 |
| 8 | *Braun v. Keating*, 6:00-cv-00371-MB-JHP | MJ | 7/18/2000 (Doc. #3), appendix filed 7/18/2000 (Doc. 4) [This was a successor filed under warrant.] |  | Benjamin McCullar 405-214-2889 |
| 9 | *Phillips v. Gibson*, 6:01-cv-00045-JHP-KEW | DJ | 10/1/2001 (Doc. #18); Mot. Leave to Amend (post exhaustion) (Doc. #37); Order granting leave to amend (Doc. #40); Amendment to Pet. filed 4/15/2004 (Doc. #43) | No, counsel said it was a "brief" | Gregory W. Laird 405-632-6668 10-22-09 |
| 10 | *Taylor v. Workman*, 6:01-cv-00252-JHP-KEW | MJ, DJ | 11/29/2001 (Doc. #14)[included request for evidentiary hearing]; 3/12/2007 Order denying petition & request for hearing (without briefing) (Doc. #32) | No, per Randy Bauman | Randy Bauman |
| 11 | *Hammon v. Gibson*, 6:01-cv-00253-FHS-KEW |  |  |  |  |
| 12 | *Wackerly v. Sirmons*, 6:01-cv-00567-FHS-KEW |  |  |  |  |
| 13 | *Murphy v. Mullin*, 6:03-cv-00443-RAW-KEW | n/a | 3/5/1004 (Doc.14); Amended Petition Removing unexhausted claims filed 9/10/2004 (Doc. #34); 2nd Amendment filed 12/28/2005 (Doc. #54) [not on form; includes points and authorities; requests hearing & briefing; is 46 pages long; list of exhibits; no verification] | No, per counsel | Kristi Christopher |

| | CASE | JHP | FILED DATE & DOC. # | ON FORM | COUNSEL |
|---|---|---|---|---|---|
| 14 | *Duty v. Mullin*, 6:05-cv-00023-FHS-SPS | | 7/28/2005 (Doc. #32) | No, per counsel | Randy Bauman |
| 15 | *Ryder v. Mullin*, 6:05-cv-00024-JHP-KEW | | 9/13/2005 (Doc. #13); Suppl. Auth filed 3/21/2006 contains argument (Doc. 21) | No, per counsel | Randy Bauman |
| 16 | *Derosa v. Mullin*, 6:05-cv-00213-JHP-SPS | | 12/23/2005 (Doc. #17); Attachments filed 12/23/2005 (Doc. #18); Response filed 3/22/2006 with attachments (Doc. #19). | No, per counsel | Patti Palmer Ghezzi (FPD) |
| 17 | *Barrett v. USA*, 6:09-cv-00105-JHP | | | | |

According to this Court's CM/ECF system, in the eleven years before Kenny Barrett filed his petition, there were sixteen habeas corpus petitions filed in the Eastern District of Oklahoma in death-penalty cases. Judge Payne was involved in ten of those cases either as a magistrate judge, district judge, or both. A review of those cases, and discussions with the petitioner's counsel in those cases shows the form appended to the Rules Governing Section 2254 Cases in the District Court was not used by counsel in any of those cases. The dockets and memories of counsel indicate Judge Payne did not require the form to be used in any case. In these cases, the petitioners included legal points and authorities in their petitions, as Mr. Barrett did, and the petitions exceeded 25 pages in length, as Mr. Barrett's did. None of the petitioners sought leave to file an oversized brief. There were appendices of exhibits filed with ___ petitions. Although Judge Payne found fault with Mr. Barrett's counsel for filing in this form, he did not raise similar concerns in the previous cases. In ___ cases in which Judge Payne was involved, the petitioner requested an evidentiary hearing in the prayer for relief at the end of the petition. The records in those cases contain no order finding it was improper to request a hearing in the petition. Judge Payne denied hearings in all cases. In ___ cases in which Judge Payne presided he denied relief and an evidentiary hearing without affording the petitioner an opportunity to submit briefing other than a reply to the response, or motions for discovery or an evidentiary hearing. In one case, *Taylor v. Workman*, Judge Payne found the petitioner failed to present evidence to rebut the presumption of correctness *before* denying the petitioner's request for an evidentiary hearing.

   The evidence available to counsel at this time of filing shows the Court's treatment of Mr. Barrett is unique.

AO 243
(Rev. 10/07)

# Motion to Vacate, Set Aside, or Correct a Sentence
# By a Person in Federal Custody

### (Motion Under 28 U.S.C. § 2255)

### Instructions

1. To use this form, you must be a person who is serving a sentence under a judgment against you in a federal court. You are asking for relief from the conviction or the sentence. This form is your motion for relief.

2. You must file the form in the United States district court that entered the judgment that you are challenging. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file the motion in the federal court that entered that judgment.

3. Make sure the form is typed or neatly written.

4. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5. Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a brief or arguments, you must submit them in a separate memorandum.

6. If you cannot pay for the costs of this motion (such as costs for an attorney or transcripts), you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you.

7. In this motion, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different judge or division (either in the same district or in a different district), you must file a separate motion.

8. When you have completed the form, send the original and two copies to the Clerk of the United States District Court at this address:

> Clerk, United States District Court for
> Address
> City, State Zip Code

9. **CAUTION:  You must include in this motion all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this motion, you may be barred from presenting additional grounds at a later date.**

10. **CAPITAL CASES:  If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT

SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District | Eastern District of Oklahoma |
|---|---|---|
| Name (under which you wee convicted):<br>Kenneth Eugene Barrett | | Docket or Case No.:<br>06:09-cv-00105 JHP |
| Place of Confinement:  Terra Haute, Indiana | | Prisoner No.: 04342-063 |
| UNITED STATES OF AMERICA<br><br>v. | | Movant (include name under which you were convicted)<br>Kenneth Eugene Barrett |

MOTION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

U.S. District Court, Eastern District of Oklahoma, Muskogee, Oklahoma.

(b) Criminal docket or case number (if you know):  04-CR-115

2.  (a) date of the judgment of conviction (if you know):  December 29, 2005

(b) Date of sentencing:  December 19, 2005

3.  Length of sentence:  Death, 2 life sentences

4.  Nature of crime (all counts):

Count I:   18 U.S.C. § 924 (c)(1)(A) and (j)

Count II:  18 U.S.C. § 924 (c)(1)(A) and (j)

Count III: 18 U.S.C. § 848 (e)(1)(B)

5.  (a) what was your plea?  (Check one)

(1)   Not guilty ☒        (2)   Guilty ☐        (3) Nolo contendere (no contest)  ☐

(b)  If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

6.  If you went to trial, what kind of trial did you have? (Check one)     Jury ☒        Judge only ☐

7.      Did you testify at a pretrial hearing, trial, or post-trial hearing?  Yes ☐       No ☒

8.      Did you appeal from the judgment of conviction?       Yes ☒       No ☐

9.      If you did appeal, answer the following:

(a) Name of court:  U.S. Court of Appeals for the Tenth Circuit.

(b) Docket or case number (if you know):  06-7005.

(c) Result:  Affirmed.

(d) Date of result (if you know):  July 25, 2007.

(e) Citation to the case (if you know): 496 F.3d 1079.

(f) Grounds raised:

In his direct appeal, Movant challenged his convictions and sentence of death by raising the following claims:

      a.      The district court erred by denying Movant's motion to suppress. More specifically, the search warrant did not satisfy the Oklahoma standards for a nighttime warrant; the executing officers failed to meet Oklahoma standards regarding executing officers; the warrant failed to comply with Fed. R. Crim. P. 41 (warrant was not issued by a federal officer); and the evidence should be suppressed on double jeopardy grounds.

      b.      Movant challenged the indictment, more specifically, its sufficiency because it failed to set forth elements of predicate offenses; its multiplicity because all three counts were based on the same conduct (firearms, drugs, and killing of the same person) and misjoinder of offenses.

      c.      The district court allowed admission of improper victim impact evidence.

d.      The district court allowed juror misconduct, more specifically, one of the jurors knew a state trooper involved in the case and another trooper had limited contact with a juror.

e.      The Government violated *Batson* by failing to exercise its peremptory challenges in a race neutral manner.

f.      Movant challenged the constitutionality of the federal death penalty scheme, more specifically, arguing that the penalty phase process of weighing aggravating and mitigating factors violates the Sixth Amendment; the federal scheme unconstitutionally delegates legislative authority; the statute fails to require proportionality review; the statute allows for consideration of impermissibly vague aggravating factors; and the statute does not narrow the class of persons eligible for the death penalty.

g.      Movant challenged the "intent to kill" aggravating factor, more specifically, because that factor is used in the eligibility process then again in the weighing process.

h.      The Government did not present sufficient evidence of "intent to kill."

i.      The Government failed to produce names and addresses of key witnesses.

k.      The district court erred by failing to dismiss the indictment on double jeopardy grounds.

l.      The Government failed to follow the *Petite* policy.

m.      Movant asserted cumulative error.

(g) Did you file a petition for certiorari in the United States Supreme Court?   Yes ☒   No ☐

If "Yes," answer the following:

(1) Docket or case number (if you know): 07-7066

(2) Result:   Denied.

(3) Date of result (if you know):   March 17, 2008

(4) Citation to the case (if you know):   128 S.Ct. 1646.

(5) Grounds raised:

GROUND ONE: Did inclusion of the "intent to kill" eligibility factor in weighing

the aggravating factors against the mitigating factors in second stage, pursuant to

the statute which required aggravating factors to substantially outweigh the

mitigating factors, result in an improper weighing scheme violating the Fifth,

Sixth and Eighth Amendments.

I.       The Federal Death Penalty Act, 18 U.S.C. § 3591, *et seq.*

II.      Capital Offenses Under 21 U.S.C. § 848

GROUND TWO: Did the trial court commit reversible error in denying the

motion to suppress the drug search warrant?

GROUND THREE: Was victim impact evidence so unduly prejudicial as to deny

petitioner of his constitutional rights under the Fifth and Eighth Amendments?

10.     Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

Yes ☐   No ☒

This is an amendment of Petitioner's only application for collateral relief.

11.     If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the Proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition or

application?          Yes  ☐          No  ☐

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or

application?          Yes  ☐          No  ☐

(7) Result:

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your

motion, petition, or application?

(1) First petition:     Yes  ☐          No  ☐

(2) Second petition:  Yes  ☐          No  ☐

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly

why you did not

12.      For this motion, state every ground on which you claim that you are being held in violation of the

Constitution, laws, or treaties of the United States.  Attach additional pages if you have more

than four grounds.  State the facts supporting each ground.

**GROUND ONE**:

> **Actions of the Trial Court Violated Mr. Barrett's Rights to Due Process, to Effective Assistance of Counsel, to Cross-Examine Witnesses, to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel**.

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Actions of the trial court denied Mr. Barrett a fair trial under conditions required or routinely provided to similarly situated defendants[1]

The trial court interfered with Mr. Barrett's counsel. The trial court stated an interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and it engaged in communications with counsel that created a conflict between the court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense.

The trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases.  The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as a class of one, intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment.  Imposition of the death penalty through such a skewed process is arbitrary.

---

[1] Mr. Barrett would present citations to authorities that serve as an aid to understanding and responding to each of his claims, as well as supporting argument in light of these authorities,  but the court has ordered him not to do so.

The trial judge's conduct towards Mr. Barrett's interests and his counsel violated the Code of Judicial Conduct and was not impartial.

The court was required to consider the recommendations of the Federal Defender when appointing counsel. The Federal Defender and the court should take into account the facts and circumstances of the case to determine the qualifications which may be required to provide effective representation. Courts are encouraged to appoint counsel who are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation.

Judge Payne initially expressed a desire to appoint the Federal Defender to represent Mr. Barrett. When the Federal Defender informed Judge Payne that the only attorney in his office qualified to handle a capital case was already appointed to such a case, Judge Payne indicated that he anticipated the assistant federal defender who normally worked in the Eastern District would be responsible. The Federal Defender explained that the attorney was not qualified and his office could not provide competent representation to two capital defendants at the same time. (Exhibit 67.)

Two Federal Defenders and an assistant federal defender recommended that the court appoint John D. Echols and Robert Nigh of Tulsa, based on their past capital defense experience and, in Mr. Echols's case, his demonstrated commitment to Mr. Barrett's defense. (Exhibit 54; Exhibit 67; Exhibit 34.) Judge Payne indicated he preferred to have the Federal Defender appointed so the court would not have to authorize funds for Mr. Barrett's representation. (Exhibit 54; Exhibit 67.)

During discussions with these attorneys, the trial judge expressed an interest in considering factors that are not recognized by the Judicial Conference or national indigent defense organizations as indicative of an attorney's qualifications to provide effective representation. Judge Payne expressed an interest in appointing less-qualified attorneys to represent Mr. Barrett as a means of giving local attorneys experience so that a local panel could be formed for representation in capital cases. (Exhibit 54; Exhibit 67; Exhibit 34.). To this end, the trial judge rejected the recommendation of Robert Nigh and appointed Roger Hilfiger, based in part on Mr. Hilfiger's past experience as United States Attorney for the Eastern District of Oklahoma. *Id.*

The CJA Guidelines provide that courts budgeting federal death penalty cases should ask counsel for the "best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) likely to be needed through the guilt and penalty phases of the trial." The Judicial Conference's guidelines also provide that these "[c]ase budgets should be submitted *ex parte* and filed and maintained under seal." The trial court in this case required a high degree of specificity, and threatened to reverse the prior order Judge White entered authorizing *ex parte* submissions if counsel did not disclose "a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case)." (Exhibit 65 – Letter from Hon. James H. Payne to John David Echols dated 2/22/05.)

Judge Payne expressed a desire that the case rapidly proceed to trial. (Exhibit 34.) On January 7, 2005, the court admonished Mr. Barrett's attorneys for failing to mention the need for a continuance during a status conference earlier in the day. (Doc. 31.) The court said,

"Counsel is reminded this is a death penalty case, which should be given the highest priority by counsel." *Ibid.*

On January 31, 2005, Mr. Barrett's counsel filed a detailed, 10-page, budget proposal. (Doc. 46.)

The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases and the Judicial Conference's guidelines recognize the importance of prompt authorization of funds so that delay will not result in a denial of effective representation. The CJA Guidelines encourage courts "to employ[] an *ex parte* pretrial conference in order to facilitate reaching agreement on a litigation budget at the earliest opportunity," and encourage courts to "act upon requests for services where prompt authorization is necessary for adequate representation." The trial court in this case did not hold such a conference.

On February 7, 2005, Mr. Barrett's counsel filed amended, more detailed budget proposals. (Docs. 50, 51.) On February 22, 2005, the court sent lead counsel a two-page single-spaced letter listing six categories of questions and concerns the court had about Mr. Echols, but not about Mr. Hilfiger's representation. (Exhibit 65.) Throughout the letter, Judge Payne expressed concern that Mr. Echols was being paid to represent Mr. Barrett in a third trial, and expressed the view that no further investigation should needed to be done after the previous trials. *Ibid.* Mr. Echols responded by letter on February 28, 2005. (Exhibit 64.)

Statutes and guidelines related to case budgeting in federal death penalty cases state a preference for *ex parte*, sealed proceedings in order to protect defense confidentiality. The trial court in this case expressly considered using Mr. Barrett's budget submissions to aid the prosecution. In his letter to Mr. Echols, Judge Payne stated that lifting the order on *ex parte*

budgeting "might actually help resolve this case more expeditiously by allowing the government an earlier opportunity to object to the admissibility [of Mr. Barrett's experts] and perhaps allow the court to rule on the admissibility issues prior to expenditure of funds for experts which might not be allowed to testify at trial." (Exhibit 65 at 2.) Mr. Echols objected that this proposal would infringe on Mr. Barrett's Sixth Amendment rights, and it was not implemented.

On February 28, 2005, Mr. Echols informed the court that delays in authorization of a budget for any defense preparation were endangering counsel's ability to prepare for trial on the court's schedule. (Exhibit 64 at 5.) The court did not rule on the defense's budget proposal until March 18, 2005. (Doc. 97.) At that point, discovery was scheduled to close on May 11, 2005, and trial was scheduled to start on July 11, 2005. (Scheduling Order filed 12/11/04 (Doc. 22).)

Richard Burr, an attorney retained by the Office of the Defender Services of the Administrative Office of the United States Courts, served as an advisor to Mr. Barrett's counsel, John Echols, through the auspices of the Federal Death Penalty Resource Counsel project ("FDPRC"). (Exhibit 118; Exhibit 34.)[2] As Mr. Burr stated to the court at the time, the FDPRC collects "data on the initiation and prosecution of federal capital cases, and on the defense services provided in such cases." (Decl. Richard Burr re attorney compensation dated 4/4/05 and filed as Exh. B to Doc. 107.) Mr. Barrett's counsel relied upon the data collected by the FDPRC in making his funds requests. (Exhibit 64.)

---

[2] Mr. Burr offered his assistance to Roger Hilfiger, but Mr. Hilfiger did not seek any assistance from Mr. Burr. (Exhibit 29; Exhibit 118.)

The trial court's funding decisions were based on the judge's subjective view of what was "'reasonably necessary' to provide fair compensation and to provide the defense with necessary tools for a fair trial." (Order filed 3/18/05 at 2.)

The trial court had before it declarations of independent expert counsel regarding the prevailing professional norms of capital defense practice in federal death penalty cases, including courts' decisions validating these norms through the allocation of funds to similarly situated defendants. (Exhibit 118.) The trial court's order evidences no consideration of these norms or practice, whether adversarial or judicial. The trial judge's order evidences no consideration for the specific needs of counsel as expressed in their funds requests. The trial judge's limitations on funds were not based on any evidence of or expressed concern for fiscal limitations.

As expert counsel advised the court at the time,

in the GUIDE TO JUDICIARY POLICIES AND PROCEDURES, Vol, VII, "Appointment of Counsel in Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), Courts are encouraged in the course of case budgeting to secure counsel's "best preliminary estimate that can be made of all services," including the services of counsel.

[]     It is clear that the reason the attorney services were not included in the pre-authorization and circuit review provisions of 21 U.S.C. §§ 848(q)(9) and (10)(B) is that attorney services, to be meaningful, must be provided as the professional judgment of the attorney dictates and cannot, therefore, be subject to pre-authorization without significantly interfering with, even paralyzing, the process of representation.

For this reason, the inclusion of attorney services in the case budgeting guidelines of the GUIDE TO JUDICIARY POLICIES AND PROCEDURES is intended, *not* to interject the courts into case management, but to require *counsel* to assess the representation needs of the case in order to give the courts a way of projecting what counsel believes to be reasonable expenditures of time. If the expenditure of attorney time thereafter begins to depart in substantial ways from these

> projections, the budgeting of attorney time provides a basis for the court to question the attorney about the necessity of his or her efforts. This is the way in which the federal courts have uniformly approached the matter of budgeting attorney time in capital cases - with due deference to the exercise of attorney judgment, but with a basis for questioning certain expenditures of time.

(Decl. Richard H. Burr dated 4/4/05, filed as Exh. A to Doc. 107.)

Investigation is a core function of defense counsel. ABA Standards for Criminal Justice, Standard 4-4.1 (requiring "prompt investigation"). The relevant guidelines to administration of the Criminal Justice Act provide that "upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court should authorize the defendant's attorneys to obtain such services." The trial court authorized funds for Mr. Barrett's representation on a far more narrow basis.

Indeed, the trial court's funding order went beyond the simple approval or denial or funds. Mr. Barrett's trial counsel requested funds to investigate and develop evidence for the defense. (Doc. 51; Exhibit 64.) The trial court refused to permit trial counsel to expend funds in investigation based on their independent professional judgment. (Order filed 3/18/05 at 2 n.2.) The court stated that it would not approve payment of vouchers for investigative services unless counsel filed "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial." *Ibid.* This threat was contrary to the CJA Guidelines which provide in relevant part: "Courts, in examining the case budget, may reconsider amounts authorized for services prior to the budget's approval; however, *courts shall not rescind prior authorization where work has already been performed*."

The trial judge's conditioning of funds on his subjective evaluation of the significance of the facts counsel sought to investigate barred or chilled investigation into factual matters trial counsel deemed necessary through their exercise of independent professional judgment. If Mr. Barrett had been represented by private counsel or an independent indigent defense office, the investigation of his case would not have been limited to factual issues that had "significance" to the person paying counsel.

As set forth more fully in Ground Three, *infra*, the court reduced the compensation rate of Mr. Barrett's investigator from the private investigator rate of $50.00 per hour to the rate charged by a state-subsidized agency for its salaried investigators. (Order filed 5/5/05 at 3 n.1.) In the court's initial order reducing the rate, the court did not disclose the state agency's rate as the basis for the reduction. (*See* Order filed 3/18/05 at 2.) This limitation meant that for Mr. Barrett's investigator, compared to his other cases, he *lost* $20.00 for every hour spent working on Mr. Barrett's case.

Mr. Burr compared this Court's March 18, 2005 order reducing resources for Mr. Barrett's defense with the data collected by the FDPRC. Mr. Burr informed the trial court:

> The number of hours needed for fact investigation of course varies from case to case. The number of hours requested here, however, is below the average for federal cases in which the death penalty has been authorized. The average number of hours approved for fact investigation in authorized cases is closer to 500 hours. The 100 hours approved by the Court is certainly enough to get a fact investigator started, but since it is far less than counsel has estimated is needed, approving only 100 hours now means that counsel in the near future will likely have to submit another request for approval of additional hours.

(Decl. Richard H. Burr re Non-Attorney Costs, dated 4/4/05, filed as Exh. C to Doc. 107.)  The

court treated this statement as an "illustration" that Mr. Barrett's counsel "have the attitude that

the budget in this matter is unlimited . . . ."  (Order filed 5/5/05 (Doc. 128) at 3 & n.1.)

The trial court did not merely deny funds to Mr. Barrett's defense, it interjected

into the funding denial a false impression of the evidence that would be admitted at trial.  The

court denied 75 percent of the time and one hundred percent of the in-court assistance trial

counsel requested from a ballistics and crime scene reconstruction expert.  (*Compare* Doc. 50 at

7 *with* Order filed 3/18/05 at 3.)  At the same time, the court said, "Counsel should be aware that

this Court has, [*sic*] never allowed crime scene reconstruction to be introduced in trial."  (Order

filed 3/18/05 at 3.)  Trial counsel did not consult a crime scene reconstruction expert.  (Tr.

10/3/05 Hr'g at 8.)  The court's ruling gave counsel an unwarranted impression of the need to

consult with a crime scene reconstruction expert and left counsel with no ability to bring such an

expert to court to testify or assist in cross-examination.  Contrary to the impression given by the

court's March 18 order, the court permitted the Government to present and place heavy reliance

upon crime scene reconstruction evidence.  (*See* R. 3154-3484.)

As set forth more fully in Ground Three, *infra*, the trial court denied in full or in

majority all Mr. Barrett's requests for expert and investigative services.  The court stated no basis

for any denial or reduction related to the facts or circumstances of the case.  Based on the

FDPRC's data regarding other capital cases, the court's ruling against Mr. Barrett was unique.

Mr. Burr informed the court at the time that Mr. Barrett's request for a mitigation specialist was

"well below average," and "no federal court ha[d] failed to provide expenses for mitigation

specialists' work."  (Decl. Richard H. Burr dated 4/4/05, Exh. C to Doc. 107.)  Where this court

denied funds for experts to travel as part of their work on Mr. Barrett's defense, Mr. Burr found

that "[t]ravel expenses - lodging, meals, and transportation - are always provided, as are any

other expenses incidental to the expert's ability to provide services." (*Id.*)  Where this court

permitted Mr. Barrett's counsel to retain only one mental health expert, regardless of the

circumstances, the FDPRC found, the "standard practice in federal capital cases is to provide the

services of more than one mental health expert." *Id.*  Trial counsel felt the court's restriction of

funds was an impediment to preparing a mitigation investigation.  (*See* Exhibit 56.)

The trial court paradoxically relied upon the experienced judgment of trial counsel

as grounds for denying requests they made based on their considered professional judgment.  For

example, the court denied counsel's request for a jury consultant on the ground that trial counsel

had extensive experience picking juries.  (Order filed 3/18/05 at 3.)  This ruling was influenced

by the trial judge's personal choice of trial counsel.  The trial judge personally selected  Roger

Hilfiger to represent Mr. Barrett against the recommendations of experienced defense counsel.

(Exhibit 54; Exhibit 67.)  The trial judge then relied upon his own subjective view of Mr.

Hilfiger's experience, not as a defense lawyer, but as the former United States Attorney as a

reason for denying counsel's request for a jury consultant.  (Order filed 3/18/05 at 3.)  However,

as set forth *infra* this ruling did not bind Mr. Hilfiger as it would have bound Mr. Echols.

The trial judge hampered trial counsel's ability to prepare a defense by at first

denying, then delaying, authorization for counsel to obtain the prior testimony of prosecution

witnesses.  (Order filed 3/18/05 at 4.)  The court's reasoning is contrary to the purpose of the right

to counsel.  Where the Supreme Court has held that the purpose of defense counsel is opposing

the prosecution, the trial judge initially denied access to the second state trial transcripts on the

ground that "the government has indicated they do not need the prior transcripts to try this case. If counsel for the government are able to try this case without prior state court trial transcripts, defense counsel should be able to do the same." (*Id.* at 5.)  Just as the right to cross-examine witnesses depends upon the availability of counsel, so too does the right depend upon the court not denying counsel access to readily available sources of cross-examination.

Initially, the court would not permit the second state trial transcripts to be obtained "unless convinced the testimony of said [prior] witness is critical to the issue of the defendant's intent as it relates to the elements of the offenses charged herein." (Order filed 3/18/05 at 6.)  The court later rescinded this limitation and permitted counsel to obtain the transcripts they had been seeking since January 2005. (*See* Doc. 23.)  Although some transcripts were obtained, the delay caused by the trial judge prevented preparation of transcripts before each witness who testified previously testified in federal court.  The delay also impeded or prevented defense counsel's preparation for cross-examination.  *See* Ground Two, Part A, *infra*.

The trial court also limited the ability of defense counsel to prepare for and conduct cross-examinations by denying access to transcripts of witnesses' testimony in earlier federal hearings.  (Order filed 3/18/05 at 6.)  This ruling was especially arbitrary and unfair in that the court could have provided Mr. Barrett's counsel these transcripts without making it part of the budget.  The Criminal Justice Act specifically provides that court reporters may be paid separately for preparing transcripts in cases of indigence.

Congress, the Judicial Conference, and every professional association concerned with criminal defense practice have expressed the view that cases involving the death penalty require higher degrees of skill and greater preparation than other criminal cases.  The trial judge

in this case compared the budget for Mr. Barrett's case only to unidentified budgets in non-capital criminal cases. (*See generally* Orders filed 3/18/05 and 5/5/05.)

The court's rejection of Mr. Echols's proposed budget was part of a pattern of interference with, or indifference to, Mr. Barrett's legal representation. As stated *supra*, the trial judge initially wanted to appoint two local attorneys to represent Mr. Barrett so that the capital experience of the local bar would be increased. (Exhibit 67.) In his letter to Mr. Echols in February 2005, Judge Payne indicated he had appointed Mr. Echols, at least in part, because Echols and the Public Defender left him with the understanding that "there would be a substantial savings in the amount of time that would be required for [Echols] to represent the defendant." (Exhibit 65.)

As stated *supra*, the trial court required Mr. Echols, as lead counsel, to submit very detailed and specific budget requests. On April 1, 2005, the Magistrate Judge recommended denying Mr. Echols any compensation for time spent preparing those budgets. The CJA Guidelines specifically provide that time spent on case budgeting in *capital* cases is compensable. Mr. Burr submitted a declaration to the Court regarding the extraordinary nature of the ruling against Mr. Echols's voucher:

> In every federal capital case with which the members of our project are familiar - which is virtually all such cases since the inception of the Federal Death Penalty Resource Counsel project in 1992 - defense counsel have been compensated for their work in seeking funding for the services of defense investigators and experts. We know of no other case in which the court has refused to compensate counsel for such work. The reason for this is that, in seeking funding for these services, counsel is required to plan the defense investigation and litigation, determine the specific need for investigation and expert assistance, identify appropriate, competent investigators and experts, and contact a number of investigators and experts to discuss the merits of the case and the need for their services and to determine whether those investigators and experts are actually appropriate and

> available.  All of these efforts are in direct service to the client.  Unlike the preparation of defense counsel's CJA 30 vouchers, through which counsel is compensated - and for which courts usually do not compensate counsel, the work of counsel in seeking finds [*sic*] for investigation and expert assistance is of no financial benefit to counsel.  Its sole purpose if [*sic*] to assist the client in his or her defense.

(Decl. Richard H. Burr re Compensation for Budgeting, dated 4/14/05, filed as Exh. to Doc. 118.)  The trial court denied Mr. Echols compensation, because lawyers in the Eastern District in *non-capital* cases were not compensated for budgeting.  (Order filed 5/5/05 at 4.)

Mr. Echols's budget submissions were based in part on advice and data regarding other federal death penalty cases that Mr. Echols received from Federal Death Penalty Resource Counsel.  Only Mr. Echols sought the advice of these experts; Mr. Hilfiger did not.  (Exhibit 118; Exhibit 34.)  Although compensation for consultation with expert counsel is specifically authorized by the Criminal Justice Act and 18 U.S.C. § 3599(f), the Magistrate Judge recommended denying payment for Mr. Echols's consultations, and Judge Payne upheld this ruling.  (Order filed 5/5/05.)

On April 4 and 6, 2005, Mr. Echols filed motions seeking reconsideration of the March 18 budget order and April 1 report and recommendation regarding vouchers.  These filings sought a budget conference as provided in the CJA Guidelines and included four declarations from Federal Death Penalty Resource Counsel, Richard Burr, some of which are quoted herein, regarding the CJA Guidelines and statements that the restrictions imposed by the court were unique in all the previously litigated federal death penalty cases.

On April 6, 2005, Mr. Echols also moved to withdraw as counsel for Mr. Barrett citing five circumstances that prevented him from providing effective representation: (1) the trial

was less than four months away; (2) no final budget had been approved that was adequate to prepare a defense; (3) the denial of compensation for budgeting and expert consultation placed an unreasonable burden on counsel; (4) Mr. Hilfiger had not done any significant work on the case; (5) the requirements of the March 18 order impaired counsel's exercise of independent professional judgment. (Doc. 113.) Mr. Hilfiger had urged Mr. Echols not to file the motion. (Exhibit 118; Exhibit 34.) However, during a hearing on the motion, Mr. Hilfiger did not join in Mr. Echols's concerns about the budget order. (Exhibit 34.)

Mr. Echols stated as one ground for his motion to withdraw: "The relationship between the undersigned and co-counsel, Roger Hilfiger, is cordial, but we have not been able to work effectively together, and virtually all of the work performed on pleadings, budgeting and other issues has been performed by Mr. Echols." (Doc. 113 at ¶ 4.) In granting Mr. Echols's motion, the trial judge attributed to Mr. Echols the assertion that "he is unable to work with co-counsel Mr. Hilfiger," and omitted the information about Mr. Hilfiger's lack of work. (Order filed 5/5/05 at 5.) The court instead focused on Mr. Hilfiger being "more familiar with practice before this Court than Mr. Echols." (*Ibid.*)

In granting Mr. Echols's motion to withdraw the court expressed displeasure with the amount of information Mr. Echols provided in his budget submissions. (Order filed 5/5/05 at 2-3.) The court permitted Mr. Echols to withdraw in part because his budget proposals had not "'set forth separately and with specificity the time each of the appointed attorneys anticipates spending' on each of several categories." (*Ibid.* (quoting Order filed 1/29/05 (Doc. 38).) The record shows Mr. Echols filed lengthy budget requests describing the specific needs of the defense and, most, but not all the time, describing with particularity the experts he sought to hire

and the work they would perform.  (Docs. 50, 51.)  Mr. Echols also sent Judge Payne a six page single-spaced letter detailing the amounts he and others were paid for Mr. Barrett's defense in state court, and what matters were not completely investigated there.

Judge Payne did not hold Mr. Hilfiger to the same standards as Mr. Echols. During the trial the court became concerned that Mr. Hilfiger and Mr. Smith would exceed the budget authorized on March 18, 2005.  (Tr. 10/3/05 Hr'g.)  In that event, Judge Payne said, "I think the safest thing to do maybe on the attorney's fees for October would be for y'all to analyze that and get me an amended budget just to -- I mean, just make your best guestimate."  (Tr. 10/3/05 Hr'g at 8.)

In his letter to Mr. Echols, Judge Payne expressed his concern that Mr. Echols not be unduly compensated for work if his prior representation of Mr. Barrett made further labors unnecessary.  The court had limited Mr. Echols's rate of compensation to $125.00 per hour.  On May 17, 2005, the day Mr. Hilfiger was made lead counsel, Judge Payne raised his compensation rate to $150.00 per hour.  (Tr. 10/3/05 Hr'g at 3.)

The concerns Mr. Echols expressed in his motion to withdraw about the lack of work Mr. Hilfiger committed to the case proved to be well-founded, although the court was again unconcerned.  On May 23, 2005, Mr. Barrett filed a motion seeking appointment of new counsel based, in part, on the assertion that the case loads of appointed counsel interfered with their ability to devote sufficient time to his defense.  (Doc. 135.)  Mr. Barrett's counsel did not file a response to the motion.  There was no hearing on the motion.

On May 24, 2005, the court denied Mr. Barrett's motion to replace counsel.  (Doc. 137.)  The denial was based in part on the "finding" that "[c]ounsel has a copy of the first state

court trial transcript . . . ."  (Order filed 5/24/05 (Doc. 137) at 2 n.2.)  The denial was based in part on the court's belief that appointed counsel "will have adequate time to prepare for this particular case."  *Id.* at 2.  Subsequent events suggest there was no basis for these two statements in the May 24 order.

On May 26, 2005, trial counsel Hilfiger filed a motion to continue the trial date. (Doc. 138.)  Counsel averred as one ground for the continuance that Mr. Hilfiger had "been presented with ten storage boxes of materials, discovery, motions and other paperwork from defendant's two State jury trials, including transcripts of the first State jury trial; and all of such material needs to be reviewed to determine its value for defensive purposes, in this new action." (Doc. 138 at 1.)  Mr. Hilfiger was not specific about when he received the materials, but the evidence indicates it was between May 17, 2005, the day Mr. Hilfiger was made lead counsel, and May 26, the date of his assertion.  Regardless of the specific date, the record reveals no basis for the court's statement that Hilfiger possessed the record on May 24, and shows that whatever Mr. Hilfiger "possessed" on that date, he had not reviewed it during the six months that had elapsed since his appointment in November 2004.

Mr. Hilfiger's statement about not having reviewed the records from the state-court proceedings, including discovery and transcripts, indicates that he had not made a sufficient inquiry into the facts of the case to support the position he took on the budget during the May 5, 2005, hearing.  On May 17, 2005, the court directed Mr. Hilfiger to file by May 27, 2005, any supplemental budget request he deemed necessary.  (Tr. 10/3/05 Hr'g at 3.)  Assuming the trial court had learned on or before May 17, 2005, that Mr. Hilfiger had not become familiar with the

previous litigation over the previous six months, it was unreasonable for the court to give Mr. Hilfiger only 10 days to request supplemental resources.

In February 2005, Mr. Hilfiger informed Mr. Echols, and Mr. Echols informed the court, that Mr. Hilfiger believed he would need to spend 160 hours assembling and reviewing the files and records related to the case.  (Doc. 50 at 4; Exhibit 64 at 1 n.1.)  On March 18, 2005, the court reduced to 80 hours the compensable time for Mr. Hilfiger – then second-chair – to complete these tasks.  (Doc. 97 at 2.)  In any event, it was impossible for Mr. Hilfiger to have completed these tasks between May 17 and May 27, and Mr. Hilfiger did not file an amended budget.

In January, when Mr. Echols was lead counsel, the court chastised Mr. Barrett's defense for failing to devote sufficient attention to the case that it could stay on schedule.  (Doc. 31.)  The court admonished counsel to give the case the "highest priority."  *Ibid.*  In May, when Mr. Hilfiger acknowledged that he had not reviewed the records from the prior state court proceedings, and after Mr. Echols and the lawyers' vouchers revealed the paucity of Mr. Hilfiger's work on the case, the trial court expressed no concern about Mr. Hilfiger's priorities, and simply granted the continuance.  (Tr. 6/6/05 Hr'g; Doc. 142.)  In September, Mr. Smith revealed that Mr. Hilfiger had not assembled the files and records related to the mitigation investigation that had been done in state court.  (Tr. 9/9/05 Hr'g at 43.)  Again, the court was not concerned with new counsel's priorities.

Mr. Hilfiger himself had informed Mr. Echols and the court that it would take him as second-chair 300 hours to prepare for trial, *not* including court hearings, legal research and preparation of pleadings and briefs.  (Doc. 51 at 4.)  On October 3, 2005, with the trial underway,

Page 24

Mr. Hilfiger informed the court that he had worked approximately 300 hours on the case, *including* legal research and writing and preparation for and in all court proceedings. (Tr. 10/3/05 Hr'g at 5.) Whereas the court had expressed a great deal of skepticism about Mr. Echols's requests for compensable hours, Mr. Hilfiger's statements prompted no expressions of concern.

In other respects, the record does not support the inference that Judge Payne's treatment of Mr. Echols was based either on fiscal concerns or concern for Mr. Barrett's representation. The trial court denied Mr. Echols's request for a jury consultant on the ground that, "Each of defense counsel come before this Court with combined practical experiences on in excess of sixty years in selecting criminal juries, including Mr. Hilfiger's experiences as United States Attorney for the Eastern District of Oklahoma." (Doc. 97 at 3.) If counsel's allegedly vast experience supported their professional judgment in selecting the jury, as the court conjectured, there was no reason for the court to reject the same professionals' judgment that they required the assistance of a jury consultant.

After he was elevated to lead counsel, Mr. Hilfiger filed no supplemental budget request. On September 9, 2005, Mr. Hilfiger informed the court that he would be relying upon a private jury consultant. (Tr. 9/9/05 Hr'g at 10.) Mr. Hilfiger casually stated, "I'll assume Angie Cole will be coming in with us the next two weeks. She's going to set [*sic*] at the counsel table with us during the selection." (*Ibid.*) The court recognized Ms. Cole's name and identified her as a jury consultant. (*Ibid.*) Despite the earlier denial of funds based on Mr. Hilfiger's particular experience, and the fact that the court was paying Mr. Hilfiger more than it had paid Mr. Echols, Judge Payne expressed no concern or objection to Mr. Hilfiger's unauthorized retention of an

expert for two weeks of trial.  (*Ibid.*)  If Mr. Hilfiger had been able to obtain a jury consultant without funds from the court, he did not inform Mr. Echols of the fact.

In summary, Judge Payne had only reluctantly appointed John Echols to represent Mr. Barrett, and then based in significant part, at least, on the belief that Mr. Echols would be able to try the case cheaply and quickly.  Judge Payne personally chose Roger Hilfiger to represent Mr. Barrett for reasons that had nothing to do with the circumstances of Mr. Barrett's case, but for the purpose of using Mr. Barrett to develop a local capital defense panel.  During Mr. Echols's tenure, Judge Payne imposed requirements and restrictions on budgeting and investigation that experts concluded were unheard of in federal death penalty trials, and that intruded upon the constitutionally protected independence of counsel.  At one point, Judge Payne threatened to use counsel's budget proposals as a mechanism for finding defense experts' testimony inadmissible at trial.  When Mr. Echols left the case due to these restrictions, and Mr. Hilfiger sought no additional resources, Judge Payne's conduct towards defense counsel changed.  Judge Payne permitted, or through his actions encouraged, Mr. Hilfiger to show a lack of diligence and inattention to the conduct of the case including obtaining resources, investigative, and expert assistance.  Under these conditions, Mr. Barrett did not receive independent, reasonably funded, reasonably prepared, representation.

The trial judge also violated Mr. Barrett's right to due process, and the Code of Judicial Conduct, by conducting *ex parte* communications with the prosecutors.  During an *ex parte* hearing held September 13, 2005, the judge solicited the views of the United States Attorney regarding such matters as (a) when the trial started for purposes of 18 U.S.C. § 3432, (b) whether the defense should be entitled to a continuance based on delayed disclosure of

Page 26

witnesses, and (c) whether the disclosures posed a problem under Rule 404(b) of the Federal Rules of Evidence.  (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 22-23.)  Although the hearing was held for the purpose of disclosing information supposedly related to dangers to witnesses, the trial court solicited the prosecutor's views on these other matters which did not involve discussion of any information that could not be disclosed to the defense.

Also during the *ex parte* portion of the hearing Assistant United States Attorney Michael Littlefield revealed that he knew the identity of a witness who failed to corroborate statements by informant, Charles Sanders.  (Tr. 9/13/05 Hr'g at 14, 17.)

The court's conduct during the *ex parte* portion of the September 13, 2005 proceedings, and its conduct in relation to those proceedings thereafter, violated Rule 2.9 of Canon 2 of the Code of Judicial Conduct.

After the *ex parte* portion of the hearing, and at the beginning of the hearing with defense counsel present, the court did not disclose the discussion regarding the meaning of § 3432, the discussion of the continuance, AUSA Littlefield's revelation about a witness, or the discussion of Rule 404(b).  (Tr. 9/13/05 Hr'g at 25-27.)  During the *ex parte* conversation, the judge revealed to the prosecutors that he had researched the § 3432 issue and found support for the proposition that the trial had started the previous day.  (Tr. 9/13/05 Hr'g at 4-5.)  The court permitted the prosecutor to represent, outside the presence of the defense, that the Government "and defense counsel have been operating under the inference that the trial begins on or after the 26th [of September]."  *Id.* at 7.

Once defense counsel was present, the judge did not reveal the findings of his research in relation to § 3432, though they were potentially helpful to the defense.  The court

made no effort to confirm the prosecutor's representations, or familiarize itself with the defense

attorneys' views on § 3432.

During the *ex parte* conference, the judge said the following regarding a possible

continuance:

> Well, I – of course, the notice of who the witnesses are – the term ambush you are
> familiar with and I guess what concerns me is when these names are revealed with
> three days [*sic*] notice that we are going to have a request for a continuance. It
> would be difficult – if they are as important to the government's case as you say
> they may be, it looks like we are setting this case up for a long continuance.

(Tr. 9/13/05 Hr'g at 12.) Then the prosecutors conferred off the record. (At the conclusion of

the *ex parte* conference the court said he would see the prosecutors "down stairs" indicating the

conference occurred in chambers.) During the hearing with defense counsel present, the judge

did not share his views regarding possible ambush and the defense potentially needing a long

continuance.

The trial judge's statements showed the court was aware that the seven informant

witnesses were very important to the Government's case. Nevertheless, during the portion of the

hearing with defense counsel present, and in subsequent related proceedings on September 14,

2005, the court did not bring up the female witness who failed to corroborate confidential

informant Charles "Monk" Sanders, either to ask whether the witness had been identified to the

defense or to notify the defense that the court had been informed of the existence of a witness

who could impeach Sanders.

The judge misrepresented the content of the *ex parte* conference to defense

counsel. When the *ex parte* hearing concluded the judge and prosecutor were discussing Rule

404(b), with the court saying "there is 404(b) material obviously in the proposed motion, it

appears to me." (Tr. 9/13/05 Hr'g at 22.) The prosecutor agreed "[i]t appears to be implicit." *Ibid.* Then the prosecutor offered a rationale for not "provid[ing] reasonable notice in advance of trial," (Fed. R. Evid. 404(b)), and the judge said he would "take this matter under advisement" before calling the conference to an end. *Id.* at 23.

At the beginning of the hearing with defense counsel present, the judge did not reveal these discussions. The prosecutor sought guidance from the court regarding "where we were when we stopped" the *ex parte* conference. (Tr. 9/13/05 Hr'g at 26.) The court said they had been discussing "security issues." *Ibid.* The court said, "it sounded like there had been some discussion with defense counsel. And that's about as much as the Court knows." *Ibid.* The transcript shows the court drastically understated the true scope of the *ex parte* communications. Once they were thus misstated, the prosecutor said, "I'm willing for the matter to be unsealed." *Ibid.* Mr. Barrett's trial counsel were entitled to rely upon the court's representations. The combination of the court's omissions and the prosecutor's sudden willingness for the hearing to be unsealed suggested to defense counsel the transcript need not be requested or reviewed.[3]

During the *ex parte* portion of the hearing, the judge made statements suggesting skepticism about the Government's position. The court specifically and repeatedly emphasized that the Government had no evidence of any overt act by any person that would suggest the witnesses were in danger. *(Id.* at 20.) The court did not inform the defense that the government had failed to produce evidence of an actual danger to its witnesses. Without disclosing the weakness of the Government's position, the court permitted defense counsel to agree (a) to

---

[3] Of course, whether it was unsealed during the trial was irrelevant insofar as Judge Payne had denied counsel any funds for obtaining pretrial hearing transcripts. (Doc. 97.)

further delays in learning the identities and contact information for the witnesses, and (b) to be limited in its access to Government witnesses to the extent that they would only be interviewed in the presence of Government representatives.  (*Id.* at 27.)

The court had another opportunity to inform defense counsel of what transpired during the September 13 *ex parte* hearing.  On September 14, 2005, after jury selection proceedings ended, the court raised the issue of the unidentified witnesses.  The United States Attorney informed the court that the Government and Mr. Barrett's counsel had reached an agreement that the witnesses' names, contact information, criminal histories and (allegedly) promises made to them would be revealed the following Monday.  (R. 840.)  The United States Attorney further advised the court that the defense would, possibly, have access to some of the witnesses at the prosecutor's office.  (R. 841.)  Mr. Hilfiger stated that he had no objection to the arrangement, "based on what we talked about yesterday."  *Ibid.*  The court then stated that this would make a "clear record" and the parties' "announcement . . . resolves everything that is under seal."  (R. 843.)

As shown in Ground Two, Parts A.4 and A.5, trial counsel acted unreasonably by failing to object to the delayed disclosures, by failing to seek a reasonable continuance, and by failing to investigate the seven informant witnesses.  Evidence available at the time would have provided extensive grounds for impeachment and cross-examination.

The Government restricted defense access to witnesses, for example, by telling the witnesses they should only agree to defense interviews if the Government is present.  The American Bar Association considers it unprofessional conduct for a prosecutor to condition a witness's interview with defense counsel on the prosecutor being present.  The trial court

permitted defense counsel for Mr. Barrett to agree to such restrictions (Tr. 9/13/05 Hr'g at 27; R. 841-42), without revealing to the defense the weaknesses in the Government's motion for a protective order that the court had freely discussed with the prosecutors.

The trial judge's withholding of his views about a continuance was particularly prejudicial. Mr. Hilfiger has consistently and repeatedly stated that he agreed to the delays and other restrictions on his access to information about the witnesses because he believed Judge Payne would not grant a continuance of the trial. (Exhibit 29.) Judge Payne's views, as freely expressed to the prosecutors, would have given Mr. Hilfiger a completely different view of the situation. If Judge Payne had revealed his research regarding § 3432, the issue would not have been reviewed for plain error on appeal. If Judge Payne had revealed his views on a continuance, Mr. Hilfiger likely would have requested one, and again the matter would have been reviewed differently on appeal. If Judge Payne had revealed his views on the weakness of the Government's motion for a protective order, Mr. Hilfiger would have had further grounds for a continuance and grounds for objecting to restrictions the Government placed on access to witnesses. Mr. Hilfiger also would have had grounds for a continuance if Judge Payne had revealed that Mr. Littlefield knew the identity of an impeachment witness who had not been disclosed in discovery, as the court's earlier orders required.

The trial judge's conduct in soliciting *ex parte* the prosecutor's views on the court's private concerns while at the same time failing to accurately disclose those communications to the defense violated Mr. Barrett's right to due process of law. The disparate conduct of the court between the prosecution and defense is evidence of bias. In a capital case, courts may not consider information the defense has no opportunity to hear or explain.

For the foregoing reasons, the trial judge should recuse himself from this case. Thereafter, this Court should grant the relief sought herein.

To the extent the matters raised in this Claim could have been raised on direct appeal, appellate counsel were ineffective. As stated *supra*, Judge Payne specifically selected Mr. Hilfiger for this case, and Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter. Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal. To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in this Claim could not be adequately litigated on appeal, because they required consideration of extra-record evidence. (Exhibit 29.) To the extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal. (Exhibit 29.) However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal. *Id.* Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards. At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised herein had been raised on appeal.

Page 32

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, the limitations on pleading imposed by the courts, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐     No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

Relies on extra-record evidence, ineffective assistance of trial and appellate counsel.

See Grounds Two, Five and Eighteen.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐     No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. [section sign] 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes   ☐          No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes   ☐          No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes   ☐          No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND TWO**:

**Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution.**

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

The numerous acts and omissions of Movant's trial counsel described herein fell below prevailing professional norms of capital defense practice.  Absent these acts and omissions, whether considered individually or collectively, there is a reasonable probability that Mr. Barrett would not have been convicted of the charged offenses, or that he would have received a sentence less than death.

A.    As set forth in Ground One, the trial court interfered with the

constitutionally protected independence of trial counsel.

**1.    There is a reason the numerous acts and omissions of Mr. Barrett's**

**appointed counsel fell below the standards set forth in prevailing professional norms.**

The trial court's stated desire to minimize costs associated with Mr. Barrett's

defense and to appoint local counsel to this case for the purpose of establishing their credentials

for appointment in future capital cases, *see* Ground One, created an actual conflict between the

financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough

investigation and a vigorous defense.  This conflict adversely affected counsel's performance in

that they failed to obtain the services of numerous experts, failed to devote time to preparing for

and conducting the trial that counsel himself had considered necessary prior to the court's

rulings, and failed to use other resources as expected under prevailing professional norms.

**2.    Trial counsel for Movant committed unreasonable acts and made**

**unreasonable omissions when rearguing the motion to suppress under *Franks v. Delaware*,**

**438 U.S. 154 (1978), following the first stage testimony of Charles "Monk" Sanders.**

Counsel's failure in this regard undermines confidence in the jury's first stage

verdicts.  Because it was shown during Sanders's cross-examination that the material averments

made in the search warrant affidavit to secure a no-knock warrant were false, or were made in

reckless disregard for the truth, all evidence seized in the search of Mr. Barrett's cabin and

property was subject to suppression.  Because the search warrant was defective under *Franks,* the

drug-related and firearms evidence which formed the basis for each of the three counts of

conviction would have evaporated, leaving nothing upon which the jury could have returned

guilty verdicts.  Counsel's unreasonable acts and omissions therefore undermine confidence in the trials outcome.

The information used to secure the no-knock search warrant in this case was based on information supplied to Clint Johnson, the affiant on the warrant, by an alleged confidential informant (C.I.)  The C.I. did not testify at Mr. Barrett's two state trials.  At the conclusion of the second state trial, Clint Johnson wrote the alleged informant's name on a piece of paper, and placed it in an envelope, which was sealed in the state court file.  (Tr. 1/ 26/05 Hr'g. at 88-89).  It was only when Sanders testified in the first stage of Mr. Barrett's federal trial that it was revealed, for the first time that Sanders was the alleged informant who supplied the information providing probable cause.  (R. 2521).

In pertinent part, the affidavit for the no-knock, nighttime search warrant states the following:

> On September 18, 1999 this affiant was contacted by a confidential informant (CI) who advised that, within the past seventy-two (72) hours, they [sic] were in the above-described residence and observed a male that is known to the CI as Kenny Barrett present a quantity of white powder substance and represent it as being "methamphetamine."
>
> The CI went on to state that while in the above described residence they [sic] observed Kenny Barrett divide and exchange a portion of the white powder substance for a quantity of money.  The CI stated that they [sic] had been in the above-described residence on previous occasions and observed Kenny Barrett make "drug transactions."  The CI further stated that while in the above-described residence they [sic] overheard Kenny Barrett state "if the cops try to raid me they will regret it because I'm going to kill the first cop through the door."
>
> The C.I. also stated that while in the residence they [sic] observed several pistols lying around the residence and also Kenny Barrett had a pistol on his person.
>
> This affiant is familiar with Kenny Barrett due to a pending investigation for the past six (6) months and is familiar that [sic] Kenny Barrett has an outstanding

felony arrest warrant out of Sequoyah County, Oklahoma for failure to appear for a jury trial and unlawful delivery of CDS case number CF-97-86.

This affiant has learned from the CI that Kenny Barrett is maintaining his "drug transactions" in the night time hours due to the cover of darkness and that law enforcement personnel are less frequent [sic] at night.

The CI further stated that Kenny Barrett, due to Kenny Barrett's belief that law enforcement personnel cannot execute search warrants during the night, sell's [sic] controlled dangerous substances at nighttime and keeps large quantities of meth-amphetamine in his residence at nighttime in order to be undetected by law enforcement personnel.

This affiant asks that this search warrant be directed for day or night service due to the facts stated herein.

This affiant received information from the informant on at least five (5) occasions. Each time that this informant has provided information, the information proved to be true and accurate and resulted in the confiscation of illegal substances.

(Exhibit 194.)

On cross-examination in Mr. Barrett's federal trial, Sanders largely disavowed the information that was contained in the search warrant affidavit, and which allegedly supplied probable cause for the no-knock search. Sanders's testimony on cross-examination demonstrates that the search warrant affidavit was knowingly based on false information, or that this "information" was supplied to the Sequoyah County District Court with reckless disregard for the truth. Without the false information allegedly supplied by Sanders, there was clearly insufficient evidence to establish probable cause, let alone probable cause for a no-knock warrant. In contrast to the representations made in the search warrant affidavit, Sanders testified to the following on cross-examination:

a.        That he never saw Mr. Barrett manufacture methamphetamine on his

property, or attempt to do so, and that he never told Clint Johnson anything to indicate that Mr.

Barrett was manufacturing or attempting to manufacture methamphetamine (R. 2596-97, 2609);

b.        That when he first met with Johnson after having been to Mr. Barrett's

residence in July, 1999, he gave Johnson no information regarding drugs on Mr. Barrett's

property.  He did not see any drugs on Mr. Barrett's property, and did not even do drugs with him

on any occasion he was supposedly at Mr. Barrett's residence in July, 1999 (R. 2597-98);

c.        In September, 1999[4], Sanders, at Johnson's direction, allegedly went to

Mr. Barrett's residence to exchange a set of car keys.  Based on when Sanders alleged this trip

occurred, it was just days before the raid in the early morning hours of September 24, 1999.  A

"day or two" after being at Mr. Barrett's, Sanders testified he was not asked by Clint Johnson

whether he saw any drug activity at Mr. Barrett's on September 19 or 20.  Sanders testified that if

Johnson had asked him about drug activity at Mr. Barrett's on September 19 or September 20, he

"probably" would have told him that he saw no drug activity.  Sanders then testified, "I didn't see

him doing nothing."  (R. 2608-2610);

d (1).   After allegedly being at Mr. Barrett's in mid-September, 1999, Sanders

testified that Johnson directed him to again go back to Mr. Barrett's property.  Sanders testified

that he told Johnson what he observed on this supposed trip to Mr. Barrett's.  According to

Sanders, the pretext for going to Mr. Barrett's on this last occasion was to ask Mr. Barrett about

the title to an automobile.  Sanders claimed to have been accompanied by his nephew.  Sanders

---

[4] Sanders placed the date of this alleged trip to Mr. Barrett's cabin as September 19 or 20, 1999. The state search warrant was issued on September 20, 1999.  Of course, the precise dates of Sanders's alleged trips to Mr. Barrett's property are unclear. *E.g.,* R. 2518-21, 2609.

Page 38

thought that either he or his nephew asked Mr. Barrett if he had any drugs available.  Mr. Barrett apparently had no methamphetamine.  The only drugs supposedly seen by Sanders was a joint of marijuana, which he, his nephew, and Mr. Barrett smoked in Mr. Barrett's cabin.  (R. 2618-22);

d(2).    Sanders allegedly reported to Clint Johnson in the last meeting that he had seen guns at Mr. Barrett's.  He had also reported to Johnson seeing firearms at Mr. Barrett's residence when he allegedly visited in August, 1999.  To the extent Johnson in his affidavit presented this information as a new development to justify altering the existing bench warrant to a no-knock warrant, Johnson misled the court.  Authorities had long been aware that like many rural dwellers, Mr. Barrett had firearms on his property.  In any event, the search warrant affidavit was directed at drug activity only, not the possession of weapons.  (R. 2623);

e.        Sanders's gave conflicting accounts of alleged visits to Mr. Barrett's shack which, together, show he did not observe any drug transactions there.  On direct examination, Sanders testified that in August 1999 he went to Mr. Barrett's home with a person identified only as "Ronny," and saw Mr. Barrett hand something to "Ronny."  Sanders testified that the alleged trip was for the purpose of buying drugs.  At the close of cross-examination, defense counsel walked Sanders through the information Sanders had given to Clint Johnson, according to Sanders's testimony on cross-examination.  Sanders agreed that when he was supposedly at Mr. Barrett's in July 1999 (a) he did not see any drugs, (b) did not see any manufacturing or attempted manufacturing of methamphetamine, and (c) did not do any drugs with Mr. Barrett.  Therefore, Sanders testified that based on his alleged July trips to Mr. Barrett's property he would have told Johnson *nothing* about Mr. Barrett engaging in drug activities.  Sanders also testified that when he supposedly went to Mr. Barrett's place in August 1999, with his sister and

"Ronny," he saw no drugs, and told Johnson he saw no drugs or any evidence of drug manufacturing. Sanders admitted he did not go into Mr. Barrett's house with "Ronny" (he waited in the car), and never testified he saw Mr. Barrett go outside. How he saw any alleged drug transaction is therefore a mystery. (R. 2599-2601, 2625-28).

Sanders agreed with defense counsel that he saw no drug manufacturing or other drug activity at Mr. Barrett's in September 1999, other than smoking a "joint" on what he claimed was his last trip to the property before the raid. Aside from smoking a joint with Mr. Barrett on this occasion, the only drug activity he witnessed or participated in at Mr. Barrett's residence was when he and Movant, who was also a methamphetamine user, shot methamphetamine together. (R. 2625-28).

Sanders's cross-examination testimony also belied Johnson's claims (a) that Sanders informed him that Mr. Barrett conducted drug transactions at night because there were fewer police around, and (b) that Mr. Barrett kept a "large quantity" of drugs in his house at night because he believed the police could not conduct a nighttime search. Of course, no "large quantity" of drugs was found when Mr. Barrett's residence and property were searched by the authorities.

After Sanders was cross-examined, AUSA Littlefield asked to take a "bathroom break." (R. 2630). The real purpose of the break was for Littlefield to talk to Sanders about his testimony. Sanders admitted Littlefield talked to him during the break. At first, he denied anything was discussed except how much longer he would be on the stand. In the next breath, he then admitted that Littlefield "may have" asked him whether he was confused about dates.

Sanders did not "think" Littlefield asked him about the substance of his testimony on cross-examination. (R. 2239-40, 2642).

After speaking to Sanders during the break, Littlefield sought to repair the damage inflicted by Sanders's remarkably inconsistent testimony by having Sanders contradict, within a matter of a few minutes of the cross-examination having ended, certain aspects of the testimony he gave when questioned by defense counsel. Sanders's abrupt about-face on re-direct alone demonstrates that this is a witness who cannot be believed about anything, and demonstrates that he was anything but the "reliable" confidential informant Clint Johnson claimed him to be in the search warrant affidavit.

On re-direct, and in contrast to his testimony on cross-examination, Sanders stated that when he went to exchange car keys at Mr. Barrett's residence three to four days before Trooper Eales's was killed, Mr. Barrett sold drugs to Geniece Thomas.[5] He also claimed he went to Mr. Barrett's residence with Thomas on more than two occasions to buy drugs. He also claimed that he saw drug activity practically every time he supposedly went to Mr. Barrett's property, and that he would have reported any such drug activity to his alleged "handler," Clint Johnson. Changing up his testimony from cross-examination, Sanders then claimed that on his last alleged trip to Mr. Barrett's, he saw a substance in Mr. Barrett's cabin that he believed to be methamphetamine. Again in contrast to his testimony on cross-examination, Sanders claimed he may have even been at Mr. Barrett's after the last supposed trip he testified about on cross, and

---

[5] "Geniece" is the way Ms. Thomas's name is spelled in the transcript. Her name is actually Janesse Thomas. What she has to say about Mr. Sanders's account of their alleged trips to buy drugs at Mr. Barrett's residence is addressed in the portion of this claim relating to counsel's failure to investigate and effectively impeach the informant witnesses. (*See also* Exhibit 13.)

that he could not remember how many times, during the summer of 1999 and into September 1999, he had been to Mr. Barrett's property. (R. 2531-38).

On re-cross, Sanders contradicted himself about whether he shot methamphetamine daily, gave conflicting answers as to whether there was a drug transaction at Mr. Barrett's when he supposedly went there with Geniece Thomas the first time, and again contradicted his testimony on cross-examination by stating that when he allegedly went to Mr. Barrett's with his nephew, he saw methamphetamine in addition to marijuana. (R. 2642-48).

After Sanders testified, defense counsel re-urged the motion to suppress, but did so in a manner that did not comport with prevailing professional norms. (R. 2677-80). Defense counsel argued orally that the motion to suppress was being re-urged because, based on Sanders's testimony on cross-examination, the warrant was based on "faulty" information. Clint Johnson, who had been questioned about the search warrant affidavit during the hearing on the motion to suppress, related certain information contained in the affidavit that Sanders specifically denied giving. Specifically, page 2 of the search warrant affidavit stated that the C.I. (Sanders) had advised Johnson within the last 72 hours he had been at Mr. Barrett's residence and observed Mr. Barrett present a quantity of white powder, which Mr. Barrett represented was methamphetamine. On cross-examination, Sanders stated there had been no discussion about what Sanders thought was methamphetamine in Mr. Barrett's kitchen. According to Sanders's testimony on cross-examination, there had been no representation that this substance was methamphetamine, and no presentation of the white powder to Sanders. The search warrant affidavit went on to state that the C.I. (Sanders) observed Mr. Barrett divide and exchange a portion of white powder for a quantity of money. Sanders testified on cross-examination that this

did not happen. Defense counsel pointed out they were confronted with all this by the answers Sanders gave on cross-examination; there had been no opportunity to interview Sanders before he testified.

AUSA Littlefield responded that Clint Johnson had testified at the hearing on the motion to suppress, had testified under oath what he had been told by the C.I., and what facts had formed the basis for the search warrant affidavit. (R. 2679.)

The court instructed defense counsel to put the motion in writing, and for the Government to respond in writing. The court stated that it would either hold a hearing, if such was deemed necessary, or would rule on the pleadings. (R. 2679.) As pointed out by the Government in its response to the renewed suppression motion:

> The entire basis of defendant's Motion to Reurge the Motion to Suppress arises from "testimony" of Charles Sanders which was elicited on cross-examination. Specifically, Barrett relies upon the statement attributed to Sanders in the affidavit that he assumed a powder to be methamphetamine. Sanders purportedly testified that he did not advise Clint Johnson that Barrett represented such powder as methamphetamine to him purportedly denied telling Clint Johnson that he had observed Barrett divide and exchange a portion of white powder for quantity of money. [sic] Barrett's Motion to Reurge ignores substantial portions of Sanders' testimony on direct and redirect examination.

(Doc. 231 at 1.)

The court ruled on the renewed motion to suppress by written order, without conducting an evidentiary hearing. (Doc. 253.) In its ruling, the court noted that in the original motion to suppress, there was no *Franks* allegation, a rather irrelevant observation because the basis for the *Franks* claim occurred during trial. Instead, it had been alleged that the C.I. did not really exist. The court summarized at length aspects of Sanders's testimony, and concluded that, in light of the testimony of Johnson and Sanders, *as well as other witnesses to activities at Mr.*

*Barrett's residence*, there was "absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful." Because Johnson accepted as true what he was told by Sanders, and because Johnson had found Sanders to have given reliable information in the past, "the affidavit was properly supported." Based on the totality of the testimony, it was concluded that Mr. Barrett had "not even established that the information provided in 1999 by the informant was untruthful or unreliable." Thus, the court concluded, facts recited in the affidavit "could not have been made with deliberate or reckless disregard for the truth." (Doc. 253 at 7.).

Had defense counsel forcefully and properly re-urged the motion to suppress based on *Franks v. Delaware, supra,* the motion by all rights should and would have been sustained. Moreover, as shown below, the court's order is seriously flawed. Trial counsel urged only one (or at best two) grounds in support of the renewed motion to suppress based on *Franks.* These revolved around Sanders's assumption that a powder he observed at Mr. Barrett's residence was methamphetamine; Sanders's testimony on cross-examination that Mr. Barrett did not represent the powder to be methamphetamine; and the fact Sanders did not tell Johnson he saw Mr. Barrett divide and exchange a portion of the white powder for money.

The one or two areas of impeachment cited by the defense simply scratched the surface. Based solely on the cross-examination of Sanders (as well as other factors that could have been used to impeach Sanders, but were not, as is discussed in another subpart of this claim for relief and Ground Five, *infra*), the defense could have argued much more, and would have been entitled to an evidentiary hearing and suppression of the evidence. Aside from what was stated in the re-urged motion to suppress, counsel could have argued the following:

a.      that Sanders had never seen drug manufacturing or attempted drug manufacturing at Mr. Barrett's residence at any time, which conflicted with the averment in the affidavit that Mr. Barrett kept a "large quantity" of drugs at his house;

b.      that Sanders witnessed no drug activities of any kind on Mr. Barrett's property in July 1999, which also conflicts with Johnson's claims that Sanders said Mr. Barrett kept a large quantity of drugs and engaged in repeated drug sales at night;

c.      that Johnson was recklessly indifferent to the truth in that he did not ask Sanders whether he observed drug activity at Mr. Barrett's residence in mid-September 1999 when he supposedly was there with his girlfriend Ms. Thomas to exchange a set of car keys; if Johnson had asked, Sanders would have contradicted the affidavit because he "probably" would have told Johnson he witnessed no drug activity, because "I didn't see him doing nothing";

d.      that Johnson knew Sanders had not informed him of methamphetamine activity as shown when Sanders testified that after Johnson told him to go back to Mr. Barrett's in September 1999 – after Sanders had supposedly been there just a short time before – Sanders or his "nephew" asked if Mr. Barrett had any drugs available, but there was no methamphetamine, and the three of them simply smoked marijuana;

e.      that Sanders further testified to Johnson's indifference when, summarizing what he supposedly knew, Sanders repeated he witnessed no drug activity at Mr.

Barrett's in July 1999, and told Johnson nothing about any drug activity at Mr. Barrett's during that month;

f.        that, consistent with the court's order, there was no drug activity witnessed in August, 1999; and that, other than smoking a joint with Mr. Barrett and his "nephew," Sanders witnessed no drug activity at Mr. Barrett's in September, 1999.

Again, Sanders's claim that he had seen guns in Mr. Barrett's residence provided no probable cause for a drug search warrant, which is what Johnson secured. Nor did Sanders's claim that Mr. Barrett had threatened law enforcement provide probable cause for a drug search warrant.

Counsel also unreasonably failed to argue evidence of Johnson's reckless disregard for the truth. Sanders testified he was in regular contact with Johnson and continued to use drugs steadily. Sanders acknowledged in his testimony that his drug use seriously impaired his ability to recall and relate information accurately. Sanders testified that Johnson, in effect, made a point of not asking Sanders about his own drug use or, on occasion, what he saw or failed to see at Mr. Barrett's residence. This demonstrated Johnson could not rely reasonably on Sanders for anything. Counsel also unreasonably failed to argue that Sanders would radically change his testimony depending simply on which lawyer was asking him questions. Johnson surely would have seen the same tendency in Sanders to say whatever pleased the authority figure asking him questions. Based on his supposed repeated and close contact with Sanders, Johnson had to be well aware of this fact.

In sum, Sanders not only disavowed the statements Clint Johnson attributed to him, he repeatedly asserted that Johnson had not asked about Sanders's own drug use – which would impair his perceptions and his truthfulness – or what he supposedly observed. This testimony would have shown that Johnson made material false statements in the affidavit for search warrant both about the informant's alleged observations and Johnson's own grounds for trusting the informant. These false statements negate the entirety of the warrant affidavit. At a minimum, it is clear, based on Sanders's testimony on cross-examination, that Johnson recklessly disregarded the truth in reciting the "facts" supporting "probable cause" for the search warrant.

In its order denying the renewed motion to suppress, the court did not recite all the facts bearing on the use of false statements by Johnson, or Johnson's reckless disregard for the truth. Had these matters been urged, there is a reasonable probability that the outcome of the renewed suppression motion would have been different. At a minimum, had all the evidence from Sanders's cross-examination been marshaled, the defense surely would have been entitled to the evidentiary hearing under *Franks* that was denied when the court simply ruled on the pleadings.

In its order, the court seemed to rely on the testimony of other informant witnesses to buttress the credibility of Sanders and Johnson. Not only could counsel, had they conducted a reasonable investigation (or had the time to conduct a reasonable investigation), have impeached many of these other witnesses (see below), the court could not properly rely on years-after-the-fact testimony to find that the search warrant affidavit, founded solely on information from Charles "Monk" Sanders, was based on the truth, rather than outright fabrication or a reckless disregard of the truth.

The *Franks* issue, and counsel's failure to effectively argue it, was at least partially framed by the record.[6] The issue was not raised on direct appeal. Because the issue was obviously meritorious, even with the record that was made, there could be no reasonable strategic basis for omitting it. The failure to raise this issue was professionally unreasonable and prejudicial. *See* Ground Eighteen, *infra*.

**3.      Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense.**

The Government's theory of the case was that Mr. Barrett anticipated a police raid, prepared for it, and intended to use deadly force if the police came to his property. The prosecution argued that when Mr. Barrett began firing his weapon, he was well aware that the police, rather than trespassers, had arrived. This argument was highly relevant to count 3 of the superseding indictment, which charged that Mr. Barrett intentionally killed a state law enforcement officer in the performance of his official duties. (Doc. 52.) This is the count of conviction for which Mr. Barrett received the death penalty. (Docs. 258, 285.)

In the first stage of trial, the jury was instructed that among the essential elements of the offense charged in count 3 were that Mr. Barrett intentionally killed the victim, knowing or having reason to know that the victim was a law enforcement officer, and that the victim was

---

[6] *Brady* evidence suppressed by the Government, and/or newly discovered evidence, places the *Franks* issue in a much stronger light than even existed on the trial record. See Ground Five, *infra*.

killed while engaging in and on account of the performance of his official duties.  (Doc. 240; R. 4262-64, 4266-67.)

Mr. Barrett shows below that trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from eyewitnesses Toby Barrett and Alvin Hahn that would have rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting.  Mr. Barrett also shows that the actions of the Tact Team fell outside professional standards for law enforcement and that one aspect of the team's recklessness was the use of unprofessional procedures that minimized the chances of being recognized as law enforcement.  (Exhibit 44.)  In addition to these failings, a proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the Government's portrait of Mr. Barrett was wholly inaccurate.  Rather than the intentional and remorseless killer who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the Government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals.  The testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case as to both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses.

Defense counsel's consultation with a mental health professional in preparation for Mr. Barrett's trial was limited to retaining Dr. Jeanne Russell of Tulsa, Oklahoma, to reprise

the risk assessment she had done in preparation for a second stage proceeding in state court, and to conduct research on memory loss stemming from traumatic events.  Due to counsel's failure to conduct a proper investigation, counsel never had Mr. Barrett evaluated with the full range of psychiatric and neuropsychological testing that would have shown him to be the antithesis of the Government's picture.[7]  Professional norms of criminal practice, particularly in capital cases, tell attorneys that they should secure expert assistance.  (*E.g.*, ABA Guidelines 10.7, 10.10.1, and 10.11.)  Counsel's failures to have Mr. Barrett evaluated in connection with first-stage intent or mental state issues, in light of the defense arguments made at trial respecting how the shooting occurred, constitute deficient performance.

The results of an accurate and reliable mental health evaluation demonstrate that trial counsel's failings were prejudicial.  George W. Woods, Jr., M.D., a Board Certified psychiatrist who specializes in psychiatry and neuropsychiatry, performed a clinical and forensic evaluation of Mr. Barrett in February 2009, and concluded to a reasonable degree of medical certainty, *inter alia*, Mr. Barrett's mental functioning was impaired at the time of the offense by psychiatric illness and significant brain damage, which prevented him from knowing or deliberating on the nature of his responses to the police incursion before he acted.  Dr. Woods concluded that at the time of the charged offenses, Mr. Barrett suffered from several major brain disorders including Bipolar Disorder, Post Traumatic Stress Disorder and damage to his brain in the areas that are necessary to exercise judgment and reasoning.  Among the most significant functional effects of Mr. Barrett's disorders are a heightened state of fear of imminent

---

[7] Grounds One and Three show that Mr. Barrett had constitutional and statutory rights to expert assistance to refute the testimony of Government witnesses.

annihilation coupled with an inability to understand or regulate his reactions – including overreactions – to perceived threats.  Thus, when the events unfolded at the time of the offense, Mr. Barrett could not and did not know right from wrong, and acted with the distorted perception that his response was necessary to keep intruders from killing him.  (Exhibit 117.)

Dr. Woods's evaluation was based on reliable information that was reasonably available to trial counsel through timely investigation.  This information included social and medical history documents, the opinions of experts consulted during prior proceedings, as well as witness accounts that documented Mr. Barrett's personal as well as family history of mental illness.  The data Dr. Woods relied on, and which was available to trial counsel, also included a neuropsychological evaluation performed by Dr. Myla Young.

Dr. Young has a wealth of experience, has published in peer reviewed journals, and has lectured and instructed other professionals in her field on a frequent basis.  (Appendix to Exhibit 89, curriculum vitae.)  She administered sixteen hours of neuropsychological testing to Mr. Barrett over a period of three days, and reviewed his relevant educational, medical and mental health records.  (Exhibit 89 at 7-24.)

Dr. Young's testing determined that Mr. Barrett has significant brain damage and resulting brain dysfunction.  This damage primarily involves the prefrontal and temporal cortices of the brain.  Proper functioning of these areas of the brain is necessary "for the brain to effectively communicate information and function effectively."  The severity of Mr. Barrett's brain dysfunction has a negative impact on each and every aspect of Mr. Barrett's daily functioning.

Most especially, Mr. Barrett's organic impairments would negatively impact his abilities to "organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment." (Exhibit 89 at 24.)  Mr. Barrett's disabilities are further exacerbated under "conditions of complexity and/or highly stressful situations." (Exhibit 89 at 24.)  Mr. Barrett is a "concrete thinker," whose executive function, which controls the ability to think, organize, problem solve, and change actions based on the information he receives, is severely compromised. (Exhibit 89 at 11, 13.)  Because of the significant impairments to Mr. Barrett's temporal cortex, he has difficulty processing visual information and is abnormally subject to feelings of fear and paranoia, with consequent tendencies to impulsiveness and aggressive outbursts. (Exhibit 89 at 13.)  Mr. Barrett's ability to actively process and comprehend information is compromised.  This includes the ability to actively to process visual information, in the "here and now," or as it unfolds. (Exhibit 89 at 14, 15, 19.)  In lay terms, Mr. Barrett acts or reacts before he is able to accurately perceive and process what is going on around him, a dysfunction that is especially heightened, as noted, in stressful situations. (Exhibit 89 at 14, 24.)  Mr. Barrett has moderate to significant impairments in his ability to visually scan and accurately recognize information. (Exhibit 89 at 20.)  The "fluency" with which Mr. Barrett interprets visual information, and the manner in which he processes such information, is also significantly impaired. (Exhibit 89 at 21, 23.)

As Dr. Woods explained, the accuracy and reliability of Dr. Young's neuropsychological tests results are medically unassailable:

> [N]europsychological testing offers a reliable method for the delineation of
> cognitive strengths and weaknesses. The clinical batteries administered by Dr.
> Young included methods for validating findings of deficits within individual test

protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results.  The successful manipulation of test data to exaggerate measures of neurological impairment in a manner that eluded detection by imbedded validity scales would have required Mr. Barrett to have specific knowledge and mastery of neuroanatomy and test construction.

Based on his consideration of these and other psychiatric data, Dr. Woods concluded:

[¶]      Mr. Barrett meets diagnostic criteria in the DSM-IV-TR for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

[¶]      Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).

***

[¶]      Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial.

(Exhibit 117 at ¶¶ 66-68.)

The concurrent findings of Dr. Young and Dr. Woods show that,

[¶]      Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms . . . .

* * *

[¶]      He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]      Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]      He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]      Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]      Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]      Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]      Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]      Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated

startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer. It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]       My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment. The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Exhibit 117 at ¶¶ 69-78.)

Movant's trial counsel unreasonably failed to utilize whatever resources they had to discover these facts about their client's organic brain impairments. Prevailing professional norms called upon trial counsel to investigate their client's medical history prior to trial so that counsel could make informed decisions about what strategies to pursue. Trial Counsel were on notice that Mr. Barrett had mental problems, based on existing mental health records from Eastern State Hospital, Sequoyah Memorial Hospital, Wagoner Community Hospital, and the Bill Willis mental health facility in Sallisaw, as well as the preliminary results of the mental health investigation conducted by predecessor counsel in the state court proceedings. Yet trial counsel did not retain an expert prior to trial who could advise them regarding mental state defenses that would be available at either stage.

If counsel had undertaken reasonable steps to investigate, prepare and present evidence regarding Mr. Barrett's severe organic deficits, the first stage defense of lack of intent, and the arguments that Mr. Barrett was unaware that the police were on his property and was simply reacting in the moment in a fearful and panicked state to a perceived threat by criminal trespassers would have been strengthened immeasurably.  Due to Mr. Barrett's inability to correctly process information, especially visual information, it could have been argued that even if, as the police witnesses claimed, some of the automobiles which converged on Mr. Barrett's property had their emergency lights engaged, Mr. Barrett did not recognize this and instead simply reacted by firing on the vehicle which all witnesses agreed looked like an ordinary automobile.  At a minimum, this evidence would have been critical in contesting the intent element of count 3 which, as noted, required Mr. Barrett to have a specific intent to kill someone who was known to him to be a law enforcement officer engaged in official duties.

The exculpatory nature of expert testimony regarding Mr. Barrett's numerous and severe psychiatric, psychological and organic impairments could have been buttressed by reasonably available testimony from lay witnesses about Mr. Barrett's mental state.  In addition to providing contemporaneous, real-world accounts of Mr. Barrett's impaired mental functioning, the testimony of such witnesses would have confirmed that Mr. Barrett's disabilities pre-dated the charged offenses and thus clearly impaired his mental state at the time in question.  Family witnesses interviewed in connection with the current proceedings describe an individual who had been mentally and emotionally troubled from childhood on; who was subject to inexplicable and wild mood swings; who was paranoid, suspicious and overly vigilant; who had suffered from deep and prolonged episodes of depression; who reacted without thinking or correctly perceiving

what was going on around him; who handled stress poorly and who reacted under stress; and who retreated to a safe place when he felt threatened.  (*See, e.g.*, Exhibit 103; Exhibit 96; Exhibit 97; Exhibit 98; Exhibit 93; Exhibit 86; Exhibit 81; Exhibit 99; Exhibit 74; 101; Exhibit 79.)  None of these witnesses, if they were interviewed at all by trial counsel, were questioned about Mr. Barrett's mental state, either with respect to the first or the second stage of trial.

The accurate picture of Mr. Barrett and his mental state, and how it bore on his intent, was further evidenced by reasonably available records of Mr. Barrett's previous hospitalizations, which counsel could have obtained, but unreasonably failed to do so.  In 1986, Mr. Barrett was at Eastern State Hospital in Vinita after shooting himself in a suicide attempt. Among other things, he was diagnosed with bipolar disorder.  In 1995, he was again hospitalized because he was "losing [his] mind."  On this occasion, Mr. Barrett was diagnosed with an acute psychotic reaction.  Mr. Barrett had also received mental health treatment, as noted, at Wagoner Community Hospital and the Bill Willis facility in Sallisaw.  (*See* Exhibit 147.)  As discussed in detail in Mr. Barrett's claim that he was denied effective assistance of counsel in the penalty phase of trial, his family history, on both his mother's and father's side, is replete with serious mental illness, suicide and suicide attempts.  (Exhibit 117.)

Not only would all of this evidence have been critical in attacking the intent element of count 3, it also would have established the basis for a defense of not guilty by reason of insanity, as well as an instruction on lesser included offenses, at least with respect to Count 3.[8]

---

[8] As argued in Ground Nine, Mr. Barrett was denied his due process rights under the Fifth Amendment when the court failed to give a defense theory instruction, and denied requests from both the government and the defense for a manslaughter instruction.

Voluntary manslaughter is murder without malice, upon a sudden quarrel (which does not apply here) or heat of passion.  Homicide is voluntary manslaughter where a defendant, in a sudden heat of passion and without malice, intentionally kills the victim, or acts recklessly with extreme disregard for human life.  Heat of passion is defined as passion, fear or rage in which the defendant loses normal self-control, as a result of a circumstance or circumstances that provoke such a passion in an ordinary person, but which do not justify the use of deadly force.

The mental state required for voluntary manslaughter would apply to all three of the counts charged against Mr. Barrett, because it negates malice altogether.  Expert and lay testimony would have raised the issue that Mr. Barrett, even if he had been able to know the difference between right and wrong (which he could not) when confronted with a strange vehicle barreling onto his property and striking his porch, would not have been aware of a police presence, but simply reacted out of a passion, fear or rage in which whatever self-control he possessed was lost, due to the circumstance of the middle-of-the-night intrusion onto his property of automobiles he could not discern as police vehicles.

In sum, trial counsel, had they acted, or been permitted to act, in a manner consistent with prevailing professional norms, would have investigated and presented evidence from Toby Barrett and Alvin Hahn that corroborated several law enforcement witnesses, and showed that at the critical moment, Mr. Barrett likely could not see any emergency lights or other indications that the vehicle heading toward his house and young son contained law enforcement officers.  Trial counsel also would have investigated Mr. Barrett's background and medical history and, through consultation with appropriate experts, found extensive evidence of organic brain dysfunction, bipolar disorder and PTSD.  Had this evidence been produced, there is a

reasonable probability that the outcome of the first stage of trial would have been different.  This evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to Count 3, and would have supported either outright acquittal or a finding that, at most, Mr. Barrett was guilty of voluntary manslaughter.

**4.      Due to the unreasonable failure of Mr. Barrett's trial counsel to retain expert assistance, Mr. Barrett was tried while incompetent.**

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, compulsory process, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, a trial free of materially false and misleading evidence, to confront and cross examine witnesses, and to a jury trial as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution, by virtue of trial counsel's prejudicial failure wholly or adequately to investigate Mr. Barrett's mental state and functioning before and during trial, and further failure to invoke adequate procedures, and obtain the assistance of experts, necessary evidence and/or any other reasonable and constitutionally requisite means by which to evaluate, assess and diagnose Mr. Barrett's underlying mental diseases and defects, and accurately and reliably determine his mental competency to stand trial.

Judges must depend to some extent on counsel to bring competence issues into focus.  Defense counsel are constitutionally and professionally obligated to vindicate the right to a competence determination by bringing evidence suggesting incompetence to the attention of the court.

Trial counsel failed to investigate Mr. Barrett's mental health as it related to competency, to guilt-innocence phase defenses, and to punishment phase mitigation, and they failed to raise and preserve numerous legal issues involved, all to his prejudice.  Counsel unreasonably failed to complete the investigation of Mr. Barrett's social history and background, and failed to consult with qualified mental health experts, including a neuropsychologist, despite the existence of readily available evidence of which counsel were or should have been aware including, but not limited to Mr. Barrett's history of psychiatric diagnoses and treatments, and his family history of mental illness.

As a result of counsel's unreasonable failing, no one working on Mr. Barrett's behalf obtained requisite social history data, nor did any competent mental health professional conduct testing and other evaluation methods necessary to perform a reliable assessment of Mr. Barrett's competency including, but not limited to medically indicated neurological and neuropsychological testing, which was necessary to determine the existence, nature and severity of Mr. Barrett's brain damage and mental illnesses.

If counsel had conducted a professionally adequate investigation, including retaining competent mental health professionals, they would have learned that Mr. Barrett suffered from a life-long history of impaired functioning that was medically indicative of a neuropsychiatric condition, which included organic brain damage associated with, or superimposed on, chronic major mental illnesses, Bipolar Disorder and Post Traumatic Stress Disorder (PTSD).   Access to, consideration of and reliance on the results of the neuropsychological testing that was medically and forensically indicated would have enabled any competent expert to inform counsel that the functional impairments associated with the

neurologically damaged areas of Mr. Barrett's brain were consistent with impairment of the domains necessary for trial competence, such as executive functioning; and that Mr. Barrett would not be able to track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise his legal rights.

ABA Mental Health Standard 7-4-2 codifies a professional norm of criminal defense practice in which reasonably diligent counsel informed of such information would have been obligated to request a hearing to determine Mr. Barrett's competency.

There is a reasonable probability that Movant was incompetent at the time of his trial. The documentary evidence submitted in support of Mr. Barrett's petition demonstrates that he is in the impaired range on the critical indicators of brain damage to his frontal lobes and executive functioning. (Exibits 35, 89, 117.) Mr. Barrett's previous psychiatric diagnosis of Bipolar Disorder, made by independent state clinicians, is supported by the observations of lay witnesses over the course of his life. The medical indications in his social history and life-time functioning, which meet diagnostic criteria for PTSD, are also documented by reliable sources. Moreover, the congruence of all the clinical data, including social history, testing and reported symptoms demonstrates that Mr. Barrett is not malingering or exaggerating his condition.

Mr. Barrett's brain damage, coupled with his disruptive psychotic illness, left him unable to appreciate the nature of his actions at the time of the offenses for which he was tried and convicted, and left him unable rationally to understand the proceedings or to assist in his defense during the period in which he was tried. As Dr. George Woods, Jr. concluded, "Mr.

Page 61

Barrett was unable rationally to assist his attorneys in the preparation of his trial." (Exhibit 117 at 81.)

Rather, Mr. Barrett's ability to understand and track the judicial proceedings was substantially impaired by the confluence of his psychiatric disorders and measured brain damage. The fragments of police bullets in Mr. Barrett's body caused him continuing pain, and provoked an immunological reaction, all of which served as "built-in reminders" of his life-threatening trauma.  The ongoing distortion and distraction of Mr. Barrett's PTSD were compounded by the racing thoughts symptomatic of the disabling "manic form" of Bipolar Disorder. (Exhibit 117 at ¶ 80.)  These disabling impacts on Mr. Barrett's mental state were, in turn, exponentially increased by the effect of his brain damage that left Mr. Barrett being "unable to get unstuck." (Exhibit 117 at ¶ 80.)  This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings.  (Exhibit 117 at ¶¶ 59, 80.)

Trial counsel's unreasonable omissions were exacerbated by the court's infliction of an electric shock belt on Mr. Barrett.  (*See* Ground Seven, *infra*.)

The evidence shows that trial counsel's lack of investigation created a substantial risk that their client's due process rights were violated by standing trial while incompetent, and therefore undermines confidence in the reliability of the adversarial testing process.

**5.      But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.**

Ground One discussed the trial court's improper failure to disclose the contents of the *ex parte* hearing held between the Court and the Government on the prosecution's sealed motion to delay disclosing the identities of their seven informant witnesses. During this hearing, the Court criticized the Government for failing to raise the issue sooner. The Court also found the Government's justification for throwing a veil of secrecy over these witnesses unconvincing, because no evidence was produced that any of them had been threatened or were in any sort of danger. The Government merely represented that these witnesses, all of whom had criminal records, had an undefined and inchoate "fear" that they "may" be in danger if they testified. The Court made the obvious point that it envisioned a long continuance to allow the defense sufficient time to investigate these witnesses and prepare for their testimony. (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 20, 22-23, 27.) However, the Court also enabled the Government to benefit by its motion by deferring ruling and withholding information.

Movant's trial counsel unreasonably acceded into an "arrangement" with the Government to "interview" these key witnesses in the presence of the Government. (Tr. 9/13/05 Hr'g at 27; R. 840-43.) There were no reports of anything the witnesses told the Government, presumably because Government counsel – particularly AUSA Mike Littlefield – interviewed them alone so as to claim attorney work-product as a shield to discovery.

The defense was flying blind. The "arrangement," doomed as it was from the start to be anything approaching an adequate substitute for a competent investigation, backfired when all but one of the witnesses refused to be interviewed by the defense. The obvious and reasonable path of moving for a continuance, which the court itself knew was the proper course, was not taken. As a result, the defense was woefully unprepared to effectively cross-examine

these witnesses, and failed to conduct whatever real investigation could have been accomplished in the little time that remained before the snitches hit the stand. Had a continuance been asked for, it would have been granted, based on the court's own remarks during the *ex parte* hearing. Because a continuance was not requested, and because trial counsel otherwise failed to conduct an adequate investigation, a wealth of evidence that would have destroyed the credibility of the informant witnesses was never heard by the jury.

Direct appeal attorney Mark Henricksen, who was assisted by lead trial counsel Roger Hilfiger on the appeal, questioned Mr. Hilfiger about why he did not seek a continuance. Mr. Hilfiger did not dismiss the merits of moving for a continuance, but instead stated that he simply did not think one would be granted, even though he recognized the importance of the seven snitches to the Government's case. (Exhibit 29.) Of course, the court's comments at the improper *ex parte* hearing, of which Mr. Hilfiger was never made aware during trial, indicate otherwise.

A great deal of evidence was available to impeach the Government's key witnesses. As set forth in Ground Five, *infra*, the Government suppressed material impeachment evidence related to these witnesses and engaged in improper delay tactics to prevent trial counsel from discovering the evidence independently. Whether due to the Government, and/or the trial court's misconduct, or trial counsel's unreasonable failure to seek a continuance, there is a reasonable probability that jurors would have rejected the seven snitches if they had heard the following evidence attacking their testimony.

Page 64

### a. Travis Crawford.

Travis Crawford, Mr. Barrett's maternal first cousin (R. 450-51), testified in the first stage of trial that the day before the police raid, he noticed a white SUV drive down the road in front of Mr. Barrett's cabin. Mr. Crawford testified he saw Mr. Barrett go to his front gate at the time the SUV passed. Crawford claimed to have walked over to Mr. Barrett's property from his parents' house. Mr. Barrett allegedly told him that he (Mr. Barrett) knew that the people in the white SUV were the police. Mr. Barrett expressed the opinion that they were probably going to come back to serve a warrant. With respect to the potential service of the warrant, Mr. Barrett said, "D.G.F." which, according to Travis Crawford, means "Don't Give a Fuck." Crawford testified Mr. Barrett told him that he was "going out in a blaze of glory," as he had supposedly said on numerous previous occasions. (R. 462-66.) Travis Crawford testified that while he had been a methamphetamine user for 15 years, he had been "clean" for nine months.[9] (R. 457.)

On cross-examination, Mr. Crawford stated he had been arrested previously for failure to pay $11,000.00 in back child support. He was also arrested on hot check charges many years before. He admitted to having used a lot of drugs. His alleged "past" drug use affected his memory, distorted his perception, and his mind was not as sharp as it had been before he became a methamphetamine addict. (R 467-68, 472.)

Mr. Crawford had never been interviewed by the defense before his testimony. He acknowledged on cross-examination that he had an appointment to talk to defense counsel the

---

[9] This is in marked contrast with what Mr. Crawford revealed recently to a defense investigator. Mr. Crawford stated that he was a heavy methamphetamine user at the time he was interviewed by the Government, had taken drugs before his testimony, and was under the influence of drugs at the time he testified against Mr. Barrett. *See also* Ground Five.

preceding Friday, but claimed he did not show up because he was working and would have been fired from his job if he absented himself for the interview.  He claimed he was not told by the prosecution that defense counsel had made themselves available on the previous Saturday and Sunday to interview him.  (R. 468-69.)  Sequoyah County Sheriff John Philpot had been by his residence to let him know that Mr. Barrett's lawyers might want to talk to him.  (R 469.)  Mr. Crawford admitted he had never provided a written statement to law enforcement or the Government prosecutors relating what his testimony would be.  (R. 481.)

When asked why he was coming forward with this information six years after the fact, Mr. Crawford said it was because he had been subpoenaed; he himself wanted to know why he had been contacted by the Government.  He denied being threatened with charges or other dire consequences if he failed to cooperate with the prosecution.[10]  (R. 470.)  Before being approached to testify in the federal trial, he had never talked to anyone about what he supposedly knew of the circumstances surrounding the shooting of Trooper Eales.  Despite the admitted problems with his memory, Mr. Crawford claimed he remembered the years-old events to which he testified.  He could not recall how many times he had spoken to Sheriff Philpot about what he knew, and also stated, at one point, that he had not had any conversations with government agents other than Sheriff Philpot. (R. 481-82.)

On re-direct examination, AUSA Littlefield reminded Mr. Crawford that he had talked to Littlefield about testifying, and Crawford then stated that before Littlefield interviewed him, he had spoken to no law enforcement agents about Mr. Barrett.  "Correcting" his earlier

---

[10]  Crawford stated recently he had been threatened by Littlefield, which ensured his cooperation. (See Ground Five *infra.*)

testimony about his contacts with Sheriff Philpot, Mr. Crawford stated either Littlefield, Sheriff Philpot, or Lance and Judy Bergman got a message to him that he needed to be in court. If Sheriff Philpot was the individual who contacted him for this purpose, this would be the only contact he had with the Sheriff about the case. (R 487-88.)

On cross-examination, Mr. Crawford basically repeated the claims he made on direct about his conversation with Mr. Barrett on the late afternoon or evening of September 23 regarding the white SUV that had driven past Mr. Barrett's property. He assumed the occupants of the vehicle were "the laws" instead of Kevin Adams, who owned a white Bronco and lived approximately a mile from Mr. Barrett, even though the vehicle he saw was unmarked, had no antennas like those on law enforcement vehicles, had no spotlights, and Mr. Crawford was not able to see the vehicle's license tag. (R 478-79.) Retreating somewhat from his testimony on direct examination, Mr. Crawford said that when he went to speak to Mr. Barrett that evening, he did not tell Mr. Barrett that the "laws" had just driven by, and were probably coming to get him, although he might have commented to Mr. Barrett that the people who had driven by in the white SUV were law enforcement officers. Ultimately, Crawford testified on re-direct examination that when the white SUV drove past and he went to talk to Mr. Barrett, he did not recall whether he or Mr. Barrett commented that the occupants of the vehicle were law enforcement, but it "seem[ed]" this subject was discussed. Travis Crawford stuck to his claim that Mr. Barrett said that he was "going out in a blaze of glory." (R 479-80, 484.) Mr. Crawford believed that when he went over to talk to Mr. Barrett, the front gate to the property was open, and then "guessed" that Mr. Barrett locked the gate. (R. 48-81.)

During his testimony, Mr. Crawford never mentioned – and was never asked – about his testifying as an informant or snitch in any other case.  Had counsel asked about this, and had Crawford been truthful, it would have been revealed to the jury that Crawford had acted as a police informant in the past and had given testimony against others in order to escape prosecution, a fact that surely would have adversely affected his credibility.   (Exhibit 45, Exhibit 92.)  See also Ground Five, *infra.*

Because trial counsel was professionally unreasonable in failing to move for a continuance, and otherwise failed to conduct a proper investigation, the jury failed to hear from witnesses who could have testified that Crawford was dishonest and not to be believed about anything, particularly with regard to the events on the evening of September 23, 1999. Mr. Barrett is in possession of newly discovered evidence showing that Travis Crawford's trial testimony was false.  Mr. Crawford recently recanted his testimony against Mr. Barrett.  (*See* Exhibit 45; Exhibit 92; Exhibit 31; *see also* Ground Five §§ A & B.)

Rick Lunsford is a local Sallisaw resident who could have been located and interviewed if any sort of competent defense investigation into Mr. Crawford had been conducted.  Mr. Lunsford, along with several other people, were at Mr. Barrett's residence on the afternoon of September 23, at the time Mr. Barrett was approached by Travis Crawford about the white SUV that had driven past the property. Mr. Lunsford had arrived at Mr. Barrett's around noon on September 22, and stayed until around 9:00 p.m. on September 23.  Mr. Lunsford went to Mr. Barrett's to drop off a Chevy truck he was selling to him.  Mr. Lunsford told investigators currently working for Mr. Barrett that on the late afternoon of September 23, Mr. Barrett and others were standing near the fence to Mr. Barrett's property.  Travis Crawford walked over from

his parents house, which was located a couple of residences down the road, and stood at the fence line. Mr. Crawford asked Mr. Barrett whether he had seen the white SUV that had driven by toward the dead-end, but had not yet driven back. Crawford stated he believed the individuals in the SUV were law enforcement officers. Mr. Barrett did not take Crawford seriously, because he did not trust Crawford. Mr. Barrett was more nervous about Mr. Crawford than he was of law enforcement. Mr. Lunsford would have testified that Travis Crawford was regarded as a "real flaky person" and that he was known to have been a police informant in the past. (Exhibit 90.)

After Crawford left, Mr. Barrett told the others who were present that if they wanted to leave because of the SUV, they should do so. Mr. Barrett was concerned about the others getting in trouble if in fact the SUV contained law enforcement officers, because everyone there was using drugs. Toby Barrett and Mr. Lunsford stayed, and the others left. Toby Barrett locked the gate to the driveway, and Mr. Barrett, Toby Barrett and Mr. Lunsford went to either Mr. Barrett's cabin or his garage. Mr. Lunsford left Mr. Barrett's property around 9:00 p.m. to see his family. (Exhibit 90.)

Mr. Lunsford states that during the time Crawford came to Mr. Barrett's to talk about the white SUV, before that occurrence, and after that time until Lunsford left later that night, Mr. Barrett *never* said that he would shoot or kill the first law enforcement officer who came on his property, or that if the police came on his property and tried to arrest him, he would "go out in a blaze of glory." Mr. Barrett never said this or anything like it either on September 23, 1999, or at any other time Mr. Lunsford was around Mr. Barrett. Such a statement would be out of character for Mr. Barrett, because he was not a violent or threatening person. (Exhibit 90.)

Had any investigation been conducted by trial counsel, and had Lunsford been contacted, he could also have opined on Travis Crawford's truthfulness, and Crawford's reputation for honesty in the community.  In Lunsford's opinion, Travis Crawford is a completely dishonest person; nothing he says can be believed.  Mr. Crawford was not only a heavy drug user, but also dealt drugs.  Mr. Crawford would sell bad dope to people and "rip them off."  Travis Crawford would basically do and say anything to get his hands on drugs, or to get out of trouble. Travis Crawford was known in the community for his dishonesty and untrustworthiness. (Exhibit 90.)  Independent of Mr. Lunsford's testimony, his knowledge of Travis Crawford's conduct and record would have provided Mr. Barrett's counsel with additional grounds for impeaching Crawford on cross-examination.  .

Mr. Lunsford was never contacted by any representatives of Mr. Barrett in connection with the federal trial.  Had he been contacted, he would have been willing to testify to the matters described above.  (Exhibit 90.)

Brandy Hill is Travis Crawford's niece.  Ms. Hill told investigators currently working on Mr. Barrett's behalf that she, like Rick Lunsford, was present at Mr. Barrett's on the afternoon and evening of September 23, 1999.  She was present when Travis Crawford came to the fence of Mr. Barrett's property to tell Mr. Barrett about the white SUV that had driven by. Crawford stated he believed police were in the vehicle, or that his father, Roger Crawford, believed it was a police vehicle.  Crawford said his father saw the white SUV drive down the road toward the dead-end, but it had not come back.  After relaying this information, Crawford walked back home.  Shortly after this, Ms. Hill's husband Sean Hill arrived at Mr. Barrett's, and she went home.  (Exhibit 77.)

During and after the time Crawford spoke to Mr. Barrett and the others who were there, there was no talk by Mr. Barrett about killing or shooting the police or "going out in a blaze of glory." After Travis Crawford expressed his suspicions about the white SUV, Mr. Barrett did not react with threats, or in a heated manner. He behaved as if it were normal that the police had driven by. According to Ms. Hill, the police drove by Mr. Barrett's property all the time, sometimes up to three times a week, from 1996 to 1999. (Exhibit 77.)

According to Ms. Hill, and in contrast to Travis Crawford's claim at trial that he had been offered nothing by the Government in exchange for his testimony, Crawford told her that both he and his wife, Cindy Crawford, had been paid for their testimony against Mr. Barrett. Again in contrast to Crawford's claim that he had been off drugs for a period of months before his testimony, Crawford told Ms. Hill he did two "hits" of dope immediately before testifying, and was under the influence of drugs when he testified. (Exhibit 77.) (*See also,* Mr. Barrett's *Brady* and newly discovered evidence claim.)

Ms. Hill was never interviewed by Mr. Barrett's federal lawyers, or any investigator working for them. She was an easily discoverable, readily available witness. Had she been contacted, she would have given them the information related above, and would have agreed to testify as a defense witness for Mr. Barrett. (Exhibit 77.)

Toby Barrett was obviously a readily available witness. He testified for the prosecution in the two state-court trials. He was present at his father's residence on the evening of September 23, 1999. On that evening, Mr. Barrett asked Toby to close the gate to the driveway. Because the gate was usually kept locked in the evenings (certainly a routine occurrence in rural areas), this was nothing out of the ordinary. On September 23, Mr. Barrett

said nothing to Toby Barrett, or in Toby Barrett's presence, about the police, let alone that he believed they were coming to arrest him and that he would "go out in a blaze of glory."  While trial counsel spoke briefly to Toby Barrett several times, he never discussed with Toby any testimony he could give.  Had he been asked, Toby Barrett would have testified to these facts, as well as others which are discussed elsewhere in this motion.  (Exhibit 96.)

Like Rick Lunsford, Brandy Hill and Toby Barrett, Robert "Bubba" Thompson was present at Mr. Barrett's on the afternoon of September 23, 1999.  Although he cannot recall specifically whether he saw Travis Crawford there that afternoon, he is sure that while he was there, Mr. Barrett never made any statements about expecting the police to raid his house, wanting to kill law enforcement officers, or desiring to go out "in a blaze of glory."  (Exhibit 37.)  In fact, Mr. Thompson never heard Mr. Barrett make such statements at any time, even though he was a frequent visitor to Mr. Barrett's property in 1999 because he was close friends with Toby Barrett.  (Exhibit 37.)

Trial counsel could have, but did not, discuss with Mr. Barrett's and Mr. Crawford's aunt, Carolyn Joseph, her knowledge of Travis Crawford's honesty and trustworthiness.  Although trial counsel interviewed Ms. Joseph briefly, she was never questioned about the credibility of either Travis Crawford or Cindy Crawford.  (Exhibit 78.)

According to Ms. Joseph, Travis Crawford, contrary to his claim of being "clean" of drugs for several months preceding his testimony, was a heavy drug user at the time of Mr. Barrett's trial.  It is her personal belief that Crawford is not an honest or trustworthy person.  Nor does Mr. Crawford have a reputation for honesty in the community at large.   (Exhibit 78.)

Every time Mr. Crawford would come to her house, something turned up missing or stolen. Travis Crawford would steal from Ms. Joseph in order to get money to buy drugs. Crawford was the type of person who would say one thing and then do the opposite, so long as it was to his advantage. Ms. Joseph once paid Crawford $400.00 in advance to build a well house on her property. Crawford simply pocketed the money and never built the well house. Crawford never repaid the money he took for a job he never did. The materials that had been purchased for construction of the well house were later stolen. Travis Crawford and/or his wife Cindy were the only people who could have stolen the materials. Crawford once stole four rolls of barbed wire from Ms. Joseph's property, and later admitted the theft to her. Crawford even went so far as to steal from the property of her late son, DeWitt Joseph, who had been killed in an automobile accident. (Exhibit 78.)

Even if Ms. Joseph could not give "extraneous evidence" of the specific bad acts of Crawford that reflected his dishonesty, trial counsel, using the information gained from her, could have cross-examined him about these dishonest acts. Coupled with testimony from Ms. Joseph regarding her opinion that Crawford is a dishonest person, and is regarded as dishonest in the community, any denials offered by Crawford to the specific acts of dishonesty he committed against his own aunt would have rung hollow and marked him as a witness of dreadful credibility.

**b.      Cindy Crawford.**

Movant is in possession of evidence demonstrating that Cindy Crawford was pressured and threatened by former AUSA Mike Littlefield into testifying against Mr. Barrett, that she was coached in her testimony, and that she embellished her second stage testimony.

Movant is now in possession of Cindy Crawford's medical records, which show that she suffers from post-traumatic stress disorder and other maladies impacting her credibility, and which support her recent statement to defense investigators that she embellished her penalty phase testimony against Mr. Barrett and was susceptible to pressure from the prosecutor and law enforcement.  See Ground Five, *infra.*  Ms. Crawford gave Movant's counsel access to these records.

Cindy Crawford testified for the Government in both stages of trial.  Like her husband, she never talked to defense counsel before her testimony but denied that she had simply refused to meet with them.  (R. 3063, 3069.)

In the first stage, she testified she had done drugs at Mr. Barrett's house, although she did not know who supplied the drugs.  Cindy Crawford testified Mr. Barrett told her he had a misdemeanor warrant out for his arrest, and that he stayed on his property because he did not want to get in trouble.  He knew there was a chance the police could come to his house; that was why he had guns for protection.  According to Cindy Crawford, Mr. Barrett told her that if the police (or anyone else, for that matter), invaded his property, he would "go out in a blaze of glory."  (R. 3063-69.)

On cross-examination in the first stage of trial, Cindy Crawford stated she started using methamphetamine at age 18.  She used the drug for nine years, and would either snort it or shoot it.  She stated or implied on direct examination that she was currently drug and alcohol free.  (R. 3161.)  While on a "meth run," the longest she had stayed up was five days.  While using methamphetamine, she would often stay up for three to four days at a time.  (R. 3070-71.)

Cindy Crawford admitted her drug use had caused her to lose a sense of time.  To her, time was just a blur that played tricks on her mind.  (R. 3073.)  She really did not know when Mr. Barrett had made the alleged statement about having an outstanding misdemeanor warrant.  Defense counsel, in his questioning, stated that any misdemeanor warrant for Mr. Barrett would have been long before 1999.  (R. 3072.) While she had done drugs at Mr. Barrett's residence, she was not testifying that Mr. Barrett had ever given her drugs.  (R. 3072.) With respect to Mr. Barrett's statement about taking on the police and "going out in a blaze of glory," Cindy Crawford stated this was typical "doper talk" that she had often heard from many drug users.  (R. 3075.)

In the penalty phase of trial, Cindy Crawford claimed Mr. Barrett once became angry with her because she would not have sex with him.  He ran from his home when she was leaving with his brother Richie Barrett, put the barrel of a rifle against her leg, and threatened to kill her.  (R. 4577-79.)

As with the other informant or "snitch" witnesses, trial counsel relied strictly on cross-examination to impeach Cindy Crawford.  Had trial counsel moved for a continuance and obtained the time to investigate Crawford, or conducted a reasonable investigation in the time allowed, a wealth of evidence could have been developed which would have shown her to be a witness who jurors would have found not worthy of belief.

During the first stage of trial, Cindy Crawford was never questioned on whether she suffered from any mental problems.  In her second stage testimony, she volunteered that she suffered from PTSD, but it was of course too late to use the information to cast doubt on what she told the jury in the first stage. A reasonable investigation would have uncovered evidence

that she had an impaired mental condition, which, along with her drug use, could have impeached her ability to recall and relate, and shown her to be unstable and amenable to pressure or influence from law enforcement.  Medical records for Cindy Crawford confirm that she suffers from PTSD, is subject to bouts of anxiety, and has panic attacks.  (Exhibit 144.)

Although Crawford testified on direct examination that she was on a five year deferred sentence for misdemeanor marijuana possession (R. 3061), and had a previous misdemeanor marijuana conviction in 1999, counsel failed to explore whether her testimony was motivated by a fear that if she declined to cooperate with the Government, she might face acceleration of her current deferred sentence to either a suspended sentence, which would constitute a felony conviction under Oklahoma law, or could face jail or prison time.  Counsel, who evidently did not search Cindy Crawford's court files, failed to ask her about the fact that she could have been charged with a felony rather than a misdemeanor for her second marijuana possession case, and whether the fact she had not been charged with a felony was due to her regularly acting as a police informant, as other witnesses could have attested.  (Exhibit 204; Exhibit 170.)

Counsel failed to question Cindy Crawford about the fact that her two misdemeanor marijuana cases were originally charged as felonies.  Trial counsel neglected to confront her with the fact that a bench warrant had been issued for her arrest for failure to appear on July 19, 2005, just shortly before Mr. Barrett's trial commenced.  Counsel also neglected to question her about the fact that on March 20, 2005, the Sequoyah County District Attorney's Office had filed an application to accelerate her deferred sentence because she had failed to pay certain required fees.  Significantly, the bench warrant and the application to accelerate were

hanging over Cindy Crawford's head at the time she testified against Mr. Barrett.  It was not until

April 24, 2006, after Mr. Barrett's trial concluded, that the application to accelerate and the

bench warrant were withdrawn because she had finally complied with the terms of her probation.

(Exhibit 204; Exhibit 170.)  The circumstances surrounding Crawford's Sequoyah County cases

could have been used to show she had a powerful motive to testify for the Government in

exchange for help in keeping her deferred sentence.

Due to a failure to investigate Cindy Crawford's court history, the jury was denied

other valuable impeachment evidence.  The court file in the domestic case of *Crawford v.*

*Mattox,* Sequoyah County Case No. P-03-458, contains a letter from Larry and Brandie Sell, the

grandparents of one of Crawford's children, to District Judge John Garrett.  The letter states that

Cindy Crawford has problems with depression, and threatened to "do something with her baby,"

which she would be able to "get away with" because she had been in the Harbor View mental

hospital.  The letter also states that drugs had become "all consuming" for Cindy Crawford.  This

would not only demonstrate a history of mental illness, but would show that Cindy Crawford was

such a despicable and unbelievable character that she had actually threatened harm to her own

child, while contemplating the use of her mental illness as an excuse or defense.  (File in

Sequoyah County Case No. P-03-458.)

Again because no investigation of Cindy Crawford's court records was made,

counsel failed to confront her with the numerous acts of dishonesty which served as the basis for

a victim protective order in *Michael Mackey, et al. v. Cindy Crawford,* Sequoyah County Case

No. PO-03-390.  The application for protective order states the plaintiffs had been harassed with

false accusations by Crawford, threats to cause problems for Mr. Mackey's children, acts of

stalking, and burglary of the Mackey home and storage shed.  (Exhibit 176.)  Again, even if extraneous evidence of these misdeeds reflecting Cindy Crawford's lack of honesty could not have been introduced, Crawford certainly could have been cross-examined about them.

Aside from court records which would have severely impeached Cindy Crawford's credibility, counsel failed to investigate and produce numerous available witnesses who could have testified to her complete dishonesty and lack of believability, as well as her history as a police informant.

Roger Crawford testified briefly as a second stage witness for Mr. Barrett.  In preparation for his second stage testimony, he was only interviewed for a matter of minutes. Unfortunately, trial counsel neglected to interview him regarding information he had on the credibility of Cindy Crawford.  Had Roger Crawford been properly interviewed, he could have testified in both stages of trial that Cindy Crawford was dishonest and untrustworthy, and that her reputation in the community for honesty was extremely poor.  Roger Crawford could have testified that at the time of her testimony at Mr. Barrett's trial, Cindy Crawford was a heavy drug user, contrary to what she tried to claim to the jury.  Roger Crawford also would have testified that it was well known in the community that Cindy Crawford, far from being a disinterested witness, had regularly acted as a police informant to escape prosecution and punishment for her own criminal activities.  Roger Crawford would have testified that Cindy Crawford had filed false reports about family members with the Oklahoma Department of Human Services, and also had made false accusations when seeking victim protective orders.  Mr. Crawford was in an excellent position to offer an opinion on Cindy Crawford's dishonesty and her reputation in the

community for dishonesty. He is Cindy Crawford's father in law, and has known her for years. (Exhibit 92.)

Mike Mackey is another witness counsel easily could have discovered by searching court files related to Cindy Crawford. Mr. Mackey is one of several individuals who filed for a protective order against Cindy Crawford. He has also known her for years. He was never contacted or interviewed by Mr. Barrett's trial lawyers, or any investigator working on their behalf. Had he been contacted, he could have testified that Cindy Crawford is thoroughly dishonest and untrustworthy, and her reputation in the community for honesty is abysmal. Mr. Mackey goes so far as to state that Cindy Crawford is the "most wickedly evil" person he has ever had the misfortune to run across. Ms. Crawford made false reports to state DHS regarding him and his mentally handicapped son, and lied to get a victim protective order against him. Mr. Mackey is also aware that Cindy Crawford has made false claims to the authorities about other family members. According to Mr. Mackey, Cindy Crawford has repeatedly broken into his home and stolen from him in order to get money or property to buy drugs. Like Roger Crawford, Mr. Mackey is aware that Cindy Crawford has long worked as a snitch for the local police, and "works the system" to escape responsibility for her own actions, while getting other people into trouble. (Exhibit 88.)

Again, even if extrinsic evidence of Crawford's bad and dishonest acts could not have been introduced through Mackey's first stage testimony, they could have been inquired into during cross-examination of Crawford. Extrinsic evidence of these acts of criminality could have been introduced in the penalty phase when Crawford returned to the witness stand.

Brandy Hill is another witness who, with a competent investigation, could have given testimony regarding Cindy Crawford's lack of honesty. As noted in the discussion of Travis Crawford, Ms. Hill was never contacted before or during Mr. Barrett's trial. Ms. Hill has known Cindy Crawford for many years. In her opinion, Cindy Crawford is completely dishonest and untrustworthy. Ms. Crawford's reputation for honesty in the community is extremely poor. Ms. Hill describes Cindy Crawford as manipulative. Cindy Crawford has stolen from Ms. Hill and her family on numerous occasions in order to get money to buy drugs. Like other witnesses who could have testified to Cindy Crawford's dreadful lack of honesty, Ms. Hill is aware that Cindy Crawford has long acted as a local police informant and has lied against others to obtain something of advantage for herself. (Exhibit 77.)

Similar testimony could have been offered by Sean Hill. Mr. Hill, though available at the time of trial, was never contacted by anyone working on Mr. Barrett's defense. He states that Cindy Crawford's reputation in the community is that "she's dishonest, evil and worthless." (Exhibit 95.)

Carolyn Joseph has known Cindy Crawford for years. As with Travis Crawford, Ms. Joseph was not interviewed regarding her knowledge of Cindy Crawford's honesty, or any other information which would have served to impeach Ms. Crawford. Ms. Joseph could have testified that Cindy Crawford was a heavy drug user, and that, in her opinion, Ms. Crawford's drug use affected her mentally. According to Ms. Joseph, Cindy Crawford has the mind and attitude of a twelve year old child. In Ms. Joseph's personal opinion, Cindy Crawford is "so deceitful and dishonest that it is pitiful." Ms. Crawford's reputation in the community for honesty is, to put it mildly, poor. No one Ms. Joseph knows would trust or believe anything

Cindy Crawford said.  Cindy Crawford has stolen from Ms. Joseph on several occasions and has

conned money out of her.  (Exhibit 78.)

Still another witness who could have testified to Cindy Crawford's bedrock

reputation for dishonesty is Gwendolyn Crawford, Travis Crawford's sister.  Ms. Crawford, as

with the other individuals who could have been, but were not contacted to testify on Mr. Barrett's

behalf, has known Cindy Crawford for years.  Gwen Crawford's experience of Cindy informed

her opinion that Cindy Crawford is dishonest, and is well known in the community for her

dishonesty.  Echoing several of the other witnesses who know Cindy Crawford well, her

reputation for honesty in the community is bottom-of-the-barrel.  Gwendolyn Crawford is also

aware that Cindy Crawford has acted as a police snitch for years and does not hesitate to falsely

accuse others if it means getting something for herself.  (Exhibit 83.)

Cindy Crawford's penalty phase testimony that Mr. Barrett had put a rifle barrel to

her leg and threatened to kill her, allegedly because she would not have sex with him, could have

been further impeached if trial counsel had interviewed Mr. Barrett's brother, Richie Barrett.

Crawford testified this incident occurred when she was leaving Mr. Barrett's property with

Richie Barrett.  Richie Barrett was interviewed by a defense investigator in connection with the

current action.  Richie Barrett states unequivocally that Cindy Barrett fabricated this story out of

whole cloth, and that the incident never occurred.  (Exhibit 104.)

Cindy Crawford's claim that Mr. Barrett had threatened violence to law

enforcement officers if they came on his property could have been impeached had defense

counsel investigated and produced witnesses Rick Lunsford, Toby Barrett, Brandy Hill, and

Robert "Bubba" Thompson, all of whom state that Mr. Barrett never made such statements

around them and would not have done so.  (Exhibit 90; Exhibit 96; Exhibit 77; Exhibit 37.)  This

same point could have been made through Government witness Randy Weaver, had counsel

simply asked the obvious.  (Exhibit 38.)

        **c.**        **Charles "Monk" Sanders.**

        **1.**        **Failure to adequately investigate and prepare to cross-examine Sanders about his previous convictions, charges against him that were dismissed, and the favorable treatment he often secured to escape punishment.**

Movant's trial counsel failed to investigate and present numerous grounds for

impeachment of Charles "Monk" Sanders, the alleged confidential source for information

contained in Clint Johnson's affidavit for a no-knock warrant.  The evidence related to

impeachment is vast.  Movant presents this evidence under subheadings to facilitate

understanding.

Sanders was a professional informant.  He gave wildly conflicting trial testimony

regarding alleged drug activities at Mr. Barrett's residence in the Summer of 1999.  He also

testified that at some undetermined time, Mr. Barrett allegedly made statements that he would

shoot the first law enforcement officer who came on his property.  (R. 2515.)  In the penalty

phase of trial, the Government once more sponsored Sanders to testify that Mr. Barrett, while

incarcerated, supposedly contacted a third party about doing harm to the informant in his case.

(R. 4587.)  In an off-hand manner, Sanders testified, under questioning by AUSA Littlefield, that

the most the Government was going to do for him in exchange for his testimony was to talk to

prosecutors in Sequoyah and Tulsa Counties, informing them of Sanders's cooperation in the

case against Mr. Barrett.  (R. 2494.)

Trial counsel unreasonably failed to investigate and challenge Sanders from a myriad of angles the informant's history made readily available.  Trial counsel not only failed to capitalize on the entirety of Sanders's cross-examination testimony when he re-urged the motion to suppress, but counsel failed to impeach him effectively, both on cross-examination and with independent evidence.

While trial counsel cross-examined Sanders on some, but by no means all, of his prior convictions, counsel failed to conduct a search of court records, not only to demonstrate that Sanders lied about the number and nature of his previous convictions, but that he had received amazing deal after amazing deal for his work as an informant, including after he supposedly gave information to Clint Johnson about Mr. Barrett. In that sense, assuming he really was the C.I. on the Johnson search warrant, Sanders had *already received and was continuing to receive favor from the authorities based on his "work" against Mr. Barrett.*  Had counsel effectively cross-examined Sanders about his prior record, he could have easily exposed Sanders's lies including that Clint Johnson only helped with "some" of his cases, that Sanders had not gotten out of "a lot" of trouble, and his denial that he could commit crimes without fear of paying the full consequences as long as he worked as an informant.  (R. 2535-37.)

The beginning of cross-examination revealed no court searches were conducted on Sanders's previous convictions.  Counsel stated that he had looked at Sanders's D.O.C. "sheet."  This obviously referred to the Oklahoma Department of Corrections website, which would merely list, without any elaboration at all, the case numbers in which Sanders had been convicted, and the offenses for which he was convicted.  Counsel confronted Sanders with the fact that he had far more than the four priors he acknowledged on direct examination, a patent lie

that prosecutor Littlefield had an obligation to correct, but did not. (R. 2524.)  *See* Ground Five, *infra*.

Counsel superficially asked Sanders about the following prior convictions: (1) an Arkansas conviction in 1986 for distribution of drugs, for which Sanders received a sentence of four years confinement, and six years probation; (2) a 1989 conviction in Sequoyah County for uttering a forged instrument, for which Sanders allegedly received one year in the county jail, and time on probation; (3) a 1990 sexual battery conviction and drug possession conviction in Sequoyah County, for which he received three years incarceration and seven years suspended; (4) a 1992 Sequoyah County conviction for drug possession, in which Sanders received a sentence of three years in prison and seven years suspended (Sanders claimed this was "the same" case as his 1990 Sequoyah County conviction, even though the conviction was in a different case number); 5) a Muskogee County conviction in Case No. CF-93-131 for illegal possession of a weapon, bringing drugs or alcohol into a jail, and escape (Sanders acknowledged the escape conviction, but said he had not been convicted of the other charges); (6) a 1995 conviction in Arkansas for possession of drugs, concealing stolen property, and forgery; (7) a Sequoyah County conviction in Case No. CF-98-346, for which Sanders received five years incarceration and twenty years suspended; (8) a conviction in Sequoyah County Case No. CF-98-363, for uttering a forged instrument, for which Sanders received five years incarceration and twenty years suspended; (9) a conviction in Sequoyah County Case No. CF-99-562 for concealing stolen property, for which Sanders received five years incarceration and twenty years suspended (a condition of probation in these last three cases was that Sanders successfully complete a Department of Corrections drug program, which Sanders claimed he had not yet been able to get into); (10) a conviction in

Sequoyah County Case No. CF-03-124 for two counts of running a roadblock; and (11) a conviction in Sequoyah County Case No. CF-04-19 for two counts of concealing stolen property, second degree burglary, and second degree arson, for which Sanders received a deal similar to that in the other Sequoyah County cases. (R. 2524-36.)

Sanders agreed that after this many convictions, he received, on his current sentences, a very favorable deal (to say the least), requiring him at most to serve five years in prison, which would equate to service of only two and one-half years, even if he was not able to enter the Department of Corrections drug program, which, upon completion, would put him back on the streets immediately. Sanders admitted that his mentor, Clint Johnson, had helped him with "some," but by no means all, of his prior cases. (R. 2534-35.)

Had counsel conducted even minimal research into Sanders's court records, far more about the witness's criminal history and the virtual "get out of jail free" cards he received repeatedly would have been revealed to the jury. The following readily available records, from the nineteen cases marked "a" through "s", among others, would have marked Sanders as a career informant who would say and do anything to continue to have access to drugs and escape incarceration:

a. Counsel failed to point out that in Sequoyah County Case No. CF-92-91, in which Sanders was convicted of felony drug possession in count 5, the state had charged him with having previously been convicted in Sebastian County, Arkansas, with delivery of marijuana and amphetamines in Case No. 86-604-B. Sanders was also charged in this Sequoyah County case with the misdemeanors of attempting to elude the police, possession of drug paraphernalia, driving under the influence, and possession of marijuana.

The allegation of the "after former" would have set Sanders's exposure, under then existing Oklahoma law, at ten years to life on the felony drug charge. (21 O.S. 1991, section 51.) He also could have been charged with felony possession of marijuana, rather than a misdemeanor, because of his prior Arkansas drug conviction. (63 O.S. section 2-402 (2).) Instead, he initially was sentenced to 10 years imprisonment on the felony drug charge, and one year in the county jail on the marijuana possession charge. An amended judgment and sentence cut Sanders's prison time on the felony drug charge from ten to three years, with the balance suspended, with the misdemeanor attempting to elude and possession of paraphernalia charges dismissed, and a one year concurrent sentence on the DUI charge. (Exhibit 168.)

b.       In Sequoyah County Case No. CF-97-9, Sanders was charged with three crimes of dishonesty: concealing stolen property, and two counts of uttering a forged instrument. Although Sanders could have been charged with two or more "after formers," which would have set his exposure at twenty years to life under Oklahoma law, he was not. (21 O.S. 1991, section 51.) Instead, the concealing stolen property felony charge was dismissed, and the two uttering charges were reduced to misdemeanors, for which he received one year suspended sentences, to run concurrently. (Exhibit 157.)

On October 2, 1998, an application to revoke Sanders's misdemeanor suspended sentences was filed because Sanders had violated the terms of his probation by committing second degree burglary and larceny from a house as charged in Sequoyah County Case No. CF-98-128, and also by failing to pay the restitution he promised when he received his misdemeanor suspended sentences.

On October 7, 1998, Sanders failed to appear for a court hearing, and a bench warrant was issued for his arrest. No disposition is shown for the revocation action. The last entry in the docket on this case notes that on December 9, 1999, a waiver of preliminary hearing in Sequoyah County Case No. CF-99-562 was filed. As discussed below, the application to revoke in this case was later "passed" for ninety days, and would be dismissed altogether upon payment of restitution. If restitution were not paid, Sanders would receive one year in the county jail. As matters developed, and as is discussed below, Sanders was required to pay no restitution.

Although these records indicated Sanders was receiving favorable treatment from the Sequoyah County District Attorney at the time he was working for Clint Johnson to gather "evidence" against Mr. Barrett, and Mr. Barrett's trial counsel demonstrated a desire to impeach Sanders on those grounds, trial counsel failed to present these records to the jury.

c.      In Sequoyah County Case No. CF-97-75, Sanders was charged with the felony crime of running a roadblock, and misdemeanors for attempting to elude, having an open container, and reckless driving. Although prior felony conviction enhancements could have been filed to increase the range of punishment on the running a roadblock felony charge, they were not. On October 16, 1997, this case was dismissed outright on motion of the state, based on what is reflected on OSCN. The court case file itself apparently shows no disposition. Sanders was questioned on none of this by defense counsel. (Exhibit 158.)

d.      In Sequoyah County Case No. CF-97-140, Sanders was charged with concealing stolen property and felony possession of methamphetamine. It was alleged on page two of the information that he had three prior felony convictions, all out of Sequoyah County, in Case Nos. CF-89-396 (uttering a forged instrument); CF-92-91 (drug possession); and

CF-90-144 (sexual battery).  Again, Sanders was facing up to life in prison upon conviction.  (21 O.S. section 51.)  Instead, again on October 16, 1997, all charges were dismissed on motion of the state, according to OSCN.  The court file itself shows no case disposition.  Counsel did not cross-examine Sanders on this gift from the state prosecutors.

> e.   In Sequoyah County Case No. CF-98-22, Sanders was charged with concealing stolen property, grand larceny, unlawful use of a police radio, and *providing false information to a police officer*.  Despite his many prior convictions, Sanders received an illegal deferred sentence, which was later accelerated.  (22 O.S. 1991, section 991c (prohibiting defendant with even one prior felony conviction from receiving a deferred sentence).[11]  Counsel was professionally unreasonable for failing to question Sanders about how he managed to get a deferred sentence from Sequoyah County authorities when, due to his record, the deferment was absolutely barred by law.  (Record from court clerk's office on case; other parts of file have been lost or destroyed.)

> f.   In Sequoyah County Case No. CF-98-128, Sanders was charged with the felonies of second degree burglary and larceny from a house.  The three "after-formers" alleged in Sequoyah County Case No. CF-97-140 (Sequoyah County Case Nos. CRF-89-396, Exhibit 168; and CRF-90-144) were alleged, setting Sanders's exposure at twenty years to life.  An amended information alleging the same charges and same "after-formers" was filed on July 7, 1998.  Miraculously, the state dismissed the after former conviction allegations, and Sanders received patently illegal five year deferred sentences, running concurrently, with costs waived by

---

[11]  This statute was later amended by 22 O.S. section 991c (F) to permit convicted felons to receive a deferred sentence, but only on motion and waiver by the State.

the District Attorney's office. The sentences were also ordered to run concurrently with a conviction Sanders obtained in Creek County. Later, CF-98-128 was dismissed with costs, as is discussed below. (Exhibit 159.)

It was unreasonable for Mr. Barrett's trial counsel not to discover and use on cross-examination records showing that Sanders, who faced the prospect of life in prison on this offense alone, received illegal deferred sentences, and that even those illegally lenient sentences eventually were lifted.

g. In Sequoyah County Case No. CF-98-346, Sanders was charged with possession of methamphetamine (a felony) and misdemeanor possession of drug paraphernalia. Again, he was charged after having been previously convicted of the same three Sequoyah County felonies discussed above. Sanders was yet again facing twenty to life. Per a plea agreement reached with the state, Sanders received a twenty year suspended sentence. The misdemeanor charge was dismissed. At the time he entered his plea, due to his record of prior felony convictions, Sanders was not eligible for a suspended sentence under Oklahoma law as it then existed. (22 O.S. 1991, § 51; 22 O.S. 1991, § 991c.)[12]

Although Mr. Barrett's trial counsel briefly alluded to this case, and the sentence Sanders received, counsel failed to point out the following impeaching facts: (a) on May 3, 2001, the state filed an application to revoke Sanders's suspended sentence because he had been arrested for larceny of merchandise from a retailer and possession of drug paraphernalia in Sequoyah County Case No. CF-01-314, and also failed to report to his probation officer, as he

---

[12] Again, as with the statute governing deferred sentences, the law was later amended to permit defendants, such as Sanders, with two or more prior felony convictions to received suspended sentences, but only on motion and waiver by the State.

told the court he would do when he received his suspended sentence; (b) on August 23, 2001, the court ordered Sanders's sentence revoked in full, with Sanders ordered to complete the "Last Stop" program in the Department of Corrections, upon successful completion of which the balance of the sentence would again be suspended; (c) coming to Sanders's aid yet again, the Sequoyah County District Attorney's Office moved on February 22, 2002, to amend the revocation to allow Sanders to attend either the "Last Stop" program, or an equivalent program, and requested that the sentence in this case be ordered to run concurrently with the sentence in Sequoyah County Case No. CF-98-363; (d) *nunc pro tunc* orders granting these requests were entered by the court on March 5 and March 28, 2002; (e) on March 12, 2004, the District Attorney filed a second application to revoke Sanders's suspended sentence, because he had committed a new offense, burglary in the second degree, as alleged in Sequoyah County Case No. CF-04-19; (f) an amended second application to revoke Sanders's suspended sentence was filed on June 17, 2004, based on the amended information filed in Case No. CF-04-19, which alleged, in addition to second degree burglary, that Sanders had also committed the offenses of second degree arson, concealing stolen property, and felon in possession of a firearm; (g) on November 17, 2004, instead of revoking the entirety of the suspended sentence, the court, pursuant to Sanders's agreement with the state, revoked only five years of the suspended sentence, with the entirety of the sentence to again be suspended if Sanders successfully completed the "Key to Life" program in the Department of Corrections; (h) incredibly, the partial revocation in this case was ordered to run concurrently with the suspended in whole or in part sentences in Sequoyah County Case Nos. CF-98-363, CF-99-562, CF-04-19, and CF-03-124.

Sanders was not questioned about the fact he faced revocation of the entire twenty year sentence based on his various probation violations, with consecutive time in his other active Sequoyah County cases. Nor was it brought to the jury's attention that absent the various deals he received, Sanders was once more facing the potential of life in prison on this offense of conviction due to his record of previous felony convictions. Counsel also failed to point out Sanders's statutory ineligibility for any suspended sentence due to his prior felony convictions, absent a motion and waiver from the State. (Exhibit 160.)

h.       In Sequoyah County Case No. CF-98-363, Sanders was charged, yet again, with uttering a forged instrument. The same previous felony convictions noted in the cases above were alleged on page 2 of the information, meaning Sanders was facing twenty to life. On December 9, 1999, the allegation of prior convictions was dismissed and Sanders received a twenty years suspended sentence that he was not eligible to receive under then-existing Oklahoma law. This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-99-562 and CF-98-346.

Again in this case, an application to revoke was filed on May 3, 2001, for failure to report, and based on Sanders's arrest for felony larceny of merchandise from a retailer and possession of drug paraphernalia, a misdemeanor, as charged in Sequoyah County Case No. CF-01-314. Again, an order revoking was entered by the state court on August 23, 2001, with the sentence ordered revoked in full, but to be suspended in its entirety if Sanders successfully completed the "Last Stop" program in the Department of Corrections. Sanders was allowed to self-surrender to the county jail instead of being immediately placed in custody.

As described in connection with Case No. CF-98-346, a motion to amend the order revoking was filed. A *nunc pro tunc* order amending the previous revocation order, and directing Sanders's sentence to be served concurrently with the sentence in Sequoyah County Case No. CF-98-346, was entered. A second motion to revoke based on the same allegations of new offenses filed in CF-98-346, was also filed in connection with this case. On April 17, 2004, the court entered a second order revoking Sander's suspended sentence. As with Case No. CF-98-346, only five years of the twenty-year suspended sentence was revoked, and the sentence would again be suspended in its entirety if Sanders successfully completed the in-house "Key to Life" program or its equivalent. This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-98-346, CF-99-562, CF-04-19, and CF-03-124.

Counsel failed to cross-examine Sanders about the fact he faced a sentence of up to life imprisonment on this conviction absent the deal he received, and, having received probation, could have had his sentence revoked in full, with consecutive time on all his other active cases, absent the tremendous break he received from the prosecutors. (Exhibit 161.)

i.     In Sequoyah County Case No. CF-99-562, Sanders was charged with still more crimes of dishonesty. Some, but not all of the charges in this case, were mentioned briefly by defense counsel on cross-examination. Sanders was charged with three counts of concealing stolen property, one count of uttering a forged instrument, misdemeanor possession of marijuana (which could have been charged as a felony due to Sanders's prior drug convictions), and possession of a sawed-off shotgun. Instead of trotting out the usual three "after-formers" charged in some of the cases discussed above, Sanders was charged with committing the instant offenses after previous conviction of five felonies. In addition to the same

three prior Sequoyah County felonies that were usually alleged on page 2, it was also charged

that Sanders had felony convictions in Muskogee County Case No. CF-93-772 for escape from

custody, and Muskogee County Case No. CF-93-131 for carrying a weapon into the jail.  Yet

again, Sanders faced twenty years to life.

Based on yet another deal-of-a-lifetime, Sanders received a twenty year suspended

sentence on count 1.  In an extraordinary gift from prosecutors, and at an extraordinary cost to

public safety, counts 2, 3, 4, 5 and 6 were dismissed outright.  Consequently, Sanders, a

convicted felon many times over, was allowed to walk around with a sawed-off shotgun, with no

repercussion whatsoever.

This case was "wrapped up" on the same guilty plea forms with Sequoyah County

Case Nos. CF-98-363, CF-98-346, CF-98-128, and CF-97-9.  As noted, Sanders received a

twenty year suspended sentence on the felony conviction in CF-98-363; Case No. CF-98-128 was

dismissed with costs Sanders was later relieved of paying; and the long-moribund revocation

action in CF-97-9 was passed for ninety days to allow payment of restitution, which, in the end,

Sanders was never required to pay, thus making hollow the threat of a year in jail for failure to

satisfy restitution.

The same application and amended applications to revoke, and the same or similar

*nunc pro tunc* orders discussed above in Sanders's other cases, were filed in this case.  As with

the other cases discussed above, Sander's suspended sentence in this case was first revoked for

only five years.  He would revert to full probationary status upon completion of a Department of

Corrections drug program.  The initial revocation order for up to five years and the rest were

ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-03-124 and CF-04-19.

Trial counsel failed to question Sanders about the fact he was facing up to life in prison in this case; that five of the six charges lodged against him were dismissed; and that, without the largesse of the state prosecutors, he could have (and should have, based on his horrific record) faced revocation of all the suspended sentences he was serving, to be served consecutively. As with the other cases discussed above, counsel failed to point out that Sanders was either ineligible for a suspended sentence, or had to receive a special dispensation from the prosecution to get one. (Exhibit 162.)

j.       In Sequoyah County Case No. CF-01-314, Sanders was charged with another felony crime of dishonesty, larceny of merchandise from a retailer. He was also charged with a misdemeanor for possession of drug paraphernalia. The state alleged in page two of the information that Sanders committed the felony of larceny after having been convicted of six felonies (Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363, and CF-99-562). (Exhibit 163; Exhibit 160; Exhibit 161; Exhibit 162, Exhibit 168.) With two or more "after-formers," Sanders faced a minimum of twenty years, and a maximum of life on the felony charge.

Initially, on August 23, 2001, this case was dismissed upon the payment of costs. On October 19, 2002, the case was "combined" with other cases, with a result similar to those discussed above.

Mr. Barrett's trial counsel unreasonably failed to reference this case at all during cross-examination, and thereby failed to inform the jury that from the time Sanders became Clint

Page 94

Johnson's confidential informant he received the most extraordinary lenient treatment which left him free to roam the streets committing crime after crime.  (Exhibit 163.)

k.　　　In Sequoyah County Case No. CF-03-124, Sanders was charged in a seven count information with: 1) feloniously pointing a firearm; 2) being a felon in possession of a firearm; 3) felony running a roadblock; 4) felony running a roadblock; 5) attempting to elude (misdemeanor); 6) reckless driving (misdemeanor); 7) and resisting an officer (misdemeanor). Sanders was charged with the felony offenses in this case after having been convicted of six felonies in Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363, and CF-99-562.  With the allegation of two or more "after-formers," Sanders was staring at his usual 20 to life term.

Sanders, as with all his other Sequoyah County convictions, entered into wildly generous plea agreement with the state.  As reflected by the judgment and sentence in this case, filed on November 17, 2004, counts 1 and 2 were dismissed.  The allegation of "after-formers" carried no real sting.  The misdemeanor charges were dismissed.  On the felony running a roadblock charges in counts 3 and 4, Sanders was "punished" with sentences of twenty-five years, running concurrently, all to be suspended except for the first five years (also running concurrently), with the entirety of the sentences to be suspended upon completion of the "Key to Life" program, or another similar program.  These sentences were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19.  (Exhibit 164.)

Mr. Barrett's trial counsel unreasonably failed to impeach Sanders with this highly impeaching evidence.  The jury could not help but notice that Sanders was given the lightest

144

Page 95

treatment for conduct very similar to acts the Government attributed to Mr. Barrett.  The jury also would have been impressed to learn that charges had been dismissed in this case, that Sanders again escaped 20 years to life due to prosecutors' intervention, that despite his repeated crimes Sanders never drew consecutive sentences, and that, as reflected by his other cases, prosecutors for years gave Sanders a license to commit whatever crime he wished in Sequoyah County, with only the most minor of consequences.

l.      In Sequoyah County Case No. CF-04-19, Sanders was originally charged with second degree burglary, after former conviction of six felonies in Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CRF-92-91, CF-98-346, CF-98-363, and CF-99-562.   The case was amended to charge additional counts of second degree arson, concealing stolen property, and felonious possession of a firearm.

On November 17, 2004, per a plea agreement with the state, and with the "page two" still intact, Sanders was sentenced on each of counts 1, 2, and 3 to twenty-five years imprisonment, with all but the first five years suspended, and with the balance of the sentences suspended in full upon completion of the Department of Corrections in-house drug program. Count 4, in which Sanders was charged with being a felon in possession of a firearm, was dismissed.  The sentences in this case were ordered to run concurrently to one another and concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562, and CF-03-124.  (Exhibit 165.)

Counsel was professionally unreasonable in failing to cross-examine Sanders on the fact that he faced twenty to life absent a deal from the state prosecutors, that he received

concurrent probation time rather than consecutive prison time, and that the firearm charge against him was dismissed.

m.      In Cherokee County Case No. CF-98-111, Sanders was charged with no fewer than six counts of uttering a forged instrument, after former conviction of felonies. Amended and second amended informations were filed on June 1, 1998 and August 20, 1998, respectively.  Although he promised to appear at all court dates after being released on bond, he incurred a failure to appear.  A bench warrant was issued on May 15, 1998.  Sanders had a second failure to appear on March 24, 2000.  On May 3, 2001, he was ordered released to a bondsman.  On July 29, 2009, in keeping with the unbelievable sweetheart deals Sanders has received throughout his appalling and protracted criminal career, the felony charges in this case were dismissed on payment of costs of $229.00, with payment to be made beginning September 1, 2009.   (Exhibit 183; Exhibit 57.)

Counsel were professionally unreasonable for failing to cross-examine Sanders about this case, which was pending at the time of Mr.  Barrett's trial.  Because this case was still pending without disposition during Mr. Barrett's trial, seven years after it had been filed, Sanders's bias and motive in appearing as a Government witness in the hopes that he could resolve this case favorably – as he had all of his other cases – was apparent.

n.      In Muskogee County Case Nos. CF-93-131 and CF-93-772 Sanders was convicted of escape and carrying a weapon into a jail, respectively.  Sanders attempted to claim that these were the same case, when they clearly were not.  Counsel was professionally unreasonable in failing to demonstrate that Sanders lied and that he in fact had separate Muskogee County convictions.  (Exhibit 183.)

Page 97

o.      In Tulsa County Case No. CF-94-1503, Sanders was charged with uttering a forged instrument.  This case was dismissed years later, on September 18, 2001.  Costs were assessed against the state.  Counsel was professionally unreasonable for failing to cross-examine Sanders regarding the disposition of this case, in which he once again avoided a conviction and prison time.  (Exhibit 183.)

p.      In Tulsa County Case No. CM-03-6603, Sanders was charged with obtaining merchandise by false pretenses, a crime of dishonesty upon which he could have been cross-examined, but was not.  Sanders received a one year suspended sentence, fines and costs.  Although he surely promised to do so, Sanders failed to appear before the Tulsa County cost administrator as directed on March 24, 2004.  A bench warrant was issued for his arrest on April 12, 2004.  An application to revoke his suspended sentence was filed on April 14, 2004.  Another bench warrant for Sanders's arrest was issued on May 20, 2004.  On October 6, 2005, Sanders was sentenced to thirty-six days in jail, at a rate of $15.00 per day, to work off what was owed.  Not only the fact of Sanders's conviction for this crime of dishonesty, but his failure to follow through on promises to fulfill the terms of his suspended sentence, could have been inquired into on cross-examination to show him to be a completely untrustworthy individual, who will say one thing to receive something of advantage to himself, but whose word is utterly worthless.  (Exhibit 185.)

q.      In Tulsa County Case No. CM-04-1187, Sanders was charged with drug possession and possession of drug paraphernalia.  On April 5, 2004, he incurred a failure to appear, despite a promise as a condition of his bond to make all court appearances.  During Mr. Barrett's trial, Sanders appeared, in custody, on September 28, 2005.  He entered a not guilty

plea, and the case was set for the jury sounding docket on October 13, 2005. On that date, again during Mr. Barrett's trial, and around the time he appeared as a first stage witness, the case was passed to November 17, 2005. On November 17, the last day of Mr. Barrett's trial, the case was passed to February 2, 2006, because Sanders was "in federal custody." On December 9, 2005, Sanders appeared in custody, entered a guilty plea, and was rewarded with sentences of one year in the county jail on each count, with the jail time suspended. (Exhibit 186.)

Mr. Barrett's trial counsel unreasonably failed to cross-examine Sanders over the fact that this case kept getting passed until Sanders performed for the Government at Mr. Barrett's trial, the obvious implication being that any deals he would receive in that case were contingent solely on how much he pleased the Government.

r.      In Sequoyah County Case No. CM-00-389, Sanders was charged with attempting to elude an officer, affixing an improper license plate to his vehicle, and eluding arrest. On June 30, 2000, Sanders entered into a plea bargain which called for count 1 (attempted eluding) to be dismissed, fines and costs on count 2 (improperly affixing a license plate), and a one year suspended sentence and a fine on count 3 (eluding arrest). On March 7, 2001, a bench warrant was issued for Sanders's arrest for failure to satisfy terms of probation he promised the court he would fulfill at the time he entered his plea. Counsel was professionally unreasonable for failing to cross-examine Sanders on this act of dishonesty. (Exhibit 187.)

s.      In Sequoyah County Case No. CM-03-365, Sanders was arrested, among other charges, for possession of marijuana. He also attempted to resist arrest. Counsel was professionally unreasonable for failing to cross-examine Sanders about the fact that with his

prior drug convictions, he could have been, but was not, charged with felony possession of marijuana rather than a misdemeanor. (Exhibit 166.)

In sum, counsel was professionally unreasonable for failing to move for a continuance so Sanders could be cross-examined effectively about his litany of prior convictions; his deals which the jury could have concluded resulted from his working continuously as a snitch; the charges and cases against him which had been dismissed; the fact that he was facing up to life in prison on many charges, but got virtually nothing by way of punishment; his acts of dishonesty in connection with various charges and his obligation to appear in court and adhere to the conditions of his probation, and the like.

Counsel even failed to discover all of Sanders's prior convictions. Counsel stated that by his count, Sanders had ten previous convictions, or nine, if Sanders's dispute with one of them was credited. (R. 2524-36.) In truth, after the dismissed cases and charges against Sanders are set aside, Sanders had no fewer than eighteen prior felony convictions, if the various counts of conviction are totaled. The better part of a day or more could have been spent cross-examining Sanders about his criminal record and the wonderful deals he got time after time, even while he continued to commit crimes with impunity. Instead, counsel merely scratched the surface, cross-examining Sanders generally (and inaccurately) about the number of previous felony convictions, what they were for, and that he received little jail or prison time. Counsel neglected altogether to cross-examine Sanders about his misdemeanor cases involving dishonesty, and did not even draw the jury's attention to the fact that many of Sanders's convictions, for both felonies and misdemeanors, involved acts of dishonesty.

Had an effective cross-examination on Sanders's record been conducted, his credibility would have been completely destroyed in the eyes of any rational jury. Impeachment of Sanders also would have undercut the credibility of Clint Johnson and other Sequoyah County law enforcement officials, not to mention the Government then relying upon him to seek a death sentence. These omissions alone, or in conjunction with counsel's other failures to investigate the informant witnesses and prosecution evidence, undermines confidence in the verdict. If trial counsel had presented the available evidence, the jury would have had an entirely different and more truthful view of the case, including that the raid on Mr. Barrett's house was conducted on the word of someone whom the Sequoyah County District Attorney knew was a lifelong liar, drug addict, and opportunistic snitch.

> **2. Counsel unreasonably failed to investigate and produce witnesses who could have impeached specific claims made by Sanders, and Sanders's credibility as a whole.**

Even in the absence of moving for and securing a reasonable continuance to investigate the snitch witnesses, it is plain that counsel failed to perform an adequate investigation into readily available evidence and witnesses who would have impeached Sanders's credibility and shown him to be completely unworthy of belief about anything and everything. Instead of locating available witnesses to impeach Sanders, counsel relied on cross-examination alone, which was plainly inadequate.

As noted, Sanders was somewhat "confused" over the dates he supposedly visited Mr. Barrett's property. Based on one reasonable interpretation of the dates Sanders claimed to have been at Mr. Barrett's residence, and as argued by AUSA Littlefield to the jury, Sanders was at Mr. Barrett's on the afternoon of September 23, 2009, just hours before the early morning

police raid on Mr. Barrett's property.  Littlefield told the jury Sanders was present around 5:00 p.m. to 6:00 p.m. on September 23, around the time the gate to Mr. Barrett's driveway was locked.  (R. 4299.)

Had counsel conducted a reasonable investigation, or sought the time to conduct one, they could have produced Rick Lunsford as a witness to rebut this claim.  As noted in the discussion of Travis Crawford's testimony, Mr. Lunsford arrived at Mr. Barrett's around noon on September 22, 1999, and stayed until approximately 9:00 p.m. on September 23.  Mr. Lunsford states that Sanders was never at Mr. Barrett's property on either September 22 or September 23, 1999.  Mr. Barrett's trial counsel did not contact Mr. Lunsford.  Had he been contacted, he would have been willing to testify that Sanders was never on Mr. Barrett's property on the afternoon and early evening of September 23.  (Exhibit 90.)

Likewise, trial counsel failed to contact and interview another witness who could have refuted Sanders's claim to have been in Mr. Barrett's house, where he supposedly saw methamphetamine and a drug sale, according to his direct testimony, in September, 1999.  Sean Hill would have testified that Sanders was never in Mr. Barrett's house because Mr. Barrett would not let him in.  Mr. Barrett and his real friends stayed as far away from Sanders as possible because it was well known he was a chronic liar and a police snitch.  (Exhibit 95.)

As noted, Brandy Hill was present at Mr. Barrett's on the afternoon of September 23, 1999.  She could have identified the people who were present during that time.  Charles Sanders was not among them.  Ms. Hill was never contacted by defense counsel.  (Exhibit 77.)

Critically, Sanders testified that two to three days before the shooting, he went to Mr. Barrett's with his then-girlfriend, Geniece [sic] Thomas.[13]  He gave conflicting testimony as to whether Mr. Barrett sold drugs to either him or Ms. Thomas, on this or any other occasion. When questioned by the prosecutor, Sanders claimed that Mr. Barrett sold Ms. Thomas drugs. Questioned by defense counsel, Sanders stated that there was no drug deal when he supposedly went to Mr. Barrett's two to three days before the police raid, and that he merely went there, with Ms. Thomas, to exchange a set of car keys.

Trial counsel never contacted Ms. Thomas.  She was an available witness.  Had counsel located and interviewed her, she would have testified that Sanders was lying.  Ms. Thomas would have testified that she was not at Mr. Barrett's with Sanders a few days before the shooting.  She also would have testified that on the occasions she did go to Mr. Barrett's, she never went with Sanders.  Moreover, Ms. Thomas could have testified that on the occasions she went to Mr. Barrett's, she never bought drugs from him.  On any occasion she was at Mr. Barrett's when Sanders was on the property, she never witnessed or had any knowledge of any drug transactions between Mr. Barrett and Sanders.  Mr. Barrett would not have sold drugs or engaged in drug activities with Sanders because Mr. Barrett neither liked nor trusted Sanders, who was a well-known snitch.  (Exhibit 13.)

Staff Sergeant Robert "Bubba" Thompson is an eyewitness whom trial counsel could have called to impeach Sanders's and the Government's claim that Sanders was at Mr. Barrett's on the afternoon of September 23, 1999.  Trial counsel never contacted Mr. Thompson, although he was readily available and would have testified had he been asked to do so.  In 1999,

---

[13]  Her true name is Janesse Thomas.

Mr. Thompson was a good friend of Toby Barrett's, and often visited the Barrett property.  He

was at Mr. Barrett's on the afternoon of September 23, hanging out with Toby Barrett on the

front porch.  There were two or three other people visiting with Kenneth Barrett at the time Mr.

Thompson was there.  Mr. Thompson is sure that Charles "Monk" Sanders was not at Mr.

Barrett's on the afternoon of September 23.  In fact, Mr. Thompson never saw Sanders at Mr.

Barrett's, even though Thompson was a frequent visitor.  Contrary to the claims of Sanders and

some of the other informant witnesses, Mr. Thompson never heard Mr. Barrett state, on

September 23, 1999, or at any other time, that he wanted to kill police, that he would kill any law

enforcement officer who came on his property, or that he wanted to go out "in a blaze of glory."

(Exhibit 37.)

Counsel unreasonably failed to interview and present at trial some of the

witnesses discussed immediately above, and others who could have testified that Sanders is a

pathological liar whose word should not have been relied upon by Clint Johnson or the jury.

These witnesses were known in the community, had experience with Sanders, had formed the

opinion that Sanders was dishonest and completely untrustworthy, and knew that Sanders had a

horrendous reputation in the community for truth and veracity.  These witnesses also could have

armed counsel with information to cross-examine Sanders, in the first stage of trial, about various

bad acts and acts of dishonesty.  Since Sanders also appeared as a penalty phase witness for the

Government, and because the rules of evidence are relaxed in the second stage of a capital trial,

these witnesses could have given specific testimony on specific bad acts of Sanders and actions

which reflected negatively on his credibility.  The impeachment of Sanders, alone or in

conjunction with doubts about the conduct of the Tact Team, would have provided jurors with reason to vote for a sentence less than death.

Rick Lunsford could have testified that he knows Sanders, and had done drugs with him in the past. Sanders was a heavy drug user, who also dealt drugs. In Mr. Lunsford's opinion, Sanders is a dishonest person. Mr. Lunsford would not believe anything Sanders said. Sanders was even dishonest in his drug dealings. Sanders often sold bad dope to people and ripped them off. As reflected in court documents, he never seemed to get in trouble for his drug dealings. Mr. Lunsford is aware that Sanders once kidnaped a woman, Sally Davis. Mr. Lunsford could have testified to his personal opinion that Sanders is wholly dishonest, and his knowledge that Sanders has a richly deserved reputation for dishonesty in the community. Mr. Lunsford, as noted in the discussion regarding Travis Crawford, also could have testified that Mr. Barrett never threatened harm to the police, and never said he would go out in a "blaze of glory" or anything like that. (Exhibit 90.)

Janesse Thomas, Mr. Sanders one-time girlfriend, could have testified to her well-informed opinion that Sanders is dishonest and would say and do anything as long as he believed he would obtain something of advantage to himself. Sanders's reputation for honesty in the community is horrible. Ms. Thomas could also have given testimony showing that Sanders resented Mr. Barrett and had a motive to lie against him. On one occasion, when Thomas was still Sanders's girlfriend, she tried to get away from him and called Mr. Barrett and another friend for help. Thomas left Sanders, and was picked up by Mr. Barrett. Sanders and his mother, Evelyn Sanders, followed Mr. Barrett and Thomas. Sanders was angry and was trying to persuade Ms. Thomas to come back with him and his mother. Instead, Mr. Barrett was able to

get Ms. Thomas away from Sanders. (Exhibit 13.) Based on these events, jurors would have found Sanders had a personal motive to lie about Mr. Barrett, apart from or in addition to his interest in currying favor with law enforcement.

Sean Hill, another person with experience and knowledge of Sanders, could have testified to his opinion, and the community's judgment, that Charles Sanders is a liar who was accorded no credibility whatever, and was known to trade false allegations about others for favors from law enforcement. When Mr. Hill heard that the Government sponsored Sanders as a witness at Mr. Barrett's trial, he could not believe the prosecutors would rely on Sanders because of his lengthy arrest record. In his penalty phase testimony, Sanders claimed that Mr. Barrett had made statements to the effect that the informant against him should be found and harmed. Mr. Hill could have given testimony from which the jury could infer that Sanders was attributing to Mr. Barrett actions that routinely occurred without any connection to Mr. Barrett. Mr. Hill would have informed the jury that when Sanders is in jail, he is routinely beaten up by other inmates because he falsely informs on others. (Exhibit 95.)

Sally Davis Johnson, a one-time girlfriend of Sanders, was available as a witness, but was never contacted by the defense. She last had contact with Sanders in 2004, before Mr. Barrett's trial. In her personal opinion, Sanders is untrustworthy. Sanders is dishonest when sober, but when he is on drugs, he is "100 times more dishonest." Ms. Johnson could never believe anything Sanders said on any subject. (Exhibit 94.)

Ms. Johnson could have provided defense counsel with information about specific bad acts of dishonesty and violence that could have been used to impeach Sanders either in the first or second stage of trial. This evidence would have put the lie to the prosecution's portrayal

of Sanders as simply a non-violent doper who was himself the innocent victim of planned violence by others.

On one occasion, Sanders used lies and fraud to get Ms. Johnson to go with him. Sanders showed up at her house and said he needed to talk to her. She told him she could talk to him briefly, but had to get back to school. She left with Sanders in his car. Against her will, Sanders kidnaped her and took her to Vian, Oklahoma, where she was held for eight days. She was beaten on a daily basis by Sanders, and was even stabbed. During this ordeal, Sanders lied to her repeatedly, telling her he would take her home when her bruises healed. Instead, Sanders simply kept beating her. When she tried to escape, Sanders threw a knife at her, and stabbed her in the foot. Sanders also used a knife to cut her from her neck to her chin. After five days of being held by Sanders, he turned himself in to the police on an outstanding charge. At this point, Sanders turned Ms. Johnson over to his mother, Evelyn Sanders, who confined her for another two to three days. The police finally rescued Ms. Johnson. Evelyn Sanders tried to cover up Ms. Johnson's many bruises with make-up. A police report was made by Ms. Davis about what Sanders did to her. (Exhibit 94.)[14]

Ms. Johnson could have told defense counsel, had she been contacted, about an act of threatened violence committed by Sanders. Sanders once threatened Ms. Johnson's mother, Linda Davis, because Ms. Davis would not tell Sanders where Ms. Johnson was. Sanders stated that unless Ms. Davis gave him the information he wanted, he would find Ms. Johnson and cut her tongue out. (Exhibit 94.)

---

[14] Evidently, based on the search of Sanders's court records, he was never charged in this incident because he was working as a police snitch.

Ms. Johnson, had she been contacted by defense counsel, also could have informed the defense about other specific acts of dishonesty committed by Sanders. Sanders once took her along on a stealing spree, during which Sanders stole from virtually everyone he knew in order to get money to buy drugs. The police were informed about this by Ms. Johnson. Sanders had also stolen from Ms. Johnson and her family in order to get money to buy drugs. Sanders was so pathetically dishonest he once stole Ms. Johnson's children's toys in order to pawn them for drug money. (Exhibit 94.)

One of Mr. Sanders's own relatives could have testified, had he been contacted by the defense, that "Monk" is untrustworthy and his claims are considered uniformly unbelievable. Billy Poindexter is Sanders's uncle, and has known Sanders his entire life. According to Mr. Poindexter, "you can believe him [Sanders] about as far as you can throw a pick-up truck." Mr. Poindexter would have confirmed that Sanders has been in trouble his whole life. Mr. Poindexter himself would not believe his nephew about anything. Mr. Poindexter is aware that when Sanders testified at Mr. Barrett's trial, Sanders was doing so in order to get out of his own troubles with the law. Mr. Poindexter is also aware that after testifying against Mr. Barrett, Sanders served no jail time for anything he was in trouble for. Mr. Poindexter would have testified that Sanders has a low reputation in the community for truthfulness. (Exhibit 76.)

Additionally, had trial counsel moved for a continuance, they could have developed all the evidence detailed above respecting Sanders's credibility to mount a persuasive

attack on the search warrant under *Franks*.  This evidence would demonstrate that no one,

including Clint Johnson, could have used Sanders as a "reliable" confidential informant.[15]

### d.    Randy Weaver.

Randall Weaver testified in the first stage of Mr. Barrett's trial.  He stated that in

1999, he was using methamphetamine, and had been to Mr. Barrett's place three or four times in

the Spring and Summer of that year.  Using the death of Trooper Eales as a benchmark, Weaver

stated he had been to Mr. Barrett's earlier in 1999 looking at cars.  On that occasion, Weaver and

Mr. Barrett used methamphetamine together.  Weaver went to Mr. Barrett because he was a good

mechanic.  Whenever he went to Mr. Barrett's property, the gate was open; Mr. Barrett did not

come out with a gun on the occasions Weaver went to the property.  Weaver testified he bought

$20.00 of methamphetamine from Mr. Barrett.  Weaver claimed Mr. Barrett told him that he (Mr.

Barrett) had missed a court date, and that he thought a warrant had been issued.  (R. 1835-39.)

Weaver, who was interviewed by Bret Smith and defense investigator Loyd Cobb

in AUSA Mike Littlefield's presence, testified he had first been approached about Mr. Barrett's

federal case by Littlefield, who came to his tattoo shop in Arkansas.  Weaver had previously

done time on an Arkansas cocaine charge.  When Littlefield came to see him at the tattoo shop,

he asked whether Weaver had ever sold ammunition to Mr. Barrett, and informed Weaver that it

was against federal law for Weaver to possess ammunition because of his previous conviction.

Weaver told Littlefield he never sold ammunition to Mr. Barrett.  Littlefield's statement to Mr.

---

[15]  *See also* Ground Five (Mr. Barrett's *Brady/*newly discovered evidence claim regarding the complete lack of credibility of both Sanders and Johnson).

Weaver about the sale of ammunition might be construed as a subtle threat, but Weaver felt he had nothing to worry about because he had done nothing wrong.  (R. 1835-39.)

Questioned by defense counsel, Weaver testified that in a rural area like he and Mr. Barrett lived in, people don't drive up without warning in the middle of the night.  If a gate is closed, people should not go onto somebody else's property.  It makes no sense to do such a thing.  (R. 1840-45.)

Although he was interviewed briefly by the defense, defense counsel and the defense investigator failed to ask Weaver whether, when Mr. Barrett supposedly discussed his court case, or at any other time during the Spring and Summer of 1999, he ever said words to the effect that he would blast the first policeman who came onto his property, would "go out in a blaze of glory," or had in any way, at any time, threatened the police.  Had he been asked these questions at trial, Weaver would have testified that Mr. Barrett never made such statements to him or anyone else in his presence.  In fact, Mr. Barrett never indicated to Weaver that he would ever do violence to anyone.  (Exhibit 24; Exhibit 38.)

### e.     Brandie Zane Price.

Brandie Price testified she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period.  (R. 3485-86.)  Price testified that a week to ten days before the shooting incident, Mr. Barrett mentioned that he had an outstanding warrant and that the police were going to come get him.  Mr. Barrett supposedly stated that if the police arrived, those present should either grab a gun or hit the floor, because he "was going to take as many of them bastards out as he could."  (R. 3492-93.)

Price stated that she usually went to Mr. Barrett's house with Ronny Baldwin,[16] who would drive her vehicle through the ditch area the police went through when they raided Mr. Barrett's house. (R. 3502-06.) Defense counsel cross-examined Price about statements she made to the authorities in 2000, where she stated that Mr. Barrett had a MAC-10 and a Mini-14 at his residence, which were unlike the weapons she described on cross-examination. She also stated in 2000 that she went to Mr. Barrett's with a lady named Jaime Crow, which she denied doing in her testimony. (R. 3509-11.)

Price's claim that Ronny Baldwin or she usually approached Mr. Barrett's residence from the east through the ditch in her Mazda or Mitsubishi automobile could have been easily refuted by the testimony of Sean and Brandy Hill. Had they been contacted, they would have testified that it would have been impossible for this low-slung vehicle, no matter how slowly it was going, to navigate the ditch successfully. The undercarriage would have been severely damaged in the attempt. (Exhibit 95; Exhibit 77.)

Counsel also failed to call any witnesses who could testify to their well-informed opinions regarding Price's honesty, or her reputation for honesty in the community. Sean Hill was an available witness never contacted by the defense. If he had been interviewed and prepared to testify, he could have told the jury that Price was known in the community as a thoroughly dishonest person who would do or say anything to obtain drugs. (Exhibit 95. *See also* Ground Five, *infra*.) Moreover, the witnesses who were never investigated who could have

---

[16] Ronny Baldwin testified for the defense. He stated he could never recollect going to Mr. Barrett's house with Brandie Price at any time, and that he never would have driven her car through the depressed area to the east of Mr. Barrett's cabin. Baldwin could not have gone to Mr. Barrett's in August and September as she claimed, because he was jailed on August 4, 1999, and remained in jail through the entire month of September 1999. (R. 4117-23, 4182-83.)

impeached claims by Monk Sanders, Travis Crawford and Cindy Crawford that Mr. Barrett made

threatening statements against law enforcement could have been used to indirectly discredit

Price, since her story was simply too pat and conveniently lined up with what Sanders and the

Crawfords said on the witness stand.  (Exhibit 90; Exhibit 77; Exhibit 96; Exhibit 38; Exhibit

37.)

### f.        Karen Real.

Karen Real, like all the other informant witnesses except Randy Weaver, refused

to talk to the defense.  (R. 3076-77.)  At the time she testified against Mr. Barrett, she was

serving a fourteen year federal sentence on drug charges and a firearms charge.  (*See* Ground

Five, *infra*.)  Real had been to Mr. Barrett's on several occasions.  She claimed he usually kept

his gate locked, and that when people arrived on his property, he would grab a gun before he

determined who they were.  (R. 3085-86.)  Real did drugs with Mr. Barrett, and testified that he

sold drugs and kept syringes in his house.  (R. 3087-88, 3099, 3091, 3102-03.)  According to

Real, Mr. Barrett stated he would shoot the police if they came on his property.  (R. 3106.)

Counsel relied strictly on cross-examination in an attempt to impeach Karen Real.

No witnesses who knew her in the community were called to testify regarding her honesty.  As

with Brandie Price, Sean Hill could have testified that Real's word was not to be believed.

According to Mr. Hill, Real is a "pretty messed up" person.  Although Real's federal conviction

was brought out, counsel never asked her if she had provided information against her co-

defendants in an effort to secure leniency.  Mr. Hill states that she informed on her boyfriend and

co-defendant, Doss Gann, in an attempt to get favorable treatment.  Karen Real is the type of

person who would do and say anything to get out of trouble.  (Exhibit 95.)  Again, witnesses who

could have been called to impeach the claims of the Crawfords and Sanders that Mr. Barrett

threatened violence against the authorities if they came on his property could have been used to

indirectly impeach Real's virtually identical claim. (Exhibit 90; Exhibit 77; Exhibit 96; Exhibit

38; Exhibit 37.)

As with a number of the informant witnesses, trial counsel failed to conduct a

search of available state court files to impeach Karen Real.  A search of the Sequoyah and

Cherokee County Court files would have shown that she had several serious state drug cases that

were ultimately dismissed, some shortly before Mr. Barrett's trial.  These dismissed charges

would have shown Real's bias and motive in testifying against Mr. Barrett.  Bias and motive are

never "collateral matters" from which a witness can be shielded from cross-examination.

Moreover, it is of no significance if some or all of these state charges were dismissed in lieu of

Real's federal prosecution.  Under the dual sovereign doctrine, Real could have, but for the

dismissal of these charges, faced serious prison time in the Oklahoma Department of

Corrections.  After all, Mr. Barrett was convicted in both state and federal court for a single

alleged criminal transaction.  There was nothing to guarantee that the state charges against Real

would not be revived if she failed to please the federal prosecutors with her testimony against

Mr. Barrett.

In Sequoyah County Case No. CF-97-445A, Real was charged with attempted

manufacture of methamphetamine, possession of CDS with intent to distribute, possession of

marijuana, two counts of possession of CDS, and two counts of possession of drug paraphernalia.

These charges were filed on December 22, 1997.  The case was passed, or little action was taken

on it, until May 18, 2004, when a motion to dismiss was filed.  The motion to dismiss was granted by an order entered on May 24, 2004.  (Exhibit 52.)

In Sequoyah County Case No. CF-98-264A, Real was charged with manufacturing methamphetamine, trafficking in methamphetamine, unlawful use of a police radio, possession of CDS, and possession of drug paraphernalia.  The charges were filed on July 29, 1998.  A bench warrant for failure to appear was issued on June 7, 1999, and was recalled on June 9 or 10, 1999.  Nothing happened in the case until May 18, 2004, until a motion to dismiss was filed.  The motion was granted on May 24, 2004.  (Exhibit 51.)

In Sequoyah County Case No. CF-99-250A, Real was charged with trafficking methamphetamine, possession of marijuana with intent to distribute, unlawful use of a police radio, possession of a firearm in the commission of a felony, and unlawful possession of drug paraphernalia.  This case was filed on June 8, 1999, over three months before Trooper Eales was killed.  Little or no action was taken on the case before it was dismissed on May 24, 2004, based on a motion filed on May 18, 2004. (Exhibit 49.)

In Sequoyah County Case No. CF-99-251, Real was charged with unlawful possession of CDS.  The information was filed June 28, 1999.  On February 15, 2001, an order was entered that Real was awaiting sentencing in her federal case and that this state case would be dismissed after Real was sentenced in federal court.  On September 4, 2001, a motion to dismiss and an order dismissing the case were filed.  The order dismissing was apparently finalized on December 20, 2001.  (Exhibit 50.)

In Cherokee County Case No. CF-99-18,  Real was charged, on January 26, 1999, with trafficking in illegal drugs, manufacture of a controlled dangerous substance, possession of

marijuana with intent to distribute, possession of a controlled dangerous substance in the presence of a minor child, and use of a weapon in the commission of a crime. The case was passed on a number of occasions. On February 15, 2001, an order was entered that Real was awaiting sentencing in federal court, and that the case would be dismissed after she had received her federal sentence. On June 4, 2001, a motion to dismiss and an order dismissing were filed. (Exhibit 47.)

In Cherokee County Case No. CM-99-40, Real was charged with the misdemeanor of possession of drug paraphernalia. The case was filed on January 26, 1999. Little happened on the case until February 15, 2001. An order was entered noting that Real was pending sentencing in federal court, and that the case would be dismissed after Real received her federal sentence. On September 4, 2001, a motion to dismiss and an order dismissing the case were entered. (Exhibit 48.)

In Cherokee County Case No. CF-99-251, Real was charged with possession of CDS. The charge was filed on June 28, 1999. On February 15, 2001, an order was entered reflecting that Real was awaiting sentence in federal court, and that the case would be dismissed after she received her federal sentence. On September 4, 2001, a motion to dismiss the case and an order dismissing the case were entered. (Exhibit 50.)

Because counsel failed to adequately research Real's criminal record, the jury was left with the false impression that the only trouble she had been in stemmed from the federal prosecution on which she was doing time when she testified against Mr. Barrett.[17] Based on the

---

[17] Real was rewarded for her testimony against Mr. Barrett when the Government filed a Rule 35 motion to reduce her 14 year sentence to time served. See Ground Five.

dismissed state charges, counsel could have drawn her credibility into serious question by pointing out that she had previously avoided the potential of lengthy sentences in state court, which could well have run consecutively to one another and to her federal sentence, and that to prevent the possible revival of her state cases, it was certainly in her interest to cooperate with the Government in Mr. Barrett's prosecution.  Each of these state cases involved separate criminal transactions, and some were apparently dismissed not necessarily in lieu of federal prosecution, but for other reasons.  It certainly could have been strongly implied on cross-examination that some of these cases were dismissed because Real acted as a police informant.  Mr. Barrett's trial counsel's failure to discover Real's state criminal record was professionally unreasonable, and prejudiced Mr. Barrett because her direct testimony was largely unscathed by cross-examination.  Thus, the jury was wrongly left with another largely un-impeached witness who regaled it with tales of Mr. Barrett's "plan" to confront law enforcement with deadly force if his property were ever raided.

g.      **Randy Turman**.

At trial, Randy Turman claimed Mr. Barrett taught him how to cook methamphetamine.  (R. 193.)  At the time he testified, Turman had pending state charges for manufacturing methamphetamine.  (R. 193.)  He was at liberty on a $120,000.00 bond.  Turman admitted that he had cooked methamphetamine once a week for five years, and that he possessed a firearm while doing so.  When asked about these charges, Turman said "it's done been taken care of."  (R. 445-46.)  The witness had taken numerous drugs over an extended period of time, and was once up for four days on a "meth run."  (R. 430-31.)  Turman claimed there was nothing going on in his case.  He had gone to court, and as far as he knew, the charges had been resolved.

(R. 434-35.)  Turman testified he had no deals in exchange for his testimony, that he had not been given immunity from punishment, and that he never worked as an informant or paid informant.  He declined to talk to the defense because he figured he would be questioned in court, and that would suffice.  Asked if one of the charges currently lodged against him was for altering the serial number on an SKS, he stated that charge had been dropped.  (R. 434-35, 439-44.)  Turman stated he was simply in court to tell the truth.  (R. 445.)

Turman claimed he met Mr. Barrett three or four months before Trooper Eales was shot.  (R. 364-65.)  He "hung out" at Mr. Barrett's and would use methamphetamine there. (R. 366.)  He stated he witnessed Mr. Barrett cooking methamphetamine in his cabin.  (R. 377.) He identified Government's Exhibit 65, a photograph taken in Mr. Barrett's shop of mineral spirits, toluene, and paint thinner.  Turman stated Mr. Barrett would use these ingredients to cook meth.  (R. 383-84.)  Tubing used to manufacture methamphetamine was kept in Mr. Barrett's cabin.  (R. 384-85.)  Glassware used in the manufacturing process was kept in a water trough. (R. 385-86.)  Turman explained how Mr. Barrett supposedly "powdered" methamphetamine in his shop and how a hose was attached to a gas tank during the cooking process.  (R. 387-91.) Turman testified, though, that he never actually saw Mr. Barrett cooking meth, and that he never really discussed the manufacturing process with Mr. Barrett, even though he claimed Mr. Barrett was the person who taught him how to cook meth.  (R. 389-91.)

Turman testified he recognized items that were in Mr. Barrett's house during the summer of 1999, including a tool box and hose, and explained how Mr. Barrett could used these items to make dope.  (Government's Exhibit 63, R. 396-97.)  Turman testified Mr. Barrett would lock the gate to his driveway to restrict access to his property, and identified the "warning sign"

that had been placed there.  (Government's Exhibit 104.)  The witness claimed Mr. Barrett never left his property because there was a warrant out for his arrest, and that he was afraid the police would come to his house.  (R. 397-401, 416.)

Mr. Barrett kept several weapons in his home, including a .233 Colt Sporter rifle; a .22 pistol; a Smith and Wesson 9mm pistol; and a double-barreled 12-gauge shotgun, which Turman said he sold Mr. Barrett.  (R. 401, 404-11.)

Turman admitted he went to Mr. Barrett's house to paint a car on one occasion, and that the enamel reducer and mineral spirits in the cabinet to Mr. Barrett's shop were used to paint vehicles.  (R. 437-39.)

Turman testified Mr.  Barrett had expressed concern about law enforcement coming to his property, and allegedly stated there would be a shoot-out if this occurred. According to Turman, Mr.  Barrett expressed the hope that Sheriff Philpot or Frank Loyd would be the first law enforcement officers through the door.  (R.  412).  Turman also testified that on one occasion, late at night, an individual had come to the gate of Mr.  Barrett's property and said he was running from the law and expected law enforcement to arrive at any time.  Mr.  Barrett's response to this, according to Turman, was to go into his cabin and retrieve his Colt Sporter rifle. (R. 414-15).

Thus, Turman was a critical witness on the underlying drug charges in the superseding indictment, as well as on the question of Mr. Barrett's intent.  Turman was especially important on the drug charges, since the search of Mr. Barrett's home and property yielded no working methamphetamine lab and virtually no drugs.  It was therefore of paramount

importance that Turman be effectively impeached.  This, trial counsel failed to take reasonable steps to do.

Trial counsel were professionally unreasonable for failing to research Turman's court file on the charge that had "done been taken care of."  The pending felony drug and firearms charges were still open when Turman testified.  Contrary to Turman's testimony, the possession of a firearm with an altered serial number charge had not been dismissed.  The only way these charges could have been "taken care of" is if Turman were acting as a police informant, and was going to get some sort of deal in exchange for his informant work and his testimony against Mr. Barrett.

In Sequoyah County Case No. CF-02-477, filed on September 10, 2002, Turman was charged in a six count information with manufacturing methamphetamine; possession of methamphetamine with intent to distribute; possession of precursor material; another count of possession of precursor material; possession of a firearm while committing a felony; and possession of a firearm with an altered serial number.  The charges were based on evidence recovered during the execution of a search warrant.  Turman posted an appearance bond on September 20, 2002.  A preliminary hearing was set for April 17, 2003.  The preliminary hearing was re-set for June 12, 2003, and apparently re-set again on later dates, since the preliminary hearing was ultimately waived on November 3, 2003.  According to documents in the Sequoyah County Court file, the case literally fell off the map until May 9, 2007, when the District Attorney's Office filed a motion to dismiss "in the best interests of justice."  The motion to dismiss was granted by written order the same day it was filed.  (Exhibit 195.)

Counsel were professionally unreasonable for failing to expose Turman's bald-faced lie about his case having been "taken care of," and one of the firearms charges having been dismissed, when the case was still active and literally nothing had happened on it in two years. Not only would Turman have been exposed as a perjurer, but the curious chronology of his Sequoyah County felony case could have been used to support counsel's claim on cross-examination, which Turman denied, that he was a police snitch, had made an undisclosed deal with the Government for his testimony against Mr. Barrett, and was going to be rewarded in the end (as he was) depending on whether he pleased the Government with his testimony. With respect to Turman's testimony regarding Mr. Barrett's supposed comments about law enforcement, counsel were also unreasonable for failing to produce testimony from available witnesses who could have testified, in direct contrast to the informant witnesses, that Mr. Barrett did not and would not threaten violence toward law enforcement. (E.g., Exhibits 37, 77, 90, 96).

Counsel were also professionally unreasonable, as with the other informant witnesses discussed above, in failing to develop and introduce evidence regarding Turman's overall lack of honesty. Sean Hill could have testified that Randy Turman is "as low as you get," and that he was known in the community as a thief who would "testify against anyone to save his own skin." (Exhibit 95.)

The testimony of the seven snitches was the main difference between Mr. Barrett's state prosecution, which ended in a conviction of manslaughter, and his federal case, which resulted in the death penalty. Their testimony was vital to the Government's case for intent in both stages of trial, and to establishing the underlying drug charges. Despite the obvious importance of these witnesses, as the trial court itself stated on September 13, 2005, Mr. Barrett's

trial counsel failed to move for a continuance, and failed to conduct a thorough investigation in order to impeach these witnesses. Counsel in effect agreed to a trial by ambush with respect to the seven crucial informant witnesses. Because of the critical importance of these witnesses, who could have been devastated had proper investigative steps been taken, the failures of trial counsel were unquestionably prejudicial. There is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that but for counsel's indefensible errors and omissions, the result of the guilt stage of trial would have been different. At a minimum, these failings also had a prejudicial effect on the punishment stage.

> **6.    Trial counsel were ineffective in failing to make appropriate and timely objections to improper hearsay evidence of other bad acts**.

On September 22, 2005, after the start of the trial, the Government filed a Notice of Intent to Offer Evidence of Other Crimes. (Doc. 206.) Aside from evidence regarding narcotics activity at Mr. Barrett's residence preceding the shooting of Trooper Eales, the Government stated it intended to offer testimony from the majority of its informant witnesses (Charles Sanders, Randy Turman, Cindy Crawford, Travis Crawford and Brandie Price) that in the weeks and months preceding the shooting of Trooper Eales, Mr. Barrett had made statements to the effect that if law enforcement came on his property, he would shoot them.[18] The Government argued these alleged statements were relevant to show Mr. Barrett's intent. (Doc. 206 at 1-3.) The Government's filing failed to give notice that informant witness Karen Real would offer similar evidence of supposed statements made by Mr. Barrett. Before Mr. Barrett

---

[18] Mr. Barrett's claim concerns only the testimony offered by the informant witnesses regarding his alleged statements or actions related to those statements.

could respond, the Government's filing said, "The defendant has not complained of lack of notice." (Doc. 206 at 4.)

The Government's Notice was filed nine days after the trial court, during an *ex parte* hearing, advised the prosecutors that the testimony they intended to present from informants included evidence covered by Fed. R. Evid. 404(b). (Tr. 8/13/05 Hr'g at 22-23.) The court permitted the prosecutors to argue outside the presence of Mr. Barrett and his counsel that the testimony was not within the scope of the rule. *Ibid.* Following the conclusion of that discussion, when defense counsel were present, the trial court described the content of the *ex parte* discussion without revealing that it included the court stating that the testimony described *in camera* included 404(b) evidence. *Id.* at 25-27.

On September 27, 2005, trial counsel for Mr. Barrett filed a response to the Government's 404(b) Notice, contesting specifically the evidence of Mr. Barrett's alleged statements, and arguing that the proposed testimony from the informant witnesses was irrelevant propensity evidence; any marginal relevance or probative value it might possess was outweighed by the danger of unfair prejudice. (Doc. 215.)

On the same day counsel for Mr. Barrett filed their response to the 404(b) Notice, the court stated it would rule on admissibility as the evidence developed, and directed the Government to approach the bench immediately before it intended to offer such evidence. Defense counsel were directed to submit an appropriate limiting instruction, should they desire to do so. (R. 174.) Defense counsel filed a proposed limiting instruction on September 28. (Doc. 218.)

Without objection, informant Randy Turman testified that Mr. Barrett expressed concerns that the police were going to come to his property; said there would be a shootout if this happened; that he hoped Sequoyah County Sheriff John Philpot or Frank Loyd would be the first officers through the door; and that he would "take out" as many officers as he could.  (R. 412-13.)  Turman also testified about a supposed late-night incident where a man came to the gate of Mr. Barrett's property and said he was running from the law and expected the police to arrive.  In response to this, Mr. Barrett supposedly went in his cabin and retrieved his Colt Sporter rifle.  (R. 414-15.)  This testimony was met with an objection, which was overruled.  (R. 414.)

Turman testified that he began going to Mr. Barrett's property three to four months before the shooting of Trooper Eales.  By his vague estimate, he was last there a month or two before the shooting.  (R. 413.)  On cross-examination, Turman stated he could not remember the dates and times on which any of the incidents he testified occurred.  All Turman could really say was that they had to have occurred in the three to four months preceding the shooting of Trooper Eales that he claimed to have frequented Mr. Barrett's property.  (R. 422-23.)

Without objection, Charles Sanders, on direct examination, stated Mr. Barrett told him that if the police came to his property, he would shoot the first officer who came through the door, and that he expected it to be John Philpot.  No real time frame was given for this alleged statement.  (R. 2515.)  On cross-examination, Sanders testified that in September 1999, Clint Johnson asked if Mr. Barrett had ever made any statements about doing violence to law enforcement.  Sanders stated, "I think the response was that me and Kenny Barrett had a discussion about him killing John Philpot if he came through his door."  (R. 2612.)  Sanders was

initially unable to put any kind of time frame on this statement; the statement was simply made "sometime," and he did not know when the alleged conversation occurred. Drifting toward an attempt at some sort of specificity, Sanders then said that while the conversation could not have occurred in 1998, it would have been before July, 1999. (R. 2612, 2614.)

Responding to a leading question by the prosecutor which set the relevant time frame at a month or two before the shooting of Trooper Eales, Cindy Crawford testified Mr. Barrett said he would "go out in a blaze of glory" if the police raided his property. This statement supposedly occurred in the context of Mr. Barrett remarking that he had a misdemeanor warrant outstanding. Crawford admitted she was a heavy drug user at the time of this alleged conversation, that she lost her sense of time when she was on drugs, and that Mr. Barrett's reference to a misdemeanor warrant could have been made long before 1999. (R. 3068, 3070, 3072-73.) No objection was made to Crawford's testimony regarding Mr. Barrett's alleged statements. (R. 3068.)

Brandie Price, who claimed she went to Mr. Barrett's cabin in August and September 1999, testified that a week to ten days before the shooting of Trooper Eales, Mr. Barrett remarked that he had an outstanding warrant and that if the police came to the property, any visitors to his residence should either grab a gun or hit the floor. Mr. Barrett supposedly stated that he would "take out as many" lawmen as he could. Price admitted that her memory was very foggy during this period of time due to her drug use. (R. 3485-86, 3492-93, 3507, 3509.) No objection was made to Price's testimony regarding Mr. Barrett's purported statements.

Karen Real testified she periodically visited Mr. Barrett at his cabin from 1997 until, by her estimation, early 1999. (R. 3082-83.) She told defense counsel it was possible the last time she had been to Mr. Barrett's property was in late 1998. (R. 3118-20.) During this time period, according to Real, Mr. Barrett expressed a negative view of law enforcement. (R. 3090.) Initially, a defense objection was sustained when the prosecutor asked Real what Mr. Barrett had specifically said about this subject. (R. 3090.) A short time later, without objection, when asked what Mr. Barrett had said about the police in late 1998 or early 1999, Real responded Mr. Barrett said he would shoot law enforcement officers who came on his property. (R. 3106.) Like the other informant witnesses, Real had been a heavy drug user. At the conclusion of Real's testimony, defense counsel moved to strike her testimony because it was remote in time. The prosecution countered that Real's testimony related to a continuing pattern of behavior on Mr. Barrett's part. The court overruled the objection. (R. 3135-36.)

The only witness to give testimony respecting alleged statements by Mr. Barrett threatening violence to law enforcement that was in any sense contemporaneous with the shooting of Trooper Eales came from Travis Crawford. Crawford testified that on September 23, 1999, the afternoon before the shooting, Mr. Barrett said if the police came on his property he would "go out in a blaze of glory." (R. 462-66.) As noted in Mr. Barrett's original petition and this amendment, Crawford has since recanted his testimony. (*See* Ground 5(A)(b), *infra*.)

Evidence of Mr. Barrett's alleged statements to these witnesses, excluding Travis Crawford, was inadmissible, and wrongly argued and considered by the jury as propensity evidence in violation of Fed. R. Evid. 404(b). Trial counsel unreasonably failed (a) to seek reasonable pretrial disclosure of these statements, (b) to make appropriate objections to the

Government's delay and to the admissibility of the statements, and (c) to seek an appropriate order limiting the jury's consideration of the evidence to Mr. Barrett's alleged state of mind at the time the statements were made.

Trial counsel were on notice by September 12, 2005, at the latest, that the Government intended to use informant witnesses, but made no request for notice under Rule 404(b). To the extent earlier requests for discovery included requests for 404(b) notice, trial counsel unreasonably failed to assert that the Government had staged an ambush (as the trial judge himself thought likely, Tr. 9/13/05 Hr'g at 7, 10-12), failed to seek a continuance to investigate, and failed to object that the Government failed to show good cause for the late disclosures, as required by Rule 404(b).

The statements were hearsay, and pursuant to Fed.R.Evid. 803(3) were admissible only to show the declarant's state of mind at the time the statements allegedly were made. The alleged statements made weeks, several months, or many months before the offense could not reliably or relevantly evince Mr. Barrett's intent on the night Trooper Eales was fatally shot; they were injected into the trial simply to unfairly prejudice Mr. Barrett.

Moreover, any time frame placed on these alleged statements by the informant witnesses was completely unreliable. Their memories were vague in the extreme due not only to the passage of time, but because of their own repeated use of mind-altering drugs. The alleged statements attributed to Mr. Barrett by Turman, Sanders, Cindy Crawford, Brandie Price and Karen Real *were not* close in time to the offense itself, and had only possible worth, not real probative value. Any slight probative value this evidence could arguably be said to possess was clearly outweighed by the danger of unfair prejudice.

Even assuming Mr. Barrett made these statements (which he did not), they could not relate to any specific intent to do harm to law enforcement when the Highway Patrol Tact Team invaded his property unannounced in the middle of the night, with the lead vehicle having all the appearance of a civilian automobile. This evidence simply covered Mr. Barrett in a veil of unwarranted suspicion.

Although defense counsel filed a response the Government's 404(b) Notice objecting to the admission of Mr. Barrett's statements to these witnesses, and made, as outlined above, sporadic objections during the testimony of Randy Turman and Karen Real, the remainder of the evidence complained of here passed without a contemporaneous objection, and a contemporaneous request for a limiting instruction. Because the evidence addressed here was clearly inadmissible, and trial counsel recognized its inadmissibility in their response to the Government's 404(b) Notice, counsel were professionally unreasonable for failing to make adequate, contemporaneous objections. Since the testimony of the informant witnesses regarding Mr. Barrett's supposed statements was the centerpiece of the Government's case for intent, the failure to adequately object affected the trial outcome. Without the informants' inadmissible statements the prosecution's case would have been no stronger than the prosecution case presented to the two state juries. The actual results of these trials demonstrates there is at least a reasonable probability that the result of the federal trial would have been different if federal trial counsel had challenged admissibility.

Defense counsel were also professionally unreasonable, to Mr. Barrett's prejudice, for failing to object to Karen Real's other crimes or bad act testimony because no pretrial notice was given as required by Rule 404(b), and for failing to object to the prosecution's 404(b) Notice

because it was filed untimely.  Rule 404(b) states that upon request, reasonable notice in advance of trial of other crimes or bad act evidence must be given, absent good cause indicating notice should be excused.  The prosecution did not file its 404(b) Notice until individual jury selection in the case was underway.

To the extent trial counsel did object to the other bad acts evidence addressed here, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.  *See* Ground Eighteen, *infra*.

**7.      Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence.**

Trial counsel were professionally unreasonable for failing to hire an independent crime analyst or reconstruction expert in order to rebut the testimony of OSBI agent Iris Dalley. Mr. Barrett's counsel sought $17,000.00 for an expert to conduct a crime scene reconstruction, in anticipation that the Government would rely on Iris Dalley, who appeared as a witness at Mr. Barrett's two state trials.  Counsel sought authorization to hire Edward Hueske of Denton, Texas. Mr. Hueske had consulted with the defense during Mr. Barrett's state trials.  The court authorized $4,000.00 for a crime scene reconstructionist.  After Mr. Echols left the case, trial counsel Roger Hilfiger informed the court that het had not used available funds to hire a crime scene reconstructionist, but instead used the funds for an investigator.  Loyd Cobb, the investigator hired by trial counsel, testified that he went to Mr. Barrett's property and took photographs, at least some of which were introduced into evidence.  *See* Ground One, *supra*, and Ground Three, *infra.*

As stated in Grounds One and Three, Mr. Barrett had a constitutional and statutory right to expert assistance to rebut the Government's witness.  Prevailing professional norms of criminal defense practice advise attorneys to obtain expert assistance.  Mr. Barrett's trial counsel acted unreasonably by failing to secure any benefit from the exercise of Mr. Barrett's statutory and constitutional rights to expert assistance.  Counsel's failure to investigate the benefits of expert advice was deficient performance.

Iris Dalley was a key witness for the Government.  Her crime scene reconstruction testimony was used by the prosecution to argue that Mr. Barrett had been standing on the porch when he fired his .233 Sporter rifle, and therefore would have seen the several police vehicles with emergency lights engaged which had descended on his property.  The defense contended that Mr. Barrett fired from inside his house and would only have seen the lead vehicle, driven by Buddy Hamilton, which did not have any emergency lights engaged, and thus could not be identified as a police vehicle.  Dalley's crime scene reconstruction testimony, complete with a PowerPoint presentation and animations, which were shown to the jury but not introduced as exhibits, was used to support the prosecution's theory.

Trial counsel's unreasonable omission was prejudicial.  Had counsel engaged the services of the independent expert authorized for Mr. Barrett's defense, the defense could have been shown that Dalley's analysis was amateurish, unscientific, seriously flawed, and did not comport with the necessary protocols for conducting a legitimate and reliable reconstruction.  In connection with the current proceedings, counsel asked Mr. Hueske to review Ms. Dalley's testimony, the exhibits introduced in the case, her PowerPoint presentation, her animations, and other materials upon which she relied.  Mr. Hueske, a nationally known expert whose credentials,

training and experience far outstrip Dalley's meager qualifications, has concluded that Dalley's testimony was not worthy of belief. (Exhibit 109; Exhibit 110.)

In his report, Mr. Hueske first shows that Dalley's use of inappropriate terminology reflects her poor understanding of the fundamentals of crime scene analysis, if not an intention to confuse, rather than inform, the jury. "Ms. Dalley repeatedly uses terminology that is inappropriate both with regard to vehicular descriptions and firearms components." For example, Dalley, in her testimony, refers to the "front quarter panel" of the Ford Bronco driven by Buddy Hamilton, and in which David Eales was a passenger, when she is trying to reference the front fender. Instead of referring to the "driver's side" and "passenger's side" of the vehicle as points of orientation, she used the confusing terms "left" and "right." Dalley used the term "sidewall," which obviously refers to the portion of a tire, when she is attempting to describe an inner body panel on the Ford Bronco. Dalley consistently and improperly used the term "projectile" to refer to anything that may have caused an impact, rather than using correct terms for a bullet, a bullet fragment, or other constituent parts of a bullet. (Exhibit 109 at 2.)

Dalley exhibited a fundamental misunderstanding of "bullet fragmentation upon impact with glass[.]" In reality, fragmentation of a bullet begins when it impacts a surface such as glass. If trial counsel had secured Mr. Hueske's services, the jury would have known that Dalley erroneously stated that a bullet would only fragment after perforating or passing through glass. Dalley admitted she was not a firearms examiner, stating that she seeks the assistance of such experts when she has a "ballistics" question. While it could be argued that one need not be a firearms expert to conduct a crime scene reconstruction, "a basic understanding of firearms and ammunition components is essential to being able to recognize what one is viewing at a shooting

scene."  Mr. Hueske notes Dalley testified there "might" be some caliber similar to a .233 rifle that "could have made" some of the bullet holes in the Bronco.  When asked by defense counsel for examples, Dalley could not come up with any.  (Exhibit 109 at 2-3.)

If he had been called to testify, Mr. Hueske would have exposed to the jury that Dalley's use of "inappropriate terminology and ambiguous statements" made understanding her testimony difficult.  Dalley's shortcomings in these areas likely reflect her lack of expertise with firearms and vehicles.  (Exhibit 109 at 3.)  Hueske's analysis shows that Dalley lacked sufficient knowledge of ballistics, vehicle construction, and the necessity of using consistent, accurate terms of reference when reconstructing a scene to render reliable, credible opinions about a shooting scene involving a vehicle.

Mr. Hueske states there are numerous more serious flaws in Dalley's attempt at a crime scene reconstruction in this case, and with her trial testimony.  Mr. Hueske's bottom line conclusion is that Dalley "did not follow widely accepted protocol used in shooting incident reconstruction. ... Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation."  (Exhibit 109 at 3, 6.)

Mr. Hueske would have exposed the following failings to the jury:

a.       Standard, accepted crime scene reconstruction protocol requires a determination of the length, width and height of any vehicle involved in a shooting.  Dalley neglected to determine the dimensions of the Ford Bronco in aid of any trajectory analysis. There is also an unresolved question as to how wide the passenger door was open when shots were fired.  No measurements were taken.  Instead, Dalley illogically explained that because the

passenger door was curved, it could not be measured. (Exhibit 109 at 3.)

b. Before trajectory rods are used, proper protocol demands an examination of the margins, interior surface, and surrounding area for trace evidence. Placing trajectory rods in bullet holes, as Dalley did, invariably alters them. Dalley was specifically asked whether she saw gunshot residue around any bullet holes, and stated she saw none. (R. 3399.) (Exhibit 109 at 3.)

c. To legitimately evaluate the area around a bullet hole for trace evidence, close inspection with a magnifying lens, or a lift for later analysis, should be done. Bullet holes should also be examined for blood, tissue, hair, fibers or other forms of trace evidence. Dalley failed to do this. (Exhibit 109 at 3.)

d. The caliber of a bullet creating a bullet hole can be determined with an acceptable degree of confidence, when bullet holes are "symmetrical and devoid of any distortion." In such instances, accepted, standard protocol requires the length and width of the bullet holes to be measured with a pair of dial calipers. The width of the hole can be "related to the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates." Dalley could not determine the caliber of any bullets striking the Bronco (and thus could not say whether any of them were created by "friendly fire"). (R. 3298.) Based on some of the photographs taken of the bullet holes in the Bronco, it appears they could have been measured to determine caliber with the appropriate instrument. (Exhibit 109 at 3.)

e. Dalley's heavy reliance on trajectory rods to determine the trajectories of the fired rounds failed to follow protocols and was based on unwarranted assumptions. Correct placement of trajectory rods to properly determine trajectories "requires an understanding of

bullet penetration/perforation in a variety of substrates." This is especially true with bullets that fragment or tend to fragment, like rounds fired from a .233 rifle. Equally important is knowing when the calculation of trajectories, rather than the use of trajectory rods to determine them, is called for. Trajectory rods such as Dalley utilized are a reliable tool for determining bullet trajectories where there is "a secondary impact that has not resulted from initial impact deflection and/or fragmentation." However, Dalley attempted to determine bullet trajectories "utilizing fragment impacts into secondary targets based on the presumption" that the bullet core, or a large part of the bullet core, "travels in a straight path." This assumption is unwarranted, and skews the analysis. Mr. Hueske would have explained that Dalley was making contradictory claims, as when she testified (correctly) that the "exact path" of each bullet could not be determined, and also testified (incorrectly) that her trajectory patterns, as she described them, were "accurate." (R. 3446; Exhibit 109 at 4.)

f. Dalley relied upon fallacious reasoning to say that bullets would pass through an intervening target such as the passenger door of the Bronco "undeterred," or straight through. Dalley testified repeatedly that bullets going through the "partially open" Bronco door would go "straight through," and that bullet core fragments would do the same. Where, as in this case, bullets fragment on impact, the path or trajectory is unpredictable. Dalley conjured a number of scenarios to make her theory that the bullet trajectories were unaffected by intervening targets (and thus her trajectory analysis as a whole) "fit" the evidence. Dalley posited that the passenger door of the Ford Bronco moved to various different positions "to account for the incongruity of different trajectories through it." (R. 3314) Although this type of movement cannot be excluded, it is a speculative endeavor to make the evidence correspond with the theory

being propounded.  The more likely explanation is that bullet deflections or fragmentations account for the variations in bullet trajectories through the vehicle door.  Deflections occur frequently when bullets strike objects with irregular surfaces, as opposed to those which strike flat surfaces.  (Exhibit 109 at 4.)

g.      Dalley lacked basic equipment and measurements necessary to make her diagrams and animations reliable.  When trying to ascertain the trajectories of bullet holes in vehicles and other inanimate objects, trajectory rods placed through the bullet holes are referenced by two linear and two angular coordinates.  This is indispensable to establishing "reproducible data for creating diagrams and animations" that *accurately*, within the limits of uncertainty, represent the true bullet trajectories.  Mr. Hueske finds it "amazing" that Dalley *did not* determine any of the angles because she "did not have the necessary equipment."  ( R. 3275) All that would be required to perform this essential task is a "$30 zero base protractor and a $5 plumb bob."  Because Dalley failed to take such measurements, and because she could not determine the "exact paths" of the bullets using trajectory rods alone, "it is unclear how the diagrams and animation she produced can be perceived as having any reliability." Again, the chief reason for getting such linear and angular measurements "is to be able to accurately create diagrams and animations, such as the ones Ms. Dalley prepared in this incident." (Exhibit 109 report at 5.)

h.      Dalley failed to ascertain bullet impact angles "relative to a common point of reference (plumb line) [as] is the accepted standard" for reliable reconstruction.  (Exhibit 109 at 5.)  In her testimony, Dalley generally described the terrain of the shooting scene as "hilly," but did not establish the exact grade of the terrain, or consider the potential impact the grade might

have had on what she perceived to be the trajectories of the bullets hitting the Ford Bronco.

    i.  Where holes are of questionable origin, and may or may not be bullet holes, the proper procedure requires on-site chemical testing for the presence of copper or lead to confirm that the holes or perforations were produced by a bullet rather than something else. Although Dalley testified that she had some knowledge of this kind of testing, she did not testify that she actually conducted it.  (Exhibit 109 at 5.)

    j.  Dalley testified she had "no means of sequencing any of the shots" at the scene.  This was not accurate. Analysis to determine the sequence of shots is not always possible, but it can sometimes be accomplished "through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets [or] fragments[,]" such as glass, fibers, hair, paint and other substances.  Thus, Dalley had the means of attempting to sequence the shots, but she either was not aware of the techniques used in that process or, she chose not to employ those methods either at the scene or later.  (Exhibit 109 at 5.)

    k.  Critically, Mr. Hueske could have shown that Ms. Dalley failed to employ well known methods that could have shed light on the location of Hamilton's Bronco when specific shots struck it.  In any incident involving a moving vehicle, any legitimate reconstruction or re-enactment would include actually placing the Bronco in various positions to determine the likelihood of each shot coming from one or more particular positions.  It was particularly important here to determine the angle of fire after the Bronco came to a stop.  However, the Bronco itself was not placed in a variety of positions to determine the trajectories of the shots fired at or into it.  Dalley testified that before she arrived at the scene, the Bronco had been moved.  However, she also testified there were tire impressions and a fluid deposit in the dirt in

front of Mr. Barrett's residence.  These markings could have been used to re-position the Bronco

to where it came to rest before being moved.  (Exhibit 109 at 5.)

l.      Dalley employed a fundamentally flawed approach when she attempted to

establish the trajectory of bullets that passed through the window glass, blinds and curtain or

towel hanging over the front window of Mr. Barrett's cabin.  She testified that the results of her

trajectory analysis for these objects were reliable.  (R. 3389.)  First, the accepted method for

reliably determining trajectories is to set up a tripod and place a laser on the tripod.  Dalley had

someone assisting her hold a trajectory rod by hand.  Second, Dalley failed to take measurements

of the hole locations.  (Exhibit 109 at 5.)

m.     Dalley's method of "placing a hand-held laser into bullet holes in the

Bronco window glass is equally flawed since it presumes no deflection resulted from either the

impacts or the fragmentation."  *Ibid.*

n.      Dalley overstated her ability to reach a warranted conclusion regarding the

critical issue of Mr. Barrett's position in relation to the Bronco.  When attempting to determine

the distance of fire on the bullet holes in the cabin window, Dalley testified she did not "see" any

evidence of gunshot residue on the window.  Because of this, she opined that the distance had to

be greater than three feet from the glass, since the literature states that the absence of gunshot

residue at the edges of a bullet hole indicates shots were fired from greater than three feet away

from impact. This general rule varies greatly depending on the weapon used, and also depends on

the type of ammunition used.  To correctly evaluate the maximum muzzle to target distance, the

weapon in question should be fired into glass like that at the scene, and the same type of

ammunition should be used.  (Exhibit 109 at 6.)

o.      In a shooting incident like this, a metal detector should be used to detect the presence of bullets or bullet fragments.  Dalley did not attempt to locate any bullets or fragments in the soil.  (Exhibit 109 at 6.)

p.      In reaching her conclusion that David Eales was struck in the right arm after he exited the Bronco, Dalley ignored the elementary dictum in forensic science that "absence of evidence is not evidence of absence."  Dalley testified that since she found no tissue in the Bronco, and tissue appeared to be missing based on the appearance (to her) of the wound, Trooper Eales must have been outside when he was struck.  However, Dalley's testimony fails to establish that she looked for any tissue outside the Bronco. It would have been easy to try to confirm Dalley's conclusion by spraying luminol on the ground in the area around the Bronco.  There is nothing to show this was done.  An honest forensic scientist would say the fact that evidence is not found (and Dalley apparently took no steps to find it) cannot be used to "conclude anything other than that no evidence was found."  (Exhibit 109 at 6.)  Dalley's conclusion in this regard was critical to the prosecution's theory because the Government argued that at the time Trooper Eales was shot, he was outside the Bronco and the type of equipment he was wearing would have made it obvious to Mr. Barrett that he was a law enforcement officer.

In sum, if trial counsel had obtained the services of a qualified forensic examiner, they could have challenged the admissibility of Dalley's testimony under Fed.R.Evid 702.  Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction.  She failed to take many steps that should have been taken, and failed to utilize the appropriate methodology.  Due to these numerous failures, her conclusions, aimed at strengthening the Government's case, were scientifically unreliable.  At a

minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, were outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis.

Mr. Hueske's report demonstrates that Dalley's methodology, and thus her conclusions, fell well outside the range of accepted protocol and were thus unreliable. Had defense counsel hired an independent expert to advise them, a powerful motion to exclude Dalley's testimony altogether could have been presented. Dalley's testimony and analysis was little better, if at all, than the "expert" testimony of James Horn, which the court found so bereft of reliability and relevance that it was stricken.

Due to the importance of Dalley's analysis to the Government's case, it was unreasonable for counsel to fail to hire an independent expert such as Mr. Hueske to evaluate her methods and conclusions and to testify for the defense. Had all the flaws in Dally's testimony been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle. If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired, and was thus unaware that the vehicle coming directly at his house was a police vehicle, especially due to the fact the Ford Bronco driven by Trooper Hamilton had no emergency lights engaged.

All this is especially critical on the issue of intent with respect to Count 3 of the superseding indictment, the intent elements of Counts 1 and 2, and the intent elements in the penalty phase. Even if the trial court had received Dalley's testimony, there is at least a

reasonable probability that the outcome of the trial would have been different. If jurors had been shown the chasm between what counts as a scientifically reliable claim and Dalley's testimony they would have reached any of several conclusions adverse to the prosecution from finding that Dalley just made things up in an effort to assist the prosecution, to finding that her conclusions were entitled to little credence or weight.

To obtain a conviction on Count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed a law enforcement officer in the performance of his official duties, that he knew or had reason to know he was shooting at a law enforcement officer, and that the shooting was precipitated by this knowledge. Absent Dalley's testimony, all the Government had to rely on were the often conflicting accounts and compromised memories of the tactical team members who testified.

It is not only Movant who says Ms. Dalley is not the objective scientific witness she was portrayed as during trial but is a partisan advocate who dresses up her personal opinions in the guise of "science." The Oklahoma Court of Criminal Appeals has chastised Ms. Dalley, recently reversing a first degree murder conviction due to Dalley's unreliable, unscientific testimony, including the improper use of computer animations. *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl. Cr. 2006). In that case, the defendant's murder conviction was reversed in large part because Iris Dalley's conclusions and computer-generated animations were not based on objective scientific findings, but simply restated the prosecution's theory of the case under a "scientific" gloss. Based on Mr. Hueske's report, Dalley did the same thing in Mr. Barrett's case. She used improper methodologies and techniques to "package" evidence already heard by the jury, offering conclusions based on an incompetent and unscientific evaluation of the evidence.

In addition to trial counsel's other failings with respect to Dalley's testimony, counsel were professionally unreasonable for failing to investigate Dalley's track record of giving scientifically groundless testimony. Although the *Dunkle* case was decided in 2006, after Mr. Barrett's trial concluded in 2005, the case was tried some years before, the appellate briefs had been filed at the time of Mr. Barrett's trial, and Dalley's reputation was well known in the criminal defense community.

**8.     The outcome of the trial is unreliable due to trial counsel's unreasonable failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death.**

The jury should have heard that methods used by the Oklahoma Highway Patrol tactical team were contrary to established law enforcement standards and practices. Based on all the circumstances surrounding the mission, it was ill-conceived and should have been aborted. Even though every piece of information considered by the Task Force and Tact Team called for a daytime, talk-first approach, with prominent insignia of law enforcement and the use of distance and cover, the officers chose a nighttime, close-contact, force-first approach, with no advanced signs of law enforcement. The results of this provocative assault were foreseeable and tragic for Trooper Eales who, due to poor planning and execution, was exposed to gunfire on all sides.

Mr. Barrett's trial counsel unreasonably failed to secure the testimony of an independent expert who would have revealed to the jury that the midnight raid was reckless and dangerous, as though calculated to provoke a violent response, and that it was foreseeable that these errors would result in harm to a law enforcement officer. Prior to trial, Mr. Echols sought

authorization to retain an independent expert on tact-team methods and procedures, Dr. George Kirkham.  (Doc. 50.)  The court authorized some funds for this expert.  (Doc. 97.)  However, Mr. Barrett's trial counsel never contacted the expert.

Trial counsel knew or should have known that it was necessary to retain an expert to assist the defense.  In the second state trial Chuck Choney, a former FBI agent, testified for the prosecution and, when surprised on cross-examination, provided testimony favorable to Mr. Barrett.  However, trial counsel knew that Mr. Choney, because of his affinity with law enforcement, was unhappy about his testimony and was unwilling to provide any further helpful testimony for Mr. Barrett.  Based on this knowledge, trial counsel requested authorization to retain another, independent expert, Dr. Kirkham.  (Doc. 50 at 5.)  During a hearing on March 22, 2005, Mr. Echols stated, in Mr. Hilfiger's presence, "we'd like to be able to call Mr. Choney. But he said he's an ex-FBI agent, and he'd rather be drawn and quartered than appear in court as a defense witness in Mr. Barrett's case." (Tr. 3/22/05 Hr'g at 14-15.)

After the court authorized part of the funds trial counsel sought to retain Dr. Kirkham, trial counsel failed to contact him.  Dr. Kirkham received no background materials and had no contact with trial counsel about assisting in Mr. Barrett's defense.  (Exhibit 44.)

Trial counsel did not attempt to contact Mr. Choney until approximately mid-September, 2005.  Trial counsel made unsuccessful efforts to speak with Mr. Choney by telephone on September 13, 2005, and were told Mr. Choney would not be available until September 22 or 23.  Thus, at the time trial started, Mr. Barrett's counsel conducted no investigation into what evidence could be presented from an independent expert authorized by

the court, and fell back on a witness who counsel knew would take any opportunity to harm Mr. Barrett's case.

Even after the trial started, trial counsel knew Mr. Choney was reluctant to be subpoenaed as a defense witness and provide evidence favorable to the defense. (Tr. 10/03/05 Hr'g at 6-7.) Trial counsel told the court they were "in the process of trying to get this swat [sic] team expert to testify." *Id.* at 6. Yet counsel made no effort to learn what opinions Dr. Kirkham would have had if he had been informed of the facts of the case. Trial counsel could not have made a reasonable decision to forego Dr. Kirkham's assistance because they had not inquired into what that assistance would mean, and they knew they would get no assistance from Choney.

If trial counsel had enforced Mr. Barrett's constitutional and statutory rights to expert assistance, Dr. Kirkham would have provided the jury with more than reasonable doubt about Mr. Barrett's alleged intent. Dr. Kirkham would have explained that the jury could assume – against the weight of evidence – that the claims made in Clint Johnson's affidavit were true, and even credit the dubious testimony of the other informants, and still conclude that the raid was uncalled for and conducted in a way that provoked violence and minimized the chances that Mr. Barrett would see that he was being confronted by law enforcement officers. The evidence would have shown the raid was contrary to the standards and practices of law enforcement agencies precisely because it increased the chance that the target would be unable to tell whether those attacking him and his teenage son were law enforcement officers. The Tact Team's errors conceiving the raid and carrying it out meant (a) the first vehicle visible to Mr. Barrett would have no law enforcement markings; (b) the nighttime darkness made it more difficult to identify law enforcement vehicles; (c) there would be no audible indication that law enforcement was

involved in the attack; (d) the raid would play into any paranoid fears or legitimate fears of being attacked by drug dealers or other criminals; (e) that the lead vehicle lacked necessary cover from the terrain or a sniper; (f) that the lead Bronco advanced onto the property from a tactically disadvantageous position that drew fire towards Trooper Eales; and (g) that the plan ignored a variety of tactics deemed by law enforcement experts to be less likely to result in violence. (Exhibit 44 at 3-4.)

Instead of forcefully bringing these points to the jury's attention, the defense relied on the extremely reluctant Mr. Choney, who only appeared because he was compelled to by subpoena. He turned out to be a Government witness rather than a defense witness. He did offer some criticisms of the manner in which the raid was conceived and executed, such as the inclusion of the caravan of local dignitaries and law enforcement onlookers, and the failure of the tactical team to independently verify the reliability of the information provided by the alleged confidential informant. However, the Government easily turned Mr. Choney into a prosecution witness on cross-examination. In his opinion, while hindsight might suggest other alternatives to the action taken, there was no compelling need to have aborted the mission.

Mr. Choney was contacted late in the day by defense counsel. He was strongly aligned with law enforcement. He made it clear that he did not want to testify for the defense. He appeared only when compelled by a subpoena. Whatever little mileage the defense got out of his testimony was quickly reversed during the prosecution's cross-examination. On the whole, Mr. Choney's testimony supported the Government's case, and exonerated the tactical team of any serious errors. Defense counsel knew Choney would be a most reluctant, if not to say

hostile, witness, but he was thrown into the breach anyway, with the predictable negative consequences to Mr. Barrett.

Counsel's failure to retain an independent expert and reliance upon a witness who would not even talk to them, was plainly unreasonable and prejudicial. As evidenced by the arguments of both the defense and prosecution at the close of the first stage, questions about how the raid was conceived and carried out were critical issues. If trial counsel had presented the numerous deficiencies pointed out here, there is a reasonable probability the jury would have rejected either murder or the death penalty. One indication of this probability is the state-court jury's acquittal of Mr. Barrett on charges of murder. Had the federal jury known that law enforcement standards and practices counseled against a raid of this type precisely because the failure to give the clearest sign of law enforcement's presence is more likely to provoke an uninformed, violent response, there is a reasonable probability that Mr. Barrett either would not have been convicted of murder, or not have been sentenced to death.

**9.      Mr. Barrett's trial counsel unreasonably and prejudicially failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials.**

Grounds One and Three discuss the trial court's interference with proper defense preparation with respect to authorizing payment for the transcripts of the testimony from the second state trial at public expense. The Court initially denied the request, adding the proviso that the matter could be reconsidered upon a specific showing that the testimony requested went to Mr. Barrett's intent. Eventually, the Court permitted the record of the testimony to be provided at public expense, but far too late for counsel to be adequately prepared. Trial counsel also unreasonably failed to make use of impeachment material that was available to them, and/or

elicited damaging testimony on cross-examination, even where that testimony was beyond the scope of direct.

There were numerous delays occasioned in acquiring the transcripts, and they continued through Mr. Barrett's federal trial. At a June 6, 2005 status conference, a few short months before trial was to begin, the court was informed that based on counsel's communications with the court reporter, it was anticipated that the transcripts would be ready by July 11, 2005. (Tr. 6/6/05 Hr'g at 4-5.) This proved to be an unreasonable assumption. At another status conference on July 15, 2005, the Court was informed that the state court reporter had completed five of the nine volumes of testimony. On August 30, 2005, trial counsel reiterated that the transcripts were necessary for the defense to prepare for trial. At the pretrial hearing on August 31, 2005, it was revealed that little if any progress had been made; five volumes of testimony had still not been completed. (Tr. 8/31/05 Hr'g at 38-39.) The transcripts continued to trickle in during trial.

A combination of the Court's rulings on the transcript issue, the delay in producing the transcripts, and counsel's unreasonable preparation with the transcripts they had resulted in counsel failing to effectively impeach the tactical team members and Clint Johnson on several critical points with their testimony from the second state trial.

As already stated herein, a key factual dispute was whether Mr. Barrett knew the police were on his property because the emergency lights on some of the vehicles were engaged and visible to him prior to the shooting. Because of the delay in producing the transcripts, counsel's failure to prepare in the time available, or both, Mr. Barrett lost crucial opportunities for the impeachment of key prosecution witnesses in violation of his Fifth, Sixth, Eighth and

Fourteenth Amendment rights, as well as his statutory and rule-based rights to counsel, discovery, and cross-examination.

At the federal trial, Trooper Poe stated he became aware that emergency lighting was being used when he saw Trooper Hamilton's vehicle come into view from the east, implying that emergency lights were engaged before any shots were fired, and thus supporting the Government's theory. (R. 1412.) However, at the second state trial, he testified that he first became aware of seeing emergency lights *after* he heard shooting break out. (2nd St. Tr. Tx. at 747.) Trooper Greninger gave conflicting evidence between the second state trial and the federal trial regarding what lighting he observed. In state court, he testified he turned on his emergency lights after turning left to approach Mr. Barrett's residence, and recalled seeing Trooper Hise's emergency lights on. (2nd St. Tr. Tx at 448, 461.) At the federal trial, he testified Trooper Manion activated his emergency lights as he turned into the driveway before entering the property. He noticed also that Trooper Hash had his emergency lights on, but did not know when they were engaged. He was not completely sure Trooper Hise's emergency lights were on. Trooper Pettingill did not activate his lights. (R. 732, 760, 770, 773, 822.)

Most significantly, Clint Johnson testified initially in the second state trial that he was thirty seconds behind the tactical team and saw red and blue police lights at the intersection after turning onto the dirt road. He was impeached with a prior statement in which he said he only saw taillights, not emergency lights. Johnson made no mention in his statement about arriving thirty seconds after the tactical team and seeing any red and blue emergency lights. (2nd St. Tr. Tx at 25, 49, 51.) In the federal trial, Johnson said nothing on direct examination about any lighting. Trial counsel was caught flat-footed on cross-examination, when he opened the

area up and Johnson, in contrast to the statement he was impeached with in state court, testified

that he saw emergency lighting on the patrol vehicle and the second Ford Bronco.  (R. 358, 361.)

Counsel failed to impeach Johnson as counsel did in the second state trial.  Arguably, not even a

transcript would have been required to undermine Johnson on this point, because he was

impeached in state court with a previous statement, not previous testimony.

There obviously was a critical question as to whether Mr. Barrett or the police

opened fire first.  At the second state trial, Trooper Poe testified he did not know who fired or

where the gunfire was coming from, despite having an unobstructed view of the house.  He heard

shots as he exited his vehicle by the fence, and the gunfire was over by the time he was at the

fence.  (2nd St. Tr. Tx at 757, 766.)  None of this was brought out on cross-examination at Mr.

Barrett's federal trial.

The issue of where Trooper Hamilton's Bronco was when it first received fire was

a focal point of the debate over Mr. Barrett's knowledge and intent.  Although Trooper Greninger

professed a failed memory at the federal trial, and could only say that the shooting began

somewhere between the ditch and where Hamilton's Bronco came to a stop (R. 736), he testified

at the state trial (albeit with an addled memory), that while he had no real idea when the shooting

started, Hamilton's vehicle was ahead of his and had cleared the ditch; he became aware of the

shooting between the time his vehicle cleared the ditch and came to a stop halfway between the

ditch and Hamilton's Bronco.  In his first statement to investigators following the incident, he

recalled hearing gunfire as Hamilton's vehicle approached the front of the house, which would

indicate Hamilton had already gone through the ditch and was near the house when the gunfire

started.  This statement supported Mr. Barrett's defense argument that he only fired when

Hamilton's Bronco was almost literally in front of his house, with its headlights obstructing Mr. Barrett's view.  (2nd St. Tr. Tx 450, 504.)  Mr. Barrett's trial counsel unreasonably failed to refresh Greninger's memory with his helpful state court testimony, and to introduce that prior recorded recollection, or inconsistent statement.

Trooper Hamilton testified in state court that the shooting started as his vehicle was coming out of the ditch, and after he noticed Toby Barrett in the yard and began driving toward him.  (2nd St. Tr. Tx 330.)  This was helpful to the defense argument that Mr. Barrett only started firing when the Bronco was close to his house and was in fact headed toward his son, a dangerous situation to which any father would react.  In federal court, Hamilton stated the gunfire began earlier.  Instead of gunfire starting as he was coming out of the ditch, Hamilton stated gunfire began shortly after he initially hit the ditch.   In contrast to his testimony in state court, Hamilton stated his vehicle began receiving fire at head level in the middle of the windshield.  (R. 534, 603, 674.)  Counsel failed to effectively contrast Hamilton's testimonies on this point.

Defense counsel failed to exploit other differences between the state and federal trial testimony.  At the state trial, neither Troopers Poe nor Greninger testified to seeing any guns in Mr. Barrett's house.  In federal court, Trooper Poe said he saw an AR 15 and a shotgun in the back room off the entryway.  Greninger testified the rifle he found in Mr. Barrett's cabin was the one used to fire on the officers.  (R. 1426, 1427, 748-49.)

Perhaps Mr. Barrett's trial counsel's most grievous error occurred during cross-examination of Clint Johnson.  On direct examination, no details regarding any belief Johnson had that serving the warrant was "high risk" were explored.  On cross-examination, Mr. Barrett's

counsel asked an open-ended question, and received a barrage of hearsay damaging to Mr. Barrett. When counsel opened the door, Johnson marched through it, in the most prejudicial manner imaginable. Johnson stated he believed this was a "high risk" operation because Mr. Barrett had threatened to kill police officers and that he was making methamphetamine at his residence, which also creates hazards to law enforcement trying to take down a meth lab. Buttressing the testimony not only of the despicable Charles Sanders, but six of the seven informant witness, Johnson stated not only that several people had reported to the sheriff's office that Mr. Barrett was constantly firing weapons across the road, but that they had received several tips from different people within the last six months that Mr. Barrett was going to kill law enforcement officers.[19] This damaging answer, given only because counsel opened the door, just hung in the air. Counsel undermined the defense's own (meager) efforts to attack the credibility of the informant witnesses by brining out testimony from Johnson regarding these "prior reports" from "several" sources.[20]

Counsel's failures to impeach were professionally unreasonable, and not motivated by any legitimate strategy. Indeed it was contrary to the strategy evidenced in counsel's closing argument where Mr. Hilfiger sought to sow doubt about the accuracy of various

---

[19] As shown elsewhere in this Ground and in Ground Three, trial counsel's blundering cross-examination was most damaging because counsel failed to retain the expert in police tactics whose assistance the Court had authorized in part. Without an independent source of information about the raid, the Government was able to give jurors the *false* impression that the conduct of the tactical team was appropriate under the circumstances Johnson described.

[20] Johnson's testimony was surely false. None of these "known sources" reporting threats by Mr. Barrett to kill law enforcement officers were presented at the state trials. Surely, if several individuals were reporting this, they would have testified in 2002 and 2004. Counsel failed to point out that Johnson had given no such testimony previously. Indeed, the informant witnesses were purely last-minute creatures of the federal trial.

officers' accounts of the raid. Counsel's elicitation of damaging evidence from Johnson was highly prejudicial because it tended to invest credibility in the informant witnesses – however spurious it might have been, and however false Johnson's testimony was – that these witnesses otherwise lacked.

Trial counsel's unreasonable failure to investigate what an independent expert would say about the conduct of the tactical team, and their unreasonable failure to impeach Johnson, left the jury with two false impressions: (a) that at the time of the raid Johnson and the tactical team had sources of information other than Monk Sanders; and (b) that even if the information they had was true and backed by multiple sources, the raid was reckless and carried out in a way that made it hardest for Mr. Barrett to recognize his attackers as law enforcement officers. There is a reasonable probability that jurors would have rejected first degree murder or the death sentence if counsel had impeached law enforcement witnesses with available evidence.

**10.     Trial counsel unreasonably failed to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on. This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers.**

**a.     Toby Barrett.**

The primary contention of the defense in the first stage of trial was that when Mr. Barrett fired on the Ford Bronco driven by Buddy Hamilton, he was unaware that it was a police vehicle, and was unaware that several police vehicles had driven onto his property. It was undisputed that the lead vehicle driven by Hamilton, which the evidence showed struck Mr.

Barrett's porch, had no emergency lights engaged and appeared to be a civilian vehicle. Although no defense theory instructions were given, the defense argued that because Hamilton's car was unmarked, Mr. Barrett reasonably believed he was shooting at trespassers who had zoomed into his yard and struck his house with their vehicle, and reacted by shooting from inside his house.

The prosecution relied upon testimony from members of the tactical team to argue that but for Hamilton's vehicle and the "sniper" vehicle initially parked outside the locked gate to the property, the other police vehicles on or near the property had emergency lights of one sort or another engaged, making it obvious to Mr. Barrett that he was shooting at the police. The prosecution contended Mr. Barrett fired some of the shots after he emerged from his home, and could easily observe that the police were on his property.

Among the omissions of counsel that were inconsistent with prevailing professional norms was counsel's failure to call Toby Barrett to rebut the law enforcement officers' accounts of the raid. These witnesses would have furthered Mr. Barrett's right to present evidence inconsistent with the prosecution's theory of how the raid was conducted.

Prevailing professional norms of capital defense practice required Mr. Barrett's trial counsel to investigate, develop, and present witness testimony that could have called into question the manner in which law enforcement officers conducted the raid. (ABA Guideline 10.7 – Investigation and Commentary (specifically noting duty to interview eyewitnesses).)

Trial counsel were aware, or should have been aware, that there were conflicting accounts of the raid, even among law enforcement officers. Toby Barrett was the only witness to the beginning of the raid other than law enforcement officers. Toby Barrett testified in two prior

state-court trials. Toby Barrett was prepared for his testimony in those cases and was willing and able to be prepared by trial counsel to testify in the federal trial. (Exhibit 96. *See also* 1st State Tr. Tx at 1781.) Obviously, each of the state-court trials ended in a result more favorable to Mr. Barrett than the result of the federal trial.

During the federal trial, the Government made much of the sign on Mr. Barrett's gate. Toby Barrett would have testified, as he did when called by the prosecution in the first state-court trial, that the sign was only meant to convey "No trespassing or something. He had one something to that effect, sir." (1st St. Tr. Tx at 1787.)

Toby Barrett also testified as a prosecution witness in state court that the gate on which the sign was posted was open at the time the Bronco drove by earlier in the day. (1st St. Tr. Tx at 1822.) Toby Barrett's account of being in the front yard with his friend Bubba Thompson at the time of the drive-by is consistent with the testimony of Trooper Greninger, who saw two people in the yard at the time. (R. 724.) However, Trooper Hamilton testified in federal court that the gate was locked at the time of the drive-by, and this was offered as a justification for driving onto the property. (R. 518.)

In other respects, the testimonies of Toby Barrett and Trooper Hamilton are consistent with each other. For example, Toby Barrett confirmed that Hamilton had his headlights on but no lights signaling that he was law enforcement. (1st St. Tr. Tx at 1796-97; R. 524-26, 598.) However, Trooper Greninger testified that the vehicles' lights were turned on at the commencement of the raid. Officer Steve Hash could not verify Greninger's account. (R. 1036-37.)

Toby Barrett testified in state court that when the shooting occurred, there were no police vehicles with emergency lights on at all that were visible. (1st St. Tr. Tx at 1796.) The first police lights he saw were on the vehicle that crashed through the gate, but this was after the shooting was over. (Exhibit 96.) He denied telling the police he saw flashing lights. (1st St. Tr. Tx at 1809.) When Toby Barrett saw Hamilton's vehicle speed into the yard, he called out "Dad!" (1st St. Tr. Tx at 1790, 1795.) Toby Barrett never saw his father out on the front porch, shooting. If he saw his father at all it was for perhaps a split second, after which Mr. Barrett went back inside the house. (1st St. Tr. Tx 1794, 1795, 1796.) He never saw who was firing a weapon. (1st St. Tr. Tx at 1807.) The entire incident happened very quickly. (Exhibit 96.) The declaration Toby Barrett recently provided to investigators currently working for his father is consistent with his state trial testimony. (Exhibit 96.)

Mr. Barrett's federal trial counsel had every reason to trust the reliability of Toby Barrett's account. The prosecution in state court deemed Toby Barrett a reliable witness regarding the sequence of events leading up to and during the raid. His testimony was consistent with the state jury's verdict.

Toby Barrett's testimony would have provided the jury reasonable doubt regarding the federal prosecutor's argument regarding the raid, and in particular, his argument that the bullet that killed Trooper Eales was fired by Mr. Barrett with the intention of killing someone who was part of a law enforcement raid. Toby Barrett would have contradicted the prosecutor's assertion that the sign on Mr. Barrett's gate was evidence of intent. (*See* R. 4297, 4305.) Toby Barrett's testimony that his father only knew a SUV was speeding onto the property, and had only a split second's view of the Bronco before he went inside; that the

Bronco's headlights were shining on the porch; and that no police lights were visible as the shooting occurred, would have contradicted the prosecutor's argument that Mr. Barrett had the opportunity to observe the scene, see police lights, and form the intent to kill before the shooting started. (*See* R. 4299-4302.)

Toby Barrett's location when the lead Bronco pulled up would have been important to defense trial counsel's closing argument. (R. 4316-17.) Instead of being able to draw the jury's attention to Toby's testimony regarding his location when the Bronco pulled in, and point to a specific location on an exhibit, as the state trial prosecutor had done, trial counsel could only argue "Toby Barrett was some place out in here." (R 4317.)

Even though Toby Barrett had testified at his father's state trials, counsel in the federal case made no effort to interview him or prepare him to testify. In his recent declaration, Toby Barrett states, "I went up to Mr. Hilfiger in court more than once and asked him if he was going to want me to testify at the trial. He said yes each time, but he never called me. He never asked me about the incident, my father's mental problems, my home life or about me or my mom." (Exhibit 96.)

### b.      Alvin Hahn.

Alvin Hahn was a neighbor of Mr. Barrett's. On the night of the shooting, he was asleep and was awakened by gunfire. When Mr. Hahn looked outside about fifteen seconds after the shooting stopped, he saw only one vehicle with its police lights on. (Exhibit 75.)

Mr. Hahn's account is consistent with Toby Barrett's, and would have corroborated Toby Barrett's testimony that *after* the shooting, there was only one police vehicle with its emergency lights on, namely the vehicle that crashed through the gate. Just as it was

professionally unreasonable to fail to call Toby Barrett as a witness, counsel had no legitimate

reason for neglecting to call Alvin Hahn, who could have supported the defense theory that the

police descended on Mr. Barrett's property with nothing to indicate they were law enforcement,

and that Mr. Barrett had every reason to believe he was being invaded by trespassers.

Trial counsel's omissions of known witnesses Toby Barrett and Alvin Hahn were

unreasonable and prejudicial.  The testimony of Toby Barrett and Alvin Hahn would have

conflicted sharply with the accounts of the Government's witnesses, and provided jurors with

evidence that Mr. Barrett did not know, in the few seconds he had to act, that the people

attacking his cabin in the middle of the night were law enforcement officers.  Viewed

individually or collectively, with all the evidence defense counsel failed to prepare and produce

in the first stage of trial to counter the Government's case, there is a reasonable likelihood of a

different result had Toby Barrett and Alvin Hahn been called as witnesses.

**11.     Trial counsel unreasonably failed to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence.**

A key component of the Government's case was its theory that Mr. Barrett was

well aware there was a warrant out for him for failing to appear for trial in a minor felony drug

case.  *See* file, Sequoyah County Case No. CF-97-80, *State of Oklahoma v. Kenneth Eugene

Barrett.*  According to the Government, Mr. Barrett anticipated the police were going to arrest

him at any time on this warrant, and he was therefore making preparations to repel the police

with deadly force.  This theory was founded on the testimony of informant witnesses Charles

Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Randy Turman and Karen Real, who,

as noted, testified that Mr. Barrett told them about the warrant, and stated he would kill the first

policeman who came on his property and would "go out in a blaze of glory."  The Government

argued that the killing of Trooper Eales was the fulfillment of Mr. Barrett's "plan."

It was imperative that trial counsel rebut this linchpin theory of the Government's

case; yet, trial counsel did virtually nothing to rebut this argument other than rely on cross-

examination.  Had counsel conducted anything approaching a reasonable, professional

investigation into Mr. Barrett's alleged failure to appear, or had they been paying sufficient

attention to certain testimony that was introduced at the hearing on Mr. Barrett's motion to

suppress  (Tr. 1/ 26/05 Hr'g at 25-45, testimony of Bernell Edwards, Deputy Sequoyah County

Court Clerk), the Government's theory would have evaporated, the snitches would have been

further impeached, and the Government's case for intent would have suffered mightily.

### a.      Mr. Barrett's "failure to appear".

Any reasonable investigation would have cast doubt on Mr. Barrett's alleged

failure to show up for trial and the circumstances surrounding the warrant issued for his arrest.

Had trial counsel conducted a reasonable investigation of the court files related to Mr. Barrett's

state court charges, they would have discovered that there was not going to be a trial.  No citizens

had been summoned for jury service on the date of Mr. Barrett's scheduled trial, January 25,

1999.  (Exhibit 39.)  In fact, when the Clerk of the Sequoyah County Court checked the court

records, she found that no citizens were summoned for jury service in January 1999, and no

jurors reported to the court during the entire month of January 1999. (Exhibit 39.)  This is

curious, as Ms. Edwards specifically testified at the suppression hearing that the trial scheduled for January 25, 1999 was a jury trial. (Tr. 1/ 26/05 at 25.) Accordingly, Mr. Barrett was charged with failing to appear for a trial that never was scheduled. He was not the only party who failed to appear; apparently, the entire jury failed to appear because they were never summoned.

The importance of this fact – and the importance of this fact being pointed out to a jury – goes to the defense theory of the suspect circumstances involving every single detail of the state prosecution of Mr. Barrett. The trial that never was is the first shaky detail in the whole house of cards.  The first cause of the events leading to Trooper Eales death was a warrant issued for Mr. Barrett's arrest for his failure to appear for a trial that was not going to happen anyway. That warrant was "issued" in violation of state law as the state court found.  The warrant was "issued" by a deputy clerk who lacked legal authority because the warrant was not sought on application by the District Attorney.

The State's "investigation" went downhill from there.  The rare no-knock warrant was intended to deny Mr. Barrett notice he was going to be arrested.  The warrant was based on the statements of a serial felon, informant, and liar, and a law enforcement officer who proved to be a crook himself.  Evidence indicated that Mr. Barrett had cooperated with authorities in the past, and had not been violent toward law enforcement officers.  The suspicious confidential informant recanted at trial the information he allegedly gave in the search warrant affidavit.  The search warrant was executed with a team of "dignitaries."  Once the search warrant was executed, no methamphetamine was ever discovered.  Each of these facts is consistent with the conclusion that Mr. Barrett was the target of an unjustified raid that was recklessly conceived and implemented in a manner designed to conceal the fact that law enforcement officers were the

raiders.  In other words, the fact that there was no jury summoned for the day Mr. Barrett was

supposed to be tried supports the conclusion of the state-court jury that this was not a case of a

man lying in wait for law enforcement officers.  Trial counsel's lack of investigation was

inexcusable and caused extreme prejudice to Mr. Barrett.

### b.    Mr. Barrett's lack of knowledge of the warrant.

The Government called Ms. Bernell Edwards at the motion to suppress hearing to

testify regarding the contents of the court file in CF-97-80.  Ms. Edwards stated that according to

the file, Mr. Barrett had a trial date of January 25, 1999, at which he failed to appear.  A bench

warrant was issued for Mr. Barrett on January 27, 1999.  When a defendant is not represented by

an attorney, the practice of the court clerk's office is to mail a notice regarding the missed court

appearance to the defendant.  (Tr. 1/ 26/05 at 25, 29; File in Sequoyah County Case No. CF-97-

80.)

On cross-examination by Mr. Echols, it was pointed out there was nothing in the

file to indicate that, in accordance with Oklahoma law, the bench warrant was issued on the

motion of the District Attorney.  (Tr. 1/ 26/ 05 at 36.)  The docket sheet showed that at one time,

Mr. Barrett was represented by attorney Bill Ed Rogers.  Mr. Rogers filed a motion to withdraw

on September 11, 1998, but there was no docket entry showing that he had actually been allowed

to withdraw.  (Tr. 1/ 26/05 at 37-38.)  Mr. Barrett applied for court appointed counsel on

December 14, 1998.  Nothing in the court file indicated that Mr. Barrett's bail bondsman was

given notice of the bench warrant.  There was nothing in the court file showing that based on Mr.

Barrett's failure to appear, a bond forfeiture action was instituted, which would have necessitated

the bondsman to bring Mr. Barrett in so the bondsman would not be liable for the entire amount

of the bond. There was nothing in the court file to show that Mr. Barrett had actually received notice that he failed to appear, and that a bench warrant had been issued for his arrest. The letter sent by the court clerk's office was simply sent in the regular mail; the letter was not certified, with a return receipt requested. (Tr. 1/ 26/05 at 39-43, 45.) For all the court file suggested, Mr. Barrett was totally unaware there was a warrant out for his arrest.

Without question, it was professionally unreasonable for counsel to fail to call Ms. Edwards, or another representative of the court clerk's office, to sponsor the court file to demonstrate there was *no official record indicating Mr. Barrett would have been aware a warrant had been issued for his arrest.* The evidence was already in the record. Only gross neglect can explain this glaring failure to review the file in the case that started the entire tragic chain of events.

Mr. Rogers, the last attorney to represent Mr. Barrett in the state-court distribution case, whose motion to withdraw was never granted, certainly never informed Mr. Barrett that he had an outstanding warrant. Mr. Rogers is now deceased. In connection with this Petition, his widow, Mary Rogers, was contacted by a defense investigator. Mr. Barrett's current representatives have obtained a copy of Mr. Rogers's file in the case. Mrs. Rogers states there is nothing in her late husband's file to show that Mr. Rogers ever informed Mr. Barrett he had missed a court date, and that a warrant had been issued for his arrest. Even if Mr. Rogers had been informed a bench warrant had been issued, he would not have informed Mr. Barrett, because Mr. Rogers was upset over the manner in which Mr. Barrett had terminated his services. (Exhibit 31; Exhibit 182.)

In addition, the file of Bill Ed Rogers shows that Mr. Barrett was offered a plea in which he faced no jail time. This fact alone, or in conjunction with other facts set forth herein, including that no jury was called for the "trial," would have convinced jurors that the State had unnecessarily sought the no-knock warrant. This fact, combined with the evidence of errors made in the planning and execution of the raid, and the abundant impeachment evidence undermining the Government's eleventh-hour informants, would have given jurors more than reasonable doubt about Mr. Barrett's intent, and certainly the death penalty.

Trial counsel considered it important that Mr. Barrett had not received notice of the bench warrant. But, inexplicably, the defense waited until the second stage of trial to call Mr. Barrett's bail bondsman, Martin Daggs. He explained that he had never informed Mr. Barrett of the bench warrant. The bond was never forfeited. Mr. Daggs testified that if he needed to get hold of Mr. Barrett to surrender him on a warrant or bring him to court, he knew where to find him. There was no sound, strategic reason for deferring Mr. Daggs's testimony to the penalty phase, when he could have and should have been called in the first stage in aid of refuting the Government's theory of the case.

### c.      Mr. Barrett's previous cooperation with the law.

Had Mr. Barrett's trial counsel conducted a reasonable investigation, there were other readily available witnesses who could have testified that Mr. Barrett was unconcerned with the police, had been staying on his property rather than venturing out into the larger community for years *preceding* any warrant, and had in fact been visited by the police within a few weeks of the shooting incident without incident and without being taken into custody. Evidence was also readily available that would have demonstrated that had Mr. Barrett and his family been

contacted and told he had an outstanding warrant, he would have turned himself in or allowed his family to do so. See also Ground Five (suppression of evidence and newly discovered evidence).[21]

Janice Sanders, a relative of Mr. Barrett's, lived near his property. Approximately three weeks or so before the shooting incident, she called the police because Mr. Barrett was firing a gun into the air. Five officers, including Sequoyah County Sheriff John Philpot, responded to Mr. Barrett's residence. The sheriff inspected Mr. Barrett's rifle to determine whether it was empty, and gave it back to him. There was no confrontation with the authorities, and Mr. Barrett was not taken into custody on the "outstanding warrant" or for any other reason. (Exhibit 85.)

During Mr. Barrett's state case, Mr. Philpot was deposed by John Echols regarding his previous contacts with Mr. Barrett. In late 1998, Sheriff Philpot and others, including Deputy Sheldon Fair, went to Mr. Barrett's residence over a complaint that he was firing weapons, something he did not infrequently. (Exhibit 85.) On this occasion, Sheriff Philpot arrived after the other officers. When the sheriff arrived, the officers who were already there were inspecting Mr. Barrett's weapons and running the serial numbers. One of the weapons being inspected appeared to be an SKS. Sheriff Philpot informed Mr. Barrett that he had an outstanding misdemeanor warrant. Mr. Barrett said he would appear and take care of the matter. Sheriff Philpot did not take Mr. Barrett in on the warrant. Mr. Barrett never threatened

---

[21] *See also* Ground 5, (*Brady/*newly discovered evidence). Former Sequoyah County Sheriff Philpot has admitted to a defense investigator, consistent with the statements of Janice Sanders and Sylvia Gelene Dotson, that he was on Mr. Barrett's property, without incident, within a month of Trooper Eales being killed.

any of the officers, and his weapons were returned to him after they were inspected.  (Exhibit 108.)

Although Ms. Sanders was interviewed by defense counsel, she was not called as a witness.  When she was contacted by Mr. Hilfiger and a man who was likely Bret Smith, this gentleman asked Mr. Hilfiger if he was going to call Ms. Sanders as a witness.  To his surprise, Mr. Hilfiger said "no."  (Exhibit 85.)  In addition to impeaching the Government's theory of the case, testimony from Ms. Sanders and Ms. Dotson would have been important to the motion to suppress, showing there was no cause for a no-knock, nighttime warrant.

Mr. Barrett's mother, Sylvia Gelene Dotson, who lived next door, was called as a defense witness in the first stage of trial, but she was not asked about the police coming to her son's residence shortly before the shooting incident, or how long Mr. Barrett had kept close to his property.  Had she been asked, she would have testified that Mr. Barrett was not capable of living on his own, and thus stayed close to his relatives in the community for support.  He had been doing this long before the "warrant" was issued.  Ms. Dotson was stunned at the midnight raid on Mr. Barrett's house.  Had the police simply contacted Mr. Barrett's family, they would have brought him in.  Even if the police had come out to simply arrest Mr. Barrett in a non-confrontational way, there would have been no problem.  Moreover, shortly before the raid, and consistent with what Janice Sanders says, the police had been to Mr. Barrett's property to inspect his weapons.  There had been no violence and no problem.  (Exhibit 97.)

Ruth Harris, Mr. Barrett's aunt, also states that had the authorities simply let the family know that Mr. Barrett had an outstanding warrant, it could have been arranged without any difficulty for Mr. Barrett to surrender peacefully.  (Exhibit 93.)

Another of Mr. Barrett's aunts, Phyllis Crawford, lived just down the road. On one occasion when Mr. Barrett felt he was wanted for something by the police, far from threatening violence or bragging that he would "go out in a blaze of glory," Mr. Barrett came to her in tears, asking what he should do. Ms. Crawford told him if the police really wanted him, he should simply go with them. Instead of issuing threats, this advice seemed entirely reasonable to Mr. Barrett, and calmed him down. (Exhibit 91.)

Sean Hill, who was available to testify but never contacted by the defense, states that far from "hiding out" from a warrant, Mr. Barrett had really never left his property for years. Police drove by Mr. Barrett's property all the time. When Tom Sanders would call in noise complaints against Mr. Barrett, the police would drive by, and there was no reaction from Mr. Barrett. Mr. Barrett was used to the regular police patrols and police presence in the area. His view was that he was there if the police wanted him. Mr. Hill also could have testified that the sign on Mr. Barrett's gate (Government Exhibit 104) which the prosecution made much of had been placed there on September 22, 1999, because the night before drug addicts had climbed over the fence and woken Mr. Barrett up. (Exhibit 95.)

Brandy Hill could have given similar testimony. She states that from 1996 to the time of the shooting incident, police drove by Mr. Barrett's place on a frequent basis, sometimes up to three times a week. Mr. Barrett was used to the police presence and was not bothered by it. (Exhibit 77.)

Trial counsel also unreasonably failed to call in the first stage one of Mr. Barrett's neighbors, Clyde Edgmon, and bail bondsman Martin Daggs. Both these witnesses were known to trial counsel at some point, as they were called to testify in the second stage of trial. In the

penalty phase, Mr. Edgmon testified that approximately six months before the raid, two law enforcement officers, John Owens and Sandy Gerdner, came by his house when Mr. Barrett was working on a truck for him. The officers talked to Mr. Barrett for some time. There were no problems, and Mr. Barrett was friendly with the officers. Mr. Edgmon, Ms. Hill, and other witnesses contradicted the Government's theory that Mr. Barrett was "hiding out" from the law for months before the raid, priming himself for a violent confrontation. Mr. Edgmon's testimony also would have cast doubt on the claims of several of the informant witnesses that Mr. Barrett was prepared to "go out in a blaze of glory" and would react violently to any police contact.

Had counsel conducted a proper investigation and presented this evidence, there is a reasonable probability that the outcome would have been different. Evidence that there was no jury trial for which Mr. Barrett "failed" to appear, that the bench warrant was invalid, that he was without counsel, that he had no notice of the "trial," and that he was willing to be questioned and produce his firearms to law enforcement directly countered the prosecution's theory of the case. Compared to this evidence, the self-serving testimony of the seven snitches would have been found clearly wanting in credibility.

**12. Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony. Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.**

Mr. Barrett's trial counsel unreasonably failed to challenge the Government's use of irrelevant and prejudicial testimony of James H. Horn, a so-called expert in the area of "traumatic stress" (R. 849.) Trial counsel allowed the jury to hear Horn's testimony over a

period of two days, failed to timely move to strike that testimony, and when the court did finally strike the testimony, failed to obtain an adequate curative instruction, or to move for a mistrial.

The Government was clearly concerned about the discrepancies in the testimony of its fact witnesses, both as compared to other witnesses, and with regard to their own testimony in the previous state court trials. (R. 925, 934, 1630-31.) Consequently, it again called a witness who had previously testified at the state court trials, former FBI agent James Horn. Horn testified to his credentials, including a B.S. in Psychology – although he admitted he was not a psychologist (R. 843, 909) – and a Masters of Forensic Science degree from George Washington University in Washington D.C. (R. 843.) Horn also stated he was board certified through the American Academy of Experts in Traumatic Stress in "Emergency Crisis Response" and "Traumatic Stress." (R. 848.) He informed the jury, in some detail, about his service as a decorated Marine Corps infantry officer, having served two tours in Vietnam before joining the FBI. (R. 843-45.) Horn had worked with the FBI's behavioral unit as a criminal profiler, and then as program manager of the FBI critical incident program. (R. 845-848.)

Horn's testimony revealed a strong affiliation with law enforcement and allowed him to present himself as having extraordinary first-hand knowledge of traumatic events. Even during the process of stating his credentials before being offered as an expert, Horn spoke of having been exposed to rocket attacks by the Viet Cong, engaging in combat with the North Vietnamese, and working for the FBI on "critical incidents" such as Hurricanes Andrew and Hugo, the Oklahoma City Bombing and the assassination attempt on Ronald Reagan, as well as being a member of the first FBI SWAT team (R. 844-847.)

During the two state court trials, Horn similarly claimed involvement in the FBI's first SWAT team (Trial # 1, 2120), the aftermath of the Oklahoma City Bombing (Trial # 1, 2122; Trial # 2, 1436, 1441); wartime experience in Vietnam (Trial # 1, 2135; Trial # 2, 1436-37, 1445, 1451, 1459-60); the incident at Wounded Knee (Trial # 2, 1437-39, 1460); as part of an anti-terrorist squad at the Lake Placid Winter Olympics (Trial # 2, 1438); and in connection with a fatal sky-jacking (Trial # 2, 1439).

Horn was accepted by the court as an "expert witness in the area of traumatic stress" without objection from the defense (R. 849), nor any request for a *Daubert* hearing. Horn then testified in very general terms about the impact of trauma on an individual's ability to relate and recall the incidents and circumstances in question.  While unable to comment on the specifics of any of the lay witnesses' testimony (R. 881), Horn narrated the impact of "personal feeling[s] of mortality and vulnerability" that trauma creates (R. 850), and particularly how there is "an extreme aggravation by the loss and injury to fellow police and fellow agents ... the worst thing that happens to a law enforcement officer in the line of duty is the death of a partner in the line of duty. So we can expect to see in those circumstances the worst, the most serious impact in effects on the colleagues who survive." (R. 851.)  In explaining his views about the impact of trauma on recollection, Horn referred repeatedly to his FBI days and cited to specific cases he had been involved in or had simply heard of, giving names and locations.  (R. 852-4, 858, 859, 860.)  However, he offered no particular opinion concerning the members of the SWAT team in this case, even though he had actually been involved in debriefing them in group "counseling sessions," where he had offered them "peer support" (R. 905, 874-79), and claimed that he had the officers sign confidentiality agreements concerning the debriefing.  Horn stated correctly that

"confidentiality doesn't extend to the courtroom, privilege does." (R. 880.)   However, counsel simply acquiesced to Horn not testifying about the specifics of what had been said in the debriefing, apparently out of concern that Horn should not run the risk of creating a conflict for himself.  (R. 881.)

After testimony from Horn running to some forty printed pages (R. 849-889), including his narration of what an FBI "psychiatrist" had said on the soundtrack of a training video (R. 856), the court finally intervened *sua sponte*, noting that: "I don't have a clue why the government called this witness ... I don't know what his expertise is ... I don't think a foundation has been laid ... it could be a *Daubert* issue ...".  (R. 890.)

Nonetheless, Horn's testimony continued without challenge from defense counsel, who elicited details of how law enforcement officers should be treated after a traumatic incident, and Horn establishing that his work was not "interested in critiquing and facts, but in helping them resolve their emotional response to these incidents." (R. 897-98.)   As his testimony continued, it became apparent that Horn was unfamiliar with various concepts relevant to the area of memory and trauma, such as acute traumatic disassociation (R. 908-10),[22] confabulation (R. 906),[23] and contamination of memory through contact with others.  (R. 900-901.)[24]  In fact,

---

[22]*See, e.g.,* Vermetten, Dorahy and Spiegel, *Traumatic Dissocation: Neurobiology and Treatment* p. 83, American Psychiatric Publishing 2007.

[23]Horn defined confabulation as "it means to make it up," whereas confabulation is the formation of false memories, perceptions or beliefs as a result of neurological or psychological dysfunction. Helen Phillips, *Mind Fiction: Why your brain tells tall tales,* 2572 New Scientist, 7th October 2006.

[24]Contamination of eyewitness testimony by subsequent input is a phenomenon that has been confirmed by clinical studies. Anthony Esgate, *An Introduction to Applied Cognitive Psychology*,

(continued...)

Horn made it plain that he was not interested in the current research in the field, just in dealing with individual cases.  (R. 883.)

Before recessing for the day, the court again expressed concern about Horn giving expert testimony, citing to Fed.R.Evid. 702 and the fact that Horn "hasn't talked about any principles or methods that he has used to reach any conclusion and he hasn't applied any of the principles or methods reliably to any facts of this case because he really hasn't talked about the facts in this case." (R. 918.)  The following morning, having expressed further concern, the court indicated that it was contemplating striking Horn's testimony, since it was not likely to aid the jury in resolving any factual dispute, but rather consisted merely of talking "in generalities." (R. 923-27.)  Only after the court had questioned the government at length about the relevance and usefulness of Horn's testimony (R. 923-940) did the defense finally make the half-hearted statement: "I think the Court should consider striking his testimony" (R. 940).  When given a further opportunity to ask that the testimony to be stricken, the defense still failed to affirmatively request that remedy. (R. 948.)   The court then permitted further cross-examination of the witness before the jury (R. 949-958) at the end of which the defense finally moved to strike.  However, the Government was then permitted to take the witness on redirect.  (R. 966-975.)

Eventually, the Court gave counsel a further opportunity to argue the issue (R.1628-1632) and then struck the testimony (R. 1636), giving an instruction to disregard:

> Members of the jury, if you will listen, I'm going to give an
> instruction.  I started to say a special instruction.  It's not special,
> it's just – it's just a – (Pause) Not a special instruction, but just an
> instruction in regard to some testimony you have heard from Mr.

---

[24](...continued)
51 Psychology Press 2004.

> Horn.  So if you would listen to this interim instruction:  Ladies
> and gentlemen of the jury, when we started this trial I gave you
> some preliminary instructions to guide you in your participation in
> this trial.  As I advised you at that time, it is my duty to determine
> the law applicable to this case and it is your duty to accept and
> follow my instructions regardless of whether or not you agree with
> the law.  As a matter of law, I have determined that the testimony
> which you heard on Monday afternoon and Tuesday morning of
> James Horn should not have been admitted into this trial.  You
> should not speculate about the reasons for my ruling on this issue;
> it is based solely on my interpretation of the law applicable in this
> case.  Therefore, I instruct you that you should disregard Mr.
> Horn's testimony in its entirety and not consider it for any purpose
> in making your decision when reaching a verdict in this case.

(R. 1740.)

Nothing in the record indicates that defense counsel urged any amendment to the

instruction, even though the trial court gave them that opportunity.  (R. 1636-37.)  Inexplicably,

in spite of the trial court's concern about Horn's testimony, and willingness to strike it, defense

counsel made no motion for a mistrial.

Horn's testimony, as the court readily saw, was inadmissible under Fed. R. Evid.

702.  The fact was equally clear on the basis of the two state trial transcripts.

Counsel were ineffective for failing initially to challenge Horn's qualifications

and the admissibility of his testimony.  Counsel had ample opportunity to prepare for Horn's

testimony and consider whether to challenge it, because Horn was listed in the Government's

witness list  and had testified at the two previous state court trials.  Counsel do not appear to have

bothered to ascertain what Horn's qualifications were.   During a budgeting hearing on the

morning before Horn testified, Mr. Hilfiger stated he believed Horn was a psychologist. (Tr.

10/3005 at p. 7.)   However, although Horn had a degree in psychology and had acquired

practical experience as an FBI agent, he frankly stated that he was not a psychologist (R. 909) or

psychiatrist (R. 907), was not focused on research, or with accuracy of recollections, but with the counseling of individuals. (R. 883, 903-904.)

Horn did state, however, that he was Board Certified in two areas, "Emergency Crisis Response" and "Traumatic Stress", through the "American Academy of Experts in Traumatic Stress" [AAETS] (R. 848.)   Had defense counsel spent even a few minutes researching those qualifications, they would have discovered that the AAETS is an organization in which membership can be bought over the internet (at present, for as little as $60), and that its "Board Certification" credential simply requires a "comprehensive application and examination, along with supporting documentation ... utilized in concert to validate a member's experience in working with survivors of traumatic events, knowledge of the literature and level of education."[25] Indeed, it is an organization through which one can become "Certified in Acute Traumatic Stress Management" merely by completing an application and taking an examination based on a book, "Comprehensive Acute Traumatic Stress Management," which is purchased through the AAETS itself.[26]   When contacted for information about Board Certification in Traumatic Stress, the AAETS provides a link to "The National Center for Crisis Management," which produces a form indicating that Board Certification may be obtained for $350.00, a resume/vita and copies of relevant licenses and certificates, with no mention of any examination, and with the applicant self-certifying as to completion of "relevant course work concerning the specific speciality area"

---

[25]*See* http://www.aaets.org/diplomate.htm (last accessed March 2, 2009).

[26]*See* http://www.aaets.org/catsm.htm (last accessed March 2, 2009).

and to other ill-defined criteria.[27]  For example, 30% of the necessary points required for Board

Certification can be acquired by being "Author/Co-author of an article, paper and/or presentation

related to the specific specialty area," but the Board Certification application does not even

demand a copy of the article or paper in question.

Further, when being cross-examined about an article by psychiatrist Park Dietz,

Horn was asked whether he was a "master's level educated expert in this field," to which he

replied "In emergency response, yes, emergency crises response." (R. 908).[28]  This was clearly

untrue: his master's was in forensic science, but counsel did not correct that false impression.

Defense counsel did not even talk to Horn in advance of his testimony (R. 863),

but cross-examined him by asking questions to which they did not know the answers he would

give.  R. 863-866, 887.   For example, they attempted to question him about an article by Dave

Grossman on "Critical Incident Amnesia," asserting that Horn "knows Dr. Grossman," only to

have Horn state moments later that he knew nothing about Grossman. R. 885-888.[29]  The defense

[27]*See* http://www.nc-cm.org/APPLICATION%20FOR%20SPECIALTIES.cwk.pdf (last accessed March 9, 2009).  The National Center for Crisis Management offers no fewer than fourteen different Board Certifications, in Forensic Traumatology, Emergency Crisis Response, Motor Vehicle Trauma, Disability Trauma, Pain Management, Illness Trauma, University Crisis Response, Bereavement Trauma, Domestic Violence, Sexual Abuse, Rape Trauma, Stress Management, School Crisis Response and as a "Crisis Chaplain."

[28]The article appears to have been J.M. Rivard, P. Dietz, D. Martell and M. Widawski, *Acute Dissociative Responses in Law Enforcement Officer involved in Critical Shooting Incidents: the clinical and forensic implications*, 47 Journal of Forensic Sciences, Issue No. 5 (2002).

[29]The article in question was not introduced into evidence.  It was, presumably, Lt. Col. Dave Grossman & Bruce K. Siddle, *Critical Incident Amnesia and the Implication of Memory Loss During Extreme Survival Stress Situations*, 31 The Firearms Instructor: The Official Journal of the International Association of Law Enforcement Firearms Instructors (Aug. 2001).  *See* http://www.traumaregister.co.uk/Articles/critical_incident_amnesia.htm  (last accessed March 6,

(continued...)

also continued to reinforce Horn's credentials, for example bringing out his role as state director of the Oklahoma Chapter of Concerns of Police Survivors (R. 866), his award from the "Concerns of Police Survivors" group (R. 867), the number of presentations he had supposedly given (R. 868), the fact that he had already testified twice concerning this incident (R. 869), and his supposed involvement in research. R. 883-84. While bolstering Horn's seeming credentials, the defense failed altogether to attack the "board certifications" he had acquired through a diploma mill.

Defense counsel were also ineffective for failing to challenge the essential shortcoming of Horn's testimony: that it was not helpful to the trier of fact. Any suggestion that counsel made a legitimate strategic decision not to challenge Horn but to adopt whatever aspects of his testimony were useful, (R. 959) is belied by their obvious lack of preparation. The unopposed admission of his testimony, and counsel's eventual need to have it stricken were the result of inattention, not reasoned strategic judgment.

Ultimately Horn was, as the court put it, nothing more than "a forensic person who deals with traumatic experiences that police officers have." (R. 935.) Horn did not hold himself out as a psychiatrist (R. 907), or a psychologist. (R. 909.) Horn himself emphasized that his work involved helping people cope with the stress of unexpected trauma, not with any issue concerning factual debriefing. He did not even really purport to be giving his opinions as an expert, seeming confused when asked whether he was expressing an expert opinion: "Pardon? ... if I am testifying as an expert witness, I guess what I'm saying are expert answers." (R. 957.)

---

[29](...continued)
2009).

Defense counsel appear to have had no real strategy concerning Horn's testimony. They conceded admissibility, but then had second thoughts when the court ruled the testimony inadmissible and suggested moving to strike it. Counsel indicated that they had foregone their opportunity to present their own witness to rebut the matters to which he testified, intending simply to "develop out of him what we could find useful and move on down the road and not have an expert come up and tell the other side of the stories *per se.*" (R. 959.) Given Horn's lifelong work with law enforcement, and the nebulous nature of his expertise, this "decision" was uninformed and unreasonable under prevailing professional standards. It is hard to ascertain whether defense counsel actually viewed Horn as a witness for or against their client, but their sheer unpreparedness resulted in a "cross-examination" that was faltering, and characterized by the witness denying knowledge of the authorities that counsel was seeking to have discussed, resulting in an entirely unsuccessful examination on the part of the defense.

This quixotic attempt to get mileage out of a witness so favorable to the prosecution was mirrored in the October 3 Budget Hearing, where counsel revealed that they were contemplating compelling the testimony of a "SWAT team expert" they knew to be actively opposed to testifying for them. *Id.* at 6. *See supra* claim of unreasonable performance regarding Chuck Choney.

The court had authorized limited funds for trial counsel to retain a psychologist to assist in preparing to deal with Mr. Barrett's and the law enforcement officers' responses to the raid. (Doc. 97.) However, the court permitted Mr. Barrett to be assisted by only one mental health expert and only at below-market rates of compensation, and only for a number of hours far below the norm for federal capital trials, although the expert had to cover many disparate issues.

*See* Grounds One, *supra*, and Three, *infra.*  Mr. Hilfiger, whom the court personally selected to represent Mr. Barrett as part of a plan to develop a panel for future capital cases (Exhibit 67), declined to join his former lead counsel in requesting additional funds from the court.  (Exhibit 34.)  Mr. Hilfiger stated that he relied upon Jeanne Russell, Ed.D., to provide him questions for his cross-examination of Horn.  (Tr. 10/3/05 Hr'g at 7.)  Trial counsel did not contact Dr. Russell until mid-August, and did not possess the second state trial transcripts until late September, 2005, at the earliest.

Dr. Russell, in her communications to trial counsel, questioned what role Horn was to play in the trial, and admitted difficulty in framing questions for him.  A particular concern for her was whether Horn was a mental health expert who might be prevented from testifying for reasons of confidentiality and privilege, and the fact that Horn was assuming dual roles by providing counseling and then testifying as an expert regarding the same subject matter. Defense counsel seemed to accept without question that Horn could not testify about what the officers had actually said in the debriefing sessions (R. 938), apparently believing that information was somehow privileged.  Similarly, counsel did not pursue discovery of any notes or records of the various debriefing sessions.  (R. 939.)

Not only did counsel lack information from the debriefings with which to cross-examine, but they also overlooked the critical fact that the group sessions were, in effect, a pre-emptive violation of Fed. R. Evid. 615:  an untrammeled opportunity for the officers to learn in advance what other officers would say and, consciously or unconsciously, adopt other officers' perspectives on the incident.  Defense counsel also did not question the narrative technique adopted by some of the officers, of speaking in the present tense - a recognized therapeutic

technique in trauma counseling - when describing what they said had taken place.[30]  This not only

suggested an unusual degree of synchronicity in the officer's testimony, but rendered it more

powerful than a normal past-tense narrative.

Regardless of the court's instruction, Horn's testimony should not have been

admitted and was highly prejudicial.  It was the court that recognized Horn had nothing

legitimate to offer, hence the fact that his testimony was stricken.  This testimony must have had

a tremendous impact on the jury, and the court's instruction to disregard it was an exercise in

futility.  Horn painted a powerful picture of law enforcement officers as a valiant brotherhood,

referring to "one of our FBI heroes" (R. 855), to the powerful impact of losing a colleague (R.

851) and to the close relationship of SWAT team members: "it's very akin to the relationship I

still have to this day with the Marines with whom I served in Vietnam because there is a bond

when you face life-threatening situations that is formed, that is probably like no other bond." R.

861-62.  Not only did this testimony improperly bolster the prosecution witnesses, suggesting

that the inaccuracies in their testimony were of little moment, given the trauma experienced by

the grieving band of law enforcement agents, it also amounted to victim impact testimony that

should never have come in at the guilt phase.  The Court itself acknowledged this facet of the

testimony when ruling that it would strike the testimony: "At best, Mr. Horn's testimony is

simply an attempt by the government to bolster the credibility of its witnesses for memory lapses

of those witnesses at issue." (R. 1635.)  Moreover, it sought to explain the fact that officers might

"recall" significant facts long after an incident which they had not previously mentioned, without

---

[30]  *See* David H. Barlow, *Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-Step Treatment Manual*, 71 Guilford Press 2001.

beginning to explore the question of whether those recovered "memories" were reliable recollections. (R. 858-59.)

Horn's testimony concluded on October 4, 2005, but the jury was not instructed to disregard it until three days later, on October 7, 2005. This delay allowed the evidence to sink into the jury's consciousness. Moreover, the low-key nature of the instruction, which downplayed even its own importance, can have done little to erase the jury's recall of Horn's testimony. "It's not special ... Not a special instruction, but just an instruction in regard to some testimony that you have heard from Mr. Horn." (R. 1739.) The trial court also missed an opportunity to drive home the importance of the instruction, by failing to emphasize that the evidence was simply inadmissible as a matter of controlling law, but rather stating that the ruling "is based solely on my interpretation of the law applicable in this case." (R. 1740.)

Notably, this was a case where the prosecution evidence had previously failed to convince two state court juries to convict Mr. Barrett of either first or second degree murder. It can therefore be readily concluded that the evidence was otherwise not overwhelming and that the impact of Horn's testimony on the jury requires a new trial.

Given the history of this case, especially with two prior trials that had not resulted in a murder conviction, let alone a death sentence, defense counsel had nothing to lose on their client's behalf by moving for a mistrial. The trial court had properly identified the shortcomings of Horn's testimony, and made clear its readiness to strike that testimony. The court had recognized the appropriateness of giving an instruction to disregard, although the instruction actually given was inadequate. Defense counsel could and should have argued that the jury's

Page 176

exposure to Horn's evidence had irredeemably tainted Mr. Barrett's right to a fair trial.  There was no downside to a motion for mistrial and therefore no strategic reasons for failing to make the motion.  Counsel's failure to move for a mistrial clearly demonstrated deficient performance.

To the extent the issue could have been fully resolved on the record, direct appeal counsel for Mr. Barrett unreasonably failed to raise the issue of the ineffective assistance provided by trial counsel with regard to Mr. Horn's testimony, and their failure to mitigate or correct that error through a stronger instruction or a mistrial.  *See* Ground Nineteen, *infra*. However, as indicated here, there is extra-record evidence in trial counsel's files showing that they did not conduct a timely or thorough investigation of Horn's qualifications, the limitations of his testimony, their own expert's ability to provide questions on cross-examination, or the general admissibility of his testimony under federal law.

**13.     The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions.**

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would have given the jury a way to give effect to the defense evidence and argument.  Although trial counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel unreasonably failed to seek a jury instruction to the same effect.  The instructions trial counsel unreasonably failed to seek include an instruction on informant witness credibility, an instruction on drug-addict witness credibility, an instruction on self-defense, instructions on the theory of the defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses. These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution

226

in this case from the two previous state-court prosecutions.  Some of these witnesses acknowledged at trial, or have acknowledged since the trial, that they were involved in illegal activities before, during, and after their testimony or the events about which they testified.  These activities included illegal drug possession, use, and/or distribution, various civil violations, making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, be informed about, and seek from the trial court, such orders as may be available to assist in the presentation of the defense.

The informant witnesses also confessed to being drug addicts, either at the time of their testimony, or at the time they allegedly perceived the "events" they described in their testimony.  Karen Real, Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, and Brandie Price were all drug addicts at relevant times.

Courts have long instructed juries that the

> testimony of someone who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.
>
> [¶]  You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

(Fifth Circuit Pattern Jury Instr. 1.16 (2001).)

Movant was entitled to an instruction on his theory of defense.  The defense theories were (a) that at the point in time when Mr. Barrett fired his weapon he had no indication that the vehicle speeding toward him contained law enforcement officers (R 4314), and (b) Mr. Barrett was not engaged in drug manufacturing or distribution when the raid took place.  As evidenced by the state-court verdicts, the inconsistent testimony of the law enforcement

percipient witnesses in federal court, and the jury's verdict in this case, there was evidence and legal support for a theory-of-defense instruction.

**14.     The outcomes of the trial and appeal are unreliable due to trial counsel's unreasonable failure to preserve a record of error, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard.**

Trial counsel were professionally unreasonable for failing to make proper objections in order to preserve the record for appeal.  As a consequence, Mr. Barrett was denied his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment.

As demonstrated by the direct appeal decision in this case, *United States v. Barrett,* 469 F.3d 1079 (10th Cir. 2007), Mr. Barrett's trial counsel failed to timely preserve complete objections to the following:

1.     the prosecution's violation of Oklahoma state law requirements for nighttime search warrants (*id.* at 1089-90);

2.     the improper execution of search warrants by federal officers (*id.* at 1090);

3.     the violation of Fed. R. Crim. P. 41, because no federal judge or magistrate authorized the search warrant executed on Mr. Barrett's home (*id.* at 1090-91);

4.     the insufficiency of Mr. Barrett's federal indictment (*id.* at 1090-91);

5.     the improper multiplicity of various counts of Mr. Barrett's federal indictment for the same alleged criminal conduct (*id.* at 1095-96);

6.      the misjoinder of offenses in violation of Fed.R.Crim.P. 8 (*id.* at 1096-97);

7.      the improper admission of victim impact evidence (*id.* at 1097-1101);

8.      the prosecutor's use of racially motivated strikes in violation of *Batson v. Kentucky,* 476 U.S. 76 (1986), in that defense counsel failed to present reasons why the government's purported race-neutral reasons for peremptory strikes were false and pretextual, and also failed to inquire into the Government's justifications for the strikes (*id.* at 1105-06);

9.      the federal death penalty statute's improper allowance of non-statutory factors in aggravation (*id.* at 1108);

10.      the lack of constitutionally required proportionality review (*id.* at 1108-09);

11.      the violation of *Woodson v. North Carolina,* 428 U.S. 280 (1976) occasioned by the court's use of a relaxed standard for the admissibility of evidence (*id.* at 1109-10);

12.      the federal death penalty statute's improper allowance of impermissibly vague aggravating factors ( *id.* at 1110);

13.      the improper double counting of Mr. Barrett's alleged intent to kill as both a special circumstance and an aggravating factor (*id.* at 1110-11); and,

14.      The Government's improper failure to give timely discovery of the names of seven prosecution witnesses called to establish Mr. Barrett's intent to kill (*id.* at 1115-17.)

Trial counsel unreasonably failed to object to numerous instances of prosecutorial misconduct in closing argument in the penalty phase of trial. Whether considered as a repeated omission, or considered cumulatively with other unreasonable acts and omissions, there is a reasonable probability that the outcome of the first or second stage of trial would have been different if trial counsel had objected.

Ground Five, section C details repeated instances of prosecutorial misconduct in questioning witnesses and in closing arguments in both the guilt/innocence and the sentencing phase. The specific instances will not be repeated herein but are incorporated herein by specific reference. Faced with arguments that could in no sense be termed appropriate, counsel failed altogether to object. The failure to object to clear prosecutorial misconduct can never be termed a reasonable strategy. Especially in light of the numerous, serious constitutional errors which plagued Mr. Barrett's trial, this omission by counsel was prejudicial. Trial counsel's omitted objections permitted the prosecution to do whatever it pleased, and abuses of the process continued unabated in second stage closing arguments, to Mr. Barrett's clear detriment.

## Conclusion

But for trial counsel's numerous unreasonable acts and omissions, each one a contravention of prevailing professional norms, there is at least a reasonable probability that jurors would have reached a different verdict in the first stage of trial. In summary, the deficient performance affecting the first stage verdict, second stage verdict, or both, includes the following:

Counsel late in the case recognized the need to attack the search warrant based on the trial testimony of the C.I., Charles "Monk" Sanders, but unreasonably omitted key facts and

argument from their briefing.  A competent and thorough re-urging of the motion to suppress based on *Franks v. Delaware*, 438 U.S. 154 (1978), likely would have resulted in the exclusion of much of the  Government's case.

When informed that prosecutors sought to conceal seven informant witnesses, and did conceal them until after the start of jury selection, counsel unreasonably acquiesced to a trial by ambush when they acceded to an arrangement that resulted in these crucial prosecution witnesses taking the stand with little or no time to investigate their backgrounds, criminal records, or their motives for testifying.  As a result, a wealth of impeachment evidence that could have been used to show them to be the incredible, self-serving witnesses they were was not produced.  Because counsel unreasonably failed to seek a continuance, or were induced into not seeking a continuance by prosecutorial and judicial misconduct, counsel left relatively unscathed key prosecution witnesses whose credibility would have been shattered.  With reasonable investigation the Government's case for intent, particularly with respect to Count 3 of the superseding indictment, would have been damaged beyond repair.

Trial counsel unreasonably failed to object to the seven informants' testimony to prior bad acts under Fed. R. Evid. 404(b).  When the Government failed to give notice that Karen Real would offer such testimony, in violation fo Rule 404(b), trial counsel offered no objection. Trial counsel permitted the prosecutors to use the hearsay evidence for an improper, and highly prejudicial purpose, i.e., to show Mr. Barrett's state of mind at a time far removed from his alleged statements and under circumstances that gave the alleged statements little probative value.

Numerous witnesses were available to rebut the Government's claim that Mr. Barrett had "holed up" on his property, readying himself for an attack on law enforcement, because he feared the authorities would arrest him on an outstanding felony warrant. This spurious claim went virtually unchallenged due to a total failure of investigation although court documents and court personnel would have shown, *inter alia*, there was no trial, no jurors were summoned, the failure-to-appear warrant was invalid, and Mr. Barrett was without counsel. The two witnesses the defense did call that would have challenged this theory – Martin Daggs and Clyde Edgmon – inexplicably did not appear until the sentencing phase of trial, even though their testimony was directly relevant to the guilt/innocence stage. Several other witnesses who could have refuted the prosecution's theory were either never contacted or were interviewed only superficially. Likewise, defense counsel failed to produce readily available witnesses who could have contradicted the testimony of law enforcement regarding the lighting used on the police vehicles, and supported the defense argument that Mr. Barrett reasonably believed he and his property were being attacked by lawless intruders.

Mr. Barrett had a well-documented history of mental impairments that were highly relevant to why he stayed close to his property, what he would have perceived at the time of the raid, and on his intent at the time of the shooting, but, due to both limitations on funds for expert witnesses and counsel's failure to investigate and prepare, the jury heard about none of this. Because of counsel's failures, the Government had a clear path to falsely portraying Mr. Barrett as a deliberate killer. Along the same lines, counsel failed altogether to challenge Mr. Barrett's competency to stand trial, though a thorough investigation would have revealed his mental competency to be very much in doubt.

Trial counsel unreasonably failed to use what funds were available to prepare to impeach prosecution "expert," Iris Dalley, and her dubious "reconstruction" of the manner in which the shooting occurred. Due to trial counsel's failure to retain an expert he asked the court to authorize, no *Daubert* challenge was made to exclude her testimony and conclusions, and the jury never heard that her methodology and testimony were seriously flawed and lacking in a reliable foundation. In a related fashion, the version of events testified to by the members of the OHP Tactical Team, which dovetailed with Dalley's "expert testimony," was not impeached with readily available previous testimony they had given in the two state trials. Any failures of memory on their part, or contradictions in their testimony, were allowed to be explained away by James Horn, another "expert" who held forth for the better part of two days without objection, until the court itself struck his testimony because it so plainly failed to meet the test of *Daubert* and *Kumho Tire*. The court's curative instruction was inadequate; the bell could not be unrung. Horn never should have been allowed to appear, but counsel's failure to object to his obviously inadmissible testimony ensured that Mr. Barrett would be prejudiced. Whatever headway counsel did make in casting doubt on the testimony of the officers was swept away in the welter of innocent explanations for their inconsistent testimony offered by Horn.

Trial counsel recognized that it was crucial to present expert testimony to show that the raid by law enforcement was contrary to law enforcement policies and procedures, was inadvisable, ill-conceived, poorly planned, and was met by violence from Mr. Barrett only because law enforcement did not make its presence plainly known. But trial counsel failed to contact the expert the court authorized them to retain for that purpose. The effort to support this theory came to grief when the defense inexplicably decided to rely on the testimony of Chuck

Choney, even though the witness told trial counsel he was hostile to Mr. Barrett and would not testify for the defense. What few half-hearted criticisms he may have offered for the manner in which the raid was conducted were more than counterbalanced by his defense at almost every turn of the conduct of the OHP Tactical Team, and his ringing conclusion that they did "nothing wrong." Had counsel engaged the services of a truly independent expert, the jury would have heard an entirely different story. Dr. Kirkham, an independent, nationally recognized authority whom the Court authorized counsel to hire as the defense's SWAT expert, would have testified that the OHP raid on Mr. Barrett's property was a textbook example in almost every respect of *what not to do,* resulting in Mr. Barrett reacting in the belief that criminal trespassers were on his property.

Symptomatic of counsel's ineffectiveness were also the failure to request appropriate instructions; the failure, on many points eventually raised on direct appeal, to adequately preserve the record with timely objections and motions; and the failure to object to prosecutorial misconduct.

Based on the above evidence, the conclusion is inescapable that trial counsel rendered ineffective assistance in the first stage of trial. As the results of the state prosecution demonstrated, this was a very defensible case, even with (or perhaps especially) the eleventh hour addition of the informant witnesses. The deficiencies of counsel argued above were not grounded in sound strategy, but fell outside the wide range of reasonable professional assistance. Mr. Barrett was clearly prejudiced. Whether the Court views the errors of trial counsel individually or in the aggregate, a different outcome was reasonably likely.

**B.** **Unreasonable Acts and Omissions Primarily Affecting the Second Stage of Trial.**

Mr. Barrett had a constitutionally protected right to have his trial counsel investigate, develop and present, and have the jury give effect to, mitigation evidence related to his background and character and the circumstances of the offense, i.e., evidence that the jury could have relied upon to understand Mr. Barrett and offer an explanation for his conduct. Trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"). The evidence detailed herein shows numerous unreasonable acts and omissions of Movant's trial counsel, and further shows there is a reasonable probability that at least one juror would have struck a different balance at the second stage of trial.

**1.** **The evidence of deficient performance – trial counsel's unreasonable failure to interview witnesses, gather documentary evidence, consult with experts, counter the Government's case, and argue for a sentences less than death – includes the following:**

Trial counsel were impeded in their efforts to develop mitigation evidence by the trial court's refusal to authorize funds for retaining the necessary resources. As stated in Ground One, *supra*, and Ground Three, *infra*, the allegations of which are incorporated herein by specific reference, the trial court denied Mr. Barrett resources regularly afforded similarly situated capital defendants, and which were deemed necessary in the independent professional judgment of his trial counsel. (*See also* Docs. 50, 51, 57, 97, 128; Exhibit 34; Exhibit 118.)

Mr. Barrett's trial counsel had a duty to retain a mitigation specialist to assist in preparation for the penalty phase.  (ABA Guideline 4.1(A)(2).)  Trial counsel were on notice that the work done by a person previously hired in state court was incomplete, and that the work was done by a novice who refused to produce a summary of her findings for counsel.  (Exhibit 64 Letter to Honorable James H. Payne dated 2/2/8/2005; Exhibit 34.)  However, trial counsel were aware, or should have been aware, that the preliminary investigation showed there was evidence of mental disorders and other mitigating factors.  Mental health professionals who were consulted during state proceedings found evidence of paranoia, a mood disorder, Attention Deficit/Hyperactivity Disorder ("ADHD"), and organic brain impairment including deficits in impulse control and processing information, especially under stress.

The attorneys who represented Mr. Barrett at trial did not obtain the files of the mitigation investigator who worked on the case before the first state trial, although the files were readily available.  (Exhibit 111; Exhibit 34.)  Nor did Mr. Barrett's trial attorneys timely confer with the prior attorneys who had worked on second-stage issues in order to develop or implement a plan of investigation or for trial.  (Exhibit 82; Exhibit 34.)  The available files included records showing that Mr. Barrett had been raised in a chaotic household by neglectful, alcoholic parents, a father who was only present when not out drinking and carousing, that Mr. Barrett attempted suicide as a young man, and had been diagnosed with Bipolar Disorder.

On March 18, 2005, less than six months before the start of trial, the court authorized Mr. Barrett's counsel to retain Inquisitor, Inc., to perform the function of a mitigation specialist.  (Doc. 97.)  The delay was contrary to ABA Guidelines which call for assembly of the defense team "[a]s soon as possible after designation" of lead counsel.  (ABA Guideline

10.4(C).)  Trial counsel first sought funds for this task on January 31, 2005, then again on February 7, 2005.  (Docs. 46 and 50.)  Although counsel's professional judgment and that of the mitigation consultant they sought to retain dictated that the investigation would require $20,000 in labor and $5,000 in travel expenses, the court arbitrarily cut this figure in half without any allowance for travel expenses.  (Doc. 97.)  *See* Grounds One, *supra*, and Three, *infra*.

The denial of travel funds – which were essential in this case – may have been due in part to counsel erroneously informing the court that Mr. Barrett had "not lived in numerous locales." (Doc. 50.)  Had counsel asked Mr. Barrett or his family, they could have told counsel that Mr. Barrett was born and lived as a child in Illinois, lived as a child in New Jersey and Indiana, and lived and worked as an adult in Arkansas, western Oklahoma, Texas, and Idaho.  Even with this misinformation, the trial court's denial of travel funds obviously impaired the prospects for an investigation in that the mitigation investigator resided in Tennessee and even the most minimal investigation would require travel to Oklahoma.

Mr. Barrett's trial counsel had a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." (ABA Guideline 10.11(A).)  Reasonably competent counsel would speak with "[w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . ., would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death." (ABA Guideline 10.11(F)(1).)

Mr. Barrett's trial counsel knew or should have known that Mr. Barrett's family lived nearby and were ready to be interviewed or re-interviewed.  However, neither of the attorneys who tried the case, nor an investigator working for them, conducted detailed interviews of family and friends regarding Mr. Barrett's life history.  (*See*, *e.g.*, Exhibit 77; Exhibit 78; Exhibit 84; Exhibit 80; Exhibit 81; Exhibit 83; Exhibit 86; Exhibit 85; Exhibit 90; Exhibit 95; Exhibit 96; Exhibit 37.)

On May 17, 2005, the court appointed Roger Hilfiger Mr. Barrett's lead counsel in place of John Echols.  The court also appointed Bret A. Smith.  Mr. Hilfiger had only worked on one prior federal death penalty case.  Mr. Smith had no capital experience, yet Mr. Hilfiger gave him primary responsibility for the penalty trial.  Contrary to statutes and Judicial Conference guidelines, Mr. Smith was appointed without consultation with the Federal Defender.  As stated in Ground One, *supra*, the trial judge chose counsel for Mr. Barrett based on the judge's desire to give inexperienced local attorneys capital experience so that they could form a capital panel in the Eastern District.

On May 17, 2005, the trial court gave Mr. Barrett's counsel until May 27, 2005 to amend the budget that had been reduced by order filed March 18, 2005.  The budget submitted for Mr. Barrett's defense had been prepared by Mr. Echols, and was informed by his extensive knowledge of the background of the case, including that many investigative and expert tasks had not been completed during the state proceedings, and that only preliminary work had been done to prepare for a penalty trial.  (Exhibit 64; Exhibit 34; Doc. 113; Exhibit 118.)

Mr. Hilfiger did not seek an amendment of the budget.  His failure to do so was unreasonable.  On May 26, 2005, Mr. Hilfiger filed a motion for a continuance based on his

having only recently received the files and records related to some of the state court proceedings, including transcripts and discovery.  Mr. Hilfiger stated in his motion that he was not familiar with the materials.  In February 2005, Mr. Hilfiger had informed Mr. Echols that it would take him (Mr. Hilfiger) 160 hours to assemble and review the files related to the case.  On September 9, 2005, Mr. Smith advised the court that as of that date, Mr. Barrett's lawyers had not yet assembled or reviewed the records of the preliminary mitigation investigation that had been done prior to the first state trial.  These statements, and the declarations of John Echols, Jack Gordon, and Steve Leedy (Exhibits 34, 82 and 111), show Mr. Hilfiger failed to undertake a reasonable investigation before concluding that no additional funds were needed to prepare for either stage of trial.

On or about June 30, 2005, trial counsel telephoned then Assistant Federal Defender Julia O'Connell and requested an opportunity to speak with her mitigation investigator. (Exhibit 67.)  Trial counsel had not contacted the mitigation specialist whom the court had authorized to work on Mr. Barrett's case.  (Exhibit 66.)  Nor had trial counsel familiarized himself with the results of an earlier mitigation investigation.  (Exhibit 111; Exhibit 34; Exhibit 82.)  Ms. O'Connell recommended that trial counsel contact Richard Burr, Federal Death Penalty Resource Counsel, for assistance.  Trial counsel did not contact him.  (Exhibit 118.)  At that time, the trial was approximately ten weeks away.  As Federal Defender O'Connell explains, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second-stage investigation if it had not already been completed, even if Mr. Hilfiger were able to secure the services of a mitigation investigator or investigators.  (Exhibit 67.)

Mr. Barrett's trial counsel did not secure the services of a mitigation specialist or other trained mitigation investigator. Although the court authorized trial counsel to retain Inquisitor, Inc., trial counsel failed to contact the agency, and never sent any documents or requested any investigation for Mr. Barrett's case. (Exhibit 66.)

As the Supreme Court has held, where there is a failure to investigate, alleged "strategic" decisions are not reasonable. In all capital cases, prevailing norms of capital defense practice, and empirical research on its results, indicate that "[c]ounsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." (ABA Guideline 10.10.1; ABA Guidelines, 31 Hofstra L. Rev. 913, 1059, 1065 (2003) (commentary on Guideline 10.11) ("counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial").)

Trial counsel were aware that expert testimony regarding the mind's response to threats such as an unmarked S.U.V. barreling towards one's cabin was important so that the jury could understand Mr. Barrett's reactions. (Doc. 50.) Trial counsel were aware that Mr. Barrett "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders." *Ibid.* Trial counsel were aware that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting." *Ibid.*

The court authorized trial counsel "to hire a psychiatrist or a psychologist for up to 40 hours." (Doc. 97.) This ruling denied Mr. Barrett the expert assistance to which he was

entitled.  *See* Ground Three, *infra*.  It also denied Mr. Barrett the resources afforded similarly situated defendants in federal death penalty cases.  (Exhibit 118; Doc. 107.)  The court denied Mr. Barrett resources that would exceed the amount of money spent to represent him in state court, (Doc. 128 at 4), even though there was no second stage of trial in state court.

Trial counsel obtained a copy of a preliminary report prepared by a mental health expert, Bill Sharp, Ph.D., prior to the first state trial.  (Exhibit 55 at ¶ 16.)  Dr. Sharp had identified numerous sources of mitigation, and recommended further testing and treatment.  (*Id.* at ¶¶ 9-14.)  Federal trial counsel never consulted with Dr. Sharp about his findings or how his diagnoses might be relevant to mitigating circumstances.  (*Id.* at ¶ 16.)  Dr. Sharp's report put trial counsel on notice that Mr. Barrett suffered from extreme paranoia and long-term memory problems (*id.* at ¶¶ 3, 14), facts that would have indicated a need to spend more time with Mr. Barrett and to rely on other sources for background information.  (ABA Guideline 10.7 and commentary, 31 Hofstra L. Rev. at 1023-24.)

Prevailing professional norms of capital defense practice provide that counsel should obtain the assistance of expert witnesses who will be provided relevant supporting documentation regarding the defendant's medical, scholastic, cultural, economic, and sociological background.  (ABA Guideline 10.11(F)(1).)  The United States Attorney said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation.  (Tr. 9/9/05 Hr'g at 38.)  Mr. Barrett's trial counsel did not retain an expert to assess mental health mitigation and did not conduct a background investigation that would have supported a reliable opinion.  At no time prior to or during the federal trial did Mr. Hilfiger or Mr. Smith either

consult with mental health professionals who had consulted with Mr. Echols during the state-court proceedings or obtain their files.

In mid-August 2005, Mr. Barrett's counsel contacted Jeanne Russell, Ed.D., regarding the risk assessment that had been contemplated in January and authorized in March, 2005. (Exhibit 56.) Dr. Russell had performed an assessment of Mr. Barrett in preparation for the state trial. In mid-August 2005, federal trial counsel did not have the report she provided to Mr. Echols in 2003. (*Id.*) The scope of Dr. Russell's inquiry was limited, and did not encompass many mitigating factors previously identified by trial counsel and routinely pursued in capital cases. Dr. Russell did nothing more for Mr. Barrett's federal counsel than update the report she had prepared in 2003 in anticipation of the second state trial, and conduct some research on an unrelated matter. (*Id.*) At the time of her report in September 2005 she had conducted no additional interviews.

Dr. Russell was not asked to conduct a mental health evaluation for the purpose of identifying mitigation evidence such as the existence of a serious mental illness or organic brain dysfunction. (Exhibit 56.) Indeed, trial counsel represented to the court that the defense did not have to produce a report from Dr. Russell pursuant to Fed. R. Cr. P. 12.2 because Dr. Russell would not testify regarding Mr. Barrett's mental condition. (Tr. 9/9/05 Hr'g at 41.)

Mr. Smith asked Dr. Russell whether she would conduct a mitigation investigation. (Exhibit 56.) She informed him that she was not qualified to take on that assignment, and that it was too late for anyone to conduct the type of thorough background investigation she viewed as the norm in other capital cases with which she had been involved.

(*Id.*)  Mr. Smith indicated that the trial court's refusal to provide the defense with resources impaired their ability to conduct such an investigation.  (*Id.*)

By September 9, 2005, Mr. Barrett's trial counsel had not obtained records from any state court investigation for a penalty phase.  (Tr. 9/9/05 Hr'g at 43.)  Mr. Smith said he had contacted "Mr. Echols[] because we have been able to find very little on mitigation" from the past trials.  *Ibid.*  This hardly should have come as a surprise given (a) that Mr. Echols had informed Mr. Hilfiger and the Court that his preparation for a mitigation case was never fully formed during the state trials, (b) that Mr. Echols withdrew from the case in large part because he believed the Court's limitations on time and resources made reasonable preparation for a penalty phase impossible, and (c) that there was no penalty phase in either state trial.  Mr. Smith told the court Dr. Russell's testimony would not involve an examination of Mr. Barrett.  *Id.* at 41.  Dr. Russell had "examined" Mr. Barrett, however.  At that time, Mr. Smith believed that Dr. Russell only had "reviewed records and what have you."  (Tr. 9/9/05 Hr'g at 41.)  The court generously described the defense's preparation as "still work in progress."  *Id.* at 42.

By September 15, 2005, when Dr. Russell submitted her "updated" report, she had not had an opportunity to conduct any additional interviews.  (Exhibit 56.)

On October 3, 2005, trial counsel disclosed to the court that they had not consulted a psychiatrist or psychologist.  (Tr. 10/3/05 Hr'g at 7.)  Mr. Hilfiger informed the court that Dr. Russell would be used as a mitigation expert.  *Ibid.*  However, Mr. Smith had previously informed the court and the Government that Dr. Russell would not be testifying regarding mental health mitigation.  (Tr. 9/9/05 Hr'g at 41.)  Mr. Hilfiger apparently meant that Dr. Russell would

act as a mitigation investigator.  However, Dr. Russell was not qualified to conduct a mitigation investigation, and she so informed Mr. Smith in August 2005.

As stated in § A of this Ground for relief, *supra*, trial counsel unreasonably failed to investigate, *inter alia*, (a) the circumstances of the state drug charges for which trial Mr. Barrett allegedly failed to appear; (b) the Government's evidence of how the raid occurred and the supposed "reconstruction" of the crime scene; (c) whether the conduct of the raid followed law enforcement protocols for identification and safety; and (d) the unreliability of the Government's eleventh hour informant witnesses.  Trial counsel's unreasonable omissions denied the jury a thorough understanding of the events of September 24, 1999, and denied Mr. Barrett a defense applicable to both stages of trial.  Their conduct constitutes deficient performance.

**2.      The evidence demonstrating prejudice from trial counsel's deficient performance includes abundant, readily available evidence of Mr. Barrett's neglectful upbringing, parental drug abuse and mental illness, his own mental illness and organic brain impairment.  This evidence includes the following:**

A thorough investigation of Mr. Barrett's background would have provided the jury with a completely different, more accurate, and exculpatory view of events, including Mr. Barrett's character and actions.  Jurors informed by this evidence would have understood that Mr. Barrett would not and did not knowingly or intentionally take the life of a law enforcement officer.  Having failed to inform themselves of the readily available evidence, trial counsel presented only a superficial penalty case.

Trial counsel informed the jury that four categories of "mitigation evidence" would be presented:  (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction"; (3) "Kenny Barrett's incarceration"; (4) "Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999."  (R. 4704).  The cursory description of the evidence that would be presented in the last category (R. 4709-13), was not "an accurate representation of [Mr. Barrett]" (R. 4713), in that it was terribly incomplete.

If trial counsel had followed the norms of capital defense practice, and pursued the evidence available to them, the jury would have heard truer and radically different testimony regarding Mr. Barrett.  Jurors would have learned the following about Mr. Barrett, his background, and character:

### a.      The family, social, and medical background of Kenny Barrett.

### Introduction

Kenneth Barrett's familial roots began in Sequoyah County, Oklahoma, at the intersection of two epic journeys in American history.  The deprivation of Depression era Sallisaw provided the inspiration for the Joad family in *The Grapes of Wrath* who came to personify legions of real-life sharecroppers living in the nearly hopeless circumstances of Sallisaw's drought and poverty before they set out for California.  The Trail of Tears[31] ended at

---

[31] In 1838, the US government uprooted some 13,000 Cherokee Indians from their land east of the Mississippi River and forced them westward into the Oklahoma territory.  The 1,000 mile route they took to Oklahoma is called the Trail of Tears because of the hardships of weather, disease, and starvation that claimed the lives of 4,000 Cherokee.  It was a dismal journey that took place in the middle of harsh winter, and forced Indians from their homelands through north

(continued...)

Sallisaw Creek for those Cherokees who survived starvation, freezing temperature, disease and murder during their forced relocation from their homelands.

Kenny's heritage is a blend of both cultures.  His paternal relatives, the Barretts, were hard-scrabble farmers, who married Cherokee Indians.  His maternal relatives, the Dotsons, were Cherokee ranchers who married non-Indians.  (Exhibits 155, 2, 131, 124.)  With some success and much tragedy, both families endured the historical forces that shaped their communities.  Some family members grew up in Indian orphanages, some became successful ranchers, educators, doctors, and business people.  Many struggled with profound mental illness and its attendant chaos.

Intergenerational, genetic predisposition to mental illness affected Kenneth Barrett's development, behavior, perceptions, and experiences over the course of his life.  It made him vulnerable to developing major psychiatric illness.  In lay terms, Kenny was affected by a confluence of the most damaging genetic defects handed down from both the Barrett and the Dotson families.  His mental illness was marked by severe neuropsychological deficits that manifested themselves in extraordinarily compromised cognitive and psychiatric functioning.

## Family History of Mental Illness

Kenny meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component.  (Exhibit 117.)  Multiple generations on both his mother's and father's side include family members who succumbed to depression, bipolar disorder, schizophrenia and addictive diseases.  Although members carried genetic-based risk

---

[31](...continued)
Georgia, middle Tennessee, Kentucky, Missouri, and Arkansas, into present day Oklahoma.

factors, some who were spared the most debilitating symptoms of mental illness were able to pursue successful professional careers as educators, doctors, ranchers, and business people. Other family members required psychiatric institutionalization. This spectrum of impairment included other family members who functioned marginally, but were unable to meet their responsibilities to their families and community. The nature and severity of Kenny's mental illness were both indicative of and exacerbated by significant neurological impairments, including pervasive damage to the prefrontal lobe of his brain.

### Maternal Family Mental Illness

Kenny's mother, maternal aunt, and maternal cousins satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression, anxiety disorders, and developmental disabilities. Kenny's mother's family "had to deal with mental illness for a long time." (Exhibit 91.) Kenny's mother, Gelene Dotson, has suffered from clinical depression, mood swings and anxiety since her teenage years. Gelene's sister, Carolyn (Kenny's aunt), also suffers from bipolar mood disorder and requires therapeutic medication with a regimen of mood stabilizers and antidepressants. (Exhibit 4; Exhibit 78; Exhibit 139; Exhibit 202.) One of Carolyn's daughters manifests signs of mood-related psychiatric distress and is unable to rear her children. (Exhibit 78.) Gelene's brother Mark, the youngest child in her family and now a podiatrist, witnessed Gelene and Carolyn struggle "with serious impairments." (Exhibit 98.)

One of Kenny's maternal cousins, Gwendolyn Crawford, also has bipolar mood disorder that necessitates ongoing treatment and medication. (Exhibit 83; Exhibit 137; Exhibit 77; Exhibit 41; Exhibit 201.) Gwendolyn's two children both have significant mental

impairments.  Her 26 year old son Brandon has a developmental disability and is unable to speak or live independently.  (Exhibit 83; Exhibit 135; Exhibit 153.)  Gwendolyn's daughter Brandy Hill reported that her family "learned first hand about bipolar disorder and depression" and that Brandy herself "battle[d] with depression," experienced episodes of "high euphoria" and underwent treatment for her mood disorder until she could no longer tolerate chemical regimens. (Exhibit 77; Exhibit 141.)

Travis Crawford, another of Kenny's first cousins (*see* Exhibit 198), also receives medication for anxiety and reports a history depression.  (Exhibit 45; Exhibit 92; Exhibit 143.) Travis has had "a long struggle with drugs and ha[s] anxiety and panic attacks" and his "mind does not work that well."  (Exhibit 45; Exhibit 92.)  He struggled and did not succeed in the Army, or in his employment.  (Exhibit 196; Exhibit 203.)  Travis understands that "psychological problems run in [his]family" and reports his oldest daughter, now "a grown young woman" has bipolar disorder and one of his sons "seems a little slow and is having a tough time of it." (Exhibit 45; Exhibit 92.)

Gelene's uncle, Warren Dotson, has two daughters who "each have a son who is bipolar, and it is a challenge for a lifetime.  It never goes away."  (Exhibit 101.)

In the maternal family, depression and mood disorders trace back to Kenny's grandmother's (Hattie Gertrude Dotson) generation.  Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the Twentieth Century.  (Exhibit 78; Exhibit 129.)  Another relative, Wallace Dotson, was involuntarily hospitalized at the state mental institution on a

petition brought by his father, Tom Dotson,[32] who described Wallace as being "completely out of his mind," suffering from "some kind of spells" and not having slept for "three days and nights." (Exhibit 32.)

### Paternal Family Mental Illness

Mental disease and its affects on family life were transmitted down at least four generations of Barretts.  Illness has affected Kenny's great-great-grandfather, his great grandfather, his grandfather and finally Kenny  himself.  (Exhibit 28; Exhibit 146; Exhibit 84.) As Kenny's cousin, Kathy Trotter, explained: "Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression." (Exhibit 86.) Kenny's great-great-grandfather,  A. J. (Jack) Barrett, was committed to a mental hospital and a Certificate of Lunacy was entered in the local courthouse in Sequoyah County in 1918.  (Exhibit 27.)  Kenny's great grandfather, Issac Clifford Barrett, by all accounts a man who was committed to his family and community, overcame tremendous odds and poverty to build a successful ranch ("cow rich"), but ended his life by suicide.  (Exhibit 84, Exhibit 87, Exhibit 132.)

Issac's oldest son, Andrew Jackson "A.J." Barrett shared in only the tragedy of Issac's life and none of its success.  A.J., Kenny's grandfather (*see* Exhibit 1) , was haunted by suspicion, paranoia, and hostility, which was manifested by violent physical and sexual assaults against his wife and children, which forced one after the next to flee the home in search of safety. A.J. terrorized his wife who hid "in the woods" from him (Exhibit 87), raped one of his daughters who became pregnant and placed the baby for adoption (Exhibit 84), and went on drunken rampages through town.  His Certificate of Lunacy documents auditory hallucinations,

---

[32]Tom Dotson was the uncle of Kenny's maternal grandfather, Hugh Dotson.  (Exhibit 130.)

persecutory delusions and paranoid ideation.  (Exhibit 27.)  His family believed he "was bipolar." (Exhibit 87.)  A.J. was able to work only "sporadically."  His family eked out a "marginal" living, and at one point A.J. was involuntarily committed to the state hospital for one month but returned home to his wife who would not "consider divorce."  (Exhibit 87; Exhibit 125; Exhibit 146.)

A.J.'s maternal family also faced the tragedy of mental illness.  A.J.'s mother (and Kenny's great grandmother), Mary Ellen Maxwell, suffered a "mental breakdown," (Exhibit 146), wandered the ranch at night talking to herself and believed that she was canning goods for the winter when she washed bottles in the middle of the night (Exhibit 84).  She "died very confused."  (Exhibit 146; Exhibit 133.)  Mary's brother, Howard, was "Looney Tunes" (Exhibit 84), and Howard's son, Billy Dean, who was a disabled veteran with a history of schizophrenia, committed suicide.  (Exhibit 26; Exhibit 128.)  Kenny's great aunt, Elnora Long, is bipolar and requires significant doses of medication.  (Exhibit 84; Exhibit 86.)  Elnora, who has a complicated lineage, is "very emotionally unstable" and "unpredictable."  (Exhibit 86.)  Kathy, Kenny's cousin who experienced an anxiety and depressive episode and was hospitalized, believes Elnora is manic depressive because of her extreme mood swings.  (Exhibit 86; Exhibit 140.)  Elnora is Ernie and his siblings' maternal half sister whose father was her mother's former son in law's brother.

Kenny  has one paternal aunt (Linda Riley) and three paternal cousins who suffer from depression and bipolar disorder.  His father's sister, Linda Riley, is treated for depression, and both her adult daughters have been diagnosed with bipolar disorder.  (Exhibit 86; Exhibit

145.)  Linda's seven-year-old grandson has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder.  (Exhibit 86.)

## Maternal Family History

Kenny's maternal grandfather, Hugh Dotson, was a direct descendant of Cherokee Native Americans, whose everyday life reflected the travails and successes of Indians in eastern Oklahoma.  Hugh grew up in an Indian orphanage, and became an adult universally loved by his children and grandchildren and respected in the Sallisaw community.  He spent his formative years living at Dwight Mission,[33] an Indian mission school started by the Presbyterian Church.  Hugh's mother, Minnie Andrews,  placed Hugh and four of his siblings (Christine, John E., Anna, and Eleanor) at Dwight Mission after their father, Abe Dotson, was murdered.  (Exhibit 100.)  Hugh's mother, a widow with no ability to support her children, placed her two younger children (Lela and Warren) with her husband's relatives.  (Exhibit 100; Exhibit 102; Exhibit 106; Exhibit 134.)

Circumstances of Abe Dotson's death are unclear, but it is indisputable that he, two of his brothers, and his brother's son were killed by gunfire over a three year period in separate incidents.  Abe, his siblings Mark and Greenberry, and his nephew Bee, were Cherokee,

---

[33]Dwight Presbyterian Mission of the Cherokees was originally founded in 1820 as an Indian mission school in western Arkansas and was named for Timothy Dwight, president of Yale University.  In 1838, as Cherokees were forced into Oklahoma, Dwight Mission was moved at the invitation of the Cherokee chief to its current location 20 miles into then newly organized Indian Territory. Dwight Mission served generations of Native Americans as a mission and training school until public education became available and the school was finally closed in 1948.

and it appears that at least one of the men who shot and killed them did so with impunity.[34] (Exhibit 59; Exhibit 106.)  Records also show that Abe got into trouble with alcohol, committed violent offenses and stole.  (Exhibits 16 through 23.)

Abe's son, Hugh, and the other Indian children at the mission worked in its fields and stockyards to earn their keep.  Hugh impressed the administrators at Dwight Mission with his skill and sense of responsibility.  Hugh and his siblings stayed in the community after they left Dwight Mission, farming as sharecroppers and day laborers.  They barely survived, and some of his siblings made the long trek to California in hopes of better jobs in the fields.

Hugh married Hattie Gertrude Real in 1939 (Exhibit 8), and they had five children over their life-long marriage, the oldest of whom is Sylvia Gelene Dotson, Kenny's mother.  (Exhibit 120.)  Hugh "barely earned enough to live on."  (Exhibit 97.)  Hugh, Hattie and their growing family lived in "tumble down" houses that "were in pretty bad shape even by standards back then."  (Exhibit 97.)  The family "had no running water, electricity or plumbing and used wood stoves for heating and kerosene for cooking."  (Exhibit 97.)

World War II intervened, and Hugh served in the U.S. Army.  When he returned home he attended classes on the GI bill that were taught by his brother in law, Carl Cook.  Hugh "learned how to run a farm, a big farm, not just a home farm," and when Gelene was six, the family moved to the Dwight Mission School where Hugh ran the farm.  (Exhibit 97.)  Gelene "always heard" her family was "part Indian and that [she] was 3/16 Cherokee."  (Exhibit 97.)

---

[34]Cherokee Census Cards M2799 and 3294.

Dwight Mission provided a house for the family that had electricity and plumbing, and Gelene began her elementary education at the school.  She was her mother's least favorite no matter that she was the most attentive to her mother's needs.  (Exhibit 97.)  The school shut down in 1949, but the Presbyterian Church sent Hugh and his family to its Menual School in Albuquerque that served Spanish speaking students from New Mexico.  Hugh "ran the cattle and vegetable farm" and served as "the overseer" to the student farm hands.  (Exhibit 97.)  After a year at Menual Hugh accepted the church's offer for him to run the farm operations at a new orphanage in Farmington, Missouri.  The family stayed in Farmington two years until the orphanage closed and the family moved back to Oklahoma.

Rural Sallisaw offered no jobs, and Hugh and his family moved in with his brother-in-law Carl and sister Christine.  (Exhibit 102.)  Public schools did not conduct classes during cotton season because children had to join parents picking and chopping cotton.  Hugh and his family traveled to western Oklahoma and "chopped cotton in the spring and pulled cotton balls in the fall." (Exhibit 97.)  The family returned to Sallisaw when school began in the fall, but left at Christmas to join family in California who had arranged for Hugh to become an irrigation manager on a large farm near Bakersfield.  Gelene loved her life on that farm where they "were not migrant workers, but people who lived there permanently" in the "30 or 40 houses on the farm, all with kids."  (Exhibit 97.)  It was "a joyful time" and Gelene "was a happy child," but her mother and father yearned to return to Sallisaw and own their own land.  (Exhibit 97.)  Gelene explained that "[l]and is just something very important" to her family and "always has been."  (Exhibit 97.)

Hugh and his wife Hattie were dedicated to their dream of owning land.  Hugh "worked seven day weeks, 12 hour-days" and "was tired from too much work but he never considered working less." (Exhibit 97.)  Children in the family "always knew [they] went out there to make enough money to buy [their] own place back home." (Exhibit 97.)   When they had saved enough, the family returned to its roots and soon after their youngest child was born in 1961, Hugh bought 40 acres in Sequoyah County. Gelene and her siblings enrolled in local public schools, and Gelene graduated but she never recaptured the joy of her few years in California.  Years later, Hugh gave each of his five children seven of his treasured 40 acres and retained five.  Kenneth Barrett eventually built his shack for $150.00 on a spit of  his grandfather's land adjacent to his mother's house, on land that Gelene expected she would one day be deeded, and she was.

## Paternal Family History

Like Hugh Dotson, Issac Clifford Barrett, Kenny's paternal great-grandfather, enjoyed a fine reputation in Sequoyah County.  From 1917 to 1943, Issac managed a 20,000-acre ranch owned by a Kansas doctor.  Issac married Mary Ellen Maxwell, who was one of ten children born in Sequoyah County.  Issac was known as "a fair man" who, when he learned of a neighbor's falling on hard times, shared the bounty of his own garden. (Exhibit 84.)  Issac "had his burdens to carry after he married" Mary.  She had a "mental breakdown" (Exhibit 146), and "walked around the yard talking to herself.  At night, she would wake up, wash jars, and think she was canning." (Exhibit 84.)  According to Issac Barrett, Mary's brother, Howard Maxwell, was "Loony Tunes" and Howard's son Billy Dean Maxwell was accused of burglary, and was involuntarily committed to the state mental institution four times over a ten year period before he

committed suicide by shooting himself in the head.  (Exhibit 84; Exhibit 25; Exhibit 26; Exhibit 128.)  Issac also committed suicide, by "ingesting a remedy for black leg cattle disease" on November 24, 1952.  (Exhibit 84.)  Family members believed Issac killed himself "because he had a broken heart" after his brother convinced him to sell his cattle and invest all the proceeds in a failed enterprise.  "He had nothing left."  (Exhibit 84.)

Issac's oldest son, Andrew Jackson Barrett (A.J.), is Kenny's paternal grandfather, but "[w]hatever good Issac had in him, and there was plenty of it, did not pass down" to A.J. (Exhibit 84.)  A.J. married Ada Mae Hatter, a woman who came to be "very well thought of" and who " was someone who worked extremely hard."  (Exhibit 86; Exhibit 1.)  Ada's mother, Ida Melton, was an Indian (Exhibit 131) married to Sam Hatter.  (Exhibit 9.)   Ida and Sam divorced, and Ida married A.J.'s brother John.  (*See* Exhibit 10.)  Ida and John had one child, Elnora Barrett Long, who was debilitated by her manic depression and anxiety to such a degree that she has recently been put in a nursing home.  Ida's marriage to John meant that her son-in-law, A.J., was also her brother-in-law.

A.J. and his wife, Ada Mae "lived a hard life."  (Exhibit 84.)  Three children "died at or near childbirth; the oldest was two weeks old.  Two are buried in Akins cemetery.  The stillbirth is buried back in the mountains."  (Exhibit 84.)  The oldest of the five children born to A.J. and Ada Mae who survived is Ernest (Ernie) Barrett, Kenny's father.  Ernie and his four siblings who survived (Margaret, Issac, Gary and Linda) lived under the shadow of A.J.'s mental illness, alcoholism, and cruelty in a cabin with "a dirt floor and no electricity or running water. [W]ell water was not usable for humans, although it was all right for animals and crops." (Exhibit 84.)

A.J.'s education ended at the seventh or eighth grade. He worked sporadically as a laborer "doing public construction work" and "spent eleven months in the service during World War II." (Exhibit 146.)  Unable to support his family, "[t]he entire family had to work in the fields traveling from one crop to the next." (Exhibit 84.)  State Hospital records described their economic status as "marginal," and the family "had a tough time getting by." (Exhibit 146.)

Life for Ernie, Kenny's father, and other children in the family was  dismal.  One of Ernie's "earliest memories is being taken out of school to work in the fields." (Exhibit 81.)  Ernie described their grim life:

> As my brothers and sisters got big enough to walk and carry a load, they joined us in the field.  Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell [sic], and picked beans in Moffitt [sic], Oklahoma.  It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sunup to sundown.  It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it.  When cotton season came, we worked or we starved.  When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

(Exhibit 81.)

"We had a neighbor who raised purple whole peas for animal feed.  My Granny Ida asked her if we could have what she had left on the vines for our cows—we scavenged them and my mom cooked them." (Exhibit 87.)

A.J. was unable to ameliorate the harshness of poverty and its impact on his family.  His parenting was derailed by mental illness that ultimately led to his being involuntarily institutionalized by court order at the state hospital for one month. (Exhibit 146.)  None of his children "wanted him to be at home because of the crazy things he did." (Exhibit 84.)  He

suffered from mood swings that he attempted unsuccessfully to self medicate with copious amounts of alcohol, to which he became addicted.  His alcoholism only aggravated his behavior. (Exhibit 146.)  Family members believed his behavior worsened after an automobile accident in 1960, but he "had always been high tempered and jealous."  (Exhibit 146.)  His behavior was erratic and unpredictable leaving his children unable to tell "from one day to the next what was going to happen."  (Exhibit 84.)  When he was in a "bad mood" he struck out against his children, hitting them with "any dumb thing, belt, club, board, or limb" (Exhibit 84), but he "was difficult to figure out because he was also a decent guy when he was sober."  (Exhibit 81.)  A.J. spared no one; he raped his daughter who went away to New Orleans to have the baby and placed it for adoption.  (Exhibit 84.)

A.J.'s psychiatric symptoms made it impossible for anyone in the family to appease him, and his sons, including Kenny's father Ernie, tried to "stay out of [his] way."  The children left home as soon as they could.  (Exhibit 146.)  Family members reported that A.J. had "two different personalities" and "angry spells about three times a week."  (Exhibit 146.)  A.J. had "enormous moods swings from being an alright guy to being totally out of control."  (Exhibit 81.)

A.J.'s mental illness "caused him not to be able to get along with neighbors and especially his employers."  (Exhibit 146.)  A.J. thought "people were after him," heard "imaginary voices," was "somewhat confused," and reported "men outside his window that [were] going to kill him."  (Exhibit 146.)  A.J. was "unpredictable, irresponsible, irritable, uncooperative and not in complete reality."  (Exhibit 146.)  A physician examining A.J. when he was admitted to the state hospital, reported his findings:

His memory for past and remote past is poor.  He can retain a number of five digits but is unable to repeat them in reverse with any degree of facility.  Serial subtraction of eight from one hundred is done with much hesitation and inaccuracy.  His general intelligence seems inaverage and dull normal.  His reasoning and judgement are limited.  His insight is poor.

(Exhibit 146.)

Ernie and his siblings were powerless to protect themselves or their mother from A.J.'s assaults and terror.  A.J.'s wife, Ada Mae, was an old fashioned woman who "would not divorce" him (Exhibit 87; Exhibit 146), even though "nothing could stop him from attacking them." (Exhibit 81.)  Ada "was churchgoing and devout; she did not believe in leaving a marriage no matter how bad it was." (Exhibit 81.)  Ernie believed his mother "was as good a woman as there is, but she had a hard life between my father being half crazy and always poor." (Exhibit 81.)  Ernie tried "[a]s the oldest boy in the family," to protect his mother and the other children, but he was "no match"  for his father until he was "half grown." (Exhibit 81.)  Because Ernie tried to "get between" his father and mother when A.J. attacked her, he "got beaten more than the other children." (Exhibit 81.)

Ernie developed characteristic responses to the life threatening trauma he witnessed and experienced.  He "learned never to cry" when his father hit him and he does not remember "feeling a hell of a lot." (Exhibit 81.)   High school for Ernie was "different." (Exhibit 81 .)  In a community known for its poverty, Ernie's family stood out as still poorer than most.  Other students "made fun of [Ernie] and laughed at [him] because of the way [he] dressed." (Exhibit 81.)  Ernie responded to the taunts with fighting "every boy in [his] high school class to hold any respect." (Exhibit 81.)  Other students called Ernie "'Loco' because of the way he acted, and he never completely straightened out." (Exhibit 84.)  Ernie's brother

described him as "pretty cruel." (Exhibit 84.) He treated his younger siblings "pretty rough," and when he made them cry, "he thought it was funny." (Exhibit 84.) Ernie's brother thought Ernie was "a lot like [his] father," A.J. (Exhibit 84.) An aunt who taught Ernie in elementary school described him as "a mean child." (Exhibit 93.)

Ernie left home without graduating from high school and joined the U.S. Marines. He kept memories of his maltreatment and his powerlessness to protect his family at bay by drinking to excess. He was three months short of 17 the last time he stepped between his father and mother to try and protect her. His father hit him across the shoulder with a "19-inch metal file that busted [his] shoulder wide open." He still has a scar from it. (Exhibit 81.) Ernie described that day: " I left home that day just running because I knew that if I stayed at home I would have to kill my father to protect the others. I was 6'3" and weighed 187 pounds." (Exhibit 81.)

### Family of Origin

Ernie Barrett and Gelene Dotson brought to their marriage a strong genetic predisposition to major mental illness, budding alcoholism, and little understanding of the demands of parenting. They met in high school, dated briefly before Ernie left to join the U.S. Marines, reunited by accident when both were back in their home town and married July 8, 1960, without much thought. (Exhibit 91; Exhibit 97; Exhibit 5.) Ernie and Gelene started married life in Joliet, Illinois, at the recommendation of Gelene's relatives who helped Ernie find work at a Kerr Glass manufacturing plant.

Ernie and Gelene's marriage was tumultuous and marked by discord from its beginning. Although Ernie was very "determined not to live in the kind of poverty [he] knew as

a child growing up," he had little notion of family life or fatherhood.  (Exhibit 81.)

Ernie acknowledges that he "did not give much thought to fatherhood" and "did not think about

Gelene or, later on, the boys, other than working and supporting them."  (Exhibit 81.)

Ernie "almost immediately started running around with other women" (Exhibit

81) and was gone for days at a time.  He had his "mind set on doing whatever" he wanted, as

long as he worked.  (Exhibit 81.)  After he finished his shift at the plant, he went to bars and got

"into as many brawls as there were" before coming home.  (Exhibit 81.)  Ernie "did pretty much

whatever [he] wanted to.  [He] would go out, drink as much as [he] wanted, and chase women," a

pattern he maintained until well after his marriage with Gelene ended.   He "drank a fifth at a

time." (Exhibit 81.)  Today Ernie is deeply ashamed of his behavior towards his children and

wishes he "could take it back and do for [his] children what they needed and be the kind of

parent they deserved."  (Exhibit 81.)  At the time he and Gelene started their family, his only

measurement of success was being able to work himself  "up from pushing brooms to production

manager."  (Exhibit 81.)

Gelene was "pretty depressed" and  "miserable" in the marriage.  (Exhibit 97.)

She was "a heavy drinker with dramatic mood swings."  (Exhibit 98.)   She had planned on going

to college but discovered she was "crazy about Ernie" who "came home kind of like a knight in

shining armor."  (Exhibit 97.)  She did not realize, until after they married, that Ernie "was not

the same boy" she knew in high school and that "he had changed, none for the better."  (Exhibit

97.)  Looking back, she "never imagined that life with Ernie could be so terrible, not just for

[her], but for the children [they] had together."

Ernie's infidelity, unpredictable absences, and lack of concern for her was "humiliating and embarrassing. " (Exhibit 97.)  Gelene knew that Ernie chased after "other women," and she and her aunt went from bar to bar  "looking for him – he would be out drinking," but barkeepers would tell her he was not there.  (Exhibit 97.)  Throughout their 13-year marriage, Ernie "had his other women."  There was never a time he did not have other women.  Gelene "drank right from the beginning of the marriage," according to Ernie.  One of Gelene's sisters, Phyllis (*see* Exhibit 197), who visited Gelene when she was pregnant with Kenneth Barrett reported that "Gelene drank from the moment she woke up until she went to bed."  (Exhibit 91.)

Kenny's parents separated multiple times, sometimes for extended periods and sometimes more briefly, but always in chaos. Their relationship was acrimonious and rife with recrimination.  Ernie was unrepentant and "would not even talk" to Gelene "about what was going on" with her or the children.  Gelene says that "[I]t drove [her] crazy," and that she "begged, pleaded, threatened, and cried with Ernie."  (Exhibit 97.)   They "split up and got back together and threatened to leave each other over and over."  (Exhibit 97.) They "always had a difficult time of it."  (Exhibit 97.)

Their son Kenneth Barrett was born to this troubled marriage in Joliet, Illinois, June 29, 1961.  (Exhibit 119.)  He was followed by his younger brother, Richard, born June 24, 1964.  (Exhibit 97; Exhibit 121.)  Shortly after Richard's birth, Gelene left Ernie for almost three years and returned home to Sallisaw with the boys.  Ernie "felt bad about leaving" his sons but he "could not take Gelene anymore."  (Exhibit 81.)  Ernie admits that he "was still young and

immature" and not " much of a husband" who "just put the boys out of [his] mind as much as [he] could." (Exhibit 81.)

The three-year separation ended when Ernie was not able to "keep the boys out of [his] mind" and he reunited with Gelene in 1967. (Exhibit 81.) Gelene and the boys returned to Joliet and "moved into the same mobile home" Ernie had been living in with his girlfriend. (Exhibit 81.) The nature of the marriage did not change after Gelene and the boys returned to Illinois. Gelene gave birth to their third and last child, Stephen, January 1, 1969. (Exhibit 97; Exhibit 123.) Gelene and Ernie "both drank as much as [they] could," and Ernie "still stayed away from home." (Exhibit 81.) Ernie was arrested multiple times for drunk and disorderly conduct, and a judge threatened him with a year's jail sentence. Ernie contacted a friend in New Jersey who found him a job at a glass plant. Leaving Joliet allowed him to avoid the inevitable jail sentence he knew would come because he could not stop drinking and fighting. The family moved, living first in Stanhope and then Lake Hopatcong, but Ernie "kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time." (Exhibit 81.)

Gelene's humiliation at Ernie's hands continued. Ernie started "seeing another woman almost as soon as" the family arrived in New Jersey. (Exhibit 97.) Ernie had promised Gelene that "he wanted to leave Joliet and have a fresh start, straighten himself out, but that's not what happened." (Exhibit 97.) Ernie moved out of the home and lived with another woman, but Gelene allowed him to move back home with her and the boys. Gelene contracted gonorrhea twice from Ernie. Although Ernie had vowed he would never become violent like his father, he assaulted Gelene and "gave her two black eyes and split [her] lip." (Exhibit 97.) Gelene "was at

the end of her rope" and left Ernie for good in Lake Hopatcong, returning home to Sallisaw with three young boys in 1972.  Ernie and Gelene divorced June 20, 1973.  (Exhibit 97; Exhibit 12.)

### Infancy and Childhood Development

Kenny  has long standing neurologic deficits that were apparent early in his infancy, continued throughout his childhood and adolescence, and affected his behavior and understanding over the course of his life.  Although it is difficult if not impossible to determine with precision the etiology of his neurological deficits, there is no doubt that they are present and significant.  These deficits can be the result of his mother's ingestion of alcohol or other neurotoxins during her pregnancy with him, head trauma he sustained during childhood and young adulthood, ingestion or exposure to neurotoxins at work or home, or a combination of one or more of these factors.

Gelene was stressed throughout her pregnancy with Kenny, which she describes as "very difficult."  (Exhibit 97.)  She was in "constant pain," uncomfortable, and depressed.  (Exhibit 97.)  She described her pregnancy as "battling with Kenny before he was born."  (Exhibit 97.)  Gelene drank throughout her pregnancy with Kenny, unaware of alcohol's potentially devastating effect on a developing fetus's brain.  (Exhibit 97; Decl. Linda Riley.)  Gelene's in-laws commented on her early alcoholism and stated she "was a drunk right out of high school."  (Exhibit 86.)

Kenny  had a difficult infancy and "exhausted" his mother.  (Exhibit 97.)  His "days and nights were mixed up," and he "was colicky" and unable to be comforted.  (Exhibit 97.)  He cried and fussed "all the time," making Gelene think all babies must be like him.  After she had her other two children and observed their development, she "realized something was

wrong with Kenny." (Exhibit 97.) Gelene received no help from her husband who acknowledged he "was not around the house much when Kenny was a little baby" but " heard all about how hard it was to soothe him. He was colicky and cried all the time." (Exhibit 81.) Kenny was born with a large lump on the back of his head. (Exhibit 97.)

Kenny failed to meet developmental milestones expected of healthy infants. Gelene faithfully recorded Kenny's progress at three, six, nine, and 12 month intervals in a complimentary baby book she received at the hospital. (Exhibit 35.) Although it appears that he met most of his three and six month milestones, he lagged in some.

At three months, Kenny did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand, splash in bath, take stepping movements when held erect," or "open mouth at sight of nipple before lips are touched." Kenny's mother nursed him. (Exhibit 35.)

At nine months, Kenny did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave "bye-bye" or play "peek-a-boo" instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say "ma-ma" or "da-da" or equivalent," or "make stepping movements when feet are touched to floor." (Exhibit 35.)

At one year, Kenny's delays were more obvious. His mother noted he "had trouble learning to walk." (Exhibit 97.) He could not "climb stairs, hold and drink from cup, put one block on another when shown, say two or three words indicating want, play "pat-a-cake," or "show preference for one hand in reaching." (Exhibit 35.)

Kenny early on demonstrated patterns of behavior associated with the prodromal symptom of bipolar mood disorder, which family members described as extreme hyperactivity. Gelene recognized that his behavior lacked purpose and reported he "moved around without thinking about what he was doing" and was "very, very active." (Exhibit 97.) Gelene described him as "a handful" who "could not be still" and "was more than hyper." (Exhibit 97.) An aunt stated he was "always hyperactive, on the go, into everything, and could not sit still." (Exhibit 91.) Ada Blount, Kenny's maternal great aunt, recollected that "Kenny was a hyper little boy who could not sit still." (Exhibit 74.)

Ernie recollected that when Kenny "got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing." (Exhibit 81.) Janice Sanders, a maternal cousin, remembered that "Kenny was a hyper little boy, the most hyper child" she had have ever seen. (Exhibit 85.) She also noticed that Kenny "had strong feelings" (Exhibit 85), a common symptom of children who develop bipolar mood disorder. Other family members who "used to babysit Kenny and saw him on and off through his teens and at family reunions" confirmed that he was "very hyperactive." (Exhibit 101.)

Family members recognized "that Kenny was different" and "needed so much more attention as a child than the other children." (Exhibit 91.) Kenny "was extremely sensitive and cried over every little thing from the time he was small until he was a grown man . . . . He would break down and cry easily." (Exhibit 91.) His cousin remembered that "back then we called Kenny hyper. He was erratic and temperamental." (Exhibit 86.) His mother reported that "any little thing could upset him, but it took a lot to calm him." (Exhibit 97.) Ernie also recognized that Kenny was "a sensitive little boy...who cried if you hurt his feelings." (Exhibit

81.)  When Kenny was a toddler, he had to go to the hospital for several different accidents because "he got into everything.  He had to have his stomach pumped twice when on two separate occasions, he managed to climb to a top cabinet. Once he ate baby aspirins the other time he ate ex-lax."  (Exhibit 97.)  Kenny's mother had to "rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting it open and raising a big knot."  (Exhibit 97.)

Gelene was overwhelmed by the responsibility of a child with special needs. Already a very emotional person who was alcoholic, she reacted to Kenny's impairments by punishing him.  Gelene admits that she decided "to be especially hard on Kenney because he went from one thing to the next" and "was never still."  (Exhibit 97.)  It "almost drove [her] crazy."  (Exhibit 97.)  She thought he "was emotional about things that did not matter.  He would cry and scream like there was no tomorrow."  (Exhibit 97.)

She physically punished him by beating him with a thin belt and degraded him verbally. Ernie remembered that Gelene "used to whip the boys over any little thing and whipped them all the time.  She had a bad habit of saying cruel things not just to me but to the boys, too." (Exhibit 81.)  Gelene's niece by marriage "thought Gelene was mean, that she had a mean spirit" and that the way "she would talk to. . .kids was angry."  (Exhibit 86.)  Children were "afraid of her."  (Exhibit 86.)  Kenny suffered "more verbal abuse from her than her other two children." (Exhibit 86.)  Kenny's neurologic impairments and his chaotic home life took their toll on his school work.  Gelene stated he "had a difficult time in school and was in special classes part of the time."  (Exhibit 97.)  Kenny  had difficulty almost immediately in school.  He failed reading

and arithmetic in the first grade and was barely able to keep pace with his peers. He had difficulty learning to read. (Exhibit 97; Exhibit 136.)

Ernie "hardly had anything to do with [Kenny] after the divorce, and everyone could see how much it hurt Kenny." Even when Ernie made semi-annual trips to town to see his sons, family reported he was insensitive to his children's needs. He came "by to show off his new Corvette when his children did not have shoes or decent clothes to wear." (Exhibit 84; Exhibit 91.) Ernie's sister in law did not think Ernie was "a good husband or father. Ernie did not come around and visit his children the way he should have. He was absent in their lives. Ernie has always been for Ernie." (Exhibit 93.) Ernie "went his way and let Gelene take care of the kids." (Exhibit 93.)

Ernie remembered that "Kenny kicked and screamed to stay" with Ernie and "did not want to go with his mother back to Oklahoma." (Exhibit 81.) Kenny "wanted to stay" with Ernie, but Ernie felt he "was not set up to take care of him and work." (Exhibit 81.)

Gelene's emotional needs took precedence over Kenny . Her sister recalled that Gelene "had a lot of problems, especially with alcohol and men" and those problems "affected Kenny badly." (Exhibit 91.) Gelene brought different men into the house when Kenny was entering his teenage years, and "it was very confusing for him." (Exhibit 91.) Gelene "seldom gave Kenny a kind word" and "screamed at him over anything." (Exhibit 91.) Gelene once asked Phyllis to intervene and help her get Kenny out of his room. Phyllis and her husband went to Gelene's house and talked to Kenny. Kenny told them "he could not get his mom's voice out of his head. The only time Gelene talked to him was to scream." (Exhibit 91.) Gelene's "ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and

unpredictability.  She had a hard enough time dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood swings."  (Exhibit 99.)  When Gelene "lost control of herself," she whipped the boys,  but "there was no real parenting."  (Exhibit 99.)

Gelene was harsher with Kenny, "verbally and physically," than she was with her other two sons.  (Exhibit 99.)  Gelene used a strap to whip Kenny, and Kenny "hated" it. (Exhibit 99.)  Kenny had a German shepherd that Ernie had given him, and the dog was very protective of Kenny.  When Gelene "would try to beat" Kenny, he would hide behind the dog and the dog would growl at Gelene and not let her near him.  (Exhibit 99.)  The dog was run over by a car.

Steve, Kenny's youngest brother, lived at home with Kenny, Richard, and his mother, but found refuge and support with the extended family.  Steve, an educator and principal at a junior high school, has given great thought to understanding how he "was able to overcome many of the challenges" he faced and "how those challenges affected Kenny."  (Exhibit 99.)

Steve and Kenny "were exposed to vastly different environments and experiences" during their formative years due to Steve's much younger age.  (Exhibit 99.)  Steve benefitted from the guidance, support, and structure of an extended family that "Kenny never experienced in his developmental period.  Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children."  (Exhibit 99.)

While Gelene's move back to Sallisaw separated 12-year-old Kenneth Barrett from the closeness and love he longed for with his father, the move placed Steve in the middle of a "village. . .in an extended support structure" when he was in the second grade and Kenny was

repeating eighth grade. (Exhibit 99.) Steve was "literally surrounded by aunts, uncles, cousins, and most importantly" his maternal grandparents, Hugh and Hattie Dotson. Steve believes "another critical factor" is that "Ernie. . . abandoned Kenny when Kenny most needed him" but that Steve, at the age of two, had no real relationship with Ernie. (Exhibit 99.) Ernie's absence in Steve's childhood and adolescence was "replaced by attentive older men and women relatives who rooted [him] in their love and guidance." (Exhibit 99.)

Steve also attributed his success to his academic ability and recognized that "Kenny had great difficulty with his education. Kenny failed in school." (Exhibit 99.) School became the focal point for Steve and provided "the value system" that was absent at home. Steve developed close relationships with his extended family, and explained "it made all the difference in the world to have that support structure. It was a pivotal part" of his life, and he had "positive experiences and influences that Kenny never had." (Exhibit 99.)

Gelene was unable "to have meaningful conversations about day to day problems, to figure out how to solve normal problems that arise in the course of everyday life, or to tolerate the routine activity of growing boys." (Exhibit 99.) Steve once found "diary-type notes" of hers that "were very depressive and full of blackness and darkness." (Exhibit 99.) Gelene "did not know how to respond to Kenny's special needs as a youngster with profound psychological problems." (Exhibit 99.)

Kenny begged his father to allow him to live with him, and Ernie relented and "let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny completed ninth grade." (Exhibit 81.) Kenny resented Ernie's wife Diana and "it got the best" of Ernie, who "lost control when he sassed her" and "hit him pretty hard in the chest. He went

flying slamming against the wall." (Exhibit 81; Exhibit 149.) After his father's assault, Kenny went back to Sallisaw and soon withdrew from school.

Gelene reported that Kenny "never got over" the divorce and believed that it "caused some of Kenny's problems." (Exhibit 97.) She knew that "Kenny never adjusted" after the family moved back to Sallisaw when Kenny was in the seventh grade. (Exhibit 97.) Kenny "got pretty depressed and lost interest in school." (Exhibit 97.) Kenny's youngest brother Steve realized that Kenny "idolized Ernie." (Exhibit 99.) He could tell "how much Kenny missed [their] dad by the way he acted when Kenny was around him. Kenny made sure to stay in close proximity. . . Ernie was a god to Kenny." (Exhibit 99.) Extended family members knew that "Kenny never had much of a father," and "never had any guidance." (Exhibit 74.)

Kenny had "a hard time with lessons" and repeated the eighth grade. (Exhibit 81.) In the fall of 1976, at the age of 14, Kenny enrolled in eighth grade for the second time at Tommy Spear Junior High in Sallisaw. He was placed in special education classes in English and staff made "some adjustments to the curriculum" for him. (Exhibit 136.) At the end of the academic year, he showed improvement in two courses (math and social sciences) and decline in one course (science). It was a very difficult year for Kenny, whose beloved grandmother, Ada Mae, died in 1976. (Exhibit 126.) Ada Mae "adored" him, and "[w]hen she died . . . Kenny was just 14. It was as if the only adult who ever cherished him had gone." (Exhibit 86.) Ada Mae's death was the hardest on Kenny "because his father had recently deserted him at the age he most needed direction." (Exhibit 86.)

Kenny moved from Sallisaw to live with his father in Dunkirk, Indiana, and enrolled in the ninth grade at Jay County High School at the age of 15 in the fall of 1976. His

grades declined in three of the five subjects (general math, comm arts, and life science). (Exhibit 136.) Kenny returned to Sallisaw, but "just couldn't make it in school, so he withdrew from school and went to work full time." (Exhibit 81; Exhibit 200.)

When Kenny was 17, he was assaulted and beaten by Sallisaw police officer John Philpot, who hit Kenny so forcefully, it broke Officer Philpot's hand. The assault had long term consequences on Kenny who could not understand the reason for the assault. Kenny had been arrested for "hot rodding, squealing his tires" when he was "out driving one of his souped-up cars." (Exhibit 97.) The incident only added to Kenny's already burgeoning paranoia. The traumatic impact of the assault on Kenny – then a youth with manic-depressive illness, brain damage and a low I.Q. – affected the development of paranoid delusions that would cause him, almost 20 years later, and 12 years after he shot himself in the chest with a shotgun, to fend off imaginary satellites or dirigibles that he thought were surveilling him. (Exhibit 117.)

### Onset of Mental Illness

Kenny entered late adolescence and young adulthood with modest expectations that were obliterated by the onset of major mental illness emanating from and exacerbated by his long standing neurologic deficits. He battled "terrible mood swings" and periods of depression that lasted for days. He hoped that hard work would make his pain go away. It did not. He had worked steadily since he left high school, and "his bosses liked him." He was "a good worker, strong, and able" and was "proud of his work." (Exhibit 97.) By the time Kenny was 18, he worked on pipelines and oil rigs and traveled throughout Oklahoma and other states.

Soon, Kenny met and fell in love with a beautiful young girl, Abby, and they married in 1980 when he was 19 and she was almost 16. (Exhibit 7.) Their only child, Toby,

was born December 1, 1980.  (Exhibit 122.)  Kenny and Abby's marriage was "rocky. . . and they were more unhappy than happy even though they loved each other."  (Exhibit 97.)

Kenny "was far too mentally unstable" to live independently, so the young couple lived off and on with Gelene for the first few years of their marriage.  (Exhibit 103.)  Kenny's relationship with his mother was complex, and although she resented his presence, she insisted that he join her when her friends came over and used drugs.  Kenny's wife, Abby, worried about the effect such goings on would have on her baby, and she desperately wanted to move into their own apartment.  Abby reported that "Gelene made Kenny get up from bed and party with crack and pot."  (Exhibit 103.)  Gelene never treated "her other sons the way she treated Kenny." (Exhibit 103.)  She and Kenny had a "terrible relationship."  (Exhibit 103.)  Gelene remarried and divorced a local bar owner, and was frequently "depressed" and "intoxicated." (Exhibit 152; Exhibit 11; Exhibit 150.)

Kenny tried "to bury his problems under constant work and activity."  (Exhibit 99.)  Kenny  measured his life by how much he could work, but he was too depressed to keep a steady work schedule on his own.  Depressive episodes overtook him, and he would "get real depressed and sleep all the time."  (Exhibit 103.)  The only antidote to his depression was drugs. His wife knew that "he smoked a lot of pot, but without it he never got motivated. He turned to drugs to make himself feel better."  (Exhibit 103.)  He used methamphetamine as an antidepressant and discovered that he could work well under its influence.  Abby observed that Kenny "would work hard and then sleep all the time. . . .[He] did the drugs to make himself feel better, because otherwise he would just sleep."  (Exhibit 103.)

Kenny's behavior easily fit the pattern of bipolar mood disorder, and his family knew he was "deeply troubled." (Exhibit 86.) His wife thought he was "like a manic depressive, hot one minute and depressed and even immobile the next." (Exhibit 103.) Kenny had "racing thoughts." (Exhibit 103.) He did things without thinking and "then regretted them." (Exhibit 103.) Abby knew that Kenny "did not act the way normal people act" and that he "got swept away in his emotions." (Exhibit 103.) When Kenny lost control of himself, he hit Abby and later "would come back crying, begging" Abby to take him back. (Exhibit 103.) He was genuinely "remorseful" and would "be good as he could be—he would go the extra mile,. . . . but he could not keep it up." (Exhibit 103.)

Kenny's cousin, Brandy, recognized Kenny's bipolar mood disorder created severe problems for his marriage. Brandy compared Kenny's behavior to her own behavior and reported that her "mood swings" made it "hard" on her husband because she "used to attack him, kind of the way Kenny and Abby fought." (Exhibit 77; Exhibit 141.)

Kenny and Abby separated and reunited frequently; his mood fluctuations and deep depressive episodes made him irritable, agitated, paranoid, and suspicious. During one of the separations, he went to his father's home where Ernie found work for him. Ernie described his observations of the effect of Kenny's mental impairments on his behavior:

> Kenny had bouts of depression and did things that did not make any sense. Sometimes he would be very down but other times he would be manic, always on the go and upbeat. Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it. In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me. I got him a job with Kerr Glass and he was making real good money. Kenny had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill

himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve.

(Exhibit 81.)

Abby knew that Kenny "had mental issues" and tried to persuade him to seek psychiatric treatment.  (Exhibit 103.)  Abby recognized that she "was the only stable thing he ever had in his life" and that she "kept him together."  (Exhibit 103.)  She opposed his drug use but stayed with him in their fitful marriage to try "to keep him from falling off the deep edge." (Exhibit 103.)  Kenny's brother reported, "[a]s troubled as Kenny was, he worked all the time." (Exhibit 99.)  Kenny's use of drugs allowed him to keep working, despite his serious mental illness.  Kenny increased the amount of drugs he ingested in direct response to the symptoms of depression he experienced; his goal was very simple.  He needed methamphetamines in order to work.

Abby lost battle after battle with Kenny's bipolar mood disorder.  In 1986, Kenny attempted suicide and nearly succeeded in killing himself with a shotgun blast to his chest. (Exhibit 147.)  Kenny's brother Steve was home at their mother's and witnessed Kenny's suicide attempt:

> In a terrible episode of depression, he tried to kill himself.  I was home with Monty and Podgy in the living room watching Carl Sagan kind of stuff on television.  Kenny came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenny leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. . . .Kenny was in and out of it, mumbling, making no sense.  Kenny was in ICU in Sparks Medical Center in Fort Smith for 11 days.

(Exhibit 99.)

Abby convinced Kenny to see a psychiatrist after he survived the shooting, and he briefly took Elavil and Ascendin.  His dramatic mood swings continued to be "like a roller coaster."  (Exhibit 103.)  Elavil was extremely helpful and made a big difference in Kenny, but he discontinued his treatment.

Kenny continued to decline and was involuntarily committed to Eastern State Hospital October 8, 1986 "as a result of mental disorder or impairment by chronic alcoholism or drug abuse" that created "an immediate likelihood of serious harm to self or others."  (Exhibit 147; Exhibit 33.)  The admitting psychiatrist provisionally diagnosed Kenny with "depressive neurosis with suicidal potential extremely high."  (Exhibit 147.)  The nursing assessment reported that Kenny did "not recognize problems."  (Exhibit 147.)  Kenny had a nine year history of polysubstance abuse.  Kenny hand wrote on a printed questionnaire, "I wish I was back home in the woods."  (Exhibit 147.)

On the mental status examination, Kenny was noted to be "labile" and to laugh "inappropriately at times."  (Exhibit 147.)   His insight and judgment were impaired.  Staff found Kenny to be "courteous, cooperative."  (Exhibit 147.)  Kenny acknowledged that he had "a hot temper."  (Exhibit 147.)  Kenny's highest level of functioning in the preceding year was "poor." (Exhibit 147.)  Kenny reported being anxious and depressed.  He was paranoid and blamed his wife and mother for his being hospitalized.  Kenny was discharged early on October 17, 1986 to his cousin.  His discharge summary noted he "wants to return to work."  (Exhibit 147.)

Kenny was not able to return to work.  Gelene arranged for his second cousins to "pick Kenny up from Eastern State after they had him committed."  (Exhibit 101.)  Nona described Kenny's preoccupation with Abby:

> He stayed with me in Kellyville that first week.  It was apparent how much Kenny loved Abby and he could not get his mind off her.  He was very paranoid, being without her. Gelene hoped that by staying with us he would be in a new environment and do better.

(Exhibit 101.)

Kenny  sustained repeated head injuries from his work and from car accidents.  He was preoccupied and distracted by depression and mania and unable to focus his attention.  He applied for disability due to his mental impairments, and was denied but evaluators found him to be "moderately depressed" and periodically unable to "think clearly."  (Exhibit 147.)  Kenny made repeated trips to the hospital after falling down stairs, sustaining a contusion to the right periorbital region of his head, being involved in a motor vehicle accident, experiencing rib and chest pain, and suffering a rash "all over."  (Exhibit 147.)

When Kenny's marriage ended after 14 years, he "never recovered."  (Exhibit 103; Kenneth Barrett, Divorce Proceedings.)  He and Abby had wanted the marriage to work for the sake of their son, but Abby was unable to tolerate the irritability, agitation, paranoia, and severe mood swings that came at unpredictable times and derailed their lives.  By the end of their marriage, Abby "felt like [they] were more like brother-sister than wife and husband because [she] was always bailing him out of trouble and taking care of him" and "trying to keep up with his mood swings."  (Exhibit 103.)  Kenny was too impaired to take care of Abby, and she recognized that "he was mentally ill."  (Exhibit 103.)  It pained Abby to leave Kenny because "[t]here were times he could be good. . . .and would try so hard to be good."  (Exhibit 103.)  She also knew that "he could not function without her."  (Exhibit 103.)

After their final separation, Kenny spiraled downward, as Abby had predicted. His multiple impairments made it impossible for him to function independently. He was hospitalized January 20, 1995, given "10 mg of Haldol IM," and diagnosed with bipolar mood disorder after telling hospital staff, "I'm losing my mind." (Exhibit 147.) Hospital staff noted he was "extremely agitated." (Exhibit 147.) During his three day hospitalization, staff reported he was "very agitated" and not able to sleep "for a few days." (Exhibit 147.) He demonstrated "lack of concentration" and "rapid thought process." (Exhibit 147.)

Kenny was discharged to his mother with "outpatient follow-up at the Bill Willis Community Mental Health," but he did not follow through. (Exhibit 147.) Kenny "moved back home" and "built a little shack" next door to his mother's trailer. (Exhibit 99.) His brother visited it and observed that the shack was "almost Waldenish in its own way." (Exhibit 99.) The shack was constructed from discarded and used materials, did not have electricity or plumbing and only had "the essential stuff." (Exhibit 99; Exhibit 97 and Attachment.) Kenny "ran an electrical cord from (Gelene's) trailer to his shack for electricity." (Exhibit 97.) Gelene prepared his meals for him, and he ate at her trailer. Kenny's son, Toby, visited often, but knew that his father had "some problems inside his head" and "always thought he had a chemical imbalance." (Exhibit 96.) Even as a teenager, Toby "knew something was wrong with him because he had mood changes that were not normal." (Exhibit 96.) Toby observed that his "dad could be in the best of moods one minute, then the worst" and was "a very paranoid" and "a very scared person." (Exhibit 96.)

Everyone in the family and Kenny's ex-wife knew he could not "live on his own." (Exhibit 97.) During his and Abby's frequent separations, "Kenny always came home" to his

mother.  (Exhibit 97.)  An aunt explained that Kenny's "only security was with Gelene because he did not have anybody else" to care for him.  (Exhibit 93.)  Kenny's son who had to come to terms with his father's mental illness "had to bring things to him" after his father "stopped leaving his property."  (Exhibit 96.)

Gelene "knew he had serious mental problems" but "hoped if he lived close to [her] and just worked on his cars and fixed things for people, he might be able to make it." (Exhibit 97.)  He stayed more and more to himself and became more and more paranoid, but he was not a loner at all because many friends visited him.  (Exhibit 90; Exhibit 77; Exhibit 95.) Kenny told a neighbor, Alvin Hahn, "he thought there were satellites watching him."  (Exhibit 75.)

As Kenny's paranoia increased, so too did his dependency on family.  His friends knew his paranoia was in full force and was the reason he "hardly left his property for several years."  (Exhibit 95)  His aunt Phyllis understood that he "was never able to be independent as a grown man.  His emotions got in the way of his being able to live too far from home."  Phyllis described an incident that explained how he relied on family when his emotions overcame him:

> [A] couple of years before the incident, Kenny had run to my house in tears, crying,  "The laws are after me. They're coming! What should I do?" I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail.

(Exhibit 91.)

Despite the limitations created by his mental impairments, Kenny "would give you the shirt off his back if you needed it."  (Exhibit 91.)  He "tried to stay close to home, always worked hard and took pride in his work."  (Exhibit 91.)  Kenny's family and friends uniformly

reported that Kenny was not violent or dangerous to them.  His great aunt Ada stated, "I never felt threatened by Kenny. He did not bother me any, but I worried about him." (Exhibit 74.) Janice, his cousin, grew irritated and impatient with Kenny on more one occasion for playing his music too loud and called the police to Kenny's, but she loved Kenny and "was never afraid of him." (Exhibit 85.)  Kenny's maternal aunt Ruth found him to be "sweet person, nice, and respectful" whose drug use "may have hidden his mental illness." (Exhibit 93.)  Ruth and her husband, who visited Kenny "to talk about the Bible and how he could straighten out his life" were "never afraid of him" and did not "believe he would intentionally hurt anyone." (Exhibit 93.)  Relatives visited and talked with Kenny.  His second cousin Nona, who "got along wonderfully" with him counseled him about religion. (Exhibit 101.)  Nona described the last conversation she had with Kenny:

> The last conversation I had with Kenny was in 1995-96 when my husband at the time and I visited Gelene.  Kenny came by to visit. It was clear to me that Kenny was studying life and thinking deeply, trying to figure things out. I remember he said, "'Aunt Nona, how do you know there's a God?" I took him to the window and said, "See how beautiful that is."  He agreed but asked me "Why can't we see God?"  I tried to explain to him that the Bible says we should worship God in spirit and we will see His truth.

(Exhibit 101.)

Friends and family thought at times Kenny would be alright.  A friend and neighbor reported that "Kenny had a reputation in the community as an excellent mechanic who was fair."  (Exhibit 90.)  A cousin, Brandy Hill, remembered that "Kenny was very generous, and his auto repair business was getting more solid every day. People would pay him hundreds of dollars in cash to replace an engine or a transmission." (Exhibit 77.)  Despite Kenny's mental illness, his son Toby had "a lot of fond memories of . . . going canoeing, and helping him work

on cars." (Exhibit 96.) Toby was intimate with Kenny's fears but knew that Kenny "was not

dangerous," and Toby "was not afraid of him." (Exhibit 96.) Toby thought that Kenny "did the

best he could" and saw that his father "had a tender side to him" that helped "offset the pain of

having a dad with mental problems." (Exhibit 96.)

The family hoped that Kenny could recover. His mother described their

observations:

> As time went on, he did a little better, built a garage and fixed everything from
> appliances to cars, trucks, and trailers for friends and neighbors. He stayed more
> and more to himself, though, and did not like to leave the property. Friends
> bought him food and went grocery shopping for him. He ate most of his meals at
> my trailer, and I cooked for him. I hoped and prayed he was going to make it. At
> least, I believed, with him living right next door, he was safe and I could keep an
> eye on him. We had our arguments; that's for sure. He was so paranoid and
> crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

(Exhibit 97.)

### b. Kenny Barrett's mental illness and organic brain dysfunction.

Mr. Barrett's trial counsel had a duty to obtain this information about his family

and his own personal history. This is the story of a unique human being whom jurors never met.

If trial counsel had gathered this readily available information and provided it to a qualified

expert, as prevailing professional norms required, the jury would have understood how Mr.

Barrett's life history, while intrinsically compelling, also has profound implications for a

scientific understanding of his mind and actions. A competent mental health expert would have

seen significant risk factors in Mr. Barrett's background that would have helped explain who he

is and why he would act as he did.

> Both father's and mother's sides of Mr. Barrett's family were burdened by multi-generational neurological impairments and affective mood disorders, as well as patterns of substance abuse and parental neglect consistent with an affective-laden family.  Mr. Barrett's young parents were apparently ill-equipped cognitively, emotionally or financially to rear children.  Mr. Barrett's developmental years were characterized by parental neglect, lack of appropriate boundaries, domestic discord, inter-parental violence and physical abuse.  These factors likely potentiated Mr. Barrett's genetic predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning.

(Exhibit 117 at ¶ 22.)

An expert presented with the available background data would have informed the jury that Mr. "Barrett's own genetically based potential for developing a mental illness was significantly increased by the circumstances of his upbringing, especially his parents' chemical dependency."  (Exhibit 117 at ¶ 30.)

> His parents' dependency and their different, unpredictable behaviors while intoxicated, further compromised Mr. Barrett's ability to perceive and incorporate a sense of appropriate boundaries, and develop an adequate perception of social cues and interpersonal interactions.  Ernie Barrett was frequently physically absent for days at a time as a result of extramarital affairs, and Gelene Barrett was rendered emotionally distant and neglectful by her intoxication.  These behaviors left Mr. Barrett's parents ill equipped to develop the primary attachments or provide the basic physical and emotional nurturing necessary for a young child's normal, healthy neurocognitive development.

(Exhibit 117 at ¶ 32.)

As Dr. Woods explains, research published by the National Academy of Science documents the impact of such parenting on a child's developing brain:

> *From Neurons to Neighborhoods*, a study of early childhood development by the National Research Council and the Institute of Medicine, documented sensory stimulation, and social interactions as conditions that affect the developing brain. They also determined that chronic stress is detrimental to the normal development of the brain. ***

[¶]     Parental neglect of the type suffered by Mr. Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the longest term and most pernicious effects of all such early traumatic experiences.

[¶]     The brain is only starting to grow, mature, and differentiate at the time of birth.  Within the newborn brain there are certain structures that develop only if stimulated, and there are other structures that atrophy if not stimulated.  The newborn child's interpersonal and environmental experiences determine the rate and quality of development for domains that regulate definition of person and comprehension of one's place in his or her environment.  The absence of necessary caretaking or experiences that promote attachment between parent and child can alter both the structure and function of the child's developing brain. Mr. Barrett's reactivity rather than responsiveness is directly related to the lack of parental training of appropriate coping mechanism, in addition to his genetically-derived mood disorder.

(Exhibit 117 at ¶¶ 33-35.)

Documents and family history also present experts with data that are important to understanding what chemical and other physical insults touched Mr. Barrett's development.  His mother drank when she was pregnant with him.  Alcohol use during pregnancy is known to be associated with abnormal brain development and brain dysfunction.  (Exhibit 89 at ¶ 23, Exhibit 117 at ¶ 37.)  Mr. Barrett's brain continued to be affected by alcohol and other drugs in adolescence and young adulthood.  His father initiated his drinking at age seven, and drinking and drug use, modeled by his parents, continued from there until it included a vast array of substances and prolonged exposure.  Research informed mental health clinicians that childhood and adolescent intoxication has damaging neurological consequences.  (Exhibit 89 at ¶ 23.)

Mr. Barrett's chemical dependency history is consistent with the high incidence of substance use secondary to the increased neurovegetative symptoms of eating and sleep disorders, adhedonia and mania found in bipolar disorder. Mr. Barrett's combination of traumatic stress and bipolar disorder predisposed him to chemical

dependency. PTSD and bipolar disorder each have a co-occurring incidence with chemical dependence greater than 40% in the clinical literature.

(Exhibit 117 at ¶ 44.)

Jurors would want to know whether there were signs that these sources of trauma and potential impairment had an effect on the young Kenny Barrett.  Records kept contemporaneously, when considered by clinicians, showed evidence of harm.

As a child, Mr. Barrett exhibited signs of impaired neurological growth, failing to meet developmental milestones expected of healthy infants.   During his first year, Mr. Barrett exhibited increasing delays in areas associated with creating interpersonal relations and emotional development.  Among other delays, at age three months, he did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand"; at nine months, he did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent"; at one year, Mr. Barrett's mother noticed that he "had trouble learning to walk," and could not "drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching."

[¶]      Mr. Barrett failed reading in the first grade, was required to repeat the eighth grade and was eventually referred to special education classes before he dropped out of school in the ninth grade.  By pre-adolescence his hyperactivity, irritability, isolation, and impaired academic functioning introduced the prodromal symptoms associated with major mood disorder.   He became more hyperactive, intrusive, and emotional labile, extremely sensitive, and a tendency to emotionally decompensate without apparent provocation.

(Exhibit 117 at ¶¶ 38-39.)

The life history information that was available to trial counsel includes evidence of other sources of trauma that placed him at risk for organic brain impairment.  (Exhibit 89 at ¶ 21, Exhibit 171 at ¶ 41.)  He was hit in the head with a steel ball when he was eight or nine years

Page 234

old; at age 17, Johnny Philpot beat Mr. Barrett about the face and head, including a blow that broke his jaw; in his early twenties, he was involved in motorcycle accidents; at age 24, he shot himself in the chest with a shotgun. *Id.*

If trial counsel had followed prevailing professional norms and had timely retained appropriate mental health experts to assist the defense, Mr. Barrett's jury would have heard extensive evidence of mental illness and impaired brain functions due to organic damage. As explained by Dr. Young: "The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex." (Exhibit 89 at ¶ 28.)

The prefrontal cortex is responsible for executive functioning, which allows an individual to think and reason; solve problems; adapt to circumstances; accurately receive, process and organize information; make rational decisions; and, based on the information that is received, adapt behavior based on experience and make appropriate choices of action.

> More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation. Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders. The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

(Exhibit 89 at ¶ 26.)

Dr. Young's findings are based on approximately 16 hours of neuropsychological testing, including intelligence testing, a clinical interview including the taking of a history, review of educational records, and a review of psychiatric and medical records. (Exhibit 89 at ¶¶ 20-26.) The objective testing and historical study performed by Dr. Young constitutes an accepted, reliable method for assessing cognitive function. (Exhibit 89 at ¶ 62.) Based on the historical data available at the time of trial and the scientific literature, Dr. Young opines that the damage to Mr. Barrett's prefrontal cortex likely stems from abnormal prenatal development, traumatic brain injuries Mr. Barrett suffered, and drug abuse. (Exhibit 89 at ¶¶ 63-65.)

Like any other person, Mr. Barrett has areas of weakness and areas of strength in the many brain functions evaluated by a neuropsychological test battery. However, testing shows Mr. Barrett is impaired in some areas which means that he functions at a level below the average person, and sometimes far below. The testing data and congruent findings on psychiatric study show Mr. Barrett experiences dysfunction in areas of his brain

> that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use

of hindsight and foresight in the direction of current processing.  Mr. Barrett suffers significantly impaired functioning in all these domains.

(Exhibit 117 at ¶ 58.)  In less scientific terms, Mr. Barrett has brain damage that makes him less able than a normal person to process information and formulate a rational response.

Mr. Barrett's temporal cortex is also damaged or otherwise dysfunctional, and in ways that complement (aggravate) his other impairments, as they relate to culpability in the death of Trooper Eales.  The temporal cortex controls verbal and visual memory, as well as learning, interpreting and processing speech and the emotional tones and meaning in speech.  The temporal cortex is also responsible for processing visual information.  Dysfunction of the temporal cortex is associated with, among other things, amnesia, fear, paranoia, impulsivity, and outbursts of aggression.  (Exhibit 89 at ¶¶ 36-77.)

Based on Dr. Young's findings and his own assessment, psychiatrist George W. Woods, Jr., M.D. concludes that Mr. Barrett experiences dysfunction in the areas of the brain that are necessary to sound reasoning, judgment and planning.  That is, "Mr. Barrett . . . suffers from a Dysexcutive Syndrome, which would be categorized on Axis III" of the DSM-IV-TR™. (Exhibit 117 at ¶ 67.)  In other words, Mr. Barrett's ability to accurately and appropriately process, retain, integrate and respond to information and events as they unfold is significantly compromised.  (Exhibit 117 at ¶ 58.)

The areas in which Mr. Barrett experiences impairment make understanding his functioning a necessary part of understanding him as a unique human being trying to get along in the world, and for understanding the events of September 24, 1999.  The problems Mr. Barrett

has experienced from organic brain impairments are compounded and exacerbated by severe psychiatric illness.

> Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.   * * *   Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

(Exhibit 117 at ¶ 66.)  As Dr. Woods states it, Mr. Barrett's cognitive functioning and behavior "is severely compromised by overlapping symptoms of depression and mania ... and impairments in [the] higher cortical regions necessary for inhibition, reasoning and judgment." (Exhibit 117 at ¶ 66.)

The development of Mr. Barrett's bipolar disorder was strongly influenced by his familial predisposition to this and other mental illnesses.  As shown in the attached medical records and summarized *supra*, Mr. Barrett comes from a family plagued with bipolar disorder. The onset of his organic brain damage can likely be traced not only to early head trauma, but his mother's drinking while pregnant, and other factors.  (Exhibit 117 at ¶¶ 63-65.)

Dr. Woods explains that people with frontal lobe damage, and people with Bipolar Disorder share suffering in significant areas of daily functioning.  "Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become [sic] incorrect."  (Exhibit 117 at ¶ 59.)

> Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types

of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

(*Id.* at ¶ 60.)

Mr. Barrett's case would have presented the jury with extraordinary evidence to support these diagnoses. Mr. Barrett's personal and family history, as set forth *supra* and as documented in the exhibits to this Petition, is replete with incidence of major mental illness, including Bipolar Disorder. A qualified clinician would have explained the significance of this remarkable history to jurors.

[¶]     Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult. The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

[¶]     The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

[¶]     Mr. Barrett's family history, the consistency of emotional dysregulation beginning early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

(Exhibit 117 at ¶¶ 63-65.)

In other words, "Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial." (Exhibit 117 at ¶ 68.)

If trial counsel had informed themselves regarding Mr. Barrett's history, and consulted relevant experts, the jury too would have been informed that

[¶]     Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.

* * *

[¶]     Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings . . . . He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder.  The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]     Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening.  Over the course of his life, he had been beaten multiple times by his caregiver and the police.  He had shot himself in the chest, at close range, almost losing his life.

[¶]     He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid.  Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]     Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]     Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction.  This includes not only the intensity of

emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]     Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor.  Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]     Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme.  He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce.  Mr. Barrett had become increasingly withdrawn, by everyone's account.  He reported to me that the years from his divorce and the raid on his home were the darkest of his life.  He was self medicating more heavily than ever before.

[¶]     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property.  This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation.  His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]     My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Exhibit 117 at ¶¶ 69-78.)

Trial counsel had available to them some resources for obtaining mental health evidence to present in mitigation.  If trial counsel had contacted Dr. Bill Sharp, who had done a preliminary evaluation during the state-court proceedings, he would have been able to rely upon the additional social history data and neuropsychological findings.  (Exhibit 55 at ¶ 16.)  Dr. Sharp concurs in the findings of Dr. Young and Dr. Woods.  (*Id.* at ¶ 23.)

> Taking [the social history] information into account and Mr. Barrett's assessment by myself, Dr. Young, and Dr. Woods, one could conclude that Mr. Barrett's response to the raid on his property was impulsive and not thought-out.  I liken the situation to a person being surprised in the night by an unexpected phone call or alarm clock.  In general, someone in those circumstances will experience some disorientation and difficulty understanding events.  For someone with Mr. Barrett's mental impairments those experiences would be magnified many times over.  For a normally functioning person to understand how Mr. Barrett would have experienced the assault on his property, he would have to think about his own sense of surprise or disorientation and think of that experience multiplied one thousand times over.

(*Id.* at ¶ 24.)

Armed with the available information, trial counsel would have been able to persuade the jury on multiple fronts including (a) doubts about the truthfulness and motivations of the prosecution's informants; (b) doubts about the need for a no-knock warrant (including whether Mr. Barrett could have failed to appear for a trial that was not going to happen); (c) the inappropriate nature of the raid and the tactics that call into doubt whether Mr. Barrett could have seen that his attackers were law enforcement officers; (d) that the Tact Team recklessly approached a man who was hyperreactive, who had been suicidal, who was extremely paranoid, and whose teenage son was threatened; (e) that Mr. Barrett had pre-existing, organically induced impairments in the abilities to solve problems, the ability to engage in goal-directed behavior, the ability to plan strategically, the ability to anticipate the consequences of his actions, the ability to

see the "big picture," and the ability to be mentally flexible rather than rigidly persist in an action that new information indicates is inappropriate; (f) that apart from the conditions existing at the time of the offense, Mr. Barrett grew up in an environment of alcoholism, violence, selfishness, abuse, and neglect; (g) that he struggled to overcome the burdens of his background and mental impairments but in doing so fell into drug abuse that exacerbated these problems.

As elaborated in the conclusion to Mr. Barrett's second stage ineffective assistance of counsel arguments, trial counsel had a clearly defined duty to investigate, develop and present this mental health evidence in the penalty phase of trial. The mental health evidence that could have and should have been presented on Mr. Barrett's behalf was not only powerful evidence in mitigation of punishment, as the Supreme Court has recognized repeatedly, but was also directly relevant to refuting the statutory aggravating circumstances that Mr. Barrett *knowingly* created a grave risk of death to one or more persons in addition to Trooper Eales, and that Mr. Barrett committed the offense after substantial planning and premeditation.

The evidence presented here shows both that trial counsel's lack of investigation and expert consultation fell below the objective standards of reasonableness codified in the ABA Standards and Guidelines and in case law. There was abundant undisclosed mitigating evidence which, taken as a whole, might well have influenced the jury's appraisal of Mr. Barrett's culpability. Had the jury been able to place the evidence related to both phases of trial on the mitigation side of the scale, there a reasonable probability that at least one juror would have struck a different balance. Accordingly, the sentence of death should be vacated.

c.      **The prosecution's exploitation of trial counsel's deficient performance.**

Not surprisingly, the inaccurate, incomplete and misleading  portrayal of Mr.

Barrett and his background and character given by the extremely superficial and unprofessional

"mitigation case" that was placed before the jury was ripe fodder for ridicule by the prosecutors

in closing arguments.  Due to the unreasonable failures to investigate, prepare and present

anything approaching a proper case in mitigation, the prosecution was free to tell the jury that

Mr. Barrett was simply a cold, calculating and unrepentant killer who had little if anything going

for him in the sentencing balance.  (R. 5340-42, 5402, 5404, 5405-09, 5411-13, 5420-22). Due to

trial counsel's unreasonable failure to inform the jury regarding Mr. Barrett's abusive, neglected,

chaotic and troubled upbringing; his lengthy history of severe mental illness; the extensive

history of mental illness in his family; his low I.Q.; and, despite it all, his good and positive

qualities, the prosecution had a field day depicting Mr. Barrett as a prime candidate for the death

penalty.

Prosecutor Littlefield ran down a list of the few, bare-bones mitigating

circumstances that were instructed upon based on the evidence presented.  Littlefield noted the

jury had been told Mr. Barrett was simply a "father," which involved no more than a biological

process.  Left unsaid was what kind of father he was.  The prosecutor also ridiculed the claim

that Mr. Barrett was a loved son and stepson, remarking that what was missing was any feelings

Mr. Barrett had for his parents.  It was pointed out that Ernie Barrett had not seen his son for two

years before the shooting of Trooper Eales, and that his stepmother had only had contact with

him after he was in jail.  As to Mr. Barrett's relationship with his mother, Gelene Dotson, the

prosecutor pointed out that they had a tumultuous relationship with frequent arguments, fights and threats between them.  Mr. Littlefield remarked that Mr. Barrett's parents cared so much for him that they could not tell the difference between him being "hyper" and being "hyped up" on drugs.  As to Mr. Barrett being a good neighbor and friend, the prosecutor reminded the jurors that all they heard was that he fixed cars cheaply.  Dismissing the mitigating circumstance that Mr. Barrett's execution would have an impact on his child, family and friends, the prosecutor was quick to point out that since Toby Barrett had not testified, there was no evidence that Mr. Barrett's death would have any negative impact on his own child.  Indeed, the only testimony regarding the impact of Mr. Barrett's execution on his family came from his stepmother, Doris Barrett, who would no longer be able to visit Mr. Barrett in prison.  Making short work of the claim that Mr. Barrett had expressed remorse, Littlefield told the jury that Mr. Barrett only told his mother that he wished things had turned out differently.  This ambiguous statement was used as a springboard for the prosecutor to argue that by this, Mr. Barrett simply meant that he was sorry he had gotten caught and was prevented from "killing more of the bastards."  Finally, the "catch-all" instruction on any other factors the jury might find to be mitigating opened the door for more negative characterizations of Mr. Barrett, whom the prosecutor described as having dropped out of school because he did not want to get a haircut; as a user and seller of methamphetamine; as a wife-beater; and as a man so unconcerned about the safety of his son that he allowed him to remain on the property knowing full well that a police raid, which was going to be met by lethal force, was imminent.  (R. 5354, 5356.)

Since virtually nothing of Mr. Barrett's background, history and upbringing was placed before the jury by trial counsel, AUSA Littlefield was able to portray Kenneth Barrett as

---

Page 245

simply a bad and unrepentant seed when compared to his brother Steven Barrett, who became a successful educator and who was raised in the same home as Mr. Barrett.  (R. 5358.)

Picking up the theme that Mr. Barrett's case in mitigation was pitifully anemic, United States Attorney Sperling reminded the jury that Sequoyah County Court Clerk Maudeen Vann testified that Abby Barrett had filed seven domestic abuse complaints against Kenneth Barrett.  Abby Barrett was portrayed as a pathetic, abused wife, helpless at the hands of a husband who was simply a mean person, a man who had stalked her and threatened to "blow [her] head off."  Kathy Trotter was dismissed as a witness who knew very little about her cousin, Mr. Barrett, since she stated she was ignorant of his drug activities, his penchant for being armed, his domestic violence record, and was unaware of his "threats" to law enforcement, as testified to by the seven snitch witnesses.  Mr. Barrett's "helpfulness," for all the jury knew, was limited to fixing a few cars.  Just as Littlefield had done, Mr. Sperling contrasted Mr. Barrett with his brother Steven, a success story who was raised by the same parents and in the same environment, but chose to take a different path than Kenneth Barrett, the knowing, violent criminal:  "How he [Kenneth Barrett] must envy his hard working, highly achieving brother's success."  Mr. Sperling pointed out that Mr. Barrett had only sporadic contact with his mother until his arrest, hinting that he was a bad and neglectful son.  Ernie Barrett, being the good father that he was, gave Kenneth Barrett several chances to succeed at work, but Kenneth Barrett simply chose to "[blow] them."  Doris Barrett was loyal to her stepson, despite his misbehavior in jail, the implication being that her loyalty was more a tribute to her than anything positive or redeeming about Mr. Barrett.  Whatever Mr. Barrett had done for his family was vague and undetermined, and was in any event far outweighed by the crimes he had committed.  If the jurors were tempted to feel any

sympathy for Mr. Barrett's family at all, they should remember that Mr. Barrett abandoned his family by his own conduct.  Mr. Sperling stated that Mr. Barrett had "victimized" his own family by making them serve as "props" or witnesses on his behalf in the penalty phase.  Concluding his remarks on Mr. Barrett's mitigation case, Mr. Sperling told the jury that Mr. Barrett had paid for his membership among "the worst of the worst."  Mr. Barrett was simply a murderer who had killed remorselessly, wantonly, and selfishly, a man who was devoid of sympathy or empathy for his victim.  (R. 5417-20.)

The record and extra record evidence establishes that Mr. Barrett's trial counsel first possessed some information about Mr. Barrett's background in late May 2005.  By the beginning of July, trial counsel were searching about for a mitigation specialist.  In August, trial counsel learned it was essentially too late to develop a social history and mental health diagnoses informed by that history.  In September, the month the trial began, trial counsel were again searching about for information they should have had the previous December.  The evidence shows trial counsel never contacted the mitigation specialist the trial court authorized, and never obtained all the records of the state-court mitigation investigation.  Trial counsel's statements on the record establish that they made no effort to obtain a psychiatric or psychological evaluation of Mr. Barrett, and merely repackaged, at the last possible minute or later, the risk assessment done years earlier at the request of state-court counsel.

Prejudice from trial counsel's failures to properly investigate and present available evidence in mitigation, exacerbated by the trial court's funding restrictions (*see* Ground Three), is manifest because the Government's case for death was hardly overwhelming.  The jury rejected the death sentence on Counts 1 and 2.  Even though the death sentence was imposed on

Count 3, the jury rejected the non-statutory aggravating circumstance that Mr. Barrett would constitute a continuing threat to society.  The statutory aggravating circumstances the jury did find all revolved around the circumstances of the commission of the offense (which, it should be noted, would have been viewed in an entirely different way had counsel not rendered ineffective assistance in the guilt/innocence stage).  Especially where, as here, the case for death was not overwhelming, prejudice from counsels' unprofessional performance is readily apparent.

Due to the lack of investigation, the jury was uninformed of Mr. Barrett's background, the desperate alcoholism of his parents, his father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the psychologically damaging harsher treatment he experienced from his mother, his father's abandonment of the family, moving from place to place due to the parents' inability to sustain a life, and finally landing in Sequoyah County.  There Kenny Barrett's head injuries and genetic vulnerability to mental illness overtook him.  He developed Bipolar Disorder and exhibited the symptoms of his organic brain damage. Despite the mania and paranoia, the hypervigilence, hyperactivity, and disinhibition, his family, friends, neighbors, bail bondsman, and even the local sheriff, all knew that Mr. Barrett would have gone peacefully into custody if someone he knew had simply asked him to.  The overwhelming weight of the evidence from both stages of a competently tried case would have shown the jury that law enforcement made tragic errors in assessing the situation.  Just as Trooper Eales should not have been put in danger, Mr. Barrett should not have been sentenced to death.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

Page 248

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)     **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐     No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This is a claim of ineffective assistance of trial counsel, which is properly raised for the first time in post-conviction proceedings, because it relies largely on evidence and investigation outside the trial record. To the extent any of the individual claims of ineffective assistance of appellate counsel could have been raised on direct appeal, appellate counsel was ineffective. Claims of ineffective assistance of appellate counsel are properly raised for the first time in post-conviction proceedings.

(c)     **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐     No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. [section sign] 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes  ☐         No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes  ☐         No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes  ☐         No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND THREE**:

> **Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Transcripts, Expert and Investigative Assistance under 18 U.S.C. §§3005 & 3006A.**

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

      Mr. Barrett incorporates by specific reference all facts, allegations and arguments

made elsewhere in this petition, and all supporting exhibits, as well as all facts, allegations and

arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The trial court violated Mr. Barrett's constitutional and statutory rights by denying him expert assistance that was lawful, necessary, and appropriate under the circumstances of the case. The types of lawful witnesses to which the trial court denied Mr. Barrett fair access included a psychiatrist, neuropsychologist, psychologist, mitigation specialist, ballistics expert, independent fact investigator, an independent expert on SWAT team practices, a metallurgist, a drug analyst, crime scene reconstruction expert, and a jury consultant. The complete or partial denial of these expert and investigative resources was prejudicial both individually and in combination.

In addition to the denial of expert and investigative assistance afforded other capital defendants, the trial court denied Mr. Barrett and his counsel access to transcripts of pretrial hearings, including hearings in which witnesses testified who would later testify at trial. (Order filed 3/18/05 (Doc. 97) at 6-7.) Mr. Barrett was plainly entitled to those transcripts pursuant to Chapter 2, section 2.27, and Chapter 3, section 3.12(A) of the Guidelines for the Administration of the Criminal Justice Act. Effective trial counsel, or the trial judge, should have known that it was unnecessary for counsel even to seek reimbursement for transcripts as the court reporter would normally be independently compensated through the Criminal Justice Act. The trial court's decision to reject these Judicial Conference guidelines was arbitrary and capricious. The error was particularly prejudicial because it denied or delayed Mr. Barrett's trial counsel access to the trial court's *ex parte* communications with the prosecutors until it was too late. *See* Grounds One and Two, *supra*.

Mr. Barrett had a history of psychiatric treatment, including involuntary hospitalization and forced medication with psychotropic drugs.  (Exhibit 117; Exhibit 147.)  Trial counsel were aware, or should have been aware, of this history.  (*See* Doc. 208; Exhibit 147; Muskogee County Jail Medical Records of Kenneth Barrett; Exhibit 118.)  In addition, Mr. Barrett had a history of illicit drug use and of head injuries.  Furthermore, he has a multi-generational predisposition to developing serious mental illness, including the Bipolar Disorder for which he was medically diagnosed prior to the events in question.  These factors, together with his developmental and trauma history, indicated the forensic appropriateness of performing a comprehensive neuropsychological evaluation to assess the presence and effects of brain dysfunction which, again, had a medically indicated onset prior to his arrest.  (Exhibit 118; Exhibit 89; Exhibit 117.)

Counsel requested the assistance of a neuropsychologist to perform testing, as well as of a medical doctor to explain the significance of this combination of medication, and other drugs and injuries, including the significance of any discontinuation of treatment. Nonetheless, the trial court would permit Mr. Barrett's counsel the assistance of a psychiatrist or a psychologist, but not both.  (Order filed 3/18/05 (Doc. 97).)

In light of the information known or available to Mr. Barrett's trial counsel, prevailing norms of capital defense practice required that they consult with experts whose training and experience were appropriate to addressing Mr. Barrett's history and the needs of the litigation.  The appropriate experts included a medical doctor who could diagnose and explain the functional impact of Mr. Barrett's mental disorders, a neuropsychologist who could determine the location, nature and severity of Mr. Barrett's probable brain dysfunction, and a

mitigation specialist qualified to gather data in a manner consistent with the clinical protocols of mental health professionals when considering social history and medical information in the course of forming their opinions.   (Decl. Richard H. Burr dated 4/4/05, filed as Exh. C to Doc. 107, at 4, 8.)  To the extent trial counsel failed to apprise the court of the specific need for psychiatric assistance, or the assistance of any other expert or investigator, their conduct fell below prevailing professional norms.  *See also* Ground Two, *supra*.

Trial counsel informed the trial court that the court's refusal to permit more than one mental health professional to assist in Mr. Barrett's defense was contrary to law, the Judicial Council's Guidelines for the administration of the Criminal Justice Act, and the practice of district courts in numerous other federal death penalty cases with similar circumstances.  (Docs. 107, 112; Exhibit 53.)  "The standard practice in federal capital trials is to provide the services of more than one mental health expert."  (Decl. Richard H. Burr, filed as Exh. C to Doc. 107.)  Counsel also informed the court that authorization for a single expert at the cut rates permitted by the court made it impossible to retain an expert competent to provide the necessary assistance, and that the court's authorization was inadequate to develop defense evidence or to rebut the prosecution evidence at both stages of trial.  (Docs. 107, 112; Exhibit 118.)

The court's denial of psychiatric assistance for Mr. Barrett's defense was prejudicial.  Trial counsel informed Dr. Russell in August 2005 that the court would not fund a thorough investigation for mitigating circumstances.  (Exhibit 56.)  As stated in the attached declaration of George W. Woods, M.D., a psychiatrist retained at the time of trial would have provided Mr. Barrett with evidence to rebut the prosecution's theory of malice aforethought and intent, and would have provided abundant mitigation evidence.  *See* Ground Two, *supra*.

In addition to the outright denial of psychiatric assistance, the trial court arbitrarily denied funding for all expert and investigative resources that were necessary for Mr. Barrett to receive adequate representation. (*Compare* Doc. 51 *with* Order filed 3/18/05 (Doc. 97).) Contrary to Judicial Council Guidelines, and the ABA Guidelines, contrary to the Supreme Court's recognition that death penalty cases demand a higher level of due process, and contrary to the tendency of experts, investigators and other paraprofessionals to charge more for the more exacting work required by capital cases, the trial court consistently based its funding decision on a comparison to non-capital cases in the Eastern District. (Order filed 5/5/05 (Doc. 128) at 3 n.1, 4, 6.)

Mr. Barrett's counsel demonstrated the need for a psychologist to assist in preparation of the defense. (*See* Order filed 3/18/05 (Doc. 97) at 3.) Counsel sought this expert for purposes similar to those envisioned by the Government in retaining Jim Horn. (*See* Doc. 50 at 5-6.) Counsel informed the court that a psychologist could not be retained for less than $150.00 per hour, and estimated 60 hours would be needed (Doc. 50 at 5-6), but the court limited the defense to 40 hours at $100.00 per hour. This was despite the fact that the court had been informed that this reduced hourly rate was 30-60% below the hourly rate of $150-250 authorized by federal courts for such services in death penalty cases. (Exh. C to Doc. 107, at 8.) The court gave no reason for this restriction and cited no information upon which the court could have found that any competent psychologist would have worked for the approved rate.

Mr. Barrett specifically sought the assistance of a psychologist who had assisted in the preparation for trial, and testified in the penalty trials, of other federal death penalty defendants. (Doc. 107.) That psychologist had been compensated in other similar cases at a rate

of $270.00 per hour, and counsel advised the court that he could complete his work in 30 hours. (*Id.* at 3-4.)  The court denied the request without explanation.

Mr. Barrett sought the assistance of a mental health expert who was competent to diagnose organic brain dysfunction.  (Doc. 50 at 8.)  Counsel justified this request with the findings of prior investigations, including that Mr. Barrett had used drugs known to cause brain damage, and that he had suffered significant head injuries during his life.  (*Ibid.*)  Except to the extent the assistance of such an expert was included in the authorization for a psychologist, the court denied this request without explanation.  (Doc. 97 at 3.)  This summary denial was highly prejudicial to Mr. Barrett.  The only expert on whom trial counsel attempted to rely, Dr. Russell, had not evaluated Mr. Barrett for mental illness or organic brain dysfunction.  (Exhibit 56.)  As shown in the attached declaration of Myla Young, Ph.D. (Exhibit 89), Mr. Barrett's history of insults to his brain resulted in significant impairments in his functioning.  (*See* Ground Two, *supra*.)

Mr. Barrett's counsel, in consultation with a mitigation specialist, Federal Death Penalty Resource Counsel, and the Federal Defender, concluded that a mitigation specialist would require more than 333 hours and $5,000.00 in travel costs.  Counsel and the mitigation specialist based this estimate on the knowledge gained in a preliminary investigation conducted before Mr. Barrett's first state-court trial.  (Docs. 50, 107.)  A mitigation specialist is an essential member of the team in a capital case.  (ABA Guideline 10.7.)  Without explanation, the court

limited the mitigation investigation to 100 hours and no travel.[35]  As resource counsel informed

the court at the time,

> The number of hours requested by the defense is well below average.  The average
> number of hours worked by mitigation specialists in federal capital cases is 600
> hours.  In a number of cases, mitigation specialist services have exceeded 1000
> hours.  Investigating a client's life history thoroughly - through gathering and
> reviewing documents and interviewing scores of witnesses who are often difficult
> to find - and working with counsel and other experts to develop the themes of
> mitigation and the way in which mitigation will be presented, is extremely labor
> intensive.  The modest number of hours requested by the defense here reflects the
> hope that the mitigation investigation previously conducted, but not completed in
> the state prosecution will be of use in the current investigation.  Measured against
> the number of hours authorized for mitigation specialist services in every other
> capital case in which the death penalty has been authorized, the 100 hours
> approved by the Court is grossly inadequate.

(Exh. C to Doc. 107 at 4.)

The court's withholding of resources was highly prejudicial.  Shortly before trial,

trial counsel turned to Dr. Jeanne Russell, for whom the court had approved some funds, and

asked her to conduct a mitigation investigation.  (Exhibit 56.)  Dr. Russell was not qualified to

perform that role, even if trial counsel had contacted her in time, which he did not.  (*Id.*)  Trial

counsel informed Dr. Russell that the defense's efforts were hampered by the court's refusal to

approve resources for a comprehensive mitigation investigation.  (*Id.*)  As shown in the social

history presented in Ground Two, Part B, and the numerous declarations cited therein, a

reasonable mitigation investigation, including travel to the various states in which Mr. Barrett

lived as a child and adult, would have produced abundant mitigation evidence.

---

[35]  The court authorized "100 hours at $150.00 per hour" apparently without realizing that the
mitigation specialist counsel had consulted quoted a rate of $75 per hour.  (*See* Doc. 107.)

Mr. Barrett sought 300 hours of investigative assistance at a rate of $50 per hour. (Doc. 50 at 4.) The court permitted only 100 hours of investigation, and limited it to those areas in which counsel could show a particularly acute need. (Order filed 3/18/05 (Doc. 97) at 2.) "The average number of hours approved for fact investigation in authorized cases is closer to 500 hours." (Exh. C to Doc. 107 at 3.) The Court was aware that this rate was considered reasonable by experts in relation to the practice in other federal capital cases. Moreover, despite the preauthorization, the court, contrary to Judicial Conference guidelines, conditioned payment of an investigator on counsel persuading the court with "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial." (Order filed 3/18/05 (Doc. 97) at 2 n.2.) The court prohibited the investigator from working at market rates, and required him to work at the same rate as state-subsidized investigators working for salary at the Oklahoma Indigent Defense System ("OIDS") even though state-subsidized investigators were not available to Mr. Barrett. (Order filed 5/5/05 (Doc. 128) at 3 n.1. *See also* Exhibit 111.)

At a minimum, the restrictions the court placed on investigation chilled inquiry. Compared with his other cases, Mr. Barrett's investigator *lost $20.00 each hour* he worked on Mr. Barrett's case. Moreover, the court's requirements for approving vouchers meant there was no guarantee any specific amount of time would be compensated at all. The investigator could work many hours on an issue only to find after he submitted a voucher that the facts he had investigated were not, in the court's view, significant to evidence that would be used at trial.

The Government relied extensively upon testimony regarding the trajectory of bullets during the raid on Mr. Barrett's house. Mr. Barrett's counsel requested the assistance of

an expert, Edward E. Hueske, to assist in responding to the Government's evidence, performing up to 80 hours work, billed at a rate of $200.00 per hour, in addition to $1,000.00 for lodging, travel and incidentals. (Doc. 50 at 7.) While the Government faced no limits on its ability to marshal this type of evidence, the court, again without explanation, authorized less than one fourth the amount Mr. Barrett's counsel and the expert they consulted determined was reasonably necessary to confront the Government's case. (*Compare* Doc. 50 at 7 *with* Doc. 97 at 3 *and with* 18 U.S.C. § 3005). Moreover, the court did not authorize any lodging or travel expenses whatsoever which would have made it impossible for a defense expert to observe the testimony of the Government's expert and impossible for the defense expert to travel to Oklahoma to testify.

After advising Mr. Barrett's counsel that "this Court has[] never allowed crime scene reconstruction to be introduced in trial" (Doc. 97 at 3), and at the same time denying Mr. Barrett seventy-five percent of the time and one hundred percent of the in-court assistance counsel needed from Mr. Hueske, the Court admitted the Government's crime scene reconstruction evidence without reservation. As a result of the Court's denial of funds, it was impossible for Mr. Barrett to have an expert present either to challenge the admissibility of the Government's testimony under Federal Rule of Evidence 702, or to assist with cross-examination of the Government's "expert." To the extent the Court's statement about its past practice regarding crime scene reconstructions misled counsel into foregoing expert assistance, the Court's interference with the defense went well beyond the mere denial of funds and constituted active interference in the functioning of the defense. *See* Ground One, *supra*.

The court's denial of funds for ballistics and crime scene reconstruction experts was prejudicial.  As set forth in Ground Two, *supra*, if trial counsel had been able to consult with an expert prior to trial, they could have presented evidence to exclude the testimony of Iris Dalley, an "expert" who was central to the Government's theory of how the shooting took place, including whether Mr. Barrett was in a position to see emergency lights when the shooting started.  Even if counsel had not succeeded in excluding that testimony entirely, counsel would have been far better able to rebut it.  For example, if counsel had been able to employ adequate expert services, at a minimum, Mr. Barrett would have shown the following:

     i.     Dalley failed to follow standard protocol by omitting the measurement of the objects through which she claimed bullets passed;

     ii.     Dalley failed to follow accepted methods by using magnification and/or chemical analysis to detect the presence of gun shot residue, blood, tissue, hair, fibers or other matter around bullet holes;

     iii.     Dalley falsely claimed she could not determine the caliber of bullet holes in the Bronco whereas the determination could have been made with standard tools and methods;

     iv.     Dalley offered misleading testimony, beyond the scientific bounds of her methodology, when she claimed that the trajectories she identified for bullet fragments were "accurate" while the method she used could not provide an accurate trajectory;

v.      Dalley selected descriptions of the evidence to fit the Government's theory when she described the trajectories of bullets that passed through the door of the Bronco;

vi.      Dalley's diagrams and animation were not based on accepted methods, and she testified falsely when she claimed she lacked the necessary equipment to create data with which other experts could attempt to reproduce her findings based on those diagrams and that animation;

vii.      Dalley failed to use available, accepted methods (such as a plumb line) to determine the grade of the terrain on which the shooting occurred;

viii.      Dalley failed to employ proper methods of chemical analysis before concluding that holes of questionable origin came from bullets;

ix.      Dalley misrepresented the facts when she claimed there was "no means of sequencing any of the shots," while the truth was that she did not employ the available means to determine whether they would produce reliable results, i.e. Dalley ignored scientific methods that might have invalidated her claims;

x.      Dalley failed to use accepted methods for determining the trajectory of bullets that struck a moving vehicle, failing to move the Bronco back to the place where it initially came to rest, and ignoring another standard practice that might have invalidated her findings; Dalley employed scientifically inappropriate methods for making claims about the trajectory of bullets that passed through the window of Mr. Barrett's cabin;

(k)     Dalley overstated her ability to estimate the distance of a firearm from the cabin window based on a rule of thumb, and ignored more reliable methods that might have contradicted her theory;

(l)     Dalley failed to use the standard tool of a metal detector to locate any bullets or fragments in the soil;

(m)     Dalley failed to follow an essential, generally accepted protocol for reconstructing a shooting scene when she did not attempt to collect all the bullets or fragments from the interior of the Bronco;

(n)     Dalley's conclusion regarding the location of Trooper Eales' arm when it was struck was based on her failure to examine the surrounding area for tissue or blood, and her violation of a cornerstone of forensic science.

(Exhibit 109.)

The trial court denied Mr. Barrett due process, equal protection, and his statutory rights to develop a defense by denying him meaningful access to an expert in law enforcement tactics. As stated in Ground Two, *supra*, trial counsel sought funds to retain Dr. George Kirkham, a criminologist, sworn law enforcement officer, and expert in police tactics. (Doc. 50 at 5.) Counsel informed the court that Dr. Kirkham charged a flat rate for pretrial review and preparation, and that he would need to travel from his residence in Florida. (*Ibid.*) The trial court, without explanation, refused to authorize Dr. Kirkham's rate, arbitrarily limited the defense to 40 hours of services at $100.00 per hour, and denied funds for Dr. Kirkham to travel. (Doc. 97 at 3.)

As stated in Ground Two, *supra*, if trial counsel had been able to retain Dr. Kirkham, or had been diligent in pursuing his services, the jury would have heard that the raid on Mr. Barrett's home (a) violated – indeed, was converse to – established law enforcement standards and procedures in that it relied upon force and aggression before any other methods were explored; (b) was carried out in a way that minimized the chances of Mr. Barrett having visible evidence that his attackers were law enforcement officers and no audible evidence of law enforcement's presence; ©) was carried out in a way that trained law enforcement officers would expect to provoke a violent response from the target; and (d) unnecessarily exposed Troopers Hamilton and Eales to gunfire from the cabin and other law enforcement officers.  Dr. Kirkham would have explained how these things are just as true if the jury credited the testimony of the Government's seven informants, as they were when the second state court jury, without the testimony of those witnesses, acquitted Mr. Barrett of first-degree murder.  (Exhibit 44.)  That is, with expert assistance, Mr. Barrett would have been able to show that he did not have the intent to kill law enforcement officers, or, at a minimum, that there was every reason to doubt the Government's claim that he had such intent.  Jurors at the second stage or trial would have had ample grounds to vote for a sentence less than death if they had known of the errors made in deciding upon, planning, and conducting the ill-fated attack.

To the extent the trial court's denial of expert and investigative resources could have been raised on the existing record, appellate counsel was ineffective for failing to raise the claim.  *See* Ground Eighteen, *infra*.  Trial counsel Hilfiger, who also was counsel on appeal, had a conflict of interest which prevented him raising this claim, insofar as he failed to make use of the resources the trial court had authorized.  *Id.* and Ground One, *supra*.

Page 262

The record and extra-record evidence establishes that the trial court's denial of resources was not harmless and was highly prejudicial. Mr. Barrett could have presented substantial evidence to counter the Government's case at both stages of trial. The trial court's denial of access to this evidence violated Mr. Barrett's right to due process, to confront adverse witnesses, and to effective assistance of counsel.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)        **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

            Yes   ☐        No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

            Yes   ☐        No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the

Page 263

judgments of conviction and sentences; this issue is properly before the court in a "first" post-

conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes   ☐          No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes   ☐          No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes   ☐          No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND FOUR**

> **Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under *Franks v. Delaware*, 438 U.S. 154 (1978).  Appellate Counsel Were Ineffective for Failing to Raise the Issue on Direct Appeal.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

As shown in Ground Two, *supra*, in connection with the claim that trial counsel were ineffective for failing to argue all available evidence supporting the renewed motion to suppress, the trial record itself established the Clint Johnson warrant was invalid.  Suppressed *Brady* material and other evidence gathered in support of this 2255 petition which relates back to the credibility of the informant at the relevant time makes this conclusion even stronger.

Since the warrant was based solely on the word of the confidential informant, Charles Sanders, his reliability was the linchpin of probable cause.  There was no other information from any other source, and no other circumstances cited in the affidavit, that provided probable cause to search Mr. Barrett's residence and property.  The "totality of the circumstances" in this case *was* Sanders.  If Sanders is unreliable, his information is *per se* unreliable.  Because Sanders is the antithesis of a reliable source, Clint Johnson, at the very least, acted with reckless disregard for the truth in utilizing him as a source, and in omitting

information from the search warrant affidavit that would have given an accurate picture of

Sanders's credibility.

Sanders could not be relied upon to provide reliable information.  No reasonable person could put stock in anything he says.  Sanders is a professional criminal, who had racked up at least eighteen felony convictions at the time he testified against Mr. Barrett, and had surpassed double digits by 1999.  Numerous other felony charges against him were dismissed because of his work as a snitch.  He always had a motive to lie against others to get out of his own scrapes with the law, and has largely been successful, continuing to land on his feet with probationary sentences so he could commit still more crimes in the community.  His convictions for crimes of dishonesty are legion: repeated instances of forgery, burglary, concealing stolen property, larceny of merchandise from a retailer, and other forms of fraud and theft, not to mention a laundry list of other felonies.  He has a history of promising to appear in court and then failing to appear.  He has a history of promising to adhere to terms of probation and then breaking them by committing still more crimes, after which he is given still more probation.  He is a long time drug addict.  Sanders could not give a straight and consistent answer to save his life at Mr. Barrett's trial, which reflects his almost congenital inability to tell the truth.  Yet he was rewarded for his testimony, as he has always been rewarded for informing on others, despite his wretched history of dishonesty, and despite the fact that he continued to victimize the community as a virtual one man crime wave.   All this was known about Sanders in 1999, and it has only gotten worse.

At the time he signed the affidavit, Clint Johnson was aware of Sanders's lack of reliability, and Johnson himself intentionally ignored evidence of Sanders's then-current drug

usage, crimes of dishonesty, and Sanders's inability to see evidence of drug activity at Mr. Barrett's residence during the critical time. Yet Johnson still relied on this miscreant as a "reliable confidential informant."

In connection with the claim of ineffective assistance of trial counsel for failing to produce witnesses to attack Sanders's honesty, Mr. Barrett has provided declarations from several people in the community, including one of Sanders's uncles, who say without reservation and in the strongest terms possible that Sanders is totally dishonest and unbelievable, and that this is the opinion by acclamation in the community as a whole. (Exhibit 90; Exhibit 70; Exhibit 94; Exhibit 76; Exhibit 13; Exhibit 95.) Sanders claimed that he and Janesse Thomas bought drugs at Mr. Barrett's a few days before the shooting incident. Ms. Thomas says this is absolutely false.

Is it to be believed that the community as a whole regards Sanders as thoroughly dishonest and untrustworthy, but that Clint Johnson could realistically think he was a reliable informant, about whom nothing had to be revealed to a reviewing magistrate? It simply does not wash. Johnson acted with reckless disregard for the truth, at a minimum, in relying on Sanders for information about Mr. Barrett or anyone else, let alone presenting that information in a search warrant affidavit.

The prosecution suppressed exculpatory evidence regarding Sanders's dishonesty. As stated in Grounds One and Two, Mike Littlefield informed the court of a witness who failed to corroborate Sanders. This would have assisted in establishing a *Franks* claim, and in generally impeaching Sanders, but the evidence was never revealed to the defense. The transcript of this hearing was, however, available to direct appeal counsel.

Then there is Clint Johnson himself.  The Government suppressed *Brady* evidence that before, during and after Mr. Barrett's trial, Johnson was caught in a web of his own bad acts, deceit and corruption,  including abuse of his position of trust; passing hot checks; failing to control his informants and neglecting to properly supervise and document their activities; failure to account for funds and evidence; theft of drug fund money; kickback schemes; dishonesty with his superiors; and likely drug use, as he tooled around in his drug task force car with drug paraphernalia, marijuana and methamphetamine, none of it properly packaged and marked as evidence.  Johnson was fired from the District Attorney's Office a little over two weeks after Mr. Barrett was formally sentenced.  In sum, Johnson and Sanders were birds of a feather:  both liars, both drug addicts, both trading lies for favorable treatment from law enforcement.

With respect to Johnson's request for a no-knock, nighttime warrant, which was predicated on information from the C.I.  that Mr. Barrett had threatened law officers, Johnson acted with reckless disregard for the truth by omitting mention of the fact that local law enforcement, including Sheriff John Philpot, had been to Mr. Barrett's residence less than a month before, and encountered no resistance.  (Exhibit 6.)

Here, at a minimum, when the omitted material information about the reliability of the informant is considered, probable cause could not have been found, because Sanders's history, character, actions and reputation would show him and his word to be totally unreliable. Johnson called Sanders "reliable," a deliberately false or reckless statement in itself, and omitted an avalanche of information, detailed above and elsewhere in this motion, that would have proved the exact opposite to any reasonable magistrate.  Had Johnson given a true picture of his C.I.'s numerous crimes of dishonesty; his motivation to accuse others of wrongdoing in order to

escape punishment for his own acts, for which he received deal after deal instead of the hard prison time he deserved, after which he continued to commit crimes; his violations of the terms of probation; his bond forfeitures and failures to appear; the number of arrests; the number of convictions; his chronic drug use; and his bottom-of-the-barrel reputation in the community for anything even remotely approaching honesty and trustworthiness, no neutral, detached magistrate would find probable cause.

Johnson's failure to mention that less than a month before securing the warrant, Sheriff Philpot and other officers had been to Mr. Barrett's without incident, was material to the request for a no-knock, nighttime search warrant. In failing to mention this crucial fact, Johnson acted with reckless disregard for the truth. Had the magistrate been informed of this, the averment in the affidavit that Mr. Barrett, according to the "reliable" C.I., had "threatened" law enforcement would have been rendered meaningless, and no cause for a no-knock, nighttime warrant would have been established, even aside from the question whether any warrant should issue at all.

Although defense counsel raised a *Franks* issue, however incompletely, at trial, and there were certainly indications of Sanders's deplorable criminal record and rampant dishonesty in the ever-shifting sands of his testimony, appellate counsel failed to raise the issue on direct appeal, either as a freestanding argument under *Franks*, or one coupled with an ineffective assistance of trial counsel argument. (Exhibit 29.) *See* Ground Eighteen, *infra*. Mr. Barrett is of course requesting an evidentiary hearing on each factual issue raised in this motion, and specifically requests a *Franks* hearing, or its equivalent. He has more than made the requisite showing.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐      No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐      No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

       Yes   ☐          No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

       Yes   ☐          No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

       Yes   ☐          No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FIVE**

> **Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Convictions and Sentences Based on Newly Discovered Evidence.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

       Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and

arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The prosecution in Mr. Barrett's case suppressed, before, during and after trial, exculpatory evidence relevant to several key witnesses. Deals or leniency given to these witnesses in exchange for their testimony in Mr. Barrett's case and, with respect to Charles Sanders, deals he received in other cases because of his supposed work as an informant, were not disclosed. Threats to witnesses to get them to cooperate with the Government were not disclosed. Relevant to this were the ongoing criminal activities of former AUSA Mike Littlefield, which came to light in 2007, when he was allowed to enter an *Alford* plea in Muskogee County District Court to charges of physically abusing his own children, the relevance of which is explained in Ground Five, Part B.2, *infra*. Among other misdeeds, Littlefield suppressed exculpatory evidence regarding one of the seven informant witnesses that was made known to the court during the improper *ex parte* hearing on the Government's motion to delay disclosure of the identities of its seven informant witnesses, but never disclosed to the defense. (*See* Ground One, *supra*.)

Some of the evidence discussed below was relevant not only to the credibility of witnesses, but the propriety of the initial nighttime, no knock search warrant that was secured by Drug Task Force agent Clint Johnson, based on the good word of Charles "Monk" Sanders. The Government or its agents were aware of numerous impeaching facts regarding acts of dishonesty and criminality of Clint Johnson and his girlfriend, OSBI agent Vickie Lyons, none of which were revealed to the defense.

Most egregious of all, the Government knowingly used perjured testimony from Randy Turman, who claimed that a Sequoyah County felony case had been disposed of and was no longer active when it was in fact open, giving Turman every reason to fashion his testimony to the Government's liking. The same could also be said for its tactic of implying to the jury that the most it would do for Charles Sanders was "talk to" the prosecutors in Sequoyah and Tulsa Counties about his cases there, to let them know that Sanders had cooperated in the federal case against Mr. Barrett. At the improper *ex parte* hearing discussed in Ground One, AUSA Littlefield told the court that he knew the identify of an informant witness who failed to corroborate Charles Sanders. Thus, it could be said the Government knew Sanders's testimony was false, as was the basis for the search warrant secured by Clint Johnson. In any event, the Government failed to disclose exculpatory evidence of the witness who failed to corroborate Sanders. The Government also sponsored false testimony from Travis and Cindy Crawford. Newly discovered evidence reveals that their testimony was the product of threats and intimidation. If the jury's verdict could be affected by false testimony presented by the prosecution – as it surely was here – vacation of Mr. Barrett's convictions and sentences is required.

A.      **Suppressed Exculpatory Evidence, Evidence of Knowing use of Perjured Testimony, and Newly Discovered Evidence**

1.      **Evidence regarding informant witnesses Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman entitles Mr. Barrett to relief from his convictions and sentences.**

### a.      Charles "Monk" Sanders

The prosecution suppressed deals given to Charles "Monk" Sanders in Sequoyah and Tulsa Counties in exchange for his testimony, in both stages of trial, against Mr. Barrett.  In examining Sanders at trial, AUSA Littlefield merely stated, and Sanders agreed, that he would speak to the authorities in Sequoyah and Tulsa Counties regarding Sanders's cooperation, implying there were no guarantees anything would be done.  (R. 2495.)  In fact, near the end of Mr. Barrett's trial on November 17, 2005, Sanders got a sweetheart deal on his active Sequoyah County cases, and more favors shortly thereafter, all due to a "plea agreement with feds." Favorable disposition of Sanders's active Tulsa County case was delayed until after Mr. Barrett's trial.  The prosecution cynically attempted to jettison its *Brady* obligations with respect to Sanders's testimony by either failing to reveal deals it knew were in the works, and/or postponing the culmination of those deals until the end of Mr. Barrett's trial or shortly after its conclusion. The Government's ploys in these regards plainly violated the *continuing duty* to disclose *Brady* evidence.  Moreover, the prosecution violated its *Brady* obligations by failing to disclose to the defense Sanders's complete criminal history, which could have and should have been used for impeachment purposes.  It was argued in Ground Two that trial counsel were ineffective in failing to cross-examine Sanders about all his previous criminal convictions and dismissed cases; counsel unreasonably failed to make a search of Sanders's available court files.  Above and beyond that failing, the prosecution was obligated under *Brady* to reveal Sanders's complete criminal history to the defense, since it constituted impeachment evidence.  The prosecution failed to do so, papering over Sanders's appalling criminal history on direct examination, and

leaving defense counsel to simply scratch the surface based on what counsel was able to glean from the Department of Corrections website.

Of course, Sanders's alleged information was the basis upon which the no-knock warrant was secured..  Sanders's testimony was critical to the drug charges which underlay the various counts of the superseding indictment, and to the Government's arguments on malice and intent with respect to both stages of trial.

As noted in Mr. Barrett's first stage ineffective assistance of counsel argument respecting trial counsel's failure to impeach Sanders with the number and nature of his previous convictions (Ground Two, section A.4, *supra*), as well as favorable treatment he had received in these and other cases, Sanders had convictions in Sequoyah County Case No. CF-98-346 (for which he originally received a twenty year suspended sentence, of dubious legality due to his numerous prior convictions), for the felony offense of possession of methamphetamine.  Sanders was also charged in this case with a misdemeanor count for possession of drug paraphernalia, which was dismissed pursuant to plea bargain.  Two applications to revoke Sanders's suspended sentence were filed.  Initially, five years of the suspended sentence was ordered revoked, but the balance would again be suspended if Sanders completed a Department of Corrections drug program.  The revocation was ordered to run concurrently with similar dispositions Case Nos. CF-98-363, CF-99-562, CF-04-19 and CF-03-124.  (Exhibit 160.)

In CF-98-363, Sanders received another twenty year suspended sentence for uttering a forged instrument, to run concurrently with the sentences in Case Nos. CF-99-562 and CF-98-346.  Similar applications to revoke were filed in this case based on Sanders's failure to abide by the terms and conditions of probation, in part because he committed new offenses.

Initially, as with CF-98-346, the court ordered five years of the sentence to be revoked, with the balance to again be suspended in full upon completion of the drug program. The revocation in this case was ordered to run concurrently with similar actions taken in Case Nos. CF-98-346, CF-99-562, CF-03-124, and CF-04-19. (Exhibit 161.)

In CF-99-562, in which Sanders was initially charged with three counts of concealing stolen property, uttering a forged instrument, felonious possession of a sawed-off shotgun, and a misdemeanor charge of possession of marijuana, he was allowed to plead to a single count of concealing stolen property, with the other counts dismissed. He originally received a twenty year suspended sentence. Again, applications to revoke were filed due to Sanders's commission of new crimes and for otherwise failing to adhere to the terms of his probation. Five years of the sentence was revoked, the balance again to be suspended upon completion of an in-house drug program. The sentence in this case was ordered to run concurrently with similar dispositions in Case Nos. 98-346, 98-363, 03-124 and 04-19. (Exhibit 162.)

In Case No. CF-03-124, Sanders was allowed to plead guilty to two counts of feloniously running a roadblock, with the other charges dismissed. Sanders received concurrent twenty-five year sentences on the two counts of conviction, with all but five years suspended, and with the entirety of the terms to be suspended on successful completion of the drug program. The sentences in this case were ordered to run concurrently with the sentences in Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19. (Exhibit 164.)

In Case No. CF-04-19, Sanders was eventually charged in an amended information with second degree burglary, second degree arson, concealing stolen property, and

feloniously carrying a firearm.  The firearm charge was dismissed pursuant to the plea agreement. On the three remaining counts, Sanders was sentenced to concurrent terms of twenty-five years, with all but the first five years suspended and, yet again, the balance to be suspended upon completion of the drug program.  The sentences in this case were ordered to run concurrently with the sentences in Case Nos. 98-346, 98-363, 99-562 and 03-124.  (Exhibit 165.)

The Government violated Mr. Barrett's due process rights by failing to disclose that on November 17, 2005 (the final day of Mr. Barrett's trial), and because of his testimony in Mr. Barrett's trial, amended judgments and sentences were entered on behalf of Sanders in all of the above-described cases, with a filing date of November 23, 2005 (well before Mr. Barrett's formal sentencing) ordering that Sanders receive straight suspended sentences across the board. Moreover, in each of the cases discussed above, an order was entered on April 3, 2006, making Sanders's suspended sentences in these cases unsupervised by the Department of Corrections, even though the sentences did not expire until 2030.  This was done, according to the notations on the orders, "***per plea agreement with feds***." (Emphasis added).  Finally, on December 8, 2008, orders were entered in each of these cases relieving Sanders of the obligation to pay any outstanding fines or costs.  (*See* the above listed Sequoyah County court files.)

Sanders received similar largesse as the result of his testimony against Mr. Barrett in his pending Tulsa County Case, disposition of which, as noted in the ineffective assistance of counsel argument, was delayed until Sanders could perform for the Government in Mr. Barrett's trial.  In Tulsa County Case No. CM-04-1187, Sanders's case was passed from November 13, 2005 until November 17, 2005 (the last day of Mr. Barrett's trial), and was again passed from November 17 until December 9, 2005.  At that time, instead of facing jail on his misdemeanor

drug possession and possession of drug paraphernalia charges, despite his numerous prior convictions, because of his testimony against Mr. Barrett, Sanders received concurrent one year suspended sentences.

During the pendency of this §2255 action, investigators for Mr. Barrett have attempted repeatedly to interview Sanders, but were stymied. Sanders initially told a defense investigator he would meet with him, and had things he wanted to discuss, but dodged all subsequent attempts at an interview. However, when a defense investigator spoke to Sanders's mother, Evelyn Sanders, regarding her son's testimony against Mr. Barrett, she revealed that Sanders had been promised a number of things in exchange for his testimony that he never received. (Exhibit 14.) This witness's statement suggests that aside from the leniency he got, Sanders was given other inducements by the Government to testify against Mr. Barrett.

Not only did the prosecution flatly violate *Brady* and its progeny by failing to disclose Sanders's deals in the particular cases discussed above, it wantonly violated its *Brady* obligations by failing to reveal the jaw-dropping favorable treatment Sanders had received in *all his* Sequoyah County and other cases, as detailed in the ineffectiveness of counsel claim. Taken together, this evidence would have destroyed Sanders's credibility, shown his motive to lie, and would have shown, contrary to this court's order, that Clint Johnson – whose nefarious, but never revealed, acts of dishonesty and criminality are discussed below – could not have reasonably relied on "information" from Sanders to establish probable cause for the no-knock search warrant, which was the poisonous tree from which the later search warrants resulting in the recovery of drug and firearms related evidence grew.

When the prosecution falsely suggested it would merely "talk to" county prosecutors, even though Sanders received deals on the last day of Mr. Barrett's trial in Sequoyah County and shortly thereafter in Tulsa County, and Sanders agreed with this assessment of the situation, it sponsored materially false testimony.

### b. Travis Crawford.[36]

During the investigation conducted for this §2255 motion, Mr. Barrett has discovered that one of the key witnesses in the first stage of trial, Travis Crawford, lied about material matters. Travis Crawford supplied testimony critical to the Government's case for malice and intent, at least as to count 3 of the superseding indictment. Crawford's testimony was also crucial to establishing the intent elements in the punishment phase of trial. Crawford's testimony was summarized in the claim regarding ineffective assistance of counsel in the first stage of trial, and will not be repeated here.

When Crawford was interviewed in the presence of his parents on December 11, 2008 by defense investigator Leonard Post, he recanted his trial testimony. To summarize, Mr. Crawford told Mr. Post the following:

Mr. Barrett's habit of not leaving his property had been established several years before the raid which led to Trooper Eales's death. At trial, of course, the prosecution contended that Mr. Barrett rarely left his property only after he supposedly learned there was a warrant for his arrest on the Sequoyah County drug charge. (Exhibit 45.)

---

[36] At the time Mr. Barrett filed his original Motion to Vacate, Mr. Crawford had declined to sign a declaration reflecting what he told defense investigator Leonard Post. Mr. Crawford has since signed his declaration to the information he gave a defense investigator prior to Mr. Barrett's initial filing. (*See* Exhibit 91; Exhibit 92; Exhibit 31; and, Exhibit 45.)

Mr. Crawford stated that he has anxiety and psychological problems, something he was not cross-examined on at trial.[37]  Although he was a long-time methamphetamine addict, he told Mr. Post he had been off drugs for four months preceding Mr. Post's interview.  Before finally getting off drugs, Crawford had been a daily methamphetamine user for years preceding Mr. Barrett's arrest in this case and during Mr. Barrett's federal trial.  (Exhibit 45.)  Thus, Crawford's trial testimony to the effect that he was not a drug addict or under the influence of drugs at the time he testified against Mr. Barrett was false.

Mr. Crawford stated that at the time he was interviewed by then-AUSA Mike Littlefield regarding Mr. Barrett, he was "living in so many places and was so strung out" on drugs, that he did whatever he was told by anyone in authority in order to stay out of trouble.  Mr. Crawford states that when he was interviewed by Mr. Littlefield, he was high on drugs. Moreover, anybody who had been around drug addicts for any period of time (which surely includes Mr. Littlefield and then-Sequoyah County Sheriff John Philpot, who took Crawford to Muskogee to be interviewed by Littlefield)  would have known Crawford was high.  Not only was Mr. Crawford under the influence of illicit drugs at the time he was interviewed by Littlefield, but he was also high when he testified in the first stage of Mr. Barrett's trial. Crawford stated that the other informant witnesses who testified against Mr. Barrett were high and strung out on drugs at the time of their testimony.  (Exhibit 45.)

---

[37] These problems and his drug abuse also doubtless contributed to the difficulties he had while in the military, which Mr. Crawford alludes to in his declaration, and his spotty employment history.  Travis Crawford's military records reflect that he went AWOL four times, and suffered at least one conviction at a court-martial.  Mr. Crawford was not honorably discharged.  (Sealed military records of Travis Crawford.)   He also did not maintain steady employment in the years preceding or following the assault on Mr. Barrett's home.  (Exhibit 143.)

When Sheriff Philpot took Crawford to Muskogee to be interviewed by Mike Littlefield shortly before Mr. Barrett's trial, Crawford felt he "was already arrested" and did not know "if [he] was ever going to come back home."  When Littlefield interviewed him at the United States Attorney's Office, Mr. Crawford was terrified about losing his freedom. Consequently, he said whatever he thought it was Littlefield wanted him to say.  Mr. Littlefield asked Travis Crawford if Kenneth Barrett ever said he (Mr. Barrett) was "going to go down in a blaze of glory" if the police ever came onto his property.  Littlefield made it clear to Crawford what the appropriate answer was.  Crawford stated that before he could answer, Littlefield threatened him, stating bad things would happen to him if he "lied."  Where a witness is pressured to testify, the prosecution has every reason to believe that the product of that coercion will be false testimony.  Mr. Crawford stated he was scared and panicked, and therefore told Littlefield that Mr. Barrett had made this statement.  According to Mr. Crawford, the truth was otherwise: *Mr. Barrett never made such a statement, or anything like it, at any time*.  (Exhibit 45.)

Travis Crawford's recantation is corroborated by witnesses who were present at Mr. Barrett's house on September 23, 1999, but were not called to testify at trial.  *See* Ground Two, section A.4, *supra*.  Rick Lunsford and Brandy Hill are adamant in stating the Mr. Barrett never made such a statement.  (Exhibit 90; Exhibit 77.)

Because the Government and its agents knew or had reason to know that Crawford was a drug addict at the time he was interviewed by the prosecution, and at the time he testified at trial, the Government was obligated to disclose this information under *Brady.*  Due process and the rules of professional conduct required AUSA Littlefield to correct Travis

Crawford's false testimony about being off drugs. The same is true of at least some of the other informant witnesses, whom Mr. Crawford states were high at the time of their testimony. Moreover, the Government plainly violated its *Brady* obligations by failing to reveal Littlefield's threats to induce cooperation and shape Crawford's testimony.

Mr. Crawford admitted that before he became a witness against Mr. Barrett, he had previously worked as a snitch for local law enforcement, setting up drug buys at the direction of the authorities in exchange for escaping bogus check charges he was facing. Crawford stated that he testified regarding the controlled drug buys in state court, even though the police had promised him he would not have to do so. (Exhibit 45.) Crawford's history as an informant was not testified to at trial, though it was known to the Government or its agents. Crawford's work as a snitch was exculpatory evidence affecting his credibility. By failing to inform the defense of this fact, the Government violated is *Brady* obligations.

In marked contrast to what the Government attempted to portray at Mr. Barrett's trial regarding the "necessity" for a no-knock warrant and the armed raid on Mr. Barrett's property, Travis Crawford stated that only two weeks or so before the raid, Sheriff John Philpot had gone to Mr. Barrett's residence and inspected his firearms without incident. (Exhibit 45.)

This information is consistent with that given by Janice Sanders and Sylvia Gelene Dotson, who, though never asked by trial counsel, state that Sheriff Philpot and other law enforcement agents were at Mr. Barrett's house mere weeks before the raid. *See* Ground Two. As shown below, ex-Sheriff Philpot recently admitted to a defense investigator that he indeed was at Mr. Barrett's less than a month before the raid, and encountered no violence or threats. Mr. Barrett was not arrested on his outstanding failure to appear warrant. (Exhibit 6.) This

exculpatory evidence, of which the Government and/or its agent Mr. Philpot was well aware, was concealed from the defense in violation of *Brady.*

Again in contrast to what Mr. Crawford implied in his testimony, and to what the Government argued at trial, he recently stated that while Mr. Barrett told him he had a pending state drug charge, he was not overly concerned with it. Mr. Barrett never told Crawford he had an outstanding warrant, and was thus laying low and hiding from the law. Crawford simply assumed that having an active case meant the same thing as having an active arrest warrant. (Exhibit 45.)

At trial, with the aid of Mr. Crawford's testimony, the Government made much of the sign posted on the gate, construing it as a threat to law enforcement. Mr. Crawford states that the sign was posted as a warning to anyone coming on the property in order to prevent trespassing and theft. (Exhibit 45.)[38]

Evidence of Crawford's recantation is newly discovered, and could not have been discovered with the exercise of due diligence before or during trial, because the Government sprung the existence of Crawford and the other informant witnesses (without initially giving their names) after juror qualification had begun, and Crawford refused to be interviewed by the defense. Crawford's recantation pulls the rug out from under the prosecution's arguments respecting malice and intent in both stages of trial. Crawford was *the key Government witness* in

---

[38] At the time the original and corrected §2255 motions in Mr. Barrett's case were filed, Travis Crawford had declined to sign a declaration reflecting his statements to a defense investigator currently working for Mr. Barrett. Thus, declarations reflecting what Mr. Crawford said were filed by his parents, Roger and Phyllis Crawford, and defense investigator Leonard Post. During the continuing investigation following the filing of the §2255 action, Mr. Crawford has signed his declaration.

this respect, because he testified that only hours before the raid, Mr. Barrett talked about the police "drive-by," the "fact" that they were coming back, that he (Mr. Barrett) "[didn't] give a fuck," and that he (Mr. Barrett) was going to go out in a "blaze of glory." Crawford's recantation also undermines the Government theory that Mr. Barrett only stayed close to home, and was thus lying in wait for a supposedly inevitable police raid, after he supposedly learned that he had a warrant out for his arrest.

### c. Cindy Crawford.

As outlined in the first stage ineffective assistance of counsel argument (Ground Two, section A.4, *supra*), Cindy Crawford testified in the guilt/innocence stage of trial regarding drug activity she witnessed at Mr. Barrett's home, and Mr. Barrett's supposed threats to law enforcement if his property were raided. In the penalty phase of trial, Cindy Crawford testified that on one occasion, Mr. Barrett, after she rebuffed his sexual advances and was leaving his residence with Richie Barrett, came out of the house, put the barrel of a rifle up to her leg, and threatened to kill her.

Leonard Post and another defense investigator currently working on Mr. Barrett's case, Dale Anderson, interviewed Cindy Crawford on January 13, 2009. Like her husband, Cindy Crawford refused to *read* a declaration which faithfully recounted what she told Messrs. Post and Anderson. (Exhibit 31.) Mr. Post's and Mr. Anderson's declarations detail what Cindy Crawford told them, which is summarized as follows.

Cindy Crawford explained how she was contacted by the Government. According to her, one to two weeks before she testified in the first stage of Mr. Barrett's trial, Sequoyah County Sheriff John Philpot came to see her. Philpot told her she had to go with him. Although

Ms. Crawford was unsure whether she was under arrest, it was clear to her that she had no choice but to go with Sheriff Philpot.  She was driven by Mr. Philpot to the United States Attorney's office in Muskogee, where she was interviewed by Mike Littlefield in Littlefield's office. (Exhibit 31; Exhibit 14.)

Armed law enforcement officers were also present during the interview.  They showed Ms. Crawford several firearms which looked similar to ones she had seen in Mr. Barrett's cabin. In order to secure her cooperation and testimony, Mike Littlefield threatened her.  Littlefield told her she need to work with him and testify against Mr. Barrett.  Otherwise, she was going to prison.  Littlefield pointedly reminded her that she was then under a five-year deferred sentence in a drug case.  Littlefield told Ms. Crawford that Mr. Barrett's residence had been under surveillance for six months preceding the raid, and that she had supposedly been observed on his porch acting as a "lookout" while methamphetamine was cooked on the property.[39]  While Ms. Crawford states that she had no pending charges at the time she was interviewed by Littlefield, she had recently lost a child to foster care.  Along with the threat of prosecution, the possibility that she would not get her child back unless she played ball with the Government hung in the air throughout the interview.  (Exhibit 31; Exhibit 14.)

According to what Ms. Crawford recently told Mr. Barrett's defense investigators, Mike Littlefield not only threatened her, but coached her testimony.  Littlefield told her to make Mr. Barrett appear violent and an imminent threat to those around him.  Again issuing threats,

---

[39]  Consistent with her first stage trial testimony, Cindy Crawford told Mr. Post and Mr. Anderson that she never saw Mr. Barrett cook methamphetamine on his property.  She had done drugs at Mr. Barrett's residence, but did not know who supplied them.  Ms. Crawford never bought drugs from Mr. Barrett.  (Exhibit 31; Exhibit 14.)

Littlefield told her that she risked a perjury charge if she did not testify in this manner.  Littlefield emphasized that he could make it extremely hard on her if she did not testify against Mr. Barrett. (Exhibit 31; Exhibit 14.)

In addition to the threats, Ms. Crawford described the interview taking place in an intimidating atmosphere.  She stated that when she went to the bathroom, an armed guard accompanied her and waited outside.  It was her belief that she was not free to decline to be interviewed, to terminate the interview, or to leave.  Mr. Philpot had driven her to Muskogee, and she had no way back other than him.  Ms. Crawford expressed the sentiment that she was not going to cross Sheriff Philpot due to his reputation for violence.  (Exhibit 31; Exhibit 14.)

Ms. Crawford was interviewed by the Government separately from her husband, Travis.  After both had been interviewed, Travis Crawford told her that Philpot had told him that if he (Travis) said the right things on the witness stand, he would not get into trouble.  (Exhibit 31; Exhibit 14.)

Mike Littlefield and John Philpot discouraged her from talking to Mr. Barrett's lawyers.  Both told her that she did not have to talk to the defense.  According to Ms. Crawford, the clear implication was that she should not speak to the defense. (Exhibit 31; Exhibit 14.)

Like her husband Travis Crawford, Cindy Crawford was under the effects or after-effects of heavy methamphetamine use at the time she was interviewed by Mr. Littlefield and law enforcement at Littlefield's office.  At the time of the interview in the prosecutor's office, Cindy Crawford was just coming down from a two day methamphetamine high.  She also admitted to being in the same condition when she testified against Mr. Barrett, because her heavy drug use was ongoing at the time of his trial. That her drug use affected what she told Mr. Littlefield and

testified to at trial is apparent from her recent comment to Mr. Barrett's current investigators: "If you had ever crashed from a meth high, you would know that you would not be in your right mind." (Exhibit 31; Exhibit 14.)

Although, on cross-examination in the second stage of trial, Cindy Crawford told defense counsel she suffered from PTSD, her mental condition was not inquired about during her first stage testimony, and was not effectively exploited by counsel in the penalty phase, largely because Crawford refused to be interviewed by trial counsel. (*See* Ground Two) Because Crawford refused to be interviewed, there are facts about the manner in which her mental condition impacts her credibility that were only recently discovered.[40] (Exhibit 144.) According to what Ms. Crawford told Mr. Post and Mr. Anderson, one of the symptoms of her PTSD is that she overreacts in stressful situations, sometimes to the point of passing out. She admitted that when she is under stress, she may not perceive things correctly. This causes her to exaggerate what is going on around her. Ms. Crawford told Mr. Post and Mr. Anderson that when she testified in the penalty phase about Mr. Barrett allegedly pressing a gun to her leg, her mental condition very well could have caused her to overreact and embellish the incident. At the conclusion of her recent interview with the defense investigators, Cindy Crawford told them that having given this alleged incident more thought, she was positive she had overreacted to it. She emphasized that Mr. Barrett had a history of being nice and helpful to her. (Exhibit 31; Exhibit 14.)

---

[40] Cindy Crawford executed a release authorizing Mr. Barrett's counsel to obtain her medical records.

However, even Ms. Crawford's claim to have overreacted is a fabrication. A readily available witness to the alleged event, Richie Barrett, states that neither the incident Crawford described nor anything like it ever happened. (*See* Ground Two; Exhibit 104; Exhibit 31.)

Between her first stage and second stage testimony, the prosecution subjected Cindy Crawford to more threats. The Government was upset with her first stage performance on the witness stand because she denied seeing chemicals or equipment for making methamphetamine at Mr. Barrett's cabin or on his property, and because she had not made Mr. Barrett seem threatening or violent. To quote Ms. Crawford, "They [the Government] were very angry. They scared me and threatened me." Again, according to Ms. Crawford, while the Government never told her explicitly that she could lie and fabricate during her testimony, it was implied that she could say whatever she wanted, true or not, so long as it helped the Government's case. (Exhibit 31; Exhibit 14.)

In several areas, the Government violated its *Brady* duties with respect to Cindy Crawford. Ms. Crawford implied during her first stage testimony that she was off drugs ( R. 3070), but, based on what Ms. Crawford recently told defense investigators, this was incorrect. The Government or its agents, based on its observations of Ms. Crawford, had to know that she was a drug user both at the time she was interviewed by Littlefield and when she gave testimony. If not, this evidence is at a minimum newly discovered. It is also submitted that the Government or its agents were aware of Cindy Crawford's mental problems, but this was only revealed, and not developed well, when she volunteered this information to trial counsel during cross-examination in the penalty phase of trial. The Government's intimidation of and

threats to Cindy Crawford, as well as disgraced former AUSA Mike Littlefield's "coaching" of her testimony, were well known, obviously, to Littlefield himself and the law enforcement officers who participated in Crawford's interview at Littlefield's office.  The Government's failure to reveal these facts is a *Brady* violation as well as newly discovered evidence.  The impeaching evidence related above would have seriously undermined Cindy Crawford's credibility.  More significantly, where, as with Cindy Crawford, a witness is threatened and coached, the prosecution is guilty of knowingly sponsoring materially false testimony and/or failing to correct false testimony in violation of Mr. Barrett's right to due process of law.

Additionally, as reflected by the declarations of several available witnesses whom the defense did not call at trial to impeach Cindy Crawford's credibility, it was well known in the community that she acted on a regular basis as a snitch for local law enforcement.  This *Brady* information was never revealed, and the Government or its agents had to know about it.

The fact that Crawford received favor from the authorities for acting as a snitch, against Mr. Barrett or others, is demonstrated by the manner in which her conviction in Sequoyah County Case No. CF-2004-613 was handled.  Crawford was originally charged with felony possession of marijuana, because she had incurred a previous marijuana possession conviction.  On April 28, 2005, she entered a no contest plea to a misdemeanor and received a five year deferred sentence.  She received a one year deferred sentence on count 2, which charged misdemeanor possession of drug paraphernalia.  On March 20, 2005, an application to accelerate Ms. Crawford's deferred sentence was filed because she failed to make a required payment.  On July 17, 2005, shortly before Mr. Barrett's trial commenced, a bench warrant was issued for failure to appear.  On April 24, 2006, after Mr. Barrett's trial, an application to dismiss the

acceleration action was filed because Crawford had finally "paid in full." (Exhibit 170.) Thus, when she testified at Mr. Barrett's trial, an acceleration action for failure to comply with the terms of her deferred sentence was pending, but this impeaching information, which could have been used to argue that Crawford had a motive to please the prosecutors lest her deferred sentence be accelerated, was not disclosed.

The *Brady* violations committed by the Government with respect to Cindy Crawford could also be considered a form of newly discovered evidence that could not have been discovered with the exercise of due diligence. As with all the informant witnesses, her identity was not revealed until the eleventh hour, the Government kept her under tight wraps, and she refused to speak with the defense.

Cindy Crawford continues to milk benefits from her work as an informant, and her testimony against Mr. Barrett, up to the present day. She was charged in Sequoyah County Case No. CF-08-224 with first degree burglary and conspiracy on June 18, 2008, which was amended on July 13, 2008. The first degree burglary charge carried from seven to twenty years. The conspiracy charge carried up to ten years. On December 15, 2008 she received an almost unheard of two year deferred sentence on the first degree burglary charge, with the conspiracy charge dismissed. (Exhibit 169.)

### d.    Brandie Zane Price.

Price testified in the first stage of Mr. Barrett's trial. She claimed that she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period. (R. 3485-86.) For various convictions she received in Sequoyah County, she was sentenced to complete the RTP program, a regimented inmate discipline program for females

within the Oklahoma Department of Corrections.  The balance of her sentences were suspended

upon her completion of the program.  (R. 3487.)  Responding to feeds by prosecutor Littlefield,

Price testified that the program "worked," that she was "absolutely" clean of drugs, and,

presumably, was not engaging in any drug related activity.  (R. 3488, 3497.)

After Mr. Barrett's trial, Brandie Zane Price and others were charged in the

Eastern District in a methamphetamine drug distribution conspiracy.  *United States v. McAdams,*

*et al.,* No. CR-07-16-RAW.  The indictment alleged that the overall conspiracy began "prior to

approximately" May, 2006, and continued to February 20, 2007.  Significantly, the indictment

alleged that beginning approximately January 1, 2006, until June 22, 2006, Price received from

the lead defendant in the case, Joseph Alondo McAdams, one pound of methamphetamine per

delivery, receiving between one delivery and as many as three deliveries a week.  (Doc. 18, CR-

07-16-RAW.)  (Exhibit 174.)  Mr. Barrett's trial concluded November 17, 2005, and he was

formally sentenced on December 19, 2005, less than two weeks before the same United States

Attorney who prosecuted Mr. Barrett later alleged that Price began receiving large quantities of

methamphetamine for resale in a widespread drug conspiracy.

Price was later allowed to plead guilty to a superseding information (Doc. 116,

CR-07-16-RAW) (Exhibit 174) charging that from May, 2006 to February 20, 2007, she

distributed and possessed with intent to distribute in excess of 500 grams of methamphetamine,

or a mixture or substance containing methamphetamine.  A plea agreement, in which Price

agreed to provide all information regarding criminal activities known by her to the Government,

and in which the Government, based on its assessment of the value of her cooperation, agreed, if

appropriate, to move for a Guidelines downward departure, was entered into. (Doc. 121, CR-07-16-RAW.) (Exhibit 174.)

Price was ultimately sentenced to sixty months imprisonment. (Doc. 218, CR-07-16-RAW.) (Exhibit 174.) She received a substantial downward departure or variance from the advisory Guideline range based *on her cooperation and testimony against Mr. Barrett at his federal trial.* Otherwise, the punishment range for the offense of conviction was a mandatory minimum of ten years imprisonment, a maximum of life, and not less than five years supervised release. In the September 7, 2007 edition of the *Fort Smith Times-Record*, under the headline "Drug Offender Receives Break," the news article about Price's sentencing hearing states, "Price's sentence was significantly impacted by her testimony in the government's case against Kenneth Eugene Barrett, U.S. Attorney Sheldon Sperling stated in a news release." (Exhibit 70.) Thus, Price received substantial favor not for her cooperation in the drug conspiracy case in which she was charged, but for her testimony against Mr. Barrett, which preceded the drug indictment against her.[41]

Mr. Barrett alleges that the Government or its agents knew full well (or had reason to know) at the time of Brandie Price's testimony against Mr. Barrett that she was involved in drug use and drug dealing. This is clearly exculpatory evidence affecting her credibility that was not disclosed by the Government. Nor, under the Government's continuing duty to disclose exculpatory evidence under *Brady*, has it been disclosed by the Government that in exchange for her testimony against Mr. Barrett, she received a substantial downward departure in her own

---

[41] The various sentencing memoranda and motion for downward departure are sealed. Docs. 198, 200, 204, 205, 206, No. CR-07-16-RAW.

federal drug case. The deal Price received in her federal drug case based on her testimony against Mr. Barrett is also newly discovered, because it occurred after Mr. Barrett's trial. The Government's knowledge of these facts expose it once again to be the purveyors of false testimony – Ms. Price was not the clean, law-abiding citizen it portrayed her to be.

### e.     Karen Real.

Karen Real was another of the informant witnesses the Government kept under wraps until the eleventh hour, and who refused to talk to the defense. (R. 3076-77.) At the time Real appeared as a Government witness, she was serving a fourteen year federal sentence.[42] During direct examination, AUSA Littlefield asked Real if he ever indicated that he would do anything for her based on her cooperation. Real initially answered "[n]o, sir." Littlefield then asked, "Did I talk about anything I'd say to the court?" Real responded, "Well, you just mentioned that, you know, what I did. And that it would be up to the judge." (R. 3080-81.) On cross-examination, Real testified that while she hoped her testimony against Mr. Barrett could help her with her sentence, she was not really expecting anything. (R. 3134.)

Although the picture painted for the jury was that the Government would inform Real's sentencing judge of her cooperation, and that Real, while hopeful of a break, was not really expecting one, she actually received the largest favor she could have received shortly after Mr. Barrett's trial concluded. On March 1, 2006, the Government did much more than

---

[42]  In Eastern District Case No. 6:00-cr-21-FHS, Real had been convicted of conspiracy to manufacture, to possess with intent to distribute, and to distribute methamphetamine (count 1); maintaining a place for the purpose of manufacturing, distributing, or using methamphetamine (count 3); and possessing a firearm during a drug trafficking crime (count 5). Real received sentences of 108 months on count 1, 60 months on count 3, running concurrently to count 1; and 60 months on count 5, running consecutively to the concurrent terms on counts 1 and 3. (Doc. 158, Apr. 25, 2006, order reducing sentence on Government's Rule 35 motion.) (Exhibit 68.)

"mention" Ms. Real's testimony, it initiated a new proceeding in her case by filing a motion under Fed.R.Crim.P. 35 for reduction of sentence, based on her cooperation against Mr. Barrett. (Doc. 148 in Case No. 6:00-cr-21-FHS.) (Exhibit 68.) On April 25, 2005, the sentencing court reduced Real's sentence from 168 months (fourteen years) to time served (six years), and ordered Real's immediate release from custody. (Doc. 158 in Case No. 6:00-cr-21-FHS.) (Exhibit 68.) The Government also violated its *Brady* obligations by failing to disclose the numerous state cases, discussed in Ground Two (4)(f), that were dismissed against Real, and which could have been used as impeachment evidence. The Government was obligated under *Brady* to disclose to the defense Real's criminal record, and failed to do so. As with the other *Brady* violations discussed here, Mr. Barrett was prejudiced by the Government's "hide the ball" approach. Due to its failure to follow the law, the Government was allowed to portray this witness as far more credible than she really was.

Mr. Barrett submits that the Government misled the jury with respect to the assistance it was going to give Real. The Government surely knew all along that it would ask that Real's sentence be reduced to time served based on her cooperation against Mr. Barrett, an eventuality which in fact occurred. The Government has a continuing duty to disclose exculpatory evidence under *Brady*. The Government's true intentions were never disclosed to the defense or told to the jury. Additionally, the tremendous break Real received on her sentence is newly discovered evidence adversely impacting her credibility and the Government's lack of forthrightness at trial. Evidence of Real's deal could not have been discovered with the exercise of due diligence before or during trial, because it post-dated Mr. Barrett's trial. Yet again, the

Government's conduct in soft-peddling the assistance it was going to give Real in exchange for her testimony constituted a constitutional violation..

**f.      Randy Turman**.

It was argued in Ground Two that counsel were ineffective for failing to research Turman's court file in Sequoyah County Case No. CF-02-447 (Exhibit 195), and expose his perjury that this six count felony charge had been "taken care of" or disposed of, but was still pending, with no action in the case for two years preceding Mr. Barrett's trial.  Regardless of any duty counsel had to investigate Turman's criminal background, the Government had an overarching duty to refrain from sponsoring perjured testimony, and to disclose exculpatory evidence.

The Government or its agents obviously knew that Turman was committing perjury when he stated he no longer had a pending felony case in Sequoyah County, but they let him give false testimony anyway.  It is equally clear the Government knew, despite Turman's denials, that he had worked or was working as a snitch.  Otherwise, there was no reason for his case to lie dormant for two years.  The Government let Turman get away with another blatant falsehood when he stated the Government had nothing to hang over his head.  Clearly, his testimony was motivated by the fact he had a still pending felony case.  Unless he pleased the prosecutors with his testimony, there is every reason to believe they would have taken action against him, or seen to it that the Sequoyah County authorities did.

The Government's conduct in connection with Turman is a *Brady* violation.  The fact he had an open, unresolved felony case gave him a powerful motive to testify for the Government, and this fact affected his credibility.

Finally, the fact Turman's case was dismissed "in the interests of justice" in 2007 after lying dormant for years is highly indicative that his testimony against Mr. Barrett was at least in part a basis for the dismissal. (Exhibit 195.) This constitutes newly discovered evidence.

**2.       The Government failed to reveal exculpatory evidence
of a witness who failed to corroborate Charles Sanders.**

In Ground One, *supra*, Mr. Barrett described the *ex parte* hearing held September 13, 2005, during which AUSA Mike Littlefield, in the presence of the United States Attorney, informed the court that Littlefield had spoken with, and knew the identity of, a witness who when questioned failed to corroborate information to which Charles "Monk" Sanders would eventually testify in the penalty phase of Mr. Barrett's trial. (Tr. 9/13/05 H'rg at 14, 17.) Littlefield advised the court that he attempted to corroborate Sanders's claim that he (Sanders) was in a woman's house when he overheard her speaking on the telephone. Sanders, as he later testified, claimed he could recognize Mr. Barrett's voice over the phone, and that he heard the voice say they had to identify the C.I. and get rid of him. Littlefield told the court he had spoken with the woman himself, and she did not corroborate Sanders, although Littlefield claimed he subjectively believed the woman's denial was motivated by fear.

The fact that the Government knew the identity of a witness who failed to corroborate Sanders about a key piece of second-stage testimony was not disclosed until after trial when appellate counsel obtained the transcript of the *ex parte* proceeding. To this day, the Government has failed to identify the witness. This was clearly *Brady* material, because it was evidence that could have been used not only to impeach Sanders's testimony, but to attack the search warrant.

But the situation is worse than that.  Sanders was able to commit crimes with impunity, and the Government knew that.  As long as he was willing to inform on others, Sanders had a "get out of jail free" card.  No reasonable person could believe Sanders about anything.  This is especially true since the prosecution was in possession of evidence that Sanders's sorry word was contradicted by another witness.  Due to Sanders's record of total dishonesty and the fact that he was contradicted by another witness known to the prosecutor, polluting a federal courtroom with Sanders's testimony constituted the knowing use of perjured evidence.

**B.      The Judgements of Conviction and Sentence Should be Vacated Based on the Suppression and New Discovery of Evidence Undermining the Credibility of Key Law Enforcement Personnel.**

The Government suppressed exculpatory evidence that would have shown Clint Johnson and Vickie Lyons to be witnesses of poor credibility.  With respect to evidence showing Johnson had no credibility, the suppressed evidence would have also supported a motion to suppress.  The Government suppressed exculpatory evidence that would have torpedoed not only the warrant, but its seven informant witnesses and overall theory of the case, because Sequoyah County Sheriff John Philpot had been to Mr. Barrett's residence with other officers less than a month before the September 24, 1999 incident without coming to any harm.  Newly discovered evidence of former AUSA Littlefield's criminal activities supports claims by some of the informant witnesses that they were threatened and coerced into giving testimony.

Page 297

### 1.      Evidence of Clint Johnson's illicit activities.

But for Clint Johnson's alleged reliance upon "Monk" Sanders to secure the nighttime, no-knock warrant for Mr. Barrett's residence and property, David "Rocky" Eales's tragic death never would have occurred. The Government or its agents knew that Johnson, just like his alleged snitch, Sanders, is untrustworthy and was subject to impeachment in a variety of areas. To the extent the impeachment evidence discussed below was generated after Mr. Barrett's trial, it constitutes newly discovered evidence. However, the Government was aware of this evidence, or had a duty to become aware of it, and has once again failed to fulfill its *continuing* duty to disclose exculpatory evidence. The impeachment evidence detailed below not only could have been used to attack the overall testimony of Johnson and Sanders, but could have been used at either stage of Mr. Barrett's trial to argue that but for the acts of a "dirty cop," Clint Johnson, the entire chain of events leading to Trooper Eales's death never would have occurred.

At the time of Mr. Barrett's trial and shortly thereafter, Johnson was under official investigation for embezzlement of funds, illegal drug use, perjury, and gross misuse of his official office. Agent Vickie Lyons of the Oklahoma State Bureau of Investigation, another critical witness in the Government's case against Mr. Barrett, colluded with and protected Johnson. Had the jury known these facts, Johnson's credibility, and the validity of the no-knock search warrant, would have been destroyed. Likewise, the credibility of Vickie Lyons would have suffered greatly had the jury learned of her participation in her boyfriend Clint Johnson's numerous illegal activities.

Although not known to the defense, at the time of Mr. Barrett's trial, Johnson, Lyons and a number of other state law enforcement officers involved in Mr. Barrett's case had

been involved in a series of crimes involving the misuse of their office. On November 1, 2005, while Mr. Barrett's trial was ongoing, Cherokee County District Attorney investigators Tommy Morgan and Jeff Lancaster reported to District Attorney Richard Gray that Johnson had passed four bad checks in September, 2005 at Champlain's Truck Stop in Tahlequah. (Exhibit 181 - Memo to Richard Gray from Tommy Morgan and Jeff Lancaster dated November 1, 2005.) Beginning on November 5, 2005, Assistant District Attorney and Drug Task Force Director Jeff Sheridan kept a detailed log of discussions with Johnson, which led to Johnson's termination and the seizure of his vehicle on January 5, 2006. (Exhibit 181 - Log of events from November 2005 through January 2006 by Jeff Sheridan; Letter from Richard Gray to Clint Johnson dated January 5, 2006.) On January 5, 2006, District Attorney investigators found in Johnson's car various drugs and drug paraphernalia that had never been logged into evidence, which they suspected Johnson had acquired through seizure or purchase with official funds, and which they suspected Johnson was abusing himself. (Exhibit 181 - Report of Investigation dated January 5, 2006 from Courtney Bates; February 3, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries.) These items included multiple syringes, a pipe, a spoon with methamphetamine residue, a partially smoked hand-rolled marijuana cigarette, vials of liquid methamphetamine, a baggie containing marijuana, and bottles of Xanax and Darvon. (Exhibit 181 - OSBI Criminalistics Investigation Report dated January 26, 2006.)

As early as November 9, 2005, Sheridan was expressing concern over Johnson's inability to account for funds allegedly used for drug buys by confidential informants and funds seized during drug raids. (Exhibit 181 - Log of events from November 2005 through January 2006 by Jeff Sheridan; Memo dated November 17, 2005 from Donovan Dobbs to Jeff Sheridan; Undated

Memo from Jeff Sheridan to Clint Johnson; Undated Memo from Jeff Sheridan to Richard Gray; Memo dated November 21, 2005 from Jeff Sheridan to Clint Johnson; Memo dated December 19, 2005 from Courtney Bates to Jeff Sheridan; Memo dated December 27, 2005 from Jeff Sheridan to Clint Johnson; January 17, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries; February 22, 2006 Letter from Richard Gray to OSBI Special Agent Shawn Ward; Undated Report of Second OSBI Interview of Clint Johnson; Memo dated November 13, 2006 from Misty Brinley to Richard Gray).

Johnson had considerable difficulties managing his finances.  He declared bankruptcy in 2001, and his actions in passing hot checks had further alarmed his supervisors. (Exhibit 181 - *In re Clint Johnson,* No. 01-72501, United States Bankruptcy Court, E.D. Okl.)  In December 2005 and January 2006, Sheridan repeatedly expressed his conviction that Johnson was lying to him.  (Exhibit 181 - Log of events from November, 2005 through January, 2006 by Jeff Sheridan; Undated Memo from Jeff Sheridan to Richard Gray).  On November 23, 2005, Sheridan noted Johnson's possible involvement, as either a target or witness, in a Multi-County Grand Jury criminal investigation.  (Exhibit 181 - Log of events from November, 2005 to January, 2006 by Jeff Sheridan).  It is plainly apparent that law enforcement knew, during the course of Mr. Barrett's trial, that Johnson was involved in a course of serious criminal conduct that involved financial dishonesty and the misuse of his office.

In October, 2006, a Multi-County Grand Jury unsealed an indictment against Richard Gray, the District Attorney for Cherokee and Sequoyah Counties, for embezzling money seized as evidence from drug investigations.  In June, 2008, Okmulgee County District Judge Michael Claver dismissed the charges against Gray at the conclusion of the prosecution's case,

and barred further prosecution, based on defense counsel's scathing impeachment of Clint

Johnson, who testified as a prosecution witness.

The transcript of the cross-examination of Clint Johnson, which took place on

June 4, 2008, is replete with additional evidence of Johnson's misappropriation of funds.

(Exhibit 181 - Transcript of Proceedings in *State of Oklahoma v. Richard Loy Gray, Jr.,*

Cherokee County Case No. CF-2007-28, June 4, 2008.) (hereinafter "Gray RT".)  During the

cross-examination of Johnson, Gray's defense counsel suggested that: 1) Johnson had fathered a

child out of wedlock with the daughter of former Adair County Sheriff Charles Hartshorne, and

that Johnson and Hartshorne were dividing up drug money between themselves (Gray RT 26-27);

2) Johnson lived with another critical prosecution witness in Mr. Barrett's case, Vickie Lyons of

the OSBI (*id.* at 74); 3) based on his relationship with Lyons, Johnson knew that the OSBI would

do nothing to address official theft of drug money (*id.*); 4) Johnson used Lyons's cell phone and

drove her car, and when government officials confronted Johnson about property he had illegally

taken, Lyons brought it back (*id.*); 5) Johnson attempted to borrow, and in some cases did

borrow, money from counsel for defendants whose assets Johnson seized (*id.* at 65); 6) Johnson

illegally released funds seized from defendants to defense counsel, and then obtained kickbacks

from defense counsel for this illegal conduct (*id.* at 66-67); 7) Johnson used drug funds as his

own private ATM (*id.* at 64); 8) throughout 2003 and 2004, Johnson took money seized from

drug arrests and purchased cashier's checks for his own personal use (*id.* at 68); and 9) Johnson

began writing bad checks as early as May, 2003.  *Id.* at 54.

None of this information was shared by the Government with Mr. Barrett's

lawyers; it is obvious they intentionally concealed it.  Mr. Barrett's current counsel first learned

of this information in February, 2009, when they obtained a copy of the court reporter's transcript of Johnson's testimony in Richard Gray's trial and defense exhibits in Mr. Gray's case. Mr. Barrett's counsel are currently investigating this newly discovered evidence of prosecutorial misconduct, and will amend this motion to include new details about the breadth and scope of this misconduct as it becomes available to them.

But there is now abundant evidence calling into question Mr. Barrett's convictions. At an evidentiary hearing conducted on Mr. Barrett's motion to suppress on January 26, 2005 (Tr. ½6/05 Hr'g), Johnson was called by the Government, and testified that the no-knock search warrant he obtained was based on information he received from a confidential informant (later identified as Charles Sanders). Johnson had used this particular informant at least five times, and the informant had "never been wrong." (Tr. 1/ 26/05 Hr'g at 66-67.)

On cross-examination, Johnson acknowledged that during the state court proceedings, he had never revealed the name of the confidential informant, and that defense counsel John Echols (who examined Johnson at the motion hearing) was the only one who had asked for the identity. Johnson admitted writing the name of the C.I. on a piece of paper, which was placed in a sealed envelope in the state court file. (Tr. 1/ 26/05 Hr'g at 78, 83-90.) However, Johnson stated that he had revealed the name of the C.I. to the United States Attorney's Office. (Tr. 1/ 26/05 Hr'g at 81.)

Johnson testified that before September, 1999 the C.I. had been involved in criminal activity leading to formal charges. (Tr. 1/ 26/05 Hr'g at 82-83.) When counsel asked Johnson whether the informant had been involved in other criminal activity since September 1999, the Government objected on relevance grounds, and the magistrate sustained the objection,

holding that only what occurred before the no-knock warrant was issued was relevant.  Counsel responded that he always believed the C.I. was not a real person, but a composite.  (Tr. 1/ 26/05, Hr'g at 83-90.)  In the state proceedings, one of the reasons given for shielding the alleged C.I.'s identity was the claim the C.I. was involved in assisting an ongoing investigation until 2004.  Of course, the claim the C.I.'s identity was being protected for this reason (assuming Sanders was the C.I.) is obviously false.  Sanders, with the patronage of Clint Johnson, was allowed to commit crimes at will in Sequoyah County after 1999 with only minor consequences.  The Government did not want it brought out at the suppression hearing that Johnson's C.I. had continued to commit crimes with impunity and was therefore an unreliable source.  The Government, which had been informed of Sanders's identity, was well aware of the litany of crimes he had committed since 1999, and knew that his identity was not being protected because of an "ongoing investigation."

Switching tracks, Mr. Echols asked Johnson if the C.I. had participated in drug transactions or drug dealing prior to September 24, 1999.  Johnson replied, "They [meaning drugs] were probably used some, yes, sir."  Asked if the C.I. sold drugs, Johnson stated "Not that I am aware of."  Asked if the C.I. had run a meth lab, Johnson again replied, "Not that I am aware of, no, sir."  (Tr. 1/ 26/05 Hr'g at  92.)

Johnson, who was presumably aware of Sanders's extensive criminal history before 1999, gave false testimony on this score.  As illustrated in the first stage ineffective assistance of counsel claim, Sanders had a 1986 Arkansas conviction for delivery of cocaine and amphetamines.  Information gathered during this §2255 investigation indicates that Sanders also routinely sold drugs, activities Johnson would have known about if he were regularly in contact

with Sanders and not recklessly disregarding the truth of his activities.  (Exhibit 90; Exhibit 95.)

Johnson's testimony was false on a material matter and prevented proper development of

evidence to challenge the warrant because of the unreliability of the C.I.  The prosecution had

every reason to be aware of Sanders's criminal conviction in Arkansas for drug delivery, but

stood silently by as Johnson gave false testimony.

The Government was well aware of damning evidence regarding the alleged C.I.,

Charles Sanders, but used objections to prevent counsel from eliciting this information in order

to build a record for a motion to suppress.  It was not until trial, when Sanders testified, that only

some of his criminal history, but not the many deals and the repeated lenient treatment he had

received, was revealed.  By then, the challenge to the search warrant that was mounted was

incompetent, as detailed in Ground Two.

### 2.      David Michael Littlefield's illicit activities.

Following Mr. Barrett's conviction

> [United States Attorney Sheldon] Sperling said he is grateful to Mike Littlefield
> for his work as chief prosecutor in the case; and to Sequoyah County Sheriff
> Johnny Philpot, who was instrumental in identifying key witnesses who could
> prove Barrett acted with premeditation.

(Exhibit 69 - Tahlequah *Daily Press*.)  In fact Littlefield himself was responsible for bringing the

seven drug-addict informants to support the Government's case, as he stated during the *ex parte*

hearing held September 13, 2005, and discussed elsewhere in this Petition.

Former AUSA Littlefield threatened and pressured Travis and Cindy Crawford to

provide testimony against Mr. Barrett.  Since Littlefield primarily conducted the interviews of the

seven informant witnesses, it is likely that others were threatened as well.  Support for this claim

comes from newly discovered evidence of Littlefield's own troubles with the law, and consequent proceedings against him by the Oklahoma Bar Association.

In Muskogee County Case No. CF-07-363, Littlefield was charged with felony child abuse. On August 3, 2007, Littlefield was permitted to enter an *Alford* plea to count 2 of the Information, charging child abuse by injury in violation of 10 O.S. 2001, section 7115(A). Based on this plea, Littlefield received a two year unsupervised deferred sentence, and was required to pay court costs. *See* Complaint, *State of Oklahoma ex rel. Oklahoma Bar Association v. David M. Littlefield,* OBAD #1720, SCBD #5338, filed with the Oklahoma Supreme Court on September 28, 2007. Littlefield's criminal case file in Muskogee County was expunged even before the Bar Complaint was filed, although his deferred sentence was to run for two years from August 3, 2007.[43] (Exhibit 156 - Trial Brief of Complainant, p. 2, filed on January 2, 2008, in *State of Oklahoma ex rel. Oklahoma Bar Association v. Littlefield, supra.*) On September 14, 2009, the Oklahoma Supreme Court determined that, based on the Bar Complaint filed against Littlefield, he should receive a private reprimand by the Court, scheduled to occur on October 22, 2009. (Exhibit 53.)

In the affidavit for search warrant for Littlefield's home, captioned SW-07-34, and filed in the District Court of Muskogee County on April 23, 2007, Jan Ray, a Muskogee County Deputy Sheriff, states in pertinent part that Littlefield had been brutally abusing his minor children for a period of years extending back to the time he was the chief prosecutor on Mr.

---

[43] The fact Littlefield's case was expunged long before his two year deferred sentence expired, as noted by the Bar Association's Assistant General Counsel, prevents Mr. Barrett from ascertaining whether Littlefield lied to investigators before entering his plea. It also prevents Mr. Barrett from ascertaining why Mr. Littlefield received such favorable treatment.

Barrett's case.  (Exhibit 189 - Affidavit for search warrant, SW-07-34, filed in Muskogee County

District Court, April 23, 2007, signed by affiant on April 13, 2007.)

Based on the affidavit, a search warrant was issued on April 13, 2007, and filed in

the court record on April 23, 2007.  (Exhibit 189 - Search warrant, SW-07-34.)  Various camera

and computer equipment were seized in the search.  (Exhibit 189 - Search warrant return, SW-

07-34, filed in the District Court of Muskogee County on April 23, 2007.)

Littlefield did not contest the charges.  He was found guilty on an *Alford* plea,

receiving a very generous sentence which has already been dismissed, with the case file

expunged.

The Bar Association action resulted in a private reprimand.  (Exhibit 53.)

Littlefield was found guilty of violations of Rule 8.4(b) of the Oklahoma Rules of Professional

Conduct, and Rule 1.3 of the Rules Governing Disciplinary Proceedings.  *Id.*  Thus, the

Oklahoma Supreme Court found Littlefield's actions reflect adversely on his honesty,

trustworthiness, or fitness as a lawyer in other respects.  *Id.*  Just as the Oklahoma Supreme Court

found that Littlefield's conduct brought "discredit upon the legal profession," this Court should

find that his conduct both in and out of court during Mr. Barrett's trial brings discredit upon the

judgment of conviction and sentence of death Littlefield engineered.

Littlefield's child abuse charges are relevant to the manner in which he handled

the informant witnesses in Mr. Barrett's case.  A bully who apparently had no compunction about

using his minor children as punching bags for years to work out his "temper fits" and frustrations

would have no problem threatening witnesses with all manner of dire consequences to keep them

in line and produce the desired testimony against Mr. Barrett.  This newly discovered evidence

regarding Littlefield's own deplorable and shocking criminal conduct against his own children

not only corroborates Travis Crawford's and Cindy Crawford's claims they were threatened by

Littlefield to secure their testimony, and Randy Weaver's assertion that Littlefield tried to

intimidate him, but also is relevant to Mr. Barrett's claim of prosecutorial misconduct dealing

with the manner in which Littlefield handled his informant witnesses in an attempt to prevent

defense counsel from having anything close to a reasonable opportunity to investigate the

backgrounds of these witnesses and their testimony.

The current defense investigation supports the claim Littlefield routinely sought to

intimidate witnesses.  Janice Sanders described her contact with Littlefield:

> Mr. Littlefield came to see me.  Johnny Philpot accompanied him.  Mr. Littlefield
> got angry with me when I told him that I thought that Kenny's state sentence was
> fair and that it was un-American to try him again since he had been convicted and
> sentenced.

(Exhibit 85.)[44]

---

[44] Since Mr. Barrett's original Motion to Vacate was filed, there has been continuing
investigation into Littlefield's Muskogee County child abuse charges, which have been shrouded
in secrecy because the file was apparently improperly expunged even before his 2-year deferred
sentence expired.  An investigator working on Mr. Barrett's case interviewed Tim Brown, the
current chief of police in Webbers Falls, Oklahoma.  Mr. Brown was formerly a lieutenant in the
Muskogee County Sheriff's Department.  He was employed with the Muskogee County Sheriff's
Office at the time criminal charges were filed against Littlefield.  He was also a member of the
Eastern Oklahoma Regional Child Death Review Board.  According to Mr. Brown, Littlefield
threatened the sheriff's investigators working on the child abuse case.  Littlefield also dismissed
the charges as "bullshit" (a protestation of innocence belied by his later *Alford* plea), and,
adopting a victim role, claimed the Muskogee County Sheriff's Office was "trying to get him."
In addition to committing child abuse, it was alleged by Mike and Dawn Littlefield's daughter
that her parents smoked marijuana in front of her and her younger brother.
According to Mr. Brown, the prosecutors assigned to Littlefield's criminal case from the
Oklahoma Attorney General's Office were scared that Littlefield's prosecution would "open up a
can of worms" because Littlefield, while he was employed with the Muskogee County District
Attorney's Office, had prosecuted most of the big drug cases brought in that county.  During the
<div align="right">(continued...)</div>

During the penalty trial Littlefield repeatedly questioned Mr. Barrett's ex-wife, Abby Stites, about instances of violence in their marriage. Each time Ms. Stites put these events in context – including Mr. Barrett's mental illness and her own violence towards him – Littlefield returned the jury's attention to Mr. Barrett. It is now clear that Littlefield had his own guilt to project onto Mr. Barrett during this cross-examination. Although jurors rejected the idea that Mr. Barrett was a future danger, it is likely that Littlefield's harping on the violence in the Barrett marriage had an impact on the jury's assessment of the appropriate punishment. This Court should not permit a death verdict to stand where it was influenced by the rhetoric of a prosecutor expiating his own sins of abuse on the life of the defendant.

### 3.    John Philpot.

The Government argued extensively at trial that a middle-of-the-night, no-knock search warrant had to be issued to search Mr. Barrett's property, and that the authorities had to proceed in the way they did, because Mr. Barrett was dangerous; if he had any warning that police were on his property, he would have shot them. This was the repeated theme of the Government's case, based on its seven informant witnesses.

---

[44](...continued)
continuing defense investigation into this matter, former DHS child abuse investigator Melissa Todd was also interviewed. While she declined to discuss Littlefield's criminal case because of confidentiality concerns, she attested to the honesty of Tim Brown. (Exhibit 43.)

Littlefield's conduct lends additional support to Mr. Barrett's claim that Littlefield threatened the informant witnesses he cultivated for Mr. Barrett's federal prosecution. It shows that Littlefield behaved as a law unto himself, a pattern of conduct indicating he would have few qualms about concealing *Brady* material and sponsoring false testimony. Mr. Barrett will continue to seek information from the Government about these matters and amend his claims as the information becomes available to him.

The truth is otherwise. John Philpot, former Sequoyah County Sheriff, recently admitted to a defense investigator that he and other local law enforcement officers were on Mr. Barrett's property less than a month before the raid which led to the death of David Eales, as police reports reflect they had also done the previous year. There were no shots fired and no violence from Mr. Barrett. (Exhibit 6.)

This evidence, known to the Government or its agents, was unquestionably exculpatory, in several respects. Had this fact been known to the defense, the entire edifice of the prosecution's case would have crumbled. It would have supported an attack on the nighttime, no-knock warrant, demonstrating there was no probable cause for a warrant of this type. Because the initial warrant lacked probable cause, the fruits of any subsequent warrant, *i.e.,* drugs and firearms evidence later seized, would have been acquired unlawfully, knocking out the foundations of the three counts in the superseding indictment. This evidence would have discredited the seven snitches, some of whom claimed they were told by Mr. Barrett that if the police came on his property, he would shoot the first one through the door, and that he hoped the first officer through the door would be John Philpot. This evidence would have demonstrated that, as the defense argued, Mr. Barrett was unaware the police were raiding his property; he thought he was repelling civilian trespassers. Even if convictions had been returned, this evidence was relevant to rebutting the intent factors alleged by the Government in the punishment phase.

Certainly when viewed together, the exculpatory evidence suppressed by the Government, some of which could also be termed newly discovered evidence, the other newly discovered evidence discussed above, and the Government's sponsorship of false testimony

would have made the difference between conviction and acquittal at trial. At a minimum, it would have made a difference in the sentencing stage.

The Government suppressed and has continued to suppress evidence which would have dealt fatal blows to Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Karen Real, Randy Turman, Clint Johnson, Vickie Lyons, and John Philpot. At least two of the informant witnesses, Travis and Cindy Crawford, testified based on threats from then-AUSA Littlefield, a fact well known, obviously, to Littlefield himself. The suppressed exculpatory or newly discovered evidence, or both, affecting the credibility of these witnesses, were known and became known to the Government and its agents. This evidence was unquestionably favorable to Mr. Barrett, and was material in the sense that disclosure of this evidence would have created a reasonable probability of a different outcome.

Taken together, the suppressed exculpatory evidence addressed above would have been fatal to the admissibility of all the physical evidence introduced against Mr. Barrett, and would have left in shreds the prosecution's claims of Mr. Barrett's "intent," as testified to by the seven informants. Newly discovered evidence in the form of after-the-fact deals given to various prosecution witnesses – which Mr. Barrett contends still constitutes *Brady* material, because these deals were in the works or promised all along, and because the prosecution's duty under *Brady* is continuing – would have shown the various snitch witnesses to have no credibility whatever.

Travis Crawford's recantation, if known at the time of Mr. Barrett's trial, belies the prosecution's theory of intent and could have been used to impeach the credibility of other witnesses' claims that Mr. Barrett had threatened armed confrontation with the police. Likewise,

had the former AUSA's violent temper and assaultive behavior against his own children been known at the time of Mr. Barrett's trial, the claims now made by the Crawfords that they were coerced to testify against Mr. Barrett ring true. The newly discovered evidence discussed here goes to the foundation of the case.

Most troubling, of course, is the Government's sponsorship of false evidence from Randy Turman, Charles Sanders and, at the motion to suppress, from Clint Johnson. This evidence clearly affected the outcome of trial. Threats to witnesses Travis and Cindy Crawford is also a form of false evidence; a threatened witness is, *per se*, an unreliable witness. The Government also misled the jury about what it was going to do for Sanders and Karen Real in exchange for their testimony.

The misconduct of the prosecutors was repeated and blatant. Mr. Barrett's fundamental constitutional rights were violated. He should be granted relief from his convictions and sentences.

> **C.     Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses.**

The prosecution in Mr. Barrett's case interfered with the defense's access to key prosecution witnesses including Karen Real, Randy Turman, Randall Weaver, Charles "Monk" Sanders, Cindy Crawford, Travis Crawford, and Brandie Price. Prosecutors, through statements and/or actions, communicated to witnesses that they should not speak with defense personnel outside the presence of the prosecutor. (Exhibit 92; Exhibit 31.) For example, Karen Real has told Mr. Barrett's investigator that she was told not to speak with him. (Exhibit 43.) Additionally, the prosecutors intentionally delayed access to the identities of the witnesses in

order to prevent meaningful interviews with them, including by preventing interviews with

incarcerated witnesses, and to prevent meaningful investigations of their backgrounds and

honesty.

Prosecutors intentionally withheld the names and contact information for these

witnesses.  On February 17, 2005, prosecutor D. Michael Littlefield wrote in a letter to defense

counsel that the Government did not intend to reveal the identity of the confidential informant,

and added the "situation would change should we determine to utilize this individual as a

witness."  The Government did not reveal the identities of its seven key witnesses until

September 15, 2005.  In order to keep the identities secret past the deadline imposed by 18

U.S.C. § 3432, the Government filed a baseless motion for a protective order.  The trial court

found the Government could have filed its motion to keep the witnesses' names from the defense

weeks earlier.  (Tr. 9/13/05 Hr'g at 5).  The trial court found the Government's motion did not

present any evidence to justify withholding the names and other information from the defense.

(Tr. 9/13/05 Hr'g at 4).  The prosecutor admitted that the Government could have raised its

concerns about at least some of the witnesses earlier.  *Id.* at 9.  Despite the delay the court found

"there is no evidence of any overt activities by anyone on behalf of the defendant to intimidate

witnesses that you [the Government] are aware of."  *Id.* at 19.[45]

During an *in camera* hearing on the Government's motion for a protective order,

AUSA Littlefield was not candid with the court.  The court appeared to recognize that Littlefield

was making inconsistent claims.  On the one hand he was claiming that the defense attorneys had

---

[45] The only person the Government could point to who had any known affinity with Mr. Barrett
that could conceivably suggest a threat, was a man who posed no threat whatsoever because he
was in a federal prison somewhere.  *Id.* at 14.

sufficient notice of the witnesses (a) because they were Mr. Barrett's associates and family members (Tr. 9/13/05 Hr'g at 9-10), and (b) because Littlefield told defense counsel what the witnesses would testify to. *Ibid.* The court raised the obvious point that if Littlefield had been so forthcoming, there was no need for secrecy because the disclosed information would be sufficient for Mr. Barrett "to be able to determine roughly who we are talking about." *Id.* at 11. Littlefield said it would not be. This admission strongly suggests Mr. Barrett was not aware of having said the things attributed to him by the witnesses because he had never said them.

At that point the United States Attorney cut Littlefield off and had an off-the-record discussion. Back on the record, Littlefield said that the notice he had provided would be insufficient to identify the witnesses because Mr. Barrett had said these things to so many people, it would be hard for him to remember them all. Littlefield could produce no evidence of this "belief" he had. *Id.* at 12.

Following the *in camera ex parte* hearing, the Government and Judge Payne withheld from defense counsel information that was critical to the defense including: (a) that the court's research indicated that for purposes of § 3532 the trial had started the previous day; (b) that the court indicated a request for a continuance would be valid based on the importance of the witnesses and what they would say; (c) that the Government had made representations about defense counsel's interpretation of § 3532; (d) that AUSA Littlefield had spoken with a witness who failed to corroborate information from confidential informant Charles Sanders; (e) that the Government's motion for a protective order relied upon information the court deemed irrelevant – *viz.* that the court permitted Mr. Barrett to be restrained by an electric-shock belt and that the court would keep jurors anonymous – and lacked sufficient factual support; (f) that the

prosecutors revealed *in camera* information that fell within the notice requirements of Federal Rule of Evidence 404(b). *See* Ground One, *supra*.

To the extent Mr. Barrett's trial counsel acquiesced in the prosecutors' plan to delay production of the witnesses' names, contact information, statements, and the arrangements for interviewing the witnesses, Mr. Barrett was denied his right to effective assistance of counsel. As the prosecutor said, Mr. Barrett's trial counsel had no information about the identities of the witnesses or the content of their testimony. (Tr. 9/13/05 Hr'g at 6-7). With the information withheld from them, trial counsel could not have made an informed decision regarding whether delayed disclosure was acceptable, whether the arrangements for interviews were acceptable, and whether trial counsel were ready for trial once the witness names were known.

The concerns of any reasonable defense lawyer under the circumstances – including the need for a continuance – were obvious to the trial court. (Tr. 9/13/05 Hr'g at 10, 12.) The record shows defense counsel acquiesced in the Government's proposal that witnesses be interviewed with Government representatives present. *Id.* at 27. In addition to this "decision" being professionally unreasonable, it was to some extent induced by the trial court's failure to disclose weaknesses the Court had identified in the Government's position, weaknesses the court disclosed to prosecutors, but not to the defense. *See* Ground One, *supra*. Neither Mr. Barrett nor his counsel could have made an informed decision about access to the witnesses without the information the trial court possessed but was unwilling to share with the defense. To the extent Mr. Barrett's trial counsel could have uncovered the same legal arguments the court identified, they failed to act professionally.

Faced with the Government's intentional delay (the confidential informant at least was known to the Government from the start), and the Government's pretextual expression of concern for the witnesses' safety, and ignorant of the Court's views and complicity in extending the delay, Mr. Barrett's trial counsel "agreed" to restrictions on their access to witnesses. The Government's promise of restricted access was itself illusory. Mr. Barrett's counsel were unable to conduct any meaningful interviews of the witnesses prior to trial. The delays also prevented or impeded meaningful investigation of the witnesses. As shown *supra* in this Ground and Ground Two, an investigation of the Government's key witnesses would have yielded abundant evidence of their dishonesty and incentives to color their testimony to the desires of law enforcement.

If trial counsel had met their ethical and constitutional obligations to Mr. Barrett, there is a reasonable probability the outcome of the case would have been different. In the absence of the seven snitches' testimony two prior juries refused to convict Mr. Barrett of capital murder. As the trial judge repeatedly asserted in his budget rulings and elsewhere in the record, the main difference between the federal case and state cases was the question of premeditation, or a pre-formed intent to kill. As the United States Attorney has publicly acknowledged, the seven snitches were key to the Government's ability to convince the jury Mr. Barrett acted with the requisite *mens rea*. But for the Government's misconduct or trial counsel's deficient performance, the evidence presented herein would have impeached the seven witnesses. It is reasonably probable that if the witnesses had been impeached with the evidence presented herewith, Mr. Barrett would not have been convicted of capital murder, or would not have been sentenced to death.

**D.** **Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses and Closing Argument**.

The prosecutor's improper conduct included the following examples: The prosecutor improperly asked questions for which he lacked a good faith basis, or to which he knew the witness could not give an answer based on personal knowledge, the effect being to imply that the prosecutor had knowledge of the facts. (R. 4743 (implying existence of records adverse to Mr. Barrett), 4765-66, 4781 (implying Mr. Barrett had been denied custody of his son), 4788-92, 4850, 4852-53, 4859, 4862, 4866, 4869, 4911, 4913, 4925 (bolstering Karen Real by implying prosecutor's knowledge of her reputation for honesty), 4980, 5006 (falsely suggesting prosecutor had knowledge of Mr. Barrett trying to infect jail worker with communicable disease).)

The prosecutor improperly commented upon Mr. Barrett exercising his trial rights in state court. (R. 4765.) The prosecutor improperly adduced through a witness who lacked personal knowledge whether someone who is sentenced to 20 years' imprisonment will be released earlier by the Department of Corrections. (R. 4765-66.)

The prosecutor asked witnesses whether other witnesses had made false statements although, due to Federal Rule of Evidence 615, the witness being questioned could have had no knowledge of the other witnesses' testimony. (R. 5092.)

The prosecutor repeatedly exceeded the scope of direct examination and asked witnesses questions about the seven informant witnesses the Government presented in federal court, or Abby Stites' charges against Mr. Barrett, although – or because – the prosecutor knew the witnesses lacked personal knowledge of the facts. (R. 4767, 4788-92, 4925, 4926, 5024-26,

5045 (Littlefield acknowledging he asked question knowing witness had no personal knowledge), 5069, 5116.) As the prosecutor's obvious goal was to merely repeat the testimony of witnesses who claimed to observe various facts, regardless of whether the witness testifying had said anything related to the other witnesses' testimony, the questioning lacked any probative value and trial counsel were ineffective for failing to object. The effect of the prosecutor's improper questioning was to repeat the Government's case over and over and over, and make defense witnesses appear ignorant of facts to which their testimony did not relate. Ultimately, the prosecutor's misconduct – enabled by trial counsel's unreasonable failure to object – completely drowned out the defense witnesses' testimony.

In arguing for death, the prosecutors stooped to conquer.

In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently. Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards." (R. 5356-57.)

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer. This was "way over the capital murder line." (R. 5402-03.) Similarly, Sperling later asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?" (R. 5412.)

Denigrating Mr. Barrett's fundamental right to a fair trial, Sperling, in the form of a rhetorical question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness." (R. 5408.)

Trotting out a variation on the old Bob Macy[46] "three hots and a cot" argument, Sperling repeatedly – and falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room." (R. 5412, 5423.) Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. (R. 5412.) Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. (R. 5412.) In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent." (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence." Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?" The prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill." (R. 5412-13.)

---

[46] Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[47], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough." to testify. (R. 5414-15.)

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them. To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. (R. 5415.) This falsely implied the victim impact witnesses did not testify in the state trials only because the incompetent, "under-evidenced" state prosecutors did not have sense enough to put them on the stand. Sperling was well aware they *could not have testified by law* because the case never got past the first stage. Shielded by the court's erroneous ruling excluding

---

[47] This was a knowing false statement on the prosecutor's part. As discussed in Ground One, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett. "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

Mr. Barrett's statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]." (R. 5419.) The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did. Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone. Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing." The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops." (R. 5420-21.) There were additional comments on Mr. Barrett's supposed lack of remorse. (R. 5419-20, 5421-22.)

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life. (R. 5420.)

Sperling improperly aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again. (R. 5421-22.)

Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warning the jury they would make him a "hero" in prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time." (R. 5423.) This was little better than telling the jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit.

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections. *See* Ground Two. The error stemming from

prosecutorial misconduct cannot be termed harmless.  This was not a runaway case for the death penalty.  The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

A claim of prosecutorial misconduct was not raised on direct appeal.  Because the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused the failure to raise the claim.  Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Five:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)     **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐     No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes  ☐     No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes  ☐     No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes  ☐     No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND SIX**

**Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements**.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The court wrongly excluded relevant and admissible *defense* evidence and facts to the jury, including various statements by Mr. Barrett around the time of his arrest that showed deep remorse for the death of Trooper David Eales, and improperly restricted the jury's consideration of the state-court verdict.

During the course of Mr. Barrett's trial, trial counsel sought to admit a number of statements made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper Eales. For example, Mr. Barrett's counsel sought to admit the written statement of Trooper Glen Smithson, who recorded that on September 29, 1999, Mr. Barrett told him, "The wrong person got killed. I wished it had been me." (Exhibit 107.)

However, the prosecutor objected to these statements, and the court incorrectly excluded them. The Government cynically exploited the court's ruling in closing argument,

mocking the notion Mr. Barrett had any remorse at all.  The prosecutor fastened on Mr. Barrett's statement to his mother that he wished things had turned out differently, which AUSA Littlefield stated meant Mr. Barrett had wished he had not gotten caught so he could "kill more of the bastards." (R. 5356.)  During closing argument, Mr. Barrett's counsel argued, as a factor in mitigation, that Mr. Barrett expressed  remorse.  With Mr. Barrett's expressions of remorse excluded, the United States Attorney was able, without fear of contradiction, to call him a "common, cold-blooded murderer." (R. 5423.)  As a result, all of the jurors rejected as a mitigating factor that Mr. Barrett expressed remorse for his crimes.

By refusing Mr. Barrett's attempts to present evidence of his contemporaneous expressions of remorse, the Court prevented Mr. Barrett from proving the existence of this factor in mitigation.  In fact, Mr. Barrett's expressions of remorse were highly relevant and admissible.  Remorse is an important mitigating factor.  This is particularly true when, as in this case, the Government emphasized the lack of remorse in closing argument.

The court's error in excluding this evidence prejudiced Mr. Barrett.  Had Mr. Barrett been allowed to present this evidence, there is a substantial probability that he would not have been sentenced to death.  The court clearly erred in excluding this evidence, because the rules of evidence, with respect to the introduction of both mitigating and aggravating evidence, do not apply in the sentencing stage of a capital case.  21 U.S.C. section 848(j), in effect at the time of Mr. Barrett's trial, states that any other information a party may want to submit is not constrained by the rules of evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice.  Because a defendant must be allowed under the Eighth Amendment to introduce any relevant mitigating evidence, it beggars the imagination to believe that

expressions of remorse are more prejudicial than probative. The court excluded highly relevant mitigating evidence of remorse, which opened the door for the Government to prejudicially deride Mr. Barrett as a cold blooded killer who wanted to take out more cops.

Appellate counsel were ineffective for failing to raise this issue, clearly framed by the record, on direct appeal. Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded. There could be no reasonable strategy for neglecting to raise this issue. There is a reasonable probability that had it been raised, the outcome of the appeal would have been different.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)     **Direct Appeal of Ground Six:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐     No ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal because it pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)     **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes   ☐      No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes   ☐      No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes   ☐      No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND SEVEN**

> **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification**.

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the U.S. Marshal to place visible restraints on Mr. Barrett during the trial without a finding that Mr. Barrett was or would be a security risk. Throughout the trial Mr. Barrett was forced to wear a "stun belt" around his waist.  The belt left an unusual bulge that was visible through Mr. Barrett's clothing.  The marshals' ability to send an electric shock through the belt intimidated Mr. Barrett and posed a danger to him that impaired his ability fully to observe and participate in the trial, including communicating with his attorneys.

During a sealed hearing held August 31, 2005, a deputy U.S. Marshal testified that there were never any problems with Mr. Barrett acting out or showing any signs of being a risk of danger or escape.  The Court opined that the mere fact that a stun belt had been used against other capital defendants without their lawyers complaining was a ground to permit its use.  Mr.

Barrett had been through two previous capital trials related to the same events and during that time never posed any security risk or risk of escape. In sum, none of the constitutionally required circumstances existed to justify placing visible and/or intimidating restraints on Mr. Barrett during trial.

On September 9, 2005, the Court abdicated its role and consigned the question of whether to place restraints on Mr. Barrett to the discretion of the U.S. Marshal Service. This ruling, in addition to violating the constitutional rights mentioned above, violated Mr. Barrett's right to a fair and impartial trial judge. *See also* Ground One.

In an *ex parte* hearing outside the presence of defense counsel, the trial judge stated that "probably any capital case where I was the presiding judge a stun belt would be used just because of the nature of the potential punishment. It just seems that it's a common – almost a common sense call under those circumstances." (Tr/ 9/13/05 ex parte Hr'g at 13.) The Supreme Court requires much more than a "common sense call" before a defendant can be restrained in the fashion Mr. Barrett was.

The stun belt created a visible bulge in Mr. Barrett's clothing that was observable by the jury. (Exhibit 80.) In addition, Mr. Barrett was known by the Government and Court to be a victim of violent abuse by Sheriff Johnny Philpot and his deputy. Indeed, the jury found that Mr. Barrett had suffered abuse from Philpot. The Government and Court also were aware that Mr. Barrett had been beaten and threatened by law enforcement officers for his role in the death of David Eales. Under the circumstances it was reasonable for Mr. Barrett to fear that he would be stunned by the marshals on the slightest perceived provocation, and as this issue was raised by trial counsel, the Court was aware that the stun belt would inhibit Mr. Barrett's movements and

communications with counsel in court. After all, he was to be restrained even though the marshals admitted he had never caused them any trouble.

Trial counsel informed the court that Mr. Barrett was at special risk from the stun belt due to conductive steel wire in his chest and abdomen area. (Tr. 9/9/05 Hr'g at 27.) (Trial counsel's statement at this hearing reveals that three days before the trial began trial counsel Hilfiger had not reviewed Mr. Barrett's medical records which clearly mention – and in the case of x-rays, depict – the metal wires in Mr. Barrett's chest.) Trial counsel's statements informed the court that Mr. Barrett was especially fearful of the stun belt and the danger it posed to him. This fear was exacerbated by the marshal's failure to conduct or inquire about Mr. Barrett's unique medical circumstances. Since the trial, trial counsel have confirmed that Mr. Barrett felt intimidated wearing the stun belt throughout the trial. (Exhibit 29.)

The unjustified use of restraints on Mr. Barrett inhibited his movement and communications with counsel and made him appear dangerous to jurors. The stun belt scared and intimidated Mr. Barrett and chilled his communications, and restricted his ability fully to observe and participate in the proceedings.

To the extent the stun belt was used without sufficient justification, its use was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance. The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt. In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness. Therefore, there is a reasonable probability that Mr.

Barrett would have been granted a new trial if the issue had been raised on direct appeal.  *See* Ground Eighteen, *infra*.

To the extent the record was insufficiently developed for this claim to have been raised on direct appeal, trial counsel's performance was deficient.  Counsel recognized the serious danger for prejudice and continued to object on September 9, 2005, when the Court gave the marshal discretion to restrain Mr. Barrett without either the prerequisite legal or medical showings of necessity or safety.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Seven:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

     Yes ☐       No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

     Yes ☐       No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

     Yes ☐       No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND EIGHT**

> **Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**.

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and the exhibits thereto.

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Mr. Barrett was tried, convicted and sentenced to death when he was in fact mentally incompetent to stand trial.

The factual allegations set forth in more detail in Grounds Two and Thirteen, and incorporated by this reference as though fully set forth; and the supporting documentary and record evidence submitted with and/or incorporated by reference into this petition irrefutably demonstrates that Mr. Barrett was incompetent as a matter of clinical and medical fact at all stages of the trial proceedings.   At the time of his trial, Mr. Barrett had a documented psychiatric history, including medical diagnosis of Bipolar Disorder, a serious mental illness known to produce "bizarre behavior," impair judgment and distort perceptions.  Mr. Barrett was

involuntarily committed to psychiatric hospitals on two occasions and forcibly treated with antipsychotic medication.

In the months preceding Mr. Barrett's arrest, he was psychiatrically decompensating, and his disordered thinking became increasingly paranoid and delusional as he became preoccupied with the distorted belief that he was being monitored by some form of unknown aircraft; and withdrew to his rundown shack, unable to venture into the outside world. Mr. Barrett's mental state was further impaired by brain damage, particularly in the areas that are necessary to reason, exercise sound judgment and inhibit overreaction to stress situations. Neuropsychological assessment of Mr. Barrett by Dr. Myla Young has revealed that prior to and throughout Mr. Barrett's trial, he suffered brain dysfunction that seriously disrupted his executive functioning, compromising his ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior; screen out interference and sustain attention; inhibit reflexive responses and return to ongoing activity; efficiently integrate multiple outputs; oversee the selection of verbal and non-verbal processing mechanisms; regulate emotional control; direct motor output; and adequately process and make use of new information.   (Exhibit 89 at ¶¶ 36-38;  Exhibit 117 at ¶¶ 57-58.)

George W. Woods, Jr., M.D., a clinical and forensic psychiatrist, has concluded that Mr. Barrett was incompetent at the time of trial, based on Dr. Woods's review of extensive life history and medical data, his clinical evaluation of Mr. Barrett in February 2009, and his consideration of Mr. Barrett's psychiatric diagnosis of Bipolar Disorder and Post Traumatic Stress Disorder (PTSD), as well as the neuropsychological findings of Dr. Young.  In Dr. Woods's expert medical opinion, Mr. Barrett was unable rationally to assist his attorneys in the

preparation of his trial due to a confluence of his psychiatric disorders (Bipolar Disorder and PTSD) and his neurocognitive dysfunction resulting from his brain damage.  (Exhibit 117 at ¶ 81.)  The distorting and distracting effects of the PTSD were exacerbated by "built-in reminders," in the form of bullet fragments that caused Mr. Barrett continual and significant pain, and an immunological reaction he had to the bullet fragments in his body. (Exhibit 117 at ¶ 79.)  In turn, Mr. Barrett's ability to rationally perceive and attend to legal proceedings was significantly compromised by the racing thoughts indicative of the disabling "manic form" of Bipolar Disorder.  (Exhibit 117 at ¶ 80.)  These disabling impacts on Mr. Barrett's mental state were synergistically increased by the effect of his brain damage to produce a "ruminative" thought process, which caused Mr. Barrett to be "unable to get unstuck."  (Exhibit 117, at ¶ 80.)  This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings.  (Exhibit 117 at ¶¶ 59, 80.)

As discussed more fully in Ground Thirteen, the trial record reflects the functional impacts of Mr. Barrett's cluster of impairments.  Mr. Barrett could not regulate his verbal output or emotional control after he became agitated by some aspect of the prosecutor's closing argument.  His involuntary remarks were heard by persons in the courtroom, and his reflexive motoric reaction of attempting to stand prompted intervention by the courtroom marshals.  Once contained and redirected, Mr. Barrett was escorted from the courtroom without further incident. Mr. Barrett's uncontrolled behaviors, however, disrupted the proceedings and likely had a deleterious effect on the jury's deliberations.  Mr. Barrett's reflexive, self-harming comments and actions occurred without regard to social context or the damage they threatened to inflict on his case, and demonstrate that he was unable rationally to assist with his defense.  Because such

behaviors were the product of Mr. Barrett's mental diseases and defects, he was incompetent to stand trial.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Eight:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

       Yes   ☐        No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

       Yes   ☐        No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

       Yes   ☐        No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND NINE**

> **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel Were Ineffective for Failing to Raise this Issue.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

At Mr. Barrett's trial, both the prosecution and the defense requested that the trial court instruct on voluntary manslaughter.  (R. 4212, 4213, 4215, 4218-19.  18 U.S.C. § 1112.) The United States Attorney conceded there was evidence in the record that raised this lesser offense, because testimony indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's actions in firing on the vehicle could be seen as an imperfect form of self-defense or defense of another, reducing the crime to voluntary manslaughter.  Consistent with the reasoning behind the authority applicable to this issue, the prosecutor stated that because this was a capital case, caution dictated a lesser included-offense instruction be given.  The United States Attorney distinguished count 3 from counts 1 and 2 (which in essence charged felony murder), because count 3 had a specific knowledge and intent element.  To be guilty of count 3, Mr. Barrett had to have more than the intent required to commit an underlying felony, which alone would supply the necessary intent for first degree murder in the usual felony murder case.  As suggested by the Government, and as the court ultimately instructed the jury, to be guilty of count 3, the Government was required to prove

beyond a reasonable doubt that Mr. Barrett intentionally killed Trooper Eales, knowing or having reason to know he was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties. (R. 4215-19, *See also,* Doc. 240, first stage jury instructions; R. 4262-63, elements of count 3.) The court declined to instruct on voluntary manslaughter, ruling the case came down to "murder one or nothing." (R. 4211, 4222.)

In Mr. Barrett's case, the element or elements distinguishing the greater and lesser offenses were in dispute. The crux of the whole case was knowledge and intent. The Government contended Mr. Barrett intentionally killed Trooper Eales knowing or having reason to know he was a law enforcement officer engaged in the performance of his official duties, and on account of the performance of those duties. The defense theory was that when Mr. Barrett saw an ordinary, unmarked vehicle he had no idea contained police officers speed toward his house and his son, Toby, he reacted out of fear and fired. This circumstance, while perhaps not justifying the use of deadly force, would have aroused a "heat of passion" in any ordinary individual.

Mr. Barrett also contends, as was discussed in Ground Two, that a voluntary manslaughter instruction was appropriate as a lesser-included offense for Counts 1 and 2. Although these were "straight" felony murder counts, heat of passion negates the element of malice, however it is defined. When one kills in a heat of passion, that act and the mental state underlying it removes the act from being committed in the course or in furtherance of the commission of a felony, which supplies the intent or malice element for felony murder.

As set forth in Ground Eighteen, *infra*, appellate counsel were ineffective for failing to raise this issue on appeal, particularly insofar as the error was conceded by the

Government at trial, appellate counsel were well aware that Mr. Barrett had been convicted of manslaughter in state court, and the factual basis for Mr. Barrett's federal court defense was the same as it was in state court.  (Exhibit 29.)

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Nine:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐      No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐      No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

    Yes   ☐         No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes   ☐         No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes   ☐         No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND TEN**

> **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor.**

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

On September 26, 2005, the court entered an order that Mr. Barrett could not rely upon the prior proceedings in mitigation because they were not relevant to the circumstances of the offense, (Tr. 9/26/05 Hr'g at 10-11), and could not rely upon residual doubt as a mitigating circumstance. *Id.* at 11.  This ruling compounded the trial court's prior rulings impairing the defense's ability to cross-examine prosecution witnesses with testimony given in the second state-court trial.

During the penalty phase conference on jury instructions, the court asked whether either party objected to leaving out a residual doubt instruction.  (R. 5288.)  Mr. Hilfiger stated that he did not object.  (R. 5289.)  This omission was professionally unreasonable.

Mr. Barrett's defense counsel were aware that two prior juries had sufficient doubts about his culpability that they either could not reach a unanimous verdict or rejected first-degree murder liability.  The principal difference between those trials and the federal trial was the testimony of seven informants, each of whom was impeached, to a limited and ineffective degree, on cross-examination.  As argued elsewhere in this Petition, if trial counsel had

conducted a reasonable investigation, and/or the Government had complied with its constitutional obligation to disclose exculpatory evidence, further impeachment would have been presented. Regardless of those constitutional violations, trial counsel's failure to seek a residual doubt instruction at the penalty phase denied Mr. Barrett his constitutional right to have the jury consider in their sentencing deliberations whatever value there was in the first stage cross-examination of the informants.

Mr. Barrett had a constitutionally protected right to introduce evidence, and have the jury give mitigating effect to evidence, that tended to cast doubt on the Government's theory of the manner in which the crime occurred. The trial ruling excluding such evidence treated the issue as one of guilt or innocence. Professionally diligent counsel would have pointed out that the evidence of the prior conviction showed that a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings.

Trial counsel were on notice that courts in other federal death penalty cases, as well as state courts, had held that residual doubt is a valid mitigation circumstance. Trial counsel received from Federal Death Penalty Resource Counsel lists of cases that included references to cases in which residual doubt was considered in mitigation, and where the defendant received a sentence less than death.

Capital juries are called upon to express the community's reasoned moral response to the crime. Knowledge that two prior juries had been unconvinced that the crime was committed in a manner consistent with capital murder would have been important to the federal jury's ability to perform this function.

Attorneys acting in a manner consistent with prevailing professional norms would have argued to the court that evidence of the prior jury's conclusion was relevant to the defense evidence presented in the first stage of trial. For example, during some of their cross-examination, trial counsel attempted to show the jury that nearly all the Government's informant witnesses who provided evidence of malice aforethought had not come forth with their claims during the previous six years of investigation and litigation. (R. 481, testimony of Travis Crawford; R. 3128, testimony of Karen Real.) Reasonably diligent defense counsel would have argued that these witnesses' testimony was an insufficiently reliable foundation for a death sentence, and informed the jury that another jury representing the community had concluded, without those witnesses' testimony, that the death of Trooper Eales was not caused in a capitally culpable manner.

To the extent the trial ruling excluding consideration of residual doubts about the manner in which the offense occurred was based upon trial counsel proffering sufficient evidence to call into question the reliability of the Government's evidence, the ruling was based on trial counsel's unreasonable failure to investigate the informant witnesses and/or the Government's misconduct in withholding impeachment evidence and/or limiting defense counsel's access to the witnesses as alleged elsewhere in this motion.

Compounding the error, the court gave a bizarre instruction telling the jury residual or lingering doubt about Mr. Barrett's guilt was not a mitigating factor, that it was bound by its first stage verdict, that it could not speculate on the reasons for the verdict in Sequoyah County, and that the sentence in that case could only be considered for any mitigating effect it

might have on the sentence in the federal proceedings.  (Doc. 257, Instruction No. 19, R. 5320-21.)

For similar reasons, direct appeal counsel were professionally unreasonable for failing to raise this issue on direct appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Ten:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐       No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐       No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the

Page 344

judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐        No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐        No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐        No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND ELEVEN**

> **Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option. Appellate Counsel Were Ineffective for Failing to Raise this Issue on Direct Appeal.**

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and argument made in his original, corrected and amended petitions previously filed, and exhibits thereto.

Juror 62 was improperly excused for cause by the court solely because of her conscientious scruples against the death penalty, not because she would be prevented or substantially impaired from considering it, even though it might do violence to her conscience, and even though it might be difficult.

Asked by the court if she had any opinions about the death penalty, Juror 62 responded, "I don't – I could not do it.  I could not say anybody to be sentenced to death."  Asked if she meant by this that she could not personally carry out an execution, the juror stated, "I couldn't even say they deserve it, no.  I don't believe in it."  The juror stated she could impose a life sentence and had no philosophical, religious, moral or other objections to such a sentence, and said, "Yes, I do[]" when asked whether she had such objections that would "prevent [her] from considering the imposition of a death sentence[.]" (R. Individual jury selection, 819-21.)

Questioned by defense counsel, the juror said that she had held her views on the death penalty her whole adult life.  Defense counsel informed her that in order to be qualified to sit on a capital case, she would have to consider not only evidence in mitigation, but the

Government's evidence as to why the death penalty should be imposed and to give that evidence "due consideration."  Asked if she would be able to do this, the juror responded:

> Well, I don't know if I understand your question, but I could listen to that and see whether he needs to either have the death penalty or go to prison for life without parole.

(R. individual jury selection 823-24.)

Again asked, in a slightly different way, whether she could listen to the evidence in aggravation and mitigation, and weigh the evidence, she said she "could probably say he needed to or should," as long as the responsibility lay elsewhere, "but I could not say that he – myself, that he needs the death penalty."  The juror answered "No[]" when asked if she could imagine a murder so heinous that she could "find for the death penalty" after "having considered the Government's evidence[.]" (R. individual jury selection 824-25.)

Questioned briefly by the Government, the juror was asked if she could sign her name to a death verdict form "knowing that the result of that verdict would be the death by execution of another human being, the defendant in this case[.]" The juror responded that if she thought the crime "deserved it," she "probably could sign a paper saying that he should get the death penalty, but I couldn't say to do it.  I could not sign a paper that says the death penalty for him."  Told by the prosecutor that a jury's death verdict was not just a recommendation, and that the judge could not change the verdict, the juror said, "I could not do that, huh-uh."  (R. individual jury selection 825-26.)

The court asked additional death-qualification questions of the juror:

Q.        ... If I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your

personal opinions about the death penalty so strong that you would not be able to follow my instructions?

A.    If you told me I had to, I would do it, because that's my duty, but I would probably live with it for the rest of my life.  But if you told me I had to do it, and I thought that he actually – the crime was so heinous that he should have the death penalty, because I was instructed to do it, and I thought it was, I could do it.  I would do it.  But I do not – I would live –

Q.    So you understand, I realize that no one, probably, if they were asked, wants to serve on the jury where that's a possibility.

A.    I understand that.

Q.    And – but if you were selected – otherwise selected as a juror, would you be willing to put your, what I know are strong, personal beliefs aside, and fairly consider the imposition of the death penalty?

A.    I would consider it, yes.

Q.    And, of course, when you say "consider it," couched in the – in the history of how you've answered these questions, it prompts me to say: Would you consider it fairly?  I mean, in this case, the first thing that would have to happen, before we got to even a sentencing stage, is there would have to be a finding –

A.    Right.

Q.    – that justified – I wouldn't turn the case over to you for sentencing until there had been a conviction for murder that, under the law,  justified either death or imprisonment for life without the possibility of release.  So, under those circumstances, then the Government would have to follow through with their obligation and put on aggravating factors.  And aggravating factors are those factors that would suggest that death is the appropriate punishment.  Then the defendant would have the opportunity to put on what's called mitigating factors.  And as a juror, you'd be obligated to not exactly balance them, but give serious consideration to whether or not the Government had put on sufficient aggravation, when compared to the mitigation, for you to arrive at a death penalty.  So, do you think you could do that?

A.    I think I could.  It would be very hard for me to do that, but if it was my duty.

Q.      Well, I think when you say it would be – that encourages me, because you say it would be very hard. I agree. I don't disagree with that. It will be very hard. I mean, the people who end up sitting as jurors in any case, but particularly in this case, it's going to be very hard.

A.      Uh-huh.

Q.      And it should be very hard.

(R. individual jury selection 826-28.)

Before turning the floor over for additional questions by counsel, the court asked the juror if she could consider life without the possibility of release, to which the juror responded, "Definitely. I could do that." (R. individual jury selection 828-29.)

Defense counsel had no additional questions for Juror 62. (R. individual jury selection 829.) Questioned again by the Government, the juror stated she realized the judge would never tell her what decision to make. Asked if, considering the two penalty options, she would "take life as the more comfortable out, given [her] feelings about the death penalty[]," the juror said she would "take life, but it wouldn't be comfortable. I would still take life in prison, yes." (R. individual jury selection 829-30.) Asked if she could ever envision a situation in which "[she] would sign [her] name to a death verdict?", the juror responded:

If the judge told me that that was my options, either the death or – the death penalty and – I would do that, yes. That would be my duty. I'm here, and that

would be what I'm here for. But I couldn't live with it, but I would do that, yes.

(R. individual jury selection 830.)

The juror again stated she understood the court would not tell her what sentence to impose. The Government then asked not whether the juror could simply consider both punishment options, but whether she was "capable for returning a death verdict for this

defendant[]," to which the juror understandably replied, "I don't know whether I could or not."

Again going to the ultimate issue of whether the juror would actually vote to impose the death

penalty, given a choice between life and death, the juror was asked if she could "imagine a

circumstance in which you would ever impose a death penalty[,]" to which the juror said "No."

(R. individual jury selection 830-31.) Mining the same subject – not merely whether the juror

could consider death as a punishment option, but whether she could "ever return a death penalty

unless the judge told you, you had to[,]"– the juror responded that she probably could, but could

not predict her vote in advance:

> I think I would have to hear what he has done and how heinous it was and all of
> this. And I have a – something personal in my life, that happened to me, and I
> could not, you know – had no remorse about it. So, I don't know how I would
> react, but I – you know, since this has never – I've never had this or have to think
> about, I just always thought I could never do this. But I think that if it was so bad
> that I think this person should not even be here anymore, I possibly could do that.
> Now, I can't say that I would – you know – I – I – my mind can always be
> changed, but it has to be changed to where I understand it. So, I thought – if he
> deserved it, I – I probably – I think I probably could, but I – I'm only human.

(R. individual jury selection 831-32.)

Yet again going beyond whether the juror could consider the death penalty, the

prosecutor asked her in effect "how bad it would have to be" before she voted for the death

penalty, to which the juror responded, "It would have to be pretty bad." In response to the

prosecutor's question regarding what she meant, the juror gave the example of killing or torturing

a child, but she "couldn't tell you how bad it would have to be." (R., individual jury selection

832.)

Unsatisfied still, the prosecutor continued without court interference (or objection)

to harangue the juror with whether, and under what precise circumstances, she could actually

Page 350

vote to impose the death penalty.  Juror 62 responded reasonably that everything would depend on the facts, but gave every indication that she could consider both penalties, despite her personal views on capital punishment:

> Q.  All right.  Other than torture to a child or something – other than torture to a child, can you imagine a circumstance in which you'd return a death verdict?
>
> A.  I never heard anything so heinous that I even had to think about it.  But I would have to give it a lot of thought.  But I'm – I'm just – I cannot lie to you. I would have to say that I would not know until I'm in that situation.
>
> Q.  Okay.  Well, at the end of the day –
>
> A.  Okay.
>
> Q.  – are your feelings such that you would really be substantially impaired in serving as a juror in a case where you might be asked to vote in favor of a death penalty?
>
> A.  Like I say, it depends on what he has done and how bad I think it is.   And I'd have to weigh all of the things – I cannot say yes nor can I say no.  I would think that – I would think that I am just enough to know that if this is what it is, and I think he deserves it, I probably could sign, yes.  But I'd have to really decide for myself – you know, I'd have to hear it.  I can't say no, I'll just go in here and sign it.  I'd have to see how bad it is.  And it would have to be really bad.

(R., individual jury selection 832-33.)

The United States Attorney then had the temerity to tell the juror that he could not "try the case for you today," detailing the facts of the case so as to inquire whether, on those facts, they would be "bad enough" for her to return the death penalty, even though he asked her repeatedly to commit in advance to signing a death verdict.  (R. individual jury selection 833-34.) Worn down by repeated questioning on whether she could not just consider both punishment options, but could put her name to a death verdict, the juror, again very reasonably in light of the

400

fact she had heard no evidence, said, "Well, let me just say no, then.  Because, you know, I would have to say no right now.  I know no other thing except to say no, I could not sign it."  (R., individual jury selection 834.)

Continuing the seemingly endless round-robin, the court again inquired of Juror 62 whether she could set her personal views aside and follow the court's sentencing instructions:

> Q.   ... But if I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions – and I want to repeat those – if they are, tell me – your personal opinions about the death penalty, are they so strong that you would not be able to follow the instructions?
>
> A.   Well, I have to say it again, it's my duty to do this or not to do this, but if you told me that that was one or the other, and I thought he deserved the death penalty, I would have to – I think I could sign the death penalty, if I listened to the information and that it was bad enough, I – and you told me that this was my duty and that this – I probably could sign the death penalty.
>
> Q.   And could you, likewise, consider the possible imposition of life imprisonment without the possibility of release?
>
> A.   Certainly could.

(R., individual jury selection 835-36.)

Defense counsel argued the juror was qualified, and had in fact "backed off her initial stance" when questioned by the Government.  (R., individual jury selection 838.) The Government moved to excuse Juror 62 for cause, arguing that she answered "three or four questions in the right direction, under significant pressure."  (Left unsaid, of course, was that any pressure applied to the juror came from Mr. Sperling himself, rather than defense counsel or, for that matter, the court.)  Yet again focusing on the irrelevant inquiry whether the juror could commit ahead of time to voting for death, the Government maintained the juror was

"substantially impaired," because a murder would have to be "really heinous" before she would vote for death. The court agreed with the Government that the juror was "substantially impaired" and excused her for cause, over objection by defense counsel. (R. individual jury selection 838-40.) The excusal for cause of Juror 62 was improper.

The excusal of Juror 62 was not raised on direct appeal, even though the error was plainly apparent from the record. There was no reasonable strategic ground for omitting this argument. Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b) **Direct Appeal of Ground Eleven:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal due to ineffective assistance of appellate counsel, a matter which is appropriately addressed in the first instance in these collateral proceedings.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐          No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐          No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐          No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

Page 354

**GROUND TWELVE**

> **The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue**.

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows.  Although this court instructed the jury that it must determine whether the government had proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors.  The jury was provided with the following penalty phase instruction regarding the weighing process:

> As to Count Three, you must find first the Defendant was at least 18 years of age at the time he committed the offense; and second, the Government has proven beyond a reasonable doubt the existence of the threshold eligibility factor; and third, the existence of at least one statutory aggravating factor; and fourth, that the threshold eligibility factor plus the statutory aggravating factor or factors which you have found to exist sufficiently outweigh any mitigating factor or factors which you found to exist are [*sic*] in the absence of the mitigating factor or factors alone are sufficient to justify imposition of a sentence of death.

(R. 4502.)

The instruction falls short of the requirements of the United States Constitution, which require that the jurors be instructed that they may only impose a sentence of death if they

404

are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that the death penalty is justified and that death is the appropriate penalty to be imposed under all the circumstances.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel. Their performance fell far below the standards expected of competent counsel in capital cases. Moreover, had counsel requested an appropriate instruction on this issue, there is a substantial probability that Mr. Barrett would not have been sentenced to death. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial. *See* Ground Eighteen, *infra*.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)     **Direct Appeal of Ground Twelve:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐     No ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal because it pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐      No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended

motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other

issues raised herein are not successor or second and subsequent collateral attacks on the

judgments of conviction and sentences; this issue is properly before the court in a "first" post-

conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes   ☐      No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes   ☐      No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes   ☐      No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THIRTEEN**

**Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, and allegations made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and argument made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The facts in support of this claim, among others to be presented after further investigation, discovery, access to subpoena power, and an evidentiary hearing, include the following:

During the prosecutor's penalty phase closing argument in the jury's presence, Mr. Barrett impulsively made audible remarks and began to rise from his chair so that he could leave the courtroom.  The marshals restrained him and asked the judge if Mr. Barrett should be removed.  The court said yes.  (R. 5421.)  Two to three marshals then took Mr. Barrett from the courtroom, and the prosecutor concluded his closing argument.  The court sent the jury out.  (R. 5429.)  The court then held a hearing with counsel but without Mr. Barrett present to discuss whether it should instruct the jury about Mr. Barrett's removal from the court room.  (R. 5430.)

The court described the incident in the following way:

> Before the recess and during the closing moments of U.S. Attorney Sperling's closing remarks, the Court first heard the Defendant say words to the effect: Sperling, leave my family out of this. He said something other than that I could not detect. And then I saw the Defendant come out of his chair and make what appeared to the Court to be an effort to get up. I can't say that he was attempting to come out across the table but he did attempt to get up and take a step. As a result of that, it was necessary for the U.S. Marshals to restrain him and take him from the courtroom. I will say that once the marshals made contact with the Defendant, he ceased – there ceased to be any struggle and he was removed from the courtroom without further activity in front of the jury.

(R. 5430.)

Mr. Hilfiger stated that the words Mr. Barrett said which the court did not hear were Mr. Barrett asking why the court and Government did not permit the jury to hear about his statements to law enforcement. (R. 5431.) Mr. Hilfiger also corrected the court's description by saying Mr. Barrett

> was not making an aggressive move toward anybody. What he was saying is I want to get out of courtroom [*sic*]. Take me out of the courtroom. I don't want to be here. And then the marshals, you know, asked you if they could take him out. Before that they were trying to put him back down in the chair. His move as I saw at that point was he was saying, you know, take me out of the courtroom. I want to get out of here. It wasn't an aggressive move towards anybody, just he wanted to get out.

(R. 5432.)

Mr. Hilfiger then stated that Mr. Barrett personally did not want a curative instruction and did not "want to participate in the court proceeding now." (R. 5432.)

According to the prosecutor, a deputy marshal "indicated or asked the Court do you want us to take him out and you [the Court] said yes. And at about that same time, the Defendant indicated he also wanted to leave." (R. 5433.)

The court confirmed that it ordered Mr. Barrett removed from the courtroom, and added that Mr. Barrett "was removed from the courtroom by two or three deputy marshals." (R. 5433-34.)

The Government asserted that the court "should make specific inquiry of the Defendant." (R. 5434.)

Mr. Hilfiger requested no instructions. (R. 5434.) When the court read its proposed instruction, Mr. Hilfiger stated, "I don't really care one way or the other. I don't object, I don't approve." (R. 5435.)

Mr. Hilfiger and Mr. Smith described that in their past interactions with Mr. Barrett, they observed him get upset then calm down and discuss matters. (R. 5436-37.) They recommended that his alleged desires regarding presence in court be revisited. *Ibid*. However, when the court offered them the opportunity to revisit the issue with Mr. Barrett before the court ruled, Mr. Hilfiger declined. (R. 5437.) Trial counsel did not have a private conversation with Mr. Barrett about the incident or his presence; they spoke to him in the presence of a deputy U.S. marshal. (R. 5437.)

The court ordered Mr. Barrett placed in "minimum restraints." (R. 5438.) The court asserted that an unidentified deputy marshal "brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems." (R. 5438.)

Thereafter, Mr. Barrett's counsel requested to speak with him. (R. 5438.)

Mr. Barrett was brought into the courtroom, and the following took place:

> Mr. Barrett, I asked the marshal to bring you up because you have a right to be
> present in court during all proceedings. I've been advised by both of your
> attorneys that you advised them you did not desire to be here in any further

proceedings; is that correct?

Mr. Barrett:    Yes, Your Honor.

The Court:    Do you have any questions of the Court about that?

Mr. Barrett:    No, sir.

The Court:    I'll ask the marshal to return – (Interrupted)

Mr. Hilfiger:    One more.  Does that include the verdict?

Mr. Barrett:    Yes, Your Honor.

The Court:    Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

Mr. Barrett:    Yes, sir.

(R. 5439.)

Mr. Barrett was escorted out, and the jury escorted in.  (R. 5439.)

The court read the following instruction to the jury:

Members of the jury, you are instructed that neither the Defendant's conduct nor his statements during closing arguments are evidence in this case and you should not consider them in rendering your verdict herein.

(R. 5440.)

Mr. Barrett was absent for the jury instructions, (R. 5440-45), and for the reading of the jury's verdict.  (R. 5448-50.)

Prevailing professional norms of criminal defense practice advise counsel to maintain close contact with the defendant in order to develop trust, (1 ABA Standards for Criminal Justice, Criminal Defense Function 4-3.1 and commentary (2nd ed. 1986)), and to "advise the accused with complete candor concerning all aspects of the case, including a candid

Page 361

estimate of the probable outcome." *(Id.*, Standard 4-5.1.) One reason for this professional norm is "to keep the client from making suicidal choices about the case." (ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.2, commentary (Feb. 1989 ed.)). Mr. Barrett's counsel failed to follow these fundamental practices and, as a result, the jury was given a false impression of Mr. Barrett, and Mr. Barrett was denied his right to be present during trial.

Mr. Barrett's trial counsel unreasonably failed to conduct a thorough investigation of his background, including his mental health problems. *See* Ground Two, *supra*. Nevertheless, Mr. Barrett's counsel knew, or reasonably should have known, (a) that Mr. Barrett had attempted suicide in the past; (b) that Mr. Barrett had been diagnosed with depression and bipolar disorder; (c) that Mr. Barrett had been prescribed medications for these conditions; (d) that Mr. Barrett was not being given medication at the time of trial; (e) that Mr. Barrett was suffering the effects of steroids. Reasonably diligent counsel, informed about their client's condition, would have taken steps to obtain a competent mental health evaluation and judicial determination of the medical necessity for the drug regimen Mr. Barrett was being administered; the medical appropriateness of discontinuing his psychotropic medications; whether Mr. Barrett had psychiatrically decompensated since the termination of the medications; and the nature and severity of the functional impact of discontinuing and/or administering any medication on his ability to communicate and cooperate with counsel and on his affect and appearance before the jury.

In the face of a judicial determination that the drug regimen to which Mr. Barrett was subjected was justified by medical necessity, reasonably diligent counsel would have sought a further medical and legal determination of the degree to which the effects of such a regimen

interfered with Mr. Barrett's ability to participate in trial proceedings, including any distortion or alteration of his demeanor, affect and presentation in front of the jury; his attitude toward participating in the proceedings; his ability to endure the disclosure and/or discussion of sensitive information; his capacity to understand his rights and make informed decisions regarding the exercise of waiver of such rights; and his ability and willingness to communicate and cooperate with counsel.

In the event the trial court made a judicial determination that Mr. Barrett's medication regimen was justified and that he was competent to proceed with trial, reasonably diligent counsel would have taken all steps necessary to prevent any untoward scenes in front of the jury, for example, by seeking appropriate medications and counseling Mr. Barrett regarding the prosecutor's likely arguments and preparing him for them. If Mr. Barrett nonetheless acted inappropriately to his potential detriment in front of the jury, reasonably diligent counsel would have renewed the request for a medical evaluation and determination of the necessity for and functional impact of the medication regimen, as well as an assessment of Mr. Barrett's adjudicatory competency.

Mr. Barrett's counsel failed to gather medical records of his medical treatment in jail during the trial and/or failed to provide those records to a competent mental health or other medical expert retained by the defense. Had trial counsel conducted a reasonable inquiry, they would have known that Mr. Barrett had been injected with steroids in jail. If counsel had developed the relationship of trust required in criminal cases, counsel would have been aware that the steroids had a medically predictable effect that contraindicated their use with defendants

who were on trial, and impaired Mr. Barrett's capacity to control his inability to endure any psychological or emotional distress that might be caused by the prosecutor's arguments.

Due to the actions of jailers and the unreasonable omissions of Mr. Barrett's trial counsel, the jury was permitted to see him under the effects of steroids and without the benefit of medication deemed medically necessary to control the emotional dysregulation caused by his bipolar disorder.

Trial counsel's failings and the trial court's denial of authorization for counsel to obtain necessary and appropriate mental health assistance, including the assistance of a psychiatrist, individually and cumulatively deprived Mr. Barrett of his right not to be tried while his functioning was altered and impaired by the effects of voluntarily or involuntarily administered or discontinued medication, and/or while his functioning was altered and impaired by the effects of a medication regimen that was unjustified by any medical necessity. *See* Grounds One, Two and Three, *supra*.

Mr. Barrett's periodically altered mental condition, the ineffectiveness of his attorneys, and the unlawful actions of the court and marshals, also resulted in the denial of his right to be present during the close of the penalty trial. The trial court's order – which the court initially did not reveal on the record – that marshals remove Mr. Barrett without warning did not comport with the requirements of law. (R. 5430, 5433-34.)

Whether the defense sought or objected to an instruction from the court regarding Mr. Barrett's actions was the "exclusive province" of counsel. (ABA Standard 4-5.2(c).) As reflected in counsel's statements on the record, Mr. Barrett's counsel unreasonably failed to give the matter sufficient thought to determine whether an instruction was desirable or not. (R. 5435.)

Page 364

Counsel unreasonably failed to consider whether an instruction that the jury should disregard the marshal's action in removing Mr. Barrett from the courtroom would have mitigated the prejudice of the jury having witnessed him being forcibly removed.

The willingness of Mr. Barrett's counsel and the trial court to let Mr. Barrett be absent from court during the remainder of the prosecutor's argument, the court's instructions, and the reading of the penalty phase verdict violated Mr. Barrett's constitutional rights.

Trial counsel's performance was ineffective because they allowed him to absent himself from the courtroom during critical stages (closing argument, jury instructions, and the reading of the penalty phase verdict) without ensuring that he was making an informed, knowing and intelligent decision.

The error in allowing Mr. Barrett's absence was not harmless. In his absence, factual matters were discussed, namely what he purportedly said and did that caused the marshal to remove him. His presence would have contributed to the fairness of the proceeding because Mr. Barrett could have advised his counsel about the facts. Here, defense counsel was present, but refused to take a position on the court's proposed jury instruction. "I really don't care one way or the other." (R. 5435.) Had Mr. Barrett been present, he could have consulted with counsel about the proposed jury instruction.

Among the most prejudicial inferences affecting the jury's penalty determination, Mr. Barrett's apparent voluntary withdrawal from the proceedings likely conveyed a misleading sense of indifference to the outcome of the trial, callous disregard for the seriousness of the questions facing the jury, and even lack of remorse. Similarly, any jurors who had been focused on the prosecutor before observing the marshals restraining and removing Mr. Barrett may have

414

concluded prejudicially that the marshals acted in response to Mr. Barrett's threatening behavior toward someone in the courtroom or an attempt to escape.

Mr. Barrett's trial counsel acted unreasonably (a) by failing to object to the additional restraints; (b) by failing to object to the choice the court gave Mr. Barrett (be present in unlawful restraints or absent); (c) by failing to consult mental health or other medical experts regarding Mr. Barrett's condition, including his competence to make a valid waiver; (d) by failing to raise a doubt about Mr. Barrett's competence; (e) by failing to seek a hearing on his competence and/or the effects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (f) by failing to advise him about the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court, and Mr. Barrett's absence.

Significantly, one of the prosecutors explicitly conceded that he did not "think he [Mr. Barrett] – *consciously* chose to do what he did in the presence of the jury." (R. 5427 [emphasis added].) According to Mr. Hilfiger, Mr. Barrett himself said "I couldn't take it anymore." (R. 5437.)

Irrespective of whether Mr. Barrett could have made or did make a valid waiver of his right to be present, trial counsel acted unreasonably by failing to seek an instruction that was necessary to avoid harm to the jury's deliberations. Trial counsel's statements on the record reflect that counsel considered only whether the court's proposed instruction brought Mr. Barrett's actions to mind, or minimized their effects. Mr. Hilfiger twice stated that he could not think of an instruction to give the jury. (R. 5426-28.) Unable to decide, he said, "I don't care."

Upon due consideration, trial counsel would have recognized that the court's instruction failed to address the scope of the problem. The court's instructions permitted the jury to consider the actions of the marshals in restraining Mr. Barrett and removing him from the courtroom, presumably, from the jury's perspective, upon the court's orders or with the court's blessing. Although Mr. Hilfiger was adamant that Mr. Barrett had not made an aggressive move toward anyone, he permitted the jury to consider that marshals and the court were justified in removing Mr. Barrett. There is no reason why Mr. Hilfiger would not have sought a modification of the instruction that would have communicated truthful information about Mr. Barrett not having made any aggressive moves, Mr. Barrett suffering the effects of poor or absent medical treatment, or an instruction that directed the jury not to consider or draw any inference from Mr. Barrett's absence from the courtroom.

To the extent the facts supporting this claim were apparent on the appellate record, appellate counsel unreasonably failed to raise this issue on appeal. Had counsel raised the issues presented in this claim it is reasonably probable that the court would have found the numerous violations of federal law were not harmless beyond a reasonable doubt, or constituted plain error. *See* Ground Eighteen, *infra*.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Thirteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐      No ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐      No ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes   ☐        No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes   ☐        No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes   ☐        No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND FOURTEEN**

> **Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

(a)      Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

      Mr. Barrett incorporates by specific reference all facts, allegations and arguments

made elsewhere in this Petition, and the exhibits thereto, as well as all facts, allegations and

arguments made in his original, corrected and amended petitions previously filed, and exhibits

thereto.

Some twenty years ago, the federal death penalty was reintroduced; since then it has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims. As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level." (Exhibit 115.) Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims which were presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized. During the administration of Attorney General Gonzales, the difference was even more striking: 41% of cases involving white victims

were authorized, while only 16% of cases involving non-white victims were authorized.[48]
(Exhibit 116.)

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence.  According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases.  Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference."  (Exhibit 115.)

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases.  This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008.  (Exhibit 113.)  Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403.   She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim.  Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero."  (Exhibit 112.)

---

[48]    Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzales.

Page 371

While some of the statistics above are based in part on periods after Mr. Barrett's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.[49] Had counsel performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Barrett's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

Mr. Barrett has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act is the work of a single decision maker, i.e. the DOJ. This fact renders the above statistics all the more probative of discrimination. The Court should grant relief from Mr. Barrett's death sentence because the Government's charging

---

[49] Defendant's Motion To Declare The Federal Death Penalty Statute Unconstitutional, (Doc. 78), does not address the disparate application of the statute according to race of the victim. Appellate counsel did not raise the issue on appeal. *See* Defendant/Appellant's Brief, C.A. No. 06-7005, Proposition VI. To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused," (Doc. 78 at 3), appellate counsel were ineffective in failing to pursue and develop the issue. *See* Ground Eighteen, *infra*.

Page 372

and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

(b)       **Direct Appeal of Ground Fourteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐      No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)       **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐      No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

422

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐          No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐          No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐          No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FIFTEEN**

> **Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

<div align="right">Page 374</div>

In direct contravention of the constitutional principles mentioned in the heading for this Ground for Relief, the Government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the Government claimed justified Mr. Barrett's death sentence in the indictment. This structural defect in Mr. Barrett's capital proceedings requires that his death sentence be vacated.

Appellate counsel unreasonably failed to raise this issue on direct appeal. There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)     **Direct Appeal of Ground Fifteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐     No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal because it pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)     **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐     No   ☐

<div align="right">424</div>

Page 375

Not applicable: The current motion is an amendment of original, corrected and amended

motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other

issues raised herein are not successor or second and subsequent collateral attacks on the

judgments of conviction and sentences; this issue is properly before the court in a "first" post-

conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes  ☐       No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes  ☐       No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes  ☐       No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

425

**GROUND SIXTEEN**

> **Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution**.

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

  Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

  Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by misconduct involving the jury. Such misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Barrett and the case, false or misleading responses of jurors on voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, and/or the trial judge, and improperly prejudging the guilt/innocence and penalty phases of Mr. Barrett's trial. The jury was not sequestered in such a way as to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Mr. Barrett had no opportunity to confront the extraneous information to which the jurors were exposed, denying Mr. Barrett his Sixth and Fourteenth Amendment rights to a fair trial and due process.

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Barrett's prejudice. Counsel's ineffective assistance resulted in the deprivation of Mr. Barrett's rights under the Sixth, Eighth and Fourteenth Amendments.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)     **Direct Appeal of Ground Sixteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐     No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)     **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐     No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the

Page 378

judgments of conviction and sentences; this issue is properly before the court in a "first" post-

conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND SEVENTEEN**

> **Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment.**

(a)      Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition, and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended Petitions previously filed, and exhibits thereto.

Throughout his life, Mr. Barrett has struggled with severe mental illness, as well as organic brain disease and neurological and intellectual impairments. The Eighth Amendment's prohibition of the execution of the mentally retarded and underage offenders should be expanded to preclude the execution of severely mentally ill individuals such as Mr. Barrett. Similar to people with mental retardation and juveniles, the execution of the mentally ill serves no retributive or deterrent function and offends "evolving standards of decency."

Mr. Barrett does not have, and never has had, an intact brain. (*See* Ground Two, § B.2.b., *supra*; Exhibit 117; Exhibit 89.) He suffers from severe mental illness in the form of Bipolar Disorder, Post Traumatic Stress Disorder and Dysexecutive Syndrome, and his brain is organically damaged. Experts who have examined Mr. Barrett have opined that Mr. Barrett's functioning is compromised by multiple neurological and neuropsychiatric symptoms such that he mis-processes information and cannot understand the difference between right and wrong. (Exhibit 117.) Simply put, Mr. Barrett cannot think the way that other people think; he cannot experience and interact with the world the way other people do; and he cannot act in his own best interest in a rational manner. Because of both his organic brain disease and severe mental illness,

there is no meaningful way to distinguish Mr. Barrett from the mentally retarded or juvenile murderers.

(b)      **Direct Appeal of Ground Seventeen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐          No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐          No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐          No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND EIGHTEEN**

> **The Failure of Counsel to Raise or Effectively Argue on Appeal Claims Which Are of Record Violated Mr. Barrett's Due Process and Sixth Amendment Rights to Effective Assistance of Appellate Counsel.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and argument made in his original, corrected and amended petitions previously filed, and exhibits thereto.

431

**A.      Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel.**

**1.      Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government.**

As stated *supra*, Judge Payne specifically selected Roger Hilfiger for this case over the recommendations of the Oklahoma Federal Defenders that he appoint more experienced capital defense counsel. Judge Payne appointed Mr. Hilfiger for the expressed purpose of boosting counsel's experience so that he could receive future capital appointments. Judge Payne refused to compensate prior lead counsel, John Echols, at the highest prevailing rate for capital defense counsel, but immediately raised Mr. Hilfiger's compensation to that level after Mr. Echols withdrew from the case. Judge Payne required Mr. Echols to be painstaking in his accounting for resources, but permitted Mr. Hilfiger to make requests based on his "best guestimate." In sum, Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter. Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal. To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in Ground One could not be adequately litigated on appeal, because they required consideration of extra-record evidence. (Exhibit 29.) To the extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal. (Exhibit 29.) However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal. (*Id.*) Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards. At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised in Ground One had been raised on appeal. The record shows the trial judge interceded on behalf of the prosecution in a way that deceived defense counsel and aided the prosecutors in their effort to delay revealing the names and type of testimony that would be offered from the Government's seven most important witnesses.

**2.      Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under *Franks v. Delaware,* 438 U.S. 154 (1978).**

For the reasons stated in Ground Two, Part A.1, and Ground Four, *supra*, Mr. Barrett had at the time of appeal, a claim based on *Franks v. Delaware*, that was at least partially framed by the record. Appellate counsel did not raise the issue because he felt trial counsel had failed to make an adequate record. (Exhibit 29.) The *Franks* issue, in conjunction with a claim of ineffective assistance of trial counsel for failing to competently argue it, would have made a difference in the outcome of the appeal, and Mr. Barrett was prejudiced. Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.

**3.      Appellate Counsel Unreasonably Failed to Raise on
Appeal the Government's Inappropriate Use of Hearsay
Evidence used to Show Propensity or Character.**

In Ground Two, Part A.5, Mr. Barrett demonstrated that improper "propensity"

evidence concerning alleged statements made by him to various informant witnesses threatening

violence to the police if they showed up on his property was wrongly admitted, and that trial

counsel were ineffective for failing to lodge appropriate, timely objections to this evidence.  To

the extent trial counsel did preserve this issue by filing a response to the Government's 404(b)

Notice (Docs. 206, 215), and by at least lodging some objections to part of this testimony, direct

appeal counsel were ineffective for failing to raise a substantive 404(b) issue.

Because the 404(b) issue was meritorious, even based on the record that was

made, no reasonable strategic basis for excluding it exists.  Due to trial counsel's omissions,

appellate counsel was forced to raise several issues that were subject to review for clear error.

The failure to raise the issue was professionally unreasonable.  Had the issue been raised, a

reasonable probability exists that the outcome of the appeal would have been different.

**4.      Appellate Counsel Unreasonably Failed to Raise on
Appeal the Jury's Exposure to Phony Expert Jim Horn.**

In Ground Two, Part A.11, Mr. Barrett showed that the testimony of Government

"expert" Jim Horn was erroneously and prejudicially heard by the jury.  The fact that trial

counsel failed to preserve error initially by moving to exclude the testimony of Mr. Horn, and

only asked for his testimony to be stricken after the court's *sua sponte* expressions of concern,

did not necessarily waive for appeal the issues of mistrial and a meaningful jury instruction to

cure the error in permitting Horn to testify.  Appellate counsel could and should have raised the

issue as falling under the plain error doctrine, since trial counsel had failed to raise them in a timely fashion.

The trial court itself had identified the existence of error, but had not remedied it with a more appropriate instruction or a mistrial.  Mr. Barrett's right to a fair trial and, ultimately, a fair sentencing proceeding were thus affected and, particularly given the highly questionable nature of Mr. Horn's testimony, the integrity of these proceedings was unquestionably tainted.

5.    **Appellate Counsel Unreasonably Failed to Raise on Appeal the Prosecutors' Use of Improper, Inflammatory Argument in Violation of Mr. Barrett's Due Process Rights**

Prosecutorial misconduct through questions and argument as described Ground Five, Part D was not raised on direct appeal.  The misconduct of the prosecutors in both stages of trial was glaring.  No reasonable strategy excused the failure to raise the claim.  Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.

6.    **Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Restrictions on the Use of Mr. Barrett's Statements.**

As set forth in Ground Six, *supra*, the trial court placed unconstitutional restrictions on the introduction and use of Mr. Barrett's statements.  This issue was clearly framed by the record.  Appellate counsel acted unreasonably in failing to present this issue to the Court of Appeals.  Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded.  There could be no reasonable strategy for neglecting to

raise this issue.  There is a reasonable probability that had it been raised, the outcome of the appeal would have been different.

Without considering the mitigating impact Mr. Barrett's statements would have had, the Court of Appeals could not conduct meaningful review of the death sentence.  The appellate court's view of the balance of aggravating and mitigating evidence was skewed, as was the jury's, in favor of death.

**7.     Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Use of a Shock Belt on Mr. Barrett during Trial.**

As set forth in Ground Seven, *supra*, the trial court, admittedly without constitutionally required justification, ordered Mr. Barrett to be fitted with an electric-shock belt during trial.  The shock pack created a large bulge under Mr. Barrett's clothes, induced fear in Mr. Barrett, distracted him from the trial, and prevented him from sitting normally or concentrating on the proceedings.

The trial court's lack of justification for the use of this restraint was apparent on the record, as were some of its affects on the trial.  To the extent the shock belt was used without sufficient justification, the constitutional violation was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance.  Appellate counsel believed the issue required extra-record development.  (Exhibit 29.)  The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt.  In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness.  Therefore, there is a reasonable probability that Mr. Barrett would have been

granted a new trial if the issue had been raised on direct appeal.

> **8. Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Denial of a Jury Instruction on Lesser Included Offenses**.

As set forth in Ground Nine, *supra*, the trial court unconstitutionally failed to instruct the jury on the lesser included offense of voluntary manslaughter. Appellate counsel asserts he failed to raise this issue because it was not adequately preserved for appeal by co-appellate counsel, Roger Hilfiger. (Exhibit 29.) Counsel's judgment was unreasonable. Although many issues not preserved for review with timely objections or records were raised on appeal, this fully preserved issue, *even conceded by the Government at trial,* was not. Appellate counsel was well aware that Mr. Barrett had been convicted of manslaughter in state court. The factual basis for Mr. Barrett's federal court defense was the same as it was in state court. Under these very clear circumstances, *no* reasonable strategy excuses the failure to raise this issue, as appellate counsel recognizes. (Exhibit 29.) Had this issue been raised, there is at the very least a reasonable probability that the outcome of the appeal, particularly (but not exclusively) as to Count 3, would have been different.

> **9. Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred**.

As set forth in Ground Ten, *supra*, the trial court violated Mr. Barrett's rights under the Fifth, Sixth, and Eighth Amendments by failing to instruct jurors that they could consider in the second stage doubts regarding the raid. It was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal. It is at least

reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have

followed its own precedent and reversed the death judgment.

> **10.    Appellate Counsel Unreasonably Failed to Raise on
> Direct Appeal the Trial Court's Unconstitutional
> Dismissal of Juror 62.**

The dismissal of Juror 62, as set out in detail in Ground Eleven, *supra*, was not

raised on direct appeal, even though the error was plainly apparent from the record.  There was

no reasonable strategic ground for omitting this argument.  Had the issue been raised, there is a

reasonable probability that the outcome of the appeal would have been different.

> **11.    Appellate Counsel Unreasonably Failed to Raise on
> Appeal the Trial Court's Unconstitutional Failure to
> Require Proof Beyond a Reasonable Doubt as to the
> Weighing Factor Necessary to Impose a Death Sentence**.

As set forth in Ground Twelve, *supra*,  the Court's failure to provide an

instruction to the jury regarding the Government's burden to prove beyond a reasonable doubt

that the aggravating circumstances outweigh mitigating circumstances renders Mr. Barrett's

death sentence unconstitutional.  To the extent that the federal death penalty scheme allows

capital defendants to be sentenced to death without a finding beyond a reasonable doubt that

death is the appropriate punishment, it too is unconstitutional.  The "fact" that the aggravating

factors outweigh the evidence in mitigation is *the indispensable factual finding* that increases the

penalty for a crime beyond the prescribed statutory maximum.  Because the weighing instruction

given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual

finding, the weighing process in Mr. Barrett's case was constitutionally invalid. Had appellate

counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial.

### 12. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Removal of Mr. Barrett from the Courtroom.

As set forth in Ground Thirteen, *supra*, Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated due to the effects of drugs he was given in jail, trial counsel's failure to inquire about the drugs' effects, the trial court's removal of Mr. Barrett from the Courtroom in the presence of the jury without cause or inquiry, and Mr. Barrett's subsequent absence from critical stages of the proceedings without a valid waiver. To the extent the matters surrounding the forceful removal and denial of presence at all critical proceedings are a matter of record, it was unreasonable for appellate counsel not to raise these issues on appeal. It is at least reasonably probable that the conviction or sentence would have been reversed and new proceedings ordered if these multiple violations of the Constitution were presented on appeal.

### 13. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Racial Bias in the Administration of the Federal Death Penalty.

As set forth in Ground Fourteen, *supra*, trial counsel filed a Motion To Declare The Federal Death Penalty Statute Unconstitutional (Doc. 78), which addressed the disparate application of the statute but did not argue disparity based on the race of the victim. Appellate counsel did not raise on appeal the issue of the unconstitutionality of the federal death penalty on the basis of arbitrary and capricious disparities in application of the penalty based on the race of the victim on appeal. To the extent, if any, that trial counsel did properly raise and preserve the

439

question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused" (Doc. 78 at 3), appellate counsel acted unreasonably in failing to raise the issue.  There is a reasonable probability that the death sentence would have been vacated had the issue been raised.

To the extent the Court of Appeals prevented appellate counsel from raising this issue, the court's review of the death sentence imposed on Mr. Barrett was constitutionally inadequate.  The Court of Appeals failed to consider the disproportionate use of the federal death penalty based on the race of the victim.

### 14.      Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment.

As set forth in Ground Fifteen, *supra*, Mr. Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case made did not charge either the non-statutory aggravating factors relied upon by the government during the penalty phase or the allegation that the aggravating factors outweighed the mitigating factors.  Appellate counsel unreasonably failed to raise this issue on direct appeal.  There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

**B.**    **A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise.**

The Court of Appeals reviewed the errors in this case cumulatively. *United States v. Barrett, supra*, 496 F.3d at 1121. "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" *Ibid.*, quoting, *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002). The review conducted on appeal was deficient due to the unreasonable omissions of appellate counsel, the Court of Appeals' limitations on counsel, or both.

There is a reasonable probability that any two or more of the errors identified herein *supra*, if they had been considered cumulatively on appeal, would hare resulted in reversal. Several of the errors appellate counsel unreasonably failed to raise, or did raise on appeal, complement each other such that the risk of harm is increased. For example, the harm from the trial court's withholding from trial counsel the contents of the *ex parte* hearing complements the continuance issue raised on appeal. As appellate counsel states, without knowing that Judge Payne had said he believed a continuance was likely, failed to seek a continuance because he believed the court would deny the request. (Exhibit 29.) Issues related to the seven snitches would have been enhanced if trial and appellate counsel had argued the Government's violation of Fed. R. Evid. 404(b), particularly with regard to failure to disclose that Karen Real would testify to prior bad acts.

Multiple errors in the second stage had greater cumulative impact than their already prejudicial independent impact. The jury in this case, after being denied the opportunity

to convict on manslaughter, was denied consideration of Mr. Barrett's statements, doubts about the raid, and were inflamed by improper argument and seeing Mr. Barrett in an electric shock belt. These errors, in and of themselves, or combined with the unconstitutional circumstances that removed Mr. Barrett from the courtroom, had a prejudicial influence on the penalty deliberations.

Whether considered individually or cumulatively, appellate counsel's unreasonable failure to raise issues on appeal, and/or the Court of Appeals' failure to consider them, violated Mr. Barrett's rights under the Fifth, Eighth, and Fourteenth Amendments.

(b) **Direct Appeal of Ground Eighteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue pertains to ineffective assistance of trial and direct appeal counsel, a matter which is appropriately addressed in the first instance in these collateral proceedings.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

Page 393

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes   ☐        No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes   ☐        No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes   ☐        No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

443

**GROUND NINETEEN**

> **Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case.**

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett's convictions and sentences are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness.

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and the exhibits thereto.  In addition, Mr. Barrett re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process.  Each of these errors deprived Mr. Barrett of important constitutional rights, including but not limited to his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claims presented in this Petition individually justifies reversal, when considered cumulatively, these errors denied Mr. Barrett his constitutional rights.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Nineteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

445

Page 396

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes   ☐          No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes   ☐          No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes   ☐          No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

13.    Is there any ground in this motion that you have <u>not</u> previously presented in some federal court?

If so, which ground or grounds have not been presented, and state your reasons for not

presenting them.

**No.  Each ground presented here is a repetition and continuation of a claim or**

**subclaim previously presented in the petition filed March 16, 2009, corrected on**

**March 17, 2009, and amended on September 25, 2009.**

14.    Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court

for judgement you are challenging?    Yes   ☒          No   ☐

446

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

**This filing is a court-ordered amendment of the same petition/motion timely filed March 16, 2009 in Eastern District of Oklahoma Case No. 09-cv-105-JHP, and corrected on March 17, 2009, and amended as of right on September 25, 2009.  Those pleadings remain pending.**

15.     Give the name and address, if know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:  n/a

(b) At arraignment and plea:

John D. Echols, P.O. Box 701196, Jenks, OK 74037; Roger Hilfiger, 620 W. Broadway, Muskogee, OK 74401

(c) At trial:

Roger Hilfiger, 620 W. Broadway, Muskogee, OK 74401; Bret A. Smith, 417 West Broadway, P.O. Box 2250, Muskogee, OK 74402

(d) At sentencing:

Roger Hilfiger, 620 W. Broadway, Muskogee, OK 74401; Bret A. Smith, 417 West Broadway, P.O. Box 2250, Muskogee, OK 74402

(e) On appeal:

Mark Henrickesen, 600 N. Walker, Suite 220, Oklahoma City, OK 73102; Roger Hilfiger, 620 W. Broadway, Muskogee, OK 74401

(f) In any post-conviction proceeding:

David B. Autry, 1021 N.W. 16th Street, Oklahoma City, OK

73106; Tivon Schardl, Office of the Federal Defender, 801 I Street,

3rd Floor, Sacramento, CA 95814

(g) On appeal from any ruling against you in a post-conviction proceeding:

16.     Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?     Yes   ☒          No   ☐

17.     Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?     Yes   ☐          No   ☒

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?          Yes   ☐          No   ☐

18.    TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statue of limitations as contained in 28 U.S.C. § 2255 does not bar your motion. *************

> **This is a court-ordered amendment of a timely filed motion.**
>
> **All grounds presented herein were filed prior to the expiration of the statute of limitations.  Each part of this amendment relates back to the timely motion/petition filed March 16, 2009, corrected on March 17, 2009, and amended as of right on September 25, 2009.  To the extent any allegation in this amendment was not previously filed, it was not previously discoverable through the exercise of due diligence, or Mr. Barrett was prevented from presenting it due to the unconstitutional conduct of the government actors as to whom the allegation relates.**

---

*************The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of -

(1) the date on which the judgment of conviction became final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, the movant asks that the Court grant the following relief:

1.     That United States District Judge James H. Payne recuse himself and have all proceedings regarding this Petition reassigned randomly to another judge;

2.     That Petitioner be permitted to file a Memorandum of Law in Support of this Petition in accordance with a briefing schedule established by this Court;

3.     Require Respondent to file an Answer to the Petition in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Petitioner's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

4.     Permit Petitioner to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

5.     Permit Petitioner to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Petition, and refute any defenses thereto raised by the Respondent's Answer;

6.     Permit Petitioner to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Petitioner, and, to allow the amendment to relate back to the date of the filing of his Section 2255 Motion;

7.    Conduct an evidentiary hearing to resolve any factual disputes raised by the

Respondent's Answer to this Petition, or by Petitioner's Response to any

Affirmative Defenses raised by the Respondent. Because Petitioner has alleged

facts which, if true, entitle him to relief, he is also entitled to a full evidentiary

hearing to establish the facts he alleges;

8.    Permit oral argument as appropriate and required;

9.    Vacate Petitioner's convictions and sentences and order that appropriate retrial

and/or sentencing hearings be conducted; and or any other relief to which movant

may be entitled.

<div style="margin-left:40%">

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

/s/ Joan M. Fisher
JOAN M. FISHER, IDA Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

</div>

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 ~~was placed in the prison mailing system~~ **electronically filed** on  December 4, 2009.

Executed (signed) on   December 4, 2009     (date).

/s/ Joan M. Fisher
Signature of Movant
by:     Joan M. Fisher
         Assistant Federal Defender
         Counsel for Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

I am an attorney licensed to practice law by the State of Florida, and I am a member in good standing of the bar of the United States District Court for the Eastern District of Oklahoma.  I am a research and writing attorney in the Office of the Federal Defender for the Eastern District of California.  In 2008, I was appointed post-conviction counsel for Kenneth Eugene Barrett with David B. Autry as lead counsel.

I am authorized by Kenneth Eugene Barrett to file the foregoing amended motion to vacate, set aside, or correct the sentence pursuant to 28 U.S.C. § 2255.  I am filing the amended motion on Mr. Barrett's behalf.  Mr. Barrett is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing amended motion for collateral relief, to vacate, set aside, and correct the conviction and death sentence is made pursuant to 28 U.S.C. § 2255.  I declare that the contents of the foregoing amended motion are true except for those

matters based upon information and belief, and I believe the latter matters to be true. The sources of my information include, but are not limited to, official court records, various documents obtained or prepared during investigation of this amended motion, and items in the possession of other lawyers, investigators and/or experts connected with the preparation of this amended motion. I make this verification pursuant to Rule 2(b)(5) of the Rules Governing § 2255 Proceedings because these matters are more within my knowledge than Mr. Barrett's knowledge.

/s/ Joan M. Fisher

**Certificate of Electronic Filing and Service**

I hereby certify that on this 4th day of December 2009, I caused the foregoing AMENDED PETITION to be filed with the Clerk of the Court using the ECF System for filing. A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

/s/ Joan M. Fisher

FILED
United States Court of Appeals
Tenth Circuit

December 14, 2009

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

In re:

KENNETH EUGENE BARRETT,

Petitioner.

No. 09-7096
(D.C. No. 6:09-CV-00105-JHP)
(E.D. Okla.)

---

**ORDER**

---

Before **BRISCOE**, **LUCERO**, and **TYMKOVICH**, Circuit Judges.

---

In this mandamus proceeding, Kenneth Eugene Barrett seeks either the recusal of the district judge who presided over his federal criminal trial and now is hearing his 28 U.S.C. § 2255 motion to vacate, set aside, or correct his sentence, or, in the alternative, an evidentiary hearing before a different district judge on the facts underlying his recusal motion. Citing three examples of allegedly improper conduct, Mr. Barrett alleges that the judge is biased against him, and that recusal is mandated by 28 U.S.C. §§ 455(a), 455(b)(1), 455(b)(3), and 455(b)(5)(iv). The district judge denied Mr. Barrett's motion to recuse. Both the United States and the district judge have responded to the mandamus petition, and Mr. Barrett has replied.

"[M]andamus is an appropriate vehicle by which to challenge a district court's denial of a recusal motion." *Nichols v. Alley*, 71 F.3d 347, 350 (10th Cir.

454

1995) (per curiam).  While a district court's denial of recusal generally is reviewed for abuse of discretion, on mandamus the higher mandamus standards apply.  *Id.*  Thus, Mr. Barrett must show that he has "a clear and indisputable right to relief."  *Id.*  "[A] writ of mandamus is used only to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so.  Only exceptional circumstances, amounting to a judicial usurpation of power, will justify the invocation of this extraordinary remedy."  *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1186 (10th Cir. 2009) (quotations omitted).

We have carefully reviewed the parties' filings and the record.  We are not convinced that Mr. Barrett has established a clear and indisputable right to the district judge's recusal under any of § 455's subsections or that this case presents the exceptional circumstances required to issue a writ of mandamus.

Because the district court granted Mr. Barrett leave to proceed without prepayment of fees and it appears his circumstances have not changed, the motion to proceed in this court without prepayment of fees is GRANTED.  The petition for a writ of mandamus is DENIED.

Entered for the Court,

ELISABETH A. SHUMAKER, Clerk

-2-

455

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**
**OFFICE OF THE CLERK**

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

December 14, 2009

Douglas E. Cressler
Chief Deputy Clerk

Mr. David B. Autry
1021 N.W. 16th Street
Oklahoma City, OK 73106

Mr. Tivon Schardl
Federal Defender's Office
Capital Habeas Unit
801 I Street, 3rd Floor
Sacramento, CA 95814

**RE:     09-7096, In re: Barrett**
District docket: 6:09-CV-00105-JHP

Dear Counsel:

Enclosed please find an order issued today by the court.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

cc:     Jeffrey Bradford Kahan
Christopher Wilson

EAS/ao

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | **Case No. 6:09-CV-00105-JHP** |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Respondent*. | ) | |

### NOTICE TO PETITIONER
### RE: SUBMISSION OF MATTER FOR *IN CAMERA* REVIEW

**COMES NOW**, Respondent United States of America, by and through undersigned counsel,

and hereby provides notice to Petitioner that on January 11, 2010 Respondent submitted a letter

dated January 11, 2010 to the Court under seal for an *in camera* review to determine whether the

Government is permitted to disclose information contained therein to counsel for Petitioner in whole

or in part.

Respectfully submitted,

SHELDON J. SPERLING
United States Attorney

s/      Christopher J. Wilson
CHRISTOPHER J. WILSON OBA #13801
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100

s/      Jeffrey B. Kahan
JEFFREY B. KAHAN
Trial Attorney
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779

458

## CERTIFICATE OF SERVICE

I, hereby certify that on 11th day of January, 2010, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry, Attorney for Petitioner
Tivon Schardl, Attorney for Petitioner
Joan M. Fisher, Attorney for Petitioner

s/      Christopher  J. Wilson
          Assistant United States Attorney

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | **Case No. 6:09-CV-00105-JHP** |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Respondent*. | ) | |

### PROTECTIVE ORDER

NOW on this 12th day of January, 2010, the Respondent's request for a Protective Order is GRANTED as follows:

1.     The letter dated and submitted January 11, 2010 for *in camera* review ("January 11 letter") shall remain under seal.  However, subject to the provisions of this Order, counsel for Respondent shall disclose to Petitioner's counsel the subject-matter of the January 11 letter.

2.     None of the information contained in January 11 letter shall be revealed to the Petitioner, or to any person other than counsel of record for the Petitioner and/or persons working for counsel for the Petitioner in connection with these § 2255 proceedings, without prior approval and order from this Court.

IT IS SO ORDERED.

James H. Payne
United States District Judge
Northern District of Oklahoma

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,    )
    )
    *Plaintiff,*    )
    )
v.    )    **Case No. 6:09-cv-00105-JHP**
    )
KENNETH EUGENE BARRETT,    )
    )
    *Defendant.*    )

---

**REDACTED EXHIBIT 119**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255           *U.S. v. Barrett*, 6:09-cv-00105-JHP

## CERTIFICATION OF VITAL RECORD

# STATE OF ILLINOIS

### DEPARTMENT OF PUBLIC HEALTH - DIVISION OF VITAL RECORDS

ORIGINAL   STATE OF ILLINOIS

## CERTIFICATE OF LIVE BIRTH

| | | |
|---|---|---|
| REGISTRATION DISTRICT NO. | 99.0 | 112-61 06-5545 |
| REGISTERED NUMBER | 2151 | CHILD'S BIRTH NUMBER |

**1. PLACE OF BIRTH**
a. COUNTY: **Will** COUNTY, ILLINOIS
b. Birth took place
☐ OUTSIDE city limits and in................................TOWNSHIP.
☒ INSIDE city limits and in the city, village, or town named of 1c.
c. CITY, VILLAGE, OR TOWN: **Joliet**
d. MOTHER'S LENGTH OF STAY IN 1b or 1c: **11 mo.**
e. NAME OF HOSPITAL OR INSTITUTION (If not in hospital or institution, give street address): **Silver Cross Hospital**

**2. USUAL RESIDENCE OF MOTHER**
a. STATE: **Illinois**  b. COUNTY: **Will**
c. Residence is ☐ OUTSIDE city limits and in................................TOWNSHIP.  ☒ INSIDE city limits and in the city, village, or town named at 2H
d. CITY, VILLAGE, OR TOWN: **Joliet**
e. LENGTH of RESIDENCE AT 2H: **11 mo.**
f. STREET ADDRESS: ███████████
g. Does mother reside on a FARM? YES ☐ NO ☒

**3. CHILD'S NAME**
a. (FIRST): **Kenneth**  b. (MIDDLE): **Eugene**  c. (LAST): **Barrett**
**4. SEX**: **Male**

**5a. THIS BIRTH was** SINGLE ☒, TWIN ☐, TRIPLET ☐
**5b. IF TWIN OR TRIPLET, was this child** born 1st ☐, 2nd ☐, 3rd ☐
**6. DATE OF BIRTH** (HOUR): **6:21 P. M.,** (MONTH): ███ (DAY): — (YEAR): **1961.**

**7. FATHER'S FULL NAME**
a. (FIRST): **Ernest**  b. (MIDDLE): **Eugene**  c. (LAST): **Barrett**
**8. HIS RACE**: **White**
**9. HIS AGE**: **22 YEARS**
**10. HIS BIRTHPLACE** (City and State or Country): **Sillsaw Oklahoma**
**11a. HIS USUAL OCCUPATION**: **Laborer**
**11b. KIND OF BUSINESS OR INDUSTRY**: **Can Co.**

**12. MOTHER'S FULL MAIDEN NAME**
a. (FIRST): **Sylvia**  b. (MIDDLE): **Gelene**  c. (LAST): **Fotson**
**13. HER RACE**: **White**
**14. HER AGE**: **21 YEARS**
**15. HER BIRTHPLACE** (City and State or Country): **Viann, Oklahoma**
**16. CHILDREN PREVIOUSLY BORN TO MOTHER** (Do NOT include THIS child)
a. How many OTHER children are NOW LIVING? —
b. How many OTHER children were born alive but are NOW DEAD? —
c. How many were STILLBORN, i.e., delivered dead after twenty weeks' pregnancy? —

**17. MOTHER'S MAILING ADDRESS**: ███████████ **Joliet, Illinois**

**18. INFORMANT**: *Sylvia Gelene Barrett*

**19.** I hereby certify that this child was born alive at the place and on the hour and date stated above, I further certify that I attended the mother in this birth.
SIGNED: *Furllerk Jr* M. D.
MIDWIFE / OTHER (specify)
DATE: **6-30-61**
ADDRESS: **#0 New Avenue, Lemont, Illinois.**
PHONE NO.: **OL 72265**

**20. Received for filing on**: **July 5, 1961**
(Signed): *Felix A. Tornabene M.D.*
LOCAL REGISTRAR:

007806

This is to certify that this is a true and correct copy of the official record filed with the Illinois Department of Public Health.

DATE ISSUED: **DEC 0 6 2000**

*Steven L. Perry*
STEVEN L. PERRY
DEPUTY STATE REGISTRAR

481

KEB400011

462

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 120**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

462

DEPARTMENT OF COMMERCE
Bureau of the Census

**STANDARD CERTIFICATE OF LIVE BIRTH**
State of Oklahoma 68 11194   State File No. _____   Registrar's No. 73

432

1. PLACE OF BIRTH:
(a) County _Sequoyah_
(b) City or town _Rural_
   IF OUTSIDE OF CITY OR TOWN LIMITS PUT RURAL
(c) Name of hospital or institution: _____

IF NOT IN HOSP. OR INST. GIVE ST. NO. AND LOCATION.
(d) Mother's stay before delivery:
In hospital or institution _____ , In this community _18 yrs_
   SPECIFY WHETHER YRS., MO., OR DAS.

2. USUAL RESIDENCE OF MOTHER:
(a) State _Oklahoma_
(b) County _Sequoyah_
(c) City or town _Rural_
   IF OUTSIDE CITY LIMITS, WRITE RURAL
(d) Street No. _____
   IF RURAL, GIVE LOCATION

3. Full name of child _Sylvia Helena Dotson_

4. Date of birth ██████ 40
   MO.  DA.  YR

5. Sex: _Female_
6. Twin or triplet _____   If so-born 1st, 2nd, or 3rd _____
7. No. months of pregnancy _9_
8. Is mother married? _Yes_

FATHER OF CHILD
9. Full name _Hugh V. Dotson_
10. Color or race _White_
11. Age at time of this birth _22_ yrs.
12. Birthplace _Sequoyah County_
    CITY, TOWN, COUNTY OR ST. OR FOREIGN COUNTRY
13. Usual occupation _Common labor_
14. Industry or business _____

MOTHER OF CHILD
15. Full maiden name _Hattie Gertrude Real_
16. Color or race _White_
17. Age at time of this birth _18_ yrs.
18. Birthplace _Sequoyah County_
    CITY, TOWN, COUNTY OR ST. OR FOREIGN COUNTRY
19. Usual occupation _Housewife_
20. Industry or business _____

21. Children born to this mother: _One_
(a) How many other children of this mother now living? _None_
(b) How many other children born alive but now dead? _None_
(c) How many children were born dead? _None_

22. Mother's mailing address for registration notice:
_Mrs Hugh Dotson_
_Vian Oklahoma_
██████████████

23. (a) Was a solution of Silver Nitrate used in eyes? _Yes_
    (b)

24. I hereby certify that I attended the birth of this child who was born alive at the hour of _4:10_ P. m. on the date above stated and that the information given was furnished by _Mr Dotson_ , related to this child as _Father_

25. Date received by local registrar _5-2-40_
26. Registrar's own signature _Jas McLaughlin_
27. Date given name added _____ by _____
    REGISTRAR

Attendant's own signature _M. Newlin_
M. D., midwife or other _M.D._   Date signed _4-18-40_
Address _Sallisaw Oklahoma_



𝔖𝔱𝔞𝔱𝔢 𝔇𝔢𝔭𝔞𝔯𝔱𝔪𝔢𝔫𝔱 𝔬𝔣 𝔥𝔢𝔞𝔩𝔱𝔥
𝔖𝔱𝔞𝔱𝔢 𝔬𝔣 𝔒𝔨𝔩𝔞𝔥𝔬𝔪𝔞
OKLAHOMA CITY, OKLAHOMA 73117

CERTIFIED COPY MUST BE
VALIDATED IN THREE COLORS



I hereby certify the foregoing to be a true and correct copy, original of which is on file in this office. In testimony whereof, I have hereunto subscribed my name and caused the official seal to be affixed, at Oklahoma City, Oklahoma, this date.

October 30, 2000

STATE REGISTRAR
OF VITAL STATISTICS

KEB400007

464

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

────────────────────

**REDACTED EXHIBIT 121**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

────────────────────

# CERTIFICATION OF VITAL RECORD

## STATE OF ILLINOIS

### DEPARTMENT OF PUBLIC HEALTH - DIVISION OF VITAL RECORDS



ORIGINAL

### STATE OF ILLINOIS
## CERTIFICATE OF LIVE BIRTH

| Registration District No. 99.0 | Child's Birth Number |
| Registered Number 2081 | 112- 64-062647 |

1. Place of Birth
A. State **Illinois**   B. County **Will**
C. ☒ Inside corporate limits and in **Joliet**
D. ☐ Outside corporate limits and in ............ City, Village, or incorporated Town
...... Township, or Road District No.
E. Name of Hospital or Institution **Silver Cross Hospital**
F. If not in hospital or institution, give Street & No. or R.F.D. and Post Office

2. Usual Residence of Mother (Where does mother live)?
A. State **Illinois**   B. County **Will**
C. ☐ Inside corporate limits and in ............ City, Village, or incorporated Town
D. ☒ Outside corporate limits and in **Joliet**  ...... Township, or Road District No.
E. Residence address (Street & No. or R.F.D. and Post Office) ███████████
F. Does mother reside on a farm?   Yes ☐   No ☒

3. Child's Name   A. (First) **Richard**   B. (Middle) **Andrew**   C. (Last) **Barrett**   4. Sex **Male**

5A. This Birth was Single ☒ Twin ☐ Triplet ☐ Quad ☐   5B. If Multiple, Child Born 1st ☐ 2nd ☐ 3rd ☐ 4th ☐   6. Date of Birth (Hour) **10:05 P.M.** (Month) ███ (Day) (Year) **1964**

7. Father's Full Name A. (First) **Ernest** B. (Middle) **Eugene** C. (Last) **Barrett**   8. His Race **White**

9. His Age **25** Years   10. His Birthplace (City and State or Country) **Salli Sall, Oklahoma**   11A. His Usual Occupation **Operator**   11B. Kind of Business or Industry **Glass Factory**

12. Mother's Full Maiden Name A. (First) **Sylvia** B. (Middle) **Gelene** C. (Last) **Dotson**   13. Her Race **White**

14. Her Age **24** Years   15. Her Birthplace (City and State or Country) **Viane, Oklahoma**   16. Mother's Mailing Address ███████████ **Joliet, Illinois**

17. Informant (Signature) *Sylvia G. Barrett*   *Sylvia G. Barrett*

18A. Signature *[signature]*
I hereby certify that this child was born alive on the date stated above
18. Address **50 New Avenue, Lemont, Illinois**
18B. Attendant at Birth   M.D. ☒ D.O. ☐ Midwife ☐ Other (Specify)
18D. Date Signed **6-28-1964**
18E. Illinois License Number **34970**

17. Received for Filing on **June 30, 1964**   (Signed) *Barbara Shnecker* *William J. Cassel Jr.* Local Registrar

VS 100 - BUREAU OF STATISTICS—ILLINOIS DEPARTMENT OF PUBLIC HEALTH—SPRINGFIELD

**090939**

This is to certify that this is a true and correct copy of the official record filed with the Illinois Department of Public Health.

DATE ISSUED

*[signature]* STEVEN L. PERRY
STEVEN L. PERRY
DEPUTY STATE REGISTRAR

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



KEB400015

466

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,        )
                                 )
                 *Plaintiff,*    )
                                 )
v.                               )        **Case No. 6:09-cv-00105-JHP**
                                 )
KENNETH EUGENE BARRETT,          )
                                 )
                 *Defendant.*    )

---

**REDACTED EXHIBIT 122**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

# CERTIFICATE OF LIVE BIRTH

### STATE OF OKLAHOMA – DEPARTMENT OF HEALTH

LOCAL REG NO **5**

STATE FILE NO **135 -** **80-050154**

| 1. CHILD (Type or print) NAME | First | Middle | Last | 2. DATE OF BIRTH | Month | Day | Year | 3. HOUR |
|---|---|---|---|---|---|---|---|---|
| | TOBY WAYNE BARRETT | | | | | ███ | 1980 | 10:05 A. M. |

| 4. SEX | 5a. THIS BIRTH | | | 5b. IF TWIN OR TRIPLET, WAS CHILD BORN | | | 6a. COUNTY OF BIRTH |
|---|---|---|---|---|---|---|---|
| Male | SINGLE ☒ | TWIN ☐ | TRIPLET ☐ | 1st ☐  2d ☐  3d ☐ | | | Sequoyah |

| 6b. CITY, TOWN, OR LOCATION OF BIRTH | 6c. INSIDE CITY LIMIT | 6d. HOSPITAL – NAME (If not in hospital, give street and number) |
|---|---|---|
| Sallisaw | Yes ☒  No ☐ | Sequoyah Memorial Hospital |

| 7. MOTHER MAIDEN NAME | First | Middle | Last | 8. AGE (at time of this birth) | 9. BIRTHPLACE (State or foreign country) |
|---|---|---|---|---|---|
| | Abby Gail Teague | | | 16 | Arkansas |

| 10a. RESIDENCE – STATE | 10b. COUNTY | 10c. CITY, TOWN, OR LOCATION | 10d. INSIDE CITY LIMIT | 10e. STREET ADDRESS |
|---|---|---|---|---|
| Oklahoma | Sequoyah | Sallisaw | Yes ☒  No ☐ | ███████ |

| 11. FATHER NAME | First | Middle | Last | 12. AGE (at time of this birth) | 13. BIRTHPLACE (State or foreign country) |
|---|---|---|---|---|---|
| | Kenneth Eugene Barrett | | | 19 | Illinois |

| 14a. INFORMANT SIGNATURE OF EITHER PARENT | 14b. IF UNABLE TO OBTAIN ONE OF PARENTS SIGNATURE, STATE REASON THEREFORE. |
|---|---|
| *Abby Barrett* | |

| 15. MOTHER'S MAILING ADDRESS | STREET or R.F.D. NO. | POSTOFFICE | STATE | ZIP CODE NO. |
|---|---|---|---|---|
| ███████ | | Sallisaw, Okla. | | 74955 |

| 16a. WAS BLOOD OF THIS CHILD'S MOTHER TESTED FOR SYPHILIS? | 16b. DATE TEST MADE | 16c. IF NO TEST, STATE REASON THEREFORE |
|---|---|---|
| Yes ☒  No ☐ | June 1980 | |

| 17. WEIGHT OF CHILD AT BIRTH | 18. WAS PROPHYLACTIC DRUG USED IN BABY'S EYES? |
|---|---|
| 7 LBS.  1 OZS. | Yes ☒  No ☐ |

I hereby certify that this child was born alive on the date stated above.

| 19a. SIGNATURE OF ATTENDANT | 19b. DATE SIGNED |
|---|---|
| *Gary D. Fine* | December 2, 1980 |

| 19c. NAME OF ATTENDANT (Print or Type) | 19d. ATTENDANT AT BIRTH |
|---|---|
| Gary D. Fine, D.O. | M.D. ☐  D.O. ☒  D.C. ☐  Midwife ☐  Other ☐ (Specify) |

| 19e. ADDRESS OF ATTENDANT | STREET or R F D NO | POSTOFFICE | STATE | ZIP CODE NO. |
|---|---|---|---|---|
| ███████ | | Sallisaw, Okla. | | 74955 |

| 20a. DATE REC'D. BY LOCAL REG. | 20b. LOCAL REGISTRAR'S SIGNATURE | 21. DATE RECEIVED BY STATE REGISTRAR |
|---|---|---|
| 1-13-81 | *Margaret Vaughan* | JAN 16 1981 |

| THIS LINE FOR USE OF STATE REGISTRAR | 22a. DATE CORRECTIONS MADE | 22b. ITEMS CORRECTED | 22c. AUTHORITY | 22d. CLERK |
|---|---|---|---|---|



## State Department of Health

### State of Oklahoma

OKLAHOMA CITY, OKLAHOMA 73117

I hereby certify the foregoing to be a true and correct copy, original of which is on file in this office. In testimony whereof, I have hereunto subscribed my name and caused the official seal to be affixed, at Oklahoma City, Oklahoma, this date.

April 18, 2001

CERTIFIED COPY MUST BE VALIDATED IN THREE COLORS



467

KEB400018

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )          **Case No. 6:09-cv-00105-JHP** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

---

**REDACTED EXHIBIT 125**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP


468

# CERTIFICATE OF DEATH
## STATE OF OKLAHOMA – DEPARTMENT OF HEALTH

LOCAL REGISTRAR'S FILE NO. **80**

STATE BIRTH NO.

STATE FILE NO. **12036**

1. DECEASED – NAME: First **Andrew** Middle **Jackson** Last **Barrett**
   SEX: **Male**  DATE OF DEATH (Month, Day, Year): **June 6, 1969**

4. RACE: **White**   5a. AGE – Last Birthday (Years): **52**   5b. UNDER 1 YEAR / UNDER 1 DAY
   6. DATE OF BIRTH (Month, Day, Year): **1916**   7. COUNTY OF DEATH: **Sequoyah**

7b. CITY, TOWN, OR LOCATION OF DEATH: **Sallisaw**   7c. INSIDE CITY LIMITS: Yes **X** No
   7d. HOSPITAL OR OTHER INSTITUTION – NAME: **Sequoyah Memorial Hospital**

8. STATE OF BIRTH: **Oklahoma**   9. CITIZEN OF WHAT COUNTRY: **U.S.A.**
   10. Married **X** Never Married / Widowed / Divorced
   11. SURVIVING SPOUSE: **Ada Mae Hatter**

12. SOCIAL SECURITY NUMBER: **6940**
   13a. USUAL OCCUPATION: **Farmer**   13b. KIND OF BUSINESS OR INDUSTRY:

14a. RESIDENCE – STATE: **Oklahoma**   14b. COUNTY: **Sequoyah**   14c. CITY, TOWN, OR LOCATION: **Sallisaw**
   14d. INSIDE CITY LIMITS: Yes / No **X**   14e. STREET AND NUMBER:

15. FATHER – NAME: First **Isaac** Middle **C.** Last **Barrett**
   16. MOTHER – MAIDEN NAME: First **Mary** Middle **E.** Last **Maxwell**

17a. INFORMANT – NAME: **Ada Mae Barrett**   17b. MAILING ADDRESS: **Sallisaw, Oklahoma 74955**

### PART I
18. DEATH WAS CAUSED BY:
   IMMEDIATE CAUSE (a): **Coronary Occlusion**   Approximate Interval Between onset and Death: **Instant**
   DUE TO, OR AS A CONSEQUENCE OF (b):
   DUE TO, OR AS A CONSEQUENCE OF (c):

Conditions, if any, which gave rise to immediate cause (a), stating the underlying cause last

### PART II. OTHER SIGNIFICANT CONDITIONS:

19a. AUTOPSY: Yes / No **X**   19b. IF YES, Were findings considered in determining cause of death: Yes / No

20a. ACCIDENT / HOMICIDE / SUICIDE / UNDETERMINED
   20b. DATE OF INJURY   HOUR 20c. M.   20d. HOW INJURY OCCURRED

INJURY AT WORK: Yes / No   20f. PLACE OF INJURY   20g. LOCATION

21a. CERTIFICATION – PHYSICIAN: I attended the Deceased from ___ TO ___   And Last saw him/her alive on ___   21e. I did/did not view body after death: **Did**

22a. CERTIFICATION – MEDICAL EXAMINER OR LOCAL HEALTH OFFICER... opinion, death occurred on the date and due to the cause(s) stated.   **100 AT** M   THE DECEDENT was pronounced dead on **1969**   DEATH OCCURRED AT **1:00 A.M.**

22b. CERTIFIER – TYPE/PRINT NAME: **Dr. Van Delindu**
   23b. SIGNATURE: **Dr. Van Delindu**   23c. DATE SIGNED: **6-11-69**

23d. MAILING ADDRESS – CERTIFIER: **105 N. Oak, Sallisaw, Okla 74955**

24a. BURIAL, CREMATION, REMOVAL: **Burial**   24b. DATE: **6 11 69**   24c. CEMETERY OR CREMATORY – NAME: **Akins Cemetery**

24d. LOCATION: City or Town **Akins**   State **Okla**
   25. FUNERAL HOME – NAME AND ADDRESS: **Wheeler's, Sallisaw, Okla. 74955**   FUNERAL DIRECTOR: **Richard P. Wheeler**

26a. REGISTRAR'S SIGNATURE: **Eddie King**   26b. DATE RECD. BY LOCAL REG.: **6-20-69**
   27. DATE RECEIVED BY STATE REGISTRAR: **JUN 25 1969**



State Department of Health
State of Oklahoma
OKLAHOMA CITY, OKLAHOMA 73117

I hereby certify the foregoing to be a true and correct copy, original of which is on file in this office. In testimony whereof, I have hereunto subscribed my name and caused the official seal to be affixed, at Oklahoma City, Oklahoma, this date.

January 19, 2001

CERTIFIED COPY MUST BE VALIDATED IN THREE COLORS

KEB400601

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 126**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

ATTENDING PHYSICIAN
# CERTIFICATE OF DEATH
STATE OF OKLAHOMA - DEPARTMENT OF HEALTH

LOCAL REGISTRAR'S FILE NO. 42

STATE FILE NO. 06403

| DECEASED - NAME | | | |
|---|---|---|---|
| 1. | First Ada | Middle Mae | Last Barrett |

DATE OF DEATH (Month, Day, Year) 2. March 24, 1976

SEX 3. Female

RACE - White, Negro, American Indian, Etc. (Specify) 4. White

AGE - Last Birthday (Year) 5a. 56

UNDER 1 YEAR 5b. Mos. Days

UNDER 1 DAY 5c. Hours Min.

DATE OF BIRTH (Month, Day, Year) 6. 1919

COUNTY OF DEATH 7a. Sequoyah

CITY, TOWN, OR LOCATION OF DEATH 7b. Sallisaw

INSIDE CITY LIMITS 7c. Yes X No

HOSPITAL OR OTHER INSTITUTION – NAME (If not in either, give Street and Number) 7d. Sequoyah Memorial Hospital

STATE OF BIRTH (If not in U.S.A., Name Country) 8. Oklahoma

CITIZEN OF WHAT COUNTRY 9. USA

Married  Never Married  Widowed XX  Divorced 10.

SURVIVING SPOUSE (If Wife, Give Maiden Name) 11.

SOCIAL SECURITY NUMBER 12. 9317

USUAL OCCUPATION (Give kind of work done during most of working life, even if retired) 13a. Laundry Manager

KIND OF BUSINESS OR INDUSTRY 13b. Sequoyah Memorial Hospital

RESIDENCE – STATE 14a. Oklahoma

COUNTY 14b. Sequoyah

CITY, TOWN, OR LOCATION 14c. Sallisaw

INSIDE CITY LIMITS 14d. Yes  No X

STREET AND NUMBER 14e. 74955

FATHER – NAME 15. First Sam Middle Last Hatter

MOTHER – MAIDEN NAME 16. First Ida Middle Last Melton

INFORMANT – NAME 17a. Wanda Floyd

MAILING ADDRESS 17b. (Street or R.F.D. No., City or Town, State, Zip) Sallisaw, Oklahoma 74955

PART 1.

18. CAUSE OF DEATH

DEATH WAS CAUSED BY: (Enter only one cause per line for (a), (b), and (c).)

Condition if any, which gave rise to immediate cause(s), stating the underlying cause last

IMMEDIATE CAUSE (a) Diffuse metastatic carcinoma of colon, right hemiparesis, metastatic adenocarcinoma to lung, brain and abdomen.

DUE TO OR AS A CONSEQUENCE OF: (b)

DUE TO OR AS A CONSEQUENCE OF: (c)

Approximate Interval Between onset and Death

10 months

PART II. OTHER SIGNIFICANT CONDITIONS: (Conditions contributing to death but not related to cause given in part 1 (a))

AUTOPSY 19a. Yes  No X

IF YES: Were findings considered in determining cause of death. 19b. Yes  No

Notice to attending physician: Do not sign this certificate unless you are the physician who attended the deceased for a natural illness—unrelated to injury or poisoning—to which the patient has apparently succumbed, provided that death did not occur while deceased was in penal incarceration or during a therapeutic procedure in which death was not reasonably medically expected. For enumeration of deaths subject to investigation and certification by Medical Examiner, refer to O.S. Title 63, Sec. 938, or contact office of Chief Medical Examiner in Oklahoma City.

CERTIFICATION – I attended the deceased from 20a. Month 5 Day 4 Year 75 TO Month 3 Day 24 Year 76

And last saw him/her alive on 20b. Month 3 Day 28 Year 76

I did/did not view body after death 20c. did

DEATH OCCURRED at 20d. 3-24-76 1:30 P M. at the place, on the date listed, and to the best of my knowledge, due to the cause(s) stated.

CERTIFIER – NAME (Type or Print) 21a. Bob G. Mitchell, M. D.

SIGNATURE OF CERTIFIER 21b. [signature] MD

Degree or Title

DATE SIGNED (Month, Day, Year) 21c. 3-29-76

MAILING ADDRESS – CERTIFIER 21d. Street or R.F.D. No. City or Town State Post Office Box G, Sallisaw, Oklahoma 74955

THE DECEDENT was pronounced dead on 22a. Month 3 Day 24 Year 76

AT 22b. 1:30 P M.

BURIAL, CREMATION, REMOVAL (Specify) 23a. Burial

DATE 23b. Month March Day 26 Year 1976

CEMETERY OR CREMATORY – NAME 23c. Akins Cemetery

LOCATION (Crematory or Cemetery) City or Town State 23d. Northeast of Sallisaw, Ok

FUNERAL HOME - NAME AND ADDRESS (Street or R.F.D. No., City or Town, State, Zip) Wheeler's Box 562 Sallisaw, okla

FUNERAL DIRECTOR 24b. Richard P. Wheeler

LOCAL REGISTRAR SIGNATURE 25a. Margaret Vaughan

DATE RECD. BY LOCAL REG. 25b. 3-31-76

DATE RECEIVED BY STATE REGISTRAR 26. APR - 1 1976



# State Department of Health
### State of Oklahoma
OKLAHOMA CITY, OKLAHOMA 73117

CERTIFIED COPY MUST BE VALIDATED IN THREE COLORS

I hereby certify the foregoing to be a true and correct copy, original of which is on file in this office. In testimony whereof, I have hereunto subscribed my name and caused the official seal to be affixed, at Oklahoma City, Oklahoma, this date.

November 7, 2000

471

KEB400016

State of Oklahoma—Department of Health

# DELAYED CERTIFICATE OF BIRTH

STATE FILE NO. D 2099-204

| 1. NAME AT BIRTH | First: Ada | Middle: Mae | Last: Hatter | 2. DATE OF BIRTH | Month: ▮▮▮ | Day: ▮▮▮ | Year: 1919 |
|---|---|---|---|---|---|---|---|

| 3. PLACE OF BIRTH | County: LeFlore County | City: OKLAHOMA | 4. COLOR OR RACE: white | 5. SEX: female |
|---|---|---|---|---|

| 6. FULL NAME OF FATHER | Sam Hatter | 7. FATHER'S BIRTHPLACE State or Foreign Country: Range County, Texas |
|---|---|---|

| 8. MAIDEN NAME OF MOTHER | Ida Melton | 9. MOTHER'S BIRTHPLACE State or Foreign Country: Sequoyah County, Oklahoma |
|---|---|---|

10. AFFIDAVIT OF REGISTRANT: (Person whose birth is being recorded) I hereby declare upon oath that the above statements are true to the best of my knowledge and belief.

SIGNATURE: *Ada Mae Hatter*

PRESENT ADDRESS: ▮▮▮ Sallisaw, Oklahoma

Subscribed and sworn to before me this Date: 5-6-71

NOTARY PUBLIC: *O. Ellen Armstrong*

My commission expires: 7/23/72

## DO NOT WRITE BELOW -- TO BE COMPLETED IN DIVISION OF VITAL STATISTICS

### ABSTRACT OF SUPPORTING RECORDS

| | TYPE OF RECORD | BY WHOM SIGNED | DATE ISSUED | DATE ORIGINAL RECORD MADE |
|---|---|---|---|---|
| 1 | Affidavit of Personal Knowledge | Sam Hatter | 5/6/71 | 5/6/71 |
| 2 | School Enumeration Record-Sequoyah Co. | A. Y. Blackburn | 3/23/71 | 1928 |
| 3 | Child's Birth Certificate-Oklahoma | M. H. Newlin MD | | 12/26/41 |
| 4 | | | | |

### INFORMATION CONCERNING REGISTRANT AS STATED IN RECORD

| | BIRTHDATE OR AGE | BIRTHPLACE | NAME OF FATHER | NAME OF MOTHER |
|---|---|---|---|---|
| 1 | Sept. 10, 1919 | LeFlore Co., Okla. | Sam Hatter | Ida Melton |
| 2 | Sept. 10, 1919 | LeFlore Co., Okla. | | |
| 3 | 22 years | *Oklahoma | | |
| 4 | | | | |

ADDITIONAL INFORMATION:
*Sequoyah Co.

I hereby certify that no prior birth certificate has been found in the Division of Vital Statistics for this registrant and that documentary evidence has been reviewed, which substantiates the facts as set forth in the foregoing abstract.

| DATE FILED: May 17, 1971 | EVIDENCE REVIEWED BY: L. A. Bell | STATE REGISTRAR: *[signature]* |
|---|---|---|



# State Department of Health
## State of Oklahoma
### OKLAHOMA CITY, OKLAHOMA 73117

I hereby certify the foregoing to be a true and correct copy, original of which is on file in this office. In testimony whereof, I have hereunto subscribed my name and caused the official seal to be affixed, at Oklahoma City, Oklahoma, this date.

April 18, 2001

CERTIFIED COPY MUST BE VALIDATED IN THREE COLORS



KEB400017

473

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**REDACTED EXHIBIT 128**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

473

STATE OF OKLAHOMA
CERTIFICATE OF DEATH

LOCAL FILE NUMBER

STATE FILE NUMBER **002113**

| 1. DECEDENT'S NAME (First, Middle, Last) Billy Dean Maxwell | 2. SEX male. | 3. DATE OF DEATH (Month, Day, Year) January 21, 1999 |
|---|---|---|

| 4. SOCIAL SECURITY NO. ████5014 | 5a. AGE-Last Birthday (Years) 48 | 5b. UNDER 1 YEAR Months / Days | 5c. UNDER 1 DAY Hours / Minutes | 6. DATE OF BIRTH (Month, Day, Year) ████1950 | 7. BIRTHPLACE (City, and State or Foreign Country) Maxwell Mt., Okla. |
|---|---|---|---|---|---|

| 8a. PLACE OF DEATH (Check only one) HOSPITAL: ☐ Inpatient ☐ ER/Outpatient ☐ DOA  OTHER: ☒ Nursing Home ☐ Residence ☐ Other (Specify) | 8b. FACILITY NAME (If not Institution, give street and number) |
|---|---|

| 8c. CITY, TOWN, OR LOCATION OF DEATH Sallisaw | 8d. INSIDE CITY LIMITS ☐ Yes ☒ No | 8e. COUNTY OF DEATH Sequoyah | 9. ☐ MARRIED ☐ NEVER MARRIED ☐ WIDOWED ☐ DIVORCED | 10. SURVIVING SPOUSE (If wife, give maiden name) |
|---|---|---|---|---|

| 11a. DECEDENT'S USUAL OCCUPATION (Give kind of work done during most of working life) Do not use retired. Disabled Veteran | 11b. KIND OF BUSINESS/INDUSTRY Disabled | 12e. INSIDE CITY LIMITS? | 12f. ZIP CODE |
|---|---|---|---|

| 12a. RESIDENCE-STATE Oklahoma | 12b. COUNTY Sequoyah | 12c. CITY, TOWN, OR LOCATION Sallisaw | 12d. STREET AND NUMBER ████ | ☐ Yes ☒ No | 74955 |
|---|---|---|---|---|---|

| 13. WAS DECEDENT OF HISPANIC ORIGIN? (Specify No or Yes--If yes, specify Cuban, Mexican, Puerto Rican, etc.) ☒ No ☐ Yes Specify: | 14. RACE--American Indian, Black, White, etc. Specify: White | 15. DECEDENT'S EDUCATION (Specify only highest grade completed) Elementary/Secondary (0-12) 12 / College (1-4 or 5+) 1 |
|---|---|---|

| 16. FATHER'S NAME (First, Middle, Last) Howard A. Maxwell | 17. MOTHER'S NAME (First, Middle, Maiden, Surname) Violet Gipson Maxwell |
|---|---|

| 18a. INFORMANTS NAME (Type/Print) Marcella Yvonne Kramer, sister | 18b. MAILING ADDRESS (Street and Number or Rural Route Number, City or Town, State, Zip Code) ████ Shelton, Wa 98584 |
|---|---|

| 19a. METHOD OF DISPOSITION ☒ Burial ☐ Cremation ☐ Removal from State ☐ Donation ☐ Other (Specify) | 19b. PLACE OF DISPOSITION (Name of cemetery, crematory or other place) Akins Cemetery | 19c. DATE OF DISPOSAL 1-29-99 | 19d. LOCATION--City or Town, State NE Sallisaw, Okla. |
|---|---|---|---|

| 20. FUNERAL HOME - HOME AND ADDRESS (Street or R.F.D. No., City or Town, State, Zip) Agent Funeral Home P.O. Box 566 Sallisaw, Ok 74955 | 20b. FUNERAL DIRECTOR Rickard N. Agent  20c. SIGNATURE |
|---|---|

| 21. TIME OF DEATH 1237 | 22. DATE PRONOUNCED DEAD (Month, Day, Year) 1/21/99 | 23. WAS CASE REFERRED TO MEDICAL EXAMINER? ☒ Yes ☐ No |
|---|---|---|

24. PART I. Enter the diseases, injuries, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock, or heart failure. List only one cause on each line.

| | | Approximate interval between onset and death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) | a. Traumatic Brain Injury  Due to (or as a consequence of): | |
| Sequentially list conditions, if any, leading to immediate cause. Enter UNDERLYING CAUSE (Disease or injury that initiated events resulting in death) LAST | b. Gun Shot wound To Head  Due to (or as a consequence of): | |
| | c. Due to (or as a consequence of): | |
| | d. | |

| PART II. Other significant conditions contributing to death resulting in the underlying cause given in Part I: History of Schizophrenia | 24a. WAS AN AUTOPSY PERFORMED? Yes ☐ No ☒ | 24b. WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH? Yes ☐ No ☐ |
|---|---|---|

| 24c. AUTOPSY AUTHORIZED BY: | 24d. WAS BODY VIEWED? Yes ☒ No ☐ | 25. MANNER OF DEATH ☐ Natural ☐ Accident ☒ Suicide ☐ Homicide ☐ Pending investigation ☐ Could not be determined |
|---|---|---|

| 26a. DATE OF INJURY (Month, Day, Year) Unknown | 26b. TIME OF INJURY unknown | 26c. INJURY AT WORK? Yes ☐ No ☒ | 26d. DESCRIBE HOW INJURY OCCURRED GSW To Head |
|---|---|---|---|

| 26e. PLACE OF INJURY--At home, farm, street, factory, office, building, etc. (specify) Home | 26f. LOCATION (Street and Number or Rural Route Number, City or Town, State) ████ Sallisaw OK |
|---|---|

27a. CERTIFIER (Check only one)

☐ ATTENDING PHYSICIAN
To the best of my knowledge, death occurred at the time, date, and place, and due to the cause(s) and manner as stated.

Notice to attending physician: Do not sign this certificate unless you are the physician who attended the deceased for a natural illness--unrelated to injury or poisoning--to which the patient has apparently succumbed, provided that death did not occur while deceased was in penal incarceration or during a therapeutic procedure in which death was not reasonably medically expected. For enumeration of deaths subject to investigation and certification by Medical Examiner, refer to O.S. Title 63, Sec. 938, or contact office of Chief Medical Examiner in Oklahoma City.

☒ MEDICAL EXAMINER
On the basis of examination and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner as stated.

| 27b. SIGNATURE AND TITLE OF CERTIFIER | 27c. DATE SIGNED (Month, Day, Year) 1/26/99 |
|---|---|

| 28. NAME AND ADDRESS OF PERSON WHO COMPLETED CAUSE OF DEATH (ITEM 27) (Type/Print) James Campbell, DO, ME Sequoyah Memorial E.R. Sallisaw, ok 74955 |
|---|

| 29. REGISTRAR'S SIGNATURE (LOCAL) Charity Richardson RN | 30. DATE RECEIVED BY LOCAL REGISTRAR 1-27-99 | 31. DATE RECEIVED BY STATE REGISTRAR FEB 04 1999 |
|---|---|---|

475

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**REDACTED EXHIBIT 129**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

475

STATE OF OKLAHOMA
# CERTIFICATE OF DEATH

LOCAL FILE NUMBER 4567

STATE FILE NUMBER 026766

| 1. DECEDENT'S LEGAL NAME (First, Middle, Last, Suffix) | 2. SEX | 3. SOCIAL SECURITY NUMBER | 4. EVER IN US ARMED FORCES? |
|---|---|---|---|
| **Hattie Gertrude Dotson** | female | ███ 9307 | ☐ Yes ☒ No |

| 5a. AGE- Last birthday (years) | 5b. UNDER 1 YEAR | | 5c. UNDER 1 DAY | | 6. DATE OF BIRTH | 7. BIRTHPLACE (City and State or Foreign Country) |
|---|---|---|---|---|---|---|
| 86 | Months | Days | Hours | Minutes | ███ 1921 (Mo/Day/Yr) | Sallisaw, Oklahoma |

| 8a. RESIDENCE-State | 8b. RESIDENCE-County | 8c. RESIDENCE-City or Town | 8d. RESIDENCE-Zip Code | 8e. RESIDENCE-Inside City Limits? |
|---|---|---|---|---|
| Oklahoma | LeFlore | Arkoma | 74901 | ☒ Yes ☐ No |

| 8f. RESIDENCE-Street and Number | 8g. RESIDENCE-Apartment Number |
|---|---|
| ███ | |

| 9. MARITAL STATUS AT TIME OF DEATH | 10. SURVIVING SPOUSE'S NAME (If wife, give name prior to first marriage) |
|---|---|
| ☐ Married ☐ Never Married ☒ Widowed ☐ Divorced ☐ Married, but separated ☐ Unknown | |

| 11. FATHER'S NAME (First, Middle, Last) | 12. MOTHER'S NAME PRIOR TO FIRST MARRIAGE (First, Middle, Last) |
|---|---|
| Allen Real | Ida Goodwin |

**13. DECEDENT OF HISPANIC ORIGIN?** (Check the box that best describes whether the decedent is Spanish/Hispanic/Latino. Check the 'No' box if the decedent is not Spanish/Hispanic/Latino)

☒ No, not Spanish/Hispanic/Latino

☐ Yes, Mexican, Mexican American, Chicano
☐ Yes, Puerto Rican
☐ Yes, Cuban
☐ Yes, other Spanish/Hispanic/Latino
(specify) _____

**14. DECEDENT'S RACE** (Check one or more races to indicate what the decedent considered himself or herself to be)

☒ White
☐ Black or African American
☐ American Indian or Alaska Native _____ (Name of the enrolled or principal tribe)
☐ Asian Indian
☐ Chinese
☐ Filipino
☐ Japanese
☐ Korean
☐ Vietnamese
☐ Other Asian (Specify) _____
☐ Pacific Islander (Specify) _____
☐ Other (Specify) _____

**15. DECEDENT'S EDUCATION** (Check the box that best describes the highest degree or level of school completed at the time of death)

☐ 8th grade or less
☐ 9th – 12th grade, no diploma
☒ High school graduate or GED completed
☐ Some college credit, but no degree
☐ Associate degree (e.g. AA, AS)
☐ Bachelor's degree (e.g. BA, AB, BS)
☐ Master's degree (e.g. MEd, MA, MS, MEng, MSW, MBA)
☐ Doctorate (e.g. PhD, EdD) or Professional degree (e.g. MD, JD)

| 16. DECEDENT'S USUAL OCCUPATION (Indicate type of work done during most of working life. DO NOT USE RETIRED.) | 17. KIND OF BUSINESS / INDUSTRY |
|---|---|
| Cafeteria Cook for Sallisaw Schools - 20 Years | food preparation |

| 18a. INFORMANT'S NAME | 18b. RELATIONSHIP TO DECEDENT | 18c. MAILING ADDRESS (Street and Number, City, State, Zip Code) |
|---|---|---|
| Mark Dotson | son | ███ Vian, Oklahoma 74962 |

| 19. METHOD OF DISPOSITION | 20. PLACE OF DISPOSITION (Name of cemetery, crematory, other place) | 21. LOCATION – City, Town and State |
|---|---|---|
| ☒ Burial ☐ Cremation ☐ Donation ☐ Entombment ☐ Removal from state ☐ Other (specify) | Dwight Mission Cemetery | Sallisaw, Oklahoma |

| 22. NAME AND COMPLETE ADDRESS OF FUNERAL FACILITY | 23. SIGNATURE OF FUNERAL HOME DIRECTOR OR FAMILY MEMBER ACTING AS SUCH |
|---|---|
| **Agent Funeral Home** **102 E. Chickasaw P.O. Box 566 Sallisaw, Ok 74955** | *Richard Nugent* |
| | 24. FH ESTABLISHMENT LICENSE # 1240 ES |

**25. PLACE OF DEATH** (Check only one: see instructions)

IF DEATH OCCURRED IN A HOSPITAL:
☐ Inpatient ☐ Emergency Room/Outpatient ☐ Dead on Arrival

IF DEATH OCCURRED OTHER THAN IN A HOSPITAL:
☐ Hospice Facility ☒ Nursing home/Long term care facility ☐ Decedent's home ☐ Other (specify) _____

| 26. FACILITY NAME (If not institution, give street & number) | 27. CITY OR TOWN, STATE AND ZIP CODE OF LOCATION OF DEATH | 28. COUNTY OF DEATH |
|---|---|---|
| Medihomes of Arkoma | Arkoma, Oklahoma | LeFlore |

| 29. DATE OF DEATH | 30. TIME OF DEATH | 31. WAS MEDICAL EXAMINER CONTACTED? | 32. WAS AN AUTOPSY PERFORMED? | 33. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? |
|---|---|---|---|---|
| Oct 7, 2007 (Mo/Day/Yr) | 12:45am | ☐ Yes ☒ No | ☐ Yes ☒ No | ☐ Yes ☐ No |

**CAUSE OF DEATH** (See instructions and examples)

34. PART I. Enter the chain of events – diseases, injuries or complications – that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. Enter only one cause on a line. Add additional lines if necessary.

| | | Approximate interval Onset to death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) → a. Colon Cancer - Cell type unknown | Due to (or as a consequence of): | 11 years |
| Sequentially list conditions, if any, leading to the cause listed on line a. b. _____ | Due to (or as a consequence of): | |
| Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST. c. _____ | Due to (or as a consequence of): | |
| d. _____ | | |

35. PART II. Enter other significant conditions contributing to death but not resulting in the underlying cause given in PART I.

| 36. MANNER OF DEATH | 37. IF FEMALE: | 38. DID TOBACCO USE CONTRIBUTE TO DEATH? |
|---|---|---|
| ☒ Natural ☐ Homicide ☐ Accident ☐ Suicide ☐ Pending Investigation ☐ Could not be determined | ☒ Not pregnant within past year ☐ Pregnant at time of death ☐ Not pregnant, but pregnant within 42 days of death ☐ Not pregnant, but pregnant 43 days to 1 year before death ☐ Unknown if pregnant within the past year | ☐ Yes ☒ No ☐ Probably ☐ Unknown |

| 39. DATE OF INJURY (Mo/Day/Yr) | 40. TIME OF INJURY | 41. PLACE OF INJURY (e.g. Decedent's home; construction site; wooded area) | 42. DESCRIBE HOW INJURY OCCURRED: | 43. INJURY AT WORK? ☐ Yes ☐ No |
|---|---|---|---|---|
| | | | | |

| 44. LOCATION OF INJURY: State: City or Town: Zip Code: Street & Number: Apartment Number: | 45. IF TRANSPORTATION INJURY, SPECIFY: ☐ Driver/Operator ☐ Passenger ☐ Pedestrian ☐ Other (specify) |
|---|---|

**46. CERTIFIER** (Check only one):

☒ ATTENDING PHYSICIAN: Physician in charge of the patient's care ☐ Physician in attendance at time of death only
To the best of my knowledge, death occurred at the time, date, and place, and due to the cause(s) and manner as stated.

☐ MEDICAL EXAMINER: On the basis of examination, and/or investigation, in my opinion, death occurred at the time, date and place, and due to the cause(s) and manner stated.

| 47. NAME, ADDRESS AND ZIP CODE OF PERSON COMPLETING CAUSE OF DEATH (Items 34-35) |
|---|
| Dr. Judy Trent P.O. Box 130 Spiro, Ok 74959 |

Signature of Certifier: *Judy Trent, DO*

| 48. LICENSE NUMBER | 49. DATE DEATH CERTIFIED |
|---|---|
| 2119 | 10/15/07 (Mo/Day/Yr) |

| 50. REGISTRAR'S SIGNATURE (Local) | 51. DATE RECEIVED BY LOCAL REGISTRAR | 52. DATE RECEIVED BY STATE REGISTRAR |
|---|---|---|
| *Delores Woodall, Deputy Registrar* | 10-18-07 (Mo/Day/Yr) | OCT 24 2007 (Mo/Day/Yr) |

2004 REVISION

February 19, 2009

VS 154 (1-04)

476

477

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 130**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

ATTENDING PHYSICIAN
# CERTIFICATE OF DEATH
STATE OF OKLAHOMA · DEPARTMENT OF HEALTH

## 007252

| LOCAL REGISTRAR'S FILE NO. | | | STATE FILE NO. | | |
|---|---|---|---|---|---|
| DECEASED - NAME  First  Middle  Last | | | DATE OF DEATH (Month, Day, Year) | | SEX |
| Hugh   Virgil   Dotson | | | 2 March 19, 1995 | | 3 Male |
| RACE White, Negro, American Indian, Etc (Specify) 4  White | AGE - Last Birthday (Year) 5a 77 | UNDER 1 YEAR Mos. 5b  UNDER 1 DAY Hours Min. 5c | DATE OF BIRTH (Month, Day, Year) 6 ▮▮1917 | | COUNTY OF DEATH 7 Sequoyah |
| CITY, TOWN, OR LOCATION OF DEATH 7b Vian | INSIDE CITY LIMITS Yes ☐ No ☒ 7c | | HOSPITAL OR OTHER INSTITUTION -- NAME (If not in either, give Street and Number) 7d Home | | |
| STATE OF BIRTH (If not in U.S.A., Name Country) 8 Oklahoma | CITIZEN OF WHAT COUNTRY 9 USA | | Married ☒ Never Married ☐ Widowed ☐ Divorced ☐ 10 | SURVIVING SPOUSE (If Wife, Give Maiden Name) 11 Hattie Gertrude Real | |
| SOCIAL SECURITY NUMBER 12 ▮▮2492 | USUAL OCCUPATION (Give kind of work done during most of working life, even if retired) 13a Retired from Crown Zellerbach and a Cattle Rancher | | | KIND OF BUSINESS OR INDUSTRY | |
| RESIDENCE - STATE 14a Oklahoma | COUNTY 14b Sequoyah | CITY, TOWN, OR LOCATION 14c Vian | INSIDE CITY LIMITS Yes ☐ No ☒ 14d | STREET AND NUMBER 14e ▮▮ | |
| FATHER - NAME  First  Middle  Last 15 Abe  Dotson | | | MOTHER -- MAIDEN NAME  First  Middle  Last 15 Minnie  Andrews | | |
| INFORMANT - NAME 17a Hattie Dotson, wife | MAILING ADDRESS 17b ▮▮ Vian, Oklahoma 74962 | | (Street or R.F.D. No., City or Town, State, Zip) | | |

| PART 1 | DEATH WAS CAUSED BY (Enter only one cause per line for (a), (b), and (c).) | Approximate Interval Between onset and Death |
|---|---|---|
| 18 CAUSE OF DEATH | IMMEDIATE CAUSE (a) CHF | |
| Condition if any, which gave rise to immediate cause(s), stating the underlying cause last | DUE TO OR AS A CONSEQUENCE OF (b) cardiomyopathy | |
| | DUE TO OR AS A CONSEQUENCE OF (c) ASVD | |

PART II. OTHER SIGNIFICANT CONDITIONS (Conditions contributing to death but not related to cause given in part I (a))   AUTOPSY 19a Yes ☐ No ☒   IF YES Were findings considered in determining cause of death. 19b.   Yes ☐   No ☐

Notice to attending physician: Do not sign this certificate unless you are the physician who attended the deceased for a natural illness- unrelated to injury or poisoning—to which the patient has apparently succumbed, provided that death did not occur while deceased was in penal incarceration or during a therapeutic procedure in which death was not reasonably medically expected. For enumeration of deaths subject to investigation and certification by Medical Examiner, refer to O.S. Title 63, Sec. 938, or contact office of Chief Medical Examiner in Oklahoma City.

| CERTIFICATION - Month Day Year TO Month Day Year 20a PHYSICIAN I attended the deceased from 3-15-95 TO 3-19-95 | And Last saw him/her alive on 20b. Month Day Year 3-17-95 | I did/did not view body after death 20c "not | DEATH OCCURRED at 10:33p M. 20d. at the place, on the date stated, and to the best of my knowledge, due to the cause(s) stated. |
|---|---|---|---|
| CERTIFIER - NAME (Type or Print) 21a Michael Callery, DO | SIGNATURE OF CERTIFIER 21b M Callery | Degree or Title | DATE SIGNED (Month, Day, Year) 21c 3-27-95 |
| MAILING ADDRESS - CERTIFIER Street or R.F.D. No.  City or Town  State  Zip 21d 1109 East Cherokee Sallisaw, Ok 74955 | | | THE DECEDENT was pronounced dead on 22a Month Day Year 3-19-95 | AT 22b. 10:33p M. |
| BURIAL, CREMATION, REMOVAL (Specify) 23a Burial | DATE Month Day Year 23b March 22, 1995 | CEMETERY OR CREMATORY - NAME 23c Dwight Mission Cemetery | |
| LOCATION (Crematory or Cemetery) City or Town  State 23d W Sallisaw, Oklahoma | FUNERAL HOME - NAME AND ADDRESS (Street or R.F.D. No., City or Town, State, Zip) 24a Agent, Box 566 Sallisaw, Ok 74955 | FUNERAL DIRECTOR 24b Richard N. Agent | |
| LOCAL REGISTRAR SIGNATURE 25a Chauty Richardson | DATE RECD. BY LOCAL REG. 25b 3-29-95 | DATE RECEIVED BY STATE REGISTRAR 26. MAR 3 1 1995 | |



## State Department of Health
### State of Oklahoma
OKLAHOMA CITY, OKLAHOMA 73117

CERTIFIED COPY MUST BE
VALIDATED IN THREE COLORS

I hereby certify the foregoing to be a true and correct copy, original of which is on file in this office. In testimony whereof, I have hereunto subscribed my name and caused the official seal to be affixed, at Oklahoma City, Oklahoma, this date.

April 11, 2001



478

KEB400240

479

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 132**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                 *U.S. v. Barrett*, 6:09-cv-00105-JHP

479

STATE OF OKLAHOMA - DEPARTMENT OF HEALTH                                      018701

**CERTIFICATE OF DEATH**

LOCAL REGISTRAR'S FILE NO. 119

STATE BIRTH NO. _____   STATE FILE NO. _____

| 1. PLACE OF DEATH | 2. USUAL RESIDENCE (Where deceased lived. If institution: residence before admission). |
|---|---|
| a. COUNTY Sequoyah | a. STATE Oklahoma    b. COUNTY Sequoyah |
| b. CITY OR TOWN Sallisaw  ☐ INSIDE / ☒ OUTSIDE CITY LIMITS   c. LENGTH OF STAY (in this place) | c. CITY OR TOWN Sallisaw   ☐ INSIDE / ☒ OUTSIDE CITY LIMITS |
| d. FULL NAME OF HOSPITAL OR INSTITUTION (If not in hospital or institution, give street address or location) Home - | d. STREET ADDRESS (If rural give location) |

| 3. NAME OF DECEASED (Type or Print) | 4. DATE OF DEATH |
|---|---|
| a. (First) ISAAC   b. (Middle) CLIFFORD   c. (Last) BARRETT | (Month) (Day) (Year) Nov. 24, 1953 |

| 5. SEX Male | 6. COLOR OR RACE White | 7. MARRIED, NEVER MARRIED, WIDOWED, DIVORCED (Specify) Married | 8. DATE OF BIRTH 1886 | 9. AGE (In years last birthday) 67 | IF UNDER 1 YEAR Months / Days | IF UNDER 24 HRS. Hours / Min. |
|---|---|---|---|---|---|---|

| 10a. USUAL OCCUPATION (Give kind of work done during most of working life, even if retired) Farmer | 10b. KIND OF BUSINESS OR INDUSTRY Farming | 11. BIRTHPLACE (State or foreign country) Muldraw, I.T. | 12. CITIZEN OF WHAT COUNTRY? U.S.A. |
|---|---|---|---|

| 13. FATHER'S NAME Jack Barrett | 14. MOTHER'S MAIDEN NAME Sallie Grant |
|---|---|

| 15. WAS DECEASED EVER IN U.S. ARMED FORCES? (Yes, no, or unknown) No | (If yes, give war or dates of service) None | 16. SOCIAL SECURITY NO. None | 17. INFORMANT G. J. Barrett | ADDRESS Sallisaw, Okla. |
|---|---|---|---|---|

| 18. CAUSE OF DEATH | MEDICAL CERTIFICATION | INTERVAL BETWEEN ONSET AND DEATH |
|---|---|---|
| Enter only one cause per line for (a), (b), and (c) | I. DISEASE OR CONDITION DIRECTLY LEADING TO DEATH* (a) Coronary Thrombosis | 1 hour |
| *This does not mean the mode of dying, such as heart failure, asthenia, etc. It means the disease, injury, or complication which caused death. | ANTECEDENT CAUSES Morbid conditions, if any, giving rise to the above cause (a) stating the underlying cause last.  DUE TO (b) _____  DUE TO (c) _____ | |
| | II. OTHER SIGNIFICANT CONDITIONS Conditions contributing to the death but not related to the disease or condition causing death. | |

| 19a. DATE OF OPERATION | 19b. MAJOR FINDINGS OF OPERATION | 20. AUTOPSY? YES ☐ NO ☒ |
|---|---|---|

| 21a. ACCIDENT SUICIDE HOMICIDE (Specify) | 21b. PLACE OF INJURY (e.g., in or about home, farm, factory, street, office bldg., etc.) | 21c. WHERE INJURY OCCURRED (City, Town, or Rural Location) (County) (State) |
|---|---|---|
| 21d. TIME OF INJURY (Month) (Day) (Year) (Hour) ___ m. | 21e. INJURY OCCURRED WHILE AT WORK ☐   NOT WHILE AT WORK ☐ | 21f. HOW DID INJURY OCCUR? |

22. I hereby certify that I attended the deceased from _11-19_, 19_51_, to _11-24_, 19_53_, that I last saw the deceased alive on _11-23_, 19_53_, and that death occurred at ___ m., from the causes and on the date stated above.

| 23a. SIGNATURE (Degree or title) | 23b. ADDRESS Sallisaw, Okla. | 23c. DATE SIGNED 11-24-53 |
|---|---|---|

| 24a. BURIAL, CREMATION, REMOVAL (Specify) Burial | 24b. DATE Nov. 25, 1953 | 24c. NAME OF CEMETERY OR CREMATORY Akins Cemetery | 24d. LOCATION (City, town, or county) (State) Sallisaw - Rt #1 - Okla. |
|---|---|---|---|

| DATE REC'D BY LOCAL REG. 11-25-53 | REGISTRAR'S SIGNATURE Bertie Nichols | 25. FUNERAL DIRECTOR Wheeler Funeral Home - Sallisaw | ADDRESS Okla. |
|---|---|---|---|

V. S. 154 9-48

February 19, 2009

480

VOID VOID VOID

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )   Case No. 6:09-cv-00105-JHP |
| | ) |
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| *Defendant.* | ) |

REDACTED EXHIBIT 133

TO KENNETH EUGENE BARRETT'S

SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

481

# CERTIFICATE OF DEATH
## STATE OF OKLAHOMA · DEPARTMENT OF HEALTH

LOCAL REGISTRAR'S FILE NO. 149
STATE BIRTH NO.

STATE FILE NO. **23435**

**1. PLACE OF DEATH**
a. COUNTY: Sequoyah
b. CITY, TOWN, OR LOCATION: Sallisaw
c. LENGTH OF STAY IN 1b:
d. NAME OF HOSPITAL OR INSTITUTION (If not in hospital, give street address): Sequoyah Memorial Hosp.
e. IS PLACE OF DEATH INSIDE CITY LIMITS? YES ☒ NO ☐

**2. USUAL RESIDENCE** (Where deceased lived. If institution: Residence before admission)
a. STATE: Oklahoma
b. COUNTY: Sequoyah
c. CITY, TOWN, OR LOCATION: Sallisaw
d. STREET ADDRESS: Rt. 1
e. IS RESIDENCE INSIDE CITY LIMITS? YES ☐ NO ☒
f. IS RESIDENCE ON A FARM? YES ☒ NO ☐

**3. NAME OF DECEASED** (Type or print): Mary Ellen Barrett

**4. DATE OF DEATH**: Dec. 25, 1964

**5. SEX**: female
**6. COLOR OR RACE**: white
**7.** MARRIED ☐ NEVER MARRIED ☐ WIDOWED ☒ DIVORCED ☐
**8. DATE OF BIRTH**: ▮▮▮ 1889
**9. AGE** (in years last birthday): 75

**10a. USUAL OCCUPATION** (Give kind of work done during most of working life, even if retired): housewife
**10b. KIND OF BUSINESS OR INDUSTRY**:
**11. BIRTHPLACE** (State or foreign country): Alabama
**12. CITIZEN OF WHAT COUNTRY?**: USA

**13. FATHER'S NAME**: William Maxwell
**14. MOTHER'S MAIDEN NAME**: Mattie Mewby

**15. WAS DECEASED EVER IN U.S. ARMED FORCES?** (Yes, no, or unknown) (If yes, give war or dates of service):
**16. SOCIAL SECURITY NO.**:
**17. INFORMANT** — Address: A. J. Barrett, Sallisaw, Okla.

**18. CAUSE OF DEATH** [Enter only one cause per line for (a), (b), and (c).]
PART I. DEATH WAS CAUSED BY:
IMMEDIATE CAUSE (a): Cardio Renal Disease
INTERVAL BETWEEN ONSET AND DEATH: 2 years
Conditions, if any, which gave rise to above cause (a), stating the underlying cause last.
DUE TO (b): _____
DUE TO (c): _____
PART II. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO THE TERMINAL DISEASE CONDITION GIVEN IN PART I(a):

**19. WAS AUTOPSY PERFORMED?** YES ☐ NO ☐

**20a.** ACCIDENT ☐ SUICIDE ☐ HOMICIDE ☐
**20b. DESCRIBE HOW INJURY OCCURRED.** (Enter nature of injury in Part I or Part II of item 18.)
**20c. TIME OF INJURY**: Hour a.m. p.m.  Month, Day, Year
**20d. INJURY OCCURRED** WHILE AT WORK ☐ NOT WHILE AT WORK ☐
**20e. PLACE OF INJURY** (e.g., in or about home, farm, factory, street, office bldg., etc.):
**20f. CITY, TOWN, OR LOCATION**:  COUNTY:  STATE:

**21.** I attended the deceased from 2/10/56, to 12/25/64 and last saw her alive on 12/25/64 m on the date stated above; and to the best of my knowledge, from the causes stated. Death occurred at _____

**22a. SIGNATURE** (Degree or title): F. B. Oliver D.O.
**22b. ADDRESS**: Sallisaw, Okla.
**22c. DATE SIGNED**: 1-4-65

**23a. BURIAL, CREMATION, REMOVAL** (Specify): burial
**23b. DATE**: 12-28-64
**23c. NAME OF CEMETERY OR CREMATORY**: Akins Cemetery
**23d. LOCATION** (City, town, or county) (State): Sequoyah Co, Oklahoma

**24. DATE RECD. BY LOCAL REG.**: 1-27-65
**25. REGISTRAR'S SIGNATURE**: Elsie King
**26. FUNERAL DIRECTOR** — ADDRESS: Wheeler Funeral Home, Sallisaw, Okla.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

—————————————————————————

**REDACTED EXHIBIT 134**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

—————————————————————————

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

483

STATE OF OKLAHOMA
CERTIFICATE OF DEATH

012686

LOCAL FILE NUMBER                                          STATE FILE NUMBER

| 1 DECEDENTS NAME (First, Middle, Last) | 2 SEX | 3a DATE OF DEATH (Month, Day, Year) | 3b TIME OF DEATH |
|---|---|---|---|
| Minnie Irene Andrews | F | 05-11-2003 | 13:50 p.m. |

4a PLACE OF DEATH (Check only one) [X] HOSPITAL [ ] Patient [ ] ER/Outpatient [ ] DOA [ ] OTHER [ ] Nursing Home [ ] Residence [ ] Other (Specify)
4b FACILITY NAME (If not institution, give street and number) Muskogee Regional Medical Center

4c CITY, TOWN, OR LOCATION OF DEATH Muskogee | 4d INSIDE CITY LIMITS [X] Yes [ ] No | 4e COUNTY OF DEATH Muskogee

5 [ ] MARRIED [ ] NEVER MARRIED [X] WIDOWED [ ] DIVORCED | 6 SURVIVING SPOUSE (if wife, give maiden name) NA

7 SOCIAL SECURITY NO ███3850 | 8a Age Last Birthday (Years) 94 | 8b Under 1 Year Months Days | 8c Under 1 Day Hours Minutes | 9 DATE OF BIRTH (Month, Day, Year) 1909

10 BIRTHPLACE (City and State or Foreign Country) Huntsville, Alabama | 11a DECEDENT'S USUAL OCCUPATION (Give kind of work done during most of working life) Homemaker

11b KIND OF BUSINESS/INDUSTRY Domestic | 12a RESIDENCE-STATE Oklahoma | 12b COUNTY Muskogee | 12c CITY TOWN OR LOCATION Muskogee

12d STREET AND NUMBER ███ | 12e INSIDE CITY LIMITS? [ ] Yes [ ] No | 12f ZIP CODE 74403 | 13 WAS DECEDENT OF HISPANIC ORIGIN? [ ] Yes [X] No (If Yes, specify Cuban Mexican Puerto Rican, etc.)

14 RACE-American Indian Black, White, etc. Specify White | 15 DECEDENTS EDUCATION (Specify only highest grade completed) Elementary / Secondary (0-12) 5th College (1-4 or 5+)

16 FATHER'S NAME (First, Middle, Last) Ed Fitch | 17 MOTHER'S NAME (First, Middle, Maiden Surname) Mary Hambrick Fitch

18a INFORMANT'S NAME (Type/Print) Virginia Whiteley | 18b MAILING ADDRESS (Street and Number or Rural Route Number, City or Town, State, Zip Code) ███, Broken Arrow OK 74012

19a METHOD OF DISPOSITION [X] Burial [ ] Cremation [ ] Donation [ ] Removal from state [ ] Other (Specify) | 19b PLACE OF DISPOSITION (Name of cemetery, crematory or other place) National Cemetery

19c DATE OF DISPOSITION 05-15-2003 | 19d LOCATION City or Town, State Fort Gibson, Oklahoma | 20a FUNERAL HOME AND ADDRESS (Street or RFD No, City or Town, State, Zip) Bradley Funeral Service, 1020 W. Okmulgee, Muskogee OK 74401

20b FUNERAL DIRECTOR Carter Bradley | 20c SIGNATURE

21a PART I. Enter the diseases, injuries, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock, or heart failure. List only one cause on each line | Approximate interval between onset and death

IMMEDIATE CAUSE (Final disease or condition resulting in death)
a. Multisystem Failure — 72 hours
Due to (or as a consequence of)

Sequentially list conditions if any, leading to immediate cause. Enter UNDERLYING CAUSE (Disease or injury that initiated events resulting in death) LAST
b. Respiratory Failure — 72 hours
Due to (or as a consequence of)
c. Bilateral Pneumonia — 5 days
Due to (or as a consequence of)
d.

PART II. OTHER SIGNIFICANT MEDICAL CONDITIONS (not directly contributing to death) COPD, Congestive Heart Failure, Coronary Artery Disease, Hypertension, Lupus

21b WAS AN AUTOPSY PERFORMED? [ ] Yes [X] No | 21c AUTOPSY AUTHORIZED BY | 21d WAS BODY VIEWED? [X] Yes [ ] No

22. MANNER OF DEATH [X] Natural [ ] Accident [ ] Suicide [ ] Homicide [ ] Pending Investigation [ ] Could not be determined

23a DATE OF INJURY (Month, day, Year) | 23b TIME OF INJURY | 23c INJURY AT WORK [ ] Yes [ ] No | 23c DESCRIBE HOW INJURY OCCURRED

23e PLACE OF INJURY-At home, farm, street, factory, office, building, etc. (specify) | 23f LOCATION (Street and Number or Rural Route Number, City or Town, State)

24a CERTIFIER (Check only one) [X] ATTENDING PHYSICIAN
To the best of my knowledge, death occurred at the time, date, and place and due to the cause(s) and manner as stated

Notice to attending physician. Do not sign this certificate unless you are the physician who attended the deceased for a natural illness—unrelated to injury or poisoning—to which the patient has apparently succumbed, provided that death did not occur while deceased was in penal incarceration or during a therapeutic procedure in which death was not reasonable medically expected. For enumeration of deaths subject to investigation and certification by a Medical Examiner, refer to O.S. Title 63, Sec 938 or contact office of Chief Medical Examiner in Oklahoma City.

[ ] MEDICAL EXAMINER
On the basis of examination and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner as stated

24b SIGNATURE AND TITLE OF CERTIFIER | 24c DATE SIGNED (Month, Day, Year) 05/14/03

25 NAME AND ADDRESS OF PERSON WHO COMPLETED CAUSE OF DEATH (ITEM 24) (Type/Print) Dr. George M. Jennings, 384 S. 33rd, Suite D, Muskogee OK 74401

26 REGISTRAR'S SIGNATURE (LOCAL) Sandra K Corrier/By Latricia Hall | 27 DATE RECEIVED BY LOCAL REGISTRAR MAY 22, 2003 | 28 DATE RECEIVED BY STATE REGISTRAR MAY 27 2003

February 19, 2009

## IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

## REDACTED EXHIBIT 137

## TO KENNETH EUGENE BARRETT'S

## SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

# OFFICIAL TRANSCRIPT
## SALLISAW HIGH SCHOOL
### SALLISAW, OKLAHOMA

| Crawford | Gwen | |
|---|---|---|
| LAST NAME | FIRST | Middle |

ENTERED: DATE __8-26-74__ GRADE _____9th_____

FROM: _____Tommie Spear_____

| -60 | Sallisaw, Okla. |
|---|---|
| DATE OF BIRTH | PLACE OF BIRTH |

SEX _____F_ RACE _____ MAILING ADDRESS _____ Vian _____  PHONE NUMBER 5-

FATHER _____Roger Lee Crawford_____ OCCUPATION _____Star Furniture_____ MOTHER _____ OCCUPATION _____

**9th Year — 74 — 75**

| SUBJECTS | Sem. Marks 1st | 2nd |
|---|---|---|
| English I | C | C |
| Civics | | D |
| Oklahoma History | C | |
| Math | C | D |
| General Science | C | C |
| P. E. | A | A |
| Home Ec. | B | C |

**10th Year — 75 — 76**

| SUBJECTS | Sem. Marks 1st | 2nd |
|---|---|---|
| English II | B- | D |
| Biology | C | C |
| Health | B | |
| Gen. Math | B | B |
| General Business | C | C |
| Home Ec II | A | A |
| Driver's Ed. | | A |

**11th Year — —**

| SUBJECTS | Sem. Marks 1st | 2nd |
|---|---|---|
| English III | | |
| American History | | |
| | | |

**12th Year — —**

| SUBJECTS | Sem. Marks 1st | 2nd |
|---|---|---|
| English IV | | |
| P.O.D. | | |
| | | |

## RECORD OF TEST DATA

| CREDITS SENT TO: | |
|---|---|
| School | Date |
| School | Date |
| | Date |
| Passing Marks | A B C D |
| Rank in Class _____ | |
| Periods Per Week _____ | |
| Length of Periods _____ | |

Number in Class: Boys_____ Girls_____ Total_____

Graduated_____ Dropped___X___ Withdrew_____

Date of Graduation_____ 19_____

Course: College Prep. _____ General_____

_____ Principal

Transcript Certified _____ Registrar

*Sandra Hoar*

1-16-09

487

# IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## REDACTED EXHIBIT 138

## TO KENNETH EUGENE BARRETT'S

## SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

# OFFICIAL TRANSCRIPT
## SALLISAW HIGH SCHOOL
### SALLISAW, OKLAHOMA

*Barrett, Earnest*

LAST NAME _____ 38 _____ FIRST *Atkins Oklahoma* Middle

DATE OF BIRTH _____ PLACE OF BIRTH _____

ENTERED: DATE *8-23-54* GRADE *age 16*

FROM: *Sallisaw Jr. High*

SEX _____ RACE _____ MAILING ADDRESS *Sallisaw* ■■■ PHONE NUMBER _____

FATHER *A. J. Barrett* OCCUPATION _____ MOTHER _____ OCCUPATION _____

| 9th Year — — | | | 10th Year *54 55* | | | 11th Year — — | | | 12th Year — — | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sem. Marks | | | Sem. Marks | | | Sem. Marks | | | Sem. Marks | |
| SUBJECTS | 1st | 2nd | SUBJECTS | 1st | 2nd | SUBJECTS | 1st | 2nd | SUBJECTS | 1st | 2nd |
| English I | | | English II | B | B | English III | | | English IV | | |
| Civics | | | Biology | | | American History | | | | | |
| Oklahoma History | | | *Alg I* | C | B | | | | | | |
| Math | | | *World History* | C | B | | | | | | |
| General Science | | | *Ind. Arts I* | B | B | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

### RECORD OF TEST DATA

*Otis S.A. 100 - 1954*
*Orleans 24 - 1953*

| CREDITS SENT TO: | |
|---|---|
| School | Date |
| School | Date |
| | Date |
| Passing Marks | A B C D |
| Rank in Class _____ | |
| Periods Per Week _____ | |
| Length of Periods _____ | |

Graduated _____ Dropped _____ Withdrew _____

Date of Graduation _____ 19 _____

Course: College Prep. _____ General _____

_____ Principal

Transcript Certified *E W Minter* 1/16/09 Registrar

Number in Class: Boys _____ Girls _____ Total _____

489

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## REDACTED EXHIBIT 148

## TO KENNETH EUGENE BARRETT'S

## SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

# OKLAHOMA STATE BUREAU OF INVESTIGATION

PAGE 1 of 2

TITLE OF
REPORT  INTERVIEW OF KENNETH EUGENE BARRETT

**KENNETH EUGENE BARRETT**, WM, DOB: ███/61, SSN: ███-9952, ██████ ██████ Vian, Oklahoma, 918/775-6969 (mother's telephone), provided the following information:

BARRETT was a self-employed mechanic.

On September 24, 1999, BARRETT and his son TOBY WAYNE BARRETT (18 years of age) were outside in the yard of their residence working on a 1985 Camero. At around midnight KENNETH went in the house and then heard TOBY yelling but KENNETH could not understand what TOBY was saying. A Bronco, which KENNETH had never seen before, was pulling across a field into KENNETH'S yard. KENNETH walked out of the house and looked and the Bronco pulled up to within five feet of the front door of KENNETH'S house. The Bronco had its headlights on and the lights were blinding KENNETH.

KENNETH then felt a pain in his leg and started to fall. KENNETH stated that he was standing inside his house by the bedroom door and as he was falling he grabbed his loaded AR-15 which he kept by the bedroom door. As KENNETH was falling he started shooting and he fired "a bunch of rounds". KENNETH'S AR-15 was not a full automatic weapon. People were yelling and KENNETH thought he had been shot but did not know for sure where the shots came from but KENNETH thought the shots came through the window. KENNETH had other weapons in the house but they were locked in a cabinet.

TOBY was outside screaming "Dad" and then there was a man (unidentified) standing over KENNETH with a gun and wearing fatigues but KENNETH did not think that was the man who shot him. The man with the gun told KENNETH to get up and KENNETH told the man he could not get up. KENNETH was dragged outside but he did not know who dragged him outside. After being dragged outside KENNETH was "stomped and hit in the face with a flashlight" but KENNETH did not know who was stomping and hitting him. According to KENNETH people (unidentified) were calling him "scum and a piece of shit" and putting their feet on his head. KENNETH did not know if the people were police officers until he saw Sequoyah County Sheriff JOHNNY PHILPOT. PHILPOT told KENNETH that KENNETH would be in his (PHILPOT'S) jail and KENNETH would die there. PHILPOT told KENNETH that he was a "stupid son-of-a-bitch" and that PHILPOT should have killed KENNETH when KENNETH was younger. Someone

| | | | |
|---|---|---|---|
| INVESTIGATION ON 09/24/99 | AT TULSA, OKLAHOMA | BY DENNIS FRANCHINI | FILE CR 99-746 |
| OFFENSE HOMICIDE | | VICTIM DAVID EALES | CASE AGENT BEN ROSSER |
| OFFICE NERO    DATE REPORTED 10/11/99 | DATE TYPED 10/14/99 | TYPIST kc    APPROVED | IND 027 |

This document contains neither recommendations nor conclusions of the OSBI. It is the property of the OSBI and is loaned to your agency; it and its content are not to be distribute outside your agency.

64

490 00000286
KEB300474

CR 99-746
INTERVIEW OF KENNETH WAYNE BARRETT
PAGE TWO

(unidentified) told KENNETH to "keep your mouth shut or you'll die". PHILPOT then told KENNETH that he (PHILPOT) would burn KENNETH'S house down along with everything in it. An ambulance arrived and KENNETH was placed in the ambulance where his clothes were taken off and he was transported to the hospital in Sallisaw, Oklahoma.

Someone (unidentified) asked KENNETH if BOSS GREEN was going to take care of him. KENNETH described GREEN as an acquaintance that KENNETH had done some mechanical work for. The AR-15 KENNETH fired belonged to him. KENNETH had purchased the weapon from DOUG SHOCKEY (phonetic) who lived in Sallisaw. SHOCKEY had pawned the weapon at a pawn shop and KENNETH had helped SHOCKEY get the weapon out of the pawn shop. KENNETH did not remember the name of the pawn shop or where it was located. KENNETH then bought the gun from SHOCKEY for $500.00.

KENNETH then stated that when he was shot he was standing by his bedroom door and as he was falling he could see out the front door of his house. KENNETH stated "they (unidentified) were inside the truck and I just grabbed the gun and started shooting". KENNETH then stated that "they came in through my neighbors driveway and across the field".

END NOTE: Prior to being interviewed KENNETH was advised of his Miranda Rights by OSBI Deputy Inspector DENNIS FRANCHINI. KENNETH declined to be interviewed and asked for an attorney. KENNETH'S request was noted on the rights form (copy attached). As FRANCHINI was preparing to leave KENNETH'S hospital room, KENNETH stated that he wanted to talk with FRANCHINI and KENNETH requested that the two Oklahoma Highway Patrol Troopers who had entered the room leave, which they did. FRANCHINI again reminded KENNETH of his rights but KENNETH wanted to talk with FRANCHINI. KENNETH stated that he understood his rights and he signed the rights waiver. KENNETH appeared to understand everything being said to him as he responded to all of FRANCHINI'S questions without hesitation and FRANCHINI did not have to repeat questions for KENNETH. The only visible injury on KENNETH'S face was a slight abrasion on his forehead.

65

491
00000287
KEB300475

492

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 149**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

492

Form Prescribed By
Indiana State Board of
Health under Authority
Chap. 126, Ind. Acts 1905

## STATE OF INDIANA
## APPLICATION FOR MARRIAGE LICENSE

_____ JAY _____ County

No. __76__

File __31__

February 19, 1976

Date of Application

| MALE<br>Medical Examination Report Dated __Feb. 3, 1976__<br>Name of Physician __Peter P. Mayock, M. D.__ | FEMALE<br>Medical Examination Report Dated __Feb. 3, 1976__<br>Name of Physician __Peter P. Mayock, M. D.__ |

ALL QUESTIONS MUST BE ANSWERED. Chapter 126, Indiana Acts 1905 prescribes "False statement—Whoever procures the issuance of a license to marry by any false statement, representation or pretense shall be fined in any sum not exceeding five hundred dollars ($500.00)".

### MALE APPLICANT

Name: First __Ernest__ Middle __Eugene__ Last __Barrett__

Date of Birth: Month ▮ Day ▮ Year __1938__

Place of Birth (State or foreign country) __Sallisaw, Oklahoma__

Residence Address ▮ Street or R. R. ▮ City __Dunkirk__ County __Jay__ State __Indiana__

Previous Marital Status: Never Married ☐  Number of Previous Marriages __1__

Last Marriage Ended By: Death ☐  Divorce ☒  Annulment ☐

Color or Race: White ☒  Negro ☐  Other ☐ (specify) _____

Usual Occupation __Supervisor, Kerr Glass Co.__

Date of birth verified by: ☐ Birth Cert. ☐ Judicial Decree ☐ Other (Specify) __Driver's License__

1. Are you now or have you been adjudged, diagnosed or considered as:
   An Imbecile? No ☒ Yes ☐
   Of Unsound Mind? No ☒ Yes ☐
2. Are you now under guardianship as a person of unsound mind? No ☒ Yes ☐
3. Are you now or have you been within five (5) years an inmate of a county asylum or home for indigent persons? No ☒ Yes ☐
   If answer to 3 is "yes" has the cause of such condition been removed? No ☐ Yes ☐
4. Are you afflicted with a transmissible disease? No ☒ Yes ☐
5. Are you related to the bride closer than second cousin? No ☒ Yes ☐
6. Are you now under the influence of intoxicating liquor? No ☒ Yes ☐
7. Are you now under the influence of a narcotic drug? No ☒ Yes ☐
8. Are you able to support a family? Yes ☒ No ☐
9. Are you likely to so continue? Yes ☒ No ☐
10. Do you have minor children from one or more former marriages? No ☐ Yes ☒
    (If yes, answer questions a, b, c)
    (a) List their full names, ages and addresses

| Name | Age | Address |
|---|---|---|
| Kenneth Eugene Barrett | 14 | Sallisaw, Oklahoma |
| Richard Andrew Barrett | 11 | Sallisaw, Okla. |
| Stephen Wayne Barrett | 7 | Sallisaw, Okla. |

(b) Are you supporting or contributing to their support? Yes ☐ No ☒
(c) Are you complying with any court order or orders issued for their support? Yes ☐ No ☐

11. Full name of father __Andrew Jackson Barrett__
Residence of father (if deceased so state) __Deceased__
Occupation of father ____ Race of father __White__
Birthplace of father (State or foreign country) __Sallisaw, Oklahoma__
12. Full maiden name of mother __Ada May Hatter__
Residence of mother (If deceased so state) __Sallisaw, Oklahoma__
Occupation of mother __Housewife__ Race of mother __White__
Birthplace of mother (State or foreign country) __Sallisaw, Oklahoma__

State of Indiana,
County of __JAY__ } ss: I depose and state the information given in this application is true and correct.

Signed ___Ernest E. Barrett___
New Address __Dunkirk, Indiana__

Subscribed and sworn to before me this __19th__ day of __February__, 19 __76__
___Vera M. Stults___ Clerk __JAY__ Circuit Court

### CONSENT OF PARENTS, PARENT OR GUARDIAN
We, the parents, of this applicant hereby give consent for this marriage. If only one parent signs, state facts which render the consent of the other parent unnecessary _____

State of Indiana,
County of __JAY__ } ss:
Signed _____ Father
Signed _____ Mother
Subscribed and sworn to before me this ____ day of ____ 19____ Clerk

### FEMALE APPLICANT

Name: First __Diana__ Middle __Kay__ Last __Wilson__

Date of Birth: Month ▮ Day ▮ Year __1947__

Place of Birth (State or foreign country) __Jay County, Indiana__

Residence Address ▮ Street or R. R. ▮ City __Dunkirk__ County __Jay__ State __Indiana__

Maiden Name if Different __Diana Kay Wilkes__

Previous Marital Status: Never Married ☐  Number of Previous Marriages __2__

Last Marriage Ended By: Death ☐  Divorce ☒  Annulment ☐

Color or Race: White ☒  Negro ☐  Other ☐ (specify) _____

Usual Occupation __Teacher__

Date of birth verified by: ☒ Birth Cert. ☐ Judicial Decree ☐ Other (Specify) _____

1. Are you now or have you been adjudged, diagnosed or considered as:
   An Imbecile? No ☒ Yes ☐
   Of Unsound Mind? No ☒ Yes ☐
2. Are you under guardianship as a person of unsound mind? No ☒ Yes ☐
3. Are you afflicted with a transmissible disease? No ☒ Yes ☐
4. Are you related to the groom closer than second cousin? No ☒ Yes ☐
5. Are you now under the influence of intoxicating liquor? No ☒ Yes ☐
6. Are you now under the influence of a narcotic drug? No ☒ Yes ☐
7. Full name of father __Herbert William Wilkes__
Residence of father (if deceased so state) __unknown__
Occupation of father __unknown__ Race of father __white__
Birthplace of father (State or foreign country) __unknown__
8. Full maiden name of mother __Dorothy Evelyn Crawmer__
Residence of mother (if deceased so state) __Dunkirk__
Occupation of mother __Factory Worker__ Race of mother __White__
Birthplace of mother (State or foreign country) __Jay Co., Indiana__

State of Indiana,
County of __JAY__ } ss: I depose and state the information given in this application is true and correct.

Signed x ___Diana Kay Wilson___
New Address __Dunkirk, Indiana__

Subscribed and sworn to before me this __19th__ day of __February__, 19 __76__
___Vera M. Stults___ Clerk __JAY__ Circuit Court

### CONSENT OF PARENTS, PARENT OR GUARDIAN
We, the parents, of this applicant hereby give consent for this marriage. If only one parent signs, state facts which render the consent of the other parent unnecessary _____

State of Indiana,
County of __JAY__ } ss:
Signed _____ Father
Signed _____ Mother
Subscribed and sworn to before me this ____ day of ____ 19____ Clerk

---

COMPLETE IF MARRIAGE LICENSE ISSUED BY ORDER OF COURT. A marriage license having been refused to the above named parties, the _____ County _____ Court by written order issued _____ and filed in _____ authorizes and directs the issuance of a marriage license to the above named parties.

### RETURN OF MARRIAGE LICENSE AND MARRIAGE CERTIFICATE

Be It Remembered, there was filed in my office a marriage license issued by the clerk of the __Jay__ Circuit Court of Indiana dated the __23rd__ day of __February__, 19 __76__, authorizing the joining together as husband and wife __Ernest Eugene Barrett__ and __Diana Kay Wilson__

Be it further remembered, the following marriage certificate was filed in my office, to-wit:
I, __Wendell Williams__ hereby certify that on the __29th__ day of __February__, one thousand nine hundred and __seventy-six__ at __Hartford City__, County of __Blackford__, State of Indiana, Groom __Ernest Eugene Barrett__ of __Jay__ County, State of __Indiana__, and, Bride __Diana Kay Wilson__ of __Jay__ County, State of __Indiana__, were by me united in marriage as authorized by a marriage license issued for that purpose by the Clerk of the Circuit Court of __Jay__ County.

Dated this __29th__ day of __February__, 19 __76__.
Signed ___J. Wendell Williams___
Official Designation __Minister__

Filed and recorded in accordance with the laws of the State of Indiana this __3rd__ day of __March__, 19 __76__.
Signed ___Vera M. Stults___ Clerk
__Jay__ Circuit Court

494

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,    )
    )
        *Plaintiff,*   )
    )
v.    )    **Case No. 6:09-cv-00105-JHP**
    )
KENNETH EUGENE BARRETT,    )
    )
        *Defendant.*   )

---

## REDACTED EXHIBIT 150

## TO KENNETH EUGENE BARRETT'S

## SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255    *U.S. v. Barrett*, 6:09-cv-00105-JHP

494

KEB400099

fully advised in the premises, and having fully considered the evidence, finds:

That the Plaintiff is now and has been for six (6) months next proceding the filing of her Petition,. an actual resident in good faith of the State of Oklahoma; and

That she is now, and has been for thirty (30) days next proceding the filing of her Petition, an  actual resident in good faith of Sequoyah County.

That the parties hereto were legally married on the 18th day of Oct. 1982, in Sallisaw, Oklahoma, and have ever since that time been husband and wife; and

That no children have been born or are to be born of the marriage of Plaintiff and Defendant.

That the Plaintiff, by virtue of the prayer in her Petition, is entitled to a divorce upon the grounds of incompatibilty as alleged in her pleadings; and

That the parties have settled their mutual claims concerning a division of all jointly acquired property, both real and personal, of which either or both of them are seized and possessed; and that the Defendent is to be awarded as his separate property the following:

Personal Belongings in his
possession

KEB400100

court at any time hereafter without notice to, and in the absence of, this defendant.

_____
Defendant

STATE OF Oklahoma )
                  ) ss.
_____ Sequoyah _____ COUNTY,)

Before me, the undersigned, a Notary Public within and for the State of Oklahoma on this 20th day of April, 1985, personally appeared the above named defendant, _____ to me known to be the identical person who executed the above and foregoing entry of appearance and waiver, and personally acknowledged to me that he-she read, understood and signed the same; and that he-she executed the same as his-her free and voluntary act and deed for the uses and purposes therin set forth.

IN WITNESS WHEREOF I have hereunto affixed my signature and official seal the day and date heretofore stated.

_____
Notary Public

My Commission expires April 14, 1990

496

KEB400101

preceding the filing of this petition.

2. That the Plaintiff's full name and address is: Sylvia Gelene Dudley ▓▓▓▓▓▓▓ Vian, Oklahoma 74962

3. That the Plaintiff is of legal age, having been born on ▓▓▓▓▓▓ 1940

4. That the Defendant's full name and address is: Paul Eugene Dudley  Lawton, Oklahoma

5. That the Defendant is of legal age having been born on ▓▓▓▓▓▓ 1939

6. That the maiden name of the wife herin was  Dotson

7. That all former legal names of the wife herin are Barrett

8. That parties were married at Sallisaw  Oklahoma  in the
County of Sequoyah on the  18  day of  Oct.  19 82
                                 (city) (state)

9. "That a state of complete and irreconcilable incompatibilty has arisen between the parties hereto, and by reason of the Defendant and the resulting irremediable breaksown of the material relationship the Plaintiff can not continue to live with said Defendant, and therefore, the Plaintiff is entitled to a Degree of Divorce from the Defendant."

10. That the wife (is not) pregnant at this time.

11. That there are  0  Child(ren) of this marriage.

follows: _____

_____

_____

That it is further petitioned that starting on_____
and continuing on the _____day of each month thereafter,
_____ should pay to_____,for
each of said minor children which are not in _____ custody, the
sum of_____per each such said child per month for support
and maintenance until each such child attains legal age or is
emancipated or enters the military or until further order of the
court.

That it is futther petitioned that _____

_____

_____

_____

That it is further petitioned that _____

_____

_____

Page 2 of petition for Divorce

KEB400103

parties hereto hold the other harmless as to the resourse or creditors on their respetive liabilities and debts of which the other was unaware at the time of the filing of the petition in this matter. Defendant Sylcia Gelene Dudley will pay the creditors and obligation listed below:

| Name of Creditor | Address of Creditor | Security on Debt or type of Debt | Balance- Owing | As (Dat |
|---|---|---|---|---|
| First State Bank | P.O.B. 730 | Mobile Home | 20,015.64 | |
| | Kimball, N.E. 69145 | | | 4-1- |
| Farmers Furniture | Sallisaw | Furniture | 1561.94 | 3-26- |
| | | | | |

Plaintiff, Paul E. Dudley will pay the creditors and obligations listed below:

| Name of Creditor | Address of Creditor | Security on Debt or Type of Debt | Balance Owing | As of (Date) |
|---|---|---|---|---|
| | NONE | | | |
| | | | | |
| | | | | |
| | | | | |

Page 3 of Petition for Divorce

I, Bernell Edwards, Court Clerk, for Sequoyah County Oklahoma, hereby certify that the foregoing is a true, correct, and full copy of the instrument herewith set out as appears of record in the Court Clerk's office of Sequoyah County, Oklahoma, and said instrument is now in full force and effect.
Dated this 23rd day of May
20 01      Bernell Edwards, Court C-
By
Deputy

499

KEB400104

Date: 4-22-86

Signed _Sylvia Gelene Dudley_
Plaintiff

## VERIFICATION

STATE OF OKLAHOMA)
         COUNTY ) ss.

I, _Sylvia Gelene Dudley_, of lawful age, being first duly sworn, upon oath, state that I am the plaintiff above named; that I have read the above and foregoing Petition for Divorce that I am familiar with the contents thereof; and that the things and matters therein contained are true and correct.

_Sylvia Gelene Dudley_
Plaintiff

Subscirbed and sworn to before me this 22nd day of April, 19 86.

My commission expires on:

9-13.86

_Becky Pell_
Notary Public

_____
Plaintiff's name

████████████ Vian, Ok
Plaintiff's address

KEB400105

Subscribed and sworn to before me this.............................................day of.......................................................... Parent or Guardian.

(SEAL)

................................................., 19..........

....................................................... Court Clerk.

By ...........................................................

.................................... Deputy.

## MARRIAGE LICENSE

STATE OF OKLAHOMA, Adair County, ss.

IN COUNTY COURT

To any Person Authorized to Perform and Solemnize the Marriage Ceremony—Greeting:

You are hereby authorized to join in marriage Mr. *Ernest E. Barrett*

of *Sallisaw*, County of *Sequoyah*, State of *Oklahoma*, aged *21* years,

and M *Sylvia L. Dotson*

of *Sallisaw*, County of *Sequoyah*, State of *Oklahoma*, aged *16* years,

And of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at *Stilwell* in said County, this *8th* day of

*July* A. D. 19 *60*

Recorded this *8th* day of *July* 19 *60*

................................. Court Clerk.

By ....................................... Deputy.

................................. Court Clerk.

By ....................................... Deputy.

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, Adair County, ss.

I, *E. B. Arnold*, *County Judge*, *Adair County Court*
NAME              OFFICIAL DESIGNATION        COURT OR CONGREGATION

of *Stilwell* in *Adair* County, State of Oklahoma, do hereby certify

that I joined in marriage the persons named in and authorized by this License to be married, on the *8th* day of

*July* A. D. 19 *60* at *Stilwell* in *Adair* County,

State of Oklahoma, in the presence of *Johnny Simmonds* of *Sallisaw, Okla*

and ...................................... of *Sallisaw, Okla*

My credentials are recorded in Minister's Credentials

Book................ Page................

*E. B. Arnold,*
*County Judge*

of................................ County. Oklahoma.

Returned and recorded this *8th* day of *July* 19 *60*

................................. Court Clerk.

By....................... Deputy.

501

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 151**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                          *U.S. v. Barrett*, 6:09-cv-00105-JHP

502

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
**FILED**
IN DISTRICT COURT

**SEP 12 1995**

BERNELL EDWARDS, COURT CLERK

BY _____ DEPUTY

ABBY GAIL BARRETT,

        Plaintiff,

vs.

KENNETH EUGENE BARRETT,

        Defendant.

        Case No. FD-95-149

## ENTRY OF APPEARANCE AND WAIVER

Comes now the Defendant herein, the undersigned, and acknowledges receipt of a copy of the Petition filed and on file herein, states that he has read and understands the same, hereby waives the issuance of service and return of process upon him in this action, enters a voluntary appearance in this cause, waiving all time and right to plead, answer or appear in this action, and consents that the same may be set down for trial and heard by the Court at any time hereafter without notice to, and in the absence of this Defendant.

_____
Kenneth Eugene Barrett,
Defendant

STATE OF OKLAHOMA    )
                      ) ss.    **ACKNOWLEDGMENT**
COUNTY OF SEQUOYAH )

Before me, the undersigned Notary Public in and for the State of Oklahoma, on the _____ day of _____, 1995, personally appeared before me the above-named Defendant, Kenneth Eugene Barrett, to me known to be the identical person who executed the above and foregoing Entry of Appearance and Waiver, and personally acknowledged to me that he has read, understood, and signed the same, and that he executed the same of his free and voluntary act and deed, for the uses and purposes therein set forth.

IN WITNESS WHEREOF, I have hereunto affixed my signature and official seal the day and date hereof as stated.

_____
Notary Public

My Commission Expires: _October 16, 1998_

503

KEB400573

IN THE DISTRICT COURT IN AND FOR ~~ADAIR~~ COUNTY
STATE OF OKLAHOMA

ABBY GAIL BARRETT,
            Plaintiff,

vs.

KENNETH EUGENE BARRETT,
            Defendant.

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 0 4 1995

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

Case No. FD-95-_149_

### PETITION FOR DIVORCE

Comes now the Plaintiff, Abby Gail Barrett, and for her cause of action against the Defendant, Kenneth Eugene Barrett, alleges and states as follows:

1.   That the Plaintiff is now and has been for more than six (6) months prior hereto, an actual resident in good faith of the State of Oklahoma, and has been for more than thirty (30) days prior hereto, a bona fide resident of the County of Sequoyah.

2.   That the Plaintiff and Defendant were married on or about 10th day of May, 1980, at Sallisaw, Oklahoma, and have been since that time and are now, husband and wife.

3.   That as grounds for divorce, the Plaintiff alleges incompatibility and physical abuse.

4.   That of the marriage one (1) child has been born, now a minor, namely:

Toby Wayne Barrett, born December 1, 1980;

and that both Parties are fit and proper persons to have the care, custody and control of the minor child of the Parties and they should share joint custody of the minor child as set forth more fully in the Joint Custody Plan attached hereto and incorporated by reference herein; and further, that each party should pay for the daily living expenses and necessities of life while the child is in his or her respective physical custody.

5.   This Court has jurisdiction to determine custody of the above-named minor child pursuant to 10 O.S. Section 1601 et seq., in that this state is the home state of the minor child and as further set forth in the Affidavit attached hereto.

504

KEB400574

## VERIFICATION

STATE OF OKLAHOMA     )
                      )  ss.
COUNTY OF SEQUOYAH    )


    I, Abby Gail Barrett, Plaintiff herein, duly sworn on oath, state that I have read the above and foregoing Joint Custody Plan and the facts set forth therein are true and correct to the best of my knowledge and belief.

_____
Abby Gail Barrett, Plaintiff


    Subscribed and sworn to before me this ___3rd___ day of May, 1995.


(SEAL)

_____
Notary Public

My Commission Expires:

___12.16.95___ .

KEB400575

STATE OF OKLAHOMA   )
                    ) ss.        **VERIFICATION AND AFFIDAVIT**
COUNTY OF SEQUOYAH  )


Abby Gail Barrett, of lawful age, being first duly sworn upon oath, deposes and states:

1.  That she is the Plaintiff named in the attached Petition.

2.  That she has read the contents of the attached Petition, is familiar with the contents thereof, and that the allegations contained therein and believes them to be true to the best of her knowledge and belief.

3.  That the present address of the child listed in the attached Petition is as follows:

    a.  ▮▮▮▮▮▮▮▮▮▮ Sallisaw, Oklahoma.

4.  The present address of said minor child, the child's address within the past five (5) years, and the names and present address of the persons with whom said child lived during that time are as follows:

    Time Period:  Birth to January 1, 1989
    Address of Child:
    Custodians:   Kenneth Eugene Barrett and Abby
              Gail Barrett;

    Time Period:  January 1, 1989 to January 1, 1995
    Address of Child:  Sallisaw, Oklahoma
    Custodians:   Kenneth Eugene Barrett and Abby
              Gail Barrett;

    Time Period:  January 1, 1995 to March 1995
    Address of Child:  Sallisaw, Oklahoma
    Custodian:   ~~Kenneth Eugene Barrett and~~ Abby
              Gail Barrett.

    Time Period:  March 1995 to Present
    Address of Child:  Sallisaw, Oklahoma
    Custodian:   Abby Gail Barrett *and Kenneth Barrett*

5.  That the names and present addresses of the person whom the child has lived during the past five (5) years are:

    a.  Abby Gail Barrett, ▮▮▮▮▮▮▮▮
        Sallisaw, Oklahoma;

    b.  Kenneth Eugene Barrett, ▮▮▮▮▮▮▮▮
        Vian, Oklahoma.

506

KEB400576

6.    That neither the federal nor the state of Indian Child Welfare Act, 25 U.S.C. Section 1901 et seq., and 10 O.S. Section 40 et seq., respectively, apply to these proceedings.

7.    That each Party shall pay 50% of health, dental and vision expenses for the benefit of the minor child.

8.    That during the marriage of the Parties hereto they have acquired the following personal property, to-wit:

TO THE PLAINTIFF:

> 1988 Chevrolet pickup; Bedroom suite; Couch and chair; Cooking utensils; Table and chairs; Hutch and stereo;

TO THE DEFENDANT:

> 1972 Dodge; 1982 Chevrolet Camaro; 1969 Chevrolet; Pioneer stereo; all guns; and Defendant's personal belongings and effects.

9.    That during the marriage of the Parties hereto they have incurred debts and that the Defendant should be ordered to pay all debts of the marriage and hold Plaintiff harmless therefrom.

WHEREFORE, Plaintiff prays that she be awarded:

A Decree of Divorce from the Defendant;

Custody of the minor child to both Parties jointly as set forth above;

Each Party shall pay for health, dental and vision expenses for the minor child as set forth above;

Division of personal property and debts as set forth above;

and such other and further relief as the Court may deem just and equitable.

                              ABBY GAIL BARRETT, Plaintiff


                              TANYA LANE DOBBS, OBA #1301
                              Attorney for Plaintiff
                              Legal Services of Eastern
                              Oklahoma, Inc.
                              P.O. Box 924
                              Stilwell, Oklahoma 74960
                              Phone: 918-696-2331

507

KEB400577

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, OKLAHOMA
STATE OF OKLAHOMA

SEQUOYAH COUNTY
FILED
IN DISTRICT COURT

AUG 15 1995

BERNELL EDWARDS, COURT CLERK

BY _____ DEPUTY

| | |
|---|---|
| ABBY GAIL BARRETT,<br>　　　　　Plaintiff,<br><br>vs.<br><br>KENNETH EUGENE BARRETT,<br>　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. FD-95-149

## MOTION FOR DEFAULT JUDGMENT

COMES NOW the Plaintiff, Abby Gail Barrett, by her attorney, Tanya Lane Dobbs, Legal Services of Eastern Oklahoma, Inc., and hereby moves this Honorable Court to grant her judgment by default in the above entitled and numbered cause and in support thereof would have the Court to know and be informed that the Defendant was served with Summons on June 11, 1995.

That the Defendant has wholly failed, refused and neglected to file an Answer to the Plaintiff's Petition and by reason thereof the Defendant is in default.

WHEREFORE, premises considered, the Plaintiff respectfully requests this Court to grant her judgment by default and for such other and further relief as to which the Plaintiff may be entitled and which the Court may deem just and proper.

ABBY GAIL BARRETT, Plaintiff

TANYA LANE DOBBS, OBA #13012
Legal Services of Eastern
Oklahoma, Inc.
P.O. Box 924
Stilwell, Oklahoma 74960
Phone: 918-696-2331

Attorney for Plaintiff

508

KEB400578

## CERTIFICATE OF MAILING

I hereby certify that on the _15th_ day of August, 1995, I mailed a true and correct copy of the above and foregoing Motion for Default Judgment, to:

Kenneth Eugene Barrett
Defendant
Route 2, Box 92-6
Vian, Oklahoma   74962

with sufficient postage being fully prepaid thereon.

_Tanya L. Dobbs_
Tanya Lane Dobbs

509

KEB400579

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY OKLAHOMA
FILED
IN DISTRICT COURT
AUG 15 1995

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

ABBY GAIL BARRETT, )
        Plaintiff, )
vs. )
 )
 )
KENNETH EUGENE BARRETT, )
        Defendant. )     Case No. FD-95-149

## ORDER FOR HEARING

Motion for Default Judgment having been filed in the above styled cause of action by the Plaintiff; the Court finds that this matter should be set for hearing on its merits;

IT IS ORDERED that the same be, and is hereby, set for hearing before the undersigned Judge at _____ _1:00_ o'clock _P_.M. on the _12th_ day of _September_, 1995.

_____
JUDGE OF THE DISTRICT COURT

## CERTIFICATE OF MAILING

I hereby certify that on the _15th_ day of August, 1995, I mailed a true, correct and exact copy of this Order to the following person(s), to-wit:

       Kenneth Eugene Barrett
       Defendant
       Route 2, Box 92-6
       Vian, Oklahoma  74962

with sufficient postage thereon fully prepaid.

_____
Tanya Lane Dobbs

510

KEB400580

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 12 1995

BERNELL EDWARDS, COURT CLERK
_____ DEPUTY

ABBY GAIL BARRETT,
       Plaintiff,    )
vs.                  )
                    )
KENNETH EUGENE BARRETT,  )
       Defendant.    )   Case No. FD-95-149

**SUMMONS**

To the above-named Defendant:  **KENNETH EUGENE BARRETT**

▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Vian, Oklahoma

    You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached Petition in the Court at the above address within twenty (20) days after service of this Summons upon you, exclusive of the day of service. If the Summons was served by mail, the answer is due twenty-three (23) days after Summons was mailed. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the Plaintiff.

    Unless you answer the Petition within the time stated, judgment will be rendered against you with costs of the action.

    Issued this 9th day of May, 1995.

                    BERNELL EDWARDS, Court Clerk

               BY: _____
ATTORNEY FOR PLAINTIFF:         Court Clerk/Deputy

TANYA LANE DOBBS, OBA #13012
Legal Services of Eastern OK., Inc.
P.O. Box 924
Stilwell, Oklahoma 74960
Phone:  918-696-2331

    This Summons was served on _6/11/95_____
                               (Date of Service)

    _____
    (Signature of Person Serving Summons)

    YOU MAY SEEK THE ADVISE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.

511

KEB400581

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

ABBY GAIL BARRETT,
           Plaintiff,    )

vs.

KENNETH EUGENE BARRETT,
           Defendant.

SEQUOYAH COUNTY, OKLAHOMA
**FILED**
IN DISTRICT COURT

SEP 12 1995

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

Case No. FD-95-149

## DECREE OF DIVORCE

*Decree (2nd)*

NOW, on this _12th_ day of _September_, 1995, the above-entitled matter comes on for trial; Plaintiff appears in person and by and through her attorney, Tanya Lane Dobbs, Legal Services of Eastern Oklahoma, Inc., and the Defendant appears not; the Court examined the records, heard the evidence and statements of counsel and based thereon finds:

That Defendant has ~~executed and filed sufficient Entry of~~ *been notified of this Motion for Default Hearing* ~~Appearance and Waiver~~; that the Court has jurisdiction over the parties and subject matter of this action.

That prior to the filing of the Petition herein, the Plaintiff has been a resident in good faith of the County of Sequoyah and State of Oklahoma for 30 days and six months, respectively.

That the Plaintiff and Defendant were married on or about the 10th day of May, 1980, at Sallisaw, Oklahoma, and have been and are now, husband and wife.

That the Plaintiff is entitled to a divorce on the grounds of incompatibility and physical abuse.

That of the marriage one (1) child has been born, now a minor, namely:

Toby Wayne Barrett, born ███████████ 1980;

and that both parties are fit and proper persons to have the care, custody and control of the minor child of the parties and they should share joint custody of the minor child as set forth more fully in Joint Custody Plan attached hereto and incorporated by reference herein; and further, that each party should pay for the daily living expenses and necessities of life while the child is in his or her respective physical custody.

KEB400582

This Court has jurisdiction to determine custody of the above-named child pursuant to 10 O.S. Section 1601 et seq., in that this state is the home state of the minor child.

That neither the federal nor the state Indian Child Welfare Act, 25 U.S.C. Section 1901 et seq., and 10 O.S. Section 40 et seq., respectively, apply to these proceedings.

That each party shall pay 50% of health, dental and vision expenses for the benefit of the minor child.

That during the marriage of the Parties hereto they have acquired personal property, to-wit:

TO THE PLAINTIFF:

     1988 Chevrolet pickup; bedroom suite, couch and chair; cooking utensils; table and chairs; hutch, and stereo;

TO THE DEFENDANT:

     1972 Dodge; 1982 Chevrolet Camaro; 1969 Chevrolet; Pioneer stereo; all guns; and Defendant's personal belongings and effects.

That each party should be ordered to pay debts incurred in his or her own name.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the findings herein constitute and are made the judgment and order of this Court.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that the Plaintiff herein is hereby granted a Decree of Divorce from the Defendant herein on the grounds of incompatibility, and their marriage relationship dissolved and both parties released therefrom; PROVIDED, neither party shall marry any other person in the State of Oklahoma until six months from the date hereof.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that the parties are awarded Joint Custody of the minor child of the parties, namely, Toby Wayne Barrett, and that neither party shall pay child support and each party shall provide for the needs and requirements of the minor child while in his or her respective care, custody and control as set forth more fully in the Joint Custody Plan attached hereto and incorporated by reference herein.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that each party be, and each is hereby, ordered to pay 50% of health, dental and vision expenses for the benefit of the minor child.

KEB400583



IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that the Plaintiff be, and she is hereby, awarded the following personal property, to-wit:

> 1988 Chevrolet pickup; bedroom suite; couch and chair; cooking utensils; table and chairs; hutch, and stereo;

and that the Defendant be, and he is hereby, awarded the following personal property, to-wit:

> 1972 Dodge; 1982 Chevrolet Camaro; 1969 Chevrolet; Pioneer stereo; all guns, and Defendant's personal belongings and effects.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that each party be, and each is hereby, ordered to pay debts incurred in his or her own name.

_____
JUDGE OF THE DISTRICT COURT

APPROVED:

_____
Abby Gail Barrett, Plaintiff

_____
Kenneth Eugene Barrett, Defendant

KEB400584

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
**FILED**
IN DISTRICT COURT

SEP 12 1995

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

ABBY GAIL BARRETT, )
        Plaintiff, )
)
vs. )
)
KENNETH EUGENE BARRETT, )
        Defendant. )
)
_____ )

Case No. FD-95-149

*Jt. Custody Plan*

## JOINT CUSTODY PLAN

Comes now the Plaintiff, Abby Gail Barrett, and the Defendant, Kenneth Eugene Barrett, jointly, and respectfully submit this Joint Custody Plan agreed upon by and between the Parties hereto with supporting affidavit for the Court's consideration; that the terms and provisions of the Plan are in the best interests of the minor child of the Parties hereto, to-wit: Toby Wayne Barrett, born ███████████ 1980; that said parties hereto respectfully move the Court for an order confirming and adopting said Plan as the Court's plan for the exercise of joint child care, custody and control of the minor child by the parties hereto, all pursuant to Oklahoma Statutes, Title 12, Section 1275.4, and the parties allege and state as follows:

1. That both parties hereto should and shall reasonably confer with one another by the most reasonable and appropriate method, and should and shall share decision making authority as to important decisions affecting the physical, mental and moral welfare and upbringing of the minor child to arrive at decisions promoting the minor child's best interests.

2. That both parties hereto should and shall decide jointly the following matters, to-wit:

    A. Medical, dental and health care the minor child should or shall receive;

    B. Schools which the minor child should or shall attend;

    C. Summer camps and church schools and/or classes which the minor child should or shall attend;

    D. Fashion and manner in which the minor child should or shall be disciplined;

515

KEB400585

585

E.  Extent of any travel of the minor child away from home, including purpose, duration, mode, chaperon, etc.;

F.  Religious instruction the minor child should or shall receive; and

G.  Such other areas requiring decisions affecting the growth and development of the minor child.

3.  That both parties hereto agree that in order to insure continuing association between the minor child and parents, and to best promote and foster continued parent-child companionship, physical custody of the minor child should and shall be as follows, to-wit:

A.  That the minor child should and shall reside with the Plaintiff on Wednesday, Thursday and Friday and with the Defendant on Sunday, Monday and Tuesday; alternating holidays and school breaks.

B.  That both parties hereto agree that they should and shall be mindful and considerate of the child's school activities, sports activities and peer activities and associations, and the wishes of the child, and in the event of a conflict respecting the visitation as provided above, both parties should and shall work together reasonably in advance to arrange for alternate visitation if necessary.

C.  That both parties agree that the parent given the right to exercise visitation and wishing to exercise visitation should and shall bear and assume the cost, expenses and responsibility for transportation, pickup and delivery.

4.  That both parties agree that during the period each of them has physical custody or is exercising visitation, that party-parent should and shall decide all normal, regular and routine matters concerning the child and that each party-parent should and shall cooperate with one another in maintaining a mutually supportive arrangement regarding such normal, regular and routine matters.

5.  That both parties agree to be responsible for the expenses of the child when the child is in their physical custody and that neither party pay child support to the other.

6.  That both parties agree that the address and telephone numbers of one another, and those places where the minor child might be temporarily staying, should and shall be known to each other at all times, and that each party-parent shall notify the other immediately of any illness, sickness or emergency that may arise while said minor child is in her or his physical custody.

KEB400586

7. That both parties agree that if the minor child is to be beyond the boundaries of the State of Oklahoma for whatever reason, the physical custodial parent should and shall notify the other reasonably in advance, that if the child is to be beyond the boundaries of the State of Oklahoma for a period of more than three days, the consent of the other should and shall be necessary reasonably in advance.

WHEREFORE, Plaintiff and Defendant move this Court for an order confirming and adopting the above and foregoing Joint Custody Plan as the Court's Plan in the best interests of the minor child and for such other and further relief in law and/or equity said parties be entitled.

RESPECTFULLY SUBMITTED,

Abby Gail Barrett, Plaintiff and Kenneth Eugene Barrett, Defendant
(Verifications Attached)

KEB400587

6.   That she has not participated as a Party, witness, or any other capacity in any other litigation concerning the custody of the same child in this or any other state.

7.   That she does not have information of any custody proceedings concerning the child pending in a Court of this or any other state.

8.   That she does not know of any person not a Party to the proceedings who has physical custody of the child or claims to have custody or visitation rights with respect to the child.

9.   That she understands that she has a continuing duty to inform the Court of any custody proceeding concerning the child in this or any other state of which he may obtain information during this proceeding.


_____
Abby Gail Barrett, Plaintiff


Subscribed and sworn to before me this ___5th___ day of May, 1995.


(SEAL)                    _____
                          Notary Public


My Commission Expires:

___02/05/99___ .

518

KEB400588

**VERIFICATION**

STATE OF OKLAHOMA      )
                       )  ss.
COUNTY OF SEQUOYAH     )


    I, Kenneth Eugene Barrett, Defendant herein, duly sworn on oath, state that I have read the above and foregoing Joint Custody Plan and the facts set forth therein are true and correct to the best of my knowledge and belief.

                                    Kenneth Eugene Barrett,
                                    Defendant


    Subscribed and sworn to before me this ___17___ day of ___August___, 1995.

                                   _____
(SEAL)                           Notary Public

My Commission Expires:

_October 16, 1998_.

KEB400589

520

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 152**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

**IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY**

**STATE OF OKLAHOMA**

SEQUOYAH COUNTY, OKLAHOMA
IN DISTRICT COURT

JAN 0 9 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

KIMBERLY FAYE PULICE, )
           Plaintiff, )
Vs. )    Case No. JFP 2004-17
RICHARD BARRETT, )
           Defendant. )

**APPLICATION FOR TEMPORARY ORDER**

**COMES NOW** the Plaintiff and for her Application for Temporary Order and states as follows:

1. That on the 9th day of January, 2004 Plaintiff filed herein her Petition for Paternity.

2. That Plaintiff is the natural mother of the minor child, ▉▉▉▉ ▉▉▉▉ ▉▉▉▉ born ▉▉03.

3. That said minor child has never been away from Plaintiff for more than one day.

4. That on January 5, 2004 Plaintiff was forced by Defendant to leave her residence, which is a mobile home that she owns that is sitting on property owned by Defendant's mother, and since that time Defendant has refused to let Plaintiff have contact with the minor child.

5. That on January 5, 2004 Defendant physically assaulted Plaintiff and threatened her with a knife.

illiam K. Orendorff
Attorney At Law
206 N. Oak
allisaw, OK 74955

521

APPLICATION FOR TEMPORARY RESTRAINING ORDER
Page 2 of 2

6. That the minor child is currently in the care of Defendant and his mother and as recently as January 3, 2004 Defendant's mother was depressed, intoxicated, under the influence of medications and not capable of caring for a child.

7. That based upon the age of the minor child and the child's ongoing relationship with Plaintiff the Court should enter an ex parte Temporary Order giving temporary custody of said minor child to the Plaintiff.

8. That under the circumstances the minor child would be at risk of irreparable harm if the Court waited for the Defendant or his attorney to be heard on this Application before entering such order.

9. That the Court should enter the Temporary Order requested by the Plaintiff and set the matter for hearing as required by law.

_____
WILLIAM K. ORENDORFF / OBA #11950
Attorney for Plaintiff
P.O. Box 129
Sallisaw, Oklahoma 74955
(918) 775-4436

522

523

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　*Plaintiff,*　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)　　　　Case No. 6:09-cv-00105-JHP
　　　　　　　　　　　　　　　　)
KENNETH EUGENE BARRETT,　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　*Defendant.*　　)

---

## REDACTED EXHIBIT 153

## TO KENNETH EUGENE BARRETT'S

## SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255　　　　　　*U.S. v. Barrett*, 6:09-cv-00105-JHP

523

#2378/ORD.APPT/csw

IN THE DISTRICT COURT IN AND FOR THE COUNTY OF SEQUOYAH

STATE OF OKLAHOMA

IN THE MATTER OF THE GUARDIANSHIP OF )
                                      )   CASE NO.  PG-02-85
BRANDON LEROY SMITH, An Incapacitated )
Person.                               )
                                      )

SEQUOYAH COUNTY, OKLAHO
FILED
IN DISTRICT COURT

OCT 1 6 2002

BERNELL EDWARDS, COURT CLE
BY_____DEP(

**ORDER APPOINTING GUARDIAN**

**ON** this 26th day of September, 2002, the Petition of Gwendolyn Holt, alleging that it is necessary that a Guardian be appointed for the person and estate of Brandon LeRoy Smith comes on for hearing on its merits.  The Petitioner appears with her attorney, Clark S. Wood and Brandon LeRoy Smith, the alleged incapacitated person appeared.  Also, Katherine Wilson appears for the Department Of Human Services which is providing assistance to Brandon LeRoy Smith.

The Court, having examined the files and records herein, having considered the evidence presented in open court, having heard sworn testimony, having heard argument of counsel and being otherwise fully advised in the premises finds:

That proper notice of this hearing has been given pursuant to Title 30 O.S. § 3-110, and this Court's Order issued on the 22nd day of August, 2002.

That Brandon LeRoy Smith is a resident of Sequoyah County, Oklahoma.

That the financial resources and personal property of Brandon LeRoy Smith consist of an SSI check in the approximate sum of

$491.00, a check from the State of Oklahoma payable through the Department Of Human Services in the approximate sum of $33.00, and his clothing.

That the essential requirements for managing the financial resources include the ability to balance a checking account, and pay monthly bills.

That the essential requirements for the health and safety of Brandon LeRoy Smith, include obtaining the necessary health care, including; food, shelter, clothing, personal hygiene and other care.

That the necessary skills and knowledge to meet the essential requirements for the health and safety of Brandon LeRoy Smith, include the ability to obtain professional assistance in his health care and to provide the proper health care, food, shelter, clothing and to assist with his personal hygiene.

That by clear and convincing evidence, Brandon LeRoy Smith is determined to be an incapacitated person, who is impaired by reason of multiple congenital abnormalities, IQ of 42, and his mental age is six (6) years of age, resulting in an inability to receive and evaluate information effectively, meet the essential requirements for his physical health and safety, and management of his financial resources.

That Gwendolyn Holt is qualified to serve as guardian of Brandon LeRoy Smith in that she is not a minor, incapacitated or partially incapacitated person, convicted felon, bankrupt, nor is

she insolvent or under any financial obligation to the Ward which would affect her ability to perform her duties as guardian. Gwendolyn Holt is not subject to a conflict of interest which would preclude or be substantially detrimental to her ability to act in the best interest of Brandon LeRoy Smith.

That Gwendolyn Holt, ▮▮▮▮▮▮▮▮▮▮ Vian, Oklahoma 74962, is appointed to serve as Guardian of Brandon LeRoy Smith.

That pursuant to title 30 O.S. § 4-201 no bond is required.

That Letters of Guardianship shall be issued to Gwendolyn Holt, upon taking the oath of office. Gwendolyn Holt shall not be required to file an inventory of the estate of Brandon LeRoy Smith, within two (2) months because Brandon LeRoy Smith has no real or personal property.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** by the Court that the above findings are fully incorporated in this Court's Order as if fully set out herein and Gwendolyn Holt is hereby appointed guardian over the person and estate of Brandon LeRoy Smith upon taking the oath of office. No bond is required at this time.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** by the Court that the  PLAN FOR THE CARE AND TREATMENT OF THE WARD  and THE PLAN FOR THE MANAGEMENT OF THE WARD'S ESTATE as submitted by the Guardian immediately following her appointment are hereby approved.



JUDGE OF THE DISTRICT COURT

#2378/OFH/arh

IN THE DISTRICT COURT IN AND FOR THE COUNTY OF SEQUOYAH
STATE OF OKLAHOMA

IN THE MATTER OF THE GUARDIANSHIP OF )
) CASE NO. PG-02-85
BRANDON LEROY SMITH, An Incapacitated )
Person. )

SEQUOYAH COUNTY, OKLAHO
FILED
IN DISTRICT COURT

AUG 2 2 2002

BERNELL EDWARDS, COURT CLI

BY_____DEP

ORDER FOR HEARING
PETITION FOR APPOINTMENT OF GUARDIAN

On this 22nd day of August, 2002, Gwendolyn Holt, having filed herein her Petition praying for the appointment of herself as guardian of the person and estate of Brandon LeRoy Smith, An Incapacitated Person, and alleging that said child and his estate is subject to the jurisdiction of this Court. The Court finds that the Petition For Appointment Of Guardian should be set for hearing on a date certain.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court that the 26th day of September, 2002, at the hour of 1:00 o'clock p.m. be and the same is hereby set for hearing said petition, which hearing shall be held in the District Court of Sequoyah County, at Sallisaw, Oklahoma.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that notice of said hearing be given to the sister, Brandy Qualls, Village West Apartments ███████ Sallisaw, Oklahoma 74955; to the Incapacitated Person whose address is ████████████ Sallisaw, Oklahoma 74955 and to the Department of Human Services, Att: Katherine Wilson, 5005 N. Wood Drive, Okmulgee, Oklahoma, 74447.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that notice of said hearing be given by mailing said notices and a true and correct copy of this Order to the persons herein named as being entitled to notice not less than ten (10) days prior to the date herein set for said hearing.

_____
JUDGE OF THE DISTRICT COURT

CLARK S. WOOD, OBA #9841
Attorney at Law
303 South Oak
P.O. Box 1020
Sallisaw, OK 74955
PHONE:      (918) 775-9191
FAX   :      (918) 775-7549

Page-2

528

PATIENT'S NAME _____ Brandon Smith ____ 89 ____   ALLERGIES _____

NONE KNOWN  ☒

| DATE MO. | DAY | YR. | SUBSEQUENT VISITS AND FINDINGS |
|---|---|---|---|
| 2 | 24 | 84 | Wt: 17-14 clothed    Coughing & cold x 1 wk. Has had off & on for 3 mos. On Nouahistine DH & Decongestant ⊽ relief. Temp off & on. Spitting up milk. A lot of mucus/throat. |
| | | | A) 1) Bronchitis  2) O E M  3) Gastheyngen  P) 1) ___ ___  2) Tylenol ↓ temp  3) Pediazole ℥3⁴ @ 10  12:00    MWH |
| 11 | 16 | 84 | Wt 21# (by scales - clothed)    Chest cong - cough - ↓ appetite. Requests Rx for vitamin. Has had symptoms for 1 wk. ↑ temp @ 1st of wk. |
| | | | A) O p m  Bronchitis  Viral URI  P) 1) Tylenol P.S. 2½cc   BID  2) Pediazole Ex Med q 8   ⊽ cc q 4° - QID  3) ↑ fl, no milk    MWH |
| 7 | 12 | 85 | Playing in wading pool - 45 min ago - began crying - index finger & palm of (L) hand puffy & red. |
| | | | A) Insect sting (L) 1st day  P) Benadryl 12.5 mg/tid   ℥ gtt q 4°  Ice  RTC or ER prn    MWH |

are excellent. Overall, this is considered to be an accurate estimate of Brandon's current functional skills.

<u>Test Results:</u>

<u>Intellectual:</u>   The *Stanford-Binet, Fourth Edition* was used for the intellectual assessment. Brandon's scores were as follows:

| | |
|---|---|
| Verbal Reasoning | 54 |
| Abstract/Visual Reasoning | 52 |
| Quantitative Reasoning | 44 |
| Short-Term Memory | 45 |
| Test Composite | 42 |

This performance is better than that received on his last assessment from 1992, which was reported in his 1/24/94 assessment. In this report it was noted that when the *Slosson Intelligence Test* was administered in 1992, Brandon's IQ was assessed as being 27, which would place his level of functioning in the severe range of mental retardation. The current score of 42 places Brandon's level of cognitive abilities in the moderate range of functioning, and appears to be a better estimate of his abilities.

On the *Goodenough Draw-A-Person* test, which is used to assess intellectual functioning in young people, Brandon received a score of 14, which translates to a Mental Age of 6 years, 6 months. This score also places Brandon's abilities in the moderate range of functioning, which corroborates his *Stanford-Binet* score.

<u>Adaptive:</u>   On the *Vineland Adaptive Behavior Scales (Interview Edition-Survey Form)*, using Brandon and case manager Kelly Henshaw as the informants, the following scores were attained:

| <u>Domain</u> | <u>Scaled Score</u> | <u>Age Equivalent</u> |
|---|---|---|
| Communication | <20 | 1 year, 7 months |
| Daily Living Skills | <20 | 4 years, 1 month |
| Socialization | 31 | 2 years, 9 months |
| Adaptive Behavior Composite | | 2 years, 10 months |

This score places Brandon's adaptive skills at the high end of the profound range of adaptive functioning, although it is significantly higher than that achieved in 1994, as can be seen below:

| <u>Domain</u> | <u>Age Equivalent</u> |
|---|---|
| Communication | 1 year, 2 months |
| Daily Living Skills | 2 years, 11 months |
| Socialization | 1 year, 0 months |
| Adaptive Behavior Composite | 1 year, 8 months |

An area of strength for Brandon is in his daily living skills and an area of weakness is in his communication skills.

*Social/Emotional:* On the Maladaptive Behaviors section of the *Vineland Adaptive Behavior Scales (Interview Edition-Survey Form)*, Brandon's score was 4, indicating intermediate problems in this area.   One maladaptive behavior was reported as occurring "often" (bites fingernails), and those reported as occurring "sometimes" were has poor concentration and attention and is stubborn.   In the past Brandon was reported by his mother as being aggressive and noncompliant, but his behavior has reportedly improved significantly over the past year.

Summary:   Brandon is a 14 year, 1 month old young man whose cognitive skills were assessed as being in the moderate range of impairment and whose adaptive skills were assessed as being at the high end of the profound range of impairment. Behavior problems are few and have apparently improved this past year.   Brandon continues to be eligible to receive services through the Developmental Disabilities Services Division of DHS.

DSM-IV Impressions:

| | | |
|---|---|---|
| Axis I | V71.09 | No diagnosis or condition on Axis I |
| Axis II | 318.0 | Moderate mental retardation |
| | | IQ = 42, from evaluation dated 4/21/97;   Adaptive Behavior Composite Score = 2 years, 10 months, from evaluation dated 4/21/97 |
| Axis III: | Multiple congenital anomalies | |
| Axis IV: | Psychosocial Stressors: Communication impairments | |
| Axis V: | 40-50 | |

Recommendations:

1.  Continued psychological service hours are recommended to assist Brandon's mother on a consultative basis if any behavioral issues recur this coming year. 20 units (5 hours) of W3036 are requested for this purpose.
2.  Brandon has severe impairments in his ability to communicate.   It has been reported that a recommendation has been made to teach Brandon and those around him sign language.   This is an excellent idea, as Brandon was able to imitate signs used by the examiner easily, and retained them through the end of the testing session (which lasted several hours).   Brandon is a natural mimic, has excellent receptive skills, and would probably be able to show a lot more of what he knows if he was able to consistently communicate with others.
3.  I was unable to find a current medical diagnosis for Brandon, even though I looked through his available medical records.   Brandon has a number of genetic anomalies which are reminiscent of Trisomy 9 mosaic syndrome.   I know that Brandon was seen at Children's Medical Center when he was a young child; however, I was unable to find a definitive diagnosis in his records.

It might be of assistance to those who work with Brandon on a consistent basis to be aware of any possible genetic syndrome so that they can take this into account when planning for his future needs. Another referral to the genetics clinic at Children's Medical Center in Tulsa would not be unreasonable if this has not be done recently.

4. Due to his poor expressive language skills I imagine that there are many people who tend to underestimate Brandon's abilities. I believe that it is important to alert as many people as possible who spend any significant amount of time with Brandon about his excellent abilities and skills, especially as he is unable to tell them himself.

5. As required by current DHS/DDSD regulations, Brandon will have to have another full psychological evaluation in 2000.

Lynne Anne Daurelle, Ph.D., BCFE
Licensed Psychologist (#639)

532

## SOCIAL SERVICE RE-EVALUATION

NAME: Brandon L. Smith   DOB: ███ 83 SSN: ███ 5808
MR-___:_____ SEX: Male RACE: C  NICKNAME: Bubba
HAIR: Brown EYES: Blue RELIGION: Bapt. POC EXP. DATE: 07-31-01
ADDRESS: ███████ Vian, OK. 74962 PHONE: 775-5816
COUNTY: Sequoyah #68 CASE MANAGER: Michael DeMoss DATE: 04-30-01
CASE NUMBER: D-018593

IMPROVEMENTS AND/OR PROBLEMS THIS PAST YEAR:

Brandon is attending Muldrow School and is doing very well. He continues to receive O.T. and Speech Therapy through the school. He has also shown some improvement in self-care skills, ie: dressing/undressing and bathing.

SCHOOL/EMPLOYMENT:
Brandon attends Muldrow Schools and will be in the 12th grade in August.

METHOD OF TRANSPORTATION: Brandon's mother provides transportation for him to and from school; his HTS also provides transportation, for him, as his mother works shift work and can not attend to him sometimes during waking hours.

PROGRESS OR PROBLEMS:
Brandon has a communication device which was repaired but his teacher and staff did not know how to use it. Stephanie Turner, the SLP for Muldrow schools, has received some training from the manufacture and is passing it on to the staff & school teacher.

MEDICAL: GENERAL HEALTH: Brandon is in good general health, aside from seasonal allergies.

MEDICATIONS: None

DOCTOR'S NAME: Dr. Cole, M.D.

DENTIST: James Lee, DDS

SPECIALIST: (EYES, HEARING, ORTHOPEDICS, ETC.)
Dobbs Eye Clinic, Sallisaw, OK

LEISURE TIME AND HOUSEHOLD DUTIES:
Brandon likes a variety of leisure activities, ie: riding his bike all over his community (McKee), swimming, boating, fishing, yard games, music, watching CMT, Nintindo and visiting with family and friends.

Brandon helps make his bed, likes to do dishes, can make himself a sandwich and pour a drink and picks up his toys.

SOCIAL SERVICE RE-EVALUATION
PAGE TWO

| SERVICES RECEIVED IN PAST YEAR | SERVICES NEEDED IN UPCOMING YEAR |
|---|---|
| O.T. at school | Same as last year |
| Speech at school | |
| Case Management | |
| HTS of 55 hours per week | |
| Transportation | |

FAMILY STATUS: Brandon lives with his mother and step-brother.

CHANGE OF ADDRESS OR EMPLOYMENT: None

HOUSEHOLD MEMBERS/NUMBER: 3

COPING ABILITY: Brandon can be uncooperative and can become aggressive sometimes, especially when he is ordered or told what to do but has done very well since he transferred back to school at Muldrow.

INCOME CHANGES/INSURANCE: Brandon receives SSI - $530.00.

RECOMMENDATIONS: See Above - Services Needed In Upcoming Year.

_Michael DeMoss_                    04/31/01
CASE MANAGER                    DATE

## STATE OF OKLAHOMA
## DEPARTMENT OF HUMAN SERVICES
### REFERRAL FORM FOR EXAMINATION OR TREATMENT

Name: _Brandon LeRoy Smith_  DOB: ███ -83

Case No: _____  Appointment Date/Time: _2:30  9-18-02_

Address: ███████████ _Vian OK_  Phone: _755-5816_

Provider: _____  Legal Guardian: _____

Case Manager: _Angela Ward_  Referred to: _____

**DIAGNOSIS:** _____

**CURRENT MEDICATIONS/TREATMENTS**

Name of medication, dosage amount, times administered, include any over-the-counter and/or P.R.N.

Claritin   daily

ALLERGIES. Include medication/food/environmental allergies: _okna_

**REASON FOR VISIT:**

Annual Physical Exam

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 2 6 2002

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

_____
Signature and Title of Person Completing Form

19 Apr 2002
Date

**PHYSICIAN/MEDICAL FACILITY SECTION**

Diagnosis/Findings: Developmental Delay   Genetic Abnormalities   [?] Allergic Rhinitis

Recommendations: Ongoing Public Assistance

Treatments: Speech Therapy   Occupational Therapy

_____
Physician Signature

19 Apr 2002
Date

Routing: One to physician, one for home record, one sent to case manager, within one working day.

OKLA. DHS REVISED 3-31-99                                    DDS-5

535

Lynne Anne Dairdle, PhD, BCFE
Licensed Psychologist (OK #639)
Clinical Psychology/Mental Retardation
6704 East 97th Street
Tulsa, OK 74133-5904
(918) 259-4995
(918) 298-0965 (fax #)

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 2 6 2002

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

## Psychological Assessment

**Name:** Brandon Smith
**DOB:** ████83
**Address:** (unavailable)
Roland, OK

**DHS ID#:** D-018593-01
**Age:** 14 years, 1 month
**Date of Evaluation:** 4/15/97
**Date of Report:** 4/23/97

**Reason for Assessment:** Brandon was referred for a full psychological assessment by Kelly Henshaw, DDSD case manager, to provide an annual psychological assessment to determine eligibility to continue receiving Title XIX funding through DHS/DDSD, and to provide input into his annual Individual Habilitation Program.

**Testing Instruments:**

*Stanford-Binet Intelligence Test, Fourth Edition*
*Vineland Adaptive Behavior Scales (Interview Edition - Survey Form)*
*Goodenough Draw-A-Person test*
Interview with Brandon
Interview with Kelly Henshaw, case manager
Review of available records

**Behavioral Observations:** Brandon is a friendly young man of 14 years, 1 month who has light brown hair and blue eyes. He is of average height and weight and ambulates independently. Brandon has been assessed as having a visual impairment, which is corrected with prescription glasses, and his hearing appeared normal for testing purposes. He is nonverbal and communicates through gestures (such as yes and no), body language, and a few signs. In previous reports Brandon's medical diagnosis was listed as "multiple congenital anomalies"; however, the complete medical evaluation was not available at the time of this report. Brandon does not have a psychiatric diagnosis. He is not reported to be receiving any medications on a daily basis. Brandon attends school at Roland School, which is in Roland, Oklahoma, where he and his family recently moved.

For the testing session, which was held at the Sallisaw DHS/DDSD office, Brandon was casually dressed in a maroon and gray jacket, gray shirt, blue jeans, and black tennis shoes. He was quite cooperative, alert, friendly, outgoing, and appeared very interested in the different testing materials. His eye contact was good, he was excited about participating, and he always worked hard before making a final choice on his test responses. When he didn't know an answer he would try to solve the problem anyway with minimal prompting. Brandon is a very sociable young man, and tried hard to please. Even though his expressive skills are minimal his receptive skills

536

*Mental retardation, congenital heart disease, blepharophimosis, blepharoptosis, and hypoplastic teeth* 243

showed her height to be 82·5 cm (−1·3 SD), weight 11·8 kg, and head circumference 48·0 cm. Blepharophimosis and ptosis were present (fig 2). Her external auditory canals were not narrow. A grade 3/6 holosystolic murmur was heard at the lower left sternal border. The heart murmur was diagnosed as being due to a ventricular septal defect. Dermatoglyphic study showed the fingertip patterns to consist of four whorls, four ulnar loops, one radial loop, and one arch. The *atd* angle was 79° on the right palm and 72° on the left. The G banded karyotype, ECG, and chest x-ray were normal. The develop-

mental quotient was about 60. She frequently had otitis media. The heart murmur disappeared by the age of 5.

On 31.8.84 her height was 126·4 cm (−1·5 SD), weight 30·9 kg, and head circumference 52·5 cm. In spite of three operations for blepharophimosis and ptosis, these conditions were not fully corrected (fig 2). Mild microphthalmia and severe amblyopia were discovered. Her teeth were small and widely spaced. Hearing impairment was also noted. Her IQ was 37. Although urine analysis detected proteinuria, her renal function was normal.



FIG 1    *The proband at 5 and 14 years of age.*

 

FIG 2    *The proband's sister at 2 and 10 years of age.*

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 154**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

538

STATE OF OKLAHOMA )
                  ) SS.          IN THE COUNTY COURT.
COUNTY OF SEQUOYAH )


In re: Sale of Inherited Lands )
of Lewis Bee Dotson, Deceased, ) NO. ___441___
Lucy R. Dotson, Petitioner,. . )


P E T I T I O N .

Comes now, Lucy R. Dotson and states to the Court:

1.

That she is a citizen of the Cherokee Nation of the
Fullblood, enrolled under the name of Lucy R. Walkingstick
at No.3033 of the final rolls of the Cherokee Nation; that
she is the widow of Berry Dotson, a non citizen, who died
on the _17_ day of _December_, 19_23_; that there was
born of said marriage several children among whom was Lewis
Bee Dotson, a son, who was a citizen of the Cherokee Nation
of the half blood, enrolled at No. 3294 on the final rolls of
New Born Citizens of the Cherokee Nation.

11.

That said Lewis Bee Dotson died on the _8_ day of
_August_, 19_25_, at Sequoyah County, Oklahoma, leaving
your petitioner, Lucy R. Dotson, as his only heir at law.

111.

That said Lewis Bee Dotson died seized and possessed.
of the following described lands, to-wit:
**REDACTED**

Sequoyah County, Oklahoma, except that
part of said land occupied by Right-of-way of Kansas City
Southern Railway Company.

1V.

That your petitioner as the only heir at law of said
Lewis Bee Dotson is the owner of said land at this time; that
she has bargained and sold the same to _Lewis D. Walkingstick_
for the price and sum of $_300 00_, and has executed a
general Warranty Deed to the said _Lewis D. Walkingstick_
for the same, subject to confirmation and approval by this
court; that said price and sum of $_300 00_ is a fair and
adequate price for said land.

THEREFORE, the petitioner asks the court to approve
and confirm said sale by proper order.

WITNESS My hand this 12th day of November, 1926.

_Lucy R. Dotson_

Subscribed and sworn to before me this 12th day of November, 192_

My Com. Exp.
Sept. 6, 1928                    _Alta Loomis_
                                NOTARY PUBLIC

539

IN THE COUNTY COURT.


In re: Sale of Inherited
Lands of Lewis Bee Dotson,
Deceased,
Lucy R. Dotson, Petitioner.


P E T I T I O N .

*Filed*

*1-12-1926*

*Roy and B Dotson*
*Court Clerk*

*Lucie Brown*
*Dep*

*Recorded*

*Book 2*

*Page 3 99*

STATE OF OKLAHOMA )
                  )SS.        IN THE COUNTY COURT.
SEQUOYAH COUNTY   )

In re: Sale of Inherited Lands)
of Lewis Bee Dotson, Deceased,)NO. ____481____
Lucy R. Dotson, Petitioner,. .)

ORDER OF COURT.

Lucy R. Dotson (nee Walkingstick) having filed in this court her petition, praying for the approval of the sale of the following described lands, to-wit:

██████████████████████████████████████, Sequoyah County, Oklahoma;except that part occupied by right-of-way of Kansas City Southern Railway Company, and the court, after hearing the evidence,finds:

That Lewis Bee Dotson died at Sequoyah County, Oklahoma, on the 8 day of August ,1926, that he was a citizen of Sequoyah County, Oklahoma, at the time of his death, and that this court has jurisdiction of his estate; that the petitioner, Lucy R. Dotson, is the only heir at law, as mother of the said Lewis Bee Dotson, and that she is a citizen of the Cherokee Nation enrolled at No. 3033; that the said Lewis Bee Dotson was a citizen of the Cherokee Nation enrolled at New Born Roll No.3094.

The court further finds that the price of $300.00 for which said land was sold is a fair and adequate value of said land.

**REDACTED**

IT IS THEREFORE ORDERED AND ADJUDGED That said sale for said sum of $300.00 to said Lewis D Walkingstick be and the same hereby is approved.

Dated this 12th day of November, 1926.

_W. S. Moore_
COUNTY JUDGE.

Filed:
11-12-1926

541

377

. No. 480 continued.

ave executed their Warranty Deed, conveying the same, which deed
erewith presented for approval.

Court further finds, that the said Charlie Leaf is a full-blood
okee Indian, and duly enrolled on the approved Rolls of the
okee Indians, opposite Roll No. _____.

Court further finds, that said sale of said lands and the deed
in presented in Court, is regular and in good form and that the
sideration is fair and adequate, and that the said Charlie Leaf
received a fair and reasonable market  value of said land. And it
be to the best interest  of the said Charlie Leaf, for this
to be approved.

S THEREFORE BY THE COURT CONSIDERED, ORDERED, ADJUDGED AND DECREED,
the said of said land, and that said deed is herein approved,
rmed and declared valid.

SS MY HAND AND THE SEAL OF SAID COURT, this the 1st day of November,
1926.

W. S. Moore. County Judge,
Sequoyah County, Okla.

November 1st, 1926.

ond P. Drake, Court Clerk, by Hallie Francis, Deputy.

-----------------------------------------------------------------

FULL BLOOD No.  481.

TE OF OKLAHOMA.
NTY OF SEQUOYAH. SS.          IN THE COUNTY COURT.

Re: Sale of Inherited lands
Lewis B. Dotson, Deceased,
y R. Dotson, Petitioner....          No. 481.

P E T I T I O N.

es now Lucy R. Dotson, and states to the Court:—

1.

at she is a Citizen of the Cherokee Nation, of the Fullblood, enrolled
er the name of Lucy R. Walkingstick, at No. 3033; of the Final Rolls
the Cherokee Nation;  that she is the widow of Berry Dotson, a non-
tizen, who died on the 17th day of December, 1923; that there was born
said marriage several children, among whom was Lewis B. Dotson, a son,
o was a citizen of the Cherokee Nation, of the halfpblood, enrolled
No. 3294, on the Final Rolls of New Born Citizens of the Cherokee
tion.

11.

at said Lewis B. Dotson died on the 8th day of August, 1925, at
quoyah County, Oklahoma, leaving your petitioner, Lucy R. Dotson, as
s only heir at law.

111.

at said Lewis B. Dotson died seized and possessed of the following
scribed lands, to-wit:—

█████, Sequoyah County, Oklahoma, except that part of said land occupied
Righty-of-way of Kansas City Southern Railway Company.

542

No. 481 continued.

IV.

That your petitioner as the only heir-at-law of said Lewis B. D
is the owner of said land at this time; that she has bargained
sold the same to Lewis D. Walkingstick, for the price and sum of
$300.00, and has executed a general warranty deed to the said L
D. Walkingstick, for the aaa, same, subject to the confirmation
approval by this Court; that said price and sum of $300.00 is a
and adequate price for said land.

THEREFORE, the petitioner aks the Court to approve and confirm
sale by proper order.

Witness my hand this 12th day of November, 1926.

Lucy R. Dotson.

Subscribed and sworn to before me this 12th day of November, 192

(SEAL)                                  Alta Loggains. Notary Publ

My commission expires
Sept. 5th, 1928.

Filed November 12th, 1926. Raymond P. Drake, Court Clerk,
by Hallie Francis, Deputy.


STATE OF OKLAHOMA.
SEQUOYAH   COUNTY. SS.         IN THE COUNTY COURT.

In Re: Sale of Inherited lands of
Lewis Bee Dotson, deceased, Lucy R. Dotson,       No. 481.
Petitioner.....   ...........

ORDER OF COURT.

Lucy R. Dotson. nee Walkingstick, having filed in this Court her
tion, praying for the approval of the sale of the following desc
lands, to-wit:-

███████████ Sequoyah County, Oklahoma, except that part occupied as rig
of-way of the Kansas City Southern Railway Company, and the Cou
after hearing the evidence, finds:-

That Lewis Bee Dotson, died in REDACTED Sequoyah County, Oklahoma, onn th
day of August, 1925; that he was a citizen of Sequoyah County, O
at the time of his death, and that this Court has jurisdiction o
estate; that the petitioner, Lucy R. Dotson, is the only heir-at-l
as mother of the said Lewis Bee Dotson, and that she is a citizen
the Cherokee Nation, enrolled at No. 3033; that the said Lewis B
Dotson, was a citizen of the Cherokee Nation, enrolled at New Bo
Roll No. 3094.

The Court further finds, that the price of $300.00, for which sa
was sold, is a fair and adequte value of said land.

IT IS THEREFORE ORDERED AND ADJUDGED that said sale, for said sum
$300.00, to said Lewis D. Walkingstick, be, and the same hereby
approved.

Dated this 12th day of November, 1926.
(SEAL)                                  W. S. Moore. County Judg

Filed November  12th, 1926.

Raymond P. Drake, Court Clerk,
By Hallie Francis, Deputy Clerk.

IN THE COUNTY COURT.

In re: Sale of Inherited
Lands of Lewis Bee Potson
Deceased.
Lucy F. Potson, Petitioner

ORDER OF COURT.

Filed
11-13-1926
Raymond C. Beck
Court Clerk
Harrie Ferrin
Dep

Misc. Book
Page
378.

944

545

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Defendant. | ) | |

REDACTED EXHIBIT 123

TO KENNETH EUGENE BARRETT'S

SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255



## CERTIFICATION OF VITAL RECORD

# STATE OF ILLINOIS

### DEPARTMENT OF PUBLIC HEALTH - DIVISION OF VITAL RECORDS

STATE OF ILLINOIS

CHILD'S BIRTH NUMBER

### CERTIFICATE OF LIVE BIRTH

112- **69 006462**

| MATCHING IDC | | | | | |
|---|---|---|---|---|---|
| REGISTRATION DISTRICT NO. | 99.0 | | | | |
| REGISTERED NUMBER | 300 | | | | |

| CHILD—NAME | FIRST | MIDDLE | LAST | DATE OF BIRTH (MONTH, DAY, YEAR) | HOUR |
|---|---|---|---|---|---|
| 1. | Stephen | Wayne | Barrett | 2a. ▓▓▓▓, 1969 | 2b. 3:17 A. M. |

| SEX | THIS BIRTH—SINGLE, TWIN, TRIPLET, ETC. (SPECIFY) | IF NOT SINGLE BIRTH—BORN FIRST, SECOND, THIRD, ETC. (SPECIFY) | PLACE OF BIRTH | COUNTY |
|---|---|---|---|---|
| 3. male | 4a. single | 4b. | 5a. | Will |

| CITY, TOWN, TWP. OR ROAD DISTRICT NO. | INSIDE CITY (YES/NO) | HOSPITAL—NAME | IF NOT IN HOSPITAL, GIVE STREET AND NUMBER |
|---|---|---|---|
| 5b. Joliet | 5c. yes | 5d. St. Joseph | |

| MOTHER—MAIDEN NAME | FIRST | MIDDLE | LAST | AGE (AT TIME OF THIS BIRTH) | BIRTHPLACE (STATE OR FOREIGN COUNTRY) |
|---|---|---|---|---|---|
| 6a. | Sylvia | G. | Dotson | 6b. 28 | 6c. Oklahoma |

| RESIDENCE STATE | COUNTY | CITY, TOWN, TWP. OR ROAD DISTRICT NO. | INSIDE CITY (YES/NO) | STREET AND NUMBER |
|---|---|---|---|---|
| 7a. Illinois | 7b. Will | 7c. Wheatland | 7d. no | 7e. ▓▓▓▓▓▓▓ |

| MOTHER'S COMPLETE MAILING ADDRESS | STREET AND NUMBER OR R.F.D. | CITY OR TOWN | STATE | ZIP |
|---|---|---|---|---|
| 7f. | ▓▓▓▓▓▓▓ | Plainfield | Illinois | 60544 |

| FATHER—NAME | FIRST | MIDDLE | LAST | AGE (AT TIME OF THIS BIRTH) | BIRTHPLACE (STATE OR FOREIGN COUNTRY) |
|---|---|---|---|---|---|
| 8a. | Ernest | E. | Barrett | 8b. 30 | 8c. Oklahoma |

| INFORMANT'S SIGNATURE | | RELATION TO CHILD |
|---|---|---|
| 9a. ▶ *Sylvia G Barrett* | | 9b. mother |

| I CERTIFY THAT THE ABOVE NAMED CHILD WAS BORN ALIVE AT THE PLACE AND TIME AND ON THE DATE STATED ABOVE. | DATE SIGNED (MONTH, DAY, YEAR) | ATTENDANT—M.D., D.O., MIDWIFE, OTHER (SPECIFY) |
|---|---|---|
| | 10b. Jan. 29, 1969 | 10c. M.D. |

| SIGNATURE | ILLINOIS LICENSE NUMBER | |
|---|---|---|
| 10a. ▶ *F.C. Chuc..........* | 10d. 37809 | |

| CERTIFIER'S COMPLETE MAILING ADDRESS | STREET AND NUMBER OR R.F.D. | CITY OR TOWN | STATE | ZIP |
|---|---|---|---|---|
| 10e. | ▓▓▓▓▓▓▓ | Joliet | Illinois | 60431 |

| LOCAL REGISTRAR'S SIGNATURE | DATE REC'D BY LOCAL REGISTRAR (MONTH, DAY, YEAR) |
|---|---|
| 11a. ▶ *Herbert S Mull, M.D.* | 11b. February 3, 1969 |

VS 100 — (1968)   ILLINOIS DEPARTMENT OF PUBLIC HEALTH — BUREAU OF STATISTICS   (BASED ON 1968 U.S. STANDARD CERTIFICATE)

**783593**

This is to certify that this is a true and correct copy of the official record filed with the Illinois Department of Public Health.

DATE ISSUED

**FEB 27 2009**

*Damon T. Arnold, M.D., M.P.H.*

DAMON T. ARNOLD, M.D., M.P.H.
STATE REGISTRAR



ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

346

547

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,      )
                               )
                  *Plaintiff,* )
                               )
v.                             )      Case No. 6:09-cv-00105-JHP
                               )
KENNETH EUGENE BARRETT,        )
                               )
                  *Defendant.* )

---

REDACTED EXHIBIT 124

TO KENNETH EUGENE BARRETT'S

SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255            *U.S. v. Barrett*, 6:09-cv-00105-JHP

547

# CERTIFICATE OF DEATH
### STATE OF OKLAHOMA – DEPARTMENT OF HEALTH

22507

LOCAL REGISTRAR'S FILE NO. 264 DELAYED FILING

STATE FILE NO. **DELAYED FILING**

| DECEASED – NAME | First | Middle | Last | DATE OF DEATH (Month, Day, Year) | SEX |
|---|---|---|---|---|---|
| 1. | Allen | M. | Real | 2. Oct. 15, 1960 | 3. male |

| RACE - White, Negro, American Indian, Etc. (Specify) 4. white | AGE - Last Birthday 5a. 50 | UNDER 1 YEAR Mos. Days 5b. | UNDER 1 DAY Hours Min. 5c. | DATE OF BIRTH (Month, Day, Year) 6. 1910 | COUNTY OF DEATH 7a. Leflore |

| CITY, TOWN, OR LOCATION OF DEATH 7b. Bokoshe | INSIDE CITY LIMITS Yes ☒ No ☐ 7c. | HOSPITAL OR OTHER INSTITUTION – NAME (If not in either, give Street and Number) 7d. Gen. Del. | Residence | Bokoshe, Okla. |

| STATE OF BIRTH (If not in U.S.A., Name Country) 8. Kansas | CITIZEN OF WHAT COUNTRY 9. U.S.A. | Married ☒ Never Married ☐ Widowed ☐ Divorced ☐ 10. | SURVIVING SPOUSE (If Wife, Give Maiden Name) 11. Ocie Vincent |

| SOCIAL SECURITY NUMBER 12. 1920 | USUAL OCCUPATION (Give kind of work done during most of working life, even if retired) 13a. Miner | KIND OF BUSINESS OR INDUSTRY 13b. Coal |

| RESIDENCE – STATE 14a. Oklahoma | COUNTY 14b. Leflore | CITY, TOWN, OR LOCATION 14c. Bokoshe | INSIDE CITY LIMITS Yes ☐ No ☐ 14d. X | STREET AND NUMBER 14e. |

| FATHER – NAME First Fred | Middle Earnest | Last Real 15. | MOTHER – MAIDEN NAME First Linda | Middle | Last Hynes 16. |

| INFORMANT – NAME 17a. Mrs. Ocie Real | MAILING ADDRESS 17b. | (Street or R.F.D. No., City or Town, State, Zip) Bokoshe, Oklahoma 74930 |

**PART I.** DEATH WAS CAUSED BY: (Enter only one cause per line for (a), (b), and (c)) **DELAYED FILING**

Approximate interval Between onset and Death

18. CAUSE OF DEATH

IMMEDIATE CAUSE

(a) Acute Myocardial Infarction — 2 Hours

DUE TO OR AS A CONSEQUENCE OF:

(b) Coronary Occlusion — 2 Hours

DUE TO, OR AS A CONSEQUENCE OF:

(c) Lodging of Thrombus in Coronary Artery — 2 Hours

Condition, if any, which gave rise to immediate cause(s), stating the underlying cause last

PART II. OTHER SIGNIFICANT CONDITIONS: (Conditions contributing to death but not related to cause given in part I (a))

AUTOPSY: 19a. Yes ☐ No ☒

IF YES: Were findings considered in determining cause of death? 19b. Yes ☐ No ☒

| 20a. ACCIDENT ☐ HOMICIDE ☐ SUICIDE ☐ UNDETERMINED ☐ | DATE OF INJURY (Month, Day, Year) 20b. | HOUR OF INJURY 20c. M. | HOW INJURY OCCURRED (Enter nature of injury in Part I or Part II, item 18) 20d. |

| 20e. INJURY AT WORK Yes ☐ No ☐ | 20f. PLACE OF INJURY: At Home, Farm, Street, Factory, Office Bldg., Etc. (Specify) | 20g. LOCATION OF INJURY (Street or R.F.D. No., City or Town, State) |

| CERTIFICATION – Month Day Year 21a. PHYSICIAN I attended the deceased from TO | Month Day Year 10 15 60 | And Last saw him/her alive on 21b. Month Day Year 7 1 60 | I did/did not view body after death 21c. | DEATH OCCURRED at 21d. at the place, on the date stated, and to the best of my knowledge, due to the cause(s) stated. 8 A. M. |

| CERTIFIER – NAME (Type or Print) 22a. R.J. Fridman | SIGNATURE OF CERTIFIER 22b. Rolf J. Fridman | Degree or Title D.O. | DATE SIGNED (Month, Day, Year) 22c. 1-11-71 |

| MAILING ADDRESS – CERTIFIER 22d. | Street or R.F.D. No. | City or Town Panama, Oklahoma | State | Zip 74951 |

| CERTIFICATION – MEDICAL EXAMINER OR LOCAL HEALTH OFFICER: On the basis of the examination of the body and/or the investigation, in my opinion, death occurred on the date and due to the cause(s) stated as certified by my signature in item 22b. 23a. | THE DECEDENT was pronounced dead on 23a. Month Day Year | AT 23b. M. |

| BURIAL, CREMATION, REMOVAL (Specify) 24a. Burial | DATE 24b. Oct. 19, 1960 | Month Day Year | CEMETERY OR CREMATORY – NAME 24c. Old Bokoshe, Cemetery |

| LOCATION (Crematory or Cemetery) City 24d. Bokoshe, Okla. | FUNERAL HOME - NAME AND ADDRESS (Street or R.F.D. No., City or Town, State, Zip) Mallory Funeral Home Stigler, Okla. | FUNERAL DIRECTOR R. L. Munn |

| LOCAL REGISTRAR SIGNATURE 26a. Clarence Johnston | DATE RECD. BY LOCAL REG. 26b. 1/15/71 | DATE RECEIVED BY STATE REGISTRAR 27. JAN 18 1971 |

February 19, 2009



B00913057

This is a true and correct copy of the official record on file in the Office of Vital Statistics, Oklahoma City, Oklahoma, certified on the date stamped.

*Kelly M Baker*

Kelly M. Baker
State Registrar
Office of Vital Statistics
Department of Health



It is in violation of Oklahoma Statutes, Title 63, Section 1-324.1, to "prepare or issue any certificate which purports to be original, certified copy or copy of a certificate of birth, death or stillbirth, except as authorized in this act or rules and regulations adopted under this act."

**CERTIFIED COPIES WILL BE PRODUCED ON MULTI-COLOR SECURITY PAPER.**

**VERIFY PRESENCE OF WATERMARK   HOLD TO LIGHT TO VIEW**

**WARNING:** THIS DOCUMENT IS PRINTED ON SECURITY WATERMARKED PAPER AND CONTAINS SECURITY FIBERS. DO NOT ACCEPT WITHOUT VERIFYING THE PRESENCE OF THE WATERMARK.

THE DOCUMENT FACE CONTAINS A SECURITY BACKGROUND. THE BACK CONTAINS SPECIAL LINES WITH TEXT, EMBOSSED SEAL AND THERMOCHROMIC INK.

CERTIFICATE OF DEATH

20721

STATE OF OKLAHOMA · DEPARTMENT OF HEALTH

LOCAL REGISTRAR'S FILE NO. 133

STATE FILE NO.

STATE BIRTH NO.

**1. PLACE OF DEATH**
a. COUNTY: Sequoyah
b. CITY, TOWN, OR LOCATION: Sallisaw
c. LENGTH OF STAY IN 10
d. NAME OF HOSPITAL OR INSTITUTION (If not in hospital, give street address): Sequoyah Memorial Hosp.
e. IS PLACE OF DEATH INSIDE CITY LIMITS? YES ☒ NO ☐

**2. USUAL RESIDENCE** (Where deceased lived. If institution: Residence before admission)
a. STATE: Oklahoma Sequoyah
c. CITY, TOWN, OR LOCATION: Vian
d. STREET ADDRESS: Route 2
e. IS RESIDENCE INSIDE CITY LIMITS? YES ☐ NO ☒
f. IS RESIDENCE ON A FARM? YES ☒ NO ☐

**3. NAME OF DECEASED (Type or print)**
First: Allen | Middle: Cleveland | Last: Real

**4. DATE OF DEATH** Month Day Year: 11-21-64

**5. SEX:** male
**6. COLOR OR RACE:** white
**7.** MARRIED ☒ NEVER MARRIED ☐ WIDOWED ☐ DIVORCED ☐
**8. DATE OF BIRTH:** 11-12-1884
**9. AGE (In years last birthday):** 80 | IF UNDER 1 YEAR Months Days | IF UNDER 24 HRS. Hours Min.

**10a. USUAL OCCUPATION** (Give kind of work done during most of working life, even if retired): Farmer
**10b. KIND OF BUSINESS OR INDUSTRY:** Farming
**11. BIRTHPLACE (State or foreign country):** Subiaco, Arkansas
**12. CITIZEN OF WHAT COUNTRY?** USA

**13. FATHER'S NAME:** Churchill Real
**14. MOTHER'S MAIDEN NAME:** Amanda Ward

**15. WAS DECEASED EVER IN U.S. ARMED FORCES?** (Yes, no, or unknown) (If yes, give war or dates of service): no
**16. SOCIAL SECURITY NO.:** none
**17. INFORMANT:** Ida Real | Address: Vian, Oklahoma Route 2

**18. CAUSE OF DEATH** [Enter only one cause per line for (a), (b), and (c).]
PART I. DEATH WAS CAUSED BY:
IMMEDIATE CAUSE (a): Massive Cerebral Hemorrhage
Conditions, if any, which gave rise to above cause (a), stating the underlying cause last.
DUE TO (b)
DUE TO (c)
PART II. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO THE TERMINAL DISEASE CONDITION GIVEN IN PART I(a)

INTERVAL BETWEEN ONSET AND DEATH Hrs.

**19. WAS AUTOPSY PERFORMED?** YES ☐ NO ☐

**20a.** ACCIDENT ☐ SUICIDE ☐ HOMICIDE ☐
**20b. DESCRIBE HOW INJURY OCCURRED.** (Enter nature of injury in Part I or Part II of item 18.)
**20c. TIME OF INJURY** Hour / Month, Day, Year / a.m. p.m.
**20d. INJURY OCCURRED** WHILE AT WORK ☐ NOT WHILE AT WORK ☐
**20e. PLACE OF INJURY** (e.g., in or about home, farm, factory, street, office bldg., etc.)
**20f. CITY, TOWN, OR LOCATION** COUNTY STATE

**21.** I attended the deceased from _____ to _____ m on the date stated above; and last saw her/him alive on _____ ; and to the best of my knowledge, from the causes stated.
Death occurred at _____

**22a. SIGNATURE** _____ (Degree or title)
**22b. ADDRESS:** Sallisaw, Oklahoma
**22c. DATE SIGNED:** 11/24/64

**23a. BURIAL, CREMATION, REMOVAL (Specify):** Burial
**23b. DATE:** 11-23-64
**23c. NAME OF CEMETERY OR CREMATORY:** Drake Stand Cemetery
**23d. LOCATION (City, town, or county):** Sequoyah County, Oklahoma (State)

**24. DATE RECD. BY LOCAL REG.:** 11-25-64
**25. REGISTRAR'S SIGNATURE:** Elsie King
**26. FUNERAL DIRECTOR:** Wheeler Funeral Home, Sallisaw, Okla.



### State Department of Health
#### State of Oklahoma
OKLAHOMA CITY, OKLAHOMA 73152

ROGER C. PIRRONG
STATE REGISTRAR OF VITAL STATISTICS

CERTIFIED COPY MUST HAVE EMBOSSED SEAL

I hereby certify the foregoing to be a true and correct copy, original of which is on file in this office. In testimony whereof, I have hereunto subscribed my name and caused the official seal to be affixed, at Oklahoma City, Oklahoma, this date.

STATE REGISTRAR

551

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,                )
                                         )
                         *Plaintiff*,    )
                                         )
v.                                       )    Case No. 6:09-cv-00105-JHP
                                         )
KENNETH EUGENE BARRETT,                  )
                                         )
                         *Defendant.*    )

---

REDACTED EXHIBIT 127

TO KENNETH EUGENE BARRETT'S

SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

MEDICAL EXAMINER
# CERTIFICATE OF DEATH
STATE OF OKLAHOMA — DEPARTMENT OF HEALTH

LOCAL REGISTRAR'S FILE NO. 85

STATE FILE NO. 12879

| DECEASED — NAME | First | Middle | Last | DATE OF DEATH (Month, Day, Year) | SEX |
|---|---|---|---|---|---|
| 1. | Albert | Howard | Maxwell | 2. June 11, 1975 | 3. Male |

RACE — White, Negro, American Indian, Etc. (Specify) 4. White | AGE — Last Birthday (Year) 5a. 62 | UNDER 1 YEAR 5b. Months 6 Days 25 | UNDER 1 DAY Hours Min. | DATE OF BIRTH (Month, Day, Year) 6. 1912 | COUNTY OF DEATH 7. Sequoyah

CITY, TOWN, OR LOCATION OF DEATH 7a. Sallisaw | INSIDE CITY LIMITS Yes ☐ No ☒ | HOSPITAL OR OTHER INSTITUTION — NAME (If not in either, give Street and Number) 7d. Residence: Sallisaw, Oklahoma

STATE OF BIRTH (If not in U.S.A. Name Country) 8. Oklahoma | CITIZEN OF WHAT COUNTRY 9. USA | Married ☐ Never Married ☐ Widowed ☒ Divorced ☐ 10. | SURVIVING SPOUSE (If Wife, Give Maiden Name) 11.

SOCIAL SECURITY NUMBER 12. 7719 | USUAL OCCUPATION (Give kind of work done during most of working life, even if retired) 13a. Electrian | KIND OF BUSINESS OR INDUSTRY 13. Commercial

RESIDENCE — STATE 14a. Oklahoma | COUNTY 14b. Sequoyah | CITY, TOWN, OR LOCATION 14c. Sallisaw | INSIDE CITY LIMITS Yes ☐ No ☒ 14d. | STREET AND NUMBER 14e. | ZIP CODE

FATHER — NAME First William | Middle M | Last Maxwell 15. | MOTHER — MAIDEN NAME First Martha | Middle R. | Last Newby 16.

INFORMANT — NAME OR SOURCE OF INFORMATION 17a. Mrs. Lynda Matthews | MAILING ADDRESS (Street or R.F.D. No., City or Town, State, Zip) 17b. Aberdene, Wa., 98520

PART I. DEATH WAS CAUSED BY: (Enter only one cause per line for (a), (b), and (c))

18. CAUSE OF DEATH — IMMEDIATE CAUSE (a) Apparently Acute Coronary Insufficiency — Approximate Interval Between Onset and Death: 15 min. ?

Condition, if any, which gave rise to immediate cause(s), stating the underlying cause last.

DUE TO, OR AS A CONSEQUENCE OF: (b)

DUE TO, OR AS A CONSEQUENCE OF: (c)

PART II. OTHER SIGNIFICANT CONDITIONS: (Conditions contributing to death but not related to cause given in part I (a)) | AUTOPSY 19a. Yes ☐ No ☒ | AUTOPSY AUTHORIZED BY: 19b.

Manner: Natural ☒ Pending ☐ Accident ☐ Suicide ☐ Homicide ☐ Unknown ☐ | DATE OF INJURY (Month, Day, Year) 20a. | HOUR OF INJURY 20c. M. | 20d. HOW INJURY OCCURRED (Enter nature of injury in Part I or Part II, Item 18)

20b. INJURY AT WORK Yes ☐ No ☐ | 20f. PLACE OF INJURY: At Home, Farm, Street, Factory, Office Bldg., Etc. (Specify) | 20g. LOCATION OF INJURY (Street or R.F.D. No., City or Town, State)

CERTIFICATION — MEDICAL EXAMINER On the basis of the examination of the body and/or the investigation, in my opinion, death occurred on the date and due to the cause(s) and manner stated as certified by my signature in Item 22b. 21a. | I did/did not examine body after death 21b. | DEATH OCCURRED at 8:30 A. M. 21c. at the place, on the date stated, and to the best of my knowledge, due to the cause(s) stated.

CERTIFIER — NAME (Type or Print) 22a. Dr. Wm M. Wilson | SIGNATURE OF MEDICAL EXAMINER 22b. Wm. M. Wilson, D.O. | DATE SIGNED (Month, Day, Year) 22c. 6-12-75

MAILING ADDRESS — CERTIFIER 23. Post Office Drawer 607 | City or Town Sallisaw | State Oklahoma | Zip 74955

BURIAL, CREMATION, REMOVAL (Specify) 24a. Burial | DATE 24b. Month June | Day 14 | Year 1975 | CEMETERY OR CREMATORY — NAME 24c. Akins Cemetery

LOCATION (Crematory or Cemetery) 25. W.E. of Sallisaw, Okla. | FUNERAL HOME — NAME AND ADDRESS (Street or R.F.D. No., City or Town, State, Zip) 26. Agent Funeral Home, Sallisaw, Oklahoma 74955 | FUNERAL DIRECTOR W. Neal Agent

LOCAL REGISTRAR'S SIGNATURE 27a. | DATE REC'D BY LOCAL REG. 27b. June 19, 1975 | DATE RECEIVED BY STATE REGISTRAR 28. JUN 20 1975



B00913051

This is a true and correct copy of the official record on file in the Office of Vital Statistics, Oklahoma City, Oklahoma, certified on the date stamped.



Kelly M. Baker
State Registrar
Office of Vital Statistics
Department of Health

It is in violation of Oklahoma Statutes, Title 63, Section 1-324.1, to "prepare or issue any certificate which purports to be original, certified copy or copy of a certificate of birth, death or stillbirth, except as authorized in this act or rules and regulations adopted under this act."

**CERTIFIED COPIES WILL BE PRODUCED ON MULTI-COLOR SECURITY PAPER.**

**VERIFY PRESENCE OF WATERMARK HOLD TO LIGHT TO VIEW**

**WARNING:** THIS DOCUMENT IS PRINTED ON SECURITY WATERMARKED PAPER AND CONTAINS SECURITY FIBERS. DO NOT ACCEPT WITHOUT VERIFYING THE PRESENCE OF THE WATERMARK.

THE DOCUMENT FACE CONTAINS A SECURITY BACKGROUND. THE BACK CONTAINS SPECIAL LINES WITH TEXT, EMBOSSED SEAL AND THERMOCHROMIC INK.

553

554

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Defendant. | ) | |

---

## REDACTED EXHIBIT 131

## TO KENNETH EUGENE BARRETT'S

## SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

ATTENDING PHYSICIAN
# CERTIFICATE OF DEATH
STATE OF OKLAHOMA · DEPARTMENT OF HEALTH

07987

| LOCAL REGISTRAR'S FILE NO. | 9½ | | | | | STATE FILE NO. | | |
|---|---|---|---|---|---|---|---|---|
| DECEASED - NAME 1. First | *IDA* | Middle | Last *MELTON* | | DATE OF DEATH (Month, Day, Year) *April 7, 1978* | | SEX *Female* | |
| RACE - White, Negro, American Indian, Etc. (Specify) 4. *Indian* | AGE - Last Birthday (Year) 5a. *80* | UNDER 1 YEAR Mos. 5b. | UNDER 1 DAY Hours Min. 5c. | DATE OF BIRTH (Month, Day, Year) *1897* | | COUNTY OF DEATH 7a. *McCurtain* | | |
| CITY, TOWN, OR LOCATION OF DEATH 7b. *Idabel* | INSIDE CITY LIMITS Yes ☑ No ☐ 7c. X | | HOSPITAL OR OTHER INSTITUTION — NAME (If not in either, give Street and Number) 7d. *McCurtain Memorial Hospital* | | | | | |
| STATE OF BIRTH (If not in U.S.A., Name Country) 8. *Oklahoma* | CITIZEN OF WHAT COUNTRY 9. *USA* | | Married ☐ Never Married ☐ Widowed ☑ Divorced ☐ 10. X | SURVIVING SPOUSE (If Wife, Give Maiden Name) 11. | | | | |
| SOCIAL SECURITY NUMBER 12. | USUAL OCCUPATION (Give kind of work done during most of working life, even if retired) 13a. *Housewife* | | | KIND OF BUSINESS OR INDUSTRY 13b. | | | | |
| RESIDENCE — STATE *Oklahoma* | COUNTY *McCurtain* | CITY, TOWN, OR LOCATION 14c. *Broken Bow* | | INSIDE CITY LIMITS Yes ☐ No ☐ 14d. X | STREET AND NUMBER 14e. ▮▮▮▮▮ | | | |
| FATHER - NAME 15. First *Joseph* | Middle *Baker* | Last | MOTHER — MAIDEN NAME 16. First *Unknown* | | Middle | | Last | |
| INFORMANT — NAME 17a. *Mary Winship* | | MAILING ADDRESS 17b. *Broken Bow, Okla* | | | (Street or R. F. D. No., City or Town, State, Zip) | | | |

| PART 1. | DEATH WAS CAUSED BY: (Enter only one cause per line for (a), (b), and (c).) | | Approximate Interval Between onset and Death |
|---|---|---|---|
| 18. CAUSE OF DEATH Condition if any, which gave rise to immediate cause(s), stating the underlying cause last | IMMEDIATE CAUSE (a) *Cardiorespiratory Failure* | | |
| | DUE TO OR AS A CONSEQUENCE OF: (b) *Metabolic Acidosis* | | |
| | DUE TO OR AS A CONSEQUENCE OF: (c) *Renal Failure* | | |

| PART II. OTHER SIGNIFICANT CONDITIONS: (Conditions contributing to death but not related to cause given in part 1 (a).) *Arteriosclerotic Heart Disease - Failure* | AUTOPSY 19a. Yes ☐ No ☑ | IF YES: Were findings considered in determining cause of death. 19b. Yes ☐ No ☐ |
|---|---|---|

Notice to attending physician: Do not sign this certificate unless you are the physician who attended the deceased for a natural illness—unrelated to injury or poisoning—to which the patient has apparently succumbed, provided that death did not occur while deceased was in penal incarceration or during a therapeutic procedure in which death was not reasonably medically expected. For enumeration of deaths subject to investigation and certification by Medical Examiner, refer to O.S. Title 63, Sec. 938, or contact office of Chief Medical Examiner in Oklahoma City.

| CERTIFICATION - Month Day Year 20a. PHYSICIAN I attended the deceased *4 25 72* | Month Day Year TO *4 7 78* | And Last saw ▮▮▮ alive on 20b. Month Day Year *4 7 78* | I ▮▮▮ did not view body after death 20c. | DEATH OCCURRED at 2:35 P. M. 20d. at the place, on the date stated, and to the best of my knowledge, due to the cause(s) stated. |
|---|---|---|---|---|
| CERTIFIER — NAME (Type or Print) 21a. *Dr. B. J. Waldrop* | SIGNATURE OF CERTIFIER 21b. *E J Waldrop* | | Degree or Title | DATE SIGNED (Month, Day, Year) 21c. *4/20/78* |
| MAILING ADDRESS — CERTIFIER Street or R.F.D. No. 21d. *124 S. E. Ave. N,* | City or Town *Idabel, Okla* | State | Zip | THIS DECEDENT was pronounced dead on 22a. Month Day Year 22b. M. |
| BURIAL, CREMATION, REMOVAL (Specify) 23a. *Burial* | DATE 23b. *April 10, 1978* | | CEMETERY OR CREMATORY — NAME 23c. *Bethel Hill Cemetery* | |
| LOCATION (Crematory or Cemetery) City or Town 23d. *Battiest, Okla* | FUNERAL HOME - NAME AND ADDRESS (Street or R.F.D. No., City or Town, State, Zip) 24a. *Norwood-Welch Funeral Home* | | FUNERAL DIRECTOR 24b. *James P. Norwood* | |
| LOCAL REGISTRAR SIGNATURE 25a. *Marie Akers* | DATE REC'D. BY LOCAL REG. 25b. *4-28-78* | | DATE RECEIVED BY STATE REGISTRAR 26. *MAY 1 - 1978* | |

B00913052

This is a true and correct copy of the official record on file in the Office of Vital Statistics, Oklahoma City, Oklahoma, certified on the date stamped.



Kelly M. Baker
State Registrar
Office of Vital Statistics
Department of Health

It is in violation of Oklahoma Statutes, Title 63, Section 1-324.1, to "prepare or issue any certificate which purports to be original, certified copy or copy of a certificate of birth, death or stillbirth, except as authorized in this act or rules and regulations adopted under this act."

**CERTIFIED COPIES WILL BE PRODUCED ON MULTI-COLOR SECURITY PAPER.**

VERIFY PRESENCE OF WATERMARK   HOLD TO LIGHT TO VIEW

**WARNING:** THIS DOCUMENT IS PRINTED ON SECURITY WATERMARKED PAPER AND CONTAINS SECURITY FIBERS, DO NOT ACCEPT WITHOUT VERIFYING THE PRESENCE OF THE WATERMARK.

THE DOCUMENT FACE CONTAINS A SECURITY BACKGROUND. THE BACK CONTAINS SPECIAL LINES WITH TEXT, EMBOSSED SEAL AND THERMOCHROMIC INK.

# IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,     )
     )
     *Plaintiff,*     )
     )
v.     )     Case No. 6:09-cv-00105-JHP
     )
KENNETH EUGENE BARRETT,     )
     )
     *Defendant.*     )

---

## REDACTED EXHIBIT 135

## TO KENNETH EUGENE BARRETT'S

## SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255     *U.S. v. Barrett*, 6:09-cv-00105-JHP

557

```
SSA-1826                 ITEMIZED STATEMENT OF EARNINGS          JOB:
VERSION 1984.002 * * *       FOR SSN ████████5808      * * *
```

```
FROM:   SOCIAL SECURITY ADMINISTRATION
        OFFICE OF CENTRAL OPERATIONS
        300 N. GREENE STREET
        BALTIMORE, MARYLAND  21290-0300

CCA                                    NUMBER HOLDER NAME:
                                       BRANDON L SMITH
1116 POWHATTAN AVE


SAN FRANCISCO           CA  94110

PERIOD REQUESTED   JANUARY 1997  THRU  DECEMBER 2007
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|

```
EMPLOYER NUMBER:  73-1243774
PEOPLE INC
205 J T STITES BLVD
SALLISAW  OK 74955-9301
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|------------|
| 2000 | - | - | - | - |  |
| 2002 | - | - | - | - | $  19.68 |
| 2003 | - | - | - | - | $  77.29 |
| 2004 | - | - | - | - | $ 861.79 |
| 2005 | - | - | - | - | $ 880.40 |
| 2006 | - | - | - | - | $ 874.75 |
| 2007 | - | - | - | - | $ 901.70 |
|      |   |   |   |   | $ 691.10 |

```
THERE ARE NO OTHER EARNINGS RECORDED UNDER THIS SOCIAL SECURITY
NUMBER FOR THE PERIOD(S) REQUESTED.

EARNINGS FOR THE YEARS AFTER   2007 MAY NOT BE SHOWN, OR ONLY
PARTIALLY SHOWN, BECAUSE THEY MAY NOT YET BE ON OUR RECORDS.

                        PAGE 001 END
```

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 155**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                  *U.S. v. Barrett*, 6:09-cv-00105-JHP

559

**From:** ████████████████████████

**To:** ████████████████████████

**Date:** Monday, November 27, 2000 11:37 AM

**Subject:** Dotson Line

---

this is what I received the other day about the Dotson. I am still learning
more about some of the names listed, and will pass on as quickly as I can.
Descendants 1.    ?    Dotson

Generation No. 1

2. i. WILLIAM ABRAHAM DOTSON
    b. 1780, Grainger County, Tennessee;
    d. January 02, 1861, Madison County, Arkansas.
  ii. NOAH DOTSON.
    More About NOAH DOTSON:
    Comment: Went to Texas as a young man and was never heard from again.
  iii. JEFF DOTSON
    More About JEFF DOTSON:
    Comment: Went to Texas as a yong man and never heard from again.
  iv. ALLEN DOTSON

Generation No. 2

2. WILLIAM ABRAHAM DOTSON
    was born 1780 in Grainger County, Tennessee, and died January 02, 1861 in
    Madison County, Arkansas. He married (1) ELIZABETH A RAYNOR
    1799 in North Carolina, daughter of HENRY RAYNOR and ANNA GOATS.
    He married (2) CLARESA COOK Bet. 1839 - 1845 in Madison County, Arkansas
    More About WILLIAM ABRAHAM DOTSON:
  AKA: Bart Dotson

Children of WILLIAM DOTSON and ELIZABETH RAYNOR are:
i. STEPHEN DOTSON, b. 1797, Granville,
North Carolina; d. March 14, 1882, Arkansas; m. NANCY PARKER,
September 29, 1822, Granger County, Tennessee
More About NANCY PARKER
Comment: Twin sister of Mary Parker, wife of Fountain Dotson.
Comment 1: No children
ii. ARCHIBALD DOTSON, b. 1802, North
Carolina, South Carolina or Virgina; d. Bef. 1880, Madison County, Arkansas
iii. FOUNTAIN DOTSON, b. 1804, Granger
County, Tennessee; d. Bet. 1858 - 1859, Rhea County, Tennessee.
iv. DOCTOR FLOYD SR. DOTSON,
b. 1813, Grainger County, Tennessee; d. 1861, Possibly Madison County,
Arkansas.
v. EDMOND DOTSON, b. 1817, Tennessee; d. June 1897, Arkansas.
vi. JANE DOTSON, b. 1822, Tennessee.
vii. NOAH SR. DOTSON b. 1827, Tennessee; d. Aft. 1850 **D**
viii. ISABELLA DOTSON, b. 1838, Tennessee.
ix. ROBERT DOTSON, b. 1839, Tennessee.

Children of WILLIAM DOTSON and CLARESA COOK are:
x. WILLIAM HUGH DOTSON b. Bet. March 1846 - March 1847, Arkansas.
xi. BLOOMINGTON I. DOTSON
b. 1848, Arkansas; d. August 14, 1864, Arkansas.
11/27/00

PAGE 16          4802    FEDEX KINKO'S          501--785-3229    15:38   02/15/2009

More About BLOOMINGTON I. DOTSON:
Burial: Fayetteville National Cemetery, Fayetteville, Arkansas
Cause of Death: Civil War
xii. NANCY DOTSON, b. 1850, Arkansas.
xiii. GLASCO DOTSON, b.⬛⬛⬛⬛1852, Arkansas.
xiv. DAVID CROCKET DOTSON b. 1853, Arkansas.

Generation No. 3

ARCHIBALD DOTSON
was born 1802 in North Carolina, South Carolina or Virgina, and died Bef.
1880 in Madison County, Arkansas.
He married (1) CILEY RENO. He
married (2) CATHERINE GLENN
Notes for ARCHIBALD DOTSON:
1880 census of Madison County, Arkansas
More About ARCHIBALD DOTSON
Burial: Wharton Cemetery, Madison County, Arkansas
More About CILEY RENO
AKA: Ciley Amos
Children of ARCHIBALD DOTSON and CILEY RENO are:
i. WILLIAM DOTSON, b. Bet. 1825 - 1827,
Tennessee; m. ELIZA SPENCER, Bef. 1850.
ii. MARY DOTSON, b. 1828.
iii. FOUNTAIN DOTSON, b. 1831, Tennessee.
iv. SARAH DOTSON, b. 1832, Tennessee; d.
April 13, 1888, Arkansas; m. BOURDON WHEELER
v. JANE DOTSON, b. 1834, Tennessee; m. PETE RICHARDSON
vi. ELIZA DOTSON, b. 1839, Tennessee.
vii. PATSY DOTSON, b. 1844, Arkansas
Children of ARCHIBALD DOTSON and CATHERINE GLENN are:
viii. CATHERINE DOTSON, b. 1846, Arkansas.
ix. LAMBERT DOTSON, b. 1856, Arkansas.
x. NANCY DOTSON, b. 1859, Arkansas; d.November 28, 1918; m.
WILLIAM CRANEYASEY
xi. MARTHA E DOTSON, b. 1866, Missouri.
xii. PALESTINE DOTSON, b. 1869, Arkansas
FOUNTAIN DOTSON
was born 1804 in Granger County, Tennessee, and died Bet. 1858 - 1859 in Rhea
County, Tennessee.
He married MARY PARKER
July 27, 1824, daughter of JAMES PARKER
More About FOUNTAIN DOTSON:
Burial: Rhea County, Tennessee
Cause of Death: Typhoid Fever
More About MARY PARKER:
AKA: Polly Parker
Burial: Rhea County, Tennessee
Cause of Death: Typhoid Fever
Comment: Twin sister of Nancy Parker, wife of Stephen Dotson.

Children of FOUNTAIN DOTSON and MARY PARKER are:
i. WILLIAM A DOTSON b. 1828.          **D**
ii. STEPHEN DOTSON, b. 1831, Tennessee.
iii. NANCY DOTSON, b.⬛⬛⬛⬛1832,
Tennessee; d. March 02, 1862, Arkansas; m. W
ILLIAM T HARWOOD
iv. JAMES L DOTSON, b.⬛⬛⬛⬛1834, Tennessee; d. June 06, 1888, Madison
County, Arkansas.
v. LITTLEBERRY DOTSON, b. 1837, Tennessee; d. 1859.

11/27/00

More About LITTLEBERRY DOTSON:
Cause of Death: Typhoid Fever
vi. JOHN C DOTSON b. 1839; d. Civil War, fought with Confederate Army.
More About JOHN C DOTSON:
Cause of Death: Killed in Civil War, fought for the Confederate Army.
vii. ELIZA DOTSON, b. 1841, Tennessee.
More About ELIZA DOTSON:
Cause of Death: Typhoid Fever
viii. BETSY DOTSON, b. 1843, Tennessee.
ix. ABRAHAM DOTSON, b. 1845, Tennessee; d.Civil War, fought with Confederate
Army.
x. SARAH DOTSON, b. 1847.
More About SARAH DOTSON:
AKA: Sally Dotson
Cause of Death: Typhoid Fever
DOCTOR FLOYD SR. DOTSON
was born 1813 in Grainger County,
Tennessee, and died 1861 in Possibly Madison County, Arkansas. He married
DAWN RAINCROW November 11, 1830 in Roane County, Tennessee,
daughter of CHEROKEE MINOR CHIEF JOSEPH RAINCROW and ?
More About DOCTOR FLOYD SR. DOTSON:
Burial: Aft. 1860, Wharton Cemetery, Madison County, Arkansas
Comment: 1860, Madison County, Arkansas census
Comment 2: unable to locate grave, may be buried elsewhere.
Notes for DAWN RAINCROW:
AKA: Polly Ann Raincrow
AKA: Mary Polly Raincrow
AKA: Mary Polly Renneau
AKA: Mary Polly Reno
AKA: Mary Ann Reno
AKA: Mary Ann Amos
More About DAWN RAINCROW:
Comment: Full Blood Cherokee Indian
Comment 1: Orphaned on the Trail of Tears
Children of DOCTOR DOTSON and DAWN RAINCROW are:
i. NANCY DOTSON, b. 1829, Tennessee; m. WILLIAM PHILLIPS
ii. RHODA DOTSON, b. 1832, Tennessee.
iii. HANNAH DOTSON, b. April 02, 1837; d.January 19, 1918; m.
ISAAC NEWTON BOLINGER
iv. SUSAN DOTSON, b. 1839; m. DOOD PAGE
v. NOAH DOTSON, b. 1841, Madison
County, Arkansas; m. MARY J.? 1860.
vi. WILLIAM SQUIRE DOTSON,
b. 1842, Madison County, Arkansas; m. (1) RACHEL ANN COOK
m. (2) BARBARA ELIZABETH  PHILLIPS
vii. MATILDA CATHERINE DOTSON, b. 1846, Madison County, Arkansas; d. July 10,
1931, Arkansas;
m. WILLIS PHILLIPS, August 15, 1867.
viii. GREENBERRY DOTSON, b. 1849, Madison
County, Arkansas; m. SUSAN.
ix. AMANDA EVALINE DOTSON,
b. ███████ 1850, Arkansas; d. January 03, 1929, Park Hill, Cherokee
County,
Oklahoma.

**D**

x. DOCTOR FLOYD JR. DOTSON, b. ██████ 1852, Madison County, Arkansas;
d. January 14, 1941, Arkansas.
xi. MELLISSA EMMA DOTSON,b ████████ 1852, Arkansas; d. September 19,
1926, Arkansas;
m. REUBEN L PHILLIPS
More About MELLISSA EMMA DOTSON:

11/27/00

02/15/2009  15:38    501--785-3229    FEDEX KINKO'S  4802    S,OKNIX XEDEF    PAGE  18

AKA: Lish Dotson
EDMOND DOTSON was born 1817 in Tennessee, and died June 1897 in Arkansas.
He married SUSAN CASEY February 13, 1840.
Children of EDMOND  DOTSON and SUSAN CASEY are:
i. NANCY DOTSON, b. 1840, Tennessee.
ii. WILLIAM S DOTSON b. 1843, Arkansas; m. ELISABETH ?.
iii. MARY A.DOTSON, b. 1845, Arkansas.
More About MARY A DOTSON
AKA: Polly A. Dotson
iv. PLEASANT DOTSON, b. 1847, Arkansas.
v. DOCTOR F DOTSON b. 1853, Arkansas.
vi. JOHN M DOTSON b. 1855, Arkansas.
vii. MARTHA E DOTSON b. 1858, Arkansas.
viii. THOMAS E DOTSON b. 1861,Arkansas
JANE DOTSON was born 1822 in Tennessee. She married
WILLIAM GIPSON PHILLIPS
Children of JANE DOTSON and WILLIAM PHILLIPS are:
i. WILLIAM PHILLIPS, b. 1847, Arkansas.
ii. PLEASANT PHILLIPS, b. ███████████1848, Arkansas; d. March 04, 1882;
m. (1) SARAH E ? m. (2) ELVIRA GEORGE.
More About PLEASANT PHILLIPS:
Comment: 2nd date of birth shows ████-1849
Comment 1: Member of the Masonic Lodge
NOAH SR. DOTSON
was born 1827 in Tennessee, and died Aft. 1850. He married
MARY J ?
Child of NOAH DOTSON and MARY ? is:
i. NOAH JR. DOTSON

WILLIAM HUGH DOTSON was born Bet.████ 1846 - ████
1847 in Arkansas. He married SARAH ANN WHEELER
More About WILLIAM HUGH DOTSON
AKA: Billy Dotson
More About SARAH ANN WHEELER:
Comment: Father born in Tennessee and mother born in Georgia
Children of WILLIAM DOTSON and SARAH WHEELER are:
i. CLARISSA DOTSON, b. 1870, Arkansas.
ii. EVALINE DOTSON, b. 1871, Arkansas.
iii. EDMOSON DOTSON, b. 1874, Arkansas.
iv. MARY E. DOTSON,b████1876, Arkansas.
v. SARAH R. DOTSON,b.████1879, Arkansas.
vi. LILLIE A DOTSON, b.████ 1882,Arkansas.
vii. JAMES R. DOTSON,b. ████1883, Arkansas.
viii. JADA DOTSON, b. ██████1888,Arkansas.
ix. STELLER DOTSON, b.█████1890, Arkansas
NANCY DOTSON was born 1850 in Arkansas. She married JAMES HAYNES
Children of NANCY DOTSON and JAMES HAYNES are:
i. BLOOMINGTON HAYNES, b. 1867, Arkansas.
ii. ABRAHAM LINCOLN HAYNES,b. 1869, Arkansas
GLASCO DOTSON was born █████1852 in Arkansas. He married
SARAH ELIZABETH  WHARTON
Children of GLASCO DOTSON and SARAH WHARTON are:
i. JOHN T  DOTSON,b.██████ 1878, Arkansas.          **D**
ii. LAULA A DOTSON,b.██████ 1881, Texas.
iii. MARION W. DOTSON,b.█████ 1887, Arkansas.
iv. ALBERT CLINTON DOTSON,b.█████████1887, Huntsville, Madison County,
Arkansas; d. 1949, Oklahoma;
m. ? , October 05, 1907.
v. MATTIE L DOTSON,b.████1889, Arkansas.
vi. ELIZA  L DOTSON, b.████ 1894, Arkansas

11/27/00

02/15/2009  15:38   501--785-3229   FEDEX KINKO'S  4802   PAGE  19

DAVID CROCKET DOTSON was born 1853 in Arkansas. He married
RUTH EVALINE WHEELER, daughter of BORDEN WHEELER and MELISSA POWELL
Children of DAVID DOTSON and RUTH WHEELER are:
i. WILLIAM DOTSON, b. 1873, Wharton Creek Township, Madison County, Arkansas.
ii. ANNA DOTSON, b. 1875, Wharton Creek Township, Madison County, Arkansas.
iii. GREENBERRY DOTSON, b. 1876, Wharton Creek
Township, Madison County, Arkansas; d. December 17, 1923, Ramona, Washington
County, Oklahoma.
iv. SARAH DOTSON, b. 1879, Wharton Creek
Township, Madison County, Arkansas.
More About SARAH DOTSON:
AKA: Jennie Dotson
v. ABRAHAM DOTSON, b. 1882, Wharton Creek
Township, Madison County, Arkansas; d. Sallisaw, Oklahoma.
vi. GEORGE W DOTSON, b. 1884.
vii. ELIZABETH A DOTSON, b. 1886.
viii. CORA L DOTSON, b. 1888.
ix. TOMMY C DOTSON, b. 1889.
x. NANCY DOTSON, b. 1895.
xi. JOHN DOTSON, b. 1895.
xii. TRESSA DOTSON, b. 1896.
Generation No. 4
JAMES L DOTSON
was born ▮▮▮▮ 1834 in Tennessee, and died June 06, 1888 in Madison
County, Arkansas. He married
ISABELLE GLENN Abt. 1855 in Madison County, Arkansas.
Notes for JAMES L DOTSON:
James L. Dotson moved to Madison County, Arkansas about 1849 or 1850 and
lived there until he died at the age of 52. He was a farmer all his life, and
was a good citizen. During the late war, he was in the Confederate Service,
but
against his will, and was afterwards in the Home Guards, Federal Service. He
was
a Republican for many years, was justice of the peace, and afterward notary
public. Although not a member of any church, his sympathies were with the
Christian Church. He took a leading part in all sociaeties that tended to
elevate the farmer and society in general, and when he died, Madison County
lost
one of its best citizens. He was an excellent legal advisor, and many of his
neighbors went to him for advice, and in that way he made many life-long
friends. In Madison COunty, Arkansas, he married Miss Isabel Glen, a native
of
North Carolina, born in 1839. She is one of the leading members of the
Whorton
Creek Christian Church, and the mother of twelve children, nine now living.
(Taken from Madison County Biography of "Dotson, William Abraham" 1857)

More About JAMES L DOTSON:
Comment: 2nd source shows date of birth as ▮▮▮ 1836
Children of JAMES DOTSON and ISABELLE GLENN are:
i. WILLIAM ABRAHAM DOTSON, b. ▮▮▮▮ 1857, Madison County, Arkansas.
ii. CLARISSA J DOTSON, m. ? BURGESS
iii. JAMES FOUNTAIN DOTSON                **D**
iv. MARY ELIZABETH DOTSON, m. ALBERT LYMAN
v. NANCY EMELINE DOTSON, m. ? LANKFORD
vi. ELIZA CATHERINE DOTSON, m. ? EASTERLING
vii. MARTHA ELLEN DOTSON
viii. J.B.DOTSON
ix. THOMAS M DOTSON

AMANDA EVALINE DOTSON
was born ████████ 1850 in Arkansas, and
died January 03, 1929 in Park Hill, Cherokee County, Oklahoma. She married
LEANDER SMITHSON
son of ALBERT SMITHSON and MARY LANCE
Notes for AMANDA EVALINE DOTSON:
AKA: Leander "Joe" Smithson
AKA: Mandy Dotson Smithson
Leander and Amanda named their two pet mules after their own nicknames...
Mandy and Joe.
More About AMANDA EVALINE DOTSON:
Burial: South Bethel Cemetary, Braggs, OK
Comment: 2nd birth date of ████-1852
More About LEANDER SMITHSON
Burial: South Bethel Cemetary, Braggs, OK

Children of AMANDA DOTSON and LEANDER SMITHSON are:
i. ANDY LINCOLN SMITHSON, b. ████████ 1870, Arkansas; d.
June 07, 1937, Cherokee County, Oklahoma.
More About ANDY LINCOLN SMITHSON
Comment: Never Married, no children
ii. WILLIS ASBERRY SMITHSON, b. ██████████ 1880, Madison County, Arkansas; d.
March 11, 1952,
Muskogee, Oklahoma
iii. DORA ELBURN SMITHSON, b. ██████ 1886, Arkansas; d. June 12, 1953,
Cherokee County, Oklahoma.
iv. FLORA ELLENDER SMITHSON, b. 1889, Indian Territory, later to become
Oklahoma.
v. NORA LEE SMITHSON, b. 1895, Indian Territory, later to become Oklahoma; d.
October 06, 1942, Cherokee County,

DOCTOR FLOYD JR. DOTSON
was born ████████ 1852 in
Madison County, Arkansas, and died January 14, 1941 in Arkansas. He married
THERESA MAYINMAN COOK
More About DOCTOR FLOYD JR. DOTSON:
AKA: Docky Dotson
Children of DOCTOR DOTSON and THERESA COOK are:
i. WILLIAM HAYWARD DOTSON, b. 1870, Madison County, Arkansas; d. 1901.
ii. DOLLY ELLEN DOTSON, b. ████████ 1877, New County, Arkansas.
iii. ISAM DOTSON
iv. MATILDA DOTSON
v. REBECCA DOTSON
vi. WILIS DOTSON
vii. ALBERT DOTSON
viii. MINNIE DOTSON
ix. DOCK OLIVER DOTSON

GREENBERRY DOTSON
was born 1876 in Wharton Creek Township, Madison County,
Arkansas, and died December 17, 1923 in Ramona, Washington County, Oklahoma.
He married LUCY R WALKINGSTICK                        **D**
Notes for GREENBERRY DOTSON:
Sources include "The Morning Examiner" dated Tuesday, December 18, 1923,
published in Bartlesville, Oklahoma. Headline states "Berry Dotson is killed
by Ramona Marshall. Other stories concerning the shooting can be found in
this same newspaper. Funeral expenses and cause of death record signed by
physician. This record states Berry Dotson to be the son of Dave Dotson and
Evelyn Wheeler and states he is Indian.

11/27/00

More About GREENBERRY DOTSON
Burial: December 20, 1923, Dwight Mission Cemetery, Sequoyah County, Oklahoma>
Cause of Death: Gunshot through the head, homicide.
Comment: December 17, 1923, Shot by J.P. Nicholson, found not guilty.
Comment 2: Census card #M2799, Cherokee
Occupation: Farmer
More About LUCY R WALKINGSTICK
Comment: Cherokee Census card number M2799
Children of GREENBERRY DOTSON and LUCY WALKINGSTICK are:
i. LEWIS BEE DOTSON, b. 1903; d. 1924, Cookson Hills, Oklahoma.
Notes for LEWIS BEE DOTSON
Lewis Bee Dotson was killed at a railroad crossing by a posse after robbing a store in Cookson Hills, Oklahoma.
More About LEWIS BEE DOTSON

Comment: enrolled as Cherokee 1/2 blood at age 2, Roll number 3294, census card #M2799, shown living in Marble City, Oklahoma.
ii. CHARLES DOTSON, b. 1905; d. 1934,
Incarcerated in Nebraska..
Notes for CHARLES DOTSON
Charles Dotson died of tubercolosis while incarcerated in Nebraska.
More About CHARLES DOTSON
Cause of Death: Tubercolosis
Comment: Cherokee 1/2 blood, Census card number M2799, registered at age 1, living in Marble City, Sequoyah County, Oklahoma
Comment 1: No children.
iii. JOHNNY DOTSON, b. 1910; d. 1938
ABRAHAM DOTSON was born 1882 in Wharton Creek Township, Madison County, Arkansas, and died in Sallisaw, Oklahoma. He married MINNIE ANDREWS
More About ABRAHAM DOTSON
Comment: Shot and killed on 17 Highway, north of Sallisaw, Oklahoma. He left orphaned children.

Children of ABRAHAM DOTSON and MINNIE ANDREWS are:
i. HUGH V DOTSON
ii. CHRISTINE DOTSON, m. CARL COOK
More About CHRISTINE DOTSON
Comment: orphaned at a young age
Comment 1: Raised at Dwight Mission orphanage, near Sallisaw, Oklahoma

Generation No. 5

WILLIAM ABRAHAM DOTSON
was born ████████1857 in Madison
County, Arkansas. He married MARY E PHILIPS
August 1875 in Madison County, Arkansas, daughter
of WILLIAM PHILIPS
Notes for WILLIAM ABRAHAM DOTSON

Madison County Biography of:
"DOTSON, William Abraham, one of the thrifty, enterprising citizens of Whorton Creek Valley, was born near where he now lives ████ 1857. He is the son of James L. and Isabel (GLEN) DOTSON, grandson of Fountain DOTSON, and great-grandson of William DOTSON, who was born in Tennessee, and died in Madison
County, Arkansas, in 1861. Fountain Dotson was also born in Tennessee, but for a
time lived in Madison County, Arkansas, but died in Tennessee. His son, James L.

Dotson, like his father and grandfather, was born in Tennessee, and moved to Madison County, Arkansas,, about 1849 or 1850, and there died June 9, 1888, as the age of fifty-two. He was a farmer all his life, and was a good citizen. During the late war he was in the Confederate service, but against his will, and was afterwards in the Home Guards, Federal Service. He was a Republican for many years, was justice of the peace, and afterward notary public. Although not a member of any church, his sympathies were with the Christian Church. He took a leading part in all societies that tended to elevate the farmer and society in general, and when he died Madison County lost one of its best citizens. He was an excellent legal adviser, and many of his neighbors went to him for advice, and in that way he made many life-long friends. In Madison County, Arkansas, he married Miss Isabel GLEN, a native of North Carolina, born in 1839. She is one of the leading members of the Whorton Creek Christian Church, and the mother of twelve children, nine now living: Mrs. Clarissa J. BURGESS, James Fountain, Mrs. Mary Elizabeth LYMAN (widow of Albert LYMAN), Mrs. Nancy Emeline LANKFORD, Mrs. Eliza Catherine EASTERLING, William A., Martha Ellen, J. B. and Thomas M. William Abraham received his education in the home schools, and in August, 1875, he married Miss Mary E. PHILIPS, daughter of William PHILIPS, and a native of Madison County, Arkansas, born ████████ 1860. Five children have blessed this union: Louisa, Bertha Ella, Oliver Burton, Mary May and Cora. Mr. DOTSON is the owner of a fine farm of 410 acres, with a considerable portion in the valley, and 175 under cultivation. To himself alone is due the credit of all this, as he started with very little means. He is a wide-awake, thorough-going young citizen, and will make his mark in the world. He is a member of the Christian Church, and a Republican in politics." (Goodspeeds History of NW AR& #8230;)

Last Revised 17 August 1997
1997 Madison County Online. These electronic pages may not be reproduced for profit. If copied, this copyright notice must appear with the information.

Return to Madison Co, AR Biographies INDEX

Children of WILLIAM D OTSON and MARY PHILIPS are:
i. LOUISA DOTSON
ii. BERTHA ELLA DOTSON
iii. OLIVER BURTON DOTSON
iv. MARY MAY DOTSON
v. CORA DOTSON

**D**

WILLIS ASBERRY SMITHSON
was born ██████ 1880 in Madison County, Arkansas, and died March 11, 1952 in Muskogee, Oklahoma. He married (1) JULIA ?

11/27/00

02/15/2009   15:38   501--785-3229   FEDEX KINKO'S   4802   S,OXNIX XƎᗡƎℲ   PAGE   23

Child of LEO DOTSON is:
i. HARLEY DOTSON.
BARRY  DOTSON He married (1) LAHOMA CAUGHMAN. He met (2) ?.
Child of BARRY DOTSON and ? is:
i. JASON DOTSON.

JERRY KIRK DOTSON
was born 1939, and died 1991. He
married PATSY ELLIS 1960.
More About JERRY KIRK DOTSON:
Occupation: Director for the Bureau of Indian Affairs for Cherokee Nation of
Oklahoma, Tahlequah, Oklahoma
Children of JERRY DOTSON and PATSY ELLIS are:
i. JERRIPAT DOTSON, b. 1961.
ii. PAUL DOTSON>, b. 1964; m. (1) CHERYL SMITH; m. (2) LISA WHITTMAN, 1995.
iii. LISA K. DOTSON, b. 1966.
iv. ERIC EDDIE DOTSON,
b. ███████1969; m. STARRA MICHELLE RICE, April 1994.
1. Smithson C.FTW, Date of Import: Dec 9,
1999

D

11/27/00

02/15/2009   15:38   501--785-3229   FEDEX KINKO'S   4802   PAGE   24

███████████ 1907 in Kansas City, Kansas. He married (2)
MAUDIE LEE MCBEE Bet. 1918 - 1920 in Probably Muskogee County, Oklahoma,
daughter of GEORGE MCBEE and FLORA> STAPLETON
More About WILLIS ASBERRY SMITHSON
Cause of Death (Facts Page): March 11, 1952, Stroke/Old Age
Comment: 1898, Was serving in the Phillipines with the Expeditionary forces
during the Spanish American War. His ship was the U.S.A.T. Sherman.
More About MAUDIE LEE MCBEE
Burial: South Bethel Cemetery, near Braggs, Oklahoma
Comment: September 05, 1961, Cause of Death was Hodgekins Disease
Child of WILLIS SMITHSON and JULIA ? is:
i. GEORGE WASHINGTON SMITHSON, b. ███████████ 1907; d. May 1983, Avenal,
California
Children of WILLIS SMITHSON and MAUDIE MCBEE are:
ii. MANDY ALICE SMITHSON, b. ███████████ 1920, Braggs, Oklahoma; d. August
04, 1922, Braggs,
Oklahoma.
iii. W.A.SMITHSON, b. ███████████ 1923, Braggs, OK.
iv. BETTY LOUISE SMITHSON, b. ███████████ 1935, Braggs, Oklahoma; d. October
29, 1935, Braggs, Oklahoma.
v. CECIL GLEN SMITHSON, b. ███████ 1937

WILLIAM HAYWARD DOTSON
was
born 1870 in Madison County, Arkansas, and died 1901
More About WILLIAM HAYWARD DOTSON
AKA Willie Dotson
Child of WILLIAM HAYWARD DOTSON is:
i. WALTER LEON DOTSON, b. 1895, Madison County, Arkansas; d. 1988

DOLLY ELLEN DOTSON
was born ███████ 1877 in New
County, Arkansas. She married (1) J.W.MCCOLLOUGH
February 12, 1896 in Arkansas. She married (2)
J.W. CROUCH 1912 in Fayetteville,
Arkansas.
Children of DOLLY DOTSON and J.W. MCCOLLOUGH are:
i. LOUISEA MCCOLLOUGH
ii. MOLLIE MCCOLLOUGH
iii. ALBERT MCCOLLOUGH
iv. WILLIE MCCOLLOUGH
v. BONNIE MCCOLLOUGH
vi. ADDIE MCCOLLOUGH
vii. WALCIE MCCOLLOUGH
viii. DEWEY MCCOLLOUGH

Children of DOLLY DOTSON and J.W. CROUCH are:
ix. ARTHIA CLEO CROUCH, b. Abt. 1913, Winslow, Arkansas; d. November 23, 1991.
x. DELMO CROUCH
xi. GRACIE CROUCH
xii. DOROTHY CROUCH
xiii. ROBERT CROUCH

ISAM DOTSON
Child of ISAM DOTSON is:
i. LEO DOTSON

JOHNNY DOTSON
was born 1910, and died 1938. He married F
LORENCE KIRK

02/15/2009  15:38  501--785-3229  FEDEX KINKO'S  4802  S,OKNIX XEDEF  PAGE  25

570

More About JOHNNY DOTSON
Cause of Death: Complications from Malaria
Children of JOHNNY DOTSON and FLORENCE KIRK are:
i. BARRY DOTSON
ii. JERRY KIRK DOTSON, b. 1939; d. 1991

HUGH V DOTSON
More About HUGH V DOTSON
Comment: orphaned at a young age
Comment 1: Raised at Dwight Mission Orphanage, near Sallisaw, Oklahoma
Child of HUGH V DOTSON is:
i. PHYLLIS DOTSON, m. Roger Lee CRAWFORD

No. 6

GEORGE WASHINGTON SMITHSON
was born ███████ 1907, and died May 1983 in Avenal, California. He married
RUTH RIGGS
Children of GEORGE SMITHSON and RUTH RIGGS are:
i. DEAN SMITHSON, d. Car Accident in California; m. ROSIE MAYES
More About ROSIE MAYES
Comment: Cause of Death: Childbirth
ii. CURTIS SMITHSON
W A SMITHSON
size=2> was born ███████ 1923 in Braggs, OK.
He married ANNA DORIS SUMPTER October 06, 1945 in Muskogee, OK,
daughter of ANDREW SUMPTER and ALMEDA BROWN
Notes for W.A. SMITHSON
It is hard to say what is what. Maybe you might enjoy a very true story that
I can relate to you about my father (still living.)
My dad was born in 1923. His father, Willis Asberry Smithson b.1880, and
mother, Maudie Lee McBee b.1900, disagreed as to what they would name their
first born son, my dad.
My grandmother detested the name Willis Asberry and insisted she would not
name her son with that name. My grandfather, who went by Asberry, was just as
adamant that Willis Asberry is exactly what his son would be named.

My dad was born at home, delivered by his grandmother, Flora Alice Stapleton
McBee. Well, in 1923, in Oklahoma, more people did not have birth
certificates
than did have. Anyway, my grandparents finally agreed to name this first born
son, my dad, W.A. Smithson. The W and the A not standing for anything, it
would
just be initials.

This was fine and dandy. My father went into the army and served during World
War II for 4 years and even though the U.S. Army was insistent that he take a
name for the initials, W.A., he was just as insistent that he remain what he
had
been named by his parents, and that he did. On all of his military records,
marriage record, school records, social security records, and every other
kind
of record he has, he is listed as W.A. Smithson.

Now to get to the confusing part. My grandfather died in 1952 and my
grandmother died in 1961. The years roll on and in 1992, I decided to try to
find a birth certificate for my father if there was one since he had never
had

11/27/00

02/15/2009   15:38   501--785-3229   FEDEX KINKO'S   4802   PAGE   26

one. Well... Lo and Behold, not only did he have a birth certificate, he had a
new name. On his birth certificate, his name is...
and get this...
W. Asberry Smithson Jr.
I thought this was almost funny because his fathers name was not W. Asberry,
but Willis Asberry.
The best we were able to figure out was this...
My grandfather could sign his name, but that was the only "writing" he did
according to my father. He must have gone into the courthouse to register my
dad's birth and when the person asked what he wanted to name the child, he
probably just told them, I want it named after me... For, on the signature of
the reporting person, is in my grandfather's handwriting, W. Asberry
Smithson.
You see, the space was very short on which to sign his name and he always
went by Asberry.
We figure the clerk filled in the space for the child's name after my
grandfather signed his name, and then just added Jr. to it. So, at the ripe
old
age of 69 years old, my father found out he was not named what he thought he
had
been named after all.
We have all had a big family laugh out of this one!

One more time have I run across a birth certificate in which a child's name
was reported as one name, only to have the parents later change their minds
and
rename them something else. This happened with my husband's uncle and we have
a
copy of that birth certificate also.

I used to work at the county clerk's office where the old birth certificates
were kept and there were mistakes supposedly made on many of them as well as
one
death certificate that I remember especially well. The death certificate,
signed
by the county doctor, was for a man, aged 67 years old at death, that showed
the
cause of death as CHILDBIRTH! I thought that was one for the books!

Anyway, I don't know if this confuses you more or not, but maybe you will get
a chuckle out of another fine mess our ancestors got themselves into.

Pam

More About W.A. SMITHSON:
AKA : W. Asberry Smithson, Jr.
Notes for ANNA DORIS SUMPTER:
Born on her grandfather, John Elisha Sumter's, 40th birthday. She was the
first grandchild in both her mothers and fathers families.
More About ANNA DORIS SUMPTER:
Children of W.A. SMITHSON
and ANNA SUMPTER are:
i. CHERYL ANN SMITHSON, b. ████████ 1947, Yuba City, Sutter County, CA;
m. JAMES WENDELL MILLS, July 03, 1965, Parents home, Sallisaw, Sequoyah
County, OK.
ii. W.A. GLEN SMITHSON, b. ████████ 1948, Gore, OK at home;
m. LEONA CAROL ENGLAND, May 31, 1969, Carol's parents home in Edmond, OK.
More About W.A. GLEN SMITHSON:
Honors: 1979, Oklahoma Highway Patrol Trooper of the Year Award

11/27/00

Military service: Bet. August 08, 1967 - August 07, 1969, U.S. Army, Rank
SP4, VietNam Veteren
iii. PAMELA LEA SMITHSON, b. ████████ 1954, Marysville Rideout Hospital,
Marysville, CA; m.
RICHARD DALE CRUTCHFIELD, October 18, 1971, Sallisaw, OK.
More About PAMELA LEA SMITHSON:
Degree: May 1989, Carl Albert State College,, Poteau, OK
Degree 2: May 1992, Northeastern State University, Tahlequah, OK
Graduation: May 17, 1972, Sallisaw High School, Sallisaw, OK
Occupation: Bet. 1994 - 2000, Sequoyah County Sheriff
More About RICHARD DALE CRUTCHFIELD:
College: Bet. 1989 - 1991, Northeasten State College, Tahlequah, OK
Degree: 1989, Carl Albert State College, Poteau, OK
Occupation: Bet. 1989 - 2000, Police Officer

CECIL GLEN SMITHSON
was born ████████1937. He married (1) BETTY RICHARDS,
daughter of MORGAN RICHARDSand BEULAH ?. He married (2)
JANET SHORES, daughter of JESSY LINEBERRY and ERNESTINE
More About CECIL GLEN SMITHSON:
Military service: September 1954, Entered U.S. Navy and later retired.
Children of CECIL SMITHSON and BETTY RICHARDS are:
i. STEVEN GLEN SMITHSON, b.████████, 1959, Bethesda, Maryland.
More About STEVEN GLEN SMITHSON :
Comment: Married Once, Divorced, no children.
ii. NORMAN DENE SMITHSON, b.████████1960, Bethesda, Maryland; m. PAM ?
iii. STILLBORN SMITHSON, b. Abt. 1961; d. Abt.1961.
iv. KELLY JUNE SMITHSON, b.████████ 1962, Ankra, Turkey;
m. (1) ROBERT HENRY RHODES, Never Married; m. (2) ANTHONY LEE  FAULKNER
v. ROBERT GENE SMITHSON, b. ████████ 1963, Birmahaven, Germany;
m. CHRISTIE LONGIN.
vi. MICHAEL MORGAN SMITHSON, b.████████1964, Birmahaven, Germany;
m. GINGER CHAMBERS.
Child of CECIL SMITHSON and JANET SHORES is:
vii. TASHA ALIENE SMITHSON, b. ████1992.

WALTER LEON DOTSON
was born 1895 in Madison County, Arkansas, and died 1988.
Child of WALTER LEON DOTSON is:
i. MARY ROSALIE DOTSON, b. 1925; d. 1978.

ARTHIA CLEO CROUCH
was born Abt. 1913 in Winslow, Arkansas, and died November 23, 1991. She
married
CARL LEWIS FISHER
December 14, 1932 in Bartlesville, Oklahoma.
More About ARTHIA CLEO CROUCH:
Burial: Oglesby, Oklahoma
Children of ARTHIA CROUCH and CARL FISHER are:
i. CARL L. FISHER, b. 1946, Bartlesville, Oklahoma; m. HAZEL POLLAN, 1966,
Bartlesville, Oklahoma.
ii. ROBERT FISHER.
iii. WILLIAM FISHER.
iv. BETTY FISHER.
v. LOIS FISHER.
vi. HELEN F ISHER.
vii. RANDY FISHER.

**D**

LEO DOTSON

11/27/00

## CHILDREN'S NAMES

Father – Allen Real – ████ 1884
Mother – Ida Real – ████ 1890

Jim Pinkston – ████ 1908.

Wiley Wouster – ████ 1910

Monroe Benjamin ████ 1912

Rosie Bell ████ 1914

Valerie ████ 1916

A. C. ████ 1919

Hattie Gertrude ████ 1921

Adam Gentry ████ 1923

Asa Ingram – ████ 1925.

Silas Eugene ████ 1927

Harold – ████ 1929

Carol – ████ 1929

Vilma Virginia ████ 1930



D

## *Ancestors of Churchill (Chuck) Real (1 of 11)*



| Parents | Grandparents | Great-Grandparents |

**George Real, Jr.**
b: 1764 in , , Virginia — Cont. p. 2

**George Real III**
b: ████ 1793 in , Grayson County, Virginia

**Hannah Greer**
b: 1764 in , Scott Co, Virginia — Cont. p. 3

**Edward B. F. Real**
b: 1827 in , White County , Tennessee

**Richard Pilson III**
b: Abt. 1779 in , , Virginia — Cont. p. 4

**Esther Pilson**
b: ████ 1800 in , , Virginia

**Churchill (Chuck) Real**
b: 1860 in , , Missouri

**Frances "Fanny" Denney**
b: ████ 1779 in , Henry County, Virginia — Cont. p. 5

**William Massey Greer**
b: 1806 in , , Virginia

**Elizabeth Greer**
b: ████ 1832 in , Grayson Co, Virginia

**Mary (Polly) Vaughan**
b: 1809 in , , Virginia

D

*Ancestors of Churchill (Chuck) Real (2 of 11)*



| Great-Grandparents | 2nd Great-Grandparents |
|---|---|

**George Real, Sr.**

**George Real, Jr.**
b: 1764 in , , Virginia

Cont. p. 1

D

## *Ancestors of Churchill (Chuck) Real (3 of 11)*



Great-Grandparents   2nd Great-Grandparents   3rd Great-Grandparents

**William Greer, Sr.**
b: 1710 in Baltimore Co, Maryland

Cont. p. 6

Cont. p. 1

**William Greer, Jr.**
b: 1727 in , Baltimore Co, Maryland

**Hannah Greer**
b: 1764 in , Scott Co, Virginia

**Mary Ann Fitch**
b: WFT Est. 1692-1715

**Sarah Freeland**
b: WFT Est. 1719-1741

D

## *Ancestors of Churchill (Chuck) Real (6 of 11)*



| 3rd Great-Grandparents | 4th Great-Grandparents | 5th Great-Grandparents |

**James Greer**
b: 1660 in Dumfrieshire, Scotland

Cont. p. 7

**John Greer, Sr.**
b: 1688 in Big Falls of the Gunpowder River, Baltimore County, Maryland

**Margaret Ann Taylor**
b: 1670

Cont. p. 8

**William Greer, Sr.**
b: 1710 in Baltimore Co, Maryland

**Nichalas Day**
b: WFT Est. 1635-1664

**Sarah Day**
b: 1682 in , Baltimore County, Maryland

Cont. p. 3

**Sarah**
b: WFT Est. 1644-1667

D

## Ancestors of Churchill (Chuck) Real (7 of 11)



| 5th Great-Grandparents | 6th Great-Grandparents | 7th Great-Grandparents |
|---|---|---|

**William Grier**
b: 1550 in Dumfrieshire, Scotland

Cont. p. 9

**Sir James Grier**
b: 1604 in Dumfrieshire, Scotland

**Nichola Maxwell**
b: Abt. 1552

**James Greer**
b: 1660 in Dumfrieshire, Scotland

**John Browne**
b: WFT Est. 1553-1582

**Mary Browne**
b: 1604 in Scotland

Cont. p. 6

**D**

## Ancestors of Churchill (Chuck) Real (8 of 11)



| 5th Great-Grandparents | 6th Great-Grandparents | 7th Great-Grandparents |

**John Taylor**
b: WFT Est. 1602-1635

Cont. p. 6

**Arthur Taylor**
b: WFT Est. 1619-1648

**Margaret**
b: WFT Est. 1610-1637

**Margaret Ann Taylor**
b: 1670

**Margaret Hill**
b: WFT Est. 1628-1651

D

## *Ancestors of Churchill (Chuck) Real (9 of 11)*



## *Ancestors of Churchill (Chuck) Real (10 of 11)*



| 10th Great-Grandparents | 11th Great-Grandparents | 12th Great-Grandparents | 13th Great-Grandparents |

**Gilbert Grier**
b: WFT Est. 1298-1360

Cont. p. 11

**Gilbert Grierson**
b: WFT Est. 1335-1389

**Vedas Grierson**
b: WFT Est. 1373-1416

**Roger Grierson**
b: WFT Est. 1413-1442

Cont. p. 9

**D**

581

## *Ancestors of Churchill (Chuck) Real (11 of 11)*



| 13th Great-Grandparents | 14th Great-Grandparents |
|---|---|

**Malcolm Gregor**
b: WFT Est. 1266-1331

**Gilbert Grier**
b: WFT Est. 1298-1360

Cont. p. 10

D.

## *Ancestors of Churchill (Chuck) Real (5 of 11)*



| Great-Grandparents | 2nd Great-Grandparents | 3rd Great-Grandparents | 4th Great-Grandparents | 5th Great-Grandparents |

**Edward Denney**
b: 1720 in Ireland

**Iseriah Denney**
b: WFT Est. 1734-1754 in Kerry County, Ireland

**Samuel Denney**
b: WFT Est. 1702-1734 in Amherst County, Virginia

**Mary**
b: WFT Est. 1724-1747

**James Denney**
b: 1745

**Elizabeth**
b: WFT Est. 1708-1734

Cont. p. 1

**Frances "Fanny" Denney**
b: ▮▮▮▮ 1779 in , Henry County, Virginia

**John Small**
b: WFT Est. 1688-1724 in Scotland

**Esther Small**
b: 1755

**Margaret (Burnett)?**
b: WFT Est. 1695-1724

**D**

583

## *Ancestors of Churchill (Chuck) Real (4 of 11)*



Great-Grandparents | 2nd Great-Grandparents | 3rd Great-Grandparents

**Richard Pilson, Sr.**

**Richard Pilson, Jr.**
b: 1745 in , Augusta County, Virginia

**Richard Pilson III**
b: Abt. 1779 in , , Virginia

**Elizabeth Unknown**

Cont. p. 1

D

584

Jess Lee Smith

Born        ▮▮▮▮ -1901          Sallisaw, OK
married    6-19-34          in Sallisaw, OK
Died · 8-18-69          Haskell, OK

Brothers: <u>Allen Real</u> : wife  Ida  Goodwin
      childern: Jim, Wiley, Monroe, Rosie, Valerie,
      Allen Cleveland, Hattie, Adam, Ada, Silas,
      Harold & Carrol, Virginia
<u>Jim Real</u> - wife Thena Porter
      childern: Allen
<u>Walter Smith</u> - wife Stella _____
      childern: Roy, Hail, Dub, martha


Sisters: <u>Daisy Smith</u> - husband Elbern Goodwin
      childern: Cleveland, Juanita, Raymond,
      Bonnie, Vinita
<u>Lizzy Smith</u> - husband Henry Wells
      childern: Deva, myrtle, Wauhalla,
      Obey, Harvey, Kenneth, George, A.J.


       Can you add spouses to any of the above:
Allen's
Rosie and Jim Newton        Jim    Allen &  _____  Real
Ada and Coy Blount      Walters  Roy &  _____  Smith
Adam and mary Real        Hail &  _____  Smith
Virginia & Audy Combs      Dub &  _____  Smith
Valerie & monroe Bell        Martha &  _____
Hattie & Hugh Dodson   Daisy Cleveland
Jim & ▮▮▮▮ 1908 Real  Died 1-5-1909 Juanita
Wiley & ▮▮▮▮ 1910 Real  1 3-22-1911 Raymond
Monroe & ▮▮▮▮ 1912  Real 1-7, 1929 Bonnie
Allen & A.C. ▮▮▮▮ 1919 Real 7-7-1919 Vinita
Silas & Aline Real  Lizzy Deva
Harold & ▮▮▮▮ 1929 Real 6-8-1929 myrtle
Carrol ▮▮▮▮ 1929  6-8-19 Wauhalla
                        1929 Obey
                          Harvey
                          Kenneth
                          George

A.J.

586

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

REDACTED EXHIBIT 156

TO KENNETH EUGENE BARRETT'S

SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                     *U.S. v. Barrett*, 6:09-cv-00105-JHP

586

Case 6:09-cv-00105-JHP   Document 118-2   Filed 02/18/10   Page 2 of 68

## THE OKLAHOMA STATE COURTS NETWORK

| Home | Courts | Court Dockets | Legal Research | Calendar | Help |

The information contained in this report is provided in compliance with the Oklahoma Open Records Act, governed by this act, as well as other applicable state and federal laws. . Use of this information is

### IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

| State of Oklahoma ex rel., Oklahoma Bar Association, Complainant, | No. SCBD - 5338 (Disciplinary Rule 6) |
|---|---|
| vs. | Filed: 10/18/2007 |
| David M. Littlefield, Respondent. | Appealed from: |

## Parties

Littlefield, David M , Respondent
Oklahoma Bar Association , Complainant

## Attorneys

| **Attorney** | **Represented Parties** |
|---|---|
| Green, Mark(Bar # 3570) P.O. Box 2362 Muskogee, OK 74402 | |
| Hubbard, Janis(Bar # 14641) PO BOX 53036 OKLAHOMA CITY, OK 73152 | Oklahoma Bar Association |
| Pickett-Iski, Carol(Bar # 11471) 100 North Second Street P.O. Box 636 Eufaula, OK 74432 | Littlefield David M |
| Reheard, Deborah Ann(Bar # 12448) PO BOX 636 EUFAULA, OK 74432 | Littlefield David M |

## Events

| Event | Party | Docket | Reporter |
|---|---|---|---|

## Lower Court Counts and Other Information

| Count | Case Number | Statute | Crime | Special | Sentence | Judge | Reporter |
|---|---|---|---|---|---|---|---|
| - | | - | | | | | |

## Docket

REDACTED

| Date | Code | Entry Date | Serial # |
|---|---|---|---|
| 10-18-2007 | CASE | 18 Oct 2007 14:07:08:000 | 1846119 |
| | | DISCIPLINARY RULE 6 INITIAL FILING | |

10-18-2007 TEXT   18 Oct 2007 14:28:45:527                    1846127
LETTER DATED 10-16-07 TO CJ FROM MARK GREEN

10-18-2007 TEXT   18 Oct 2007 14:27:49:247                    1846129
ENTRY OF APPEARANCE BY JANIS HUBBARD

10-18-2007 TEXT   18 Oct 2007 14:28:59:870                    1846130
NOTICE OF SELECTION AND APPT OF TRIAL PANEL AND NOTICE OF SETTING AND
NOTICE OF HEARING

10-18-2007 TEXT   23 Oct 2007 11:47:11:630                    1846131
AFFIDAVIT FOR PROOF OF SERVICE OF COMPLAINT

10-23-2007 TEXT   23 Oct 2007 11:48:21:720                    1846747
ENTRY OF APP OF REHEARD & ISKI FOR RSPDNT, LITTLEFIELD

11-09-2007 TEXT   09 Nov 2007 13:34:14:843                    1850073
ORDER CONTINUING HEARING

01-02-2008 TEXT   02 Jan 2008 15:39:23:370                    1857639
TRIAL BRIEF OF COMPLAINANT

01-08-2008 TEXT   08 Jan 2008 15:24:01:740                    1858486
JOINT MOTION FOR PROTECTIVE ORDER

01-10-2008 TEXT   10 Jan 2008 14:38:58:157                    1858907
ORDER GRANTING JOINT MOT FOR PROTECTIVE ORDER (PRT)

02-07-2008 TEXT   07 Feb 2008 16:16:50:387                    1863364
"REPORT OF PRT" (FILED UNDER SEAL)

02-07-2008 TEXT   07 Feb 2008 16:18:36:053                    1863365
"APPLIC TO ASSES COSTS" (FILED UNDER SEAL)
**REDACTED**

05-28-2008 TEXT   28 May 2008 14:35:04:387                                          1882179

    JE:ORDER WINCHESTER CJ, BRIEFING SCHEDULE CMPLNT'S BRIEF IS DUE 6-16-08, RSPNDT'S BRIEF S/B FILED NOT MORE THAN FIFTEEN DAYS AFTER CMPLNT'S BRIEFIS FILED. CMPLNT MAY REPLY W/N 10 DAYS AFTER RSPNDT'S BRIEF IS FILED C/CJ, ATTYS, NP

07-10-2008 TEXT   10 Jul 2008 15:45:04:590                                          1889847

    COMPLAINANT'S WAIVER OF REPLY BRIEF ****FILED UNDER SEAL****

Report Generated by The Oklahoma Court Information System at

End of Transmission.

**REDACTED**

Case 6:09-cv-00105-JHP  Document 118-2  Filed 02/18/10  Page 5 of 68



## THE OKLAHOMA STATE COURTS NETWORK

| Home | Courts | Court Dockets | Legal Research | Calendar | Help | |

The information contained in this report is provided in compliance with the Oklahoma Open Records Act,      . Use of this information is governed by this act, as well as other applicable state and federal laws.

### IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

| State of Oklahoma ex rel., Oklahoma Bar Association, Complainant, | No. SCBD - 5338 (Disciplinary Rule 6) |
|---|---|
| vs. | Filed: 10/18/2007 |
| David M. Littlefield, Respondent. | Appealed from: |

## Parties

Littlefield, David M , Respondent
Oklahoma Bar Association , Complainant

## Attorneys

| Attorney | Represented Parties |
|---|---|
| Green, Mark(Bar # 3570)<br>P.O. Box 2362<br>Muskogee, OK 74402 | |
| Hubbard, Janis(Bar # 14641)<br>PO BOX 53036<br>OKLAHOMA CITY, OK 73152 | Oklahoma Bar Association |
| Pickett-Iski, Carol(Bar # 11471)<br>100 North Second Street<br>P.O. Box 636<br>Eufaula, OK 74432 | Littlefield David M |
| Reheard, Deborah Ann(Bar # 12448)<br>PO BOX 636<br>EUFAULA, OK 74432 | Littlefield David M |

## Events

| Event | Party | Docket | Reporter |
|---|---|---|---|

## Lower Court Counts and Other Information

| Count | Case Number | Statute | Crime | Special | Sentence | Judge | Reporter |
|---|---|---|---|---|---|---|---|
| - | | - | | | | | |

## Docket

REDACTED

| Date | Code | Entry Date | Serial # |
|---|---|---|---|
| 10-18-2007 | CASE | 18 Oct 2007 14:07:08:000 | 1846119 |

DISCIPLINARY RULE 6 INITIAL FILING

Case 6:09-cv-00105-JHP   Document 118-2   Filed 02/18/10   Page 6 of 68

10-18-2007 TEXT   18 Oct 2007 14:28:45:527                                    1846127
                  LETTER DATED 10-16-07 TO CJ FROM MARK GREEN

10-18-2007 TEXT   18 Oct 2007 14:27:49:247                                    1846129
                  ENTRY OF APPEARANCE BY JANIS HUBBARD

10-18-2007 TEXT   18 Oct 2007 14:28:59:870                                    1846130
                  NOTICE OF SELECTION AND APPT OF TRIAL PANEL AND NOTICE OF SETTING AND
                  NOTICE OF HEARING

10-18-2007 TEXT   23 Oct 2007 11:47:11:630                                    1846131
                  AFFIDAVIT FOR PROOF OF SERVICE OF COMPLAINT

10-23-2007 TEXT   23 Oct 2007 11:48:21:720                                    1846747
                  ENTRY OF APP OF REHEARD & ISKI FOR RSPDNT, LITTLEFIELD

11-09-2007 TEXT   09 Nov 2007 13:34:14:843                                    1850073
                  ORDER CONTINUING HEARING

01-02-2008 TEXT   02 Jan 2008 15:39:23:370                                    1857639
                  TRIAL BRIEF OF COMPLAINANT

01-08-2008 TEXT   08 Jan 2008 15:24:01:740                                    1858486
                  JOINT MOTION FOR PROTECTIVE ORDER

01-10-2008 TEXT   10 Jan 2008 14:38:58:157                                    1858907
                  ORDER GRANTING JOINT MOT FOR PROTECTIVE ORDER (PRT)

02-07-2008 TEXT   07 Feb 2008 16:16:50:387                                    1863364
                  "REPORT OF PRT" (FILED UNDER SEAL)

02-07-2008 TEXT   07 Feb 2008 16:18:36:053                                    1863365
                  "APPLIC TO ASSES COSTS" (FILED UNDER SEAL)
                  REDACTED

591

05-28-2008 TEXT   28 May 2008 14:35:04:387                                    1882179
          JE:ORDER WINCHESTER CJ, BRIEFING SCHEDULE CMPLNT'S BRIEF IS DUE 6-16-08,
          RSPNDT'S BRIEF S/B FILED NOT MORE THAN FIFTEEN DAYS AFTER CMPLNT'S
          BRIEFIS FILED. CMPLNT MAY REPLY W/N 10 DAYS AFTER RSPNDT'S BRIEF IS FILED
          C/CJ, ATTYS, NP

07-10-2008 TEXT   10 Jul 2008 15:45:04:590                                    1889847
          COMPLAINANT'S WAIVER OF REPLY BRIEF ****FILED UNDER SEAL****

Report Generated by The Oklahoma Court Information System at

End of Transmission.

**REDACTED**

## IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

STATE OF OKLAHOMA ex rel.        )
OKLAHOMA BAR ASSOCIATION,         )
      Complainant,               )
                               )
                               )
vs.                              )   OBAD # 1729
                               )   SCBD #5338
                               )
DAVID M. LITTLEFIELD,            )
      Respondent.                )

FILED
SUPREME COURT BAR DOCKET
STATE OF OKLAHOMA

OCT 2 3 2007

MICHAEL S. RICHIE
CLERK

### ENTRY OF APPEARANCE

**COME NOW** Deborah A. Reheard and Carol Iski of Reheard Law Office, and enter their appearance in the above-entitled and numbered cause as co-counsel for the Respondent herein.

Respectfully submitted,

DEBORAH A. REHEARD, OBA #12448
**CAROL ISKI, OBA #11471**
**Reheard Law Office**
100 N. Second Street
P.O. Box 636
Eufaula, OK 74432
(918) 689-9281/FAX (918) 689-9285
ATTORNEYS FOR RESPONDENT

### CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of October, 2007, a true, correct and exact copy of the above and foregoing instrument was mailed to:

Janis Hubbard
First Assistant General Counsel
Oklahoma Bar Association
1901 N. Lincoln
P.O. Box 53036
Oklahoma City, OK 7315

Janis Grant-Johnson
Presiding Master
623 N. Porter, Suite 400
Norman, OK 73071

Roger Scott
Lawyer Member
525 S. Main, Suite 1111
Tulsa, OK 74103

Dale Cabbiness
Lay Member
P.O. Box 1603
Edmond, OK 73083-1603

Mark Green
218 W. Okmulgee
Muskogee, OK 74401

Deborah A. Reheard
Carol Iski

IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

FILED
SUPREME COURT BAR DOCKET
STATE OF OKLAHOMA

OCT 1 8 2007

MICHAEL S. RICHIE
CLERK

FILED
SEP 2 8 2007
Office Of Chief Justice
Bar Docket

| | |
|---|---|
| STATE OF OKLAHOMA ex rel. OKLAHOMA BAR ASSOCIATION, | ) ) ) |
| Complainant, | ) ) |
| v. | ) OBAD #1729 ) |
| DAVID M. LITTLEFIELD, | ) SCBD # 5338 ) |
| Respondent. | ) |

## COMPLAINT

The Complainant, State of Oklahoma ex rel. Oklahoma Bar Association, for its claim against the Respondent, David M. Littlefield, alleges and states:

1.     The Respondent is a member of the Oklahoma Bar Association and is licensed to practice law by the Supreme Court of the State of Oklahoma. The Respondent was so licensed at all times relevant to this Complaint.

2.     To the best knowledge, information, and belief of the Complainant, the Respondent has committed specific acts which constitute professional misconduct in violation of the Oklahoma Rules of Professional Conduct, ("ORPC"), 5 O.S. 2001, Ch. 1, App. 3-A, and the Rules Governing Disciplinary Proceedings, ("RGDP"), 5 O.S. 2001, Ch. 1, App. 1-A, and are cause for professional discipline as provided in the RGDP. These standards of conduct, adopted and enforced by the Supreme Court of the State of Oklahoma, provide guidelines by which all attorneys are to practice law in Oklahoma.

3.     These proceedings are begun pursuant to Rule 6, RGDP.

4.     The official Oklahoma Bar Association roster address of the Respondent is: David M. Littlefield, OBA # 5461, 218 W. Okmulgee, Muskogee, OK 74401.

594

## COUNT I

5.      On August 3, 2007, the Respondent entered an Alford Plea to Count 2: Child Abuse by Injury in violation of 10 O.S. § 7115(A) in the District Court of Muskogee County, Case No. CF-2007-363.

6.      The Respondent received a two (2) year deferred sentence, along with court costs, and un-supervised probation.

7.      By letter dated May 11, 2007, the Office of the General Counsel notified the Respondent that an investigation pertaining to his Alford Plea in Case CF-2007-363 was being opened and that the Respondent had twenty (20) days to respond.

8.      The Respondent, through counsel, did timely respond to the Office of the General Counsel generally denying the allegations and asserting the Fifth Amendment.

9.      The Respondent's misconduct thereby violates the mandatory provisions of Rule 8.4(b), ORPC, and Rule 1.3, RGDP, and warrants the imposition of professional discipline.

WHEREFORE, premises considered, the Complainant, Oklahoma Bar Association, prays that the Respondent, David M. Littlefield, be disciplined as this Court finds equitable and proper, and such other relief as this Court finds appropriate.

Done at the direction of the Professional Responsibility Commission, this the _____ day of September, 2007,

_____
Mark W. Dixon, Chairman
Professional Responsibility Commission

AND                                        **REDACTED**

-2-

595

_Janis Hubbard_

Janis Hubbard, OBA #14641
First Assistant General Counsel
Oklahoma Bar Association
1901 N. Lincoln,  P.O. Box 53036
Oklahoma City, Oklahoma 73152
(405) 416-7007

ATTORNEY FOR COMPLAINANT

## CERTIFICATE OF MAILING

The undersigned hereby certifies that on the ___28th___ day of September, 2007, a true and correct copy of the foregoing Complaint was mailed, by certified mail and restricted delivery, to: David M. Littlefield, Respondent, ███████████ Muskogee, OK 74401 ; and by regular mail to: Ronald Main, Professional Responsibility Tribunal Chief Master, ███████████ Tulsa, OK 74105-6251 and Mark Fredrick Green, Attorney for Respondent, P.O. Box 2362, Muskogee, OK 74402.

_Janis Hubbard_

Janis Hubbard

**REDACTED**

**IN THE SUPREME COURT OF THE STATE OF OKLAHOMA**

**BEFORE THE PROFESSIONAL RESPONSIBILITY TRIBUNAL**

FILED
SUPREME COURT BAR DOCKET
STATE OF OKLAHOMA

JAN – 8 2008

MICHAEL S. RICHIE
CLERK

| | |
|---|---|
| STATE OF OKLAHOMA ex rel. | ) |
| OKLAHOMA BAR ASSOCIATION, | ) |
| Complainant, | ) |
| | ) |
| vs. | )   OBAD # 1729 |
| | )   SCBD #5338 |
| DAVID M. LITTLEFIELD, | ) |
| Respondent. | ) |

## JOINT MOTION FOR PROTECTIVE ORDER

1.       Respondent stands accused of violating the Rules of Professional Conduct based upon his arrest and a felony charge filed against him in the District Court of Muskogee County, State of Oklahoma.

2.       That felony case has been disposed of through an Alford plea by the Respondent in a brief deferred sentence.  Now, this case has been dismissed and the Respondent's record expunged pursuant to Title 22 *O.S.* §19.  This expungement included the court record, the district attorney's record, and law enforcement record.

3.       The Expungement Order filed in the District Court of Muskogee County, State of Oklahoma was entered after the filing of this Complaint.  The parties have agreed that the record which is now expunged is necessary to be presented to the Office of the General Counsel, the Professional Responsibility Tribunal and the Court.  Due to the Expungement Order of the District Court, the parties submit that it is appropriate for court documents relating to the charge and disposition of this case should be filed with the Court under protective seal so these documents are not disclosed to the public or anyone not a party to these disciplinary proceedings, member of the Professional Responsibility Tribunal or the Court. REDACTED

4.       Title 22 *O.S.* §19 sets forth a procedure for the District Court to unseal the record for a legitimate purpose following notice of hearing.  Respondent agrees that the records which

597

were ordered sealed by the District Court, may be made a part of this record without order from the District Court of Muskogee County with the provision that those records be filed under seal with this Court. Specifically, the documents include: the Docket Sheet, Information, Summary of Facts, Deferment, transcript of Guilty Plea, letters regarding Treatment Plan, Journal Entry of related case involving the Treatment Plan through the Department of Human Services, Order of Expungement, the transcript of these proceedings, and the Report of the Trial Panel if reference is made therein to specific facts known only from the expunged documents.

5.      Further, there are Joint Stipulations of the parties that include facts known only from facts derived from these expunged records. In addition, the Joint Stipulations and the information contained in the documents set forth above make specific references to minors and in order to protect their privacy and identity, these documents should be sealed from public view. Therefore, the Joint Stipulations are included in this motion to file under protective seal.

6.      Respondent submits that filing these records under protective seal is necessary to protect the interest of the Respondent and in keeping with the mandate, intent, and spirit of Title 22 *O.S.* §19.

7.      The documents subject to this protective order shall be placed in an envelope, sealed, clearly marked with the caption and number of this case, and clearly marked with the legend: "This envelope contains confidential information and is subject to a Protective Order of the Professional Responsibility Tribunal." Copies of these documents, similarly marked, may be presented to members of the Professional Responsibility Tribunal or the copies may be transmitted by email, using reasonable precaution, to members of the Professional Responsibility Tribunal in advance of the hearing in this matter. The parties will proceed with the intention that these documents will be considered and treated as protectively sealed from the public until final order of the Court.

**REDACTED**

**WHEREFORE**, above premises considered, the parties jointly move this Court to enter a

2

protective order sealing court documents which will be submitted as part of the record in this case and for such other and further relief which may be entitled in law and in equity.

Respectfully submitted,

JANIS HUBBARD, OBA #14641
First Assistant General Counsel
Oklahoma Bar Association
1901 N. Lincoln
P.O. Box 53036
Oklahoma City, OK 73152
(405) 416-7057/FAX (405) 416-7003
ATTORNEY FOR COMPLAINANT

DEBORAH A. REHEARD, OBA #12448
CAROL ISKI, OBA #11471
**Reheard Law Office**
100 N. Second Street
P.O. Box 636
Eufaula, OK 74432
(918) 689-9281/FAX (918) 689-9285
ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of January, 2008, a true, correct and exact copy of the above and foregoing instrument was mailed to:

Janis Grant-Johnson
Presiding Master
623 N. Porter, Suite 400
Norman, OK 73071

Steve Dobbs
Lawyer Member
100 N. Broadway, Ste. 2500
Oklahoma City, OK 73102-8805

Dale Cabbiness
Lay Member
P.O. Box 1603
Edmond, OK 73083-1603

Mark Green
706 West Okmulgee Street
P.O. Box 2362
Muskogee, OK 74401

REDACTED
Janis Hubbard

3

599

**FILED**
IN THE SUPREME COURT OF THE STATE OF OKLAHOMA
STATE OF OKLAHOMA

OCT 1 8 2007

MICHAEL S. RICHIE
CLERK

**FILED**

OCT 1 7 2007
Office Of Chief Justice
Bar Docket

| | |
|---|---|
| STATE OF OKLAHOMA ex rel. OKLAHOMA BAR ASSOCIATION, | ) ) ) |
| Complainant, | ) ) |
| vs. | ) ) |
| DAVID M. LITTLEFIELD, | ) ) ) |
| Respondent. | ) |

OBAD # 1729

**# 5338**

## ANSWER

COMES NOW the Respondent, David M. Littlefield, and for his answer to the Complaint filed by the State of Oklahoma ex rel. Oklahoma Bar Association, alleges and states:

1. That Respondent admits the allegations contained in paragraph 1 of the Complaint.

2. That Respondent denies the allegations contained in paragraph 2 and demands strict proof thereof.

3. That Respondent admits the allegations contained in paragraph 3 of the Complaint.

4. That Respondent admits the allegations contained in paragraph 4 of the Complaint.

5. That Respondent admits the allegations contained in paragraph 5 of the Complaint.

6. That Respondent admits the allegations contained in paragraph 6 of the Complaint.

7. That with regard to paragraph 7, Respondent admits that he was notified by the Office of the General Counsel of an investigation, however the investigation did not pertain to his Alford Plea as it had not been entered at that time.

**REDACTED**

8. That Respondent admits the allegations contained in paragraph 8 of the Complaint.

9.   That Respondent denies the allegations contained in paragraph 9 and demands strict proof thereof.

## MITIGATION

As to mitigation, Respondent offers the following:

1.   That Case No. CF-07-363 is now dismissed; the Respondent is no longer on probation nor does he have a criminal conviction. A certified copy of the Order of Expungement is attached hereto as Exhibit A.

2.   That Respondent did not admit the allegations contained in paragraph 2 as he entered an Alford Plea. The Alford Plea was entered as the result of the lenient plea agreement, the prosecution's agreement to dismiss any allegations against Respondent's spouse, and the fact that this disposition prevented the continued mental and emotional distress upon Respondent's ten-year old son who would have been called to testify. Further, the Respondent had been suspended without pay from his job with the United States Attorney's Office for the Eastern District of Oklahoma and final determination as to his job status would not be made until after the case was final, thus causing severe financial problems and requiring a speedy resolution to the case.

3.   That Respondent has taken significant steps toward resolution in that he has completed several types of counseling relevant to the social and domestic issues in this matter.

4.   That Respondent's family unit was restored less than a month and a half after the information for the case was filed.

**REDACTED**

WHEREFORE, Respondent prays that the Court dismiss this action as same is without merit.

MARK GREEN, OBA #3570
P. O. Box 2362
Muskogee, OK 74402
(918) 683-0309 Telephone
(918) 687-5964 Telecopier

## CERTIFICATE OF SERVICE

I, Mark Green, hereby certify that on the _____ day of _____, 2007, a true and correct copy of the foregoing was served in the following manner and on the following:

__X__ U.S. Mail          _____ Facsimile          _____ Hand-delivery

Janis Hubbard
Oklahoma Bar Association
P. O. Box 53036
Oklahoma City, OK 73152

MARK GREEN

**REDACTED**

IN THE SUPREME COURT OF THE STATE OF OKLAHOMA
BEFORE THE PROFESSIONAL RESPONSIBILITY TRIBUNAL

STATE OF OKLAHOMA ex rel.        )
OKLAHOMA BAR ASSOCIATION,        )
                                 )
        Complainant,             )
                                 )
v.                               )        OBAD #1729
                                 )
DAVID M. LITTLEFIELD,            )
                                 )
        Respondent.              )

FILED
SUPREME COURT BAR DOCKET
STATE OF OKLAHOMA
OCT 18 2007
MICHAEL S. RICHIE

\# 5338

FILED
OCT 05 2007
Office Of Chief Justice
Bar Docket

## NOTICE OF SELECTION AND APPOINTMENT OF TRIAL PANEL AND NOTICE OF SETTING AND NOTICE OF HEARING

Pursuant to the provisions of Rule 11.3, Rules Governing Disciplinary Proceedings, 5.O.S. 1995, Ch. 1, App. 1-A, notice of selection of trial panel and notice of setting hearing are hereby given, to-wit:

1.      That:

        Janis Grant-Johnson
        Presiding Master
        623 North Porter, Suite 400
        Norman, Oklahoma 73071

        Roger Scott
        Lawyer Member
        525 South Main, Suite 1111
        Tulsa, Oklahoma 74103

        Dale Cabbiness
        Lay Member
        P. O. Box 1603
        Edmond, Oklahoma 73083-1603

are hereby appointed to serve as the Trial Panel and Janis Grant-Johnson shall serve as Presiding
                        **REDACTED**
Master in the above disciplinary proceeding.

603

2.      That his proceeding is set for trial on **Wednesday, November 14, 2007, at 9:30 a.m.** at the main floor conference room of the Oklahoma Bar Association, 1901 North Lincoln Boulevard, Oklahoma City, Oklahoma.  **All motions, including those for continuance, should be addressed to the Presiding master appointed above.**

Done this ___2d___ day of ___Oct___, 2007.

_____
Ronald Main
Professional Responsibility Tribunal
Chief Master

**REDACTED**

<u>CERTIFICATE OF MAILING</u>

The undersigned hereby certifies that on the ⸻5th⸻ day of October, 2007, a true and correct copy of the foregoing Notice of Hearing was mailed, by U.S. Mail, postage prepaid, to: Janis Grant Johnson, PRT Presiding Master, 623 North Porter, Suite 400, Norman, OK 73071; Roger Scott, Lawyer Member, 525 South Main, Suite 1111, Tulsa, OK 74103; Dale Cabbiness, Lay Member, PO Box 1603, Edmond, OK 73083-1603; Mark Fredrick Green, Attorney for Respondent, P.O. Box 2362, Muskogee, OK 74402; and by certified mail to David M. Littlefield, Respondent, ██████ ██████ Muskogee, OK 74401.

*Janis Hubbard*

**REDACTED**

IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

FILED
SUPREME COURT BAR DOCKET
STATE OF OKLAHOMA
OCT 18 2007
MICHAEL S. RICHIE
CLERK

| | |
|---|---|
| STATE OF OKLAHOMA, *ex rel.*<br>Oklahoma Bar Association,<br><br>Complainant,<br><br>v.<br><br>DAVID M. LITTLEFIELD,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

OBAD # 1729

SCBD # 5338

FILED
OCT 03 2007
Office Of Chief Justice
Bar Docket

## AFFIDAVIT FOR PROOF OF SERVICE OF COMPLAINT

| | |
|---|---|
| STATE OF OKLAHOMA | ) |
| | ) ss: |
| COUNTY OF OKLAHOMA | ) |

I, Dana Shelburne, of lawful age, being first duly sworn, on oath, aver and state that I am an employee of the Oklahoma Bar Association; that, in accordance with 12 O.S. 2001, §2004(C)(2)(b), the formal Complaint filed with this Court was mailed on September 28, 2007, by certified mail, return receipt requested and restricted delivery, to the Respondent, David M. Littlefield, ▮▮▮▮▮▮▮ Muskogee, OK 74401; that the Complaint was received on behalf of Respondent on October 1, 2007, (a copy of the postal scanned image of the recipient information is attached hereto as Exhibit "A").

Further affiant saith not.

_____
Dana Shelburne
Oklahoma Bar Association
P.O. Box 53036
Oklahoma City, OK 73152
REDACTED
(405) 416-7007

1

606

Subscribed and sworn to before me this ___3rd___ day of October, 2007.

_____
NOTARY PUBLIC

My Commission Expires:

TRACY SANDERS
Notary Public In and for the
State of Oklahoma
Commission #05001876
My Commission expires 2/22/2009

Commission # _____

## CERTIFICATE OF MAILING

The undersigned hereby certifies that on the ___3rd___ day of October, 2007, a true and

correct copy of the foregoing Proof of Service of Complaint was mailed to: Respondent, David M.

Littlefield, ██████████████ Muskogee, OK 74401; and Mark Fredrick Green, Attorney for

Respondent, P.O. Box 2362, Muskogee, OK 74402.

_____
Janis Hubbard

**REDACTED**

2

 **UNITED STATES POSTAL SERVICE.**

OBAD #1729
Littlefield

Date: 10/02/2007

Dana Shelburne:

The following is in response to your 10/01/2007 request for delivery information on your Certified item number 7108 2133 3934 1174 9709. The delivery record shows that this item was delivered on 10/01/2007 at 11:41 AM in MUSKOGEE, OK 74401. The scanned image of the recipient information is provided below.

Signature of Recipient:



Address of Recipient:

74401

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local Post Office or postal representative.

Sincerely,

United States Postal Service

**REDACTED**

 **EXHIBIT**

A          608

IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

BEFORE THE PROFESSIONAL RESPONSIBILITY TRIBUNAL

| | | |
|---|---|---|
| STATE OF OKLAHOMA ex rel. Oklahoma Bar Association, | ) ) ) | **FILED** SUPREME COURT BAR DOCKET STATE OF OKLAHOMA |
| Complainant, | ) ) | NOV - 9 2007 |
| v. | ) | OBAD #1729 |
| | ) | MICHAEL S. RICHIE CLERK |
| DAVID M. LITTLEFIELD, | ) | SCBD #5338 |
| Respondent. | ) ) | |

## ORDER CONTINUING HEARING

By agreement of the parties, it is hereby ordered that the hearing on the merits previously set for Wednesday, November 14, 2007, at 9:30 a.m., is hereby continued to Friday, January 11, 2008 at 9:30 a.m. The hearing will be held at the Oklahoma Bar Center in Oklahoma City, Oklahoma, 1901 N. Lincoln Blvd.

DONE this 7th day of November, 2007.

_____
Janis Grant-Johnson, Presiding Master

**REDACTED**

1

## CERTIFICATE OF MAILING

The undersigned hereby certifies that on the ___9th___ day of November, 2007, a true and correct copy of the foregoing instrument was mailed to: Respondent, David M. Littlefield, ████ ████ Muskogee, OK 74401; Deborah Ann Reheard, Attorney for Respondent, P.O. Box 636, 100 N 2nd St., Eufaula, OK 74432; Janis Grant-Johnson, PRT Presiding Master, 623 N. Porter, Ste. 400, Norman, OK 73071; Roger R. Scott, PRT Lawyer Member, 525 S. Main, Suite 1111, Tulsa, OK 74 103; and Dale Cabbiness, PRT Lay Member, P.O. Box 1603, Edmond, OK 73083.

_Janis Hubbard_
Janis Hubbard

**REDACTED**

2

IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

BEFORE THE PROFESSIONAL RESPONSIBILITY TRIBUNAL

| | | |
|---|---|---|
| STATE OF OKLAHOMA *ex rel.* Oklahoma Bar Association, | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | |
| v. | ) | OBAD #1729 |
| | ) | |
| DAVID M. LITTLEFIELD, | ) | SCBD #5338 |
| | ) | |
| Respondent. | ) | |

FILED
SUPREME COURT BAR DOCKET
STATE OF OKLAHOMA

JAN = 2 2008

MICHAEL S. RICHIE
CLERK

## TRIAL BRIEF OF COMPLAINANT

Complainant, State of Oklahoma *ex rel.* Oklahoma Bar Association, for its claim against the Respondent, David M. Littlefield (hereinafter "Respondent"), respectfully submits this Trial Brief to the Professional Responsibility Tribunal ("PRT"). Allegations of violations of the Oklahoma Rules of Professional Conduct[1], (hereinafter "ORPC"), and the Rules Governing Disciplinary Proceedings[2], (hereinafter "RGDP"), have been made against the Respondent. The matter is currently set for hearing on Friday, January 11, 2008.

## SUMMARY OF FACTS

On May 11, 2007, the Complainant requested from the Respondent a response to a newspaper article describing the Respondent's arrest on April 26, 2007 on felony charges while employed as an Assistant United States Attorney. On July 2, 2007, the Complainant

**REDACTED**

---

[1] 5 O.S. 2001, Ch. 1, App. 3-A.

[2] 5 O.S. 2001, Ch. 1, App. 1-A.

1

611

received a letter from counsel for the Respondent stating a general denial, asserting his client's Fifth Amendment right, and that he was not specifically addressing any allegation.

On August 3, 2007, the Respondent entered an Alford Plea to one (1) count of Child Abuse by Injury in violation of 10 O.S. § 7115(A) in the District Court of Muskogee County, Case No. CF-2007-363. The Respondent received a two (2) year deferred sentence, along with court costs, and un-supervised probation.

On September 28, 2007, the formal Complaint was filed. Not withstanding the two year deferred sentence ordered at the plea on August 3, 2007, the criminal case has been dismissed and expunged since the filing of the Complaint.

## AUTHORITY AND APPLICABLE CASE LAW

The conduct described in the Complaint violates the mandatory provisions of Rule 8.4(b), ORPC, and Rule 1.3, RGDP, and constitutes grounds for professional discipline. Discipline on this Alford plea[3] is comparative to a *nolo contendere* plea, and is appropriately imposed. It is well established that professional discipline is appropriate in cases

---

[3] *North Carolina v. Alford*, 400 U.S. 25 at 37, 91 S.Ct. 160, 27 L.Ed.2d 162 (1969):
The fact that his plea was denominated a plea of guilty rather than a plea of nolo contendere is of no constitutional significance with respect to the issue now before us, for the Constitution is concerned with the practical consequences, not the formal categorizations, of state law. Thus, while most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime. Nor can we perceive any material difference between a plea that refuses to admit commission of the criminal act and a plea containing a protestation of innocence when, as in the instant case, a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt. [Footnotes omitted.]

2

612

constituting a *nolo contendere* plea and where a sentence has been deferred.[4]   Also, professional discipline is appropriate in cases where a deferred sentence has run its term and the case has been dismissed and expunged.[5]   Further, professional discipline is appropriate in cases involving conduct outside of the attorney-client relationship. In *State ex rel. Okla. Bar Ass'n v. Burns*, 2006 OK 75, ¶ 24, 145 P.3d 1088, the Court explains, in pertinent part:

> The counts of the complaint brought against respondent do not concern questions regarding the quality of his professional practice or his conduct within the attorney-client relationship. His professional competence and honesty are not placed in question here and are not germane to issues concerning the quantum of appropriate professional discipline. This Court has recognized that discipline may be imposed for occurrences outside the professional setting and attorney-client relationship. (Footnotes omitted.)

Rule 8.4(b), ORPC[6], states that it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on that person's fitness as a lawyer.  Rule 1.3, RGDP[7],

---

[4]  *State ex rel. Oklahoma Bar Ass'n v. Bradley*, 1987 OK 78, ¶¶ 19-22, 746 P.2d 1130.

[5]  *State ex rel. Oklahoma Bar Ass'n v. Maddox*, 2006 OK 95, ¶ 4, 152 P.3d 204.

[6] Rule 8.4 Misconduct

It is professional misconduct for a lawyer to:

. . .

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

. . .

[7] Rule 1. 3 Discipline for Act Contrary to Prescribe Standards of Conduct

The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

3

states that it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on that person's fitness as a lawyer. In the case, *State ex rel. Oklahoma Bar Ass'n v. Aston*, 2003 OK 101, ¶¶11-12, 81 P.3d 676, the Court explained, in pertinent part:

> We have said that the phrase "fitness to practice law" encompasses more than an absence of detriment to specific clients. . . . Rule 1.3 states that a lawyer may be disciplined when he or she commits an act that is contrary to the prescribed standards of conduct and would reasonably be found to bring discredit upon the legal profession. In 1999 we said that three convictions (two misdemeanors and a felony) for driving while under the influence of alcohol showed a pattern of repeated offenses indicating indifference to legal obligations.

The pivotal issue to be determined in this case is whether the Respondent's conduct seriously adversely reflects on his fitness to practice law, Rule 8.4(b), RGDP, and if the act would reasonably be found to bring discredit upon the legal profession, Rule 1.3, RGDP. If so, it shall be grounds for disciplinary action. The Complainant argues that the Respondent's conduct does adversely reflect on the Respondent's fitness as a lawyer and brought discredit upon the legal profession.

The landmark cases addressing the Rule 6, RGDP, versus the Rule 7, RGDP, standard of "facially demonstrating unfitness to practice law" are *State ex rel. Oklahoma Bar Ass'n v. Armstrong*, 1990 OK 9, 791 P.2d 815 and *State ex rel. Oklahoma Bar Ass'n v. Armstrong*, 1992 OK 79, 848 P.2d 538. In *Armstrong*, 1990 OK 9, ¶ 8, the Court explained conviction of some crimes will facially show unfitness to practice law, while others will not. This principle is recognized in the *Comments* to Rule 8.4(b), ORPC, describing the offenses indicating a lack of characteristics relevant to the practice of law, that states:

**REDACTED**

> Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense

4

of willful failure to file an income tax return. However, some kinds of offense carry no such implication. . . . Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. **Offenses involving violence**, dishonesty or breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation. [Emphasis added.]

Does the crime of Child Abuse by Injury indicate a lack of those characteristics relevant to law practice? The *ABA/BNA Lawyers' Manual on Professional Conduct*, 7/18/01, page 229 [Criminal Conduct] §101:301-304 discusses the Model Rules and states: "Under each scheme, it is the **underlying conduct** - as opposed to a conviction for such conduct - that forms the basis for the ethics violation." Regarding conduct addressed by ethics rules, it states:

Thus, although "[t]o some extent, every criminal act shows lack of support for our laws and diminishes public confidence in lawyers, thereby reflecting adversely on a lawyer's fitness to practice," *In re White*, 815 P.2d 1257, 1265 (Or. 1991), not all criminal conduct violates the ethics rules. According to *White*, "[e]ach case must be decided on its own facts. There must be some rational connection other than the criminality of the act between the conduct and the actor's fitness to practice law. Pertinent considerations include the lawyer's mental state; the extent to which the act demonstrates disrespect for the law or law enforcement; the presence or absence of a victim; the extent of actual or potential injury to a victim; and the presence or absence of a pattern of criminal conduct. (Emphasis added.)

A review of the elements of Child Abuse by Injury will assist in this determination.

The elements are described at 10 O.S. § 7115(A) stating:

Any parent or other person who shall willfully or maliciously engage in child abuse shall, upon conviction, be guilty of a felony punishable by imprisonment in the custody of the Department of Corrections not exceeding life imprisonment, or

5

by imprisonment in a county jail not exceeding one (1) year, or by a fine of not less than Five Hundred Dollars ($500.00) nor more than Five Thousand Dollars ($5,000.00), or both such fine and imprisonment. As used in this subsection, "child abuse" means the willful or malicious abuse, as defined by paragraph 1 of subsection B of Section 7102[8] of this title, of a child under eighteen (18) years of age by another, or the act of willfully or maliciously injuring, torturing or maiming a child under eighteen (18) years of age by another. (Footnote added.)

The instant bar discipline case involving child abuse may be a case of first impression before the Oklahoma Supreme Court. There is strong public policy against child abuse. In bar discipline matters in cases from other states, *Magrid* and *Principato, infra,* discussed below, some Courts have considered their state legislation against domestic abuse. Regarding Oklahoma legislation against child abuse, the Oklahoma Child Abuse Prevention Act was added in 1984 as 63 O.S. 2001 § 1-227. The Office of Child Abuse Prevention also was created in 1984. The web page for the Office of Child Abuse Prevention states, in part:

> The intent of the Child Abuse Prevention Act is...
> • that a comprehensive approach for the prevention of child abuse and neglect be developed for the state and used as a basis of funding of programs and services;
> • that multidisciplinary and discipline-specific training on child abuse and neglect and domestic violence be available to professionals with responsibilities affecting children, youth, and families; and
> • that the Office of Child Abuse Prevention within the Oklahoma State Department of Health establish a comprehensive statewide approach towards the prevention of child abuse and neglect.

---

[8] Section 7102: <u>Public Policy - Protection of Children - Definitions</u>

B. Except as otherwise provided by and used in the Oklahoma Child Abuse Reporting and Prevention Act:   **REDACTED**

1. "Abuse" means harm or threatened harm to a child's health, safety or welfare by a person responsible for the child's health, safety or welfare, including sexual abuse ...

6

Evidence will be admitted at trial that will demonstrate a *prima facie*[9] case that is clear and convincing evidence the acts were committed by the Respondent[10] Further, the evidence to be presented will provide the PRT with the facts surrounding the incident that resulted in the felony charge. These facts can then be considered to determine whether or not the crime of Child Abuse by Injury falls into the categories of offenses indicating a lack of those characteristics relevant to law practice, along with any possible mitigation evidence.

The Complainant argues that the Respondent should be professionally answerable for this offense as it indicates a lack of those characteristics relevant to law practice. The crime the Respondent pled to involved an act of willfully or maliciously engaging in child abuse. Physically assaultive behavior can be found to reflect adversely on a lawyer's fitness to practice law. *People v. Musick,* 960 P.2d 89, 92 (Colo. 1998). (Copy attached.)   In an Iowa case, *Comm. on Professional Ethics and Conduct v. Lapointe,* 415 N.W.2d 617 (Iowa 1987) (copy attached), the Supreme Court of Iowa stated, at 619, that:

---

[9]   *State ex rel. Oklahoma Bar Ass'n v. Bradley,* 1987 OK 78, ¶ 19, 746 P.2d 1130 (we find no reason in a disciplinary action to not allow a deferred sentence to be admitted as evidence that certain acts or commission were committed by the respondent, particularly as they relate to acts alleged in the complainant filed by the Bar Association).

[10] *State ex rel. Oklahoma Bar Ass'n v. Rogers,* 2006 OK 54,  ¶ 9 and  ¶ 14, 142 P.3d 428 (clear and convincing evidence is 'that measure or degree of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.' ... The victim of the accident reported to the police that Respondent had left the scene and Respondent was eventually apprehended six blocks away. This conduct is the basis for the Complainant's charge that Respondent violated Rule 8.4(c), and we find that under the circumstances of this case, Respondent's conviction for leaving the scene of a motor vehicle accident with property damage, which he caused due to his driving while intoxicated, constitutes clear and convincing evidence of conduct involving dishonesty for which discipline is warranted pursuant to Rule 8.4(c) ...).

REDACTED

7

617

> Notwithstanding the relaxed mores of contemporary society, no one can seriously contend that our community tolerates such conduct. ... Because assaultive behavior was illegal and morally reprehensible, it necessarily reflect on fitness to practice law.

The Complainant argues the Respondent's conduct seriously adversely reflects on his fitness to practice law, Rule 8.4(b), and such act would reasonably be found to bring discredit upon the legal profession, Rule 1.3, RGDP. Further, the Complainant argues the Respondent should be professionally answerable for this offense as it demonstrates disrespect for the law and rule of law.

Once it is determined that the crime of Child Abuse by Injury falls into a category for which the Respondent should be professionally answerable, the question becomes: What is the most appropriate discipline in this matter? The Court considers each disciplinary matter on a case by case basis considering the different offenses and mitigating circumstances to impose discipline fairly and consistently.

Since there is no Oklahoma case with similar facts, we first look the *ABA/BNA Lawyers' Manual on Professional Conduct*, 6/17/92, pages 29-30 [Standards for Imposing Lawyer Sanctions] §01:828 (hereinafter "ABA Standards") states, under 5.1 Failure to maintain Personal Integrity, at 5.12, §01:827, page 29:

> Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11[11] and that seriously adversely reflects on the lawyer's fitness to practice. (Footnote added.)

---

[11] Disbarment is generally appropriate when:
(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or
(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

8

The ABA Standards in considering whether a private reprimand is appropriate explain that a private censure, because it does not inform the public about a lawyer's misconduct, "should be used only when the lawyer is negligent, when the ethical violation results in little or no injury to a client, the public, the legal system, or the profession, and when there is little or no likelihood of repetition." ABA Standard 2.6, *Commentary*.

Discipline should be imposed fairly and consistently. Therefore, the Court considers each situation on a case by case basis considering the different offenses and mitigating circumstances. A search of Oklahoma law reveals no prior case with similar facts of Child Abuse by Injury. Therefore, a review of an Oklahoma case and a few cases outside of Oklahoma, some more egregious and some may be less egregious than the instant case, that may assist in an analysis is presented.

In *State ex rel. Okla. Bar Ass'n v. Foster*, 2000 OK 4, 995 P.2d 1138, Foster was publicly reprimanded and admonished for his misconduct involving his entering a plea of *nolo contendere* to the charge of assault with the intent to commit a felony and received a five-year deferred sentence. Foster unlawfully, wilfully, and feloniously touched a minor child under the age of eighteen (18) years, with the intent to commit the felony of procuring obscene and indecent photographs. The only issue before the Court involved Foster viewing the minor's breasts and inappropriate comments made to the minor following the incident.

In the New Jersey case, *In the Matter of Magid*, 655 A.2d 916, 139 N.J. 449 (N.J. 1995) (copy attached), Magid was charged with attempting to cause bodily injury by punching his victim in the head and face area causing a black eye, knocking her to the ground and kicking her in the neck, head, REDACTEDback, causing other bruising. *Id.* at 451. At the time of the incident, Magid was the First Assistant Prosecutor of Gloucester County.

9

The victim was also employed by the Gloucester County Prosecutor's Office. The two had been dating for several months. As a result of this incident, Magid was discharged from his position in the prosecutor's office. Magid pleaded guilty and was placed on probation for one year and fined $300.

This is the first case, along with *Principato, infra,* the Supreme Court of New Jersey considered appropriate professional discipline to be imposed on an attorney convicted of a domestic violence act. The Supreme Court of New Jersey determined in *Magid,* at 455:

> [Magid's] conduct was a serious violation of RPC 8.4(b). But for the fact that we have not previously addressed the appropriate discipline to be imposed on an attorney who is convicted of an act of domestic violence, and that respondent did not engage in a pattern of abusive behavior, respondent's discipline would be greater than the public reprimand we hereby impose. We caution members of the bar, however, that the Court in the future will ordinarily suspend an attorney who is convicted of an act of domestic violence.

The Supreme Court of New Jersey considered Magid's position as First Assistant Prosecutor. The New Jersey Court stated in *Magid,* at 455:

> Attorneys who hold public office are invested with a public trust and are thereby more visible to the public. Such attorneys are held to the highest of standards. 'Respondent's conduct must be viewed from the perspective of an informed and concerned private citizens and be judged in the context of whether the image of the bar would be diminished if such conduct were not publicly disapproved.' *In re McLaughlin,* 105 N.J. 457, 461, 522 A.2d 999 (1987) (citation omitted).

In the New Jersey case, *In the Matter of Principato,* 655 A.2d 920, 139 N.J. 456 (N.J., 1995) (copy attached), Principato was charged with simple assault on his client with whom he had developed a romantic relationship. Principato admitted to going to this

REDACTED

client's home where he yelled and used profanity. The Haddon Township Municipal Court

10

also found he turned over the mattress on which his client was sitting and, with his client pinned behind the mattress, "Mr. Principato lost control of himself, possibly because she was ending this relationship.... [H]e began to pummel her against the mattress, he never hit her skin directly, but he did pummel the mattress forcefully at least 10 or 15 times ... the matter lasted at least 10 seconds." *Id.* at 459. Further, the court found that "although the client did not sustain serious injuries, she was in fear for her life, suffered pain, and suffered a scratch on her arm." *Id.* at 459. Principato received a public reprimand.

The Supreme Court of New Jersey addressed domestic violence offenses stating in *Principato*, at 461:

> Unlike many other 'victimless' disorderly persons offenses, domestic violence offenses always involve victims, often-times vulnerable and defenseless. The public must be assured that the legal profession is concerned about domestic violence.

In the Indiana case, *In the Matter of Walker*, 597 N.E.2d 1271 (Ind., 1992) (copy attached), Walker visited the victim's home after having consumed several alcoholic beverages. They discussed their deteriorating relationship. This discussion evolved into an argument. During the ensuing argument, Walker straddled the victim, slapped her several times, and hit her in the face with a closed fist cutting her lip. As Walker was leaving the residence, he forcibly took the telephone from the victim's nine-year old daughter and pushed her. The incident was reported to the police but the incident report was lost and was not introduced in evidence.

At the time of the incident, Walker was the Chief Deputy Prosecuting Attorney for Elkhart County. The prosecutor, who was also Respondent's law partner, advised the victim that she had a right to a special prosecutor. She declined but requested that Walker receive

REDACTED

11

621

counseling, pay her medical bills, pay for her daughter's counseling and have no further contact with her. Walker met all of these requests. The incident was reported in the local press. Walker received considerable publicity on this incident.

Walker argued no professional misconduct occurred. His argument was that "the physical altercation was the culmination of a private, adult relationship, and that the battery 'arose instantaneously' after provocation." *Id.* at 1272. The Supreme Court of Indiana stated, at 1272:

> The circumstances presented by the findings reveal an act of domestic violence. This admittedly criminal conduct is not and did not remain a private matter. We are not persuaded by the claim of provocation, nor are we comforted by the fact that the grievant's daughter, also a victim of Respondent's conduct, recovered after some counselling sessions. Respondent's position as deputy prosecutor requires even stricter scrutiny of this conduct. As was stated in the *Matter of Oliver* (1986), Ind., 493 N.E.2d 1237, Respondent's duty to conform his behavior to the law does not arise solely out of his status as an attorney. As an officer charged with the administration of the law, Respondent's behavior has the capacity to bolster or damage public esteem for the system. Were those whose job it is to enforce the law break it instead, the public rightfully questions whether the system itself is worthy of respect. The damage this incident has undoubtedly brought to the public's esteem will be addressed only if Respondent is held accountable.

Further, the Supreme Court of Indiana explained the conduct reflects upon the attorney's fitness as a lawyer stating, at 1272:

> Also, Respondent's conduct reflects upon his fitness as a lawyer and constitutes a violation of Rule 8.4(b). Not every violation of the penal code reflects upon an attorney's suitability as a practitioner. *See, Matter of Oliver, supra.* The issue is whether there exists a nexus between the misconduct and the Respondent's duties to his clients, the courts, or the legal system. *Matter of Oliver, supra.* REDACTED Another important assessment is the impact of the conduct on the public's perception of Respondent's fitness as a lawyer. *Matter of Roche*

12

622

> (1989), Ind., 540 N.E.2d 36. As a part-time prosecutor, Respondent inevitably encounters domestic assaults, and this incident calls into question his ability to zealously prosecute or to effectively work with the victims of such crimes. As a part-time practitioner, Respondent's effectiveness with his own clients or with adversaries in situations involving issues of domestic violence is compromised by his own contribution to this escalating societal problem. In both his capacities, we believe the perception of his fitness is tainted.

The Supreme Court of Indiana suspended Walker for sixty (60) days.

In the instant case, the Respondent's arrest and the charges against him were made public in numerous news reports. It is reasonable to conclude from the written news reports the Respondent received some portion of the publicity due to his position as an Assistant United States Attorney. He resigned his position prior to entering his Alford plea.

In an Iowa case, *Comm. on Professional Ethics and Conduct v. Patterson*, 369 N.W.2d 798 (Iowa, 1985) the Supreme Court of Iowa stated, at 801, that:

> Obedience to law exemplifies respect for law. To lawyers especially, respect for the law should be more than a platitude. ... Paraphrasing what we wrote in *Committee on Professional Ethics and Conduct v. Bromwell*, 221 N.W.2d 777, 779 (Iowa 1974), when those licensed to operate the law's machinery knowingly violate essential criminal statutes, there inexorably follows an intensified loss of law persons' respect for the law.

The purpose of disciplinary proceedings is not to inflict punishment on the offending lawyer but to safeguard the interests of the public, the judiciary and the legal profession. Responsibilities of this Court in the discipline process also include maintaining confidence in the profession by the public and deterring the commission of similar acts in the future by the offending lawyer and other members of the bar.[12]

<div align="center">

**REDACTED**

</div>

---

[12] *State ex rel. Okla. Bar Ass'n v. Wilburn*, 2006 OK 50, ¶ 11, 142 P.3d 420.

<div align="center">13</div>

In conclusion, the Complainant argues the Respondent's conduct lacked of those characteristics relevant to law practice since the crime involves an attempt of violence and demonstrates disrespect for the law. The Complainant further argues the Respondent's conduct seriously adversely reflects on his fitness to practice law, Rule 8.4(b), and the act would reasonably be found to bring discredit upon the legal profession, Rule 1.3, RGDP, and demonstrates grounds for disciplinary action. Therefore, the Complainant argues that the Respondent should be professionally answerable for his conduct and that professional discipline is necessary and appropriate.

WHEREFORE, premises considered, Complainant, Oklahoma Bar Association, prays that the Respondent, David M. Littlefield, be disciplined as this Court finds equitable and proper, and for such other relief as this Court finds appropriate.

Janis Hubbard
Assistant General Counsel, OBA #14641
Oklahoma Bar Association
1901 N. Lincoln, P.O. Box 53036
Oklahoma City, Oklahoma 73152
(405) 416-7007
ATTORNEY FOR COMPLAINANT

**REDACTED**

14

624

625

## CERTIFICATE OF MAILING

The undersigned hereby certifies that on the 2nd day of January 2008, a true and correct copy of the foregoing Trial Brief of Complainant was mailed, by regular mail, to: Deborah A. Reheard, Attorney for Respondent, P.O. Box 636, 100 N. 2nd St., Eufaula, OK 74432, Mark Green, Attorney for Respondent, P.O. Box 2362, Muskogee, OK 74402; Janis Grant-Johnson, PRT Presiding Master, 623 N. Porter, Ste. 400, Norman, OK 73071; Roger R. Scott, PRT Lawyer Member, 525 S. Main, Suite 1111, Tulsa, OK 74103; and Dale Cabbiness, Ph.D., PRT Lay Member, Box 1603, Edmond, OK 73083-1603.

Janis Hubbard

**REDACTED**

15

Page 89

**960 P.2d 89**

**98 CJ C.A.R. 2655**

**The PEOPLE of the State of Colorado, Complainant,**
**v.**
**John D. MUSICK, Jr., Attorney-Respondent.**

**No. 97SA210.**

**Supreme Court of Colorado,**
**En Banc.**

**May 26, 1998.**
**Rehearing Denied June 22, 1998.**

Linda Donnelly, Disciplinary Counsel, James S. Sudler, Assistant Disciplinary Counsel, Denver, for Complainant.

Frascona, Joiner and Goodman, P.C., Joseph Adams Cope, Louise Culberson-Smith, Boulder, for Attorney-Respondent.

PER CURIAM.

In this lawyer discipline case, a hearing panel of the supreme court grievance committee sent the findings and recommendation of a hearing board back for further consideration in light of the objections filed by the respondent and the complainant. The hearing panel then approved the board's supplemental findings, but modified the board's recommendation of discipline from a three-month suspension to a suspension of one year and one day. The respondent has excepted to the findings and recommendation. We now accept the hearing panel's recommendation and suspend the respondent for one year and one day.

Page 90

I.

The respondent was admitted to practice law in Colorado in 1970. He is also licensed to practice law in California and Hawaii. Following a three-day hearing, the board made the following findings by clear and convincing evidence. The respondent takes issue with most of these findings.

The respondent and Victoria Johnson lived together first in Aspen, Colorado and then in Los Angeles from October of 1988 to October of 1993. In February 1992, the respondent physically assaulted Johnson inside their Los Angeles apartment. The board found that the assault resulted in multiple soft tissue contusions, but no serious injury. The parties reconciled.

On a combination vacation and business trip to Hawaii in May 1993, the respondent again physically assaulted Johnson in their hotel room. Her injuries were minor. At one point during the assault, he threatened to throw Johnson out of the window of their room on the sixteenth floor. He

also restrained her with a belt throughout the night so that she could not leave.

Finally, in October 1993, the respondent physically assaulted Johnson in Los Angeles. The assault resulted in no actual injuries, although it caused her pain.

The Code of Professional Responsibility governs the 1992 assault, but the Rules of Professional Conduct apply to the 1993 assaults. In its initial report, the hearing board stated:

The Board was not presented with any evidence that Respondent's temper which resulted in the physical attacks had affected his law practice or clients in any way. To the contrary, all evidence presented to the Board indicated that throughout the relevant time he had a very successful practice with well-satisfied clients. The Board concluded that the three physical assaults were isolated incidents not involving a fixed pattern of misbehavior. The behavior at issue can find redress in the criminal and civil laws. The Board found that the physical attacks were directly related to the tumultuous and dysfunctional relationship in which the Respondent and Ms. Johnson were involved and were entirely situational. The Board concluded that it was highly unlikely that the temper exhibited by the Respondent which gave rise to the physical attacks on Ms. Johnson would adversely affect his clients. Therefore, the Board concludes that the physical attacks on Ms. Johnson were not a violation of disciplinary Rule 1-102(a)(1) [violating a disciplinary rule] or DR 1-102(A)(6) [engaging in conduct adversely reflecting on the lawyer's fitness to practice] of the Code of Professional Responsibility or Rules 8.4(a) [violating the rules of professional conduct] and 8.4(h) [engaging in conduct adversely reflecting on the lawyer's fitness to practice] of the Rules of Professional Conduct.

The hearing board did find, however, that the respondent's physical assaults violated C.R.C.P. 241.6(3) (violating the highest standards of honesty, justice, and morality) and C.R.C.P. 241.6(5) (violating the criminal laws of a state). Following a remand by the hearing panel for further consideration in light of the objections filed by the parties, the hearing board filed supplemental findings of fact and recommendation.

As part of its findings and conclusions, the board affirmed evidentiary rulings involving the admission of medical records and tape recordings of telephone messages and conversations. The board found the medical record admissible under CRE 803(4). The respondent objected to the admissibility of tape recordings and transcriptions of telephone messages he left for Johnson and tapes of telephone conversations between the respondent and Johnson. These tape recordings were presumably made in California. In his objections to the report of the hearing board, the respondent raised, for the first time, that the tape recordings of his conversations with Johnson were not admissible because of a California statute that prohibited the introduction into evidence of a recording of a confidential communication made without the consent of all the parties to the conversation. See Cal.Penal Code § 632 (West 1988 & Supp.1998).

We need not address the question of whether this California statute should be applied

Page 91

in a lawyer discipline proceeding in Colorado.[1] The hearing board properly found that by failing to contemporaneously object on this basis at the hearing, the respondent waived the objection.[2]

The respondent also alleged that he could not be found to have violated either C.R.C.P. 241.6(3) or C.R.C.P. 241.6(5) since those rules were not specifically pleaded in the complaint. The hearing board agreed and withdrew those findings. However, the hearing board also

reconsidered whether the respondent's conduct adversely reflected on his fitness to practice law, in violation of DR 1-102(A)(6) and Colo. RPC 8.4(h):

The Board concluded that the physical attacks by Respondent on Victoria Johnson were the result of a very critical failure of judgment and evidence a contempt for the law which is at odds with the Respondent's duty to uphold the law. The Board concludes that the conduct reflects adversely on the Respondent's judgment and duty to uphold the law.

In reaching this conclusion, the board quoted from People v. Senn, 824 P.2d 822 (Colo.1992):

It is preeminently the business of the criminal justice system to punish violations of the laws. While the respondent's misconduct [committing offense of prohibited use of weapon in a domestic altercation] did not directly arise from the practice of law, disciplinary proceedings supplement the work of the criminal courts to maintain respect for the rule of law and protect the public. The respondent's conduct on the morning of September 14 was the result of a very critical failure of judgment and we believe it evinced a contempt for the law which was at odds with the respondent's duty to uphold the law.

824 P.2d at 824-25 (citations omitted).

The complaint also charged the respondent with misconduct relating to his use of an American Express card issued on an account for which Johnson was ultimately liable. The board found that these charges had not been proved by clear and convincing evidence and dismissed that count.

II.

The hearing board recommended that the respondent be suspended for three months and that he be ordered to engage in mental health counseling for the personal and emotional problems that led to his physical attacks. The hearing panel approved the board's supplemental findings. However, the panel modified the board's recommendation of a three-month suspension to suspension for one year and one day, "because a shorter suspension would be unduly lenient under the facts of this case." In addition, the panel modified the recommendation of mental health counseling to a requirement that the respondent complete a certified domestic violence treatment program as a condition of reinstatement. See § 18-6-802, 6 C.R.S. (1997). The respondent filed exceptions to the panel's action.

The respondent's first contention is that "isolated instances of minor assault" outside of the context of a law practice can never be considered conduct that adversely reflects on the fitness to practice law, especially when the respondent was not charged with violating any criminal laws. In particular, the complaint filed against the respondent did not charge such a violation. The respondent is correct that in other lawyer

Page 92

discipline cases involving assault, violation of a criminal law was also charged. See, e.g., Senn, 824 P.2d at 823.

However, we have never held that a complaint must charge a violation of the criminal law before physically assaultive behavior can be found to reflect adversely on a lawyer's fitness to

practice law. As we said People v. Crossman, 850 P.2d 708 710-11 (Colo.1993), "[w]e agree with the Supreme Court of Florida that '[i]mproprieties that directly and intentionally harm others always are serious offenses in the eyes of this Court.' Florida Bar v. Samaha, 557 So.2d 1349, 1350 (Fla.1990) (emphasis in original)." People v. Brailsford, 933 P.2d 592, 595 (Colo.1997), we observed that "the actual nature of [the attorney's] conduct [which resulted in a guilty plea to third-degree sexual assault] is more important for disciplinary purposes than the statutory label put on it." We suspended Brailsford for one year and one day following his conviction for the third-degree sexual assault of his wife. See id. at 596.

In a similar way, we deem the actual nature of the respondent's violent assaultive behavior in this case on multiple occasions more significant than the presence or absence of a criminal charge. Assault on another person is malum in se. People v. Washburn, 197 Colo. 419, 424 n. 3, 593 P.2d 962, 965 n. 3 (1979) ("It is the nature of this offense which gives rise to this issue; the bulk of criminally proscribed behavior is not reasonably subject to the defense of: 'my conduct was not wrong.' Homicide, assault, kidnapping, sexual assault, arson, burglary, and robbery are all malum per se, and protestations by the accused that such conduct is blameless is irrational."); In re Ruffalo, 390 U.S. 544, 555, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) (White, J., concurring) ("Even when a disbarment standard is as unspecific as the one before us, members of a bar can be assumed to know that certain kinds of conduct, generally condemned by responsible men, will be grounds for disbarment. This class of conduct certainly includes the criminal offenses traditionally known as malum in se. It also includes conduct which all responsible attorneys would recognize as improper for a member of the profession."). Such conduct on the part of an officer of the court is very serious indeed. The fact that the respondent's misconduct was not directly related to his practice of law is only one factor to be taken into account, but is not a determinative factor.

The respondent also contends that the recommended discipline is excessive and that his conduct warrants no more than a private censure. People v. Knight, 883 P.2d 1055, 1056 (Colo.1994), we suspended Knight for 180 days with the additional requirement that he petition for reinstatement and demonstrate that he had not participated in any further acts of domestic violence. Knight was convicted of the third-degree assault of his wife over a three-day period. Id. Knight pleaded guilty to third-degree assault and the court imposed a deferred judgment and sentence conditioned upon his completion of a thirty-six week domestic violence counseling program and a twenty-four month period with no criminal offenses. Knight self-reported his conviction, and the hearing board found that at the time of the hearing he had completed the domestic violence counseling program and had not engaged in any other acts of domestic violence. Id. Of particular importance to the present case, we noted that Knight had taken steps toward rehabilitation but, as we said People v. Wallace, 837 P.2d 1223[, 1224] (Colo.1992):

We do not minimize the importance of the steps toward rehabilitation that the respondent has already taken, nor are we unmindful of the consequences flowing from a suspension as opposed to private discipline. Our primary duty in attorney discipline cases, however, is to protect the public from unfit practitioners, and the respondent's multiple acts of violence are indicative of a "dangerous volatility which might well prejudice his ability to effectively represent his clients' interests given the pressures associated with the practice of law." In re Nevill, 39 Cal.3d 729, 217 Cal.Rptr. 841, 845, 704 P.2d 1332, 1336 (1985).

883 P.2d at 1056. The most striking difference between Knight and the present case is not the degree of injury inflicted or threatened, but the complete absence of evidence

Page 93

that the respondent has taken any steps whatsoever to rehabilitate himself or even to recognize

that he has a problem. See ABA Standards for Imposing Lawyer Sanctions 9.22(g) (1991 & Supp.1992) (ABA Standards ) (refusing to acknowledge the wrongful nature of conduct is an aggravating factor for purposes of determining the proper level of discipline). The hearing board found that the physical assaults actually occurred, by clear and convincing evidence. We decline to regard the respondent's failure to take any steps toward rehabilitation as a legitimate exercise of a defense to the charges of misconduct.

The three separate physical assaults constitute a pattern of misconduct, which is also an aggravating factor. See id. at 9.22(c). In addition, at the time of the hearing in this case in June 1996, the respondent had not been previously disciplined. On August 22, 1996, a hearing panel of the supreme court grievance committee sent the respondent a letter of admonition for violating Colo. RPC 1.9(a) in his representation of a client whose interests were materially adverse to a former client. This court affirmed that determination in Musick v. People, No. 96SA462 (Colo. Apr. 1, 1997) (unpublished order). See ABA Standards 9.22(a) (prior discipline is an aggravating factor).

In mitigation, the respondent cooperated in the disciplinary proceedings, see id. at 9.32(e); he was experiencing personal or emotional problems at the time of the misconduct, see id. at 9.32 (c); and he has an otherwise good character or reputation in the legal community, see id. at 9.32 (h). However, the fact that the respondent has a good reputation is of less importance in a case such as this. Acts of domestic violence, like sexual assaults, "commonly occur in secret and remain unknown to the public until the victim complains." People v. Bertagnolli, 922 P.2d 935, 939 (Colo.1996).

Taking the seriousness of the offenses together with the aggravating and mitigating factors, we conclude that a long, rather than short, period of suspension is necessary. In addition, as People v. Wotan, 944 P.2d 1257, 1264 (Colo.1997), we believe that the respondent must be required to demonstrate that he has been rehabilitated and is once again fit to practice law before he may be reinstated. The respondent must therefore undergo reinstatement proceedings. In addition, because he has shown no inclination to undergo appropriate therapy voluntarily, we agree with the hearing panel that the respondent should complete a certified domestic violence treatment program as a condition of reinstatement. Accordingly, we accept the hearing panel's recommendations. At least one member of the court would have accepted the hearing board's recommendation of a three-month suspension.

III.

John D. Musick, Jr., is hereby suspended from the practice of law for one year and one day, effective thirty days after the date of this opinion. Musick shall not be reinstated until he has petitioned for reinstatement pursuant to C.R.C.P. 241.22(b)-(d). In addition, as a condition for reinstatement, the respondent must demonstrate that he has completed a certified domestic violence treatment program. See § 18-6-802, 6 C.R.S. (1997). Finally, Musick is ordered to pay the costs of this proceeding in the amount of $4,108.11 within ninety days after the date on this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920-S, Dominion Plaza, Denver, Colorado 80202.

HOBBS, J., does not participate.                   **REDACTED**

--------------------

1 We do note that other courts have declined to apply California's statutes to determine admissibility of similar tape recorded evidence. United States v. Little, 753 F.2d 1420, 1434-35 (9th Cir.1984) (holding that tape

recordings made in conformity with federal law but in violation of Cal.Penal Code § 632 were admissible in federal prosecution); Roberts v. Americable Int'l, Inc., 883 F.Supp. 499, 503-04 (E.D.Cal.1995) (federal statute permitting a party to a conversation to intercept the conversation, not California statute prohibiting intentional recording of confidential communications without consent of all parties, applied to admissibility of employee's interception of conversations in employment discrimination action in federal court). The respondent has not asserted that the tapes were made in violation of Colorado law.

2 The respondent has provided no reasonable explanation for his failure to object at the hearing on this California state law ground, especially since he indicates that he is licensed to practice law in California.

**REDACTED**

**Page 617**
**415 N.W.2d 617**
**COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF THE IOWA STATE BAR ASSOCIATION, Complainant,**
**v.**
**Joseph R. LAPOINTE, Respondent.**
**No. 87-1136.**
**Supreme Court of Iowa.**
**Nov. 25, 1987.**

James E. Gritzner and Kasey W. Kincaid of Nyemaster, Goode, McLaughlin, Emery & O'Brien, P.C., Des Moines, for complainant.

James P. McGuire of McGuire & O'Bryan, Mason City, for respondent.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, LAVORATO, and NEUMAN, JJ.

LAVORATO, Justice.

After a bench trial, the district court found attorney Joseph R. Lapointe guilty of assault, a serious misdemeanor, and tampering with a witness, an aggravated misdemeanor. The two convictions resulted in a temporary suspension of Lapointe's license to practice law on December 19, 1986, and later led to this disciplinary proceeding.

The Grievance Commission found that Lapointe violated Iowa Code of Professional Responsibility for Lawyers DR 1-102(A)(1) (violating disciplinary rule), (5) (engaging in conduct prejudicial to the administration of justice), (6) (engaging in any other conduct adversely reflecting on his fitness to practice law), and EC 1-5 (failing to refrain from all illegal and morally reprehensible conduct). The commission recommended a one-year suspension "with credit given for the time that his license has been suspended."

Page 618

Lapointe is a sole practitioner who has been practicing law in Mason City since his admission to the bar in 1978. He has a general law practice with approximately twenty percent of his work devoted to criminal defense.

For several years leading up to the events triggering the filing of criminal charges against Lapointe, he had been intimately involved with Ramona Nava. On the evening of February 21, 1986, the couple attended a county bar association party. After several hours of heavy drinking by Lapointe, the two left the party for Lapointe's home. There, Ramona found a match book cover with a woman's name and telephone number written inside. The discovery led to an argument during which Lapointe struck Ramona in the stomach and face. The blow to the face resulted in a cut above Ramona's eye.

Ramona refused Lapointe's offer to take her to the hospital. Instead, she left and proceeded to a bar the couple frequented. From there, a friend and bar maid drove Ramona to the hospital where she received six stitches in the cut. The three then returned to the bar, where two police officers on routine patrol saw Ramona's condition and interviewed her. Later, she signed a statement about the incident at the police station.

The next afternoon Lapointe telephoned Ramona inquiring about her condition. During the course of the conversation, Lapointe asked whether she would file criminal charges. Ramona said she would not but neglected to tell him she had been interviewed by the police. Lapointe also offered to pay whatever damages upon which the two could agree, suggesting that

**REDACTED**



he would either borrow the money or make monthly payments. He suggested that she contact a lawyer for advice as to the amount of any settlement. Later that evening, Lapointe learned from people at the bar that Ramona had been interviewed there by the police.

Several weeks later, the couple reconciled and resumed their relationship. In the weeks that followed, the two talked frequently about the events of February 21. In the meantime, a criminal complaint charging aggravated assault and false imprisonment was filed against Lapointe.

In the latter part of April, Lapointe learned of an impending grand jury proceeding concerning the pending complaint. Before the grand jury convened, Lapointe saw statements Ramona had given to the county attorney. Lapointe felt that the statements cast him in a bad light and concluded that the statements were prompting the authorities to take a "hard line attitude" against him. Lapointe confronted Ramona about these statements. She expressed regret and told Lapointe she had said many of the things in an effort to get back at him for what he had done.

After several conversations with Ramona about these statements and her upcoming grand jury testimony, Lapointe prepared a two-page document carrying the heading "Mona, these are the most important things to remember." He insists the document is true and was prepared at Ramona's request to help her remember her testimony before the grand jury. Lapointe prepared and gave the document to Ramona several days prior to her appearance before the grand jury.

The document suggests Ramona give testimony that the blows were struck in self-defense. Such testimony would nullify the false imprisonment charge, which was based on Ramona's statements to the authorities that Lapointe had locked her in his home shortly before she was assaulted. In one part of the document, Lapointe emphasizes that Ramona should make it clear to the grand jury that his

offer of money was in no way conditioned on her refusal to press charges or testify. In another part of the document, Lapointe urges Ramona to tell the grand jury that in her previous statements to the authorities she "exaggerated and stretched the truth." Toward the end of the document, Lapointe suggests that Ramona should stress the good things that have happened to her because of their relationship and should leave the grand jury with the impression that despite what has happened, they love each other and plan to live their lives together.

Page 619

Ramona ultimately testified before the grand jury, which returned a four-count indictment against Lapointe. The case was tried without a jury with Ramona as the State's main witness. The court found Lapointe guilty of assault causing bodily injury, in violation of Iowa Code section 708.2(2) (1985), and tampering with a witness, in violation of Iowa Code section 720.4. Lapointe received a thirty-day sentence and actually spent twenty-six days in jail. He appealed the tampering conviction but not the assault conviction, and his appeal is pending.

It is not surprising that Lapointe readily admits the assault. However, he vigorously denies he is guilty of tampering. Regardless of the outcome of the tampering appeal, he concedes, as he must, that the commission may consider all of his actions in determining his fitness to practice law. See Committee on Professional Ethics & Conduct v. Kraschel, 260 Iowa 187, 198-99, 148 N.W.2d 621, 628 (1967) (" 'Acquittal of a member of the bar following trial of a criminal indictment is not res judicata in a subsequent disciplinary proceeding based on substantially the same charge or conduct. Not only are the parties different but the purposes of the two proceedings are different.' ") (quoting In re Pennica, 36 N.J. 401, 418, 177 A.2d 721, 730 (1962)); Annotation, Effect of Acquittal or Dismissal in Criminal Prosecution as Barring

REDACTED

fastcase

Disciplinary Action Against Attorney, 76 A.L.R.3d 1028 (1977).

Despite Lapointe's characterization of his assault as a "crime of passion, a brief and sudden episode without any premeditation or time for reflecting," we agree with the commission that such conduct violated DR 1-102(A)(1), (5), (6), and EC 1-5. The conduct was, without question, illegal because a criminal law was admittedly violated. See EC 1-5. It could also be described as "morally reprehensible." See id. Notwithstanding the relaxed mores of contemporary society, no one can seriously contend that our community tolerates such conduct. See Committee on Professional Ethics & Conduct v. Patterson, 369 N.W.2d 798, 801 (Iowa 1985) (three-month suspension for assaultive behavior considered morally reprehensible in violation of EC 1-5).

Because Lapointe's assaultive behavior was illegal and morally reprehensible, it necessarily reflects on his fitness to practice law. See DR 1-102(A)(6). It likewise reflects prejudicially on the administration of justice. See DR 1-102(A)(5). We are convinced that "when those licensed to operate the law's machinery knowingly violate essential criminal statutes, there inexorably follows an intensified loss of lay persons' respect for the law." Patterson, 369 N.W.2d at 801. A showing that DR 1-102(A)(5) and (6), disciplinary rules, were violated necessarily establishes violation of DR 1-102(A)(1), which prohibits a violation of a disciplinary rule.

The question whether Lapointe's actions following the assault constitute unethical conduct presents a closer question. Admittedly, in many conversations, Lapointe discussed with Ramona the facts in relation to the criminal charges against him and prepared, for her use before the grand jury, the ill-advised "refresher" document. We express no opinion whether such conduct constitutes a criminal violation of our witness tampering statute. Nevertheless, after **REDACTED** our careful review of the record, we are convinced the commission was correct in

concluding such conduct did violate DR 1-102(A)(1), (5), (6), and EC 1-5.

It is interesting to note that Lapointe, in answering the committee's request for admissions, admits these actions violated EC 1-5 but denies they violated DR 1-102(A)(1), (5), and (6). The commission certainly could rely on the admission in reaching its decision. See Committee on Professional Ethics & Conduct v. Cody, 412 N.W.2d 637, 638 (Iowa 1987); see also Iowa R.Civ.P. 127, 128.

Several facts support a reasonable inference that Lapointe intended to influence Ramona's testimony and minimize the chances that he would be indicted. These include Lapointe's expertise in the criminal area; his persistence in talking with Ramona about the criminal charges while at the same time offering her restitution; and his self-serving statements in the document,

Page 620

which were clearly designed to destroy Ramona's credibility and to dilute, if not completely meet, the charges against him. Such attempts by Lapointe to influence a witness to "assist in chilling or hindering [his] prosecution," Committee on Professional Ethics & Conduct v. Halleck, 325 N.W.2d 117, 118 (Iowa 1982), were clearly improper and, in our view, had a prejudicial impact on the administration of justice, in violation of DR 1-102(A)(5), and thus reflected adversely on his fitness to practice law, in violation of DR 1-102(A)(6). See Halleck, 325 N.W.2d at 118 (fourteen-month suspension for conviction of witness tampering in violation of DR 1-102(A)(1), (3), (4), (5), and (6)) ("The vice in this case was not in offering restitution but in using it as a leverage to attempt to influence the witness to assist in chilling or hindering the prosecution of respondent's client.").

Because we conclude Lapointe's conduct subsequent to the assault violated disciplinary rules, the same conduct also constitutes a

violation of DR 1-102(A)(1), which we earlier said prohibits a violation of a disciplinary rule.

The commission found that Ramona deliberately set out to cause Lapointe difficulty with the authorities in an effort to "get even" with him. Although the record certainly supports the finding, her efforts do not excuse his unprofessional conduct. In short, he must be disciplined. Whatever sanction we do impose should be sufficient to deter others and to indicate to the public that "the courts will maintain the ethics of the profession." Halleck, 325 N.W.2d at 118.

We agree with the committee's recommendation that Lapointe's license to practice law should be suspended with credit given for the time his license has already been suspended; however, we are convinced the period of suspension should be not less than fourteen months rather than twelve as recommended by the committee. We therefore suspend Lapointe's license to practice law in the courts of this state indefinitely, with no possibility of reinstatement for a period of fourteen months from December 19, 1986. This suspension shall apply to all facets of the practice of law. See Iowa Sup.Ct.R. 118.12. Upon application for reinstatement, Lapointe shall have the burden to prove he has not practiced law during the period of suspension and that he meets the requirements of Iowa Supreme Court Rule 118.13. We caution Lapointe that any hearing on an application for reinstatement will be at least sixty days after the filing of such application. See Iowa Sup.Ct.R. 117. Costs are assessed to Lapointe pursuant to Supreme Court Rule 118.22.

LICENSE SUSPENDED.

**REDACTED**

fastcase

- 4 -

Page 449

139 N.J. 449

655 A.2d 916

In the Matter of Lawrence G. MAGID, An Attorney at Law.

Supreme Court of New Jersey.

Submitted Jan. 18, 1995.
Decided March 31, 1995.

Robyn M. Hill, Chief Counsel, submitted a recommendation for discipline on behalf of Disciplinary Review Bd.

Maressa, Goldstein, Birsner, Patterson, Drinkwater & Oddo, Berlin, for respondent.

PER CURIAM.

This disciplinary proceeding arose from a Motion for Final Discipline Based Upon a Criminal Conviction filed by the Office of Attorney Ethics (OAE) before the Disciplinary Review Board (DRB), seeking final discipline of Lawrence Magid, pursuant to

Page 451

Rule 1:20-6(c)(2)(i). That motion was based on respondent's conviction of simple assault, in violation of N.J.S.A. 2C:12-1a(1).

The DRB found that respondent had engaged in unethical conduct. Four members recommended that respondent be publicly reprimanded. Two members would have imposed a private reprimand. Our independent review of the record leads us to accept the DRB's recommendation.

I

Respondent was admitted to the bar in 1969. At the time of the assault he had been an attorney with the Prosecutor's Office of Gloucester County for more than sixteen years. The DRB accurately sets forth the relevant facts in its Decision and Recommendation:

On September 28, 1993, a complaint was filed in Woodbury Heights Municipal Court charging respondent with the disorderly persons offense of assault, in violation of N.J.S.A. 2C:12-1a(1). The complaint charged respondent with attempting "to cause bodily injury to [K.P.], specifically by punching her in the head and face area causing a black eye, knocking her to the ground and kicking her in the neck, head, and lower back, causing other bruising". The incident in question occurred on the evening of September 25, 1993, at Badges, a private club in Woodbury Heights, frequented by law enforcement personnel. At the time of the incident, respondent was the First Assistant Prosecutor of Gloucester County. The victim, [K.P.] was also employed by the Gloucester County Prosecutor's Office and had been dating respondent for several months. As a result of this incident, respondent was discharged from his position in the prosecutor's office.

On December 7, 1993, respondent pleaded guilty to assaulting [K.P.]. The plea was taken by Superior Court Judge Robert W. Page, sitting as Municipal Court Judge for the Woodbury Heights Municipal Court.

At sentencing on February 7, 1993, Judge Page placed respondent on probation for a period of one year, fined him $250, and administered a $50 violent crime penalty. As conditions of probation, Judge Page required that respondent have no contact with [K.P.] and be responsible for any medical expenses incurred by her. He also directed respondent to continue treatment with his psychiatrist and remain drug- and alcohol-free during the course of his probation.

[Citations to Exhibits omitted].

II

A criminal conviction is conclusive evidence of guilt in a disciplinary proceeding. R. 1:20-6(c)(1). The sole issue to be

Page 452

determined is the extent of discipline to be imposed. R. 1:20-6(c)(2)(ii); In re Lunetta, 118 N.J. 443, 445, 572 A.2d 586 (1989); In re Goldberg, 105 N.J. 278, 280, 520 A.2d 1147 (1987); In re Tuso, 104 N.J. 59, 61, 514 A.2d 1311 (1986). In determining appropriate discipline, we consider the interests of the public, the bar, and the respondent. In re Litwin, 104 N.J. 362, 365, 517 A.2d 378 (1986); In re Mischlich, 60 N.J. 590, 593, 292 A.2d 23 (1977). The appropriate discipline depends on many factors, including the "nature and severity of the crime, whether the crime is related to the practice of law, and any mitigating factors such as respondent's reputation,[655 A.2d 918] his prior trustworthy conduct, and general good conduct." In re Lunetta, supra, 118 N.J. at 445, 446, 572 A.2d 586; In re Kushner, 101 N.J. 397, 400-01, 502 A.2d 32 (1986). Although we do not make an independent examination of the underlying facts to ascertain guilt, we do consider them relevant to the nature and extent of discipline to be imposed. In re Goldberg, supra, 105 N.J. at 280, 520 A.2d 1147; In re Rosen, 88 N.J. 1, 438 A.2d 316 (1981).

III

Respondent's conviction of the disorderly persons offense of simple assault is clear and convincing evidence that he has violated RPC 8.4(b) (by committing a criminal act that reflects adversely on his honesty, trustworthiness, or fitness as a lawyer). The primary purpose of discipline is not to punish the attorney but to preserve the confidence of the public in the bar. We judge each case on its own facts. In re Kushner, supra, 101 N.J. at 400, 502 A.2d 32.

That respondent's misconduct did not directly involve the practice of law or a client is of little moment. It is well-established that the private conduct of attorneys may be the subject of public discipline. In re Bock, 128 N.J. 270, 274, 607 A.2d 1307 (1992). The reason for that rule is

not a desire to supervise the private lives of attorneys but rather that the character of a man is single and hence misconduct revealing a deficiency is not less

**REDACTED**

Page 453

compelling because the attorney was not wearing his professional mantle at the time. Private misconduct and professional misconduct differ only in the intensity with which they reflect upon

fitness at the bar. This is not to say that a court should view in some prissy way the personal affairs of its officers, but rather that if misbehavior persuades a man of normal sensibilities that the attorney lacks capacity to discharge his professional duties with honor and integrity, the public must be protected from him.

[In re Mattera, 34 N.J. 259, 264, 168 A.2d 38 (1961).]

IV

Both this case and In re Principato, 139 N.J. 456, 655 A.2d 920 (1995), also decided today, involve acts of domestic violence. The national spotlight is focused on domestic violence. Between three and four million women each year are battered by husbands, partners, and boyfriends. Domestic Violence: Not Just A Family Matter: Hearing Before the Subcomm. on Crime and Criminal Justice of the House Comm. on the Judiciary, 103rd Cong., 2nd Sess. (June 30, 1994) (statement of Senator Joseph Biden, Jr.). The New Jersey Legislature has found that

domestic violence is a serious crime against society; that there are thousands of persons in this State who are regularly beaten, tortured and in some cases even killed by their spouses or cohabitants; that a significant number of women who are assaulted are pregnant; that victims of domestic violence come from all social and economic backgrounds and ethnic groups; that there is a positive correlation between spousal abuse and child abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence. It is therefore, the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide.

[ N.J.S.A. 2C:25-18].

Based on those findings, the Legislature enacted one of the toughest domestic violence laws in the nation. N.J.S.A. 2C:25-17 to -33. During the last decade the number of complaints filed in New Jersey courts has increased from 13,842 in fiscal year 1984 to 55,639 in 1994, an increase of 302 percent. Dana Coleman, Domestic violence charges explode by 302% in decade, New Jersey Lawyer, Feb. 13, 1995, at 1 (citing the Administrative Office of the Courts).

Page 454

V

We have not yet addressed the appropriate discipline to be imposed on an attorney convicted of an act of domestic violence. There are few reported attorney ethics cases that involve acts of domestic violence. In re Nevill, 39 Cal.3d 729, 217 Cal.Rptr. 841, 704 [655 A.2d 919] P.2d 1332 (1985) (disbarring attorney who was convicted of voluntary manslaughter of his wife whom he shot ten times); In re Knight, 883 P.2d 1055 (Colo.1994) (holding that attorney's conviction of third-degree assault of his wife that arose from three days of severe beatings warranted six-month suspension); In re Wallace, 837 P.2d 1223 (Colo.1992) (imposing three-month suspension from practice of law on attorney who assaulted his girlfriend more than once and who on one occasion entered plea of guilty to assault); In re Walker, 597 N.E.2d 1271 (Ind.1992) (imposing six-month suspension on part-time prosecutor for physically assaulting his female companion and her daughter); In re Runyon, 491 N.E.2d 189 (Ind.1986) (disbarring attorney who forced entry into former wife's apartment, struck former wife with club, held her at gunpoint and who additionally was convicted of three felony counts of possession of unregistered firearms); Committee on Professional Ethics and Conduct of the Iowa State Bar Association v. Patterson, 369 N.W.2d 798

(Iowa 1985) (imposing three-month suspension from practice of law on attorney convicted of assault for severely beating his girlfriend for two hours while her four-year-old son was at home and aware of the assault).

Respondent's assault was an isolated incident on an otherwise unblemished professional record. Unlike Nevill, Knight and Wallace, there is no pattern of abusive behavior. And unlike Wallace, Runyon and Patterson, the actual assault lasted for a very short period of time. Moreover, the intense negative publicity has drastically affected respondent's career. As a result of this incident, respondent lost his long-term position in the Prosecutor's Office. Other mitigating factors also existed at the time of the assault, such as respondent's son's critical illness and his troubled

Page 455

relationship with K.P. However, those mitigating factors neither excuse the attack nor obviate the necessity for public discipline.

Acts of violence are condemned in our society. As we stated In re Principato, supra, 139 N.J. 456, 461, 655 A.2d 920, 922, "Unlike many other 'victimless' disorderly persons offenses, domestic violence offenses always involve victims, often-times vulnerable and defenseless." The Legislature was particularly concerned that police and judicial personnel be trained "in the procedures and enforcement of this act, and about the social and psychological context in which domestic violence occurs." N.J.S.A. 2C:25-18. It is therefore important that victims of domestic violence understand that prosecutors, as members of law enforcement, are sensitive to their problems. As a prosecutor respondent must combat acts of domestic violence, not commit them. This "incident calls into question his ability to zealously prosecute or effectively work with the victims of such crimes." In re Walker, supra, 597 N.E.2d at 1271 (Ind.1992).

Attorneys who hold public office are invested with a public trust and are thereby more visible to the public. Such attorneys are held to the highest of standards. "Respondent's conduct must be viewed from the perspective of an informed and concerned private citizens and be judged in the context of whether the image of the bar would be diminished if such conduct were not publicly disapproved." In re McLaughlin, 105 N.J. 457, 461, 522 A.2d 999 (1987) (citation omitted).

Respondent's conduct was a serious violation of RPC 8.4(b). But for the fact that we have not previously addressed the appropriate discipline to be imposed on an attorney who is convicted of an act of domestic violence, and that respondent did not engage in a pattern of abusive behavior, respondent's discipline would be greater than the public reprimand we hereby impose. We caution members of the bar, however, that the Court in the future will ordinarily suspend an attorney who is convicted of an act of domestic violence.

Page 456

Respondent shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

For public reprimand--Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN--7.

Opposed --None.

[655 A.2d 920] ORDER

It is ORDERED that LAWRENCE MAGID of WOODBURY, who was admitted to the bar of this State in 1969, is hereby publicly reprimanded; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.

**REDACTED**

**REDACTED**

Page 456

### 139 N.J. 456

### 655 A.2d 920, 63 USLW 2671

### In the Matter of Salvatore PRINCIPATO, an Attorney at Law.

### Supreme Court of New Jersey.

**Submitted Jan. 18, 1995.**
**Decided March 31, 1995.**

Robyn M. Hill, Chief Counsel, submitted a recommendation for discipline on behalf of Disciplinary Review Bd.

Saverio R. Principato, Camden, submitted a letter in lieu of brief on behalf of respondent.

Page 458

PER CURIAM.

This disciplinary proceeding arose from a Motion for Final Discipline Based Upon a Criminal Conviction filed by the Office of Attorney Ethics (OAE) before the Disciplinary Review Board (DRB), seeking final discipline of Salvatore Principato, pursuant to Rule 1:20-6(c)(2)(i). That motion was based on respondent's conviction of simple assault, in violation of N.J.S.A. 2C:12-1a (1).

The DRB found that respondent had engaged in unethical conduct, and recommended that respondent be privately reprimanded. Our independent review of the record leads us to conclude that respondent has been guilty of unethical conduct. However, we believe that a public reprimand more appropriately reflects the seriousness of respondent's misconduct.

I

Respondent was admitted to the bar in 1983. Prior to this present incident, he had an unblemished professional career. On February 14, 1992, a former client, J.M., filed [655 A.2d 921] a complaint against respondent in Haddon Township Municipal Court, charging him with simple assault, a disorderly persons offense. Respondent was tried and found guilty as charged. He was fined $200, assessed $25 in court costs and directed to pay a $50 violent crimes penalty.

In August of 1992 a representative of SOLACE (Services for Victims of Domestic Violence) informed the OAE of respondent's conviction. The OAE initiated a review that resulted in the filing of the Motion for Final Discipline. While the OAE review was ongoing, J.M. on February 8, 1993 filed with the District IV Ethics Committee an ethics grievance against respondent, alleging in addition to the criminal conviction respondent's ethical impropriety in having represented her in a matrimonial action and commencing an affair with her during that representation. The OAE did not conduct an investigation of the allegations contained in J.M.'s grievance but filed the Motion for Final Discipline only on the basis of respondent's criminal conviction for simple assault.

Page 459

Thus, our inquiry and examination is limited to the facts underlying that criminal conviction.

On February 1990, J.M. was referred to respondent by a battered women's shelter for advice on filing a domestic violence complaint against her then husband. J.M. decided not to file the complaint. She had no further contact with respondent until approximately one year later when she contacted respondent concerning a problem she was having at work. Respondent gave J.M. advice that he characterized as "a common sense approach and ... not ... legal advice per se."

Subsequently, a social relationship, which evolved into a sexual relationship, developed between respondent and J.M. On April 11, 1991, J.M. telephoned respondent. In hysterics, she related that her husband had taken her daughter and run off. Although respondent realized the impropriety of maintaining both a sexual and professional relationship with J.M., he indicated "my normal protective instincts kind of kicked in and I wanted to help her." Respondent accepted a retainer of $2,500 on April 19, 1991 and represented J.M. in custody and divorce proceedings. Respondent acknowledged that he continued seeing J.M. on an intimate basis through July 1991.

On August 2, 1991, respondent went to J.M.'s home. There, respondent admitted to yelling and using profanity. The Haddon Township Municipal Court found in addition that respondent overturned the mattress on which J.M. was sitting and, with J.M. pinned behind the mattress, "Mr. Principato lost control of himself, possibly because she was ending this relationship.... [H]e began to pummel her against the mattress, he never hit her skin directly, but he did pummel the mattress forcefully at least 10 or 15 times ... the matter lasted at least 10 seconds." The court found that although J.M. did not sustain serious injuries, she was in fear for her life, suffered pain, and suffered a scratch on her arm.

Respondent remained attorney of record for J.M.'s divorce action until the case was taken over by her new attorney in

Page 460

November 1991. However, respondent apparently took no further action on behalf of J.M. after August 2, 1991.

II

A criminal conviction is conclusive evidence of guilt in a disciplinary proceeding. R. 1:20-6(c)(1). Therefore, respondent's conviction of the disorderly persons offense of simple assault is clear and convincing evidence that he has violated RPC 8.4(b) (by committing a criminal act that reflects adversely on his honesty, trustworthiness, or fitness as a lawyer). The sole issue to be determined is the extent of discipline to be imposed. R. 1:20-6(c)(2)(ii); In re Lunetta, 118 N.J. 443, 445, 572 A.2d 586 (1989); In re Goldberg, 105 N.J. 278, 280, 520 A.2d 1147 (1987). In determining appropriate discipline, we consider the interests of the public, the bar, and the respondent. In re Litwin, 104 N.J. 362, 365, 517 A.2d 378 (1986). The primary purpose of discipline is not to punish the attorney but to preserve the confidence of the public in the bar. The appropriate discipline depends on many factors, including the "nature and severity of the crime, whether the crime is related to the practice of law, and any mitigating factors such as respondent's [655 A.2d 922] reputation, his prior trustworthy REDACTED and general good conduct." In re Lunetta, supra, 118 N.J. at 445, 446, 572 A.2d 586; In re Kushner, 101 N.J. 397, 400-01, 502 A.2d 32 (1986).

III

Although the assault itself was not related to respondent's legal practice, respondent assaulted his client. An attorney in his relations with a client is bound to the highest degree of fidelity and good faith. To the public he is a lawyer whether he acts in a representative capacity or otherwise. In re Gavel, 22 N.J. 248, 265, 125 A.2d 696 (1956). Public policy requires strict adherence to that rule. The fact that respondent was involved with his client in a sexual relationship exacerbates the problem. We have warned attorneys that sexual relationships with clients jeopardize

Page 461

the attorney-client relationship and have the strong potential to involve the attorney in unethical behavior. In re Liebowitz, 104 N.J. 175, 179, 516 A.2d 246 (1985). In that case we held that sexual misconduct with an assigned client warranted a public reprimand.

For the first time in this case and In re Magid, 139 N.J. 449, 655 A.2d 916 (1995), also decided today, we address the appropriate discipline to be imposed on an attorney who is convicted of domestic violence. In enacting the Prevention of Domestic Violence Act of 1991, N.J.S.A. 2C:25-17 to -33, the Legislature recognized that "domestic violence is a serious crime against society" that affects people "from all social and economic backgrounds and ethnic groups." N.J.S.A. 2C:25-18. The policy of New Jersey is "that violent behavior will not be excused or tolerated." N.J.S.A. 2C:25-18. Unlike many other "victimless" disorderly persons offenses, domestic violence offenses always involve victims, often-times vulnerable and defenseless. The public must be assured that the legal profession is concerned about domestic violence.

IV

To be admitted to the bar, an applicant "must possess a certain set of traits--honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the judicial process and the administration of justice." In re Matthews, 94 N.J. 59, 77, 462 A.2d 165 (1983). We described those traits as the fundamental norms that control the professional and personal behavior of attorneys. Ibid. Acts of domestic violence violate those fundamental norms.

There are few reported attorney ethics cases that involve acts of domestic violence. In re Nevill, 39 Cal.3d 729, 217 Cal.Rptr. 841, 704 P.2d 1332 (1985) (disbarring attorney who was convicted of voluntary manslaughter of his wife whom he shot ten times); In re Knight, 883 P.2d 1055 (Colo.1994) (holding that attorney's conviction of third-degree assault of his wife that arose from three days

Page 462

of severe beatings warranted six-month suspension); In re Wallace, 837 P.2d 1223 (Colo.1992) (imposing three-month suspension from practice of law on attorney who assaulted his girlfriend more than once and who on occasion entered plea of guilty to assault); In re Walker, 597 N.E.2d 1271 (Ind.1992) (imposing six-month suspension on part-time prosecutor for physically assaulting his former client/girlfriend and her daughter); In re Runyon, 491 N.E.2d 189 (Ind.1986) (disbarring attorney who forced entry into former wife's apartment, struck former wife with club, held her at gunpoint and who additionally was convicted of three felony counts of possession of unregistered firearms); Committee on Professional Ethics and Conduct of the Iowa State Bar Association v. Patterson, 369 N.W.2d 798 (Iowa 1985) (imposing three-month suspension from practice of law on attorney convicted of assault for severely beating his girlfriend for two hours while her four-year-old son was at home and aware of assault).

Respondents in the those cases all committed acts of domestic violence that resulted in serious bodily injury to the victim. Additionally, in Nevill, Knight and Wallace, there was a pattern of abusive behavior. Respondent's actions did not result in any physical injury to J.M., other than a scratch on her finger. Moreover, both the municipal court and the DRB found several mitigating factors. We agree. The municipal court observed that no serious harm was done; that [655 A.2d 923] respondent had no prior history of misconduct; that "the character and attitude of the defendant indicate he is unlikely to commit another offense"; and that there was no indication that respondent's representation of J.M. was adversely affected by their personal relationship. In fact, according to J.M.'s own testimony, respondent's legal representation of her was excellent.

The DRB in its Decision and Recommendation also acknowledged that there were mitigating factors:

First, respondent recognized that he used poor judgment in becoming personally involved with [J.M.]. He acknowledged his wrongdoing in assaulting [J.M.] and was contrite for what he had done. Second, his conduct was aberrational and is highly unlikely to recur. The Board is also mindful of the impact that the negative

Page 463

publicity generated by respondent's case has had on his career (See, e.g., exhibit C to OAE's brief). Moreover, the incident occurred nearly three years ago. The Board has taken these factors into account and has further considered respondent's previous unblemished ethics record.

New Jersey has a strong public policy against domestic violence. Respondent's assault on J.M., a particularly vulnerable client, referred to him by a battered women's shelter, was a serious violation of RPC 8.4(b). But for the fact that we have not previously addressed the appropriate discipline to be imposed on a lawyer who is convicted of an act of domestic violence, and that respondent's offense was an isolated incident and did not present a pattern of abusive conduct, respondent's discipline would be greater than the public reprimand we hereby impose. We caution members of the bar, however, that the Court in the future will ordinarily suspend an attorney who is convicted of an act of domestic violence.

We direct that respondent reimburse the Disciplinary Oversight Committee for administrative costs.

For public reprimand--Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN--7.

Opposed--None.

## ORDER

It is ORDERED that SALVATORE PRINCIPATO of CAMDEN, who was admitted to the bar of this State in 1983, is hereby publicly reprimanded; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.

**REDACTED**

**REDACTED**

Page 1271

## 597 N.E.2d 1271

## In the Matter of Max K. WALKER, Jr.

## No. 20S00-9006-DI-405.

## Supreme Court of Indiana.
## Aug. 21, 1992.

R. Michael Parker, Barnes & Thornburg, Elkhart, for respondent.

Shelden Breskow, Executive Secretary, Indiana Supreme Court Disciplinary Com'n, Indianapolis, for Indiana Supreme Court Disciplinary Com'n.

### DISCIPLINARY ACTION

PER CURIAM.

The Respondent, Max K. Walker Jr., was charged in a disciplinary complaint with violations of Rules 8.4(a), 8.4(b), 8.4(c), and 8.4(d) of the Rules of Professional Conduct for Attorneys at Law. The hearing officer appointed in this case tendered his findings of fact which were not challenged by the parties. He declined to reach a conclusion as to whether Respondent's conduct violated the Rules of Professional Conduct, which is the issue argued by the parties and now before us for determination.

The unchallenged findings establish that Respondent represented the grievant in her dissolution of marriage action which was concluded in December, 1982. Shortly thereafter, they developed a personal relationship which lasted until 1987 when it began to deteriorate.

On March 5, 1987, Respondent visited the grievant's home after having consumed several alcoholic beverages. They discussed their deteriorating relationship, which discussion evolved into an argument. The grievant asked Respondent to leave her house and walked into her bedroom, expecting him to leave. Instead, Respondent followed her into the bedroom. In the course of the ensuing argument, the grievant suggested that the Respondent should "go (and have sex)" with a woman with whom he had cocktails with earlier. Respondent then straddled the grievant, slapped her several times, and hit her in the face with a closed fist cutting her lip. As Respondent was leaving the residence, he forcibly took the telephone from and pushed the grievant's nine-year old daughter. The incident was reported to the police but the incident report was lost and was not introduced in evidence.

At the time of the incident, Respondent was Chief Deputy Prosecuting Attorney for Elkhart County. The prosecutor, who was also Respondent's law partner, advised the grievant that she had a right to a special prosecutor. She declined but requested that Respondent receive counselling, pay her medical bills, pay for her daughter's counseling and have no further contact with her. All of these requests were met. The incident was reported in the local press and Respondent received considerable publicity.

Respondent urges this Court to conclude that no professional misconduct occurred. His argument is that the physical altercation was the culmination of a private, adult relationship, and

that the battery "arose instantaneously" after provocation.

Page 1272

The circumstances presented by the findings reveal an act of domestic violence. This admittedly criminal conduct is not and did not remain a private matter. We are not persuaded by the claim of provocation, nor are we comforted by the fact that the grievant's daughter, also a victim of Respondent's conduct, recovered after some counselling sessions. Respondent's position as deputy prosecutor requires even stricter scrutiny of this conduct. As was stated in the Matter of Oliver (1986), Ind., 493 N.E.2d 1237, Respondent's duty to conform his behavior to the law does not arise solely out of his status as an attorney. As an officer charged with the administration of the law, Respondent's behavior has the capacity to bolster or damage public esteem for the system. Were those whose job it is to enforce the law break it instead, the public rightfully questions whether the system itself is worthy of respect. The damage this incident has undoubtedly brought to the public's esteem will be addressed only if Respondent is held accountable. We conclude that, as a prosecuting attorney, Respondent engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d).

Also, Respondent's conduct reflects upon his fitness as a lawyer and constitutes a violation of Rule 8.4(b). Not every violation of the penal code reflects upon an attorney's suitability as a practictioner. See, Matter of Oliver, Supra. The issue is whether there exists a nexus between the misconduct and the Respondent's duties to his clients, the courts, or the legal system. Matter of Oliver, supra. Another important assessment is the impact of the conduct on the public's perception of Respondent's fitness as a lawyer. Matter of Roche (1989), Ind., 540 N.E.2d 36. As a part-time prosecutor, Respondent inevitably encounters domestic assaults, and this incident calls into question his ability to zealously prosecute or to effectively work with the victims of such crimes. As a part-time practitioner, Respondent's effectiveness with his own clients or with adversaries in situations involving issues of domestic violence is compromised by his own contribution to this escalating societal problem. In both his capacities, we believe the perception of his fitness is tainted.

Finally, the findings do not support the Commission's allegation that Respondent committed acts of dishonesty, deceit, or misrepresentation, nor are we inclined to find as charged that Respondent violated Rule 8.4(a).

In assessing an appropriate sanction, we note that Respondent's violent outburst occurred after Respondent was asked to and expected to leave the grievant's home. Although not charged or prosecuted, Respondent's crime had two very real victims. Respondent's position as an official charged with the duty of enforcing the very laws he violated further exacerbates his actions.

In light of the foregoing, we find that the appropriate sanction is a suspension from the practice of law, and that Respondent's reinstatement should be automatic. It is, therefore, ordered that Max K. Walker, Jr. is suspended from the practice for a sixty-day period beginning September 21, 1992. Costs of this proceeding are assessed against the Respondent.

**REDACTED**

Page 798

## 369 N.W.2d 798

**COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Complainant,**
**v.**
**Stanford J. PATTERSON, Respondent.**

No. 84-1102.

Supreme Court of Iowa.

June 19, 1985.

Page 799

Frank A. Comito, Jr., and Patrick W. O'Bryan of Comito & Capps, Des Moines, for complainant.

Thomas W. Langlas of Gallagher, Langlas & Gallagher, P.C., Waterloo, for respondent.

Considered en banc.

REYNOLDSON, Chief Justice.

This is a disciplinary proceeding against an attorney, based on a serious misdemeanor conviction, "assault without intent to inflict serious injury but causing bodily injury contrary to ... section 708.2(2) of the Iowa Code." Although respondent Stanford J. Patterson entered an "Alford"-type guilty plea to this offense in Black Hawk County, there is little dispute concerning the circumstances surrounding the incident.

Respondent is a forty-nine-year-old solo practioner in Waterloo. In the fall of 1983 he met Debra Herman, age twenty-nine, when they both enrolled in a concealed weapons class at Hawkeye Institute of Technology in Waterloo. Debra was estranged from her husband; respondent and his wife recently had concluded a bitter dissolution proceeding. Respondent and Debra soon became romantically involved. When she decided to file for marital dissolution, respondent agreed to represent her and filed the action in her behalf.

On the evening of January 31, 1984, Debra had a dinner date with her husband to discuss ways of communicating about Jason, their four-year-old son who lived with Debra. The latter, apparently concerned about respondent's reaction, told him she would be with a girl friend. After dinner Debra picked up Jason at her mother's home and returned to her own house.

Respondent, using a key Debra had provided and following an established custom, was already in the home and waiting in Debra's bedroom when she put Jason to bed. When she entered the bedroom at about 10 p.m. respondent asked Debra where she had been, although he already had called her girl friend and found Debra was not with her. When Debra told respondent that she had been with her husband, he immediately began striking her and tore off her clothes. This abuse lasted approximately two hours. Jason, aroused, attempted to enter his mother's bedroom but respondent had locked the door. He ordered Debra to tell Jason to go back to bed.

Jason then attempted to call his father or the police from the kitchen telephone, but the telephone in Debra's room was off'the hook. Photographs of Debra taken the following day show a badly disfigured and battered woman, a dramatic testimonial to respondent's eighteen-month instruction in the martial arts.

At about 1 a.m. respondent began to apply cold compresses to minimize Debra's swelling and bruises, and carried her to the bathroom because she could not walk as a result of the beating. Respondent and Debra testified he offered to take her from the community until she recovered, and at another time offered to take her to the hospital. He stayed throughout the night, occasionally checking Debra's pulse and temperature. Respondent consistently has denied any recollection of his actions during the two-hour incident.

In the morning when Jason's sitter came to pick him up, Debra accompanied him from the house and then left in her own car, wearing only a coat over her pajamas and a towel around her head. She went to her mother's home. The latter insisted Debra go to the hospital, and, apparently without Debra's knowledge, called the police. At the hospital the police interviewed and photographed Debra. Debra testified she had never told her family of her relationship with respondent, but later she did tell the police.

Meanwhile, respondent left the state and drove to Mayo Clinic, Rochester, Minnesota, where it appears he was examined or treated by a psychiatrist for three days on an outpatient basis. He took from Waterloo the clothing he had torn off Debra and destroyed it there. The day following the incident, after Debra returned home,

Page 800

respondent called her several times from Minnesota, wanting "to talk." Debra testified she had a telephone conversation with respondent on February 2, at which time she reported she was "being hounded by the police" for a written statement. Respondent provided her with the names of two lawyers, one of whom she retained.

Subsequently Debra refused to answer questions at a county attorney's examination, and was confined briefly to jail for contempt. At the same time the court appointed other counsel who persuaded her to respond to the questions.

Trial information was filed against respondent February 8, 1984. Respondent and Debra were married March 8, 1984. June 8, 1984, he entered his guilty plea to the charges. Thereafter Debra initiated dissolution proceedings against respondent. The decree was entered November 19, 1984, shortly before the November 29 hearing in this proceeding.

The complaint filed by the Committee on Professional Ethics and Conduct of the Iowa State Bar Association, alleged

[t]hat the acts and conduct of Respondent in violation of the Criminal Code of the State of Iowa, and the aforesaid conviction itself, constitute violations of the following

(a) Section[s] 602.10122(3) and 602.10122(4) of the Iowa Code; REDACTED

(b) EC 1-5;

(c) DR 1-102(A)(1), (5) and (6);

(d) EC 9-1;

(e) EC 9-2; and

(f) EC 9-6 of the Iowa Code of Professional Responsibility for Lawyers.

The Grievance Commission (commission) found a violation of EC 1-5 only, and recommended a reprimand. We suspend respondent's license to practice law indefinitely with no possibility of reinstatement for three months.

I. The principles we apply in these proceedings were reviewed recently Committee on Professional Ethics and Conduct v. Shuminsky, 359 N.W.2d 442, 444-45 (Iowa 1984):

We review the record made before the commission de novo. We give respectful consideration to the commission's findings and recommendations although they are not binding on us. If we find the complainant has established the charges by a convincing preponderance of the evidence, we impose an appropriate sanction, considering not only the respondent's fitness to practice law, but the need to deter others from similar conduct and assure the public that courts will uphold the ethics of the legal profession. Complainant need not prove respondent was acting as a lawyer at the time of the alleged misconduct; lawyers do not shed their professional responsibility in their personal lives.

(Citations omitted.)

Iowa Code section 602.10122(3) provides that the license of an attorney may be suspended or revoked upon the ground he or she has committed "[a] willful violation of any of the duties of an attorney ... as hereinbefore prescribed." One of those duties is "[n]ot to encourage either the commencement or continuance of an action or proceeding from any motive of passion or interest." Iowa Code § 602.10112(6). We are not required here to determine whether this attorney who assaulted his dissolution action client because she went to dinner with her husband encouraged the continuance of the action from a motive of passion. Adequate ground for the discipline we impose exists within the Code of Professional Responsibility for Lawyers.

In Iowa the ethical considerations do more than illuminate the disciplinary rules; in this jurisdiction a violation of an ethical consideration alone is sufficient to support discipline. Shuminsky, 359 N.W.2d at 445; Committee on Professional Ethics and Conduct v. Millen, 357 N.W.2d 313, 314-15 (Iowa 1984).

EC 1-5 provides:

A lawyer ... should refrain from all illegal and morally reprehensible conduct. Because of his position in society, even minor violations of law by a lawyer may tend to lessen public confidence in

Page 801

**REDACTED**

the legal profession. Obedience to law exemplifies respect for law. To lawyers especially, respect for the law should be more than a platitude.

A portion of the above concept finds a place in EC 9-6:

Every lawyer owes a solemn duty ... to encourage respect for the law....

Paraphrasing what we wrote Committee on Professional Ethics and Conduct v. Bromwell, 221 N.W.2d 777, 779 (Iowa 1974), when those licensed to operate the law's machinery knowingly violate essential criminal statutes, there inexorably follows an intensified loss of lay persons' respect for the law.

II. We find respondent's two-hour assault on an unresisting female constitutes a violation of EC 1-5 and EC 9-6. Based on the duration of the beating, respondent's intermittent "discussions" with Debra, coupled with his demands she divert her interceding son, we are convinced that respondent was fully conscious of what he was doing. There is little beyond his own contentions, and no professional opinion, to support respondent's claim that he lost his reason and has no recollection of the event. He stands convicted of a serious misdemeanor.

In our view, respondent's conduct is fully as morally reprehensible as accepting gifts in violation of a federal statute limiting attorney fees, Committee on Professional Ethics and Conduct v. Christoffers, 348 N.W.2d 227, 229-30 (Iowa 1984); having possession of marijuana and amphetamines, Shuminsky, 359 N.W.2d at 445; or making obscene telephone calls, Committee on Professional Ethics and Conduct v. Floy, 334 N.W.2d 739, 740 (Iowa 1983). Committee on Professional Ethics and Conduct v. Wilson, 270 N.W.2d 613, 615 (Iowa 1978).

Nor, in the circumstances of this case, can we agree with the commission's finding that respondent's conduct did not involve moral turpitude.

The term "moral turpitude" has been used in the law for centuries. It has been the subject of many decisions by the courts but has never been clearly defined because of the nature of the term. Perhaps the best general definition of the term "moral turpitude" is that it imports an act of baseness, vileness or depravity in the duties which one person owes to another or to society in general, which is contrary to the usual, accepted and customary rule of right and duty which a person should follow.

Committee on Legal Ethics v. Scherr, 149 W.Va. 721, 726-27, 143 S.E.2d 141, 145 (1965). Respondent's conduct, under the facts disclosed by this record and modern day social mores, clearly met the above definition.

It is ordered that respondent's license to practice law should be suspended indefinitely with no possibility of reinstatement for three months. This suspension shall apply to all facets of the practice of law. See Iowa Sup.Ct.R. 118.12. Upon application for reinstatement, respondent shall have the burden to prove that he has not practiced law during the period of suspension and that he meets the requirements of supreme court rule 118.13.

LICENSE SUSPENDED.

**REDACTED**

654

### IN THE UNITED STATES DISTRICT COURT FOR THE

### EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

### REDACTED EXHIBIT 157

### TO KENNETH EUGENE BARRETT'S

### SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

654

**INFORMATION**

================================================================

### IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. CF-97-9 |
| | ) | |
| **CHARLES EDMOND SANDERS** | ) | |
| DOB: ██████66 | ) | |
| DL/SS# ████████9539 | ) | |
| Defendant. | ) | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN - 7 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

### I N F O R M A T I O N

## IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CHARLES EDMOND SANDERS did, in Sequoyah County, and in the State of Oklahoma, before the presentment hereof, commit the crime of

COUNT I: KNOWINGLY CONCEALING STOLEN PROPERTY-21 O.S. 1713
That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did unlawfully, wilfully, knowingly, and feloniously conceal from Raymond Keith, certain personal property of value, to-wit: checks #2880 and #2891, that had prior thereto been stolen from the said Raymond Keith, the said defendant knowing or reasonably should have believed that said property was stolen did then and there unlawfully conceal and withhold said property from the owner thereof, with the felonious intent to deprive said owner thereof,

COUNT II: UTTERING A FORGED INSTRUMENT-21 O.S. 1592
CHARLES EDMOND SANDERS unlawfully, willfully, knowingly, fraudulently and feloniously with intent to defraud, utter and publish as true to one John Speir, of Mazzio's Pizza a certain instrument, to-wit: a check, which is in words and figures as follows: Check #2880 in the amount of $25.00; that said defendant then and there knowing at the time that said written instrument was forged and counterfeited, and that the signature of Raymond Keith to said instrument was forged and counterfeited, but said defendant did then and there unlawfully, willfully, fraudulently and feloniously, utter and publish same with the felonious intent then and there on the part of said defendant to beat, cheat and defraud,

COUNT III: UTTERING A FORGED INSTRUMENT-21 O.S. 1592
CHARLES EDMOND SANDERS unlawfully, willfully, knowingly, fraudulently and feloniously with intent to defra**REDACTED** and publish as true to one Oyne McGinnis, of Short Stop Foods a certain instrument, to-wit: a check, which is in words and figures as follows: Check #2891 in the amount of $27.63; that said defendant then and there knowing at the time that said written instrument was forged and counterfeited, and that the signature of Raymond Keith to said instrument was forged and counterfeited, but said defendant did then and there unlawfully, willfully, fraudulently and feloniously, utter and publish same with the felonious intent then and there on the part of said defendant to beat, cheat and defraud,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

By _____
        Assistant District Attorney

STATE OF OKLAHOMA )
                  )  ss.
COUNTY OF SEQUOYAH)

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

Subscribed and sworn to before me this _____ day of January, 1997.

My Commission Expires:
_____

                                    NOTARY PUBLIC

WITNESSES:
Raymond Keith
John Speir
Oyne S. McGinnis
Robert Young
Terry Franklin                Sallisaw, OK
                              Sallisaw, OK
                              Alma, AR
                              Sallisaw, OK
          Sallisaw Police Dept., Sallisaw, OK

**REDACTED**

656

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA


THE STATE OF OKLAHOMA,
                    PLAINTIFF,


vs.                                             NO. CF-97-9


   Charles Edmond Sanders   ,
                    DEFENDANT,

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN - 7 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY


## A F F I D A V I T


STATE OF OKLAHOMA   )
COUNTY OF SEQUOYAH ) ss.

   Terry Franklin   , OF LAWFUL AGE AND BEING FIRST DULY
SWORN UPON OATH, DEPOSES AND SAYS:

   See attached Affidavit.


BASED ON THIS INFORMATION, THE UNDERSIGNED PRAYS THAT THIS
HONORABLE COURT ISSUE A FINDING OF FACT THAT PROBABLE CAUSE
EXISTS TO BELIEVE THAT A CRIME HAS BEEN COMMITTED AND THAT THERE
IS PROBABLE CAUSE TO BELIEVE THE DEFENDANT(S) ABOVE NAMED
COMMITTED THAT CRIME.   REDACTED

3 cts KCSP
   FURTHER SAYETH NOT.   3 cts Uttering a Forged Instrument

_____ SPD #13

   SUBSCRIBED AND SWORN TO BEFORE ME THIS 13th DAY OF
December, 199<u>6</u>.

MY COMMISSION EXPIRES:
3-23-2000                    NOTARY PUBLIC


                    FINDING OF PROBABLE CAUSE

   THE UNDERSIGNED JUDGE OF THIS COURT, UPON SWORN TESTIMONY
AND/OR AFFIDAVIT, HEREBY DETERMINES THERE TO BE PROBABLE
CAUSE TO DETAIN THE DEFENDANT(S).
   DATED THIS ___6___ DAY OF ___January___, 1997.

                    _____
                    JUDGE OF THE DISTRICT COURT


657

Victim (A)    Raymond Keith had his checks stolen from his residence on December 7, 1995. Report was taken by Sequoyah County Sheriff's Office, case number 12-2695.

Victim (B)    Mazzio's Pizza, ███████████████ Sallisaw, OK, phone number is 775-██████ They called the Police Department on November 18, 1996 at approximately 2300 hours to make a report of a stolen check that they had taken for a pizza. The manager said his driver, John Speirs (Witness A) brought him the check. It was not filled out and it was dated 11-16-96 for $25.00 check number was 2880. The account number was 618████ The name on the check was Raymond L. Keith. Mr. Speir said he received this check from the Downtown Apartments, Apt 220 C & D for payment of a pizza that he delivered with a $6.00 tip. Mr. Speirs was shown a photo line up in which he identified the defendant, Charles Edmond Sanders as the person who gave him the Raymond Keith check.

Victim (C)    Short Stop Foods Stores, ██████████████Sallisaw, OK. Phone number 775-█████ On 12-5-96 Short Stop came into the Police Department to file a forged check report. Donna King who is an employee for the Short Stop reported it. The check was taken on November 19, 1996 in the afternoon hours. The check was a personal check on Raymond Keith, account number 618████ Check number 2891 in the amount of $27.63. She said a clerk said Oyne S. Mcginnis (Witness B) took the check and he could identify the person. Oyne McGinnis, the clerk had wrote down the name of Robert Young who was with the guy he took the check from he said. I then talked to Robert Young. Robert Young said he knew the guy and would stand good for the check and so he took the check because Robert Young was a good customer. I read a taped narrative where Sergeant Doug Hodge had talked to Robert Young for me. Mr. Young said that Charles Edmond Sanders, also known as Monk Sanders was the one that wrote the check at the Short Stop and that he didn't know that Sanders was writing it on somebody else's account and that he did say that he would stand good for it but he wasn't aware that it wasn't on Charles Monk Sanders' account.

Victim (D)    Full Moon Cafe, █████████████Sallisaw, OK. Phone number 775-█████ Mr. Bounmy Sayasowe said someone from Downtown Apartment brought a personal check into his restaurant on 11-19-96. The check was a Raymond Keith check account number 618█████ check number 2888 for $15.00 and that it came back stolen, account closed.

Mr. Raymond Keith did not give anyone permission to write or cash any of these checks.

CHARLES EDMOND SANDERS
P.O. BOX 118, MARBLE CITY, OK
DOB: ████66   #████9539                    Case No. CF-97-9
Caucasian:Male

# WARRANT

STATE OF OKLAHOMA,
COUNTY OF SEQUOYAH—ss.

THE STATE OF OKLAHOMA, to any Sheriff, Constable, Marshal or Policeman in the above named County and State:

Information upon oath having been this day laid before me that the crime of _____
KCSP/UTTERING FORGED INSTR (2 COUNTS)
_____ has been committed, and

accusing ____Charles Edmond Sanders_____ thereof.

You are therefore commanded forthwith to arrest the above named ____Charles Edmond Sanders

and bring h__im___ before me at _____Sallisaw, OK_____.

or, in the case of my absence or inability to act, before the nearest or most accessible magistrate in this county.

Dated at _____, this _____6ᵗʰ_____ day of ___January___, 19 97.

_____
Judge of the District Court.

The Defendant is to be admitted
to bail in the amount of __$5,000.⁰⁰__

REDACTED

MERRILL BONDING COMPANY
210 EAST CHICKASAW
SALLISAW, OKLA. 74955

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 2 1 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

DATE:    February 21, 1997

To:      District Court - Sequoyah County

FROM:    Raymond Merrill - Executing Bail Bondsman

RE:      Varification of Responsiblity

This is to verify that Raymond Merrill, d/b/a Merrill Bonding Company, agrees to allow the $10,000.00 Bond in Misdemeanor - Case # CM-96-444, State v Charles Sanders, Also, Liable for Felony - Case # CF-97-9, State v Charles Sanders.

RAYMOND MERRILL - BAIL BONDSMAN

Accepted and approved,

Feb 21, 1997

Judge of the District Court

**REDACTED**

CHARLES EDMOND SANDERS
P.O. BOX 118, MARBLE CITY, OK
DOB: ███66  #█████9539
Caucasian:Male

Case No. CF-97-9

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

# WARRANT

FEB 26 1997

STATE OF OKLAHOMA,
COUNTY OF SEQUOYAH—ss.

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

THE STATE OF OKLAHOMA, to any Sheriff, Constable, Marshal or Policeman in the above named County and State:

Information upon oath having been this day laid before me that the crime of _____
KCSP/UTTERING FORGED INSTR (2 COUNTS)
-------------------------------------------------------------------- has been committed, and

accusing _____ Charles Edmond Sanders _____ thereof.

You are therefore commanded forthwith to arrest the above named ____ Charles Edmond Sanders ____

and bring h__im__ before me at _____ Sallisaw, OK _____

or, in the case of my absence or inability to act, before the nearest or most accessible magistrate in this county.

Dated at _____, this ____6ᵗʰ____ day of ____January____, 19 97.

The Defendant is to be admitted
to bail in the amount of $5,000.00

_____
Judge of the District Court.

661

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH—ss:

I, _____

in and for the above named county, hereby certify that I have served the within warrant upon the within

named at _____ in the County of _____, said State of Oklahoma, by then

and there taking h _____ into possession, and then I carried h _____ before _____

for the purpose of making bond, and upon h_____

_____

**FEES FOR SERVICE**

For serving Warrant — — — — $_____

For mileage — — — — — — $_____        _____

For committing to jail — — — $_____

For making bond — — — — — $_____   By _____*Frank L Dixon*_____ Deputy

TOTAL — — — — $_____

No._____

## WARRANT

THE STATE OF OKLAHOMA

vs.

Defendant_____

Returned and filed this _____ day of _____, 19____,

_____
Judge of the District Court.

WARRANT CLEARANCE

WARRANT #CF97-9

WARRANT NAME: CHARLES EDMOND SANDERS

DATE & TIME CLEARED: FEBRUARY 25, 1997 AT 1:10 P.M.

WARRANT CLEARED BY:

   ARREST__X__   OFFICER SERVING: FRANK HIXON

               AGENCY: SEQUOYAH COUNTY SHERIFF'S OFFICE

   CANCELLATION_____   JUDGE OR OFFICIAL DIRECTING WARRANT CANCELLATION

             _____

WARRANT PULLED FROM FILE     YES__X__  NO_____   IF NO, EXPLAIN WHY NOT

_____

WARRANT CANCELLED FROM NCIC    YES_____   NO__X__   IF YES, NCIC

                             CANCELLATION NUMBER_____

                             IF NO, EXPLAIN WHY NOT REMOVED

NOT ENTERED N.C.I.C.

SHERIFF'S OFFICE EMPLOYEE SIGNATURE *Pamela Lea Crutchfield*
                                   MUST SIGN FULL NAME

NOTE:   AFTER COMPLETION, ATTACH THIS FORM TO THE CANCELLED OR SERVED
         WARRANT. BE SURE TO ATTACH THIS FORM BACK TO BACK WITH THE
         WARRANT.

**REDACTED**

663

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
**FILED**
IN DISTRICT COURT

FEB 26 1997

BERNELL EDWARDS, COURT CLERK

BY _____ DEPUTY

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CF-97-9 |
| | ) | |
| CHARLES EDMOND SANDERS, | ) | |
| Defendant. | ) | |

## MOTION TO PRODUCE EXCULPATORY EVIDENCE

COMES NOW Charles Edmond Sanders, Defendant herein, by and through his attorney, William H. Dodson Sr. and hereby moves the Court to Order the District Attorney to produce all evidence favorable to Defendant in this case as mandated by the due process clause of the United States Constitution. Brady v Maryland, 373 U.S. 83 (1963).

1.      The Defendant would respectfully submit that the specific items mentioned are material because they would be admissible and relevant to the issue of guilt or degree of punishment. Further, there exists a reasonable possibility that such disclosure could affect the result of this prosecution or punishment and cause it to be different in outcome. Further, failure to disclose the items requested will cause both Counsel to be mislead in the investigation and defense of this case. Defendant respectfully and specifically requests the following:

2.      All statements by any witnesses that have been given to any law enforcement agency or District Attorney in this case. Further, all statements by possible witnesses who were, at any time, unable to positively identify the Defendant in any manner or at any time.

3.      All reports, tests or opinions, including internal memoranda of any police department or law enforcement agency or the District Attorney's Office concerning tangible evidence that has been lost or destroyed while in the custody of any office, and that would have had relevance in the present prosecution.

4.      All reports relating to any polygraph examination administered to any possible witness for the state.                **REDACTED**

Page One of Three

664

5.    All documents and reports regarding the physical or mental disease or disorder affecting any individual the State intends to call as a witness in the present case.

6.    All information that is arguably exculpatory through its use as impeachment of possible State witnesses, including, but not limited to, the prior criminal convictions of each witness, copies or summaries of any prior and arguable inconsistent statement of such witnesses concerning this prosecution, promises of leniency or reward by the State, and any other matter which would have relevance to the general credibility of such witnesses.

7.    All facts, information, written statements, tapes, videos and other recorded material, electronic or written, of questioning and interrogation of the Defendant from the State's initial contact with the Defendant until the conclusion of the interrogation or series of interrogation sessions.

8.    All material now known to the State, or which may become known, or which through due diligence may be learned from the investigating personnel or witnesses in this case, which is arguably exculpatory in nature or favorable to the accused, or may lead to arguably exculpatory material.  Further, if subsequent to compliance with these requirements or Orders pursuant thereto, the District Attorney or his agents discover additional material or information is discovered during the trial, the Court shall also be notified of the discovery of such evidence.

WHEREFORE, premises considered, the Defendant respectfully prays that the Court Order the State to disclose the items hereinabove set forth.

CHARLES EDMOND SANDERS,
Defendant.

by:    _____
William H. Dodson Sr   OBA #2397
Attorney at Law
P.O. Box 682
Sallisaw, Oklahoma  74955
(918) 775-3033

**REDACTED**

Page Two of Two

## CERTIFICATE OF DELIVERY

This is to certify that on the 26 day of February, 1997 a true and correct copy of the above and forgoing document was hand delivered to:

The Office of the District Attorney
Sequoyah County Courthouse
120 East Chickasaw
Sallisaw, Oklahoma  74955

*[signature]*

**REDACTED**

Page Three of Three

## IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CF-97-9 |
| | ) | |
| CHARLES EDMOND SANDERS, | ) | |
| Defendant. | ) | |

SEQUOYAH COUNTY, OKLAHOMA
**FILED**
IN DISTRICT COURT

FEB 2 6 1997

BERNELL EDWARDS, COURT CLERK

BY _____DEPUTY

## <u>DEMURRER</u>

COMES NOW Charles Edmond Sanders,, Defendant herein, and demurs to the information filed herein and moves the Court to dismiss this cause pending against said Defendant, and in support thereof, alleges and states:

I.

That this Court has no jurisdiction of the person of this Defendant or of the subject matter of this action;

II.

That the information herein is vague, indefinite and duplicitous and not substantially clear or in ordinary and concise language which could be in such a manner as to enable a person of common understanding to know what is intended;

III.

That the information wholly fails to state an offense, with such a degree of certainty, so as to enable the Court to pronounce judgment upon a conviction of the case;

IV.

That said information does not contain allegations of sufficient facts to constitute the basis of the crime charged or of any other criminal violation of the laws of the State of Oklahoma;

V.

That the facts stated in the information do not state facts sufficient to constitute a cause of action against said Defendant;

**REDACTED**

VI.

That said information does not substantially conform to the provisions of the laws and statutes of the State of Oklahoma;

WHEREFORE, said Defendant prays that his demurrer be sustained; that the information filed against said Defendant be dismissed and said Defendant be granted such other and further relief as to which the Defendant may be entitled and which the Court deems fair, just, equitable, proper and right.

AUTHORITY:

22 OS 401 et seq.
22 OS 493
22 OS 504 et seq.

CHARLES EDMOND SANDERS,
Defendant

William H. Dodson Sr.
Attorney at Law
P.O. Box 682
Sallisaw, Oklahoma 74955
(918) 775-3033

## CERTIFICATE OF DELIVERY

This is to certify that a true and correct copy of the above and forgoing Demurrer was hand delivered this 26 day of February, 1997 to:

Office of the District Attorney
Sequoyah County Courthouse
120 East Chickasaw
Sallisaw, Oklahoma 74955

**REDACTED**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA,<br>Plaintiff, | )<br>)<br>) | |
| vs. | )<br>) | CF-97-9 |
| CHARLES EDMOND SANDERS,<br>Defendant. | )<br>)<br>)<br>) | |

SEQUOYAH COUNTY, OKLAHOMA
**FILED**
IN DISTRICT COURT

FEB 2 6 1997

BERNELL EDWARDS, COURT CLERK

BY _____ DEPUTY

## MOTION FOR DISCOVERY

COMES NOW Charles Edmond Sanders, Defendant herein, by and through his Attorney, William H. Dodson Sr., and moves the Court to Order the State to disclose the following:

1.      The names and addresses of witnesses, together with their respective oral, written or recorded statement, or summaries of same. Allen v District Court, 803 P.2d 1164 (Okla. 1990). 22 OS Section 2001, et seq.

2.      All law enforcement reports made in connection with this case. 22 OS Section 2001, et seq.

3.      All sworn statements of persons having knowledge of the alleged criminal offense that have been obtained by the District Attorney's Office, any peace officer or any other entity privy to the District Attorney. 22 OS 749.

4.      Any reports or statements made by experts in connection with this particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons. Allen v District Court, supra. 22 OS Section 2001, et seq.

5.      Any written or recorded statements and the substance of any oral statements made by the accused. Allen v District Court, supra. 22 OS Section 2001 et seq.

6.      All tape recordings and stenographic transcriptions of any statements, or alleged admissions or confessions made by the Defendant. Watts v State, 487 P.2d 981 (Okla. 1971).                    **REDACTED**

Page One of Three

669

7.    Any books, papers, documents, photographs, tangible objects, buildings, or places which the prosecuting attorney intends to use in the hearing or trial or which were obtained from or belong to the accused.  <u>Allen v District Court</u>, supra.  22 OS Section 2001 et seq.

8.    A detailed description of and access to all forms of tangible evidence in the custody of the District Attorney, State or private laboratories or police departments. <u>Allen v  District Court</u>, supra.

9.    Any record of prior criminal convictions of the Defendant.  <u>Allen v District Court</u>, supra. 22 OS Section 2001, et seq.

10.    OSBI or FBI rap sheet/record check on any witnesses listed by the State or the Defense as possible witnesses who will testify at trial.  <u>Allen v District Court</u>, supra.

11.    Copies of any photographs to be used by the prosecution.  <u>Stafford v District Court</u>, 593 P.2d 797 (Okla. 1979); <u>State, ex rel Fallis v Truesdell</u>, 493 P.2d 1134 (Okla. 1972).

12.    Any and all written statement, oral statements or recordings of any other persons interviewed by the State or its agents which are inconsistent with an earlier statement or which are inconsistent with a statement made by any other person interviewed by the State or its witnesses.  <u>U.S. v Rutkin</u>, 212 F.2d 641 (3rd Cir. 1954).

13.    The nature, date and place of any criminal offense or acts of misconduct, other than those charged in the present information, which the State will offer for impeachment purposes and attempt to disprove good character or reputation of the Defendant.  <u>Burks v State</u>, 594 P.2d 771.

14.    Any and all consideration or promises of consideration given to any witness for the State or its attorney, referring to absolutely anything of value or use, including but not limited to immunity, witness fees, assistance to members of witnesses families or associates, assistants or favorable treatment with respect to any criminal action, and anything else which would create an interest or bias in a witness in favor of the State. <u>King v United States</u>, 419 U.S. 18 (1974).

15.    All diagrams, sketches and pictures which have been made by any witness or prospective witness in the case.

16.    A detailed description of, and access to, all physical items other than those specifically set out above which the District Attorney anticipates using as evidence in this proceeding.

<div align="center">Page Two of Three</div>

CHARLES EDMOND SANDERS,
Defendant.

By: _____

William H. Dodson Sr.   OBA #2397
Attorney at Law
P.O. Box 682
Sallisaw, Oklahoma  74955
(918) 775-3033

## CERTIFICATE OF DELIVERY

This is to certify that a true and correct copy of the above and forgoing instrument was was hand delivered this _26_ day of February, 1997 to:

The Office of the District Attorney
Sequoyah County Courthouse
120 East Chickasaw
Sallisaw, Oklahoma  74955

_____

**REDACTED**

Page Three of Three

## IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA,<br>Plaintiff, | )<br>)<br>) | |
| vs. | ) | CF-97-9 |
| | ) | |
| CHARLES EDMOND SANDERS,<br>Defendant. | )<br>)<br>) | |

SEQUOYAH COUNTY, OKLAHOMA
**FILED**
IN DISTRICT COURT

FEB 2 6 1997

BERNELL EDWARDS, COURT CLERK

BY _____ DEPUTY

### MOTION TO QUASH

COMES NOW Charles Edmond Sanders, Defendant herein, by and through his attorney, William H. Dodson Sr., and moves the Court to quash the information filed herein, and to further quash said Defendant's arrest on this charge for the following reasons, to-wit:

#### I.

That said information is not found, endorsed, presented or filed as prescribed by law;

#### II.

That the evidence had by the State in support of said information is totally and wholly insufficient to sustain the allegations set forth in said charge;

WHEREFORE, Defendant prays that this Motion to Quash be sustained; that the Defendant's arrest be held inviolate; that the evidence taken from the search of this Defendant and the premises where this Defendant was arrested be suppressed; that the evidence taken from the interrogation of this Defendant in violation of said Defendant's constitutional and statutory rights be suppressed; that this charge be dismissed and the Defendant be granted such other and further relief as to which said Defendant may be entitled and which the Court deems fair, just equitable, proper and right.

AUTHORITY:

22 OS 401 et seq.
22 OS 493

### REDACTED

672

CHARLES EDMOND SANDERS,
Defendant

William H. Dodson Sr.   OBA #2397
Attorney at Law
P.O. Box 682
Sallisaw, Oklahoma  74955
(918) 775-3033

## CERTIFICATE OF DELIVERY

This is to certify that a true and correct copy of the above and forgoing Motion to Quash was hand delivered this _26_ day of February, 1997, to:

Office of the District Attorney
Sequoyah County Courthouse
120 East Chickasaw
Sallisaw, Oklahoma  74955

**REDACTED**

673

**"AMENDED"**
**INFORMATION**
================================================================

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA )
       Plaintiff, )
vs. )       **No. CF-97-9**
 )
**CHARLES EDMOND SANDERS** )
**DOB:**▮▮▮▮**66** )
**DL/SS#**▮▮▮▮▮**9539** )
       Defendant. )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 0 4 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**"AMENDED"**
**I N F O R M A T I O N**

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:**

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CHARLES EDMOND SANDERS did, in Sequoyah County, and in the State of Oklahoma, before the presentment hereof, commit the crime of

COUNT I: KNOWINGLY CONCEALING STOLEN PROPERTY-21 O.S. 1713
That on the 18th day of November, 1996, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did unlawfully, wilfully, knowingly, and feloniously conceal from Raymond Keith, certain personal property of value, to-wit: checks #2880 and #2891, that had prior thereto on the 7th day of December, 1995, been stolen from the said Raymond Keith, the said defendant knowing or reasonably should have believed that said property was stolen did then and there unlawfully conceal and withhold said property from the owner thereof, with the felonious intent to deprive said owner thereof,

COUNT II: UTTERING A FORGED INSTRUMENT-21 O.S. 1592
That on the 18th day of November, 1996, CHARLES EDMOND SANDERS unlawfully, willfully, knowingly, fraudulently and feloniously with intent to defraud, utter and publish as true to one John Speir, of Mazzio's Pizza a certain instrument, to-wit: a check, which is in words and figures as follows: Check #2880 in the amount of $25.00; that said defendant then and there knowing at the time that said written instrument was forged and counterfeited, and that the signature of Raymond Keith to said instrument was forged and counterfeited, but said defendant did then and there unlawfully, willfully, fraudulently and feloniously, utter and publish same with the felonious intent then and there on the part of said defendant to beat, cheat and defraud,

COUNT III: UTTERING A FORGED INSTRUMENT-21 O.S. 1592
That on the 19th day of November, 1996, CHARLES EDMOND SANDERS unlawfully, willfully, knowingly, fraudulently and feloniously with intent to defraud, utter and publish as true to one Oyne McGinnis, of Short Stop Foods a certain instrument, to-wit: a check, which is in words and figures as follows: Check #2891 in the amount of $27.63; that said defendant then and there knowing at the time that said written instrument was forged and counterfeited, and that the signature of Raymond Keith to said instrument was forged and counterfeited, but said defendant did then and there unlawfully, willfully, fraudulently and feloniously, utter and publish same with the felonious intent then and there on the part of said defendant to beat, cheat and defraud,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

By_____
Assistant District Attorney

674

STATE OF OKLAHOMA )
) ss.
COUNTY OF SEQUOYAH)

   Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

        Subscribed and sworn to before me this _28th_ day of February, 1997.

My Commission Expires:

_6/28/99_

                    NOTARY PUBLIC

WITNESSES:
Raymond Keith
John Speir
Oyne S. McGinnis
Robert Young
Terry Franklin

Sallisaw, OK
, Sallisaw, OK
Alma, AR
Sallisaw, OK
Sallisaw Police Dept., Sallisaw, OK

**REDACTED**

675

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY

STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 1 6 1997

State of Oklahoma

                                   Plaintiff

vs.

Charles E. Sanders

                                  Defendants

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

No. CF 97 9
CF 97 75
CF 97 140
CM 96 444

## ORDER FOR HEARING

MOTION TO WITHDRAW AS ATTORNEY

having been ( filed ~~serxxxreset~~ )                 in the above styled cause by the

( Court   Plantiff   Defendant ) _____

IT IS ORDERED that the same be, and is hereby, set for hearing before the undersigned,

Judge, _____ Hon. Dennis M. Sprouse _____, at __9:00 a.m.__,

on the __16th__ day of __October__, 19__97__.

_____
Judge of the District Court

### CERTIFICATE OF SERVICE

I hereby certify that on the _____16_____ day of _Sept_____, 19_97_

I mailed a true, correct and exact copy of this Order to:

Bill Dodson
Box 682
Sallisaw, OK            **REDACTED**

DA
120 E. Chickasaw
Sallisaw, OK

Charles E. Sanders
c/o Evelyn Sanders
▇▇▇▇▇▇▇▇
Sallisaw, OK

with proper postage thereon fully prepaid.

By _____
Clerk for Judge of the District Court

676

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CF-97-9 |
| | ) | |
| CHARLES EDMOND SANDERS, | ) | |
| Defendant. | ) | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 1 2 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## MOTION TO WITHDRAW AS ATTORNEY OF RECORD

COMES NOW William H. Dodson Sr., attorney for Charles Edmond Sanders, and Moves the Court to enter an Order allowing counsel to withdraw from representation of the Defendant for the following reasons:

1.    Failure to pay attorney fees.

2.    Failure to maintain contact with the attorney.

3.    Failure to acknowledge advice of the attorney.

4.    Failure to abide with agreements made in this matter.

WHEREFORE, premises considered, counsel requests that the Court enter an Order allowing counsel to withdraw as attorney of record.

Respectfully submitted,

William H. Dodson Sr.

## CERTIFICATE OF MAILING AND DELIVERY

This is to certify that on this 12th day of September, 1997, a true and correct copy of the above and forgoing Motion to Withdraw as Attorney of Record was mailed with postage prepaid thereon to Charles Edmond Sanders, c/o Evelyn Sanders, ███████ Sallisaw, Oklahoma 74955 and that a true and correct copy of same was hand delivered to the Office of the Sequoyah County District Attorney.

**REDACTED**

677

## IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA,　　　　　　　）
　　　　Plaintiff,　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
v.　　　　　　　　　　　　　　　　　）　　CF-97-75
　　　　　　　　　　　　　　　　　　）
CHARLES EDMOND SANDERS,　　　　）
　　　　Defendant.　　　　　　　　　　）

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 12 1997

BERNELL EDWARD COURT CLERK
BY _____ DEPUTY

### MOTION TO WITHDRAW AS ATTORNEY OF RECORD

COMES NOW William H. Dodson Sr., attorney for Charles Edmond Sanders, and Moves the Court to enter an Order allowing counsel to withdraw from representation of the Defendant for the following reasons:

1.　　Failure to pay attorney fees.

2.　　Failure to maintain contact with the attorney.

3.　　Failure to acknowledge advice of the attorney.

4.　　Failure to abide with agreements made in this matter.

WHEREFORE, premises considered, counsel requests that the Court enter an Order allowing counsel to withdraw as attorney of record.

Respectfully submitted,

William H. Dodson Sr.

### CERTIFICATE OF MAILING AND DELIVERY
This is to certify that on this 12th day of September, 1997, a true and correct copy of the above and forgoing Motion to Withdraw as Attorney of Record was mailed with postage prepaid thereon to Charles Edmond Sanders, c/o Evelyn Sanders, ███████ Sallisaw, Oklahoma 74955 and that a true and correct copy of same was hand delivered to the Office of the Sequoyah County District Attorney.
**REDACTED**

678

## IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CF-97-140 |
| | ) | |
| CHARLES EDMOND SANDERS, | ) | |
| Defendant. | ) | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 12 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

### MOTION TO WITHDRAW AS ATTORNEY OF RECORD

COMES NOW William H. Dodson Sr., attorney for Charles Edmond Sanders, and Moves the Court to enter an Order allowing counsel to withdraw from representation of the Defendant for the following reasons:

1.      Failure to pay attorney fees.

2.      Failure to maintain contact with the attorney.

3.      Failure to acknowledge advice of the attorney.

4.      Failure to abide with agreements made in this matter.

WHEREFORE, premises considered, counsel requests that the Court enter an Order allowing counsel to withdraw as attorney of record.

Respectfully submitted,

William H. Dodson Sr.

### CERTIFICATE OF MAILING AND DELIVERY

This is to certify that on this 12th day of September, 1997, a true and correct copy of the above and forgoing Motion to Withdraw as Attorney of Record was mailed with postage prepaid thereon to Charles Edmond Sanders, c/o Evelyn Sanders, ████████ Sallisaw, Oklahoma 74955 and that a true and correct copy of same was hand delivered to the Office of the Sequoyah County District Attorney.

REDACTED

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA,<br>Plaintiff, | ) ) ) | |
| v. | ) ) | CM-96-444 |
| CHARLES EDMOND SANDERS,<br>Defendant. | ) ) ) | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 1 2 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## MOTION TO WITHDRAW AS ATTORNEY OF RECORD

COMES NOW William H. Dodson Sr., attorney for Charles Edmond Sanders, and Moves the Court to enter an Order allowing counsel to withdraw from representation of the Defendant for the following reasons:

1.  Failure to pay attorney fees.

2.  Failure to maintain contact with the attorney.

3.  Failure to acknowledge advice of the attorney.

4.  Failure to abide with agreements made in this matter.

WHEREFORE, premises considered, counsel requests that the Court enter an Order allowing counsel to withdraw as attorney of record.

Respectfully submitted,

William H. Dodson Sr.

## CERTIFICATE OF MAILING AND DELIVERY

This is to certify that on this 12th day of September, 1997, a true and correct copy of the above and forgoing Motion to Withdraw as Attorney of Record was mailed with postage prepaid thereon to Charles Edmond Sanders, c/o Evelyn Sanders, ████████ Sallisaw, Oklahoma 74955 and that a true and correct copy of same was hand delivered to the Office of the Sequoyah County District Attorney.

**REDACTED**

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY, OKLAHOMA
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**OCT 16 1997**

BERNECE EDWARDS, COURT CLERK
BY _____ DEPUTY

THE STATE OF OKLAHOMA
                              Plaintiff

VS.

Charles Sanders

D.O.B ▮▮▮▮▮ 66
DATE 10-16-97

CASE NUMBER: CF-97-7

FAYE TEAGUE
Assistant District Attorney
NONE
Defendant's Attorney

RULE 8 HEARING
(summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES, IT IS HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

$75.00 ON OR BEFORE 11-7-97 BY 4:00 P.M. AND

$75.00 ON OR BEFORE 12-7-97 7th BY 4:00 P.M. , THEN

$75.00 PER MONTH ON OR BEFORE THE 7th DAY OF EACH MONTH WITH LIKE SUMS ON THE SAME DATE THEREAFTER UNTIL PAID IN FULL; OR THE BALANCE IN FULL ON OR BEFORE THE 7th DAY OF Nov 1998 BY 4 P.M. OR, Sooner if possible
IT IS FURTHER ORDERED THAT DEFENDANT MAKE ALL PAYMENTS IN PERSON AT THE OFFICE OF THE COURT CLERK.
COMMENTS:

TOTAL TO PAY $ 888.00

_____
JUDGE OF THE DISTRICT COURT

_____
DEFENDANT                    REDACTED

**\* Defendant is further ordered to notify the Collections Adm. of any change of address, telephone, employment or income.**

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

Case No: *CF- 97-9*          Defendant: *Charles Edmond Sanders*

### ACCUMULATIVE COURT COST FOR SEQUOYAH COUNTY

### NON-VIOLENT COURT COST

**COURT FUND**
| | | |
|---|---|---|
| Court Fees | | $103.00 |
| Bail Bond Fee | $10.00 @_____ | _____ |
| Jury Fee | $50.00@_____ | _____ |
| Fines | set by court | *500.00* |
| Sub total Court Fund | | *603.00* |

**SHERIFF FEES**
| | | |
|---|---|---|
| Sheriff Fees | | $5.00 |
| Arrest Warrant | $20.00 | *20.00* |
| Bench Warrnts | $20.00@_____ | _____ |
| Subpoenas | $20.00@_____ | _____ |
| Sub total Sheriff Fees | | *25.00* |

| | | |
|---|---|---|
| **LAW LIBRARY** | | $3.00 |
| **CLEET & FINGERPRINTING** | | $7.00 |

| | | |
|---|---|---|
| VCA | $30.00 or set by court | *250.00* |
| OSBI LAB | set by court | _____ |
| D.A. DRUG FUND | set by court | _____ |
| OIDS-(Court appt. atty. appl. fee) | | ~~$20.00~~ |
| REVOLVING FUND | | _____ |
| IDF-ATTORNEY FEE | set by court | _____ |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

OCT 1 6 1997

TOTAL          REDACTED          *888.00*

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**BENCH WARRANT--After Conviction**

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Sequoyah County, | ) | **IN DISTRICT COURT** |
| | | |
| THE STATE OF OKLAHOMA | ) | |
| VS. | ) | No.CF-97-9 |
| CHARLES E. SANDERS | ) | |
| ██████████SALLISAW OK 74955 | ) | |
| ██████████9539 | ) | **NO BOND** |

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**CHARLES E. SANDERS** having been on the 16TH DAY OF OCTOBER, 1997, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :FAILURE TO APPEAR AND PAY MONIES DUE THE COURT IN THE AMOUNT OF $845.00

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **CHARLES E. SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 6TH DAY OF JANUARY, 1998, By Order of the Court.

BERNEDL EDWARDS, COURT CLERK

BY: _/Maureen Van_____
DEPUTY

SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199____, at _____ o'clock _____M., and executed on the _____day of _____, 199____, at _____o'clock _____M. by _____
_____

Dated this _____day of _____199____.

_____
SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY:_____
DEPUTY

**REDACTED**

683

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA, )
        Plaintiff )
vs. )
                      )   Case No. CF-97-00009
CHARLES EDMOND SANDERS )
█████████████ )
                      )
                      )
SALLISAW, OK 74955 )
        Defendant )
  SS#: █████9539
  DOB: █████1966

Date: 01/30/98      State's Attorney: FAYE TEAGUE
               Defendant's Attorney: NONE

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 3 0 1996

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

RULE 8 HEARING
(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

*300.00 pd on 1-30-98 to S.C.S.O.*

_____ $110.00 on or before 02/25/98 and then

_____ $110.00 per month on or before 03/25/98

then *110⁰⁰* per month on or before the *25th* day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before ~~02/25/98~~ _____

OR; _____

_____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: *jailtime credit of $85⁰⁰*

_____

TOTAL TO PAY $ *bal 740⁰⁰*

                                       **REDACTED**

_____   _____
   Defendant          DENNIS M. SPROUSE Judge of the District Court

*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

684

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,            )
            Plaintiff,            )
                                  )
vs.                               )        No. CF-97-9
                                  )
CHARLES EDMOND SANDERS            )
            Defendant.            )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

OCT - 2 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

### APPLICATION TO REVOKE SUSPENDED SENTENCE

COMES NOW, Dianne Barker Harrold, the duly elected, qualified, and acting District Attorney of Sequoyah County, and states to the Court that on the 16th day of October, 1997, the said Defendant entered his/her plea of guilty in the above entitled case, in the District Court of Sequoyah County, Oklahoma, to the reduced charge of: OBTAINING MERCHANDISE BY BOGUS CHECK, and the said defendant was sentenced to serve a term of One (1) year in the County Jail, which sentence the Court suspended during the good behavior of said defendant.

Thereafter, the defendant violated the rules and conditions of probation as imposed by the Court in the following manner:

by violating city, state or federal law, and being arrested on the 15th day of April, 1998, and charged with BURGLARY SECOND DEGREE and LARCENY FROM THE HOUSE as alleged in Sequoyah County Case No. CF-98-128;
by failing to pay court ordered restitution in the sum of $52.63;

WHEREFORE, applicant prays that the Court set a date for hearing this application and that the suspension clause in said Judgment and Sentence be carried out in full, according to its terms. That the Court direct the Court Clerk of Sequoyah County, Oklahoma, to issue a Bench Warrant for the arrest of said defendant.

Dated this ___30th___ day of September, 1998.

DIANNE BARKER HARROLD, District Attorney

BY: _____
            Assistant District Attorney

WITNESSES:

Walter Ross, SCSO, Sallisaw, OK REDACTED
Kelly Karnes, SCSO, Sallisaw, OK
Leola Lee, P.O. Box 1602, Sallisaw, OK

### FINDING OF PROBABLE CAUSE

The Undersigned Judge of the District Court, upon the above application hereby determines there to be probable cause for the issuance of a Bench Warrant and so orders.

Dated this 30th day of September, 1998.

Bond set at $5,000

s/DENNIS  M. SPROUSE
JUDGE OF THE DISTRICT COURT

*WARRANT ISSUED AND SERVED IN
OPEN COURT 9/30/98.

685

BENCH WARRANT ON INDICTMENT OR INFORMATION.

STATE OF OKLAHOMA,)

Sequoyah County        )

IN _DISTRICT___ COURT

THE STATE OF OKLAHOMA

vs.

Charles Edmond Sanders    DOB: ███66__

██████████ Sallisaw _____

#_███_9539                    Defendant.

No. CF-97-9__
   CF-98-363

**ISSUED**
10-9-98

Bond $50,000

THE STATE OF OKLAHOMA

To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

Whereas an __information_____ having been _filed_____.

on the _30th_____ day of _Sept._____ A. D. 19 _98_, in the _district__ Court of

Sequoyah County, State of Oklahoma, charging _Charles Edmond Sanders_____

_____ with the crime of _Uttering a forged instrument and failing__

_to appear_____

You are therefore commanded forthwith to arrest the above named _Charles Edmond Sanders_____

and bring him before* _District Judge_____

_____ or if the said Court have adjourned for the

term that you deliver him into the custody of the Sheriff of Sequoyah County, Oklahoma.

Given under my hand with the seal of said Court affixed, this_____ 9th_____day of

October_____A. D. 19 98_

By order of the Court.

Bernell Edwards_____
Bernell Edwards  _Amanda Woody_    Court Clerk.
By_Amanda Woody_____
                                    Deputy.

*See Sec. 5384, Wilson's Statutes.

REDACTED

ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, first, middle, suffix(please print or type) (show alias) ▮▮▮▮ 9539

Sanders  Charles  ▮▮▮ 66

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF97-9 | Bonded | uttering forged inst |
| CF-98-36 | per Sprouse | |
| | $25,000.00 | |
| | Hamilton/ | |
| | Morse | |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the 30 day of Sept _____, 19 98.

White Copy - Court
Yellow Copy - Sheriff's File

_Leilani Leach_ Signature

AUTHORIZED BY _Sprouse_
JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 3 0 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**REDACTED**

# Hamilton - Morgan Bail Bonds
## Diane Hamilton
## APPEARANCE BOND

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB - 2 1999

BERNELL EDWARDS COURT CLERK
BY _____ DEPUTY

IN THE DISTRICT COURT OF ___Seq___ COUNTY, STATE OF OKLAHOMA
State of Oklahoma,                                    Plaintiff,

vs. __Charles Sanders__, Defendant          Case No. __CF-97-9__

Know all men by these presents, that we the above named defendant, as principal, and the undersigned __Diane Hamilton DBA__ Diane Hamilton, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of __Thirty Thousand__ _____ Dollars ($__30,000.00__) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of __Seq__ County, State of Oklahoma, shall personally be and appear before the District Court of said county on the __18__ day of __Feb__, 19__99__, at __9__ o'clock __a.m.__, of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of __CF-97-9 — CF 98-363__

and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this __2__ day of __Feb__, 19__99__.

__Diane Hamilton DBA__ Principal  [REDACTED] , OK, _____ Address
Hamilton - Morgan          Surety          113 North Oak  Sallisaw, Oklahoma 74955
Diane Hamilton
__Charles Sanders__ _____ Surety _____ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this __2__ day of __Feb__, 19__99__.

_____ Court Clerk/Sheriff _____ Deputy

This undertaking approved this __2__ day of __Feb__, 19__99__.

(SEAL)                     By: __Craig Marshall__ _____ Deputy/Clerk

## AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, __Seq__ County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of __Seq__ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as herinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $__4500.00__

b) Other security received or promised for making this undertaking, is as follows:__PN.__ __final.__

c) Such promise, security or consideration was received from:
__Charles Sanders__ [REDACTED] __Sallisaw ok 74955__
Name                          Address

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as on commits perjury.

__Diane Hamilton__ [REDACTED] __Sallisaw, OK. 74955__
Affiant                      Address

Subscribed and sworn to before me this __2__ day of __Feb__, 19__99__.

(SEAL)

_____
Court Clerk - Notary Public

My Commission Expires:

_____
Deputy

688

ORDER OF RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order:

Last name, first, middle, suffix (please print or type) (show alias)  SSN = ███████ 9539
DOB = ██████ 66

Sanders Charles Edmond

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF97-9 | Hamilton Morgan | Uttering Forged Inst. |
| CF98-363 | Hamilton Morgan | FTA |
| | Bond $30,000 | |
| | Released to | |
| | Cherokee CO | |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the 01 day of Feb., 19 99.

White Copy - Court
Yellow Copy - Sheriff's File

Jenny Manley
Signature

AUTHORIZED BY    Garett
JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB - 2 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**REDACTED**

689

690

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 158**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

690

**INFORMATION**

===========================================================================

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA<br>Plaintiff,<br>vs.<br><br>**CHARLES EDMOND SANDERS**<br>**DOB:** ▮▮▮66<br>DL/SS#▮▮▮▮9539<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. CF-97-**75** |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 1 2 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**I N F O R M A T I O N**

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:**

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CHARLES EDMOND SANDERS did, in Sequoyah County, and in the State of Oklahoma, on the 5th day of March, in the year of our Lord, One Thousand, Nine Hundred and Ninety-Seven and before the presentment hereof, commit the crime of

COUNT I: FELONY RUNNING ROADBLOCK-21 O.S. 540 B
That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did unlawfully, knowingly, wilfully and feloniously after having received a visual and audible signal, to-wit: a red light and siren, failed to stop vehicle; and did unlawfully and wilfully thereafter fail to stop at a roadblock set up and attended by Walter Ross, Sequoyah County Undersheriff, at or near a point located 4 miles Northwest of Marble City, in Sequoyah County, Oklahoma and wilfully passed through said roadblock without the permission of the police officer in attendance of said roadblock,

COUNT II: ATTEMPTING TO ELUDE AN OFFICER-(MISD) 21 O.S. 540 A
That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did wilfully and wrongfully attempt to elude Herman Skelton, Oklahoma Highway Patrol, of Sequoyah County, while in the performance of his duty, in the following manner, to-wit: that the said defendant was then and there operating a motor vehicle on the public streets and roads of Sequoyah County, and had received a visual and audible signal by means of a red light and a siren from the said Herman Skelton, who was then and there driving a motor vehicle showing the same to be an official highway patrol car, directing the said defendant to bring his vehicle to a stop, but that said defendant did then and there wilfully and wrongfully increase his speed in an attempt to elude said Herman Skelton,

REDACTED

COUNT III: TRANSPORTING BEER IN AN OPEN CONTAINER-(MISD) 21 O.S. 1220
That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did knowingly transport in a moving vehicle upon a public highway, street or alley, a non-intoxicating beverage containing more than 1/2 or 1% alcohol by volume and not more than 3.2% alcohol by weight in a container which had been opened and from which the original cap or seal had been removed, said container being accessible to the driver or other person in the vehicle while it is in motion,

COUNT IV: RECKLESS DRIVING-(MISD) 47 O.S. 11-901
CHARLES EDMOND SANDERS did willfully and wrongfully drive and operate an automobile vehicle in a careless and reckless manner upon a public highway, without due care for the safety of the people or their property and in such manner as to endanger the life and limbs and property of other persons and the safety of their property and did drive an automobile, to-wit: a 1992 GMC pickup, bearing 1997 Oklahoma license number SA▮▮▮, upon a County Road 2 miles North of Sallisaw, at a speed that was neither careful nor prudent and that was greater than was reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing, and at a speed greater than would permit him to bring said automobile to a stop within the assured clear distance ahead,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

By _____
Assistant District Attorney

STATE OF OKLAHOMA )
                  ) ss.
COUNTY OF SEQUOYAH)

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____

Subscribed and sworn to before me this _11th_ day of March, 1997.

My Commission Expires:

_6/28/99_

_____
NOTARY PUBLIC

WITNESSES:
Herman Skelton          OHP, Sallisaw, OK
Leon Spencer            OHP, Muskogee, OK
Lelland Choate          Sequoyah County Sheriff Dept., Sallisaw, OK
Walter Ross             Sequoyah County Sheriff Dept., Sallisaw, OK

**REDACTED**

692

MERIDIAN BONDING COMPANY
210 EAST CHICKASAW
SALLISAW, OKLA. 74955

002673

APPEARANCE BOND

IN THE DISTRICT COURT ___SEQUOYAH___ COUNTY, OKLAHOMA

STATE OF OKLAHOMA,

PLAINTIFF,

VS

___Charles Sanders___ DEFENDANT

CASE NO. CF-97-75

FILED
SEQUOYAH COUNTY, OKLAHOMA
IN DISTRICT COURT

MAR 06 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

KNOW ALL MEN BY THESE PRESENTS, THAT

me the above named defendant, as principal, and the undersigned bondsman, corporation and other signers as sureties, jointly and severally acknowledge ourselves to owe and be indebted to the State of Oklahoma in the sum of _four thousand three_ Dollars ( _4,350 00_ ) to be levied on our property, real and personal, cash deposits and escrow deposits, wherever, found, in the use of the State of Oklahoma.

THE CONDITIONS OF THIS BOND IS SUCH THAT, if the above named defendant, now charged in the District Court of ___SEQUOYAH___ County, with the crime (s) of _TOC, ATT to Elude, Running Rd Block, wrek DR._ and admitted to bail in the above stated sum, shall personally be and appear before the said Court, in the division to which said case is assigned, on the _12_ day of _March_ 19_97_, an ordered for arraignment, preliminary hearing, trial or judgment, and from day to day and term to term thereafter as ordered, or on the first day of the next jury term of said Court, if so ordered, and from day to day and term to term thereafter as ordered by said Court and not depart therefrom without leave, and shall do and receive what shall be enjoined upon him by said Court until this case is finally determined, then this bond to be void, otherwise to be in full force and effect.

Principal (Defendant): _Charles Sanders_

ADDRESS: _P.O. Box 118 Marble City Ok. 74945_

Surety_____ Address: 210 E. Chickasaw Sallisaw, Ok. 74955

Surety-Licensed Bondsman: PAUL MORELAND

Office Address: ▮▮▮▮▮▮▮ Sallisaw, Ok. 74955

Date Filed and Approved this _____ day of _____ 199____.

Corporate Surety: International Fidelity Insur. Co.

Court Clerk, Sheriff or District Judge:

By _____    By _____
    Attorney-in-Fact                              Deputy

AFFIDAVIT AS TO UNDERTAKING AND QUALIFICATIONS OF SURETY

(Required of all licensed bondsmen, under penalty of perjury, 5905; 1322; 1205-61-120.S.,-62.)

STATE OF OKLAHOMA, COUNTY OF _SEQUOYAH_ ,SS

The undersigned licensed bondsman, being duly sworn, on oath states: That neither he or she, nor anyone for his or her use, has been promised or has received any surety or consideration for his or her undertaking, except as stated herein.

Consideration received or promised $ _4,350 00_ .

Surety received or promised (List deeds or mortgages and describe personal property)

_____

Such promise, security or consideration was received from:

NAME: _____ ADDRESS: _____

That he or she is presently duly licensed, registered, and in all respects authorized by law to become surety in the undertaking, 59 O.S., 1301 st. sec.; 12 O.S., sec.; 61 st. sec.; 220.S, 1320.

That he or she is worth double the sum to be secured, over the above all exemptions, debts and liabilities., 12 O.S.; -1301 st. sec.; 220.S.. 1101 st. sec.; 120.S. 61 st. sec. **REDACTED**

That he or she has not signed or countersigned this bond in blank, nor has he or she given power of attorney to or otherwise, any person to countersign his name to this bond unless that person is a licensed bondsman directly employed by a bondsman giving such power of attorney, 59 O.S.;-1316.

That he or she has attached hereunto all receipts for collateral accepted by him or her, fully described in detail, 59 O.S.; 1314; 590.S.;1322.

That he or she is authorized and legally capable, in all respects, to enter into this undertaking , both personally and on behalf of the corporate surety above named; and that this undertaking is within, and does not the limitations and conditions of the power of attorney granted him or her by said corporate surety, all pursuant to 590.S.; 1320.

That he or she is familiar with the provisions of Oklahoma Statute regarding the effects and defects, omissions and irregularities in such undertakings, 590.S.; 1326.

That all legal requirements of licensing, registration and certification have been met by this bondsman, 590.S.; 1320.

That the bondsman fully understands that willful misstatement of any material fact herein my subject him or her to prosecution for perjury, and/or to proceedings seeking denial, suspension or revocation of the bondsman's license, 590.S. 1310.

That he or she is a resident of the County of _SEQUOYAH_ State of Oklahoma.

_Paul Moreland_
(LICENSED BONDSMAN)

Before me, the undersigned, on this _____ day of _____ 199____, personally appeared _____, known to me to be the identical person who executed the within and foregoing instrument, and acknowledged to me that he executed same as his free and voluntary act and deed. Given under my sign and seal of office on the day and year written above, or signature witnessed by undersigned.

Bernell Edwards, Court Clerk

_____                    _____
(Deputy)                                          (Deputy Court Clerk)

693

**POWER OF ATTORNEY**
**INTERNATIONAL FIDELITY INSURANCE COMPAN** Power No. **IC-1273281**

It is unlawful to print this form without written consent of home office.

Bond Department
One Newark Center, 20th Floor, Newark, New Jersey 07102

THIS POWER OF ATTORNEY NULL AND VOID
UNLESS USED BEFORE 12/31/97

KNOW ALL MEN BY THESE PRESENTS, that INTERNATIONAL FIDELITY INSURANCE CORPORATION, a corporation duly organized and existing under the laws of the State of New Jersey has constituted and appointed, and does hereby constitute and appoint,

Its true and lawful attorney-in-fact, with full power and authority to sign the company's name and affix its corporate seal to, and deliver on its behalf as surety, any and all obligations as herein provided, and the execution of such obligations in pursuance of these presents shall be as binding upon the company as fully and to all intents and purposes as if done by the regularly elected officers of said company at its home office in their own proper person; and the said company hereby ratifies and confirms all and whatsoever its said attorney-in-fact may lawfully do and perform in the premises by virtue of these presents.

THIS POWER OF ATTORNEY IS VOID IF ALTERED OR ERASED, THE OBLIGATION OF THE COMPANY SHALL NOT EXCEED THE SUM OF FIVE THOUSAND FIVE HUNDRED DOLLARS ($5,500.00) AND MAY BE EXECUTED FOR RECOGNIZANCE ON CRIMINAL BAIL BONDS ONLY.

| NOT VALID FOR IMMIGRATION BONDS |
|---|

Bond Amt $ **4,350** Case # _____

Defendant **Charles Sanders**

Appearance Date **3-12-97** DIV _____

Court City **Sallisaw**

Court County **Seq.** State **OK**

Offense **TOC Running Red Blck. Att to Elude,**
**Wreck DR** **3-5-97**

Date Filed _____

Atty in fact **Paul Mouland**
SIGNATURE/If applicable, add your COURT assigned Agent #

FORM # IC

*NOTICE*
STACKING OF
POWER IS
STRICTLY
PROHIBITED!
No more than
one power from
this Surety may
be used to
execute any one
bond.

IN WITNESS WHEREOF, said INTERNATIONAL FIDELITY INSURANCE COMPANY, by virtue of authority conferred by its Board of Directors, has caused these presents to be sealed with its corporate seal, signed by the Chairman of the Board and attested by its Secretary, this 2nd day of April, 1991.

Philip Konvitz, Chairman of the Board

Norman Konvitz, Secretary

1. A separate Power of Attorney must be attached to each bond executed.
2. Powers of Attorney must not be returned to attorney-in-fact, but should remain a permanent part of court records.
3. The authority of such attorney-in-fact is limited to appearance bonds and cannot be construed to guarantee for failure to provide payments, back alimony payments, fines or wage law claims.

ENTER SURETY-ASSIGNED EXECUTING AGENT CODE # HERE:

INTERNATIONAL FIDELITY INSURANCE CO. 1904

694

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA,           )
           Plaintiff,          )
                                )
vs.                          )     CF-97-75
                                )
CHARLES EDMOND SANDERS,       )
           Defendant.          )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**JUL 03 1997**

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## DEMURRER

COMES NOW Charles Edmond Sanders,, Defendant herein, and demurs to the information filed herein and moves the Court to dismiss this cause pending against said Defendant, and in support thereof, alleges and states:

### I.
That this Court has no jurisdiction of the person of this Defendant or of the subject matter of this action;

### II.
That the information herein is vague, indefinite and duplicitous and not substantially clear or in ordinary and concise language which could be in such a manner as to enable a person of common understanding to know what is intended;

### III.
That the information wholly fails to state an offense, with such a degree of certainty, so as to enable the Court to pronounce judgment upon a conviction of the case;

### IV.
That said information does not contain allegations of sufficient facts to constitute the basis of the crime charged or of any other criminal violation of the laws of the State of Oklahoma;

### V.
That the facts stated in the information do not state facts sufficient to constitute a cause of action against said Defendant;**REDACTED**

### VI.

That said information does not substantially conform to the provisions of the laws and statutes of the State of Oklahoma;

WHEREFORE, said Defendant prays that his demurrer be sustained; that the information filed against said Defendant be dismissed and said Defendant be granted such other and further relief as to which the Defendant may be entitled and which the Court deems fair, just, equitable, proper and right.

AUTHORITY:

22 OS 401 et seq.
22 OS 493
22 OS 504 et seq.

CHARLES EDMOND SANDERS,
Defendant

William H. Dodson Sr.
Attorney at Law
P.O. Box 682
Sallisaw, Oklahoma  74955
(918) 775-3033

## CERTIFICATE OF DELIVERY

This is to certify that a true and correct copy of the above and forgoing Demurrer was hand delivered this _32_ day of July, 1997 to:

Office of the District Attorney
Sequoyah County Courthouse
120 East Chickasaw
Sallisaw, Oklahoma  74955

**REDACTED**

696

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA**

THE STATE OF OKLAHOMA,  )
           Plaintiff,  )
                       )
                       )
vs.  )   CF-97-75
                       )
CHARLES EDMOND SANDERS,  )
           Defendant.  )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 03 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## MOTION FOR DISCOVERY

COMES NOW Charles Edmond Sanders, Defendant herein, by and through his Attorney, William H. Dodson Sr., and moves the Court to Order the State to disclose the following:

1.      The names and addresses of witnesses, together with their respective oral, written or recorded statement, or summaries of same. Allen v District Court, 803 P.2d 1164 (Okla. 1990). 22 OS Section 2001, et seq.

2.      All law enforcement reports made in connection with this case. 22 OS Section 2001, et seq.

3.      All sworn statements of persons having knowledge of the alleged criminal offense that have been obtained by the District Attorney's Office, any peace officer or any other entity privy to the District Attorney. 22 OS 749.

4.      Any reports or statements made by experts in connection with this particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons. Allen v District Court, supra. 22 OS Section 2001, et seq.

5.      Any written or recorded statements and the substance of any oral statements made by the accused. Allen v District Court, supra. 22 OS Section 2001 et seq.

6.      All tape recordings and stenographic transcriptions of any statements, or alleged admissions or confessions made by the Defendant. Watts v State, 487 P.2d 981 (Okla. 1971).

**REDACTED**

Page One of Three

697

7.      Any books, papers, documents, photographs, tangible objects, buildings, or places which the prosecuting attorney intends to use in the hearing or trial or which were obtained from or belong to the accused.  Allen v District Court, supra.  22 OS Section 2001 et seq.

8.      A detailed description of and access to all forms of tangible evidence in the custody of the District Attorney, State or private laboratories or police departments. Allen v  District Court, supra.

9.      Any record of prior criminal convictions of the Defendant.  Allen v District Court, supra. 22 OS Section 2001, et seq.

10.      OSBI or FBI rap sheet/record check on any witnesses listed by the State or the Defense as possible witnesses who will testify at trial. Allen v District Court, supra.

11.      Copies of any photographs to be used by the prosecution.  Stafford v District Court, 593 P.2d 797 (Okla. 1979); State, ex rel Fallis v Truesdell, 493 P.2d 1134 (Okla. 1972).

12.      Any and all written statement, oral statements or recordings of any other persons interviewed by the State or its agents which are inconsistent with an earlier statement or which are inconsistent with a statement made by any other person interviewed by the State or its witnesses.  U.S. v Rutkin, 212 F.2d 641 (3rd Cir. 1954).

13.      The nature, date and place of any criminal offense or acts of misconduct, other than those charged in the present information, which the State will offer for impeachement purposes and attempt to disprove good character or reputation of the Defendant.  Burks v State, 594 P.2d 771.

14.      Any and all consideration or promises of consideration given to any witness for the State or its attorney, referring to absolutely anything of value or use, including but not limited to immunity, witness fees, assistance to members of witnesses families or associates, assistants or favorable treatment with respect to any criminal action, and anything else which would create an interest or bias in a witness in favor of the State. King v United States, 419 U.S. 18 (1974).

15.      All diagrams, sketches and pictures which have been made by any witness or prospective witness in the case.

16.      A detailed description of, and access to, all physical items other than those specifically set out above which the District Attorney anticipates using as evidence in this proceeding.

REDACTED

Page Two of Three

699

CHARLES EDMOND SANDERS,
Defendant.

By: _____

William H. Dodson Sr.  OBA #2397
Attorney at Law
P.O. Box 682
Sallisaw, Oklahoma  74955
(918) 775-3033

## CERTIFICATE OF DELIVERY

This is to certify that a true and correct copy of the above and forgoing instrument was was hand delivered this **30** day of July, 1997 to:

The Office of the District Attorney
Sequoyah County Courthouse
120 East Chickasaw
Sallisaw, Oklahoma  74955

_____

**REDACTED**

Page Three of Three

699

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CF-97-75 |
| | ) | |
| CHARLES EDMOND SANDERS, | ) | |
| Defendant. | ) | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**JUL 03 1997**

BERNELL EDWARDS, COURT CLERK
BY _____

### MOTION TO PRODUCE EXCULPATORY EVIDENCE

COMES NOW Charles Edmond Sanders, Defendant herein, by and through his attorney, William H. Dodson Sr. and hereby moves the Court to Order the District Attorney to produce all evidence favorable to Defendant in this case as mandated by the due process clause of the United States Constitution. Brady v Maryland, 373 U.S. 83 (1963).

1. The Defendant would respectfully submit that the specific items mentioned are material because they would be admissible and relevant to the issue of guilt or degree of punishment. Further, there exists a reasonable possibility that such disclosure could affect the result of this prosecution or punishment and cause it to be different in outcome. Further, failure to disclose the items requested will cause both Counsel to be mislead in the investigation and defense of this case. Defendant respectfully and specifically requests the following:

2. All statements by any witnesses that have been given to any law enforcement agency or District Attorney in this case. Further, all statements by possible witnesses who were, at any time, unable to positively identify the Defendant in any manner or at any time.

3. All reports, tests or opinions, including internal memoranda of any police department or law enforcement agency or the District Attorney's Office concerning tangible evidence that has been lost or destroyed while in the custody of any office, and that would have had relevance in the present prosecution.

4. All reports relating to any polygraph examination administered to any possible witness for the state. **REDACTED**

Page One of Three

5.      All documents and reports regarding the physical or mental disease or disorder affecting any individual the State intends to call as a witness in the present case.

6.      All information that is arguably exculpatory through its use as impeachment of possible State witnesses, including, but not limited to, the prior criminal convictions of each witness, copies or summaries of any prior and arguable inconsistent statement of such witnesses concerning this prosecution, promises of leniency or reward by the State, and any other matter which would have relevance to the general credibility of such witnesses.

7.      All facts, information, written statements, tapes, videos and other recorded material, electronic or written, of questioning and interrogation of the Defendant from the State's initial contact with the Defendant until the conclusion of the interrogation or series of interrogation sessions.

8.      All material now known to the State, or which may become known, or which through due diligence may be learned from the investigating personnel or witnesses in this case, which is arguably exculpatory in nature or favorable to the accused, or may lead to arguably exculpatory material. Further, if subsequent to compliance with these requirements or Orders pursuant thereto, the District Attorney or his agents discover additional material or information is discovered during the trial, the Court shall also be notified of the discovery of such evidence.

WHEREFORE, premises considered, the Defendant respectfully prays that the Court Order the State to disclose the items hereinabove set forth.

CHARLES EDMOND SANDERS,
Defendant.

by:   _____
William H. Dodson Sr    OBA #2397
Attorney at Law
P.O. Box 682
Sallisaw, Oklahoma  74955
(918) 775-3033

REDACTED

Page Two of Two

701

## CERTIFICATE OF DELIVERY

This is to certify that on the **3d** day of July, 1997 a true and correct copy of the above and forgoing document was hand delivered to:

The Office of the District Attorney
Sequoyah County Courthouse
120 East Chickasaw
Sallisaw, Oklahoma  74955

*Wm H Dodson Jr* (signature)

REDACTED

Page Three of Three

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 163**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

703

INFORMATION

=================================================================================

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

STATE OF OKLAHOMA )
       Plaintiff, )
vs. )
       )
CHARLES E. SANDERS )
DOB: ▮▮66 SSN: ▮▮▮-9539 )
      Defendant. )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**MAY 3 0 2001**

No. CF-2001-314 BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

## INFORMATION

## IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CHARLES E. SANDERS did, in Sequoyah County, and in the State of Oklahoma, on the 17th day of May, in the year of our Lord, Two Thousand One, and before the presentment hereof, commit the crime of

### Count I:
### LARCENY OF MERCHANDISE FROM RETAILER 21 O.S. 1731

CHARLES E. SANDERS did unlawfully, wilfully, stealthily, wrongfully take, steal and carry away certain merchandise being then and there held for sale by WAL-MART the same being a retail mercantile establishment, and the owner of said merchandise which was taken without its consent; said property being described as follows: BINOCULARS, NOKIA CELL PHONE, FLASHLIGHT, POCKET KNIFE & AA BATTERIES, and all of the total value of $116.75, with the unlawful, willful and wrongful intent then and there on the part of said defendant to deprive the owner thereof permanently and to convert the same to his own use and benefit,

### Count II:
### UNLAWFUL POSSESSION OF PARAPHERNALIA-(MISD) 63 O.S. 2-405

On the day and year in the County and State aforesaid, said CHARLES E. SANDERS did unlawfully, wilfully and wrongfully have in his possession and under his control certain paraphernalia, to-wit: ROLLING PAPERS, used to consume drugs classified as controlled dangerous substances under the Uniform Controlled Dangerous Substances Act of this State, and for the purpose and with the unlawful intent to administer such controlled dangerous substances without having any medical or other lawful need requiring possession of said paraphernalia, REDACTED

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

By_____
Assistant District Attorney

STATE OF OKLAHOMA   )
                    ) ss.
COUNTY OF SEQUOYAH )

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____
**Assistant District Attorney**

Subscribed and sworn to before me this _29_ day of May, 2001.

_____
**NOTARY PUBLIC**

My Commission Expires:

_10/4/04_

WITNESSES:

**Derek Brown,** ███████████ **Sallisaw, Ok**
**Rocky Gaither,** █████ **Sallisaw, OK**
**Dustin Walters,** ████ **Sallisaw, OK**
**Leri Kay,** ███ **Sallisaw, Ok**
**Debbie Carter, 1101 W. Ruth, Sallisaw, OK**
**Arthur Cox, SPD**

**REDACTED**

SEQUOYAH COUNTY OKLAHOMA
FILED
IN DISTRICT COURT

MAY 3 0 2001

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

INFORMATION
Page 2

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) | SEQUOYAH COUNTY, STATE |
| | ) | OF OKLAHOMA |
| vs. | ) | CASE NO. CRF-2001-'314 |
| | ) | |
| CHARLES E. SANDERS, | ) | |
| Defendant. | ) | |

## FORMER CONVICTIONS

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-89-396, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UTTERING FORGED INSTRUMENT, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-92-91, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UNLAWFUL POSSESSION OF CONTROLLED DRUG, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-90-144, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of SEXUAL BATTERY, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 9th day of December, 1999, in Case No. CF-98-346, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of POSSESSION OF CONTROLLED DRUG, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 9th day of December, 1999, in Case No. CF-98-363, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UTTERING A FORGED INSTRUMENT, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 9th day of December, 1999, in Case No. CF-99-562, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of KNOWINGLY CONCEALING STOLEN PROPERTY, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

DIANNE BARKER HARROLD,
DISTRICT ATTORNEY

BY:_____
Assistant District Attorney

706

## IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
### STATE OF OKLAHOMA

CF- 01-314

### Probable Cause Affidavit for Warrantless Arrest

Comes now the undersigned Affiant, and states upon Oath or Affirmation that the following information and facts are correct to the best of the Affiant's knowledge and belief:

Name of Person Arrested: Sanders , Charles Edmond     Social Security Number: ████-9539

Date of Birth: ████ 66   Date of Arrest (Detention): 05  17  01   Time of Arrest: 19:00   P .M.

State Specific Facts for Probable Cause for the Arrest and Detention:

05-17-2001 at approx. 19:00 I was caled to Wal Mart Super Center in reference to a shoplifter being detained. Upon my arrival I met with loss prevention officer Derek Brown and he informed me that he observed a white malelater identified to him as Charles Edmond Sanders select a flashlight kin and attempt to conceal it in the back of his pants. Brown reports that Sanders then selected a pocket knife and a packet of double a batteries. Sanders went to the Garden Center where he left the building without paying for the merchandise. Brown reports that he and Rocky Gaither approached Sanders and requested that he come back into the store. ( cont.)

**[Use reverse side or attach another page if necessary]**

Anticipated Charge(s): Grand Larceny, Possession of drug para., Assault and Battery in comm. of a felony

AFCF: No /(Yes) times (1) (2) or __3__     _Arthur Cox_
                                        Affiant (Arresting Officer)

Subscribed and sworn to before me the undersigned, this 22 Day of May 2001

My Commission Expires: 4-16-2003     Brooke A. Phillips
                                     Notary Public / Judge / Witness

### Probable Cause Determination

I, _Dennis M. Sprouse_, Judge of the District Court reviewed this Probable Cause Affidavit on the _23rd_ day of _May_, 200_1_, at _3:33_ AM/(P.M.)

__✓__  This Affidavit contains sufficient facts showing probable cause to detain the Arrestee to await further proceedings. The Sheriff for Sequoyah or Chief of Police of the arresting agency is hereby commanded to receive him/her into their custody and detain until he/she is legally discharged.

__✓__  The Court sets [  ]an Appearance Bond in the amount of $ _50,000_ .00 or [X] as per Sequoyah County Bond Schedule.

_____  The Court denies Bond at this time.

_____  This Affidavit contains insufficient facts to show there exists probable cause to detain the Arrestee. **The Arrestee is Ordered Released From Custody Immediately.**

REDACTED

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 3 0 2001

BERNELL EDWARDS, COURT CLERK

BY_____ DEPUTY

_____
Judge of the District Court

707

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

## Probable Cause Affidavit for Warrantless Arrest

Brown reports that at this time Sanders attempted to run from them. Brown and Gaither containd Sanders and took him back into the store. Upon my arrival I handcuffed Sanders and patted him down checking for weapons and contraband. Stuck down in the front of Sanders pants was a new set of binoculars. In Sanders right rear pocket was a Nokia (for display only) cell phone. While inventoring Sanders property there was a package of Zig-Zag rolling papers. There was no tobacco products found on Sanders person. Approx. value of stolen property was $116.75.

REDACTED

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 0 7 2001

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

**State of Oklahoma**
Plaintiff

vs. Sanders

CASE NO: CP-01-314

Defendant

### APPLICATION FOR APPOINTED COUNSEL
### AND
### AFFIDAVIT OF FINANCIAL INABILITY TO EMPLOY COUNSEL

I swear and affirm that I am the party in the above entitled action. I want an attorney to represent me in this case. I am financially unable to obtain the services of an attorney without causing substantial hardship to myself or to my family. The following information is true and is given and intended to be relied upon by the court and other persons or agencies in determining my eligibility for legal services to be furnished to me at public expense.

PLEASE FILL IN ALL SPACES BELOW AND SIGN YOUR NAME UNDER OATH IN FRONT OF THE JUDGE, A NOTARY OR THE COURT CLERK. IF A QUESTION DOES NOT APPLY TO YOU, PLEASE WRITE IN THE BLANK "DOES NOT APPLY".

I. GENERAL INFORMATION     DATE: 5-30-01
NAME: Charles Sanders
ADDRESS: ████████ Sallisaw OK
TELEPHONE: 918/775-     MESSAGE NUMBER: 5095
SOCIAL SECURITY NO: ████ 9539     AGE: 35     DOB: ██-66
SINGLE ( ✓ ) MARRIED ( ) SEPARATED ( )
SPOUSE'S NAME: 
ADDRESS: 
TELEPONE: 
HOW MANY PEOPLE ARE IN YOUR HOUSEHOLD? Evelyn Sanders
NAME AND AGES: 68

ARE YOU CLAIMED AS A DEPENDENT BY A PARENT OR GUARDIAN? YES ( ) NO ( )

II FAMILY INCOME
YOUR MONTHLY TAKE HOME PAY: Ø     WEEKLY TAKE HOME PAY: Ø
YOUR EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY)

YOUR EMPLOYER'S PHONE NUMBER: Ø
SPOUSE'S SALARY: Ø
SPOUSE'S EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY

SPOUSE'S EMPLOYER'S PHONE NUMBER: Ø
IS ANY OTHER MEMBER OF YOUR HOUSEHOLD EMPLOYED? YES( ) NO(✗)
WHO? N/A     **REDACTED**
WHERE? N/A
SALARY? N/A
DEPENDENT'S EMPLOYER: N/A

OTHER SOURCE OF INCOME OR BENEFITS (INCLUDE INTEREST, DIVIDENDS, ROYALTIES, ETC.) Ø
TOTAL FAMILY INCOME FOR PRECEDING MONTH WAS $ Ø N/A

III FAMILY ASSETS (WHAT YOU OWN LESS WHAT YOU OWE ON IT)
MONEY:
IN JAIL:____ AT HOME:____ CHECKING:____
SAVINGS:____ SAFE DEPOSIT BOX____ OTHER:____
HOME OR OTHER REAL ESTATE VALUE:____ JEWELRY VALUE:____
AUTOMOBILES: MAKE AND VALUE____ FURNITURE VALUE____
MOTORCYCLES:    MAKE    AND    VALUE____ TOOLS/EQUIPMENT
VALUE____
NOTES, MORTGAGES AND TRUST DEEDS:____ ANY DEBTS OWED TO THE DEF____
OTHER ASSETS AND PROPERTY VALUE:____
ARE YOU PARTY TO A SUIT (PROBATE, WORKER'S COMPENSATION, PERSONAL
INJURY)WHERE?____ JUDGMENT MAY BE EXPECTED? YES( ) NO( )
NAME OF ATTORNEY?____

IV EXPENSES AND DEBTS
RENT/HOUSE PAYMENT:__N/A__ CLOTHING __0__ FOOD __N/A__
DOCTOR/MEDICINE __N/A__ UTILITIES __N/A__ CAR PAYMENT __N/A__
INSURANCE:__N/A__ OTHER:____
TOTAL MONTHLY LIVING EXPENSES:__N/A__
MORTGAGE/LANDLORD'S NAME:__N/A__
MAJOR DEBTS: (list to whom and amount owed):__N/A__

LIST THE PERSONS WHO ARE DEPENDENT ON YOU FOR SUPPORT.  STATE YOUR
RELATIONSHIP TO EACH PERSON AND HOW MUCH YOU CONTRIBUTE MONTHLY TO THEIR
SUPPORT:__N/A__

V. LAST EMPLOYMENT
WHEN DID YOU LAST WORK?:__3-07__
WHO WAS YOUR EMPLOYER?:__Self Employ__
SALARY:____ HOW LONG DID YOU WORK THERE?:__1 Lawla__
WHY DID YOU QUIT?__Jb Ended__

VI. THE FOLLOWING PEOPLE CAN VERIFY TO A LARGE EXTENT MY ABOVE MENTIONED
FINANCIAL SITUATION.  GIVE NAME , ADDRESS AND PHONE NUMBER.
1. __Evlyn Sanders__
   ____
2. __Carles Wilson__
   ____
3. __Cyndi Wilson__
   ____

VII. CHARGE AND BOND
CHARGE(S): FELONY ____  MISDEMEANOR __REDACTED__ __ JUVENILE____
ARRESTING AGENCY:__City__
CITY __X__ COUNTY____ STATE____
HAS BOND BEEN POSTED? YES( ) NO(X) DID YOU USE A BONDSMAN? YES( ) NO( )
WHO PAID THE BONDSMAN?____

AMOUNT OF BOND: _____ PREMIUM PAID TO BONDING CO: _____
IF YOU DID NOT USE A BONDSMAN, DID YOU POST A CASH _____ OR P.R. _____
LIST ANY DEFENDANTS CHARGES WITH YOU _____

VIII

1. HAVE YOU TRANSFERRED OR SOLD ANY ASSETS SINCE CHARGES WERE FILED IN THE CASE? YES ( ) NO (✓) IF SO, DESCRIBE THE BUYER AND THE AMOUNT RECEIVED.

_____

2. HAVE YOU RETAINED COUNSEL IN THE CASE OR IN ANY OTHER PENDING CRIMINAL CASE? YES ( ) NO (✗) IF SO, STATE THE CASE NUMBER, COURT ATTORNEY AND AMOUNT PAID TO ATTORNEY FOR SERVICES: _N/A_

_____

3. DO YOU HAVE ANY FRIENDS OR RELATIVES WHO ARE ABLE AND WILLING TO ASSIST YOU IN HIRING COUNSEL AND PAYING FOR TRANSCRIPTS? YES ( ) NO (✗) IF SO, HAVE THOSE PERSONS BEE ASKED TO HELP? YES (✗) NO ( )

4. IF ANY FRIEND OR RELATIVE HAS GIVEN PREVIOUS FINANCIAL ASSISTANCE IN THIS CASE, BUT IS NO LONGER ABLE OR WILLING TO DO SO, AN AFFIDAVIT TO THAT EFFECT FROM THAT PERSON SHOULD BE ATTACHED. IS THAT AFFIDAVIT ATTACHED YES( ) NO( )

IX. NAMES OF THREE ATTORNEY'S YOU CONTACTED:

1. NAME: _Don Peterson Muskogee_
   WHEN DID YOU CONTACT THIS ATTORNEY? _last week_
   HOW DID YOU CONTACT THIS ATTORNEY? _Phone_
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO (✓)
2. NAME: _Greg Thomas_
   WHEN DID YOU CONTACT THIS ATTORNEY? _last week_
   HOW DID YOU CONTACT THIS ATTORNEY? _Phone_
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO (✗)
3. NAME: _Don Baker_
   WHEN DID YOU CONTACT THIS ATTORNEY? _last week_
   HOW DID YOU CONTACT THIS ATTORNEY? _Phone_
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO (✗)

X. I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION I HAVE PROVIDED IS TRUE AND CORRECT. I UNDERSTAND THAT I MAY BE PROSECUTED FOR PROVIDING FALSE INFORMATION IN THIS APPLICATION AND AFFIDAVIT. I UNDERSTAND THAT I MUST INFORM THE OKLAHOMA INDIGENT DEFENSE SYSTEM OF ANY CHANGE IN MY FINANCIAL SITUATION THAT MAY CHANGE THE INFORMATION I HAVE PROVIDED. I FURTHER DECLARE THAT I HAVE CONTACTED THREE ATTORNEYS, LICENSED TO PRACTICE LAW IN THIS STATE, AND I AM WITHOUT FUNDS TO PAY AN ATTORNEY TO REPRESENT ME OR TO PAY FOR TRANSCRIPTS AND COST ASSOCIATED WITH THIS CASE.

DATED THIS ____ DAY OF _____, ____

DEFENDANT _____

LEGAL GUARDIAN _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS REDACTED DAY OF _____, ____

comm. exp. _____        _____
                                   PUBLIC NOTARY OR CLERK OR JUDGE

I FIND THAT THE DEFENDANT IS UNABLE TO PAY THE APPLICATION FEE AND I HEREBY WAIVE THE FEE.

_____

JUDGE

APPOINTMENT OF INDIGENT DEFENSE COUNSEL

APPROVED _dms_ DENIED_____

### NOTICE

A copy of this APPLICATION AND AFFIDAVIT shall be sent to the prosecuting attorney or office of attorney general, whichever is applicable, for review and, upon request, the court shall hold a hearing to determine your eligibility for legal services to be furnished to you at public expense.

### IMPORTANT NOTICE

The court shall order you to pay the costs of your legal representation in total, or in installments. The court shall set the amount and due of each installment payment. The costs shall be paid to the court clerk in your county. The costs shall be a debt against you until paid and shall subject you to debt collection procedures as provided by law. The costs shall be deducted from any state income tax refund due you until the total costs are paid.

**REDACTED**

SUBPOENA

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA,
          Plaintiff,

vs.                                                        No. CF-01-314
                                                           CF-99-562

CHARLES EDMOND SANDERS
          Defendant.

TO: DEREK BROWN C/O ███████████████████ SALLISAW, OK
    DUSTIN DEWAYNE ████████████████████ CENTER, SALLISAW, OK
    ROCKEY GITHER C/O ███████████████ SALLISAW, OK
    LAURA KAY LERI C/O ████████████████ SALLISAW, OK
    DEBBIE CARTER C/O ████████████████ SALLISAW, OK
    OFFICER ARTHUR COX SALLISAW P.D.  .
    OFFICER EMMETT DANIELS PROBATION AND PAROLE, SALLISAW, OK

          GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **23ᴿᴰ   day of AUGUST, 2001, at the hour of 10:00: o'clock A. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES EDMOND SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

          HEREOF FAIL NOT, under penalty of law.

          IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the District Court of said County, this 16ᵀᴴ  day of AUGUST, 2001.

                                        BERNELL EDWARDS, COURT CLERK

                                    By_____
                                            Deputy

==============================================================================

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE AND PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.
                              **REDACTED**

==============================================================================


                         SHERIFF'S RETURN

          Received   this   Writ   this_____day   of_____,
20____,_____,
o'clock_____M.,_____, 20_____, served   the   same   by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 19____,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____
_____By_____
_____20_____, I cannot
find the within named_____
_____in my county.


                         JOHNNY PHILPOT, SHERIFF

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 27 2001

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

# SHERIFF'S RETURN
### State of Oklahoma, County of Sequoyah

Case #_CF01-314_
_CF-99-562_

I certify that I received the foregoing summons on the ____16____ day of __August__, 20_01_, and that I

delivered, or attempted delivery of the said summons as shown below to each party named for service request.

| Name of person to be served | Service Address | Served? Yes or No | Date & Time of Service or Attempted Service | Comments |
|---|---|---|---|---|
| Dustin Walters | Wal-Mart | Yes | 8-22-2001 | |
| Rocky Gither | Wal-Mart | Yes | 8-22-2001 | |
| Laura Levi | Wal-Mart | Yes | 8-22-2001 | |
| Debbie Carter | Wal-Mart | Yes | 8-22-2001 | |
| Derek Brown | | No | No longer Employed | |
| Left Subpoenas with Management who in turn would contact Employees | | | | |

I certify that on _____, I served _____ by leaving a copy of said

summons with a copy of the petition attached at_____ which is

his/her usual place of residence.

I certify that on _____, I served_____ by leaving a copy of said

summons with a copy of the petition attached at_____ with

_____, a member of his family over fifteen (15) years of age.

Dated on the __22__ day of __August__, 20_01_.

J.W. Philpot, Sheriff of Sequoyah County

REDACTED   By:_____, Deputy Sheriff

Sequoyah County, Oklahoma

SUBPOENA

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA,
          Plaintiff,

vs.                                          No. CF-01-314
                                             CF-99-562

CHARLES EDMOND SANDERS
          Defendant.

TO: DEREK BROWN C/O ███████████████    SALLISAW, OK
    DUSTIN DEWAYNE WALTERS C/O ██████████████, SALLISAW, OK
    ROCKEY GITHER C/O ███████████████    SALLISAW, OK
    LAURA KAY LERI C/O███████████████    SALLISAW, OK
    DEBBIE CARTER C/O ███████████████    SALLISAW, OK
    ~~OFFICER ARTHUR COX SALLISAW P.D.~~
    ~~OFFICER EMMETT DANIELS PROBATION AND PAROLE, SALLISAW, OK~~

          GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **23RD day of AUGUST, 2001, at the hour of 10:00: o'clock A. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES EDMOND SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

          HEREOF FAIL NOT, under penalty of law.

          IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the District Court of said County, this 16TH day of AUGUST, 2001.

                              BERNELL EDWARDS, COURT CLERK
                              By _____
                                      Deputy

==============================================================

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE AND PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.                    **REDACTED**

==============================================================

SHERIFF'S RETURN

          Received this Writ this_____day of_____,
20_____,_____
o'clock_____M.,_____, 20_____, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____,
19_____,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____
_____
_____By_____
_____20_____, I cannot
find the within named_____
_____in my county.

                              JOHNNY PHILPOT, SHERIFF

<u>SUBPOENA</u>

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA,
       Plaintiff,

vs.                             No. CF-01-314
                                  CF-99-562

CHARLES EDMOND SANDERS
       Defendant.

TO: DEREK BROWN C/O ████████████████ SALLISAW, OK
    DUSTIN DEWAYNE WALTERS C/O ████████████ SALLISAW, OK
    ROCKEY GITHER C/O ███████████ SALLISAW, OK
    LAURA KAY LERI C/O ██████████ SALLISAW, OK
    DEBBIE CARTER C/O ██████████ SALLISAW,OK
    OFFICER ARTHUR COX SALLISAW P.D.   .
    OFFICER EMMETT DANIELS PROBATION AND PAROLE, SALLISAW, OK

         GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **23RD** **day of AUGUST, 2001, at the hour of 10:00: o'clock A. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES EDMOND SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

         HEREOF FAIL NOT, under penalty of law.

         IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the District Court of said County, this 16TH day of AUGUST, 2001.

                         BERNELL EDWARDS, COURT CLERK

                         By _____
                              Deputy

=============================================================

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE <u>AND</u> PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.              **REDACTED**

=============================================================

                        SHERIFF'S RETURN

         Received this Writ this_____day of_____, 20____,_____ o'clock____M.,_____, 20_____, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the ____ day of _____, 19____,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____By_____

_____20_____, I cannot find the within named_____ _____in my county.

                      JOHNNY PHILPOT, SHERIFF

BERNELL EDWARDS
SEQUOYAH COUNTY COURT CLERK
120 EAST CHICKASAW
SALLISAW, OK 74955

PH. (918)775-4411                                      (918)775-1223

M. VANN, DEPUTY                                 E. MERRILL, DEPUTY
P. LASITER, DEPUTY                              A. ADAMS, DEPUTY
B. LOCKHART, DEPUTY                          S. HUFF, DEPUTY
K. VICTORY, DEPUTY                             T. ALLEN, DEPUTY

RE: _CF-01-314_

Dear: _Charles Sanders_

     This court has been informed of Pharmaceutical billing submitted by the Sheriff's Department and is hereby included in the total fines and cost that has been assessed to you. Please note on your original Rule 8 the total due and add these charges $ _40.80_ . This will give you the new balance. Please feel free to contact this office if you have any questions concerning this matter.

Sincerely
_Amanda Adams_
Amanda Adams
Collections Administrator

**REDACTED**

717

CF-01-314

**CLIF'S PHARMACY**

SALLISAW, OK 74955
(918) 776-████

Rx C 11████                    07/18/2001
**Charles E Sanders**
SEQ CO JAIL
SALLISAW, OK 74955
(000) 000-0918

Dr.WELLS, JAMES DDS
SALLISAW, OK

10 Tab VICOPROFEN 7.5/200 TABLETS
NDC:00044-0723-02 KNOLL LABS

$16.70

** Thank you **

Save This Receipt
For Tax or Insurance
00000935                    00000000
Waiting _____ Not Waiting _____

**CLIF'S PHARMACY**

SALLISAW, OK 74955
(918) 776-████

Rx  51████                   07/18/2001
**Charles E Sanders**
SEQ CO JAIL
SALLISAW, OK 74955
(000) 000-0918

Dr.WELLS, JAMES DDS
SALLISAW, OK

28 Tab PEN V K 250 MG TABLETS
NDC:00003-0115-75 APOTHECON

$7.40

** Thank you **

Save This Receipt
For Tax or Insurance
00000083                    00000000
Waiting _____ Not Waiting _____

*Charged*

DELIVERY

**CLIF'S PHARMACY**

SALLISAW, OK 74955
(918) 776-████

Rx C 11████                   07/09/2001
**Charles E Sanders**
SEQ CO JAIL
SALLISAW, OK 74955
(000) 000-0918

Dr.WELLS, JAMES DDS
SALLISAW, OK

10 Tab VICOPROFEN 7.5/200 TABLETS
NDC:00044-0723-02 KNOLL LABS

$16.70

** Thank you **

Save This Receipt
For Tax or Insurance
00000935        REDACTED 00000000
Waiting _____ Not Waiting _____

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 27 2001

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

718



IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                          )
      Plaintiff                     )
vs.                                         )      Case No. CF-01-00314
CHARLES EDMOND SANDERS                      )            CF-98-00346
                                            )            CF-98-00363
                                            )            CF-99-00562
                                            )
SALLISAW, OK  74955                         )
      Defendant                     )
  SS#:  9539
  DOB:  1966

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

State's Attorney:
Defendant's Attorney:

AUG 1 4 2002

Date: 08/14/02                RULE 8 HEARING STEVE BARNES  BERNELL EDWARDS, COURT CLERK
                                  (Summary)             BY_____DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

          $536.80 on or before 10-30-20**02** and

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 10-30-20_____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $536.80

**REDACTED**

                         DENNIS M. SPROUSE
X_____     Judge of the District Court
      Defendant
Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

719

*SEQUOYAH COUNTY, OKLAHOMA*
*IN DISTRICT COURT*
*FILED*
*AUG 1 4 2002*
*BY DARNELL EDWARDS, COURT CLERK*
*DEPUTY*

## APPLICATION FOR STAY OF EXECUTION ON FINES/COSTS

CHECK ONE     _____ I plan to pay before 3:30 pm today

_____ I plan to pay within 48 hours     _____ I want extended time to pay

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by the Court. I understand that I may be subject to penalties, including but not limited to imprisonment, if I fail to pay my assessed fine(s)/costs as ordered. I consent to an investigation into all information I provide on this application to verify its validity. I understand I may be held in CONTEMPT OF COURT for providing false and/or incomplete information on this application. I swear under PENALTY OF PERJURY that the below information is true and complete.

SIGNATURE _Charles Sander_     DATE _8/14/02_

CASE # _____     DATE OF BIRTH ███ 66

SS# ███ 9539     FINE/COST _____

LAST NAME _Sanders_     FIRST _Charles_  MI _E_

STREET _Rt 3_     CITY _Sallisaw_     PHONE _775-___

EMPLOYER _____ HOW LONG _____ PHONE _____

EARNINGS _____ per _____ #hrs/wk _____ paydates _____

### IF PAYING BEFORE 3:30 PM TODAY: STOP HERE

MARITAL STATUS     SINGLE____  MARRIED____     DIVORCED _✓_
                   SEPERATED____  WIDOW/ER____     COMMON LAW____

Names and Ages of Children_____
List others living in household   NAME     RELATIONSHIP   EMPLOYER   INCOME
_____
_____

AMOUNT OF CASH WITH YOU $_____ Saving/Checking Accounts $_____
Property,Investments, Assets $_____
I AM SUPPORTED BY:_____ Do you receive housing assistance____
    Alimony/Child Support_____     Monthly Expenses:
    Social Security_____     Rent_____
    Pension/Retirement_____     Food_____
    Welfare_____     Utilities_____
    Food Stamps_____     Child Care_____
    Unemployment_____ **REDACTED** Medical_____
    My Gross Monthly Earning_____     TOTAL$_____
    Other Income Support_____ Source_____

DRIVERS LICENSE # _SPN SS#_     STATE _OK_  EXP.DATE _5-1/89 Y_
VEHICLES YOU OWN OR USE:   YEAR     MAKE/MODLE     MONTHLY PAYMENTS
_____
_____

720

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                    )
          Plaintiff                   )
vs.                                   )        Case No.   CF-01-00314
CHARLES EDMOND SANDERS                )                   CF-98-00346
                                      )                   CF-98-00363
                                      )                   CF-99-00562
SALLISAW, OK  74955                   )
                    Defendant         )
     SS#:         9539
     DOB:         966

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 1 4 2002

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

State's Attorney:
Defendant's Attorney:

Date: 08/14/02          RULE 8 HEARING STEVE BARNES
                             (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

          $536.80 on or before 10-30-20**02** and

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 10-30-20 _____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

_____

TOTAL TO PAY $536.80

REDACTED DENNIS M. SPROUSE
Judge of the District Court

X_____
          Defendant
Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

721

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                    )
            Plaintiff                 )
vs.                                   )        Case No. CF-01-00314
CHARLES EDMOND SANDERS                )                 CF-98-00346
                                      )                 CF-98-00363
                                      )                 CF-99-00562
SALLISAW, OK  74955                   )
▮▮▮▮▮▮▮Defendant                      )        SEQUOYAH COUNTY, OKLAHOMA
    SS#: ▮▮▮▮9539                              FILED
    DOB: ▮▮▮▮▮1966                             IN DISTRICT COURT

                                               OCT - 9 2002

            State's Attorney:                  BERNELL EDWARDS, COURT CLERK
            Defendant's Attorney:              BY_____DEPUTY

Date: 10/09/02              RULE 8 HEARINGBRIAN MORTON
                                (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

        $100.00 on or before 11-09-20**02** and

then **100.00** per month on or before the **9** day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 11-09-20

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $**536.80**

X_____        REDACTED
        Defendant                      DENNIS M. SPROUSE
                                       Judge of the District Court
Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*



IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,            )
       Plaintiff        )
vs.                          )  Case No. ~~CF-01-00314~~ 4  **391.00**
CHARLES EDMOND SANDERS       )       CF-98-00346  1  **75.80**
                     )       CF-98-00363  2  **35.00**
SALLISAW, OK  74955          )       CF-99-00562  3  **35.00**
████████████Defendant         )
  SS#: ████9539                 )    SEQUOYAH COUNTY, OKLAHOMA
  DOB: ████/1966                               FILED
                                IN DISTRICT COURT

        State's Attorney:           **OCT - 9 2002**
        Defendant's Attorney:

                                  BERNELL EDWARDS, COURT CLERK
                                  BY_____DEPUTY

Date: 10/09/02          RULE 8 HEARINGBRIAN MORTON
                       (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

        $100.00 on or before 11-09-20**02** and

then **100.00** per month on or before the **9** day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before ~~11-09-20~~_____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $ **536.80**

                         **REDACTED**

X*Charles Sanders*        DENNIS M. SPROUSE
     Defendant            Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

OCT - 9 2002

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

## APPLICATION FOR STAY OF EXECUTION ON FINES/COSTS

CHECK ONE          _____ I plan to pay before 3:30 pm today

_____ I plan to pay within 48 hours          ✓ I want extended time to pay

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by the Court.  I understand that I may be subject to penalties, including but not limited to imprisonment, if I fail to pay my assessed fine(s)/costs as ordered.  I consent to an investigation into all information I provide on this application to verify its validity.  I understand I may be held in CONTEMPT OF COURT for providing false and/or incomplete information on this application. I swear under PENALTY OF PERJURY that the below information is true and complete.

SIGNATURE _Charles Sanders_ DATE _10-9-2002_

CASE # _____          DATE OF BIRTH _____66

SS# _____9539          FINE/COST_____

LAST NAME _Sanders_          FIRST_Charles_  MI _E_

STREET ▮▮▮▮▮  CITY _Sallisaw_  PHONE (918)775-▮▮▮

EMPLOYER _Kavin_  HOW LONG _Temp_  PHONE 776-▮▮▮

EARNINGS _24000_ per _week_  #hrs/wk_____  paydates _Friday_

### IF PAYING BEFORE 3:30 PM TODAY:  STOP HERE

MARITAL STATUS          SINGLE_____ MARRIED_____          DIVORCED_____
SEPERATED ✓  WIDOW/ER_____          COMMON LAW_____

Names and Ages of Children _Jennifer Sanders_
List others living in household   NAME          RELATIONSHIP   EMPLOYER   INCOME
_____
_____

AMOUNT OF CASH WITH YOU $ _00_ Saving/Checking Accounts $_____
Property, Investments, Assets $_____
I AM SUPPORTED BY:_____          Do you receive housing assistance_____
   Alimony/Child Support_____          Monthly Expenses:
   Social Security_____          Rent_____
   Pension/Retirement_____          Food_____
   Welfare_____          Utilities_____
   Food Stamps_____          Child Care_____
   Unemployment_____  **REDACTED**   Medical_____
   My Gross Monthly Earning_____          TOTAL$_____
   Other Income Support_____ Source_____

DRIVERS LICENSE # _4417▮_ STATE _OK_ EXP.DATE _11-8-2005_
VEHICLES YOU OWN OR USE:   YEAR   MAKE/MODLE   MONTHLY PAYMENTS
Ø_____

724

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 164**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

725

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

INFORMATION

MAR 2 5 2003

===============================================================

BERNELL EDWARDS, COURT CLERK

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

BY_____ DEPUTY

| | | |
|---|---|---|
| STATE OF OKLAHOMA | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. CF-2003- 124 |
| | ) | |
| CHARLES EDMOND SANDERS | ) | |
| DOB: ▮▮▮66, SS#: ▮▮▮9539 | ) | |
| Defendant. | ) | |

## INFORMATION

## IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes RICHARD GRAY, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CHARLES EDMOND SANDERS did, in Sequoyah County, and in the State of Oklahoma, on the 13th day of March, 2003, in the year of our Lord, Two Thousand Three, and before the presentment hereof, commit the crime of

### COUNT I:
### FELONIOUSLY POINTING WEAPON
### 21 O.S. 1289.16

That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did wilfully, and feloniously without lawful cause point a .22 Revolver, at one Sharla Bonner, for the purpose of threatening and intimidating Sharla Bonner, and with the unlawful, malicious and felonious intent then and there on the part of said defendant to injure the said Sharla Bonner, physically or by mental or emotional intimidation,

### COUNT II:
### FELON IN POSSESSION OF FIREARM
### 21 O.S. 1283

That on the day and year, and in the County and State aforesaid, CHARLES EDMOND SANDERS, did wilfully and feloniously have in his possession a .22 caliber revolver after he had been convicted of KNOWINGLY CONCEALING STOLEN PROPERTY in CF-99-562 in Sequoyah County, State of Oklahoma, on 9th day of December, 1999,

### COUNT III:
### FELONY RUNNING ROADBLOCK
### 21 O.S. 540 B

That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did unlawfully, knowingly, wilfully and feloniously after having received a visual and audible signal, to-wit: a red light and siren, failed to stop vehicle; and did unlawfully and wilfully thereafter fail to stop at a roadblock set up and attended by Roger Fuller, at or near a point located Art Gallery Road, in Sequoyah County, Oklahoma and wilfully passed through said roadblock without the permission of the police officer in attendance of said roadblock,

### COUNT IV:
### FELONY RUNNING ROADBLOCK
### 21 O.S. 540 B

That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did unlawfully, knowingly, wilfully and feloniously after having received a visual and audible signal, to-wit: a red light and siren, failed to stop vehicle; and did unlawfully and wilfully thereafter fail to stop at a roadblock set up and attended by Trooper Rodney Copeland, at or near a point located Art Gallery Road, in Sequoyah County, Oklahoma and wilfully passed through said roadblock without the permission of the police officer in attendance of said roadblock,

726

## COUNT V:
## ATTEMPTING TO ELUDE AN OFFICER
### 21 O.S. 540 A

That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did wilfully and wrongfully attempt to elude Jeremy Weedon of Sequoyah County, while in the performance of his duty, in the following manner, to-wit: that the said defendant was then and there operating a motor vehicle on the public streets and roads of Sequoyah County, and had received a visual and audible signal by means of a red light and a siren from the said Jeremy Weedon, who was then and there driving a motor vehicle showing the same to be an official Oklahoma Highway Patrol Unit, directing the said defendant to bring his vehicle to a stop, but that said defendant did then and there wilfully and wrongfully increase his speed in an attempt to elude said Jeremy Weedon,

## COUNT VI:
### RECKLESS DRIVING-47 O.S. 11-901

CHARLES EDMOND SANDERS did willfully and wrongfully drive and operate an automobile vehicle in a careless and reckless manner upon a public highway, without due care for the safety of the people or their property and in such manner as to endanger the life and limbs and property of other persons and the safety of their property and did drive an automobile, to-wit: a 1987 Ford pickup, bearing no license number , upon Art Gallery Road, Sequoyah County, at a speed that was neither careful nor prudent and that was greater than was reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing, and at a speed greater than would permit him to bring said automobile to a stop within the assured clear distance ahead,

## COUNT VII:
## RESISTING AN OFFICER
### 21 O.S. 268

That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did wilfully, knowingly and wrongfully resist by the use of force and violence one Trooper Jeremy Weedon, an Oklahoma Highway Patrolman, in the performance of his legal duty, to-wit: by running from Trooper Weedon, that the said defendant well knowing that the said Jeremy Weedon, was an executive officer then and there performing his duty,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

RICHARD GRAY
DISTRICT ATTORNEY

By_____
Assistant District Attorney

STATE OF OKLAHOMA   )
                    ) ss.
COUNTY OF SEQUOYAH )

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____
Affiant

Subscribed and sworn to before me this ___ day of March, 2003.

_____
NOTARY PUBLIC

My Commission Expires:

*5-14-2005*

*# 01006202*

WITNESSES:

**Deputy Richard Crutchfield, SCSO**

**Deputy Kelly Karnes, SCSO**

**Deputy Roger Fuller, SCSO**

**Trooper Jeremy Weedon, OHP**

**Trooper Rd Copeland, OHP**

**Sharla Bonner,** ███████████ **Grand Lake, OK**

SEQUOYAH COUNTY  OKLAHOMA
FILED
IN DISTRICT COURT

INFORMATION
Page 2

**MAR 2 5 2003**

BERNELL EDWARDS, COURT CLERK
BY_____

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) | SEQUOYAH COUNTY, STATE |
| | ) | OF OKLAHOMA |
| vs. | ) | CASE NO. CRF-2003- 124 |
| | ) | |
| CHARLES E. SANDERS, | ) | |
| Defendant. | ) | |

## FORMER CONVICTIONS

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-89-396, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UTTERING FORGED INSTRUMENT, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-92-91, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UNLAWFUL POSSESSION OF CONTROLLED DRUG, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-90-144, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of SEXUAL BATTERY, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 9th day of December, 1999, in Case No. CF-98-346, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of POSSESSION OF CONTROLLED DRUG, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 9th day of December, 1999, in Case No. CF-98-363, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UTTERING A FORGED INSTRUMENT, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 9th day of December, 1999, in Case No. CF-99-562, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of KNOWINGLY CONCEALING STOLEN PROPERTY, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

RICHARD L. GRAY,
DISTRICT ATTORNEY

BY:_____
Assistant District Attorney

729

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

*CF-03-124*

### Probable Cause Affidavit for Warrantless Arrest

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

Comes now the undersigned Affiant, and states upon Oath or Affirmation that the following information and facts are correct to the best of the Affiant's knowledge and belief:

MAR 2 5 2003

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

Name of Person Arrested: CHARLES EDMOND SANDERS      Social Security Number: 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

Date of Birth: ███████ 66   Date of Arrest (Detention): 03 / 13 / 03   Time of Arrest: _____ .M.

State Specific Facts for Probable Cause for the Arrest and Detention:

OIN 03-13-03 DEPUTY REICHARD CRUTHFIELD WAS DISPATCHED TO THE RESIDENCE OF EVELYN SANDERS ON A

COMPLAINT ON CHARLES SANDERS POINTING A FIREARM AT HER. ACCORDING TO THE VICTIM SHARLA

BONNER) SHE WAS AT HER MOTHERS RESIDENCE WHICH HER MOTHER GAVE HER PERMISSION TO BE THERE TO

GET SOME SLEEP BECAUSE SHE HAD BEE UP ALNIGHT AT THE HOSPITAL WITH HER MOTHER. AT

APPROXIMATELY 9 AM THE ABOVE SUBJECT CAME DOWN THE ROAD AND STOPPED AND PULLED A GUN AND

[Use reverse side or attach another page if necessary]
Anticipated Charge(s): SEE ATTACHED PAGE

AFCF: No / Yes times (1) (2) or _____

_____ Kelly Kerns _____
Affiant (Arresting Officer)

Subscribed and sworn to before me the undersigned, this __17th__ Day of __March__ 2003

My Commission Expires: 5-11-2005
# 01006902

_____ John Edwards _____
Notary Public / Judge / Witness

### Probable Cause Determination

I, __A. J. Henshan Jr__, Judge of the District Court reviewed this Probable Cause Affidavit on the __17th__ day of __March__, 2003, at __11:00__ A.M./P.M.

__✓__ This Affidavit contains sufficient facts showing probable cause to detain the Arrestee to await further proceedings. The Sheriff for Sequoyah or Chief of Police of the arresting agency is hereby commanded to receive him/her into their custody and detain until he/she is legally discharged.

__✓__ The Court sets [___]an Appearance Bond in the amount of $ __100,000__.00 or [___] as per Sequoyah County Bond Schedule.

_____ The Court denies Bond at this time.

_____ This Affidavit contains insufficient facts to show there exists probable cause to detain the Arrestee. **The Arrestee is Ordered Released From Custody Immediately.**

_____
Judge of the District Court

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
# STATE OF OKLAHOMA

## Probable Cause Affidavit for Warrantless Arrest

WAIVING IT AROUND AND STARTED THREATNING TO SHOOT THE VICTIM.. AT APPROXIMATELY 09:38 AM I (DEPUTY KELLY KARNES) WAS DISPATCHED TO THE RESIDENCE OF BRAD DAVIS WHERE SHOTS HAD BEEN FIRED UPON ARRIVING I WAS ADVISED BY BRAD DAVIS THAT CHARLES SANDERS HAD COME TO HIS RESIDENCE AND PULLED A GUN A STARTED THREATNING MR DAVIS THEN TOOK OFF DRIVING THROUGH THE WOODS TO THE WEST OF THE RESIDENCE. THEN TROOPER WEEDEN ADVISED THAT THE VEHICLE THE SUSPECT IS DRIVING IS HEADED BACK UP TOWARDS THE DIRECTION OF US. THEN DEPUTY ROGER FULLER TURNED HIS EMERGANCY EQUIPMENT ON AND MR SANDERS REFUSED TO STOP THE TROOPER ROD COPELAND WAS PARKED BESIDE THE ROAD WITH HIS EMERGANCY EQUIPMENT ON AND MR SANDERS FORCED TROOPER COPELAND OFF IN THE DITCH SO MR SANDERS WOULD NOT HIT HIM HEAD ON. THEN TROOPER WEEDEN WAS BEHIND MR SANDERS WITH EMERGANCY EQUIPMENT ON. MR SANDER CONTIUED SOUTH AROUND THE RESIDENCE AND JUMPED OUT OF THE VEHICLE JUST BEFORE IT HIT BEFORE IT HIT A TREE THEN TOOK OFF RUNNIG THROUGH THE WOODS WHERE TROOPER WEEDEN AND TROOPER COPELAND CAUGHT MR SANSERSWHILE LOOKING IN THE VEHICLE I FOUND A 22 REVOLVER WITH FIVE LIVE ROUNDS AND TWO SPENT ROUNDS AND ONE EMPTY HOLE. LAYING IN THE FLOOR BOARD OF THE VEHICLE. WHILE SECURING THE WEAPON IN THE VEHICLE I SMELL A STRONG ORDOR OF INTOXICATING BEVERAGE IN SIDE OF THE VEHICLE. WHEN MR SANDERS WAS BROUGHT BACK TO THE VEHICLE I COULD SMELL A STRONG ODOR OF INTOXICATING BEVERAGE ABOUT HIS BREATH AND PERSON. MR SANDERS WAS BOOKED INTO THE SEQUOYAH COUNTY JAIL FOR FELONOUSLY POINTING FIREARM, FELON IN POSSESSION OF FIREARM, FELONOUSLY RUNNING ROAD BLOCK X2, RESISTING ARREST, RECKLESS DRIVING,

**OKLAHOMA HIGHWAY PATROL**
**OKLAHOMA UNIFORM VIOLATIONS COMPLAINT**

Case No. _____ Docket No. _____ Page No. _____

State of Oklahoma
County of _SEQUOYAH_ } ss    In The District Court

NAME:

**COMPLAINT-INFORMATION**    DPS **D666695**

The undersigned, being duly sworn, upon his oath deposes and says that:

| on or about (date) | at (24 hour time) | at or near (location) |
|---|---|---|
| 03-13-03 | 1330 | 405 GALLWAY RD E ½ W OLD 17 |

| County Number | 68 | East Control-Int. | 0 3 5-0 | North Location | 0 4 2-2 |
|---|---|---|---|---|---|

within the city, county and state aforesaid:

Name (last, first, middle)    Phone Number
_SANDERS CHARLES EDMUND_   918-775-3093

Address

City _SALLISAW_   State _OK_   Zip Code _74955_

| Birthdate (mo., day, yr.) | Height | Weight | Race | Sex | Class | Endorsements |
|---|---|---|---|---|---|---|
|  | 5-10 | 170 | W | M | D |  |

Driver License Number   Month/Year   State
441 709 539   04   OK

Employer   NONE   Did Unlawfully   Operate ☐   Park ☐

| Vehicle-Make | Year | Body Style-Color | Tag Number | Year | State |
|---|---|---|---|---|---|
| FORD | 87 | PU-WHT/RED | NONE |  |  |

Commercial Motor Vehicle  Y  N ☒   ☐ Haz. Mat. Placard   ACCIDENT: ☐ PD ☐ PI ☐ FATALITY

and did then and there commit the following offense:

| | Pace | Radar | Plane | Other |
|---|---|---|---|---|
| SPEEDING   MPH in   MPH Zone | ☐ | ☐ | ☐ | ☐ |

Other Violation: _ATTEMPING TO ELUDE A PEACE OFFICER_

Contrary to Title _21_ Section _540 AA_   Oklahoma Statutes

I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.

_____ 03-13-03 _____ Badge No. 272 Troop C
Signature of Officer   Date

Sworn to and subscribed before me this _____ day of _____, 20 ____

_____   My Commission
Name and Title   Expires _____

Court Appearance: ____ day of _____, 20 __, at ____ M   (DPS USE) ES6

Address of Court _____

**NOTICE:** Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.

**WITHOUT ADMITTING GUILT,** I promise to appear in said court at said time and place.

X Signature _____   JAILED
(CHECK ONLY ONE BOX)

| Signed Personal Recognizance ☐ | Bond Attached ☐ | ☐ Magistrate | ☒ Jail | ☐ Other |
|---|---|---|---|---|

☐ Share the RD   Name of Parent or Guardian _____
☐ Juvenile   Address _____

Officer's Remarks: _FOOT PURSUIT_

DPS D666695

AREA: ☐ business  ☐ industrial  ☐ school  ☐ residential  ☒ rural
HIGHWAY TYPE: ☐ 1 lane  ☒ 2 lane  ☐ 3 lane  ☐ 4 or more undivided  ☐ 4 or more divided  ☐ on/off ramp

732

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

# Hamilton - Morgan Bail Bonds

APR 03 2003

Diane Hamilton

## APPEARANCE BOND

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

IN THE DISTRICT COURT OF _____*Seq*_____ COUNTY, STATE OF OKLAHOMA
State of Oklahoma,                    / Plaintiff,

vs. *Charles E. Sanders* , Defendant                    Case No. *CF-0312-4*

Know all men by these presents, that we the above named defendant, as principal, and the undersigned _*Diane Pratt*_ Diane Hamilton, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of *Thirty Thousand* _____ Dollars ($*30,000*) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of_*Seq*_County, State of Oklahoma, shall personally be and appear before the District Court of said county on the *9* day of *April*, 20*03*, at *10* o'clock *A.M.*, of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of *Running Roadblock X2 - Feloniously Pointing FA X2 - Felon in poss. of FA. Eluding Police officer - AFCF X2 or more - Wreckless Driving - Resisting Arrest.* and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this *2* day of *April* , 20 *03* .

_*Charles Sanders*_ Principal ▓▓▓▓▓▓▓▓▓ *Sallisaw* _____ Address

Hamilton - Morgan
Diane Hamilton                    Surety
_*Diane Pratt*_____ Surety ▓▓▓▓▓▓ *Sallisaw, OK* _____ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _____ day of _____, 20 ____.

_____ Court Clerk/Sheriff _____ Deputy

This undertaking approved this _____ day of _____, 20 ____.

(SEAL)                    By: _____ Deputy/Clerk

### AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, _*Seq*_ County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of _*Seq*_ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as herinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $*3000*

b) Other security received or promised for making this undertaking, is as follows:_*PN*_

c) Such promise, security or consideration was received from: _*Charles Sanders   Same as Above*_

Name                              Address

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as on commits perjury.

_*Diane Pratt*_ ▓▓▓▓ *Sallisaw, OK*
Affiant                    Address

Subscribed and sworn to before me this _____ day of _____, 20 _____.

(SEAL)

_____
Court Clerk - Notary Public

My Commission Expires:                    _____
                                         Deputy

733

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 03 2003

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type)(show alias)

Sanders  Charles Edmond  ▮▮▮ 66 ▮▮▮  9539

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-03-124 | Bonded by Hamilton Morgan | Running Roadblock x 2, Feloniously pointing firearm, Felon in possession of a firearm, Eluding police officer, AFCF x2 or more |
| | | |
| | | |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the 2nd day of April , 20 03 .

Sarah Durritt
Signature

AUTHORIZED BY

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

_____
JUDGE OF THE DISTRICT COURT

734

HAMILTON MORGAN BAIL BONDS
P.O. BOX 189
SALLISAW, OK. 74955
918-775-7887

CERTIFICATE OF SURRENDER

CASE NO(S): _CF-03-124_    BOND AMOUNT(S): _30,000.00_

I, _Sondra K. Davis_, JAILER OF SEQUOYAH COUNTY SHERIFF'S OFFICE, STATE OF OKLAHOMA, HEREBY ACKNOWLEDGE THAT I RECEIVED FROM DIANE HAMILTON, A LICENSED BAIL BONDSMAN IN THE STATE OF OKLAHOMA, _Charles Sanders_, DEFENDANT, IN A CERTAIN CASE PENDING IN DISTRICT COURT, IN SEQUOYAH COUNTY, STATE OF OKLAHOMA, AND THAT I HAVE RETAINED IN MY CUSTODY SAID DEFENDANT, THIS _31_ DAY OF _March_, 20_04_, AT _____ O'CLOCK __M.

JAILER _[signature]_
SEQUOYAH COUNTY JAIL

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 0 1 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

735

# In The District Court In And For Sequoyah County, State of Oklahoma

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| | ) | |
| **PLAINTIFF** | ) | **CASE NO:  CF-2003-124** |
| VS. | ) | |
| | ) | SEQUOYAH COUNTY, OKLAHOMA |
| CHARLES EDMOND "MONK" SANDERS) | | FILED |
| DOB: ███66 | ) | IN DISTRICT COURT |
| SS# █████9539 | ) | NOV 1 7 2004 |
| **DEFENDANT.** | ) | BERNELL EDWARDS, COURT CLERK |
| | | BY_____DEPUTY |

## JUDGMENT AND SENTENCE

Now, on this 18th day of November, 2004 this matter comes on before the undersigned Judge, for sentencing and the Defendant, __CHARLES EDMOND "MONK" SANDERS__ , appears personally and by his attorney of record, __JOHN SAWNEY__ , the State of Oklahoma represented by Assistant District Attorney, __JEFF SHERIDAN__ , and the Defendant, having previously:

(X )  Entered a plea of guilty
( )  Entered a plea of Nolo Contendere
( )  Found guilty by jury
( )  Found guilty by Judge after waiver of jury trial
      to/of the crime(s) of:

CT. I: DISMISSED
CT. II: DISMISSED
CT. III: FELONY RUNNING ROADBLOCK 21 O.S. 540 B
CT. IV: FELONY RUNNING ROADBLOCK 21 O.S. 540 B

( X )    The Defendant has previously been convicted of ___SIX (6)___ felony crimes and the sentence has been enhanced in accordance with the provisions set forth in Title 21 O.S. § 51 and 51A.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** by the Court that the Defendant, CHARLES EDMOND "MONK" SANDERS____, is guilty of the above-described offense(s) and is sentenced as follows:

### TERM OF IMPRISONMENT
COUNT _____: Sentenced to a term of _____ imprisonment;

all under the custody and control of the Oklahoma Department of Corrections.
These terms to be served ( ) concurrently, or ( ) consecutively;

### TERM OF IMPRISONMENT - (PART SUSPENDED)
COUNT __III__ : Sentenced to a term of _TWENTY-FIVE (25) YEARS_ imprisonment;
COUNT  IV  : Sentenced to a term of  TWENTY-FIVE (25) YEARS  imprisonment;
with all except the first _FIVE (5) YEARS_ suspended under the custody and control of the Oklahoma Department of Correction pursuant to the rules and conditions of probation entered by the Court. ALL TIME TO BE SUSPENDED UPON COMPLETION OF KEY TO LIFE OR SIMILAR PROGRAM.
These terms to be served (X ) concurrently, or ( ) consecutively; with CF-04-19; CF-99-562; CF-98-363 AND CF-98-346

### TERM OF IMPRISONMENT - (ALL SUSPENDED)
COUNT _____: Sentenced to a term of _____ imprisonment;

under the custody and control of the Oklahoma Department of Corrections all of said term(s) of imprisonment suspended pursuant to the rules and conditions of probation entered by the Court. These terms to be served ( ) concurrently, or ( ) consecutively;

736

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT** that in addition to the preceding term(s), the Defendant is also sentenced to:

### FINE

( ) The defendant shall pay a fine of $_____  ( ) immediately or ( ) on or before _____, 20\_\_\_, at the rate of $\_\_\_\_\_ per month, or within \_\_\_\_\_ days of release from the Department of Corrections.

( ) The payment of a fine of $_____ is suspended.

( ) The defendant shall report to the District Court of Sequoyah County within \_\_\_\_\_ days of release for a hearing on the defendant's ability to pay fines and costs pursuant to Section VIII of the rules of the Court of Criminal Appeals, 22 O.S. Chapter 18, App.

### COSTS, VCA, RESTITUTION

( ) The defendant shall pay costs, fees, and restitution in accordance with the schedule attached as Exhibit \_\_\_\_\_. (SEE RULES & CONDITIONS)

### RULES AND CONDITIONS OF PROBATION

( ) The rules and conditions as ordered by the court and signed and acknowledged by the defendant are attached as hereto.

### ATTORNEY FEES

( ) The defendant shall pay court-appointed attorney fee amount of $_____ on or before _____, 20\_\_, to _____.

It is further ordered that judgment is hereby entered against the Defendant as to the fines, court costs and assessments set forth above.

The Court further advised the Defendant of his rights to appeal to the Court of Criminal Appeals of the State of Oklahoma, and of the necessary steps to be taken by him to perfect such appeal, and that if he desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State without cost to him.

In the event the above sentence is for incarceration in the Department of Corrections, the sheriff of Sequoyah County, Oklahoma, is ordered and directed to deliver the Defendant to the Lexington Assessment and Reception Center at Lexington, Oklahoma, and leave therewith a copy of this Judgment and Sentence to as warrant and authority of the imprisonment of the Defendant as provided herein. A second copy of this Judgment and Sentence to warrant and authority of the sheriff for the transportation and imprisonment of the Defendant as herein before provided. The sheriff to make due return to the clerk of this Court, with his proceedings endorsed thereon.

_____
JUDGE OF THE DISTRICT COURT

(SEAL)
ATTEST:
BERNELL EDWARDS, COURT CLERK

_____, DEPUTY CLERK

737

Sequoyah County Form CF-1                                    Uniform Plea of Guilty--Summary of Facts

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## THE STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

STATE OF OKLAHOMA,                    )
                                      )                    NOV 1 7 2004
                    Plaintiff         )
                                      )         BERNELL EDWARDS, COURT CLERK
VS.                                   )         BY_____DEPUTY
                                      )
CHARLES EDMOND SANDERS                )
                                      )         Case No. CF-2003-124
                    Defendant         )
                                      )
DOB ████████ / 20  1966               )
SS# ████████ -_____                )

## SUMMARY OF FACTS FOR THE PLEA OF GUILTY

Part A: FINDING OF FACT, ACCEPTANCE OF PLEA                                    Circle

1.   Is the name just read to you your true name?                             (YES)   NO
     If no, then what is your correct name?_____
     I have also been known by the name(s) MONK

2.   (A) Do you wish to have a record of these proceedings made by a Court Reporter?   YES   (NO)
     (B) Do you wish to waive your right to have a record of these proceedings made?   (YES)  NO

3.   What is your age? 38  What grade level in school have you completed? GED

4.   Can you read and understand this form? [If no, Addendum A must be completed and attached]   (YES)   NO

5.   Are you currently taking any medications or substances which affect your ability to understand   YES   (NO)
     these proceedings?

6.   Have you been prescribed any medication which you are not taking?              YES   (NO)
     If yes, what medication are you not taking? _____
     What is the purpose of the medication? _____
     Why are you not taking the medication?_____

7.   Have you ever been treated by a doctor or health professional for mental illness or confined in   YES   (NO)
     a hospital for mental illness?
     If yes, list doctor or health professional, place, and when treatment occurred:
     _____

8.   Do you understand the purpose, the nature and the consequences of this proceeding?   (YES)   NO

9.   Have you received a copy of the State's Information and read its allegations?   (YES)   NO

738

10.   A. Do you understand you are charged with:
          Crime                                    Statutory Reference

[1] __FELONIOUSLY PONT. FIREARM__          __21__ O.S __1289.16__      YES  NO
[2] __FELON IN POSSESSION OF FIREARM__  21 O.S __1283__          YES  NO
[3] __FELONY RUNNING ROADBLOCK__        __21__ O.S __540B__        YES  NO
[4] __FELONY RUNNING ROADBLOCK__        __21__ O.S __540B__        YES  NO
[5] __Dismissed [6] Dismissed [7] Dismissed__   ____ O.S ____    YES  NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

B. Are you charged after former conviction of a felony (AFCF) ?          YES  NO
If yes, list the felony(ies) charged: __see attached list__

11.  Do you understand the range of punishment for the crime(s) is/are?
     (List in the same order as in Number 10)

[1] Minimum of __3 yrs__ to a maximum of __LIFE__ and/or a fine of $ __1000.00__   YES  NO
[2] Minimum of __3 yrs__ to a maximum of __LIFE__ and/or a fine of $ __1000.00__   YES  NO
[3] Minimum of __3 yrs__ to a maximum of __LIFE__ and/or a fine of $ __1000.00__   YES  NO
[4] Minimum of __3 yrs__ to a maximum of __LIFE__ and/or a fine of $ __1000.00__   YES  NO
[5] Minimum of _____ to a maximum of _____ and/or a fine of $_____   YES  NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

12.  Read the following statements: You have the right to a speedy trial before a jury of your peers to determine whether you are guilty or not guilty and if you request, to determine the sentence. If pleading to a capital murder, advise of the procedure in 21 O.S. 701.10 (B)
At the trial:
[1] You have the right to have an attorney represent you, either one you hire or if you are indigent a court appointed attorney.
[2] You are presumed to be innocent of the charges.
[3] You may remain silent or, if you choose, you may testify on your own behalf.
[4] You have the right to see and hear all witnesses called to testify against you and the right to have those witnesses cross-examined.
[5] You may have your witnesses ordered to appear in court to testify and present evidence of any defense you have to these charges.
[6] The State is required to prove your guilt beyond a reasonable doubt.
[7] The verdict of guilty or not guilty decided by a jury must be unanimous. However, you can waive a jury trial and, if all parties agree, the case could be tried by a Judge alone who would decide if you were guilty or not guilty and if determined to be guilty, the appropriate punishment.

Do you understand each of these rights?          YES  NO

13.  Do you understand by entering a plea of guilty you give up these rights?          YES  NO

14.  Do you understand that a conviction on a plea of guilty could increase punishment in any future case committed after this plea?          YES  NO

15.  Is __John W Sam__ your attorney?          YES  NO

16.  Have you talked with your attorney about the charges, advised him/her regarding any defense you may have to the charges and received his/her advice?          YES  NO

739

17. Do you believe your attorney has effectively assisted you in this case and are you satisfied with his/her representation?   YES   NO

18. Do you wish to change your plea of not guilty to a plea of guilty and give up your right to a jury trial and all previously explained constitutional rights?   YES   NO

19. Is there a plea agreement? _Restitution in amount of $10,500.00_   YES   NO
What is your understanding of the plea agreement? _Cts 1-2, 5, 6, 7 Dismissed_
_Cts 3 & 4  25 years with all but first 5 yrs suspended_
_5 years to be suspended upon completion of KEY TO LIFE_
_or similar program, concurrent with CF-04-19 and all revocation cases._

20. Do you understand the Court is not bound by any agreement or recommendation and if the Court does not accept the plea agreement, you have the right to withdraw your plea of guilty?   YES   NO

21. Do you understand that if there is no plea agreement the Court can sentence you within the range of punishment stated under question 11?   YES   NO

22. Do you understand your plea of guilty to the charge(s) is subject to: (check one)   YES   NO
[ ] no prior felony conviction
[ ] one (1) prior felony conviction
[✓] two (2) or more felony convictions: List prior felony convictions to which you are pleading:
_See attached list_

23. What is/are your plea(s) to each charge(s)?
[1] _Dismiss_ [2] _Dismiss_ [3] _Guilty_ [4] _Guilty_ [5] _Dismiss 5,6,7._

24. Did you commit the acts as charged in the information?   YES   NO
State a factual basis for your plea(s) (attach additional pages as needed, labeled as ADDENDUM C):
_The facts alleged are true, and correct as to remaining_
_counts and would likely result in a guilty_
_verdict._

25. Have you been forced, abused, mistreated or promised anything by anyone to have you enter your plea(s)?   YES   NO

26. Do you plead guilty of your own free will and without any coercion or compulsion of any kind?   YES   NO

27. If you are entering a plea to a felony offense, you have a right to a Pre-sentencing investigation and Report which would contain the circumstances of the offense, any criminal record, social history and other background information about you. Do you request a Pre-sentence report?   YES   NO

28. (A) Do you have any additional statements to make to the Court?   YES   NO

(B) Is there any legal reason as to why you should not sentence now?   YES   NO

HAVING BEEN SWORN, I, the Defendant whose signature appears below, make the Following statements under oath:

(1) CHECK ONE:

_____ (A) I have read, understood and completed this form.

✓ (B) My attorney completed this form and we (the attorney and I) have gone over the form and I understand its contents and agree with the answers. Complete Addendum A and attach to this form.

740

_____ (C)    The Court completed this form for me and inserted my answers to the questions in open court.

(2)    All Answers are true and correct.

(3)    I understand that I may be prosecuted for perjury if I have made false statements to this Court.

Acknowledged this ___8th___ day of ___November___, 200__.

_____
DEFENDANT

I, the undersigned attorney for the Defendant, believe the Defendant understands the nature, purpose, and consequence of this proceeding. (S)He is able to assist me in formulating any defense to the charge(s). I am satisfied that the Defendant's waivers and plea(s) of guilty are voluntarily given and he/she had been informed of all legal and constitutional rights.

_____
ATTORNEY FOR DEFENDANT

The sentence recommendation in question 19 is correctly stated. I believe the recommendation is fair to the State of Oklahoma. Offer of Proof (nolo contendere plea): _____

_____

_____

_____
ASSISTANT DISTRICT ATTORNEY

## THE COURT FINDS AS FOLLOWS:

A. The Defendant was sworn and responded to questions under oath.
B. The Defendant understands the purpose, nature and consequences of this proceeding.
C. The Defendant's plea(s) of __Guilty__ is/are knowingly and voluntarily entered and accepted by the COURT REPORTER PRESENT Court.
D. The Defendant is competent for the purpose of this hearing.
E. A factual basis exists for the plea(s) (and former conviction(s), if applicable).
F. The Defendant is guilty as charged: (check as appropriate)
    [  ] after no prior felony conviction.
    [  ] after one (1) prior felony conviction.
    [✓] after two (2) or more prior felony convictions
G. Sentencing or order deferring sentence shall be: [✓] imposed instanter or [ .] continued until the _____ day of _____ at _____ : _____ , _____ .M. If the Pre-sentence investigation and Report is requested, it shall be provided to the Court by the _____ day of _____ , _____ .

DONE IN OPEN COURT this ___18th___ day of ___Nov.___ 200__

_____
JUDGE OF THE DISTRICT COURT

John C Garrett
NAME OF JUDGE TYPED OR PRINTED

_____     _____
Court Reporter Present          Deputy Court Clerk Present

## "NOTICE OF RIGHT TO APPEAL"

Sentence to Incarceration, Suspended or Deferred:

To appeal from this conviction, or order deferring sentence, on your plea of guilty, you must file in the Sequoyah County District Court Clerk's Office a written Application to Withdraw Plea of Guilty within ten (10) days from today's date. You must set forth in detail why you are requesting to withdraw your plea. The trial court must hold a hearing and rule upon your application within thirty (30) days from the date it is filed. If the trial court denies your application, you have a right to ask the Court of Criminal Appeals to review the District Court's denial by filing a Petition for Writ of Certiorari within ninety (90) days of the date of denial. Within ten (10) days from the date the application to withdraw plea of guilty is denied, notice of intent to appeal and designation or record must be filed pursuant to Oklahoma Court of Criminal Appeals Rule 4.2 (D). If you are indigent, you have the right to be represented on appeal by a court appointed attorney.

Do you understand each of these rights to appeal?                                              YES       NO

Do you want to remain in the county jail ten (10) days before being taken to place of          YES       NO
confinement?

Have you fully understood the questions that have been asked?                                   YES       NO

Have your answers been freely and voluntarily given?                                           YES       NO

I ACKNOWLEDGE UNDERSTANDING OF RIGHTS AND SENTENCE IMPOSED.

_____
Defendant

I, the undersigned attorney, have advised the Defendant of his appellate rights.

_____
Attorney for the Defendant

DONE IN OPEN COURT, this __18TH__ day of ___Nov.___, __2004__.

_____
Judge of the District Court

_____
Court Reporter Present

_____
Deputy Court Clerk Present

## ADDENDUM "A"
### CERTIFICATE OF DEFENSE COUNSEL

As the attorney for the defendant, __Charles Edward Sanders__ , I certify that:

1. The Defendant has stated to me that he/she is [✓] able [ ] unable to read and understand the attached form, and I have [✓] determined the Defendant is able to understand the English language or [ ] determined the Defendant is unable to understand the English language and obtained _____ to interpret to the Defendant in the _____ language.

2. I have read and fully explained to the Defendant the allegations contained in the information in this case.

3. I have read and fully explained to the Defendant all of the questions in the Plea of Guilty/Summary of Facts and the answers to the questions set out in the Summary of Facts are the Defendant's answers.

4. To the best of my knowledge and belief the statement and declarations made by the Defendant are accurate and true and have been freely and voluntarily made.
   Dated this __18th__ day of __November__, __2004__.

_____
Attorney for the Defendant

742

Sequoyah County Form CF-1-b                    Uniform Plea of Guilty -- Sentence on Plea

Case Number CF- _O3-124_     State v. _Charles Sanders_  Date: _11-18-04_

**Part B:** Sentence on Plea    [NOTE ON USE:  Part B is to be used with the Summary of Facts if contemporaneous with the entry of plea or may be formatted as a separate sentencing form if sentencing is continued to a future date.]

**THE COURT SENTENCES THE DEFENDANT AS FOLLOWS:**

<p style="text-align:center">DEFERRED SENTENCE</p>

1. The sentencing date is deferred until _____, ___ , _____ at ___ : _____, ___ M.

2. You [  ] will [  ] will not be under supervision by the Department of Corrections.  The terms set forth in the Rules and Conditions of Probation in Addendum D shall be the rules you must follow during the period of deferment.

<p style="text-align:center">SUSPENDED SENTENCE or SUSPENDED AS TO PART</p>

1. You are sentenced to confinement under the supervision of the Department of Corrections for a term of years as follows:
[1] _____ [2] _____ [3] _25 year_ [4] _25 years_ [5] _____

TO BE SUSPENDED as follows:

   (A) ALL SUSPENDED   [  ] YES    [  ] NO

   (B) suspended except as to the first __5 years__ (months) (years) of the term(s) during which you are to be held in the custody of the Department of Corrections.  The remaining term of the sentence(s) is to be suspended under the terms set forth in the Rules and Conditions of Probation in Addendum D.

2. The sentence(s) is/are to run [✓] concurrently [  ] consecutively with/to _CF-04-19, CF-98-346_ _CF-98-363_ _____ or NOT APPLICABLE.

<p style="text-align:center">TIME TO SERVE</p>

1. You are sentencd to confinement under the supervision of the Department of Corrections for a term of years as follows:
[1]_____ [2]_____ [3] _____ [4]_____ [5]_____

2. The sentence(s) is/are to run [  ] concurrently [  ] consecutively with/to _____ _____ or NOT APPLICABLE.

<p style="text-align:center">FINES AND COSTS</p>

You are to pay in full any fine(s), costs, fees and restitution at the time of sentencing.  In the alternative, you may request a stay of execution (SOE) from the Cost Administrator in the Sequoyah County District Court Clerk's Office.  All information given to the Cost Administrator in requesting the SOE will be under oath and is considered as part of the summary of facts before the Court.  You will appear in person to make all payments as agreed.  Any payment tendered other than in person will be accepted; however, such acceptance does not excuse your appearance in the Clerk's Office.

<p style="text-align:right">743</p>

Sequoyah County Form CF-3(B)     Uniform Plea of Guilty -- Additional Findings

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, THE STATE OF OKLAHOMA

STATE vs. _Charles Sanders_ Defendant     Case No. _CF-03-124_

ADDITIONAL FINDINGS AT TIME OF SENTENCING

# EXHIBIT 1

A. Original Charges (A copy of the information may be attached instead) Please list any additional charges on a separate attached sheet.

| OFFENSE | STATUTE CITATION |
|---|---|
| | |
| | |
| | |
| | |

B. Prior Felony Charges Used For Enhancement Please list any additional convictions on a separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| see attached list | | |
| | | |
| | | |

C. Prior Charge(s) For Which Order Deferring Sentence Was Entered Please list any additional charges on separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| N/A | | |
| | | |
| | | |

D. Prior Felony Convictions Not Used For Enhancement Please list any additional convictions on a separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| N/A | | |
| | | |
| | | |

E.
If the defendant plead guilty to multiple counts, did the offense(s) arise from the same transaction?

Circle

YES     NO

744

## F.  Other Enhancers Used to Determine Placement on Matrix

Circle

1. Did the offender commit the current offense with the use of a firearm within the immediate possession and control of the offender?

YES   NO

2. Was the victim of the offense over 62 years of age, under 12 years of age or disabled by reason of mental or physical illness to such extent that the victim lacked the ability to effectively protect his or her property or persons?

YES   NO

3. Did the offender in the commission of the offense maim or torture the victim?

YES   NO

4. Did the offender commit a Schedule N-2 or N-3 drug offense in, on, or within 1,000 feet of real property comprising of a public or private elementary or secondary school; public or private college, university, or other institution of higher education; recreation or public park (including state facilities); public housing project; or in the presence of any child under 12 years of age?

YES   NO

5. Did the offender commit a Schedule N-2 or N-3 drug offense by using or soliciting the services of a person less than 18 years of age, providing the offender was at least 18 years of age at the time of the offense?

YES   NO

6. If the controlling offense was a property or drug offense, what was the total amount involved in that offense (e.g., the value of the property involved; the amount of money stolen, embezzled, or obtained by fraud; or the amount of drug proceeds utilized?)   $ _____

7. If the controlling offense was a drug offense, what was the predominant drug and what was the amount of that drug? (Please specify quantity in grams, ounces, etc.)

DRUG: _N/A_____

QUANTITY: (oz., grams, etc.) _____

## G.  Offender Characteristics

Gender (Circle)                        Race   (Circle)
Male   Female          White   Black   Hispanic   Asian   Native American

**This Exhibit shall not be admitted into evidence in any future prosecutions.**

Certified this ____ day of _November_ , 200_8_ .

_____          _____
Attorney for the State                           Attorney of the Defendant

                                         _____
                                         Judge of the District Court

745

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 1 3 2004

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type) (show alias) ████ Cole

Sanders, Charles Edmond      ████  9539

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| Booking # 2004-03181 | Sent to State Prison | Hold for Tulsa County |
| Warrant #'s | | Hold for Tulsa County (App. to revoke) |
| CF-04-14 | | Hold for Tulsa Co. (FTA) |
| CF-03-365 | | Merrills Bonding Surrender |
| CF-99-005162 | | Knowingly concealing stolen property |
| CF-03-124 | | Application to Revoke |
| CF-98-003103 | | Surrendered by Hamilton/Morgan |
| CF-98-00346 | | Burglery 2nd Degree |
| | | Uttering a forged Instrument |
| | | Application to revoke |
| | | Possession of controlled dangerous substance |
| | | Application to revoke |
| | | Hold for DOC |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the ___11___ day of December, 20 04.

_____
Signature

**AUTHORIZED BY**

_____
JUDGE OF THE DISTRICT COURT

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

IN THE DISTRICT COURT OF )   Defendant ___CHARLES EDMOND "MONK" SANDERS___
SEQUOYAH COUNTY )
STATE OF OKLAHOMA )   Case No. ___CF-2004-19 2003-124___
)
)   Date ___11/18/04___

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 1 7 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general state of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I will understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or any representative thereof.

8. I understand that I must support myself and all my dependents without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within the eighteen months.

15. **SPECIAL CONDITIONS:** The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, OSBI lab fees) of $_____ within _____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 20_____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed).*

COURT COSTS

( )   Defendant is to pay restitution through the District Attorney's office as set out in Exhibit "A" attached, the sum of $_____.

16. Defendant to report to DOC Probation & Parole Office within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_____
Attorney for Defendant

_____
Probationer

_____
JUDGE OF THE DISTRICT COURT

Defendant's Mailing Address:

_____

_____
Sallisaw, OK 74955

747

CF.99-562   CF.98.363
CF.98.346   CF.2004.19

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA                    CASE NO._____ CF.03.124

VS.                                  J & S DATE: NOV 17 - 2004

*Charles Edmond Sanders*
DEFENDANT

## STATEMENT OF JAIL TIME

PRISONER WAS ARRESTED ON DATES:   10·22·99 – 12·09·99 / 8·23·01 – 10·25·01
3·13·03 – 4·02·03 / 1·16·04 – 1·21·04
3·31·04 – 12·10·04

PRISONER REMAINED IN JAIL ____372____ DAYS BEFORE JUDGEMENT AND
SENTENCE.

PRISONER REMAINED IN JAIL ____23____ DAYS AFTER JUDGEMENT AND
SENTENCE.

TOTAL DAY'S OF JAIL TIME ____395____

_____ *Christine Calbert*
SEQUOYAH COUNTY CRIMINAL JUSTICE AUTHORITY
12·28·2004

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 2 8 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

SEQUOYAH COUNTY, OKLAHOMA
FILED

IN THE DISTRICT COURT OF            )
SEQUOYAH COUNTY                     )
STATE OF OKLAHOMA                   )
NOV 1 8 2005                        )
                                    )
BERNELL EDWARDS, COURT CLERK        )
BY_____ DEPUTY

Defendant CHARLES EDMOND "MONK" SANDERS

Case No. CF-05-406
CF-03-124, CF-97-562 - CF-98-363
Date _NOVEMBER 17, 2005_  CF-98-346

**RULES AND CONDITIONS OF PROBATION**

1.  I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general state of my environment and progress.

2.  I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I will understand that I am not to go into or loiter around beer taverns or pool halls.

3.  I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4.  I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5.  I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6.  I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7.  I understand that it will be a violation of my probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or any representative thereof.

8.  I understand that I must support myself and all my dependents without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9.  I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within the eighteen months.

15. **SPECIAL CONDITIONS:** The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, OSBI lab fees) of $_____ within _____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 20____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed).*

( )  Defendant is to pay restitution through the District Attorney's office as set out in Exhibit "A" attached, the sum of $_____.

16. Defendant to report to DOC Probation & Parole Office within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

Attorney for Defendant

JUDGE OF THE DISTRICT COURT

Probationer

Defendant's Mailing Address:

# In The District Court In And For Sequoyah County, State of Oklahoma

THE STATE OF OKLAHOMA,        )
                              )
              PLAINTIFF       )        CASE NO: CF-2003-124
VS.                           )
                              )        SEQUOYAH COUNTY, OKLAHOMA
CHARLES EDMOND "MONK" SANDERS)                FILED
DOB: ▆▆▆▆/66                   )         IN DISTRICT COURT
SS# ▆▆▆▆▆9539                  )
              DEFENDANT.       )            NOV 2 3 2005

### A M E N D E D
### J U D G M E N T   A N D   S E N T E N C E

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

Now, on this 17th day of November, 2005 this matter comes on before the undersigned Judge, for sentencing and the Defendant, __CHARLES EDMOND "MONK" SANDERS__, appears personally and by his attorney of record, __JOHN SAWNEY__, the State of Oklahoma represented by Assistant District Attorney, __JEFF SHERIDAN__, and the Defendant, having previously:

(X ) Entered a plea of guilty
( ) Entered a plea of Nolo Contendere
( ) Found guilty by jury
( ) Found guilty by Judge after waiver of jury trial
    to/of the crime(s) of:

CT. I: DISMISSED
CT. II: DISMISSED
CT. III: FELONY RUNNING ROADBLOCK 21 O.S. 540 B
CT. IV: FELONY RUNNING ROADBLOCK 21 O.S. 540 B

( X ) The Defendant has previously been convicted of ___SIX (6)___ felony crimes and the sentence has been enhanced in accordance with the provisions set forth in Title 21 O.S. § 51 and 51A.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** by the Court that the Defendant, CHARLES EDMOND "MONK" SANDERS____, is guilty of the above-described offense(s) and is sentenced as follows:

### TERM OF IMPRISONMENT
COUNT _____: Sentenced to a term of _____ imprisonment;

all under the custody and control of the Oklahoma Department of Corrections.
These terms to be served ( ) concurrently, or ( ) consecutively;

### TERM OF IMPRISONMENT - (PART SUSPENDED)
COUNT _____: Sentenced to a term of _____ imprisonment;

with all except the first _ suspended under the custody and control of the Oklahoma Department of Correction pursuant to the rules and conditions of probation entered by the Court. .
These terms to be served (X ) concurrently, or ( ) consecutively; with CF-04-19; CF-99-562; CF-98-363 AND CF-98-346

### TERM OF IMPRISONMENT - (ALL SUSPENDED)
COUNT ___III__: Sentenced to a term of _TWENTY-FIVE (25) YEARS_____ imprisonment;
COUNT    IV  : Sentenced to a term of  TWENTY-FIVE (25) YEARS  imprisonmen;t
under the custody and control of the Oklahoma Department of Corrections all of said term(s) of imprisonment suspended pursuant to the rules and conditions of probation entered by the Court.
These terms to be served ( X ) concurrently, or ( ) consecutively;  with CF-04-19; CF-99-562; CF-98-363 and CF-98-346

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT** that in addition to the preceding term(s), the Defendant is also sentenced to:

## FINE

( ) The defendant shall pay a fine of $_____ ( ) immediately or ( ) on or before _____, 20___, at the rate of $_____ per month, or within _____ days of release from the Department of Corrections.

( ) The payment of a fine of $_____ is suspended.

( ) The defendant shall report to the District Court of Sequoyah County within _____ days of release for a hearing on the defendant's ability to pay fines and costs pursuant to Section VIII of the rules of the Court of Criminal Appeals, 22 O.S. Chapter 18, App.

## COSTS, VCA, RESTITUTION

( ) The defendant shall pay costs, fees, and restitution in accordance with the schedule attached as Exhibit _____. (SEE RULES & CONDITIONS)

## RULES AND CONDITIONS OF PROBATION

( ) The rules and conditions as ordered by the court and signed and acknowledged by the defendant are attached as hereto.

## ATTORNEY FEES

( ) The defendant shall pay court-appointed attorney fee amount of $_____ on or before _____, 20___, to _____.

It is further ordered that judgment is hereby entered against the Defendant as to the fines, court costs and assessments set forth above.

The Court further advised the Defendant of his rights to appeal to the Court of Criminal Appeals of the State of Oklahoma, and of the necessary steps to be taken by him to perfect such appeal, and that if he desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State without cost to him.

In the event the above sentence is for incarceration in the Department of Corrections, the sheriff of Sequoyah County, Oklahoma, is ordered and directed to deliver the Defendant to the Lexington Assessment and Reception Center at Lexington, Oklahoma, and leave therewith a copy of this Judgment and Sentence to as warrant and authority of the imprisonment of the Defendant as provided herein. A second copy of this Judgment and Sentence to warrant and authority of the sheriff for the transportation and imprisonment of the Defendant as herein before provided. The sheriff to make due return to the clerk of this Court, with his proceedings endorsed thereon.

_____
JUDGE OF THE DISTRICT COURT

(SEAL)
ATTEST:
BERNELL EDWARDS, COURT CLERK

_____ Hickman, DEPUTY CLERK

751

# DISTRICT COURT OF MUSKOGEE, WAGONER, CHEROKEE
## AND SEQUOYAH COUNTIES

FIFTEENTH JUDICIAL DISTRICT

(ORDER)

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 0 3 2006

BERNELL EDWARDS, COURT CLERK

BY _____ DEPUTY

DATE: 3-29-06

DEFENDANT: Sanders, Charles

CHARGE: Burglary 2 nd

SENTENCE DATE: 11-17-05

C7- 04-19
C7- 03-124
C7- 99- 562
C7- 98- 346
CASE NUMBER: C7- 98- 363

EXPIRATION DATE: 11-16-30

THE DEPARTMENT OF CORRECTIONS IS HEREBY RELIEVED FROM FURTHER ACTIVE SUPERVISION OF THIS DEFENDANT IN THIS PARTICULAR CASE.

JUDGE OF DISTICT COURT   Garrett

* Per plea agreement with the feds. banish from Sequoyah county.

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

| STATE OF OKLAHOMA | CASE NO.(S) | FINES(S) | SEQUOYAH COUNTY, OKLAHOMA FILED IN DISTRICT COURT |
|---|---|---|---|

VS.

_Charles Sanders_   _CM03-365_

_CF04-19_

_CF03-124_

**DATE:**

**DEC 0 8 2008**

MAUDEEN MANN, COURT CLERK

BY _____ DEPUTY

SUBTOTALS: _____

☐ **MINUTE** / ☐ **SENTENCING ORDER**     TOTAL: _____

LSI: _____ / _____   Supervision: ☐ Community  ☐ Drug  ☐ Standard  ☐ Other _____

_CM03-365 — State dismisses case costs to State._

_CF 04-19 — State agrees to suspend remaining fines + court costs_

_CF 03-124 — State agrees to suspend remaining fines + court costs_

_Withdraw all costs warrants_

**DEFENDANT IS ORDERED BACK:** _____ , 200___ @ _____ , ___.M.

Payment of fines, costs, fees, etc. shall be payable by money orders or cashier's checks (no personal checks or cash)
Include your name and case number - Payments shall be paid to the following entities:

| FINES AND COURT COSTS | RESTITUTION | DRUG FUND |
|---|---|---|
| Total of _____ | Total of _____ | Total of _____ |
| Payable in monthly payments of _____ for ____ months | Payable in monthly payments of _____ for ____ months | Payable in monthly payments of _____ for ____ months |
| 1st payment due: _____ | 1st payment due: _____ | 1st payment due: _____ |
| Payable to: Sequoyah County Court Clerk 120 E. Chickasaw, Ste 205 Sallisaw, OK 74955 (918) 775-4411 | Payable to: District Attorney's Annex 120 E. Chickasaw, Ste 204 Sallisaw, OK 74955 (918) 775-9131 | Payable to: Office of the District Attorney 120 E. Chickasaw, Ste 204 Sallisaw, OK 74955 (918) 775-9131 |

**I, THE DEFENDANT, UNDERSTAND THAT I MUST PAY AND COMPLETE ALL THE THINGS LISTED ABOVE AND MUST APPEAR BACK IN COURT ON THE DATE AND TIME SET FORTH ABOVE, OR I WILL BE ARRESTED AND JAILED!!!**

_____
DEFENDANT

_____
DEFENDANT'S ATTORNEY

_____
DISTRICT COURT JUDGE

_____
ASSISTANT DISTRICT ATTORNEY

White - Original     Yellow - District Attorney     Pink - Defendant

753

754

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**REDACTED EXHIBIT 161**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

754

**INFORMATION**
========================================================================

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA  )
       Plaintiff,  )
vs.  )  No. CF-98-363
  )
  )
CHARLES EDMOND SANDERS  )
DOB: ███ 66  )
DL/SS# █████ 9539  )
       Defendant.  )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 3 0 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## I N F O R M A T I O N

### IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CHARLES EDMOND SANDERS did, in Sequoyah County, and in the State of Oklahoma, on the 13th day of August, in the year of our Lord, One Thousand, Nine Hundred and Ninety-Eight and before the presentment hereof, commit the crime of

### UTTERING A FORGED INSTRUMENT-21 O.S. 1592

CHARLES EDMOND SANDERS unlawfully, willfully, knowingly, fraudulently and feloniously with intent to defraud, utter and publish as true to one Jeremy Mounce, employee at Marble City Store, a certain instrument, to-wit: a check, which is in words and figures as follows: Check #4781 in the amount of $48.00; that said defendant then and there knowing at the time that said written instrument was forged and counterfeited, and that the signature of Mary Copeland to said instrument was forged and counterfeited, but said defendant did then and there unlawfully, willfully, fraudulently and feloniously, utter and publish same with the felonious intent then and there on the part of said defendant to beat, cheat and defraud,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

By _____
    Assistant District Attorney

STATE OF OKLAHOMA )
       ) ss.
COUNTY OF SEQUOYAH)
  Undersigned, being duly sworn, upon oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____
Assistant District Attorney

Subscribed and sworn to before me this 28th day of September, 1998.

My Commission Expires:
_____6/28/99_____

_____
NOTARY PUBLIC

WITNESSES:
Mary Copeland, ███████ Muldrow, OK
Jeremy Lee Mounce, ███████ Marble City, OK
Kelly Karnes, SCSO, Sallisaw, OK

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 3 0 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

INFORMATION
Page 2

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) | SEQUOYAH COUNTY, STATE |
| | ) | OF OKLAHOMA |
| vs. | ) | CASE NO. CRF-98-363 |
| | ) | |
| CHARLES E. SANDERS, | ) | |
| Defendant. | ) | |

## FORMER CONVICTIONS

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-89-396, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UTTERING FORGED INSTRUMENT, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-92-91, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UNLAWFUL POSSESSION OF CONTROLLED DRUG, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-90-144, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of SEXUAL BATTERY, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

DIANNE BARKER HARROLD,
DISTRICT ATTORNEY

BY: _____
Assistant District Attorney

**REDACTED**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**SEP 3 0 1998**

THE STATE OF OKLAHOMA,
                    Plaintiff,

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

vs.

_Charles Sanders_ ,
                    Defendant.

No. _CF-98-363_

A F F I D A V I T

State of Oklahoma )
County of Sequoyah ) ss.

_Kelly Karnes_ , of lawful age and being first duly
sworn upon an oath, deposes and says:

On 08-13-98 I (Deputy Kelly Karnes) was Dispatched to marble City to meet with mary Copeland in Ref. to some Forgering her Name on some Canceled Checks upon ARRiving Mrs Copeland advised That The Bank told her That some Checks had Come Through on Closed account Mrs Copeland advised That The Checks was In a travel TRAiler upon Ridge Route Road at Laketenkiller

Based on this information, the undersigned prays that this
Honorable Court issue a finding of fact that probable cause exists
to believe that a crime has been committed and that there is
probable cause to believe the defendant(s) above named committed
that crime.

FURTHER AFFIANT SAYETH NOT.

Subscribed and sworn to REDACTED before me this 22nd day of

MY COMMISSION EXPIRES:
03-27-99

NOTARY PUBLIC

FINDING OF PROBABLE CAUSE

The undersigned Judge of this Court, upon sworn testimony
and/or affidavit, hereby determines there to be probable cause to
detain the defendant(s).
DATED this ____ day of _September_ , 1998.

JUDGE OF THE DISTRICT COURT

757

CF-98-363

Marble City,OK
DOB: ████66  SS# ████9539
White Male

# WARRANT

STATE OF OKLAHOMA,
COUNTY OF SEQUOYAH—ss.

THE STATE OF OKLAHOMA, to any Sheriff, Constable, Marshal or Policeman in the above named County and State:

Information upon oath having been this day laid before me that the crime of _____

____UTTERING A FORGED INSTRUMENT_____ has been committed, and

accusing ___Charles E.Sanders_____ thereof.

You are therefore commanded forthwith to arrest the above named _Charles E. Sanders_____

and bring h_im___ before me at ___Sequoyah County Courthouse_____.

or, in the case of my absence or inability to act, before the nearest or most accessible magistrate in this county.

Dated at __Sallisaw_____, this _____29_____ day of __September_____, 19_98__.

_____
Judge of the District Court.

**The Defendant is to be admitted
to bail in the amount of** _$5,000.00_____

REDACTED

SANDERS, CHARLES E.

CF-98-363

Marble City,OK
DOB: ██████66  SS#██████████9539
White Male

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

# WARRANT

OCT  2 1998

STATE OF OKLAHOMA,
COUNTY OF SEQUOYAH—ss.

BERNELL EDWARDS, COURT CLERK
BY _____ _Aul_____ DEPUTY

THE STATE OF OKLAHOMA, to any Sheriff, Constable, Marshal or Policeman in the above named County and State:

Information upon oath having been this day laid before me that the crime of _____

___UTTERING_A_FORGED_INSTRUMENT_____ has been committed, and

accusing ___Charles E.Sanders_____ thereof.

You are therefore commanded forthwith to arrest the above named _Charles_E._Sanders_____

and bring h_im___ before me at ___Sequoyah_County_Courthouse_____·

or, in the case of my absence or inability to act, before the nearest or most accessible magistrate in this county.

Dated at __Sallisaw_____, this ____29ᵘ_____ day of _September_____, 19_98_.

_____
Judge of the District Court.

The Defendant is to be admitted
to bail in the amount of _$5,000.⁰⁰_____

759

*Clearance*

WARRANT CLEARANCE

WARRANT # _CF98-363_

WARRANT NAME _Charles Sanders_

DATE & TIME CLEARED _9-30-98_

WARRANT CLEARED BY:

    ARREST __X__   OFFICER SERVING _Craig Manley_

               AGENCY _SCSO_

    CANCELLATION_____   JUDGE OR OFFICIAL DIRECTING WARRANT CANCELLATION

WARRANT PULLED FROM FILE     YES _X_   NO_____   IF NO, EXPLAIN WHY NOT

WARRANT CANCELLED FROM NCIC     YES_____   NO _X_   IF YES, NCIC

                                  CANCELLATION NUMBER_____

                                  IF NO, EXPLAIN WHY NOT REMOVED _Not Entered_

SHERIFF'S OFFICE EMPLOYEE SIGNATURE _Boyd_

                                     MUST SIGN FULL NAME

NOTE:   AFTER COMPLETION, ATTACH THIS FORM TO THE CANCELLED OR SERVED
        WARRANT. BE SURE TO ATTACH THIS FORM BACK TO BACK WITH THE
        WARRANT.

**REDACTED**

# Hamilton - Morgan Bail Bonds
## Diane Hamilton
## APPEARANCE BOND

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 3 0 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

IN THE DISTRICT COURT OF _____Sequoyah_____ COUNTY, STATE OF OKLAHOMA
State of Oklahoma, _____ Plaintiff,

vs. ___Charles Sanders___ , Defendant

Case No. _CF 98-363_
_CF-98-36_

Know all men by these presents, that we the above named defendant, as principal, and the undersigned ___Joe Morgan___ Diane Hamilton, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of _twenty five thousand_ Dollars ($ _25,000_ ) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of _Sequoyah_ County, State of Oklahoma, shall personally be and appear before the District Court of said county on the _7_ day of _Oct._, 19_98_, at _9:00_ o'clock _A.m._, of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of _Uttering A Forged Instrument 5,000') (CF-98-36 increased 20,000)_ and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this _30_ day of _Sept_ 19_98_.

X _Charles Sanders_ Principal _____ _marble city ok_ Address _74945_

Hamilton - Morgan                Surety        113 North Oak  Sallisaw, Oklahoma 74955
Diane Hamilton

_Joe Morgan_ _____ Surety  _Sallisaw OK 74955_ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _30_ day of _Sept_, 19_98_.

_____ Court Clerk/Sheriff _____ Deputy

This undertaking approved this _30_ day of _Sept._, 19_98_.

(SEAL)                           By: _____ Deputy/Clerk

---

## AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, _Sequoyah_ County, SS:

The undersigned, being first duly sworn upon oath, REDACTED says that he is a resident of _Sequoyah_ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as hereinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $ _3750.00_

b) Other security received or promised for making this undertaking, is as follows: _____
_Prom. Note_

c) Such promise, security or consideration was received from: _____ _marble city_

X _Charles Sanders_ _____ _marble city_
Name                           Address

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as on commits perjury.

_Joe Morgan_ _____ _Sallisaw 74955_
Affiant                        Address

Subscribed and sworn to before me this _30_ day of _Sept_, 19_98_.

(SEAL)

_____
Court Clerk - Notary Public

My Commission Expires: _____
                       Deputy

# POWER OF ATTORNEY
## Hamilton - Morgan Bail Bonds
DIANE HAMILTON DBA
HAMILTON MORGAN BAIL BOND
113 North Oak • Sallisaw Oklahoma 74955
(918) 775-7887

$200,000.00 Bond Power                               No. 44619

Know all men by these presents:

That I, Diane Hamilton, of Sallisaw, Sequoyah County, State of Oklahoma, have made and constituted and appointed by the present do make, constitute and appoint the below named agent, my true and lawful attorney, for me in my name, place and stead, and to my use as my employee and agent to write professional bonds, to sign my name, by him/her, in the execution of any and all bonds made as my agent, giving my said attorney full power to do every thing whatsoever requisite and necessary to be done in the premises as fully as I could do if personally present, hereby ratifying and confirming all that my said attorney shall lawfully do, or cause to be done, by virtue hereof. All this provided this Power-Of-Attorney is filled with the bond and retained as a part of the court records, the said Attorney-In-Fact is authorized to insert in this Power-Of-Attorney the name of the person whose behalf the bond was giving.

IN WITNESS THERE OF, Diane Hamilton, has caused these presents to be signed by its authorized officer, proper for the purpose this _30_ day of _Sept_ 19_98_.

$200,000.00 Bond Power

Diane Hamilton, Professional Bondsman
Hamilton - Morgan Bail Bonds

Bond Amount $ _25,000.00_ Appearance Date _10/7/98_
Defendant _Charles Saunders_ Address ███████
Court _District_ City _Marble City_ State _OK_
_(F-98-36 increased 20,000.00)_ Zip Code _74945_
Offense _uttering a forged instrument_ Case # _____
Executing Agent _____

762

WARRANT CLEARANCE

WARRANT # *CF-97-9  CF98-363*

WARRANT NAME *SANDERS, Charles*

DATE & TIME CLEARED *11-16-98   19:05*

WARRANT CLEARED BY:

 ARREST ___✓___ OFFICER SERVING_____

 AGENCY *SCSO*

 CANCELLATION_____ JUDGE OR OFFICIAL DIRECTING WARRANT CANCELLATION

_____

WARRANT PULLED FROM FILE   YES_____  NO ✓   IF NO, EXPLAIN WHY NOT

*Had To get copy From court Clerk before find then cra NCIC Was Filed*

WARRANT CANCELLED FROM NCIC   YES_____  NO_____  IF YES, NCIC

 CANCELLATION NUMBER_____

 IF NO, EXPLAIN WHY NOT REMOVED

_____

SHERIFF'S OFFICE EMPLOYEE SIGNATURE_____

 MUST SIGN FULL NAME

NOTE: AFTER COMPLETION, ATTACH THIS FORM TO THE CANCELLED OR SERVED
 WARRANT. BE SURE TO ATTACH THIS FORM BACK TO BACK WITH THE
 WARRANT.

**REDACTED**

BENCH WARRANT ON INDICTMENT OR INFORMATION.

STATE OF OKLAHOMA,)

    Sequoyah County      )                       IN _DISTRICT_ _ COURT

THE STATE OF OKLAHOMA

vs.

__Charles Edmond Sanders__ DOB ██ ′66 __

████████ Sallisaw _____

███████ 9539 _____ Defendant. _____

No. _CF-97-9_
CF-98-363
Bond $50,000

**ISSUED**
_10-9-98_

THE STATE OF OKLAHOMA

To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

Whereas an_____ __information__ _____ having been __filed__ ___.

on the __30th__ day of __Sept.__ _____ A. D. 19 _98_ , in the __district__ Court of

Sequoyah County, State of Oklahoma, charging __Charles Edmond Sanders__ _____

_____ with the crime of __Uttering a forged instrument and_____

_failing to appear_____

You are therefore commanded forthwith to arrest the above named __Charles Edmond Sanders__ ____

and bring him before* __District Judge__ _____

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**NOV 1 7 1998**

BERNELL EDWARDS, COURT CLERK
BY _____ _Cui_ _____ DEPUTY

term that you deliver him into the custody of the Sheriff of Sequoyah County, Oklahoma. or if the said Court have adjourned for the

Given under my hand with the seal of said Court affixed, this _____ __9th__ _____ day of

__October__ _____ A. D. 19 _98_

By order of the Court.

*See Sec. 5384, Wilson's Statutes.

_Bernell Edwards_____
_Bernell Edwards_) _____ Court Clerk.
By _Amanda Woody_ _____
Deputy.

764

SHERIFF'S RETURN

RECEIVED the within Writ on the_____ day of_____19_____., at
_____o'clock_____M., and executed on the_____day of_____19____,
_____o'clock_____M., by_____

_____

_____

Dated this____16th____day of ____Nov.____ 19 28

_____
Sheriff of_____.County
By__ Walter Ross _____
Under Sheriff.        Deputy.

No._____
In_____Court
BENCH WARRANT ON INDICT-MENT OR INFORMATION
THE STATE OF OKLAHOMA
vs.
Defendant
19.___
Filed_____
Court Clerk
By_____
Deputy

BENCH WARRANT ON INDICTMENT OR INFORMATION.

STATE OF OKLAHOMA,)

Sequoyah County            )

IN __DISTRICT__ COURT

THE STATE OF OKLAHOMA

vs.

Charles Edmond Sanders · DOB: ███66

████████ Sallisaw

#████9539            Defendant.

No. CF-97-9

CF-98-363

Bond $50,000

**ISSUED**

10-9-98

THE STATE OF OKLAHOMA

To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

Whereas an __information__ _____ having been __filed_____

on the __30th____ day of __Sept._____ A. D. 19 _98_, in the __district__ Court of

Sequoyah County, State of Oklahoma, charging __Charles Edmond Sanders_____

_____ with the crime of __Uttering a forged instrument and failing__

__to appear_____

You are therefore commanded forthwith to arrest the above named __Charles Edmond Sanders_____

and bring him before* __District Judge_____

_____ or if the said Court have adjourned for the

term that you deliver him into the custody of the Sheriff of Sequoyah County, Oklahoma.

Given under my hand with the seal of said Court affixed, this _____9th_____ day of

__October_____ A. D. 19 _98_

By order of the Court.

*See Sec. 5384, Wilson's Statutes.

Bernell Edwards_____

Bernell Edwards

By Amanda Woody            Court Clerk.

_____

Deputy.

REDACTED

BENCH WARRANT ON INDICTMENT OR INFORMATION.

STATE OF OKLAHOMA, )

    Sequoyah County     )

        THE STATE OF OKLAHOMA

                vs.

Charles Edmond Sanders   DOB: ███ 66

████████ Sallisaw

#████ 9539        Defendant.

THE STATE OF OKLAHOMA

IN **DISTRICT** COURT

No. CF-97-9
CF-98-363

**ISSUED**
10-9-98

Bond $50,000

To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

    Whereas an **information** _____ having been **filed** ____
on the **30th** day of **Sept.** A. D. 19 **98**, in the **district** Court of
Sequoyah County, State of Oklahoma, charging **Charles Edmond Sanders** ____
_____ with the crime of **Uttering a forged instrument and failing**
**to appear** _____

    You are therefore commanded forthwith to arrest the above named **Charles Edmond Sanders**
_____     SEQUOYAH COUNTY, OKLAHOMA
and bring him before* **District Judge**     IN DISTRICT COURT

                      NOV 3 0 1998

                      BERNELL EDWARDS, COURT CLERK
                      BY _____ DEPUTY

_____ or if the said Court have adjourned for the
term that you deliver him into the custody of the Sheriff of Sequoyah County, Oklahoma.

    Given under my hand with the seal of said Court affixed, this _____ **9th** _____ day of
**October** _____ A. D. 19 **98**

    By order of the Court.

                    Bernell Edwards
                    Bernell Edwards     Court Clerk.
               By _Amanda Woody_

*See Sec. 5384, Wilson's Statutes.                 Deputy.

## SHERIFF'S RETURN

RECEIVED the within Writ on the_____day of_____19____., at

_____o'clock_____M., and executed on the_____day of_____,19____,

_____o'clock_____M., by_____

_____

_____

Dated this_____day of _____ 19 ___

_____

Sheriff of_____County

By_____

Under Sheriff.     Deputy.

No._____Court

In_____Court

**BENCH WARRANT ON INDICT-MENT OR INFORMATION**

THE STATE OF OKLAHOMA

vs.

Defendant

19.___

Filed_____

Court Clerk

By_____

Deputy

WARRANT CLEARANCE

WARRANT # *CF97-9 & CF98-363*

WARRANT NAME *Charles Edmond Sanders*

DATE & TIME CLEARED _____

WARRANT CLEARED BY:

   ARREST __✓__ OFFICER SERVING _0_ *Jailer* _____

           AGENCY _SCSO_ _____

  CANCELLATION _____ JUDGE OR OFFICIAL DIRECTING WARRANT CANCELLATION

_____

WARRANT PULLED FROM FILE    YES __✓__ NO _____ IF NO, EXPLAIN WHY NOT

_____

WARRANT CANCELLED FROM NCIC    YES __✓__ NO _____ IF YES, NCIC

                            CANCELLATION NUMBER _____

                            IF NO, EXPLAIN WHY NOT REMOVED

_____

SHERIFF'S OFFICE EMPLOYEE SIGNATURE *Michelle Pitts* _____

                             MUST SIGN FULL NAME

NOTE: AFTER COMPLETION, ATTACH THIS FORM TO THE CANCELLED OR SERVED
WARRANT. BE SURE TO ATTACH THIS FORM BACK TO BACK WITH THE
WARRANT.

**REDACTED**

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

Case No: *CF-98-363*　　　Defendant: *Charles ~~Borden~~*

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

## ACCUMULATIVE COURT COST FOR SEQUOYAH COUNTY

DEC - 8 1999

### NON-VIOLENT COURT COST

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**COURT FUND**

| | | |
|---|---|---|
| Court Fees | | $103.00 |
| Bail Bond Fee | $10.00 @ __1__ | _10.00_ |
| Jury Fee | $30.00@ _____ | |
| Fines | set by court | _500.00_ |
| Mailing fee | $7.00 @ _____ | |
| Sub total Court Fund | | _613.00_ |

**SHERIFF FEES**

| | | |
|---|---|---|
| Sheriff Fees | | $30.00 |
| Arrest Warrant | $30.00 | _30.00_ |
| Bench Warrant | $30.00@ __1__ | _30.00_ |
| Revolving Fund | $5.00 | _5.00_ |
| Subpoenas | $30.00@ _____ | |
| Sub total Sheriff Fees | | _95.00_ |

| | | |
|---|---|---|
| LAW LIBRARY | | $3.00 |
| CLEET & FINGERPRINTING | | $7.00 |

| | | |
|---|---|---|
| VCA | $25.00 or set by court | _125.00_ |
| OSBI LAB | set by court | _____ |
| D.A. DRUG FUND | set by court | _____ |
| REVOLVING FUND(appl fee-$40.00) | | _____ |
| IDF-ATTORNEY FEE | set by court | _____ |

**REDACTED**

TOTAL　　　　　　$843.00

IN THE DISTRICT COURT OF )
SEQUOYAH COUNTY )
STATE OF OKLAHOMA )
)
)
)

Defendant __CHARLES EDMOND SANDERS__

Case No. __CF-98-363__

Date __DECEMBER 9, 1999__

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 9 1999

BERNELL EDWARDS, COURT CLERK
BY _____
DEPUTY

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general state of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I will understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or any representative thereof.

8. I understand that I must support myself and all my dependents without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within the eighteen months.

15. **SPECIAL CONDITIONS:** The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, OSBI lab fees) of $_____ within _____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 19_____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed).*

$500 FINE and $125 VCA

( X ) Defendant is to pay restitution through the District Attorney's office as set out in Exhibit "A" attached, the sum of $ 48.00 __REDACTED__

16. Defendant to report to DOC Probation & Parole Office within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_____
Attorney for Defendant

_____
JUDGE OF THE DISTRICT COURT

_____
Probationer

771

# In The District Court In And For Sequoyah County, State of Oklahoma

THE STATE OF OKLAHOMA,      )
     )
             **PLAINTIFF**      )
VS.      )
CHARLES EDMOND SANDERS      )
DOB: ███66      )
SS# ███9539      )
             **DEFENDANT.**      )

**CASE NO: CF-98-363**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 9 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## JUDGMENT AND SENTENCE

Now, on this **9TH DAY OF DECEMBER, 1999**, this matter comes on before the undersigned Judge, for sentencing and the Defendant, _____CHARLES EDMOND SANDERS_____ , appears personally and by his attorney of record, _____MONTE JOHNSON_____, the State of Oklahoma represented by Assistant District Attorney, __ROBBIE COWAN__, and the Defendant, having previously:

(X)    Entered a plea of guilty
( )    Entered a plea of Nolo Contendere
( )    Found guilty by jury
( )    Found guilty by Judge after waiver of jury trial
       to/of the crime(s) of:

CT. I: UTTERING A FORGED INSTRUMENT, 21 O.S. 1592

( )    The Defendant has previously been convicted of _____ felony crimes and the sentence has been enhanced in accordance with the provisions set forth in Title 21 O.S. § 51 and 51A.

     **IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** by the Court that the Defendant, _____**CHARLES EDMOND SANDERS**_____, is guilty of the above-described offense(s) and is sentenced as follows:

### TERM OF IMPRISONMENT

COUNT _____: Sentenced to a term of _____ imprisonment;

all under the custody and control of the Oklahoma Department ~~REDACTED~~ of Corrections.
These terms to be served ( ) concurrently, or ( ) consecutively;

### TERM OF IMPRISONMENT - (PART SUSPENDED)

COUNT _____: Sentenced to a term of_____ imprisonment;

with all except the first _____ suspended under the custody and control of the Oklahoma Department of Correction pursuant to the rules and conditions of probation entered by the Court. These terms to be served ( ) concurrently, or ( ) consecutively;

### TERM OF IMPRISONMENT - (ALL SUSPENDED)

COUNT _____: Sentenced to a term of __TWENTY (20) YEARS__ imprisonment;

under the custody and control of the Oklahoma Department of Corrections all of said term(s) of imprisonment suspended pursuant to the rules and conditions of probation entered by the Court. These terms to be served (X) concurrently, or ( ) consecutively; w/Seq County Case Nos. CF-99-562 and CF-98-346

772

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT** that in addition to the preceding term(s), the Defendant is also sentenced to:

### FINE

( ) The defendant shall pay a fine of $_____ ( ) immediately or ( ) on or before _____, 19___, at the rate of $_____ per month, or within _____ days of release from the Department of Corrections.

( ) The payment of a fine of $_____ is suspended.

( ) The defendant shall report to the District Court of Sequoyah County within _____ days of release for a hearing on the defendant's ability to pay fines and costs pursuant to Section VIII of the rules of the Court of Criminal Appeals, 22 O.S. Chapter 18, App.

### COSTS, VCA, RESTITUTION

( ) The defendant shall pay costs, fees, and restitution in accordance with the schedule attached as Exhibit _____.

### RULES AND CONDITIONS OF PROBATION

( ) The rules and conditions as ordered by the court and signed and acknowledged by the defendant are attached as hereto.

### ATTORNEY FEES

( ) The defendant shall pay court-appointed attorney fee amount of $_____ on or before _____, 19___, to _____.

It is further ordered that judgment is hereby entered against the Defendant as to the fines, court costs and assessments set forth above.

The Court further advised the Defendant of his rights to appeal to the Court of Criminal Appeals of the State of Oklahoma, and of the necessary steps to be taken by him to perfect such appeal, and that if he desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State without cost to him.

In the event the above sentence is for incarceration in the Department of Corrections, the sheriff of Sequoyah County, Oklahoma, is ordered and directed to deliver the Defendant to the Lexington Assessment and Reception Center at Lexington, Oklahoma, and leave therewith a copy of this Judgment and Sentence to as warrant and authority of the imprisonment of the Defendant as provided herein. A second copy of this Judgment and Sentence to warrant and authority of the sheriff for the transportation and imprisonment of the Defendant as herein before provided. The sheriff to make due return to the clerk of this Court, with his proceedings endorsed thereon.

REDACTED

_____
JUDGE OF THE DISTRICT COURT

(SEAL)
ATTEST:
BERNELL EDWARDS, COURT CLERK

_____, DEPUTY CLERK

773

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 3 1 2001

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No.  CF-98-363 |
| | ) | |
| CHARLES E. SANDERS | ) | |
| Defendant. | ) | |

## APPLICATION TO REVOKE SUSPENDED SENTENCE

COMES NOW, Dianne Barker Harrold, the duly elected, qualified, and acting District Attorney of Sequoyah County, and states to the Court that on the 9th day of December, 1999, the said Defendant entered his plea of guilty in the above entitled case, in the District Court of Sequoyah County, Oklahoma, to the charge of: UTTERING A FORGED INSTRUMENT, as set out in the Information on file in this cause and the said defendant was sentenced to serve a term of TWENTY (20) years, under the Supervision of the Department of Correction, which sentence the Court suspended during the good behavior of said defendant.

Thereafter, the defendant violated the rules and conditions of probation as imposed by the Court in the following manner:

**Rule #1**: by failing to report for Probation and Parole.

**Rule #2**: by being in possession of intoxicants and being arrested for:  LARCENY OF MERCHANDISE FROM RETAILER, POSSESSION OF PARAPHERNALIA in Sequoyah County, OK on May 17th, 2001.

**Rule #9**: by violating city, state or federal law, and being charged with:  LARCENY OF MERCHANDISE FROM RETAILER, POSSESSION OF PARAPHERNALIA in Sequoyah County, OK CF-2001-314.

WHEREFORE, applicant prays that the Court set a date for hearing this application and that the suspension clause in said Judgment and Sentence be carried out in full, according to its terms. That the Court direct the Court Clerk of Sequoyah County, Oklahoma, to issue a Bench Warrant for the arrest of said defendant.

Dated this ___30th___ day of May, 2001.

**DIANNE BARKER HARROLD, District Attorney**

BY:  REDACTED
Assistant District Attorney

WITNESSES:

Emmett Daniels, c/o Probation & Parole, Sallisaw, OK
Derek Brown, ▮▮▮▮▮▮▮▮▮ Sallisaw, OK
Rocky Gaither, ▮▮▮▮▮▮▮ Sallisaw, OK
Dustin Walters, ▮▮▮▮▮▮▮ Sallisaw, OK
Leri Kay, ▮▮▮▮▮▮▮ Sallisaw, OK
Debbie Carter, ▮▮▮▮▮ , Sallisaw, OK

## FINDING OF PROBABLE CAUSE

The Undersigned Judge of the District Court, upon the above application hereby determines there to be probable cause for the issuance of a Bench Warrant and so orders.

Dated this ___30th___ day of ___May___ , 200_.
Bond set at $ ___10,000.00___

_____
JUDGE OF THE DISTRICT COURT

774

ISSUED
6/5/01

## BENCH WARRANT--After Conviction

| | | |
|---|---|---|
| **STATE OF OKLAHOMA,** | ) | |
| **Sequoyah County,** | ) | **IN DISTRICT COURT** |
| | | |
| THE STATE OF OKLAHOMA | ) | |
| VS. | ) | No.CF-98-363 |
| CHARLES E. SANDERS | ) | |
| ██████████████ | ) | |
| | ) | |
| SALLISAW, OKLAHOMA 74955 | ) | |
| ████1966 ████9539 | ) | **BOND: $10,000** |

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**CHARLES E. SANDERS** having been on the 9TH DAY OF DECEMBER, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :UTTERING A FORGED INSTRUMENT, **APPLICATION TO REVOKE SUSPENDED SENTENCE**

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **CHARLES E. SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 5TH DAY OF JUNE, 2001. By Order of the Court.

BERNELL EDWARDS, COURT CLERK

BY: _Dara Allen_
                                    DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199____, at _____ o'clock _____M., and executed on the _____ day of _____, 199____, at _____ o'clock _____M. by _____

_____

Dated this _____ day of _____ 199____.

_____
SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY: _____
**REDACTED**                                   DEPUTY

775

ISSUED
6/5/01

**BENCH WARRANT--After Conviction**

**STATE OF OKLAHOMA,**          )
**Sequoyah County,**             )

THE STATE OF OKLAHOMA          )
                VS.             )
CHARLES E. SANDERS             )
███████████████                )
SALLISAW, OKLAHOMA 74955       )
████966████9539                )

IN DISTRICT COURT SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

No.CF-98-363   **JUN 13 2001**

BERNELL EDWARDS, COURT CLERK
_____DEPUTY
BY_____

**BOND: $10,000**

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**CHARLES E. SANDERS** having been on the 9TH DAY OF DECEMBER, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :UTTERING A FORGED INSTRUMENT, **APPLICATION TO REVOKE SUSPENDED SENTENCE**

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named
**CHARLES E. SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 5TH DAY OF JUNE, 2001. By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**
BY: *Dara Allen*
_____
DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

S H E R I F F ' S   R E T U R N

RECEIVED the within Writ on the _____ day of _____, 199____, at _____o'clock _____M., and executed on the _____day of _____, 199____, at_____o'clock _____M. by _____
_____

Dated this _____day of _____199____.

SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA
BY: *Cecil Duty*
_____
DEPUTY

**REDACTED**

776

## WARRANT CLEARANCE

WARRANT # _CF96-363_

WARRANT NAME _Charles E. Sanders_

DATE & TIME CLEARED _6/12/01   1654_

WARRANT CLEARED BY:

ARREST _X_   OFFICER SERVING _Cecil Duty_

AGENCY _SCSO_

CANCEL _____   OFFICIAL DIRECTING WARRANT CANCELLATION

_____

WAS WARRANT PULLED FROM FILE?          (YES)          NO

IF NO, EXPLAIN WHY NOT _____

WAS WARRANT MARKED OFF BOOK?          (YES)          NO

IF NO, EXPLAIN WHY NOT _____

WAS WARRANT CANCELLED FROM NCIC?          YES          (NO)

IF NO, EXPLAIN WHY NOT _Not entered_

WAS WARRANT REMOVED FROM HOLDS BOOK?          YES          (NO)

IF NO, EXPLAIN WHY NOT _No hold_

SHERIFF'S OFFICE EMPLOYEE SIGNATURE _Amy Nelson_

NOTE:   AFTER COMPLETING THIS FORM, STAPLE THIS FORM BACK TO BACK WITH THE WARRANT AND PLACE IN THE FOLDER MARKED "SEND TO COURT CLERK." ONLY USE THIS FORM TO CLEAR SEQUOYAH COUNTY WARRANTS. REDACTED

USE ONE FORM FOR EACH WARRANT CLEARED.

777

ISSUED

8/23/01

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

THE STATE OF OKLAHOMA,           )
                  Plaintiff,     )
                                 )
vs.                              )        No. CF-98-363
                                 )
CHARLES E. SANDERS               )
                  Defendant.     )

AUG 23 2001

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

## ORDER REVOKING SUSPENDED SENTENCE

NOW, on this 23rd day of August, 2001, the above styled case comes on for hearing on the State's Application to Revoke Suspended Sentence. The State is present by Assistant District Attorney, Rob Cowan, the defendant is present and represented by the attorney of record, . Monte Johnson.

The Court finds that on the 9th day of December, 1999, the said defendant was found guilty of the crime of UTTERING A FORGED INSTRUMENT, and sentenced to a term of TWENTY (20) years with the direction of the Department of Corrections, and of said sentence TWENTY (20) years was suspended pending the defendant's good behavior.

The Court finds that on the 31st day of May, 2001, the State filed an Application to Revoke Suspended Sentence based on violations of the defendant's Rules and Conditions of Probation. The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the suspended sentence is revoked in full with the defendant to attend the Last Stop Program with said balance to be suspended upon successful completion thereof. The Sheriff of Sequoyah County shall deliver said defendant to the Department of Corrections and leave therewith a copy of this Order of Judgment and Sentence to serve as a warrant and authority for the revocation of said defendant as provided herein. The second copy of the Order to be warrant and authority of said Sheriff for the transportation and imprisonment of said defendant as herein before provided. The Sheriff to make due return to the Clerk of this Court, with his procedure endorsed thereon. Defendant to turn himself in to Seq County Jail on Aug 30, 01 @ Noon.

_____
REDACTED JUDGE OF THE DISTRICT COURT

778

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 2 8 2002

BERNELL EDWARDS, COURT CLERK
BY_____ ᔑᏓ _____DEPUTY

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA, )
         Plaintiff, )
         )
vs. )       No. CF-98-363
         )
CHARLES E. SANDERS )
        Defendant. )

## NUNC PRO TUNC
## ORDER REVOKING SUSPENDED SENTENCE

NOW, on this _28th_ day of ~~January~~ March, 2002, the above styled case comes on for hearing on the State's Application to Revoke Suspended Sentence. The State is present by Assistant District Attorney, Rob Cowan, the defendant is present and represented by the attorney of record, . Monte Johnson.

The Court finds that on the 9th day of December, 1999, the said defendant was found guilty of the crime of UTTERING A FORGED INSTRUMENT and sentenced to a term of TWENTY (20) years with the direction of the Department of Corrections, and of said sentence TWENTY (20) years was suspended pending the defendant's good behavior.

The Court finds that on the 31st day of May, 2001, the State filed an Application to Revoke Suspended Sentence based on violations of the defendant's Rules and Conditions of Probation. The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the suspended sentence is revoked in full and shall run concurrently with CF-98-346 with the defendant to attend the Last Stop Program or similar program with said balance to be suspended upon successful completion thereof. The Sheriff of Sequoyah County shall deliver said defendant to the Department of Corrections and leave therewith a copy of this Order of Judgment and Sentence to serve as a warrant and authority for the revocation of said defendant as provided herein. The second copy of the Order to be warrant and authority of said Sheriff for the transportation and imprisonment of said defendant as herein before provided. The Sheriff to make due return to the Clerk of this Court, with his procedure endorsed thereon.

REDACTED

_____
JUDGE OF THE DISTRICT COURT

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA STATE OF
OKLAHOMA                                                  CASE NO. _CF-98-363_
                                                              _CF-98-346_
SEQUOYAH COUNTY, OKLAHOMA     _CF-99-562_
FILED
IN DISTRICT COURT

VS.                                                  _J&S date 08-28-01_

JAN 1 8 2002

Sanders, Charles

BERNELL EDWARDS, COURT CLERK
DEFENDANT                BY _____ DEPUTY

STATEMENT OF JAIL TIME

PRISONER WAS ARRESTED ON DATE OR DATES AS FOLLOWS: _See below_

PRISONER REMAINED IN JAIL ___279___ DAYS BEFORE JUDGEMENT AND
SENTENCING.

PRISONER REMAINED IN JAIL ___2___ DAYS AFTER JUDGEMENT AND
SENTENCING.

Jamie Fullch

SEQUOYAH COUNTY SHERIFF'S DEPARTMENT

04-15-98 thru 04-15-98 = 1 day
~~09-17-98 to thru~~ 09-18-98 = 1 day
11-16-98 thru 02-01-99 = 78
06-22-99 thru 06-23-99 = 1 day
09-30-98 thru 09-30-98 = 1 day
10-22-99 thru 12-09-99 = 49 days
05-20-00 thru 08-13-00 = 86 days
05-27-01 thru ~~10-25~~-08-29-01 = 64

**REDACTED**

780

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                    )
       Plaintiff                     )
vs.                                   )       Case No. CF-01-00314
CHARLES EDMOND SANDERS                )                CF-98-00346
                                      )                CF-98-00363
                                      )                CF-99-00562
SALLISAW, OK  74955                   )
████████████Defendant                 )       **SEQUOYAH COUNTY, OKLAHOMA**
   SS#: ████9539                              **FILED**
   DOB: ████1966                              **IN DISTRICT COURT**

**OCT - 9 2002**

       State's Attorney:           BERNELL EDWARDS, COURT CLERK
       Defendant's Attorney:       BY_____DEPUTY

Date: 10/09/02              RULE 8 HEARINGBRIAN MORTON
                               (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $100.00 on or before 11-09-20 02 and

then 100.00 ____ per month on or before the 9 day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 11-09-20 _____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $536.80        REDACTED
                            _____
x_Charles Sanders_____    DENNIS M. SPROUSE
      Defendant         Judge of the District Court
Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
           Plaintiff                    )
                                        )
vs.                                     )
CHARLES EDMOND SANDERS                  )        Case No. CF-01-00314
                                        )                 CF-98-00346
                                        )                 CF-98-00363
                                        )                 CF-99-00562
SALLISAW, OK  74955                     )
                        Defendant       )
        SS#:        9539
        DOB:        1966

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 1 4 2002

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

State's Attorney:
Defendant's Attorney:

Date: 08/14/02                RULE 8 HEARING STEVE BARNES
                                 (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $536.80 on or before 10-30-20 02 and

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 10-30-20 _____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

TOTAL TO PAY $536.80

X_____        REDACTED  DENNIS M. SPROUSE
        Defendant                          Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

782

**ISSUED**
3-15-04

**BENCH WARRANT – After Conviction**

| | |
|---|---|
| **STATE OF OKLAHOMA**<br>**Sequoyah County,**<br>**THE STATE OF OKLAHOMA**<br>VS.<br>**CHARLES EDMOND SANDERS**<br>████████<br>**SALLISAW, OK 74955**<br>█████66 █████9539 | **IN DISTRICT COURT**<br><br>**CF-98-00363**<br><br><br><br>**BOND - $10,000** |

THE STATE OF OKLAHOMA
To any Sheriff or Policeman of the State of Oklahoma – Greeting:

**CHARLES EDMOND SANDERS** having been on the 9th day of December, 1999 duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of : UTTERING A FORGED INSTRUMENT / APPLICATION TO REVOKE OR APPLICATION TO IMPOSE JUDGMENT AND SENTENCE

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above – named **CHARLES EDMOND SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this Monday, March 15, 2004. By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: _Robin Hickman_
**Deputy**

**WILL ONLY EXTRIDIATE FROM SURROUNDING STATES**

**SHERIFF'S RETURN**

RECEIVED the Writ on the _____ day of _____, 20___, at _____ o'clock ___a.m. by _____

—————————————————— REDACTED ——————————————————

Dated this _____ day of _____ 20___.

_____
SHERIFF OF SEQUOYAH COUNTY, OK

BY:_____

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

THE STATE OF OKLAHOMA, )
  Plaintiff, )
vs. )
  ) No. CF-98-363
  )
CHARLES E. SANDERS, )
  Defendant. )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 12 2004

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

## SECOND APPLICATION TO REVOKE SUSPENDED SENTENCE

COMES NOW, Richard L. Gray, the duly elected, qualified, and acting District Attorney of Sequoyah County, and states to the Court that on the 9th day of December, 1999, the said Defendant entered his/her plea of guilty in the above entitled case, in the District Court of Sequoyah County, Oklahoma, to the charge of: UTTERING A FORGED INSTRUMENT , as set out in the Information on file in this cause and the said defendant was sentenced to serve a term of TWENTY (20) years, under the Supervision of the Department of Correction, which sentence the Court suspended during the good behavior of said defendant. Further that on the 31st day of May, 2001 the State of Oklahoma filed its Application to Revoke Suspended Sentence. That on the 23rd day of August, 2001, Defendant was found guilty of violating the rules and conditions of probation and the suspended sentence was revoked, with Defendant to successfully complete the Last Stop or similar program, at which time the balance of said sentence would be suspended.

Thereafter, the defendant violated the rules and conditions of probation as imposed by the Court in the following manner:

**Rule #9**: by violating city, state or federal law, and being cited for Burglary, 2nd degree in Sequoyah County Case CF-04-19.

WHEREFORE, applicant prays that the Court set a date for hearing this application and that the suspension clause in said Judgment and Sentence be carried out in full, according to its terms. That the Court direct the Court Clerk of Sequoyah County, Oklahoma, to issue a Bench Warrant for the arrest of said defendant.

Dated this __11TH__ day of , 2004.

RICHARD L. GRAY, District Attorney

BY: _____
  REDACTED
  Assistant District Attorney

WITNESSES:
Chief Gary Philpot, Sallisaw PD
Sam Pinson, State Fire Marshall
Sally Jackson▮▮▮▮▮▮▮▮Sallisaw, OK 74955
Wung Mei Fung,▮▮▮▮▮▮▮▮▮▮Sallisaw, OK
Hui Hui Zheng▮▮▮▮▮▮▮▮▮▮▮Sallisaw, OK

## FINDING OF PROBABLE CAUSE

The Undersigned Judge of the District Court, upon the above application hereby determines there to be probable cause for the issuance of a Bench Warrant and so orders.

Dated this __11TH__ day of __March__ , 2004
Bond set at $__10,000"__

_____
JUDGE OF THE DISTRICT COURT

**BENCH WARRANT – After Conviction**

ISSUED
3-15-04

**STATE OF OKLAHOMA**
Sequoyah County,
THE STATE OF OKLAHOMA
VS.
**CHARLES EDMOND SANDERS**

SALLISAW, OK 74955

██66 ██9539

**IN DISTRICT COURT**

**CF-98-00363**

**BOND - $10,000**

THE STATE OF OKLAHOMA
To any Sheriff or Policeman of the State of Oklahoma – Greeting:

**CHARLES EDMOND SANDERS** having been on the 9th day of December, 1999 duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of : UTTERING A FORGED INSTRUMENT / APPLICATION TO REVOKE OR APPLICATION TO IMPOSE JUDGMENT AND SENTENCE

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above – named
**CHARLES EDMOND SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this Monday, March 15, 2004. By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: _Robin Hickman_
**Deputy**

**WILL ONLY EXTRIDIATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the Writ on the _____ day of _____, 20___, at _____ o'clock
___a.m. by _____

_____ REDACTED _____

Dated this _____ day of _____ 20___.

SHERIFF OF SEQUOYAH COUNTY, OK

BY: _____

Sequoyah County
Warrant Clearance

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

Warrant Number: _CP 98-00363_                              APR. 0 5 2004

BERNELL EDWARDS, COURT CLERK

Warrant Name: _CHARLES EDmond Sanders_          BY _____ DEPUTY

Date & Time Cleared: _03/31/04  17:15_

Warrant Cleared By:

    Arrest___✓ Officer Serving: _Chris Grizzle_

               Agency: _Seq. Co._  Badge Number: _825_

    Cancel___ Official Directing Warrant Cancelation_____

Was warrant pulled from file?                    (Yes)           No

If no explain:_____

Was warrant marked off warrant book and data base?   (Yes)    No

If no explain:_____

Was warrant cleared from NCIC?                   (Yes)      Not entered

Was warrant removed from holds book?     Yes      (No hold placed)

Sheriff's office employee signature:_____

Note:   After completing this form staple to the back of warrant signed by arresting officer and place in folder marked
    _Court Clerk_. Use this form only to clear warrants issued by _Sequoyah County_. Every warrant must be cleared
    on a seperate form.          **REDACTED**

786

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 17 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. CF-98-363 |
| | ) | |
| CHARLES E. SANDERS, | ) | |
| Defendant. | ) | |

**AMENDED**
**SECOND APPLICATION TO REVOKE SUSPENDED SENTENCE**

COMES NOW, Richard L. Gray, the duly elected, qualified, and acting District Attorney of Sequoyah County, and states to the Court that on the 9th day of December, 1999, the said Defendant entered his/her plea of guilty in the above entitled case, in the District Court of Sequoyah County, Oklahoma, to the charge of: UTTERING A FORGED INSTRUMENT , as set out in the Information on file in this cause and the said defendant was sentenced to serve a term of TWENTY (20)  years, under the Supervision of the Department of Correction, which sentence the Court suspended during the good behavior of said defendant.  Further that on the 31st day of May, 2001 the State of Oklahoma filed its Application to Revoke Suspended Sentence.  That on the 23rd day of August, 2001, Defendant was found guilty of violating the rules and conditions of probation and the suspended sentence was revoked, with Defendant to successfully complete the Last Stop or similar program, at which time the balance of said sentence would be suspended.

Thereafter, the defendant violated the rules and conditions of probation as imposed by the Court in the following manner:

**Rule #9**: by violating city, state or federal law, and being cited for Burglary, 2nd degree, Arson 2nd degree; Knowingly Concealing Stolen Property, and Feloniously Carrying Firearm in Sequoyah County Case CF-04-19.

WHEREFORE, applicant prays that the Court set a date for hearing this application and that the suspension clause in said Judgment and Sentence be carried out in full, according to its terms.  That the Court direct the Court Clerk of Sequoyah County, Oklahoma, to issue a Bench Warrant for the arrest of said defendant.

Dated this _17th_____ day of June, 2004.

RICHARD L. GRAY, District Attorney

BY: REDACTED

Assistant District Attorney

WITNESSES:
Chief Gary Philpot, Sallisaw PD
Sam Pinson, State Fire Marshall
Sally Jackson,           Sallisaw, OK 74955
Wung Mei Fung,                         Sallisaw, OK
Hui Hui Zheng,                       Sallisaw, OK

787

## SUBPOENA
### IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

SEQUOYAH CC

FILED
IN DISTRICT COURT

STATE OF OKLAHOMA,
Plaintiff,

VS.

No. CF-04-19
CF-98-363
CF-99-562
CF-98-346
PRELIMINARY HEARING/APP TO REVOKE

JUL 2 6 2004

BERNELL EDWARDS, COUNTY CLERK
BY _____ DEPUTY

CHARLES "MONK" SANDERS

Defendant,

TO:   CHIEF GARY PHILPOT SALLISAW P.D.
      SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD ST. SUITE 4, OKLAHOMA CITY, OK
      SALLY JACKSON ████████, SALLISAW, OK
      WUNG MEI FUNG, C/O ████████████████, SALLISAW, OK
      HUI HUI ZHENG C/O ████████████████, SALLISAW, OK
      DET JOHN OWENS SALLISAW P.D.

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **29th day of July, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES "MONK" SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

HEREOF FAIL NOT, under penalty of law.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 26th day of JULY, 2004.

BERNELL EDWARDS, COURT CLERK

By _____ Hickman
                    Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

### SHERIFF'S RETURN

Received this Writ this _____ day of _____, 20___, _____ o'clock ___.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 20___,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness: _____

_____
_____By_____
_____20_____. I cannot find the within named
_____in my county.

JOHNNY PHILPOT, SHERIFF

By_____
                    Deputy

Mileage_____miles

788

## Sheriff's Return

### State of Oklahoma, County of Sequoyah

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 1 0 2004

BERNELL EDWARDS, COURT CLERK

BY_____ DEPUTY

Case # CF-04-15   CF-98-346
CF-96-363
CF-99-562

I certify that I received the foregoing summons on the ___26___ day of ___July___, 20_04_, and that I delivered, or attempted delivery of the said summons as shown below to each party named for service request.

| Name of Person To be served | service address | served? yes or no | Date & Time of service or Attempt | |
|---|---|---|---|---|
| Sally Jackson | | No | 07 28 04 | 07-29-04 |
| Wung Mei Fung | | Yes | 07-27-04 | |
| Hui Hui Zheng | | Yes | 07-27-04 | |

I certify that on _____, I served_____
By leaving a copy of said summons with a copy of the petition attached at _____ which is his/her place of residence.

I certify that on _____, I served_____ by leaving a copy of said summons with a copy of the petition attached at _____ with_____, a member of his/her family over fifteen (15) years of age.

Dated on the __08__ day of __August__, 20_04_.
J.W. Philpot, Sheriff of Sequoyah County

#82S

By: _____, Deputy Sheriff
Sequoyah County, Oklahoma

**REDACTED**

789

**SUBPOENA**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
    Plaintiff,

VS.

                    No. CF-04-19
                    CF-98-363
                    CF-99-562
                    CF-98-346

CHARLES "MONK" SANDERS        PRELIMINARY HEARING/APP TO REVOKE

        Defendant,

TO:  CHIEF GARY PHILPOT SALLISAW P.D.
     SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD ST. SUITE 4, OKLAHOMA CITY, OK
     SALLY JACKSON ▮▮▮▮▮▮▮▮▮ SALLISAW, OK ▮▮▮▮
     WUNG MEI FUNG, C/O ▮▮▮▮▮▮▮▮▮▮▮▮▮ SALLISAW, OK
     HUI HUI ZHENG C/O ▮▮▮▮▮▮▮▮▮▮▮▮ SALLISAW, OK
     DET JOHN OWENS SALLISAW P.D.

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **29th day of July, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES "MONK" SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

     HEREOF FAIL NOT, under penalty of law.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 26th day of JULY, 2004.

                               BERNELL EDWARDS, COURT CLERK

                               By *Robin Hickman*
                                    Deputy

---

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

---

**SHERIFF'S RETURN** REDACTED

     Received this Writ this _____day of _____, 20\_\_\_, _____o'clock \_\_\_.M., _____, 20\_\_\_, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____day of _____, 20\_\_\_; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____

_____By_____

_____20_____. I cannot find the within named _____in my county.

                             JOHNNY PHILPOT, SHERIFF

                       By_____
                                Deputy

                  Mileage_____miles

790

*Gubbert*
*07-26-04*

## SUBPOENA
### IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

STATE OF OKLAHOMA,
    Plaintiff,

VS.

No. CF-04-19
CF-98-363
CF-99-562
CF-98-346
PRELIMINARY HEARING/APP TO REVOKE

CHARLES "MONK" SANDERS

    Defendant,

TO: CHIEF GARY PHILPOT SALLISAW P.D.
SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD ST. SUITE 4, OKLAHOMA CITY, OK
SALLY JACKSON ▓▓▓▓▓ SALLISAW, OK ░░░ 07-28-04 N0 072904 N0
WUNG MEI FUNG, C/O ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
HUI HUI ZHENG C/O ▓▓▓▓▓▓▓▓▓▓▓▓ SALLISAW, OK 07-27-04 yes
DET JOHN OWENS SALLISAW P.D. SALLISAW, OK 07-27-04 yes

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the __29th day of July, 2004, at the hour of 1:30 o'clock P. M.__ to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and __CHARLES "MONK" SANDERS,__ is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

    HEREOF FAIL NOT, under penalty of law.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 26th day of JULY, 2004.

BERNELL EDWARDS, COURT CLERK

By _Robin Hickman_
              Deputy

---

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE AND PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

---

### SHERIFF'S [REDACTED]

Received this Writ this _____ day of _____, 20___, _____ o'clock ____.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 20___; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____
_____By_____
_____20_____. I cannot find the within named _____in my county.

JOHNNY PHILPOT, SHERIFF

By_____
           Deputy

Mileage_____miles

**SUBPOENA**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 3 0 2004

STATE OF OKLAHOMA,
Plaintiff,

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

No. CF-04-19
CF-98-363
CF-99-562
CF-98-346
PRELIMINARY HEARING
APPLICATION TO REVOKE

VS.
CHARLES "MONK" SANDERS.
Defendant,

TO:   CHIEF GARY PHILPOT SALLISAW P.D.
      AGENT SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD SUITE 4, OK. CITY, OK
      SALLY JACKSON ████████████ SALLISAW, OK
      WUNG MEI FUNG C/O ████████████ SALLISAW, OK
      HUI HUI ZHENG C/O ████████████ SALLISAW, OK
      DET. JOHN OWENS SALLISAW P.D.


GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **2ND  day of SEPTEMBER, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

        HEREOF FAIL NOT, under penalty of law.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 27TH day of AUGUST, 2004.

                              BERNELL EDWARDS, COURT CLERK


                              By_____
                                        Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

SHERIFF'S RETURN **REDACTED**

        Received this Writ this _____day of _____, 20___, _____o'clock ___.M., _____, 20___; served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____day of _____, 20___; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____
_____By_____
_____20_____. I cannot find the within named _____in my county.

                              JOHNNY PHILPOT, SHERIFF


                              By_____
                                        Deputy

                              Mileage_____miles

792

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 17 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

THE STATE OF OKLAHOMA, )
      Plaintiff, )
  )
vs. )     No. CF-98-363
  )
CHARLES E. SANDERS, )
DOB: ███66, SS#: ███9539 )
      Defendant. )

## ORDER REVOKING SUSPENDED SENTENCE

NOW, on this 18th day of November, 2004, the above styled case comes on for hearing on the State's Application to Revoke Suspended Sentence. The State is present by Assistant District Attorney, Jeff Sheridan, the defendant is present and represented by the attorney of record, John Sawney.

The Court finds that on the 9th day of December, 1999, the said defendant was found guilty of the crime of UTTERING A FORGED INSTRUMENT and sentenced to a term of TWENTY (20) years with the direction of the Department of Corrections, and of said sentence TWENTY (20) years was suspended pending the defendant's good behavior. That on the 31st day of May, 2001, the State of Oklahoma filed its Application to Revoke Suspended Sentence and on the 23rd day of August, 2001 Defendant was found guilty of violating the rules and conditions of probation. Said suspended sentence was revoked, with Defendant to successfully complete the Last Stop or similar program, at which time the balance of said sentence would be suspended.

The Court finds that on the 17th day of June, 2004, the State filed a Second Application to Revoke Suspended Sentence based on violations of the defendant's Rules and Conditions of Probation. The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that FIVE (5) YEARS of the suspended sentence is revoked, with balance to be suspended upon successful completion of Key to Life or similar program, to run concurrent with CF-98-346; CF-99-562, CF-04-19 and CF-03-124, and the Sheriff of Sequoyah County shall deliver said defendant to the Department of Corrections and leave therewith a copy of this Order of Judgment and Sentence to serve as a warrant and authority for the revocation of said defendant as provided herein. The second copy of the Order to be warrant and authority of said Sheriff for the transportation and imprisonment of said defendant as herein before provided. The Sheriff to make due return to the Clerk of this Court, with his procedure endorsed thereon.

_____
JUDGE OF THE DISTRICT COURT

793

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 1 3 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type) (show alias)

Sanders, Charles Edmond ▮▮▮ lelp ▮▮▮ 9539

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| Booking # 2004-03181 | Sent to State Prison | Hold for Tulsa County |
| Warrant #'s CF-04-14 | | Hold for Tulsa County (App. to revoke) |
| CF-03-365 | | Hold for Tulsa Co. (FTA) |
| CF-99-005102 | | Merrills Bonding Surrender |
| CF-03-124 | | Knowingly concealing stolen property |
| CF-98-00303 | | Application to Revoke |
| CF-98-00346 | | Surrendered by Hamilton/Morgan |
| | | Burglery 2nd Degree |
| | | Uttering A forged Instrument |
| | | Application to revoke |
| | | Possession of controlled dangerous substance |
| | | Application to revoke |
| | | Hold for Doc |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the ____11____ day of ___December___, 20_04_.

_____
Signature

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

AUTHORIZED BY

_____
JUDGE OF THE DISTRICT COURT

**REDACTED**

CF-99-562 CF-98-363

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA
CF-98-346 CF-2004-19

STATE OF OKLAHOMA                    CASE NO._____ CF-03-124

VS.                                  J & S DATE: NOV 17 - 2004

_Charles Edmond Sanders_
DEFENDANT

### STATEMENT OF JAIL TIME

PRISONER WAS ARRESTED ON DATES: 10-22-99 – 12-07-99 / 8-23-01 - 10-25-01
3-13-03 – 4-02-03 / 1-16-04 - 1-21-04
3-31-04 - 12-10-04

PRISONER REMAINED IN JAIL _372_ DAYS BEFORE JUDGEMENT AND
SENTENCE.

PRISONER REMAINED IN JAIL _23_ DAYS AFTER JUDGEMENT AND
SENTENCE.

TOTAL DAY'S OF JAIL TIME _395_

_____ _Christine Calbert_
SEQUOYAH COUNTY CRIMINAL JUSTICE AUTHORITY
12-28-2004

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 2 8 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

**REDACTED**

795

SEQUOYAH COUNTY, OKLAHOMA

IN THE DISTRICT COURT OF )
SEQUOYAH COUNTY )
STATE OF OKLAHOMA )
FILED )
NOV 2 8 2005 )
)
BERNELL EDWARDS, COURT CLERK )
BY_____ DEPUTY

Defendant CHARLES EDMOND "MONK" SANDERS

Case No. CF-05-406
CF-03-124  CF-98-562 - CF-98-363
Date _NOVEMBER 17, 2005_ CF-98-346

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general state of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I will understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or any representative thereof.

8. I understand that I must support myself and all my dependents without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within the eighteen months.

15. **SPECIAL CONDITIONS:** The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, OSBI lab fees) of $_____ within _____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 20____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed).*

( ) Defendant is to pay restitution through the District Attorney's office as set out in Exhibit "A" attached, the sum of $_____.

**REDACTED**

16. Defendant to report to DOC Probation & Parole Office within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

Attorney for Defendant

_____
JUDGE OF THE DISTRICT COURT

Probationer

Defendant's Mailing Address:

_____

_____

796

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 2 3 2005

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,  )
      Plaintiff,  )
                      )
                      )
vs.  )      No. CF-98-363
                      )
CHARLES E. SANDERS,  )
DOB: ▓▓▓/66, SS#: ▓▓▓▓9539  )
      Defendant.  )

### AMENDED
### ORDER REVOKING SUSPENDED SENTENCE

NOW, on this 17th day of November, 2005, the above styled case comes on for hearing on the State's Application to Revoke Suspended Sentence. The State is present by Assistant District Attorney, Jeff Sheridan, the defendant is present and represented by the attorney of record, John Sawney.

The Court finds that on the 9th day of December, 1999, the said defendant was found guilty of the crime of UTTERING A FORGED INSTRUMENT and sentenced to a term of TWENTY (20) years with the direction of the Department of Corrections, and of said sentence TWENTY (20) years was suspended pending the defendant's good behavior. That on the 31st day of May, 2001, the State of Oklahoma filed its Application to Revoke Suspended Sentence and on the 23rd day of August, 2001 Defendant was found guilty of violating the rules and conditions of probation. Said suspended sentence was revoked, with Defendant to successfully complete the Last Stop or similar program, at which time the balance of said sentence would be suspended.

The Court finds that on the 17th day of June, 2004, the State filed a Second Application to Revoke Suspended Sentence based on violations of the defendant's Rules and Conditions of Probation. The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that said sentence remain suspended pursuant to the rules and conditions of probation and to run concurrent with CF-98-346; CF-99-562, CF-04-19 and CF-03-124.

REDACTED

_____
JUDGE OF THE DISTRICT COURT

# DISTRICT COURT OF MUSKOGEE, WAGONER, CHEROKEE AND SEQUOYAH COUNTIES

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FIFTEENTH JUDICIAL DISTRICT

(ORDER)

APR 0 3 2006

BERNELL EDWARDS, COURT CLERK

BY _____ DEPUTY

C7- 04-19
C7- 03-124
C7- 99- 562
C7- 98- 346

DATE: 3-29-06

DEFENDANT: Sanders, Charles

CASE NUMBER: C7-98-363

CHARGE: Burglary 2nd

SENTENCE DATE: 11-17-05

EXPIRATION DATE: 11-16-30

THE DEPARTMENT OF CORRECTIONS IS HEREBY RELIEVED FROM FURTHER ACTIVE SUPERVISION OF THIS DEFENDANT IN THIS PARTICULAR CASE.

JUDGE OF DISTICT COURT   Garrett

* Per plea agreement with the feds. banish from Sequoyah county.

**REDACTED**

798

SANDERS, CHARLES E.

██████████
Marble City,OK
DOB:████66  SS#███████9539
White Male

CF-98-**363**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

# WARRANT

OCT 2 1998

STATE OF OKLAHOMA,
COUNTY OF SEQUOYAH—ss.

BERNELL EDWARDS, COURT CLERK
BY _____*Cui*_____ DEPUTY

THE STATE OF OKLAHOMA, to any Sheriff, Constable, Marshal or Policeman in the above named County and State:

Information upon oath having been this day laid before me that the crime of _____

____UTTERING A FORGED INSTRUMENT_____ has been committed, and

accusing ____Charles E.Sanders_____ thereof.

You are therefore commanded forthwith to arrest the above named _Charles E. Sanders_____

and bring h_im__ before me at ___Sequoyah County Courthouse_____

or, in the case of my absence or inability to act, before the nearest or most accessible magistrate in this county.

Dated at __Sallisaw_____, this ____29ᵉ____ day of __September____, 19_98_.

The Defendant is to be admitted
to bail in the amount of __$5,000.ᵒᵒ____

_____
Judge of the District Court.

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH—ss:

I, _____

in and for the above named county, hereby certify that I have served the within warrant upon the within

named at _____ in the County of _____, said State of Oklahoma, by then

and there taking h _____ into possession, and then I carried h _____ before _____

for the purpose of making bond, and upon h_____

_____

**FEES FOR SERVICE**

For serving Warrant — — — — $_____

For mileage — — — — — — — $_____

For committing to jail — — — $_____    _____ $_____

For making bond — — — — — $_____    By _____ Deputy

TOTAL — — — — — $_____

No._____

WARRANT

THE STATE OF OKLAHOMA

vs.

_____ Defendant

Returned and filed this _____ day of _____, 19____

_____ Judge of the District Court.

# U.S. District Court
# Eastern District of Oklahoma (Muskogee)
# CIVIL DOCKET FOR CASE #: 6:09−cv−00105−JHP

Barrett v. USA

Assigned to: District Judge James H. Payne

Case in other court:  10th Circuit, 12−07086

ED/OK, 6:04−cr−115

Cause: 28:2255 Motion to Vacate / Correct Illegal Sentence

Date Filed: 03/16/2009

Date Terminated: 08/16/2012

Jury Demand: None

Nature of Suit: 535 Death Penalty – Habeas Corpus

Jurisdiction: U.S. Government Defendant

**Petitioner**

**Kenneth Eugene Barrett**                represented by  **David B. Autry**
1021 NW 16th St
Oklahoma City, OK 73106
405−521−9600
Fax: 405−521−9669
Email: dbautry44@hotmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joan M. Fisher**
Federal Public Defender – Sacramento, CA
801 "I" St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−5706
Email: joan.fisher@fd.org
*ATTORNEY TO BE NOTICED*

**Tivon Schardl**
Federal Public Defender – Sacramento, CA
801 "I" St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−6656
Email: tim.schardl@fd.org
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**USA**                represented by  **Christopher J. Wilson**
US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401

1

918–684–5100
Fax: 918–684–5150
Email: Chris.Wilson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Kahan**
US Department of Justice – Capital Case
Unit
1331 F St NW
Rm 345
Washington, DC 20530
202–305–8910
Fax: 202–353–9779
Email: jeffrey.kahan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheldon J. Sperling**
US Attorney (OKED)
1200 W Okmulgee
Muskogee, OK 74401
918–684–5100
Fax: 918–684–5150
*TERMINATED: 11/24/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/10/2009 | 4 | | MOTION to File Exhibits Under Seal and for a Protective Order by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 5 | | ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for a Protective Order (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 6 | | MOTION to Reconsider (Re: 5 Order Ruling on Motion to Seal Exhibits and for Protective Order) by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 7 | | AMENDED ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for Protective Order (Re: 5 Order, 6 Motion to Reconsider) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 1 | | MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett; Responses due by 6/16/2009 (With attachments – **EXHIBITS 1–36; 59–60**)(EXHIBITS 37–58 NOT USED)(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 3 | | |

| | | | |
|---|---|---|---|
| | | | EXHIBITS IN SUPPORT OF MOTION **Nos. 61–70, 71–80, 81–99, 100–118** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 8 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134 and 135** (Re: 1 MOTION to Vacate and 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 9 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 10 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 11 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 12 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 13 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 137, 138, 139, 140, 141, 142 and 143** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 14 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 144A, 144B, 145 and 146** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 15 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 16 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 17 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 18 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 19 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 147B2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 20 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) |

| | | | |
|---|---|---|---|
| | | | (Entered: 03/18/2009) |
| 03/16/2009 | 21 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 22 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 23 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 24 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 25 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 26 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147F** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 27 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147G** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 28 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 148, 149, 150, 151, 152, 153, 154, 155, 156, 157 and 158** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 29 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 159, 160, 161, 162, 163, 164 and 165** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 30 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 166, 167, 168, 169, 170, 171, 172, 173, 174 and 175** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 31 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 32 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 33 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 34 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| | | | |
|---|---|---|---|
| 03/16/2009 | 35 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 36 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 37 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 178, 179 and 180** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 38 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 39 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 40 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 41 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 42 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 182, 183, 184 and 185** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 43 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 186, 187, 188, 189, 190, 191, 192, 193, 194 and 195** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/17/2009 | 2 | | CORRECTED MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett (corrected to include verification) (Re: 1 Motion to Vacate); Responses due by 6/16/2009(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/18/2009 | 44 | | NOTICE to Government to Respond by **6/16/2009** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) Modified on 3/19/2009 to change response date to 6/16/09 (cjt, Deputy Clerk). (Entered: 03/18/2009) |
| 03/19/2009 | | | NOTICE of Docket Entry Modification; Error: Wrong date of 3/16/09 given in text; Correction: Correcting response date to 6/16/09 (Re: 44 Notice to Respond) (cjt, Deputy Clerk) (Entered: 03/19/2009) |
| 05/29/2009 | 45 | | MOTION to Disqualify Judge by Kenneth Eugene Barrett Responses due by 6/15/2009 Replies due by 6/24/2009.(Schardl, Tivon) (Entered: 05/29/2009) |
| 06/03/2009 | 46 | | ATTORNEY APPEARANCE by Christopher J. Wilson on behalf of USA (Wilson, Christopher) (Entered: 06/03/2009) |
| 06/11/2009 | 47 | | |

| | | | |
|---|---|---|---|
| | | | First MOTION for Extension of Time to Respond to Motion (Re: 45 MOTION to Disqualify Judge ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/11/2009 | 48 | | First MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment, 1 MOTION to Vacate Order/Judgment ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/12/2009 | 49 | | MINUTE ORDER by District Judge James H. Payne granting Application for Extension of Time to Respond to Petitioner's Motoin to Disqualify and Recuse United States District Judge James H. Payne from Further Participation in this Matter ( 47 Motion for Extension of Time to Respond to Motion). Accordingly, the respondent has until 7/15/09 within which to file its response to petitioner's motion (Re: 45 MOTION to Disqualify Judge ).(law, Deputy Clerk) (Entered: 06/12/2009) |
| 06/12/2009 | 50 | | MINUTE ORDER by District Judge James H. Payne granting in part and denying in part Application for Extension of Time to Respond to Petitioner's 28 U.S.C. Section 2255 Motion ( 48 Motion for Extension of Time to Respond to Motion ). Respondent has an additional 3 months or until 9/16/09 within which to file its response to petitioner's 28 U.S.C. Section 2255 Motion. (law, Deputy Clerk) (Entered: 06/12/2009) |
| 07/13/2009 | 51 | | RESPONSE in Opposition to Motion (Re: 45 MOTION to Disqualify Judge ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 07/13/2009) |
| 07/24/2009 | 52 | | First MOTION to unseal documents in cr−04−115 by USA Responses due by 8/10/2009 Replies due by 8/19/2009.(Wilson, Christopher) (Entered: 07/24/2009) |
| 08/14/2009 | 53 | | MOTION to File Response to Government's Motion to Unseal Out of Time by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/14/2009 | 54 | | MOTION to File Out of Time *PROPOSED ORDER* by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/17/2009 | 55 | | ORDER by District Judge James H. Payne: striking 54 Petitioner's Proposed Order which was filed in error (cjt, Deputy Clerk) (Entered: 08/17/2009) |
| 08/19/2009 | 56 | | MINUTE ORDER by District Judge James H. Payne: Directing Petitioner to supplement 53 MOTION to File Response to Government's Motion to Unseal Out of Time by 5:00 p.m. today, 8/19/09, to include a statement as to whether either Christopher J. Wilson or Jeffrey B. Kahan, counsel for respondent, USA objects to the motion. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 57 | | SUPPLEMENT (Re: 56 Minute Order,,, 53 MOTION to File Response to Government's Motion to Unseal Out of Time ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 08/19/2009) |
| 08/19/2009 | 58 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/19/2009) |

| | | | |
|---|---|---|---|
| 08/19/2009 | 59 | | MINUTE ORDER by District Judge James H. Payne: Striking 58 Petitioner's Response in Opposition to the Government's Motion to Unseal (Re: 52 Government's MOTION to Unseal Documents). (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 60 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53 ) is hereby granted. The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2255 Motion (Doc. # 2) and that the Government's Motion to Unseal (Doc. # 52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion. To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their current response deadlines on the § 2255 Motion. Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52 ) and the Government shall be given until September 2, 2009, to Reply. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/26/2009 | 61 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/26/2009) |
| 08/28/2009 | 62 | | REPLY to Response to Motion (Re: 52 First MOTION to unseal documents in cr–04–115 ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 08/28/2009) |
| 09/04/2009 | 63 | | Second MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment ) by USA Responses due by 9/21/2009(Wilson, Christopher) (Entered: 09/04/2009) |
| 09/04/2009 | 64 | | MINUTE ORDER by District Judge James H. Payne: granting 63 Respondent's Motion for Extension of Time to Respond to Motion; Response due by 10/16/2009 (Re: 1 MOTION to Vacate Order/Judgment, 2 Corrected MOTION to Vacate Order/Judgment ) (cjt, Deputy Clerk) (Entered: 09/04/2009) |
| 09/04/2009 | 65 | | RESPONSE to Motion (Re: 63 Second MOTION for Extension to Respond to 2255 Motion) by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 9/8/2009 to change text and change link (dma, Deputy Clerk). (Entered: 09/04/2009) |
| 09/11/2009 | 66 | | ORDER by District Judge James H. Payne: denying 45 Petitioner's Motion to Disqualify and Recuse (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/11/2009 | 67 | | ORDER by District Judge James H. Payne: Granting in part, denying in part and taking under advisement in part 52 Government's MOTION to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings filed Cr–04–115 (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/22/2009 | 68 | | NOTICE of Intention Not to Abandon Claims and REQUEST for Protective Order (Re: 67 Order) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) Modified on 9/23/2009 change text (dma, |

| | | | |
|---|---|---|---|
| | | | Deputy Clerk). (Entered: 09/22/2009) |
| 09/23/2009 | 69 | | ORDER by District Judge James H. Payne (Re: 67 Order, 68 Petitioner's NOTICE of Intent Not to Abandon Claims and REQUEST for Protective Order) (cjt, Deputy Clerk) (Entered: 09/23/2009) |
| 09/25/2009 | 70 | | Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* by Kenneth Eugene Barrett Responses due by 10/13/2009 (With attachments – **EXHIBITS 1–10**)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 71 | | EXHIBIT(S) **11 through 50** (Re: 70 Amended MOTION to Vacate Order/Judgment *, Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 72 | | EXHIBIT(S) **51 through 118** (Re: 70 Amended MOTION to Vacate Order/Judgment *, Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/28/2009 | 73 | | OBJECTION to Petitioner's Proposed Protective Order (Re: 68 MOTION for Protective Order) by USA (Wilson, Christopher) Modified on 9/29/2009 to change text (dma, Deputy Clerk). (Entered: 09/28/2009) |
| 09/29/2009 | 74 | | ORDER by District Judge James H. Payne: Show Cause Hearing and Scheduling Conference are set for 10/6/2009 at 02:00 PM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 70 Amended MOTION for Collateral Relief, to Vacate, Set Aside or Correct Sentence and for a New Trial) (cjt, Deputy Clerk) (Entered: 09/29/2009) |
| 09/30/2009 | 75 | | RESPONSE (Re: 69 Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 09/30/2009) |
| 10/02/2009 | 76 | | MOTION to Vacate Order/Judgment *Order Filed September 29, 2009*, MOTION to Continue Hearing(s) *On Order to Show Cause* (Re: 74 Order,, Setting/Resetting Hearing(s), Setting/Resetting Hearing(s),, ) by Kenneth Eugene Barrett Responses due by 10/19/2009 (With attachments)(Schardl, Tivon) (Entered: 10/02/2009) |
| 10/02/2009 | 77 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's emergency motion (Dkt 76 ) to vacate show cause order is denied. The court hereby waives the presence of petitioner's counsel, Tivon Schardl, at the hearing scheduled October 6, 2009, at 2:00 p.m. Lead counsel, David Autry, is required to attend; however, arrangements will be made for lead counsel to speak with co–counsel Tivon Schardl via telephone, if necessary. In addition, the parties should be aware the court intends to conduct a status and scheduling conference to receive the parties' observations and comments as to the time frame necessary for disposition of this matter. (cjt, Deputy Clerk) (Entered: 10/02/2009) |
| 10/05/2009 | 78 | | MOTION to Continue Hearing(s), MOTION to Recuse, MOTION to Reconsider, MOTION for Leave to Appear *y* (Re: 77 Minute Order,,, Ruling on Motion to Vacate Order/Judgment,,, Ruling on Motion to Continue |

| | | | |
|---|---|---|---|
| | | | Hearing(s), Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 10/20/2009(Schardl, Tivon) (Entered: 10/05/2009) |
| 10/05/2009 | 79 | | MINUTE ORDER by District Judge James H. Payne: denying 78 Petitioner's Motion to Reconsider; denying 78 Petitioner's Motion to Continue Hearing; finding as moot 78 Motion for Leave to Appear by Telephone pursuant to Minute Order 77 entered on 10/2/09. 78 Petioner's Motion to Recuse was previously denied by Order 66 entered on 9/11/09. (cjt, Deputy Clerk) (Entered: 10/05/2009) |
| 10/06/2009 | 80 | | MINUTES of Proceedings – held before District Judge James H. Payne: Show Cause/Scheduling Hearing held on 10/6/2009 (Court Reporter: K.Sidwell) (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 81 | | SCHEDULING ORDER by District Judge James H. Payne: Amended Motion to Vacate due 11/6/2009; Brief in Support due 1/5/2010; Response due 3/8/2010; Reply due 3/23/2010 (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 82 | | PROTECTIVE ORDER by District Judge James H. Payne: granting 68 Petitioner's Motion for Protective Order; granting 52 Government's Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/08/2009 | 83 | | ***Remark: Pursuant to 82 Protective Order entered on 10/7/2009, copies of sealed Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, 274, 301 and the sealed letter dated 2/28/2005, all filed in Case No. CR–04–115–JHP, were personally delivered to Asst. United States Attorney Christopher Wilson on 10/8/2009. (cjt, Deputy Clerk) (Entered: 10/08/2009) |
| 10/09/2009 | 84 | | STATUS REPORT by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 10/09/2009) |
| 10/15/2009 | 85 | | TRANSCRIPT of Proceedings (Unredacted) of Show cause/Scheduling Hearing held on 10/6/09 before District Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–42). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 80 Minutes of Scheduling Conference, Striking/Terminating Deadline(s)/Hearing(s) ) (kns, Court Reporter) (Entered: 10/15/2009) |
| 10/16/2009 | 86 | | MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* by Kenneth Eugene Barrett Responses due by 11/2/2009(Schardl, Tivon) (Entered: 10/16/2009) |
| 10/20/2009 | 87 | | ORDER by District Judge James H. Payne ; denying 86 Motion to Stay (lsa, Chambers) (Entered: 10/20/2009) |
| 10/28/2009 | 88 | | Unopposed MOTION to Extend Deadline(s) *Established by Order filed October 7, 2009* by Kenneth Eugene Barrett Responses due by 11/12/2009 (With attachments)(Schardl, Tivon) (Entered: 10/28/2009) |

| | | | |
|---|---|---|---|
| 11/02/2009 | 89 | | SUPPLEMENT to Unopposed Motion to Continue Filing Schedule 88 by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 11/3/2009 to edit text (cjt, Deputy Clerk). (Entered: 11/02/2009) |
| 11/03/2009 | 90 | | ORDER EXTENDING FILING SCHEDULE by District Judge James H. Payne: granting 88 Petitioner's Unopposed Motion to Continue Filing Schedule (cjt, Deputy Clerk) (Entered: 11/03/2009) |
| 11/04/2009 | 91 | | ORDER from Circuit Court (Re: 86 MOTION to Stay Proceedings Pending Disposition of Mandamus Action 87 Order Denying Motion to Stay) (cjt, Deputy Clerk) (Entered: 11/04/2009) |
| 12/03/2009 | 92 | | MINUTE ORDER by District Judge James H. Payne: Show Cause Hearing is set for 12/15/2009 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne for David Autry to show cause why he has failed to comply with this Court's prior orders regarding submission of CJA vouchers. Only David Autry's appearance is required at this hearing. (cjt, Deputy Clerk) (Entered: 12/03/2009) |
| 12/04/2009 | 93 | | ATTORNEY APPEARANCE by Joan Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified on 12/7/2009 to change text (dma, Deputy Clerk). (Entered: 12/04/2009) |
| 12/04/2009 | 94 | | NOTICE Petitioner's Notice Regarding Amended Petition by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 12/04/2009) |
| 12/04/2009 | 95 | | Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* by Kenneth Eugene Barrett Responses due by 12/18/2009(Fisher, Joan) (Entered: 12/04/2009) |
| 12/14/2009 | 96 | | ORDER from Circuit Court (Re: 87 Order, Ruling on Motion to Stay, 86 MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* ) (With attachments)(law, Deputy Clerk) (Entered: 12/14/2009) |
| 12/15/2009 | 97 | | SEALED MINUTES of Show Cause Hearing (cjt, Deputy Clerk) (Entered: 12/15/2009) |
| 01/08/2010 | 98 | | MOTION to Extend Deadline(s) *for submission of cja voucher* by Kenneth Eugene Barrett Responses due by 1/22/2010(Autry, David) (Entered: 01/08/2010) |
| 01/08/2010 | 99 | | MINUTE ORDER by District Judge James H. Payne: granting 98 Motion to Extend Time for Submittal of CJA Voucher by Petitioner's counsel, David Autry, until 1/11/2010. (cjt, Deputy Clerk) (Entered: 01/08/2010) |
| 01/11/2010 | 100 | | NOTICE of Submission of Matter for In Camera Review by USA (Wilson, Christopher) (Entered: 01/11/2010) |
| 01/11/2010 | 101 | | SEALED LETTER (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/12/2010 | 102 | | PROTECTIVE ORDER by District Judge James H. Payne (Re: 101 Sealed Letter) (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/13/2010 | 103 | | Unopposed MOTION to Extend Deadline(s) *to File Brief in Support of Amended Petition and Subsequent Briefing* by Kenneth Eugene Barrett Responses due by 1/27/2010 (With attachments)(Schardl, Tivon) (Entered: |

| | | | |
|---|---|---|---|
| | | | 01/13/2010) |
| 01/15/2010 | 104 | | MINUTE ORDER by District Judge James H. Payne: For good cause shown, 103 Petitioner's Motion for Extension of Time to File Brief in Support of Amended Motion to Vacate is granted. Petitioner shall be given until 2/18/2010 to file his brief. No further extensions of time shall be granted. Respondent's answer shall be due 4/19/2010 and Petitioner's reply will be due 5/4/2010. (Re: 95 Amended MOTION to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255) (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 01/15/2010 | 105 | | MINUTE ORDER by District Judge James H. Payne: It is hereby ordered that Petitioner Kenneth Eugene Barrett's CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT–APPOINTED COUNSEL comes before the Court by David B. Autry. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original application and supporting documents. (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 02/02/2010 | 106 | | MINUTE ORDER by District Judge James H. Payne (Attachments: # 1 1/29/2010 E–Mail) (cjt, Deputy Clerk) (Entered: 02/02/2010) |
| 02/11/2010 | 107 | | Third MOTION to Extend Deadline(s) *Due to Newly Disclosed Evidence* by Kenneth Eugene Barrett Responses due by 2/25/2010 (With attachments)(Schardl, Tivon) (Entered: 02/11/2010) |
| 02/12/2010 | 108 | | MINUTE ORDER by District Judge James H. Payne: Motion Hearing and Status Conference are set for 3/1/2010 at 09:30 AM before District Judge James H. Payne (Re: 107 Petitioner's Third MOTION to Continue Briefing Schedule). Counsel are required to be present at this hearing. Petitioner does not need to be present. (cjt, Deputy Clerk) (Entered: 02/12/2010) |
| 02/18/2010 | 109 | | MOTION Leave to File Oversized Brief in Support of Amended Motion to Vacate, MOTION for Leave to File Brief in Support of Second Amended Motion to Vacate by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 110 | | Unopposed MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 3/4/2010(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 111 | | Amended MOTION for Leave to Exceed Page Limitation by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 112 | | MINUTE ORDER by District Judge James H. Payne: denying 111 Petitioner's Amended Motion for Leave to File Oversized Brief, with written order to follow (finding as moot 109 Petitioner's Motion for Leave to File Oversized Brief) (cjt, Deputy Clerk) (Entered: 02/18/2010) |
| 02/18/2010 | 113 | | MOTION to Reconsider *Order Denying Leave to File Oversized Brief* (Re: 112 Minute Order,, Ruling on Motion for Miscellaneous Relief,, Ruling on Motion for Leave to File Document(s), Ruling on Motion for Leave to File Document(s), Ruling on Motion to Exceed Page Limitation, ) by Kenneth |

| | | | |
|---|---|---|---|
| | | | Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 114 | | REDACTED EXHIBITS **119, 120, 121, 122** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 115 | | REDACTED EXHIBITS **125, 126, 128, 129, 130, 132, 133, 134, 137, 138** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 116 | | REDACTED EXHIBITS **148, 149, 150, 151, 152, 153, 154** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 117 | | REDACTED EXHIBITS **123, 124, 127, 131, 135** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 118 | | REDACTED EXHIBITS **155, 156** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 119 | | REDACTED EXHIBITS **157, 158** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 120 | | REDACTED EXHIBITS **163, 164** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 121 | | REDACTED EXHIBIT **161** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 122 | 22 | REDACTED EXHIBIT **162** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 123 | 83 | REDACTED EXHIBITS **165, 166** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 124 | 152 | REDACTED EXHIBIT **159 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: |

| | | | |
|---|---|---|---|
| | | | 02/18/2010) |
| 02/18/2010 | 125 | 198 | REDACTED EXHIBITS **167, 168, 169** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 126 | 263 | REDACTED EXHIBIT **159 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 127 | 294 | REDACTED EXHIBITS **170, 171** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 128 | 335 | REDACTED EXHIBIT **160 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 129 | 377 | REDACTED EXHIBIT **160 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 130 | | REDACTED EXHIBITS **172, 173** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 131 | | REDACTED EXHIBIT **177 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 132 | | REDACTED EXHIBITS **174, 175, 176, 178** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 133 | | REDACTED EXHIBIT **177 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 134 | | REDACTED EXHIBIT **177 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 135 | | REDACTED EXHIBITS **179, 180, 181a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |

| | | | |
|---|---|---|---|
| 02/18/2010 | 136 | | REDACTED EXHIBIT **181 Part B1** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 137 | | REDACTED EXHIBITS **182, 183** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 138 | | REDACTED EXHIBIT **181 Part B2** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 139 | | REDACTED EXHIBIT **196 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 140 | | REDACTED EXHIBITS **184, 185, 186, 187, 188** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 141 | | REDACTED EXHIBIT **196 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 142 | | REDACTED EXHIBIT **196 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 143 | | REDACTED EXHIBIT **196 Part d** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 144 | | REDACTED EXHIBITS **189, 190, 191, 192, 193, 194, 195** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 145 | | REDACTED EXHIBITS **197, 198, 199, 200, 203, 204, and 205** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/18/2010) |
| 02/26/2010 | 146 | | ORDER by District Judge James H. Payne: granting 113 petitioner's Motion to Reconsider; Petitioner's brief due 3/1/10 at 4:30 p.m.; Status Conference RESET for 3/31/2010 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne; (granting in part 107 Motion to Continue Briefing Schedule; striking |

| | | | |
|---|---|---|---|
| | | | 1 Motion to Vacate Order/Judgment; striking 2 Corrected Motion to Vacate Order/Judgment; striking 70 Amended Motion to Vacate Order/Judgment) (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 02/26/2010 | 147 | | ORDER by District Judge James H. Payne: Re: 110 petitioner's Unopposed MOTION to File Exhibits Under Seal; Petitioner's response due 3/12/10 (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 03/01/2010 | 148 | | STIPULATION *and Order [Proposed] Modified Protective Order* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 149 | | BRIEF in Support of Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 150 | | MOTION for Evidentiary Hearing (Re: 95 Amended MOTION to Vacate) by Kenneth Eugene Barrett; Responses due by 3/15/2010(Schardl, Tivon) Modified on 3/2/2010 to change text and link (dma, Deputy Clerk). (Entered: 03/01/2010) |
| 03/01/2010 | 151 | | MOTION Expand the Record (Re: 149 Brief in Support of Motion ) by Kenneth Eugene Barrett Responses due by 3/15/2010(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/03/2010 | 152 | | Joint MOTION to Modify Protective Order by all parties Responses due by 3/17/2010(Wilson, Christopher) (Entered: 03/03/2010) |
| 03/05/2010 | 153 | | RESPONSE in Opposition to Motion (Re: 150 MOTION for Hearing ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/05/2010 | 154 | | RESPONSE in Opposition to Motion (Re: 151 MOTION Expand the Record ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/12/2010 | 155 | | RESPONSE by Kenneth Eugene Barrett (Re: 147 Order) (Fisher, Joan) (Entered: 03/12/2010) |
| 03/25/2010 | 156 | | MINUTE ORDER by District Judge James H. Payne: **TIME CHANGE ONLY** – Status Conference RESET for 3/31/2010 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th &Okmulgee, Muskogee, OK before District Judge James H. Payne. (cjt, Deputy Clerk) (Entered: 03/25/2010) |
| 03/29/2010 | 157 | | ORDER by District Judge James H. Payne: denying 150 Petitioner's Motion for Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/29/2010 | 158 | | MOTION to be Excused from the Status Conference set on March 31, 2010 by USA Responses due by 4/12/2010(Wilson, Christopher) (Entered: 03/29/2010) |
| 03/29/2010 | 159 | | MINUTE ORDER by District Judge James H. Payne: granting 158 Government's Motion to be Excused from Attendance of Status Conference. The Court further grants Government's request for substitute counsel, Douglas Horn, to appear in lieu of Christopher Wilson for this hearing only. (cjt, Deputy Clerk) (Entered: 03/29/2010) |

| | | | |
|---|---|---|---|
| 03/30/2010 | 160 | | MINUTE ORDER by District Judge James H. Payne: The Court directs that Courtroom 1, Room 230, be sealed on 3/31/2010 at 9:00 a.m. for the portion of the Status Hearing pertaining to the Protective Order. The Clerk is directed to post this Minute Order on the Court's bulletin board for public viewing located on the 2nd floor of the United States Courthouse. (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 161 | | ORDER (Re: Exhibits) by District Judge James H. Payne: granting 110 Petitioner's Motion to File Exhibits under Seal; granting 151 Petitioner's Motion to Expand the Record (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 162 | | SEALED EXHIBIT **201** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 163 | | SEALED EXHIBIT **202** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/31/2010 | 164 | | SEALED MINUTES of Proceedings – held before District Judge James H. Payne: Motion/Status Hearing held on 3/31/2010 (Re: 152 Joint MOTION to Modify Protective Order ) (Court Reporter: B.Neil) (cjt, Deputy Clerk) (cjt, Deputy Clerk). (Entered: 04/01/2010) |
| 03/31/2010 | 165 | | MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 03/31/2010 | 166 | | CORRECTED MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010, Reply due by 7/1/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 04/05/2010 | 167 | | SEALED REPORT TO COURT by USA (Re: 152 Joint Motion to Modify Protective Order) (cjt, Deputy Clerk) (Entered: 04/05/2010) |
| 04/08/2010 | 168 | | SEALED ORDER by Judge James H. Payne Re: 152 Joint Motion to Modify Protective Order (cjt, Deputy Clerk) (Entered: 04/08/2010) |
| 04/14/2010 | 169 | | SEALED STATUS REPORT by Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 4/20/2010 to add corrected attachment (cjt, Deputy Clerk). (Entered: 04/15/2010) |
| 05/12/2010 | 170 | | Unopposed MOTION for Leave to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief by USA Responses due by 5/26/2010(Wilson, Christopher) (Entered: 05/12/2010) |
| 05/13/2010 | 171 | | ORDER by District Judge James H. Payne: granting 170 Respondent's Unopposed Motion to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief (cjt, Deputy Clerk) (Entered: 05/13/2010) |
| 05/14/2010 | 172 | | TRANSCRIPT of Proceedings (Unredacted) of Status Hearing held on 3–31–2010 before District Judge James H. Payne (Court Reporter: Brian P. Neil) (Pages: 1–46). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without |

| | | | |
|---|---|---|---|
| | | | redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s) ) (bpn, Court Reporter) (Entered: 05/14/2010) |
| 05/14/2010 | 173 | | TRANSCRIPT ORDER FORM for Status and Scheduling Conference conducted on 3/31/10 (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s), 172 Transcript of Proceedings – Unredacted) by Kenneth Eugene Barrett (law, Deputy Clerk) (Entered: 05/17/2010) |
| 05/17/2010 | 174 | | Redacted RESPONSE in Opposition to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 05/17/2010) |
| 05/17/2010 | 175 | | SEALED RESPONSE (Re: 174 RESPONSE to Motion; 95 Amended MOTION to Vacate, Set Aside or Correct a Sentence) by USA (dma, Deputy Clerk) (Entered: 05/17/2010) |
| 06/30/2010 | 176 | | Unopposed MOTION for Leave to Exceed Page Limitation *For Reply Brief* by Kenneth Eugene Barrett Responses due by 7/14/2010(Schardl, Tivon) (Entered: 06/30/2010) |
| 06/30/2010 | 177 | | MINUTE ORDER by District Judge James H. Payne: granting 176 Petitioner's Unopposed Motion for Leave to File Oversized Brief (cjt, Deputy Clerk) (Entered: 06/30/2010) |
| 07/01/2010 | 178 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 07/01/2010) |
| 07/23/2010 | 179 | | NOTICE of Filing of Signed Declaration of Toby Barrett (Re: 178 Reply to Response to Motion ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 07/23/2010) |
| 08/13/2010 | 180 | | REPORT AND RECOMMENDATION ON REQUEST FOR EXCESS COMPENSATION by Magistrate Judge Steven P. Shreder (Re: 105 Minute Order Referring CJA 30 Voucher) Objections to RRdue by 8/27/2010(eje, Deputy Clerk) (Entered: 08/13/2010) |
| 09/03/2010 | 181 | | SEALED ORDER by District Judge James H. Payne: Re: 180 Report and Recommendation) (cjt, Deputy Clerk) (Entered: 09/03/2010) |
| 09/03/2010 | | | CJA 30: Authorization to Pay David B. Autry on behalf of Kenneth Eugene Barrett. (JHP 9/3/10)(smg, Deputy Clerk) (Entered: 09/14/2010) |
| 02/07/2011 | 182 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 2/22/2011 (With attachments)(Fisher, Joan) (Entered: 02/07/2011) |
| 02/08/2011 | 183 | | MINUTE ORDER by District Judge James H. Payne: granting 182 Petitioner's Unopposed Motion to Seal. Petitioner is given leave to file the following documents under seal: Petitioners Motion to Vacate or Modify |

| | | | |
|---|---|---|---|
| | | | Protective Order and Request for Hearing; Brief in Support of Motion to Vacate or Modify Protective Order and Request for Hearing; Petitioners Motion for Leave to Conduct Discovery; and Petitioners Brief in Support of Motion to Conduct Discovery. (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 184 | | SEALED MOTION to Vacate or Modify Protective Orders and Request for Hearing by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 185 | | SEALED BRIEF in Support of 184 Petitioner's Sealed Motion to Vacate and/or Modify Protective Order and Request for Hearing (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 186 | | SEALED MOTION for Leave to Conduct Discovery by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 187 | | SEALED BRIEF in Support of 186 Sealed Motion to Conduct Discovery (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/17/2011 | 188 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 186 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 189 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 184 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 190 | | MINUTE ORDER by District Judge James H. Payne: granting 188 and 189 Government's Motions for Extension of Time to Respond to Motions; Responses due by 3/8/2011 Re: 184 Petitioner's SEALED MOTION to Vacate or Modify Protective Orders and 186 Petitioner's SEALED MOTION for Leave to Conduct Discovery (cjt, Deputy Clerk) (Entered: 02/17/2011) |
| 03/04/2011 | 191 | | Unopposed MOTION to Seal Document by USA Responses due by 3/18/2011(Kahan, Jeffrey) (Entered: 03/04/2011) |
| 03/04/2011 | 192 | | MINUTE ORDER by District Judge James H. Payne: granting 191 Respondent's Motion to File Sealed Oppositions to Sealed Motions (cjt, Deputy Clerk) (Entered: 03/04/2011) |
| 03/08/2011 | 193 | | SEALED RESPONSE in Opposition (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/08/2011 | 194 | | SEALED RESPONSE in Oposition (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/18/2011 | 195 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 4/1/2011 (With attachments)(Fisher, Joan) (Entered: 03/18/2011) |
| 03/18/2011 | 196 | | MINUTE ORDER by District Judge James H. Payne: granting 195 Petitioner's Motion to Seal Replies to documents 193 and 194 (cjt, Deputy Clerk) (Entered: 03/18/2011) |
| 03/21/2011 | 197 | | SEALED REPLY to Response (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by Petitioner (cjt, Deputy Clerk) (Entered: |

| | | | |
|---|---|---|---|
| | | | 03/22/2011) |
| 03/21/2011 | 198 | | SEALED REPLY to Response (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/16/2012 | 199 | | NOTICE of Filing of Declaration of Paul D. Gordon (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) Modified to reflect DVDs for Exhibits 2, 3 and 4 stored in file cabinet in vault on 2nd floor Court Clerk's Office (cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/16/2012 | 200 | | NOTICE of Filing of Declaration of Leonard Post (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 03/16/2012) |
| 03/16/2012 | 201 | | MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett Responses due by 3/30/2012 (With attachments)(Fisher, Joan) Modified to reflect CDs of Appendix A and Appendix B stored in file cabinet in vault on 2nd floor Court Clerk's Office(cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/19/2012 | 202 | | CERTIFICATE of Service (Re: 199 Notice (Other) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/19/2012 | 203 | | CERTIFICATE of Service (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/29/2012 | 204 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 201 Motion to Supplement) by USA; Responses due by 4/12/2012 (With attachments)(Wilson, Christopher) Modified on 3/30/2012 (cjt, Deputy Clerk). (Entered: 03/29/2012) |
| 03/30/2012 | 205 | | MINUTE ORDER by District Judge James H. Payne: granting 204 Motion for Extension of Time to Respond to Motion; Response deadline extended to 4/30/2012 (Re: 201 MOTION to Supplement) (cjt, Deputy Clerk) (Entered: 03/30/2012) |
| 04/27/2012 | 206 | | RESPONSE in Opposition to Motion (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by USA ;(Wilson, Christopher) (Entered: 04/27/2012) |
| 05/07/2012 | 207 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255, 201* MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/07/2012) |
| 06/18/2012 | 208 | | MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY by Kenneth Eugene Barrett. Responses due by 7/2/2012(Fisher, Joan) (Entered: 06/18/2012) |

| | | | |
|---|---|---|---|
| 06/18/2012 | 209 | | BRIEF in Support of Motion (Re: 208 MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/18/2012) |
| 06/20/2012 | 210 | | ORDER by District Judge James H. Payne denying 201 Motion for Leave to Supplement Pending Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence Under 28 U.S.C. Section 2255 (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/20/2012 | 211 | | MINUTE ORDER by District Judge James H. Payne denying 208 Motion to Preserve Testimony of Judge John Garrett, Retired, Without Further Delay (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/28/2012 | 212 | | MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* (Re: 210 Ruling on Motion to Supplement ) by Kenneth Eugene Barrett. Responses due by 7/12/2012(Fisher, Joan) (Entered: 06/28/2012) |
| 07/10/2012 | 213 | | RESPONSE in Opposition to Motion (Re: 212 MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* ) by USA ;(Wilson, Christopher) (Entered: 07/10/2012) |
| 08/16/2012 | 214 | | OPINION AND ORDER by District Judge James H. Payne: denying 95 Amended Motion to Vacate; denying 184 Sealed Motion; denying 186 Sealed Motion; denying 212 Motion to Reconsider (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 215 | | SEALED ORDER by District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 216 | | JUDGMENT by District Judge James H. Payne entering judgment in favor of USA against Kenneth Eugene Barrett (terminates case) (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 09/13/2012 | 217 | | MOTION to Alter Order/Judgment *and Brief in Support* (Re: 216 Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider ) by Kenneth Eugene Barrett. Responses due by 9/27/2012 (With attachments)(Fisher, Joan) (Entered: 09/13/2012) |
| 09/27/2012 | 218 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA. Responses due by 10/11/2012(Wilson, Christopher) (Entered: 09/27/2012) |
| 09/27/2012 | 219 | | ORDER by District Judge James H. Payne: granting 218 Motion for Extension of Time to Respond to Motion; Responses due by 10/29/2012 (Re: 217 MOTION to Alter or Amend Judgment) (cjt, Deputy Clerk) (Entered: 09/27/2012) |
| 10/29/2012 | 220 | | RESPONSE in Opposition to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 10/29/2012) |
| 10/30/2012 | 221 | | OPINION AND ORDER by District Judge James H. Payne: denying 217 Petitioner's Motion to Alter or Amend Judgment (cjt, Deputy Clerk) |

| | | | (Entered: 10/30/2012) |
|---|---|---|---|
| 12/26/2012 | 222 | | NOTICE OF APPEAL to Circuit Court (Re: 216 Judgment, 221 Ruling on Motion to Alter Order/Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider, 215 Sealed Order ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 12/26/2012) |
| 12/27/2012 | 223 | | Transmission of Notice of Appeal and Docket Sheet to Circuit Court with copy of 222 Notice of Appeal, 216 Judgment, 221 Ruling, 214 Ruling and 215 Sealed Order. Preliminary Record transmitted to 10th Circuit Court of Appeals electronically. (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/27/2012) |
| 12/27/2012 | 224 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 12–7086 (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/28/2012) |
| 01/10/2013 | 225 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/10/2013) |
| 01/10/2013 | 226 | | DESIGNATION of Record on Appeal (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 01/10/2013) |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 162**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

22

## INFORMATION
==========  ===============================================================

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA        )
          Plaintiff,     )
vs.                      )            No. CF-99- 562
                         )
CHARLES EDMOND SANDERS   )
DOB ████/66 #██████9539  )
          Defendant.     )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV - 3 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## I N F O R M A T I O N

### IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that **CHARLES EDMOND SANDERS** did, in Sequoyah County, and in the State of Oklahoma, on the 22nd day of October, in the year of our Lord, One Thousand, Nine Hundred and Ninety-Nine and before the presentment hereof, commit the crime of

COUNT I: KNOWINGLY CONCEALING STOLEN PROPERTY-(FELONY) 21 O.S. 1713 That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did unlawfully, wilfully, knowingly, and feloniously conceal from Horseshoe Lounge, certain personal property of value, to-wit: checks on the account of Horseshoe Lounge, that had prior thereto been stolen from the said Horseshoe Lounge, the said defendant knowing or reasonably should have believed that said property was stolen did then and there unlawfully conceal and withhold said property from the owner thereof, with the felonious intent to deprive said owner thereof,

COUNT II: KNOWINGLY CONCEALING STOLEN PROPERTY-(FELONY) 21 O.S. 1713 That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did unlawfully, wilfully, knowingly, and feloniously conceal from Dortha Asbill, certain personal property of value, to-wit: checks belonging to Dortha Asbill, that had prior thereto been stolen from the said Dortha Asbill, the said defendant knowing or reasonably should have believed that said property was stolen did then and there unlawfully conceal and withhold said property from the owner thereof, with the felonious intent to deprive said owner thereof,

COUNT III: KNOWINGLY CONCEALING STOLEN PROPERTY-(FELONY)21 O.S. 1713 That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, did unlawfully, wilfully, knowingly, and feloniously conceal from JoNell McLaughlin, certain personal property of value, to-wit: checks and credit cards, that had prior thereto been stolen from the said JoNell McLaughlin, the said defendant knowing or reasonably should have believed that said property was stolen did then and there unlawfully conceal and withhold said property from the owner thereof, with the felonious intent to deprive said owner thereof,

COUNT III: UTTERING A FORGED INSTRUMENT-(FELONY) 21 O.S. 1592 CHARLES EDMOND SANDERS unlawfully, willfully, knowingly, fraudulently and feloniously with intent to defraud, utter and publish as true to one Dick's One Stop a certain instrument, to-wit: a check, which is in words and figures as follows: Check # 1665 in the amount of $10.00 drawn on the account of Dortha Asbill; that said defendant then and there knowing at the time that said written instrument was forged and counterfeited, and that the signature of Dortha Asbill to said

23

instrument was forged and counterfeited, but said defendant did then and there unlawfully, willfully, fraudulently and feloniously, utter and publish same with the felonious intent then and there on the part of said defendant to beat, cheat and defraud,

COUNT IV: POSSESSION OF SAWED OFF SHOTGUN-(FELONY) 21 O.S. 1289.18(C)
On the day and year in the County and State aforesaid, said CHARLES EDMOND SANDERS, did wilfully, feloniously and without lawful cause have in his possession a shotgun with a barrel length of less than 18 inches,

COUNT V: UNLAWFUL POSSESSION OF MARIHUANA-(MISD) 63 O.S. 2-402
That on the day and year and in the county and state aforesaid, said CHARLES EDMOND SANDERS did unlawfully, wilfully, knowingly, intentionally and wrongfully have in his possession and under his control MARIHUANA, said drug being classified as a controlled dangerous substance in Schedule I (C) of the Uniform Controlled Dangerous Substances Act of this State,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

By_____
Assistant District Attorney

STATE OF OKLAHOMA )
                  ) ss.
COUNTY OF SEQUOYAH)
   Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____
Assistant District Attorney

      Subscribed and sworn to before me this _3rd_ day of November, 1999.

My Commission Expires:
   _6/26/2003_

_____
NOTARY PUBLIC

**REDACTED**

WITNESSES:
Jeff Murray, Sallisaw PD
Rick Nicholson, Sallisaw PD
Charles Wiley, Sallisaw PD
Chemist, OSBI Lab, Tahlequah, OK
David Bethany, Sallisaw PD
Kelli Gwynn, ███████████████ Sallisaw, OK
JoNell McLaughlin, ████████ Ft. Smith, AR
Dortha Asbill, ████████████ OK
Cashier, ███████████ Sallisaw, OK

24

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

INFORMATION
Page 2

NOV 0 8 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

THE STATE OF OKLAHOMA,
                Plaintiff,

vs.

CHARLES EDMOND SANDERS,
                Defendant.

)  IN THE DISTRICT COURT OF
)  SEQUOYAH COUNTY, STATE
)   OF OKLAHOMA
)  CASE NO. CF-99-562
)
)
)
)

## FORMER CONVICTIONS

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES EDMOND SANDERS was heretofore on the 20th day of July, 1992, in Case No. CRF-92-91, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UNLAWFUL POSSESSION OF CONTROLLED DRUG, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES EDMOND SANDERS was heretofore on the 20th day of July, 1992, in Case No. CRF-90-144, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of SEXUAL BATTERY, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES EDMOND SANDERS was heretofore on the 20th day of July, 1992, in Case No. CRF-89-396, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UTTERING A FORGED INSTRUMENT, said defendant being represented by counsel, and said conviction having become a final judgment in the case,

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES EDMOND SANDERS was heretofore on the 1st day of December, 1994, in Case No. CF-93-772, in the District Court of Muskogee County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of ESCAPE FROM CONFINEMENT, said defendant being represented by counsel, and said conviction having become a final judgment in the case,

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES EDMOND SANDERS was heretofore on the 1st day of December, 1994, in Case No. CF-93-131, in the District Court of Muskogee County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of CARRYING WEAPON INTO JAIL, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

DIANNE BARKER HARROLD,
DISTRICT ATTORNEY

BY: _____
    Assistant District Attorney

25

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 1 5 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

_State_

Plaintiff

vs. _Sandus_

Defendant

CASE NO: _CF 562_

APPLICATION FOR APPOINTED COUNSEL
AND
AFFIDAVIT OF FINANCIAL INABILITY TO EMPLOY COUNSEL

I swear and affirm that I am the party in the above entitled action. I want an attorney to represent me in this case. I am financially unable to obtain the services of an attorney without causing substantial hardship to myself or to my family. The following information is true and is given and intended to be relied upon by the court and other persons or agencies in determining my eligibility for legal services to be furnished to me at public expense.

PLEASE FILL IN ALL SPACES BELOW AND SIGN YOUR NAME UNDER OATH IN FRONT OF THE JUDGE, A NOTARY OR THE COURT CLERK. IF A QUESTION DOES NOT APPLY TO YOU, PLEASE WRITE IN THE BLANK "DOES NOT APPLY".

I. GENERAL INFORMATION                    DATE:_____
NAME: Charles Sandus
ADDRESS:▨▨▨▨▨
TELEPHONE: (918)_____    MESSAGE NUMBER: 775-▨▨▨
SOCIAL SECURITY NO: ▨▨▨ 9539  AGE: 33   DOB ▨▨ 66
SINGLE (✓) MARRIED ( ) SEPARATED ( )
SPOUSE'S NAME: 0
ADDRESS: 0
TELEPONE: 0
HOW MANY PEOPLE ARE IN YOUR HOUSEHOLD? 1
NAME AND AGES: Charus Sandus

ARE YOU CLAIMED AS A DEPENDENT BY A PARENT OR GUARDIAN? YES ( ) NO ( )

II FAMILY INCOME
YOUR MONTHLY TAKE HOME PAY: 0    WEEKLY TAKE HOME PAY: 0
YOUR EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY)

YOUR EMPLOYER'S PHONE NUMBER: 0
SPOUSE'S SALARY: 0
SPOUSE'S EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY

SPOUSE'S EMPLOYER'S PHONE NUMBER: 0
IS ANY OTHER MEMBER OF YOUR HOUSEHOLD EMPLOYED? YES ( ) NO (✓)
WHO? 0
WHERE? 0
SALARY? 0
DEPENDENT'S EMPLOYER: 0
OTHER SOURCE OF INCOME OR BENEFITS (INCLUDE INTEREST, DIVIDENDS, ROYALTIES, ETC.) 0
TOTAL FAMILY INCOME FOR PRECEDING MONTH WAS $ 0

26

III FAMILY ASSETS (WHAT YOU OWN LESS WHAT YOU OWE ON IT)
MONEY:
IN JAIL: _____ AT HOME: _____ . CHECKING: _____
_____ SAVINGS: _____ SAFE DEPOSIT BOX _____ OTHER: _____
HOME OR OTHER REAL ESTATE VALUE: _____ JEWELRY VALUE: _____
AUTOMOBILES: MAKE AND VALUE _____ FURNITURE VALUE _____
MOTORCYCLES: MAKE AND VALUE _____ TOOLS/EQUIPMENT
VALUE _____
NOTES, MORTGAGES AND TRUST DEEDS: _____ ANY DEBTS OWED TO THE DEF _____
OTHER ASSETS AND PROPERTY VALUE: _____
ARE YOU PARTY TO A SUIT (PROBATE, WORKER'S COMPENSATION, PERSONAL
INJURY)WHERE? _____ JUDGMENT MAY BE EXPECTED? YES( ) NO( )
NAME OF ATTORNEY? _____

IV EXPENSES AND DEBTS
RENT/HOUSE PAYMENT _____ CLOTHING _____ FOOD: _____
DOCTOR/MEDICINE _____ UTILITIES _____ CAR PAYMENT _____
INSURANCE: _____ OTHER _____
TOTAL MONTHLY LIVING EXPENSES: _____
MORTGAGE/LANDLORD'S NAME: _____
MAJOR DEBTS: (list to whom and amount owed): _____
_____
_____

LIST THE PERSONS WHO ARE DEPENDENT ON YOU FOR SUPPORT. STATE YOUR
RELATIONSHIP TO EACH PERSON AND HOW MUCH YOU CONTRIBUTE MONTHLY TO THEIR
SUPPORT _____
_____
_____

V. LAST EMPLOYMENT
WHEN DID YOU LAST WORK?: _____
WHO WAS YOUR EMPLOYER?: _____
SALARY: _____ HOW LONG DID YOU WORK THERE? _____
WHY DID YOU QUIT? _____
_____

VI. THE FOLLOWING PEOPLE CAN VERIFY TO A LARGE EXTENT MY ABOVE MENTIONED
FINANCIAL SITUATION. GIVE NAME , ADDRESS AND PHONE NUMBER.
1. _____

2. _____

3. _____

REDACTED

VII. CHARGE AND BOND
CHARGE(S): FELONY _____ MISDEMEANOR _____ JUVENILE _____
ARRESTING AGENCY CPF
CITY _____ COUNTY _____ STATE _____
HAS BOND BEEN POSTED? YES( ) NO( ) DID YOU USE A BONDSMAN? YES( ) NO( )
WHO PAID THE BONDSMAN? _____
AMOUNT OF BOND: _____ PREMIUM PAID TO BONDING CO: _____
IF YOU DID NOT USE A BONDSMAN, DID YOU POST A CASH _____ OR P.R. _____

27

LIST ANY DEFENDANTS CHARGES WITH YOU _____

VIII

1. HAVE YOU TRANSFERRED OR SOLD ANY ASSETS SINCE CHARGES WERE FILED IN THE CASE? YES ( ) NO ( ) IF SO, DESCRIBE THE BUYER AND THE AMOUNT RECEIVED.

_____

_____

2. HAVE YOU RETAINED COUNSEL IN THE CASE OR IN ANY OTHER PENDING CRIMINAL CASE? YES ( ✓ ) NO ( ) IF SO, STATE THE CASE NUMBER, COURT ATTORNEY AND AMOUNT PAID TO ATTORNEY FOR SERVICES: 97-397

3. DO YOU HAVE ANY FRIENDS OR RELATIVES WHO ARE ABLE AND WILLING TO ASSIST YOU IN HIRING COUNSEL AND PAYING FOR TRANSCRIPTS? YES ( ) NO ( ) IF SO, HAVE THOSE PERSONS BEE ASKED TO HELP? YES ( ✓ ) NO ( )

4. IF ANY FRIEND OR RELATIVE HAS GIVEN PREVIOUS FINANCIAL ASSISTANCE IN THIS CASE, BUT IS NO LONGER ABLE OR WILLING TO DO SO, AN AFFIDAVIT TO THAT EFFECT FROM THAT PERSON SHOULD BE ATTACHED. IS THAT AFFIDAVIT ATTACHED YES( ) NO( )

IX. NAMES OF THREE ATTORNEY'S YOU CONTACTED:

1. NAME: _____
   WHEN DID YOU CONTACT THIS ATTORNEY? _____
   HOW DID YOU CONTACT THIS ATTORNEY? _____
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓ )

2. NAME: _____
   WHEN DID YOU CONTACT THIS ATTORNEY? _____
   HOW DID YOU CONTACT THIS ATTORNEY? _____
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( )

3. NAME: _____
   WHEN DID YOU CONTACT THIS ATTORNEY? _____
   HOW DID YOU CONTACT THIS ATTORNEY? _____
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓ )

X. I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION I HAVE PROVIDED IS TRUE AND CORRECT. I UNDERSTAND THAT I MAY BE PROSECUTED FOR PROVIDING FALSE INFORMATION IN THIS APPLICATION AND AFFIDAVIT. I UNDERSTAND THAT I MUST INFORM THE OKLAHOMA INDIGENT DEFENSE SYSTEM OF ANY CHANGE IN MY FINANCIAL SITUATION THAT MAY CHANGE THE INFORMATION I HAVE PROVIDED. I FURTHER DECLARE THAT I HAVE CONTACTED THREE ATTORNEYS, LICENSED TO PRACTICE LAW IN THIS STATE, AND I AM WITHOUT FUNDS TO PAY AN ATTORNEY TO REPRESENT ME OR TO PAY FOR TRANSCRIPTS AND COST ASSOCIATED WITH THIS CASE.

DATED THIS _____ DAY OF _____ 19____

DEFENDANT _____

LEGAL GUARDIAN _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____ 19____

comm. exp. _____    **REDACTED**

PUBLIC NOTARY OR CLERK OR JUDGE

I FIND THAT THE DEFENDANT IS UNABLE TO PAY THE APPLICATION FEE AND I HEREBY WAIVE THE FEE.

_____
                    JUDGE

APPOINTMENT OF INDIGENT DEFENSE COUNSEL
APPROVED *Jhr* DENIED _____

## NOTICE

A copy of this APPLICATION AND AFFIDAVIT shall be sent to the prosecuting attorney or office of attorney general, whichever is applicable, for review and, upon request, the court shall hold a hearing to determine your eligibility for legal services to be furnished to you at public expense.

## IMPORTANT NOTICE

The court shall order you to pay the costs of your legal representation in total, or in installments. The court shall set the amount and due of each installment payment. The costs shall be paid to the court clerk in your county. The costs shall be a debt against you until paid and shall subject you to debt collection procedures as provided by law. The costs shall be deducted from any state income tax refund due you until the total costs are paid.

REDACTED

29

Sequoyah County Form CF-1                    Uniform Plea of Guilty — Summary of Facts

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, OKLAHOMA
THE STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 9 1999

BERNELL EDWARDS, COURT CLERK
BY _____

STATE OF OKLAHOMA,                          )
                          Plaintiff         )
                                            )
vs.                                         )    Case No. CF-99-562
                                            )              98-363
*Charles Edmond Sanders*                    )              98-346
                          Defendant         )              98-128
DOB [REDACTED] 19 66                        )              97-9
SS# [REDACTED] — 9539                       )

SUMMARY OF FACTS FOR THE PLEA OF GUILTY

Part A: Finding of Fact, Acceptance of Plea                          Circle

1.  Is the name just read to you your true name?                     YES  NO
    If no, then what is your correct name? _____
    I have also been known by the name(s) _____
    _____

2.  (A)  Do you wish to have a record of these proceedings made by a Court Reporter ?    YES  NO

    (B)  Do you wish to waive your right to have a record of these proceedings made ?     YES  NO

3.  What is your age ? 33  What grade level in school have you completed ? GED

4.  Can you read and understand this form ? [If no, Addendum A must be completed and attached]    YES  NO

5.  Are you currently taking any medications or substances which affect your ability to understand    YES  NO
    these proceedings ?

6.  Have you been prescribed any medication which you are not taking ?                               YES  NO
    If yes, what medication are you not taking? _____NO_____
    What is the purpose of the medication ? _____
    Why are you not taking the medication ? _____ REDACTED _____

7.  Have you ever been treated by a doctor or health professional for mental illness or confined in    YES  NO
    a hospital for mental illness ?
    If Yes, list doctor or health professional, place, and when treatment occurred:
    _____

8.  Do you understand the purpose, the nature and the consequences of this proceeding ?    YES  NO

9.  Have you received a copy of the State's Information and read its allegations ?          YES  NO

30

10.  A.  Do you understand you are charged with:

Crime Statutory Reference

CF-99-562

[1] Knowingly Concealing Stolen Property 21 O.S. 1713   YES   NO
[2] Knowingly Concealing Stolen Property 21 O.S. 1713   YES   NO
[3] Knowingly Concealing Stolen Property 21 O.S. 1713   YES   NO
[4] Uttering a Forged Instrument 21 O.S. 1592   YES   NO
[x] Poss. of Sawed off Shotgun 21 O.S. 1289.18(C)   YES   NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

B.  Are you charge after former conviction of a felony (AFCF) ?        YES   NO
If yes, list the felony(ies) charged: _____
_____

11.  Do you understand the range of punishment for the crime(s) is/are ?
(List in the same order as in Number 10)

[1]  Minimum of _____ to a maximum of __5 yrs__ and/or a fine of $ __500__   YES   NO

[2]  Minimum of _____ to a maximum of __5 yrs__ and/or a fine of $ __500__   YES   NO

[3]  Minimum of _____ to a maximum of __5 yrs__ and/or a fine of $ __500__   YES   NO

[4]  Minimum of _____ to a maximum of __7 yrs__ and/or a fine of $ _____   YES   NO

[5]  Minimum of _____ to a maximum of __2 yrs__ and/or a fine of $ __1,000__   YES   NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

12.  Read the following statements:  You have the right to a speedy trial before a jury of your peers to determine whether you are guilty or not guilty and if you request, to determine the sentence.
*If pleading to a capital murder,* advise of the procedure in 21 O.S. 701.10( B)
At the trial:
[1] You have the right to have an attorney represent you, either one you hire or *if you are indigent* a court appointed attorney.
[2] You are presumed to be innocent of the charges.
[3] You may remain silent or , if you chose, you may testify on your own behalf.
[4] You have the right to see and hear all witnesses called to testify against you and the right to have those witnesses cross-examined.
[5] You may have your witnesses ordered to appear in court to testify and present evidence of any defense you have to these charges.
[6] The State is required to prove your guilt beyond a reasonable doubt.
[7] The verdict of guilty or not guilty decided by a jury must be unanimous.  However, you can waive a jury trial and, if all parties agree, the case could be tried by a Judge alone who would decide if you were guilty or not guilty and if determined to be guilty, the appropriate punishment.

**REDACTED**

Do you understand each of these rights ?        YES   NO

13.  Do you understand by entering a plea of guilty you give up these rights ?        YES   NO

14.  Do you understand that a conviction on a plea of guilty could increase punishment in any future case committed after this plea ?        YES   NO

15.  Is __Monte E. Johnson__ your attorney ?        YES   NO

16.  Have you talked with your attorney about the charges, advised him/her regarding any defense you may have to the charges and received his/her advice ?        YES   NO

31

17. Do you believe your attorney has effectively assisted you in this case and are you satisfied with his/her representation ? **YES** NO

18. Do you wish to change your plea of not guilty to a plea of guilty and give up your right to a jury trial and all previously explained constitutional rights ? **YES** NO

19. Is there a plea agreement ? **YES** NO
What is your understanding of the plea agreement ? _____*See Addendum C*_____
_____
_____

20. Do you understand the Court is *not* bound by any agreement or recommendation and if the Court does not accept the plea agreement, you have the right to withdraw your plea of guilty ? **YES** NO

21. Do you understand that if there is no plea agreement the Court can sentence you within the range of punishment stated under question 11 ? **YES** NO

22. Do you understand your plea of guilty to the charge(s) is subject to : **YES** NO
(check one)
[✓] no prior felony conviction
[ ] one (1) prior felony conviction
[ ] two (2) or more felony convictions   List prior felony convictions to which you are pleading:
_____

23. What is/are your plea(s) to the each charge(s) ? 363   346
562   [1] *Guilty*  [2] _____  [3] *guilty*  [4] _____  [5] *guilty*   **YES** NO

24. Did you commit the acts as charged in the information ?
State a factual basis for your plea(s) (attach additional pages as needed, labeled as ADDENDUM C) :
*Received stolen RXR on the Oct-4- and had the check on my person. A had stolen checks, passed checks ad had CDS on his person — Ams 12-9-99*

25. Have you been forced, abused, mistreated or promised anything by anyone to have you enter your plea(s) ? YES **NO**

26. Do you plead guilty of your own free will and without any coercion or compulsion of any kind ? **YES** NO

27. If you are entering a plea to a felony offense, you have a right to a Pre-sentencing investigation and Report which would contain the circumstances of the offense, any criminal record, social history and other background information about you. Do you request a Pre-sentence report ? YES **NO**

28. (A) Do you have any additional statements to make to the Court ? YES **NO**

(B) Is there any legal reason as to why you should *not* sentence now ? YES **NO**

HAVING BEEN SWORN, I , the Defendant whose signature appears below, make the following statements under oath: **REDACTED**

(1)   CHECK ONE:

_____ (A)   I have read, understood and completed this form.

_____ (B)   My attorney completed this form and we (the attorney and I) have gone over the form and I understand its contents and agree with the answers. *Complete Addendum A and attach to this form.*

_____ (C)    The Court completed this form for me and inserted my answers to the questions in open court.

All answers are true and correct.

(2)

(3)    I understand that I may be prosecuted for perjury if I have made false statements to this Court.

Acknowledged this ___9th___ Day of ___December___, 1999.

_____
DEFENDANT

I, the undersigned attorney for the Defendant, believe the Defendant understands the nature, purpose, and consequence of this proceeding. (S)He is able to assist me in formulating any defense to the charge(s). I am satisfied that the Defendant's waivers and plea(s) of guilty are voluntarily given and he/she had been informed of all legal and constitutional rights.

_____
ATTORNEY FOR DEFENDANT

The sentence recommendation in question 19 is correctly stated. I believe the recommendation is fair to the State of Oklahoma. Offer of Proof (nolo contendere plea) : _____

_____
ASSISTANT DISTRICT ATTORNEY

THE COURT FINDS AS FOLLOWS:
A. The Defendant was sworn and responded to questions under oath.
B. The Defendant understands the purpose, nature and consequences of this proceeding.
C. The Defendant's plea(s) of ___guilty___ is/are knowingly and voluntarily entered and accepted by the Court Reporter Present Court.
D. The Defendant is competent for the purpose of this hearing.
E. A factual basis exists for the plea(s) (and former conviction(s), if applicable).
F. The Defendant is guilty as charged: (check as appropriate)
   [✓] after no prior felony conviction.
   [ ] after one (1) prior felony conviction.
   [ ] after two (2) or more prior felony convictions
G. Sentencing or order deferring sentence shall be: [✓] imposed instanter or [ ] continued until the ____ day of _____, _____ at ____:____ ____. M . If the Pre-sentence investigation and Report is requested, it shall be provided to the Court by the ____ day of _____, _____.

DONE IN OPEN COURT this ___9th___ day of ___December___, 1997.

**REDACTED**

_____
JUDGE OF THE DISTRICT COURT

___Dennis M. Sprouse___
NAME OF JUDGE TYPED OR PRINTED

___nch___
Deputy Court Clerk Present

___N/A___
Court Reporter Present

33

## "NOTICE OF RIGHT TO APPEAL"

Sentence to Incarceration, Suspended or Deferred:

To appeal from this conviction, or order deferring sentence, on your plea of guilty, you must file in the Sequoyah County District Court Clerk's Office a written Application to Withdraw Plea of Guilty within ten (10) days from today's date. You must set forth in detail why you are requesting to withdraw your plea. The trial court must hold a hearing and rule upon your application within thirty (30) days from the date it is filed. If the trial court denies your application, you have a right to ask the Court of Criminal Appeals to review the District Court's denial by filing a Petition for Writ of Certiorari within ninety (90) days of the date of denial. Within ten (10) days from the date the application to withdraw plea of guilty is denied, notice of intent to appeal and designation or record must be filed pursuant to Oklahoma Court of Criminal Appeals Rule 4.2(D). If you are indigent, you have the right to be represented on appeal by a court appointed attorney.

Do you understand each of these rights to appeal ?                                    (YES)  NO

Do you want to remain in the county jail ten (10) days before being taken to place of     YES  (NO)
confinement ?

Have you fully understood the questions that have been asked ?                         (YES)  NO

Have your answers been freely and voluntarily given ?                                 (YES)  NO

I ACKNOWLEDGE UNDERSTANDING OF RIGHTS AND SENTENCE IMPOSED.

_____
Defendant

I, the undersigned attorney, have advised the Defendant of his appellate rights.

_____
Attorney for the Defendant

DONE IN OPEN COURT, this ___9___ day of ___December___, 1999.

_____
Judge of the District Court

___N/A___                                              ___N/A___
Court Reporter Present                           Deputy Court Clerk Present

ADDENDUM "A"

### CERTIFICATE OF DEFENSE COUNSEL

As the attorney for the defendant, *Charles Sanders*, I certify that: **REDACTED**

1. The Defendant has stated to me that he/she is [✓] able [ ] unable to read and understand the attached form, and I have [✓] determined the Defendant is able to understand the English language or [ ] determined the Defendant is unable to understand the English language and obtained _____ to interpret to the Defendant in the _____ language.
2. I have read and fully explained to the Defendant the allegations contained in the Information in this case.
3. I have read and fully explained to the Defendant all of the questions in the Plea of Guilty/Summary of Facts and the answers to the questions set out in the Summary of Facts are the Defendant's answers.
4. To the best of my knowledge and belief the statement and declarations made by the Defendant are accurate and true and have been freely and voluntarily made.  Dated this ___9th___ day of ___December___, 1999.

_____
Attorney for the Defendant

34

Sequoyah County Form CF-1 - b          Uniform Plea of Guilty — Sentence on Plea

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case Number CF- *99-562*          State v. *Charles Sanders*   Date: *12/9/99*
*98-363   98-479-App*

**Part B:** Sentence on Plea    [NOTE ON USE: Part B is to be used with the Summary of Facts if contemporaneous with the entry of plea or may be formatted as a separate sentencing form if sentencing is continued to a future date.]

THE COURT SENTENCES THE DEFENDANT AS FOLLOWS:

DEFERRED SENTENCE
_____

1. The sentencing date is deferred until _____ , _____ , _____ at __ : ___ _ M.

2. You [ ] will [ ] will not be under supervision by the Department of Corrections. The terms set forth in the Rules and Conditions of Probation in Addendum D shall be the rules you must follow during the period of deferment.

SUSPENDED SENTENCE or SUSPENDED AS TO PART

1. You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:
[1] *20 yrs* [2] _____ [3] _____ [4] _____ [5] _____

TO BE SUSPENDED as follows:

    (A) ALL SUSPENDED [ ✓ ] Yes        [ ] No

    (B) suspended *except* as to the first _____ (months) (years) of the term(s) during which you are to be held in the custody of the Department of Corrections. The remaining term of the sentence(s) is to be suspended under the terms set forth in the Rules and Conditions of Probation in Addendum D.

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____ _____ or NOT APPLICABLE.

TIME TO SERVE

1. You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:
[1]_____ [2]_____ [3]_____ [4]_____ [5]_____

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____ _____ or NOT APPLICABLE.
**REDACTED**

FINES AND COSTS

You are to pay in full any fine(s), costs , fees and restitution at the time of sentencing. In the alterative, you may request a stay of execution (SOE) from the Cost Administrator in the Sequoyah County District Court Clerk's Office. All information given to the Cost Administrator in requesting the SOE will be under oath and is considered as part of the summary of facts before the Court. *You will appear in person to make all payments as agreed.* Any payment tendered other than in person will be accepted; however, such acceptance does not excuse your appearance in the Clerk's Office.

35

Sequoyah County Form CF-3 ( B )          Uniform Plea of Guilty — Additional Findings

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

I THE DISTRICT COURT OF SEQUOYAH COUNTY THE STATE OF OKLAHOMA

STATE vs. _____Defendant    Case No. _____

## ADDITIONAL FINDINGS AT TIME OF SENTENCING

### EXHIBIT 1

A.  Original Charges (A copy of the information may be attached instead) Please list any additional charges on a separate attached sheet.

| OFFENSE | STATUTE CITATION |
|---|---|
| Knowingly Concealing Stolen Property | 21 O.S. 1713 |
| Knowingly Concealing Stolen Property | 21 O.S. 1713 |
| Knowingly Concealing Stolen Property | 21 O.S. 1713 |
| Uttering a Forged Instrument | 21 O.S. 1592 |
| Poss. of sawed off shotgun | 21 O.S. 1289.18 (c) |

*See Exhibit 1, Page 2*

B.  Prior Felony Charges Used For Enhancement Please list any additional convictions on a separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| N/A | | |

C. Prior Charge(s) For Which Order Deferring Sentence Was Entered Please list any additional charges on separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| N/A | | |

D.  Prior Felony Convictions Not Used For Enhancement Please list any additional convictions on a separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| N/A | | |
| REDACTED | | |

E.

If the defendant plead guilty to multiple counts, did the offense(s) arise from the same transaction?

Circle

Yes    No

## F.  Other Enhancers Used to Determine Placement on Matrix          Circle

1.  Did the offender commit the current offense with the use of a firearm within the immediate possession and control of the offender?          Yes    No

2.  Was the victim of the offense over 62 years of age, under 12 years of age or disabled by reason of mental or physical illness to such extent that the victim lacked the ability to effectively protect his or her property or persons?          Yes    No

3.  Did the offender in the commission of the offense maim or torture the victim?          Yes    No

4.  Did the offender commit a Schedule N-2 or N-3 drug offense in, on, or within 1,000 feet of real property comprising of a public or private elementary or secondary school; public or private college, university, or other institution of higher education; recreation or public park (including state facilities); public housing project; or in the presence of any child under 12 years of age?          Yes    No

5.  Did the offender commit a Schedule N-2 or N-3 drug offense by using of soliciting the services of a person less than 18 years of age, providing the offender was at least 18 years of age at the time of the offense?          Yes    No

6.  If the controlling offense was a property or drug offense, what was the total amount involved in that offense (e.g., the value of the property involved; the amount of money stolen, embezzled, or obtained by fraud; or the amount of drug proceeds utilized?     $_____

7.  If the controlling offense was a drug offense, what was the *predominant* drug and what was the amount of that drug? (Please specify quantity in grams, ounces, etc.)
DRUG:_____
QUANTITY:(oz, grams, etc.)_____

## G.  Offender Characteristics

Gender (Circle)          Race    (Circle)
Male   Female          White   Black   Hispanic   Asian   Native Am.

This Exhibit shall **not** be admitted into evidence in any future prosecutions.

Certified this ___9th___ day of ___December___, ___1999___.

_____          **REDACTED** _Marth E Johnson_
Attorney for the State          Attorney of the Defendant

          _____
          Judge of the District Court

## PLEA GUILTY ADDENDUM B

CF-98-363   Uttering A forged Instrument          21 O.S. 1592

up to 5yrs in D.O.C custd.

CF-98-346   Count 1: Poss of CDS    63 O.S. 2-402
Count 2: Dismissed ⤷ up to 10 yrs in
2 to
D.O.C. custody

CF-98-128   Dismissed

CF-97-9   Dismissed

REDACTED

**Plea Guilty Addendum C**

CF-99-562    Count 1 :    20 yrs. susp. & $500.00 fine + $125.00 VCF + costs
                Count 2 :    Dismissed
                Count 3 :    Dismissed
                Count 4 :    Dismissed
                Count 5 :    Dismissed
                Count 6 :    Dismissed

---

CF-98-363    Count 1 :    20 yrs. susp.  c/c + $500.00 fine + $125.00 VCF + $48.00 restitution + costs

CF-98-346    Count 1 :   ~~Dismissed + costs~~ *20 yr. susp. C/c + $500 fine + $250 DADF + costs*

*Count 2: Dismissed*

CF-98-128    Count 1 :    Dismissed + costs

CF-97-9    Application To Impose:    Confession to Application.

                Pass for 90 days.  Pay restitution in amount of $52.63.  If restitution is paid, application will be withdrawn.  If fail to pay restitution, 1 yr. in Sequoyah County Jail.

**REDACTED**

**"EXHIBIT 1, PAGE 2"**

CF-98-363        Uttering a Forged Instrument        21 O.S. 1592

                 up to 5 years


CF-98-346        Count 1:  Poss of CDS        63 O.S. 2-402

                 Count 2: Dismissed


CF-98-128        Dismissed


CF-97-9          Dismissed


**REDACTED**

40

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

Case No: _CF-99-562_     Defendant: _Charles Sanders_

### ACCUMULATIVE COURT COST FOR SEQUOYAH COUNTY

<u>NON-VIOLENT COURT COST</u>

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**COURT FUND**

| | | |
|---|---|---|
| Court Fees | | $103.00 |
| Bail Bond Fee | $10.00 @_____ | _____ |
| Jury Fee | $30.00@_____ | _____ |
| Fines | set by court | _500.00_ |
| Mailing fee | $7.00 @_____ | _____ |
| Sub total Court Fund | | _603ᵒᵒ_ |

DEC -9 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**SHERIFF FEES**

| | | |
|---|---|---|
| Sheriff Fees | | $30.00 |
| Arrest Warrant | $30.00 | _____ |
| Bench Warrant | $30.00@_____ | _____ |
| Revolving Fund | $5.00 | _____ |
| Subpoenas | $30.00@_____ | _____ |
| Sub total Sheriff Fees | | _30.00_ |

LAW LIBRARY $3.00
CLEET & FINGERPRINTING $7.00

| | | |
|---|---|---|
| VCA | $25.00 or set by court | _125.00_ |
| OSBI LAB | set by court | _____ |
| D.A. DRUG FUND | set by court | _40.00_ |
| REVOLVING FUND(appl fee-$40.00) | | _40.00_ |
| IDF-ATTORNEY FEE | set by court | _150.00_ |

**REDACTED**

TOTAL _958ᵒᵒ_

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

IN THE DISTRICT COURT OF   )
SEQUOYAH COUNTY           )
STATE OF OKLAHOMA         )
                          )
                          )

Defendant __CHARLES EDMOND SANDERS__   DEC   9 1999

Case No. __CF-99-562__

Date __DECEMBER 9, 1999__

BY _____, COURT CLERK
                                    DEPUTY

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general state of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I will understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or any representative thereof.

8. I understand that I must support myself and all my dependents without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within the eighteen months.

15. **SPECIAL CONDITIONS:** The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, OSBI lab fees) of $_____ within _____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 19_____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed).*

    $500 FINE and $125 VCA

    ( X )  Defendant is to pay restitution through the District Attorney's office as set out in Exhibit "A" attached, the sum of $___455.00_____.

16. Defendant to report to DOC Probation & Parole Office within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_____
Attorney for Defendant

_____
Probationer

_____
JUDGE OF THE DISTRICT COURT

Defendant's Mailing Address:

███████████████  Sallisaw, Ok 74955

Charles Sanders

# In The District Court In And For Sequoyah County,
## State of Oklahoma

THE STATE OF OKLAHOMA,    )
    )
      PLAINTIFF    )    **CASE NO: CF-99-562**
VS.    )
CHARLES EDMOND SANDERS    )
DOB: █66    )    SEQUOYAH COUNTY, OKLAHOMA
SS#█9539    )    FILED
      DEFENDANT.    )    IN DISTRICT COURT

DEC 9 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## JUDGMENT AND SENTENCE

Now, on this  9TH DAY OF DECEMBER, 1999,  this matter comes on before the undersigned Judge, for sentencing and the Defendant,  _____CHARLES EDMOND SANDERS_____ , appears personally and by his attorney of record,  _____MONTE JOHNSON_____ , the State of Oklahoma represented by Assistant District Attorney,  _ROBBIE COWAN_ , and the Defendant, having previously:

(X )    Entered a plea of guilty
( )    Entered a plea of Nolo Contendere
( )    Found guilty by jury
( )    Found guilty by Judge after waiver of jury trial
    to/of the crime(s) of:

CT. I:  KNOWINGLY CONCEALING STOLEN PROPERTY, 21 O.S. 1713
COUNTS 2 -6 DISMISSED

(  )  The Defendant has previously been convicted of _____ felony crimes and the sentence has been enhanced in accordance with the provisions set forth in Title 21 O.S. § 51 and 51A.

    **IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** by the Court that the Defendant,  _____CHARLES EDMOND SANDERS_____ , is guilty of the above-described offense(s) and is sentenced as follows:

### TERM OF IMPRISONMENT
COUNT _____:  Sentenced to a term of _____ imprisonment;

all under the custody and control of the Oklahoma Department of Corrections.
These terms to be served ( ) concurrently, or ( ) consecutively;

### TERM OF IMPRISONMENT - (PART SUSPENDED)
COUNT _____:  Sentenced to a term of_____ imprisonment;

with all except the first _____ suspended under the custody and control of the Oklahoma Department of Correction pursuant to the rules and conditions of probation entered by the Court. These terms to be served ( ) concurrently, or ( ) consecutively;

### TERM OF IMPRISONMENT - (ALL SUSPENDED)
COUNT _____:  Sentenced to a term of _TWENTY (20) YEARS_ imprisonment;

under the custody and control of the Oklahoma Department of Corrections all of said term(s) of imprisonment suspended pursuant to the rules and conditions of probation entered by the Court. These terms to be served (X ) concurrently, or ( ) consecutively;  w/Seq County Case Nos. CF-98-363 and CF-98-346

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT** that in addition to the preceding term(s), the Defendant is also sentenced to:

### FINE

( ) The defendant shall pay a fine of $_____ ( ) immediately or ( ) on or before _____, 19___, at the rate of $_____ per month, or within _____ days of release from the Department of Corrections.

( ) The payment of a fine of $_____ is suspended.

( ) The defendant shall report to the District Court of Sequoyah County within _____ days of release for a hearing on the defendant's ability to pay fines and costs pursuant to Section VIII of the rules of the Court of Criminal Appeals, 22 O.S. Chapter 18, App.

### COSTS, VCA, RESTITUTION

( ) The defendant shall pay costs, fees, and restitution in accordance with the schedule attached as Exhibit _____.

### RULES AND CONDITIONS OF PROBATION

( ) The rules and conditions as ordered by the court and signed and acknowledged by the defendant are attached as hereto.

### ATTORNEY FEES

( ) The defendant shall pay court-appointed attorney fee amount of $_____ on or before _____, 19__, to _____.

It is further ordered that judgment is hereby entered against the Defendant as to the fines, court costs and assessments set forth above.

The Court further advised the Defendant of his rights to appeal to the Court of Criminal Appeals of the State of Oklahoma, and of the necessary steps to be taken by him to perfect such appeal, and that if he desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State without cost to him.

In the event the above sentence is for incarceration in the Department of Corrections, the sheriff of Sequoyah County, Oklahoma, is ordered and directed to deliver the Defendant to the Lexington Assessment and Reception Center at Lexington, Oklahoma, and leave therewith a copy of this Judgment and Sentence to as warrant and authority of the imprisonment of the Defendant as provided herein. A second copy of this Judgment and Sentence to warrant and authority of the sheriff for the transportation and imprisonment of the Defendant as herein before provided. The sheriff to make due return to the clerk of this Court, with his proceedings endorsed thereon.

_____
JUDGE OF THE DISTRICT COURT

(SEAL)
ATTEST:
BERNELL EDWARDS, COURT CLERK

_____, DEPUTY CLERK

44

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA            )
        Plaintiff,        )
vs.                         )        Case No. ___CF-99-562___
                           )
CHARLES EDMOND SANDERS       )
        Defendant.        )

**RESTITUTION SCHEDULE - EXHIBIT "A"**

    The following is a schedule of restitution to be made by __CHARLES EDMOND SANDERS__, Defendant herein, and said Defendant hereby made by agrees to make said restitution to the terms set out by the Court. The total amount of restitution is $_455.00_. Restitution is to be made by the payment of $_60.00_ on or before the __10th__ day of __January__, 2000, and $__60.00__ on or before the __10th__ day of each month thereafter until said $__455.00__ has been paid in full or until further order of the Court. Each payment specified herein is to be made only by cashier's check or money order made payable to the order of the **DA RESTITUTION PROGRAM** and remitted to: **P.O. BOX 500, TAHLEQUAH, OK 74465.** Each payment must have your name and the case number on it for proper credit.

SCHEDULE OF RECIPIENTS

| Name | Address | Telephone | Amount |
|------|---------|-----------|--------|
|  |  |  | $455.00 |
|  | **REDACTED** |  |  |

TOTAL DUE: $_455.00_

DIANNE BARKER HARROLD
DISTRICT ATTORNEY, DISTRICT 27

BY: _____
    Assistant District Attorney

_Charles Sanders_
DEFENDANT

Address                Zip

D.O.B.                 SS#

ATTORNEY FOR DEFENDANT

# In the District Court in and for Sequoyah County, State of Oklahoma

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC - 9 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

State of Oklahoma, )
)
        Plaintiff, )
)
vs. *Charles Edmond Sanders* ) Case No. CF- *99-562*
*DOB: 1-11-66* ) *98-363*
*SS# 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* ) *98-346*
        Defendant ) *98-128*
) *97-9*

## WAIVER OF PRELIMINARY HEARING

Now on this _____8th_____ day of _December_, 19_99_, the above styled case comes on for preliminary hearing. The defendant appears in person and represented by his attorney of record,_Monte Johnson_____, the State of Oklahoma appears by its Assistant District Attorney. Thereupon the defendant herein acknowledges having been advised of the right to a preliminary hearing. That in said hearing the State of Oklahoma must prove to the satisfaction of the Court that the crime as alleged in the information was, in fact, committed and there is probable cause to believe that the defendant committed said crime. That if said burden was not met then the case would be dismissed and the bond exonerated.

The defendant is further advised that at said hearing that he/she has the right to cross examine any of the State's witnesses and to call witnesses on his/her own behalf. And further, the defendant is advised of the right at the hearing to limited discovery of the State's case in chief.

Having these rights in mind, the defendant herein, waives all the above rights with respect to a preliminary hearing in this matter.

REDACTED _____
Defendant

_____
Attorney for Defendant

## WAIVER OF JURISDICTION OF EXAMINING MAGISTRATE

The defendant is further advised that neither the examining magistrate nor the Special Judge has the jurisdiction to proceed further with the case unless affirmatively waived. Having these rights in mind, the defendant hereby waives his/her rights to object to any jurisdictional defects of the Court.

_____
Defendant

_____
Attorney for Defendant

## COURT MINUTE OF PRELIMINARY HEARING

The defendant in the above styled case having knowingly and intelligently waived his/her rights to the preliminary hearing and there being no objection by the State of Oklahoma, the Court accepts the defendant's waiver and hereby binds the defendant over to stand trial in the District Court of Sequoyah County, State of Oklahoma, on the charges as set out in the information as filed in this case.

D.C.A.
12-9-99 @ 1:30pm.
J. Norman

_____
JUDGE OF THE DISTRICT COURT

46

**ORDER TO RELEASE FROM CUSTODY**

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order. Last Name, First, Middle, suffix (please print or type) (show alias) DOB. ██ 66

_Sanders_          _Charels_          _E_          SSn ██ 9539

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-99-562 | Pled out Per Sprouse | Time suspended |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the ⁹ day of _Dec_ , 19 99 .

_[signature]_
Signature

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

**AUTHORIZED BY**

_Sprouse_
JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
**FILED**
IN DISTRICT COURT

DEC 27 1999

BERNELL EDWARDS, COURT CLERK
BY_____ _au_ _____DEPUTY

REDACTED

47

BENCH WARRANT-AFTER CONVICTION

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 0 2 2000

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

THE STATE OF OKLAHOMA,      )
                            )
vs.                         )     Case No. CF-99-00562, CF-98-346
CHARLES EDMOND SANDERS             CF-98-363,
████████████                      NO BOND
SALLISAW, OK  74955
████1966  ████9539

BENCH WARRANT

THE STATE OF OKLAHOMA,
        TO ANY SHERIFF, CONSTABLE, MARSHALL, OR POLICEMAN IN THIS STATE
GREETINGS:
CHARLES EDMOND SANDERS having been on December 09, 1999, duly convicted in
the District Court of Sequoyah County, State of Oklahoma, of the crime of:
FAILURE TO APPEAR AND PAY MONIES DUE THE COURT IN THE AMOUNT OF $2819.00

        YOU ARE THEREFORE COMMANDED FORTHWITH to arrest the above named
defendant, CHARLES EDMOND SANDERS, and bring him/her before said Court for
judgement, or if said Court has adjourned for the term, deliver him/her to
the Sheriff of the County of Sequoyah; there to be detained by said Sheriff
until further order of the court;

        WITNESS my hand and seal of said Court this 03-01-2000.


                                    BERNELL EDWARDS
                                    COURT CLERK

                                By: _____
                                        Deputy

                WILL ONLY EXTRIDATE FROM SURROUNDING STATES

                            SHERIFF'S RETURN


RECEIVED the within Writ on the _____ day of _____, 199__, at
_____o'clock ___.m., and executed on the _____ day of _____, 199__, at
_____ o'clock ___.m., by _____.

DATED this _____ day of _____, 1999.

                                    JOHNNY PHILPOT,
                                    SHERIFF, SEQUOYAH COUNTY
                **REDACTED**
                                    BY:_____
                                            Deputy

dms                                                                    48

## WARRANT CLEARANCE

WARRANT #   *CF99-00562, CF 98-344 CF98-343*

WARRANT NAME   *CHARLES Edmond SANders*

DATE & TIME CLEARED   *05/20/00   @2*

WARRANT CLEARED BY:

ARREST   *✓*   OFFICER SERVING *DAMON Tucker*

AGENCY *OHP Muskogee*

CANCEL_____   OFFICIAL DIRECTING WARRANT CANCELLATION

_____

WAS WARRANT PULLED FROM FILE?   (YES)   NO

IF NO, EXPLAIN WHY NOT_____

WAS WARRANT MARKED OFF BOOK?   (YES)   NO

IF NO, EXPLAIN WHY NOT_____

WAS WARRANT CANCELLED FROM NCIC?   (YES)   NO

IF NO, EXPLAIN WHY NOT_____

WAS WARRANT REMOVED FROM HOLDS BOOK?   (YES)   NO

IF NO, EXPLAIN WHY NOT_____

SHERIFF'S OFFICE EMPLOYEE SIGNATURE *Debbie Fuller*

NOTE:   AFTER COMPLETING THIS FORM, STAPLE THIS FORM BACK TO
BACK WITH THE WARRANT AND PLACED IN THE FOLDER MARKED
"SEND TO COURT CLERK." ONLY USE THIS FORM TO CLEAR
SEQUOYAH COUNTY WARRANTS.

USE ONE FORM FOR EACH WARRANT CLEARED.

49

BENCH WARRANT-AFTER CONVICTION

THE STATE OF OKLAHOMA,                                  )
                                                         )
vs.                                                      )      Case No. CF-99-00562, CF-98-346
CHARLES EDMOND SANDERS                                          CF-98-363,
SALLISAW, OK  74955                                             NO BOND
1966                    9539

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
MAR 0 2 2000
BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

BENCH WARRANT

THE STATE OF OKLAHOMA,
     TO ANY SHERIFF, CONSTABLE, MARSHALL, OR POLICEMAN IN THIS STATE
GREETINGS:
CHARLES EDMOND SANDERS having been on December 09, 1999, duly convicted in
the District Court of Sequoyah County, State of Oklahoma, of the crime of:
FAILURE TO APPEAR AND PAY MONIES DUE THE COURT IN THE AMOUNT OF $2819.00

     YOU ARE THEREFORE COMMANDED FORTHWITH to arrest the above named
defendant, CHARLES EDMOND SANDERS, and bring him/her before said Court for
judgement, or if said Court has adjourned for the term, deliver him/her to
the Sheriff of the County of Sequoyah; there to be detained by said Sheriff
until further order of the court;

     WITNESS my hand and seal of said Court this 03-01-2000.

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 2 2 2000

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

BERNELL EDWARDS
COURT CLERK

By: _____
          Deputy

WILL ONLY EXTRIDATE FROM SURROUNDING STATES

SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199__, at
_____o'clock __.m., and executed on the _____ day of _____, 199__, at
_____ o'clock __.m., by _____.
DATED this _____ day of _May_____, 2000

                                REDACTED JOHNNY PHILPOT,
                                         SHERIFF, SEQUOYAH COUNTY

                                BY: _____
                                          Deputy

50

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**MAY 3 1 2001**

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

THE STATE OF OKLAHOMA,            )
             Plaintiff,            )
vs.            )            No.  CF-99-562
                            )
CHARLES E. SANDERS            )
             Defendant.            )

## APPLICATION TO REVOKE SUSPENDED SENTENCE

COMES NOW, Dianne Barker Harrold, the duly elected, qualified, and acting District Attorney of Sequoyah County, and states to the Court that on the 9th day of December, 1999, the said Defendant entered his plea of guilty in the above entitled case, in the District Court of Sequoyah County, Oklahoma, to the charge of: KNOWINGLY CONCEALING STOLEN PROPERTY, as set out in the Information on file in this cause and the said defendant was sentenced to serve a term of TWENTY (20) years, under the Supervision of the Department of Correction, which sentence the Court suspended during the good behavior of said defendant.

Thereafter, the defendant violated the rules and conditions of probation as imposed by the Court in the following manner:

**Rule #1**: by failing to report for Probation and Parole.
**Rule #2**: by being in possession of intoxicants and being arrested for:  LARCENY OF MERCHANDISE FROM RETAILER, POSSESSION OF PARAPHERNALIA in Sequoyah County, OK on May 17th, 2001.
**Rule #9**: by violating city, state or federal law, and being charged with:  LARCENY OF MERCHANDISE FROM RETAILER, POSSESSION OF PARAPHERNALIA in Sequoyah County, OK CF-2001-314.

WHEREFORE, applicant prays that the Court set a date for hearing this application and that the suspension clause in said Judgment and Sentence be carried out in full, according to its terms. That the Court direct the Court Clerk of Sequoyah County, Oklahoma, to issue a Bench Warrant for the arrest of said defendant.

REDACTED
Dated this _____ day of May, 2001.

**DIANNE BARKER HARROLD, District Attorney**

BY: _____
                    Assistant District Attorney

WITNESSES:

Emmett Daniels, c/o Probation & Parole, Sallisaw, OK
Derek Brown, ██████████████ Sallisaw, OK
Rocky Gaither██████████████ Sallisaw, OK
Dustin Walters,██████████████ Sallisaw, OK
Leri Kay,██████████████Sallisaw, OK
Debbie Carter, ██████████████ Sallisaw, OK

## FINDING OF PROBABLE CAUSE

The Undersigned Judge of the District Court, upon the above application hereby determines there to be probable cause for the issuance of a Bench Warrant and so orders.

Dated this ____30__ day of ____may____, 200_.
Bond set at $ _10,000.00_

_____
**JUDGE OF THE DISTRICT COURT**

ISSUED
6/5/01

## BENCH WARRANT--After Conviction

| | | |
|---|---|---|
| **STATE OF OKLAHOMA,** | ) | |
| **Sequoyah County,** | ) | **IN DISTRICT COURT** |

THE STATE OF OKLAHOMA )
    VS. )                         No.CF-99-562
CHARLES E.  SANDERS )
██████████████ )
SALLISAW, OKLAHOMA 74955 )
███966 ███9539 )                 **BOND: $10,000**

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**CHARLES E.  SANDERS** having been on the 9TH DAY OF DECEMBER, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :KNOWINGLY CONCEALING STOLEN PROPERTY, **APPLICATION TO REVOKE**

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **CHARLES E.  SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah;  there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 5TH DAY OF JUNE, 2001.  By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: *Tara Allen*
                                                                    DEPUTY

### WILL ONLY EXTRIDATE FROM SURROUNDING STATES

### SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199____, at _____ o'clock _____M., and executed on the _____ day of _____, 199____, at _____ o'clock _____M. by _____ _____

Dated this _____ day of _____ 199____.

SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY:_____
**REDACTED**                                            DEPUTY

52

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA )
                Plaintiff )

vs. )

Charles Monk Sanders )

_____ )
           Defendant )

CF- 98 - 346
       98 - 363
       99 - 562

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 0 8 2001

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

## Waiver of Twenty Day (20) Rule

You are a defendant who has received a suspended sentence from the District Court in Sequoyah County, State of Oklahoma. As part of your suspended sentence, you were given rules and conditions of probation at the time of your sentence. The State of Oklahoma now alleges you have violated your rules of probation and has filed a petition to revoke your probation.

Under State law, 22 O.S. § 991b, you are entitled to a hearing to be held for the purpose of considering evidence within twenty (20) days after the entry of the plea of not guilty to the petition, *unless waived by both the state and the defendant.* At the hearing for revocation of a suspended sentence, the court shall take testimony and review evidence presented, and if it appears to the satisfaction of the court that grounds for a revocation exist, the court shall revoke the suspended sentence.

The court may revoke a portion of the sentence and leave the remaining part not revoked, but suspended for the remainder of the term of the sentence, and under the provisions applying to it. The person whose suspended sentence is being considered for revocation at said hearing shall have the right to be represented by counsel, to present competent evidence in his or her own behalf and to be confronted by the witnesses against the defendant. Any order of the court revoking such suspended sentence, in whole or in part, shall be subject to review on appeal, as in other appeals of criminal cases. Provided, however, that if the crime for which the suspended sentence is given was a felony, the defendant may be allowed bail pending appeal. If the reason for revocation be that the defendant committed a felony, the defendant shall not be allowed bail pending appeal.

Do you understand these rights?                          (Yes)   No
Do you waive your right to have a hearing within 20 days?    (Yes)   No

Dated this __6__ day of __June__, 2001.

_____         _____
        Defendant                    Attorney for Defendant
                **REDACTED**
_____         _____
Attorney for the State               Judge of the District Court

ISSUED
6/5/01

## BENCH WARRANT--After Conviction

STATE OF OKLAHOMA, )
Sequoyah County, )                    **IN DISTRICT COURT**

THE STATE OF OKLAHOMA )                SEQUOYAH COUNTY, OKLAHOMA
VS. )                                  FILED
CHARLES E. SANDERS )       No.CF-99-562 IN DISTRICT COURT
████████████████████ )
SALLISAW, OKLAHOMA 74955 )                 JUN 13 2001
████966████9539 )               BERNELL EDWARDS, COURT CLERK
                                  BOND: $10,000 _____DEPUTY

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**CHARLES E. SANDERS** having been on the 9TH DAY OF DECEMBER, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :KNOWINGLY CONCEALING STOLEN PROPERTY, **APPLICATION TO REVOKE**

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **CHARLES E. SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 5TH DAY OF JUNE, 2001. By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: *Tara Allen*
                                              DEPUTY
**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199____, at _____o'clock _____M., and executed on the _____day of _____, 199____, at _____o'clock _____M. by _____ _____

Dated this _____day of_____199____.

_____
SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY: *Cecil Duty*
REDACTED                              DEPUTY

## WARRANT CLEARANCE

WARRANT #_____*CF99-562*_____

WARRANT NAME_____*Charles E. Sanders*_____

DATE & TIME CLEARED_____*6/12/01 @ 1655*_____

WARRANT CLEARED BY:

    ARREST__*X*__  OFFICER SERVING_____*Cecil Duty*_____

                  AGENCY_____*SCSO*_____

    CANCEL_____  OFFICIAL DIRECTING WARRANT CANCELLATION

_____

WAS WARRANT PULLED FROM FILE?    (YES)   NO

IF NO, EXPLAIN WHY NOT_____

WAS WARRANT MARKED OFF BOOK?    (YES)   NO

IF NO, EXPLAIN WHY NOT_____

WAS WARRANT CANCELLED FROM NCIC?    YES   (NO)

IF NO, EXPLAIN WHY NOT_____*Not entered*_____

WAS WARRANT REMOVED FROM HOLDS BOOK?    YES   (NO)

IF NO, EXPLAIN WHY NOT_____*No hold*_____

SHERIFF'S OFFICE EMPLOYEE SIGNATURE_____*Amy Nelson*_____

NOTE:  AFTER COMPLETING THIS FORM, STAPLE THIS FORM BACK TO BACK WITH THE WARRANT AND PLACE IN THE FOLDER MARKED "SEND TO COURT CLERK" ONLY USE THIS FORM TO CLEAR SEQUOYAH COUNTY WARRANTS.

      USE ONE FORM FOR EACH WARRANT CLEARED.

ISSUED
8/23/01

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 23 2001

BERNELL EDWARDS, COURT CLERK

BY_____

_____ DEPUTY

| | |
|---|---|
| THE STATE OF OKLAHOMA,<br>Plaintiff,<br><br>vs.<br><br>CHARLES E. SANDERS<br>Defendant. | )<br>)<br>)<br>)   No.  CF-99-562<br>)<br>)<br>)<br>) |

## ORDER REVOKING SUSPENDED SENTENCE

NOW, on this 23rd day of August, 2001, the above styled case comes on for hearing on the State's Application to Revoke Suspended Sentence.  The State is present by Assistant District Attorney, Rob Cowan, the defendant is present and represented by the attorney of record, . Monte Johnson.

The Court finds that on the 9th day of December, 1999, the said defendant was found guilty of the crime of KNOWINGLY CONCEALING STOLEN PROPERTY, 21 O.S. 1713 and sentenced to a term of TWENTY (20) years with the direction of the Department of Corrections, and of said sentence TWENTY (20) years was suspended pending the defendant's good behavior.

The Court finds that on the 31st day of May, 2001, the State filed an Application to Revoke Suspended Sentence based on violations of the defendant's Rules and Conditions of Probation.  The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the suspended sentence is revoked in full with the defendant to attend the Last Stop Program with said balance to be suspended upon successful completion thereof.  The Sheriff of Sequoyah County shall deliver said defendant to the Department of Corrections and leave therewith a copy of this Order of Judgment and Sentence to serve as a warrant and authority for the revocation of said defendant as provided herein.   The second copy of the Order to be warrant and authority of said Sheriff for the transportation and imprisonment of said defendant as herein before provided.  The Sheriff to make due return to the Clerk of this Court, with his procedure endorsed thereon.
Defendant to turn himself in to the Seq County Jail on Aug 30, 01 @ Noon.

_____
JUDGE OF THE DISTRICT COURT

56

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type)(show alias)

*Sanders          Charles     E     ██     66*

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-99-562 | Tulsa Co sent to Doc on our charges | A&B resist |
|  |  | SEQUOYAH COUNTY, OKLAHOMA FILED IN DISTRICT COURT **OCT 29 2001** BERNELL EDWARDS, COURT CLERK BY _____ DEPUTY |
|  |  |  |
|  |  |  |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the _25_ day of _Oct_ , 20 _01_ .

AUTHORIZED BY

Signature _____

JUDGE OF THE DISTRICT COURT

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

**REDACTED**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA STATE OF
OKLAHOMA

CASE NO. CF-98-363
CF-98-346
CF-99-562
J&S date 08-28-01

VS.

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 1 8 2002

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

Sanders, Charles
DEFENDANT

STATEMENT OF JAIL TIME

PRISONER WAS ARRESTED ON DATE OR DATES AS FOLLOWS: See below

PRISONER REMAINED IN JAIL ___279___ DAYS BEFORE JUDGEMENT AND SENTENCING.

PRISONER REMAINED IN JAIL ___2___ DAYS AFTER JUDGEMENT AND SENTENCING.

Jamie Fulker

SEQUOYAH COUNTY SHERIFF'S DEPARTMENT

04-15-98 thru 04-15-98 = 1 day
~~09-17-98 thru~~ 09-18-98 = 1 day
11-16-98 thru 02-01-99 = 78
06-22-99 thru 06-23-99 = 1 day
09-30-98 thru 09-30-98 = 1 day
10-22-99 thru 12-09-99 = 49 days
05-20-00 thru 08-13-00 = 86 days
05-27-01 thru ~~5~~-08-29-01 = 64

**REDACTED**

58

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 1 2 2002

BERNELL EDWARDS, COURT CLERK
BY_____
_____DEPUTY

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Case No.  CF-99-562 |
| | ) | |
| CHARLES E. SANDERS | ) | |
| Defendant | ) | |

## APPLICATION FOR ORDER NUNC PRO TUNC

COMES NOW Lynn R. Anderson , Assistant District Attorney for the State of Oklahoma, and for his Application for Nunc Pro Tunc states as follows:

1.    The Court entered an Order Revoking Suspended Sentence on the 23rd day of August, 2001..

2.    That the sentence in the Order Revoking Suspended Sentence  stating " the defendant to attend the Last Stop Program with said balance to be suspended upon successful completion thereof,  is incorrect and should be corrected in said document. Sentence should state "the defendant to attend the Last Stop Program or similar program with said balance to be suspended upon successful completion thereof".

3.    That the Applicant requests that the Court enter an Order of Nunc Pro Tunc, correcting  said sentence in  the Order Revoking Suspended Sentence  in the above styled cause .

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

BY:_____
Assistant District Attorney

REDACTED

59

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 1 2 2002

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

THE STATE OF OKLAHOMA          )
          Plaintiff,          )
                       )          CASE NO. CF-99-562
                       )
CHARLES E. SANDERS             )
          Defendant.          )

## ORDER NUNC PRO TUNC

This matter coming on to be heard before me the undersigned Judge, on the 12TH day of August, 2002, and there being present Application of the District Attorney, for an Order Nunc Pro Tunc herein, correcting the Order Revoking Suspended Sentence filed in said cause. The Court having heard evidence and being satisfied that by scribner's error stating **"the defendant to attend the Last Stop Program with said balance to be suspended upon successful completion thereof,** is in error and should be stricken from said document and it appearing that the proceedings are regular and said error should be corrected.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the ORDER REVOKING SUSPENDED SENTENCE should be, and is hereby corrected to show the statement stricken from Order and the statement **"the defendant to attend the Last Stop Program or similar program with said balance to be suspended upon successful completion thereof"**, entered.

_____
JUDGE OF THE DISTRICT COURT

**REDACTED**



IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,  )
        Plaintiff  )
  )
vs.  )   Case No. CF-01-00314
CHARLES EDMOND SANDERS  )             CF-98-00346
  )             CF-98-00363
  )             ~~CF-99-00562~~
SALLISAW, OK  74955  )
▮▮▮▮▮Defendant  )
    SS#: ▮▮▮9539
    DOB: ▮▮1966

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 1 4 2002

State's Attorney:
Defendant's Attorney:

BERNELL EDWARDS, COURT CLERK

Date: 08/14/02        RULE 8 HEARINGSTEVE BARNES
              (Summary)      BY_____DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

                                02
_____$536.80 on or before 10-30-20 and

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 10-30-20_____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

_____

TOTAL TO PAY $536.80      **REDACTED**

X_____    DENNIS M. SPROUSE
      Defendant         Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

SEQUOYAH COUNTY, OKLAHOMA
IN DISTRICT COURT
FILED
AUG 1 4 2002
BY_____
DARNELL EDWARDS, COURT CLERK
_____ DEPUTY

APPLICATION  FOR STAY OF EXECUTION ON FINES/COSTS

CHECK ONE      _____I plan to pay before 3:30 pm today

_____I plan to pay within 48 hours      _____I want extended time to pay

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by the Court.  I understand that I may be subject to penalties, including but not limited to imprisonment, if I fail to pay my assessed fine(s)/costs as ordered.  I consent to an investigation into all information I provide on this application to verify its validity.  I understand I may be held in CONTEMPT OF COURT for providing false and/or incomplete information on this application. I swear under PENALTY OF PERJURY that the below information is true and complete.

SIGNATURE Charles Sanders      DATE 8/14/02

CASE #_____      DATE OF BIRTH ▓▓▓ 6 6

SS#_▓▓▓▓ 9539_____      FINE/COST_____

LAST NAME Sanders_____      FIRST Charles MI E

STREET ▓▓▓▓_____      CITY Sallisaw_____      PHONE 775▓▓▓

EMPLOYER_____—_____HOW LONG___—___      PHONE_____

EARNINGS___—___per___—___#hrs/wk_____paydates___—___

IF PAYING BEFORE 3:30 PM TODAY:  STOP HERE

MARITAL STATUS      SINGLE_____  MARRIED_____      DIVORCED_✓_
                    SEPERATED_____      WIDOW/ER_____      COMMON LAW_____

Names and Ages of Children_____
List others living in household    NAME         RELATIONSHIP    EMPLOYER    INCOME
_____
_____
_____

AMOUNT OF CASH WITH YOU $_____Saving/Checking Accounts $_____
Property,Investments, Assets $_____
I AM SUPPORTED BY:_____      Do you receive housing assistance_____
   Alimony/Child Support_____      Monthly Expenses:
   Social Security_____      Rent_____
   Pension/Retirement_____      Food_____
   Welfare_____      Utilities_____
   Food Stamps_____ **REDACTED** Child Care_____
   Unemployment_____      Medical_____
   My Gross Monthly Earning_____      TOTAL$_____
   Other Income Support_____Source_____

DRIVERS LICENSE # Sein SS #      STATE OK  EXP.DATE 5-14-9 Y
VEHICLES YOU OWN OR USE:   YEAR      MAKE/MODLE      MONTHLY PAYMENTS
_____
_____

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                     )
      Plaintiff                  )
vs.                                    )      Case No. CF-01-00314
CHARLES EDMOND SANDERS                 )               CF-98-00346
                                       )               CF-98-00363
                                       )               CF-99-00562
SALLISAW, OK  74955                    )
████████████Defendant                  )
   SS#: ██████9539
   DOB: ██████1966

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

OCT - 9 2002

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

State's Attorney:
Defendant's Attorney:

Date: 10/09/02               RULE 8 HEARINGBRIAN MORTON
                                   (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $100.00 on or before 11-09-20̲0̲2̲ and

then 100.00 per month on or before the 9 day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 11-09-20_____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $536.80      REDACTED

X_____
    Defendant

DENNIS M. SPROUSE
Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
   Plaintiff

vs.

CHARLES EDMOND SANDERS

SALLISAW, OK 74955
    Defendant
 SS#:   9539
 DOB:   1966

)
)
)
)
)
)
)
)
)
)

Case No. CF-01-00314   4   **391.00**
      CF-98-00346   1   **75.80**
      CF-98-00363   2   **35.00**
      ~~CF-99-00562~~   **3**   **35.00**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**OCT - 9 2002**

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

State's Attorney:
Defendant's Attorney:

Date: 10/09/02

RULE 8 HEARING BRIAN MORTON
(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____$100.00 on or before 11-09-20 **02** and

then **100.00**_____ per month on or before the **9** day of each month –

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 11-09-20_____

OR;_____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments:_____

_____

_____

TOTAL TO PAY $**536.80**    **REDACTED**

X_____
  Defendant

DENNIS M. SPROUSE
Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

*

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
OCT - 9 2002
BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

APPLICATION FOR STAY OF EXECUTION ON FINES/COSTS

CHECK ONE _____ I plan to pay before 3:30 pm today

_____ I plan to pay within 48 hours    ✓ I want extended time to pay

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by the Court.  I understand that I may be subject to penalties, including but not limited to imprisonment, if I fail to pay my assessed fine(s)/costs as ordered.  I consent to an investigation into all information I provide on this application to verify its validity.  I understand I may be held in CONTEMPT OF COURT for providing false and/or incomplete information on this application. I swear under PENALTY OF PERJURY that the below information is true and complete.

SIGNATURE Charles Sanders    DATE 10-9-2002

CASE # _____    DATE OF BIRTH ███ 66

SS# ███9539    FINE/COST _____

LAST NAME Sanders    FIRST Charles    MI E

STREET Rt 3 Bx 55    CITY Sailisaw    PHONE (918) 775-███

EMPLOYER Kavin    HOW LONG Temp    PHONE 776-███

EARNINGS 240.00 per week #hrs/wk _____ paydates Friday

IF PAYING BEFORE 3:30 PM TODAY: STOP HERE

MARITAL STATUS    SINGLE_____ MARRIED_____ DIVORCED_____
SEPERATED ✓ WIDOW/ER_____ COMMON LAW_____

Names and Ages of Children Jennifer Sanders
List others living in household    NAME    RELATIONSHIP    EMPLOYER    INCOME
_____
_____
_____

AMOUNT OF CASH WITH YOU $ 00    Saving/Checking Accounts $_____
Property, Investments, Assets $_____
I AM SUPPORTED BY:_____    Do you receive housing assistance_____
Alimony/Child Support_____    Monthly Expenses:
Social Security_____    Rent_____
Pension/Retirement_____    Food_____
Welfare_____    Utilities_____
Food Stamps_____    **REDACTED** Child Care_____
Unemployment_____    Medical_____
My Gross Monthly Earning_____    TOTAL$_____
Other Income Support_____ Source_____

DRIVERS LICENSE # 44170 9539 STATE OK EXP.DATE 11-7-2005
VEHICLES YOU OWN OR USE:  YEAR    MAKE/MODLE    MONTHLY PAYMENTS
_____
_____

65

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA, )
     Plaintiff )
vs. ) Case No. CF-01-00314
CHARLES EDMOND SANDERS ) CF-98-00346
) CF-98-00363
) CF-99-00562
SALLISAW, OK  74955 )
████████Defendant )
    SS#: ████9539
    DOB: ████1966

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 1 4 2002

State's Attorney:
Defendant's Attorney:

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

Date: 08/14/02      RULE 8 HEARING STEVE BARNES
        (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

        $536.80 on or before 10-30-20 **O2** and

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 10-30-20 _____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

_____

TOTAL TO PAY $**536.80**

REDACTED _____
       DENNIS M. SPROUSE
X_____    Judge of the District Court
      Defendant
Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

66

ISSUED
3-15-04

**BENCH WARRANT – After Conviction**

**STATE OF OKLAHOMA**                          **IN DISTRICT COURT**
**Sequoyah County,**
**THE STATE OF OKLAHOMA**                       CF-99-00562
        **VS.**
**CHARLES EDMOND SANDERS**
████████████

**SALLISAW, OK 74955**

████66 ████9539                                **BOND - $10,000**

THE STATE OF OKLAHOMA
To any Sheriff or Policeman of the State of Oklahoma – Greeting:

**CHARLES EDMOND SANDERS** having been on the 9th day of December, 1999 duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of : KNOWINGLY CONCEALING STOLEN PROPERTY / APPLICATION TO REVOKE OR APPLICATION TO IMPOSE JUDGMENT AND SENTENCE

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above – named
**CHARLES EDMOND SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this Monday, March 15, 2004.  By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: _Robin Hickman_
                                          **Deputy**

**WILL ONLY EXTRIDIATE FROM SURROUNDING STATES**

**REDACTED**
SHERIFF'S RETURN

RECEIVED the Writ on the _____ day of _____, 20____, at _____ o'clock
____a.m. by _____

_____

Dated this _____ day of _____ 20____.


_____
SHERIFF OF SEQUOYAH COUNTY, OK

BY:_____

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 1 2 2004

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

THE STATE OF OKLAHOMA, )
             Plaintiff, )
vs. )
                          )     No. CF-99-562
                          )
CHARLES E. SANDERS, )
             Defendant. )

## SECOND APPLICATION TO REVOKE SUSPENDED SENTENCE

COMES NOW, Richard L. Gray, the duly elected, qualified, and acting District Attorney of Sequoyah County, and states to the Court that on the 9th day of December, 1999, the said Defendant entered his/her plea of guilty in the above entitled case, in the District Court of Sequoyah County, Oklahoma, to the charge of: KNOWINGLY CONCEALING STOLEN PROPERTY , as set out in the Information on file in this cause and the said defendant was sentenced to serve a term of TWENTY (20) years, under the Supervision of the Department of Correction, which sentence the Court suspended during the good behavior of said defendant. Further that on the 31st day of May, 2001 the State of Oklahoma filed its Application to Revoke Suspended Sentence. That on the 23rd day of August, 2001, Defendant was found guilty of violating the rules and conditions of probation and the suspended sentence was revoked, with Defendant to successfully complete the Last Stop or similar program, at which time the balance of said sentence would be suspended.

Thereafter, the defendant violated the rules and conditions of probation as imposed by the Court in the following manner:

**Rule #9**: by violating city, state or federal law, and being cited for Burglary, 2nd degree in Sequoyah County Case CF-04-19.

WHEREFORE, applicant prays that the Court set a date for hearing this application and that the suspension clause in said Judgment and Sentence be carried out in full, according to its terms. That the Court direct the Court Clerk of Sequoyah County, Oklahoma, to issue a Bench Warrant for the arrest of said defendant.

Dated this _11TH_ day of , 2004.

                             RICHARD L. GRAY, District Attorney

              BY: _____
                            Assistant District Attorney

WITNESSES:
Chief Gary Philpot, Sallisaw PD
Sam Pinson, State Fire Marshall
Sally Jackson, ███████ Sallisaw, OK 74955
Wung Mei Fung, ███████████ Sallisaw, OK
Hui Hui Zheng, ██████████, Sallisaw, OK

## FINDING OF PROBABLE CAUSE

The Undersigned Judge of the District Court, upon the above application hereby determines there to be probable cause for the issuance of a Bench Warrant and so orders.

Dated this _11TH_ day of ___March___, 2004
Bond set at $ _10,000.00_

                             _____
                        JUDGE OF THE DISTRICT COURT

**BENCH WARRANT – After Conviction**

**ISSUED**

3-15-04

**STATE OF OKLAHOMA**
Sequoyah County,
**THE STATE OF OKLAHOMA**
                **VS.**
**CHARLES EDMOND SANDERS**

███████████

**SALLISAW, OK 74955**

███ 66 █████ 9539

**IN DISTRICT COURT**

**CF-99-00562**

**BOND - $10,000**

THE STATE OF OKLAHOMA
To any Sheriff or Policeman of the State of Oklahoma – Greeting:

**CHARLES EDMOND SANDERS** having been on the 9th day of December, 1999 duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of : KNOWINGLY CONCEALING STOLEN PROPERTY / APPLICATION TO REVOKE OR APPLICATION TO IMPOSE JUDGMENT AND SENTENCE

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above – named
**CHARLES EDMOND SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this Monday, March 15, 2004.  By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: _Robin Hickman_
                                                **Deputy**

**WILL ONLY EXTRIDIATE FROM SURROUNDING STATES**

**REDACTED**
SHERIFF'S RETURN

RECEIVED the Writ on the _____ day of _____, 20___, at _____ o'clock ___a.m. by _____

_____

Dated this _____ day of _____ 20___.

SHERIFF OF SEQUOYAH COUNTY, OK

BY: _____

SEQUOYAH COUNTY OKLAHOMA
FILED
IN DISTRICT   URT

APR. 0 5  2004

Sequoyah Co BILWELL EDWARDS COURT CLERK
Warrant Clearance BY_____DEPUTY

Warrant Number:_____CF 99-00562_____

Warrant Name:_____CHARLES . EDMOND SANDERS_____

Date & Time Cleared:_____03/31/04  17:13_____

Warrant Cleared By:

Arrest____Officer Serving:_____Chris Grizzle_____

Agency:_____Seq. CO.____Badge Number:__825__

Cancel____Official Directing Warrant Cancelation_____

Was warrant pulled from file?                    (Yes)            No

If no explain:_____

Was warrant marked off warrant book and data base?    (Yes)        No

If no explain:_____

Was warrant cleared from NCIC?                   (Yes)        Not entered

Was warrant removed from holds book?            Yes        (No hold placed)

Sheriff's office employee signature:_____Debbie Fuller_____

Note:   After completing this form staple to the back of warrant signed by arresting officer and place in folder
marked
         Court Clerk. Use this form only to clear warrants issued by Sequoyah County. Every warrant must be
cleared
         on a seperate form.

**REDACTED**

70

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 1 7 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

THE STATE OF OKLAHOMA,  )
    Plaintiff,  )
vs.  )
         )  No. CF-99-562
         )
CHARLES E. SANDERS,  )
    Defendant.  )

## AMENDED
## SECOND APPLICATION TO REVOKE SUSPENDED SENTENCE

   COMES NOW, Richard L. Gray, the duly elected, qualified, and acting District Attorney of Sequoyah County, and states to the Court that on the 9th day of December, 1999, the said Defendant entered his/her plea of guilty in the above entitled case, in the District Court of Sequoyah County, Oklahoma, to the charge of: KNOWINGLY CONCEALING STOLEN PROPERTY , as set out in the Information on file in this cause and the said defendant was sentenced to serve a term of TWENTY (20)  years, under the Supervision of the Department of Correction, which sentence the Court suspended during the good behavior of said defendant.  Further that on the 31st day of May, 2001 the State of Oklahoma filed its Application to Revoke Suspended Sentence.  That on the 23rd day of August, 2001, Defendant was found guilty of violating the rules and conditions of probation and the suspended sentence was revoked, with Defendant to successfully complete the Last Stop or similar program, at which time the balance of said sentence would be suspended.

   Thereafter, the defendant violated the rules and conditions of probation as imposed by the Court in the following manner:

   **Rule #9**: by violating city, state or federal law, and being cited for Burglary, 2nd degree, Arson 2nd degree, Knowingly Concealing Stolen Property, and Feloniously Carrying Firearm  in Sequoyah County Case CF-04-19.

   WHEREFORE, applicant prays that the Court set a date for hearing this application and that the suspension clause in said Judgment and Sentence be carried out in full, according to its terms.   That the Court Direct the Court Clerk of Sequoyah County, Oklahoma, to issue a Bench Warrant for the arrest of said defendant.

   Dated this __17th _ day of June, 2004.

        RICHARD L. GRAY, District Attorney

      BY:
        Assistant District Attorney

WITNESSES:
Chief Gary Philpot, Sallisaw PD
Sam Pinson, State Fire Marshall
Sally Jackson, ▮▮▮▮▮▮Sallisaw, OK 74955
Wung Mei Fung, ▮▮▮▮▮▮▮▮▮Sallisaw, OK
Hui Hui Zheng, ▮▮▮▮▮▮▮▮▮▮,Sallisaw, OK

**SUBPOENA**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
          Plaintiff,

VS.

CHARLES "MONK" SANDERS

          Defendant,

No. CF-04-19
CF-98-363
~~CF-99-562~~
CF-98-346
PRELIMINARY HEARING/APP TO REVOKE

SEQUOYAH CO
FILED
IN DISTRICT COURT

JUL 2 6 2004

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

TO:  CHIEF GARY PHILPOT SALLISAW P.D.
SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23ᴿᴰ ST. SUITE 4, OKLAHOMA CITY, OK
SALLY JACKSON ▇▇▇▇▇▇▇ SALLISAW, OK
WUNG MEI FUNG, C/O ▇▇▇▇▇▇▇▇▇▇, SALLISAW, OK
HUI HUI ZHENG C/O ▇▇▇▇▇▇▇▇▇▇ SALLISAW, OK
DET JOHN OWENS SALLISAW P.D.

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **29th day of July, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES "MONK" SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

     HEREOF FAIL NOT, under penalty of law.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 26th day of JULY, 2004.

                    BERNELL EDWARDS, COURT CLERK

                    By _Robin Hickman_
                           Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE <u>AND</u> PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

**REDACTED**

SHERIFF'S RETURN

     Received this Writ this _____ day of _____, 20___, _____ o'clock ____.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 20___,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____By_____
_____, 20_____. I cannot find the within named _____in my county.

                    JOHNNY PHILPOT, SHERIFF

                By_____
                      Deputy

           Mileage_____miles

Gabbert
07-26-04

**SUBPOENA**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
          Plaintiff,

VS.                                         No. CF-04-19
                                            CF-98-363
                                            CF-99-562
CHARLES "MONK" SANDERS                      CF-98-346

          Defendant,                        PRELIMINARY HEARING/APP TO REVOKE

TO:   ~~CHIEF GARY PHILPOT SALLISAW P.D.~~
      ~~SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23~~RD~~ ST. SUITE 4, OKLAHOMA CITY, OK~~
      SALLY JACKSON ███████ SALLISAW, OK   07-28-04 No 07-29-04 N3
      WUNG MEI FUNG, C/O ███████████, SALLISAW, OK   07-27-04 yes
      HUI HUI ZHENG C/O ██████████████████; SALLISAW, OK  07-27.04 yes
      ~~DET JOHN OWENS SALLISAW P.D.~~ ███████SALLISAW, OK  07-27.04 yes

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **29th day of July, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES "MONK" SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

          HEREOF FAIL NOT, under penalty of law.

          IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 26th day of JULY, 2004.

                                   BERNELL EDWARDS, COURT CLERK

                                   By _Robin Hickman_
                                          Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

REDACTED

                         SHERIFF'S RETURN

          Received this Writ this _____ day of _____,
___.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon,
duly certified to the within named on the _____ day of _____, 20___,; served the same by leaving a
copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named
witness:_____
_____
_____By_____
_____20_____. I cannot find the within named
_____in my county.

                         JOHNNY PHILPOT, SHERIFF

                         By_____
                                   Deputy

                    Mileage_____miles

73

**SUBPOENA**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
Plaintiff,

VS.

No. CF-04-19
CF-98-363
CF-99-562
CF-98-346
PRELIMINARY HEARING/APP TO REVOKE

CHARLES "MONK" SANDERS

Defendant,

TO: CHIEF GARY PHILPOT SALLISAW P.D.
SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD ST. SUITE 4, OKLAHOMA CITY, OK
SALLY JACKSON ██████████ SALLISAW, OK
WUNG MEI FUNG, C/O █████████████████ , SALLISAW, OK
HUI HUI ZHENG C/O ███████████████████████ SALLISAW, OK
DET JOHN OWENS SALLISAW P.D.

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **29th day of July, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES "MONK" SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

HEREOF FAIL NOT, under penalty of law.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 26th day of JULY, 2004.

BERNELL EDWARDS, COURT CLERK

By _Robin Hickman_
Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

REDACTED

SHERIFF'S RETURN

Received this Writ this _____ day of _____, 20___, _____ o'clock ___.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 20___; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness: _____

_____ By _____

_____ 20_____. I cannot find the within named _____ in my county.

JOHNNY PHILPOT, SHERIFF

By _____
Deputy

Mileage _____ miles

74

## Sheriff's Return
## State of Oklahoma, County of Sequoyah

SEQUOYAH COUNTY, OKLAHOMA
FILED
DISTRICT COURT

Case # *CF-09-19*
*CF 98 363*   *CF-98-346*
*CF- 99-562*

AUG 1 0 2004

BERNELL EDWARDS, COURT CLERK

BY_____ DEPUTY

I certify that I received the foregoing summons on the ___26___ day of ___July___, 20_04_, and that I delivered, or attempted delivery of the said summons as shown below to each party named for service request.

| Name of Person To be served | service address | served? yes or no | Date & Time of service or Attempt | |
|---|---|---|---|---|
| Sally Jackson | ▓▓▓▓▓▓ | No | 07 28 04 | 07-29-04 |
| Wung Mei Fung | ▓▓▓▓▓▓ | Yes | 07-27-04 | |
| Hui Hui Zheng | ▓▓▓▓▓▓ | Yes | 07-27-04 | |

I certify that on _____, I served_____
By leaving a copy of said summons with a copy of the petition attached at
_____ which is his/her place of residence.

I certify that on_____, I served_____ by leaving
a copy of said summons with a copy of the petition attached at
_____ with_____, a member of
his/her family over fifteen (15) years of age.

Dated on the ___08___ day of ___August___, 20_04_.
J.W. Philpot, Sheriff of Sequoyah County

By: ___Travis Gibbel___ #825, Deputy Sheriff
Sequoyah County, Oklahoma

**REDACTED**

**SUBPOENA**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 3 0 2004

STATE OF OKLAHOMA,
       Plaintiff,

No. CF-04-19
CF-98-363
CF-99-562
CF-98-346

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

VS.
CHARLES "MONK" SANDERS,
       Defendant,

PRELIMINARY HEARING
APPLICATION TO REVOKE

TO:   CHIEF GARY PHILPOT SALLISAW P.D.
      AGENT SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD SUITE 4, OK. CITY, OK
      SALLY JACKSON█████████████SALLISAW, OK
      WUNG MEI FUNG C/O█████████████, SALLISAW, OK
      HUI HUI ZHENG C/O█████████████SALLISAW, OK
      DET. JOHN OWENS SALLISAW P.D.

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **2ND day of SEPTEMBER, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

      HEREOF FAIL NOT, under penalty of law.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 27TH day of AUGUST, 2004.

BERNELL EDWARDS, COURT CLERK

By _Robin Hickman_
            Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

SHERIFF'S RETURN

      Received this Writ this _____day of _____, 20___, _____o'clock ___.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____day of _____, 20___; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____

_____By_____

_____20_____. I cannot find the within named _____in my county.

JOHNNY PHILPOT, SHERIFF

By_____
          Deputy

Mileage_____miles

76

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY** SEQUOYAH COUNTY, OKLAHOMA
**STATE OF OKLAHOMA**                 FILED
                                     IN DISTRICT COURT

|  |  |  |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | NOV 1 7 2004 |
| Plaintiff, | ) | |
| | ) | BERNELL EDWARDS, COURT CLERK |
| vs. | ) | No. CF-99-562  BY_____DEPUTY |
| | ) | |
| CHARLES E. SANDERS, | ) | |
| DOB:■■■66, SS#:■■■■9539 | ) | |
| Defendant. | ) | |

## ORDER REVOKING SUSPENDED SENTENCE

NOW, on this 18th   day of November, 2004, the above styled case comes on for hearing on the State's Application to Revoke Suspended Sentence.  The State is present by Assistant District Attorney, Jeff Sheridan, the defendant is present and represented by the attorney of record, John Sawney.

The Court finds that on the 9th day of December, 1999, the said defendant was found guilty of the crime of UTTERING A FORGED INSTRUMENT and sentenced to a term of TWENTY (20) years with the direction of the Department of Corrections, and of said sentence TWENTY (20)  years was suspended pending the defendant's good behavior. That on the 31st day of May, 2001, the State of Oklahoma filed its Application to Revoke Suspended Sentence and on the 23rd day of August, 2001 Defendant was found guilty of violating the rules and conditions of probation.  Said suspended sentence was revoked, with Defendant to successfully complete the Last Stop or similar program, at which time the balance of said sentence would be suspended.

The Court finds that on the 17th  day of June, 2004,  the State filed a Second Application to Revoke Suspended Sentence based on violations of the defendant's Rules and Conditions of Probation.  The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that FIVE (5) YEARS of the suspended sentence is revoked, with balance to be suspended upon successful completion of Key to Life or similar program, to run concurrent with, CF-98-346; CF-98-363 CF-04-19 and CF-03-124,  and the Sheriff of Sequoyah County shall deliver said defendant to the Department of Corrections and leave therewith a copy of this Order of Judgment and Sentence to serve as a warrant and authority for the revocation of said defendant as provided herein.  The second copy of the Order to be warrant and authority of said Sheriff for the transportation and imprisonment of said defendant as herein before provided.  The Sheriff to make due return to the Clerk of this Court, with his procedure endorsed thereon.

_____
JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 1 3 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type) (show alias)   ████ Celo

Sanders, Charles Edmond   ████   9539

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| Booking # 2004-03181 Warrant #'s CF-04-14 CF-03-365 CF-99-005102 CF-03-124 CF-98-003103 CF-98-00346 | Sent to State Prison | Hold for Tulsa County Hold for Tulsa County (App. to revoke) Hold for Tulsa Co. (FTA) Merrills Bonding Surrender Knowingly concealing stolen property Application to Revoke Surrendered by Hamilton/morgan Burglery 2nd Degree uttering A forged Instrument Application to revoke Possession of controlled dangerous substance Application to revoke |
|  |  | Hold for DOC |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the ___11___ day of ___December___, 20_04_.

_Amanda Hughes_
Signature

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

AUTHORIZED BY

_Ben judge_
JUDGE OF THE DISTRICT COURT

**REDACTED**

78

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

*CF.99-562 CF.98.363*
*CF.98.346 CF.2004.19*

STATE OF OKLAHOMA                    CASE NO. _____ *CF.03.124*

VS.                                  J & S DATE: *NOV 17.- 2004*

*Charles Edmond Sanders*
DEFENDANT

### STATEMENT OF JAIL TIME

PRISONER WAS ARRESTED ON DATES: *10.22.99 – 12.07.99 / 8.23.01 – 10.25.01*
*3.13.03 – 4.02.03 / 1.16.04 – 1.21.04*
*3.31.04 – 12.10.04*

PRISONER REMAINED IN JAIL *372* DAYS BEFORE JUDGEMENT AND SENTENCE.

PRISONER REMAINED IN JAIL *23* DAYS AFTER JUDGEMENT AND SENTENCE.

TOTAL DAY'S OF JAIL TIME *395*

*Christine Calbert*

SEQUOYAH COUNTY CRIMINAL JUSTICE AUTHORITY

*12.28.2004*

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 2 8 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

**REDACTED**

79

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN THE DISTRICT COURT OF )
SEQUOYAH COUNTY )
STATE OF OKLAHOMA )
NOV 2 8 2005 )
)
BERNELL EDWARDS, COURT CLERK )
BY_____DEPUTY

Defendant CHARLES EDMOND "MONK" SANDERS

Case No. CF-05-406  *CF-03-124  CF-98-562 - CF-98-363*

Date _NOVEMBER 17, 2005_  *CF-98-346*

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general state of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I will understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or any representative thereof.

8. I understand that I must support myself and all my dependents without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within the eighteen months.

15. **SPECIAL CONDITIONS:** The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, OSBI lab fees) of $_____ within _____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 20____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. ~~REDACTED~~ *(Set out how the money is to be distributed).*

( )   Defendant is to pay restitution through the District Attorney's office as set out in Exhibit "A" attached, the sum of  $_____.

16. Defendant to report to DOC Probation & Parole Office within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_____
Attorney for Defendant

_____
JUDGE OF THE DISTRICT COURT

Probationer

Defendant's Mailing Address:

_____

_____

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 2 3 2005

BERNELL EDWARDS, COURT CLERK
BY_____
_____DEPUTY

### IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,    )
        Plaintiff,       )
                      )
vs.                     )      No.  CF-99-562
                      )
CHARLES E. SANDERS,     )
DOB:▓▓▓66, SS#:▓▓▓9539  )
        Defendant.     )

### AMENDED
### ORDER REVOKING SUSPENDED SENTENCE

NOW, on this 17th    day of November, 2005, the above styled case comes on for hearing on the State's Application to Revoke Suspended Sentence.  The State is present by Assistant District Attorney, Jeff Sheridan, the defendant is present and represented by the attorney of record, John Sawney.

The Court finds that on the 9th  day of December, 1999, the said defendant was found guilty of the crime of UTTERING A FORGED INSTRUMENT and sentenced to a term of TWENTY (20) years with the direction of the Department of Corrections, and of said sentence TWENTY (20)  years was suspended pending the defendant's good behavior. That on the 31st day of May, 2001, the State of Oklahoma filed its Application to Revoke Suspended Sentence and on the 23rd day of August, 2001 Defendant was found guilty of violating the rules and conditions of probation.  Said suspended sentence was revoked, with Defendant to successfully complete the Last Stop or similar program, at which time the balance of said sentence would be suspended.

The Court finds that on the 17th  day of June, 2004,  the State filed a Second Application to Revoke Suspended Sentence based on violations of the defendant's Rules and Conditions of Probation.  The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that said sentence remain suspended pursuant to the rules and conditions of probation and to run concurrent with CF-98-346; CF-98-363; CF-04-19 and CF-03-124.

_____
JUDGE OF THE DISTRICT COURT

# DISTRICT COURT OF MUSKOGEE, WAGONER, CHEROKEE AND SEQUOYAH COUNTIES

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FIFTEENTH JUDICIAL DISTRICT

(ORDER)

APR 0 3 2006

BERNELL EDWARDS, COURT CLERK

BY _____ DEPUTY

C7- 04-19
C7- 03-124
C7-99-522
C7-98-346

DATE: 3-29-06

DEFENDANT: Sanders, Charles

CASE NUMBER: C7 - 98- 363

CHARGE: Burglary 2 nd

SENTENCE DATE: 11-17-05

EXPIRATION DATE: 11-16-30

THE DEPARTMENT OF CORRECTIONS IS HEREBY RELIEVED FROM FURTHER ACTIVE SUPERVISION OF THIS DEFENDANT IN THIS PARTICULAR CASE.

JUDGE OF DISTICT COURT   Garrett

*Per plea agreement with the feds. banish from Sequoyah county.

**REDACTED**

82

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 165**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

83

INFORMATION

==================================================================

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 1 5 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

| | | |
|---|---|---|
| STATE OF OKLAHOMA | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. CF-2004- 19 |
| | ) | |
| CHARLES EDMOND "MONK" SANDERS,) | ) | |
| DOB:██████66, SS#:██████9539 | ) | |
| Defendant. | ) | |

## I N F O R M A T I O N

### IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes RICHARD GRAY, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CHARLES EDMOND "MONK" SANDERS did, in Sequoyah County, and in the State of Oklahoma, on or about the 13th day of November, in the year of our Lord, Two Thousand Three, and before the presentment hereof, commit the crime of

### BURGLARY SECOND DEGREE-21 O.S. 1435

That on the day and year and in the county and state aforesaid, said CHARLES EDMOND "MONK" SANDERS did unlawfully, wilfully, burglariously and feloniously, while acting in concert with unnamed others, break and enter into a certain building located at 313 South Kerr Blvd, in the City of Sallisaw, Sequoyah County, Oklahoma, owned by and in the possession of Wung Mei Fung d/b/a China Panda Restaurant, in which building property of value was kept and contained, by breaking open the outer back door of said building and entering without the consent of said owner, with the wilful, felonious and burglarious intent to steal said property,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

RICHARD GRAY
DISTRICT ATTORNEY

By_____
Assistant District Attorney

STATE OF OKLAHOMA   )
                    ) ss.
COUNTY OF SEQUOYAH  )

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____
Affiant

Subscribed and sworn to before me this 15th day of January, 2004.

_____
NOTARY PUBLIC

My Commission Expires:
6/23/04   #000106726

WITNESSES:
Chief Gary Philpot, Sallisaw PD
Sam Pinson, State Fire Marshall
Sally Jackson, ██████████Sallisaw, OK 74955
Wung Mei Fung, China Panda Restaurant, Sallisaw, OK
Hui Hui Zheng, China Panda Restaurant, Sallisaw, OK

84

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 1 5 2004

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

INFORMATION
Page 2

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) | SEQUOYAH COUNTY, STATE |
| | ) | OF OKLAHOMA |
| vs. | ) | CASE NO. CRF-2004- 19 |
| | ) | |
| CHARLES E. SANDERS, | ) | |
| Defendant. | ) | |

## FORMER CONVICTIONS

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-89-396, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UTTERING FORGED INSTRUMENT, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-92-91, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UNLAWFUL POSSESSION OF CONTROLLED DRUG, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-90-144, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of SEXUAL BATTERY, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 9th day of December, 1999, in Case No. CF-98-346, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of POSSESSION OF CONTROLLED DRUG, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 9th day of December, 1999, in Case No. CF-98-363, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UTTERING A FORGED INSTRUMENT, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 9th day of December, 1999, in Case No. CF-99-562, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of KNOWINGLY CONCEALING STOLEN PROPERTY, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

RICHARD L. GRAY,
DISTRICT ATTORNEY

BY:_____
Assistant District Attorney

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 1 5 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,
PLAINTIFF,

VS.

NO. CF-2004-19

Sanders, Charles Edmond (Monk)
DEFENDANT,

## AFFIDAVIT

STATE OF OKLAHOMA )
COUNTY OF SEQUOYAH ) ss.

Chief Gary Philpot_____, OF LAWFUL AGE AND BEING FIRST DULY SWORN UPON OATH, DEPOSES AND SAYS:

That on 11-13-2003 at approx. 06:33 AM hours, officers were called to 313 South Kerr Boulevard, Sallisaw, Sequoyah County, Oklahoma the China Panda Restaurant in reference a fire. The Sallisaw Fire Department was on sight and the building on the west end was completely engulfed in flame. That the renters, Wung Mei Fung, dob-████69 was at the scene and could speak very little english. Hui Hui Zheng, dob-████1986 was brought to the scene and advised that his father, mother and he had been the last in the restaurant on 11-12-03 at approx. 9:00 PM hours and that all had checked the back door before leaving through the front door. That Sam Pinson, State Fire Marshall, had arrived on the scene and advised that the severity of the fire was in the kitchen area, however it appeared to be an arson and the cash register was missing from the counter with the wires and things pulled from the countertop, in appearance of a burglary. The firemen advised that the back door was standing open when they arrived on scene.

.    That Chief Gary Philpot, Sallisaw Police Department, had made contact with Arnold Sutton, dob-████1977 in regards to the burning and burglary of the China Panda Restaurant on 11-13-2003. Mr. Sutton advised that on 11-5-03 at approx. 4:00 AM, was in a converstion with the defendant and Sally Jackson, dob-████1975, sister, and girlfriend to the defendant. Mr. Sutton advised the defendant was telling Ms. Jackson, an employee of the China Panda, to leave the back door unlocked so that he could burglarize it or to leave the money bag by the back door. That Chief Philpot brought a check register, with chinese writing, to the office, this being an item taken during the arson/burglary, stating the check transaction register was brought to Henry Davis, father to Sally, by Sally.

.    That on 1-15-2004 Sally Jackson, dob-████1975, ████████Sallisaw, Sequoyah County, Oklahoma, stated that the night before the China Panda was burglarized and burned, that the defendant: Charles Sanders told her that he and JD Moffett, dob████1979, were going to break into the restaurant. That Ms. Jackson states she heard on the scanner that the restaurant was on fire at approx. 6:00 AM and spoke with the defendant about him burning the restaurant. That the defendant stated that JD had dropped him off and kept circling the restaurant while he was trying to get the stuff from the restaurant. That some food, paperwork, passports and tea were taken from the restaurant and brought to another residence by the defendant and JD and some burned at a later time. That approx. $130 dollars in coins were taken.

BASED ON THIS INFORMATION, THE UNDERSIGNED PRAYS THAT THIS HONORABLE COURT ISSUE A FINDING OF FACT THAT PROBABLE CAUSE EXISTS TO BELIEVE THAT A CRIME HAS BEEN COMMITTED AND THAT THERE IS PROBABLE CAUSE TO BELIEVE THE DEFENDANT (S) ABOVE NAMED COMMITTED THAT CRIME

FURTHER SAYETH NOT.

SUBSCRIBED AND SWORN TO BEFORE ME THIS __15__ DAY OF __January__ 20_04_

MY COMMISSION EXPIRES: __N/A__

NOTARY PUBLIC    Judge

## FINDING OF PROBABLE CAUSE

THE UNDERSIGNED JUDGE OF THIS COURT, UPON SWORN TESTIMONY AND/OR AFFIDAVIT, HEREBY DETERMINES THERE TO BE PROBABLE CAUSE TO DETAIN THE DEFENDANTS (S).

DATED THIS __15__ DAY OF __January, 2004__

JUDGE OF THE DISTRICT COURT

CHARLES EDMOND "MONK" SANDERS
ADDRESS: RR, MARBLE CITY, OK
DOB: 01/11/66  DL/SS# 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
RACE/  W    / SEX/ M

CASE NO. CF-2004-19

**WARRANT OF ARREST**

**COUNTY OF SEQUOYAH**
**STATE OF OKLAHOMA**

**TO THE SHERIFF OF SEQUOYAH COUNTY:**

WHEREAS, Complaint in writing and upon oath having been this day made before me that the crime of **BURGLARY, 2ND DEGREE* was committed, and accusing **CHARLES EDMOND "MONK" SANDERS** thereof.

YOU are therefore commanded to arrest said *CHARLES EDMOND "MONK" SANDERS** and bring him before me or some other magistrate having cognizance of the case to be dealt with according to law.

ISSUED at SALLISAW, SEQUOYAH COUNTY, Oklahoma, this _15th_ day of _January_, 2004, at _3:20_ o'clock_____ P _M.

The defendant is to be admitted to

bail in the sum of $_100,000.00_xx

_____
DISTRICT JUDGE

87

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 15 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | Case No. __CF-2004 - 19 |
| vs. | ) | |
| | ) | |
| | ) | |
| CHARLES EDMOND "MONK" SANDERS,) | | |
| Defendant. | ) | |

## Evidence Inspection Notification

COMES NOW the State of Oklahoma District Attorney of Sequoyah County, Oklahoma, Richard L. Gray, pursuant to 22 O.S. 2002 Supp., § 258, and gives notice that law enforcement reports regarding this case are available for inspection at least five (5) days prior to the date of the preliminary hearing.

To inspect the law enforcement reports make a **written** request to the office of the Sequoyah County District Attorney by delivering, faxing or mailing such request to:

**Sequoyah County District Attorney**
**120 E. Chickasaw**
**Sallisaw, OK 74955**
**FAX: (918) 775-1215**

The request must be received at least one day in advance of the date of inspection. Each request must include the name of the defendant, case number, date of the preliminary hearing and date of the requested inspection. Inspection may be made on any business day between the hours of nine (9) o'clock a.m. and four (4) o'clock p.m. in the Sequoyah County District Attorney's office.

RICHARD L. GRAY

By: _____
Diana Clayton
Assistant District Attorney

88

CHARLES EDMOND "MONK" SANDERS
ADDRESS: ███ MARBLE CITY, OK
DOB: ████ /66  DL/SS# ████████ 9539
RACE/  W   / SEX/ M

CASE NO. CF-2004-19

**WARRANT OF ARREST**

COUNTY OF SEQUOYAH
STATE OF OKLAHOMA

**TO THE SHERIFF OF SEQUOYAH COUNTY:**

WHEREAS, Complaint in writing and upon oath having been this day made before me that the crime of **BURGLARY, 2ND DEGREE* was committed, and accusing **CHARLES EDMOND "MONK" SANDERS** thereof.

YOU are therefore commanded to arrest said *CHARLES EDMOND "MONK" SANDERS** and bring him before me or some other magistrate having cognizance of the case to be dealt with according to law.

ISSUED at SALLISAW, SEQUOYAH COUNTY, Oklahoma, this _15th_ day of _January_, 2004, at _3:20_ o'clock _P_ M.

The defendant is to be admitted to

bail in the sum of $_100,000.00_

_____
DISTRICT JUDGE

89

CHARLES EDMOND "MONK" SANDERS
ADDRESS: ███ MARBLE CITY, OK
DOB: ███ /66  DL/SS# █████ 9539
RACE/ W   / SEX/ M ███

CASE NO. CF-2004-19

**WARRANT OF ARREST**

**COUNTY OF SEQUOYAH**
**STATE OF OKLAHOMA**

**TO THE SHERIFF OF SEQUOYAH COUNTY:**

WHEREAS, Complaint in writing and upon oath having been this day made before me that the crime of **\*\*BURGLARY, 2ND DEGREE\*** was committed, and accusing **\*\*CHARLES EDMOND "MONK" SANDERS\*\*** thereof.

YOU are therefore commanded to arrest said **\*CHARLES EDMOND "MONK" SANDERS\*\*** and bring him before me or some other magistrate having cognizance of the case to be dealt with according to law.

ISSUED at SALLISAW, SEQUOYAH COUNTY, Oklahoma, this __15th__ day of __January__, 2004, at __3:20__ o'clock __P__ M.

The defendant is to be admitted to

bail in the sum of $ __100,000.00/xx__                    _____
                                                          DISTRICT JUDGE

90

JAN 2 0 2004

## Sequoyah County
## Warrant Clearance BY _____

Warrant Name: __CHARLES EDMOND "MONK" SANDERS__

Warrant Number: __CF-2004-19__

Date & Time Cleared: __01-16-04   18:05__

Warrant Cleared By:

Arrest ✓ Serving Officer: __Roy Coleman__   Badge #: __821__

Agency: __Seq. Co. Sheriff Office__

Cancel: _____ Authority: _____

Was Warrant Pulled from file?              (Yes)              No

If no Explain: _____

Was Warrant Marked Off Warrant Book?       (Yes)              No

If no Explain: _____

Was Warrant Canceled from NCIC?            (Yes)          Not Entered

Was Warrant Removed From Holds Book?        Yes         (No Hold Placed)

Sheriff's Office Employee Signature: __Debbie Zwell__

Note: After completing this form, staple it to the back of cleared warrant and put it in the folder marked *Court Clerk*. Use this form only to clear Sequoyah County Warrants. Every warrant must me cleared on a separate form.

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type)(show alias)

Sanders, Charles Edmond

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-04-19 | Merrill Bonding 50,000 | Burgalary 2nd |
| | | |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the 21 day of JAN , 20 04 .

Jenny Manly
Signature

AUTHORIZED BY

Sprouse
JUDGE OF THE DISTRICT COURT

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

92

MERRILL BONDING COMPANY
107 East CReek
SALLISAW, OK. 74955
PHONE: 918-775-5579     FAX: 918-775-9240

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 31 2004

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

zzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzzz

"CERTIFICATE OF SURRENDER"

DATE: 3-31 , 20 04

CASE NO: CF-04-14 + CF-03-365

I, Robert Gude, the County Jailer of Sequoyah County, City of Sallisaw, State of OK, hereby acknowledge that I received from the executing bail bondsman: Thad moody, a licensed Bail Bondsman in the State of OK, Defendant: Charles Sanders, in the certain case above, pending in (Circle One) (DISTRICT), MUNICIPAL, Sequoyah County County Court, City of Sallisaw, State of OK, along with a Certified Copy of the Appearance Bail Bond heretofore deposited with the Sequoyah County Court Clerks Office, State of OK. I have retained within my custody, Defendant: Charles Sanders, this 31st day of March, 20 04, at 2:45 o'clock P M.

_____
Signature of Attending Jailer

93

INFORMATION

===================================================================================

### IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

STATE OF OKLAHOMA )
      Plaintiff, )
vs. )        No. CF-2004-19
                   )
CHARLES EDMOND "MONK" SANDERS,)
DOB: ■66, SS#: ■9539 )
      Defendant. )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 0 1 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

### AMENDED
### I N F O R M A T I O N

## IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes RICHARD GRAY, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CHARLES EDMOND "MONK" SANDERS did, in Sequoyah County, and in the State of Oklahoma, on or about the 13th day of November, in the year of our Lord, Two Thousand Three, and before the presentment hereof, commit the crime of

### COUNT I: BURGLARY SECOND DEGREE-21 O.S. 1435
**That on the day and year and in the county and state aforesaid, said CHARLES EDMOND "MONK" SANDERS did unlawfully, wilfully, burglariously and feloniously, while acting in concert with unnamed others, break and enter into a certain building located at 313 South Kerr Blvd, in the City of Sallisaw, Sequoyah County, Oklahoma, owned by and in the possession of Wung Mei Fung d/b/a China Panda Restaurant, in which building property of value was kept and contained, by breaking open the outer back door of said building and entering without the consent of said owner, with the wilful, felonious and burglarious intent to steal said property,**

### COUNT II: ARSON, SECOND DEGREE-21 O.S. 1402
**CHARLES EDMOND "MONK" SANDERS did feloniously, wilfully, and unlawfully and maliciously set fire to and burn a certain unoccupied building/structure, to wit: China Panda Restaurant, the property of Wung Mei Fung and located at 313 South Kerr Blvd, City of Sallisaw, Sequoyah County, Oklahoma, with the unlawful intent then and there on the part of the defendant to wilfully, maliciously and feloniously burn said property,**

### COUNT III: KNOWINGLY CONCEALING STOLEN PROPERTY-21 O.S. 1713
**That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND "MONK", did unlawfully, wilfully, knowingly, and feloniously conceal from Wung Mei Fung d/b/a China Panda Restaurant, certain personal property of value, to-wit: China brand tea, checkbook register, that had prior thereto on the 13th day of November, 2003, been stolen from the said China Panda Restaurant, the said defendant knowing or reasonably should have believed that said property was stolen did then and there unlawfully conceal and withhold said property from the owner thereof, with the felonious intent to deprive said owner thereof,**

### COUNT IV: FELONIOUSLY CARRYING (or FELON IN POSSESSESION OF) FIREARM- 21 O.S. 1283
**CHARLES EDMOND "MONK" SANDERS did unlawfully, willfully, and feloniously have in his possession or within his immediate control a rifle, to-wit: semi-automatic rifle, after having been heretofore convicted of a felony in Case No CF-99-562 , for the crime of KNOWINGLY CONCEALING STOLEN PROPERTY, in Sequoyah County, State of Oklahoma,**

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

RICHARD GRAY
DISTRICT ATTORNEY

By _____
Assistant District Attorney

WITNESSES:
Chief Gary Philpot, Sallisaw PD
Sam Pinson, State Fire Marshall
Sally Jackson, ███████████ Sallisaw, OK 74955
Wung Mei Fung, China Panda Restaurant, Sallisaw, OK
Hui Hui Zheng, China Panda Restaurant, Sallisaw, OK
Det. John Owens, Sallisaw PD
Arnold Sutton, ███████████ Sallisaw, OK
Dep. Alan Loyd, SCSO
Guo Ping Zheng, China Panda Restaurant, Sallisaw, OK

95

*CF-04-19*

**CLIF'S PHARMACY**   (918) 776-0100
505 E REDWOOD  SALLISAW, OK 74955
**Rx: 583207    04/01/2004**            Dr.ROBBINS, RICK L. DO
**CHARLES E SANDERS**                   511 E REDWOOD
SEQ CO JAIL                             SALLISAW, OK 74955
SALLISAW, OK 74955
(000) 000-0918
**NDC: 49884-0469-01**

*CF-04-19*                          $8.10

30 Tab **IBUPROFEN 800 MG TABS**  Auth:

96

# SUBPOENA
### IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

STATE OF OKLAHOMA,
        Plaintiff,

VS.                                       No. CF-04-19

CHARLES EDMOND "MONK" SANDERS,
        Defendant,

**TO:  Chief Gary Philpot, Sallisaw Police Dept., Sallisaw, OK;  Sam Pinson, State Fire Marshall, 2401 N. W. 23rd St., Suite 4, Oklahoma City, OK;  Sally Jackson,▮▮▮▮▮Sallisaw, OK;  Wung Mei Fung, China Panda Restaurant, Kerr Blvd., Sallisaw, OK;  Hui Hui Zheng, China Panda Restaurant, Kerr Blvd., Sallisaw, OK;  Det. John Owens, Sallisaw Police Dept., Sallisaw, OK;  Arnold Sutton,▮▮▮▮▮Sallisaw, OK; Dep. Alan Loyd, S. C. S. O., Sallisaw OK;  Guo Ping Zheng, China Panda Restaurant, Kerr Blvd., Sallisaw, OK;**

        GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the  **13th day of April, 2004, at the hour of  9:00 o'clock A. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and  **CHARLES EDMOND "MONK" SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

        HEREOF FAIL NOT, under penalty of law.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 2nd day of April, 2004.

                        BERNELL EDWARDS, COURT CLERK

                        By _Robin Hickman_____
                                  Deputy

---

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

---

### SHERIFF'S RETURN

        Received this Writ this _____day of _____, 20___, _____o'clock ____.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____day of _____, 20___.; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____By_____
                                    20_____ . I cannot find the within
named _____in my county.

                        JOHNNY PHILPOT, SHERIFF

                    By_____
                           Deputy

              Mileage_____miles

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 2 3 2004

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

_____STATE_____
Plaintiff

vs. ___Sanders, Charles___          CASE NO: __N/A__
Defendant

CF-04-19

APPLICATION FOR APPOINTED COUNSEL
AND
AFFIDAVIT OF FINANCIAL INABILITY TO EMPLOY COUNSEL

I swear and affirm that I am the party in the above entitled action. I want an attorney to represent me in this case. I am financially unable to obtain the services of an attorney without causing substantial hardship to myself or to my family. The following information is true and is given and intended to be relied upon by the court and other persons or agencies in determining my eligibility for legal services to be furnished to me at public expense.

PLEASE FILL IN ALL SPACES BELOW AND SIGN YOUR NAME UNDER OATH IN FRONT OF THE JUDGE, A NOTARY OR THE COURT CLERK. IF A QUESTION DOES NOT APPLY TO YOU, PLEASE WRITE IN THE BLANK "DOES NOT APPLY".

I. GENERAL INFORMATION          DATE: 4-18-04
NAME: Charles Sanders
ADDRESS: ████████████ Sallisaw Okla 74955
TELEPHONE: — — —          MESSAGE NUMBER: 775-6195
SOCIAL SECURITY NO: ████-9539   AGE: 38   DOB: ██66
SINGLE ( ✓ ) MARRIED ( ) SEPARATED ( )
SPOUSE'S NAME: N/A
ADDRESS: N/A
TELEPONE: N/A
HOW MANY PEOPLE ARE IN YOUR HOUSEHOLD? (1) me
NAME AND AGES: —

ARE YOU CLAIMED AS A DEPENDENT BY A PARENT OR GUARDIAN? YES ( ) NO ( ✓ )

II FAMILY INCOME
YOUR MONTHLY TAKE HOME PAY: 0     WEEKLY TAKE HOME PAY: 0
YOUR EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY)
N/A
YOUR EMPLOYER'S PHONE NUMBER: N/A
SPOUSE'S SALARY: N/A
SPOUSE'S EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY
N/A
SPOUSE'S EMPLOYER'S PHONE NUMBER: N/A
IS ANY OTHER MEMBER OF YOUR HOUSEHOLD EMPLOYED? YES( ) NO( ✓ )
WHO? N/A
WHERE? N/A
SALARY? N/A
DEPENDENT'S EMPLOYER: N/A

OTHER SOURCE OF INCOME OR BENEFITS (INCLUDE INTEREST, DIVIDENDS, ROYALTIES, ETC.) N/A
TOTAL FAMILY INCOME FOR PRECEDING MONTH WAS $ N/A

98

III FAMILY ASSETS (WHAT YOU OWN LESS WHAT YOU OWE ON IT)
MONEY: $ 3.64

IN JAIL: _____ AT HOME: 0  CHECKING: 0

SAVINGS: 0  SAFE DEPOSIT BOX 0  OTHER: 0

HOME OR OTHER REAL ESTATE VALUE: 0  JEWELRY VALUE: 0

AUTOMOBILES: MAKE AND VALUE 0  FURNITURE VALUE 0

MOTORCYCLES:   MAKE   AND   VALUE 0  TOOLS/EQUIPMENT

VALUE 0

NOTES, MORTGAGES AND TRUST DEEDS: 0  ANY DEBTS OWED TO THE DEF ____

OTHER ASSETS AND PROPERTY VALUE: 0

ARE YOU PARTY TO A SUIT (PROBATE, WORKER'S COMPENSATION, PERSONAL INJURY) WHERE? 0  JUDGMENT MAY BE EXPECTED? YES( ) NO( ✓ )

NAME OF ATTORNEY? _____

IV EXPENSES AND DEBTS

RENT/HOUSE PAYMENT: 0  CLOTHING 0  FOOD 0

DOCTOR/MEDICINE 0  UTILITIES 0  CAR PAYMENT 0

INSURANCE: 0  OTHER: 0

TOTAL MONTHLY LIVING EXPENSES: 0

MORTGAGE/LANDLORD'S NAME: 0

MAJOR DEBTS: (list to whom and amount owed): 0

N/A

LIST THE PERSONS WHO ARE DEPENDENT ON YOU FOR SUPPORT. STATE YOUR RELATIONSHIP TO EACH PERSON AND HOW MUCH YOU CONTRIBUTE MONTHLY TO THEIR SUPPORT:

N/A

V. LAST EMPLOYMENT

WHEN DID YOU LAST WORK?: Jan - 2004

WHO WAS YOUR EMPLOYER?: Bratt farms

SALARY: 220  HOW LONG DID YOU WORK THERE?: 2 weeks

WHY DID YOU QUIT? Job Ended

VI. THE FOLLOWING PEOPLE CAN VERIFY TO A LARGE EXTENT MY ABOVE MENTIONED FINANCIAL SITUATION. GIVE NAME, ADDRESS AND PHONE NUMBER.

1. Sheila Roonee

2. Darla Davis

3. Donna Davis

VII. CHARGE AND BOND

CHARGE(S): FELONY ✓  MISDEMEANOR ✓  JUVENILE _____

ARRESTING AGENCY: County - Turn self In To County

CITY _____  COUNTY _____  STATE _____

HAS BOND BEEN POSTED? YES( ) NO( ✓ ) DID YOU USE A BONDSMAN? YES( ) NO( ✓ )

WHO PAID THE BONDSMAN? _____

AMOUNT OF BOND: _130,000_ PREMIUM PAID TO BONDING CO: _nn_
IF YOU DID NOT USE A BONDSMAN, DID YOU POST A CASH_____ OR P.R. _____
LIST ANY DEFENDANTS CHARGES WITH YOU_____
VIII
1. HAVE YOU TRANSFERRED OR SOLD ANY ASSETS SINCE CHARGES WERE FILED IN THE
CASE? YES ( ) NO ( ✓) IF SO, DESCRIBE THE BUYER AND THE AMOUNT RECEIVED.
_____ N/A _____
_____
2. HAVE YOU RETAINED COUNSEL IN THE CASE OR IN ANY OTHER PENDING CRIMINAL
CASE? YES ( ✓ ) NO ( ) IF SO, STATE THE CASE NUMBER, COURT ATTORNEY AND
AMOUNT PAID TO ATTORNEY FOR SERVICES: _N/A_____

3. DO YOU HAVE ANY FRIENDS OR RELATIVES WHO ARE ABLE AND WILLING TO ASSIST
YOU IN HIRING COUNSEL AND PAYING FOR TRANSCRIPTS? YES ( ) NO ( ✓) IF SO, HAVE
THOSE PERSONS BEE ASKED TO HELP? YES (✓) NO (✓)
4. IF ANY FRIEND OR RELATIVE HAS GIVEN PREVIOUS FINANCIAL ASSISTANCE IN THIS
CASE, BUT IS NO LONGER ABLE OR WILLING TO DO SO, AN AFFIDAVIT TO THAT EFFECT
FROM THAT PERSON SHOULD BE ATTACHED. IS THAT AFFIDAVIT ATTACHED YES( ) NO( )

IX. NAMES OF THREE ATTORNEY'S YOU CONTACTED:
1. NAME: _Wanda Payton_
    WHEN DID YOU CONTACT THIS ATTORNEY? _last week  4-15-04_
    HOW DID YOU CONTACT THIS ATTORNEY? _Phone_
    CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓)
2. NAME: _Rex Earl Starr_
    WHEN DID YOU CONTACT THIS ATTORNEY? _4-16-04_
    HOW DID YOU CONTACT THIS ATTORNEY? _Ph_
    CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓)
3. NAME: _Bill Ed Rogers_
    WHEN DID YOU CONTACT THIS ATTORNEY? _4-16-04_
    HOW DID YOU CONTACT THIS ATTORNEY? _Phone_
    CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓)

X. I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION I HAVE PROVIDED
IS TRUE AND CORRECT. I UNDERSTAND THAT I MAY BE PROSECUTED FOR PROVIDING
FALSE INFORMATION IN THIS APPLICATION AND AFFIDAVIT. I UNDERSTAND THAT I
MUST INFORM THE OKLAHOMA INDIGENT DEFENSE SYSTEM OF ANY CHANGE IN MY
FINANCIAL SITUATION THAT MAY CHANGE THE INFORMATION I HAVE PROVIDED. I
FURTHER DECLARE THAT I HAVE CONTACTED THREE ATTORNEYS, LICENSED TO
PRACTICE LAW IN THIS STATE, AND I AM WITHOUT FUNDS TO PAY AN ATTORNEY TO
REPRESENT ME OR TO PAY FOR TRANSCRIPTS AND COST ASSOCIATED WITH THIS CASE.

DATED THIS _4_ DAY OF _21st_____ , _04_

                    DEFENDANT _Charles Sanders_

                    LEGAL GUARDIAN _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____ , _____

comm. exp. _____        _____
                                    PUBLIC NOTARY OR CLERK OR JUDGE

I FIND THAT THE DEFENDANT IS UNABLE TO PAY THE APPLICATION FEE AND I HEREBY WAIVE THE FEE.

_____
JUDGE

APPOINTMENT OF INDIGENT DEFENSE COUNSEL
APPROVED _dms_   DENIED_____

## NOTICE

A copy of this APPLICATION AND AFFIDAVIT shall be sent to the prosecuting attorney or office of attorney general, whichever is applicable, for review and, upon request, the court shall hold a hearing to determine your eligibility for legal services to be furnished to you at public expense.

## IMPORTANT NOTICE

The court shall order you to pay the costs of your legal representation in total, or in installments. The court shall set the amount and due of each installment payment. The costs shall be paid to the court clerk in your county. The costs shall be a debt against you until paid and shall subject you to debt collection procedures as provided by law. The costs shall be deducted from any state income tax refund due you until the total costs are paid.

101

## IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
### STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**APR 2 3 2004**

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

| | |
|---|---|
| STATE OF OKLAHOMA,<br>Plaintiff,<br><br>vs.<br><br>CHARLES EDMOND SANDERS,<br>Defendant. | )<br>)<br>)<br>)  Case No. CF-04-19<br>)<br>)<br>)<br>) |

### NOTICE OF ENDORSEMENT OF WITNESS

COMES NOW the State of Oklahoma and gives notice to the Defendant of the endorsement of the following witnesses in the above styled case, to-wit:

JAMES MOFFETT

██████████

MARBLE CITY, OK

RICHARD L. GRAY
DISTRICT ATTORNEY

BY:_____
Assistant District Attorney

### CERTIFICATE OF DELIVERY/MAILING

I do hereby certify that on this 23rd day of April , 2004, I delivered/mailed a true and correct copy of the above and foregoing Notice to: John Sawney, 920 E. Cherokee, Sallisaw, OK 74955.

102

CLIF'S PHARMACY          (918) 776-0100
505 E REDWOOD  SALLISAW, OK 74955
Rx: 583207      04/13/2004        Dr.ROBBINS, RICK L. DO
CHARLES E SANDERS                 511 E REDWOOD
SEQ CO JAIL                       SALLISAW, OK 74955
SALLISAW, OK 74955
(000) 000-0918

NDC: 49884-0469-01

CF04-19                          $8.10              ✓

30 Tab IBUPROFEN 800 MG TABS  Auth:

CF-04-19

**CLIF'S PHARMACY**   (918) 776-0100
505 E REDWOOD/SALLISAW, OK 74955
Rx: C 125693 / 06/14/2004          Dr.LOGGAINS, BENTON PA
**CHARLES E SANDERS**              DR WOODS OFFICE
SEQ CO JAIL                        SALLISAW, OK 74955
SALLISAW, OK 74955
(000) 000-0918
NDC: 00093-0833-01

CF-04-19

                                   $23.90
25 Tab CLONAZEPAM 1MG TABS  Auth:

CF-04-19 *Charles Sanders*

**CLIF'S PHARMACY**   (918) 776-0100   **RECEIPT**
505 E REDWOOD  SALLISAW, OK 74955
Rx: C 125693    07/03/2004
CHARLES E SANDERS

Dr.LOGGAINS, BENTON PA
DR WOODS OFFICE
SALLISAW, OK 74955

SEQ CO JAIL
SALLISAW, OK 74955
(000) 000-0918
NDC: 00093-0833-01

CF-04-19

$23.90

25 Tab CLONAZEPAM 1MG TABS  Auth:

105

**SUBPOENA**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH CO.
**FILED**
IN DISTRICT COURT

STATE OF OKLAHOMA,
      Plaintiff,

VS.

No. CF-04-19
CF-98-363
CF-99-562
CF-98-346
PRELIMINARY HEARING/APP TO REVOKE

**JUL 2 6 2004**

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

CHARLES "MONK" SANDERS

      Defendant,

**TO:** CHIEF GARY PHILPOT SALLISAW P.D.
SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD ST. SUITE 4, OKLAHOMA CITY, OK
SALLY JACKSON ▓▓▓▓▓▓SALLISAW, OK
WUNG MEI FUNG, C/O CHINA PANDA RESTUARANT, SALLISAW, OK
HUI HUI ZHENG C/O CHINA PANDA RESTAURANT, SALLISAW, OK
DET JOHN OWENS SALLISAW P.D.

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **29th day of July, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES "MONK" SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

      HEREOF FAIL NOT, under penalty of law.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 26th day of JULY, 2004.

BERNELL EDWARDS, COURT CLERK

By _Robin Hickman_
            Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

SHERIFF'S RETURN

      Received this Writ this _____ day of _____, 20___, _____o'clock ___.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 20___,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____
_____By_____
_____20_____. I cannot find the within named
_____in my county.

JOHNNY PHILPOT, SHERIFF

By_____
             Deputy

Mileage_____miles

106

CF-04-19      Charles Sanders

CLIF'S PHARMACY      (918) 776-0100
505 E REDWOOD  SALLISAW, OK 74955
Rx:  589324    06/24/2004          Dr.LOGGAINS, BENTON PA
CHARLES E SANDERS                  DR WOODS OFFICE
SEQ CO JAIL                        SALLISAW, OK 74955
SALLISAW, OK 74955
(000) 000-0910
NDC: 49884-0544-05

CF-04-19

$15.10

15 Tab RANITIDINE 150MG TAB  Auth:

8-2-04

107

# Sheriff's Return

## State of Oklahoma, County of Sequoyah

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

Case #  CF-09-11  CF-98-363  CF-98-346  CF-99-562

AUG 1 0 2004

BERNELL EDWARDS, COURT CLERK

BY_____ DEPUTY

I certify that I received the foregoing summons on the ___26___ day of ___July___ ,20 _04_ , and that I delivered, or attempted delivery of the said summons as shown below to each party named for service request.

| Name of Person To be served | service address | served? yes or no | Date & Time of service or Attempt | |
|---|---|---|---|---|
| Sally Jackson | ███████ | No | 07 28 04 | 07-29-04 |
| Wung Mei Fung | China Panda | Yes | 07-27-04 | |
| Hui Hui Zheng | China Panda | Yes | 07-27-04 | |

I certify that on _____ , I served _____ By leaving a copy of said summons with a copy of the petition attached at _____ which is his/her place of residence.

I certify that on _____ , I served _____ by leaving a copy of said summons with a copy of the petition attached at _____ with _____ , a member of his/her family over fifteen (15) years of age.

Dated on the __08__ day of __August__ ,20 _04_ .

J.W. Philpot, Sheriff of Sequoyah County

By: ___Travis Gibbel___ #829 Deputy Sheriff

Sequoyah County, Oklahoma

108

Gooder
07-26-04

## SUBPOENA

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
Plaintiff,

VS.

No. CF-04-19
CF-98-363
CF-99-562
CF-98-346
PRELIMINARY HEARING/APP TO REVOKE

CHARLES "MONK" SANDERS

Defendant,

TO: ~~CHIEF GARY PHILPOT SALLISAW P.D.~~
~~SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD ST. SUITE 4, OKLAHOMA CITY, OK~~
SALLY JACKSON ████████ SALLISAW, OK   07-28-04 No 07-29-04 No
WUNG MEI FUNG, C/O CHINA PANDA RESTUARANT, SALLISAW, OK   07-27-04 Yes
HUI HUI ZHENG C/O CHINA PANDA RESTAURANT, SALLISAW, OK   07-27-04 Yes
~~DET JOHN OWENS SALLISAW P.D.~~

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the __29th day of July, 2004, at the hour of 1:30 o'clock P. M.__ to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and __CHARLES "MONK"__ __SANDERS,__ is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

HEREOF FAIL NOT, under penalty of law.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 26th day of JULY, 2004.

BERNELL EDWARDS, COURT CLERK

By _Robin Hickman_
Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

## SHERIFF'S RETURN

Received this Writ this _____ day of _____, 20___, _____ o'clock ___.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 20___,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____

_____ By _____

_____ 20_____ . I cannot find the within named _____ in my county.

JOHNNY PHILPOT, SHERIFF

By _____
Deputy

Mileage _____ miles

**SUBPOENA**
IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
Plaintiff,

VS.

No. CF-04-19
CF-98-363
CF-99-562
CF-98-346
PRELIMINARY HEARING/APP TO REVOKE

CHARLES "MONK" SANDERS

Defendant,

TO:  CHIEF GARY PHILPOT SALLISAW P.D.
SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23ᴿᴰ ST. SUITE 4, OKLAHOMA CITY, OK
SALLY JACKSON                    SALLISAW, OK
WUNG MEI FUNG, C/O CHINA PANDA RESTUARANT, SALLISAW, OK
HUI HUI ZHENG C/O CHINA PANDA RESTAURANT, SALLISAW, OK
DET JOHN OWENS SALLISAW P.D.

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **29th day of July, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES "MONK" SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

HEREOF FAIL NOT, under penalty of law.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 26th day of JULY, 2004.

BERNELL EDWARDS, COURT CLERK

By_____
Deputy

---

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

---

SHERIFF'S RETURN

Received this Writ this _____ day of _____, 20___, _____ o'clock ____.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 20___; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____
_____By_____
_____20_____. I cannot find the within named
_____in my county.

JOHNNY PHILPOT, SHERIFF

By_____
Deputy

Mileage_____miles

*CF-04-19 Charles Sanders*

**CLIF'S PHARMACY**   (918) 776-0100
505 E REDWOOD  SALLISAW, OK 74955
Rx: 591452    08/08/2004
CHARLES E SANDERS
SEQ CO JAIL
SALLISAW, OK 74955
(000) 000-0918
NDC: 59930-1560-01

*CF-04-19*

Dr.LOGGAINS, BENTON PA
DR WOODS OFFICE
SALLISAW, OK 74955

*8-13-04*

$17.00

17 Gm ALBUTEROL INHALER  Auth:

111

**SUBPOENA**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 3 0 2004

STATE OF OKLAHOMA,
    Plaintiff,

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

No. CR-04-19
CF-98-363
CF-99-562
CF-98-346
PRELIMINARY HEARING
APPLICATION TO REVOKE

VS.

CHARLES "MONK" SANDERS.
    Defendant,

TO:   CHIEF GARY PHILPOT SALLISAW P.D.
     AGENT SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD SUITE 4, OK. CITY, OK
     SALLY JACKSON ▓▓▓▓▓▓ SALLISAW, OK
     WUNG MEI FUNG C/O CHINA PANDA RESTAURANT, SALLISAW, OK
     HUI HUI ZHENG C/O CHINDA PANDA RESTAURANT, SALLISAW, OK
     DET. JOHN OWENS SALLISAW P.D.

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **2ND day of SEPTEMBER, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

     HEREOF FAIL NOT, under penalty of law.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 27TH day of AUGUST, 2004.

BERNELL EDWARDS, COURT CLERK

By_____Robin Hickman_____
              Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

SHERIFF'S RETURN

     Received this Writ this _____day of _____, 20___, _____o'clock ___.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____day of_____, 20___,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____
_____By_____
_____20_____. I cannot find the within named
_____in my county.

JOHNNY PHILPOT, SHERIFF

By_____
           Deputy

Mileage_____miles

112

# In the District Court in and for Sequoyah County
## State of Oklahoma

State of Oklahoma,                    )
                                      )
        Plaintiff,                    )
                                      )
vs.                                   )      Case No. CF- *04 - 19*
                                      )
*Charles Edmond Sanders,*             )
                                      )
        Defendant                     )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 0 2 2004

BERNELL EDWARDS, COURT CLERK
BY_____
                    DEPUTY

## WAIVER OF PRELIMINARY HEARING

Now on this ___*2nd*___ day of ___*September 2004*___ the above styled case comes on for preliminary hearing. The defendant appears in person and represented by his attorney of record, ___*John W. Sawney*___, the State of Oklahoma appears by its Assistant District Attorney. Thereupon the defendant herein acknowledges having been advised of the right to a preliminary hearing. That in said hearing the State of Oklahoma must prove to the satisfaction of the Court that the crime as alleged in the information was, in fact, committed and there is probable cause to believe that the defendant committed said crime. That if said burden was not met then the case would be dismissed and the bond exonerated.

The defendant is further advised that at said hearing that he/she has the right to cross examine any of the State's witnesses and to call witnesses on his/her own behalf. And further, the defendant is advised of the right at the hearing to limited discovery of the State's case in chief.

Having these rights in mind, the defendant herein, waives all the above rights with respect to a preliminary hearing in this matter.

_____
                    Defendant

_____
            Attorney for Defendant

## WAIVER OF JURISDICTION OF EXAMINING MAGISTRATE

The defendant is further advised that neither the examining magistrate nor the Special Judge has the jurisdiction to proceed further with the case unless affirmatively waived. Having these rights in mind, the defendant hereby waives his/her rights to object to any jurisdictional defects of the Court.

_____
                    Defendant

_____
            Attorney for Defendant

## COURT MINUTE OF PRELIMINARY HEARING

The defendant in the above styled case having knowingly and intelligently waived his/her rights to the preliminary hearing and there being no objection by the State of Oklahoma, the Court accepts the defendant's waiver and hereby binds the defendant over to stand trial in the District Court of Sequoyah County, State of Oklahoma, on the charges as set out in the information as filed in this case.

_____
        JUDGE OF THE DISTRICT COURT

113

# SUBPOENA
### IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

STATE OF OKLAHOMA,
Plaintiff,

No. CF-04-19
CF-98-363
CF-99-562
CF-98-346
PRELIMINARY HEARING
APPLICATION TO REVOKE

VS.
CHARLES "MONK" SANDERS.
Defendant,

TO:   CHIEF GARY PHILPOT SALLISAW P.D.
AGENT SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD SUITE 4, OK. CITY, OK
SALLY JACKSON ▮▮▮▮▮▮▮ SALLISAW, OK
WUNG MEI FUNG C/O CHINA PANDA RESTAURANT, SALLISAW, OK
HUI HUI ZHENG C/O CHINDA PANDA RESTAURANT, SALLISAW, OK
DET. JOHN OWENS SALLISAW P.D.

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **2ND  day of SEPTEMBER,  2004, at the hour of  1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES SANDERS,**  is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

HEREOF FAIL NOT, under penalty of law.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 27TH day of AUGUST, 2004.

BERNELL EDWARDS, COURT CLERK

By *Robin Hickman*
Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE AND PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

### SHERIFF'S RETURN

Received this Writ this _____day of _____; 20___, _____o'clock ___.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____day of _____, 20___,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____By_____

_____20_____. I cannot find the within named
_____in my county.

JOHNNY PHILPOT, SHERIFF

By_____
Deputy

Mileage_____miles

## Sheriff's Return
## State of Oklahoma, County of Sequoyah

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
SEP 0 1 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

Case # __CF-04-19__

I certify that I received the foregoing summons on the __30__ day of __August__ ,20 __04__ , and that I delivered, or attempted delivery of the said summons as shown below to each party named for service request.

| Name of Person To be served | service address | served? yes or no | Date & Time of service or Attempt |
|---|---|---|---|
| Sally Jackson | ████████ | Yes | 08-30-04 1600 |
| Wung Mei Fung | ████████ | Yes | 08-30-04 1900 |
| Hui Hui Zheng | ████████ | Yes | 08-30-04 1900 |

I certify that on _____, I served_____
By leaving a copy of said summons with a copy of the petition attached at
_____ which is his/her place of residence.

I certify that on_____, I served_____ by leaving
a copy of said summons with a copy of the petition attached at
_____ with_____, a member of
his/her family over fifteen (15) years of age.

Dated on the __30__ day of __August__ ,20 __04__ .
J.W. Philpot, Sheriff of Sequoyah County

By: __George B__ , Deputy Sheriff
Sequoyah County, Oklahoma

115

CLIF'S PHARMACY

(918) 776-0100

505 E REDWOOD  SALLISAW, OK 74955

Dr.LOGGAINS, BENTON PA
DR WOODS OFFICE
SALLISAW, OK 74955

Rx: 126535      08/24/2004

CHARLES E SANDERS

SEQ CO JAIL
SALLISAW, OK 74955
(000) 000-0918

NDC: 00093-0833-01

CF 04-19

$25.60

30 Tab CLONAZEPAM 1MG TABS  Auth:

116

CF-04-19- Charles Sanders

**CLIF'S PHARMACY,** (918) 776-0100
505 E REDWOOD  SALLISAW, OK 74955
**Rx: 593338** 09/23/2004
**CHARLES E SANDERS**
SEQ CO JAIL
SALLISAW, OK 74955
(000) 000-0918
NDC: 00172-2083-80

Dr.LOGGAINS, BENTON PA
DR WOODS OFFICE
SALLISAW, OK 74955

9-30-04

CF-04-19

$7.00

15 Tab HCTZ 25MG  Auth:

CF-04-19 Charles Sanders

CLIF'S PHARMACY (918) 776-0100
505 E REDWOOD SALLISAW, OK 74955
Rx: 596708 10/10/2004
CHARLES E SANDERS
SEQ CO JAIL
SALLISAW, OK 74955
(000) 000-0918
NDC: 60505-0016-06

Dr.LOGGAINS, BENTON PA
DR WOODS OFFICE
SALLISAW, OK 74955

10-11-04

CF-04-19
$37.50
30 Cap DILTIAZEM ER 240MG CAP SA Auth:

118

Sequoyah County Form CF-1            Uniform Plea of Guilty--Summary of Facts

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## THE STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

STATE OF OKLAHOMA,           )

            Plaintiff       )

VS.                   )

CHARLES EDMOND SANDERS, )

            Defendant     )

DOB ██████ / 28  1966 )
SS# ██████ - 9539 )

NOV 1 7 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

Case No. CF-04-19

## SUMMARY OF FACTS FOR THE PLEA OF GUILTY

Part A: FINDING OF FACT, ACCEPTANCE OF PLEA           <u>Circle</u>

1. Is the name just read to you your true name?     **YES**   NO
   If no, then what is your correct name?_____
   I have also been known by the name(s) **MONK** _____

2. (A) Do you wish to have a record of these proceedings made by a Court Reporter?    YES **NO**
   (B) Do you wish to waive your right to have a record of these proceedings made?    **YES** NO

3. What is your age? **38** What grade level in school have you completed? **GED**

4. Can you read and understand this form? [If no, Addendum A must be completed and attached]    **YES** NO

5. Are you currently taking any medications or substances which affect your ability to understand these proceedings?    YES **NO**

6. Have you been prescribed any medication which you are not taking?    YES **NO**
   If yes, what medication are you not taking? _____
   What is the purpose of the medication?_____
   Why are you not taking the medication?_____

7. Have you ever been treated by a doctor or health professional for mental illness or confined in a hospital for mental illness?    YES **NO**
   If yes, list doctor or health professional, place, and when treatment occurred:
   _____

8. Do you understand the purpose, the nature and the consequences of this proceeding?    **YES** NO

9. Have you received a copy of the State's Information and read its allegations?    **YES** NO

119

10.   A. Do you understand you are charged with:
Crime Statutory Reference

[1] BURGLARY SECOND DEGREE   21 O.S 1435   (YES) NO
[2] ARSON, SECOND DEGREE   21 O.S 1402   (YES) NO
[3] KNOWINGLY CONCEALING STOLEN PROP. 21 O.S 1713   (YES) NO
[4] FELONIOUSLY CARRYING FIREARM   21 O.S 1283   (YES) NO
[5] _____   _____ O.S _____   YES NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

B. Are you charged after former conviction of a felony (AFCF) ?   YES NO
If yes, list the felony(ies) charged: _____

11.   Do you understand the range of punishment for the crime(s) is/are?
(List in the same order as in Number 10)

[1] Minimum of __6__ to a maximum of __LIFE__ and/or a fine of $__1000.00__   YES NO
[2] Minimum of __4__ to a maximum of __LIFE__ and/or a fine of $__10,000.00__   YES NO
[3] Minimum of __4__ to a maximum of __LIFE__ and/or a fine of $__1000.00__   YES NO
[4] Minimum of __3__ to a maximum of __LIFE__ and/or a fine of $__1000.00__   YES NO
[5] Minimum of _____ to a maximum of _____ and/or a fine of $_____   YES NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

12.   Read the following statements: You have the right to a speedy trial before a jury of your peers to determine whether you are guilty or not guilty and if you request, to determine the sentence. If pleading to a capital murder, advise of the procedure in 21 O.S. 701.10 (B)
At the trial:
[1] You have the right to have an attorney represent you, either one you hire or if you are indigent a court appointed attorney.
[2] You are presumed to be innocent of the charges.
[3] You may remain silent or, if you choose, you may testify on your own behalf.
[4] You have the right to see and hear all witnesses called to testify against you and the right to have those witnesses cross-examined.
[5] You may have your witnesses ordered to appear in court to testify and present evidence of any defense you have to these charges.
[6] The State is required to prove your guilt beyond a reasonable doubt.
[7] The verdict of guilty or not guilty decided by a jury must be unanimous. However, you can waive a jury trial and, if all parties agree, the case could be tried by a Judge alone who would decide if you were guilty or not guilty and if determined to be guilty, the appropriate punishment.

Do you understand each of these rights?   (YES) NO

13.   Do you understand by entering a plea of guilty you give up these rights?   (YES) NO

14.   Do you understand that a conviction on a plea of guilty could increase punishment in any future case committed after this plea?   (YES) NO

15.   Is __John Sawyer__ your attorney?   (YES) NO

16.   Have you talked with your attorney about the charges, advised him/her regarding any defense you may have to the charges and received his/her advice?   (YES) NO

120

17. Do you believe your attorney has effectively assisted you in this case and are you satisfied with his/her representation? **YES** NO

18. Do you wish to change your plea of not guilty to a plea of guilty and give up your right to a jury trial and all previously explained constitutional rights? **YES** NO

19. Is there a plea agreement? **YES** NO
What is your understanding of the plea agreement? Ct. 4- DISMISSED. Ct 1, 2, 3
5 years incarceration and 20 years suspended sentence total 25 yrs
All time, to be suspended upon completion of KEY TO LIFE PROGRAM or
similar program. All costs to run c/c and along with CF-03-124 & CF-99-562

20. Do you understand the Court is not bound by any agreement or recommendation and if the Court does not accept the plea agreement, you have the right to withdraw your plea of guilty? **YES** NO

21. Do you understand that if there is no plea agreement the Court can sentence you within the range of punishment stated under question 11? **YES** NO

22. Do you understand your plea of guilty to the charge(s) is subject to: **YES** NO
(check one)
[ ] no prior felony conviction
[ ] one (1) prior felony conviction
[✓] two (2) or more felony convictions: List prior felony convictions to which you are pleading:
see attached list.

23. What is/are your plea(s) to each charge(s)?
[1] Guilty [2] Guilty [3] Guilty [4] DISMISSED [5] _____

24. Did you commit the acts as charged in the information? **YES** NO
State a factual basis for your plea(s) (attach additional pages as needed, labeled as ADDENDUM C):
The facts alleged in the Probable Cause Affidavit and
Information are true and correct and would likely
result in a guilty verdict if presented to a trial court

25. Have you been forced, abused, mistreated or promised anything by anyone to have you enter your plea(s)? YES **NO**

26. Do you plead guilty of your own free will and without any coercion or compulsion of any kind? **YES** NO

27. If you are entering a plea to a felony offense, you have a right to a Pre-sentencing investigation and Report which would contain the circumstances of the offense, any criminal record, social history and other background information about you. Do you request a Pre-sentence report? YES **NO**

28. (A) Do you have any additional statements to make to the Court? YES **NO**

(B) Is there any legal reason as to why you should not sentence now? YES **NO**

**HAVING BEEN SWORN, I, the Defendant whose signature appears below, make the Following statements under oath:**

(1) CHECK ONE:

_____ (A) I have read, understood and completed this form.

__✓____ (B) My attorney completed this form and we (the attorney and I) have gone over the form and I understand its contents and agree with the answers. Complete Addendum A and attach to this form.

121

_____ (C)   The Court completed this form for me and inserted my answers to the questions in open court.

(2)   All Answers are true and correct.

(3)   I understand that I may be prosecuted for perjury if I have made false statements to this Court.

Acknowledged this ___18___ day of ___November___, 2004.

_____
DEFENDANT

I, the undersigned attorney for the Defendant, believe the Defendant understands the nature, purpose, and consequence of this proceeding. (S)He is able to assist me in formulating any defense to the charge(s). I am satisfied that the Defendant's waivers and plea(s) of guilty are voluntarily given and he/she had been informed of all legal and constitutional rights.

_____
ATTORNEY FOR DEFENDANT

The sentence recommendation in question 19 is correctly stated. I believe the recommendation is fair to the State of Oklahoma. Offer of Proof (nolo contendere plea): _____

_____

_____

_____
ASSISTANT DISTRICT ATTORNEY

## THE COURT FINDS AS FOLLOWS:

(A). The Defendant was sworn and responded to questions under oath.

(B) The Defendant understands the purpose, nature and consequences of this proceeding.

(C) The Defendant's plea(s) of _Guilty_ is/are knowingly and voluntarily entered and accepted by the COURT REPORTER PRESENT Court.

(D) The Defendant is competent for the purpose of this hearing.

(E) A factual basis exists for the plea(s) (and former conviction(s), if applicable).

(F) The Defendant is guilty as charged:  (check as appropriate)

[  ] after no prior felony conviction.

[  ] after one (1) prior felony conviction.

[✓] after two (2) or more prior felony convictions

G.  Sentencing or order deferring sentence shall be: [✓] imposed instanter or [  ] continued until the _____ day of _____ at _____ : _____ , _____ .M. If the Pre-sentence investigation and Report is requested, it shall be provided to the Court by the _____ day of _____ , _____ .

DONE IN OPEN COURT this ___18th___ day of ___Nov___, 2004.

_____
JUDGE OF THE DISTRICT COURT

John C. Garrett
NAME OF JUDGE TYPED OR PRINTED

_____
Court Reporter Present

_____
Deputy Court Clerk Present

## "NOTICE OF RIGHT TO APPEAL"

Sentence to Incarceration, Suspended or Deferred:

To appeal from this conviction, or order deferring sentence, on your plea of guilty, you must file in the Sequoyah County District Court Clerk's Office a written Application to Withdraw Plea of Guilty within ten (10) days from today's date. You must set forth in detail why you are requesting to withdraw your plea. The trial court must hold a hearing and rule upon your application within thirty (30) days from the date it is filed. If the trial court denies your application, you have a right to ask the Court of Criminal Appeals to review the District Court's denial by filing a Petition for Writ of Certiorari within ninety (90) days of the date of denial. Within ten (10) days from the date the application to withdraw plea of guilty is denied, notice of intent to appeal and designation or record must be filed pursuant to Oklahoma Court of Criminal Appeals Rule 4.2 (D). If you are indigent, you have the right to be represented on appeal by a court appointed attorney.

Do you understand each of these rights to appeal?                                              (YES)    NO

Do you want to remain in the county jail ten (10) days before being taken to place of          YES     (NO)
confinement?

Have you fully understood the questions that have been asked?                                   (YES)    NO

Have your answers been freely and voluntarily given?                                            (YES)    NO

I ACKNOWLEDGE UNDERSTANDING OF RIGHTS AND SENTENCE IMPOSED.

_____
Defendant

I, the undersigned attorney, have advised the Defendant of his appellate rights.

_____
Attorney for the Defendant

DONE IN OPEN COURT, this 18th day of ___Nov___, 2004

_____
Judge of the District Court

_____                                  _____
Court Reporter Present                                             Deputy Court Clerk Present

## ADDENDUM "A"
## CERTIFICATE OF DEFENSE COUNSEL

As the attorney for the defendant, ___Charles Edmond Sanders___, I certify that:

1. The Defendant has stated to me that he/she is [✓] able [  ] unable to read and understand the attached form, and I have [✓] determined the Defendant is able to understand the English language or [  ] determined the Defendant is unable to understand the English language and obtained _____ to interpret to the Defendant in the _____ language.
2. I have read and fully explained to the Defendant the allegations contained in the information in this case.
3. I have read and fully explained to the Defendant all of the questions in the Plea of Guilty/Summary of Facts and the answers to the questions set out in the Summary of Facts are the Defendant's answers.
4. To the best of my knowledge and belief the statement and declarations made by the Defendant are accurate and true and have been freely and voluntarily made.
   Dated this ___18th___ day of ___November___, 2004.

_____
Attorney for the Defendant

123

Sequoyah County Form CF-1-b                                    Uniform Plea of Guilty -- Sentence on Plea

Case Number CF- _O4 - 19_          State v. _Sanders_          Date: _11-18-04_

**Part B: Sentence on Plea**   [NOTE ON USE: Part B is to be used with the Summary of Facts if contemporaneous with the entry of plea or may be formatted as a separate sentencing form if sentencing is continued to a future date.]

## THE COURT SENTENCES THE DEFENDANT AS FOLLOWS:

### ~~DEFERRED SENTENCE~~

1. The sentencing date is deferred until _____, ___, ___ at ___ : ___, ___ M.

2. You [ ] will [ ] will not be under supervision by the Department of Corrections. The terms set forth in the Rules and Conditions of Probation in Addendum D shall be the rules you must follow during the period of deferment.

### SUSPENDED SENTENCE or SUSPENDED AS TO PART

1. You are sentenced to confinement under the supervision of the Department of Corrections for a term of years as follows:
[1] _25 years_ [2] _25 years_ [3] _25 years_ [4] _DISMISSED_ [5] _____

TO BE SUSPENDED as follows:

   (A) ALL SUSPENDED   [ ] YES   [ ] NO

   (B) suspended except as to the first _5 years_ (months/(years)) of the term(s) during which you are to be held in the custody of the Department of Corrections. The remaining term of the sentence(s) is to be suspended under the terms set forth in the Rules and Conditions of Probation in Addendum D.

2. The sentence(s) is/are to run [✓] concurrently [ ] consecutively with/to _CF-03-124, and CF-99-542_ _____ or NOT APPLICABLE.

### TIME TO SERVE

1. You are sentenced to confinement under the supervision of the Department of Corrections for a term of years as follows:
[1] _____ [2] _____ [3] _____ [4] _____ [5] _____

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____ _____ or NOT APPLICABLE.

### FINES AND COSTS

You are to pay in full any fine(s), costs, fees and restitution at the time of sentencing. In the alternative, you may request a stay of execution (SOE) from the Cost Administrator in the Sequoyah County District Court Clerk's Office. All information given to the Cost Administrator in requesting the SOE will be under oath and is considered as part of the summary of facts before the Court. You will appear in person to make all payments as agreed. Any payment tendered other than in person will be accepted; however, such acceptance does not excuse your appearance in the Clerk's Office.

124

Sequoyah County Form CF-3(B)  Uniform Plea of Guilty -- Additional Findings

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, THE STATE OF OKLAHOMA

STATE vs. __Charles Edmond Sawlss__ Defendant  Case No. __CE-04-19__

### ADDITIONAL FINDINGS AT TIME OF SENTENCING

## EXHIBIT 1

A. **Original Charges** (A copy of the information may be attached instead) Please list any additional charges on a separate attached sheet.

| OFFENSE | STATUTE CITATION |
|---------|------------------|
|         |                  |
|         |                  |
|         |                  |
|         |                  |

B. **Prior Felony Charges Used For Enhancement** Please list any additional convictions on a separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---------|------|------------------|
| See attached list |  |  |
|         |      |                  |
|         |      |                  |
|         |      |                  |

C. **Prior Charge(s) For Which Order Deferring Sentence Was Entered** Please list any additional charges on separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---------|------|------------------|
| see → N/A |  |  |
|         |      |                  |
|         |      |                  |
|         |      |                  |

D. **Prior Felony Convictions Not Used For Enhancement** Please list any additional convictions on a separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---------|------|------------------|
| N/A     |      |                  |
|         |      |                  |
|         |      |                  |
|         |      |                  |

E.
If the defendant plead guilty to multiple counts, did the offense(s) arise from the same transaction?

Circle
YES    NO

125

## F.  Other Enhancers Used to Determine Placement on Matrix

Circle

1. Did the offender commit the current offense with the use of a firearm within the immediate possession and control of the offender?

YES **NO**

2. Was the victim of the offense over 62 years of age, under 12 years of age or disabled by reason of mental or physical illness to such extent that the victim lacked the ability to effectively protect his or her property or persons?

YES **NO**

3. Did the offender in the commission of the offense maim or torture the victim?

YES **NO**

4. Did the offender commit a Schedule N-2 or N-3 drug offense in, on, or within 1,000 feet of real property comprising of a public or private elementary or secondary school; public or private college, university, or other institution of higher education; recreation or public park (including state facilities); public housing project; or in the presence of any child under 12 years of age?

YES **NO**

5. Did the offender commit a Schedule N-2 or N-3 drug offense by using or soliciting the services of a person less than 18 years of age, providing the offender was at least 18 years of age at the time of the offense?

YES **NO**

6. If the controlling offense was a property or drug offense, what was the total amount involved in that offense (e.g., the value of the property involved; the amount of money stolen, embezzled, or obtained by fraud; or the amount of drug proceeds utilized?)   $ _____

7. If the controlling offense was a drug offense, what was the predominant drug and what was the amount of that drug? (Please specify quantity in grams, ounces, etc.)

DRUG: _N/A_____

QUANTITY: (oz., grams, etc.) _____

## G.  Offender Characteristics

Gender (Circle)
**Male**  Female

Race  (Circle)
White  Black  Hispanic  Asian  **Native American**

**This Exhibit shall not be admitted into evidence in any future prosecutions.**

Certified this _18th_ day of _November_ , _2009_.

_____
Attorney for the State

_____
Attorney of the Defendant

_____
Judge of the District Court

126

# In The District Court In And For Sequoyah County,
## State of Oklahoma

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| | ) | |
| PLAINTIFF | ) | CASE NO: CF-2004-19 |
| VS. | ) | |
| | ) | |
| CHARLES EDMOND "MONK" SANDERS | ) | SEQUOYAH COUNTY, OKLAHOMA |
| DOB: ■■■66 | ) | FILED |
| SS# ■■■9539 | ) | IN DISTRICT COURT |
| DEFENDANT. | ) | NOV 1 7 2004 |

**JUDGMENT AND SENTENCE**

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

Now, on this 18th day of November, 2004 this matter comes on before the undersigned Judge, for sentencing and the Defendant, __CHARLES EDMOND "MONK" SANDERS__, appears personally and by his attorney of record, __JOHN SAWNEY__, the State of Oklahoma represented by Assistant District Attorney, __JEFF SHERIDAN__, and the Defendant, having previously:

(X )   Entered a plea of guilty
( )    Entered a plea of Nolo Contendere
( )    Found guilty by jury
( )    Found guilty by Judge after waiver of jury trial
       to/of the crime(s) of:

CT. I: BURGLARY, 2ND DEGREE 21 O.S. 1435
CT. II: ARSON, 2ND DEGREE 21 O.S. 1402
CT. III: KNOWINGLY CONCEALING STOLEN PROPERTY 21 O.S. 1713
CT. IV: DISMISSED

( X )   The Defendant has previously been convicted of ___SIX (6)___ felony crimes and the sentence has been enhanced in accordance with the provisions set forth in Title 21 O.S. § 51 and 51A.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** by the Court that the Defendant, CHARLES EDMOND "MONK" SANDERS_____, is guilty of the above-described offense(s) and is sentenced as follows:

### TERM OF IMPRISONMENT
COUNT _____: Sentenced to a term of _____ imprisonment;

all under the custody and control of the Oklahoma Department of Corrections. These terms to be served ( ) concurrently, or ( ) consecutively;

### TERM OF IMPRISONMENT - (PART SUSPENDED)
COUNT __I__ : Sentenced to a term of _TWENTY-FIVE (25) YEARS_   imprisonment;
COUNT  II  : Sentenced to a term of  TWENTY-FIVE (25) YEARS   imprisonment;
COUNT  III  : Sentenced to a term of  TWENTY-FIVE (25) YEARS   imprisonment;
with all except the first _FIVE (5) YEARS_ suspended under the custody and control of the Oklahoma Department of Correction pursuant to the rules and conditions of probation entered by the Court. ALL TIME TO BE SUSPENDED UPON COMPLETION OF KEY TO LIFE OR SIMILAR PROGRAM.
These terms to be served (X) concurrently, or ( ) consecutively; with CF-03-124; CF-99-562; CF-98-363 AND CF-98-346

### TERM OF IMPRISONMENT - (ALL SUSPENDED)
COUNT _____: Sentenced to a term of_____ imprisonment;

under the custody and control of the Oklahoma Department of Corrections all of said term(s) of imprisonment suspended pursuant to the rules and conditions of probation entered by the Court. These terms to be served ( ) concurrently, or ( ) consecutively;

127

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT** that in addition to the preceding term(s), the Defendant is also sentenced to:

### FINE

( ) The defendant shall pay a fine of $_____ ( ) immediately or ( ) on or before _____, 20___, at the rate of $_____ per month, or within _____ days of release from the Department of Corrections.

( ) The payment of a fine of $_____ is suspended.

( ) The defendant shall report to the District Court of Sequoyah County within _____ days of release for a hearing on the defendant's ability to pay fines and costs pursuant to Section VIII of the rules of the Court of Criminal Appeals, 22 O.S. Chapter 18, App.

### COSTS, VCA, RESTITUTION

( ) The defendant shall pay costs, fees, and restitution in accordance with the schedule attached as Exhibit _____. (SEE RULES & CONDITIONS)

### RULES AND CONDITIONS OF PROBATION

( ) The rules and conditions as ordered by the court and signed and acknowledged by the defendant are attached as hereto.

### ATTORNEY FEES

( ) The defendant shall pay court-appointed attorney fee amount of $_____ on or before _____, 20__, to _____.

It is further ordered that judgment is hereby entered against the Defendant as to the fines, court costs and assessments set forth above.

The Court further advised the Defendant of his rights to appeal to the Court of Criminal Appeals of the State of Oklahoma, and of the necessary steps to be taken by him to perfect such appeal, and that if he desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State without cost to him.

In the event the above sentence is for incarceration in the Department of Corrections, the sheriff of Sequoyah County, Oklahoma, is ordered and directed to deliver the Defendant to the Lexington Assessment and Reception Center at Lexington, Oklahoma, and leave therewith a copy of this Judgment and Sentence to as warrant and authority of the imprisonment of the Defendant as provided herein. A second copy of this Judgment and Sentence to warrant and authority of the sheriff for the transportation and imprisonment of the Defendant as herein before provided. The sheriff to make due return to the clerk of this Court, with his proceedings endorsed thereon.

_____
JUDGE OF THE DISTRICT COURT

(SEAL)
ATTEST:
BERNELL EDWARDS, COURT CLERK

_____, DEPUTY CLERK

128

IN THE DISTRICT COURT OF ) Defendant ___CHARLES EDMOND MONROE SANDERS___
SEQUOYAH COUNTY )
STATE OF OKLAHOMA ) Case No. __CF-2004-19__
)
) Date ___11/18/04___

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 1 7 2004

BERNELL EDWARDS COURT CLERK
BY_____ DEPUTY

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general state of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I will understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or any representative thereof.

8. I understand that I must support myself and all my dependents without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within the eighteen months.

15. **SPECIAL CONDITIONS**: The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, OSBI lab fees) of $_____ within _____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 20_____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed)*.

COURT COSTS PLUS RESTITUTION

( X ) Defendant is to pay restitution through the District Attorney's office as set out in Exhibit "A" attached, the sum of $ __10,500.00__ .

16. Defendant to report to DOC Probation & Parole Office within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_____
Attorney for Defendant

_____
Charles Sanders
Probationer

_____
JUDGE OF THE DISTRICT COURT

Defendant's Mailing Address:

_____
[redacted]

_____
Sallisaw, OK 74955

129

IN THE DISTRICT COURT WITHIN AND FOR _SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 1 7 2004

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | CF-2004-19 |
| | ) | |
| CHARLES EDMOND SANDERS, | ) | |
| Defendant. | ) | |

RESTITUTION SCHEDULE - EXHIBIT "A"

The following is a schedule of restitution to be made by _CHARLES EDMOND SANDERS , Defendant herein, and said Defendant hereby made by agrees to make said restitution to the terms set out by the Court. The total amount of restitution is $10,500.00. Restitution is to be made by the payment of _____ by _____, 200__, and _____ to be paid monthly by the ___day of each month until restitution has been paid in full or until further order of the Court.

Each payment specified is to be made only by **cashier's check or money order** made payable to **D.A. Restitution** and remitted to: **109-C North College, Tahlequah OK 74464.** Each payment must have your name and the case number on it for proper credit.

Total Due: $10,500.00_____

SCHEDULE OF RECIPIENT(S)

| Name | Address | Phone | Amount |
|---|---|---|---|
| _Rosa Turner, | ████████ | Sallisaw, OK 74955  918 775-6094 | $10,500.00 |

Total _____

RICHARD L. GRAY
District Attorney, District 27

by_____
Assistant District Attorney

_____
Attorney for Defendant

_____
Defendant

_____
Address

_____
City        State      Zip          Phone

Judge of the District Court

Money Order/Cashier's Check Payable to;
        **D.A. RESTITUTION**

Mail to:   D.A. Restitution
                 Attn: Tina
                 109-C North College
Tahlequah OK 74464

Any Questions: 1-918-456-4993
                Tina Johnson, Restitution Coordinator

**SEND STAMPED SELF-ADDRESSED ENVELOPE FOR RETURN RECEIPT**
**A BOOKKEEPING FEE OF $1 WILL BE COLLECTED WITH EACH INDIVIDUAL PAYMENT**

130

CF-04-19 Charles Sanders

CLIF'S PHARMACY       (918) 776-0100
505 E REDWOOD  SALLISAW, OK 74955
Rx: 596721     11/20/2004
CHARLES E SANDERS
SEQ CO JAIL
SALLISAW, OK 74955
(000) 000-0918
NDC: 11980-0011-05

Dr.LOGGAINS, BENTON PA
DR WOODS OFFICE
SALLISAW, OK 74955

CF-04-19

$21.20

5 MI BLEPH-10 Auth:

11-30-04

131

CF-99-562  CF-98-363

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

CF-98-346  CF-2004-19

STATE OF OKLAHOMA

CASE NO._____  CF-03-124

VS.

J & S DATE: NOV 17 - 2004

Charles Edmond Sanders

**DEFENDANT**

### STATEMENT OF JAIL TIME

PRISONER WAS ARRESTED ON DATES:  10-22-99 — 12-09-99 / 8-23-01 - 10-25-01
3-13-03 — 4-02-03 / 1-16-04 - 1-21-04
3-31-04 - 12-10-04

PRISONER REMAINED IN JAIL ___372___ DAYS BEFORE JUDGEMENT AND SENTENCE.

PRISONER REMAINED IN JAIL ___23___ DAYS AFTER JUDGEMENT AND SENTENCE.

TOTAL DAY'S OF JAIL TIME ___395___

Christine Calbert

_____
SEQUOYAH COUNTY CRIMINAL JUSTICE AUTHORITY

12-28-2004

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 2 8 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

132

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 1 7 2005

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,          )
            Plaintiff,          )
                                )
vs.                             )          No.  CF-04-19
                                )
CHARLES EDMOND "MONK" SANDERS   )
            Defendant.          )

AFFIDAVIT FOR WRIT OF HABEAS CORPUS AD PROSEQUENDUM

STATE OF OKLAHOMA   )
                    ) ss.
COUNTY OF SEQUOYAH  )

JEFF SHERIDAN, being duly sworn, deposes and says that he is an Assistant District Attorney for Sequoyah County; that the above named defendant has been charged by information filed in this court in the above styled and numbered cause.

That said defendant is presently confined in the Tulsa County Jail, in the custody of the Warden thereof.

That the aforementioned case is now on the calendar of this court and is set for hearing on the 18th day of November, 2005, at 1:00 a.m., and it is necessary for the said defendant to appear before this court.

WHEREFORE, your petitioner respectfully prays that the court issue its Writ of Habeas Corpus Ad Prosequendum to the Warden/Administrator of the Tulsa County Jail, and to the Sheriff of Sequoyah County to receive the said defendant and to bring him before this Honorable Court. and thereafter the said defendant shall be discharged.

_____
Assistant District Attorney

Subscribed and sworn to before me this  17th  ____  day of November, 2005.

_____
Notary Public

My Commission Expires: 5-14-2009
#01006902

133

# In The District Court In And For Sequoyah County,
## State of Oklahoma

THE STATE OF OKLAHOMA, )
)
                **PLAINTIFF** )         **CASE NO: CF-04-19**
**VS.** )
)         SEQUOYAH COUNTY, OKLAHOMA
**CHARLES EDMOND "MONK" SANDERS** )             FILED
DOB:       1966 )          IN DISTRICT COURT
SS#      -9539 )
               **DEFENDANT.** )       **NOV 2 3 2005**

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## AMENDED
## JUDGMENT AND SENTENCE

Now, on this 17TH day of November, 2005, this matter comes on before the undersigned Judge, for sentencing and the Defendant, CHARLES EDMOND "MONK" SANDERS, appears personally and by his attorney of record, _____ JOHN SAWNEY _____, the State of Oklahoma represented by Assistant District Attorney, JEFF SHERIDAN, and the Defendant, having previously:

(x)     Entered a plea of guilty
( )     Entered a plea of Nolo Contendere
( )     Found guilty by jury
( )     Found guilty by Judge after waiver of jury trial
         to/of the crime(s) of:

COUNT I   BURGLARY SECOND DEGREE 21 O.S. 1435
COUNT II   ARSON SECOND DEGREE 21 O.S. 1402
COUNT III   KNOWINGLY CONCEALING STOLEN PROPERTY 21 O.S. 1713
COUNT IV   DISMISSED

( X )     The Defendant has previously been convicted of _SIX (6)_____ felony crimes and the sentence has been enhanced in accordance with the provisions set forth in Title 21 O.S. § 51 and 51A.

     **IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** by the Court that the Defendant, CHARLES EDMOND "MONK" SANDERS, is guilty of the above-described offense(s) and is sentenced as follows:

### TERM OF IMPRISONMENT
COUNT _____: Sentenced to a term of _____ imprisonment;

all under the custody and control of the Oklahoma Department of Corrections.
These terms to be served () concurrently, or ( ) consecutively;

### TERM OF IMPRISONMENT - (PART SUSPENDED)
COUNT _____: Sentenced to a term of _____ imprisonment;
with all except the first _____ suspended under the custody and control of the Oklahoma Department of Correction pursuant to the rules and conditions of probation entered by the Court. These terms to be served ( ) concurrently, or ( ) consecutively;

### TERM OF IMPRISONMENT - (ALL SUSPENDED)
COUNT __I__: Sentenced to a term of _TWENTY FIVE (25) YEARS_____ imprisonment;
COUNT __II__: Sentenced to a term of TWENTY FIVE (25) YEARS____ imprisonment,
COUNT __III__: Sentenced to a term of TWENTY FIVE (25) YEARS____ imprisonment,_

under the custody and control of the Oklahoma Department of Corrections all of said term(s) of imprisonment suspended pursuant to the rules and conditions of probation entered by the Court. These terms to be served (X) concurrently, or ( ) consecutively; CF-03-124; CF-99-562; CF-98-363 AND CF-98-346

     **IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT** that in addition to the preceding term(s), the Defendant is also sentenced to:

134

## FINE

( ) The defendant shall pay a fine of $_____ ( ) immediately or ( ) on or before _____, 20___, at the rate of $_____ per month, or within _____ days of release from the Department of Corrections.

( ) The payment of a fine of $_____ is suspended.

( ) The defendant shall report to the District Court of Sequoyah County within _____ days of release for a hearing on the defendant's ability to pay fines and costs pursuant to Section VIII of the rules of the Court of Criminal Appeals, 22 O.S. Chapter 18, App.

## COSTS, VCA, RESTITUTION

( ) The defendant shall pay costs, fees, and restitution in accordance with the schedule attached as Exhibit _____. (SEE RULES & CONDITIONS)

## RULES AND CONDITIONS OF PROBATION

( ) The rules and conditions as ordered by the court and signed and acknowledged by the defendant are attached as hereto.

## ATTORNEY FEES

( ) The defendant shall pay court-appointed attorney fee amount of $_____ on or before _____, 20__, to _____.

It is further ordered that judgment is hereby entered against the Defendant as to the fines, court costs and assessments set forth above.

The Court further advised the Defendant of his rights to appeal to the Court of Criminal Appeals of the State of Oklahoma, and of the necessary steps to be taken by him to perfect such appeal, and that if he desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State without cost to him.

In the event the above sentence is for incarceration in the Department of Corrections, the sheriff of Sequoyah County, Oklahoma, is ordered and directed to deliver the Defendant to the Lexington Assessment and Reception Center at Lexington, Oklahoma, and leave therewith a copy of this Judgment and Sentence to as warrant and authority of the imprisonment of the Defendant as provided herein. A second copy of this Judgment and Sentence to warrant and authority of the sheriff for the transportation and imprisonment of the Defendant as herein before provided. The sheriff to make due return to the clerk of this Court, with his proceedings endorsed thereon.

JUDGE OF THE DISTRICT COURT

(SEAL)
ATTEST:
BERNELL EDWARDS, COURT CLERK

, DEPUTY CLERK

135

IN THE DISTRICT COURT OF ) Defendant ___CHARLES EDMOND "MONK" FLANDERS___ SEQUOYAH COUNTY, OKLAHOMA
SEQUOYAH COUNTY )                                                    IN DISTRICT COURT
STATE OF OKLAHOMA ) Case No. ___CF-2004-19___
                  )                                          NOV 2 8 2005
                  ) Date ___11/18/04___
                  )                                    BERNELL EDWARDS, COURT CLERK

### RULES AND CONDITIONS OF PROBATION

BY _____ DEPUTY

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general state of my environment and progress.
2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I will understand that I am not to go into or loiter around beer taverns or pool halls.
3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.
4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.
5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.
6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.
7. I understand that it will be a violation of my probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or any representative thereof.
8. I understand that I must support myself and all my dependents without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.
9. I will refrain from violation of any City, State or Federal law.
10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.
11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.
12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.
13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion exists in their mind.
14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within the eighteen months.
15. **SPECIAL CONDITIONS:** The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, OSBI lab fees) of $_____ within _____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 20_____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed).*

COURT COSTS

( )   Defendant is to pay restitution through the District Attorney's office as set out in Exhibit "A" attached, the sum of $_____.

16. Defendant to report to DOC Probation & Parole Office within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.      SEQUOYAH COUNTY, OKLAHOMA
                                                                         FILED
                                                                  IN DISTRICT COURT

_____                     NOV 2 3 2005
Attorney for Defendant                                            Probationer

                                                        BERNELL EDWARDS, COURT CLERK
_____                     Defendant's Mailing Address
JUDGE OF THE DISTRICT COURT                             BY _____ DEPUTY

_____

136

# DISTRICT COURT OF MUSKOGEE, WAGONER, CHEROKEE AND SEQUOYAH COUNTIES

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FIFTEENTH JUDICIAL DISTRICT

(ORDER)

APR 0 3 2006

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

C 7- 04-19
C 7- 03-104
C 7- 99- 562
C 7- 98- 346

DATE: 3-29-06

DEFENDANT: Sanders, Charles

CASE NUMBER: C7 - 98- 363

CHARGE: Burglary 2nd

SENTENCE DATE: 11-17-05

EXPIRATION DATE: 11-16-30

THE DEPARTMENT OF CORRECTIONS IS HEREBY RELIEVED FROM FURTHER ACTIVE SUPERVISION OF THIS DEFENDANT IN THIS PARTICULAR CASE.

JUDGE OF DISTICT COURT   Garrett

* Per plea agreement with the feds. banish from Sequoyah County.

137

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA

VS.

*Charles Sanders*

DATE:

| | CASE NO.(S) | FINES(S) | COSTS |
|---|---|---|---|
| | CM03-365 | | |
| | CF04-19 | | |
| | CF03-124 | | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 08 2008

MAUDEEN MANN, COURT CLERK

BY_____ DEPUTY

SUBTOTALS: _____

☐ **MINUTE** / ☐ **SENTENCING ORDER**     TOTAL: _____

LSI:_____/_____ Supervision: ☐ Community ☐ Drug ☐ Standard ☐ Other_____

CM03-365 — State dismisses case costs to State.
CF 04-19 — State agrees to suspend remaining fines + court costs
CF 03-124 — State agrees to suspend remaining fines + court costs

Withdraw all costs warrants

**DEFENDANT IS ORDERED BACK:** _____ , 200__ @ _____ , ___.M.

Payment of fines, costs, fees, etc. shall be payable by money orders or cashier's checks (no personal checks or cash)
Include your name and case number - Payments shall be paid to the following entities:

### FINES AND COURT COSTS

Total of _____

Payable in monthly payments of
_____for____months

1st payment due:_____

Payable to:
Sequoyah County Court Clerk
120 E. Chickasaw, Ste 205
Sallisaw, OK 74955
(918) 775-4411

### RESTITUTION

Total of _____

Payable in monthly payments of
_____for____months

1st payment due:_____

Payable to:
District Attorney's Annex
120 E. Chickasaw, Ste 204
Sallisaw, OK 74955
(918) 775-9131

### DRUG FUND

Total of _____

Payable in monthly payments of
_____for____months

1st payment due:_____

Payable to:
Office of the District Attorney
120 E. Chickasaw, Ste 204
Sallisaw, OK 74955
(918) 775-9131

**I, THE DEFENDANT, UNDERSTAND THAT I MUST PAY AND COMPLETE ALL THE THINGS LISTED ABOVE
AND MUST APPEAR BACK IN COURT ON THE DATE AND TIME SET FORTH ABOVE,
OR I WILL BE ARRESTED AND JAILED!!!**

_____
DEFENDANT

_____
DEFENDANT'S ATTORNEY

_____
DISTRICT COURT JUDGE

_____
ASSISTANT DISTRICT ATTORNEY

White - Original     Yellow - District Attorney     Pink - Defendant

138

139

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 166**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

# B B B

## Berglan Bail Bonds

### 235-0007

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 0 9 2003

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

## APPEARANCE BOND

**POWER NUMBER** _7149_

LICENSE # _800626_   D.O.B. _____ -66

District Court, Case No. _CM-03-365_

STATE OF OKLAHOMA, SEQUOYAH COUNTY, ss:

BE IT REMEMBERED that on the 7th day of _June_, _2003_, _Charles E. Sanders_, as principal of **SEQUOYAH** County and State of **OKLAHOMA,** _Lance L. Berglan / Dennis L. Berglan_ as securities residents of Sequoyah County and State aforesaid appeared personally before the undersigned authority **Sequoyah County Court Clerk** in and for Sequoyah County, and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of _Three Thousand One Hundred Fifty_ DOLLARS ($ _3150_ ), to be made and levied on their respective goods, chattles, and lands, tenements, cash deposit and/or escrow deposit, to be void, however if the said _Charles "Monk" Sanders_ Defendant, who has been committed to the county jail of Sequoyah County, State of Oklahoma, shall personally be and appear before the District Court of said County on the _11_ day of _June_, _2003_ at _____ o'clock _____ .m., of said day and from term to term, and from day to day of each term, to answer a charge preferred against him/her for the offense of

_Poss / Mary, Poss Parn, PI, Resist Arrest,_
_No Ins,_

and to do and receive what shall be enjoined by said Court upon him/her, and shall not depart the said court without leave.

WITNESS our hands and seals this _____ day of _____, _____

Principal _Charles Sanders_ Address of Principal ████████████ _Sallisaw_

**Berglan Bail Bonds** Surety, Address of Surety 112 N. Main, Sallisaw, OK 74955.

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _____ day of _____, _____ Bernell Edwards, District Court Clerk, by Deputy _Jennie Williams #82_. This undertaking approved this _____ day of _____, _____, Bernell Edwards, Court Clerk, _____, Judge.

### AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, SEQUOYAH COUNTY, ss:

_Lance L. Berglan_, being first duly sworn upon oath, says that he/she is a resident of Sequoyah County, State of Oklahoma, and that

(a) Neither he/she nor anyone for his/her use has been promised or has received any surety or consideration. for making this undertaking

(b) He/She has received the sum of $0 from_____ **DEFENDENT** and/or has been promised the sum of $ _315_ from_____ as consideration for making this undertaking.

(c) He/She has received the following described property or instrument from _____ **DEFENDANT ET AL** as security for making this undertaking: **INDEMNITY AGREEMENT SIGNED BY DEFENDANT....**

(d) _____ **DEFENDANT ET AL** has promised to secure him/her for making this undertaking.

Surety _____, Professsional _Dennis L. Berglan_

Subscribed and sworn to before me this _____ day of _____, _____.

_____          _____

**NOTARY PUBLIC**          **My Commission Expires**
(Sec. 1322, Title 59, O.S.A.)

140

Case 6:09-cv-00105-JHP   Document 123-2   Filed 02/18/10   Page 3 of 13

# P   VER OF ATTORNEY

## DENNIS BERGLAN

Advise Bail Bonds
2001 Exchange Avenue
Oklahoma City, Oklahoma 73108

DB1495

**KNOW ALL MEN BY THESE PRESENTS:** That, Dennis Berglan, Professional Bondsman licensed by the State of Oklahoma, does constitute and appoint the below named agent as my Attorney in Fact to excute Bail Bonds only in my name and on my behalf as Surety. *THIS POWER MUST BE ATTACHED TO AND FILED WITH THE BAIL BOND WRITTEN ON THE DEFENDANT NAMED BELOW AND IS VOID IF ALTERED OR ERASED.*

Dated this _____7th_____ day of __JUNE__ , 20 _03_

Defendant Name: __Charles__      __Edmond__      __Sanders__

   (First)               (Middle)           (Last)

D.O.B.: __1-11-66__      Amt. of Bond: $ __3150.00__      Premium: $ __315.00__

Offense: __Poss Marj, Poss Para, PI, Resist Arrest, No Ins__

Case Number: _____      Court: __District__

City: __Sallisaw__      Court Date: __June 11, 2003 / OK__ Posted For: __Berglan Bail Bonds__

Rewrite of Power #: _____      Dated: _____      Amount: $ _____

_____        _____
Executing Agent's Signature        Professional Bondsman's Signature

SEQUOYAH COUNTY OKLAHOMA 6:09-cv-00105-JHP   Document 123-2   Filed 02/18/10   Page 4 of 13
FILED
IN DISTRICT COURT

JAN 26 2004

BERNELL EDWARDS, COURT CLERK

BY_____ DEPUTY

**MERRILL BONDING COMPANY**
**210 EAST CHICKASAW**
**SALLISAW, OKLA. 74955  (PHONE: 775-5579)**

APPEARANCE BOND
*IN THE DISTRICT COURT OF Sequoyah COUNTY, STATE OF OKLA.*

State of Oklahoma,                    *Plaintiff,*

vs.                                                    CASE NO. CF-03-365

Charles Edward Sanders , *Defendant,*

KNOW ALL MEN BY THESE PRESENTS, THAT, me the above named defendant, as
principal, and the undersigned _____, Bail Bonds as sureties personally appeared
before the undersigned authority and jointly and severally acknowledged
themselves to be indebted to the State of Oklahoma in the sum of: Three thousand one
hundred dollars and no cents ,-Dollars ($ 3,100         ) good and
lawfully money of the United States, to which payment well and truly to be made we bind ourselves, our
assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the
county jail of ___ Sequoyah unty, State of Oklahoma, shall personally be and appear
before the District ____ Court of said county on the _____ day of_____,
_____, at _____ o'clock _____M., of said day and from term to term and from day to day
of each term, to answer a charge preferred against him for the offense(s) PI, Resisting ,
of: No Ins., Poss of Mary, Drug Para
and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court
without leave, then this bond and recognizance to be void, in full force and effect.

*Witness our hands and seals this* 21st *day of* January , 2004.
*Principal:*_____*Address:*_____
*Surety:* RAYMOND MERRILL *Address:* 210 E. Chickasaw, Sallisaw, Ok. 74955
Professional Bail Bondsman
_____*Address:* 107 E. Creek, Sallisaw, OK 74955
*Executing Surety Licensed Bail Bondsman*

This undertaking approved this 21st day of January , 2004.

(SEAL)          By:_____Deputy/Clerk

MY COMMISSION EXPIRES:_____

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

AFFIDAVIT AS TO UNDERTAKING
STATE OF OKLAHOMA, Sequoyah County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of Sequoyah County,
STATE OF OKLAHOMA, and that neither he nor anyone for his use has received or been promised any
security or consideration for making this under-taking, except as hereinafter specified under one or more
of the following relevant statutory provisions, to-wit:
(a) Consideration for this undertaking received or promised in the sum of $ 310         .
(b) Other security received or promised for making this undertaking, is as follows:
_____
(c) Such promise, security or consideration was received from:
_____
Name        (Principal)               Address

142

## POWER OF ATTORNEY

Raymond L. Merrill, Professional Bondsman

$5,500.00 POWER LIMIT          N⁰ 5 4447

Merrill Bonding Co.
210 E. Chickasaw
Sallisaw, OK 74955

KNOW ALL MEN BY THESE PRESENT:

That I, Raymond L. Merrill, of Sallisaw, Sequoyah County, State of Oklahoma, have made and constituted and appointed by these present do make constitute and appoint the below named agent, my true and lawful attorney, for me and in my name, place and stead, and to my use as my employee and agent to write professional bonds, to sign my name, by him, in the execution of any and all bonds made as my agent, giving my said attorney full power to do every thing whatsoever requisite and necessary to be done in the premises as fully as I could do if personally present, hereby ratifying and confirming all that my said attorney shall lawfully do, or cause to be done, by virtue hereof. All this provided this Power-Of-Attorney is filed with the bond retained as a part of the court records, the said Attorney-In-Fact is hereby authorized to insert in this Power-Of-Attorney the name of the person whose behalf this bond was given.

IN WITNESS THEREOF, Raymond L. Merrill, was caused these present to be signed by its duly authorized officer, proper, for this purpose this **21st** day of **January**, 20 **04**

Prem. Chg'd $ **310**

Bond Amount $ **3100**

Case # **CF-03-365**

DOB ▓▓▓▓ 66

Collateral _____

Offense **PI, Resisting, No Ins, Poss of Mary, Drug Para**

County **Sequoyah**

RAYMOND L. MERRILL, Professional Bondsman
MERRILL BONDING CO.

Defendant _____

Address ▓▓▓▓▓▓▓▓▓▓

City **Sallisaw**          State **OK 74955**

App. Date _____

Executing Agent _____

143

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

CM-03-365

## Probable Cause Affidavit for Warrantless Arrest

SEQUOYAH COUNTY OKLAHOMA
FILED
IN DISTRICT COURT

JUN 11 2003

BERNELL EDWARDS, COURT CLERK

BY_____

Comes now the undersigned Affiant, and states upon Oath or Affirmation that the following information and facts are correct to the best of the Affiant's knowledge and belief:

Name of Person Arrested: SANDERS, CHARLES EDMOND    Social Security Number: ███ 9539

Date of Birth: ███████ 66   Date of Arrest (Detention): 06 / 08 / 03   Time of Arrest: 1:45   A .M.

State Specific Facts for Probable Cause for the Arrest and Detention:
PLEASE SEE PAGE # 2

[Use reverse side or attach another page if necessary]

Anticipated Charge(s): POSS OF MARIHAUANA, POSS OF DRUG PARA, RESISTING ARREST, P.I. NO INS VERI.

AFCF: No / Yes times (1) (2) or _____

Affiant (Arresting Officer)

Subscribed and sworn to before me the undersigned, this 9 Day of June 2005

My Commission Expires: 5-14-2005
#01006982                    Notary Public / Judge / Witness

## Probable Cause Determination

I Dennis M. Sprouse, Judge of the District Court reviewed this Probable Cause Affidavit on the 9 day of June, 2003, at 8:18 A.M./P.M.

___✓___ This Affidavit contains sufficient facts showing probable cause to detain the Arrestee to await further proceedings. The Sheriff for Sequoyah or Chief of Police of the arresting agency is hereby commanded to receive him/her into their custody and detain until he/she is legally discharged.

___✓___ The Court sets [ ] an Appearance Bond in the amount of $_____.00 or [✓] as per Sequoyah County Bond Schedule.

_____ The Court denies Bond at this time.

_____ This Affidavit contains insufficient facts to show there exists probable cause to detain the Arrestee. **The Arrestee is Ordered Released From Custody Immediately.**

_____
Judge of the District Court

144

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
# STATE OF OKLAHOMA

## Probable Cause Affidavit for Warrantless Arrest

ON 06-08-2003 AT APPROX 01:40 HRS. WHILE CHECKING DRIVERS LICENSES AND INSURANCE CARDS AT A CKECK POINT, A WHITE CHEVY EXT CAB PICKUP PULLED UP AND I ASKED THE DRIVER A MR. CHARLES SANDERS FOR HIS LICENSE AND INSURANCE CARD. MR. SANDERS GAVE ME LICENSE BUT COULD NOT FIND AN INSURANCE CARD. I TOLD MR. SANDERS THAT I WAS GOING TO WRITE HIM FOR NO INSURANCE CARD AND I WENT BACK TO MY UNIT WHILE OFFICER RICK FARGO AND OFFICER TAMMY DEER STAYED WITH MR. SANDERS AND THE PASSENGER OF THE VEHICLE. THE PASSENGERS NAME WAS A MR. JAMES MOFFETT. WHILE I WAS WRITING THE CITATION OFFICER FARGO ASKED MR. SANDERS TO STEP OUT OF THE VEHICLE AND DO A SOBERIETY TEST. MR. SANDERS FAILED AND OFFICER FARGO BEGAN TO SEARCH MR. SANDERS POCKETS FOR WEAPONS. WHILE I WAS WALKING UP TO MR. SANDERS OFFICER FARGO FOUND MARIHUANA IN MR. SANDERS POCKETS AND TOLD HIM THAT HE WAS PLACING HIM UNDER ARREST. OFFICER FARGO WAS PLACING HAND CUFFS ON MR. SANDERS WHEN HE TRIED TO SPIN AROUND. OFFICER FARGO KEPT A GRIP ON MR. SANDERS AND OFFICER DEER ASSISTED I WALKED UP TO AND ASSISTED BY PUTTING MY HAND ON HIS SHOULDER AND TOLD MR. SANDERS TO RELAX AND CALM DOWN. MR. SANDERS THEN COMPLIED. MR. SANDERS WAS PLACED INTO CUSTODY AND WAS PUT IN THE PATROL UNIT. OFFICER FARGO ASKED MR JAMES MOFFETT TO STEP OUT OF THE VEHICLE. OFFICER FARGO HAD MR. MOFFETT TO DO A SOBERIETY TEST AND FAILED. MR. MOFFET WAS PLACED UNDER ARREST . WHILE DOING AN INVENTORY OF THE VEHICLE, A SYRING WAS FOUND UNDER THE FRONT SEAT BY OFFICER FARGO. I FOUND ROLLING PAPERS ON THE FRONT CENTER SEAT. OFFICER DEER FOUND MARIHUANA AND MARIHUANA SEEDS ON THE PASSENGER FLOOR BOARD. WE HAD ALL TALKED WITH OUR CHIEF ON THE PHONE AT DIFFERNT TIMES TO KEEP HIM INFORMED ON WHAT WAS DEVLOPING. OFFICER FARGO ASKED MR. SANDERS IF THE MARIHAUANA WAS HIS THAT WAS FOUND IN THE VEHICLE AND MR. SANDERS DENIED OWNING IT. ACCORDING TO OFFICER DEER MR. MOFFETT STATED TO HER THAT HE AND MR. SANDERS HAD JUST SMOKED A MARIHAUANA CIGARETTE ABOUT AN HOUR AGO. AFTER THE VEHICLE WAS INVENTORIED I CALLED FOR A WRECKER TO IMPOUND THE VEHICLE. THE GREEN LEAFY SUBSTANCE FOUND ON MR. SANDERS AND IN THE VEHICLE FIELD TESTED POSITIVE FOR MARIHAUANA.

SEQUOYAH COUNTY, OKLAHOMA
FILED
COURT

JUN 0 9 2003

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type)(show alias)

SS.# ____-____-9539
D.O.B. - ____-____-66

SANDERS, CHARLES EDMOND

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CM-03-365 | Bail Bond Berglan/Berglan $3,150.00 | Possession of Marijuana |
| | | Possession of Paraphernalia |
| | | Public Intoxication |
| | | No Insurance Verification |
| | | Resisting Arrest |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the 8th day of June , 20 03

_____
Signature

AUTHORIZED BY

per Schedule
_____
JUDGE OF THE DISTRICT COURT

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

146

SEQUAH COUNTY OKLAHOMA
FILED
IN DISTRICT COURT

JAN 2 0 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

**BBB**
**Berglan Bail Bonds**
**112 North Main**
**Sallisaw, OK 74955**
**235-0007 or 866-281-2245**

## CERTIFICATE OF SURRENDER

Date: _____*01-17-04*_____, 200*4*

Case#: _____*CM-03-365*_____

I, ___*Diane Holt*_____, Jailor County of

_____*Sequoyah*_____, City of

_____*Sallisaw*_____ State of *Oklahoma*,

hereby acknowledge bail bondsman, ___*Lancel Berglan*___,

a licensed Bail Bondsman in the State of *Oklahoma*,

Defendant *Charles Edmond Sanders*,

in the certain case above, pending in (circle one)

(DISTRICT COURT) or MUNICIPAL COURT, County of *Sequoyah*,

City of ___*Sallisaw*_____ State of *Oklahoma*,

along with a Certified Copy of the Appearance Bail Bond heretofore

deposited with ___*Sequoyah*___ County Court Clerks Office, State

of *Oklahoma*.

I have retained in my custody, Defendant *Charles E. Sanders*,

This ___*17th*___ day of *January* 200*4*,

At ___*11:15*___ o'clock am/pm.

*Diane Holt*
**(Signature of Attending Jailer)**

147

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type)(show alias)

Sanders Charles Edmond ▮▮▮▮▮-9539

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CM-03-365 | Merrill Bonding 3,100 | No Ins, poss marij Poss para |
| | | |
| | | |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the _21_ day of ___JAN___ , 20 _04_ .

*Jenny Manly*
Signature

AUTHORIZED BY

*Spruse*
JUDGE OF THE DISTRICT COURT

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 26 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

148

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA**

| STATE OF OKLAHOMA | CASE NO.(S) | FINES(S) | COSTS |
|---|---|---|---|

VS.

*Charles Sanders*

CM03-365
CF04-19
CF03-124

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**DEC 0 8 2008**

MAUDEEN VANN, COURT CLERK

BY _____ DEPUTY

DATE: _____

SUBTOTALS: _____

☐ **MINUTE** / ☐ **SENTENCING ORDER**     TOTAL: _____

LSI:_____/_____    Supervision: ☐ Community  ☐ Drug  ☐ Standard  ☐ Other_____

CM03-365 — State dismisses case costs to State.

CF04-19 — State agrees to suspend remaining fines + court costs

CF03-124 — State agrees to suspend remaining fines + court costs

Withdraw all costs warrants

**DEFENDANT IS ORDERED BACK:** _____ , 200___ @ _____ , ____.M.

Payment of fines, costs, fees, etc. shall be payable by money orders or cashier's checks (no personal checks or cash)
Include your name and case number - Payments shall be paid to the following entities:

| **FINES AND COURT COSTS** | **RESTITUTION** | **DRUG FUND** |
|---|---|---|
| Total of _____ | Total of _____ | Total of _____ |
| Payable in monthly payments of _____ for____months | Payable in monthly payments of _____ for____months | Payable in monthly payments of _____ for____months |
| 1st payment due:_____ | 1st payment due:_____ | 1st payment due:_____ |
| Payable to: Sequoyah County Court Clerk 120 E. Chickasaw, Ste 205 Sallisaw, OK 74955 (918) 775-4411 | Payable to: District Attorney's Annex 120 E. Chickasaw, Ste 204 Sallisaw, OK 74955 (918) 775-9131 | Payable to: Office of the District Attorney 120 E. Chickasaw, Ste 204 Sallisaw, OK 74955 (918) 775-9131 |

**I, THE DEFENDANT, UNDERSTAND THAT I MUST PAY AND COMPLETE ALL THE THINGS LISTED ABOVE
AND MUST APPEAR BACK IN COURT ON THE DATE AND TIME SET FORTH ABOVE,
OR I WILL BE ARRESTED AND JAILED!!!**

_____
DEFENDANT

_____
DEFENDANT'S ATTORNEY

_____
DISTRICT COURT JUDGE

_____
ASSISTANT DISTRICT ATTORNEY

White - Original     Yellow - District Attorney     Pink - Defendant

149

## Form 1 (top left) — No. 001490

OKLAHOMA UNIFORM VIOLATIONS COMPLAINT
State of Oklahoma
**COUNTY OF SEQUOYAH**
**TOWN OF VIAN** CM-03-365 ss  N. 001490
CT-I

ABSTRACT OF COURT RECORD
The undersigned, being duly sworn, upon his oath deposes and says that:

on or about (date) 6-8-03  at (24 hour time) 01:45  at or near (location) WART & ECHO ST
County Number 68  40  East Control-Int.  North Location

Name (last, first, middle): SANDERS, CHARLES EDMOND
City: SALLISAW  State: OK  Zip Code: 74955
Birthdate: -66  Height: 5'10"  Weight: 170  Race: W  Sex: M  Class: D
Driver License Number: 441709539  Month/Year: 11-04  State: OK

Did Unlawfully: Operate ☒  Park ☐
Vehicle-Make: Chev  Year: 92  Body Style-Color: PK/WHT  Tag Number: UZS 854  Year: 03  State: OK
Commercial Motor Vehicle: Y N  ☐ Haz. Mat. Placard  ACCIDENT: ☐ PD ☐ PI ☐ FATALITY
and did then and there commit the following offense:

SPEEDING  MPH in  MPH Zone  Pace ☐  Radar ☐  Plane ☐  Other ☐
Other Violation: Public Intox

Contrary to Statute/Ordinance:
I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.
Signature of Officer  Date 6-8-03  Badge No. 386  Dist.
Sworn to and subscribed before me this ____ day of ____

Court Appearance: 11 day of June 03 at 9 A M
SEQUOYAH County Court House
Address of Court: P.O. BOX 687 VIAN, OK 74962

NOTICE: Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.
WITHOUT ADMITTING GUILT, I promise to appear in said court at said time and place.

X SIGNATURE: JAIL
(CHECK ONLY ONE BOX)
Signed Personal Recognizance ☐  Bond Attached ☐  Magistrate ☐  Jail ☒  Other ☐
JUVENILE ☐  Name of Parent or Guardian ____  Address ____
Officer's Remarks:

AREA: ☐ business ☐ Industrial ☒ school ☐ residential ☐ rural
HIGHWAY TYPE: ☐ 1 lane ☒ 2 lane ☐ 3 lane ☐ undivided  4 or more divided  4 or more on/off  ☐ ramp

## Form 2 (top right) — No. 001487

OKLAHOMA UNIFORM VIOLATIONS COMPLAINT
State of Oklahoma
**COUNTY OF SEQUOYAH**
**TOWN OF VIAN** CM-03-365 ss  N. 001487
CT-II

ABSTRACT OF COURT RECORD
The undersigned, being duly sworn, upon his oath deposes and says that:

on or about (date) 6-8-03  at (24 hour time) 01:45  at or near (location) WART & ECHO ST
County Number 68  40  East Control-Int.  North Location

Name (last, first, middle): SANDERS, CHARLES EDMOND
City: SALLISAW  State: OK  Zip Code: 74755
Birthdate: -66  Height: 5'8"  Weight: 170  Race: W  Sex: M  Class: D
Driver License Number: 441709539  Month/Year: 11-04  State: OK

Did Unlawfully: Operate ☒  Park ☐
Vehicle-Make: CHEV  Year: 92  Body Style-Color: PK/WHT  Tag Number: UZS 854  Year: 03  State: OK
Commercial Motor Vehicle: Y N  ☐ Haz. Mat. Placard  ACCIDENT: ☐ PD ☐ PI ☐ FATALITY
and did then and there commit the following offense:

SPEEDING  MPH in  MPH Zone  Pace ☐  Radar ☐  Plane ☐  Other ☐
Other Violation: RESISTING ARREST

Contrary to Statute/Ordinance:
I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.
Signature of Officer  Date 6-8-03  Badge No. 386  Dist.
Sworn to and subscribed before me this ____ day of ____

Court Appearance: 11 day of June 05 at 9 A M
SEQUOYAH County Court House
Address of Court: P.O. BOX 687 VIAN, OK 74962

NOTICE: Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.
WITHOUT ADMITTING GUILT, I promise to appear in said court at said time and place.

X SIGNATURE: JAIL
(CHECK ONLY ONE BOX)
Signed Personal Recognizance ☐  Bond Attached ☐  Magistrate ☐  Jail ☒  Other ☐
JUVENILE ☐  Name of Parent or Guardian ____  Address ____
Officer's Remarks:

AREA: ☐ business ☐ Industrial ☐ school ☒ residential ☐ rural
HIGHWAY TYPE: ☐ 1 lane ☒ 2 lane ☐ 3 lane ☐ undivided  4 or more divided  4 or more on/off  ☐ ramp

## Form 3 (bottom left) — No. 001485

OKLAHOMA UNIFORM VIOLATIONS COMPLAINT
State of Oklahoma
**COUNTY OF SEQUOYAH**
**TOWN OF VIAN** CM-03-365 ss  Court  N. 001485
CT-III

ABSTRACT OF COURT RECORD
The undersigned, being duly sworn, upon his oath deposes and says that:

on or about (date) 6-8-03  at (24 hour time) 01:45  at or near (location) Betsy & Echo ST
County Number 68  40  East Control-Int.  North Location

Name (last, first, middle): SANDERS, CHARLES Edmond
City: SALLISAW  State: OK  Zip Code: 74955
Birthdate: Height: 5'10"  Weight: 170  Race: W  Sex: M  Class: D  Endorsements
Driver License Number: 441709539  Month/Year: 11-04  State: OK

Did Unlawfully: Operate ☒  Park ☐
Vehicle-Make: Chev  Year: 92  Body Style-Color: PK/WHT  Tag Number: UZS 854  Year  State
Commercial Motor Vehicle: Y N  ☐ Haz. Mat. Placard  ACCIDENT: ☐ PD ☐ PI ☐ FATALITY
and did then and there commit the following offense:

SPEEDING  MPH in  MPH Zone  Pace ☐  Radar ☐  Plane ☐  Other ☐
Other Violation: No Ins Card

Contrary to Statute/Ordinance:
I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.
Signature of Officer  Date 6-8-03  Badge No. 386  Dist.
Sworn to and subscribed before me this ____ day of ____

Court Appearance: 11 day of June 03 at 9 A M
SEQUOYAH County Court House
Address of Court: P.O. BOX 687 VIAN, OK 74962

NOTICE: Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.
WITHOUT ADMITTING GUILT, I promise to appear in said court at said time and place.

X SIGNATURE: Charles Snider
(CHECK ONLY ONE BOX)
Signed Personal Recognizance ☐  Bond Attached ☐  Magistrate ☐  Jail ☐  Other ☐
JUVENILE ☐  Name of Parent or Guardian ____  Address ____
Officer's Remarks:

AREA: ☐ business ☐ Industrial ☐ school ☒ residential ☐ rural
HIGHWAY TYPE: ☐ 1 lane ☒ 2 lane ☐ 3 lane ☐ undivided  4 or more divided  4 or more on/off  ☐ ramp

## Form 4 (bottom right) — No. 001488

OKLAHOMA UNIFORM VIOLATIONS COMPLAINT
State of Oklahoma
**COUNTY OF SEQUOYAH**
**TOWN OF VIAN** CM-03-365 ss  Municipal Court  N. 001488
CT-IV

ABSTRACT OF COURT RECORD
The undersigned, being duly sworn, upon his oath deposes and says that:

on or about (date) 6-8-03  at (24 hour time) 01:45  at or near (location) WART & ECHO ST
County Number 68  40  East Control-Int.  North Location

Name (last, first, middle): SANDERS, CHARLES EDMOND
City: SALLISAW  State: OK  Zip Code: 74955
Birthdate: Height: 5'10"  Weight: 170  Race: W  Sex: M  Class: D
Driver License Number: 44709539  Month/Year: 11-04  State: OK

Did Unlawfully: Operate ☒  Park ☐
Vehicle-Make: Chev  Year: 92  Body Style-Color: PK/WHT  Tag Number: UZS 854  Year: 03  State: OK
Commercial Motor Vehicle: Y N  ☐ Haz. Mat. Placard  ACCIDENT: ☐ PD ☐ PI ☐ FATALITY
and did then and there commit the following offense:

SPEEDING  MPH in  MPH Zone  Pace ☐  Radar ☐  Plane ☐  Other ☐
Other Violation: POSS OF MARIHUANA

Contrary to Statute/Ordinance:
I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.
Signature of Officer  Date 6-8-03  Badge No. 386  Dist.
Sworn to and subscribed before me this ____ day of ____

Court Appearance: 11 day of June 03 at 9 A M
SEQUOYAH County Court House
Address of Court: P.O. BOX 687 VIAN, OK 74962

NOTICE: Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.
WITHOUT ADMITTING GUILT, I promise to appear in said court at said time and place.

X SIGNATURE: JAIL
(CHECK ONLY ONE BOX)
Signed Personal Recognizance ☐  Bond Attached ☐  Magistrate ☐  Jail ☒  Other ☐
JUVENILE ☐  Name of Parent or Guardian ____  Address ____
Officer's Remarks:

AREA: ☐ business ☐ Industrial ☐ school ☒ residential ☐ rural
HIGHWAY TYPE: ☐ 1 lane ☒ 2 lane ☐ 3 lane ☐ undivided  4 or more divided  4 or more on/off  ☐ ramp

150

**OKLAHOMA UNIFORM VIOLATIONS COMPLAINT**

State of Oklahoma
**COUNTY OF SEQUOYAH**
**TOWN OF VIAN**

Jud. Dist.
Municipal Court

No. **001489**

CM-03-3 __ CHII

**ABSTRACT OF COURT RECORD**

The undersigned, being duly sworn, upon his oath deposes and says that:

on or about (date) 6-8-03   at (24 hour time) 01:45   at or near (location) WAY & ECHO ST

County Number 68  40   East Control-Int.   North Location

within the city, county and state aforesaid:

Name (last, first, middle): SANDERS, CHARLES EDMOND   Phone number

Address: [redacted]

City: SALLISAW   State: OK   Zip Code: 74955

Birthdate (mo., day, yr.): [redacted] 66   Height: 5'9"   Weight: 170   Race: W   Sex: M   Class: D   Endorsements

Driver License Number: 441709539   Month/Year: 11-04   State: OK

Employer:   Did Unlawfully   Operate ☑   Park ☐

Vehicle-Make: Chev   Year: 92   Body Style-Color: P4/WHT   Tag Number: 4ZS854   Year: 03   State: OK

Commercial Motor Vehicle: Y/N   ☐ Haz. Mat. Placard   ACCIDENT: ☐ PD  ☐ PI  ☐ FATALITY

and did then and there commit the following offense:

SPEEDING ___ MPH in ___ MPH Zone   Pace ☐  Radar ☐  Plane ☐  Other ☐

Other Violation: POSS OF DRUG PARA

Contrary to Statute/Ordinance:

I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.

Signature of Officer   Date 6-8-03   Badge No. 326   Dist.

Sworn to and subscribed before me this ___ day of ___

Name and Title   My Commission Expires

Court Appearance: 11 day of JUNE 03 at 9 A M   (DPS USE)
SEQUOYAH County Court House

Address of Court: P.O. BOX 687 VIAN, OK  74962

NOTICE: Release upon personal recognizance based upon a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.

WITHOUT ADMITTING GUILT, I promise to appear in said court at said time and place.

X SIGNATURE: JAIL

(CHECK ONLY ONE BOX)

Signed Personal Recognizance ☐   Bond Attached ☐   Magistrate ☐   Jail ☑   Other ☐

☐ JUVENILE   Name of Parent or Guardian ___   Address ___

Officer's Remarks:

AREA: HIGHWAY   ☐ business  ☐ industrial  ☐ school  ☑ residential  ☐ rural

151

152

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

REDACTED EXHIBIT 159

TO KENNETH EUGENE BARRETT'S

SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

152

**INFORMATION**

════════════════════════════════════════════════════════════════════

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

STATE OF OKLAHOMA      )
        Plaintiff,      )
vs.      )    No. CF-98-⎮2 8
                )
CHARLES E. SANDERS      )
DOB: ▓▓▓66 # ▓▓▓▓9539 )
TERESA JORDAN      )
DOB: ▓▓▓65 ▓▓▓▓5710)
        Defendant.      )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**MAY - 5 1998**

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

### I N F O R M A T I O N
**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:**

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CHARLES E. SANDERS and TERESA JORDAN did, in Sequoyah County, and in the State of Oklahoma, on the 14TH DAY OF APRIL, in the year of our Lord, One Thousand, Nine Hundred and Ninety-EIGHT and before the presentment hereof, commit the crime of

**COUNT I: BURGLARY SECOND DEGREE-21 O.S. 1435**

That on the day and year and in the county and state aforesaid, said CHARLES E. SANDERS and TERESA JORDAN, while acting in concert each with the other, did unlawfully, wilfully, burglariously and feloniously, break and enter into a certain building located two miles North of Brushy Lake, in Sequoyah County, Oklahoma, owned by and in the possession of Leola Lee, in which building property of value was kept and contained, by breaking open the outer door of said building and entering without the consent of said owner, with the wilful, felonious and burglarious intent to steal said property,

**COUNT II: LARCENY FROM THE HOUSE-21 O.S. 1723**

That on the day and year, and in the County and State, aforesaid, CHARLES E. SANDERS and TERESA JORDAN, while acting in concert each with the other, did unlawfully, wilfully, and feloniously enter into a certain house located at two miles North of Brushy Lake, in the County of Sequoyah, Oklahoma, occupied by and in possession of Leola Lee, and did then and there take, steal, and carry away certain personal property of value, to-wit: RCA VCR, Zennith TV and VCR, Sony play station Genesis game, as well as various prescription bottles, with the unlawful, larcenous and felonious intent then and there on the part of said defendant to deprive the owner thereof permanently and to convert the same to his own use and benefit,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

REDACTED

By _____
    Assistant District Attorney

STATE OF OKLAHOMA )
           ) ss.
COUNTY OF SEQUOYAH)

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_Walter Ross_

Subscribed and sworn to before me this 5ᵗʰ day of May, 1998.

My Commission Expires:
___6/28/99___

_Graciela Hart Brumley_
NOTARY PUBLIC

WITNESSES:
Walter Ross, SCSO, Sallisaw, OK
Joe Buzzard, Marble City PD, Marble City, OK
Kelly Karnes, SCSO, Sallisaw, OK
Leola Lee, P.O. Box 1602, Sallisaw, OK
Loyd Poindexter, ▓▓▓▓▓▓▓▓▓▓▓▓ Sallisaw, OK
Sheila Poindexter, ▓▓▓▓▓▓▓ Sallisaw, OK

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY - 5 1998

BONNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

INFORMATION
Page 2

| | |
|---|---|
| THE STATE OF OKLAHOMA,<br>Plaintiff,<br><br>vs.<br><br>CHARLES E. SANDERS,<br>Defendant. | ) IN THE DISTRICT COURT OF<br>) SEQUOYAH COUNTY, STATE<br>) OF OKLAHOMA<br>) CASE NO. CRF-98- 128<br>)<br>)<br>) |

## FORMER CONVICTIONS

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-89-396, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UTTERING FORGED INSTRUMENT, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-92-91, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UNLAWFUL POSSESSION OF CONTROLLED DRUG, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-90-144, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of SEXUAL BATTERY, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

DIANNE BARKER HARROLD,
DISTRICT ATTORNEY

BY: _____
Assistant District Attorney

**REDACTED**

## ORDER OF RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order:

Last name, first, middle, suffix (please print or type) (show alias) ██████ ░539

Sanders Charles   ████ 66

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-128 | Bondsmen $2500.00 Hamilton | Burg II |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 1 6 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the 15 day of April _____, 19 98

White Copy - Court
Yellow Copy - Sheriff's File

Signature

AUTHORIZED BY _____
JUDGE OF THE DISTRICT COURT

**REDACTED**

WARRANT CLEARANCE

WARRANT # _CF-98-128_

WARRANT NAME: _TERESA JORDAN_

DATE & TIME CLEARED: _05-08-98_

WARRANT CLEARED BY:

ARREST _X_ OFFICER SERVING: _SHELTON FAIR #826_

AGENCY: _SEQUOYAH COUNTY S.O._

CANCELLATION _____ JUDGE OR OFFICIAL DIRECTING WARRANT CANCELLATION

WARRANT PULLED FROM FILE: YES _X_ NO _____

IF NO, EXPLAINED WHY NOT REMOVED: _____

WARRANT MARKED OFF BOOK: YES _X_ NO _____

IF NO, EXPLAIN WHY NOT:_____

WARRANT CANCELLED FROM NCIC: YES _X_ NO _____

IF YES, NCIC CANCELLATION NUMBER: _W 0747730328_

IF NO, EXPLAIN WHY NOT REMOVED: _____

SHERIFF'S OFFICE EMPLOYEE SIGNATURE: _Scott Bell #869_
MUST SIGN FULL NAME

NOTE: AFTER COMPLETION, ATTACH THIS FORM TO THE CANCELLED OR SERVED
WARRANT. BE SURE TO ATTACH THIS FORM BACK TO BACK WITH THE
WARRANT.

**REDACTED**

156

BENCH WARRANT ON INDICTMENT OR INFORMATION.

STATE OF OKLAHOMA,)

Sequoyah County        )

IN __DISTRICT__ COURT

THE STATE OF OKLAHOMA

VS.

Teresa Jordan

DOB: ▓▓▓▓65

#▓▓▓▓5710                          Defendant.

No. CF-98-128

Bond $5000.00

**ISSUED**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**MAY 1 1 1998**

THE STATE OF OKLAHOMA

To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

BERNELL EDWARDS, COURT CLERK

Whereas an __Teresa Jordan__ __having been__ BY __filed   aw__ DEPUTY

on the __14th__ day of __April__ A.D. 19 __98__, in the __District__ Court of

Sequoyah County, State of Oklahoma, charging __Teresa Jordan__

with the crime of __Burglary Second Degree and Failure__

__to Appear__

You are therefore commanded forthwith to arrest the above named __Teresa Jordan__

and bring him before* __Judge of the District Court__

or if the said Court have adjourned for the

term that you deliver him into the custody of the Sheriff of Sequoyah County, Oklahoma.

Given under my hand with the seal of said Court affixed, this __7th__ day of __May__ A.D. 19 __98__

By order of the Court.

BERNELL EDWARDS

Bernell Edwards                    Court Clerk.

By _Amanda Woods_                    Deputy.

157

*See Sec. 5384, Wilson's Statutes.

## SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____ 19_____, at
_____ o'clock _____M., and executed on the_____ O8 _____ day of _____ MAY _____19 98,
2343 o'clock____ P ____M., by ARREST _____

_____

Dated this_____ 8TH ____day of ____ MAY _____ 19 98

_____

Sheriff of_____County

By_____ [signature] (#826) _____
Under Sheriff.          Deputy.

No._____
In_____ Court
BENCH WARRANT ON INDICT-
MENT OR INFORMATION
THE STATE OF OKLAHOMA
vs.
Defendant
19.
Filed
Court Clerk
By_____
Deputy

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA**

STATE OF OKLAHOMA, )
              Plaintiff, )
vs. )
*Charles E. Sanders* )
            Defendant )

No: *CF-98-128*

**P 164 434 552**

| US Postal Service | |
|---|---|
| **Receipt for Certified Mail** | |
| No Insurance Coverage Provided. | |
| Do not use for International Mail *(See reverse)* | |
| Sent to Diane Hamilton | |
| Street & Number ████████ | |
| Post Office, State, & ZIP Code Sallisaw, OK 74955 | |
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | |

PS Form 3800, April 1995

**...ER AND JUDGEMENT OF FORFEITURE**

...day of *May* _____ 199_, the above cause came on ... regular assignment of th docket of this Court. ...that the above named defendant having heretofore been ...of *failure to appear,* ...ted to bail in the amount of $ *2500.00* _____ was released executed by *Diane Hamilton* and *Diane Hamilton* _____, if applicable his ...itioned as provided by law for the appearance of said defendant ...quired, and the Court having ordered said defendant to appear ...of *May* _____, 199_, and said defendant, being ...en court, without sufficient excuse failed to appear before the

...r finds that the conditions of said Appearance Bond have been ...ant and said bondsman, and that an Order and Judgment of ...tered.

...E ORDERED, ADJUDGED AND DECREED by the Court that the ...d defendant be, and the same is hereby declared and is ordered ...Oklahoma, and the amount of said bond is ordered paid to the

...ORDERED, ADJUDGED AND DECREED that the Court Clerk shall ...y of this Order and Judgment of Forfeiture to the bondsman and, if applicable, his insurer. The bondsman is hereby directed to deposit with the Court Clerk, the face amount of the said forfeited bond, to wit: $ *2500.00* _____. Such deposit to be made within 91 days from receipt of this Order and Judgment of Forfeiture, or the mailing of the notice if no receipt is made.

**JUDGE OF THE DISTRICT COURT**

**CERTIFICATE OF MAILING**

**REDACTED**

I certify that I mailed a true and correct copy of this instrument to the above named bondsman and, if applicable, his insurer, to the last known address of each, by certified mail with return receipt requested this _*11th*_ day of *May* _____, 1997.

**BERNELL EDWARDS, COURT CLERK**

by *Amanda Woody*
           **Deputy**

159

WARRANT CLEARANCE

WARRANT # _CF-98-128_

WARRANT NAME: _SANDERS, CHARLES E._

DATE & TIME CLEARED: _05-08-98 @ 11:33PM_

WARRANT CLEARED BY:

    ARREST _X_ OFFICER SERVING: _LARRY LANE #824_

               AGENCY: _SEQUOYAH COUNTY SHERIFF DEPT._

    CANCELLATION _____ JUDGE OR OFFICIAL DIRECTING WARRANT CANCELLATION

        _____

WARRANT PULLED FROM FILE:     YES _X_    NO _____

IF NO, EXPLAINED WHY NOT REMOVED: _____

WARRANT MARKED OFF BOOK:     YES _X_    NO _____

IF NO, EXPLAIN WHY NOT:_____

WARRANT CANCELLED FROM NCIC:  YES _X_    NO _____

IF YES, NCIC CANCELLATION NUMBER: _W 07474 0944_

IF NO, EXPLAIN WHY NOT REMOVED: _____

SHERIFF'S OFFICE EMPLOYEE SIGNATURE: _Scott Bell_ _#869_
                                  MUST SIGN FULL NAME

NOTE:  AFTER COMPLETION, ATTACH THIS FORM TO THE CANCELLED OR SERVED
       WARRANT. BE SURE TO ATTACH THIS FORM BACK TO BACK WITH THE
       WARRANT.

**REDACTED**

BENCH WARRANT ON INDICTMENT OR INFORMATION.

STATE OF OKLAHOMA,)

Sequoyah County     )

THE STATE OF OKLAHOMA

vs.

Charles E. Sanders

DOB: ████ 66

Defendant.

█████9539

IN **DISTRICT** COURT

**ISSUED**

5/7/98

No. CF-98-128

Bond $5000.00

THE STATE OF OKLAHOMA

To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

Whereas an Charles E. Sanders having been filed

on the 14th day of April A.D. 19 98, in the District Court of

Sequoyah County, State of Oklahoma, charging Charles E. Sanders

with the crime of Burglary Second Degree and Failure to

Appear

You are therefore commanded forthwith to arrest the above named Charles E. Sanders

and bring him before* Judge of the District Court

or if the said Court have adjourned for the

term that you deliver him into the custody of the Sheriff of Sequoyah County, Oklahoma.

Given under my hand with the seal of said Court affixed, this 7th day of

May A.D. 19 98

By order of the Court.

BERNELL EDWARDS                    Court Clerk.

Bernell Edwards

By _Cimanda Woody_                 Deputy.

*See Sec. 5384, Wilson's Statutes.

**SHERIFF'S RETURN**

RECEIVED the within Writ on the _____ day of _____ 19_____., at
_____ o'clock _____M., and executed on the_____day of_____,19____,
__11:33__ o'clock__ P ____M., by__ARREST_____
_____
_____

Dated this __ 8TH __ day of __ MAY _____ 19 98

Sheriff of _____County

By _____
Under Sheriff. / Deputy.

No._____
In_____Court
**BENCH WARRANT ON INDICT-
MENT OR INFORMATION**
THE STATE OF OKLAHOMA
vs.
Defendant
_____19.___
Filed_____
Court Clerk
By_____
Deputy

162

## CERTIFICATE OF SURRENDER

CF-98-128

I, _Craig Manley_, Jailer _Seq._ _Co_, State of _OK_, hereby acknowledge that I received from _Diane Hamilton_ a licensed Bail Bondsman in the State of _OK_, _Charles Sanders_, defendant, in a certain case pending in _District_ Court, _Seq. Co._, State of _OK_, along with a Certified Copy of a Bail Bond heretofore deposited with _Seq. Co. Sheriff Dept._, State of _OK_. That I have retained in my custody _Charles Sanders_, defendant, this _9_ day of _May_, 19 ___, at _20:53_ o'clock _P_ m.

_____
(Jailer)

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**MAY 1 1 1998**

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**REDACTED**

163

BENCH WARRANT ON INDICTMENT OR INFORMATION.

STATE OF OKLAHOMA,)

Sequoyah County )

IN ___DISTRICT___ COURT

**ISSUED**

5/7/98

THE STATE OF OKLAHOMA

vs.

Charles E. Sanders

DOB: ████/66

#████9539          Defendant.

No. CF-98-128

Bond $5000.00

THE STATE OF OKLAHOMA

To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

Whereas an __Charles E. Sanders_____ having been __filed____

on the __14th____ day of __April_____ A. D. 19 _98_ , in the _District__Court of

Sequoyah County, State of Oklahoma, charging __Charles E. Sanders_____

_____ with the crime of __Burglary Second Degree and Failure to___

__Appear_____

You are therefore commanded forthwith to arrest the above named __Charles E. Sanders_____

and bring him before* __Judge of the District Court_____

_____ or if the said Court have adjourned for the

term that you deliver him into the custody of the Sheriff of Sequoyah County, Oklahoma.

Given under my hand with the seal of said Court affixed, this __7th_____day of

__May_____ A. D. 19 _98_

By order of the Court.

BERNELL EDWARDS

Bernell Edwards          Court Clerk.

By _Amanda Woody_____

*See Sec. 5384, Wilson's Statutes.          Deputy.

**REDACTED**

164

BENCH WARRANT ON INDICTMENT OR INFORMATION.

STATE OF OKLAHOMA,)
    Sequoyah County    )

IN ___DISTRICT____ COURT

      THE STATE OF OKLAHOMA
            vs.
  Teresa Jordan

    DOB: ██████65
  #██████5710      Defendant.

No. CF-98-128

Bond $5000.00

**ISSUED**
**5/7/98**

THE STATE OF OKLAHOMA
To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma—Greeting:

    Whereas an__Teresa Jordan_____ having been __filed____

on the __14th_____ day of __April_____A. D. 19 _98__, in the _District_ Court of

Sequoyah County, State of Oklahoma, charging __Teresa Jordan_____

_____ with the crime of __Burglary Second Degree and Failure____

__to Appear_____

    You are therefore commanded forthwith to arrest the above named __Teresa Jordan_____

and bring him before*__Judge of the District Court_____

_____ or if the said Court have adjourned for the

term that you deliver him into the custody of the Sheriff of Sequoyah County, Oklahoma.

    Given under my hand with the seal of said Court affixed, this_____7th_____day of

__May_____A. D. 19 _98__

    By order of the Court.

    BERNELL EDWARDS_____
    Bernell Edwards    Court Clerk.
By _Amanda Woolley_____
                Deputy.

*See Sec. 5384, Wilson's Statutes.

**REDACTED**

IN THE DISTRICT COURT OF _Seq_ COUNTY.
STATE OF OKLAHOMA

_____, Plaintiff

vs.                      Case Number _CF-98-128A_

_Teresa L. Jordan_
_____, Defendant

APPLICATION FOR APPOINTED COUNSEL
AND
AFFIDAVIT OF FINANCIAL INABILITY TO EMPLOY COUNSEL

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 1 4 1998

BERNELL EDWARDS, COURT CLERK
BY _____.
_____ DEPUTY

I swear and affirm that I am the party in the above entitled action. I want an attorney to represent me in this case. I am financially unable to obtain the services of an attorney without causing substantial hardship to myself or to my family. The following information is _true_ and is given and intended to be relied upon by the court and other persons or agencies in determining my eligibility for legal services to be furnished to me at public expense.

PLEASE FILL IN ALL SPACES BELOW AND SIGN YOUR NAME UNDER OATH IN FRONT OF THE JUDGE, A NOTARY OR THE COURT CLERK. IF A QUESTION DOES NOT APPLY TO YOU, PLEASE WRITE IN THE BLANK "DOES NOT APPLY."

I.    GENERAL INFORMATION           Date: 5-12-98
NAME:  _Teresa Lynn Jordan_
ADDRESS: ▮▮▮▮▮ _Sallisaw OK 74955_
TELEPHONE: 918 775 ▮▮▮▮
MESSAGE NUMBER: 9187▮▮▮▮  SOCIAL SECURITY NO.: ▮▮▮▮ 5710
AGE: 32    Date of Birth: ▮▮▮▮ 65
SINGLE: [ ] MARRIED: [ ] SEPARATED: [ X ]
SPOUSE'S NAME: _____
ADDRESS: _____
TELEPHONE: _____
HOW MANY PEOPLE ARE IN YOUR HOUSEHOLD?: _____
NAMES AND AGES: _____

ARE YOU CLAIMED AS A DEPENDENT BY A PARENT OR GUARDIAN? YES [ ] NO [ X ]

II.   FAMILY INCOME
YOUR MONTHLY TAKE HOME PAY: ___0___ WEEKLY TAKE HOME PAY: ___0___
YOUR EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY)
_unemployed_
YOUR EMPLOYER'S PHONE NUMBER: _____
SPOUSE'S SALARY: _____
SPOUSE'S EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY)
_____

SPOUSE'S EMPLOYER'S PHONE NUMBER: _____
IS ANY OTHER MEMBER OF YOUR HOUSEHOLD **REDACTED** YES [ ] NO [ ]
WHO? _____
WHERE? _____
SALARY? _____
DEPENDENT'S EMPLOYER: _____
OTHER SOURCE OF INCOME OR BENEFITS (INCLUDE INTEREST, DIVIDENDS, ROYALTIES, ETC.)
_____

TOTAL FAMILY INCOME FOR PRECEDING MONTH WAS $ ___0___

III.   FAMILY A____S (what you own less what you owe on it)

MONEY:

IN JAIL: _____ AT HOME: _____ CHECKING: _____

SAVINGS: _____ SAFE DEPOSIT BOX: _____ OTHER: _____

HOME OR OTHER REAL ESTATE: VALUE: _____ JEWELRY: VALUE: _____

AUTOMOBILE(S): MAKE AND VALUE: _____ FURNITURE: VALUE: _____

MOTORCYCLE(S): MAKE AND VALUE: _____

TOOLS\EQUIPMENT: VALUE: _____

NOTES, MORTGAGES AND TRUST DEEDS: _____

ANY DEBTS OWED TO THE DEFENDANT: _____

OTHER ASSETS AND PROPERTY: VALUE: _____

ARE YOU PARTY TO A SUIT (PROBATE, WORKER'S COMPENSATION, PERSONAL INJURY) WHERE JUDGMENT MAY BE EXPECTED?: YES [   ] NO [   ]

NAME OF ATTORNEY?: Don't have one

IV.   EXPENSES AND DEBTS

RENT/HOUSE PAYMENT: _____ CLOTHING: _____ FOOD: _____

DOCTOR/MEDICINE: _____ UTILITIES: _____

CAR PAYMENT: _____ INSURANCE: _____

OTHER: _____

TOTAL MONTHLY LIVING EXPENSES: _____

MORTGAGEE\LANDLORD'S NAME: _____

MAJOR DEBTS: (list to whom and amount owed): _____

_____

_____

_____

LIST THE PERSONS WHO ARE DEPENDENT ON YOU FOR SUPPORT. STATE YOUR RELATIONSHIP TO EACH PERSON AND HOW MUCH YOU CONTRIBUTE MONTHLY TO THEIR SUPPORT:

_____

_____

_____

V.   LAST EMPLOYMENT:

WHEN DID YOU LAST WORK?: _____

WHO WAS YOUR EMPLOYER?: _____

_____

SALARY: _____ HOW LONG DID YOU WORK THERE?: _____

WHY DID YOU QUIT? _____

_____

_____

VI.   THE FOLLOWING PEOPLE CAN VERIFY TO A LARGE EXTENT MY ABOVE MENTIONED FINANCIAL SITUATION. GIVE NAME, ADDRESS AND PHONE NUMBER.

1.   _____

2.   _____ **REDACTED** _____

3.   _____

VII. CHARGE AND BOND

CHARGE(S): FELONY: _____ MISDEMEANOR: _____ JUVENILE: _____

ARRESTING AGENCY: _____

CITY: _____ COUNTY: _____ STATE: _____

HAS BOND BEEN POSTED?        YES [✓] NO [ ]
DID YOU USE A BONDSMAN?      YES [✓] NO [ ]
WHO PAID THE BONDSMAN? TOM Bradshaw
AMOUNT OF BOND: 395 00          PREMIUM PAID TO BONDING CO: 785
IF YOU DID NOT USE A BONDSMAN, DID YOU POST
CASH BOND: yes            P.R. BOND: _____.
LIST ANY DEFENDANTS CHARGED WITH YOU: No
Charles Sanders

VIII.
1.  Have you transferred or sold any assets since charges were filed in this case?
    YES [ ] NO [✓] If so, describe the buyer and the amount received

2.  Have you retained counsel in this case or in any other pending criminal case?
    YES [ ] NO [✓] If so, state the case number, court, attorney and amount paid to attorney for services

3.  Do you have any friends or relatives who are able and willing to assist you in hiring counsel
    and paying for transcripts? YES [ ] NO [✓] If so, have those persons been asked to help?
    YES [✓] NO [ ]
4.  If an friend or relative has given previous financial assistance in this case, but is no longer able
    or willing to do so, an affidavit to that effect from that person should be attached. Is that
    affidavit attached? YES [✓] NO [ ]

IX. NAMES OF THREE ATTORNEYS YOU CONTACTED:
1.  NAME _Mone_
    WHEN DID YOU CONTACT THIS ATTORNEY? - NA
    HOW DID YOU CONTACT THIS ATTORNEY? NA
    CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES [ ] NO [✓]
2.  NAME _____
    WHEN DID YOU CONTACT THIS ATTORNEY? _____
    HOW DID YOU CONTACT THIS ATTORNEY? _____
    CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES [ ] NO [ ]
3.  NAME _____
    WHEN DID YOU CONTACT THIS ATTORNEY? _____
    HOW DID YOU CONTACT THIS ATTORNEY? _____
    CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES [ ] NO [ ]

I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION I HAVE PROVIDED IS TRUE
AND CORRECT. I UNDERSTAND THAT I MAY BE PROSECUTED FOR PROVIDING FALSE INFORMATION
I THIS APPLICATION AND AFFIDAVIT. I UNDERSTAND THAT I MUST INFORM THE OKLAHOMA
IDIGENT DEFENSE SYSTEM OF ANY CHANGE IN MY FINANCIAL SITUATION THAT MAY CHANGE THE
IFORMATION I HAVE PROVIDED. I FURTHER DECLARE THAT I HAVE CONTACTED THREE ATTORNEYS, REDACTED
CENSED TO PRACTICE LAW IN THIS STATE, AND I AM WITHOUT FUNDS TO PAY AN ATTORNEY TO
EPRESENT ME OR TO PAY FOR TRANSCRIPTS AND COSTS ASSOCIATED WITH THIS CASE.

ATED AND SIGNED THIS 13 DAY OF May, 19 78.
                     DEFENDANT Teresa Jordan

                     LEGAL GUARDIAN _____

SUBSCRIBED AND SWORN TO BEFORE ME ON THE 13 DAY OF MAY , 19 98

JAN 8 2001

MY COMMISSION EXPIRES _____

_____
NOTARY (or CLERK or JUDGE)

### APPLICATION FEE WAIVER

I FIND THAT THE DEFENDANT IS UNABLE TO PAY THE APPLICATION FEE AND I HEREBY WAIVE THE FEE.

_____
JUDGE

APPOINTMENT OF INDIGENT DEFENSE COUNSEL

APPROVED  Hunter  DENIED _____

OKS - 5-13-98

### NOTICE

A copy of this APPLICATION AND AFFIDAVIT shall be sent to the prosecuting attorney or office of attorney general, whichever is applicable, for review and, upon request, the court shall hold a hearing to determine your eligibility for legal services to be furnished to you at public expense.

### IMPORTANT NOTICE

The court shall order you to pay the costs of your legal representation in total, or in installments. The court shall set the amount and due date of each installment payment. The costs shall be paid to the court clerk in your county. The costs shall be a debt against you until paid and shall subject you to debt collection procedures as provided by law. The costs shall be deducted from any state income tax refund due you until the total costs are paid.

**REDACTED**

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA,  )
    Plaintiff,  )
vs.  )
_Teresa A____  )
    No: CF-98-128A

**SENDER:**
■ Complete items 1 and/or 2 for additional services.
■ Complete items 3, 4a, and 4b.
■ Print your name and address on the reverse of this form so that we can return this card to you.

I also wish to receive the following services (for an extra fee):
1. ☒ Addressee's Address
2. ☐ Restricted Delivery
Consult postmaster for fee.

P 164 434 550
CF-98-128A
US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)

Sent to
Diane Hamilton
Street & Number
Post Office, State, & ZIP Code
Sallisaw, OK 74955

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | |

PS Form **3800**, April 1995

4a. Article Number
P 164 434 550
4b. Service Type
☐ Registered    ☒ Certified
☐ Express Mail    ☐ Insured
☐ Return Receipt for Merchandise ☐ COD
7. Date of Delivery
8. Addressee's Address (Only if requested and fee is paid)

102595-97-B-0179   Domestic Return Receipt

...ause came on ...retofore been ...was released ...pplicable his ...aid defendant ...nt to appear ...ndant, being ...r before the ...d have been ...Judgment of

: ORDERED, ADJUDGED AND DECREED by the Court that the defendant be, and the same is hereby declared and is ordered Oklahoma, and the amount of said bond is ordered paid to the

RDERED, ADJUDGED AND DECREED that the Court Clerk shall of this Order and Judgment of Forfeiture to the bondsman and, . The bondsman is hereby directed to deposit with the Court of the said forfeited bond, to wit: $2500.00 _____.

...... within 91 days from receipt of this Order and Judgment of Forfeiture, or the mailing of the notice if no receipt is made.

_____
JUDGE OF THE DISTRICT COURT

### CERTIFICATE OF MAILING

I certify that I mailed a true and correct copy of this instrument to the above named bondsman and, if applicable, his insurer to the last known address of each, by certified mail with return receipt requested this _11th_ day of _May_, 1997.

BERNELL EDWARDS, COURT CLERK

by _Amanda Woody_
    **Deputy**

REDACTED

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA, )
     Plaintiff, )
vs. )  No: CF-98-128A
_Teresa A_ )

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- _the mailpiece, or on the back if space does not_

I also wish to receive the following services (for an extra fee):
1. ☒ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

P 164 434 550
CF-98-128A

**US Postal Service**
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail *(See reverse)*

Sent to
Diane Hamilton
Street & Number
████████████
Post Office, State, & ZIP Code
Sallisaw, OK 74955

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | |

PS Form 3800, April 1995

4a. Article Number
P 164 434 550
4b. Service Type
☐ Registered   ☒ Certified
☐ Express Mail   ☐ Insured
☐ Return Receipt for Merchandise ☐ COD
7. Date of Delivery
8. Addressee's Address *(Only if requested and fee is paid)*

102595-97-B-0179   Domestic Return Receipt

...ause came on ...retofore been ...was released ...pplicable his ...id defendant ...nt to appear ...ndant, being ...r before the ...d have been ...Judgment of

ORDERED, ADJUDGED AND DECREED by the Court that the defendant be, and the same is hereby declared and is ordered Oklahoma, and the amount of said bond is ordered paid to the

...RDERED, ADJUDGED AND DECREED that the Court Clerk shall of this Order and Judgment of Forfeiture to the bondsman and, ... The bondsman is hereby directed to deposit with the Court of the said forfeited bond, to wit: $2500.00_____.

...within 91 days from receipt of this Order and Judgment of Forfeiture, or the mailing of the notice if no receipt is made.

_____
**JUDGE OF THE DISTRICT COURT**

## CERTIFICATE OF MAILING

    I certify that I mailed a true and correct copy of this instrument to the above named bondsman and, if applicable, his insurer to the last known address of each, by certified mail with return receipt requested this ___11th___ day of ___May___, 1997.

**BERNELL EDWARDS, COURT CLERK**

by _Amanda Woody_
       **Deputy**

171

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA, )
          Plaintiff, )
vs. )
         )       No: CF-98-128
Charles E. Sanders )
     Defendant )

### ORDER AND JUDGEMENT OF FORFEITURE

On the 6th day of May 1998, the above cause came on for hearing, according to regular assignment of th docket of this Court.

The Court finds that the above named defendant having heretofore been charged with the crime of Failure to Appear, and having been committed to bail in the amount of $ 2500.00 was released ... Bond executed by Diane Hamilton ... Hamilton, if applicable his ... ce of said defendant ... dant to appear ... fendant, being ... ear before the

Bond have been ... d Judgment of Court that the ... d and is ordered ... dered paid to the Court Clerk shall ... he bondsman and, ... sit with the Court .00 ... r and Judgment of

**[Certified Mail Receipt overlay:]**
P 164 434 551
US Postal Service
Receipt for Certified Mail
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)
CF-98-128
Sent to Diane Hamilton
Street
Post Office, State, & ZIP Code
Sallisaw, OK 74955
Postage $
Certified Fee
Special Delivery Fee
Restricted Delivery Fee
Return Receipt Showing to Whom & Date Delivered
Return Receipt Showing to Whom, & Addressee's Address
Total Postage & Fees $
Postmark or Date

**[Return Receipt overlay:]**
I also wish to receive the following services (for an extra fee):
1. ☒ Addressee's Address
2. ☐ Restricted Delivery
Consult postmaster for fee.
4a. Article Number
P 164 434 551
4b. Service Type
☐ Registered
☐ Express Mail
☐ Return Receipt for Merchandise
☒ Certified
☐ Insured
☐ COD
7. Date of Delivery
8. Addressee's Address (Only if requested and fee is paid)
102595-97-B-0179 Domestic Return Receipt

JUDGE OF COURT

### CERTIFICATE OF MAILING

I certify that I mailed a true and correct copy of this instrument to the above named bondsman and, if applicable, his insurer to the last known address of each, by certified mail with return receipt requested this 11th day of May, 1997.

BERNELL EDWARDS, COURT CLERK

by: Amanda Woody
**Deputy**

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA, )
              Plaintiff, )
vs. )
            )
Charles E. Sanders )
        Defendant )

No: CF-98-128

## ORDER AND JUDGEMENT OF FORFEITURE

On the 6th day of May 1998, the above cause came on for hearing, according to regular assignment of th docket of this Court.

The Court finds that the above named defendant having heretofore been charged with the crime of _Failure to Appear,_ and having been committed to bail in the amount of $ 2500.00 was released ... Bond executed by Diane Hamilton Hamilton , if applicable his ... of said defendant ... to appear ... defendant, being ... before the ... bond have been ... Judgment of Court that the ... and is ordered ... paid to the Court Clerk shall ... the bondsman and, ... sit with the Court .00 ... and Judgment of

_[overlapping US Postal Service Receipt for Certified Mail and Domestic Return Receipt forms]_

P 164 434 551
CF-98-128
US Postal Service
Receipt for Certified Mail
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)
Sent to Diane Hamilton
Street
Sallisaw, OK 74955
Postage $
Certified Fee
Special Delivery Fee
Restricted Delivery Fee
Return Receipt Showing to Whom & Date Delivered
Return Receipt Showing to Whom, Addressee's Address
Total Postage & Fees $
Postmark or Date

I also wish to receive the following services (for an extra fee):
1. ☒ Addressee's Address
2. ☐ Restricted Delivery
Consult postmaster for fee.
4a. Article Number
P 164 434 551
4b. Service Type
☐ Registered
☐ Express Mail ☒ Certified
☐ Return Receipt for Merchandise ☐ Insured
            ☐ COD
7. Date of Delivery
8. Addressee's Address (Only if requested and fee is paid)
102595-97-B-0179 Domestic Return Receipt
Thank you for using Return Receipt Service.

JUDGE

COURT

## CERTIFICATE OF MAILING

I certify that I mailed a true and correct copy of this instrument to the above named bondsman and, if applicable, his insurer to the last known address of each, by certified mail with return receipt requested this 11th day of May , 1997.

BERNELL EDWARDS, COURT CLERK

by: Amanda Woody
           Deputy

# Hamilton - Morgan Bail Bonds
## Diane Hamilton
## APPEARANCE BOND

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 16 1998

IN THE DISTRICT COURT OF _____ Seq _____ COUNTY, STATE OF OKLAHOMA
State of Oklahoma,                    Plaintiff,        BY DARNELL EDWARDS, COURT CLERK
                                                        _____ DEPUTY

vs. Charles Sanders , Defendant          Case No. CF-98-128

Know all men by these presents, that we the above named defendant, as principal, and the undersigned _____ Diane Hamilton, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of Twenty five hundred Dollars ($2500.00) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of Seq County, State of Oklahoma, shall personally be and appear before the District Court of said county on the 22 day of April , 19 98 , at 9 o'clock a.m., of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of Burglary II _____

and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this 15 day of April , 19 98 .

Diane Hamilton DBA Principal ████████ Sallisaw, OK- 74955 Address
Hamilton - Morgan                Surety  ████████  Sallisaw, Oklahoma 74955
Diane Hamilton

_____ Surety _____ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this 15 day of April , 19 98 .

_____ Court Clerk/Sheriff _____ Deputy

This undertaking approved this 15 day of April , 19 98 .

(SEAL)                    By: _____ Deputy/Clerk

---

## AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, Seq , County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of REDACTED _____ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as herinafter specified under one or more of the following relevant statutory provisions, to-wit:

   a) Consideration for this undertaking received or promised in the sum of $ 375.00

   b) Other security received or promised for making this undertaking, is as follows: PN.
      End Agreement.

   c) Such promise, security or consideration was received from: ████████ Sallisaw

Charles Sanders
Name                                   Address

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as on commits perjury.

Diane Hamilton ████████ Sallisaw, OK 74955
Affiant                    Address

Subscribed and sworn to before me this 15 day of April , 19 98 .

(SEAL)

_____
Court Clerk - Notary Public

My Commission Expires:          _____
                                Deputy

# Hamilton - Morgan Bail Bonds
## Diane Hamilton
## APPEARANCE BOND

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 16 1998

IN THE DISTRICT COURT OF ___Seq.___ COUNTY, STATE OF OKLAHOMA
State of Oklahoma,                    Plaintiff,
BY ___BERNEICE EDWARDS___ COURT CLERK
_____ DEPUTY

vs. ___Thresia Jordan___, Defendant           Case No. _CF-98-128A_

Know all men by these presents, that we the above named defendant, as principal, and the undersigned ___Diane Hamilto DBA___ Diane Hamilton, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of ___Twenty five hundred___ Dollars ($_2500.⁰⁰_) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of ___Seq.___ County, State of Oklahoma, shall personally be and appear before the District Court of said county on the _22_ day of ___April___, 19_98_, at _9_ o'clock_AM_., of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of ___Burglary II___

and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this _15_ day of ___April___, 19_98_.

___Diane Hamilton___ Principal ___[REDACTED]___ ___Sallisaw, OK.___ Address
Hamilton - Morgan            Surety ___[REDACTED]___ allisaw, Oklahoma 74955
Diane Hamilton

_____ Surety _____ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _15_ day of ___April___, 19_98_.

_____ Court Clerk/Sheriff _____ Deputy

This undertaking approved this _15_ day of ___April___, 19_98_.

(SEAL)                    By: _____ Deputy/Clerk

---

## AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, ___Seq.___ County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of ___Seq.___ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as herinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $_375.⁰⁰_

b) Other security received or promised for making this undertaking, is as follows:_PN_ ___Ind Agreement___

c) Such promise, security or consideration was received from: _OK 74962_

___Thresia Jordan___ ___[REDACTED]___ ___Sallisaw OK 74962___
Name                              Address

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as on commits perjury.

___Diane Hamilton___
Affiant                              Address

Subscribed and sworn to before me this _____ day of _____, 19 _____.

(SEAL)

_____
Court Clerk - Notary Public

My Commission Expires:
                              _____
                              Deputy

## *Sheriff's Return*

State of Oklahoma, County of Sequoyah

I certify that I received the foregoing summons on the _____

day of _____ -19_____, and that I delivered a copy of

said summons with a copy of the petition attached to each of the following named defendants

personally in Sequoyah County, Oklahoma at the address and on the date set forth opposite each

name, to wit:

| Name of Defendant | Address Where Served | Date of Service |
|---|---|---|
| Walter Ross | So | 5-29-98 |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 1 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

I certify that on_____,I served_____

by leaving a copy of said summons with a copy of the petition attached at_____

_____

which is his usual place of residence, with _____

a member of his family over fifteen (15) years of age.

Dated on the _29_ day of _May_ , 19 _98_

J. W. Philpot, Sheriff of Sequoyah County

REDACTED

By_____ , Deputy Sheriff

Sequoyah County, Oklahoma

## SUBPOENA
IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA,
        Plaintiff,

vs.                                          No. CF-98-128


CHARLES E. SANDERS
TERESA JORDAN
        Defendant.

TO: **WALTER ROSS S.C.S.O.**
    **LEOLA LEE P.O. BOX 1602, SALLISAW, OK.**
    ██████████████████████████████████


        GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **8TH day of JUNE, 1998, at the hour of 9:30 o'clock A. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES E. SANDERS & TERESA JORDAN,** are defendants; on the part of the State of Oklahoma and not depart without leave of the Court.

        HEREOF FAIL NOT, under penalty of law.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the District Court of said County, this 29TH day of MAY, 1998.

                        BERNELL EDWARDS, COURT CLERK

                        By _Emma Merrill_____
                                    Deputy

==================================================================

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE AND PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

==================================================================

                        SHERIFF'S RETURN
                           REDACTED
        Received this Writ this_____day of_____,
19____,_____
o'clock_____M.,_____, 19_____, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the ____ day of _____, 19____,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____
_____By_____
_____19____, I cannot find the within named_____
_____in my county.

                        JOHNNY PHILPOT, SHERIFF

                        By_____
                                Deputy

                        Mileage_____miles



SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 2 9 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

OFFICE OF THE DISTRICT ATTORNEY

DIANNE BARKER HARROLD
DISTRICT ATTORNEY
STATE OF OKLAHOMA
DISTRICT 27

SEQUOYAH COUNTY
120 E. Chickasaw
Sallisaw, OK 74955
(918) 775-9131
FAX: (918) 775-1215

TO:   **GERALD HUNTER**
      Attorney for Defendant

CASE NO. CF-98-128
State vs.
CHARLES SANDERS

Pursuant to Title 22, Section 258 of Oklahoma State Statutes, please be informed that the criminal file relating to the above captioned case is available for your inspection at least five (5) working days prior to the scheduled preliminary hearing date.

Please feel free to come by the District Attorney's office to inspect the file and contents.

Thank you!

DIANNE BARKER HARROLD
District Attorney

BY: _____
Assistant District Attorney
Sequoyah County

## CERTIFICATE OF MAILING

I hereby certify that on the 29th day of May, 1998, the foregoing notice was mailed, postage thereon fully prepaid, to said attorney of record:

GERALD HUNTER
Attorney at Law
P.O. Box 122
Sallisaw, OK 74955

REDACTED

178

## *Sheriff's Return*
### State of Oklahoma, County of Sequoyah

I certify that I received the foregoing summons on the _____ 7th _____

day of _____ June _____ -19 __98__ , and that I delivered a copy of

said summons with a copy of the petition attached to each of the following named defendants

personally in Sequoyah County, Oklahoma at the address and on the date set forth opposite each

name, to wit:

| Name of Defendant | Address Where Served | Date of Service |
|---|---|---|
| Leola Lee | P.O. Box 1602 | |
| | SALLISAW | SEQUOYAH COUNTY, OKLAHOMA |

NOT SERVED.
NEVER MADE CONTACT
WITH LEOLA LEE

FILED
IN DISTRICT COURT
JUN 0 9 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

I certify that on _____ ,I served _____

by leaving a copy of said summons with a copy of the petition attached at_____

_____

which is his usual place of residence, with _____

a member of his family over fifteen (15) years of age.

Dated on the _____ day of _____ , 19 ____

REDACTED J. W. Philpot, Sheriff of Sequoyah County

By _____ #826 , Deputy Sheriff

Sequoyah County, Oklahoma

179

**SUBPOENA**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA,
        Plaintiff,

vs.                                         No. CF-98-128


CHARLES E. SANDERS
TERESA JORDAN
        Defendant.

TO: WALTER ROSS S.C.S.O.
    LEOLA LEE P.O. BOX 1602, SALLISAW, OK.
    ████████████████████████████████


        GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **8TH day of JUNE, 1998, at the hour of 9:30 o'clock A. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES E. SANDERS & TERESA JORDAN,** are defendants; on the part of the State of Oklahoma and not depart without leave of the Court.

    HEREOF FAIL NOT, under penalty of law.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the District Court of said County, this 29TH day of MAY, 1998.

                            BERNELL EDWARDS,  COURT CLERK

                            By _Emma Muriel_____
                                    Deputy
======================================================================

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

======================================================================

                        SHERIFF'S RETURN
                          REDACTED
        Received    this    Writ    this_____day   of_____,
19____,_____
o'clock_____M.,_____, 19_____, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 19____,;   served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____By_____
_____19_____, I cannot find the within named_____
_____in my county.

                            JOHNNY PHILPOT, SHERIFF

                            By_____
                                    Deputy

                            Mileage____·____miles

824

## SUBPOENA
IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA,
        Plaintiff,

vs.

No. CF-98-128

CHARLES E. SANDERS
TERESA JORDAN
        Defendant.

TO: ~~WALTER ROSS S.C.S.O.~~ *served*
    LEOLA LEE P.O. BOX 1602, SALLISAW, OK. ███████████

       GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **8TH day of JUNE, 1998, at the hour of 9:30 o'clock A. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES E. SANDERS & TERESA JORDAN,** are defendants; on the part of the State of Oklahoma and not depart without leave of the Court.

      HEREOF FAIL NOT, under penalty of law.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the District Court of said County, this 29TH day of MAY, 1998.

                    BERNELL EDWARDS,   COURT CLERK

                    By _Emma Merrill_
                       Deputy

=================================================================

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE AND PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

=================================================================

## SHERIFF'S RETURN
### REDACTED

     Received  this  Writ  this_____day  of_____, 19____,_____ o'clock_____M.,_____, 19_____, served  the  same  by delivering  a  copy  thereof,  with  the  endorsements  thereon,  duly certified to the within named on the ____ day of _____, 19____,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____By_____

_____19____, I cannot find the within named_____ _____in my county.

                    JOHNNY PHILPOT, SHERIFF

                    By_____
                        Deputy

                    Mileage_____miles

ORDER OF RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order:

Last name, first, middle, suffix (please print or type) (show alias) ████████ *5710*

Jordon  Teresa  ██████ *65*

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-128 | Bondsm— Sprouse $2500.00 | unknown |
| | | SEQUOYAH COUNTY, OKLAHOMA FILED IN DISTRICT COURT MAY 21 1998 BERNELL EDWARDS, COURT CLERK BY _____ DEPUTY |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the _20_ day of _May_ _____, 19 _98_

White Copy - Court
Yellow Copy - Sheriff's File

Signature

AUTHORIZED BY _Sprouse_
JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 21 1998

BERNELL EDWARDS, COURT CLERK
**REDACTED**   BY ___au___ DEPUTY

ORDER OF RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order:

Last name, first, middle, suffix (please print or type) (show alias)

5710

Jordon    Teresa    65

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-128 | Bondsm— Sprouse $500.00 | unknw |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 21 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the 20 day of May _____, 19 98

White Copy - Court
Yellow Copy - Sheriff's File

Signature

AUTHORIZED BY    Sprouse

JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 21 1998

BERNELL EDWARDS, COURT CLERK
REDACTED   BY ___au_____ DEPUTY

183

## SUBPOENA
IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA,
                Plaintiff,

vs.                                         No. CF-98-128

CHARLES E. SANDERS                                      SEQUOYAH COUNTY, OKLAHOMA
TERESA JORDAN                                                  FILED
                Defendant.                               IN DISTRICT COURT

TO: **WALTER ROSS S.C.S.O. SALLISAW, OK** *Acc served 6-14-98*   JUN 1 6 1998
    **LEOLA LEE P.O. BOX 1602 SALLISAW, OK**

    **LOYD POINDEXTER**                        BERNELL EDWARDS, COURT CLERK
                                                                   DEPUTY

        GREETINGS: You are hereby commanded to appear before the
District Court of Sequoyah County, at the Courthouse therein on the
**26th day of June, 1998, at the hour of 1:30:00 o'clock P. M.** to
testify as a witness in a certain action pending in said Court
wherein the State of Oklahoma is Plaintiff, and **Charles E. Sanders
and Teresa Jordan,** are defendants; on the part of the State of
Oklahoma and not depart without leave of the Court.

        HEREOF FAIL NOT, under penalty of law.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed
the seal of the District Court of said County, this 8th day of
June, 1998.

                                BERNELL EDWARDS,  COURT CLERK
                            By___Amanda Woody___
                                        Deputy

========================================================================

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS
PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN
PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE
NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR
APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU
CALL.

========================================================================

                            SHERIFF'S RETURN

        Received    this    Writ REDACTED    day    of_____,
19____,_____
o'clock_____M.,_____, 19_____, served the same by
delivering a copy thereof, with the endorsements thereon, duly
certified to the within named on the ____ day of _____,
19____,;  served the same by leaving a copy thereof with the
endorsements thereon, duly certified at the usual place of
residence of the within named witness:_____
_____
_____By_____
_____19____, I cannot
find the within named_____
_____in my county.

                                JOHNNY PHILPOT, SHERIFF

                                By_____
                                        Deputy

                                Mileage_____miles

## *Sheriff's Return*

State of Oklahoma, County of Sequoyah

I certify that I received the foregoing summons on the ___10th___

day of ___June___ -19 _98_ , and that I delivered a copy of

said summons with a copy of the petition attached to each of the following named defendants

personally in Sequoyah County, Oklahoma at the address and on the date set forth opposite each

name, to wit:

| Name of Defendant | Address Where Served | Date of Service |
|---|---|---|
| Leola Lee of ████ Stlisaw | | 6-14-98 |
| Loyd Poindexter ████ Stll. aw Okla | | 6-14-98 |

I certify that on ___6-14-98___ I served _Leola Lee + Loyd Poindexter_

by leaving a copy of said summons with a copy of the petition attached at ___Their Residences___

which is his usual place of residence, with _____

a member of his family over fifteen (15) years of age.

Dated on the _14_ day of ___June___, 19 _98_

REDACTED

J. W. Philpot, Sheriff of Sequoyah County

By _____, Deputy Sheriff

Sequoyah County, Oklahoma

185

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

# Hamilton - Morgan Bail Bonds
## Diane Hamilton
## APPEARANCE BOND

MAY 2 1 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

IN THE DISTRICT COURT OF ____Seq.____ COUNTY, STATE OF OKLAHOMA
State of Oklahoma,
                                    Plaintiff,

vs. _Teresa Jordon_____, Defendant          Case No. _CF-98-128A_

Know all men by these presents, that we the above named defendant, as principal, and the undersigned _Adam Morris LLC DBA_ Diane Hamilton, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of _Twenty five hundred_ Dollars ($_2500.00_) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of _Seq_ County, State of Oklahoma, shall personally be and appear before the District Court of said county on the _28_ day of _May_, 19_98_, at _9_ o'clock_A.M._, of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of _F.T.A. CF-98-128_

and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this _20_ day of _May_, 19_98_.

_____ Principal _____ Address

Hamilton - Morgan          Surety     113 North Oak  Sallisaw, Oklahoma 74955
Diane Hamilton
_Diane Hamilton_ Surety [REDACTED] _Sallisaw, OK 74955_ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _20_ day of _May_, 19_98_.

_____ Court Clerk/Sheriff _____ Deputy

This undertaking approved this _20_ day of _May_, 19_98_.

(SEAL)                          By: _____ Deputy/Clerk

---

### AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, _Seq_ County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of _Seq_, County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as herinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $_375.00_

b) Other security received or promised for making this undertaking, is as follows:_PN_

c) Such promise, security or consideration was received from:—

_Teresa Jordan_____ [REDACTED] _Sallisaw OK 74955_
Name                          Address

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as on commits perjury.

_Diane Hamilton_ [REDACTED] _Sallisaw, OK 74955_
Affiant                       Address

Subscribed and sworn to before me this _20_ day of _May_, 19_98_.

(SEAL)

_____
Court Clerk - Notary Public

My Commission Expires: _____
                          _____
                          Deputy

186

# Hamilton - Morgan Bail Bonds
## Diane Hamilton
## APPEARANCE BOND

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 1 9 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

IN THE DISTRICT COURT OF _____*Seq,*_____ COUNTY, STATE OF OKLAHOMA
State of Oklahoma, _____ Plaintiff,

vs _____*Charles Sanders*_____ , Defendant          Case No. *CF-98-128*

Know all men by these presents, that we the above named defendant, as principal, and the undersigned *Diane Hamilte D.BA* Diane Hamilton, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of *Three Thousand* Dollars ($ *3000 00* ) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of *Seq,* County, State of Oklahoma, shall personally be and appear before the District Court of said county on the *20* day of *May*, 19 *98*, at *9* o'clock *am* of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of *CF 98 128* _____

and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this *19* day of *May*, 19 *98*.

_____ Principal _____ Address

Hamilton - Morgan          Surety          113 North Oak  Sallisaw, Oklahoma 74955
Diane Hamilton
*Diane Hamilte D.BA* Surety [REDACTED] *Sallisaw, OK. 74955* Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this *19* day of *May*, 19 *98*.

_____ Court Clerk/Sheriff _____ Deputy

This undertaking approved this *19* day of *May*, 19 *98*.

(SEAL)          By: _____ Deputy/Clerk

### AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, *Seq* County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of *Seq* County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as herinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $ *450 00*

b) Other security received or promised for making this undertaking, is as follows: *PN*

c) Such promise, security or consideration was received from: *Sallisaw*

*Charles Sanders*
Name

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as on commits perjury.

*Diane Hamilton* [REDACTED] *Sallisaw, OK. 74955*
Affiant          Address

Subscribed and sworn to before me this *19* day of *May*, 19 *98*.

(SEAL)

_____
Court Clerk - Notary Public

My Commission Expires: _____

_____
Deputy

187

"AMENDED" INFORMATION
================================================================

### IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA | ) | |
|      Plaintiff, | ) | |
| vs. | ) | No. CF-98-128 |
| | ) | |
| CHARLES E. SANDERS | ) | |
| DOB:████ #█████9539 | ) | |
| TERESA JORDAN | ) | |
| DOB:████65 #██████-5710 | ) | |
|      Defendant. | ) | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**JUL 07 1998**

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## "AMENDED"
## INFORMATION
**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:**

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CHARLES E. SANDERS and TERESA JORDAN did, in Sequoyah County, and in the State of Oklahoma, on the 15TH DAY OF APRIL, in the year of our Lord, One Thousand, Nine Hundred and Ninety-EIGHT and before the presentment hereof, commit the crime of

### COUNT I: BURGLARY SECOND DEGREE-21 O.S. 1435

That on the day and year and in the county and state aforesaid, said CHARLES E. SANDERS and TERESA JORDAN, while acting in concert each with the other, did unlawfully, wilfully, burglariously and feloniously, break and enter into a certain building located two miles North of Brushy Lake, in Sequoyah County, Oklahoma, owned by and in the possession of Leola Lee, in which building property of value was kept and contained, by breaking open the outer door of said building and entering without the consent of said owner, with the wilful, felonious and burglarious intent to steal said property,

### COUNT II: LARCENY FROM THE HOUSE-21 O.S. 1723

That on the day and year, and in the County and State, aforesaid, CHARLES E. SANDERS and TERESA JORDAN, while acting in concert each with the other, did unlawfully, wilfully, and feloniously enter into a certain house located at two miles North of Brushy Lake, in the County of Sequoyah, Oklahoma, occupied by and in possession of Leola Lee, and did then and there take, steal, and carry away certain personal property of value, to-wit: RCA VCR, Zennith TV and VCR remote, Sony play station Genesis game, as well as various prescription bottles; with the unlawful, larcenous and felonious intent then and there on the part of said defendant to deprive the owner thereof permanently and to convert the same to his own use and benefit,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

By _____
    Assistant District Attorney

STATE OF OKLAHOMA )
          ) ss.
COUNTY OF SEQUOYAH)

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____
    District Attorney

Subscribed and sworn to before me this 7th day of July, 1998.

My Commission Expires:
6/28/99

_____
NOTARY PUBLIC

WITNESSES:
Walter Ross, SCSO, Sallisaw, OK
Joe Buzzard, Marble City PD, Marble City, OK
Kelly Karnes, SCSO, Sallisaw, OK
Leola Lee, P.O. Box 1602, Sallisaw, OK
Loyd Poindexter, ████████████████ Sallisaw, OK
Sheila Poindexter, ████████████ Sallisaw, OK

**REDACTED**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 0 7 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

INFORMATION
Page 2

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) | SEQUOYAH COUNTY, STATE |
| | ) | OF OKLAHOMA |
| vs. | ) | CASE NO. CRF-98-128 |
| | ) | |
| CHARLES E. SANDERS, | ) | |
| Defendant. | ) | |

## FORMER CONVICTIONS

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-89-396, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UTTERING FORGED INSTRUMENT, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-92-91, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UNLAWFUL POSSESSION OF CONTROLLED DRUG, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-90-144, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of SEXUAL BATTERY, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

DIANNE BARKER HARROLD,
DISTRICT ATTORNEY

BY: _____
Assistant District Attorney

**REDACTED**

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA,  )
                    Plaintiff,  )
vs.                 )                    No: CF-98-128A
                    )
*Teresa Jordan*     )
            Defendant  )

### ORDER AND JUDGEMENT OF FORFEITURE

___ day of *May* ___ 1998, the above cause came on to regular assignment of th docket of this Court.

s that the above named defendant having heretofore been of *Failure to Appear,* ___

tted to bail in the amount of $ *2500.00* ___ was released executed by *Diane Hamilton* ___

and *Diane Hamilton* ___, if applicable his itioned as provided by law for the appearance of said defendant uired, and the Court having ordered said defendant to appear of *May* ___, 1998, and said defendant, being en court, without sufficient excuse failed to appear before the

finds that the conditions of said Appearance Bond have been nt and said bondsman, and that an Order and Judgment of red.

ORDERED, ADJUDGED AND DECREED by the Court that the defendant be, and the same is hereby declared and is ordered klahoma, and the amount of said bond is ordered paid to the

DERED, ADJUDGED AND DECREED that the Court Clerk shall this Order and Judgment of Forfeiture to the bondsman and, The bondsman is hereby directed to deposit with the Court the said forfeited bond, to wit: $ *2500.00* ___ within 91 days from receipt of this Order and Judgment of forteiture, or the mailing of the notice if no receipt is made.

*(signature)*
**JUDGE OF THE DISTRICT COURT**

### CERTIFICATE OF MAILING

I certify that I mailed a true and ~~REDACTED~~ correct copy of this instrument to the above named bondsman and, if applicable, his insurer to the last known address of each, by certified mail with return receipt requested this ___ *11th* ___ day of *May* ___, 1997.

**BERNELL EDWARDS, COURT CLERK**

by: *Amanda Woody*
        Deputy

---

P 164 434 549

**US Postal Service**
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail *(See reverse)*

Sent to
Diane Hamilton

Street & Number
█████████████

Post Office, State, &
Sallisaw, OK 74955

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | |

PS Form 3800, April 1995

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 1 3 1998

BERNELL EDWARDS, COURT CLERK
BY _____
_____ DEPUTY

## CERTIFICATE OF SURRENDER

I, _JEFF MURRAY_, jailer _SEQUOYAH Co. SHERIFFS DEPT._ State of _OK_, hereby acknowledge that I received from _Dione Hamilton_ a licensed Bail Bondsman in the State of _OK_, _Thresia Jordan_, defendant, in a certain case pending in _District_ Court, _Sallisaw_, State of _OK_, along with a Certified Copy of a Bail Bond heretofore deposited with _Seq. Co. Sheriff Dept._, State of _OK_. That I have retained in my custody _Thresia Jordan_, defendant, this _13_ day of _May_, 19 _98_, at _2:14_ o'clock _P_ m.

_____
(Jailer)

CF-98-128A

**REDACTED**

192

ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, first, middle, suffix(please print or type) (show alias)

Jordan   Teresa

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-138A | DA Declined To prosute per Steve Barnes | Traff meth poss para Attempt to Elude |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the *85* day of *Oct*_____, 19*98*.

White Copy - Court
Yellow Copy - Sheriff's File

AUTHORIZED BY _Steve Ba_____

Signature

JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

OCT  6 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**REDACTED**

193

IN AND FOR THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

| STATE OF OKLAHOMA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case Nos. CRF-92-91 |
| | ) | CF-97-9 |
| | ) | CF-98-128 |
| CHARLES E. SANDERS, | ) | CF-98-346 |
| Defendant. | ) | CF-98-363 |

## MOTION TO REDUCE BOND

COMES NOW the Defendant, Charles E. Sanders, and respectfully requests that this Court reduce the bond now set for Defendant in the above styled action. In support of this motion, Defendant shows this Court the following:

1.  The Oklahoma Constitution, Art. II, Sec. 8 provides:

    "All persons shall be bailable by sufficient sureties, except for capital cases, when the **proof of guilt is evident, or the presumption thereof is great.**" [Emphasis added];

2.  The Oklahoma Statutes 1991, 22 O.S. Sec. 15 provide:

    "No person can be compelled in a criminal action to be a witness against himself; nor can a person charged with public offense be subjected **before conviction** to any more restraint than is necessary for his detention to answer the charge..." [Emphasis added];

3.  The Oklahoma Statutes, 22 O.S. Sec. 1102 provide:

    "Bail, by sufficient sureties, may be admitted upon all arrests in criminal cases where the punishment may be death, unless the proof is evident or the presumption great..."

194

4. The Oklahoma Constitution, Art. II, Sec.9 provides that bail may not be excessive. Excessive bond is tantamount to no bond.

5. Defendant is presumed innocent by law until found guilty, and is thus entitled to bail. Further incarceration of Defendant is a restraint of his liberty that is not necessary to assure that Defendant will answer the charged offense before this Court.

6. Defendant is currently represented by counsel and release on bail will better allow Defendant to assist counsel in the preparation and presentation of his defense to this serious charge.

WHEREFORE, Defendant respectfully requests that this honorable Court enter its order releasing Defendant on his own recognizance, or set a reasonable bond and upon the posting of a reasonable bond for appearance in further proceedings order his release.

Defendant further requests that a hearing upon any matters disputed by the State regarding allegations in this motion be scheduled as soon as practicable.

Charles E. Sanders,
Defendant

By: _____
REDACTED GERALD HUNTER, OBA #4501
Attorney for Defendant
P.O. Box 122
Sallisaw, OK 74955
(918) 775-1220

## CERTIFICATE OF DELIVERY

I, Gerald Hunter, do hereby certify that on this 15th day of December, 1998, I hand delivered a true and correct copy of the above and foregoing Motion to Reduce Bond to the Office of the District Attorney, Sequoyah County Courthouse, Sallisaw, Oklahoma.

_____
GERALD HUNTER

**REDACTED**

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| Plaintiff | ) | |
| vs. | ) | Case No. CF-98-00128A |
| TERESA JORDAN | ) | CF-98-00346A |
| ▮ | ) | |
| | ) | |
| | ) | |
| SALLISAW, OK  74955 | ) | |
| Defendant | ) | |

SS#: ▮5710
DOB: ▮1965

*TEMP.*

Date: 02/12/99          State's Attorney: ROBBIE COWAN

Defendant's Attorney: GERALD HUNTER

RULE 8 HEARING

(Summary)

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 1 2 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____  $100.00 on or before 4-12-99  and then

_____  ~~$100.00 per month on or before~~ _____

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 4-12-99 _____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: *CF 98-128 = $1603.00*

*CF 98-346 = $2118.00*

TOTAL TO PAY $ *3721.00*

REDACTED

JOHN C. GARRETT
Judge of the District Court

Teresa Jordan
Defendant

*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 167**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

198

MERRILL BONDING COMPANY
210 EAST CHICKASAW
SALLISAW, OKLA. 74955

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 21 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

DATE:    February 21, 1997

To:      District Court - Sequoyah County

FROM:    Raymond Merrill - Executing Bail Bondsman

RE:      Varification of Responsiblity

This is to verify that Raymond Merrill, d/b/a Merrill Bonding Company, agrees to allow the $10,000.00 Bond in Misdemeanor - Case # CM-96-444, State v Charles Sanders, Also, Liable for Felony - Case # CF-97-9, State v Charles Sanders.

RAYMOND MERRILL - BAIL BONDSMAN

*Accepted and approved,*

*Feb 21, 1997*

*Dennis M. _____*
*Judge of the District Court*

199

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, OKLAHOMA
STATE OF OKLAHOMA

FILED
IN DISTRICT COURT
SEQUOYAH COUNTY, OKLAHOMA

JAN 21 1997

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

| State of Oklahoma | |
|---|---|
| Plaintiff | |
| vs. | No. CM 96-444 |
| Charles Sanders | |
| Defendants | |

## ORDER FOR HEARING

MISDEMEANOR DISPOSITION

having been   ~~( filed x set~~   reset )   in the above styled cause by the

( Court   ~~Plantiff x Defendant~~ ) _____

IT IS ORDERED that the same be, and is hereby, set for hearing before the undersigned,

Judge, _____ Hon. Dennis M. Sprouse _____, at **9:30 a.m.**,

on the __28th__ day of __February__, 19 __97__.

_____
Judge of the District Court

### CERTIFICATE OF SERVICE

I hereby certify that on the _____ 16 _____ day of _____ Jan _____, 19 __97__

I mailed a true, correct and exact copy of this Order to:

Charles Sanders
█████
Marble City, OK

Dist atty
120 E. Chickasaw
Sallisaw, OK

with proper postage thereon fully prepaid.

By _____
Clerk for Judge of the District Court

IN THE DISTRICT COURT SE   OYAH   COUNTY, OKLAHOMA
STATE OF OKLAHOMA,

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

                                    Plaintiff,

                    Vs                                      NOV 15 1996

*Charles Sanders*                    Defendant,        No. _____ CM-96-444

                                                       BERNELL EDWARDS, COURT CLERK
                                                       BY _____ DEPUTY

Know All Men By These Presents, That

that the above named defendant, as principal, and the undersigned bondsman, corporation and other signers as sur-
eties, jointly and severally acknowledge ourselves to owe and be indebted to the State of Oklahoma in the sum
of *ten thous* _____Dollars($ 10,000 )to be levied on our property, real and
personal, cash deposits and escrow deposits, wherever found, to the use of the State of Oklahoma.

The condition of this bond is such that if the above named defendant, now charged in the District Court of
_____ County, with the crime of *Possession of A Stolen Auto, etc* and admitted to bail in the
above stated sum, shall personally be and appear before the said Court, in the division to which said case   is
assigned, on the 20 day of *Nov 96*, an ordered for arraignment, preliminary hearing, trial
or judgment, and from day to day and term to term thereafter as ordered, or on the first day of the next   Jury
term of said Court. If so ordered, and from day to day and term to term thereafter as ordered by said Court and
not depart therefrom without leave, and shall do and receive what shall be enjoined upon him by said Court until
this case is finally determined, then this bond to be void, otherwise to be in full force and effect.

Principal(Defendant) *Charles Sanders*    Address *Rt 3 Box 55*

Surety_____     Address *Sallisaw, Okla*

Surety_____     Address_____

Surety-Licensed Bondsman   RAYMOND MERRILL   Office Address 210 E. Chickasaw
                                            Dated, filed and approved this Sallisaw, Okla.

Corporate Surety International Fidelity    day of 11-14          19 96
            Insurance Co.                   COURT CLERK, SHERIFF OR DISTRICT JUDGE

By_____          By_____
        Attorney-In-Fact                              Deputy

### AFFIDAVIT AS TO UNDERTAKING AND QUALIFICATIONS OF SURETY
(Required of all licensed bondsman, under penalty of perjury, 59OS; 1322:1120S-61-120.5.,-62)

STATE OF OKLAHOMA, COUNTY OF ___Sequoyah___ ,SS
The undersigned licensed bondsman, being duly sworn, on oath states:
that neither he or she, nor anyone for his or her use, has been promised or has received any surety or con-
sideration for his or her undertaking, except as stated herein.

Consideration received or promised$_____.
Surety received or promised:(List deeds or mortgages and describe personal property)

_____

_____

Such promise, security or consideration was received from:

_____

        NAME                              ADDRESS

That he or she is presently duly licensed, registered, and in all respects authorized by law to become surety
in this undertaking, 59 O.S., 1301 et seq.; 1101 et seq.; 12 O.S., 61et seq.; 220.S. 1320.
That he or she is worth double the sum to be secured, over and above all exemptions, debts and liabilities,
12 O.S.-1301et seq.; 220.S.. 1101 et seq.; 120.S. 61 et seq.
That he or she has not signed or countersigned this bond in blank, nor has he or she given power of attorney
to or otherwise, any person to countersign his or her name to this bond unless that person is a licensed bonds-
man directly employed by a bondsman giving such power of attorney, 59 O.S.-1316.
That he or she has attached hereunto all receipts for collateral accepted by him or her, fully described in
detail, 59 O.S. 1316; 590.S.;1322.
That he or she is authorized and legally capable, in all respects, to enter into this undertaking, both per-
sonally and on behalf of the corporate surety above named; and that this undertaking is within, and   does   not
the limitations and conditions of the power of attorney granted him or her by said corporate surety, all pursu-
ant to 590.S.; 1320.
That he or she is familiar with the provisions of Oklahoma Statute regarding the effects and defects,   omm-
issions and irregularities in such undertakings, 590.S.; 1326.
That all legal requirements of licensing, registration and certification have been met by this bondsman,
590.S.; 1320.
That the bondsman fully understands that will ful misstatement of any material fact herein my subject   him
or her to prosecution for perjury, and/or to proceedings seeking denial, suspension or revocation of the bonds-
man's license, 590.S. 1310.
That he or she is a resident of the County of ___Sequoyah___, State of Oklahoma.

                                            _____
                                                (Licensed Bondsman)

Before me, the undersigned, on this_____day of_____19_____, personally   appeared
_____, known to me to be the identical person who executed the within and
foregoing instrument, and acknowledged to me that he executed same as his free and voluntary act and deed.
Given under my sign and seal of office on the day and year written above, or signature witnessed by under-
signed.

                                            KATHY REED, COURT CLERK

_____          _____
        (Deputy)                                (Deputy Court Clerk)

201

**POWER OF ATTORNEY**

It is unlawful to print this form without written consent of home office.

TERNATIONAL FIDELITY INSURANCE COMPANY
Bond Department
One Newark Center, 20th Floor, Newark, New Jersey 07102

ower No. **ID- 141944**

THIS POWER OF ATTORNEY NULL AND VOID UNLESS USED BEFORE 12/31/96

KNOW ALL MEN BY THESE PRESENTS, that INTERNATIONAL FIDELITY INSURANCE CORPORATION, a corporation duly organized and existing under the laws of the State of New Jersey has constituted and appointed, and does hereby constitute and appoint,

its true and lawful attorney-in-fact, with full power and authority to sign the company's name and affix its corporate seal to, and deliver on its behalf as surety, any and all obligations as herein provided, and the execution of such obligations in pursuance of these presents shall be as binding upon the company as fully and to all intents and purposes as if done by the regularly elected officers of said company at its home office in their own proper person; and the said company hereby ratifies and confirms all and whatsoever its said attorney-in-fact may lawfully do and perform in the premises by virtue of these presents.

THIS POWER OF ATTORNEY IS VOID IF ALTERED OR ERASED. THE OBLIGATION OF THE COMPANY SHALL NOT EXCEED THE SUM OF ELEVEN THOUSAND DOLLARS ($11,000.00) AND MAY BE EXECUTED FOR RECOGNIZANCE ON CRIMINAL BAIL BONDS ONLY.

**NOT VALID FOR IMMIGRATION BONDS**

Bond Amt $ _10,000_  Case # _____

Defendant _Charles Sanders_

Appearance Date _11-20-96_  DIV _____

Court City _Dirt_

Court County _See_  State _Ohi_

Offense _____

Date Filed _11-14-96_

Atty in fact _____
SIGNATURE/If applicable add your COURT assigned Agent #

**\*NOTICE\***
STACKING OF POWER IS STRICTLY PROHIBITED!
No more than one power from this Surety may be used to execute any one bond.

IN WITNESS WHEREOF, said INTERNATIONAL FIDELITY INSURANCE COMPANY, by virtue of authority conferred by its Board of Directors, has caused these presents to be sealed with its corporate seal, signed by the Chairman of the Board and attested by its Secretary, this 2nd day of April, 1991.

Philip Konvitz, Chairman of the Board

Norman Konvitz, Secretary

1. A separate Power of Attorney must be attached to each bond executed
2. Powers of Attorney must not be returned to attorney-in-fact, but should remain a permanent part of court records.
3. The authority of such attorney-in-fact is limited to appearance bonds and cannot be construed to guarantee for failure to provide payments, back alimony payments, fines or wage law claims.

ENTER SURETY-ASSIGNED EXECUTING AGENT CODE # HERE:

1904

202

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED

NOV 2 0 1996

BERNELL EDWARD, COURT CLERK
BY _____ DEPUTY

State of Oklahoma,　　　　　)
　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　)
　　　　VS.　　　　　　　　　)　　　　　　CRM- 96-444
　　　　　　　　　　　　　　)
_Charles Sanders_　　　　　　)
　　　　　　　　　　　　　　)
_____ )
　　　　Defendant

## ORDER TO APPEAR FOR DISPOSITION

You are hereby ordered to appear the __6__ day of __Dec_____, 199_6_ at _____9:30_____ a__. M. You should report to the Court Clerk's office on the second floor of the Sequoyah County Courthouse in Sallisaw. You should report thirty minutes prior to your appearance time. **NO Further Notice Will Be Given.**

Dated this _20__ day of _November_____, 199_6_.

_____
Judge of the District Court

I understand I have been charged with a misdemeanor crime and must appear for a dispositional docket for the Court's review of my case. The purpose of the dispositional docket is to give me a chance to visit with an attorney from the District Attorney's Office. After the visit, if a plea bargain is reached, I may enter a plea of guilty in exchange for the state's recommendation. If no agreement is possible then I may request a jury trial.

Most Importantly I understand that my failure to appear at the date and time given above will result in the issuance of a warrant for my arrest and that my present bond will be forfeited.

_____
Defendant

KEEP THIS FOR YOUR RECORDS AS NO FURTHER NOTICE WILL BE GIVEN

White - Court's Copy

203

INFORMATION
============================================================================

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

| | |
|---|---|
| STATE OF OKLAHOMA  Plaintiff, | ) ) |
| vs. | ) No. CM-96-444 |
| CHARLES E. SANDERS | ) |
| DOB: ███/66    Defendant. | ) ) |

NOV 19 1996

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

I N F O R M A T I O N

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:**

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CHARLES E. SANDERS did, in Sequoyah County, and in the State of Oklahoma, on the 10th day of November, in the year of our Lord, One Thousand, Nine Hundred and Ninety-Six and before the presentment hereof, commit the crime of

COUNT I: ASSAULT AND BATTERY-(MISD) 21 O.S. 644

On the day and year in the County and State aforesaid, said CHARLES E. SANDERS did unlawfully, wilfully and wrongfully commit an assault and battery upon the person of one Donna Davis by then and there striking and beating her about the head and body with his hands and fists with force and violence and with the unlawful intent to do her corporal hurt and bodily injury,

COUNT II: PUBLIC INTOXICATION-(MISD) 37 O.S. 8

On the day and year in the County and State aforesaid, said CHARLES E. SANDERS did unlawfully, wilfully and wrongfully be drunk and intoxicated while being then and there in a public place, to-wit: North of Sallisaw

COUNT III: ESCAPE FROM LAWFUL CUSTODY-(MISD) 21 O.S. 444

CHARLES E. SANDERS did unlawfully, wilfully, and wrongfully after having been placed in lawful custody by Sheriff Deputy Kelly Karnes, did then and there depart lawful custody with the intent to unlawfully evade the due course of justice,

COUNT IV: RESISTING AN OFFICE-(MISD) 21 O.S. 268

That on the day and year, and in the County and State, aforesaid, CHARLES E. SANDERS, did wilfully, knowingly and wrongfully resist by the use of force and violence one Kelly Karnes, a Sequoyah County deputy, in the performance of his legal duty, to-wit: by bumping and said officer and pulling away from him, that the said defendant well knowing that the said Kelly Karnes, was an executive officer then and there performing his duty,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

DIANNE BARKER HARROLD
DISTRICT ATTORNEY

By _____
Assistant District Attorney

STATE OF OKLAHOMA )
                  ) ss.
COUNTY OF SEQUOYAH)

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____

Subscribed and sworn to before me this 19th day of November, 1996.

My Commission Expires:
____6/28/99____

_____
NOTARY PUBLIC

WITNESSES:
Kelly Karnes          Sequoyah County Sheriff Dept., Sallisaw, OK
Terry Mathis          Sequoyah County Sheriff Dept., Sallisaw, OK
Lelland Choate        Sequoyah County Sheriff Dept., Sallisaw, OK
Donna Davis           ██████████ Marble City, OK

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

REDACTED EXHIBIT 168

TO KENNETH EUGENE BARRETT'S

SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

205

**INFORMATION**

================================================================

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA            )
        Plaintiff,        )
vs.                         )        No. CRF-92-91
                  )
**CHARLES EDWARD SANDERS**     )
aka **CHARLES EDWARD MONK**    )
DOB: ███66                    )
        Defendant.         )

SEQUOYAH COUNTY, OKLAHOMA
F I L E D
IN DISTRICT COURT

MAY - 4 1992

KATHY REED, Court Clerk
By _____ Deputy

**I N F O R M A T I O N**

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:**

Now comes GREGORY N. COMBS, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that **Charles Edward Sanders, aka Charles Edward Monk** did, in Sequoyah County, and in the State of Oklahoma, on the 2nd day of May, in the year of our Lord, One Thousand, Nine Hundred and Ninety-Two and before the presentment hereof, commit the crime of

COUNT I: ATTEMPTING TO ELUDE AN OFFICER-(MISD) 21 O.S. 540 A
That on the day and year, and in the County and State, aforesaid, Charles Edward Sanders, aka Charles Edward Monk, did wilfully and wrongfully attempt to elude a Sallisaw Police Officer of Sequoyah County, while in the performance of his duty, in the following manner, to-wit: that the said defendant was then and there operating a motor vehicle on the public streets and roads of Sequoyah County, and had received a visual and audible signal by means of a red light and a siren from the said David Bethany, who was then and there driving a motor vehicle showing the same to be an official Sallisaw Police car, directing the said defendant to bring his vehicle to a stop, but that said defendant did then and there wilfully and wrongfully increase his speed in an attempt to elude said David Bethany,

COUNT II: UNLAWFUL POSSESSION OF PARAPHERNALIA-(MISD) 63 O.S. 2-405
On the day and year in the County and State aforesaid, said Charles Edward Sanders, aka Charles Edward Monk did unlawfully, wilfully and wrongfully have in his possession and under his control certain paraphernalia, to-wit: spoon, filters and part of a syringe, used to consume drugs classified as controlled dangerous substances under the Uniform Controlled Dangerous Substances Act of this State, and for the purpose and with the unlawful intent to administer such controlled dangerous substances without having any medical or other lawful need requiring possession of said paraphernalia,

COUNT III: DRIVING UNDER THE INFLUENCE OF INTOXICATING
LIQUOR- (MISD) 47 O.S.11-902
That on the day and year and in the County and State aforesaid, said Charles Edward Sanders, aka Charles Edward Monk, did wilfully, knowingly and wrongfully drive and operate a certain motor vehicle, to-wit: a 1992 Ford Pickup bearing 1992 Oklahoma license number AEE-588, in Sequoyah County, Oklahoma, to-wit: West Maple and Eppler Streets, City of Sallisaw, while under the influence of intoxicating liquor,

COUNT IV: UNLAWFUL POSSESSION OF MARIHUANA-(MISD) 63 O.S. 2-402
That on the day and year and in the county and state aforesaid, said Charles Edward Sanders, aka Charles Edward Monk, did unlawfully, wilfully, knowingly, intentionally and wrongfully have in his possession and under his control MARIHUANA, said drug being classified as a controlled dangerous substance in Schedule I (C) of the Uniform Controlled Dangerous Substances Act of this State,

COUNT V: UNLAWFUL POSSESSION OF CONTROLLED DRUG-
(FELONY) 63 O.S. 2-402 (B-1)

That on the day and year, and in the County and State, aforesaid, Charles Edward Sanders, aka Charles Edward Monk, did unlawfully, wilfully, knowingly, or intentionally and feloniously have in his possession and under his control METHAMPHETAMINE, said drug being classified as a controlled dangerous substance in Schedule II of the Uniform Controlled Dangerous Substances Act of this State,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

GREGORY N. COMBS
DISTRICT ATTORNEY

By_____
Assistant District Attorney

STATE OF OKLAHOMA )
) ss.
COUNTY OF SEQUOYAH)

I, DAVID BETHANY, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____

Subscribed and sworn to before me this _5th_ day of May, 1992.

My Commission Expires:
_____6/28/95_____

Graciela Hart Brumley
NOTARY PUBLIC

WITNESSES:

Aaron B. Johnson
David Bethany
Richard Crutchfield
OSBI Chemist

████████████████ Vian, OK
Sallisaw Police Dept., Sallisaw, OK
Sallisaw Police Dept., Sallisaw, OK
P.O. Box 767, Tahlequah, OK

SEQUOYAH COUNTY, OKLAHOMA
F I L E D
IN DISTRICT COURT

INFORMATION
Page 2

1992

KATHY RUTH, Clerk

| | |
|---|---|
| THE STATE OF OKLAHOMA,<br>             Plaintiff,<br><br>vs.<br><br>CHARLES EDWARD SANDERS<br>aka CHARLES EDWARD MONK,<br>          Defendant. | ) IN THE DISTRICT COURT OF<br>) SEQUOYAH COUNTY, STATE<br>)  OF OKLAHOMA<br>) CASE NO. CRF-92-91   AFCF<br>)<br>)<br>)<br>) |

## FORMER CONVICTIONS

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same Charles Edward Sanders, aka Charles Edward Monk, was heretofore on the 11th day of December, 1984, in Case No. 86-604-B, in the Circuit Court of Sebastian County, State of Arkansas, a court of competent jurisdiction, convicted of the crimes of DELIVERY OF MARIHUANA and DELIVERY OF AMPHETAMINES, said defendant Charles Edward Sanders, aka Charles Edward Monk, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

GREG COMBS, DISTRICT ATTORNEY

BY: _____
    Assistant District Attorney

208

Please call the District Attorney's
Office the day prior to hearing to
confirm the Court date. 18/775-9131

## SUBPOENA - - - Criminal Action

STATE OF OKLAHOMA,
Sequoyah County, } SS:    IN DISTRICT COURT    CASE No.  CRM-_____
CRF -92-91

In the Name of the State of Oklahoma

To  David Bethany, Sallisaw Police Department, Sallisaw, OK _____

_____

_____, GREETING:

YOU ARE COMMANDED to appear before the District Court of the County of Sequoyah, at the Court House in Sallisaw, State of Oklahoma, on the ____2nd____ day of ____June____, 19_92_ at the hour of __2:00__ o'clock in the ___after___ noon of said day, and remain in attendance on call of said court from day to day and term to term until lawfully discharged, as a witness in a criminal action prosecuted by the State of Oklahoma, against Charles Edward Sanders on behalf of the State of Oklahoma (Preliminary Hearing)

Dated at Sallisaw, in said Sequoyah County, the _20th_ day of _____May_____, 19_92_

Hereof fail not, under penalty of law.

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 21 1992

KATHY REED, Court Clerk
By_____Deputy

**KATHY REED, Court Clerk**

By _Bernell Edwards_

Deputy

Case 6:09-cv-00105-JHP Document 125-2 Filed 02/18/10 Page 5 of 32

Case 6:09-cv-00105-JHP   Document 125-2   Filed 02/18/10   Page 6 of 32

# OFFICER'S RETURN

Received this writ this _20th_ day of _May_ 19_92_, served the same delivering a copy thereof with the endorsement thereon to the within named _David Bethany_

_____ the _20th_ day of _May_, 19_92_

and _____

_____ the _____ day of _____, 19 _____

by leaving a copy thereof with the endorsement thereon with a number of _____ family over 15 years

of age, at usual place of residence of _____

_____ the _____ day of _____, 19 _____

I cannot find the within named _____

_____ in my County.

By _____    _____    _____
**Deputy.**         **Under Sheriff.**         **Sheriff.**

CASE No.  CRM–_____  CRF–_____

IN DISTRICT COURT

THE STATE OF OKLAHOMA

_____ Plaintiff.

vs.

_____ Defendant.

SUBPOENA–Criminal Action

_____ 19 _____

Filed _____ Court Clerk.

_____ Deputy.

_____ Attorney.

SHERIFF'S FEES

Serving subpoena, first person $ _____

Serving subpoena other person $ _____

_____ cop _____ of subpoena

Mileage _____ Miles

Not found _____

Total $ _____

By _____ Sheriff

By _____, Under Sheriff

_____, Deputy

SEQUOYAH COUNTY, OKLAHOMA
**FILED**
IN DISTRICT COURT

JUN - 2 1992

KATHY REED, Court Clerk
By_____Deputy

|  |  |  |
|---|---|---|
| GREGORY N. COMBS<br>DISTRICT ATTORNEY | STATE OF OKLAHOMA<br>OFFICE OF THE DISTRICT ATTORNEY<br>DISTRICT 27 | SEQUOYAH COUNTY<br>120 E. Chickasaw<br>Sallisaw, OK 74955<br>(918) 775-9131 |

NOTICE

ATTORNEY:   MIKE DAFFIN            DEFENDANT   CHARLES EDMOND SANDERS

Case No.   CRF-92-91

(X)  O.S.B.I. Laboratory Report No. 92-4019
( )  Medical Examiner's Report of Investigation
( )  Medical Examiner's Report of Autopsy
( )  Oklahoma Forensic Laboratory Report

The State of Oklahoma intends to offer the report checked above at the preliminary hearing of the above-named defendant(s).  A copy is attached and made available to the accused pursuant to 22 O.S. section 751.

_____
Assistant District Attorney

CERTIFICATE OF MAILING

I hereby certify that on this  2nd   day of    June       , 1992, I mailed a certified copy of Lab Report # 92-4019         in State of Oklahoma vs  Charles Edmond Sanders                                                ,
Case number CRF -92 - 91       to:

Mike Daffin
Attorney at Law
P.O. Box 1461
Sallisaw, OK 74955

attorney(s) for the defendant(s) herein, with sufficient postae prepaid thereon.

_____



SEQUOYAH COUNTY, OKLAHOMA
F I L E D
IN DISTRICT COURT

JUN – 5 1992

KATHY REED, Court Clerk
By_____Deputy

**GREGORY N. COMBS**
DISTRICT ATTORNEY

STATE OF OKLAHOMA
## OFFICE OF THE DISTRICT ATTORNEY
DISTRICT 27

SEQUOYAH COUNTY
120 E. Chickasaw
Sallisaw, OK 74955
(918) 775-9131

NOTICE

ATTORNEY:   MIKE DAFFIN

DEFENDANT   CHARLES EDMOND SANDERS

Case No.   CRF-92-91

(X)  O.S.B.I. Laboratory Report No. 92-4019
( )  Medical Examiner's Report of Investigation
( )  Medical Examiner's Report of Autopsy
( )  Oklahoma Forensic Laboratory Report

The State of Oklahoma intends to offer the report checked above at the preliminary hearing of the above-named defendant(s). A copy is attached and made available to the accused pursuant to 22 O.S. section 751.

Assistant District Attorney

CERTIFICATE OF MAILING

I hereby certify that on this 5th day of June, 1992, I mailed a certified copy of Lab Report # 92-4019 in State of Oklahoma vs Charles Edmond Sanders,

Case number CRF - 92 - 91 to:

Mike Daffin
Attorney at Law
P.O. Box 1461
Sallisaw, OK 74955

attorney(s) for the defendant(s) herein, with sufficient postae prepaid thereon.

212

577

*Smith-Ringgold Bonding Co*

SEQUOYAH COUNTY, OKLAHOMA
IN DISTRICT COURT

MAY - 8 1992

KATHY REED, Court Clerk

By_____ JB _____Deputy

APPEARANCE BOND-DISTRICT COURT

IN THE DISTRICT COURT *Sequoyah* COUNTY, OKLAHOMA
STATE OF OKLAHOMA,

Plaintiff,

vs

Charles E. (Monk) Sanders Defendant,

No. CY 92-91

Know All Men By These Presents, That

we the above named defendant, as principal, and the undersigned bondsman, corporation and other signers as sureties, jointly and severally acknowledge ourselves to owe and be indebted to the State of Oklahoma in the sum of *Five Thousand & No/100* Dollars($ 5,000.00 )to be levied on our property, real and personal, cash deposits and escrow deposits, wherever found, to the use of the State of Oklahoma.

The condition of this bond is such that if the above named defendant, now charged in the District Court of *Sequoyah* County, with the crime of *Dist Poss CDS W/ or w/o & admitted to bail in the Drug etc & Attempting to Elude* above stated sum, shall personally be and appear before the said Court, in the division to which said case is assigned, on the 2 day of *June* 19 92, as ordered for arraignment, preliminary hearing, trial or judgment, and from day to day and term to term thereafter as ordered, or on the first day of the next jury term of said Court, if so ordered, and from day to day and term to term thereafter as ordered by said Court and not depart therefrom without leave, and shall do and receive what shall be enjoined upon him by said Court until this case is finally determined, then this bond to be void, otherwise to be in full force and effect.

Principal(Defendant) _____    Address ████████████ *Sallisaw OK*

Surety _____    Address _____

Surety *Charles E Smith Co*    Address ████████████ *Sallisaw OK*

Surety-Licensed Bondsman *Marty Cogg*    Office Address *P.O. Box 824, Sallisaw OK*

Dated, filed and approved this ___ 6 ___

Corporate Surety _____    day of *May* 19 92

COURT CLERK, SHERIFF OR DISTRICT JUDGE

By _____    By *Jennie Clabourn*

Attorney-in-Fact    Deputy

AFFIDAVIT AS TO UNDERTAKING AND QUALIFICATIONS OF SURETY

(Required of all licensed bondsmen, under penalty of perjury, 590S; 1322:120S-61-120.S.,-62)

STATE OF OKLAHOMA, COUNTY OF *Sequoyah* SS

The undersigned licensed bondsman, being duly sworn, on oath states:

That neither he or she, nor anyone for his or her use, has been promised or has received any surety or consideration for his or her undertaking, except as stated herein.

Consideration received or promised$ *700.00* .

Surety received or promised:(List deeds or mortgages and describe personal property)

*Promissory Note & Indemnity Agreement*

Such promise, security of consideration was received from: ████████████ *Vian OK*

*Laurie A Brown*
NAME    ADDRESS

5/8/92

That he or she is presently duly licensed, registered, and in all respects authorized by law to become surety in this undertaking, 59 O.S., 1301 et seq.; 1101 et seq.; 12 O.S., 61et seq.; 220.S. 1320.

That he or she is worth double the sum to be secured, over and above all exemptions, debts and liabilities, 12 O.S.-1301et seq.; 220.S.. 1101 et seq.; 120.S. 61 et seq.

That he or she has not signed or countersigned this bond in blank, nor has he or she given power of attorney to or otherwise, any person to countersign his or her name to this bond unless that person is a licensed bondsman directly employed by a bondsman giving such power of attorney, 59 O.S.-1316.

That he or she has attached hereunto all receipts for collateral accepted by him or her, fully described in detail, 59 O.S. 1314; 590.S.;1322.

That he or she is authorized and legally capable, in all respects, to enter into this undertaking, both personally and on behalf of the corporate surety above named; and that this undertaking is within, and does not the limitations and conditions of the power of attorney granted him or her by said corporate surety, all pursuant to 590.S.; 1320.

That he or she is familiar with the provisions of Oklahoma Statute regarding the effects and defects, ommissions and irregularities in such undertakings, 590.S.; 1326.

That all legal requirements of licensing, registration and certification have been met by this bondsman, 590.S.; 1320.

That the bondsman fully understands that will ful misstatement of any material fact herein my subject him or her to prosecution for perjury, and/or to proceedings seeking denial, suspension or revocation of the bondsman's license, 590.S. 1310.

That he or she is a resident of the County of *Sequoyah*, State of Oklahoma.

*Marty Cogg*
(Licensed Bondsman)

Before me, the undersigned, on this_____day of_____19_____, personally appeared

_____, known to me to be the identical person who executed the within and foregoing instrument, and acknowledged to me that he executed same as his free and voluntary act and deed. Given under my sign and seal of office on the day and year written above, or signature witnessed by undersigned.

_____    _____
Sheriff    Court Clerk

213

107 E. Creek                   **POWER OF ATTORNEY**                    Sallisaw, OK 74955
Sallisaw, OK 74955        Cha    з E. Smith, Professional Bondsmar

$5,500.00 POWER LIMIT              C.E.I. № **210407**

KNOW ALL MEN BY THESE PRESENTS:

That I, Charles E. Smith, of Sallisaw, Sequoyah County, State of Oklahoma, have made and constituted and appointed by these presents do make, constitute and appoint the below named agent, my true and lawful attorney, for me and in my name, place and stead, and to my use as my employee and agent to write professional bonds, to sign my name, by him, in the execution of any and all bonds made as my agent, giving my said attorney full power to do everything whatsoever requisite and necessary to be done in the premises as fully as I could do if personally present, hereby ratifying and confirming all that my said attorney shall lawfully do, or cause to be done, by virtue hereof.  All this provided this Power-Of-Attorney is filed with the bond and retained as a part of the court records, the said Attorney-In-Fact is hereby authorized to insert in this Power-Of Attorney the name of the person whose behalf this bond was given.

IN WITNESS THEREOF, Charles E. Smith, mas caused these presents to be signed by its duly authorized officer, proper for the purpose this ___6___ day of _May_ 19_97_.

$5,500.00 POWER LIMIT

Charles E. Smith, Professional Bondsman
SMITH-RINGGOLD BAIL BONDS

Bond Amount $ _5,000.00_                Appearance Date _June 2_

Defendant _Charles E. (Monk) Sanders_  Address _____

Court _Sequoyah District_              City _Sallisaw_   State _OK._

Offense _Dist Poss of CDS AFCF Poss of Marij AFCF a_ ... _Attempting to Elude_

Executing Agent _Marty Nagy_

214

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
**F I L E D**
IN DISTRICT COURT

JUN – 4 1992

**KATHY REED, Court Clerk**

By_____Deputy

STATE OF OKLAHOMA

Plaintiff

vs.

Charles Sanders

Defendants

No. CRF 89 396
90 144
92 91

NOTICE TO DEFENDANTS

PRELIMINARY HEARING AND APPLICATION TO REVOKE

having been   ( filedxxset   reset )                    in the above styled cause by the

( Courtx&xxxx-  Defendant ), and you are hereby ORDERED TO APPEAR in the District Court of Sequoyah County, State of Oklahoma, for such hearing in the above entitled cause before the undersigned,

Judge, _____Hon. Dennis M. Sprouse_____, at \_10:30 a.m.

on the \_20th\_ day of \_\_July\_\_, 19\_92\_, and remain until discharged by the Court.

_____
Judge of the District Court

CERTIFICATE OF SERVICE

I hereby certify that on the \_\_\_3\_\_\_ day of \_\_June\_\_, 19\_92\_ I mailed a true, correct and exact copy of this Order to:

Mike Daffin
Box 1461
Sallisaw, OK

Dist atty
Co courthouse
Sallisaw, OK

with proper postage thereon fully prepaid.

By _____
Clerk for Judge of the District Court

215

**SUBPOENA - - - Criminal Action**    SEQUOYAH COUNTY, OKLAHOMA

FILED

IN DISTRICT COURT

| STATE OF OKLAHOMA, ⎫ SS: | IN DISTRICT COURT | CASE No. | CRM– |
|---|---|---|---|

JUL 20 1992

KATHY REED, Court Clerk

By_____Deputy

CRF – 89-396

CRF – 90-144

CRF – 92-91

In the Name of the State of Oklahoma

To   AARON B. JOHNSON, HCR-68, Box 400, Vian, OK; DAVID BETHENY, Sallisaw Police Dept.; RICHARD CRUTCHFIELD, Sallisaw Police Dept.; LORETTA HONEYCUTT, DOC, Sallisaw, OK;

_____, GREETING:

YOU ARE COMMANDED to appear before the District Court of the County of Sequoyah, at the Court House in Sallisaw, State of Oklahoma, on the _____20th_____ day of ___July___, 19_92_ at the hour of ___10:30___ o'clock in the ___fore___ noon of said day, and remain in attendance on call of said court from day to day and term to term until lawfully discharged, as a witness in a criminal action prosecuted by the State of Oklahoma, against CHARLES EDWARD SANDERS _____ on behalf of the ____Defendant____

a/k/a Charls Edward Monk Sanders

Dated at Sallisaw, in said Sequoyah County, the __15th_ day of ____July____, 19_92_

Hereof fail not, under penalty of law.

KATHY REED, Court Clerk

By _____

                                                                   Deputy

---

Please call the District Attorney's Office the day prior to hearing to confirm the Court date. 9__/775-9131

**SUBPOENA - - - Criminal Action**

SEQUOYAH COUNTY, OKLAHOMA

FILED

IN DISTRICT COURT

| STATE OF OKLAHOMA, ⎫ SS: | IN DISTRICT COURT | CASE No. | CRM– |
|---|---|---|---|

JUL – 7 1992

KATHY REED, Court Clerk

By_____Deputy

CRF – 92-91

In the Name of the State of Oklahoma

To   David Bethany, Sallisaw Police Department, Sallisaw, OK

_____, GREETING:

YOU ARE COMMANDED to appear before the District Court of the County of Sequoyah, at the Court House in Sallisaw, State of Oklahoma, on the _____20th_____ day of ___July___, 19_92_ at the hour of ___10:30___ o'clock in the ___fore___ noon of said day, and remain in attendance on call of said court from day to day and term to term until lawfully discharged, as a witness in a criminal action prosecuted by the State of Oklahoma, against ___Charles Edward Sanders___ on behalf of the ___State of Oklahoma (Preliminary Hearing)___

Dated at Sallisaw, in said Sequoyah County, the _30th_ day of ___June___, 19_92_

Hereof fail not, under penalty of law.

KATHY REED, Court Clerk

By _____

                                                                   Deputy

**OFFICER'S RETURN**

Received this writ this _15th_ day of _July_ 19 _92_, served the same delivering a copy thereof with the endorsement thereon to the within named _David Bethany, Richard Crutchfield, Loretta Honeycutt_ the _15th_ day of _July_, 19 _92_

and _____ the _____ day of _____, 19 ____

by leaving a copy thereof with the endorsement thereon with a number of _____ family over 15 years of age, at usual place of residence of _____ the _____ day of _____, 19 ____

I cannot find the within named _____ _____ in my County.

By _____ Deputy.    _____ Under Sheriff.    _____ Sheriff.

CASE No. CRM—
CRF—

IN DISTRICT COURT

THE STATE OF OKLAHOMA

Plaintiff.

vs.

Defendant.

SUBPOENA—Criminal Action

Filed _____ 19 ____

Court Clerk.

Deputy.

Attorney.

SHERIFF'S FEES

Serving subpoena, first person $ _____
Serving subpoena other person $ _____
cop _____ of subpoena
Mileage _____ Miles
Not found _____
Total _____ $

_____, Sheriff
_____, Under Sheriff
By _____
By _____, Deputy

---

**OFFICER'S RETURN**

Received this writ this _30th_ day of _June_ 19 _92_, served the same delivering a copy thereof with the endorsement thereon to the within named _David Bethany_ the _6th_ day of _July_, 19 _92_

and _____ the _____ day of _____, 19 ____

by leaving a copy thereof with the endorsement thereon with a number of _____ family over 15 years of age, at usual place of residence of _____ the _____ day of _____, 19 ____

I cannot find the within named _____ _____ in my County.

By _____ Deputy.    _____ Under Sheriff.    _____ Sheriff.

CASE No. CRM—
CRF—

IN DISTRICT COURT

THE STATE OF OKLAHOMA

Plaintiff.

vs.

Defendant.

SUBPOENA—Criminal Action

Filed _____ 19 ____

Court Clerk.

Deputy.

Attorney.

SHERIFF'S FEES

Serving subpoena, first person $ _____
Serving subpoena other person $ _____
cop _____ of subpoena
Mileage _____ Miles
Not found _____
Total _____ $

_____, Sheriff
_____, Under Sheriff
By _____
By _____, Deputy

217

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

THE STATE OF OKLAHOMA

vs

Case No. CRF-92-91

Charles   Edmond   "Monk"  Sanders
DOB ████ 66                   Defendant

SEQUOYAH COUNTY, OKLAHOMA
F I L E D
IN DISTRICT COURT

JUL 2 1 1992

KATHY REED, Court Clerk
By____JB_____Deputy

**PLEA OF GUILTY: SUMMARY OF FACTS**

WAIVER OF REPORTER:

   I hereby waive the making of a shorthand record of the hereinafter proceedings, waive the presence of a court reporter, and consent that this "SUMMARY OF FACTS" may be used as the record of these preceedings.

_____, DEFENDANT

1. Is the name just read to you your true name? YES Y    NO____

2. How old are you now?  _26_ years of age

3. Have you taken any medication, alcoholic beverages, drugs or done anything that would effect your mind here today? YES____  NO X  If YES, what kind and when did you take it?_____

4. Do you believe you are mentally competent to appreciate and understand the nature, purpose and consequences of these proceedings? YES X  NO____ If NO, explain
_____

5. You have an absolute right to be represented by an attorney during these proceedings. If you are without means to employ an attorney the Court will appoint one for you at the States expense. Do you understand that? YES X  NO____

6. You have an absolute right to represent yourself if you choose, do you understand that? YES X  NO____

7. Do you want to waive assistance of counsel and represent yourself here today? YES____  NO X

8. Have you received a copy of the Information YES X  NO____ and do you know you are charged with: Poss. C.D.S. (Cocaine), Marijuana, D.U.I.

9. Do you understand that the law presumes you are innocent of the crime charged in the Information? YES X  NO____

10. Do you understand that a plea of not guilty requires the State to prove each and every material allegation of the Information to the satisfaction of a Jury, or the Court when a Jury is waived; beyond a reasonable doubt, and if the State is not able to meet that burden, you will not be convicted? YES X  NO____

11. Do you know that the maximum punishment provided for the crime now charged is imprisonment in the County Jail for 20 years, one year & one year and a fine of $ 22,000 ?

12. Do you understand that by pleading guilty you may be sentenced to a term of imprisonment within these limits? YES X  NO____

13. Do you understand that you are entitled to a speedy jury trial on this charge, to confront all witnesses who testify against you at the trial and that you cannot be forced to testify against yourself? YES X  NO____

14. Do you understand that by entering a plea of guilty you waive your right to jury trial waive your right to confront witnesses, and waive your privilege against self-incrimination? YES X  NO____

218

15. Do you understand you have the right to enter or maintain a plea of not guilty and in doing so you could exercise all the rights explained herein?  YES__X__    NO_____

16. Do you want a jury trial?  YES____    NO_X__

17. Do you understand that on conviction of Driving Under the Influence, your drivers license will be revoked for no less than six months?
    YES__X__    NO_____    NOT APPLICABLE_____

18. Do you understand that upon conviction or plea of guilty to this charge, any later such offense of DRIVING UNDER THE INFLUENCE will be filed as a felony, and that punishment for a second conviction would be imprisonment in the State Penitentiary for a term of not less than one (1) year nor more than five (5) years?
    YES__X__    NO_____    NOT APPLICABLE_____

19. Do you understand that upon conviction or plea of guilty to this charge, any later such offense of POSSESSION OF MARIJUANA will be filed as a felony, and that punishment for a second conviction would be imprisonment in the State Penitentiary for a term of not less than two (2) years nor more than ten (10) years?
    YES__X__    NO_____    NOT APPLICABLE_____

20. Do you fully understand your rights and options in this matter?  YES__X__    NO_____

21. Do you wish to enter your plea now and be sentenced now?  YES__X__    NO_____

22. What is your plea to the charge?  GUILTY__X__    NOT GUILTY_____    NOLO CONTENDRE_____

23. Do you plea guilty of your own free will, without any coercion or compulsion of any kind and only for the sole reason that you are guilty, and you admit you did the acts charged?  YES__X__    NO_____

24. Explain to the Court how you committed the crime._____

    _____

    _____

    _____

25. Have you been abused, mistreated, threatened or promised anything by anyone, to have you enter this plea?  YES_____    NO__X__    If YES, explain_____

    _____

26. Recommendation for Sentence by District Attorney's Office:_____
    Three years in and seven years out (all counts run concurrently),$152 Court costs & $150 O.S.B.I. fees. Def. to report to S.O. When called to be transported and time to start when arrives at D.O.C. (One year each on Misd.s).

27. FINDING:  The Court finds the defendant was mentally competent to appreciate and understand the acts he committed on or about the date alleged in the Information, and to realize the nature, purpose and consequences of those acts at the time they were committed.  The Court further finds the plea of guilty entered herein has been knowingly and voluntarily entered. The Court further finds that the defendant has knowingly and voluntarily waived presence and assistance of counsel in this matter.

28. Do you have anything more to say, or do you know of any reason why you should not be sentenced now?  YES_____    NO__X__    If YES, explain_____

    _____

29. Memorandum of Sentence:___Same as 26_____

    _____

    _____

    _____

30. The Court at this time will advise the defendant of his right to appeal.  You may within the next then (10) days make a motion to withdraw your plea of guilty and request a hearing of your motion.  The Court will hold that hearing within thirty (30) days of today.  The Court may or may not allow you to withdraw your plea of guilty.  If the Court allows such motion your case will be set for jury trial. If it does not allow that motion you may appeal that decision to the Court of Criminal Appeals.  That is done by filing a petition for writ of certiorari within ninety (90) days of today and by serving a copy of the petition on the Attorney General of the State and the District Attorney of the County within five (5) days of filing.  The Court of Criminal Appeals may or may not hear your appeal and if they do they may or may not allow you to withdraw your plea of guilty.  Do you understand your right of an appeal?  YES _X_    NO _____

31. Terms for either a suspended or deferred sentence are as follows:
You are not to violate any City, State or Federal Laws.
You are not to fail to pay the fine and court cost as imposed by this Court in the required sum of money each month to the Court Clerk.
You are not to fail to make restitution of _____
OTHER: _____

A VIOLATION OF THE ABOVE TERMS WILL RESULT IN THE REVOCATION OF YOUR SENTENCE.

32. Do you fully understand the terms of your suspended/deferred sentence, as just read to you and set forth herein and do you agree to abide by and obey these rules during your suspended/deferred sentence, so long as the same is in force?  YES _X_    NO _____

33. The defendant advises the Court that he/she is unable to pay the monies due the Court assessed this date, the defendant does admit to the Court that he/she has the ability to pay the monies due the Court as assessed if given _____ to do so.  The Court therefore grants the defendant's request and orders that the monies be paid in the following manner_____

_____.

34. Have you fully understood the questions that have just been asked you and the answers you have given to each question,  and are they your free and voluntary answers to these questions as asked and without any compulsion or coercion of any kind?  YES _X_    NO _____

ABOVE DONE IN OPEN COURT this _20th_ day of _July_ , 19_____ .

_____
ASSISTANT DISTRICT ATTORNEY

_____
JUDGE OF THE DISTRICT COURT

_____
ATTORNEY FOR DEFENDANT

I, the defendant, have read the above and foregoing "SUMMARY OF FACTS" and it is a full and true statement of the questions asked and my answers to them.  I approve this "SUMMARY OF FACTS" and do not desire to change it or add anything to it.

_____
DEFENDANT

In the District Court of Sequoyah County
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 21 1992

KATHY REED, Court Clerk

RULES AND CONDITIONS OF PROBATION By Deputy

| Defendant | Charles Edmond Sanders |
| --- | --- |
| Case No. | CRF-92-91 |
| Date | July 20, 1992 |

1. I will at the end of each month, until my final release, make a written report as directed. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general statement of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind; nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside, or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I hereby agree not to marry without consulting and discussing the proposed marriage with the Probation and Parole Officer.

7. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

8. I understand that it will be a violation of my Probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or a representative thereof.

9. I understand that I must support myself and all my dependents without public assistance so long as I am physically able to do so; failure to do my full duty to my dependent shall constitute grounds for revocation of my Parole, Probation, or Conditional Release.

10. I will refrain from violation of any City, State or Federal law.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. SPECIAL CONDITIONS: The defendant is to pay probation fees of $20 per month as well as the total fees of: (court costs, court-appointed attorney fees, lab fees and restitution) of $ 302  within 10  months at a rate of not less than $ 30  per month. Payments are to begin on the 5th day of *  199*  and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. (Set out how the money is to be distributed).
Court costs of $152 and $150 O.S.B.I. lab fees.
*starting the 5th day of the 2nd month after release from incarceration.
Defendant to report to S.O. when called and to be transported to D.O.C.-Time to start when actually reports into D.O.C. custody.
I distinctly understand and agree that the continuance of my probation depends entirely on my conduct. That I must obey the laws of any City, State and the United States, wherever I may be, and that I must be an upright and lawabiding citizen and must shun evil associates, association and places. I understand that should I violate the terms and conditions of my probation, that the Court will revoke my suspended sentence and that I will be required to serve imprisonment of the sentence imposed by the Court.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision.

IN THE PRESENCE OF:

_____
Attorney For Defendant

_____
Probationer-Defendant

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY

STATE OF OKLAHOMA

STATE OF OKLAHOMA,
                                   PLAINTIFF,

VS.

Charles  Edmond  Sanders
_____,
                                   DEFENDANT.

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 2 1 1992

KATHY REED, Court Clerk
By_____Deputy

CASE NO. CRF-92-91

## WAIVER OF PRELIMINARY HEARING

Comes now on this 20th day of July      19 92  the above style case comes on for preliminary hearing.  The defendant appears in person and represented by his attorney of record  Mike Daffin , the State of Oklahoma appears by its Assistant District Attorney. Thereupon the defendant herein acknowledges that he has been advised of his rights to a preliminary hearing.  That in said hearing the State of Oklahoma must prove to the satisifaction of the Court that the crime as alleged in the information was, in fact, committed and that there is probable cause to believe that the defendant committed said crime.  That if said a burdon was not met then the case would be dismissed and the bond exonerated.

The defendant is further advised that at said hearing that he has the right to cross examine any of the State's witnesses and to call witnesses on his own behalf. And further, the defendant is advised that he has the right at the hearing to limited discovery of the State's case in chief.

Having these rights in mind, the defendant herein, waives all the above rights with respect to a preliminary hearing in this matter.

_____
DEFENDANT

_____
ATTORNEY FOR THE DEFENDANT

## COURT MINUTE OF PRELIMINARY HEARING

The defendant in the above style case having knowingly and intelligently waived his rights to the preliminary hearing and there being no objection by the State of Oklahoma, the Court accepts the defendant's waiver and hereby binds the defendant over to stand trial in the District Court of Sequoyah County, State of Oklahoma on the charges as set out in the information as filed in this case.

_____
JUDGE OF THE DISTRICT COURT

222

SEQUOYAH COUNTY, OKLAHOMA
**FILED**
IN DISTRICT COURT

JUL 2 1 1992

KATHY REED, Court Clerk

By_____7/b_____Deputy

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                    )
                    Plaintiff.        )
                                      )
.vs.                                  )        NO.   CRF-92-91
                                      )
                                      )
Charles Edmond Sanders                )
                    Defendant.        )

## WAIVER OF RIGHT TO PRESENTENCE INVESTIGATION

I, the defendant above named, have been advised by Judge  D.M. Sprouse_____, that pursuant to 57 O.S. 1971, Section 519, as amended, that whenever a person is convicted of a felony, except where the death sentence is imposed, the Court shall, before imposing sentence to commit any felony to incarceration by the Department of Corrections, order a presentence investigation to be made by the Division of Probation and Parole of the Department of Corrections. I have further been advised by the Court that the Division is required to inquire into the circumstances of the offense, the criminal record, social history, and present conditions of the convicted person; and further, that there shall be made a report of such investigation to the Court, including a recommendation for or against probation, and that such report shall be prepared within a reasonable time.  I have further been advised that whenever, in the opinion of the Court, that the same is desirable, the investigation shall also include a physical and/or mental examination of the committed person and that such report shall be confidential with the Judge making the request, except that the factual aspects of it may be reviewed by the District Attorney of the defendant within the discretion of the Judge.

I, the undersigned defendant, understand that I do have the right to have a presentence investigation in my case and that one will be made unless I voluntarily waive the same.  With full knowledge of my rights, I hereby waive and give up my right to the presentence investigation and state that I am doing so with knowledge of my rights and with the advice of my attorney.

Executed in open court this 20th day of _July_____, 1992.

_____
DEFENDANT

I am the attorney of record for the defendant in the above entitled case and do hereby state that I have fully advised my client, the defendant, as to his right to a presentence investigation and in my opinion he has understood my advice and voluntarily executed the within Waiver of that right and that this was also done upon my advice.

_____
ATTORNEY FOR DEFENDANT

223

950

**IN THE DISTRICT COURT OF THE 16TH JUDICIAL DISTRICT**
**OF THE STATE OF OKLAHOMA**
**SITTING IN AND FOR Sequoyah COUNTY, OKLAHOMA**

SEQUOYAH COUNTY, OKLAHOMA
**F I L E D**
IN DISTRICT COURT

OCT 30 1992

THE STATE OF OKLAHOMA,                    Plaintiff

vs

Charles Edmond "Monk" SANDERS
DOB: [ ]-66 ---------------------- Defendant,

No. CRF-92-9

KATHY REED, Court Clerk

By_____Deputy

Count Five

Counts I & II are dismissed.

**JUDGMENT AND SENTENCE ON PLEA OF GUILTY**
**FELONY**
(Part Suspended—22 OSA 991a Sec. 1)

Now, on this 20th day of July, 1992, the same being a juridical day of said court, and the time appointed for judgment and sentence in the above entitled cause, the defendant Charles Edmond "Monk" Sanders being personally present in open court, and being represented by his attorney of record Mike Daffin, and the State of Oklahoma being represented by its Assistant District Attorney T. Scott Hickman

The defendant having been legally charged by Information filed in this case with a criminal offense and having been duly arraigned thereon; the said defendant, after consulting with his attorney, personally entered his plea of guilty to the crime of Unlawful Possession of C.D.S. (Cocaine) AFCF charged in said Information. 63 O.S.2-402 (B-1) 21 O.S 51

The Court prior to accepting said plea informed the defendant of his Constitutional rights, including his right to trial by jury, his right to be confronted by his accusers and his right to his privilege against compulsory self-incrimination; and in response to questioning by the Court, the defendant said that he understood his Constitutional rights and that he waived each of them, and persisted in his plea of guilty. The Court further informed the defendant of the minimum and maximum penalty provided by law for the aforesaid offense, and the effect of such plea; and after being further interrogated by the Court the defendant stated that he is guilty of said crime and that his plea of guilty is voluntary and is made by him without inducement or coercion.

The Court thereupon accepted the defendant's plea of guilty to the aforesaid crime; and the defendant having been asked by the Court whether he had any legal cause to show why judgment and sentence should not now be pronounced against him, and he stating no such sufficient cause, and none appearing to the Court;

IT IS THE JUDGMENT OF THE COURT that the defendant Charles Edmond Sanders

is guilty of the crime of Unlawful Possession of C.D.S. (Cocaine) A.F.C.F.

IT IS THEREFORE ORDERED AND ADJUDGED BY THE COURT that the said Charles Edmond "Monk" Sanders be committed to the custody of

the STATE DEPARTMENT OF CORRECTIONS at the STATE PENITENTIARY at McAlester, Oklahoma, for a term of ten (10) years, said term of sentence to begin at and from the delivery of the defendant to the Warden of said Penitentiary.

IT IS FURTHER ORDERED AND ADJUDGED that the said defendant pay a FINE of Dollars ($ none ) and the cost of this prosecution taxed at $ 302, for which judgment is hereby rendered against the defendant, and if said fine and cost be not paid prior thereto, It is Further Ordered that upon his release from said penitentiary, the Sheriff of Sequoyah County take said defendant into custody and detain him in the Sequoyah County Jail until said fine and costs are paid or satisfied as provided by law.

IT IS FURTHER ORDERED THAT SAID DEFENDANT serve 1,095 days of the sentence in the State Penitentiary at McAlester, Oklahoma, and that the balance of his sentence be, and the same hereby is SUSPENDED; that upon his release from incarceration that he be on probation under the SUPERVISION of the DIVISION OF PROBATION AND PAROLE of the STATE DEPARTMENT OF CORRECTIONS, upon the terms and conditions of probation as are now prescribed and imposed by this Court.

THE TERMS AND CONDITIONS OF PROBATION prescribed and imposed by the Court, after having been read, agreed to, and accepted by the defendant, and signed by him in open court, are attached hereto and made a part of this judgment and sentence.

IT IS FURTHER ORDERED THAT IN THE EVENT OF VIOLATION of the terms and conditions of probation, that the Order suspending the balance of the defendant's sentence be immediately revoked, and that the defendant be recommitted to the State Penitentiary to serve the balance of said sentence.

The Court further advised the defendant of his right to appeal to the Court of Criminal Appeals of the State of Oklahoma, and of the necessary steps to be taken by him to perfect such appeal, and that if he desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State without cost to him.

IT IS FURTHER ORDERED that the Sheriff of Sequoyah County transport said defendant to the State Penitentiary at McAlester, Oklahoma, and leave therewith a copy of this judgment and sentence to serve as warrant and authority for the imprisonment of said defendant as provided herein. A second copy of this Judgment and Sentence to be warrant and authority of said Sheriff for the transportaion and imprisonment of said defendant as hereinbefore provided. The Sheriff to make due return to the Clerk of this Court, with his proceedings endorsed thereon.

Attest:
COURT CLERK OF Sequoyah COUNTY

By:_____
                    Deputy Court Clerk

_____
                    District Judge

224

THE STATE OF OKLAHOMA } SS.
LeFLORE COUNTY

I, ------------------------------ Court Clerk of the District Court of the 15th Judicial District of the State of Oklahoma, sitting in and for Sequoyah County, Oklahoma, do hereby certify the above and foregoing to be a true, correct, full and complete copy of the original judgment and sentence in the case of the State of Oklahoma vs.

------------------------------------------------------------------------------------------------------

----------------------------------------------------------------, as the same appears of record in my office.

WITNESS my hand and official seal this----------day of----------------------, 19----.

(SEAL)

------------------------------------------------, Court Clerk

By: ----------------------------------------
            Deputy Court Clerk

THE STATE OF OKLAHOMA } SS.
LeFLORE COUNTY

I received this judgment and sentence this------day of--------------------, 19----, and executed the same

by transporting the within named defendant to the State Penitentiary at McAlester, Oklahoma, and delivered

h------ to the Warden thereof on the------------day of-------------------------, 19----, as herein ordered.

----------------------------------------------, Sheriff

By: ----------------------------------, Deputy Sheriff

225

951

STATE OF OKLAHOMA )
Plaintiff,        )
                  )
                  )
                  )                           CASE # _CRF 92-91_
                  )
VS.               )
                  )
                  )
                  )
Charles Sanders   )
Defendant

S H E R I F F ' S   R E T U R N

Received this ORDER and Sentence on this __20 th__ day of
_July_ ,1992 and on __Oct. 29__ ,19_92_ did as
ordered, transported _Charles E. Sanders_
to the Department of Corrections at Lexinton,Oklahoma and
delivered him to the Warden in Charge.

Signed:

WADE STOVALL, Sheriff


BY _Join Lowe/ Bill Sizemore_
Deputy

226

953

## OKLAHOMA DEPARTMENT OF CORRECTIONS
## RECEIPT FOR PRISONER/DOCUMENTS/DETAINER

| Name and Address of Other Agency: | Name and Address of Institution/CTC: |
|---|---|
| *Sequoyah Co* | *LARC* |

RE: *Charles Edmond "Mouk" Sanders*

YOUR REF:

OUR REF:

JUDGMENT/~~WARRANT/ORDER~~: *CRF 92-91*

OFFENSE: *Ct.5 - Unlawful Poss. of CDS - (Cocaine) AFCF*

TERM: *10 yrs, 1,095 days to serve, remainder susp.*

THE PARAGRAPH(S) CHECKED BELOW INDICATE(S) OUR DISPOSITION OF THE JUDGMENT/WARRANT/ORDER:

[✓] RECEIVED AS NEW RECEPTION/~~PAROLE VIOLATOR~~

[ ] A DETAINER HAS BEEN FILED AGAINST HIM IN YOUR FAVOR. THE PRISONER'S CURRENT RELEASE DATE IS

_____ AND HIS PAROLE ELIGIBILITY DATE IS _____.

WE WILL NOTIFY YOU APPROXIMATELY 30 DAYS PRIOR TO RELEASE.

[ ] PRISONER WILL BE HELD FOR SERVICE ON THE ABOVE JUDGMENT AND SENTENCE.

[ ] FORM I OF THE AGREEMENT ON DETAINERS IS BEING SERVED ON THE PRISONER.

[ ] WE ARE RETURNING THE WARRANT YOU FILED AS A DETAINER AGAINST THE ABOVE NAMED, WHICH HAS BEEN

WITHDRAWN IN COMPLIANCE WITH YOUR REQUEST OF _____.

[ ] OUTWITNESS PRISONER RELEASED/RECEIVED BY OKLAHOMA DEPARTMENT OF CORRECTIONS.

[ ] PRISONER RELEASED ON/RETURNED FROM APPEAL BOND.

[ ] OTHER_____

BY: _____   DATE AND TIME: *10-29-92*
Signature and Title of Receiving Official

DISTRIBUTION:

| | |
|---|---|
| Original: | Other Agency |
| 1st Copy: | Inmate |
| 2nd Copy: | Field File |
| 3rd Copy: | Central Records |

DOC 062009
REVISED (1-22-79)

475

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 2 1 1992

KATHY REED, Court Clerk
By_____Deputy

IN THE DISTRICT COURT OF THE 15TH JUDICIAL DISTRICT
OF THE STATE OF OKLAHOMA
SITTING IN AND FOR SEQUOYAH COUNTY, OKLAHOMA

STATE OF OKLAHOMA,
                              Plaintiff,

vs

Charles Edmond  "Monk" Sanders                 Case No.____CRF-92-91____
                    Defendant

                                                    Count IV
Mike Daffin
            Attorney of Record

## JUDGEMENT AND SENTENCE ON PLEA OF GUILTY

Now, on this ___20th__ day of __July_____, 19_92_,
the same being a regular day of said Court and said case
coming on for hearing, the defendant being personally present
in open Court, with his attorney of record __Mike Daffin__
_____, having been advised of his right to court
appointed counsel and have knowingly waived his right, and
having received a copy of the information and being informed
of the nature of the charge for the offense of POSSESSION OF
MARIHUANA. The defendant further being advised that the
punishment for POSSESSION OF MARIHUANA is not less than 10
days nor more than one year in the county jail and/or a fine
not more than $1,000. He being further advised that upon
conviction for POSSESSION OF MARIHUANA any second and
subsequent offense of POSSESSION OF MARIHUANA may be filed as
a felony and carries a penalty of not less than 2 years nor
more than 10 years in the State Penitentiary and a fine of
not more than $10,000. He further being advised of his right
to withdraw his plea of guilty within 10 days of this date
and his right to appeal this conviction.

The defendant was further advised of his rights to
speedy trial, to confront witness who testify against him,
his right to remain silent and not be forced to testify, his
presumption of innocence, the State's burden of proof beyond
reasonable doubt, his right to jury and non-jury trial; the
defendant freely, knowingly and voluntary waives these rights
and enters a plea of guilty to the charge of POSSESSION OF
MARIHUANA.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED that the
defendant  Charles Edmond  Monk Sanders , is guilty of the
offense of POSSESSION OF MARIHUANA, that he is Sentenced to a
term of __one year_____ in the County Jail of Sequoyah
County and of said sentence ___none_____ is hereby
suspended. IT IS FURTHER ORDERED that the defendant pay a
fine of _____none_and court costs of ___302____.
To run concurrenlty with count V which is served in the
D.O.C.

JUDGE OF THE DISTRICT COURT

228

476

IN THE DISTRICT COURT OF THE 16TH JUDICIAL DISTRICT
OF THE STATE OF OKLAHOMA
SITTING IN AND FOR Sequoyah COUNTY, OKLAHOMA

THE STATE OF OKLAHOMA,                    Plaintiff

vs

Charles Edmond   "Monk" SANDERS
. DOB. ███-66 ------------------------- Defendant,

No. CRF-92-91

Count Five

Counts I & II are dismissed.

## JUDGMENT AND SENTENCE ON PLEA OF GUILTY
### FELONY
(Part Suspended—22 OSA 991a Sec. 1)

Now, on this 20th day of July, 19 92, the same being a juridical day of said court, and the time appointed for judgment and sentence in the above entitled cause, the defendant Charles Edmond "Monk" Sanders being personally present in open court, and being represented by his attorney of record Mike Daffin, and the State of Oklahoma being represented by its Assistant District Attorney T. Scott Hickman

The defendant having been legally charged by Information filed in this case with a criminal offense and having been duly arraigned thereon; the said defendant, after consulting with his attorney, personally entered his plea of guilty to the crime of Unlawful Possession of C.D.S. (Cocaine) AFCF charged in said Information. 63 O.S.2-402(B-1)  21 O.S 51

The Court prior to accepting said plea informed the defendant of his Constitutional rights, including his right to trial by jury, his right to be confronted by his accusers and his right to his privilege against compulsory self-incrimination; and in response to questioning by the Court, the defendant said that he understood his Constitutional rights and that he waived each of them, and persisted in his plea of guilty. The Court further informed the defendant of the minimum and maximum penalty provided by law for the aforesaid offense, and the effect of such plea; and after being further interrogated by the Court the defendant stated that he is guilty of said crime and that his plea of guilty is voluntary and is made by him without inducement or coercion.

The Court thereupon accepted the defendant's plea of guilty to the aforesaid crime; and the defendant having been asked by the Court whether he had any legal cause to show why judgment and sentence should not now be pronounced against him, and he stating no such sufficient cause, and none appearing to the Court;

IT IS THE JUDGMENT OF THE COURT that the defendant Charles Edmond Sanders is guilty of the crime of Unlawful Possession of C.D.S. (Cocaine) A.F.C.F.

IT IS THEREFORE ORDERED AND ADJUDGED BY THE COURT that the said Charles Edmond "Monk" Sanders be committed to the custody of the STATE DEPARTMENT OF CORRECTIONS at the STATE PENITENTIARY at McAlester, Oklahoma, for a term of ten (10) years, said term of sentence to begin at and from the delivery of the defendant to the Warden of said Penitentiary.

IT IS FURTHER ORDERED AND ADJUDGED that the said defendant pay a FINE of Dollars ($ none) and the cost of this prosecution taxed at $ 302, for which judgment is hereby rendered against the defendant, and if said fine and cost be not paid prior thereto, It is Further Ordered that upon his release from said penitentiary, the Sheriff of Sequoyah County take said defendant into custody and detain him in the Sequoyah County Jail until said fine and costs are paid or satisfied as provided by law.

IT IS FURTHER ORDERED THAT SAID DEFENDANT serve 1,095 days of the sentence in the State Penitentiary at McAlester, Oklahoma, and that the balance of his sentence be, and the same hereby is SUSPENDED; that upon his release from incarceration that he be on probation under the SUPERVISION of the DIVISION OF PROBATION AND PAROLE of the STATE DEPARTMENT OF CORRECTIONS, upon the terms and conditions of probation as are now prescribed and imposed by this Court.

THE TERMS AND CONDITIONS OF PROBATION prescribed and imposed by the Court, after having been read, agreed to, and accepted by the defendant, and signed by him in open court, are attached hereto and made a part of this judgment and sentence.

IT IS FURTHER ORDERED THAT IN THE EVENT OF VIOLATION of the terms and conditions of probation, that the Order suspending the balance of the defendant's sentence be immediately revoked, and that the defendant be recommitted to the State Penitentiary to serve the balance of said sentence.

The Court further advised the defendant of his right to appeal to the Court of Criminal Appeals of the State of Oklahoma, and of the necessary steps to be taken by him to perfect such appeal, and that if he desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State without cost to him.

IT IS FURTHER ORDERED that the Sheriff of Sequoyah County transport said defendant to the State Penitentiary at McAlester, Oklahoma, and leave therewith a copy of this judgment and sentence to serve as warrant and authority for the imprisonment of said defendant as provided herein. A second copy of this Judgment and Sentence to be warrant and authority of said Sheriff for the transportaion and imprisonment of said defendant as hereinbefore provided. The Sheriff to make due return to the Clerk of this Court, with his proceedings endorsed thereon.

Attest:
COURT CLERK OF Sequoyah COUNTY

By: _____
        Deputy Court Clerk

_____
        District Judge

229

IN THE DISTRICT COURT OF _Sequoyah_ COUNTY
STATE OF OKLAHOMA

_Charles Sanders,_ )
          Petitioner,      )
                           )
                           )
vs.                        )          CASE NO. _CRF - 92 - 91_
                           )                   _CRF - 90 - 144_
_State of Okla._,          )
          Respondent(s),   )
                           )

NOTICE OF INTENT TO APPEAL

COMES NOW the Petitioner, _Charles Sanders_ pro se, and

files herewith in open Court, Notice of Intent to Appeal to the Court of Criminal

Appeals of Oklahoma, from the oreder rendered herein on the _26_ day of _MAY_

_____,199_3_, in favor of the Respondent(s) and against this Petitioner

and requests that this Notice be entered on the trial docket of this Court as

provided by law.

                         Respectfully submitted,

                         /s/ _Charles Sanders_
                         Pro Se Petitioner

                         Jess Dunn Correctional Center

                         Drawer AA

                         Taft, Oklahoma  74463 - 0483

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 07 1993

KATHY REED, Court Clerk
By_____Deputy

230

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
MAY 2 6 1993
KATHY REED, Court Clerk
By_____Deputy

IN THE DISTRICT COURT OF THE 16TH JUDICIAL DISTRICT
OF THE STATE OF OKLAHOMA
SITTING IN AND FOR Sequoyah COUNTY, OKLAHOMA

THE STATE OF OKLAHOMA,                    Plaintiff

vs

Charles Edmond "Monk" Sanders
DOB ██████ 66 ------------------------ Defendant,

No. CRF-92-91

Count Five,
Counts I & II are dismissed.

"AMENDED"
JUDGMENT AND SENTENCE ON PLEA OF GUILTY
FELONY
(Part Suspended—22 OSA 991a Sec. 1)

Now, on this 20th day of July , 19 92 , the same being a juridical day of said court, and the time appointed for judgment and sentence in the above entitled cause, the defendant Charles Edmond "Monk" Sanders being personally present in open court, and being represented by his attorney of record Mike Daffin , and the State of Oklahoma being represented by its Assistant District Attorney T. Scott Hickman

The defendant having been legally charged by Information filed in this case with a criminal offense and having been duly arraigned thereon; the said defendant, after consulting with his attorney, personally entered his plea of guilty to the crime of Amended to Unlawful Possession of C.D.S. (Cocaine) charged in said Information. After Former Conviction of a Similiar Offense.

The Court prior to accepting said plea informed the defendant of his Constitutional rights, including his right to trial by jury, his right to be confronted by his accusers and his right to his privilege against compulsory self-incrimination; and in response to questioning by the Court, the defendant said that he understood his Constitutional rights and that he waived each of them, and persisted in his plea of guilty. The Court further informed the defendant of the minimum and maximum penalty provided by law for the aforesaid offense, and the effect of such plea; and after being further interrogated by the Court the defendant stated that he is guilty of said crime and that his plea of guilty is voluntary and is made by him without inducement or coercion.

The Court thereupon accepted the defendant's plea of guilty to the aforesaid crime; and the defendant having been asked by the Court whether he had any legal cause to show why judgment and sentence should not now be pronounced against him, and he stating no such sufficient cause, and none appearing to the Court;

IT IS THE JUDGMENT OF THE COURT that the defendant Charles Edmond "Monk" Sanders is guilty of the crime of Unlawful Possession of C.D.S. (Cocaine) After Former Conviction of a Similiar Offense 63 O.S.2-402(B-1).
IT IS THEREFORE ORDERED AND ADJUDGED BY THE COURT that the said Charles Edmond "Monk" Sanders be committed to the custody of the STATE DEPARTMENT OF CORRECTIONS at the STATE PENITENTIARY at McAlester, Oklahoma, for a term of ten (10) years , said term of sentence to begin at and from the delivery of the defendant to the Warden of said Penitentiary.

IT IS FURTHER ORDERED AND ADJUDGED that the said defendant pay a FINE of _____

Dollars ($_____) and the cost of this prosecution taxed at $ 302 , for which judgment is hereby rendered against the defendant, and if said fine and cost be not paid prior thereto, It is Further Ordered that upon his release from said penitentiary, the Sheriff of Sequoyah County take said defendant into custody and detain him in the Sequoyah County Jail until said fine and costs are paid or satisfied as provided by law.

IT IS FURTHER ORDERED THAT SAID DEFENDANT serve 1,025 days of the sentence in the State Penitentiary at McAlester, Oklahoma, and that the balance of his sentence be, and the same hereby is SUSPENDED; that upon his release from incarceration that he be on probation under the SUPERVISION of the DIVISION OF PROBATION AND PAROLE of the STATE DEPARTMENT OF CORRECTIONS, upon the terms and conditions of probation as are now prescribed and imposed by this Court.

THE TERMS AND CONDITIONS OF PROBATION prescribed and imposed by the Court, after having been read, agreed to, and accepted by the defendant, and signed by him in open court, are attached hereto and made a part of this judgment and sentence.

IT IS FURTHER ORDERED THAT IN THE EVENT OF VIOLATION of the terms and conditions of probation, that the Order suspending the balance of the defendant's sentence be immediately revoked, and that the defendant be recommitted to the State Penitentiary to serve the balance of said sentence.

The Court further advised the defendant of his right to appeal to the Court of Criminal Appeals of the State of Oklahoma, and of the necessary steps to be taken by him to perfect such appeal, and that if he desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State without cost to him.

IT IS FURTHER ORDERED that the Sheriff of Sequoyah County transport said defendant to the State Penitentiary at McAlester, Oklahoma, and leave therewith a copy of this judgment and sentence to serve as warrant and authority for the imprisonment of said defendant as provided herein. A second copy of this Judgment and Sentence to be warrant and authority of said Sheriff for the transportaion and imprisonment of said defendant as hereinbefore provided. The Sheriff to make due return to the Clerk of this Court, with his proceedings endorsed thereon.

Attest:
COURT, CLERK OF Sequoyah COUNTY

By: _____
         Deputy Court Clerk

_____
                    District Judge

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA )
        Plaintiff )
            )
VS. )   CASE NUMBER: Cy.91-144,
          )       Cy-89.396-
*Charles Sanders* )      Cy-92-91
          )
D.O.B. ███ 66
DATE 7-10-96 .

                SEQUOYAH COUNTY, OKLAHOMA
               **FILED**
      Assistant District Attorney   IN DISTRICT COURT

       Defendant's Attorney    JUL 1 0 1996
             BERNELL EDWARDS, COURT CLERK
   RULE 8 HEARING       BY_____
    (summary)                DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE
MEANS TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL
PENALTIES, IT IS HEREBY ORDERED BY THE COURT THAT DEFENDANT
PAY:

$ 100.00 ON OR BEFORE *Aug. 1st* BY 4:00    P.M. AND

$    ON OR BEFORE     BY  4:00  P.M. , THEN

$ 100.00   PER MONTH ON OR BEFORE THE *1st*   DAY OF EACH
MONTH WITH LIKE SUMS ON THE SAME DATE THEREAFTER UNTIL PAID IN
FULL; OR THE BALANCE IN FULL ON OR BEFORE THE  *1st*  DAY OF *Dec* .
1996 BY   P.M. OR,
IT IS FURTHER ORDERED THAT DEFENDANT MAKE ALL PAYMENTS IN
PERSON AT THE OFFICE OF THE COURT CLERK.
COMMENTS: *last pay. last $133.04*

TOTAL TO PAY $ 533.04  *(90-144 = 116ᵉ  92-91 = 302ᵉ  89-396 = 115.04)*

            _____
            JUDGE OF THE DISTRICT COURT

_____
DEFENDANT

**\* Defendant is further ordered to notify the Collections Adm. of any change of address, telephone, employment or income.**

*Judge Sprouse
Sequoyah Co Courthouse
Sallisaw Okla
74955*

*owes $533.04
Patti 918 775 4411*

NOTICE OF COURT HEARING
FOR PAYMENT OF FINES AND COSTS

Inmate/DOC #  *191483 Sanders, Charles*

*OM-*

Your judgment and sentence in case(s)  *91-144, 89-396 92-91*

indicate that you are to return to the sentencing court  in

*Sequoyah*  county for a judicial hearing to determine your

ability to pay your court-ordered fines and costs.  If you are not

immediately able to pay the fines and costs, a payment schedule will be

established.  You are to appear before the Honorable  Judge

*Dennis Sprouse*  of  *Sequoyah*  County on

*7/10/96*  at  *8 AM*  am/pm, to determine your

ability to pay your fines and costs.  Failure to attend this hearing

could result in further imprisonment in the  *Sequoyah*

County jail.

I acknowledge this notice and agree to appear in court on the scheduled

date and time.  Signed this  *1st*  day of  *July, 1996*

*Charles Sanders  191483*
Inmate Signature and DOC #

Inmate's Forwarding Address:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Street

*Cathy Alberty, CLM*
Witness

*Sallisaw*  *Okla  74955*
City  State/Zip

CC  Inmate
    Sentencing Court
    Field File--Section 1

DOC 090107

474

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 21 1992

KATHY REED, Court Clerk

By___7ß._____Deputy

IN THE DISTRICT COURT OF THE 15TH JUDICIAL DISTRICT
OF THE STATE OF OKLAHOMA
SITTING IN AND FOR SEQUOYAH COUNTY, OKLAHOMA

STATE OF OKLAHOMA,
              Plaintiff,

vs

Charles Edmond "Monk" Sanders
DOB ███ 66
              Defendant,

Mike Daffin
      Attorney of Record.

Case No. __CRF-92-91__
      Count III

## JUDGMENT AND SENTENCE ON PLEA OF GUILTY - D.U.I.

Now, on this __20th__ day of __July__, 19 92, the same being a regular day of said Court and said case coming on for hearing, the defendant being personally present in open Court, with his attorney of record __Mike Daffin__, having been advised of his right to court appointed counsel and have knowingly waived his right, and having received a copy of the information and being informed of the nature of the charge for the offense of DRIVING UNDER THE INFLUENCE OF INTOXICATING LIQUOR (DUI). The defendant further being advised that the punishment for DUI is not less then 10 days nor more than one year in the county jail and/or a fine not more than $1,000. He being further advised that upon conviction for DUI any second and subsequent offense of DUI may be filed as a felony and carries a penalty of not less than one year nor more than five years in the State Penitentiary and a fine of not more than $2,500. He further being advised of his right to withdraw his plea of guilty within ten days of this date and his right to appeal this conviction.

The defendant was further advised of his rights to speedy trial, to confront witness who testify against him, his right to remain silent and not be forced to testify, his presumption of innocence, the State's burden of proof beyond reasonable doubt, his right to jury and non-jury trial; the defendant freely, knowingly and voluntary waives these rights and enters a plea of guilty to the charge of Driving Under The Influence of Intoxicating Liquor.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED that the defendant __Charles Edmond Sanders__, is guilty of the offense of DRIVING UNDER THE INFLUENCE OF INTOXICATING LIQUOR, that he is sentenced to a term of __one years__ in the County Jail of Sequoyah County and of said sentence __none__ is hereby suspended. IT IS FURTHER ORDERED that the defendant pay a fine of __none__ and court costs of __302__.

Runs concurrenly with count V which is served in the D.O.C.

_____
JUDGE OF THE DISTRICT COURT

234




# Darla Cantrell, CSR

Sequoyah County Courthouse
Sallisaw, OK  74955

Darla Cantrell
P.O. Box 1314
Ft. Gibson, OK  74434
(918)478-3714

## NOTICE OF ESTIMATION OF TRANSCRIPT

Date **6-8-93**

To: **Dan George**

IN RE:
State of Oklahoma vs. **Sixkiller + Vicki Johnson**
CR**E-92-205**                     Sequoyah County

     The estimated pages of this **Preliminary** hearing taken on **3-22-93** is approximately **185** pages @ $2.50. I will need a deposit of $ **210.00** before I will begin the transcription of this proceeding. Please send the deposit as soon as possible to the address above, and I will get the transcript to you upon completion.
     Please contact me if you have any further questions concerning this matter.

Thank you,

*Darla Cantrell*

Darla Cantrell, CSR-CP

# (918)775-4262

235




# Darla Cantrell, CSR

Sequoyah County Courthouse
Sallisaw, OK  74955

Darla Cantrell
P.O. Box 1314
Ft. Gibson, OK   74434
(918)478-3714

## NOTICE OF ESTIMATION OF TRANSCRIPT

Date _6-8-93_

To: _Dan George_

IN RE:
  State of Oklahoma vs. _Terry Webb + Ronnie Bradley_
  CR _E-93 -181_                 Sequoyah County

          The estimated pages of this _Preliminary_ hearing
taken on _2-17-93_ is approximately _1145_ pages
@ $2.50.  I will need a deposit of $ _365.00_ before
I will begin the transcription of this proceeding.  Please
send the deposit as soon as possible to the address above,
and I will get the transcript to you upon completion.
          Please contact me if you have any further questions
concerning this matter.

                              Thank you,

                              _Darla Cantrell_

                              Darla Cantrell, CSR-CP

# (918)775-4262

236

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

REDACTED EXHIBIT 169

TO KENNETH EUGENE BARRETT'S

SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255          *U.S. v. Barrett*, 6:09-cv-00105-JHP

237

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR SEQUOYAH COUNTY

| | |
|---|---|
| THE STATE OF OKLAHOMA,<br>        Plaintiff, | ) )<br>) |
| vs. | ) )<br>) |
| CINDY ELAINE CRAWFORD | ) )<br>) |
| ADDR: ▮▮▮▮▮<br>        Sallisaw, OK   74955<br>SSN: ▮▮▮2026<br>DOB: ▮▮/76 | ) )<br>) )<br>) )<br>) |
| Defendant(s), | ) )<br>) |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**JUN 1 3 2008**

MAUDEEN VANN, COURT CLERK
BY_____DEPUTY
Case No. CF-2008-224

**INFORMATION**

FOR:

COUNT 1:     BURGLARY IN THE FIRST DEGREE~ 21 O.S. § 1431 a FELONY
COUNT 2:     CONSPIRACY~ 21 O.S. § 421 a FELONY

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH:

I, **Jerry S. Moore**, the undersigned District Attorney of said County, in the name and by the authority, and on behalf of the State of Oklahoma, give information that in said County of Sequoyah and in the State of Oklahoma, **CINDY ELAINE CRAWFORD,** did then and there unlawfully, willfully, knowingly and wrongfully commit the crime(s) of:

**COUNT 1      BURGLARY IN THE FIRST DEGREE~ a FELONY, on or about the 11th day of June, 2008, by breaking and entering into the dwelling house occupied by and in the possession of Quincy Haymer and located at 416 W Port Arthur Sallisaw OK, and in which there was at the time and place a human being, to-wit: Quincy Haymer by forcibly entering the front door of said dwelling house and entering without the consent of said occupant with the intent to commit the crime of assault.**

This crime is punishable by imprisonment for 7 to 20 years

**COUNT 2      CONSPIRACY~ a FELONY, on or about the 11th day of June, 2008, by conspiring and agreeing with Aaron Shields to commit the crime of Burglary 1st, a felony, by entering Quincy Haymer's home without permission and threatening individuals within the home, and said defendant and Aaron Shields did  in furtherance of the conspiracy.**

This crime is punishable by imprisonment for up to 10 years, or a fine of up to $5,000, or both.

JERRY S. MOORE
DISTRICT ATTORNEY

By: _____

238

Kyle Waters
Assistant District Attorney

Subscribe and sworn to before me this ⏐3ʰⁿ day of June, 2008.

*Tracy Carlile*

NOTARY PUBLIC

My Commission expires:

### WITNESSES ENDORSED FOR THE STATE OF OKLAHOMA

Herbert  Hutchinson Off.,  Sallisaw Police Department, 101 W. Chickasaw, Sallisaw OK  74955
Bill  Oliver,  Sallisaw Police Department, 101 W. Chickasaw, Sallisaw OK  74955
Justin  Smithson,  Sallisaw Police Department, 101 West Chickasaw, Sallisaw OK  74955
Quincy Haymer Jr., ███████████████████ Sallisaw OK  74955
Crystal  Jackson, ██████████ Sallisaw OK  74955
Marcus White, ████████████ SALLISAW OK  74955
Christopher  Burley, ████████████ Sallisaw OK  74955
Larry Tye Ross, c/o District Attorneys Office



IN THE DISTRICT COURT OF SEQUOYAH COUNTY

**STATE OF OKLAHOMA**

Page 1 of 5

| | |
|---|---|
| STATE OF OKLAHOMA<br>Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| CRAWFORD, CYNTHIA ELAINE<br>Defendant. | ) |

Case No. CF-08-224

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 1 3 2008

MAUDEEN VANN, COURT CLERK

BY_____ DEPUTY

## PROBABLE CAUSE AFFIDAVIT FOR ARREST WITHOUT WARRANT

Comes now the undersigned Affiant, and states upon Oath or Affirmation that the following information and facts are correct to the best of the Affiant's knowledge and belief. The undersigned believes that probable cause exists for the detention of the below named ARRESTEE for the below listed crimes committed on the below listed date, in the City of Sallisaw, County of Sequoyah, Oklahoma.

**Arrestee Name** CRAWFORD, CYNTHIA ELAINE
**SSN** ███2026    **DOB** ███1976

| | | | |
|---|---|---|---|
| **Sex** | Female | **Race** | White |
| **Hair** | Blond or Strawberry | **Eye** | Blue |
| **Ethnicity** | Not Hispanic Origin | **Build** | Medium Build |
| **HGT** | 5 Ft. 3 In. | **WGT** | 140 lbs. |

**Address** ██████████
**City** Sallisaw
**State** Oklahoma 74955

**Date Of Arrest** 06/11/2008    **Time Of Arrest** 04:11
**Arrest Location** 411 S ASH
**Arrest City** Sallisaw
**Offense Location** 416 West Port Arthur Sallisaw, Oklahoma
**Offense City** Sallisaw

**Offense(s) Committed / Anticipated Charge(s)**
  1. 21 O.S. § 1431(2) • Burglary in the first degree: breaks into a house in which there is some human being with intent to commit some crime by other manner, being armed with a dangerous weapon or assisted by other.
  2. 21 O.S. § 421(A)(1) • Conspiracy: Two or more persons commit any crime.

**Facts & Circumstance that support probable cause to arrest the above named person are**
On the 11th day of June 2008, at approximately 01:55 hours, I and other

IN THE DISTRICT COURT OF SEQUOYAH COUNTY

**STATE OF OKLAHOMA**

Page 2 of 5

**Case No. :**
**Defendant :** CRAWFORD, CYNTHIA ELAINE

**Facts & Circumstance that support probable cause to arrest the above named person are**
officers with the Sallisaw Police Department were dispatched to 416 West Port Arthur in reference to a fight in progress. Upon my arrival at the residence I observed a female subject later identified as Crystal Jackson come running out of the residence yelling that a man was inside her residence with a hatchet. I went into the residence an observed a black male subject identified as Quincy Haymer standing in the hallway of the residence, I then observed a white male subject later identified as Aaron Shields lying in the bathroom floor. At this time Officer Smithson arrived at my location, and I asked him to stay with the male subject while I spoke with Haymer outside the residence. Haymer advised me that he was inside his residence with his girlfriend Crystal Jackson. Haymer stated that he heard someone knock on the door to his residence. Haymer advised when he answered the door he observed a female subject that he identified as being Cindy Crawford standing

240

Case 6:09-cv-00105-JHP Document 125-3 Filed 02/18/10 Page 5 of 26

in front of the door with a    subject later identified as Aaron Shields. Haymer    ted that he went to close the door to the residence and both Shields and Crawford pushed their way inside. Haymer stated that Shields was coming at him with a hatchet saying give us the drugs. Haymer then ran into the bedroom and called his brother from his cell phone. Haymer advised that Shields continued yelling and a hitting the wall with the hatchet trying to get him to leave the bedroom. Haymer stated to me that when he thought Shields was gone from the residence he walked out and Shields tried hitting him with the hatchet. Haymer advised that he and Shields got into a physical altercation and he kept Shields in the bathroom until the police arrived.

On the 11th day of June 2008, at approximately 02:15 hours, I spoke with Crystal Jackson and advised me that she was in the kitchen, when she heard a knock on the front door to her residence. Jackson advised me that Haymer answered the door, and she observed a male and female subject standing outside the door. She advised that the male and female subject ran into the residence, and a male subject was holding a hatchet. Jackson stated that the female subject held her against the wall while the male subject chased Haymer into the bedroom of the residence. Jackson advised me that Crawford was yelling at her if she moved they would kill her. Jackson stated that she realized Marcus White and Chris Burley had arrived so she ran outside and called the police department.

On the 11th day of June 2008, at approximately 02:30 hours, I went into the residence to speak with Shields and could smell a strong odor of an

241



IN THE DISTRICT COURT OF SEQUOYAH COUNTY

**STATE OF OKLAHOMA**
Page 3 of 5

Case No.  :
Defendant : CRAWFORD, CYNTHIA ELAINE

**Facts & Circumstance that support probable cause to arrest the above named person are**

alcoholic beverage coming from his breath and person. Shields was then transported by EMS to Sequoyah Memorial Hospital were he was later admitted. I took statements from all the witnesses at the residence. After collecting witness statements Myself, Officer Justin Smithson, and Officer Billy Oliver traveled to the Crawford residence which is located at ███████████████ We made contact with Crawford at the residence and I could smell a strong odor of an alcoholic beverage coming from her breath and person. Crawford also had slurred speech and was very unstable on her feet. While standing with Crawford she stated that she was walking to her friends when a male subject put a knife to her throat and made her stand in a corner inside Haymers residence. At this time I placed Crawford under arrest and she was transported by Officer Oliver to the police department without further incident.

On the 11th day of June 2008, at approximately 11:30 hours, I went to Sequoyah Memorial Hospital and spoke with Shields. Before speaking with Shields I advised him of his Miranda Rights and he agreed that he understood. I asked Shields to tell me what happened last night, and he agreed to speak with me. Shields advised me that Cindy Crawford showed up at his residence and asked him if he would go with her across the street to get some money that the people owed her. He advised me that she said her husband Travis was a chicken and wouldn't go with her. Shields stated that he went outside his residence and he noticed Travis holding a Hatchet. He had Travis hand him the hatchet and he walked across the street with Cindy. He advised that Cindy knocked on the door to the residence. He advised that the subjects opened the door, and Cindy walked into the residence and he followed. Shields advised me that he told the female subject to stand against the wall, and Haymer took off running to the bedroom. He stated the he beat on the door and door jam trying to get Haymer to come out of the bedroom. Shields stated that he heard Haymer on the phone so he went to the leave the residence and there was three male subjects standing in the living room area. Shields advised that Haymer came out of the bedroom and they started fighting. Shields advised me that he ran into the bathroom to try and get away, but they kicked in the door to the bathroom. Shields stated that they kicked and punched him until he was unable to stand under his own power. Shields stated to me that it was Crawford and her husband ideal, and the only reason he went with her was because he was intoxicated. Shields advised that he smoked a bowl on meth with Crawford at her residence a short time before the incident occurred.



IN THE DISTRICT COURT OF SEQUOYAH COUNTY

**STATE OF OKLAHOMA**
Page 4 of 5

Case No.  :
Defendant : CRAWFORD, CYNTHIA ELAINE

AFCF: No ☐ / Yes ☑   Times (1) ☑ (2) ☐ or _____

Upon oath, I declare that the above information is true and correct to the best of my knowledge and belief.
Officer's Name    HUTCHINSON, HERB        Badge No. 914

_____
(Signature of Affiant)

Subscribed and sworn before me this *12 June 2008*
My commission number *02011938*
My commission expires *7.12.2010*

*Patsy Allen*
_____
Notary Public

☐ Yes   ☑ No   Sheriff's Affidavit Required

☐ Bond Posted   ☐ Appear in Court

**BOND POSTED**

A probable cause determination is not necessary, the arrestee bonded out of jail on the _____ at _____

**APPEAR IN COURT**

The undersigned Judge of this Court having conducted a probable cause determination for the above named person's arrest without warrant by sworn testimony and/or affidavit finds:

☑ This affidavit/testimony contains sufficient facts showing probable cause for the person's arrest existed at the time of the arrest. Arraignment before a court is ordered on _6/18_ at _10 AM_

  ☑ The Court sets an appearance Bond in the amount of $ _APS_
  ☐ Bond in the amount of  $_____    For the crime of _____
  ☐ Bond in the amount of  $_____    For the crime of _____
  ☐ Bond in the amount of  $_____    For the crime of _____
  ☐ Bond in the amount of  $_____    For the crime of _____
  ☐ Bond in the amount of  $_____    For the crime of _____
  ☐ The Court denies Bond at this time.

☐ This affidavit/testimony contains insufficient facts to show probable cause for the person's arrest existed at the time of arrest. The arrestee is ordered released from custody immediately.

Date _____    Time _____

243

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**

**STATE OF OKLAHOMA**

Page 5 of 5

Case No. :
Defendant : CRAWFORD, CYNTHIA ELAINE

I make the preceeding findings and order pursuant to <u>Gerstein v. Pugh,</u> 420 U.S. 103 (1975), and <u>County of Riverside v. McLaughlin,</u> No. 89-1817 (U.S. May 13, 1991) (Lexis 2528):

_____
Judge

June 13, 2008 @ 10:41 a
Date

_____
Judge's Signature

IN THE DISTRICT COURT OF THE FIFTEENTH JUDICIAL DISTRICT OF
THE STATE OF OKLAHOMA SITTING IN AND FOR SEQUOYAH COUNTY

THE STATE OF OKLAHOMA,
　　　　　Plaintiff,

vs.

CYNTHIA ELAINE CRAWFORD

ADDR: ███████████
　　　　Sallisaw, OK   74955
SSN: ███████2026
DOB: ██████76

　　　　⟍ Defendant(s),

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 1 8 2008

MAUDEEN VANN, COURT CLERK
BY_____ DEPUTY

Case No.  CF-2008-224

## AMENDED

## INFORMATION

FOR:

COUNT 1:　　BURGLARY IN THE FIRST DEGREE~ 21 O.S. § 1431 a FELONY
COUNT 2:　　CONSPIRACY~ 21 O.S. § 421 a FELONY

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH:

　　　　I, **Jerry S. Moore**, the undersigned District Attorney of said County, in the name and by the authority, and on behalf of the State of Oklahoma, give information that in said County of Sequoyah and in the State of Oklahoma, **CYNTHIA ELAINE CRAWFORD**, did then and there unlawfully, willfully, knowingly and wrongfully commit the crime(s) of:

**COUNT 1　　BURGLARY IN THE FIRST DEGREE~  a FELONY, on or about the 11th day of June, 2008, by breaking and entering into the dwelling house occupied by and in the possession of Quincy Haymer and located at** ███████████**Sallisaw OK, and in which there was at the time and place a human being, to-wit: Quincy Haymer by forcibly entering the front door of said dwelling house and entering without the consent of said occupant with the intent to commit the crime of assault.**

**This crime is punishable by imprisonment for 7 to 20 years**

**COUNT 2　　CONSPIRACY~  a FELONY, on or about the 11th day of June, 2008, by conspiring and agreeing with Aaron Shields to commit the crime of Burglary 1st, a felony, by entering Quincy Haymer's home without permission and threatening individuals within the home, and said defendant and Aaron Shields did  in furtherance of the conspiracy.**

**This crime is punishable by imprisonment for up to 10 years, or a fine of up to $5,000, or both.**

245

JERRY S. MOORE
DISTRICT ATTORNEY

By: _____
Kyle Waters
Assistant District Attorney

Subscribe and sworn to before me this 18th day of June, 2008.

ROBIN HICKMAN
Notary Public
State of Oklahoma
Commission # 07008018  Expires 08/30/11

NOTARY PUBLIC   Robin Hickman

My Commission expires:

## WITNESSES ENDORSED FOR THE STATE OF OKLAHOMA

Herbert Hutchinson, Sallisaw Police Department, 101 W. Chickasaw, Sallisaw OK  74955
Billy Oliver, Sallisaw Police Department, 101 W. Chickasaw, Sallisaw OK  74955
Justin Smithson, Sallisaw Police Department, 101 West Chickasaw, Sallisaw OK  74955
Quincy Haymer Jr., ███████████████ Sallisaw OK  74955
Crystal Jackson, ███████████ Sallisaw OK  74955
Marcus White, ████████ SALLISAW OK  74955
Christopher Burley, ███████████ Sallisaw OK  74955
Larry Tye Ross, c/o District Attorneys Office

246

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

JUN 2 5 2008

MAUDEEN VANN, COURT CLERK

BY_____ DEPUTY

THE STATE OF OKLAHOMA
Plaintiff

}
}
}
}

Case No. CF-2008-224

vs.

*Cynthia Elaine Crawford*

}
}
}
}
}

Defendant

}

### MOTION TO WITHDRAW AS ATTORNEY OF RECORD
### FOR OIDS CLIENT DUE TO INELIGIBILITY

COMES NOW the attorney of record, Jeffrey Bryant Jones, for the above-entitled defendant and would request that this honorable court allow him to withdraw as attorney of record for said defendant.

That in ___June___ of 2008, the Oklahoma Indigent Defense System (OIDS) was appointed to represent that above-named individual in the above-styled case. That the Defendant is ineligible for a court appointed attorney, for the following reasons, to-wit:

*The defendant made a substantial bond*

_____

_____

WHEREFORE, the above premises considered movant prays that said Motion be granted.

Jeffrey Bryant Jones, OBA #17919

### ORDER ALLOWING ATTORNEY TO WITHDRAW

NOW ON THIS the 25th day of ___June___, 2008, this case comes on for hearing on the request of the attorney of record to withdraw from said case, the finding is that said motion should be granted.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED, that Jeffrey Bryant Jones should be allowed to withdraw from said case. That he is relieved of any future responsibility to this court in said case.

Judge of the District Court

247

# Hamilton - Morgan Bail Bonds
## Diane Pratt
### APPEARANCE BOND

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 19 2008

_____ COURT CLERK
BY_____ DEPUTY

IN THE DISTRICT COURT OF _____ Seq _____ COUNTY, STATE OF OKLAHOMA
State of Oklahoma, _____ Plaintiff,

vs. Cynthia Crawford , Defendant          Case No. CF-08-224

Know all men by these presents, that we the above named defendant, as principal, and the undersigned Diane Pratt, Diane Pratt, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of Ten Thousand _____ Dollars ($ 10,000 )
good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of Seq County, State of Oklahoma, shall personally be and appear before the District Court of said county on the 25 day of June , 2008 , at 10 o'clock a.m., of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of Burg I - AFCF XI _____

and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this 18 day of June , 20 08

Cynthia C Crawford Principal _____ Sallisaw, OK Address
Hamilton - Morgan
Diane Pratt          Surety
Diane Pratt _____ Surety _____ Sallisaw, OK Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _____ day of _____ , 20 ___ .

_____ Court Clerk/Sheriff Ann Mulkunmur _____ Deputy

This undertaking approved this _____ day of _____ , 20 ___ .

(SEAL)

By: _____ Deputy/Clerk

### AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, _____ Seq _____ County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of _____ Seq _____ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as herinafter specified under one or more of the following relevant statutory provisions, to-wit:
    a) Consideration for this undertaking received or promised in the sum of $ 1,000.00

    b) Other security received or promised for making this undertaking, is as follows: PN

    c) Such promise, security or consideration was received from:
Cynthia C Crawford      PO Box 189 _____ Sallisaw, OK.
Name                    Address

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as on commits perjury.
Diane Pratt , _____ Sallisaw, OK 74955
Affiant              Address

Subscribed and sworn to before me this _____ day of _____ , 20 ___ .
(SEAL)

_____
Court Clerk - Notary Public

My Commission Expires:
_____
Deputy

248

# In the District Court in and for Sequoyah County
## State of Oklahoma

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 1 4 2008

MAUDEEN VANN, COURT CLERK
BY_____
_____ DEPUTY

State of Oklahoma, )
)
Plantiff, )
)
vs. )   Case No. CF- 2008-294
Cynthia Elaine Crawford )
)
)
Defendant )

## WAIVER OF PRELIMINARY HEARING

Now on this ___13th___ day of ___August___, 20_08_, the above styled case comes on for preliminary hearing. The defendant appears in person and represented by his attorney of record, ___WILLIAM ORENDORFF___, the State of Oklahoma appears by its Assistant District Attorney. Thereupon the defendant herein acknowledges having been advised of the right to a preliminary hearing. That in said hearing the State of Oklahoma must prove to the satisfaction of the Court that the crime as alledged in the information was, in fact, committed and there is probable cause to believe that the defendant committed said crime. That if said burden was not met then the case would be dismissed and the bond exonerated.

The defendant is further advised that at said hearing that he/she has the right to cross examine any of the State's witnesses and to call witnesses on his/her behalf. And further, the defendant is advised of the right at the hearing to limited discovery of the State's case in chief.

Having these rights in mind, the defendant herein, waives all of the above rights with respect to a preliminary hearing in this matter.

_____
Defendant

_____
Attorney for Defendant

## WAIVER OF JURISDICTION OF EXAMINING MAGISTRATE

The defendant is further advised that neither the examining magistrate nor the Special Judge has the jurisdiction to proceed further with the case unless affirmatively waived. Having these rights in mind, the defendant hereby waives his/her rights to object to any jurisdictional defects of the Court.

_____
Defendant

_____
Attorney for Defendant

## COURT MINUTE OF PRELIMINARY HEARING

The defendant in the above styled case having knowingly and intelligently waived his/her rights to the preliminary hearing and there being no objection by the State of Oklahoma, the Court accepts the defendant's waiver and hereby binds the defendant over to stand trial in the District Court of Sequoyah County, State of Oklahoma, on the charges as set out in the information as filed in this case.

Sept 25, 2008 @ 1:30
J. Payton.

_____
JUDGE OF THE DISTRICT COURT

249

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
        Plaintiff
vs.
CINDY ELAINE CRAWFORD
411 APT A ASH ST

SALLISAW, OK 74955
        Defendant
    SS#: ████2026
    DOB: ████1976

)
)
)
)
)
)
)
)
)

*CF-08-224*

Case No. CF-08-00224

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**NOV 0 6 2008**

MAUDEEN VANN, COURT CLERK

BY_____ DEPUTY

Date: 11/06/08      State's Attorney:      KYLE WATERS
                         Defendant's Attorney: WILLIAM K. ORENDORFF

RULE 8 HEARING
(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $25.00 on or before 11-13-2008 and

then __25__ per month on or before the 13th day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 11-13-20_____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $2868.80

X _Cynthia E Crawford_
        Defendant

DENNIS M. SPROUSE
Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

250

# SEQUOYAH COUNTY DISTRICT COURT
## 120 E. Chickasaw, Sallisaw, OK 74955
## 918-775-4411

---

### DEFENDANT'S FINANCIAL STATEMENT / SUPERVISION APPLICATION
Thoroughly and legibly complete this Defendant's Financial Statement/Supervision Application
Do not leave any blanks. If an item does not pertain to you, fill in "N/A" for not applicable.

---

## DEFENDANT

Name: (First, Middle, Last) Cynthia t Crawford    Nickname: Cindy Maiden Name: Lucas    Place of Birth: Ft Smith

Social Security No: [redacted] 2026    Date of Birth: [redacted] 76    Age: 32    Driver's License No:    State: OK    Expiration Date: 2010

Current Address: ☐ House ☐ Apt/Bldg # ☐ Mobile Home Lot # ☐ Other [redacted]    How Long? 3 mo

Previous Address: [redacted]    City Sallisaw    Zip 74955    How Long? 3 yr

Home Phone No. [redacted] None    Cell Phone No: None    Message Phone No: 773 6095

No. of Dependents:  ☑ Spouse  ☐ Children (ages): _____  ☐ Other (Relationship)    Total Dependents:

Sex: F    Race: W    Hair: Blonde    Height: 5 2    Weight: 140

| Employer: (Name & Address): None | Supervisor's Name: | Phone No: |
|---|---|---|
| How Long? | Your Title: | Hours per Week: | Hourly Rate: | Pay Schedule: ☐ Weekly ☐ Bi-weekly ☐ Other | Date of Next Check: |

## SPOUSE

Name: (First, Middle, Last) Travis Dn Crawford    Nickname; Maiden Name:

Social Security No: [redacted] 5635

| Employer: (Name & Address) | Supervisor's Name: | Phone No: |
|---|---|---|
| How Long? | Title: | Hours per Week: | Hourly Rate: | Pay Schedule: ☐ Weekly ☐ Bi-weekly ☐ Other | Date of Next Check: |

## References - Someone who will always know how to contact you

| Full Name & Address of Nearest Relative Not Living With You | Relationship: | Phone No: |
|---|---|---|
| Suzanne Richards | mother | 773 6095 |
| Full Name & Address of Nearest Relative Not Living With You | Relationship: | Phone No: |
| Full Name & Address of Nearest Relative Not Living With You | Relationship: | Phone No: |
| Full Name & Address of Nearest Relative Not Living With You | Relationship: | Phone No: |

Continued on other side

251

Sequoyah County Form CF-1

Uniform Plea of Guilty--Summary of Facts

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## THE STATE OF OKLAHOMA

STATE OF OKLAHOMA,

                Plaintiff

VS.

Cynthia E. Crawford    Defendant

DOB ███████ 1976
SS# ███████ -2026

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
DEC 1 5 2008
MAUDEEN VANN, COURT CLERK
BY _____ DEPUTY

Case No. CF 08 - 224

## SUMMARY OF FACTS FOR THE PLEA OF ~~GUILTY~~ No Contest

**Part A: FINDING OF FACT, ACCEPTANCE OF PLEA**

Circle

1. Is the name just read to you your true name?  **YES** NO
   If no, then what is your correct name? _____
   I have also been known by the name(s) _____

2. (A) Do you wish to have a record of these proceedings made by a Court Reporter?  YES **NO**
   (B) Do you wish to waive your right to have a record of these proceedings made?  **YES** NO

3. What is your age? **32** What grade level in school have you completed? **GED + 2 yrs College**

4. Can you read and understand this form? [If no, Addendum A must be completed and attached]  **YES** NO

5. Are you currently taking any medications or substances which affect your ability to understand these proceedings?  YES **NO**

6. Have you been prescribed any medication which you are not taking?  YES **NO**
   If yes, what medication are you not taking? _____
   What is the purpose of the medication? _____
   Why are you not taking the medication? _____

7. Have you ever been treated by a doctor or health professional for mental illness or confined in a hospital for mental illness?  YES **NO**
   If yes, list doctor or health professional, place, and when treatment occurred:
   _____

8. Do you understand the purpose, the nature and the consequences of this proceeding?  **YES** NO

9. Have you received a copy of the State's Information and read its allegations?  **YES** NO

252

10.   A. Do you understand you are charged with:
         Crime                            Statutory Reference

[1] Burglary in the First Degree          21  O.S  1431          (YES)  NO

[2] Conspiracy                            21  O.S  421           (YES)  NO

[3] _____              _____ O.S _____        YES  NO

[4] _____              _____ O.S _____        YES  NO

[5] _____              _____ O.S _____        YES  NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

   B. Are you charged after former conviction of a felony (AFCF) ?        YES  (NO)
   If yes, list the felony(ies) charged: _____

   _____

11.   Do you understand the range of punishment for the crime(s) is/are?
      (List in the same order as in Number 10)

   [1] Minimum of ___7___ to a maximum of ___20___ and/or a fine of $_____   (YES)  NO

   [2] Minimum of _____ to a maximum of ___10___ and/or a fine of $ 5,000.00  (YES)  NO

   [3] Minimum of _____ to a maximum of _____ and/or a fine of $_____   YES  NO

   [4] Minimum of _____ to a maximum of _____ and/or a fine of $_____   YES  NO

   [5] Minimum of _____ to a maximum of _____ and/or a fine of $_____   YES  NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

12.   Read the following statements: You have the right to a speedy trial before a jury of your peers
      to determine whether you are guilty or not guilty and if you request, to determine the sentence.
      If pleading to a capital murder, advise of the procedure in 21 O.S. 701.10 (B)
      At the trial:
      [1] You have the right to have an attorney represent you, either one you hire or if you are indigent
      a court appointed attorney.
      [2] You are presumed to be innocent of the charges.
      [3] You may remain silent or, if you choose, you may testify on your own behalf.
      [4] You have the right to see and hear all witnesses called to testify against you and the right to
      have those witnesses cross-examined.
      [5] You may have your witnesses ordered to appear in court to testify and present evidence of
      any defense you have to these charges.
      [6] The State is required to prove your guilt beyond a reasonable doubt.
      [7] The verdict of guilty or not guilty decided by a jury must be unanimous. However, you can
      waive a jury trial and, if all parties agree, the case could be tried by a Judge alone who would
      decide if you were guilty or not guilty and if determined to be guilty, the appropriate punishment.

      Do you understand each of these rights?                                  (YES)  NO

13.   Do you understand by entering a plea of guilty you give up these rights?  (YES)  NO

14.   Do you understand that a conviction on a plea of guilty could increase punishment in any future  (YES)  NO
      case committed after this plea?

15.   Is __William K. Orendorff__ your attorney?                               (YES)  NO

16.   Have you talked with your attorney about the charges, advised him/her regarding any defense  (YES)  NO
      you may have to the charges and received his/her advice?

253

17. Do you believe your attorney has effectively assisted you in this case and are you satisfied with his/her representation?   (YES)   NO

18. Do you wish to change your plea of not guilty to a plea of guilty and give up your right to a jury trial and all previously explained constitutional rights?   (YES)   NO

19. Is there a plea agreement?
What is your understanding of the plea agreement? _____   (YES)   NO

_____

_____

_____

20. Do you understand the Court is not bound by any agreement or recommendation and if the Court does not accept the plea agreement, you have the right to withdraw your plea of guilty?   (YES)   NO

21. Do you understand that if there is no plea agreement the Court can sentence you within the range of punishment stated under question 11?   (YES)   NO

22. Do you understand your plea of guilty to the charge(s) is subject to: (check one)   (YES)   NO
[X] no prior felony conviction
[  ] one (1) prior felony conviction
[  ] two (2) or more felony convictions:  List prior felony convictions to which you are pleading:

_____

23. What is/are your plea(s) to each charge(s)?
[1] _no Contest_ [2] _____ [3] _____ [4] _____ [5] _____

24. Did you commit the acts as charged in the information?   YES   NO (N/A)
State a factual basis for your plea(s) (attach additional pages as needed, labeled as ADDENDUM C):

_____

_____

_____

25. Have you been forced, abused, mistreated or promised anything by anyone to have you enter your plea(s) ?   YES   (NO)

26. Do you plead guilty of your own free will and without any coercion or compulsion of any kind?   (YES)   NO

27. If you are entering a plea to a felony offense, you have a right to a Pre-sentencing investigation and Report which would contain the circumstances of the offense, any criminal record, social history and other background information about you.  Do you request a Pre-sentence report?   YES   (NO)

28. (A) Do you have any additional statements to make to the Court?   YES   (NO)

(B) Is there any legal reason as to why you should not sentence now?   YES   (NO)

HAVING BEEN SWORN, I, the Defendant whose signature appears below, make the Following statements under oath:

(1) CHECK ONE:

_____ (A)   I have read, understood and completed this form.

__X__ (B)   My attorney completed this form and we (the attorney and I) have gone over the form and I understand its contents and agree with the answers.  Complete Addendum A and attach to this form.

254

_____ (C)     The Court completed this form for me and inserted my answers to the questions in open court.

(2)             All Answers are true and correct.

(3)             I understand that I may be prosecuted for perjury if I have made false statements to this Court.

Acknowledged this *6th* day of *November*, *2008*.

_____
_Cynthia E Crawford_
DEFENDANT

I, the undersigned attorney for the Defendant, believe the Defendant understands the nature, purpose, and consequence of this proceeding. (S)He is able to assist me in formulating any defense to the charge(s). I am satisfied that the Defendant's waivers and plea(s) of guilty are voluntarily given and he/she had been informed of all legal and constitutional rights.

_____
ATTORNEY FOR DEFENDANT

The sentence recommendation in question 19 is correctly stated. I believe the recommendation is fair to the State of Oklahoma. Offer of Proof (nolo contendere plea): _____

_____

_____

_____

_____
ASSISTANT DISTRICT ATTORNEY

**THE COURT FINDS AS FOLLOWS:**

A. The Defendant was sworn and responded to questions under oath.

B. The Defendant understands the purpose, nature and consequences of this proceeding.

C. The Defendant's plea(s) of _____ is/are knowingly and voluntarily entered and accepted by the COURT REPORTER PRESENT Court.

D. The Defendant is competent for the purpose of this hearing.

E. A factual basis exists for the plea(s) (and former conviction(s), if applicable).

F. The Defendant is guilty as charged: (check as appropriate)

    [ ] after no prior felony conviction.

    [ ] after one (1) prior felony conviction.

    [ ] after two (2) or more prior felony convictions

G. Sentencing or order deferring sentence shall be: [ ] imposed instanter or [ ] continued until the ____ day of _____ at _____ : ___ , _____ .M. If the Pre-sentence investigation and Report is requested, it shall be provided to the Court by the _____ day of _____ , _____ .

DONE IN OPEN COURT this ___ day of _____ , *2008* .

_____
JUDGE OF THE DISTRICT COURT

_____
NAME OF JUDGE TYPED OR PRINTED

_____     _____
Court Reporter Present              Deputy Court Clerk Present

255

"NOTICE OF RIGHT TO APPEAL"

Sentence to Incarceration, Suspended or Deferred:

To appeal from this conviction, or order deferring sentence, on your plea of guilty, you must file in the Sequoyah County District Court Clerk's Office a written Application to Withdraw Plea of Guilty within ten (10) days from today's date. You must set forth in detail why you are requesting to withdraw your plea. The trial court must hold a hearing and rule upon your application within thirty (30) days from the date it is filed. If the trial court denies your application, you have a right to ask the Court of Criminal Appeals to review the District Court's denial by filing a Petition for Writ of Certiorari within ninety (90) days of the date of denial. Within ten (10) days from the date the application to withdraw plea of guilty is denied, notice of intent to appeal and designation or record must be filed pursuant to Oklahoma Court of Criminal Appeals Rule 4.2 (D). If you are indigent, you have the right to be represented on appeal by a court appointed attorney.

Do you understand each of these rights to appeal?                                          YES        NO

Do you want to remain in the county jail ten (10) days before being taken to place of confinement?                                                                                    YES        NO

Have you fully understood the questions that have been asked?                             YES        NO

Have your answers been freely and voluntarily given?                                      YES        NO

I ACKNOWLEDGE UNDERSTANDING OF RIGHTS AND SENTENCE IMPOSED.

_____
Defendant

I, the undersigned attorney, have advised the Defendant of his appellate rights.

_____
Attorney for the Defendant

DONE IN OPEN COURT, this __6__ day of __November__, 2008

_____
Judge of the District Court

_____          _____
Court Reporter Present               Deputy Court Clerk Present

ADDENDUM "A"
CERTIFICATE OF DEFENSE COUNSEL

As the attorney for the defendant, __Cynthia E Crawford__, I certify that:

1. The Defendant has stated to me that he/she is [ ✓ ] able [   ] unable to read and understand the attached form, and I have [   ] determined the Defendant is able to understand the English language or [   ] determined the Defendant is unable to understand the English language and obtained _____ to interpret to the Defendant in the _____ language.
2. I have read and fully explained to the Defendant the allegations contained in the information in this case.
3. I have read and fully explained to the Defendant all of the questions in the Plea of Guilty/Summary of Facts and the answers to the questions set out in the Summary of Facts are the Defendant's answers.
4. To the best of my knowledge and belief the statement and declarations made by the Defendant are accurate and true and have been freely and voluntarily made.
     Dated this __16th__ day of __November__ 2008

_____
Attorney for the Defendant

256

Sequoyah County Form CF-1 b                                  Uniform Plea of Guilty -- Sentence on Plea

Case Number CF- _____   State v. _____   Date:_____

## Part B: Sentence on Plea   [NOTE ON USE: Part B is to be used with the Summary of Facts if contemporaneous with the entry of plea or may be formatted as a separate sentencing form if sentencing is continued to a future date.]

## THE COURT SENTENCES THE DEFENDANT AS FOLLOWS:

### DEFERRED SENTENCE

1. The sentencing date is deferred until _____, ____ , _____ at ____ : _____ , ___ M.

2. You [  ] will [  ] will not be under supervision by the Department of Corrections. The terms set forth in the Rules and Conditions of Probation in Addendum D shall be the rules you must follow during the period of deferment.

### SUSPENDED SENTENCE or SUSPENDED AS TO PART

1. You are sentenced to confinement under the supervision of the Department of Corrections for a term of years as follows:
[1] _____ [2]_____ [3] _____ [4] _____ [5]_____

TO BE SUSPENDED as follows:

   (A) ALL SUSPENDED   [  ] YES   [  ] NO

   (B) suspended except as to the first _____ (months) (years) of the term(s) during which you are to be held in the custody of the Department of Corrections. The remaining term of the sentence(s) is to be suspended under the terms set forth in the Rules and Conditions of Probation in Addendum D.

2. The sentence(s) is/are to run [  ] concurrently [  ] consecutively with/to _____
_____ or NOT APPLICABLE.

### TIME TO SERVE

1. You are sentencd to confinement under the supervision of the Department of Corrections for a term of years as follows:
[1] _____ [2]_____ [3] _____ [4] _____ [5]_____

2. The sentence(s) is/are to run [  ] concurrently [  ] consecutively with/to _____
_____ or NOT APPLICABLE.

### FINES AND COSTS

You are to pay in full any fine(s), costs, fees and restitution at the time of sentencing. In the alternative, you may request a stay of execution (SOE) from the Cost Administrator in the Sequoyah County District Court Clerk's Office. All information given to the Cost Administrator in requesting the SOE will be under oath and is considered as part of the summary of facts before the Court. You will appear in person to make all payments as agreed. Any payment tendered other than in person will be accepted; however, such acceptance does not excuse your appearance in the Clerk's Office.

257

Sequoyah County Form CF-3(B)                    Uniform Plea of Guilty -- Additional Findings

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY, THE STATE OF OKLAHOMA

STATE vs. _____ Defendant     Case No. _____

## ADDITIONAL FINDINGS AT TIME OF SENTENCING

## EXHIBIT 1

A.  Original Charges (A copy of the information may be attached instead) Please list any additional charges on a separate attached sheet.

| OFFENSE | STATUTE CITATION |
|---|---|
| | |
| | |
| | |
| | |

B.  Prior Felony Charges Used For Enhancement Please list any additional convictions on a separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

C.  Prior Charge(s) For Which Order Deferring Sentence Was Entered Please list any additional charges on separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

D.  Prior Felony Convictions Not Used For Enhancement Please list any additional convictions on a separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

E.

If the defendant plead guilty to multiple counts, did the offense(s) arise from the same transaction?

Circle

YES   NO

258

F. Other Enhancers Used to Determine Placement on Matrix

Circle

1. Did the offender commit the current offense with the use of a firearm within the immediate possession and control of the offender?

YES   NO

2. Was the victim of the offense over 62 years of age, under 12 years of age or disabled by reason of mental or physical illness to such extent that the victim lacked the ability to effectively protect his or her property or persons?

YES   NO

3. Did the offender in the commission of the offense maim or torture the victim?

YES   NO

4. Did the offender commit a Schedule N-2 or N-3 drug offense in, on, or within 1,000 feet of real property comprising of a public or private elementary or secondary school; public or private college, university, or other institution of higher education; recreation or public park (including state facilities); public housing project; or in the presence of any child under 12 years of age?

YES   NO

5. Did the offender commit a Schedule N-2 or N-3 drug offense by using or soliciting the services of a person less than 18 years of age, providing the offender was at least 18 years of age at the time of the offense?

YES   NO

6. If the controlling offense was a property or drug offense, what was the total amount involved in that offense (e.g., the value of the property involved; the amount of money stolen, embezzled, or obtained by fraud; or the amount of drug proceeds utilized?)   $ _____

7. If the controlling offense was a drug offense, what was the predominant drug and what was the amount of that drug? (Please specify quantity in grams, ounces, etc.)

DRUG: _____

QUANTITY: (oz., grams, etc.) _____

G. Offender Characteristics

Gender (Circle)
Male   Female

Race   (Circle)
White  Black  Hispanic  Asian  Native American

**This Exhibit shall not be admitted into evidence in any future prosecutions.**

Certified this _____ day of _____, _____.

_____
Attorney for the State

_____
Attorney of the Defendant

_____
Judge of the District Court

259

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA | ) | |
| Plaintiff, | ) | |
| VS. | ) | Case No. CF-08-224 |
| | ) | |
| CINDY ELAINE CRAWFORD | ) | |
| DOB: ███76: SS#███-2026 | ) | |
| Defendant. | ) | |

## IMPOSITION JUDGMENT AND SENTENCE DEFERRED ON PLEA OF NOLO CONTENDERE

NOW, on this __6TH__ day of __NOVEMBER__, 2008, the same being a judicial day of said court, and the defendant, __CINDY ELAINE CRAWFORD__, being personally present in open court, with his attorney __WILLIAM K. ORENDORFF__, and having been duly represented at all proceedings before the Court by such attorney of record, and having been legally charged with the offense of __COUNT I - BURGLARY IN THE SECOND DEGREE- 47 O.S. 1431 a FELONY; COUNT II – DISMISSED-CONSPIRACY– 21 O.S. 421 a FELONY__ and having been duly informed of the nature of the charge, and of his constitutional rights and having been duly arraigned thereon, and having duly and properly entered his plea of Nolo Contendere to the crime of __COUNT I - BURGLARY IN THE SECOND DEGREE- 47 O.S. 1431 a FELONY;__ and having been advised of his rights and the effect of such plea, and the defendant having been asked by the Court whether he has any legal cause to show why the Court should not defer further proceedings and place him/her on probation under supervision of the Sequoyah County District Attorney's Office upon the conditions of probation prescribed by the Court, and the defendant consents to such procedure.

IT IS THEREFORE the decision and Order of the Court to defer the imposition of judgment and sentence in this case for a period of __TWO (2)__ years for Count I, and the defendant is placed on probation during such period under the supervision of the District Attorney's Office, such deferment to continue during good behavior and pursuant to the Rules and Conditions of Supervised Probation through the Sequoyah County District Attorney's Office State of Oklahoma, as prescribed in the "Addition to Judgment and Sentence."

The defendant is further taxed costs of this prosecution in the amount of $_____ for which judgment is hereby rendered.

Upon successful completion of the probationary term, the defendant shall be discharged without a court judgment of guilt, and the verdict or plea of guilty shall be expunged from the record and said charge shall be dismissed with prejudice to any further action. Upon violation of the conditions of probation, the court may enter a judgment of guilt and proceed as provided in Section 1, Title 22-901a of the Oklahoma Statutes Annotated, 1970.

JUDGE OF THE DISTRICT COURT

260

**IN THE DISTRICT COURT OF** _Sequoyah_ **COUNTY, STATE OF OKLAHOMA**
**SUPPLEMENTAL ORDER OF THE COURT**

Defendant _Cindy Elaine Crawford_          Case No(s)  CM-_____

Date of Sentence _11/6/08_          Type of Sentence _____   CF- _08-224_

**RULES AND CONDITIONS OF SUPERVISED PROBATION**
**THROUGH THE DISTRICT ATTORNEY'S OFFICE**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
DEC 1 5 2008
MAUDEEN VANN, COURT CLERK
BY ____ DEPUTY

1. I will report in person as directed by the District Attorney's Office.
2. I will not violate any city, state, federal, or tribal jurisdiction law and I will advise the District Attorney's Office within 72 hours of arrest by any law enforcement agency.
3. I will not possess marijuana or any other illegal narcotic drug.
4. I will not associate with convicted felons.
5. I will not change my address without notifying the District Attorney's Office.
6. I understand that I will be supervised unless released, in writing, by the District Attorney's Office or by order of the Court.
7. I will attempt to maintain legal and gainful employment and supply written verification. I will notify the District Attorney's Office within 72 hours if I change employment.
8. I understand that certain violations may result in the imposition of additional sanctions, and/or revocation or acceleration of my sentence.
9. I agree to pay all court costs, fines, miscellaneous costs and any other accruing costs in this case.
10. I agree to pay a monthly probation fee of $40.00 in the form of a money order or cashiers check made payable to "DASF" (NO CASH OR PERSONAL CHECKS ACCEPTED), each month that I am under supervision of the District Attorney's Office, with the first payment due on or before the _____ of each month.
11. I agree to submit to random Drug Testing and pay the cost of such testing.

**SPECIAL CONDITIONS:  (CHECK IF APPLICABLE)**

_____ A. Pay restitution per separate schedule and provide receipts of payment to District Attorney every 90 days.

_____ B. Complete community service per separate schedule.

_____ C. Attend psychiatric counseling as directed and provide written proof.

_____ D. Attend Domestic Abuse Counseling and/or Classes and provide progress report from HIC every 90 days.

_____ E. Attend VIP / MADD Program.

_____ F. Attend AA or NA meetings and provide proof of participation.

_____ G. Obtain assessment for alcohol/drug treatment and complete any treatment recommended and provide proof

_____ H. Complete Anger Management Program

_____ I. Complete DARP Program

_____ J. Install Guardian Interlock system on any vehicle driven by Defendent

_____ K. Complete DUI School

_____ L. Complete letter of apology & submit to the DA Office

✓ M. Other _Fine  $ 100.00 plus cost_

_____
Defendant

_____
Attorney for the Defendant

_____
Assistant District Attorney for
JERRY S. MOORE, District Attorney

_11/6/08_
Date

_____
Judge of the District Court

WHITE - COURT CLERK          YELLOW- DISTRICT ATTORNEY          PINK- DEFENSE ATTORNEY

261

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,  )
     Plaintiff,  )
  )
vs.  )     Case No CF-08-224
  )
CYNTHIA ELAINE CRAWFORD,  )
     Defendant.  )

## ORDER SETTING FOR HEARING

ON THIS 22nd day of December, 2008, the above styled and numbered cause comes on before me, the undersigned Judge of the District Court pursuant to the *State's Motion*.

It is therefore Ordered that this matter is set for DISTRICT COURT ARRAIGNMENT on the 15th day of January, 2009 at 1:30 o'clock a.m./p.m., in the Sequoyah County Courthouse, Sallisaw, Oklahoma, before the Honorable JEFF PAYTON, Judge of the District Court.

IT IS SO ORDERED.

_____
**JUDGE OF THE DISTRICT COURT**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**DEC 2 3 2008**

MAUDEAN VANN, COURT CLERK
BY_____ DEPUTY

## CERTIFICATE OF MAILING

The undersigned hereby certifies that a true and correct copy of the above and foregoing was mailed via U.S. First Class Mail with the proper postage prepaid thereon on this 23RD day of December, 2008, to the following to-wit:

WILLIAM ORENDORFF
P.O. BOX 129
SALLISAW, OK 74955

Robin Hickman
Office of the District Attorney

262

IN AND FOR THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,            )
    Plaintiff,            )
                     )
vs.            )    Case No. CF-98-128
                     )
CHARLES E. SANDERS,            )
    Defendant.            )

## MOTION TO WITHDRAW

COMES NOW Gerald Hunter, and requests that the Court allow him to withdraw as attorney of record for the Defendant and therefore informs the Court as follows:

That circumstances have arisen which make it unreasonably difficult for this attorney to represent said Defendant; and that Defendant has not made an effort to communicate with this attorney, nor contact this attorney personally or financially, to ensure proper representation.

WHEREFORE, attorney of record respectfully requests that this honorable Court enter an order allowing attorney to withdraw as attorney of record.

Respectfully submitted,

Gerald Hunter

By: _____
GERALD HUNTER, OBA #4501
Attorney for Defendant
P.O. Box 122
Sallisaw, OK  74955
(918) 775-1220
FAX (918) 775-2202

REDACTED

263

## CERTIFICATE OF DELIVERY

I, Gerald Hunter, do hereby certify that on this _19th_ day of January, 1999, I hand delivered a true and correct copy of the above and foregoing motion to withdraw to the Office of the District Attorney, Sequoyah County Courthouse, Sallisaw, Oklahoma 74955.

_____
GERALD HUNTER

**REDACTED**

2500.⁰⁰ CF98-128A
20,000.⁰⁰ CF98-346A

CERTIFICATE OF SURRENDER

I, _Jenny Manley_ jailer _SCSO_,

State of Oklahoma, hereby acknowledge that I received from

_Diane Hamilton_, a licensed Bail Bondsman in the

State of Oklahoma. _Teresa Jordan_, defendant, in

certain case pending in _District_, Court,

_Sequoyah County_, State of Oklahoma, along with a  Certified

Copy of a Bail Bond heretofore deposited with _SC.SO_,

State of Oklahoma.  That I have retained in my custody

_Teresa Jordan_, defendant, this _19_ day of

_Jan_, 19_99_, at _10_ o'clock _p_ m.

Jailer                          _Jenny Manley_

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 2 0 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**REDACTED**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY

STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,    )
                          )
        Plaintiff,        )
Vs.                       )   No. CF-98-128, CF-98-346
                          )       CF-98-363
CHARLES SANDERS,          )
                          )
        Defendant.        )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**JAN 1 9 1999**

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**ENTRY OF APPEARANCE**

COMES NOW DONN F. BAKER, for the defendant, CHARLES SANDERS and hereby enters his appearance as counsel of record for Defendant.

All future notices or correspondence should be forwarded to counsel at the address below.

DONN F. BAKER, OBA 443

██████████████

TAHLEQUAH, OK 74464
(918) 456-████

ATTORNEY FOR DEFENDANT

**CERTIFICATE OF MAILING**

I, Donn F. Baker, do hereby certify that on this 19 day of January, 1999, a true, correct, and exact copy of the above and foregoing was mailed to: District Attorney, Sequoyah County Courthouse, Tahlequah, OK 74464.

Donn F. Baker

**REDACTED**

266

IN AND FOR THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,             )
    Plaintiff,             )
                       )
vs.                            )        Case No. CF-98-128
                       )
CHARLES E. SANDERS,            )
    Defendant.             )

## ORDER ALLOWING WITHDRAWAL

NOW ON THIS _19_ day of January, 1999, this matter comes on for hearing pursuant to motion allowing Gerald Hunter to withdraw as attorney of record for the Defendant in the above styled case and the Court finds justifiable cause therefore.

IT IS THEREFORE Ordered, Adjudged and Decreed that said motion be granted, and that Gerald Hunter, attorney for Defendant is hereby allowed to withdraw from said case as attorney of record.

JUDGE OF THE DISTRICT COURT

**REDACTED**

**ORDER TO RELEASE FROM CUSTODY**

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said
defendant be released, if in your custody for no other cause, immediately upon receipt of this order.
Last Name, First, Middle, suffix (please print or type) (show alias)

Jordan   Teresa   ████   65   ████   5710

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-128A | Plead + Rule 8 | Poss CDS |
| CF-98-346A | | Poss Para |
| | Also Transproted | Poss Police Radio |
| | to Cherokee Co. | Failure to Appear |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma,
witness my hand this the ___12___ day of ___Feb___ , 19_99_.

_Shelia Seeley_
Signature

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

**AUTHORIZED BY**

_____
JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 1 6 1999

REDACTED   BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

268

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 1 2 1999

BERNELL EDWARDS, COURT CLERK

BY _____ DEPUTY

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, First, Middle, suffix (please print or type) (show alias)

Jordan, Teresa

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-128 | plead & Rule 8 held | Burg 2° |
| CF-98-346 | plead & Rule 8 held | Controlled Drugs |
| | | |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the ___ day of ___February___, 19 99.

_____
Signature

AUTHORIZED BY ___John C. Garrett___
JUDGE OF THE DISTRICT COURT

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

REDACTED

# In the District Court in and for Sequoyah County
## State of Oklahoma

State of Oklahoma, )
)
Plaintiff, )
)
vs. ) Case No. CF- *9 R-128*
)
*Teresa Jordan* )
)
Defendant )

*9 8 - 346*

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**FEB 1 2 1999**

## WAIVER OF PRELIMINARY HEARING

BERNICE EDWARDS, COURT CL—
BY _____ COURT CL—

Now on this ___12___ day of ___Feb___, 19_99_, the above-styled case comes on for preliminary hearing. The defendant appears in person and represented by his attorney of record, _____, the State of Oklahoma appears by its Assistant District Attorney. Thereupon the defendant herein acknowledges having been advised of the right to a preliminary hearing. That in said hearing the State of Oklahoma must prove to the satisfaction of the Court that the crime as alleged in the information was, in fact, committed and there is probable cause to believe that the defendant committed said crime. That if said burden was not met then the case would be dismissed and the bond exonerated.

The defendant is further advised that at said hearing that he/she has the right to cross examine any of the State's witnesses and to call witnesses on his/her own behalf. And further, the defendant is advised of the right at the hearing to limited discovery of the State's case in chief.

Having these rights in mind, the defendant herein, waives all the above rights with respect to a preliminary hearing in this matter.

_____
Defendant

_____
Attorney for Defendant

## WAIVER OF JURISDICTION OF EXAMINING MAGISTRATE

The defendant is further advised that neither the examining magistrate nor the Special Judge has the jurisdiction to proceed further with the case unless affirmatively waived. Having these rights in mind, the defendant hereby waives his/her rights to object to any jurisdictional defects of the Court.

REDACTED

_____
Defendant

_____
Attorney for Defendant

## COURT MINUTE OF PRELIMINARY HEARING

The defendant in the above styled case having knowingly and intelligently waived his/her rights to the preliminary hearing and there being no objection by the State of Oklahoma, the Court accepts the defendant's waiver and hereby binds the defendant over to stand trial in the District Court of Sequoyah County, State of Oklahoma, on the charges as set out in the information as filed in this case.

_____
JUDGE OF THE DISTRICT COURT

IN THE DISTRICT COURT OF )
SEQUOYAH COUNTY )
STATE OF OKLAHOMA )
)
)
)

Defendant    TERESA JORDAN

Case No.    CF-98-128

Date    February 12, 1999

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general statement of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my Probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or a representative thereof.

8. I understand that I must support myself and all my dependants without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion that I may be in control of contraband. That my probation officer may search me or my property if that suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within that eighteen months.

15. SPECIAL CONDITIONS: The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, O.S.B.I. Lab Fees, fines or restitution) of $_____ within_____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 19____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed).*
$1,000 fine $250 VCA and $190 OIDS

**REDACTED**

SEQUOYAH COUNTY, OKLAHOMA
IN DISTRICT COURT
FILED
FEB 1 2 1999
BERNELL EDWARDS, COURT CLERK
BY _____ COURT CLERK
DEPUTY

16. Defendant to report to DOC within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_____
Attorney for Defendant

_____
Probationer

Defendant's Mailing Address:

_____
JUDGE OF THE DISTRICT COURT

_____

_____

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA
           Plaintiff,

VS.

Case No. __CF-98-128__

TERESA JORDAN DOB: ████ 65
           Defendant.

## IMPOSITION JUDGMENT AND SENTENCE DEFERRED ON PLEA OF GUILTY

NOW, on this __12th__ day of __February__, 19 __99__, the same being a judicial day of said court, and

the defendant, __Teresa Jordan__, being personally present in open court, with his/her attorney

__Gerald Hunter__, and having been duly represented at all proceedings before the Court by such

attorney of record, and having been legally charged with the offense of

__BURGLARY SECOND DEGREE, 21 O.S. 1435 and LARCENY FROM HOUSE,__ and having been duly
                                            21 O.S. 1723

informed of the nature of the charge, and of his/her constitutional rights and having been duly arraigned

thereon, and having duly and properly entered his/her plea of guilty to the crime of

__BURGLARY SECOND DEGREE and LARCENY FROM HOUSE__ and having been advised

of his/her rights and the effect of such plea, and the defendant having been asked by the Court whether he/she

has any legal cause to show why the Court should not defer further proceedings and place him/her on

probation under supervision of the Department of Corrections upon the conditions of probation prescribed by

the Court, and the defendant consents to such procedure. *To run CC. with Cherkee Co. Case. Oce*

IT IS THEREFORE the decision and Order of the Court to defer the imposition of judgment and

sentence in this case for a period of __Five (5)__ years, and the defendant is placed on probation during
                              __each count__

such period under the supervision of the Department of Corrections of the State of Oklahoma, such deferment

to continue during good behavior and pursuant to the Rules of the Department of Corrections of the State of

Oklahoma, as prescribed in the "Addition to Judgment and Sentence."

The defendant is further taxed costs of this prosecution in the amount of $_____ for which

judgment is hereby rendered.

Upon successful completion of the probationary term, the defendant shall be discharged without a court

judgment of guilt, and the verdict or plea of guilty shall be expunged from the record and said charge shall be

dismissed with prejudice to any further action. Upon violation of the conditions of probation, the court may

enter a judgment of guilt and proceed as provided in Section 1, Title 22-901a of the Oklahoma Statutes

Annotated, 1970. Said counts to run concurrent each with the other and also to run
concurrent with CF-98-346.

_____
JUDGE OF THE DISTRICT COURT

272

Sequoyah County Form CF-1                                    Uniform Plea of Guilty — Summary of Facts
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## THE STATE OF OKLAHOMA

STATE OF OKLAHOMA,                           )
                                             )
                              Plaintiff      )
                                             )
vs.                                          )         Case No. CF 98-128
                                             )                  CF 98-346
                                             )
~Teresa Jordan~                              )
                              Defendant      )
DOB ███████████        19 65                 )
SS# ███████████        5710                  )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 1 2 1999

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

### SUMMARY OF FACTS FOR THE PLEA OF GUILTY

## Part A: Finding of Fact, Acceptance of Plea                                  Circle

1.  Is the name just read to you your true name?                               (YES)   NO
    If no, then what is your correct name? _____
    I have also been known by the name(s) _____
    _____

2.  (A)  Do you wish to have a record of these proceedings made by a Court Reporter ?   (YES)   NO

    (B)  Do you wish to waive your right to have a record of these proceedings made ?    YES    NO

3.  What is your age ? 33   What grade level in school have you completed ? 10th

4.  Can you read and understand this form ? [If no, Addendum A **must** be completed and attached]   (YES)   NO

5.  Are you currently taking any medications or substances which affect your ability to understand   YES   (NO)
    these proceedings ?

6.  Have you been prescribed any medication which you are not taking ?         YES   (NO)
    If yes, what medication are you not taking? _____
    What is the purpose of the medication ? _____
    Why are you not taking the medication ? _____

7.  Have you ever been treated by a doctor or health professional for mental illness or confined in   YES   (NO)
    a hospital for mental illness ?                     **REDACTED**
    If Yes, list doctor or health professional, place, and when treatment occurred:
    _____

8.  Do you understand the purpose, the nature and the consequences of this proceeding ?   (YES)   NO

9.  Have you received a copy of the State's Information and read its allegations ?   (YES)   NO

10.  A.  Do you understand you are charged with:
         Crime Statutory Reference

*98-128* [1] Burglary 2nd Degree   21 o.s. 1435   (YES)  NO
        [2] Larceny from House    21 o.s. 1723   (YES)  NO
        [3] _____  _____ O.S. _____  YES  NO
*58-346* [4] Poss of CDS           63 o.s. 2-402 B1 (YES)  NO
        [5] Poss of Para           63 o.s. 2-405   (YES)  NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

B.  Are you charge after former conviction of a felony (AFCF) ?          YES   NO
If yes, list the felony(ies) charged: _____
_____

11.  Do you understand the range of punishment for the crime(s) is/are ?
     (List in the same order as in Number 10)

[1]  Minimum of ___2___ to a maximum of ___7___ and/or a fine of $_500___  YES  NO
[2]  Minimum of ___0___ to a maximum of ___8___ and/or a fine of $_500___  YES  NO
[3]  Minimum of _____ to a maximum of _____ and/or a fine of $_____  YES  NO
[4]  Minimum of ___2___ to a maximum of ___10___ and/or a fine of $_500___ (YES)  NO
[5]  Minimum of ___0___ to a maximum of _12 mo_ and/or a fine of $_500___ (YES)  NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

12.  **Read the following statements:** You have the right to a speedy trial before a jury of your peers to determine whether you are guilty or not guilty and if you request, to determine the sentence. *If pleading to a capital murder*, advise of the procedure in 21 O.S. 701.10( B)
**At the trial:**
[1] You have the right to have an attorney represent you, either one you hire or *if you are indigent* a court appointed attorney.
[2] You are presumed to be innocent of the charges.
[3] You may remain silent or , if you chose, you may testify on your own behalf.
[4] You have the right to see and hear all witnesses called to testify against you and the right to have those witnesses cross-examined.
[5] You may have your witnesses ordered to appear in court to testify and present evidence of any defense you have to these charges.
[6] The State is required to prove your guilt beyond a reasonable doubt.
[7] The verdict of guilty or not guilty decided by a jury must be unanimous. However, you can waive a jury trial and, if all parties agree, the case could be tried by a Judge alone who would decide if you were guilty or not guilty and if determined to be guilty, the appropriate punishment.

Do you understand each of these rights ?                                 (YES)  NO

13.  Do you understand by entering a plea of guilty you give up these rights ?   **REDACTED**   (YES)  NO

14.  Do you understand that a conviction on a plea of guilty could increase punishment in any future case committed after this plea ?                                (YES)  NO

15.  Is __Gerald Hunter__ your attorney ?                                 (YES)  NO

16.  Have you talked with your attorney about the charges, advised him/her regarding any defense you may have to the charges and received his/her advice ?   (YES)  NO

17. Do you believe your attorney has effectively assisted you in this case and are you satisfied with his/her representation ?   YES / NO

18. Do you wish to change your plea of not guilty to a plea of guilty and give up your right to a jury trial and all previously explained constitutional rights ?   YES / NO

19. Is there a plea agreement ?   YES   NO
What is your understanding of the plea agreement ? *CF-98-128 ct1* 5 yrs deferred Fin's Costs Assessments, ct2 5 yrs deferred Fine, Costs Assessments. *All CC,*
*CF-98-346* 5 yrs deferred Fine Costs Assessments ct2. 1 yr deferred Fine Costs.

20. Do you understand the Court is *not* bound by any agreement or recommendation and if the Court does not accept the plea agreement, you have the right to withdraw your plea of guilty ?   YES / NO

21. Do you understand that if there is no plea agreement the Court can sentence you within the range of punishment stated under question 11 ?   YES   NO   *N/A*

22. Do you understand your plea of guilty to the charge(s) is subject to :   YES / NO
(check one)
[✓] no prior felony conviction
[ ] one (1) prior felony conviction
[ ] two (2) or more felony convictions   List prior felony convictions to which you are pleading:
_____

23. What is/are your plea(s) to the each charge(s) ?
[1] *Guilty* [2] *Guilty* [3] *Guilty* [4] *Guilty* [5] _____

24. Did you commit the acts as charged in the information ?   YES   NO
State a factual basis for your plea(s) (attach additional pages as needed, labeled as ADDENDUM C) :
*I did as Charged, in the Info.*
_____

25. Have you been forced, abused, mistreated or promised anything by anyone to have you enter your plea(s) ?   YES / NO

26. Do you plead guilty of your own free will and without any coercion or compulsion of any kind ?   YES / NO

27. If you are entering a plea to a felony offense, you have a right to a Pre-sentencing investigation and Report which would contain the circumstances of the offense, any criminal record, social history and other background information about you. Do you request a Pre-sentence report ?   YES / NO

28. (A) Do you have any additional statements to make to the Court ?   YES / NO

(B) Is there any legal reason as to why you should *not* sentence now ?   YES / NO

HAVING BEEN SWORN, I , the Defendant whose signature appears below, make the following statements under oath:

(1)   CHECK ONE:   **REDACTED**

____X____ (A)   I have read, understood and completed this form.

_____ (B)   My attorney completed this form and we (the attorney and I) have gone over the form and I understand its contents and agree with the answers. *Complete Addendum A and attach to this form.*

_____ (C)   The Court completed this form for me and inserted my answers to the questions in open court.

(2)   All answers are true and correct.

(3)   I understand that I may be prosecuted for perjury if I have made false statements to this Court.

Acknowledged this 12th Day of Feb. , 1999 .

_Teresa Jordan_
DEFENDANT

I, the undersigned attorney for the Defendant, believe the Defendant understands the nature, purpose, and consequence of this proceeding. (S)He is able to assist me in formulating any defense to the charge(s). I am satisfied that the Defendant's waivers and plea(s) of guilty are voluntarily given and he/she had been informed of all legal and constitutional rights.

_____
ATTORNEY FOR DEFENDANT

The sentence recommendation in question 19 is correctly stated. I believe the recommendation is fair to the State of Oklahoma. Offer of Proof (nolo contendere plea) : _____
_____
_____

_____
ASSISTANT DISTRICT ATTORNEY

## THE COURT FINDS AS FOLLOWS:

(A) The Defendant was sworn and responded to questions under oath.
(B) The Defendant understands the purpose, nature and consequences of this proceeding.
(C) The Defendant's plea(s) of _____ is/are knowingly and voluntarily entered and accepted by the Court Reporter Present Court.
(D) The Defendant is competent for the purpose of this hearing.
(E) A factual basis exists for the plea(s) (and former conviction(s), if applicable).
(F) The Defendant is guilty as charged: (check as appropriate)
    [✓] after no prior felony conviction.
    [ ] after one (1) prior felony conviction.
    [ ] after two (2) or more prior felony convictions
  G. Sentencing or order deferring sentence shall be: [ ] imposed instanter or [ ] continued until the ____ day of _____ , _____ at ____ : _____ ___ . M . If the Pre-sentence investigation and Report is requested, it shall be provided to the Court by the _____ day of _____ , _____ .

DONE IN OPEN COURT this 12TH day of Feb , 1999 .

REDACTED JUDGE OF THE DISTRICT COURT

_John C Garrett_
NAME OF JUDGE TYPED OR PRINTED

_Waived_
Court Reporter Present

_____
Deputy Court Clerk Present

## "NOTICE OF RIGHT TO APPEAL"

Sentence to Incarceration, Suspended or Deferred:

To appeal from this conviction, or order deferring sentence, on your plea of guilty, you must file in the Sequoyah County District Court Clerk's Office a written Application to Withdraw Plea of Guilty within ten (10) days from today's date. You must set forth in detail why you are requesting to withdraw your plea. The trial court must hold a hearing and rule upon your application within thirty (30) days from the date it is filed. If the trial court denies your application, you have a right to ask the Court of Criminal Appeals to review the District Court's denial by filing a Petition for Writ of Certiorari within ninety (90) days of the date of denial. Within ten (10) days from the date the application to withdraw plea of guilty is denied, notice of intent to appeal and designation or record must be filed pursuant to Oklahoma Court of Criminal Appeals Rule 4.2(D). If you are indigent, you have the right to be represented on appeal by a court appointed attorney.

Do you understand each of these rights to appeal ?                              (YES) NO

Do you want to remain in the county jail ten (10) days before being taken to place of     YES (NO)
confinement ?

Have you fully understood the questions that have been asked ?                  (YES) NO

Have your answers been freely and voluntarily given ?                          (YES) NO

I ACKNOWLEDGE UNDERSTANDING OF RIGHTS AND SENTENCE IMPOSED.

_____
Defendant

I, the undersigned attorney, have advised the Defendant of his appellate rights.

_____
Attorney for the Defendant

DONE IN OPEN COURT, this ___12th___ day of ___Feb___, ___1999___.

_____
Judge of the District Court

_____
Court Reporter Present

_____
Deputy Court Clerk Present

## ADDENDUM "A"

## CERTIFICATE OF DEFENSE COUNSEL

As the attorney for the defendant, __Teresa Jordan__, I certify that:

1. The Defendant has stated to me that he/she is [X] able [ ] unable to read and understand the attached form, **and** I have [ ] determined the Defendant is able to understand the English language or [ ] determined the Defendant is unable to understand the English language and obtained _____ _____ to interpret to the Defendant in the _____ REDACTED _____ language.

2. I have read and fully explained to the Defendant the allegations contained in the Information in this case.

3. I have read and fully explained to the Defendant all of the questions in the Plea of Guilty/Summary of Facts and the answers to the questions set out in the Summary of Facts are the Defendant's answers.

4. To the best of my knowledge and belief the statement and declarations made by the Defendant are accurate and true and have been freely and voluntarily made.

Dated this ___12___ day of ___Feb___, ___99___.

_____
Attorney for the Defendant

**Sequoyah County Form CF-1 - b**          **Uniform Plea of Guilty — Sentence on Plea**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case Number CF- _____          State v. _____          Date: _____

**Part B:** Sentence **on Plea**     [NOTE ON USE: Part B is to be used with the Summary of Facts if contemporaneous with the entry of plea or may be formatted as a separate sentencing form if sentencing is continued to a future date.]

**THE COURT SENTENCES THE DEFENDANT AS FOLLOWS:**

<div align="center">DEFERRED SENTENCE</div>

1.  The sentencing date is deferred until _____*Feb*_____, _12_, _2004_ at _1_:_30_ M.

2.  You [ ] will [ ] will not be under supervision by the Department of Corrections. The terms set forth in the Rules and Conditions of Probation in Addendum D shall be the rules you must follow during the period of deferment.

<div align="center">SUSPENDED SENTENCE or SUSPENDED AS TO PART</div>

1.  You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:
[1]_____ [2]_____ [3] _____ [4] _____ [5] _____

TO BE SUSPENDED as follows:

    (A) ALL SUSPENDED  [ ] Yes          [ ] No

    (B) suspended *except* as to the first _____ (months) (years) of the term(s) during which you are to be held in the custody of the Department of Corrections. The remaining term of the sentence(s) is to be suspended under the terms set forth in the Rules and Conditions of Probation in Addendum D.

2.  The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____ _____ or NOT APPLICABLE.

<div align="center">TIME TO SERVE</div>

1.  You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:
[1]_____ [2]_____ [3] _____ [4] _____ [5] _____

2.  The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____ _____ or NOT APPLICABLE.

<div align="center">FINES AND COSTS **REDACTED**</div>

You are to pay in full any fine(s), costs , fees and restitution at the time of sentencing. In the alterative, you may request a stay of execution (SOE) from the Cost Administrator in the Sequoyah County District Court Clerk's Office. All information given to the Cost Administrator in requesting the SOE will be under oath and is considered as part of the summary of facts before the Court. *You will appear in person to make all payments as agreed. Any payment tendered other than in person will be accepted; however, such acceptance does **not** excuse your appearance in the Clerk's Office.*

Sequoyah County Form CF-1                                  Uniform Plea of Guilty — Summary of Facts

---

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## THE STATE OF OKLAHOMA

STATE OF OKLAHOMA,                          )
                                            )
                        Plaintiff           )
                                            )
vs.                                         )        Case No. *CF 98-128*
                                            )                 *CF 98-346*
*Teresa Jordan*                             )
_____,                  )
                        Defendant           )
DOB  ████████████    19 *65*                )
SS#  ████████████    *5710*                 )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 1 2 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

### SUMMARY OF FACTS FOR THE PLEA OF GUILTY

## Part A: Finding of Fact, Acceptance of Plea                                    Circle

1.  Is the name just read to you your true name?                                      (YES)   NO
    If no, then what is your correct name? _____
    I have also been known by the name(s) _____
    _____

2.  (A)  Do you wish to have a record of these proceedings made by a Court Reporter ?   (YES)   NO

    (B)  Do you wish to waive your right to have a record of these proceedings made ?    YES    NO

3.  What is your age ? *33*  What grade level in school have you completed ? *10th*

4.  Can you read and understand this form ? [If no, Addendum A **must** be completed and attached]   (YES)   NO

5.  Are you currently taking any medications or substances which affect your ability to understand   YES   (NO)
    these proceedings ?

6.  Have you been prescribed any medication which you are not taking ?                  YES   (NO)
    If yes, what medication are you not taking? _____
    What is the purpose of the medication ? _____
    Why are you not taking the medication ? _____

7.  Have you ever been treated by a doctor or health professional for mental illness or confined in   YES   (NO)
    a hospital for mental illness ?                     REDACTED
    If Yes, list doctor or health professional, place, and when treatment occurred:
    _____

8.  Do you understand the purpose, the nature and the consequences of this proceeding ?   (YES)   NO

9.  Have you received a copy of the State's Information and read its allegations ?         (YES)   NO

279

10.   A.   Do you understand you are charged with:
Crime Statutory Reference

*98-128* [1] Burglary 2nd Degree   21 o.s. 1435   (YES)   NO
[2] Larceny from House   21 o.s. 1723   (YES)   NO
[3] _____   _____ o.s. _____   YES   NO
*98-346* [4] Poss of CDS   63 o.s. 2-402 B1   (YES)   NO
[5] Poss of Para   63 o.s. 2-405   (YES)   NO

*For additional charges:* List  additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

B.   Are you charge after former conviction of a felony (AFCF) ?     YES   NO
If yes, list the felony(ies) charged: _____
_____

11.   Do you understand the range of punishment for the crime(s) is/are ?
(List in the same order as in Number 10)

[1]   Minimum of ___2___ to a maximum of ___7___ and/or a fine of $ 500   YES   NO
[2]   Minimum of ___0___ to a maximum of ___8___ and/or a fine of $ 500   YES   NO
[3]   Minimum of _____ to a maximum of _____ and/or a fine of $ ___   YES   NO
[4]   Minimum of ___2___ to a maximum of ___10___ and/or a fine of $ 500   (YES)   NO
[5]   Minimum of ___0___ to a maximum of _12 mo_ and/or a fine of $ 500   (YES)   NO

*For additional charges:* List  additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

12.   **Read the following statements:**   You have the right to a speedy trial before a jury of your peers to determine whether you are guilty or not guilty and if you request, to determine the sentence.
*If pleading to a capital murder,* advise of the procedure in 21 O.S. 701.10( B)
**At the trial:**
[1] You have the right to have an attorney represent you, either one you hire or *if you are indigent* a court appointed attorney.
[2] You are presumed to be innocent of the charges.
[3] You may remain silent or , if you chose, you may testify on your own behalf.
[4] You have the right to see and hear all witnesses called to testify against you and the right to have those witnesses cross-examined.
[5] You may have your witnesses ordered to appear in court to testify and present evidence of any defense you have to these charges.
[6] The State is required to prove your guilt beyond a reasonable doubt.
[7] The verdict of guilty or not guilty decided by a jury must be unanimous.  However, you can waive a jury trial and, if all parties agree, the case could be tried by a Judge alone who would decide if you were guilty or not guilty and if determined to be guilty, the appropriate punishment.

Do you understand each of these rights ?     (YES)   NO

13.   Do you understand by entering a plea of guilty you REDACTED these rights ?     (YES)   NO

14.   Do you understand that a conviction on a plea of guilty could increase punishment in any future case committed after this plea ?     (YES)   NO

15.   Is Gerald Hunter _____ your attorney ?     (YES)   NO

16.   Have you talked with your attorney about the charges, advised him/her regarding any defense you may have to the charges and received his/her advice ?     (YES)   NO

280

17. Do you believe your attorney has effectively assisted you in this case and are you satisfied with his/her representation ?    YES   NO

18. Do you wish to change your plea of not guilty to a plea of guilty and give up your right to a jury trial and all previously explained constitutional rights ?    YES   NO

19. Is there a plea agreement ?    YES   NO
What is your understanding of the plea agreement ? *CF-98-128 ct1 5 yrs deferred Fine, Costs Assessments, ct2 5 yrs deferred Fine, All CC, Costs Assessments. CF-98-346 5 yrs deferred Fine Costs assessments ct2. 1 yr deferred Fine Costs .*

20. Do you understand the Court is *not* bound by any agreement or recommendation and if the Court does not accept the plea agreement, you have the right to withdraw your plea of guilty ?    YES   NO

21. Do you understand that if there is no plea agreement the Court can sentence you within the range of punishment stated under question 11 ?    YES   NO   N/A

22. Do you understand your plea of guilty to the charge(s) is subject to :
(check one)
[ ✓ ] no prior felony conviction
[   ] one (1) prior felony conviction
[   ] two (2) or more felony convictions   List prior felony convictions to which you are pleading:    YES   NO

23. What is/are your plea(s) to the each charge(s) ?
[1] *Guilty* [2] *Guilty* [3] *Guilty* [4] *Guilty* [5] _____

24. Did you commit the acts as charged in the information ?    YES   NO
State a factual basis for your plea(s) (attach additional pages as needed, labeled as ADDENDUM C) :
*I did as Charged, in the Info .*

25. Have you been forced, abused, mistreated or promised anything by anyone to have you enter your plea(s) ?    YES   NO

26. Do you plead guilty of your own free will and without any coercion or compulsion of any kind ?    YES   NO

27. If you are entering a plea to a felony offense, you have a right to a Pre-sentencing investigation and Report which would contain the circumstances of the offense, any criminal record, social history and other background information about you. Do you request a Pre-sentence report ?    YES   NO

28. (A) Do you have any additional statements to make to the Court ?    YES   NO

(B) Is there any legal reason as to why you should *not*   sentence now ?    YES   NO

HAVING BEEN SWORN, I, the Defendant whose signature appears below, make the following statements under oath:

(1)   CHECK ONE:   **REDACTED**

____✗____ (A)   I have read, understood and completed this form.

_____ (B)   My attorney completed this form and we (the attorney and I) have gone over the form and I understand its contents and agree with the answers. *Complete Addendum A and attach to this form.*

_____ (C) The Court completed this form for me and inserted my answers to the questions in open court.

(2) All answers are true and correct.

(3) I understand that I may be prosecuted for perjury if I have made false statements to this Court.

Acknowledged this 12th Day of _____Feb._____, 1999.

_____
DEFENDANT

I, the undersigned attorney for the Defendant, believe the Defendant understands the nature, purpose, and consequence of this proceeding. (S)He is able to assist me in formulating any defense to the charge(s). I am satisfied that the Defendant's waivers and plea(s) of guilty are voluntarily given and he/she had been informed of all legal and constitutional rights.

_____
ATTORNEY FOR DEFENDANT

The sentence recommendation in question 19 is correctly stated. I believe the recommendation is fair to the State of Oklahoma. Offer of Proof (nolo contendere plea) : _____
_____
_____

_____
ASSISTANT DISTRICT ATTORNEY

**THE COURT FINDS AS FOLLOWS:**

(A) The Defendant was sworn and responded to questions under oath.
(B) The Defendant understands the purpose, nature and consequences of this proceeding.
(C) The Defendant's plea(s) of _____ is/are knowingly and voluntarily entered and accepted by the
Court Reporter Present Court.
(D) The Defendant is competent for the purpose of this hearing.
(E) A factual basis exists for the plea(s) (and former conviction(s), if applicable).
(F) The Defendant is guilty as charged: (check as appropriate)
[✓] after no prior felony conviction.
[ ] after one (1) prior felony conviction,
[ ] after two (2) or more prior felony convictions
G. Sentencing or order deferring sentence shall be: [ ] imposed instanter or [ ] continued until the ____ day of _____, _____ at ____ : _____ __ . M . If the Pre-sentence investigation and Report is requested, it shall be provided to the Court by the _____ day of _____, _____ .

DONE IN OPEN COURT this _12TH_ day of _Feb_____, 1999.

_____
REDACTED JUDGE OF THE DISTRICT COURT

John C Garrett
_____
NAME OF JUDGE TYPED OR PRINTED

Waived
_____
Court Reporter Present

_____
Deputy Court Clerk Present

**"NOTICE OF RIGHT TO APPEAL"**

Sentence to Incarceration, Suspended or Deferred:

To appeal from this conviction, or order deferring sentence, on your plea of guilty, you must file in the Sequoyah County District Court Clerk's Office a written Application to Withdraw Plea of Guilty within ten (10) days from today's date. You must set forth in detail why you are requesting to withdraw your plea. The trial court must hold a hearing and rule upon your application within thirty (30) days from the date it is filed. If the trial court denies your application, you have a right to ask the Court of Criminal Appeals to review the District Court's denial by filing a Petition for Writ of Certiorari within ninety (90) days of the date of denial. Within ten (10) days from the date the application to withdraw plea of guilty is denied, notice of intent to appeal and designation or record must be filed pursuant to Oklahoma Court of Criminal Appeals Rule 4.2(D). If you are indigent, you have the right to be represented on appeal by a court appointed attorney.

Do you understand each of these rights to appeal ?                                          YES  NO

Do you want to remain in the county jail ten (10) days before being taken to place of      YES  (NO)
confinement ?

Have you fully understood the questions that have been asked ?                              (YES)  NO

Have your answers been freely and voluntarily given ?                                       (YES)  NO

I ACKNOWLEDGE UNDERSTANDING OF RIGHTS AND SENTENCE IMPOSED.

_____
Defendant

I, the undersigned attorney, have advised the Defendant of his appellate rights.

_____
Attorney for the Defendant

DONE IN OPEN COURT, this _12th_ day of ___Feb___, _1999_.

_____
Judge of the District Court

_____
Court Reporter Present

_____
Deputy Court Clerk Present

ADDENDUM "A"

CERTIFICATE OF DEFENSE COUNSEL

As the attorney for the defendant, _Teresa Jordan_, I certify that:

1. The Defendant has stated to me that he/she is [X] able [ ] unable to read and understand the attached form, **and** I have [ ] determined the Defendant is able to understand the English language or [ ] determined the Defendant is unable to understand the English language and obtained _____ to interpret to the Defendant in the REDACTED _____ language.

2. I have read and fully explained to the Defendant the allegations contained in the Information in this case.

3. I have read and fully explained to the Defendant all of the questions in the Plea of Guilty/Summary of Facts and the answers to the questions set out in the Summary of Facts are the Defendant's answers.

4. To the best of my knowledge and belief the statement and declarations made by the Defendant are accurate and true and have been freely and voluntarily made.

Dated this _12_ day of ___Feb___, _99_.

_____
Attorney for the Defendant

283

**Sequoyah County Form CF-1 - b**          **Uniform Plea of Guilty — Sentence on Plea**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case Number CF- _____          State v. _____          Date: _____

**Part B:** Sentence **on Plea**     [NOTE ON USE: Part B is to be used with the Summary of Facts if contemporaneous with the entry of plea or may be formatted as a separate sentencing form if sentencing is continued to a future date.]

**THE COURT SENTENCES THE DEFENDANT AS FOLLOWS:**

DEFERRED SENTENCE

1. The sentencing date is deferred until _____*Feb*_____ , *12* , *2004* at *1:30* M.

2. You [ ] will [ ] will not be under supervision by the Department of Corrections. The terms set forth in the Rules and Conditions of Probation in Addendum D shall be the rules you must follow during the period of deferment.

SUSPENDED SENTENCE or SUSPENDED AS TO PART

1. You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:
[1]_____ [2]_____ [3] _____ [4] _____ [5] _____

TO BE SUSPENDED as follows:

(A) ALL SUSPENDED  [ ] Yes          [ ] No

(B) suspended *except* as to the first _____ (months) (years) of the term(s) during which you are to be held in the custody of the Department of Corrections. The remaining term of the sentence(s) is to be suspended under the terms set forth in the Rules and Conditions of Probation in Addendum D.

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____ _____ or NOT APPLICABLE.

TIME TO SERVE

1. You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:
[1]_____ [2]_____ [3] _____ [4] _____ [5] _____

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____ _____ or NOT APPLICABLE.

FINES AND COSTS **REDACTED**

You are to pay in full any fine(s), costs , fees and restitution at the time of sentencing. In the alterative, you may request a stay of execution (SOE) from the Cost Administrator in the Sequoyah County District Court Clerk's Office. All information given to the Cost Administrator in requesting the SOE will be under oath and is considered as part of the summary of facts before the Court. *You will appear in person to make all payments as agreed.* Any payment tendered other than in person will be accepted; however, such acceptance does **not excuse** your appearance in the Clerk's Office.

284

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

Case No: *CF-98-123*          Defendant: *Teresa Jordan*

## ACCUMULATIVE COURT COST FOR SEQUOYAH COUNTY

### NON-VIOLENT COURT COST

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 1 2 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**COURT FUND**

| | | |
|---|---|---|
| Court Fees | | $103.00 |
| Bail Bond Fee | $10.00 @ 2 | 20.00 |
| Jury Fee | $30.00@ | |
| Fines | set by court | 1000.00 |
| Mailing fee | $7.00 @ | |
| Sub total Court Fund | | 1123.00 |

**SHERIFF FEES**

| | | |
|---|---|---|
| Sheriff Fees | | $5.00 |
| Arrest Warrant | $20.00 | |
| Bench Warrnts | $20.00@ 1 | 20.00 |
| Subpoenas | $20.00@ | |
| Sub total Sheriff Fees | | 25.00 |

| | | |
|---|---|---|
| LAW LIBRARY | | $3.00 |
| CLEET & FINGERPRINTING | | $7.00 |
| VCA | $25.00 or set by court | 250.00 |
| OSBI LAB | set by court | |
| D.A. DRUG FUND | set by court | |
| REVOLVING FUND(appl fee-$40.00) | | 45.00 |
| IDF-ATTORNEY FEE | set by court | 150.00 |

**TOTAL**          **REDACTED**          $1603.00

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,            )
      Plaintiff              )
                       )
vs.                               )      Case No. CF-98-00128A
TERESA JORDAN                     )             CF-98-00346A
                                  )
█████████████                     )
                                  )
SALLISAW, OK  74955               )
      Defendant              )
   SS#: █████5710
   DOB: █████1965

Date: 04/06/99          State's Attorney: ROBBIE COWAN
                    Defendant's Attorney: GERALD HUNTER
                           RULE 8 HEARING
                             (Summary)

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR - 6 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:


_____ $50.00 on or before _4-30-99_ and then


_____ $50.00 per month on or before _05-25-1999_

then _50.00_ per month on or before the _6-25-99_ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before ~~4-30-99~~

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _Defendant is ordered to re-appear on the 25th day of June 1999 to increase payments. CF-98-128 $ 1603   CF-99-346 = $ 2118.00_

TOTAL TO PAY $ _3721.00_

REDACTED

_____
JOHN C. GARRETT
Judge of the District Court

_____
Defendant

*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,                )
          Plaintiff                   )
                                      )
vs.                                   )     Case No. CF-98-00128A
                                      )
TERESA JORDAN                         )           CF-98-00346A
                                      )
▮▮▮▮▮▮▮▮▮▮▮                           )
                                      )
VIAN, OK  74962                       )
          Defendant                   )
     SS#: ▮▮▮▮5710
     DOB: ▮▮▮1965

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 1 4 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

Date: 06/14/99          State's Attorney: ROBBIE COWAN
                   Defendant's Attorney: GERALD HUNTER
                        RULE 8 HEARING
                          (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:


_____ $75.00 on or before 7-15-99  and then

_____ $75.00 per month on or before 08-15-1999

then _75⁰⁰_ per month on or before the 15ᵗʰ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before ~~7-15-99~~ _____

OR; _____



IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _CF-98-128=$1603⁰⁰_____

_CF-99-346=$2118⁰⁰_____


TOTAL TO PAY $ 3721⁰⁰                          **REDACTED**

_____        JOHN T. GARRETT
         Defendant              Judge of the District Court

*Defendant is further ordered to notify the Collections Adm. of
 any change of address, telephone, employment, or income.

#CF-98-128  3000°°
CF-98-346-20,000
CF-98-363

**Case No:** CF-97-9

**Bond Amount:** 30,000·°°

Unassigned  8500°°
(6/23/99

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

OCT 25 1999

BERNELL EDWARDS, COURT CLERK

BY _____ AW _____ DEPUTY

## CERTIFICATE OF SURRENDER

I, Jenny Manley, jailer  SCSO  ,

State of Oklahoma, hereby acknowledge that I received from

Joe Mosier

~~Diane Hamilton~~, a licensed Bail Bondsman in the State

of Oklahoma. Charles Sanders , defendant, in a

certain case pending in District Court, District

County, State of Oklahoma.  That I have retained in my custody

Charles Sanders , defendant, this  22  day of

Oct , 19 99 , at _____ o'clock _____ m.

Jenny K. Manley,
Jailer

REDACTED

288



# Hamilton - Morgan Bail Bonds
## Diane Hamilton
## APPEARANCE BOND

IN THE DISTRICT COURT OF _____Sequoyah_____ COUNTY, STATE OF OKLAHOM
State of Oklahoma, Plaintiff,

vs. _Charles Sanders_ , Defendant        Case No. _CF-98-128_

Know all men by these presents, that we the above named defendant, as principal, and the undersigned
_____Joe Morgan_____ Diane Hamilton, Professional as surety(ies) personally appeared befor
the undersigned authority and jointly and severally acknowledged themselves to be indebted to the Stat
of Oklahoma in the sum of_____eighty five hundred_____ Dollars ($ _8,500_

good and lawful money of the United States, to which payment well and truly to be made we bin
ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to
the county jail of _Sequoyah_ County, State of Oklahoma, shall personally be and appear before
the District Court of said county on the _7_ day of _July_ , 19_99_ , at____ o'clock___ ., of said
day, and from term to term, and from day to day of each term, to answer a charge preferred against him
for the offense of _DUS, TCC, No Insurance, All taxes Due to state, P. of may, p. of po_
_Problem weapon_
and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court
without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this _23_ day of _June_ , 19_99_ .

X _Charles Sanders_ Principal [REDACTED] _Joe Morgan_ Address
Hamilton - Morgan        Surety        113 North Oak  Sallisaw, Oklahoma 74955
Diane Hamilton
_Joe Morgan_ Surety [REDACTED] _Sallisaw OK 74955_ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _23_ day of _June_ , 19 _99_ .

_____ Court Clerk/Sheriff _Leila Zehher_ _____Deputy

This undertaking approved this _23_ day of _June_ , 19 _99_ .

(SEAL)                    By: _____ Deputy/Clerk

---

### AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, _Sequoyah_ REDACTED County, SS:

The undersigned, being first duly sworn upon oath, says that he is a resident of _Sequoyah_
County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any
security or consideration for making this undertaking, except as herinafter specified under one or more of
the following relevant statutory provisions, to-wit:
    a) Consideration for this undertaking received or promised in the sum of $_1275_

    b) Other security received or promised for making this undertaking, is as follows:_____
_____ _no._ _____

    c) Such promise, security or consideration was received from:_____
X _Charles Sanders_ [REDACTED] _Sallisaw ok 74955_
Name

I understand that any willful misstatement relating to the security or consideration promised or given shall
make me liable to the same prosecution and penalty as on commits perjury.
_Joe Morgan_ [REDACTED] _Sallisaw ok 74955_
Affiant                              Address

Subscribed and sworn to before me this _23_ day of _June_ , 19 _99_ .

(SEAL)

_____
Court Clerk - Notary Public

My Commission Expires:                    _____
                                          Deputy

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Plaintiff | ) | |
| vs. | ) | Case No. CF-98-00128A |
| TERESA JORDAN | ) | CF-98-00346A |
| | ) | CF-99-00332 |
| | ) | |
| ~~VDABQXOK~~4474962 | ) | |
| Defendant | ) | |

SS#: ████710
DOB: ████1965

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 1 3 2000

State's Attorney:
Defendant's Attorney:

Date: 11/13/00                          ROBBIE COWAN
                    RULE 8 HEARINGGERALD HUNTER  BERNELL EDWARDS, COURT CLERK
                         (Summary)                    BY _____ DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $100.00 on or before 01-05-20 and then

_____ $100.00 per month on or before 02-05-2001

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 01-05-20 _____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: CF-98-128A = $ 1510 / CF-98-346A = $ 2118
CF-99-332 = $ 1308

TOTAL TO PAY $ 4936        REDACTED

                                    _____
                                    JOHN C. GARRETT
_____                Judge of the District Court
Defendant
*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

290

BENCH WARRANT-AFTER CONVICTION

| | |
|---|---|
| THE STATE OF OKLAHOMA, | ) |
| | ) |
| vs. | )   Case No. CF-98-00128A |
| TERESA JORDAN | |
| ▮▮▮▮▮▮▮▮ | NO BOND |
| VIAN, OK  74962 | |
| ▮▮▮▮1965   ▮▮▮▮5710 | |

BENCH WARRANT

THE STATE OF OKLAHOMA,
    TO ANY SHERIFF, CONSTABLE, MARSHALL, OR POLICEMAN IN THIS STATE
GREETINGS:
TERESA JORDAN having been on November 13, 2000, duly convicted in the
District Court of Sequoyah County, State of Oklahoma, of the crime of:
FAILURE TO APPEAR AND PAY MONIES DUE THE COURT IN THE AMOUNT OF $4069.00

    YOU ARE THEREFORE COMMANDED FORTHWITH to arrest the above named
defendant, TERESA JORDAN, and bring him/her before said Court for judgement,
or if said Court has adjourned for the term, deliver him/her to the Sheriff
of the County of Sequoyah; there to be detained by said Sheriff until
further order of the court;

    WITNESS my hand and seal of said Court this 03-21-2003.


                                        BERNELL EDWARDS
                                        COURT CLERK

                                    By: *Amanda Adams*
                                        Deputy

        WILL ONLY EXTRIDATE FROM SURROUNDING STATES

                        SHERIFF'S RETURN


RECEIVED the within Writ on the _____ day of _____, 199__, at
_____o'clock __.m., and executed on the _____ day of _____, 199__, at
_____ o'clock __.m., by _____.

DATED this _____ day of _____, 1999.

                                    JOHNNY PHILPOT,
                                    SHERIFF, SEQUOYAH COUNTY
                    **REDACTED**
                                    BY:_____
                                        Deputy

dms

SEQUOYAH COUNTY, OKLAHOMA
IN DISTRICT COURT

MAY 15 2003

Sequoyah County
Warrant Clearance

BERNELL EDWARDS, COURT CLERK
BY_____
                          DEPUTY

Warrant Number: CF-98-00128A

Warrant Name: Teresa Jordan a.k.a. Fields

Time & Date Cleared: May 14, 2003 @ 17:13

Warrant Cleared By;

Arrest___X___ Officer Serving: Kenneth Wilson

Badge #: 824 Agency: Sequoyah County Sheriff

Canceled_____ Official Directing Cancelation:_____

Was warrant pulled from file?          (YES)                    NO

If no explain:_____

Was warrant marked off warrant book?   (YES)                    NO

If no explain:_____

Was warrant canceled from NCIC?        (YES)          NOT ENTERED

Was warrant removed from holds book?   (YES)          NO HOLD PLACED

Sheriff's Office employee signature: Amanda Wittman

NOTE: After completing this form, staple it to the back of warrant, and put it in the folder marked *COURT CLERK*. Use this form only to clear *Sequoyah County Warrnats*. Every warrant must be cleared on a seperate form.

REDACTED

292

*Order Day 4/031 Ermine,*
*C.C. Merrill*

BENCH WARRANT-AFTER CONVICTION

THE STATE OF OKLAHOMA,      )

                )

vs.             )   Case No. CF-98-00128A

TERESA JORDAN *AKA Fields*

▉▉▉▉▉▉▉▉▉▉        NO BOND

VIAN, OK  74962

▉▉▉▉▉1965  ▉▉▉▉▉5710

BENCH WARRANT

THE STATE OF OKLAHOMA,

  TO ANY SHERIFF, CONSTABLE, MARSHALL, OR POLICEMAN IN THIS STATE
GREETINGS:
TERESA JORDAN having been on November 13, 2000, duly convicted in the
District Court of Sequoyah County, State of Oklahoma, of the crime of:
FAILURE TO APPEAR AND PAY MONIES DUE THE COURT IN THE AMOUNT OF $4069.00

  YOU ARE THEREFORE COMMANDED FORTHWITH to arrest the above named
defendant, TERESA JORDAN, and bring him/her before said Court for judgement,
or if said Court has adjourned for the term, deliver him/her to the Sheriff
of the County of Sequoyah; there to be detained by said Sheriff until
further order of the court;

  WITNESS my hand and seal of said Court this 03-21-2003.

               BERNELL EDWARDS
               COURT CLERK

             By: *Amanda Adams*
               Deputy

    WILL ONLY EXTRIDATE FROM SURROUNDING STATES

        SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199__, at
_____o'clock __.m., and executed on the _____ day of _____, 199__, at
_____ o'clock __.m., by _____.

DATED this _____ day of _____, 1999.

          JOHNNY PHILPOT,
          SHERIFF, SEQUOYAH COUNTY

     **REDACTED**   BY: _____
             Deputy

dms

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 170**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                     *U.S. v. Barrett*, 6:09-cv-00105-JHP

# B B B

## Berglan Bail Bonds
### 235-0007

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 15 2004

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

## APPEARANCE BOND

**POWER NUMBER** 1430

LICENSE # 800625  D.O.B. ▓▓▓▓ 76

District Court, Case No. CF-04-613

**STATE OF OKLAHOMA, SEQUOYAH COUNTY, ss:**

BE IT REMEMBERED that on the 10 day of Nov 2004 Cynthia Crawford as principal of SEQUOYAH County and State of OKLAHOMA, Judy Berglan / Judy Berglan as securities residents of Sequoyah County and State aforesaid appeared personally before the undersigned authority **Sequoyah County Court Clerk** in and for Sequoyah County, and jointly and severally thousand acknowledged themselves to be indebted to the State of Oklahoma in the sum of Eleven ~~thousand~~ DOLLARS ($ 11,000 ), to be made and levied on their respective goods, chattles, and lands, tenements, cash deposit and/or escrow deposit, to be void, however if the said Cynthia Crawford Defendant, who has been committed to the county jail of Sequoyah County, State of Oklahoma, shall personally be and appear before the District Court of said County on the 17 day of Nov 04 at 10 o'clock A .m., of said day and from term to term, and from day to day of each term, to answer a charge preferred against him/her for the offense of

poss of marij/para afcf

and to do and receive what shall be enjoined by said Court upon him/her, and shall not depart the said court without leave.

WITNESS our hands and seals this _____ day of _____

Principal X Cynthia Crawford Address of Principal ▓▓▓▓▓▓▓▓▓▓

**Berglan Bail Bonds** Surety, Address of Surety 112 N. Main, Sallisaw, OK 74955.   Pam OK 74962

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, ~~this~~ ___ day of _____ , ____ Bernell Edwards, District Court Clerk, by Deputy _____ . This undertaking approved this _____ day of _____ , _____ Bernell Edwards, Court Clerk, _____ ,Judge.

### AFFIDAVIT AS TO UNDERTAKING

**STATE OF OKLAHOMA, SEQUOYAH COUNTY, ss:**

Judy Berglan , being first duly sworn upon oath, says that he/she is a resident of Sequoyah County, State of Oklahoma, and that

(a) Neither he/she nor anyone for his/her use has been promised or has received any surety or consideration. for making this undertaking

(b) He/She has received the sum of $0 from _____ **DEFENDENT** and/or has been promised the sum of $ 1100 from Travis Crawford as consideration for making this undertaking.

(c) He/She has received the following described property or instrument from _____ **DEFENDANT ET AL** as security for making this undertaking: **INDEMNITY AGREEMENT SIGNED BY DEFENDANT....**

(d) _____ **DEFENDANT ET AL** has promised to secure him/her for making this undertaking.

Surety X Judy Berglan , Professsional   Judy L. Berglan

Subscribed and sworn to before me this _____ day of _____ , _____.

_____     _____

**NOTARY PUBLIC**            **My Commission Expires**
(Sec. 1322, Title 59, O.S.A.)

POWER OF ATTORNEY
Judy Berglan
Berglan Bail Bonds
112 N. Main St.
Sallisaw, OK 74955

JB

№ 1430

KNOW ALL MEN BY THESE PRESENTS: That Judy Berglan, Professional Bondsman licensed by the State of Oklahoma, does constitute and appoint the below named agent as my Attorney in Fact to execute Bail Bonds only in my name and on my behalf as Surety. *THIS POWER MUST BE ATTACHED TO AND FILED WITH THE BAIL BOND WRITTEN ON THE DEFENDANT NAMED BELOW AND IS VOID IF ALTERED OR ERASED.*

Dated this ____10____ day of ____Nov____, 20__04__

Defendant Name: __Cynthia____Elaine____Crawford__
    (First)          (Middle)          (Last)

D.O.B.: _____ Amt. of Bond: $ __11,000__ Premium: $ __1100⁰⁰__

Offense: __pass of marij, para, afcf__

Case Number: _____ Court: __District__

City: __Sallisaw__ Court Date: __Nov 17 '04__ Posted For: __Berglan__

Rewrite of Power #: _____ Dated: _____ Amount: $ _____

__Judy Berglan__                    __Judy Berglan__
Executing Agent's Signature          Professional Bondsman's Signature

296

INFORMATION

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 16 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

=====================================================================

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

|  |  |  |
|---|---|---|
| **STATE OF OKLAHOMA** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. CF-2004- 613** |
| | ) | |
| | ) | |
| **CINDY CRAWFORD** | ) | |
| **AKA/ CYNTHIA MATTOX** | ) | |
| **DOB:** ▉-1976 **SS#** ▉-2026 | ) | |
| **Defendant.** | ) | |

## I N F O R M A T I O N

### IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes RICHARD GRAY, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that Cindy Crawford did, in Sequoyah County, and in the State of Oklahoma, on or about the 10th day of November , in the year of our Lord, Two Thousand Four, and before the presentment hereof, commit the crime of

**COUNT I    UNLAWFUL POSSESSION OF MARIHUANA-63 O.S. 2-402 (B)(2)**
That on the day and year and in the county and state aforesaid, said  Cindy Crawford did unlawfully, wilfully, knowingly, intentionally and wrongfully have in her possession and under her control MARIHUANA, said drug being classified as a controlled dangerous substance in Schedule I (C) of the Uniform Controlled Dangerous Substances Act of this State, after having previously been convicted of the crime of UNLAWFUL POSSESSION OF MARIHUANA in the District Court of Sequoyah County in case no. CF-99-645

**COUNT II UNLAWFUL POSSESSION OF PARAPHERNALIA-(MISD) 63 O.S. 2-405**
On the day and year in the County and State aforesaid, said Cindy Crawford did unlawfully, wilfully and wrongfully have in  her possession and under her control certain paraphernalia, to-wit: Plastic Baggie, used to consume drugs classified as controlled dangerous substances under the Uniform Controlled Dangerous Substances Act of this State, and for the purpose and with the unlawful intent to administer such controlled dangerous substances without having any medical or other lawful need requiring possession of said paraphernalia,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

RICHARD GRAY

DISTRICT ATTORNEY

By _____
                Assistant District Attorney

STATE OF OKLAHOMA   )
                    ) ss.
COUNTY OF SEQUOYAH )

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____
                Affiant

Subscribed and sworn to before me this 16th day of November, 2004.

_____
                NOTARY PUBLIC

My Commission Expires:
6/23/08   #00010626

WITNESSES:
Det. John Owens Sallisaw P.D., Sallisaw, Ok
Det. Jeff Murray Sallisaw P.D., Sallisaw, Ok
Deputy Chris Grizzle SCSO, 119 So. Oak, Sallisaw, Ok
Deputy Frank Lloyd SCSO, 119 So, Oak, Sallisaw, Ok
Det. Sandra Girdner Sallisaw P.D., Sallisaw, Ok
OSBI Chemist, OSBI Lab, Tahlequah, Ok

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 16 2004

BERNELL EDWARDS COURT CLERK
BY_____DEPUTY

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,                )
                    PLAINTIFF,        )
                                      )
VS                                    )        CASE NO. CF-2004-613
                                      )
CINDY CRAWFORD                        )
                    DEFENDANT

### EVIDENCE INSPECTION NOTIFICATION

COMES NOW the State of Oklahoma District Attorney of Sequoyah County, Oklahoma, Richard L. Gray, pursuant to 22 O.S. 2002 Supp., 258, and gives notice that law enforcement reports regarding this case are available for inspection at least five (5) days prior to the date of the preliminary hearing.

To inspect the law enforcement reports make a written request to the office of the Sequoyah County District Attorney by delivering, faxing or mailing such request to:

SEQUOYAH COUNTY DISTRICT ATTORNEY
120 E. CHICKASAW
SALLISAW, OK 74955
FAX: (918) 775-1215

The request must be received at least one day in advance of the date of inspection. Each request must include the name of the defendant, case number, date of the preliminary hearing and date of the requested inspection. Inspection may be made on any business day between the hours of nine (9( o'clock a.m. and four (4) o'clock p.m. in the Sequoyah County District Attorney's office

RICHARD L. GRAY
BY:_____
Assistant District Attorney

299

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA  CF-2004-613

### Probable Cause Affidavit for Warrantless Arrest

Comes now the undersigned Affiant, and states upon Oath or Affirmation that the following information and facts are correct to the best of the Affiant's knowledge and belief:

Name of Person Arrested: Crawford, Cindy _____ Social Security Number: 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 _____

Date of Birth: ████ / 76 _ Date of Arrest (Detention): 11 / 10 / 04  Time of Arrest: 8:30 ___ A_.M.

State Specific Facts for Probable Cause for the Arrest and Detention:

See page two

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**NOV 16 2004**

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

[Use reverse side or attach another page if necessary]

Anticipated Charge(s): possession of marijuana II, possession of paraphernalia, afcf

AFCF: No / Yes times (1) (2) or _____          _____
                                                  Affiant (Arresting Officer)

Subscribed and sworn to before me the undersigned, this _12th_ Day of _November_ 2004

My Commission Expires: 5-14-2005
#01006902J
                                                  Notary Public / Judge / Witness

### Probable Cause Determination

I, _Dennis M. Sprouse_____, Judge of the District Court reviewed this Probable Cause Affidavit on the _15th_ day of _November_____, 2004, at _10:47_ (A.M)/P.M.

___dns___  This Affidavit contains sufficient facts showing probable cause to detain the Arrestee to await further proceedings. The Sheriff for Sequoyah or Chief of Police of the arresting agency is hereby commanded to receive him/her into their custody and detain until he/she is legally discharged.

___dns___  The Court sets [___]an Appearance Bond in the amount of $_____.00 or [dns] as per Sequoyah County Bond Schedule.

_____  The Court denies Bond at this time.

_____  This Affidavit contains insufficient facts to show there exists probable cause to detain the Arrestee. **The Arrestee is Ordered Released From Custody Immediately.**

_____
Judge of the District Court

300

On 11-10-2004 @ 08:30, I assisted in the execution of a search warrant at the Callahan Motel, room 106, the residence of Travis & Cindy Crawford. After knocking & announcing, we breached the door. Inside the residence, I found a w/f I recognized as Cindy Crawford, asleep in the bed. No other occupants were found in the room. During the search of the residence, I saw a partial handrolled cigarette & a loose green leafy stem on a table in the livingroom area. After miranda, Cindy Crawford stated that the marijuana on the table was the only drugs in the residence. Crawford also stated that her husband, Travis Crawford whom lived there with her, was gone to work at Akins. Cindy Crawford was arrested for possession of marijuana & was arrested w/o incident. We continued the search & found a plastic baggie w/ green leafy substance, a rolling paper & partial handrolled cigarettes, under the mattress of the bed. We also found documents in the residence in the names of Cynthia Crawford & Travis Crawford. Also found was a baggie w/ mixed pills. I field tested the green leafy substance from the partial handrolled cigarette from the livingroom & a positive reaction for the presence of marijuana occurred. A criminal history check showed that both Cynthia Crawford & Travis Crawford have a prior felony conviction for cultivation of marijuana.

301

# In the District Court in and for Sequoyah County, State of Oklahoma

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 3 0 2004

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

State of Oklahoma,

        Plaintiff,

vs.

Cindy Crawford

        Defendant

Case No. CF- 04 - 613

## WAIVER OF PRELIMINARY HEARING

Now on this **22** day of **Dec**, **2004**, the above styled case comes on for preliminary hearing. The defendant appears in person and represented by his attorney of record, **Pro Se**, the State of Oklahoma appears by its Assistant District Attorney. Thereupon the defendant herein acknowledges having been advised of the right to a preliminary hearing. That in said hearing the State of Oklahoma must prove to the satisfaction of the Court that the crime as alleged in the information was, in fact, committed and there is probable cause to believe that the defendant committed said crime. That if said burden was not met then the case would be dismissed and the bond exonerated.

The defendant is further advised that at said hearing that he/she has the right to cross examine any of the State's witnesses and to call witnesses on his/her own behalf. And further, the defendant is advised of the right at the hearing to limited discovery of the State's case in chief.

Having these rights in mind, the defendant herein, waives all the above rights with respect to a preliminary hearing in this matter.

_____
Defendant

_____
Attorney for Defendant

## WAIVER OF JURISDICTION OF EXAMINING MAGISTRATE

The defendant is further advised that neither the examining magistrate nor the Special Judge has the jurisdiction to proceed further with the case unless affirmatively waived. Having these rights in mind, the defendant hereby waives his/her rights to object to any jurisdictional defects of the Court.

_____
Defendant

_____
Attorney for Defendant

## COURT MINUTE OF PRELIMINARY HEARING

The defendant in the above styled case having knowingly and intelligently waived his/her rights to the preliminary hearing and there being no objection by the State of Oklahoma, the Court accepts the defendant's waiver and hereby binds the defendant over to stand trial in the District Court of Sequoyah County, State of Oklahoma, on the charges as set out in the information as filed in this case.

Jan. 13, 2005
@ 1:30 p.m.

J. Garrett

_____
JUDGE OF THE DISTRICT COURT

302

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

# BENCH WARRANT
## FAILURE TO APPEAR

**ISSUED**
3-3-05

**STATE OF OKLAHOMA**
Plaintiff

VS.

**Case No: CF-04-00613**

**CINDY CRAWFORD aka Cindy Mattox**
Defendant

S.S.#: ██████026
D.O.B: ██████-76

THE STATE OF OKLAHOMA,
To any Sheriff or Policeman in this State
GREETINGS:

WHEREAS, an INFORMATION having been filed on 11-16-2004, in the DISTRICT Court of SEQUOYAH County, State of Oklahoma, charging:

> **Name: CINDY CRAWFORD**
> **Address:** ████████ SALLISAW, OK, 74955
> ████026 ████76

with the crime of **UNLAWFUL POSSESSION OF MARIHUANA—**
**FAILURE TO APPEAR AS CITED ON OR BEFORE APPEARANCE DATE**

# BOND: $ 22,000.00

You are therefore commanded forthwith to arrest the above named defendant and bring said defendant before the District Court of SEQUOYAH County to answer said Charge, or if the Court has adjourned, that you deliver said defendant into the custody of the Sheriff of SEQUOYAH County, to be detained by said Sheriff until the further order of the Court, or until bond is posted as listed above.

GIVEN UNDER MY HAND AND SEAL of said Court, this _3rd_ day of __March__, 2005.
BY ORDER OF THE COURT:

BERNELL EDWARDS, COURT CLERK

_____
Deputy Clerk

## OFFICER'S RETURN

I received this FAILURE TO APPEAR BENCH WARRANT on the ___ day of _____, 19___,
and executed the same on the ___ day of _____, 19 ____, BY:

_____

_____, SHERIFF

BY: _____, UNDERSHERIFF/DEPUTY

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA.
Plaintiff

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR - 3 2005

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

NO: CF-04-613

VS.

*Cindy Crawford*
Defendant

### ORDER AND JUDGMENT OF FORFEITURE

On the **3RD** day of **February** 200**5** the above cause came on for hearing, according to regular assignment of the docket of this Court.

The Court finds that the above named defendant having heretofore been charged with the crime of **Unlaw. Poss of Marij. + etc.+ FTA** and having been committed to bail in the amount of $ **11,000.00** was released on an Appearance Bond executed by **Judy Bierglein** a licensed bondsman, and **Bierglein Bail Bonds** if applicable his insurer, and bondsman conditioned as provided by law for the appearance of said defendant before this court as required, and the Court having ordered said defendant to appear on the **3RD** day of **February** 200**5**, and said defendant, being called three times in open court, without sufficient excuse failed to appear before the Court as ordered.

The Court further finds that the conditions of said Appearance Bond have been broken by both defendant and said bondsman, and that an Order and Judgment of Forfeiture should be entered.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the Appearance Bond of said defendant be, and the same is hereby declared and is ordered forfeited to the Satae of Oklahoma, and the amount of said bond is ordered paid to the Clerk of the Court.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Court Clerk shall immediately mail a copy of this Order and Judgment of Forfeiture to the bondsman and, if applicable, his insurer. The bondsman is hereby directed to deposit with the Court Clerk, the face amount of the said forfeited bond, to wit: $ **11,000.00**. Such deposit to be made within 91 days from receipt of this Order and Judgment of Forfeiture, or the mailing of the notice if no receipt is made.

_____
JUDGE OF THE DISTRICT COURT

### CERTIFICATE OF MAILING

I CERTIFY THAT I MAILED A TRUE AND CORRECT COPY OF THIS INSTRUMENT TO THE ABOVE NAMED BONDSMAN AND, IF APPLICABLE, HIS INSURER TO THE LAST KNOWN ADDRESS OF EACH. BY CERTIFIED MAIL WITH RETURN RECEIPT REQUESTED THIS **3RD** DAY OF **March** . 200**5**

BERNELL EDWARDS, COURT CLERK

BY **Robin Hickman**

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To   Judy Berglan   CF-04-613

Street, Apt. No.;   112 N. Main

7002 2410 0006 2328 7431

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

CF-04-613

Judy Berglan
112 N. Main St.
Sallisaw, OK 74955

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent
                   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Lance Berglan                    3/4/05

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☒ No

3. Service Type
☒ Certified Mail     ☐ Express Mail
☐ Registered         ☒ Return Receipt for Merchandise
☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7002 2410 0006 2328 7431

PS Form 3811, February 2004     Domestic Return Receipt

305

Sequoyah County Form CF-1                                      Uniform Plea of Guilty--Summary of Facts

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
# THE STATE OF OKLAHOMA

STATE OF OKLAHOMA,                          )
                                            )
                          Plaintiff         )                   SEQUOYAH COUNTY, OKLAHOMA
                                            )                            FILED
                                            )                   IN DISTRICT COURT
VS.                                         )
*Cindy Crawford A/K/A*                      )                   APR 2 8 2005
*Cynthia Mattox*        Defendant           )                   BERNELL EDWARDS, COURT CLERK
                                            )                   BY_____ DEPUTY
DOB _____ 1976                    )          Case No. *CF-04-613*
SS# _____ 2026                )

## SUMMARY OF FACTS FOR THE PLEA OF GUILTY

Part A:  FINDING OF FACT, ACCEPTANCE OF PLEA                                        Circle

1.   Is the name just read to you your true name?                                   (YES)  NO
     If no, then what is your correct name? _____
     I have also been known by the name(s) **mattox    Lucas**

2.   (A) Do you wish to have a record of these proceedings made by a Court Reporter?   YES  (NO)
     (B) Do you wish to waive your right to have a record of these proceedings made?  (YES)  NO

3.   What is your age? **29**  What grade level in school have you completed? **11 with 6 ED now**

4.   Can you read and understand this form? [If no, Addendum A must be completed and attached]  (YES)  NO

5.   Are you currently taking any medications or substances which affect your ability to understand   YES  (NO)
     these proceedings?

6.   Have you been prescribed any medication which you are not taking?                 YES  (NO)
     If yes, what medication are you not taking? _____
     What is the purpose of the medication? _____
     Why are you not taking the medication? _____

7.   Have you ever been treated by a doctor or health professional for mental illness or confined in  (YES)  NO
     a hospital for mental illness?
     If yes, list doctor or health professional, place, and when treatment occurred:
     _____

8.   Do you understand the purpose, the nature and the consequences of this proceeding?  (YES)  NO

9.   Have you received a copy of the State's Information and read its allegations?     (YES)  NO

306

10.   A. Do you understand you are charged with:
        Crime Statutory Reference

   [1] _____   _____ O.S _____   (YES)  NO

   [2] _____   _____ O.S _____   YES   NO

   [3] _____   _____ O.S _____   YES   NO

   [4] _____   _____ O.S _____   YES   NO

   [5] _____   _____ O.S _____   YES   NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

   B. Are you charged after former conviction of a felony (AFCF) ?                    YES   NO
   If yes, list the felony(ies) charged: possion of marihuana
   paraphernalia

11.   Do you understand the range of punishment for the crime(s) is/are?
      (List in the same order as in Number 10)

   [1] Minimum of _____ to a maximum of _____ and/or a fine of $_____   (YES)  NO

   [2] Minimum of _____ to a maximum of _____ and/or a fine of $_____   YES   NO

   [3] Minimum of _____ to a maximum of _____ and/or a fine of $_____   YES   NO

   [4] Minimum of _____ to a maximum of _____ and/or a fine of $_____   YES   NO

   [5] Minimum of _____ to a maximum of _____ and/or a fine of $_____   YES   NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

12.   Read the following statements:  You have the right to a speedy trial before a jury of your peers
      to determine whether you are guilty or not guilty and if you request, to determine the sentence.
      If pleading to a capital murder, advise of the procedure in 21 O.S. 701.10 (B)
      At the trial:
      [1] You have the right to have an attorney represent you, either one you hire or if you are indigent
      a court appointed attorney.
      [2] You are presumed to be innocent of the charges.
      [3] You may remain silent or, if you choose, you may testify on your own behalf.
      [4] You have the right to see and hear all witnesses called to testify against you and the right to
      have those witnesses cross-examined.
      [5] You may have your witnesses ordered to appear in court to testify and present evidence of
      any defense you have to these charges.
      [6] The State is required to prove your guilt beyond a reasonable doubt.
      [7] The verdict of guilty or not guilty decided by a jury must be unanimous. However, you can
      waive a jury trial and, if all parties agree, the case could be tried by a Judge alone who would
      decide if you were guilty or not guilty and if determined to be guilty, the appropriate punishment.

      Do you understand each of these rights?                                          (YES)  NO

13.   Do you understand by entering a plea of guilty you give up these rights?   no contest (YES)  NO

14.   Do you understand that a conviction on a plea of guilty could increase punishment in any future   YES  (NO)
      case committed after this plea?

15.   Is _____ your attorney?                               YES   NO

16.   Have you talked with your attorney about the charges, advised him/her regarding any defense   YES  (NO)
      you may have to the charges and received his/her advice?

307

17.   Do you believe your attorney has effectively assisted you in this case and are you satisfied with his/her representation?   (YES)   NO

18.   Do you wish to change your plea of not guilty to a plea of guilty and give up your right to a jury trial and all previously explained constitutional rights?   *no Contest*   (YES)   NO

19.   Is there a plea agreement?   (YES)   NO
      What is your understanding of the plea agreement?   5 Defered

20.   Do you understand the Court is not bound by any agreement or recommendation and if the Court does not accept the plea agreement, you have the right to withdraw your plea of guilty?   (YES)   NO

21.   Do you understand that if there is no plea agreement the Court can sentence you within the range of punishment stated under question 11?   (YES)   NO

22.   Do you understand your plea of guilty to the charge(s) is subject to: (check one)   YES   NO
      [  ] no prior felony conviction
      [  ] one (1) prior felony conviction
      [  ] two (2) or more felony convictions:  List prior felony convictions to which you are pleading:
      _____

23.   What is/are your plea(s) to each charge(s)?
      [1] _____ [2] _____ [3] _____ [4] _____ [5] _____

24.   Did you commit the acts as charged in the information?   (YES)   NO
      State a factual basis for your plea(s) (attach additional pages as needed, labeled as ADDENDUM C):
      5 Defered

25.   Have you been forced, abused, mistreated or promised anything by anyone to have you enter your plea(s) ?   YES   (NO)
      *no Contest*

26.   Do you plead guilty of your own free will and without any coercion or compulsion of any kind?   (YES)   NO

27.   If you are entering a plea to a felony offense, you have a right to a Pre-sentencing investigation and Report which would contain the circumstances of the offense, any criminal record, social history and other background information about you.  Do you request a Pre-sentence report?   YES   (NO)

28.   (A)  Do you have any additional statements to make to the Court?   (YES)   NO

      (B)  Is there any legal reason as to why you should not sentence now?   YES   (NO)

HAVING BEEN SWORN, I, the Defendant whose signature appears below, make the Following statements under oath:

(1)   CHECK ONE:

      ___✓___ (A)   I have read, understood and completed this form.

      _____ (B)   My attorney completed this form and we (the attorney and I) have gone over the form and I understand its contents and agree with the answers.  Complete Addendum A and attach to this form.

308

_____ (C)   The Court completed this form for me and inserted my answers to the questions in open court.

(2)

(3)   All Answers are true and correct.

I understand that I may be prosecuted for perjury if I have made false statements to this Court.

Acknowledged this __28__ day of __4 - 2005__ , _____ .

_Cynthia C Crawford_
DEFENDANT

I, the undersigned attorney for the Defendant, believe the Defendant understands the nature, purpose, and consequence of this proceeding. (S)He is able to assist me in formulating any defense to the charge(s). I am satisfied that the Defendant's waivers and plea(s) of guilty are voluntarily given and he/she had been informed of all legal and constitutional rights.

_Pro Se_
ATTORNEY FOR DEFENDANT

The sentence recommendation in question 19 is correctly stated. I believe the recommendation is fair to the State of Oklahoma. Offer of Proof (nolo contendere plea): _____

_____

_____

_____

ASSISTANT DISTRICT ATTORNEY

## THE COURT FINDS AS FOLLOWS:

A. The Defendant was sworn and responded to questions under oath.
B. The Defendant understands the purpose, nature and consequences of this proceeding.
C. The Defendant's plea(s) of __Guilty__ is/are knowingly and voluntarily entered and accepted by the COURT REPORTER PRESENT Court.
D. The Defendant is competent for the purpose of this hearing.
E. A factual basis exists for the plea(s) (and former conviction(s), if applicable).
F. The Defendant is guilty as charged: (check as appropriate)
   [✓] after no prior felony conviction.
   [ ] after one (1) prior felony conviction.
   [ ] after two (2) or more prior felony convictions

G. Sentencing or order deferring sentence shall be: [ ] imposed instanter or [✓] continued until the 28ᵗʰ day of __April 2010__ at __1:30__ , __P__ .M. If the Pre-sentence investigation and Report is requested, it shall be provided to the Court by the _____ day of _____ , _____ .

DONE IN OPEN COURT this __28ᵗʰ__ day of __April__ , __2005__ .

_____
JUDGE OF THE DISTRICT COURT

_John C Garrett_
NAME OF JUDGE TYPED OR PRINTED

_Ward_
Court Reporter Present

Deputy Court Clerk Present   309

## "NOTICE OF RIGHT TO APPEAL"

Sentence to Incarceration, Suspended or Deferred:

To appeal from this conviction, or order deferring sentence, on your plea of guilty, you must file in the Sequoyah County District Court Clerk's Office a written Application to Withdraw Plea of Guilty within ten (10) days from today's date. You must set forth in detail why you are requesting to withdraw your plea. The trial court must hold a hearing and rule upon your application within thirty (30) days from the date it is filed. If the trial court denies your application, you have a right to ask the Court of Criminal Appeals to review the District Court's denial by filing a Petition for Writ of Certiorari within ninety (90) days of the date of denial. Within ten (10) days from the date the application to withdraw plea of guilty is denied, notice of intent to appeal and designation or record must be filed pursuant to Oklahoma Court of Criminal Appeals Rule 4.2 (D). If you are indigent, you have the right to be represented on appeal by a court appointed attorney.

Do you understand each of these rights to appeal? **YES**    NO

Do you want to remain in the county jail ten (10) days before being taken to place of confinement? YES    **NO**

Have you fully understood the questions that have been asked? **YES**    NO

Have your answers been freely and voluntarily given? **YES**    NO

I ACKNOWLEDGE UNDERSTANDING OF RIGHTS AND SENTENCE IMPOSED.

_Cynthia C Crawford_
Defendant

I, the undersigned attorney, have advised the Defendant of his appellate rights.

_Pro Se_
Attorney for the Defendant

DONE IN OPEN COURT, this _28TH_ day of _April_ , _2005_.

_____
Judge of the District Court

_Waived_
Court Reporter Present

_____
Deputy Court Clerk Present

## ADDENDUM "A"
### CERTIFICATE OF DEFENSE COUNSEL

As the attorney for the defendant, _____ ,I certify that:

1. The Defendant has stated to me that he/she is [  ] able [  ] unable to read and understand the attached form, and I have [  ] determined the Defendant is able to understand the English language or [  ] determined the Defendant is unable to understand the English language and obtained _____ to interpret to the Defendant in the _____ language.

2. I have read and fully explained to the Defendant the allegations contained in the information in this case.

3. I have read and fully explained to the Defendant all of the questions in the Plea of Guilty/Summary of Facts and the answers to the questions set out in the Summary of Facts are the Defendant's answers.

4. To the best of my knowledge and belief the statement and declarations made by the Defendant are accurate and true and have been freely and voluntarily made.

Dated this _____ day of _____, _____.

_____ 310
Attorney for the Defendant

Sequoyah County Form CF-1 b            Uniform Plea of Guilty -- Sentence on Plea

Case Number CF- _____    State v. _____    Date: _____

**Part B:** Sentence on Plea     [NOTE ON USE: Part B is to be used with the Summary of Facts if contemporaneous with the entry of plea or may be formatted as a separate sentencing form if sentencing is continued to a future date.]

## THE COURT SENTENCES THE DEFENDANT AS FOLLOWS:

### DEFERRED SENTENCE

1. The sentencing date is deferred until _____ , _____ , _____ at _____ : _____ , ___ M.

2. You [ ] will [ ] will not be under supervision by the Department of Corrections. The terms set forth in the Rules and Conditions of Probation in Addendum D shall be the rules you must follow during the period of deferment.

### SUSPENDED SENTENCE or SUSPENDED AS TO PART

1. You are sentenced to confinement under the supervision of the Department of Corrections for a term of years as follows:
[1] _____ [2] _____ [3] _____ [4] _____ [5] _____

TO BE SUSPENDED as follows:

   (A) ALL SUSPENDED    [ ] YES    [ ] NO

   (B) suspended except as to the first _____ (months) (years) of the term(s) during which you are to be held in the custody of the Department of Corrections. The remaining term of the sentence(s) is to be suspended under the terms set forth in the Rules and Conditions of Probation in Addendum D.

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____
_____ or NOT APPLICABLE.

### TIME TO SERVE

1. You are sentenced to confinement under the supervision of the Department of Corrections for a term of years as follows:
[1] _____ [2] _____ [3] _____ [4] _____ [5] _____

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____
_____ or NOT APPLICABLE.

### FINES AND COSTS

You are to pay in full any fine(s), costs, fees and restitution at the time of sentencing. In the alternative, you may request a stay of execution (SOE) from the Cost Administrator in the Sequoyah County District Court Clerk's Office. All informa-tion given to the Cost Administrator in requesting the SOE will be under oath and is considered as part of the summary of facts before the Court. You will appear in person to make all payments as agreed. Any payment tendered other than in person will be accepted; however, such acceptance does not excuse your appearance in the Clerk's Office.

Sequoyah County Form CF-3(B)                                    Uniform Plea of Guilty -- Additional Findings

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, THE STATE OF OKLAHOMA

STATE vs. _____ Defendant     Case No. _____

ADDITIONAL FINDINGS AT TIME OF SENTENCING

# EXHIBIT 1

A.  Original Charges (A copy of the information may be attached instead) Please list any additional charges on a separate attached sheet.

| OFFENSE | STATUTE CITATION |
|---|---|
| | |
| | |
| | |
| | |

B.  Prior Felony Charges Used For Enhancement Please list any additional convictions on a separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

C.  Prior Charge(s) For Which Order Deferring Sentence Was Entered Please list any additional charges on separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| | | |
| | | |
| | | |

D.  Prior Felony Convictions Not Used For Enhancement Please list any additional convictions on a separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| | | |
| | | |
| | | |

E.

If the defendant plead guilty to multiple counts, did the offense(s) arise from the same transaction?

Circle

YES     NO

312

F. Other Enhancers Used to Determine Placement on Matrix        Circle

1. Did the offender commit the current offense with the use of a firearm within the immediate possession and control of the offender?      YES  NO

2. Was the victim of the offense over 62 years of age, under 12 years of age or disabled by reason of mental or physical illness to such extent that the victim lacked the ability to effectively protect his or her property or persons?      YES  NO

3. Did the offender in the commission of the offense maim or torture the victim?      YES  NO

4. Did the offender commit a Schedule N-2 or N-3 drug offense in, on, or within 1,000 feet of real property comprising of a public or private elementary or secondary school; public or private college, university, or other institution of higher education; recreation or public park (including state facilities); public housing project; or in the presence of any child under 12 years of age?      YES  NO

5. Did the offender commit a Schedule N-2 or N-3 drug offense by using or soliciting the services of a person less than 18 years of age, providing the offender was at least 18 years of age at the time of the offense?      YES  NO

6. If the controlling offense was a property or drug offense, what was the total amount involved in that offense (e.g., the value of the property involved; the amount of money stolen, embezzled, or obtained by fraud; or the amount of drug proceeds utilized?)   $ _____

7. If the controlling offense was a drug offense, what was the predominant drug and what was the amount of that drug? (Please specify quantity in grams, ounces, etc.)

DRUG: _____

QUANTITY: (oz., grams, etc.) _____

G. Offender Characteristics

       Gender (Circle)                             Race  (Circle)
       Male  Female           White  Black  Hispanic  Asian  Native American

**This Exhibit shall not be admitted into evidence in any future prosecutions.**

Certified this *28TH* day of *April*, *2005*.

_____          _____
Attorney for the State                 Attorney of the Defendant

                                         _____
                                         Judge of the District Court    313

**IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

THE STATE OF OKLAHOMA )
        Plaintiff, )
VS. )      Case No. CF-2004-613 **SEQUOYAH COUNTY, OKLAHOMA**
                                                       **FILED**
                                                **IN DISTRICT COURT**
CINDY CRAWFORD a/k/a )
CYNTHIA MATTOX )                               **APR 2 8 2005**
DOB: ███/76 SS#████2026 )
        Defendant. )        **BERNELL EDWARDS, COURT CLERK**
                                         **BY**_____**DEPUTY**

## IMPOSITION JUDGMENT AND SENTENCE DEFERRED ON PLEA OF GUILTY

NOW, on this __28th__ day of April, 2005, the same being a judicial day of said court, and the defendant, CINDY CRAWFORD a/k/a CYNTHIA MATTOX, being personally present in open court, appearing PRO SE, and having been duly represented at all proceedings before the Court by such attorney of record, and having been legally charged with the offense of CT. I: POSSESSION OF MARIHUANA, SECOND OFFENSE 63 O.S. 2-402(B)(2), CT.II: POSSESSION OF PARAPHERNALIA 63 O.S. 2-405 and having been duly informed of the nature of the charge, and of her constitutional rights and having been duly arraigned thereon, and having duly and properly entered her plea of guilty to the crime of POSSESSION OF MARIHUANA , SECOND OFFENSE 63 O.S. 2-402(B)(2) and POSSESSION OF PARAPHERNALIA 63 O.S. 2-405 and having been advised of her rights and the effect of such plea, and the defendant having been asked by the Court whether she has any legal cause to show why the Court should not defer further proceedings and place her on probation under supervision of the Department of Corrections upon the conditions of probation prescribed by the Court, and the defendant consents to such procedure.

IT IS THEREFORE the decision and Order of the Court to defer the imposition of judgment and sentence in this case for a period of FIVE (5) years for Count I and ONE (1) year Count II, concurrent, and the defendant is placed on probation during such period under the supervision of the Department of Corrections of the State of Oklahoma, such deferment to continue during good behavior and pursuant to the Rules of the Department of Corrections of the State of Oklahoma, as prescribed in the "Addition to Judgment and Sentence."

The defendant is further taxed costs of this prosecution in the amount of $_____ for which judgment is hereby rendered.

Upon successful completion of the probationary term, the defendant shall be discharged without a court judgment of guilt, and the verdict or plea of guilty shall be expunged from the record and said charge shall be dismissed with prejudice to any further action. Upon violation of the conditions of probation, the court may enter a judgment of guilt and proceed as provided in Section 1, Title 22-901a of the Oklahoma Statutes Annotated, 1970.

_____
JUDGE OF THE DISTRICT COURT

314

IN THE DISTRICT COURT OF )  Defendant: CINDY CRAWFORD a/k/a
SEQUOYAH COUNTY )  CYNTHIA MATTOX
STATE OF OKLAHOMA )  Case No.: CF-2004-613
)
)  Date: 04/28/05

**SEQUOYAH COUNTY, OKLAHOMA**
**IN DISTRICT COURT**
**FILED**
**APR 2 8 2005**
**BERNELL EDWARDS, COURT CLERK**
**BY_____DEPUTY**

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general state of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I will understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or any representative thereof.

8. I understand that I must support myself and all my dependents without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within the eighteen months.

15. **SPECIAL CONDITIONS:** The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, OSBI lab fees) of $_____ within _____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 2002 and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed).*

Count I: FINES $100.00; DEF$50.00 to be paid within 90 days to the D.A.'s Office; LAB FEES $165.00; MHF $100

( ) Defendant is to pay restitution through the District Attorney's office as set out in Exhibit "A" attached, the sum of $

16. Defendant to report to DOC within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_Pro Se_
_____
Attorney for Defendant

_____
JUDGE OF THE DISTRICT COURT

_Cynthia E Crawford_
_____
Probationer

Defendant's Mailing Address:
1013 Rosewood Dr.
Sallisaw OK 74955

315

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,      )
            Plaintiff   )
vs.                     )      Case No. CF-04-613
CINDY CRAWFORD          )
1013 ROSEWOOD DR.       )
                        )
SALLISAW, OK  74955     )
            Defendant   )
    SS#: ████2026
    DOB: ████1976

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT
APR 2 8 2005
BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

Date: 04/28/05      State's Attorney:      KYLE WATERS
                    Defendant's Attorney: PRO SE

RULE 8 HEARING
(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____$20.00 on or before _05-28-2005_ and

then _20.00_ per month on or before the _28_ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before _05-28-20_____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _Do appear in August_____

_____

TOTAL TO PAY $_799.30_

_Cynthie Crawford_____          _____
        Defendant                   JOHN C. GARRETT
                                    Judge of the District Court
Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

APPLICATION FOR STAY OF EXECUTION ON FINES/COSTS

CHECK ONE:

_____ I PLAN TO PAY BEFORE 3:30 PM TODAY _____ I PLAN TO PAY IN 48 HRS.

__X____ I WANT EXTENDED TIME TO PAY

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by the Court. I understand that I may be subject to penalties, including but not limited to imprisonment, if I fail to pay my assessed fine(s)/costs as ordered. I consent to an investigation in CONTEMPT OF COURT for providing false and/or incomplete information on this application I swear under PENALTY OF PERJURY that the below information is true and complete.

SIGNATURE _Cynthia E Crawford_ DATE _4-28-05_

CASE # _____ DATE OF BIRTH _____ 76

SSN# _____ 21020 FINE/COSTS $ _____

LAST NAME _Crawford_ FIRST _Cynthia_ MI _Elaine_

STREET _____ CITY _Sallisaw_ PH _774-3353_

EMPLOYER _Eds Truck Stp_ HOW LONG _3 WK_ PH _5948_

EARNINGS ~~_____~~ 5.15 PER _WK_ #HRS/WK _30_ PAYDATES _Wensdeys_

IF PAYING BEFORE 3:30 PM TODAY: STOP HERE

MARITAL STATUS _____ SINGLE ___✓___ MARRIED _____ SEPARATED
_____ DIVORCED _____ COMMON LAW _____ WIDOW(ER)

NUMBER OF CHILDREN _2_ AGES OF CHILDREN _6 & 9_

LIST OTHERS LIVING IN HOUSEHOLD, NAME RELATIONSHIP EMPLOYER INCOME

| Name | Relationship | Employer | Income |
|---|---|---|---|
| Trinity Faith Mattox | Daughter | Eds truck stop | |
| Halie Mattox | Daughter | | |
| Travis Crawford | Husband | ~~_____~~ none | |

AMOUNT OF $ W/YOU _5.00_ SAVING/CHECKING ACC $ _none_

PROPERTY, INVESTMENTS, ASSETS $ _____

I AM SUPPORTED BY: _Self_ DO YOU RECEIVE HOUSING ASSISTANCE __

ALIMONY/CHILD SUPPORT _None_ MONTHLY EXPENSES:

SOCIAL SECURITY _None_ RENT _850_

PENSION/RET. _None_ FOOD _300_

WELFARE _None_ UTILITIES _48.00 + gas 15.00_

FOOD STAMPS _None_ CHILD CARE _None_

UNEMPLOYMENT _None_ MEDICAL _5,1720_

GROSS MO. EARNING _None_ TOTAL $ _____

OTHER INCOME SUPPORT _None_ SOURCE _Self_

DRIVERS LICENSE # _021188_ STATE _OK_ EXP.DATE _2006_

VEHICLES YOU OWN OR USE: YEAR MAKE/MODEL MONTHLY PMT.

_Mazda 626_ _95_ _626 4DL_ _weekly 200.00_

Sequoyah County
Warrant Clearance

ant Name: CRAWFORD, CINdy

ant Number: CF-04-00613

& Time Cleared: 06-01-05

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 1 9 2005

BERNELL EDWARDS, COURT CLERK
Badge #
BY_____DEPUTY

rant Cleared By:

_____Serving Officer _____

Agency:_____

Authority:_____

Warrant Pulled from file?            Yes      No

Explain: NOT VALid  Tooll and NCTC

Warrant Marked Off  Warrant Book and Data Base?     Yes      No

Explain:_____

Warrant Canceled from NCIC?          Yes     Not Entered

Warrant Removed From Holds Book?     Yes     No Hold Placed

ff's Office Employee Signature: Yoakum

After completing this form, staple it to the back of cleared warrant and put it in the folder marked Court Clerk. Us
form only to clear Sequoyah County Warrants. Every warrant must me cleared on a separate form.

318

SEQUOYAH COUNTY, OKLAHOMA
FILED

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA COURT

# BENCH WARRANT
## FAILURE TO APPEAR

JUL 19 2005

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

**STATE OF OKLAHOMA**
Plaintiff

VS.

**Case No: <u>CF-04-00613</u>**

**CINDY CRAWFORD aka Cindy Mattox**
Defendant

S.S.#:  446902026
D.O.B:  02-21-76

THE STATE OF OKLAHOMA,
To any Sheriff or Policeman in this State
GREETINGS:

WHEREAS, an INFORMATION having been filed on 11-16-2004, in the DISTRICT Court of SEQUOYAH County, State of Oklahoma, charging:

    **Name:  CINDY CRAWFORD**

    **Address:** ▮▮▮▮▮▮▮ SALLISAW, OK, 74955

    ▮▮▮2026 ▮▮▮76

with the crime of  **UNLAWFUL POSSESSION OF MARIHUANA---**
    **<u>FAILURE TO APPEAR AS CITED ON OR BEFORE APPEARANCE DATE</u>**

# BOND: $ 22,000.00

You are therefore commanded forthwith to arrest the above named defendant and bring said defendant before the District Court of SEQUOYAH County to answer said Charge, or if the Court has adjourned, that you deliver said defendant into the custody of the Sheriff of SEQUOYAH County, to be detained by said Sheriff until the further order of the Court, or until bond is posted as listed above.

    GIVEN UNDER MY HAND AND SEAL of said Court, this _3rd_ day of __March___, 2005.
    BY ORDER OF THE COURT:

        BERNELL EDWARDS, COURT CLERK

        _____
                Deputy Clerk

## OFFICER'S RETURN

I received this FAILURE TO APPEAR BENCH WARRANT on the ____ day of _____, 19___,

and executed the same on the ____ day of _____, 19_____, BY:

_____

_____, SHERIFF

    BY: _____, UNDERSHERIFF/DEPUTY

319

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

# BENCH WARRANT
## FAILURE TO APPEAR

**STATE OF OKLAHOMA**
               Plaintiff

VS.
                                           **Case No: <u>CF-04-00613</u>**

**CINDY CRAWFORD aka Cindy Mattox**
               Defendant
                                     **S.S.#:** ████2026
                                     **D.O.B:** ████-76

THE STATE OF OKLAHOMA,
To any Sheriff or Policeman in this State
GREETINGS:

WHEREAS, an INFORMATION having been filed on 11-16-2004, in the DISTRICT Court of SEQUOYAH County, State of Oklahoma, charging:

    **Name:  CINDY CRAWFORD**

    **Address:** ████████ SALLISAW, OK, 74955

    ████ 2026 ████ 76

with the crime of **UNLAWFUL POSSESSION OF MARIHUANA---**
      **<u>FAILURE TO APPEAR AS CITED ON OR BEFORE APPEARANCE DATE</u>**

# BOND: $ 22,000.00

You are therefore commanded forthwith to arrest the above named defendant and bring said defendant before the District Court of SEQUOYAH County to answer said Charge, or if the Court has adjourned, that you deliver said defendant into the custody of the Sheriff of SEQUOYAH County, to be detained by said Sheriff until the further order of the Court, or until bond is posted as listed above.

    GIVEN UNDER MY HAND AND SEAL of said Court, this _3rd_ day of __March__, 2005.
    BY ORDER OF THE COURT:
                  BERNELL EDWARDS, COURT CLERK

    _____
                  Deputy Clerk

### OFFICER'S RETURN

I received this FAILURE TO APPEAR BENCH WARRANT on the ____ day of _____, 19 ___ , and executed the same on the ____ day of _____, 19 ____ , BY:

_____

             _____, SHERIFF
          BY: _____, UNDERSHERIFF/DEPUTY

320

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 2 0 2006

BERNELL EDWARDS, COURT CLERK

BY _____

_____ DEPUTY

|  |  |  |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.: CF-2004-613 |
| | ) | |
| CINDY CRAWFORD, | ) | |
| DOB: ███ 1976 SS: ███ 2026 | ) | |
| Defendant. | ) | |

## APPLICATION TO IMPOSE JUDGMENT AND SENTENCE

COMES NOW, Richard L. Gray, the duly elected, qualified, and acting District Attorney of Sequoyah County, and states to the Court that on the 28th day of April, 2005, said Defendant entered his/her plea of Guilty in the above entitled cases, in the District Court of Sequoyah County, Oklahoma, to the charge of CT. I: UNLAWFUL POSSESSION OF MARIHUANA 63 O.S. 2-402 (B) (2) CT. 11: UNLAWFUL POSSESSION OF PARAPHERNALIA-(MISD) 63 O.S. 2-405, as set out in the Information on file in this cause and that upon acceptance of said plea the Court ordered to defer the Imposition of Judgment and Sentence for good cause shown at any time prior to the expiration of the probationary term.

That subsequent to the said Order of Deferment of Imposition of Judgment and Sentence, the Defendant violated the rules and conditions of probation in the following manner:

RULE #15: Defendant was to paid $50.00 to the D.A.D.F. Fund with in 90 days

That the commission of the said acts against the laws of violations of probation by the Defendant is good cause for the Court to impose Judgment and Sentence immediately. Further, that it is necessary for the State to secure the attendance of the Defendant at the hearing and such attendance might not come about unless the said Defendant is taken into custody, and that the Court should issue a Bench Warrant for the arrest of the Defendant pending such hearing.

321

WHEREFORE, applicant prays that the Court set a date for hearing this application and that the deferring of Imposition of Judgment and Sentence be set aside and that Judgment be imposed immediately and that the Court direct the Court Clerk to issue a Bench Warrant for the arrest of the Defendant.

Dated this 14th day of March, 2006.

RICHARD L. GRAY, District Attorney

BY: _____

Assistant District Attorney

WITNESSES:

Lynn Kleman, 120 E. Chickasaw, Sallisaw, Ok. 74955

## FINDING OF PROBABLE CAUSE

The Undersigned Judge of the District Court, upon the above application hereby determines there to be probable cause for the issuance of a Bench Warrant and so orders.

Dated this _16th_ day of _March_, 2006.

Bond set at $ _10,000⁰⁰_

_____

**JUDGE OF THE DISTRICT COURT**

322

**ISSUED**

**BENCH WARRANT – After Conviction**

| | |
|---|---|
| **STATE OF OKLAHOMA** | **IN DISTRICT COURT** |
| **Sequoyah County,** | |
| **THE STATE OF OKLAHOMA** | **CF-04-00613** |
| **VS.** | |
| **CINDY CRAWFORD** | |



**SALLISAW, OK 74955**

6    2026                          **BOND**           -                $10,000.00

THE STATE OF OKLAHOMA
To any Sheriff or Policeman of the State of Oklahoma -- Greeting:

**CINDY CRAWFORD** having been on the March 20, 2006 duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of : UNLAWFUL POSSESSION OF MARIHUANA / APPLICATION TO REVOKE OR APPLICATION TO IMPOSE JUDGMENT AND SENTENCE

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above – named
**CINDY CRAWFORD** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this Wednesday, March 29, 2006. By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: _____
                                                    **Deputy**

**WILL ONLY EXTRIDIATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the Writ on the _____ day of _____, 20____, at _____ o'clock ____a.m. by _____

_____

Dated this _____ day of _____ 20____.

_____
SHERIFF OF SEQUOYAH COUNTY, OK

BY:_____

323

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA,<br>    Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. CF-04-00613 |
| CINDY CRAWFORD | ) | |
| ██████████████ | ) | |
| | ) | |
| SALLISAW, OK 74955 | ) | SEQUOYAH COUNTY, OKLAHOMA |
|     Defendant | ) | FILED |
| SS#: ███2026 | | IN DISTRICT COURT |
| DOB: ███1976 | | APR 13 2006 |

PERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

Date: 04/13/06     State's Attorney:    KYLE WATERS
                            Defendant's Attorney: PRO SE

RULE 8 HEARING
(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS
TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,
HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $25.00 on or before 05-13-2006 and

then **25.00** per month on or before the **13th** day of each month

with like sums on the same date thereafter until paid in full;

~~OR; the balance~~ in full on or before 05-13-20 _____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN
PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

_____

TOTAL TO PAY $ **2,631.30**

_____     _____
         Defendant                        JOHN C. GARRETT
                                           Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

324

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA )
                Plaintiff )       CASE NO. CF 04-613
                       )
VS )       SEQUOYAH COUNTY, OKLAHOMA
                       )                 FILED
CINDY CRAWFORD, )       IN DISTRICT COURT
                Defendant )          APR 2 4 2006

                                    BERNELL EDWARDS, COURT CLERK
                                    BY_____DEPUTY

### MOTION TO DISMISS

COMES NOW Richard L. Gray, District Attorney, in and for Sequoyah County, State of Oklahoma, and moves the Court to recall and dismiss the Application to Impose Deferred Sentence and to recall the Bench Warrant, in the above case now pending against the above named defendant, CINDY CRAWFORD, as Defendant has now paid in full as ordered. WHEREFORE, movant prays that this matter be dismissed for the above named reason.

                                 RICHARD L. GRAY
                                 DISTRICT ATTORNEY

            BY_____
                        ASSISTANT DISTRICT ATTORNEY

325

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APR 2 4 2006

BERNELL EDWARDS, COURT CLERK
BY _____
_____ DEPUTY

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA )
       Plaintiff, )
        )
VS. )    Case No. CF 04-613
        )
CINDY CRAWFORD, )
       Defendant. )

## ORDER

**NOW** on this _____24ᵗʰ_____ day of _____April_____, 2006, this matter comes before the Court upon the Motion of the District Attorney, Richard L. Gray, and by his assistant moving the Court to recall and dismiss the above pending Application to Impose Deferred Sentence and the Bench Warrant in the above named case against said defendant is hereby recalled and dismissed.

IT IS SO ORDERED.

_____
JUDGE OF THE DISTRICT COURT

326

**ISSUED**

**BENCH WARRANT – After Conviction**

| | |
|---|---|
| **STATE OF OKLAHOMA**<br>**Sequoyah County,**<br>**THE STATE OF OKLAHOMA**<br>VS.<br>**CINDY CRAWFORD** | **IN DISTRICT COURT**<br><br>**CF-04-00613** |

**SALLISAW, OK 74955**

██████76 █████2026        **BOND**   -   **$10,000.00**

THE STATE OF OKLAHOMA
To any Sheriff or Policeman of the State of Oklahoma – Greeting:

**CINDY CRAWFORD** having been on the March 20, 2006 duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of : UNLAWFUL POSSESSION OF MARIHUANA / APPLICATION TO REVOKE OR APPLICATION TO IMPOSE JUDGMENT AND SENTENCE

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above – named **CINDY CRAWFORD** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this Wednesday, March 29, 2006. By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY:_____
                                        **Deputy**

**WILL ONLY EXTRIDIATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the Writ on the _____ day of _____, 20___, at _____ o'clock ____a.m. by _____

_____

Dated this _____ day of _____ 20___.

_____
SHERIFF OF SEQUOYAH COUNTY, OK

BY:_____

ISSUED

**BENCH WARRANT – After Conviction**

| | |
|---|---|
| **STATE OF OKLAHOMA**<br>**Sequoyah County,**<br>**THE STATE OF OKLAHOMA**<br>          **VS.**<br>**CINDY CRAWFORD** ████ | **IN DISTRICT COURT**<br><br>**CF-04-00613** |

**SALLISAW, OK 74955**

██76 ██2026                          **BOND**          -                    **$10,000.00**

THE STATE OF OKLAHOMA
To any Sheriff or Policeman of the State of Oklahoma – Greeting:

**CINDY CRAWFORD** having been on the March 20, 2006 duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of : UNLAWFUL POSSESSION OF MARIHUANA / APPLICATION TO REVOKE OR APPLICATION TO IMPOSE JUDGMENT AND SENTENCE

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above – named
**CINDY CRAWFORD** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this Wednesday, March 29, 2006.  By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: _Ryun Skinner_
                                                    **Deputy**

**WILL ONLY EXTRIDIATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the Writ on the _____ day of _____, 20____, at _____ o'clock ____a.m. by _____

_____

Dated this _____ day of _____ 20____.

SHERIFF OF SEQUOYAH COUNTY, OK

BY:_____

328

*Sequoyah County*
*Warrant Clearance*

Warrant Name: _CRAWford, Crwdy_

Warrant Number: _CF04-00613_

Date & Time Cleared: _04-28-06   11:44_

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

Warrant Cleared By:

MAY 0 3 2006

Arrest _____ Serving Officer _____  Badge #: _____
BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

Agency: _____

Cancel: ✓  Authority: _Recall On Office Order_

Was Warrant Pulled from file?        (Yes)        No

If no Explain: _____

Was Warrant Turned Off Warrant Book and Dels Book?   (Yes)      No

If no Explain: _____

Was Warrant Canceled from NCIC?      (Yes)      Not Entered

Was Warrant Removed From Hold Book?   Yes   (No Hold Place)

Sheriff's Office Employee Signature: _Debbie Fuller_

Note: After completing this form, staple it to the back of cleared warrant and put it in the folder marked *Court Clerk Use* this form only to clear Sequoyah County Warrants. Every warrant must be cleared on a separate form.

329

Attachment I
OP-160201

## Notice of Termination of Active Probation Supervision

To:      The Honorable Judge Jeff Payton, Sequoyah County District Court

Re:      Cindy E. Crawford  DOC#:502387 CRF 2004-613

**This will serve to provide notice that <u>Cindy E. Crawford</u> has completed <u>24</u> months of probation supervision under the jurisdiction of the Oklahoma Department of Corrections.**

☐      Assessment results indicate the referenced probationer has no criminogenic needs to be addressed by continued supervision.

☐      The offender has successfully completed all supervision modules identified and the corresponding programs to address the offender's criminogenic need(s).

☒      The offender has completed the statutorily mandated term of supervision.

**The Oklahoma Department of Corrections has determined that supervision in this case shall not extend beyond the period already completed. The probationer has complied with his/her Rules and Conditions of supervision to date and, by his/her signature below, acknowledges that the remainder of his/her probation sentence will not be supervised by the Department of Corrections. However, termination of supervision does not modify the sentencing court's jurisdiction over the case, which will not expire by term until the date ordered by the court has been reached. Until that date, the district attorney's office may elect to file an application to accelerate/revoke this sentence should the probationer commit any violations of his/her probation prior to the scheduled discharge date of <u>4/27/2010</u>.**

The determination to terminate supervision of this case is in accordance with 22 O.S. 991a.E or 22 O.S. 991c pertaining to suspended and deferred sentences, respectively. Please direct any questions pertaining to this matter to the supervising officer at the following address:

**Mike Evans**
**107 N. Oak**
**Sallisaw, Oklahoma 74955**
**Phone: (918) 775-6414**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**MAY 0 2 2007**

MAUDEEN VANN, COURT CLERK
BY_____ DEPUTY

Records indicate that the following obligations (conditions) are not complete:

☐      Community service ____ hours of community service that must completed by _____.

☒      Court costs in the amount of $673.30 payable to the office of the Court Clerk.

☐      Other court-ordered obligations: _____

_____         10 Apr 07
Supervising Officer                              Date

_____
Team Supervisor                                  Date
                                                      4-10-07
_____         Date
Probationer

CC:      District Attorney
         DOC Restitution and Accounting
         Offender

330

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 171**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

331

INFORMATION

====================================================================

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| **STATE OF OKLAHOMA** | ) | |
| **Plaintiff,** | ) | |
| vs. | ) | **No. CM-2001- 885** |
| | ) | |
| **CYNTHIA MATTOX-LUCAS** | ) | |
| DOB:███76 SSN:███2206 | ) | |
| **Defendant.** | ) | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**DEC 19 2001**

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

### INFORMATION

## IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:

Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CYNTHIA MATTOX-LUCAS did, in Sequoyah County, and in the State of Oklahoma, on the 12ᵗʰ day of December, in the year of our Lord, Two Thousand One, and before the presentment hereof, commit the crime of

**UNLAWFUL POSSESSION OF CONTROLLED DRUG (MISD) - 63 O.S. 2-402 (B-1)**
That on the day and year, and in the County and State, aforesaid, CYNTHIA MATTOX-LUCAS, did unlawfully, wilfully, knowingly, and intentionally have in her possession and under her control CLONAZEPUM, said drug being classified as a controlled dangerous substance in Schedule IV of the Uniform Controlled Dangerous Substances Act of this State,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

**DIANNE BARKER HARROLD**
**DISTRICT ATTORNEY**

By _____
**Assistant District Attorney**

**STATE OF OKLAHOMA** )
) ss.
**COUNTY OF SEQUOYAH** )

Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

_____
**Assistant District Attorney**

Subscribed and sworn to before me this **18** day of December, 2001.

_____
**NOTARY PUBLIC**

My Commission Expires:
10 4 04

WITNESSES:

**Calvin Lockhart, SPD**
**OSBI Lab Analyst, Tahlequah, Ok**

332

KEB502880

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
## STATE OF OKLAHOMA

cm - ol - 685

### Probable Cause Affidavit for Warrantless Arrest

Comes now the undersigned Affiant, and states upon Oath or Affirmation that the following information and facts are correct to the best of the Affiant's knowledge and belief:

Name of Person Arrested: Mattox-Lucas, Cynthia            Social Security Number: ____████2026____

Date of Birth: ██████ 76   Date of Arrest (Detention): 12 / 12 / 01   Time of Arrest: 3:00   P. M.

State Specific Facts for Probable Cause for the Arrest and Detention:
See attached page.

_____

_____

_____

_____

[Use reverse side or attach another page if necessary]
Anticipated Charge(s): Possesion of CDS without valid Prescription, Possession of Contraband in Jail

AFCF: No / Yes times (1) (2) or _____    Cal. Tockhart 12/13/01
                                          Affiant (Arresting Officer)

Subscribed and sworn to before me the undersigned, this 14 Day of December 2001

My Commission Expires: 4-16-2003    Brooke H Hagan
                                    Notary Public / Judge / Witness

### Probable Cause Determination

I, Dennis M. Sprouse, Judge of the District Court reviewed this Probable Cause Affidavit on the 17 day of December, 2001, at 9:34 A.M./P.M.

✓ This Affidavit contains sufficient facts showing probable cause to detain the Arrestee to await further proceedings. The Sheriff for Sequoyah or Chief of Police of the arresting agency is hereby commanded to receive him/her into their custody and detain until he/she is legally discharged.

✓ The Court sets [___]an Appearance Bond in the amount of $_____.00 or [✓] as per Sequoyah County Bond Schedule.

____ The Court denies Bond at this time.

____ This Affidavit contains insufficient facts to show there exists probable cause to detain the Arrestee. **The Arrestee is Ordered Released From Custody Immediately.**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 19 2001

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

_____
(Judge of the District Court

KEB502881

# IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY STATE OF OKLAHOMA

## Probable Cause Affidavit for Warrantless Arrest

On 12-12-2001 I was sent to the Sequoyah County District Attorneys Office on a report of a Cynthia Lucas-Mattox being there. I was aware that Ms. Mattox had a warrant for her arrest through the City of Sallisaw. Upon arriving to the DA's office I placed Ms. Mattox under arrest for the warrant. Ms. Mattox was then transported to the Sallisaw Holding Facility. Before the booking process was started I asked Ms. Mattox if she had and type of illegal drugs on her person or in her purse. Ms. Mattox stated "No I do not." While inventorying Ms. Mattox's purse she had with her while she was arrested, I found what appeared to be a piece of plastic that is found on a cigarette package with two white pills bearing the numbers 93834. When I asked Ms. Mattox about the pills she stated that they were aspirin. They did not have the appearance of any type of aspirin I had seen the past. I then seized the pills to try to identify what they were. I also could not locate any prescription bottle or prescription in her purse or on her person that matched the pills I found. She did however have a prescription in her purse, but was not the same as the two white pills in the plastic. After the booking procedure was finished on Ms. Mattox I then called Cliff's Pharmacy in Sallisaw and gave them a description of the pills and the numbers that were on them. The person I was speaking with advised that it was Clonazepam a schedule four controlled substance. I then had Officer Teague contact Detective John Owens. Det. Owens advised the same thing that the employee at Cliff's Pharmacy did. Owens also advised that it was a felony to be in possession of Clonazepam with out a valid prescription. I then sealed the pills and plastic in a envelope, signed and taped the seams, and locked the package in a drawer to be sent the Oklahoma State Bureau Investigation Lab for analysis. I later talked with DA Robbie Cowan advised that being in possession of a schedule four drug was only a misdemeanor, but since Ms. Mattox had been arrested before for the same thing that this time to charge her with a felony.

334

KEB502882

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**REDACTED EXHIBIT 160**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Redacted Exhibits to Brief in Support of
Second Amended Motion Pursuant to U.S.C. § 2255        *U.S. v. Barrett*, 6:09-cv-00105-JHP

335

**INFORMATION**

═══════════════════════════════════════════════════════════════

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

| | |
|---|---|
| STATE OF OKLAHOMA )<br>　　　　Plaintiff, )<br>vs. )<br>　　　　　　　 )<br>CHARLES EDMOND SANDERS )<br>DOB: ████66 #████9539)<br>TERESA JORDAN )<br>DOB:████65 #████-5711 )<br>JOHN EUGENE JORDAN )<br>DOB:████66 #████-5294 )<br>　　　　Defendant. ) | No. CF-98-346<br><br>SEQUOYAH COUNTY, OKLAHOMA<br>FILED<br>IN DISTRICT COURT<br><br>SEP 2 2 1998<br><br>BERNELL EDWARDS, COURT CLERK<br>BY _____ DEPUTY |

## I N F O R M A T I O N
**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OKLAHOMA:**

　　Now comes DIANNE BARKER HARROLD, the duly qualified and acting District Attorney, in and for Sequoyah County, State of Oklahoma and gives the District Court to know and to be informed that CHARLES EDMOND SANDERS, TERESA JORDAN and JOHN EUGENE JORDAN did, in Sequoyah County, and in the State of Oklahoma, on the 17th day of September, in the year of our Lord, One Thousand, Nine Hundred and Ninety-Eight and before the presentment hereof, commit the crime of

### COUNT I: UNLAWFUL POSSESSION OF CONTROLLED DRUG
### (FELONY) 63 O.S. 2-402 (B-1)

That on the day and year, and in the County and State, aforesaid, CHARLES EDMOND SANDERS, TERESA JORDAN and JOHN EUGENE JORDAN, while acting in concert each with the other, did unlawfully, wilfully, knowingly, or intentionally and feloniously have in their possession and under their control METHAMPHETAMINE, said drug being classified as a controlled dangerous substance in Schedule II of the Uniform Controlled Dangerous Substances Act of this State,

### COUNT II: UNLAWFUL POSSESSION OF PARAPHERNALIA-(MISD) 63 O.S. 2-405

On the day and year in the County and State aforesaid, said CHARLES EDMOND SANDERS, TERESA JORDAN and JOHN EUGENE JORDAN, while acting in concert each with the other, did unlawfully, wilfully and wrongfully have in their possession and under their control certain paraphernalia, to-wit: syringes, used to consume drugs classified as controlled dangerous substances under the Uniform Controlled Dangerous Substances Act of this State, and for the purpose and with the unlawful intent to administer such controlled dangerous substances without having any medical or other lawful need requiring possession of said paraphernalia,

contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma.

　　　　　　　　　REDACTED DIANNE BARKER HARROLD
　　　　　　　　　　　　DISTRICT ATTORNEY

　　　　　　　　By _____
　　　　　　　　　　Assistant District Attorney

STATE OF OKLAHOMA )
　　　　　　　　　　) ss.
COUNTY OF SEQUOYAH)

　　Undersigned, being duly sworn, on oath state, that I have read the above and foregoing information and know the contents thereof and that the facts stated therein are true.

　　　　　　　　_____
　　　　　　　　Assistant District Attorney

　　　　Subscribed and sworn to before me this 22nd day of September, 1998.

My Commission Expires:
_____　　　　_____
　6/28/99　　　　　　　　　　　　NOTARY PUBLIC

WITNESSES:
Kelly Karnes, SCSO, Sallisaw, OK
Roy Coleman, SCSO, Sallisaw, OK
Walter Ross, SCSO, Sallisaw, OK
Chemist, OSBI Lab, Tahlequah, OK

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEP 2 3 1998

_____
Plaintiff

BERNELL EDWARDS, COURT CLERK
BY _____ *CW* _____ DEPUTY

vs.

_____
Defendant

CASE NO: *CF-98-346A*

APPLICATION FOR APPOINTED COUNSEL
AND
AFFIDAVIT OF FINANCIAL INABILITY TO EMPLOY COUNSEL

I swear and affirm that I am the party in the above entitled action. I want an attorney to represent me in this case. I am financially unable to obtain the services of an attorney without causing substantial hardship to myself or to my family. The following information is true and is given and intended to be relied upon by the court and other persons or agencies in determining my eligibility for legal services to be furnished to me at public expense.

PLEASE FILL IN ALL SPACES BELOW AND SIGN YOUR NAME UNDER OATH IN FRONT OF THE JUDGE, A NOTARY OR THE COURT CLERK. IF A QUESTION DOES NOT APPLY TO YOU, PLEASE WRITE IN THE BLANK "DOES NOT APPLY".

I. GENERAL INFORMATION       DATE: *09 23 98*
NAME: *Theresa Jordan*
ADDRESS: ▓▓▓▓ *918 775-* *Marble City OK 74945*
TELEPHONE: *918 775-* ▓▓▓▓ MESSAGE NUMBER: _____
SOCIAL SECURITY NO: ▓▓▓ *5710* AGE: *33* DOB: ▓▓▓ *65*
SINGLE ( ✓ ) MARRIED ( ) SEPARATED ( ✗ )
SPOUSE'S NAME: _____
ADDRESS: _____
TELEPONE: _____
HOW MANY PEOPLE ARE IN YOUR HOUSEHOLD? *2*
NAME AND AGES: *Myself, Tara Fields age 14*

ARE YOU CLAIMED AS A DEPENDENT BY A PARENT OR GUARDIAN? YES ( ) NO ( ✓ )

II FAMILY INCOME
YOUR MONTHLY TAKE HOME PAY: *0* WEEKLY TAKE HOME PAY: *0*
YOUR EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY) *0*
YOUR EMPLOYER'S PHONE NUMBER: *N/A*
SPOUSE'S SALARY: *N/A*
SPOUSE'S EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY
_____
SPOUSE'S EMPLOYER'S PHONE NUMBER: _____
IS ANY OTHER MEMBER OF YOUR HOUSEHOLD EMPLOYED? YES ( ) NO ( ✓ )
WHO? _____
WHERE? _____ **REDACTED**
SALARY? _____
DEPENDENT'S EMPLOYER: *None*
OTHER SOURCE OF INCOME OR BENEFITS (INCLUDE INTEREST, DIVIDENDS, ROYALTIES, ETC.) *None*
TOTAL FAMILY INCOME FOR PRECEDING MONTH WAS $ *0*

337

III FAMILY ASSETS (WHAT YOU OWN LESS WHAT YOU OWE ON IT)
MONEY:
IN JAIL: -0-     AT HOME: -0-     CHECKING: -0-
SAVINGS: -0-     SAFE DEPOSIT BOX  -0-     OTHER: -0-
HOME OR OTHER REAL ESTATE VALUE: -0-     JEWELRY VALUE: -0-
AUTOMOBILES: MAKE AND VALUE -0-     FURNITURE VALUE -0-
MOTORCYCLES:    MAKE    AND    VALUE -0-     TOOLS/EQUIPMENT
VALUE -0-
NOTES, MORTGAGES AND TRUST DEEDS: -0-     ANY DEBTS OWED TO THE DEF -0-
OTHER ASSETS AND PROPERTY VALUE: -0-
ARE YOU PARTY TO A SUIT (PROBATE, WORKER'S COMPENSATION, PERSONAL
INJURY)WHERE? -0-     JUDGMENT MAY BE EXPECTED? YES( ) NO( )
NAME OF ATTORNEY? Gerald Hunter

IV  EXPENSES AND DEBTS
RENT/HOUSE PAYMENT: 150 00/mo CLOTHING -0-     FOOD -0-
DOCTOR/MEDICINE -0-     UTILITIES 300 00/mo CAR PAYMENT -0-
INSURANCE: -0-     OTHER: -0-
TOTAL MONTHLY LIVING EXPENSES: 450 00/mo
MORTGAGE/LANDLORD'S NAME: Tom Bradshaw
MAJOR DEBTS: (list to whom and amount owed): Fines/Court Cost - Sequoyah Co
amount total unknown

LIST THE PERSONS WHO ARE DEPENDENT ON YOU FOR SUPPORT. STATE YOUR
RELATIONSHIP TO EACH PERSON AND HOW MUCH YOU CONTRIBUTE MONTHLY TO THEIR
SUPPORT: Tara Fields, Britanie Jordan - Daughters
50%

V. LAST EMPLOYMENT
WHEN DID YOU LAST WORK?: 1997
WHO WAS YOUR EMPLOYER?: Vian Nursing Home
SALARY: 450 00/mo     HOW LONG DID YOU WORK THERE?: 6mo
WHY DID YOU QUIT? Moved

VI. THE FOLLOWING PEOPLE CAN VERIFY TO A LARGE EXTENT MY ABOVE MENTIONED
FINANCIAL SITUATION. GIVE NAME, ADDRESS AND PHONE NUMBER.
1. Imogene Jordan ▮▮▮▮▮ Vian OK 773-8187
2. Evelyn Sanders ▮▮▮▮▮ Marble City 775-3093
3. Donna Davis ▮▮▮▮▮ Marble City 775-3093

VII. CHARGE AND BOND
CHARGE(S): FELONY ✓     MISDEMEANOR     JUVENILE
ARRESTING AGENCY: Seq. Co Sheriff's Dept
CITY     COUNTY ✓     STATE
HAS BOND BEEN POSTED? YES(✓) NO( ) DID YOU USE A BONDSMAN? YES( ) NO(✓)
WHO PAID THE BONDSMAN? N/A
AMOUNT OF BOND: 20,000     PREMIUM PAID TO BONDING CO: -0-
IF YOU DID NOT USE A BONDSMAN, DID YOU POST A CASH     OR P.R.

338

LIST ANY DEFENDANTS CHARGES WITH YOU _Charles Sanders, Johnny Jordan_

VIII

1. HAVE YOU TRANSFERRED OR SOLD ANY ASSETS SINCE CHARGES WERE FILED IN THE CASE? YES ( ) NO ( ✓) IF SO, DESCRIBE THE BUYER AND THE AMOUNT RECEIVED.

_____

_____

2. HAVE YOU RETAINED COUNSEL IN THE CASE OR IN ANY OTHER PENDING CRIMINAL CASE? YES ( ✓) NO ( ) IF SO, STATE THE CASE NUMBER, COURT, ATTORNEY, AND AMOUNT PAID TO ATTORNEY FOR SERVICES: _O 4, court Appt ; Gerald Hunter_

_____

3. DO YOU HAVE ANY FRIENDS OR RELATIVES WHO ARE ABLE AND WILLING TO ASSIST YOU IN HIRING COUNSEL AND PAYING FOR TRANSCRIPTS? YES ( ) NO ( ✓) IF SO, HAVE THOSE PERSONS BEE ASKED TO HELP? YES ( ✓) NO ( )

4. IF ANY FRIEND OR RELATIVE HAS GIVEN PREVIOUS FINANCIAL ASSISTANCE IN THIS CASE, BUT IS NO LONGER ABLE OR WILLING TO DO SO, AN AFFIDAVIT TO THAT EFFECT FROM THAT PERSON SHOULD BE ATTACHED. IS THAT AFFIDAVIT ATTACHED YES( ) NO( )

IX. NAMES OF THREE ATTORNEY'S YOU CONTACTED:

1. NAME: _Sullivan_
   WHEN DID YOU CONTACT THIS ATTORNEY? _8-22_
   HOW DID YOU CONTACT THIS ATTORNEY? _8-2 Phone_
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓)
2. NAME: _Donnie Baker_
   WHEN DID YOU CONTACT THIS ATTORNEY? _8-22_
   HOW DID YOU CONTACT THIS ATTORNEY? _Phone_
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓)
3. NAME: _Datflu, Mike_
   WHEN DID YOU CONTACT THIS ATTORNEY? _8-22_
   HOW DID YOU CONTACT THIS ATTORNEY? _Phone_
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( ✓)

X. I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION I HAVE PROVIDED IS TRUE AND CORRECT. I UNDERSTAND THAT I MAY BE PROSECUTED FOR PROVIDING FALSE INFORMATION IN THIS APPLICATION AND AFFIDAVIT. I UNDERSTAND THAT I MUST INFORM THE OKLAHOMA INDIGENT DEFENSE SYSTEM OF ANY CHANGE IN MY FINANCIAL SITUATION THAT MAY CHANGE THE INFORMATION I HAVE PROVIDED. I FURTHER DECLARE THAT I HAVE CONTACTED THREE ATTORNEYS, LICENSED TO PRACTICE LAW IN THIS STATE, AND I AM WITHOUT FUNDS TO PAY AN ATTORNEY TO REPRESENT ME OR TO PAY FOR TRANSCRIPTS AND COST ASSOCIATED WITH THIS CASE.

DATED THIS _23_ DAY OF _Sept_ 19 _78_ .

DEFENDANT _Teresa Jordan_

LEGAL GUARDIAN _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____ 19____ .

comm. exp._____  **REDACTED**_____

PUBLIC NOTARY OR CLERK OR JUDGE

I FIND THAT THE DEFENDANT IS UNABLE TO PAY THE APPLICATION FEE AND I HEREBY WAIVE THE FEE.

_____
JUDGE

APPOINTMENT OF INDIGENT DEFENSE COUNSEL

APPROVED _Chs_ DENIED_____

_Clerk_

## NOTICE

A copy of this APPLICATION AND AFFIDAVIT shall be sent to the prosecuting attorney or office of attorney general, whichever is applicable, for review and, upon request, the court shall hold a hearing to determine your eligibility for legal services to be furnished to you at public expense.

## IMPORTANT NOTICE

The court shall order you to pay the costs of your legal representation in total, or in installments. The court shall set the amount and due of each installment payment. The costs shall be paid to the court clerk in your county. The costs shall be a debt against you until paid and shall subject you to debt collection procedures as provided by law. The costs shall be deducted from any state income tax refund due you until the total costs are paid.

**REDACTED**

340

ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, first, middle, suffix(please print or type) (show alias)

Jordan Teresa     DOB. 06-29-65     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

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-346A | Hamilton + Morgan Bond 80,000 | Poss CDS, Escape Poss Para Poss of Radio in Comm of Felony |
| | | |
| | | |
| | | |
| | | |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the 25 day of Sept 19 98.

Shelia Seeley
Signature

AUTHORIZED BY  Del Sprouse
JUDGE OF THE DISTRICT COURT

White Copy - Court
Yellow Copy - Sheriff's File

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 28 1998

BERNELL EDWARDS, COURT CLERK
REDACTED DEPUTY

341

ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, first, middle, suffix(please print or type) (show alias)

Sanders    Charles  E   ███  66  ███  9539

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF-98-346 | Hamilton & Morgan $20,000 | Poss CDS, Poss Para, Unlawful escape of Custody, Poss of Police Radio |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the _18_ day of _Sept_ _____, 19_98_.

White Copy - Court
Yellow Copy - Sheriff's File

_Shelia Seeley_
Signature

AUTHORIZED BY   _PR. Garrett_
JUDGE OF THE DISTRICT COURT

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 21 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**REDACTED**

342

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 2 9 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

INFORMATION
Page 2

| | |
|---|---|
| THE STATE OF OKLAHOMA, | ) IN THE DISTRICT COURT OF |
| Plaintiff, | ) SEQUOYAH COUNTY, STATE |
| | ) OF OKLAHOMA |
| vs. | ) CASE NO. CRF-98- 346 |
| | ) |
| CHARLES E. SANDERS, | ) |
| Defendant. | ) |

## FORMER CONVICTIONS

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-89-396, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UTTERING FORGED INSTRUMENT, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-92-91, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of UNLAWFUL POSSESSION OF CONTROLLED DRUG, said defendant being represented by counsel, and said conviction having become a final judgment in the case;

THE STATE OF OKLAHOMA FURTHER ALLEGES that the same CHARLES E. SANDERS was heretofore on the 20th day of July, 1992, in Case No. CF-90-144, in the District Court of Sequoyah County, State of Oklahoma, a court of competent jurisdiction, convicted of the crime of SEXUAL BATTERY, said defendant being represented by counsel, and said conviction having become a final judgment in the case, and, therefore, this defendant is prosecuted as a second and subsequent offender.

DIANNE BARKER HARROLD,
DISTRICT ATTORNEY

BY: _____
Assistant District Attorney

**REDACTED**

343

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEP 3 0 1998

_____
Plaintiff

BERNELL EDWARDS, COURT CLERK
BY _____ _Ow_ _____ DEPUTY

vs. _John E. Jordan_
Defendant

CASE NO: _CF-98-346B_

APPLICATION FOR APPOINTED COUNSEL
AND
AFFIDAVIT OF FINANCIAL INABILITY TO EMPLOY COUNSEL

I swear and affirm that I am the party in the above entitled action. I want an attorney to represent me in this case. I am financially unable to obtain the services of an attorney without causing substantial hardship to myself or to my family. The following information is true and is given and intended to be relied upon by the court and other persons or agencies in determining my eligibility for legal services to be furnished to me at public expense.

PLEASE FILL IN ALL SPACES BELOW AND SIGN YOUR NAME UNDER OATH IN FRONT OF THE JUDGE, A NOTARY OR THE COURT CLERK. IF A QUESTION DOES NOT APPLY TO YOU, PLEASE WRITE IN THE BLANK "DOES NOT APPLY".

I. GENERAL INFORMATION                    DATE: _9/22/98_
NAME: _John E. Jordan_
ADDRESS: ▮▮▮▮▮  _Musk, OK 74403_
TELEPHONE: _Ø_          MESSAGE NUMBER: _Ø_
SOCIAL SECURITY NO: ▮▮▮▮ _5799_  AGE: _32_  DOB: ▮▮▮ _66_
SINGLE ( )  MARRIED (✓)  SEPARATED ( )
SPOUSE'S NAME: _Kathy Jordan_
ADDRESS: _same_
TELEPONE: _Ø_
HOW MANY PEOPLE ARE IN YOUR HOUSEHOLD? _5_
NAME AND AGES: _Kathy 38, Reganna 12, Amber 10, Amanda, John Jr._
ARE YOU CLAIMED AS A DEPENDENT BY A PARENT OR GUARDIAN? YES (✓) NO ( )

II FAMILY INCOME
YOUR MONTHLY TAKE HOME PAY: _Ø_      WEEKLY TAKE HOME PAY: _Ø_
YOUR EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY)
_Ø_
YOUR EMPLOYER'S PHONE NUMBER: _____
SPOUSE'S SALARY: _Ø_
SPOUSE'S EMPLOYER OR OTHER SOURCE OF INCOME (INCLUDING GOVERNMENT AGENCY
_Ø_
SPOUSE'S EMPLOYER'S PHONE NUMBER: _____
IS ANY OTHER MEMBER OF YOUR HOUSEHOLD EMPLOYED? YES( ) NO(✓)    **REDACTED**
WHO? _____
WHERE? _____
SALARY? _____
DEPENDENT'S EMPLOYER: _Ø_
OTHER SOURCE OF INCOME OR BENEFITS (INCLUDE INTEREST, DIVIDENDS, ROYALTIES, ETC.) _Ø_
TOTAL FAMILY INCOME FOR PRECEDING MONTH WAS $ _____

344

III FAMILY ASSETS (WHAT YOU OWN LESS WHAT YOU OWE ON IT)
MONEY:
IN JAIL: _____ AT HOME: _____ CHECKING: _____
SAVINGS: _____ SAFE DEPOSIT BOX _____ OTHER: _____
HOME OR OTHER REAL ESTATE VALUE: _____ JEWELRY VALUE: _____
AUTOMOBILES: MAKE AND VALUE _76 car_ FURNITURE VALUE _____
MOTORCYCLES:   MAKE   AND   VALUE _____ TOOLS/EQUIPMENT
VALUE _____
NOTES, MORTGAGES AND TRUST DEEDS: _____ ANY DEBTS OWED TO THE DEF _____
OTHER ASSETS AND PROPERTY VALUE: _____
ARE YOU PARTY TO A SUIT (PROBATE, WORKER'S COMPENSATION, PERSONAL
INJURY)WHERE? _____ JUDGMENT MAY BE EXPECTED? YES( ) NO( )
NAME OF ATTORNEY? _Gerald Hunter court appointed_

IV EXPENSES AND DEBTS
RENT/HOUSE PAYMENT: _350⁰⁰_ CLOTHING _____ FOOD _300⁰⁰_
DOCTOR/MEDICINE _____ UTILITIES _300⁰⁰_ CAR PAYMENT _____
INSURANCE: _____ OTHER: _____
TOTAL MONTHLY LIVING EXPENSES: _950⁰⁰_
MORTGAGE/LANDLORD'S NAME: _Charles Deqm Francid_
MAJOR DEBTS: (list to whom and amount owed): _____
_____
_____

LIST THE PERSONS WHO ARE DEPENDENT ON YOU FOR SUPPORT.   STATE YOUR
RELATIONSHIP TO EACH PERSON AND HOW MUCH YOU CONTRIBUTE MONTHLY TO THEIR
SUPPORT: _____
_____
_____

V. LAST EMPLOYMENT
WHEN DID YOU LAST WORK?: _Park Place Nursing Center_
WHO WAS YOUR EMPLOYER?: _____
SALARY: _10.75 hr_ HOW LONG DID YOU WORK THERE?: _3 months_
WHY DID YOU QUIT? _conflict with boss_

VI. THE FOLLOWING PEOPLE CAN VERIFY TO A LARGE EXTENT MY ABOVE MENTIONED
FINANCIAL SITUATION.  GIVE NAME, ADDRESS AND PHONE NUMBER.
1. _____
2. _____
3. _____

VII. CHARGE AND BOND                    **REDACTED**
CHARGE(S): FELONY _CDS_ MISDEMEANOR _FTP, FTA_ JUVENILE _____
ARRESTING AGENCY: _Sequoyah_
CITY _Sallisaw_ COUNTY _Seq._ STATE _Ok_
HAS BOND BEEN POSTED? YES( ) NO(✓) DID YOU USE A BONDSMAN? YES( ) NO(✓)
WHO PAID THE BONDSMAN? _____
AMOUNT OF BOND: _265⁰⁰ cash PR bond_ PREMIUM PAID TO BONDING CO: _____
IF YOU DID NOT USE A BONDSMAN, DID YOU POST A CASH _____ OR P.R. _____

345

LIST ANY DEFENDANTS CHARGES WITH YOU _Teresa Jordan, Monk Saunders_

VIII

1. HAVE YOU TRANSFERRED OR SOLD ANY ASSETS SINCE CHARGES WERE FILED IN THE CASE? YES ( ) NO (✓) IF SO, DESCRIBE THE BUYER AND THE AMOUNT RECEIVED.

_____

2. HAVE YOU RETAINED COUNSEL IN THE CASE OR IN ANY OTHER PENDING CRIMINAL CASE? YES (✓) NO ( ) IF SO, STATE THE CASE NUMBER, COURT ATTORNEY AND AMOUNT PAID TO ATTORNEY FOR SERVICES: _____

_Gerald Hunter court appointed_

3. DO YOU HAVE ANY FRIENDS OR RELATIVES WHO ARE ABLE AND WILLING TO ASSIST YOU IN HIRING COUNSEL AND PAYING FOR TRANSCRIPTS? YES ( ) NO (✓) IF SO, HAVE THOSE PERSONS BEE ASKED TO HELP? YES ( ) NO (✓)

4. IF ANY FRIEND OR RELATIVE HAS GIVEN PREVIOUS FINANCIAL ASSISTANCE IN THIS CASE, BUT IS NO LONGER ABLE OR WILLING TO DO SO, AN AFFIDAVIT TO THAT EFFECT FROM THAT PERSON SHOULD BE ATTACHED. IS THAT AFFIDAVIT ATTACHED YES( ) NO( )

IX. NAMES OF THREE ATTORNEY'S YOU CONTACTED:

1. NAME: _____
   WHEN DID YOU CONTACT THIS ATTORNEY?_____
   HOW DID YOU CONTACT THIS ATTORNEY?_____
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( )
2. NAME: _____
   WHEN DID YOU CONTACT THIS ATTORNEY?_____
   HOW DID YOU CONTACT THIS ATTORNEY?_____
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( )
3. NAME: _____
   WHEN DID YOU CONTACT THIS ATTORNEY?_____
   HOW DID YOU CONTACT THIS ATTORNEY?_____
   CAN YOU AFFORD TO HIRE THIS ATTORNEY? YES ( ) NO ( )

X. I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION I HAVE PROVIDED IS TRUE AND CORRECT. I UNDERSTAND THAT I MAY BE PROSECUTED FOR PROVIDING FALSE INFORMATION IN THIS APPLICATION AND AFFIDAVIT. I UNDERSTAND THAT I MUST INFORM THE OKLAHOMA INDIGENT DEFENSE SYSTEM OF ANY CHANGE IN MY FINANCIAL SITUATION THAT MAY CHANGE THE INFORMATION I HAVE PROVIDED. I FURTHER DECLARE THAT I HAVE CONTACTED THREE ATTORNEYS, LICENSED TO PRACTICE LAW IN THIS STATE, AND I AM WITHOUT FUNDS TO PAY AN ATTORNEY TO REPRESENT ME OR TO PAY FOR TRANSCRIPTS AND COST ASSOCIATED WITH THIS CASE.

DATED THIS _2nd_ DAY OF _Sept_ 19_98_.

DEFENDANT _____

LEGAL GUARDIAN _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _3rd_ DAY OF _Sept_ 19_98_.

comm. exp._____

REDACTED

PUBLIC NOTARY OR CLERK OR JUDGE

346

I FIND THAT THE DEFENDANT IS UNABLE TO PAY THE APPLICATION FEE AND I HEREBY WAIVE THE FEE.

_____
JUDGE

APPOINTMENT OF INDIGENT DEFENSE COUNSEL
APPROVED _Jms_ DENIED_____

## NOTICE

A copy of this APPLICATION AND AFFIDAVIT shall be sent to the prosecuting attorney or office of attorney general, whichever is applicable, for review and, upon request, the court shall hold a hearing to determine your eligibility for legal services to be furnished to you at public expense.

## IMPORTANT NOTICE

The court shall order you to pay the costs of your legal representation in total, or in installments. The court shall set the amount and due of each installment payment. The costs shall be paid to the court clerk in your county. The costs shall be a debt against you until paid and shall subject you to debt collection procedures as provided by law. The costs shall be deducted from any state income tax refund due you until the total costs are paid.

**REDACTED**

# Hamilton - Morgan Bail Bonds
## Diane Hamilton
## APPEARANCE BOND

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 28 1998

IN THE DISTRICT COURT OF _____ _Seq_ _____ COUNTERNST STATE OF, OKLAHOMA
State of Oklahoma,                    'Plaintiff,        BY _____ _lw_ _____ DEPUTY

vs. _Teresa Jordan_, Defendant                    Case No. _CF-98-346A_

Know all men by these presents, that we the above named defendant, as principal, and the undersigned _Teresa Hamilton DBA_ Diane Hamilton, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of _Twenty Thousand_ Dollars ($ _20,000_ ) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of _Seq_ County, State of Oklahoma, shall personally be and appear before the District Court of said county on the _30_ day of _Sept_ , 19 _98_ , at _9_ o'clock _AM_ ., of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of _Poss. of CDS / Poss of police Radio / Poss of firm / Ulawful escape from Custody_ and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this _25_ day of _Sept_ , 19 _98_ .

_Teresa Jordan_ _____ Principal ▮▮▮▮ _Marble City Ok 74942_ Address
Hamilton - Morgan                    Surety            113 North Oak  Sallisaw, Oklahoma 74955
Diane Hamilton
_Diane Hamilton_ _____ Surety ▮▮▮▮ _Sallisaw, OK 74955_ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _25_ day of _Sept_ , 19 _98_ .

_____ Court Clerk/Sheriff _Shelia Dooley_ _____ Deputy

This undertaking approved this _25_ day of _Sept_ , 19 _98_ .

(SEAL)                         By: _____ Deputy/Clerk

## AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, _Seq_ County, SS:

The undersigned, being first duly sworn upon oath says that he is a resident of _Seq_ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as herinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $ _5,000.00_

b) Other security received or promised for making this undertaking, is as follows: _PN_

c) Such promise, security or consideration was received from:

_Teresa Jordan_ ▮▮▮▮ _Marble City OK 74942_
Name                         Address

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as on commits perjury.

_Diane Hamilton_ ▮▮▮▮ _Sallisaw, OK 74955_
Affiant                     Address

Subscribed and sworn to before me this _25_ day of _Sept_ , 19 _98_ .

(SEAL)

_____ Court Clerk - Notary Public

My Commission Expires:                    _____
                                         Deputy

348

# Hamilton - Morgan Bail Bonds
## Diane Hamilton
## APPEARANCE BOND

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

IN THE DISTRICT COURT OF _____ COUNTY, STATE OF OKLAHOMA
State of Oklahoma, _____ Plaintiff,   SEP 21 1998

vs _Charles Sanders_, Defendant

BERNELL EDWARDS, COURT CLERK
BY ___ aw ___ DEPUTY   Case No. _CF-98-346_

Know all men by these presents, that we the above named defendant, as principal, and the undersigned _____ Diane Hamilton, Professional as surety(ies) personally appeared before the undersigned authority and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of _Twenty Thousand & 00/100_ Dollars ($ _20,000.00_ ) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our assigns, heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this bond are such that, if the above named defendant, who has been committed to the county jail of _Seq_ County, State of Oklahoma, shall personally be and appear before the District Court of said county on the _23_ day of _Sept_, 1998, at _9_ o'clock _AM_., of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of _Poss C.D.S. / Poss of Para / Poss of police radio / AFCF Escape from lawful officer_. and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hand and seals this _18_ day of _Sept_, 19 _98_.

_Charles Sanders_ Principal   ████████ _Marble City 74945_ Address

Hamilton - Morgan   Surety   113 North Oak   Sallisaw, Oklahoma 74955
Diane Hamilton
_Diane Hamilton_ Surety   ████████ _Sallisaw, OK._ Address

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _18_ day of _Sept_, 19 _98_.

_____ Court Clerk/Sheriff _Shelia Seeley_ Deputy

This undertaking approved this _18_ day of _Sept_, 19 _98_.

(SEAL)   By: _____ Deputy/Clerk

---

### AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, _Seq._ County, SS:

The undersigned, being first duly sworn upon Faith Says that he is a resident of _Seq_, County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as herinafter specified under one or more of the following relevant statutory provisions, to-wit:

a) Consideration for this undertaking received or promised in the sum of $ _3000.00_

b) Other security received or promised for making this undertaking, is as follows: _P.N._

c) Such promise, security or consideration was received from:

_Charles Sanders_   ████████ _Marble City, OK_
Name   Address

I understand that any willful misstatement relating to the security or consideration promised or given shall make me liable to the same prosecution and penalty as on commits perjury.

_Diane Hamilton_   ████████ _Sallisaw, OK 74955_
Affiant   Address

Subscribed and sworn to before me this _18_ day of _Sept_, 19 _98_.

(SEAL)

_____
Court Clerk - Notary Public

My Commission Expires: _____   _____
Deputy

S.E.&I. FORM NO. 408 (1966)

APPEARANCE BOND-DISTRICT COURT

Case No. *CF-98-346B*

STATE OF OKLAHOMA, SEQUOYAH COUNTY, SS:

Know all men by these presents, that _JOHN EUGENE JORDAN_ as principal, and _____ as suret(y)(ies) personally appeared before the undersigned authority _JUDGE DENNIS M. SPROUSE_ in and for _SEQUOYAH_ County, and jointly and severally acknowledged themselves to be indebted to the State of Oklahoma in the sum of _TEN THOUSAND_ Dollars ($ _10,000_ ) good and lawful money of the United States, to which payment well and truly to be made we bind ourselves, our heirs, executors and administrators jointly and severally, firmly by these presents.

The conditions of this obligation are such that, if the said _JOHN EUGENE JORDAN_, defendant, who has been committed to the county jail of _SEQUOYAH_ County, State of Oklahoma, shall personally be and appear before the _DISTRICT_ Court of said county on the _7th_ day of _JANUARY_, 19 _99_, at _9:00_ o'clock _A_ m., of said day, and from term to term, and from day to day of each term, to answer a charge preferred against him for the offense of _POSS. OF CDS, POSS. OF PARAPHERNALIA_, and to do and receive what shall be enjoined by said Court upon him, and shall not depart the said Court without leave, then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hands and seals this _____ day of _____, 19____.

_P.O. Box 761, VIAN, OK_ Address   _John C. Jordan_ Principal

_____ Address   _____ Surety

_____ Address   _____ Surety

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this _9_ day of _Oct_, 19 _98_

BERNELL EDWARDS   Court Clerk   By _Amanda Wood_ Deputy

_Dennis M. Sprouse_
_approved 10-9-98_
This undertaking approved this _9_ day of _Oct_, 19 _98_.

_____ Court Clerk

SEAL   _Amanda Wood_ Deputy

AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, SEQUOYAH COUNTY, SS:

_____ REDACTED, being first duly sworn upon oath, says that he is a resident of _____ County, State of Oklahoma, and that neither he nor anyone for his use has received or been promised any security or consideration for making this undertaking, except as hereinafter specified under one or more of the following relevant statutory provisions, to-wit:

   (a) He has received the sum of $_____ from _____ as consideration for making this undertaking;

   (b) He has received the following described property or instrument from _____ _____ as security for making this undertaking, as evidenced by attached copy of a receipt for collateral security _____ _____;

   (c) _____ has promised to secure him for making this undertaking.

_____ BONDSMAN

Subscribed and sworn to before me this _____ day of _____, 19____.

BERNELL EDWARDS
_____
Notary Public - Court Clerk

SEAL

My Commission expires _____   By: _____
_____ Deputy

ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.

Last Name, first, middle, suffix(please print or type) (show alias)

Jordan   Johnny   Eugene   ██████ 5999

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| CF98-346 | OR Bond per Sprouse And D.D. Steve Barns | Poss of CDS. Poss of Para |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the _09_ day of _10_ _____, 19_98_.

_Shelia Seeley_
Signature

AUTHORIZED BY _D.R. Sprouse_
JUDGE OF THE DISTRICT COURT

White Copy - Court
Yellow Copy - Sheriff's File

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

OCT 1 2 1998

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**REDACTED**

351

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 16 1998

BERNELL EDWARDS, COURT CLERK

BY ____aw____ DEPUTY

**CERTIFICATE OF SURRENDER**

Case No:
CF98-346
CF98-128
CF98-363
CF98-36
Total Amount of
bonds: 48000⁰⁰

I, _Leilani Letcher_, jailer _Sequoyah Co._,

State of Oklahoma, hereby acknowledge that I received from

_Joe Morgan_, a licensed Bail Bondsman in the State

of Oklahoma. _Charles Sanders_, defendant, in a

certain case pending in _District_ Court,

_Sequoyah County_, State of Oklahoma. That I have

retained in my custody _Charles Sanders_, defendant,

this _16_ day of _Nov_, 19 _98_, at _2_ o'clock_30_ ø m.

_Leilani Letcher_
Jailer

**REDACTED**

352

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA**

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| Vs. | ) | Case No. CF-98-346 |
| | ) | |
| CHARLES SANDERS, | ) | |
| | ) | |
| Defendant. | ) | |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**JAN 1 9 1999**

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## MOTION TO RECONSIDER AMOUNT OF BAIL

COMES NOW the defendant, Charles Sanders, by and through his attorney of record, Donn F. Baker, and respectfully requests this Honorable Court to reconsider the amount of bail and conditions of release now set for the defendant, Charles Sanders. In support of said motion, defendant's attorney states:

1.  That the defendant, Charles Sanders, is a resident of Sequoyah County, Oklahoma, and his address is ███████ Marble City, OK  74945.  That his mother, Evelyn Sanders, also resides in Sequoyah County at ███████ Marble City, OK 74945 and therefore has family ties in Sequoyah County.

2.  That the defendant, Charles Sanders, is 33 years of age, has never been in serious trouble before and is unable to post the exorbitant bond which is excessive and tantamount to a denial of bail.

3.  That the defendant, Charles Sanders, has now been incarcerated in the Sequoyah County Jail for more than 45 days.

4.  That the defendant, Charles Sanders, is not a flight risk and should have his bond reduced.

WHEREFORE, the defendant, Charles Sanders, respectfully requests this Honorable Court to reconsider the $45,000.00 bond which has been set in this matter, and reduce said bail to a more reasonable sum of $10,000.00 which the defendant is financially able to make.

Respectfully submitted,

REDACTED

By _____

Donn F. Baker, OBA#443
Attorney at Law
239 W. Keetoowah
Tahlequah, OK  74464
918-456-1233

353

354

## CERTIFICATE OF MAILING

The undersigned hereby certifies that on the 19 day of January, he mailed a true and correct copy of the above and foregoing Motion to Reconsider Amount of Bail, postage prepaid, to : District Attorney, Sequoyah County Courthouse, 120 E. Chickasaw, Sallisaw, OK 74955.

Donn F. Baker

**REDACTED**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 19 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| Vs. | ) | |
| | ) | Case No. CF-98-346 |
| CHARLES SANDERS, | ) | |
| Defendant. | ) | |

## DEFENDANT, CHARLES SANDER'S, BRIEF IN SUPPORT OF MOTION TO RECONSIDER THE AMOUNT OF BAIL

The defendant, CHARLES SANDERS, contends that pursuant to the United States Constitution and the Oklahoma Constitution, the defendant is, as a matter of right, entitled to be released on bail based upon the facts and circumstances presented at the preliminary hearing.  The Constitution of the State of Oklahoma, Article 2, Section 8, states:

"All persons shall be bailable by sufficient sureties, except for capital offenses when the proof of guilt is evident, or the presumption thereof is great."

The Court of Criminal Appeals has held that the right to be released on bail is absolute in all non-capital cases.  Ex Parte Womack, 62 Okl. Cr. 290, 71 P.2d 494, 495 (1937).  The purpose of bail is to guarantee the defendant's presence in Court, not to punish him.  Application of Owens, 394 P.2d 766 (Okl. Cr. 1960).  The Court of Criminal Appeals has recognized several factors which may be considered in the setting of bail: (1) maximum punishment for the offense charged; (2) the defendant's ties to the jurisdiction; Bowman v State, 585 P.2d 1373, 1378 (Okl. Cr. 1978); (3) the character of the defendant; (4) the means and standing of the defendant; Ex Parte Holden, 55 Okl. Cr. 51, 24 P.2d 665, 666 (1933); (5) the strength of evidence in the defendant's defense; Ex Parte Womack, 62 Okl. Cr. 290, 71 P.2d 494, 495 (1937); (6) the former employment of the defendant; (7) the defendant's inability to make the bail as set; In re Cheek, 355 P.2d 881, 882 (Okl. Cr. 1960); and (8) the protracted nature of the pending charges; Application of Wollaston, 350 P.2d 959 (Okl. Cr. 1960).  The setting of an excessive bail can be modified when the excessive amount is the equivalent to the denial of bail altogether.  Ex Parte Beard, 84 Okl. Cr. 94, 179 P.2d 484 (1947).                    **REDACTED**

In reviewing all of the above cited cases and the various criteria used in setting bail at a particular amount, it becomes evident that the $45,000.00 bond now set is excessive and is the equivalent to the denial of bail altogether.

WHEREFORE, the defendant, CHARLES SANDERS, prays that bond be lowered to a more reasonable amount of $10,000.00 and that upon posting same he be

355

released from custody forthwith.

Respectfully submitted,

By _____
Donn F. Baker, OBA#443
Attorney at Law
239 W. Keetoowah
Tahlequah, OK  74464
918-456-1233

CERTIFICATE OF MAILING

The undersigned hereby certifies that on the _19_ day of January, 1999, he mailed a true and correct copy of the above and foregoing Motion to Reconsider Amount of Bail, postage prepaid, to District Attorney, Sequoyah County Courthouse, 120 E. Chickasaw, Sallisaw, OK  74955.

_____
Donn F. Baker

**REDACTED**

CF-98-346

DISTRICT COURTS   Jan-15-99

I, Charles Sanders, Does not Demand a Speedy Trial, as to my Pending Charges, as to the January/Felony 1999 Jury Docket.

Respectfully

Charles Sanders

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**JAN 20 1999**

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**REDACTED**

357

*01-21-99*

SUBPOENA
IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA,
        Plaintiff,

vs.                              No. CF-98-346

CHARLES EDMOND SANDERS
        Defendant.

TO: DEPUTY KELLY KARNES S.C.S.O.
    DEPUTY ROY COLEMAN S.C.S.O.
    UNDERSHERIFF WALTER ROSS S.C.S.O.

*Served*

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JAN 25 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

        GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **29TH day of JANUARY, 1999, at the hour of 9:00: o'clock A. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES EDMOND SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

        HEREOF FAIL NOT, under penalty of law.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the District Court of said County, this 20TH day of JANUARY, 1999.

                    BERNELL EDWARDS,   COURT CLERK

                    By *Amanda Woody*
                         Deputy

=========================================================================

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE AND PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

=========================================================================

SHERIFF'S RETURN

        Received   this   Writ   this_____day   of_____,
19____,_____
o'clock____M.,_____**REDACTED**____, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the ____ day of _____, 19____,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____
_____By_____
_____19____, I cannot
find the within named_____
_____in my county.

                  JOHNNY PHILPOT, SHERIFF

                  By_____
                      Deputy

                  Mileage_____miles

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA          )
            Plaintiff,          )
VS.          )          Case No.  CF-98-346
                     )
TERESA JORDAN, DOB: 6/29/65          )
            Defendant.

## IMPOSITION JUDGMENT AND SENTENCE DEFERRED ON PLEA OF GUILTY

NOW, on this __12th__ day of __February__, 19 __99__, the same being a judicial day of said court, and

the defendant, __Teresa Jordan__, being personally present in open court, with his/her attorney

__Gerald Hunter__, and having been duly represented at all proceedings before the Court by such

attorney of record, and having been legally charged with the offense of

__UNLAWFUL POSSESSION OF CONTOLLED DRUG, 63 O.S. 2-402(B-1)__ and having been duly

informed of the nature of the charge, and of his/her constitutional rights and having been duly arraigned

thereon, and having duly and properly entered his/her plea of guilty to the crime of

__UNLAWFUL POSSESSION OF CONTROLLED DRUG__ and having been advised

of his/her rights and the effect of such plea, and the defendant having been asked by the Court whether he/she

has any legal cause to show why the Court should not defer further proceedings and place him/her on

probation under supervision of the Department of Corrections upon the conditions of probation prescribed by

the Court, and the defendant consents to such procedure. *To Run CC with Cherokee Co. Case. qc*

IT IS THEREFORE the decision and Order of the Court to defer the imposition of judgment and

sentence in this case for a period of __Five (5)__ years, and the defendant is placed on probation during

such period under the supervision of the Department of Corrections of the State of Oklahoma, such deferment

to continue during good behavior and pursuant to the Rules of the Department of Corrections of the State of

Oklahoma, as prescribed in the "Addition to Judgment and Sentence."

The defendant is further taxed costs of this prosecution in the amount of $_____ for which

judgment is hereby rendered.

Upon successful completion of the probationary term, the defendant shall be discharged without a court

judgment of guilt, and the verdict or plea of guilty shall be expunged from the record and said charge shall be

dismissed with prejudice to any further action. Upon violation of the conditions of probation, the court may

enter a judgment of guilt and proceed as provided in Section 1, Title 22-901a of the Oklahoma Statutes

Annotated, 1970.  Said term to run concurrent with CF-98-128.

_____
JUDGE OF THE DISTRICT COURT

IN THE DISTRICT COURT OF    )    Defendant ___TERESA JORDAN___
SEQUOYAH COUNTY             )
STATE OF OKLAHOMA           )    Case No. ___CF-98-346___
                            )
                            )    Date ___February 12, 1999___

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general statement of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my Probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or a representative thereof.

8. I understand that I must support myself and all my dependants without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion that I may be in control of contraband. That my probation officer may search me or my property if that suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within that eighteen months.

15. SPECIAL CONDITIONS: The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, O.S.B.I. Lab Fees, fines or restitution) of $_____ within_____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 19____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed).*

$1,250 fine $375 VCA $100 DA Drug Fund $75 lab fee and $190 Oids

**REDACTED**

SEQUOYAH COUNTY, OKLAHOMA
IN DISTRICT COURT
FILED
FEB 1 2 1999
BERNELL EDWARDS, COURT CLERK
BY _____
DEPUTY

16. Defendant to report to DOC within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_____    _____
Attorney for Defendant          Probationer

                                Defendant's Mailing Address:

_____         _____
JUDGE OF THE DISTRICT COURT      _____

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

Case No: CF-98-346          Defendant: Teresa Jordan

## ACCUMULATIVE COURT COST FOR SEQUOYAH COUNTY

### NON-VIOLENT COURT COST

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**COURT FUND**

| | | |
|---|---|---|
| Court Fees | | $103.00 |
| Bail Bond Fee | $10.00 @ / | 10.00 |
| Jury Fee | $30.00 @ | |
| Fines | set by court | 1250.00 |
| Mailing fee | $7.00 @ | |
| Sub total Court Fund | | 1363.00 |

FEB 12 1999

BERNELL EDWARDS, COURT CLERK

_____ DEPUTY

**SHERIFF FEES**

| | | |
|---|---|---|
| Sheriff Fees | | $5.00 |
| Arrest Warrant | $20.00 | |
| Bench Warrnts | $20.00 @ | |
| Subpoenas | $20.00 @ | |
| Sub total Sheriff Fees | | 5.00 |

| | | |
|---|---|---|
| LAW LIBRARY | | $3.00 |
| CLEET & FINGERPRINTING | | $7.00 |

| | | |
|---|---|---|
| VCA | $25.00 or set by court | 375.00 |
| OSBI LAB | set by court | 75.00 |
| D.A. DRUG FUND | set by court | 100.00 |
| REVOLVING FUND(appl fee-$40.00) | | 40.00 |
| IDF-ATTORNEY FEE | set by court | 150.00 |

**TOTAL**          **REDACTED**          $ 2118.00

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

State of Oklahoma,                  )
        Plaintiff,              )
Vs.                                 ) No. CF-98-346
                                    )
Charles Sanders,                    )
        Defendant.              )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 0 9 1999

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

## MOTION FOR CONTINUANCE

COMES NOW Donn F. Baker, attorney of record for Defendant, Charles Sanders, moves this Honorable Court to continue the pre-setting scheduled for March 11, 1999. Counsel for the Defendant will be in Minnesota taking his wife back to the Mayo Clinic for a check up on her cancer and cannot attend this review. The opposing counsel does not object to this continuance.

WHEREFORE, movant prays that this matter be continued.

DONN F. BAKER OBA #443
Attorney at Law
239 W. Keetoowah
Tahlequah, OK 74464
(918) 456-1233

## CERTIFICATE OF MAILING

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was mailed by first class mail in the U.S. mail on the 5 day of March, 1999, to: Jeff Sheridian, Assistant District Attorney, 120 E. Chickasaw St., Sallisaw, OK 74955 with postage prepaid thereon.

**REDACTED**

362

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 12 1999

BERNELL EDWARDS COURT CLERK
BY _____ DEPUTY

| | | |
|---|---|---|
| State of Oklahoma, | ) | |
| | ) | |
| Plaintiff, | ) | |
| Vs. | ) No. CF-98-346 | |
| | ) | |
| Charles Sanders, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER FOR CONTINUANCE

NOW on this 11ᵗʰ day of March, 1999, upon the Motion for Continuance of the pre-setting scheduled for March 11, 1999, the Court finds that the same should be continued to the 15th day of April, 1999 at 9:00 a.m.

_____
JUDGE OF THE DISTRICT COURT

CERTIFICATE OF MAILING

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was mailed by first class mail in the U.S. Mail on the 9 day of March, 1999, to: Jeff Sheridian, Assistant District Attorney, 120 E. Chickasaw St., Sallisaw, OK 74955 with postage prepaid thereon.

_____

**REDACTED**

7) 5-99

Re CF-98-346B

Mr Cowens

This is concerning my brother, John Jordan. Last year I believe in Feb 1998 myself + Charlis Sanders lived in Marble City.

The police was called to my home on a domestic call, my brother had just arrived at my home when police got there. He had no knoledge of nothing found in my home. But he was with us + part. I plead out to all charges. Charles Sanders beat all charges. My brother is innocent and should not be charged.

It was my home and took responsability for all charges. Please reconsider charging my brother John Jordan. He is innocent.

Sincerely
REDACTED Teresa Jordan

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUL 16 1999

BERNELL EDWARDS, COURT CLERK
BY _____ aw _____
DEPUTY

Sequoyah County Form CF-1                    Uniform Plea of Guilty — Summary of Facts
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

IN THE DISTRICT COURT OF SEQUOYAH COUNTY SEQUOYAH COUNTY, OKLAHOMA
THE STATE OF OKLAHOMA                        FILED
                                             IN DISTRICT COURT

STATE OF OKLAHOMA,                    )                          AUG   9 1999
                                      )
                      Plaintiff       )              BERNELL EDWARDS, COURT CLERK
                                      )              BY _____ DEPUTY
VS.                                   )         Case No. CF-98-346
                                      )
                                      )
  Jordan, Johnny Eugene               )
                      Defendant       )
DOB _____ / 19 66                   )
SS# _____ 5799                      )

SUMMARY OF FACTS FOR THE PLEA OF GUILTY

Part A: Finding of Fact, Acceptance of Plea                                  Circle

1.   Is the name just read to you your true name?                           YES   NO
     If no, then what is your correct name? _____
     I have also been known by the name(s) _____
     _____

2.   (A)  Do you wish to have a record of these proceedings made by a Court Reporter ?   YES   NO

     (B)  Do you wish to waive your right to have a record of these proceedings made ?   YES   NO

3.   What is your age ? 33   What grade level in school have you completed ? 12th

4.   Can you read and understand this form ? [If no, Addendum A must be completed and attached]   YES   NO

5.   Are you currently taking any medications or substances which affect your ability to understand   YES   NO
     these proceedings ?

6.   Have you been prescribed any medication which you are not taking ?      YES   NO
     If yes, what medication are you not taking? _____
     What is the purpose of the medication ? _____
     Why are you not taking the medication ? _____
                                    REDACTED
7.   Have you ever been treated by a doctor or health professional for mental illness or confined in   YES   NO
     a hospital for mental illness ?
     If Yes, list doctor or health professional, place, and when treatment occurred:
     _____

8.   Do you understand the purpose, the nature and the consequences of this proceeding ?   YES   NO

9.   Have you received a copy of the State's Information and read its allegations ?   YES   NO

365

10.    A.   Do you understand you are charged with:

Crime Statutory Reference

[1] _Poss of CDS_____ _____ O.S. _____   ⬭YES⬭ NO

[2] _Cf2 Diamond'_____ _____ O.S. _____   (YES) NO

[3] _____ _____ O.S. _____   YES   NO

[4] _____ _____ O.S. _____   YES   NO

[5] _____ _____ O.S. _____   YES   NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

B.  Are you charge after former conviction of a felony (AFCF) ?                    YES   (NO)

If yes, list the felony(ies) charged: _____

_____

11.    Do you understand the range of punishment for the crime(s) is/are ?

(List in the same order as in Number 10)

[1]  Minimum of ___2___ to a maximum of ___10___ and/or a fine of $ _1000O_  (YES)  NO

[2]  Minimum of _____ to a maximum of _____ and/or a fine of $_____  YES   NO

[3]  Minimum of _____ to a maximum of _____ and/or a fine of $_____  YES   NO

[4]  Minimum of _____ to a maximum of _____ and/or a fine of $_____  YES   NO

[5]  Minimum of _____ to a maximum of _____ and/or a fine of $_____  YES   NO

*For additional charges:* List additional charges on a separate sheet and label as PLEA GUILTY ADDENDUM B

12.    Read the following statements:   You have the right to a speedy trial before a jury of your peers to determine whether you are guilty or not guilty and if you request, to determine the sentence. *If pleading to a capital murder,* advise of the procedure in 21 O.S. 701.10( B)

At the trial:

[1] You have the right to have an attorney represent you, either one you hire or *if you are indigent* a court appointed attorney.

[2] You are presumed to be innocent of the charges.

[3] You may remain silent or , if you chose, you may testify on your own behalf.

[4] You have the right to see and hear all witnesses called to testify against you and the right to have those witnesses cross-examined.

[5] You may have your witnesses ordered to appear in court to testify and present evidence of any defense you have to these charges.

[6] The State is required to prove your guilt beyond a reasonable doubt.

[7] The verdict of guilty or not guilty decided by a jury must be unanimous.  However, you can waive a jury trial and, if all parties agree, the case could be tried by a Judge alone who would decide if you were guilty or not guilty and if determined to be guilty, the appropriate punishment.

Do you understand each of these rights ?            **REDACTED**                    (YES)  NO

13.    Do you understand by entering a plea of guilty you give up these rights ?            (YES)  NO

14.    Do you understand that a conviction on a plea of guilty could increase punishment in any future    (YES)  NO
case committed after this plea ?

15.    Is _Gerald Hunter_____ your attorney ?                    (YES)  NO

16.    Have you talked with your attorney about the charges, advised him/her regarding any defense    (YES)  NO
you may have to the charges and received his/her advice ?

366

17. Do you believe your attorney has effectively assisted you in this case and are you satisfied with his/her representation ?   (YES)   NO

18. Do you wish to change your plea of not guilty to a plea of guilty and give up your right to a jury trial and all previously explained constitutional rights ?   (YES)   NO

19. Is there a plea agreement ?   (YES)   NO
    What is your understanding of the plea agreement ? *5 in DOC with* ~~10 yr~~ *Probation forbearance Suspended – Drug Offender Work Camp Jail Costs assessment – ct 2 Dismissed*

20. Do you understand the Court is *not* bound by any agreement or recommendation and if the Court does not accept the plea agreement, you have the right to withdraw your plea of guilty ?   (YES)   NO

21. Do you understand that if there is no plea agreement the Court can sentence you within the range of punishment stated under question 11 ?   YES   NO   *N/A*

22. Do you understand your plea of guilty to the charge(s) is subject to :
    (check one)
    [✓] no prior felony conviction
    [  ] one (1) prior felony conviction
    [  ] two (2) or more felony convictions   List prior felony convictions to which you are pleading:
    _____

23. What is/are your plea(s) to the each charge(s) ?
    [1] *Guilty*  [2] _____  [3] _____  [4] _____  [5] _____

24. Did you commit the acts as charged in the information ?   YES   NO
    State a factual basis for your plea(s) (attach additional pages as needed, labeled as ADDENDUM C) :
    *I did as charged in the imformation.*
    _____

25. Have you been forced, abused, mistreated or promised anything by anyone to have you enter your plea(s) ?   YES   (NO)

26. Do you plead guilty of your own free will and without any coercion or compulsion of any kind ?   (YES)   NO

27. If you are entering a plea to a felony offense, you have a right to a Pre-sentencing investigation and Report which would contain the circumstances of the offense, any criminal record, social history and other background information about you. Do you request a Pre-sentence report ?   YES   (NO)

28. (A) Do you have any additional statements to make to the Court ?   YES   (NO)

    (B) Is there any legal reason as to why you should *not* sentence now ?   YES   (NO)

HAVING BEEN SWORN, I, the Defendant whose signature appears below, make the following statements under oath:

**REDACTED**

(1)   CHECK ONE:

____X____ (A)   I have read, understood and completed this form.

_____ (B)   My attorney completed this form and we (the attorney and I) have gone over the form and I understand its contents and agree with the answers. *Complete Addendum A and attach to this form.*

_____ (C)    The Court completed this form for me and inserted my answers to the questions in open court.

(2)    All answers are true and correct.

(3)    I understand that I may be prosecuted for perjury if I have made false statements to this Court.

Acknowledged this ___9___ Day of _____August_____, __99__.

_____
DEFENDANT

I, the undersigned attorney for the Defendant, believe the Defendant understands the nature, purpose, and consequence of this proceeding. (S)He is able to assist me in formulating any defense to the charge(s). I am satisfied that the Defendant's waivers and plea(s) of guilty are voluntarily given and he/she had been informed of all legal and constitutional rights.

_____
ATTORNEY FOR DEFENDANT

The sentence recommendation in question 19 is correctly stated. I believe the recommendation is fair to the State of Oklahoma. Offer of Proof (nolo contendere plea) : _____

_____

_____

_____
ASSISTANT DISTRICT ATTORNEY

## THE COURT FINDS AS FOLLOWS:

A. The Defendant was sworn and responded to questions under oath.
B. The Defendant understands the purpose, nature and consequences of this proceeding.
C. The Defendant's plea(s) of __guilt§__ is/are knowingly and voluntarily entered and accepted by the Court Reporter Present Court.
D. The Defendant is competent for the purpose of this hearing.
E. A factual basis exists for the plea(s) (and former conviction(s), if applicable).
F. The Defendant is guilty as charged: (check as appropriate)
    [ ] after no prior felony conviction.
    [ ─] after one (1) prior felony conviction.
    [ ] after two (2) or more prior felony convictions.
G. Sentencing or order deferring sentence shall be: [ ] imposed instanter or [ ] continued until the ____ day of _____, _____ at ____ : _____ __ . M. If the Pre-sentence investigation and Report is requested, it shall be provided to the Court by the _____ day of _____, _____.

DONE IN OPEN COURT this __9ᵗ__ day of _____August_____, _1999_.

REDACTED

_____
JUDGE OF THE DISTRICT COURT

_____
Dennis M. Sprouse
NAME OF JUDGE TYPED OR PRINTED

_____
N/A
Court Reporter Present

_____
N/A
Deputy Court Clerk Present

## "NOTICE OF RIGHT TO APPEAL"

Sentence to Incarceration, Suspended or Deferred:

To appeal from this conviction, or order deferring sentence, on your plea of guilty, you must file in the Sequoyah County District Court Clerk's Office a written Application to Withdraw Plea of Guilty within ten (10) days from today's date. You must set forth in detail why you are requesting to withdraw your plea. The trial court must hold a hearing and rule upon your application within thirty (30) days from the date it is filed. If the trial court denies your application, you have a right to ask the Court of Criminal Appeals to review the District Court's denial by filing a Petition for Writ of Certiorari within ninety (90) days of the date of denial. Within ten (10) days from the date the application to withdraw plea of guilty is denied, notice of intent to appeal and designation or record must be filed pursuant to Oklahoma Court of Criminal Appeals Rule 4.2(D). If you are indigent, you have the right to be represented on appeal by a court appointed attorney.

Do you understand each of these rights to appeal ?                                          YES  NO

Do you want to remain in the county jail ten (10) days before being taken to place of       YES  NO
confinement ?

Have you fully understood the questions that have been asked ?                              YES  NO

Have your answers been freely and voluntarily given ?                                       YES  NO

I ACKNOWLEDGE UNDERSTANDING OF RIGHTS AND SENTENCE IMPOSED.

_____
Defendant

I, the undersigned attorney, have advised the Defendant of his appellate rights.

_____
Attorney for the Defendant

DONE IN OPEN COURT, this ___9___ day of ___August___, 1999.

_____
Judge of the District Court

___N/A___                                            ___N/A___
Court Reporter Present                               Deputy Court Clerk Present

### ADDENDUM "A"

### CERTIFICATE OF DEFENSE COUNSEL

As the attorney for the defendant, _____, I certify that:

1. The Defendant has stated to me that he/she is [X] able [ ] unable to read and understand the attached form, **and** I have [ ] determined the Defendant is able to understand the English language or [ ] determined the Defendant is unable to understand the English language and obtained _____ to interpret to the Defendant in the _____ language.
2. I have read and fully explained to the Defendant the allegations contained in the Information in this case.
3. I have read and fully explained to the Defendant all of the questions in the Plea of Guilty/Summary of Facts and the answers to the questions set out in the Summary of Facts are the Defendant's answers.
4. To the best of my knowledge and belief the statement and declarations made by the Defendant are accurate and true and have been freely and voluntarily made.

Dated this ___9___ day of ___August___, 99.

_____
Attorney for the Defendant

369

Sequoyah County Form CF-1 - b                    Uniform Plea of Guilty — Sentence on Plea

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case Number CF- _____    State v. _____    Date: _____

**Part B:** Sentence on Plea    [NOTE ON USE: Part B is to be used with the Summary of Facts if contemporaneous with the entry of plea or may be formatted as a separate sentencing form if sentencing is continued to a future date.]

THE COURT SENTENCES THE DEFENDANT AS FOLLOWS:

DEFERRED SENTENCE

1. The sentencing date is deferred until _____ , _____ , _____ at __ : ___ _ M.

2. You [ ] will [ ] will not be under supervision by the Department of Corrections. The terms set forth in the Rules and Conditions of Probation in Addendum D shall be the rules you must follow during the period of deferment.

SUSPENDED SENTENCE or SUSPENDED AS TO PART

1. You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:
[1]_____ [2]_____ [3] _____ [4] _____ [5] _____

TO BE SUSPENDED as follows:

(A) ALL SUSPENDED  [ ] Yes       [✓] No

120-day   Do wc

(B) suspended *except* as to the first __1 year__ (months) (years) of the term(s) during which you are to be held in the custody of the Department of Corrections. The remaining term of the sentence(s) is to be suspended under the terms set forth in the Rules and Conditions of Probation in Addendum D.

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____
_____ or NOT APPLICABLE.

TIME TO SERVE

1. You are sentence t confinement under the supervision of the Department of Corrections for a term of years as follows:
[1]_____ [2]_____ [3] _____ [4] _____ [5] _____

2. The sentence(s) is/are to run [ ] concurrently [ ] consecutively with/to _____
_____ or NOT APPLICABLE.

**REDACTED**
FINES AND COSTS

You are to pay in full any fine(s), costs , fees and restitution at the time of sentencing. In the alterative, you may request a stay of execution (SOE) from the Cost Administrator in the Sequoyah County District Court Clerk's Office. All information given to the Cost Administrator in requesting the SOE will be under oath and is considered as part of the summary of facts before the Court. *You will appear in person to make all payments as agreed.* Any payment tendered other than in person will be accepted; however, such acceptance does not excuse your appearance in the Clerk's Office.

370

Sequoyah County Form CF-3 ( B )          Uniform Plea of Guilty — Additional Findings

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

I THE DISTRICT COURT OF SEQUOYAH COUNTY THE STATE OF OKLAHOMA

STATE vs. _John Jordan_ Defendant   Case No. _CF98-346_

## ADDITIONAL FINDINGS AT TIME OF SENTENCING

### EXHIBIT 1

A.  Original Charges (A copy of the information may be attached instead) Please list any additional charges on a separate attached sheet.

| OFFENSE | STATUTE CITATION |
|---|---|
| Poss of CDS | |
| | |
| | |
| | |

B.  Prior Felony Charges Used For Enhancement Please list any additional convictions on a separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| N/A | | |
| | | |
| | | |

C. Prior Charge(s) For Which Order Deferring Sentence Was Entered Please list any additional charges on separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| N/A | | |
| | | |
| | | |

D.  Prior Felony Convictions Not Used For Enhancement Please list any additional convictions on a separate attached sheet.

| OFFENSE | DATE | STATUTE CITATION |
|---|---|---|
| N/A | | |
| | REDACTED | |
| | | |

E.

If the defendant plead guilty to multiple counts, did the offense(s) arise from the same transaction?

Circle

Yes / No

N/A

## F.   Other Enhancers Used to Determine Placement on Matrix                Circle

1.  Did the offender commit the current offense with the use of a firearm within the immediate possession and control of the offender?                Yes   No

2.  Was the victim of the offense over 62 years of age, under 12 years of age or disabled by reason of mental or physical illness to such extent that the victim lacked the ability to effectively protect his or her property or persons?                Yes   No

3.  Did the offender in the commission of the offense maim or torture the victim?                Yes   No

4.  Did the offender commit a Schedule N-2 or N-3 drug offense in, on, or within 1,000 feet of real property comprising of a public or private elementary or secondary school; public or private college, university, or other institution of higher education; recreation or public park (including state facilities); public housing project; or in the presence of any child under 12 years of age?                Yes   No

5.  Did the offender commit a Schedule N-2 or N-3 drug offense by using of soliciting the services of a person less than 18 years of age, providing the offender was at least 18 years of age at the time of the offense?                Yes   No

6.  If the controlling offense was a property or drug offense, what was the total amount involved in that offense (e.g., the value of the property involved; the amount of money stolen, embezzled, or obtained by fraud; or the amount of drug proceeds utilized?     $_____

7.  If the controlling offense was a drug offense, what was the *predominant* drug and what was the amount of that drug? (Please specify quantity in grams, ounces, etc.)
DRUG:_____ *Meth* _____
QUANTITY:(oz, grams, etc.)_____

## G.   Offender Characteristics

Gender (Circle)                Race   (Circle)
Male   Female                White   Black   Hispanic   Asian   Native Am.

**This Exhibit shall not be admitted into evidence in any future prosecutions.**

Certified this ___9___ day of ___Aug___, ___1999___ .

_____   REDACTED   _____
Attorney for the State                Attorney of the Defendant

_____
Judge of the District Court

# In the District Court in and for Sequoyah County
# State of Oklahoma

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG   9 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

State of Oklahoma,                          )
            Plaintiff,                       )
                                             )
vs.   John E. Jordan                         )      Case No. CF-98-346
                                             )
                                             )
            Defendant                        )

## WAIVER OF PRELIMINARY HEARING

Now on this ____7____ day of __Aug__, 19_99_, the above styled case comes on for preliminary hearing. The defendant appears in person and represented by his attorney of record, __Gerald Hunter__, the State of Oklahoma appears by its Assistant District Attorney. Thereupon the defendant herein acknowledges having been advised of the right to a preliminary hearing. That in said hearing the State of Oklahoma must prove to the satisfaction of the Court that the crime as alleged in the information was, in fact, committed and there is probable cause to believe that the defendant committed said crime. That if said burden was not met then the case would be dismissed and the bond exonerated.

The defendant is further advised that at said hearing that he/she has the right to cross examine any of the State's witnesses and to call witnesses on his/her own behalf. And further, the defendant is advised of the right at the hearing to limited discovery of the State's case in chief.

Having these rights in mind, the defendant herein, waives all the above rights with respect to a preliminary hearing in this matter.

X _____
                                    Defendant

_____
                        Attorney for Defendant

## WAIVER OF JURISDICTION OF EXAMINING MAGISTRATE

The defendant is further advised that neither the examining magistrate nor the Special Judge has the jurisdiction to proceed further with the case unless affirmatively waived. Having these rights in mind, the defendant hereby waives his/her rights to object to any jurisdictional defects of the Court.

x _____
                                    Defendant

_____
                        Attorney for Defendant

## COURT MINUTE OF PRELIMINARY HEARING

The defendant in the above styled case having knowingly and intelligently waived his/her rights to the preliminary hearing and there being no objection by the State of Oklahoma, the Court accepts the defendant's waiver and hereby binds the defendant over to stand trial in the District Court of Sequoyah County, State of Oklahoma, on the charges as set out in the information as filed in this case.

_____
            JUDGE OF THE DISTRICT COURT

373

IN THE DISTRICT COURT OF )
SEQUOYAH COUNTY )
STATE OF OKLAHOMA )
)
)

Defendant __JOHN EUGENE JORDAN__

Case No. ___CF-98-346___

Date ___August 5, 1999___

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG   9 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general state of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I will understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or any representative thereof.

8. I understand that I must support myself and all my dependents without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within the eighteen months.

15. **SPECIAL CONDITIONS**: The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, OSBI lab fees) of $_____ within _____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 19____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed).*

( ) Defendant is to pay restitution through the District Attorney's office as set out in Exhibit "A" attached, the sum of $_____**REDACTED**_____.

16. Defendant to report to DOC within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_____
Attorney for Defendant

_____
JUDGE OF THE DISTRICT COURT

_____
Probationer

Defendant's Mailing Address:

███████████████████

*Viau Okla. 74962*

# In The District Court In And For Sequoyah County, State of Oklahoma

**ISSUED**
**8-9-99**

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| | ) | |
| PLAINTIFF | ) | CASE NO: CF-98-346 |
| VS. | ) | |
| JOHN EUGENE JORDAN | ) | |
| DOB: 8/7/66 #563-11-~~5294~~ 5299 | ) | |
| DEFENDANT. | ) | |

## JUDGMENT AND SENTENCE

Now, on this 5th day of August, 1999, this matter comes on before the undersigned Judge, for sentencing and the Defendant, _____JOHN EUGENE JORDAN_____, appears personally and by his attorney of record, _____Gerald Hunter_____, the State of Oklahoma represented by Assistant District Attorney, __Lynn Anderson__, and the Defendant, having previously:

(X )   Entered a plea of guilty
( )    Entered a plea of Nolo Contendere
( )    Found guilty by jury
( )    Found guilty by Judge after waiver of jury trial
      to/of the crime(s) of:

CT. I: UNLAWFUL POSSESSION OF CONTROLLED DRUG, 63 O.S. 2-402(B-1)
CT. II: DISMISSED

( )   The Defendant has previously been convicted of _____ felony crimes and the sentence has been enhanced in accordance with the provisions set forth in Title 21 O.S. § 51 and 51A.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** by the Court that the Defendant, _____JOHN EUGENE JORDAN_____, is guilty of the above-described offense(s) and is sentenced as follows:

### TERM OF IMPRISONMENT
COUNT _____: Sentenced to a term of _____ imprisonment;

all under the custody and control of the Oklahoma Department of Corrections.
These terms to be served ( ) concurrently, or ( ) consecutively;
**REDACTED**

### TERM OF IMPRISONMENT - (PART SUSPENDED)
COUNT __I__: Sentenced to a term of __FIVE (5) years__ imprisonment;

with all except the DRUG OFFENDER WORK PROGRAM suspended under the custody and control of the Oklahoma Department of Correction pursuant to the rules and conditions of probation entered by the Court.
These terms to be served (X) concurrently, or ( ) consecutively; w/Sequoyah County Case No. CF-97-112

### TERM OF IMPRISONMENT - (ALL SUSPENDED)
COUNT _____: Sentenced to a term of _____ imprisonment;

under the custody and control of the Oklahoma Department of Corrections all of said term(s) of imprisonment suspended pursuant to the rules and conditions of probation entered by the Court.
These terms to be served ( ) concurrently, or ( ) consecutively;

375

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT** that in addition to the preceding term(s), the Defendant is also sentenced to:

### FINE

( ) The defendant shall pay a fine of $_____ ( ) immediately or ( ) on or before _____, 19___, at the rate of $_____ per month, or within _____ days of release from the Department of Corrections.

( ) The payment of a fine of $_____ is suspended.

( ) The defendant shall report to the District Court of Sequoyah County within _____ days of release for a hearing on the defendant's ability to pay fines and costs pursuant to Section VIII of the rules of the Court of Criminal Appeals, 22 O.S. Chapter 18, App.

### COSTS, VCA, RESTITUTION

( ) The defendant shall pay costs, fees, and restitution in accordance with the schedule attached as Exhibit _____. $250 FINE $125 VCA $250 DA Drug Fund & COSTS

### RULES AND CONDITIONS OF PROBATION

( ) The rules and conditions as ordered by the court and signed and acknowledged by the defendant are attached as hereto.

### ATTORNEY FEES

( ) The defendant shall pay court-appointed attorney fee amount of $_____ on or before _____, 19__, to _____.

It is further ordered that judgment is hereby entered against the Defendant as to the fines, court costs and assessments set forth above.

The Court further advised the Defendant of his rights to appeal to the Court of Criminal Appeals of the State of Oklahoma, and of the necessary steps to be taken by him to perfect such appeal, and that if he desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State without cost to him.

In the event the above sentence is for incarceration in the Department of Corrections, the sheriff of Sequoyah County, Oklahoma, is ordered and directed to deliver the Defendant to the Lexington Assessment and Reception Center at Lexington, Oklahoma, and leave therewith a copy of this Judgment and Sentence to as warrant and authority of the imprisonment of the Defendant as provided herein. A second copy of this Judgment and Sentence to warrant and authority of the sheriff for the transportation and imprisonment of the Defendant as herein before provided. The sheriff to make due return to the clerk of this Court, with his proceedings endorsed thereon.

REDACTED

_____
JUDGE OF THE DISTRICT COURT

(SEAL)
ATTEST:
BERNELL EDWARDS, COURT CLERK

_____, DEPUTY CLERK

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

OCT 01 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

Case No: _CF-98-346_        Defendant: _John Eugene Jordan_

### ACCUMULATIVE COURT COST FOR SEQUOYAH COUNTY

#### NON-VIOLENT COURT COST

**COURT FUND**

| | | |
|---|---|---|
| Court Fees | | $103.00 |
| Bail Bond Fee | $10.00 @ 1 | 10.00 |
| Jury Fee | $30.00@ _____ | |
| Fines | set by court | 250.00 |
| Mailing fee | $7.00 @ _____ | |
| Sub total Court Fund | | 363.00 |

**SHERIFF FEES**

| | | |
|---|---|---|
| Sheriff Fees | | $5.00 |
| Arrest Warrant | $20.00 | |
| Bench Warrnts | $20.00@ 1 | 20.00 |
| Subpoenas | $20.00@ | |
| Sub total Sheriff Fees | | 25.00 |

| | | |
|---|---|---|
| LAW LIBRARY | | $3.00 |
| CLEET & FINGERPRINTING | | $7.00 |

| | | |
|---|---|---|
| VCA | $25.00 or set by court | 125.00 |
| OSBI LAB | set by court | |
| D.A. DRUG FUND | set by court | 250.00 |
| REVOLVING FUND(appl fee-$40.00) | | 45.00 |
| IDF-ATTORNEY FEE | set by court | 150.00 |

**REDACTED**

TOTAL        $968.00

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

Case No: CF-98-346          Defendant: Charles Sanders

### ACCUMULATIVE COURT COST FOR SEQUOYAH COUNTY

**NON-VIOLENT COURT COST**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**COURT FUND**

| | | |
|---|---|---|
| Court Fees | | $103.00 |
| Bail Bond Fee | $10.00 @ _____ | |
| Jury Fee | $30.00 @ _____ | |
| Fines | set by court | 500.00 |
| Mailing fee | $7.00 @ _____ | |
| Sub total Court Fund | | 603. |

DEC - 8 1999

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

**SHERIFF FEES**

| | | |
|---|---|---|
| Sheriff Fees | | $30.00 |
| Arrest Warrant | $30.00 | |
| Bench Warrant | $30.00 @ _____ | |
| Revolving Fund | $5.00 | |
| Subpoenas | $30.00 @ 3 | 90.00 |
| Sub total Sheriff Fees | | 120. |

LAW LIBRARY                                    $3.00
CLEET & FINGERPRINTING                         $7.00

| | | |
|---|---|---|
| VCA | $25.00 or set by court | 250.00 |
| OSBI LAB | set by court | |
| D.A. DRUG FUND | set by court | |
| REVOLVING FUND(appl fee-$40.00) | | |
| IDF-ATTORNEY FEE | set by court | |

**REDACTED**

TOTAL                                          983

IN THE DISTRICT COURT OF )
SEQUOYAH COUNTY )
STATE OF OKLAHOMA )
)
)

Defendant __CHARLES EDMOND SANDERS__

Case No. __CF-98-346__

Date __DECEMBER 9, 1999__

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 9 1999

BERNICE HARRIS, COURT CLERK
BY _____ DEPUTY

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general state of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I will understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or any representative thereof.

8. I understand that I must support myself and all my dependents without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within the eighteen months.

15. **SPECIAL CONDITIONS:** The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, OSBI lab fees) of $_____ within _____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 19_____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed).*

    $500 FINE and $250 DA DRUG FUND

    ( ) Defendant is to pay restitution through the District Attorney's office as set out in Exhibit "A" attached, the sum of $_____**REDACTED**

16. Defendant to report to DOC Probation & Parole Office within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_____
Attorney for Defendant

_____
JUDGE OF THE DISTRICT COURT

_____
Probationer

Defendant's Mailing Address:
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  Sallisaw OK 74955

379

# In The District Court In And For Sequoyah County, State of Oklahoma

THE STATE OF OKLAHOMA,    )
    )
        PLAINTIFF   )    **CASE NO: CF-98-346**
VS.    )
CHARLES EDMOND SANDERS    )
DOB:██66    )    SEQUOYAH COUNTY, OKLAHOMA
SS#██9539    )    FILED
    )    IN DISTRICT COURT
        DEFENDANT.   )

DEC 9 1999

BERNI L. EDWARDS, COURT CLERK
BY _____ DEPUTY

## JUDGMENT AND SENTENCE

Now, on this 9TH DAY OF DECEMBER, 1999, this matter comes on before the undersigned Judge, for sentencing and the Defendant, _____CHARLES EDMOND SANDERS_____ , appears personally and by his attorney of record, _____MONTE JOHNSON_____, the State of Oklahoma represented by Assistant District Attorney, _ROBBIE COWAN_, and the Defendant, having previously:

(X) Entered a plea of guilty
( ) Entered a plea of Nolo Contendere
( ) Found guilty by jury
( ) Found guilty by Judge after waiver of jury trial
    to/of the crime(s) of:

CT. I: UNLAWFUL POSSESSION OF CONTROLLED DRUG, 63 O.S. 2-402 (B-1)
COUNT II: DISMISSED

( ) The Defendant has previously been convicted of _____ felony crimes and the sentence has been enhanced in accordance with the provisions set forth in Title 21 O.S. § 51 and 51A.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** by the Court that the Defendant, _____**CHARLES EDMOND SANDERS**_____, is guilty of the above-described offense(s) and is sentenced as follows:

### TERM OF IMPRISONMENT
COUNT _____: Sentenced to a term of _____ imprisonment;
REDACTED
all under the custody and control of the Oklahoma Department of Corrections.
These terms to be served ( ) concurrently, or ( ) consecutively;

### TERM OF IMPRISONMENT - (PART SUSPENDED)
COUNT _____: Sentenced to a term of _____ imprisonment;

with all except the first _____ suspended under the custody and control of the Oklahoma Department of Correction pursuant to the rules and conditions of probation entered by the Court. These terms to be served ( ) concurrently, or ( ) consecutively;

### TERM OF IMPRISONMENT - (ALL SUSPENDED)
COUNT _____: Sentenced to a term of _TWENTY (20) YEARS_ imprisonment;

under the custody and control of the Oklahoma Department of Corrections all of said term(s) of imprisonment suspended pursuant to the rules and conditions of probation entered by the Court. These terms to be served (X) concurrently, or ( ) consecutively; w/Seq County Case Nos. CF-99-562 and CF-98-363

380

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT** that in addition to the preceding term(s), the Defendant is also sentenced to:

### FINE

( ) The defendant shall pay a fine of $_____ ( ) immediately or ( ) on or before _____, 19___, at the rate of $_____ per month, or within _____ days of release from the Department of Corrections.

( ) The payment of a fine of $_____ is suspended.

( ) The defendant shall report to the District Court of Sequoyah County within _____ days of release for a hearing on the defendant's ability to pay fines and costs pursuant to Section VIII of the rules of the Court of Criminal Appeals, 22 O.S. Chapter 18, App.

### COSTS, VCA, RESTITUTION

( ) The defendant shall pay costs, fees, and restitution in accordance with the schedule attached as Exhibit _____.

### RULES AND CONDITIONS OF PROBATION

( ) The rules and conditions as ordered by the court and signed and acknowledged by the defendant are attached as hereto.

### ATTORNEY FEES

( ) The defendant shall pay court-appointed attorney fee amount of $_____ on or before _____, 19___, to _____.

It is further ordered that judgment is hereby entered against the Defendant as to the fines, court costs and assessments set forth above.

The Court further advised the Defendant of his rights to appeal to the Court of Criminal Appeals of the State of Oklahoma, and of the necessary steps to be taken by him to perfect such appeal, and that if he desired to appeal and was unable to afford counsel and a transcript of the proceedings, that the same would be furnished by the State without cost to him.

In the event the above sentence is for incarceration in the Department of Corrections, the sheriff of Sequoyah County, Oklahoma, is ordered and directed to deliver the Defendant to the Lexington Assessment and Reception Center at Lexington, Oklahoma, and leave therewith a copy of this Judgment and Sentence to as warrant and authority of the imprisonment of the Defendant as provided herein. A second copy of this Judgment and Sentence to warrant and authority of the sheriff for the transportation and imprisonment of the Defendant as herein before provided. The sheriff to make due return to the clerk of this Court, with his proceedings endorsed thereon.

REDACTED

_____
JUDGE OF THE DISTRICT COURT

(SEAL)
ATTEST:
BERNELL EDWARDS, COURT CLERK

_____, DEPUTY CLERK

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OLKLAHOMA,                    )
      Plaintiff                    )
vs.                                    )    Case No. CF-98-00346
CHARLES EDMOND SANDERS                 )             CF-98-00363
                                       )             CF-99-00562
                                       )
                                       )
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                        )
      Defendant                    )
  SS#: ▓▓▓▓9539
  DOB: ▓▓▓▓1966

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC - 8 1999

State's Attorney:
Defendant's Attorney:
Date: 12/09/99                    *TEMP.*    LYNN R. ANDERSON
RULE 8 HEARINGMONTE E. JOHNSON
(Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

    $100.00 on or before 1-28-200 and then

    ~~$100.00 per month on or before~~

~~then~~    ~~per month on or before the~~  ~~day of each month~~

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 1-28-200

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: *Defendant is ordered to re-appear on the 28th day of January 2000.  $958⁻ $843⁻ $983⁻*

TOTAL TO PAY $ *2784⁻*     **REDACTED**

_____
JOHN C. GARRETT
Judge of the District Court

Defendant
*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.



ISSUED
4|9|99

## BENCH WARRANT ON INDICTMENT OR INFORMATION

STATE OF OKLAHOMA,)
SEQUOYAH COUNTY,   )                    IN THE DISTRICT COURT

          THE STATE OF OKLAHOMA        )
                  VS.                  )
                                       )      CASE NO: __CF-98-346B__
  __John Eugene Jordan_____)
  _____)
  _____)
                                       )
  DOB: _8/7/66_____)
  SS/DL NO: _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_____)

## THE STATE OF OKLAHOMA
To any Sheriff, Constable, Marshal or Policeman of the State of Oklahoma-Greeting:

     Whereas an Information having been filed on the _22nd_ day of __Sept.___
19_98_, in the District Court of Sequoyah County, State of Oklahoma, charging
_John Eugene Jordan_____with the crime of __Unlaw. poss of CD and_
_failure to appear_____

YOU ARE THEREFORE COMMANDED FORTHWITH TO ARREST THE ABOVE
NAMED: _John Eugene Jordan_____
and bring him before* _Dennis M. Sprouse_____
or if the said Court have adjourned for the term that you deliver him into the custody of
the Sheriff of Sequoyah County, Oklahoma.

Given under my hand and the seal of said Court affixed, this _9__ day of __April____
19_99_. By order of the Court.

                       BERNELL EDWARDS, COURT CLERK

               by: _Amanda Woody_____
                  Deputy Court Clerk

### SHERIFF'S RETURN

     Received the Writ on the _____ day of _____19___, at _____o'clock
_____M., and executed on the _____ day of _____19___, at _____o'clock
by:_____

DATED THIS _____ DAY OF _____19___.
                         REDACTED

                     SHERIFF OF SEQUOYAH COUNTY, OK.

                     DEPUTY

*see sec. 5384, Wilson's Statutes

383

S.E.&I. FORM NO. 408 (1966)

SEQUOYAH COUNTY, OKLAHOMA
IN DISTRICT COURT

APPEARANCE BOND-DISTRICT COURT

MAY 24 2000

Case No. CF-98-34<u>6</u>
CF-98-363

BERNELL EDWARDS, COURT CLERK
BY _____ DEPUTY

STATE OF OKLAHOMA, SEQUOYAH COUNTY, SS:

Know all men by these presents, that <u>Charles Edmond Sanders</u>
as principal, and <u>Jo Nell McLaughlin</u>
_____ as suret(y)(ies) personally appeared before
the undersigned authority <u>Court Clerk</u> in and for <u>Sequoyah</u>
County, and jointly and severally acknowledged themselves to be indebted to the State
of Oklahoma in the sum of <u>Twelve thousand</u> Dollars ($<u>12,000.00</u>)
good and lawful money of the United States, to which payment well and truly to be made
we bind ourselves, our heirs, executors and administrators jointly and severally,
firmly by these presents.

The conditions of this obligation are such that, if the said <u>Charles Edmond Sanders</u>,
defendant, who has been committed to the county jail of <u>Sequoyah</u> County,
State of Oklahoma, shall personally be and appear before the <u>District</u> Court of
said county on the <u>31st</u> day of <u>May</u>, 192000 at <u>10</u> o'clock <u>a</u> m.,
of said day, and from term to term, and from day to day of each term, to answer a
charge preferred against him for the offense of <u>Unlaw. poss of CD, ETC</u>
_____, and to do and receive what shall be
enjoined by said Court upon him, and shall not depart the said Court without leave,
then this bond and recognizance to be void; otherwise, in full force and effect.

Witness our hands and seals this <u>24th</u> day of <u>May</u>, 192000.

█████ Sallisaw, OK 74955 Address X _____ Principal

█████ Sallisaw, OK 74955 Address X _____ Surety

_____ Address _____ Surety

TAKEN, SUBSCRIBED AND ACKNOWLEDGED, this <u>24th</u> day of <u>May</u>, 192000

**BERNELL EDWARDS** Court Clerk By _____ Deputy

This undertaking approved this <u>24th</u> day of <u>May</u>, 192000

_____
A.J. Henshaw, District Judge

SEAL

Bernell Edwards _____ Court Clerk

_____ Deputy

AFFIDAVIT AS TO UNDERTAKING

STATE OF OKLAHOMA, SEQUOYAH COUNTY, SS:

_____ **REDACTED** being first duly sworn upon oath,
says that he is a resident of _____ County, State of Oklahoma, and
that neither he nor anyone for his use has received or been promised any security or
consideration for making this undertaking, except as hereinafter specified under one
or more of the following relevant statutory provisions, to-wit:

(a) He has received the sum of $_____ from _____
as consideration for making this undertaking;

(b) He has received the following described property or instrument from _____
_____ as security for making this undertaking, as evidenced by
attached copy of a receipt for collateral security _____

(c) _____ has promised to secure him for making
this undertaking.

_____
BONDSMAN

Subscribed and sworn to before me this _____ day of _____, 19___.

_____
**BERNELL EDWARDS**
Notary Public - Court Clerk

SEAL

My Commission expires _____

By: _____
Deputy

384

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

**MAY 31 2001**

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

|  |  |  |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. CF-98-346 |
|  | ) | |
| CHARLES E. SANDERS | ) | |
| Defendant. | ) | |

### APPLICATION TO REVOKE SUSPENDED SENTENCE

COMES NOW, Dianne Barker Harrold, the duly elected, qualified, and acting District Attorney of Sequoyah County, and states to the Court that on the 9th day of December, 1999, the said Defendant entered his plea of guilty in the above entitled case, in the District Court of Sequoyah County, Oklahoma, to the charge of: POSSESSION OF CONTROLLED DRUG, as set out in the Information on file in this cause and the said defendant was sentenced to serve a term of TWENTY (20) years, under the Supervision of the Department of Correction, which sentence the Court suspended during the good behavior of said defendant.

Thereafter, the defendant violated the rules and conditions of probation as imposed by the Court in the following manner:

**Rule #1:** by failing to report for Probation and Parole.
**Rule #2:** by being in possession of intoxicants and being arrested for: LARCENY OF MERCHANDISE FROM RETAILER, POSSESSION OF PARAPHERNALIA in Sequoyah County, OK on May 17th, 2001.
**Rule #9:** by violating city, state or federal law, and being charged with: LARCENY OF MERCHANDISE FROM RETAILER, POSSESSION OF PARAPHERNALIA in Sequoyah County, OK CF-2001-314.

WHEREFORE, applicant prays that the Court set a date for hearing this application and that the suspension clause in said Judgment and Sentence be carried out in full, according to its terms. That the Court direct the Court Clerk of Sequoyah County, Oklahoma, to issue a Bench Warrant for the arrest of said defendant.

Dated this _30__ day of May, 2001.

**DIANNE BARKER HARROLD, District Attorney**

BY: RED̶A̶C̶T̶E̶D̶ _____
Assistant District Attorney

WITNESSES:

Emmett Daniels, c/o Probation & Parole, Sallisaw, OK
Derek Brown, ▮▮▮▮▮▮▮▮ Sallisaw, OK
Rocky Gaither, ▮▮▮▮▮ Sallisaw, OK
Dustin Walters, ▮▮▮▮▮ Sallisaw, OK
Leri Kay, ▮▮▮▮▮ Sallisaw, OK
Debbie Carter, ▮▮▮▮ Sallisaw, OK

### FINDING OF PROBABLE CAUSE

The Undersigned Judge of the District Court, upon the above application hereby determines there to be probable cause for the issuance of a Bench Warrant and so orders.

Dated this _30__ day of __MAY__, 200_.
Bond set at $ _10,000_

_____
JUDGE OF THE DISTRICT COURT

ISSUED
6/5/01

## BENCH WARRANT--After Conviction

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Sequoyah County, | ) | IN DISTRICT COURT |

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA | ) | |
| VS. | ) | No.CF-98-346 |
| CHARLES E.  SANDERS | ) | |
| ███████████████ | ) | |
| SALLISAW, OKLAHOMA 74955 | ) | |
| ███1966 ███9539 | ) | BOND: $10,000 |

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**CHARLES E.  SANDERS** having been on the 9TH DAY OF DECEMBER, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :POSSESSION OF CONTROLLED DRUG, **APPLICATION TO REVOKE**

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **CHARLES E.  SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah;  there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 5TH DAY OF JUNE, 2001.  By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: Tara Allen
                                                    DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199____, at _____o'clock _____M., and executed on the _____day of _____, 199____, at _____o'clock _____M. by _____

_____

Dated this _____day of _____199____.

_____
SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY:_____
                                                    DEPUTY
**REDACTED**

ISSUED
6/5/01

## BENCH WARRANT--After Conviction

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Sequoyah County, | ) | **IN DISTRICT COURT** |

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

| | |
|---|---|
| THE STATE OF OKLAHOMA ) | |
| VS. ) | **No.CF-98-346** |
| CHARLES E. SANDERS ) | |
| ) | |
| SALLISAW, OKLAHOMA 74955 ) | |
| ████ 1966 ████ 9539 ) | |

**JUN 13 2001**

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

**BOND: $10,000**

THE STATE OF OKLAHOMA
To any Sheriff, constable, Marshal or Policeman of the State of Oklahoma--Greeting:

**CHARLES E. SANDERS** having been on the 9TH DAY OF DECEMBER, 1999, duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of :POSSESSION OF CONTROLLED DRUG, **APPLICATION TO REVOKE**

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above - named **CHARLES E. SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this 5TH DAY OF JUNE, 2001. By Order of the Court.

BERNELL EDWARDS, COURT CLERK

BY: _Tara Allen_
DEPUTY

**WILL ONLY EXTRIDATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the within Writ on the _____ day of _____, 199____, at _____o'clock _____M., and executed on the _____ day of _____, 199____, at _____o'clock _____M. by _____

Dated this _____ day of _____ 199____.

SHERIFF OF SEQUOYAH COUNTY, OKLAHOMA

BY: _Cecil Duty_
**REDACTED**                                        DEPUTY

387

ISSUED
_8/23/01_

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 23 2001

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

THE STATE OF OKLAHOMA,          )
                      Plaintiff,          )
                                          )
vs.                                       )          No. CF-98-346
                                          )
CHARLES E. SANDERS                        )
                      Defendant.          )

## ORDER REVOKING SUSPENDED SENTENCE

NOW, on this 23rd day of August, 2001, the above styled case comes on for hearing on the State's Application to Revoke Suspended Sentence. The State is present by Assistant District Attorney, Rob Cowan, the defendant is present and represented by the attorney of record, . Monte Johnson.

The Court finds that on the 9th day of December, 1999, the said defendant was found guilty of the crime of POSSESSION OF CONTROLLED DRUG, 63 O.S. 2-402(B-1) and sentenced to a term of TWENTY (20) years with the direction of the Department of Corrections, and of said sentence TWENTY (20) years was suspended pending the defendant's good behavior.

The Court finds that on the 31st day of May, 2001, the State filed an Application to Revoke Suspended Sentence based on violations of the defendant's Rules and Conditions of Probation. The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the suspended sentence is revoked in full with the defendant to attend the Last Stop Program with said balance to be suspended upon successful completion thereof. The Sheriff of Sequoyah County shall deliver said defendant to the Department of Corrections and leave therewith a copy of this Order of Judgment and Sentence to serve as a warrant and authority for the revocation of said defendant as provided herein. The second copy of the Order to be warrant and authority of said Sheriff for the transportation and imprisonment of said defendant as herein before provided. The Sheriff to make due return to the Clerk of this Court, with his procedure endorsed thereon.

_Defendant to turn himself into Seq County Jail on Aug 30,01 a Noon._

_____
**JUDGE OF THE DISTRICT COURT**

388

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA STATE OF
OKLAHOMA                                                        CASE NO. CF-98-363
                                                                         CF-98-346
VS.                                                                      CF-99-562

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT                                                J&S date 08-28-01

Sanders, Charles                        JAN 18 2002

DEFENDANT                       BERNELL EDWARDS, COURT CLERK
                                BY_____
                                                      DEPUTY

STATEMENT OF JAIL TIME

PRISONER WAS ARRESTED ON DATE OR DATES AS FOLLOWS: _See below_

PRISONER REMAINED IN JAIL _279_ DAYS BEFORE JUDGEMENT AND
SENTENCING.

PRISONER REMAINED IN JAIL _2_ DAYS AFTER JUDGEMENT AND
SENTENCING.

_Jamie Fulleh_
SEQUOYAH COUNTY SHERIFF'S DEPARTMENT

04-15-98 thru 04-15-98 = 1 day
~~09-17-98 thru~~ 09-18-98 = 1 day
11-16-98 thru 02-01-99 = 78
06-22-99 thru 06-23-99 = 1 day
09-30-98 thru 09-30-98 = 1 day
10-22-99 thru 12-09-99 = 49 days
05-30-00 thru 08-13-00 = 86 days
05-27-01 thru ~~___~~-08-29-01 = 64

**REDACTED**

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 0 5 2002

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  CF-98-346 |
| | ) | |
| CHARLES E. SANDERS | ) | |
| Defendant. | ) | |

**NUNC PRO TUNC**
**ORDER REVOKING SUSPENDED SENTENCE**

NOW, on this **5 Th** day of **March**, 2002, the above styled case comes on for hearing on the State's Application to Revoke Suspended Sentence.  The State is present by Assistant District Attorney, Rob Cowan, the defendant is present and represented by the attorney of record, . Monte Johnson.

The Court finds that on the 9th day of December, 1999, the said defendant was found guilty of the crime of POSSESSION OF CONTROLLED DRUG, 63 O.S. 2-402(B-1) and sentenced to a term of  TWENTY (20) years with the direction of the Department of Corrections, and of said sentence TWENTY (20) years was suspended pending the defendant's good behavior.

The Court finds that on the 31st day of May, 2001, the State filed an Application to Revoke Suspended Sentence based on violations of the defendant's Rules and Conditions of Probation.  The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the suspended sentence is revoked in full and shall run concurrently with CF-98-363 with the defendant to attend the Last Stop Program or similar program with said balance to be suspended upon successful completion thereof.  The Sheriff of Sequoyah County shall deliver said defendant to the Department of Corrections and leave therewith a copy of this Order of Judgment and Sentence to serve as a warrant and authority for the revocation of said defendant as provided herein.  The second copy of the Order to be warrant and authority of said Sheriff for the transportation and imprisonment of said defendant as herein before provided.  The Sheriff to make due return to the Clerk of this Court, with his procedure endorsed thereon.

REDACTED

**JUDGE OF THE DISTRICT COURT**

390

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 2 8 2002

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

| | |
|---|---|
| THE STATE OF OKLAHOMA, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. CF-98-346 |
| | ) |
| CHARLES E. SANDERS | ) |
| Defendant. | ) |

**NUNC PRO TUNC**
**ORDER REVOKING SUSPENDED SENTENCE**

NOW, on this *28th* day of ~~January~~ *March*, 2002, the above styled case comes on for hearing on the State's Application to Revoke Suspended Sentence. The State is present by Assistant District Attorney, Rob Cowan, the defendant is present and represented by the attorney of record, . Monte Johnson.

The Court finds that on the 9th day of December, 1999, the said defendant was found guilty of the crime of POSSESSION OF CONTROLLED DRUG, 63 O.S. 2-402(B-1) and sentenced to a term of TWENTY (20) years with the direction of the Department of Corrections, and of said sentence TWENTY (20) years was suspended pending the defendant's good behavior.

The Court finds that on the 31st day of May, 2001, the State filed an Application to Revoke Suspended Sentence based on violations of the defendant's Rules and Conditions of Probation. The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the suspended sentence is revoked in full and shall run concurrently with CF-98-363 with the defendant to attend the Last Stop Program or similar program with said balance to be suspended upon successful completion thereof. The Sheriff of Sequoyah County shall deliver said defendant to the Department of Corrections and leave therewith a copy of this Order of Judgment and Sentence to serve as a warrant and authority for the revocation of said defendant as provided herein. The second copy of the Order to be warrant and authority of said Sheriff for the transportation and imprisonment of said defendant as herein before provided. The Sheriff to make due ~~return to the~~ Clerk of this Court, with his procedure endorsed thereon.

REDACTED

_____
**JUDGE OF THE DISTRICT COURT**



IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
   Plaintiff

vs.
CHARLES EDMOND SANDERS

SALLISAW, OK 74955
    Defendant
  SS#:   9539
  DOB:   1966

)
)
)
)
)
)
)
)
)

Case No. CF-01-00314
~~CF-98-00346~~
CF-98-00363
CF-99-00562

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 1 4 2002

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

State's Attorney:
Defendant's Attorney:

Date: 08/14/02      RULE 8 HEARING STEVE BARNES
          (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____$536.80 on or before 10-30-20 OR and

then _____ per month on or before the ___ day of each month _

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 10-30-20_____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $536.80    **REDACTED**

          DENNIS M. SPROUSE
X_____    _____
  Defendant       Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

APPLICATION FOR STAY OF EXECUTION ON FINES/COSTS

SEQUOYAH COUNTY, OKLAHOMA
IN DISTRICT COURT
FILED
AUG 1 4 2002
BURNELL EDWARDS, COURT CLERK
BY_____
_____DEPUTY

CHECK ONE        _____ I plan to pay before 3:30 pm today

_____ I plan to pay within 48 hours        _____ I want extended time to pay

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by the Court.  I understand that I may be subject to penalties, including but not limited to imprisonment, if I fail to pay my assessed fine(s)/costs as ordered.  I consent to an investigation into all information I provide on this application to verify its validity.  I understand I may be held in CONTEMPT OF COURT for providing false and/or incomplete information on this application. I swear under PENALTY OF PERJURY that the below information is true and complete.

SIGNATURE _Charles Sanders_        DATE _8/14/02_

CASE #_____        DATE OF BIRTH ██████ 6

SS# ██████ 9539        (FINE)/COST_____

LAST NAME _Sanders_        FIRST _Charles_   MI _E_

STREET ██████        CITY _Sallsaw_        PHONE 775-██████

EMPLOYER_____—_____        HOW LONG __—__        PHONE_____

EARNINGS __—__ per __—__ #hrs/wk __—__ paydates __—__.

IF PAYING BEFORE 3:30 PM TODAY:  STOP HERE

MARITAL STATUS        SINGLE_____        MARRIED_____        DIVORCED__✓__
                      SEPERATED_____        WIDOW/ER_____        COMMON LAW_____

Names and Ages of Children_____
List others living in household    NAME        RELATIONSHIP    EMPLOYER    INCOME

_____
_____

AMOUNT OF CASH WITH YOU $_____Saving/Checking Accounts $_____
Property, Investments, Assets $_____
I AM SUPPORTED BY:_____        Do you receive housing assistance_____
    Alimony/Child Support_____        Monthly Expenses:
    Social Security_____        Rent_____
    Pension/Retirement_____        Food_____
    Welfare_____        Utilities_____
    Food Stamps_____ **REDACTED**        Child Care_____
    Unemployment_____        Medical_____
    My Gross Monthly Earning_____        TOTAL$_____
    Other Income Support_____ Source_____

DRIVERS LICENSE # _Sane SS #_  STATE _OK_ EXP.DATE _5-//-9 4_
VEHICLES YOU OWN OR USE:    YEAR        MAKE/MODLE        MONTHLY PAYMENTS

_____
_____

393

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| Plaintiff | ) | |
| vs. | ) | Case No. CF-01-00314 |
| CHARLES EDMOND SANDERS | ) | CF-98-00346 |
| | ) | CF-98-00363 |
| | ) | CF-99-00562 |
| SALLISAW, OK  74955 | ) | |
| Defendant | ) | |

SS#: █████9539
DOB: █████1966

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 1 4 2002

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

State's Attorney:
Defendant's Attorney:

Date: 08/14/02                    RULE 8 HEARINGSTEVE BARNES
                                  (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____$536.80 on or before 10-30-20 or and

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 10-30-20 _____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $536.80

REDACTED DENNIS M. SPROUSE
Judge of the District Court

X_____
        Defendant

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

394



IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                    )
          Plaintiff                   )
vs.                                   )        Case No. CF-01-00314
CHARLES EDMOND SANDERS                )                CF-98-00346
                                      )                ~~CF-98-00363~~
                                      )                CF-99-00562
SALLISAW, OK  74955                   )
          ███████Defendant            )
     SS#: ██████9539
     DOB: ██████/1966

                                               SEQUOYAH COUNTY, OKLAHOMA
                                                        FILED
                                                  IN DISTRICT COURT

                    State's Attorney:
                    Defendant's Attorney:          AUG 1 4 2002

Date: 08/14/02             RULE 8 HEARING STEVE BARNES BERNELL EDWARDS, COURT CLERK
                              (Summary)              BY_____DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

                                          02
_____$536.80 on or before 10-30-20__ and

then _____ per month on or before the ___ day of each month  _

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 10-30-20_____

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $536.80       **REDACTED**

X_____                 _____
          Defendant                     DENNIS M. SPROUSE
                                        Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

APPLICATION FOR STAY OF EXECUTION ON FINES/COSTS

*SEQUOYAH COUNTY, OKLAHOMA*
*IN DISTRICT COURT*
*FILED*
*AUG 1 4 2002*
*BY_____*
*DARNELL EDWARDS, COURT CLERK*
*DEPUTY*

CHECK ONE _____ I plan to pay before 3:30 pm today

_____ I plan to pay within 48 hours   _____ I want extended time to pay

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by the Court. I understand that I may be subject to penalties, including but not limited to imprisonment, if I fail to pay my assessed fine(s)/costs as ordered. I consent to an investigation into all information I provide on this application to verify its validity. I understand I may be held in CONTEMPT OF COURT for providing false and/or incomplete information on this application. I swear under PENALTY OF PERJURY that the below information is true and complete.

SIGNATURE *Charles Sanders*   DATE 8/14/02

CASE # _____   DATE OF BIRTH ███ 66

SS# ███ 9539   FINE/COST _____

LAST NAME Sanders   FIRST Charles   MI E

STREET Rt 3   CITY Sallisaw   PHONE 775-███

EMPLOYER _____   HOW LONG _____   PHONE _____

EARNINGS _____ per _____ #hrs/wk _____ paydates _____

IF PAYING BEFORE 3:30 PM TODAY: STOP HERE

MARITAL STATUS   SINGLE_____   MARRIED_____   DIVORCED ✓
                 SEPERATED_____   WIDOW/ER_____   COMMON LAW_____

Names and Ages of Children_____
List others living in household   NAME   RELATIONSHIP   EMPLOYER   INCOME
_____
_____
_____

AMOUNT OF CASH WITH YOU $_____ Saving/Checking Accounts $_____
Property,Investments, Assets $_____
I AM SUPPORTED BY:_____ Do you receive housing assistance_____
  Alimony/Child Support_____   Monthly Expenses:
  Social Security_____   Rent_____
  Pension/Retirement_____   Food_____
  Welfare_____   Utilities_____
  Food Stamps_____ **REDACTED**   Child Care_____
  Unemployment_____   Medical_____
  My Gross Monthly Earning_____   TOTAL$_____
  Other Income Support_____ Source_____

DRIVERS LICENSE # *Sam SS#*   STATE OK   EXP.DATE 5-1-9Y
VEHICLES YOU OWN OR USE:   YEAR   MAKE/MODLE   MONTHLY PAYMENTS
_____
_____

396

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                      )
      Plaintiff                       )
vs.                                     )    Case No. CF-01-00314  4  391.00
CHARLES EDMOND SANDERS                  )              ~~CF-98-00346~~  1  75.80
      -                               )              CF-98-00363  2  35.00
                                        )              CF-99-00562  3  35.00
SALLISAW, OK  74955                     )
      ████████Defendant               )              SEQUOYAH COUNTY, OKLAHOMA
    SS#: ████9539                                            FILED
    DOB: ████1966                                      IN DISTRICT COURT

                                   OCT - 9 2002

               State's Attorney:              BERNELL EDWARDS, COURT CLERK
               Defendant's Attorney:         BY_____DEPUTY

Date: 10/09/02              RULE 8 HEARINGBRIAN MORTON
                        (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

                                        02
_____$100.00 on or before 11-09-20 and

then 100.00 per month on or before the 9 day of each month -

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before ~~11-09-20~~_____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

_____

TOTAL TO PAY $536.80        **REDACTED**

x_Charles Sanders_____        _____
        Defendant                  DENNIS M. SPROUSE
Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

                            Judge of the District Court

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

APPLICATION  FOR STAY OF EXECUTION ON FINES/COSTS OCT - 9 2002

BERNELL EDWARDS, COURT CLERK

CHECK ONE          _____ I plan to pay before 3:30 pm today    BY_____DEPUTY

_____ I plan to pay within 48 hours          ✓ I want extended time to pay

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by
the Court.   I understand that I may be subject to penalties, including but not limited to
imprisonment, if I fail to pay my assessed fine(s)/costs as ordered. I consent to an investigation
into all information I provide on this application to verify its validity.  I understand I may be held
in CONTEMPT OF COURT for providing false and/or incomplete information on this application.
I swear under PENALTY OF PERJURY that the below information is true and complete.

SIGNATURE _Charles Sanders_ DATE _10-9-2002_

CASE # _____          DATE OF BIRTH ____66

SS# ____9539_____          FINE/COST_____

LAST NAME _Sanders_____          FIRST _Charles_ MI _E_

STREET _____ CITY _Sallisaw_          PHONE (918) 775-____

EMPLOYER _Kavin_____ HOW LONG _Temp_          PHONE 776-____

EARNINGS _24000_ per _Week_ #hrs/wk_____ paydates _Friday_

### IF PAYING BEFORE 3:30 PM TODAY:  STOP HERE

MARITAL STATUS     SINGLE_____ MARRIED_____     DIVORCED_____
                   SEPERATED ✓  WIDOW/ER_____     COMMON LAW_____

Names and Ages of Children _Jennifer   Sanders_
List others living in household   NAME          RELATIONSHIP   EMPLOYER   INCOME

_____
_____

AMOUNT OF CASH WITH YOU $ _0_          Saving/Checking Accounts $_____
Property,Investments, Assets $_____
I AM SUPPORTED BY:_____     Do you receive housing assistance____
     Alimony/Child Support_____     Monthly Expenses:
     Social Security____,_____     Rent_____
     Pension/Retirement_____     Food_____
     Welfare_____     Utilities_____
     Food Stamps_____ **REDACTED** Child Care_____
     Unemployment_____     Medical_____
     My Gross Monthly Earning_____     TOTAL$_____
     Other Income Support_____ Source_____

DRIVERS LICENSE # _441_____ STATE _OK_ EXP.DATE _11-8-2005_
VEHICLES YOU OWN OR USE:   YEAR     MAKE/MODLE     MONTHLY PAYMENTS

_____ ∅ _____

398

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                        )
       Plaintiff                      )
vs.                                       )       Case No. CF-01-00314
CHARLES EDMOND SANDERS                    )                CF-98-00346
                                          )                CF-98-00363
                                          )                CF-99-00562
SALLISAW, OK  74955                       )
     Defendant                       )       SEQUOYAH COUNTY, OKLAHOMA
  SS#: ███████9539                               FILED
  DOB: ███████1966                              IN DISTRICT COURT

                                OCT - 9 2002

State's Attorney:               BERNELL EDWARDS, COURT CLERK
Defendant's Attorney:         BY_____DEPUTY

Date: 10/09/02          RULE 8 HEARINGBRIAN MORTON
                  (Summary)

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____$100.00 on or before 11-09-20 02 and

then _100.00_ per month on or before the 9 day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 11-09-20 _____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

_____

TOTAL TO PAY $536.80        **REDACTED**

X_____Charles Sanders_____     DENNIS M. SPROUSE
      Defendant         Judge of the District Court
Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                          )
      Plaintiff                       )
vs.                                         )       Case No. CF-98-00128A
TERESA JORDAN                               )                CF-98-00346A
                                            )                CF-99-00332
                                            )                PO-00-00439
VIAN, OK  74962                             )
        Defendant                    )
   SS#: ■■■■5710
   DOB: ■■■■1965

**SEQUOYAH COUNTY, OKLAHOMA**
**FILED**
IN DISTRICT COURT

State's Attorney:
Defendant's Attorney:

MAY 1 5 2003

Date: 05/15/03                 RULE 8 HEARING ROBBIE COWAN BERNELL EDWARDS, COURT CLERK
                                 (Summary)   GERALD HUNTER _____ BY _____ DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____ $100.00 on or before 06-01-20̲0̲3̲ and

then 1̲0̲0̲.̲0̲0̲ per month on or before the 1̲s̲t̲ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 06-01-20

OR; _____

IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $2919.00      **REDACTED**
                                              JOHN C. GARRETT
X Teresa Jordan                               Judge of the District Court
      Defendant
Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

400

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                          )
                    Plaintiff              )
vs.                                         )     Case No. ~~CF-98-00128A~~
TERESA JORDAN                               )              CF-98-00346A 3  1611
                                            )              CF-99-00332 4  1308
                                            )              ~~PO-00-00439~~

VIAN, OK  74962                             )
          Defendant                         )
     SS#: ████5710
     DOB: ████1965                                SEQUOYAH COUNTY, OKLAHOMA
                                                           FILED
                                                  IN DISTRICT COURT
                    State's Attorney:
                    Defendant's Attorney:         MAY 1 5 2003

Date: 05/15/03                    RULE 8 HEARING  ROBBIE COWAN  BERNELL EDWARDS, COURT CLERK
                                  (Summary)  GERALD HUNTER  BY_____DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:


_____$100.00 on or before 06-01-20 03 and

then 100.00 per month on or before the 1st day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 06-01-20_____

OR; _____



IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _____

_____

TOTAL TO PAY $2919.00          **REDACTED**

_____      _____
          Defendant                    JOHN C. GARRETT
                                  Judge of the District Court

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

APPLICATION FOR STAY OF EXECUTION ON FINES/COSTS

CHECK ONE:

_____I PLAN TO PAY BEFORE 3:30 PM TODAY     _____ I PLAN TO PAY IN 48 HRS.

___X___I WANT EXTENDED TIME TO PAY

I understand that my assessed fine(s)/costs are due IMMEDIATELY unless otherwise ordered by the Court. I understand that I may be subject to penalties, including but not limited to imprisonment, if I fail to pay my assessed fine(s)/costs as ordered. I consent to an investigation in CONTEMPT OF COURT for providing false and/or incomplete information on this application I swear under PENALTY OF PERJURY that the below information is true and complete.

SIGNATURE _Teresa Jordan_____     DATE _____

CASE # _____     DATE OF BIRTH ███████ 6 5

SSN# ███████ 57/0_____     FINE/COSTS $ _____

LAST NAME █████████     FIRST _____ MI _____

STREET ████████     CITY _Tulsa_____ PH _____
6YS

EMPLOYER _Tulsa Welding School_ HOW LONG _____ PH _____

EARNINGS _____ PER _____ #HRS/WK _____ PAYDATES _____

IF PAYING BEFORE 3:30 PM TODAY:  STOP HERE

MARITAL STATUS _____ SINGLE     _____MARRIED   _____SEPARATED
_____ DIVORCED   _____COMMON LAW   _____ WIDOW(ER)

NUMBER OF CHILDREN _____     AGES OF CHILDREN _____
LIST OTHERS LIVING IN HOUSEHOLD   NAME   RELATIONSHIP   EMPLOYER   INCOME
_daughter_____
_____
_____

AMOUNT OF $ W/YOU _1000.00___     SAVING/CHECKING ACC $ _____
PROPERTY, INVESTMENTS, ASSETS $ _____
I AM SUPPORTED BY: _self_____     DO YOU RECEIVE HOUSING ASSISTANCE__
  ALIMONY/CHILD SUPPORT _____     MONTHLY EXPENSES:
  SOCIAL SECURITY _____     RENT _200.00_____
  PENSION/RET. _____     FOOD _____
  WELFARE _____     UTILITIES _100.00_____
  FOOD STAMPS _____     CHILD CARE _____
  UNEMPLOYMENT _____     MEDICAL _____
  GROSS MO. EARNING _____ **REDACTED**OTAL $ _____
  OTHER INCOME SUPPORT _____     SOURCE _____

DRIVERS LICENSE # _2_____ STATE _____ EXP.DATE _____
VEHICLES YOU OWN OR USE:     YEAR   MAKE/MODEL     MONTHLY PMT.
_____
_____



IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                      )
            Plaintiff                   )
vs.                                     )    Case No. CF-98-00128A-1 ⟨1030.00⟩
TERESA JORDAN                           )              CF-98-00346A-2
                                        )              CF-99-00332-3
Vian                                    )
        OK 74962                        )
            Defendant                   )
      SS#:         5710
      DOB:         1965                                SEQUOYAH COUNTY, OKLAHOMA
                                                              FILED
                                                        IN DISTRICT COURT

                        State's Attorney:
                        Defendant's Attorney:                NOV 1 3 2000
Date: 11/13/00                          ROBBIE COWAN
                    RULE 8 HEARING GERALD HUNTER  BERNELL EDWARDS, COURT CLERK
                        (Summary)                        BY _____ DEPUTY

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:

_____   $100.00 on or before 01-05-20 and then ext to

_____   $100.00 per month on or before ⟨02-05-2001⟩ √

then _____ per month on or before the ___ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before 01-05-20 _____

OR; _____


IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: CF-98-128A = $1510⁻ / CF-98-346A = $2118⁻
CF-99-332 = $1308⁻                    3-30-01 pc mailed ⟨4987⟩

_____ **REDACTED** _____

TOTAL TO PAY $ 4936⁻

_____              JOHN C. GARRETT
        Defendant                  Judge of the District Court
*Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.

IN THE DISTRICT COURT WITHIN AND FOR SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                     )
       Plaintiff                   )
vs.                                    )    Case No.   ~~CF-99-00128A~~
TERESA JORDAN                          )               CF-98-00346A
                                       )               CF-99-00332
Sallisaw OK 74955                      )               ~~PO-00-00139~~
~~VIAN, OK 74962~~                     )
       Defendant                   )
   SS#: 5710
   DOB: 1965

State's Attorney:
Defendant's Attorney:

Date: 12/30/03              RULE 8 HEARING  ROBBIE COWAN
                           (Summary)       GERALD HUNTER

BASED UPON A FINDING THAT THE DEFENDANT DOES NOT HAVE THE MEANS

TO IMMEDIATELY SATISFY HIS COURT-IMPOSED FINANCIAL PENALTIES,

HEREBY ORDERED BY THE COURT THAT DEFENDANT PAY:


_____ $50.00 on or before 01-21-2003 and

then _50.00_ per month on or before the _21_ day of each month

with like sums on the same date thereafter until paid in full;

OR; the balance in full on or before ~~01-21-20~~ _____

OR; _____



IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE ALL PAYMENTS IN

PERSON AT THE OFFICE OF THE COURT CLERK.

Comments: _To begin paying $100.00_
_On April 21, 2004_

_____

TOTAL TO PAY $2249.00        **REDACTED**
                             _____
                             JOHN C. GARRETT
_____      Judge of the District Court
      Defendant

Defendant is further ordered to notify the Collections Adm. of
any change of address, telephone, employment, or income.
*

*Stamp:* SEQUOYAH COUNTY, OKLAHOMA FILED IN DISTRICT COURT FEB 2 5 2004 BERNELL EDWARDS, COURT CLERK BY _____ DEPUTY

**BENCH WARRANT – After Conviction**



ISSUED
3-15-04

STATE OF OKLAHOMA                    IN DISTRICT COURT
Sequoyah County,
THE STATE OF OKLAHOMA                CF-98-00346
        VS.
CHARLES EDMOND SANDERS
█████████
SALLISAW, OK 74955

███66 ████9539                       BOND - $10,000

THE STATE OF OKLAHOMA
To any Sheriff or Policeman of the State of Oklahoma – Greeting:

**CHARLES EDMOND SANDERS** having been on the 9th day of December, 1999 duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of : UNLAWFUL POSSESSION OF CONTROLLED DRUG / APPLICATION TO REVOKE OR APPLICATION TO IMPOSE JUDGMENT AND SENTENCE

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above – named **CHARLES EDMOND SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this Monday, March 15, 2004. By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: *Robin Hickman*
                                    **Deputy**

**WILL ONLY EXTRIDIATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the Writ on the _____ day of _____, 20___, at _____ o'clock ____a.m. by _____

_____
                              REDACTED

Dated this _____ day of _____ 20___.


_____
SHERIFF OF SEQUOYAH COUNTY, OK

BY:_____

405

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAR 12 2004

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

|   |   |
|---|---|
| THE STATE OF OKLAHOMA, | ) |
| Plaintiff, | ) |
| vs. | ) |
|   | ) |
| CHARLES E. SANDERS, | ) |
| Defendant. | ) |

No. CF-98-346

## SECOND APPLICATION TO REVOKE SUSPENDED SENTENCE

COMES NOW, Richard L. Gray, the duly elected, qualified, and acting District Attorney of Sequoyah County, and states to the Court that on the 9th day of December, 1999, the said Defendant entered his/her plea of guilty in the above entitled case, in the District Court of Sequoyah County, Oklahoma, to the charge of: POSSESSION OF CONTROLLED DRUG, as set out in the Information on file in this cause and the said defendant was sentenced to serve a term of TWENTY (20) years, under the Supervision of the Department of Correction, which sentence the Court suspended during the good behavior of said defendant. Further that on the 31st day of May, 2001 the State of Oklahoma filed its Application to Revoke Suspended Sentence. That on the 23rd day of August, 2001, Defendant was found guilty of violating the rules and conditions of probation and the suspended sentence was revoked, with Defendant to successfully complete the Last Stop or similar program, at which time the balance of said sentence would be suspended.

Thereafter, the defendant violated the rules and conditions of probation as imposed by the Court in the following manner:

**Rule #9**: by violating city, state or federal law, and being cited for Burglary, 2nd degree in Sequoyah County Case CF-04-19.

WHEREFORE, applicant prays that the Court set a date for hearing this application and that the suspension clause in said Judgment and Sentence be carried out in full, according to its terms. That the Court direct the Court Clerk of Sequoyah County, Oklahoma, to issue a Bench Warrant for the arrest of said defendant.

Dated this _11TH_ day of , 2004.

RICHARD L. GRAY, District Attorney

BY: <REDACTED>
Assistant District Attorney

WITNESSES:
Chief Gary Philpot, Sallisaw PD
Sam Pinson, State Fire Marshall
Sally Jackson,███████ Sallisaw, OK 74955
Wung Mei Fung,█████████████ Sallisaw, OK
Hui Hui Zheng,████████████ Sallisaw, OK

## FINDING OF PROBABLE CAUSE

The Undersigned Judge of the District Court, upon the above application hereby determines there to be probable cause for the issuance of a Bench Warrant and so orders.

Dated this _11TH_ day of ___March___, 2004.
Bond set at $_10,000.00_

JUDGE OF THE DISTRICT COURT

406

Sequoyah County
Warrant Clearance

Warrant Number: _CP 98-00346_

Warrant Name: _Charles Edmond Sanders_

Date & Time Cleared: _03/31/04  17:14_

Warrant Cleared By:

Arrest ✓ Officer Serving: _Chris Grizzle_

Agency: _Seq. Co_  Badge Number: _825_

Cancel____Official Directing Warrant Cancelation_____

Was warrant pulled from file?  (Yes)  No

If no explain:_____

Was warrant marked off warrant book and data base?  (Yes)  No

If no explain:_____

Was warrant cleared from NCIC?  (Yes)  Not entered

Was warrant removed from holds book?  Yes  (No hold placed)

Sheriff's office employee signature:_____

Note: After completing this form staple to the back of warrant signed by arresting officer and place in folder
marked
Court Clerk  Use this form only to clear warrants issued by *Sequoyah County.* Every warrant must be
cleared
on a seperate form.  **REDACTED**

**BENCH WARRANT – After Conviction**

ISSUED
3-15-04

STATE OF OKLAHOMA
Sequoyah County,
THE STATE OF OKLAHOMA
                VS.
CHARLES EDMOND SANDERS

SALLISAW, OK 74955

██66 ██9539

IN DISTRICT COURT

CF-98-00346

BOND - $10,000

THE STATE OF OKLAHOMA
To any Sheriff or Policeman of the State of Oklahoma – Greeting:

**CHARLES EDMOND SANDERS** having been on the 9th day of December, 1999 duly convicted in the District Court of Sequoyah County, State of Oklahoma, of the crime of : UNLAWFUL POSSESSION OF CONTROLLED DRUG / APPLICATION TO REVOKE OR APPLICATION TO IMPOSE JUDGMENT AND SENTENCE

YOU ARE THEREFORE COMMANDED Forthwith to arrest the above – named
**CHARLES EDMOND SANDERS** and bring him/her before said Court for judgment, or if the said Court has adjourned for the term, deliver him/her to the Sheriff of the County of Sequoyah; there to be detained by said Sheriff until the further order of the Court.

WITNESS MY HAND And seal of said Court this Monday, March 15, 2004. By Order of the Court.

**BERNELL EDWARDS, COURT CLERK**

BY: _Robin Hickman_____
                                    **Deputy**

**WILL ONLY EXTRIDIATE FROM SURROUNDING STATES**

SHERIFF'S RETURN

RECEIVED the Writ on the _____ day of _____, 20___, at _____ o'clock
___a.m. by _____

——————————————————— **REDACTED** ———————————————————

Dated this _____ day of _____ 20___.

_____
SHERIFF OF SEQUOYAH COUNTY, OK

BY: _____

*CF-98-346*



**CLIF'S PHARMACY**   (918) 776█████
█████SALLISAW, OK 74955
Rx: 58████   05/03/2004      Dr.LOGGAINS, BENTON PA
**CHARLES E SANDERS**      DR WOODS OFFICE
SEQ CO JAIL                SALLISAW, OK 74955
SALLISAW, OK 74955
(000) 000-0918
NDC: 10939-█████

*CF-98-346*                      $7.00
48 Cap ALLERGY CAPS (BENADRYL GEN)  Auth:

**REDACTED**

# IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 1 7 2004

BERNELL EDWARDS, COURT CLERK
BY_____, DEPUTY

| | |
|---|---|
| THE STATE OF OKLAHOMA, ) | |
| Plaintiff, ) | |
| vs. ) | No. CF-98-346 |
| ) | |
| CHARLES E. SANDERS, ) | |
| Defendant. ) | |

## AMENDED
## SECOND APPLICATION TO REVOKE SUSPENDED SENTENCE

COMES NOW, Richard L. Gray, the duly elected, qualified, and acting District Attorney of Sequoyah County, and states to the Court that on the 9th day of December, 1999, the said Defendant entered his/her plea of guilty in the above entitled case, in the District Court of Sequoyah County, Oklahoma, to the charge of: POSSESSION OF CONTROLLED DRUG, as set out in the Information on file in this cause and the said defendant was sentenced to serve a term of TWENTY (20) years, under the Supervision of the Department of Correction, which sentence the Court suspended during the good behavior of said defendant. Further that on the 31st day of May, 2001 the State of Oklahoma filed its Application to Revoke Suspended Sentence. That on the 23rd day of August, 2001, Defendant was found guilty of violating the rules and conditions of probation and the suspended sentence was revoked, with Defendant to successfully complete the Last Stop or similar program, at which time the balance of said sentence would be suspended.

Thereafter, the defendant violated the rules and conditions of probation as imposed by the Court in the following manner:

**Rule #9**: by violating city, state or federal law, and being cited for Burglary, 2nd degree, Arson, 2nd degree; Knowingly Concealing Stolen Property and Feloniously Carrying Firearm in Sequoyah County Case CF-04-19.

WHEREFORE, applicant prays that the Court set a date for hearing this application and that the suspension clause in said Judgment and Sentence be carried out in full, according to its terms. That the Court direct the Court Clerk of Sequoyah County, Oklahoma, to issue a Bench Warrant for the arrest of said defendant.

Dated this 17th day of June, 2004.

RICHARD L. GRAY, District Attorney

BY:_____

Assistant District Attorney

WITNESSES:
Chief Gary Philpot, Sallisaw PD
Sam Pinson, State Fire Marshall
Sally Jackson,▮▮▮▮▮▮ Sallisaw, OK 74955
Wung Mei Fung,▮▮▮▮▮▮▮▮ Sallisaw, OK
Hui Hui Zheng,▮▮▮▮▮▮▮▮▮ Sallisaw, OK

**SUBPOENA**
IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH CO.
FILED
IN DISTRICT COURT

STATE OF OKLAHOMA,
Plaintiff,

No. CF-04-19
CF-98-363
CF-99-562
CF-98-346,
PRELIMINARY HEARING/APP TO REVOKE

JUL 2 6 2004

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

VS.

CHARLES "MONK" SANDERS

Defendant,

TO:   CHIEF GARY PHILPOT SALLISAW P.D.
      SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD ST. SUITE 4, OKLAHOMA CITY, OK
      SALLY JACKSON ████████████, SALLISAW, OK
      WUNG MEI FUNG, ███████████████████ SALLISAW, OK
      HUI HUI ZHENG C/O ████████████████ SALLISAW, OK
      DET JOHN OWENS SALLISAW P.D.

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **29th day of July, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES "MONK" SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

HEREOF FAIL NOT, under penalty of law.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 26th day of JULY, 2004.

BERNELL EDWARDS, COURT CLERK

By_____ Hickman
                Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE AND PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

**SHERIFF'S RETURN** REDACTED

Received this Writ this _____day of _____, 20___, _____o'clock ___.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____day of _____, 20___,; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____By_____
_____20_____. I cannot find the within named
_____in my county.

JOHNNY PHILPOT, SHERIFF

By_____
                Deputy

Mileage_____miles

411

## Sheriff's Return
## State of Oklahoma, County of Sequoyah

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

Case #  CF-04-19   CF-98-346
CF 98 363
CF-99-562

AUG 1 0 2004

BERNELL EDWARDS, COURT CLERK

BY_____ DEPUTY

I certify that I received the foregoing summons on the ___26___
day of ___July___,20_04_, and that I delivered, or
attempted delivery of the said summons as shown below to
each party named for service request.

| Name of Person To be served | service address | served? yes or no | Date & Time of service or Attempt |
|---|---|---|---|
| Sally Jackson | ▓▓▓▓▓ | No | 07 28 04   07-29-04 |
| Wung Mei Fung | ▓▓▓▓▓ | Yes | 07-27-04 |
| Hui Hui Zheng | ▓▓▓▓▓ | Yes | 07-27-04 |

I certify that on _____, I served_____
By leaving a copy of said summons with a copy of the petition attached at
_____ which is his/her place of residence.

I certify that on_____, I served_____ by leaving
a copy of said summons with a copy of the petition attached at
_____ with_____, a member of
his/her family over fifteen (15) years of age.

Dated on the __08__ day of __August__,20_04_.
J.W. Philpot, Sheriff of Sequoyah County
#825
By:_____Deputy Sheriff
Sequoyah County, Oklahoma

**REDACTED**

*Gubbett 07-26-04*

## SUBPOENA
### IN THE DISTRICT COURT OF SEQUOYAH COUNTY
### STATE OF OKLAHOMA

STATE OF OKLAHOMA,
       Plaintiff,

                                  No. CF-04-19

VS.                            CF-98-363
                                    CF-99-562
                                    CF-98-346

CHARLES "MONK" SANDERS           PRELIMINARY HEARING/APP TO REVOKE

         Defendant,

TO:   ~~CHIEF GARY PHILPOT SALLISAW P.D.~~
     ~~SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD ST. SUITE 4, OKLAHOMA CITY, OK~~ *N°072904 NS*
     SALLY JACKSON ████████ SALLISAW, OK  *07-28-04 N°072904 NS*
     WUNG MEI FUNG, C/O ████████, SALLISAW, OK *07-27-04 yes*
     HUI HUI ZHENG C/O ████████ SALLISAW, OK *07-27.04 yes*
   ~~DET JOHN OWENS SALLISAW P.D.~~

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **29th day of July, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES "MONK" SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

       HEREOF FAIL NOT, under penalty of law.

       IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 26th day of JULY, 2004.

                                   BERNELL EDWARDS, COURT CLERK

                         By *Robin Hickman*
                                 Deputy

---

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE <u>AND</u> PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

---

### SHER█REDACTED█

     Received this Writ this _____ day of _____, 20___, _____ o'clock ___.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 20___; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____
_____ By_____
_____20_____. I cannot find the within named
_____ in my county.

                                JOHNNY PHILPOT, SHERIFF

                          By_____
                                   Deputy

                     Mileage_____miles

413

**SUBPOENA**
IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,
      Plaintiff,

                                  No. CF-04-19
                                  CF-98-363
VS.                             CF-99-562
                                  CF-98-346

CHARLES "MONK" SANDERS      PRELIMINARY HEARING/APP TO REVOKE

      Defendant,

TO:   CHIEF GARY PHILPOT SALLISAW P.D.
       SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD ST. SUITE 4, OKLAHOMA CITY, OK
       SALLY JACKSON███████ SALLISAW, OK
       WUNG MEI FUNG, C/O█████████ SALLISAW, OK
       HUI HUI ZHENG C/O████████ SALLISAW, OK
       DET JOHN OWENS SALLISAW P.D.

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **29th day of July, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES "MONK" SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

      HEREOF FAIL NOT, under penalty of law.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 26th day of JULY, 2004.

                           BERNELL EDWARDS, COURT CLERK

                           By *Robin Hickman*
                                  Deputy

---

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE **AND** PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

---

SHER**REDACTED**

      Received this Writ this _____ day of _____, 20___, _____ o'clock ____.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the _____ day of _____, 20___; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____
_____By_____
_____20_____. I cannot find the within named
_____in my county.

                         JOHNNY PHILPOT, SHERIFF

                  By_____
                             Deputy

                Mileage_____miles

414

**SUBPOENA**

IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

AUG 3 0 2004

STATE OF OKLAHOMA,
                Plaintiff,

No. CF-04-19
CF-98-363
CF-99-562
CF-98-346

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

VS.

CHARLES "MONK" SANDERS.
                Defendant,

PRELIMINARY HEARING
APPLICATION TO REVOKE

TO:   CHIEF GARY PHILPOT SALLISAW P.D.
      AGENT SAM PINSON STATE FIRE MARSHALL 2401 N.W. 23RD SUITE 4, OK. CITY, OK
      SALLY JACKSON ███████████ SALLISAW, OK
      WUNG MEI FUNG C/O ███████████████ SALLISAW, OK
      HUI HUI ZHENG C/O ███████████████ SALLISAW, OK
      DET. JOHN OWENS SALLISAW P.D.

GREETINGS: You are hereby commanded to appear before the District Court of Sequoyah County, at the Courthouse therein on the **2ND  day of SEPTEMBER, 2004, at the hour of 1:30 o'clock P. M.** to testify as a witness in a certain action pending in said Court wherein the State of Oklahoma is Plaintiff, and **CHARLES SANDERS,** is defendant; on the part of the State of Oklahoma and not depart without leave of the Court.

        HEREOF FAIL NOT, under penalty of law.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal or the District Court or said County, this 27TH day of AUGUST, 2004.

                BERNELL EDWARDS, COURT CLERK

                By Robin Hickman
                        Deputy

PLEASE CONTACT DISTRICT ATTORNEY'S OFFICE AT 918/775-9132 24 HOURS PRIOR TO HEARING TO FIND OUT IF ANY CHANGE IN THE HEARING HAS TAKEN PLACE WHICH MIGHT EXCUSE YOUR APPEARANCE AND PLEASE LEAVE A PHONE NUMBER AT WHICH A MESSAGE CAN BE GIVEN FROM US TO CANCEL YOUR APPEARANCE SHOULD A CHANGE IN THE HEARING TAKE PLACE AFTER YOU CALL.

SHERIFF'S RETURN ~~REDACTED~~

        Received this Writ this _____day of _____, 20___, _____o'clock ___.M., _____, 20___, served the same by delivering a copy thereof, with the endorsements thereon, duly certified to the within named on the ____day of_____, 20___; served the same by leaving a copy thereof with the endorsements thereon, duly certified at the usual place of residence of the within named witness:_____

_____By_____
_____20_____. I cannot find the within named
_____in my county.

                JOHNNY PHILPOT, SHERIFF

                By_____
                        Deputy

                Mileage_____miles

415

CF-98-346-   Charles Sanders

CLIF'S PHARMACY             (918) 776██████
            SALLISAW, OK 74955
Rx: 59██      09/04/2004        Dr.LOGGAINS, BENTON PA
CHARLES E SANDERS               DR WOODS OFFICE          9-15-04
SEQ CO JAIL                     SALLISAW, OK 74955
SALLISAW, OK 74955
(000) 000-0918
NDC: 59930-██████

CF-98-346        $17.00
17 Gm ALBUTEROL INHALER  Auth:

REDACTED

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 1 7 2004

BERNELL EDWARDS COURT CLERK
BY_____ DEPUTY

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY**
**STATE OF OKLAHOMA**

THE STATE OF OKLAHOMA,          )
      Plaintiff,          )
               )
vs.          )          No.  CF-98-346
               )
CHARLES E. SANDERS,          )
DOB: ■■■66, SS#: ■■■-9539          )
      Defendant.          )

## ORDER REVOKING SUSPENDED SENTENCE

NOW, on this 18th   day of November, 2004, the above styled case comes on for hearing on the State's Application to Revoke Suspended Sentence.  The State is present by Assistant District Attorney, Jeff Sheridan, the defendant is present and represented by the attorney of record, John Sawney.

The Court finds that on the 9th  day of December, 1999, the said defendant was found guilty of the crime of POSSESSION OF COLNTROLLED DRUG and sentenced to a term of TWENTY (20) years with the direction of the Department of Corrections, and of said sentence TWENTY (20)  years was suspended pending the defendant's good behavior. That on the 31st day of May, 2001, the State of Oklahoma filed its Application to Revoke Suspended Sentence and on the 23rd day of August, 2001 Defendant was found guilty of violating the rules and conditions of probation.  Said suspended sentence was revoked, with Defendant to successfully complete the Last Stop or similar program, at which time the balance of said sentence would be suspended.

The Court finds that on the 17th  day of June, 2004,  the State filed a Second Application to Revoke Suspended Sentence based on violations of the defendant's Rules and Conditions of Probation.  The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that FIVE (5) YEARS of the suspended sentence is revoked, with balance to be suspended upon successful completion of Key to Life or similar program, to run concurrent with CF-98-363;  CF-99-562, CF-04-19 and CF-03-124,  and the Sheriff of Sequoyah County shall deliver said defendant to the Department of Corrections and leave therewith a copy of this Order of Judgment and Sentence to serve as a warrant and authority for the revocation of said defendant as provided herein.  The second copy of the Order to be warrant and authority of said Sheriff for the transportation and imprisonment of said defendant as herein before provided.  The Sheriff to make due return to the Clerk of this Court, with his procedure endorsed thereon.

REDACTED

**JUDGE OF THE DISTRICT COURT**

417

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 1 3 2004

BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

## ORDER TO RELEASE FROM CUSTODY

TO THE SHERIFF OF SEQUOYAH COUNTY, STATE OF OKLAHOMA, it is ordered that said defendant be released, if in your custody for no other cause, immediately upon receipt of this order.
Last Name, First, Middle, suffix (please print or type) (show alias)  ▆▆▆ Colo

Sanders, Charles Edmond   ▆▆▆▆▆ 9539

| WARRANT/CASE NUMBER | REASON FOR RELEASE | DESCRIPTION OF CHARGE |
|---|---|---|
| Booking # 2004-03181 | Sent to State Prison | Hold for Tulsa County |
| Warrant #'s | | Hold for Tulsa County (App. to revoke) |
| CF-04-14 | | Hold for Tulsa Co. (FTA) |
| CF-03-365 | | Merrills Bonding Surrender |
| CF-99-005162 | | Knowingly concealing stolen property |
| CF-03-124 | | Application to Revoke |
| CF-98-003163 | | Surrendered by Hamilton/Morgan |
| CF-98-00346 | | Burglery 2nd Degree |
| | | Uttering A forged Instrument |
| | | Application to revoke |
| | | Possession of controlled dangerous substance |
| | | Application to revoke |
| | | Hold for DOC |

In and for the District Court of Sequoyah County, State of Oklahoma, witness my hand this the____11____ day of December , 20 04 .

_____
Signature

WHITE COPY - COURT
YELLOW COPY - SHERIFF'S FILE

AUTHORIZED BY

_____
JUDGE OF THE DISTRICT COURT

**REDACTED**

CF.99-062  CF.98.363

CF.98.346  CF.2004.19

IN THE DISTRICT COURT OF SEQUOYAH COUNTY, STATE OF OKLAHOMA

STATE OF OKLAHOMA

CASE NO. _____ CF.03.124

VS.

_Charles Edmond Sanders_

DEFENDANT

J & S DATE: NOV 17 - 2004

## STATEMENT OF JAIL TIME

PRISONER WAS ARRESTED ON DATES:

10.22.99 - 12.09.99 / 8.23.01 - 10.25.01
3.13.03 - 4.02.03 / 1.16.04 - 1.21.04
3.31.04 - 12.10.04

PRISONER REMAINED IN JAIL ___372___ DAYS BEFORE JUDGEMENT AND SENTENCE.

PRISONER REMAINED IN JAIL ___23___ DAYS AFTER JUDGEMENT AND SENTENCE.

TOTAL DAY'S OF JAIL TIME ___395___

_Christine Calbert_

SEQUOYAH COUNTY CRIMINAL JUSTICE AUTHORITY

12.28.2004

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 2 8 2004

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

**REDACTED**

SEQUOYAH COUNTY, OKLAHOMA

IN THE DISTRICT COURT OF )
SEQUOYAH COUNTY )
STATE OF OKLAHOMA )
)
)
)

FILED
NOV 2 8 2005
BERNELL EDWARDS, COURT CLERK
BY_____DEPUTY

Defendant CHARLES EDMOND "MONK" SANDERS

Case No. CF-05-406, CF-03-124 CF-97-562 - CF-98-363

Date  NOVEMBER 17, 2005   CF-98-346

## RULES AND CONDITIONS OF PROBATION

1. I will at the end of each month, until my final release (by the Court), make a written report. I will state whether I have been constantly at work during the month and if not, why not; I will state how much I have earned together with a general state of my environment and progress.

2. I will not use or be in possession of intoxicants of any kind or alcoholic beverages, nor use or be in possession of narcotic drugs. I will not visit places where intoxicants or drugs are unlawfully sold, dispensed or used. I will understand that I am not to go into or loiter around beer taverns or pool halls.

3. I will not leave the county in which I reside or the State of Oklahoma without written permission of the Probation and Parole Officer, nor will I change my address or employment without first consulting the Probation and Parole Officer.

4. I will not, in any way, communicate with persons on Parole, ex-convicts, or inmates of any penal institutions, nor will I associate with persons having a criminal record.

5. I will promptly and truthfully answer all inquiries directed to me by Probation and Parole authorities and I will allow a representative of the Probation and Parole Division to visit me at my home, place of employment or elsewhere, and I will carry out all instructions he may give me.

6. I understand that I am to remain under supervision by the Probation and Parole Division until I serve my maximum term or may be granted a Pardon by the Governor of the State of Oklahoma.

7. I understand that it will be a violation of my probation to own or carry firearms of any type, to perpetuate any falsehood or deception, to misrepresent any truth to any branch of Government or any representative thereof.

8. I understand that I must support myself and all my dependents without public assistance so long as I am physically able to do so; failure to do my duty to my dependants shall constitute grounds for revocation of my Parole, Probation or Conditional Release.

9. I will refrain from violation of any City, State or Federal law.

10. I will abide by my curfew from 12 midnight until 5:00 a.m. daily unless I have written permission from my probation officer.

11. I hereby waive extradition to the State of Oklahoma from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Oklahoma.

12. I will not refuse a breath-alcohol test if arrested for DUI, APC or an alcohol related offense.

13. I hereby waive my State and Federal constitutional rights of protection from unreasonable searches and seizures if my probation officer has a reasonable suspicion exists in their mind.

14. I further understand that if I do not possess a high school diploma or a G.E.D. that I will acquire my G.E.D. within eighteen months or show proof of my inability to acquire the same to the Court, in writing, within the eighteen months.

15. **SPECIAL CONDITIONS:** The defendant is to pay probation fees of $20 per month as well as the total fees of: (Court Costs, Court Appointed Attorney fees, OSBI lab fees) of $_____ within _____ months at a rate of not less than $_____ per month. Payments are to begin on the 5th day of _____, 20_____ and by the 5th of each month thereafter until paid in full. All payments are to be paid to the Sequoyah County Court Clerk's Office. *(Set out how the money is to be distributed).*

( )   Defendant is to pay restitution through the District Attorney's office as set out in Exhibit "A" attached, the sum of $_____.

## REDACTED

16. Defendant to report to DOC Probation & Parole Office within 72 hours for intake.

I hereby certify that I have carefully read the above rules and conditions and fully understand what my obligations are while under supervision of the Division of Probation and Parole. I further acknowledge receipt of a copy of these rules and conditions which I agree to study from time to time so that I will be fully informed at all times regarding my obligations while under supervision. I further understand that these rules may not be terminated, modified or suspended by any probation officer, law enforcement officer or any other person without the written approval of the sentencing Judge and notice to the District Attorney's Office.

_____
Attorney for Defendant

_____
Probationer

Defendant's Mailing Address:

_____
JUDGE OF THE DISTRICT COURT

_____

_____

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

NOV 23 2005

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY

**IN THE DISTRICT COURT OF SEQUOYAH COUNTY
STATE OF OKLAHOMA**

THE STATE OF OKLAHOMA,           )
      Plaintiff,                )
                        )
vs.                              )          No. CF-98-346
                        )
CHARLES E. SANDERS,              )
DOB: ███66, SS#: ███9539         )
      Defendant.                )

**AMENDED
ORDER REVOKING SUSPENDED SENTENCE**

NOW, on this 17th   day of November, 2005, the above styled case comes on for hearing on the State's Application to Revoke Suspended Sentence. The State is present by Assistant District Attorney, Jeff Sheridan, the defendant is present and represented by the attorney of record, John Sawney.

The Court finds that on the 9th day of December, 1999, the said defendant was found guilty of the crime of POSSESSION OF COLNTROLLED DRUG and sentenced to a term of TWENTY (20) years with the direction of the Department of Corrections, and of said sentence TWENTY (20)  years was suspended pending the defendant's good behavior. That on the 31st day of May, 2001, the State of Oklahoma filed its Application to Revoke Suspended Sentence and on the 23rd day of August, 2001 Defendant was found guilty of violating the rules and conditions of probation. Said suspended sentence was revoked, with Defendant to successfully complete the Last Stop or similar program, at which time the balance of said sentence would be suspended.

The Court finds that on the 17th   day of June, 2004,  the State filed a Second Application to Revoke Suspended Sentence based on violations of the defendant's Rules and Conditions of Probation. The Court further finds the defendant did, in fact, violate the rules and conditions as alleged in the State's Application.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that said sentence remain suspended pursuant to the rules and conditions of probation and to run concurrent with CF-98-363; CF-99-562, CF-04-19 and CF-03-124.

REDACTED

**JUDGE OF THE DISTRICT COURT**

421

# DISTRICT COURT OF MUSKOGEE, WAGONER, CHEROKEE AND SEQUOYAH COUNTIES

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FIFTEENTH JUDICIAL DISTRICT

(ORDER)

APR 0 3 2006

BERNELA EDWARDS, COURT CLERK

BY_____DEPUTY

C7- 04-19
C7- 03-124
C7- 99- 562
C7-98-340

DATE: 3-29-06

DEFENDANT: Sanders, Charles

CASE NUMBER: C7 - 98- 365

CHARGE: Burglary 2nd

SENTENCE DATE: 11-17-05

EXPIRATION DATE: 11-16-30

THE DEPARTMENT OF CORRECTIONS IS HEREBY RELIEVED FROM FURTHER ACTIVE SUPERVISION OF THIS DEFENDANT IN THIS PARTICULAR CASE.

JUDGE OF DISTICT COURT  Garrett

* Per plea agreement with the feds. banish from Sequoyah county.

**REDACTED**

422

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

MAY 16 2006

BERNELL EDWARDS, COURT CLERK
BY_____ DEPUTY

SEQUOYAH COUNTY DISTRICT COURT
BERNELL EDWARDS, COURT CLERK
SEQUOYAH COUNTY
SALLISAW, OK   74955

05-16-2006

CHARLES EDMOND (MONK) SANDERS
████████████████

SALLISAW, OK   74955

In Re:CF-01-314,  CF-98-346,  CF-98-363, CF-99-562

Dear Charles Edmond (monk) Sanders,

        Our records show that you are now delinquent on your fine
and/or court costs in the amount of $142.80. The total amount due
in your case(s) is $152.80. If payment is not received within 10
days a warrant will be issued.  Additional court costs will be
charged.  The  bond amount on the warrant will be $152.80.(Cash
bond only.)
        Please be advised that this is the ONLY OVERDUE NOTICE YOU
WILL RECEIVE FROM THIS OFFICE.
        Any questions concerning this matter should be directed to
the Sequoyah County Court Clerk, 120 East Chickasaw, Sallisaw, OK
74955, or by calling (918) 775-4411. Thank you for prompt
attention to this matter.

                                Sincerely,

                                Bernell Edwards, Court Clerk

                                By: Robin Hickman        ,Deputy

On 10-09-2002, you were ordered and agreed to begin payments on
11-09-2002.  Payments were to be made in the amount of $100.00.
The last payment received on this pay order was made on
07-03-2003.


There is a $10.00 charge for this notice, which is included in
the total amount due.


                            REDACTED